UNITED STATES DISTRICT COURT
(DISTRICT OF MASSACHUSETTS)

CIVIL ACTION NO.

**05 - 1 1 6 9 7 GAO**

Bowler MS

MARILYN KUNELIUS,
    PLAINTIFF       )
                    )
V.                  )
                    )
TOWN OF STOW separately, A    )
PARTNERSHIP OF UNKNOWN NAME  )
BETWEEN TOWN OF STOW and THE  )
TRUST FOR PUBLIC LAND, THE    )
TRUST FOR PUBLIC LAND separately  )
and CRAIG A. MACDONNELL, in his  )
individual capacity,          )
    DEFENDANTS.        )

RECEIPT #_____
AMOUNT $ 250
SUMMONS ISSUED Y
LOCAL RULE 4.1
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK. TDM
DATE 8/16/25

## COMPLAINT

### JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction over this action under 28 U.S.C.

        §1331, because the matter in controversy arises under the Constitution and

        laws of the United States.

2.    This Court has subject matter jurisdiction over this action under 28 U.S.C.

        §1332 (2) because the Plaintiff is a citizen of the State of Main and the

        Defendants are citizens of the Commonwealth of Massachusetts or a foreign

        state.

3.  Venue is proper in this District because all of the Defendants are located in this District. In addition, all of the events and conduct give rise to the violations of the law complained of herein occurred and continue to occur in this District.

4.  This Court has jurisdiction as provided for in §5 of the Fourteenth Amendment. §5 specifically provides that Congress shall have the power to enforce, by appropriate legislation, the provisions of the Fourteenth Amendment. This Court also has jurisdiction under 42 U.S.C. §§1981, 1983, 1985, 1986, and 1988.

5.  This Court has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

## FACTS

6.  The plaintiff Marilyn Kunelius ("Kunelius") is a former resident of the town of Stow, Massachusetts and currently has a principle place of residence at 635 Stow Road, Stow, Maine.

7.  The defendant, the town of Stow, Massachusetts ("Stow") is a Massachusetts Municipal Corporation having a mailing address of Town Building, 380 Great Road, Stow, Massachusetts 01775-2127.

8.  Upon information and belief, the defendant, the partnership of the town of Stow and the Trust for Public Land ("the Partnership") is a Massachusetts partnership formed by Stow and the Trust for Public Land for the alleged purpose of acquiring property owned by Kunelius and developing the property for business purposes.

9.   The defendant, the Trust for Public Land ("TPL") is a foreign corporation organized under the laws of the State of California with a principle office in Massachusetts at 33 Union Street, Boston, Massachusetts.

10.  The defendant, Craig A. MacDonnell ("MacDonnell") is an individual who is also a "director" of the Massachusetts Division of TPL and upon information and belief resides in Concord, Massachusetts.

11.  On or about October 11, 2002, Kunelius entered into a Purchase and Sale Agreement ("P&S") with Cohousing Resources, LLC ("Cohousing") (a business which develops land) for the sale of land and buildings known as and located at 142 and 144 Red Acres Road, Stow, Massachusetts ("the Property"). See Exhibit 1. The Property represents essentially all of Kunelius' assets.

12.  The purchase price for the Property was $1,116,900.00.

13.  The Property consists of uplands, wooden wetlands, a scenic pond, a vernal pool, two houses, a barn, a paddock and a pasture, and 42 acres that are designated as agricultural/horticultural and under M.G.L. c. 61 and therefore was taxed at a lower rate than land which was not so designated.

14.  Under the terms of the P&S, Cohousing notified Stow that Cohousing intended to build a 30 house subdivision using the Anti-Snob Zoning law M.G.L. c. 40B, which enables developers to avoid local zoning by building 25% of a development as "affordable housing" if the community's affordable housing stock is below 10% of the town's housing. The P&S anticipated that the zoning designation of agricultural/horticultural would be abandoned. This abandoning of the zoning designation results in a statutory right of the first

3

refusal under M.G.L. c. 61 whereby Stow if it elected to do so could preserve the agricultural/horticultural zoning designation and the preservation of the property as open space by purchasing the Property at the purchase price of the P&S. This right of first refusal strips the buyer of the P&S but ensures that Kunelius receives the full purchase price.

15. Stow was not statutorily mandated to exercise the right of refusal. The right of first refusal is an elective right. Stow immediately sought to avoid the 40B subdivision by Cohousing and exercised the right of first refusal by relying on M.G.L. c. 61 section 8. The purpose of the right of first refusal is to allow Stow to step into the position of the buyer Cohousing. In so doing, Stow must meet Cohousing's bona fide offer for the land. The right of first refusal requires Stow to purchase the land substantially on the same business terms and conditions as Cohousing. See M.G.L. c. 61.

16. Stow exercised its right of first refusal by letter dated February 12, 2003. See Exhibit 2.

17. Under the provisions M.G.L. c. 61 section 14, Stow, assigned its first refusal option to a nonprofit conservation, organization known as TPL.

18. Attached as Exhibit 3 is the February 12, 2003 Assignment and Acceptance between Stow and TPL in which TPL through its counsel accepted the assignment. In addition, Exhibit 4 is also a second exercise of the right of first refusal by TPL itself, whereby TPL Regional Counsel Dorothy Nelson Stookey not only acknowledged TPL's acceptance of the assignment but also "elects to exercise the right of first refusal under M.G.L. c. 61 section 8 that

4

was assigned to TPL by the town of Stow and assume the position of buyer under the above-referenced agreement." See Exhibit 4. This exercise of the right of first refusal by TPL was absolute, unconditional and obligated TPL to fund the purchase of the Property. By TPL exercising the right of first refusal put TPL in business and contractual position of Cohousing.

19.   TPL, on February 13, 2003 notified Kunelius of TPL's assumption of Stow's exercise of right of first refusal. See Exhibit 4.

20.   Shortly after TPL notified Kunelius of the assumption of Stow's exercise of the right of first refusal, Kunelius and her counsel met with MacDonnell. During that meeting, Kunelius informed MacDonnell that the Property was the sole asset of Kunelius, she was a single woman supporting herself and the sole care giver of her 91 year old mother and the sale of the Property under the terms of the P&S was critical to her financial wellbeing and financial stability. Kunelius informed MacDonnell that she was relying on his representations that TPL would acquire the Property under the terms of the P&S. MacDonnell acknowledged to Kunelius and her attorney that the acquisition of the Property by TPL was a certainty.

21.   Stow and TPL formed a partnership for the purpose of trade and business whereby the Partnership could develop the Property and derive profit so that Stow could benefit from the property. As part of the partnership Stow agreed to contribute $400,000 of the purchase price in the P&S.

22.   Upon information and belief, Stow and TPL undertook a course of action which was intended to and resulted in Stow and TPL deliberately interfering

with a contractual relationship between Kunelius and Cohousing whereby Stow and TPL knew that Stow and TPL never intended to purchase the property in compliance with the terms of the P&S but nevertheless exercised the right of first refusal.

23. Stow was aware following its exercise of its right of first refusal and the assignment of said right to TPL, that TPL even though TPL had also exercised the right of first refusal, had no intention of honoring the business terms and purchase price in the P&S but rather intend to develop the Property itself.

24. Stow was aware that TPL, after exercising its right of first refusal, immediately attempted, in violation of M.G.L. c. 61, and the P&S to renegotiate the terms of the P&S and the purchase price with Kunelius in order to obtain a more favorable business deal for itself.

25. Stow had knowledge of and participated in TPL's attempt to dishonor the P&S by attempting to change the terms and negotiate the P&S purchase price in order to achieve a profit.

26. A letter dated September 24, 2003, from Stow's Board of Selectmen evidences that Stow "after due diligence and pursuant to M.G.L. c. 61, section 8, the town of Stow Board of Selectmen transferred completely to the Trust for Public Land the town's right of first refusal to acquire said property." See Exhibit 5.

27. Exhibit 5 unequivocally demonstrates that Stow was aware of TPL's intent to change the P&S and in fact the nature of the development of the Property itself. TPL made repeated attempts to change the terms of the P&S. Exhibit 5

6

states "the Board of Selectmen still believes the Project as originally outlined by TPL is in the best interest of the Town and we hope that your client [Kunelius] and the TPL, with the support from the Friends of Red Acre (FORA) will work together to make the project successful for all parties." The above quote demonstrates that:

    A.    Stow knew that TPL was "altering" the P&S because TPL decided after its exercise of right of first refusal to not move forward unless it received certain concessions from Kunelius which would allow Stow and TPL to profit from the Property.

    B.    Stow was not interested in compliance with the P&S but was acting in a manner to improve its own interests.

    C.    Stow was acknowledging that its interest and TPL were the same.

    D.    Stow had approved TPL's actions because TPL reneging on the terms of the P&S.

28.    Exhibit 5 also shows that the Board of Selectmen was aware of and approved of TPL's dishonoring the P&S and TPL's submitting a new proposal to Kunelius. This, in spite of the fact that Stow and TPL were bound by the terms of the P&S under the provision of M.G.L. c. 61 once the voluntary election to exercise the right of first refusal was made.

29.    After Stow and TPL dishonored the P&S, certain members of the Board of Selectmen became concerned about Stow's involvement in the partnership. A Memorandum entitled "Kunelius Property Workout" ("Board of Selectmen Memorandum") which was written by Greg Jones, a member of the Board of

Selectmen was submitted to the Board of Selectmen for consideration at a

regularly scheduled meeting of the Board of Selectmen on November 25, 2003.

See Exhibit 6.

30.    The following quote is the opening paragraph of the Board of Selectmen

Memorandum:

> The lawyer for Marilyn Kunelius [plaintiff] has threatened a suit to
> enforce the contract that called for a $750,000 closing September 26[th].
> The town does not want to find out if it has any legal liability. Yes, we
> ceded our right of first refusal to TPL and TPL certainly has the assets to
> make good on the transaction. But they have reneged, and the contract has
> been breached. The seller has certainly been harmed by our actions and
> TPL's inaction. Should a suit against TPL be initiated, it is likely the town
> would become involved. At a minimum the town had committed to
> contribute $400,000 to the deal, and the actions of many could be
> interpreted as implying the town was a partner in the deal. (emphasis
> supplied)

31.    The Board of Selectmen Memorandum (Exhibit 6) demonstrates that (i) Stow

was aware of its involvement in the dishonoring of the P&S, (ii) TPL reneged

on its obligations, (iii) the P&S had been breached by Stow and TPL (iv) Stow

was allowing itself to appear as a partner with TPL because it had committed

to contribute $400,000 of the purchase price, (v) the Board of Selectmen

Memorandum demonstrates that the actions of Stow and TPL would lead many

to believe that Stow and TPL were acting as a partnership and (vi) Kunelius

"has certainly been harmed by our actions and TPL's inaction."

32.    Notwithstanding the clear recognition that Stow was responsible for harming

Kunelius, Stow and TPL continued to move forward in their efforts to obtain

the benefits of avoiding the M.G.L. c. 40(B) benefit while stripping Kunelius

of her rights under the P&S both as it related to Cohousing purchasing the

8

Property and as it related to Stow's exercise of the right of first refusal and assignment thereof to TPL and TPL's subsequent exercise of the right of first refusal.

33. Stow took no steps to cause its partner TPL to honor the P&S.

34. Despite the Board of Selectmen's assertion that the Board had exercised "due diligence" Stow took no steps to ensure that TPL had sufficient funds to honor the P&S. See Exhibit 5.

35. Stow, as part of its partnership obligations, did appropriate $400,000 as Stow's share of the purchase price.

36. Stow deliberately misled Kunelius by claiming that Stow had exercised due diligence prior to assigning the P&S to TPL, (See Exhibit 5) because Stow had failed to appropriate the full purchase price under the terms of the P&S.

37. Subsequent to the assignment to TPL and TPL's exercise of its right of first refusal, numerous newspaper articles described TPL's default under the terms of the P&S. Included in the newspaper articles is an article written by Brian Eastwood for the Beacon Villager indicating that indeed TPL had missed the deadline to make the payment on the purchase of the Kunelius property because TPL had failed to raise the money necessary. See Exhibit 7.

38. A newspaper article written by Maureen Costello in which TPL is quoted through its "director" MacDonnell as admitting that it did not raise the funds and further that it attempted to get Kunelius to accept less than the purchase price contained in the P&S. See Exhibit 8.

39. On September 25, 2003, TPL through its counsel attempted to renege on the assignment and its exercise of the right of first refusal by sending a letter to the chairman of the Stow Zoning Board of Appeals. See Exhibit 9. Exhibit 9 demonstrates that despite TPL's obligations under the P&S, it attempted to disregard such obligations. TPL did not honor the P&S and pay the purchase price. Rather, TPL decided to "develop" the Property by way of private sales in or to benefit financially and thus submitted its own plan to accomplish the private sale to the Stow Zoning Board of Appeals as to how the Property would be used by TPL and Stow as market participants in sale of individual lots. TPL's submission of its own plan to the Stow Zoning Board of Appeals was in blatant disregard of its obligation to pay Kunelius to pay the full purchase price.

40. Upon information and belief, TPL has filed financial reports with the Secretary of State for the Commonwealth of Massachusetts. TPL has disclosed on its website that it has total assets of Three Hundred and Forty-Nine Million ($349,000,000) with total liabilities of One Hundred and Twenty Million ($120,000,000). Further, TPL also reveals total revenues of in excess of Seventy-Eight Million, Nine Hundred and Sixty Thousand ($78,960,000) for the year 2004. See Exhibit 10.

