UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MARILYN KUNELIUS,

        Plaintiff,

v.

TOWN OF STOW, et al.

        Defendants.

Civil Action No. 05-11697-GAO

**MEMORANDUM OF LAW IN SUPPORT
OF THE MOTION TO DISMISS OF DEFENDANTS THE TRUST
FOR PUBLIC LAND, CRAIG A. MACDONNELL, AND THE TOWN OF STOW**

Defendants The Trust for Public Land ("TPL"), Craig A. MacDonnell, and the Town of Stow ("Town")[1] submit this Memorandum in Support of their Motion to Dismiss the Complaint of plaintiff Marilyn Kunelius ("Kunelius") pursuant to Federal Rule of Civil Procedure 12(b)(6).

**INTRODUCTION**

This lawsuit is no more than plaintiff's unavailing effort to transform her disappointment over a failed real estate sale into a viable legal action, even though she has already received contractual liquidated damages. The Town validly assigned to TPL its statutory right of first refusal to purchase plaintiff's property located at 142 and 144 Red Acres Road in Stow, Massachusetts (the "Property"), as authorized by M.G.L. c. 61, pursuant to a Purchase and Sale Agreement (the "Agreement") entered into by plaintiff and a private real estate developer. When TPL accepted that assignment and exercised the right of first refusal, TPL stepped into the place of the Buyer in that Agreement and became subject to its terms and conditions. When TPL was

---

[1] In addition to naming TPL and the Town separately, the Complaint names as a defendant "A Partnership of Unknown Name Between Town of Stow and The Trust for Public Land." As no such entity exists, all claims against this unknown entity must be dismissed summarily.

1

ultimately unable to raise the money to fund the purchase, it was unable to acquire the Property and forfeited thousands of dollars to Kunelius pursuant to the liquidated damages clause. Under the clear terms of the Agreement, freely negotiated by the plaintiff herself, those deposits are her *sole* remedy. There is no tenable legal or factual basis for her to claim otherwise.

At bottom, this action stems from nothing more than Kunelius's apparent frustration and disappointment at seeing the sale of her property fall through, notwithstanding the fact that she knew at the time of signing the Agreement that any failure to perform by the Buyer would be remedied solely though the liquidated damages clause. Kunelius's disappointment at the Town's assignment of its first refusal right to TPL, TPL's exercise of that right, and TPL's subsequent inability to purchase the Property is not a valid basis for a lawsuit, nor is it permissible for Kunelius to use the litigation process to attempt to force TPL or the Town to perform under a now defunct Agreement. Rather, the outcome of this failed transaction is a risk Kunelius expressly assumed under M.G.L. c. 61 and the Agreement, and she has been compensated by receipt of the contractual liquidated damages, the only remedy to which she is entitled.

## **BACKGROUND**[2]

**A.    The Trust for Public Land**

TPL is a non-profit national conservation corporation qualified under section 501(c)(3) of the Internal Revenue Code and organized under the laws of California, with a New England Regional Office located in Boston. TPL was formed over 30 years ago, springing from the first Earth Day in 1970. Its mission is "Conserving Land For People," to improve the quality of life in communities and protect natural and historic resources. More than 400 TPL employees work

---

[2]    The facts set forth in this section are offered to provide additional context. To the extent they go beyond the allegations of the Complaint, they are not material to the Motion to Dismiss. The material facts are set forth in the Complaint and its exhibits, as recited in the Statement of Facts.

out of 40 offices nationwide. In partnership with government, business, and public interest organizations, TPL has helped many Massachusetts communities protect and preserve critical wildlife habitat, recreation areas, waterfront, scenic views, and parkland.

**B.     Chapter 61**

Chapters 61, 61A, and 61B of the Massachusetts General Laws embody the General Court's intent to encourage the preservation of forest, agricultural/horticultural, and recreational land by conferring favorable assessment and taxation on land subjected to the statutory schemes. In return, landowners taking advantage of the offered tax savings must afford the city or town in which the land is located a first refusal option to meet a bona fide offer to purchase the land. *See, e.g.,* M.G.L. c. 61, § 8. Recognizing the limited financial resources of many municipalities, the law expressly authorizes municipalities to assign their first refusal rights to a non-profit conservation organization for the purpose of continuing the forest, agricultural, or recreational use of the majority of the property. *Id.* In this case, the majority of Kunelius's Property was taxed and assessed at reduced levels under Chapter 61 as forest land. After Kunelius notified the Town of Stow that she had entered into a Purchase and Sale Agreement with a developer, the Town's first refusal right was triggered. At that point, the Town had 120 days to assess its interest in exercising its right, consult with local conservation groups, and, ultimately, solicit TPL to accept an assignment, as authorized by the statute.

