UNITED STATES DISTRICT COURT
(DISTRICT OF MASSACHUSETTS)

| | |
|---|---|
| MARILYN KUNELIUS,<br>      PLAINTIFF<br><br>V.<br><br>TOWN OF STOW separately, A<br>PARTNERSHIP OF UNKNOWN NAME<br>BETWEEN TOWN OF STOW and THE<br>TRUST FOR PUBLIC LAND, THE<br>TRUST FOR PUBLIC LAND separately<br>and CRAIG A. MACDONNELL, in his<br>individual capacity,<br>      DEFENDANTS. | CIVIL ACTION NO. 05-11697-GAO |

**PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS**

Plaintiff Marilyn Kunelius ("Kunelius"), by and through her counsel, Michael C. McLaughlin, submits this Memorandum in Opposition to Defendants' joint Motion to Dismiss the Complaint.

The Defendants seek to dismiss the Complaint on a pretextual defense that this is a simple breach of real estate Purchase and Sale contract and argue that liquidated damages under the contract are the only measure of recovery. Defendants expediently ignore the facts as well as Plaintiff's causes of action off the contract. This is not simply a failed real estate transaction; it is a complicated scenario involving a statutory right of first refusal and exercise of option by the Town of Stow ("Stow"), subsequently assigned to a third party, Trust for Public Land ("TPL"), which together acted in bad faith to avoid the bona fide purchase price it was required to pay to Kunelius under the law. The Defendants deliberately and in bad faith failed to comply with the requirements of both M.G.L. c. 61 and the

Purchase and Sales contract. Once the Chapter 61 right of first refusal is exercised, its holder must comply with the statutory prerogative that the full bona fide original purchase price of the contract be paid. Defendants have not so complied, have violated the statute, are in breach of contract, and have breached their duty of good faith and fair dealing. The liquidated damages clause of the contract is not enforceable because the damages, as a result of the Defendants' bad faith, were unforeseeable, and because it is unconscionable as the amounts recoverable under it are far disproportionate to actual damages. Additionally, Plaintiff has alleged sufficient facts to support all of its remaining causes of action, including M.G.L. c. 93A, intentional interference with contractual relationship, intentional infliction of emotional distress, unconstitutional taking, and fraud. The standards of Fed.R.Civ.P. 12(b)(6) are to be construed liberally in favor of the Plaintiff, accepting all allegations in the Complaint as true. Because the Plaintiff has properly pled the facts and can prove the facts it has alleged, the Complaint should not be dismissed

## FACTS

On or about October 11, 2002, Kunelius entered into a Purchase and Sale Agreement ("P&S") with Cohousing Resources, LLC ("Cohousing"), a real estate developer, for the sale of her property located at 142 and 144 Red Acres Road, Stow, Massachusetts ("the Property"). The purchase price for the Property was $1,116,900.00. This Property represents essentially all of Kunelius' assets. Complaint, ¶¶ 11 - 12 and Exhibit 1.

The P&S was unusual in that there was no deposit required under its terms and none was paid. Rather, the P&S contemplated installment payments on the purchase price. The P&S clearly lists the "deposit" as "0". Exhibit 1, ¶ 7. The P&S required the buyer to commence making "earnest money payments" in installments. Exhibit 1, ¶ 31. These earnest money payments were not deposits but were monthly payments made by the buyer directly to the seller.

2

The Property consists of uplands, wooded wetlands, a scenic pond, a vernal pool, two houses, a barn, a paddock and a pasture, and 42 acres that are designated as agricultural/horticultural and recreational under Chapter 61. As required by Chapter 61, Cohousing notified Stow that Cohousing intended to build a 30 house subdivision using the Anti-Snob Zoning law M.G.L. c. 40B ("Chapter 40B"), which enables developers to avoid local zoning by building 25% of a development as "affordable housing" if the community's affordable housing stock is below 10% of the town's housing. The P&S acknowledged the statutory provisions of Chapter 61 applied and therefore included provisions addressing the possibility that Stow could or would exercise its rights under Chapter 61.

Chapter 61 entitled Stow to notice of Cohousing's offer to buy the Property and gave Stow a right of first refusal to buy the Property itself instead, at the bona fide purchase price agreed to by Cohousing, that is, $1,116,900.00. On or about October 16, 2002 Stow was given the necessary notice of the P&S. Complaint, Exhibit 2. Pursuant to Chapter 61, Stow had the right to, but was not required to, exercise its right of first refusal, within 120 days of notice of the P&S, in order to protect the zoning designation and to preserve the Property as open space.

