UNITED STATES DISTRICT COURT
(DISTRICT OF MASSACHUSETTS)

CIVIL ACTION NO. 05-11697 GAO

_____

MARILYN KUNELIUS,            )
        Plaintiff,            )
                 )
V.                           )
                 )
TOWN OF STOW separately, A   )
PARTNERSHIP OF UNKNOWN NAME  )
BETWEEN TOWN OF STOW and THE )
TRUST FOR PUBLIC LAND, THE   )
TRUST FOR PUBLIC LAND separately )
and CRAIG A. MACDONNELL, in his )
individual capacity,         )
        Defendants.           )
_____ )

## <u>MEMORANDUM IN OPPOSITION TO DEFENDANT, THE TRUST OF PUBLIC LAND'S MOTION TO QUASH AND IN SUPPORT OF THE PLAINTIFF'S MOTION FOR SANCTIONS</u>

NOW COMES the Plaintiff with this Memorandum in Opposition to Defendant, The Trust For Public Land's ("TPL") Motion to Quash and In Support of the Plaintiff's Motion For Sanctions.  As a result of recent discovery, the Plaintiff believes that TPL's Motion to Quash has been filed in bad faith and further that all Defendants have filed documents with this Court that were, at minimum, misleading and intended to convince the Court and the Plaintiff into believing that TPL could not raise funds necessary to purchase the Plaintiff's property. The Plaintiff respectfully suggests that the Court's review of the following discovery will be sufficient for the Court to conclude that the Motion to Quash should be denied and all Defendants should be sanctioned for participating in nothing less than an attempt to withhold the truth from the Court and Plaintiff.

**Defendants' Misstatements to the Court**

A fundamental component of the Plaintiff's case has involved the Plaintiff's assertion that TPL and the other Defendants (Town of Stow ("Stow"), Partnership of unknown name between the Town of Stow and the Trust of Public Land, TPL, and Craig MacDonnell ("MacDonnell")) deliberately lied to the Plaintiff when TPL defaulted on its obligation to purchase the property from the Plaintiff ("Plaintiff's Property), as required under the provisions of Massachusetts General Laws Chapter 61A. This deliberate lie has involved the Defendants' joint statement that TPL "could not raise the money necessary to purchase the property from Mrs. Kunelius." As the Court is aware, all of the Defendants have jointly filed a Motion to Dismiss which states:

> "However, after paying thousand of dollars for deposits required under Agreement, TPL found itself **unable** to raise the money necessary to fund the project and was **unable** to complete its purchase of the Property." [emphasis supplied].

(*See* Defendants' Motion to Dismiss, pages 1 and 2).

> "When TPL was ultimately **unable** to raise the money to fund the purchase, it was **unable** to acquire the Property and forfeited thousands of dollars to Kunelius pursuant to the liquidated damage clause." [emphasis supplied].

(*See* Defendants' Memorandum of Law in Support of Motion to Dismiss of the Defendants, pages 1 and 2).

> "Ultimately, however, TPL was **unable** to raise the funds necessary to purchase the Property by the closing date of September 26, 2003. *Id*. As TPL publicly expressed, its efforts to raise the funds were hindered by a declining economy, a difficult market for philanthropy, and the unexpected denial of a needed state grant." [emphasis supplied].

(*See* Defendants' Memorandum of Law in Support of Motion to Dismiss of the Defendants, page 6). The above statements are hereinafter referred to as the "Inability to Purchase Defense."

It must be noted that the Inability to Purchase Defense has been made **jointly by all Defendants since they filed Joint Motions and Memoranda**. The above statements are

unequivocal. However, recent discovery has shockingly revealed that <u>all</u> Defendants were and are aware that the above statements to the Court and the Plaintiff were entirely and completely false as to every component of those statements.

During discovery, the Plaintiff uncovered an application from the Defendants to the Commonwealth of Massachusetts for the express purposes of convincing the Commonwealth of Massachusetts Department of Housing Community Development ("DHCD") to fund $352,000.00 as a component of the money that the Defendants were obligated to pay the Plaintiff. This application, which is attached as Exhibit A, involves TPL, Stow, and MacDonnell directly. In the application, filed on March 30, 2003, the Defendants informed the Commonwealth of Massachusetts that, notwithstanding the $352,000.00 sought from the Commonwealth, **TPL had a "fall back" plan because a $6 million line of credit reserved for the purpose of acquisition of the Plaintiff's Property.** The following are the specific statements made by the Defendants to the Commonwealth of Massachusetts revealing to the Commonwealth the fact that TPL <u>did not even need the grant sought from the Commonwealth</u>.

> "TPL is prepared to purchase the Property. TPL has a primary plan and a fallback plan. The primary plan envisions a multilateral funding approach to this project. Some of the funding is contingent, as explained below, **but all of it is subject to a fallback Line of Credit from Wainwright Bank.** [emphasis supplied]
>
> TPL's primary plan is to generate the funds necessary for the closing as follows.
> a. <u>Town Funds:</u>  The Town's contribution will be allocated from the pre-existing Community Preservation Fund (CPF) in Stow. CPF monies are derived from a property tax surcharge imposed on real estate. The fund currently has approximately [$550,000] available for allocation to projects like this one. Any allocation requires a simple majority vote at Town Meeting on May 19, 2003. The Board of Selectmen and the Community Preservation Committee have voted to support this measure. This contribution will entitle the Town to the ownership of 45 acres of adjacent woodlands and wetlands for conservation and municipal water supply purposes.
> b. <u>144 Red Acre Road</u>: TPL will sell 144 Red Acre Road, an adjacent five-acre property containing a two-bedroom house, two barns and a small outbuilding to the Eye of the Storm Equine Rescue, Inc. (EOS), a non-profit corporation dedicated to the rehabilitation of sick and injured horses. EOS intends to utilize this property as its primary rehabilitation facility.

> c. <u>DHCD Funds</u>: TPL intends to use the acquisition funds requested in this application at the closing of the purchase of the property from the current owner on September 25, 2003.
> d. <u>Private Fundraising</u>: TPL has and will continue to pursue private-sector fundraising for this project. Currently, there are pledges in excess of $200,000 available for this project (two $100,000 pledges from other non-profit organizations, and the remainder in individual donations).
>
> **As a fallback plan, if any or all of the above referenced sources of funds are unavailable, TPL intends to utilize capital from the private market. In this regard, TPL has available for its use a Line of Credit from Wainwright Bank in the amount of $6,000,000, as evidenced by the letter attached as Exhibit ___. The use of this capital is subject to TPL's internal approval process, including customary due diligence and approval by the Board of Directors.**" [emphasis supplied].

(<u>See</u> Exhibit A, bate stamp pages 342 and 343).

The above statements by the Defendants to the Commonwealth demonstrate the utter disregard of the truth in the statements made by the Defendants to this Court and the Plaintiff. For example, TPL was never "unable" to purchase the Plaintiff's Property despite its assertion to the contrary on 5 different occasions to this Court.[1]

As a result of the above quotes, it is absolutely clear that the Defendants and their counsel were aware of the expressed availability of the line of credit for the purchase of the Plaintiff's Property. TPL despite its assertions to the contrary was always "able" to purchase the Plaintiff's Property. This information, in light of the Defendants' Inability to Purchase Defense that TPL could not "raise" the money and was <u>unable</u> to purchase the Plaintiff's Property, is nothing short of a deliberate misrepresentation that was not only made to the Court but also to the Plaintiff at the time of default.

The Court may recall that at the time of the hearing on the Motion to Dismiss, the Defendants and their attorneys stood silently as the Plaintiff's counsel asserted and reasserted to this Court that the Defendants' Inability to Purchase Defense as reflected in their Motion

---

[1] In addition, the above statement refers to a line of credit from Wainwright Bank evidenced by a letter presumably from that bank. <u>However, Stow failed to provide that letter or any documents relative to Wainwright Bank</u>.

was false and misleading.  Simply as a matter of candor to the Court, the Defendants had an obligation to the Court to acknowledge that their statements were not truthful and accurate. This is particularly true since <u>only</u> the Defendants knew of the "line of credit" that was expressly available for the purchase of the Plaintiff's Property.  The Plaintiff, obviously, will leave to the Court the issue of whether the Court believes that the Defendants have attempted to mislead the Court by seeking the sympathy of the Court for the alleged "penniless non-profit TPL."  However, the Plaintiff suggests that any reading of the Defendants' statements demonstrates multiple levels of deceit.  Any individual that is told "I can't raise the money and therefore I am <u>unable</u> to buy the property" will understand that the speaker <u>cannot</u> buy the property.

**The Defendants' Attempt to Mislead Has Continued through Depositions**

The Plaintiff believes that the Defendants' misrepresentations to the Court are consistent with their misrepresentations to the Plaintiff and with their ongoing and deliberate effort to avoid answering questions truthfully in the depositions.  During the recent deposition of Craig MacDonnell on February 8, 2007, the Director of the Massachusetts office of TPL, Mr. MacDonnell was questioned about the Wainwright Bank letter of credit. Mr. MacDonnell, who is himself a member of the Massachusetts bar, was apparently surprised that the Plaintiff had discovered information concerning the $6 million line of credit.  When asked questions about the line of credit, Mr. MacDonnell feigned ignorance or lack of memory concerning virtually every question as to the availability of that line of credit, its status, whether it was in default, or how much money was available in the line.  The Plaintiff respectfully suggests to this Court that his testimony was deliberately misleading and knowingly false.  In reviewing the transcript testimony below, the Court should be aware that Mr. MacDonnell specifically testified that he reviewed the Stow and TPL application with the reference of the $6 million line of credit before it was filed with the Commonwealth.

(*See* Exhibit B, page 206, line 5 through line 11).  In addition, he testified that the application was prepared by TPL personnel including the Project Manager for the TPL's efforts regarding the Plaintiff's property.  (*See* Exhibit B, page 104, line 17 through page 105, line 15).

```
Q. Were you aware that there was a line of credit at Wainwright Bank
that was available as a fallback to the financing of this purchase from
Mrs. Kunelius?
A. I am familiar that TPL has a line of credit with Wainwright Bank.
Q. Are you familiar that it was described as a fallback for the funding,
as a contingency for the funding, of the purchase of Mrs. Kunelius'
property?
A. Well, I see it written here, and it does remind me that there was
some discussion about using Wainwright.
Q. And did you participate in the application for a line of credit to
Wainwright Bank?
A. No.
Q. Who would have made application on behalf of TPL to Wainwright Bank?
   MR. CONROY:  Objection.
A. It's a standing line of credit.  There's no application involved.
Q. Does TPL have a standing line of credit right now with Wainwright
Bank?
A. Yes.
Q. What is the amount of that line of credit?
A. I don't know.
```

(*See* Exhibit B, page 108, line13 through page109, line 11).

```
Q. Is today the first time that you have become aware that there was a
six million dollar line of credit available to TPL for the purchase of
the property if, quote, any or all of the above-referenced sources listed
on Page 343 and 342 were unavailable?
A. I was familiar with the Wainwright line of credit before today.
Q. And so you were aware that, should the funds that you sought from the
town fail, TPL intended to use the line of credit.  Is that fair to say?
            MR. CONROY:  Objection.
            MS. FETOUH:  Objection.
A. No, it's fair to say that TPL could use that line of credit if
necessary and subject to due diligence and approval.
Q. But it doesn't say that.  It says:  TPL intends to utilize the
capital from the private market.  In this regard, it has available for
its use a line of credit. Do you see that?
A. I do.
Q. Doesn't say could, might.  It says intends to.  Is that correct?
A. Well, the word in the document is intends.
…
Q. You're aware, are you not, in this litigation that TPL has made
representations to the federal court that TPL did not have the money to
purchase the property?  Are you aware of that?
            MR. CONROY:  Objection.
A. As I sit here today?
Q. Yeah.
A. I am not sure I am aware of that.
Q. Did you review the documents filed on behalf of TPL in the
current litigation?
A. On behalf of TPL or myself?
Q. Yes, on behalf of TPL.
```

```
A. I believe I saw them before they were filed, yes.
Q. And did you review the documents that were filed on your behalf?
A. I did.
Q. And do you recall seeing statements to the federal court indicating
that TPL did not have the money to purchase the property and that that's
the reason that the property purchase did not go forward?
A. Well, in fact, TPL did not have the money."
```

(*See* Exhibit B, page 110, line 24 through page 113, line 1).

```
"Q. Now, you were not unable to raise the money because you had a six
million dollar line of credit, but you just decided not to use it. Isn't
that reasonable to say?
          MR. CONROY:  Objection.
          MS. FETOUH:  Objection.
          MS. ECKER:  Objection.
A. The decision was made not to use the line of credit.
Q. But that's not what you told the judge. What you told the judge was
you were unable to raise it. Is there some sort of stop-payment or stop-
borrowing order on your line of credit at Wainwright Bank?  In other
words, can you go in there right now, TPL, and borrow money on the line
of credit, or is it in some way in default?
A. I don't know.
Q. You don't know if your own line of credit is in default, sir?
A. Correct.
Q. Do you have reason to believe that your line of credit is in default?
A. I have no reason to believe.
Q. So, as the director of the State of Massachusetts TPL, is it your
testimony today under oath that you do no know whether your line of
credit is in default or not.
          MR. CONROY:  Objection.
          MS. FETOUH:  Objection.
A. I think I answered that question.
Q. And the answer is you do not know whether it's in default or not.
A. Correct.
Q. Do you know if it's overdrawn or not?
A. I don't.
Q. Do you know if any money is withdrawn on that account?
A. I don't.
Q. Who would?
          MR. CONROY:  Objection.
A. Our finance manager.
Q. And is the line of credit that's in Wainwright Bank, is that money
that is earmarked for the Massachusetts branch of TPL?
A. I think it's available for the region.
Q. And so the region would be the New England region?
A. Right.
Q. Do you know who applied for that six million dollar
line of credit?
A. No."
```

(*See* Exhibit B, page 114, line 3 through page 116, line 1).

The Plaintiff respectfully suggests that the above testimony was intended to misrepresent and obfuscate the matter relating to the line of credit which had been specifically set aside for the purchase of the property. Again, the deponent, Mr. MacDonnell

was not only the Director of Massachusetts TPL, <u>he is also an attorney and member of the</u> <u>Massachusetts bar</u>.

The Plaintiff, having identified the serious misrepresentations referred to above and encountered the extraordinary bad faith answers of Mr. MacDonnell, has sought information directly from Wainwright Bank by way of subpoena in order to further demonstrate the scope of the Defendants' deliberate efforts to misrepresent. Common sense would dictate that information concerning the Wainwright Bank account is particularly important to the Plaintiff especially considering the issues of pre-textual and false justifications given by the Defendants. The Plaintiff respectfully suggests that the sudden lapse of memory by Mr. MacDonnell is a coordinated attempt of the Defendants to avoid the consequences of the information that will result from Subpoena of Wainwright Bank being made available to the Plaintiff.

### The Current Motion Demonstrates the Continuing Willingness to Mislead the Court

There is no doubt that Mr. MacDonnell's feigning of ignorance during the deposition concerning the Wainwright Bank account, is reflective of his dismay that the Plaintiff "found out" about the $6 million line of credit." Given the Inability to Purchase Defense made by the Defendants to this Court, there can be no greater evidence of the Defendants' ongoing attempts to mislead the Court than the actual language found on page 3 of TPL's Memorandum of Law in Support of the Motion to Quash the Subpoena in which the Defendants now deny that they ever made the Inability to Purchase Defense.

> "**TPL has never argued and does not now argue that it failed to perform under the P&S because it could not have paid the purchase price from TPL's own funds or available credit, had TPL chosen to do so**." [emphasis added].

(<u>See</u> page 3 of the Defendants' Memorandum in Law).

This new denial of the Defendants' Inability to Purchase Defense has been made not only to the Court, but has been made on March 5, 2007 to the Plaintiff's counsel.

> "TPL has never argued that TPL could not have resorted its own funds or available resources to complete the purchase of Mrs. Kunelius' Property."

(See March 5, 2007 letter of Dahlia S. Fetouh, attached hereto as Exhibit E).

The above quotes are as misleading as the Inability to Purchase Defense. No reasonable person could assign any credibility to the Defendants who, after being caught in a lie during the deposition, now deny that they made the untruthful statements to this Court in the first place. For example, if an attorney, having missed a hearing before this Court, told the Court that the reason he missed the hearing was "I was unable to attend" and the Court later found out that the attorney actually was in the Courthouse building but "elected" not to attend the hearing, then one could reasonably expect that this Court, at a minimum, would sanction the attorney for misleading the Court and for violation of ethical standards and Candor to the Court. It must be remembered that the misrepresentations are being made by an alleged non-profit organization TPL, and an attorney as well as the Town of Stow. These are organizations and/or individuals that claim special benefits, rights, and protections because of their acting for some greater good. In fact, the Defendants acted in such a predatory way as to be shockingly non-charitable. Equally misleading is the following statement that in TPL's Memorandum of Law in Support the Motion to Quash.

> "TPL accepted the assignment of the Kunelius Agreement based upon projections that the purchase price could be raised form a variety of sources, including a contribution by the Town of Stow, a state grant from the Department of Housing and Community Development, private fundraising with the assistance of local conservation organizations, and limited development of a portion of the Property, as expressly permitted under Chapter 61."

(See page 3 of the Defendants' Memorandum in Law in Support of Motion to Quash the Subpoena). The above statement so fundamentally contradicts the Defendants to the Commonwealth of Massachusetts as to raise serious concerns about the veracity of the

Defendants before this Federal Court.    The Plaintiff respectfully requests that the Court consider the precise language quoted directly from the application to the Commonwealth as seen on the beginning of page 3 of this Memorandum.    The Defendants told the Commonwealth;

> "As a fallback plan, <u>if any or all of the above referenced sources of funds are unavailable, DHCD funding and private fund raising, TPL intends to utilize capital from the private market.  In this regard, TPL has available for its use a Line of Credit from Wainwright Bank in the amount of $6,000,000, as evidenced by the letter attached as Exhibit       </u>.  The use of this capital is subject to TPL's internal approval process, including customary due diligence and approval by the Board of Directors." [emphasis supplied].

(*See* Exhibit A, bate stamp page 343).

The completely contradictory statements made to this Court and to the Commonwealth of Massachusetts demonstrate the difficult position the Defendants find themselves in, having decided to get on the "slippery slope of deception."  On one hand, the Defendants will have to admit that they misled the Court and the Plaintiff.  On the other hand, the Defendants would have to admit that their statements to the Commonwealth were knowingly false.  Obviously, the Defendants are faced with estoppel with regard to the statements made to the Commonwealth and they are faced with a misrepresentation issue with regard to the statements made to this Court.

The Plaintiff was able to secure from the Commonwealth of Massachusetts, Department of Housing Community and Development, a copy of two letters dealing with specifically the disclosure of the $6 million line of credit referred to in the Application.  Those two letters are attached hereto as Exhibits C and D.  The first letter, Exhibit C, is an April 1, 2003 letter from MacDonnell to the Commonwealth specifically describing the line of credit to the Commonwealth.  Exhibit C is signed by MacDonnell one day after the Application of Stow was signed and proves that MacDonnell had specific knowledge about the line of credit despite his testimony since he specifically attached a copy of a letter from

Wainwright Bank renewing "our line of credit."  (*See* Exhibit C).  The fact that Exhibits C and D are mysteriously missing from the documents produced by Stow suggests that MacDonnell's credibility is extremely low since it was MacDonnell himself who sent the Wainwright Bank letter to the Commonwealth.

If this is not shocking enough, the Plaintiff would ask the Court to consider that Exhibit C also has the following statement in it.

> **"In order to complete this transaction, TPL may need to pursue private capital of its own, as we do in many of our transactions.  Our private capital needs are met in a variety of ways, including foundations, private donations, and market funds.  TPL currently has lines of credit across the country in excess of 70 MILLION DOLLARS.  A local lending institution, Wainwright Bank, has issued us a line of credit in the amount of six million dollars, which funds we could utilize if necessary to complete the Stow transaction, subject to normal due diligence and internal TPL review**." [emphasis supplied].

(*See* Exhibit C).

This is the first time that either the Court or the Plaintiff has learned how utterly bogus the Inability to Purchase Defense is, since there was $70 million available to TPL.  There can be little doubt as to why the Defendants elected not to provide the attached two Exhibits C and D to the Court or to the Plaintiff.  There can be no doubt as to why the Defendants now seek to Quash the Subpoena and feign ignorance concerning the line of credit.  Exhibits C and D retrieved from the Commonwealth by the Plaintiff, are more than just an embarrassment for the Defendants.  These Exhibits provide overwhelming evidence of a deliberate effort to mislead and obfuscate by the Defendants.

Now that the Court and the Plaintiff are aware that there was over $70 million available to TPL to make the purchase, the question remains why Stow, clearly aware of the $70 million, did not question why TPL was not availing itself of these funds. [2]  During the

---

[2] The answer, which was not initially immediately apparent, is becoming very clear.  TPL and Stow had a clear partnership as alleged in the Complaint.  TPL was required to purchase the property under the Assignment of the Right of First Refusal and Stow was required to contribute $400,000.00 for the purchase.

deposition of the former Chairman of the Board of Selectmen, Perry, testified that he never questioned TPL about the use of the line of credit. At the time of the deposition, the Plaintiff was only aware of the $6 million line of credit. Obviously, since Perry signed the Application to Commonwealth he was aware of the $70 million available to TPL. The fact that Exhibits C and D have been withheld from the Plaintiff by Stow is not coincidental. The fact that MacDonnell feigned ignorance concerning every aspect of the lines of credit, is similarly not coincidental.

During the deposition of MacDonnell, he specifically was asked about any correspondence between TPL and Wainwright Bank regarding the disclosure of the line of credit;

```
Q. Are you aware of any correspondence between TPL and Wainwright Bank
regarding the disclosure of the line of credit to the state as a backup
plan?
A. I am not.
```

(See Exhibit B, page 206, line 3 through 18).

What is very clear from Exhibit C is that MacDonnell absolutely was aware of the correspondence between TPL and Wainwright Bank since he specifically referred to that correspondence in his letter to the Commonwealth. (See Exhibit C). What is also clear is that MacDonnell suspected that the Plaintiff would not discover Exhibits C and D. Again, MacDonnell is a member of the Massachusetts bar.

A second and equally disturbing component of the Inability to Purchase Defense involves the Inability to Purchase Defense the statement that;

---

Once TPL "elected" not to purchase the property, Stow quickly realized that it did not have to contribute the $400,000.00. At that point there was no need to do anything because the original low income buyer had been driven off by the talks of TPL of millions of assets that original buyer would never return. Stow in fact got the benefit of not developing the property, which was its goal, without paying a penny. The Complaint alleges these facts and now discovery proves the same. Every aspect of the finances of TPL is fair game a although not apparent, every part of TPL's presentation to Stow and the Commonwealth relied on the financial strength and specific reference to not only Wainwright Bank but to what we now understand is $70 million of available funds.

"...**after paying thousand of dollars for deposits required under Agreement**, TPL found itself unable to raise the money necessary to fund the project and was unable to complete its purchase of the Property." [emphasis supplied].

(*See* Defendants' Memorandum of Law in Support of Motion to Dismiss of the Defendants, page 2). It now appears certain, as a result of deposition testimony, that TPL never paid any of its own money to Mrs. Kunelius for earnest money payments that were required under the P&S Agreement. The Defendants knew that TPL had caused a neighborhood organization, the Friends of Red Acre, to raise the money that was given to the Plaintiff as earnest money payments. The following is the deposition testimony of Craig MacDonnell with regard to the source of the earnest money payment which is referred to in the Inability to Purchase Defense.

```
"Q. What were the funds that TPL, of the purchase price, now what funds
which were to make up the purchase price were actually TPL's own monies?
     MR. CONROY:   Objection
A. There were deposits made against the contract, the amount of which I'm
not quite certain of, but those were TPL dollars.
Q. Well, in fact, weren't those dollars that were donated to TPL from the
Friends of Red Acre?
A. Some of them, I believe, were.
Q. Weren't all of them, sir?
A. I don't recall.
Q. Is it likely that they were? Do you have any recollection?
     MR. CONROY:   Objection
     MS. FETOUH:   Objection
A. My recollection is that we did ask for a donation from the Friends of
   Red Acre for some money up front. What I can't remember is how much.
Q. So, you don't remember how much of the earnest money that was paid to
Mrs. Kunelius was actually TPL funds and how much had been raised by TPL
through the Friends of Red Acre. That's your testimony, correct?
     MS. FETOUH:   Objection
A. What I don't remember is how much, how many of the dollars that were
deposited with Mrs. Kunelius were dollars and how many were Friends of
Red Acre dollars.
Q. And as you sit here today, you cannot say with any certainly that any
of those monies that were - you used the word deposited. I used the word
earnest money.  You cannot say with any certainty that any of those
dollars were TPL dollars. Isn't that fair to say?
A. I do not know where they came from."
```

(*See* Exhibit B, page 79, line 21 through page 81, line 7)

The former Chairman of the Board of Selectmen testified as follows;

```
"And, in fact, the funds that went to Mrs. Kunelius were entirely from
the Friends of Red Acre.  Isn't that correct?
A. That doesn't surprise me.
Q. But do you know that that's in fact the case?
```

```
A. When you say entirely from the Friends of Red Acre, I don't know.  I
believe they came from the Friends for Red Acre. Whether it was a hundred
percent or not, I can't comment.
Q. So, other than the money that was paid - knowing that, isn't it in
fact true that TPL had not one penny of money into the purchase of the
property, because one hundred percent of the $15,000 received by Mrs.
Kunelius came from donations of the Friends of Red Acre?
    MS. FETOUH: Objection.
A. I just said I don't know that it was a hundred percent from the
Friends. I understood that it came from them. I do not know whether it
included some TPL funds or not."
```

(*See* Exhibit F which is an excerpt of the deposition of Perry, page 10, line 13 through page 11, line 8).  The testimony of another member of the Board of Selectmen, Jones, also indicated that the source of thousands of dollars in payment was the neighborhood organization, not TPL.  Finally, Jones testified on Monday, March 5, 2007, that he also understood that the payments made to the Plaintiff were not from TPL's funds.

This issue is not in and of itself of the greatest importance to the Plaintiff's case but it does demonstrate the lengths to which the Defendants will go to unfairly use their status as a non-profit in seeking the sympathy of the Court, through outright deception.

### Discovery of Wainwright Bank Is Appropriate

The Plaintiff respectfully asserts that the Subpoena of Wainwright Bank and the inquiry into the status of the $6 million line of credit is appropriate and relevant because other discovery in this case strongly suggests that TPL has been fundamentally misleading the Plaintiff and the Court on virtually every aspect of their involvement in their acceptance of the Assignment of the Right of First Refusal.  The Plaintiff asserts that TPL used its status and its representation of overwhelming financial solvency to permanently discourage the original buyer once TPL had exercised the right of first refusal.  A member of the Board of Selectmen, Jones, testified that the assignment to TPL "killed" the original deal between the Plaintiff and the original buyer.  The repeated statements concerning TPL's financial credit worthiness, on one hand has been listed by the Board of Selectmen as justification for the Assignment.  On the other hand, former Chairman of the Board of Selectmen, Perry, has

testified being informed that TPL " was unable to purchase the Property" that the Board of Selectmen never questioned TPL as to why it did not use the $6 million line of credit. It was not as if the Board of Selectmen did not know about the $6 million line of credit or the 70 million dollars because the application to the Commonwealth was signed and reviewed by the Board of Selectmen. It is inconceivable that the Board of Selectmen would not have insisted on TPL using the $6 million line of credit. Nevertheless, that is exactly what happened. The Complaint alleges that Stow and TPL worked together to defeat the P&S Agreement between the Plaintiff and the original buyer. Factors relating to the existence of the line of credit, how much money was available, etc. are relevant to demonstrating the deliberate collusion between Stow and TPL, the veracity of their statements made to the Court, Mrs. Kunelius, and to the Commonwealth. The Complaint contains a Civil Rights Count as well as Counts for Unfair and Deceptive Trade Practices, Intentional Interference with Contractual Relationship, and Fraud and Misrepresentation. Paragraph 20 of the Complaint asserts that Mrs. Kunelius was assured by Mr. MacDonnell and TPL that the acquisition of her property by TPL was a certainty (and by implication, therefore, she did not need to worry about the loss of the original buyer). (_See_ paragraph 20 of the Complaint). Presumably since MacDonnell was telling the Commonwealth of Massachusetts that the purchase was also a certainty because of their intention to use the $6 million line of credit, there is every reason to believe that Mrs. Kunelius' assertion in this regard is extremely credible.

### Defendants Elected to Try to Use This Court for A Bogus Motion to Certify

In addition, it now appears that TPL and the Town of Stow were involved in another attempt to mislead the Court as to the Inability to Purchase Defense particularly in their Motion to Certify a Question to the SJC. In that Motion, the Defendants asserted repeatedly that;

> "It is rare that the town or non-profit has funds appropriated for a purpose prior to the conclusion of the 120-day notice period."

(*See* Paragraph 10 of the Defendants' Motion to Certify Question to The Supreme Judicial Court).

> "In practice much of the hundred twenty day option period [the period between the Notice of the P&S Agreement and the time the Town must exercise the Right of First Refusal] is consumed by the town's deliberations, leaving non-profits with very little time in which to assess the preservation value, determine the risks and benefits, assess the fund raising possibilities, and coordinate with local interest groups before they are forced to decide whether to exercise the Right of First Refusal.

(*See* Paragraph 11, page 6, of the Defendants' Motion to Certify Question to The Supreme Judicial Court). In fact, the above statements by all Defendants in their Motion to Certify are directly related to the Wainwright Bank Subpoena. Certainly, the existence of the Wainwright Bank line of credit and the $70 million, which had been hidden from the Court and the Plaintiff have made the above two statements obviously contradictory. Nevertheless, the Defendants, in an attempt to gain the sympathy the Court, used the supposed lack of time to raise funds as a justification for this Court to certify to the Supreme Judicial Court. At a minimum, the Plaintiff believes that this is a complete failure of Defendants' obligation of Candor to the Court since the Motion to Certify, in reality could not be even remotely based upon "the possibility of not having money" since the Defendants had already told the Commonwealth that they had the $6 million line of credit and the $70 million for the purchase and in their current Motion states that they never claimed that they did not have the money to purchase the property. That being said, they were certainly willing to ask this Court to ask the SJC to Certify a Question which, was based upon misinformation at best and misrepresentation at worst.

**Relevance of Financial Data**

The existence of the line of credit and the facts and circumstances surrounding its status are also relevant to the testimony of former Chairman of the Board of Selectmen,

Perry.  On Monday, February 26, 2007 Perry testified during his deposition that although he was aware of the above language concerning the fallback plan of using the $6 million line of credit, he never bothered to ask TPL or Craig MacDonnell why they were defaulting on the P&S Agreement when Perry had signed the application with the Commonwealth indicating that the line of credit will be used if the other funds were not raised. [3]  The Plaintiff asks the Court to remember that the Counts of Fraud and Misrepresentation are against both the Town and TPL.  It is virtually inconceivable that the Town, having assigned the Right of First Refusal to TPL with full knowledge of the line of credit, would not insist upon the use of that line of credit in order for TPL to meet its obligations under the assignment.  The Town had already been warned one day before the assignment, by Town Counsel, that litigation would certainly ensue if TPL defaulted on the purchase.  Attached as Exhibit G is a letter of Stow's former counsel to Stow strongly warning against the Assignment and warning Stow that litigation would be very likely as a result of the Assignment.  The Plaintiff respectfully suggests that a complete reading of Exhibit G would demonstrate to the Court that the Plaintiff's assertions with regard to virtually every component of her claim have substantial justification.  In addition Exhibit G states that;

> "Since the language of Chapter 61 does not absolve the Town of any further liability to the land owner for failure of the assignee to carry out the obligations to purchase the land under the assignment, or for any other claims as may be made by the land owner (such as exists in the present circumstances and are discussed below), appropriate terms and conditions of the assignment would include an indemnification agreement by the assignee (TPL) to the assignor (the Town) from any such claims as might be made by the land owner resulting from the assignment…"

(*See* Exhibit G).  The above quote demonstrates that Stow had been advised that it would be exposed if TPL did not go forward.  Notwithstanding this advice from Stow' counsel to the Board of Selectmen "elected" not to inquire as to why TPL was not availing itself of the $70

---

[3] Mr. Perry's transcript is not yet available.  The portion of the transcript will be provided to the Court as soon as the transcript is available.

million dollars. They never asked TPL why it did not use the $6 million line of credit, because Stow and TPL achieved their goal, i.e. defeat the P&S Agreement and spend nothing.

## Conclusion

The behavior of the Defendants in this case, given their individual status as a municipality, a non-profit conservation group, and an attorney, is frankly outrageous. Misdirection and outright lying have been the hallmark of their behavior. Had the Defendants not inadvertently provided the application to the Commonwealth, then the Plaintiff would have never known about the Wainwright Bank and the $70 million line of credit. The efforts to mislead are outrageous.

If the line of credit was not earmarked for the project, or if it did not exist, or if it was in default, or if it was never intended to be used, then each of these possibilities are relevant to the remaining Counts. If the line of credit was in place and was not in default, then the facts and circumstances surrounding its status remain relevant and material given the outright lie by TPL and MacDonnell that TPL couldn't raise the funds and therefore had to default. The existence of the line of credit is also relevant to the Fraud and Misrepresentation Counts because if MacDonnell's current testimony is to be believed, i.e. that the inability to raise the funds and the loss of state grants was critical to the purchase then under what circumstance could the Defendants assert to the Commonwealth the exact opposite. The Defendant should be sanctioned and produce the documents and testimony sought by the Plaintiff.

The Plaintiff alleged in paragraph 46 of the Complaint the following;

"In the Spring of 2004, MacDonnell met with Kunelius, Kunelius' counsel and Jim Boothroyd, a local real estate broker, David Norris, in connection with TPL's demands for a lower purchase price. **During that meeting MacDonnell threatened** and intimidated Kunelius and her counsel by stating generally that (i) **TPL had "serious and influential connections by way of its Board of Advisors" who would defend TPL against any legal action brought by Kunelius as a result of**

**TPL's default**, (ii) **TPL's Board of Advisors included prominent law firms that would tie up Kunelius and any attempt by her to enforce the P&S**, (iii) **TPL would notify the Court of its "influential connections beyond reproach" and that the Court would never find in favor of Kunelius notwithstanding that TPL was demanding a reduction in purchase price of $400,000**, (iv) TPL was aware that Kunelius was of very limited means and that she and her attorney would not be able to spend sufficient funds to win any matter against TPL and (v) **TPL had unlimited resources available to it to overwhelm anyone who would make the mistake of opposing TPL**." [emphasis supplied].

(*See* paragraph 46 of the Complaint).  Based upon current behavior of the Defendants it appears clear that  the Defendants are following through on MacDonnell's threats.

Respectfully submitted,

Marilyn Kunelius,

By her Attorney

Dated:  March 7, 2007      By:      */s/ Michael C. McLaughlin, Esq.*
                                    Michael C. McLaughlin BBO# 337350
                                    Law Offices of Michael C. McLaughlin
                                    One Beacon Street, 33rd Floor
                                    Boston, MA 02108
                                    617-227-2275
                                    michaelcmclaughlin@speakeasy.net

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on March 7, 2007.

*/s/ Michael C. McLaughlin, Esq.*
Michael C. McLaughlin BBO# 337350
Law Offices of Michael C. McLaughlin
One Beacon Street, 33rd Floor
Boston, MA 02108
617-227-2275
michaelcmclaughlin@speakeasy.net

**3COM**

Ross Perry/US/3Com
03/30/2003 10:35 AM

Sent by: Ross Perry - Product Management, BNC/LID/ Interconnect

To:
cc:
Subject: Kunelius Farm

Bill:

I left at your door the DHCD grant application that TPL has filled out.

After a review of the application, it appears to be reasonable and I have signed in multiple locations as indicated by the yellow post-it notes.

There is one requirement that should be reviewed before further signatures. This is the requirement that the town hire a grant manager to oversee the expenditure of these funds. The grant application includes funds (up to $32K) to cover this obligation. Since this is cost neutral, does this requirement impact our FY 04 budgeting or Town Meeting process?

I believe TPL needs to have this application completed and submitted by April 1. So there isn't much time. Its your call whether this application should be reviewed by Jake.

Let Craig MacDonnell and me know if there are questions.

If there is a need to deliver this to Jake for a quick review, I'm sure someone from the Friends of Red Acre will agree to run the courier service. They probably will also pick it the signed copies when it is ready.

Thanks,

Ross

Craig can be reached at 617-367-6200

KUN336

# HOUSING DEVELOPMENT SUPPORT PROGRAM

## MASSACHUSETTS COMMUNITY DEVELOPMENT BLOCK GRANT

### APPLICATION COVER SHEET
### (Form 1-1)

*APPLICANT*

Community: Town of Stow

Address: 380 Great Road

 Stow, MA 01775-2127

Contact Person: (Name) Edward R. Perry

 (Title) Chairman, Stow Board of Selectmen

Address: 380 Great Road, Stow, MA 01775-2127

Phone: 978-897-4514

 Fax: 978-897-4534  E-Mail: Ross_Perry@3com.com

*PROPOSED PROJECT*

Project Name: Kunelius Farm

Use of Funds (indicate amount for each category applied for)

| Category | Amount | Executive Order 418 Certification: | |
|---|---|---|---|
| Acquisition | $320,000 | | |
| Demolition | $ | Included with application | |
| Relocation | $ | Date Certified _____ | ☐ |
| Housing Rehabilitation | $ | Awaiting Certification | ☒ |
| New Construction | $ | Request attached | ☐ |
| Infrastructure Improvements | $ | | |
| Other: | $ | | |
| Administrative Costs | $32,000 | | |

Total HDSP Grant Request: $352,000

*AUTHORIZATION*

*Edward R. Perry*
Signature Chief Elected Official (CEO)

Edward R. Perry
Name of Chief Elected Official

3/30/03
Date

Chairman, Board of Selectmen
Title

978-897-4514
Phone Number of CEO

To the best of my knowledge, information in this application is true and correct.

KUN337

# HOUSING DEVELOPMENT SUPPORT PROGRAM

# MASSACHUSETTS COMMUNITY DEVELOPMENT BLOCK GRANT

## APPLICATION COVER SHEET
### (Form 1-1)

### *APPLICANT*

Community: Town of Stow

Address: 380 Great Road

Stow, MA 01775-2127

Contact Person: (Name) Edward R. Perry

(Title) Chairman, Stow Board of Selectmen

Address: 380 Great Road, Stow, MA 01775-2127

Phone: 978-897-4514

Fax: 978-897-4534     E-Mail: Ross_Perry@3com.com

### *PROPOSED PROJECT*

Project Name: Kunelius Farm

Use of Funds (indicate amount for each category applied for)

| | | Executive Order 418 Certification: | |
|---|---|---|---|
| Acquisition | $320,000 | | |
| Demolition | $ | Included with application | |
| Relocation | $ | Date Certified | ☐ |
| Housing Rehabilitation | $ | Awaiting Certification | ☒ |
| New Construction | $ | Request attached | ☐ |
| Infrastructure Improvements | $ | | |
| Other: | $ | | |
| Administrative Costs | $32,000 | | |

Total HDSP Grant Request: $352,000

### *AUTHORIZATION*

Edward R. Perry
Name of Chief Elected Official

Chairman, Board of Selectmen
Title

_____
Signature Chief Elected Official (CEO)

_____
Date

978-897-4514
Phone Number of CEO

To the best of my knowledge, information in this application is true and correct.

KUN338

## Item 1-2: Community Development Strategy

In 1996, The Town of Stow published *Stow 2000, A Master Plan*. This 359-page document was adopted by the Planning Board and presents a comprehensive report on the characteristics of the town; the needs and challenges that face the community; and a strategy of implementation to address these issues. Its contents were developed in a community planning process by the Stow 2000 Committee, whose planning analyses included a survey sent to all town households that had a 33% response rate. It was further refined with public input at many meetings including public forums in 1994 and 1995. A final draft was released for public comment before the document was published. This CDS summary relies on the content of the *Stow 2000: A Master Plan* to describe the town's community development strategy and how this project is consistent with the needs and goals of the Town of Stow.

**Background:**

Stow, a 17.62 square mile community of 5,902 residents (Census 2000) has a land use that is 63% residential. There are two developments constructed under comprehensive permits for senior citizens (50 units) and diverse income rental units (12 of 60 are restricted for renters of low and moderate income). "The balance of Stow's housing is primarily frontage lots along existing roadways and a few smaller subdivisions."

Stow recognizes that housing prices within the town are "...beyond the reach of first time home buyers." At the time of the report, the median price of a single-family home was in excess of $250,000. According to the report, "less than 10% of the houses in Stow are sold for under $150,000. New construction houses are now selling for an average price of $300,000." Median single-family home sales for the month of September 2002 (the most recent month available) were in excess of $450,000. The continuing strong real estate market has reinforced the need for affordable single-family units in Stow.

Stow has become a community that is affordable only to buyers with higher incomes. Residents that are adversely affected by this limited opportunity for purchasing homes include "...first time home buyers, service employees, and the elderly who earn low and moderate incomes." Providing housing opportunities for these residents is listed as Goal number 4.10.1 in the report: Provide housing opportunities for those at the entry level of homeownership, "empty-nesters, elder residents, and those requiring housing assistance and rental housing units."

The comprehensive permit developments mentioned above, along with a housing development that contains deed restricted affordable housing, have added to an affordable housing stock within the town that has exceeded 7%. "The sales or rental price is based on the Boston Primary Statistical Area median income and is defined by the Commonwealth. These dwelling units are deed restricted to require resale or rental only to qualified buyers under the State program."

### 142 Red Acre Road

The CDS outlines strategic goals that include higher density development in the village areas of the town; residential condominiums; elderly housing; and the conversion of existing "...affordable housing stock into non-profit or residential ownership models that protect affordability on a permanent basis (Priority: high)".

The purchase and sale of 142 Red Acre Road as deed restricted as affordable in perpetuity will capture an existing house in Stow and provide an opportunity for someone with an income between 65% and 80% of

the Boston Primary Statistical Area median income with a 2-3 bedroom home on .93 acres in an attractive, wooded neighborhood of single family homes.

Regardless of what the Town does to expand its housing stock, it is important to preserve the variety of housing that it already has.

This goal is reiterated in the passing of the Planned Conservation Development amendment to the Zoning Bylaw at the 1995 Annual Town Meeting. One of the intents of this amendment was to encourage "...a greater mixture of housing types..."

Under the "Objectives and Action Items" section of Stow 2000: A Master Plan are two action items that this project addresses:

2. Protect existing subsidized rental units... and where possible, move the affordable housing stock into nonprofit or resident ownership models that protect affordability on a permanent basis. (Priority: high)

3. Revitalize the Stow Housing Partnership in order to provide housing for the empty nesters, young families, and low and moderate-income residents in our community. (Priority: high).

The unique characteristic of this project is that it fits neither of the usual models for affordable housing development. It is neither a Town-initiated project, nor is it a Town partnership with a traditional for-profit developer. The project is a unique partnership between the Town and a national non-profit organization, which will provide the following benefits:

1. A model for encouraging the capture of suitable housing throughout the Stow community that can be offered for sale as deed restricted affordable in perpetuity. Many of the underserved residents of Stow would benefit from having the opportunity to live in and own a single-family detached residence in an economically diverse neighborhood.

2. A model for bringing federal dollars to bear in Stow's continuing effort to increase affordable housing stocks. Experience gained from the preparation of this application provides the town a foundation for future affordable housing funding efforts.

In summary, this project allows for the capture, conversion and sale of existing housing stock to deed restricted affordable in perpetuity. The project meets many of the goals and objectives defined by the town in its master planning process, and has the added benefit of public-private partnership to reduce the burden on Town staff. In this partnership, The Trust for Public Land is fulfilling its mission, which is to work with communities on land projects that fulfill town goals and objectives. The Trust for Public Land is pleased and excited to have the opportunity to work with the Town of Stow and with the Massachusetts DHCD to convert an existing home into affordable housing stock to further benefit the community.

Reference: Stow 2000, A Master Plan, (May 1996), pps 21, 22, 78-82, 175-186.

Item 1-3: Project Description and One-Stop

| Project Summary | |
|---|---|
| Project Scope | Acquisition and rehabilitation |
| Number/Type of Unit | 1 two-bedroom, single family ownership unit |
| Developer Identity | The Trust for Public Land |
| Housing Type and Proposed Clientele | Single family residential, affordable to persons earning 65% - 80% of Median Income |
| Affordability Terms | Unit will be sold for $199,000, and will be affordable to families earning XXXX |

The Kunelius Farm is located at 142/144 Red Acre Road and Tuttle Lane between Red Acre Woods Conservation Land and Captain Sargent Conservation Land. The property consists of 50 acres that includes approximately 8 acres of uplands, wooded wetlands, a scenic pond, a vernal pool, two houses, a barn, a paddock, a riding ring, and pasture. One house, the residence at 142 Red Acre Road, is the subject of this application.

The project calls for approximately 45 acres to be acquired by the Town of Stow for the purpose of conservation and for a potential future water supply. The two houses will be owned privately, but will be deeded "affordable" to moderate-income families in perpetuity. The project developer expects that the Eye of the Storm, a local equine rescue facility, will occupy the existing horse facilities and the house at 144 Red Acre Road, and continue to shelter and care for injured and frail horses. Upon sale of the house, affordability restrictions will be attached and conveyance will be subject to the town-directed lottery system.

The entire 50-acre parcel is now under contract for a price of $1,116,900, plus interest on a retained motgage. Because the property is subject to Chapter 61A, the Town had a right of first refusal to purchase the land instead of the developer. After a public hearing, the Town assigned this right to the Trust for Public Land.

The Town of Stow will be voting at Town Meeting to spend $300,000 for the purchase of the 45-acre conservation and aquifer protection parcel and $100,000 to purchase the affordability restrictions on the two houses.

The cost of these acquisitions will be borne by the Community Preservation Fund, which will pay the principal and interest on the bonds that will be sold to generate the funds for this town investment.

Acquisition of the Kunelius Farm by the Town will provide a critical link between the Red Acre woodland and the Captain Sargent conservation area that extends across Tuttle Lane and South Acton Road. Limiting development on this parcel to the existing residential and horse-related uses also will preserve the integrity of the Town's investment in surrounding open space. In addition, public ownership will result in increased opportunities for trail connections, preserve the existing wildlife corridor, and provide greater public access to previously protected open space.

Protecting the Kunelius Farm will also preserve an important water resource. Portions of the Kunelius Farm sit above one the most valuable and productive aquifers in town. It would be an important safeguard for Stow to have ownership rights in this valuable resource. The proposed conservation project would ensure that this resource will be protected and not be utilized primarily by the multi-unit development being proposed for the property.

Perhaps the most important aspect of this project is that it will add two units to Stow's very limited inventory of affordable housing. Based on discussions with the Community Preservation Committee (CPC), it appears likely that CPC will spend $100,000 to purchase affordability restrictions on the two houses on the property. Adding these two units of affordable housing would help maintain Stow as a diverse and affordable community, one of the major objectives of CPA.

The unique opportunity presented by this project to rehabilitate at-risk affordable single-family housing is one that is consistent with Stow's Community Development Strategy (see Item 1-2). Along with 45 acres of conservation land, the project will ultimately deliver two units of high-quality housing that is affordable to moderate-income families. These units are located in a highly desirable neighborhood within a short distance to shopping, schools, public services, and recreational opportunities.

Project Schedule

| | |
|---|---|
| May 19: | Town meeting vote to determine use of CPA funds |
| June - September: | Federal grants and private development funds sought for acquisition and renovation of the structures. |
| September 26: | Formal acquisition of the property by the Trust for Public Land. 45 acres conservation parcel deeded to Town. Conservation and affordability restrictions imposed on private parcels. |

1. Financing Mechanism:

The total acquisition costs, including the conservation land, the horse property, and the residence at 142 Red Acre Road are nearly $1.2 million, including interest due the owner under the purchase and sale agreement. HDSP funds will be specifically used for acquisition of the property at 142.

TPL is prepared to purchase the Property. TPL has a primary plan and a fallback plan. The primary plan envisions a multilateral funding approach to this project. Some of the funding is contingent, as explained below, but all of it is subject to a fallback Line of Credit from Wainwright Bank.

TPL's primary plan is to generate the funds necessary for the closing as follows.

| Primary Plan | |
|---|---|
| Town of Stow contribution | $300,000 |
| Sale of 144 Red Acre Road | $400,000 |
| DHCD funding | $250,000 |
| Private fundraising | $200,000 |
| TOTAL | $1,150,000 |

a. Town Funds: The Town's contribution will be allocated from the pre-existing Community Preservation Fund (CPF) in Stow. CPF monies are derived from a property tax surcharge imposed on real estate. The fund currently has approximately [$550,000] available for allocation to projects like this one. Any allocation requires a simple

majority vote at Town Meeting on May 19, 2003. The Board of Selectmen and the Community Preservation Committee have voted to support this measure. This contribution will entitle the Town to the ownership of 45 acres of adjacent woodlands and wetlands for conservation and municipal water supply purposes.

b. 144 Red Acre Road: TPL will sell 144 Red Acre Road, an adjacent five-acre property containing a two-bedroom house, two barns and a small outbuilding to the Eye of the Storm Equine Rescue, Inc. (EOS), a non-profit corporation dedicated to the rehabilitation of sick and injured horses. EOS intends to utilize this property as its primary rehabilitation facility.

c. DHCD Funds: TPL intends to use the acquisition funds requested in this application at the closing of the purchase of the property from the current owner on September 26, 2003.

d. Private Fundraising: TPL has and will continue to pursue private-sector fundraising for this project. Currently, there are pledges in excess of $200,000 available for this project (two $100,000 pledges from other non-profit organizations, and the remainder in individual donations).

As a fallback plan, if any or all of the above-referenced sources of funds are unavailable, TPL intends to utilize capital from the private market. In this regard, TPL has available for its use a Line of Credit from Wainwright Bank in the amount of $6,000,000, as evidenced by the letter attached as Exhibit __. The use of this capital is subject to TPL's internal approval process, including customary due diligence and approval by the board of directors.

2. Contingency Plan for Cost Overruns

As part of the larger Kunelius Farm project, the Trust for Public Land has organized a significant private fundraising campaign. This campaign, in conjunction with Stow CPA funds, the sale of the unit, and HDSP funds, has sufficient capacity to, if necessary, cover cost overruns.

In addition, the Trust for Public Land has received confirmation that its $6,000,000 line of credit has been renewed by Wainwright Bank, and these funds would be available to cover cost overruns, subject to TPL's normal due diligence and internal review.

3. Construction Estimates and Procurement Process

Based upon an appraisal performed by Prospectus, Inc. (see Exhibit 6), the acquisition cost of the land, a .93-acre parcel, and the 1,066 square foot residence will be $320,000. Given the scarcity of frontage land in Stow, and the current housing market, this price is appropriate.

Estimates for housing rehabilitation were provided by Integrity Builders and Remodelers, Inc., from Acton, MA. Renovation estimates provided by Dana McKiel of Integrity to bring the structure up to appropriate conditions and current building code total approximately $126,000. The work is estimated to take between four and six months to complete given the extensive work required on the roof. In addition to the roof, windows, exterior doors, side and rear decks, and kitchen cabinets need replacing.

Infrastructure improvements to the property include the septic repairs necessary to achieve full Title V Certification. ABC Cesspool Co. Inc. completed a Title V inspection on March 20, 2003, and granted a conditional certification. Cost for the repairs are estimated at $1,200.

The Town of Stow will circulate, according to procedures described in *Municipal, County, District, and Local Authority Procurement of Supplies, Services, and Real Property*, a request for bids for the management, administration, and oversight of this grant. A grant management consultant will be chosen by the Town (with advice and guidance for suitability from DHCD prior to the commencement of the contract between the town and the consultant).

# Section 1
# PROJECT DESCRIPTION

## Name and Address of Project

| | |
|---|---|
| 1 . Project Name: | Kunelius Farm |
| 1a . Application Completed By: | Christopher LaPointe, TPL, Rodger Brown, R. Broen and Associates |
| 1b . Original Application Date: | April 1, 2003    Application Revision Date: |

2 . Project Address:    142 Red Acre Road

3 . Neighborhood

4 . City/ Town    Stow      MA      01775
              *(state)*      *(zip code)*

5 . County    MIDDLESEX

6 . ☐ Scattered sites

7 . Is this a qualified census tract?    No      **Enter a census tract**

8 . Difficult to develop area      **QCT information last updated on:**    3/20/03

## Development Plan

9 . Development Type (Please check all that apply.)

| | |
|---|---|
| No | New construction |
| Yes | Acquisition, substantial rehab of existing housing |
| No | Acquisition, moderate rehab of existing housing |
| No | Acquisition, minimal or no rehab of existing housing |
| No | Adaptive re-use of non-residential structure |

10 . Proposed Housing Type    Home Ownership

11 . **Project Description:**      Number of buildings:      1

> Acquisition and renovation of a .93-acre parcel in the Town of Stow, with a 3 bedroom, one bath split level residence built in 1967. The Town of Stow will purchase an affordability restriction using CPA funds.  Property is part of a larger 50-acre project which includes 45 acres of conservation land to be conveyed to the Town of Stow, and an approximately 5-acre horse property to be purchased by the Eye of the Storm equine rescue group, a 2 bedroom residence that will be subject to an affordability restiction upon future

12 . **Development Schedule:**

| | Original | Revised | Optional user comments |
|---|---|---|---|
| Application Date | April 1, 2003 | | |
| Construction Loan Closing | N/A | | |
| Initial Loan Closing (MHFA only) | N/A | | |
| Construction Start | 9/27/03 | | |
| 50% Construction Completion | TBD | | |
| Construction Completion | TBD | | |
| First Certificate of Occupancy | TBD | | |
| Final Certificate of Occupancy | TBD | | |
| Sustained Occupancy | TBD | | |
| Permanent Loan Closing | | | |

KUN345

© Massachusetts Housing Investment Corporation, 1993, 1994, 1995, 1999 in its own name and on behalf of MHFA, DHCD, and the MHP Fund.   All rights reserved.

### 13. Unit Mix:

| | Low-Income Rental Assisted | Low-Income below 50% | Low-Income below 60% | Other Income 80% | Market Rate | Total Units | |
|---|---|---|---|---|---|---|---|
| 2 bedrooms | | | | 1 | | 1 | Exhibit A |
| 0 bedroom | | | | | | 0 | |
| 1 bedroom | | | | | | 0 | |
| 2 bedrooms | | | | | | 0 | |
| 3 bedrooms | | | | | | 0 | |
| 4 bedrooms | | | | | | 0 | |
| Total Units | 0 | 0 | 0 | 1 | 0 | 1 | |
| Home Units* | | | | 0 | | 0 | |

*HOME units included in the above totals.    Other Income=Below    80%    of median income

### 14. Unit Size in square feet:

| | Low-Income Rental Assisted | Low-Income below 50% | Low-Income below 60% | Other Income 80% | Market Rate | Average All Incomes |
|---|---|---|---|---|---|---|
| 2 bedrooms | | | | 1066.0 | | 1,066 |
| 0 bedroom | | | | | | N/A |
| 1 bedroom | | | | | | N/A |
| 2 bedrooms | | | | | | N/A |
| 3 bedrooms | | | | | | N/A |
| 4 bedrooms | | | | | | N/A |

### 15. Number of bathrooms in each unit:

| | Low-Income Rental Assisted | Low-Income below 50% | Low-Income below 60% | Other Income 80% | Market Rate | Average All Incomes |
|---|---|---|---|---|---|---|
| 2 bedrooms | | | | 1.0 | | 1.0 |
| 0 bedroom | | | | | | N/A |
| 1 bedroom | | | | | | N/A |
| 2 bedrooms | | | | | | N/A |
| 3 bedrooms | | | | | | N/A |
| 4 bedrooms | | | | | | N/A |

### 16. Funding Applied For:

Please check all the funding that is being applied for at this time, with this application:

| | |
|---|---|
| DHCD Tax Credit Allocation ................................................. | No |
| Category ...............………….................. | Not Applicable |
| Category ...............……….............. | Not Applicable |
| HOME Funding through DHCD ............................................ | No |
| Massachusetts Housing Finance Agency (select all that apply): | |
| Official Action Status ......................................................... | No |
| Construction Financing/Bridge Financing......................... | No |
| Permanent Financing ....................................................... | No |
| Massachusetts Housing Partnership (MHP) Fund: | |
| Permanent Rental Financing Program ............................. | No |
| Massachusetts Housing Investment Corporation (select all that apply): | |
| Debt Financing ................................................................ | No |
| Tax Credit Equity Investment ......................................... | No |
| Boston Department of Neighborhood Development (DND): | No |
| Other | Yes |
| Other.......................................................... | HDSP |
| Other.......................................................... | |
| Other.......................................................... | |
| Financing from MassDevelopment | No |

**KUN346**

New

| 17 . Number of buildings planned | Total | Construction | Rehabilitation Exhibit A |
|---|---|---|---|
| a. Single-Family | 1 | | 1 |
| b. 2-4 Family | 0 | | |
| c. Townhouse | 0 | | |
| d. Low/Mid rise | 0 | | |
| e. High-rise | 0 | | |
| f. Other | 0 | | |
| TOTAL | 1 | 0 | 1 |

18 . Number of units:    1               1

19 . Gross Square Footage

| | | | |
|---|---|---|---|
| a. Residential | 1,066 | | 1,066 |
| b. Commercial | - | | |

20 . Net Rentable Square Footage:

| | Total | | Percent of Gross |
|---|---|---|---|
| a. Residential | 1,066 | s.f. | 100% |
| b. Commercial | | s.f. | N/A |

21 . Number of handicapped accessible units    0   Percent of total    0%

22 . Fire Code Type     Wood frame

23 . Will building(s) include elevators?     No

24 . Are the following provided with the housing units:

| | | |
|---|---|---|
| a. Range? | Yes | Gas or electric? electric |
| b. Refrigerator? | Yes | |
| c. Microwave? | No | |
| d. Dishwasher? | Yes | |
| e. Disposal? | No | |
| f. Washer/Dryer Hookup? | Yes | |
| g. Washer & Dryer? | No | |
| h. Wall-to-wall Carpet? | No | |
| i. Window Air Conditioner? | No | |
| j. Central Air Conditioning? | No | |

*Optional user comments*

25 . Are the following included in the rent:

| | |
|---|---|
| a. Heat? | No |
| b. Domestic Electricity? | No |
| c. Cooking Fuel? | No |
| d. Hot Water? | No |
| e. Central A/C, if any? | No |

26 . Type of heating fuel:     Oil

27 . Total no. of parking spaces:    2    Outdoor:    2    Enclosed:

28 . Number of parking spaces exclusively for the use of tenants:

| | | | | | |
|---|---|---|---|---|---|
| a. Residential | Total: | 2 | Outdoor: | 2 | Enclosed: |
| b. Commercial | Total: | 0 | Outdoor: | | Enclosed: |

KUN347

29 . Will rehabilitation require the relocation of existing tenants?  | No |
Exhibit A

30 . Scope of rehabilitation: Please describe the following (or type N/A).
   a. Major systems to be replaced:

   | Minor septic work, conditional Title V certification. |

   b. Substandard conditions and structural deficiencies to be repaired:

   | Roof, including sheathing and shingles, windows, exterior doors, interior wall repair and painting, complete bathroom renovation, partial kitchen renovation, exterior siding repair and repainting, more. *(see attached House Inspection)* |

   c. Special features/adaptations for special needs clients to be housed:

   | |

31 . Are energy conservation materials in excess of the Building Code?

   a. Insulation ...........................  | No |
   b. Windows .............................  | No |
   c. Heating system ...................  | No |

## Information On Site And Existing Buildings

|   | *Square Feet* | *Acres* |
|---|---|---|
| 32 . Size of Site: | 40,510 | 0.93 |
| 33 . Wetlands area: | 0 | |
| 34 . Buildable area: | | |

### Existing Conditions:
35 . What is the present use of the property?  | Residential |
36 . Number of existing structures:  | 1 |
37 . Gross s.f. of existing structures:  | 1,066 |
38 . If rehabilitation:

|   | number of units | num. of bedrooms |
|---|---|---|
| a. Number of existing residential units/bedrooms: | 1 | 3 |
| b. Number of units/bedrooms currently occupied: | 1 | 2 |

39 . If site includes commercial space:
   a. Square footage of existing commercial space:  | | square feet
   b. Square footage currently occupied:  | | square feet

40 . What are the surrounding land uses?  | Residential. Abutting property is currently used as a horse farm. Property is adjacent to town-owned conservation land and is located on a quiet, scenic country road. |

### Utilities:
41 . Are the following utilities available on the site?
   a. Sanitary sewer?  | No |   Distance from site (ft.) | |
   b. Storm sewer?  | No |   Distance from site (ft.) | |
   c. Public water?  | No |   Distance from site (ft.) | |
   d. Electricity?  | Yes |
   e. Gas?  | No |   Distance from site (ft.) | |  0
   If any of the above are not available, is plan attached explaining how such service will be extended
   to the site?  | Yes |

*Please attach as part of Exhibit 2*

KUN348

Exhibit A

### Zoning:

*Please include information on the property zoning in Exhibit 3. This should include a zoning map, highlighting any special use or dimensional restrictions on the property. If the present zoning does not allow for the proposed use, please explain current status and how approvals will be obtained.*

42 . Does the present zoning allow the proposed development?    ⦿ Yes    ○ No

43 . Have you applied for a zoning variance, change, special permit or subdivision?    | N/A |

44 . Do you anticipate applying for a comprehensive permit under Chapter 774   | N/A |

### Site Control:

45 . What form of site control do you have?    | Purchase and Sale Agreement(s) |

*Include copies of the appropriate site control documents as part of Exhibit 4.*

46 . Please provide details about your site control agreement.

| | |
|---|---|
| a. Name of Seller: | Marilyn Kunelius |
| b. Principals of seller corporation: | |
| c. Type of Agreement: | Purchase and Sale Agreement |
| d. Agreement Date: | 11/11/02 |
| e. Expiration Date: | 09/26/03 |
| f. Purchase price if under agreemen | $1,116,900 |
| g.  Is there any identity of interest between buyer and seller? | |

47 . In the past three years, have there been any defaults on any mortgage on the property or any other forms of financial distress?    | No |

48 . Are there any outstanding liens on the property?    | No |

### Amenities and Services:

49 . Please indicate distance from site and locate on city/town map (Exhibit 1).

| | Distance | |
|---|---|---|
| a. Shopping facilities ...................................... | 0.78 | miles |
| b. Schools ...................................................... | 1.90 | miles |
| c. Hospitals .................................................... | 5.58 | miles |
| d. Parks and recreational facilities ................... | <0.1 | miles |
| e. Police station ............................................. | 3.00 | miles |
| f. Fire station ................................................. | 1.94 | miles |
| g. Public transportation ................................... | N/A | miles |
| h. Houses of worship ....................................... | 1.53 | miles |
| i. City/Town Hall ............................................ | 1.90 | miles |

**KUN349**

## Environmental Information

Exhibit A

50 . Is there any evidence of underground storage tanks or releases of oil or hazardous materials, including hazardous wastes, on the site or within close proximity to the site?  | Yes |

51 . Has a Chapter 21E assessment been performed?  | Yes |
*Please include a copy as Exhibit 2*

52 . Does the project consist of either: (a) new construction of more than 100 units; or (b) substantial rehabilitation of more than 200 units, or where more than 10% new floor space is added?  | No |

53 . Does the building require lead paint abatement?  | Yes |
*Lead inspection and a plan for abatement are required and should be included in Exhibit 2. Include information on how the budget will cover expense of deleading all units, except SRO's.*

54 . Does the building require asbestos abatement?  | No |

55 . Do radon tests show radon levels exceeding four picocuries/liter?  | No |

56 . Is there any evidence that the premises are insulated with urea formaldehyde foam (UFFI)?  | No |

57 . Is the site located in an historic district, or contain buildings listed or eligible for listing in the State Register of Historic Places?  | No |

58 . Are there any above ground storage containers with flammable or explosive petroleum products or chemicals within 1/2 mile of the site?  | Yes |

59 . Is the site located in a floodplain or wetlands area?  | No |

60 . Does the site contain endangered animal or plant species?  | No |

61 . Is the site subject to noise impact from jet airports within five miles, major highways within 1,000 feet, or rail traffic within 3,000 feet?  | No |

KUN350

# Section 2
# DEVELOPMENT TEAM SUMMARY

**62 . Developer/Sponsor Type** | Non-profit corporation (Chapter 180)

**63 . Developer/Sponsor:**

| | |
|---|---|
| Form of Legal Entity | Non-profit corporation |
| Legal Name | The Trust for Public Land |
| Address | 33 Union Street |
| | Boston, MA  02108 |
| Contact Person | Craig MacDonnell |
| | (617) 367-6200 | (617) 367-9885 |
| E-mail | Craig.MacDonnell@tpl.org |

**64 . Owner/Mortgagor:**

| | | |
|---|---|---|
| Legal Name | The Trust for Public Land | |
| Address | 116 New Montgomery Street | |
| | San Francisco, CA  94105-3607 | |
| Has this entity already been formed? | Yes | Soc. Sec. or Tax ID # | 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 |
| Principals | Francis W. Hatch | |
| Principals | | |
| Contact Person | Craig MacDonnell | |
| Telephone No. / Fax. No. | (617) 367-6200 | 6173679885 |
| E-mail | craig.macdonnell@tpl.org | |

**65 . General Partner:**

| | |
|---|---|
| Legal Name | N/A |
| Address | |
| | |
| Has this entity already been formed? | No |
| Principal (if corporate) | |
| Contact Person | |
| % of Ownership | |
| Telephone No. / Fax. No. | |
| E-mail | |

**66 . General Partner:**

| | |
|---|---|
| Legal Name | N/A |
| Address | |
| | |
| Has this entity already been formed? | No |
| Principal (if corporate) | |
| Contact Person | |
| % of Ownership | |
| Telephone No. / Fax. No. | |
| E-mail | |

KUN351

**67 . Development Consultant:**         Exhibit A

| | |
|---|---|
| Legal Name | N/A |
| Address | |
| | |
| Contact Person | |
| Telephone No. / Fax. No. | |
| E-mail | |

**68 . Contractor:**

| | |
|---|---|
| Name | Integrity Building and Design, Inc. |
| Address | 498 Great Road |
| | Acton, MA 01720 |
| Fed Tax ID # | |
| Contact Person | Dana McKiel |
| Telephone No. / Fax. No. | (978) 264-0657   9782669463 |
| E-mail | |

**69 . Architect:**

| | |
|---|---|
| Name | Gary Wolf Architects |
| Address | 7 Marshall Street |
| | Boston, MA 02108-2404 |
| Contact Person | Gary Wolf |
| Telephone No. / Fax. No. | (617) 742-7557 |
| E-mail | |

**70 . Management Agent:**

| | |
|---|---|
| Name | N/A |
| Address | |
| | |
| Contact Person | |
| Telephone No. / Fax. No. | |
| E-mail | |

**71 . Attorney (Real Estate):**

| | |
|---|---|
| Name | Denise Pelletier, Esq. |
| Address | 33 Union Street |
| | Boston, MA 02108 |
| Contact Person | |
| Telephone No. / Fax. No. | (617) 367-6200   6173671616 |
| E-mail | Denise.Pelletier@tpl.org |

**72 . Attorney (Tax):**

| | |
|---|---|
| Name | Dorothy Stookey, Esq. |
| Address | 33 Union Street |
| | Boston, MA 02108 |
| Contact Person | |
| Telephone No. / Fax. No. | (617) 367-6200   6173671616 |
| E-mail | dorothy.stookey@tpl.org |

**73 . Syndicator:**

| | |
|---|---|
| Name | N/A |
| Address | |
| | |
| Contact Person | |
| Telephone No. / Fax. No. | |
| E-mail | |

**KUN352**

Exhibit A

74 . **Guarantor:**
        Name                N/A
        Address
        Contact Person
        Telephone No. / Fax. No.
        E-mail

75 . **Service Provider or Coordinator:**
        Name                Metropolitan Boston Housing Partnership or TBD by Town of
        Address
        Contact Person
        Telephone No. / Fax. No.
        E-mail

76 . **Marketing Agent:**
        Name                Century 21 Classic Properties
        Address             42 Summer Street
                        Maynard, MA  01754
        Contact Person    James Boothroyd
        Telephone No. / Fax. No.    (978) 897-5311      9788974874
        E-mail               creativejim0717@aol.com

77 . _Other role_   Name        N/A
                      Address
                      Contact Person
                      Telephone No. / Fax. No.
                      E-mail

78 . _Other role_   Name        N/A
                      Address
                      Contact Person
                      Telephone No. / Fax. No.
                      E-mail

79 . Is there any identity of interest between any members of the development team?

        No

80 . Please describe the relationship of the development entity to sponsoring organizations. Is the
      entity newly-formed or to-be-formed?  Is it a single-purpose corporation?  How will the
      parent corporation provide support to this entity?  Include an organizational chart showing
      other affiliates of the parent corporation, as appropriate, and principals of each.

KUN353

# Section 3
# SOURCES AND USES OF FUNDS

Exhibit A

| Sources of Funds |
|---|

**Private Equity:**

*Optional user calculations*

| | | |
|---|---|---|
| 81 . | Developer's Cash Equity | $0 |
| 82 . | Tax Credit Equity (net amount)   *(See line 360, Section 5, page 18.)* | $ |
| 83 . | Developer's Fee/Overhead, Contributed or Loaned | $0 |
| 84 . | Other Source: | |

**Public Equity:**

| | | | |
|---|---|---|---|
| 85 . | HOME Funds, as Grant | | $ |
| 86 . | Grant: | HDSP | $320,000 |
| 87 . | Grant: | | $ |
| 88 . | **Total Public Equity** | | $320,000 |

**Subordinate Debt (see definition):**

| | | Amount | Rate | Amortiz. | Term |
|---|---|---|---|---|---|
| 89 . | Home Funds-DHCD, as Subordinate Debt | $0 | % | yrs. | yrs. |
| | Source: | | | | |
| 90 . | Home Funds-Local, as Subordinate Debt | $0 | % | yrs. | yrs. |
| | Source: | | | | |
| 91 . | Subordinate Debt | $0 | % | yrs. | yrs. |
| | Source: | | | | |
| 92 . | Subordinate Debt | $0 | % | yrs. | yrs. |
| | Source: | | | | |
| 93 . | Subordinate Debt | $0 | % | yrs. | yrs. |
| | Source: | | | | |
| 94 . | Total Subordinate Debt | $0 | | | |

**Permanent Debt (Senior):**

| | | | Amount | Rate | Override | Amortiz. | Term | MIP |
|---|---|---|---|---|---|---|---|---|
| 95 . | MHFA | MHFA Program 1 | $ | % | % | yrs. | yrs. | % |
| 96 . | MHFA | MHFA Program 2 | $ | % | % | yrs. | yrs. | % |
| 97 . | MHP Fund Permanent Loan | | $ | % | | yrs. | yrs. | % |
| 98 . | Other Permanent Senior Mortgage | | $0 | % | | | yrs. | yrs. | % |
| | Source: | Sales Proceeds | | | | | | |
| 99 . | Other Permanent Senior Mortgage | | $ | % | | yrs. | yrs. | % |
| | Source: | | | | | | | |

| | | |
|---|---|---|
| 100 . | **Total Permanent Senior Debt** | $0 |
| 101 . | **Total Permanent Sources** | $320,000 |

**Construction Period Financing:**

| | | Amount | Rate | Term |
|---|---|---|---|---|
| 102 . | Construction Loan | $187,060 | 4.00% | 8.0 |
| | Source: | TPL | | |
| | Repaid at: | Sale of house | *(event)* | |
| 103 . | Other Interim Loan | $0 | % | mos. |
| | Source: | | | |
| | Repaid at: | | *(event)* | |
| 104 . | Syndication Bridge Loan | $0 | % | mos. |
| | Source: | | | |
| | Repaid at: | | *(event)* | |

KUN354

## Uses of Funds

Exhibit A

**Direct Construction:**

The Contractor certifies that, to the best of their knowledge, the construction estimates, and trade-item breakdown on this page are complete and accurate.

105 . Who prepared the estimates? | Dana McKiel, Integrity Building an
| Name | Signature |

106 . Basis for estimates? | Based upon a review of a house inspection and a site visit on 3/18/03.

| | DV | Trade Item | Amount | Description |
|---|---|---|---|---|
| 107 . | 3 | Concrete | $750 | |
| 108 . | 4 | Masonry | $0 | |
| 109 . | 5 | Metals | $0 | |
| 110 . | 6 | Rough Carpentry | $26,440 | |
| 111 . | 6 | Finish Carpentry | $10,361 | |
| 112 . | 7 | Waterproofing | $0 | |
| 113 . | 7 | Insulation | $2,440 | |
| 114 . | 7 | Roofing | $3,300 | |
| 115 . | 7 | Sheet Metal and Flashing | $0 | |
| 116 . | 7 | Exterior Siding | $9,000 | |
| 117 . | 8 | Doors | $1,250 | |
| 118 . | 8 | Windows | $3,200 | |
| 119 . | 8 | Glass | $0 | |
| 120 . | 9 | Lath & Plaster | $7,160 | |
| 121 . | 9 | Drywall | $0 | |
| 122 . | 9 | Tile Work | $0 | |
| 123 . | 9 | Acoustical | $0 | |
| 124 . | 9 | Wood Flooring | $2,592 | |
| 125 . | 9 | Resilient Flooring | $0 | |
| 126 . | 9 | Carpet | $0 | |
| 127 . | 9 | Paint & Decorating | $8,000 | |
| 128 . | 10 | Specialties | $0 | |
| 129 . | 11 | Special Equipment | $0 | |
| 130 . | 11 | Cabinets | $6,000 | |
| 131 . | 11 | Appliances | $0 | |
| 132 . | 12 | Blinds & Shades | $0 | |
| 133 . | 13 | Modular/Manufactured | $0 | |
| 134 . | 13 | Special Construction | $0 | |
| 135 . | 14 | Elevators or Conveying Syst. | $0 | |
| 136 . | 15 | Plumbing & Hot Water | $4,000 | |
| 137 . | 15 | Heat & Ventilation | $1,750 | |
| 138 . | 15 | Air Conditioning | $0 | |
| 139 . | 15 | Fire Protection | $0 | |
| 140 . | 16 | Electrical | $2,150 | |
| 141 . | | Accessory Buildings | | |
| 142 . | | Other/misc | $0 | |
| 143 . | | **Subtotal Structural** | $88,393 | |
| 144 . | 2 | Earth Work | | |
| 145 . | 2 | Site Utilities | | |
| 146 . | 2 | Roads & Walks | | |
| 147 . | 2 | Site Improvement | | |
| 148 . | 2 | Lawns & Planting | $2,000 | |
| 149 . | 2 | Geotechnical Conditions | | |
| 150 . | 2 | Environmental Remediation | | |
| 151 . | 2 | Demolition | $9,920 | |
| 152 . | 2 | Unusual Site Cond | $0 | |
| 153 . | | **Subtotal Site Work** | $11,920 | |
| 154 . | | **Total Improvements** | $100,313 | |
| 155 . | 1 | General Conditions | $7,500 | |
| 156 . | | **Subtotal** | $107,813 | |
| 157 . | 1 | Builders Overhead | $11,416 | |
| 158 . | 1 | Builders Profit | $7,610 | |
| 159 . | | **TOTAL** | $126,839 | |

| 160 | Total Cost/square foot: | $122.91 | Residential Cost/s.f.: | $122.91 |

KUN355

## Development Budget:

Exhibit A

| | Total | Residential | Commercial | Comments |
|---|---|---|---|---|
| 161 . Acquisition: Land | $320,000 | $320,000 | | |
| 162 . Acquisition: Building | $0 | $0 | | |
| 163 . **Acquisition Subtotal** | $320,000 | $320,000 | $0 | |
| | | | | |
| 164 . Direct Construction Budget | $126,839 | $126,839 | | (from line 159) |
| 165 . Construction Contingency | $7,308 | $7,308 | | 5.8% of construction |
| 166 . **Subtotal: Construction** | $134,147 | $134,147 | $0 | |

**General Development Costs:**

| | Total | Residential | Commercial | Comments |
|---|---|---|---|---|
| 167 . Architecture & Engineering | $1,000 | $1,000 | | |
| 168 . Survey and Permits | $6,800 | $6,800 | | |
| 169 . Clerk of the Works | $0 | $0 | | |
| 170 . Environmental Engineer | $2,250 | $2,250 | | |
| 171 . Bond Premium | $0 | | | |
| 172 . Legal | $1,750 | $1,750 | | |
| 173 . Title and Recording | $1,500 | $1,500 | | |
| 174 . Accounting & Cost Cert. | $500 | $500 | | |
| 175 . Marketing and Rent Up | $5,000 | $5,000 | | |
| 176 . Real Estate Taxes | $625 | $625 | | |
| 177 . Insurance | $1,000 | $1,000 | | |
| 178 . Relocation | $0 | | | |
| 179 . Appraisal | $1,500 | $1,500 | | |
| 180 . Security | $0 | | | |
| 181 . Construction Loan Interest | $4,988 | $4,988 | | |
| 182 . Inspecting Engineer | $0 | | | |
| 183 . Fees to: | $0 | | | |
| 184 . Fees to: | $0 | | | |
| 185 . MIP | $0 | | | |
| 186 . Credit Enhancement Fees | $0 | | | |
| 187 . Letter of Credit Fees | $0 | | | |
| 188 . Other Financing Fees | $0 | | | |
| 189 . Development Consultant | $0 | $0 | | |
| 190 . Other: | $0 | | | |
| 191 . Other: | $0 | | | |
| 192 . Soft Cost Contingency | $1,000 | $1,000 | | 3.7% of soft costs |
| 193 . **Subtotal: Gen. Dev.** | $27,913 | $27,913 | $0 | |
| | | | | |
| 194 . **Subtotal: Acquis., Const and Gen. Dev.** | $482,060 | $482,060 | $0 | |
| | | | | |
| 195 . Capitalized Reserves | $0 | | | |
| 196 . Developer Overhead | $0 | | | |
| 197 . Developer Fee | $25,000 | $25,000 | | |

| | Total | Residential | Commercial | | |
|---|---|---|---|---|---|
| 198 . **Total Development Cost** | $507,060 | $507,060 | $0 | **TDC per unit** | $507,060 |
| | | | | | |
| 199 . **TDC, Net** | $507,060 | $507,060 | $0 | **TDC, Net per unit** | $507,060 |

*Kunelius Farm*        *Application Date: April 1, 2003*        *#VALUE!*

KUN356

## Additional Detail on Development Pro-Forma:        Exhibit A

| | |
|---|---|
| 200 . Gross Syndication Investment | |

**Off-Budget Costs:**
**Syndication Costs:**

| | |
|---|---|
| 201 . Syndication Legal | |
| 202 . Syndication Fees | |
| 203 . Syndication Consultants | |
| 204 . Bridge Financing Costs | |
| 205 . Investor Servicing (capitalized) | |
| 206 . Other Syndication Expenses | |
| 207 . Total Syndication Expense | $0 |
| 208 . Current Reserve Balance | |

**Reserves (capitalized):**

| | |
|---|---|
| 209 . Development Reserves | |
| 210 . Initial Rent-Up Reserves | |
| 211 . Operating Reserves | |
| 212 . Net Worth Account | |
| 213 . Other Capitalized Reserves | |
| 214 . Subtotal: Capitalized Reserves | $0 |
| | |
| 215 . Letter of Credit Requirements | |
| | |
| 216 . Total of the Above | $0 |

**Check: Line 214 is the same as line 195.**

| Please Answer The Following | Dev. Reserves | Initial Rent-Up | Op. Reserves | Net Worth | Other | Letter of Credit |
|---|---|---|---|---|---|---|
| Who requires the reserves? | | | | | | |
| Who administers the reserves? | | | | | | |
| When and how are they used? | | | | | | |
| Under what circumstances can they be released? | | | | | | |

**Unit Sales (For Sale Projects Only):**

| | |
|---|---|
| 217 . Gross Sales From Units | $199,000 |
| 218 . Cost of Sales (Commissions, etc.) | $11,940 |
| 219 . Net Receipt from Sales | $187,060 |

**Debt Service Requirements:**

| | |
|---|---|
| 220 . Minimum Debt Service Coverage | |
| | |
| 221 . Is this Project subject to HUD Subsidy Layering Review? | No |

*Optional user comments*

KUN357

# Exhibit 11
## Construction Period Sources and Uses

Exhibit A

*Please fill out the following table with information on each month for which the project will be under construction. "Sources" and "Uses" should equal each other every month. Indicate loan repayment during the construction period.*

| Sources of Cash: | Total | Closing | Month 1 | Month 2 | Month 3 | Month 4 |
|---|---|---|---|---|---|---|
| Construction Loan | $187,060 | $13,925 | $23,171 | $23,171 | $23,171 | $23,171 |
| Proceeds from Sale (Net)* | $187,060 | | $ | $ | $ | $ |
| Equity: Cash | $320,000 | $320,000 | $ | $ | $ | $ |
| Equity: Tax Credit (Net) | $0 | $ | $ | $ | $ | $ |
| Subordinate Debt | $0 | $ | $ | $ | $ | $ |
| Permanent Debt | $0 | $ | $ | $ | $ | $ |
| Syndication Bridge Loan | $0 | $ | $ | $ | $ | $ |
| Other Interim Loan | $0 | $ | $ | $ | $ | $ |
| SUBTOTAL | $694,120 | $333,925 | $23,171 | $23,171 | $23,171 | $23,171 |
| Repayment: Construction Loan | $187,060 | $ | $ | $ | $ | $ |
| Repayment: Syndication Loan | $ | $ | $ | $ | $ | $ |
| Repayment: Interim Loan | $ | $ | $ | $ | $ | $ |
| **TOTAL SOURCES, NET** | $507,060 | $333,925 | $23,171 | $23,171 | $23,171 | $23,171 |
| **Cumulative Sources** | | $333,925 | $357,096 | $380,267 | $403,438 | $426,609 |

* Only relevant in the case of for-sale projects.

| Uses of Cash (Expenses): | Total | Closing | Month 1 | Month 2 | Month 3 | Month 4 |
|---|---|---|---|---|---|---|
| **Acquisition** | $320,000 | $320,000 | $ | $ | $ | $ |
| **Hard Costs:** | | | | | | |
| Direct Construction | $126,839 | | $21,140 | $21,140 | $21,140 | $21,140 |
| Contingency | $7,308 | | $0 | $0 | $0 | $0 |
| Total Hard Costs | $134,147 | | $21,140 | $21,140 | $21,140 | $21,140 |
| **Soft Costs:** | | | | | | |
| Construction Loan Interest | $4,988 | $ | $ | $ | $ | $ |
| Architecture & Engineering | $1,000 | $ | $250 | $250 | $250 | $250 |
| Survey and Permits | $6,800 | $6,800 | $ | $ | $ | $ |
| Clerk of the Works | $0 | $ | $0 | $0 | $0 | $0 |
| Environmental Engineer | $2,250 | $2,250 | $ | $ | $ | $ |
| Bond Premium | $0 | $ | $ | $ | $ | $ |
| Legal | $1,750 | $875 | $ | $ | $ | $ |
| Title and Recording | $1,500 | $1,500 | $ | $ | $ | $ |
| Accounting & Cost Certificat. | $500 | $ | $125 | $125 | $125 | $125 |
| Marketing and Rent Up | $5,000 | $ | $1,250 | $1,250 | $1,250 | $1,250 |
| Real Estate Taxes | $625 | $ | $156 | $156 | $156 | $156 |
| Insurance | $1,000 | $1,000 | $ | $ | $ | $ |
| Relocation | $0 | $ | $ | $ | $ | $ |
| Appraisal | $1,500 | $1,500 | $ | $ | $ | $ |
| Security | $0 | $ | $ | $ | $ | $ |
| Inspecting Engineer | $0 | $ | $ | $ | $ | $ |
| Financing Fees | $0 | $ | $ | $ | $ | $ |
| Development Consultant | $0 | $ | $ | $ | $ | $ |
| Other | $0 | $ | $ | $ | $ | $ |
| Other | $0 | $ | $ | $ | $ | $ |
| Developer's Overhead | $0 | $ | $ | $ | $ | $ |
| Developer's Fee (Net) | $25,000 | $ | $ | $ | $ | $ |
| Soft Cost Contingency | $1,000 | $ | $250 | $250 | $250 | $250 |
| Contribution to Reserves | $0 | $ | $ | $ | $ | $ |
| Subtotal Soft Costs, Fees | $52,913 | $13,925 | $2,031 | $2,031 | $2,031 | $2,031 |
| **TOTAL USES** | $507,060 | $333,925 | $23,171 | $23,171 | $23,171 | $23,171 |
| **Cumulative Uses** | | $333,925 | $357,096 | $380,267 | $403,438 | $426,609 |

| Budget: Percentage of Funds Expended | | 65.9% | 4.6% | 4.6% | 4.6% | 4.6% |
|---|---|---|---|---|---|---|
| Construction Loan Balance | $0 | $13,925 | $37,096 | $60,267 | $83,438 | $106,609 |
| Syndication Loan Balance | $0 | $0 | $0 | $0 | $0 | $0 |
| Interim Loan Balance | $0 | $0 | $0 | $0 | $0 | $0 |

*Kunelius Farm*     *Application Date: April 1, 2003*     #VALUE!

KUN358

# Exhibit 11
## Construction Period Sources and Uses

Exhibit A

*Please fill out the following table with information on each month for which the project will be under construction. "Sources" and "Uses" should equal each other every month. Indicate loan repayment during the construction period.*

| Sources of Cash: | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 |
|---|---|---|---|---|---|---|
| Construction Loan | $21,140 | $54,323 | $4,988 | $ | $ | $ |
| Proceeds from Sale (Net)* | $ | $ | $ | $ | $ | $ |
| Equity: Cash | $ | $ | $ | $ | $ | $ |
| Equity: Tax Credit | $ | $ | $ | $ | $ | $ |
| Subordinate Debt | $ | $ | $ | $ | $ | $ |
| Permanent Debt | $ | $ | $ | $ | $ | $ |
| Syndication Bridge Loan | $ | $ | $ | $ | $ | $ |
| Other Interim Loan | $ | $ | $ | $ | $ | $ |
| **SUBTOTAL** | $21,140 | $54,323 | $4,988 | $0 | $0 | $0 |
| Repayment: Construction Loan | $ | $ | $187,060 | $ | $ | $ |
| Repayment: Syndication Loan | $ | $ | $ | $ | $ | $ |
| Repayment: Interim Loan | $ | $ | $ | $ | $ | $ |
| **TOTAL SOURCES, NET** | $21,140 | $54,323 | ($182,072) | $0 | $0 | $0 |
| **Cumulative Sources** | $447,749 | $502,072 | $320,000 | $320,000 | $320,000 | $320,000 |

\* Only relevant in the case of for-sale projects.

| Uses of Cash (Expenses): | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 |
|---|---|---|---|---|---|---|
| Acquisition | $ | $ | $ | $ | $ | $ |
| **Hard Costs:** | | | | | | |
| Direct Construction | $21,140 | $21,140 | $ | $ | $ | $ |
| Contingency | $0 | $7,308 | $ | $ | $ | $ |
| Total Hard Costs | $21,140 | $28,448 | $0 | $0 | $0 | $0 |
| **Soft Costs:** | | | | | | |
| Construction Loan Interest | $ | $ | $4,988 | $0 | $ | $ |
| Architecture & Engineering | $ | $ | $ | $ | $ | $ |
| Survey and Permits | $ | $ | $ | $ | $ | $ |
| Clerk of the Works | $ | $ | $ | $ | $ | $ |
| Environmental Engineer | $ | $ | $ | $ | $ | $ |
| Bond Premium | $ | $ | $ | $ | $ | $ |
| Legal | $ | $875 | $ | $ | $ | $ |
| Title and Recording | $ | $ | $ | $ | $ | $ |
| Accounting & Cost Certificat. | $ | $ | $ | $ | $ | $ |
| Marketing and Rent Up | $ | $ | $ | $ | $ | $ |
| Real Estate Taxes | $ | $ | $ | $ | $ | $ |
| Insurance | $ | $ | $ | $ | $ | $ |
| Relocation | $ | $ | $ | $ | $ | $ |
| Appraisal | $ | $ | $ | $ | $ | $ |
| Security | $ | $ | $ | $ | $ | $ |
| Inspecting Engineer | $ | $ | $ | $ | $ | $ |
| Financing Fees | $ | $ | $ | $ | $ | $ |
| Development Consultant | $ | $ | $ | $ | $ | $ |
| Other | $ | $ | $ | $ | $ | $ |
| Other | $ | $ | $ | $ | $ | $ |
| Developer's Overhead | $ | $ | $ | $ | $ | $ |
| Developer's Fee (Net) | $ | $25,000 | $ | $ | $ | $ |
| Soft Cost Contingency | $ | $ | $ | $ | $ | $ |
| Contribution to Reserves | $ | $ | $ | $ | $ | $ |
| Sub-Total Soft Costs | $0 | $25,875 | $4,988 | $0 | $0 | $0 |
| **TOTAL** | $21,140 | $54,323 | $4,988 | $0 | $0 | $0 |
| **Cumulative Uses** | $447,749 | $502,072 | $507,060 | $507,060 | $507,060 | $507,060 |
| **Percentage of Funds Expended** | 4.2% | 10.7% | 1.0% | 0.0% | 0.0% | 0.0% |
| Construction Loan Balance | $127,749 | $182,072 | $0 | $0 | $0 | $0 |
| Syndication Loan Balance | $0 | $0 | $0 | $0 | $0 | $0 |
| Interim Loan Balance | $0 | $0 | $0 | $0 | $0 | $0 |

KUN359

# Construction Period Sources and Uses

Exhibit A

*Please fill out the following table with information on each month for which the project will be under construction. "Sources" and "Uses" should equal each other every month. Indicate loan repayment during the construction period.*

| Sources of Cash: | Month 11 | Month 12 | Month 13 | Month 14 | Month 15 | Month 16 |
|---|---|---|---|---|---|---|
| Construction Loan | $ | $ | $ | $ | $ | $ |
| Proceeds from Sale (Net)* | $ | $ | $ | $ | $ | $ |
| Equity: Cash | $ | $ | $ | $ | $ | $ |
| Equity: Tax Credit | $ | $ | $ | $ | $ | $ |
| Subordinate Debt | $ | $ | $ | $ | $ | $ |
| Permanent Debt | $ | $ | $ | $ | $ | $ |
| Syndication Bridge Loan | $ | $ | $ | $ | $ | $ |
| Other Interim Loan | $ | $ | $ | $ | $ | $ |
| **SUBTOTAL** | $0 | $0 | $0 | $0 | $0 | $0 |
| Repayment: Construction Loan | $ | $ | $ | $ | $ | $ |
| Repayment: Syndication Loan | $ | $ | $ | $ | $ | $ |
| Repayment: Interim Loan | $ | $ | $ | $ | $ | $ |
| **TOTAL SOURCES, NET** | $0 | $0 | $0 | $0 | $0 | $0 |
| **Cumulative Sources** | $320,000 | $320,000 | $320,000 | $320,000 | $320,000 | $320,000 |

* Only relevant in the case of for-sale projects.

| Uses of Cash (Expenses): | Month 11 | Month 12 | Month 13 | Month 14 | Month 15 | Month 16 |
|---|---|---|---|---|---|---|
| Acquisition | $ | $ | $ | $ | $ | $ |
| **Hard Costs:** | | | | | | |
| Direct Construction | $ | $ | $ | $ | $ | $ |
| Contingency | $ | $ | $ | $ | $ | $ |
| Total Hard Costs | $0 | $0 | $0 | $0 | $0 | $0 |
| **Soft Costs:** | | | | | | |
| Construction Loan Interest | $ | $ | $ | $ | $ | $ |
| Architecture & Engineering | $ | $ | $ | $ | $ | $ |
| Survey and Permits | $ | $ | $ | $ | $ | $ |
| Clerk of the Works | $ | $ | $ | $ | $ | $ |
| Environmental Engineer | $ | $ | $ | $ | $ | $ |
| Bond Premium | $ | $ | $ | $ | $ | $ |
| Legal | $ | $ | $ | $ | $ | $ |
| Title and Recording | $ | $ | $ | $ | $ | $ |
| Accounting & Cost Certificat. | $ | $ | $ | $ | $ | $ |
| Marketing and Rent Up | $ | $ | $ | $ | $ | $ |
| Real Estate Taxes | $ | $ | $ | $ | $ | $ |
| Insurance | $ | $ | $ | $ | $ | $ |
| Relocation | $ | $ | $ | $ | $ | $ |
| Appraisal | $ | $ | $ | $ | $ | $ |
| Security | $ | $ | $ | $ | $ | $ |
| Inspecting Engineer | $ | $ | $ | $ | $ | $ |
| Financing Fees | $ | $ | $ | $ | $ | $ |
| Development Consultant | $ | $ | $ | $ | $ | $ |
| Other | $ | $ | $ | $ | $ | $ |
| Other | $ | $ | $ | $ | $ | $ |
| Developer's Overhead | $ | $ | $ | $ | $ | $ |
| Developer's Fee (Net) | $ | $ | $ | $ | $ | $ |
| Soft Cost Contingency | $ | $ | $ | $ | $ | $ |
| Contribution to Reserves | $ | $ | $ | $ | $ | $ |
| Sub-Total Soft Costs | $0 | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | $0 | $0 | $0 | $0 | $0 | $0 |
| **Cumulative Uses** | $507,060 | $507,060 | $507,060 | $507,060 | $507,060 | $507,060 |
| **Percentage of Funds Expended** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Construction Loan Balance | $0 | $0 | $0 | $0 | $0 | $0 |
| Syndication Loan Balance | $0 | $0 | $0 | $0 | $0 | $0 |
| Interim Loan Balance | $0 | $0 | $0 | $0 | $0 | $0 |

KUN360

# Exhibit 11
## Construction Period Sources and Uses

Exhibit A

*Please fill out the following table with information on each month for which the project will be under construction. "Sources" and "Uses" should equal each other every month. Indicate loan repayment during the construction period.*

| Sources of Cash: | Month 17 | Month 18 | Month 19 | Month 20 | Month 21 | Month 22 |
|---|---|---|---|---|---|---|
| Construction Loan | $ | $ | $ | $ | $ | $ |
| Proceeds from Sale (Net)* | $ | $ | $ | $ | $ | $ |
| Equity: Cash | $ | $ | $ | $ | $ | $ |
| Equity: Tax Credit | $ | $ | $ | $ | $ | $ |
| Subordinate Debt | $ | $ | $ | $ | $ | $ |
| Permanent Debt | $ | $ | $ | $ | $ | $ |
| Syndication Bridge Loan | $ | $ | $ | $ | $ | $ |
| Other Interim Loan | $ | $ | $ | $ | $ | $ |
| **SUBTOTAL** | $0 | $0 | $0 | $0 | $0 | $0 |
| Repayment: Construction Loan | $ | $ | $ | $ | $ | $ |
| Repayment: Syndication Loan | $ | $ | $ | $ | $ | $ |
| Repayment: Interim Loan | $ | $ | $ | $ | $ | $ |
| **TOTAL SOURCES, NET** | $0 | $0 | $0 | $0 | $0 | $0 |
| **Cumulative Sources** | $320,000 | $320,000 | $320,000 | $320,000 | $320,000 | $320,000 |

\* Only relevant in the case of for-sale projects.

| Uses of Cash (Expenses) | Month 17 | Month 18 | Month 19 | Month 20 | Month 21 | Month 22 |
|---|---|---|---|---|---|---|
| Acquisition | $ | $ | $ | $ | $ | $ |
| **Hard Costs:** | | | | | | |
| Direct Construction | $ | $ | $ | $ | $ | $ |
| Contingency | $ | $ | $ | $ | $ | $ |
| Total Hard Costs | $0 | $0 | $0 | $0 | $0 | $0 |
| **Soft Costs:** | | | | | | |
| Construction Loan Interest | $ | $ | $ | $ | $ | $ |
| Architecture & Engineering | $ | $ | $ | $ | $ | $ |
| Survey and Permits | $ | $ | $ | $ | $ | $ |
| Clerk of the Works | $ | $ | $ | $ | $ | $ |
| Environmental Engineer | $ | $ | $ | $ | $ | $ |
| Bond Premium | $ | $ | $ | $ | $ | $ |
| Legal | $ | $ | $ | $ | $ | $ |
| Title and Recording | $ | $ | $ | $ | $ | $ |
| Accounting & Cost Certificat. | $ | $ | $ | $ | $ | $ |
| Marketing and Rent Up | $ | $ | $ | $ | $ | $ |
| Real Estate Taxes | $ | $ | $ | $ | $ | $ |
| Insurance | $ | $ | $ | $ | $ | $ |
| Relocation | $ | $ | $ | $ | $ | $ |
| Appraisal | $ | $ | $ | $ | $ | $ |
| Security | $ | $ | $ | $ | $ | $ |
| Inspecting Engineer | $ | $ | $ | $ | $ | $ |
| Financing Fees | $ | $ | $ | $ | $ | $ |
| Development Consultant | $ | $ | $ | $ | $ | $ |
| Other | $ | $ | $ | $ | $ | $ |
| Other | $ | $ | $ | $ | $ | $ |
| Developer's Overhead | $ | $ | $ | $ | $ | $ |
| Developer's Fee (Net) | $ | $ | $ | $ | $ | $ |
| Soft Cost Contingency | $ | $ | $ | $ | $ | $ |
| Contribution to Reserves | $ | $ | $ | $ | $ | $ |
| Sub-Total Soft Costs | $0 | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | $0 | $0 | $0 | $0 | $0 | $0 |
| **Cumulative Uses** | $507,060 | $507,060 | $507,060 | $507,060 | $507,060 | $507,060 |

| Percentage of Funds Expended | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
|---|---|---|---|---|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| Construction Loan Balance | $0 | $0 | $0 | $0 | $0 | $0 |
| Syndication Loan Balance | $0 | $0 | $0 | $0 | $0 | $0 |
| Interim Loan Balance | $0 | $0 | $0 | $0 | $0 | $0 |

KUN361

*Please fill out the following table with information on each month for which the project will be under construction. "Sources" and "Uses" should equal each other every month. Indicate loan repayment during the construction period.*

| Sources of Cash: | Month 23 | Month 24 | Month 25 | Month 26 | Month 27 | Month 28 |
|---|---|---|---|---|---|---|
| Construction Loan | | | | | | |
| Proceeds from Sale (Net)* | | | | | | |
| Equity: Cash | | | | | | |
| Equity: Tax Credit | | | | | | |
| Subordinate Debt | | | | | | |
| Permanent Debt | | | | | | |
| Syndication Bridge Loan | | | | | | |
| Other Interim Loan | | | | | | |
| **SUBTOTAL** | $0 | $0 | $0 | $0 | $0 | $0 |
| Repayment: Construction Loan | | | | | | |
| Repayment: Syndication Loan | | | | | | |
| Repayment: Interim Loan | | | | | | |
| **TOTAL SOURCES, NET** | $0 | $0 | $0 | $0 | $0 | $0 |
| **Cumulative Sources** | $320,000 | $320,000 | $320,000 | $320,000 | $320,000 | $320,000 |

\* Only relevant in the case of for-sale projects.

| Uses of Cash (Expenses): | Month 23 | Month 24 | Month 25 | Month 26 | Month 27 | Month 28 |
|---|---|---|---|---|---|---|
| **Acquisition** | | | | | | |
| **Hard Costs:** | | | | | | |
| Direct Construction | | | | | | |
| Contingency | | | | | | |
| Total Hard Costs | $0 | $0 | $0 | $0 | $0 | $0 |
| **Soft Costs:** | | | | | | |
| Construction Loan Interest | | | | | | |
| Architecture & Engineering | | | | | | |
| Survey and Permits | | | | | | |
| Clerk of the Works | | | | | | |
| Environmental Engineer | | | | | | |
| Bond Premium | | | | | | |
| Legal | | | | | | |
| Title and Recording | | | | | | |
| Accounting & Cost Certificat. | | | | | | |
| Marketing and Rent Up | | | | | | |
| Real Estate Taxes | | | | | | |
| Insurance | | | | | | |
| Relocation | | | | | | |
| Appraisal | | | | | | |
| Security | | | | | | |
| Inspecting Engineer | | | | | | |
| Financing Fees | | | | | | |
| Development Consultant | | | | | | |
| Other | | | | | | |
| Other | | | | | | |
| Developer's Overhead | | | | | | |
| Developer's Fee (Net) | | | | | | |
| Soft Cost Contingency | | | | | | |
| Contribution to Reserves | | | | | | |
| Sub-Total Soft Costs | $0 | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | $0 | $0 | $0 | $0 | $0 | $0 |
| **Cumulative Uses** | $507,060 | $507,060 | $507,060 | $507,060 | $507,060 | $507,060 |
| **Percentage of Funds Expended** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Construction Loan Balance | $0 | $0 | $0 | $0 | $0 | $0 |
| Syndication Loan Balance | $0 | $0 | $0 | $0 | $0 | $0 |
| Interim Loan Balance | $0 | $0 | $0 | $0 | $0 | $0 |

# Exhibit 11
## Construction Period Sources and Uses

Exhibit A

*Please fill out the following table with information on each month for which the project will be under construction. "Sources" and "Uses" should equal each other every month. Indicate loan repayment during the construction period.*

| Sources of Cash: | Month 29 | Month 30 | Month 31 | Month 32 | Month 33 | Net Balance |
|---|---|---|---|---|---|---|
| Construction Loan | | | | | | $0 |
| Proceeds from Sale (Net)* | | | | | | $187,060 |
| Equity: Cash | | | | | | $0 |
| Equity: Tax Credit | | | | | | $0 |
| Subordinate Debt | | | | | | $0 |
| Permanent Debt | | | | | | $0 |
| Syndication Bridge Loan | | | | | | $0 |
| Other Interim Loan | | | | | | $0 |
| **SUBTOTAL** | $0 | $0 | $0 | $0 | $0 | $187,060 |
| Repayment: Construction Loan | | | | | | $187,060 |
| Repayment: Syndication Loan | | | | | | $0 |
| Repayment: Interim Loan | | | | | | $0 |
| **TOTAL SOURCES, NET** | $0 | $0 | $0 | $0 | $0 | $0 |
| **Cumulative Sources** | $320,000 | $320,000 | $320,000 | $320,000 | $320,000 | |

* Only relevant in the case of for-sale projects.

| Uses of Cash (Expenses) | Month 29 | Month 30 | Month 31 | Month 32 | Month 33 | Net Balance |
|---|---|---|---|---|---|---|
| **Acquisition** | | | | | | $0 |
| **Hard Costs:** | | | | | | |
| Direct Construction | | | | | | $0 |
| Contingency | | | | | | $0 |
| Total Hard Costs | $0 | $0 | $0 | $0 | $0 | $0 |
| **Soft Costs:** | | | | | | |
| Construction Loan Interest | | | | | | $0 |
| Architecture & Engineering | | | | | | $0 |
| Survey and Permits | | | | | | $0 |
| Clerk of the Works | | | | | | $0 |
| Environmental Engineer | | | | | | $0 |
| Bond Premium | | | | | | $0 |
| Legal | | | | | | $0 |
| Title and Recording | | | | | | $0 |
| Accounting & Cost Certificat. | | | | | | $0 |
| Marketing and Rent Up | | | | | | $0 |
| Real Estate Taxes | | | | | | $0 |
| Insurance | | | | | | $0 |
| Relocation | | | | | | $0 |
| Appraisal | | | | | | $0 |
| Security | | | | | | $0 |
| Inspecting Engineer | | | | | | $0 |
| Financing Fees | | | | | | $0 |
| Development Consultant | | | | | | $0 |
| Other | | | | | | $0 |
| Other | | | | | | $0 |
| Developer's Overhead | | | | | | $0 |
| Developer's Fee (Net) | | | | | | $0 |
| Soft Cost Contingency | | | | | | $0 |
| Contribution to Reserves | | | | | | $0 |
| Sub-Total Soft Costs | $0 | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | $0 | $0 | $0 | $0 | $0 | |
| **Cumulative Uses** | $507,060 | $507,060 | $507,060 | $507,060 | $507,060 | |

| Percentage of Funds Expended | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | |
|---|---|---|---|---|---|---|
| Construction Loan Balance | $0 | $0 | $0 | $0 | $0 | |
| Syndication Loan Balance | $0 | $0 | $0 | $0 | $0 | |
| Interim Loan Balance | $0 | $0 | $0 | $0 | $0 | |

# APPENDIX A

## "One-Stop" Affordable Housing Finance Application
### Required Exhibits and Attachments

**Note:  These <u>must</u> be submitted as part of the HDSP application**

| | DHCD HDSP |
|---|---|
| *General Exhibits:* | |
| 1   Site Information | Y |
| 2   Environmental | Y |
| 3   Evidence of Zoning | Y |
| 4   Evidence of Site Control | Y |
| 5   Evidence of Local Support | N |
| 6   Market Information and Acquisition Value | Y |
| 7   Marketing Plan* | N |
| 8   Affirmative Fair Marketing Plan | N |
| 9   Equal Opportunity Questionnaire | N |
| 10  Sales Prices and Affordability* | Y* |
| 11  Construction Period Sources and Uses | N |
| 12  Tax-Exempt Project Information* | N* |
| 13  Relocation Plan* | N |
| 14  Special Needs Service Plan* | Y* |
| 15  Required Tax Credit Certifications* | N |
| *Design Exhibits:* | |
| 16  Preliminary Plans and Specifications | Y |
| 17  Commitment Drawings and Specifications | N |
| 18  Soil and/or Structural Report* | N |
| 19  Energy Budget | N |
| *Funding Interest/Commitments:* | |
| 20  Construction Financing | Y |
| 21  Permanent Financing | Y |
| 22  Equity Commitment* | Y* |
| 23  Other Funding Commitments* | Y* |
| 24  Rental Subsidies* | Y* |
| *Developer Team Information:* | |
| 25  Developer Profile | Y |
| 26  Mortgagor's Other Real Estate | Y |
| 27  Architect's Resume | N |
| 28  Management Agent Profile | N |
| 29  General Contractor's Profile | L |
| 30  Financial Statement and Credit Release | N |
| 31  Mortgagor Personal Financial Statement | N |
| 32  Individual Financial Profile | N |
| 33  General Contractor's Financial Capacity | N |

*Only if applicable (see instructions in "One Stop.")

*Legend*:

Y = Yes, required; application will be deemed incomplete if not submitted.

N = Not required.

L = Not required with application, but may be required prior to commitment or closing; should be submitted with application if available.

Federal FY 2003 Mass. CDBG Application
Page 101 of 123

KUN364

# Exhibit 10:
# Sales Prices and Affordability

If the proposed project is *for-sale* housing, then complete the following sales and affordability information.

*10:1* **Unit Descriptions**: Describe each unit type or style which will have different sales prices and assign them each letters (A, B, C, etc.).

| Type | Number of Units | Bed-rooms | Square Footage | Bath-rooms | Appliances | Other |
|------|----------------|-----------|----------------|------------|------------|-------|
| A | 1 | 2 | 1066 | 1 | | |
| B | | | | | | |
| C | | | | | | |
| D | | | | | | |
| E | | | | | | |
| F | | | | | | |
| G | | | | | | |
| H | | | | | | |

*10:2* **Sales Prices:**

| Type | Sales Price | Income to Afford | Percent of Median | Number of Units, By Phase I | II | III | IV |
|------|-------------|------------------|-------------------|---|----|-----|-----|
| A | $199,000 | $47,855  ** | 59% | 1 | | | |
| B | | | | | | | |
| C | | | | | | | |
| D | | | | | | | |
| E | | | | | | | |
| F | | | | | | | |
| G | | | | | | | |
| H | | | | | | | |

** Assumes 5.5%, 30 year fixed rate mortgage currently available from several local lenders

*10:3* **Subsidy:**
  Source of subsidy (if any) to support reduced prices or below-market financing:
  HDSP_____
  Amount of subsidy:  $320,000 _____

*10:4* **Source of Financing:**
  Indicate source of permanent financing:  Trust for Public Land, Homeowner End Loans.

KUN365

## Item 1-4: Grant Management Plan

In compliance with 24 Code of Federal Regulations Part 85, and M.G.L. Ch. 30B, the Town of Stow will hire a grant management consultant with suitable CDBG experience to administer the HDSP grant for the Town.

Upon notice of grant award, the Town of Stow will circulate, according to procedures described in *Municipal, County, District, and Local Authority Procurement of Supplies, Services, and Real Property*, a request for bids for the management, administration, and oversight of this grant. The consultant will be reviewed by DHCD for suitability prior to the commencement of the contract between the town and the consultant.

Because the Town of Stow largely relies on volunteer time, it is inappropriate to expect that existing personnel within the Town of Stow would be able to administer this grant. Because of this, and because of the level of understanding of the CDBG process required, the Town of Stow recognizes that an outside administrator is required.

To that end, the Town of Stow requests $32,000.00 in administrative assistance to cover salary and soft costs.

As directed by DHCD, the Town of Stow will contract with a grant management administrator who will develop a grant management plan, including systems of checks and balances for oversight of all project activities.

[Subcontractors used for this project will be contracting directly with the Trust for Public Land. Other than any required public bidding processes, there will be no relationship between subcontractors and the Town of Stow.]

KUN366

(Form 1-5)
HOUSING DEVELOPMENT SUPPORT PROGRAM

MASSACHUSETTS CDBG PROGRAM

*PART A*  Program Delivery/General Administrative Cost Breakdown - Personnel, Fringe Benefits

| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|
| COST CATEGORY | HOUSING REHAB. (4a) | ECONOMIC DEVEL. (5a) | INFRA/PUB FACILITIES (6a) | SOCIAL SERV. (8a) | GENERAL ADMIN. (9) | TOTAL CDBG FUNDS | OTHER TOWN/AGENCY FUNDS |
| A | % | % | % | % | % | | |
| A1 Personnel (list each position) | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| A2 Fringe Benefits (list for each position) | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| A3 Sub-Total Personnel Costs (A1 & A2) | $0 | | $0 | | $0 | $0 | $0 |

KUN367

MASSACHUSETTS CDBG PROGRAM
Budget Summary Sheet
Form 1-6

| | PROGRAM/PROJECT/ACTIVITY | HDSP FUNDS ($) | OTHER FUNDS |
|---|---|---|---|
| 1 | PROPERTY ACQUISITION | $320,000 | |
| 2 | CLEARANCE/DEMOLITION | | |
| 3 | RELOCATION | | |
| 4 | HOUSING REHABILITATION | XXXXXXXXXX | XXXXXXXXXX |
| A | Program Delivery | $32,000 | $160,663 |
| B | Unit Development/Creation | | |
| C | Rehabilitation Loan/Grant | | |
| D | Other | | |
| 5 | COMMUNITY ECONOMIC DEVELOPMENT | XXXXXXXXXX | XXXXXXXXXX |
| | Program Delivery | XXXXXXXXXX | |
| | Acquisition | XXXXXXXXXX | |
| | Commercial Improvements (Signs/Facades) | XXXXXXXXXX | |
| | Assist. to For-profits (formally Sm. Business Assist.) | XXXXXXXXXX | |
| | Infrastructure or Streetscape Improvements | XXXXXXXXXX | |
| | Planning/Technical Assistance Activities | XXXXXXXXXX | |
| | Downtown Partnerships/Technical Assistance | XXXXXXXXXX | |
| | Other/Microenterprise Assistance | XXXXXXXXXX | |
| 6 | PUBLIC FACILITIES/INFRASTRUCTURE | XXXXXXXXXX | XXXXXXXXXX |
| A | Program Delivery | | |
| B | Streets and Sidewalks | | |
| C | Parks and Recreation | | |
| D | Neighborhood Facilities | | |
| E | Parking | | |
| F | Water, Sewer, Drainage | | |
| G | Architectural Barriers | | |
| H | Other | | |
| 7 | OTHER/PLANNING | | |
| 8 | PUBLIC SOCIAL SERVICES | XXXXXXXXXX | XXXXXXXXXX |
| A | Program Delivery | XXXXXXXXXX | XXXXXXXXXX |
| B | Program Costs | XXXXXXXXXX | XXXXXXXXXX |
| 9 | GENERAL ADMINISTRATION | | |
| | TOTAL PROGRAM COSTS | $352,000 | $160,663 |

KUN368

## Item 1-7: Affordability and Recapture Plan

This project will be subject to the Affordability and Recapture provisions outlined in the attached Regulatory Agreement and Attachments 1-7.1-3. The Town believes that these provisions will ensure affordability, discourage real estate speculation, and adequately provide information about the availability of affordable units to all relevant population groups.

The components of this plan include a Regulatory Agreement, suggested Affordable Housing Covenant (Attachment 1-7.1) which includes language describing the maximum resale value of the unit, the number of years that the restriction will be in effect (in perpetuity), methods for the community's monitoring of property owner compliance, methods for the community to take corrective action in instances of non-compliance with the plan, and provisions for preventing windfall on sale. In addition, the plan includes a Monitoring Service Agreement (Attachment 1-7.2) and a Marketing, Monitoring, Education and Enforcement Plan (Attachment 1-7.3) to be used by the Town of Stow with respect to the property at 142 Red Acre Road.

## REGULATORY AGREEMENT

In consideration of the mutual promises contained herein, The Trust for Public Land, a California nonprofit corporation having a regular place of business at 33 Union Street, Boston, Massachusetts 02108 ("TPL"), and the Town of Stow, Massachusetts, a municipal corporation with a mailing address of 380 Great Road, Stow, Massachusetts 01775 ("Town"), hereby agree that with respect to the intention of TPL to purchase property located at 142 Red Acre Road, Stow, Massachusetts (the "Property") for the purposes of renovating the single-family residence located thereon; and with respect to the Town's intention to make application to the Department of Housing and Community Development ("DHCD") for Housing Development Support Program funds to be utilized to assist TPL regarding the acquisition, renovation and resale of the Property (the "Project"), the following terms shall apply:

1. TPL and the Town agree to abide by the terms of any DHCD grant made with respect to the Project:
2. TPL and the Town agree that the terms of the [Affordable Housing Covenant] attached hereto as Attachment 1-7.1 shall govern the Project;
3. TPL and the Town agree that the Monitoring Services Agreement attached hereto as Attachment 1-7.2 shall govern the Project;
4. TPL and the Town agree that the Marketing, Monitoring, Education and Enforcement Plan attached hereto as Attachment 1-7.3 shall govern the Project.

TRUST FOR PUBLIC LAND                    TOWN OF STOW

By _____                      By _Edward R Perry_

**[Proposed Form of Agreement]**

**KUN370**

<u>Attachment 1-7.1</u>

## **AFFORDABLE HOUSING COVENANT**

### **for 142 Red Acre Road, Stow MA**

OWNER - _____

OWNER'S ADDRESS - 142 Red Acre Road, Stow, Massachusetts 01775.

COVENANT HOLDER - Town of Stow, Massachusetts.

COVENANT HOLDER 'S ADDRESS - 380 Great Road, Stow, MA 01775-2127.

PREMISES - The land, building and other improvements, presently a 1 family house, now or hereafter thereon located at 142 Red Acre Road, Stow, Massachusetts, as more completely described in Exhibit A hereto, together with all rights and easements now or hereafter appurtenant thereto and all fixtures now or hereafter thereon insofar as the same are a part of the realty.

RESIDENCE - The residential unit at the Premises occupied by the Owner's Household.

---

**Summary of the Affordable Housing Covenant**

     I am buying this home to live in it as my principal residence. I acknowledge that I am qualified to buy and live in this home because my income is _____. This home has been made affordable by government activities so that it can be home to persons of low or moderate income in perpetuity and I recognize that I must (i) live in the Residence as my principal residence and (ii) sell the home to persons having income no greater than permitted under this Covenant. Just as I could not afford to buy this home unless its price were reduced to affordable levels, they will also need the price at which I sell to be at affordable levels. I agree to this restriction recognizing I probably will not make as much profit from sale of this home as another homeowner in the neighborhood who purchased and may sell at full market value. To enforce these provisions intended to assure long term affordability for this home, I recognize I will need to give notice to the **Covenant Holder** (or its designated representative) when I sell the home, the **Covenant Holder** will have a right to purchase the Premises if it wishes, and any buyer will be subject to this Affordable Housing Covenant. I recognize that this paragraph is a brief summary of the complete terms and conditions of this Covenant, which are set out below, which have been explained to me to my satisfaction, and to which I agree.

**Owner initials** _____       _____

---

# The Full Covenant

The Covenant Holder, to further the public purpose of assuring affordable housing in Stow, Massachusetts, has provided assistance in the creation of the Premises for long term use as Affordable Housing to be owned by members of a Household of Qualified Income for use as their principal residence. The assistance and support of the Covenant Holder has reduced significantly the Owner's cost of buying the Premises. The Owner acknowledges the receipt and sufficiency of such assistance and support as consideration for this Covenant.

For valuable consideration, the receipt and sufficiency of which is acknowledged, the Owners, for themselves and their heirs, successors and assigns (including all persons who subsequently own the Premises or any interest therein while this Covenant is in effect), hereby covenant and agree that the Premises shall be subject to the following covenants and restrictions for the benefit of the Covenant Holder, its successors, assigns, agents and designees, with the intent that these restrictions created by this Covenant shall be perpetual duration.

## 1.    Definitions

The following words and phrases when capitalized have the following meaning:

1.1.    "Affordable Housing" means housing occupied as its principal residence by a Household who at the time of the purchase of the Premises by one or more of its members was of Qualified Income as the same may be defined from time to time by the Covenant Holder of Stow.

1.2.    "Covenant" means this Affordable Housing Covenant.

1.3.    "Covenant Holder" means any legal person or entity who possesses the rights under this and similar Covenants or to whom the rights under this and similar Covenants have been transferred either outright or for purposes of administration. A general delegation of authority by the current Covenant Holder to another person as a new Covenant Holder shall transfer those rights, powers and obligations assigned to the new Covenant Holder in this Covenant. Transfer of any rights, powers and obligations assigned to the Covenant Holder in this Covenant shall be effective only to the extent such rights, powers and obligations are specifically enumerated in the delegation of authority.

1.4.    "Fair Market Value" means fair market value as of the day of the event in question (for example, purchase, foreclosure or termination of this Covenant) taking into account the restrictions on ownership and occupancy imposed by this Covenant as if such restriction were perpetual. (When not capitalized, fair market value has the ordinary meaning established by law or custom without regard to the terms of this Covenant.)

1.5.    "Household" means all persons who reside together and with the Owner at the Residence.

1.6.    "Low income" means total household income less than or equal to sixty percent (60%) of the Median Income.

**KUN372**

1.7. "Maximum Resale Price" means, with respect to the Premises, as of a given date, the sum of:

   (a)     the consideration paid for the Premises as specified in the Deed to the Owner increased five percent (5%( per annum), compounded annually;

   (b)     plus the actual cost of bedrooms added to the units located on the Premises;

   (c)     plus the actual cost of bathrooms added to the units located on the Premises if such unit(s) contain(s) three (3) or more bedrooms;

   (d)     plus the actual cost of other capital improvements made to the Premises by the Owner from time to time subject to the limitation that credit for such capital improvements shall not exceed one percent (1%) per year of the consideration paid for the Premises by the Owner;

   (e)     plus the amount incurred by the Owner for the services of a real estate agent, up to an amount not greater than six percent (6%) of the sum of (a) through (d) and provided that such expense is documented (the "Broker's Commission").

Consideration shall include the aggregate value of all money, property and services of every kind given or paid by the buyer to or for the benefit of the Owner in connection with the transfer of the Premises, including any consideration paid for any other real property or personal property conveyed by the Owner to the buyer.

The cost of capital improvements shall be included in the Maximum Resale Price only if, (i) the improvement is considered to be a "capital" improvement within the definition of the United States Internal Revenue Code; (ii) the improvements complied with all pertinent statutes, ordinances and regulations at the time such improvements were made, and (iii) the cost of such improvements have been documented to the satisfaction of the Covenant Holder at the time of resale.

Upon written application and upon submission of such evidence as the Covenant Holder may require, the Covenant Holder shall furnish to any Owner, mortgagee or person having a security interest in the Premises, a certificate in recordable form stating the Maximum Resale Price for the Premises pursuant to Section 3.1.5 below.

1.8. "Median Income" means the median household income for the Boston Metropolitan Statistical Area ("BMSA") set forth in or calculated pursuant to regulations promulgated by HUD, pursuant to Section 8. If HUD discontinues publication of median income statistics, then the Covenant Holder shall designate another measure of household income.

1.9. "Moderate income" means total household income less than or equal to eighty percent (80%) of Median Income.

1.10. "Owner" means each legal and equitable owner of all or any portion of the Premises during the term of this Covenant, including the Owner identified above, and any subsequent owner by sale, conveyance or other transfer of any legal or beneficial interest in the

Premises. Unless the context otherwise requires, "Owner" shall mean the Owner at the time in question. "Owner" and "owners" are used interchangeably.

1.11.   "Qualified Income" means the Household income level of a purchaser of the Premises which shall not exceed an amount calculated as follows:

(a)   Calculate the "Imputed Loan Amount" by multiplying the Maximum Resale Price at the time of the sale by ninety percent (90%);

(b)   Calculate the "Imputed Monthly Debt Service Amount" by calculating the level monthly payment needed to amortize the Imputed Loan Amount, using the average interest rate offered during the 30 days prior to the date of said calculation [by financial institution approved by the Covenant Holder ] for a thirty-year, fixed rate residential mortgage, or as specified in such standard index of home mortgage loans as the [Covenant Holder ] may designate from time to time;

(c)   Calculate the "Annual Imputed Housing Cost" by adding twelve times the Imputed Monthly Debt Service Amount plus three times the Imputed Monthly Debt Service Amount (to make a standard allowance for real estate taxes and insurance) plus twelve times the imputed monthly condominium fee applicable to the Residence, if any, as the case may be; and

(d)   Calculate Qualified Income by multiplying the Annual Imputed Housing Cost by 3.928.

1.12.   "Section 8" means Section 8 of the Housing Act of 1937, as amended by the Housing and Community Development Act of 1974 (24 CFR Part 812), or any successor thereto.

1.13.   "Term" shall mean that period during which the restrictions imposed by this Covenant are legally enforceable against the Premises. It is the parties' intention that the Term shall be of perpetual duration.

## 2.  Affordable Housing Covenants

### 2.1.   Covenant as to Residence

2.1.1   Affordable Housing; Principal Residence.  Each Owner covenants and agrees that the Residence shall be Affordable Housing throughout the term of this Covenant.

2.1.2   Principal Residence.  Each Owner agrees that, except as otherwise expressly permitted in this Covenant, the Residence shall be used only as the principal residence for members of the Household of which the Owner is a member. Each Owner agrees not to permit use or occupancy of the Residence by any other person or for any other purpose (including without limitation short-term tenancy) without the prior written consent of the Covenant Holder, which consent need not be given if in the Covenant Holder's judgment the occupancy or use would not further the purposes of this Covenant to promote Affordable Housing in Stow.

**KUN374**

**2.1.3** <u>Changes in Household's Circumstances</u>. It is not a violation of this Covenant if the Household of which the Owner is a member ceases during the Owner's ownership of the Premises to be of Qualified Income, provided the Owner's Household continues to occupy the Residence as its principal residence.

**2.1.4** <u>Accessory Legal Uses</u>. It is not a violation of this Covenant if members of the Owner's Household, while occupying the Residence as their principal residence, make accessory use of the Residence (for instance, as their place of business) so long as such additional use is in compliance with zoning and all other requirements of law.

**2.1.5** <u>Sale Only to Households of Qualified Income as Principal Residence</u>. Under this Covenant, the Premises can be sold or otherwise transferred (i) only for an amount not exceeding the Maximum Resale Price and (ii) only to members of Households who at the time of acquisition of their interest in the Premises are a Household of Qualified Income acquiring the Residence for occupancy as their principal residence.

**3.** **Rights and Obligations on Sale of Premises**

**3.1..** <u>The Owner's Right to Sell the Premises.</u>

**3.1.1** <u>Notice of Intent to Sell</u>. Any time the Owner intends to sell or otherwise voluntarily transfer the Premises or any interest in the Premises, the Owner shall give written notice to the Covenant Holder in the manner required in Section 7 which shall state the Owner's intention to sell or otherwise voluntarily transfer the Premises or any interest in the Premises (the "Notice of Intent to Sell").

**3.1.2** <u>Second Notice of Intent to Sell</u>. The Owner, having given a Notice of Intent to Sell as stated above in <u>Notice of Intent to Sell</u> as to which the Purchase Rights were not exercised, shall give written notice to the Covenant Holder in the manner required in Section 7 prior to making a legally binding obligation to sell or otherwise transfer the Premises or any interest therein (the "Second Notice of Intent to Sell").

The Owner's Second Notice of Intent to Sell shall specify at least

(i) the full consideration for the proposed sale (which in no event shall exceed the Maximum Resale Price), and in the case of other voluntary transfer, a description of the proposed transaction,

(ii) sufficient evidence to determine whether each person to whom any interest in the Premises is proposed to be sold or otherwise transferred is / are members of a Household of Qualified Income as defined in this Covenant and

(iii) the statement of each person to whom any interest in the Premises is proposed to be sold or otherwise transferred that (a) their Household intends to use the Residence as its principal residence and (b) they have read and understand this Covenant.

**KUN375**

3.1.3 <u>Sale Free of Repurchase Rights Following Second Notice To Sell</u>. Only after the Purchase Rights have expired unexercised as stated in this Covenant, the Owner may proceed to sell the Premises to the proposed purchaser(s) identified in the Second Notice of Intent to Sell or otherwise transfer the Premises to the person(s) identified in the Second Notice of Intent to Sell, free of the Purchase Rights for a price not exceeding the price stated in the Second Notice of Intent to Sell. In all events the Premises shall remain as Affordable Housing as stated in this Covenant until the termination of this Covenant.

3.1.4 <u>Revival of Purchase Rights</u>. Any sale of the Premises, or any other transfer the Premises, occurring more than six (6) months after the last day the Covenant Holder could have exercised the Purchase Rights under the Notice of Intent to Sell required under Section 3.1.2, <u>Second Notice of Intent to Sell</u>, shall be subject once again to all the Covenant Holder's Purchase Rights, a new Notice of Intent to Sell (and Second Notice of Intent to Sell, as the case may be) shall be required and the Covenant Holder shall have all the Purchase Rights as to such sale or other transfer as stated above.

3.1.5 <u>Certificate of Price and Purchaser's Qualification</u>. The Owner may request, and the Covenant Holder after due verification shall issue (when such is the case), a certificate in recordable form stating that the price for the proposed purchase does not exceed the Maximum Resale Price and that the proposed purchaser(s) and the purchaser(s) Household are qualified to own the Premises under the terms of this Covenant. Such certificate shall be valid for the period stated in the certificate, which shall not be less than ninety (90) days.

3.1.6 <u>Deed to Reference This Covenant</u>. The Owner shall include a reference to this Covenant in any and all deeds or other instruments conveying any interest in the Premises or any part thereof or interest therein, although neither the validity nor enforceability of this Covenant shall be affected in any manner by failure to do so.

3.2. <u>The Covenant Holder's Right to Purchase the Premises</u>

3.2.1 <u>Grant of Purchase Rights</u>. To maintain the Residence as Affordable Housing throughout the Term of this Covenant, the Covenant Holder shall have, and each Owner hereby grants the Covenant Holder the right (but without obligation) to purchase the Premises in any of the following circumstances (the "Purchase Rights"):

(a)  The Owner has given the Covenant Holder a Notice of Intent to Sell or a Second Notice of Intent to Sell as stated in Section 3.1; or

(b)  The Residence is no longer the principal residence of the Owner whose occupancy fulfills the requirements of Section 2 (or that deceased Owner's spouse as permitted in <u>Changes in Household's Circumstances</u> above), or the Premises is being used in any other manner which does not comply with this Covenant, the Owner (or that deceased Owner's spouse) has been given written notice identifying the violations and has failed to cure them; or

(c)  Any legal or beneficial interest in the Premises is conveyed without both Notice of Intent to Sell and Second Notice of Intent to Sell as required in Section 3

having been given, unless the Covenant Holder has waived the Purchase Rights in writing; or

(d)     The Covenant Holder has notice of a pending mortgage or other lien foreclosure or similar proceeding (for instance, a sheriff's sale) against the Premises; or

(e)     The Covenant Holder has notice that the Premises are being taken for unpaid taxes; or

(f)     The Owner made material misrepresentations in applying to buy the Premises which cause the Owner's ownership of the Premises to be not in compliance with this Covenant; or

(g)     The Owner has failed to observe and perform the Owner's obligations under this Covenant (other than as stated in (h) below), has been given written notice identifying the violations and has failed to cure them; or

(h)     The Owner has failed to observe and perform the Owner's obligations under this Covenant in a manner which constitutes criminal conduct or in the Covenant Holder's judgment constitutes other willful, egregious and continuing violation of such obligations.

The Covenant Holder shall be obligated to give the Owner notice and an opportunity to cure only for events under subsections (b) or (g); and for those events, the Owner shall have a reasonable time to cure which shall not exceed six months. In all cases other than sale or other transfer of the Premises under subsection (a), the Covenant Holder's right to buy the Premises shall continue only while the event giving rise to exercise of the Purchase Rights continues unremedied.

3.2.2   <u>Duration of Purchase Rights</u>.  The Purchase Rights may be exercised throughout the term of this Covenant.

3.2.3   <u>Purchase Price</u>.  The purchase price of the Premises under the Purchase Rights shall be one of the following:

(i) if the Owner proposes to sell or otherwise voluntarily transfer the Premises,
(a) the amount for which the Owner proposes to sell or transfer the Premises, or
(b) the Maximum Resale Price if less; and
(ii) in all other cases, the Maximum Resale Price .

3.2.4   <u>Exercise of Purchase Rights</u>.  To exercise the Purchase Rights, the Covenant Holder shall give written notice to the Owner in the manner described in Section 7 as follows.

3.2.5   If the Covenant Holder is exercising the Purchase Rights pursuant to a Notice of Intent to Sell or a Second Notice of Intent to Sell, the Covenant Holder shall give its notice of exercise, if at all, within (sixty calendar (60) days) (in response to a Notice of Intent to

Sell) or ten (10) business days (in response to a Second Notice of Intent to Sell) of receipt of the Owner's Notice of Intent to Sell (or Second Notice of Intent to Sell, as the case may be).

The Covenant Holder may give notice exercising the Purchase Rights in all other circumstances until the event giving rise to the Purchase Rights has ceased to exist.

3.2.6  Closing Procedure. The closing shall be held on the date specified at 2:00 P.M. at the _____ of Deeds (unless the Covenant Holder's notice specifies another place for closing in Stow) on a date not greater than ninety (90) days before the notice of exercise under Section 3.2.5. The Premises are to be conveyed by a good and sufficient quitclaim deed to the Covenant Holder or its designee, conveying good and clear record and marketable title free from encumbrances except (i) such taxes for the then current year as are not due and payable on the date of the delivery of the deed, (ii) such matters of record (other than mortgages) to which this Covenant was intended to be subordinate at the time of its recording, and (iii) such other matters of record (other than mortgages) to which the Covenant Holder gave its express written consent. The Premises shall be delivered in the same condition as at the time of the Covenant Holder's exercise of the Purchase Rights (but always in at least the condition required under this Covenant) and shall be free of all tenants and occupants as to the Residence. The Covenant Holder may inspect the Premises prior to closing to determine whether its condition complies with this paragraph. Common expenses, fuel, and water and sewer use charges, if applicable, and current real estate taxes shall be adjusted as of the closing date.

3.2.7  Purchaser's Right to Cure Defaults at Closing. If the Owner shall be unable on the closing date to give title or to make conveyance or to deliver possession of the Premises, all in accordance with the terms of this Covenant, or if on the closing date the Premises in any other way does not conform with the requirements of this Covenant, then the Covenant Holder may apply as much of the Purchase Price as necessary to curing such failures and nonconformities; but this remedy shall not be deemed to waive, impair or otherwise diminish the priority of the Purchase Rights over other's rights, whether or not appearing of record.

3.2.8  No Closing if Defaults Cured. Except as to Purchase Rights arising under a Notice of Intent to Sell or a Second Notice of Intent to Sell, if at closing the event(s) giving rise to exercise of the Purchase Rights have been remedied and no longer exist, then the Purchase Rights may not be exercised with respect to those events.

3.2.9  Purchase Rights Arising in Sales Revocable Only by Covenant Holder. Purchase Rights which have been exercised pursuant to a Notice of Intent to Sell or a Second Notice of Intent to Sell shall not be revocable except by the Covenant Holder.

3.2.10 Purchase Rights Exercisable as to All Ownership Interests. The Purchase Rights shall always be exercisable as to the entire ownership interest in the Premises, notwithstanding that the event giving rise to the Purchase Rights might involve less than the entire ownership interest, and shall be exercisable against all the Owners (or any subsequent Owner) notwithstanding that the acts of fewer than all the Owners (or a prior Owner) gave rise to the Purchase Rights.

**KUN378**

3.3. <u>Certificate of Nonexercise of Purchase Rights</u>. If the Covenant Holder does not exercise the Purchase Rights, the Owner may request, and the Covenant Holder shall issue, a certificate in recordable form stating that the Covenant Holder did not exercise the Purchase Rights as to specified events. Such certificate, if recorded with the Middlesex Registry of Deeds, shall constitute the Covenant Holder's waiver of the Purchase Rights as to the events stated therein.

3.4. <u>Maintenance of Premises</u>. The Owner covenants to maintain the Premises in good order, repair and condition at all times, including without limitation all fixtures, utility services, driveway and parking areas, and landscaping in existence from time to time. Without limiting the foregoing, the Owner shall maintain the Premises in full compliance with all laws, regulations, ordinances, codes, orders or other law, now existing or hereafter enacted, regarding the habitability of the Premises as housing.

4. **Compliance**

4.1. <u>Certificate of Compliance</u>. Each sale, conveyance or other transfer of full or partial ownership of the Premises shall be subject to all the terms of this Covenant (including without limitation the Purchase Rights) unless a certificate, signed, and acknowledged by the Covenant Holder which acknowledges non-exercise of the Purchase Rights, or waives the same, or acknowledges the purchaser(s) qualifications, as the case may be, is recorded with the Middlesex Registry of Deeds. The Covenant Holder agrees to issue such a certificate, when required, within a reasonable time of receipt of written request. If the Covenant Holder determines that a proposed conveyance, sale or other transfer does not comply with the requirements of this Covenant, or in the event of other noncompliance rendering issuance of such a certificate inappropriate, the Covenant Holder shall within such time issue a statement in writing (which need not be in recordable form) stating in reasonable detail the reasons for the finding of noncompliance.

4.2. <u>Reliance on Evidence of Compliance with this Agreement</u>. Any mortgagee or other bona fide purchaser for value of the Premises may conclusively rely upon a certificate issued by the Covenant Holder pursuant to this Section as to compliance with or waiver of rights under this Covenant, as the case may be.

4.3. <u>Compliance Information</u>. The Owner shall furnish such information about the Premises as the Covenant Holder may reasonably request from time to time, for example, on the identity of each Owner and of each member of the Household living in the Residence, the identity of any mortgagee or other person having an interest in the Premises, the full consideration paid for the Premises or any interest therein identified by category (e.g., equity, institutional loan and so forth), the condition of the Premises, and any other information which the Covenant Holder in good faith deems relevant, all for the purpose of assuring compliance with this Covenant.

5. **Enforcement**

5.1. <u>Remedies</u>. Without limiting other remedies of the Covenant Holder, in the event a court of competent jurisdiction finds that any Owner sold, conveyed or otherwise transferred,

KUN379

or leased the Residence, or any Owner or any member of the Household living in the Residence used the Residence in violation of the provisions of this Covenant, or that in any other material way any Owner or any member of such Household was in violation of this Covenant, then after expiration of all applicable appeal rights the Covenant Holder shall be entitled to the following remedies (which shall be cumulative and not mutually exclusive) against each Owner and any other person whose conduct has contributed to the violation :

(a)    specific performance of the provisions of this Covenant (including, if such be the case, the Covenant Holder's assertion of the Purchase Rights as to such violation);

(b)    voiding of any rental arrangement that violates this Covenant;

(c)    (i) in the case of any rental which violated this Covenant, damages equivalent to the rent charged during the existence of the violation, or (ii) in the case of a conveyance or other transfer of the Premises which violates this Covenant, damages for the cost of creating or obtaining other comparable dwelling units to replace the Premises in the event it can no longer be Affordable Housing for Households of Qualified Income;

(d)    voiding of any contract for sale, or any sale or other transfer or conveyance, of the Premises in violation of the provisions of this Covenant including without limitation any sale, transfer or conveyance made in the absence of a certificate from the Covenant Holder approving such sale, transfer or conveyance as provided in Section 5, Certificate of Compliance, of this Covenant; or

(e)    Damages in the amount of the Affordable Housing Subsidy, together with interest thereon, as set forth in the Mortgage Securing this Affordable Housing Covenant.

5.2.    Attorney's Fees.  If any action is brought to enforce this Covenant, the prevailing party shall be entitled to reasonable attorneys' fees and other costs of bringing such action, in addition to any other relief or remedy to which such party may be entitled.

5.3.    Covenant Holder Right to Enter.  Each Owner hereby grants to the Covenant Holder the right to enter upon the Premises upon reasonable notice for the purpose of enforcing the restrictions contained in this Covenant.

5.4.    Survival of Enforcement Rights.  Notwithstanding the definition of Owner hereinbefore contained, the rights of enforcement for violations of this Covenant shall survive any subsequent sale or transfer of the Premises.

5.5.    Remedies under Separate Instruments Not Limited.  Nothing in this Covenant shall limit exercise of rights or remedies (for instance, foreclosure under the Mortgage Securing Obligations Under A Certain Affordable Housing Covenant recorded herewith) arising under an instrument other than this Covenant.

KUN380

## 6.    Mortgagees' Rights

Other provisions of this Covenant notwithstanding, a financial institution (the "Lender") holding a mortgage or security interest in the Premises which secures repayment of funds loaned to purchase the Premises (or to refinance any such mortgage) or for other purposes which comply with this Covenant, shall acquire title by deed in lieu of foreclosure, and such Lender (or any other successful bidder(s) at a foreclosure sale) shall acquire title by foreclosure superior to this Affordable Housing Covenant and the Mortgage which secures it, and all Affordable Housing restrictions, including all Purchase Rights contained in this Covenant, shall terminate and have no further effect. All notices shall be sent to the Covenant Holder as set forth in Section 7 of this Covenant. The holders of all other mortgage(s) (or any other successful bidder(s) at a foreclosure sale of such other mortgage(s)) who shall acquire title, whether by foreclosure or deed in lieu thereof, are and shall remain subject to this Covenant.

Within a reasonable time of receipt of written request, the Covenant Holder will issue a certificate in recordable form stating whether a mortgage secures repayment of funds loaned to purchase the Premises (or to refinance any such mortgage) or for other purposes which comply with this Covenant, and any such certificate, when recorded with the Middlesex District Registry of Deeds, shall be binding and conclusive on the Covenant Holder and all other persons relying thereon.

Notwithstanding the foregoing, if any person who was an Owner of the Premises immediately prior to foreclosure acquires an interest in the Premises through or subsequent to foreclosure, or by deed in lieu of foreclosure, then all covenants and the Purchase Rights contained herein shall apply thereafter to the Premises with their original full force and effect as if never terminated.

## 7.    Notice

Any demand, notice or request by either party to the other shall be sufficiently given if in writing delivered to the party intended to receive the same, or if mailed by certified mail, return receipt requested, or delivered to a recognized national courier, or if given in a manner sufficient for legal process. Each notice to the Owner named above shall be addressed to such party at the Owner's Address set forth above, or to such other address as may be stated in a notice given as herein provided. Each notice to subsequent Owners shall be sufficiently given if addressed to or given at the Residence. Notices to the Covenant Holder, to be valid, must be correctly and sufficiently addressed to Board of Selectmen, Town of Stow, 380 Great Road, Stow, MA 01775-2127.

## 8.    Term; Termination

8.1.    <u>Term</u>.  This Covenant shall be binding upon each Owner, and all heirs, successors and assigns, for the benefit of, and enforceable by the Covenant Holder and its successors and assigns for the maximum duration permitted by law with the approval of the Commonwealth of Massachusetts, pursuant to General Laws, Chapter 184, Sections 31-33, and absent such approval, for a period of thirty (30) years from the date of this Covenant and for such further

KUN381

time thereafter (up to 99 years) as this Covenant may be lawfully extended (including without limitation extensions permitted under General Laws, Chapter 184, Section 27-30).

8.2.    _Certificate of Termination._  Within a reasonable time of receipt of written request, the Covenant Holder will issue a certificate in recordable form stating (if such be the case) that this Covenant has been terminated, and any such certificate, when recorded with the Middlesex Registry of Deeds, shall be binding and conclusive on the Covenant Holder and all persons relying thereon.

8.3.    _Payment on Termination._  When this Covenant terminates for whatever reason (such as mortgage foreclosure or by operation of law) other than expiration of the agreed period of restriction, the Owner shall owe the Covenant Holder the amount equal to the difference between (i) the fair market value of the Premises free of the restrictions imposed by this Covenant, and (ii) the Fair Market Value of the Premises subject to the restrictions imposed by this Covenant (assuming the same to be perpetual for such purpose), but not less than all sums, with interest at annual rate of _____% compounded annually, paid by the Covenant Holder for the purpose of making the Premises Affordable Housing (the "Affordable Housing Subsidy"). The parties agree that as of this date the Affordable Housing Subsidy is $_____ . Fair market value (both subject to and free of the restrictions imposed by this Covenant) shall be determined by the Covenant Holder through its Assessing Department or other qualified municipal staff; provided however, that after notice to the Covenant Holder, given before or after determination by the Covenant Holder, the Owner may obtain an appraisal at the Owner's expense from a qualified appraiser approved by the Covenant Holder to determine fair market values for these purposes, whose decision shall be binding on the parties. Payment shall be made out of the proceeds from or on account of the Premises (such as sales proceeds, foreclosure proceeds or insurance proceeds) received at the time of, or next following, such termination after discharge of mortgages and other liens senior to this Covenant and shall be paid after payment (net of such mortgage and other lien payments) of the Fair Market Value of the Premises as restricted to the Owner and as if perpetual. In no event shall the Owner be personally liable to pay the Covenant Holder more than the amount, determined as stated above, actually received from or on account of the Premises as stated above.

## 9.    Appointment of Agent; Appointment of Covenant Holder

The Covenant Holder may from time to time appoint and revoke the appointment of one or more persons (who may but need not be municipal employees and who may be natural or legal persons) who shall have the authority to issue certificates as provided herein and to exercise the appointor's other rights under this Covenant to the extent stated in such Certificate. Such appointments shall be made (or revoked) only by instrument duly executed by the appointor and recorded in the Middlesex District Registry of Deeds, and each such action shall be effective only upon recording. No such instrument of appointment or revocation of appointment shall be effective unless it expressly refers to this Covenant. Only the Covenant Holder may appoint a Covenant Holder, and no appointee shall be a Covenant Holder unless the same is stated in the recorded certificate. As of the date of execution of this Covenant, the Covenant Holder is _____ and such certificates shall be signed by _____ .

KUN382

## 10.   Miscellaneous

10.1.   <u>Covenants Run with the Land</u>.  All covenants, rights and restrictions set forth in this Covenant shall run with the real property constituting or including the Premises for the purpose of maintaining the Residence as Affordable Housing throughout the Term of this Covenant.

10.2.   <u>Public Purpose</u>.  The Covenant Holder declares, and the Owner and each other person, including mortgagees, hereafter holding any interest in the Premises acknowledges, that the reservation and grant of the covenants, and restrictions contained in this Covenant are for public purposes.

10.3.   <u>Releases</u>.  Except as expressly authorized in this Covenant (for instance, as to Certificates of Compliance or waivers), no release of or other change in the rights of the Covenant Holder contained in this Covenant shall be effective unless it is in writing and duly executed by the Covenant Holder or an authorized agent (including without limitation the Covenant Holder) as stated above.

10.4.   <u>Severability</u>.  If any provision of this Covenant or the application thereof to any person or circumstances is held to be invalid or unenforceable by any decision of any court of competent jurisdiction, such decision shall not impair or otherwise affect any other provision of this Covenant, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable.

10.5.   <u>Interpretation</u>.  This Covenant shall be enforceable according to its terms, is subject to the general principles of equity, fairness and reasonableness irrespective of whether such enforcement or interpretation is considered in a proceeding at equity or in law and shall be construed according to its purpose of fostering and preserving Affordable Housing.

10.6.   <u>Successors Bound</u>.  This Covenant shall be legally binding on, as the obligations of, the parties and their respective successors and assigns, including without limitation successors in title or interest to the Premises, who by their acceptance of any ownership interest in the Premises shall be deemed to have agreed to perform and observe all the Owner's obligations under, and to be bound by all the terms and condition of, this Covenant.

This Covenant shall take effect as a sealed instrument as of this _____ day of _____, 200__.

*owner signature*


COVENANT HOLDER

By:_____          _____

**KUN383**

Approved as to Form: _____

KUN384

## COMMONWEALTH OF MASSACHUSETTS

Middlesex, ss.                                                    *date*

Then personally appeared the above-named *owner*, and acknowledged the foregoing instrument to be his / her free act and deed, before me

_____
Notary Public
My Commission Expires_____


## COMMONWEALTH OF MASSACHUSETTS

Middlesex, ss.                                                    *date*

Then personally appeared the above-named _____, and acknowledged the foregoing instrument to be his / her free act and deed and the free act and deed of said Covenant Holder of Stow, before me

_____
Notary Public
My Commission Expires_____

KUN385

# EXHIBIT A

## LEGAL DESCRIPTION

**KUN386**

# MORTGAGE
## SECURING OBLIGATIONS UNDER A CERTAIN
## AFFORDABLE HOUSING COVENANT
### for _____, Stow, MA
(CHAPA Model Form - 3/00)

OWNER - _____

OWNER'S ADDRESS - _____, Stow, Massachusetts _____.

COVENANT HOLDER - _____

COVENANT HOLDER 'S ADDRESS - _____.

THE OBLIGATIONS - All the Owner's obligations set forth in that certain Affordable Housing Covenant dated _____ recorded herewith in the Middlesex Registry of Deeds as instrument _____ of _____, Book _____, Page _____ (the "Affordable Housing Covenant")

THE MORTGAGED PREMISES - The land, building and other improvements now or hereafter thereon located at _____, Stow, Middlesex County, Massachusetts, as more completely described in Exhibit A hereto, together with all rights and easements now or hereafter appurtenant thereto and all fixtures now or hereafter on the Mortgaged Premises insofar as the same are a part of the realty.

Capitalized words or phrases not defined in this Mortgage have the meaning ascribed to them in the Affordable Housing Covenant.

In consideration of the benefits of the Affordable Housing Covenant, and for other valuable consideration paid, the receipt and sufficiency of which is acknowledged, the Owner hereby grants the Mortgaged Premises to the Covenant Holder WITH MORTGAGE COVENANTS to secure the Obligations.

This Mortgage shall in all events be subordinate to any other mortgage now or hereafter on all or any portion of the Mortgaged Premises which secures the repayment of funds loaned to purchase the Mortgaged Premises (or to refinance any such mortgage) or for other purposes which comply with the Affordable Housing Covenant. On written request, the Covenant Holder shall confirm such subordination in a recordable instrument.

The Owner covenants and agrees that the CONDITION of this Mortgage is that the Owner, and all other persons now or hereafter owning all or any part of the Mortgaged Premises faithfully performs and observes the Obligations.

KUN387

For any breach of such condition continuing uncured for such period as is specifically stated in the Affordable Housing Covenant with respect thereto (and for ninety (90) days after notice if none is stated), the Covenant Holder shall have the STATUTORY POWER OF SALE.

In event foreclosure of any prior mortgage extinguishes the Affordable Housing Covenant, or the Affordable Housing Covenant terminates for whatever reason other than expiration of the agreed period of restriction, this Mortgage shall also secure repayment to the Covenant Holder of the amount equal to the difference between (i) the fair market value of the Mortgaged Premises, free of the restrictions on ownership and occupancy imposed by this Covenant, and (ii) the Fair Market Value of the Mortgaged Premises, subject to the restrictions imposed by this Covenant as if perpetual, but not less than all sums, with interest at annual rate of _____% compounded annually, paid by the Covenant Holder for the purpose of making the Mortgaged Premises Affordable Housing (the "Affordable Housing Subsidy"). The parties agree that as of this date the Affordable Housing Subsidy is $_____.

**In no event shall any Owner of the Mortgaged Premises, or any other person, be personally responsible to repay all or any portion of the Affordable Housing Subsidy, or any interest thereon, or any costs or expenses under this Mortgage (such as but not limited to costs and expenses of foreclosure), and the Covenant Holder agrees to look solely to the Mortgaged Premises for payment thereof, except for recovery of funds wrongfully derived by the Owner from the Mortgaged Premises in violation of the Affordable Housing Covenant.**

EXECUTED as a sealed instrument under Massachusetts law this *date*.

*owner signature*

KUN388

## COMMONWEALTH OF MASSACHUSETTS

*date*

Then personally appeared the above-named *owner*, and acknowledged the foregoing instrument to be his / her free act and deed, before me

_____
Notary Public
My Commission Expires_____

**KUN389**

# EXHIBIT A

## LEGAL DESCRIPTION

KUN390

Attachment 1-7.2

MONITORING SERVICES AGREEMENT

THIS AGREEMENT is made as of the _____ day of, _____ 2003, by and between The Trust for Public Land, a California non-profit corporation having a usual place of business at 33 Union Street, Boston, MA 02108 ("TPL") and the Town of Stow with an address at 380 Great Road, Stow, MA 01775 ("Monitoring Agent").

Background

Developer, a California non-profit corporation, will develop one (1) single-family ownership unit (the "Unit") on property located at 142 Red Acre Road, Stow, MA. 142 Red Acre Road is currently owned by the Trust for Public Land (the "Property" as more fully described in Exhibit A attached hereto and incorporated herein).

Pursuant to a deed rider recorded with the deed to the Property, dated _____, and recorded with the Middlesex County Registry of Deeds in Book _____, Page _____ (the "Property Deed Rider"), this unit is required to be sold to a family whose income is below 80% of the median household income for the Boston Metropolitan Statistical Area set forth in or calculated pursuant to regulations promulgated by DHCD (the "Affordable Unit"). In addition, the Affordable Unit will be subject to a deed rider governing resale (the "Affordable Housing Covenant") in perpetuity.

Pursuant to requirements of the Property Deed Rider, the Monitoring Agent has agreed to perform monitoring and enforcement services regarding the initial sale of the Affordable Unit and compliance of the Project with the Affordable Housing Covenant.

Agreement

The parties, intending to be legally bound, agree as follows:

1.    Monitoring Services. Monitoring Agent shall monitor the initial sale of the Affordable Unit and compliance of the Project with the Affordability Requirement, including:

(i)     Review of the substantive compliance of the Project with the Affordable Housing Covenant.

(iii)    Review of Unit Deed and deed rider with respect to initial sale of Affordable Unit.

(iv)    Monitoring of re-sales of Affordable Unit for compliance with the terms of the applicable deed riders and issuance of certifications, as appropriate, approving re-sales and the payment of recapture amounts.

The Monitoring Agent may provide reasonable supplemental monitoring on its own initiative in order to ensure to the extent practicable the compliance of the Affordable Unit owners and the Developer with the Affordable Housing Covenant. The services under this Agreement shall not include any construction period monitoring. The services under this Agreement shall include follow-up discussions with the Developer or Affordable Unit owner(s), if appropriate, after an event of noncompliance.

**[Proposed Form of Agreement]**

KUN391

2.     Enforcement Services.

Prior to the initial conveyance of an Affordable Unit:

(a)     the Monitoring Agent shall have the right, at its discretion, to take appropriate enforcement action against the Developer, including, without limitation, notice to DHCD to compel the Developer to comply with the requirements of the Affordable Housing Covenant.

(b)     Developer shall pay the fees and expenses (including legal fees) of the Monitoring Agent with respect to such Affordable Unit(s) in the event such enforcement action is taken against the Developer, and

(c)     the Monitoring Agent shall be entitled to seek recovery of its fees and expenses incurred in enforcing the Affordability Requirement against the Developer and to seek an attachment of the interest of the Developer in the Project in connection with any action to recover its fees and expenses, and to assert a lien on any interest of the Developer in the Project.

After the initial conveyance of an Affordable Unit:

(x)     in the event of a violation of the provisions of a Unit Deed rider, the Monitoring Agent shall have the right, at its discretion, to take appropriate enforcement action against the Affordable Unit owner or such owner's successors in title, including, without limitation, notice to DHCD or legal action to compel the such unit owner to comply with the requirements of the Affordable Housing Covenant and

(y)     the Monitoring Agent shall be entitled to seek recovery of its fees and expenses incurred in enforcing an Affordable Housing Covenant against the Affordable Unit owner or such owner's successors in title and in any action against the Affordable Unit owner or such owner's successors in title and to seek an attachment of the relevant Affordable Unit to secure payment of such fees and expenses and to assert a lien against the Affordable Unit as provided in the deed rider.

The form of Affordable Housing Covenant will provide for payment by the unit owner of fees and expenses (including legal fees) of the Monitoring Agent in the event enforcement action is taken against the unit owner thereunder or under this Agreement.

The Monitoring Agent shall not be entitled to seek any compensation or reimbursement from DHCD or Developer (except as provided herein) in connection with the enforcement services under this Section 3, it being understood that the Monitoring Agent shall look solely to the reimbursement rights described above for payment of the Monitoring Agent's costs and expenses.

4.     Term.  The monitoring services are to be provided until such time that the Monitoring Agent, in collaboration with DHCD creates a new monitoring entity, which shall occur upon the initial sale of the Affordable Unit conveyed by the Developer.

5.     Responsibility of Monitoring Agent.  The Monitoring Agent shall not be held liable for any action taken or omitted under this Agreement so long as it shall have acted in good faith and without gross negligence.

6.     Applicable Law.   This Agreement, and the application or interpretation of this Agreement, shall be governed by the laws of The Commonwealth of Massachusetts.

**[Proposed Form of Agreement]**

7. <u>Binding Agreement</u>. This Agreement shall be binding on the parties to this Agreement, their heirs, executors, personal representatives, successors and assigns. In the event that the Monitoring Agent shall cease to exist, then a successor Monitoring Agent may be appointed by DHCD.

8. <u>Headings</u>. All paragraph headings in this Agreement are for convenience of reference only and are not intended to qualify the meaning of the paragraph.

IN WITNESS WHEREOF, the parties to this Agreement have caused this Agreement to be duly executed as of the date first written above.

The Trust for Public Land

By:_____
    Craig A. MacDonnell, Massachusetts
    State Director

The Town of Stow, Massachusetts

By:_____
    Edward R. Perry
    Its Chief Elected Official

**[Proposed Form of Agreement]**

KUN393

Attachment 1-7.3

**Marketing, Monitoring, Education and Enforcement Plan**

## Marketing and Buyer Selection

The two basic elements of the Marketing and Buyer Selection plan are local preference and the buyer selection process. Each aspect of the marketing plan is described below.

## Local Preference

The marketing plan includes local preference for the moderate-income unit. A separate pool of applicants will be maintained to address the desire for local preference expressed by the community. This local preference pool will comply with all DHCD and fair housing regulations, and will have not discriminatory or unlawful effects. The mechanics of the "local preference" pool and the "other" pool are further described in the buyer selection section.

## Buyer Selection (Lottery Process)

The demand for this moderate-income housing unit in and around Stow exceeds the supply. Because of the disparity between demand and supply, prospective buyers will be selected using a lottery to be administered by the Town of Stow, modeled upon the recommendations of the Citizen's Housing and Planning Association (CHAPA). The lottery process will be managed by the Town of Stow subject to approval by DHCD.

The Town of Stow reserves the right to expand the Local Preference category beyond current residents, to potentially include parents and/or children of Stow residents, current employees in the Town of Stow who may not live in the town, etc. Additional outreach will be employed to attract these additional qualified applicants, including such strategies as flyers accompanying paychecks, separate mailings to municipal employees or informational sessions targeted to these employees.

*Step 1: Determining Basic Qualifications*

Below are minimum thresholds for lottery qualifications:
• Total household gross income cannot exceed 80% of the area median income as defined by the U.S. Department of Housing and Urban Development. There are different income limits, depending on household size. Annual income should include all members of the household over the age of 18 (unless full-time students) during the most recent calendar year.

• The buyer must have funds or demonstrate the ability to obtain funds for a down payment and closing costs, as determined by lending industry standards. This can be verified after the lottery result. There will likely be many more applicants than available units and it makes more sense to process down payment and mortgage qualification items for the successful lottery applicant. However, every applicant should have a lottery position (assigned a number) so that if any earlier applicants are not fully eligible, they will move up into that position.

• Household size should be appropriate for the number of bedrooms in the home. It is appropriate to set a minimum and maximum household size for the units. In this case, it may be appropriate for two bedroom homes to set a minimum household size of two persons.

• It is recommended that buyer income should be able to support at least 50% of the price of the home. No more than 50% of the purchase price should be cash.

• The Town, with guidance from DHCD, can choose to impose an asset limit. It is recommended that, at a minimum, household assets over $5,000 be calculated as imputed income using the current HUD approved passbook rate (currently at 2%).

• Non-household members should not be permitted as co-signers of the mortgage.

• The lottery process will give preference to families of two or more over single individuals in all cases. Units with two or more bedrooms shall be prioritized for larger families requiring additional bedrooms, as follows:

First preference shall be given to families requiring the total number of bedrooms in the unit to house members of the household, based on the following criteria:

> (i) No two persons (with the exception of husband and wife, or those in a similar living arrangement) shall be required to share a bedroom;

> (ii) A person described in (i) shall not be required to share a bedroom if a consequence of sharing would be a severe adverse impact on his or mental or physical health and the lottery director receives reliable medical documentation as to such impact of sharing.

Second preference shall be given to families requiring the number of bedrooms in the unit minus one, based on the above criteria; third preference shall be given to families requiring the number of bedrooms in the unit minus two; and so on.

A "family" shall mean two or more persons who will live regularly in the unit as their primary residence and who are related by blood, marriage, law or who have otherwise evidenced a stable inter-dependent relationship.

Lottery drawings shall result in each applicant being given a ranking among other applicants and larger families being prioritized for units with appropriate numbers of bedrooms based on the above criteria.

*Step 2: Developing Application Materials*

The developer, in collaboration with the Town of Stow, will prepare complete application materials, including an application form, application certification form, authorization for consent to release information, the Affordable Housing Covenant, a description of the threshold eligibility requirements, a clear description of the preference categories being used, and how the lottery winners will be chosen.

*Step 3: Advertising and Outreach*

Notices will be sent to area churches, local and regional housing agencies, local housing authorities, civic groups, lending institutions, social service agencies, and other non-profit organizations.

The Town of Stow will offer one or more information meetings for the public to educate them about the lottery process and the development. These meetings may include local officials, lottery administrators, developers, and local bank or finance officials. The date, time, and location of these meetings will be published in ads or flyers that publicize the availability of lottery applications. Meetings will be held in the evening and at least one weekend day in accessible public facilities in order to reach as many potential

applicants as possible. Attendance at a meeting will not have any effect on the approval of a lottery application.

The purpose of the meeting is to answer questions that are commonly asked by lottery applicants. A town official will be available to describe the town's role in the affordable housing project, and the lottery administrator will explain the information requested on the application and answer questions about the lottery drawing process. The developer will be present at the initial lottery to describe the development and to answer specific questions about the affordable unit. The Town also expects that a local banker or financial representative will be present to answer questions about qualifications for the financing of affordable units. The number of meetings will be determined by the interest in the development throughout the community.

At the meetings and through general outreach, the lottery administrator will provide application materials to lottery applicants, which outline income qualifications for the lottery, the sales prices of the affordable units, the Affordable Housing Covenant, and the process one must follow to be eligible for the lottery.

Sales prices will be "locked-in" at the time of the initial marketing of the affordable units. The prices of the homes will not be increased once the lottery process begins, even if interest rates and HUD income guidelines change during this period.

### Step 4: Developing and Distributing Applications

The application period will be at least 60 days. The lottery applicants should submit all of the required materials by a deadline to be specified by the Town of Stow. The level of documentation required from the applicant will depend on whether DHCD suggests that the Town of Stow allow the applicants to "self-qualify" based on information obtained from the meeting and materials or require that applicants obtain a "pre-qualification" letter from a lender and submit income tax returns to be eligible for the lottery.

In either case, only applicants that are income eligible and who submit all required information will be entered into the lottery.

### Step 5: Lottery Selection

Once all required information has been received, each qualified applicant will be assigned a number. The Town of Stow will have two drawing pools: one for at large applicants and one for local preference applicants (up to 70% of the total units).

### Step 6: Loan Application

Once the lottery has been completed and all persons have been assigned a lottery number, applicants will be given a time period in which they must apply for a loan (usually three weeks). Lottery winners should be free to choose the lender of their choice. A formal loan application is made to the lender within the time limit prescribed at the meeting. The lender should determine eligibility based on the qualifications outlined in step 1 above as well as credit worthiness of the applicant.

The lender should also review the deed rider, which contains the long-term affordability restrictions.

The lender will send a preliminary approval, at which time the applicant contacts the property owner and enters into a Purchase and Sale Agreement. The executed Purchase and Sale Agreement is submitted to the lender who then will issue a firm financing commitment.

**KUN396**

*Step 7: Final Qualification*
Prior to a Purchase and Sale Agreement being executed, the developer or lender should submit each applicant's income documentation of the applicant to the monitoring agent. Income verification should include tax returns from the past year and five most recent pay stubs. The monitoring agent will then verify that the household's income does not exceed 80% of the area median income according to household size. The developer should also submit the signed deed rider to the monitoring agent. The deed rider restricts the resale price of the home so that it will remain affordable in the future.

*Step 8: Execute a Purchase and Sale Agreement*
Once the monitoring agent has approved the applications, the property owner and the homebuyer execute a purchase and sale agreement for each affordable home.

Item 1-8: Anti-Displacement and Relocation Assistance Plan/ Form 1-9 MA CDBG Program Anti-

Displacement & Relocation Assistance Certification

When purchased by the developer (The Trust for Public Land), the unit will be vacant. The project involves a single homeownership unit that will not involve displacement at any time. No displacement or relocation is required as part of this project, and therefore an Anti-Displacement and Relocation Assistance Plan is not required.

**KUN398**

1-10 Citizen Participation Plan

Development of the Kunelius Farm Project began in November of 2002. It is a testament to the soundness of the plan and its community based support that the initial concept has not been modified since its inception. The conversion and sale of an existing .93 acre parcel with 2 bedroom house as deed restricted affordable in perpetuity has been presented at numerous town committee meetings, a Special Town Meeting, and at an Open Hearing. This section will describe the wide range of local audiences that has provided feedback during the project's development and will project a plan for further community input upon grant funding.

## Community Participation: A Summary

Neighborhood citizens learned in late October 2002 that the Town of Stow had a right of first refusal to purchase the properties of 142 and 144 Red Acre Road that had recently been put under a single contract for a housing development. On November 12, 2002, 15 citizens attended a Board of Selectmen meeting and convinced the Board to defer their decision to waive that right to give the group more time to develop an alternative proposal.

On November 16, 2002, a neighborhood group of sixteen Stow residents met to begin developing this plan. The minutes of this meeting clearly identified affordable housing in perpetuity as something that the town needs.

Subsequently, four community members then canvassed Red Acre Road and invited neighbors to a second meeting to "brainstorm" on the best possible project and how it should be implemented. Over 35 people attended that second meeting on November 23, 2002. The local citizens group called itself Friends of Red Acre (FORA). Throughout the meetings and the canvassing of the neighborhood neighbors and citizens fully supported the conversion of two houses to deed restricted affordable in perpetuity. Those residents that directly abut the subject houses continue to actively support this project (See Exhibit 5, Evidence of Local Support).

Members of FORA attended meetings of the Stow Housing Task Force and spoke with members of the Stow Housing Authority and with staff members of the Massachusetts Department of Housing and Community Development. The purpose of this outreach was to verify that this plan for affordable housing met the needs of the Town of Stow and to learn about the procedures and requirements for renovating, writing the deed restrictions, and selling the house at 142 Red Acre Road.

## Presentations to the Town

FORA made a presentation to the Planning Board on November 19th to provide project information to inform the board's recommendation to the Board of Selectmen on whether or not to waive their right of first refusal. These minutes contain the first public record that FORA recognized the town's need for affordable housing and planned to purchase the two houses and put affordable deed restrictions on them. After deliberation, the Planning Board voted unanimously to "...recommend that the Selectmen refrain from waiving the Town's option, pending further review, and development of a potential plan for purchase" (Stow Planning Board Minutes, November 19, 2002).

As noted in the minutes, dozens of citizens filled the meeting room and hallway to support FORA's presentation to the Board of Selectmen at their November 26th meeting. The Selectmen voted unanimously to let the full 120 days pass before making a decision on their right of first refusal. They also agreed to put two placeholders for articles for warrant for the Special Town Meeting to see if the town would vote to appropriate funding for this project. Also notable were comments made by a member of the

Community Preservation Committee stating that the CPC would be interested in hearing a presentation from the group once their project was better defined.

In early December, The Trust for Public Land (TPL) agreed to become involved in this project and was assigned the right of first refusal on the property by the town in mid-February. TPL has continued to work with FORA, but now assumes directorship of the project.

In preparation for the Special Town Meeting in January, the town committees met individually to review and make recommendations on the various warrant articles. TPL and FORA attended the Conservation Commission, Planning Board, Finance Committee, and Capital Planning Committee to seek their public endorsement of this project at the Special Town Meeting. Though other concerns were raised about the project, there were no concerns voiced about the conversion of the houses to deed restricted affordable. Prior to the Special Town Meeting, The Trust for Public Land made an introductory presentation to the Board of Selectmen on January 7th. There was a majority vote of the Selectmen in favor of supporting the efforts of the Trust for Public Land.

At the Special Town Meeting on January 13, 2003 the Red Acre Project's Article for Warrant asked that the town vote to go to the polls and vote in favor of a Prop. 2 1/2 override to fund $305,000 of the Kunelius Farm Project. The project's plan to have affordable deed restrictions placed on the two houses was part of the presentation. The article passed, requiring a two-thirds majority of the voters.

**Open Hearing, January 28, 2003**

The Board of Selectmen met to decide whether or not to assign the right of first refusal to The Trust for Public Land. In order to obtain sufficient input from the town, the Board of Selectmen held a public hearing on January 28th. The announcement of the meeting was published in the local newspaper on January 16th.

The discussion at this meeting regarding the affordable housing component was not about the merits of the affordable housing proposal, but how The Trust for Public Land would ensure the Town of Stow that the properties would be deeded affordable. According to the minutes, "Selectman Clayton moved to transfer the Town's Right of First Refusal to the Trust for Public Land contingent upon all deliverables being received in time for Town Council to approve prior to the Board's meeting on February 11, 2003, and the offer to be rescinded if all is not received. Seconded by Selectman Burchfield and voted unanimously."

The Public Hearing was continued on February 11, 2003. At that meeting, Craig MacDonnell of The Trust for Public Land explained "...that 142 Red Acre Road would be conveyed subject to a perpetual affordability restriction if the Town votes to spend CPA funds to purchase one and a conservation restriction reasonably limiting the further development of the property. Any sale of the property would be coordinated with a local preference lottery and would be subject to all appropriate law and regulation."

The Selectmen voted to approve the following:

- that the Town transfer its Right of First Refusal under Chapter 61 to the Trust for Public Land and ratifying the vote taken at the January 28, 2003 meeting.

- that the Board support an article at ATM (Annual Town Meeting) in which funds from the CPA will be used for affordable housing and open space at 142-144 Red Acre Road.

- to inform the Zoning Board of Appeals of this Board's approval of the Red Acre Road planned project.

## Preparing for Annual Town Meeting

On February 10th, The Trust for Public Land made a formal presentation to the Community Preservation Committee. At that meeting, the CPC voted to recommend that $400,000 of CPA funds be expended on that project by borrowing against the existing funds over two years. $100,000 of that amount would be from CPC funding set aside for affordable housing.

## Management of Affordable Housing Project Component

Upon the sale of 142 Red Acre Road to The Trust for Public Land, the property will be vacated by the owner and no existing tenant will be displaced during the renovation and sale of the house.

The Trust for Public Land will seek to keep the public apprised of the project's progress and seek input on how the project should proceed. Stow is a small town of 2,082 households (Census 2000). The Stow Housing Authority, under direction of the Board of Selectmen, will be closely involved with this project and help to determine the public input process through scheduled meetings and Open Hearings. TPL and the Town of Stow will rely on the Housing Authority's ability to involve the community members that represent the needs of those of low and moderate income.

The Town of Stow will arrange for technical assistance through the Housing authority to help coordinate the provision of technical assistance to groups who represent low and moderate income persons throughout the grant term;

The grant management consultant, in conjunction with TPL, will hold at least one public hearing to review program performance during the grant year.

Procedures for the resolution of complaints and grievances will be consistent with those already in place in the Town of Stow, and in use by the Stow Housing Authority.

Throughout the process, handicapped residents will be provided for by holding all public meetings in accessible locations. Both the Stow Town Offices and Stow Housing Authority are handicap accessible. Non-English speaking residents will be accommodated as much as possible given the capacity of the Town of Stow. Whenever necessary, assistance will be sought to accommodate non-English speaking persons during the citizen participation process.

Federal FY 2002 Massachusetts CDBG Program

## PUBLIC HEARING DOCUMENTATION
(Form 1-11)

PUBLIC HEARING INFORMATION:

Date/Time Held: January 28, 2003, 8:00 pm; February 11, 2003, 9:00 pm

Number of Attendees: Approximately 35

Location: Stow Town Building, 380 Great Road

Hearing Officer: Chairman, Board of Selectmen, Edward R. Perry
Hearing Outreach: Beacon-Villager , Circulation of 3,500 Weekly
(List all sources)
Posted in Town Building


Dates Published: 1/16/03

How Published? Newspaper, Public Posting in Town Building


## HEARING NOTICE AND MINUTES DOCUMENTATION:

Attach a copy of the public hearing notice as it appeared in the newspaper(s) listed
above, or a copy of the notice as was posted in the appropriate public buildings.
In addition, you must attach a copy of the minutes from the public hearing.


**Attachment 1-11.1    Public Hearing Notice**
**Attachment 1-11.2    Public Hearing Minutes**
**Attachment 1-11.3    List of Attendees at Public Hearing**

KUN402

# LEGAL NOTICES

**MAURA ESTATES**
**LEGAL NOTICE**
**NOTICE OF PUBLIC HEARING**

The Stow Planning Board will hold a public hearing on February 11, 2003, at 7:30 P.M. at the Stow Town Building, 380 Great Road, Stow, MA, to discuss a proposed Amendment to the Certificate of Action for Road A of the Maura Estates Definitive Subdivision, as petitioned by Foresite Engineering Associates, Inc. Road A, owned by Trustees of Boston College and Nancy Nyhan, is located off Taylor Road as shown on Property Map Sheet R-7. Plans may be viewed at the Office of the Planning Board or the Office of the Town Clerk during normal business hours.

Donald G. McPherson, Chairman

AD#135703
Beacon Villager 1/16, 1/23/03

**SHOEMAKER**
**LEGAL NOTICE**
**NOTICE OF MORTGAGEE'S SALE OF REAL ESTATE**

By virtue and in execution of the Power of Sale contained in a certain mortgage given by Philip P. Shoemaker Jr. and Michele L. Shoemaker to Source One Mortgage Corporation, dated July 6, 1998 and recorded with the Middlesex County (Southern District) Registry of Deeds at Book 30408, Page 409, of which mortgage Bank One, National Association, as Trustee is the present holder by assignment, for breach of the conditions of said mortgage and for the purpose of foreclosing, the same will be sold at Public Auction at 11:00 a.m. on February 3, 2003, on the mortgaged premises located at 5 Red Acre Road, Stow, Middlesex County, Massachusetts, all and singular the premises described in said mortgage,

TO WIT:

That certain parcel of land with the buildings thereon, situated on the Easterly side of Red Acre and the Northerly side of Summer Street, in Stow, Middlesex County, Massachusetts, and being shown on a plan entitled, "Land in Stow owned by the Estate of John Wanhatalo", surveyed by Horace F. Tuttle, C.E., dated January 11, 1955, recorded as Plan No. 85 of 1955 in Middlesex South District Registry of Deeds, Book 8398, Page 244, bounded and described as follows:

WESTERLY by Red Acre Road, one hundred eighty-five and 8/10 (185.8) feet;

SOUTHWESTERLY by said Road and the Old County Road to Lancaster, twentyseven and 2/10 (27.2) feet;

SOUTHERLY by said Old County Road by three courses, one hundred twenty-five and 4/10 (125.4) feet, seventy and 65/100 (70.65) feet, and thirty-three and 82/100 (33.82) feet;

SOUTHEASTERLY by said Old County Road, thirty-six and 2/10 (36.2) feet;

SOUTHEASTERLY by Summer Street, one hundred fifty-five and 46/100 (155.46) feet;

EASTERLY by land of the Estate of John Wanhatalo two hundred and fifty-six (256) feet;

NORTHERLY by land formerly of Mrs. Bass, one hundred forty-six and 7/10 (146.7) feet;

WESTERLY by land of Ralph G. Moody, one hundred and twenty-four (124) feet;

NORTHERLY by said Moody land, one hundred and forty-five (145) feet;

EASTERLY by said Moody land, fifty-one (51) feet, and

NORTHERLY by said Moody land, ninety-nine (99) feet.

Containing according to said Plan two (2) acres, more or less.

Said premises are conveyed subject to rights of way of record.

For mortgagors' title see deed recorded with Middlesex County (Southern District) Registry of Deeds in Book 27783, Page 9

These premises will be sold and conveyed subject to and with the benefit of all rights, rights of way, restrictions, easements, covenants, liens or claims in the nature of liens, improvements, public assessments, any and all unpaid taxes, tax titles, tax liens, water and sewer liens and any other municipal assessments or liens or existing encumbrances of record which are in force and are applicable, having priority over said mortgage, whether or not reference to such restrictions, easements, improvements, liens or encumbrances is made in the deed.

**TERMS OF SALE**

A deposit of Five Thousand ($5,000.00) Dollars by certified or bank check will be required to be paid by the purchaser at the time and place of sale. The balance is to be paid by certified or bank check at Harmon Law Offices, P.C., 150 California Street, Newton, Massachusetts 02458, or by mail to P.O. Box 610389, Newton Highlands, Massachusetts 02461-0389, within thirty (30) days from the date of sale. Deed will be provided to purchaser for recording upon receipt in full of the purchase price. The description of the premises contained in said mortgage shall control in the event of an error in this publication.

Other terms, if any, to be announced at the sale.

BANK ONE, NATIONAL ASSOCIATION, AS TRUSTEE
Present holder of said mortgage

By its Attorneys,
HARMON LAW OFFICES, P.C.
Kristin A. Hedvig, Esquire
150 California Street
Newton, MA 02458
(617) 558-0500

AD#135400, 135401
Beacon Villager 1/09, 1/16, 1/23/03

**142 & 144 RED ACRE ROAD**
**LEGAL NOTICE**
**TOWN OF STOW**
**NOTICE OF PUBLIC HEARING**

The Board of Selectmen will hold a public hearing on Tuesday, January 28, 2003, at 7:30 pm, in the Stow Town Building, Stow, Massachusetts, for public input regarding assigning the Right of First Refusal to Trust For Public Land, a nonprofit conservation organization, pursuant to Massachusetts General Laws, Chapter 61, Section 8, as it relates to the Kunelius property located at 142 and 144 Red Acre Road, Stow, MA.

AD#138197
Beacon Villager 1/16/03



**Town of Stow**
**BOARD OF SELECTMEN**
**380 Great Road**
**Stow, Massachusetts 01775-1122**
(978) 897-4515
FAX (978) 897-4534

January 28, 2003

**Public Hearing – Transfer of Right of First Refusal**
At 8:00pm, Selectman Perry opened the public hearing by reading the public hearing notice.

Mr. David Cobb, representing the Friends of Red Acre, and Mr. Craig MacDonnell, representing The Trust for Public Land (TPL), were in to inform the Board that they are still gathering
information in their assistance to help the Friends of Red Acre to accept the transfer of Right of
First Refusal if offered by the Town.

Although The Trust for Public Land does qualify under statute as a non-profit organization to accept this right, they are not sure, at this point, if they can meet all the financial demands to accept the offer of Right of First Refusal.

Selectman Perry has requested of TPL to submit legal documentation of how they intend to deed the property, that the two houses on the property will be deeded affordable and a promissory of deliverables before the Board considers transferring their rights. The Board is also looking for language that clearly establishes the Town's right to the 42 acres of backland together with our right to access this land for the purposes of building and maintaining a drinking water well and an indemnification clause in the agreement that requires that TPL defend and hold harmless the Town against any third party claims.

Mr. MacDonnell stated that he has not been in the two homes and is unaware of what it will take financially to make them livable and will need to research that. He also stated that there would be slightly more than 42 acres deeded to the Town but didn't feel the Trust for Public Land would agree to defend and hold harmless the Town against future claims.

Selectman Clayton moved to transfer the Town's Right of First Refusal to The Trust for Public Land contingent upon all deliverables being received in time for Town Council to approve prior to the Board's meeting on February 11, 2003, and the offer to be rescinded if all is not received.
Seconded by Selectman Burchfield and voted unanimously.

The Public Hearing will continue on February 11, 2003.

**KUN404**



# Town of Stow
# BOARD OF SELECTMEN
### 380 Great Road
### Stow, Massachusetts 01775-1122
(978) 897-4515
FAX (978) 897-4534

**Right of First Refusal – Kunelius property**
At 9:00pm Selectman Perry re-opened the public hearing on transferring the Town's Right of
First Refusal on the Kunelius property.

Craig MacDonnell of the Trust For Public Land (TPL) was present to offer the Board a summary of conditions under which TPL would consider accepting the proposed assignment. Mr. MacDonnell explained that although TPL has not had the opportunity to access the property, he is requesting a recorded vote by the Community Preservation Committee and the Board of Selectmen to support an
Page 4
February 11, 2003

article on the Annual Town Meeting (ATM) warrant to spend Community Preservation Act (CPA) funds for affordable housing and open space. They are also requesting a recorded vote of the Board of Selectmen to support the variance required for the subdivision of the property.

Mr. MacDonnell stated that an agreement in principle that the deeds to the private parcels would include certain provisions and the sales of the properties would be restricted in certain respects. He went on to explain that 142 Red Acre Road would be conveyed subject to a perpetual affordability restriction if the Town votes to spend CPA funds to purchase one and a conservation restriction reasonably limiting the further development of the property. Any sale of the property would be coordinated with a local preference lottery and would be subject to all appropriate law and regulation.

He went on to explain that 144 Red Acre Road would be conveyed subject to a conservation restriction reasonably limiting (a) further development of the property allowed under existing zoning and (b) agricultural and animal husbandry activities that pose direct threats to the aquifer.

Regarding the possibility of a municipal well, TPL will need to negotiate terms of access for purposes of construction, operation and maintenance of future water supply facilities and for the potential development of a water line from the farm pond to a hydrant for purposes of fire suppression that may be developed on the adjacent parcel.

KUN405

Mr. MacDonnell stated that as a condition of Eye of the Storm buying the parcel at 144 Red Acre Road, a perpetual affordability restriction will be imposed if the Town votes to purchase one.

Selectman Jones moved that the Town not transfer their rights under Chapter 61 to the Trust for Public Land. There was not a second to this motion. No action on the motion.

Selectman Farrell moved that the Town transfer its Right of First Refusal under Chapter 61 to the Trust for Public Land and ratifying the vote taken at the January 28, 2003 meeting. Seconded by Selectman Burchfield. Discussion ensued with Selectman Farrell stating that she feels she represents the interests of the entire community by offering this parcel to TPL. Selectman Burchfield stated that she feels the questions given to TPL by Selectman Perry have been answered to her satisfaction. Selectman Perry stated that he feels that his concerns have been answered and the transfer is the wish of the Town voters. Selectman Jones stated that he feels that transferring the Town's rights unconditionally is not reasonable and is against the idea because of the risks involved. Selectman Perry ended the discussion by saying that TPL is a national entity and feels that this is a risk worth taking. The motion carried by a 3-1 vote with Selectman Jones voting in opposition.

Selectman Burchfield moved that the Board support an article at ATM in which funds from the CPA will be used for affordable housing and open space at 142-144 Red Acre Road. Seconded by Selectman Farrell. The motion carried by majority with Selectman Jones abstaining from the vote.

Selectman Farrell moved to recommend supporting the frontage variance needed to support TPL's
plan for division of the property. Seconded by Selectman Burchfield. Discussion ensued and Mr.
Page 5
February 11, 2003

Wrigley suggested that the Board may not want to make a decision to weigh on the deliberation of another Board and that this Board should not ask the Zoning Board of Appeals to recommend or influence their decision on a variance as there is no negotiation on a variance. The motion did not
carry with a 1-3 vote with Selectmen Perry, Jones and Burchfield voting in opposition.

Selectman Farrell moved to inform the Zoning Board of Appeals of this Board's approval of the Red Acre Road planned project. Seconded by Selectman Burchfield and carried by a majority vote. Selectman Jones abstained from voting.

Selectman Perry closed the Public Hearing.

Attachment 1-11.3

List of Attendees at Public Hearing:

Ross Perry, Chair of Board of Selectmen
Greg Jones, Board of Selectmen
Shirley Burchfield, Board of Selectmen
Kathleen Farrell, Board of Selectmen
Bill Wrigley, Town Administrator
Paula Bruno, Board of Selectmen Admin Assistant
Linda Hathaway, Town Clerk
Stephanie Doss, Mosaic Commons
Peter Kachagian, seller's attorney
Jim Boothroyd, seller's realtor
Chris LaPointe, Trust for Public Land
Craig MacDonnell, Trust for Public Land
Matt Gunderson, Beacon Villager Reporter
Bob Wilber, Chair of the Stow Community Preservation Committee
John Beusch, Stow Resident, Director of Stow Conservation Trust
Rob Bowers, Stow Resident, Board Member of Stow Conservation Trust
Tom Maher, Stow Resident
Peter Mills, Stow Resident
Karen Gray, Stow Resident
Nina Arbella, Stow Resident
Janet Burge
Tim Reed
David Cobb
Karen Sommerlad
Sharlet Ramsland
Drew Simmons
Erica Nilsson
Michael Labosky
Allan Fierce
Serena Furman
Peter Christianson
John Browne
Victor Castelline
Peter McManus
Kate McManus

KUN407

## Chief Elected Official Certifications (Form 1-14)

MASSACHUSETTS CDBG PROGRAM

**CHIEF ELECTED OFFICIAL (CEO) CERTIFICATION FORM**

On behalf of the applicant, of which I am a duly authorized local official empowered to sign such documents, I certify that the following actions have or will be taken:

1.  The applicant possesses the legal authority to make a grant submission.

2.  The applicant will minimize displacement resulting from CDBG-funded projects whenever possible, and comply with relocation requirements governing the CDBG program.

3.  The project will be conducted in accordance with Title VI and Title VIII of the Civil Rights Act and, further, the applicant will affirmatively further fair housing.

4.  The applicant has provided opportunities for citizen participation, and has conducted a public hearing, and has provided information to citizens regarding the project that is to be submitted for CDBG funding consistent with Section 104(a) (2) of Title I of the Housing and Community Development Act of 1974 as amended through 1987.

5.  The applicant will not attempt to recover any capital costs of public improvements assisted in whole or in part with CDBG funds by assessing properties owned and occupied by low and moderate persons unless: (A) CDBG funds are used to pay the portion of such assessment that relates to non-CDBG funding or; (B) the applicant certifies to the State that, for the purposes of assessing properties owned and occupied by low and moderate income persons who are not very low income, the applicant does not have sufficient CDBG funds to comply with the provisions of "A" above.

6.  In applying for this grant from the Massachusetts Small Cities Program, the applicant understands that its Chief Elected Official is ultimately responsible for compliance with all requirements of the Program, including providing sufficient management oversight to carry out the activities requested hereunder.

**Certification Regarding the Use of Force**

The Community further certifies that:

1.  The applicant will adopt/has adopted and will enforce a policy to prohibit the use of excessive force by law enforcement agencies within their jurisdiction against any individuals engaged in nonviolent civil rights demonstrations.

2.  The policy to be adopted or has been adopted is contained in:
    a.  a local legislative act (such as an ordinance); or
    b.  a local administrative act (such as a written statement of policy by the local chief exe cutive); or
    c.  an executive order; or
    d.  a regulation within the police department.

3.  The community understands that a new policy need not be adopted if they have and are enforcing a written policy that meets the requirements of Section 519 of the Housing and Community Development act of 1974, as amended.

**KUN408**

**Certification Regarding Assistance to Primarily Religious Organizations:**

The Community further certifies that:

1. Community Development Block Grant [CDBG] funds shall not be provided to primarily religious organizations, such as churches, for any activities including secular activities, or to rehabilitate or construct housing owned by primarily religious organizations or assist primarily religious organizations in acquiring housing. CDBG funds may be provided to a wholly secular entity established by a religious organization, provided that the program or housing receiving assistance is wholly secular in purpose and is available to all persons regardless of religion.

**Certification Regarding Lobbying**

The Community further certifies that:

1. No federal appropriated funds have been paid or will be paid by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, and officer or employee of Congress, in connection with the awarding of any federal contract, the making of any federal grant, the making of any federal loan, the entering into of any cooperative agreement, and the extension, continuation, or renewal, amendment or modification of any federal contract, grant, loan or cooperative agreement.

2. If any funds other than federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an employee or officer of congress, or an employee of a member of congress in connection with this shall complete and submit standard form - III, "Disclosure Form to Report Lobbying," in accordance with its instructions.

3. The undersigned shall require that the language of this certification be included in the award documents for all sub-awards at all tiers, (including subcontracts, sub-grants, and contracts under grants, loans and cooperative agreements) and that all sub-recipients shall certify and disclose accordingly.

**Certification Regarding**
**Disclosure Requirements for Activities**
**Receiving $200,000 or More**

1. The undersigned shall comply with the requirements of full disclosure for any project or activity proposed for and receiving funding equal to $200,000 or more. Disclosure will include providing information regarding:

   - assistance from other government sources in connection with the project;
   - financial interests of persons involved in the project (from planning to development to implementation of the project or activity), such financial interests exceeding $50,000 or 10% of the project assistance requested, whichever is lower; and
   - sources and uses of other funds involved in the project.

   This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by section 1352, Title 31, US Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $ 10,000 and not more than $ 100,000 for each such failure.

By:_____

**KUN409**

Signature, Chief Elected Official
(Lead Applicant Only)

_Edward R Perry_

Typed Name

Title

Date

KUN410

MASSACHUSETTS CDBG PROGRAM

**CHIEF FINANCIAL OFFICER CERTIFICATION**
**1-15**

*Budget Summary/Administrative Cost Breakdown:*

This is to certify that the Budget Summary and Administrative Cost Breakdown forms included in the City/Town of _____'s application to the Massachusetts CDBG Program have been reviewed and determined to be a fair and accurate accounting of allowable and reasonable costs.

The costs identified compare consistently with those described for each requested program activity identified in this application.

By:

Chief Financial Officer

City/Town of _____

*(signature)* _____
Signature

_____
Typed Name

_____
Title

_____
Date

**KUN411**

Volume: I
Pages: 1-251
Exhibits: 23

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11697-GAO

MARILYN KUNELIUS,

Plaintiff,

v.

TOWN OF STOW, separately,
A PARTNERSHIP OF UNKNOWN NAME
BETWEEN TOWN OF STOW and THE
TRUST FOR PUBLIC LAND, THE
TRUST FOR PUBLIC LAND, separately,
and CRAIG A. MacDONNELL, in his
individual capacity,

Defendants.

DEPOSITION of CRAIG MacDONNELL, a witness called by and
on behalf of the plaintiff, taken pursuant to the
Massachusetts Rules of Civil Procedure, before Roberta J.
Daniels, a Court Reporter and Notary Public within and for
the Commonwealth of Massachusetts, at the Law Offices of
Michael C. McLaughlin, One Beacon Street, Boston,
Massachusetts 02108, on Thursday, February 8, 2007,
scheduled to commence at 10:00 A.M.

## INDEX

| Witness | D | C | RD | RC |
|---|---|---|---|---|
| CRAIG MacDONNELL | 6 | | | |

- 3 -

## APPEARANCES

Michael C. McLaughlin, Esquire
Law Offices of Michael C. McLaughlin
One Beacon Street
Boston, Massachusetts 02108
    Counsel for the Plaintiff

Peter A. Kachajian, Jr., Esquire
292 Main Street
Northborough, Massachusetts 01532
    Co-counsel for the Plaintiff

Deborah I. Ecker, Esquire
Brody Hardoon Perkins & Kesten, LLP
One Exeter Plaza
Boston, Massachusetts 02116
    Counsel for Defendant Town of Stow

Dahlia S. Fetouh, Esquire
Goodwin Procter, LLP
Exchange Place
Boston, Massachusetts 02109
    Counsel for Defendant Trust for Public Land

James B. Conroy, Esquire
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd floor
Boston, Massachusetts 02108
    Counsel for Defendant Craig MacDonnell
Also present:
Lucie DeBellis, Paralegal
The Law Offices of Michael C. McLaughlin
Marilyn Kunelius, Plaintiff
David Norris, Husband of the plaintiff

## EXHIBITS

| No. | Description | Page |
|---|---|---|
| 1 | TPL corporate registration form | 16 |
| 2 | Notice of deposition | 17 |
| 3 | TPL Land Action Fund corporate registration form | 18 |
| 4 | Stow annual report, 2003 | 35 |
| 5 | Stow letter with attachments to Kunelius, 2-12-03 | 45 |
| 6 | MacDonnell letter to Perry, 2-11-03 | 49 |
| 7 | Conditions for right of first refusal | 51 |
| 8 | Minutes of Stow CPC meeting, 2-10-03 | 64 |
| 9 | Printout of TPL Web site | 75 |
| 10 | Stow Finance Committee minutes, 1-7-03 | 79 |
| 11 | DHCD grant application | 105 |
| 12 | TPL Web site excerpt | 124 |
| 13 | MacDonnell letter to Kachajian, 9-9-03 | 137 |
| 14 | Conditions for right of first refusal | 154 |
| 15 | Sommerlad email to Kennedy | 164 |
| 16 | Jacobs email to Sommerlad and Kennedy | 166 |
| 17 | Stow Board of Selectmen meeting, 2-11-03 | 191 |
| 18 | Stow Conservation Commission documents | 193 |
| 19 | MacDonnell email to Perry, 4-17-03 | 209 |
| 20 | Friends of Red Acre letter to Stow Board of Selectmen, 6-6-03 | 212 |

- 4 -

21  Pelletier letter to Stow Board of
    Appeals, 9-25-03                     228

22  MacDonnell letter to Kachajian, 7-6-04   234

23  MacDonnell letter to Perry, 1-5-03      238

- 5 -



1         PROCEEDINGS
2       Thursday, February 8, 2007
3         10:01 A.M.
4    (Plaintiff and Mr. Norris not present)
5    CRAIG MacDONNELL, first having been
6 satisfactorily identified by the production of a
7 Massachusetts driver's license and then duly
8 sworn, on oath, deposes and says as follows:
9     MR. McLAUGHLIN: Before we start, we'll
10 use the usual stipulations? We'll reserve all
11 objections till the time of trial, except as to
12 form, waive the signature of the deposition?
13     MR. CONROY: Waive the notary.
14     MR. McLAUGHLIN: Yes, right.
15     MR. CONROY: Right.
16     DIRECT EXAMINATION
17 By MR. McLAUGHLIN:
18 Q  Could you please state your name and spell it, please?
19 A  It's Craig MacDonnell, C-R-A-I-G. Last name is M-A-C-
20   D-O-N-N-E-L-L.
21 Q  And can you tell me what your address is?
22 A  800 Old Road to Nine Acre Corner, Concord, Mass.
23 Q  Can you tell me what your occupation is?
24 A  I work for the Trust for Public Land.

    - 6 -

1 A  Well less than a million.
2 Q  Less than a half a million dollars?
3 A  Yes.
4 Q  Less then two hundred and fifty thousand?
5 A  Yes.
6 Q  Do you have a general idea what the limitation was?
7 A  I believe -- well, it was very small, but I don't know
8   a number.
9 Q  Do you have a general estimation of what -- well, let
10   me strike that.
11 A  I've already said I don't remember.
12 Q  If a contract was put in front of you, was there a
13   point where you would say to yourself, gee, I can't
14   sign this; this is too big?
15 A  Are we talking about now or then?
16 Q  Then.
17 A  Yes.
18 Q  And what would that number be that would cause you to
19   think you didn't have the authority?
20 A  Well, I don't recall as to what it was then, so I
21   can't testify to that.
22 Q  Are you on any medication that would affect your
23   memory?
24 A  No.

    - 9 -

1 Q  And what is the Trust for Public Land?
2 A  The Trust for Public Land is a 501c3, a national non-
3   profit land conservation organization.
4 Q  And what do you do for them?
5 A  I'm the Massachusetts state director.
6 Q  In 2002, what was your job at TPL?
7 A  I was the Massachusetts state director.
8 Q  Does each state have a director?
9 A  Most states where TPL works have a director.
10 Q  Is there a regional headquarters for TPL for the
11   northeast region?
12 A  Yes.
13 Q  Where is that?
14 A  Boston.
15 Q  And is that the same place as your office?
16 A  Yeah.
17 Q  And is there someone in charge of the region that you
18   report to?
19 A  Yes.
20 Q  And who is that?
21 A  Whitney Hatch.
22 Q  Is Whitney Hatch a man?
23 A  He is.
24 Q  Whitney, okay. And what is his title?

    - 7 -

1 Q  Can you tell me what your background is, your
2   educational background, please?
3 A  I'm trained as a lawyer.
4 Q  And what kind of lawyer were you trained to be?
5 A  A litigator.
6 Q  Did you practice as an attorney?
7 A  I did.
8 Q  And where did you practice?
9 A  Two law firms.
10 Q  What are the names of the two firms?
11 A  Nutter, McClennen & Fish and Keegan, Werlin & Pabian.
12 Q  Where is Keegan, Werlin, Pabian?
13 A  Boston.
14 Q  And can you tell me when you worked for these two
15   firms, sequentially?
16 A  I worked for Nutter, McClennen & Fish from 1983
17   through '87 or '88. I worked for Keegan, Werlin from
18   the early '90s through the late '90s.
19 Q  Why did you leave Nutter?
20 A  To change my career.
21 Q  And you were a litigator at Nutter?
22 A  Yes.
23 Q  Were you a partner?
24 A  No.

    - 10 -

1 A  Regional director.
2 Q  And do you still report to Whitney Hatch?
3 A  I do.
4 Q  In 2003, were you also the Massachusetts director?
5 A  In 2003, I was the Massachusetts state director.
6 Q  In your role as Massachusetts state director, could
7   you define what your authorities were as far as
8   acquisitions of property?
9 A  What do you mean by define my authority?
10 Q  Well, were you in a position to bind TPL into
11   contracts, for example?
12     MR. CONROY: Objection.
13 A  Some contracts.
14 Q  When I say in a position, did you have the authority
15   to?
16 A  Well, in my position, there were some contracts that I
17   could bind TPL with respect to.
18 Q  And what kind of contracts were those?
19 A  Very small.
20 Q  Was there a dollar amount limitation?
21 A  There was.
22 Q  What was that?
23 A  I don't know.
24 Q  Was it less than a million dollars?

    - 8 -

1 Q  Were you an associate?
2 A  Yes.
3 Q  And at Keegan, were you a partner?
4 A  Yes.
5 Q  Did you go in as a partner?
6 A  No.
7 Q  Did you go in as an associate?
8 A  I did.
9 Q  How long were you an associate there?
10 A  About three years.
11 Q  So, in the span of between approximately '90 and the
12   late '90s, you were three years an associate and up to
13   perhaps as many as six or seven a partner?
14 A  Approximately.
15 Q  And what did you do between '88 and '90?
16 A  I worked for the Department of Fisheries, Wildlife &
17   Environmental Law Enforcement.
18 Q  And what was your position there?
19 A  I was a lawyer.
20 Q  In their legal department?
21 A  Yes.
22 Q  Is there a separate legal department for that, for the
23   Department of Fisheries?
24 A  Well, no, not really. I mean, there were lawyers, but

    - 11 -



1    I don't recall it being organized as a department.
2 Q  And that's a federal department, or is that a state
3    department?
4 A  State.
5 Q  So, it's Commonwealth of Massachusetts?
6 A  Correct.
7 Q  And who was your supervisor at the Department of
8    Fisheries?
9 A  The commissioner.
10 Q  And who was that?
11 A  Walter Bickford at the beginning and, later, John
12   Phillips.
13 Q  Where did you go to law school?
14 A  Cornell.
15 Q  And undergrad?
16 A  Nasson.
17 Q  Could you spell that?
18 A  N-A-S-S-O-N.
19 Q  And where is that?
20 A  Springvale, Maine.
21 Q  When did you graduate from law school?
22 A  '83.
23 Q  In your practice as a litigator, did you practice in
24   state courts?

- 12 -

1 A  Yes.
2 Q  Federal courts?
3 A  Yes.
4 Q  And what kind of litigation did you practice?
5 A  Mostly environmental.
6 Q  Did you ever do corporate?
7         MS. FETOUH: Objection.
8 Q  Did you ever practice corporate law?
9 A  I worked on corporate issues. I don't know if you
10   could call that practicing corporate law.
11 Q  Did you ever practice tax law?
12 A  I worked on tax issues, but I don't know if you could
13   say I practiced tax law.
14 Q  Other than your degree from Cornell, do you have any
15   advanced law degrees?
16 A  No.
17 Q  Have you taken any advanced professional education
18   beyond, for example, MCLE courses or that sort of
19   thing?
20 A  I have.
21 Q  And what were those in?
22 A  I took so many that I can't remember.
23 Q  When you left Keegan, what was the reason you left
24   Keegan?

- 13 -

1 A  To join the Trust for Public Land.
2 Q  Were you asked to leave, or did you leave because you
3    wanted --
4 A  I chose to leave.
5 Q  You mentioned that TPL is a -- is it a non-profit or
6    charitable institution, or how do you describe it?
7 A  It's a 501c3.
8 Q  And is that a charitable institution?
9 A  Correct.
10 Q  Is it also a non-profit?
11 A  Correct.
12 Q  Is that the same designation?
13 A  (No response.)
14 Q  Are you aware whether or not TPL has a designation of
15   being a non-profit with the Secretary of State?
16 A  I do not know.
17 Q  Have you ever checked to see whether TPL is listed as
18   a for-profit corporation?
19 A  I have not.
20 Q  In your role as director of the Massachusetts area,
21   did you in 2003 undertake any legal work for TPL?
22         MR. CONROY: Objection.
23 A  I don't know how to answer that question. I mean, I
24   thought about legal issues. As a lawyer, I can't help

- 14 -

1    myself.
2 Q  I'm going to put a document in front of you, which I
3    have not marked yet, and ask you if you've ever seen a
4    document like that.
5 A  I have not.
6 Q  Can I ask you to look at the second page?
7 A  (Examining.)
8 Q  Do you see where it appears to indicate that TPL is a
9    for-profit corporation? Do you see that?
10 A  You're pointing to the X in the middle of the page?
11 Q  Yeah.
12 A  I see the X.
13 Q  And that would be beside the for-profit designation,
14   is that correct?
15 A  Correct.
16 Q  And you don't have any idea why that's listed with the
17   Commonwealth as a for-profit corporation. Is that
18   correct?
19 A  Correct.
20 Q  Do you share in bonuses issued by TPL in connection
21   with monies that are derived from TPL's operation?
22 A  There are no bonuses at TPL.
23 Q  You're on a salary at TPL?
24 A  Correct.

- 15 -

1 Q  What is your salary?
2 A  Somewhere in the eighty thousand to ninety thousand
3    dollar range, maybe between ninety and a hundred. I'm
4    not quite sure where it is right now.
5         (Plaintiff and Mr. Norris enter)
6 Q  You're here today because you received or your
7    attorney received a notice of deposition, is that
8    correct?
9 A  I believe that's correct.
10         MR. McLAUGHLIN: Can I have that marked
11   as Exhibit 1, please?
12         (WHEREUPON, Exhibit No. 1, TPL
13   corporate registration form, marked for
14   identification.)
15 Q  Have you seen this notice of deposition before?
16         MR. CONROY: Can I just clarify for the
17   record? Exhibit 1 is the document that you've
18   just been asking questions about, correct?
19         MR. McLAUGHLIN: Yes.
20         MR. CONROY: Okay.
21 A  I believe I've seen this before.
22         MR. McLAUGHLIN: Okay. We'll just have
23   that marked.
24 Q  And that's why you're here today, correct?

- 16 -

1 A  Essentially.
2         MR. McLAUGHLIN: We'll have that marked
3    as Exhibit 2.
4         (WHEREUPON, Exhibit No. 2, notice of
5    deposition, marked for identification.)
6 Q  Do you hold any other positions with TPL--related
7    entities?
8         MS. FETOUH: Objection.
9 A  I don't know what you mean by TPL--related entities.
10 Q  Well, have you ever heard of TPL Land Action Fund?
11 A  I have.
12 Q  Well, you hesitated in answering that, and I'm
13   wondering. Is that because you're generally
14   unfamiliar with the TPL Land Action Fund?
15         MR. CONROY: Objection.
16 A  The reason I hesitated is that I was trying to
17   remember the name.
18 Q  What is the TPL Land Action Fund?
19 A  I don't know.
20 Q  I'm going to put before you a document and have you
21   take a look at it from the Secretary of State. Does
22   that refresh your memory as to what the TPL Land
23   Action Fund is?
24 A  No.

- 17 -

1 Q What's the address of TPL where you work? Where do
2   you work? What's the address?
3 A 33 Union Street in Boston.
4 Q And I note here that the document in front of you is
5   also 33 Union Street. Do you see that?
6 A Yes, it's misspelled here.
7 Q What's misspelled, Union?
8 A The word Union, yes.
9       MR. McLAUGHLIN: Can we mark that as
10      Exhibit -- whatever it is, three?
11      (WHEREUPON, Exhibit No. 3, TPL Land
12      Action Fund corporate registration form, marked
13      for identification.)
14 Q Who is Ernest Cook?
15 A He's a gentleman who works for the Trust for Public
16   Land.
17 Q And does he work with you?
18 A He works in the same building I do. He is employed by
19   the conservation finance office of the Trust for
20   Public Land.
21 Q Is that a separate entity?
22 A No.
23 Q So, when you say conservation finance, is that the
24   division of TPL that deals with financial matters of
                        - 18 -

1   the entity?
2 A No.
3 Q Okay. What is conservation finance division?
4 A I don't think it's a division. It's an office that
5   helps communities raise money for land acquisition.
6 Q So, he, like you, is an employee of TPL as far as you
7   understand?
8 A Yes.
9 Q And is today the first time you've become aware that
10  he is the president of the TPL Land Acquisition Fund?
11      MS. FETOUH: Objection.
12 A The Land Action Fund?
13 Q The Land Action Fund, I'm sorry, Action Fund.
14      MR. CONROY: Objection.
15 A Yes, it is.
16 Q I note that under Exhibit 3, on Exhibit 3, it says
17  that the TPL Land Action Fund was organized in the
18  year 2000, on the first page about halfway down. Are
19  you at all surprised that this entity has existed for
20  the last seven years or thereabouts without your
21  knowledge?
22      MR. CONROY: Objection.
23 A I don't have a reaction one way or another.
24 Q On the second page, it also indicates that it is for-
                        - 19 -

1   profit. Do you see that?
2 A Are you looking at the X in the middle of the second
3   page?
4 Q Yes.
5 A I see the X.
6 Q And the X is to the left of the designation for-
7   profit. Do you see that?
8 A I do.
9 Q Are you surprised that there is a for-profit
10  designation for any entity related to TPL?
11 A Yes.
12 Q And as an attorney, were you at all involved in filing
13  any documents with the Secretary of State for TPL
14  during your tenure as a director of the Massachusetts
15  section or region?
16      MR. CONROY: Objection.
17      MS. FETOUH: Objection.
18 A Well, which question would you like me to answer?
19 Q Well, let's go back. Shall we call it the
20  Massachusetts region? Is that what you're the
21  director of, or is it State of Massachusetts or?
22 A You can call it the Massachusetts state office.
23 Q Okay. So, in your role as the director, were you ever
24  involved in filing any documents on behalf of TPL with
                        - 20 -

1   the Secretary of State?
2 A No.
3 Q And what makes you believe that TPL is a 501c3?
4       MR. CONROY: Objection.
5 A That is what I had been told.
6 Q So, you haven't specifically seen documents that would
7   verify whether it is or is not.
8 A I may have, but I don't currently recall.
9 Q Can you tell me how TPL became acquainted with the
10  Town of Stow concerning the Kunelius property?
11 A Yes.
12 Q Would you do that, please?
13 A I believe the Trust for Public Land was contacted by a
14  fellow named Peter Christianson.
15 Q And who is Peter Christianson?
16 A A resident of Stow.
17 Q Did he have some official position with the Town of
18  Stow? Was he an elected official or anything like
19  that?
20 A Not to my knowledge.
21 Q And did he contact you directly?
22 A No.
23 Q Who did he contact?
24 A I don't remember.
                        - 21 -

1 Q Do you recall the circumstances as to why he called
2   you?
3 A Yes.
4 Q What were those?
5 A It was with respect to a piece of property near his
6   house.
7 Q And was that the Kunelius property?
8 A The property at 142 Red Acre Road.
9 Q And do you have reason to believe that's not the
10  Kunelius property?
11 A No.
12 Q You don't recall who he contacted at TPL. Is that
13  your testimony?
14 A I do not.
15 Q Do you recall the reasons that he contacted TPL?
16      MS. FETOUH: Objection.
17 A Yes.
18 Q What were those?
19 A It was with respect to a potential conservation
20  project.
21 Q Did Mr. Christianson tell you there was a potential
22  project there at the Kunelius property?
23 A I don't believe he used those words.
24 Q Well, you didn't actually talk to him about it, so how
                        - 22 -

1   do you know what his words were?
2 A I don't know what his words were.
3 Q Do you know who established that there was a potential
4   conservation project at the Kunelius property?
5 A I'm not sure I understand what you mean by
6   established.
7 Q Well, you said that he contacted you about a potential
8   conservation project at the Kunelius property at 142
9   Red Acre Road, and my question is --
10 A He contacted TPL.
11 Q And my question is: who said there was a potential
12  project there? If you don't know what he said, how
13  did you know there was a potential project there?
14 A The words potential project are my words.
15 Q Do you recall any of the circumstances surrounding the
16  contact of TPL by Peter Christianson resulting from
17  any discussions you had with any other people at TPL?
18 A Yes.
19 Q Can you tell me what you know about that?
20 A I believe he talked to other people in my office about
21  the potential for a conservation project on the
22  Kunelius property.
23 Q Now, he was not the owner at that time of the Kunelius
24  property. Is that correct?
                        - 23 -



1 A  Correct.
2 Q  Was it unusual for someone who is not an owner of a
3     property to contact you concerning the establishment
4     of a conservation project on someone else's property?
5 A  No.
6 Q  Does that happen regularly?
7 A  Yes.
8 Q  Do you recall who the people were in your office?
9 A  I believe he contacted Valerie Talmadge.
10 Q  And who is Valerie Talmadge?
11 A  Valerie Talmadge is the director of projects for the
12     New England region.
13 Q  Is she still an employee of TPL?
14 A  Yes.
15 Q  How many employees are there at TPL in Boston?
16 A  Well, without actually taking the time to count the
17     offices, I'd say in the neighborhood of twenty-five or
18     thirty.
19 Q  And were there 25 or 30 back in 2003?
20 A  Maybe a few less.
21 Q  Did you have discussions with Valerie Talmadge
22     concerning TPL's involvement with the property
23     which -- instead of calling it the Kunelius
24     property, I'm just going to call it the property

— 24 —

1     from now on.  Did you have discussions with her
2     concerning the property?
3 A  I did.
4 Q  And what do you recall from those discussions?
5 A  I have a general recollection of them, that Peter
6     Christianson proposed that TPL consider working with
7     the Town of Stow to conserve the Kunelius property.
8 Q  Do you recall discussing with Valerie Talmadge what
9     motivated Mr. Christianson to come to TPL?
10 A  No.
11 Q  Do you recall that there was a 40B development on the
12     Kunelius property approximately at the time that TPL
13     was contacted?
14 A  Yes.
15 Q  Does that refresh your memory at all as to why
16     Mr. Christianson had contacted TPL, i.e., that
17     they wanted a conservation development rather
18     than a 40B development?
19 A  Does that itself refresh my recollection?
20 Q  Yes.
21 A  No.
22 Q  Do you have any knowledge concerning
23     Mr. Christianson's wish that a 40B not be built
24     on property adjacent to his property?

— 25 —

1 A  Yes.
2 Q  And is it fair to say that Mr. Christianson made that
3     known to TPL fairly early on in his discussions with
4     TPL involving the possibility of TPL getting a
5     conservation restriction on the property?
6 A  I don't recall.
7 Q  Do you recall ever meeting Mr. Christianson yourself?
8 A  Yes.
9 Q  And how long after his initial contact with TPL did
10     you meet him, approximately?
11 A  I'm not sure.
12 Q  Do you recall approximately when the initial contact
13     was made from Mr. Christianson to TPL?
14 A  I believe it was in the winter.
15 Q  The winter of 2002?
16 A  I'm not sure.
17 Q  Did Mr. Christianson come to your office at some point
18     prior to you contacting the Town of Stow officials
19     concerning the possibility of TPL's involvement?
20 A  I don't know when, in the sequence of things, he came
21     to TPL's office.
22 Q  Do you recall meeting with him in your office?
23 A  I do.
24 Q  And when was that?

— 26 —

1 A  That's what I don't remember.
2 Q  Was it prior to your involvement in attending any
3     public hearings in the Town of Stow concerning Mosaic
4     Commons?
5         MS. FETOUH:  Objection.
6 A  That's what I don't remember, is when.
7 Q  You're familiar with the term Mosaic Commons?
8 A  I'm familiar with the entity known as Mosaic Commons.
9 Q  And what is it?
10 A  I understand it's a development company.
11 Q  And did you have an understanding at some point that
12     Mosaic Commons had intended to purchase the Kunelius
13     property?
14 A  Yes.
15 Q  And is it fair to say that the intended purchase of
16     the Kunelius property by Mosaic Commons was one of the
17     reasons that you were contacted concerning TPL's
18     involvement?
19 A  The proposed land use change, it's my understanding,
20     was the reason that we were contacted.
21 Q  And the proposed land use change, by that you mean
22     that the Kunelius property was under either a farm
23     designation or forestry designation under Chapter 61
24     and, if it were sold to Mosaic Commons, it would be

— 27 —

1     changed to some other designation.  Is that right?
2 A  By that I mean that there was development planned.
3     That's all I mean.
4 Q  Let me go back.  Do you recall attending meetings in
5     December of 2002 where Mosaic Commons made
6     presentations to the Town of Stow, the Board of
7     Selectmen?
8 A  I don't remember seeing presentations.
9 Q  Do you recall whether anyone at TPL attended meetings
10     where Mosaic Commons made a presentation to the Board
11     of Selectmen or any other board of the Town of Stow?
12 A  The introduction to your question, do I remember if
13     anybody from TPL?
14 Q  Yes.
15 A  No.
16 Q  Would you have been the point person, in other words,
17     the person with the general authority, to go to such
18     meetings and make comments at such meetings on behalf
19     of TPL?
20         MS. FETOUH:  Objection.
21 A  I don't know about the authority question.  So, I'm
22     not sure how to answer that.
23 Q  Well, would TPL send an intern to have discussions
24     with the town's Board of Selectmen concerning the

— 28 —

1     possibility of having TPL assist the town in some way?
2         MR. CONROY:  Objection.
3         MS. FETOUH:  Objection.
4 A  Well, TPL scopes projects in a lot of different ways
5     and gathers lots of information about projects ahead
6     of time.  Sometimes that involves project managers.
7     Sometimes that involves interns.
8 Q  Tell me about the scoping of a project.  Does that
9     mean that, prior to a potential sale of property that
10     might change a land use designation, you might know
11     about that even before the sale occurs?
12         MR. CONROY:  Objection.
13         MS. FETOUH:  Objection.
14 A  I don't understand your question.
15 Q  Well, tell me what you mean when you say scopes a
16     project.
17 A  Analyzes a potential project.  That's what scope
18     means.
19 Q  And what do you do to analyze a project?
20 A  You have discussions with local representatives.  You
21     take a look at sort of the whole constellation of
22     factors that enable conservation projects to occur,
23     including the availability of conservation financing,
24     various transactional pieces, and you make an

— 29 —



1  assessment about the political interest of, in this
2  case, a town to undertake a conservation project.
3 Q  And did such a scoping occur with regard to the
4  Kunelius property?
5 A  Yes.
6 Q  And do you recall when that scoping began?
7 A  No.
8 Q  Is it likely that it began when you were first
9  contacted by Mr. Christianson?
10 A  Yes.
11 Q  Other than Mr. Christianson, who else attended the
12  meeting with you at your office that you mentioned
13  earlier?
14 A  The meeting that I mentioned, if you recall, I
15  couldn't put a date on it, and, actually, as I think
16  about it now, I can't remember who else was there. I
17  do remember meeting Mr. Christianson in my office.
18 Q  Do you recall whether other people were there?
19 A  I don't recall.
20 Q  Do you recall whether other TPL personnel were there?
21 A  I don't recall.
22 Q  Is it likely that Valerie Talmadge would have been
23  there?
24      MS. FETOUH: Objection.

- 30 -

1 A  I don't know how to answer it. I mean, I can tell you
2  what I remember. What I remember is that I did meet
3  with Mr. Christianson, but I don't remember who else
4  was there.
5 Q  And if I've asked this question, I apologize. Do you
6  recall, in that meeting, Mr. Christianson looking for
7  ways to prevent a 40B development occurring on the
8  Kunelius property?
9 A  The focus of the conversation, if I remember it in
10  that first meeting, was the creation of a conservation
11  project, and how one would do that, more than the
12  prevention of an alternative.
13 Q  Do you recall that Mr. Christianson was concerned
14  about low-income housing being adjacent to his
15  property?
16 A  No.
17 Q  At some point, after meeting with Mr. Christianson,
18  did you initiate any contact with the Town of Stow on
19  behalf of TPL?
20 A  I don't recall whether I initiated any contact.
21 Q  Who would have initiated contact with the Town of
22  Stow, if you did not, from TPL?
23      MR. CONROY: Objection.
24      MS. FETOUH: Objection.

- 31 -

1 A  Normally, the person who would be handling the
2  potential scoping would make that contact.
3 Q  And who was that in this case?
4 A  That would be me.
5 Q  So, is it likely that you were the person that
6  contacted the Town of Stow?
7 A  Well, I'd like to tell you that I remember contacting
8  the Town of Stow, but at this point in time, I just
9  don't remember that. I've had conversations with
10  Stow, subsequently, but whether or not I was the one
11  who initiated that contact, I just don't recall.
12 Q  But since you were the person running the scoping of
13  the project, it is likely that you were the person
14  that would contact the town? Is that correct?
15      MR. CONROY: Objection.
16      MS. FETOUH: Objection.
17      MR. CONROY: I think it's been asked
18  and answered.
19 A  I've tried to tell you what I remember about it. I
20  don't recall whether, in this situation, it was me or
21  not.
22 Q  How old are you?
23 A  Fifty.
24 Q  Have you testified before in a deposition?

- 32 -

1 A  No.
2 Q  Have you testified in any litigation?
3 A  No.
4 Q  Are you still a member of the bar?
5 A  Yes.
6 Q  At some point, did you contact the Town of Stow
7  concerning the possibility of TPL acquiring the
8  property, the Kunelius property?
9 A  Yes.
10 Q  And do you recall when that was?
11 A  No.
12 Q  You have no idea at all as to when you may have
13  initiated a discussion with them concerning TPL
14  acquiring the property. Is that your testimony?
15      MR. CONROY: Objection.
16      MS. FETOUH: Objection.
17 A  My testimony is, for the third time, I don't remember
18  when it happened.
19 Q  Do you remember, generally, when it happened?
20 A  After talking with Peter.
21 Q  But I'm talking about something different. So, maybe
22  I'm being unclear. I didn't ask you when you
23  initiated discussions concerning a conservation
24  commission, I mean, a conservation restriction. I'm

- 33 -

1  asking you: when did you initiate discussions with
2  the Town of Stow concerning TPL acquiring the Kunelius
3  property?
4      MR. CONROY: Objection.
5      MS. FETOUH: Objection.
6      MS. ECKER: Objection.
7 A  I'm not sure what you mean by acquiring the property.
8  I mean, I don't distinguish -- I mean, my memory is
9  that I had discussions with the town in the period of
10  time after Peter Christianson brought this potential
11  project to our attention. That's my memory.
12 Q  But you don't understand the term acquiring the
13  property as I'm using it?
14 A  Well, the discussions weren't so much about acquiring
15  as they were about how to do a potential conservation
16  project out there.
17 Q  Did, using your term, doing a potential conservation
18  project out there, involve acquiring some or all of
19  the Kunelius property by TPL?
20 A  It may have or it may not have. At the beginning of a
21  project, you don't pre-ordain what the outcome of the
22  project is.
23 Q  But my question to you, sir, is: when did you discuss
24  it where it did involve the acquiring of the property

- 34 -

1  by TPL?
2 A  Sometime after meeting with Peter.
3 Q  And would that be in 1999?
4 A  No. I don't recall.
5 Q  So, you do have some sense of, generally, when it was.
6  Can you give me, plus or minus, a year? When did you
7  do this?
8 A  Well, my memory is that this project occurred during
9  the 2003 and 2004 period, generally. So, that
10  suggests that these conversations took place during
11  that time.
12      (WHEREUPON, Exhibit No. 4, Stow annual
13  report, 2003, marked for identification.)
14 Q  I've put before you a document which has been marked
15  as Exhibit 4 and ask you if you've seen this before.
16 A  I believe I have.
17 Q  And on the first page -- by the way, this has a Bate
18  stamp on it KUN205 through 216. These are
19  documents that were provided by the Town of Stow.
20  That is their designation on the Bate stamp number.
21      The first page of this document, which is
22  Exhibit 4, has a picture of a horse on it and it
23  says Town of Stow Annual Report, 2003, Red Acre
24  Farm. Do you see that?

- 35 -



1 A  I do.
2 Q  The second page indicates that this is a special town
3     meeting. It has a heading: Special Town Meeting,
4     2003, January 13, 2003. Do you see that?
5 A  Yes.
6 Q  Now, just looking at that, does that in any way assist
7     you as to whether or not you may have contacted the
8     Town of Stow in 2002 concerning the possibility of
9     acquiring the Kunelius property?
10 A  Looking at Page 2?
11 Q  Yes.
12 A  Page 2 does not remind me.
13 Q  Well, you see where it says there's a special town
14    meeting of January 13th?
15 A  Yes.
16 Q  Is it likely that a special town meeting dealing with
17    the Kunelius property, that you would have attended
18    such a meeting, if in fact you did, without first
19    making contact with the town prior to January 13,
20    2003?
21         MR. CONROY: Objection.
22         MS. FETOUH: Objection.
23 A  Could I take a minute and just read this?
24 Q  Well, actually, let me just direct you to a couple of
                        - 36 -

1     sections which may be helpful to you.
2 A  Okay.
3 Q  I'd like you to take a look on Page 95, also, marked
4     as KUN211. In the third full paragraph down, it says:
5     Craig MacDonald of the Trust for Public Land would
6     work with the Stow Conservation Trust and Friends of
7     Red Acre together with the selectmen with regard to
8     the Chapter 61A assignment. TPL would be the project
9     manager. Do you see that?
10         MR. CONROY: It's MacDonnell, by the
11    way.
12         MR. McLAUGHLIN: What did I say?
13         MR. CONROY: MacDonald.
14         MR. McLAUGHLIN: I'm sorry. I
15    apologize.
16 A  I see that.
17 Q  Does this suggest to you that you had contacted the
18    Town of Stow prior to January 13, 2003, in order to at
19    least discuss a Chapter 61 matter, a 61A assignment?
20 A  Yes.
21 Q  And can you tell me what a 61A assignment would be?
22 A  My understanding is that, under Mass. General Law,
23    Chapter 61A, there's a provision that authorizes
24    municipalities to assign rights of first refusal to
                        - 37 -

1     conservation organizations.
2 Q  And do I understand it correctly that this reference
3     is referring to the possible assignment of the right
4     of first refusal to TPL?
5 A  This paragraph?
6 Q  Uh-huh.
7 A  Yes, I believe that would be the case.
8 Q  So, this is referring to -- it's also referring to TPL
9     would be the project manager. What does that mean?
10         MR. CONROY: To whom?
11         MR. McLAUGHLIN: I don't know. That's
12    what it says. What does it mean to him?
13 A  What does that mean to me?
14 Q  Yeah.
15 A  It means that we would manage the conservation
16    project.
17 Q  And would you manage the assignment?
18         MS. FETOUH: Objection.
19 A  We would help the town accomplish the assignment.
20 Q  And when the assignment occurs, who has the right to
21    purchase the property under the terms of an
22    assignment?
23         MR. CONROY: Objection.
24         MS. FETOUH: Objection.
                        - 38 -

1 A  The assignee.
2 Q  And do you have an understanding of what this
3     paragraph is referring to or who the assignee would be
4     under this paragraph?
5 A  TPL.
6 Q  So, when TPL then becomes the assignee, sir, was it
7     your expectation that TPL would then purchase the
8     land?
9         MS. FETOUH: Objection.
10 A  It was my expectation that we would live by the terms
11    of the contract.
12 Q  No, was it your expectation that under the terms of
13    the assignment the only entity that could purchase the
14    land would be TPL?
15 A  Correct.
16 Q  Now, do you recall, having read this, when you would
17    have first discussed the possibility of TPL acquiring
18    the land by assignment? Strike that.
19         Do you recall when you discussed this with
20    the town officials, concerning TPL acquiring the
21    land by assignment, given the fact that this
22    representation appears to be sometime on January
23    13th of 2003?
24         MR. CONROY: Objection.
                        - 39 -

1 A  Well, this paragraph would suggest to me that
2     conversations occurred prior to the town meeting.
3 Q  Is it likely that TPL met with the town in December of
4     2002 concerning this issue of a possible of assignment
5     of the right of first refusal?
6         MR. CONROY: Objection.
7         MS. FETOUH: Objection.
8 A  Well, what I can say is that TPL did meet with town
9     officials prior to January 13th.
10 Q  Was it you that met with the town officials prior to
11    January 13th?
12 A  I believe so.
13 Q  And who did you meet with?
14 A  There were many meetings between myself and municipal
15    officials regarding this project over many months, and
16    so I guess there were maybe seventy-five or a hundred
17    meetings over the period of this project. So, for me
18    to remember how who was at any one meeting is
19    difficult, but I do remember there were a series of
20    meetings.
21 Q  You don't remember who was at the first meeting, the
22    introductory meeting. Is that your testimony?
23 A  Correct.
24 Q  You don't remember where the introductory meeting was.
                        - 40 -

1     Is that right?
2 A  I don't.
3 Q  You don't recall whether it was the Board of
4     Selectmen. Is that correct?
5 A  I do not.
6 Q  You don't remember whether the meeting was in your
7     office or in the Town of Stow.
8 A  I don't remember the first meeting.
9 Q  Do you remember the second meeting?
10 A  No.
11 Q  In your role as director, who would you normally
12    contact from a town when initiating discussions
13    concerning a Chapter 61A assignment?
14         MS. FETOUH: Objection.
15 A  I would be interested in talking to the Board of
16    Selectmen.
17 Q  But you don't know in this case whether you contacted
18    the Board of Selectmen?
19 A  I do not recall.
20 Q  Who else in the Town of Stow would you have contacted
21    in order to initiate discussions on a Chapter 61A
22    assignment?
23         MS. FETOUH: Objection.
24         MR. CONROY: Might he have contacted?
                        - 41 -



1       MR. McLAUGHLIN: Yeah.
2  A  Well, what I can say is, normally, in a 61A project, I
3       like to talk to people on the Conservation Commission.
4       I like to talk to people on the CPC and on the
5       Planning Board and other municipal committees. The
6       objective is to get a feel for the possibility of the
7       project by talking to as many people as possible, and
8       because TPL has many projects going in every year,
9       there are hundreds of these meetings that occur, have
10      occurred, since 2002.
11  Q  You described having seventy-five or a hundred
12      meetings with the town officials from the initiation
13      of the possibility of an assignment of the Chapter 61A
14      exercise of right of first refusal to --
15  A  I'd like to clarify that. I'd say discussions,
16      probably not meetings but discussions.
17  Q  Okay. The span of time from the initiation, perhaps
18      sometime before January 13, 2003, to the end of the
19      hundredth meeting was approximately what date?
20      MS. FETOUH: Objection.
21  A  Well, I'm not saying there were a hundred meetings. I
22      said I've had between seventy-five and a hundred
23      discussions.
24  Q  Okay.

- 42 -

1  A  And that's a ball-park. So, your question is?
2  Q  Well, over what span of time did you have these
3       discussions and/or meetings, beginning with --
4  A  The course of the whole project.
5  Q  At some point, is it fair to say you actively began
6       lobbying for the possibility of accepting an
7       assignment of the 61A right of first refusal to --
8       MR. CONROY: Objection.
9       MS. FETOUH: Objection.
10  A  Lobbying to whom?
11  Q  To the town.
12  A  It is fair that at some point it made sense to TPL
13      that, for the project to go forward, the way that
14      would occur is via an assignment of the right of first
15      refusal.
16  Q  And at some point did you begin any process of
17      convincing the town that that was the way the project
18      should go?
19  A  Well, I had a number of discussions, the place and
20      time of which I can't recall right now, with various
21      town officials about how to go forward, how to do
22      this, and we certainly talked about Chapter 61A among,
23      you know, a whole host of other issues.
24  Q  And when you would have these discussions, do you ever

- 43 -

1       recall discussions with a political body, such as the
2       entire Board of Selectmen?
3  A  Yes.
4  Q  And how often did you meet with the entire Board of
5       Selectmen?
6  A  I don't recall the frequency. I think it was a number
7       of times that I met with the whole board.
8  Q  Did you meet with them during official Board of
9       Selectmen hearings or privately?
10  A  I met with them during regularly scheduled meetings,
11      and I believe I had conversations with individual
12      members outside of those meetings.
13  Q  Do you know approximately when you met with the Board
14      of Selectmen in official meetings?
15  A  No.
16  Q  Can you tell me approximately when you did that?
17  A  Not with reference to a date. I mean, I believe that,
18      in order to accomplish the assignment, there were
19      meetings with the Board of Selectmen in advance of the
20      actual assignment. So, you know, in relation to other
21      events, I can remember it, but I don't have dates in
22      mind.
23  Q  Do you recall when the assignment took place?
24  A  I believe it was in 2003.

- 44 -

1       (WHEREUPON, Exhibit No. 5, Stow letter
2       with attachments to Kunelius, dated February 12,
3       2003, marked for identification.)
4  Q  I've put before you what has been marked as Exhibit 5
5       and ask you if you've seen that before.
6  A  Yes, I believe I have.
7  Q  Now, for the record, this is a compilation of
8       documents as received from the Town of Stow. So, they
9       were stapled together in this matter when we received
10      them and I've left them that way. The first page is
11      KUN474. It is a February 12th letter to Marilyn
12      Kunelius from the Board of Selectmen. The second one
13      is an assignment and acceptance, and that's 476,
14      signed by three members of the Board of Selectmen.
15      And the third page is an acceptance of assignment,
16      which is 478, and that is signed by Dorothy Nelson
17      Stuckey, regional counsel, Trust for Public Land.
18      Now, does this exhibit, number five, assist
19      you in getting a sense of when the assignment
20      took place?
21  A  It does.
22  Q  And the first page of Exhibit 5 is a notice from the
23      Town of Stow to Marilyn Kunelius that they are
24      assigning the right of first refusal to the Trust for

- 45 -

1       Public Land. Do you see that?
2  A  I do.
3  Q  And you've seen this before. Is that correct?
4  A  Yes.
5  Q  And this is copied to Dorothy Nelson Stuckey, Trust
6       for Public Land, on the cc: line. Is that correct?
7  A  Yes.
8  Q  And does she remain counsel for the Trust for Public
9       Land?
10  A  Yes.
11  Q  And that was on February 12th of 2003. Is that
12      correct?
13  A  Exhibit 5 is dated February 12th.
14  Q  And the last page of Exhibit 5 is an acceptance of the
15      assignment signed on February 12, 2003. Do you recall
16      that?
17  A  Do I recall the acceptance?
18  Q  I'm sorry. Am I correct there?
19  A  Well, I see the last page of Exhibit 5.
20  Q  Okay. Now, were you at any meeting of the Board of
21      Selectmen when they voted to assign the rights to TPL?
22  A  I believe I was.
23  Q  And do you recall what that meeting was?
24  A  No.

- 46 -

1  Q  Was Dorothy Stuckey with you at that meeting with the
2       Board of Selectmen when they voted to assign the right
3       of first refusal to you, to TPL?
4  A  Don't believe so.
5  Q  Well, I note that both are dated the same date,
6       February 12th. Do you see that?
7  A  Page 3 being -- or --
8  Q  Well, if we look at the date of the letter, first page
9       of Exhibit 5, February 12, 2003, and if you look at
10      the acceptance, it's dated the same day. Would that
11      suggest that she was with you at a meeting concerning
12      the acceptance?
13  A  Not necessarily.
14  Q  So, you don't remember whether she was even with you
15      at the meeting of the Board of Selectmen when the
16      assignment was made?
17      MS. FETOUH: Objection, asked and
18      answered.
19  A  My recollection is that she was not.
20  Q  And did you have the authority, at the time of the
21      vote to assign it to TPL, to accept on behalf of TPL
22      that assignment?
23  A  Are you asking whether, as Massachusetts state
24      director, I had the authority to do that?

- 47 -



1  Q  Yeah.
2  A  I don't know whether I had the authority to do it.
3     Let me clarify that. I believe the Trust for Public
4     Land had considered this and had voted to accept the
5     assignment and, by that vote, essentially authorize
6     Dorothy Stuckey to sign that acceptance.
7  Q  And was that a vote of the Board of Directors of TPL?
8  A  It was a vote of the Project Review Committee of the
9     Board of Directors.
10 Q  And is that of the national Board of Directors or is
11    there --
12 A  There is only one Board of Directors.
13 Q  So, the Project Review Committee voted to accept the
14    assignment?
15 A  Correct.
16 Q  And it's that vote that authorized Dorothy Stuckey to
17    accept on behalf of TPL?
18 A  Correct.
19 Q  And it is likely, therefore, that the vote occurred
20    prior to her accepting the assignment? Is that
21    correct?
22 A  It is likely.
23 Q  I'm going to put before you another document. Do you
24    have a sense, prior to doing that, when they voted?

- 48 -

1     Would they have voted a week before, a day before?
2  A  I do not know.
3        (WHEREUPON, Exhibit No. 6, MacDonnell
4     letter to Perry, dated February 11, 2003, marked
5     for identification.)
6  Q  I've put before you a document that we received from
7     the Town of Stow. This has been marked as Exhibit 6.
8     It's a February 11, 2003, letter to Ross Perry from
9     Craig MacDonnell, Massachusetts state director. Do
10    you recognize this?
11 A  I do.
12 Q  Is that your signature?
13 A  Yes.
14 Q  Now, this is dated the day before the vote to assign
15    to TPL, is that correct?
16       MS. FETOUH: Objection.
17 A  It's dated February 11th.
18 Q  And this is the day before Dorothy Stuckey accepted
19    the assignment, correct?
20       MR. CONROY: Objection.
21 A  The day before the 12th, which is the date next to
22    Dorothy's signature on Exhibit 5.
23 Q  So, it's the day before she accepted the assignment.
24    Is that fair to say?

- 49 -

1        MR. CONROY: Objection.
2        MS. FETOUH: Objection.
3  A  Well, since I don't have a recollection independent of
4     these documents, what happened in what sequence, all I
5     can do is sort of agree with you that those two dates
6     are one after another.
7  Q  Looking at the first paragraph of Exhibit 6, well,
8     strike that.
9        Do you have a recollection of why you sent
10    this letter to Ross Perry?
11 A  I need to take a minute and read this. Okay. Your
12    question?
13 Q  Is it fair to say this was a letter from you
14    establishing what the terms were that would have to be
15    met by the town in order for TPL to accept the
16    assignment of the right of first refusal?
17 A  It was a proposal to that effect, yes.
18 Q  And did the town meet your proposal?
19 A  I believe they did.
20 Q  And that resulted in the assignment the next day. Is
21    that correct?
22       MS. FETOUH: Objection.
23 A  I believe it resulted in the assignment. I don't have
24    independent recollection of the date that it actually

- 50 -

1     occurred.
2        (WHEREUPON, Exhibit No. 7, Conditions
3     for right of first refusal, marked for
4     identification.)
5  Q  I am going to put before you the next document,
6     Exhibit 7. Do you recognize this document?
7  A  I don't.
8  Q  Do you recall this document -- well, let me suggest to
9     you that there are numerous copies of this document in
10    the Town's production which indicate that this is
11    something that was sent to you seeking answers to the
12    questions outlined, or the statements outlined, in two
13    pages.
14       MS. FETOUH: Objection.
15 Q  Does that in any way refresh your memory?
16 A  That by itself doesn't, no.
17 Q  This document appears -- it's an unsigned document
18    that has a signature line for Ross Perry. Do you see
19    that on the second page?
20 A  Yes.
21 Q  Do you recall Ross Perry discussing with you topic
22    number two on the front page of Exhibit 7? And for
23    the record, the second item on the first page is:
24    Town is held harmless if TPL backs out of deal before

- 51 -

1     closing. In other words, TPL will defend the town
2     against any suit resulting from the failure of the
3     property purchase to be completed. Alternatively, TPL
4     posts a bond that guarantees their performance.
5  A  I remember discussing this issue with the board as a
6     whole. I don't remember having an individual
7     discussion with Ross Perry about it.
8  Q  What do you remember about that discussion?
9  A  I remember the issue of indemnification coming up in
10    the Board of Selectmen's meeting.
11 Q  And what do you recall about the indemnification issue
12    at the Board of Selectmen meeting?
13       MR. CONROY: Hold on one minute. Go
14    ahead.
15 A  I remember it was discussed in the open meeting.
16       MR. CONROY: That having been asked and
17    answered, can I just have a minute with counsel?
18       MR. McLAUGHLIN: Sure.
19       (Brief recess held)
20       MR. McLAUGHLIN: Can you repeat the
21    question? I don't even remember what it was.
22       (Question and answer read back)
23 Q  Can you tell me what you remember about the
24    indemnification issue during the meeting at the Board

- 52 -

1     of Selectmen?
2  A  Yes.
3  Q  Go ahead.
4  A  I remember the issue was discussed. William Wrigley
5     raised the issue, asked if TPL would indemnify. I
6     told the board we would not.
7  Q  Is that your recollection?
8  A  Yes.
9  Q  Do you recall why they were asking for
10    indemnification?
11       MR. CONROY: Objection.
12       MS. FETOUH: Objection.
13       MR. McLAUGHLIN: Strike that.
14 Q  Do you recall whether they told you why they were
15    asking for the indemnification?
16 A  I don't.
17 Q  Do you recall whether they asked you whether TPL had
18    the money to make the purchase under the terms of the
19    right of first refusal?
20 A  I don't.
21 Q  Do you recall telling TPL, I'm sorry, do you recall
22    telling the Board of Selectmen that TPL did have the
23    money necessary to make the purchase?
24 A  No.

- 53 -



1 Q You do not recall telling them that. Do you know
2 whether TPL did have the money to make the purchase at
3 the time that you met with the Board of Selectmen on,
4 I presume, February 11th or 12th?
5 A I'm not sure I know what you mean by have the money.
6 Q Did you have the funds necessary to complete the
7 purchase?
8 A No, not in hand.
9 Q What was the source of the money that would allow TPL
10 to make the purchase under the terms of the right of
11 first refusal?
12 A I believe it was a combination of sources, including
13 the Town of Stow, a hoped for private sale of a part
14 of Mrs. Kunelius' property and private fund-raising.
15 Q Any state money?
16 A There was the hope for a grant.
17 Q Okay. Let's go back to Exhibit No. 6 for a moment.
18 On the first page of No. 6, there's a reference to
19 $100,000 for affordable housing and 300,000 for open
20 space. Is that correct?
21 A I see that.
22 Q And is that the amount that you were looking for when
23 you referred to the source of money from the Town of
24 Stow?

- 54 -

1 A Yes.
2 Q So, there's $400,000 there.
3 A Correct.
4 Q Did TPL ever receive any of that money?
5 A No.
6 Q The second reference you made was the hoped for
7 private sale. And I would ask you to look at the same
8 Exhibit 6, and it refers to deeds from private
9 parcels. Is that correct?
10 A I see those words.
11 Q And is that what you were referring to when you said
12 that a source of the money would be hoped for private
13 sales?
14 A Well, the intention was to subdivide Mrs. Kunelius'
15 land into three portions, one for the town and two
16 lots that would be sold privately, the two lots we
17 referred to as 142 and 144. So, the hope was to sell
18 those two lots, 142 and 144, on the private market and
19 raise funds for Mrs. Kunelius.
20 Q And raise funds. Where on Exhibit 6 does it discuss,
21 as a requirement of accepting the assignment, that
22 funds would have to be raised?
23 MS. FETOUH: Objection.
24 MR. CONROY: Objection.

- 55 -

1 A Well, the four hundred thousand are funds that would
2 need to be raised.
3 Q So, the $400,000 of funds we've already discussed in
4 the funds to be raised by the Town of Stow, I thought.
5 Am I incorrect there?
6 A No. No, you're correct.
7 Q And so then there's $400,000. And then you hoped for
8 funds from the private sale of one or two of the lots.
9 Am I correct there?
10 A Both lots, sale of both lots.
11 Q And does it say anywhere in Exhibit 6 how much money
12 that would be, would be derived from the sale of the
13 two lots?
14 A I don't believe so.
15 Q So, you didn't make, as a requirement of the
16 acceptance of the right of first refusal, a specific
17 dollar amount that would have to be derived from the
18 hoped for private sale, is that correct?
19 A In this letter, no.
20 Q And between the date of this letter, January 11th, and
21 the acceptance --
22 MS. FETOUH: February 11th?
23 Q I'm sorry, February 11, 2003, and the acceptance on
24 February 12, 2003, in which Dorothy Stuckey on behalf

- 56 -

1 of TPL accepted the assignment, are you aware of any
2 other document that would have outlined additional
3 requirements of TPL necessary for TPL to accept the
4 assignment?
5 A As I sit here this morning, no.
6 Q Now, the private funding, let's get back to the
7 private funding that you referred to, private funding,
8 private fund-raising. Where does your letter of
9 February 11th, Exhibit 6, refer to that private fund-
10 raising?
11 MR. CONROY: Objection.
12 MS. FETOUH: Objection.
13 A I don't believe it does.
14 Q And are you aware of any other document between
15 February 11th and February 12th of 2003 that
16 established, as a condition for the acceptance of the
17 assignment, that private fund-raising would be a
18 necessary component of the acceptance?
19 A As I sit here this morning, no.
20 Q Looking at the last page of Exhibit 6, there's a
21 paragraph that states: Under these circumstances, TPL
22 will entertain acceptance of the ROFR. All in
23 caps. Right of first refusal is what that means.
24 Is that correct?

- 57 -

1 A Yes.
2 Q Upon acceptance, TPL, quote, steps into the shoes,
3 unquote, of the buyer and is bound by the applicable
4 terms of the contract. Have I read that correctly?
5 A You have.
6 Q What did you mean by applicable terms?
7 A I meant the terms that the common law would require
8 TPL to meet.
9 Q And what do you mean by common law? What terms would
10 the common law require?
11 MR. CONROY: Objection.
12 A I mean decisions of the Massachusetts courts under
13 Chapter 61A.
14 Q And in fact, at that point, did you not have an
15 understanding that there were no decisions concerning
16 what terms would necessarily be applicable and what
17 terms would not?
18 MS. FETOUH: Objection.
19 MR. CONROY: Objection.
20 A My understanding was that courts would apply some
21 terms and not other terms.
22 Q And did you have an understanding of what those terms
23 were that would be applicable and what terms would not
24 be applicable?

- 58 -

1 A My understanding was that the terms that would
2 naturally make sense for an assignee to abide by would
3 apply.
4 Q So, in your mind, when you wrote Exhibit 6, you had an
5 understanding that some of the terms of the contract
6 were applicable to the assignment and some were not.
7 Is that correct?
8 A Basically.
9 Q Do you recall being asked by the Town of Stow to
10 identify what terms you thought were applicable and
11 what terms you did not think were applicable?
12 A No.
13 MR. CONROY: Somewhere in here, Mike,
14 I'd like to take a five-minute break if we could.
15 MR. McLAUGHLIN: Sure. That would be
16 good. It's now 11:30. We'll take a break; 531
17 for the ladies room, is the code, and then why
18 don't we go, say, to 12:30. There's a cafeteria
19 downstairs that's not bad. Oh, you know that.
20 MR. CONROY: So I hear.
21 MR. McLAUGHLIN: Cafeteria downstairs
22 is not bad, and we can take like a half hour if
23 that's all right.
24 (Recess, 11:30 A.M.)

- 59 -

| | |
|---|---|
| 1       (After recess, 11:44 A.M.)<br>2       THE WITNESS: Are we still on Exhibit 6<br>3   here?<br>4       MR. McLAUGHLIN: We're still on<br>5   Exhibit 6, yeah.<br>6       THE WITNESS: All right.<br>7 Q   Just so I understand, when you refer to the language<br>8     on Exhibit 6, on the last page, where it says, "Upon<br>9     acceptance, TPL steps into the shoes of the buyer and<br>10    is bound by the applicable terms of the contract,"<br>11    have I understood you correctly that you believed that<br>12    there were terms that you did not have to abide with<br>13    in the contract, or comply with in the contract, when<br>14    you wrote this letter?<br>15 A   By that sentence, I meant to convey my general<br>16     understanding about an assignee's obligation under<br>17     Chapter 61. As a general matter, I can only have in my<br>18     mind at that time a particular term, if that's what<br>19     you're asking, that would not apply.<br>20 Q   Okay.<br>21 A   But while we're on that sentence, I'd like to clarify<br>22     something I said earlier about this letter not<br>23     referencing any other financing that was required.<br>24       The next sentence in that paragraph, where I<br>- 60 - | 1 Q   As an attorney, you have some understanding of<br>2    Chapter 61.<br>3       MR. CONROY: Excuse me. I will just<br>4    not repeat that.<br>5       MR. McLAUGHLIN: No, I understand.<br>6       MR. CONROY: But throughout the<br>7    deposition, I have that standing objection, okay?<br>8       MR. McLAUGHLIN: Yes.<br>9       MR. CONROY: Is that acceptable?<br>10      MR. McLAUGHLIN: That's acceptable.<br>11 Q   Can you tell me, based upon your understanding of the<br>12    fact that, under Chapter 61, there are terms of a<br>13    contract that apply and terms of a contract that don't<br>14    apply, please tell me what terms apply.<br>15      MS. FETOUH: Objection.<br>16 A   Because I don't have this contract in my mind as we're<br>17     talking about it, I can only tell you that sort of as<br>18     an example of a kind of a term that I don't think<br>19     would apply, a Chapter 61A contract that imagines a<br>20     full-scale development process whereby the purchaser<br>21     gets permits. Those kinds of provisions would sort of<br>22     be inapposite for an assignee to comply with under<br>23     Chapter 61.<br>24 Q   And so, for example, under the terms of the contract<br>- 63 - |
| 1     wrote, "TPL is ready to work hard to assemble the<br>2     finances required to make the seller whole," by<br>3     that sentence, I meant that there was a lot of<br>4     work to do to bring the finances to the table,<br>5     including town money, private sale money and<br>6     private fund-raising.<br>7 Q   So, the reader of the sentence that you just read, TPL<br>8     is ready to work hard to assemble the finances<br>9     required to make the seller whole, the reader of that<br>10    would have to know that it involved some private fund-<br>11    raising as well. Is that your testimony?<br>12      MS. FETOUH: Objection.<br>13      MR. CONROY: Objection.<br>14 A   Not really. I'm just trying to tell you what I meant<br>15     by that so I could answer your earlier question more<br>16     completely. It's that sentence that is sort of the<br>17     textual reference to some of the things that we talked<br>18     about between TPL and the town in the meetings that<br>19     we've referred to.<br>20 Q   So, on February 11th, the day before the acceptance of<br>21    the right of first refusal by TPL, is your<br>22    testimony that you did not have specific terms of the<br>23    contract which you believed would allow you to not<br>24    perform under the contract?<br>- 61 - | 1     in question, which anticipated a 40B development, you<br>2     did not feel compelled to put up a 40B development as<br>3     the assignee of the right of first refusal. Is that<br>4     fair to say?<br>5 A   For example.<br>6 Q   Yeah, okay. Do you recall ever meeting with the Town<br>7     of Stow Community Preservation Committee?<br>8 A   Yes.<br>9 Q   I'm going to put before you what will be marked as<br>10    Exhibit 8.<br>11      (WHEREUPON, Exhibit No. 8, minutes of<br>12    Stow CPC meeting, February 10, 2003, marked for<br>13    identification.)<br>14 Q   And these are provided to us from the Town of Stow. 1<br>15     note that they are doubled. They're printed on both<br>16     sides. I'm going to just have you look at one small<br>17     part of this document, and it's on the second page,<br>18     which is marked as 039, and it's a -- by the way, this<br>19     document is called Minutes of Meeting of February 10,<br>20     2003, and it says a committee member asked what<br>21     happens if CPC votes in favor and gets voted down at<br>22     the town meeting. TPL responded that they would be<br>23     under contract at that point and would have to make it<br>24     work. Do you recall whether the person that said that<br>- 64 - |
| 1      MS. FETOUH: Objection.<br>2      MR. CONROY: Objection.<br>3 A   No, what I said was a little different than that.<br>4     What I meant to say was that, by using that sentence,<br>5     I was saying that, under Chapter 61, there are terms<br>6     of a contract that apply to an assignee and that,<br>7     depending on the circumstances, there are others that<br>8     don't apply.<br>9 Q   So, based on the fact that you're an attorney and you<br>10    profess to know Chapter 61, can you tell me what terms<br>11    you think apply?<br>12      MS. FETOUH: Objection.<br>13      MR. CONROY: Objection. Let me say,<br>14    Mike, if I may, for the record, I have some<br>15    concern about Mr. MacDonnell being asked to<br>16    testify, effectively, as an expert, as a legal<br>17    expert. I think it's fair game to ask him what<br>18    was in his mind when he did what he did and how<br>19    that may have influenced him, but for him to be<br>20    asked to testify in general as to the meaning of<br>21    the law, I think is inappropriate. So, I object<br>22    on that basis.<br>23      MR. McLAUGHLIN: Okay. But I'm not<br>24    going to change the question.<br>- 62 - | 1     for TPL was you?<br>2      MR. CONROY: Objection.<br>3      MS. FETOUH: Objection.<br>4 A   I recall discussing this issue at a meeting of CPC. I<br>5     don't know whether it was on February 10th.<br>6 Q   February 10th would have been two days before the<br>7     assignment. Does that in any way refresh your<br>8     recollection?<br>9 A   It would make sense.<br>10 Q   And it would make sense that you were the person at<br>11    that point that would have been attending the<br>12    Community Preservation Committee meeting.<br>13 A   Yes.<br>14 Q   Given that, what did you mean when you said that TPL<br>15    would be under contract at that point and would have<br>16    to make it work?<br>17 A   I don't know if I've testified that I actually said<br>18     that. I remember discussing it.<br>19 Q   Do you have reason to believe that the minutes of the<br>20    meeting of February 10th of the Preservation Committee<br>21    are inaccurate with regard to this paragraph that I've<br>22    just read?<br>23 A   I have no reason to think they are accurate or<br>24    inaccurate.<br>- 65 - |



1 Q  Well, you have no reason to believe that it's accurate
2    or inaccurate?
3 A  I don't know anything about this document. I've seen
4    it here this morning for the first time. So, I don't
5    know anything about it.
6 Q  Well, let's go back. The document, Exhibit 8,
7    purports to be minutes of a meeting of February 10th.
8    Do you see that?
9 A  I do.
10 Q  And it's your testimony that you likely attended that
11    meeting since it was two days before the assignment.
12 A  Yes.
13 Q  And so is your testimony that you have no comment as
14    to the accuracy of the statement that TPL responded
15    that they would be under contract at that point and
16    would have to make it work? You have no comment as to
17    whether that is inaccurate or accurate?
18 A  I just don't have a recollection of saying that,
19    that's all.
20 Q  Do you remember being asked the question?
21 A  I don't remember being asked the question.
22 Q  Do you remember questions concerning what happens if
23    the town meeting votes down this project?
24 A  I don't.

- 66 -

1 Q  Did in fact the town vote down the project?
2 A  No.
3 Q  Did the town have a vote to buy the project?
4 A  Yes.
5 Q  And it passed?
6 A  Correct.
7 Q  Is it fair to say, sir, that you were involved
8    extensively in the drafting of a warrant for the town
9    for a town meeting?
10 A  I remember participating in the drafting of a warrant
11    article in Stow.
12 Q  And is it fair to say that that warrant involved the
13    town purchasing the Kunelius property?
14 A  Yes.
15 Q  And is it fair to say that the town voted and they
16    voted down the purchase?
17 A  My memory is they voted to approve that.
18 Q  Let's go back to Exhibit 6 for a second. Looking at
19    Exhibit 6, which is right here, did you ever tell
20    anyone that if you didn't get the town financial
21    commitment of $400,000 that it didn't matter? You
22    were going to buy the property anyhow under the
23    assignment of right of first refusal.
24 A  I don't remember that.

- 67 -

1 Q  Is it likely that you would have said that?
2      MR. CONROY: Objection.
3 A  I don't know how to answer the is-it-likely question.
4 Q  Was the $400,000 that is referred to in Exhibit 6 a
5    requirement of TPL's acceptance of the assignment?
6      MS. FETOUH: Objection.
7 A  No.
8 Q  So, if you didn't get the $400,000, you were still
9    going to accept the assignment. Is that correct?
10 A  Well, I believe the vote to authorize the expenditure
11    post-dated the assignment. So, the decision whether
12    to accept the assignment would occur before that would
13    happen.
14 Q  Is it also true that if you didn't get the, quote,
15    hoped for sale of the two parcels that that was not
16    critical in whether or not you would accept the
17    assignment?
18      MS. FETOUH: Objection.
19      MR. CONROY: Objection.
20 A  Well, likewise, the proposed sale of 142 and 144 Red
21    Acre Road were going to post-date the assignment, so
22    we would not have known then whether in fact those
23    parcels would have sold. It would be later in time.
24 Q  Did you tell the Community Preservation Commission

- 68 -

1    that it didn't matter whether you got the four hundred
2    thousand from the town or whether you sold off
3    portions of the property; you would still purchase the
4    property?
5 A  I don't recall.
6 Q  Do you recall telling that to anyone?
7 A  It not mattering --
8 Q  Yeah.
9 A  -- is your question? I don't recall using that --
10 Q  Did it matter? In other words, if the money wasn't
11    given to TPL from the town, $400,000, and if you
12    couldn't sell the two lots, did you tell anyone that
13    it didn't matter because TPL would purchase the
14    property and pay the full asking price?
15 A  That's what I don't recall. I don't recall using that
16    language.
17 Q  My question to you is: is that a fact that it didn't
18    matter to TPL, that they were going to purchase it
19    anyhow?
20 A  It was our complete and absolute intention to do this
21    project and conserve this property and buy this
22    property from Marilyn Kunelius. It's our business to
23    do this. The reason I changed careers was to be
24    involved in the environmental field. This is why I

- 69 -

1    work at TPL. This is why we do this stuff. We fully
2    intended -- from the very second we looked at this
3    project, we would never have accepted the assignment
4    unless we fully intended to do this.
5 Q  So, the answer --
6 A  Yes, the answer is we fully intended to buy this
7    property.
8 Q  And what was your source of funds in the absence of
9    the $400,000 and the absence of the sale of parcels
10    and in the absence of fund-raising? What would be the
11    source of the funds that you would purchase the
12    property with?
13      MR. CONROY: Objection.
14      MS. FETOUH: Objection.
15 A  We did not contemplate being able to do this project
16    without finding adequate financial sources external to
17    TPL to complete it.
18 Q  You never considered that?
19 A  What we considered was, as we consider in all our
20    projects, is advocating as hard as we can for public
21    money, if necessary for private sale money, and if
22    necessary for private fund-raising money, and working
23    as hard as we can to put that money together as we
24    have in every one of our 61 projects in Massachusetts,

- 70 -

1    and so we fully intended that the sources we had
2    identified would come together and that we would be
3    able to purchase this property.
4 Q  And did you consider what your obligations would be to
5    Marilyn Kunelius if those sources did not pan out?
6      MS. FETOUH: Objection.
7 A  Yes.
8 Q  And how did you consider dealing with that
9    possibility?
10 A  We looked at the contract.
11 Q  You didn't consider any other assets or sources of
12    funds, other than the three that we've already
13    discussed, the money from the Town of Stow, sale of
14    the private lots and fund-raising?
15 A  The obligation that TPL had was measured by the
16    contract. So, it's natural for us to look at the
17    contract to figure out what the scope of the
18    obligation was, which is what we did.
19 Q  So, you looked at the contract. And is it fair to say
20    you determined that, if we don't get the money from
21    the Town of Stow and if we don't get the private sale
22    from the two lots and we don't get fund-raising, then
23    we'll claim that we don't have to purchase the
24    property because of the liquidated damage clause? Is

- 71 -

1    that correct?
2        MS. FETOUH: Objection.
3 A  We read the liquidated damages clause and believed it
4    would apply in this case and -- well, I'll leave it at
5    that.
6 Q  And you made that determination prior to the
7    acceptance of the assignment. Is that correct?
8 A  Correct.
9 Q  And that was because just the normal prudence would
10   suggest that you would have to have some contingency
11   for the possibility that you wouldn't have the town
12   financing, you wouldn't have the sale of the lots, and
13   you wouldn't have money from fund-raising. Your
14   normal procedure, due diligence and prudence, would
15   suggest that you would have to have some way to deal
16   with that, correct?
17      MR. CONROY: Objection.
18      MS. FETOUH: Objection.
19 A It's true that, when we scope a project, we look at
20   our legal obligations and make decisions in accordance
21   with them, absolutely.
22 Q And did you ever tell the Town of Stow prior to the
23   acceptance of the assignment, the right of first
24   refusal, that if you failed to accomplish obtaining
            - 72 -

1    money from the Town of Stow or from obtaining the
2    deeds or from fund-raising or selling property from
3    the deeds, that you would rely on the liquidated
4    damage clause and not purchase the property?
5 A  Did I tell the Town of Stow?
6 Q  Yes.
7 A  About our analysis of the --
8 Q  Yes.
9 A  At some point, yes.
10 Q Prior to the time that you accepted the assignment,
11   did you tell them?
12 A I don't remember when I had that discussion.
13 Q Is there anything in Exhibit 6 that outlines,
14   specifically, that you intended to rely on the
15   liquidated damage clause if necessary?
16      MR. CONROY: Objection.
17 A Well, not explicitly. The sentence where I say that
18   we are bound by the applicable terms of the contract
19   is a summary, really, of normal Chapter 61 legal
20   analysis, which includes all of those terms.
21 Q Do you recall telling any public officials from the
22   Town of Stow that TPL had never failed at any time to
23   honor an assignment of a right of first refusal?
24 A Yes, I believe I did say that.
            - 73 -

1 Q  And, in fact, do you remember telling public officials
2    of the Town of Stow that they had nothing to worry
3    about regarding indemnification because TPL, having
4    never failed, would find a way to purchase the
5    property to make Mrs. Kunelius whole?
6 A  I remember discussing this issue with the town. I
7    don't recall the language I used.
8 Q  But you do recall that you told the town that TPL had
9    never failed in the past to honor an assignment of a
10   right of first refusal.
11 A I do remember that, and I believe we honored it here.
12 Q So, I don't want to belabor a point, but I'm a little
13   confused. On one hand I thought you said that you had
14   every intention of going forward and purchasing the
15   property even if the three items outlined in your
16   letter of February 11th, Exhibit 6, were not achieved.
17      MR. CONROY: Objection.
18 Q And on the other hand you say that if you did not
19   achieve the three items on Exhibit 6, i.e., the money
20   from the town, the sale of private lots, the two
21   private lots, and fund-raising, that you would look to
22   the liquidated damage clause. So, which is it?
23      MR. CONROY: Objection.
24      MS. FETOUH: Objection.
            - 74 -

1      MS. ECKER: Objection.
2 Q  Was the intention to go forward even if you didn't
3    have the three requirements that are outlined on
4    Exhibit 6, or was it your intention to rely on the
5    liquidated damage clause?
6      MR. CONROY: Objection.
7      MS. FETOUH: Objection.
8 A  It was our intention at the beginning and throughout
9    most of this project to close no matter what because
10   that's the way TPL does its business, believing fully
11   that it would be possible to do so. It became
12   apparent at some point, despite all of our good
13   efforts, that the public and private money was not
14   going to make it to the table, and it was only after
15   realizing that there was, what TPL concluded was, an
16   unbridgeable cap between the money that was available
17   and the money that was needed that it became
18   impossible to go forward.
19      (WHEREUPON, Exhibit No. 9, printout of
20   TPL Web site, marked for identification.)
21 Q I'm going to put before you a document, Exhibit 9, and
22   ask you to take a look at it. This is a printout of
23   the TPL Web site. It was printed out on 3-23, 2005.
24   I'm going to ask you to look at the second page under
            - 75 -

1    Buying Time, which is about two-thirds of the way
2    down. It says: Timing is critical in today's real
3    estate markets, but public agencies may not have the
4    capacity or budget to move quickly to acquire land
5    when it becomes unavailable. Using our private
6    capital, TPL can bridge the gap to secure and hold
7    vital lands under the public acquisition process until
8    the public acquisition can gear up. Now, have I read
9    that correctly?
10 A The word available, I think you said unavailable, but
11   otherwise --
12 Q I'm sorry, becomes available. I apologize. But other
13   than that, have I read it correctly?
14 A I believe so.
15 Q Now, in your last answer, you talked about the fact
16   that you could not bridge the gap in the Kunelius
17   property, and my question is, for you: what are you
18   referring to when you say our private capital?
19      MR. CONROY: Objection.
20 Q Using our private capital, TPL can bridge the gap.
21   What is the private capital?
22      MS. FETOUH: Objection.
23 A Well, it's not what I mean, because it's really not my
24   creation.
            - 76 -

1 Q  I understand.
2 A  So, you're asking me what I believe TPL means?
3 Q  Yes.
4 A  Private capital is a generic term to describe lines of
5    credit and borrowed funds. Really, it's borrowed
6    funds to bridge gaps in conservation projects where
7    timing is a problem.
8 Q  And so the term private capital from your point of
9    view is money that is borrowed by TPL?
10 A Yes.
11 Q That's private capital?
12 A Yes.
13 Q Is that definition of private capital your definition,
14   or do you think it has some greater understanding in
15   the public, that the term private capital means
16   borrowed funds?
17      MS. FETOUH: Objection.
18      MR. CONROY: Objection.
19 A I can only say what I believe it means here.
20 Q Do you know Rob Glassman?
21 A No.
22 Q You've heard of Rob Glassman?
23 A I may have, but I don't recall.
24 Q Robert Glassman?
            - 77 -

1  A  I don't believe I know Robert Glassman.
2  Q  What was the point where TPL determined that it could
3     not bridge the gap?
4  A  It wasn't so much a point in time if you're using the
5     phrase bridge the gap to mean is it possible to do the
6     deal, or are you using it to mean borrow money? I'm
7     not quite sure.
8  Q  I'm using it however you meant to use it when you said
9     the answer to one of the questions was that TPL made a
10    determination. These are not the exact terms, but you
11    said made a determination that they could not bridge
12    the gap to acquire the property, something to that
13    effect. So, using it however you meant to use it, my
14    question is: at what point did you determine that you
15    could not bridge the gap?
16 A  Well, what I can tell you is that there was a gradual
17    dawning that this project had lots of problems
18    associated with it. So, there was no exact point in
19    time when we can say that's when we knew. It was a
20    very gradual awareness that dawned on TPL that this
21    project was troubled.
22 Q  Now, in considering the term bridging the gap, if we
23    consider the gap on one side is the purchase price and
24    on the other side is the buyer, and if TPL is the

- 78 -

1     buyer, can you identify for me specific TPL funds, not
2     borrowed funds, not state funds, not town funds, but
3     TPL funds, which were identified and earmarked for the
4     purchase of the Kunelius property?
5  A  Can I identify those funds?
6  Q  Yes.
7  A  No.
8  Q  Were there any TPL funds ever specifically earmarked
9     for the purchase of the property?
10 A  I don't believe so.
11       (WHEREUPON, Exhibit No. 10, Stow
12    Finance Committee minutes, January 7, 2003,
13    marked for identification.)
14 Q  So, from your point of view, TPL itself never had one
15    dollar of the purchase price at risk with regard to
16    this project. Is that correct?
17       MS. FETOUH: Objection.
18       MR. CONROY: Objection.
19 A  I don't think that's my testimony. No, I wouldn't say
20    that.
21 Q  What were the funds that TPL, of the purchase price,
22    now, what funds which were to make up the purchase
23    price were actually TPL's own monies?
24       MR. CONROY: Objection.

- 79 -

1  A  There were deposits made against the contract, the
2     amount of which I'm not quite certain of, but those
3     were TPL dollars.
4  Q  Well, in fact, weren't those dollars that were donated
5     to TPL from the Friends of Red Acre?
6  A  Some of them, I believe, were.
7  Q  Weren't all of them, sir?
8  A  I don't recall.
9  Q  Is it likely that they were? Do you have any
10    recollection?
11       MR. CONROY: Objection.
12       MS. FETOUH: Objection.
13 A  My recollection is that we did ask for a donation from
14    the Friends of Red Acre for some money up front. What
15    I can't remember is how much.
16 Q  So, you don't remember how much of the earnest money
17    that was paid to Mrs. Kunelius was actually TPL funds
18    and how much had been raised by TPL through the
19    Friends of Red Acre. That's your testimony, correct?
20       MS. FETOUH: Objection.
21 A  What I don't remember is how much, how many of the
22    dollars that were deposited with Mrs. Kunelius were
23    TPL dollars and how many were Friends of Red Acre
24    dollars.

- 80 -

1  Q  And as you sit here today, you cannot say with any
2     certainty that any of those monies that were -- you
3     used the word deposited. I used the word earnest
4     money. You cannot say with any certainty that any of
5     those dollars were TPL dollars. Isn't that fair to
6     say?
7  A  I do not know where they came from.
8  Q  Now, if we look at the document --
9  A  Well, let me -- I'd like to clarify that. That's all
10    right. I'll leave it at that.
11 Q  Let's look at Exhibit 10, which is before you, and
12    this is also from the Town of Stow. It's Finance
13    Committee meeting minutes, January 7, 2003, town
14    building draft. It appears to be: Fincom joins the
15    Board of Selectmen in a joint meeting at 7:15. It
16    begins -- I'm going to read just a couple of
17    sentences.
18       Craig MacDonnell from TPL and David Cobb
19    from the Friends of Red Acre are present. The
20    Trust for Public Land is a national non-profit
21    organization that helps communities achieve
22    effective use in conservation land planning.
23    TPL, responding to the Stow Conservation Trust
24    and Friends of Red Acre, proposes that Stow

- 81 -

1     exercise the right of first refusal at the
2     Kunelius land. TPL would like to bear 50 percent
3     of the 1.2 million dollar cost of the land. Do
4     you see that?
5  A  I do.
6  Q  Now, were you present at that meeting?
7  A  As with respect to the other minutes --
8  Q  Well, this is a joint meeting, so it's Fincom and the
9     Board of Selectmen. And so the question --
10 A  My name is listed as being there. I have to say to
11    you, just in being honest, I don't, as I sit here this
12    morning, have an independent recollection of being at
13    this meeting.
14 Q  Do you recall telling them that TPL would bear 50
15    percent of the cost of 1.2 million dollars?
16 A  No.
17 Q  Do you have any reason to believe that these minutes
18    are inaccurate with regard to that statement?
19       MR. CONROY: Objection.
20       MS. FETOUH: Objection.
21 A  Yes, I do.
22 Q  And in what regard are they inaccurate?
23 A  I would not have said, I do not believe, that we would
24    bear 50 percent of the cost. That was not the project

- 82 -

1     structure that we were considering. So, I have to
2     assume that these minutes are inaccurate and just
3     not -- it doesn't jive with what was going on.
4  Q  And that's because you never told anyone you'd pay 50
5     percent of the costs for the acquisition. Is that
6     fair to say?
7  A  It is fair to say.
8  Q  So, going further down, there is a sentence about one-
9     third down that says: TPL would buy the property and
10    would actually own it. And on the left-hand side,
11    there's a word, household, would be in the amount of
12    17.50 for ten years, and it picks up right there, just
13    about halfway down. TPL would buy the land and
14    actually own it.
15 A  I see that.
16 Q  So, what was TPL intending to use as a source of
17    income based on -- well, strike that.
18       Do you have reason to believe that this
19    statement is inaccurate as well, that is, TPL
20    would buy the property and actually own it?
21 A  It would be consistent with the project design for TPL
22    to buy the property in September, I think it was, of
23    that year, subdivide it and then convey out the
24    pieces.

- 83 -



1 Q Now, at the time, in January of 2003, you had not
2    identified a specific amount of money necessary from
3    the town in order to accept an assignment. Is that
4    correct?
5 A Well, I think there was a discussion about four
6    hundred thousand.
7 Q And that discussion, you expect, was prior to
8    January 7, 2003?
9 A I would say that it is, in part, having my
10   recollection refreshed by the reference to four
11   hundred thousand in this paragraph.
12 Q The purchase was approximately 1.2. That's fair to
13   say, right?
14 A It was a little under that.
15 Q A little under. Four hundred thousand dollars
16   subtracted from the 1.2 would leave $800,000,
17   approximately, correct?
18 A Approximately.
19 Q And you expected to make some money from the sale of
20   the two lots. Did you have any expectation of what
21   that would be on or about January 7th of 2003?
22 A Is your question how much TPL thought we would sell
23   142 and 144 for?
24 Q Yes.

- 84 -

1 A And if we knew that at this moment in time?
2 Q Yes.
3 A I have a recollection of what, ultimately, we expected
4    to sell those for, but I can't say whether at this
5    moment in time I knew or I had that number in my mind.
6 Q What is your recollection of what it ultimately would
7    sell for?
8 A Well, there's two pieces. I think the hope was that
9    142 would sell for between two and three hundred and
10   that 144 would sell for more. How much, I can't
11   remember right now.
12 Q So, if we have 300,000 and 700,000, I'm sorry, 300,000
13   and 400,000, meaning 300,000 from one sale, 400,000
14   from the town, and another 300,000 from the second
15   lot, approximately, how did you anticipate making up
16   the difference at that point?
17     MS. FETOUH: Objection.
18 A Well, I think there were other project costs as well.
19   I mean, some of these properties needed to have
20   renovation before they could be sold. So, I don't
21   know what sum we were trying to achieve, but there was
22   an intention to raise money privately.
23 Q Have you ever read the complaint?
24     MS. FETOUH: Objection. In this

- 85 -

1    matter?
2     MR. McLAUGHLIN: No, the complaint in
3    the matter has nothing to do with this.
4     MR. CONROY: That's not necessary.
5     MR. McLAUGHLIN: All right. Well, I
6    mean, neither is the question. If you are asking
7    that question, Madam, tell me what other
8    complaint you could possibly be considering.
9     MR. CONROY: Let's move on.
10    MS. FETOUH: My objection has been
11   noted.
12 Q All right. Have you ever read the complaint in this
13   matter?
14 A I have skimmed through it.
15 Q And did you read your answer in this matter prior to
16   it being filed with the court?
17 A Yes.
18 Q Did you check it to make sure it was truthful and
19   accurate?
20 A I believe I did.
21 Q Do you recall having a telephone discussion with
22   Marilyn Kunelius after TPL accepted the assignment?
23 A I remember trying to reach Mrs. Kunelius, and I also
24   remember trying to reach her attorney then, Peter

- 86 -

1    Kachajian. I remember having difficulty reaching both
2    of them, but I believe I recall talking to one or both
3    of them at some point during that time.
4 Q Do you recall talking to Mrs. Kunelius before the
5    assignment?
6 A I don't remember when I first talked to Mrs. Kunelius.
7 Q I'm going to just quickly read something from the
8    complaint. This is Paragraph 20 of the complaint.
9       Shortly after TPL notified Kunelius of the
10   assumption of Stow's exercise of right of first
11   refusal, Kunelius and her counsel met with
12   MacDonnell. During that meeting, Kunelius
13   informed MacDonnell that the property was the
14   sole asset of Kunelius, that she was a single
15   woman supporting herself and the sole care-giver
16   to her 91-year-old mother -- should have been
17   father -- and that the sale of the property under
18   the terms of the P&S were critical to her
19   financial well-being and financial stability.
20   Kunelius informed MacDonnell that she was relying
21   on his representations that TPL would acquire the
22   property under the terms of the P&S. MacDonnell
23   acknowledged to Kunelius and her attorney that
24   the acquisition of the property by TPL was a

- 87 -

1    certainty.
2       Do you recall that discussion with
3    Mrs. Kunelius?
4     MR. CONROY: Objection.
5 A As I said a minute ago, I recall an early discussion,
6    but as I sit here this morning, I can't remember all
7    of the details of it.
8 Q Your answer to this was: MacDonnell admits that he
9    met with Kunelius and her attorney on several
10   occasions and was informed that Kunelius was a single
11   woman caring for her elderly father and that Kunelius
12   wanted to sell the property. Except as expressly
13   admitted, MacDonnell denies the allegations in
14   Paragraph 20 of the complaint.
15      As you sit here today, is it your testimony
16   that you have no recollection of telling
17   Mrs. Kunelius that the sale was a certainty?
18 A That is my testimony.
19 Q And is it your testimony you would never have told
20   Mrs. Kunelius that the sale was a certainty?
21     MR. CONROY: Objection.
22 A No, my testimony is that I don't recall using that
23   word.
24 Q Are you testifying that you did not use the word or

- 88 -

1    that you do not recall using the word?
2 A I have no recollection of that word being used in that
3    conversation.
4 Q So, is your testimony concerning the word certainty as
5    opposed to the concept that the sale would most
6    certainly occur?
7 A It is both. I do not believe that I used the word
8    certainty, as I sit here this morning, but I do not
9    recall using it or not using it.
10 Q So, as you sit here today, you cannot deny with any
11   certainty at all that you had a discussion with her in
12   which you told her that she did not have to worry
13   about this sale because it would occur.
14     MR. CONROY: Objection.
15     MS. FETOUH: Objection.
16     MS. ECKER: Objection.
17 A I believed it would occur. Whenever TPL goes into
18   these projects, it is our one hundred percent belief
19   and we are very confident that the deals go through,
20   and in every one of the other Chapter 61 cases that
21   TPL has worked on, it has gone through. So, I would
22   have had confidence that this one would go through.
23 Q In fact, you told her that every other TPL sale went
24   through. Do you recall telling her that?

- 89 -

1    MS. FETOUH: Objection.
2 A  I do not recall telling Mrs. Kunelius that. I
3    remember saying that to others through the course of
4    this project.
5 Q  Is it likely, therefore, that you may have also said
6    it to her?
7    MR. CONROY: Objection.
8    MS. FETOUH: Objection.
9 A  I can't use the word likely because I don't --
10 Q  Is it possible?
11 A  It is possible because I believed it would occur.
12 Q  Now, do you recall saying to Mrs. Kunelius during that
13    meeting that TPL already had all of the money
14    assembled necessary to make the purchase?
15 A  No, I don't remember that.
16 Q  Did TPL have the money already assembled to make the
17    purchase?
18 A  We had identified the money from the town, what we
19    thought we would get from the sale of the two lots and
20    the hoped for fund-raising. So, those were funds we
21    expected to bring to the table.
22 Q  Was it your intention to pay Mrs. Kunelius with the
23    funds from the sale of the two lots after you acquired
24    it, or were you going to pay her the full purchase

- 90 -

1    price when you acquired the property?
2    MR. CONROY: Objection.
3 A  I don't believe that had been determined.
4 Q  So, as you sit here today, you do not even know
5    whether TPL intended to provide Mrs. Kunelius with the
6    full purchase price on the date of the closing or
7    whether the full purchase price was dependent upon the
8    subsequent sale by TPL of the two lots. Is that fair
9    to say?
10 A  No, that's not what I'm saying. I'm saying something
11    different. I can clarify it if you'd like.
12 Q  I would.
13 A  I believe the contract had a mortgage provision. So,
14    when you ask the question whether or not TPL was going
15    to deliver the full amount, I don't believe it had
16    been decided whether or not it was appropriate to
17    utilize the mortgage provision or not.
18 Q  In other words, take back a mortgage from
19    Mrs. Kunelius.
20 A  To do whatever the contract said with respect to that.
21    MR. McLAUGHLIN: Okay. It's now a
22    little after 12:30, so we'll stop and pick it up
23    in a half hour or so.
24    MR. CONROY: Okay.

- 91 -

1    (Luncheon recess, 12:34 P.M.)
2    (After recess, 1:16 P.M.)
3    (All parties present)
4    MR. McLAUGHLIN: Just as a housekeeping
5    matter, in the room is Peter Kachajian who has
6    been co-counsel with me on this matter and
7    Mrs. Kunelius' attorney for many years and also
8    David Norris who is Mrs. Kunelius' husband, and
9    so counsel for Mr. MacDonnell has requested that
10    since they are both likely to be witnesses, that
11    when there is any discussion in which there's
12    testimony relating to something that they are
13    also going to testify to, that they leave the
14    room, and so is that acceptable to everybody?
15    MS. ECKER: Yes.
16    MS. FETOUH: Yes.
17    MR. McLAUGHLIN: So, I think I know
18    where you're going to testify, but if you think
19    so, then just get up and leave. Otherwise, I'll
20    ask you to leave when I think it is -- but don't
21    let me mistake that it is.
22    MR. KACHAJIAN: So, if I storm out, no
23    one will take it personally.
24    MR. McLAUGHLIN: That's correct.

- 92 -

1    MR. CONROY: Unless you let us know
2    that we're supposed to take that personally.
3    MR. KACHAJIAN: Oh, you'd know.
4    MR. CONROY: Okay.
5    By MR. McLAUGHLIN:
6 Q  Okay. Just going back to, I think, the last thing
7    that we were talking about, and you had mentioned,
8    sir, that there was the possibility of taking back a
9    mortgage, which was referred to in the purchase and
10    sale agreement. Do you remember that?
11 A  I do.
12 Q  So, as I understand it, that mortgage was
13    approximately $400,000 that Mrs. Kunelius was willing
14    to grant to Mosaic Commons in their purchase and sale
15    agreement. Is that right?
16 A  I don't remember the amount.
17 Q  Do you remember approximately what it was?
18 A  We could take a quick look at the contract. I don't
19    remember the amount.
20 Q  I'm going to represent to you that it was $400,000 or
21    thereabouts.
22 A  Okay.
23 Q  Assuming that to be a fact, and we will look at the
24    purchase and sale agreement shortly, that would mean

- 93 -

1    that out of the 1.116 million of the purchase price,
2    that approximately $800,000 was accounted for by way
3    of the mortgage that she was willing to give back and
4    the $400,000 that you were receiving from the Town of
5    Stow. Is that correct?
6 A  I'm not sure I understand your question. You're
7    saying that if you add up those --
8 Q  Yeah, at the time that you have to close under the
9    terms of the purchase and sale agreement, if you
10    assumed all of the obligations and rights of Mosaic
11    Commons, the purchase price would have been assembled
12    by way of $400,000 from the town and taking back a
13    mortgage note of $400,000 from Mrs. Kunelius, leaving
14    approximately $400,000 of additional cash that had to
15    be put in at the time of the closing to effectuate the
16    sale. Is that fair to say?
17 A  There's one wrinkle to that. There may be more than
18    one wrinkle. The town's vote was split in two parts,
19    a three hundred thousand dollar component for open
20    space and a one hundred thousand dollar component that
21    I believe was split into two fifty thousand dollar
22    pieces attached to the sales of the two structures as
23    affordability restrictions, and it was my memory that
24    the town was uninterested in contributing the one

- 94 -

1    hundred thousand affordability dollars until those
2    properties had been renovated and were sort of up to
3    snuff, if you will. So, that one hundred might come in
4    in sometime later.
5 Q  So, is it fair to say that between 700- and $800,000,
6    perhaps 700,000 if your understanding is correct,
7    would have been funds already accounted for in order
8    to effectuate the purchase of the Kunelius property,
9    leaving either 4- or $500,000, approximately, that
10    needed to be found in order to complete the purchase?
11 A  So, you would start with the three hundred open space
12    money?
13 Q  Yes.
14 A  And to that, what would you add?
15 Q  The four hundred thousand dollar mortgage that
16    Mrs. Kunelius agreed to to Mosaic
17    Commons, which you had said earlier you had
18    considered.
19 A  Considered.
20 Q  Yeah.
21 A  We had considered.
22 Q  Right.
23 A  Right.
24 Q  Okay. So, given that, that would be a total of

- 95 -

# DEPOSITION OF CRAIG MACDONNELL



1    $700,000 that would have been available at the time of
2    the closing, given the fact that 400,000 was a note,
3    and that TPL would have to come up with between 4- and
4    $500,000 of additional funds at the closing in order
5    to effectuate the sale.
6  A  If there was a way to take advantage of the mortgage,
7    but ultimately we concluded that there wasn't.
8  Q  And you concluded that there wasn't because, isn't it
9    fair to say, that TPL voted not to borrow the money
10   from Mrs. Kunelius?
11 A  The reason that the mortgage didn't seem to be helpful
12   for TPL is that it would have required that the
13   property be subject to a mortgage and that --
14 Q  Right. And -- go ahead.
15 A  I was going to say that it was the town's insistence
16   that, if they're going to spend their money, they're
17   going to get a property interest for it. The town
18   would be uninterested in getting the property interest
19   that they were teeing up, which is the 45 acres,
20   subject to a mortgage.
21 Q  So, it's fair to say that there was an independent
22   decision by TPL not to avail itself of the four
23   hundred thousand dollar mortgage that was part of the
24   purchase and sale agreement. Isn't that fair to say?
                              - 96 -

1            MS. FETOUH: Objection.
2  A  It didn't seem that it would work.
3  Q  So, you had testified earlier that, according to your
4    understanding of Chapter 61, there were certain
5    provisions that were applicable on an assignment under
6    Chapter 61 and certain provisions that were not. My
7    question now is relative to the purchase price itself,
8    which includes components such as mortgage provisions.
9            Is it your testimony today that, prior to
10   accepting the assignment, you had concluded that
11   you would not comply with the mortgage provision
12   because TPL didn't like the effect of that
13   mortgage provision?
14           MS. FETOUH: Objection.
15 A  I can't recall when, in the sequence of this long
16   project, the mortgage problem came up, so I just don't
17   have that recollection, but somewhere along the way
18   that issue was considered and it resulted in sort of
19   an awareness. It's not so much a decision, an
20   awareness that it just wasn't going to be helpful.
21 Q  But the term of the mortgage was clearly stated in the
22   purchase and sale agreement that was provided to you
23   and to the town at the time that the town considered
24   the exercise of the right of first refusal or the
                              - 97 -

1    assignment thereof. Is that fair to say?
2  A  Was the mortgage provision in the contract?
3  Q  Yeah.
4  A  Yes.
5  Q  So, it didn't come as a surprise to you or to the town
6    that, as a result of complying with the terms of the
7    contract, there would be a mortgage on the property
8    for some period of time until the final $400,000 was
9    paid off. Is that correct?
10           MS. FETOUH: Objection.
11 A  Not necessarily. I mean, I think part of TPL's
12   analysis was not so much to conclude ahead of time,
13   early in the game, whether or not the mortgage was
14   helpful or not helpful or something that we'd take
15   advantage of or not. It was just there.
16 Q  So, from your point of view, that term, that mortgage,
17   was an option available to you but not something that
18   you were required to do. Is that fair to say?
19           MS. FETOUH: Objection.
20 A  You know, I don't know whether using the term option
21   is the right way to describe it. I remember reading
22   the provision and sometime later figuring out that it
23   was problematic to use it and that we needed to
24   wrestle with that issue.
                              - 98 -

1  Q  Do you recall being told by Mrs. Kunelius --
2            MR. McLAUGHLIN: Could you step out?
3            MR. KACHAJIAN: Yes.
4            (Messrs. Kachajian and Norris exit the room.)
5  Q  Do you recall being told by Mrs. Kunelius or her
6    counsel that the mortgage provision remained available
7    to TPL after TPL accepted the assignment?
8  A  I don't remember that. I remember having a discussion
9    with somebody within Mrs. Kunelius' team about the
10   mortgage, but I don't recall exactly what we said.
11 Q  Do you recall, generally, that perhaps Mr. Kachajian
12   had a discussion with you concerning the fact that
13   Mrs. Kunelius remained open to the application of that
14   provision of the contract to TPL?
15 A  As I think I said, I don't remember that.
16 Q  So, you don't even remember Mr. Kachajian saying that?
17 A  I don't remember anybody expressing the availability
18   of a mortgage provision. I remember having a
19   discussion about the mortgage provision.
20 Q  At some point, the issue came up concerning looking
21   for additional funds from the state. Do you recall
22   that?
23 A  Yes.
24 Q  What were the funds that were being sought from the
                              - 99 -

1    state and what were the purposes of those funds?
2  A  The funds sought were a grant from DHCD, which I
3    believe stands for the Department of Housing and
4    Community Development.
5  Q  And what were they for?
6  A  My memory is that they were a grant which would help
7    facilitate the conversion of the units to affordable
8    structures, affordable housing.
9  Q  Do you remember what the amount was that you sought
10   from the Commonwealth?
11 A  I believe it's three hundred and fifty thousand.
12 Q  And do you recall that it was initially 125,000 and
13   then it was increased to 350 or 325?
14 A  No.
15 Q  So, you don't recall any circumstances in which there
16   was a need to increase the amount of the application.
17   You don't recall anything related to that?
18 A  I don't.
19 Q  Going back to the conversation and/or meeting with
20   Mrs. Kunelius and her attorney, I believe your answer
21   indicated that you remembered that this was her
22   retirement. I think that's what you said, that you
23   realized it was her retirement, but I probably -- let
24   me just read his answer to make sure I'm saying that
                              - 100 -

1    correctly.
2            MR. CONROY: You mean the answer to the
3    complaint?
4            MR. McLAUGHLIN: Answer to the
5    complaint.
6            MR. CONROY: Are you going to put it in
7    front of him?
8            MR. McLAUGHLIN: Yeah.
9  Q  All right. So, here's what it says. If you can just
10   read your response. It's 20. That's to the telephone
11   conversation.
12 A  You want me to read this?
13 Q  Yes.
14 A  Number 20?
15 Q  Yes.
16 A  MacDonnell admits, or, quote: MacDonnell admits that
17   he met with Kunelius and her attorney on several
18   occasions and was informed that Kunelius was a single
19   woman caring for her elderly father and that Kunelius
20   wanted to sell her property. Except as expressly
21   admitted, MacDonnell denies the allegations in
22   Paragraph 20 of the complaint.
23 Q  Would it refresh your memory if I told you that,
24   during that discussion, Mrs. Kunelius will testify
                              - 101 -



1 that you told her that you had several million dollars
2 available for the purchase in-hand at the time that
3 you had the telephone discussion, in-hand?
4 A It would not.
5 Q Do you recall telling anyone that TPL, and when I say
6 you, I mean TPL under that circumstance, so if I
7 replace the word you having the money with TPL, would
8 your answer still be the same? I wasn't implying that
9 you had the money but that TPL had the money.
10       MR. CONROY: Will you state it again?
11 A Could you just ask the question?
12 Q Would it refresh your memory if you were to learn that
13 Mrs. Kunelius would testify that you told her that you
14 had several million dollars, that TPL had several
15 million dollars of funds in-hand, available to it
16 immediately, for the purchase of the property?
17 A It would not.
18 Q Are you testifying that you didn't say that or that
19 you don't recall saying that?
20 A I don't have a recollection of that conversation, so
21 that's sort of the sum total of what I can say about
22 it.
23 Q So, you're not saying for certain that you didn't say
24 it. You're only saying that you don't have a

- 102 -

1 recollection of saying it.
2 A There is nothing in my memory that suggests to me that
3 I said that.
4 Q Is there anything in your memory that suggests that
5 TPL, at that time, had several million dollars of
6 funds available to it on a fairly immediate basis that
7 would allow for the purchase of the property without
8 any other source other than the TPL funds themselves?
9 A I'm sorry to make you do this, but I think I need to
10 have you say that again.
11 Q Is there anything that you can recall that would
12 suggest that TPL had several million dollars available
13 to it to buy the property at the time that you had a
14 discussion with Mrs. Kunelius, this discussion
15 referred to in Paragraph 20?
16 A No.
17 Q Did you ever tell Mrs. Kunelius that you had the
18 equivalent of a Plan A or Plan B and a Plan C,
19 something like that, so that no matter what happened
20 the sale would go forward?
21 A I don't.
22 Q You don't recall telling her that, correct?
23 A Right.
24 Q Did you have a Plan A or a Plan B or a Plan C to

- 103 -

1 ensure that the sale would go forward even if Plan A
2 failed or Plan B failed?
3 A Well, the way TPL crunches these projects, generally,
4 is with a Plan A, the set of circumstances that we
5 hope will work, and I'd say in, you know, nine out of
6 ten projects, what feels like Plan A actually is
7 utilized but that there are, in most projects, a
8 number of variables that result in some things
9 changing. So, at the beginning of a project, it's
10 very common that Plan A becomes Plan B. I don't
11 recall this discussion using those terms.
12 Q Do you have specific expertise in your role as the
13 state director, Massachusetts state director, in
14 applying for loans from DH, whatever, Department of
15 Housing and Community Development?
16 A No.
17 Q You are aware, are you not, that TPL made an
18 application for funds to the Department of Housing and
19 Community Development?
20 A Yes.
21 Q And you are aware that TPL itself filled out the
22 application for those funds, which were the 325- or
23 $350,000 that you referred to earlier, correct?
24 A We hired a consultant who knows more about this

- 104 -

1 process than we do to help us do that, but together
2 with him, we prepared it.
3 Q And do you know who prepared it from TPL?
4 A Together with the consultant?
5 Q Yes.
6 A Yes, I do.
7 Q Who is that?
8 A Chris LaPointe.
9 Q And what's Chris LaPointe's position?
10 A Project manager.
11 Q And does he report to you?
12 A He does.
13 Q And do you recall working with Ross Perry in reviewing
14 the application to DHCD?
15 A Yes.
16 Q I'm going to put before you what is now going to be
17 marked as 11.
18       (WHEREUPON, Exhibit No. 11, DHCD grant
19 application, marked for identification.)
20 A I'm putting before you Exhibit 11, and just for the
21 record, this is a compilation of various documents
22 received from the town, beginning with Bate stamp
23 number KUN336 and continuing to 411, the first page of
24 which is a document that appears to be sent by Ross

- 105 -

1 Perry, project management of BNC/LID/Interconnect, to
2 someone by the name of Bill, and the first sentence
3 says: I left at your door the DHCD grant application
4 that TPL has filled out.
5       Do you recall receiving a copy of this?
6 A Of the cover memo?
7 Q The whole thing.
8 A I have a recollection of seeing the application before
9 it was submitted, whether this is the application that
10 you have in front of me or it has, you know, more
11 pages here, I just don't know.
12 Q This appears to us, having gone through the documents
13 received from the town, that this is the application
14 minus the signature of TPL. The second page appears
15 to be the signature of Ross Perry on 3-30-03. Do you
16 see that?
17 A 3-3 --
18 Q 3-30-03, second page.
19 A 337?
20 A No, down at the bottom, his signature.
21 A Oh, I'm sorry. I was reading the Bate's number. Yes,
22 I see that.
23 Q I direct you to the first page again, which says: Let
24 Craig MacDonnell and me know if there are any

- 106 -

1 questions.
2       Do you know from looking at this who Bill
3 is?
4 A I would guess that it's Bill Wrigley.
5 Q And Bill Wrigley is the town administrator?
6 A Either administrator or manager. I can't remember his
7 title.
8 Q And at the bottom, it says: Craig can be reached at
9 617-367-6200. Is that the TPL number?
10 A Yes.
11 Q Now, I have a couple of questions here which, I must
12 admit, confuse me. So, if I can direct your attention
13 to Page 342, under the Financing Mechanism, and it's a
14 paragraph with a one, Financing Mechanism.
15 A Uh-huh.
16 Q And the second paragraph says: TPL is prepared to
17 purchase the property. TPL has a primary plan and a
18 fallback plan. The primary plan envisions a
19 multilateral funding approach to this project. Some
20 of the funding is contingent, as explained below, but
21 all of it is subject to a fallback plan, fallback line
22 of credit from Wainwright Bank. Do you see that?
23 A I do.
24 Q So, earlier I had asked you if you knew a man by the

- 107 -



1   name of Rob or Robert Glassman. Do you recall me
2   asking you that?
3 A   I do.
4 Q   Do you know who Robert Glassman is now?
5 A   No.
6 Q   I will represent to you that he was on the board of
7   your advisors at the time that this application was
8   made, a Robert Glassman. Does that ring a bell?
9 A   No.
10 Q   If I told you he was the president and founder of
11   Wainwright Bank, would that ring a bell to you?
12 A   No.
13 Q   Were you aware that there was a line of credit at
14   Wainwright Bank that was available as a fallback to
15   the financing of this purchase from Mrs. Kunelius?
16 A   I am familiar that TPL has a line of credit with
17   Wainwright Bank.
18 Q   Are you familiar that it was described as a fallback
19   for the funding, as a contingency for the funding, of
20   the purchase of Mrs. Kunelius' property?
21 A   Well, I see it written here, and it does remind me
22   that there was some discussion about using Wainwright.
23 Q   And did you participate in the application for a line
24   of credit to Wainwright Bank?

- 108 -

1 A   No.
2 Q   Who would have made application on behalf of TPL to
3   Wainwright Bank?
4      MR. CONROY: Objection.
5 A   It's a standing line of credit. There's no
6   application involved.
7 Q   Does TPL have a standing line of credit right now with
8   Wainwright Bank?
9 A   Yes.
10 Q   What is the amount of that line of credit?
11 A   I don't know.
12 Q   Let me turn you to the next page, and before I do,
13   let's stay on the same page and look at TPL's primary
14   plan to generate funds, and it has a chart, and then
15   it says: A. Town funds. B. Red Acre. C. The DHCD
16   funds -- which are the subject of this application --
17   and D. Private financing. Do you see that?
18 A   I do.
19 Q   Right after that, it says, quote:
20      MR. CONROY: Excuse me. Private fund-
21   raising.
22      MR. McLAUGHLIN: I'm sorry. Private
23   fund-raising.
24 Q   After that, it says: As a fallback position, if any

- 109 -

1   or all of the above-referenced sources of funds are
2   unavailable, TPL intends to utilize capital from the
3   private market. In this regard, TPL has available for
4   its use a line of credit from Wainwright Bank in the
5   amount of $6,000,000 -- and it's written as 6,000,000
6   with a dollar sign -- as evidenced by the letter
7   attached as Exhibit -- blank. The use of this capital
8   is subject to TPL's internal approval process,
9   including customary due diligence and approval of the
10   Board of Directors.
11      Now, at the time -- did I read that
12   correctly? Let's make sure I read that
13   correctly.
14 A   I didn't follow you close enough to do that.
15 Q   Okay. All right. Well, your counsel hasn't corrected
16   me, so I probably did.
17      MR. CONROY: Minor.
18      MR. McLAUGHLIN: Okay.
19      MR. CONROY: Minor failings but
20   otherwise substantively accurate.
21      MR. McLAUGHLIN: That's the best thing
22   anybody's said in a long time.
23      THE WITNESS: He's very kind.
24 Q   Is today the first time that you have become aware

- 110 -

1   that there was a six million dollar line of credit
2   available to TPL for the purchase of the property if,
3   quote, any or all of the above-referenced sources
4   listed on Page 343 and 342 were unavailable?
5 A   I was familiar with the Wainwright line of credit
6   before today.
7 Q   And so you were aware that, should the funds that you
8   sought from the town fail, TPL intended to use the
9   line of credit. Is that fair to say?
10      MR. CONROY: Objection.
11      MS. FETOUH: Objection.
12 A   No, it's fair to say that TPL could use that line of
13   credit if necessary and subject to due diligence and
14   approval.
15 Q   But it doesn't say that. It says: TPL intends to
16   utilize the capital from the private market. In this
17   regard, it has available for its use a line of credit.
18   Do you see that?
19 A   I do.
20 Q   Doesn't say could, might. It says intends to. Is
21   that correct?
22 A   Well, the word in the document is intends.
23      MR. CONROY: I'll point out for the
24   sake of completeness that there is other language

- 111 -

1   that follows on that same page, Counsel.
2      MR. McLAUGHLIN: I'm going to get to
3   that.
4      MR. CONROY: Okay.
5 Q   You're aware, are you not, in this litigation that TPL
6   has made representations to the federal court that TPL
7   did not have the money to purchase the property? Are
8   you aware of that?
9      MR. CONROY: Objection.
10 A   As I sit here today?
11 Q   Yeah.
12 A   I am not sure I am aware of that.
13 Q   Did you review the documents filed on behalf of TPL in
14   the current litigation?
15 A   On behalf of TPL or myself?
16 Q   Yes, on behalf of TPL.
17 A   I believe I saw them before they were filed, yes.
18 Q   And did you review the documents that were filed on
19   your behalf?
20 A   I did.
21 Q   And do you recall seeing statements to the federal
22   court indicating that TPL did not have the money to
23   purchase the property and that that's the reason that
24   the property purchase did not go forward?

- 112 -

1 A   Well, in fact, TPL did not have the money.
2 Q   I thought you just said that TPL has a line of credit.
3 A   The line of credit is not our money. It's somebody
4   else's money.
5 Q   Is it your testimony today that TPL did not intend to
6   use the line of credit as a way of paying for the
7   property if all other sources failed?
8 A   Our intention with respect to the use of any borrowed
9   money has to be decided in the context of what's
10   possible. So, here, utilizing the six million dollar
11   line of credit, being subject as it is to due
12   diligence and approval of the Board of Directors, TPL
13   could only borrow that money if the project manager,
14   in this case me, went to the Board of Directors and
15   said, "Can I use this money?" And there's a process,
16   an internal process, for getting that approval.
17 Q   I want to direct your attention to the Motion to
18   Dismiss of the Defendants, Trust for Public Land and
19   Craig A. MacDonnell and the Town of Stow, and in this
20   motion, beginning on Page 1, is the following
21   statement: However, after paying thousands of dollars
22   in deposits required under the agreement, TPL found
23   itself unable to raise the money necessary to fund the
24   project and was unable to complete its purchase of the

- 113 -



1 property. Do you see that?
2 A Yes.
3 Q Now, you were not unable to raise the money because
4 you had a six million dollar line of credit, but you
5 just decided not to use it. Isn't that reasonable to
6 say?
7        MR. CONROY: Objection.
8        MS. FETOUH: Objection.
9        MS. ECKER: Objection.
10 A The decision was made not to use the line of credit.
11 Q But that's not what you told the judge. What you told
12 the judge was you were unable to raise it. Is there
13 some sort of stop-payment or stop-borrowing order on
14 your line of credit at Wainwright Bank? In other
15 words, can you go in there right now, TPL, and borrow
16 money on the line of credit, or is it in some way in
17 default?
18 A I don't know.
19 Q You don't know if your own line of credit is in
20 default, sir?
21 A Correct.
22 Q Do you have reason to believe that your line of credit
23 is in default?
24 A I have no reason to believe.
                  - 114 -

1 Q So, as the director of the State of Massachusetts TPL,
2 is it your testimony today under oath that you do not
3 know whether your line of credit is in default or not.
4        MR. CONROY: Objection.
5        MS. FETOUH: Objection.
6 A I think I answered that question.
7 Q And the answer is you do not know whether it's in
8 default or not.
9 A Correct.
10 Q Do you know if it's overdrawn or not?
11 A I don't.
12 Q Do you know if any money is withdrawn on that account?
13 A I don't.
14 Q Who would?
15        MR. CONROY: Objection.
16 A Our finance manager.
17 Q And is the line of credit that's in Wainwright Bank,
18 is that money that is earmarked for the Massachusetts
19 branch of TPL?
20 A I think it's available for the region.
21 Q And so the region would be the New England region?
22 A Right.
23 Q Do you know who applied for that six million dollar
24 line of credit?
                  - 115 -

1 A No.
2 Q How would Christopher LaPointe know of this line of
3 credit as a project manager?
4        MS. FETOUH: Objection.
5        MR. CONROY: Objection.
6 A He would ask our business manager, finance manager.
7 Q He would not ask you, sir?
8 A I'm not sure what he did in this case. I don't know
9 what he would do. He could ask me. He could also ask
10 our finance manager.
11 Q Is it your testimony today that this is the first time
12 you are aware that TPL informed the Commonwealth of
13 Massachusetts, under oath, that it had a six million
14 dollar line of credit?
15        MR. CONROY: Wait a minute. 1 object.
16        MS. FETOUH: Objection.
17 Q Do you know of any laws that prohibit the filing of
18 inaccurate documents with the state, the Commonwealth
19 of Massachusetts, with regard to attempting to obtain
20 grants where the applications contain false
21 information?
22 A No.
23 Q Are you aware of whether the money that you sought to
24
                  - 116 -

1 obtain from the Commonwealth of Massachusetts came
2 entirely from the Commonwealth of Massachusetts or
3 from some federal agency?
4 A I don't know.
5 Q Are you familiar with making applications for funds
6 from federal agencies?
7 A Yes.
8 Q Are you familiar with any statutes providing for
9 criminal and civil penalties for the filing of
10 inaccurate or untrue statements where federal funds
11 are being requested?
12 A No.
13 Q Let's go forward on this paragraph, under two,
14 contingency plan for cost overruns. It says: As part
15 of the larger Kunelius project, the Trust for Public
16 Land has organized a significant private fund-raising
17 campaign. This campaign, in conjunction with the Stow
18 CPA funds, the sale of the unit and the HDSP funds,
19 has sufficient capacity to, if necessary, cover cost
20 overruns. Do you see that?
21 A I do.
22 Q So, at the time of the application, you were not
23 relying on multiple sale of units. You were relying
24 on one sale. Isn't that correct?
                  - 117 -

1 A We made reference to just 144. Now, whether in fact,
2 by that reference, we intended to capture a sale of
3 just 140 -- at that time, it had not been subdivided.
4 Whether we were referring to just the single lot or
5 the hoped for double lot, I don't know.
6 Q Going on, it says: In addition, the Trust for Public
7 Land has received confirmation that its six million
8 dollar line of credit has been renewed by Wainwright
9 Bank and that these funds would be available to cover
10 cost overruns subject to TPL's normal due diligence
11 and internal review. Do you see that?
12 A I do.
13 Q Is this the first time you knew that the money could
14 be also used, the line of credit could also be used,
15 for cost overruns?
16 A No, I was aware of the line of credit.
17 Q But you were not aware of a fallback position that
18 involved the use of borrowing under the line of
19 credit?
20 A What I remember is that the line of credit was out
21 there and that, if the circumstances were right, it
22 might make sense to use it.
23 Q So, at the time that you told the federal court that
24 you could not raise the funds sufficient to purchase
                  - 118 -

1 the property -- I'm going to withdraw that question.
2 I'm going to read from a document that was filed on
3 your behalf called, "Memorandum of Law in Support of
4 the Motion to Dismiss of the Defendants, the Trust for
5 Public Land, Craig A. MacDonnell and the Town of Stow.
6        Down at the bottom of the first page on the
7 right-hand side, three lines up, it says: When
8 TPL accepted that assignment and exercised the
9 right of first refusal, TPL stepped into the
10 place of the buyer in that agreement and became
11 subject to its terms and conditions. When TPL
12 ultimately was unable to raise the money to fund
13 the purchase, it was unable to acquire the
14 property and forfeited thousands of dollars to
15 Kunelius pursuant to the liquidated damage
16 clause. Do you see that?
17 A I do.
18 Q Now, did you read this before it was submitted to the
19 court on your behalf?
20 A I believe I did.
21 Q And you've already testified that you were aware that
22 there was a line of credit. Am I correct there?
23 A Yes.
24 Q But you weren't aware of how much money was in the
                  - 119 -



1 line of credit. Am I correct as well?
2 A Correct.
3 Q And you weren't aware of whether the line of credit
4 was in default, is that correct?
5 A I don't have a recollection of the status of the line,
6 as I sit here today, regarding my awareness then.
7 Q Are you aware of TPL being in default on lines of
8 credit or other banking obligations?
9 A I am not.
10 Q In your tenure as director of the Massachusetts state
11 office of TPL, are you aware of any circumstance in
12 which TPL was in default on a line of credit or any
13 other financial obligation to a bank?
14 A I am not.
15 Q You are aware, are you not, that the president of
16 Wainwright Bank was a Board of Advisor member to TPL?
17 A I was not aware of that.
18 Q Are you aware of any banking obligations in which
19 insiders to bank operations have to disclose certain
20 applications for loans?
21 A Could you state that again?
22 Q Well, if you don't understand it, I'll withdraw the
23 question.
24 A I don't understand it.

- 120 -

1 Q I want to read from Page 6 of your Memorandum of Law
2 in Support of a Motion to Dismiss the Defendants, the
3 Trust for Public Land, Craig A. MacDonnell, and the
4 Town of Stow. Page 6 says: Ultimately -- this is the
5 second paragraph, four lines down. Ultimately,
6 however, TPL was unable to raise the funds necessary
7 to purchase the property by the closing date of
8 September 26, 2003. Do you see that?
9 A Yes.
10 Q Now, I would like you to look back at Exhibit 11 and
11 tell me: what is the date of Exhibit 11 on the first
12 page?
13 A 3-30.
14 Q So, that would be March 30, 2003. So, we have April,
15 May, June, July, August, September. Six months later,
16 you certainly had the -- strike that.
17 Is it your testimony today that you elected
18 not to borrow the money for the purchase of the
19 property from Mrs. Kunelius?
20 MR. CONROY: Clarify when you say you.
21 MR. McLAUGHLIN: TPL.
22 A The decision of how to go forward on this project was
23 a function of a lot of different variables, including
24 whether or not it was likely that TPL could raise the

- 121 -

1 money privately via traditional fund-raising and the
2 sale of 142 and 144 and the town's contribution.
3 Q If that's the case, sir, why does TPL write: As a
4 fallback position, if any or all of the above-
5 referenced sources of funds are unavailable, TPL
6 intends to use capital from the private market?
7 The statement in the application to the
8 Commonwealth of Massachusetts seems to be
9 inconsistent with your last answer because this
10 statement says it doesn't matter whether you get
11 any of the funds; you're going to borrow in order
12 to meet the obligation. Did you read this
13 application before it was signed?
14 A Exhibit 11?
15 Q Yeah.
16 A I'm sure I did. Put it this way. I'd like to clarify
17 that. I don't have a recollection today of reading
18 it. I remember working on it.
19 Q I'm going to have you look at Page 351 of Exhibit 11.
20 A Yup.
21 Q Under Item 63, you're listed as the contact person for
22 TPL. Is that correct?
23 A Yes.
24 Q And also mortgagor. Do you see that?

- 122 -

1 A Sixty-four.
2 MS. FETOUH: Objection.
3 Q Sixty-four. And, I'm sorry, on Item 64, it refers to
Do you see that?

...tending to borrow in order to be a
...pon this application?
...FETOUH: Objection.
...CONROY: Objection.
...of this, number 64, the significance
...had the opportunity under the
...land and become an owner of the
...the money from the state, from the
...d TPL have to grant any mortgage? Did
...at money in any way?
...ere to take advantage of
...rtgage.
...at the next page, Item 71, Denise
...he, if you know?

21 A She is an attorney who worked, at the time, for TPL.
22 Q Does she work for TPL anymore?
23 A No.
24 Q Was she an intern of Goodwin, Procter & Hoar?

- 123 -

1 A I don't know.
2 Q You're aware that there are virtually dozens of people
3 from Goodwin, Procter & Hoar that have worked as
4 interns at TPL, is that correct?
5 MS. FETOUH: Objection.
6 A There have been several. I wouldn't say dozens.
7 Q You wouldn't?
8 A No. No, I wouldn't.
9 (WHEREUPON, Exhibit No. 12, TPL Web
10 site excerpt, marked for identification.)
11 Q I'm going to put this -- Exhibit 12. Exhibit 12 is an
12 excerpt from your Web site. I think it refers to 40
13 associates, 17 partners, something like that. Do you
14 see that? And that they've done over 4,000 hours of
15 work for TPL since 2001. Do you see that?
16 A Yes.
17 Q So, there have been dozens of Goodwin, Procter & Hoar
18 partners and associates who have worked pro bono
19 some as interns. Isn't that correct?
20 A That is correct. They were not all interns.
21 Q I understand.
22 A You asked me whether or not dozens had been interns
23 and so.
24 Q I want to point out with as much kindness as possible

- 124 -

1 that that Michael McLaughlin in that picture most
2 certainly is not me. Do you see that?
3 A Doesn't look like you.
4 MR. CONROY: Nor are you Mike
5 McLaughlin.
6 MR. McLAUGHLIN: Yes, I know.
7 Q So, can I have that back?
8 A Yeah.
9 Q On Paragraph 71, are you aware of whether Denise
10 Pelletier reviewed this document?
11 A I am not aware.
12 Q Looking at the next line, Dorothy Stuckey, Esquire,
13 we've already referenced Dorothy Stuckey. She is
14 counsel, correct, to TPL?
15 A Stuckey, yes.
16 Q Stuckey. Are you aware of whether she had reviewed
17 this document?
18 A I am not aware.
19 Q Would Dorothy Stuckey be aware of whether there was a
20 line of credit in the amount of $6,000,000 that TPL
21 had?
22 MR. CONROY: Objection.
23 MS. FETOUH: Objection.
24 A I don't know.

- 125 -

1 Q Is it likely that counsel would know that?
2       MR. CONROY: Objection.
3       MS. FETOUH: Objection.
4 A I don't know what she knows.
5 Q Are you aware of any circumstance in which the line of
6    credit was ever used?
7 A No, I am not aware of those circumstances.
8 Q Are you aware of any time which you were involved, and
9    I'm going to, with all due respect, remind you're
10   under oath, that you were involved in the acquisition
11   of any property by TPL in which the line of credit was
12   used?
13 A I am not aware of utilizing the Wainwright line of
14   credit on one of my projects.
15 Q Are you aware of utilizing any line of credit on one
16   of your projects?
17 A It is hard to answer your question, because when
18   project managers seek approval to borrow money to do
19   projects, it's not always made clear to them which --
20   where the money comes from. In other words, the
21   finance office at TPL generally addresses accessing
22   those funds.
23 Q Is that finance office in Boston or in California?
24 A Here.

                        - 126 -

1 Q What other banks does TPL have lines of credit with?
2       MR. CONROY: Objection.
3 A I only know of one other, and I believe it's Sun
4    Trust.
5 Q As I understand it at the time you told the court, the
6    time the memorandums were filed on behalf of TPL and
7    yourself, that TPL was unable to borrow the money. As
8    it understand it, the amount of money that would have
9    had to have been borrowed -- strike that.
10      At the time that TPL filed its memorandum
11   with the court indicating that it was unable to
12   raise the money, it had available to it a four
13   hundred thousand dollar possibility with
14   Mrs. Kunelius and a six million dollar
15   possibility of borrowing with Wainwright Bank,
16   correct?
17      MS. FETOUH: Objection.
18      MR. CONROY: Objection.
19 A Well, as we've talked about with respect to the
20   Kunelius potential, that did not seem to be available.
21 Q Availing or available?
22 A As I think I mentioned earlier, my understanding of
23   the mortgage, the potential mortgage, was that were
24   TPL to close utilizing it, Mrs.

                        - 127 -

1 Q I understand that. I understand that. What I'm
2    trying to say --
3       MR. McLAUGHLIN: I don't need an
4    explanation for why he didn't use it. My
5    question was: does he understand that that was
6    available and the six million dollar line of
7    credit was available for the possibility of
8    borrowing on? That's all I'm asking.
9       MR. CONROY: And I think he's entitled
10   to answer the question as he sees fit.
11 A I'm addressing the availability issue. If you'll let
12   me finish, I can complete the thought.
13 Q Well, before I do, before I do, the issue -- I don't
14   want to mince words. When I say available, I mean
15   that your organization had the ability, should it so
16   desire, to borrow that money. I am not talking -- I
17   don't want to mince words and have you say, well,
18   available to us means does it work. The question was:
19   did the contract, either the line of credit or the
20   purchase and sale agreement, allow you to borrow
21   money?
22      MR. CONROY: Objection.
23      MS. FETOUH: Objection.
24 Q That's the question.

                        - 128 -

1       MS. ECKER: Objection.
2 A The four hundred thousand dollar mortgage required an
3    actual mortgage to be imposed on the property which
4    would have prevented us from conveying it to the town.
5 Q Didn't that also require that of Mosaic Commons as
6    well?
7 A I don't know.
8 Q You don't know that?
9 A Well, what I'd like to do is finish my sentence.
10      MR. CONROY: Yeah, and I'm going to
11   insist that he finish uninterrupted.
12      MR. McLAUGHLIN: I thought he had
13   finished, but I'm sorry.
14      MR. CONROY: Go ahead, Craig.
15 A The Kunelius mortgage potential would have required an
16   actual mortgage to be imposed on the property itself.
17   The existence of that mortgage would have been
18   unacceptable to the Town of Stow because they wanted
19   to take their 45 acres free of any mortgage. If
20   they're going to invest, they don't want to burden the
21   property. That led us to conclude that, in your
22   words, that mortgage was unavailable.
23      (Messrs. Kachajian and Norris enter.)
24 Q You make the assumption in your answer, I believe,

                        - 129 -

1    that the mortgage was to be entirely on that portion
2    of the property that was going to the town. In fact,
3    TPL was to retain certain property after the purchase.
4    Isn't it in fact true that the mortgage that was to be
5    given to Mrs. Kunelius was to be on that portion of
6    the property not going to the town?
7       MR. CONROY: Objection.
8 A I don't know that.
9 Q But you have just testified that you did, because
10   you've said that the town objected concerning that
11   mortgage. I will represent to you that there is not
12   one document from the town indicating that objection,
13   unless I've missed it. So, if there is such an
14   objection, then I would request town counsel to
15   provide that to me, where the town says they will not
16   allow the deal to be done because of a mortgage on the
17   property to be given to the town. Having said that,
18   are you --
19      MS. ECKER: Can I object to that
20   request first?
21      MR. McLAUGHLIN: Yes.
22      MS. ECKER: I object to the request.
23   The town has turned over all documents pursuant
24   to the documents requested. Whether that

                        - 130 -

1    specific document exists, I am not sure.
2       MR. McLAUGHLIN: Okay.
3       MS. ECKER: But, in general, we've
4    turned over all documents to you, whether it's
5    contained in a conversation or otherwise. So, I
6    want --
7       MR. McLAUGHLIN: I'm not impugning you,
8    madam.
9       MS. ECKER: I understand, but, no, I'm
10   not going to go through the town documents at
11   this time and provide you any further documents.
12      MR. McLAUGHLIN: Well, at this point,
13   I'm going to ask the witness again if the witness
14   believes that the town objected to the borrowing
15   by the witness' organization because it resulted
16   in a mortgage on the portion of the land going to
17   the town. Then I will ask you again to see if
18   there is such a document, because nothing has
19   been produced. I'm just saying --
20      MS. ECKER: Well, let me just start
21   here. I don't know if nothing has been produced.
22   We produced hundreds of documents to you. It
23   might your interpretation of the document. I
24   have not had the opportunity, nor do I suggest

                        - 131 -



1 the witness had the opportunity, to review the
2 hundreds of documents, including meeting minutes,
3 that have been produced. So, I'm not going to
4 agree to produce anything at this time.
5     MR. McLAUGHLIN: Okay.
6     MS. ECKER: Or agree that I haven't
7 produced it.
8     MR. McLAUGHLIN: Okay. Let the record
9 reflect that counsel has spoken to the witness.
10 Q I'm going to again ask you: are you certain that the
11 town objected to TPL complying with the terms of the
12 purchase and sale agreement and borrowing $400,000
13 from Mrs. Kunelius?
14     MS. FETOUH: Objection.
15 A I don't believe that was my testimony.
16 Q What was your testimony, sir?
17 A My testimony, I thought, and --
18     MR. CONROY: With all due respect, the
19 question is: what is his testimony? That's the
20 right question.
21     MR. McLAUGHLIN: What did I just say?
22     MR. CONROY: What was your testimony?
23 And the record will say what his testimony was.
24 I'd suggest that he be asked a question now and
      - 132 -

1 he answer it.
2     MR. McLAUGHLIN: No, that's not -- but
3 I thank you for the instruction. What I am
4 saying is I want to know what he said, not what
5 he's saying now but what he said, and then I'll
6 work from there.
7     MR. CONROY: What he said back in time?
8     MR. McLAUGHLIN: I want to know what,
9 no, what he just said about the town objecting,
10 because he's now saying that wasn't his
11 testimony. I want to know what he thinks he just
12 said about the town objecting.
13     MR. CONROY: Well, I object.
14     THE WITNESS: Well, I'm happy to
15 clarify it.
16 Q Okay. Go ahead.
17 A Okay. The issue of the mortgage, requiring an actual
18 mortgage to be placed on the property, led TPL to
19 believe, correctly or incorrectly, that that would
20 have been a problem for the town. It's not my
21 testimony that I had a conversation with anyone from
22 the town about that. It was my -- it is my
23 recollection that that presented an obstacle to
24 utilizing that portion of the financing.
      - 133 -

1 Q Why would the mortgage have been on the property that
2 went to the town rather than the property that went to
3 TPL?
4 A I'm testifying to my recollection of that issue, and
5 I've shared with you what my recollection is of that
6 issue.
7 Q But I believe you just said that TPL surmised that the
8 town wouldn't want -- my question to you is: the land
9 that was going to the town was a donation as part of
10 the deal with Mosaic Commons. The mortgage with
11 Mosaic Commons stayed on the remaining portion of the
12 property that was to be owned by Mosaic Commons. What
13 made TPL believe that it would not remain on the
14 portion to be maintained by TPL and be somehow
15 transferred to that land being given to the town?
16     MR. CONROY: Objection. Among other
17 things, this is not a 30(b)(6) deposition.
18     MR. McLAUGHLIN: I understand. I'm
19 going to do a 30(b)(6), and he may be the person
20 to come back.
21     MR. CONROY: I understand you are.
22     MR. McLAUGHLIN: But if he can answer
23 the question --
24 A I think I've exhausted my ability to speak to that
      - 134 -

1 issue.
2 Q So, if I can sum up, the town never told you they
3 would not accept a mortgage on the property that was
4 going back to the town, is that correct?
5     MS. ECKER: Objection.
6 A We never had a discussion about it.
7 Q So, it was your, TPL's, assumption that they might
8 object and, therefore, it would not work?
9 A Correct.
10 Q And that TPL never anticipated that the mortgage for
11 the $400,000 would be on the portion of the property
12 that TPL was to acquire.
13     MS. FETOUH: Objection.
14 A That's where I don't have a recollection.
15 Q But you realize, do you not, that TPL was the borrower
16 and that the remaining portion of the land was going,
17 as part of the sale, to the town? So, how is it
18 possible that TPL could ever have anticipated that
19 they acquire the money, they borrow the money -- they
20 acquire the property, they borrow the money from
21 Mrs. Kunelius, and somehow transfer the liability
22 for that money to the town?
23     MR. CONROY: Craig, don't answer.
24 Q And somehow transfer the liability for that money to
      - 135 -

1 the town rather than TPL, because TPL's the borrower.
2     MR. CONROY: Objection.
3     MS. FETOUH: Objection.
4     (Mr. Kachajian exits the room.)
5 A With all due respect, I don't think I understand the
6 question.
7 Q Okay. Who was going to borrow the money, the
8 $400,000, under the purchase and sale agreement?
9 A Do you mean under the Kunelius mortgage option?
10 Q Yes, under the terms of the purchase and sale
11 agreement, who was to borrow $400,000 from
12 Mrs. Kunelius?
13 A The ultimate purchaser.
14 Q Well, it says -- it doesn't say the ultimate
15 purchaser, does it? It says Mosaic Commons. Isn't
16 that what it says?
17     MS. FETOUH: Objection.
18 A Why don't we get out the contract.
19     MR. CONROY: We have the document, so.
20     THE WITNESS: I'm going to take a
21 break.
22     (Recess, 2:20 P.M.)
23     (After recess, 2:31 P.M.)
24     (Messrs. Kachajian and Norris not present)
      - 136 -

1     (WHEREUPON, Exhibit No. 13, MacDonnell
2 letter to Kachajian, dated September 9, 2003,
3 marked for identification.)
4 By MR. McLAUGHLIN:
5 Q Before you is Exhibit 13, which is a September 9,
6 2003, letter from you to Peter Kachajian. Do you
7 recognize this?
8 A Yes.
9 Q And that's your signature at the end?
10 A Yes.
11 Q Looking at the first page, there is a paragraph
12 beginning with First, which reads: First, there is a.
13 significant fund-raising gap. What was the
14 significant fund-raising gap that you were referring
15 to?
16 A The gap between the number of dollars that we believed
17 was going to come in from the Town of Stow investment
18 and the purchase price.
19 Q And what investment are you talking about by the Town
20 of Stow?
21 A The three hundred thousand dollar open space
22 investment and the one hundred thousand dollar
23 affordable housing.
24 Q And so did you become aware on or about September 9th
      - 137 -



1 of 2003 that the Town of Stow was not going to provide
2 the three hundred thousand and the one hundred
3 thousand?
4 A No. No.
5 Q So, the fund-raising gap that you're referring to does
6 not include the Stow funds, correct?
7 A Correct.
8 Q And so what you were referring to -- well, let's go
9 on. Not only has the economy been hostile to
10 philanthropy, in general, we have experienced a
11 catastrophic failure in the rejection of the 350,000
12 Department of Housing and Community Development grant.
13 Do you see that?
14 A Yes.
15 Q Now, why was that catastrophic?
16 A Because we needed it.
17 Q But if you look at Exhibit 11, Exhibit 11 says: As a
18 fallback plan, if any or all of the above-referenced
19 sources are unavailable, TPL intends to utilize
20 capital from the private market.
21     Now, Exhibit 11 suggests that nothing would
22 be catastrophic because you had the fallback plan
23 which involved a line of credit. What made the
24 loss of the 350 catastrophic?

— 138 —

1     MR. CONROY: Objection.
2     MS. FETOUH: Objection.
3 A When TPL analyzes these projects, it identifies
4 sources of takeout money, dollars that will be spent
5 to acquire the property interests that are necessary
6 to make the conservation project complete. Because
7 TPL is not a landholding organization -- in other
8 words, we don't buy land to hold for conservation. We
9 occasionally will buy it and sell it, if necessary, to
10 complete a conservation project -- we always look for
11 the ultimate takeout, that is, the source of funds
12 that will purchase the property interest that I just
13 mentioned.
14     So, in determining whether or not a project
15 can be completed, TPL engages in an analysis of
16 whether the ultimate takeout funds will be
17 available. In this project, those funds appeared
18 not to be available, ultimately. The fund-
19 raising we had imagined did not materialize, the
20 DHCD grant did not come through, and it did not
21 seem as if it was possible to raise those dollars
22 for the ultimate conclusion of the project, not
23 that TPL could not borrow the money to make -- to
24 replicate those dollars but that any borrowing

— 139 —

1 that TPL engages in is designed only as a
2 stopgap, an interim stopgap, subject to our own
3 due diligence that would satisfy us that
4 ultimately that loan could be repaid from capital
5 takeout.
6 Q At the time that you accepted the assignment, I
7 believe your testimony was that you had every
8 expectation that everything would work out.
9 A We did.
10 Q Is it reasonable -- is it your position that
11 Mrs. Kunelius, in signing the purchase and sale
12 agreement with Mosaic Commons, should have
13 anticipated, one, that TPL was coming onboard
14 and, two, that eventually, notwithstanding their
15 alleged best intentions, they would fail?
16     MS. FETOUH: Objection.
17 Q Is that something that you think Mrs. Kunelius should
18 have anticipated?
19     MR. CONROY: Objection.
20     MS. FETOUH: Objection.
21 A Well, I don't know if Mrs. Kunelius should have
22 anticipated that, but an attorney reading the contract
23 and knowing Chapter 61 would know that the assignee
24 steps into the shoes of a contract negotiated by him

— 140 —

1 or her and that that contract imagined Mrs. Kunelius
2 walking away with liquidated damages but not the
3 purchase of her property.
4 Q It's your testimony that you did not anticipate,
5 ultimately, that this matter would fail, and, in fact,
6 your testimony is that you had every expectation that
7 it would go forward. Am I right on that?
8 A As with every TPL project we work on. We don't get
9 into these projects just for the heck of them. We do
10 them to achieve conservation. So, absolutely, yes,
11 completely our intention.
12 Q And, therefore, you were not expecting that
13 Mrs. Kunelius should have anticipated that TPL
14 would not have been able to raise money for the
15 purchase. Is that reasonable to say? I don't
16 care about lawyers.
17 A No.
18 Q The question is: if you didn't anticipate it, is it
19 reasonable for you to expect that Mrs. Kunelius should
20 have anticipated that you would have failed?
21     MR. CONROY: Objection.
22     MS. FETOUH: Objection.
23     MS. ECKER: Objection.
24 Q TPL would have failed.

— 141 —

1 A I don't know what it is reasonable for Mrs. Kunelius
2 to have expected on her own, but anyone reading the
3 contract would know that there are two ways forward
4 under that contract. One is with the purchase.
5 Another is via an in-completed transaction.
6 Q But you told the Commonwealth of Massachusetts there
7 was a fallback plan. I still don't understand what
8 was intended by TPL in telling the Commonwealth that,
9 even if any or all of the other sources were
10 unavailable, that TPL intends to utilize capital. If
11 that's the fallback plan, what was the purpose of
12 telling the Commonwealth that?
13     MR. CONROY: Objection.
14     MS. FETOUH: Objection.
15 A What that means is that TPL could have borrowed to
16 conclude this transaction if it made sense, otherwise,
17 from a due diligence point of view. What I'm trying
18 to tell you about is this due diligence piece that
19 imagines in every TPL project that if borrowing is
20 necessary, the borrowing is replaced by conservation
21 takeout dollars that materialize somewhere. In the
22 absence of dollars on the horizon, fund-raised, sale
23 of 142 or 144, it would not be prudent for TPL to
24 borrow the money to complete the transaction.

— 142 —

1 Q How much money you had to borrow?
2     MS. FETOUH: Objection.
3 A It depends how much money would have been on the table
4 to begin with.
5 Q Well, at the time, the application says none of the
6 sources are critical because you can borrow. That's
7 essentially what it says. My question is, at a
8 minimum, one source was available. That's the four
9 hundred thousand from the city, from the town, is that
10 correct?
11     MS. FETOUH: Objection.
12     MR. CONROY: Objection.
13 A Well, three hundred is available at the closing if the
14 town gets their land. The one hundred wouldn't be
15 available until the ultimate renovation and resale of
16 the two units, of 142 and 144. It became apparent in
17 the middle of this project that that subdivision
18 process was fraught with problems, that we can talk
19 about, but towards the end of the project, the ability
20 of TPL to subdivide that property was highly
21 problematic, and it did not appear as if that
22 subdivision was possible.
23 Q In fact, you were told prior to the time that you
24 acquired the property that the subdivision was

— 143 —

# DEPOSITION OF CRAIG MACDONNELL



1 unlikely. Isn't that true?
2 A No, in fact, we were told it was very likely.
3 Q Isn't in fact true that, before you accepted the
4 assignment, you had already been told that a
5 subdivision was not likely at all?
6 A That's not my recollection at all.
7 Q My question remains: how much money did you think you
8 had to borrow at the time that you decided not to go
9 forward in making the purchase?
10 MR. CONROY: Objection.
11 A Well, as I testified earlier, there is no point in
12 time. It's a gradual awareness that this project is
13 getting highly complicated and highly problematic from
14 a whole lot of different perspectives.
15 Q Did the Mosaic Commons deal require a subdivision?
16 MS. FETOUH: Objection.
17 MR. McLAUGHLIN: I'll strike that.
18 Q Did the purchase and sale agreement with Mosaic
19 Commons include a subdivision?
20 MR. CONROY: Objection. It speaks for
21 itself.
22 A I don't remember.
23 Q Isn't it in fact true that the subdivision issue was
24 not part of the Mosaic Commons contract, but it was a
- 144 -

1 part of your requirement after you accepted the
2 assignment, that you wanted a subdivision of the
3 property in a particular way?
4 MR. CONROY: Objection.
5 A Well, I don't know what the Mosaic provision
6 contained. I just don't have that contract in front
7 of me, so I can't speak to it. My understanding is
8 that's it a 40B and that that short of greases the
9 skids.
10 Q Your counsel has the contract in front of him. Why
11 don't you take a look at it, and I'll look at the one
12 I have.
13 A I have it in front of me.
14 Q Okay. I'm going to move off that subject. I'm going
15 to ask you to look at Paragraph 30.
16 A Yes.
17 Q Second paragraph of Paragraph 30: Security for the
18 four hundred thousand promissory note afore-described
19 shall be in the form of a mortgage on the 8.57 acre
20 parcel. Do you see that?
21 A I do.
22 Q Is it fair to say that you were wrong in making the
23 assumption that the mortgage for the $400,000 was
24 going to be on that portion of the property that was
- 145 -

1 being given to the town?
2 A What I don't know is whether the configuration of the
3 8.57 acre parcel is the same configuration that the
4 two, 142 and 144, parcels were located on.
5 Q Sir, did you just make up, today, the argument that
6 the Town of Stow would object to the inclusion of a
7 mortgage on the parcel of land that was to be donated
8 to the town?
9 MS. FETOUH: Objection.
10 MR. CONROY: Objection.
11 MS. ECKER: Objection.
12 Q Did you make that up today?
13 MS. FETOUH: Objection.
14 MS. ECKER: Objection.
15 MR. CONROY: Objection. And this is
16 inappropriate sort of questioning,
17 Mr. McLaughlin.
18 MR. McLAUGHLIN: I don't think so.
19 Your objection is noted.
20 Q Let me ask you again, sir.
21 A I will happily say I did not make that up today.
22 Q And can you tell me who raised that issue with you?
23 A What issue?
24 Q From TPL, as to whether or not the four hundred
- 146 -

1 thousand dollar mortgage was going to be put on the
2 land that was being given to the town?
3 MS. FETOUH: Objection.
4 A That was my own notion.
5 Q Now, you have, do you not, substantial tax expertise?
6 MS. FETOUH: Objection.
7 MR. CONROY: Objection.
8 A No.
9 Q Do you recall writing an extensive letter concerning
10 the tax benefits that Mrs. Kunelius would gain if she
11 accepted a four hundred thousand dollar reduction in
12 the purchase price?
13 A I can't remember whether the reduction was four
14 hundred, but I do remember writing a letter with
15 respect to the value of a bargain sale.
16 Q Do you recall that a significant component of your
17 letter dealt with the donation of land by
18 Mrs. Kunelius and the tax benefits to be derived
19 from that donation of land to the Town of Stow?
20 MS. FETOUH: Objection.
21 A I don't think it related to a donation. I think it
22 was with respect to a theoretical below-market sale.
23 Q Do you recall that a component of the sale involved a
24 donation of a substantial portion of the property to
- 147 -

1 the Town of Hull for a tax consideration on her part?
2 MR. CONROY: Objection.
3 MS. FETOUH: Objection.
4 MS. ECKER: Objection.
5 A That's not my recollection.
6 Q So, how was the remaining land going to be given to
7 the Town of Stow? The portion that was being donated
8 to the Town of Stow, how was that going to work under
9 the terms of the Mosaic Commons deal?
10 MS. FETOUH: Objection.
11 MR. CONROY: Objection.
12 A You're asking me to essentially read this contract and
13 tell you how the land pieces were to be -- I'm sorry.
14 Q Well, earlier you testified that you were familiar
15 under the provision of Chapter 61 with what provisions
16 of a purchase and sale agreement would be applicable
17 and what wouldn't. So, I have perhaps mistakenly
18 assumed -- I have assumed that you have read the
19 purchase and sale agreement, because you've drawn
20 conclusions as to what portions of the purchase and
21 sale agreement are applicable to TPL and which are
22 not.
23 So, let me start with a basic question.
24 Have you ever read in its entirety the purchase
- 148 -

1 and sale agreement?
2 MS. FETOUH: Objection.
3 A Yes.
4 Q Are you the person at TPL that came to the conclusion
5 that you could rely on the liquidated damage clause
6 provision?
7 MR. CONROY: Objection.
8 MS. FETOUH: Objection.
9 A There were a number of people at TPL who reached that
10 conclusion.
11 Q And who besides you reached that conclusion?
12 MR. CONROY: Before you answer the
13 question, I want to consider whether it calls for
14 an attorney-client privilege, raises an attorney-
15 client privilege issue.
16 Q Other than attorneys, was there anybody else?
17 MR. McLAUGHLIN: Does that do it for
18 you?
19 MR. CONROY: Well, why don't you
20 rephrase it, please.
21 Q Other than TPL's counsel, who reached the conclusion
22 that the liquidated damage clause would apply and that
23 should you not move forward in the purchase, Mrs.
24 Kunelius would be left with the earnest money?
- 149 -

## MELVIN LIPMAN COURT REPORTING
### 617-227-3985

1             MR. CONROY: Objection.
2             MS. FETOUH: Objection.
3 A   I can testify that I reached that conclusion, but I
4    can't say who else in their own minds reached that
5    conclusion.
6 Q   Okay. Let's go back to Paragraph 30, and I want to,
7    again, ask you since I didn't understand your past
8    answer.
9          Look at Paragraph 30, the third paragraph of
10    Paragraph 30: Notwithstanding the foregoing,
11    buyer shall only encumber the 8.57 acre parcel
12    expected to be developed -- parentheses --
13    consisting of .93 acre parcel and 7.64 acre horse
14    farm parcel. Do you see that?
15 A   Yes.
16 Q   Again, I'm going to ask you what made you consider
17    that the security for the four hundred thousand dollar
18    loan from Mrs. Kunelius to TPL would be anything but
19    the parcel described for security in Paragraph 30?
20 A   And as I sit here today, I don't know what caused me
21    to reach that conclusion.
22 Q   In fact, isn't it fair to say that it's entirely
23    possible that your conclusion was wrong?
24             MS. FETOUH: Objection.
                    - 150 -

1 A   I don't know if that is a fair thing to say. What I
2    started to talk about was the configuration of the
3    8.57 acre parcel. One of the things TPL was doing was
4    considering revising the boundary between the town
5    parcel and the developed parcels, and the reason that
6    we imagined doing that was to facilitate the
7    redevelopment, or the reconfiguration, of 142 and 144
8    so that they could be sold. There were a number of
9    provisions in the subdivision law that required us --
10    I think there were shape variances and various things
11    that required us to redraw the boundary of the line
12    between the town parcels and the developed parcels. I
13    don't know, as I sit here today, whether or not that
14    followed the same line.
15 Q   But where in the purchase and sale agreement or in the
16    assignment does it allow TPL to alter such a basic
17    term of the purchase and sale agreement involving the
18    very essence of the amount that is to be paid and how
19    it's to be paid? In other words, does TPL, simply as
20    an assignee, have the right to say, "I don't like this
21    term as defined in Paragraph 30, and, therefore, we're
22    going to do something else"? Is that what TPL
23    believes is their right under the assignment?
24             MR. CONROY: Objection.
                    - 151 -

1             MS. FETOUH: Objection.
2 A   I don't know what you're asking.
3 Q   You do not know what I'm asking? Is it your testimony
4    that TPL could unilaterally change the terms and
5    provisions of Paragraph 30 and not have to comply with
6    Paragraph 30?
7 A   That's not my testimony.
8 Q   Is it your testimony that you agreed to comply with
9    Paragraph 30?
10           MS. FETOUH: Objection.
11           MR. CONROY: Objection.
12 A   We stepped into the shoes of the contract.
13 Q   But the contract does not say that there will be a
14    redefining of the 8.57 parcel. It doesn't say that
15    anywhere, does it?
16 A   This discussion is in the context of trying to decide
17    whether or not the four hundred thousand dollar
18    mortgage was available or usable, correct?
19 Q   Well, certainly, I think you're aware that it was
20    available. Mrs. Kunelius was willing to lend it. The
21    question becomes whether TPL believed it could
22    unilaterally say, "We're not going to do it unless we
23    get a subdivision in a manner that we deem
24    appropriate. Otherwise, there is no availability."
                    - 152 -

1    Essentially, that's what you're saying, and I'm
2    saying, where in the contract does that allow --
3 A   I think you've misunderstood me.
4           MS. FETOUH: Objection.
5           MS. ECKER: Objection.
6           MR. CONROY: Objection.
7 A   With respect to the subdivision, the subdivision issue
8    relates to the question of how TPL would create value
9    and bring dollars to the table. What became apparent
10    is that that subdivision wasn't possible.
11 Q   But your argument, I think, sir, is that you stepped
12    into the shoes of the buyer. The shoes of the buyer
13    allowed for what was contained in Paragraph 30, but
14    you didn't like what was contained in Paragraph 30, so
15    TPL changed those terms by seeking to get variances,
16    did you not?
17           MS. FETOUH: Objection.
18           MR. CONROY: Objection.
19           MS. ECKER: Objection.
20 A   With all due respect, it's a complete non sequitur.
21    What I'm talking about is how TPL brings money to the
22    table, not whether or not this contract imagines or
23    doesn't imagine us doing that.
24 Q   Well, do you agree that you stepped into the shoes of
                    - 153 -

1    the buyer?
2           MS. FETOUH: Objection.
3 A   Yes.
4 Q   And do you agree that some terms do not apply to TPL?
5 A   As a matter of Chapter 61 law, or lore, the assignee
6    is naturally required to comply with some but not all
7    terms.
8 Q   Does the assignee have to comply with the purchase
9    price?
10          MR. CONROY: Objection.
11          MS. FETOUH: Objection.
12 A   If the assignee goes forward and purchases the
13    property, I would say yes.
14 Q   I'm going to put before you another document.
15          (WHEREUPON, Exhibit No. 14, Conditions
16    for right of first refusal, marked for
17    identification.)
18 Q   The document that I am putting before you appears to
19    be an iteration of what you've already seen as
20    Exhibit 7. It was received from the Town of
21    Stow. It has DRAFT on the top. It discusses the
22    conditions for transfer of the town's right of
23    first refusal on the Kunelius property. The bold
24    language appears to be TPL's answers to
                    - 154 -

1    questions.
2          I had asked you earlier if you remembered
3    Exhibit 7, and you said you were not sure or, no,
4    you didn't. I'm asking you now. Do you remember
5    what is now Exhibit 14?
6          MR. CONROY: Objection.
7 A   It looks somewhat familiar.
8 Q   And isn't it in fact true that all of the TPL
9    responses are after each question raised by the town,
10    and those responses are in bold print?
11 A   It appears that way.
12 Q   And are you the author of the bold print responses?
13 A   I believe so.
14 Q   And you would agree with me that this correspondence,
15    or this document, had to be drafted prior to the
16    assignment?
17 A   That would make sense.
18 Q   So, let's look at Item No. 2, which is referring to
19    the town's request that the town be held harmless if
20    TPL backs out of the deal before closing, in other
21    words, and I'm quoting, in order words, that TPL will
22    defend the town against any suit resulting from the
23    failure of the property purchase to be completed.
24    Alternatively, TPL posts a bond that guarantees their
                    - 155 -



1  performance. Then there's a response.
2  TPL: The appropriate way for risks
3  presented by this project to be managed are for
4  the common law of contract to apply. This law
5  will require TPL, not the town, to be obligated
6  to perform if the right of first refusal is
7  assigned. The town's legal responsibility ends
8  with the assignment. If we are offered the
9  opportunity to accept the assignment and we
10  decide to go forward, the law will require us to
11  meet the essential requirements of the contract
12  or suffer the consequences of default.
13  Now, at this point, you were referring, were
14  you not, to the fact that if you defaulted, then
15  the only money that was at risk to you was the
16  20,000 or $22,000 that had been paid as earnest
17  money to Mrs. Kunelius, is that correct?
18  MR. CONROY: Objection.
19  MS. FETOUH: Objection.
20 A  We believed that the liquidated damages provision
21  would apply.
22 Q  Now, I want you to go to the last page, Item No. 7.
23  The town raises the following issue: Because of the
24  difference in type of buyer, any parts of the P&S that
- 156 -

1  TPL believes don't apply should be addressed. A,
2  Paragraph 8, Time Performance, references a 12-month
3  extension if 40B approval process is proceeding
4  forward. B, Paragraph 30, Purchase Price Financing,
5  references a construction loan of 80 percent of the
6  construction costs. C, Paragraph 30, Purchase Price
7  Financing, references all purchase agreements of the
8  Co-housing project should be assigned to the seller as
9  further security. D, Paragraph 30, buyer shall only
10  encumber the 8.57 parcel. E, Paragraph 32, buyer and
11  seller agree to cooperate on a 40B submission. F,
12  Paragraph 35, upon receipt of all permits for the
13  development of the 8.57 acre parcel, seller will
14  transfer the right of the 42.1 acre parcel to the
15  town.
16  Now, those appear, is it fair to say that
17  those appear, to be the issues that the town was
18  identifying that needed to be considered in
19  reference to the difference in the buyer, in the
20  type of buyer? Is that how you understood that
21  question?
22 A  I understood the question to be just a straight-up
23  question to TPL, whether or not A through F apply.
24 Q  Look at your response. TPL: Because the decided
- 157 -

1  cases under Chapter 61 do not explicitly resolve all
2  of the potential issues that arise when a municipality
3  assigns its right of first refusal to a non-profit
4  conservation organization, including which of the
5  terms of the underlying contract should obligate the
6  assignee, it would be prudent for TPL and Marilyn
7  Kunelius' attorney to enter into good-faith dialogue
8  to determine which terms are relevant and which are
9  truly inapplicable. Do you see that?
10 A  Yes.
11 Q  So, you knew prior to accepting that that, in fact,
12  Chapter 61 did not identify with any certainty at all,
13  nor did the cases applying to Chapter 61 explicitly
14  resolve, what terms were applicable to whom.
15  MS. FETOUH: Objection.
16  MR. CONROY: Objection.
17  MS. ECKER: Objection.
18 A  That's not true.
19 Q  Well, I believe earlier you testified that -- I think
20  you said the cases -- I don't remember. You said that
21  you believed that, given the case law under Chapter
22  61, you could rely on the liquidated damage clause
23  provision. Yet, in this correspondence, you say,
24  because the decided cases under Chapter 61 do not
- 158 -

1  explicitly resolve all the potential issues that
2  arise, the parties essentially have to get together to
3  decide what truly does apply and what doesn't.
4  So, in your mind, is it fair to say that you
5  understood that the parties, i.e., yourself and
6  the town and Mrs. Kunelius, did not have an
7  understanding as to what terms specifically
8  applied and what did not and that's why you
9  suggested getting together with them?
10  MR. CONROY: Objection.
11  MS. FETOUH: Objection.
12  MS. ECKER: Objection.
13 A  Okay. Well, there's a lot of pieces to that question.
14  I guess what I'd start by saying is that what TPL said
15  there was that the cases don't resolve all of the
16  issues but that, together with the advice of counsel,
17  it was clear to us that some provisions would apply.
18 Q  What provisions? What provisions would apply?
19  MS. FETOUH: Objection.
20 Q  The P&S, you have the P&S right in front of you.
21  Let's go through them and decide, have you tell me
22  right now, what provisions would apply and what
23  provisions would not.
24  MS. FETOUH: Objection. And I'll just
- 159 -

1  note the concern that this will infringe on
2  communications with counsel, as the witness has
3  identified, and just instruct the witness to
4  limit his answer to anything that does not
5  involve communications with counsel.
6 A  Much of what I would say would refer to communications
7  with counsel.
8  MR. McLAUGHLIN: You want to go this
9  way?
10  MS. FETOUH: Well, I think I need some
11  time to talk to the witness about what those
12  communications are and the extent to which they
13  were shared with others.
14  MR. McLAUGHLIN: Okay. If you want to
15  go this way, we can go over to the court right
16  now. If your argument is, if I understand this,
17  that he's not going to testify as to what
18  provisions apply and don't apply because he only
19  heard it from his counsel, if that's what you're
20  actually saying, then I am prepared to go over to
21  see the judge right now if in fact that's what
22  you're saying. Maybe you're not.
23  MS. FETOUH: I think what I said is I
24  need to speak to the witness about this.
- 160 -

1  MR. McLAUGHLIN: Well, wait a minute.
2  The position taken by TPL, the position taken by
3  TPL is that some provisions apply and some do
4  not. It is a quintessential component of the
5  case as to what provisions do and do not apply.
6  This man is the director of Massachusetts and has
7  been the decision-maker with regard to a large
8  percentage of what's before the court right now.
9  I have every right for him -- since he has
10  testified he is aware that, under the provisions
11  of Chapter 61, certain provisions do and do not
12  apply, I certainly have the right to say, fine,
13  here's the P&S. Tell me what applies and what
14  doesn't. And if he says, no, I'm sorry, I
15  learned that from my counsel, I'm not asking what
16  counsel told him. I'm asking what is his
17  understanding. That's simple, what his
18  understanding is. I'm not asking what his
19  counsel told him.
20  MS. FETOUH: And it may be that he can
21  answer those questions, but I need an opportunity
22  to speak with my witness first. If I can have
23  that for a few minutes, we'll be right back.
24  MR. McLAUGHLIN: Okay.
- 161 -



1   MR. CONROY: And I would add to that,
2   Mr. McLaughlin, that you do have a 30(b)(6)
3   deposition coming, and this is not the
4   appropriate role for this deposition. Let me
5   finish, please. You're here, as I understand it,
6   to question Craig MacDonnell about Craig
7   MacDonnell's memories, things he saw, touched,
8   smelled, heard, whatever. You'll have another
9   opportunity to depose the Trust for Public Land
10  as to what their position is.
11      MR. McLAUGHLIN: That is true.
12      MR. CONROY: And let me suggest that
13  that be deferred to that deposition.
14      MR. McLAUGHLIN: I think I should have
15  the right, since he's already testified what he
16  knows under Chapter 61, to ask him the questions
17  of which one applies. You can talk to him.
18  You're talking to him in his role as an employee
19  of TPL.
20      MS. FETOUH: That's correct.
21      MR. McLAUGHLIN: Okay. Just for the
22  record, I want to note that the responses in this
23  case have been indistinguishable as to who is
24  saying what since they've been jointly filed.
                    - 162 -

1   So, each response is from Craig MacDonnell, and
2   statements regarding these types of questions
3   have also been defended by Craig MacDonnell.
4   That's why we have a joint motion to dismiss
5   statements by Craig MacDonnell that say there are
6   certain provisions that apply and there are
7   certain provisions that do. It's in your
8   responses.
9       So, if it was only in TPL's, I would say
10  maybe you're right. That's not what you guys
11  elected to do, but if you want to talk to him,
12  that's fine. We can take a break.
13          (Recess, 3:10 P.M.)
14          (After recess, 3:17 P.M.)
15          (All parties present)
16      MS. FETOUH: I've had an opportunity to
17  speak with Mr. MacDonnell. We'll allow him to
18  answer your question to the extent of his
19  understanding of the answer to your questions in
20  his individual capacity, not speaking for TPL as
21  an institution.
22      MR. McLAUGHLIN: Okay. Thank you.
23      MR. KACHAJIAN: Is this regarding the
24  purchase and sale?
                    - 163 -

1       MR. McLAUGHLIN: Yes. You probably
2   ought to go.
3           (Mr. Kachajian exits the room.)
4       MR. CONROY: And let me make my little
5   piece, too, if I may. I have objected
6   previously, and now again, to the mixing of what
7   I think is appropriate 30(b)(6) versus individual
8   deposition and also to the notion of querying
9   Mr. MacDonnell as a legal expert. With those
10  objections stated and reserved, I have no grounds
11  to instruct him not to answer, other than to be
12  careful that he doesn't reveal any attorney-
13  client confidences.
14  By MR. McLAUGHLIN:
15 Q Okay. Before we go into the purchase and sale
16  agreement, I want to go back to some of your prior
17  testimony. Do you remember we talked about the fact
18  that you didn't know that variances were not going to
19  be granted until well after the acquisition of the
20  assignment?
21 A My memory was that I had reason to believe that the
22  variance would be granted.
23      (WHEREUPON, Exhibit No. 15, Sommerlad
24  email to Kennedy, marked for identification.)
                    - 164 -

1 Q I have put before you what has been marked as Exhibit
2   15 and ask you if you recognize this document.
3 A I can describe it. I don't recall seeing it before.
4 Q Well, who is Ruth Kennedy, do you know?
5 A She's a Stow resident. I believe she's on the
6   Planning Board.
7 Q Who is Karen Sommerlad?
8 A She lives on Red Acre Road.
9 Q And Exhibit 15 is a letter from Karen Sommerlad to R.
10  Kennedy, Landvest. Subject, Planning Board. Question
11  re Kunelius property. Importance, high. Ruth, I
12  apologize for bothering you at work. I'm writing on
13  behalf of Friends of Red Acre and Craig MacDonnell.
14      Was Karen Sommerlad writing on your behalf
15  with regard to questions relating to variances
16  and special permits and so forth?
17 A Well, I don't know. I remember having some
18  conversations with a number of the Red Acre Road
19  people about subdivision.
20 Q Does this remind you or refresh your memory concerning
21  the fact that you were subsequently told that
22  subdivision and special permits were not going to be
23  granted in February of 2003?
24      MS. FETOUH: Objection.
                    - 165 -

1 A No.
2 Q Looking at the second paragraph, it reads: The
3   question is, if we need a zoning variance for lot
4   frontage and possibly other dimensional variances, can
5   we submit an approval-not-required, ANR, for the
6   submission and is the appropriate sequencing of events
7   to get variances and then submit the ANR? Is it
8   possible to submit an ANR and have it approved subject
9   to receiving the variances? Is an ANR in this
10  situation even possible?
11      Do you recall what the answer to those
12  questions were?
13 A I remember having questions about how to go forward on
14  the subdivision, and I believe we set up a meeting
15  with a representative of the planning office to cut
16  through the ambiguity in which we met with Karen
17  Kelleher who is an employee of the Town.
18 Q Let's go to this one.
19      (WHEREUPON, Exhibit No. 16, Jacobs
20  email to Sommerlad and Kennedy, dated February 6,
21  2003, marked for identification.)
22 Q Before you is what has been marked as Exhibit 16, and
23  we're looking at the first page of that exhibit.
24 A Uh-huh.
                    - 166 -

1 Q This appears to be from Donna Jacobs to Karen
2   Sommerlad and Ruth Kennedy, copied to you. Do you see
3   that?
4 A Yes.
5 Q The second paragraph says: I do not clearly
6   understand your objective. However, I can add some
7   additional statements for your consideration. The
8   caretaker's cottage is a pre-existing, non-conforming
9   structure and use. As such, any extension, change in
10  use or alteration addition is subject to a special
11  permit from the ZBA. I am uncertain of the specifics
12  of the Kunelius property as I do not have a map I can
13  view at this time, but it is likely to be a pre-
14  existing, non-conforming lot because almost 90 percent
15  of the lots in Stow fall into that category. The
16  Planning Board cannot endorse an ANR plan that will
17  increase the degree of non-conformity of a pre-
18  existing non-conforming lot. Because the purpose of
19  the subdivision approval is to create lots with
20  adequate accesses, frontage and lot area in compliance
21  with the zoning bylaw, the board can't grant the
22  waivers you are seeking.
23      Now, this is dated February 6, 2003, is that
24  correct?
                    - 167 -



1  A  The email from Jacobs to Sommerlad?
2  Q  Yes.
3  A  Yes.
4  Q  So, you had reason to believe in early February, long
5     before the acceptance of the assignment, that there
6     were going to be problems with zoning for the two lots
7     in question, didn't you?
8        MR. CONROY: Objection.
9  A  We knew it would be a challenging subdivision that
10    would require relief from the relevant boards.
11  Q  But I thought you testified, sir, that you didn't have
12    any inkling that there was going to be a problem until
13    well after the acceptance of the assignment and it was
14    well into the process. In fact, you did have
15    knowledge very early on, even before you accepted the
16    assignment, that you weren't going to get approvals
17    from the Planning Board. Isn't that fair to say?
18       MS. ECKER: Objection.
19       MS. FETOUH: Objection.
20       MR. CONROY: Objection.
21  A  I think you're confusing two issues.
22  Q  What are the two issues I'm confusing?
23  A  One is whether there was an analysis to be had on the
24    front end about which waivers, which variances, which

- 168 -

1     permits, were required and which path through that
2     process was appropriate. My recollection is that that
3     issue was wrestled with and that Karen Kelleher, in a
4     meeting with TPL, led us to believe that those issues
5     could be resolved. So, later on, however, in the
6     process, another more complicating factor emerged, so
7     that when I was referring to the problem earlier -- do
8     you follow me?
9  Q  Yes.
10  A  That I was referring to the problem that developed
11    later rather than the analysis, sort of the just
12    working through the kinks on the front end.
13  Q  Let's go to the purchase and sale agreement, if you
14    would. Where in the purchase and sale agreement
15    between Mrs. Kunelius and Co-housing does it discuss
16    zoning changes, special permits or variances?
17  A  I don't believe there's any reference to those issues
18    in the contract.
19  Q  So, the insertion of a zoning variance, special
20    permit, subdivision issues, those three issues, was
21    made by TPL since it's not discussed in the purchase
22    and sale agreement itself.
23  A  We're not inserting anything. I'm not suggesting that
24    the subdivision issue is a contract contingency. It's

- 169 -

1     a fund-raising obstacle.
2  Q  So, let me move back. This is the first time I've
3     heard that.
4        So, your refusal to move forward and
5     purchase the property did not result from the
6     failure to get a subdivision plan approved, or
7     any variances or permits that would be needed,
8     for the project that you envisioned to be built
9     on the site rather than what Mosaic Commons
10    envisioned. Is that correct?
11       MR. CONROY: Objection.
12       MS. FETOUH: Objection.
13  A  What I'm saying is that the difficulty TPL encountered
14    in achieving the subdivision was not related to the
15    contract per se at all. It was a project issue that
16    prevented TPL from subdividing 142 and 144 and thus
17    realizing on the sale of the separate lots.
18  Q  You realize, sir, that Mrs. Kunelius lost the
19    opportunity to sell the property to Mosaic Commons as
20    a result, direct result, of the actions of TPL in
21    accepting the assignment and then failing to go
22    forward in the purchase.
23       MS. FETOUH: Objection.
24       MR. CONROY: Objection.

- 170 -

1  Q  Do you realize that?
2  A  Is that a question?
3  Q  Yeah.
4  A  I believe that the contract played out as it was
5     intended, to either enable Mosaic or the assignee to
6     go forward under the contract.
7  Q  But, in fact, neither did. Isn't that correct?
8  A  In fact, the contract imagined either a sale or a
9     default, and the default resulted in liquidated
10    damages. That was the end of the contract.
11  Q  Is it your testimony that you believe Mrs. Kunelius
12    anticipated that TPL -- strike that.
13       Prior to TPL scoping out Mrs. Kunelius'
14    property, did you ever meet with her?
15  A  Prior to scoping it out?
16  Q  Yeah.
17  A  No, I believe we spoke on the phone and met through
18    the course of the project.
19  Q  But is it your testimony that you believe
20    Mrs. Kunelius anticipated that TPL would come in
21    and then default and that she would lose, as a
22    result of that default, the opportunity to sell
23    the property to Mosaic Commons?
24       MR. CONROY: Objection.

- 171 -

1        MS. FETOUH: Objection.
2        MS. ECKER: Objection.
3  A  I have no idea what Mrs. Kunelius --
4  Q  Do you have an understanding that Mrs. Kunelius had
5     considered such an outcome when she was negotiating
6     her deal with Mosaic Commons?
7        MR. CONROY: Objection.
8        MS. FETOUH: Objection.
9  A  Given that I wasn't in the room when she was talking
10    about this contract with her attorney, I have no idea
11    what she anticipated.
12  Q  Looking at Paragraph 1, 2, 3, 4, of the purchase and
13    sale agreement, since I don't think anyone disagrees,
14    at least for the purposes of today, that those apply,
15    or perhaps they don't. Do you agree that all of those
16    provisions, 1, 2, 3 and 4, of the purchase and sale
17    agreement apply to TPL?
18  A  Well, I'll go through them one by one. Should I do
19    that?
20  Q  Sure.
21  A  Paragraph 1 speaks in terms of the seller and the
22    buyer, and the buyer is listed as Co-housing
23    Resources, not TPL.
24  Q  Right.

- 172 -

1  A  Of course, the operation of 61 would alter that.
2     Paragraph 2 talks about the property. Paragraph 3
3     talks about the buildings. Paragraph 4 talks about
4     title.
5  Q  Well, let me stop at Paragraph 3 for a minute. It
6     says in as-is condition, does it not?
7  A  Those are the last three words of Paragraph 3.
8  Q  Do you have an understanding as to what as-is
9     condition means?
10  A  I do.
11  Q  And what is your understanding?
12  A  That the property is sold as is.
13  Q  Not with additional subdivisions, doesn't mention
14    that. Doesn't mention additional permits. It says as
15    is, isn't that correct?
16       MS. FETOUH: Objection.
17       MR. CONROY: Objection. It says what
18    it says.
19  Q  Well, you don't see anything in there that talks about
20    additional provisions such as subdivisions or permits
21    or anything.
22  A  As I mentioned a minute ago, the question of
23    subdivision is not a contract -- just allow me to
24    finish -- is not a contract issue that TPL is raising.

- 173 -



1 It's a fund-raising issue.
2 Q Have you ever made such a statement to the court, that
3 the subdivision issue was a function of the fund-
4 raising and that's why it didn't have the money?
5 MS. FETOUH: Objection.
6 MS. ECKER: Objection.
7 MR. CONROY: Objection. This
8 deposition is out of control. I will say that on
9 the record. And there comes a time when it gets
10 out of control.
11 MR. McLAUGHLIN: I have to say I am
12 just totally appalled, sir. I am appalled by
13 this --
14 MR. CONROY: Well, I'm sorry to hear
15 you're appalled. Now, why don't you ask a
16 factual question and go forward.
17 MR. McLAUGHLIN: I am just appalled at
18 the behavior of this man who is a member of the
19 bar. I am appalled.
20 MS. FETOUH: Objection.
21 MR. CONROY: I am going to walk out of
22 this room the next time that gets said or
23 anything of that sort gets said.
24 MR. McLAUGHLIN: You go ahead.
— 174 —

1 MR. CONROY: And you can talk to Judge
2 O'Toole and tell him, and I hope the stenographer
3 is getting this. You can tell him and defend to
4 him why you are abusing this witness. If you
5 want to ask a question, ask it, and he will
6 answer it.
7 MR. McLAUGHLIN: Do not, do not, point
8 your finger at me.
9 MR. CONROY: I'll point anything I want
10 at you. Go ahead and ask your question.
11 MR. McLAUGHLIN: If you'd like to walk
12 out of this, you do anything you want. The rules
13 are the rules. If you want to disregard the
14 rules, that's fine.
15 MR. CONROY: Yeah, the rules include,
16 the ethical rules include, not abusing a witness.
17 So, let's continue.
18 MR. McLAUGHLIN: I understand your
19 frustration based upon what's happened already in
20 this deposition, because -- I understand all of
21 your frustrations, because I can't believe that
22 there is a six million dollar line of credit and
23 all of you told the judge that there was no money
24 available.
— 175 —

1 MR. CONROY: Okay. Go ahead.
2 MR. McLAUGHLIN: Good luck. Not all
3 but maybe all.
4 Q All right. Let's look to number four. Did the title
5 provision apply to TPL?
6 A Based on sort of my own perception of this?
7 Q That's right. All of these are based upon your
8 perception as the director of the Massachusetts branch
9 of TPL.
10 A By your question, I assume you're asking whether or
11 not TPL, as the assignee, has the right to require
12 Mrs. Kunelius to provide good title.
13 Q I presume that's what I mean.
14 A Well, if that's what you mean, I'll answer. I don't
15 want to guess about what you mean.
16 Q Does Paragraph 4, is that obligation applicable to
17 TPL?
18 A I believe it's applicable to Mrs. Kunelius. It
19 requires her to deliver good title.
20 Q Five, Paragraph 5?
21 A It requires Mrs. Kunelius to deliver the plan
22 referenced there.
23 Q Six?
24 A I would say that would require Mrs. Kunelius to comply
— 176 —

1 with the requirements related to registered land.
2 Q Paragraph 7, Purchase Price, I'm going to direct your
3 attention to the amount of the deposit listed under
4 Paragraph 7. How much of a deposit was made under
5 this provision?
6 A The first line says zero.
7 Q And noting the bottom of the compilation of numbers
8 there, four hundred thousand promissory note secured
9 by a mortgage, do you see that?
10 A Yes.
11 Q It has an asterisk that refers to Paragraph 30 for
12 further terms and provisions.
13 A Yes.
14 Q And turn to Paragraph 30. Now, this is the paragraph
15 that you had already looked at. My question to you
16 now is: does Paragraph 30, is this an obligation of
17 Mrs. Kunelius under the terms of the purchase and sale
18 agreement?
19 MS. FETOUH: Objection.
20 MR. CONROY: Objection.
21 A Based on my own perception of this contract, not from
22 TPL's perception, it would require Mrs. Kunelius to
23 make that mortgage a part of the assigned
24 relationship.
— 177 —

1 Q And you would agree that the mortgage is secured by
2 the 8.57 parcel as we've already discussed?
3 A We have already discussed that.
4 Q And looking at the time for performance, number eight,
5 is that time for performance applicable to TPL?
6 A I would say the first sentence is. The reference to
7 Chapter 40B would not apply.
8 Q So, the time for performance by TPL was September 26,
9 2003, correct?
10 A That's what the contract says.
11 Q Did you perform at that time?
12 A Did we bring the purchase price to the table on that
13 date?
14 Q Yes.
15 A No.
16 Q Now, is it your understanding that the bold language
17 of Paragraph 8 did not apply to TPL or was optional
18 for TPL?
19 A Well, based on my own understanding of the provision
20 and my own understanding of the law, the Chapter 40B
21 related extension would be inapposite to TPL.
22 Q And by inapposite, meaning that it just would be
23 inapplicable, it would be inappropriate based upon the
24 goals and directions of TPL as a conservation
— 178 —

1 foundation.
2 A No. No.
3 Q What do you mean by inapposite, then?
4 A It means, I mean, that TPL would not be in the
5 business of applying for a Chapter 40B approval.
6 Q But there was nothing that prevented TPL from moving
7 forward and obtaining a 40B approval, except that TPL
8 did not want to. Is that correct? Is there anything
9 in this contract, I'm taking about, that prevents TPL
10 from doing that?
11 A No.
12 Q In fact, this contract anticipates that the buyer
13 would do that. Isn't that fair to say?
14 A Anticipates that Mosaic Commons would.
15 Q And you testified before that TPL steps into the shoes
16 of Mosaic Commons, correct?
17 A I have.
18 Q And would it be your testimony that Mrs. Kunelius
19 should have understood that maybe TPL may also want to
20 do a 40B?
21 MS. FETOUH: Objection.
22 A I have no idea what she would have expected.
23 Q Number nine, does this apply to TPL?
24 A I believe it would require Mrs. Kunelius to comply
— 179 —

— 180 —

1  with that paragraph.
2  Q  Number ten?
3  A  I believe the printed paragraph before the asterisk
4     would enable Mrs. Kunelius to perfect title and go
5     forward.
6  Q  Number eleven and twelve are related. So, I'm going
7     to ask you, at any time, did you determine that
8     Mrs. Kunelius had failed to provide the property
9     in accordance with what she was required to do by
10    way of title defect? Did you identify any title
11    defects?
12 A  I don't recall any title defects.
13 Q  So, twelve really doesn't apply because no defects
14    were identified. What about thirteen?
15 A  I haven't read Paragraph 12 yet, but I'll move on to
16    thirteen. Or eleven. Okay. I believe Mrs. Kunelius
17    could, based on my own understanding, could ask that
18    TPL live by the terms of Paragraph 13.
19 Q  Fourteen?
20 A  That would enable Mrs. Kunelius to clear title with
21    purchase.
22 Q  Fifteen?
23 A  Fifteen, based on my own understanding, would require
24    Mrs. Kunelius to maintain insurance on the property.

— 181 —

1  Q  Sixteen, seventeen, together, since they deal with
2     adjustments, would you agree that at the time of
3     closing, TPL would have the right to make adjustments
4     on fees paid for water, sewer and so forth, and
5     Mrs. Kunelius would have the right to recover on
6     amounts that had already been paid but not fully
7     accrued?
8  A  I'm just going to read these quickly.
9  Q  Okay.
10 A  It appears as if 16 and 17 could be utilized by both
11    Mrs. Kunelius and the assignee.
12 Q  Who was going to pay the brokerage fee under eighteen?
13 A  The language of Paragraph 18 suggests that a brokerage
14    fee would be paid by the seller.
15 Q  Nineteen is probably inapplicable to this situation.
16    The deposit described in 20, were deposits made?
17 A  Yes.
18 Q  Were these the earnest money deposits that are
19    described in Paragraph 31?
20 A  I believe TPL made what are described in Paragraph 31,
21    or made deposits, however they're described, to
22    Mrs. Kunelius.
23 Q  Do you differentiate between a deposit and earnest
24    money?

— 182 —

1  A  It's been my understanding that a deposit is a deposit
2     is a deposit.
3  Q  And is earnest money earnest money earnest money?
4  A  My understanding all along is that whatever had been
5     paid ahead of time before the purchase price, before
6     the closing, excuse me, was a deposit.
7  Q  And is that because of your understanding of normal
8     real estate procedure in which money was put down to
9     hold the property?
10 A  It's my recollection of this transaction.
11 Q  Did you have any understanding that the earnest monies
12    described in Paragraph 31 were to be used as living
13    expenses by Mrs. Kunelius during the pendency of the
14    40B approval process?
15 A  No.
16 Q  So, is it fair to say there's nothing in this contract
17    that says that, but did you have any separate
18    understanding that the money that was being given to
19    Mrs. Kunelius, that fifteen hundred dollars a month,
20    was because she didn't have any money to live on and,
21    therefore, Co-housing agreed that they would pay her
22    living expenses while they went forward?
23 A  No.
24 Q  Today is the first time you've heard that?

— 183 —

1  A  Yes.
2  Q  On Paragraph 21, that's the provision that you believe
3     applies, is that correct, on liquidated damages?
4  A  I do believe, on my own personal understanding of the
5     contract, that Paragraph 21 applies.
6  Q  Twenty-two, 23, 24, don't seem to apply. Twenty-five?
7  A  Based on my own understanding of the contract, I
8     believe Paragraph 25 would apply.
9  Q  So, representations made by you on behalf of TPL would
10    apply to this purchase. Is that fair to say? Is that
11    how you read that?
12        MS. FETOUH: Objection.
13        MS. ECKER: Objection.
14        MR. CONROY: Objection.
15 A  The way I read that is as follows: the buyer
16    acknowledges that the buyer has not been influenced to
17    enter into this transaction nor has he -- I guess, in
18    this case, she -- relied upon any warranties or
19    representations not set forth or incorporated in this
20    agreement. And it goes on.
21 Q  And TPL is the buyer?
22 A  TPL is the assigned buyer.
23 Q  Mortgage contingency clause refers to 80 percent of a
24    project construction price. Under your understanding

— 184 —

1     of this contract, could you have borrowed money, TPL
2     have borrowed money, construction loan, and have it
3     secured by the property?
4        MR. CONROY: Objection.
5  A  Based on my own understanding of the contract, this is
6     exactly the kind of provision that would not apply to
7     TPL.
8  Q  That's by election of TPL. In other words, if TPL
9     were to elect to have a project construction price, I
10    mean, a conventional financing, they could do that.
11    TPL could have availed themselves of this provision,
12    correct?
13        MS. FETOUH: Objection.
14        MS. ECKER: Objection.
15        MR. CONROY: Objection.
16 A  Well, speaking on my own understanding of the
17    contract, it appears that Paragraph 26 was designed to
18    enable -- we've been saying Mosaic Commons, but it's
19    actually Co-housing Resources -- to borrow money to
20    build the project that they imagined, and since that
21    notion really is inapposite to what TPL was intending
22    to do, it seems to me that Paragraph 26 would not be
23    available for TPL to rely on.
24 Q  That's because TPL wouldn't do the 40B. Is that

— 185 —

1     correct?
2  A  It's because that provision imagines a large-scale
3     construction on the property.
4  Q  So, it is important for you to consider what the
5     provision must have imagined at the time that it was
6     entered into in order for it to have some validity in
7     the contract. Is that your testimony?
8        MS. FETOUH: Objection.
9  A  My testimony is, on my own personal understanding of
10    the law, is that a court would require some provisions
11    to apply and others not to apply and that there would
12    be an analysis conducted by a judge, if this were ever
13    put to a judge, that would figure out which provisions
14    are applicable to an assignee and the assignee's
15    purpose under the statute.
16 Q  Where does it say that, under the statute? Have you
17    ever found any particular portion of the statute that
18    deals with what the intention of the assignee or his
19    purpose might be, his or its purpose?
20 A  What I'm referring to is the lore and the common law
21    under Chapter 61A that's understood by Chapter 61A
22    practitioners.
23 Q  So, you've had some experience identifying what
24    Chapter 61A practitioners do as a matter of course.



1 How did you establish what that was?
2 A It's through working with them.
3 Q Any other provision of the purchase and sale agreement
4 that you believe -- well, which one are we on here?
5 We're on the mortgage contingency, the construction of
6 the agreement, lead paint law, smoke detectors. The
7 purchase price financing, we have already discussed.
8 The earnest money, we have discussed. The 40B
9 application and transfer of the land, I think you've
10 discussed. Are there any other provisions? For
11 example, let's go to thirty-five.
12 A I don't think I have an opinion on that one.
13 Q Well, you would agree with me, wouldn't you, that the
14 seller was not going to convey the entire parcel to
15 Co-housing but, rather, was going to convey 8.57 acres
16 only, and that the purchase price was for the 8.57
17 acres only and that the remaining parcel would be
18 transferred as a charitable contribution to the town?
19 Isn't that correct?
20 A Paragraph 35 contemplates that.
21 Q But that's not what TPL contemplated, is it? In other
22 words, TPL did not contemplate spending 1.116 million
23 dollars for the 8.57 acres, did it?
24 MS. FETOUH: Objection.

- 186 -

1 A I think it imagines, speaking of my own understanding
2 of the contract, that it would have the ability to
3 control the whole parcel and achieve the conservation
4 project that we've talked about.
5 Q Your answer, therefore, is that TPL did not want to
6 comply with a strict reading of Paragraph 35 because
7 TPL wanted to control the whole parcel. Is that fair
8 to say?
9 MS. ECKER: Objection.
10 MS. FETOUH: Objection.
11 MR. CONROY: Objection.
12 A No, I'm saying that our intention was to have that
13 parcel, a conservation parcel that in our minds was
14 that parcel, go to the town and that there be a
15 development on a portion adjacent to Red Acre Road
16 that would bring enough dollars to be able to pay
17 Mrs. Kunelius.
18 Q Or pay back TPL had they borrowed on their line of
19 credit.
20 A Our intention was to pay Mrs. Kunelius.
21 Q But that money from the parcel development was
22 intended, at least initially, according to the
23 statements that you made to the Commonwealth of
24 Massachusetts, that that development would pay back

- 187 -

1 TPL for the money it borrowed under its line of credit
2 with Wainwright Bank.
3 MS. FETOUH: Objection.
4 A If TPL decided to borrow the money.
5 Q So, the crux of the issue, from your point of view, is
6 that it was simply an issue of whether TPL decided it
7 wanted to borrow or not. If it didn't, then it
8 wouldn't. If it did, Mrs. Kunelius would be paid. Is
9 that fair?
10 MS. FETOUH: Objection.
11 A No.
12 Q What's unfair about that?
13 A What I've tried to help you understand is that TPL's
14 mission was to complete this project. The way we
15 would go about that would be to raise money in these
16 various ways. If it appeared likely that either
17 private fund-raising or private sales were going to
18 come together successfully, then TPL would have
19 considered borrowing ahead of time, but where, in this
20 case, where it seemed so unlikely that those various
21 sources of money would come back to TPL, that it would
22 not have been prudent for TPL to borrow.
23 Q So, it was the fact that TPL faced a risk of loss that
24 was the reason that they didn't go forward. When you

- 188 -

1 were doing that analysis, is it fair to say that you
2 became aware that Mosaic Commons had been dissuaded
3 from re-applying to purchase the property and get a
4 40B because of the activities of TPL and the Town of
5 Stow?
6 MS. FETOUH: Objection.
7 MR. CONROY: Objection.
8 A No.
9 Q Did you ever have discussions with anyone from Mosaic
10 Commons or Co-housing?
11 A Yes.
12 Q Are you aware that Mosaic Commons believes that TPL
13 and the Town of Stow were intentionally trying to
14 dissuade it from coming back and purchasing the
15 property under the 40B requirement?
16 MR. CONROY: Objection.
17 A I am not aware of that.
18 Q Are you aware of any conversations between yourself
19 and anyone from the town dealing with the fact that
20 the town members were pleased with your efforts
21 because it resulted in the 40B being defeated, in
22 effect, because Mosaic Commons would not come back?
23 MS. ECKER: Objection.
24 MR. CONROY: Objection.

- 189 -

1 A No.
2 Q It is your testimony that no one ever said to you that
3 the outcome prevented low-income housing from being
4 adjacent to the properties and the Red Acre Road and
5 that that was a result that a lot of people hoped to
6 achieve?
7 A I don't recall anyone saying that to me in so many
8 words, no.
9 Q Do you recall them saying it to you in some other
10 fashion?
11 A Well, I have an understanding, and, actually, as I sit
12 here now, I don't know where that understanding came
13 from, but I believe that the Friends of Red Acre were
14 disappointed this overall project did not go forward
15 but were not unhappy about Mosaic Commons not being
16 there.
17 Q And that's because Mosaic Commons was low-income
18 housing. Isn't that correct?
19 A Well, I can't say that.
20 Q Was there any other reason that you had heard as to
21 why the abutter would be happy that Mosaic Commons was
22 not going to be coming, other than the fact that the
23 housing they were going to be putting in was low-
24 income?

- 190 -

1 MS. FETOUH: Objection.
2 A Part of the justification of this conservation project
3 was that this was a delicate aquifer area. So, many
4 folks saw this conservation project as a way of
5 protecting Stow's water supply and that the absence of
6 any development on Mrs. Kunelius' land was good for
7 the water supply in the Town of Stow, and I think the
8 absence of a development on that property does result
9 in the protection of that water supply. So, that
10 would be another reason why people would be not
11 unhappy that Mosaic Commons is not around anymore.
12 MR. CONROY: When you're ready, five
13 minutes, ten minutes?
14 MR. McLAUGHLIN: Sure. I'll ask one
15 question and we'll take a break.
16 Q On February 11th, there was a town Board of
17 Selectmen's meeting concerning TPL, and I think you've
18 already testified that you attended that meeting. I'm
19 going to put before you the following document.
20 (WHEREUPON, Exhibit No. 17, Stow Board
21 of Selectmen meeting, February 11, 2003, marked
22 for identification.)
23 Q I'd ask you to look at the second page. These appear
24 to be minutes, although I can't tell exactly what they

- 191 -



1   are. It's a February 11th document. At the top is
2   Stow Board of Selectmen Meeting. It talks about
3   handouts. Some of it's written in the first person.
4   I don't know whether these are minutes or not.
5      Pointing to the second page, the last two
6   paragraphs say: If TPL can complete this deal
7   without additional cost to the taxpayers, I urge
8   you, then, to vote the way that the townspeople
9   have demonstrated at the polls, conservation, and
10   assign the right of first refusal under Chapter
11   61B to Trust for Public Land. Otherwise, the
12   proposed 40B development will have a negative
13   irreversible effect on the Red Acre community and
14   the Town of Stow.
15      When you were at that meeting, were you
16   aware that there were people who were against the
17   40B simply because it would have a negative
18   effect on the community?
19 A   Well, I don't recall this fellow, Drew Simmons, being
20   there, but apparently he's one.
21 Q   So, you don't recall that discussion?
22 A   I don't recall his presentation. I don't know if he
23   made a presentation. I've never seen this before, so
24   I don't know what it is.

- 192 -

1 Q   Okay. I'm going to put before you another document,
2   which is a compilation of documents from the Stow
3   Conservation Commission.
4      (WHEREUPON, Exhibit No. 18, Stow
5   Conservation Commission documents, marked for
6   identification.)
7 Q   I'd ask you to look to Bate stamp No. 154, and on that
8   Bate stamp number are Stow conservation minutes, April
9   15, 2004. Going down to about three-quarters of the
10   page down, Trust for Public Land/Kunelius parcel, it
11   states: Craig MacDonnell, of the Trust for Public
12   Land, TPL, and Carol Sommerlad, of the Friends of Red
13   Acre, requested a meeting with the Commission to give
14   them an update on their progress with the Kunelius
15   property on Red Acre Road. The Board of Selectmen
16   assigned the right of first refusal to TPL for the 50-
17   acre Kunelius Farm located on Red Acre, preventing a
18   40B Co-housing development.
19      So, you were aware, certainly, that your
20   efforts with TPL had the effect of preventing a
21   40B development. Is that fair to say?
22 A   Were we successful in conserving the property, the
23   property would have been conserved and not developed.
24 Q   Under 40B.

- 193 -

1 A   Correct.
2 Q   And you are aware, also, that under 40B there were no
3   permits or variances required by Co-housing in moving
4   forward. Isn't that correct?
5      MS. ECKER: Objection.
6      MS. FETOUH: Objection.
7 A   I don't know. I mean, I don't have a thorough
8   understanding Chapter 40B.
9 Q   Well, under the provisions of the purchase and sale
10   agreement, there were no contingencies for the
11   obtaining of variances or permits by Co-housing.
12   Isn't that fair to say?
13 A   Yes.
14 Q   And the only contingency under the purchase and sale
15   agreement was for some sort of feasibility study by
16   Co-housing. Is that fair to say?
17 A   I could go back and double-check the contract if you'd
18   like.
19 Q   You don't recall offhand. Is that your testimony?
20 A   Well.
21 Q   That's all right.
22 A   It's late in the day and I've been looking at a lot of
23   documents. I'd be happy to go back and take a look at
24   it.

- 194 -

1 Q   No, that's all right. Do you recall, when you had a
2   discussion with Mrs. Kunelius, that she told you that
3   the reason that she agreed to the Co-housing purchase
4   price of $1,116,900 was because, in effect, while it
5   was less than she wanted, there was a certainty of
6   collection because it was a 40B and did not require
7   any variances or permits? Do you remember her telling
8   you that?
9 A   No.
10 Q   As you sit here today, are you testifying that she did
11   not tell you that or that you do not remember that?
12 A   I have no recollection of her saying that.
13 Q   If she were to testify that she did say that, would
14   you testify that she did not?
15      MR. CONROY: Objection.
16      MS. FETOUH: Objection.
17      MS. ECKER: Objection.
18 Q   Or that you did not remember it?
19 A   I would be surprised to hear that testimony.
20 Q   Do you recall anything in a discussion with her
21   concerning the fact that the certainty of payment with
22   Co-housing under the 40B ensured that her retirement
23   would be available to her? Do you recall anything
24   like that?

- 195 -

1 A   I remember a reference to retirement. I don't recall
2   the reference being in the context of Chapter 40B.
3 Q   Do you recall her telling you that she had no money?
4 A   No.
5 Q   Did you ever go out on the site?
6 A   Uh-huh.
7      MR. CONROY: Yes or no.
8 A   Yes, I did go on the site.
9 Q   What was the condition of the house?
10 A   I never went in the house. I only saw it from the
11   outside.
12 Q   What was the condition of the barn?
13 A   It needed repair.
14 Q   Was it dilapidated?
15 A   You know, the structure was still pretty good. It
16   needed some work, but the basic timbers were fairly
17   strong.
18      MR. McLAUGHLIN: I'm going to read
19   something from the complaint and I'd like you to
20   leave.
21      (Mr. Norris exits the room.)
22 Q   I'd like you to turn to Paragraph 46 of the complaint.
23   It reads as follows: In the spring of 2004,
24   MacDonnell met with Kunelius, Kunelius' counsel and

- 196 -

1   Jim Boothroyd, and a local real estate broker, David
2   Norris, in connection with TPL's demands for a lower
3   purchase price. During that meeting, TPL threatened
4   and intimidated Kunelius and her counsel by stating,
5   generally, that TPL had serious and influential
6   connections by way of its Board of Advisors who would
7   defend TPL against any legal action brought by
8   Kunelius as a result of TPL's default.
9      I'm going to stop there and continue from
10   that point, but without commenting on Item No. 1
11   which I've just read, do you recall attending a
12   meeting with Kunelius, Kunelius' counsel,
13   Mr. Kachajian, Jim Boothroyd and David Norris and
14   others?
15 A   Is this Mr. Norris here?
16 Q   Yes.
17 A   Yes, I do remember a meeting in Boothroyd's office
18   with them.
19      MR. CONROY: Before you ask the next
20   question, we've been going a long time. I'd like
21   to take a little break before we go further.
22      MR. McLAUGHLIN: Sure.
23      (Recess, 4:14 P.M.)
24      (After recess, 4:24 P.M.)

- 197 -



1    (Messrs. Kachajian and Norris not present)
2    By MR. McLAUGHLIN:
3  Q  We were talking about the meeting, I think you said,
4    at Boothroyd's office. Do you remember if anyone
5    accompanied you from TPL to that meeting?
6  A  I don't believe so.
7  Q  Do you recall whether anyone from the town accompanied
8    you to that meeting?
9        MS. FETOUH: Objection.
10 A  You know, I don't remember. There were so many of
11   these with various players.
12 Q  Do you recall being assisted out of the room by one of
13   the individuals at that meeting because you had become
14   extremely angry, angry and agitated?
15 A  No, that did not happen.
16 Q  Do you know a Bob Wilbur?
17 A  I do know Bob.
18 Q  Do you recall, was Bob Wilbur at that meeting?
19 A  Bob Wilbur was at several of these meetings. This
20   doesn't have a date on it.
21 Q  You're looking at the complaint?
22 A  Yes.
23 Q  No, it doesn't not have a date. How well do you know
24   Jim Boothroyd?
                    - 198 -

1    I met Jim through this project.
2  Q  Do you recall the discussion between yourself and
3    Mrs. Kunelius and her representatives as being heated?
4  A  I remember this period of time continuing, actually,
5    into the fall, later -- what is the date, spring of
6    '04? Is that right?
7  Q  Yes.
8  A  I remember there were discussions in the spring and in
9    the summer and into the fall where TPL was trying very
10   hard to keep this project alive, and there were a
11   number of meetings to do that.
12 Q  When you say they were trying to keep the project
13   alive, do you recall proposing a new purchase price
14   for the property?
15 A  I recall trying to put together an alternative deal.
16 Q  And did that include a new purchase price?
17 A  Yes.
18 Q  And do you recall doing that on at least two
19   occasions?
20 A  Yes.
21 Q  Do you recall asking that the price be reduced to
22   $900,000?
23 A  I remember, I believe, eight hundred and nine hundred.
24 Q  Okay. Saved me the question. Under the terms of the
                    - 199 -

1    purchase and sale agreement, did you believe you had
2    the right to change the purchase price?
3  A  The contract was over at that point. We weren't
4    talking about the contract anymore.
5  Q  So, you viewed the contract as dead at that point?
6  A  Yes.
7  Q  Back to the meeting. Do you recall getting into an
8    argument with Mr. Kachajian and then threatening him
9    in any way?
10 A  I remember having a discussion where TPL was trying
11   very hard to come up with an alternative plan that
12   would get a significant amount of money into
13   Mrs. Kunelius' pocket, and what I remember is
14   that we weren't making any progress on that front
15   and that Mr. Kachajian and I went back and forth
16   on whether or not this was possible or not, and I
17   believe Mr. Kachajian was not encouraging this
18   outcome, and I was trying my best to encourage
19   him that it's a good opportunity for
20   Mrs. Kunelius.
21 Q  And the good opportunity you're talking about is
22   accepting a lower purchase price. Is that fair to
23   say?
24 A  Lower than the contract price.
                    - 200 -

1  Q  And in the alternative, if she did not, that you would
2    not pay her anything at all and walk away.
3  A  We had already walked away.
4  Q  Now, back to Paragraph 46. Do you recall saying
5    something to the effect that TPL had serious and
6    influential connections by way of its Board of
7    Advisors who would defend TPL against any legal action
8    brought by Kunelius as a result of TPL's default? Do
9    you remember saying anything like that?
10 A  I remember saying that we thought that, if necessary,
11   we would litigate this issue, because we thought we
12   were right, and that if we couldn't put a project
13   together now or then, after the contract was dead,
14   that we would look to our pro bono counsel to litigate
15   the issue, and because we thought we had a good case,
16   we thought we'd win.
17 Q  And, in fact, the pro bono counsel was on your Board
18   of Advisors, and that was Goodwin, Procter & Hoar.
19        MS. FETOUH: Objection.
20 A  Goodwin does represent us in this matter, and, you
21   know, whether I referred to them by name, I can't
22   remember.
23 Q  You also had other counsel, pro bono counsel, on your
24   Board of Advisors, including Hill & Barlow?
                    - 201 -

1  A  If it was still Hill & Barlow then. I can't remember.
2  Q  I think it was. But you recall them being on your
3    Board of Advisors?
4  A  I do. Well, not the firm. There was --
5  Q  Someone from Hill & Barlow?
6  A  -- a lawyer from what I think was Hill & Barlow.
7  Q  Do you recall referring to Choate, Hall & Stewart as
8    your counsel in that discussion with Mr. Kachajian?
9  A  I don't.
10 Q  Do you recall saying to Mr. Kachajian that your pro
11   bono counsel could bury him because it doesn't cost
12   you anything and Mrs. Kunelius couldn't afford to have
13   counsel represent her in the long run?
14 A  I remember saying that I thought we had a really good
15   case and that, if necessary, we would litigate it and
16   that we would win because of the strength of our
17   position.
18 Q  But you do not remember saying -- are you denying that
19   you said to anyone at that meeting that your counsel,
20   your pro bono counsel, would bury Mrs. Kunelius and
21   anyone who tried to represent her?
22 A  I don't know if I used the word bury, but I was
23   vehement in my statements that we had a very strong
24   case.
                    - 202 -

1  Q  Do you recall saying that the Board of Advisors
2    included prominent law firms that would tie up
3    Kunelius for as long as it took?
4  A  Not in those words, I don't recall, but I do remember
5    saying that we would litigate this to the end and that
6    we would win.
7  Q  Do you recall saying that it would tie up whatever
8    assets she had and that she couldn't possibly win,
9    something to that effect?
10 A  I don't recall discussing assets. I recall discussing
11   the merits of the case and saying that, because of the
12   correctness of our position and the capacity of our
13   counsel, I believed we would prevail.
14 Q  Do you recall saying to Mrs. Kunelius and the people
15   that were with her there that you knew she was of
16   limited means and that her attorney would not be able
17   to spend sufficient funds to win any matter against
18   TPL because of TPL's pro bono counsel which didn't
19   charge anything?
20 A  What I can tell you is what I remember of that
21   meeting, in which I believe Mr. Kachajian and I
22   debated at length whether or not it was possible for
23   this project to be reconstructed, and we debated
24   lawyer to lawyer who would win the litigation if it
                    - 203 -


1 came.
2 Q How well do you know Bob Wilbur?
3 A I know him in a professional capacity.
4 Q And do you know him to be an honest person?
5 A I have not experienced any dishonesty from Bob.
6 Q Is it your testimony today, after discussing this
7 meeting which you attended, that you still have no
8 recollection of Mr. Wilbur literally forcing you out
9 of the room to calm you down?
10 A I have a very explicit understanding of what happened
11 that day with respect to Mr. Wilbur and it had nothing
12 to do with him forcing me out of the room.
13 Q So, you have a pretty good and explicit memory as to
14 some things related to this case and some meetings,
15 and on this particular matter, you remember the actual
16 specifics of whether or not Mr. Wilbur took you out of
17 the room. If Mr. Wilbur testified that he did, would
18 that surprise you?
19     MS. FETOUH: Objection.
20     MS. ECKER: Objection.
21 A What I will say about that is that Bob asked me to go
22 out to the street to talk about how to refine our
23 position. We went outside. Mr. Boothroyd's office is
24 a storefront. We were meeting in the open space. We
- 204 -

1 went outside, Bob and I, to discuss is it possible to
2 get another chunk of money on the table for
3 Mrs. Kunelius. We didn't discuss the hijinks or
4 whatever it was that went on inside. We talked
5 about the proposal we were trying to fashion for
6 Mrs. Kunelius. I discussed with Bob the
7 possibility of bringing additional Stow
8 Conservation Trust money to the table on the
9 sidewalk in Maynard. That was the reason we went
10 outside.
11 Q Were you yelling at Mr. Wilbur at that point, outside
12 on the sidewalk, do you recall?
13 A We were on the same team, if you will. We were trying
14 to keep this project together.
15 Q Do you recall swinging your fists and your arms in the
16 air when you were out on the sidewalk or during the
17 meeting when Mr. Wilbur left with you?
18 A I recall doing no such thing inside. Outside, I don't
19 have a recollection of whether I waved my arms in an
20 animated sort of way of helping me articulate what I
21 was saying, sort of like the way I am now, but there
22 was nothing intimidating about it.
23     MR. CONROY: Off the record?
24     (Brief discussion off the record)
- 205 -

1 By MR. McLAUGHLIN:
2 Q When you left the meeting, after you had your meeting
3 out on the sidewalk with Mr. Wilbur, did you come back
4 into the meeting?
5 A I think we did.
6 Q I have referred to Bob Glassman in the past. I just
7 want to, to give you a sense -- I don't even need to
8 use this as an exhibit, but just so you have an
9 understanding, Bob Glassman is listed on your Web site
10 as the founder of Wainwright Bank and is on your Board
11 of Advisors. I want to again turn to
12 Mr. Glassman and what knowledge Wainwright Bank
13 had of references to that line of credit.
14     Are you aware of any correspondence between
15 TPL and Wainwright Bank regarding the disclosure
16 of the line of credit to the state as a backup
17 plan?
18 A I am not.
19 Q Are you aware of any restrictions on the line of
20 credit as to how much money can be taken out at a
21 particular time?
22 A I am not.
23 Q You were aware, were you not, that Mrs. Kunelius was,
24 during the summer of 2003, extremely worried about the
- 206 -

1 status of the sale to TPL?
2 A I was aware from talking to her counsel that she was
3 concerned.
4 Q Did you ever call Mr. Kachajian prior to the
5 acceptance of the right of first refusal and say to
6 Mr. Kachajian or to Mrs. Kunelius, or any
7 representative of Mrs. Kunelius, including Boothroyd,
8 that it was your intention to rely on the liquidated
9 damage clause provision and that she should be aware
10 of that in case she wanted to take any steps to let
11 the town know of that prior to the town assigning the
12 right of first refusal to TPL?
13     MS. ECKER: Objection.
14 A No, I have no recollection.
15 Q Do you think, as an attorney, that you had any
16 obligation, dealing with an elderly woman, to inform
17 her of the likelihood or the chance that if the town
18 assigned the right of first refusal to TPL that TPL,
19 as a charitable institution, might in effect prevent
20 the sale to Mosaic Commons and leave Mrs. Kunelius
21 with no buyer?
22     MR. CONROY: Objection.
23     MS. FETOUH: Objection.
24 A Do I think as an attorney that I have an obligation or
- 207 -

1 that TPL -- I'm just trying to --
2 Q Well, let's start with you. You, as an attorney, do
3 you think you had any obligation to be up front about
4 the possibility that Mrs. Kunelius would be left with
5 $22,000 months after the fact with no one to purchase
6 her property?
7     MR. CONROY: Objection.
8     MS. FETOUH: Objection.
9 A An attorney who happens to be working for the Trust
10 for Public Land doing this project or?
11 Q Well, why don't we do this. TPL is a charitable
12 institution, is it not?
13 A It's a non-profit.
14 Q Well, I asked you earlier if it was a charitable
15 institution, and I thought you said yes. It is not?
16 What's the difference between a charitable institution
17 and a non-profit?
18     MR. CONROY: Objection.
19 A You know, I should be accurate here. My understanding
20 is that it is a California not-for-profit corporation
21 that's registered as a 501c3.
22 Q And as a result, TPL has a tax-exempt status, right?
23 A Yes, that's my understanding.
24 Q And as a result of that, TPL, with its tax-exempt
- 208 -

1 status, is able to obtain pro bono counsel and pro
2 bono advice and doesn't have to count it as income.
3 Is that correct?
4     MS. FETOUH: Objection.
5     MR. CONROY: Objection.
6 A I don't really know how TPL accounts for the provision
7 of pro bono services.
8 Q Do you recall trying to convince the Town of Stow to
9 re-describe the involvement of TPL in the Kunelius
10 property after the fact so that TPL could get a tax
11 deduction where otherwise it could not?
12     MR. CONROY: Objection.
13     MS. FETOUH: Objection.
14     MS. ECKER: Objection.
15 A TPL -- well, I have no such recollection of any
16 conversation like that.
17 Q Do you recall writing to Ross Perry and telling him
18 that you would like him to re-designate TPL's
19 activities on the Kunelius property from activities of
20 lobbying to activities of advice so that you could
21 claim deductions and have a tax benefit for that?
22 A No, that's not my memory.
23     (WHEREUPON, Exhibit No. 19, MacDonnell
24 email to Perry, dated April 17, 2003, marked for
- 209 -

# DEPOSITION OF CRAIG MACDONNELL


1 identification.)
2 Q Exhibit 19 is before you. This appears to be a
3 letter, or an email, from Craig MacDonnell, with your
4 email address, to Ross and Bill. I believe it's Ross
5 Perry and perhaps Bill Wrigley, but I can't be sure,
6 but it goes to the town administrator, so it's
7 probably Bill Wrigley, the town administrator, in
8 which you, apparently, are revising letters for the
9 Board of Selectmen to you, in which you ask them to
10 write a letter on April 15, 2003, describing your
11 involvement as technical rather than lobbying. Do you
12 see that?
13 A I see the language under the heading Ross and Bill.
14 Q Now, up until April 15th, isn't in fact true that
15 it was TPL's absolute intention from early January of
16 2003, at the latest, through the time of the
17 assignment, that TPL sought to acquire and control the
18 property known as the Kunelius Farm? Isn't that fair
19 to say that's what you were doing?
20 MR. CONROY: Objection.
21 A Pardon me. I just had a moment of lack of
22 concentration and I missed your question. Would you
23 mind restating it? I'm sorry.
24 Q Well, I'm interested here in your letter to Mr. Perry
- 210 -

1 in which you write for him, it appears, in which you
2 are asking Mr. Perry, and, in fact, sir, I will inform
3 you that he does write such a letter on April 15th or
4 thereafter in which the letter seems to be asking for
5 technical advice, and the purpose of this letter seems
6 to be that the reason TPL needs it is because it
7 enables TPL to count more of the support work as
8 technical assistance rather than lobbying for IRS
9 purposes.
10 MS. FETOUH: Objection.
11 Q Now, in fact, TPL was lobbying for that property.
12 Isn't that fair to say?
13 MR. CONROY: Objection.
14 MS. FETOUH: Objection.
15 A TPL typically asks boards of selectmen for these kinds
16 of letters because the IRS recognizes the work that
17 TPL does in response to requests from boards of
18 selectmen as technical assistance rather than lobbying
19 if the record so reflects that. So, it's a normal,
20 every-project request that we ask boards of selectmen
21 to do this letter.
22 (Mr. Kachajian enters the room.)
23 Q Well, you may recall that I asked you at the beginning
24 of this deposition how you got involved with the
- 211 -

1 Kunelius property, and your testimony was through
2 Mr. Christianson concerning the possibility of
3 establishing a conservation restriction on the
4 property. Is it your testimony that the
5 application for $350,000 from the state was
6 advice work on behalf of the Town of Stow, or was
7 it lobbying?
8 MR. CONROY: Objection.
9 MS. FETOUH: Objection.
10 A I don't think I have a position on that. I mean, I
11 have never thought of that in one way or another, so
12 forgive me here, late in the day, for not having a
13 facile answer to that question.
14 (WHEREUPON, Exhibit No. 20, Friends of
15 Red Acre letter to Board of Selectmen, dated June
16 6, 2003, marked for identification.)
17 Q These two documents, which are Exhibit 20, were
18 together when we received them, so we kept them
19 together. The first one is from Friends of Red Acre
20 to the Town of Stow, and it is a letter to the Board
21 of Selectmen of the Town Stow signed by three people,
22 apparently, from the Friends of Red Acre. It's dated
23 June 6th. I'm going to ask you to just take a look at
24 that letter, because it would seem that this letter
- 212 -

1 indicates that the Friends of Red Acre believed that
2 the deal was done as of June 6, 2003, and I would ask
3 you to read the letter and then tell me whether you
4 have any understanding concerning this letter.
5 A I read it.
6 Q Had you seen this before?
7 A I don't remember seeing it before.
8 Q Is it fair to say that the Friends of Red Acre had
9 been approached by you for fund-raising purposes?
10 A Yes.
11 Q Is it also fair to say that at some point in the fund-
12 raising process you approached them and told them not
13 to fund-raise because, for other reasons, you had
14 decided not to go forward with the development?
15 A I have no memory of telling Friends of Red Acre not to
16 fund-raise during the period of time that was sort of
17 relevant to the possibility of the project going
18 forward.
19 Q Is it your testimony that you did not tell them, or is
20 it your testimony that you have no recollection of not
21 telling them to fund-raise, of telling them not to
22 fund-raise, because you didn't want to go forward with
23 the project?
24 A I did not tell them not to fund-raise because TPL did
- 213 -

1 not want to go forward with the project.
2 Q So, if any of these people were to testify, any of
3 these people listed here were to testify, that in fact
4 you did discourage them from fund-raising because TPL
5 did not want to go forward with the project, would
6 they be lying?
7 MS. FETOUH: Objection.
8 MS. ECKER: Objection.
9 MR. CONROY: Objection.
10 A I would be surprised.
11 Q Do you know Michael Labosky?
12 A I have met Michael, yes.
13 Q Did you ever have any discussions with him in which
14 you discouraged him from fund-raising?
15 A The reason I'm pausing is that over the course of, you
16 know, more than one year we talked about this project
17 a lot, this group of people and TPL. Towards the end
18 of that period of time, when the project was falling
19 apart, TPL discussed with Friends of Red Acre the fact
20 that it was falling apart, and during those
21 conversations, when the horizon was very dark, it made
22 sense for all of us to fold our tent.
23 Q Well, do you recall them questioning you as to why TPL
24 was not using the money that TPL said it had in its
- 214 -

1 own funds or by way of line of credit in order to
2 effectuate the sale?
3 A Generally, I remember having discussions with this
4 group about how to keep the project together,
5 including where was the money going to come from, is
6 it borrowed; is it privately fund-raised. There were
7 many, many conversations along those lines.
8 Q But do you remember them questioning you as to why you
9 would not use the line of credit or any other funds
10 that you had referred to as capital?
11 A Yes.
12 (Mr. Norris enters the room.)
13 Q And do you recall them being angry at you or
14 dissatisfied with you because they felt that you had
15 misled them concerning the availability of funds that
16 TPL itself had or could obtain in order to effectuate
17 the purchase?
18 A I remember some difficult conversations about the
19 future of the project.
20 Q But not so much --
21 A I'm trying to answer your question.
22 Q I know, but you have a distinct method of answering
23 surrounding issues. I'm talking about just the issue
24 of were they angry at you for not using the line of
- 215 -

1  credit or such other capital funds as you had
2  described to them previously, just that issue, line of
3  credit or capital funds.
4  Q  Do I remember anger related to line of credit?
5  A  Not being used.
6  A  Not specifically.
7  Q  Generally, do you remember it?
8          MR. CONROY:  Remember anger?
9  Q  Anger by the members of the Friends of Red Acre
10  because they were upset that you were not using either
11  the line of credit or such other capital funds as you
12  had referred to in the past with them.
13  A  My memory regarding their frustration regarding the
14  pace of the project was, really, the frustration we
15  were all having with the private fund-raising.  There
16  was a sense going into this project that there was a
17  very significant amount of private fund-raising easily
18  had in the Town of Stow in a small collection of
19  foundations and that when it became apparent later on
20  in the project that those identified sources of funds
21  and the dollars assigned to those funds were
22  overstated, there was a disconnect between TPL and the
23  Friends of Red Acre and there was upset over that
24  question.

– 216 –

1  Q  Was there also upset over the disconnect between your
2  description of private market funds and the line of
3  credit which you were now refusing to use?
4          MS. FETOUH:  Objection.
5  A  Okay.  I've tried to testify that my memory regarding
6  this upset is not specific as to the line of credit.
7  It's regarding sort of the overall progress of the
8  project.
9  Q  Do you recall reviewing an except from your Web site
10  which referred to the ability of TPL to bridge the gap
11  when the town couldn't raise funds?
12  A  The one you showed me earlier today?
13  Q  Yes.
14  A  Yes, I do remember that.
15  Q  Do you recall Friends of Red Acre being angry at you
16  concerning your refusal to bridge the gap because you
17  had told them of TPL's ability to do so and it was
18  because you had that they had spent time trying to
19  fund-raise?
20  A  My memory of this disconnect is related to the debate
21  between finances and financing, which was a question
22  of is it possible to raise the money necessary for the
23  project versus how do you finance it.
24  Q  Well, do you not recall that the $22,000 that was paid

– 217 –

1  to Mrs. Kunelius by TPL was raised by the Friends of
2  Red Acre and that they were concerned and upset with
3  you once you decided that you were not going to borrow
4  the money from the line of credit and/or from your
5  private capital markets that you had referred to, and
6  there was an issue as to whether or not -- why you
7  were doing that when you had caused them to raise the
8  $22,000, which was the entire amount of money that was
9  paid to Mrs. Kunelius?
10          MS. FETOUH:  Objection.
11          MR. CONROY:  Objection.
12  A  I'd like to answer your question, but I really -- it's
13  so long that I'm afraid I don't understand it.
14  Q  You would agree with me that $19,000 has been paid to
15  Mrs. Kunelius under the terms of the purchase and sale
16  agreement.
17  A  As I sit here today, I'm not certain how much has been
18  paid.  I know that a significant amount has been paid.
19  Q  Would you agree with me that the Friends of Red Acre
20  had raised $22,000 and given it to TPL in order to
21  fund the -- what's the money called?
22          MR. KACHAJIAN:  Earnest money?
23  Q  Earnest money.  That $22,000 came from the Friends of
24  Red Acre.

– 218 –

1  A  I know the Friends of Red Acre raised some money for
2  the purposes of making deposits.  I don't know how
3  much it was as I sit here today.
4  Q  Did you give back any money to the Friends of Red Acre
5  that they raised that was not used for earnest money
6  payments to Mrs. Kunelius?
7  A  I don't believe so.
8  Q  Is it fair to say that the Friends of Red Acre were
9  very upset with you concerning this issue of TPL not
10  obtaining funds sufficient from their own resources,
11  TPL's own resources, and that, essentially, the
12  Friends of Red Acre believed that you had misled them?
13  Do you recall any discussions concerning that?
14  A  My memory is that I had discussions with folks in
15  Friends of Red Acre about the same issues that we've
16  talked about today, the question being whether or not,
17  ultimately, any dollars would materialize that could
18  pay off any potential amount.
19  Q  I'm going to have you look at Exhibit 14 again, if you
20  would.
21  A  Yup.
22  Q  I want you to look at Bate stamp No. 443.
23  A  Yes.
24  Q  Item No. 6.  We have answers to 6A through D.  Under

– 219 –

1  Item No. C, letter C, mine from the town relative
2  to the four hundred thousand dollar promissory note,
3  with seven percent interest, paid in full within 24
4  months, with monthly interest payments of $2,333, TPL
5  states, to be paid from privately raised funds or from
6  the sale of the houses on the property.  Do you see
7  that?
8  A  Yes.
9  Q  So, as to the issue of the $400,000, is it fair to say
10  that, in fact, TPL absolutely intended to avail
11  themselves of the four hundred thousand dollar loan
12  from Mrs. Kunelius and that your method of repaying it
13  within 24 months was either the sale of the houses or
14  privately raised funds?
15          MS. FETOUH:  Objection.
16          MS. ECKER:  Objection.
17          MR. CONROY:  Objection.
18  A  With reference to Exhibit 14, Paragraph 6C, and the
19  bold sentence after the letters TPL, that sentence was
20  intended to communicate that the total of the four
21  hundred, as a whole, could be raised.  We intended it
22  to be raised from those sources when I put this
23  together.  That was our intention at that time.
24  Q  What four hundred was it?

– 220 –

1  A  Did you ask me about 6C?
2  Q  Yes.
3  A  Okay.  That's the one.
4  Q  The four hundred thousand promissory note.  You're
5  talking about raising money to pay off the four
6  hundred thousand dollar promissory note to
7  Mrs. Kunelius.
8  A  Correct.  Well, actually, I'd like to clarify that,
9  because the further along we got in this process,
10  whether our decision-making was correct or not about
11  the availability of the mortgage itself -- we've
12  talked about that a lot today -- it was our sense that
13  that mortgage was not available to us and that,
14  instead, TPL contemplated adding on to the four
15  hundred thousand the interest that Mrs. Kunelius would
16  have earned over the term, and I think that was
17  $56,000.
18          So, I think our planning, for planning
19  purposes, four hundred was not four hundred.  The
20  four hundred was 456,000, which we would need to
21  deliver at the time of closing.
22  Q  But that was the term of the purchase and sale
23  agreement.  Is it your testimony -- I'm not trying to
24  put words in your mouth.  Your testimony is, as I now

– 221 –



1 understand it, that you simply changed your mind about
2 the terms of the purchase and sale agreement and did
3 not want to borrow the money, the $400,000. Am I
4 right?
5      MS. FETOUH: Objection.
6 A No.
7 Q Let's look at Exhibit 12, I'm sorry, Exhibit 13. On
8 Exhibit 13, which is the September 9th letter from you
9 to Peter Kachajian --
10      (Mr. Kachajian exits the room.)
11 Q Strike that. Let's look at the third paragraph, which
12 says, five lines down: TPL's Board of Directors will
13 not approve any borrowing to bridge a fund-raising gap
14 because the prospects of raising funds necessary to
15 repay the loan required are not encouraging. Further,
16 any bridge loan would be for an amount greater than
17 the land would be worth even if the subdivision were
18 approved.
19      Now, isn't it in fact true, sir, that what
20 you have said today has not been accurate, in
21 that one of the primary reasons that you did not
22 go forward was that you did not like the purchase
23 price of the property?
24      MS. FETOUH: Objection.
- 222 -

1 A Is completely untrue.
2 Q So, when you state that the amount of the loan -- any
3 bridge loan would be for an amount greater than the
4 land would be worth even if the subdivision were
5 approved, let me ask you something. How much money
6 were you talking about when you said a bridge loan?
7 Were you talking about the $400,000?
8 A As I sit here today, I don't know how much money I was
9 talking about.
10 Q And you would agree, wouldn't you, that the 8.57 acres
11 had a price on it of $1,116,000 and change for 8.57
12 acres? Is that correct?
13 A TPL always viewed this as a 50-acre project.
14 Q But nothing in the P&S agreement gave a 50-acre
15 project to Mosaic Commons or Co-housing. Isn't that
16 correct?
17      MS. FETOUH: Objection.
18      MS. ECKER: Objection.
19      MR. CONROY: Objection.
20 A Well, I think there's a legal question out there,
21 whether or not the allocation, 8.57 versus 50,
22 survives the assignment in the exact same form it
23 existed prior to.
24 Q So, you're disagreeing with the allocation of the
- 223 -

1 purchase price that is outlined in the terms of the
2 purchase and sale agreement, which specifically states
3 that Co-housing was to get 8.57 acres and the town, by
4 way of gift, would get the remaining portion, and your
5 testimony now is that you did not agree with that
6 allocation. Is that your testimony?
7      MS. FETOUH: Objection.
8      MS. ECKER: Objection.
9      MR. CONROY: Objection.
10 A No.
11 Q Is it your testimony that you always viewed it as, TPL
12 always viewed it as, a 50-acre project and, therefore,
13 you do not agree with the allocation as to the
14 $1,116,900 that was applicable to the 8.57 acres?
15      MS. FETOUH: Objection.
16      MS. ECKER: Objection.
17      MR. CONROY: Objection.
18 A I'm saying something less than what you would like me
19 to say.
20 Q Do you recall telling people that Mosaic Commons
21 overpaid for the property?
22 A Yes.
23 Q And that's because you believed that it wasn't a good
24 deal for Mosaic Commons but it was a good deal for
- 224 -

1 Mrs. Kunelius. Isn't that correct?
2 A I have no idea whether it was a good deal for Mosaic
3 Commons.
4 Q Well, if Mosaic Commons overpays for the property,
5 it's probably not a good thing for Mosaic Commons, is
6 it?
7      MS. FETOUH: Objection.
8 A I would say that Mosaic Commons paid more than fair
9 market value, but it may be a good deal for them
10 because they have the power of 40B.
11 Q And it was certainly a good deal for Mrs. Kunelius if
12 you believe she got better than market value. Is that
13 correct?
14      MS. FETOUH: Objection.
15 A I would agree with that.
16 Q So, a component of your refusal, TPL's refusal, as
17 reflected by your letter of September 9th, was that
18 you did not believe you could borrow an amount of
19 money that would not exceed the value of the 8.57 acre
20 parcel. Am I correct on that?
21 A If you're asking me to explain what the third
22 paragraph of Exhibit 13 is, it's my testimony that I
23 don't recall the number of dollars that I was
24 referring to, as I sit here today, in that letter that
- 225 -

1 I wrote four years ago.
2 Q Well, maybe you can explain this to me, sir. You say,
3 I mean, there has to be some amount of money that
4 would be applicable to the loan that you're talking
5 about bridging, and by any stretch of the imagination,
6 it's hard for me to consider it being more than
7 $800,000, meaning, subtract the 400,000, 300- and
8 100,000 from the purchase price that you knew you were
9 going to get, eventually, from the town. You're left
10 with approximately $800,000. Now, if that's the case,
11 doesn't this say that any bridge loan would be for an
12 amount greater than the land would be worth even if a
13 subdivision were approved, which means you did not
14 like the value of the deal and you wouldn't borrow
15 even $800,000 because you did not think that the land
16 would be worth even $800,000?
17      MR. CONROY: Objection.
18      MS. ECKER: Objection.
19      MS. FETOUH: Objection.
20 A That's not really what I'm saying. I cannot
21 characterize any further what I believe, as I sit here
22 today, this sentence means.
23 Q Well, what did you expect Peter Kachajian to think
24 when he read this if you don't understand?
- 226 -

1 A Well, if it was September 9, 2003, I could tell you
2 what I meant, but it's four years later.
3 Q Let's go forward to the next sentence, which says:
4 Essentially, this would be asking TPL for an unsecured
5 loan based on weak fund-raising prospects with no
6 backup plan to repay the loan.
7      Tell me, if you would, who was asking TPL
8 for an unsecured loan? Was anybody asking TPL
9 for an unsecured loan?
10 A What that sentence referred to was the notion that
11 borrowing against an uncertain fund-raising future
12 was, on the basis of a line of credit, was unwise if
13 TPL did not believe that the fund-raising prospects
14 would materialize.
15 Q So, you were concerned -- well, this says this would
16 be asking TPL for an unsecured loan. Who was asking
17 TPL? I just don't understand.
18 A It's a hypothetical notion that it would be imprudent
19 for TPL to invest money in this project without a
20 reasonable expectation of capital takeout, whether
21 that be the sale of assets or private fund-raising.
22 Q I'm going to put before you a document that is
23 attached to the complaint as Exhibit 9. We'll re-mark
24 it as Exhibit 21 to the complaint.
- 227 -

**DEPOSITION OF CRAIG MACDONNELL** 

1  (WHEREUPON, Exhibit No. 21, Pelletier
2  letter to Stow Board of Appeals, dated September
3  25, 2003, marked for identification.)
4  MR. McLAUGHLIN: I don't know what you
5  want to do. I've still got a substantial amount
6  here, so we'll keep plugging along here as long
7  as we can.
8 Q  Exhibit 21 appears to be a letter from regional
9  counsel, Denise Pelletier, to the chairman of the Stow
10  Board of Appeals on September 25th, in which you're
11  asking for variances to be dropped, I should say, to
12  drop your application for variances, and, this, some
13  almost three weeks after your letter to Mr. Kachajian.
14  During the time that you were applying for
15  these variances, particularly, in September, I
16  thought you already said that if it was
17  September, the deal was done. It was over. You
18  were looking at some new deal. Am I correct in
19  my characterization of your testimony?
20 A  As I've testified earlier, TPL's confidence level in
21  this project waned gradually over a period of time.
22  There was no decision point, so that over the summer
23  of 2003, it became increasingly untenable that this
24  project could go forward. There was a moment in time
- 228 -

1  when it became particularly problematic, and I think
2  that moment probably was when we determined that the
3  subdivision was hugely problematic, and you recall
4  earlier today we talked about sort of the early
5  analysis of when we were trying to just, as lawyers,
6  figure out the best route to subdivide the property,
7  and then I said later on another problem arose that
8  was even more problematic.
9  What happened in the summer -- let me just
10  finish the thought. In the summer, we learned
11  something that we hadn't known before, which was
12  that the two parcels, 142 and 144, were not owned
13  by separate entities. It was our understanding
14  before that time that they were owned by separate
15  entities and that the common law doctrine of
16  merger would not apply, and so that so long as we
17  could get the variances that we were seeking, the
18  future existence of 142 and 144 could be created
19  for purposes of sale. Somewhere along the path,
20  it became apparent to us that, in fact, 142 and
21  144 were owned by the same entity, the doctrine
22  of merger applied, and there was no way to
23  subdivide it.
24 Q  There was no way to subdivide based upon your plan for
- 229 -

1  the property rather than the plan for Co-housing and
2  Mosaic Commons, correct?
3 A  The proposal for what we intended to do, the variances
4  we sought, would be rejected. So, it was important
5  for us not to have that rejection made. In effect, we
6  were thinking of Mrs. Kunelius' property rights at
7  this point in time and didn't want an adverse variance
8  decision on the record, not only for Mrs. Kunelius'
9  sake but also for the possibility of the future in
10  which the town, TPL, everybody else, could reconfigure
11  this project and make it go forward.
12 Q  Are you familiar with how much cash on hand TPL
13  Massachusetts has at any particular point in time?
14 A  No.
15 Q  Do you have even a general sense of how much cash on
16  hand TPL has right now?
17 A  TPL, nationally?
18 Q  No, Massachusetts.
19 A  I do not know.
20 Q  Could you tell me within a half a million dollars?
21 A  No.
22 Q  As the director of the Massachusetts division of TPL,
23  you do not know how much money is in your checking
24  account, approximately?
- 230 -

1 A  In any given moment, no, because a lot of money goes
2  in and out to do projects all the time.
3 Q  I understand. But within general terms, do you carry
4  a balance in your checking account of a half a million
5  dollars?
6 A  I just told you that I don't know what the balance is,
7  and I don't know what it normally is. It fluctuates
8  hugely.
9 Q  So, do you have any idea of what amounts TPL has in
10  other assets, liquid assets, nationally?
11 A  I do not.
12 Q  Have you ever looked at TPL's financial statements to
13  determine how much money they have in their accounts?
14 A  Not closely.
15 Q  But you've looked?
16 A  I mean, I've seen the balance sheet.
17 Q  Have you ever considered or did you consider using any
18  of TPL's assets beyond the line of credit in order to
19  fund the purchase from Mrs. Kunelius?
20 A  No.
21 Q  Did you ask anybody if there were funds available that
22  could be used? I'm talking about liquid assets, such
23  as cash or certificates of deposit or any other types
24  of assets, which could be liquidated within some
- 231 -

1  reasonable period of time in order to effectuate the
2  purchase.
3 A  I don't recall.
4 Q  Is it your testimony today that you do not know
5  whether TPL, nationally, has $800,000 in cash or
6  liquid assets available to it, or had $800,000 in cash
7  or liquid assets available to it, that it could have
8  used at the time that TPL was required to purchase the
9  property from Mrs. Kunelius?
10 A  That's not my testimony.
11 Q  So, is it possible that TPL did have cash or liquid
12  assets sufficient to make the purchase from
13  Mrs. Kunelius?
14 A  I just don't know what the state of TPL's liquid
15  assets were in that period of time.
16 Q  Do you have to submit a budget in your role as a
17  director of Massachusetts?
18 A  Yes.
19 Q  And with that budget, do you consider sources and uses
20  of funds on a daily, weekly, monthly, yearly basis?
21 A  Quarterly.
22 Q  Quarterly. And when was the last time you did that?
23  Would it be December 31?
24 A  TPL's fiscal year ends at the end of March. So, we
- 232 -

1  are coming up on the end of our fiscal year.
2 Q  So, you're actually considering a budget right now for
3  next year, are you not?
4 A  Yes.
5 Q  Is it your testimony today that in establishing that
6  budget, as you are apparently doing currently, you
7  have no idea of how much money is in the cash
8  reserves, the bank accounts, the checking accounts,
9  the savings accounts, of TPL for Massachusetts?
10 A  TPL begins every year at zero and ends, hopefully,
11  every year at zero. We don't have an endowment. This
12  is not an organization that has cash sitting around
13  ready to throw at projects. This is a very squeaky
14  organization when it comes to spending money. We're a
15  conservation organization. We just don't have that
16  much. So, in the budgeting process, we think very
17  carefully about anticipated revenue, anticipated
18  expenses, going forward.
19 Q  When your line of credit was obtained for six million
20  dollars, what did TPL give as collateral for that, if
21  you know?
22 A  I don't know.
23 Q  Is it an unsecured line of credit?
24 A  It very well may be.
- 233 -



1 Q Would that suggest to you that Wainwright Bank has
2 some confidence in the ability to be repaid on a six
3 million dollar line of credit?
4 MS. FETOUH: Objection.
5 A I don't know what Wainwright is thinking.
6 (WHEREUPON, Exhibit No. 22, MacDonnell
7 letter to Kachajian, dated July 6, 2004, marked
8 for identification.)
9 Q I want to have you look at the next exhibit.
10 THE WITNESS: Before you ask that
11 question, could I take a two-minute break?
12 MR. McLAUGHLIN: Sure.
13 (Recess, 5:24 P.M.)
14 (After recess, 5:29 P.M.)
15 (All parties present)
16 By MR. McLAUGHLIN:
17 Q Exhibit 22, this is also attached to the complaint as
18 Exhibit 11 to the complaint, and it is a July 6, 2004,
19 letter from you, sir.
20 MR. KACHAJIAN: Is that to me?
21 MR. McLAUGHLIN: To Peter Kachajian,
22 yes, see you later.
23 (Mr. Kachajian exits the room.)
24 Q With attachments. And the attachments have an A and a

- 234 -

1 B on them, and I'm wondering first, sir, whether you
2 recall this letter.
3 A I do.
4 Q And you authored this letter?
5 A I did.
6 Q And did you assemble Exhibit A and Exhibit B to this?
7 A Did I attach them?
8 Q No, did you assemble the information in Exhibit A and
9 Exhibit B? Is that your work product or is that
10 someone else's work?
11 A It's like a little software program that generates
12 these tax benefit analyses. It's not entirely my work
13 product. It's relying on the built-in analysis.
14 Q Now, is it fair to say that -- well, let's look at the
15 second page of your letter, beginning with the first
16 paragraph, third line. It says: The first such
17 proposal contemplated a partnership with the town and
18 Mrs. Kunelius whereby TPL would pay her eight hundred
19 thousand for the property. The town would invest
20 three hundred thousand.
21 So, does that mean that Mrs. Kunelius gets a
22 million-one, or does that mean that Mrs. Kunelius
23 gets eight hundred thousand and the town then
24 pays back TPL three hundred thousand so that TPL

- 235 -

1 is paying five hundred thousand?
2 A It imagined paying $800,000 for the property.
3 Q And the town's investment was a repay to TPL of three
4 hundred thousand, is that correct?
5 A Well, in exchange for the three hundred thousand which
6 had previously been approved, the CPC money, the town
7 would receive the conservation parcel.
8 Q So, this first paragraph is an offer of eight hundred
9 thousand to Mrs. Kunelius. Down at the bottom of the
10 page, in the middle of the page, third paragraph, it
11 says: It's my understanding that the purchase price
12 could be improved to nine hundred thousand. Do you
13 see that?
14 A Yes, I do.
15 Q So, in order for you to move forward, meaning TPL,
16 your letter indicates that Mrs. Kunelius was going to
17 have to accept one of these two offers in order for
18 TPL to move forward with it. Is that a fair
19 description of the purpose of the letter?
20 A The purpose of the letter was to advise Mr. Kachajian
21 that TPL continued to have an interest in this
22 conservation project, that it wanted to continue to
23 work hard to bring as much money as possible to
24 Mrs. Kunelius, and that the hope was to be able

- 236 -

1 to bring in the neighborhood of eight or nine
2 hundred thousand dollars to her.
3 Q Where was the $500,000 coming from that resulted from
4 the $800,000 minus the payback of three hundred to
5 TPL? That meant that TPL had to come up five hundred.
6 Where were you proposing that $500,000 come from?
7 A We would hope to sell the two lots, 142 and 144.
8 Q And that was it, no money from TPL in this deal
9 whatsoever. It was the sale of the lots from
10 Mrs. Kunelius' property and the money from the
11 town of $300,000 and nothing from TPL. Is that
12 correct?
13 A In this proposal, in the first paragraph, on Page 2, I
14 believe the two lots plus three hundred would come up
15 to eight hundred.
16 Q So, in other words, TPL was going to put nothing in it
17 themselves?
18 MS. FETOUH: Objection.
19 Q For the purchase price.
20 A It was never contemplated for TPL to put its own money
21 in the deal.
22 Q Well, it's either its money or capital market money or
23 the line of credit. I'm counting that as TPL's money
24 for the purposes of my question, but let me just move

- 237 -

1 on. Let me just move on. You don't have to answer
2 that.
3 MR. CONROY: I'll make it clear that
4 he's not answering the question.
5 MR. McLAUGHLIN: All right.
6 (WHEREUPON, Exhibit No. 23, MacDonnell
7 letter to Perry, dated January 5, 2003, marked
8 for identification.)
9 Q Is it fair to say that in the eight hundred thousand
10 dollar offer, none of the $800,000 came from TPL's own
11 funds, that is, their own assets, cash or the sale of
12 stock or anything else?
13 A Well, this was a proposal, and because it was still in
14 the proposal stage, it's not clear to me whether the
15 five hundred thousand would come from the sale of the two
16 lots would be fronted by TPL and then recovered from
17 the sale or whether the sale of the two lots would
18 have to precede it.
19 Q And where would the money come from if it was fronted
20 by TPL? That's my question.
21 A That was not proposed.
22 Q Well, you could borrow it. Isn't that fair to say?
23 A TPL could borrow that money. Correct, we could borrow
24 that money.

- 238 -

1 Q Fine.
2 A If there was a reasonable likelihood of return to pay
3 back the loan, the same issue we've talked about all
4 day.
5 Q So, that offer wasn't an offer, because you didn't
6 know if you could sell the units, the two units. So,
7 it was contingent upon whether there was a likelihood
8 of selling the two units, correct?
9 MS. FETOUH: Objection.
10 MR. CONROY: Objection.
11 A No, that's not what I just said.
12 Q So, let me make sure I understand. You could borrow
13 money providing there was an assurance that you could
14 pay it back. Is that fair to say?
15 A Like any business.
16 Q And the only source of being assured of paying back
17 the money was the sale of the two units. Is that
18 correct?
19 A No.
20 Q So, then there was another source, and that was what?
21 A Private fund-raising, if the private fund-raising was
22 substantiated. Is it likely to come forward?
23 Q So, this wasn't an offer. It was a proposal for which
24 you were not certain that you could perform under that

- 239 -



1 proposal because you didn't know the likelihood of
2 fund-raising. Is that fair to say?
3     MS. FETOUH: Objection.
4 A No. No, not at all. This letter talks about a
5 proposal that was previously on the table. This
6 letter, the purpose of this letter, is to talk about
7 the next proposal, a better proposal.
8 Q And that's the nine hundred thousand dollar proposal?
9 A Right.
10 Q All right. Let me simply ask you a few questions
11 concerning the complaint and your understanding of
12 your relationship with the town.
13     I presume as an attorney that, when you went
14 to law school, you studied partnership law. Is
15 that fair to say?
16 A Well, I'm trying to remember whether I took that
17 course.
18 Q Well, Cornell most certainly teaches that course.
19     MS. FETOUH: Objection.
20 Q Well, she doesn't think Cornell does, but --
21     MS. FETOUH: No, I went to a comparable
22 school. We didn't learn that.
23     MR. McLAUGHLIN: There's nothing
24 comparable to Cornell.

- 240 -

1 Q You don't have to answer that question. You're aware,
2 are you not, that Mrs. Kunelius has alleged that there
3 was a joint venture, or a partnership, between TPL and
4 the town. Is that fair to say?
5 A I've seen the word -- that there's the allegation?
6 Q Yes.
7 A I've seen the word partnership in the complaint.
8 Q And you are aware, are you not, that TPL has denied
9 that there is a partnership?
10 A I am aware of that.
11 Q And you are aware, also, that you denied there was a
12 partnership.
13 A I am aware of that.
14 Q Okay. Let's look at the January 5th letter from you
15 to the town, to Ross Perry of the Board of Selectmen,
16 and I would ask you to look at the fifth line up from
17 the bottom. On the right-hand side, it says: All our
18 projects are done at the request of and in partnership
19 with entities that become permanent owners of the
20 property. The two most important roles we play in
21 this process are, one, we make sure that our
22 obligations to our partners are met and, two, to raise
23 funds necessary for the transaction from a combination
24 of private and public sources.

- 241 -

1     Now, when you used the word partnership on
2 the first page of your January 5th letter, which
3 is Exhibit 25, were you referring to a
4 partnership with the town?
5 A I was using the term in its colloquial sense and not
6 in its formal legal sense.
7 Q There is a colloquial sense to partnership? And that
8 would be what?
9 A Working together on something less than a legal
10 partnership.
11 Q Well, is it fair to say that, in a partnership, would
12 you expect the individuals or parties to a partnership
13 to have a financial stake in a partnership?
14     MS. FETOUH: Objection.
15     MR. CONROY: Objection.
16 Q An investment, something that --
17 A A legal partnership, you're talking about?
18 Q Yes.
19 A Not always.
20 Q Doesn't have to have one?
21 A Correct.
22 Q Would you expect that there would be some contractual
23 stake in a partnership where the parties enter into a
24 written agreement by which they declare their partner

- 242 -

1 status to each other?
2 A Sometimes but not always.
3 Q Well, let me just ask you to look at your letter of
4 January 5th to the town, and the second full paragraph
5 says: For TPL to consider a financial and contractual
6 stake in this project, we would need to secure our
7 involvement in a way that will enhance the likelihood
8 of sufficient public and private funds being available
9 and ensures a strong conservation and community
10 outcome.
11     Now, this says, as I understand it, that TPL
12 intended to have a financial stake in the
13 project. Am I wrong in my reading of that, sir?
14 A No.
15 Q So, what was the financial stake of TPL in the project
16 when the project was for the acquisition of a
17 1,116,900 dollar piece of property? What was your
18 financial stake, TPL's?
19 A Well, it would be the out-of-pocket dollars that we
20 spent in pursuit of the deal, together with the value
21 of the services that we provided through our staff
22 that would otherwise be working on some other project.
23 Q Well, now, from a matter of your standing as a non-
24 profit tax-exempt entity, do you bill services of your

- 243 -

1 staff on an hourly rate in order to establish a
2 financial investment in a particular project?
3 A We analyze the time commitments of our staff on the
4 basis of dollars every year, every project, all the
5 time.
6 Q What was the contractual stake that you were entering
7 into as a partner with the town that you're referring
8 to here?
9 A It makes reference to a contractual stake in the
10 project that I think we were contemplating. This is
11 before the assignment?
12 Q Yeah.
13 A We're talking about stepping into the shoes of Co-
14 housing Resources.
15 Q So, it was a financial stake with the town and a
16 contractual stake with who, Mrs. Kunelius?
17     MS. FETOUH: Objection.
18     MS. ECKER: Objection.
19 A Well, there is a contract that we've spent a lot of
20 time talking about that TPL became the assignee of.
21 So, in effect, yes, that contract is the contract
22 we're talking about.
23 Q Looking at the very last sentence of this exhibit, it
24 states: If so, we ask that you authorize your

- 244 -

1 chairman to sign below as an indication of your
2 partnership with TPL. Do you see that?
3 A I do.
4 Q Now, you have alleged, or you have denied, the
5 existence of any partnership between yourself and the
6 Town of Stow, is that correct?
7 A Yes.
8 Q Not yourself but TPL. Is that correct?
9 A It's my understanding that TPL has denied the
10 existence of a partnership and that, individually, I
11 have denied that TPL and the town had a partnership.
12 Q And you continue to deny that notwithstanding the fact
13 that there is a written document that evidences their
14 indication of joining the partnership and that there's
15 a written document indicating what the cost of joining
16 the partnership would be.
17     MR. CONROY: Objection.
18     MS. FETOUH: Objection.
19     MS. ECKER: Objection.
20 Q That means the Town of Stow.
21     MS. FETOUH: Objection
22     MS. ECKER: Objection.
23 Q Is that fair to say? Well, go head.
24 A Do you want to keep asking something?

- 245 -

# DEPOSITION OF CRAIG MacDONNELL

1 Q  No, go head. Is that fair to say?
2 A  It is fair to say that the partnership we're referring
3     to in Exhibit 23 is not a legal partnership but just a
4     colloquial level of cooperation that doesn't rise to
5     the level of a legal partnership.
6 Q  Now, do you think a legal partnership has to be in
7     writing, sir?
8        MS. FETOUH:  Objection.
9        MR. CONROY:  Objection.
10 A  I don't have thoughts about that.
11 Q  Well, you're aware that two people can have a joint
12     venture which is called a general partnership in which
13     they both work for some single purpose, such as two
14     lawyers joining together for a law firm. There's no
15     requirement of a written document in that instance, is
16     there?
17        MS. FETOUH:  Objection.
18        MR. CONROY:  Objection.
19 A  I don't know that to be true. My understanding is
20     that the relationship that TPL had with the Town of
21     Stow is not that kind of partnership.
22 Q  How many kinds of partnerships are there that you're
23     aware of?
24        MS. FETOUH:  Objection.

- 246 -

1        MR. CONROY:  Objection.
2 A  Well, there is this kind, this informal collaboration,
3     lower case P, non-legal, and then there are legal
4     partnerships, sort of the formal partnership that the
5     law firms that I was a part of and you may have been a
6     part of, and that these folks are part of, that
7     constitute a partnership.
8 Q  Have you ever heard of the concept of partnership
9     estoppel?
10 A  No.
11        MR. McLAUGHLIN:  Almost done.  I think
12     we're there.
13 Q  I want you to just look at Exhibit 8 for a moment.
14     Exhibit 8 is the Stow Community Preservation Committee
15     minutes of February 10th.  On the third page, which is
16     040, now, this is on February 10th, third paragraph
17     down:  A committee member asked Bob Wilbur about his
18     conversation with Marilyn Kunelius. Bob said that she
19     is afraid the contract may unravel with the town
20     intervention and she will lose everything. Bob said
21     TPL will not back down from a commitment.
22        Now, you were present at that meeting, so
23     isn't it fair to say that you were aware that
24     Mrs. Kunelius was afraid that she would lose

- 247 -

1     everything as a result of the intervention of the
2     town and subsequent transfer of the right to TPL?
3        MR. CONROY:  Objection.
4 A  My memory of Mrs. Kunelius' situation is that this was
5     an important asset for her. I don't have a
6     recollection of this item being discussed at this
7     meeting.
8 Q  It goes on to say:  Tom Marr spoke from the audience
9     and said, "This is not the babe we want to fool around
10     with and 1.2 is not the figure." Do you know what
11     that's about, and do you know who he's talking about?
12     Is Mrs. Kunelius the babe they were talking about?
13 A  I can honestly say I have no idea what that refers to.
14 Q  You can honestly say you have no idea. Was there some
15     other individual that was a babe that had a connection
16     with the 1.2 million dollar number?
17        MS. FETOUH:  Objection.
18        MR. CONROY:  Objection.
19 A  I don't know what this is about.
20        MR. McLAUGHLIN:  Okay.  I think that's
21     it.  Thank you.
22        (WHEREUPON, the deposition concluded at
23     5:52 P.M.)
24

- 248 -

C E R T I F I C A T E
COMMONWEALTH OF MASSACHUSETTS
COUNTY OF ESSEX, ss.
   I, Roberta J. Daniels, a Court Reporter and
Notary Public within and for the Commonwealth of
Massachusetts, do hereby certify that the foregoing
deposition of CRAIG MacDONNELL was taken before me on
February 8, 2007, that the said witness was
satisfactorily identified and duly sworn before the
commencement of his testimony and that the testimony
was taken audiographically by myself and then
transcribed by myself.  To the best of my knowledge,
skill and ability, the within transcript is a complete,
true and accurate record of said deposition.
   Further, I am not connected either by blood
or by marriage with any of the said parties nor am I
interested either directly or indirectly in the matter
in controversy.
   IN WITNESS WHEREOF, I have hereunto set my
hand and affixed my notarial seal this 20th day of
February, 2007.

   Roberta J. Daniels, Notary Public
   Commission expires:  11-15-13

- 249 -

C E R T I F I C A T E
   I, CRAIG MacDONNELL, do hereby certify that I
have read the foregoing transcript of my testimony and
further certify that said transcript is a true,
accurate and complete record of said testimony.
   Dated at _____, this
   day of _____, 2007,
under the pains and penalties of perjury.




- 250 -

E R R A T A   S H E E T
Deposition of CRAIG MacDONNELL

Page  Line
No.   No.    Transcript reads    Change made

- 251 -

# DEPOSITION OF CRAIG MACDONNELL

MINDEX by Kenson

| Word ...... Page | Word ..... Page | Word ...... Page | Word ...... Page | Word .... Page |
|---|---|---|---|---|
| .93 ... 150 | 18 ... 181, 193 | 192-196, 225 | abusing ... 175 | advantage ... 96, 98, 123 |
| $1,116,000 ... 223 | 19 ... 209, 210, 218 | 411 ... 105 | abutter ... 190 | adverse ... 230 |
| $1,116,900 ... 195, 224 | 1983 ... 10 | 42.1 ... 157 | accept ... 47, 48, 50, 57, 68, | advice ... 159, 209, 211, 212 |
| $100,000 ... 54 | 1999 ... 35 | 443 ... 219 | 84, 135, 156, 236 | advise ... 236 |
| $19,000 ... 218 | 2 ... 17, 36, 82, 84, 136, | 45 ... 96, 129 | acceptable ... 63, 92 | Advisor ... 120 |
| $2,333 ... 220 | 155, 172, 173, 220, | 456,000 ... 221 | acceptance ... 45-48, 56-58, | Advisors ... 108, 197, |
| $22,000 ... 156, 208, 217, | 237, 248 | 46 ... 196, 201 | 60, 61, 68, 72, 168, | 201-203, 206 |
| 218 | 2:20 ... 136 | 476 ... 45 | 207 | advocating ... 70 |
| $300,000 ... 237 | 2:31 ... 136 | 478 ... 45 | accepted ... 49, 57, 70, 73, | affect ... 9 |
| $350,000 ... 104, 212 | 20 ... 87, 88, 101, 103, 136, | 5 ... 45-47, 49, 176, 234, | 86, 99, 119, 140, 144, | afford ... 202 |
| $400,000 ... 55, 56, 67-70, | 156, 181, 212 | 238, 248 | 145, 147, 168 | affordability ... 94, 95 |
| 93, 94, 98, 132, 135, | 20,000 ... 156 | 5:24 ... 234 | accepting ... 43, 48, 55, 97, | affordable ... 54, 100, 137 |
| 136, 145, 220, 222, | 2000 ... 19 | 5:29 ... 234 | 158, 170, 200 | afore ... 145 |
| 223 | 2001 ... 124 | 5:52 ... 248 | accesses ... 167 | afraid ... 218, 247 |
| $500,000 ... 95, 96, 237 | 2002 ... 7, 26, 28, 36, 40, | 50 ... 82, 83, 193, 223, 224 | accessing ... 126 | against ... 52, 80, 155, 192, |
| $56,000 ... 221 | 42 | 501c3 ... 7, 14, 21, 208 | accompanied ... 198 | 197, 201, 203, 227 |
| $6,000,000 ... 110, 125 | 2003 ... 8, 14, 24, 35-37, | 531 ... 59 | accomplish ... 38, 44, 72 | agencies ... 76, 117 |
| $700,000 ... 96 | 39, 42, 44-47, 49, 56, | 5th ... 241-243 | accordance ... 72, 180 | agency ... 117 |
| $800,000 ... 84, 94, 95, 226, | 57, 64, 79, 81, 84, | 6 ... 49, 50, 54-57, 59, 60, | according ... 97, 187 | agitated ... 198 |
| 232, 236-238 | 121, 137, 138, | 67, 68, 73-75, 110, | account ... 115, 230, 231 | agree ... 50, 132, 153-155, |
| $900,000 ... 199 | 165-167, 178, 191, ... | 121, 125, 134, 162, | accounted ... 94, 95 | 157, 172, 178, 181, |
| 03 ... 106 | 206, 209, 210, 212, | 164, 166, 167, 212, | accounts ... 209, 231, 233 | 186, 218, 223-225 |
| 039 ... 61 | 213, 227, 228, 238 | 213, 219, 234... | accrued ... 181 | agreed ... 95, 152, 182, 195 |
| 040 ... 247 | 2004 ... 35, 193, 196, 234 | 6,000,000 ... 110, 125 | accuracy ... 66 | agreement ... 93, 94, 96, 97, |
| 1 ... 16, 82, 84, 92, 94, 113, | 2005 ... 75 | 61 ... 27, 37, 60, 62, 63, 70, | accurate ... 65, 66, 86, 110, | 113, 119, 128, 132, |
| 157, 172, 186, 195, | 2007 ... 6 | 73, 89, 97, 140, 148, | 208, 222 | 136, 140, 144, 148, |
| 197, 223, 224, 243, | 21 ... 183, 227, 228 | 154, 158, 161, 162, | achieve ... 74, 81, 85, 141, | 149, 151, 164, 169, |
| 248 | 216 ... 35 | 173 | 187, 190 | 172, 177, ... 183, 186, |
| 1.116 ... 94, 186 | 22 ... 156, 208, 217, 218, | 617 ... 107 | achieved ... 74 | 194, 200, 218, |
| 1.2 ... 82, 84, 248 | 234 | 61A ... 37, 41-43, 58, 63, | achieving ... 170 | 221-224, 242 |
| 1.2. ... 84 | 23 ... 75, 183, 238, 246 | 185 | acknowledged ... 87 | agreements ... 157 |
| 1,116,900 ... 195, 224, 243 | 24 ... 183, 197, 220, 234 | 61B ... 192 | acknowledges ... 183 | ahead ... 29, 52, 53, 96, 98, |
| 1:16 ... 92 | 25 ... 24, 183, 228, 242 | 6200 ... 107 | acquainted ... 21 | 129, 133, 174-176, |
| 10 ... 6, 64, 79, 81, 163 | 25th ... 228 | 63 ... 122 | acquire ... 76, 78, 87, 119, | 182, 188 |
| 10:01 ... 6 | 26 ... 121, 178, 184 | 64 ... 123, 150 | 135, 139, 210 | air ... 205 |
| 100,000 ... 54, 226 | 3 ... 18, 19, 47, 75, 106, | 6A ... 219 | acquired ... 90, 91, 143 | alive ... 199 |
| 10th ... 65, 66, 247 | 121, 163, 172, 173 | 6C ... 220, 221 | acquiring ... 33, 34, 36, 39 | allegation ... 241 |
| 11 ... 49, 56, 59, 60, 105, | 3:10 ... 163 | 6th ... 212 | acquisition ... 19, 76, 83, 87, | allegations ... 88, 101 |
| 121, 122, 138, 191, | 3:17 ... 163 | 7 ... 51, 79, 81, 84, 150, | 126, 164, 243 | alleged ... 140, 241, 245 |
| 234 | 30 ... 24, 59, 91, 106, 121, | 154-156, 177 | acquisitions ... 8 | allocation ... 223, 224 |
| 11:30 ... 59 | 134, 145, 150-153, | 7.64 ... 150 | acre ... 6, 22, 23, 35, 37, 68, | allow ... 54, 61, 103, 128, |
| 11:44 ... 60 | 157, 162, 164, 177 | 7:15 ... 81 | 80, 81, 109, 145, 146, | 130, 151, 153, 163, |
| 11th ... 49, 54, 56, 57, 61, | 300 ... 54, 85, 226, 237 | 700 ... 85, 95, 96 | 150, 151, 157, 165, | 173 |
| 74, 191, 192 | 300,000 ... 54, 85, 237 | 700,000 ... 85, 95, 96 | 187, 190, 192, 193, | allowed ... 153 |
| 12 ... 45-47, 56, 59, 91, 92, | 31 ... 136, 181, 182, 232 | 71 ... 123, 125 | 212-214, ... 216-219, | alter ... 151, 173 |
| 124, 157, 180, 222 | 32 ... 157 | 7th ... 84 | 223-225 | alteration ... 167 |
| 12:30 ... 59, 91 | 325 ... 100, 104 | 8 ... 6, 64, 66, 145, 146, | acres ... 96, 129, 186, 223, | alternative ... 31, 199-201 |
| 12:34 ... 92 | 33 ... 18 | 150-152, 157, 178, | 224 | Alternatively ... 52, 155 |
| 125,000 ... 100 | 337 ... 106 | 186, 223-225, 247 | Action ... 17-19, 197, 201 | ambiguity ... 166 |
| 12th ... 45-47, 49, 54, 57 | 342 ... 107, 111 | 8.57 ... 145, 146, 150-152, | actions ... 170 | among ... 43, 134 |
| 13 ... 36, 37, 42, 137, 180, | 343 ... 111 | 157, 178, 186, 223-225 | actively ... 43 | amount ... 8, 54, 56, 80, 83, |
| 222, 225 | 35 ... 157, 186, 187 | 80 ... 157, 183 | activities ... 189, 209 | 84, 91, 93, 100, 109, |
| 13th ... 36, 39, 40 | 350 ... 100, 104, 138, 212 | 800 ... 6, 84, 94, 95, 226, | actual ... 44, 129, 133, 204 | 110, 125, 127, 151, |
| 14 ... 154, 155, 197, 219, | 350,000 ... 104, 138, 212 | 232, 236-238 | add ... 94, 95, 162, 167 | 177, 200, 216, 218, |
| 220 | 351 ... 122 | 9 ... 75, 137, 227 | adding ... 221 | 219, 222, ... 223, 225, |
| 140 ... 118 | 367 ... 107 | 90 ... 167 | addition ... 118, 167 | 226, 228 |
| 142 ... 22, 23, 55, 68, 84, 85, | 4 ... 35, 95, 96, 124, 172, | 91 ... 87 | address ... 6, 18, 210 | amounts ... 181, 231 |
| 122, 142, 143, 146, | 173, 176, 197 | 95 ... 37 | addressed ... 157 | analyses ... 235 |
| 151, 170, 229, 237 | 4,000 ... 124 | 9th ... 137, 222, 225 | addresses ... 126 | analysis ... 73, 98, 139, 168, |
| 144 ... 55, 68, 84, 85, 118, | 4:14 ... 197 | | addressing ... 128 | 169, 185, 189, 229, |
| 122, 142, 143, 146, | 4:24 ... 197 | **A** | adequate ... 70, 167 | 235 |
| 151, 170, 229, 237 | 40 ... 124 | A.M. ... 6, 59, 60 | adjacent ... 25, 31, 187, 190 | analyze ... 29, 244 |
| 15 ... 81, 164, 165, 193, 210 | 400,000 ... 55, 56, 67-70, | abide ... 59, 60 | adjustments ... 181 | analyzes ... 29, 139 |
| 154 ... 193 | 85, 93, 94, 96, 98, | ability ... 128, 134, 143, 187, | administrator ... 107, 210 | Anger ... 216 |
| 15th ... 210, 211 | 132, 135, 136, 145, | 217, 234 | admit ... 107 | angry ... 198, 215, 217 |
| 16 ... 92, 166, 181 | 220, 222, 223, 226 | able ... 70, 71, 141, 187, | admits ... 88, 101 | animated ... 205 |
| 17 ... 83, 124, 163, 181, 191, | 40B ... 25, 31, 64, 145, | 203, 209, 236 | admitted ... 88, 101 | annual ... 35 |
| 209 | 157, 178, 179, 182, | above ... 110, 111, 122, 138 | advance ... 44 | ANR ... 166, 167 |
| 17.50 ... 83 | 184, 186, 189, | absence ... 70, 142, 191 | advanced ... 13 | anticipate ... 85, 141 |
| | | absolute ... 69, 210 | | |

Word ...... Page

anticipated ... 64, 135, 140, 141, 171, 172, 233
anticipates ... 179
anyhow ... 67, 69
anymore ... 123, 191, 200
anywhere ... 56, 152
apologize ... 31, 37, 76, 165
appalled ... 174
apparent ... 75, 143, 153, 216, 229
apparently ... 192, 210, 212, 233
Appeals ... 228
appear ... 143, 157, 191
appeared ... 139, 188
appears ... 15, 39, 51, 81, 105, 106, 154, 155, 167, 181, 184, 210, 211, 228
applicable ... 58-60, 73, 97, 148, 158, 176, 178, 185, 224, 226
application ... 99, 100, 104-106, 108, 109, 117, 122, 123, 143, 186, 212, 228
applications ... 116, 117, 120
applied ... 115, 159, 229
applies ... 161, 162, 183
apply ... 58-60, 62, 63, 72, 149, 154, 156, 157, 159-161, 163, 172, 176, 178-180, 183-185, 229
applying ... 104, 158, 179, 189, 228
approach ... 107
approached ... 213
appropriate ... 91, 152, 156, 162, 164, 166, 169
approval ... 110, 111, 113, 126, 157, 166, 167, 179, 182
approvals ... 168
approve ... 67, 222
approved ... 166, 170, 222, 223, 226, 236
approximately ... 11, 25, 26, 42, 44, 84, 85, 93-95, 226, 230
April ... 121, 193, 209-211
aquifer ... 191
area ... 14, 167, 191
argument ... 146, 153, 160, 200
arise ... 158, 159
arms ... 205
arose ... 229
article ... 67
articulate ... 205
assemble ... 61, 235
assembled ... 90, 94
assessment ... 30
asset ... 87, 248
assets ... 71, 203, 227, 231, 232, 238
assign ... 37, 46, 47, 49, 192
assigned ... 156, 157, 177, 183, 193, 207, 216

assignee ... 39, 59, 62-64, 140, 151, 154, 158, 171, 176, 181, 185, 244
assigning ... 45, 207
assignment ... 37-50, 55, 57, 59, 65-68, 70, 72-74, 84, 86, 87, 97-99, 119, 140, 144, 145, 151, 155, ... 156, 164, 168, 170, 210, 223, 244
assigns ... 158
assist ... 29, 36, 45
assistance ... 211
assisted ... 198
associate ... 11
associated ... 78
associates ... 124
assumption ... 87, 129, 135, 145
assurance ... 239
assured ... 239
asterisk ... 177, 180
attach ... 235
attached ... 94, 110, 227, 234
attachments ... 45, 234
attempting ... 118
attended ... 28, 30, 36, 66, 191, 204
attending ... 27, 28, 65, 197
attention ... 34, 107, 113, 177
attorney ... 10, 16, 20, 62, 63, 86-88, 92, 100, 101, 123, 140, 149, 158, 164, 172, 203, 207, 208, 240...
attorneys ... 149
audience ... 248
August ... 121
author ... 155
authored ... 235
authorities ... 8
authority ... 8, 9, 28, 47, 48
authorize ... 48, 68, 244
authorized ... 48
authorizes ... 37
avail ... 96, 220
availability ... 29, 99, 128, 152, 215, 221
available ... 75, 76, 96, 98, 99, 102, 103, 108, 110, 111, 115, 118, 127, 128, 139, 143, 152, 175, 184, ... 195, 221, 231, 232, 243
availed ... 184
Availing ... 127
aware ... 14, 19, 57, 104, 108, 110-112, 116, 118-120, 124-126, 137, 152, 161, 189, 192-194, 206, ... 207, 241, 246, 247
awareness ... 78, 97, 120, 144

B

babe ... 248
back ... 20, 24, 28, 52, 54, 57, 66, 67, 91, 93-95, 100, 121, 125, 133-135, 150, 161, 164, 170, 187-189, ... 194, 200, 201, 206, 219, 235, 239, 247
background ... 10
backs ... 51, 155
backup ... 206, 227
balance ... 231
ball ... 43
Bank ... 107-110, 114, 115, 118, 120, 127, 188, 206, 233, 234
banking ... 120
banks ... 127
bar ... 33, 174
bargain ... 147
Barlow ... 201, 202
barn ... 196
based ... 62, 63, 83, 123, 175-178, 180, 183, ... 184, 227, 229
basic ... 148, 151, 196
basis ... 62, 103, 227, 232, 244
Bate ... 35, 105, 193, 219
bear ... 82
became ... 21, 75, 119, 143, 153, 189, 216, 228, 229, 244
become ... 19, 110, 123, 137, 198, 241
becomes ... 39, 76, 104, 152
began ... 30, 43
begins ... 81, 233
behavior ... 174
belabor ... 74
belief ... 89
believed ... 60, 61, 72, 89, 90, 137, 152, 156, 158, 203, 213, 219, 224
believes ... 131, 151, 157, 189
believing ... 75
bell ... 108
below ... 107, 147, 245
benefit ... 209, 235
benefits ... 147
beside ... 15
Bickford ... 12
big ... 9
Bill ... 106, 107, 210, 243
bind ... 8
blank ... 110
BNC ... 106
Board ... 28, 41, 42, 44-48, 52-54, 81, 82, 108, 110, 113, 120, 165, 167, 168, 191-193, 197, 201-203, ... 206, 210, 212, 222, 228, 241
boards ... 168, 211
Bob ... 198, 204-206, 247
body ... 44
bold ... 154, 155, 178, 220

bob ... 52, 155
bono ... 124, 201-203, 209
bonuses ... 15
Boothroyd ... 197, 198, 207
borrow ... 78, 96, 113, 114, 121-123, 126-128, 135, 136, 139, 142-144, 184, 188, 218, 222, 225, 226, ... 238, 239
borrowed ... 77, 79, 113, 127, 142, 184, 187, 188, 215
borrower ... 135, 136
borrowing ... 114, 118, 127, 128, 131, 132, 139, 142, 188, 222, 227
Boston ... 7, 10, 18, 24, 126
Both ... 47, 56, 64, 87, 89, 92, 181, 246
bothering ... 65
bottom ... 106, 107, 119, 177, 236, 241
bound ... 58, 60, 73
boundary ... 151
branch ... 115, 176
break ... 59, 136, 163, 191, 197, 234
bridge ... 76-78, 217, 222, 223, 226
bridging ... 78, 226
Brief ... 52, 205
brings ... 153
broker ... 197
brokerage ... 181
brought ... 34, 197, 201
budget ... 76, 232, 233
budgeting ... 233
build ... 184
building ... 18, 81
buildings ... 173
built ... 25, 170, 235
burden ... 129
bury ... 202
business ... 69, 75, 116, 179, 239
buy ... 67, 69, 70, 83, 103, 123, 139
buyer ... 58, 60, 78, 79, 119, 150, 153, 154, 156, 157, 172, 179, 183, 207
Buying ... 76
bylaw ... 167

C

Cafeteria ... 59
California ... 126, 208
call ... 13, 20, 24, 207
called ... 22, 64, 119, 218, 246
calling ... 24
calls ... 149
calm ... 204
campaign ... 117
Can ... 6, 10, 15, 16, 18, 20, 21, 23, 31, 35, 37, 40, 42, 44, 50, 52, 59, 62, 63, 70, 76-79, 91, 101-103, ... 107, 113, 114, 125, 128, 130,

134, 135, 139, 143, 146, 150, 160-163, 165-167, ... 175, 192, 203, 206, 226, 228, 246, 248
cap ... 75
capacity ... 76, 117, 163, 203, 204
capital ... 76, 77, 110, 111, 122, 138, 140, 142, 215, 216, 218, 227, 237
caps ... 57
capture ... 118
care ... 87, 141
career ... 10
careers ... 69
careful ... 164
carefully ... 233
caring ... 88, 101
Carol ... 193
carry ... 231
case ... 30, 32, 38, 41, 72, 113, 116, 122, 158, 161, 162, 183, 188, 201-204, 226, 247
cases ... 89, 158, 159
cash ... 94, 230-233, 238
catastrophic ... 13
category ... 167
cause ... 9
caused ... 150, 218
cc ... 46
certain ... 80, 97, 102, 120, 130, 132, 161, 163, 218, 239
certainly ... 43, 89, 121, 125, 152, 161, 193, 225, 240
certainty ... 81, 88, 89, 158, 195
certificates ... 231
chairman ... 228, 245
challenging ... 168
chance ... 207
change ... 10, 27, 29, 62, 152, 167, 200, 223
changed ... 28, 69, 153, 222
changes ... 169
changing ... 104
Chapter ... 27, 37, 41-43, 58, 60, 62, 63, 73, 89, 97, 140, 148, 154, 158, 161, 162, 178, 179, 185, 192, ... 194, 196
characterization ... 228
characterize ... 226
charge ... 7, 203
charitable ... 14, 186, 207, 208
chart ... 109
check ... 86, 194
checked ... 14
checking ... 230, 231, 233
Choate ... 202
chose ... 14
Chris ... 105
Christianson ... 21-23, 25, 26, 30, 31, 34, 212

# DEPOSITION OF CRAIG MACDONNELL

MINDEX by Kenson

| Word ...... Page | Word ...... Page | Word ...... Page | Word ...... Page | Word .... Page |
|---|---|---|---|---|
| Christopher ... 116 | 196, 198, 227, 234, | consequences ... 156 | Cook ... 18 | 178, 198, 199 |
| chunk ... 205 | 240, 241 | conservation ... 7, 18, 19, | cooperate ... 157 | dated ... 45-47, 49, 68, 137, |
| circumstance ... 102, 120, | complete ... 54, 69, 70, 95, | 22-26, 29-31, 33, 34, | cooperation ... 246 | 166, 167, 209, 212, |
| 126 | 113, 128, 139, 142, | 37, 38, 42, 77, 81, 139, | copied ... 46, 167 | 228, 234, 238 |
| circumstances ... 22, 23, 57, | 153, 188, 192 | 141, 142, 158, 178, | copies ... 51 | dates ... 44, 50 |
| 62, 100, 104, 118, 126 | completed ... 52, 139, 142, | 187, 191-193, ... 205, | copy ... 106 | David ... 81, 92, 197 |
| city ... 143 | 155 | 212, 233, 236, 243 | Cornell ... 12, 13, 240 | dawned ... 78 |
| civil ... 117 | completely ... 61, 141, 223 | conserve ... 25, 69 | Corner ... 6 | dawning ... 78 |
| claim ... 71, 209 | completeness ... 111 | conserved ... 193 | corporate ... 13, 16, 18 | day ... 47, 49, 50, 61, 194, |
| clarify ... 16, 42, 48, 60, 81, | compliance ... 167 | conserving ... 193 | corporation ... 14, 15, 208 | 202, 212, 239 |
| 91, 121, 122, 133, 221 | complicated ... 144 | consider ... 25, 70, 71, 78, | corrected ... 110 | days ... 65, 66 |
| clause ... 71-75, 119, 149, | complicating ... 169 | 149, 150, 185, 226, | correctly ... 38, 58, 60, 76, | dead ... 200, 201 |
| 158, 183, 207 | comply ... 60, 63, 97, 152, | 231, 232, 243 | 101, 110, 133 | deal ... 51, 72, 78, 130, 134, |
| close ... 75, 94, 110, 127 | 154, 176, 179, 187 | consideration ... 148, 167 | correctness ... 203 | 144, 148, 155, 172, |
| closely ... 231 | complying ... 98, 132 | considered ... 48, 70, 95, 97, | correspondence ... 155, 158, | 181, 192, 199, 213, |
| closing ... 52, 91, 94, 96, | component ... 57, 94, 147, | 157, 172, 188, 231 | 206 | 224-226, 228, 237, 243 |
| 121, 143, 155, 181, | 161, 225 | considering ... 78, 83, 86, | cost ... 82, 117, 118, 192, | dealing ... 36, 71, 189, 207 |
| 182, 221 | components ... 97 | 151, 233 | 202, 245 | deals ... 18, 89, 185 |
| Co ... 92, 157, 169, 172, | concentration ... 210 | consistent ... 83 | costs ... 83, 85, 157 | dealt ... 147 |
| 182, 184, 186, 189, | concept ... 89, 247 | consisting ... 150 | cottage ... 167 | debate ... 217 |
| 193-195, 223, 224, | concern ... 62, 160 | constellation ... 29 | couch ... 45, 46, 52, 87, 92, | debated ... 203 |
| 230, 244 | concerned ... 31, 207, 218, | constitute ... 247 | 99, 110, 112, 125, 126, | December ... 28, 40, 232 |
| Cobb ... 81 | 227 | construction ... 157, 183-186 | 130, 132, 145, 149, | decide ... 152, 156, 159 |
| code ... 59 | concerning ... 21, 24-28, | consultant ... 104, 105 | 159-161, 196, 197, | decided ... 91, 113, 114, 144, |
| collaboration ... 247 | 33, 34, 36, 39-41, 47, | contact ... 21, 23, 24, 26, | 201-203, ... 207, 209, | 157, 158, 188, 213, |
| collateral ... 233 | 58, 66, 89, 99, 130, | 31-33, 36, 41, 122 | 228 | 218 |
| collection ... 195, 216 | 147, 165, 191, 195, | contacted ... 21-25, 27, 30, | count ... 24, 209, 211 | decision ... 68, 96, 97, 114, |
| colloquial ... 242, 246 | 212, 213, 215, ... 217, | 32, 36, 37, 41 | counting ... 237 | 121, 161, 221, 228, |
| combination ... 54, 241 | 219, 240 | contacting ... 26, 32 | couple ... 56, 81, 107 | 230 |
| come ... 25, 26, 71, 95, 96, | conclude ... 98, 129, 142 | contain ... 116 | course ... 43, 90, 171, 173, | decisions ... 58, 72 |
| 98, 134, 137, 139, 171, | concluded ... 75, 96, 97, | contained ... 131, 145, 153 | 185, 214, 240 | declare ... 242 |
| 188, 189, 200, 206, | 248 | contemplate ... 70, 186 | courses ... 13 | deduction ... 209 |
| 215, 237-239 | conclusion ... 139, 149, 150 | contemplated ... 186, 221, | court ... 86, 112, 118, 119, | deductions ... 209 |
| comes ... 126, 174, 233 | conclusions ... 148 | 235, 237 | 127, 160, 161, 174, | deeds ... 55, 73 |
| coming ... 52, 140, 162, 189, | Concord ... 6 | contemplates ... 186 | 185 | deem ... 152 |
| 190, 233, 237 | condition ... 57, 173, 196 | contemplating ... 244 | courts ... 12, 13, 58 | default ... 114, 115, 120, |
| comment ... 66 | Conditions ... 51, 119, 154 | context ... 113, 152, 196 | cover ... 106, 117, 118 | 156, 171, 197, 201 |
| commenting ... 197 | conducted ... 185 | contingencies ... 194 | CPA ... 117 | defaulted ... 156 |
| comments ... 28 | confidence ... 89, 228, 234 | contingency ... 72, 108, 117, | CPC ... 42, 64, 65, 236 | defeated ... 189 |
| Commission ... 33, 42, 68, | confidences ... 164 | 169, 183, 186, 194 | Craig ... 6, 37, 49, 81, 106, | defect ... 180 |
| 193 | confident ... 89 | contingent ... 107, 239 | 107, 113, 119, 121, | defects ... 180 |
| commissioner ... 12 | configuration ... 146, 151 | continue ... 175, 197, 236, | 129, 135, 162, 163, | defend ... 52, 155, 175, 197, |
| commitment ... 67, 247 | confirmation ... 118 | 245 | 165, 193, 210 | 201 |
| commitments ... 244 | conforming ... 167 | continued ... 236 | create ... 153, 167 | Defendants ... 113, 119, 121 |
| Committee ... 48, 64, 65, 79, | conformity ... 167 | continuing ... 105, 199 | created ... 229 | defended ... 163 |
| 81, 247 | confuse ... 107 | contract ... 9, 39, 58-66, 71, | creation ... 31, 76 | deferred ... 162 |
| committees ... 42 | confused ... 74 | 73, 80, 91, 93, 98, 99, | credit ... 77, 107-111, | define ... 8 |
| common ... 58, 104, 156, | confusing ... 168 | 123, 128, 136, | 113-116, 118-120, | defined ... 151 |
| 185, 229 | conjunction ... 117 | 140-142, 144, 145, | 125-128, 138, 175, | definition ... 77 |
| Commons ... 27, 28, 93-95, | connection ... 15, 197, 248 | 148, 152, 153, ... 156, | 187, 188, 206, | degree ... 13, 167 |
| 129, 134, 136, 140, | connections ... 197, 201 | 158, 169-173, 177-179, | 215-218, 227, 231, | degrees ... 13 |
| 144, 148, 170-172, | CONROY ... 6, 8, 14, 16, | 182-185, 187, 194, | 233, ... 234, 237 | delicate ... 191 |
| 179, 184, 189-191, | 17, 19-21, 29, 31-34, | 200, 201, 244, 247 | criminal ... 117 | deliver ... 91, 176, 221 |
| 207, 223-225, ... 230 | 36-41, 43, 49, 50, 52, | contracts ... 8 | critical ... 68, 76, 87, 143 | demands ... 197 |
| Commonwealth ... 12, 15, | 53, 55, 57-59, 61-63, | contractual ... 242-244 | crunches ... 104 | demonstrated ... 192 |
| 100, 116, 117, 122, | 65, 68, ... 70, 72-77, | contributing ... 94 | crux ... 188 | denied ... 241, 245 |
| 123, 142, 187 | 79, 80, 82, 86, 88-91, | contribution ... 122, 186 | current ... 112 | denies ... 88, 101 |
| communicate ... 220 | 93, 101, 102, | control ... 174, 187, 210 | currently ... 21, 233 | Denise ... 123, 125, 228 |
| communications ... 160 | 109-112, 114-116, | conventional ... 184 | customary ... 110 | deny ... 89, 245 |
| communities ... 19, 81 | 121, 123, 125-130, ... | conversation ... 31, 89, | cut ... 166 | denying ... 202 |
| Community ... 64, 65, 68, | 132-136, 139-156, | 100-102, 131, 133, | | Department ... 11, 12, 100, |
| 100, 104, 138, 192, | 158, 159, 162, 164, | 209, 247 | **D** | 104, 138 |
| 243, 247 | 168, 170-177, 183, | conversations ... 32, 35, 40, | daily ... 232 | dependent ... 91 |
| company ... 27 | 184, 187, 189, 191, ... | 44, 165, 189, 214, 215 | damage ... 71, 73-75, 119, | depose ... 162 |
| comparable ... 240 | 195-197, 205, | conversion ... 100 | 149, 158, 207 | deposes ... 6 |
| compelled ... 64 | 207-212, 214, 216, | convey ... 60, 83, 186 | damages ... 72, 141, 156, | deposit ... 177, 181, 182, 231 |
| compilation ... 45, 105, 177, | 218, 220, 223, 224, | conveying ... 129 | 171, 183 | deposited ... 80, 81 |
| 193 | 226, 238, 239, 242, | convince ... 209 | dark ... 214 | deposition ... 6, 16, 17, 32, |
| complaint ... 85-88, 101, | 245-248 | convincing ... 43 | date ... 30, 42, 44, 47, 49, | 63, 134, 162, 164, 174, |
| | | | 50, 56, 68, 91, 121, | |

| Word . . . . . . Page | Word . . . . . Page | Word . . . . . . Page | Word . . . . . . Page | Word . . . . Page |
|---|---|---|---|---|
| 175, 211, 248 | dissatisfied ... 215 | 158, 159, 168, 172, | 148, 153, 159, 219, | faced ... 188 |
| deposits ... 80, 113, 181, 219 | dissuade ... 189 | 174, 183, 184, ... 187, | 227 | facile ... 212 |
| derived ... 15, 56, 147 | dissuaded ... 189 | 189, 194, 195, 204, | establish ... 186, 244 | facilitate ... 100, 151 |
| describe ... 14, 77, 98, 165, | distinct ... 215 | 207, 209, 214, 220, | established ... 23, 57 | factors ... 29 |
| 209 | distinguish ... 34 | 223, 224, 226, 244, | establishing ... 50, 212, 233 | fail ... 111, 140, 141 |
| described ... 42, 108, 145, | division ... 18, 19, 230 | 245 | establishment ... 24 | failed ... 72-74, 104, 113, |
| 150, 181, 182, 216 | doctrine ... 229 | economy ... 138 | estate ... 76, 182, 197 | 141, 180 |
| describing ... 210 | document ... 15-18, 35, 48, | education ... 13 | estimation ... 9 | failing ... 170 |
| description ... 217, 236 | 49, 51, 57, 64, 66, 75, | educational ... 10 | estoppel ... 247 | failings ... 110 |
| design ... 83 | 81, 105, 111, 119, | effect ... 50, 78, 97, 189, | ethical ... 175 | failure ... 52, 138, 155, 170 |
| designate ... 209 | 125, 130, 131, 136, | 192, 193, 195, 201, | events ... 44, 166 | fair ... 26, 27, 43, 49, 50, 62, |
| designation ... 14, 15, 20, | 154, 155, ... 165, | 203, 207, 230, 244 | eventually ... 140, 226 | 64, 67, 71, 81, 83, 84, |
| 27-29, 35 | 191-193, 227, 245, | effective ... 81 | everybody ... 92, 230 | 91, 94-96, 98, 111, |
| designed ... 140, 184 | 246 | effectively ... 62 | everything ... 140, 247, 248 | 145, 150, 151, 157, |
| despite ... 75 | documents ... 20, 21, 35, | effectuate ... 94-96, 215, 232 | evidenced ... 110 | 159, 168, ... 179, 182, |
| detectors ... 186 | 45, 50, 105, 106, 112, | efforts ... 75, 189, 193 | evidences ... 245 | 183, 187-189, 193, |
| determination ... 72, 78 | 116, 130-132, 193, | eight ... 178, 199, 235-238 | EXAMINATION ... 6 | 194, 200, 210, 211, |
| determine ... 78, 158, 180, | 194, 212 | eighteen ... 181 | Examining ... 15 | 213, 219, 220, 225, |
| 231 | dollar ... 8, 16, 56, 79, 82, | eighty ... 16 | example ... 8, 13, 63, 64, 186 | 235, 236, 238-242, ... |
| determined ... 71, 78, 91, | 94-96, 110, 111, | elderly ... 88, 101, 207 | exceed ... 225 | 245-247 |
| 229 | 113-116, 118, | elect ... 184 | except ... 6, 88, 101, 179, | fairly ... 26, 103, 196 |
| determining ... 139 | 127-129, 137, 147, | elected ... 21, 121, 163 | 217 | faith ... 158 |
| developed ... 150, 151, 169, | 150, 152, 175, 220, | election ... 184 | excerpt ... 124 | fall ... 167, 199 |
| 193 | 221, ... 234, 238, 240, | eleven ... 180 | exchange ... 236 | fallback ... 107-109, 118, |
| development ... 25, 27, 28, | 243, 248 | email ... 164, 166, 168, 209, | exempt ... 208, 243 | 122, 138, 142 |
| 31, 63, 64, 100, 104, | dollars ... 8, 9, 80-82, 84, | 210 | exercise ... 42, 82, 87, 97 | falling ... 214 |
| 138, 157, 187, | 95, 102, 103, 113, | emerged ... 169 | exercised ... 119 | false ... 116 |
| 191-193, 213 | 119, 137, 139, 142, | employed ... 18 | exhausted ... 134 | far ... 8, 19 |
| DH ... 104 | 153, 182, 186, 187, | employee ... 19, 24, 162, 166 | Exhibit ... 16-19, 35, 45-47, | Farm ... 27, 35, 150, 193, |
| DHCD ... 100, 105, 106, | 216, 219, 225, ... 230, | employees ... 24 | 49-51, 54-57, 59, 60, | 210 |
| 109, 139 | 231, 233, 237, 243, | enable ... 29, 171, 180, 184 | 64, 66-68, 73-75, 79, | fashion ... 190, 205 |
| dialogue ... 158 | 244 | enables ... 211 | 81, 105, 110, 121, 122, | father ... 87, 88, 101 |
| difference ... 85, 156, 157, | donated ... 80, 146, 148 | encountered ... 170 | 124, ... 137, 138, 154, | favor ... 64 |
| 208 | donation ... 80, 134, 147 | encourage ... 200 | 155, 164-166, 191, | feasibility ... 194 |
| different ... 29, 33, 62, 91, | Donna ... 167 | encouraging ... 200, 222 | 193, 206, 209, 210, | February ... 6, 45-47, 49, 54, |
| 121, 144 | door ... 106 | encumber ... 150, 157 | 212, 219, 220, 222, | 56, 57, 61, 64-66, 74, |
| differentiate ... 181 | Dorothy ... 45-49, 56, 125 | endorse ... 167 | 225, 227, ... 228, 234, | 165-168, 191, 192, 247 |
| difficult ... 40, 215 | double ... 118, 194 | endowment ... 233 | 235, 238, 242, 244, | federal ... 12, 13, 112, 117, |
| difficulty ... 87, 170 | doubled ... 64 | ends ... 156, 232, 233 | 246, 247 | 118 |
| dilapidated ... 196 | downstairs ... 59 | Enforcement ... 11 | existed ... 19, 223 | fee ... 181 |
| diligence ... 72, 110, 111, | dozens ... 124 | engages ... 139, 140 | existence ... 129, 229, 245 | feel ... 42, 64 |
| 113, 118, 140, 142 | draft ... 81, 154 | England ... 24, 115 | exists ... 131 | feels ... 104 |
| dimensional ... 166 | drafted ... 155 | enhance ... 243 | exit ... 99 | fees ... 181 |
| directions ... 178 | drafting ... 67 | ensure ... 104 | exits ... 136, 164, 196, 222, | fellow ... 21, 192 |
| directly ... 21 | drawn ... 148 | ensured ... 195 | 234 | felt ... 215 |
| director ... 7, 8, 14, 20, 24, | Drew ... 192 | ensures ... 243 | expect ... 84, 141, 226, 242 | FETOUH ... 13, 17, 19, 20, |
| 41, 47, 49, 104, 115, | drop ... 228 | enter ... 16, 129, 158, 183, | expectation ... 39, 84, 140, | 22, 27-34, 36, 38-43, |
| 120, 161, 176, 230, | dropped ... 22 | 242 | 141, 227 | 47, 49-51, 53, 55-58, |
| 232 | due ... 72, 110, 111, 113, | entered ... 185 | expected ... 84, 85, 90, 142, | 61-63, 65, 68, 70-72, |
| Directors ... 48, 110, 113, | 118, 126, 132, 136, | entering ... 244 | 150, 179 | 74-77, ... 79, 80, 82, |
| 222 | 140, 142, 153 | enters ... 211, 215 | expecting ... 141 | 85, 86, 89, 90, 92, 97, |
| disagreeing ... 223 | duly ... 6 | entertain ... 57 | expenditure ... 68 | 98, 111, 114-116, |
| disagrees ... 172 | | entire ... 44, 186, 218 | expenses ... 182, 233 | 123-128, 132, 135, |
| disappointed ... 190 | **E** | entirely ... 117, 130, 150, | experience ... 185 | 136, 139-144, ... |
| disclose ... 120 | each ... 7, 155, 163, 243 | 235 | experienced ... 138, 204 | 146-150, 152-154, 156, |
| disclosure ... 206 | earlier ... 30, 60, 61, 95, 97, | entirety ... 148 | expert ... 62, 164 | 158-163, 165, 168, |
| disconnect ... 216, 217 | 104, 107, 127, 144, | entities ... 17, 229, 241 | expertise ... 104, 147 | 170, 172-174, 177, |
| discourage ... 214 | 148, 155, 158, 169, | entitled ... 128 | explain ... 225, 226 | 179, 183-189, 191, ... |
| discouraged ... 214 | 208, 217, 228, 229 | entity ... 18-20, 27, 39, 229, | explained ... 107 | 194, 195, 198, 201, |
| discusses ... 154 | early ... 10, 26, 88, 98, 168, | 243 | explanation ... 128 | 204, 207-209, 211, |
| discussing ... 25, 51, 52, 65, | 210, 229 | environmental ... 11, 13, 69 | explicit ... 204 | 212, 214, 217, 218, |
| 74, 203, 204 | earmarked ... 79, 115 | envisioned ... 170 | explicitly ... 73, 158, 159 | 220, 222-226, 234, |
| discussions ... 23-26, 28, 29, | earned ... 221 | envisions ... 107 | expressing ... 99 | 237, ... 239, 240, 242, |
| 33, 34, 41-44, 189, | earnest ... 80, 81, 149, 156, | equivalent ... 103 | expressly ... 88, 101 | 244-246, 248 |
| 199, 214, 215, 219 | 181, 182, 186, 218, | Ernest ... 18 | extension ... 157, 167, 178 | field ... 69 |
| dishonesty ... 204 | 219 | Esquire ... 125 | extensive ... 147 | Fifteen ... 180, 182 |
| Dismiss ... 113, 119, 121, | easily ... 216 | essence ... 151 | extensively ... 67 | fifth ... 241 |
| 163 | ECKER ... 34, 75, 89, 92, | essential ... 156 | external ... 70 | fifty ... 9, 32, 94, 100 |
| disregard ... 175 | 114, 129-132, 135, | essentially ... 17, 48, 143, | | figure ... 71, 185, 229, 248 |
| | 141, 146, 148, 153, | | **F** | |

| Word ...... Page | Word ...... Page | Word ...... Page | Word ...... Page | Word .... Page |
| --- | --- | --- | --- | --- |
| figuring ... 98 | 121, 123, 127, 129, | gift ... 224 | hard ... 61, 70, 126, 199, | 105, 124, 137, 154, |
| filed ... 86, 112, 119, 127, | 143, 145-147, 150, | give ... 35, 94, 95, 193, 206, | 200, 226, 236 | 164, 166, 191, 193, |
| 162 | 152, 176, 177, 220, | 219, 233 | harmless ... 51, 155 | 210, 212, ... 228, 234, |
| filing ... 20, 116, 117 | 221, 226, 227... | given ... 39, 65, 69, 95, 96, | Hatch ... 7, 8 | 238 |
| filled ... 104, 106 | Fourteen ... 180 | 130, 134, 146-148, | HDSP ... 117 | identified ... 6, 71, 79, 84, |
| final ... 98 | fraught ... 143 | 158, 172, 182, 218, | head ... 245, 246 | 90, 160, 180, 216 |
| finance ... 18, 19, 79, 81, | free ... 129 | 231 | heading ... 36, 210 | identifies ... 139 |
| 115, 116, 126, 217 | frequency ... 44 | giver ... 87 | headquarters ... 7 | identifying ... 157, 185 |
| finances ... 61, 217 | Friends ... 37, 80, 81, 165, | Glassman ... 77, 78, 108, | hear ... 59, 174, 195 | imagination ... 226 |
| financial ... 18, 67, 70, 87, | 190, 193, 212-214, | 206 | heard ... 17, 77, 160, 162, | imagine ... 153 |
| 120, 231, 242-244 | 216-219 | go ... 11, 12, 20, 28, 43, | 170, 182, 190, 247 | imagined ... 139, 141, 151, |
| Financing ... 29, 60, 72, | front ... 9, 15, 18, 51, 80, | 52-54, 59, 66, 67, 75, | hearings ... 27, 44 | 171, 184, 185, 236 |
| 107-109, 133, 157, | 81, 101, 106, 145, 159, | 89, 96, 103, 104, 112, | heated ... 199 | imagines ... 63, 142, 153, |
| 184, 186, 217 | 168, 169, 200, 208 | 114, 117, 121, 129, | heck ... 141 | 185, 187 |
| Fincom ... 81, 82 | frontage ... 166, 167 | 131, 133, ... 138, 141, | held ... 51, 52, 155 | immediate ... 103 |
| find ... 74 | fronted ... 238 | 144, 150, 156, 159, | help ... 14, 38, 100, 105, 188 | immediately ... 102 |
| finding ... 70 | frustration ... 175, 216 | 160, 164, 166, | helpful ... 37, 96-98 | implying ... 102 |
| fine ... 161, 163, 175, 239 | frustrations ... 175 | 169-172, 174-176, 180, | helping ... 205 | Importance ... 165 |
| finger ... 175 | full ... 37, 63, 69, 90, 91, | 186-188, 190, ... 194, | helps ... 19, 81 | important ... 185, 230, 241, |
| firm ... 202, 246 | 220, 243 | 196, 197, 204, 213, | hesitated ... 17 | 248 |
| firms ... 10, 203, 247 | fully ... 70, 71, 75, 181 | 214, 222, 227, 228, | high ... 165 | imposed ... 129 |
| first ... 6, 19, 30, 31, 35-43, | function ... 121, 174 | 230, 245, 246 | highly ... 143, 144 | impossible ... 75 |
| 45, 47, 50, 51, 53, 54, | fund ... 17-19, 54, 57, 61, | goals ... 178 | hijinks ... 205 | improved ... 236 |
| 56, 57, 61, 64, 66, 67, | 70-74, 90, 109, 113, | going ... 15, 17, 24, 42, 48, | Hill ... 201, 202 | imprudent ... 227 |
| 72-74, 82, 87, 97, 105, | 117, 119, 122, | 51, 62, 64, 67-69, 74, | hired ... 104 | impugning ... 131 |
| 106, ... 110, 116, 118, | 137-139, 142, 170, | 75, 81, 83, 87, 90-93, | Hoar ... 123, 124, 201 | inaccurate ... 65, 66, 82, 83, |
| 119, 121, 130, 137, | 174, 188, 213-218, ... | 96, 97, 100, 101, 105, | hold ... 17, 52, 76, 139, 182 | 116, 117 |
| 154, 156, 158, 161, | 222, 227, 231, 239, | 112, ... 118, 119, 122, | honest ... 82, 204 | inapplicable ... 158, 178, 181 |
| 166, 170, 177, 178, | 240 | 124, 126, 129-132, | honestly ... 248 | inapposite ... 63, 178, 179, |
| 182, 192, ... 193, 207, | funding ... 57, 107, 108 | 134-138, 145, 147, | honor ... 73, 74 | 184 |
| 212, 235-237, 242 | funds ... 54-56, 70, 71, 77, | 148, 150-152, 154, | honored ... 74 | appropriate ... 62, 146, 178 |
| fiscal ... 232, 233 | 79, 80, 90, 95, 96, 99, | 160, 164, ... 165, 168, | hope ... 54, 55, 85, 104, 175, | inclusion ... 146 |
| Fish ... 10 | 100, 102-104, | 174, 177, 180, 181, | 236, 237 | income ... 31, 83, 190, 209 |
| Fisheries ... 11, 12 | 109-111, 117, 118, | 186, 188, 190, 191, | hoped ... 54-56, 68, 90, 118, | inconsistent ... 122 |
| fists ... 205 | 121, 122, 126, ... 138, | 193, 196, 197, 212, | 190 | incorporated ... 183 |
| five ... 24, 40, 42, 45, 59, | 139, 203, 215-217, | 213, 215, 216, ... 218, | hopefully ... 233 | incorrect ... 56 |
| 176, 183, 186, 191, | 219, 220, 222, 231, | 219, 226, 227, 233, | horizon ... 142, 214 | incorrectly ... 133 |
| 222, 236-238 | 232, 238, 241, 243 | 236, 237 | horse ... 35, 150 | increase ... 100, 167 |
| fluctuates ... 231 | further ... 83, 131, 157, | gone ... 89, 106 | host ... 43 | increased ... 100 |
| focus ... 31 | 177, 197, 221, 222, | good ... 59, 75, 158, 176, | hostile ... 138 | increasingly ... 228 |
| fold ... 214 | 226 | 191, 196, 200-202, | hour ... 59, 91 | indemnification ... 52, 53, 74 |
| folks ... 191, 219, 247 | future ... 215, 227, 229, 230 | 204, 224, 225 | hourly ... 244 | indemnify ... 53 |
| follow ... 110, 169 | **G** | Goodwin ... 123, 124, 201 | hours ... 124 | indicated ... 100 |
| followed ... 151 | gain ... 147 | gradual ... 78, 144 | house ... 22, 196 | indicating ... 112, 127, 130, |
| following ... 113, 156, 191 | game ... 62, 98 | gradually ... 228 | household ... 83 | 245 |
| follows ... 6, 112, 183, 196 | gap ... 76, 78, 137, 138, | graduate ... 12 | housekeeping ... 92 | indication ... 245 |
| fool ... 248 | 217, 222 | grant ... 54, 93, 100, 105, | houses ... 220 | indistinguishable ... 162 |
| forcing ... 204 | gaps ... 77 | 106, 123, 138, 139, | housing ... 31, 54, 100, 104, | individually ... 245 |
| foregoing ... 150 | gathers ... 29 | 167 | 137, 138, 157, 169, | influenced ... 62, 183 |
| forestry ... 27 | gave ... 223 | granted ... 164, 165 | 172, 182, 184, 186, | influential ... 197, 201 |
| forfeited ... 119 | gear ... 76 | grants ... 116 | 189, 190, 193-195, | informal ... 247 |
| forgive ... 212 | general ... 9, 25, 28, 37, 60, | greases ... 145 | 223, 224, 230, ... 244 | informed ... 87, 88, 101, 116 |
| form ... 6, 16, 18, 145, 223 | 62, 131, 138, 230, | greater ... 77, 222, 223, 226 | hugely ... 229, 231 | infringe ... 160 |
| formal ... 242, 247 | 231, 246 | grounds ... 164 | Hull ... 148 | initial ... 26 |
| forth ... 165, 181, 183, 200 | Generally ... 17, 33, 35, 99, | group ... 214, 215 | hundred ... 9, 16, 40, 42, 56, | initially ... 100, 187 |
| forward ... 43, 74, 75, 103, | 104, 126, 197, 215, | guarantees ... 52, 155 | 69, 84, 85, 89, 94-96, | initiate ... 31, 34, 41 |
| 104, 112, 117, 121, | 216 | guess ... 40, 107, 159, 176, | 100, 127, 129, 137, | initiated ... 31-33 |
| 141, 142, 144, 149, | generate ... 109 | 183 | 138, 143, 145-147, | initiating ... 41 |
| 154, 156, 157, 166, | generates ... 235 | guys ... 163 | 150, 152, ... 177, 182, | initiation ... 42 |
| 170, 171, 174, ... 179, | generic ... 77 | **H** | 199, 220, 221, | inkling ... 168 |
| 180, 182, 188, 190, | gentleman ... 18 | half ... 9, 59, 91, 230, 231 | 235-238, 240 | inserting ... 169 |
| 194, 213, 214, 222, | get ... 42, 57, 67, 68, 71, | halfway ... 19, 83 | hundreds ... 42, 131, 132 | insertion ... 169 |
| 227, 228, 230, 233, | 90, 92, 96, 112, 122, | Hall ... 202 | hundredth ... 42 | inside ... 205 |
| 236, 239 | 123, 136, 141, 152, | hand ... 54, 74, 83, 102, 119, | husband ... 92 | insiders ... 120 |
| found ... 95, 113, 185 | 153, 159, 166, 168, | 230, 241 | hypothetical ... 227 | insist ... 129 |
| foundation ... 179 | 170, 189, 200, ... 205, | handling ... 32 | **I** | insistence ... 96 |
| foundations ... 216 | 209, 224, 226, 229 | handouts ... 192 | i.e. ... 25, 74, 159 | institution ... 14, 163, 207, |
| founder ... 108, 206 | gets ... 63, 64, 143, 174, | happily ... 146 | identification ... 16-18, 35, | 208 |
| four ... 56, 69, 84, 95, 96, | 235 | happy ... 133, 190, 194 | 45, 49, 51, 64, 75, 79, | instruct ... 160, 164 |

Word ...... Page

instruction ... 133
insurance ... 180
intend ... 113
intended ... 27, 70, 71, 73, 91, 111, 118, 142, 171, 187, 220, 230, 243
intending ... 83, 123, 184
intends ... 110, 111, 122, 138, 142
intention ... 55, 69, 74, 75, 85, 90, 113, 141, 185, 187, 207, 210, 220
intentionally ... 189
intentions ... 140
Interconnect ... 106
interest ... 30, 96, 139, 220, 221, 236
interests ... 139
interim ... 140
intem ... 28, 123
internal ... 110, 113, 118
interns ... 29, 124
interpretation ... 131
intervention ... 247, 248
intimidated ... 197
intimidating ... 205
introduction ... 28
introductory ... 40
invest ... 129, 227, 235
investment ... 137, 236, 242, 244
involve ... 34, 160
involvement ... 24, 26, 27, 209, 210, 243
involves ... 29
irreversible ... 192
IRS ... 211
issue ... 40, 52, 53, 65, 74, 97-99, 128, 133-135, 144, 146, 149, 153, 156, 169, 170, 173, 174, 188, ... 201, 215, 216, 218-220, 239
issued ... 15
issues ... 13, 14, 43, 157-159, 168, 169, 215, 219
Item ... 51, 122, 123, 155, 156, 197, 219, 220, 248
items ... 74
iteration ... 154

J

Jacobs ... 166-168
January ... 36, 37, 39, 40, 42, 56, 79, 81, 84, 210, 238, 241-243
Jim ... 197-199
jive ... 83
job ... 7
John ... 12
join ... 14
joining ... 245, 246
joins ... 81
joint ... 81, 82, 163, 241, 246
jointly ... 162
Judge ... 114, 160, 175, 185
July ... 121, 234
June ... 121, 212, 213

justification ... 191

K

Kachajian ... 87, 92, 93, 99, 129, 136, 137, 163, 164, 197, 198, 200, 202, 203, 207, 211, 218, 222, ... 226, 228, 234, 236
Karen ... 165-167, 169
Keegan ... 10, 11, 13
Kelleher ... 166, 169
Kennedy ... 164-167
kindness ... 124
kinds ... 63, 211, 246
kinks ... 169
knowing ... 140
knowledge ... 19, 21, 25, 168, 206
known ... 26, 27, 68, 210, 229
knows ... 104, 126, 162
KUN205 ... 35
KUN211 ... 37
KUN336 ... 105
KUN474 ... 45
Kunelius ... 21-25, 27, 30, 31, 33, 34, 36, 45, 55, 67, 69, 71, 74, 76, 79, 80, 82, 86-88, 90, 91, 93-96, ... 99-103, 108, 117, 119, 121, 127, 129, 130, 132, 135, 136, 140-142, 147, 149, 150, ... 152, 154, 156, 159, 165, 167, 169-172, 176, 177, 179-182, 187, 188, ... 193, 195-197, ... 199-203, 205-210, 212, 218-221, 225, 231, 232, 235, 236, 241, 244, 247, 248

L

Labosky ... 214
lack ... 210
ladies ... 59
land ... 6, 7, 14, 17-19, 21, 27, 29, 37, 39, 45, 46, 48, 55, 76, 81-83, 113, 117-119, 121, 123, 131, 134, ... 135, 139, 143, 146-148, 162, 177, 186, 191-193, 208, 222, 223, 226
landholding ... 139
lands ... 76
Landvest ... 165
language ... 60, 69, 74, 111, 154, 178, 181, 210
LaPointe ... 105, 116
large ... 161, 185
larger ... 117
late ... 10, 11, 194, 212
later ... 12, 68, 95, 98, 121, 169, 199, 216, 227, 229, 234
latest ... 210

lawyer ... 10, 11, 14, 202, 203
lawyers ... 11, 141, 229, 246
lead ... 186
learn ... 102, 240
learned ... 161, 229
leave ... 10, 14, 72, 81, 84, 92, 196, 207
leaving ... 94, 95
left ... 129, 133, 169
left ... 13, 20, 45, 83, 106, 149, 205, 206, 208, 226
legal ... 11, 14, 62, 72, 73, 156, 164, 197, 201, 223, 242, 246, 247
lend ... 152
length ... 203
letter ... 45, 47, 49, 50, 56, 57, 60, 74, 110, 137, 147, 165, 210-213, 220, 222, 225, 228, 234-236, 238, ... 240-243
letters ... 210, 211, 220
level ... 228, 246
liability ... 135
license ... 6
LID ... 106
likelihood ... 207, 239, 240, 243
likewise ... 68
limit ... 160
limitation ... 8, 9
limited ... 203
line ... 46, 51, 107-111, 113-116, 118-120, 125, 126, 128, 138, 151, 175, 177, 187, 188, 206, 215-218, ... 227, 231, 233-235, 237, 241
lines ... 77, 119-121, 127, 215, 222
liquid ... 231, 232
liquidated ... 71-75, 119, 141, 149, 156, 158, 171, 183, 207, 231
listed ... 14, 15, 82, 111, 122, 177, 177, 206, 214
literally ... 204
litigate ... 201-203
litigation ... 13, 33, 112, 203
litigator ... 10, 12
lives ... 165
loan ... 140, 150, 157, 184, 220, 222, 223, 226, 227, 239
loans ... 104, 120
lobbying ... 43, 209-212
local ... 29, 197
located ... 146, 193
long ... 11, 26, 97, 110, 168, 197, 202, 203, 218, 228, 229
look ... 15, 17, 29, 37, 47, 55, 64, 71, 72, 74, 75, 81, 93, 109, 121-123, 125, 138, 139, 145,

150, 155, ... 157, 176, 191, 193, 194, 201, 212, 219, 222, 234, 235, 241, 243, 247
looked ... 70, 71, 177, 231
Looking ... 20, 31, 36, 50, 54, 57, 67, 99, 107, 125, 137, 166, 172, 178, 194, 198, 228, 244
lore ... 154, 185
lose ... 171, 247
loss ... 138, 188
lost ... 170
lot ... 29, 61, 85, 118, 121, 144, 159, 166, 167, 190, 194, 214, 221, 231, 244
lots ... 29, 55, 56, 69, 71, 72, 74, 78, 84, 90, 91, 167, 168, 170, 237, 238
low ... 31, 190
Lower ... 197, 200, 247
luck ... 176
Luncheon ... 92
lying ... 214

M

MacDonald ... 37
MacDonnell ... 6, 37, 49, 62, 81, 87, 88, 92, 101, 106, 113, 119, 121, 137, 162-165, 193, 196, 209, ... 210, 234, 238
Madam ... 86, 131
Maine ... 12
maintain ... 180
maintained ... 134
make ... 28, 29, 32, 53, 54, 56, 59, 61, 64-66, 72, 74, 75, 79, 84, 86, 90, 100, 103, 110, 118, 129, 139, ... 146, 155, 164, 177, 181, 230, 232, 238, 239, 241
maker ... 161
making ... 36, 85, 117, 144, 145, 200, 219, 221
man ... 7, 107, 161, 174
manage ... 38
managed ... 156
management ... 156
manager ... 37, 38, 105, 107, 113, 115, 116
managers ... 29, 126
many ... 11, 13, 24, 40, 42, 80, 92, 190, 191, 198, 215, 246
map ... 167
March ... 121, 232
Marilyn ... 45, 69, 71, 86, 158, 247
mark ... 18, 227
marked ... 15-18, 35, 37, 45, 49, 51, 64, 75, 79, 105, 124, 137, 154, 164-166, 191, 193, 209, 212, 228, ... 234, 238

market ... 55, 110, 111, 122, 138, 147, 217, 225, 237
markets ... 76, 218
Marr ... 248
Mass ... 6, 37
Massachusetts ... 6-8, 12, 14, 20, 47, 49, 58, 70, 104, 115-117, 120, 122, 142, 161, 176, 187, 230, 232, ... 233
materialize ... 139, 142, 219, 227
mattering ... 69
matters ... 18
Maynard ... 205
McClennen ... 10
McLAUGHLIN ... 6, 16-18, 37, 38, 42, 52, 53, 59, 60, 62, 63, 86, 91-93, 99, 101, 109, 110, 112, 121, ... 125, 128-134, 137, 144, 146, 149, 160-164, 174-176, 191, 196-198, 206, 228, 234, ... 238, 240, 242, 247, 248
MCLE ... 13
means ... 29, 38, 57, 77, 128, 142, 173, 179, 203, 226, 245
meant ... 58, 60-62, 78, 227, 237
measured ... 71
Mechanism ... 107
medication ... 9
meet ... 26, 31, 40, 44, 50, 58, 122, 156, 171
meeting ... 26, 30, 31, 35, 36, 40-42, 46, 47, 52, 64-67, 81, 82, 87, 90, 100, 132, 166, 169, 191-193, ... 197, 198, 200, 202-206, 247, 248
meetings ... 28, 40, 42-44, 61, 198, 199, 204
member ... 33, 64, 120, 174, 247
members ... 44, 45, 189, 216
memo ... 106
memorandum ... 119, 121, 127
memorandums ... 127
memories ... 162
memory ... 9, 17, 25, 34, 35, 51, 67, 94, 100-103, 123, 164, 165, 204, 209, 213, 216, 217, 219, 248...
merger ... 229
merits ... 203
Messrs ... 99, 129, 136, 198
met ... 40, 44, 50, 54, 87, 88, 101, 166, 171, 196, 199, 214, 241
method ... 215, 220
Michael ... 125, 214
Mike ... 59, 62, 125
million ... 8, 9, 82, 94, 102,

| Word ...... Page | Word ..... Page | Word ...... Page | Word ...... Page | Word .... Page |
|---|---|---|---|---|
| 103, 111, 113-116, 118, 127, 128, 175, 186, 230, 231, 233-235, 248 | national ... 7, 48, 81 | objective ... 42, 167 | outlined ... 51, 57, 74, 75, 224 | Performance ... 52, 156, 157, 178 |
| mince ... 128 | nationally ... 230-232 | obligate ... 158 | outlines ... 73 | perhaps ... 11, 42, 95, 99, 148, 172, 210 |
| minds ... 150, 187 | natural ... 71 | obligated ... 156 | overdrawn ... 115 | period ... 34, 35, 40, 98, 199, 213, 214, 228, 232 |
| minimum ... 143 | naturally ... 59, 154 | obligation ... 60, 71, 120, 122, 176, 177, 207, 208 | overpaid ... 224 | permanent ... 241 |
| Minor ... 110 | near ... 22 | | overpays ... 225 | permit ... 167, 169 |
| minus ... 35, 106, 237 | necessary ... 53, 54, 57, 70, 73, 84, 86, 90, 111, 113, 117, 121, 139, 142, 201, 202, 217, 222, 241 | obligations ... 71, 72, 94, 120, 241 | overruns ... 117, 118 | permits ... 63, 157, 165, 169, 170, 173, 194, 195 |
| misled ... 215, 219 | | obstacle ... 133, 170 | overstated ... 216 | Perry ... 49-52, 105, 106, 209-211, 238, 241 |
| missed ... 130, 210 | needed ... 75, 85, 95, 98, 138, 157, 170, 196 | obtain ... 116, 117, 209, 215 | own`... 79, 83, 114, 140, 142, 147, 150, 176-178, 180, 183-185, 187, 215, 219, 237, 238 | person ... 28, 32, 64, 65, 122, 134, 149, 192, 204 |
| mission ... 188 | negotiated ... 140 | obtained ... 233 | | personal ... 183, 185 |
| misspelled ... 18 | negotiating ... 172 | obtaining ... 72, 73, 179, 194, 219 | owned ... 134, 229 | personally ... 92, 93 |
| mistake ... 92 | neighborhood ... 24, 237 | occasionally ... 139 | owner ... 23, 24, 123 | personnel ... 30 |
| mistakenly ... 148 | neither ... 86, 171 | occasions ... 88, 101, 199 | owners ... 241 | perspectives ... 144 |
| misunderstood ... 153 | Nelson ... 45, 46 | occupation ... 6 | | Peter ... 21, 23, 25, 33-35, 86, 92, 137, 222, 226, 234 |
| mixing ... 164 | New ... 24, 115, 199, 228 | occur ... 29, 30, 42, 43, 68, 89, 90 | **P** | |
| money ... 9, 53-56, 61, 69-75, 77, 78, 80, 81, 84, 85, 90, 95, 96, 102, 112-116, 118, 119, 121-123, ... 126-128, 135, 136, 139, 141-144, 149, 153, 156, 174, 175, 181, 182, 184, 186-188, ... 196, 200, 205, 206, 214, 215, 217-219, 221-223, 225-227, 230, 231, 233, 236-239... | nine ... 6, 104, 179, 199, 236, 237, 240 | occurred ... 35, 40, 42, 48, 51 | P.M. ... 92, 136, 163, 197, 234, 248 | philanthropy ... 138 |
| | Nineteen ... 181 | occurring ... 31 | Pabian ... 10 | Phillips ... 12 |
| | ninety ... 16 | occurs ... 29, 38 | pace ... 216 | phone ... 171 |
| | non ... 7, 14, 81, 153, 158, 167, 208, 243, 247 | offer ... 236, 238, 239 | paid ... 80, 98, 151, 156, 181, 182, 188, 217, 218, 220, 225 | phrase ... 78 |
| | nor ... 125, 131, 158, 183 | offered ... 156 | | pick ... 91 |
| | normal ... 72, 73, 118, 182, 211 | offers ... 236 | paint ... 186 | picks ... 83 |
| | | office ... 7, 18-20, 23, 24, 26, 30, 41, 120, 126, 166, 197, 198, 204 | pan ... 71 | picture ... 35, 125 |
| | Normally ... 32, 41, 42, 231 | | parcel ... 145, 146, 150-152, 157, 178, 186, 187, 193, 225, 236 | piece ... 22, 142, 164, 243 |
| monies ... 15, 79, 81, 182 | Norris ... 6, 16, 92, 99, 129, 136, 196-198, 215 | offices ... 24 | | pieces ... 29, 83, 85, 94, 148, 159 |
| month ... 157, 182 | | official ... 21, 44 | parcels ... 55, 68, 70, 146, 151, 229 | |
| monthly ... 220, 232 | northeast ... 7 | officials ... 26, 39, 40, 42, 43, 73, 74 | parentheses ... 150 | place ... 7, 35, 43-45, 119 |
| months ... 40, 121, 208, 220 | notary ... 6 | often ... 44 | park ... 43 | placed ... 133 |
| morning ... 57, 66, 82, 88, 89 | note ... 18, 19, 47, 64, 94, 96, 145, 160, 162, 177, 220, 221 | Old ... 6, 32, 87 | participate ... 108 | Plaintiff ... 6, 16 |
| mortgage ... 91, 93-99, 123, 127, 129-131, 133-136, 145-147, 152, 177, 178, 183, 186, 221 | | onboard ... 140 | participating ... 67 | plan ... 103, 104, 107, 109, 117, 138, 142, 167, 170, 176, 200, 206, 227, 229, 230 |
| | noted ... 86, 146 | one ... 19, 27, 31, 32, 40, 45, 48, 50, 52, 55, 56, 64, 70, 74, 78, 79, 83, 85, 87, 89, 92, 94, 95, 107, 117, ... 126, 127, 130, 137, 138, 140, 142, 143, 145, 151, 162, 166, 168, 172, 186, 190-192, ... 198, 208, 212, 214, 217, 221, 222, 225, 236, 241, 242 | particularly ... 228, 229 | |
| | notice ... 16, 17, 45 | | parties ... 92, 159, 163, 234, 242 | planned ... 28 |
| mortgagor ... 122, 123 | notified ... 87 | | partner ... 10, 11, 242, 244 | planning ... 42, 81, 165-168, 221 |
| Mosaic ... 27, 28, 93-95, 129, 134, 136, 140, 144, 145, 148, 170-172, 179, 184, 189-191, 207, 223-225, ... 230 | noting ... 177 | | partners ... 124, 241 | play ... 241 |
| | notion ... 147, 164, 184, 227 | | partnership ... 235, 240-242, 245-247 | played ... 171 |
| | notwithstanding ... 140, 150, 245 | | partnerships ... 246, 247 | players ... 198 |
| | numbers ... 177 | open ... 52, 54, 94, 95, 99, 137, 204 | parts ... 94, 156 | pleased ... 189 |
| mother ... 87 | Nutter ... 10 | operation ... 15, 173 | passed ... 67 | plugging ... 228 |
| Motion ... 113, 119, 121, 163 | | operations ... 120 | past ... 74, 150, 206, 216 | pocket ... 200, 243 |
| motivated ... 25 | **O** | opinion ... 186 | path ... 169, 229 | Pointing ... 15, 192 |
| mouth ... 221 | object ... 62, 116, 130, 133, 135, 146 | opposed ... 89 | pausing ... 214 | political ... 30, 44 |
| move ... 76, 86, 145, 149, 170, 180, 236-238 | objected ... 130-132, 164 | option ... 98, 136 | pay ... 69, 83, 90, 181, 182, 187, 201, 219, 221, 235, 239 | polls ... 192 |
| moving ... 179, 194 | objecting ... 133 | optional ... 178 | | portion ... 130, 131, 133-135, 145, 147, 148, 185, 187, 224 |
| much ... 34, 56, 78, 80, 84, 85, 97, 98, 119, 124, 143, 144, 160, 177, 206, 215, 218, 219, 223, 230, ... 231, 233, 236 | Objection ... 8, 13, 14, 17, 19-22, 27-34, 36, 38-43, 47, 49-51, 53, 55, 57, 58, 61-63, 65, 68, 70-77, ... 79, 80, 82, 85, 86, 88-91, 97, 98, 109, 111, 112, 114-116, 123-130, 132, 134-136, ... 139-156, 158, 159, 165, 168, 170-174, 177, 179, 183-189, 191, 194, 195, 198, ... 201, 204, 207-212, 214, 217, 218, 220, 222-226, 234, 237, 239, 240, 242, 244-248 | ordain ... 34 | payback ... 237 | portions ... 55, 69, 148 |
| | | order ... 37, 41, 44, 50, 84, 95, 96, 114, 122, 123, 155, 185, 215, 218, 231, 232, 236, 244 | paying ... 113, 236, 239 | position ... 8, 11, 21, 105, 109, 118, 122, 140, 161, 162, 202-204, 212 |
| | | | payment ... 114, 195 | |
| | | | payments ... 219, 220 | positions ... 17 |
| multilateral ... 107 | | organization ... 7, 81, 128, 131, 139, 158, 233 | pays ... 235 | possibility ... 26, 29, 33, 36, 39, 42, 43, 71, 72, 93, 127, 128, 205, 208, 212, 213, 230 |
| multiple ... 117 | | organizations ... 38 | Pelletier ... 123, 125, 228 | |
| municipal ... 40, 42 | | organized ... 12, 19, 117 | penalties ... 117 | |
| municipalities ... 37 | | otherwise ... 76, 92, 110, 131, 142, 152, 192, 209, 243 | pendency ... 182 | post ... 68 |
| municipality ... 158 | | | people ... 23, 24, 30, 42, 124, 149, 165, 190-192, 203, 212, 214, 224, 246 | posts ... 52, 155 |
| **N** | | outcome ... 34, 172, 190, 200, 243 | | potential ... 22, 23, 29, 32, 34, 127, 129, 158, 159, 219 |
| named ... 21 | | | percent ... 82, 83, 89, 157, 167, 183, 220 | |
| names ... 10 | | objections ... 6, 164 | percentage ... 161 | power ... 225 |
| Nasson ... 12 | | | perception ... 176, 177 | |
| | | | perfect ... 180 | |
| | | | perform ... 61, 156, 178, 239 | |

| Word . . . . . . Page | Word . . . . . Page | Word . . . . . . Page | Word . . . . . . Page | Word . . . . Page |
|---|---|---|---|---|
| practice ... 10, 12, 13 | 113, 116, 117, 121, | 139-142, 144, 147-149, | receiving ... 94, 106, 166 | replicate ... 139 |
| practiced ... 13 | 126, 139, 141-144, | 151, 154, 155, ... 157, | recognize ... 49, 51, 137, 165 | report ... 7, 8, 35, 105 |
| practicing ... 13 | 156, 157, 170, 171, | 163, 164, 169, 170, | recognizes ... 211 | representation ... 39 |
| practitioners ... 185 | 183, 184, 187, ... 188, | 172, 177, 178, 180, | reconfiguration ... 151 | representations ... 87, 112, |
| pre ... 34, 167 | 190, 191, 199, 201, | 182, 183, 186, 189, | reconfigure ... 230 | 183 |
| precede ... 238 | 203, 205, 208, 211, | 194, 195, 197, 199, ... | reconstructed ... 203 | representative ... 166, 207 |
| prepared ... 105, 107, 160 | 213-217, 223, 224, | 200, 208, 215, 218, | recover ... 181 | representatives ... 29, 199 |
| present ... 6, 81, 82, 92, 136, | 227, 228, 230, 236, ... | 221, 222, 224, 226, | recovered ... 238 | request ... 130, 155, 211, 241 |
| 163, 198, 234, 247 | 243, 244 | 231, 232, 236, 237 | Red ... 22, 23, 35, 37, 68, 80, | requested ... 92, 117, 130, |
| presentation ... 28, 192 | projects ... 24, 29, 42, 70, | purchaser ... 63, 136 | 81, 109, 165, 187, 190, | 193 |
| presentations ... 28 | 77, 89, 104, 126, 139, | purchases ... 154 | 192, 193, 212-214, | requests ... 211 |
| presented ... 133, 156 | 141, 231, 233, 241 | purchasing ... 67, 74, 189 | 216-219 | require ... 58, 129, 144, 156, |
| Preservation ... 64, 65, 68, | prominent ... 203 | pursuant ... 119, 130 | redefining ... 152 | 168, 176, 177, 179, |
| 247 | promissory ... 145, 177, | pursuit ... 243 | redevelopment ... 151 | 180, 185, 195 |
| president ... 19, 108, 120 | 220, 221 | putting ... 105, 154, 190 | redraw ... 151 | required ... 60, 61, 96, 98, |
| prevail ... 203 | properties ... 85, 95, 190 | | reduced ... 199 | 113, 129, 151, 154, |
| prevent ... 31, 207 | property ... 8, 21-27, 29-31, | **Q** | reduction ... 147 | 166, 169, 180, 194, |
| prevented ... 129, 170, 179, | 33, 34, 36, 38, 52, 54, | Quarterly ... 232 | referenced ... 110, 111, 122, | 222, 232 |
| 190 | 67, 69-71, 73, 74, 76, | quarters ... 193 | 125, 138, 176 | requirement ... 55, 56, 68, |
| preventing ... 193 | 78, 79, 83, 87, 88, 91, | querying ... 164 | references ... 157, 206 | 145, 189, 246 |
| prevention ... 31 | 95, ... 96, 98, | questioning ... 146, 214, 215 | referencing ... 60 | requirements ... 57, 75, 156, |
| prevents ... 179 | 101-103, 107, 108, | quick ... 93 | referred ... 54, 55, 57, 61, 68, | 177 |
| previously ... 164, 216, 236, | 111-114, 119, 121, | quickly ... 76, 87, 181 | 93, 103, 104, 201, 206, | requires ... 176 |
| 240 | 126, 129, 130, | quintessential ... 161 | 215-218, 227 | requiring ... 133 |
| price ... 69, 78, 79, 91, 94, | 133-135, 139, 141, | quote ... 58, 68, 101, 109, | refers ... 55, 123, 124, 177, | resale ... 143 |
| 97, 137, 147, 154, 157, | 143, ... 145, 147, 154, | 111 | 183, 248 | reserve ... 6 |
| 177, 178, 182-184, | 155, 165, 167, 170, | quoting ... 155 | refine ... 204 | reserves ... 233 |
| 186, 195, 197, 199, | 171, 173, 180, 182, | | reflect ... 132 | resident ... 21, 165 |
| 200, 222-224, ... 226, | 184, 185, 189, 191, | **R** | reflected ... 225 | resolve ... 158, 159 |
| 236, 237 | 193, 199, ... 208-212, | raise ... 19, 55, 85, 113, 114, | reflects ... 211 | resolved ... 169 |
| print ... 155 | 220, 222, 224, 225, | 118, 119, 121, 127, | refreshed ... 84 | resources ... 172, 184, 219, |
| printed ... 64, 75, 180 | 229, 230, 232, | 139, 141, 188, 213, | refusal ... 37, 38, 40, 42, 43, | 244 |
| printout ... 75 | 235-237, 241, 243 | 217, 218, 241 | 45, 47, 50, 51, 53, 54, | respect ... 8, 22, 82, 91, 113, |
| Prior ... 26, 27, 29, 36, 37, | proposal ... 50, 205, 230, | raised ... 53, 55, 56, 80, 142, | 56, 57, 61, 64, 67, | 126, 127, 132, 136, |
| 40, 48, 72, 73, 84, 86, | 235, 237-240 | 146, 155, 215, 218-220 | 72-74, 82, 87, 97, 119, | 147, 153, 204 |
| 97, 143, 155, 158, 164, | proposed ... 25, 27, 68, 192, | raises ... 149, 156 | 154, ... 156, 158, 170, | responded ... 64, 66 |
| 171, 207, 223 | 238 | raising ... 54, 57, 61, 70-74, | 192, 193, 207, 217, | responding ... 81 |
| private ... 54-57, 61, 70, 71, | proposes ... 81 | 90, 109, 117, 122, | 225 | response ... 14, 101, 156, |
| 74-77, 109-111, 117, | proposing ... 199, 237 | 137-139, 170, 173, | refusing ... 217 | 157, 163, 211 |
| 122, 138, 188, | prospects ... 222, 227 | 174, 188, 213, 214, | region ... 7, 20, 24, 115 | responses ... 155, 162, 163 |
| 216-218, 227, 239, | protecting ... 191 | 216, 221, 222, ... 227, | Regional ... 7, 8, 45, 228 | responsibility ... 156 |
| 241, 243 | protection ... 191 | 239, 240 | registered ... 177, 208 | restating ... 210 |
| privately ... 44, 55, 85, 122, | provide ... 91, 130, 131, | range ... 16 | registration ... 16, 18 | restriction ... 26, 33, 212 |
| 215, 220 | 138, 176, 180 | rate ... 244 | regularly ... 24, 44 | restrictions ... 94, 206 |
| privilege ... 149 | provided ... 35, 64, 97, 243 | rather ... 25, 134, 136, 169, | rejected ... 230 | result ... 98, 104, 170, 171, |
| pro ... 124, 201-203, 209 | providing ... 117, 239 | 170, 186, 210, 211, | rejection ... 138, 230 | 190, 191, 197, 201, |
| problem ... 77, 97, 133, 168, | provision ... 37, 91, 97-99, | 230 | relation ... 44 | 208, 248 |
| 169, 229 | 145, 148, 149, 156, | re ... 165, 189, 209, 227 | relationship ... 177, 240, 246 | resulted ... 50, 97, 131, 171, |
| problematic ... 98, 143, 144, | 158, 176-178, | reach ... 86, 150 | relative ... 97, 220 | 189, 237 |
| 229 | 183-186, 207, 209 | reached ... 107, 149, 150 | relied ... 183 | resulting ... 23, 52, 155 |
| problems ... 78, 143, 168 | provisions ... 63, 97, 148, | reaching ... 87 | relief ... 168 | retain ... 130 |
| procedure ... 72, 182 | 151, 152, 159-161, | reaction ... 19 | rely ... 73, 75, 149, 158, 184, | retirement ... 100, 195, 196 |
| Procter ... 123, 124, 201 | 163, 172, 173, 177, | reader ... 61 | 207 | return ... 239 |
| produce ... 132 | 185, 186, 194 | reads ... 137, 166, 196 | relying ... 87, 117, 235 | reveal ... 164 |
| produced ... 131, 132 | prudence ... 72 | ready ... 61, 191, 233 | remain ... 46, 134 | revenue ... 233 |
| product ... 235 | prudent ... 142, 158, 188 | realize ... 135, 170, 171 | remained ... 99 | reviewed ... 125 |
| production ... 6, 51 | Public ... 6, 7, 14, 18, 21, | realized ... 100 | remaining ... 134, 135, 148, | reviewing ... 105, 217 |
| profess ... 62 | 27, 37, 45, 46, 48, 70, | realizing ... 75, 170 | 186, 224 | revising ... 151, 210 |
| professional ... 13, 204 | 73-77, 81, 113, | reason ... 13, 17, 22, 27, 65, | remains ... 144 | rights ... 37, 46, 94, 230 |
| profit ... 7, 14, 15, 20, 81, | 117-119, 121, 162, | 66, 69, 82, 83, 96, 112, | remind ... 36, 108, 126, 165 | ring ... 108 |
| 158, 208, 243 | 192, 193, 208, ... 241, | 114, 151, 164, 168, | renewed ... 118 | rise ... 246 |
| program ... 235 | 243 | 188, 190, 191, 195, | renovated ... 95 | risk ... 79, 156, 188 |
| progress ... 193, 200, 217 | purchase ... 27, 38, 39, | 205, 211, ... 214 | renovation ... 85, 143 | risks ... 156 |
| prohibit ... 116 | 52-54, 67, 69-71, 73, | reasonable ... 114, 140-142, | repaid ... 140, 234 | Road ... 6, 22, 23, 68, 165, |
| project ... 22-24, 29-32, 34, | 74, 78, 79, 84, 90, 91, | 227, 232, 239 | repair ... 196 | 187, 190, 193 |
| 35, 37, 38, 40, 42, 43, | 93-97, 102, 103, 107, | reasons ... 22, 27, 213, 222 | repay ... 222, 227, 236 | Rob ... 77, 108 |
| 48, 66, 67, 69, 70, 72, | 108, 111-113, ... 118, | receipt ... 157 | repaying ... 220 | Robert ... 77, 78, 108 |
| 75, 78, 79, 82, 83, 85, | 119, 121, 128, 130, | receive ... 55, 236 | replace ... 102 | ROFR ... 57 |
| 90, ... 97, 104-107, | 132, 136, 137, | received ... 16, 45, 49, 105, | replaced ... 142 | role ... 8, 14, 20, 41, 104, |
| | | 106, 118, 154, 212 | | |

| Word ...... Page | Word ..... Page | Word ...... Page | Word ...... Page | Word .... Page |
|---|---|---|---|---|
| 162, 232 | 101, 139, 170, 171, | smelled ... 162 | stop ... 91, 114, 173, 197 | **T** |
| roles ... 241 | 237, 239 | smoke ... 186 | stopgap ... 140 | table ... 61, 75, 90, 143, 153, |
| room ... 59, 92, 99, 136, 164, | seller ... 61, 157, 172, 181, | snuff ... 95 | storefront ... 204 | 178, 205, 240 |
| 172, 174, 196, 198, | 186 | software ... 235 | storm ... 92 | takeout ... 139, 140, 142, |
| 204, 211, 215, 222, | selling ... 73, 239 | sold ... 27, 55, 68, 69, 85, | Stow ... 21, 25-28, 31-37, | 227 |
| 234 | sent ... 50, 51, 105 | 151, 173 | 41, 45, 49, 54, 56, 59, | taking ... 24, 93, 94, 179 |
| Ross ... 49-52, 105, 106, | sentences ... 81 | sole ... 87 | 64, 67, 71-74, 79, 81, | Talmadge ... 24, 25, 30 |
| 209, 210, 241 | separate ... 1, 18, 170, | somewhat ... 155 | 94, 113, 117, 119, 121, | tax ... 13, 147, 148, 208, |
| route ... 229 | 182, 229 | Sommerlad ... 164-168, 193 | 129, ... 137, 138, | 209, 235, 243 |
| rules ... 175 | September ... 83, 121, 137, | sought ... 99, 100, 111, 116, | 146-148, 154, 165, | taxpayers ... 192 |
| run ... 202 | 178, 222, 225, 227, | 210, 230 | 167, 189, 191-193, | teaches ... 240 |
| running ... 32 | 228 | source ... 54, 55, 70, 83, 103, | 205, 209, 212, 216, | team ... 99, 205 |
| Ruth ... 165, 167 | sequence ... 26, 50, 97 | 139, 143, 239 | 228, 245-247 | technical ... 210, 211 |
| | sequencing ... 166 | sources ... 54, 70, 71, 110, | straight ... 157 | teeing ... 96 |
| **S** | sequentially ... 10 | 111, 113, 122, 138, | Street ... 18, 204 | telephone ... 86, 101, 102 |
| sake ... 111, 230 | sequitur ... 153 | 139, 142, 143, 188, | strength ... 202 | telling ... 53, 54, 69, 73, 74, |
| salary ... 15, 16 | series ... 40 | 216, 220, 232, 241 | stretch ... 226 | 82, 88-90, 102, 103, |
| sale ... 29, 54-56, 61, 68, | serious ... 197, 201 | space ... 54, 94, 95, 137, 204 | strict ... 187 | 142, 195, 196, 209, |
| 70-72, 74, 84, 85, | services ... 209, 243 | span ... 11, 42, 43 | strike ... 9, 39, 50, 53, 83, | 213, 224 |
| 87-91, 93, 94, 96, 97, | set ... 104, 166, 183 | speaks ... 144, 172 | 121, 127, 144, 171, | ten ... 83, 104, 180, 191 |
| 103, 104, 117, 118, | seven ... 11, 19, 220 | special ... 36, 165, 167, 169 | 222 | tent ... 214 |
| 122, 128, 132, ... 135, | seventeen ... 181 | specific ... 56, 61, 79, 84, | strong ... 196, 202, 243 | tenure ... 20, 120 |
| 136, 140, 142, 144, | seventy ... 40, 42 | 104, 131, 217 | structure ... 83, 167, 196 | term ... 27, 34, 60, 63, 77, |
| 147-149, 151, 163, | several ... 88, 101-103, 124, | specifics ... 167, 204 | structures ... 94, 100 | 78, 97, 98, 151, 221, |
| 164, 169-172, 177, | 198 | spell ... 6, 12 | Stuckey ... 45-49, 56, 125 | 242 |
| 186, 194, 200, 207, ... | sewer ... 181 | spend ... 96, 203 | studied ... 240 | terms ... 38, 39, 50, 53, 54, |
| 215, 218, 220-222, | Shall ... 20, 145, 150, 157 | spending ... 186, 233 | study ... 194 | 58-63, 73, 78, 87, 94, |
| 224, 227, 229, 237-239 | shape ... 151 | spent ... 139, 217, 243, 244 | subdivide ... 55, 83, 143, 229 | 98, 104, 119, 132, 136, |
| sales ... 55, 94, 188 | share ... 15 | split ... 94 | subdivided ... 118 | 148, 152-154, 158, |
| satisfactorily ... 6 | shared ... 134, 160 | spoken ... 132 | subdividing ... 170 | 159, 172, ... 177, 180, |
| satisfy ... 140 | sheet ... 231 | spring ... 196, 199 | subdivision ... 143-145, | 199, 218, 222, 224, |
| Saved ... 199 | shoes ... 58, 60, 140, 152, | Springvale ... 12 | 151-153, 165-170, 173, | 231 |
| savings ... 233 | 153, 179, 244 | squeaky ... 233 | 174, 222, 223, 226, | testimony ... 22, 33, 40, 61, |
| saw ... 112, 162, 191, 196 | shortly ... 87, 93 | stability ... 87 | 229 | 66, 79, 80, 88, 89, 92, |
| scale ... 63, 185 | showed ... 217 | staff ... 243, 244 | subdivisions ... 173 | 97, 113, 115, 116, 121, |
| scheduled ... 44 | side ... 78, 83, 119, 241 | stage ... 238 | submission ... 157, 166 | 132, 133, 140, 141, |
| school ... 12, 240 | sides ... 64 | stake ... 242-244 | submitted ... 106, 119 | 152, ... 164, 171, 179, |
| scope ... 29, 71, 72 | sidewalk ... 205, 206 | stamp ... 35, 105, 193, 219 | subsequent ... 91, 248 | 185, 190, 194, 195, |
| scopes ... 29 | sign ... 9, 48, 110, 245 | standing ... 63, 109, 243 | subsequently ... 32, 165 | 204, 212, 213, 221, |
| scoping ... 29, 30, 32, 171 | signature ... 6, 49, 51, 106, | stands ... 100 | substantial ... 147, 228 | 224, 225, 228, 232, |
| second ... 15, 19, 20, 36, 41, | 137 | stapled ... 45 | substantiated ... 239 | 233 |
| 45, 51, 55, 64, 67, 70, | signed ... 45, 46, 122, 212 | start ... 6, 95, 131, 148, 159, | substantively ... 110 | textual ... 61 |
| 75, 85, 106, 107, 121, | significance ... 123 | 208 | subtract ... 226 | theoretical ... 147 |
| 145, 166, 167, 191, | significant ... 17, 137, | started ... 151 | subtracted ... 84 | thereabouts ... 19, 93 |
| 192, ... 235, 243 | 147, 200, 216, 218 | state ... 6-8, 12, 14, 17, 20, | successful ... 193 | therefore ... 48, 90, 135, 141, |
| Secretary ... 14, 17, 20, 21 | signing ... 140 | 21, 47, 49, 54, 79, 99, | successfully ... 188 | 151, 182, 187, 224 |
| sections ... 37 | Simmons ... 192 | 100, 102, 104, 115, | suffer ... 156 | thereof ... 98 |
| secure ... 76, 123, 243 | simple ... 161 | 116, 120, 123, 206, | sufficient ... 117, 118, 203, | these ... 10, 35, 42, 43, 50, |
| secured ... 177, 178, 184 | simply ... 151, 188, 192, | 212, 223, ... 232 | 219, 232, 243 | 57, 64, 78, 82, 83, 85, |
| security ... 145, 150, 157 | 222, 240 | statement ... 66, 82, 83, 113, | suggested ... 159 | 89, 104, 118, 139, 141, |
| see ... 14, 15, 18, 20, 35-37, | single ... 87, 88, 101, 118, | 122, 174 | suggests ... 35, 103, 138, 181 | 163, 176, 181, 188, |
| 46, 47, 51, 54, 55, 66, | 246 | statements ... 51, 112, 117, | suit ... 52, 125 | 191, ... 192, 198, 211, |
| 82, 83, 106-109, 111, | sit ... 57, 81, 82, 88, 89, 91, | 163, 167, 187, 202, | sum ... 85, 102, 135 | 212, 214, 228, 235, |
| 114, 117-119, 121-125, | 112, 120, 150, 151, | 231 | summary ... 73 | 236, 247 |
| 131, ... 138, 145, 150, | 190, 195, 218, 219, | stating ... 197 | summer ... 199, 206, 228, | third ... 33, 37, 45, 83, 150, |
| 158, 160, 167, 173, | 223, 225, 226 | status ... 120, 207-209, 243 | 229 | 222, 225, 235, 236, |
| 177, 210, 220, 234, | site ... 75, 124, 170, 196, | statute ... 185 | Sun ... 127 | 247 |
| 236, 245 | 206, 217 | statutes ... 117 | supervisor ... 12 | thirds ... 76 |
| seeing ... 28, 106, 112, 165, | sitting ... 233 | stay ... 109 | supply ... 191 | thirteen ... 180 |
| 213 | situation ... 32, 166, 181, | stayed ... 134 | Support ... 119, 121, 211 | thirty ... 24, 186 |
| seek ... 126 | 248 | stenographer ... 175 | supporting ... 87 | thorough ... 194 |
| seeking ... 51, 153, 167, 229 | six ... 11, 111, 113-116, | step ... 99 | supposed ... 93 | thousand ... 9, 16, 56, 69, 84, |
| seen ... 15, 16, 21, 35, 45, | 118, 121, 127, 128, | stepped ... 119, 152, 153 | surmised ... 134 | 94-96, 100, 127, 129, |
| 46, 66, 154, 192, 213, | 175, 176, 233, 234 | stepping ... 244 | surprise ... 98, 204 | 137, 138, 143, 145, |
| 231, 241 | Sixteen ... 181 | steps ... 58, 60, 140, 179, | surprised ... 19, 20, 195, 214 | 147, 150, 152, 177, |
| sees ... 128 | Sixty ... 123 | 207 | surrounding ... 23, 215 | 220, 221, ... 235-238, |
| Selectmen ... 28, 37, 41, | skids ... 145 | Stewart ... 202 | survives ... 223 | 240 |
| 44-47, 52-54, 81, 82, | skimmed ... 86 | stipulations ... 6 | swinging ... 205 | thousands ... 113, 119 |
| 191-193, 210-212, 241 | small ... 8, 9, 64, 216 | stock ... 238 | sworn ... 6 | threatened ... 197 |
| sell ... 55, 69, 84, 85, 88, | | | | |

| Word ...... Page | Word ..... Page | Word ...... Page | Word ...... Page | Word .... Page |
|---|---|---|---|---|
| threatening ... 200 | 213-221, ... 223, 224, | update ... 193 | whole ... 29, 43, 44, 52, 61, | |
| three ... 11, 18, 45, 55, 71, | 227, 230-233, | upset ... 216-219 | 74, 106, 144, 187, 220 | |
| 74, 75, 85, 94, 95, 100, | 235-238, 241, | urge ... 192 | Wilbur ... 198, 204-206, 247 | |
| 119, 137, 138, 143, | 243-248 | usable ... 152 | Wildlife ... 11 | |
| 169, 173, 193, 212, | traditional ... 122 | uses ... 232 | will ... 52, 57, 63, 64, 92, 93, | |
| 228, 235-237... | trained ... 10 | using ... 34, 62, 69, 76, 78, | 95, 101, 102, 104, 108, | |
| throw ... 233 | transaction ... 142, 182, | 88, 89, 98, 104, 108, | 130-132, 139, 146, | |
| Thursday ... 6 | 183, 241 | 214-216, 231, 242 | 152, 155-157, 160, | |
| thus ... 170 | transactional ... 29 | utilize ... 91, 110, 111, 138, | 167, 174, ... 175, 192, | |
| tie ... 203 | transfer ... 135, 154, 157, | 142 | 204, 205, 211, 222, | |
| timbers ... 196 | 186, 248 | utilized ... 104, 181 | 243, 247 | |
| time ... 6, 19, 23-25, 29, | transferred ... 134, 186 | utilizing ... 113, 126, 127, | William ... 53 | |
| 32-35, 42, 43, 47, 54, | trial ... 6 | 133 | willing ... 93, 94, 152 | |
| 60, 66, 68, 73, 76, 78, | troubled ... 78 | **V** | win ... 201-203 | |
| 84, 85, 87, 94, 96-98, | truly ... 158, 159 | Valerie ... 24, 25, 30 | winter ... 26 | |
| 102, 103, ... 108, 110, | Trust ... 6, 7, 14, 18, 21, 37, | validity ... 185 | wish ... 25 | |
| 116-118, 123, 126, | 45, 46, 48, 81, 113, | value ... 147, 153, 225, 226, | withdraw ... 119, 120 | |
| 127, 131-133, 140, | 117-119, 121, 127, | 243 | withdrawn ... 115 | |
| 143, 144, 157, 160, | 162, 192, 193, 205, | variables ... 104, 121 | witness ... 60, 110, 131-133, | |
| 167, 170, 174, ... 178, | 208 | variance ... 164, 166, 169, | 136, 160, 161, 175, | |
| 180-182, 185, 188, | truthful ... 86 | 230 | 234 | |
| 197, 199, 206, 210, | turn ... 109, 177, 196, 206 | variances ... 151, 153, | witnesses ... 92 | |
| 213, 214, 217, 220, | turned ... 130, 131 | 164-166, 168-170, 194, | woman ... 87, 88, 101, 207 | |
| 221, 228-232, 244... | twelve ... 180 | 195, 228-230 | word ... 18, 76, 81, 83, | |
| times ... 44 | Twenty ... 24, 183 | vehement ... 202 | 88-90, 102, 111, 202, | |
| Timing ... 76, 77 | two ... 9, 10, 50, 51, 55, 56, | venture ... 241, 246 | 241, 242 | |
| title ... 7, 107, 173, 176, 180 | 65, 66, 68, 69, 71, 74, | verify ... 21 | words ... 22, 23, 28, 52, 55, | |
| today ... 16, 19, 81, 88, 89, | 76, 84, 85, 90, 91, 94, | versus ... 164, 217, 223 | 69, 91, 114, 126, 128, | |
| 91, 97, 110-113, 115, | 117, 140, 142, 143, | via ... 43, 122, 142 | 129, 139, 151, 155, | |
| 116, 120-123, 146, | 146, 168, ... 183, 192, | view ... 77, 79, 98, 142, 167, | 173, 184, 186, 190, | |
| 150, 151, 172, 182, | 199, 212, 229, 234, | 188 | 203, 221, ... 237 | |
| 195, 204, ... 217-219, | 236-239, 241, 246 | viewed ... 200, 223, 224 | work ... 6, 14, 18, 37, 61, | |
| 221-223, 225, 226, | types ... 163, 231 | vital ... 76 | 64-66, 70, 97, 104, | |
| 229, 232, 233 | typically ... 211 | vote ... 47-49, 67, 68, 94, | 123, 124, 128, 133, | |
| Tom ... 248 | | 192 | 135, 140, 141, 148, | |
| took ... 13, 35, 44, 45, 203, | **U** | voted ... 46-49, 64, 67, 96 | 165, 196, 211, ... 212, | |
| 204, 240 | ultimate ... 136, 139, 143 | votes ... 64, 66 | 235, 236, 246 | |
| top ... 154, 192 | unable ... 113, 114, 119, | **W** | worked ... 10, 11, 13, 89, | |
| topic ... 51 | 121, 127 | Wainwright ... 107-111, 114, | 123, 124 | |
| total ... 95, 102, 220 | unacceptable ... 129 | 115, 118, 120, 126, | working ... 25, 70, 105, 122, | |
| touched ... 162 | unavailable ... 76, 110, 111, | 127, 188, 206, 234 | 169, 186, 208, 242, | |
| towards ... 143, 214 | 122, 129, 138, 142 | Wait ... 116, 161 | 243 | |
| Town ... 21, 25-43, 45, | unbridgeable ... 75 | waivers ... 167, 168 | works ... 7, 18 | |
| 49-52, 54-56, 59, 61, | uncertain ... 167, 227 | walk ... 174, 175, 201 | worried ... 206 | |
| 64, 66, 67, 69, 71-74, | unclear ... 33 | walked ... 201 | worry ... 74, 89 | |
| 79, 81, 84, 85, 90, 94, | undergrad ... 12 | walking ... 141 | worth ... 222, 223, 226 | |
| 96-98, 105-107, ... 109, | underlying ... 158 | Walter ... 12 | wrestle ... 98 | |
| 111, 113, 119, 121, | understood ... 60, 157, 159, | waned ... 228 | wrestled ... 169 | |
| 129-138, 143, 146-148, | 179, 185 | warrant ... 67 | Wrigley ... 53, 107, 210 | |
| 151, 154-157, 159, | undertake ... 14, 30 | warranties ... 183 | wrinkle ... 94 | |
| 166, 186, ... 187, 189, | unfair ... 188 | water ... 181, 191 | write ... 122, 210, 211 | |
| 191, 192, 198, 207, | unfamiliar ... 17 | waved ... 205 | writing ... 147, 165, 209, 246 | |
| 209, 210, 212, 216, | unhappy ... 190, 191 | ways ... 29, 31, 142, 188 | written ... 108, 110, 192, | |
| 217, 220, 224, 226, | unilaterally ... 152 | weak ... 227 | 242, 245, 246 | |
| 230, 235-237, ... | uninterested ... 94, 96 | Web ... 75, 124, 206, 217 | wrote ... 59-61, 226 | |
| 240-248 | uninterrupted ... 129 | week ... 49 | **Y** | |
| townspeople ... 192 | Union ... 18 | weekly ... 232 | year ... 19, 35, 42, 83, 87, | |
| TPL ... 7, 8, 14-26, 28-31, | unit ... 117 | weeks ... 228 | 214, 232, 233, 244 | |
| 33-35, 37-40, 42, 43, | units ... 100, 117, 143, 239 | Werlin ... 10 | yearly ... 232 | |
| 46-55, 57, 58, 60, 61, | unless ... 70, 93, 123, 130, | whatsoever ... 237 | years ... 11, 19, 83, 92, 226, | |
| 64-66, 69-71, 73-84, | 152 | whereby ... 63, 235 | 227 | |
| 86, 87, ... 89-91, 96, | unlikely ... 144, 188 | WHEREUPON ... 16-18, 35, | yelling ... 205 | |
| 97, 99, 102-116, | unquote ... 58 | 45, 49, 51, 64, 75, 79, | Yup ... 122, 219 | |
| 119-127, 130, 132-136, | unravel ... 247 | 105, 124, 137, 154, | **Z** | |
| 138-143, 146, 148-159, | unsecured ... 227, 233 | 164, 166, 191, 193, | ZBA ... 167 | |
| 161-163, ... 169-173, | unsigned ... 51 | 209, 212, ... 228, 234, | zero ... 177, 233 | |
| 176, 178-181, 183, | untenable ... 228 | 238, 248 | zoning ... 166-169 | |
| 184, 186-189, 191-193, | untrue ... 117, 223 | Whitney ... 7, 8 | | |
| 197-201, 203, 206-211, | unusual ... 24 | | | |
| | unwise ... 227 | | | |

Exhibit C



# THE
# TRUST
F  O  R
# PUBLIC
# LAND

*Conserving Land for People*

April 1, 2003

David Lawson, Program Coordinator
Housing Development Support Program
Massachusetts Department of Housing and Community Development
One Congress Street
Boston, MA 02114

RE:  <u>4/1/03 Application by Stow, MA for Housing Development Support</u>

Dear Mr. Lawson:

Please be advised that the Trust for Public Land, in cooperation with the Town of Stow, intends to purchase the property located at 142-144 Red Acre Road in Stow, Massachusetts for the purposes of (1) renovating the single-family house located at 142 Red Acre Road and selling it subject to an affordable housing covenant; (2) selling 144 Red Acre Road to an equine rehabilitation nonprofit corporation known as Eye of the Storm Equine Rescue, Inc.; and (3) conveying 45 acres to the Town for conservation and municipal water supply. In this regard, as is our normal course, TPL will engage in a public and private fundraising effort, which will include seeking funds from the Community Preservation Fund in Stow and from private sources. In order to complete this transaction, TPL may need to pursue private capital of its own, as we do in many of our transactions. Our private capital needs are met in a variety of ways, including foundations, private donations, and market funds. TPL currently has lines of credit across the country in excess of 70 million dollars. A local lending institution, Wainwright Bank, has issued us a line of credit in the amount of six million dollars, which funds we could utilize if necessary to complete the Stow transaction, subject to normal due diligence and internal TPL review. For your further information, I have attached our Annual Report, which provides additional financial information about the Trust for Public Land, and a copy of a letter from Wainwright Bank renewing our line of credit.

Sincerely,

Craig A. MacDonnell
Massachusetts State Director

The Trust for Public Land
New England Regional Office
33 Union Street, Fourth Floor
Boston, MA 02108

(617) 367-6200

Connecticut Field Office
383 Orange Street
New Haven, CT 06511

(203) 777-7367

Maine Field Office
377 Fore Street 3rd Floor
Portland, ME 04101

(207) 772-7424

Vermont Field Office
3 Shipman Place
Montpelier, VT 05602

(802) 223-1373

Conne
Projecc
54 Port
Conco

(603) 2

# WAINWRIGHT BANK

Exhibit D

63 Franklin Street, Boston, Massachusetts 02110-1301 • Telephone 617-478-4000 • Toll Free 800-

Nora Bloch
*Assistant Vice President*



February 19, 2003

Mr. Holden Lee
The Trust for Public Land
116 New Montgomery
Fourth Floor
San Francisco, CA 94105

Dear Holden:

I am pleased to inform you that the $6,000,000 Line of Credit extended to the Trust for Public Land has been renewed for one year and will mature on February 14, 2004. In addition, a new interest rate was approved at Wall Street Journal Prime minus 0.25%.

Therefore, pursuant to the Revolving Credit Agreement dated February 14, 1996 ("the Agreement") between Wainwright Bank & Trust ("The Bank") and the Trust for Public Land, this letter is official notification that "Floating Rate" as defined in Section 1 of Article 1 is hereby amended to state: "means a rate per annum equal to 0.25% less than the prime rate as reported in the "Money Rates" section of *The Wall Street Journal*, changing when and as the prime rate changes."

Please feel free to contact me at (617) 478-4000 regarding this or any other matter.

Regards,

Nora Bloch
Assistant Vice President

Cc:    Jonathan Klein, Esq.
       Steve Irza

WAINWRIGHT BANK & TRUST COMPANY
www.wainwrightbank.com

GOODWINPROCTER

Dahlia S. Fetouh
617.570.1263
dfetouh@
goodwinprocter.com

Goodwin Procter LLP
Counsellors at Law
Exchange Place
Boston, MA 02109
T: 617.570.1000
F: 617.523.1231

Exhibit E

March 5, 2007

**BY FACSIMILE AND FIRST-CLASS MAIL**

Michael C. McLaughlin, Esq.
Law Offices of Michael C. McLaughlin
One Beacon Street, 33rd Floor
Boston, MA 02108

RE:    Marilyn Kunelius v. Town of Stow, Partnership of an Unknown Name between Town of
       Stow and the Trust for Public Land, The Trust for Public Land and Craig A. MacDonnell
       Civil Action No.: 05-11697

Dear Mr. McLaughlin:

The following outlines the response of defendant The Trust for Public Land ("TPL") to
Plaintiff's Notice of Rule 30(b)(6) Deposition of Defendant The Trust For Public Land
("30(b)(6) Notice"). The numbers below correspond to the numbered "Subject Matters" listed in
Schedule A to the 30(b)(6) Notice.

Topics 1, 4, 5, 8, 11, and 12

The topics listed above concern activities related to the proposed purchase of Ms. Kunelius'
property. At the deposition of Craig A. MacDonnell, the Massachusetts State Director of TPL,
which was taken over the course of a full day on February 8, 2007, you inquired into each of
these topics. Pursuant to our discussion at the conclusion of Mr. Perry's deposition on February
26, 2007, TPL hereby notices its intent to adopt Mr. MacDonnell's testimony concerning these
project-specific topics as its own. Accordingly, TPL will not produce another witness on these
topics.

Topics 2 and 3

TPL objects to the production of a witness to testify on the subject matters listed in Topics 2 and
3 because they are wholly irrelevant to the current dispute. For the reasons articulated in TPL's
Motion to Quash Plaintiff's Subpoena and Notice of Deposition to the Keeper of the Records of
Wainwright Bank ("Motion to Quash"), TPL believes these topics cover subject matter that is
irrelevant and not reasonably calculated to lead to the discovery of admissible evidence
regarding the claims and defenses in this dispute. As we stated in the Motion to Quash, details
concerning TPL's liquid assets and lines of credit are irrelevant to the question of liability or the
damages to which Ms. Kunelius may be entitled. TPL has never argued that TPL could not have

GOODWIN │ PROCTER

Michael C. McLaughlin, Esq.
March 5, 2007
Page 2

resorted to its own funds or available resources to complete the purchase of Ms. Kunelius'
property. Rather, TPL made the decision not to resort to them where there was no prospect of
completing TPL's mission by raising sufficient funds to recover TPL's investment and transfer
the property to a long-term steward. Furthermore, you already appear to have possession of
TPL's publicly-available annual reports, which contain financial information. To the extent you
require copies of those publicly-available documents, we will provide a copy of the annual report
for 2003.

In addition to the irrelevance of Topics 2 and 3, they are overbroad, seeking extensive categories
of information concerning TPL's "bookkeeping, applications, withdrawal histories, repayment
histories, notices of default, and disbursement schedules" for all of TPL's lines of credit over a
five-year period. Even assuming TPL could produce a witness with knowledge on the wide-
ranging details you seek, you have demonstrated no need for such far-reaching information.

Accordingly, TPL will not produce a witness on these topics. Assuming we cannot reach an
agreement concerning Topics 2 and 3, TPL will seek a protective order to prohibit testimony into
these areas.

Topics 6, 7, 9, and 10

Because these topics include subject areas that are not project-specific and were not covered
fully in Mr. MacDonnell's deposition, TPL will produce a witness to testify on Topics 6, 7, 9,
and 10.

We are available for this deposition on March 22, 2007, one of the dates we were given for your
availability.

Thank you.

Very truly yours,

*Dahlia Fetouh*

Dahlia S. Fetouh

DSF/baf

cc:    James B. Conroy, Esq.
       Deborah I. Ecker, Esq.

Volume: I<br>Pages: 1-279<br>Exhibits: 20

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11697-GAO

MARILYN KUNELIUS,

              Plaintiff,

v.

TOWN OF STOW, separately,
A PARTNERSHIP OF UNKNOWN NAME
BETWEEN TOWN OF STOW and THE
TRUST FOR PUBLIC LAND, THE TRUST
FOR PUBLIC LAND, separately,
and CRAIG A. MacDONNELL, in
his individual capacity,

              Defendants.

DEPOSITION of EDWARD R. PERRY, JR., a

witness called by and on behalf of the Plaintiff,

taken pursuant to Fed.R.Civ.P. 30, before Roberta

J. Daniels, a Court Reporter and Notary Public

within and for the Commonwealth of Massachusetts,

at the Law Offices of Michael C. McLaughlin, One

Beacon Street, Boston, Massachusetts  02108, on

Monday, February 26, 2007, scheduled to commence

at 10:00 A.M.

A P P E A R A N C E S

Michael C. McLaughlin, Esquire
Law offices of Michael C. McLaughlin
One Beacon Street
Boston, Massachusetts  02108
          Counsel for the Plaintiff

Deborah I. Ecker, Esquire
Brody Hardoon Perkins & Kesten, LLP
One Exeter Plaza
Boston, Massachusetts  02116
          Counsel for Defendant Town of Stow

Dahlia S. Fetouh, Esquire
Goodwin Procter, LLP
Exchange Place
Boston, Massachusetts  02109
          Counsel for Defendant Trust for Public Land

James B. Conroy, Esquire
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd floor
Boston, Massachusetts  02108
          Counsel for Craig MacDonnell

Also present:
Lucie DeBellis, Paralegal
Law Offices of Michael C. McLaughlin

Marilyn Kunelius, Plaintiff
David Norris, Husband of the plaintiff

Craig A. MacDonnell, Defendant

Exhibit F

3

I N D E X

| Witness | D | C | RD | RC |
|---------|---|---|----|----|
| EDWARD R. PERRY, JR. | | | | |
| By Mr. McLaughlin | 5 | | 266 | |
| By Mr. Conroy | | 264 | | |

E X H I B I T S

| No. | Description | Page |
|-----|-------------|------|
| 1 | Notice of deposition | 41 |
| 2 | *Beacon Villager* article | 41 |
| 3 | DHCD grant application | 51 |
| 4 | Stow letter to Kunelius, 2-12-03 | 80 |
| 5 | P&S agreement | 94 |
| 6 | DHCD letter to Perry, 7-2-03 | 104 |
| 7 | Kachajian letter to Perry, 9-12-03 | 108 |
| 8 | Perry letter to Kachajian, 9-24-03 | 112 |
| 9 | MacDonnell letter to Perry, 1-5-03 | 118 |
| 10 | Diemert letter to Wrigley, 2-10-03 | 135 |
| 11 | Kachajian letter to Stow, 1-28-03 | 147 |
| 12 | Simmons letter to Stow, 2-11-03 | 156 |
| 13 | Conditions of right of first refusal | 158 |
| 14 | Stow proposed terms of agreement, 5-20-03 | 161 |
| 15 | Kachajian undated email to Perry | 179 |
| 16 | DHCD letter to Farrell, 9-23-03 | 189 |
| 17 | ZBA minutes | 213 |
| 18 | Jacobs letter to Sommerlad, 2-6-03 | 222 |
| 19 | MacDonnell memo to Stow with letter | 243 |
| 20 | Friends of Red Acre letter, 6-6-03 | 244 |

5

P R O C E E D I N G S

                                    Monday, February 26, 2007

                                                10:08 A.M.

                              [EXCERPT]

        (Begins on Page 258, Line 6, of original

        transcript and ends on Page 264.)


Q       Are you aware of any heated discussions or did you

        attend any heated discussions between Friends of Red

        Acre and Craig MacDonnell?

A       I'm aware of the one that you related to me a little

        while ago.  I did not attend any conversations or I

        don't remember any meetings where there was a heated

        conversation.

Q       Other than the one that I referred to where

        Mr. MacDonnell lost his temper, are you aware of

        any discussions in which Mr. MacDonnell went to

        the Friends of Red Acre and instructed them in

        the summer of 2003 not to raise any funds?

A       No, I'm not aware of that.

Q       Is today the first time that you have ever heard of

        even a suggestion that Craig MacDonnell had instructed

        the Friends of Red Acre not to raise anymore money?

                MR. CONROY:  Objection.

6

| | | |
|---|---|---|
| 1 | A | There may have been a comment by Peter Christianson or |
| 2 | | Dave Cobb to that extent, but what I remember from |
| 3 | | that is Craig saying that they didn't raise the money |
| 4 | | and them saying they could have and did raise the |
| 5 | | money.  So, if you're suggesting that Craig told them |
| 6 | | not to raise money -- |
| 7 | Q | Correct. |
| 8 | A | -- that doesn't sound right. |
| 9 | Q | So, as far as you're concerned, that seems illogical. |
| 10 | | Is that fair to say? |
| 11 | A | Yes. |
| 12 | Q | Looking at Exhibit 20, on the front page of Exhibit |
| 13 | | 20, the front page appears to be a Friends of Red Acre |
| 14 | | letter dated June 6th, and I'm almost done here, and I |
| 15 | | would ask you to look at the last paragraph in which |
| 16 | | it says:  With your help, this citizens group has been |
| 17 | | able to partner with the town to form an unprecedented |
| 18 | | coalition of organizations, including TPL, Stow |
| 19 | | Conservation Trust, Eye of the Storm and others, and |
| 20 | | we are well on our way to raising the necessary funds. |
| 21 | | Thank you for working with us and allowing the voters |
| 22 | | to speak on this conservation alternative. |
| 23 | | Did you have any understanding as to how |
| 24 | | much money the Friends of Red Acre had raised? |

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

Exhibit F

7

1    A    Tens of thousands.

2    Q    Well, when they said they were well on their way to

3         raising the necessary funds, how much money did you

4         expect that they were going to have to raise?

5    A    Still tens of thousands.  They were looking for money,

6         you know, from the Eye of the Storm and others.

7    Q    In the application for the funds from the state, you

8         broke down how much money was going to have to be

9         raised by private fund-raising, and that was $200,000.

10   A    I think private fund-raising is bigger than the

11        Friends for Red Acre Road, so.

12   Q    Okay.

13   A    I thought what you asked me is how much did I think

14        the Friends for Red Acre Road were going to raise.

15   Q    That's right.

16   A    And I thought, in terms of tens of thousands, I mean,

17        these are private citizens who were going to put some

18        of their own money up front.  From other foundations,

19        they presumably had more money.

20   Q    Of the $200,000 that you informed the state was going

21        to be raised by fund-raising, what percentage of that

22        was going to come from capital market, the capital

23        market, the market capital that TPL was going to bring

24        to the table, if you know?

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

Exhibit F

8

1    A    I don't know.

2    Q    And so you never actually saw a budget of Friends of

3         Red Acre as to what their actual obligations were in

4         order to go forward with the deal.  Is that fair to

5         say?  You didn't know if it was fifty thousand or a

6         hundred thousand or ten thousand.

7    A    No, I believe there were spreadsheets where they had

8         identified funding sources.

9    Q    And was that part of some establishment of a budget by

10        TPL and the town in figuring out whether this was

11        going to be do-able?

12   A    It was not a budget between TPL and the town.  It was

13        my understanding it was a budget between TPL and the

14        Friends for Red Acre.

15   Q    Okay.  Last series of questions.  Did you become aware

16        that anyone from Friends of Red Acre had made

17        suggestions that they had been misled by TPL?

18   A    In the summer or fall of '03, when things were

19        unraveling, they felt they -- they had commented that

20        they felt they had been misled.

21   Q    And how had they been misled?

22   A    Maybe a better term for *misled* would have been they

23        felt that TPL hadn't fulfilled their obligation.

24   Q    And isn't that true, because they were aware that TPL

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

Exhibit F

9

1        had told certain people in the town, including the

2        Board of Selectmen and Friend of Red Acre, that there

3        was a six million dollar line of credit, but then TPL

4        had subsequently refused to access it?

5    A   My understanding is the Friends from Red Acre had been

6        told that TPL could not follow through with the

7        funding.  The funding included all of the sources that

8        you mentioned.

9    Q   Including --

10   A   We did not -- I don't recall specifically discussing

11       then what about the line of credit.

12   Q   But do you know if Friends of Red Acre did not know

13       about the -- strike that.

14            Are you aware of whether TPL was aware of

15       the six million dollar line of credit?

16   A   TPL was, yes.

17            MS. ECKER:  TPL?

18   Q   I'm sorry.  Friends of Red Acre.

19   A   I am not aware that they knew of that.  It would

20       surprise me that they weren't as they were involved in

21       what was happening and would have seen the process.

22   Q   And would it also surprise you that their being upset

23       with TPL revolved around the fact that TPL, having

24       caused the Friends of Red Acre to raise tens of

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

Exhibit F

10

1          thousands of dollars, was now refusing to access a

2          line of credit which you certainly knew about?

3                    MS. FETOUH:  Objection.

4     A    I think they were upset that TPL was not following

5          through with the funding.  I don't know whether it was

6          specifically for accessing one set of funds or

7          another.  They were upset that it wasn't going

8          forward.

9     Q    Do you know if the funds raised by TPL, I'm sorry, do

10         you know if the Friends of Red Acre had actually given

11         funds to TPL.

12    A    I believe they had.

13    Q    And, in fact, the funds that went to Mrs. Kunelius

14         were entirely from the Friends of Red Acre.  Isn't

15         that correct?

16    A    That doesn't surprise me.

17    Q    But do you know that that's in fact the case?

18    A    When you say entirely from the Friends for Red Acre, I

19         don't know.  I believe they came from the Friends for

20         Red Acre.  Whether it was a hundred percent or not, I

21         can't comment.

22    Q    So, other than the money that was paid -- knowing

23         that, isn't it in fact true that TPL had not one penny

24         of money into the purchase of the property, because

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

Exhibit F

11

1        one hundred percent of the $15,000 received by

2        Mrs. Kunelius came from donations of the Friends

3        of Red Acre?

4             MS. FETOUH:  Objection.

5   A   I just said I don't know that it was a hundred percent

6        from the Friends.  I understood that it came from

7        them.  I do not know whether it included some TPL

8        funds or not.

9             MR. McLAUGHLIN:  All right.  I have no

10       further questions.

11           MR. CONROY:  Before we break, can we

12       just have one minute with you?

13          MS. ECKER:  Okay.

14            (Recess, 5:41 P.M.)

15

Feb. 10. 2003  4:25PM                                              No.0218  P. 2

Exhibit G

# WILSON & ORCUTT, P.C.
## COUNSELORS AT LAW
### 201 GREAT ROAD
### ACTON, MASSACHUSETTS 01720

PHILIP A. WILSON (1934-1967)
CHARLES E. ORCUTT, JR. (1962-1996)
RICHARD M. COTTER
DANIEL B. GREENBERG
JACOB C. DEEMERT
JO/EN R. McNAMARA
KRISTIN A. BULLWINKEL

TELEPHONE: (978) 264-4770
FACSIMILE: (978) 263-7142
EMAIL: JAKE@WILSONORCUTT.COM

VIA FACSIMILE
February 10, 2003

Mr. William J. Wrigley
Town Administrator
Stow Town Building
380 Great Road
Stow, Massachusetts 01775

Re:    Kunelius Property – Purchase or Assignment of Chapter 61 Rights

Dear Bill:

This letter follows several phone conferences, e-mails and memos that you, Ross Perry, Greg Jones and I have exchanged over the last several weeks, both before and after Town Meeting action concerning the acquisition of the Kunelius land or certain rights therein. I will summarize where I think we are in terms of the terms and conditions to be incorporated in any assignment agreement that might be entered into with the Trust for Public Land (TPL) by the Board of Selectmen, as discussed or found in the various written correspondence exchanged.

1.    M.G.L. c. 61, s. 8 requires that a right of first refusal be granted to the town by notice in the event of the sale or conversion of use of c. 61 lands and a 120 day period during which the town can either exercise the right, or to assign such right "to a nonprofit conservation organization under such terms and conditions as…the Board of Selectmen deem appropriate…for the purpose of maintaining the major portion of the property…in use as forest land." (quoting Section 8 language.) Section 8 also provides that a written notice to the landowner and to be recorded with the Registry of Deeds sets forth "the terms and conditions of such assignment."

2.    Since the language of c. 61 does not absolve the Town of any further liability to the landowner for failure of the assignee to carry out the obligations to purchase the land under the assignment, or for any other claims as may be made by the landowner (such as exist in the present circumstances and are discussed below), appropriate terms and conditions for the assignment would include an indemnification agreement by the assignee (TPL) to the assignor (the Town) from any such claims as might be made by the landowner resulting from the assignment or its implementation and exercise by the assignee (TPL). I highly recommend such an indemnity clause be required for acceptance of the assignment of TPL in the present circumstances.

3.    These circumstances include two potential sources of litigation and possible damage claims by the Seller (Kunelius) who provided the c. 61 Notice to the Town in the present matter. First, the Seller, through his attorney, is saying that no c. 61 notice was required in the

**KUN428**

Mr. William Wrigley
February 10, 2003
page 2

proposed sale, because the use of the chapter land was not being sold or converted to a
use other than forest land. Second, the Seller is saying that compliance with the terms of
the Purchase and Sale Agreement, which was attached to the c. 61 Notice, include not
only monetary compensation but a tax benefit to the Seller, all of which together constitute
the benefit of the bargain with the intended Buyer.

4. While we may disagree with the Seller's contentions, made through Seller's counsel (the
only party actually to opine on the issue of the c. 61 Notice given to the Town being TPL
at the Special Town Meeting), the contentions contain the elements of causes of action that
could result in a legal action, involving not only the possibility of damages being assessed,
but the costs of defending any such action, which can be substantial whether the Town
wins or loses.

5. Moreover, unless agreement can be reached both with TPL and the Seller prior to making
the assignment over the Seller's claims, the assertion of one or more of these claims by
a lawsuit is, in my judgment, highly likely given the various communications with counsel
for the Seller. Of course, an alternative to an indemnification agreement from TPL to
cover these two potential claims would be to have the Seller's agreement to the terms of
the assignment prior to actually making the assignment, which agreement would
presumably have to preserve what she views as the secondary benefit of the bargain (i.e.
her gift of the c. 61 land to the Town), with negotiations with the Seller occurring before,
not after, the assignment is made.

6. Another alternative to the indemnification by TPL would be an indemnity agreement or
guarantee of any payment to be made or awarded to the Seller, by third parties, which
could include individuals or other entities, recognizing a benefit to them to be gained by
the assignment, and agreeing to waive any later defense based on lack of consideration for
entering into such an agreement. Such an indemnity (or guaranty) by third parties should
include an agreement to pay any and all monetary consideration as may be due as a result
of claims by the Seller based on the original notice or assignment, including any amounts
required of the assignee (TPL) to complete the purchase (purchase price stated plus any
other successful claim to consideration for tax benefits lost), and any attorneys fees or
legal costs to the Town as would be incurred in the defense of any legal claims, whether
or not the Seller is ultimately successful.

In the event that it is possible to agree upon either an indemnification clause in the Town's
proposed assignment to TPL, or some sort of third-party agreement, please let me know so that we can
discuss the language for either. Please let me know if you have any questions or if I can be of further
assistance before the February 11 meeting.

Very truly yours,

Jacob C. Diemert, Esq.
Town Counsel

cc:   Mr. Ross Perry (via facsimile)
      Mr. Greg Jones (via facsimile)

KUN429