UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARILYN KUNELIUS, | CIVIL ACTION NO. 05-11697-GAO |
| Plaintiff, | |
| v. | |
| TOWN OF STOW, et al. | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF THE TRUST FOR PUBLIC LAND'S MOTION FOR A PROTECTIVE ORDER

Pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, defendant the Trust for Public Land ("TPL") hereby moves for a protective order prohibiting plaintiff Marilyn Kunelius ("Kunelius") from examining TPL's Rule 30(b)(6) deponent on issues that are overbroad and seek patently irrelevant information not reasonably calculated to lead to the discovery of admissible evidence regarding the narrow questions at issue in this matter.

## BACKGROUND

### *The Claims and Defenses in the Lawsuit*

The issues in this case are narrow. This lawsuit arises out of the proposed sale of land in Stow, Massachusetts owned by Kunelius (the "Property"). Kunelius entered into a Purchase and Sale Agreement ("Agreement" or "P&S") with Cohousing Resources, LLC, a land developer, in October 2002. Because Kunelius had previously elected to have the Property valued and assessed under Chapter 61 of the Massachusetts General Laws as forest land, resulting in tax savings to Kunelius, Kunelius was bound to offer the Town of Stow a right of first refusal to meet the bona fide offer. The Town voted to assign its statutory right of first refusal to TPL, a

nonprofit conservation organization, as provided under the terms of Chapter 61.  TPL accepted

that assignment and stepped into the shoes of the Buyer in the Agreement.  Ultimately, however,

TPL was unable to complete the purchase as intended and failed to close on the Property.

Kunelius brought a complaint against TPL, the Town of Stow, and Craig A. MacDonnell,

the Massachusetts State Director of TPL, alleging that TPL's failure under the Agreement

violated state and federal law and seeking, *inter alia*, specific performance of the Agreement

along with monetary damages, interest, costs, and attorney's fees.  Specifically, Kunelius alleges

breach of contract, violations of Mass. Gen. Laws c. 93A, intentional interference with a

contractual relationship, violation of 42 U.S.C. §§ 1983, 1988, fraud and misrepresentation.

Complaint at 14-22.[1]  Defendants argue that Kunelius has already received the only damages to

which she is entitled under any of these theories – the liquidated damages explicitly contracted

for in the P&S – and that she is entitled to no more under the plain terms of the contract.  The

essential question in this case, thus, is whether Kunelius is limited to the liquidated damages

provided for in the P&S.  Plaintiff's attempt now to conduct discovery into facts well outside of

this inquiry is no more than a red herring designed to distract from the infirmity of her claims.

### *Plaintiff's Notice of Rule 30(b)(6) Deposition of TPL*

On or about February 20, 2007, Kunelius served a Notice of Rule 30(b)(6) Deposition of

Defendant The Trust for Public Land ("Deposition Notice").  A copy of the Deposition Notice is

attached hereto as Exhibit A.  The Deposition Notice seeks testimony into twelve subject matters

listed on Schedule A to the Deposition Notice.  This Deposition Notice was sent *after* plaintiff's

counsel had already deposed TPL's Massachusetts State Director, Craig A. MacDonnell, for a

full day on February 8, 2007 on the details of the transaction.

---

[1]    The Court has already dismissed one count of Kunelius' complaint – that of intentional infliction of emotional distress.  *See* Memorandum and Order, dated May 17, 2006.

The Deposition Notice called for a deposition on March 12, 2007. On February 26, 2007, counsel conferred and counsel for TPL informed Kunelius' counsel that counsel for TPL was not available on March 12, 2007 and offered to provide other available dates. In this same conference, Kunelius' counsel stated that he would be willing to allow TPL to adopt the testimony of Mr. MacDonnell as its own for purposes of a Rule 30(b)(6) deposition. Because Mr. MacDonnell was TPL's project manager for the proposed purchase of the Property, he is the representative of TPL that has the most personal knowledge concerning the events surrounding the proposed purchase of the Property.

Counsel for TPL sent a letter by facsimile and first-class mail to Kunelius' counsel on March 5, 2007 outlining TPL's response to the Deposition Notice ("March 5 Letter"). A copy of this letter is attached as Exhibit B. In that letter, TPL offered to adopt Mr. MacDonnell's prior testimony as its own for all topics in the Deposition Notice that were specific to the proposed purchase of the property. TPL offered to produce a witness on relevant areas of inquiry that were not project-specific and had not been addressed in Mr. MacDonnell's deposition. Finally, TPL objected to the production of a witness on two topics on the ground that the testimony sought was overbroad and irrelevant. The testimony in dispute centers largely around TPL's financial status, including TPL's available lines of credit and bank accounts. Counsel for Kunelius sent a letter to TPL's counsel by facsimile on March 7, 2007 outlining the areas of disagreement between counsel for TPL and Kunelius ("March 7 Letter"). A copy of Kunelius' letter is attached as Exhibit C. The parties have since re-scheduled the deposition for March 22, 2007.

### *Disputed Topics in the Deposition Notice*

There are four areas of inquiry that are the subject of this motion.[2]  These areas of inquiry fall into two categories: (1) topics on which TPL has already provided testimony through the deposition of Mr. MacDonnell and for which TPL is willing to adopt Mr. MacDonnell's individual testimony as its own; and (2) topics on which TPL objects to the provision of testimony because the subject matter exceeds the discovery permissible under Fed. R. Civ. P. 26.

The first category of topics on which TPL has already provided testimony through an individual that it has offered to adopt includes two disputed topics, Topics 1 and 11 on Schedule A to the Deposition Notice. Topic 1 calls for testimony on "The sources of funding for the purchase of the Plaintiff's Property as a result of TPL's exercise of the right of first refusal." Exhibit A, at 5.  Topic 11 seeks testimony on "Negotiations, instructions, and assistance to the Friends of Red Acre's effort to raise funds in connection with the Plaintiff's Property." *Id.* at 6.

The second category of overbroad and irrelevant topics includes two disputed topics, Topics 2 and 3.  Topic 2 calls for testimony on "TPL's financial status from January 1, 2003 through December 31, 2003 including but not limited to TPL's available cash needs, other liquidate asserts [sic], lines of credit in place or available to TPL upon application, lines of credit available to TPL where such lines of credit were supplied by banks or financial institutions connected to or in any way related to TPL's officer [sic], directors, Board of Advisors or any other such designation." Exhibit A, at 5.  Topic 3 calls for testimony on "TPL's bookkeeping, applications, withdrawal histories, repayment histories, notices of default, and disbursement

---

[2]   The parties have been able to reach agreement on the remaining topics in the Deposition Notice.  Specifically, TPL and Kunelius have agreed that TPL will produce a witness on Topics 6, 7, 9, and 10.  Further, TPL and Kunelius have agreed that TPL will adopt Mr. MacDonnell's testimony as its own on Topics 4, 5, 8, and 12, and that TPL will not have to produce a witness on those topics.

schedules with regard to a line(s) of credit with Wainwright Bank, or any other bank, financial institution, private lender, including brokerage firms or any other source, for any amount of money or any other loan or lending vehicle in place or applied for from 2002 through 2007." *Id.*

**Argument**

A.    **Kunelius Should be Barred From Obtaining Cumulative Discovery on Topics on Which She Has Already Had Ample Opportunity to Obtain Discovery.**

Kunelius should be prohibited from requiring TPL to produce a witness on Topics 1 and 11 in the Deposition Notice because they are areas into which Kunelius has already inquired, had ample opportunity to inquire, and on which TPL has offered to adopt Mr. MacDonnell's testimony as its own as invited by Kunelius' own counsel. Rule 26(b)(2) prohibits discovery that is "unreasonably cumulative or duplicative," as well as discovery on which "the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought." For both of these reasons, a protective order should be granted prohibiting Kunelius from inquiring into Topics 1 and 11.

The discovery sought has already been covered extensively in the deposition of Mr. MacDonnell, which TPL has offered to adopt as its own. Kunelius' counsel spent a full day comprehensively examining Mr. MacDonnell on all issues related to the purchase of the Property. The deposition began at 10:01 a.m. and did not conclude until 5:52 p.m., spanning the full seven hours permitted under Fed. R. Civ. P. 26(d)(2). In that deposition, Kunelius' counsel inquired at length into both Topics 1 and 11. Indeed, the vast majority of the deposition was spent inquiring into Topic 1, TPL's "sources of funding" for the purchase of the Property. *See, e.g.,* Deposition of Craig A. MacDonnell (attached hereto as Exhibit D) at 54-57, 60-61, 70, 75, 78-80, 85, 94-96, 99-100, 104, 107-17, 121-22, 137-40, 142-44, 187-88, 220-21, 223, 225-27, 232, 235-39.

Kunelius' assertion in the March 7 Letter that Topic 1 was not answered by Mr. MacDonnell because "MacDonnell claimed to know nothing about the line of credit" is patently false. *See* Exhibit C. Mr. MacDonnell was questioned at length by Kunelius' counsel about the availability of a line of credit from Wainwright Bank and Mr. MacDonnell responded to those questions with specific facts about the line of credit. Specifically, Mr. MacDonnell testified that (1) TPL had a standing line of credit with Wainwright Bank, *id.* at 108; (2) no application was required for the line of credit, *id.* at 109; (3) this line of credit was available to the New England Regional Office of TPL, *id.* at 115; (4) there was some discussion about using this line of credit for the Kunelius Property, *id.* at 108; (5) TPL could use that line of credit if necessary and subject to due diligence and approval, *id.* at 111; (6) use of the line of credit was subject to due diligence and approval by TPL's Board of Directors, *id.* at 113; (7) a decision was made by TPL not to use the line of credit, *id.* at 114; (8) Mr. MacDonnell had no reason to believe the line of credit was in default, *id.* at 114; (9) he was not aware of TPL being in default on any lines of credit or other banking obligations, *id.* at 120; (10) he was not aware of ever utilizing the Wainwright line of credit on any of his projects at TPL, *id.* at 126; and (11) he is aware that TPL has one other line of credit with Sun Trust, *id.* at 127.

Furthermore, Mr. MacDonnell testified concerning the other topic in dispute, Topic 11, the fundraising efforts of the Friends of Red Acre ("FORA"). Specifically, Mr. MacDonnell testified that (1) he approached FORA for fundraising purposes, *id.* at 213; (2) he did not tell FORA not to fundraise because TPL did not want to go forward with the project, *id.* at 213-14; (3) toward the end of the project, TPL discussed with FORA the fact that the project was falling apart and that it made sense to "fold our tent," *id.* at 214; (4) TPL and FORA had discussions about "how to keep the project together, including where was the money going to come from, is

6

it borrowed, is it privately fund-raised," *id.* at 215; (5) TPL and FORA had "many, many conversations along these lines," *id.* at 215; (6) TPL and FORA were frustrated with the private fund-raising, *id.* at 216; (7) FORA raised money for the purposes of making deposits for the purchase, *id.* at 219; and (8) TPL and FORA had discussions about whether "any dollars would materialize that could pay off any potential amount," *id.* at 219.

Having had the opportunity to question Mr. MacDonnell at length regarding these topics, Kunelius should be barred from any additional, duplicative testimony. Rule 26(b)(2) prohibits precisely the testimony that Kunelius seeks here:

> The frequency or extent of the use of the discovery methods otherwise permitted under these rules and by any local rule *shall* be limited by the court if it determines that: (i) the discovery sought is ***unreasonably cumulative or duplicative*** . . . ; (ii) the party seeking discovery ***had amply opportunity by discovery in the action to obtain the information sought***; or (iii) the ***burden of expense of the proposed discovery outweighs its likely benefit***, taking into account the needs of the case, . . . the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2) (emphasis added). Kunelius' request violates all three sub-parts of Rule 26(b)(2). First, it is unreasonably cumulative and duplicative of Mr. MacDonnell's deposition testimony. Mr. MacDonnell testified at length concerning these issues. If Kunelius had noticed the Rule 30(b)(6) deposition before or contemporaneously with the individual deposition notice to Mr. MacDonnell, Mr. MacDonnell would very likely have been the designee for the Rule 30(b)(6) deposition. Second, Kunelius has already had ample opportunity to obtain this information from TPL. Kunelius deposed Mr. MacDonnell, the Massachusetts State Director of TPL and the project manager for TPL who was responsible for the Kunelius project, for a full day. To the extent Kunelius had questions about Topics 1 and 11, the deposition of Mr. MacDonnell was the time to ask them. Finally, the burden of producing a witness on these

topics outweighs its likely benefit where Kunelius already has ample testimony of TPL on these topics. To produce a witness on these topics would require TPL to produce a witness for yet another day of questioning on topics that Mr. MacDonnell has already devoted an entire day to answering.

In a case examining the exact same circumstances, the court explicitly refused to allow the type of cumulative discovery Kunelius seeks here. In *Novartis Pharmaceuticals Corp. v. Abbott Laboratories*, 203 F.R.D. 159, 163 (D. Del. 2001), the court refused to allow a Rule 30(b)(6) deposition where the company had offered to be bound by the earlier testimony of an individual who was the person most knowledgeable on the subject areas and would have been the Rule 30(b)(6) designee. In *Novartis*, the court held that another deposition "would be cumulative to the testimony already procured" and denied a motion to compel a Rule 30(b)(6) deposition on the same topics. *Id.* Similarly, forcing TPL to produce a witness on Topics 1 and 11 would be cumulative, especially where, as here, Kunelius has already had ample opportunity to obtain the information sought, Mr. MacDonnell would have been the Rule 30(b)(6) designee on these topics, and TPL has offered to adopt Mr. MacDonnell's testimony as its own. Accordingly, the Court should enter a protective order prohibiting further testimony into Topics 1 and 11.

**B.    Kunelius Should Be Barred From Seeking Testimony on Topics That are Overbroad and Irrelevant to the Claims and Defenses in the Action.**

Kunelius should be prohibited from inquiring into Topics 2 and 3 because they are overbroad and concern issues that are wholly outside of the realm of possible relevance to the claims and defenses in this litigation. Under Fed. R. Civ. P. 26(b)(1), the scope of permissible discovery is limited to "any matter . . . that is relevant to the claim or defense of any party." The Court has discretion to limit discovery where, as here, the discovery sought falls wholly outside

the claims and defenses in the case. *Blount Int'l, Ltd. v. Schuylkill Energy Resources Inc.*, 124 F.R.D. 523, 527 (D. Mass. 1989) (granting protective order where discovery requests went beyond the claims and defenses in the case). A protective order should issue to bar inquiry into Topics 2 and 3 because Kunelius is seeking discovery on subjects that are neither relevant to the issues raised in the litigation nor calculated to lead to the discovery of relevant and admissible evidence. *See United States v. Nordberg*, 1996 WL 170119, at *3, No. Civ. A. 93-12681 (D. Mass. April 8, 1996) (denying motion to compel depositions of witnesses because the testimony would be irrelevant to the issue in the case); *Blount Int'l*, 124 F.R.D. at 527 (limiting discovery to extant claims and defenses and prohibiting discovery of information falling outside those boundaries); *Flynn v. Church of Scientology Int'l*, 116 F.R.D. 1, 3 (D. Mass. 1986) ("It is axiomatic that Fed. R. Civ. P. 26(b) provides that only relevant matter may be the subject of discovery."). The question before the Court in this litigation is simply whether Kunelius is entitled solely to her liquidated damages under the Agreement or whether she is entitled, as she claims, to more. Detailed facts concerning TPL's financial status and line of credit with Wainwright Bank will not aid in this inquiry.

Whether or not TPL had sources from which it could have obtained funds to close on the Property is immaterial to the question of damages in the event of a failure to perform under the Agreement. *See, e.g., Perroncello v. Donahue*, 448 Mass. 199, 203-204 (2007) (stating that liquidated damages clauses "*will be enforced* so long as 'at the time the agreement was made, potential damages were difficult to determine and the clause was a reasonable forecast of damages expected to occur in the event of a breach'") (emphasis added) (quoting *Kelly v. Marx*, 428 Mass. 877, 878 (1999)). Nothing in the case law suggests that a liquidated damages clause will only be enforced where there is a showing of a lack of funds. Indeed, in rejecting the

"second look" doctrine, which previously allowed courts to consider the enforceability of a liquidated damages clause at the time of the breach, the Supreme Judicial Court implicitly held that evidence of the financial capability of the buyer at time of default is not only irrelevant but should not even be admissible. *See Kelly v. Marx*, 428 Mass. 877, 881 (1999) (rejecting "second look" approach because, among other things, it "undermines the peace of mind and certainty of result the parties sought when they contracted for liquidated damages") (internal citation and quotation omitted). TPL's decision not to resort to the use of its own funds or available lines of credit to close on the Property was based on its inability to raise outside funds sufficient for TPL to accomplish its mission of recovering its investment and transferring the Property to a long-term steward who could protect and conserve the land. This decision has nothing to do with Kunelius' rights upon TPL's failure to close.[3]

Indeed, counsel for TPL has offered to determine whether TPL could simply stipulate to the availability of a line of credit at the time of the closing in an amount sufficient to cover the purchase price in lieu of a deposition on these topics. However, this offer was rejected wholesale by Kunelius. The only plausible explanation for Kunelius' outright rejection of this offer is Kunelius' attempt to embark on a fishing expedition into detailed nuances of TPL's financial status – information to which Kunelius is not entitled. Moreover, Kunelius has access to TPL's publicly-available annual reports containing financial information, as evidenced by her attachment of one of those reports to her Complaint. *See* Complaint, Ex. 10. Because Topics 2

---

[3]    Moreover, Kunelius' claim that the door has been "opened" concerning these issues because "MacDonnell claimed that he knows nothing about the financing" is belied by the facts. Exhibit C. As outlined in detail above, Mr. MacDonnell answered questions at length about the available line of credit.

and 3 seek testimony on plainly irrelevant matters, the Court should enter a protective order prohibiting inquiry into these areas.[4]

## Conclusion

This is not a motion in which the requested discovery covers topics that are at least tenuously connected to the issues in the litigation – here, they are entirely unrelated, overbroad in scope and time, burdensome, harassing, and not propounded in good faith in pursuit of legitimate discovery needs. Accordingly, TPL respectfully requests that this Court issue a protective order barring Kunelius from inquiring into Topics 1, 2, 3, and 11 in the Deposition Notice, and grant such other relief as the Court deems just and proper.

## Request for Oral Argument

TPL believes that oral argument may assist the Court and requests that the Court grant a hearing on this Motion pursuant to Local Rule 7.1(D).

Respectfully submitted,

THE TRUST FOR PUBLIC LAND

By its attorneys,

/s/ Dahlia S. Fetouh_____
Richard A. Oetheimer (BBO # 377665)
Dahlia S. Fetouh (BBO # 651196)
Goodwin Procter LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

Dated: March 9, 2007

---

[4]    Kunelius served TPL with a document request via first-class mail on February 27, 2007 pursuant to Fed. R. Civ. P. 34 seeking documents concerning these same topics. Although TPL's written response is not yet due, TPL intends to object to the production of documents responsive to these requests on the same grounds articulated in this motion.

## <u>CERTIFICATION UNDER LOCAL RULE 7.1 AND LOCAL RULE 37.1; AND</u><br><u>CERTIFICATE OF SERVICE</u>

I, Dahlia Fetouh, hereby certify that counsel for The Trust for Public Land conferred with Michael McLaughlin, counsel for Plaintiff, through the attached correspondence and a telephone conversation on March 9, 2007 at 11:40 a.m., in a good faith attempt to resolve or narrow the issues in this motion prior to its filing.  The parties were unable to reach any agreement on the issues raised herein.

I further certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on March 9, 2007.

/s/ Dahlia S. Fetouh_____
Dahlia S. Fetouh

LIBA/1772122.2

# EXHIBIT A

UNITED STATES DISTRICT COURT
(DISTRICT OF MASSACHUSETTS)

CIVIL ACTION NO. 05-11697 GAO

| | |
|---|---|
| MARILYN KUNELIUS, <br>       Plaintiff, <br><br> V. <br><br> TOWN OF STOW separately, A <br> PARTNERSHIP OF UNKNOWN NAME <br> BETWEEN TOWN OF STOW and THE <br> TRUST FOR PUBLIC LAND, THE <br> TRUST FOR PUBLIC LAND separately <br> and CRAIG A. MACDONNELL, in his <br> individual capacity, <br>       Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## PLAINTIFF'S NOTICE OF
## RULE 30(b)(6) DEPOSITION OF DEFENDANT THE TRUST FOR PUBLIC LAND

**PLEASE TAKE NOTICE** that Plaintiff, pursuant to Fed. R. Civ. P. 30(b)(6) and by their undersigned counsel, will take the deposition upon oral examination of Defendant, The Trust For Public Land ("TPL"). TPL shall designate one or more officers, directors, managing agents, or other persons who consent to testify on its behalf in regards to the subject matters known or reasonably available to TPL as described in Schedule A attached hereto. The deposition will take place before a Notary Public or other officer authorized by law to take depositions on March 12, 2007 commencing at 10:00 a.m., at the Law Offices of Michael C. McLaughlin, One Beacon Street, 33rd Floor, Massachusetts 02110, or at such other date, time and place as may be agreed among counsel.

You are invited to attend and cross-examine.

Plaintiff,

Mrs. Marilyn Kunelius

By her Attorney,

Dated: February 20, 2007

Michael C. McLaughlin, BBO No. 367350)
Law Offices of Michael C. McLaughlin
One Beacon Street
Boston, MA  02108
(617) 227-2275

## CERTIFICATE OF SERVICE

I, Michael C. McLaughlin, do hereby certify that, on February 20, 2007, I caused a true copy of the above document to be served by hand upon the attorney of record for the defendants.

Michael C. McLaughlin

2

## SCHEDULE A

## DEFINITIONS

1. Except where the context does not permit, (i) the words "and" and "or" shall be construed to mean "and/or"; (ii) words used in the singular shall be deemed to include the plural; (iii) words used in the plural shall be deemed to include the singular; and (iv) the words "any" and "all" shall be construed to mean "any/all."

2. The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

3. The term "document" means the originals, all identical and non-identical copies, and all drafts or preliminary versions of written, printed, typed, graphic, photographic, electronically or mechanically recorded matter, of any kind or nature, however produced or reproduced; including, without limitations, any books, pamphlets, letters or other forms of correspondence, telegrams, telexes, cables, reports, studies, memoranda, notes, diary entries, log entries, telephone memoranda, summaries, financial records, writings, scribblings, invoices, bills, receipts, return receipts, canceled checks, ledgers, accounts, books of account, statement, invoices for credit, credit statements, credits, debits, tape recordings, videotape recordings, motion picture films, films, photographs (including negatives and prints), blueprints, specifications, charts, diagrams, drawings, sketches, computer records, e-mails (whether or not deleted), documents backed up from software systems, whether in tape, disk or other machine readable format, and any other method, means or manner used to preserve information, date or entries on computers or other electronic date systems, and all other writings and documents of any nature.

4. The term "relating" means relating, concerning, referring to, describing, evidencing or constituting.

5. The term "person" means any natural person or any business, legal, or governmental entity or association, and includes the person's employees, agents, attorneys, and representatives.

6. The term "TPL" shall mean defendant The Trust for Public Land, and its officers, directors, employees, agents, brokers, attorneys, representatives, and affiliates, or any related corporations, subsidiary, or parent corporation including those incorporated or licensed to do business in Massachusetts or any other state.

7. The term "The TPL Land Action Fund" shall mean any entity with such name located at 33 Union Street, Boston, Massachusetts, including its officers, directors, employees, agents, brokers, attorneys, representatives, and affiliates.

8. The term "Complaint" shall mean the complaint filed in the United States District Court for the District of Massachusetts on August 16, 2005, in the action captioned *Marilyn Kunelius v. Town of Stow, et al.*, Civil Action No. 05-11697-GAO.

9. The term "P&S Agreement" shall mean that certain agreement by and between Marilyn Kunelius and Cohousing Resources, LLC, entered in October, 2002.

10. The "Plaintiff's Property" shall mean the property owned by Ms. Kunelius known as and located at 142 and 144 Red Acres Road, Stow, Massachusetts, and that is the subject of the Complaint.

11. The term "Right of First Refusal" means certain Assignment and Acceptance between the Town of Stow and The Trust For Public Land dated February 12, 2007.

4

### Suject Matters for Rule 30(b)(6) Examination

1. The sources of funding for the purchase of the Plaintiff's Property as a result of TPL's exercise of the right of first refusal.

2. TPL's financial status from January 1, 2003 through December 31, 2003 including but not limited to TPL's available cash assets, other liquidate asserts, lines of credit in place or available to TPL upon application, lines of credit available to TPL where such lines of credit were supplied by banks or financial institutions connected to or in any way related to TPL's officer, directors, Board of Advisors or any other such designation.

3. TPL's bookkeeping, applications, withdrawal histories, repayment histories, notices of default, and disbursement schedules with regard to a line(s) of credit with Wainwright Bank, or any other any bank, financial institution, private lender, including brokerage firms or any other source, for any amount of money or any other loan or lending vehicle in place or applied for from 2002 through 2007.

4. TPL's role in assisting in the drafting and/or presentation of a warrant for a town meeting and the date that TPL became involved in the evaluation of Plaintiff's property.

5. The decision of TPL not to purchase the Plaintiff's property.

6. TPL participation in or lobbying for any changes in the M.G.L. c. 61, both before, during, and after the exercise of the right of first refusal of TPL.

7. Any policy or decision, whether official or unofficial, in which TPL has concluded that development by it under the provisions of M.G.L. c. 40B is unacceptable to TPL.

8. TPL's decision to forgo a development of the Plaintiff's property under the provisions of M.G.L. c. 40B.

9. TPL's identifying the "liquidated damage clause defense" as currently being used by TPL in the instant litigation.

10. The establishment of the "TPL Land Action Fund" and the "TPL Land Action Fund's" purpose.

11. Negotiations, instructions, and assistance to the Friends of Red Acre's effort to raise funds in connection with the Plaintiff's Property.

12. TPL's appraisal or estimation of value of the Plaintiffs' Property prior to and subsequent to the exercise of the right of first refusal.

# EXHIBIT B

GOODWIN | PROCTER

Dahlia S. Fetouh
617.570.1263
dfetouh@
goodwinprocter.com

Goodwin Procter LLP
Counsellors at Law
Exchange Place
Boston, MA 02109
T: 617.570.1000
F: 617.523.1231

March 5, 2007

**BY FACSIMILE AND FIRST-CLASS MAIL**

Michael C. McLaughlin, Esq.
Law Offices of Michael C. McLaughlin
One Beacon Street, 33rd Floor
Boston, MA  02108

RE:    Marilyn Kunelius v. Town of Stow, Partnership of an Unknown Name between Town of
       Stow and the Trust for Public Land, The Trust for Public Land and Craig A. MacDonnell
       Civil Action No.: 05-11697

Dear Mr. McLaughlin:

The following outlines the response of defendant The Trust for Public Land ("TPL") to
Plaintiff's Notice of Rule 30(b)(6) Deposition of Defendant The Trust For Public Land
("30(b)(6) Notice").  The numbers below correspond to the numbered "Subject Matters" listed in
Schedule A to the 30(b)(6) Notice.

Topics 1, 4, 5, 8, 11, and 12

The topics listed above concern activities related to the proposed purchase of Ms. Kunelius'
property.  At the deposition of Craig A. MacDonnell, the Massachusetts State Director of TPL,
which was taken over the course of a full day on February 8, 2007, you inquired into each of
these topics.  Pursuant to our discussion at the conclusion of Mr. Perry's deposition on February
26, 2007, TPL hereby notices its intent to adopt Mr. MacDonnell's testimony concerning these
project-specific topics as its own.  Accordingly, TPL will not produce another witness on these
topics.

Topics 2 and 3

TPL objects to the production of a witness to testify on the subject matters listed in Topics 2 and
3 because they are wholly irrelevant to the current dispute.  For the reasons articulated in TPL's
Motion to Quash Plaintiff's Subpoena and Notice of Deposition to the Keeper of the Records of
Wainwright Bank ("Motion to Quash"), TPL believes these topics cover subject matter that is
irrelevant and not reasonably calculated to lead to the discovery of admissible evidence
regarding the claims and defenses in this dispute.  As we stated in the Motion to Quash, details
concerning TPL's liquid assets and lines of credit are irrelevant to the question of liability or the
damages to which Ms. Kunelius may be entitled.  TPL has never argued that TPL could not have

LIBA/1768626.1

# GOODWIN | PROCTER

Michael C. McLaughlin, Esq.
March 5, 2007
Page 2

resorted to its own funds or available resources to complete the purchase of Ms. Kunelius'
property. Rather, TPL made the decision not to resort to them where there was no prospect of
completing TPL's mission by raising sufficient funds to recover TPL's investment and transfer
the property to a long-term steward. Furthermore, you already appear to have possession of
TPL's publicly-available annual reports, which contain financial information. To the extent you
require copies of those publicly-available documents, we will provide a copy of the annual report
for 2003.

In addition to the irrelevance of Topics 2 and 3, they are overbroad, seeking extensive categories
of information concerning TPL's "bookkeeping, applications, withdrawal histories, repayment
histories, notices of default, and disbursement schedules" for all of TPL's lines of credit over a
five-year period. Even assuming TPL could produce a witness with knowledge on the wide-
ranging details you seek, you have demonstrated no need for such far-reaching information.

Accordingly, TPL will not produce a witness on these topics. Assuming we cannot reach an
agreement concerning Topics 2 and 3, TPL will seek a protective order to prohibit testimony into
these areas.

<u>Topics 6, 7, 9, and 10</u>

Because these topics include subject areas that are not project-specific and were not covered
fully in Mr. MacDonnell's deposition, TPL will produce a witness to testify on Topics 6, 7, 9,
and 10.

We are available for this deposition on March 22, 2007, one of the dates we were given for your
availability.

Thank you.

Very truly yours,

*Dahlia Fetouh*

Dahlia S. Fetouh

DSF/baf

cc:    James B. Conroy, Esq.
       Deborah I. Ecker, Esq.

# EXHIBIT C

LAW OFFICES OF
# MICHAEL C. MCLAUGHLIN
ONE BEACON STREET
33RD FLOOR
BOSTON, MA 02108
(617) 227-2275
FACSIMILE (617) 722-9999

March 7, 2007

**BY FAX**

Dahlia Fetouh, Esq.
Goodwin Procter, LLP
Exchange Place
Boston, MA 02109

Re:    Kunelius v. The Town of Stow, et al.,
          Civil Action No. 05-11697-GAO

Dear Ms. Fetouh:

I am writing to you in response to your March 5, 2007 letter. I disagree that topic one was answered by MacDonnell. In fact, to the contrary MacDonnell claimed to know nothing about the line of credit.

1. I believe I have every right to inquire concerning the line of credit and I intend to do so. You are required in the absence of protective order to provide TPL personnel to answer such questions.

2. I disagree that MacDonnell has answered the question concerning fund raising efforts of the Friends of Red Acre as he claims to have little or no knowledge of same.

3. I disagree with your statement concerning topic 2 and 3. The Motion to Quash deals with Wainwright Bank's documents not TPL's. TPL's financial ability is in fact an issue in this case as it relates to Fraud, 93A etc. TPL has argued that it was "unable to purchase the Property." Your statement in your letter is a fundamental misrepresentation of what your firm has told Judge O'Toole. In addition, it now appears that the financial conditions of TPL were representations made to the Commonwealth as to its ability to purchase the Property and is most certainly relevant. I have every intention of asking questions concerning topics 2 and 3 and you are obligated to provide a witness. I would caution you that MacDonnell claimed that he knows nothing about the financing and this has already opened the door concerning this issue.

It is your obligation to file for a Protective Order. It is my suggestion that we schedule at the earliest possible date a concerning the same in which the Motion to Quash

1

and the Motion for Protective Order could be heard simultaneously with my Motion for Sanctions which I intend to file today or tomorrow.

Please call me so that we can discuss this.

Sincerely,

Michael C. McLaughlin

Enclosure

Cc:    Deborah I. Ecker, Esq. (by mail)
       James B. Conroy, Esq. (by mail)

2

# EXHIBIT D

DEPOSITION OF CRAIG MACDONNELL

MINIDEP by Kenson

Volume: I
Pages: 1-251
Exhibits: 23

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11697-GAO

MARILYN KUNELIUS,

Plaintiff,

v.

TOWN OF STOW, separately,
A PARTNERSHIP OF UNKNOWN NAME
BETWEEN TOWN OF STOW and THE
TRUST FOR PUBLIC LAND, THE
TRUST FOR PUBLIC LAND, separately,
and CRAIG A. MacDONNELL, in his
individual capacity,

Defendants.

DEPOSITION of CRAIG MacDONNELL, a witness called by and
on behalf of the plaintiff, taken pursuant to the
Massachusetts Rules of Civil Procedure, before Roberta J.
Daniels, a Court Reporter and Notary Public within and for
the Commonwealth of Massachusetts, at the Law Offices of
Michael C. McLaughlin, One Beacon Street, Boston,
Massachusetts 02108, on Thursday, February 8, 2007,
scheduled to commence at 10:00 A.M.

INDEX

| Witness | D | C | RD | RC |
|---|---|---|---|---|
| CRAIG MacDONNELL | 6 | | | |

- 3 -

APPEARANCES

Michael C. McLaughlin, Esquire
Law Offices of Michael C. McLaughlin
One Beacon Street
Boston, Massachusetts 02108
     Counsel for the Plaintiff

Peter A. Kachajian, Jr., Esquire
292 Main Street
Northborough, Massachusetts 01532
     Co-counsel for the Plaintiff

Deborah I. Ecker, Esquire
Brody Hardoon Perkins & Kesten, LLP
One Exeter Plaza
Boston, Massachusetts 02116
     Counsel for Defendant Town of Stow

Dahlia S. Fetouh, Esquire
Goodwin Procter, LLP
Exchange Place
Boston, Massachusetts 02109
     Counsel for Defendant Trust for Public Land

James B. Conroy, Esquire
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd floor
Boston, Massachusetts 02108
     Counsel for Defendant Craig MacDonnell
Also present:
Lucie DeBellis, Paralegal
The Law Offices of Michael C. McLaughlin
Marilyn Kunelius, Plaintiff
David Norris, Husband of the plaintiff

EXHIBITS

| No. | Description | Page |
|---|---|---|
| 1 | TPL corporate registration form | 16 |
| 2 | Notice of deposition | 17 |
| 3 | TPL Land Action Fund corporate registration form | 18 |
| 4 | Stow annual report, 2003 | 35 |
| 5 | Stow letter with attachments to Kunelius, 2-12-03 | 45 |
| 6 | MacDonnell letter to Perry, 2-11-03 | 49 |
| 7 | Conditions for right of first refusal | 51 |
| 8 | Minutes of Stow CPC meeting, 2-10-03 | 64 |
| 9 | Printout of TPL Web site | 75 |
| 10 | Stow Finance Committee minutes, 1-7-03 | 79 |
| 11 | DHCD grant application | 105 |
| 12 | TPL Web site excerpt | 124 |
| 13 | MacDonnell letter to Kachajian, 9-9-03 | 137 |
| 14 | Conditions for right of first refusal | 154 |
| 15 | Sommerlad email to Kennedy | 164 |
| 16 | Jacobs email to Sommerlad and Kennedy | 166 |
| 17 | Stow Board of Selectmen meeting, 2-11-03 | 191 |
| 18 | Stow Conservation Commission documents | 193 |
| 19 | MacDonnell email to Perry, 4-17-03 | 209 |
| 20 | Friends of Red Acre letter to Stow Board of Selectmen, 6-6-03 | 212 |

- 4 -

DEPOSITION OF CRAIG MACDONNELL                          MINIDEP by Kenson

21    Pelletier letter to Stow Board of
        Appeals, 9-25-03                    228

22    MacDonnell letter to Kachajian, 7-6-04 234

23    MacDonnell letter to Perry, 1-5-03      238

- 5 -

DEPOSITION OF CRAIG MacDONNELL

MINIDEP by Kenson

```
1              PROCEEDINGS
2         Thursday, February 8, 2007
3              10:01 A.M.
4    (Plaintiff and Mr. Norris not present)
5         CRAIG MacDONNELL, first having been
6   satisfactorily identified by the production of a
7   Massachusetts driver's license and then duly
8   sworn, on oath, deposes and says as follows:
9         MR. McLAUGHLIN:  Before we start, we'll
10  use the usual stipulations?  We'll reserve all
11  objections till the time of trial, except as to
12  form, waive the signature of the deposition?
13        MR. CONROY:  Waive the notary.
14        MR. McLAUGHLIN:  Yes, right.
15        MR. CONROY:  Right.
16              DIRECT EXAMINATION
17  By MR. McLAUGHLIN:
18  Q   Could you please state your name and spell it, please?
19  A   It's Craig MacDonnell, C-R-A-I-G.  Last name is M-A-C-
20      D-O-N-N-E-L-L.
21  Q   And can you tell me what your address is?
22  A   800 Old Road to Nine Acre Corner, Concord, Mass.
23  Q   Can you tell me what your occupation is?
24  A   I work for the Trust for Public Land.
                    - 6 -
```

```
1   Q   And what is the Trust for Public Land?
2   A   The Trust for Public Land is a 501c3, a national non-
3       profit land conservation organization.
4   Q   And what do you do for them?
5   A   I'm the Massachusetts state director.
6   Q   In 2002, what was your job at TPL?
7   A   I was the Massachusetts state director.
8   Q   Does each state have a director?
9   A   Most states where TPL works have a director.
10  Q   Is there a regional headquarters for TPL for the
11      northeast region?
12  A   Yes.
13  Q   Where is that?
14  A   Boston.
15  Q   And is that the same place as your office?
16  A   Yeah.
17  Q   And is there someone in charge of the region that you
18      report to?
19  A   Yes.
20  Q   And who is that?
21  A   Whitney Hatch.
22  Q   Is Whitney Hatch a man?
23  A   He is.
24  Q   Whitney, okay.  And what is his title?
                    - 7 -
```

```
1   A   Regional director.
2   Q   And do you still report to Whitney Hatch?
3   A   I do.
4   Q   In 2003, were you also the Massachusetts director?
5   A   In 2003, I was the Massachusetts state director.
6   Q   In your role as Massachusetts state director, could
7       you define what your authorities were as far as
8       acquisitions of property?
9   A   What do you mean by define my authority?
10  Q   Well, were you in a position to bind TPL into
11      contracts, for example?
12        MR. CONROY:  Objection.
13  A   Some contracts.
14  Q   When I say in a position, did you have the authority
15      to?
16  A   Well, in my position, there were some contracts that I
17      could bind TPL with respect to.
18  Q   And what kind of contracts were those?
19  A   Very small.
20  Q   Was there a dollar amount limitation?
21  A   There was.
22  Q   What was that?
23  A   I don't know.
24  Q   Was it less than a million dollars?
                    - 8 -
```

```
1   A   Well less than a million.
2   Q   Less than a half a million dollars?
3   A   Yes.
4   Q   Less then two hundred and fifty thousand?
5   A   Yes.
6   Q   Do you have a general idea what the limitation was?
7   A   I believe -- well, it was very small, but I don't know
8       a number.
9   Q   Do you have a general estimation of what -- well, let
10      me strike that.
11  A   I've already said I don't remember.
12  Q   If a contract was put in front of you, was there a
13      point where you would say to yourself, gee, I can't
14      sign this; this is too big?
15  A   Are we talking about now or then?
16  Q   Then.
17  A   Yes.
18  Q   And what would that number be that would cause you to
19      think you didn't have the authority?
20  A   Well, I don't recall as to what it was then, so I
21      can't testify to that.
22  Q   Are you on any medication that would affect your
23      memory?
24  A   No.
                    - 9 -
```

```
1   Q   Can you tell me what your background is, your
2       educational background, please?
3   A   I'm trained as a lawyer.
4   Q   And what kind of lawyer were you trained to be?
5   A   A litigator.
6   Q   Did you practice as an attorney?
7   A   I did.
8   Q   And where did you practice?
9   A   Two law firms.
10  Q   What are the names of the two firms?
11  A   Nutter, McClennen & Fish and Keegan, Werlin & Pabian.
12  Q   Where is Keegan, Werlin, Pabian?
13  A   Boston.
14  Q   And can you tell me when you worked for these two
15      firms, sequentially?
16  A   I worked for Nutter, McClennen & Fish from 1983
17      through '87 or '88.  I worked for Keegan, Werlin from
18      the early '90s through the late '90s.
19  Q   Why did you leave Nutter?
20  A   To change my career.
21  Q   And you were a litigator at Nutter?
22  A   Yes.
23  Q   Were you a partner?
24  A   No.
                    - 10 -
```

```
1   Q   Were you an associate?
2   A   Yes.
3   Q   And at Keegan, were you a partner?
4   A   Yes.
5   Q   Did you go in as a partner?
6   A   No.
7   Q   Did you go in as an associate?
8   A   I did.
9   Q   How long were you an associate there?
10  A   About three years.
11  Q   So, in the span of between approximately '90 and the
12      late '90s, you were three years an associate and up to
13      perhaps as many as six or seven as a partner?
14  A   Approximately.
15  Q   And what did you do between '88 and '90?
16  A   I worked for the Department of Fisheries, Wildlife &
17      Environmental Law Enforcement.
18  Q   And what was your position there?
19  A   I was a lawyer.
20  Q   In their legal department?
21  A   Yes.
22  Q   Is there a separate legal department for that, for the
23      Department of Fisheries?
24  A   Well, no, not really.  I mean, there were lawyers, but
                    - 11 -
```

## MELVIN LIPMAN COURT REPORTING
### 617-227-3985

## DEPOSITION OF CRAIG MACDONNELL

| | |
|---|---|
| 1   I don't recall it being organized as a department. | 1   myself. |
| 2 Q And that's a federal department, or is that a state | 2 Q I'm going to put a document in front of you, which I |
| 3     department? | 3     have not marked yet, and ask you if you've ever seen a |
| 4 A State. | 4     document like that. |
| 5 Q So, it's Commonwealth of Massachusetts? | 5 A I have not. |
| 6 A Correct. | 6 Q Can I ask you to look at the second page? |
| 7 Q And who was your supervisor at the Department of | 7 A (Examining.) |
| 8     Fisheries? | 8 Q Do you see where it appears to indicate that TPL is a |
| 9 A The commissioner. | 9     for-profit corporation?  Do you see that? |
| 10 Q And who was that? | 10 A You're pointing to the X in the middle of the page? |
| 11 A Walter Bickford at the beginning and, later, John | 11 Q Yeah. |
| 12     Phillips. | 12 A I see the X. |
| 13 Q Where did you go to law school? | 13 Q And that would be beside the for-profit designation, |
| 14 A Cornell. | 14     is that correct? |
| 15 Q And undergrad? | 15 A Correct. |
| 16 A Nasson. | 16 Q And you don't have any idea why that's listed with the |
| 17 Q Could you spell that? | 17     Commonwealth as a for-profit corporation.  Is that |
| 18 A N-A-S-S-O-N. | 18     correct? |
| 19 Q And where is that? | 19 A Correct. |
| 20 A Springvale, Maine. | 20 Q Do you share in bonuses issued by TPL in connection |
| 21 Q When did you graduate from law school? | 21     with monies that are derived from TPL's operation? |
| 22 A '83. | 22 A There are no bonuses at TPL. |
| 23 Q In your practice as a litigator, did you practice in | 23 Q You're on a salary at TPL? |
| 24     state courts? | 24 A Correct. |
| - 12 - | - 15 - |

| | |
|---|---|
| 1 A Yes. | 1 Q What is your salary? |
| 2 Q Federal courts? | 2 A Somewhere in the eighty thousand to ninety thousand |
| 3 A Yes. | 3     dollar range, maybe between ninety and a hundred.  I'm |
| 4 Q And what kind of litigation did you practice? | 4     not quite sure where it is right now. |
| 5 A Mostly environmental. | 5     (Plaintiff and Mr. Norris enter) |
| 6 Q Did you ever do corporate? | 6 Q You're here today because you received or your |
| 7     MS. FETOUH:  Objection. | 7     attorney received a notice of deposition, is that |
| 8 Q Did you ever practice corporate law? | 8     correct? |
| 9 A I worked on corporate issues.  I don't know if you | 9 A I believe that's correct. |
| 10     could call that practicing corporate law. | 10     MR. McLAUGHLIN:  Can I have that marked |
| 11 Q Did you ever practice tax law? | 11     as Exhibit 1, please? |
| 12 A I worked on tax issues, but I don't know if you could | 12     (WHEREUPON, Exhibit No. 1, TPL |
| 13     say I practiced tax law. | 13     corporate registration form, marked for |
| 14 Q Other than your degree from Cornell, do you have any | 14     identification.) |
| 15     advanced law degrees? | 15 Q Have you seen this notice of deposition before? |
| 16 A No. | 16     MR. CONROY:  Can I just clarify for the |
| 17 Q Have you taken any advanced professional education | 17     record?  Exhibit 1 is the document that you've |
| 18     beyond, for example, MCLE courses or that sort of | 18     just been asking questions about, correct? |
| 19     thing? | 19     MR. McLAUGHLIN:  Yes. |
| 20 A I have. | 20     MR. CONROY:  Okay. |
| 21 Q And what were those? | 21 A I believe I've seen this before. |
| 22 A I took so many that I can't remember. | 22     MR. McLAUGHLIN:  Okay.  We'll just have |
| 23 Q When you left Keegan, what was the reason you left | 23     that marked. |
| 24     Keegan? | 24 Q And that's why you're here today, correct? |
| - 13 - | - 16 - |

| | |
|---|---|
| 1 A To join the Trust for Public Land. | 1 A Essentially. |
| 2 Q Were you asked to leave, or did you leave because you | 2     MR. McLAUGHLIN:  We'll have that marked |
| 3     wanted -- | 3     as Exhibit 2. |
| 4 A I chose to leave. | 4     (WHEREUPON, Exhibit No. 2, notice of |
| 5 Q You mentioned that TPL is a -- is it a non-profit or | 5     deposition, marked for identification.) |
| 6     charitable institution, or how do you describe it? | 6 Q Do you hold any other positions with TPL--related |
| 7 A It's a 501c3. | 7     entities? |
| 8 Q And is that a charitable institution? | 8     MS. FETOUH:  Objection. |
| 9 A Correct. | 9 A I don't know what you mean by TPL--related entities. |
| 10 Q Is it also a non-profit? | 10 Q Well, have you ever heard of TPL Land Action Fund? |
| 11 A Correct. | 11 A I have. |
| 12 Q Is that the same designation? | 12 Q Well, you hesitated in answering that, and I'm |
| 13 A (No response.) | 13     wondering.  Is that because you're generally |
| 14 Q Are you aware whether or not TPL has a designation of | 14     unfamiliar with the TPL Land Action Fund? |
| 15     being a non-profit with the Secretary of State? | 15     MR. CONROY:  Objection. |
| 16 A I do not know. | 16 A The reason I hesitated is that I was trying to |
| 17 Q Have you ever checked to see whether TPL is listed as | 17     remember the name. |
| 18     a for-profit corporation? | 18 Q What is the TPL Land Action Fund? |
| 19 A I have not. | 19 A I don't know. |
| 20 Q In your role as director of the Massachusetts area, | 20 Q I'm going to put before you a document and have you |
| 21     did you in 2003 undertake any legal work for TPL? | 21     take a look at it from the Secretary of State.  Does |
| 22     MR. CONROY:  Objection. | 22     that refresh your memory as to what the TPL Land |
| 23 A I don't know how to answer that question.  I mean, I | 23     Action Fund is? |
| 24     thought about legal issues.  As a lawyer, I can't help | 24 A No. |
| - 14 - | - 17 - |

## MELVIN LIPMAN COURT REPORTING

DEPOSITION OF CRAIG MACDONNELL

1 Q  What's the address of TPL where you work? Where do
2     you work? What's the address?
3 A  33 Union Street in Boston.
4 Q  And I note here that the document in front of you is
5     also 33 Union Street. Do you see that?
6 A  Yes, it's misspelled here.
7 Q  What's misspelled, Union?
8 A  The word Union, yes.
9     MR. McLAUGHLIN: Can we mark that as
10    Exhibit -- whatever it is, three?
11    (WHEREUPON, Exhibit No. 3, TPL Land
12    Action Fund corporate registration form, marked
13    for identification.)
14 Q  Who is Ernest Cook?
15 A  He's a gentleman who works for the Trust for Public
16    Land.
17 Q  And does he work with you?
18 A  He works in the same building I do. He is employed by
19    the conservation finance office of the Trust for
20    Public Land.
21 Q  Is that a separate entity?
22 A  No.
23 Q  So, when you say conservation finance, is that the
24    division of TPL that deals with financial matters for

- 18 -

1     the entity?
2 A  No.
3 Q  Okay. What is conservation finance division?
4 A  I don't think it's a division. It's an office that
5     helps communities raise money for land acquisition.
6 Q  So, he, like you, is an employee of TPL as far as you
7     understand?
8 A  Yes.
9 Q  And is today the first time you've become aware that
10    he is the president of the TPL Land Acquisition Fund?
11    MS. FETOUH: Objection.
12 A  The Land Action Fund?
13 Q  The Land Action Fund, I'm sorry, Action Fund.
14    MR. CONROY: Objection.
15 A  Yes, it is.
16 Q  I note that under Exhibit 3, on Exhibit 3, it says
17    that the TPL Land Action Fund was organized in the
18    year 2000, on the first page about halfway down. Are
19    you at all surprised that this entity has existed for
20    the last seven years or thereabouts without your
21    knowledge?
22    MR. CONROY: Objection.
23 A  I don't have a reaction one way or another.
24 Q  On the second page, it also indicates that it is for-

- 19 -

1     profit. Do you see that?
2 A  Are you looking at the X in the middle of the second
3     page?
4 Q  Yes.
5 A  I see the X.
6 Q  And the X is to the left of the designation for-
7     profit. Do you see that?
8 A  I do.
9 Q  Are you surprised that there is a for-profit
10    designation for any entity related to TPL?
11 A  Yes.
12 Q  And as an attorney, were you at all involved in filing
13    any documents with the Secretary of State for TPL
14    during your tenure as a director of the Massachusetts
15    section or region?
16    MR. CONROY: Objection.
17    MS. FETOUH: Objection.
18 A  Well, which question would you like me to answer?
19 Q  Well, let's go back. Shall we call it the
20    Massachusetts region? Is that what you're the
21    director of, or is it State of Massachusetts or?
22 A  You can call it the Massachusetts state office.
23 Q  Okay. So, in your role as the director, were you ever
24    involved in filing any documents on behalf of TPL with

- 20 -

1     the Secretary of State?
2 A  No.
3 Q  And what makes you believe that TPL is a 501c3?
4     MR. CONROY: Objection.
5 A  That is what I had been told.
6 Q  So, you haven't specifically seen documents that would
7     verify whether it is or is not.
8 A  I may have, but I don't currently recall.
9 Q  Can you tell me how TPL became acquainted with the
10    Town of Stow concerning the Kunelius property?
11 A  Yes.
12 Q  Would you do that, please?
13 A  I believe the Trust for Public Land was contacted by a
14    fellow named Peter Christianson.
15 Q  And who is Peter Christianson?
16 A  A resident of Stow.
17 Q  Did he have some official position with the Town of
18    Stow? Was he an elected official or anything like
19    that?
20 A  Not to my knowledge.
21 Q  And did he contact you directly?
22 A  No.
23 Q  Who did he contact?
24 A  I don't remember.

- 21 -

1 Q  Do you recall the circumstances as to why he called
2     you?
3 A  Yes.
4 Q  What were those?
5 A  It was with respect to a piece of property near his
6     house.
7 Q  And was that the Kunelius property?
8 A  The property at 142 Red Acre Road.
9 Q  And do you have reason to believe that's not the
10    Kunelius property?
11 A  No.
12 Q  You don't recall who he contacted at TPL. Is that
13    your testimony?
14 A  I do not.
15 Q  Do you recall the reasons that he contacted TPL?
16    MS. FETOUH: Objection.
17 A  Yes.
18 Q  What were those?
19 A  It was with respect to a potential conservation
20    project.
21 Q  Did Mr. Christianson tell you there was a potential
22    project there at the Kunelius property?
23 A  I don't believe he used those words.
24 Q  Well, you didn't actually talk to him about it, so how

- 22 -

1     do you know what his words were?
2 A  I don't know what his words were.
3 Q  Do you know who established that there was a potential
4     conservation project at the Kunelius property?
5 A  I'm not sure I understand what you mean by
6     established.
7 Q  Well, you said that he contacted you about a potential
8     conservation project at the Kunelius property at 142
9     Red Acre Road, and my question is --
10 A  He contacted TPL.
11 Q  And my question is: who said there was a potential
12    project there? If you don't know what he said, how
13    did you know there was a potential project there?
14 A  The words potential project are my words.
15 Q  Do you recall any of the circumstances surrounding the
16    contact of TPL by Peter Christianson resulting from
17    any discussions you had with any other people at TPL?
18 A  Yes.
19 Q  Can you tell me what you know about that?
20 A  I believe he talked to other people in my office about
21    the potential for a conservation project on the
22    Kunelius property.
23 Q  Now, he was not the owner at that time of the Kunelius
24    property. Is that correct?

- 23 -

DEPOSITION OF CRAIG MACDONNELL

1 A  Correct.
2 Q  Was it unusual for someone who is not an owner of a
3     property to contact you concerning the establishment
4     of a conservation protection on someone else's property?
5 A  No.
6 Q  Does that happen regularly?
7 A  Yes.
8 Q  Do you recall who the people were in your office?
9 A  I believe he contacted Valerie Talmadge.
10 Q  And who is Valerie Talmadge?
11 A  Valerie Talmadge is the director of projects for the
12     New England region.
13 Q  Is she still an employee of TPL?
14 A  Yes.
15 Q  How many employees are there at TPL in Boston?
16 A  Well, without actually taking the time to count the
17     offices, I'd say in the neighborhood of twenty-five or
18     thirty.
19 Q  And were there 25 or 30 back in 2003?
20 A  Maybe a few less.
21 Q  Did you have discussions with Valerie Talmadge
22     concerning TPL's involvement with the property
23     which -- instead of calling it the Kunelius
24     property, I'm just going to call it the property
                        - 24 -

1     from now on.  Did you have discussions with her
2     concerning the property?
3 A  I did.
4 Q  And what do you recall from those discussions?
5 A  I have a general recollection of them, that Peter
6     Christianson proposed that TPL consider working with
7     the Town of Stow to conserve the Kunelius property.
8 Q  Do you recall discussing with Valerie Talmadge what
9     motivated Mr. Christianson to come to TPL?
10 A  No.
11 Q  Do you recall that there was a 40B development on the
12     Kunelius property approximately at the time that TPL
13     was contacted?
14 A  Yes.
15 Q  Does that refresh your memory at all as to why
16     Mr. Christianson had contacted TPL, i.e., that
17     they wanted a conservation development rather
18     than a 40B development?
19 A  Does that itself refresh my recollection?
20 Q  Yes.
21 A  No.
22 Q  Do you have any knowledge concerning
23     Mr. Christianson's wish that a 40B not be built
24     on property adjacent to his property?
                        - 25 -

1 A  Yes.
2 Q  And is it fair to say that Mr. Christianson made that
3     known to TPL fairly early on in his discussions with
4     TPL involving the possibility of TPL getting a
5     conservation restriction on the property?
6 A  I don't recall.
7 Q  Do you recall ever meeting Mr. Christianson yourself?
8 A  Yes.
9 Q  And how long after his initial contact with TPL did
10     you meet him, approximately?
11 A  I'm not sure.
12 Q  Do you recall approximately when the initial contact
13     was made from Mr. Christianson to TPL?
14 A  I believe it was in the winter.
15 Q  The winter of 2002?
16 A  I'm not sure.
17 Q  Did Mr. Christianson come to your office at some point
18     prior to you contacting the Town of Stow officials
19     concerning the possibility of TPL's involvement?
20 A  I don't know when, in the sequence of things, he came
21     to TPL's office.
22 Q  Do you recall meeting with him in your office?
23 A  I do.
24 Q  And when was that?
                        - 26 -

1 A  That's what I don't remember.
2 Q  Was it prior to your involvement in attending any
3     public hearings in the Town of Stow concerning Mosaic
4     Commons?
5          MS. FETOUH:  Objection.
6 A  That's what I don't remember, is when.
7 Q  You're familiar with the term Mosaic Commons?
8 A  I'm familiar with the entity known as Mosaic Commons.
9 Q  And what is it?
10 A  I understand it's a development company.
11 Q  And did you have an understanding at some point that
12     Mosaic Commons had intended to purchase the Kunelius
13     property?
14 A  Yes.
15 Q  And is it fair to say that the intended purchase of
16     the Kunelius property by Mosaic Commons was one of the
17     reasons that you were contacted concerning TPL's
18     involvement?
19 A  The proposed land use change, it's my understanding,
20     was the reason that we were contacted.
21 Q  And the proposed land use change, by that you mean
22     that the Kunelius property was under either a farm
23     designation or forestry designation under Chapter 61
24     and, if it were sold to Mosaic Commons, it would be
                        - 27 -

1     changed to some other designation.  Is that right?
2 A  By that I mean that there was development planned.
3     That's all I mean.
4 Q  Let me go back.  Do you recall attending meetings in
5     December of 2002 where Mosaic Commons made
6     presentations to the Town of Stow, the Board of
7     Selectmen?
8 A  I don't remember seeing presentations.
9 Q  Do you recall whether anyone at TPL attended meetings
10     where Mosaic Commons made a presentation to the Board
11     of Selectmen or any other board of the Town of Stow?
12 A  The introduction to your question, do I remember if
13     anybody from TPL?
14 Q  Yes.
15 A  No.
16 Q  Would you have been the point person, in other words,
17     the person with the general authority, to go to such
18     meetings and make comments at such meetings on behalf
19     of TPL?
20          MS. FETOUH:  Objection.
21 A  I don't know about the authority question.  So, I'm
22     not sure how to answer that.
23 Q  Well, would TPL send an intern to have discussions
24     with the town's Board of Selectmen concerning the
                        - 28 -

1     possibility of having TPL assist the town in some way?
2          MR. CONROY:  Objection.
3          MS. FETOUH:  Objection.
4 A  Well, TPL scopes projects in a lot of different ways
5     and gathers lots of information about projects ahead
6     of time.  Sometimes that involves project managers.
7     Sometimes that involves interns.
8 Q  Tell me about the scoping of a project.  Does that
9     mean that, prior to a potential sale of property that
10     might change a land use designation, you might know
11     about that even before the sale occurs?
12          MR. CONROY:  Objection.
13          MS. FETOUH:  Objection.
14 A  I don't understand your question.
15 Q  Well, tell me what you mean when you say scopes a
16     project.
17 A  Analyzes a potential project.  That's what scope
18     means.
19 Q  And what do you do to analyze a project?
20 A  You have discussions with local representatives.  You
21     take a look at sort of the whole constellation of
22     factors that enable conservation projects to occur,
23     including the availability of conservation financing,
24     various transactional pieces, and you make an
                        - 29 -

DEPOSITION OF CRAIG MACDONNELL

```
 1     assessment about the political interest of, in this
 2     case, a town to undertake a conservation project.
 3  Q  And did such a scoping occur with regard to the
 4     Kunelius property?
 5  A  Yes.
 6  Q  And do you recall when that scoping began?
 7  A  No.
 8  Q  Is it likely that it began when you were first
 9     contacted by Mr. Christianson?
10  A  Yes.
11  Q  Other than Mr. Christianson, who else attended the
12     meeting with you at your office that you mentioned
13     earlier?
14  A  The meeting that I mentioned, if you recall, I
15     couldn't put a date on it, and, actually, as I think
16     about it now, I can't remember who else was there. I
17     do remember meeting Mr. Christianson in my office.
18  Q  Do you recall whether other people were there?
19  A  I don't recall.
20  Q  Do you recall whether other TPL personnel were there?
21  A  I don't recall.
22  Q  Is it likely that Valerie Talmadge would have been
23     there?
24         MS. FETOUH: Objection.
                    - 30 -
```

```
 1  A  I don't know how to answer it. I mean, I can tell you
 2     what I remember. What I remember is that I did meet
 3     with Mr. Christianson, but I don't remember who else
 4     was there.
 5  Q  And if I've asked this question, I apologize. Do you
 6     recall, in that meeting, Mr. Christianson looking for
 7     ways to prevent a 40B development occurring on the
 8     Kunelius property?
 9  A  The focus of the conversation, if I remember it in
10     that first meeting, was the creation of a conservation
11     project, and how one would do that, more than the
12     prevention of an alternative.
13  Q  Do you recall that Mr. Christianson was concerned
14     about low-income housing being adjacent to his
15     property?
16  A  No.
17  Q  At some point, after meeting with Mr. Christianson,
18     did you initiate any contact with the Town of Stow on
19     behalf of TPL?
20  A  I don't recall whether I initiated any contact.
21  Q  Who would have initiated contact with the Town of
22     Stow, if you did not, from TPL?
23         MR. CONROY: Objection.
24         MS. FETOUH: Objection.
                    - 31 -
```

```
 1  A  Normally, the person who would be handling the
 2     potential scoping would make that contact.
 3  Q  And who was that in this case?
 4  A  That would be me.
 5  Q  So, is it likely that you were the person that
 6     contacted the Town of Stow?
 7  A  Well, I'd like to tell you that I remember contacting
 8     the Town of Stow, but at this point in time, I just
 9     don't remember that. I've had conversations with
10     Stow, subsequently, but whether or not I was the one
11     who initiated that contact, I just don't recall.
12  Q  But since you were the person running the scoping of
13     the project, it is likely that you were the person
14     that would contact the town? Is that correct?
15         MR. CONROY: Objection.
16         MS. FETOUH: Objection.
17         MR. CONROY: I think it's been asked
18     and answered.
19  A  I've tried to tell you what I remember about it. I
20     don't recall whether, in this situation, it was me or
21     not.
22  Q  How old are you?
23  A  Fifty.
24  Q  Have you testified before in a deposition?
                    - 32 -
```

```
 1  A  No.
 2  Q  Have you testified in any litigation?
 3  A  No.
 4  Q  Are you still a member of the bar?
 5  A  Yes.
 6  Q  At some point, did you contact the Town of Stow
 7     concerning the possibility of TPL acquiring the
 8     property, the Kunelius property?
 9  A  Yes.
10  Q  And do you recall when that was?
11  A  No.
12  Q  You have no idea at all as to when you may have
13     initiated a discussion with them concerning TPL
14     acquiring the property. Is that your testimony?
15         MR. CONROY: Objection.
16         MS. FETOUH: Objection.
17  A  My testimony is, for the third time, I don't remember
18     when it happened.
19  Q  Do you remember, generally, when it happened?
20  A  After talking with Peter.
21  Q  But I'm talking about something different. So, maybe
22     I'm being unclear. I didn't ask you when you
23     initiated discussions concerning a conservation
24     commission, I mean, a conservation restriction. I'm
                    - 33 -
```

```
 1     asking you: when did you initiate discussions with
 2     the Town of Stow concerning TPL acquiring the Kunelius
 3     property?
 4         MR. CONROY: Objection.
 5         MS. FETOUH: Objection.
 6         MS. ECKER: Objection.
 7  A  I'm not sure what you mean by acquiring the property.
 8     I mean, I don't distinguish -- I mean, my memory is
 9     that I had discussions with the town in the period of
10     time after Peter Christianson brought this potential
11     project to our attention. That's my memory.
12  Q  But you don't understand the term acquiring the
13     property as I'm using it?
14  A  Well, the discussions weren't so much about acquiring
15     as they were about how to do a potential conservation
16     project out there.
17  Q  Did, using your term, doing a potential conservation
18     project out there, involve acquiring some or all of
19     the Kunelius property by TPL?
20  A  It may have or it may not have. At the beginning of a
21     project, you don't pre-ordain what the outcome of the
22     project is.
23  Q  But my question to you, sir, is: when did you discuss
24     it where it did involve the acquiring of the property
                    - 34 -
```

```
 1     by TPL?
 2  A  Sometime after meeting with Peter.
 3  Q  And would that be in 1999?
 4  A  No. I don't recall.
 5  Q  So, you do have some sense of, generally, when it was.
 6     Can you give me, plus or minus, a year? When did you
 7     do this?
 8  A  Well, my memory is that this project occurred during
 9     the 2003 and 2004 period, generally. So, that
10     suggests that these conversations took place during
11     that time.
12         (WHEREUPON, Exhibit No. 4, Stow annual
13     report, 2003, marked for identification.)
14  Q  I've put before you a document which has been marked
15     as Exhibit 4 and ask you if you've seen this before.
16  A  I believe I have.
17  Q  And on the first page -- by the way, this has a Bate
18     stamp on it of KUN205 through 216. These are
19     documents that were provided by the Town of Stow.
20     That is their designation on the Bate stamp number.
21         The first page of this document, which is
22     Exhibit 4, has a picture of a horse on it and it
23     says Town of Stow Annual Report, 2003, Red Acre
24     Farm. Do you see that?
                    - 35 -
```

DEPOSITION OF CRAIG MACDONNELL

**Page 36**

1 A  I do.
2 Q  The second page indicates that this is a special town
3    meeting. It has a heading: Special Town Meeting,
4    2003, January 13, 2003. Do you see that?
5 A  Yes.
6 Q  Now, just looking at that, does that in any way assist
7    you as to whether or not you may have contacted the
8    Town of Stow in 2002 concerning the possibility of
9    acquiring the Kunelius property?
10 A  Looking at Page 2?
11 Q  Yes.
12 A  Page 2 does not remind me.
13 Q  Well, you see where it says there's a special town
14    meeting of January 13th?
15 A  Yes.
16 Q  Is it likely that a special town meeting dealing with
17    the Kunelius property, that you would have attended
18    such a meeting, if in fact you did, without first
19    making contact with the town prior to January 13,
20    2003?
21       MR. CONROY: Objection.
22       MS. FETOUH: Objection.
23 A  Could I take a minute and just read this?
24 Q  Well, actually, let me just direct you to a couple of

- 36 -

1    sections which may be helpful to you.
2 A  Okay.
3 Q  I'd like you to take a look on Page 95, also, marked
4    as KUN211. In the third full paragraph down, it says:
5    Craig MacDonald of the Trust for Public Land would
6    work with the Stow Conservation Trust and Friends of
7    Red Acre together with the selectmen with regard to
8    the Chapter 61A assignment. TPL would be the project
9    manager. Do you see that?
10       MR. CONROY: It's MacDonnell, by the
11    way.
12       MR. McLAUGHLIN: What did I say?
13       MR. CONROY: MacDonald.
14       MR. McLAUGHLIN: I'm sorry. I
15    apologize.
16 A  I see that.
17 Q  Does this suggest to you that you had contacted the
18    Town of Stow prior to January 13, 2003, in order to at
19    least discuss a Chapter 61 matter, 61A assignment?
20 A  Yes.
21 Q  And can you tell me what a 61A assignment would be?
22 A  My understanding is that, under Mass. General Law,
23    Chapter 61A, there's a provision that authorizes
24    municipalities to assign rights of first refusal to

- 37 -

1    conservation organizations.
2 Q  And do I understand it correctly that this reference
3    is referring to the possible assignment of the right
4    of first refusal to TPL?
5 A  This paragraph?
6 Q  Uh-huh.
7 A  Yes, I believe that would be the case.
8 Q  So, this is referring to -- it's also referring to TPL
9    would be the project manager. What does that mean?
10       MR. CONROY: To whom?
11       MR. McLAUGHLIN: I don't know. That's
12    what it says. What does it mean to him?
13 A  What does that mean to me?
14 Q  Yeah.
15 A  It means that we would manage the conservation
16    project.
17 Q  And would you manage the assignment?
18       MS. FETOUH: Objection.
19 A  We would help the town accomplish the assignment.
20 Q  And when the assignment occurs, who has the right to
21    purchase the property under the terms of an
22    assignment?
23       MR. CONROY: Objection.
24       MS. FETOUH: Objection.

- 38 -

1 A  The assignee.
2 Q  And do you have an understanding of what this
3    paragraph is referring to or who the assignee would be
4    under this paragraph?
5 A  TPL.
6 Q  So, when TPL then becomes the assignee, sir, was it
7    your expectation that TPL would then purchase the
8    land?
9       MS. FETOUH: Objection.
10 A  It was my expectation that we would live by the terms
11    of the contract.
12 Q  No, was it your expectation that under the terms of
13    the assignment the only entity that could purchase the
14    land would be TPL?
15 A  Correct.
16 Q  Now, do you recall, having read this, when you would
17    have first discussed the possibility of TPL acquiring
18    the land by assignment? Strike that.
19       Do you recall when you discussed this with
20    the town officials, concerning TPL acquiring the
21    land by assignment, given the fact that this
22    representation appears to be sometime on January
23    13th of 2003?
24       MR. CONROY: Objection.

- 39 -

1 A  Well, this paragraph would suggest to me that
2    conversations occurred prior to the town meeting.
3 Q  Is it likely that TPL met with the town in December of
4    2002 concerning this issue of a possible of assignment
5    of the right of first refusal?
6       MR. CONROY: Objection.
7       MS. FETOUH: Objection.
8 A  Well, what I can say is that TPL did meet with town
9    officials prior to January 13th.
10 Q  Was it you that met with the town officials prior to
11    January 13th?
12 A  I believe so.
13 Q  And who did you meet with?
14 A  There were many meetings between myself and municipal
15    officials regarding this project over many months, and
16    so I guess there were maybe seventy-five or a hundred
17    meetings over the period of this project. So, for me
18    to remember how who was at any one meeting is
19    difficult, but I do remember there were a series of
20    meetings.
21 Q  You don't remember who was at the first meeting, the
22    introductory meeting. Is that your testimony?
23 A  Correct.
24 Q  You don't remember where the introductory meeting was.

- 40 -

1    Is that right?
2 A  I don't.
3 Q  You don't recall whether it was the Board of
4    Selectmen. Is that correct?
5 A  I do not.
6 Q  You don't remember whether the meeting was in your
7    office or in the Town of Stow.
8 A  I don't remember the first meeting.
9 Q  Do you remember the second meeting?
10 A  No.
11 Q  In your role as director, who would you normally
12    contact from a town when initiating discussions
13    concerning a Chapter 61A assignment?
14       MS. FETOUH: Objection.
15 A  I would be interested in talking to the Board of
16    Selectmen.
17 Q  But you don't know in this case whether you contacted
18    the Board of Selectmen?
19 A  I do not recall.
20 Q  Who else in the Town of Stow would you have contacted
21    in order to initiate discussions on a Chapter 61A
22    assignment?
23       MS. FETOUH: Objection.
24       MR. CONROY: Might he have contacted?

- 41 -

DEPOSITION OF CRAIG MACDONNELL                    MiniDEP by Kenson

1        MR. McLAUGHLIN: Yeah.
2  A   Well, what I can say is, normally, in a 61A project, I
3      like to talk to people on the Conservation Commission.
4      I like to talk to people on the CPC and on the
5      Planning Board and other municipal committees. The
6      objective is to get a feel for the possibility of the
7      project by talking to as many people as possible, and
8      because TPL has many projects going in every year,
9      there are hundreds of these meetings that occur, have
10     occurred, since 2002.
11 Q  You described having seventy-five or a hundred
12     meetings with the town officials from the initiation
13     of the possibility of an assignment of the Chapter 61A
14     exercise of right of first refusal to --
15 A   I'd like to clarify that. I'd say discussions,
16     probably not meetings but discussions.
17 Q  Okay. The span of time from the initiation, perhaps
18     sometime before January 13, 2003, to the end of the
19     hundredth meeting was approximately what date?
20        MS. FETOUH: Objection.
21 A   Well, I'm not saying there were a hundred meetings. I
22     said I had between seventy-five and a hundred
23     discussions.
24 Q  Okay.
                        - 42 -

1  A   And that's a ball-park. So, your question is?
2  Q  Well, over what span of time did you have these
3      discussions and/or meetings, beginning with --
4  A   The course of the whole project.
5  Q  At some point, is it fair to say you actively began
6      lobbying for the possibility of accepting an
7      assignment of the 61A right of first refusal?
8         MR. CONROY: Objection.
9         MS. FETOUH: Objection.
10 A   Lobbying to whom?
11 Q  To the town.
12 A   It is fair that at some point it made sense to TPL
13     that, for the project to go forward, the way that
14     would occur is via an assignment of the right of first
15     refusal.
16 Q  And at some point did you begin any process of
17     convincing the town that that was the way the project
18     should go?
19 A   Well, I had a number of discussions, the place and
20     time of which I can't recall right now, with various
21     town officials about how to go forward, how to do
22     this, and we certainly talked about Chapter 61A among,
23     you know, a whole host of other issues.
24 Q  And when you would have these discussions, do you ever
                        - 43 -

1      recall discussions with a political body, such as the
2      entire Board of Selectmen?
3  A   Yes.
4  Q  And how often did you meet with the entire Board of
5      Selectmen?
6  A   I don't recall the frequency. I think it was a number
7      of times that I met with the whole board.
8  Q  Did you meet with them during official Board of
9      Selectmen hearings or privately?
10 A   I met with them during regularly scheduled meetings,
11     and I believe I had conversations with individual
12     members outside of those meetings.
13 Q  Do you know approximately when you met with the Board
14     of Selectmen in official meetings?
15 A   No.
16 Q  Can you tell me approximately when you did that?
17 A   Not with reference to a date. I mean, I believe that,
18     in order to accomplish the assignment, there were
19     meetings with the Board of Selectmen in advance of the
20     actual assignment. So, you know, in relation to other
21     events, I can remember it, but I don't have dates in
22     mind.
23 Q  Do you recall when the assignment took place?
24 A   I believe it was in 2003.
                        - 44 -

1        (WHEREUPON, Exhibit No. 5, Stow letter
2      with attachments to Kunelius, dated February 12,
3      2003, marked for identification.)
4  Q  I've put before you what has been marked as Exhibit 5
5      and ask you if you've seen that before.
6  A   Yes, I believe I have.
7  Q  Now, for the record, this is a compilation of
8      documents as received from the Town of Stow. So, they
9      were stapled together in this matter when we received
10     them and I've left them that way. The first page is
11     KUN474. It is a February 12th letter to Marilyn
12     Kunelius from the Board of Selectmen. The second one
13     is an assignment and acceptance, and that's 476,
14     signed by three members of the Board of Selectmen.
15     And the third page is an acceptance of assignment,
16     which is 478, and that is signed by Dorothy Nelson
17     Stuckey, regional counsel, Trust for Public Land.
18        Now, does this exhibit, number five, assist
19     you in getting a sense of when the assignment
20     took place?
21 A   It does.
22 Q  And the first page of Exhibit 5 is a notice from the
23     Town of Stow to Marilyn Kunelius that they are
24     assigning the right of first refusal to the Trust for
                        - 45 -

1      Public Land. Do you see that?
2  A   I do.
3  Q  And you've seen this before. Is that correct?
4  A   Yes.
5  Q  And this is copied to Dorothy Nelson Stuckey, Trust
6      for Public Land, on the cc: line. Is that correct?
7  A   Yes.
8  Q  And does she remain counsel for the Trust for Public
9      Land?
10 A   Yes.
11 Q  And that was on February 12th of 2003. Is that
12     correct?
13 A   Exhibit 5 is dated February 12th.
14 Q  And the last page of Exhibit 5 is an acceptance of the
15     assignment signed on February 12, 2003. Do you recall
16     that?
17 A   Do I recall the acceptance?
18 Q  I'm sorry. Am I correct there?
19 A   Well, I see the last page of Exhibit 5.
20 Q  Okay. Now, were you at any meeting of the Board of
21     Selectmen when they voted to assign the rights to TPL?
22 A   I believe I was.
23 Q  And do you recall when that meeting was?
24 A   No.
                        - 46 -

1  Q  Was Dorothy Stuckey with you at that meeting with the
2      Board of Selectmen when they voted to assign the right
3      of first refusal to you, to TPL?
4  A   Don't believe so.
5  Q  Well, I note that both are dated the same date,
6      February 12th. Do you see that?
7  A   Page 3 being -- or --
8  Q  Well, if we look at the date of the letter, first page
9      of Exhibit 5, February 12, 2003, and if you look at
10     the acceptance, it's dated the same day. Would that
11     suggest that she was with you at a meeting concerning
12     the acceptance?
13 A   Not necessarily.
14 Q  So, you don't remember whether she was even with you
15     at the meeting of the Board of Selectmen when the
16     assignment was made?
17        MS. FETOUH: Objection, asked and
18     answered.
19 A   My recollection is that she was not.
20 Q  And did you have the authority, at the time of the
21     vote to assign it to TPL, to accept on behalf of TPL
22     that assignment?
23 A   Are you asking whether, as Massachusetts state
24     director, I had the authority to do that?
                        - 47 -

MELVIN LIPMAN COURT REPORTING
617-227-3985

DEPOSITION OF CRAIG MACDONNELL                    MINIDEP by Kenson

1 Q  Yeah.
2 A  I don't know whether I had the authority to do it.
3    Let me clarify that. I believe the Trust for Public
4    Land had considered this and had voted to accept the
5    assignment and, by that vote, essentially authorize
6    Dorothy Stuckey to sign that acceptance.
7 Q  And was that a vote of the Board of Directors of TPL?
8 A  It was a vote of the Project Review Committee of the
9    Board of Directors.
10 Q  And is that of the national Board of Directors or is
11    there --
12 A  There is only one Board of Directors.
13 Q  So, the Project Review Committee voted to accept the
14    assignment?
15 A  Correct.
16 Q  And it's that vote that authorized Dorothy Stuckey to
17    accept on behalf of TPL?
18 A  Correct.
19 Q  And it is likely, therefore, that the vote occurred
20    prior to her accepting the assignment? Is that
21    correct?
22 A  It is likely.
23 Q  I'm going to put before you another document. Do you
24    have a sense, prior to doing that, when they voted?
                        - 48 -

1    Would they have voted a week before, a day before?
2 A  I do not know.
3        (WHEREUPON, Exhibit No. 6, MacDonnell
4    letter to Perry, dated February 11, 2003, marked
5    for identification.)
6 Q  I've put before you a document that we received from
7    the Town of Stow. This has been marked as Exhibit 6.
8    It's a February 11, 2003, letter to Ross Perry from
9    Craig MacDonnell, Massachusetts state director. Do
10    you recognize this?
11 A  I do.
12 Q  Is that your signature?
13 A  Yes.
14 Q  Now, this is dated the day before the vote to assign
15    to TPL, is that correct?
16        MS. FETOUH: Objection.
17 A  It's dated February 11th.
18 Q  And this is the day before Dorothy Stuckey accepted
19    the assignment, correct?
20        MR. CONROY: Objection.
21 A  The day before the 12th, which is the date next to
22    Dorothy's signature on Exhibit 5.
23 Q  So, it's the day before she accepted the assignment.
24    Is that fair to say?
                        - 49 -

1        MR. CONROY: Objection.
2        MS. FETOUH: Objection.
3 A  Well, since I don't have a recollection independent of
4    these documents, what happened in what sequence, all I
5    can do is sort of agree with you that those two dates
6    are one after another.
7 Q  Looking at the first paragraph of Exhibit 6, well,
8    strike that.
9        Do you have a recollection of why you sent
10    this letter to Ross Perry?
11 A  I need to take a minute and read this. Okay. Your
12    question?
13 Q  Is it fair to say this was a letter from you
14    establishing what the terms were that would have to be
15    met by the town in order for TPL to accept the
16    assignment of the right of first refusal?
17 A  It was a proposal to that effect, yes.
18 Q  And did the town meet your proposal?
19 A  I believe they did.
20 Q  And that resulted in the assignment the next day. Is
21    that correct?
22        MS. FETOUH: Objection.
23 A  I believe it resulted in the assignment. I don't have
24    independent recollection of the date that it actually
                        - 50 -

1    occurred.
2        (WHEREUPON, Exhibit No. 7, Conditions
3    for right of first refusal, marked for
4    identification.)
5 Q  I am going to put before you the next document,
6    Exhibit 7. Do you recognize this document?
7 A  I don't.
8 Q  Do you recall this document -- well, let me suggest to
9    you that there are numerous copies of this document in
10    the Town's production which indicate that this is
11    something that was sent to you seeking answers to the
12    questions outlined, or the statements outlined, in two
13    pages.
14        MS. FETOUH: Objection.
15 Q  Does that in any way refresh your memory?
16 A  That by itself doesn't, no.
17 Q  This document appears -- it's an unsigned document
18    that has a signature line for Ross Perry. Do you see
19    that on the second page?
20 A  Yes.
21 Q  Do you recall Ross Perry discussing with you topic
22    number two on the front page of Exhibit 7? And for
23    the record, the second item on the first page is:
24    Town is held harmless if TPL backs out of deal before
                        - 51 -

1    closing. In other words, TPL will defend the town
2    against any suit resulting from the failure of the
3    property purchase to be completed. Alternatively, TPL
4    posts a bond that guarantees their performance.
5 A  I remember discussing this issue with the board as a
6    whole. I don't remember having an individual
7    discussion with Ross Perry about it.
8 Q  What do you remember about that discussion?
9 A  I remember the issue of indemnification coming up in
10    the Board of Selectmen's meeting.
11 Q  And what do you recall about the indemnification issue
12    at the Board of Selectmen meeting?
13        MR. CONROY: Hold on one minute. Go
14    ahead.
15 A  I remember it was discussed in the open meeting.
16        MR. CONROY: That having been asked and
17    answered, can I just have a minute with counsel?
18        MR. McLAUGHLIN: Sure.
19        (Brief recess held)
20        MR. McLAUGHLIN: Can you repeat the
21    question? I don't even remember what it was.
22        (Question and answer read back)
23 Q  Can you tell me what you remember about the
24    indemnification issue during the meeting at the Board
                        - 52 -

1    of Selectmen?
2 A  Yes.
3 Q  Go ahead.
4 A  I remember the issue was discussed. William Wrigley
5    raised the issue, asked if TPL would indemnify. I
6    told the board we would not.
7 Q  Is that your recollection?
8 A  Yes.
9 Q  Do you recall why they were asking for
10    indemnification?
11        MR. CONROY: Objection.
12        MS. FETOUH: Objection.
13        MR. McLAUGHLIN: Strike that.
14 Q  Do you recall whether they told you why they were
15    asking for the indemnification?
16 A  I don't.
17 Q  Do you recall whether they asked you whether TPL had
18    the money to make the purchase under the terms of the
19    right of first refusal?
20 A  I don't.
21 Q  Do you recall telling TPL, I'm sorry, do you recall
22    telling the Board of Selectmen that TPL did have the
23    money necessary to make the purchase?
24 A  No.
                        - 53 -

DEPOSITION OF CRAIG MACDONNELL

1  Q  You do not recall telling them that. Do you know
2     whether TPL did have the money to make the purchase at
3     the time that you met with the Board of Selectmen on,
4     I presume, February 11th or 12th?
5  A  I'm not sure I know what you mean by have the money.
6  Q  Did you have the funds necessary to complete the
7     purchase?
8  A  No, not in hand.
9  Q  What was the source of the money that would allow TPL
10    to make the purchase under the terms of the right of
11    first refusal?
12 A  I believe it was a combination of sources, including
13    the Town of Stow, a hoped for private sale of a part
14    of Mrs. Kunelius' property and private fund-raising.
15 Q  Any state money?
16 A  There was the hope for a grant.
17 Q  Okay. Let's go back to Exhibit No. 6 for a moment.
18    On the first page of No. 6, there's a reference to
19    $100,000 for affordable housing and 300,000 for open
20    space. Is that correct?
21 A  I see that.
22 Q  And is that the amount that you were looking for when
23    you referred to the source of money from the Town of
24    Stow?

- 54 -

1  A  Yes.
2  Q  So, there's $400,000 there.
3  A  Correct.
4  Q  Did TPL ever receive any of that money?
5  A  No.
6  Q  The second reference you made was the hoped for
7     private sale. And I would ask you to look at the same
8     Exhibit 6, and it refers to deeds from private
9     parcels. Is that correct?
10 A  I see those words.
11 Q  And is that what you were referring to when you said
12    that a source of the money would be hoped for private
13    sales?
14 A  Well, the intention was to subdivide Mrs. Kunelius'
15    land into three portions, one for the town and two
16    lots that would be sold privately, the two lots we
17    referred to as 142 and 144. So, the hope was to sell
18    those two lots, 142 and 144, on the private market and
19    raise funds for Mrs. Kunelius.
20 Q  And raise funds. Where on Exhibit 6 does it discuss,
21    as a requirement of accepting the assignment, that
22    funds would have to be raised?
23             MS. FETOUH: Objection.
24             MR. CONROY: Objection.

- 55 -

1  A  Well, the four hundred thousand are funds that would
2     need to be raised.
3  Q  So, the $400,000 of funds we've already discussed in
4     the funds to be raised by the Town of Stow, I thought.
5     Am I incorrect there?
6  A  No. No, you're correct.
7  Q  And so then there's $400,000. And then you hoped for
8     funds from the private sale of one or two of the lots.
9     Am I correct there?
10 A  Both lots, sale of both lots.
11 Q  And does it say anywhere in Exhibit 6 how much money
12    that would be, would be derived from the sale of the
13    two lots?
14 A  I don't believe so.
15 Q  So, you didn't make, as a requirement of the
16    acceptance of the right of first refusal, a specific
17    dollar amount that would have to be derived from the
18    hoped for private sale, is that correct?
19 A  In this letter, no.
20 Q  And between the date of this letter, January 11th, and
21    the acceptance --
22             MS. FETOUH: February 11th?
23 Q  I'm sorry, February 11, 2003, and the acceptance on
24    February 12, 2003, in which Dorothy Stuckey on behalf

- 56 -

1     of TPL accepted the assignment, are you aware of any
2     other document that would have outlined additional
3     requirements of TPL necessary for TPL to accept the
4     assignment?
5  A  As I sit here this morning, no.
6  Q  Now, the private funding, let's get back to the
7     private funding that you referred to, private funding,
8     private fund-raising. Where does your letter of
9     February 11th, Exhibit 6, refer to that private fund-
10    raising?
11             MR. CONROY: Objection.
12             MS. FETOUH: Objection.
13 A  I don't believe it does.
14 Q  And are you aware of any other document between
15    February 11th and February 12th of 2003 that
16    established, as a condition for the acceptance of the
17    assignment, that private fund-raising would be a
18    necessary component of the acceptance?
19 A  As I sit here this morning, no.
20 Q  Looking at the last page of Exhibit 6, there's a
21    paragraph that states: Under these circumstances, TPL
22    will entertain acceptance of the ROFR. All in
23    caps. Right of first refusal is what that means.
24    Is that correct?

- 57 -

1  A  Yes.
2  Q  Upon acceptance, TPL, quote, steps into the shoes,
3     unquote, of the buyer and is bound by the applicable
4     terms of the contract. Have I read that correctly?
5  A  You have.
6  Q  What did you mean by applicable terms?
7  A  I meant the terms that the common law would require
8     TPL to meet.
9  Q  And what do you mean by common law? What terms would
10    the common law require?
11             MR. CONROY: Objection.
12 A  I mean decisions of the Massachusetts courts under
13    Chapter 61A.
14 Q  And in fact, at that point, did you not have an
15    understanding that there were no decisions concerning
16    what terms would necessarily be applicable and what
17    terms would not?
18             MS. FETOUH: Objection.
19             MR. CONROY: Objection.
20 A  My understanding was that courts would apply some
21    terms and not other terms.
22 Q  And did you have an understanding of what those terms
23    were that would be applicable and what terms would not
24    be applicable?

- 58 -

1  A  My understanding was that the terms that would
2     naturally make sense for an assignee to abide by would
3     apply.
4  Q  So, in your mind, when you wrote Exhibit 6, you had an
5     understanding that some of the terms of the contract
6     were applicable to the assignment and some were not.
7     Is that correct?
8  A  Basically.
9  Q  Do you recall being asked by the Town of Stow to
10    identify what terms you thought were applicable and
11    what terms you did not think were applicable?
12 A  No.
13             MR. CONROY: Somewhere in here, Mike,
14    I'd like to take a five-minute break if we could.
15             MR. McLAUGHLIN: Sure. That would be
16    good. It's now 11:30. We'll take a break; 531
17    for the ladies room, is the code, and then why
18    don't we say, to 12:30. There's a cafeteria
19    downstairs that's not bad. Oh, you know that.
20             MR. CONROY: So I hear.
21             MR. McLAUGHLIN: Cafeteria downstairs
22    is not bad, and we can take like a half hour if
23    that's all right.
24             (Recess, 11:30 A.M.)

- 59 -

DEPOSITION OF CRAIG MACDONNELL

1    (After recess, 11:44 A.M.)
2    THE WITNESS: Are we still on Exhibit 6
3 here?
4    MR. McLAUGHLIN: We're still on
5 Exhibit 6, yeah.
6    THE WITNESS: All right.
7 Q  Just so I understand, when you refer to the language
8 on Exhibit 6, on the last page, where it says, "Upon
9 acceptance, TPL steps into the shoes of the buyer and
10 is bound by the applicable terms of the contract,"
11 have I understood you correctly that you believed that
12 there were terms that you did not have to abide with
13 in the contract, or comply with in the contract, when
14 you wrote this letter?
15 A  By that sentence, I meant to convey my general
16 understanding about an assignee's obligation under
17 Chapter 61. As a general matter, I did not have in my
18 mind at that time a particular term, if that's what
19 you're asking, that would not apply.
20 Q  Okay.
21 A  But while we're on that sentence, I'd like to clarify
22 something I said earlier about this letter not
23 referencing any other financing that was required.
24    The next sentence in that paragraph, where I

- 60 -

1 wrote, "TPL is ready to work hard to assemble the
2 finances required to make the seller whole," by
3 that sentence, I meant that there was a lot of
4 work to do to bring the finances to the table,
5 including town money, private sale money and
6 private fund-raising.
7 Q  So, the reader of the sentence that you just read, TPL
8 is ready to work hard to assemble the finances
9 required to make the seller whole, the reader of that
10 would have to know that it involved some private fund-
11 raising as well. Is that your testimony?
12    MS. FETOUH: Objection.
13    MR. CONROY: Objection.
14 A  Not really. I'm just trying to tell you what I meant
15 by that so I could answer your earlier question more
16 completely. It's that sentence that is sort of the
17 textual reference to some of the things that we talked
18 about between TPL and the town in the meetings that
19 we've referred to.
20 Q  So, on February 11th, the day before the acceptance of
21 the right of first refusal by TPL, is it your
22 testimony that you did not have specific terms of the
23 contract which you believed would allow you to not
24 perform under the contract?

- 61 -

1    MS. FETOUH: Objection.
2    MR. CONROY: Objection.
3 A  No, what I said was a little different than that.
4 What I meant to say was that, by using that sentence,
5 I was saying that, under Chapter 61, there are terms
6 of a contract that apply to an assignee and that,
7 depending on the circumstances, there are others that
8 don't apply.
9 Q  So, based on the fact that you're an attorney and you
10 profess to know Chapter 61, can you tell me what terms
11 you think apply?
12    MS. FETOUH: Objection.
13    MR. CONROY: Objection. Let me say,
14 Mike, if I may, for the record, I have some
15 concern about Mr. MacDonnell being asked to
16 testify, effectively, as an expert, as a legal
17 expert. I think it's fair game to ask him what
18 was in his mind when he did what he did and how
19 that may have influenced him, but for him to be
20 asked to testify in general as to the meaning of
21 the law, I think is inappropriate. So, I object
22 on that basis.
23    MR. McLAUGHLIN: Okay. But I'm not
24 going to change the question.

- 62 -

1 Q  As an attorney, you have some understanding of
2 Chapter 61.
3    MR. CONROY: Excuse me. I will just
4 not repeat that.
5    MR. McLAUGHLIN: No, I understand.
6    MR. CONROY: But throughout the
7 deposition, I have that standing objection, okay?
8    MR. McLAUGHLIN: Yes.
9    MR. CONROY: Is that acceptable?
10    MR. McLAUGHLIN: That's acceptable.
11 Q  Can you tell me, based upon your understanding of the
12 fact that, under Chapter 61, there are terms of a
13 contract that apply and terms of a contract that don't
14 apply, please tell me what terms apply.
15    MS. FETOUH: Objection.
16 A  Because I don't have this contract in my mind as we're
17 talking about it, I can only tell you that I can of as
18 an example of a kind of a term that I don't think
19 would apply, a Chapter 61A contract that imagines a
20 full-scale development process whereby the purchaser
21 gets permits. Those kinds of provisions would sort of
22 be inapposite for an assignee to comply with under
23 Chapter 61.
24 Q  And so, for example, under the terms of the contract

- 63 -

1 in question, which anticipated a 40B development, you
2 did not feel compelled to put up a 40B development as
3 the assignee of the right of first refusal. Is that
4 fair to say?
5 A  For example.
6 Q  Yeah, okay. Do you recall ever meeting with the Town
7 of Stow Community Preservation Committee?
8 A  Yes.
9 Q  I'm going to put before you what will be marked as
10 Exhibit 8.
11    (WHEREUPON, Exhibit No. 8, minutes of
12 Stow CPC meeting, February 10, 2003, marked for
13 identification.)
14 Q  And these are provided to us from the Town of Stow. I
15 note that they are doubled. They're printed on both
16 sides. I'm going to just have you look at one small
17 part of this document, and it's on the second page,
18 which is marked as 039, and it's a -- by the way, this
19 document is called Minutes of Meeting of February 10,
20 2003, and it says a committee member asked what
21 happens if CPC votes in favor and gets voted down at
22 the town meeting. TPL responded that they would be
23 under contract at that point and would have to make it
24 work. Do you recall whether the person that said that

- 64 -

1 for TPL was you?
2    MR. CONROY: Objection.
3    MS. FETOUH: Objection.
4 A  I recall discussing this issue at a meeting of CPC. I
5 don't know whether it was on February 10th.
6 Q  February 10th would have been two days before the
7 assignment. Does that in any way refresh your
8 recollection?
9 A  It would make sense.
10 Q  And it would make sense that you were the person at
11 that point that would have been attending the
12 Community Preservation Committee meeting.
13 A  Yes.
14 Q  Given that, what did you mean when you said that TPL
15 would be under contract at that point and would have
16 to make it work?
17 A  I don't know if I've testified that I actually said
18 that. I remember discussing it.
19 Q  Do you have reason to believe that the minutes of the
20 meeting of February 10th of the Preservation Committee
21 are inaccurate with regard to this paragraph that I've
22 just read?
23 A  I have no reason to think they are accurate or
24 inaccurate.

- 65 -

MELVIN LIPMAN COURT REPORTING
617-227-3985

DEPOSITION OF CRAIG MacDONNELL

MiniDep. by Kenson

---

**- 66 -**

1 Q  Well, you have no reason to believe that it's accurate
2    or inaccurate?
3 A  I don't know anything about this document. I've seen
4    it here this morning for the first time. So, I don't
5    know anything about it.
6 Q  Well, let's go back. The document, Exhibit 8,
7    purports to be minutes of a meeting of February 10th.
8    Do you see that?
9 A  I do.
10 Q  And it's your testimony that you likely attended that
11    meeting since it was two days before the assignment.
12 A  Yes.
13 Q  And so is your testimony that you have no comment as
14    to the accuracy of the statement that TPL responded
15    that they would be under contract at that point and
16    would have to make it work? You have no comment as to
17    whether that is inaccurate or accurate?
18 A  I just don't have a recollection of saying that,
19    that's all.
20 Q  Do you remember being asked the question?
21 A  I don't remember being asked the question.
22 Q  Do you remember questions concerning what happens if
23    the town meeting votes down this project?
24 A  I don't.

**- 67 -**

1 Q  Did in fact the town vote down the project?
2 A  No.
3 Q  Did the town have a vote to buy the project?
4 A  Yes.
5 Q  And it passed?
6 A  Correct.
7 Q  Is it fair to say, sir, that you were involved
8    extensively in the drafting of a warrant for the town
9    for a town meeting?
10 A  I remember participating in the drafting of a warrant
11    article in Stow.
12 Q  And is it fair to say that that warrant involved the
13    town purchasing the Kunelius property?
14 A  Yes.
15 Q  And is it fair to say that the town voted and they
16    voted down the purchase?
17 A  My memory is they voted to approve that.
18 Q  Let's go back to Exhibit 6 for a second. Looking at
19    Exhibit 6, which is right here, did you ever tell
20    anyone that if you didn't get the town financial
21    commitment of $400,000 that it didn't matter? You
22    were going to buy the property anyhow under the
23    assignment of right of first refusal.
24 A  I don't remember that.

**- 68 -**

1 Q  Is it likely that you would have said that?
2      MR. CONROY: Objection.
3 A  I don't know how to answer the is-it-likely question.
4 Q  Was the $400,000 that is referred to in Exhibit 6 a
5    requirement of TPL's acceptance of the assignment?
6      MS. FETOUH: Objection.
7 A  No.
8 Q  So, if you didn't get the $400,000, you were still
9    going to accept the assignment. Is that correct?
10 A  Well, I believe the vote to authorize the expenditure
11    post-dated the assignment. So, the decision whether
12    to accept the assignment would occur before that would
13    happen.
14 Q  Is it also true that if you didn't get the, quote,
15    hoped for sale of the two parcels that was not
16    critical in whether or not you would accept the
17    assignment?
18      MS. FETOUH: Objection.
19      MR. CONROY: Objection.
20 A  Well, likewise, the proposed sale of 142 and 144 Red
21    Acre Road were going to post-date the assignment, so
22    we would not have known then whether in fact those
23    parcels would have sold. It would be later in time.
24 Q  Did you tell the Community Preservation Commission

**- 69 -**

1    that it didn't matter whether you got the four hundred
2    thousand from the town or whether you sold off
3    portions of the property; you would still purchase the
4    property?
5 A  I don't recall that.
6 Q  Do you recall telling that to anyone?
7 A  It not mattering --
8 Q  Yeah.
9 A  -- is your question? I don't recall using that --
10 Q  Did it matter? In other words, if the money wasn't
11    given to TPL from the town, $400,000, and if you
12    couldn't sell the two lots, did you tell anyone that
13    it didn't matter because TPL would purchase the
14    property and pay the full asking price?
15 A  That's what I don't recall. I don't recall using that
16    language.
17 Q  My question to you is: is that a fact that it didn't
18    matter to TPL, that they were going to purchase it
19    anyhow?
20 A  It was our complete and absolute intention to do this
21    project and conserve this property and buy this
22    property from Marilyn Kunelius. It's our business to
23    do this. The reason I changed careers was to be
24    involved in the environmental field. This is why I

**- 70 -**

1    work at TPL. This is why we do this stuff. We fully
2    intended -- from the very second we looked at this
3    project, we would never have accepted the assignment
4    unless we fully intended to do this.
5 Q  So, the answer --
6 A  Yes, the answer is we fully intended to buy this
7    property.
8 Q  And what was your source of funds in the absence of
9    the $400,000 and the absence of the sale of parcels
10    and in the absence of fund-raising? What would be the
11    source of the funds that you would purchase the
12    property with?
13      MR. CONROY: Objection.
14      MS. FETOUH: Objection.
15 A  We did not contemplate being able to do this project
16    without finding adequate financial sources external to
17    TPL to complete it.
18 Q  You never considered that?
19 A  What we considered was, as we consider in all our
20    projects, is advocating as hard as we can for public
21    money, if necessary for private sale money, and if
22    necessary for private fund-raising money, and working
23    as hard as we can to put that money together as we
24    have in every one of our 61 projects in Massachusetts,

**- 71 -**

1    and so we fully intended that the sources we had
2    identified would come together and that we would be
3    able to purchase this property.
4 Q  And did you consider what your obligations would be to
5    Marilyn Kunelius if those sources did not pan out?
6      MS. FETOUH: Objection.
7 A  Yes.
8 Q  And how did you consider dealing with that
9    possibility?
10 A  We looked at the contract.
11 Q  You didn't consider any other assets or sources of
12    funds, other than the three that we've already
13    discussed, the money from the Town of Stow, sale of
14    the private lots and fund-raising?
15 A  The obligation that TPL had was measured by the
16    contract. So, it's natural for us to look at the
17    contract to figure out what the scope of the
18    obligation was, which is what we did.
19 Q  So, you looked at the contract. And is it fair to say
20    you determined that, if we don't get the money from
21    the Town of Stow and if we don't get the private sale
22    from the two lots and we don't get fund-raising, then
23    we'll claim that we don't have to purchase the
24    property because of the liquidated damage clause? Is

---

**MELVIN LIPMAN COURT REPORTING**
617-227-3985

DEPOSITION OF CRAIG MacDONNELL                    MINIDEP by Kenson

1 that correct?
2        MS. FETOUH: Objection.
3 A  We read the liquidated damages clause and believed it
4    would apply in this case and -- well, I'll leave it at
5    that.
6 Q  And you made that determination prior to the
7    acceptance of the assignment. Is that correct?
8 A  Correct.
9 Q  And that was because just the normal prudence would
10   suggest that you would have to have some contingency
11   for the possibility that you wouldn't have the town
12   financing, you wouldn't have the sale of the lots, and
13   you wouldn't have money from fund-raising. Your
14   normal procedure, due diligence and prudence, would
15   suggest that you would have to have some way to deal
16   with that, correct?
17       MR. CONROY: Objection.
18       MS. FETOUH: Objection.
19 A  It's true that, when we scope a project, we look at
20   our legal obligations and make decisions in accordance
21   with them, absolutely.
22 Q  And did you ever tell the Town of Stow prior to the
23   acceptance of the assignment, the right of first
24   refusal, that if you failed to accomplish obtaining
                        - 72 -

1    money from the Town of Stow or from obtaining the
2    deeds or from fund-raising or selling property from
3    the deeds, that you would rely on the liquidated
4    damage clause and not purchase the property?
5 A  Did I tell the Town of Stow?
6 Q  Yes.
7 A  About our analysis of the --
8 Q  Yes.
9 A  At some point, yes.
10 Q  Prior to the time that you accepted the assignment,
11   did you tell them?
12 A  I don't remember when I had that discussion.
13 Q  Is there anything in Exhibit 6 that outlines,
14   specifically, that you intended to rely on the
15   liquidated damage clause if necessary?
16       MR. CONROY: Objection.
17 A  Well, not explicitly. The sentence where I say that
18   we are bound by the applicable terms of the contract
19   is a summary, really, of normal Chapter 61 legal
20   analysis, which includes all of those terms.
21 Q  Do you recall telling any public officials from the
22   Town of Stow that TPL has never failed at any time to
23   honor an assignment of a right of first refusal?
24 A  Yes, I believe I did say that.
                        - 73 -

1 Q  And, in fact, do you remember telling public officials
2    of the Town of Stow that they had nothing to worry
3    about regarding indemnification because TPL, having
4    never failed, would find a way to purchase the
5    property to make Mrs. Kunelius whole?
6 A  I remember discussing this issue with the town. I
7    don't recall the language I used.
8 Q  But you do recall that you told the town that TPL had
9    never failed in the past to honor an assignment of a
10   right of first refusal.
11 A  I do remember that, and I believe we honored it here.
12 Q  So, I don't want to belabor a point, but I'm a little
13   confused. On one hand I thought you said that you had
14   every intention of going forward and purchasing the
15   property even if the three items outlined in your
16   letter of February 11th, Exhibit 6, were not achieved.
17       MR. CONROY: Objection.
18 Q  And on the other hand you say that if you did not
19   achieve the three items on Exhibit 6, i.e., the money
20   from the town, the sale of private lots, the two
21   private lots, and fund-raising, that you would look to
22   the liquidated damage clause. So, which is it?
23       MR. CONROY: Objection.
24       MS. FETOUH: Objection.
                        - 74 -

1        MS. ECKER: Objection.
2 Q  Was the intention to go forward even if you didn't
3    have the three requirements that are outlined on
4    Exhibit 6, or was it your intention to rely on the
5    liquidated damage clause?
6        MR. CONROY: Objection.
7        MS. FETOUH: Objection.
8 A  It was our intention at the beginning and throughout
9    most of this project to close no matter what because
10   that's the way TPL does its business, believing fully
11   that it would be possible to do so. It became
12   apparent at some point, despite all of our good
13   efforts, that the public and private money was not
14   going to make it to the table, and it was only after
15   realizing that there was, what TPL concluded was, an
16   unbridgeable cap between the money that was available
17   and the money that was needed that it became
18   impossible to go forward.
19       (WHEREUPON, Exhibit No. 9, printout of
20   TPL Web site, marked for identification.)
21 Q  I'm going to put before you a document, Exhibit 9, and
22   ask you to take a look at it. This is a printout of
23   the TPL Web site. It was printed out on 3-23, 2005.
24   I'm going to ask you to look at the second page under
                        - 75 -

1    Buying Time, which is about two-thirds of the way
2    down. It says: Timing is critical in today's real
3    estate markets, but public agencies may not have the
4    capacity or budget to move quickly to acquire land
5    when it becomes unavailable. Using our private
6    capital, TPL can bridge the gap to secure and hold
7    vital lands under the public acquisition process until
8    the public acquisition can gear up. Now, have I read
9    that correctly?
10 A  The word available, I think you said unavailable, but
11   otherwise --
12 Q  I'm sorry, becomes available. I apologize. But other
13   than that, have I read it correctly?
14 A  I believe so.
15 Q  Now, in your last answer, you talked about the fact
16   that you could not bridge the gap in the Kunelius
17   property, and my question is, for you: what are you
18   referring to when you say our private capital?
19       MR. CONROY: Objection.
20 Q  Using our private capital, TPL can bridge the gap.
21   What is the private capital?
22       MS. FETOUH: Objection.
23 A  Well, it's not what I mean, because it's really not my
24   creation.
                        - 76 -

1 Q  I understand.
2 A  So, you're asking me what I believe TPL means?
3 Q  Yes.
4 A  Private capital is a generic term to describe lines of
5    credit and borrowed funds. Really, it's borrowed
6    funds to bridge gaps in conservation projects where
7    timing is a problem.
8 Q  And so the term private capital from your point of
9    view is money that is borrowed by TPL?
10 A  Yes.
11 Q  That's private capital?
12 A  Yes.
13 Q  Is that definition of private capital your definition,
14   or do you think it has some greater understanding in
15   the public, that the term private capital means
16   borrowed funds?
17       MS. FETOUH: Objection.
18       MR. CONROY: Objection.
19 A  I can only say what I believe it means here.
20 Q  Do you know Rob Glassman?
21 A  No.
22 Q  You've heard of Rob Glassman?
23 A  I may have, but I don't recall.
24 Q  Robert Glassman?
                        - 77 -

DEPOSITION OF CRAIG MacDONNELL

MiniDEP by Kenson

1  A  I don't believe I know Robert Glassman.
2  Q  What was the point where TPL determined that it could
3     not bridge the gap?
4  A  It wasn't so much a point in time if you're using the
5     phrase bridge the gap to mean is it possible to do the
6     deal, or are you using it to mean borrow money? I'm
7     not quite sure.
8  Q  I'm using it however you meant to use it when you said
9     the answer to one of the questions was that TPL made a
10    determination. These are not the exact terms, but you
11    said made a determination that they could not bridge
12    the gap to acquire the property, something to that
13    effect. So, using it however you meant to use it, my
14    question is: at what point did you determine that you
15    could not bridge the gap?
16 A  Well, what I can tell you is that there was a gradual
17    dawning that this project had lots of problems
18    associated with it. So, there was no exact point in
19    time when we can say that's when we knew. It was a
20    very gradual awareness that dawned on TPL that this
21    project was troubled.
22 Q  Now, in considering the term bridging the gap, if we
23    consider the gap on one side is the purchase price and
24    on the other side is the buyer, and if TPL is the

- 78 -

1     buyer, can you identify for me specific TPL funds, not
2     borrowed funds, not state funds, not town funds, but
3     TPL funds, which were identified and earmarked for the
4     purchase of the Kunelius property?
5  A  Can I identify those funds?
6  Q  Yes.
7  A  No.
8  Q  Were there any TPL funds ever specifically earmarked
9     for the purchase of the property?
10 A  I don't believe so.
11       (WHEREUPON, Exhibit No. 10, Stow
12    Finance Committee minutes, January 7, 2003,
13    marked for identification.)
14 Q  So, from your point of view, TPL itself never had one
15    dollar of the purchase price at risk with regard to
16    this project. Is that correct?
17       MS. FETOUH: Objection.
18       MR. CONROY: Objection.
19 A  I don't think that's my testimony. No, I wouldn't say
20    that.
21 Q  What were the funds that TPL, of the purchase price,
22    now, what funds which were to make up the purchase
23    price were actually TPL's own monies?
24       MR. CONROY: Objection.

- 79 -

1  A  There were deposits made against the contract, the
2     amount of which I'm not quite certain of, but those
3     were TPL dollars.
4  Q  Well, in fact, weren't those dollars that were donated
5     to TPL from the Friends of Red Acre?
6  A  Some of them, I believe, were.
7  Q  Weren't all of them, sir?
8  A  I don't recall.
9  Q  Is it likely that they were? Do you have any
10    recollection?
11       MR. CONROY: Objection.
12       MS. FETOUH: Objection.
13 A  My recollection is that we did ask for a donation from
14    the Friends of Red Acre for some money up front. What
15    I can't remember is how much.
16 Q  So, you don't remember how much of the earnest money
17    that was paid to Mrs. Kunelius was actually TPL funds
18    and how much had been raised by TPL through the
19    Friends of Red Acre. That's your testimony, correct?
20       MS. FETOUH: Objection.
21 A  What I don't remember is how much, how many of the
22    dollars that were deposited with Mrs. Kunelius were
23    TPL dollars and how many were Friends of Red Acre
24    dollars.

- 80 -

1  Q  And as you sit here today, you cannot say with any
2     certainty that any of those monies that were -- you
3     used the word deposited. I used the word earnest
4     money. You cannot say with any certainty that any of
5     those dollars were TPL dollars. Isn't that fair to
6     say?
7  A  I do not know where they came from.
8  Q  Now, if we look at the document --
9  A  Well, let me -- I'd like to clarify that. That's all
10    right. I'll leave it at that.
11 Q  Let's look at Exhibit 10, which is before you, and
12    this is also from the Town of Stow. It's Finance
13    Committee meeting minutes, January 7, 2003, town
14    building draft. It appears to be: Fincom joins the
15    Board of Selectmen in a joint meeting at 7:15. It
16    begins -- I'm going to read just a couple of
17    sentences.
18       Craig MacDonnell from TPL and David Cobb
19    from the Friends of Red Acre are present. The
20    Trust for Public Land is a national non-profit
21    organization that helps communities achieve
22    effective use in conservation land planning.
23    TPL, responding to the Stow Conservation Trust
24    and Friends of Red Acre, proposes that Stow

- 81 -

1     exercise the right of first refusal at the
2     Kunelius land. TPL would like to bear 50 percent
3     of the 1.2 million dollar cost of the land. Do
4     you see that?
5  A  I do.
6  Q  Now, were you present at that meeting?
7  A  As with respect to the other minutes --
8  Q  Well, this is a joint meeting, so it's Fincom and the
9     Board of Selectmen. And so the question --
10 A  My name is listed as being there. I have to say to
11    you, just in being honest, I don't, as I sit here this
12    morning, have an independent recollection of being at
13    this meeting.
14 Q  Do you recall telling them that TPL would bear 50
15    percent of the cost of 1.2 million dollars?
16 A  No.
17 Q  Do you have any reason to believe that these minutes
18    are inaccurate with regard to that statement?
19       MR. CONROY: Objection.
20       MS. FETOUH: Objection.
21 A  Yes, I do.
22 Q  And in what regard are they inaccurate?
23 A  I would not have said, I do not believe, that we would
24    bear 50 percent of the cost. That was not the project

- 82 -

1     structure that we were considering. So, I have to
2     assume that these minutes are inaccurate and just
3     not -- it doesn't jive with what was going on.
4  Q  And that's because you never told anyone you'd pay 50
5     percent of the costs for the acquisition. Is that
6     fair to say?
7  A  It is fair to say.
8  Q  So, going further down, there is a sentence about one-
9     third down that says: TPL would buy the property and
10    would actually own it. And on the left-hand side,
11    there's a word, household, would be in the amount of
12    17.50 for ten years, and it picks up right there, just
13    about halfway down. TPL would buy the land and
14    actually own it.
15 A  I see that.
16 Q  So, what was TPL intending to use as a source of
17    income based on -- well, strike that.
18       Do you have reason to believe that this
19    statement is inaccurate as well, that is, TPL
20    would buy the property and actually own it?
21 A  It would be consistent with the project design for TPL
22    to buy the property in September, I think it was, of
23    that year, subdivide it and then convey out the
24    pieces.

- 83 -

DEPOSITION OF CRAIG MACDONNELL    MiniDep by Kenson

1  Q  Now, at the time, in January of 2003, you had not
2     identified a specific amount of money necessary from
3     the town in order to accept an assignment. Is that
4     correct?
5  A  Well, I think there was a discussion about four
6     hundred thousand.
7  Q  And that discussion, you expect, was prior to
8     January 7, 2003?
9  A  I would say that it is, in part, having my
10    recollection refreshed by the reference to four
11    hundred thousand in this paragraph.
12 Q  The purchase was approximately 1.2. That's fair to
13    say, right?
14 A  It was a little under that.
15 Q  A little under. Four hundred thousand dollars
16    subtracted from the 1.2 would leave $800,000,
17    approximately, correct?
18 A  Approximately.
19 Q  And you expected to make some money from the sale of
20    the two lots. Did you have any expectation of what
21    that would be on or about January 7th of 2003?
22 A  Is your question how much TPL would sell
23    142 and 144 for?
24 Q  Yes.

- 84 -

1  A  And if we knew that at this moment in time?
2  Q  Yes.
3  A  I have a recollection of what, ultimately, we expected
4     to sell those for, but I can't say whether at this
5     moment in time I knew or I had that number in my mind.
6  Q  What is your recollection of what it ultimately would
7     sell for?
8  A  Well, there's two pieces. I think the hope was that
9     142 would sell for between two and three hundred and
10    that 144 would sell for more. How much, I can't
11    remember right now.
12 Q  So, if we have 300,000 and 700,000, I'm sorry, 300,000
13    and 400,000, meaning 300,000 from one sale, 400,000
14    from the town, and another 300,000 from the second
15    lot, approximately, how did you anticipate making up
16    the difference at that point?
17       MS. FETOUH: Objection.
18 A  Well, I think there were other project costs as well.
19    I mean, some of these properties needed to have
20    renovation before they could be sold. So, I don't
21    know what sum we were trying to achieve, but there was
22    an intention to raise money privately.
23 Q  Have you ever read the complaint?
24       MS. FETOUH: Objection. In this

- 85 -

1     matter?
2        MR. McLAUGHLIN: No, the complaint in
3     the matter has nothing to do with this.
4        MR. CONROY: That's not necessary.
5        MR. McLAUGHLIN: All right. Well, I
6     mean, neither is the question. If you are asking
7     that question, Madam, tell me what other
8     complaint you could possibly be considering.
9        MR. CONROY: Let's move on.
10       MS. FETOUH: My objection has been
11    noted.
12 Q  All right. Have you ever read the complaint in this
13    matter?
14 A  I have skimmed through it.
15 Q  And did you read your answer in this matter prior to
16    it being filed with the court?
17 A  Yes.
18 Q  Did you check it to make sure it was truthful and
19    accurate?
20 A  I believe I did.
21 Q  Do you recall having a telephone discussion with
22    Marilyn Kunelius after TPL accepted the assignment?
23 A  I remember trying to reach Mrs. Kunelius, and I also
24    remember trying to reach her attorney then, Peter

- 86 -

1     Kachajian. I remember having difficulty reaching both
2     of them, but I believe I recall talking to one or both
3     of them at some point during that time.
4  Q  Do you recall talking to Mrs. Kunelius before the
5     assignment?
6  A  I don't remember when I first talked to Mrs. Kunelius.
7  Q  I'm going to just quickly read something from the
8     complaint. This is Paragraph 20 of the complaint.
9        Shortly after TPL notified Kunelius of the
10    assumption of Stow's exercise of right of first
11    refusal, Kunelius and her counsel met with
12    MacDonnell. During that meeting, Kunelius
13    informed MacDonnell that the property was the
14    sole asset of Kunelius, that she was a single
15    woman supporting herself and the sole care-giver
16    to her 91-year-old mother -- should have been
17    father -- and that the sale of the property under
18    the terms of the P&S were critical to her
19    financial well-being and financial stability.
20    Kunelius informed MacDonnell that she was relying
21    on his representations that TPL would acquire the
22    property under the terms of the P&S. MacDonnell
23    acknowledged to Kunelius and her attorney that
24    the acquisition of the property by TPL was a

- 87 -

1     certainty.
2        Do you recall that discussion with
3     Mrs. Kunelius?
4        MR. CONROY: Objection.
5  A  As I said a minute ago, I recall an early discussion,
6     but as I sit here this morning, I can't remember all
7     of the details of it.
8  Q  Your answer to this was: MacDonnell admits that he
9     met with Kunelius and her attorney on several
10    occasions and was informed that Kunelius was a single
11    woman caring for her elderly father and that Kunelius
12    wanted to sell the property. Except as expressly
13    admitted, MacDonnell denies the allegations in
14    Paragraph 20 of the complaint.
15       As you sit here today, is it your testimony
16    that you have no recollection of telling
17    Mrs. Kunelius that the sale was a certainty?
18 A  That is my testimony.
19 Q  And is it your testimony you would never have told
20    Mrs. Kunelius that the sale was a certainty?
21       MR. CONROY: Objection.
22 A  No, my testimony is that I don't recall using that
23    word.
24 Q  Are you testifying that you did not use the word or

- 88 -

1     that you do not recall using the word?
2  A  I have no recollection of that word being used in that
3     conversation.
4  Q  So, is your testimony concerning the word certainty as
5     opposed to the concept that the sale would most
6     certainly occur?
7  A  It is both. I do not believe that I used the word
8     certainty, as I sit here this morning, but I do not
9     recall using it or not using it.
10 Q  So, as you sit here today, you cannot deny with any
11    certainty at all that you had a discussion with her in
12    which you told her that she did not have to worry
13    about this sale because it would occur.
14       MR. CONROY: Objection.
15       MS. FETOUH: Objection.
16       MS. ECKER: Objection.
17 A  I believed it would occur. Whenever TPL goes into
18    these projects, it is our one hundred percent belief
19    and we are very confident that the deals go through,
20    and in every one of the other Chapter 61 cases that
21    TPL has worked on, it has gone through. So, I would
22    have had confidence that this one would go through.
23 Q  In fact, you told her that every other TPL sale went
24    through. Do you recall telling her that?

- 89 -

MELVIN LIPMAN COURT REPORTING
617-227-3985

DEPOSITION OF CRAIG MACDONNELL

```
 1              MS. FETOUH:  Objection.
 2  A  I do not recall telling Mrs. Kunelius that.  I
 3     remember saying that to others through the course of
 4     this project.
 5  Q  Is it likely, therefore, that you may have also said
 6     it to her?
 7              MR. CONROY:  Objection.
 8              MS. FETOUH:  Objection.
 9  A  I can't use the word likely because I don't --
10  Q  Is it possible?
11  A  It is possible because I believed it would occur.
12  Q  Now, do you recall saying to Mrs. Kunelius during that
13     meeting that TPL already had all of the money
14     assembled necessary to make the purchase?
15  A  No, I don't remember that.
16  Q  Did TPL have the money already assembled to make the
17     purchase?
18  A  We had identified the money from the town, what we
19     thought we would get from the sale of the two lots and
20     the hoped for fund-raising.  So, those were funds we
21     expected to bring to the table.
22  Q  Was it your intention to pay Mrs. Kunelius with the
23     funds from the sale of the two lots after you acquired
24     it, or were you going to pay her the full purchase
                         - 90 -
```

```
 1     price when you acquired the property?
 2              MR. CONROY:  Objection.
 3  A  I don't believe that had been determined.
 4  Q  So, as you sit here today, you do not even know
 5     whether TPL intended to provide Mrs. Kunelius with the
 6     full purchase price on the date of the closing or
 7     whether the full purchase price was dependent upon the
 8     subsequent sale by TPL of the two lots.  Is that fair
 9     to say?
10  A  No, that's not what I'm saying.  I'm saying something
11     different.  I can clarify it if you'd like.
12  Q  I would.
13  A  I believe the contract had a mortgage provision.  So,
14     when you ask the question whether or not TPL was going
15     to deliver the full amount, I don't believe it had
16     been decided whether or not it was appropriate to
17     utilize the mortgage provision or not.
18  Q  In other words, take back a mortgage from
19     Mrs. Kunelius.
20  A  To do whatever the contract said with respect to that.
21              MR. McLAUGHLIN:  Okay.  It's now a
22     little after 12:30, so we'll stop and pick it up
23     in a half hour or so.
24              MR. CONROY:  Okay.
                         - 91 -
```

```
 1              (Luncheon recess, 12:34 P.M.)
 2              (After recess, 1:16 P.M.)
 3              (All parties present)
 4              MR. McLAUGHLIN:  Just as a housekeeping
 5     matter, in the room is Peter Kachajian who has
 6     been co-counsel with me on this matter and
 7     Mrs. Kunelius' attorney for many years and also
 8     David Norris who is Mrs. Kunelius' husband, and
 9     so counsel for Mr. MacDonnell has requested that
10     since they are both likely to be witnesses, that
11     when there is any discussion in which there's
12     testimony relating to something that they are
13     also going to testify to, that they leave the
14     room, and so is that acceptable to everybody?
15              MS. ECKER:  Yes.
16              MS. FETOUH:  Yes.
17              MR. McLAUGHLIN:  So, I think I know
18     where you're going to testify, but if you think
19     so, then just get up and leave.  Otherwise, I'll
20     ask you to leave when I think it is -- but don't
21     let me mistake that it is.
22              MR. KACHAJIAN:  So, if I storm out, no
23     one will take it personally.
24              MR. McLAUGHLIN:  That's correct.
                         - 92 -
```

```
 1              MR. CONROY:  Unless you let us know
 2     that we're supposed to take that personally.
 3              MR. KACHAJIAN:  Oh, you'd know.
 4              MR. CONROY:  Okay.
 5     By MR. McLAUGHLIN:
 6  Q  Okay.  Just going back to, I think, the last thing
 7     that we were talking about, and you had mentioned,
 8     sir, that there was the possibility of taking back a
 9     mortgage, which was referred to in the purchase and
10     sale agreement.  Do you remember that?
11  A  I do.
12  Q  So, as I understand it, that mortgage was
13     approximately $400,000 that Mrs. Kunelius was willing
14     to grant to Mosaic Commons in their purchase and sale
15     agreement.  Is that right?
16  A  I don't remember the amount.
17  Q  Do you remember approximately what it was?
18  A  We could take a quick look at the contract.  I don't
19     remember the amount.
20  Q  I'm going to represent to you that it was $400,000 or
21     thereabouts.
22  A  Okay.
23  Q  Assuming that to be a fact, and we will look at the
24     purchase and sale agreement shortly, that would mean
                         - 93 -
```

```
 1     that out of the 1.116 million of the purchase price,
 2     that approximately $800,000 was accounted for by way
 3     of the mortgage that she was willing to give back and
 4     the $400,000 that you were receiving from the Town of
 5     Stow.  Is that correct?
 6  A  I'm not sure I understand your question.  You're
 7     saying that if you add up those --
 8  Q  Yeah, at the time that you have to close under the
 9     terms of the purchase and sale agreement, if you
10     assumed all of the obligations and rights of Mosaic
11     Commons, the purchase price would have been assembled
12     by way of $400,000 from the town and taking back a
13     mortgage note of $400,000 from Mrs. Kunelius, leaving
14     approximately $400,000 of additional cash that had to
15     be put in at the time of the closing to effectuate the
16     sale.  Is that fair to say?
17  A  There's one wrinkle to that.  There may be more than
18     one wrinkle.  The town's vote was split in two parts,
19     a three hundred thousand dollar component for open
20     space and a one hundred thousand dollar component that
21     I believe was split into two fifty thousand dollar
22     pieces attached to the sales of the two structures as
23     affordability restrictions, and it was my memory that
24     the town was uninterested in contributing the one
                         - 94 -
```

```
 1     hundred thousand affordability dollars until those
 2     properties had been renovated and were sort of up to
 3     snuff, if you will.  So, that one hundred might come
 4     in sometime later.
 5  Q  So, is it fair to say that between 700- and $800,000,
 6     perhaps 700,000 if your understanding is correct,
 7     would have been funds already accounted for in order
 8     to effectuate the purchase of the Kunelius property,
 9     leaving either 4- or $500,000, approximately, that
10     needed to be found in order to complete the purchase?
11  A  So, you would start with the three hundred open space
12     money?
13  Q  Yes.
14  A  And to that, what would you add?
15  Q  The four hundred thousand dollar mortgage that
16     Mrs. Kunelius agreed to give back to Mosaic
17     Commons, which you had said earlier you had
18     considered.
19  A  Considered.
20  Q  Yeah.
21  A  We had considered.
22  Q  Right.
23  A  Right.
24  Q  Okay.  So, given that, that would be a total of
                         - 95 -
```

MELVIN LIPMAN COURT REPORTING
617-227-3985

DEPOSITION OF CRAIG MACDONNELL                    MINIDEP by Kenson

| | |
|---|---|
| 1    $700,000 that would have been available at the time of | 1   Q  Do you recall being told by Mrs. Kunelius -- |
| 2    the closing, given the fact that 400,000 was a note, | 2          MR. McLAUGHLIN: Could you step out? |
| 3    and that TPL would have to come up with between 4- and | 3          MR. KACHAJIAN: Yes. |
| 4    $500,000 of additional funds at the closing in order | 4      (Messrs. Kachajian and Norris exit the room.) |
| 5    to effectuate the sale. | 5   Q  Do you recall being told by Mrs. Kunelius or her |
| 6   A  If there was a way to take advantage of the mortgage, | 6    counsel that the mortgage provision remained available |
| 7    but ultimately we concluded that there wasn't. | 7    to TPL after TPL accepted the assignment? |
| 8   Q  And you concluded that there wasn't because, isn't it | 8   A  I don't remember that. I remember having a discussion |
| 9    fair to say, that TPL voted not to borrow the money | 9    with somebody within Mrs. Kunelius' team about the |
| 10    from Mrs. Kunelius? | 10    mortgage, but I don't recall exactly what we said. |
| 11   A  The reason that the mortgage didn't seem to be helpful | 11   Q  Do you recall, generally, that perhaps Mr. Kachajian |
| 12    for TPL is that it would have required that the | 12    had a discussion with you concerning the fact that |
| 13    property be subject to a mortgage and that -- | 13    Mrs. Kunelius remained open to the application of that |
| 14   Q  Right. And -- go ahead. | 14    provision of the contract to TPL? |
| 15   A  I was going to say that it was the town's insistence | 15   A  As I think I said, I don't remember that. |
| 16    that, if they're going to spend their money, they're | 16   Q  So, you don't even remember Mr. Kachajian saying that? |
| 17    going to get a property interest for it. The town | 17   A  I don't remember anybody expressing the availability |
| 18    would be uninterested in getting the property interest | 18    of a mortgage provision. I remember having a |
| 19    that they were teeing up, which is the 45 acres, | 19    discussion about the mortgage provision. |
| 20    subject to a mortgage. | 20   Q  At some point, the issue came up concerning looking |
| 21   Q  So, it's fair to say that there was an independent | 21    for additional funds from the state. Do you recall |
| 22    decision by TPL not to avail itself of the four | 22    that? |
| 23    hundred thousand dollar mortgage that was part of the | 23   A  Yes. |
| 24    purchase and sale agreement. Isn't that fair to say? | 24   Q  What were the funds that were being sought from the |
|               - 96 - |               - 99 - |
| 1          MS. FETOUH: Objection. | 1    state and what were the purposes of those funds? |
| 2   A  It didn't seem that it would work. | 2   A  The funds sought were a grant from DHCD, which I |
| 3   Q  So, you had testified earlier that, according to your | 3    believe stands for the Department of Housing and |
| 4    understanding of Chapter 61, there were certain | 4    Community Development. |
| 5    provisions that were applicable on an assignment under | 5   Q  And what were they for? |
| 6    Chapter 61 and certain provisions that were not. My | 6   A  My memory is that they were a grant which would help |
| 7    question now is relative to the purchase price itself, | 7    facilitate the conversion of the units to affordable |
| 8    which includes components such as mortgage provisions. | 8    structures, affordable housing. |
| 9         Is it your testimony today that, prior to | 9   Q  Do you remember what the amount was that you sought |
| 10    accepting the assignment, you had concluded that | 10    from the Commonwealth? |
| 11    you would not comply with the mortgage provision | 11   A  I believe it's three hundred and fifty thousand. |
| 12    because TPL didn't like the effect of that | 12   Q  And do you recall that it was initially 125,000 and |
| 13    mortgage provision? | 13    then it was increased to 350 or 325? |
| 14         MS. FETOUH: Objection. | 14   A  No. |
| 15   A  I can't recall when, in the sequence of this long | 15   Q  So, you don't recall any circumstances in which there |
| 16    project, the mortgage problem came up, so I just don't | 16    was a need to increase the amount of the application. |
| 17    have that recollection, but somewhere along the way | 17    You don't recall anything related to that? |
| 18    that issue was considered and it resulted in sort of | 18   A  I don't. |
| 19    an awareness. It's not so much a decision, an | 19   Q  Going back to the conversation and/or meeting with |
| 20    awareness that it just wasn't going to be helpful. | 20    Mrs. Kunelius and her attorney, I believe your answer |
| 21   Q  But the term of the mortgage was clearly stated in the | 21    indicated that you remembered that this was her |
| 22    purchase and sale agreement that was provided to you | 22    retirement. I think that's what you said, that you |
| 23    and to the town at the time that the town considered | 23    realized it was her retirement, but I probably -- let |
| 24    the exercise of the right of first refusal or the | 24    me just read his answer to make sure I'm saying that |
|               - 97 - |               - 100 - |
| 1    assignment thereof. Is that fair to say? | 1    correctly. |
| 2   A  Was the mortgage provision in the contract? | 2         MR. CONROY: You mean the answer to the |
| 3   Q  Yeah. | 3    complaint? |
| 4   A  Yes. | 4         MR. McLAUGHLIN: Answer to the |
| 5   Q  So, it didn't come as a surprise to you or to the town | 5    complaint. |
| 6    that, as a result of complying with the terms of the | 6         MR. CONROY: Are you going to put it in |
| 7    contract, there would be a mortgage on the property | 7    front of him? |
| 8    for some period of time until the final $400,000 was | 8         MR. McLAUGHLIN: Yeah. |
| 9    paid off. Is that correct? | 9   Q  All right. So, here's what it says. If you can just |
| 10         MS. FETOUH: Objection. | 10    read your response. It's 20. That's to the telephone |
| 11   A  Not necessarily. I mean, I think part of TPL's | 11    conversation. |
| 12    analysis was not so much to conclude ahead of time, | 12   A  You want me to read this? |
| 13    early in the game, whether or not the mortgage was | 13   Q  Yes. |
| 14    helpful or not helpful or something that we'd take | 14   A  Number 20? |
| 15    advantage of or not. It was just there. | 15   Q  Yes. |
| 16   Q  So, from your point of view, that term, that mortgage, | 16   A  MacDonnell admits, or, quote: MacDonnell admits that |
| 17    was an option available to you but not something that | 17    he met with Kunelius and her attorney on several |
| 18    you were required to do. Is that fair to say? | 18    occasions and was informed that Kunelius was a single |
| 19         MS. FETOUH: Objection. | 19    woman caring for her elderly father and that Kunelius |
| 20   A  You know, I don't know whether using the term option | 20    wanted to sell her property. Except as expressly |
| 21    is the right way to describe it. I remember reading | 21    admitted, MacDonnell denies the allegations in |
| 22    the provision and sometime later figuring out that it | 22    Paragraph 20 of the complaint. |
| 23    was problematic to use it and that we needed to | 23   Q  Would it refresh your memory if I told you that, |
| 24    wrestle with that issue. | 24    during that discussion, Mrs. Kunelius will testify |
|               - 98 - |               - 101 - |

DEPOSITION OF CRAIG MACDONNELL                    MiniDEP by Kenson

1   that you told her that you had several million dollars
2   available for the purchase in-hand at the time that
3   you had the telephone discussion, in-hand?
4   A   It would not.
5   Q   Do you recall telling anyone that TPL, and when I say
6       you, I mean TPL under that circumstance, so if I
7       replace the word you having the money with TPL, would
8       your answer still be the same? I wasn't implying that
9       you had the money but that TPL had the money.
10              MR. CONROY: Will you state it again?
11  A   Could you ask the question?
12  Q   Would it refresh your memory if you were to learn that
13      Mrs. Kunelius would testify that you told her that you
14      had several million dollars, that TPL had several
15      million dollars of funds in-hand, available to it
16      immediately, for the purchase of the property?
17  A   It would not.
18  Q   Are you testifying that you didn't say that or that
19      you don't recall saying that?
20  A   I don't have a recollection of that conversation, so
21      that's sort of the sum total of what I can say about
22      it.
23  Q   So, you're not saying for certain that you didn't say
24      it. You're only saying that you don't have a
                        - 102 -

1   recollection of saying it.
2   A   There is nothing in my memory that suggests to me that
3       I said that.
4   Q   Is there anything in your memory that suggests that
5       TPL, at that time, had several million dollars of
6       funds available to it on a fairly immediate basis that
7       would allow for the purchase of the property without
8       any other source other than the TPL funds themselves?
9   A   I'm sorry to make you do this, but I think I need to
10      have you say that again.
11  Q   Is there anything that you can recall that would
12      suggest that TPL had several million dollars available
13      to it to buy the property at the time that you had a
14      discussion with Mrs. Kunelius, this discussion
15      referred to in Paragraph 20?
16  A   No.
17  Q   Did you ever tell Mrs. Kunelius that you had the
18      equivalent of a Plan A or Plan B and a Plan C,
19      something like that, so that no matter what happened
20      the sale would go forward?
21  A   I don't.
22  Q   You don't recall telling her that, correct?
23  A   Right.
24  Q   Did you have a Plan A or a Plan B or a Plan C to
                        - 103 -

1   ensure that the sale would go forward even if Plan A
2   failed or Plan B failed?
3   A   Well, the way TPL crunches these projects, generally,
4       is with a Plan A, the set of circumstances that we
5       hope will work, and I'd say in, you know, nine out of
6       ten projects, what feels like Plan A actually is
7       utilized but that there are, in most projects, a
8       number of variables that result in some things
9       changing. So, at the beginning of a project, it's
10      very common that Plan A becomes Plan B. I don't
11      recall this discussion using those terms.
12  Q   Do you have specific expertise in your role as the
13      state director, Massachusetts state director, in
14      applying for loans from DH, whatever, Department of
15      Housing and Community Development?
16  A   No.
17  Q   You are aware, are you not, that TPL made an
18      application for funds to the Department of Housing and
19      Community Development?
20  A   Yes.
21  Q   And you are aware that TPL itself filled out the
22      application for those funds, which were the 325- or
23      $350,000 that you referred to earlier, correct?
24  A   We hired a consultant who knows more about this
                        - 104 -

1   process than we do to help us do that, but together
2   with him, we prepared it.
3   Q   And do you know who prepared it from TPL?
4   A   Together with the consultant?
5   Q   Yes.
6   A   Yes, I do.
7   Q   Who is that?
8   A   Chris LaPointe.
9   Q   And what's Chris LaPointe's position?
10  A   Project manager.
11  Q   And does he report to you?
12  A   He does.
13  Q   And do you recall working with Ross Perry in reviewing
14      the application to DHCD?
15  A   Yes.
16      I'm going to put before you what is now going to be
17      marked as 11.
18              (WHEREUPON, Exhibit No. 11, DHCD grant
19      application, marked for identification.)
20  Q   I'm putting before you Exhibit 11, and just for the
21      record, this is a compilation of various documents
22      received from the town, beginning with Bate stamp
23      number KUN336 and continuing to 411, the first page of
24      which is a document that appears to be sent by Ross
                        - 105 -

1   Perry, project management of BNC/LID/interconnect, to
2   someone by the name of Bill, and the first sentence
3   says: I left at your door the DHCD grant application
4   that TPL has filled out.
5           Do you recall receiving a copy of this?
6   A   Of the cover memo?
7   Q   The whole thing.
8   A   I have a recollection of seeing the application before
9       it was submitted, whether this is the application that
10      you have in front of me or it has, you know, more
11      things here, I just don't know.
12  Q   This appears to us, having gone through the documents
13      received from the town, that this is the application
14      minus the signature of TPL. The second page appears
15      to be the signature of Ross Perry on 3-30-03. Do you
16      see that?
17  A   3-3 --
18  Q   3-30-03, second page.
19  A   337?
20  Q   No, down at the bottom, his signature.
21  A   Oh, I'm sorry. I was reading the Bate's number. Yes,
22      I see that.
23  Q   I direct you to the first page again, which says: Let
24      Craig MacDonnell and me know if there are any
                        - 106 -

1   questions.
2           Do you know from looking at this who Bill
3   is?
4   A   I would guess that it's Bill Wrigley.
5   Q   And Bill Wrigley is the town administrator?
6   A   Either administrator or manager. I can't remember his
7       title.
8   Q   And at the bottom, it says: Craig can be reached at
9       617-367-6200. Is that the TPL number?
10  A   Yes.
11  Q   Now, I have a couple of questions here which, I must
12      admit, confuse me. So, if I can direct your attention
13      to Page 342, under the Financing Mechanism, and it's a
14      paragraph with a one, Financing Mechanism.
15  A   Uh-huh.
16  Q   And the second paragraph says: TPL is prepared to
17      purchase the property. TPL has a primary plan and a
18      fallback plan. The primary plan envisions a
19      multilateral funding approach to this project. Some
20      of the funding is contingent, as explained below, but
21      all of it is subject to a fallback plan, fallback line
22      of credit from Wainwright Bank. Do you see that?
23  A   I do.
24  Q   So, earlier I had asked you if you knew a man by the
                        - 107 -

MELVIN LIPMAN COURT REPORTING
617-227-3985

MINIDEP by Kenson

1  name of Rob or Robert Glassman. Do you recall me
2  asking you that?
3 A  I do.
4 Q  Do you know who Robert Glassman is now?
5 A  No.
6 Q  I will represent to you that he was on the board of
7  your advisors at the time that this application was
8  made, a Robert Glassman. Does that ring a bell?
9 A  No.
10 Q  If I told you he was the president and founder of
11  Wainwright Bank, would that ring a bell to you?
12 A  No.
13 Q  Were you aware that there was a line of credit at
14  Wainwright Bank that was available as a fallback to
15  the financing of this purchase from Mrs. Kunelius?
16 A  I am familiar that TPL has a line of credit with
17  Wainwright Bank.
18 Q  Are you familiar that it was described as a fallback
19  for the funding, as a contingency for the funding, of
20  the purchase of Mrs. Kunelius' property?
21 A  Well, I see it written here, and it does remind me
22  that there was some discussion about using Wainwright.
23 Q  And did you participate in the application for a line
24  of credit to Wainwright Bank?

- 108 -

1 A  No.
2 Q  Who would have made application on behalf of TPL to
3  Wainwright Bank?
4       MR. CONROY: Objection.
5 A  It's a standing line of credit. There's no
6  application involved.
7 Q  Does TPL have a standing line of credit right now with
8  Wainwright Bank?
9 A  Yes.
10 Q  What is the amount of that line of credit?
11 A  I don't know.
12 Q  Let me turn you to the next page, and before I do,
13  let's stay on the same page and look at TPL's primary
14  plan to generate funds, and it has a chart, and then
15  it says: A. Town funds. B. Red Acre. C. The DHCD
16  funds -- which are the subject of this application --
17  and D. Private financing. Do you see that?
18 A  I do.
19 Q  Right after that, it says, quote:
20       MR. CONROY: Excuse me. Private fund-
21  raising.
22       MR. McLAUGHLIN: I'm sorry. Private
23  fund-raising.
24 Q  After that, it says: As a fallback position, if any

- 109 -

1  or all of the above-referenced sources of funds are
2  unavailable, TPL intends to utilize capital from the
3  private market. In this regard, TPL has available for
4  its use a line of credit from Wainwright Bank in the
5  amount of $6,000,000 -- and it's written as 6,000,000
6  with a dollar sign -- as evidenced by the letter
7  attached as Exhibit -- blank. The use of this capital
8  is subject to TPL's internal approval process,
9  including customary due diligence and approval of the
10  Board of Directors.
11       Now, at the time -- did I read that
12  correctly? Let's make sure I read that
13  correctly.
14 A  I didn't follow you close enough to do that.
15 Q  Okay. All right. Well, your counsel hasn't corrected
16  me, so I probably did.
17       MR. CONROY: Minor.
18       MR. McLAUGHLIN: Okay.
19       MR. CONROY: Minor failings but
20  otherwise substantively accurate.
21       MR. McLAUGHLIN: That's the best thing
22  anybody's said to me in a long time.
23       THE WITNESS: He's very kind.
24 Q  Is today the first time that you have become aware

- 110 -

1  that there was a six million dollar line of credit
2  available to TPL for the purchase of the property if,
3  quote, any or all of the above-referenced sources
4  listed on Page 343 and 342 were unavailable?
5 A  I was familiar with the Wainwright line of credit
6  before today.
7 Q  And so you were aware that, should the funds that you
8  sought from the town fail, TPL intended to use the
9  line of credit. Is that fair to say?
10       MR. CONROY: Objection.
11       MS. FETOUH: Objection.
12 A  No, it's fair to say that TPL could use that line of
13  credit if necessary and subject to due diligence and
14  approval.
15 Q  But it doesn't say that. It says: TPL intends to
16  utilize the capital from the private market. In this
17  regard, it has available for its use a line of credit.
18  Do you see that?
19 A  I do.
20 Q  Doesn't say could, might. It says intends to. Is
21  that correct?
22 A  Well, the word in the document is intends.
23       MR. CONROY: I'll point out for the
24  sake of completeness that there is other language

- 111 -

1  that follows on that same page, Counsel.
2       MR. McLAUGHLIN: I'm going to get to
3  that.
4       MR. CONROY: Okay.
5 Q  You're aware, are you not, in this litigation that TPL
6  has made representations to the federal court that TPL
7  did not have the money to purchase the property? Are
8  you aware of that?
9       MR. CONROY: Objection.
10 A  As I sit here today?
11 Q  Yeah.
12 A  I am not sure I am aware of that.
13 Q  Did you review the documents filed on behalf of TPL in
14  the current litigation?
15 A  On behalf of TPL, me myself?
16 Q  Yes, on behalf of TPL.
17 A  I believe I saw them before they were filed, yes.
18 Q  And did you review the documents that were filed on
19  your behalf?
20 A  I did.
21 Q  And do you recall seeing statements to the federal
22  court indicating that TPL did not have the money to
23  purchase the property and that that's the reason that
24  the property purchase did not go forward?

- 112 -

1 A  Well, in fact, TPL did not have the money.
2 Q  I thought you just said that TPL has a line of credit.
3 A  The line of credit is not our money. It's somebody
4  else's money.
5 Q  Is it your testimony today that TPL did not intend to
6  use the line of credit as a way of paying for the
7  property if all other sources failed?
8 A  Our intention with respect to the use of any borrowed
9  money has to be decided in the context of what's
10  possible. So, the utilizing the six million dollar
11  line of credit, being subject as it is to due
12  diligence and approval of the Board of Directors, TPL
13  could only borrow that money if the project manager,
14  in this case me, went to the Board of Directors and
15  said, "Can I use this money?" And there's a process,
16  an internal process, for getting that approval.
17 Q  I want to direct your attention to the Motion to
18  Dismiss of the Defendants, Trust for Public Land and
19  Craig A. MacDonnell and the Town of Stow, and in this
20  motion, beginning on Page 1, is the following
21  statement: However, after paying thousands of dollars
22  in deposits required under the agreement, TPL found
23  itself unable to raise the money necessary to fund the
24  project and was unable to complete its purchase of the

- 113 -

1   property. Do you see that?
2  A  Yes.
3  Q  Now, you were not unable to raise the money because
4   you had a six million dollar line of credit, but you
5   just decided not to use it. Isn't that reasonable to
6   say?
7          MR. CONROY: Objection.
8          MS. FETOUH: Objection.
9          MS. ECKER: Objection.
10  A  The decision was made not to use the line of credit.
11  Q  But that's not what you told the judge. What you told
12   the judge was you were unable to raise it. Is there
13   some sort of stop-payment or stop-borrowing order on
14   your line of credit at Wainwright Bank? In other
15   words, can you go in there right now, TPL, and borrow
16   money on the line of credit, or is it in some way in
17   default?
18  A  I don't know.
19  Q  You don't know if your own line of credit is in
20   default, sir?
21  A  Correct.
22  Q  Do you have reason to believe that your line of credit
23   is in default?
24  A  I have no reason to believe.

- 114 -

1  Q  So, as the director of the State of Massachusetts TPL,
2   is it your testimony today under oath that you do not
3   know whether your line of credit is in default or not.
4          MR. CONROY: Objection.
5          MS. FETOUH: Objection.
6  A  I think I answered that question.
7  Q  And the answer is you do not know whether it's in
8   default or not.
9  A  Correct.
10  Q  Do you know if it's overdrawn or not?
11  A  I don't.
12  Q  Do you know if any money is withdrawn on that account?
13  A  I don't.
14  Q  Who would?
15          MR. CONROY: Objection.
16  A  Our finance manager.
17  Q  And is the line of credit that's in Wainwright Bank,
18   is that money that is earmarked for the Massachusetts
19   branch of TPL?
20  A  I think it's available for the region.
21  Q  And so the region would be the New England region?
22  A  Right.
23  Q  Do you know who applied for that six million dollar
24   line of credit?

- 115 -

1  A  No.
2  Q  How would Christopher LaPointe know of this line of
3   credit as a project manager?
4          MS. FETOUH: Objection.
5          MR. CONROY: Objection.
6  A  He would ask our business manager, finance manager.
7  Q  He would not ask you, sir?
8          MR. CONROY: Objection.
9  A  I'm not sure what he did in this case. I don't know
10   what he would do. He could ask me. He could also ask
11   our finance manager.
12  Q  Is it your testimony today that this is the first time
13   you are aware that TPL informed the Commonwealth of
14   Massachusetts, under oath, that it had a six million
15   dollar line of credit?
16          MR. CONROY: Wait a minute. I object.
17          MS. FETOUH: Objection.
18  Q  Do you know of any laws that prohibit the filing of
19   inaccurate documents with the state, the Commonwealth
20   of Massachusetts, with regard to attempting to obtain
21   grants where the applications contain false
22   information?
23  A  No.
24  Q  Are you aware of whether the money that you sought to

- 116 -

1   obtain from the Commonwealth of Massachusetts came
2   entirely from the Commonwealth of Massachusetts or
3   from some federal agency?
4  A  I don't know.
5  Q  Are you familiar with making applications for funds
6   from federal agencies?
7  A  Yes.
8  Q  Are you familiar with any statutes providing for
9   criminal and civil penalties for the filing of
10   inaccurate or untrue statements where federal funds
11   are being requested?
12  A  No.
13  Q  Let's go forward on this paragraph, under two,
14   contingency plan for cost overruns. It says: As part
15   of the larger Kunelius project, the Trust for Public
16   Land has organized a significant private fund-raising
17   campaign. This campaign, in conjunction with the Stow
18   CPA funds, the sale of the unit and the HDSP funds,
19   has sufficient capacity to, if necessary, cover cost
20   overruns. Do you see that?
21  A  I do.
22  Q  So, at the time of the application, you were not
23   relying on multiple sale of units. You were relying
24   on one sale. Isn't that correct?

- 117 -

1  A  We made reference to just 144. Now, whether in fact,
2   by that reference, we intended to capture a sale of
3   just 140 -- at that time, it had not been subdivided.
4   Whether we were referring to just the single lot or
5   the hoped for double lot, I don't know.
6  Q  Going on, it says: In addition, the Trust for Public
7   Land has received confirmation that its six million
8   dollar line of credit has been renewed by Wainwright
9   Bank and that these funds would be available to cover
10   cost overruns subject to TPL's normal due diligence
11   and internal review. Do you see that?
12  A  I do.
13  Q  Is this the first time you knew that the money could
14   be also used, the line of credit could also be used,
15   for cost overruns?
16  A  No, I was aware of the line of credit.
17  Q  But you were not aware of a fallback position that
18   involved the use of borrowing under the line of
19   credit?
20  A  What I remember is that the line of credit was out
21   there and that, if the circumstances were right, it
22   might make sense to use it.
23  Q  So, at the time that you told the federal court that
24   you could not raise the funds sufficient to purchase

- 118 -

1   the property -- I'm going to withdraw that question.
2   I'm going to read from a document that was filed on
3   your behalf called, "Memorandum of Law in Support of
4   the Motion to Dismiss of the Defendants, the Trust for
5   Public Land, Craig A. MacDonnell and the Town of Stow.
6   Down at the bottom of the first page on the
7   right-hand side, three lines up, it says: When
8   TPL accepted that assignment and exercised the
9   right of first refusal, TPL stepped into the
10   place of the buyer in that agreement and became
11   subject to its terms and conditions. When TPL
12   ultimately was unable to raise the money to fund
13   the purchase, it was unable to acquire the
14   property and forfeited thousands of dollars to
15   Kunelius pursuant to the liquidated damage
16   clause. Do you see that?
17  A  I do.
18  Q  Now, did you read this before it was submitted to the
19   court on your behalf?
20  A  I believe I did.
21  Q  And you've already testified that you were aware that
22   there was a line of credit. Am I correct there?
23  A  Yes.
24  Q  But you weren't aware of how much money was in the

- 119 -

DEPOSITION OF CRAIG MACDONNELL

MiniDep by Kenson

| # | Column 1 | # | Column 2 |
|---|---|---|---|

1  line of credit. Am I correct as well?
2 A  Correct.
3 Q  And you weren't aware of whether the line of credit
4  was in default, is that correct?
5 A  I don't have a recollection of the status of the line,
6  as I sit here today, regarding my awareness then.
7 Q  Are you aware of TPL being in default on lines of
8  credit or other banking obligations?
9 A  I am not.
10 Q  In your tenure as director of the Massachusetts state
11  office of the Trust for Public Land, are you aware of any circumstance in
12  which TPL was in default on a line of credit or any
13  other financial obligation to a bank?
14 A  I am not.
15 Q  You are aware, are you not, that the president of
16  Wainwright Bank was a Board of Advisor member to TPL?
17 A  I was not aware of that.
18 Q  Are you aware of any banking obligations in which
19  insiders to bank operations have to disclose certain
20  applications for loans?
21 A  Could you state that again?
22 Q  Well, if you don't understand it, I'll withdraw the
23  question.
24 A  I don't understand it.

- 120 -

1 Q  I want to read from Page 6 of your Memorandum of Law
2  in Support of a Motion to Dismiss the Defendants, the
3  Trust for Public Land, Craig A. MacDonnell and the
4  Town of Stow. Page 6 says: Ultimately -- this is the
5  second paragraph, four lines down. Ultimately,
6  however, TPL was unable to raise the funds necessary
7  to purchase the property by the closing date of
8  September 26, 2003. Do you see that?
9 A  Yes.
10 Q  Now, I would like you to look back at Exhibit 11 and
11  tell me: what is the date of Exhibit 11 on the first
12  page?
13 A  3-30.
14 Q  So, that would be March 30, 2003. So, we have April,
15  May, June, July, August, September. Six months later,
16  you certainly had the -- strike that.
17  Is it your testimony today that you elected
18  not to borrow the money for the purchase of the
19  property from Mrs. Kunelius?
20  MR. CONROY: Clarify when you say you.
21  MR. McLAUGHLIN: TPL.
22 A  The decision of how to go forward on this project was
23  a function of a lot of different variables, including
24  whether or not it was likely that TPL could raise the

- 121 -

1  money privately via traditional fund-raising and the
2  sale of 142 and 144 and the town's contribution.
3 Q  If that's the case, sir, why does TPL write: As a
4  fallback position, if any or all of the above-
5  referenced sources of funds are unavailable, TPL
6  intends to use capital from the private market?
7  The statement in the application to the
8  Commonwealth of Massachusetts seems to be
9  inconsistent with your last answer because this
10  statement says it doesn't matter whether you get
11  any of the funds; you're going to borrow in order
12  to meet the obligation. Did you read this
13  application before it was signed?
14 A  Exhibit 11?
15 Q  Yeah.
16 A  I'm sure I did. Put it this way. I'd like to clarify
17  that. I don't have a recollection today of reading
18  it. I remember working on it.
19 Q  I'm going to have you look at Page 351 of Exhibit 11.
20 A  Yup.
21 Q  Under Item 63, you're listed as the contact person for
22  TPL. Is that correct?
23 A  Yes.
24 Q  And also mortgagor. Do you see that?

- 122 -

1 A  Sixty-four.
2  MS. FETOUH: Objection.
3 Q  Sixty-four. And, I'm sorry, on Item 64, it refers to
4  owner-mortgagor. Do you see that?
5 A  Yes.
6 Q  What was TPL intending to borrow in order to be a
7  mortgagor based upon this application?
8  MS. FETOUH: Objection.
9  MR. CONROY: Objection.
10 A  I have no memory of this, number 64, the significance
11  of it, today. TPL had the opportunity under the
12  contract to buy the land and become an owner of the
13  land.
14 Q  But in order to get the money from the state, from the
15  Commonwealth, did TPL have to grant any mortgage? Did
16  it have to secure that money in any way?
17 A  No. Unless TPL were to take advantage of
18  Mrs. Kunelius' mortgage.
19 Q  I want you to look at the next page, Item 71, Denise
20  Pelletier. Who is she, if you know?
21 A  She is an attorney who worked, at the time, for TPL.
22 Q  Does she work for TPL anymore?
23 A  No.
24 Q  Was she an intern of Goodwin, Procter & Hoar?

- 123 -

1 A  I don't know.
2 Q  You're aware that there are virtually dozens of people
3  from Goodwin, Procter & Hoar that have worked as
4  interns at TPL, is that correct?
5  MS. FETOUH: Objection.
6 A  There have been several. I wouldn't say dozens.
7 Q  You wouldn't?
8 A  No. No, I wouldn't.
9  (WHEREUPON, Exhibit No. 12, TPL Web
10  site excerpt, marked for identification.)
11 Q  I'm going to put this -- Exhibit 12. Exhibit 12 is an
12  excerpt from your Web site. I think it refers to 40
13  associates, 17 partners, something like that. Do you
14  see that? And that they've done over 4,000 hours of
15  work for TPL since 2001. Do you see that?
16 A  Yes.
17 Q  So, there have been dozens of Goodwin, Procter & Hoar
18  partners and associates who have worked pro bono and
19  some as interns. Isn't that correct?
20 A  That is correct. They were not all interns.
21 Q  I understand.
22 A  You asked me whether or not dozens had been interns
23  and so.
24 Q  I want to point out with as much kindness as possible

- 124 -

1  that that Michael McLaughlin in that picture most
2  certainly is not me. Do you see that?
3 A  Doesn't look like you.
4  MR. CONROY: Nor are you Mike
5  McLaughlin.
6  MR. McLAUGHLIN: Yes, I know.
7 Q  So, can I have that back?
8 A  Yeah.
9 Q  On Paragraph 71, are you aware of whether Denise
10  Pelletier reviewed this document?
11 A  I am not aware.
12 Q  Looking at the next line, Dorothy Stuckey, Esquire,
13  we've already referenced Dorothy Stuckey. She is
14  counsel, correct, to TPL?
15 A  Stuckey, yes.
16 Q  Stuckey. Are you aware of whether she had reviewed
17  this document?
18 A  I am not aware.
19 Q  Would Dorothy Stuckey be aware of whether there was a
20  line of credit in the amount of $6,000,000 that TPL
21  had?
22  MR. CONROY: Objection.
23  MS. FETOUH: Objection.
24 A  I don't know.

- 125 -

DEPOSITION OF CRAIG MACDONNELL

1 Q  Is it likely that counsel would know that?
2        MR. CONROY: Objection.
3        MS. FETOUH: Objection.
4 A  I don't know what she knows.
5 Q  Are you aware of any circumstance in which the line of
6     credit was ever used?
7 A  No, I am not aware of those circumstances.
8 Q  Are you aware of any time which you were involved, and
9     I'm going to, with all due respect, remind you you're
10    under oath, that you were involved in the acquisition
11    of any property by TPL in which the line of credit was
12    used?
13 A  I am not aware of utilizing the Wainwright line of
14    credit on one of my projects.
15 Q  Are you aware of utilizing any line of credit on one
16    of your projects?
17 A  It is hard to answer your question, because when
18    project managers seek approval to borrow money to do
19    projects, it's not always made clear to them which --
20    where the money comes from. In other words, the
21    finance office at TPL generally addresses accessing
22    those funds.
23 Q  Is that finance office in Boston or in California?
24 A  Here.
                                    - 126 -

1 Q  What other banks does TPL have lines of credit with?
2        MR. CONROY: Objection.
3 A  I only know of one other, and I believe it's Sun
4     Trust.
5 Q  As I understand it at the time you told the court, the
6     time the memorandums were filed on behalf of TPL and
7     yourself, that TPL was unable to borrow the money. As
8     it understand it, the amount of money that would have
9     had to have been borrowed -- strike that.
10       At the time that TPL filed its memorandum
11    with the court indicating that it was unable to
12    raise the money, it had available to it a four
13    hundred thousand dollar possibility with
14    Mrs. Kunelius and a six million dollar
15    possibility of borrowing with Wainwright Bank,
16    correct?
17       MS. FETOUH: Objection.
18       MR. CONROY: Objection.
19 A  Well, as we've talked about with respect to the
20    Kunelius potential, that did not seem to be available.
21 Q  Availing or available?
22 A  As I think I mentioned earlier, my understanding of
23    the mortgage, the potential mortgage, was that were
24    TPL to close utilizing it, Mrs. --
                                    - 127 -

1 Q  I understand that. I understand that. What I'm
2     trying to say --
3        MR. McLAUGHLIN: I don't need an
4     explanation for why he didn't use it. My
5     question was: does he understand that that was
6     available and the six million dollar line of
7     credit was available for the possibility of
8     borrowing on? That's all I'm asking.
9        MR. CONROY: And I think he's entitled
10    to answer the question as he sees fit.
11 A  I'm addressing the availability issue. If you'll let
12    me finish, I can complete the thought.
13 Q  Well, before I do, before I do, the issue -- I don't
14    want to mince words. When I say available, I mean
15    that your organization had the ability, should it so
16    desire, to borrow that money. I am not talking -- I
17    don't want to mince words and have you say, well,
18    available to us means does it exist. The question was:
19    did the contract, either the line of credit or the
20    purchase and sale agreement, allow you to borrow
21    money?
22       MR. CONROY: Objection.
23       MS. FETOUH: Objection.
24 Q  That's the question.
                                    - 128 -

1        MS. ECKER: Objection.
2 A  The four hundred thousand dollar mortgage required an
3     actual mortgage to be imposed on the property which
4     would have prevented us from conveying it to the town.
5 Q  Didn't that also require that of Mosaic Commons as
6     well?
7 A  I don't know.
8 Q  You don't know that?
9 A  Well, what I'd like to do is finish my sentence.
10       MR. CONROY: Yeah, and I'm going to
11    insist that he finish uninterrupted.
12       MR. McLAUGHLIN: I thought he had
13    finished, but I'm sorry.
14       MR. CONROY: Go ahead, Craig.
15 A  The Kunelius mortgage potential would have required an
16    actual mortgage to be imposed on the property itself.
17    The existence of that mortgage would have been
18    unacceptable to the Town of Stow because they wanted
19    to take their 45 acres free of any mortgage. If
20    they're going to invest, they don't want to burden the
21    property. That led us to conclude that, in your
22    words, that mortgage was unavailable.
23       (Messrs. Kachajian and Norris enter.)
24 Q  You make the assumption in your answer, I believe,
                                    - 129 -

1     that the mortgage was to be entirely on that portion
2     of the property that was going to the town. In fact,
3     TPL was to retain certain property after the purchase.
4     Isn't it in fact true that the mortgage that was to be
5     given to Mrs. Kunelius was to be on that portion of
6     the property not going to the town?
7        MR. CONROY: Objection.
8 A  I don't know that.
9 Q  But you have just testified that you did, because
10    you've said that the town objected concerning that
11    mortgage. I will represent to you that there is not
12    one document from the town indicating that objection,
13    unless I've missed it. So, if there is such an
14    objection, then I would request town counsel to
15    provide that to me, where the town says they will not
16    allow the deal to be done because of a mortgage on the
17    property to be given to the town. Having said that,
18    are you --
19       MS. ECKER: Can I object to that
20    request first?
21       MR. McLAUGHLIN: Yes.
22       MS. ECKER: I object to the request.
23    The town has turned over all documents pursuant
24    to the documents requested. Whether that
                                    - 130 -

1     specific document exists, I am not sure.
2        MR. McLAUGHLIN: Okay.
3        MS. ECKER: But, in general, we've
4     turned over all documents to you, whether it's
5     contained in a conversation or otherwise. So, I
6     want --
7        MR. McLAUGHLIN: I'm not impugning you,
8     madam.
9        MS. ECKER: I understand, but, no, I'm
10    not going to go through the town documents at
11    this time and provide you any further documents.
12       MR. McLAUGHLIN: Well, at this point,
13    I'm going to ask the witness again if the witness
14    believes that the town objected to the borrowing
15    by the witness' organization because it resulted
16    in a mortgage on the portion of the land going to
17    the town. Then I will ask you again to see if
18    there is such a document, because nothing has
19    been produced. I'm just saying --
20       MS. ECKER: Well, let me just start
21    here. I don't know if nothing has been produced.
22    We produced hundreds of documents to you. It
23    might your interpretation of the document. I
24    have not had the opportunity, nor do I suggest
                                    - 131 -

MELVIN LIPMAN COURT REPORTING
617-227-3985

DEPOSITION OF CRAIG MacDONNELL

1 the witness had the opportunity, to review the
2 hundreds of documents, including meeting minutes,
3 that have been produced. So, I'm not going to
4 agree to produce anything at this time.
5        MR. McLAUGHLIN: Okay.
6        MR. ECKER: Or agree that I haven't
7 produced it.
8        MR. McLAUGHLIN: Okay. Let the record
9 reflect that counsel has spoken to the witness.
10 Q I'm going to again ask you: are you certain that the
11 town objected to TPL complying with the terms of the
12 purchase and sale agreement and borrowing $400,000
13 from Mrs. Kunelius?
14        MS. FETOUH: Objection.
15 A I don't believe that was my testimony.
16 Q What was your testimony, sir?
17 A My testimony, I thought, and --
18        MR. CONROY: With all due respect, the
19 question is: what is his testimony? That's the
20 right question.
21        MR. McLAUGHLIN: What did I just say?
22        MR. CONROY: What was your testimony?
23 And the record will say what his testimony was.
24 I'd suggest that he be asked a question now and
                            - 132 -

1 he answer it.
2        MR. McLAUGHLIN: No, that's not -- but
3 I thank you for the instruction. What I am
4 saying is I want to know what he said, not what
5 he's saying now but what he said, and then I'll
6 work from there.
7        MR. CONROY: What he said back in time?
8        MR. McLAUGHLIN: I want to know what,
9 no, what he just said about the town objecting,
10 because he's now saying that wasn't his
11 testimony. I want to know what he thinks he just
12 said about the town objecting.
13        MR. CONROY: Well, I object.
14        THE WITNESS: Well, I'm happy to
15 clarify it.
16 Q Okay. Go ahead.
17 A Okay. The issue of the mortgage, requiring an actual
18 mortgage to be placed on the property, led TPL to
19 believe, correctly or incorrectly, that that would
20 have been a problem for the town. It's not my
21 testimony that I had a conversation with anyone from
22 the town about that. It was my -- it is my
23 recollection that that presented an obstacle to
24 utilizing that portion of the financing.
                            - 133 -

1 Q Why would the mortgage have been on the property that
2 went to the town rather than the property that went to
3 TPL?
4 A I'm testifying to my recollection of that issue, and
5 I've shared with you what my recollection is of that
6 issue.
7 Q But I believe you just said that TPL surmised that the
8 town wouldn't want -- my question to you is: the land
9 that was going to the town was a donation as part of
10 the deal with Mosaic Commons. The mortgage with
11 Mosaic Commons stayed on the remaining portion of the
12 property that was to be owned by Mosaic Commons. What
13 made TPL believe that it would not remain on the
14 portion to be maintained by TPL and be somehow
15 transferred to that land being given to the town?
16        MR. CONROY: Objection. Among other
17 things, this is not a 30(b)(6) deposition.
18        MR. McLAUGHLIN: I understand. I'm
19 going to do a 30(b)(6), and he may be the person
20 to come back.
21        MR. CONROY: I understand you are.
22        MR. McLAUGHLIN: But if he can answer
23 the question --
24 A I think I've exhausted my ability to speak to that
                            - 134 -

1 issue.
2 Q So, if I can sum up, the town never told you they
3 would not accept a mortgage on the property that was
4 going back to the town, is that correct?
5        MS. ECKER: Objection.
6 A We never had a discussion about it.
7 Q So, it was your, TPL's, assumption that they might
8 object and, therefore, it would not work?
9 A Correct.
10 Q And that TPL never anticipated that the mortgage for
11 the $400,000 would be on the portion of the property
12 that TPL was to acquire.
13        MS. FETOUH: Objection.
14 A That's where I don't have a recollection.
15 Q But you realize, do you not, that TPL was the borrower
16 and that the remaining portion of the land was going,
17 as part of the sale, to the town? So, how is it
18 possible that TPL could ever have anticipated that
19 they acquire the money, they borrow the money -- they
20 acquire the property, they borrow the money from
21 Mrs. Kunelius, and somehow transfer the liability
22 for that money to the town?
23        MR. CONROY: Craig, don't answer.
24 Q And somehow transfer the liability for that money to
                            - 135 -

1 the town rather than TPL, because TPL's the borrower.
2        MR. CONROY: Objection.
3        MS. FETOUH: Objection.
4        (Mr. Kachajian exits the room.)
5 A With all due respect, I don't think I understand the
6 question.
7 Q Okay. Who was going to borrow the money, the
8 $400,000, under the purchase and sale agreement?
9 A Do you mean under the Kunelius mortgage option?
10 Q Yes, under the terms of the purchase and sale
11 agreement, who was to borrow $400,000 from
12 Mrs. Kunelius?
13 A The ultimate purchaser.
14 Q Well, it says -- it doesn't say the ultimate
15 purchaser, does it? It says Mosaic Commons. Isn't
16 that what it says?
17        MS. FETOUH: Objection.
18 A Why don't we get out the contract.
19        MR. CONROY: We have the document, so.
20        THE WITNESS: I'm going to take a
21 break.
22        (Recess, 2:20 P.M.)
23        (After recess, 2:31 P.M.)
24        (Messrs. Kachajian and Norris not present)
                            - 136 -

1        (WHEREUPON, Exhibit No. 13, MacDonnell
2 letter to Kachajian, dated September 9, 2003,
3 marked for identification.)
4 BY MR. McLAUGHLIN:
5 Q Before you is Exhibit 13, which is a September 9,
6 2003, letter from you to Peter Kachajian. Do you
7 recognize this?
8 A Yes.
9 Q And that's your signature at the end?
10 A Yes.
11 Q Looking at the first page, there is a paragraph
12 beginning with First, which reads: First, there is a
13 significant fund-raising gap. What was the
14 significant fund-raising gap that you were referring
15 to?
16 A The gap between the number of dollars that we believed
17 was going to come in from the Town of Stow investment
18 and the purchase price.
19 Q And what investment are you talking about by the Town
20 of Stow?
21 A The three hundred thousand dollar open space
22 investment and the one hundred thousand dollar
23 affordable housing.
24 Q And so did you become aware on or about September 9th
                            - 137 -

DEPOSITION OF CRAIG MacDONNELL

MiniDep by Kenson

1  of 2003 that the Town of Stow was not going to provide
2  the three hundred thousand and the one hundred
3  thousand?
4 A  No. No.
5 Q  So, the fund-raising gap that you're referring to does
6  not include the Stow funds, correct?
7 A  Correct.
8 Q  And so what you were referring to -- well, let's go
9  on. Not only has the economy been hostile to
10  philanthropy, in general, we have experienced a
11  catastrophic failure in the rejection of the 350,000
12  Department of Housing and Community Development grant.
13  Do you see that?
14 A  Yes.
15 Q  Now, why was that catastrophic?
16 A  Because we needed it.
17 Q  But if you look at Exhibit 11, Exhibit 11 says: As a
18  fallback plan, if any or all of the above-referenced
19  sources are unavailable, TPL intends to utilize
20  capital from the private market.
21      Now, Exhibit 11 suggests that nothing would
22  be catastrophic because you had the fallback plan
23  which involved a line of credit. What made the
24  loss of the 350 catastrophic?
— 138 —

1          MR. CONROY: Objection.
2          MS. FETOUH: Objection.
3 A  When TPL analyzes these projects, it identifies
4  sources of takeout money, dollars that will be spent
5  to acquire the property interests that are necessary
6  to make the conservation project complete. Because
7  TPL is not a landholding organization -- in other
8  words, we don't buy land to hold for conservation. We
9  occasionally will buy it and sell it, if necessary, to
10  complete a conservation project -- we always look for
11  the ultimate takeout, that is, the source of funds
12  that will purchase the property interest that I just
13  mentioned.
14      So, in determining whether or not a project
15  can be completed, TPL engages in an analysis of
16  whether the ultimate takeout funds will be
17  available. In this project, those funds appeared
18  not to be available, ultimately. The fund-
19  raising we had imagined did not materialize, the
20  DHCD grant did not come through, and it did not
21  seem as if it was possible to raise those dollars
22  for the ultimate conclusion of the project, not
23  that TPL could not borrow the money to make -- to
24  replicate those dollars but that any borrowing
— 139 —

1  that TPL engages in is designed only as a
2  stopgap, an interim stopgap, subject to our own
3  due diligence that would satisfy us that
4  ultimately that loan could be repaid from capital
5  takeout.
6 Q  At the time that you accepted the assignment, I
7  believe your testimony was that you had every
8  expectation that everything would work out.
9 A  We did.
10 Q  Is it reasonable -- is it your position that
11  Mrs. Kunelius, in signing the purchase and sale
12  agreement with Mosaic Commons, should have
13  anticipated, one, that TPL was coming onboard
14  and, two, that eventually, notwithstanding their
15  alleged best intentions, they would fail?
16          MS. FETOUH: Objection.
17 Q  Is that something that you think Mrs. Kunelius should
18  have anticipated?
19          MR. CONROY: Objection.
20          MS. FETOUH: Objection.
21 A  Well, I don't know if Mrs. Kunelius should have
22  anticipated that, but an attorney reading the contract
23  and knowing Chapter 61 would know that the assignee
24  steps into the shoes of a contract negotiated by him
— 140 —

1  or her and that that contract imagined Mrs. Kunelius
2  walking away with liquidated damages but not the
3  purchase of her property.
4 Q  It's your testimony that you did not anticipate,
5  ultimately, that this matter would fail, and, in fact,
6  your testimony is that you had every expectation that
7  it would go forward. Am I right on that?
8 A  As with every TPL project we work on. We don't get
9  into these projects just for the heck of them. We do
10  them to achieve conservation. So, absolutely, yes,
11  completely our intention.
12 Q  And, therefore, you were not expecting that
13  Mrs. Kunelius would have anticipated that TPL
14  would not have been able to raise money for the
15  purchase. Is that reasonable to say? I don't
16  care about lawyers.
17 A  No.
18 Q  The question is: if you didn't anticipate it, is it
19  reasonable for you to expect that Mrs. Kunelius should
20  have anticipated that you would have failed?
21          MR. CONROY: Objection.
22          MS. FETOUH: Objection.
23          MS. ECKER: Objection.
24 Q  TPL would have failed.
— 141 —

1 A  I don't know what it is reasonable for Mrs. Kunelius
2  to have expected on her own, but anyone reading the
3  contract would know that there are two ways forward
4  under that contract. One is with the purchase.
5  Another is via an in-completed transaction.
6 Q  But you told the Commonwealth of Massachusetts there
7  was a fallback plan. I still don't understand what
8  was intended by TPL in telling the Commonwealth that,
9  even if any or all of the other sources were
10  unavailable, that TPL intends to utilize capital. If
11  that's the fallback plan, what was the purpose of
12  telling the Commonwealth that?
13          MR. CONROY: Objection.
14          MS. FETOUH: Objection.
15 A  What that means is that TPL could have borrowed to
16  conclude this transaction if it made sense, otherwise,
17  from a due diligence point of view. What I'm trying
18  to tell you about is this due diligence piece that
19  imagines in every TPL project that if borrowing is
20  necessary, the borrowing is replaced by conservation
21  takeout dollars that materialize somewhere. In the
22  absence of dollars on the horizon, fund-raised, sale
23  of 142 or 144, it would not be prudent for TPL to
24  borrow the money to complete the transaction.
— 142 —

1 Q  How much money you had to borrow?
2          MS. FETOUH: Objection.
3 A  It depends how much money would have been on the table
4  to begin with.
5 Q  Well, at the time, the application says none of the
6  sources are critical because you can borrow. That's
7  essentially what it says. My question is, at a
8  minimum, one source was available. That's the four
9  hundred thousand from the city, from the town, is that
10  correct?
11          MS. FETOUH: Objection.
12          MR. CONROY: Objection.
13 A  Well, three hundred is available at the closing if the
14  town gets their land. The one hundred wouldn't be
15  available until the ultimate renovation and resale of
16  the two units, of 142 and 144. It became apparent in
17  the middle of this project that that subdivision
18  process was fraught with problems, that we can talk
19  about, but towards the end of the project, the ability
20  of TPL to subdivide that property was highly
21  problematic, and it did not appear as if that
22  subdivision was possible.
23 Q  In fact, you were told prior to the time that you
24  acquired the property that the subdivision was
— 143 —

MELVIN LIPMAN COURT REPORTING
617-227-3985

DEPOSITION OF CRAIG MACDONNELL                    MiniDEP by Kenson

1    unlikely. Isn't that true?
2  A  No, in fact, we were told it was very likely.
3  Q  Isn't it in fact true that, before you accepted the
4    assignment, you had already been told that a
5    subdivision was not likely at all?
6  A  That's not my recollection at all.
7  Q  My question remains: how much money did you think you
8    had to borrow at the time that you decided not to go
9    forward in making the purchase?
10          MR. CONROY: Objection.
11  A  Well, as I testified earlier, there is no point in
12    time. It's a gradual awareness that this project is
13    getting highly complicated and highly problematic from
14    a whole lot of different perspectives.
15  Q  Did the Mosaic Commons deal require a subdivision?
16          MS. FETOUH: Objection.
17          MR. McLAUGHLIN: I'll strike that.
18  Q  Did the purchase and sale agreement with Mosaic
19    Commons include a subdivision?
20          MR. CONROY: Objection. It speaks for
21    itself.
22  A  I don't remember.
23  Q  Isn't it in fact true that the subdivision issue was
24    not part of the Mosaic Commons contract, but it was a
                        - 144 -

1    part of your requirement after you accepted the
2    assignment, that you wanted a subdivision of the
3    property in a particular way?
4          MR. CONROY: Objection.
5  A  Well, I don't know what the Mosaic provision
6    contained. I just don't have that contract in front
7    of me, so I can't speak to it. My understanding is
8    that's it a 40B and that that short of greases the
9    skids.
10  Q  Your counsel has the contract in front of him. Why
11    don't you take a look at it, and I'll look at the one
12    I have.
13  A  I have it in front of me.
14  Q  Okay. I'm going to move off that subject. I'm going
15    to ask you to look at Paragraph 30.
16  A  Yes.
17  Q  Second paragraph of Paragraph 30: Security for the
18    four hundred thousand promissory note afore-described
19    shall be in the form of a mortgage on the 8.57 acre
20    parcel. Do you see that?
21  A  I do.
22  Q  Is it fair to say that you were wrong in making the
23    assumption that the mortgage for the $400,000 was
24    going to be on that portion of the property that was
                        - 145 -

1    being given to the town?
2  A  What I don't know is whether the configuration of the
3    8.57 acre parcel is the same configuration that the
4    two, 142 and 144, parcels were located on.
5  Q  Sir, did you just make up, today, the argument that
6    the Town of Stow would object to the inclusion of a
7    mortgage on the parcel of land that was to be donated
8    to the town?
9          MS. FETOUH: Objection.
10          MR. CONROY: Objection.
11          MS. ECKER: Objection.
12  Q  Did you make that up today?
13          MS. FETOUH: Objection.
14          MS. ECKER: Objection.
15          MR. CONROY: Objection. And this is
16    inappropriate sort of questioning,
17    Mr. McLaughlin.
18          MR. McLAUGHLIN: I don't think so.
19    Your objection is noted.
20  Q  Let me ask you again, sir.
21  A  I will happily say I did not make that up today.
22  Q  And can you tell me who raised that issue with you?
23  A  What issue?
24  Q  From TPL, as to whether or not the four hundred
                        - 146 -

1    thousand dollar mortgage was going to be put on the
2    land that was being given to the town?
3          MS. FETOUH: Objection.
4  A  That was my own notion.
5  Q  Now, you have, do you not, substantial tax expertise?
6          MS. FETOUH: Objection.
7          MR. CONROY: Objection.
8  A  No.
9  Q  Do you recall writing an extensive letter concerning
10    the tax benefits that Mrs. Kunelius would gain if she
11    accepted a four hundred thousand dollar reduction in
12    the purchase price?
13  A  I can't remember whether the reduction was four
14    hundred, but I do remember writing a letter with
15    respect to the value of a bargain sale.
16  Q  Do you recall that a significant component of your
17    letter dealt with the donation of land by
18    Mrs. Kunelius and the tax benefits to be derived
19    from that donation of land to the Town of Stow?
20          MS. FETOUH: Objection.
21  A  I don't think it related to a donation. I think it
22    was with respect to a theoretical below-market sale.
23  Q  Do you recall that a component of the sale involved a
24    donation of a substantial portion of the property to
                        - 147 -

1    the Town of Hull for a tax consideration on her part?
2          MR. CONROY: Objection.
3          MS. FETOUH: Objection.
4          MS. ECKER: Objection.
5  A  That's not my recollection.
6  Q  So, how was the remaining land going to be given to
7    the Town of Stow? The portion that was being donated
8    to the Town of Stow, how was that going to work under
9    the terms of the Mosaic Commons deal?
10          MS. FETOUH: Objection.
11          MR. CONROY: Objection.
12  A  You're asking me to essentially read this contract and
13    tell you how the land pieces were to be -- I'm sorry.
14  Q  Well, earlier you testified that you were familiar
15    under the provision of Chapter 61 with what provisions
16    of a purchase and sale agreement would be applicable
17    and what wouldn't. So, I have perhaps mistakenly
18    assumed -- I have assumed that you have read the
19    purchase and sale agreement, because you've drawn
20    conclusions as to what portions of the purchase and
21    sale agreement are applicable to TPL and which are
22    not.
23    So, let me start with a basic question.
24    Have you ever read in its entirety the purchase
                        - 148 -

1    and sale agreement?
2          MS. FETOUH: Objection.
3  A  Yes.
4  Q  Are you the person at TPL that came to the conclusion
5    that you could rely on the liquidated damage clause
6    provision?
7          MR. CONROY: Objection.
8          MS. FETOUH: Objection.
9  A  There were a number of people at TPL who reached that
10    conclusion.
11  Q  And who besides you reached that conclusion?
12          MR. CONROY: Before you answer the
13    question, I want to consider whether it calls for
14    an attorney-client privilege, raises an attorney-
15    client privilege issue.
16  Q  Other than attorneys, was there anybody else?
17          MR. McLAUGHLIN: Does that do it for
18    you?
19          MR. CONROY: Well, why don't you
20    rephrase it, please.
21  Q  Other than TPL's counsel, who reached the conclusion
22    that the liquidated damage clause would apply and that
23    should you not move forward in the purchase, Mrs.
24    Kunelius would be left with the earnest money?
                        - 149 -

DEPOSITION OF CRAIG MacDONNELL

1  MR. CONROY: Objection.
2  MS. FETOUH: Objection.
3 A I can testify that I reached that conclusion, but I
4  can't say who else in their own minds reached that
5  conclusion.
6 Q Okay. Let's go back to Paragraph 30, and I want to,
7  again, ask you since I didn't understand your past
8  answer.
9  Look at Paragraph 30, the third paragraph of
10  Paragraph 30: Notwithstanding the foregoing,
11  buyer shall only encumber the 8.57 acre parcel
12  expected to be developed -- parentheses --
13  consisting of .93 acre parcel and 7.64 acre horse
14  farm parcel. Do you see that?
15 A Yes.
16 Q Again, I'm going to ask you what made you consider
17  that the security for the four hundred thousand dollar
18  loan from Mrs. Kunelius to TPL would be anything but
19  the parcel described for security in Paragraph 30?
20 A And as I sit here today, I don't know what caused me
21  to reach that conclusion.
22 Q In fact, isn't it fair to say that it's entirely
23  possible that your conclusion was wrong?
24  MS. FETOUH: Objection.
        - 150 -

1 A I don't know if that is a fair thing to say. What I
2  started to talk about was the configuration of the
3  8.57 acre parcel. One of the things TPL was doing was
4  considering revising the boundary between the town
5  parcel and the developed parcels, and the reason that
6  we imagined doing that was to facilitate the
7  redevelopment, or the reconfiguration, of 142 and 144
8  so that they could be sold. There were a number of
9  provisions in the subdivision law that required us --
10  I think there were shape variances and various things
11  that required us to redraw the boundary of the line
12  between the town parcels and the developed parcels. I
13  don't know, as I sit here today, whether or not that
14  followed the same line.
15 Q But where in the purchase and sale agreement or in the
16  assignment does it allow TPL to alter such a basic
17  term of the purchase and sale agreement involving the
18  very essence of the amount that is to be paid and how
19  it's to be paid? In other words, then, TPL, simply as
20  an assignee, have the right to say, "I don't like this
21  term as defined in Paragraph 30, and, therefore, we're
22  going to do something else"? Is that what TPL
23  believes is their right under the assignment?
24  MR. CONROY: Objection.
        - 151 -

1  MS. FETOUH: Objection.
2 A I don't know what you're asking.
3 Q You do not know what I'm asking? Is it your testimony
4  that TPL could unilaterally change the terms and
5  provisions of Paragraph 30 and not have to comply with
6  Paragraph 30?
7 A That's not my testimony.
8 Q Is it your testimony that you agreed to comply with
9  Paragraph 30?
10  MS. FETOUH: Objection.
11  MR. CONROY: Objection.
12 A We stepped into the shoes of the contract.
13 Q But the contract does not say that there will be a
14  redefining of the 8.57 parcel. It doesn't say that
15  anywhere, does it?
16 A This discussion is in the context of trying to decide
17  whether or not the four hundred thousand dollar
18  mortgage was available or usable, correct?
19 Q Well, certainly, I think you're aware that it was
20  available. Mrs. Kunelius was willing to lend it. The
21  question becomes whether TPL believed it could
22  unilaterally say, "We're not going to do it unless we
23  get a subdivision in a manner that we deem
24  appropriate. Otherwise, there is no availability."
        - 152 -

1  Essentially, that's what you're saying, and I'm
2  saying, where in the contract does that allow --
3 A I think you've misunderstood me.
4  MS. FETOUH: Objection.
5  MS. ECKER: Objection.
6  MR. CONROY: Objection.
7 A With respect to the subdivision, the subdivision issue
8  relates to the question of how TPL would create value
9  and bring dollars to the table. What became apparent
10  is that that subdivision wasn't possible.
11 Q But your argument, I think, sir, is that you stepped
12  into the shoes of the buyer. The shoes of the buyer
13  allowed for what was contained in Paragraph 30, but
14  you didn't like what was contained in Paragraph 30, so
15  TPL changed those terms by seeking to get variances,
16  did you not?
17  MS. FETOUH: Objection.
18  MR. CONROY: Objection.
19  MS. ECKER: Objection.
20 A With all due respect, it's a complete non sequitur.
21  What I'm talking about is how TPL brings money to the
22  table, not whether or not this contract imagines or
23  doesn't imagine us doing that.
24 Q Well, do you agree that you stepped into the shoes of
        - 153 -

1  the buyer?
2  MS. FETOUH: Objection.
3 A Yes.
4 Q And do you agree that some terms do not apply to TPL?
5 A As a matter of Chapter 61 law, or lore, the assignee
6  is naturally required to comply with some but not all
7  terms.
8 Q Does the assignee have to comply with the purchase
9  price?
10  MR. CONROY: Objection.
11  MS. FETOUH: Objection.
12 A If the assignee goes forward and purchases the
13  property, I would say yes.
14 Q I'm going to put before you another document.
15  (WHEREUPON, Exhibit No. 14, Conditions
16  for right of first refusal, marked for
17  identification.)
18 Q The document that I am putting before you appears to
19  be an iteration of what you've already seen as
20  Exhibit 7. It was received from the Town of
21  Stow. It has DRAFT on the top. It discusses the
22  conditions for transfer of the town's right of
23  first refusal on the Kunelius property. The bold
24  language appears to be TPL's answers to
        - 154 -

1  questions.
2  I had asked you earlier if you remembered
3  Exhibit 7, and you said you were not sure or, no,
4  you didn't. I'm asking you now. Do you remember
5  what is now Exhibit 14?
6  MR. CONROY: Objection.
7 A It looks somewhat familiar.
8 Q And isn't it in fact true that all of the TPL
9  responses are after each question raised by the town,
10  and those responses are in bold print?
11 A It appears that way.
12 Q And are you the author of the bold print responses?
13 A I believe so.
14 Q And you would agree with me that this correspondence,
15  or this document, had to be drafted prior to the
16  assignment?
17 A That would make sense.
18 Q So, let's look at Item No. 2, which is referring to
19  the town's request that the town be held harmless if
20  TPL backs out of the deal before closing, in other
21  words, and I'm quoting, in order words, that TPL will
22  defend the town against any suit resulting from the
23  failure of the property purchase to be completed.
24  Alternatively, TPL posts a bond that guarantees their
        - 155 -

1  performance. Then there's a response.
2      TPL: The appropriate way for risks
3  presented by this project to be managed are for
4  the common law of contract to apply. This law
5  will require TPL, not the town, to be obligated
6  to perform if the right of first refusal is
7  assigned. The town's legal responsibility ends
8  with the assignment. If we are offered the
9  opportunity to accept the assignment and we
10 decide to go forward, the law will require us to
11 meet the essential requirements of the contract
12 or suffer the consequences of default.
13     Now, at this point, you were referring, were
14 you not, to the fact that if you defaulted, then
15 the only money that was at risk to you was the
16 20,000 or $22,000 that had been paid as earnest
17 money to Mrs. Kunelius, is that correct?
18     MR. CONROY: Objection.
19     MS. FETOUH: Objection.
20 A  We believed that the liquidated damages provision
21 would apply.
22 Q  Now, I want you to go to the last page, Item No. 7.
23 The town raises the following issue: Because of the
24 difference in type of buyer, any parts of the P&S that
                    - 156 -

1  TPL believes don't apply should be addressed. A,
2  Paragraph 8, Time Performance, references a 12-month
3  extension if 40B approval process is proceeding
4  forward. B, Paragraph 30, Purchase Price Financing,
5  references a construction loan of 80 percent of the
6  construction costs. C, Paragraph 30, Purchase Price
7  Financing, references all purchase agreements of the
8  Co-housing project should be assigned to the seller as
9  further security. D, Paragraph 30, buyer shall only
10 encumber the 8.57 parcel. E, Paragraph 32, buyer and
11 seller agree to cooperate on a 40B submission. F,
12 Paragraph 35, upon receipt of all permits for the
13 development of the 8.57 acre parcel, seller will
14 transfer the right of the 42.1 acre parcel to the
15 town.
16     Now, those appear, is it fair to say that
17 those appear to be the issues that the town was
18 identifying that needed to be considered in
19 reference to the difference in the buyer, in the
20 type of buyer? Is that how you understood that
21 question?
22 A  I understood the question to be just a straight-up
23 question to TPL, whether or not A through F apply.
24 Q  Look at your response. TPL: Because the decided
                    - 157 -

1  cases under Chapter 61 do not explicitly resolve all
2  of the potential issues that arise when a municipality
3  assigns its right of first refusal to a non-profit
4  conservation organization, including which of the
5  terms of the underlying contract should obligate the
6  assignee, it would be prudent for TPL and Marilyn
7  Kunelius' attorney to enter into good-faith dialogue
8  to determine which terms are relevant and which are
9  truly inapplicable. Do you see that?
10 A  Yes.
11 Q  So, you knew prior to accepting that that, in fact,
12 Chapter 61 did not identify with any certainty at all,
13 nor did the cases applying to Chapter 61 explicitly
14 resolve, what terms were applicable to whom.
15     MS. FETOUH: Objection.
16     MR. CONROY: Objection.
17     MS. ECKER: Objection.
18 A  That's not true.
19 Q  Well, I believe earlier you testified that -- I think
20 you said the cases -- I don't remember. You said that
21 you believed that, given the case law under Chapter
22 61, you could rely on the liquidated damage clause
23 provision. Yet, in this correspondence, you say,
24 because the decided cases under Chapter 61 do not
                    - 158 -

1  explicitly resolve all the potential issues that
2  arise, the parties essentially have to set together to
3  decide what truly does apply and what doesn't.
4      So, in your mind, is it fair to say that you
5  understood that the parties, i.e., yourself and
6  the town and Mrs. Kunelius, did not have an
7  understanding as to what terms specifically
8  applied and what did not and that's why you
9  suggested getting together with them?
10     MR. CONROY: Objection.
11     MS. FETOUH: Objection.
12     MS. ECKER: Objection.
13 A  Okay. Well, there's a lot of pieces to that question.
14 I guess what I'd start by saying is that what TPL said
15 there was that the cases don't resolve all of the
16 issues but that, together with the advice of counsel,
17 it was clear to us that some provisions would apply.
18 Q  What provisions? What provisions would apply?
19     MS. FETOUH: Objection.
20 Q  The P&S, you have the P&S right in front of you.
21 Let's go through them and decide, have you tell me
22 right now, what provisions would apply and what
23 provisions would not.
24     MS. FETOUH: Objection. And I'll just
                    - 159 -

1  note the concern that this will infringe on
2  communications with counsel, as the witness has
3  identified, and just instruct the witness to
4  limit his answer to anything that does not
5  involve communications with counsel.
6 A  Much of what I would say would refer to communications
7  with counsel.
8      MR. McLAUGHLIN: You want to go this
9  way?
10     MS. FETOUH: Well, I think I need some
11 time to talk to the witness about what those
12 communications are and the extent to which they
13 were shared with others.
14     MR. McLAUGHLIN: Okay. If you want to
15 go this way, we can go over to the court right
16 now. If your argument is, if I understand this,
17 that he's not going to testify as to what
18 provisions apply and don't apply because he only
19 heard it from his counsel, if that's what you're
20 actually saying, then I am prepared to go over to
21 see the judge right now if in fact that's what
22 you're saying. Maybe you're not.
23     MS. FETOUH: I think what I said is I
24 need to speak to the witness about this.
                    - 160 -

1      MR. McLAUGHLIN: Well, wait a minute.
2  The position taken by TPL, the position taken by
3  TPL is that some provisions apply and some do
4  not. It is a quintessential component of the
5  case as to what provisions do and do not apply.
6  This man is the director of Massachusetts and has
7  been the decision-maker with regard to a large
8  percentage of what's before the court right now.
9  I have every right for him -- since he has
10 testified he is aware that, under the provisions
11 of Chapter 61, certain provisions do and do not
12 apply, I certainly have the right to say, fine,
13 here's the P&S. Tell me what applies and what
14 doesn't. And if he says, no, I'm sorry, I
15 learned that from my counsel, I'm not asking what
16 counsel told him. I'm asking what is his
17 understanding. That's simple, what his
18 understanding is. I'm not asking what his
19 counsel told him.
20     MS. FETOUH: And it may be that he can
21 answer those questions, but I need an opportunity
22 to speak with my witness first. If I can have
23 that for a few minutes, we'll be right back.
24     MR. McLAUGHLIN: Okay.
                    - 161 -

DEPOSITION OF CRAIG MACDONNELL                    MINIDEP by Kenson

1     MR. CONROY: And I would add to that,
2   Mr. McLaughlin, that you do have a 30(b)(6)
3   deposition coming, and this is not the
4   appropriate role for this deposition. Let me
5   finish, please. You're here, as I understand it,
6   to question Craig MacDonnell about Craig
7   MacDonnell's memories, things he saw, touched,
8   smelled, heard, whatever. You'll have another
9   opportunity to depose the Trust for Public Land
10  as to what their position is.
11    MR. McLAUGHLIN: That is true.
12    MR. CONROY: And let me suggest that
13  that be deferred to that deposition.
14    MR. McLAUGHLIN: I think I should have
15  the right, since he's already testified what he
16  knows under Chapter 61, to ask him the questions
17  of which one applies. You can talk to him.
18  You're talking to him in his role as an employee
19  of TPL.
20    MS. FETOUH: That's correct.
21    MR. McLAUGHLIN: Okay. Just for the
22  record, I want to note that the responses in this
23  case have been indistinguishable as to who is
24  saying what since they've been jointly filed.
                    - 162 -

1   So, each response is from Craig MacDonnell, and
2   statements regarding these types of questions
3   have also been defended by Craig MacDonnell.
4   That's why we have a joint motion to dismiss
5   statements by Craig MacDonnell that say there are
6   certain provisions that apply and there are
7   certain provisions that do. It's in your
8   responses.
9         So, if it was only in TPL's, I would say
10  maybe you're right. That's not what you guys
11  elected to do, but if you want to talk to him,
12  that's fine. We can take a break.
13        (Recess, 3:10 P.M.)
14        (After recess, 3:17 P.M.)
15        (All parties present)
16    MS. FETOUH: I've had an opportunity to
17  speak with Mr. MacDonnell. We'll allow him to
18  answer your question to the extent of his
19  understanding of the answer to your questions in
20  his individual capacity, not speaking for TPL as
21  an institution.
22    MR. McLAUGHLIN: Okay. Thank you.
23    MR. KACHAJIAN: Is this regarding the
24  purchase and sale?
                    - 163 -

1     MR. McLAUGHLIN: Yes. You probably
2   ought to go.
3         (Mr. Kachajian exits the room.)
4     MR. CONROY: And let me make my little
5   piece, too, if I may. I have objected
6   previously, and now again, to the mixing of what
7   I think is appropriate 30(b)(6) versus individual
8   deposition and also to the notion of querying
9   Mr. MacDonnell as a legal expert. With those
10  objections stated and reserved, I have no grounds
11  to instruct him not to answer, other than to be
12  careful that he doesn't reveal any attorney-
13  client confidences.
14  By MR. McLAUGHLIN:
15 Q  Okay. Before we go into the purchase and sale
16  agreement, I want to go back to some of your prior
17  testimony. Do you remember we talked about the fact
18  that you didn't know that variances were not going to
19  be granted until well after the acquisition of the
20  assignment?
21 A  My memory was that I had reason to believe that the
22  variance would be granted.
23        (WHEREUPON, Exhibit No. 15, Sommerlad
24  email to Kennedy, marked for identification.)
                    - 164 -

1 Q  I have put before you what has been marked as Exhibit
2   15 and ask you if you recognize this document.
3 A  I can describe it. I don't recall seeing it before.
4 Q  Well, who is Ruth Kennedy, do you know?
5 A  She's a Stow resident. I believe she's on the
6   Planning Board.
7 Q  Who is Karen Sommerlad?
8 A  She lives on Red Acre Road.
9 Q  And Exhibit 15 is a letter from Karen Sommerlad to R.
10  Kennedy, Landvest. Subject, Planning Board. Question
11  re Kunelius property. Importance, high. Ruth, I
12  apologize for bothering you at work. I'm writing on
13  behalf of Friends of Red Acre and Craig MacDonnell.
14        Was Karen Sommerlad writing on your behalf
15  with regard to questions relating to variances
16  and special permits and so forth?
17 A  Well, I don't know. I remember having some
18  conversations with a number of the Red Acre Road
19  people about subdivision.
20 Q  Does this remind you or refresh your memory concerning
21  the fact that you were subsequently told that
22  subdivision and special permits were not going to be
23  granted in February of 2003?
24    MS. FETOUH: Objection.
                    - 165 -

1 A  No.
2 Q  Looking at the second paragraph, it reads: The
3   question is, if we need a zoning variance for lot
4   frontage and possibly other dimensional variances, can
5   we submit an approval-not-required, ANR, for the
6   submission and is the appropriate sequencing of events
7   to get variances and then submit the ANR? Is it
8   possible to submit an ANR and have it approved subject
9   to receiving the variances? Is an ANR in this
10  situation even possible?
11        Do you recall what the answer to those
12  questions were?
13 A  I remember having questions about how to go forward on
14  the subdivision, and I believe we set up a meeting
15  with a representative of the planning office to cut
16  through the ambiguity in which we met with Karen
17  Kelleher who is an employee of the town.
18 Q  Let's go to this one.
19        (WHEREUPON, Exhibit No. 16, Jacobs
20  email to Sommerlad and Kennedy, dated February 6,
21  2003, marked for identification.)
22 Q  Before you is what has been marked as Exhibit 16, and
23  we're looking at the first page of that exhibit.
24 A  Uh-huh.
                    - 166 -

1 Q  This appears to be from Donna Jacobs to Karen
2   Sommerlad and Ruth Kennedy, copied to you. Do you see
3   that?
4 A  Yes.
5 Q  The second paragraph says: I do not clearly
6   understand your objective. However, I can add some
7   additional statements for your consideration. The
8   caretaker's cottage is a pre-existing, non-conforming
9   structure and use. As such, any extension, change in
10  use or alteration addition is subject to a special
11  permit from the ZBA. I am uncertain of the specifics
12  of the Kunelius property as I do not have a map I can
13  view at this time, but it is likely to be a pre-
14  existing, non-conforming lot because almost 90 percent
15  of the lots in Stow fall into that category. The
16  Planning Board cannot endorse an ANR plan that will
17  increase the degree of non-conformity of a pre-
18  existing non-conforming lot. Because the purpose of
19  the subdivision approval is to create lots with
20  adequate accesses, frontage and lot area in compliance
21  with the zoning bylaw, the board can't grant the
22  waivers you are seeking.
23        Now, this is dated February 6, 2003, is that
24  correct?
                    - 167 -

**MELVIN LIPMAN COURT REPORTING**
617-227-3985

DEPOSITION OF CRAIG MACDONNELL

MiniDep by Kenson

1 A   The email from Jacobs to Sommerlad?
2 Q   Yes.
3 A   Yes.
4 Q   So, you had reason to believe in early February, long
5     before the acceptance of the assignment, that there
6     were going to be problems with zoning for the two lots
7     in question, didn't you?
8         MR. CONROY: Objection.
9 A   We knew it would be a challenging subdivision that
10    would require relief from the relevant boards.
11 Q   But I thought you testified, sir, that you didn't have
12    any inkling that there was going to be a problem until
13    well after the acceptance of the assignment and it was
14    well into the process. In fact, you did have
15    knowledge very early on, even before you accepted the
16    assignment, that you weren't going to get approvals
17    from the Planning Board. Isn't that fair to say?
18        MS. ECKER: Objection.
19        MS. FETOUH: Objection.
20        MR. CONROY: Objection.
21 A   I think you're confusing two issues.
22 Q   What are the two issues I'm confusing?
23 A   One is whether there was an analysis to be had on the
24    front end about which waivers, which variances, which

- 168 -

1     permits, were required and which path through that
2     process was appropriate. My recollection is that that
3     issue was wrestled with and that Karen Kelleher, in a
4     meeting with TPL, led us to believe that those issues
5     could be resolved. So, later on, however, in the
6     process, another more complicating factor emerged, so
7     that when I was referring to the problem earlier -- do
8     you follow me?
9 Q   Yes.
10 A   That I was referring to the problem that developed
11    later rather than the analysis, sort of the just
12    working through the kinks on the front end.
13 Q   Let's go to the purchase and sale agreement, if you
14    would. Where in the purchase and sale agreement
15    between Mrs. Kunelius and Co-housing does it discuss
16    zoning changes, special permits or variances?
17 A   I don't believe there's any reference to those issues
18    in the contract.
19 Q   So, the insertion of a zoning variance, special
20    permit, subdivision issues, those three issues, was
21    made by TPL since it's not discussed in the purchase
22    and sale agreement itself.
23 A   We're not inserting anything. I'm not suggesting that
24    the subdivision issue is a contract contingency. It's

- 169 -

1     a fund-raising obstacle.
2 Q   So, let me move back. This is the first time I've
3     heard that.
4         So, your refusal to move forward and
5     purchase the property did not result from the
6     failure to get a subdivision plan approved, or
7     any variances or permits that would be needed,
8     for the project that you envisioned to be built
9     on the site rather than what Mosaic Commons
10    envisioned. Is that correct?
11        MR. CONROY: Objection.
12        MS. FETOUH: Objection.
13 A   What I'm saying is that the difficulty TPL encountered
14    in achieving the subdivision was not related to the
15    contract per se at all. It was a project issue that
16    prevented TPL from subdividing 142 and 144 and thus
17    realizing on the sale of the separate lots.
18 Q   You realize, sir, that Mrs. Kunelius lost the
19    opportunity to sell the property to Mosaic Commons as
20    a result, direct result, of the actions of TPL in
21    accepting the assignment and then failing to go
22    forward in the purchase.
23        MS. FETOUH: Objection.
24        MR. CONROY: Objection.

- 170 -

1 Q   Do you realize that?
2 A   Is that a question?
3 Q   Yeah.
4 A   I believe that the contract played out as it was
5     intended, to either enable Mosaic or the assignee to
6     go forward under the contract.
7 Q   But, in fact, neither did. Isn't that correct?
8 A   In fact, the contract imagined either a sale or a
9     default, and the default resulted in liquidated
10    damages. That was the end of the contract.
11 Q   Is it your testimony that you believe Mrs. Kunelius
12    anticipated that TPL -- strike that.
13        Prior to TPL scoping out Mrs. Kunelius'
14    property, did you ever meet with her?
15 A   Prior to scoping it out?
16 Q   Yeah.
17 A   No, I believe we spoke on the phone and met through
18    the course of the project.
19 Q   But is it your testimony that you believe
20    Mrs. Kunelius anticipated that TPL would come in
21    and then default and that she would lose, as a
22    result of that default, the opportunity to sell
23    the property to Mosaic Commons?
24        MR. CONROY: Objection.

- 171 -

1         MS. FETOUH: Objection.
2         MS. ECKER: Objection.
3 A   I have no idea what Mrs. Kunelius --
4 Q   Do you have an understanding that Mrs. Kunelius had
5     considered such an outcome when she was negotiating
6     her deal with Mosaic Commons?
7         MR. CONROY: Objection.
8         MS. FETOUH: Objection.
9 A   Given that I wasn't in the room when she was talking
10    about this contract with her attorney, I have no idea
11    what she anticipated.
12 Q   Looking at Paragraph 1, 2, 3, 4, of the purchase and
13    sale agreement, since I don't think anyone disagrees,
14    at least for the purposes of today, that those apply,
15    or perhaps they don't. Do you agree that all of those
16    provisions, 1, 2, 3 and 4, of the purchase and sale
17    agreement apply to TPL?
18 A   Well, I'll go through them one by one. Should I do
19    that?
20 Q   Sure.
21 A   Paragraph 1 speaks in terms of the seller and the
22    buyer, and the buyer is listed as Co-housing
23    Resources, not TPL.
24 Q   Right.

- 172 -

1 A   Of course, the operation of 61 would alter that.
2     Paragraph 2 talks about the property. Paragraph 3
3     talks about the buildings. Paragraph 4 talks about
4     title.
5 Q   Well, let me stop at Paragraph 3 for a minute. It
6     says in as-is condition, does it not?
7 A   Those are the last three words of Paragraph 3.
8 Q   Do you have an understanding as to what as-is
9     condition means?
10 A   I do.
11 Q   And what is your understanding?
12 A   That the property is sold as is.
13 Q   Not with additional subdivisions, doesn't mention
14    that. Doesn't mention additional permits. It says as
15    is, isn't that correct?
16        MS. FETOUH: Objection.
17        MR. CONROY: Objection. It says what
18    it says.
19 Q   Well, you don't see anything in there that talks about
20    additional provisions such as subdivisions or permits
21    or anything.
22 A   As I mentioned a minute ago, the question of
23    subdivision is not a contract -- just allow me to
24    finish -- is not a contract issue that TPL is raising.

- 173 -

**MELVIN LIPMAN COURT REPORTING**
617-227-3985

DEPOSITION OF CRAIG MACDONNELL

MINIDEP by Kenson

1  It's a fund-raising issue.
2  Q  Have you ever made such a statement to the court, that
3     the subdivision issue was a function of the fund-
4     raising and that's why it didn't have the money?
5            MS. FETOUH: Objection.
6            MS. ECKER: Objection.
7            MR. CONROY: Objection. This
8     deposition is out of control. I will say that on
9     the record. And there comes a time when it gets
10    out of control.
11           MR. McLAUGHLIN: I have to say I am
12    just totally appalled, sir. I am appalled by
13    this --
14           MR. CONROY: Well, I'm sorry to hear
15    you're appalled. Now, why don't you ask a
16    factual question and go forward.
17           MR. McLAUGHLIN: I am just appalled at
18    the behavior of this man who is a member of the
19    bar. I am appalled.
20           MS. FETOUH: Objection.
21           MR. CONROY: I am going to walk out of
22    this room the next time that gets said or
23    anything of that sort gets said.
24           MR. McLAUGHLIN: You go ahead.
                    - 174 -

1            MR. CONROY: And you can talk to Judge
2     O'Toole and tell him, and I hope the stenographer
3     is getting this. You can tell him and defend to
4     him why you are abusing this witness. If you
5     want to ask a question, ask it, and he will
6     answer it.
7            MR. McLAUGHLIN: Do not, do not, point
8     your finger at me.
9            MR. CONROY: I'll point anything I want
10    at you. Go ahead and ask your question.
11           MR. McLAUGHLIN: If you'd like to walk
12    out of this, you do anything you want. The rules
13    are the rules. If you want to disregard the
14    rules, that's fine.
15           MR. CONROY: Yeah, the rules include,
16    the ethical rules include, not abusing a witness.
17    So, let's continue.
18           MR. McLAUGHLIN: I understand your
19    frustration based upon what's happened already in
20    this deposition, because -- I understand all of
21    your frustrations, because I can't believe that
22    there is a six million dollar line of credit and
23    all of you told the judge that there was no money
24    available.
                    - 175 -

1            MR. CONROY: Okay. Go ahead.
2            MR. McLAUGHLIN: Good luck. Not all
3     but maybe all.
4  Q  All right. Let's look to number four. Did the title
5     provision apply to TPL?
6  A  Based on sort of my own perception of this?
7  Q  That's right. All of these are based upon your
8     perception as the director of the Massachusetts branch
9     of TPL.
10 A  By your question, I assume you're asking whether or
11    not TPL, as the assignee, has the right to require
12    Mrs. Kunelius to provide good title.
13 Q  I presume that's what I mean.
14 A  Well, if that's what you mean, I'll answer. I don't
15    want to guess about what you mean.
16 Q  Does Paragraph 4, is that obligation applicable to
17    TPL?
18 A  I believe it's applicable to Mrs. Kunelius. It
19    requires her to deliver good title.
20 Q  Five, Paragraph 5?
21 A  It requires Mrs. Kunelius to deliver the plan
22    referenced there.
23 Q  Six?
24 A  I would say that would require Mrs. Kunelius to comply
                    - 176 -

1     with the requirements related to registered land.
2  Q  Paragraph 7, Purchase Price, I'm going to direct your
3     attention to the amount of the deposit listed under
4     Paragraph 7. How much of a deposit was made under
5     this provision?
6  A  The first line says zero.
7  Q  And noting the bottom of the compilation of numbers
8     there, four hundred thousand promissory note secured
9     by a mortgage, do you see that?
10 A  Yes.
11 Q  It has an asterisk that refers to Paragraph 30 for
12    further terms and provisions.
13 A  Yes.
14 Q  And turn to Paragraph 30. Now, this is the paragraph
15    that you had already looked at. My question to you
16    now is: does Paragraph 30, is this an obligation of
17    Mrs. Kunelius under the terms of the purchase and sale
18    agreement?
19           MS. FETOUH: Objection.
20           MR. CONROY: Objection.
21 A  Based on my own perception of this contract, not from
22    TPL's perception, it would require Mrs. Kunelius to
23    make that mortgage a part of the assigned
24    relationship.
                    - 177 -

1  Q  And you would agree that the mortgage is secured by
2     the 8.57 parcel as we've already discussed?
3  A  We have already discussed that.
4  Q  And looking at the time for performance, number eight,
5     is that time for performance applicable to TPL?
6  A  I would say the first sentence is. The reference to
7     Chapter 40B would not apply.
8  Q  So, the time for performance by TPL was September 26,
9     2003, correct?
10 A  That's what the contract says.
11 Q  Did you perform at that time?
12 A  Did we bring the purchase price to the table on that
13    date?
14 Q  Yes.
15 A  No.
16 Q  Now, is it your understanding that the bold language
17    of Paragraph 8 did not apply to TPL or was optional
18    for TPL?
19 A  Well, based on my own understanding of the provision
20    and my own understanding of the law, the Chapter 40B
21    related extension would be inapposite to TPL.
22 Q  And by inapposite, meaning that it just would be
23    inapplicable, it would be inappropriate based upon the
24    goals and directions of TPL as a conservation
                    - 178 -

1     foundation.
2  A  No. No.
3  Q  What do you mean by inapposite, then?
4  A  It means, I mean, that TPL would not be in the
5     business of applying for a Chapter 40B approval.
6  Q  But there was nothing that prevented TPL from moving
7     forward and obtaining a 40B approval, except that TPL
8     did not want to. Is that correct? Is there anything
9     in this contract, I'm taking about, that prevents TPL
10    from doing that?
11 A  No.
12 Q  In fact, this contract anticipates that the buyer
13    would do that. Isn't that fair to say?
14 A  Anticipates that Mosaic Commons would.
15 Q  And you testified before that TPL steps into the shoes
16    of Mosaic Commons, correct?
17 A  I have.
18 Q  And would it be your testimony that Mrs. Kunelius
19    should have understood that maybe TPL may also want to
20    do a 40B?
21           MS. FETOUH: Objection.
22 A  I have no idea what she would have expected.
23 Q  Number nine, does this apply to TPL?
24 A  I believe it would require Mrs. Kunelius to comply
                    - 179 -

**MELVIN LIPMAN COURT REPORTING**
617-227-3985

DEPOSITION OF CRAIG MACDONNELL

1  with that paragraph.
2 Q  Number ten?
3 A  I believe the printed paragraph before the asterisk
4    would enable Mrs. Kunelius to perfect title and go
5    forward.
6 Q  Number eleven and twelve are related.  So, I'm going
7    to ask you, at any time, did you determine that
8    Mrs. Kunelius had failed to provide the property
9    in accordance with what she was required to do by
10   way of title defect?  Did you identify any title
11   defects?
12 A  I don't recall any title defects.
13 Q  So, twelve really doesn't apply because no defects
14   were identified.  What about thirteen?
15 A  I haven't read Paragraph 12 yet, but I'll move on to
16   thirteen.  Or eleven.  Okay.  I believe Mrs. Kunelius
17   could, based on my own understanding, could ask that
18   TPL live by the terms of Paragraph 13.
19 Q  Fourteen?
20 A  That would enable Mrs. Kunelius to clear title with
21   purchase.
22 Q  Fifteen?
23 A  Fifteen, based on my own understanding, would require
24   Mrs. Kunelius to maintain insurance on the property.

- 180 -

1 Q  Sixteen, seventeen, together, since they deal with
2    adjustments, would you agree that at the time of
3    closing, TPL would have the right to make adjustments
4    on fees paid for water, sewer and so forth, and
5    Mrs. Kunelius would have the right to recover on
6    amounts that had already been paid but not fully
7    accrued?
8 A  I'm just going to read these quickly.
9 Q  Okay.
10 A  It appears as if 16 and 17 could be utilized by both
11   Mrs. Kunelius and the assignee.
12 Q  Who was going to pay the brokerage fee under eighteen?
13 A  The language of Paragraph 18 suggests that a brokerage
14   fee would be paid by the seller.
15 Q  Nineteen is probably inapplicable to this situation.
16   The deposit described in 20, were deposits made?
17 A  Yes.
18 Q  Were these the earnest money deposits that are
19   described in Paragraph 31?
20 A  I believe TPL made what are described in Paragraph 31,
21   or made deposits, however they're described, to
22   Mrs. Kunelius.
23 Q  Do you differentiate between a deposit and earnest
24   money?

- 181 -

1 A  It's been my understanding that a deposit is a deposit
2    is a deposit.
3 Q  And is earnest money earnest money earnest money?
4 A  My understanding all along is that whatever had been
5    paid ahead of time before the purchase price, before
6    the closing, excuse me, was a deposit.
7 Q  And is that because of your understanding of normal
8    real estate procedure in which money was put down to
9    hold the property?
10 A  It's my recollection of this transaction.
11 Q  Did you have any understanding that the earnest monies
12   described in Paragraph 31 were to be used as living
13   expenses by Mrs. Kunelius during the pendency of the
14   40B approval process?
15 A  No.
16 Q  So, is it fair to say there's nothing in this contract
17   that says that, but did you have any separate
18   understanding that the money that was being given to
19   Mrs. Kunelius, that fifteen hundred dollars a month,
20   was because she didn't have any money to live on and,
21   therefore, Co-housing agreed that they would pay her
22   living expenses while they went forward?
23 A  No.
24 Q  Today is the first time you've heard that?

- 182 -

1 A  Yes.
2 Q  On Paragraph 21, that's the provision that you believe
3    applies, is that correct, on liquidated damages?
4 A  I do believe, on my own personal understanding of the
5    contract, that Paragraph 21 applies.
6 Q  Twenty-two, 23, 24, don't seem to apply.  Twenty-five?
7 A  Based on my own understanding of the contract, I
8    believe Paragraph 25 would apply.
9 Q  So, representations made by you on behalf of TPL would
10   apply to this purchase.  Is that fair to say?  Is that
11   how you read that?
12        MS. FETOUH:  Objection.
13        MS. ECKER:  Objection.
14        MR. CONROY:  Objection.
15 A  The way I read that is as follows:  the buyer
16   acknowledges that the buyer has not been influenced to
17   enter into this transaction nor has he -- I guess, in
18   this case, she -- relied upon any warranties or
19   representations not set forth or incorporated in this
20   agreement.  And it goes on.
21 Q  And TPL is the buyer?
22 A  TPL is the assigned buyer.
23 Q  Mortgage contingency clause refers to 80 percent of a
24   project construction price.  Under your understanding

- 183 -

1    of this contract, could you have borrowed money, TPL
2    have borrowed money, construction loan, and have it
3    secured by the property?
4        MR. CONROY:  Objection.
5 A  Based on my own understanding of the contract, this is
6    exactly the kind of provision that would not apply to
7    TPL.
8 Q  That's by election of TPL.  In other words, if TPL
9    were to elect to have a project construction price, I
10   mean, a conventional financing, they could do that.
11   TPL could have availed themselves of this provision,
12   correct?
13        MS. FETOUH:  Objection.
14        MS. ECKER:  Objection.
15        MR. CONROY:  Objection.
16 A  Well, speaking on my own understanding of the
17   contract, it appears that Paragraph 26 was designed to
18   enable -- we've been saying Mosaic Commons, but it's
19   actually Co-housing Resources -- to borrow money to
20   build the project that they imagined, and since that
21   notion really is inapposite to what TPL was intending
22   to do, it seems to me that Paragraph 26 would not be
23   available for TPL to rely on.
24 Q  That's because TPL wouldn't do the 40B.  Is that

- 184 -

1    correct?
2 A  It's because that provision imagines a large-scale
3    construction on the property.
4 Q  So, it is important for you to consider what the
5    provision must have imagined at the time that it was
6    entered into in order for it to have some validity in
7    the contract.  Is that your testimony?
8        MS. FETOUH:  Objection.
9 A  My testimony is, on my own personal understanding of
10   the law, is that a court would require some provisions
11   to apply and others not to apply and that there would
12   be an analysis conducted by a judge, if this were ever
13   put to a judge, that would figure out which provisions
14   are applicable to an assignee and the assignee's
15   purpose under the statute.
16 Q  Where does it say that, under the statute?  Have you
17   ever found any particular portion of the statute that
18   deals with what the intention of the assignee or his
19   purpose might be, his or its purpose?
20 A  What I'm referring to is the lore and the common law
21   under Chapter 61A that's understood by Chapter 61A
22   practitioners.
23 Q  So, you've had some experience identifying what
24   Chapter 61A practitioners do as a matter of course.

- 185 -

MELVIN LIPMAN COURT REPORTING
617-227-3985

DEPOSITION OF CRAIG MACDONNELL



1  How did you establish what that was?
2  A  It's through working with them.
3  Q  Any other provision of the purchase and sale agreement
4     that you believe -- well, which one are we on here?
5     We're on the mortgage contingency, the construction of
6     the agreement, lead paint law, smoke detectors. The
7     purchase price financing, we have already discussed.
8     The earnest money, we have discussed. The 40B
9     application and transfer of the land, I think you've
10    discussed. Are there any other provisions? For
11    example, let's go to thirty-five.
12 A  I don't think I have an opinion on that one.
13 Q  Well, you would agree with me, wouldn't you, that the
14    seller was not going to convey the entire parcel to
15    Co-housing but, rather, was going to convey 8.57 acres
16    only, and that the purchase price was for the 8.57
17    acres only and that the remaining parcel would be
18    transferred as a charitable contribution to the town?
19    Isn't that correct?
20 A  Paragraph 35 contemplates that.
21 Q  But that's not what TPL contemplated, is it? In other
22    words, TPL did not contemplate spending 1.116 million
23    dollars for the 8.57 acres, did it?
24         MS. FETOUH: Objection.
                                   - 186 -

1  A  I think it imagines, speaking of my own understanding
2     of the contract, that it would have the ability to
3     control the whole parcel and where the conservation
4     project that we've talked about.
5  Q  Your answer, therefore, is that TPL did not want to
6     comply with a strict reading of Paragraph 35 because
7     TPL wanted to control the whole parcel. Is that fair
8     to say?
9         MS. ECKER: Objection.
10        MS. FETOUH: Objection.
11        MR. CONROY: Objection.
12 A  No, I'm saying that our intention was to have that
13    parcel, a conservation parcel that in our minds was
14    that parcel, go to the town and that there be a
15    development on a portion adjacent to Red Acre Road
16    that would bring enough dollars to be able to pay
17    Mrs. Kunelius.
18 Q  Or pay back TPL had they borrowed on their line of
19    credit.
20 A  Our intention was to pay Mrs. Kunelius.
21 Q  But that money from the parcel development was
22    intended, at least initially, according to the
23    statements that you made to the Commonwealth of
24    Massachusetts, that that development would pay back
                                   - 187 -

1     TPL for the money it borrowed under its line of credit
2     with Wainwright Bank.
3         MS. FETOUH: Objection.
4  A  If TPL decided to borrow the money.
5  Q  So, the crux of the issue, from your point of view, is
6     that it was simply an issue of whether TPL decided it
7     wanted to borrow or not. If it didn't, then it
8     wouldn't. If it did, Mrs. Kunelius would be paid. Is
9     that fair?
10        MS. FETOUH: Objection.
11 A  No.
12 Q  What's unfair about that?
13 A  What I've tried to help you understand is that TPL's
14    mission was to complete this project. The way we
15    would go about that would be to raise money in these
16    various ways. If it appeared likely that either
17    private fund-raising or private sales were going to
18    come together successfully, then TPL would have
19    considered borrowing ahead of time, but where, in this
20    case, where it seemed so unlikely that those various
21    sources of money would come back to TPL, that it would
22    not have been prudent for TPL to borrow.
23 Q  So, it was the fact that TPL faced a risk of loss that
24    was the reason that they didn't go forward. When you
                                   - 188 -

1     were doing that analysis, is it fair to say that you
2     became aware that Mosaic Commons had been dissuaded
3     from re-applying to purchase the property and get a
4     40B because of the activities of TPL and the Town of
5     Stow?
6         MS. FETOUH: Objection.
7         MR. CONROY: Objection.
8  A  No.
9  Q  Did you ever have discussions with anyone from Mosaic
10    Commons or Co-housing?
11 A  Yes.
12 Q  Are you aware that Mosaic Commons believes that TPL
13    and the Town of Stow were intentionally trying to
14    dissuade it from coming back and purchasing the
15    property under the 40B requirement?
16        MR. CONROY: Objection.
17 A  I am not aware of that.
18 Q  Are you aware of any conversations between yourself
19    and anyone from the town dealing with the fact that
20    the town members were pleased with your efforts
21    because it resulted in the 40B being defeated, in
22    effect, because Mosaic Commons would not come back?
23        MS. ECKER: Objection.
24        MR. CONROY: Objection.
                                   - 189 -

1  A  No.
2  Q  It is your testimony that no one ever said to you that
3     the outcome prevented low-income housing from being
4     adjacent to the properties and the Red Acre Road and
5     that that was a result that a lot of people hoped to
6     achieve?
7  A  I don't recall anyone saying that to me in so many
8     words, no.
9  Q  Do you recall them saying it to you in some other
10    fashion?
11 A  Well, I have an understanding, and, actually, as I sit
12    here now, I don't know where that understanding came
13    from, but I believe that the Friends of Red Acre were
14    disappointed this overall project did not go forward
15    but were not unhappy about Mosaic Commons not being
16    there.
17 Q  And that's because Mosaic Commons was low-income
18    housing. Isn't that correct?
19 A  Well, I can't say that.
20 Q  Was there any other reason that you had heard as to
21    why the abutter would be happy that Mosaic Commons was
22    not going to be coming, other than the fact that the
23    housing they were going to be putting in was low-
24    income?
                                   - 190 -

1         MS. FETOUH: Objection.
2  A  Part of the justification of this conservation project
3     was that this was a delicate aquifer area. So, many
4     folks saw this conservation project as a way of
5     protecting Stow's water supply and that the absence of
6     any development on Mrs. Kunelius' land was good for
7     the water supply in the Town of Stow, and I think the
8     absence of a development on that property does result
9     in the protection of that water supply. So, that
10    would be another reason why people would be not
11    unhappy that Mosaic Commons is not around anymore.
12        MR. CONROY: When you're ready, five
13    minutes, ten minutes?
14        MR. McLAUGHLIN: Sure. I'll ask one
15    question and we'll take a break.
16 Q  On February 11th, there was a town Board of
17    Selectmen's meeting concerning TPL, and I think you've
18    already testified that you attended that meeting. I'm
19    going to put before you the following document.
20        (WHEREUPON, Exhibit No. 17, Stow Board
21    of Selectmen meeting, February 11, 2003, marked
22    for identification.)
23 Q  I'd ask you to look at the second page. These appear
24    to be minutes, although I can't tell exactly what they
                                   - 191 -

DEPOSITION OF CRAIG MACDONNELL

1  arc. It's a February 11th document.  At the top is
2  Stow Board of Selectmen Meeting.  It talks about
3  handouts.  Some of it's written in the first person.
4  I don't know whether these are minutes or not.
5      Pointing to the second page, the last two
6  paragraphs say:  If TPL can complete this deal
7  without additional cost to the taxpayers, I urge
8  you, then, to vote the way that the townspeople
9  have demonstrated at the polls, conservation, and
10  assign the right of first refusal under Chapter
11  61B to Trust for Public Land.  Otherwise, the
12  proposed 40B development will have a negative
13  irreversible effect on the Red Acre community and
14  the Town of Stow.
15      When you were at that meeting, were you
16  aware that there were people who were against the
17  40B simply because it would have a negative
18  effect on the community?
19  A  Well, I don't recall this fellow, Drew Simmons, being
20  there, but apparently he's one.
21  Q  So, you don't recall that discussion?
22  A  I don't recall his presentation.  I don't know if he
23  made a presentation.  I've never seen this before, so
24  I don't know what it is.

- 192 -

1  Q  Okay.  I'm going to put before you another document,
2  which is a compilation of documents from the Stow
3  Conservation Commission.
4      (WHEREUPON, Exhibit No. 18, Stow
5  Conservation Commission documents, marked for
6  identification.)
7  Q  I'd ask you to look to Bate stamp No. 154, and on that
8  Bate stamp number are Stow conservation minutes, April
9  15, 2004.  Going down to about three-quarters of the
10  page down, Trust for Public Land/Kunelius parcel, it
11  states:  Craig MacDonnell, of the Trust for Public
12  Land, TPL, and Carol Sommerlad, of the Friends of Red
13  Acre, requested a meeting with the Commission to give
14  them an update on their progress with the Kunelius
15  property on Red Acre Road.  The Board of Selectmen
16  assigned the right of first refusal to TPL for the 50-
17  acre Kunelius Farm located on Red Acre, preventing a
18  40B Co-housing development.
19      So, you were aware, certainly, that your
20  efforts with TPL had the effect of preventing a
21  40B development.  Is that fair to say?
22  A  Were we successful in conserving the property, the
23  property would have been conserved and not developed.
24  Q  Under 40B.

- 193 -

1  A  Correct.
2  Q  And you are aware, also, that under 40B there were no
3  permits or variances required by Co-housing in moving
4  forward.  Isn't that correct?
5      MS. ECKER:  Objection.
6      MS. FETOUH:  Objection.
7  A  I don't know.  I mean, I don't have a thorough
8  understanding Chapter 40B.
9  Q  Well, under the provisions of the purchase and sale
10  agreement, there were no contingencies for the
11  obtaining of variances or permits by Co-housing.
12  Isn't that fair to say?·
13  A  Yes.
14  Q  And the only contingency under the purchase and sale
15  agreement was for some sort of feasibility study by
16  Co-housing.  Is that fair to say?
17  A  I could go back and double-check the contract if you'd
18  like.
19  Q  You don't recall offhand.  Is that your testimony?
20  A  Well.
21  Q  That's all right.
22  A  It's late in the day and I've been looking at a lot of
23  documents.  I'd be happy to go back and take a look at
24  it.

- 194 -

1  Q  No, that's all right.  Do you recall, when you had a
2  discussion with Mrs. Kunelius, that she told you that
3  the reason she agreed to the Co-housing purchase
4  price of $1,116,900 was because, in effect, while it
5  was less than she wanted, there was a certainty of
6  collection because it was a 40B and did not require
7  any variances or permits?  Do you remember her telling
8  you that?
9  A  No.
10  Q  As you sit here today, are you testifying that she did
11  not tell you that or that you do not remember that?
12  A  I have no recollection of her saying that.
13  Q  If she were to testify that she did say that, would
14  you testify that she did not?
15      MR. CONROY:  Objection.
16      MS. FETOUH:  Objection.
17      MS. ECKER:  Objection.
18  Q  Or that you did not remember it?
19  A  I would be surprised to hear that testimony.
20  Q  Do you recall anything in a discussion with her
21  concerning the fact that the certainty of payment with
22  Co-housing under the 40B ensured that her retirement
23  would be available to her?  Do you recall anything
24  like that?

- 195 -

1  A  I remember a reference to retirement.  I don't recall
2  the reference being in the context of Chapter 40B.
3  Q  Do you recall her telling you that she had no money?
4  A  No.
5  Q  Did you ever go out on the site?
6  A  Uh-huh.
7      MR. CONROY:  Yes or no.
8  A  Yes, I did go on the site.
9  Q  What was the condition of the house?
10  A  I never went in the house.  I only saw it from the
11  outside.
12  Q  What was the condition of the barn?
13  A  It needed repair.
14  Q  Was it dilapidated?
15  A  You know, the structure was still pretty good.  It
16  needed some work, but the basic timbers were fairly
17  strong.
18      MR. McLAUGHLIN:  I'm going to read
19  something from the complaint and I'd like you to
20  leave.
21      (Mr. Norris exits the room.)
22  Q  I'd like you to turn to Paragraph 46 of the complaint.
23  It reads as follows:  In the spring of 2004,
24  MacDonnell met with Kunelius, Kunelius' counsel and

- 196 -

1  Jim Boothroyd, and a local real estate broker, David
2  Norris, in connection with TPL's demands for a lower
3  purchase price.  During that meeting, TPL threatened
4  and intimidated Kunelius and her counsel by stating,
5  generally, that TPL had serious and influential
6  connections by way of its Board of Advisors who would
7  defend TPL against any legal action brought by
8  Kunelius as a result of TPL's default.
9      I'm going to stop there and continue from
10  that point, but without commenting on Item No. 1
11  which I've just read, do you recall attending a
12  meeting with Kunelius, Kunelius' counsel,
13  Mr. Kachajian, Jim Boothroyd and David Norris and
14  others?
15  A  Is this Mr. Norris here?
16  Q  Yes.
17  A  Yes, I do remember a meeting in Boothroyd's office
18  with them.
19      MR. CONROY:  Before you ask the next
20  question, we've been going a long time.  I'd like
21  to take a little break before we go further.
22      MR. McLAUGHLIN:  Sure.
23      (Recess, 4:14 P.M.)
24      (After recess, 4:24 P.M.)

- 197 -

DEPOSITION OF CRAIG MACDONNELL

MiniDep by Kenson

```
 1        (Messrs. Kachajian and Norris not present)
 2   By MR. McLAUGHLIN:
 3 Q We were talking about the meeting, I think you said,
 4     at Boothroyd's office. Do you remember if anyone
 5     accompanied you from TPL to that meeting?
 6 A I don't believe so.
 7 Q Do you recall whether anyone from the town accompanied
 8     you to that meeting?
 9     MS. FETOUH: Objection.
10 A You know, I don't remember. There were so many of
11     these with various players.
12 Q Do you recall being assisted out of the room by one of
13     the individuals at that meeting because you had become
14     extremely angry, angry and agitated?
15 A No, that did not happen.
16 Q Do you know a Bob Wilbur?
17 A I do know Bob.
18 Q Do you recall, was Bob Wilbur at that meeting?
19 A Bob Wilbur was at several of these meetings. This
20     doesn't have a date on it.
21 Q You're looking at the complaint?
22 A Yes.
23 Q No, it doesn't have a date. How well do you know
24     Jim Boothroyd?
```
                       - 198 -

```
 1 A I met Jim through this project.
 2 Q Do you recall the discussion between yourself and
 3     Mrs. Kunelius and her representatives as being heated?
 4 A I remember this period of time continuing, actually,
 5     into the fall, later -- what is the date, spring of
 6     '04? Is that right?
 7 Q Yes.
 8 A I remember there were discussions in the spring and in
 9     the summer and into the fall where TPL was trying very
10     hard to keep this project alive, and there were a
11     number of meetings to do that.
12 Q When you say they were trying to keep the project
13     alive, do you recall proposing a new purchase price
14     for the property?
15 A I recall trying to put together an alternative deal.
16 Q And did that include a new purchase price?
17 A Yes.
18 Q And do you recall doing that on at least two
19     occasions?
20 A Yes.
21 Q Do you recall asking that the price be reduced to
22     $900,000?
23 A I remember, I believe, eight hundred and nine hundred.
24 Q Okay. Saved me the question. Under the terms of the
```
                       - 199 -

```
 1     purchase and sale agreement, did you believe you had
 2     the right to change the purchase price?
 3 A The contract was over at that point. We weren't
 4     talking about the contract anymore.
 5 Q So, you viewed the contract as dead at that point?
 6 A Yes.
 7 Q Back to the meeting. Do you recall getting into an
 8     argument with Mr. Kachajian and then threatening him
 9     in any way?
10 A I remember having a discussion where TPL was trying
11     very hard to come up with an alternative plan that
12     would get a significant amount of money into
13     Mrs. Kunelius' pocket, and what I remember is
14     that we weren't making any progress on that front
15     and that Mr. Kachajian and I went back and forth
16     on whether or not this was possible or not, and I
17     believe Mr. Kachajian was not encouraging this
18     outcome, and I was trying my best to encourage
19     him that it's a good opportunity for
20     Mrs. Kunelius.
21 Q And the good opportunity you're talking about is
22     accepting a lower purchase price. Is that fair to
23     say?
24 A Lower than the contract price.
```
                       - 200 -

```
 1 Q And in the alternative, if she did not, that you would
 2     not pay her anything at all and walk away.
 3 A We had already walked away.
 4 Q Now, back to Paragraph 46. Do you recall saying
 5     something to the effect that TPL had serious and
 6     influential connections by way of its Board of
 7     Advisors who would defend TPL against any legal action
 8     brought by Kunelius as a result of TPL's default? Do
 9     you remember saying anything like that?
10 A I remember saying that we thought that, if necessary,
11     we would litigate this issue, because we thought we
12     were right, and that if we couldn't put a project
13     together now or then, after the contract was dead,
14     that we would look to our pro bono counsel to litigate
15     the issue, and because we thought we had a good case,
16     we thought we'd win.
17 Q And, in fact, the pro bono counsel was on your Board
18     of Advisors, and that was Goodwin, Procter & Hoar.
19     MS. FETOUH: Objection.
20 A Goodwin does represent us in this matter, and, you
21     know, whether I referred to them by name, I can't
22     remember.
23 Q You also had other counsel, pro bono counsel, on your
24     Board of Advisors, including Hill & Barlow?
```
                       - 201 -

```
 1 A If it was still Hill & Barlow then. I can't remember.
 2 Q I think it was. But you recall them being on your
 3     Board of Advisors?
 4 A I do. Well, not the firm. There was --
 5 Q Someone from Hill & Barlow?
 6 A -- a lawyer from what I think was Hill & Barlow.
 7 Q Do you recall referring to Choate, Hall & Stewart as
 8     your counsel in that discussion with Mr. Kachajian?
 9 A I don't.
10 Q Do you recall saying to Mr. Kachajian that your pro
11     bono counsel could bury him because it doesn't cost
12     you anything and Mrs. Kunelius couldn't afford to have
13     counsel represent her in the long run?
14 A I remember saying that I thought we had a really good
15     case and that, if necessary, we would litigate it and
16     that we would win because of the strength of our
17     position.
18 Q But you do not remember saying -- are you denying that
19     you said to anyone at that meeting that your counsel,
20     your pro bono counsel, would bury Mrs. Kunelius and
21     anyone who tried to represent her?
22 A I don't know if I used the word bury, but I was
23     vehement in my statements that we had a very strong
24     case.
```
                       - 202 -

```
 1 Q Do you recall saying that the Board of Advisors
 2     included prominent law firms that would tie up
 3     Kunelius for as long as it took?
 4 A Not in those words, I don't recall, but I do remember
 5     saying that we would litigate this to the end and that
 6     we would win.
 7 Q Do you recall saying that it would tie up whatever
 8     assets she had and she couldn't possibly win,
 9     something to that effect?
10 A I don't recall discussing assets. I recall discussing
11     the merits of the case and saying that, because of the
12     correctness of our position and the capacity of our
13     counsel, I believed we would prevail.
14 Q Do you recall saying to Mrs. Kunelius and the people
15     that were with her there that you knew she was of
16     limited means and that her attorney would not be able
17     to spend sufficient funds to win any matter against
18     TPL because of TPL's pro bono counsel which didn't
19     charge anything?
20 A What I can tell you is what I remember of that
21     meeting, in which I believe Mr. Kachajian and I
22     debated at length whether or not it was possible for
23     this project to be reconstructed, and we debated
24     lawyer to lawyer who would win the litigation if it
```
                       - 203 -

DEPOSITION OF CRAIG MACDONNELL                    MINIDEP by Kenson

1   came.
2 Q   How well do you know Bob Wilbur?
3 A   I know him in a professional capacity.
4 Q   And do you know him to be an honest person?
5 A   I have not experienced any dishonesty from Bob.
6 Q   Is it your testimony today, after discussing this
7       meeting which you attended, that you still have no
8       recollection of Mr. Wilbur literally forcing you out
9       of the room to calm you down?
10 A   I have a very explicit understanding of what happened
11      that day with respect to Mr. Wilbur and it had nothing
12      to do with him forcing me out of the room.
13 Q   So, you have a pretty good and explicit memory as to
14      some things related to this case and some meetings,
15      and on this particular matter, you remember the actual
16      specifics of whether or not Mr. Wilbur took you out of
17      the room.  If Mr. Wilbur testified that he did, would
18      that surprise you?
19            MS. FETOUH:  Objection.
20            MS. ECKER:  Objection.
21 A   What I will say about that is that Bob asked me to go
22      out to the street to talk about how to refine our
23      position.  We went outside.  Mr. Boothroyd's office is
24      a storefront.  We were meeting in the open space.  We

                        - 204 -

1       went outside, Bob and I, to discuss is it possible to
2       get another chunk of money on the table for
3       Mrs. Kunelius.  We didn't discuss the hijinks or
4       whatever it was that went on inside.  We talked
5       about the proposal we were trying to fashion for
6       Mrs. Kunelius.  I discussed with Bob the
7       possibility of bringing additional Stow
8       Conservation Trust money to the table on the
9       sidewalk in Maynard.  That was the reason we went
10      outside.
11 Q   Were you yelling at Mr. Wilbur at that point, outside
12      on the sidewalk, do you recall?
13 A   We were on the same team, if you will.  We were trying
14      to keep this project together.
15 Q   Do you recall swinging your fists and your arms in the
16      air when you were out on the sidewalk or during the
17      meeting when Mr. Wilbur left with you?
18 A   I recall doing no such thing inside.  Outside, I don't
19      have a recollection of whether I waved my arms in an
20      animated sort of way of helping me articulate what I
21      was saying, sort of like the way I am now, but there
22      was nothing intimidating about it.
23            MR. CONROY:  Off the record?
24            (Brief discussion off the record)

                        - 205 -

1   By MR. McLAUGHLIN:
2 Q   When you left the meeting, after you had your meeting
3       out on the sidewalk with Mr. Wilbur, did you come back
4       into the meeting?
5 A   I think we did.
6 Q   I have referred to Bob Glassman in the past.  I just
7       want to, to give you a sense -- I don't even need to
8       use this as an exhibit, but just so you have an
9       understanding, Bob Glassman is listed on your Web site
10      as the founder of Wainwright Bank and is on your Board
11      of Advisors.  I want to again turn to
12      Mr. Glassman and what knowledge Wainwright Bank
13      had of references to that line of credit.
14            Are you aware of any correspondence between
15      TPL and Wainwright Bank regarding the disclosure
16      of the line of credit to the state as a backup
17      plan?
18 A   I am not.
19 Q   Are you aware of any restrictions on the line of
20      credit as to how much money can be taken out at a
21      particular time?
22 A   I am not.
23 Q   You were aware, were you not, that Mrs. Kunelius was,
24      during the summer of 2003, extremely worried about the

                        - 206 -

1       status of the sale to TPL?
2 A   I was aware from talking to her counsel that she was
3       concerned.
4 Q   Did you ever call Mr. Kachajian prior to the
5       acceptance of the right of first refusal and say to
6       Mr. Kachajian or to Mrs. Kunelius, or any
7       representative of Mrs. Kunelius, including Boothroyd,
8       that it was your intention to rely on the liquidated
9       damage clause provision and that she should be aware
10      of that in case she wanted to take any steps to let
11      the town know of that prior to the town assigning the
12      right of first refusal to TPL?
13            MS. ECKER:  Objection.
14 A   No, I have no recollection.
15 Q   Do you think, as an attorney, that you had any
16      obligation, dealing with an elderly woman, to inform
17      her of the likelihood or the chance that if the town
18      assigned the right of first refusal to TPL that TPL,
19      as a charitable institution, might in effect prevent
20      the sale to Mosaic Commons and leave Mrs. Kunelius
21      with no buyer?
22            MR. CONROY:  Objection.
23            MS. FETOUH:  Objection.
24 A   Do I think as an attorney that I have an obligation or

                        - 207 -

1       that TPL -- I'm just trying to --
2 Q   Well, let's start with you.  You, as an attorney, do
3       you think you had any obligation to be up front about
4       the possibility that Mrs. Kunelius would be left with
5       $22,000 months after the fact with no one to purchase
6       her property?
7            MR. CONROY:  Objection.
8            MS. FETOUH:  Objection.
9 A   An attorney who happens to be working for the Trust
10      for Public Land doing this project or?
11 Q   Well, why don't we do this.  TPL is a charitable
12      institution, is it not?
13 A   It's a non-profit.
14 Q   Well, I asked you earlier if it was a charitable
15      institution, and I thought you said yes.  It is not?
16      What's the difference between a charitable institution
17      and a non-profit?
18            MR. CONROY:  Objection.
19 A   You know, I should be accurate here.  My understanding
20      is that it is a California not-for-profit corporation
21      that's registered as a 501c3.
22 Q   And as a result, TPL has a tax-exempt status, right?
23 A   Yes, that's my understanding.
24 Q   And as a result of that, TPL, with its tax-exempt

                        - 208 -

1       status, is able to obtain pro bono counsel and pro
2       bono advice and doesn't have to count it as income.
3       Is that correct?
4            MS. FETOUH:  Objection.
5            MR. CONROY:  Objection.
6 A   I don't really know how TPL accounts for the provision
7       of pro bono services.
8 Q   Do you recall trying to convince the Town of Stow to
9       re-describe the involvement of TPL in the Kunelius
10      property after the fact so that TPL could get a tax
11      deduction where otherwise it could not?
12            MR. CONROY:  Objection.
13            MS. FETOUH:  Objection.
14            MS. ECKER:  Objection.
15 A   TPL -- well, I have no such recollection of any
16      conversation like that.
17 Q   Do you recall writing to Ross Perry and telling him
18      that you would like him to re-designate TPL's
19      activities on the Kunelius property from activities of
20      lobbying to activities of advice so that you could
21      claim deductions and have a tax benefit for that?
22 A   No, that's not my memory.
23            (WHEREUPON, Exhibit No. 19, MacDonnell
24      email to Perry, dated April 17, 2003, marked for

                        - 209 -

MELVIN LIPMAN COURT REPORTING
617-227-3985

DEPOSITION OF CRAIG MacDONNELL

MiniDep by Kenson

identification.)

2 Q  Exhibit 19 is before you. This appears to be a
3     letter, or an email, from Craig MacDonnell, with your
4     email address, to Ross and Bill. I believe it's Ross
5     Perry and perhaps Bill Wrigley, but I can't be sure,
6     but it goes to the town administrator, so it's
7     probably Bill Wrigley, the town administrator, in
8     which you, apparently, are revising letters for the
9     Board of Selectmen to you, in which you ask them to
10    write a letter on April 15th, 2003, describing your
11    involvement as technical rather than lobbying. Do you
12    see that?
13 A  I see the language under the heading Ross and Bill.
14 Q  Now, up until April 15th, isn't it in fact true that
15    it was TPL's absolute intention from early January of
16    2003, at the latest, through the time of the
17    assignment, that TPL sought to acquire and control the
18    property known as the Kunelius Farm? Isn't that fair
19    to say that's what you were doing?
20        MR. CONROY: Objection.
21 A  Pardon me. I just had a moment of lack of
22    concentration and I missed your question. Would you
23    mind restating it? I'm sorry.
24 Q  Well, I'm interested here in your letter to Mr. Perry

– 210 –

1     in which you write for him, it appears, in which you
2     are asking Mr. Perry, and, in fact, sir, I will inform
3     you that he does write such a letter on April 15th or
4     thereafter in which the letter seems to be asking for
5     technical advice, and the purpose of this letter seems
6     to be that the reason TPL needs it is because it
7     enables TPL to count more of the support work as
8     technical assistance rather than lobbying for IRS
9     purposes.
10        MS. FETOUH: Objection.
11 Q  Now, in fact, TPL was lobbying for that property.
12    Isn't that fair to say?
13        MR. CONROY: Objection.
14        MS. FETOUH: Objection.
15 A  TPL typically asks boards of selectmen for these kinds
16    of letters because the IRS recognizes the work that
17    TPL does in response to requests from boards of
18    selectmen as technical assistance rather than lobbying
19    if the record so reflects that. So, it's a normal,
20    every-project request that we ask boards of selectmen
21    to do this letter.
22        (Mr. Kachajian enters the room.)
23 Q  Well, you may recall that I asked you at the beginning
24    of this deposition how you got involved with the

– 211 –

1     Kunelius property, and your testimony was through
2     Mr. Christianson concerning the possibility of
3     establishing a conservation restriction on the
4     property. Is it your testimony that the
5     application for $350,000 from the state was
6     advice work on behalf of the Town of Stow, or was
7     it lobbying?
8        MR. CONROY: Objection.
9        MS. FETOUH: Objection.
10 A  I don't think I have a position on that. I mean, I
11    have never thought of that in one way or another, so
12    forgive me here, late in the day, for not having a
13    facile answer to that question.
14        (WHEREUPON, Exhibit No. 20, Friends of
15    Red Acre letter to Board of Selectmen, dated June
16    6, 2003, marked for identification.)
17 Q  These two documents, which are Exhibit 20, were
18    together when we received them, so we kept them
19    together. The first one is from Friends of Red Acre
20    to the Town of Stow, and it is a letter to the Board
21    of Selectmen of the Town Stow signed by three people,
22    apparently, from the Friends of Red Acre. It's dated
23    June 6th. I'm going to ask you to just take a look at
24    that letter, because it would seem that this letter

– 212 –

1     indicates that the Friends of Red Acre believed that
2     the deal was done as of June 6, 2003, and I would ask
3     you to read the letter and then tell me whether you
4     have any understanding concerning this letter.
5 A  I read it.
6 Q  Had you seen this before?
7 A  I don't remember seeing it before.
8 Q  Is it fair to say that the Friends of Red Acre had
9     been approached by you for fund-raising purposes?
10 A  Yes.
11 Q  Is it also fair to say that at some point in the fund-
12    raising process you approached them and told them not
13    to fund-raise because, for other reasons, you had
14    decided not to go forward with the development?
15 A  I have no memory of telling Friends of Red Acre not to
16    fund-raise during the period of time that was sort of
17    relevant to the possibility of the project going
18    forward.
19 Q  Is it your testimony that you did not tell them, or is
20    it your testimony that you have no recollection of not
21    telling them to fund-raise, of telling them not to
22    fund-raise, because you didn't want to go forward with
23    the project?
24 A  I did not tell them not to fund-raise because TPL did

– 213 –

1     not want to go forward with the project.
2 Q  So, if any of these people were to testify, any of
3     these people listed here were to testify, that in fact
4     you did discourage them from fund-raising because TPL
5     did not want to go forward with the project, would
6     they be lying?
7        MS. FETOUH: Objection.
8        MS. ECKER: Objection.
9        MR. CONROY: Objection.
10 A  I would be surprised.
11 Q  Do you know Michael Labosky?
12 A  I have met Michael, yes.
13 Q  Did you ever have any discussions with him in which
14    you discouraged him from fund-raising?
15 A  The reason I'm pausing is that over the course of, you
16    know, more than one year we talked about this project
17    a lot, this group of people and TPL. Towards the end
18    of that period of time, when the project was falling
19    apart, TPL discussed with Friends of Red Acre the fact
20    that it was falling apart, and during those
21    conversations, when the horizon was very dark, it made
22    sense for all of us to fold our tent.
23 Q  Well, do you recall them questioning you as to why TPL
24    was not using the money that TPL said it had in its

– 214 –

1     own funds or by way of line of credit in order to
2     effectuate the sale?
3 A  Generally, I remember having discussions with this
4     group about how to keep the project together,
5     including where was the money going to come from, is
6     it borrowed, is it privately fund-raised. There were
7     many, many conversations along those lines.
8 Q  But do you remember them questioning you as to why you
9     would not use the line of credit or any other funds
10    that you had referred to as capital?
11 A  Yes.
12        (Mr. Norris enters the room.)
13 Q  And do you recall them being angry at you or
14    dissatisfied with you because they felt that you had
15    misled them concerning the availability of funds that
16    TPL itself had or could obtain in order to effectuate
17    the purchase?
18 A  I remember some difficult conversations about the
19    future of the project.
20 Q  But not so much --
21 A  I'm trying to answer your question.
22 Q  I know, but you have a distinct method of answering
23    surrounding issues. I'm talking about just the issue
24    of were they angry at you for not using the line of

– 215 –

MELVIN LIPMAN COURT REPORTING
617-227-3985

DEPOSITION OF CRAIG MacDONNELL

MINIDEP by Kenson

1  credit or such other capital funds as you had
2  described to them previously, just that issue, line of
3  credit or capital funds.
4  A  Do I remember anger related to line of credit?
5  Q  Not being used.
6  A  Not specifically.
7  Q  Generally, do you remember it?
8        MR. CONROY:  Remember anger?
9  Q  Anger by the members of the Friends of Red Acre
10  because they were upset that you were not using either
11  the line of credit or such other capital funds as you
12  had referred to in the past with them.
13  A  My memory regarding their frustration regarding the
14  pace of the project was, really, the frustration we
15  were all having with the private fund-raising.  There
16  was a sense going into this project that there was a
17  very significant amount of private fund-raising easily
18  had in the Town of Stow in a small collection of
19  foundations and that when it became apparent later on
20  in the project that those identified sources of funds
21  and the dollars assigned to those funds were
22  overstated, there was a disconnect between TPL and the
23  Friends of Red Acre and there was upset over that
24  question.

- 216 -

1  Q  Was there also upset over the disconnect between your
2  description of private market funds and the line of
3  credit which you were now refusing to use?
4        MS. FETOUH:  Objection.
5  A  Okay.  I've tried to testify that my memory regarding
6  this upset is not specific as to the line of credit.
7  It's regarding sort of the overall progress of the
8  project.
9  Q  Do you recall reviewing an except from your Web site
10  which referred to the ability of TPL to bridge the gap
11  when the town couldn't raise funds?
12  A  The one you showed me earlier today?
13  Q  Yes.
14  A  Yes, I do remember that.
15  Q  Do you recall Friends of Red Acre being angry at you
16  concerning your refusal to bridge the gap because you
17  had told them of TPL's ability to do so and it was
18  because you had that they had spent time trying to
19  fund-raise?
20  A  My memory of this disconnect is related to the debate
21  between finances and financing, which was a question
22  of is it possible to raise the money necessary for the
23  project versus how do you finance it.
24  Q  Well, do you not recall that the $22,000 that was paid

- 217 -

1  to Mrs. Kunelius by TPL was raised by the Friends of
2  Red Acre and that they were concerned and upset with
3  you once you decided that you were not going to borrow
4  the money from the line of credit and/or from your
5  private capital markets that you had referred to, and
6  there was an issue as to whether or not -- why you
7  were doing that when you had caused them to raise the
8  $22,000, which was the entire amount of money that was
9  paid to Mrs. Kunelius?
10        MS. FETOUH:  Objection.
11        MR. CONROY:  Objection.
12  A  I'd like to answer your question, but I really -- it's
13  so long that I'm afraid I don't understand it.
14  Q  You would agree with me that $19,000 has been paid to
15  Mrs. Kunelius under the terms of the purchase and sale
16  agreement.
17  A  As I sit here today, I'm not certain how much has been
18  paid.  I know that a significant amount has been paid.
19  Q  Would you agree with me that the Friends of Red Acre
20  had raised $22,000 and given it to TPL in order to
21  fund the -- what's the money called?
22        MR. KACHAJIAN:  Earnest money?
23  Q  Earnest money.  That $22,000 came from the Friends of
24  Red Acre.

- 218 -

1  A  I know the Friends of Red Acre raised some money for
2  the purposes of making deposits.  I don't know how
3  much it was as I sit here today.
4  Q  Did you give back any money to the Friends of Red Acre
5  that they raised that was not used for earnest money
6  payments to Mrs. Kunelius?
7  A  I don't believe so.
8  Q  Is it fair to say that the Friends of Red Acre were
9  very upset with you concerning this issue of TPL not
10  obtaining funds sufficient from their own resources,
11  TPL's own resources, and that, essentially, the
12  Friends of Red Acre believed that you had misled them?
13  Do you recall any discussions concerning that?
14  A  My memory is that I had discussions with folks in
15  Friends of Red Acre about the same issues that we've
16  talked about today, the question being whether or not,
17  ultimately, any dollars would materialize that could
18  pay off any potential amount.
19  Q  I'm going to have you look at Exhibit 14 again, if you
20  would.
21  A  Yup.
22  Q  I want you to look at Bate stamp No. 443.
23  A  Yes.
24  Q  Item No. 6.  We have answers to 6A through D.  Under

- 219 -

1  Item No. C, letter C, is a note from the town relative
2  to the four hundred thousand dollar promissory note,
3  with seven percent interest, paid in full within 24
4  months, with monthly interest payments of $2,333, TPL
5  states, to be paid from privately raised funds or from
6  the sale of the houses on the property.  Do you see
7  that?
8  A  Yes.
9  Q  So, as to the issue of the $400,000, is it fair to say
10  that, in fact, TPL absolutely intended to avail
11  themselves of the four hundred thousand dollar loan
12  from Mrs. Kunelius and that your method of repaying it
13  within 24 months was either the sale of the houses or
14  privately raised funds?
15        MS. FETOUH:  Objection.
16        MS. ECKER:  Objection.
17        MR. CONROY:  Objection.
18  A  With reference to Exhibit 14, Paragraph 6C, and the
19  bold sentence after the letters TPL, that sentence was
20  intended to communicate that the total of the four
21  hundred, as a whole, could be raised.  We intended it
22  to be raised from those sources when I put this
23  together.  That was our intention at that time.
24  Q  What four hundred was it?

- 220 -

1  A  Did you ask me about 6C?
2  Q  Yes.
3  A  Okay.  That's the one.
4  Q  The four hundred thousand promissory note.  You're
5  talking about raising money to pay off the four
6  hundred thousand dollar promissory note to
7  Mrs. Kunelius.
8  A  Correct.  Well, actually, I'd like to clarify that,
9  because the further along we got in this process,
10  whether our decision-making was correct or not about
11  the availability of the mortgage itself -- we've
12  talked about that a lot today -- it was our sense that
13  that mortgage was not available to us and that,
14  instead, TPL contemplated adding on to the four
15  hundred thousand the interest that Mrs. Kunelius would
16  have earned over the term, and I think that was
17  $56,000.
18        So, I think our planning, for planning
19  purposes, four hundred was not four hundred.  The
20  four hundred was 456,000, which we would need to
21  deliver at the time of closing.
22  Q  But that was the term of the purchase and sale
23  agreement.  Is it your testimony -- I'm not trying to
24  put words in your mouth.  Your testimony is, as I now

- 221 -

DEPOSITION OF CRAIG MACDONNELL

MINIDEP by Kenson

1 understand it, that you simply changed your mind about
2 the terms of the purchase and sale agreement and did
3 not want to borrow the money, the $400,000. Am I
4 right?
5        MS. FETOUH: Objection.
6 A No.
7 Q Let's look at Exhibit 12, I'm sorry, Exhibit 13. On
8 Exhibit 13, which is the September 9th letter from you
9 to Peter Kachajian --
10        (Mr. Kachajian exits the room.)
11 Q Strike that. Let's look at the third paragraph, which
12 says, five lines down: TPL's Board of Directors will
13 not approve any borrowing to bridge a fund-raising gap
14 because the prospects of raising funds necessary to
15 repay the loan required are not encouraging. Further,
16 any bridge loan would be for an amount greater than
17 the land would be worth even if the subdivision were
18 approved.
19        Now, isn't in fact true, sir, that what
20 you have said today has not been accurate, in
21 that one of the primary reasons that you did not
22 go forward was that you did not like the purchase
23 price of the property?
24        MS. FETOUH: Objection.
- 222 -

1 A Is completely untrue.
2 Q So, when you state that the amount of the loan -- any
3 bridge loan would be for an amount greater than the
4 land would be worth even if the subdivision were
5 approved, let me ask you something. How much money
6 were you talking about when you said a bridge loan?
7 Were you talking about the $400,000?
8 A As I sit here today, I don't know how much money I was
9 talking about.
10 Q And you would agree, wouldn't you, that the 8.57 acres
11 had a price on it of $1,116,000 and change for 8.57
12 acres? Is that correct?
13 A TPL always viewed this as a 50-acre project.
14 Q But nothing in the P&S agreement gave a 50-acre
15 project to Mosaic Commons or Co-housing. Isn't that
16 correct?
17        MS. FETOUH: Objection.
18        MS. ECKER: Objection.
19        MR. CONROY: Objection.
20 A Well, I think there's a legal question out there,
21 whether or not the allocation, 8.57 versus 50,
22 survives the assignment in the exact same form it
23 existed prior to.
24 Q So, you're disagreeing with the allocation of the
- 223 -

1 purchase price that is outlined in the terms of the
2 purchase and sale agreement, which specifically states
3 that Co-housing was to get 8.57 acres and the town, by
4 way of gift, would get the remaining portion, and your
5 testimony now is that you did not agree with that
6 allocation. Is that your testimony?
7        MS. FETOUH: Objection.
8        MS. ECKER: Objection.
9        MR. CONROY: Objection.
10 A No.
11 Q Is it your testimony that you always viewed it as, TPL
12 always viewed it as, a 50-acre project and, therefore,
13 you do not agree with the allocation as to the
14 $1,116,900 that was applicable to the 8.57 acres?
15        MS. FETOUH: Objection.
16        MS. ECKER: Objection.
17        MR. CONROY: Objection.
18 A I'm saying something less than what you would like me
19 to say.
20 Q Do you recall telling people that Mosaic Commons
21 overpaid for the property?
22 A Yes.
23 Q And that's because you believed that it wasn't a good
24 deal for Mosaic Commons but it was a good deal for
- 224 -

1 Mrs. Kunelius. Isn't that correct?
2 A I have no idea whether it was a good deal for Mosaic
3 Commons.
4 Q Well, if Mosaic Commons overpays for the property,
5 it's probably not a good thing for Mosaic Commons, is
6 it?
7        MS. FETOUH: Objection.
8 A I would say that Mosaic Commons paid more than fair
9 market value, but it may be a good deal for them
10 because they have the power of 40B.
11 Q And it was certainly a good deal for Mrs. Kunelius if
12 you believe she got better than market value. Is that
13 correct?
14        MS. FETOUH: Objection.
15 A I would agree with that.
16 Q So, a component of your refusal, TPL's refusal, as
17 reflected by your letter of September 9th, was that
18 you did not believe you could borrow an amount of
19 money that would not exceed the value of the 8.57 acre
20 parcel. Am I correct on that?
21 A If you're asking me to explain what the third
22 paragraph of Exhibit 13 is, it's my testimony that I
23 don't recall the number of dollars that I was
24 referring to, as I sit here today, in that letter that
- 225 -

1 I wrote four years ago.
2 Q Well, maybe you can explain this to me, sir. You say,
3 I mean, there has to be some amount of money that
4 would be applicable to the loan that you're talking
5 about bridging, and by any stretch of the imagination,
6 it's hard for me to consider it being more than
7 $800,000, meaning, subtract the 400,000, 300- and
8 100,000 from the purchase price that you knew you were
9 going to get, eventually, from the town. You're left
10 with approximately $800,000. Now, if that's the case,
11 doesn't this say that any bridge loan would be for an
12 amount greater than the land would be worth even if a
13 subdivision were approved, which means you did not
14 like the value of the deal and you wouldn't borrow
15 even $800,000 because you did not think that the land
16 would be worth even $800,000?
17        MR. CONROY: Objection.
18        MS. ECKER: Objection.
19        MS. FETOUH: Objection.
20 A That's not really what I'm saying. I cannot
21 characterize any further what I believe, as I sit here
22 today, this sentence means.
23 Q Well, what did you expect Peter Kachajian to think
24 when he read this if you don't understand?
- 226 -

1 A Well, if it was September 9, 2003, I could tell you
2 what I meant, but it's four years later.
3 Q Let's go forward to the next sentence, which says:
4 Essentially, this would be asking TPL for an unsecured
5 loan based on weak fund-raising prospects with no
6 backup plan to repay the loan.
7        Tell me, if you would, who was asking TPL
8 for an unsecured loan? Was anybody asking TPL
9 for an unsecured loan?
10 A What that sentence referred to was the notion that
11 borrowing against an uncertain fund-raising future
12 was, on the basis of a line of credit, was unwise if
13 TPL did not believe that the fund-raising prospects
14 would materialize.
15 Q So, you were concerned -- well, this says this would
16 be asking TPL for an unsecured loan. Who was asking
17 TPL? I just don't understand.
18 A It's a hypothetical notion that it would be imprudent
19 for TPL to invest money in this project without a
20 reasonable expectation of capital takeout, whether
21 that be the sale of assets or private fund-raising.
22 Q I'm going to put before you a document that is
23 attached to the complaint as Exhibit 9. We'll re-mark
24 it as Exhibit 21 to the complaint.
- 227 -

MELVIN LIPMAN COURT REPORTING
617-227-3985

DEPOSITION OF CRAIG MACDONNELL

MiniDEP by Kenson

1  (WHEREUPON, Exhibit No. 21, Pelletier
2  letter to Stow Board of Appeals, dated September
3  25, 2003, marked for identification.)
4  MR. McLAUGHLIN: I don't know what you
5  want to do. I've still got a substantial amount
6  here, so we'll keep plugging along here as long
7  as we can.
8 Q  Exhibit 21 appears to be a letter from regional
9  counsel, Denise Pelletier, to the chairman of the Stow
10  Board of Appeals on September 25th, in which you're
11  asking for variances to be dropped, I should say, to
12  drop your application for variances, and, this, some
13  almost three weeks after your letter to Mr. Kachajian.
14  During the time that you were applying for
15  these variances, particularly, in September, I
16  thought you already said that if it was
17  September, the deal was done. It was over. You
18  were looking at some new deal. Am I correct in
19  my characterization of your testimony?
20 A  As I've testified earlier, TPL's confidence level in
21  this project waned gradually over a period of time.
22  There was no decision point, so that over the summer
23  of 2003, it became increasingly untenable that this
24  project could go forward. There was a moment in time
- 228 -

1  when it became particularly problematic, and I think
2  that moment probably was when we determined that the
3  subdivision was hugely problematic, and you recall
4  earlier today we talked about sort of the early
5  analysis of when we were trying to just, as lawyers,
6  figure out the best route to subdivide the property,
7  and then I said later on another problem arose that
8  was even more problematic.
9  What happened in the summer — let me just
10  finish the thought. In the summer, we learned
11  something that we hadn't known before, which was
12  that the two parcels, 142 and 144, were not owned
13  by separate entities. It was our understanding
14  before that time that they were owned by separate
15  entities and that the common law doctrine of
16  merger would not apply, and so that so long as we
17  could get the variances that we were seeking, the
18  future existence of 142 and 144 could be created
19  for purposes of sale. Somewhere along the path,
20  it became apparent to us that, in fact, 142 and
21  144 were owned by the same entity, the doctrine
22  of merger applied, and there was no way to
23  subdivide it.
24 Q  There was no way to subdivide based upon your plan for
- 229 -

1  the property rather than the plan for Co-housing and
2  Mosaic Commons, correct?
3 A  The proposal for what we intended to do, the variances
4  we sought, would be rejected. So, it was important
5  for us not to have that rejection made. In effect, we
6  were thinking of Mrs. Kunelius' property rights at
7  this point in time and didn't want an adverse variance
8  decision on the record, not only for Mrs. Kunelius'
9  sake but also for the possibility of the future in
10  which the town, TPL, everybody else, could reconfigure
11  this project and make it go forward.
12 Q  Are you familiar with how much cash on hand TPL
13  Massachusetts has at any particular point in time?
14 A  No.
15 Q  Do you have even a general sense of how much cash on
16  hand TPL has right now?
17 A  TPL, nationally?
18 Q  No, Massachusetts.
19 A  I do not know.
20 Q  Could you tell me within a half a million dollars?
21 A  No.
22 Q  As the director of the Massachusetts division of TPL,
23  you do not know how much money is in your checking
24  account, approximately?
- 230 -

1 A  In any given moment, no, because a lot of money goes
2  in and out to do projects all the time.
3 Q  I understand. But within general terms, do you carry
4  a balance in your checking account of a half a million
5  dollars?
6 A  I just told you that I don't know what the balance is,
7  and I don't know what it normally is. It fluctuates
8  hugely.
9 Q  So, do you have any idea of what amounts TPL has in
10  other assets, liquid assets, nationally?
11 A  I do not.
12 Q  Have you ever looked at TPL's financial statements to
13  determine how much money they have in their accounts?
14 A  Not closely.
15 Q  But you've looked?
16 A  I mean, I've seen the balance sheet.
17 Q  Have you ever considered or did you consider using any
18  of TPL's assets beyond the line of credit in order to
19  fund the purchase from Mrs. Kunelius?
20 A  No.
21 Q  Did you ask anybody if there were funds available that
22  could be used? I'm talking about liquid assets, such
23  as cash or certificates of deposit or any other types
24  of assets, which could be liquidated within some
- 231 -

1  reasonable period of time in order to effectuate the
2  purchase.
3 A  I don't recall.
4 Q  Is it your testimony today that you do not know
5  whether TPL, nationally, has $800,000 in cash or
6  liquid assets available to it, or had $800,000 in cash
7  or liquid assets available to it, that it could have
8  used at the time that TPL was required to purchase the
9  property from Mrs. Kunelius?
10 A  That's not my testimony.
11 Q  So, is it possible that TPL did have cash or liquid
12  assets sufficient to make the purchase from
13  Mrs. Kunelius?
14 A  I just don't know what the state of TPL's liquid
15  assets were in that period of time.
16 Q  Do you have to submit a budget in your role as a
17  director of Massachusetts?
18 A  Yes.
19 Q  And with that budget, do you consider sources and uses
20  of funds on a daily, weekly, monthly, yearly basis?
21 A  Quarterly.
22 Q  Quarterly. And when was the last time you did that?
23  Would it be December 31?
24 A  TPL's fiscal year ends at the end of March. So, we
- 232 -

1  are coming up on the end of our fiscal year.
2 Q  So, you're actually considering a budget right now for
3  next year, are you not?
4 A  Yes.
5 Q  Is it your testimony today that in establishing that
6  budget, as you are apparently doing currently, you
7  have no idea of how much money is in the cash
8  reserves, the bank accounts, the checking accounts,
9  the savings accounts, of TPL for Massachusetts?
10 A  TPL begins every year at zero and ends, hopefully,
11  every year at zero. We don't have an endowment. This
12  is not an organization that has cash sitting around
13  ready to throw at projects. This is a very squeaky
14  organization when it comes to spending money. We're a
15  conservation organization. We just don't have that
16  much. So, in the budgeting process, we think very
17  carefully about anticipated revenue, anticipated
18  expenses, going forward.
19 Q  When your line of credit was obtained for six million
20  dollars, what did TPL give as collateral for that, if
21  you know?
22 A  I don't know.
23 Q  Is it an unsecured line of credit?
24 A  It very well may be.
- 233 -

MELVIN LIPMAN COURT REPORTING
617-227-3985

DEPOSITION OF CRAIG MacDONNELL                    MiniDep by Kenson

1  Q  Would that suggest to you that Wainwright Bank has
2     some confidence in the ability to be repaid on a six
3     million dollar line of credit?
4           MS. FETOUH: Objection.
5  A  I don't know what Wainwright is thinking.
6           (WHEREUPON, Exhibit No. 22, MacDonnell
7     letter to Kachajian, dated July 6, 2004, marked
8     for identification.)
9  Q  I want to have you look at the next exhibit.
10          THE WITNESS: Before you ask that
11    question, could I take a two-minute break?
12          MR. McLAUGHLIN: Sure.
13          (Recess, 5:24 P.M.)
14          (After recess, 5:29 P.M.)
15          (All parties present)
16 By MR. McLAUGHLIN:
17 Q  Exhibit 22, this is also attached to the complaint as
18    Exhibit 11 to the complaint, and it is a July 6, 2004,
19    letter from you, sir.
20          MR. KACHAJIAN: Is that to me?
21          MR. McLAUGHLIN: To Peter Kachajian,
22    yes, see you later.
23          (Mr. Kachajian exits the room.)
24 Q  With attachments. And the attachments have an A and a
                        - 234 -

1     B on them, and I'm wondering first, sir, whether you
2     recall this letter.
3  A  I do.
4  Q  And you authored this letter?
5  A  I did.
6  Q  And did you assemble Exhibit A and Exhibit B to this?
7  A  Did I attach them?
8  Q  No, did you assemble the information in Exhibit A and
9     Exhibit B? Is that your work product or is that
10    someone else's work?
11 A  It's like a little software program that generates
12    these tax benefit analyses. It's not entirely my work
13    product. It's relying on the built-in analysis.
14 Q  Now, is it fair to say that -- well, let's look at the
15    second page of your letter, beginning with the first
16    paragraph, third line. It says:  The first such
17    proposal contemplated a partnership with the town and
18    Mrs. Kunelius whereby TPL would pay her eight hundred
19    thousand for the property. The town would invest
20    three hundred thousand.
21       So, does that mean that Mrs. Kunelius gets a
22    million-one, or does that mean that Mrs. Kunelius
23    gets eight hundred thousand and the town then
24    pays back TPL three hundred thousand so that TPL
                        - 235 -

1     is paying five hundred thousand?
2  A  It imagined paying $800,000 for the property.
3  Q  And the town's investment was a repay to TPL of three
4     hundred thousand, is that correct?
5  A  Well, in exchange for the three hundred thousand which
6     had previously been approved, the CPC money, the town
7     would receive the conservation parcel.
8  Q  So, this first paragraph is an offer of eight hundred
9     thousand to Mrs. Kunelius. Down at the bottom of the
10    page, in the middle of the page, third paragraph, it
11    says: It's my understanding that the purchase price
12    could be improved to nine hundred thousand. Do you
13    see that?
14 A  Yes, I do.
15 Q  So, in order for you to move forward, meaning TPL,
16    your letter indicates that Mrs. Kunelius was going to
17    have to accept one of these two offers in order for
18    TPL to move forward with it. Is that a fair
19    description of the purpose of the letter?
20 A  The purpose of the letter was to advise Mr. Kachajian
21    that TPL continued to have an interest in this
22    conservation project, that it wanted to continue to
23    work hard to bring as much money as possible to
24    Mrs. Kunelius, and that the hope was to be able
                        - 236 -

1     to bring in the neighborhood of eight or nine
2     hundred thousand dollars to her.
3  Q  Where was the $500,000 coming from that resulted from
4     the $800,000 minus the payback of three hundred to
5     TPL? That meant that TPL had to come up five hundred.
6     Where were you proposing that $500,000 come from?
7  A  We would hope to sell the two lots, 142 and 144.
8  Q  And that way it, no money from TPL in this deal
9     whatsoever. It was the sale of the lots from
10    Mrs. Kunelius' property and the money from the
11    town of $300,000 and nothing from TPL. Is that
12    correct?
13 A  In this proposal, in the first paragraph, on Page 2, I
14    believe the two lots plus three hundred would come up
15    to eight hundred.
16 Q  So, in other words, TPL was going to put nothing in it
17    themselves?
18          MS. FETOUH: Objection.
19 Q  For the purchase price.
20 A  It was never contemplated for TPL to put its own money
21    in the deal.
22 Q  Well, it's either its money or capital market money or
23    the line of credit. I'm counting that as TPL's money
24    for the purposes of my question, but let me just move
                        - 237 -

1     on. Let me just move on. You don't have to answer
2     that.
3           MR. CONROY: I'll make it clear that
4     he's not answering the question.
5           MR. McLAUGHLIN: All right.
6           (WHEREUPON, Exhibit No. 23, MacDonnell
7     letter to Perry, dated January 5, 2003, marked
8     for identification.)
9  Q  Is it fair to say that in the eight hundred thousand
10    dollar offer, none of the $800,000 came from TPL's own
11    funds, that is, their own assets, cash or the sale of
12    stock or anything else?
13 A  Well, this was a proposal, and because it was still in
14    the proposal stage, it's not clear to me whether the
15    five hundred that would come from the sale of the two
16    lots would be fronted by TPL and then recovered from
17    the sale or whether the sale of the two lots would
18    have to precede it.
19 Q  And where would the money come from if it was fronted
20    by TPL? That's my question.
21 A  That was not proposed.
22 Q  Well, you could borrow it. Isn't that fair to say?
23 A  TPL could borrow that money. Correct, we could borrow
24    that money.
                        - 238 -

1  Q  Fine.
2  A  If there was a reasonable likelihood of return to pay
3     back the loan, the same issue we've talked about all
4     day.
5  Q  So, that offer wasn't an offer, because you didn't
6     know if you could sell the units, the two units. So,
7     it was contingent upon whether there was a likelihood
8     of selling the two units, correct?
9           MS. FETOUH: Objection.
10          MR. CONROY: Objection.
11 A  No, that's not what I just said.
12 Q  So, let me make sure I understand. You could borrow
13    money providing there was an assurance that you could
14    pay it back. Is that fair to say?
15 A  Like any business.
16 Q  And the only source of being assured of paying back
17    the money was the sale of the two units. Is that
18    correct?
19 A  No.
20 Q  So, then there was another source, and that was what?
21 A  Private fund-raising, if the private fund-raising was
22    substantiated. Is it likely to come forward?
23 Q  So, this wasn't an offer. It was a proposal for which
24    you were not certain that you could perform under that
                        - 239 -

DEPOSITION OF CRAIG MACDONNELL

MiniDep by Kenson

1  proposal because you didn't know the likelihood of
2  fund-raising. Is that fair to say?
3       MS. FETOUH: Objection.
4  A  No. No, not at all. This letter talks about a
5  proposal that was previously on the table. This
6  letter, the purpose of this letter, is to talk about
7  the next proposal, a better proposal.
8  Q  And that's the nine hundred thousand dollar proposal?
9  A  Right.
10 Q  All right. Let me simply ask you a few questions
11 concerning the complaint and your understanding of
12 your relationship with the town.
13      I presume as an attorney that, when you went
14 to law school, you studied partnership law. Is
15 that fair to say?
16 A  Well, I'm trying to remember whether I took that
17 course.
18 Q  Well, Cornell most certainly teaches that course.
19      MS. FETOUH: Objection.
20 Q  Well, she doesn't think Cornell does, but --
21      MS. FETOUH: No, I went to a comparable
22 school. We didn't learn that.
23      MR. McLAUGHLIN: There's nothing
24 comparable to Cornell.
                        - 240 -

1  Q  You don't have to answer that question. You're aware,
2  are you not, that Mrs. Kunelius has alleged that there
3  was a joint venture, or a partnership, between TPL and
4  the town. Is that fair to say?
5  A  I've seen the word -- that there's the allegation?
6  Q  Yes.
7  A  I've seen the word partnership in the complaint.
8  Q  And you are aware, are you not, that TPL has denied
9  that there is a partnership?
10 A  I am aware of that.
11 Q  And you are aware, also, that you denied there was a
12 partnership?
13 A  I am aware of that.
14 Q  Okay. Let's look at the January 5th letter from you
15 to the town, to Ross Perry of the Board of Selectmen,
16 and I would ask you to look at the fifth line up from
17 the bottom. On the right-hand side, it says: All our
18 projects are done at the request of and in partnership
19 with entities that become permanent owners of the
20 property. The two most important roles we play in
21 this process are, one, we make sure that our
22 obligations to our partners are met and, two, to raise
23 funds necessary for the transaction from a combination
24 of private and public sources.
                        - 241 -

1       Now, when you used the word partnership on
2  the first page of your January 5th letter, which
3  is Exhibit 25, were you referring to a
4  partnership with the town?
5  A  I was using the term in its colloquial sense and not
6  in its formal legal sense.
7  Q  There is a colloquial sense to partnership? And that
8  would be what?
9  A  Working together on something less than a legal
10 partnership.
11 Q  Well, is it fair to say that, in a partnership, would
12 you expect the individuals or parties to a partnership
13 to have a financial stake in a partnership?
14      MS. FETOUH: Objection.
15      MR. CONROY: Objection.
16 Q  An investment, something that --
17 A  A legal partnership, you're talking about?
18 Q  Yes.
19 A  Not always.
20 Q  Doesn't have to have one?
21 A  Correct.
22 Q  Would you expect that there would be some contractual
23 stake in a partnership where the parties enter into a
24 written agreement by which they declare their partner
                        - 242 -

1  status to each other?
2  A  Sometimes but not always.
3  Q  Well, let me just ask you to look at your letter of
4  January 5th to the town, and the second full paragraph
5  says: For TPL to consider a financial and contractual
6  stake in this project, we would need to secure our
7  involvement in a way that will enhance the likelihood
8  of sufficient public and private funds being available
9  and ensures a strong conservation and community
10 outcome.
11      Now, this says, as I understand it, that TPL
12 intended to have a financial stake in the
13 project. Am I wrong in my reading of that, sir?
14 A  No.
15 Q  So, what was the financial stake of TPL in the project
16 when the project was for the acquisition of a
17 1,116,900 dollar piece of property? What was your
18 financial stake, TPL's?
19 A  Well, it would be the out-of-pocket dollars that we
20 spent in pursuit of the deal, together with the value
21 of the services that we provided through our staff
22 that would otherwise be working on some other project.
23 Q  Well, now, from a matter of your standing as a non-
24 profit tax-exempt entity, do you bill services of your
                        - 243 -

1  staff on an hourly rate in order to establish a
2  financial investment in a particular project?
3  A  We analyze the time commitments of our staff on the
4  basis of dollars every year, every project, all the
5  time.
6  Q  What was the contractual stake that you were entering
7  into a partner with the town that you're referring
8  to here?
9  A  It makes reference to a contractual stake in the
10 project that I think we were contemplating. This is
11 before the assignment?
12 Q  Yeah.
13 A  We're talking about stepping into the shoes of Co-
14 housing Resources.
15 Q  So, it was a financial stake with the town and a
16 contractual stake with who, Mrs. Kunelius?
17      MS. FETOUH: Objection.
18      MS. ECKER: Objection.
19 A  Well, there is a contract that we've spent a lot of
20 time talking about that TPL became the assignee of.
21 So, in effect, yes, that contract is the contract
22 we're talking about.
23 Q  Looking at the very last sentence of this exhibit, it
24 states: If so, we ask that you authorize your
                        - 244 -

1  chairman to sign below as an indication of your
2  partnership with TPL. Do you see that?
3  A  I do.
4  Q  Now, you have alleged, or you have denied, the
5  existence of any partnership between yourself and the
6  Town of Stow, is that correct?
7  A  Yes.
8  Q  Not yourself but TPL. Is that correct?
9  A  It's my understanding that TPL has denied the
10 existence of a partnership and that, individually, I
11 have denied that TPL and the town had a partnership.
12 Q  And you continue to deny that notwithstanding the fact
13 that there is a written document that evidences their
14 indication of joining the partnership and that there's
15 a written document indicating what the cost of joining
16 the partnership would be.
17      MR. CONROY: Objection.
18      MS. FETOUH: Objection.
19      MS. ECKER: Objection.
20 Q  That means the Town of Stow.
21      MS. FETOUH: Objection
22      MS. ECKER: Objection.
23 Q  Is that fair to say? Well, go head.
24 A  Do you want to keep asking something?
                        - 245 -

MELVIN LIPMAN COURT REPORTING
617-227-3985

DEPOSITION OF CRAIG MACDONNELL

MINIDEP by Kenson

1 Q  No, go head.  Is that fair to say?
2 A  It is fair to say that the partnership we're referring
3    to in Exhibit 23 is not a legal partnership but just a
4    colloquial level of cooperation that doesn't rise to
5    the level of a legal partnership.
6 Q  Now, do you think a legal partnership has to be in
7    writing, sir?
8        MS. FETOUH:  Objection.
9        MR. CONROY:  Objection.
10 A  I don't have thoughts about that.
11 Q  Well, you're aware that two people can have a joint
12    venture which is called a general partnership in which
13    they both work for some single purpose, such as two
14    lawyers joining together for a law firm.  There's no
15    requirement of a written document in that instance, is
16    there?
17        MS. FETOUH:  Objection.
18        MR. CONROY:  Objection.
19 A  I don't know that to be true.  My understanding is
20    that the relationship that TPL had with the Town of
21    Stow is not that kind of partnership.
22 Q  How many kinds of partnerships are there that you're
23    aware of?
24        MS. FETOUH:  Objection.
                    - 246 -

1        MR. CONROY:  Objection.
2 A  Well, there is this kind, this informal collaboration,
3    lower case P, non-legal, and then there are legal
4    partnerships, sort of the formal partnership that the
5    law firms that I was a part of and you may have been a
6    part of, and that these folks are part of, that
7    constitute a partnership.
8 Q  Have you ever heard of the concept of partnership
9    estoppel?
10 A  No.
11        MR. McLAUGHLIN:  Almost done.  I think
12    we're there.
13 Q  I want you to just look at Exhibit 8 for a moment.
14    Exhibit 8 is the Stow Community Preservation Committee
15    minutes of February 10th.  On the third page, which is
16    040, now, this is on February 10th, third paragraph
17    down:  A committee member asked Bob Wilbur about his
18    conversation with Marilyn Kunelius.  Bob said that she
19    is afraid the contract may unravel with the town
20    intervention and she will lose everything.  Bob said
21    TPL will not back down from a commitment.
22        Now, you were present at that meeting, so
23    isn't it fair to say that you were aware that
24    Mrs. Kunelius was afraid that she would lose
                    - 247 -

1    everything as a result of the intervention of the
2    town and subsequent transfer of the right to TPL?
3        MR. CONROY:  Objection.
4 A  My memory of Mrs. Kunelius' situation is that this was
5    an important asset for her.  I don't have a
6    recollection of this item being discussed at this
7    meeting.
8 Q  It goes on to say:  Tom Marr spoke from the audience
9    and said, "This is not the babe we want to fool around
10    with and 1.2 is not the figure."  Do you know what
11    that's about, and do you know who he's talking about?
12    Is Mrs. Kunelius the babe they were talking about?
13 A  I can honestly say I have no idea what that refers to.
14 Q  You can honestly say you have no idea.  Was there some
15    other individual that was a babe that had a connection
16    with the 1.2 million dollar number?
17        MS. FETOUH:  Objection.
18        MR. CONROY:  Objection.
19 A  I don't know what this is about.
20        MR. McLAUGHLIN:  Okay.  I think that's
21    it.  Thank you.
22        (WHEREUPON, the deposition concluded at
23    5:52 P.M.)
24
                    - 248 -

CERTIFICATE
COMMONWEALTH OF MASSACHUSETTS
COUNTY OF ESSEX, ss.
    I, Roberta J. Daniels, a Court Reporter and
Notary Public within and for the Commonwealth of
Massachusetts, do hereby certify that the foregoing
deposition of CRAIG MacDONNELL was taken before me on
February 8, 2007, that the said witness was
satisfactorily identified and duly sworn before the
commencement of his testimony and that the testimony
was taken audiographically by myself and then
transcribed by myself.  To the best of my knowledge,
skill and ability, the within transcript is a complete,
true and accurate record of said deposition.
    Further, I am not connected either by blood
or by marriage with any of the said parties nor am I
interested either directly or indirectly in the matter
in controversy.
    IN WITNESS WHEREOF, I have hereunto set my
hand and affixed my notarial seal this 20th day of
February, 2007.

            Roberta J. Daniels, Notary Public
            Commission expires: 11-15-13
                    - 249 -

CERTIFICATE
    I, CRAIG MacDONNELL, do hereby certify that I
have read the foregoing transcript of my testimony and
further certify that said transcript is a true,
accurate and complete record of said testimony.
        Dated at _____, this
        _____ day of _____, 2007,
    under the pains and penalties of perjury.




                    - 250 -

ERRATA SHEET
Deposition of CRAIG MacDONNELL

Page  Line
No.   No.    Transcript reads    Change made
                    - 251 -

# DEPOSITION OF CRAIG MACDONNELL

MINDEX by Kenson

| Word ...... Page | Word ...... Page | Word ...... Page | Word ...... Page | Word ...... Page |
|---|---|---|---|---|
| .93 ... 150 | 18 ... 181, 193 | 192-196, 225 | abusing ... 175 | advantage ... 96, 98, 123 |
| $1,116,000 ... 223 | 19 ... 209, 210, 218 | 411 ... 105 | abutter ... 190 | adverse ... 230 |
| $1,116,900 ... 195, 224 | 1983 ... 10 | 42.1 ... 157 | accept ... 47, 48, 50, 57, 68, | advice ... 159, 209, 211, 212 |
| $100,000 ... 54 | 1999 ... 35 | 443 ... 219 | 84, 135, 156, 236 | advise ... 236 |
| $19,000 ... 218 | 2 ... 17, 36, 82, 84, 136, | 45 ... 96, 129 | acceptable ... 63, 92 | Advisor ... 120 |
| $2,333 ... 220 | 155, 172, 173, 220, | 456,000 ... 221 | acceptance ... 45-48, 56-58, | Advisors ... 108, 197, |
| $22,000 ... 156, 208, 217, | 237, 248 | 46 ... 196, 201 | 60, 61, 68, 72, 168, | 201-203, 206 |
| 218 | 2:20 ... 136 | 476 ... 45 | 207 | advocating ... 70 |
| $300,000 ... 237 | 2:31 ... 136 | 478 ... 45 | accepted ... 49, 57, 70, 73, | affect ... 9 |
| $350,000 ... 104, 212 | 20 ... 87, 88, 101, 103, 136, | 5 ... 45-47, 49, 176, 234, | 86, 99, 119, 140, 144, | afford ... 202 |
| $400,000 ... 55, 56, 67-70, | 156, 181, 212 | 238, 248 | 145, 147, 168 | affordability ... 94, 95 |
| 93, 94, 98, 132, 135, | 20,000 ... 156 | 5:24 ... 234 | accepting ... 43, 48, 55, 97, | affordable ... 54, 100, 137 |
| 136, 145, 220, 222, | 2000 ... 19 | 5:29 ... 234 | 158, 170, 200 | afore ... 145 |
| 223 | 2001 ... 124 | 5:52 ... 248 | accesses ... 167 | afraid ... 218, 247 |
| $500,000 ... 95, 96, 237 | 2002 ... 7, 26, 28, 36, 40, | 50 ... 82, 83, 193, 223, 224 | accessing ... 126 | against ... 52, 80, 155, 192, |
| $56,000 ... 221 | 42 | 501c3 ... 7, 14, 21, 208 | accompanied ... 198 | 197, 201, 203, 227 |
| $6,000,000 ... 110, 125 | 2003 ... 8, 14, 24, 35-37, | 531 ... 59 | accomplish ... 38, 44, 72 | agencies ... 76, 117 |
| $700,000 ... 96 | 39, 42, 44-47, 49, 56, | 5th ... 241-243 | accordance ... 72, 180 | agency ... 117 |
| $800,000 ... 84, 94, 95, 226, | 57, 64, 79, 81, 84, | 6 ... 49, 50, 54-57, 59, 60, | according ... 97, 187 | agitated ... 198 |
| 232, 236-238 | 121, 137, 138, | 67, 68, 73-75, 110, | account ... 115, 230, 231 | agree ... 50, 132, 153-155, |
| $900,000 ... 199 | 165-167, 178, 191, ... | 121, 125, 134, 162, | accounted ... 94, 95 | 157, 172, 178, 181, |
| 03 ... 106 | 206, 209, 210, 212, | 164, 166, 167, 212, | accounts ... 209, 231, 233 | 186, 218, 223-225 |
| 039 ... 64 | 213, 227, 228, 238 | 213, 219, 234... | accrued ... 181 | agreed ... 95, 152, 182, 195 |
| 040 ... 247 | 2004 ... 35, 193, 196, 234 | 6,000,000 ... 110, 125 | accuracy ... 66 | agreement ... 93, 94, 96, 97, |
| 1 ... 16, 82, 84, 92, 94, 113, | 2005 ... 75 | 61 ... 27, 37, 60, 62, 63, 70, | accurate ... 65, 66, 86, 110, | 113, 119, 128, 132, |
| 157, 172, 186, 195, | 2007 ... 6 | 73, 89, 97, 140, 148, | 208, 222 | 136, 140, 144, 148, |
| 197, 223, 224, 243, | 21 ... 183, 227, 228 | 154, 158, 161, 162, | achieve ... 74, 81, 85, 141, | 149, 151, 164, 169, |
| 248 | 216 ... 35 | 173 | 187, 190 | 172, 177, ... 183, 186, |
| 1.116 ... 94, 186 | 22 ... 156, 208, 217, 218, | 617 ... 107 | achieved ... 74 | 194, 200, 218, |
| 1.2 ... 82, 84, 248 | 234 | 61A ... 37, 41-43, 58, 63, | achieving ... 170 | 221-224, 242 |
| 1.2. ... 84 | 23 ... 75, 183, 238, 246 | 185 | acknowledged ... 87 | agreements ... 157 |
| 1,116,900 ... 195, 224, 243 | 24 ... 183, 197, 220, 234 | 61B ... 192 | acknowledges ... 183 | ahead ... 29, 52, 53, 96, 98, |
| 1:16 ... 92 | 25 ... 24, 183, 228, 242 | 6200 ... 107 | acquainted ... 21 | 129, 133, 174-176, |
| 10 ... 6, 64, 79, 81, 163 | 25th ... 228 | 63 ... 122 | acquire ... 76, 78, 87, 119, | 182, 188 |
| 10:01 ... 6 | 26 ... 121, 178, 184 | 64 ... 123, 150 | 135, 139, 210 | air ... 205 |
| 100,000 ... 54, 226 | 3 ... 18, 19, 47, 75, 106, | 6A ... 219 | acquired ... 90, 91, 143 | alive ... 199 |
| 10th ... 65, 66, 247 | 121, 163, 172, 173 | 6C ... 220, 221 | acquiring ... 33, 34, 36, 39 | allegation ... 241 |
| 11 ... 49, 56, 59, 60, 105, | 3:10 ... 163 | 6th ... 212 | acquisition ... 19, 76, 83, 87, | allegations ... 88, 101 |
| 121, 122, 138, 191, | 3:17 ... 163 | 7 ... 51, 79, 81, 84, 150, | 126, 164, 243 | alleged ... 140, 241, 245 |
| 234 | 30 ... 24, 59, 91, 106, 121, | 154-156, 177 | acquisitions ... 8 | allocation ... 223, 224 |
| 11:30 ... 59 | 134, 145, 150-153, | 7.64 ... 150 | acre ... 6, 22, 23, 35, 37, 68, | allow ... 54, 61, 103, 128, |
| 11:44 ... 60 | 157, 162, 164, 177 | 7:15 ... 81 | 80, 81, 109, 145, 146, | 130, 151, 153, 163, |
| 11th ... 49, 54, 56, 57, 61, | 300 ... 54, 85, 226, 237 | 700 ... 85, 95, 96 | 150, 151, 157, 165, | 173 |
| 74, 191, 192 | 300,000 ... 54, 85, 237 | 700,000 ... 85, 95, 96 | 187, 190, 192, 193, | allowed ... 153 |
| 12 ... 45-47, 56, 59, 91, 92, | 31 ... 136, 181, 182, 232 | 71 ... 123, 125 | 212-214, ... 216-219, | alter ... 151, 173 |
| 124, 157, 180, 222 | 32 ... 157 | 7th ... 84 | 223-225 | alteration ... 167 |
| 12:30 ... 59, 91 | 325 ... 100, 104 | 8 ... 6, 64, 66, 145, 146, | acres ... 96, 129, 186, 223, | alternative ... 31, 199-201 |
| 12:34 ... 92 | 33 ... 18 | 150-152, 157, 178, | 224 | Alternatively ... 52, 155 |
| 125,000 ... 100 | 337 ... 106 | 186, 223-225, 247 | Action ... 17-19, 197, 201 | ambiguity ... 166 |
| 12th ... 45-47, 49, 54, 57 | 342 ... 107, 111 | 8.57 ... 145, 146, 150-152, | actions ... 170 | among ... 43, 134 |
| 13 ... 36, 37, 42, 137, 180, | 343 ... 111 | 157, 178, 186, 223-225 | actively ... 43 | amount ... 8, 54, 56, 80, 83, |
| 222, 225 | 35 ... 157, 186, 187 | 80 ... 157, 183 | activities ... 189, 209 | 84, 91, 93, 100, 109, |
| 13th ... 36, 39, 40 | 350 ... 100, 104, 138, 212 | 800 ... 6, 84, 94, 95, 226, | actual ... 44, 129, 133, 204 | 110, 125, 127, 151, |
| 14 ... 154, 155, 197, 219, | 350,000 ... 104, 138, 212 | 232, 236-238 | add ... 94, 95, 162, 167 | 177, 200, 216, 218, |
| 220 | 351 ... 122 | 9 ... 75, 137, 227 | adding ... 221 | 219, 222, ... 223, 225, |
| 140 ... 118 | 367 ... 107 | 90 ... 167 | addition ... 118, 167 | 226, 228 |
| 142 ... 22, 23, 55, 68, 84, 85, | 4 ... 35, 95, 96, 124, 172, | 91 ... 87 | address ... 6, 18, 210 | amounts ... 181, 231 |
| 122, 142, 143, 146, | 173, 176, 197 | 95 ... 37 | addressed ... 157 | analyses ... 25 |
| 151, 170, 229, 237 | 4,000 ... 124 | 9th ... 137, 222, 225 | addresses ... 126 | analysis ... 73, 98, 139, 168, |
| 144 ... 55, 68, 84, 85, 118, | 4:14 ... 197 | | addressing ... 128 | 169, 185, 189, 229, |
| 122, 142, 143, 146, | 4:24 ... 197 | **A** | adequate ... 70, 167 | 235 |
| 151, 170, 229, 237 | 40 ... 124 | A.M. ... 6, 59, 60 | adjacent ... 25, 31, 187, 190 | analyze ... 29, 244 |
| 15 ... 81, 164, 165, 193, 210 | 400,000 ... 55, 56, 67-70, | abide ... 59, 60 | adjustments ... 181 | analyzes ... 29, 139 |
| 154 ... 193 | 85, 93, 94, 96, 98, | ability ... 128, 134, 143, 187, | administrator ... 107, 210 | Anger ... 216 |
| 15th ... 210, 211 | 132, 135, 136, 145, | 217, 234 | admit ... 107 | angry ... 198, 215, 217 |
| 16 ... 92, 166, 181 | 220, 222, 223, 226 | able ... 70, 71, 141, 187, | admits ... 88, 101 | animated ... 205 |
| 17 ... 83, 124, 163, 181, 191, | 40B ... 25, 31, 64, 145, | 203, 209, 236 | admitted ... 88, 101 | annual ... 35 |
| 209 | 157, 178, 179, 182, | above ... 110, 111, 122, 138 | advance ... 44 | ANR ... 166, 167 |
| 17.50 ... 83 | 184, 186, 189, | absence ... 70, 142, 191 | advanced ... 13 | anticipate ... 85, 141 |
| | | absolute ... 69, 210 | | |

DEPOSITION OF CRAIG MacDONNELL

MINDEX by Kenson

| Word . . . . . . Page | Word . . . . . Page | Word . . . . . . Page | Word . . . . . . Page | Word . . . . Page |
|---|---|---|---|---|
| anticipated ... 64, 135, 140, 141, 171, 172, 233 | assignee ... 39, 59, 62-64, 140, 151, 154, 158, 171, 176, 181, 185, 244 | babe ... 248 | bond ... 52, 155 | 134, 135, 139, 143, 146, 150, 160-163, 165-167, ... 175, 192, 203, 206, 226, 228, 246, 248 |
| anticipates ... 179 | | back ... 20, 24, 28, 52, 54, 57, 66, 67, 91, 93-95, 100, 121, 125, 133-135, 150, 161, 164, 170, 187-189, ... 194, 200, 201, 206, 219, 235, 239, 247 | bono ... 124, 201-203, 209 | |
| anyhow ... 67, 69 | assigning ... 45, 207 | | bonuses ... 15 | |
| anymore ... 123, 191, 200 | assignment ... 37-50, 55, 57, 59, 65-68, 70, 72-74, 84, 86, 87, 97-99, 119, 140, 144, 145, 151, 155, ... 156, 164, 168, 170, 210, 223, 244 | | Boothroyd ... 197, 198, 207 | cap ... 75 |
| anywhere ... 56, 152 | | | borrow ... 78, 96, 113, 114, 121-123, 126-128, 135, 136, 139, 142-144, 184, 188, 218, 222, 225, 226, ... 238, 239 | capacity ... 76, 117, 163, 203, 204 |
| apologize ... 31, 37, 76, 165 | | | | capital ... 76, 77, 110, 111, 122, 138, 140, 142, 215, 216, 218, 227, 237 |
| appalled ... 174 | | background ... 10 | | |
| apparent ... 75, 143, 153, 216, 229 | | backs ... 51, 155 | borrowed ... 77, 79, 113, 127, 142, 184, 187, 188, 215 | |
| apparently ... 192, 210, 212, 233 | | backup ... 206, 227 | | |
| | assigns ... 158 | balance ... 231 | | caps ... 57 |
| Appeals ... 228 | assist ... 29, 36, 45 | ball ... 43 | borrower ... 135, 136 | capture ... 118 |
| appear ... 143, 157, 191 | assistance ... 211 | Bank ... 107-110, 114, 115, 118, 120, 127, 188, 206, 233, 234 | borrowing ... 114, 118, 127, 128, 131, 132, 139, 142, 188, 222, 227 | care ... 87, 141 |
| appeared ... 139, 188 | assisted ... 198 | | | career ... 10 |
| appears ... 15, 39, 51, 81, 105, 106, 154, 155, 167, 181, 184, 210, 211, 228 | associate ... 11 | banking ... 120 | Boston ... 7, 10, 18, 24, 126 | careers ... 69 |
| | associated ... 78 | banks ... 127 | Both ... 47, 56, 64, 87, 89, 92, 181, 246 | careful ... 164 |
| | associates ... 124 | bar ... 33, 174 | | carefully ... 233 |
| applicable ... 58-60, 73, 97, 148, 158, 176, 178, 185, 224, 226 | assumption ... 87, 129, 135, 145 | bargain ... 147 | bothering ... 165 | caring ... 88, 101 |
| | | Barlow ... 201, 202 | bottom ... 106, 107, 119, 177, 236, 241 | Carol ... 193 |
| application ... 99, 100, 104-106, 108, 109, 117, 122, 123, 143, 186, 212, 228 | assurance ... 239 | barn ... 196 | | carry ... 231 |
| | assured ... 239 | based ... 62, 63, 83, 123, 175-178, 180, 183, 184, 227, 229 | bound ... 58, 60, 73 | case ... 30, 32, 38, 41, 72, 113, 116, 122, 158, 161, 162, 183, 188, 201-204, 226, 247 |
| | asterisk ... 177, 180 | | boundary ... 151 | |
| | attach ... 235 | | branch ... 115, 176 | |
| applications ... 116, 117, 120 | attached ... 94, 110, 227, 234 | basic ... 148, 151, 196 | break ... 59, 136, 163, 191, 197, 234 | cases ... 89, 158, 159 |
| applied ... 115, 159, 229 | | basis ... 62, 103, 227, 232, 244 | | cash ... 94, 230-233, 238 |
| applies ... 161, 162, 183 | attachments ... 45, 234 | | bridge ... 76-78, 217, 222, 223, 226 | catastrophic ... 138 |
| apply ... 58-60, 62, 63, 72, 149, 154, 156, 157, 159-161, 163, 172, 176, 178-180, 183-185, 229 | attempting ... 116 | Bate ... 35, 105, 193, 219 | | category ... 167 |
| | attended ... 28, 30, 36, 66, 191, 204 | bear ... 82 | bridging ... 78, 226 | cause ... 9 |
| | | became ... 21, 75, 119, 143, 153, 189, 216, 228, 229, 244 | Brief ... 52, 205 | caused ... 150, 218 |
| | attending ... 27, 28, 65, 197 | | brings ... 153 | cc ... 46 |
| | attention ... 34, 107, 113, 177 | | broker ... 197 | certain ... 80, 97, 102, 120, 130, 132, 161, 163, 218, 239 |
| applying ... 104, 158, 179, 189, 228 | attorney ... 10, 16, 20, 62, 63, 86-88, 92, 100, 101, 123, 140, 149, 158, 164, 172, 203, 207, 208, 240... | become ... 19, 110, 123, 137, 198, 241 | brokerage ... 181 | |
| approach ... 107 | | becomes ... 39, 76, 104, 152 | brought ... 34, 197, 201 | certainly ... 43, 89, 121, 125, 152, 161, 193, 225, 240 |
| approached ... 213 | | began ... 30, 43 | budget ... 76, 232, 233 | |
| appropriate ... 91, 152, 156, 162, 164, 166, 169 | | begins ... 81, 233 | budgeting ... 233 | |
| | | behavior ... 174 | build ... 184 | certainty ... 81, 88, 89, 158, 195 |
| approval ... 110, 111, 113, 126, 157, 166, 167, 179, 182 | attorneys ... 149 | belabor ... 74 | building ... 18, 81 | |
| | audience ... 248 | belief ... 89 | buildings ... 173 | certificates ... 231 |
| | August ... 121 | believed ... 60, 61, 72, 89, 90, 137, 152, 156, 158, 203, 213, 219, 224 | built ... 25, 170, 235 | chairman ... 228, 245 |
| approvals ... 168 | author ... 155 | | burden ... 129 | challenging ... 168 |
| approve ... 67, 222 | authored ... 235 | | bury ... 202 | chance ... 207 |
| approved ... 166, 170, 222, 223, 226, 236 | authorities ... 8 | believes ... 131, 151, 157, 189 | business ... 69, 75, 116, 179, 239 | change ... 10, 27, 29, 62, 152, 167, 200, 223 |
| | authority ... 8, 9, 28, 47, 48 | believing ... 75 | buy ... 67, 69, 70, 83, 103, 123, 139 | |
| approximately ... 11, 25, 26, 42, 44, 84, 85, 93-95, 226, 230 | authorize ... 48, 68, 244 | bell ... 108 | | changed ... 28, 69, 153, 222 |
| | authorized ... 48 | below ... 107, 147, 245 | buyer ... 58, 60, 78, 79, 119, 150, 153, 154, 156, 157, 172, 179, 183, 207 | changes ... 169 |
| | authorizes ... 37 | benefit ... 209, 235 | | changing ... 104 |
| April ... 121, 193, 209-211 | avail ... 96, 220 | benefits ... 147 | | Chapter ... 27, 37, 41-43, 58, 60, 62, 63, 73, 89, 97, 140, 148, 154, 158, 161, 162, 178, 179, 185, 192, ... 194, 196 |
| aquifer ... 191 | availability ... 29, 99, 128, 152, 215, 221 | beside ... 15 | Buying ... 76 | |
| area ... 14, 167, 191 | | Bickford ... 12 | bylaw ... 167 | |
| argument ... 146, 153, 160, 200 | available ... 75, 76, 96, 98, 99, 102, 103, 108, 110, 111, 115, 118, 127, 128, 139, 143, 152, 175, 184, ... 195, 221, 231, 232, 243 | big ... 9 | | characterization ... 228 |
| | | Bill ... 106, 107, 210, 243 | **C** | characterize ... 226 |
| arise ... 158, 159 | | bind ... 8 | Cafeteria ... 59 | charge ... 7, 203 |
| arms ... 205 | availed ... 184 | blank ... 110 | California ... 126, 208 | charitable ... 14, 186, 207, 208 |
| arose ... 229 | Availing ... 127 | BNC ... 106 | call ... 13, 20, 24, 207 | |
| article ... 67 | aware ... 14, 19, 57, 104, 108, 110-112, 116, 118-120, 124-126, 137, 152, 161, 189, 192-194, 206, ... 207, 241, 246, 247 | Board ... 28, 41, 42, 44-48, 52-54, 81, 82, 108, 110, 113, 120, 165, 167, 168, 191-193, 197, 201-203, ... 206, 210, 212, 222, 228, 241 | called ... 22, 64, 119, 218, 246 | chart ... 109 |
| articulate ... 205 | | | calling ... 24 | check ... 86, 194 |
| assemble ... 61, 235 | | | calls ... 149 | checked ... 14 |
| assembled ... 90, 94 | | | calm ... 204 | checking ... 230, 231, 233 |
| assessment ... 30 | | | campaign ... 117 | Choate ... 202 |
| asset ... 87, 248 | | | Can ... 6, 10, 15, 16, 18, 20, 21, 23, 31, 35, 37, 40, 42, 44, 50, 52, 59, 62, 63, 70, 76-79, 91, 101-103, ... 107, 113, 114, 125, 128, 130, | chose ... 14 |
| assets ... 71, 203, 227, 231, 232, 238 | | boards ... 168, 211 | | Chris ... 105 |
| assign ... 37, 46, 47, 49, 192 | awareness ... 78, 97, 120, 144 | Bob ... 198, 204-206, 247 | | Christianson ... 21-23, 25, 26, 30, 31, 34, 212 |
| assigned ... 156, 157, 177, 183, 193, 207, 216 | **B** | body ... 44 | | |
| | | bold ... 154, 155, 178, 220 | | |

DEPOSITION OF CRAIG MACDONNELL

MINDEX by Kenson

| Word ...... Page | Word ..... Page | Word ...... Page | Word ...... Page | Word ..... Page |
|---|---|---|---|---|
| Christopher ... 116 | 196, 198, 227, 234, | consequences ... 156 | Cook ... 18 | 178, 198, 199 |
| chunk ... 205 | 240, 241 | conservation ... 7, 18, 19, | cooperate ... 157 | dated ... 45-47, 49, 68, 137, |
| circumstance ... 102, 120, | complete ... 54, 69, 70, 95, | 22-26, 29-31, 33, 34, | cooperation ... 246 | 166, 167, 209, 212, |
| 126 | 113, 128, 139, 142, | 37, 38, 42, 77, 81, 139, | copied ... 46, 167 | 228, 234, 238 |
| circumstances ... 22, 23, 57, | 153, 188, 192 | 141, 142, 158, 178, | copies ... 51 | dates ... 44, 50 |
| 62, 100, 104, 118, 126 | completed ... 52, 139, 142, | 187, 191-193, ... 205, | copy ... 106 | David ... 81, 92, 197 |
| city ... 143 | 155 | 212, 233, 236, 243 | Cornell ... 12, 13, 240 | dawned ... 78 |
| civil ... 117 | completely ... 61, 141, 223 | conserve ... 25, 69 | Corner ... 6 | dawning ... 78 |
| claim ... 71, 209 | completeness ... 111 | conserved ... 193 | corporate ... 13, 16, 18 | day ... 47, 49, 50, 61, 194, |
| clarify ... 16, 42, 48, 60, 81, | compliance ... 167 | conserving ... 193 | corporation ... 14, 15, 208 | 204, 212, 239 |
| 91, 121, 122, 133, 221 | complicated ... 144 | consider ... 25, 70, 71, 78, | corrected ... 110 | days ... 65, 66 |
| clause ... 71-75, 119, 149, | complicating ... 169 | 149, 150, 185, 226, | correctly ... 38, 58, 60, 76, | dead ... 200, 201 |
| 158, 183, 207 | comply ... 60, 63, 97, 152, | 231, 232, 243 | 101, 110, 133 | deal ... 51, 72, 78, 130, 134, |
| close ... 75, 94, 110, 127 | 154, 176, 179, 187 | consideration ... 148, 167 | correctness ... 203 | 144, 148, 155, 172, |
| closely ... 231 | complying ... 98, 132 | considered ... 48, 70, 95, 97, | correspondence ... 155, 158, | 181, 192, 199, 213, |
| closing ... 52, 91, 94, 96, | component ... 57, 94, 147, | 157, 172, 188, 231 | 206 | 224-226, 228, 237, 243 |
| 121, 143, 155, 181, | 161, 225 | considering ... 78, 83, 86, | cost ... 82, 117, 118, 192, | dealing ... 36, 71, 189, 207 |
| 182, 221 | components ... 97 | 151, 233 | 202, 245 | deals ... 18, 89, 185 |
| Co ... 92, 157, 169, 172, | concentration ... 210 | consistent ... 83 | costs ... 83, 85, 157 | dealt ... 147 |
| 182, 184, 186, 189, | concept ... 89, 247 | consisting ... 150 | cottage ... 167 | debate ... 217 |
| 193-195, 223, 224, | concern ... 62, 160 | constellation ... 29 | counsel ... 45, 46, 52, 87, 92, | debated ... 203 |
| 230, 244 | concerned ... 31, 207, 218, | constitute ... 247 | 99, 110, 112, 125, 126, | December ... 28, 40, 232 |
| Cobb ... 81 | 227 | construction ... 157, 183-186 | 130, 132, 145, 149, | decide ... 152, 156, 159 |
| code ... 59 | concerning ... 21, 24-28, | consultant ... 104, 105 | 159-161, 196, 197, | decided ... 91, 113, 114, 144, |
| collaboration ... 247 | 33, 34, 36, 39-41, 47, | contact ... 21, 23, 24, 26, | 201-203, ... 207, 209, | 157, 158, 188, 213, |
| collateral ... 233 | 58, 66, 89, 99, 130, | 31-33, 36, 41, 122 | 228 | 218 |
| collection ... 195, 216 | 147, 165, 191, 195, | contained ... 21-25, 27, 30, | count ... 24, 209, 211 | decision ... 68, 96, 97, 114, |
| colloquial ... 242, 246 | 212, 213, 215, ... 217, | 32, 36, 37, 41 | counting ... 237 | 121, 161, 221, 228, |
| combination ... 54, 241 | 219, 240 | contacting ... 26, 32 | couple ... 36, 81, 107 | 230 |
| come ... 25, 26, 71, 95, 96, | conclude ... 98, 129, 142 | contain ... 116 | course ... 43, 90, 171, 173, | decisions ... 58, 72 |
| 98, 134, 137, 139, 171, | concluded ... 75, 96, 97, | contained ... 131, 145, 153 | 185, 214, 240 | declare ... 242 |
| 188, 189, 200, 206, | 248 | contemplate ... 70, 186 | courses ... 13 | deduction ... 209 |
| 215, 237-239 | conclusion ... 139, 149, 150 | contemplated ... 186, 221, | court ... 86, 112, 118, 119, | deductions ... 209 |
| comes ... 126, 174, 233 | conclusions ... 148 | 235, 237 | 127, 160, 161, 174, | deeds ... 55, 73 |
| coming ... 52, 140, 162, 189, | Concord ... 6 | contemplates ... 186 | 185 | deem ... 152 |
| 190, 233, 237 | condition ... 57, 173, 196 | contemplating ... 244 | courts ... 12, 13, 58 | default ... 114, 115, 120, |
| comment ... 66 | Conditions ... 51, 119, 154 | context ... 113, 152, 196 | cover ... 106, 117, 118 | 156, 171, 197, 201 |
| commenting ... 197 | conducted ... 185 | contingencies ... 194 | CPA ... 117 | defaulted ... 156 |
| comments ... 28 | confidence ... 89, 228, 234 | contingency ... 72, 108, 117, | CPC ... 42, 64, 65, 236 | defeated ... 189 |
| Commission ... 33, 42, 68, | confidences ... 164 | 169, 183, 186, 194 | Craig ... 6, 37, 49, 81, 106, | defect ... 180 |
| 193 | confident ... 89 | contingent ... 107, 239 | 107, 113, 119, 121, | defects ... 180 |
| commissioner ... 12 | configuration ... 146, 151 | continue ... 175, 197, 236, | 129, 135, 162, 163, | defend ... 52, 155, 175, 197, |
| commitment ... 67, 247 | confirmation ... 118 | 245 | 165, 193, 210 | 201 |
| commitments ... 244 | conforming ... 167 | continued ... 236 | create ... 153, 167 | Defendants ... 113, 119, 121 |
| Committee ... 48, 64, 65, 79, | conformity ... 167 | continuing ... 105, 199 | created ... 229 | defended ... 163 |
| 81, 247 | confuse ... 107 | contract ... 9, 39, 58-66, 71, | creation ... 31, 76 | deferred ... 162 |
| committees ... 42 | confused ... 74 | 73, 80, 91, 93, 98, 99, | credit ... 77, 107-111, | define ... 8 |
| common ... 58, 104, 156, | confusing ... 168 | 123, 128, 136, | 113-116, 118-120, | defined ... 151 |
| 185, 229 | conjunction ... 117 | 140-142, 144, 145, | 125-128, 138, 175, | definition ... 77 |
| Commons ... 27, 28, 93-95, | connection ... 15, 197, 248 | 148, 152, 153, ... 156, | 187, 188, 206, | degree ... 13, 167 |
| 129, 134, 136, 140, | connections ... 197, 201 | 158, 169-173, 177-179, | 215-218, 227, 231, | degrees ... 13 |
| 144, 148, 170-172, | CONROY ... 6, 8, 14, 16, | 182-185, 187, 194, | 233, ... 234, 237 | delicate ... 191 |
| 179, 184, 189-191, | 17, 19-21, 29, 31-34, | 200, 201, 244, 247 | criminal ... 117 | deliver ... 91, 176, 221 |
| 207, 223-225, ... 230 | 36-41, 43, 49, 50, 52, | contracts ... 8 | critical ... 68, 76, 87, 143 | demands ... 197 |
| Commonwealth ... 12, 15, | 53, 55, 57-59, 61-63, | contractual ... 242-244 | crunches ... 104 | demonstrated ... 192 |
| 100, 116, 117, 122, | 65, 68, ... 70, 72-77, | contributing ... 94 | crux ... 188 | denied ... 241, 245 |
| 123, 142, 187 | 79, 80, 82, 86, 88-91, | contribution ... 122, 186 | current ... 112 | denies ... 88, 101 |
| communicate ... 220 | 93, 101, 102, | control ... 174, 187, 210 | currently ... 21, 233 | Denise ... 123, 125, 228 |
| communications ... 160 | 109-112, 114-116, | conventional ... 184 | customary ... 110 | deny ... 89, 245 |
| communities ... 19, 81 | 121, 123, 125-130, ... | conversation ... 31, 89, | cut ... 110 | denying ... 202 |
| Community ... 64, 65, 68, | 132-136, 139-156, | 100-102, 131, 133, | | Department ... 11, 12, 100, |
| 100, 104, 138, 192, | 158, 159, 162, 164, | 209, 247 | **D** | 104, 138 |
| 243, 247 | 168, 170-177, 183, | conversations ... 32, 35, 40, | daily ... 232 | dependent ... 91 |
| company ... 27 | 184, 187, 189, 191, ... | 44, 165, 189, 214, 215 | damage ... 71, 73-75, 119, | depose ... 162 |
| comparable ... 240 | 195-197, 205, | conversion ... 100 | 149, 158, 207 | deposes ... 6 |
| compelled ... 64 | 207-212, 214, 216, | convey ... 60, 83, 186 | damages ... 72, 141, 156, | deposit ... 177, 181, 182, 231 |
| compilation ... 45, 105, 177, | 218, 220, 223, 224, | conveying ... 129 | 171, 183 | deposited ... 80, 81 |
| 193 | 226, 238, 239, 242, | convince ... 209 | dark ... 214 | deposition ... 6, 16, 17, 32, |
| complaint ... 85-88, 101, | 245-248 | convincing ... 43 | date ... 30, 42, 44, 47, 49, | 63, 134, 162, 164, 174, |
| | | | 50, 56, 68, 91, 121, | |

# DEPOSITION OF CRAIG MACDONNELL

MINDEX by Kenson

| Word ...... Page | Word ...... Page | Word ...... Page | Word ...... Page | Word ...... Page |
|---|---|---|---|---|
| 175, 211, 248 | dissatisfied ... 215 | 158, 159, 168, 172, | 148, 153, 159, 219, | faced ... 188 |
| deposits ... 80, 113, 181, 219 | dissuade ... 189 | 174, 183, 184, ... 187, | 227 | facile ... 212 |
| derived ... 15, 56, 147 | dissuaded ... 189 | 189, 194, 195, 204, | establish ... 186, 244 | facilitate ... 100, 151 |
| describe ... 14, 77, 98, 165, | distinct ... 215 | 207, 209, 214, 220, | established ... 23, 57 | factors ... 29 |
| 209 | distinguish ... 34 | 223, 224, 226, 244, | establishing ... 50, 212, 233 | fail ... 111, 140, 141 |
| described ... 42, 108, 145, | division ... 18, 19, 230 | 245 | establishment ... 24 | failed ... 72-74, 104, 113, |
| 150, 181, 182, 216 | doctrine ... 229 | economy ... 138 | estate ... 76, 182, 197 | 141, 180 |
| describing ... 210 | document ... 15-18, 35, 48, | education ... 13 | estimation ... 9 | failing ... 170 |
| description ... 217, 236 | 49, 51, 57, 64, 66, 75, | educational ... 10 | estoppel ... 247 | failings ... 110 |
| design ... 83 | 81, 105, 111, 119, | effect... 50, 78, 97, 189, | ethical ... 175 | failure ... 52, 138, 155, 170 |
| designate ... 209 | 125, 130, 131, 136, | 192, 193, 195, 201, | events ... 44, 166 | fair ... 26, 27, 43, 49, 50, 62, |
| designation ... 14, 15, 20, | 154, 155, ... 165, | 203, 207, 230, 244 | eventually ... 140, 226 | 64, 67, 71, 81, 83, 84, |
| 27-29, 35 | 191-193, 227, 245, | effective ... 81 | everybody ... 92, 230 | 91, 94-96, 98, 111, |
| designed ... 140, 184 | 246 | effectively ... 62 | everything ... 140, 247, 248 | 145, 150, 151, 157, |
| despite ... 75 | documents ... 20, 21, 35, | effectuate ... 94-96, 215, 232 | evidenced ... 110 | 159, 168, ... 179, 182, |
| detectors ... 186 | 45, 50, 105, 106, 112, | efforts ... 75, 189, 193 | evidences ... 245 | 183, 187-189, 193, |
| determination ... 72, 78 | 116, 130-132, 193, | eight ... 178, 199, 235-238 | EXAMINATION ... 6 | 194, 200, 210, 211, |
| determine ... 78, 158, 180, | 194, 212 | eighteen ... 181 | Examining ... 15 | 213, 219, 220, 225, |
| 231 | dollar ... 8, 16, 56, 79, 82, | eighty ... 16 | example ... 8, 13, 63, 64, 186 | 235, 236, 238-242, ... |
| determined ... 71, 78, 91, | 94-96, 110, 111, | elderly ... 88, 101, 207 | exceed ... 225 | 245-247 |
| 229 | 113-116, 118, | elect ... 184 | except ... 6, 88, 101, 179, | fairly ... 26, 103, 196 |
| determining ... 139 | 127-129, 137, 147, | elected ... 21, 121, 163 | 217 | faith ... 158 |
| developed ... 150, 151, 169, | 150, 152, 175, 220, | election ... 184 | excerpt ... 124 | fall ... 167, 199 |
| 193 | 221, ... 234, 238, 240, | eleven ... 180 | exchange ... 236 | fallback ... 107-109, 118, |
| development ... 25, 27, 28, | 243, 248 | email ... 164, 166, 168, 209, | exempt ... 208, 243 | 122, 138, 142 |
| 31, 63, 64, 100, 104, | dollars ... 8, 9, 80-82, 84, | 210 | exercise ... 42, 82, 87, 97 | falling ... 214 |
| 138, 157, 187, | 95, 102, 103, 113, | emerged ... 169 | exercised ... 119 | false ... 116 |
| 191-193, 213 | 119, 137, 139, 142, | employed ... 18 | exhausted ... 134 | far ... 8, 19 |
| DH ... 104 | 153, 182, 186, 187, | employee ... 19, 24, 162, 166 | Exhibit ... 16-19, 35, 45-47, | Farm ... 27, 35, 150, 193, |
| DHCD ... 100, 105, 106, | 216, 219, 225, ... 230, | employees ... 24 | 49-51, 54-57, 59, 60, | 210 |
| 109, 139 | 231, 233, 237, 243, | enable ... 29, 171, 180, 184 | 64, 66-68, 73-75, 79, | fashion ... 190, 205 |
| dialogue ... 158 | 244 | enables ... 211 | 81, 105, 110, 121, 122, | father ... 87, 88, 101 |
| difference ... 85, 156, 157, | donated ... 80, 146, 148 | encountered ... 170 | 124, ... 137, 138, 154, | favor ... 64 |
| 208 | donation ... 80, 134, 147 | encourage ... 200 | 155, 164-166, 191, | feasibility ... 194 |
| different ... 29, 33, 62, 91, | Donna ... 167 | encouraging ... 200, 222 | 193, 206, 209, 210, | February ... 6, 45-47, 49, 54, |
| 121, 144 | door ... 106 | encumber ... 150, 157 | 212, 219, 220, 222, | 56, 57, 61, 64-66, 74, |
| differentiate ... 181 | Dorothy ... 45-49, 56, 125 | endorse ... 167 | 225, 227, ... 228, 234, | 165-168, 191, 192, 247 |
| difficult ... 40, 215 | double ... 118, 194 | endowment ... 233 | 235, 238, 242, 244, | federal ... 12, 13, 112, 117, |
| difficulty ... 87, 170 | doubled ... 64 | ends ... 156, 232, 233 | 246, 247 | 118 |
| dilapidated ... 196 | downstairs ... 59 | Enforcement ... 11 | existed ... 19, 223 | fee ... 181 |
| diligence ... 72, 110, 111, | dozens ... 124 | engages ... 139, 140 | existence ... 129, 229, 245 | feel ... 42, 64 |
| 113, 118, 140, 142 | draft ... 81, 154 | England ... 24, 115 | exists ... 131 | feels ... 104 |
| dimensional ... 166 | drafted ... 155 | enhance ... 243 | exit ... 99 | fees ... 181 |
| directions ... 178 | drafting ... 67 | ensure ... 104 | exits ... 136, 164, 196, 222, | fellow ... 21, 192 |
| directly ... 21 | drawn ... 148 | ensured ... 195 | 234 | felt ... 215 |
| director ... 7, 8, 14, 20, 24, | Drew ... 192 | ensures ... 243 | expect ... 84, 141, 226, 242 | FETOUH ... 13, 17, 19, 20, |
| 41, 47, 49, 104, 115, | drop ... 228 | enter ... 16, 129, 158, 183, | expectation ... 39, 84, 140, | 22, 27-34, 36, 38-43, |
| 120, 161, 176, 230, | dropped ... 228 | 242 | 141, 227 | 47, 49-51, 53, 55-58, |
| 232 | due ... 72, 110, 111, 113, | entered ... 185 | expected ... 84, 85, 90, 142, | 61-63, 65, 68, 70-72, |
| Directors ... 48, 110, 113, | 118, 126, 132, 136, | entering ... 244 | 150, 179 | 74-77, ... 79, 80, 82, |
| 222 | 140, 142, 153 | enters ... 211, 215 | expecting ... 141 | 85, 86, 89, 90, 92, 97, |
| disagreeing ... 223 | duly ... 6 | entertain ... 57 | expenditure ... 68 | 98, 111, 114-116, |
| disagrees ... 172 | | entire ... 44, 186, 218 | expenses ... 182, 233 | 123-128, 132, 135, |
| disappointed ... 190 | **E** | entirely ... 117, 130, 150, | experience ... 185 | 136, 139-144, ... |
| disclose ... 120 | | 235 | experienced ... 138, 204 | 146-150, 152-154, 156, |
| disclosure ... 206 | each ... 7, 155, 163, 243 | entirety ... 148 | expert ... 62, 164 | 158-163, 165, 168, |
| disconnect ... 216, 217 | earlier ... 30, 60, 61, 95, 97, | entities ... 17, 229, 241 | expertise ... 104, 147 | 170, 172-174, 177, |
| discourage ... 214 | 104, 107, 127, 144, | entitled ... 128 | explain ... 225, 226 | 179, 183-189, 191, ... |
| discouraged ... 214 | 148, 155, 158, 169, | entity ... 18-20, 27, 39, 229, | explained ... 107 | 194, 195, 198, 201, |
| discusses ... 154 | 208, 217, 228, 229 | 243 | explanation ... 128 | 204, 207-209, 211, |
| discussing ... 25, 51, 52, 65, | early ... 10, 26, 88, 98, 168, | environmental ... 11, 13, 69 | explicit ... 204 | 212, 214, 217, 218, |
| 74, 203, 204 | 210, 229 | envisioned ... 170 | explicitly ... 73, 158, 159 | 220, 222-226, 234, |
| discussions ... 23-26, 28, 29, | earmarked ... 79, 115 | envisions ... 107 | expressing ... 99 | 237, ... 239, 240, 242, |
| 33, 34, 41-44, 189, | earned ... 221 | equivalent ... 103 | expressly ... 88, 101 | 244-246, 248 |
| 199, 214, 215, 219 | earnest ... 80, 81, 149, 156, | Ernest ... 18 | extension ... 157, 167, 178 | field ... 69 |
| dishonesty ... 204 | 181, 182, 186, 218, | Esquire ... 125 | extensive ... 147 | Fifteen ... 180, 182 |
| Dismiss ... 113, 119, 121, | 219 | essence ... 151 | extensively ... 67 | fifth ... 241 |
| 163 | easily ... 216 | essential ... 156 | external ... 70 | fifty ... 9, 32, 94, 100 |
| disregard ... 175 | ECKER ... 34, 75, 89, 92, | essentially ... 17, 48, 143, | **F** | figure ... 71, 185, 229, 248 |
| | 114, 129-132, 135, | | | |
| | 141, 146, 148, 153, | | | |

## DEPOSITION OF CRAIG MACDONNELL

MINDEX by Kenson

| Word . . . . . . Page | Word . . . . . Page | Word . . . . . . Page | Word . . . . . . Page | Word . . . . Page |
|---|---|---|---|---|
| figuring ... 98 | 121, 123, 127, 129, | gift ... 224 | hard ... 61, 70, 126, 199, | 105, 124, 137, 154, |
| filed ... 86, 112, 119, 127, | 143, 145-147, 150, | give ... 35, 94, 95, 193, 206, | 200, 226, 236 | 164, 166, 191, 193, |
| 162 | 152, 176, 177, 220, | 219, 233 | harmless ... 51, 155 | 210, 212, ... 228, 234, |
| filing ... 20, 116, 117 | 221, 226, 227... | given ... 39, 65, 69, 95, 96, | Hatch ... 7, 8 | 238 |
| filled ... 104, 106 | Fourteen ... 180 | 130, 134, 146-148, | HDSP ... 117 | identified ... 6, 71, 79, 84, |
| final ... 98 | fraught ... 143 | 158, 172, 182, 218, | head ... 245, 246 | 90, 160, 180, 216 |
| finance ... 18, 19, 79, 81, | free ... 129 | 231 | heading ... 36, 210 | identifies ... 139 |
| 115, 116, 126, 217 | frequency ... 44 | giver ... 87 | headquarters ... 7 | identifying ... 157, 185 |
| finances ... 61, 217 | Friends ... 37, 80, 81, 165, | Glassman ... 77, 78, 108, | hear ... 59, 174, 195 | imagination ... 226 |
| financial ... 18, 67, 70, 87, | 190, 193, 212-214, | 206 | heard ... 17, 77, 160, 162, | imagine ... 153 |
| 120, 231, 242-244 | 216-219 | go ... 11, 12, 20, 28, 43, | 170, 182, 190, 247 | imagined ... 139, 141, 151, |
| Financing ... 29, 60, 72, | front ... 9, 15, 18, 51, 80, | 52-54, 59, 66, 67, 75, | hearings ... 27, 44 | 171, 184, 185, 236 |
| 107-109, 133, 157, | 101, 106, 145, 159, | 89, 96, 103, 104, 112, | heated ... 199 | imagines ... 63, 142, 153, |
| 184, 186, 217 | 168, 169, 200, 208 | 114, 117, 121, 129, | heck ... 141 | 185, 187 |
| Fincom ... 81, 82 | frontage ... 166, 167 | 131, 133, ... 138, 141, | held ... 51, 52, 155 | immediate ... 103 |
| find ... 74 | fronted ... 238 | 144, 150, 156, 159, | help ... 14, 38, 100, 105, 188 | immediately ... 102 |
| finding ... 70 | frustration ... 175, 216 | 160, 164, 166, | helpful ... 37, 96-98 | implying ... 102 |
| fine ... 161, 163, 175, 239 | frustrations ... 175 | 169-172, 174-176, 180, | helping ... 205 | Importance ... 165 |
| finger ... 175 | full ... 37, 63, 69, 90, 91, | 186-188, 190, ... 194, | helps ... 19, 81 | important ... 185, 230, 241, |
| firm ... 202, 246 | 220, 243 | 196, 197, 204, 213, | hesitated ... 17 | 248 |
| firms ... 10, 203, 247 | fully ... 70, 71, 75, 181 | 214, 222, 227, 228, | high ... 165 | imposed ... 129 |
| first ... 6, 19, 30, 31, 35-43, | function ... 121, 154 | 230, 245, 246 | highly ... 143, 144 | impossible ... 75 |
| 45, 47, 50, 51, 53, 54, | fund ... 17-19, 54, 57, 61, | goals ... 178 | hijinks ... 205 | improved ... 236 |
| 56, 57, 61, 64, 66, 67, | 70-74, 90, 109, 113, | going ... 15, 17, 24, 42, 48, | Hill ... 201, 202 | imprudent ... 227 |
| 72-74, 82, 87, 97, 105, | 117, 119, 122, | 51, 62, 64, 67-69, 74, | hired ... 104 | impugning ... 131 |
| 106, ... 110, 116, 118, | 137-139, 142, 170, | 75, 81, 83, 87, 90-93, | Hoar ... 123, 124, 201 | inaccurate ... 65, 66, 82, 83, |
| 119, 121, 130, 137, | 174, 188, 213-218, ... | 96, 97, 100, 101, 105, | hold ... 17, 52, 76, 139, 182 | 116, 117 |
| 154, 156, 158, 161, | 222, 227, 231, 239, | 112, ... 118, 119, 122, | honest ... 82, 204 | inapplicable ... 158, 178, 181 |
| 166, 170, 177, 178, | 240 | 124, 126, 129-132, | honestly ... 248 | inapposite ... 63, 178, 179, |
| 182, 192, ... 193, 207, | funding ... 57, 107, 108 | 134-138, 145, 147, | honor ... 73, 74 | 184 |
| 212, 235-237, 242 | funds ... 54-56, 70, 71, 77, | 148, 150-152, 154, | honored ... 74 | inappropriate ... 62, 146, 178 |
| fiscal ... 232, 233 | 79, 80, 90, 95, 96, 99, | 160, 164, ... 165, 168, | hope ... 54, 55, 85, 104, 175, | inclusion ... 146 |
| Fish ... 10 | 100, 102-104, | 174, 177, 180, 181, | 236, 237 | income ... 31, 83, 190, 209 |
| Fisheries ... 11, 12 | 109-111, 117, 118, | 186, 188, 190, 191, | hoped ... 54-56, 68, 90, 118, | inconsistent ... 122 |
| fists ... 205 | 121, 122, 126, ... 138, | 193, 196, 197, 212, | 190 | incorporated ... 183 |
| five ... 24, 40, 42, 45, 59, | 139, 203, 215-217, | 213, 215, 216, ... 218, | hopefully ... 233 | incorrect ... 56 |
| 176, 183, 186, 191, | 219, 220, 222, 231, | 219, 226, 227, 233, | horizon ... 142, 214 | incorrectly ... 133 |
| 222, 236-238 | 232, 238, 241, 243 | 236, 237 | horse ... 35, 150 | increase ... 100, 167 |
| fluctuates ... 231 | further ... 83, 131, 157, | gone ... 89, 106 | host ... 43 | increased ... 100 |
| focus ... 31 | 177, 197, 221, 222, | good ... 59, 75, 158, 176, | hostile ... 138 | increasingly ... 228 |
| fold ... 214 | 226 | 191, 196, 200-202, | hour ... 59, 91 | indemnification ... 52, 53, 74 |
| folks ... 191, 219, 247 | future ... 215, 227, 229, 230 | 204, 224, 225 | hourly ... 244 | indemnify ... 53 |
| follow ... 110, 169 | **G** | Goodwin ... 123, 124, 201 | hours ... 124 | indicated ... 100 |
| followed ... 151 | gain ... 147 | gradual ... 78, 144 | house ... 22, 196 | indicating ... 112, 127, 130, |
| following ... 113, 156, 191 | game ... 62, 98 | gradually ... 228 | household ... 83 | 245 |
| follows ... 6, 112, 183, 196 | gap ... 76, 78, 137, 138, | graduate ... 12 | housekeeping ... 92 | indication ... 245 |
| fool ... 248 | 217, 222 | grant ... 54, 93, 100, 105, | houses ... 220 | indistinguishable ... 162 |
| forcing ... 204 | gaps ... 77 | 106, 123, 138, 139, | housing ... 31, 54, 100, 104, | individually ... 245 |
| foregoing ... 150 | gathers ... 77 | 167 | 137, 138, 157, 169, | influenced ... 62, 183 |
| forestry ... 27 | gave ... 223 | granted ... 164, 165 | 172, 182, 184, 186, | influential ... 197, 201 |
| forfeited ... 119 | gear ... 76 | grants ... 116 | 189, 190, 193-195, | informal ... 247 |
| forgive ... 212 | general ... 9, 25, 28, 37, 60, | greases ... 145 | 223, 224, 230, ... 244 | informed ... 87, 88, 101, 116 |
| form ... 6, 16, 18, 145, 223 | 62, 131, 138, 230, | greater ... 77, 222, 223, 226 | hugely ... 229, 231 | infringe ... 160 |
| formal ... 242, 247 | 231, 246 | grounds ... 164 | Hull ... 148 | initial ... 26 |
| forth ... 165, 181, 183, 200 | Generally ... 17, 33, 35, 99, | group ... 214, 215 | hundred ... 9, 16, 40, 42, 56, | initially ... 100, 187 |
| forward ... 43, 74, 75, 103, | 104, 126, 197, 215, | guarantees ... 52, 155 | 69, 84, 85, 89, 94-96, | initiate ... 31, 34, 41 |
| 104, 112, 117, 121, | 216 | guess ... 40, 107, 159, 176, | 100, 127, 129, 137, | initiated ... 31-33 |
| 141, 142, 144, 149, | generate ... 109 | 183 | 138, 143, 145-147, | initiating ... 41 |
| 154, 156, 157, 166, | generates ... 235 | guys ... 163 | 150, 152, ... 177, 182, | initiation ... 42 |
| 170, 171, 174, ... 179, | generic ... 77 | **H** | 199, 220, 221, | inkling ... 168 |
| 180, 182, 188, 190, | gentleman ... 18 | half ... 9, 59, 91, 230, 231 | 235-238, 240 | inserting ... 169 |
| 194, 213, 214, 222, | get ... 42, 57, 67, 68, 71, | halfway ... 19, 83 | hundreds ... 42, 131, 132 | insertion ... 169 |
| 227, 228, 230, 233, | 90, 92, 96, 112, 122, | Hall ... 202 | hundredth ... 42 | inside ... 205 |
| 236, 239 | 123, 136, 141, 152, | hand ... 54, 74, 83, 102, 119, | husband ... 92 | insiders ... 120 |
| found ... 95, 113, 185 | 153, 159, 166, 168, | 230, 241 | hypothetical ... 227 | insist ... 129 |
| foundation ... 179 | 170, 189, 200, ... 205, | handling ... 32 | **I** | insistence ... 96 |
| foundations ... 216 | 209, 224, 226, 229 | handouts ... 192 | i.e. ... 25, 74, 159 | institution ... 14, 163, 207, |
| founder ... 108, 206 | gets ... 63, 64, 143, 174, | happily ... 146 | identification ... 16-18, 35, | 208 |
| four ... 56, 69, 84, 95, 96, | 235 | happy ... 133, 190, 194 | 45, 49, 51, 64, 75, 79, | instruct ... 160, 164 |

# DEPOSITION OF CRAIG MACDONNELL

MINDEX by Kenson

| Word ...... Page | Word ..... Page | Word ...... Page | Word ...... Page | Word .... Page |
|---|---|---|---|---|

instruction ... 133
insurance ... 180
intend ... 113
intended ... 27, 70, 71, 73, 91, 111, 118, 142, 171, 187, 220, 230, 243
intending ... 83, 123, 184
intends ... 110, 111, 122, 138, 142
intention ... 55, 69, 74, 75, 85, 90, 113, 141, 185, 187, 207, 210, 220
intentionally ... 189
intentions ... 140
Interconnect ... 106
interest ... 30, 96, 139, 220, 221, 236
interests ... 139
interim ... 140
intern ... 28, 123
internal ... 110, 113, 118
interns ... 29, 124
interpretation ... 131
intervention ... 247, 248
intimidated ... 197
intimidating ... 205
introduction ... 28
introductory ... 40
invest ... 129, 227, 235
investment ... 137, 236, 242, 244
involve ... 34, 160
involvement ... 24, 26, 27, 209, 210, 243
involves ... 29
irreversible ... 192
IRS ... 211
issue ... 40, 52, 53, 65, 74, 97-99, 128, 133-135, 144, 146, 149, 153, 156, 169, 170, 173, 174, 188, ... 201, 215, 216, 218-220, 239
issued ... 15
issues ... 13, 14, 43, 157-159, 168, 169, 215, 219
Item ... 51, 122, 123, 155, 156, 197, 219, 220, 248
items ... 74
iteration ...154

## J

Jacobs ... 166-168
January ... 36, 37, 39, 40, 42, 56, 79, 81, 84, 210, 238, 241-243
Jim ... 197-199
jive ... 83
job ... 7
John ... 12
join ... 14
joining ... 245, 246
joins ... 81
joint ... 81, 82, 163, 241, 246
jointly ... 162
Judge ... 114, 160, 175, 185
July ... 121, 234
June ... 121, 212, 213

justification ... 191

## K

Kachajian ... 87, 92, 93, 99, 129, 136, 137, 163, 164, 197, 198, 200, 202, 203, 207, 211, 218, 222, ... 226, 228, 234, 236
Karen ... 165-167, 169
Keegan ... 10, 11, 13
Kelleher ... 166, 169
Kennedy ... 164-167
kindness ... 124
kinds ... 63, 211, 246
kinks ... 169
knowing ... 140
knowledge ... 19, 21, 25, 168, 206
known ... 26, 27, 68, 210, 229
knows ... 104, 126, 162
KUN205 ... 35
KUN211 ... 37
KUN336 ... 105
KUN474 ... 45
Kunelius ... 21-25, 27, 30, 31, 33, 34, 36, 45, 55, 67, 69, 71, 74, 76, 79, 80, 82, 86-88, 90, 91, 93-96, ... 99-103, 108, 117, 119, 121, 127, 129, 130, 132, 135, 136, 140-142, 147, 149, 150, ... 152, 154, 156, 159, 165, 167, 169-172, 176, 177, 179-182, 187, 188, 193, 195-197, ... 199-203, 205-210, 212, 218-221, 225, 231, 232, 235, 236, 241, 244, 247, 248

## L

Labosky ... 214
lack ... 210
ladies ... 59
land ... 6, 7, 14, 17-19, 21, 27, 29, 37, 39, 45, 46, 48, 55, 76, 81-83, 113, 117-119, 121, 123, 131, 134, ... 135, 139, 143, 146-148, 162, 177, 186, 191-193, 208, 222, 223, 226
landholding ... 139
lands ... 76
Landvest ... 165
language ... 60, 69, 74, 111, 154, 178, 181, 210
LaPointe ... 105, 116
large ... 161, 185
larger ... 117
late ... 10, 11, 194, 212
later ... 12, 68, 95, 98, 121, 169, 199, 216, 227, 229, 234
latest ... 210

lawyer ... 10, 11, 14, 202, 203
lawyers ... 11, 141, 229, 246
lead ... 186
learn ... 102, 240
learned ... 161, 229
leave ... 10, 14, 72, 81, 84, 92, 196, 207
leaving ... 94, 95
led ... 129, 133, 169
left ... 13, 20, 45, 83, 106, 149, 205, 206, 208, 226
legal ... 11, 14, 62, 72, 73, 156, 164, 197, 201, 223, 242, 246, 247
lend ... 152
length ... 203
letter ... 45, 47, 49, 50, 56, 57, 60, 74, 110, 137, 147, 165, 210-213, 220, 222, 225, 228, 234-236, 238, ... 240-243
letters ... 210, 211, 220
level ... 228, 246
liability ... 135
license ... 6
likelihood ... 207, 239, 240, 243
likewise ... 68
limit ... 160
limitation ... 8, 9
limited ... 203
line ... 46, 51, 107-111, 113-116, 118-120, 125, 126, 128, 138, 151, 175, 177, 187, 188, 206, 215-218, ... 227, 231, 233-235, 237, 241
lines ... 77, 119-121, 127, 215, 222
liquid ... 231, 232
liquidated ... 71-75, 119, 141, 149, 156, 158, 171, 183, 207, 231
listed ... 14, 15, 82, 111, 122, 172, 177, 206, 214
literally ... 204
litigate ... 201-203
litigation ... 13, 33, 112, 203
litigator ... 10, 12
lives ... 165
loan ... 140, 150, 157, 184, 220, 222, 223, 226, 227, 239
loans ... 104, 120
lobbying ... 43, 209-212
local ... 29, 197
located ... 146, 193
long ... 11, 26, 97, 110, 168, 197, 202, 203, 218, 228, 229
look ... 15, 17, 29, 37, 47, 55, 64, 71, 72, 74, 75, 81, 93, 109, 121-123, 125, 138, 139, 145,

150, 155, ... 157, 176, 191, 193, 194, 201, 212, 219, 222, 234, 235, 241, 243, 247
looked ... 70, 71, 177, 231
Looking ... 20, 31, 36, 50, 54, 57, 67, 99, 107, 125, 137, 166, 172, 178, 194, 198, 228, 244
lore ... 154, 185
lose ... 171, 247
loss ... 138, 188
lost ... 170
lot ... 29, 61, 85, 118, 121, 144, 159, 166, 167, 190, 194, 214, 221, 231, 244
lots ... 29, 55, 56, 69, 71, 72, 74, 78, 84, 90, 91, 167, 168, 170, 237, 238
low ... 31, 190
Lower ... 197, 200, 247
luck ... 176
Luncheon ... 92
lying ... 214

## M

MacDonald ... 37
MacDonnell ... 6, 37, 49, 62, 81, 87, 88, 92, 101, 106, 113, 119, 121, 137, 162-165, 193, 196, 209, ... 210, 234, 238
Madam ... 86, 131
Maine ... 12
maintain ... 180
maintained ... 134
make ... 28, 29, 32, 53, 54, 56, 59, 61, 64-66, 72, 74, 75, 79, 84, 86, 90, 100, 103, 110, 118, 129, 139, ... 146, 155, 164, 177, 181, 230, 232, 238, 239, 241
maker ... 161
making ... 36, 85, 117, 144, 145, 200, 219, 221
man ... 7, 107, 161, 174
manage ... 38
managed ... 156
management ... 156
manager ... 37, 38, 105, 107, 113, 115, 116
managers ... 29, 126
many ... 11, 13, 24, 40, 42, 80, 92, 190, 191, 198, 215, 246
map ... 167
March ... 121, 232
Marilyn ... 45, 69, 71, 86, 158, 247
mark ... 18, 227
marked ... 15-18, 35, 37, 45, 49, 51, 64, 75, 79, 105, 124, 137, 154, 164-166, 191, 193, 209, 212, 228, ... 234, 238

market ... 55, 110, 111, 122, 138, 147, 217, 225, 237
markets ... 76, 218
Marr ... 248
Mass ... 6, 37
Massachusetts ... 6-8, 12, 14, 20, 47, 49, 58, 70, 104, 115-117, 120, 122, 142, 161, 176, 187, 230, 232, ... 233
materialize ... 139, 142, 219, 227
mattering ... 69
matters ... 18
Maynard ... 205
McClennen ... 10
McLAUGHLIN ... 6, 16-18, 37, 38, 42, 52, 53, 59, 60, 62, 63, 86, 91-93, 99, 101, 109, 110, 112, 121, ... 125, 128-134, 137, 144, 146, 149, 160-164, 174-176, 191, 196-198, 206, 228, 234, ... 238, 240, 247, 248
MCLE ... 13
means ... 29, 38, 57, 77, 128, 142, 173, 179, 203, 226, 245
meant ... 58, 60-62, 78, 227, 237
measured ... 71
Mechanism ... 107
medication ... 9
meet ... 26, 31, 40, 44, 50, 58, 122, 156, 171
meeting ... 26, 30, 31, 35, 36, 40-42, 46, 47, 52, 64-67, 81, 82, 87, 90, 100, 132, 166, 169, 191-193, ... 197, 198, 200, 202-206, 247, 248
meetings ... 28, 40, 42-44, 61, 198, 199, 204
member ... 33, 64, 120, 174, 247
members ... 44, 45, 189, 216
memo ... 106
memorandum ... 119, 121, 127
memorandums ... 127
memories ... 162
memory ... 9, 17, 25, 34, 35, 51, 67, 94, 100-103, 123, 164, 165, 204, 209, 213, 216, 217, 219, 248...
merger ... 229
merits ... 203
Messrs ... 99, 129, 136, 198
met ... 40, 44, 50, 54, 87, 88, 101, 166, 171, 196, 199, 214, 241
method ... 215, 220
Michael ... 125, 214
Mike ... 59, 62, 125
million ... 8, 9, 82, 94, 102,

## DEPOSITION OF CRAIG MacDONNELL

MINDEX by Kenson

| Word ...... Page | Word ..... Page | Word ...... Page | Word ...... Page | Word .... Page |
|---|---|---|---|---|
| 103, 111, 113-116, 118, 127, 128, 175, 186, 230, 231, 233-235, 248 | nationally ... 230-232 | obligate ... 158 | 224 | 178 |
| mince ... 128 | natural ... 71 | obligated ... 156 | outlines ... 73 | perhaps ... 11, 42, 95, 99, 148, 172, 210 |
| minds ... 150, 187 | naturally ... 59, 154 | obligation ... 60, 71, 120, 122, 176, 177, 207, 208 | overdrawn ... 115 | period ... 34, 35, 40, 98, 199, 213, 214, 228, 232 |
| minimum ... 143 | near ... 22 | obligations ... 71, 72, 94, 120, 241 | overpaid ... 224 | permanent ... 241 |
| Minor ... 110 | necessary ... 53, 54, 57, 70, 73, 84, 86, 90, 111, 113, 117, 121, 139, 142, 201, 202, 217, 222, 241 | obstacle ... 133, 170 | overpays ... 225 | permit ... 167, 169 |
| minus ... 35, 106, 237 | needed ... 75, 85, 95, 98, 138, 157, 170, 196 | obtain ... 116, 117, 209, 215 | overruns ... 117, 118 | permits ... 63, 157, 165, 169, 170, 173, 194, 195 |
| misled ... 215, 219 | negotiated ... 140 | obtained ... 233 | overstated ... 216 | Perry ... 49-52, 105, 106, 209-211, 238, 241 |
| missed ... 130, 210 | negotiating ... 172 | obtaining ... 72, 73, 179, 194, 219 | own ... 79, 83, 114, 140, 142, 147, 150, 176-178, 180, 183-185, 187, 215, 219, 237, 238 | person ... 28, 32, 64, 65, 122, 134, 149, 192, 204 |
| mission ... 188 | neighborhood ... 24, 237 | occasionally ... 139 | owned ... 134, 229 | personal ... 183, 185 |
| misspelled ... 18 | neither ... 86, 171 | occasions ... 88, 101, 199 | owner ... 23, 24, 123 | personally ... 92, 93 |
| mistake ... 92 | Nelson ... 45, 46 | occupation ... 6 | owners ... 241 | personnel ... 30 |
| mistakenly ... 148 | New ... 24, 115, 199, 228 | occur ... 29, 30, 42, 43, 68, 89, 90 | **P** | perspectives ... 104 |
| misunderstood ... 153 | nine ... 6, 104, 179, 199, 236, 237, 240 | occurred ... 35, 40, 42, 48, 51 | P.M. ... 92, 136, 163, 197, 234, 248 | Peter ... 21, 23, 25, 33-35, 86, 92, 137, 222, 226, 234 |
| mixing ... 164 | Nineteen ... 181 | occurring ... 31 | Pabian ... 10 | philanthropy ... 138 |
| money ... 19, 53-56, 61, 69-75, 77, 78, 80, 81, 84, 85, 90, 95, 96, 102, 112-116, 118, 119, 121-123, ... 126-128, 135, 136, 139, 141-144, 149, 153, 156, 174, 175, 181, 182, 184, 186-188, ... 196, 200, 205, 206, 214, 215, 217-219, 221-223, 225-227, 230, 231, 233, 236-239... | ninety ... 16 | occurs ... 29, 38 | pace ... 216 | Phillips ... 12 |
| | non ... 7, 14, 81, 153, 158, 167, 208, 243, 247 | offer ... 236, 238, 239 | paid ... 80, 98, 151, 156, 181, 182, 188, 217, 218, 220, 225 | phone ... 171 |
| | nor ... 125, 131, 158, 183 | offered ... 156 | paint ... 186 | phrase ... 78 |
| | normal ... 72, 73, 118, 182, 211 | offers ... 236 | pan ... 71 | pick ... 91 |
| | Normally ... 32, 41, 42, 231 | office ... 7, 18-20, 23, 24, 26, 30, 41, 120, 126, 166, 197, 198, 204 | parcel ... 145, 146, 150-152, 157, 178, 186, 187, 193, 225, 236 | picks ... 83 |
| | Norris ... 6, 16, 92, 99, 129, 136, 196-198, 215 | offices ... 24 | parcels ... 55, 68, 70, 146, 151, 229 | picture ... 35, 125 |
| monies ... 15, 79, 81, 182 | northeast ... 7 | official ... 21, 44 | parentheses ... 150 | piece ... 22, 142, 164, 243 |
| month ... 157, 182 | notary ... 6 | officials ... 26, 39, 40, 42, 43, 73, 74 | park ... 43 | pieces ... 29, 83, 85, 94, 148, 159 |
| monthly ... 220, 232 | note ... 18, 19, 47, 64, 94, 96, 145, 160, 162, 177, 220, 221 | often ... 44 | participate ... 108 | place ... 7, 35, 43-45, 119 |
| months ... 40, 121, 208, 220 | noted ... 86, 146 | Old ... 6, 32, 87 | participating ... 67 | placed ... 133 |
| morning ... 57, 66, 82, 88, 89 | notice ... 16, 17, 45 | onboard ... 140 | particularly ... 67 | Plaintiff ... 6, 16 |
| mortgage ... 91, 93-99, 123, 127, 129-131, 133-136, 145-147, 152, 177, 178, 183, 186, 221 | notified ... 87 | one ... 19, 27, 31, 32, 40, 45, 48, 50, 52, 55, 56, 64, 70, 74, 78, 79, 83, 85, 87, 89, 92, 94, 95, 107, 117, ... 126, 127, 130, 137, 138, 140, 142, 143, 145, 151, 162, 166, 168, 172, 186, 190-192, ... 198, 208, 212, 214, 217, 221, 222, 235, 236, 241, 242 | parties ... 92, 159, 163, 234, 242 | plan ... 103, 104, 107, 109, 117, 138, 142, 167, 170, 176, 200, 206, 227, 229, 230 |
| | noting ... 177 | | partner ... 10, 11, 242, 244 | planned ... 28 |
| mortgagor ... 122, 123 | notion ... 147, 164, 184, 227 | | partners ... 124, 241 | planning ... 42, 81, 165-168, 221 |
| Mosaic ... 27, 28, 93-95, 129, 134, 136, 140, 144, 145, 148, 170-172, 179, 184, 189-191, 207, 223-225, ... 230 | notwithstanding ... 140, 150, 245 | | partnership ... 235, 240-242, 245-247 | play ... 241 |
| | numbers ... 177 | | partnerships ... 246, 247 | played ... 171 |
| | Nutter ... 10 | open ... 52, 54, 94, 95, 99, 137, 204 | parts ... 94, 156 | players ... 198 |
| mother ... 87 | **O** | operation ... 15, 173 | passed ... 67 | pleased ... 189 |
| Motion ... 113, 119, 121, 163 | object ... 62, 116, 130, 133, 135, 146 | operations ... 120 | past ... 74, 150, 206, 216 | plugging ... 228 |
| motivated ... 25 | objected ... 130-132, 164 | opinion ... 186 | path ... 169, 229 | pocket ... 200, 243 |
| mouth ... 221 | objecting ... 133 | opposed ... 89 | pausing ... 214 | Pointing ... 15, 192 |
| move ... 76, 86, 145, 149, 170, 180, 236-238 | Objection ... 8, 13, 14, 17, 19-22, 27-34, 36, 38-43, 47, 49-51, 53, 55, 57, 58, 61-63, 65, 68, 70-77, ... 79, 80, 82, 85, 86, 88-91, 97, 98, 109, 111, 112, 114-116, 123-130, 132, 134-136, ... 139-156, 158, 159, 165, 168, 170-174, 177, 179, 183-189, 191, 194, 195, 198, ... 201, 204, 207-212, 214, 217, 218, 220, 222-226, 234, 237, 239, 240, 242, 244-248 | option ... 98, 136 | pay ... 69, 83, 90, 181, 182, 187, 201, 219, 221, 235, 239 | political ... 30, 44 |
| moving ... 179, 194 | | optional ... 178 | payback ... 237 | polls ... 192 |
| much ... 34, 56, 78, 80, 84, 85, 97, 98, 119, 124, 143, 144, 160, 177, 206, 215, 218, 219, 223, 230, ... 231, 233, 236 | | ordain ... 34 | paying ... 113, 236, 239 | portion ... 130, 131, 133-135, 145, 147, 148, 185, 187, 224 |
| | | order ... 37, 41, 44, 50, 84, 95, 96, 114, 122, 123, 155, 185, 215, 218, 231, 232, 236, 244 | payment ... 114, 195 | portions ... 55, 69, 148 |
| | | organization ... 7, 81, 128, 131, 139, 158, 233 | payments ... 219, 220 | position ... 8, 11, 21, 105, 109, 118, 122, 140, 161, 162, 202-204, 212 |
| multilateral ... 107 | | | pays ... 235 | positions ... 17 |
| multiple ... 117 | | organizations ... 38 | Pelletier ... 123, 125, 228 | possibility ... 26, 29, 33, 36, 39, 42, 43, 71, 72, 93, 127, 128, 205, 208, 212, 213, 230 |
| municipal ... 40, 42 | objections ... 6, 164 | organized ... 12, 19, 117 | penalties ... 117 | post ... 68 |
| municipalities ... 37 | objective ... 42, 167 | otherwise ... 76, 92, 110, 131, 142, 152, 192, 209, 243 | pendency ... 182 | posts ... 52, 155 |
| municipality ... 158 | | outcome ... 34, 172, 190, 200, 243 | people ... 23, 24, 30, 42, 124, 149, 165, 190-192, 203, 212, 214, 224, 246 | potential ... 22, 23, 29, 32, 34, 127, 129, 158, 159, 219 |
| **N** | | outlined ... 51, 57, 74, 75, | percent ... 82, 83, 89, 157, 167, 183, 220 | power ... 225 |
| named ... 21 | | | percentage ... 161 | practice ... 10, 12, 13 |
| names ... 10 | | | perception ... 176, 177 | |
| Nasson ... 12 | | | perfect ... 180 | |
| national ... 7, 48, 81 | | | perform ... 61, 156, 178, 239 | |
| | | | Performance ... 52, 156, 157, | |

# DEPOSITION OF CRAIG MacDONNELL

MINDEX by Kenson

| Word ...... Page | Word ..... Page | Word ...... Page | Word ...... Page | Word ..... Page |
|---|---|---|---|---|
| practiced ... 13 | 126, 139, 146-148, | 147-149, 151, 154, | receiving ... 94, 106, 166 | replicate ... 139 |
| practicing ... 13 | 156, 157, 170, 171, | 155, ... 157, 163, 164, | recognize ... 49, 51, 137, 165 | report ... 7, 8, 35, 105 |
| practitioners ... 185 | 183, 184, 187, ... 188, | 169, 170, 172, 177, | recognizes ... 211 | representation ... 39 |
| pre ... 34, 167 | 190, 191, 199, 201, | 178, 180, 182, 183, | reconfiguration ... 151 | representations ... 87, 112, |
| precede ... 238 | 203, 205, 208, 211, | 186, 189, 194, 195, | reconfigure ... 230 | 183 |
| prepared ... 105, 107, 160 | 213-217, 223, 224, | 197, 199, ... 200, 208, | reconstructed ... 203 | representative ... 166, 207 |
| present ... 6, 81, 82, 92, 136, | 227, 228, 230, 236, ... | 215, 218, 221, 222, | recover ... 181 | representatives ... 29, 199 |
| 163, 198, 234, 247 | 243, 244 | 224, 226, 231, 232, | recovered ... 238 | request ... 130, 155, 211, 241 |
| presentation ... 28, 192 | projects ... 24, 29, 42, 70, | 236, 237 | Red ... 22, 23, 35, 37, 68, 80, | requested ... 92, 117, 130, |
| presentations ... 28 | 77, 89, 104, 126, 139, | purchaser ... 63, 136 | 81, 109, 165, 187, 190, | 193 |
| presented ... 133, 156 | 141, 231, 233, 241 | purchases ... 154 | 192, 193, 212-214, | requests ... 211 |
| Preservation ... 64, 65, 68, | prominent ... 203 | purchasing ... 67, 74, 189 | 216-219 | require ... 58, 129, 144, 156, |
| 247 | promissory ... 145, 177, | pursuant ... 119, 130 | redefining ... 152 | 168, 176, 177, 179, |
| president ... 19, 108, 120 | 220, 221 | pursuit ... 243 | redevelopment ... 151 | 180, 185, 195 |
| prevail ... 203 | properties ... 85, 95, 190 | putting ... 105, 154, 190 | redraw ... 151 | required ... 60, 61, 96, 98, |
| prevent ... 31, 207 | property ... 8, 21-27, 29-31, | | reduced ... 199 | 113, 129, 151, 154, |
| prevented ... 129, 170, 179, | 33, 34, 36, 38, 52, 54, | **Q** | reduction ... 147 | 165, 169, 180, 194, |
| 190 | 67, 69-71, 73, 74, 76, | Quarterly ... 232 | referenced ... 110, 111, 122, | 222, 232 |
| preventing ... 193 | 78, 79, 83, 87, 88, 91, | quarters ... 193 | 125, 138, 176 | requirement ... 55, 56, 68, |
| prevention ... 31 | 95, ... 96, 98, | querying ... 164 | references ... 157, 206 | 145, 189, 246 |
| prevents ... 179 | 101-103, 107, 108, | questioning ... 146, 214, 215 | referencing ... 60 | requirements ... 57, 75, 156, |
| previously ... 164, 216, 236, | 111-114, 119, 121, | quick ... 93 | referred ... 54, 55, 57, 61, 68, | 177 |
| 240 | 126, 129, 130, | quickly ... 76, 87, 181 | 93, 103, 104, 201, 206, | requires ... 176 |
| price ... 69, 78, 79, 91, 94, | 133-135, 139, 141, | quintessential ... 161 | 215-218, 227 | requiring ... 133 |
| 97, 137, 147, 154, 157, | 143, ... 145, 147, 154, | quote ... 58, 68, 101, 109, | refers ... 55, 123, 124, 177, | resale ... 143 |
| 177, 178, 182-184, | 155, 165, 167, 170, | 111 | 183, 248 | reserve ... 6 |
| 186, 195, 197, 199, | 171, 173, 180, 182, | quoting ... 155 | refine ... 204 | reserves ... 233 |
| 200, 222-224, ... 226, | 184, 185, 189, 191, | | reflect ... 132 | resident ... 21, 165 |
| 236, 237 | 193, 199, ... 208-212, | **R** | reflected ... 225 | resolve ... 158, 159 |
| print ... 155 | 220, 222, 224, 225, | raise ... 19, 55, 85, 113, 114, | reflects ... 211 | resolved ... 169 |
| printed ... 64, 75, 180 | 229, 230, 232, | 118, 119, 121, 127, | refreshed ... 84 | resources ... 172, 184, 219, |
| printout ... 75 | 235-237, 241, 243 | 139, 141, 188, 213, | refusal ... 37, 38, 40, 42, 43, | 244 |
| Prior ... 26, 27, 29, 36, 37, | proposal ... 50, 205, 230, | 217, 218, 241 | 45, 47, 50, 51, 53, 54, | respect ... 8, 22, 82, 91, 113, |
| 40, 48, 72, 73, 84, 86, | 235, 237-240 | raised ... 53, 55, 56, 80, 142, | 56, 57, 61, 64, 67, | 126, 127, 132, 136, |
| 97, 143, 155, 158, 164, | proposed ... 25, 27, 68, 192, | 146, 155, 215, 218-220 | 72-74, 82, 87, 97, 119, | 147, 153, 204 |
| 171, 207, 223 | 238 | raises ... 149, 156 | 154, ... 156, 158, 170, | responded ... 64, 66 |
| private ... 54-57, 61, 70, 71, | proposes ... 81 | raising ... 54, 57, 61, 70-74, | 192, 193, 207, 217, | responding ... 81 |
| 74-77, 109-111, 117, | proposing ... 199, 237 | 90, 109, 117, 122, | 225 | response ... 14, 101, 156, |
| 122, 138, 188, | prospects ... 222, 227 | 137-139, 170, 173, | refusing ... 217 | 157, 163, 211 |
| 216-218, 227, 239, | protecting ... 191 | 174, 188, 213, 214, | region ... 7, 20, 24, 115 | responses ... 155, 162, 163 |
| 241, 243 | protection ... 191 | 216, 221, 222, ... 227, | Regional ... 7, 8, 45, 228 | responsibility ... 156 |
| privately ... 44, 55, 85, 122, | provide ... 91, 130, 131, | 239, 240 | registered ... 177, 208 | restating ... 210 |
| 215, 220 | 138, 176, 180 | range ... 16 | registration ... 16, 18 | restriction ... 26, 33, 212 |
| privilege ... 149 | provided ... 35, 64, 97, 243 | rate ... 244 | regularly ... 24, 44 | restrictions ... 94, 206 |
| pro ... 124, 201-203, 209 | providing ... 117, 239 | rather ... 25, 134, 136, 169, | rejected ... 230 | result ... 98, 104, 170, 171, |
| problem ... 77, 97, 133, 168, | provision ... 37, 91, 97-99, | 170, 186, 210, 211, | rejection ... 138, 230 | 190, 191, 197, 201, |
| 169, 229 | 145, 148, 149, 156, | 230 | relation ... 44 | 208, 248 |
| problematic ... 98, 143, 144, | 158, 176-178, | re ... 165, 189, 209, 227 | relationship ... 177, 240, 246 | resulted ... 50, 97, 131, 171, |
| 229 | 183-186, 207, 209 | reach ... 86, 150 | relative ... 97, 220 | 189, 237 |
| problems ... 78, 143, 168 | provisions ... 63, 97, 148, | reached ... 107, 149, 150 | relied ... 183 | resulting ... 23, 52, 155 |
| procedure ... 72, 182 | 151, 152, 159-161, | reaching ... 87 | relief ... 168 | retain ... 130 |
| Procter ... 123, 124, 201 | 163, 172, 173, 177, | reaction ... 19 | rely ... 73, 75, 149, 158, 184, | retirement ... 100, 195, 196 |
| produce ... 132 | 185, 186, 194 | reader ... 61 | 207 | return ... 239 |
| produced ... 131, 132 | prudence ... 72 | reads ... 137, 166, 196 | relying ... 87, 117, 235 | reveal ... 164 |
| product ... 235 | prudent ... 142, 158, 188 | ready ... 61, 191, 233 | remain ... 46, 134 | revenue ... 233 |
| production ... 6, 51 | Public ... 6, 7, 14, 18, 21, | realize ... 135, 170, 171 | remained ... 99 | reviewed ... 125 |
| profess ... 62 | 27, 37, 45, 46, 48, 70, | realized ... 100 | remaining ... 134, 135, 148, | reviewing ... 105, 217 |
| professional ... 13, 204 | 73-77, 81, 113, | realizing ... 75, 170 | 186, 224 | revising ... 151, 210 |
| profit ... 7, 14, 15, 20, 81, | 117-119, 121, 162, | reason ... 13, 17, 22, 27, 65, | remains ... 144 | rights ... 37, 46, 94, 230 |
| 158, 208, 243 | 192, 193, 208, ... 241, | 66, 69, 82, 83, 96, 112, | remind ... 36, 108, 126, 165 | ring ... 108 |
| program ... 235 | 243 | 114, 151, 164, 168, | renewed ... 118 | rise ... 246 |
| progress ... 193, 200, 217 | purchase ... 27, 38, 39, | 188, 190, 191, 195, | renovated ... 95 | risk ... 79, 156, 188 |
| prohibit ... 116 | 52-54, 67, 69-71, 73, | 205, 211, ... 214 | renovation ... 85, 143 | risks ... 156 |
| project ... 22-24, 29-32, 34, | 74, 78, 79, 84, 90, 91, | reasonable ... 114, 140-142, | repaid ... 140, 234 | Road ... 6, 22, 23, 68, 165, |
| 35, 37, 38, 40, 42, 43, | 93-97, 102, 103, 107, | 227, 232, 239 | repair ... 196 | 187, 190, 193 |
| 48, 66, 67, 69, 70, 72, | 108, 111-113, ... 118, | reasons ... 22, 27, 213, 222 | repay ... 222, 227, 236 | Rob ... 77, 108 |
| 75, 78, 79, 82, 83, 85, | 119, 121, 128, 130, | receipt ... 157 | repaying ... 220 | Robert ... 77, 78, 108 |
| 90, ... 97, 104-107, | 132, 136, 137, | receive ... 55, 236 | replace ... 102 | ROFR ... 57 |
| 113, 116, 117, 121, | 139-142, 144, | received ... 16, 45, 49, 105, | replaced ... 142 | role ... 8, 14, 20, 41, 104, |
| | | 106, 118, 154, 212 | | |

## DEPOSITION OF CRAIG MACDONNELL

MINDEX by Kenson

| Word ..... Page | Word ..... Page | Word ..... Page | Word ..... Page | Word ..... Page |
|---|---|---|---|---|
| 162, 232 | 101, 139, 170, 171, | smelled ... 162 | stop ... 91, 114, 173, 197 | **T** |
| roles ... 241 | 237, 239 | smoke ... 186 | stopgap ... 140 | table ... 61, 75, 90, 143, 153, |
| room ... 59, 92, 99, 136, 164, | seller ... 61, 157, 172, 181, | snuff ... 95 | storefront ... 204 | 178, 205, 240 |
| 172, 174, 196, 198, | 186 | software ... 235 | storm ... 92 | takeout ... 139, 140, 142, |
| 204, 211, 215, 222, | selling ... 73, 239 | sold ... 27, 55, 68, 69, 85, | Stow ... 21, 25-28, 31-37, | 227 |
| 234 | sent ... 50, 51, 105 | 151, 173 | 41, 45, 49, 54, 56, 59, | taking ... 24, 93, 94, 179 |
| Ross ... 49-52, 105, 106, | sentences ... 81 | sole ... 87 | 64, 67, 71-74, 79, 81, | Talmadge ... 24, 25, 30 |
| 209, 210, 241 | separate ... 1, 18, 170, | somewhat ... 155 | 94, 113, 117, 119, 121, | tax ... 13, 147, 148, 208, |
| route ... 229 | 182, 229 | Sommerlad ... 164-168, 193 | 129, ... 137, 138, | 209, 235, 243 |
| rules ... 175 | September ... 83, 121, 137, | sought ... 99, 100, 111, 116, | 146-148, 154, 165, | taxpayers ... 192 |
| run ... 202 | 178, 222, 225, 227, | 210, 230 | 167, 189, 191-193, | teaches ... 240 |
| running ... 32 | 228 | source ... 54, 55, 70, 83, 103, | 205, 209, 212, 216, | team ... 99, 205 |
| Ruth ... 165, 167 | sequence ... 26, 50, 97 | 139, 143, 239 | 228, 245-247 | technical ... 210, 211 |
| | sequencing ... 166 | sources ... 54, 70, 71, 110, | straight ... 157 | teeing ... 94 |
| **S** | sequentially ... 10 | 111, 113, 122, 138, | Street ... 18, 204 | telephone ... 86, 101, 102 |
| sake ... 111, 230 | sequitur ... 153 | 139, 142, 143, 188, | strength ... 202 | telling ... 53, 54, 69, 73, 74, |
| salary ... 15, 16 | series ... 40 | 216, 220, 232, 241 | stretch ... 226 | 82, 88-90, 102, 103, |
| sale ... 29, 54-56, 61, 68, | serious ... 197, 201 | space ... 54, 94, 95, 137, 204 | strict ... 187 | 142, 195, 196, 209, |
| 70-72, 74, 84, 85, | services ... 209, 243 | span ... 11, 42, 43 | strike ... 9, 39, 50, 53, 83, | 213, 224 |
| 87-91, 93, 94, 96, 97, | set ... 104, 166, 183 | speaks ... 144, 172 | 121, 127, 144, 171, | ten ... 83, 104, 180, 191 |
| 103, 104, 117, 118, | seven ... 11, 19, 220 | special ... 36, 165, 167, 169 | 222 | tent ... 214 |
| 122, 128, 132, ... 135, | seventeen ... 181 | specific ... 56, 61, 79, 84, | strong ... 196, 202, 243 | tenure ... 20, 120 |
| 136, 140, 142, 144, | seventy ... 40, 42 | 104, 131, 217 | structure ... 83, 167, 196 | term ... 27, 34, 60, 63, 77, |
| 147-149, 151, 163, | several ... 88, 101-103, 124, | specifics ... 167, 204 | structures ... 74, 100 | 78, 97, 98, 151, 221, |
| 164, 169-172, 177, | 198 | spell ... 6, 12 | Stuckey ... 45-49, 56, 125 | 242 |
| 186, 194, 200, 207, ... | sewer ... 181 | spend ... 96, 203 | studied ... 240 | terms ... 38, 39, 50, 53, 54, |
| 215, 218, 220-222, | Shall ... 20, 145, 150, 157 | spending ... 186, 233 | study ... 194 | 58-63, 73, 78, 87, 94, |
| 224, 227, 229, 237-239 | shape ... 151 | spent ... 139, 217, 243, 244 | subdivide ... 55, 83, 143, 229 | 98, 104, 119, 132, 136, |
| sales ... 55, 94, 188 | share ... 15 | split ... 94 | subdivided ... 118 | 148, 152-154, 158, |
| satisfactorily ... 6 | shared ... 134, 160 | spoken ... 132 | subdividing ... 170 | 159, 172, ... 177, 180, |
| satisfy ... 140 | sheet ... 231 | spring ... 196, 199 | subdivision ... 143-145, | 199, 218, 222, 224, |
| Saved ... 199 | shoes ... 58, 60, 140, 152, | Springvale ... 12 | 151-153, 165-170, 173, | 231 |
| savings ... 233 | 153, 179, 244 | squeaky ... 233 | 174, 222, 223, 226, | testimony ... 22, 33, 40, 61, |
| saw ... 112, 162, 191, 196 | shortly ... 87, 93 | stability ... 87 | 229 | 66, 79, 80, 88, 89, 92, |
| scale ... 63, 185 | showed ... 217 | staff ... 243, 244 | subdivisions ... 173 | 97, 113, 115, 116, 121, |
| scheduled ... 44 | side ... 78, 83, 119, 241 | stage ... 238 | submission ... 157, 166 | 132, 133, 140, 141, |
| school ... 12, 240 | sides ... 64 | stake ... 242-244 | submitted ... 106, 119 | 152, ... 164, 171, 179, |
| scope ... 29, 71, 72 | sidewalk ... 205, 206 | stamp ... 35, 105, 193, 219 | subsequent ... 91, 248 | 185, 190, 194, 195, |
| scopes ... 29 | sign ... 9, 48, 110, 245 | standing ... 63, 109, 243 | subsequently ... 32, 165 | 204, 212, 213, 221, |
| scoping ... 29, 30, 32, 171 | signature ... 6, 49, 51, 106, | stands ... 100 | substantial ... 147, 228 | 224, 225, 228, 232, |
| second ... 15, 19, 20, 36, 41, | 137 | stapled ... 45 | substantiated ... 239 | 233 |
| 45, 51, 55, 64, 67, 70, | signed ... 45, 46, 122, 212 | start ... 6, 95, 131, 148, 159, | substantively ... 110 | textual ... 61 |
| 75, 85, 106, 107, 121, | significance ... 123 | 208 | subtract ... 226 | theoretical ... 147 |
| 145, 166, 167, 191, | significant ... 117, 137, | started ... 151 | subtracted ... 84 | thereabouts ... 19, 93 |
| 192, ... 235, 243 | 147, 200, 216, 218 | state ... 6-8, 12, 14, 17, 20, | successful ... 193 | therefore ... 48, 90, 135, 141, |
| Secretary ... 14, 17, 20, 21 | signing ... 140 | 21, 47, 49, 54, 79, 99, | successfully ... 188 | 151, 182, 187, 224 |
| sections ... 37 | Simmons ... 192 | 100, 102, 104, 115, | suffer ... 156 | thereof ... 98 |
| secure ... 76, 123, 243 | simple ... 161 | 116, 120, 123, 206, | sufficient ... 117, 118, 203, | these ... 10, 35, 42, 43, 50, |
| secured ... 177, 178, 184 | simply ... 151, 188, 192, | 212, 223, ... 232 | 219, 232, 243 | 57, 64, 78, 82, 83, 85, |
| security ... 145, 150, 157 | 222, 240 | statement ... 66, 82, 83, 113, | suggested ... 159 | 89, 104, 118, 139, 141, |
| see ... 14, 15, 18, 20, 35-37, | single ... 87, 88, 101, 118, | 122, 174 | suggests ... 35, 103, 138, 181 | 163, 176, 181, 188, |
| 46, 47, 51, 54, 55, 66, | 246 | statements ... 51, 112, 117, | suit ... 52, 155 | 191, ... 192, 198, 211, |
| 82, 83, 106-109, 111, | sit ... 57, 81, 82, 88, 89, 91, | 163, 167, 187, 202, | sum ... 85, 102, 135 | 212, 214, 228, 235, |
| 114, 117-119, 121-125, | 112, 120, 150, 151, | 231 | summary ... 73 | 236, 247 |
| 131, ... 138, 145, 150, | 190, 195, 218, 219, | stating ... 197 | summer ... 199, 206, 228, | third ... 33, 37, 45, 83, 150, |
| 158, 160, 167, 173, | 223, 225, 226 | status ... 120, 207-209, 243 | 229 | 222, 225, 235, 236, |
| 177, 210, 220, 234, | site ... 75, 124, 170, 196, | statute ... 185 | Sun ... 127 | 247 |
| 236, 245 | 206, 217 | statutes ... 117 | supervisor ... 12 | thirds ... 76 |
| seeing ... 28, 106, 112, 165, | sitting ... 233 | stay ... 109 | supply ... 191 | thirteen ... 180 |
| 213 | situation ... 32, 166, 181, | stayed ... 134 | Support ... 119, 121, 211 | thirty ... 24, 186 |
| seek ... 126 | 248 | stenographer ... 175 | supporting ... 87 | thorough ... 194 |
| seeking ... 51, 153, 167, 229 | six ... 11, 111, 113-116, | step ... 99 | supposed ... 93 | thousand ... 9, 16, 56, 69, 84, |
| seen ... 15, 16, 21, 35, 45, | 118, 121, 127, 128, | stepped ... 119, 152, 153 | surmised ... 134 | 94-96, 100, 127, 129, |
| 46, 66, 154, 192, 213, | 175, 176, 233, 234 | stepping ... 244 | surprise ... 98, 204 | 137, 138, 143, 145, |
| 231, 241 | Sixteen ... 181 | steps ... 58, 60, 140, 179, | surprised ... 19, 20, 195, 214 | 147, 150, 152, 177, |
| sees ... 128 | Sixty ... 123 | 207 | surrounding ... 23, 215 | 220, 221, ... 235-238, |
| Selectmen ... 28, 37, 41, | skids ... 145 | Stewart ... 202 | survives ... 223 | 240 |
| 44-47, 52-54, 81, 82, | skimmed ... 86 | stipulations ... 6 | swinging ... 205 | thousands ... 113, 119 |
| 191-193, 210-212, 241 | small ... 8, 9, 64, 216 | stock ... 238 | sworn ... 6 | threatened ... 197 |
| sell ... 55, 69, 84, 85, 88, | | | | |

**MELVIN LIPMAN COURT REPORTING**
617-227-3985

DEPOSITION OF CRAIG MACDONNELL

MINDEX by Kenson

| Word ...... Page | Word ..... Page | Word ...... Page | Word ...... Page | Word .... Page |
|---|---|---|---|---|

threatening ... 200

three ... 11, 18, 45, 55, 71, 74, 75, 85, 94, 95, 100, 119, 137, 138, 143, 169, 173, 193, 212, 228, 235-237...

throw ... 233

Thursday ... 6

thus ... 170

tie ... 203

timbers ... 196

time ... 6, 19, 23-25, 29, 32-35, 42, 43, 47, 54, 60, 66, 68, 73, 76, 78, 84, 85, 87, 94, 96-98, 102, 103, ... 108, 110, 116-118, 123, 126, 127, 131-133, 140, 143, 144, 157, 160, 167, 170, 174, ... 178, 180-182, 185, 188, 197, 199, 206, 210, 213, 214, 217, 220, 221, 228-232, 244...

times ... 44

Timing ... 76, 77

title ... 7, 107, 173, 176, 180

today ... 16, 19, 81, 88, 89, 91, 97, 110-113, 115, 116, 120-123, 146, 150, 151, 172, 182, 195, 204, ... 217-219, 221-223, 225, 226, 229, 232, 233

Tom ... 248

took ... 13, 35, 44, 45, 203, 204, 240

top ... 154, 192

topic ... 51

total ... 95, 102, 220

touched ... 162

towards ... 143, 214

Town ... 21, 25-43, 45, 49-52, 54-56, 59, 61, 64, 66, 67, 69, 71-74, 79, 81, 84, 85, 90, 94, 96-98, 105-107, ... 109, 111, 113, 119, 121, 129-138, 143, 146-148, 151, 154-157, 159, 166, 186, ... 187, 189, 191, 192, 198, 207, 209, 210, 212, 216, 217, 220, 224, 226, 230, 235-237, ... 240-248

townspeople ... 192

TPL ... 7, 8, 14-26, 28-31, 33-35, 37-40, 42, 43, 46-55, 57, 58, 60, 61, 64-66, 69-71, 73-84, 86, 87, ... 89-91, 96, 97, 99, 102-116, 119-127, 130, 132-136, 138-143, 146, 148-159, 161-163, ... 169-173, 176, 178-181, 183, 184, 186-189, 191-193, 197-201, 203, 206-211,

213-221, ... 223, 224, 227, 230-233, 235-238, 241, 243-248

traditional ... 122

trained ... 10

transaction ... 142, 182, 183, 241

transactional ... 29

transfer ... 135, 154, 157, 186, 248

transferred ... 134, 186

trial ... 6

troubled ... 78

truly ... 158, 159

Trust ... 6, 7, 14, 18, 21, 37, 45, 46, 48, 81, 113, 117-119, 121, 127, 162, 192, 193, 205, 208

truthful ... 86

turn ... 109, 177, 196, 206

turned ... 130, 131

twelve ... 180

Twenty ... 24, 183

two ... 9, 10, 50, 51, 55, 56, 65, 66, 68, 69, 71, 74, 76, 84, 85, 90, 91, 94, 117, 140, 142, 143, 146, 168, ... 183, 192, 199, 212, 229, 234, 236-239, 241, 246

types ... 163, 231

typically ... 211

**U**

ultimate ... 136, 139, 143

unable ... 113, 114, 119, 121, 127

unacceptable ... 129

unavailable ... 76, 110, 111, 122, 129, 138, 142

unbridgeable ... 75

uncertain ... 167, 227

unclear ... 33

undergrad ... 12

underlying ... 158

understood ... 60, 157, 159, 179, 185

undertake ... 14, 30

unfair ... 188

unfamiliar ... 17

unhappy ... 190, 191

unilaterally ... 152

uninterested ... 94, 96

uninterrupted ... 129

Union ... 18

unit ... 117

units ... 100, 117, 143, 239

unless ... 70, 93, 123, 130, 152

unlikely ... 144, 188

unquote ... 58

unravel ... 247

unsecured ... 227, 233

unsigned ... 51

untenable ... 228

untrue ... 117, 223

unusual ... 24

unwise ... 227

update ... 193

upset ... 216-219

urge ... 192

usable ... 152

uses ... 232

using ... 34, 62, 69, 76, 78, 88, 89, 98, 104, 108, 214-216, 231, 242

utilize ... 91, 110, 111, 138, 142

utilized ... 104, 181

utilizing ... 113, 126, 127, 133

**V**

Valerie ... 24, 25, 30

validity ... 185

value ... 147, 153, 225, 226, 243

variables ... 104, 121

variance ... 164, 166, 169, 230

variances ... 151, 153, 164-166, 168-170, 194, 195, 228-230

vehement ... 202

venture ... 241, 246

verify ... 21

versus ... 164, 217, 223

via ... 43, 122, 142

view ... 77, 79, 98, 142, 167, 188

viewed ... 200, 223, 224

vital ... 76

vote ... 47-49, 67, 68, 94, 192

voted ... 46-49, 64, 67, 96

votes ... 64, 66

**W**

Wainwright ... 107-111, 114, 115, 118, 120, 126, 127, 188, 206, 234

Wait ... 116, 161

waivers ... 167, 168

walk ... 174, 175, 201

walked ... 201

walking ... 141

Walter ... 12

waned ... 228

warrant ... 67

warranties ... 183

water ... 181, 191

waved ... 205

ways ... 29, 31, 142, 188

weak ... 227

Web ... 75, 124, 206, 217

week ... 49

weekly ... 232

weeks ... 228

Werlin ... 10

whatsoever ... 237

whereby ... 63, 235

WHEREUPON ... 16-18, 35, 45, 49, 51, 64, 75, 79, 105, 124, 137, 154, 164, 166, 191, 193, 209, 212, ... 228, 234, 238, 248

Whitney ... 7, 8

whole ... 29, 43, 44, 52, 61, 74, 106, 144, 187, 220

Wilbur ... 198, 204-206, 247

Wildlife ... 11

will ... 52, 57, 63, 64, 92, 93, 95, 101, 102, 104, 108, 130-132, 139, 146, 152, 155-157, 160, 167, 174, ... 175, 192, 204, 205, 211, 222, 243, 247

William ... 53

willing ... 93, 94, 152

win ... 201-203

winter ... 26

wish ... 25

withdraw ... 119, 120

withdrawn ... 115

witness ... 60, 110, 131-133, 136, 160, 161, 175, 234

witnesses ... 92

woman ... 87, 88, 101, 207

word ... 18, 76, 81, 83, 88-90, 102, 111, 202, 241, 242

words ... 22, 23, 28, 52, 55, 69, 91, 114, 126, 128, 129, 139, 151, 155, 173, 184, 186, 190, 203, 221, ... 237

work ... 6, 14, 18, 37, 61, 64-66, 70, 97, 104, 123, 124, 128, 133, 135, 140, 141, 148, 165, 196, 211, ... 212, 235, 236, 246

worked ... 10, 11, 13, 89, 123, 124

working ... 25, 70, 105, 122, 169, 186, 208, 242, 243

works ... 7, 18

worried ... 206

worry ... 74, 89

worth ... 222, 223, 226

wrestle ... 98

wrestled ... 169

Wrigley ... 53, 107, 210

wrinkle ... 94

write ... 122, 210, 211

writing ... 147, 165, 209, 246

written ... 108, 110, 192, 242, 245, 246

wrote ... 59-61, 226

**Y**

year ... 19, 35, 42, 83, 87, 214, 232, 233, 244

yearly ... 232

years ... 11, 19, 83, 92, 226, 227

yelling ... 205

Yup ... 122, 219

**Z**

ZBA ... 167

zero ... 177, 233

zoning ... 166-169