UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MARILYN KUNELIUS,

Plaintiff,

v.

TOWN OF STOW, et al.

Defendants.

CIVIL ACTION NO. 05-11697-GAO

### DEFENDANT THE TRUST FOR PUBLIC LAND'S
### OPPOSITION TO PLAINTIFF'S MOTION FOR SANCTIONS

Pursuant to Rules 11 and 37 of the Federal Rules of Civil Procedure, defendant the Trust for Public Land ("TPL") opposes plaintiff Marilyn Kunelius' spurious and unfounded "Motion for Sanctions."  As set forth below, plaintiff's motion, long on rhetoric and baseless allegations, fails to comply with mandatory procedures under Rule 11, wholly misinterprets the facts, wastes this Court's resources, and should be denied, and defendants should be awarded their fees incurred in opposing the motion.

## I.    PLAINTIFF'S MOTION FOR SANCTIONS FAILS TO COMPLY WITH THE SAFE HARBOR PROVISION OF RULE 11.

As a preliminary and procedural matter, plaintiff's motion should be denied because it fails to comply with the filing requirements outlined in Fed. R. Civ. P. 11(c)(1)(A).  Under that subsection, sanctions are available only after observance of a twenty-one day safe harbor period. A motion for sanctions "shall be served as provided in Rule 5, but shall not be filed with or presented to the court unless, within 21 days after service of the motion . . . the challenged paper, claim, defense, contentions, allegation, or denial is not withdrawn or appropriately corrected." Fed. R. Civ. P. 11(c)(1)(A).  The Advisory Committee Notes explain that this condition was

intended to provide a safe harbor against Rule 11 motions, affording parties a window in which to withdraw the disputed filing.  Informal warnings by opposing counsel do not satisfy the requirement – the clock on the safe harbor begins to run only upon service of the motion. Advisory Committee Notes (1993 Amendment); *Monahan Corp. N.V. v. Whitty*, 319 F. Supp. 2d 227, 233 (D. Mass. 2004).

Here, plaintiff filed the motion for sanctions directly with the court, without first serving the motion on defendants twenty-one days in advance of filing as explicitly required by Rule 11. As such, the motion does not comply with the procedural requirements for filing and should be denied on this ground alone.  *Monahan Corp. N.V. v. Whitty*, 319 F. Supp. 2d 227, 235 (D. Mass. 2004);  *Smith v. Robertshaw Controls Co.*, No. Civ. A. 00-11239, 2004 WL 1260097 at *2 (D. Mass. June 7. 2004); *Martins  v. Charles Hayden Goodwill Inn School*, 178 F.R.D. 4, 7 (D. Mass. 1997).[1]

## II.    PLAINTIFF'S MOTION FAILS ENTIRELY TO MEET THE STANDARD FOR SANCTIONS UNDER RULE 11.

Even if plaintiff's motion had complied with the procedural requirements of Fed. R. Civ. P. 11(c)(1)(A), it should be denied.  Plaintiff ignores the stringent standard for sanctions under Rule 11 and seeks sanctions for conduct that was entirely reasonable and based on substantial evidentiary support.  The standard for Rule 11 is "an objective standard of reasonableness under the circumstances."  *EEOC v. Tandem Computers, Inc.*, 158 F.R.D. 224, 227 (D. Mass. 1994); *Cruz v. Savage*, 896 F.2d 626, 631 (1st Cir. 1990).  When measuring an attorney's conduct under Rule 11, the First Circuit has warned that courts should "exercise caution" before imposing

---

[1]    Even if plaintiff followed the safe harbor procedures of Rule 11, TPL is not suggesting that it would have withdrawn any challenged statement.  At most, TPL might have added explicitly what was clearly conveyed implicitly – that TPL was unable to purchase the property "as planned."

sanctions. *Cruz*, 896 F.2d at 631. As demonstrated below, it was plaintiff who should have exercised caution before filing this frivolous motion.

### A.    Defendants Have Made No Misrepresentations To The Court.

Plaintiff cites several statements taken from defendants' motion to dismiss papers regarding TPL's failure to purchase plaintiff's property that she claims are "deliberate lie[s]" to the Court. *See* Plaintiff's Memorandum in Opposition to Defendant The Trust for Public Land's Motion to Quash and In Support of the Plaintiff's Motion for Sanctions, Docket No. 39, ("Plaintiff's Mem.") at 2. Specifically, plaintiff cites statements made in defendants' pleadings that TPL was unable to raise the funds necessary to meet the $1.1 Million purchase price by the closing date of September 26, 2003. *Id.* Plaintiff bases her allegations that these statements are "deliberate lie[s]" primarily on the apparent availability of a line of credit to TPL in an amount that exceeded the purchase price, which she claims demonstrates defendants' "utter disregard" for the truth and proof that TPL "was always 'able' to purchase the Plaintiff's Property." *Id.* at 3-4. Plaintiff's accusation is wholly without support and misguided.

As a preliminary matter, TPL has never denied that it failed to perform under the Purchase and Sale Agreement for the plaintiff's property. The only question before the Court is whether the plaintiff is limited to her liquidated damages for that failure to perform. Thus, the inordinate amount of time and paper spent by plaintiff on the question of the existence of funds or a credit line available to TPL has been wasted. *See* TPL's Motion to Quash Subpoena to Wainwright Bank, dated February 28, 2007, and TPL's Motion for a Protective Order, dated March 9, 2007. Plaintiff's motion is largely based on a supposed defense, the so-called "Inability to Purchase Defense," that TPL has not made. Indeed, TPL has never suggested it has any defense to a claim for breach of the Purchase and Sale Agreement. TPL admits that it breached. Plaintiff has wasted an inordinate amount of other peoples' time and money in

depositions seeking to establish through witnesses that the Purchase and Sale Agreement had no

"financing contingency," *see, e.g.,* Deposition of Gregory D. Jones (attached hereto as Exhibit

A) at 78-82, when plainly it did not, and when TPL has never claimed that it had such a

contingency.  If the Agreement had a financing contingency, TPL might have been entitled to

refund, rather than forfeiture, of its deposits.

