UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No.: 05-11697GAO

MARILYN KUNELIUS

       Plaintiff,

       v.

TOWN OF STOW, separately, A
PARTNERSHIP OF UNKOWN NAME
BETWEEN TOWN OF STOW and the TRUST
FOR PUBLIC LAND, THE TRUST FOR
PUBLIC LAND separately and CRAIG A.
MACDONNELL, in his individual capacity

       Defendants

## TOWN OF STOW'S OPPOSITION TO PLAINTIFF'S MOTION FOR SANCTIONS

**I.**    **INTRODUCTION**

The Plaintiff, Marilyn Kunelius, brought a complaint against the Town of

Stow separately, "A Partnership of Unknown Name" between the Town of Stow

and The Trust For Public Land, the Trust For Public Land separately, and Craig

MacDonnell arising from a proposed sale of land in Stow, Massachusetts owned

by Kunelius. Kunelius entered into a Purchase and Sale Agreement

("Agreement") with Cohousing Resources, LLC, a land developer in October

2002. Because Kunelius had previously elected to have the property value

assessed under Chapter 61 of the Massachusetts General Laws as forest land

resulting in tax savings to Kunelius, Kunelius was bound to offer the Town of

Stow a right of first refusal to meet the bona fide offer. The Town voted to assign

its statutory right of first refusal to the Trust for Public Land ("TPL"), a nonprofit

1

conservation organization, as provided under the terms of Chapter 61. TPL accepted that assignment and stepped into the shoes of the Buyer in the Agreement. The Town of Stow is not and was not a party to the Agreement once the assignment was made and accepted by TPL. Ultimately, TPL was unable to raise the money to complete the purchase of the property as intended and failed to close on the Property.

Kunelius received the only damages she is entitled to – the liquidated damages explicitly contracted for by the plain terms of the Agreement. Regardless of this clear contractual language, and regardless of the fact that the Town of Stow was not a party to the Agreement, Kunelius brought a complaint against the Town of Stow seeking specific performance of the Agreement and specifically alleges breach of contract, violations of Chapter 93A of the Massachusetts General Laws, intentional interference with a contractual relationship, violation of 42 U.S.C. §§ 1983, 1988, and fraud and misrepresentation. The Town of Stow, TPL, and Craig MacDonnell (the "Defendants") jointly filed a Motion to Dismiss the Plaintiff's Complaint, which Motion was denied. The Defendants then filed a Motion to Certify a Question of State Law to the Supreme Judicial Court seeking a determination as to whether the exercise of the right of first refusal under Chapter 61 of the Massachusetts General Laws leaves a liquidated damages provision in the Purchase and Sale Agreement intact and enforceable. This is the essential question in this case. The Court has not yet ruled on this Motion. In the interim, the parties have conducted discovery.

The Plaintiff now files a Motion for Sanctions pursuant to Federal Rules of Civil Procedure 11(c ) alleging that the Defendants have "repeatedly made misrepresentations to the Court in order, among other things, to induce the court into considering a Certification of a bogus issue to the Supreme Judicial Court of Massachusetts." The Plaintiff's Motion and assertions made therein are reckless and scurrilous as no misrepresentations have been made by the Defendants or their counsel and discovery conducted to date has not "shockingly revealed" any such misrepresentations. The Plaintiff's Motion is a thinly veiled attempt to distract the Court from the simple issue to be decided in this case, i.e. whether the liquidated damages received by the Plaintiff pursuant to the Agreement when TPL failed to close on the property is her sole remedy as a result of the failed deal which issue the Plaintiff characterizes as "bogus". If the question is answered in favor of the Defendants and the only remedy available to the Plaintiff is the liquidated damages already received by her pursuant to the Agreement, then all claims against the Defendants must be dismissed. The Plaintiff's attempt to distract the focus away from the substantive issues in this case and accuse the Defendants and their counsel of unethical behavior should be forcefully rejected.

The Town of Stow hereby requests that this Honorable Court deny the Plaintiff's unjustified and unscrupulous Motion for Sanctions and award the Town of Stow attorneys fees and costs for having to defend against this Motion. The Town of Stow addresses the specific allegations made by the Plaintiff against them below and incorporates those arguments made by TPL in TPL's Opposition to the Plaintiff's Motion For Sanctions as if set forth herein.

