UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MARILYN KUNELIUS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 05-11697GAO |
| | ) | |
| TOWN OF STOW et al., | ) | |
| Defendants. | ) | |

DEFENDANT CRAIG A. MACDONNELL'S
OPPOSITION TO PLAINTIFF'S MOTION FOR SANCTIONS

Defendant Craig A. MacDonnell is a Cornell Law School graduate and an accomplished

member of the bar who gave up a successful career as a commercial litigator to devote his skills

and talents to the public interest, first as a staff attorney with the Massachusetts Department of

Fisheries, Wildlife & Environmental Law Enforcement and now as Massachusetts Director of the

Trust for Public Land ("TPL"). (Deposition of Craig MacDonnell ["MacDonnell Dep."], pp. 7-

13, Ex. A hereto)  Quite apart from the baseless claims that brought him into this case to begin

with, plaintiff's motion for sanctions now accuses him, and indeed all of the defendants' counsel,

of making "shocking misrepresentations" to the Court, the Commonwealth, and the plaintiff.[1]

The slightest scrutiny exposes those claims as bogus.[2]  While MacDonnell defers to the

defendant TPL and the defendant Town of Stow to refute them in depth, he wishes to submit this

brief, individual reply.  Recklessly false diatribes against fellow members of the bar are no small

---

[1] See Plaintiff's Memorandum in Opposition to Defendant The Trust for Public Land's
Motion to Quash and in Support of the Plaintiff's Motion for Sanctions ("Plaintiff's Brief"),
passim.

[2] See Defendant the Trust for Public Land's Opposition to Plaintiff's Motion for Sanctions
("TPL's Brief") and the Town of Stow's Opposition to Plaintiff's Motion for Sanctions (the
"Town's Brief").

matter, their targets should not ignore them, and their author should be reminded of the rules that proscribe them.

Plaintiff's motion for sanctions invokes Rule 11 of the Federal Rules of Civil Procedure, which provides that the signing of any "written motion, or other paper" presented to this Court is a certification that "to the best of the [signer's] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," its allegations have evidentiary support or are likely to have it.  To the same effect, the Massachusetts Rules of Professional Conduct provide that "[a] lawyer shall not . . . assert . . . an issue [in a proceeding] unless there is a basis for doing so that is not frivolous . . ." ( Rule 3.1 of the Mass. R. Prof. Conduct).  As this Court has explained, a frivolous claim is "one that is 'both baseless and made without a reasonable and competent inquiry.'"  *Ultra-Temp Corp. v. Advanced Vacuum Systems, Inc.*, 189 F.R.D. 17, 20 (D. Mass., 1999), quoting *Townsend v. Holman Consulting Corp.*, 929 F. 2d 1358, 1362 (9th Cir., 1990) (*en banc*).  Further, the Rules of Professional Conduct provide that "[a] lawyer should demonstrate respect for the legal system and for those who serve it, including . . . other lawyers . . ." (Mass. R. Prof. Conduct, Preamble and Scope, ¶ 4)

Here, it is plaintiff's motion for sanctions and its lurid accusations against four members of the bar of this Court -- MacDonnell and all three of defendants' counsel -- that are both baseless and unsupported by a reasonable and competent inquiry.

The motion leads off with a claim that MacDonnell "deliberately lied to the Plaintiff when TPL defaulted on its obligation to purchase the property from the Plaintiff . . ." by telling her that TPL was unable to complete the transaction because it had not raised the necessary funds, when it actually had access to ample credit.  (Plaintiff's Brief, at 3-4)  Before that claim

was made, a reasonable and competent inquiry as to whether there was any basis for it would surely have included a glance at correspondence from MacDonnell that was attached to plaintiff's own complaint (the "Complaint"). One of those letters establishes that, *before* TPL defaulted, MacDonnell told plaintiff's real estate counsel that TPL's board would "not *approve* any borrowing to bridge a fundraising gap . . .," not that it lacked the *ability* to do so. (Complaint, Ex. 12, p. 1; emphasis added). "Essentially," MacDonnell explained, "this would be asking TPL for an unsecured loan based on weak fundraising prospects with no back-up plan to repay the loan." (*Id.*) In short, before the scheduled closing, MacDonnell told plaintiff's real estate counsel exactly what the situation was -- that TPL had the *ability* to seek to borrow funds to close the fundraising gap and buy the property but was not going to use it -- and why.

Second, Plaintiff's Brief insists that defendants made the same "misrepresentation" to this Court -- that TPL lacked the resources to close the transaction -- and also that defendants have asserted in this litigation a baseless "inability to purchase defense." (Plaintiff's Brief, *passim*)  A reasonably diligent inquiry preceding that attack on the integrity of defendants' pleadings would surely have included reading them. No such defense has ever been raised.

The introduction to the "Memorandum in Support of the Motion To Dismiss of Defendants The Trust for Public Land, Craig A. MacDonnell, and the Town of Stow" ("Defendants' Brief") says that, because TPL "was ultimately unable to raise the money to fund the purchase, it was unable to acquire the Property and forfeited thousands of dollars to Kunelius pursuant to the liquidated damages clause." (Defendants' Brief, at 1-2)  In Exhibit 12 to the Complaint, MacDonnell had already stated explicitly the unspoken nuance implied in the foregoing sentence -- that TPL was unable to fund the purchase *as planned*, because the

fundraising had fallen through. Defendants have never argued that TPL did not have the money to buy plaintiff's property or could not borrow it, and its potential to do both of those things has always been evident in the undisputed exhibits to the Complaint itself. In short, the "inability to purchase defense" is a mythical creature of plaintiff's own invention.

Third, Plaintiff's Brief insists that "Defendants and their attorneys stood silently" at the hearing on their motion to dismiss "as Plaintiff's counsel asserted and reasserted to this Court that the Defendants' Inability to Purchase Defense as reflected in their Motion was false and misleading." (Plaintiff's Brief, pp. 4-5) Plaintiff's assertions and reassertions that (a) TPL "had millions of dollars" and (b) the P&S agreement was not "contingent upon raising the money" in any event (Transcript of December 15, 2005 hearing, Ex. B hereto, p. 36) indeed went unchallenged and still do, underscoring the point that the "inability to purchase defense" appears only in Plaintiff's Brief and oral arguments, which have invented it, then attacked it. Further, MacDonnell's counsel did not "stand silent" on the issue at the hearing but noted that TPL's own abundant resources did not mean that it was able to raise the money required to complete this particular project. (*Id.*, p. 41).

Fourth, turning its vitriol back on MacDonnell, Plaintiff's Brief goes on to assert that he was "caught in a lie during a deposition" (*id.*, at 9), in which we are told he was "feigning ignorance or lack of memory concerning virtually every question as to the availability of [TPL's] line of credit." (Plaintiff's Brief, p. 5) This too has no connection to reality. The purely fictional notion that MacDonnell, a member of the bar of this Court, was lying or "feigning" in his sworn deposition is completely unsupported and recklessly irresponsible. In fact, in a passage quoted in plaintiff's own brief, MacDonnell acknowledges, simply and unequivocally, that "[t]he decision

-4-

was made not to use the line of credit." (*Id.*, p. 7)  In the passages that Plaintiff's Brief ignores,

MacDonnell provided forthright, accurate information about the line of credit (*see* TPL's Brief,

at 6-7 and 11) and every other subject about which he was asked and had knowledge.

It should not go unnoticed that the following is only one example of the nonsense that

embellished the questioning throughout MacDonnell's deposition:  "You're aware, are you not,

in this litigation that TPL has made representations to the federal court that TPL did not have the

money to purchase the property?  Are you aware of that?"  (*Id.*, at 6)  As noted above, TPL has

never made any such representation and has never contested the undisputed exhibits to plaintiff's

own Complaint that establish just the opposite.

Fifth, the Massachusetts Rules of Professional Conduct include the unexceptionable

observation that "[i]n all professional functions a lawyer should be competent . . ."  (Preamble

and Scope, ¶¶ 3)  "Competent handling of a particular matter includes inquiry into and analysis

of the factual and legal elements of the problem, and use of methods and procedures meeting the

standards of competent practitioners.  It also includes adequate preparation."  (*Id.*, Comment [5]

to Rule 1.1, on Competence)

Here, before accusing TPL, MacDonnell, and their counsel of deliberately withholding

documents in discovery (Plaintiff's Brief, *passim*), a reasonably competent and adequate

preparation for a Rule 11 motion might have included waiting for their responses to plaintiff's

document requests.  For reasons best known to him, plaintiff's counsel chose not to do before

conducting any of his depositions thus far, including MacDonnell's.  The Town's Brief speaks

for itself about the speciousness of the attack on its own document production.

Finally, before filing a motion under Rule 11, it would be desirable to read it, especially since it mandates important preconditions that have here been ignored. (*See* TPL's Brief, at 1-2)

Literally every page of Plaintiff's Brief makes fanciful accusations about what "recent discovery has shockingly revealed" (Plaintiff's Brief, at 3),"multiple levels of deceit" (*id.* at 5), an "ongoing and deliberate effort to avoid answering questions truthfully in the depositions" (*id.*), the "slippery slope of deception" (*id.*, p. 10), the notion that "misdirection and outright lying have been the hallmark of [defendants'] behavior" (*id.*, at 15), and a dozen other salacious attacks on MacDonnell, the other defendants, and all three of their counsel, every one of which is exposed as baseless by the pertinent documents and transcripts. Had it appeared in a *pro se* motion, all of this might be brushed away and forgotten, but recklessly false accusations against fellow members of the bar are an abuse of the privilege of judicial advocacy.

In sum, all of plaintiff's charges are frivolous and irresponsible and MacDonnell asks respectfully that the Court remain mindful of them as the lawsuit progresses.