41. On July 6, 2004, MacDonnell contacted Kunelius' counsel by letter and for the second time in violation of the P&S and M.G.L. c. 61 unfairly and deceptively attempted to renegotiate the purchase price notwithstanding the enforceability of the P&S which had been assumed by TPL. See Exhibit 11. As can be seen

on page 2 of Exhibit 11, TPL and MacDonnell proposed reducing the purchase

price by $400,000 thus giving a benefit to its business partner Stow because

Stow's investment in the partnership would be reduced rather than the

$400,000 which Stow had already committed.

42.    Kunelius refused to release TPL or Stow from their obligations under the P&S.

43.    On September 9, 2003, MacDonnell sent another letter to Kunelius' counsel

again trying to cause Kunelius to accept less than the purchase price. See

Exhibit 12. TPL aware of the illegality of its action used such illegally as

leverage in its attempt to cause Kunelius to accept less money or to face both

Stow and TPL refusing to honor the P&S which Stow and TPL were statutorily

require to do. Exhibit 12 states:

> We are aware that these project uncertainties are of concern to you and
> your client and that Mrs. Kunelius would like to know as soon as possible
> whether TPL will be able to go forward. To that end, we need to discuss
> this revised proposal with you as soon as possible and in now case later
> than the end of this week.

44.    The above quote demonstrates that TPL was using its refusal to honor the P&S

as leverage to unfairly and deceptively obtain a lower purchase price or in the

alternative to reneg on its obligations if it could not obtain a lower purchase

price.

45.    Stow, the Partnership of Stow and TPL, TPL and MacDonnell knew that

"these project uncertainties" were of concern to Kunelius because the property

was her sole source of income and her only asset.

46.    In the Spring of 2004, MacDonnell met with Kunelius, Kunelius' counsel and

Jim Boothroyd, a local real estate broker, David Norris, in connection with

11

TPL's demands for a lower purchase price. During that meeting MacDonnell threatened and intimidated Kunelius and her counsel by stating generally that (i) TPL had "serious and influential connections by way of its Board of Advisors" who would defend TPL against any legal action brought by Kunelius as a result of TPL's default, (ii) TPL's Board of Advisors included prominent law firms that would tie up Kunelius and any attempt by her to enforce the P&S, (iii) TPL would notify the Court of its "influential connections beyond reproach" and that the Court would never find in favor of Kunelius notwithstanding that TPL was demanding a reduction in purchase price of $400,000, (iv) TPL was aware that Kunelius was of very limited means and that she and her attorney would not be able to spend sufficient funds to win any matter against TPL and (v) TPL had unlimited resources available to it to overwhelm anyone who would make the mistake of opposing TPL.

47.    The Board of Selectmen Memorandum (Exhibit 6) was written approximately two and a half months after TPL's letter of September 9, 2003. The Board of Selectmen understood the seriousness of the actions of TPL even though the Board of Selectmen knew they would benefit from such unfair and deceptive practices of TPL, either by a reduced purchase price, assuming TPL had the remainder of the purchase price or in the alternative that the dishonoring of the P&S would result in Kunelius losing the sale to Cohousing and thus avoiding the M.G.L. c, 40B Anti Snob zoning project.

48.     The July 6, 2004 letter from TPL to Kunelius' counsel (Exhibit 11) indicates
        TPL's unfair and deceptive business practices by stating that TPL will
        dishonor the P&S leaving Kunelius with the "liquidated damages" anticipated
        under the terms of the P&S with Cohousing. Exhibit 11 specifically threatens
        to use the liquidated damage provision under the P&S if Kunelius refuses to
        lower the purchase price or in the alternative accept another proposal by
        MacDonnell and TPL.

49.     The use of the liquidated damage provision is prohibited as a means of
        avoidance of the P&S where Stow and TPL both had exercised the right of first
        refusal based upon the specific purchase price of $1,116,900.

50.     Upon receiving Exhibit 11, Kunelius' counsel referred TPL and Stow the
        Supreme Judicial Court's decision of Town of Franklin v. Wyllie and provided
        a copy of the decision to TPL. In Town of Franklin, the S.J.C. makes clear that
        the reliance by a town on uncertainties contained in a P&S relative to permits
        is misplaced as a vehicle to avoid compliance with M.G.L. c. 61.
        Notwithstanding the receipt of same, TPL, MacDonnell and Stow completely
        and utterly reneged their obligations on the P&S.

51.     Upon information and belief, Cohousing, having witnessed the unfair and
        deceptive trade practices and collusive and conspiratorial behavior of Stow and
        TPL and MacDonnell refused to enter into a new P&S with Kunelius for fear
        of the certain repetition of such behavior of Stow and TPL.

52.     Stow, TPL and MacDonnell's actions eliminated Cohousing's 40(B) Anti-
        Snob Zoning Development.

53. Stow informed Kunelius' counsel that any subsequent attempt by Kunelius to sell the property to a developer who intended to use M.G.L. c. 40B would be met with a similar exercise of the right of first refusal.

54. The unfair, deceptive, collusive and conspiratorial acts of Stow, the partnership of Stow and TPL and MacDonnell resulted in Kunelius being unable to collect the $1,116,900 from Cohousing, Stow or TPL.

55. The obligations of Stow and TPL under M.G.L. c. 61 could not be avoided by relying on the liquidated damage clause provision in the P&S since such liquidated damage clause provision was applicable only to Cohousing since it sought certain permits and approvals in connection with its 40(B) Anti-Snob Zoning Development. The exercise of the right of first refusal and assignment by Stow and the subsequent exercise of first refusal by TPL precluded any consideration by Stow of how or why it or TPL could rely on a submission of a wholly separate development plan submitted to Stow by its partner TPL as a means of avoiding the obligation contained in the P&S. Nor could Stow or TPL avoid the obligations under the P&S by relying on its own zoning bylaws as justification for the denial of TPL's substitute development plan.

56. The partnership of Stow and TPL's reliance on the liquidated damage provision of the P&S was a pretext for the unconditional violation of Kunelius' rights and the unfair, deceptive and conspiratorial dishonoring of the P&S.

## Count I

## Contract and Specific Performance (Stow and TPL)

57. Plaintiff restates and realleged Paragraphs 1 through 45 and incorporates them.

14

58.   The P&S is a valid and enforceable contract for the sale of land between
      Kunelius and Stow and TPL

59.   Kunelius had complied with all terms of the P&S including being prepared,
      ready, willing and able to perform under the terms of the P&S.

60.   Stow and TPL reneged on and breached their obligation under the terms of the
      P&S.

61.   WHEREFORE, Kunelius asks that this Court order Stow and TPL to
      specifically perform under the terms of the P&S and to immediately pay the
      purchase price plus statutory interest which as accrued since the scheduled
      closing date of September 26, 2003.

## Count II

### M.G.L. c. 93A, Unfair and Deceptive Trade Practice by TPL

62.   The plaintiff repeats and reasserts the allegations contained in the above
      paragraphs and incorporate them by reference as if fully and completely set
      forth herein.

63.   Stow, the Partnership of Stow and TPL, and TPL separately, acted unfairly and
      deceptively to avoid a direct contractual obligation where such behavior is
      distinctly separate from and outside of any activity that could be authorized
      under the terms of TPL's corporate charter as a nonprofit, to the extent that
      TPL is a nonprofit entity under the laws of the Commonwealth of
      Massachusetts, a fact the plaintiff does not concede.

64.   The claims against Stow, the Partnership of Stow and TPL, and TPL
      separately, in connection with c. 93A arise out of contractual obligations which

Stow, the Partnership of Stow and TPL, and TPL separately, sought to avoid

fulfilling through pretext, threats and intimidation in order to achieve a better

purchase price and in order to ensure that Kunelius be deprived of the business

bargained for purchase price, the responsibility of which TPL freely assumed

under the provisions of Massachusetts General Laws.

65.   To the extent that TPL had funds available to meet its obligations under the

assignment of the P&S and under TPL's exercise of the right of first refusal

and nevertheless sought to achieve a better purchase price then the claims by

TPL of its financial inability to meet its obligations were fraudulent, unfair and

deceptive and not covered by any charitable immunity.

66.   To the extent that TPL did not have the funds available to meet its obligations

under the assignment then TPL through the actions of its regional counsel

Dorothy Nelson Stookey and MacDonnel was not acting in accordance with its

nonprofit charter when it obligated itself to pay $1,116,900 to Kunelius under

the terms of the assignment. As such TPL's actions are not protected by any

charitable immunity which might be afforded under Massachusetts law, if TPL

is a nonprofit entity under the law, a fact not conceded by the plaintiff.

67.   WHEREFORE, the plaintiff respectfully requests that this Court award

$1,116,900 and treble that amount ($3,507,000) plus statutory interest

accruing from September 26, 2003 due to the outrageous nature of TPL's

behavior and further that this Court award attorney's fees under the provision

of M.G.L. c. 93A.

16

## Count III

## M.G.L. c. 93A, Unfair and Deceptive Trade Practices (The Partnership of Stow and TPL)

68. The plaintiff repeats and reasserts the allegations contained in the above paragraphs and incorporate them by reference as if fully and completely set forth herein.

69. Stow and TPL entered into a partnership whereby Stow would contribute $400,000 to the purchase price under the terms of the P&S and TPL would supply the additional $716,900 needed to meet the obligations of Stow and TPL under the P&S.

70. In furtherance of the partnership, Stow appropriated the $400,000 contribution to the partnership.

71. In furtherance of the partnership, Stow repeatedly participated in and approved TPL's reneging on the terms of payment under the P&S whereby TPL refused to pay the purchase price in the P&S and attempted to renegotiate a new purchase price.

72. Stow Board of Selectmen acknowledged the appearance of a partnership relationship with TPL.  See Exhibit 6.

73. Stow, despite its acknowledgement of the appearance in a partnership continued its support of TPL's breach of the P&S in order to obtain the benefit of a reduction in the purchase price.

74. Plaintiff has been damaged thereby.

75. WHEREFORE, the plaintiff respectfully requests that this Court find that Stow and TPL entered into a partnership and that the partnership acted in an unfair

and deceptive manner under the terms and provisions of M.G.L. c. 93A.
Further that this Court treble the plaintiff's damages and statutorily interest
from September 26, 2003 and award attorney's fees as provided for under
M.G.L. c. 93A.

### Count IV

### Intentional Infliction of Emotional Distress
### (TPL, the Partnership of Stow and TPL and MacDonnell)

76.  The plaintiff repeats and reasserts the allegations contained in the above
     paragraphs and incorporate them by reference as if fully and completely set
     forth herein.

77.  TPL and MacDonnell were aware that Kunelius was selling all or essentially
     all of her assets in the form of the Property. Further, the partnership of Stow
     and TPL and MacDonnell were aware that Kunelius was looking to the sale of
     the Property to Cohousing as a way to provide herself financial stability.

78.  Exhibit 12, a September 9, 2003 letter from MacDonnell makes clear that
     MacDonnell and TPL were aware of the "uncertainties and concerns" being
     suffered by Kunelius and her need to close the matter and her need to sell the
     property.

79.  Notwithstanding MacDonnell and TPL's awareness of the importance of their
     compliance with the terms of the P&S to Kunelius, MacDonnell and TPL and
     the partnership of Stow and TPL undertook a course of action which was
     intended to and had the effect of intentionally inflicting emotional distress on
     Kunelius, whereby Kunelius faced the loss of the purchase price which would
     have provided her with financial security. In addition, Kunelius faced the

18

unfair and deceptive leveraging of the P&S by MacDonnell and TPL and the Partnership of Stow and TPL whereby Kunelius faced the loss of the sale price unless she agreed to the unfair and deceptive demands of MacDonnell and TPL and changed the terms, conditions and intent of the P&S.

80.    Kunelius, as a result of the actions of MacDonnell and TPL and the Partnership of Stow and TPL with the support and approval of Stow, suffered and continues to suffer emotional distress, anxiety, sleeplessness and depression.

81.    WHEREFORE, the plaintiff requests that the Court find that MacDonnell the Partnership and TPL intentionally inflicted emotional distress on the plaintiff and award damages commensurate with such infliction.

### Count V

### Intentional Interference with an Contracual Relationship (Partnership of Stow and TPL, TPL, separately and MacDonnell, individually)

82.    The plaintiff repeats and reasserts the allegations contained in the above paragraphs and incorporate them by reference as if fully and completely set forth herein.

83.    The partnership of Stow and TPL, TPL separately and MacDonnell, individually were all aware that the P&S would provide the plaintiff with $1,116,900 and that Cohousing would be building a 40B subdivision which was opposed by Stow.

84.    Stow at the time that it exercised its right of first refusal was aware that it had not appropriated sufficient funds to honor its obligations under the P&S.

85.    Stow in assigning the P&S to TPL under the provisions of M.G.L. c. 61 knew that TPL either did not have sufficient funds to honor the terms of the P&S, or

in the alternative that TPL while capable of honoring the terms of the P&S would attempt, with the support of Stow, to alter the terms and conditions of the P&S in order to obtain a lower price.

86.  The partnership of Stow and TPL, TPL separately and MacDonnell individually were aware that exercising the right of first refusal under M.G.L. c. 61 would effectively eliminate Cohousing as a potential buyer.

87.  The partnership of Stow and TPL, TPL separately and MacDonnell individually were aware that additional low income housing was scheduled to go on the market from other developers in the town of Stow where such additional low income housing would be sufficient to eliminate Stow's "exposure" to M.G.L. c. 40B Anti-Snob Housing efforts by Cohousing or any other Buyer of Kunelius' property seeking the automatic approvals authorized under 40B.