**C.     The Kunelius Property**

The Kunelius Property consists of approximately fifty acres of forested wetlands and uplands, assessed and taxed under Chapter 61. The land abuts existing conservation tracts owned by the Stow Conservation Trust and the Town of Stow Conservation Commission. It sits above the Town's largest aquifer and is a natural linkage between the two existing conservation

3

tracts. Abundant wildlife exists on the Property. In addition, the Property contained a working horse farm. For all of these reasons, the Town and TPL believed the Property worth preserving.

## STATEMENT OF FACTS

On or about October 11, 2002, Kunelius entered into a Purchase and Sale Agreement ("Agreement") with Cohousing Resources, LLC ("Cohousing"), a real estate developer, to sell the Property for $1,116,900.00. *See* Complaint ¶¶ 11-12; Complaint Ex. 1. According to the Agreement's terms, Cohousing intended to submit an application under M.G.L. c. 40B for the development of a 30-unit residential housing development on the Property. Complaint Ex. 1, ¶ 32.[3] Recognizing that most of the Property was taxed as forest land under Chapter 61, the Agreement included provisions governing the possibility that the Town of Stow would exercise its right of first refusal. *Id.*, ¶ 35 (providing for the return of Cohousing's deposits should the Town exercise its right). The Agreement also defined the damages available to Kunelius in the event of the Buyer's inability to perform:

> If the BUYER shall fail to fulfill the BUYER'S agreements herein, all deposits made hereunder by the BUYER shall be retained by the SELLER as liquidated damages and this shall constitute SELLER'S sole remedy in equity and law.

*Id.*, ¶ 21. Payment of the purchase price is among those "BUYER'S agreements." *Id.*, ¶ 7.

Having elected to have her land valued and assessed under Chapter 61, Kunelius was bound to offer the Town of Stow a right of first refusal to meet a bona fide offer to purchase her land. *See* M.G.L. c. 61, § 8. Accordingly, on or about October 16, 2002, Kunelius gave the Town notice of her intent to sell the Property to Cohousing. *See* Complaint Ex. 2. The Town then had 120 days to give notice of its intent to exercise the option. *See* M.G.L. c. 61, § 8.

---

[3] As a development under Chapter 40B, twenty-five percent of the development would have been designated as affordable housing. Complaint Ex. 1, ¶ 32.

4

On February 12, 2003, the Town Board of Selectmen gave Kunelius formal notice that "by vote taken on February 11, 2003, the Board of Selectmen of the Town of Stow has voted to assign the Town's rights under Chapter 61, Section 8 to purchase the [Property] *under the terms set forth in the Purchase and Sale Agreement between you and Cohousing Resources, LLC dated October, 2002*." *See* Complaint Ex. 2 (emphasis added). The Town further notified Kunelius that the Town had "assigned its rights under Chapter 61, Section 8 to The Trust for Public Land, a national non-profit corporation." *Id.* Pursuant to Chapter 61, this letter was recorded with the Registry of Deeds within the statutory 120-day period. *Id.*

Attached to the letter to Kunelius was a copy of the formal "Assignment and Acceptance" executed the same day by the members of the Board of Selectmen and a representative of the Trust for Public Land. Complaint Exs. 2 and 3. The Assignment and Acceptance stated that the "Town voted by majority vote on February 11, 2003 to assign to The Trust for Public Land the Town's rights under M.G.L. Chapter 61, Section 8 to purchase land owned by Marilyn Kunelius . . . *pursuant to the terms of a Purchase and Sale Agreement between Seller and Cohousing Resources, LLC dated October, 2002*." Complaint Ex. 3 (emphasis added).

On February 13, 2003, TPL notified Kunelius that the Town had assigned its right of first refusal to TPL to purchase the Property "*pursuant to the terms of a certain Purchase and Sale Agreement between you and Cohousing*" and that TPL had accepted that assignment. Complaint Ex. 4 (emphasis added). TPL further notified Kunelius that it "elects to exercise the Right of First Refusal under M.G.L. c. 61, Section 8 that was assigned to TPL by the Town of Stow and *assume the position of buyer under the above-referenced Agreement*." *Id.* (emphasis added). Transmitted with that letter was a check in the amount of $11,500 payable to Kunelius. *Id.* This

5

sum represented the initial $10,000 deposit required by the Agreement and the first monthly $1500 deposit due each month until closing.  Complaint Ex. 1, ¶ 31.

TPL then began efforts formulated during the option period to raise funds to implement its proposed plan for the Property, which included the conservation of a majority of the land, the sale of two affordable houses, and the sale of the horse facilities to the Eye of the Storm Equine Rescue Program.  *See* Complaint Ex. 7.  Ultimately, however, TPL was unable to raise the funds necessary to purchase the Property by the closing date of September 26, 2003.  *Id.*  As TPL publicly expressed, its efforts to raise the funds were hindered by a declining economy, a difficult market for philanthropy, and the unexpected denial of a needed state grant.  *Id.*

TPL kept Kunelius apprised of its difficulties in fundraising, as well as obstacles it faced in the zoning process.  In a letter to Kunelius's counsel dated September 9, 2003, TPL detailed the hurdles it was facing.  Complaint Ex. 12.  With respect to fundraising, TPL noted:

> First, there is a significant fundraising gap.  Not only has the economy been hostile to philanthropy in general, we have experienced a catastrophic failure in the rejection of the $350,000 Department of Housing and Community Development grant.  Local fundraising efforts have not been as successful as we had hoped and are necessary to make the project work.