Stow wished to avoid the Chapter 40B subdivision planned by Cohousing and on February 12, 2003 exercised its right of first refusal in reliance on Chapter 61 § 8, which provided *in the case of intended sale* for a first refusal option to meet a *bona fide offer to purchase the Property*. Because there was a third party bona fide offer from Cohousing, the provisions of Chapter 61 §8 relating to conversion "not involving sale" did not apply and therefore *no provisions regarding fair market value or appraisal were triggered under the statute*.

Also on February 12, 2003, Stow assigned it first refusal option to TPL, and recorded the assignment with the Registry of Deeds within the 120 period, as required by Chapter 61.

3

Complaint, Exhibits 2 and 3.  On February 13, 2003, TPL itself, through its Regional Counsel Dorothy Nelson Stookey, acknowledged TPL's acceptance of the assignment and also formally elected to exercise the right of first refusal under Chapter 61 § 8 that was assigned to TPL by the town of Stow. Complaint, Exhibit 4.  This exercise of the right of first refusal by TPL was absolute, unconditional and obligated TPL to fund the purchase of the Property.

Shortly after TPL assumed and exercised of the right of first refusal, Kunelius had a telephone conference with Craig A. MacDonnell ("MacDonnell"), director of the Massachusetts Division of TPL.  During that meeting, Kunelius informed MacDonnell that the Property was her sole asset and that sale of the Property under the terms of the P&S was critical to her financial well being and stability.  Kunelius informed MacDonnell that she was relying on his representations that TPL would acquire the Property for the $1,116,900.00 price as agreed to by Cohousing in the P&S.  MacDonnell acknowledged to Kunelius and her attorney that the acquisition of the Property at that price by TPL was a certainty.

Stow and TPL entered into a partnership for the purpose of trade and business (the "Partnership") whereby they could develop the Property and derive profit so that Stow could benefit from the property.  As part of the partnership Stow agreed to contribute $400,000 towards the P&S purchase price.

Stow and TPL together deliberately interfered with the contractual relationship between Kunelius and Cohousing by exercising the Chapter 61 right of first refusal even though they never intended to pay the bona fide purchase price set forth in the P&S, as required by statute and case law, and had no intention of preserving the Property but rather intend to develop the Property pursuant to a development plan not contemplated by the terms of the P&S.  Upon exercising the right of first refusal, TPL, with Stow's knowledge and approval, immediately attempted, in violation of Chapter 61 and the P&S, to renegotiate the

4

terms of the P&S and the purchase price in order to obtain a more favorable business deal for itself.

Stow's knowledge of TPL's intent to change the P&S and the development of the Property itself is evidenced in its letter of September 24, 2003 in which it endorsed TPL's behavior, and acknowledged that i) Stow knew that TPL was "altering" the P&S because TPL decided after its exercise of right of first refusal to not move forward unless it received certain concessions from Kunelius; ii) Stow was not interested in compliance with the P&S but was acting in a manner to improve its own interests; iii) Stow's interest and TPL's were the same; iv) Stow was aware of and approved TPL's actions in reneging on the terms of the P&S and its efforts to submit a new proposal to Plaintff. *See* Complaint, Exhibit 5.

After Stow and TPL dishonored the P&S, certain members of the Board of Selectmen became concerned about Stow's involvement in the partnership. A Board of Selectmen Memorandum entitled "Kunelius Property Workout" was submitted to and considered at a meeting of the Board of Selectmen on November 25, 2003. This Memorandum stated:

> The lawyer for Marilyn Kunelius [plaintiff] has threatened a suit to enforce the contract that called for a $750,000 closing September 26th. The town does not want to find out if it has any legal liability. Yes, we ceded our right of first refusal to TPL and TPL certainly has the assets to make good on the transaction. *But they have reneged, and the contract has been breached. The seller has certainly been harmed by our actions and TPL's inaction. Should a suit against TPL be initiated, it is likely the town would become involved. At a minimum the town had committed to contribute $400,000 to the deal, and the actions of many could be interpreted as implying the town was a partner in the deal.*

Complaint, Exhibit 6. Clearly, Stow knew P&S had been breached by Stow and TPL, that TPL reneged on its obligations, that Stow appeared to be partners with TPL because it had committed to contribute and did appropriate $400,000 for the purchase price, and that Kunelius "has certainly been harmed by our actions and TPL's inaction." Id. Nonetheless, Stow took no steps to cause its partner TPL to honor the P&S. This statement is not only alleged and pled in the Complaint, but it also amounts to a party admission by Co-

5

Defendant Town of Stow. Id.  Defendants' attempts to deny any partnership are contrary to the facts as pled, which indicate that the general public had every reason to believe that the partnership did exist.