To enforce the liquidated damages provision of the Purchase and Sale Agreement, TPL's

reason for failing to perform is irrelevant.  *See, e.g., Perroncello v. Donahue*, 448 Mass. 199,

203-204 (2007) (stating that liquidated damages clauses "*will be enforced* so long as 'at the time

the agreement was made, potential damages were difficult to determine and the clause was a

reasonable forecast of damages expected to occur in the event of a breach'") (emphasis added)

(quoting *Kelly v. Marx*, 428 Mass. 877, 878 (1999)).  Whether the buyer did or did not have the

ability to pay the purchase price at the time of closing is immaterial to the enforceability of a

clause limiting the seller's remedy to retaining the buyer's deposits as liquidated damages.

1.    TPL Was Not Legally Obligated to Use Its Private Capital or Borrowing
      Ability Where, as Here, Private and Public Fundraising Efforts Were
      Unsuccessful in Raising the Purchase Price.

Furthermore, sanctions are not warranted where the very language of the statements

quoted by plaintiff makes clear that defendants were never suggesting that TPL *could* not have

completed its purchased of plaintiff's property.  Rather, the statements quoted by plaintiff state

only that TPL was "unable to raise the money necessary to fund the project" because "its efforts

to raise the funds were hindered by a declining economy, a difficult market for philanthropy, and

the unexpected denial of a needed state grant," and TPL therefore was "unable to complete its

purchase."  Plaintiff's Mem. at 2 (quoting Defendants' Motion to Dismiss at 1, 2; and

Defendants' Memorandum of Law in Support of Motion to Dismiss at 1, 2, and 6).  The implicit

message in this statement is not that TPL did not have the money or potential borrowing power

to purchase the property, but that TPL was unable to purchase the property as planned because of various fundraising failures. Accordingly, the statements in defendants' motion to dismiss papers were indeed true and supported by the facts as alleged in the Complaint and the attachments to the Complaint as required in assessing a Rule 12(b)(6) Motion to Dismiss.

These statements are all consistent with TPL's mission of assisting municipalities and land conservation groups to raise funds to purchase property and then transfer property to a long-term steward able to protect and conserve the land. TPL does not as a practice rely on its own internal funds and sources of funds to conserve property. *See, e.g.,* Deposition of Craig A. MacDonnell (Plaintiff's Mem. Ex. B) at 139-40 (explaining that TPL is not a landholding organization and looks outside itself for the "source of funds that will purchase the property interest"). TPL exists to provide guidance and expertise to municipalities and conservation groups to facilitate "conserving land for people." *See, e.g.*, http://www.tpl.org/tier2_sa.cfm?folder_id=170 (last visited March 14, 2007) (describing TPL's services as helping agencies and communities "define conservation priorities, identify lands to be protected, and plan networks of conserved land that meet public need," "identify and raise funds for conservation from federal, state, local, and philanthropic sources," "structure, negotiate, and complete land transactions," and "share[] knowledge of conservation issues and techniques"; and noting that "except in very specific instances, TPL does not award grants").

Indeed, the deposition testimony of two former members of the Board of Selectmen of the Town of Stow makes clear that they understood that TPL had adequate financial resources and/or borrowing power to purchase the property, but that TPL elected not to use those resources when the project was not proceeding as planned. *See* Deposition of Gregory D. Jones at 147-49 (attached hereto as Exhibit A) (testifying that he has always believed that TPL had the money to

purchase the property but elected not to use it because "they [TPL] evaluate each project on whether it's going to make sense and that this one wasn't in the process of making sense, and so that's why they were backing away . . . it's the local fundraising and the local permits that determine whether the project itself is going to make any sense"); Deposition of Edward R. Perry, Jr. at 38-39, 74, 77, 88, 90, and 203 (attached hereto as Exhibit B) (testifying repeatedly that it was his understanding from the time of the assignment that TPL had sufficient sources of funds to support the project; but noting that TPL said the project failed because "a number of things weren't falling together. The funding wasn't falling together, the variances weren't falling together, and the project was unraveling for a culmination of all those reasons").

Nor was any statement made to the Department of Housing and Community Development ("DHCD") "knowingly false" or evidence of any misstatement to the Court. Plaintiff's Mem. at 10. Plaintiff leaps to conclude that the mention of a line of credit in the grant application means that TPL was never "unable" to purchase the plaintiff's property. When plaintiff quotes from the grant application, however, she notably adds emphasis to every sentence about the line of credit except the sentence that states: "The use of this capital is subject to TPL's internal approval process, including customary due diligence and approval by the Board of Directors." Plaintiff's Mem. at 10. This sentence clearly conveyed to DHCD that use of the line of credit could be rejected internally at TPL.[2] As Mr. MacDonnell testified, TPL could not responsibly approve the use of its private capital where there was no chance that TPL could recoup its investment. *See* Deposition of Craig A. MacDonnell (Plaintiff's Mem. Ex. B) at 139-40, 142 (testifying that the "fund-raising we had imagined did not materialize, the DHCD grant

---

[2]    Moreover, the Wainwright credit line imposes conditions that TPL would have to satisfy in order to borrow against the line. However, in this case, although TPL could have sought to borrow against that credit line, it did not for the reasons outlined herein.

did not come through, and it did not seem as if it was possible to raise those dollars for the ultimate conclusion of the project," and that "[i]n the absence of dollars on the horizon . . . it would not be prudent for TPL to borrow money to complete the transaction"). If TPL simply used its own funds to purchase each piece of land that it helped to conserve, it could not for long fulfill its land conservation mission.