3

## II.     PRODUCTION OF DOCUMENTS BY THE TOWN OF STOW

As required under rule 26(a)(1) of the Federal Rules of Civil Procedure, the Town of Stow prepared its Automatic Disclosures and provided all of the documents identified in the Automatic Disclosures to the Plaintiff by letter dated November 21, 2006.   The documents produced by the Town of Stow are all of the documents currently contained in the Town of Stow's files concerning the Kunelius property with the exception of several documents created after the Plaintiff filed her complaint against the Town of Stow that are subject to the attorney client privilege.[1]

In her Motion for Sanctions and supporting Memorandum of Law, the Plaintiff accuses the Town of Stow of failing to provide specific documents to her inferring that the Town of Stow actually had the documents being sought and that Town's failure to produce those documents was somehow done as part of a conspiracy with TPL and in bad faith to hide the documents from the Plaintiff. Specifically, the Plaintiff focuses on a draft of an application for a grant filed with the Commonwealth of Massachusetts Department of Housing Community Development ("MDHCD") that informs the MDHCD of a line of credit in the amount of $6,000.000 available for use by TPL subject to TPL's internal approval process, including customary due diligence and approval by the Board of Directors.   The Plaintiff accuses the Town of Stow of  "failing to provide critically important attachments to the Application to the Commonwealth which demonstrates that the Defendants' representations to the Court regarding the

---

[1] While the Plaintiff did provide the Defendants with Automatic Disclosures, the Plaintiff did not provide the Defendants with the documents referenced in her Automatic Disclosures until March 5, 2007.

TPL's inability to purchase the Property have been deliberately false and misleading" and that the Town of "Stow failed to provide that letter or any documents relative to the Wainwright Bank." **Plaintiff's Motion at ¶4; Plaintiff's Memorandum of Law at p. 4, footnote 1**. What the Plaintiff totally omits from her Motion is that it was the Town of Stow who provided the Plaintiff with a copy of the application as part of the documents produced with the Town of Stow's Automatic Disclosure. The Plaintiff did not "discover" this application from another source and it would have been nonsensical for the Town of Stow to produce the bulk of the grant application that disclosed the line of credit that the Plaintiff seems to think is so critically important to her case and not the attachments referenced by the Plaintiff. The Town of Stow can only produce the documents currently in its possession and has produced all such documents to the Plaintiff. Rather than send a formal document request or attempt to conference this discovery dispute with the Town of Stow, the Plaintiff chose to file this wholly unsupported and irresponsible Motion for Sanctions against the Town and its attorneys.

### III.    LINE OF CREDIT[2]

The Plaintiff appears to be asserting in her Motion for Sanctions that because the Town of Stow was aware of the line of credit available to TPL, the Town of Stow did something untoward by not asking TPL why TPL was not accessing the line of credit in order to close on the Kunelius property and by not insisting upon the use of the line of credit in order for "TPL to meet its

---

[2] The Town of Stow incorporates the arguments made by TPL concerning the availability of the line of credit to TPL and the Plaintiff's assertions that the availability of such a line of credit evidences the Defendants' misrepresentations to the Court as if incorporated herein and will only address here arguments specific to the Town of Stow.

obligations under the assignment". **Plaintiff's Memorandum at p. 17**. It is not clear why this argument is contained in a motion for sanctions or how it supports the Plaintiff's allegations that the Town of Stow made misrepresentations to the Court as the discovery to date supports the Defendants' assertions that TPL could not raise the funds (the fundraising did not materialize) in 2003 and the deal fell through. **Exhibit 1 – Deposition of Edwin R. Perry at pp. 89-101**. The concept that TPL needed to be able to raise the funds to pay back any loan made from a line of credit if accessed to close on the Kunelius property appears to be lost on the Plaintiff. Regardless, the Town of Stow had no standing to insist that TPL access its line of credit in order to close on the deal as the Town of Stow was not a party to the Agreement between TPL and Kunelius and was not obligated to insure that the closing occurred. The Town of Stow understood that once they assigned its right of first refusal to TPL, the Town was no longer part of the deal. **Exhibit 1 at pp. 84-85, 112, 135-145.**

The Plaintiff has repeatedly attempted to misconstrue a letter written by Town Counsel to Town Administrator William Wrigley during the period of time that both were advocating that the Town obtain an indemnification agreement from TPL should a lawsuit arise as a result of the assignment and/or TPL's failure to close on the purchase of the property. In the portion of a letter referenced by the Plaintiff in her Motion, Town Counsel opines that "[s]ince the language of c. 61 does not absolve the Town of any further liability to the landowner for failure of the assignee to carry out the obligations to purchase the land under the assignment, or for any other claims as may be made by the land owner (**such as exists in the present circumstances and are discussed below** (emphasis added)) appropriate terms and conditions of the assignment would

6

include an indemnification agreement by the assignee (TPL) to the assignor (the Town)". **Exhibit G attached to the Plaintiff's Memorandum**. Not only did the <u>present circumstances</u> referenced by Town Counsel in his letter not include TPL's failure to close on the deal, but the Town, including Ross Perry, understood the statement quoted to be commenting on the fact that the Town of Stow could still be sued regardless of the assignment and not to be opining as to whether any claims brought against the Town would have merit. In fact, further on in the letter, Town Counsel indicates that he is recommending an indemnification provision although "we may disagree with the seller's [Kunelius] contention.". **Exhibit 1 at pp. 143-145**. The Town of Stow did not insist on getting an indemnification agreement from TPL and Town Counsel (who is now deceased) turned out to be correct in that Kunelius did file a lawsuit against the Town of Stow, regardless of the Town of Stow's contention that Kunelius' claims have no merit and should be dismissed.