> CRAIG A. MACDONNELL
> By his attorneys,
>
> ___/s/ James B. Conroy_____
> James B. Conroy (BBO No. 96315)
> Jill Brenner Meixel (BBO No. 652501)
> Donnelly, Conroy & Gelhaar, LLP
> One Beacon Street
> Boston, MA 02108
> (617) 720-2880

Dated: March 21, 2007

**<u>Certificate of Service</u>**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on March 21, 2007.

<u>/s/ James B. Conroy    </u>
James B. Conroy

Date:  March 21, 2007

# **EXHIBIT A**

Volume: I
Pages: 1-251
Exhibits: 23

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11697-GAO

MARILYN KUNELIUS,

Plaintiff,

v.

TOWN OF STOW, separately,
A PARTNERSHIP OF UNKNOWN NAME
BETWEEN TOWN OF STOW and THE
TRUST FOR PUBLIC LAND, THE
TRUST FOR PUBLIC LAND, separately,
and CRAIG A. MacDONNELL, in his
individual capacity,

Defendants.

DEPOSITION of CRAIG MacDONNELL, a witness called by and
on behalf of the plaintiff, taken pursuant to the
Massachusetts Rules of Civil Procedure, before Roberta J.
Daniels, a Court Reporter and Notary Public within and for
the Commonwealth of Massachusetts, at the Law Offices of
Michael C. McLaughlin, One Beacon Street, Boston,
Massachusetts 02108, on Thursday, February 8, 2007,
scheduled to commence at 10:00 A.M.

APPEARANCES

Michael C. McLaughlin, Esquire
Law Offices of Michael C. McLaughlin
One Beacon Street
Boston, Massachusetts 02108
    Counsel for the Plaintiff

Peter A. Kachajian, Jr., Esquire
292 Main Street
Northborough, Massachusetts 01532
    Co-counsel for the Plaintiff

Deborah I. Ecker, Esquire
Brody Hardoon Perkins & Kesten, LLP
One Exeter Plaza
Boston, Massachusetts 02116
    Counsel for Defendant Town of Stow

Dahlia S. Fetouh, Esquire
Goodwin Procter, LLP
Exchange Place
Boston, Massachusetts 02109
    Counsel for Defendant Trust for Public Land

James B. Conroy, Esquire
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd floor
Boston, Massachusetts 02108
    Counsel for Defendant Craig MacDonnell
Also present:
Lucie DeBellis, Paralegal
The Law Offices of Michael C. McLaughlin
Marilyn Kunelius, Plaintiff
David Norris, Husband of the plaintiff

INDEX

| Witness | D | C | RD | RC |
|---|---|---|---|---|
| CRAIG MacDONNELL | 6 | | | |

- 3 -

EXHIBITS

| No. | Description | Page |
|---|---|---|
| 1 | TPL corporate registration form | 16 |
| 2 | Notice of deposition | 17 |
| 3 | TPL Land Action Fund corporate registration form | 18 |
| 4 | Stow annual report, 2003 | 35 |
| 5 | Stow letter with attachments to Kunelius, 2-12-03 | 45 |
| 6 | MacDonnell letter to Perry, 2-11-03 | 49 |
| 7 | Conditions for right of first refusal | 51 |
| 8 | Minutes of Stow CPC meeting, 2-10-03 | 64 |
| 9 | Printout of TPL Web site | 75 |
| 10 | Stow Finance Committee minutes, 1-7-03 | 79 |
| 11 | DHCD grant application | 105 |
| 12 | TPL Web site excerpt | 124 |
| 13 | MacDonnell letter to Kachajian, 9-9-03 | 137 |
| 14 | Conditions for right of first refusal | 154 |
| 15 | Sommerlad email to Kennedy | 164 |
| 16 | Jacobs email to Sommerlad and Kennedy | 166 |
| 17 | Stow Board of Selectmen meeting, 2-11-03 | 191 |
| 18 | Stow Conservation Commission documents | 193 |
| 19 | MacDonnell email to Perry, 4-17-03 | 209 |
| 20 | Friends of Red Acre letter to Stow Board of Selectmen, 6-6-03 | 212 |

- 4 -

DEPOSITION OF CRAIG MacDONNELL     MINIDEP by Kenson

1         P R O C E E D I N G S
2         Thursday, February 8, 2007
3         10:01 A.M.
4      (Plaintiff and Mr. Norris not present)
5      CRAIG MacDONNELL, first having been
6 satisfactorily identified by the production of a
7 Massachusetts driver's license and then duly
8 sworn, on oath, deposes and says as follows:
9      MR. McLAUGHLIN: Before we start, we'll
10 use the usual stipulations? We'll reserve all
11 objections till the time of trial, except as to
12 form, waive the signature of the deposition?
13      MR. CONROY: Waive the notary.
14      MR. McLAUGHLIN: Yes, right.
15      MR. CONROY: Right.
16         DIRECT EXAMINATION
17 By MR. McLAUGHLIN:
18 Q   Could you please state your name and spell it, please?
19 A   It's Craig MacDonnell, C-R-A-I-G. Last name is M-A-C-
20    D-O-N-N-E-L-L.
21 Q   And can you tell me what your address is?
22 A   800 Old Road to Nine Acre Corner, Concord, Mass.
23 Q   Can you tell me what your occupation is?
24 A   I work for the Trust for Public Land.
          - 6 -

1 Q   And what is the Trust for Public Land?
2 A   The Trust for Public Land is a 501c3, a national non-
3    profit land conservation organization.
4 Q   And what do you do for them?
5 A   I'm the Massachusetts state director.
6 Q   In 2002, what was your job at TPL?
7 A   I was the Massachusetts state director.
8 Q   Does each state have a director?
9 A   Most states where TPL works have a director.
10 Q   Is there a regional headquarters for TPL for the
11    northeast region?
12 A   Yes.
13 Q   Where is that?
14 A   Boston.
15 Q   And is that the same place as your office?
16 A   Yeah.
17 Q   And is there someone in charge of the region that you
18    report to?
19 A   Yes.
20 Q   And who is that?
21 A   Whitney Hatch.
22 Q   Is Whitney Hatch a man?
23 A   He is.
24 Q   Whitney, okay. And what is his title?
          - 7 -

1 A   Regional director.
2 Q   And do you still report to Whitney Hatch?
3 A   I do.
4 Q   In 2003, were you also the Massachusetts director?
5 A   In 2003, I was the Massachusetts state director.
6 Q   In your role as Massachusetts state director, could
7    you define what your authorities were as far as
8    acquisitions of property?
9 A   What do you mean by define my authority?
10 Q   Well, were you in a position to bind TPL into
11    contracts, for example?
12      MR. CONROY: Objection.
13 A   Some contracts.
14 Q   When I say in a position, did you have the authority
15    to?
16 A   Well, in my position, there were some contracts that I
17    could bind TPL with respect to.
18 Q   And what kind of contracts were those?
19 A   Very small.
20 Q   Was there a dollar amount limitation?
21 A   There was.
22 Q   What was that?
23 A   I don't know.
24 Q   Was it less than a million dollars?
          - 8 -

1 A   Well less than a million.
2 Q   Less than a half a million dollars?
3 A   Yes.
4 Q   Less then two hundred and fifty thousand?
5 A   Yes.
6 Q   Do you have a general idea what the limitation was?
7 A   I believe -- well, it was very small, but I don't know
8    a number.
9 Q   Do you have a general estimation of what -- well, let
10    me strike that.
11 A   I've already said I don't remember.
12 Q   If a contract was put in front of you, was there a
13    point where you would say to yourself, gee, I can't
14    sign this; this is too big?
15 A   Are we talking about now or then?
16 Q   Then.
17 A   Yes.
18 Q   And what would that number be that would cause you to
19    think you didn't have the authority?
20 A   Well, I don't recall as to what it was then, so I
21    can't testify to that.
22 Q   Are you on any medication that would affect your
23    memory?
24 A   No.
          - 9 -

1 Q   Can you tell me what your background is, your
2    educational background, please?
3 A   I'm trained as a lawyer.
4 Q   And what kind of lawyer were you trained to be?
5 A   A litigator.
6 Q   Did you practice as an attorney?
7 A   I did.
8 Q   And where did you practice?
9 A   Two law firms.
10 Q   What are the names of the two firms?
11 A   Nutter, McClennen & Fish and Keegan, Werlin & Pabian.
12 Q   Where is Keegan, Werlin, Pabian?
13 A   Boston.
14 Q   And can you tell me when you worked for these two
15    firms, sequentially?
16 A   I worked for Nutter, McClennen & Fish from 1983
17    through '87 or '88. I worked for Keegan, Werlin from
18    the early '90s through the late '90s.
19 Q   Why did you leave Nutter?
20 A   To change my career.
21 Q   And you were a litigator at Nutter?
22 A   Yes.
23 Q   Were you a partner?
24 A   No.
         - 10 -

1 Q   Were you an associate?
2 A   Yes.
3 Q   And at Keegan, were you a partner?
4 A   Yes.
5 Q   Did you go in as a partner?
6 A   No.
7 Q   Did you go in as an associate?
8 A   I did.
9 Q   How long were you an associate there?
10 A   About three years.
11 Q   So, in the span of between approximately '90 and the
12    late '90s, you were three years an associate and up to
13    perhaps as many as six or seven as a partner?
14 A   Approximately.
15 Q   And what did you do between '88 and '90?
16 A   I worked for the Department of Fisheries, Wildlife &
17    Environmental Law Enforcement.
18 Q   And what was your position there?
19 A   I was a lawyer.
20 Q   In their legal department?
21 A   Yes.
22 Q   Is there a separate legal department for that, for the
23    Department of Fisheries?
24 A   Well, no, not really. I mean, there were lawyers, but
         - 11 -

DEPOSITION OF CRAIG MACDONNELL                    MINIDEP by Kenson

1  I don't recall it being organized as a department.
2  Q  And that's a federal department, or is that a state
3      department?
4  A  State.
5  Q  So, it's Commonwealth of Massachusetts?
6  A  Correct.
7  Q  And who was your supervisor at the Department of
8      Fisheries?
9  A  The commissioner.
10 Q  And who was that?
11 A  Walter Bickford at the beginning and, later, John
12     Phillips.
13 Q  Where did you go to law school?
14 A  Cornell.
15 Q  And undergrad?
16 A  Nasson.
17 Q  Could you spell that?
18 A  N-A-S-S-O-N.
19 Q  And where is that?
20 A  Springvale, Maine.
21 Q  When did you graduate from law school?
22 A  '83.
23 Q  In your practice as a litigator, did you practice in
24     state courts?