88.  The partnership of Stow and TPL, TPL separately and MacDonnell individually undertook a course of action to delay, defer and disregard the obligations under the P&S whereby with the passage of time, Cohousing would be unable to reassume the P&S because it would have been no longer capable of obtaining the 40B approvals.

89.  The partnership of Stow and TPL, TPL separately and MacDonnell individually were aware that the purchase price in the P&S was established based upon the availability of the 40B development.

90.  The partnership of Stow and TPL, TPL separately and MacDonnell individually undertook a course of action which resulted in: the dishonoring

the P&S, the permanent elimination of Cohousing as a potential buyer and the loss of the purchase price to the plaintiff. In addition, Stow continues to enjoy the fact that the Property remains undeveloped and under the agricultural/horticultural designation.

91.   The partnership of Stow and TPL, TPL separately and MacDonnell individually have obtained the benefit of their goal, i.e. no development on the Property and yet avoided meeting the statutory obligation to purchase the Property.

92.   The plaintiff has been damaged thereby.

93.   WHEREFORE, the plaintiff respectfully requests that this Court determine that the actions of the partnership of Stow and TPL, TPL separately and MacDonnell individually resulted in the intentional interference in an advantageous or contractual relationship and award damages in accordance therewith.

## Count VI

### 42 U.S.C. §1983, §1988 Civil Rights Violations Resulting from Violations of the United States Constitution Fifth and Fourteenth Amendments (Stow, the Partnership of Stow and TPL, TPL, separately, and MacDonnell, individually)

94.   The plaintiff repeats and reasserts the allegations contained in the above paragraphs and incorporate them by reference as if fully and completely set forth herein.

95.   The actions of Stow, the Partnership of Stow and TPL, TPL separately, and MacDonnell individually were taken under the color of state law as evidenced by Stow involvement, for the purposes of abridging the privileges and

immunities of the plaintiff and depriving the plaintiff of property without due process violating the Fourteenth Amendment of the United State Constitution.

96.    The actions of Stow, the Partnership of Stow and TPL, TPL, separately, and MacDonnell individually resulted in a constructive taking of the value of the property without just compensation violating the provisions of the Fifth Amendment of the United States Constitution.

97.    The actions of Stow, the Partnership of Stow and TPL, TPL separately, and MacDonnell individually resulted in the inability of the plaintiff to sell the property at the agreed upon purchase price and the loss of that ability in the future where such loss of ability resulted from the deliberate reneging on the purchase price by Stow, the Partnership of Stow and TPL, TPL, separately, and MacDonnell.

98.    The plaintiff has been damaged thereby.

99.    WHEREFORE, the plaintiff respectfully requests that this Court find that Stow, the Partnership of Stow and TPL, TPL separately, and MacDonnell individually violated the provisions of 42 U.S.C. §1983 and further that this Court award attorney's fees in connection with same under the provisions of 42 U.S.C. §1988.

## Count VII

### Fraud and Misrepresentation (the Partnership of Stow and TPL, TPL, separately and MacDonnell, individually)

100.    The plaintiff repeats and reasserts the allegations contained in the above paragraphs and incorporate them by reference as if fully and completely set forth herein.

22

101.  The Partnership of Stow and TPL, TPL separately and MacDonnell individually knew at the time that Stow exercised the right of first refusal and at the time that TPL exercised its right of first refusal, that the Partnership of Stow and TPL, TPL separately and MacDonnell individually were fraudulently and materially misrepresenting Stow's and TPL's ability and/or intention to meet the obligations arising under the P&S and assignment.

102.  The Partnership of Stow and TPL, TPL separately and MacDonnell individually fraudulently caused the plaintiff to rely on the terms of the P&S as assumed and assigned by Stow and TPL even though the Board of Selectmen for the Town of Stow, TPL and MacDonnell fully realized and appreciated that there were no funds available to honor the P&S.

103.  As a result of the fraud of the Partnership of Stow and TPL, TPL separately and MacDonnell individually, the plaintiff lost: the purchase price, Cohousing as a buyer, the ability to sell the Property for another 40B development, financial security and suffered and continues to suffer emotional distress.

104.  WHEREFORE, the plaintiff respectfully requests that this Court find that as a result of the fraud and misrepresentations of the Partnership of Stow and TPL, TPL, separately and MacDonnell, individually, that this Court award damages commensurate with such fraud and misrepresentations.

### PRAYERS FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court:

With respect to all of the Defendants:

1.     After a trial on Counts I through VII order judgment in the Plaintiff's
       favor in such amount as will fully compensate her for her losses to the
       greatest extent allowed by law;

2.     Order the payment of damages, interest, costs, and attorney's fees
       pursuant to 42 U.S.C. §§ 1983, 1988, M.G.L. c. 93A, and under any
       statute or common law theory applicable to these facts;

3.     Order the specific performance of the P&S whereby Stow and TPL
       immediately pay the full purchase price plus interest that has accrued from
       the date of the exercise of the right of first refusal at the statutory rate of
       12%; and

4.     Order such further relief as this Court deems fair and just.

## JURY DEMAND

PLAINTIFF RESPECTFULLY REQUESTS A TRIAL BY JURY ON ALL

ISSUES SO TRIABLE.

Respectfully submitted,

Marilyn Kunelius,

By Her Attorney

Michael C. McLaughlin, Esquire BBO# 337350
Law Offices of Michael C. McLaughlin
One Beacon Street 33rd Floor
Boston, MA  02108
(617) 227-2275

Dated: August 16, 2005

1

<table>
<tr><td></td><td><strong>STANDARD FORM<br>PURCHASE AND SALE AGREEMENT</strong></td><td><strong>From the Office of:</strong><br>Atty. Peter A. Kachajian, Jr.<br>292 Main Street<br>Northborough, MA 01532<br>(508) 393-6278</td></tr>
</table>

| | | |
|---|---|---|
| 1. | **PARTIES**<br>*(fill in)* | This _____ day of __October,___ 2002<br>**Marilyn Kunelius of 142 and 144 Red Acres Road, Stow, MA**<br>hereinafter called the **SELLER**, agrees to SELL and<br><br>**Cohousing Resources, LLC, with an address of 9813 NE Murden Cove Road, Brainbridge Islande, WA 98110**<br>hereinafter called the **BUYER** or PURCHASER, agrees to BUY, upon the terms hereinafter set forth, the following described premises: **142 and 144 Red Acres Road, Stow, MA** |
| 2. | **DESCRIPTION**<br>*(fill in and include title reference)* | The land with the buildings and improvements thereon known and located at **142 and 144 Red Acres Road, Stow, MA**. Being more particularly described in the Middlesex Registry of Deeds Book 15412; Page 316; Book 26230; Page 255 (see exhibits). |
| 3. | **BUILDINGS, STRUCTURES, IMPROVEMENTS, FIXTURES**<br><br>*(fill in or delete)* | Included in the sale as a part of said premises are 50.67 acres of land with a home, caretakers residence, barn and the buildings, structures, and improvements now thereon, and the fixtures belonging to the SELLER and used in connection therewith including, if any, all wall-to-wall carpeting, drapery rods, automatic garage door openers, venetian blinds, window shades, screens, screen doors, storm windows and doors, awnings, shutters, furnaces, heaters, heating plumbing and bathroom fixtures, garbage disposers, electric and other lighting fixtures, mantels, outside television antennas, fences, gates, trees, shrubs, plants, ONLY IF BUILT IN, refrigerators, dishwashers, washing machines and dryers; and all buildings and improvements thereon are sold in "as is" condition. |
| 4. | **TITLE DEED**<br>*(fill in)*<br>*\*Include here by specific reference any restrictions, easements, rights and obligations in party walls not included in (b), leases, municipal and other liens, other encumbrances, and make provision to protect SELLER against BUYER'S breach of SELLER'S covenants in leases, where necessary.* | Said premises are to be conveyed by a good and sufficient quitclaim deed running to the BUYER, or to the nominee designated by the BUYER by written notice to the SELLER at least seven (7) days before the deed is to be delivered as herein provided, and said deed shall convey a good and clear record and marketable title thereto, free from encumbrances, except<br>  *(a)* Provisions of existing building and zoning laws;<br>  *(b)* Such taxes for the then current taxable year are not due and payable on the date of the delivery of such deed;<br>  *(c)* Any liens for municipal betterments assessed after the date of this agreement;<br>  *(d)* Easements, restrictions and reservations of record, if any, so long as the same do not prohibit or materially interfere with the current use of said premises<br>  *(e)* |
| 5. | **PLANS** | If said deed refers to a plan necessary to be recorded therewith, the SELLER shall deliver such plan with the deed in form adequate for recording or registration. |
| 6. | **REGISTERED TITLE** | In addition to the forgoing, if the title to said premises is registered, said deed shall be in form sufficient to entitle the BUYER to a Certificate of Title of said premises, and the SELLER shall deliver with said deed all instruments, if any, necessary to enable the BUYER to obtain such Certificate of Title. |

COPYRIGHT © 1979, 1984, 1986, 1987, 1988, 1991<br>GREATER BOSTON REAL ESTATE BOARD<br>Rev. 1999    Form No RA151

All rights reserved. This form may not be copied or reproduced in whole or in part in any manner whatsoever without the prior express written consent of the Greater Boston Real Estate Board.    CWV 5.0

7. PURCHASE PRICE
*(fill in): space is allowed to write out the amounts if desired*

The agreed purchase price for said premises is $1,116,900.00
ONE MILLION ONE HUNDRED SIXTEEN THOUSAND NINE HUNDRED  and
00/100s.......dollars, of which

| | | |
|---|---|---|
| $ | 0.00 | have been paid as a deposit this day and |
| $ | 0.00 | have been paid at the time of the offer to purchase |
| $ | 716,900.00 | **(less deposits paid)** are to be paid at the time of delivery of the deed in cash, or by  certified cashier's, treasurer's or bank check, or conveyancing attorney's check.** |
| $ | 400,000.00 | **promissory note secured by a mortgage\*** |
| $ | $1,116,900.00 | TOTAL |

** See Paragraph #31 for further terms and provisions
\* See paragraph #30 for further terms and provisions

8. TIME FOR PERFORMANCE; DELIVERY OF DEED *(fill in)*

Such deed is to be delivered at  **1:00  o'clock  P.M.**  on or before the **26th** day of September, **2003** , at the Office of the Conveyancing Attorney unless otherwise agreed upon in writing provided notice of same is given to Buyer's and Seller's counsel. **However, provided the Chap. 40B approval process is proceeding forward, BUYER may have. up to 12 months extension** It is agreed that time is of the essence of this agreement.

9. POSSESSION and CONDITIONS of PREMISES. *(attach a list of exceptions, if any)*

Full possession of said premises free of all tenants and occupants, except as herein provided, is to be delivered at the time of the delivery of the deed, said premises to be then (a) in the same condition as they now are, reasonable use and wear thereof excepted and (b) not in violation of said building and zoning laws, and (c) in compliance with provisions of any instrument referred to in clause 4 hereof. The BUYER shall be entitled to an inspection of said premises prior to the delivery of the deed in order to determine whether the condition thereof complies with the terms of this clause.

10. EXTENSION TO PERFECT TITLE OR MAKE PREMISES CONFORM *(Change period of time if desired.)*

If the SELLER shall be unable to give title or to make conveyance, or to deliver possession of the premises, all as herein stipulated, or if at the time of delivery of the deed the premises do not conform with the provisions hereof, the SELLER shall use reasonable efforts to remove any defects in title, or to deliver possession as provided herein, or to make the said premises conform to the provisions hereof, as the case may be, in which event the time for performance hereof shall be extended for a period of **thirty (30) days.\***
**\* Contemplated herein is the Town of Stow exercising its right of first refusal pursuant to M.G.L c. 61.**

11. FAILURE TO PERFECT TITLE OR MAKE PREMISES CONFORM, etc.

If at the expiration of the extended time the SELLER shall have failed so to remove any defects in title, deliver possession, or make the premises conform, as the case may be, all as herein agreed, or if at any time during the period of this agreement or any extension thereof, the holder of a mortgage on said premises shall refuse to permit the insurance proceeds, if any, to be used for such purposes, then any payments made under this agreement shall be forthwith refunded and all other obligations of the parties hereto shall cease and this agreement shall be void without recourse to the parties hereto.

12. BUYER'S ELECTION TO ACCEPT TITLE

The BUYER shall have the election, at either the original or any extended time for performance, to accept such title as the SELLER can deliver to the said premises in their then condition and to pay therefor the purchase price without deduction, in which case the SELLER shall convey such title, except that in the event of such conveyance in accord with the provisions of this clause, if the said premises shall have been damaged by fire or casualty insured against, then the SELLER shall, unless the SELLER has previously restored the premises to their former condition, either

(a) pay over or assign to the BUYER, on delivery of the deed, all amounts recovered or recoverable on account of such insurance, less any amounts reasonably expended by the SELLER for any partial restoration, or

(b) if a holder of a mortgage on said premises shall not permit the insurance proceeds or a part thereof to be used to restore the said premises to their former condition or to be so paid over or assigned, give to the BUYER a credit against the purchase price, on delivery of the deed, equal to said amounts so recovered or recoverable and retained by the holder of the said mortgage less any amounts reasonably expended by the SELLER for any partial restoration.

13. **ACCEPTANCE OF DEED**

The acceptance of a deed by the BUYER or his nominee, as the case may be, shall be deemed to be a full performance and discharge of every agreement and obligation herein contained or expressed, except such as are, by the terms hereof, to be performed after the delivery of said deed.

14. **USE OF MONEY TO CLEAR TITLE**

To enable the SELLER to make conveyance as herein provided, the SELLER may, at the time of delivery of the deed, use the purchase money or any portion thereof to clear the title of any or all encumbrances or interests, provided that all instruments so procured are recorded in a manner consistent with customary conveyancing practices.