Complaint Ex. 12.  TPL also detailed problems it was facing with the Zoning Board of Appeals.  *Id.*  Based on these obstacles, TPL notified Kunelius at that time that it was "not feasible for TPL to go forward under the existing contract."  *Id.*  TPL forfeited its deposits (the $10,000 initial deposit plus all of the $1500 monthly deposits paid in the months following the Assignment), interpreting the Agreement to allow Kunelius to retain them as liquidated damages, as Kunelius's sole remedy for TPL's inability to perform. Complaint Exs. 1 and 11.

Although the Agreement was no longer operative, TPL still recognized the value of preserving the Property and attempted to work with Kunelius to formulate an alternative

6

proposal. Indeed, in that September 9, 2003 letter, TPL notified Kunelius that "[i]f . . . the parties were jointly able to create a new financial structure for this transaction, TPL would be willing to continue to stay involved." Complaint Ex. 12. TPL asked Kunelius to respond and let TPL know if they could go forward with an alternative. *Id.* Further discussions were held, but ultimately, Kunelius failed to return TPL's calls. Complaint Ex. 11; Complaint ¶ 46. In a last effort to forge a new deal, TPL sent a letter to Kunelius's attorney on July 6, 2004 providing a detailed analysis of alternative structures and the financial benefits that would accrue to Kunelius under them. Complaint Ex. 11. However, Kunelius refused to negotiate an alternate deal.

## STANDARD OF REVIEW

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) will succeed where the well-pleaded facts alleged by the plaintiff, taken as true, are insufficient to justify a judgment in her favor. *See, e.g., Varney v. R.J. Reynolds Tobacco Co.*, 118 F. Supp.2d 63, 67 (D. Mass. 2000). A complaint must allege facts that sufficiently support, either directly or by reasonable inference, every material element necessary to sustain recovery. *Id.* (citing *Pujol v. Shearson American Exp., Inc.*, 877 F.2d 132, 138 (1st Cir. 1989); *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514-15 (1st Cir. 1988)). Bald assertions and unsupported conclusions do not qualify as well-pleaded facts and should not be considered. *Id.* (noting that such conclusions "are of no assistance to a plaintiff in defeating a motion to dismiss").

## ARGUMENT

**I.  THE AGREEMENT PROVIDES LIQUIDATED DAMAGES AS KUNELIUS'S SOLE REMEDY FOR THE FAILED SALE OF THE PROPERTY.**

When TPL exercised the right of first refusal, it stepped into the shoes of the Buyer in the Agreement. Having done so, TPL was entitled to rely upon the terms and conditions in the Agreement, including the liquidated damages provision. Under Massachusetts law, liquidated

7

damages provisions such as the one found in the Agreement are enforceable. As a result, Kunelius has already received the only damages to which she is entitled for TPL's inability to meet the purchase price and she is not entitled to additional damages or specific performance.

> **A.    TPL Stepped into the Shoes of the Buyer in the Agreement, Thereby Adopting the Corresponding Rights and Obligations of the Original Buyer.**

A right of first refusal in real estate places the party exercising the right into the position of the party it is replacing. *Roy v. George W. Green, Inc.*, 404 Mass. 67, 70, 533 N.E.2d 1323, 1325 (1989). Therefore, when the Town of Stow voted to assign its right of first refusal to TPL, and TPL accepted that assignment and exercised the right, TPL stepped into the place of Cohousing in the Agreement. Indeed the Town's notice of TPL's exercise and the Assignment document both state explicitly that TPL was accepting an assignment to purchase the land "pursuant to the terms of a Purchase and Sale Agreement between [Kunelius] and Cohousing Resources, LLC." *See* Complaint Ex. 3; *see also* Complaint Ex. 2. Further, TPL's notice to Kunelius of its exercise stated that the exercise was pursuant to the terms of the Agreement and that TPL "assume[d] the position of buyer" in the Agreement. Complaint Ex. 4. Thus Kunelius was on notice from the outset that TPL was stepping into Cohousing's position.

The law is clear that a right of first refusal is the right to purchase property "upon the *same terms* as contained in any bona fide offer from a third person." *Roy*, 404 Mass. at 70, 533 N.E.2d at 1325 (emphasis added). For that reason, the entity deciding whether to exercise the right of first refusal can only do so once "informed of the details of the offer" in order to assess whether or not it is willing to take on the obligations of that offer. *Id.* at 71, 533 N.E.2d at 1326.