On September 25, 2003, TPL through its counsel attempted to renege on the assignment and its exercise of the right of first refusal by sending a letter to the chairman of the Stow Zoning Board of Appeals.  See Complaint, Exhibit 9. TPL chose not to honor the P&S, but decided instead to attempt a new development plan for the Property and sought approval for such development for marketing individual lots for sale from the Stow Zoning Board of Appeals.  TPL had the assets to honor the P&S and purchase the Property, but simply refused. *See* Complaint, Exhibit 10.

On July 6, 2004, TPL for the second time unfairly and deceptively attempted to renegotiate the purchase price notwithstanding the enforceability of the P&S. *See* Complaint, Exhibit 11.  TPL proposed reducing the purchase price by $400,000 to benefit Stow by removing Stow's investment commitment of $400,000.

In the Spring of 2004, MacDonnell met with Plaintiff and threatened and intimidated Kunelius and her counsel by stating generally that (i) TPL had "serious and influential connections by way of its Board of Advisors" who would defend TPL against any legal action brought by Kunelius as a result of TPL's default, (ii) TPL's Board of Advisors included prominent law firms that would tie up Kunelius and any attempt by her to enforce the P&S, (iii) TPL would notify the Court of its "influential connections beyond reproach" and that the Court would never find in favor of Kunelius notwithstanding that TPL was demanding a reduction in purchase price of $400,000, (iv) TPL was aware that Kunelius was of very limited means and that she and her attorney would not be able to spend sufficient funds to win any matter against TPL and (v) TPL had unlimited resources available to it to overwhelm anyone who would make the mistake of opposing TPL.

6

By letter dated July 6, 2004, TPL engaged in unfair and deceptive business practices by threatening Kunelius with the prospect of recovery of only nominal "liquidated damages" if she refused to lower the purchase price or in the alternative accept another proposal by MacDonnell and TPL.  Complaint, Exhibit 11.

Upon information and belief, Cohousing, having witnessed the unfair and deceptive trade practices and collusive and conspiratorial behavior of Stow and TPL and MacDonnell, refused to enter into a new P&S with Kunelius for fear of the certain repetition of such behavior of Stow and TPL.  Stow informed Kunelius' counsel that any subsequent attempt by Kunelius to sell the Property to a developer who intended to use Chapter 40B would be met with a similar exercise of the right of first refusal.

The unfair, deceptive, collusive and conspiratorial acts of Stow, the partnership of Stow and TPL and MacDonnell resulted in Kunelius being unable to collect the Purchase Price ($1,116,900) from Cohousing, Stow or TPL.

## ARGUMENT

A.   **Exercise of the Chapter 61 Option Binds TPL to Pay the Full $1,116,900 Purchase Price Without Regard to the Liquidated Damages Clause**

It is undisputed that the Town of Stow elected to and did exercise its right of first refusal under the provisions of Chapter 61. This was an unequivocal exercise of the right. It was not conditional partial or contingent. Indeed, Chapter 61 does not even contemplate any type of "exercise", other than a complete and binding exercise.

Chapter 61 §8 provides in pertinent part:

Land taxed under this chapter shall not be sold for, or converted to, residential, industrial or commercial use while so taxed unless the city or town in which such land is located has been notified of the intent to sell for, or so convert to, such other use…For a period of one hundred and twenty days subsequent to such notification, said city or town shall have, *in the case of intended sale, a first refusal option to meet a bona fide offer to purchase said land*, or, in the case of intended conversion not

7

>involving sale, an option to purchase said land at full and fair market value to be determined by impartial appraisal. After a public hearing, said city or town may assign either of such options to a nonprofit conservation organization under such terms and conditions as the mayor or board of selectmen deem appropriate. Such assignment shall be for the purpose of maintaining the major portion of the property subject to this assignment in use as forest land…
>
>…No sale or conversion of such land shall be consummated unless and until either said option period shall have expired or the landowner shall have been notified in writing by the mayor or board of selectmen of the city or town in question that said option will not be exercised… and such a notice that the option will not be exercised, shall be recorded with the registry of deeds.