The same message was conveyed to DHCD in the letter referencing the $70 million in lines of credit available to TPL nationally. Plaintiff's Mem. Ex. C. Plaintiff claims that defendants' defense is "bogus" based on this document and concludes that TPL had $70 million "available" to it for the purchase based on her reading of this single document. Plaintiff's Mem. at 11. In so doing, plaintiff conveniently ignores the plain language of the letter, which states that TPL "could utilize [the Wainwright line of credit] if necessary . . . *subject to normal due diligence and internal TPL review.*" Plaintiff's Mem. Ex. C (emphasis added). Further, the Wainwright credit line is $6 Million and the evidence is that it was available to all of TPL's New England Region (*see* Deposition of Craig A. MacDonnell (Plaintiff's Mem. Ex. B) at 115); there is no evidence concerning the availability of any other credit line.

There was nothing "knowingly false" about the statements made to DHCD when TPL informed DHCD that it had lines of credit it could seek to call upon if, and only if, use of those lines of credit passed internal reviews and approval. As Mr. MacDonnell explained, that review process requires some confirmation that TPL will be able raise enough money from other sources to repay the borrowed funds. *See* Deposition of Craig A. MacDonnell (Plaintiff's Mem. Ex. B) at 139-40, 142.[3]

---

[3]    In addition, plaintiff's accusations regarding the veracity of a different statement in the Motion to Dismiss regarding the payment of deposits under the Agreement is, once again, contradicted by the facts. As Mr. MacDonnell testified, TPL in fact paid part of the deposits from its own funds and raised a portion of the deposits from its local private fundraising ally, the Friends of Red Acre. *See* Deposition of Craig A.

In addition, TPL's statements to DHCD are completely immaterial. There is no evidence that plaintiff knew of them nor relied on them, nor was she entitled to, nor was there any change of position by plaintiff in reliance on them. Indeed, that is true with respect to plaintiff's misrepresentation claims in their entirety. Whether or not TPL gave plaintiff assurances it would close on her property, plaintiff can show no detrimental reliance because the assignment and exercise of the Town's statutory right of first refusal to TPL was entirely outside of her control.

2.      Defendants Have Not Concealed Facts From the Court or the Plaintiff.

TPL's argument that the existence of the line of credit is irrelevant is not a "new defense" as plaintiff would have the Court believe. Without any support, plaintiff claims that defendants "deliberate[ly]" misrepresented these facts, "stood silent[]" while this purported "defense" was asserted, and made statements that demonstrate "multiple levels of deceit." Plaintiff's Mem. at 4-5. Nothing resembling deceit can be found in the record. To the contrary, defendants have been forthright from the beginning about their position and TPL's financial status. Indeed, the very exhibits attached to plaintiff's own Complaint, as well as arguments made in the motion to dismiss hearing, belie plaintiff's suggestion that this non-existent defense was created after plaintiff began to ask questions about TPL's line of credit.

Plaintiff attached at least two exhibits to her Complaint that contradict her current attempts to accuse defendants of deliberately concealing TPL's available financial resources. First, Exhibit 10 to the Complaint is a printout from TPL's website showing TPL's balance sheet for the years ended March 31, 2003 and 2004. TPL did not deny that this was indeed an accurate printout of TPL's balance sheet. *See* Defendant Trust for Public Land's Answer to the

---

MacDonnell (Plaintiff's Mem. Ex. B) at 79-81. Mr. MacDonnell's testimony is entirely truthful and not contradicted by the testimony of Mr. Perry and Mr. Jones. *See* Plaintiff's Mem. at 13-14 (citing testimony of Messrs. Perry and Jones). Certainly, plaintiff has not pointed to any evidence to suggest any knowing untruth by defendants on this subject, as one might expect before lodging this type of attack in a court filing.

Complaint, Docket No. 28, ¶ 40. That balance sheet shows that TPL had substantial assets.

Complaint Ex. 10. Indeed, the Complaint made that very point. Complaint ¶ 40. While plaintiff

may argue in vain that TPL was legally required to use those assets to purchase plaintiff's

property, it certainly is publicly-available evidence of TPL's financial means that TPL has made

no attempt to hide. Indeed, TPL's public website contains its annual tax returns and audited

financial statements for the last four years. *See*

http://www.tpl.org/tier2_kad.cfm?folder_id=3210 (last visited March 14, 2007).

    Second, plaintiff attached as Exhibit 12 to the Complaint a letter sent from Mr.

MacDonnell on behalf of TPL to plaintiff's real estate lawyer, Peter Kachajian, on September 9,

2003 that explicitly referenced TPL's borrowing ability. Complaint Ex. 12. In that letter, TPL

described difficulties experienced with local fundraising and then stated:

> TPL's Board of Directors will not approve any *borrowing* to
> bridge a fundraising gap because the prospects for raising the funds
> necessary to repay the *loan* required are not encouraging. Further,
> any bridge loan would be for an amount greater than the land
> would be worth, even if the subdivision were approved.
> Essentially, this would be asking TPL for an unsecured loan on
> weak fundraising prospects with no back-up plan to repay the loan.

Complaint Ex. 12 (emphasis added). By telling plaintiff in 2003 – prior to the scheduled closing

– that TPL's leadership would not authorize the borrowing necessary to close the funding gap,

TPL unmistakably communicated to plaintiff that it had sources of borrowing that it could seek

to use but that it could not get approval from TPL's Board of Directors for the use of that

borrowing ability. There was no attempt at the time of the project or now to hide this fact from

plaintiff.

    Furthermore, defendants did not "stand silently" by at the Motion to Dismiss hearing on

the issue of TPL's financial ability as plaintiff now baldly accuses. Plaintiff's Mem. at 4-5.

Indeed, defendants addressed this issue and argued then, as they do now, that the resources of the

defaulting Buyer are irrelevant to the remedy. Counsel for Mr. MacDonnell specifically argued that "If this were the Ford Foundation, the fact that they have ample resources doesn't mean that they have the mechanism to raise the money for this particular project." *See* Transcript of Motion to Dismiss Hearing, dated December 15, 2005, at 41. As this quote demonstrates, defendants were open with the Court at that hearing that they did not contest TPL's own financial means but rather its ability to raise the necessary funds for this purchase through private and public fundraising as intended. The issue before the Court then and now is the extent of TPL's legal liability for breach of its agreement to purchase the property. The position TPL has consistently advanced throughout this litigation – consistent with Massachusetts law – is that the plaintiff is limited to the liquidated damages provided in the agreement, and it does not matter whether TPL could have used its own funds or borrowing power to complete the purchase. *See Kelly v. Marx*, 428 Mass. 877, 881 (1999) (holding that "in general when parties say that a sum is payable as liquidated damages they will be taken to mean what they say and will be held to their word").