## IV.   <u>CONCLUSION</u>

The Town of Stow and its counsel have acted in good faith in the defense of the claims being made by the Plaintiff in her lawsuit and the Plaintiff's allegations to the contrary are wholly unsupported and have no place in this matter given the efforts made by the Town of Stow to produce the numerous documents contained in the Town's files and to produce former Selectmen for depositions noticed by the Plaintiff. The Town of Stow respectfully requests that the Plaintiff's Motion for Sanctions be denied and that the Plaintiff be ordered to pay attorneys fees' and costs to the Town of Stow for having to defend against this Motion.

Respectfully submitted,
The Defendant,
Town of Stow,
By its attorneys,


/s/ Deborah I. Ecker
Leonard H. Kesten, BBO# 542042
Deborah I. Ecker, BBO# 554623
BRODY, HARDOON, PERKINS & KESTEN, LLP
One Exeter Plaza
Boston, MA 02116
(617) 880-7100

DATED: March 21, 2007

# EXHIBIT 1

**COPY**

Volume: I
Pages: 1-279
Exhibits: 20

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11697-GAO

MARILYN KUNELIUS,
                    Plaintiff,

v.

TOWN OF STOW, separately,
A PARTNERSHIP OF UNKNOWN NAME
BETWEEN TOWN OF STOW and THE
TRUST FOR PUBLIC LAND, THE TRUST
FOR PUBLIC LAND, separately,
and CRAIG A. MacDONNELL, in
his individual capacity,
                    Defendants.

DEPOSITION of EDWARD R. PERRY, JR., a

witness called by and on behalf of the Plaintiff,

taken pursuant to Fed.R.Civ.P. 30, before Roberta

J. Daniels, a Court Reporter and Notary Public

within and for the Commonwealth of Massachusetts,

at the Law Offices of Michael C. McLaughlin, One

Beacon Street, Boston, Massachusetts  02108, on

Monday, February 26, 2007, scheduled to commence

at 10:00 A.M.

MELVIN LIPMAN COURT REPORTING
101 Tremont Street, Suite 700
Boston, Massachusetts  02108
617-227-3985

84

1    stepped into the purchase and sale agreement and would

2    follow the terms of that purchase and sale agreement.

3    Q   And had you ever done a Chapter 61 assignment prior to

4        this matter on the Kunelius property?

5    A   I think you asked me that, and I believe the town has

6        done them.  I don't remember the timing, before or

7        after the Kunelius property.

8    Q   So, at some point, therefore, prior to the assignment,

9        is it fair to say that you specifically had

10       discussions with Mr. MacDonnell about the possibility

11       of TPL not being able to meet its obligations and go

12       forward with the purchase?

13   A   I think, in any of our discussions about the Kunelius

14       property, we always asked the what-if question, what

15       happens if we can't go forward.

16   Q   And in fact you received a letter from Jake Diemert by

17       way of -- strike that.

18       Is it your testimony that once the

19       assignment occurred and it was accepted, that the

20       town was relieved of any and all obligations to

21       go forward or to ensure that the sale occurred?

22   A   It was my understanding that by signing this the town

23       was no longer involved in the P&S, other than in the

24       $300,000 that we were looking for from the CPC funds.

1   Q   Was there another $100,000 beyond that?

2   A   Initially, I think there was a proposal for 400,000,

3       and that was turned down at town meeting, and then the

4       deal was restructured for the three hundred thousand.

5   Q   And where was the additional one hundred going to come

6       from when the deal was restructured?

7   A   The original deal was for 400,000, which I believe

8       would have been CPC funds.  It was restructured down

9       to three hundred thousand.

10   Q   When you say *restructured*, restructured between Craig

11       MacDonnell and yourself?

12   A   Restructured between TPL and the town.

13   Q   And where was the additional $100,000 going to come

14       from when TPL was no longer going to receive $400,000

15       but, rather, three hundred thousand?

16              MS. FETOUH:  Objection.

17   A   I have a problem with you saying additional hundred

18       thousand.  So, I think the question is where was the

19       shortage or the difference of $100,000 coming from

20       when they couldn't have the 400,000 from CPC funds,

21       and that was from one of those four sources.

22   Q   Well, do you recall me asking you questions about why

23       the amount of the application went up from $125,000 to

24       352?

89

1    A    I have not seen those documents, so I can't comment on

2         that.

3    Q    This is a document that was filed on behalf of the

4         Trust for Public Land, Craig MacDonnell, and the Town

5         of Stow, which has been filed with the Federal

6         District Court, and on the first page at the bottom,

7         last sentence, it says:  However, after paying

8         thousands of dollars in deposits required under the

9         agreement, TPL found itself unable to raise the money

10        necessary to fund the project and was unable to

11        complete its purchase of the property.  Do you see

12        that?

13   A    I don't.

14              MR. McLAUGHLIN:  Okay.  Did you give

15        him this one here?

16   A    Motion to dismiss?

17   Q    Yes, all right, starting at the very last line,

18        starting with *however* down at the bottom.