                        - 12 -

1  A  Yes.
2  Q  Federal courts?
3  A  Yes.
4  Q  And what kind of litigation did you practice?
5  A  Mostly environmental.
6  Q  Did you ever do corporate?
7         MS. FETOUH: Objection.
8  Q  Did you ever practice corporate law?
9  A  I worked on corporate issues. I don't know if you
10     could call that practicing corporate law.
11 Q  Did you ever practice tax law?
12 A  I worked on tax issues, but I don't know if you could
13     say I practiced tax law.
14 Q  Other than your degree from Cornell, do you have any
15     advanced law degrees?
16 A  No.
17 Q  Have you taken any advanced professional education
18     beyond, for example, MCLE courses or that sort of
19     thing?
20 A  I have.
21 Q  And what were those in?
22 A  I took so many that I can't remember.
23 Q  When you left Keegan, what was the reason you left
24     Keegan?

                        - 13 -

1  A  To join the Trust for Public Land.
2  Q  Were you asked to leave, or did you leave because you
3      wanted --
4  A  I chose to leave.
5  Q  You mentioned that TPL is a -- is it a non-profit or
6      charitable institution, or how do you describe it?
7  A  It's a 501c3.
8  Q  And is that a charitable institution?
9  A  Correct.
10 Q  Is it also a non-profit?
11 A  Correct.
12 Q  Is that the same designation?
13 A  (No response.)
14 Q  Are you aware whether or not TPL has a designation of
15     being a non-profit with the Secretary of State?
16 A  I do not know.
17 Q  Have you ever checked to see whether TPL is listed as
18     a for-profit corporation?
19 A  I have not.
20 Q  In your role as director of the Massachusetts area,
21     did you in 2003 undertake any legal work for TPL?
22        MR. CONROY: Objection.
23 A  I don't know how to answer that question. I mean, I
24     thought about legal issues. As a lawyer, I can't help

                        - 14 -

1      myself.
2  Q  I'm going to put a document in front of you, which I
3      have not marked yet, and ask you if you've ever seen a
4      document like that.
5  A  I have not.
6  Q  Can I ask you to look at the second page?
7  A  (Examining.)
8  Q  Do you see where it appears to indicate that TPL is a
9      for-profit corporation? Do you see that?
10 A  You're pointing to the X in the middle of the page?
11 Q  Yeah.
12 A  I see the X.
13 Q  And that would be beside the for-profit designation,
14     is that correct?
15 A  Correct.
16 Q  And you don't have any idea why that's listed with the
17     Commonwealth as a for-profit corporation. Is that
18     correct?
19 A  Correct.
20 Q  Do you share in bonuses issued by TPL in connection
21     with monies that are derived from TPL's operation?
22 A  There are no bonuses at TPL.
23 Q  You're on a salary at TPL?
24 A  Correct.

                        - 15 -

1  Q  What is your salary?
2  A  Somewhere in the eighty thousand to ninety thousand
3      dollar range, maybe between ninety and a hundred. I'm
4      not quite sure where it is right now.
5         (Plaintiff and Mr. Norris enter)
6  Q  You're here today because you received or your
7      attorney received a notice of deposition, is that
8      correct?
9  A  I believe that's correct.
10        MR. McLAUGHLIN: Can I have that marked
11     as Exhibit 1, please?
12        (WHEREUPON, Exhibit No. 1, TPL
13     corporate registration form, marked for
14     identification.)
15 Q  Have you seen this notice of deposition before?
16        MR. CONROY: Can I just clarify for the
17     record? Exhibit 1 is the document that you've
18     just been asking questions about, correct?
19        MR. McLAUGHLIN: Yes.
20        MR. CONROY: Okay.
21 A  I believe I've seen this before.
22        MR. McLAUGHLIN: Okay. We'll just have
23     that marked.
24 Q  And that's why you're here today, correct?

                        - 16 -

1  A  Essentially.
2         MR. McLAUGHLIN: We'll have that marked
3      as Exhibit 2.
4         (WHEREUPON, Exhibit No. 2, notice of
5      deposition, marked for identification.)
6  Q  Do you hold any other positions with TPL--related
7      entities?
8         MS. FETOUH: Objection.
9  A  I don't know what you mean by TPL--related entities.
10 Q  Well, have you ever heard of TPL Land Action Fund?
11 A  I have.
12 Q  Well, you hesitated in answering that, and I'm
13     wondering. Is that because you're generally
14     unfamiliar with the TPL Land Action Fund?
15        MR. CONROY: Objection.
16 A  The reason I hesitated is that I was trying to
17     remember the name.
18 Q  What is the TPL Land Action Fund?
19 A  I don't know.
20 Q  I'm going to put before you a document and have you
21     take a look at it from the Secretary of State. Does
22     that refresh your memory as to what the TPL Land
23     Action Fund is?
24 A  No.

                        - 17 -

# EXHIBIT B

```
 1                 UNITED STATES DISTRICT COURT

 2                  DISTRICT OF MASSACHUSETTS

 3                              No. 1:05-cv-11697-GAO

 4

 5
      MARILYN KUNELIUS,
 6               Plaintiff

 7
      vs.
 8

 9
      TOWN OF STOW, et al.,
10               Defendants

11

12                        * * * * * * * * *

13

14                      For Hearing Before:
                    Judge George A. O'Toole, Jr.
15

16                        Motion Session

17
                      United States District Court
18                    District of Massachusetts (Boston)
                      One Courthouse Way
19                    Boston, Massachusetts 02210
                      December 15, 2005
20

21                        * * * * * * *

22
              REPORTER: RICHARD H. ROMANOW, RPR
23                  Official Court Reporter
                  United States District Court
24        One Courthouse Way, Room 5200, Boston, MA 02210
                      (617) 737-0370
25
```



```
 1                    A P P E A R A N C E S

 2

 3    MICHAEL C. McLAUGHLIN, ESQ.
         Law Offices of Michael C. McLaughlin
 4       One Beacon Street
         33rd Floor
 5       Boston, Massachusetts 02108
         (617) 227-2275
 6       Email: MichaelCMclaughlin@speakeasy.net
         For Plaintiff
 7

 8    JUDY LEVENSON, ESQ.
         Brody, Hardoon, Perkins & Kesten
 9       699 Exeter Street
         Boston, Massachusetts 02116
10       (617) 880-7100
         For Defendant The Town of Stow
11

12    DAHLIA S. FETOUH, ESQ.
         Goodwin Procter, LLP
13       Exchange Place
         53 State Street
14       Boston, Massachusetts 02109
         (617) 570-1263
15       Email: Dfetouh@goodwinprocter.com
         For Defendant The Trust For Public Land
16

17    JAMES B. CONROY, ESQ.
         Donnelly, Conroy & Gelhaar, LLP
18       One Beacon Street
         33rd Floor
19       Boston, Massachusetts 02108
         (617) 720-2880
20       Email: Jbc@dcglaw.com
         For Defendant Craig A. MacDonnell
21

22

23

24

25
```

```
 1              P R O C E E D I N G S
 2              (Begins 2:30 p.m.)
 3              THE CLERK:  Next up for a motion hearing, case of
 4   Kunelius versus the Town of Stow, which is Docket Number
 5   05-11697.  Counsel please identify yourselves for the record.
 6              MR. McLAUGHLIN:  Good afternoon, Michael McLaughlin
 7   for Mrs. Kunelius.
 8              MS. FETOUH:  Good afternoon, your Honor.  Dahlia
 9   Fetouh on behalf of The Trust For Public Land.
10              MR. CONROY:  James Conroy, your Honor, for Craig
11   MacDonnell.
12              MS. LEVENSON:  Judy Levenson for the Town of Stow.
13              THE COURT:  We have the motion of the defendants to
14   dismiss the complaint.  Who's going to be arguing now?  Will it
15   be multiple argument or --
16              MR. CONROY:  We've provided Ms. Fetouh.
17              THE COURT:  All right.  Ms. Fetouh.
18              MS. FETOUH:  Thank you, your Honor.  Your Honor,
19   the plaintiff is challenging the circumstances surrounding the
20   failed sale of her property to The Trust for Public land
21   through an assignment of an exercise of right of first refusal
22   under Chapter 61.  Primarily she contends that the liquidated
23   damages clause in the contract that she negotiated and signed
24   is not enforceable and that Chapter 61 created an extra
25   contractual duty on the part of TPL to pay the full purchase
```

1    price.   Because, as a matter of law, we believe there's no

2    merit to that challenge, TPL, jointly with Mr. MacDonnell and

3    the Town of Stow, move to dismiss the complaint in its entirety

4    under Rule 12(b)(6) and I'll be addressing those parts of the

5    complaint that concern Chapter 61 under the contract along with

6    the claim of violation of 93(a) and constructive taking.

7    Mr. Conway, counsel for Mr. MacDonnell, will address the

8    remaining claims.