15. **INSURANCE**
   *Insert amount (list additional types of insurance and amounts as agreed)*

Until the delivery of the deed, the SELLER shall maintain insurance on said premises as follows:

| Type of Insurance | Amount of Coverage |
|---|---|
| (a) Fire | Risk to remain with SELLER |
| (b) Extended Coverage | As is presently insured |
| (c) | |

16. **ADJUSTMENTS**
   *(list operating expenses, if any, or attach schedule)*

Water and sewer use charges and taxes for the then current year shall be apportioned and fuel value shall be adjusted as of the day of performance of this agreement and the net amount thereof shall be added to or deducted from, as the case may be, the purchase price payable by the BUYER at the time of delivery of the deed.

17. **ADJUSTMENT OF UNASSESSED AND ABATED TAXES**

If the amount of said taxes is not known at the time of the delivery of the deed, they shall be apportioned on the basis of the taxes assessed for the preceding year, with a reapportionment as soon as the new tax rate and valuation can be ascertained; and, if the taxes which are to be apportioned shall thereafter be reduced by abatement, the amount of the abatement, less the reasonable cost of obtaining the same, shall apportioned between the parties, provided that neither party shall be obligated to institute or prosecute proceedings for an abatement unless herein otherwise agreed.

18. **BROKER'S FEE**
   *(fill in fee with dollar amount or percentage; also name of Broker(s))*

A broker's fee for professional service per listing agreement is due from the SELLER to **Century 21 Classic Properties,** the broker herein, but only if, as when the SELLER receives the full purchase price pursuant to this Agreement and the BUYER accepts and records the SELLER'S deed and not otherwise.

19. **BROKER(S) WARRANTY**
   *(fill in name)*

The Broker(s) named herein **Century 21 Classic Properties** warrant(s) that the Broker(s) is(are) duly licensed as such by the Commonwealth of Massachusetts:

20. **DEPOSIT**
   *(fill in, or delete reference to broker(s) if SELLER holds deposit)*

All deposits made hereunder shall be held by **Law Offices of Peter A. Kachajian, Jr.** subject to the terms of this agreement and shall be duly accounted for at the time for performance of this agreement, provided however that in the event of any disagreement the escrow agent may retain said deposits pending instructions mutually given by the SELLER and BUYER or a court of competent jurisdiction, **except as herein provided in Paragraph #31.**

21. **BUYER'S DEFAULT; DAMAGES**

If the BUYER shall fail to fulfill the BUYER'S agreements herein, all deposits made hereunder by the BUYER shall be retained by the SELLER as liquidated damages and this shall constitute SELLER'S sole remedy in equity and law.

22. **RELEASE BY HUSBAND OR WIFE**

The SELLER'S spouse hereby agrees to join in said deed and to release and convey all statutory and other rights and interests in said premises.

23. **BROKER AS PARTY**

The Broker(s) named herein join(s) in this agreement and becomes a party hereto, insofar as any provisions of this agreement expressly apply to the Broker(s), and to any amendments or modifications of such provisions to which the Broker(s) agree(s) in writing.

24. **LIABILITY OF TRUSTEE, SHAREHOLDER, BENEFICIARY, etc.**

If the SELLER or BUYER executes this agreement in a representative or fiduciary capacity, only the principal or the estate represented shall be bound, and neither the SELLER or BUYER so executing, nor any shareholder or beneficiary of any trust, shall be personally liable for any obligation, express or implied, hereunder.

25. **WARRANTIES AND REPRESENTATIONS** *(fill in); if none, state "none", if any listed, indicate by whom each warranty or representation was made*

1. BUYER acknowledges that the BUYER has not been influenced to enter into this transaction nor has he relied upon any warranties or representations not set forth or incorporated in this agreement or previously made in writing, except for the following additional warranties and representations, if any, made by either the SELLER or the Broker(s):

26. **MORTGAGE CONTINGENCY CLAUSE**

In order to help finance the acquisition of said premises, the parties agree that the BUYER shall apply for a conventional bank or other institutional construction loan of **80% of the project construction price**, at prevailing rates, terms and conditions.

27. **CONSTRUCTION OF AGREEMENT**

This instrument, executed in quadruplicate counterparts, is to be construed as a Massachusetts contract, is to take effect as a sealed instrument, sets forth the entire contract between the parties, is binding upon and enures to the benefit of the parties hereto and their respective heirs, devisees, executors, administrators, successors and assigns, and may be cancelled, modified or amended only by a written instrument executed by both the SELLER and the BUYER. If two or more persons are named herein as BUYER, their obligations hereunder shall be joint and several. The captions and marginal notes are used only as a matter of convenience and are not to be considered a part of this agreement or to be used in determining the intent of the parties to it.

28. **LEAD PAINT LAW**

The parties acknowledge that, under Massachusetts law, whenever a child or children under six years of age resides in any residential premises in which any paint, plaster or other accessible material contains dangerous levels of lead, the owner of said premises must remove or cover said paint, plaster or other material so as to make it inaccessible to children under six years of age.

29. **SMOKE DETECTORS**

The SELLER shall, at the time of the delivery of the deed, deliver a certificate from the fire department of the city or town in which said premises are located stating that said premises have been equipped with approved smoke detectors in conformity with applicable law.
The initialed riders, if any, attached hereto, are incorporated herein by reference.

30. **PURCHASE PRICE FINANCING**

**The $400,000.00 promissory note secured by a mortgage against the land, subordinated only to a comprehensive construction loan in the amount of 80% of project construction costs. Promissory note shall bear interest at 7% APR and shall become due and payable 24 months after closing, or within 30 days after substantial completion of the project construction. BUYER shall make interest payments to SELLER of $2,333.00 per month until principal is paid in full. All payments to be made in cash or certified funds.**

**Security for the $400,000.00 promissory note, aforescribed, shall be in the form of a mortgage on the 8.57 acre parcel. Upon BUYER obtaining construction financing, SELLER shall subordinate said mortgage to the construction lender. All purchase and sale agreements (pre-sale or otherwise) executed by potential purchasers of the BUYER'S contemplated co-housing project shall be assigned to the SELLER as further security concomitant with each purchase and sale agreement subjecting the purchaser, unequivocally, to personal liability as to the $400,000.00 promissory note.**

**Nothwithstanding the foregoing, BUYER shall only encumber the 8.57 acre parcel expected to be developed (consisting of .93 acre house parcel and 7.64 acre horse farm parcel).**

31. **EARNEST MONEY**

**Seller acknowledges receipt from Buyer of an initial earnest money deposit in the sum of $10,000 \* in the form of a Promissory Note to be held by Seller pending the completion of Feasibility. Buyer shall convert the Promissory Note to non-refundable cash at completion of the feasibility period when the Buyer has removed this contingency. Buyer will make additional non-refundable earnest money payments of $1500 per month beginning 60 days after removal of the Feasibility Contingency and until closing. It is agreed that earnest money payments shall be immediately available for use by the Seller and no payments shall be held in escrow. All earnest money payments will be applied to the purchase price at the closing.**

\* See exhibit A attached hereto and made a part hereof

32    40B APPLICATION &    The Buyer and Seller agree to cooperate in the timely submission of a 40B application for the
      TRANSFER OF LAND    development of a 30 unit owner occupied, tightly clustered, environmentally sensitive
                          residential housing project, with 25% of the units qualifying as affordable under the guidelines
                          for such an application. Said application shall be made within 135 days of the date of this
                          Agreement. It is agreed that the 40B application process will be as cooperative and friendly
                          as possible to the Town of Stow, with all mutually beneficial environmental agendas addressed
                          as openly and clearly as possible.

33.   RISK OF LOSS OR     Seller, at its sole cost and responsibility, shall keep the Premises safe and secure from
      ENVIRONMENTAL       environmental damage until the closing. Seller shall bear the risk of all damage to the
      DAMAGE             Premises from all causes until the closing. Should there be any intentional or unintentional
                          environmental damage that is not restored by Seller to its former condition by the closing,
                          Buyer, at its option, may (i) terminate this Agreement and any deposit shall be refunded to
                          Buyer, plus all costs incurred by buyer for feasibility, engineering and design, or (ii)
                          purchase the Premises and be entitled to a reduction in the purchase price which is
                          sufficient to cover the cost of the repairing any such damage.

34.   INSPECTIONS AND     The obligations of Buyer under this Agreement are expressly subject to Buyer conducting
      TESTING             engineering inspections and testing of the property during feasibility. If any such inspec-
                          tions reveal conditions unacceptable to Buyer during the feasibility period, Buyer may
                          terminate this Agreement and any deposit will be refunded to Buyer. After completion of
                          the feasibility period, Buyer shall have the right to reasonable tours, inspections and
                          testing for the purposes of planning, design and marketing of the project, with 24 hour
                          notice to Seller. Buyer agrees to conduct such a feasibility evaluation with all due dili-
                          gence. If Buyer is unable to determine that the site is feasible for their purposes within 60
                          days of the date of this agreement, Buyer shall inform Seller in writing by such date and
                          this Agreement will terminate and the earnest money deposit will be refunded to Buyer.

35.   ADDITIONAL PRO-     Upon the Town of Stow's approval of the development of the said 8.57 acre  parcel, by the
      VISIONS             BUYER, and issuance of all requisite Board Approvals, building permits and SELLER
                          receiving purchase monies as set forth herein,, BUYER and SELLER agree that SELLER
                          shall, upon acceptance of the Town of Stow, transfer all right, title and interest in the said
                          42.1 acre parcel currently under M.G.L. c. 61, as a charitable contribution.

                          In the event that the Town of Stow exercises its right of first refusal pursuant to M.G.L. c.
                          61, all monies deposited hereunder shall be forthwith returned to BUYER without further
                          recourse by either party in equity or law.


NOTICE: This is a legal document that creates binding obligations. If not understood, consult an attorney.

SELLER    Marilyn Kunelius

BUYER    Chris ScottHanson
         Representative for Cohousing Resources, LLC

**EXTENSION**

Date _____

The time for the performance of the foregoing agreement is extended until _____ o'clock _____ M. on the _____ day of _____ 19___, time still being of the essence of this agreement as extended. In all other respects, this agreement is hereby ratified and confirmed.

This extension, executed in multiple counterparts, is intended to take effect as a sealed instrument.

_____
**SELLER**

_____
**BUYER**

_____
**BROKER(S)**

# Promissory Note

In connection with the Agreement to Purchase
50.67 Acre Horse Property owned by Marilyn Kunelius

October 11, 2002

## $10,000.00

For value received and as a deposit made in conjunction with the offer to
purchase real estate of today's date, I promise to pay Marilyn Kunelius, the
sum of Ten Thousand and no/100ths Dollars ($10,000) on or before
December 10, 2002.

This note shall become void if the purchaser chooses to terminate the
purchase and sale agreement during the feasibility period terminating 60
days after the signing of the Purchase and Sale agreement.  If feasibility is
approved by the purchaser, this note shall be converted to cash at the end
of the feasibility period, as stipulated in the purchase and sale agreement
attached hereto.

If this note becomes in default, borrower agrees to pay all reasonable
collection costs and attorney's fees.

Agreed this 11th day of October, 2002

Chris ScottHanson, Owner
for Cohousing Resources LLC
9813 NE Murden Cove Rd.
Bainbridge Island, WA 98110

(206)842-9160

and MARI E. KUNELIUS, formerly Marilyn E. bnowicz, of
Stow, Middlesex County, Massachusetts, Husban and Wife as tenants
by the entirety.

mk

in consideration of ONE ($1.00) DOLLAR and other valuable consideration

grant to MARILYN E. KUNELIUS

of 142 Red Acre Road, Stow,
Massachusetts

with quitclaim covenants

the land in

A certain parcel of land with the buildings thereon on the
Northwesterly side of Red Acre Road in Stow, Middlesex County,
Massachusetts and being shown as Lot 1 on a plan entitled, "Plan
of Land Stow, Mass. owned by Charles H. Lord et al dated January 30,
1976, survey by Clyde R. Wheeler, Inc., Bolton, Mass.", recorded
at Book 12959 End, and bounded and described as follows:

| | |
|---|---|
| SOUTHEASTERLY | by land of Bubnowicz and land of Frederickson, as shown on said plan, three hundred and twenty-five (325.00) feet; |
| SOUTHEASTERLY | by land of Magurn, as shown on said plan, one hundred sixty-two (162.00) feet; |
| SOUTHWESTERLY | by land of Brown, as shown on said plan, two hundred twelve and 56/100 (212.56) feet; |
| NORTHWESTERLY | by land of Red Acre Farm Inc., as shown on said plan, two hundred eighty and 92/100 (280.92) feet; |
| NORTHWESTERLY | by land of Red Acre Farm Inc., as shown on said plan, four hundred and sixteen (416.00) feet; |
| SOUTHWESTERLY | by land of Red Acre Farm Inc., as shown on said plan, six hundred and fifteen (615.00) feet; |
| SOUTHWESTERLY | by land of Red Acre Farm Inc., as shown on said plan, four hundred and eighty-five (485.00) feet; |
| NORTHWESTERLY | by land of Red Acre Farm Inc., as shown on said plan, seven hundred fifty-one and 15/100 (751.15) feet; |
| NORTHWESTERLY | by land of Freeman, McClellan and Quinn, as shown on said plan, three hundred thirty-seven and 12/100 (337.12) feet; |
| NORTHWESTERLY | by land of Quinn, Herrick and Duncanson, as shown on said plan, one hundred ninety-two and 77/100 (192.77) feet; |
| NORTHWESTERLY | by land of Duncanson and May, as shown on said plan, one hundred ninety-three and 01/100 (193.01) feet; |
| NORTHWESTERLY | by land of May, as shown on said plan, fifty-one and 12/100 (51.12) feet; |
| NORTHWESTERLY | by land of May and Henry, as shown on said plan, one hundred forty-seven and 86/100 (147.86) feet; |
| NORTHWESTERLY | by land of Henry, as shown on said plan, fifty-one and 25/100 (51.25) feet; |
| NORTHEASTERLY | by land of Babrikki, as shown on said plan, eight hundred forty-nine and 29/100 (849.29) feet; |
| NORTHWESTERLY | by land of Babrikki, as shown on said plan, one hundred three and 09/100 (103.09) feet; |
| NORTHEASTERLY | by land of Babrikki, as shown on said plan, one hundred twenty-six and 19/100 (126.19) feet; |
| NORTHEASTERLY | by land of Babrikki, as shown on said plan, two hundred ninety-three and 47/100 (293.47) feet; |