This status is not altered in the context of a statutory right of first refusal pursuant to Chapter 61. In a recent case addressing a right of first refusal pursuant to Chapter 61A, the Supreme Judicial Court held that the law of first refusal rights is not altered in this context:

"'The common meaning of a right of first refusal involving real estate is well established,' and its use in a statutory context imparts no new meaning to the phrase." *Town of Franklin v. Wyllie*, 443 Mass. 187, 195, 819 N.E.2d 943, 949 (2005) (quoting *Greenfield Country Estates Tenants Ass'n v. Deep*, 423 Mass. 81, 89 n. 14, 666 N.E.2d 988, 994 (1996)).  Accordingly, any exercise of the right of first refusal by the Town in that case would have required the Town to purchase the land only on "substantially the *same* terms and conditions as presented in the agreement." *Id.* at 195-96, 819 N.E.2d at 949 (emphasis added).  Likewise, TPL accepted the assignment from the Town and exercised the right of first refusal on the same terms and conditions of the Agreement.  As a result, the liquidated damages clause applied with equal force when TPL became the buyer as it did when Cohousing was the buyer.

        **B.**        **The Liquidated Damages Provision Should Be Enforced.**

Liquidated damages provisions will be enforced "where actual damages are difficult to ascertain and where the sum agreed upon by the parties at the time of the execution of the contract represents a reasonable estimate of the actual damages." *Kelly v. Marx*, 428 Mass. 877, 880, 705 N.E.2d 1114, 1116 (1999) (enforcing liquidated damages provision in purchase and sale agreement for sale of real estate) (quoting *A-Z Servicecenter, Inc. v. Segall*, 334 Mass. 672, 675, 138 N.E.2d 266, 268 (1956)).  As *Marx* noted, this approach best matches the expectations of the parties who negotiated the contract based on their unique concerns. *Id.*  As a result, liquidated damages clauses that provide for the seller to retain the buyer's deposit are not only recognized and enforced, but are a "common real estate practice." *Id.* at 879, 705 N.E.2d at 1116.  Indeed, the *Marx* Court rejected the so-called "second-look" doctrine that allowed courts to take a retrospective look at the reasonableness of the liquidated damages and instead held that parties should be held to the liquidated damages provisions agreed upon at the time of execution. *Id.* at 881, 705 N.E.2d at 117.  This holding is based on the long-standing principle that the

9

"proper course is to enforce contracts according to their plain meaning and not to undertake to be wiser than the parties, and therefore that in general when parties say that a sum is payable as liquidated damages they will be taken to mean what they say and will be held to their word." *Id.* (quoting *Guerin v. Stacy*, 175 Mass. 595, 597, 56 N.E. 892, 892 (1900)).

The liquidated damages clause in the Agreement is reasonable and should be enforced. The clause provides that "[i]f the BUYER shall fail to fulfill the BUYER'S agreements herein, all deposits made hereunder by the BUYER shall be retained by the SELLER as liquidated damages and *this shall constitute SELLER'S sole remedy in equity and law*." Complaint Ex. 1, ¶ 21 (emphasis added). Kunelius's retention of deposits paid by the Buyer prior to the Buyer's failure to fulfill its obligations was a "reasonable estimate" of actual damages at the time the Agreement was executed and, as such, should be respected by the Court. In order to find the clause unenforceable, this Court would be required to find the sum "grossly disproportionate" to a reasonable estimate of actual damages made at the time of contract formation. *Marx*, 428 Mass. at 880, 705 N.E.2d at 1116. In *Marx*, the Court found liquidated damages in the amount of five percent of the purchase price was a reasonable forecast of the losses from a breach. *Id.* at 882, 705 N.E.2d at 1117; *see also Howard v. Wee*, 61 Mass. App. Ct. 912, 913, 811 N.E.2d 1050, 1052 (2004) (finding a $1000 deposit a reasonable sum for liquidated damages for the buyer's breach of an offer to purchase real estate). Here, the sum of the deposits paid is not an unreasonably low sum for Kunelius to retain for TPL's inability to perform over less than a six-

month period. As such, the claims seeking damages for a breach of the Agreement should be dismissed.[4]

## II. EXERCISE OF A RIGHT OF FIRST REFUSAL UNDER CHAPTER 61 DOES NOT CREATE ANY EXTRA-CONTRACTUAL DUTY OF PERFORMANCE.

Kunelius alleges that TPL's exercise of the right of first refusal "obligated TPL to fund the purchase of the Property." Complaint ¶ 18. Not only is this assertion devoid of any support in fact or law, it runs contrary to the history and purpose of Chapter 61. Were this Court to adopt such a wildly unsupported contention, the preservation of forest, agricultural, and recreational land in Massachusetts could come to a chilling standstill.