(Emphasis added).

Here, there is no right to appraisal or determination of fair market value, because the right of first refusal was made pursuant to the provisions applicable to an *intended sale*. Cohousing entered into a P&S for a fixed sum certain, $1,116,900.00; as this was a third party offer and a clearly intended sale, the statute provides that the town in the exercise of its first refusal option <u>must</u> <u>meet</u> the *bona fide offer to purchase.* Neither Stow nor its assignee, TPL, can avoid this obligation, having irrevocably exercised the right of first refusal. Under Chapter 61, Stow and TPL step into the shoes of Cohousing *as to full bona fide purchase price* set forth in the original P&S. The Legislature showed no intention in enacting Chapter 61 that a municipality's right of first refusal would or could permit purchase on any price terms other than that set forth in the bona fide offer. <u>Town of Franklin v. Wyllie</u>, 443 Mass. 187, __ N.E.2d __, 2005; *see* <u>Sudbury v. Scott</u>, 439 Mass. 288, 299, 787 N.E.2d 536 (Chapter 61 must be read in "commonsense fashion to effectuate the purpose of the statute.")

A right of first refusal does not give the power to compel a sale, it requires only that the owner offer the property first to the person entitled to exercise that right who then, has the right to choose to purchase or not to purchase. "A right of first refusal is not an option to purchase property at a certain price, but a limitation on the owner's ability to dispose of property without first offering the property to the holder of the right *at the third party's*

8

*offering price…*The conditions of, and the duties imposed by, a right of first refusal are well established…The owner's obligation under a right of first refusal is to provide the holder of the right seasonable disclosure of the terms of any bona fide third-party offer…It is the prerogative of the holder then to decide whether to purchase the property *at that price."* Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 805 N.E.2d 957 (2204), citing S. Williston, Contracts, Fourth Ed. (2002) §67.85. (Emphasis added.)

Upon receipt of a bona fide offer from a third party, a right of first refusal ripens into an option to purchase according to the price terms of the original offer. Town of Franklin v. Wyllie, 443 Mass. 187, __ N.E.2d __, 2005; Greenfield Country Estates Tenants Ass'n, Inc. v. Deep, 423 Mass. 81, 666 N.E. 2d 988 (1996); *see* Stone v. W.E. Aubuchon Co., Inc., 29 Mass. App.Ct. 523, 562 N.E.2d 852 (1990)(Option may be exercised only in strict compliance with price term). An option creates a power to compel the owner of the property to sell *at the stipulated price* whether or not the owner is willing to part with his ownership.

In *Town of Franklin*, *supra,* the town took the position that it did not have to comply with the Chapter 61 120-day time limitation to exercise its right of first refusal, arguing that the P&S between the original buyer and seller had several contingencies, most notably an unfixed purchase price, which the Town thought rendered the P&S an executory contract until the contingencies had been met or had lapsed. The town argued that it did not need to exercise its right under Chapter 61 until it determined that all of the contingencies had been achieved, including the contingency that the town itself grant the necessary permits that would determine the purchase price pursuant to a formula set forth in the P&S. The Supreme Judicial Court rejected the circular logic of the town and stated that there was nothing in the extensive legislative history, the unambiguous language of the statute, or the case law "interpreting that language which would allow us to read into the statue terms an exclusion

for 'bona fide offers' contained in a fully executed and enforceable purchase and sale agreement."  Town of Franklin v. Wyllie, 443 Mass. 187, __, __ N.E.2d __, 2005.

Once an option is exercised, it ripens into a bilateral contract for the stipulated price. Because an option confers a right to compel performance exclusively for the benefit of the holder, here the town of Stow and its assignee TPL, it should be strictly construed in favor of the seller, Mrs. Kunelius.  See Lewis v. Chase, 23 Mass. App.Ct. 673, 505, N.E.2d 211 (1987).  *Also* 17 Mass. Prac §10.13.