### B. **DEFENDANTS HAVE NOT MADE ANY MISREPRESENTATION IN DISCOVERY.**

   1.   Plaintiff's Attacks on Mr. MacDonnell's Testimony are Wholly Unsupported.

Plaintiff's accusations regarding the veracity and good faith of Mr. MacDonnell's deposition testimony are irresponsible and unsupported. Indeed, the Court need only look at the quotes in Plaintiff's Memorandum to see the transparency of plaintiff's baseless accusations. Plaintiff accuses Mr. MacDonnell of "feigning ignorance" and "surprise" at questions regarding

a line of credit from Wainwright Bank.  Mr. MacDonnell did no such thing, and it is improper

for plaintiff's counsel to inject his own baseless opinion of Mr. MacDonnell's demeanor.[4]

Mr. MacDonnell was questioned at length by plaintiff's counsel about the availability of

the line of credit from Wainwright Bank and Mr. MacDonnell responded to those questions with

specific, accurate facts.  Specifically, Mr. MacDonnell testified that (1) TPL had a standing line

of credit with Wainwright Bank, *see* Deposition of Mr. MacDonnell (Plaintiff's Mem. Ex. B) at

108; (2) no application was required for the line of credit, *id.* at 109; (3) this line of credit was

available to the New England Regional Office of TPL, *id.* at 115; (4) there was some discussion

about using this line of credit for the Kunelius Property, *id.* at 108; (5) TPL could use that line of

credit if necessary and subject to due diligence and approval, *id.* at 111; (6) use of the line of

credit was subject to due diligence and approval by TPL's Board of Directors, *id.* at 113; (7) a

decision was made by TPL not to use the line of credit, *id.* at 114; (8) Mr. MacDonnell had no

reason to believe the line of credit was in default, *id.* at 114; (9) he was not aware of TPL being

in default on any lines of credit or other banking obligations, *id.* at 120; (10) he was not aware of

ever utilizing the Wainwright line of credit on any of his projects at TPL, *id.* at 126; and (11) he

is aware that TPL has at least one other line of credit with Sun Trust, *id.* at 127.[5]

Exactly how these detailed answers led plaintiff to accuse Mr. MacDonnell in a motion

for sanctions of "feign[ing] ignorance or lack of memory concerning virtually every question as

---

[4]    It is unclear what relief plaintiff seeks, or what rule she invokes with respect to Mr. MacDonnell's testimony.
It is not a pleading subject to Rule 11.  Plaintiff can argue Mr. MacDonnell's veracity at summary judgment or
seek to discredit his testimony at trial if plaintiff's Complaint survives summary judgment, as it should not.

[5]    Plaintiff faults Mr. MacDonnell for not knowing the exact status of the Wainwright line of credit on the day of
his deposition.  *See* Plaintiff's Mem. at 7.  It certainly is reasonable that Mr. MacDonnell, the Massachusetts
State Director of TPL, would not be able to answer with certainty the exact status and amount of money drawn
on the line of credit currently, where that line of credit is available to the entire New England Regional Office
("NERO") of TPL and administered at the NERO level of TPL.  Furthermore, Mr. MacDonnell was not given
any advance notice of the topics that would be covered in his examination.

to the availability of that line of credit," Plaintiff's Mem. at 5, is beyond understanding.[6]
Moreover, plaintiff baldly claims that Mr. MacDonnell was "absolutely aware of the
correspondence" between TPL and Wainwright based solely on the letter attached as Exhibit C
to plaintiff's motion. Plaintiff's Mem. at 12. What plaintiff fails to point out, however, is that
Exhibit C nowhere mentions correspondence of any kind between TPL and Wainwright.

> ### 2. Defendants Cannot be Accused of Conspiring to Conceal Facts or Documents From Plaintiff Where Plaintiff Had Not Made Any Discovery Request on Defendants.

The irony of plaintiff's accusations that defendants have been somehow conspiring to
conceal facts concerning the available line of credit to TPL is the fact that until recently plaintiff
had not requested a single document from any defendant nor proffered a single interrogatory to
any defendant. Only after plaintiff notified TPL of her intent to file this motion for sanctions did
plaintiff serve a document request on TPL. TPL's responses and objections to that document
request are not due until April 2, 2007 – after the deadline for opposing this motion. To date,
plaintiff has not served the Town of Stow with any document request; rather the Town of Stow
voluntarily produced documents identified in its initial disclosures under Rule 26.[7]

To call plaintiff's motion and accusations premature would be generous at best. Plaintiff
has not explained how TPL or Mr. MacDonnell could be purposefully hiding anything from
plaintiff where, as here, plaintiff had not asked for any discovery at the time that she made these
accusations. Although TPL has objected to and challenged plaintiff's recent fishing expedition
into every detail of TPL's financial status as irrelevant and overbroad, TPL's production of
documents will include documents surrounding TPL's request for state funding from DHCD,

---

[6]   Plaintiff's unprofessional, personal attack on Mr. MacDonnell, an attorney and member of the Massachusetts Bar who practiced in this Court when he was in private practice, is particularly disappointing.

[7]   Plaintiff has not challenged the adequacy of the Initial Disclosures of TPL and Mr. MacDonnell.

which include the documents plaintiff attaches as Exhibits C and D to her motion. Plaintiff has had five months to conduct discovery and had she simply requested documents earlier, she would have been in possession of these documents directly from TPL. Instead, she has accused TPL of wrongdoing for not producing documents whose production had never been requested.