19   A    Okay.  I see it.

20   Q    Now, it was your understanding that TPL had the money.

21        I think that's what you testified to, correct?

22              MS. ECKER:  Objection.

23              MS. FETOUH:  Objection.

24   A    It was my understanding they could make this project

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

90

1    successful, yes.

2    Q    Did they have the money?  I thought it was your

3         understanding that they had the money to go forward on

4         this project.  Isn't that what you testified to?

5    A    They had funding and funding sources to make the

6         project go ahead.

7    Q    So, have you read this prior to today?

8                   MS. ECKER:  I think he's testified he

9         has not seen this document.

10   A    You're talking about this document?

11   Q    Yes.

12   A    I don't believe I've seen it before today.

13   Q    Knowing what you know about the representations and

14        whatever due diligence you did concerning TPL, do you

15        know if that statement is accurate, that TPL found

16        itself unable to raise the money?

17                  MS. ECKER:  Objection.  I would ask

18        that he read the entire document, because that's

19        one statement taken out of context.

20                  MR. McLAUGHLIN:  Okay.  You can make

21        your objection, but I don't want instructions,

22        all right?

23                  MS. ECKER:  He can answer, but, in

24        fairness, he should read the entire document and

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

1    not take one quip out of context.  So, why don't

2    you allow him to read the entire document.

3                MR. McLAUGHLIN:  I'm not going to allow

4    him to because we haven't got enough time.  The

5    issue that I have is concerning that one

6    statement.  That statement is not taken out of

7    context.  It's read exactly as has been written

8    by perhaps you, madam.

9    Q   So, the question is:  is today the first time that you

10       have become aware that TPL has informed the court and

11       that the Town of Stow has informed the court that TPL

12       was unable to fund the purchase because it could not

13       raise the money necessary to fund the project?

14               MS. ECKER:  Objection.

15   A   This is the first time I've seen this document.

16   Q   And is today the first time you realized the Town of

17       Stow and TPL and Mr. MacDonnell have told the federal

18       court that they found themselves unable --

19   A   Your question is when was I aware that they told the

20       federal court that they were unable to?

21   Q   Correct.

22   A   It is based upon this document that I just saw today.

23   Q   So, as far as you are aware, prior to today, is it

24       true that you have no knowledge of TPL being unable to

92

1          raise the money necessary to fund the project.

2                     MS. ECKER:  Objection.

3                     MR. CONROY:  Objection.

4                     MS. FETOUH:  Objection.

5                     MS. ECKER:  Go ahead.

6     A    That's an entirely different question.  When we

7          assigned the right to TPL, and then the funding

8          apparently didn't materialize in '03 and the deal fell

9          through, we were then aware that TPL did not have the

10         funds to follow through with the deal.

11    Q    You became aware that TPL did not have the line of

12         credit?

13                    MS. ECKER:  Objection.

14    A    I became aware that they did not have the funds to

15         complete the deal.

16    Q    Did you become aware that TPL did not have the line of

17         credit of six million dollars?

18    A    I was not aware that they did not have the line of

19         credit.

20    Q    So, when you say you became aware that they did not

21         have the funds, did you or did you not know that they

22         had a six million dollar line of credit?

23    A    We would have been aware that they had a six million

24         dollar line of credit.

93

| | | |
|---|---|---|
| 1 | Q | And at some point, did you become aware that they had |
| 2 | | told you they did not have the funds necessary to go |
| 3 | | forward? |
| 4 | A | I just said that, yes. |
| 5 | Q | And what did you say to them with regard to the six |
| 6 | | million dollar line of credit when they told you they |
| 7 | | were unable to raise the money necessary to fund the |
| 8 | | project? |
| 9 | A | I remember being very surprised that that happened |
| 10 | | because we thought we had covered those contingencies. |
| 11 | Q | Well, did you ask them for proof of the six million |
| 12 | | dollar line of credit at that point? |
| 13 | A | I don't recall that conversation. |
| 14 | Q | Did you ask them what they meant by their access to |
| 15 | | capital markets? |
| 16 | A | We didn't have that discussion at that point. |
| 17 | Q | Did you take any steps to figure out whether TPL had |
| 18 | | liquid assets at that point necessary to purchase the |
| 19 | | property? |
| 20 | A | I remember there were discussions with some of the |
| 21 | | people of the Friends from Red Acre that felt they |
| 22 | | should have had the funds and why didn't they have the |
| 23 | | funds. |
| 24 | Q | And Friends of Red Acre asking TPL that they should |

94

1      have had the funds?

2   A   I don't know what they were saying to TPL.  It was

3      conversations I had with people from Red Acre saying,

4      "This was not our understanding."

5   Q   Now, Exhibit 3 refers to the fact that you were aware

6      that there was over $200,000 in donations already

7      available to TPL, correct?

8          MS. FETOUH:  Objection.

9   A   It's in the grant application, yes.

10  Q   Do you remember the terms of the purchase and sale

11      agreement?

12  A   Not specifically.

13         MR. McLAUGHLIN:  Okay.  We're going to

14      mark that as Exhibit 5.