9         Your Honor, before I get to the legal issues, I just

10   want to raise one issue that plaintiff's counsel raised at our

11   last appearance and at that point suggested that the issues

12   surrounding Chapter 61 are issues of first impression that

13   might be appropriate for certification to the SJC.  As we

14   indicated at that last appearance, we disagreed with that

15   contention.  We believe there's ample precedent before your

16   Honor in which to decide our motion to dismiss.  It's well

17   grounded in decisions of the SJC and the Mass. Appeals Court as

18   well as the text of the statute itself, making the

19   certification unnecessary and indeed inappropriate.  As this

20   Court has held, certification is inappropriate where the course

21   the state courts would take is reasonably clear.

22        Your Honor, there's nothing novel or unsettled about the

23   circumstances raised in this complaint.  The main question is

24   what the consequence should be for TPL's failure to meet the

25   purchase price under the purchase and sale agreement?  And this

1   is an issue that courts routinely face.  The question of

2   whether the plaintiff is limited to her contractually specified

3   damages or whether the exercise under Chapter 61 alters the

4   effect of that contract term are also issues that the state

5   court have addressed.  The only thing novel about this case is

6   the desired outcome that the plaintiff is asking for.

7        Your Honor, the factual background is detailed at length

8   in our brief and so I won't address that now unless you have

9   any questions about it, and it's relevant directly to the legal

10  arguments, specifically what the plaintiff's not disputing.

11  She doesn't dispute that the purchase and sale agreement that

12  she negotiated with Cohousing Resources included a liquidated

13  damages clause and she doesn't dispute that the Town had a

14  right of first refusal and had the right to assign that right

15  of first refusal to TPL.  And she doesn't dispute that TPL had

16  a right to accept that assignment.

17       What she does contend is that once TPL exercised its

18  right of first refusal, it became obligated by Chapter 61 to

19  pay the purchase price no matter what happened.  And I believe

20  when I was reading the plaintiff's opposition brief, I counted

21  at least 15 different times in which he made that contention.

22  And what's notable is that not one of those 15 sentences is

23  supported by citation to the statute or to case law and they

24  are not because they cannot be.  Indeed, they are in direct

25  contravention with the case law.

1    Your Honor, the defendants' arguments are based on three

2    simple and well-established principles in the case law, all of

3    which are uncontroverted and lead to only one viable conclusion

4    in this case and that is that of dismissal.

5    First, rights of first refusal under Chapter 61 must be

6    treated in the same manner as rights of first refusal generally

7    and those who exercise rights of first refusal generally step

8    into the shoes of the buyer in the purchase and sale agreement

9    and become subject to and bound by substantially all of the

10   terms and conditions of that agreement, not just the purchase

11   price term, as the plaintiff would like us to believe.  And

12   third and finally, liquidated damages clauses are a common real

13   estate practice that should be enforced where the damages are a

14   reasonable estimate at the time of contracting.

15   Turning to the first of those principles, your Honor,

16   the view of the SJC is clear that rights of first refusal under

17   Chapter 61 should be treated in the same manner as rights of

18   first refusal in real estate generally and that was the holding

19   of the SJC in the **Town of Franklin** case where it held that the

20   common meaning of a right of first refusal is well-established

21   in the Commonwealth and that meaning isn't altered in this

22   statutory context.  And that wasn't a new holding, your Honor.

23   In the **Sudbury v. Scott** case, the Greenfield Country Estates

24   case, the SJC came to the same conclusion.

25   So with that mandate we turn to how rights of first

1    refusal are treated generally in the Commonwealth.  And the SJC

2    has held repeatedly that a right of first refusal places the

3    party exercising the right into the position of the party it's

4    replacing.  As a result, the party exercising the right becomes

5    subject to the same terms as contained in that purchase

6    agreement.

7         The SJC in **Roy versus George W. Green**, which is one of

8    the leading cases in this area, held that the entity

9    considering whether to exercise the right of first refusal can

10    only do so when it is informed of all of the details of that

11    offer in order to assess whether or not it wants to take on the

12    obligations of that offer, and not just the purchase price, but

13    all of the obligations of that offer.  Ms. Kunelius' narrow

14    reading of the term, the word "terms" to mean just the purchase

15    price and nothing else isn't supported in the statute and it is

16    not supported in the cases that it considered in Chapter 61.

17         If you look at the terms of the statute itself, your

18    Honor, it says that the city or town shall have a first refusal

19    right to meet a bona fide offer to purchase the land, it

20    doesn't say merely a bona fide purchase price.  And to read the

21    word "offer" as limited to just the purchase price, your Honor,

22    unnecessarily limits the plain meaning of that term.  In

23    contract law, the term "offer" is commonly defined to include

24    all of the terms of an agreement.

25         And if you look at the cases that it considered right to

1    first refusal under Chapter 61, they reach the same conclusion,
2    your Honor.  Decisions out of the land court in Massachusetts
3    culled that the landowner must give the Town a full description
4    of all of the terms of the bona fide offer because the Town, or
5    the nonprofit assignee, becomes subject to and bound by all of
6    the terms of that agreement.  And the Court noted that without
7    that information, the Town, or the nonprofit, would have
8    incomplete knowledge or no knowledge of the offer it has to
9    meet, and that's the same decision that the SJC reached in the
10   *Town of Franklin* case where it held that a Town exercising the
11   right of first refusal under Chapter 61(a) requires the Town to
12   purchase the land at substantially the same terms and
13   conditions as presented in the agreement.  And I would note
14   that the cases cited by the plaintiff don't contradict this
15   reading.  Those cases all stand for the same principle, that a
16   seller must disclose to the holder of the option all of the
17   terms of the offer in order to understand the terms that it
18   will be binding itself to.

19        Now, the plaintiff would like towns and nonprofits to be
20   bound unconditionally at the end of the 120-day option period
21   to pay the purchase price, but the land court, at least, has
22   already considered this and rejected this.  In the *Meachen vs.*
23   *Hayden case*, the land court found that a town considering
24   whether to exercise the right of first refusal under Chapter 61
25   need only vote to exercise the right of first refusal within

1    the 120-day option period, it need not vote to appropriate the
2    funds for that period in that 120-day option period. And so
3    what results is that after that period, often a town meeting
4    will be held, at which point the town meeting will vote on
5    whether or not to appropriate funds for the Chapter 61
6    purchase. And what's implicit in this holding is the chance
7    that a town might default on a Chapter 61 exercise and be
8    barred from paying a purchase price because the town meeting
9    votes down the purchase subsequent to the exercise by the Board
10   of Selectmen, generally. The plaintiff's suggestion that a
11   town or a nonprofit is bound to pay the purchase price by the
12   end of that 120-day option period, it is unsupported by that
13   decision and by extension applies to the nonprofit accepting
14   the assignment from the Town.

15        Your Honor, these decisions all conform with the history
16   and the purpose of Chapter 61 and its analogs. In the **Town of**
17   **Franklin** case, the SJC held that these statutes must be
18   interpreted in a manner that will not frustrate or impair the
19   Town's right of first refusal. These statutes were passed as a
20   means to encourage the preservation of open space in the
21   Commonwealth in the face of rapidly increasing development.
22   And the right of first refusal is a critical tool in order to
23   preserve this land and the ability to assign that right to a
24   nonprofit, likewise, is an important tool in that process.
25        And what results in practice is towns have 120 days in

1  which to decide whether or not to exercise their option and
2  much of that 120 days is consumed by the Town's deliberations
3  with a nonprofit frequently brought in at the last minute or
4  towards the end of that 120-day period, leaving the nonprofit
5  with much less time in which to assess the preservation value
6  of the project, to determine the risks and benefits, to assess
7  fundraising possibilities, so it's such a limited time frame.
8  What becomes critical to nonprofits is the ability to evaluate
9  the contract terms into which they are entering.

10     A conclusion that the terms of that contract is that
11  bona fide offer don't apply to towns or to nonprofits that
12  exercise their rights under Chapter 61 could bring the
13  preservation of land in the Commonwealth to a standstill under
14  Chapter 61 and its analogs. If towns and nonprofits are unable
15  to rely on the terms and conditions of those agreements, they
16  would be unable to determine the financial risks and
17  liabilities that they may be exposing themselves to. And
18  without that certainty, towns and nonprofits would cease
19  accepting rights of first refusal and land that otherwise might
20  have been served will fall into the hands of developers in
21  contravention of the purpose of the statute.

22     What all of this means for this case, your Honor, is
23  that the liquidated damages clause in the purchase and sale
24  agreement does apply to TPL. Paragraph 21 of that agreement
25  included a liquidated damages provision that held that all

1    deposits paid would be the plaintiff's sole remedy in equity
2    and in law in the event that the buyer failed to fulfill its
3    agreement under the purchase and sale agreement.  And the SJC
4    has held that liquidated damages clauses are a common real
5    estate practice, that they should be enforced where actual
6    damages are difficult to ascertain in advance, and the $19,000
7    paid by TPL to Ms. Kunelius are a reasonable estimate of the
8    plaintiff's damages.

9        The plaintiff's contention now that it is punitive
10   somehow to limit her to the $19,000 in liquidated damages where
11   the purchase price was 1.1 million ignore the fact that the
12   plaintiff still owns the property, she still has the use of
13   that property in addition to the monies paid by TPL.  And the
14   plaintiff's additional contention that she couldn't have
15   foreseen the events that unfolded here is also unpersuasive.

16       Her agreement with Cohousing Resources, the original
17   buyer, was itself conditioned on many factors including zoning,
18   environmental testing, the acquisition of necessary permits,
19   and it, too, could have failed just as easily as the purchase
20   by TPL.  Indeed, all conditional real estate sales include some
21   risk of nonperformance and that's precisely why people entering
22   into these types of contracts put liquidated damages clauses in
23   their contracts.  And in the **Kelly v. Marx** case, the SJC held
24   that purchase and sale agreements are indeed precisely the type
25   of agreement that is amenable to a liquidated damages clause

1    because of the inability to determine what sort of delays might

2    occur, what might -- what effect a delay might have on the

3    seller's plan.