*Property Address: Lot 1 and Lot 2, Red Acre Road Stow, Massachusetts*

| | |
|---|---|
| NORTHWESTERLY | by land of Babrikki, as shown on said plan, three hundred two and 41/100 (302.41) feet; |
| NORTHWESTERLY | by land of Babrikki, as shown on said plan, two hundred thirty-eight and 78/100 (238.78) feet; |
| NORTHEASTERLY | by Tuttle Lane, as shown on said plan, eighty-six and 75/100 (86.75) feet; |
| NORTHEASTERLY | by Tuttle Lane, as shown on said plan, three hundred and ten (310.00) feet; |
| NORTHEASTERLY | by Tuttle Lane, as shown on said plan, seventy-six and 47/100 (76.47) feet; |
| NORTHEASTERLY | by Tuttle Lane, as shown on said plan, one hundred twenty-one and 65/100 (121.65) feet; |
| SOUTHEASTERLY | by land of Weinman, as shown on said plan, two hundred thirty-six and 85/100 (236.85) feet; |
| SOUTHEASTERLY | by land of Ostrowski, as shown on said plan, two hundred twenty-five and 25/100 (225.25) feet; |
| SOUTHEASTERLY | by land of John J. & Kathy B. Palmaccio, Ianatta, McLean, Taylor, Wendell, and Barry A. & Sharyn L. Palmaccio, as shown on said plan, eight hundred ninety-six and 10/100 (896.10) feet; |
| NORTHEASTERLY | by land of Barry A. & Sharyn L. Palmaccio, as shown on said plan, two hundred and seventy (270.00) feet; |
| SOUTHEASTERLY | by Red Acre Road, as shown on said plan, thirty-eight and 90/100 (38.90) feet; and |
| SOUTHWESTERLY | by land of Bubnowicz, as shown on said plan, two hundred and seventy (270.00) feet to the point of beginning. |

Containing 49.75 acres more or less as shown on said plan, and hereby conveying Lot 1 as shown on said plan, however otherwise bounded, measured or described.

Also a certain parcel of land, with the buildings thereon, on the Easterly side of Tuttle Lane and being shown as Lot 2 on said plan entitled, "Plan of Land, Stow, Mass. owned by Charles H. Lord et al, Scale 1" = 100', January 30, 1976, Survey by Clyde R. Wheeler Inc., Bolton, Mass. recorded at Book 12959 End, and bounded and described as follows:

| | |
|---|---|
| NORTHEASTERLY | by land of Morey, as shown on said plan, one hundred and twenty-seven (127.00) feet; |
| NORTHEASTERLY | by land of Weinman, as shown on said plan, one hundred nineteen and 69/100 (119.69) feet; |
| SOUTHEASTERLY | by land of Andrews, as shown on said plan, one hundred thirty and 89/100 (130.89) feet; and |
| SOUTHWESTERLY | by Tuttle Lane, as shown on said plan, one hundred seventy-five and 06/100 (175.06) feet to the point of beginning. |

Containing 18,134 square feet more or less and hereby conveying Lot 2 as shown on said plan however otherwise bounded, measured or described.

Being the same premises conveyed to us by deed of Charles H. Lord, Donald L. Priest, Executor of the Estate of Evelyn L. Priest, Eleanor N. Derby  and Mary Elizabeth davis dated April 8, 1976 and recorded with the Middlesex South District Registry of Deeds in Book 12959, Page 626.

Executed as a sealed instrument this     day of November ~~October~~   19 83

_____     John A. Bubnowicz
_____     JOHN A. BUBNOWICZ

MARILYN E. KUNELIUS formerly
Marilyn E. Bubnowicz
_____

_____     _____

_____     _____

### The Commonwealth of Massachusetts

*Middlesex*    ss.          ~~October~~ November 8, 19 83

Then personally appeared the above named    John A. Bubnowicz

and acknowledged the foregoing instrument to be   his    free act and deed,

Before me, _____

Notary Public — ~~Justice of the Peace~~

My commission expires    Nov 16, 1984

COMMONWEALTH OF MASSACHUSETTS

Middlesex   . ss.             November 8 ~~October~~ , 1983

Then personally appeared the above named Marilyn E. Kunelius and acknowledged the foregoing instrument to be her free act and deed,

Before me, _____
                                       Notary Public

My commission expires: 9/28/90

2



# Town of Stow
# **BOARD OF SELECTMEN**

**380 Great Road**
**Stow, Massachusetts 01775-1122**
(978) 897-4515
FAX (978) 897-4534

February 12, 2003

BY CERTIFIED MAIL
Marilyn Kunelius
142 and 144 Red Acres Road
Stow, MA 01775

> Re: Land of Marilyn Kunelius located at 142 and 144 Red Acres Road, Stow,
> Middlesex County, MA.

Dear Ms. Kunelius:

In response to your letter dated October 16, 2002 regarding your intention to sell
the above-referenced property, which is classified as forest land under Massachusetts
General Laws Chapter 61, this will serve as formal notice that, by vote taken on February
11, 2003, the Board of Selectmen of the Town of Stow has voted to assign the Town's
rights under Chapter 61, Section 8 to purchase the above-referenced land under the terms
set forth in the Purchase and Sale Agreement between you and Cohousing Resources,
LLC dated October, 2002. The Town has assigned its rights under Chapter 61, Section 8
to The Trust for Public Land, a national non-profit corporation, having its New England
Regional Office at 33 Union Street, Boston, MA. 02108.

Copy of Assignment is attached hereto.

Marilyn Kunelius
Page 2
February 12, 2003

Pursuant to Massachusetts General Laws Chapter 61, this letter will be recorded
with the Registry of Deeds within the statutory 120 day option period.

Very truly yours,

THE TOWN OF STOW
By its Board of Selectman

_____

_____

(by first class mail)
cc. Dorothy Nelson Stookey, Esq., The Trust for Public Land
    Peter A. Kachajian, Jr., Esq., Attorney for Marilyn Kunelius

Attachment

**3**



# Town of Stow
# **BOARD OF SELECTMEN**

**380 Great Road**
**Stow, Massachusetts 01775-1122**
(978) 897-4515
FAX (978) 897-4534

### ASSIGNMENT AND ACCEPTANCE

THIS ASSIGNMENT is made as of February 11th, 2003 by the Town of Stow, a Massachusetts municipal corporation having a mailing address of Town Building, 380 Great Rd., Stow, MA. 01775-2127 ("Town") and The Trust for Public Land, a California nonprofit conservation organization, having a mailing address of 33 Union Street, Boston, MA. 02108 ("Trust") under the following circumstances:

A. Pursuant to Massachusetts General Laws, Chapter 61, Section 8, the Town has Rights of First Refusal to acquire certain property valued, assessed and taxed as forest land during a period of one hundred twenty (120) days subsequent to its receipt of a Notice of Intent;

B. Pursuant to said statute, the Town has a right to assign its Rights of First Refusal to a nonprofit conservation organization and the Town voted by majority vote on February 11, 2003 to assign to The Trust for Public Land the Town's rights under M.G.L. Chapter 61, Section 8 to purchase land owned by Marilyn Kunelius of 142 and 144 Red Acres Road, Stow, MA ("Seller") described in two Deeds recorded with the Middlesex County Registry of Deeds Books 15412, Page 316 and Book 26230, Book 255 (the "Property") pursuant to the terms of a Purchase and Sale Agreement between Seller and Cohousing Resources, LLC dated October, 2002; and

C. The Trust desires to assume the Town's Rights of First Refusal pursuant to Chapter 61, Section 8.

NOW THEREFORE, FOR VALUE RECEIVED, Town hereby assigns and transfers all of its Rights of First Refusal to exercise an option to purchase the Property as set forth above.

This instrument shall be governed by and enforced in accordance with, the laws of the Commonwealth of Massachusetts without regard to the principles of conflicts of laws thereof.

1

IN WITNESS WHEREOF, the undersigned has executed this agreement as of the date first set forth above.

TOWN OF STOW
By its Board of Selectman

_____

_____

2

THIS ACCEPTANCE OF ASSIGNMENT is made by The Trust for Public Land of the assignment of the Town of Stow's right of first refusal pertaining to 142 and 144 Red Acres Road, Stow, MA.

The Trust for Public Land

By: _____

Dorothy Nelson Stooley
Regional Counsel,
duly authorized

· Dated: February 12, 2003

3

**4**



**T   H   E**
**TRUST**
**F   O   R**
**PUBLIC**
**L A N D**

February 13, 2003

*Conserving Land*
*for People*
BY CERTIFIED MAIL
Marilyn Kunelius
142 and 144 Red Acres Road
Stow, MA 01775

Re:    Exercise of Right of First Refusal, Land in Stow, Middlesex County, MA

Dear Ms. Kunelius:

On February 12, 2003, the Board of Selectmen of the Town of Stow assigned its rights under M.G.L. c. 61, Section 8 to purchase the land located at 142 and 144 Red Acres Road, Stow, MA described in two Deeds recorded with the Middlesex County Registry of Deeds Books 15412, Page 316 and Book 26230, Book 255 pursuant to the terms of a certain Purchase and Sale Agreement between you and Cohousing Resources, LLC dated October, 2002 (the "Agreement") and The Trust for Public Land accepted that assignment.

The undersigned, Dorothy Nelson Stookey, Regional Counsel and Assistant Secretary of the Trust for Public Land ("TPL"), duly authorized, elects to exercise the Right of First Refusal under M.G.L. c. 61, Section 8 that was assigned to TPL by the Town of Stow and assume the position of buyer under the above–referenced Agreement.  A check in the amount of $ 11,500, being the initial $10,000 deposit and the first monthly $1500 deposit due under Paragraph 31 of the Agreement, made payable to you is being delivered to your attorney, Peter Kachajian, Esq.

We look forward to working with you to complete the preservation of this property.  Thank you for your anticipated assistance and cooperation.

Very truly yours,

The Trust for Public Land

By: _____
Dorothy Nelson Stookey
Regional Counsel

cc. Peter Kachajian, Esquire

The Trust for Public Land
New England Regional Office
33 Union Street, Fourth Floor
Boston, MA 02108

(617) 367-6200
Fax: (617) 367-1616

Connecticut Field Office
383 Orange Street
New Haven, CT 06511

(203) 777-7367
Fax: (203) 777-7488

Maine Field Office
377 Fore Street 3rd Floor
Portland, ME 04101

(207) 772-7424
Fax: (207) 772-7420

Vermont Field Office
3 Shipman Place
Montpelier, VT 05602

(802) 223-1373
Fax: (802) 223-0451

Connecticut Lakes
Project Office
54 Portsmouth Street
Concord, NH 03301

(603) 224-0103
Fax: (603) 228-0423



THE
TRUST
FOR
PUBLIC
LAND

The Trust for Public Land
New England Regional Office
33 Union Street, Fourth Floor
Boston, Massachusetts 02108



Peter A. Kachajian, Jr., Esq.
292 Main Street
Northboro MA 01532



**5**



**Town of Stow**
**BOARD OF SELECTMEN**
**380 Great Road**
**Stow, Massachusetts 01775**
(978) 897-4515
FAX (978) 897-4534

September 24, 2003

Mr. Peter A. Kachajian, Jr., Esq.
292 Main Street
Northborough, MA 01532

Re: Kunelius property 142 & 144 Red Acre Road

Dear Attorney Kachajian:

In response to your letter of September 12th, the Town of Stow is not a "partner" with The Trust for Public Land (TPL) for the project on Red Acre Road.

After due diligence and pursuant to Massachusetts General laws, Chapter 61, Section 8, the Stow Board of Selectmen transferred completely to the Trust for Public Land the Town's Right of First Refusal to acquire said property.

The Board of Selectmen still believes the project as originally outlined by TPL is in the best interest of the Town and we hope that your client and the TPL, with support from the Friends For Red Acre (FORA) will work together to make this project successful for all parties.

Sincerely,

Ross Perry, sb

Ross Perry

Stow Board of Selectmen

6

## Kunelius Property Workout

The lawyer for Marilyn Kunelius has threatened a suit to enforce the contract that called for a $750,000 closing September 26th. The town does not want to find out if it has any legal liability. Yes, we ceded our right of first refusal to TPL and TPL certainly has the assets to make good on the transaction. But they have reneged, and the contract has been breached. The seller has certainly been harmed by our actions and TPL's inaction. Should a suit against TPL be initiated, it is likely the town would become involved. At a minimum the town had committed to contribute $400,000 to the deal, and the actions of many could be interpreted as implying the town was a partner in the deal.