### A. Chapter 61 Must Be Read in a Manner That Does Not Frustrate Its Purpose.

The Supreme Judicial Court recently held that Chapters 61, 61A, and 61B "must be interpreted in a manner that will not frustrate or impair a town's right of first refusal." *Town of Franklin*, 443 Mass. at 196, 819 N.E.2d at 950 (holding that the statute should be "liberally construed to effectuate their goals"). These statutes embody the Commonwealth's intent to encourage the preservation of forest, agricultural, and recreational land by conferring favorable assessment and taxation on land subjected to the statutory schemes. This incentive was borne of a concern that open space in the Commonwealth was rapidly decreasing in the face of increasing taxes and pressure from urban development. *See Town of Sudbury v. Scott*, 439 Mass. 288, 299, 787 N.E.2d 536, 544 (2003) (providing a detailed description of the legislative history).

---

[4] Kunelius's claim for specific performance must fail as a matter of law. Kunelius is not entitled to the equitable remedy of specific performance because the Agreement provided that the deposits made under the Agreement are the only damages "in *equity* and law" to which Kunelius is entitled. Complaint Ex. 1 (emphasis added). Assuming arguendo that specific performance was not barred by the Agreement, it should be barred as a matter of law. Equitable remedies are not available to parties who can be adequately compensated at law. *See, e.g., Greenfield Country Estates Tenants Ass'n v. Deep*, 423 Mass. 81, 88, 666 N.E.2d 988, 993 (1996). Thus, although a buyer in a contract for real property may have the remedy of specific performance available because real property is unique, *see id.*, no similar justification extends to the seller.

11

In order to ensure that landowners did not take advantage of the substantial tax benefits provided by these statutes and then convert the land for development, the Legislature built into the statutes the requirement that landowners afford the city or town in which the land is located a first refusal option to meet a bona fide offer to purchase the land. This right of first refusal manifests a legislative intent to help preserve and protect the forest, agricultural, and recreational use of these lands before they can be sold for some other use. *Scott*, 439 Mass. at 300, 787 N.E.2d at 545. The statute provides municipalities 120 days within which to assess the offer to purchase and decide whether to exercise the right of first refusal. M.G.L. c. 61, § 8.

Recognizing that many municipalities have limited financial resources, the statute was later amended to authorize cities and towns to assign such first refusal rights to a nonprofit conservation organization. *Id*.; *see also Raffi v. Johnson*, Misc. Case No. 231739, 5 Land Ct. Rptr. 139, 143 (Mass. Land Ct. Aug. 18, 1997) (noting M.G.L. c. 61, § 8 assures municipalities that property can still be preserved via assignment to a nonprofit when the price is too high for the town). In practice, much of the 120-day option period is consumed by the town's deliberations, leaving the nonprofit with even less time in which to assess the preservation value of the project, determine the risks and benefits, assess fundraising possibilities, and coordinate with local interest groups, among other tasks. Critical to this assessment is the need to be able to evaluate the contract terms into which the nonprofit is entering. Indeed, the statute requires that a landowner's notice to a town of an offer to purchase include a "full description of all of the terms and conditions of the offer," without which, a town, and by extension a nonprofit organization, would have "no knowledge, or materially incomplete knowledge, of the offer it had to meet." *Wareham Land Trust v. A.D. Makepeace Co.*, No. 295259, 2004 WL 1117172 at *3 (Mass. Land Ct. May 19, 2004).

Nonprofit organizations such as TPL must be able to rely upon the terms and conditions of the contracts into which they are entering when they decide whether to accept an assignment. If denied that certainty, nonprofits would never be able to accept assignments because they would be unable to determine the financial risks of liability to which they would be exposed. In this case, TPL had to weigh its likelihood of raising the funds necessary for the purchase and obtaining the necessary zoning approvals against the potential exposure if it failed. In that balancing of costs and benefits, TPL was entitled to rely upon the terms and conditions of the Agreement including the limitation of damages under the liquidated damages clause.[5] Indeed, sellers have a parallel right to rely upon the terms and conditions of their "original offer." *See Costello v. Medway*, 63 Mass. App. Ct. 1112, 825 N.E.2d 1080 (Apr. 26, 2005) (unpublished) (holding that the nonprofit assignee would be bound by the terms and conditions of the original contract even where they may be contrary to conservation purposes).

In keeping with the mandate set forth by the Supreme Judicial Court that these statutes "must be interpreted in a manner that will not frustrate or impair a town's right of first refusal," *Town of Franklin*, 443 Mass. at 196, 819 N.E.2d at 950, Kunelius's argument that the exercise of a right of first refusal creates extra-contractual obligations that extend beyond the terms of the Agreement itself, and beyond the requirements of the underlying statute, must be rejected.