Chapter 61 is a very straightforward provision.  It allows for no wiggle room.  Under it, Stow became obligated to purchase the property from the Plaintiff when Stow exercised the right of first refusal.  But before it became bound in this way, Stow had 120 days to undertake its due diligence to consider the purchase, to determine whether it or its assignee could afford the Property, and to consider whether to assign the right of first refusal to a qualified non-profit conservation entity such as the defendant TPL.  It is important to note that Stow *elected* to exercise its right under Chapter 61—it was not compelled to or under any statutory mandate to purchase the Property. Chapter 61 is structured so that the town may consider and then decline to meet the purchase price, in which case, the seller and the original buyer complete the sale. The town has no obligation of any kind if it declines to exercise the right of first refusal.  However, once it does exercise the right, that decision is the town's voluntary and binding step, which terminates the rights of the original buyer under its *bona fide* P&S, and *obligates* the town or its assignee to purchase the Property. The notice of the exercise of the right of first refusal is not a notice that the town "may," "might" or " could" decide to purchase the property. It is a binding notice that irreversibly and materially alters the position of the seller and the original buyer.  The time for "considering" the exercise of the right is before the actual exercise, not after the exercise of the right.   Price terms are not negotiable in the exercise of the right of first refusal.

10

Stow did not simply exercise the right; rather it first held public hearings and this included a town meeting as required under the law. Local and regional press covered the town's actions after the town made it known that it was considering exercising its rights under Chapter 61. The town and its citizens as well as TPL actively considered the entire process. This was no small matter for the town, TPL or the Plaintiff.

Notwithstanding the clear language and intention of Chapter 61, Defendants ask this Court to reconsider the election and exercise of the right of first refusal, and further, suggest that the statute permits an appraisal of the land in order to determine fair market value price. Appraisal or fair market value are irrelevant here because this is a case of "intended sale" under Chapter 61, and the price to be paid is the bona fide contract price offered by Cohousing, that is, $1,116,900. The appraisal terms of Chapter 61 only apply to conversions of land that do not involve a bona fide third party offer, and that is not the case here.

Defendants attempt to muddy the waters and impute into their Chapter 61 option contractual terms that do not apply once the right of first refusal has been exercised: they have made numerous references to Stow and TPL's recitations and wording in the election, assignment and exercise of the right of first refusal as "pursuant to the terms of a Purchase and Sale Agreement between Seller and Cohousing…" *E.g.,* Defendants Memorandum in Support of Motion to Dismiss, p.5. These recitations are irrelevant. Defendants cannot unilaterally interpose contractual terms into the exercise of their statutory option. Chapter 61 dictates the term: that the bona fide third party purchase price be paid.

In order for the Defendants to prevail, this court would have to conclude that the Legislature intended that once the town had determined that it wanted to preserve the land, that it could simply assign that decision to TPL who could, at its sole discretion, decide to purchase the property, not purchase the property, wait indefinitely, or purchase the property at any point in the future. This is neither what Chapter 61 states nor what it intended. Once

11

the right of first refusal is exercised, the town or its assignee cannot fabricate new terms, conditions, contingencies, or other circumstances to try to undo what they have already done. They are bound, as set forth by the Supreme Judicial Court in *Town of Franklin, supra.* Any other reading of the law would lay open to all potential sellers the risk of manipulation by towns seeking to interfere with property rights in order to stall develoment; it takes little imagination to understand how the town could abuse the statute as well as the plaintiff, by exercising the right of first refusal, thus stopping the low income project anticipated by the original buyer, and then simply defaulting under the terms of the P&S. In the instant case, the town and TPL working together did exactly that.

### B. Defendants Have Acted in Bad Faith and Have Materially Misrepresented the Reason for Their Nonperformance

Stow and TPL never intended to assume the non-price terms of the P&S, such as the plan to build Section 40B housing. In fact, the very reason Stow exercised its right of first refusal was to *prevent* the transaction intended under Cohousing's original P&S. Although Defendants agreed to the bona fide purchase price, as the statute required them to, they never intended to comply with other terms of the P&S, such as the Section 40B provisions, the financing and earnest money terms, and, as it turns out, even the price terms (despite the statutory directive to pay the bona fide purchase price).

Having acted in bad faith, Defendants cannot now argue the P&S is enforceable and then cherry pick which terms they wish to assume, while rejecting others. They cannot argue strict construction on the four corners of the P&S, while themselves unilaterally eliminating multiple terms they dislike. Defendants have violated the statute, breached their contract, and now seek to enforce the liquidated damages clause, having abandoned all other essential terms of the original P&S. They do this simply as a means to cut their losses—indeed

virtually eliminate all their losses, and absolve them of their statutory obligations under Chapter 61 §8.