## C.    NOR IS PLAINTIFF ENTITLED TO SANCTIONS UNDER RULE 37.

Plaintiff also seeks sanctions under Fed. R. Civ. P. 37 because "TPL will not provide a Rule 30(b)(6) witness for certain topics identified in Exhibit A to the deposition notice." Plaintiff's Motion for Sanctions at 1. However, Rule 37 specifically provides that failure to provide a Rule 30(b)(6) witness may be excused if the party has a "pending motion for a protective order as provided by Rule 26(c)." Fed. R. Civ. P. 37(d). Because TPL has a pending motion for a protective order, plaintiff's request for sanctions under Rule 37 fails. *See* TPL's Motion for a Protective Order, Docket No. 42-1, dated March 9, 2007. Moreover, despite the pendency of TPL's Motion for a Protective Order regarding certain topics on the Rule 30(b)(6) deposition notice, TPL has agreed to produce a witness pursuant to Rule 30(b)(6) on March 22, 2007 in response to those topics in the deposition notice on which it is not objecting.

## III.    DEFENDANTS' MOTION TO CERTIFY WAS MADE IN GOOD FAITH AND SHOULD BE GRANTED.

Plaintiff, who once supported a motion to certify the primary question in this case to the Supreme Judicial Court, now turns around and labels defendants' motion to certify "bogus" and based on "misinformation" and "misrepresentation."[8] Plaintiff's Mem. at 15-16.[9] However, it is plaintiff's characterization of defendant's motion to certify that is rife with misrepresentations.

---

[8]    After hearing a summary of the issues at the initial scheduling conference on October 12, 2005, this Court raised the question of whether certification of this issue was appropriate. Plaintiff, through her counsel, agreed at that appearance that these are issues of first impression that would be appropriate for certification.

[9]    Plaintiff does not appear to invoke Rule 11 with respect to the Motion to Certify.

Plaintiff attempts to twist statements made in the motion to certify regarding the general difficulties non-profit conservation organizations face in accepting Chapter 61 assignments into alleged statements regarding TPL's financial ability to close on plaintiff's property. Nowhere in the motion to certify did defendants allude to TPL's financial status or resources at all. *See* Defendants' Motion to Certify Question of State Law to the Supreme Judicial Court ("Motion to Certify"), Docket No. 32, dated November 1, 2006, at 2 (stating only that TPL "failed to perform under the terms of the P&S" without any reference to the reasons for that failure or TPL's financial resources). It simply points out the fact that non-profits and municipalities generally do not have enough time to raise all necessary funds (or hold the necessary town meetings to appropriate funds) before they have to decide whether to exercise the right of first refusal. *See* Motion to Certify at 5-6. As a result, non-profits and municipalities must have a clear understanding of the enforceability of liquidated damages clauses in the purchase and sale agreements being assumed. *Id.* at 6. Defendants did not reference TPL's financial resources in that motion precisely because they are not relevant to the question on which they sought certification. Whether or not a non-profit or municipality has the financial resources to close does not change whether or not the liquidated damages clause should apply if the non-profit or municipality defaults after exercising the statutory right of first refusal. For example, a municipality might have enough money in its coffers to purchase a piece of property, but without proper authorization by a Town Meeting, it cannot utilize that money. *See Meachen v. Hayden*, Misc. Case. No. 240129, 6 Land Ct. Rptr. 235, 238 (Mass. Land Ct. Aug. 6, 1998) (holding that towns are not expected to raise the full purchase price in the 120 days before they have to decide whether to exercise the right of first refusal under Chapter 61).

The Motion to Certify, still pending before this Court, asks this Court to certify the following question: "Does the exercise of a right of first refusal under Chapter 61 of the Massachusetts General Laws leave a liquidated damages provision in the Purchase and Sale Agreement intact and enforceable?"  Motion to Certify at 1.  This motion reflects the very real concern that the conservation of open space in the Commonwealth could come to a chilling standstill if this question is not ultimately resolved in the affirmative.  *Id.* at 5.

## Conclusion

Plaintiff has abused the extraordinary measure of a request for sanctions – both procedurally and substantively.  In a decision sanctioning an attorney for bringing a frivolous and harassing motion for sanctions, this Court observed that "[t]here is a point beyond which zeal becomes vexation, the novel approach to a legal issue converts to frivolity and steadfast adherence to a position transforms to obdurateness." *EEOC v. Tandem Computers,* 158 F.R.D. 224, 229 (D. Mass. 1994) (quoting *Cruz v. Savage*, 691 F. Supp. 549, 556 (D.P.R. 1988)).  Plaintiff's motion falls into this category.  TPL respectfully requests that Plaintiff's Motion for Sanctions be denied and that the Court grant such other relief as the Court deems just and proper, including but not limited to an award of defendants' attorneys' fees and expenses incurred in opposing the motion under Fed. R. Civ. P. 11(c)(1)(A).

**Request for Oral Argument**

TPL believes that oral argument may assist the Court and requests that the Court grant a

hearing on this Motion and Opposition pursuant to Local Rule 7.1(D).

Dated: March 21, 2007                          Respectfully submitted,

                                               THE TRUST FOR PUBLIC LAND

                                               By its attorneys,

                                               /s/ Dahlia S. Fetouh
                                               Richard A. Oetheimer (BBO # 377665)
                                               Dahlia S. Fetouh (BBO # 651196)
                                               Patricia M. Murphy (BBO # 665056)
                                               Goodwin Procter LLP
                                               Exchange Place
                                               Boston, MA 02109
                                               (617) 570-1000

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and paper copies will be sent to those indicated as non registered participants on March 21, 2007.

                                               /s/ Dahlia S. Fetouh

LIBA/1772880.4

16

# EXHIBIT A

 **COPY**

Volume: I
Pages: 1-195
Exhibits: 16

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11697-GAO

MARILYN KUNELIUS,
               Plaintiff,

v.

TOWN OF STOW, separately,
A PARTNERSHIP OF UNKNOWN NAME
BETWEEN TOWN OF STOW and THE
TRUST FOR PUBLIC LAND, THE
TRUST FOR PUBLIC LAND, separately,
and CRAIG A. MacDONNELL, in his
individual capacity,
               Defendants.