15         (WHEREUPON, Exhibit No. 5, purchase and

16      sale agreement, marked for identification.)

17  Q   I'd ask you to look at the second page of the purchase

18      and sale agreement, and I'd ask you also -- I'm going

19      to give you a piece of paper just so you can do a

20      little calculation yourself, and I'll give you a pen

21      to boot.

22         MS. ECKER:  You're not going to have

23      him doing math on the record.

24         MR. McLAUGHLIN:  I think this MBA can

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

95

1          probably handle the math that I'm going to ask

2          him to do.

3     Q    And if you want to decide not to, that's okay.  You

4          can refuse.  And we'll let the judge decide.  But

5          looking at the purchase and sale agreement, I would

6          direct your attention to the second page under Item 7:

7          There is a four hundred thousand dollar promissory

8          note secured by a mortgage.  Do you see that?

9     A    I do.

10    Q    So, that was money that was not necessary for the

11         closing of the deal because Mrs. Kunelius was willing

12         to take back a four hundred thousand dollar mortgage

13         on the property.  Is that your understanding?

14    A    As intended with a developer such as Mosaic Commons,

15         that was the way I saw the deal being structured.

16    Q    As that was also available to TPL under the terms of

17         the purchase and sale agreement, wasn't it?

18    A    I'm not sure that it was.

19    Q    What made it not available to TPL?

20    A    Often we found in these purchase and sale agreements

21         under Chapter 61, they're designed to be used by a

22         developer.  They don't necessarily fit the mold when a

23         town tries to exercise those rights.

24    Q    That's exactly right.

96

1           MS. ECKER:  Objection.

2           MS. FETOUH:  Objection.

3           MR. CONROY:  Objection.

4           MS. FETOUH:  You're testifying.

5           MR. McLAUGHLIN:  Am I?

6    Q    Did you make a determination that it was not available

7         to TPL, that the $400,000 was not available to TPL?

8    A    I did not.

9    Q    Mrs. Kunelius has never informed TPL that the $400,000

10        was not available.  Were you aware of that?

11          MS. ECKER:  Objection.

12   Q    The four hundred thousand dollar mortgage was not

13        available to them?

14          MS. ECKER:  Objection.

15   A    I'm not aware of conversations she might have had with

16        TPL.

17   Q    In addition to the $400,000, there was over $200,000

18        that was available to TPL through donations, is that

19        correct?

20   A    That's what was in the grant application.

21   Q    So, in addition to the money that was not needed at

22        the closing, as far as Mrs. Kunelius was concerned,

23        there's $400,000, there's over 200,000, but we'll say

24        $200,000, from donations that TPL has informed you

                  *MELVIN LIPMAN COURT REPORTING*
                        *617-227-3985*

1    they had in hand, they just wouldn't tell you from

2    whom, and there's $300,000 that was apparently going

3    to be or was made available as a result of the vote.

4         Now, am I correct that that's $800,000 that

5    was available to effectuate the sale either from

6    the second mortgage of Mrs. Kunelius or the

7    donations received by TPL or the $300,000 that

8    had been earmarked by the town?

9              MS. ECKER:   Objection.

10   A    My understanding was they needed to come up with a

11        716,000 dollar payment, that that was the stumbling

12        block.

13   Q    Do you have any knowledge that the $400,000 was not

14        available?

15   A    Which $400,000?

16   Q    The mortgage from Mrs. Kunelius.

17   A    It was my recollection that wasn't available.

18   Q    And that's because some terms of a purchase and sale

19        agreement that are between Mosaic Commons and

20        Mrs. Kunelius are not applicable to the town.  Is

21        that your understanding?

22   A    It's my understanding that with 61 case issues like

23        this it's difficult for the town to a hundred percent

24        mirror the terms and that usually the town is required

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

98

1    to come up with all the money up front.

2    Q    That's correct.  And so if it's your understanding

3        that that's the case, is it also your understanding

4        that there are issues related to the applicability of

5        certain provisions of a purchase and sale agreement to

6        the town that would otherwise have been applicable to

7        the original buyer?

8    A    You lost me.  Try that again.

9    Q    Well, for example, there's a feasibility study

10       referred to in the purchase and sale agreement.  Are

11       you familiar with that?

12   A    Yup.

13   Q    Was the town required to undertake a feasibility

14       study?

15   A    The town had the option to do that.

16   Q    Was it required to?

17   A    I don't believe the town was required to do that.

18   Q    Because the town wasn't going to build a 40B.  Is that

19       fair to say?

20   A    That's true.

21   Q    Now, given that you were aware that TPL already had in

22       excess of $200,000 plus the line of credit plus the

23       $300,000 from the town, what steps did you undertake

24       to ascertain why the difference was not available to

99

1       TPL from its various sources of capital that you

2       referred to when you made the application to the

3       state?

4              MS. ECKER:   Objection.

5    A   I believe there were conversations between the town

6       and TPL about what's going on and why can't we do

7       this.

8    Q   And wasn't it in fact the case that TPL didn't want to

9       buy the property because they thought it was too

10      expensive and it wasn't worth the purchase price?