4        I will also note, your Honor, that, in that case, the

5    SJC rejected the second-look doctrine so that the

6    reasonableness of the liquidated damages can only be determined

7    at the time of contracting and not with the benefit of

8    hindsight and with any relation to actual damages.

9        THE COURT:  Well, that's as between the original

10   contracting parties, right?

11       MS. FETOUH:  Well, that's true, your Honor,

12   although plaintiff was aware when she contracted with the

13   original buyer that she would have to subject her land to this

14   offer to a right of first refusal.  She was aware of those

15   possibly contingencies.

16       THE COURT:  But might not the assessment of

17   reasonableness vary or differ between the original contracting

18   parties and a subsequent assignee?  Might the circumstance not

19   be different that would cause you to have a different

20   evaluation of reasonableness?

21       MS. FETOUH:  Your Honor, I don't believe they

22   would.  The cases have held that the person exercising the

23   right of first refusal steps into the position of the buyer,

24   becomes subject to that agreement.  And when the plaintiff is

25   aware of the contingencies within her original agreement and is

 1    aware of the fact that that agreement is subject to a right of

 2    first refusal and the possibility that a town or a nonprofit

 3    may step into that agreement, I believe she has all the

 4    information she needs at the time of contracting.

 5             THE COURT:  So that even if you were to -- I don't

 6    know whether this is likely to arise in the real world.  But if

 7    you were to have -- if you were to evaluate the reasonableness

 8    of the liquidated damages provision, by substituting the

 9    assignee for the assignor in their relevant circumstances, at

10    the time of the original contracting, that if there were a

11    difference then that appeared, you would say it's still only

12    the assignor's circumstances that were relevant?  I don't know

13    if I've asked the question well.  In other words, even if you

14    assumed the contract at its formation was between the plaintiff

15    and the assignee, would the plaintiff's circumstances and the

16    assignee's circumstances and so on, and ask the question is

17    this a reasonable forecast for these parties as to what the

18    damages might be?  If there were a difference, would you say

19    still ignore the assignee and look at the assignor?

20             MS. FETOUH:  And you're saying if the assignee was

21    in the original -- at the time of contract in the original --

22             THE COURT:  Right.  In other words, I'm trying to

23    give full effect to your argument of substitution to all the

24    terms of the contract and so on.  I'm just asking whether

25    there's something about the -- if there were people in

1  different circumstances -- let me ask it this way.  Why

2  wouldn't it be reasonable to take account of the circumstances

3  that would be expected to be played out rather than those that

4  might have been played out had the assignor held the contract?

5  MS. FETOUH:  Your Honor, because the circumstances,

6  in both situations, include a number of contingencies.  The

7  original agreement would have included a number of

8  contingencies and having a new party step into the shoes, there

9  still are a number of contingencies.  And that really doesn't

10  change anything.  And the idea is that --

11  THE COURT:  I guess maybe -- my question is that

12  those contingencies may differ.  In other words, entering into

13  a deal like this with an experienced real estate developer

14  might lead you to have some expectations about likelihood of

15  full performance, about the difficulty of finding a substitute

16  buyer if this one goes away and so on, a time frame on those

17  things, whereas entering into the same deal with a nonprofit

18  conservation trust, a town, and so on, might have different

19  things to say about the time frame, about the expertise in the

20  development field or whatever, that might lead you to estimate

21  the damage on breach differently.

22  MS. FETOUH:  And at the time of contracting the

23  plaintiff, all these -- the fact that a nonprofit might step

24  into the shoes of Cohousing, the original buyer, or that the

25  Town might step into those shoes was all foreseeable to the

1  plaintiff when she was deciding what the liquidated damages

2  clause should say. And as a result, she had that information

3  at that time in order to decide how much the liquidated damages

4  should be, how long the period until closing should be, and she

5  was able to take all of those things into account in deciding

6  how that clause should be structured, how high the deposits

7  should be, for example, in the event of a failure to perform.

8                 THE COURT:  Okay.

9                 MS. FETOUH:  Okay.  Your Honor, I think at the

10 bottom here, Ms. Kunelius is just disappointed that the sale of

11 her property fell through. She knew, as we were just

12 discussing, at the time she negotiated the agreement, that the

13 exercise of the right of first refusal is a possibility, and

14 she also knew that any failure by the buyer to perform would be

15 remedied solely through the liquidated damages clause. It's

16 that her subsequent disappointment at the exercise of the right

17 of first refusal and TPL's failure to perform don't form the

18 basis of a Federal lawsuit here. First, she contracted for the

19 risk of nonperformance and she's already received the only

20 remedy that we believe she was due and that is the remedy that

21 she contracted for.

22                 Your Honor, despite the fact that we believe the true

23 nature of this dispute is one in contract, the plaintiff has

24 made a number of other allegations, which I'll address two of

25 them, starting with the 93(a) claim, your Honor. We believe

1    that claim failed under both Rule 12(b)(6) and Rule 9(b).

2    First, the claim fails procedurally.  She hasn't met the

3    pleading requirements of 93(a).  She hasn't even specified

4    under which section of 93(a) she's proceeding, Section 9 for

5    consumers or Section 11 for those engaged in trade or

6    commerce.  Even to try to figure out which ones she was

7    proceeding under, she hasn't met the pleading requirements of

8    each of those sections.  With Section 9 she has failed to

9    allege the submission of the required demand letter and with

10   Section 11 she's failed to allege that she was engaged in trade

11   or commerce.  And even decide -- beyond these procedural

12   failures, your Honor, she has failed to allege facts sufficient

13   to find that TPL engaged in unfair or deceptive acts.

14        Instead, she's simply alleged that TPL failed to close

15   on the property.  That once the contract was defunct, TPL

16   approached the plaintiff with alternative proposals that it

17   thought it could meet and that ultimately none of those

18   proposals were agreed upon.  This conduct does not rise to the

19   level of a 93(a) claim.  A breach of contract itself does not

20   give rise to a 93(a) claim nor can an exercise of a statutory

21   right.  And we would ask that the 93(a) claim in Counts 2 and 3

22   be dismissed.

23        With respect to the constructive taking claim, your

24   Honor, in Count 7 of her complaint, the plaintiff contends that

25   the defendants have deprived her of due process of law through

1   a constructive taking of her property in violation of Section
2   1983 and the Fourteenth Amendment.  Your Honor, that claim
3   fails for two separate reasons.  First, the plaintiff hasn't
4   alleged facts sufficient to conclude that the actions of TPL or
5   Mr. MacDonnell were taken under color of state law, which is a
6   prerequisite for a 1983 claim.  The plaintiff was required to
7   allege facts to show that TPL and Mr. MacDonnell, as private
8   actors, were willful participants in joint activity with the
9   state or its agents, and there are several different tests for
10  determining whether or not a private actor meets that standard
11  and the plaintiff hasn't alleged facts sufficient to meet any
12  of those tests.

13       Finally, she hasn't alleged any well-pleaded fact to
14  demonstrate the defendants have taken all or most of the value
15  of her property, a requirement for a taking claim.  Indeed, she
16  still has the land that they mentioned, and she's free to use
17  or sell her property as she sees fit in a manner that will
18  bring economic return to her.  And even if she's unable to sell
19  her property for the same purchase price as detailed in Exhibit
20  1 to the complaint, the constructive taking claim requires a
21  showing that she was deprived of all or most of the value of
22  her property such that her property was left economically
23  idle.  I don't believe there's been any allegations to meet
24  that standard either and we would ask that that claim be
25  dismissed as well, your Honor.

```
 1        I will just note, and I know I've cited a number of land
 2   court cases in the brief and in my argument today, and I
 3   recognize that those aren't binding on this court and we do
 4   rely on the SJC and appeals court decisions, but we do believe
 5   that those land court decisions are helpful analyses.  And I do
 6   have copies of those for the Court because I know they are a
 7   little bit harder to access, if you are interested in them,
 8   your Honor, as well as copies to counsel.
 9             THE COURT:  All right.
10             MR. McLAUGHLIN:  Would you like me to respond and
11   then --
12             THE COURT:  No, I'll hear from all the defendants
13   and then we'll --
14             MR. McLAUGHLIN:  Okay.
15             THE COURT:  Okay.  Mr. Conroy.
16             MR. CONROY:  Thank you, your Honor.
17        Your Honor, I'm going to address primarily the counts
18   that are addressed against my client, Mr. MacDonnell, which are
19   also addressed to the other defendants, but the tort claims are
20   addressed to Mr. MacDonnell and he is not the target of any of
21   the others.
22        We certainly endorse the presentation that Ms. Fetouh
23   made and I would point out to the Court as well that on the
24   issue of the foreseeability of the assignment, it was not only
25   foreseeable, but foreseen.  Exhibit 1 to the complaint is the P
```

1    & S and the last line of the P & S specifically contemplates

2    the event that there may be an assignment under Chapter 61.

3    And, you know, Mrs. Kunelius has sophisticated counsel and this

4    clearly was explicitly foreseen in this deal.

5    With regard then to these other claims, your Honor, the

6    three really simple reasons why Mr. MacDonnell ought not to be

7    here, the first is that this is a contract case, your Honor,

8    and Mr. MacDonnell is not a party to that contract, no more so

9    than any other executive or manager is liable for the contracts

10   of his principal.  He simply shouldn't be here.

11   The second is that the tort counts don't plead -- that

12   the material elements that are -- the necessary elements that

13   are required to be pleaded simply aren't here.  And with regard

14   to the taking count, I'll again defer to Ms. Fetouh,

15   Mr. MacDonnell being named in that one as well.

16   With that having been said, Judge, the tort claims do go

17   against all of the defendants and the first point I would make

18   would be that the baselessness of those claims is, I think,

19   best recognized by the fact that the plaintiff's brief doesn't

20   mention them.  In a 20-page brief, we don't have a single

21   reference to any of those claims.  I would submit that they

22   basically have been conceded or waived, and the reason for that

23   is that they really have no basis and they have no place in

24   this lawsuit.