A way to avoid ever finding out about our liability is to help to reinstate the original Mosaic Commons deal. The agent for the seller is very eager to reopen negotiations with Mosaic Commons. But he is reluctant to do so without some indication from the town that the development would be supported. The last vote the Selectmen took on this issue was the Chapter 61 vote, which was clearly against Mosaic Commons. Why should Mosaic Commons spend any time or money on this property if the Selectmen are against their efforts? A resolution in support of Mosaic Commons on the Kunelius property would offer them encouragement.

As the 40B law stands now, the ZBA cannot deny a Comprehensive Permit, as the town would need to approve 1.5% (32 units) to get the ability to say NO for a year. The Villages at Stow only yields 24 units, and then only if building permits get issued within a year of 10/20/2003. Since the plan is to construct the project over 3 years, it is unlikely the ZBA will ever be able to deny another permit under the current law.

But 40B is likely to change within the next 6 months, reducing the threshold to 1% or .5% if the town has a Planned Production Strategy. Stow has submitted a Planned Production Strategy, but we have not heard if it has been approved. Even if the PPS is not approved, TVAS will give the ZBA the temporary ability to say NO. But come 10/20/2004, only the number of building permits actually granted for affordable units will count, and that is unlikely to be either number.

8 affordable units from Mosaic Commons could dramatically change the equation. Added to TVAS's 24, it could give the ZBA the ability to say NO to the airport 40B under the current law. Under the new law (depending upon the timing of actual construction) the ability to say NO could be extended for 3 years. This could be VERY popular along Boxborough Road.

Mosaic Commons is a small-scale development of the kind we endorsed in our Comprehensive Permit Policy Statement. In spite of the vehemence of the neighborhood opposition, the group proposes an environment-friendly development. Yes, the site is constricted, but 30 units on 8 acres is not particularly dense. It would be no more dense than TVAS, depending on how much of the TVAS site you consider as eligible for building.

The town will get a valuable water source from the deal, as well as 42 acres of swamp connecting 2 other conservation properties. The water is needed for Lower Village, and we could encourage Mosaic Commons by offering to co-develop the water resource, thus eliminating their need to devote part of their 8 acres to a wellhead protection area.

Therefore, I move the following:

The Selectmen would welcome Mosaic Commons to apply for a friendly 40B on the Kunelius Property. The Selectmen do not have the authority to grant a Comprehensive Permit or even to influence its consideration, but as leaders in the town the Selectmen see benefits from the development proposed by Mosaic Commons. Should the town gain control of the 42 acres proposed to be donated to the town, the Selectmen will work with Mosaic Commons to arrange for permits that will enable a well on the town-controlled property to supply water to the development in exchange for an easement across Mosaic Commons property to deliver water to Lower Village.

7

*ve made Maynard Fest an ε nual tradition.'*

DEANNA LYONS, MAYNARD RESIDENT



STAFF PHOTOS BY HOLLY SCHMIDT

her horn as she and her brother, Tony, 4, waited for the Happy Wagon to begin at a soggy

# comes the sun

EASTWOOD
WRITER

day makes.

pt some vendors and
Saturday's Maynard Fest,
ught the crowds back for
ished back one day due to

it 9:30 a.m. Saturday, half
ual Maynard Fest began,
roughout the day.
link we did pretty well,"
it of the Assabet Valley
hich organized the event.
bout 2,000 people attend-
th 4,000 under sunny
the 80 scheduled ven-
out 40 stayed until the
ressy said. Two years ago,
to pack up around noon.
active as the festival end-
fern Massage Therapy in
t massages and passing
ts.



Marisa Bonish, 5, was disappointed along with her par-
ents, Jeff and Rachel, of Stow, to discover she missed the
last ride of the day at the Happy Wagon.

Shortly after 3 p.m., she prepared to give a five-
minute massage to a woman who had just driven
from Nebraska.

"I've been having a blast," she said. "I just love
talking to people and giving stickers out to little

■ SEE **FESTIVAL**, PAGE 12

P.2

# Trust is late on payment

## Fund-raising lag hinders purchase

BY BRIAN EASTWOOD
STAFF WRITER

STOW — Citing problems with fund-raising
efforts, the Trust for Public Land has missed a
Sept. 26 deadline to make a payment on the
purchase the Kunelius Farm. The group hopes
to keep the project on track, however.

The deadline was established in February
when the Board of Selectmen voted 3-1 to
assign the trust the right of first refusal for the
property, which was put up for sale by farm
owner Marilyn Kunelius.

The farm's purchase agreement was for $1.2
million. Under the agreement with the town,
and after a Town Meeting vote in May,
$300,000 of that would come from the town's
Community Preservation Fund. Another
$100,000 from the fund would purchase per-
manent affordability restrictions on two exist-
ing residences. The rest of the money was to
come from the trust.

Craig MacDonnell, the Massachusetts state
director for the trust, said the effort to raise the
remaining funds had been hindered for many
reasons. MacDonnell referred to the declining
economy, a tough market for philanthropy
and the denial of a grant from the state Depart-
ment of Housing and Community Develop-
ment, which he said the trust lost "for reasons
we have yet to understand."

"It's a really challenging time," he said.

Now that the deadline has passed, MacDon-
nell said the trust will discuss with the town —
represented by Selectman Ross Perry —
Kunelius and the neighborhood group Friends
of Red Acre, a plan for an alternative project
design. The goal is preserving the 50-acre farm
from future housing development.

"The Trust for Public Land has been trying
hard to keep that dialogue going," MacDon-
nell said.

Last fall, a group of developers proposed a
30-unit attached apartment development
called Mosaic Commons on a small portion of
the farm. Developers would have deeded the
rest of the parcel, roughly 42 acres, to the town,
and the development would have boosted the
■ SEE **TRUST**, PAGE 14



www.beaconvillage

# to reduce hours

years.
nnon,
is the
nnon,
of the
ervice
int of
iness-
l. The
or the
vever.
, the
pping
ckage
l Ser-
d the

United Parcel Service.

Cannon said the decision to reduce hours at some post offices came after a study of post offices and when people use them. The reduced hours reflect the times when foot traffic was either light or non-existent.

"Fewer people are coming into the post office during those times," Cannon said.

Stow Postmaster Frank Jenkins said this week that he recognizes there are still some people who will be affected.

"I'm sure it will inconve-

nience some," Jenkins said. "I got a couple of minor calls, nothing heavy. It's something the Postal Service has to do to lessen the deficit without an increase."

People come into the post office early tend to be "people who want to grab their stuff first thing in the morning," Maynard Postmaster Michael Welch said.

The Maynard post office will keep its current hours of 8 a.m. to 5 p.m., Monday through Friday and 9 a.m. to noon on Saturday.

# Trust for Public Land late on payment

■ TRUST, FROM PAGE 1

town's affordable housing stock under Chapter 40B.

However, the Board of Selectmen, the Planning Board and the Friends of Red Acre did not support Mosaic Commons on the grounds that it was too dense for Stow.

"On land that's zone conservation, that's just not appropriate," Serena Furman of the Friends said.

Under the Trust for Public Land's proposal, the

farm would be preserve One house, which is on i own one-acre lot, would l auctioned off, and the ot er would be sold to the E of the Storm Equine Resc Program. Both residenc would be deed restricted.

Furman said the Frienc were happy that the tru hoped to proceed with i plan despite missing th deadline.

"We're still hoping fo the best for everybody," sh said.

---

**Connect**    www.beaconvillager.com

E-mail the editor of *The Beacon-Villager* at    beacon-villager@cnc.cor

## BERLIN ORCHARDS

Open Year Round    A Taste For All Seasons

### PICK YOUR OWN APPLES
7 Days A Week · 10:00AM to 6:00PM
On Weekends and Holidays take a Hay Wagon Ride to our Scenic Orchards

**COUNTRY SUNDAY, OCTOBER 12TH**
(Raindate, Monday, Oct. 13th)
NOON to 4PM · M-F Country DJ
Interactive Country Music · Free Line Dancing Lessons

Hot Apple Crisp · Fresh Pressed Cider · Pies · Caramel Apples
Cider Donuts · Homemade Baked Goods · Mums · Pumpkin Patch
Ice Cream · Country & Christmas Gift Shop
www.berlinorchards.com
200 Central St., Berlin, MA · Rte. 62-Exit 26 off Rte. 495
978-838-0463
Regular Store Hours: M-Sat 9-7, Sun 9-6

### PICK YOUR OWN APPLES & Pears · Daily 10-5

VISIT OUR FARM STORE OPEN 7 DAYS, 9-6
· APPLES    · CARAMEL APPLES    · PIES
· PEARS    · CIDER DONUTS    · TOMATOES
· CIDER    · SQUASH

1,000S PUMPKINS    Come See The Little Pigs & Other Animals

**VOTED #1** Apple Orchard in New England. Come See Why!

**HONEYPOT HILL ORCHARDS** Stow, MA
978-562-5666
www.honeypothill.com



# CARLSON
## GMAC
### Real Estate

"Entrusted With the Best Listings"

Glenn Berger    Mona Jameson
Charles Blair    Sarah Kussin



**8**

BOSTON SUN AY GLOBE

OCTOBER 12, 2

# Abandoned house haunts officials

▶ **SOUTHBOROUGH**
*Continued from Page 1*

Technically, Cipriano said, all of the owner's descendants have legal rights to the house.

And for the past three months, Cipriano has been developing a family tree that traces back to Margaret A. Coyle, who purchased the property for $600 in 1877. He's also had to determine which of Coyle's relatives are still living and find each of their addresses.

"We've basically tried to piece together all known heirs of law," he said, characterizing the case as a "detective story."

"And now we have to prove to the court that we've made a significant effort to find all of them."

Cipriano said he has still not

finished putting the list of descendants together, but that several of them live as close as Milford.

According to town records, Coyle (whose last name has an alternate spelling of "Coyi") died in 1890, at the age of 58, after suffering from gastritis, an inflammation of the stomach. And although her husband, Peter, and their five children continued to live in the house, it remained under Margaret Coyle's name.

Charles Scott, who owns Charles Group Real Estate, looked into the property several years ago because he wanted to purchase the land and tear down the house to build a new one.

He says the last person to occupy the house was Margaret A.

Welch, who, according to town records, was Coyle's granddaughter. Welch, who never married, died in 1988 at the age of 89.

If the court rules in the town's favor, Cipriano would send formal notification to all of the known heirs saying that the town plans to foreclose on the house, which is assessed by the town at $135,400.

If the descendants choose to reclaim the property, they would first be hit with a hefty bill of $35,700 for property taxes that haven't been paid since 1991.

The town does not keep records of who paid property taxes, according to a secretary in the town's tax collection department, so it is impossible to determine who paid taxes on the house from

1988, when Welch died, u 1991, the last year the prope taxes were paid.

If the heirs decide to for their rights to the property, priano said, the town would t over the 10,900-square-foot ho and the quarter-acre it sits on.

Selectmen would then dec whether to sell the property, dev op it for a town use, or demolis and use the land as open space.

Cipriano said he plans to f the brief in Worcester Land Co by the end of the month and he a ticipates the case would be hea "well within a year."

*Matt Viser can be reached viser@globe.com.*

---

*'We have been faced with a challenging set of circumstances. We had to request that the project be renegotiated.'*

CRAIG MacDONNELL, *Massachusetts director for the Trust for Public Land*

---

# Red Acre property deal falls through

## Owner cites Stow for nonpayment, breach of contract

**By Maureen Costello**
GLOBE CORRESPONDENT

The town, a national land conservation firm, and an ad hoc neighborhood group have been put on notice that their plan to purchase and preserve a 50-acre parcel off Red Acre Road in Stow is in breach of contract.

Last week, Peter A. Kachajian, lawyer for the property owner Marilyn Kunelius, sent the notices to the Board of Selectmen, the Trust for Public Land, and the Friends of Red Acre Road.

The three entities have been working since last fall to raise $1.1 million to purchase the wooded land as open space. It is zoned as forestry, which allows the town the right to first refusal. Kunelius put the property up for sale in April 2002 for $1.2 million and

signed a purchase and sale agreement for $1.1 million with Mosaic Common LLC, a cooperative housing group, in October 2002. Concerned that the project was too dense for the land, neighbors persuaded the town to match the sale price. The town could not come up with the full amount, so signed its right of first refusal over to the trust, which was expected to kick in the $400,000 balance.

The land contains an aquifer that the town had hoped to profit from by selling water to neighboring communities. If the deal had been closed, a parcel of land was to be sold to a horse rescue farm.

However, no money arrived from anyone for the August and September payments, said Kachajian.

"They did not hold up their end of the bargain, so the contract cannot be enforced," he said.

Because the town signed over its right of first refusal to the Trust for Public Land in the spring, Stow has no role in the negotiations,

said Town Administrator William Wrigley, and the town is immune to legal action.

"I do not agree," said Kachajian. "The town is just as liable" as the trust.

Craig MacDonnell, the Massachusetts director for the Trust for Public Land, said a slow economy thwarted fund-raising efforts and a sizable state grant fell through.

"We have been faced with a challenging set of circumstances," said MacDonnell. "We had to request that the project be renegotiated."

But Kachajian said that, so far, his client hasn't heard a viable proposal and has raised the asking price back to $1.2 million. "We have not heard of any alternative plan from anyone that sounds appealing," he said.

Kachajian said he wants to ensure that Stow gets about 45 acres of conservation land and the aquifer, that Kunelius gets her money, and that the deal stays out of court — something that would

have been accomplished unde the terms with Mosaic Commons

The group wanted to cluster 3 private dwellings on two acres of the property, and a few commun ty buildings, such as a commo building and recreation facility, o about six. It would have donate the remaining acreage, includin the aquifer, to the town.