    **B.**    **Risk of Nonperformance is Inherent in All Conditional Real Estate Sales.**

Sellers of real property subject to Chapter 61, as in other real estate transactions, are routinely subject to the risk of nonperformance, whether by the original buyer, Town, or

---

[5] Towns and, in turn, nonprofit assignees, cannot be expected to raise the full purchase price in the 120 days prior to the exercise of the right of first refusal. *See Meachen v. Hayden*, Misc. Case No. 240129, 6 Land Ct. Rptr. 235, 238 (Mass. Land Ct. Aug. 6, 1998) (holding that Chapter 61A does not require the appropriation of funds necessary for purchase before the 120-day period concludes). *Meachen* rejected the seller's contention that a municipality exercising a right of first refusal needed to appropriate funds for the purchase prior to exercising the right. *Id.* Similarly, a nonprofit stepping into the shoes of a municipality cannot be expected to raise all of the funds necessary for a purchase before deciding to accept an assignment under Chapter 61.

13

nonprofit assignee. Nonperformance can arise not only from a failure of financing, but failure to obtain necessary permits, rejected zoning applications, negative environmental testing or results, and other failures. It is because of this range of risks that parties enter into contracts that limit their consequences. Indeed, the Agreement Kunelius signed addressed all of these risks. Complaint Ex. 1. Just as Kunelius had no guarantee of performance by Cohousing as the buyer, she had no guarantee of performance by the Town or TPL. It is presumably because of these risks, that the Agreement included a liquidated damages clause. *See Marx*, 428 Mass. at 881-82, 705 N.E.2d at 1117 (noting that purchase and sale agreements are amenable to liquidated damages clauses because parties cannot know "what delays might ensue, what might occur in the real estate market, or how a failed sale might affect [the seller's] plans") (citation omitted).

### III.     KUNELIUS'S REMAINING COUNTS FAIL AS A MATTER OF LAW.

The Complaint is rife with additional counts ranging from violations of M.G.L. c. 93A to common law tort claims to federal civil rights claims. None of these counts has merit. As a preliminary matter, they all stem from the same conduct underlying the breach of contract claim and thus should be remedied through the liquidated damages clause. *See Redgrave v. Boston Symphony Orchestra, Inc.*, 557 F. Supp. 230, 238 (D. Mass. 1983) (holding that a breach of contract, standing alone, cannot be converted to a tort). Moreover, each claim fails independently as Kunelius has failed to allege facts sufficient to support a grant of relief.

#### A.     Kunelius Has Not Alleged A Claim Under c. 93A (Counts Two & Three).

Kunelius has failed to meet the procedural requirements of Chapter 93A and has failed to plead sufficient facts to support a Chapter 93A claim. Indeed, she has not even specified under which section of Chapter 93A she is proceeding, the cause of action for consumers under § 9 or for those engaged in trade and commerce under § 11. Without sufficient notice of Kunelius's theory under Chapter 93A, Counts Two and Three must be dismissed for failure to conform with

14

the stringent particularity requirements of Fed. R. Civ. P. 9(b). *See Varney v. R.J. Reynolds Tobacco Co.*, 118 F. Supp.2d 63, 72 (D. Mass. 2000) (holding that the requirements of Rule 9(b) extend to claims under c. 93A).

The pleading deficiencies do not end there. In the event that Kunelius is attempting to assert a claim based on § 9, her claim must be dismissed for failure to allege submission of a demand letter to TPL or the Town in advance of filing this action. M.G.L. c. 93A, § 9(3) (requiring submission of a demand letter defining the unfair or deceptive conduct, injury suffered, and relief sought); *City of Boston v. Aetna Life Ins. Co.*, 399 Mass. 569, 574, 506 N.E.2d 106, 109 (1987) (holding that failure to comply with demand letter requirement requires dismissal). Alternatively, to the extent Kunelius is attempting to assert a claim based on § 11, her claim must be dismissed for failure to allege that she was engaged in "trade or commerce." M.G.L. c. 93A, § 11(1). Nowhere does she allege facts sufficient to show that she was engaged in trade or commerce. Furthermore, there is no allegation in the Complaint that TPL was seeking to make a profit. *See Linkage Corp. v. Trustees of Boston Univ.*, 425 Mass. 1, 26, 679 N.E.2d 191, 209 (1997) (holding that Chapter 93A will not extend to nonprofit organizations not acting to generate a profit through the disputed transactions) (citations omitted).

Finally, Kunelius has failed to allege sufficient facts to show that TPL engaged in unfair or deceptive acts.[6] Taking as true the well-pleaded facts in the Complaint, Kunelius has alleged no more than the fact that TPL failed to meet the provisions of a contract and then attempted to re-negotiate it in a manner that at worst evidenced a desire to acquire the Property at a lower cost and encourage the plaintiff to negotiate a fair resolution. *See* Complaint Exs. 11, 12. This alleged conduct can hardly "raise the eyebrow of someone inured to the rough and tumble of the

---

[6] Again, TPL is impaired in defending against this claim because plaintiff has not specified whether she is proceeding under Section 9 or 11. The unfairness standard differs depending on the section asserted.