Defendants intentionally and in bad faith sabotaged their purchase of the Property, after having irrevocably exercised the right of first refusal, simply and only because they changed their minds about the efficacy of <u>TPL's plans for the Property</u> (not the plans anticipated by the P&S). All of their other explanations and justifications, none of which excuse performance in any case, are simply pretext. Defendants make much of the fact that their fundraising fell short—but this is irrelevant, because once having exercised the right of first refusal, Defendants became obligated to pay the bona fide purchase price regardless of financing arrangement. Exercise of the right of first refusal was not contingent on fund raising. Financing was Defendants' burden and one that they had 120 days to conduct due diligence on before exercising the right of first refusal. TPL had ample assets to fund the transaction, which it declined to use, but more significantly, in an act of indisputable bad faith, TPL, an organization with hundreds of millions of dollars of assets, elected to reject the purchase price <u>and</u> the terms of the P&S which allowed for purchaser to give the Plaintiff a note for a portion of the purchase price. The Defendants elect to focus on only one term of the P&S (i.e. the liquidated damages clause). They attempt to avoid the fact that the purchase price allowed for a $400,000.00 Note as part of the purchase price. The Court must consider that the Town had committed $400,000.00 to the Purchase Price. That amount combined with the $400,000.00 Note left only $316,900.00 due at the closing. This is hardly an overwhelming amount of money for TPL to raise, as can be seen by Exhibit 12; Failure to raise money is nothing more than a pretextual reason to dishonor the P&S. The fact is, however, that it was not the failure of fundraising that caused TPL not to go forward. Rather, in addition to this contrived reason, TPL did not want to comply with the "Note" portion of the Purchase Price. As can be seen by Exhibit 12, "TPL's Board of Directors will not approve

any borrowing to bridge a fundraising gap because the prospects for raising the funds necessary to repay the loan required are not encouraging". Thus not only do the Defendants reject the Purchase Price, they also reject the terms of the Note, simply because they do not want to borrow.

Every action taken by Defendants indicated they were more than capable of providing the necessary funds to pay the purchase price and it is not credible that Defendants did not have adequate financial resources. The Complaint provides the court with the financial information for TPL indicating that it boasted of $349,000,000.00 in assets and $78,960,000.00 of income for the year 2004. *See* ¶40 Complaint, Exhibit 10. As set forth in the Complaint, TPL, with the knowledge and complicity of Stow, simply and repeatedly tried to obtain a lower purchase price once the right of first refusal was exercised.

TPL's purported inability to raise $316,000 is not the real reasons for the Defendants' default for the purchase of the Property. Complaint, Exhibits 6, 7, 8 and 9 all indicate that the justification for not moving forward was that TPL sought to "develop" the property, as opposed to preserving it, and went so far as to submit application for variances for the property which were not part of the original P&S. Exhibit 9 demonstrates that the position taken by the Defendants in the Motion to Dismiss is fundamentally misleading and not candid with the Court.

Complaint Exhibit 11 demonstrates that the Defendants sought to avoid compliance with Chapter 61 because they decided that they did not want to pay the Purchase Price even though they had exercised the right of first refusal. Exhibit 11 demonstrates the repeated efforts of TPL and Stow to reduce the purchase price to $800,000.00. In effect, TPL and the town decided not to "preserve" the Property in compliance with Chapter 61, but rather to seek new variances and to develop it in order to alleviate Defendants' financial risk in paying the bona fide purchase price.

Failure to inform this Court of these facts is characteristic of Defendants' unfair and deceptive practices in connection with this matter. Defendants elected to exercise their right to purchase the Property at its third party bona fide price, and then immediately entered into bad faith delay tactics**,** stripping Plaintiff of her original bona fide purchaser, then attempted to renegotiate the entire transaction, seek permits that were never components of the original P&S, demand reduction of the original purchase price and, ultimately, after more than a year of delays, attempt to walk away from the purchase altogether.

Massachusetts has long recognized a duty of good faith implied in commercial contracts "that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Uproar Co. v. National Broadcast Co., 81 F.2d 373, 376 (1st Cir. 1936). Further, a contract is to be construed "with reference to the situation of the parties when they made it and to the objects to be accomplished." Shea v. Bay State Gas Co., 383 Mass. 218, 222-23 (1981). This "contextual" interpretation in contract construction is the modern approach in Massachusetts, notwithstanding early precedents for formalistic construction on the "four corners" of the contract. *See* Tory Wiegand, *The Duty of Good Faith and Fair Dealing in Commercial Contracts in Massachusetts*, 88 Mass. L. Rev. 174 (2004). Section 205 of the Restatment (Second) of Contracts similarly confirms this duty of good faith in contractual relations, stating: "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement."