DEPOSITION of GREGORY D. JONES, a

witness called by and on behalf of the Plaintiff,

taken pursuant to Fed.R.Civ.P. 30, before Roberta

J. Daniels, a Court Reporter and Notary Public

within and for the Commonwealth of Massachusetts,

at the Law Offices of Michael C. McLaughlin, One

Beacon Street, Boston, Massachusetts  02108, on

Monday, March 5, 2007, scheduled to commence at

12:00 P.M.

*MELVIN LIPMAN COURT REPORTING*
*101 Tremont Street, Suite 700*
*Boston, Massachusetts  02108*
*617-227-3985*

78

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | MS. FETOUH:  Objection. |
| 2  | A | That was certainly my understanding.  I suppose it |
| 3  |   | wouldn't be in the purchase and sale because it's |
| 4  |   | not -- |
| 5  | Q | No, it is in the purchase and sale. |
| 6  | A | It is? |
| 7  | Q | Yes. |
| 8  | A | Okay, good. |
| 9  | Q | Now, my question now goes to what you thought, what |
| 10 |   | the Board of Selectmen thought they were giving -- |
| 11 |   | since you didn't vote for it, I don't mean to say |
| 12 |   | you -- what your understanding was as a member of |
| 13 |   | the Board of Selectmen when they decided to |
| 14 |   | assign their rights to TPL.  If TPL didn't get |
| 15 |   | the money from the town, i.e., the $400,000, was |
| 16 |   | TPL obligated to go forward under the purchase |
| 17 |   | and sale agreement with Mrs. Kunelius? |
| 18 |   | MS. ECKER:  Objection. |
| 19 |   | MS. FETOUH:  Objection. |
| 20 | A | I was unaware of any escape clause, so, yes. |
| 21 | Q | They were obligated. |
| 22 | A | They were obligated. |
| 23 | Q | And, in fact, in Exhibit 3, I would ask you to look at |
| 24 |   | the assignment and acceptance, which is Exhibit 3 and |

79

1    begins on Page KUN476, and tell me where in the

2    assignment and acceptance there is any discussion of

3    contingencies if TPL failed to receive the money from

4    the town.

5              MS. ECKER:   Objection.

6              MR. CONROY:   Objection.

7              MS. FETOUH:   Objection.

8    A    This just talks about the right of first refusal being

9         ceded.  It doesn't talk about any escape

10        contingencies.

11   Q    Now, do you recall, based upon your discussions with

12        Jake Diemert, the attorney for the town, any

13        discussions at the Board of Selectmen concerning the

14        advisability of making the assignment and acceptance

15        document free of any contingency or escape clause for

16        TPL?

17             MS. ECKER:   Objection.

18   A    I don't recall discussing this directly with Jake.

19        Clearly, I was involved in discussions that may have

20        involved Jake.  His position was represented before

21        the board by Bill Wrigley, the town administrator.

22   Q    There is nothing in the purchase and sale agreement

23        between Mrs. Kunelius and Mosaic Commons that required

24        any money coming from the Town of Stow to Mosaic

1       Commons, correct?

2   A   Correct.

3   Q   So, the issue of any money coming from the Town of

4       Stow to the assignee is completely outside the terms

5       of the purchase and sale agreement.  Is that fair to

6       say?

7                   MR. CONROY:  Objection.

8   A   I believe so.  In fact, I believe the CPC funds are

9       still allocated to this project.

10  Q   So, is it fair to say that the purchase and sale

11      agreement did not anticipate any funds being offered

12      or delivered to Mosaic Commons by the Town of Stow?

13                  MR. CONROY:  Objection.

14  A   Correct.

15  Q   Is it also fair to say that there is nothing in the

16      purchase and sale agreement between Mosaic Commons and

17      Mrs. Kunelius that anticipates any fund-raising by

18      Mosaic Commons of any type?

19                  MR. CONROY:  Objection.

20                  MS. FETOUH:  Objection.

21  A   I don't think so.

22  Q   Pardon?

23  A   I don't think so.

24  Q   You don't think there's anything in there that

81

1  anticipates that.  Is that your answer?

2  A  That's my answer.

3  Q  What was the basis, what is your basis, for believing

4     that any assignment, if you do, any assignment to TPL

5     could include an issue as to whether fund-raising were

6     successful, that assignee's fund-raising was

7     successful, and if it wasn't, then somehow they did

8     not have to purchase?  Was there any such discussion

9     about that?

10          MS. ECKER:  Objection.

11          MS. FETOUH:  Objection.

12  A  There was no such discussion.

13  Q  Isn't it fair to say there's nothing in the purchase

14     and sale agreement at all dealing with any application

15     for funds from the Department of Housing and Community

16     Development by Mosaic Commons?

17  A  None.

18  Q  You are aware that TPL has alleged that the failure to

19     receive funds from the Department of Housing and

20     Community Development was one of the reason that TPL

21     did not go forward.  You're aware of that, correct?

22  A  In general, yes.

23  Q  Is there any mention in any assignment or acceptance,

24     either draft or the final document, that you're aware

82

```
 1              of where obtaining funding from the Department of

 2              Housing and Community Development was a contingency or

 3              a way out for TPL?

 4                       MS. FETOUH:  Objection.

 5      A       In any drafts or any documents, no.

 6      Q       In any draft or the final document of the assignment

 7              where the assignment says, by the way, if you don't

 8              get the money from the Department of Housing and

 9              Community Development, you don't have to go forward.

10                       MS. FETOUH:  Objection.

11      A       No, I, in fact, thought that the application to the

12              state was sort of opportunistic.  You know, if we

13              can't raise the funds that we thought we were going to

14              raise privately, is the state going to be good as a

15              source of money?

16      Q       But now do you understand that the Town of Stow,

17              through Ross Perry and TPL, actually told the state

18              that the funds that they sought from the state were

19              not even necessary for TPL to go forward with the

20              purchase?

21                       MS. ECKER:  Objection.

22                       MS. FETOUH:  Objection.

23      A       I only know about that from reading here today.

24      Q       Yeah, let's just take a quick look at it again, and
```

1    A    No idea.  I suspect it was discussions with Ross, but

2         I don't know.

3    Q    Do you recall any discussions with MacDonnell?

4    A    As I said, I think the last time I spoke with Craig

5         was that breakfast in the springtime.