11            MR. CONROY:   Objection.

12            MS. FETOUH:   Objection.

13   A   I can't comment as to why TPL wasn't able to go

14      forward with it, other than my understanding from them

15      that they didn't have the funding that we had thought

16      that they would have.

17   Q   And they never explained to you what happened to the

18      line of credit and you never asked.  Is that fair to

19      say?

20   A   I don't recall those conversations.

21   Q   Did you ask what was the status of the donations, the

22      200,000 plus, that you were aware of as of 3-30-03

23      when the application was signed?  Did you ever ask

24      Craig MacDonnell what happened to that money?

100

1    A   I think we had multiple discussions as to how to

2          salvage the deal and to figure out what happened to

3          the money and what other money could we get because we

4          were trying to have a way to -- find a way to make the

5          deal go through.  So, we would have had discussions on

6          what happened to this, what happened to that.

7    Q   So, did you have a discussion as to what happened to

8          the 200,000 plus?

9    A   I believed we looked at it all to see what we could do

10         to make it happen.

11   Q   And what were the discussions as to what happened to

12         the 200,000 plus?

13   A   I don't recall those answers, other than the DHCP

14         grant that we knew hadn't gone through.

15   Q   But I'm talking about the $200,000 plus.  You don't

16         recall any answers as to what happened to the money

17         that had already been committed by certain not-for-

18         profit corporations and private individuals?

19   A   I don't recall that conversation.

20   Q   Are you certain today, as you sit here, that you even

21         asked about that?

22   A   We had multiple discussions about what happened to the

23         funding and how do we make this deal go forward.

24         You're asking me if I asked specifically and got a

101

1    specific answer about the $200,000, and I said I don't

2    remember that.

3    Q    Specifically, during those meetings as to where you

4         could find money to make the deal work, do you recall

5         specifically asking TPL or Craig MacDonnell why they

6         weren't using the fallback plan of six million

7         dollars?

8    A    I don't remember a discussion on using the fallback

9         plan.

10   Q    But you told the state that none of the four

11        components, A through D, were significant enough to

12        prevent TPL from purchasing the property.  Doesn't it

13        seem to you odd that you would not have said, "Wait a

14        minute.  Where's the fallback position of six million

15        dollars?" since you referred twice to --

16   A    You're asking me to recall conversations --

17                   MS. FETOUH:  Objection.

18                   MR. CONROY:  Objection.

19                   MS. ECKER:  Objection.  Now you can

20        answer.

21   A    You're asking me to recall conversations in

22        specificity that are many years ago.  I don't recall

23        having those.  I recall being extremely surprised and

24        then disappointed that the project with TPL did not go

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

112

1    price, what made you think, if you did, that TPL

2    could?

3  A   Nothing made me think that they could or they

4    couldn't.  The town was no longer involved in that.

5    It was between them, the proposed new buyer and the

6    seller.

7             MR. McLAUGHLIN:  Okay.  Why don't we

8    take a break and have lunch.  How much time would

9    be good?

10             MS. ECKER:  1:30, is that all right?

11             MS. FETOUH:  Yes, okay.

12             MR. McLAUGHLIN:  Okay, terrific.

13             (Luncheon recess, 12:53 P.M.)

14               (After recess, 1:40 P.M.)

15                (All parties present)

16             (WHEREUPON, Exhibit No. 8, Perry letter

17    to Kachajian, dated September 24, 2003, marked

18    for identification.)

19             MR. McLAUGHLIN:  Just for the record,

20    what we did is we marked the September 24th

21    letter, which we'll refer to as Exhibit 8.

22  Q   So, just for the record, the references in my

23    questions to you, sir, concerning Exhibit 5 to the

24    complaint, we've now marked that document as Exhibit 8

135

1    decision and usually that requires money to be

2    expended, and that's the town meeting.

3    Q    But in the absence of a decision by the town for

4         money, is it fair to say that the actual elected body

5         is the Board of Selectmen?

6    A    Yes.

7    Q    The town administrator does not have any authority,

8         for example, to make the decision to go forward with

9         the assignment.  Is that fair to say?

10   A    The board makes the decision.

11   Q    Right.

12                  (WHEREUPON, Exhibit No. 10. Diemert

13        letter to Wrigley, dated February 10, 2003,

14        marked for identification.)

15   Q    This is a February 10, 2003, letter with a Bate stamp

16        number of 428, KUN428, supplied to us by town counsel.