25   Even assuming that there's a broken contract with regard

1   to the intentional infliction of emotional distress claim, the
2   law is quite clear that there is no intentional infliction of
3   emotional distress associated with a breach of contract.  The
4   *Redgrave* case, which is cited in the brief, says that it would
5   probably be unprecedented to make such a finding.  And if this
6   case, your Honor, is an intentional infliction of emotional
7   distress, then so is almost every contract.  It simply doesn't
8   belong here.

9        The second point, Judge, is that to exercise a legal
10  right, as was done in this case, even granting for the sake of
11  argument that there may be some room for argument about what
12  the statute provides or doesn't provide or how it should be
13  interpreted, it's clear that the exercise of a statutory right
14  can hardly be an intentional infliction of emotional distress.
15  There's certainly nothing extreme, outrageous, beyond the
16  bounds of a civilized society, in the facts that are before the
17  Court in this case.

18       Just very briefly, the only facts that are alleged in
19  the complaint to that end are that there was a meeting between
20  Mr. MacDonnell and counsel for Mrs. Kunelius in which there was
21  some, I guess, heated discussion and Mr. MacDonnell allegedly
22  said, "We have very substantial lawyers who will defend this
23  case aggressively and you'll lose.  That the Court will never
24  go your way if you have to litigate this."  There's certainly
25  nothing extreme or outrageous in any of that, your Honor, and

1    nothing that supports that claim.

2         And lastly, I would say, with regard to that claim,

3    Judge, that the exhibits to the complaint, which are quite

4    extensive, actually refute the notion that there's anything

5    here to support such a claim.  What they show is an effort to

6    preserve this deal.  There are letters from Mr. MacDonnell in

7    the complaint's exhibits to counsel for plaintiff, all of which

8    are professional in tone, accommodating, seeking to make a

9    resolution, make it work for everyone.  The idea that this is

10   somehow tortious is simply frivolous.

11        With regard to the interference with a contract claim,

12   your Honor, I, too, would like to hand up some cases when I'm

13   finished here.  We didn't want to burden the brief too much

14   with this.  But there are three principal SJC cases on this

15   tort which I will hand up, the **Gelman**, **King** and the **Pembroke**

16   **Country Club** cases, all of which make it very clear that this

17   is a disfavored tort.  That the mere existence of an

18   interference is not enough to support it, there has to be

19   evidence of improper means or improper motive.

20        Again, a statutory right to, quote, "interfere," closed

21   quote, with this sale can hardly be considered an improper

22   motive or means.  The motive that the complaint describes to

23   TPL is one of financial benefit and secondly to preserve this

24   open space.  What the **King** case says explicitly is that

25   financial benefit is not an improper motive and the very

1   purpose of Chapter 61 is, in fact, to preserve the open space,
2   as the **Franklin** case and the other cases cited in the brief
3   say.  So there simply can be no improper means or improper
4   motive here.

5        Last thing, Judge, with regard to the fraud claim.
6   There has to be, obviously, an alleged falsity, of a
7   representation of a material fact, in order to plead a fraud
8   claim.  The only representation that's made, a reference to in
9   the complaint, is the assignment and the taking on of this
10  obligation by TPL, which says on its face that they are
11  stepping into the shoes of the buyer in compliance with the P &
12  S.  So that is exactly what they did, your Honor.  There's no
13  misrepresentation involved in that.  Again, we debate what the
14  law means and what the statute properly interpreted means, but
15  we certainly can't begin to make the claim that this woman was
16  deceived or mislead or defrauded by it.

17       The other point, your Honor, is that it's pleaded on
18  pure information and belief that TPL never had any intention to
19  buy this property.  It's simply not enough to make a bare
20  allegation to that end without any facts in the complaint to
21  support it, and indeed all the facts in the complaint refute it
22  when we look at the effort that was made to make this deal
23  work.

24       Indeed, Judge, it should be pointed out, if you look at
25  the Exhibit 12, I think it is, that at the end of this whole

1    scenario, Mr. MacDonnell wrote a letter to counsel for the
2    plaintiff that explained to him that if the deal were
3    restructured in ways that they were prepared to make it be
4    restructured, there were tax benefits that would be associated
5    with it and with a reduced price that she would be given, but
6    she would also get an offsetting tax benefit that would
7    effectively offset the reduced price and might very well leave
8    her better off than had the deal gone through as originally
9    written.  She chose to reject that and I suppose that's her
10   right.  But the notion that she was defrauded or intentionally
11   subjected to emotional distress or that there was any improper
12   motive or means in this matter is not pleaded, your Honor, and
13   can't be supported.

14        The last point I would make, your Honor, is that -- an
15   issue of detrimental reliance with respect to the fraud claim.
16   The complaint says we caused her to rely on the P & S.  If
17   anyone caused her to rely on the P & S, it was the original
18   buyer.  The original buyer negotiated the P & S with her, they
19   put it in writing, they formed a contract with counsel on both
20   sides, and we stepped into those shoes, your Honor, and simply
21   were told what the P & S provided for her, and paid her $19,000
22   as the agreement says we could do.  There is simply no
23   detrimental reliance in this intervention.

24        I would close with that, your Honor, unless you have
25   some questions.

```
1              THE COURT:  Thank you.  Anything from the Town?
2              MR. CONROY:  If I may hand up the cases?
3              THE COURT:  Yes.
4              MS. LEVENSON:  No, your Honor.  We endorse the
5     arguments of co-counsel for the defendants.  Thank you.
6              THE COURT:  Mr. McLaughlin.
7              MR. McLAUGHLIN:  Your Honor, in order to deal with
8     all that has been presented today, let me go back to Chapter 61
9     for a moment and the standards that we're here for today, which
10    are whether or not this has been pled sufficiently?
11             Chapter 61 can only work if the entity, the Town or TPL,
12    does not do what the purchase and sale agreement says, except
13    pay money.  In other words, I have heard them say now
14    repeatedly that they are bound by all of the terms, bound and
15    subject to all of the terms of the purchase and sale
16    agreement.  In fact, Chapter 61 expects the exact opposite to
17    occur.  Otherwise, if they were bound to the terms, they would
18    have had to build the 40(b), which is the low-income housing.
19    So when they say repeatedly, "This is what we were bound to
20    do," that just doesn't make sense.  And there is no case, I can
21    assure you, on which the SJC has said that that is, in fact,
22    what the statute intends.  The statute intends that nothing be
23    built, that it remained the way it is.  So this assertion is
24    bizarre, from my point of view, and I cannot understand why
25    they're making that argument.  Because if that was the case,
```

1    every single time a town exercised its right, whatever was

2    originally planned wouldn't have been built.  That's just not

3    what Chapter 61 is about.

4        Secondly, they continue to say that they stepped into

5    the position of the original party and they did not.  It's a

6    very related issue, but you asked a very important question and

7    that is, "What did the parties anticipate?"  The statute says

8    that because this property was taxed under Chapter 61, it had

9    to be offered.  That's true.  But let's look at what TPL and

10   the Town did.

11       I don't know if you heard the difference, as you were

12   listening, but counsel for TPL talked about, "Well, we have 120

13   days to exercise the right that Mrs. Kunelius is arguing that

14   it wasn't paid within 120 days, the purchase price."  We never

15   said that.  What the statute says is that the Town and/or

16   whoever it assigns it to, combined, have 120 days to consider

17   the issue.  If they want to, they can exercise the right.  They

18   did.  Exhibit 4 is the exercise of the right.  Period.  It

19   doesn't say "If we can raise money" or "If we decide that we

20   want to build what's there."  It doesn't say "Oh, and by the

21   way, we're going to actually submit a subdivision plan in which

22   we then develop this property ourselves completely different

23   from what the original purchaser was going to do."  But that

24   is, in fact, what happened.

25       So as soon as TPL takes over the property, one, they do

1   an appraisal and we've attached it and they say, "It's not
2   worth what we thought it was," and we've attached that as an
3   exhibit.  Two, they submit a completely different plan for the
4   subdivision of the property so that they can sell off certain
5   portions and make money so they don't have any real cost, they
6   can recover some of the costs.  That's what they did.  So
7   they're not really saying, "By the way, we want to be in the
8   position of the buyer and we are bound and controlled," if
9   that's the term, "bound and subject to all the terms," but
10  they're actually saying, "We're not subject to any of them."
11  That's why they put in a new plan.  That's why they said "We're
12  not paying the purchase price."  That's why they decided they
13  weren't going to borrow any money from Mrs. Kunelius, which was
14  part of the original deal with the original buyer.  Because the
15  Town was putting in 400,000, Mrs. Kunelius was going to take
16  back a note for 400,000, and the remaining portion is going to
17  be from TPL for 367 or thereabouts.

18       So they're not really asking you to let them do what
19  their contract said they were going to do or to say that that
20  was applicable to them because they've already repudiated every
21  aspect of that contract for the sole purpose of then coming
22  back and saying, "But we do want you to look at the liquidated
23  damage clause."

24       Now, on a motion to dismiss we look at the liquidated
25  damage clause that refers to the deposit.  The deposit says

1    "0."  Now, there are the earnest money payments which were
2    intended by the original buyer to provide Mrs. Kunelius with
3    income, because she was going to lose the property during that
4    period of time and she's going to have to stop running the farm
5    the way she was, so that was income payments to her.  There was
6    no deposit at all.  The question then becomes, for the Court,
7    now, and that's a finding of fact, so what were intended by the
8    parties on the issue of was liquidated damage -- what was the
9    liquidated damage clause actually intended to deal with?  And
10   the answer is that we're going to have to have discovery on
11   that.  But what is clear is that under Paragraph 7 it says,
12   "What is the deposit?"  It says 0.  All right?