But promises of land and wate were not enough for neighbors many of whom formed Friends o Red Acre Road.

Chris ScottHanson, who repre sents Mosaic Commons, a cohous ing group, said the property's rea tor and Stow officials hav contacted him about reviving th deal, which he said he would onl do if a harmonious relationshi with neighbors were guaranteed.

"We said, on the face of it, we'r not interested," said ScottHanso "We have angry, upset, activis neighbors who do not want us i their backyards. We are not a de veloper. We must live there an face the neighbors."

**9**



**THE TRUST FOR PUBLIC LAND**

*Conserving Land for People*

September 25, 2003

## Via Federal Express

Mr. Donald Hyde
Chairman, Stow Zoning Board of Appeals
Town Hall
380 Great Road
Stow MA 01775

     Re: Pending Application for Variances for Property at 144 Red Acre Road

Dear Mr. Chairman and Members of the Board:

     Due to a number of circumstances, we cannot proceed with the project for the above-referenced property as we had planned it. Accordingly, we wish to withdraw our pending application for variances. Alternatively, if procedural requirements prevent withdrawal, we request that you deny our application without prejudice at your next meeting, so that if we are able to plan a viable alternative project, we will not be foreclosed from reappearing before you if necessary.

     We sincerely thank you for the time and effort you have spent on our application and for the consideration you have shown us in granting our requests for extensions. We are deeply disappointed that we are unable to proceed with the project. While we are continuing discussions to try to identify an alternative project, in light of the circumstances as they exist today, we cannot say that any further extensions of time on this application, should you decide to grant them, would be productive.

     Thank you again for the consideration you have shown us in this process.

Very truly yours,

*Denise A. Pelletier*

Denise A. Pelletier
Regional Counsel

cc:   Jacob C. Diemert, Esq.
       Peter A. Kachajian, Jr., Esq.

The Trust for Public Land
New England Regional Office
33 Union Street, Fourth Floor
Boston, MA 02108

617) 367-6200
ax: (617) 367-1616

Connecticut Field Office
383 Orange Street
New Haven, CT 06511

(203) 777-7367
Fax: (203) 777-7488

Maine Field Office
377 Fore Street 3rd Floor
Portland, ME 04101

(207) 772-7424
Fax: (207) 772-7420

Vermont Field Office
3 Shipman Place
Montpelier, VT 05602

(802) 223-1373
Fax: (802) 223-0451

Connecticut Lakes
Project Office
54 Portsmouth Street
Concord, NH 03301

(603) 224-0103
Fax: (603) 228-0423

.

**10**

## THE TRUST FOR PUBLIC LAND AND SUBSIDIARIES
### (Not-for-profit corporations)
### CONDENSED CONSOLIDATED STATEMENT OF FINANCIAL POSITION

*Year ended March 31, 2004, with comparative totals for the year ended March 31, 2003 (dollars in thousands)*

| | 2004 | 2003 |
|---|---|---|
| **ASSETS** | | |
| Cash and investments | $ 93,606 | $ 75,962 |
| Receivables and deposits | 27,281 | 33,046 |
| Fair market value of land holdings | 156,513 | 166,892 |
| Assets held in charitable trusts | 72,862 | 60,599 |
| Other assets | 1,267 | 1,712 |
| **TOTAL ASSETS** | $349,529 | $337,596 |
| **LIABILITIES AND NET ASSETS** | | |
| Liabilities: | | |
| Notes payable* | $ 68,608 | $ 73,376 |
| Liabilities to beneficiaries of charitable trusts | 58,359 | 47,650 |
| Other liabilities | 14,418 | 26,625 |
| **TOTAL LIABILITIES** | $120,765 | $148,051 |
| Net assets: | | |
| Unrestricted amounts | $ 50,676 | $ 36,073 |
| Temporarily restricted amounts | 163,328 | 138,272 |
| Permanently restricted amounts | 14,761 | 14,300 |
| **TOTAL NET ASSETS** | $228,764 | $189,945 |
| **TOTAL LIABILITIES AND NET ASSETS** | $349,529 | $337,996 |

*Including $23,222 (FY04) and $46,038 (FY03) due within one year.

**SOURCES OF FUNDS**



- 52.9% Contributions of Land Value
- 8.9% Contributions/Grants
- 1.3% Investment Income
- 7.4% Other Income
- 37.9% Contributions at Land Value

**USES OF FUNDS**



- 2.6% Development
- 8.9% Management and Support
- 87.7% Program Services

PHOTO: APPEARING IN CANON ABOVE BY PHIL SCHERMEISTER.

## THE TRUST FOR PUBLIC LAND AND SUBSIDIARIES
### (Not-for-profit corporations)
### CONDENSED CONSOLIDATED STATEMENT OF ACTIVITIES AND CHANGES IN NET ASSETS

*Year ended March 31, 2004, with comparative totals for the year ended March 31, 2003 (dollars in thousands)*

| | 2004 | 2003 |
|---|---|---|
| **REVENUES AND ADDITIONS TO NET ASSETS** | | |
| Contribution of land and easements | $ 102,270 | $241,137 |
| Fair market value acquired | (33,703) | (247,072) |
| Less consideration paid | | |
| **CONTRIBUTIONS OF LAND AND EASEMENT VALUES RECEIVED** | 64,567 | 13,045 |
| Contributions and grants - other: | | |
| Restricted | 56,612 | 46,665 |
| Unrestricted | 20,079 | 14,174 |
| Future interests in charitable trusts | 441 | 768 |
| Change in value of interests in charitable trusts | 2,926 | (6,607) |
| TOTAL CONTRIBUTIONS AND GRANTS - OTHER | 78,960 | 54,151 |
| Interest and other income | 11,744 | 15,300 |
| **TOTAL REVENUES AND ADDITIONS** | $105,271 | $103,402 |
| **EXPENSES AND REDUCTIONS TO NET ASSETS** | | |
| Program services: | | |
| Contributions of land and easements to public agencies and other nonprofit organizations | | |
| Fair market value conveyed | $ 133,515 | $ 292,535 |
| Less consideration received | (131,246) | (244,039) |
| Contributions of land and easement values made | 38,669 | 48,496 |
| Open space conservation programs | 55,703 | 53,020 |
| **TOTAL PROGRAM SERVICES** | 94,912 | 101,514 |
| Support services: | | |
| Development | 2,660 | 3,302 |
| Management and support | 10,804 | 11,078 |
| **TOTAL SUPPORT SERVICES** | 13,344 | 14,480 |
| **TOTAL EXPENSES AND REDUCTIONS** | $ 108,652 | $ 118,904 |
| **Net Increase (Decrease) in Net Assets** | $ 38,819 | $ (15,502) |

**11**



T  H  E
TRUST
F  O  R
PUBLIC
L A N D

*Conserving Land*
*for People*

July 6, 2004

### BY FACSIMILE AND REGULAR MAIL

Peter A. Kachajian, Jr., Esquire
292 Main Street
Northborough, MA 01532

### RE: <u>Kunelius Property</u>

Dear Peter:

Almost two months have passed since our last meeting in Maynard. At that time we discussed an alternative project structure that appeared to hold real promise for securing significant funds for your client. As you recall, the Trust for Public Land ("TPL") modified its previous proposal at our last meeting and asked for a response, hoping that we could refine the proposal in order to reach agreement. But we've heard nothing from you since then. I've tried to reach you by telephone several times, but have received no response.

It was unclear to me, after our last meeting, whether your client fully understood all of the potential financial benefits of the revised proposal we put on then table for her to consider. So before too much more time passed, it seemed prudent to summarize those benefits for you and for her.

You will remember that our discussion began with the recognition that the original contract (assigned by the Town of Stow ("Town") to TPL) was no longer operative. Insofar as the payments contemplated under that contract were not made, the deposits retained by Marilyn Kunelius as liquidated damages discharged the contracting parties from any further obligations under the contract. Our discussion also addressed TPL's view that the original contract price was well above the traditional development value – it being based on a speculative chapter 40B project – and that the traditional development value of the property would be in the range of eight or nine hundred thousand dollars.

The Trust for Public Land

New England Regional Office
33 Union Street, Fourth Floor
Boston, MA 02108

(617) 367-6200
Fax: (617) 367-1616

Connecticut Field Office
383 Orange Street
New Haven, CT 06511

(203) 777-7367
Fax: (203) 777-7488

Maine Field Office
377 Fore Street 3rd Floor
Portland, ME 04101

(207) 772-7424
Fax: (207) 772-7420

Vermont Field Office
3 Shipman Place
Montpelier, VT 05602

(802) 223-1373
Fax: (802) 223-0451

Connecticut Lakes
Project Office
54 Portsmouth Street
Concord, NH 03301

(603) 224-0103
Fax: (603) 228-0423

But knowing that the Town retained a strong interest in seeing the Kunelius property conserved, TPL agreed to fashion an alternative proposal. The first such proposal contemplated a partnership with the Town and Ms. Kunelius whereby: (1) TPL would pay her $800,000 for her property; (2) the Town would invest $300,000: (3) Ms Kunelius would apply (together with TPL) for the subdivision of the property into three lots (one for the Town; one including the existing house main house at 142 Red Acre Road; and one containing the rear house, barn and riding area); and (4) the Town would agree to support the subdivision. This proposal did not address the possibility of utilizing the tax savings of a so-called "bargain sale." This proposal was discussed but never accepted by Ms. Kunelius.

The second alternative proposal, made at our last meeting, contemplated several new aspects: (1) an improved bottom line; (2) rollback taxes being excused by the Town; and (3) taking advantage of the tax savings of characterizing this transaction as a "bargain sale."

It was my understanding that the purchase price could be improved to $900,000 with the assistance of the Stow Conservation Trust (Bob Wilber and I said we would discuss this with the trustees if the proposal met with your approval).

We also confirmed that Ms. Kunelius would not owe rollback taxes, which you may have assumed would be an obligation irrespective of the nature of the transaction. These taxes should not be triggered where, as here, more than fifty percent of the property is being conserved.

Finally, we discussed the impact of income taxes. I know that you are well acquainted with the tax benefits of selling land for conservation in cooperation with a non-profit like TPL, although your client may not be. Please carefully review with her the two enclosed tax benefit analyses, which compare the net, after-tax benefits of a conservation sale to TPL with a normal development sale, utilizing two different values for purposes of illustration.

She may be surprised that a sale to TPL at $900,000 is comparable to the original contract sale if evaluated from a net, after-tax perspective. The tax benefit analysis enclosed as Exhibit A reflects a "gift" in the amount of the bargain – the difference between a $900,000 conservation sale and the contract price. The tax consequences of this bargain sale together with the time value of money result in a modest net, after-tax difference (just over $20,0000) between the two approaches, with the contract sale bringing in the slightly larger amount.

A further refinement of this analysis is contained in Exhibit B. If one assumes that the value of the Kunelius property is greater than the contract price because of the value of the aquifer beneath it, then the tax benefits are

2

even more pronounced. In the tax benefit analysis attached as <u>Exhibit B</u> we have assumed for purposes of illustration that the value of the property has been appraised to be $1.5M. In that event, the amount of the bargain is larger and the net tax benefit to Ms. Kunelius is greater. The enclosed analysis shows that a sale to TPL at $900,000 would net Ms. Kunelius approximately <u>$100,000 more</u> than a private sale at the contract price. According to Jim Boothroyd, securing such an appraisal of the property from a water supply perspective would be achievable.

Utilizing this "bargain sale" approach, Ms. Kunelius stands to benefit handsomely from a sale to TPL and would avoid the uncertainty of putting her property back on the market during a period of increasing interest rates and falling land prices.

Please contact me directly if you would like to discuss the sale of your client's property in partnership with the Town and TPL.

Sincerely,

Craig A Mac Dull

Craig A. MacDonnell
MA State Director

cc  Kathy Farrell
    Bob Wilber

3

*SAMPL    IDIVIDUAL TAX BENEFIT ANALYSIS*
*CASH FLOW COMPARISONS FOR TWO ALTERNATIVE DISPOSITIONS OF REAL PROPERTY*



| TRANSACTION INFORMATION | | | | |
|---|---|---|---|---|
| Fair Market Value (Appraised): | 1,116,900 | Federal Tax Bracket: | | 35.0% |
| Basis: | 25,000 | Fed Capital Gains (owned > 12 mo | | 15.0% |
| Carrying Costs (est prop taxes per yr) | 5,000 | State of Mass. 2003 Income Tax: | | 5.3% |
| | | State of Mass. Cap Gains (over 6 y | | 0.0% |
| Brokerage Fee on Sale: | 6.0% | Present Value Discount: | | 6.0% |
| | **Alt #1** | **Alt #2** | | |
| Sales Price | 1,116,900 | 900,000 | | |
| Type of Transaction | Contract Sale | Sale to TPL | | |
| Date of the Transaction | 07/30/05 | 09/01/04 | | |
| Bargain component | 0 | 216,900 | | |
| **A: TAX COMPUTATIONS 1/** | | | | |
| Sale Price | 1,116,900 | 900,000 | | |
| less: Selling Costs (brokerage fees) | (67,014) | (27,000) | | |
| less: Basis or Adjusted Basis 2/ | (25,000) | (20,145) | | |
| Adjusted Gross Income | 1,024,886 | 852,855 | | |
| less: Deduction for Carrying Costs | (5,329) | (781) | | |
| **Taxable Gain** | 1,019,557 | 852,074 | | |
| State Tax on Gain | 0 | 0 | | |
| less: Federal Taxes Saved 3/ | 0 | 0 | | |
| Federal Tax on Gain | 152,934 | 127,811 | | |
| **Net Taxes Due From Sale 6/** | 152,934 | 127,811 | | |
| **B: CASH FLOWS:** | | | | |
| Sale Proceeds | 1,116,900 | 900,000 | | |
| less: Selling Costs | (67,014) | (27,000) | | |
| less: Carrying Costs | (5,329) | (781) | | |
| less: Net Taxes Due | (152,934) | (127,811) | | |
| **Subtotal: Net Sale Proceeds** | 891,623 | 744,408 | | |
| plus: State Taxes Saved from Gift | 0 | 0 | | |
| less: Addt'l Federal Taxes Due 4/ | 0 | 0 | | |
| plus: Federal Taxes Saved from Gift 7/ | 0 | 75,915 | | |
| Subtotal: Net Taxes Saved from Gift 6/ | 0 | 75,915 | | |
| **Net Cash Flow** | 891,623 | 820,323 | | |
| **Excess/(Shortfall) from FMV Sale** | | (71,301) | | |
| **DISCOUNTED NET CASH FLOW 8/** | 836,397 | 812,673 | | |
| **Excess/(shortfall) versus Contract Sale** | | (23,724) | | |

1/ Currently federal income tax rates as of 2003 (Tax relief act of 2003) are 10,15, 25, 28, 33, 35% depending on the taxpayer's
   The maximum tax rate on net captial gains for assets held for more than 12 months, and disposed on or after 5/5/03 is 15%
   (reduced from 20%), prior to 5/5/03 the rate is 20%.