15

world of commerce." *Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504, 396 N.E.2d 149, 153 (1979). Courts have been clear that a breach of contract alone does not amount to a Chapter 93A violation. *Ahern v. Scholz*, 85 F.3d 774, 798 (1st Cir. 1996) (holding that even knowing breaches of contract may not violate c. 93A).

   **B.**  **Kunelius Has Failed To Allege Facts Sufficient To Support A Claim of Intentional Infliction of Emotional Distress (Count Four).**

  Kunelius's claim that TPL and MacDonnell intentionally inflicted emotional distress on Kunelius and that she suffered such distress is not supported by the well-pleaded facts alleged in the Complaint. First, Kunelius alleges no facts showing that MacDonnell's or TPL's conduct was "extreme and outrageous, was beyond all possible bounds of decency, and was utterly intolerable in a civilized community." *Agis v. Howard Johnson Co.*, 371 Mass. 140, 145, 355 N.E.2d 315, 319 (1976). Further, Kunelius has failed to allege that the distress she suffered was "'severe' and of a nature 'that no reasonable [person] could be expected to endure.'" *Id.* (quoting Restatement (Second) of Torts § 46, comment j (1965)). The Supreme Judicial Court set this high standard precisely to avoid litigation involving "bad manners" and "hurt feelings." *Id.* Taking the facts in the light most favorable to the plaintiff, she has alleged no more than hard bargaining on the part of TPL and disappointment and hurt feelings on the part of Kunelius. These facts do not give rise to a claim for intentional infliction of emotional distress. Indeed, a breach of contract, even if intentional, cannot amount to an intentional infliction of emotional distress. *Redgrave*, 557 F. Supp. at 236 ("Contracts are frequently broken, and even willful breach is not unusual. But it is unusual, perhaps unprecedented, for such a breach to constitute the tort of infliction of emotional distress.").

  Kunelius's claim is also barred to the extent it alleges emotional distress arising out of the exercise of the right of first refusal because TPL was asserting its legal rights when it engaged in

16

that conduct. *Horne v. Franks*, No. 942396, 1994 WL 903014, at *3 (Oct. 17, 1994) (citing *Richey v. American Auto. Ass'n*, 380 Mass. 835, 839, 406 N.E.2d 675, 678 (1980)) (holding that "assertion of one's legal rights, even where such assertion causes another anguish, does not constitute 'extreme and outrageous' conduct"). Here, TPL was asserting its legal rights pursuant to Chapter 61 when it accepted the assignment of the Town's right of first refusal and exercised that right. Neither TPL nor MacDonnell can be liable for those actions, even if they caused Kunelius distress.

        **C.**        **Kunelius Has Failed To Allege Facts Sufficient To Support A Claim of Intentional Interference with Contractual Relations (Count Five).**

In Count Five, Kunelius seeks damages based on an allegation that TPL and MacDonnell intentionally interfered with her contract with Cohousing. This claim requires that Kunelius allege facts sufficient to prove that TPL and MacDonnell knew of her contract with Cohousing and intentionally interfered with that contract using improper motives or means. *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 551 N.E.2d 20 (1990). What Kunelius ignores is the fact that TPL, as a matter of law, was permitted to interfere with and abrogate that contract. Chapter 61 specifically granted to the Town a right of first refusal and the option to assign it to a nonprofit organization. M.G.L. c. 61, § 8. Kunelius was aware that in return for the years of substantial tax benefits she received by classifying her land under this statute, she could face the possibility that the Town and, by assignment, a nonprofit organization would "interfere" with any agreement she executed for the sale of the Property by displacing the buyer—"interference" that is authorized by statute. Accordingly, as a matter of law, Kunelius cannot prove that TPL engaged in "improper means or motive" when it exercised the right of first refusal. *See, e.g., Williams v. Watt*, No. 99-00696, 2002 WL 1009255, at *6 (Mass. Super. Apr. 5, 2002) (rejecting

17

similar claim because plaintiff had not shown improper motive or means where nonprofit conservation organization accepted assignment and exercised right of first refusal under c. 61A.)

### D. Kunelius's Claim of a Constructive Taking in Violation of the United States Constitution Fails as a Matter of Law (Count Six).

In Count Six of her Complaint, Kunelius claims that TPL, the Town, and MacDonnell violated 42 U.S.C. § 1983 by depriving her of property without due process under the Fourteenth Amendment of the United States Constitution through a "constructive taking" of the value of her property. Complaint ¶¶ 94-99. This claim, while creative on the surface, also fails.