The Supreme Judicial Court has unequivocally held that it is bad faith and impermissible for one party to take actions in a real estate development transaction that destroy or injure the other party's rights to receive the fruits of the contract. Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. 451 (1991). Central to the Court's decision in *Anthony's Pier Four* was evidence that the real reason for the breach of contract was not the

15

reason alleged (purportedly problems with approval of the development plan), but rather was because the breaching party simply changed its mind about how it felt about the purchase price and wanted to renegotiate a better deal for itself. In short, the alleged basis for breaching the contract was pretextual. The Court found this entirely unacceptable and a failure of good faith and fair dealing, and therefore declined to strictly construe the contract solely on its four corners, looking to circumstances off the contract and found it is inappropriate to manipulate performance under a contract to create new negotiating opportunities.

The same approach should be applied in this case. Defendants' misrepresented their financial position and their ability to obtain financing, refused to allow abutters to raise the necessary funds, refused to release the Property so it could be sold to the original third party bona fide buyer[1], and then sought to abandon their statutory and contractual obligations on the grounds that they had a funding shortfall, even though TPL knew before it exercised the right of first refusal, that it had no intention of complying with the bona fide price terms.

Further, breach of the duty of good faith can be inferred by circumstances, and need not be proven by overt acts of bad faith. Krapf v. Krapf, 439 Mass. 97, 100 (2003)(Court to give effect to language of contract considered in light of the context of transaction and the purpose to be accomplished). The failure to cooperate, or inaction, is also sufficient evidence of breach of good faith and fair dealing. *E.g.,* Uno Restaurants Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376 (2204).

Here, Defendants' bad faith actions constitute a breach of the duty of good faith and fair dealing and a breach of contract. TPL's post-formation conduct, that is its actions to

---

[1] Defendants have never filed with the Registry of Deeds, as required under Chapter 61 § 8, any notice that they would not exercise the right of first refusal, thereby releaseing the Property to the market. In addition, the real estate brokers involved in the original P&S continue to list the Property as under agreement and will not show it because they view it as sold, and in fact are seek their commission.

sabotage its Purchase of the Kunelius Property because it changed its mind about the financial efficacy of the purchase, violates all notions of good faith, and Defendants should be required to make Kunelius whole and pay her the bona fide purchase price Defendants agreed to of $1,116,900.00.

### C. The Liquidated Damages Clause is Unenforceable

Defendants argue that the P&S anticipated that the sale might not occur because the agreement contained a "liquidated damages clause". *See* Exhibit 1, ¶ 21. Defendants allege that TPL, supposedly in compliance with the P&S, had made "deposits" and the liquidated damages clause provided that these "deposits" were the seller's sole and exclusive remedy at law and equity once the defendants defaulted.

Liquidated damages clauses are valid only if not unconscionable or punitive and if reasonable in light of the anticipated or actual loss caused by the breach. Deerskin Trading Post, Inc. v. Spencer Press, Inc., 398 Mass. 118, 495 N.E.2d 303 (1986). Lynch v. Andrew, 20 Mass. App. Ct. 623, 481 N.E.2d 1383 (1985); Kroeger v. Stop & Shop Companies, Inc., 13 Mass. App. Ct. 310, 321-322, 432 N.E.2d 566, 572-573 (1982).

Here, the liquidated damages can never be applied because the only term that is valid as it relates to the Defendants is the purchase price. However, if the provisions of Chapter 61 did not apply to the P&S then the liquidated damages provisions is disproportional to the damages either party could have envisioned. Certainly, Mrs. Kunelius did not and could not foresee that Stow's assignee of its right of first refusal, TPL, would exercise the option in bad faith and then engage in nothing short of extortion tactics to attempt to renegotiate the purchase price. Nor could Mrs. Kunelius foresee the delays TPL's actions would engender and the consequent cascade of losses caused by these delays, including most notably the loss of the Section 40B Anti-Snob Zoning prospect. Nor was it foreseeable that Defendants would

17

take actions to alienate the original third party buyer, Cohousing, ensuring that Cohousing would not consider working with Stow on this project again. *See* Complaint at ¶51.

Further, the amount of damages the Defendants suggest are due under the liquidated damages clause is preposterously disproportionate to the losses Defendants caused in breaching their obligations. The total amount paid to Kunelius to date, as payments towards purchase (and not as deposits as proffered by Defendants) is only $19,000. The amount owed to her under Chapter 61 §8 is $1,116,900. Limiting Kunelius to a mere $19,000 is punitive and grossly inequitable in the circumstances. Punishment is not a primary purpose of contract law. Factory Realty Corp. v. Corbin Holmes Shoe Co., 312 Mass. 325, 331, 44 N.E.2d 671, 674 (1942).