6    Q    I'm going to read something to you and ask you if this

7         surprises you.  This is from a motion to quash a

8         subpoena filed by TPL, and they write:  TPL has never

9         argued and does not now argue that it failed to

10        perform under the purchase and sale agreement because

11        it could not have paid the purchase price from TPL's

12        own funds or available credit had TPL chosen to do so.

13             Is today the first time you've heard that

14        TPL could have used their own funds or available

15        credit and just decided not to do it?

16             MS. FETOUH:  Objection.

17   A    My assumption was that, yes, they were financially

18        large enough to do it and they decided that -- I

19        believe they evaluate each project on whether it's

20        going to make sense and that this one wasn't in the

21        process of making sense, and so that's why they were

22        backing away, not because -- and it's the local fund-

23        raising and the local permits that determine whether

24        the project itself is going to make any sense.

148

| | | |
|---|---|---|
| 1 | Q | Did they ever tell you that they were unable to |
| 2 | | purchase the property? |
| 3 | A | Not that I'm aware of, no. |
| 4 | Q | I'm going to read from another document filed on |
| 5 | | behalf of the town and TPL and MacDonnell, quote: |
| 6 | | However, having paid thousands of dollars in deposits |
| 7 | | required under the agreement, TPL found itself unable |
| 8 | | to raise the money necessary to fund the project and |
| 9 | | was unable to complete its purchase of the property. |
| 10 | | Is that what you were told at the time that |
| 11 | | TPL failed to go forward? |
| 12 | | MS. FETOUH: Objection. |
| 13 | A | Discussions I had at the time were more that they |
| 14 | | evaluate each parcel or each project on its own terms, |
| 15 | | and effectively they -- if the neighbors had signed up |
| 16 | | for, you know, so much in the way of fund-raising, if |
| 17 | | they didn't come through, then that affected the |
| 18 | | individual project evaluation. |
| 19 | Q | You said you believed they had the funds sufficient to |
| 20 | | purchase it.  Their own document says they were unable |
| 21 | | to raise the money necessary to fund the project and |
| 22 | | was unable to complete its purchase of the property. |
| 23 | | My question to you is have you always |
| 24 | | believed, based upon what you were told, that TPL |

149

```
 1            actually did have the money but elected not to

 2            use it?

 3      A     Do I believe that, yes.

 4      Q     Is that what you have always believed, that they had

 5            the money but they elected not to use it?

 6      A     Correct.

 7      Q     And you were never told that TPL was stating to the

 8            court that TPL found itself unable to raise the money

 9            necessary to fund the project and was unable to

10            purchase the property?

11                       MR. CONROY:  Objection.

12      Q     You were unaware that TPL and the town have stated

13            that to the court, that the Town of Stow has stated

14            that that's a fact?

15                       MR. CONROY:  Objection.

16                       MS. FETOUH:  Objection.

17      A     Was I aware of that, no, but I guess my question is:

18            is there a context that puts this in --

19      Q     Yeah.

20      A     -- the evaluation of an individual project?

21      Q     Well, it says:  TPL accepted the assignment.  This is

22            a joint motion of the town, TPL and MacDonnell.  It

23            says:  TPL accepted the assignment and stepped into

24            the shoes of the buyer in the agreement.  However,
```

# EXHIBIT B

⌐◻ **COPY**

Volume: I
Pages: 1-279
Exhibits: 20

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11697-GAO

MARILYN KUNELIUS,
          Plaintiff,

v.

TOWN OF STOW, separately,
A PARTNERSHIP OF UNKNOWN NAME
BETWEEN TOWN OF STOW and THE
TRUST FOR PUBLIC LAND, THE TRUST
FOR PUBLIC LAND, separately,
and CRAIG A. MacDONNELL, in
his individual capacity,
          Defendants.

DEPOSITION of EDWARD R. PERRY, JR., a

witness called by and on behalf of the Plaintiff,

taken pursuant to Fed.R.Civ.P. 30, before Roberta

J. Daniels, a Court Reporter and Notary Public

within and for the Commonwealth of Massachusetts,

at the Law Offices of Michael C. McLaughlin, One

Beacon Street, Boston, Massachusetts  02108, on

Monday, February 26, 2007, scheduled to commence

at 10:00 A.M.

*MELVIN LIPMAN COURT REPORTING*
*101 Tremont Street, Suite 700*
*Boston, Massachusetts  02108*
*617-227-3985*

38

1   A   We were looking for someone that could help make the

2       process work.  We wanted to be sure that they had the

3       wherewithal to do that.  We wanted to know who we

4       would be working with.

5   Q   So, in considering whether they had the wherewithal,

6       are you referring to their financial capacity to

7       effectuate the transfer?

8   A   Yes.

9   Q   And did you undertake any due diligence in order to

10      ascertain whether or not TPL had the financial ability

11      to effectuate the transfer?

12  A   We did.

13  Q   And what steps did you take?

14  A   Besides talking to Craig MacDonnell and looking at

15      their literature, it was talking to the other

16      conservation groups, other people in other towns that

17      might have had experience with TPL.

18  Q   Did you look at their financial data?

19  A   Uh-huh.  Yes, we did.

20  Q   And how did you do that?

21  A   It was information provided us by Craig.  It was by

22      looking at their Web pages and, again, by talking to

23      other towns and other conservation groups.

24  Q   Do you know where the information concerning TPL's

1       financial data would be found at the town today?

2   A   If we have it, it's in the selectmen's office in a

3       folder probably under *Kunelius property*.