17        It is a letter from Jacob C. Diemert, D-I-E-M-E-R-T,

18        town counsel, to William J. Wrigley, town

19        administrator, re Kunelius property purchase or

20        assignment of the Chapter 61 rights, and it's dated

21        February 10th which is approximately two days before

22        the notice of assignment to Mrs. Kunelius as reflected

23        on the February 12th letter from the Board of

24        Selectmen to Mrs. Kunelius which is Exhibit 4.

136

1          So, two days before the assignment takes

2     place, apparently, Mr. Diemert tells the town

3     administrator in Paragraph 2 that the language of

4     Chapter 61 does not absolve the town of any

5     further liability to the landowner for failure of

6     the assignee to carry out the obligations to

7     purchase the land under the assignment or for any

8     other claims that may be made by the landowner

9     such as exist in the present circumstances and as

10    are discussed below.  Appropriate terms and

11    conditions for the assignment would include an

12    indemnification by the assignee, TPL, to the

13    assignor, the town, for any such claims as might

14    be made by the landowner resulting from the

15    assignment or its implementation and exercise by

16    the assignee, TPL.  I highly recommend such an

17    indemnity clause be required for acceptance of

18    the assignment of TPL in the present

19    circumstances.

20         Now, do you acknowledge that you received a

21    copy of this February 10th letter?

22  A     We did.

23  Q     And would you also acknowledge that you received it

24    prior to the date of the assignment?

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

137

A    I don't remember specifically when we did that, but
     that's a safe bet.

Q    Now, at some point, did you make an independent legal
     decision in which you or the board elected to
     disregard the advice of town counsel with regard to
     his opinion that the language of Chapter 61 does not
     absolve the town of any further liability?

          MS. ECKER:  Objection.  One, I note you
     didn't complete the paragraph of what this says
     and let him read the entire letter, but, second,
     there are other documents that go along with this
     that had discussions regarding this issue after
     the letter.  So, the basis for my objection is
     you're assuming facts that aren't established.

Q    Let's look at the second page so we can clear this up.

          MS. ECKER:  And the other documents
     that went along with this.  You're assuming that
     this was the town counsel's advice, and you're
     pulling one sentence out of context in this
     letter.

          MR. McLAUGHLIN:  Actually, madam, I
     didn't mean to.  I think I read the entire
     Paragraph 2.

          MS. ECKER:  Such as exist in the

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

138

1    present circumstances discussed below, and

2    discussed below in Paragraph 3 are two

3    circumstances which are the subject of other

4    documentation that the town has provided.

5    Q    So, is there any reference in this letter, sir, to any

6         attachments included with this letter on the second

7         page?

8                    MS. ECKER:   Not attachments,

9    discussions with town counsel after the fact.

10                   MR. McLAUGHLIN:   And while I appreciate

11   your observations, madam, with the highest

12   respect, I didn't ask you that question.   I asked

13   it of your client.

14                   MS. ECKER:   The only thing I'm

15   objecting to is your characterization of what

16   town counsel concluded.   You can ask him what he

17   meant by this, what he thought.

18                   MR. McLAUGHLIN:   The document speaks

19   for itself.

20                   MS. ECKER:   And it's not in and of

21   itself, but go ahead.

22                   MR. McLAUGHLIN:   I'm not trying to

23   misrepresent the contents of this.   I simply

24   asked about Paragraph 2.   We'll get to the rest

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

139

1           of it.

2    Q      So, my question, I will restate.  Did you elect as the

3           chairman of the Board of Selectmen to disregard the

4           advice of the town counsel with regard to whether or

5           not Chapter 61 absolved the town of further liability

6           once an assignment is made?

7                  MS. ECKER:  Objection.  That's not what

8           the town counsel said, but you can answer.

9    Q      Okay.  Let's read it again.  I'll take as much time as

10          it takes.  Let's look at the first sentence, quote:

11          Since the language of Chapter 61 does not absolve the

12          town of any further liability to the landowner for

13          failure of the assignee to carry out the obligations

14          to purchase the land under the assignment or for any

15          other claims as may be made by the landowner,

16          parenthesis, such as exist in the present

17          circumstances and are discussed below, close

18          parenthesis, comma, appropriate terms and conditions

19          for the assignment would include an indemnification

20          agreement by the assignee, TPL, to the assignor, the

21          town, from any such claims as might be made by the

22          landowner resulting from the assignment or its

23          implementation and exercise by the assignee, TPL.  I

24          highly recommend that such an indemnity clause be

140

1    required for acceptance of the assignment of TPL in

2    the present circumstances, period.

3            MS. ECKER:  Paragraph 3.

4            MR. McLAUGHLIN:  I'm sorry.  I'm

5    reading one --

6            MS. ECKER:  These circumstances

7    include.

8            MR. McLAUGHLIN:  I understanding.  I'm

9    asking about -- you implied that I read one

10   sentence, madam.  No, you didn't imply.  You said

11   I read one sentence.  So, I've now gone and read

12   it again, because I didn't read one sentence.  I

13   read the entire paragraph.  This is my

14   deposition.  I will get to Paragraph 3 should I

15   so elect.  You can object to form.

16           MS. ECKER:  All right.  My objection is

17   that, in your question, you're stating town

18   counsel concluded and did they abrogate his

19   conclusion.  My objection is you are saying that

20   town counsel concluded.

21           MR. McLAUGHLIN:  I think, at this

22   point --

23           MS. ECKER:  He can answer whatever he

24   understood this paragraph to mean at the time.