13        So now we go back to what you had raised, and the
14   question is, in trying to look at the foreseeability of a
15   liquidated damage clause, if I could get the Court to agree,
16   for example, that it was never the intention of the Town or TPL
17   to build the 40(b), and that never would have happened under
18   Chapter 61 for sure, then the relevancy of all internal terms
19   to the contract go away as they should under Chapter 61 because
20   everything including, as you pointed out, the anticipation of
21   what the damages would be if the 40(b) took a long time or
22   wasn't proved are not even relevant.  It's total surplusage --
23   surplus, because it has nothing to do with what these people,
24   once they exercise the right, would actually do.  So the whole
25   liquidated damage clause issue is really a red herring.

1          Secondly, if you look at what they've suggested in their
2     papers, their papers say, "The reason we couldn't purchase it
3     was because we didn't have enough money. We couldn't raise
4     money." We have supplied the Court with correspondence from
5     them saying, "We're not borrowing any money." If you look at
6     the Exhibit 4 -- 3 and 4, you will see that the exercise of the
7     right was not contingent upon raising money. So now they're
8     asking you to enforce the terms of the contract, but -- by the
9     way, we're adding a new provision, your Honor, and that is when
10    we exercise the right of first refusal, we, independently,
11    meaning the Town and TPL, have decided, even though it doesn't
12    say it, it's contingent upon us raising money even though they
13    have 349 million dollars of assets and 49 million dollars of
14    income for 2004. That they couldn't come up with 367,000 is
15    very hard to believe and I suggest that it has been proffered
16    to the Court, in a failure of candor to the Court, because
17    clearly we believe they actually instructed people not to raise
18    money once they couldn't get the plan that they wanted approved
19    by the town.
20         How is Mrs. Kunelius supposed to know at the time that
21    she signs a purchase and sale agreement how to evaluate whether
22    -- who's going to come in, Number 1, as to the extent that
23    anybody is going to come in to take the assignment from the
24    Town, Number 1, and know what TPL is going to build, Number 2,
25    or whether TPL had the money? We have shown, from

 1    correspondence, that the Town assured her that TPL had the

 2    money.  They knew they had the money.  Exhibit 6 is the

 3    statement from the Board of Selectmen in which they said, "We

 4    investigated them.  They said they had the money."  They've got

 5    the money.  They've defaulted and she's been harmed.  The part

 6    that becomes probably most telling is the Exhibit 6 in which

 7    they literally say, "Mrs. Kunelius has been damaged.  They have

 8    defaulted.  We have defaulted.  We look like we're in

 9    partnership with them.  We have done this.  We've got to find a

10    way out of this."  All right?  That's from the Board of

11    Selectmen.

12        So from the point of view of Mrs. Kunelius, can she

13    anticipate any of this?  Right back to the issue of liquidated

14    damages, how can one possibly anticipate it?  If you were to

15    say, "The only real way, your Honor, I think you can look at it

16    is to -- on the liquidated damages, is to pretend there wasn't

17    a Chapter 61 deal and that we were in here just complaining

18    that they didn't perform and they were the original purchaser

19    and they assigned it to someone else."  That's really the only

20    way.  Because as long as it's under 61, it doesn't give extra

21    contractual rights, as my sister said, it limits it only to the

22    purchase price.

23        And that's what the SJC said in the **Franklin** case which

24    I think -- my sister's reading of the **Franklin** case and mine

25    are very, very different.  In **Franklin**, the Town did not want

1     to make a -- didn't want to exercise the right of first refusal
2     on a purchase and sale agreement because the price was linked
3     to how many units were going to be approved by the Town. And
4     so -- and I'm making up the numbers now, I apologize, but let's
5     say that it was 100 units that was being proposed by the
6     developer. The Town said, "We don't have to exercise that
7     right because it's not a bona fide purchaser, because you don't
8     have an amount." And it's there that the Court said, "You take
9     that contract as written." And that contract as written -- and
10    I'm -- again, the number is wrong, I anticipated 100 units.
11    That's what it's going to be. That's the price based upon a
12    certain amount per unit. That's what that case stands for. It
13    doesn't stand for the fact that the Town can turn around and
14    say, "Oh, but we don't have to buy it."

15         There is no case, despite what my sister said, in which
16    a town has defaulted with a TPL in these circumstances, ever.
17    And so this is a unique case. And as I listen to the
18    descriptions of what these cases hold, none of them apply.
19    We've found nothing that applies other than what the Supreme
20    Judicial Court has said in the **Town of Franklin**.

21         Now, let me just see what else she had said. Um, it was
22    stated that if Mrs. Kunelius wins, my sister said that the
23    towns and nonprofits would cease doing this. It's just exactly
24    the opposite. Towns and nonprofits were -- and this is not a
25    mandatory statute. The legislature says, "Here, take your

1   time, you've got 120 days to figure out how you're going to pay
2   for it.  If you want to assign it to someone, go ahead and do
3   it."  They were very much involved in analyzing this deal and,
4   in fact, the Town went and appropriated $400,000 to contribute
5   to TPL in their negotiations that had nothing to do with
6   Mrs. Kunelius.  So it is not like this was some big surprise
7   where they didn't know.  In fact, they knew everything.

8        There's a suggestion, if I listen to my sister, that
9   they didn't actually see the purchase and sale agreement.
10  That's absolutely -- if that was her intention, it's absolutely
11  not true.  We have alleged and can provide all of the certified
12  mail deliveries showing that everybody received all the notices
13  as they were supposed to, immediately.  So the Town had
14  everything.  The fact is that the only issue here is that TPL
15  decided very early on -- and I believe it's Exhibit 5, but I
16  might be wrong, it's certainly one of the exhibits, "We think
17  we did an appraisal.  It's not worth it.  We don't want to do
18  it."  Everything follows from that position.

19       The issue of 93(a) is -- they say that we failed to
20  allege.  We have alleged that we believe the Town and TPL were
21  in a partnership together.  Is this based upon information and
22  belief?  No.  It's based upon a document that we received from
23  the Town or indirectly from the Town that says, "You know
24  what?  Looks like we're in a partnership."  All right?  So we
25  are alleging that they're in a partnership.  And what were they

1    doing?  Well, they were both working for the purposes of

2    getting a subdivision approval from the Town.  And that clearly

3    suggests that they're in a trade or business.

4         TPL is in the business of buying and selling.  And at

5    the time of trial and during discovery, we are aware of every

6    sale of TPL and what they do, as they buy property, and they

7    resell it to people to make money so that they don't have to

8    pay for it with their own funds.  And they take in donations

9    from people and they make lots of money.  That's why they have

10   367 million dollars worth of assets right now.

11        Now, we've alleged that she -- we have not alleged she's

12   a consumer.  We believe that she signed a business agreement

13   for that sale and that's sufficient under 93(a).  That is a

14   commercial contract and she is selling that property.  It's a

15   commercial contract.  So I think that that is a stretch.

16        On the issue of color of title, if Mr. MacDonnell and

17   TPL are not working under color of title in this case where

18   they accept the rights of the Town, where the Town works with

19   them, where the Town sends letters after the assignment of the

20   right of first refusal urging Mrs. Kunelius to accept TPL's

21   position, which we have attached, those are certainly under

22   color of title.  They're working hand and glove.  And I think

23   that it's a very large stretch to suggest that MacDonnell was

24   not working in that.

25        As to claims against MacDonnell, I want to read to you

1    specifically, your Honor, what is said in the complaint as
2    opposed to what my brother said we said in the complaint.
3    Because what we said about Mr. MacDonnell and his threats were
4    the following.  "That TPL had serious influential connections,
5    by way of its Board of Advisers, who would defend TPL against
6    any legal action.  That TPL's Board of Advisors include
7    prominent law firms that would tie up Kunelius and any attempt
8    made by her to enforce the purchase and sale agreement.  That
9    TPL would notify the Court of its influential connections,
10   beyond reproach, and the Court would never find in favor of
11   Kunelius.  That TPL was aware that Kunelius was of very limited
12   means and that she and her attorney would not be able to spend
13   sufficient funds to win the matter against TPL and that TPL had
14   unlimited resources available to it to overwhelm anyone who
15   would make the mistake of opposing it."  That was not made on
16   information and belief.  I will tell you, your Honor, I've
17   interviewed four people who were at that meeting who will all
18   testify to that.  They were all at that meeting.

19        Now, if Mr. MacDonnell determines -- if the Court wants
20   to -- I'm sorry.  If TPL says, "Wait a minute.  He was acting
21   on a frolic of his own.  He has nothing -- we never would have
22   said that," and the Court came to the conclusion that he did
23   say it after listening to the witnesses, then I'm sure TPL
24   would say, "Hey, we're not responsible for that kind of
25   behavior.  That's clearly outside of his responsibility.  We

1    can't be held to that responsibility.  He's on a frolic of his
2    own."

3        We believe -- and we've spent a lot of time looking into
4    all of these allegations, and none of them are made off the
5    cuff.  And, in fact, as I've said before, people were
6    interviewed for that information.  There were six people at the
7    meeting.  We were able to interview four.  The other two were
8    Mr. MacDonnell and a representative of the town.  So from those
9    allegations -- they're very different from what you heard
10   Mr. Conway say to you, I believe.

11       As to the issue of constructive taking, we have alleged
12   -- and we will have -- and Mr. Kachagian, who was the attorney
13   that represented Mrs. Kunelius at the time, will testify that
14   he and Mrs. Kunelius were told, "You go out and get someone
15   else, we're going to do it to you again."  He was told that by
16   the Town officials.  In other words, "You're not going to sell
17   the property."  What becomes really important here, however, is
18   that if you look at Exhibit 6, you will see that they've
19   determined that the 40(b) became really not a viable option
20   anymore and that they were facing a problem.  In other words,
21   the Town had taken that opportunity away from Mrs. Kunelius and
22   now the 40(b), which is the only way that that property had any
23   significant value because you didn't need to go to the Town to
24   get approval, 40(b) exempts the developer from seeking the
25   approvals under the zoning code.  And so if you look at Exhibit

1   6, it says, "By the time this is resolved, 40(b) is going to be
2   a problem for them.  We need to get this resolved."