2/ In a bargain sale, the "adjusted basis" bears the same ratio to actual basis as the bargain sale price bears to the fair market v
   Bargain Sale Price/FMV X Basis = Adjusted Basis

3/ Amount of federal taxes saved from deduction allowed for state tax on gains: Taxable Gain X State Tax Rate X Federal Tax

4/ Amount of additional federal taxes due because of state taxes saved from state charitable gift deduction:
   Value of Gift X State Tax Rate X Federal Tax Rate

5/ This is the full amount of the gift. Contributions are generally limited to 30% of a taxpayer's adjusted gross income each ye
   but any unused portion of the gift may be carried over for an additional 5 years, subject to the 30% limitation in each year.
   Massachusetts does not allow deductions for charitble contributions.

6/ Total Tax Liability: Combination of taxes owed from gain on the sale less taxes saved from the gift.

7/ Currently (beginning in 1991), in general, total otherwise allowable federal itemized deductions are reduced by 3% of
   a taxpayer's Adjusted Gross Income in excess of $100,000. The reduction is not considered in this analysis.

·8/ Present value of cash flow. The value of a cash flow stream at a particular point in time.

NOTE: These calculations are provided    illustrative purposes only and the Trust for Pub    and cannot warrant that act
results would be the same.  Review by independent, professional tax and/or legal counsel is therefore recommende

SAMPL  'DIVIDUAL TAX BENEFIT ANALYSIS
CASH FLOW COMPARISONS FOR TWO ALTERNATIVE DISPOSITIONS OF REAL PROPERTY

| | TRANSACTION INFORMATION | | | |
|---|---|---|---|---|
| Fair Market Value (Appraised): | 1,500,000 | Federal Tax Bracket: | | 35.0% |
| Basis: | 25,000 | Fed Capital Gains (owned > 12 mo | | 15.0% |
| Carrying Costs (est prop taxes per yr) | 5,000 | State of Mass. 2003 Income Tax: | | 5.3% |
| | | State of Mass. Cap Gains (over 6 y | | 0.0% |
| Brokerage Fee on Sale: | 6.0% | Present Value Discount: | | 6.0% |

| | Alt #1 | Alt #2 | |
|---|---|---|---|
| Sales Price | 1,116,900 | 900,000 | |
| Type of Transaction | Contract Sale | Sale to TPL | |
| Date of the Transaction | 07/30/05 | 09/01/04 | |
| Bargain component 5/ | 0 | 600,000 | |
| | | | |
| **A: TAX COMPUTATIONS 1/** | | | |
| Sale Price | 1,116,900 | 900,000 | |
| less: Selling Costs (brokerage fees) | (67,014) | (27,000) | |
| less: Basis or Adjusted Basis 2/ | (25,000) | (15,000) | |
| Adjusted Gross Income | 1,024,886 | 858,000 | |
| less: Deduction for Carrying Costs | (5,329) | (781) | |
| **Taxable Gain** | 1,019,557 | 857,219 | |
| | | | |
| State Tax on Gain | 0 | 0 | |
| less: Federal Taxes Saved 3/ | 0 | 0 | |
| Federal Tax on Gain | 152,934 | 128,583 | |
| **Net Taxes Due From Sale 6/** | 152,934 | 128,583 | 0 |
| | | | |
| **B: CASH FLOWS:** | | | |
| Sale Proceeds | 1,116,900 | 900,000 | |
| less: Selling Costs | (67,014) | (27,000) | |
| less: Carrying Costs | (5,329) | (781) | |
| less: Net Taxes Due | (152,934) | (128,583) | |
| **Subtotal: Net Sale Proceeds** | 891,623 | 743,636 | |
| | | | |
| plus: State Taxes Saved from Gift | 0 | 0 | |
| less: Addt'l Federal Taxes Due 4/ | 0 | 0 | |
| plus: Federal Taxes Saved from Gift 7/ | 0 | 210,000 | |
| Subtotal: Net Taxes Saved from Gift 6/ | 0 | 210,000 | |
| | | | |
| **Net Cash Flow** | 891,623 | 953,636 | |
| | | | |
| **Excess/(Shortfall) from FMV Sale** | | 62,013 | |
| | | | |
| **DISCOUNTED NET CASH FLOW 8/** | 836,397 | 944,743 | |
| | | | |
| **Excess/(shortfall) versus Contract Sale** | | 108,346 | |

1/ Currently federal income tax rates as of 2003 (Tax relief act of 2003) are 10,15, 25, 28, 33, 35% depending on the taxpayer's
   The maximum tax rate on net capital gains for assets held for more than 12 months, and disposed on or after 5/5/03 is 15%
   (reduced from 20%), prior to 5/5/03 the rate is 20%.

2/ In a bargain sale, the "adjusted basis" bears the same ratio to actual basis as the bargain sale price bears to the fair market v
   Bargain Sale Price/FMV X Basis = Adjusted Basis

3/ Amount of federal taxes saved from deduction allowed for state tax on gains: Taxable Gain X State Tax Rate X Federal Tax

4/ Amount of additional federal taxes due because of state taxes saved from state charitable gift deduction:
   Value of Gift X State Tax Rate X Federal Tax Rate

5/ This is the full amount of the gift. Contributions are generally limited to 30% of a taxpayer's adjusted gross income each ye
   but any unused portion of the gift may be carried over for an additional 5 years, subject to the 30% limitation in each year.
   Massachusetts does not allow deductions for charitble contributions.

6/ Total Tax Liability: Combination of taxes owed from gain on the sale less taxes saved from the gift.

7/ Currently (beginning in 1991), in general, total otherwise allowable federal itemized deductions are reduced by 3% of
   a taxpayer's Adjusted Gross Income in excess of $100,000. The reduction is not considered in this analysis.

8/ Present value of net cash flow, which means the value today of net cash flow available in the future at a particular interest

NOTE: These calculations are provided [ ] llustrative purposes only and the Trust for Pub [ ] and cannot warrant that act
results would be the same. Review by independent, professional tax and/or legal counsel is therefore recommende

**12**



**THE**
**TRUST**
**FOR**
**PUBLIC**
**LAND**

*Conserving Land*
*for People*

September 9, 2003

### BY FAX and OVERNIGHT COURIER

Peter A. Kachajian, Jr., Esquire
292 Main Street
Northborough, MA 01532

### RE: Kunelius Property

Dear Peter:

Enough time had passed since our last conversation that I wanted to remind you of TPL's strong interest in keeping this transaction together. Towards that end, we have spent a considerable amount of time in the last week or so trying to find a way to reconfigure this project to meet adequately the various needs of your client, the Town of Stow, the Friends of Red Acre (FORA) and the Stow Conservation Trust (SCT).

As you and I have discussed many times, there are two major obstacles that stand in the way of success, each of which must be addressed.

First, there is a significant fundraising gap. Not only has the economy been hostile to philanthropy in general, we have experienced a catastrophic failure in the rejection of the $350,000 Department of Housing and Community Development grant. Local fundraising efforts have not been as successful as we had hoped and are necessary to make the project work. TPL's Board of Directors will not approve any borrowing to bridge a fundraising gap because the prospects for raising the funds necessary to repay the loan required are not encouraging. Further, any bridge loan would be for an amount greater than the land would be worth, even if the subdivision were approved. Essentially, this would be asking TPL for an unsecured loan based on weak fundraising prospects with no back-up plan to repay the loan.

The Trust for Public Land
New England Regional Office
33 Union Street, Fourth Floor
Boston, MA 02108

(617) 367-6200
Fax: (617) 367-1616

Connecticut Field Office
383 Orange Street
New Haven, CT 06511

(203) 777-7367
Fax: (203) 777-7488

Maine Field Office
377 Fore Street 3rd Floor
Portland, ME 04101

(207) 772-7424
Fax: (207) 772-7420

Vermont Field Office
3 Shipman Place
Montpelier, VT 05602

(802) 223-1373
Fax: (802) 223-0451

Connecticut Lakes
Project Office
54 Portsmouth Street
Concord, NH 03301

(603) 224-0103
Fax: (603) 228-0423

Second, it is unclear whether your client's property can be subdivided to meet our project design. The Zoning Board of Appeals has been sending very mixed signals, and we have recently become aware of an additional problem presented by the doctrine of merger.

In view of these circumstances it is not feasible for TPL to go forward under the existing contract. If, however, the parties were jointly able to create a new financial structure for this transaction, TPL would be willing to continue to stay involved, subject to the other contingencies noted below.

Please consider the following alternative:

1. **Finances**. Try as TPL might to persuade just one of our project partners to bridge the roughly $375,000 gap identified during our last conversation, neither your client nor FORA have agreed to do so on their own. As an alternative, TPL is proposing to each of the primary project partners (FORA, SCT, and Marilyn Kunelius) that they jointly shoulder the financial gap, contingent of course on (a) the appropriate variances being requested and granted; and (b) the Town agreeing to a revised project structure in which the two private parcels are sold on the private market subject to conservation, but not affordability, restrictions. Reduced to equal shares, each partner's obligation would be $125,000. For your client, this would mean accepting $125,000 less than the contract price. For FORA and SCT, this would mean raising $125,000 each. We are presenting this project structure to each of the three project partners simultaneously. We believe that TPL's Board will approve such a reconfigured project going forward.

2. **Subdivision**. We have recently been advised by Goodwin Procter that the doctrine of merger forces 142 and 144 Red Acre Road into a single lot. For us to go forward now, with variance requests regarding 144 only, would mean that 142 would be rendered a non-conforming, illegal lot. If we resolve the funding issues, we will have to proceed in a manner that remedies the merger problem as to both 142 and 144, which probably will require a further extension by the ZBA. Most likely this will necessitate the involvement of town counsel, whom we should approach together.

We are aware that these project uncertainties are of concern to you and your client, and that Mrs. Kunelius would like to know as soon as possible whether TPL will be able to go forward. To that end, we need to discuss this revised proposal with you as soon as possible, and in no case later than the end of this week.

Sincerely,

Craig A. MacDonnell
MA State Director

⚖JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a)  PLAINTIFFS**  MARILYN KUNELIUS

**DEFENDANTS**  See attached sheet

**(b)** County of Residence of First Listed Plaintiff   MAINE
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Michael C. McLaughlin, Law offices of Michael C.
McLaughlin, One Beacon Str., 33RD fl., Boston
MA 02108    (617) 227-2275

Attorneys (If Known)

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☒ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES(Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)     and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☒ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☒ 440 Other Civil Rights | | | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):  28 U.S.C. §1331

Brief description of cause:  FAILURE OF TOWN OF STOW AND TRUST FOR PUBLIC LAND TO PURCHASE
PROPERTY REQUIRED BY CONTRACT WITH PLAINTIFF

## VII. REQUESTED IN
COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $ 1,116,900.00
PLUS

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes   ☐ No

## VIII. RELATED CASE(S)
IF ANY

(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE  Aug 16 2005

SIGNATURE OF ATTORNEY OF RECORD  _____

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only <u>MARILYN KUNELIUS  V.  TOWN OF STOW</u>

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

     \_\_\_    I.     160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT.

     X    II.     195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,       *Also complete AO 120 or AO 121
                           740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.  for patent, trademark or copyright cases

     X    III.     110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
                           315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
                           380, 385, 450, 891.

     \_\_\_    IV.     220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660,
                           690, 810, 861-865, 870, 871, 875, 900.

     \_\_\_    V.     150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                           YES ☐ NO ☒

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?  (See 28 USC §2403)

                                                            YES ☒    NO ☐

    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                                            YES ☐    NO ☒

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                                            YES ☐    NO ☒

7. Do <u>all</u> of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

     YES ☐      NO ☒

           A.     If yes, in which division do <u>all</u> of the non-governmental parties reside?

                Eastern Division ☐         Central Division ☐         Western Division ☐

           B.     If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

                Eastern Division ☒         Central Division ☐         Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

                                                        YES ☐    NO ☐

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME    Michael C. McLaughlin

ADDRESS    Law Offices of Michael C. McLaughlin, One Beacon Street, 33rd Floor, Boston Ma 02108

TELEPHONE NO.    (617) 227-2275