First, Kunelius has failed to allege facts sufficient to conclude that the actions of TPL and MacDonnell were taken under color of state law. *See* 42 U.S.C. § 1983 (providing private right of action only against person who, acting under color of state law, subjected plaintiff to constitutional violation). A private entity or individual only becomes a state actor when it meets one of several tests to determine if it is a "willful participant in joint activity with the State or its agents." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970). The only allegations in the Complaint that TPL or MacDonnell were acting under color of state law are the summary conclusions that TPL formed a "partnership" with the Town and that their actions were "taken under the color of state law *as evidenced by Stow involvement*." Complaint ¶ 95 (emphasis added). These summary conclusions are simply not enough to support this element of the claim.

Further, Kunelius has not alleged facts sufficient to meet the elements of a constructive taking. Kunelius still owns the Property and there is no well-pleaded allegation in the Complaint suggesting that the actions of TPL, MacDonnell, or the Town have taken its value from her. She is free to encumber, lease, mine, farm, or sell her property, any one of which would bring her an economic return. She has done none of these things. Government action short of actual acquisition of property may be a "constructive taking" only where the action has deprived the

18

property owner of "all or most of [her] interest" in the property. *Trager v. Peabody Redevelopment Auth.*, 367 F. Supp. 1000, 1002 (D. Mass. 1973); *see also Palazzolo v. Rhode Island*, 533 U.S. 606, 631 (2001) (rejecting takings claim where there was no deprivation of substantially all of the use and value of the property); *Marietta Realty, Inc. v. Springfield Redevelopment Auth.*, 902 F. Supp. 310, 312-13 (D. Mass. 1995) (dismissing constructive taking claim where plaintiff alleged a taking based on loss in value resulting from the state's failure to purchase plaintiff's property after it said that it would do so). Here, the Complaint fails to allege that Kunelius has been deprived of "all or most" of the value of her Property by TPL's failure to purchase it. As a result, Count Six should be dismissed.

### E. Kunelius Has Not Alleged with Particularity Any Fraud or Misrepresentation Upon Which She Claims To Have Relied (Count Seven).

The Complaint also fails to state a claim for fraud or misrepresentation. It alleges no well-pleaded facts sufficient to find that TPL or MacDonnell intentionally provided Kunelius with false information on which she relied to her detriment. Indeed, the only alleged representations made to Kunelius by TPL were the representations in the Assignment and notice of exercise that TPL was exercising the right of first refusal pursuant to the terms of the Agreement and that TPL was assuming the place of the Buyer in that Agreement. Complaint Exs. 3 and 4. Kunelius has failed to allege one well-pleaded fact suggesting that these representations were false. Further, Kunelius has failed to allege facts to show that she justifiably relied upon any such "misrepresentation" to her detriment. *See, e.g., Piantes v. Pepperidge Farm, Inc.*, 875 F. Supp. 929, 933 (D. Mass. 1995) (noting that justifiable reliance is an element of a fraud claim). The only reliance she alleges is a reliance "on the terms of the P&S as assumed and assigned by Stow

and TPL." Complaint ¶ 102. These cryptic allegations fail to state a viable claim for fraud or misrepresentation under Rule 12(b)(6).[7]

## CONCLUSION

Kunelius's legal challenge is utterly devoid of merit. She contracted for, and received, bargained-for liquidated damages, the only damages to which she is entitled for the failed sale. Kunelius's disappointment at the Town's assignment of its first refusal right to TPL, TPL's exercise of that right, and TPL's ultimate inability to perform cannot form a valid basis for a lawsuit. Accordingly, TPL, MacDonnell, and the Town respectfully request that this Court enter an order dismissing Kunelius's Complaint in its entirety, with prejudice.

THE TOWN OF STOW

By its attorneys,

/s/ Deborah I. Ecker
Deborah I. Ecker, Esq. (BBO # 554623)
Brody Hardoon Perkins & Kesten LLP
One Exeter Plaza
Boston, MA 02116
(617) 880-7100

THE TRUST FOR PUBLIC LAND

By its attorneys,

/s/ Dahlia S. Fetouh
Richard A. Oetheimer (BBO # 377665)
Dahlia S. Fetouh (BBO # 651196)
Goodwin Procter LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

CRAIG A. MACDONNELL,

By his attorneys,

/s/ James B. Conroy
Peter E. Gelhaar (BBO # 188310)
James B. Conroy (BBO # 096315)
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd Floor
Boston, MA 02108
(617) 720-2880

Dated: September 29, 2005
LIBA/1584035.2

---

[7] Further, Fed. R. Civ. P. 9(b) requires that all averments of fraud be stated with particularity. Rule 9(b) "requires specification of the time, place, and content of an alleged false representation." *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996) (*quoting McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d 226, 228 (1st Cir. 1980)). The Complaint makes no attempt to satisfy this exacting requirement. Indeed, Kunelius alleges only that the defendants "fraudulently and materially misrepresent[ed] Stow's and TPL's ability and/or intention to meet the obligations arising under the P&S and assignment." Complaint ¶ 101. This summary conclusion falls far short of meeting the stringent pleading requirements of Rule 9(b).