The courts need not and should not enforce liquidated damages provisions in these circumstances. See Graves Equipment, Inc. v. M DeMatteo Construction Co., 397 Mass 110, 489 N.E.2d 1010 (1986).

Liquidated damages clauses that provide for the seller of real estate to retain the buyer's deposit are a common and recognized real estate practice. These clauses are meant to protect the Seller, usually by permitting the seller to retain the deposit after a breach by the buyer accompanied by the buyer's claim for a return of deposit. These are not the facts here. In any case, Massachusetts will enforce liquidated damages clauses only when the sum agreed upon represents a reasonable estimate of the actual damages at the time of contract formation. Kelly v. Marx, 428 Mass. 877, 705, N.E.2d 1114 (1999) (Sellers permitted to retain deposit as liquidated damages where sum was not grossly disproportionate to the expected damages from buyer's breach.) And there is nothing to say that the Seller cannot pursue other claims and remedies off the contract against the Buyer.

In addition, the liquidated damages clause is structured in terms of deposits retained. In reality, however, there were no "deposit" payments listed under the P&S, a fact

Defendants fails to mention. *See* Exhibit 1, ¶ 7. A review of ¶ 7 under the heading of Purchase Price clearly lists the "deposit" as "0". What the P&S did have was a provision that required the buyer to commence making payments called "earnest money payments". Exhibit 1, ¶ 31. These earnest money payments were not deposits, rather they were monthly payments made by the buyer directly to the seller. There was one and only one payment that even had the word "deposit" attached to it. This one payment was the first $10,000 earnest money payment. The earnest money payments were in fact installments of the purchase price. Defendants made these earnest money installment payments to the seller after they exercised the right of first refusal and continued to do so until the time of the default.

Defendants are anxious to construe these earnest money installment payments as "deposits" in order to fund the liquidated damages clause, thereby enabling them to claim that their default was foreseeable and contemplated by the P&S.

Defendants cannot have it both ways, choosing to assert the liquidated damages clause, while at the same time avoiding all other essential terms of the P&S. Defendants disregarded the original intention to preserve the agricultural and forested lands, changed the development deal contemplated in the P&S, sought new variances for a different development plan, and attempted to lower the purchase price, shamelessly ignoring the P&S terms in the process. They also disregarded the bona fide purchase price directive of Chapter 61 §8. Yet, now they seek to rely on the specific language of the liquidated damages clause of the contract to protect them from paying the rightful and appropriate measure of damages to Kunelius. The Defendants unfairly and deceptively attempted to force the Plaintiff to relinquish her rights under the contract and now ask the Court to overlook their actions. Defendants are not entitled to the protection they seek and the Court should not enforce this liquidated damages clause given these circumstances.

**CONCLUSION**

Plaintiff's Complaint is well pled, and therefore, under Fed. R. Civ. P. 12(b)(6) the Court must determine the sufficiency of the Complaint by accepting the allegations in the Complaint as true, drawing all inferences in the Plaintiff's favor. Defendants' suggestion that the Complaint is inadequately pled to support all counts is wishful thinking. Indeed, the Court need look no further than ¶30 of the Complaint and Exhibit 6 to find the party admission of Stow that TPL had the assets to make good on the P&S, that the Defendants reneged on their contract, that the town had appropriated $400,000 in funds towards their share and that the town could be viewed as a partner, and finally, that the Plaintiff had been harmed by the Defendants' actions.

Defendants may not avoid the applicable standards of Fed. R. Civ. P. 12(b)(6) by arguing that their interpretation of the disputed contract must be accepted by the Court. The Court has before it the issue of liquidated damages, which includes a dispute as to whether there was any deposit under the terms of P&S. Defendants are essentially asking the Court to resolve the issue by making a findings of fact. Such findings would be impermissible in the motion to dismiss context.

    Respectfully submitted,

    Marilyn Kunelius,
    By Her Attorney

    **LAW OFFICES OF MICHAEL C. MCLAUGHLIN**

Dated: November 3, 2005   By:   /s/ Michael C. McLaughlin, Esq.
    (BBO# 367350)
    One Beacon Street, 33rd Floor
    Boston, MA 02108
    (617) 227-2275