4   Q   And do you recall what you saw in that financial data?

5   A   Not specifically, other than that they had done

6       numbers of projects, had hundreds of thousands, if not

7       millions, of dollars in financing background and

8       experience and a reputation of having done a number of

9       projects.

10  Q   Did you look at their assets, balance sheets, anything

11      like that?

12  A   It would have been whatever was publicly available at

13      that time.

14  Q   I will tell you that we received no such file from the

15      town as to a financial analysis of TPL, and I believe

16      that to be the case.

17          MS. ECKER:  Objection.  Are you going

18      to ask him a question?

19          MR. McLAUGHLIN:  Yes.

20  Q   Could you give me any better direction as to where

21      that specific file might be within the town?

22          MS. ECKER:  Assuming that we have not

23      turned over the file he's referring to.

24          MR. McLAUGHLIN:  Yes, I'm assuming that

74

1      the sources didn't want to be disclosed until the

2      project was closed in case they were working on other

3      projects.

4    Q    And disclosed by whom, by TPL?  Did TPL know of these?

5    A    I don't recall whether those private funding sources

6      were from TPL or from the Friends from Red Acre, but

7      my understanding was that they were interested in

8      supporting this project, and in my mind, this was just

9      further indication that they were looking at different

10      ways to do this.

11    Q    But also in your mind, this money was not critical, as

12      far as TPL's obligation to go forward, because they

13      had a six million dollar line of credit as a fallback

14      position.

15    A    They had a backup plan.

16    Q    Right.  And you now remember this from reading this,

17      Exhibit 3.  You remember they had a backup plan.  Was

18      it the understanding of your other colleagues on the

19      Board of Selectmen that they were also aware of this

20      backup plan?

21    A    I think the board was convinced that TPL had the

22      wherewithal to make this project happen from one

23      source or the other.

24    Q    Going back to the very first page of this, very first

77

1     capital from the private market.  My question is:

2     what is your understanding of that phrase, utilization

3     of capital from the private market?

4               MS. ECKER:  Objection, asked and

5     answered.  You can repeat if you'd like.

6    A    It was my understanding that TPL had sources of funds.

7     They were an established firm, and they had ways to

8     make this project happen if any one of these steps

9     didn't follow through, or fell through.

10   Q    What does private market mean to you?

11   A    It can be stocks, bonds, individual contributions.

12   Q    What does capital mean to you?

13             MS. ECKER:  Objection.  Do you want him

14    to get a *Webster's Dictionary* and tell you?  He's

15    already explained to you what the phrase meant to

16    him three times.

17   Q    What does capital mean to you?

18             MR. McLAUGHLIN:  Objection is noted.

19   A    Capital meant to me that they had stocks and bonds and

20    other sources of funds.

21   Q    What made you think they had stocks and bonds?

22   A    Everything that I'd seen on TPL indicated that they

23    were a recognized firm with solid financing, a lot of

24    experience in doing these types of deals and good

88

| | | |
|---|---|---|
| 1 | | million dollar line of credit has been renewed by |
| 2 | | Wainwright Bank and that these funds would be |
| 3 | | available to cover cost overruns subject to TPL's |
| 4 | | normal due diligence and internal review.  Do you see |
| 5 | | that? |
| 6 | A | I do. |
| 7 | Q | Do you recall receiving anything from TPL concerning |
| 8 | | renewal of a line of credit? |
| 9 | A | I do not. |
| 10 | Q | Do you recall asking for any proof of a renewal of a |
| 11 | | line of credit? |
| 12 | A | I do not. |
| 13 | Q | Do you recall having any discussions with Craig |
| 14 | | MacDonnell about whether the line of credit could be |
| 15 | | used for cost overruns, acquisitions, that sort of |
| 16 | | thing? |
| 17 | A | I recall having conversations with Craig that they had |
| 18 | | sufficient funds to support this project and |
| 19 | | contingency issues that arise. |
| 20 | Q | You're aware, are you not, that the Town of Stow and |
| 21 | | Mr. MacDonnell, and TPL, have filed documents with the |
| 22 | | federal court in which they have said they could not |
| 23 | | raise the money to purchase the property, that TPL |
| 24 | | could not raise the money to purchase the property? |

90

1    successful, yes.

2    Q    Did they have the money?  I thought it was your

3         understanding that they had the money to go forward on

4         this project.  Isn't that what you testified to?

5    A    They had funding and funding sources to make the

6         project go ahead.

7    Q    So, have you read this prior to today?

8              MS. ECKER:  I think he's testified he

9         has not seen this document.

10   A    You're talking about this document?

11   Q    Yes.

12   A    I don't believe I've seen it before today.

13   Q    Knowing what you know about the representations and

14        whatever due diligence you did concerning TPL, do you

15        know if that statement is accurate, that TPL found

16        itself unable to raise the money?

17             MS. ECKER:  Objection.  I would ask

18        that he read the entire document, because that's

19        one statement taken out of context.

20             MR. McLAUGHLIN:  Okay.  You can make

21        your objection, but I don't want instructions,

22        all right?

23             MS. ECKER:  He can answer, but, in

24        fairness, he should read the entire document and

203

1     foundations.  You saw that document?

2              MS. ECKER:  Objection.  That's not what

3     that document says.  For the entire project or

4     just for the --

5              MR. McLAUGHLIN:  Don't know.  Can't

6     tell.

7              MS. ECKER:  Well, you do if there's a

8     document.

9    A   That document, I believe, was the one that was written

10       by Kathy Farrell.

11   Q   Yes.

12   A   Not by TPL.

13   Q   So, it's your testimony today that the reason that you

14       believe TPL did not buy the property was not that they

15       couldn't get the variances and permits which they

16       expected to get but that they didn't have the money.

17       That's your testimony, is that right?

18              MS. ECKER:  Objection.

19   A   No, my testimony is that there were a number of things

20       that weren't falling together.  The funding wasn't

21       falling together, the variances weren't falling

22       together, and the project was unraveling for a

23       culmination of all those reasons.

24   Q   What portion of the purchase and sale agreement

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*