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

141

1          MR. McLAUGHLIN:   I'm going to suggest

2     that that objection violates Massachusetts Rules

3     of Civil Procedure in that you have now given him

4     the answer that you would like him to say.   I am

5     going to object, and I am going to not waive my

6     right to bring this up in front of the judge,

7     because you're not supposed to be able to do

8     that, madam.

9          So, you can object all you want, but that is

10    nothing short of an instruction.   I'm moving

11    forward without waiving my right.

12          MS. ECKER:   I'm just going to say my

13    witness certainly needs no instruction from me.

14    He's a very competent --

15          MR. McLAUGHLIN:   Okay.   Then all you

16    have to do is object.

17          MS. ECKER:   He can answer as he sees

18    fit.

19          MR. McLAUGHLIN:   All right.   But I

20    think what you've done is violating the rules.

21          MS. ECKER:   I disagree with you.

22          THE WITNESS:   Can you summarize your

23    question?

24  Q   Did you make any independent decision to determine

142

1   whether or not town counsel's statement that the

2   language of Chapter 61 does not absolve the town of

3   any further liability was incorrect?

4   A   We did not have a discussion on whether his statement

5       was correct or incorrect.

6   Q   Now, you testified earlier today that you believed

7       that the town's obligations ended with the assignment.

8   A   That's true.

9   Q   You would agree with me, wouldn't you sir, that

10      Paragraph 2 suggests that town counsel did not

11      necessarily believe that the town's obligations were

12      absolved simply by assigning the right of first

13      refusal?

14  A   I would not.

15          MS. ECKER:   Objection.

16  Q   What's the basis for your answer?

17  A   Town counsel was advising us that we were still

18      subject to being sued if something didn't happen and

19      that we should be indemnified in case that happened.

20      I'm sure he's enjoying today in saying, "I told you

21      so." As it turns out, this was not a case of a

22      partnership with a deal. It was if something happens

23      and we're sued, the town could be named, and I think

24      he was asking for us to be protected in case that

MELVIN LIPMAN COURT REPORTING
617-227-3985

143

happened.

Q    Well, he does suggest that Chapter 61 doe not absolve
     a town of liability to a landowner when there's a
     failure by the landowner to perform, failure by the
     assignee to perform. Doesn't he suggest that to you?

A    He was saying that we could be sued by the landowner.

Q    So, and for the failure of the assignee.

A    I interpret that as we could be sued by anything, any
     reason the property owner wanted to, and, as it
     proves, that was the case. Town gets sued for a
     number of things. We win more than we lose.

Q    So, from your point of view, it's your testimony that
     the specific language, quote: Since the language of
     Chapter 61 does not absolve the town of any further
     liability -- I'll stop right there. As far as you're
     concerned, that simply meant that anybody at any time
     could sue the town for any reason, period. That's how
     you viewed that?

A    Yes.

Q    And so you didn't consider whether or not the mere
     assignment by itself absolved liability of the town,
     the assignor. You never considered whether that, just
     by assigning it, you were out completely.

A    We believed that by assigning the right of first

144

1    refusal the town was no longer part of the deal.

2  Q   Even though you read this language?

3  A   It's true.

4  Q   And so did you undertake any analysis as to what

5      Chapter 61 says with regard to the obligation of the

6      assignor at the time, what obligations continued after

7      the assignment?

8  A   I don't think there was any further evaluation, other

9      than the review by town counsel as written here.

10 Q   So, there was no other lawyer involved, is that

11     correct?

12 A   I believe that's true.

13 Q   Now, under Paragraph 3, Paragraph 3 says:  These

14     circumstances include two potential sources of

15     litigation and possible damage claims by the seller,

16     Kunelius, who provided the Chapter 61 notice to the

17     town in the present matter, period.

18         First, the seller through his attorney is

19     saying that no Chapter 61 notice was required for

20     the proposed sale because use of the Chapter 61

21     land was not being sold or converted to a use

22     other than forest land.  Second, the seller is

23     saying that compliance with the terms of the

24     purchase and sale agreement, which was attached

145

1          to the Chapter 61 notice, include not only

2          monetary compensation but a tax benefit to the

3          seller, all of which together constitute the

4          benefit of the bargain with the intended buyer.

5                  Now, earlier you had testified that you

6          believed Mr. Kachajian had notified you that

7          there was a possibility that Mrs. Kunelius was

8          going to be looking for a tax benefit as a result

9          of the sale.  In fact, it was town counsel who

10         notified you of that first, wasn't it?

11    A    Apparently so.  You know, the next paragraph says:

12         While we may disagree with seller's contention.

13    Q    I understand.  I'm going to get to --

14    A    So, the fact that he says something doesn't

15         necessarily mean we should believe that.

16    Q    I understand.  When you became aware that

17         Mrs. Kunelius was looking for a tax benefit for

18         the assignment of the property, did it occur to

19         you to determine what kind of credit she could

20         get for the assignment of the property?

21    A    I believe we looked into that and were not able to

22         determine a value nor able to determine her own

23         personal tax situation and, therefore, we couldn't

24         determine a value.