3           So is there a taking?  Well, if you tell someone, after
4   going through this for a year and a half or two years, if you
5   do it again, if you sell it again, we're going to do it to you
6   again, then that's a taking.  If you take away the value of
7   property because now no one's going to go in there, and we will
8   have testimony from the developer who said, "I will never go
9   back there.  I will never go back there and deal with those
10  people for what they have done."  They actually knew that.  And
11  Exhibit 6 literally says that the developer has already talked
12  to the Town saying, "Based upon what you've done here, we will
13  never come back."  All right?  Is that a taking?  Well, we'll
14  have to see.  I think we've pled sufficient claims here to say
15  that it is a taking.

16          So those are all very important issues.  The Town itself
17  had raised 400,000 dollars.  The Town exercised the right.  How
18  did they exercise the right under the chapter?  Well, they
19  assigned it.  But if you look at Exhibit 4, you will see that
20  General Counsel for TPL exercises the right.  So at that point
21  that's when the money was due.

22          Fundamentally if -- not due literally at that point, but
23  all they had left was to get the money, not raise it, but get
24  the money and pay it in some reasonable fashion.  There is
25  nothing in our complaint whatsoever, despite what I've heard

1   here today, that suggests that we required the money by a
2   certain day and that we are saying they didn't do it. I would
3   encourage anybody to point to me where it says that. We
4   didn't. We said they owed the money. TPL has the money. We
5   believe that when discovery is provided to you, your Honor, you
6   will see that they had it all the time.

7       The question, I guess, is as to matters of candor to the
8   Court. If the Court realizes that, in fact, they had millions
9   of dollars and they say to you, "We couldn't raise the money,"
10  and there's nothing in any of this that says it's contingent
11  upon raising the money, isn't that what is called in most civil
12  rights cases a pretextual and misleading justification for
13  their position? And my suggestion is that it is absolutely
14  pretextual.

15      So from my point of view, your Honor, I think all of the
16  issues that they're talking about, whether or not there was an
17  agreement as to what was intended on the liquidated damages,
18  all of those things are issues of finding of fact. And we have
19  alleged in every one of our counts -- the fraud count, for
20  example, which I've heard discussed, we have alleged that
21  Mrs. Kunelius had direct conversations with Mr. MacDonnell in
22  which MacDonnell said to her, "Don't worry. We've got the
23  money. There is no problem." It's alleged in the complaint.
24      She says "Fine". She goes forward. A year later, "No
25  deal. We don't have the money." They never had it, they say.

1    We know they had it.  All you have to do is look at their

2    finances and you will see they had it.  So is there a fraud

3    claim?  I think it's a fraud claim.  What they did is they get

4    her to sit there and wait while they try to come up with

5    another plan, unrelated to the original, and while she's

6    waiting they decide they can't make money and now they just

7    flush it down the toilet.  That's essentially what it is.  If

8    this is what -- if this is what she is supposed to be taking

9    under a Chapter 61 exercise of right of first refusal, then

10    every single city and town facing any kind of project can

11    simply do the same thing.

12    You don't have to have the money.  You don't have to

13    find out whether the assignee has the money.  You don't require

14    the assignee to put in nothing.  You let the assignee come in

15    and do a new development plan entirely and then say "No,"

16    because that's what happened.  And when they say "No," well,

17    you go to the owner and you say, "Too bad, but I know you've

18    lost your purchaser now.  Isn't that a shame."  And that's

19    where it comes down to.  And we think it's a bad faith

20    argument.  It's a bad faith presentation as it relates to the

21    whole, "We don't have the money."  They clearly did.

22    This is clearly a matter of specific performance.

23    They've got the money.  They should pay it.  No one should be

24    forced to go through what she's gone through and then they say,

25    "We understand she's disappointed."  Disappointed?  They knew

1   this was her only asset.

2         Finally, one of the exhibits -- I believe it's Exhibit

3   8, says specifically, "We realize you're extremely worried

4   about this.  This is your only asset."  Something to that

5   effect.  And then they say, "Take less money or we're going

6   away."  "Take less money or we're going away."  They didn't

7   say, "We can't."  I mean, where did they come up with the

8   money?  They said "Take less money or we're going away," and it

9   was 800,000 that they offered.  All right?  So if that's not

10  bad faith, under any circumstances, if that doesn't raise the

11  eyebrow particularly, your Honor, where these are charitable

12  institutions that are doing these kinds of things and making

13  these kind of threats.

14        I think, as it relates to the rest of it, I'll rely on

15  my brief.  I appreciate your time.  And I think that's it.

16              THE COURT:  Okay.

17              MS. FETOUH:  Your Honor, may I respond?

18              THE COURT:  All right.  Briefly.

19              MS. FETOUH:  Thank you, your Honor.  I will be

20  brief.  I just want to respond to a couple of issues raised by

21  plaintiff's counsel.

22        First, there was no suggestion or I didn't mean to

23  suggest that the Town or TPL did not see the purchase and sale

24  agreement.  Quite to the contrary, they obviously had to see

25  that purchase and sale agreement and that's how they determined

1     whether or not they wanted to exercise this right of first

2     refusal in order to understand the risks and the obligation

3     into which it was binding itself.

4         Also, with respect to the Town of Franklin case, that

5     case says specifically, quote, that "The Town will be bound by

6     substantially all of the terms and conditions of the

7     agreement." And that case includes that word "substantially"

8     because there may be at times a term in a purchase and sale

9     agreement that isn't practicable when applied to a nonprofit

10    assignee accepting a right of first refusal under Chapter 61 in

11    which it then has to revoke a major portion of that property to

12    forest use or agricultural use, depending on the statute. So

13    the suggestion that perhaps the 40(b) term might not apply in

14    this agreement doesn't mean that the other terms of the

15    agreement do not apply. Just like you or I or anyone wouldn't

16    enter into a purchase and sale agreement that included a price

17    term and nothing else, TPL, when it accepted this assignment,

18    entered into or stepped into the shoes of this purchase and

19    sale agreement and substantially all of those terms and

20    conditions therein.

21        Your Honor, I also just briefly want to address this

22    issue of deposits and the liquidated damage clause.

23    Plaintiff's counsel has suggested that there were no deposits

24    in the purchase and sale agreement. I would point out that the

25    earnest money payment is specifically -- at least the initial

1   one is specifically described as a deposit in the purchase and
2   sale agreement.  The subsequent payments were payments towards
3   the purchase price in advance of the closing, and we believe
4   were deposits.  They have not been returned to the Trust for
5   Public Land.  And if we read the purchase and sale agreement as
6   to not include any deposit, then that effectively renders the
7   liquidated damages clause meaningless.  And basic contract law
8   interpretation says you can't read one term of an agreement to
9   make another term meaningless.

10          Finally, your Honor, I just want to point to Exhibit 6
11  of the complaint which plaintiff's counsel has suggested is the
12  most telling exhibit in the complaint and I would suggest, your
13  Honor, Exhibit 6 tells us nothing.  It is a memorandum written
14  by one member of the Board of Selectmen and it does not speak
15  on behalf of the Board of Selectmen or the Town of Stow.  It's
16  merely the views of one individual and it shouldn't be given
17  any weight in these considerations, your Honor.  Thank you.

18          MR. CONROY:  Less than a minute, your Honor, if I
19  may?

20          THE COURT:  Okay.

21          MR. CONROY:  First of all, the reading that
22  Mr. McLaughlin made about the meeting between counsel wherein
23  my client allegedly made these statements, I would say to you,
24  Judge, that if that's utterly intolerable in a civilized
25  community, every mediation I've ever been to is utterly

1   intolerable in a civilized community.  What Mr. MacDonnell is
2   alleged to have said is that "We have more resources than you
3   do.  We have important law firms that will stand behind us.
4   You can't afford to litigate and you're going to lose."  If
5   that's utterly intolerable in a civilized community, to try to
6   avoid a lawsuit, your Honor, then I don't know what isn't.

7        The second point, your Honor, is this comment about
8   Mr. MacDonnell supposedly saying to Ms. Kunelius, "We're going
9   to buy your property.  Don't worry about it, we're going to buy
10  it," and then finding out that they can't raise the money, does
11  not support a fraud claim.  If this were the Ford Foundation,
12  the fact that they have ample resources doesn't mean that they
13  have the mechanism to raise the money for this particular
14  project.  There's simply no element of fraud here, nor of
15  reliance.

16       And then the last point, your Honor, that Mr. McLaughlin
17  quoted Mr. MacDonnell's letter, something to the effect that
18  "We realize you are concerned."  With respect, he's turned that
19  on its head.  When you read the letter, what you'll see is that
20  he's telling her counsel, "We know you and your client are
21  concerned about this deal.  We would like to meet with you to
22  try to get it done," and then the subsequent letter offers her
23  a way to get it done where she will actually come out ahead of
24  where she was before.  There simply is no tort claim here, your
25  Honor.

```
 1              THE COURT:  Okay.  I'll take the matter under
 2      advisement.
 3              (Ends 3:30 p.m.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    C E R T I F I C A T E

 2

 3

 4

 5          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

 6     hereby certify that the foregoing record is a true and accurate

 7     transcription of my stenographic notes, before

 8     Judge George A. O'Toole, Jr., on December 15, 2005, to the best

 9     of my skill and ability.

10

11

12

13

14

15     _____

16     RICHARD H. ROMANOW

17

18

19

20

21

22

23

24

25
```