UNITED STATES DISTRICT COURT
(DISTRICT OF MASSACHUSETTS)

_____

MARILYN KUNELIUS,                          )
                    Plaintiff,             )
                                           )
V.                                         )
                                           )
TOWN OF STOW separately, A                 )
PARTNERSHIP OF UNKNOWN NAME                )    CIVIL ACTION NO. 05-11697 GAO
BETWEEN TOWN OF STOW and THE               )
TRUST FOR PUBLIC LAND, THE                 )
TRUST FOR PUBLIC LAND separately           )
and CRAIG A. MACDONNELL, in his            )
individual capacity,                       )
                    Defendants.            )
_____)

## PLAINTIFF'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO THE TRUST OF PUBLIC LAND'S MOTION TO QUASH AND IN SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS

NOW COMES the Plaintiff with this Supplemental Memorandum in Opposition to the Trust for Public Land's ("TPL") Motion to Quash and In Support of the Plaintiff's Motion for Sanctions, stating as follows:

1.      It has come to the attention of the Plaintiff that there have been additional and serious misrepresentations by the Defendants to this Court and to the Plaintiff. These misrepresentations are directly relevant to the issues before the Court, as outlined in the Complaint, and are specifically relevant to the pending Motion to Quash and Motion for Sanctions.

2.      As the Court is aware, this case involves claims by the Plaintiff that the Defendants violated her rights, violated the provisions of M.G.L. Chapter 61, materially interfered with an advantageous relationship, and made material misrepresentations to prevent the Plaintiff from selling her property to *bona fide* purchaser for the amount of

$1,116,900.00.  After the Plaintiff signed a P&S Agreement, the Defendant, the Town of Stow ("Stow") had the right to exercise a Right of First Refusal under the provisions of Chapter 61 and purchase the Plaintiff's property ("Property") under the terms of the Purchase and Sale Agreement ("P&S Agreement") between the Plaintiff and the *bona fide* purchaser.  Under the provisions of Chapter 61, Stow assigned the Right of First Refusal to TPL, who in conjunction with Stow and Defendant MacDonnell, took specific actions to ensure that the original buyer would not be available when the Defendants defaulted on the P&S Agreement.  The Defendants were aware of their joint effort to defeat the P&S Agreement, and the Plaintiff alleges that the Defendants never actually intended to purchase the Property.  Ultimately, the Defendants failed to purchase the Property and repeatedly told the Plaintiff and this Court that TPL was 'unable" to purchase the Property because fundraising had failed.  The Plaintiff has continually asserted that the Defendants acted in an unfair and deceptive manner, that they were misrepresenting the truth, and that they were involved in a deliberate effort to default on the P&S Agreement so that the original purchaser's low income housing could be defeated.

3.     On Tuesday, April 3, 2007, a deposition of Serena Furman ("Furman") was held at the offices of the Plaintiff's counsel.  Furman is a neighbor, although not a friend, of the Plaintiff.  Furman was a major organizer of a loosely associated group of citizens known as the Friends of Red Acre Road ("FORA").  FORA was involved in the Defendants' alleged efforts to purchase the Property.  It appears that FORA, unlike the Defendants, believed that the Defendants did intend to purchase the Property from the Plaintiff.  Prior to the deposition of Furman, the Plaintiff had been aware of FORA and its

involvement with the Defendants in what TPL had alleged and described as a partnership among TPL, Stow, and FORA for the alleged purpose of "acquiring the Property" through an assignment of Stow's Right of First Refusal under the provisions of M.G.L. Chapter 61. However, the Plaintiff, until the deposition of Furman, was unaware of the scope of the relationship among FORA, TPL, and Stow. In addition, the Plaintiff was unaware of the deliberate and hostile efforts of TPL in actually preventing FORA from participating in fundraising for the purchase of the Property, where the alleged failure of such fundraising has been used by the Defendants as an excuse by the Defendants for being "unable to purchase the Property."

4.     As the Court is already aware, the Defendants on five (5) different occasions informed the Court that the failure of its "fundraising" resulted in TPL being "unable" purchase the Property.

> "However, after paying thousands of dollars for deposits required under Agreement, TPL found itself **unable** to raise the money necessary to fund the project and was **unable** to complete its purchase of the Property." [emphasis supplied].

(*See* Defendants' Motion to Dismiss, pages 1 and 2).

> "When TPL was ultimately **unable** to raise the money to fund the purchase, it was **unable** to acquire the Property and forfeited thousands of dollars to Kunelius pursuant to the liquidated damage clause." [emphasis supplied].

(*See* Defendants' Memorandum of Law in Support of Motion to Dismiss of the Defendants, pages 1 and 2).

> "Ultimately, however, TPL was **unable** to **raise the funds** necessary to purchase the Property by the closing date of September 26, 2003. *Id*. As TPL publicly expressed, its efforts to raise the funds were hindered by a declining economy, a difficult market for philanthropy, and the unexpected denial of a needed state grant." [emphasis supplied].

(*See* Defendants' Memorandum of Law in Support of Motion to Dismiss of the Defendants, page 6).   The above quotes were focused on by the Plaintiff in her Memorandum in Opposition to Motion to Quash and in Support of her Motion for Sanctions.   The Plaintiff's focus was related to the discovery that TPL had over $76 million in lines of credit available to it, even as it was informing the Plaintiff and the Court that TPL was "unable" to purchase the Property.   Furman's deposition testimony was the first time the Plaintiff could determine with certainty that Defendants' defense of alleged "failure of fundraising and the difficulties of philanthropy," was baseless, false, and misleading.   In addition, Furman's deposition confirmed the Plaintiff's on-going worries about "rumors" about TPL's intention concerning the purchase of the Property were true and valid.

At the deposition of Furman, the deponent arrived with 124 pages of detailed discussions, emails, letters, spreadsheets, etc., which revealed that the Defendants were absolutely aware that they were making serious misrepresentations to the Court and to the Plaintiff, and that TPL had ordered that no fundraising take place at all.   There was never a failure of fundraising.

5.     The Plaintiff has attached and highlighted copies of some of the documents submitted by Furman during her deposition[1].   (*See* Exhibits A-C, E-F, and H). These documents clearly show that FORA and Furman had identified that TPL had undertaken steps to ensure that TPL would not purchase the Property.   Each of the below quotes are statements of FORA directed to TPL dealing specifically with TPL's refusal to begin fundraising:

---

[1] These documents were bates stamped by the Plaintiff and are referred hereto by such bates stamped designation.

"TPL is choosing to change history by neglecting to mention that fundraising, local or otherwise, was organized as a joint effort with TPL, who repeatedly delayed the start up of the fundraising committees."

(*See* Exhibit A, September 11, 2003 letter of Furman to MacDonnell, bates # Furman0108).

"[I]t seems oddly late time for TPL to begin fundraising and to finally do the in-depth legal analysis of the variance issues. Both the funding efforts and the zoning analysis were held up until after the town meeting in late May."

(*See* Exhibit B, August 19, 2003 letter of Furman of behalf of FORA to MacDonell, bates # Furman0098, last paragraph, and bates # Furman0099, first paragraph).

"[W]e told you from day one that it was the financing and not finances, and we told you that the fundraising would take until the end of 2004. We also told you that it was not wise to delay sending out proposals throughout 2003. **Yet you steadfastly refuse to this day to get financing or raise funds**…there can be no implication that the "absence of private funds raised" is in any way attributable to FORA. If poor fundraising is cited by TPL, then TPL must also explicitly state that **it was TPL's choice and TPL's failure**" [emphasis supplied].

(*See* Exhibit C, August 6, 2003 email from Peter Christianson of FORA to MacDonnell, bates # Furman0096, second paragraph, and Furman0097, first full paragraph). The above is particularly troublesome since FORA, almost four years ago, was warning TPL not to use the "failure of fundraising" as an excuse for not purchasing the Property. Despite this warning on August 6, 2003, the Defendants have told the Plaintiff and this Court <u>repeatedly</u> that the fundraising had failed and thus, TPL was unable to purchase. The following is a quote from MacDonnell's deposition testimony demonstrates MacDonnell's and TPL's deliberate attempt to mislead the Plaintiff and this Court on this issue.

"Q. It is also fair to say that at some point in the fun-raising process you approached them and told them not to fund-raise because, for the other reasons, you had decided not to go forward with the development?

> A. I have no memory of telling Friends of Red Acre not to fund-raise during the period of time that was sort of relevant to the possibility of the project going forward.
> Q. Is it your testimony that you did not tell them, or is it your testimony that you have no recollection of not telling them to fund-raise, of telling them not to fund-raise, because you didn't want to go forward with the project?
> A. I did not tell them not to fund-raise because TPL did not want to go forward wit the project."

(*See* Exhibit D, MacDonnell's deposition transcript, page 213, line 11 through page 214, line 1). Despite the above MacDonnell's deposition testimony, FORA goes on to disagree with TPL's manufactured justification that fundraising had failed.

> "FORA does not agree with TPL's conclusion that "the money isn't there". We suggest that TPL explain to their Board that other hurdles have prevented their fundraising from the beginning and that a combination of financing and fundraising will keep the project moving forward to a successful conclusion in 2004. We [FORA] have commitments of 2/3rds of the budget from all sources. This is a success not a failure in these economic times."

(*See* Exhibit E, July 27, 2003 letter of FORA to MacDonnell, bates # Furman0091, second to last paragraph). It is important for the Court to realize that FORA was a group of highly sophisticated citizens of Stow and that FORA's fundraising efforts were undertaken by a fulltime professional fundraiser with sophisticated fundraising experience and contacts. FORA's disagreement with TPL was not simply a disagreement of a few unsophisticated neighbors. So sophisticated was FORA's fundraising capability that FORA provided names and addresses of sources of fundraising for TPL to review. Much to the dismay of FORA, TPL used those fundraising references for its own purposes unrelated to the fundraising for the Property. This resulted in an outrage by the FORA group.

> "They [TPL] already used several of the contacts that I [Peter Christianson of FORA] provided for other [TPL's] projects while at the same time telling their [TPL's] staff to hold off on fund raising for this project [for the purchase of the Plaintiff's property]. I feel raped.

The false paradigm here is that they are implying that they are limited to the prospect pool I [Peter Christianson of FORA] generated. The fact is that there are plenty of more prospects, and they need to identify and solicit them.

In my July 3 conversation with Craig, he [MacDonnell] explicitly told me that **TPL intended to do zero fund raising**, and that FORA was responsible for 100% of it and/or financing no later than the closing in September or TPL would have to pull out. This is tantamount to challenging me to a duel. Since I [Peter Christianson of FORA] do not participate in duels, I [Peter Christianson of FORA] will simply ignore this ridiculous, outrageous, insulting set of demands. My position is non-negotiable, because it is the only path to success. His demand is either a poison pill or simply juvenile.

I [Peter Christianson of FORA] held off on fund raising for the EOS prospects for several reasons:
1. **Craig** [MacDonnell] **told me to wait**
2. I [Peter Christianson of FORA] did not want to risk my relationships while he was threatening to pull out
3. The timing was not right
4. I [Peter Christianson of FORA] received no feedback from TPL on the proposal template
5. **TPL was not doing anything whatsoever on fund raisin**g, and I did not want to set a precedent
6. Sheila [of TPL] asked me to participate in a committee to raise funds from individuals, and I [Peter Christianson of FORA] agreed. Committee has not yet been convened, apparently because **Craig** [MacDonnell] **told her to hold off**." [emphasis supplied]

(_See_ Exhibit F, July 23, 2003 email of Peter Christianson to FORA, bates # Furman0087, first and fourth paragraph). This information was withheld from the Plaintiff and the Court throughout this litigation. Furman's testimony, a copy of which is attached hereto as Exhibit F, further demonstrates that, prior to Furman's deposition, FORA did not disclose this information to anyone. Furman's deposition was the first time that FORA "broke ranks" with TPL and Stow, and disclosed that TPL and Stow were relying on a "false paradigm." Furman's testimony was the first time that FORA went "public" with FORA's extraordinary concerns about TPL's behavior, misrepresentations, unethical use of proprietary information, and deliberate misrepresentations to the Plaintiff; all in

violation of TPL's ethical obligations as an alleged charitable institution/non-profit organization.  Furman testified:

> "[W]e have never broken ranks publicly with TPL…and this has never happened before in any public venue.  This is the public venue [i.e. the deposition] where we were first breaking ranks with TPL…"

(_See_ Exhibit G, Furman deposition testimony, page 78, line 7 through line 13).  Thus, it is no wonder that, prior to the Furman deposition, Stow provided not one shred of evidence revealing their knowledge that the failure of fundraising was a completely bogus issue.

The "breaking of ranks" also revealed that FORA had sensed a deliberate and unethical approach by TPL in its business dealings with FORA, Stow, and the Plaintiff.  TPL's unethical behavior, as mentioned above, was directly related to this alleged failure of fundraising since TPL, in effect, used FORA's fundraising efforts to advance TPL's goals on unrelated projects, thus rendering the fundraising for the Property null and void.  Furman testified that:

> "[H]e [Furman's husband] had identified all those different foundations, that many of them were responded by Trust for Public Land as we've never heard of these people before, great.  This is fantastic.  And then he followed up this e-mail saying that Trust for Public Land has now told him that they have now used those prospects for other projects, so they're not available."

(_See_ Exhibit G, page 65, line 12 through line 19).  Furman also testified that she and FORA began to sense a fundamental ethical failure on the part of TPL and MacDonnell when TPL dishonored its ethical obligations and began to act as if it were simply a hard-nosed business entity.

> "A. …[I]t seems very wrong to me that they [TPL] made the promise they did to the town and they [TPL] went back on it, and it's not – that's behaving as a business man might under his legal rights, but it is not behaving as a non-profit does…
> Q. Did you perceive that the behavior of Craig MacDonnell and TPL was violating that higher standard [for non-profit entities behavior]?

> A. I think, if they are, personally, if their business is in partnering with towns, which was very clear to me that Trust for Public Land does not do project without public partnership, that they made to the town and the right of first refusal was beyond the bounds. Totally within the rights of a businessman. Beyond the bounds.
> Q. Beyond the bounds for a non-profit?
> A. Conduct, yes."

(*See* Exhibit G, page 110, line 4 through line 9; *see also* Exhibit G, page 111, line 17 through page 112, line 3).

> "FORA does not believe that it is necessary to renegotiate a lower price with the seller. TPL should live up to its promises to the town and to the seller."

(*See* Exhibit E, July 27, 2003 letter of FORA to MacDonnell, bates # Furman0091, last paragraph). Prior to Furman's deposition, the Plaintiff had no idea that the outrageous behavior she had experienced at the hands of TPL was already being experienced by FORA. Again, there can be no doubt as to why these discussions concerning this behavior were withheld from the Court and the Plaintiff.

6.    Indeed, Stow itself, through its Board of Selectmen, knew of the "false paradigm" of the failure of fundraising. Ross Perry ("Perry"), the former Chairman of Stow's Board of Selectmen, was absolutely aware that TPL had ordered FORA and TPL's own fundraising arm to not raise any funds at all. Attached as Exhibit H is a letter from FORA to Perry informing him of the shocking news that there was no "failure of fundraising" because there was no fundraising effort at all.

> "…it was **TPL** that **decided not to fund raise** during the critical period from January through June, **directing their staff and our citizens' group to suspend fund raising**." [emphasis supplied].

(*See* Exhibit H, September 30, 2003 email from FORA to Perry, bates # Furman0121). This means that all the Defendants were aware that TPL had undertaken steps to ensure that it would not purchase the Property and that it would rely on a false paradigm to

unfairly and deceptively attempt to escape the obligations arising under the P & S Agreement. [2]

7.    As the Court is aware, once the Plaintiff discovered the existence of $76 million in lines of credits, the Defendants suddenly changed their story and denied that they were ever "unable" to purchase the Property but rather "unwilling" to purchase because of, among other things, the failure of private fundraising.

> "TPL accepted the assignment of the Kunelius Agreement based upon projections that the purchase price could be raised from a variety of sources, including a contribution by the Town of Stow, a state grant from the Department of Housing and Community Development, **private fundraising** with the assistance of local conservation organizations, and limited development of a portion of the Property, as expressly permitted under Chapter 61." [3]  [emphasis supplied].

(_See_ Defendants' Memorandum in Law in Support of Motion to Quash the Subpoena, page 3).  This latest discovery demonstrates that the Defendants' alleged "unwillingness" to purchase, as described to the Court in their most recent filing, is based upon an outright lie to the Court.  Fundraising did not fail; TPL ordered that no fundraising could take place, and TPL, as well as Stow and MacDonnell were aware of this fact.

8.  The Plaintiff respectfully asks the Court to consider the significance of these repeated misrepresentations to the Plaintiff and to the Court.  The Plaintiff further asks the Court to consider that the existence of the misrepresentations was withheld by the Defendants until the "breaking of ranks" by FORA.  The Plaintiff has alleged that the Defendants never intended to honor the P&S Agreement.  The Defendants did not want

---

[2] As further evidenced by the Defendants' deliberate withholding of documents, the Court should consider that on April 9, 2007, two days after the close of discovery and after the Furman deposition, Stow suddenly delivered 203 additional pages of documents which mysteriously included the heretofor missing documents demonstrating that Stow was fully aware that TPL had never undertaken any fundraising.

[3] As already disclosed in the Plaintiff's Memorandum, the other various reasons offered by TPL as justifications for not purchasing the Property were actually described to the Commonwealth of Massachusetts as insignificant and further that the failure of any other fundraising would not prevent the purchase.

the Court or the Plaintiff to know that the only reason that they were "unable" to purchase was because they refused to undertake fundraising and they refused to access $76 million in lines of credits that was available to them.  In other words, the Defendants used pretext, misrepresentations, and outright lies to defeat their obligations under the P&S Agreement as if there were no obligation of "good faith and fair dealing," as is required under all Massachusetts contracts.  The disclosure of the deliberate refusal to raise funds demonstrates a concerted effort to violate the requirement of good faith and fair dealing and it involves each and every Defendant withholding material information.

9.      Of further concern is the fact that the Defendants had entered into an unholy alliance intended to mislead the Plaintiff and the Court.  FORA, apparently dismayed by the behavior of the Defendants, withdrew from any further association with them.  This alliance included the joint motions by TPL, MacDonnell, and Stow.  The unholy alliance continued in the joint effort to withhold information regarding the existence of financing, the refusal to fundraise, the concoction of bogus excuses, all advanced by an alleged non-profit corporation, the Board of Selectmen, and the Massachusetts Director of the alleged non-profit corporation.  Once this information was discovered, the Court will note that suddenly the individual Defendants have now elected to abandon the joint filing of Motions and Responses.

10.      Virtually every newly discovered matter is directly related to the financial ability of TPL to purchase the Property.  It is of little consequence that TPL now freely admits that it was capable but simply unwilling to purchase the Property.  The Plaintiff has every right to examine the financial status of its line of credit and to conduct a deposition of the Keeper of the Record with regard to the line of credit and all related

matters.  The Defendants cannot misrepresent that truth to this Court and then simply, in effect, acknowledge that they made misrepresentations and seek the protection of the Court from the Plaintiff's efforts to uncover and expose the ongoing fraud and deceit which has become the hallmark of the Defendants' actions in this matter.

Respectfully submitted,

Marilyn Kunelius,

By her Attorney

Dated: April 19, 2007        By:    */s/ Michael C. McLaughlin, Esq.*
                                     Michael C. McLaughlin BBO# 337350
                                     Law Offices of Michael C. McLaughlin
                                     One Beacon Street, 33rd Floor
                                     Boston, MA 02108
                                     617-227-2275
                                     michaelcmclaughlin@speakeasy.net

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on April 19, 2007.

*/s/ Michael C. McLaughlin*
Michael C. McLaughlin

EXHIBIT A

9/11/03

DRAFT #2

Dear Craig:

We thank you for your letter of 10 September 2003 with an update to your strategy regarding the Kunelius property on Red Acre Road in Stow. We will now confer with our partners and collaborative advisors and will respond soon. We appreciate your continued communication and look forward to a successful end to this project which will benefit the Town of Stow."

FORA, in the meantime, has two observations regarding the contents of your letter:

**A. The issues raised in our letter have not been addressed.**
Your letter holds the same content as the previous letter. There is nothing that reflects your consideration of the contents of our letter. Some of the points from our previous letter are shown below in italics.

As we continue to restate our diverging visions for this project, it may be tempting to conclude that the TPL/FORA partnership will not survive. In fact, the only way that this project can succeed is that we proceed with our partners: Eye of the Storm and the Town of Stow. As this letter may hold some criticism of how this project has been allowed to unfold, FORA wants to make it clear that if we pursue the orginal plan, we think that TPL's project management is completely defendable.

**B. TPL's proposal does not offer a realistic alternative plan.**
Though it may be possible that two separate analyses of the current situation could be correct, it is more likely that there are two perceptions and perhaps diverging sets of goals that shape these widely different conclusions that we have reached as to how best to proceed.

It is increasingly clear to FORA that the single most important factor in the success of this project is the attitude of TPL towards this project.

FORA will attempt to step into TPL's shoes to see the origins of your new proposal:

**TPL's Project Assessment:**
**A. If the new TPL proposal was pursued, it would be an easier "sell" to TPL's Board.**
Time may be a major factor here. To encourage the board to take on financing might require more time. It is also not the favored approach, according to you, which could expose TPL's project leader to board criticism.

**B. TPL has assumed a position that "local fund raising efforts have not been successful" and the "catastrophic failure ...of the [DHCD] grant".**
Though the DCHD grant was not part of the original budget, TPL's financial plan became dependent on this one grant submission. The resulting financial picture does not conform to TPL project guidelines and would require advocacy on the part of TPL's project leaders that may expose them to criticism.

==TPL is choosing to change history by neglecting to mention that fundraising, local or otherwise, was organized as a joint effort with TPL, who repeatedly delayed the start up of the fundraising committees.== There was an understandable reluctance on the part of TPL to fundraise before certain key decisions were made regarding town support and Zoning Board approvals. Decisions that put off the funding campaign were based on real concerns and considerations. It is in hindsight after the DHCD grant decision that TPL might realize that fund raising should have begun in early '03.

Though TPL can provide clear reasons for the current financial situation, it exposes its staff to possible criticism. This new proposal which declares a "funding failure" is an easier

position of "we tried, but the current economy and failure of others" has resulted in this crisis. The resulting proposal asserts TPL is being asked to take on an unsecured "loan based on weak fundraising prospects with no back-up plan to repay the loan".

C. TPL is concerned about succeeding with the subdivision approvals
TPL has described uncertainty towards both the zoning board's pending approval and issues regarding common ownership of the two parcels. These issues seems primarily to affect the closing date of the project, rather than the need for the new proposal. If these issues can be resolved, TPL is equally able pursue its new proposal (sell the two parcels as houses on the open market) as it could proceed with the original proposal (sell one as affordable and one to Eye of the Storm through joint fundraising).

Meanwhile, this is an alarm bell sounding that can be the "reason" for project failure. It will be easy to explain project failure due to zoning issues than due to the above mentioned funding situation.

D. TPL is reluctant to invest more time and money
This project has taken up too much of TPL's time and money. The new proposal provides a rapid scenario for concluding this project that places the responsibility on others to finance and accept the new project proposal.

FORA's Assessment
Though TPL has motivations to reconfigure the project, the resulting proposal is neither acceptable to the town nor capable of being funded.

> In January, you stated to the Board of Selectmen that once TPL takes a right of first refusal, it never withdraws from the deal. Your partners at the Stow Town Building will feel this personally.

The Town of Stow has agreed to a specific project and cannot defend this new configuration to the population. It would require returning to town meeting which is neither advisable or timely.

> FORA has always been puzzled as to why financing has been off-limits for this project, while TPL routinely finances other projects. As you know, interest rates are at a 45-year low. Not only does this project configuration leave out two of the key project tenets - equine rescue and affordable housing but the elimination of equine rescue also severely limits potential fundraising sources. We reiterate that fund raising for this project is dependent upon inclusion of equine rescue. TPL has always been counseled that financing would be required. Recall that the elapsed time from TPL's involvement to closing never exceeded nine months, but foundations require a year. This news has even come from your funding professionals.

TPL does not seem to routinely rely on foundation funding but rather on the faster results that can occur through individual gifts. This project challenges TPL's typical pattern of project financing and offers an opportunity to develop other strategies that they can implement when the economy is "...hostile to philanthropy". This project's financial picture always included fundraising for equine rescue from foundations and the need for bridge financing to occur until these funds are received.

> I have referred to the time compression problem before. We have always had "needs to delay" and "needs to act quickly" collapsing in on each other.

It is FORA's position that TPL is completely defendable and will be supported by its board if only the funding issue exists. We encourage TPL to be honest in detailing the timing issues from a project based on the short schedule of a "right of first refusal" scenario and on the extended time demands for foundation funding. This project is a case study with more than

its fair share of road blocks and detours that needs to be presented to the board enthusiastically. Here again, attitude is everything.

> *FORA does not agree with your assertions that "funding does not exist". At eight months into the project and less than 60 days from closing, this seems an oddly late time for TPL to begin fundraising and to finally do the in-depth legal analysis of the variance issues. Both the funding efforts and the zoning analysis were held up until after the town meeting in late May.*

The board needs to understand that the current situation is because of fundraising delays not fundraising failures. This is not a typical project but a small project that is allowing TPL to explore new funding solutions and partnerships.

> *If TPL is not actively seeking to achieve the original project plan, their efforts in attempting to solve these zoning issues become questionable.*

TPL has reservations regarding success with the Zoning Board. This is contrary to the impressions received by both Stow Board of Selectmen and FORA. Has TPL factored in information that it has recently received on this topic? How will TPL's requests for extensions by viewed by the ZBA? Has TPL prepared the briefs to pursue this issue?

> *In January or February, I asked you if we should begin the ZBA process. You stated that your experts saw no problems with getting the variance and that a denial would be easily challenged and won on appeal. Now at this late date, there seems to be a lack of will and time to pursue alternatives.*

At town meeting, TPL was asked what it would do if the variance was denied and the response was, "We'll just have to roll up our sleeves". TPL needs to continue to present earnest efforts to solve the zoning issues. If TPL is not actively seeking to achieve the original project plan, their efforts in attempting to solve these zoning issues become questionable.

> *TPL may be choosing to withdraw because this project has induced high degrees of burnout and frustration. But it may be the attitude rather than the facts that drive this alternative scenario of yours forward.*

TPL must have a renewed sense of energy and vision for this project to succeed. FORA is not stepping aside to watch this project fail, nor is it providing a message of hope. We believe we are presenting a concrete plan for success that will be carried by TPL's role as an non-profit organization that sees great rewards from the persuit of good projects.

In conclusion, there are 3 elements of this project that have been obstacles, but these are being addressed:
   1. DHCD funding: We are obtaining a critique and will determine whether re-submission is imminent
   2. ZBA ruling: the efforts of FORA have yielded a reversal of the message from Town Counsel. It now appears likely that the petition would be approved if TPL follows through with writing a sample ruling.
   3. Fund raising of the remaining funds is highly feasible, and should be pursued. Foundations and individuals are prospects. In   the meantime, TPL should secure financing.

Sincerely,


Serena Furman

*Enclosures (marchletter)*

FURMAN0110

**EXHIBIT B**

August 19, 2003

Craig MacDonnell
State Director
The Trust for Public Land
33 Union Street
Boston, MA 02108

Dear Craig:

As I mentioned after our last meeting on July 21st, FORA and TPL do not have a lot in common in terms of our analysis of the Kunelius Project. Your recent document seems to gloss over the negative consequences of your "best case" strategy. In addition to not agreeing with your preferred strategy, FORA does not agree with your assertions that "funding does not exist". I would like to explain to you why TPL's best option is to take on financing; finally begin fundraising; and see this project through to a successful completion.

It's a Good Project
Please remember that the collaboration with other non-profits for funding (animal rescue) and the incorporation of affordable housing were two aspects that TPL found interesting about this project. Though not large, it is a great portfolio piece that may help TPL to orchestrate new collaborative projects during these tough economic times. Maintaining agrarian use; stopping 40Bs; and working with a Community Preservation Committee are some of the other attractive aspects of this project.

Here are the key arguments as to why TPL should not withdraw from this project:

Publicity
TPL must act as both a financially responsible project manager and also as a non-profit. As a non-profit, you must weigh the other concerns and goals of TPL that exist beyond financial considerations. TPL should consider these publicity issues:

1. In January, you stated to the Board of Selectmen that once TPL takes a right of first refusal, it never withdraws from the deal. Selectmen are probably used to meaningless verbal assurances from developers, but your word as a non-profit means an entirely different thing. TPL does not want to be known as an organization that does not keep its word.

2. Exposing towns to lawsuits, regardless of their merit, is not in the best interest of TPL as a practice. The fact that this town is $1.5 million in the red will surely fan the flames as well.

3. Your partners at the Stow Town Building will feel this personally. Selectmen, members of the Community Preservation Committee as well as other supporters are going to personally suffer if TPL withdraws.

Finance
TPL will spend more money with the ensuing legal conflicts than it will on financing. FORA has always been puzzled as to why financing has been off-limits for this project, while TPL routinely finances other projects. As you know, interest rates are at a 45-year low. This is a good time to borrow even if you don't need to.

It's Too Late
The two main issues facing this project appear to be funding and zoning relief. At eight months into the project and less than 60 days from closing, this seems an oddly late time for TPL to begin fundraising and to finally do the in-depth legal analysis of the variance issues.

**FURMAN0098**

**EXHIBIT B**

==Both the funding efforts and the zoning analysis were held up until after the town meeting in late May.==

There must have been later delays imposed on funding as the "to do" list for the TPL funders from the June 5th meeting were never acted upon. If we had begun fundraising from foundations in January or February using the qualified prospects and proposal template provided at that time by FORA, there would be results to point to in excess of the $650,000 raised to-date.

In January or February, I asked you if we should begin the ZBA process. You stated that your experts saw no problems with getting the variance and that a denial would be easily challenged and won on appeal. Now at this late date, there seems to be a lack of will and time to pursue alternatives.

I have referred to the time compression problem before. We have always had "needs to delay" and "needs to act quickly" collapsing in on each other.

Your recent letters have included alternate scenarios for the completion of the project. The scenarios include the need for fund raising but at the same time they eliminate EOS from the project and sell the properties on the market. Not only does this project configuration leave out two of the key project tenets - equine rescue and affordable housing but the elimination of equine rescue also severely limits potential fundraising sources. Although these suggested alternate project configurations may be viewed as an attempt to solve a problem, we feel that the solution is as bad as the problem. Another view of the suggested project configurations is that TPL is defining the project in a manner that it cannot be accomplished. We reiterate that fund raising for this project is dependent upon inclusion of equine rescue.

<u>There is Plenty of Time</u>
TPL has always been counseled that financing would be required. Recall that the elapsed time from TPL's involvement to closing never exceeded nine months, but foundations require a year. This news has even come from your funding professionals. The seller will also be willing to extend the deadline for the closing if we need to solve the ZBA problem.

TPL may be choosing to withdraw because this project has induced high degrees of burnout and frustration. But it may be the attitude rather than the facts that drive this alternative scenario of yours forward.

The remaining funding can be raised. The zoning issue can be solved. The closing date can be moved back.

We can keep a farm as a farm; give the town open space; provide affordable housing; and provide a permanent home for equine rescue on a 200-year-old road with a 100-year-old tradition in animal humanitarianism. We are your partners and we are confident that these sentiments that strive for success are those of the other stakeholders as well.

Sincerely,


Serena Furman
On behalf of
Friends of Red Acre

c:      **Whitney Hatch**
        **Eye of the Storm Equine Rescue**
        **Stow Conservation Trust**
        **Red Acre Foundation**

**FURMAN0099**

EXHIBIT C

8/6

Dear Craig

It is evident from your two recent e-mails that you are pulling out of the Kunelius Farm project.  We respect your right to do this and to make your business decisions based on criteria at TPL.  Of course we are disappointed about your decision, because we feel that more could have been done and still could be done, but that you have dictated that neither you nor FORA should stray from a conservative "high road".  We intend to continue to respect this route as the project disintegrates.

TPL is a worthwhile and respected organization, and we do not want the failure of this project to have a ripple effect on your ability to do business elsewhere in Massachusetts.  At the same time, we hope that TPL understands and respects the contributions to and sacrifices made for this project by FORA.  These include over $250K raised by FORA, our instrumental role in the tough battle to secure $400K of CPC funds, and countless get out the vote and public awareness campaigns.

There were many times when we disagreed with your decisions, but we never broke ranks with you.  For example, we told you from day one that it was the financing and not the finances, and we told you that the fund raising would take until the end of 2004.  We also told you that it was not wise to delay sending out proposals throughout 2003.  Yet you steadfastly refuse to this day to get financing or raise funds.  In each case, you insisted, sometimes quite bluntly, that you were the professional and we were the volunteers, and we acquiesced to your wishes.

We had our differences with you as well about political strategy and about the approach to the ZBA regarding the variance.  Craig, we never vetoed you as you vetoed us.  But let's be frank, FORA did not prevent TPL from doing anything.  And, despite FORA's pleas, TPL did not take an aggressive stance on the issues you now identify as deal breakers.

Your July 3 phone conversation and July 21 meeting were presented as leadership but were actually only attempts to intimidate us into doing your work and then blame us for not doing it.  Your two recent e-mails continue this trend of notifying us of your unilateral decisions and then blaming us for not doing something about it. Sorry friend, that is not the high road.  Your desire to control information and your failure to

EXHIBIT C

listen to your partners, colleagues and friends undermined your ability to lead and manage.

In future statements from TPL to our stakeholders or to the public, there can be no implication that the "absence of private funds raised" is in any way attributable to FORA. If poor fund raising is cited by TPL, then TPL must also explicitly state that it was TPL's choice and TPL's failure. In the event that further statements come from TPL suggesting that FORA was deficient in any aspect of this project, then it will be necessary for FORA to make public statements of a similar nature about TPL.

Craig, what you decide to do now with the Selectmen, the CPC, the SCT, the RAF, EOS, and Marilyn Kunelius is up to you. Taking the high road at this time would be especially advisable given the considerable attention that your actions will receive in the press. We pledge neither our support for nor our opposition to your exit strategy. Thank you for trying to make the project a success. We are sorry that your strategy failed. Good luck.

Volume: I
Pages: 1-251
Exhibits: 23

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11697-GAO

MARILYN KUNELIUS,

Plaintiff,

v.

TOWN OF STOW, separately,
A PARTNERSHIP OF UNKNOWN NAME
BETWEEN TOWN OF STOW and THE
TRUST FOR PUBLIC LAND, THE
TRUST FOR PUBLIC LAND, separately,
and CRAIG A. MacDONNELL, in his
individual capacity,

Defendants.

DEPOSITION of CRAIG MacDONNELL, a witness called by and
on behalf of the plaintiff, taken pursuant to the
Massachusetts Rules of Civil Procedure, before Roberta J.
Daniels, a Court Reporter and Notary Public within and for
the Commonwealth of Massachusetts, at the Law Offices of
Michael C. McLaughlin, One Beacon Street, Boston,
Massachusetts 02108, on Thursday, February 8, 2007,
scheduled to commence at 10:00 A.M.

**APPEARANCES**

Michael C. McLaughlin, Esquire
Law Offices of Michael C. McLaughlin
One Beacon Street
Boston, Massachusetts 02108
    Counsel for the Plaintiff

Peter A. Kachajian, Jr., Esquire
292 Main Street
Northborough, Massachusetts 01532
    Co-counsel for the Plaintiff

Deborah I. Ecker, Esquire
Brody Hardoon Perkins & Kesten, LLP
One Exeter Plaza
Boston, Massachusetts 02116
    Counsel for Defendant Town of Stow

Dahlia S. Fetouh, Esquire
Goodwin Procter, LLP
Exchange Place
Boston, Massachusetts 02109
    Counsel for Defendant Trust for Public Land

James B. Conroy, Esquire
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd floor
Boston, Massachusetts 02108
    Counsel for Defendant Craig MacDonnell
Also present:
Lucie DeBellis, Paralegal
The Law Offices of Michael C. McLaughlin
Marilyn Kunelius, Plaintiff
David Norris, Husband of the plaintiff

**I N D E X**

| Witness | D | C | RD | RC |
|---|---|---|---|---|
| CRAIG MacDONNELL | 6 | | | |

- 3 -

**E X H I B I T S**

| No. | Description | Page |
|---|---|---|
| 1 | TPL corporate registration form | 16 |
| 2 | Notice of deposition | 17 |
| 3 | TPL Land Action Fund corporate registration form | 18 |
| 4 | Stow annual report, 2003 | 35 |
| 5 | Stow letter with attachments to Kunelius, 2-12-03 | 45 |
| 6 | MacDonnell letter to Perry, 2-11-03 | 49 |
| 7 | Conditions for right of first refusal | 51 |
| 8 | Minutes of Stow CPC meeting, 2-10-03 | 64 |
| 9 | Printout of TPL Web site | 75 |
| 10 | Stow Finance Committee minutes, 1-7-03 | 79 |
| 11 | DHCD grant application | 105 |
| 12 | TPL Web site excerpt | 124 |
| 13 | MacDonnell letter to Kachajian, 9-9-03 | 137 |
| 14 | Conditions for right of first refusal | 154 |
| 15 | Sommerlad email to Kennedy | 164 |
| 16 | Jacobs email to Sommerlad and Kennedy | 166 |
| 17 | Stow Board of Selectmen meeting, 2-11-03 | 191 |
| 18 | Stow Conservation Commission documents | 193 |
| 19 | MacDonnell email to Perry, 4-17-03 | 209 |
| 20 | Friends of Red Acre letter to Stow Board of Selectmen, 6-6-03 | 212 |

- 4 -

21    Pelletier letter to Stow Board of
      Appeals, 9-25-03                    228

22    MacDonnell letter to Kachajian, 7-6-04  234

23    MacDonnell letter to Perry, 1-5-03      238

- 5 -

| | |
|---|---|
| 1         P R O C E E D I N G S | 1  A  Well less than a million. |
| 2       Thursday, February 8, 2007 | 2  Q  Less than a half a million dollars? |
| 3         10:01 A.M. | 3  A  Yes. |
| 4    (Plaintiff and Mr. Norris not present) | 4  Q  Less then two hundred and fifty thousand? |
| 5    CRAIG MacDONNELL, first having been | 5  A  Yes. |
| 6  satisfactorily identified by the production of a | 6  Q  Do you have a general idea what the limitation was? |
| 7  Massachusetts driver's license and then duly | 7  A  I believe -- well, it was very small, but I don't know |
| 8  sworn, on oath, deposes and says as follows: | 8      a number. |
| 9    MR. McLAUGHLIN: Before we start, we'll | 9  Q  Do you have a general estimation of what -- well, let |
| 10  use the usual stipulations? We'll reserve all | 10    me strike that. |
| 11  objections till the time of trial, except as to | 11  A  I've already said I don't remember. |
| 12  form, waive the signature of the deposition? | 12  Q  If a contract was put in front of you, was there a |
| 13    MR. CONROY: Waive the notary. | 13    point where you would say to yourself, gee, I can't |
| 14    MR. McLAUGHLIN: Yes, right. | 14    sign this; this is too big? |
| 15    MR. CONROY: Right. | 15  A  Are we talking about now or then? |
| 16       DIRECT EXAMINATION | 16  Q  Then. |
| 17  By MR. McLAUGHLIN: | 17  A  Yes. |
| 18  Q  Could you please state your name and spell it, please? | 18  Q  And what would that number be that would cause you to |
| 19  A  It's Craig MacDonnell, C-R-A-I-G. Last name is M-A-C- | 19    think you didn't have the authority? |
| 20    D-O-N-N-E-L-L. | 20  A  Well, I don't recall as to what it was then, so I |
| 21  Q  And can you tell me what your address is? | 21    can't testify to that. |
| 22  A  800 Old Road to Nine Acre Corner, Concord, Mass. | 22  Q  Are you on any medication that would affect your |
| 23  Q  Can you tell me what your occupation is? | 23    memory? |
| 24  A  I work for the Trust for Public Land. | 24  A  No. |
| - 6 - | - 9 - |
| 1  Q  And what is the Trust for Public Land? | 1  Q  Can you tell me what your background is, your |
| 2  A  The Trust for Public Land is a 501c3, a national non- | 2    educational background, please? |
| 3    profit land conservation organization. | 3  A  I'm trained as a lawyer. |
| 4  Q  And what do you do for them? | 4  Q  And what kind of lawyer were you trained to be? |
| 5  A  I'm the Massachusetts state director. | 5  A  A litigator. |
| 6  Q  In 2002, what was your job at TPL? | 6  Q  Did you practice as an attorney? |
| 7  A  I was the Massachusetts state director. | 7  A  I did. |
| 8  Q  Does each state have a director? | 8  Q  And where did you practice? |
| 9  A  Most states where TPL works have a director. | 9  A  Two law firms. |
| 10  Q  Is there a regional headquarters for TPL for the | 10  Q  What are the names of the two firms? |
| 11    northeast region? | 11  A  Nutter, McClennen & Fish and Keegan, Werlin & Pabian. |
| 12  A  Yes. | 12  Q  Where is Keegan, Werlin, Pabian? |
| 13  Q  Where is that? | 13  A  Boston. |
| 14  A  Boston. | 14  Q  And can you tell me when you worked for these two |
| 15  Q  And is that the same place as your office? | 15    firms, sequentially? |
| 16  A  Yeah. | 16  A  I worked for Nutter, McClennen & Fish from 1983 |
| 17  Q  And is there someone in charge of the region that you | 17    through '87 or '88. I worked for Keegan, Werlin from |
| 18    report to? | 18    the early '90s through the late '90s. |
| 19  A  Yes. | 19  Q  Why did you leave Nutter? |
| 20  Q  And who is that? | 20  A  To change my career. |
| 21  A  Whitney Hatch. | 21  Q  And you were a litigator at Nutter? |
| 22  Q  Is Whitney Hatch a man? | 22  A  Yes. |
| 23  A  He is. | 23  Q  Were you a partner? |
| 24  Q  Whitney, okay. And what is his title? | 24  A  No. |
| - 7 - | - 10 - |
| 1  A  Regional director. | 1  Q  Were you an associate? |
| 2  Q  And do you still report to Whitney Hatch? | 2  A  Yes. |
| 3  A  I do. | 3  Q  And at Keegan, were you a partner? |
| 4  Q  In 2003, were you also the Massachusetts director? | 4  A  Yes. |
| 5  A  In 2003, I was the Massachusetts state director. | 5  Q  Did you go in as a partner? |
| 6  Q  In your role as Massachusetts state director, could | 6  A  No. |
| 7    you define what your authorities were as far as | 7  Q  Did you go in as an associate? |
| 8    acquisitions of property? | 8  A  I did. |
| 9  A  What do you mean by define my authority? | 9  Q  How long were you an associate there? |
| 10  Q  Well, were you in a position to bind TPL into | 10  A  About three years. |
| 11    contracts, for example? | 11  Q  So, in the span of between approximately '90 and the |
| 12    MR. CONROY: Objection. | 12    late '90s, you were three years an associate and up to |
| 13  A  Some contracts. | 13    perhaps as many as six or seven as a partner? |
| 14  Q  When I say in a position, did you have the authority | 14  A  Approximately. |
| 15    to? | 15  Q  And what did you do between '88 and '90? |
| 16  A  Well, in my position, there were some contracts that I | 16  A  I worked for the Department of Fisheries, Wildlife & |
| 17    could bind TPL with respect to. | 17    Environmental Law Enforcement. |
| 18  Q  And what kind of contracts were those? | 18  Q  And what was your position there? |
| 19  A  Very small. | 19  A  I was a lawyer. |
| 20  Q  Was there a dollar amount limitation? | 20  Q  In their legal department? |
| 21  A  There was. | 21  A  Yes. |
| 22  Q  What was that? | 22  Q  Is there a separate legal department for that, for the |
| 23  A  I don't know. | 23    Department of Fisheries? |
| 24  Q  Was it less than a million dollars? | 24  A  Well, no, not really. I mean, there were lawyers, but |
| - 8 - | - 11 - |



1   I don't recall it being organized as a department.
2 Q   And that's a federal department, or is that a state
3   department?
4 A   State.
5 Q   So, it's Commonwealth of Massachusetts?
6 A   Correct.
7 Q   And who was your supervisor at the Department of
8   Fisheries?
9 A   The commissioner.
10 Q   And who was that?
11 A   Walter Bickford at the beginning and, later, John
12   Phillips.
13 Q   Where did you go to law school?
14 A   Cornell.
15 Q   And undergrad?
16 A   Nasson.
17 Q   Could you spell that?
18 A   N-A-S-S-O-N.
19 Q   And where is that?
20 A   Springvale, Maine.
21 Q   When did you graduate from law school?
22 A   '83.
23 Q   In your practice as a litigator, did you practice in
24   state courts?

- 12 -

1 A   Yes.
2 Q   Federal courts?
3 A   Yes.
4 Q   And what kind of litigation did you practice?
5 A   Mostly environmental.
6 Q   Did you ever do corporate?
7     MS. FETOUH: Objection.
8 Q   Did you ever practice corporate law?
9 A   I worked on corporate issues. I don't know if you
10   could call that practicing corporate law.
11 Q   Did you ever practice tax law?
12 A   I worked on tax issues, but I don't know if you could
13   say I practiced tax law.
14 Q   Other than your degree from Cornell, do you have any
15   advanced law degrees?
16 A   No.
17 Q   Have you taken any advanced professional education
18   beyond, for example, MCLE courses or that sort of
19   thing?
20 A   I have.
21 Q   And what were those in?
22 A   I took so many that I can't remember.
23 Q   When you left Keegan, what was the reason you left
24   Keegan?

- 13 -

1 A   To join the Trust for Public Land.
2 Q   Were you asked to leave, or did you leave because you
3   wanted --
4 A   I chose to leave.
5 Q   You mentioned that TPL is a -- is it a non-profit or
6   charitable institution, or how do you describe it?
7 A   It's a 501c3.
8 Q   And is that a charitable institution?
9 A   Correct.
10 Q   Is it also a non-profit?
11 A   Correct.
12 Q   Is that the same designation?
13 A   (No response.)
14 Q   Are you aware whether or not TPL has a designation of
15   being a non-profit with the Secretary of State?
16 A   I do not know.
17 Q   Have you ever checked to see whether TPL is listed as
18   a for-profit corporation?
19 A   I have not.
20 Q   In your role as director of the Massachusetts area,
21   did you in 2003 undertake any legal work for TPL?
22     MR. CONROY: Objection.
23 A   I don't know how to answer that question. I mean, I
24   thought about legal issues. As a lawyer, I can't help

- 14 -

1   myself.
2 Q   I'm going to put a document in front of you, which I
3   have not marked yet, and ask you if you've ever seen a
4   document like that.
5 A   I have not.
6 Q   Can I ask you to look at the second page?
7 A   (Examining.)
8 Q   Do you see where it appears to indicate that TPL is a
9   for-profit corporation? Do you see that?
10 A   You're pointing to the X in the middle of the page?
11 Q   Yeah.
12 A   I see the X.
13 Q   And that would be beside the for-profit designation,
14   is that correct?
15 A   Correct.
16 Q   And you don't have any idea why that's listed with the
17   Commonwealth as a for-profit corporation. Is that
18   correct?
19 A   Correct.
20 Q   Do you share in bonuses issued by TPL in connection
21   with monies that are derived from TPL's operation?
22 A   There are no bonuses at TPL.
23 Q   You're on a salary at TPL?
24 A   Correct.

- 15 -

1 Q   What is your salary?
2 A   Somewhere in the eighty thousand to ninety thousand
3   dollar range, maybe between ninety and a hundred. I'm
4   not quite sure where it is right now.
5     (Plaintiff and Mr. Norris enter)
6 Q   You're here today because you received or your
7   attorney received a notice of deposition, is that
8   correct?
9 A   I believe that's correct.
10     MR. McLAUGHLIN: Can I have that marked
11   as Exhibit 1, please?
12     (WHEREUPON, Exhibit No. 1, TPL
13   corporate registration form, marked for
14   identification.)
15 Q   Have you seen this notice of deposition before?
16     MR. CONROY: Can I just clarify for the
17   record? Exhibit 1 is the document that you've
18   just been asking questions about, correct?
19     MR. McLAUGHLIN: Yes.
20     MR. CONROY: Okay.
21 A   I believe I've seen this before.
22     MR. McLAUGHLIN: Okay. We'll just have
23   that marked.
24 Q   And that's why you're here today, correct?

- 16 -

1 A   Essentially.
2     MR. McLAUGHLIN: We'll have that marked
3   as Exhibit 2.
4     (WHEREUPON, Exhibit No. 2, notice of
5   deposition, marked for identification.)
6 Q   Do you hold any other positions with TPL--related
7   entities?
8     MS. FETOUH: Objection.
9 A   I don't know what you mean by TPL--related entities.
10 Q   Well, have you ever heard of TPL Land Action Fund?
11 A   I have.
12 Q   Well, you hesitated in answering that, and I'm
13   wondering. Is that because you're generally
14   unfamiliar with the TPL Land Action Fund?
15     MR. CONROY: Objection.
16 A   The reason I hesitated is that I was trying to
17   remember the name.
18 Q   What is the TPL Land Action Fund?
19 A   I don't know.
20 Q   I'm going to put before you a document and have you
21   take a look at it from the Secretary of State. Does
22   that refresh your memory as to what the TPL Land
23   Action Fund is?
24 A   No.

- 17 -

1  Q  What's the address of TPL where you work? Where do
2      you work? What's the address?
3  A  33 Union Street in Boston.
4  Q  And I note here that the document in front of you is
5      also 33 Union Street. Do you see that?
6  A  Yes, it's misspelled here.
7  Q  What's misspelled, Union?
8  A  The word Union, yes.
9          MR. McLAUGHLIN: Can we mark that as
10     Exhibit -- whatever it is, three?
11         (WHEREUPON, Exhibit No. 3, TPL Land
12     Action Fund corporate registration form, marked
13     for identification.)
14 Q  Who is Ernest Cook?
15 A  He's a gentleman who works for the Trust for Public
16     Land.
17 Q  And does he work with you?
18 A  He works in the same building I do. He is employed by
19     the conservation finance office of the Trust for
20     Public Land.
21 Q  Is that a separate entity?
22 A  No.
23 Q  So, when you say conservation finance, is that the
24     division of TPL that deals with financial matters of
                                                    - 18 -

1      the entity?
2  A  No.
3  Q  Okay. What is conservation finance division?
4  A  I don't think it's a division. It's an office that
5      helps communities raise money for land acquisition.
6  Q  So, he, like you, is an employee of TPL as far as you
7      understand?
8  A  Yes.
9  Q  And is today the first time you've become aware that
10     he is the president of the TPL Land Acquisition Fund?
11         MS. FETOUH: Objection.
12 A  The Land Action Fund?
13 Q  The Land Action Fund, I'm sorry, Action Fund.
14         MR. CONROY: Objection.
15 A  Yes, it is.
16 Q  I note that under Exhibit 3, on Exhibit 3, it says
17     that the TPL Land Action Fund was organized in the
18     year 2000, on the first page about halfway down. Are
19     you at all surprised that this entity has existed for
20     the last seven years or thereabouts without your
21     knowledge?
22         MR. CONROY: Objection.
23 A  I don't have a reaction one way or another.
24 Q  On the second page, it also indicates that it is for-
                                                    - 19 -

1      profit. Do you see that?
2  A  Are you looking at the X in the middle of the second
3      page?
4  Q  Yes.
5  A  I see the X.
6  Q  And the X is to the left of the designation for-
7      profit. Do you see that?
8  A  I do.
9  Q  Are you surprised that there is a for-profit
10     designation for any entity related to TPL?
11 A  Yes.
12 Q  And as an attorney, were you at all involved in filing
13     any documents with the Secretary of State for TPL
14     during your tenure as a director of the Massachusetts
15     section or region?
16         MR. CONROY: Objection.
17         MS. FETOUH: Objection.
18 A  Well, which question would you like me to answer?
19 Q  Well, let's go back. Shall we call it the
20     Massachusetts region? Is that what you're the
21     director of, or is it State of Massachusetts or?
22 A  You can call it the Massachusetts state office.
23 Q  Okay. So, in your role as the director, were you ever
24     involved in filing any documents on behalf of TPL with
                                                    - 20 -

1      the Secretary of State?
2  A  No.
3  Q  And what makes you believe that TPL is a 501c3?
4          MR. CONROY: Objection.
5  A  That is what I had been told.
6  Q  So, you haven't specifically seen documents that would
7      verify whether it is or is not.
8  A  I may have, but I don't currently recall.
9  Q  Can you tell me how TPL became acquainted with the
10     Town of Stow concerning the Kunelius property?
11 A  Yes.
12 Q  Would you do that, please?
13 A  I believe the Trust for Public Land was contacted by a
14     fellow named Peter Christianson.
15 Q  And who is Peter Christianson?
16 A  A resident of Stow.
17 Q  Did he have some official position with the Town of
18     Stow? Was he an elected official or anything like
19     that?
20 A  Not to my knowledge.
21 Q  And did he contact you directly?
22 A  No.
23 Q  Who did he contact?
24 A  I don't remember.
                                                    - 21 -

1  Q  Do you recall the circumstances as to why he called
2      you?
3  A  Yes.
4  Q  What were those?
5  A  It was with respect to a piece of property near his
6      house.
7  Q  And was that the Kunelius property?
8  A  The property at 142 Red Acre Road.
9  Q  And do you have reason to believe that's not the
10     Kunelius property?
11 A  No.
12 Q  You don't recall who he contacted at TPL. Is that
13     your testimony?
14 A  I do not.
15 Q  Do you recall the reasons that he contacted TPL?
16         MS. FETOUH: Objection.
17 A  Yes.
18 Q  What were those?
19 A  It was with respect to a potential conservation
20     project.
21 Q  Did Mr. Christianson tell you there was a potential
22     project there at the Kunelius property?
23 A  I don't believe he used those words.
24 Q  Well, you didn't actually talk to him about it, so how
                                                    - 22 -

1      do you know what his words were?
2  A  I don't know what his words were.
3  Q  Do you know who established that there was a potential
4      conservation project at the Kunelius property?
5  A  I'm not sure I understand what you mean by
6      established.
7  Q  Well, you said that he contacted you about a potential
8      conservation project at the Kunelius property at 142
9      Red Acre Road, and my question is --
10 A  He contacted TPL.
11 Q  And my question is: who said there was a potential
12     project there? If you don't know what he said, how
13     did you know there was a potential project there?
14 A  The words potential project are my words.
15 Q  Do you recall any of the circumstances surrounding the
16     contact of TPL by Peter Christianson resulting from
17     any discussions you had with any other people at TPL?
18 A  Yes.
19 Q  Can you tell me what you know about that?
20 A  I believe he talked to other people in my office about
21     the potential for a conservation project on the
22     Kunelius property.
23 Q  Now, he was not the owner at that time of the Kunelius
24     property. Is that correct?
                                                    - 23 -

EXHIBIT D



1  A  Correct.
2  Q  Was it unusual for someone who is not an owner of a
3     property to contact you concerning the establishment
4     of a conservation project on someone else's property?
5  A  No.
6  Q  Does that happen regularly?
7  A  Yes.
8  Q  Do you recall who the people were in your office?
9  A  I believe he contacted Valerie Talmadge.
10 Q  And who is Valerie Talmadge?
11 A  Valerie Talmadge is the director of projects for the
12    New England region.
13 Q  Is she still an employee of TPL?
14 A  Yes.
15 Q  How many employees are there at TPL in Boston?
16 A  Well, without actually taking the time to count the
17    offices, I'd say in the neighborhood of twenty-five or
18    thirty.
19 Q  And were there 25 or 30 back in 2003?
20 A  Maybe a few less.
21 Q  Did you have discussions with Valerie Talmadge
22    concerning TPL's involvement with the property
23    which -- instead of calling it the Kunelius
24    property, I'm just going to call it the property

- 24 -

1     from now on. Did you have discussions with her
2     concerning the property?
3  A  I did.
4  Q  And what do you recall from those discussions?
5  A  I have a general recollection of them, that Peter
6     Christianson proposed that TPL consider working with
7     the Town of Stow to conserve the Kunelius property.
8  Q  Do you recall discussing with Valerie Talmadge what
9     motivated Mr. Christianson to come to TPL?
10 A  No.
11 Q  Do you recall that there was a 40B development on the
12    Kunelius property approximately at the time that TPL
13    was contacted?
14 A  Yes.
15 Q  Does that refresh your memory at all as to why
16    Mr. Christianson had contacted TPL, i.e., that
17    they wanted a conservation development rather
18    than a 40B development?
19 A  Does that itself refresh my recollection?
20 Q  Yes.
21 A  No.
22 Q  Do you have any knowledge concerning
23    Mr. Christianson's wish that a 40B not be built
24    on property adjacent to his property?

- 25 -

1  A  Yes.
2  Q  And is it fair to say that Mr. Christianson made that
3     known to TPL fairly early on in his discussions with
4     TPL involving the possibility of TPL getting a
5     conservation restriction on the property?
6  A  I don't recall.
7  Q  Do you recall ever meeting Mr. Christianson yourself?
8  A  Yes.
9  Q  And how long after his initial contact with TPL did
10    you meet him, approximately?
11 A  I'm not sure.
12 Q  Do you recall approximately when the initial contact
13    was made from Mr. Christianson to TPL?
14 A  I believe it was in the winter.
15 Q  The winter of 2002?
16 A  I'm not sure.
17 Q  Did Mr. Christianson come to your office at some point
18    prior to you contacting the Town of Stow officials
19    concerning the possibility of TPL's involvement?
20 A  I don't know when, in the sequence of things, he came
21    to TPL's office.
22 Q  Do you recall meeting with him in your office?
23 A  I do.
24 Q  And when was that?

- 26 -

1  A  That's what I don't remember.
2  Q  Was it prior to your involvement in attending any
3     public hearings in the Town of Stow concerning Mosaic
4     Commons?
5        MS. FETOUH: Objection.
6  A  That's what I don't remember, is when.
7  Q  You're familiar with the term Mosaic Commons?
8  A  I'm familiar with the entity known as Mosaic Commons?
9  Q  And what is it?
10 A  I understand it's a development company.
11 Q  And did you have an understanding at some point that
12    Mosaic Commons had intended to purchase the Kunelius
13    property?
14 A  Yes.
15 Q  And is it fair to say that the intended purchase of
16    the Kunelius property by Mosaic Commons was one of the
17    reasons that you were contacted concerning TPL's
18    involvement?
19 A  The proposed land use change, it's my understanding,
20    was the reason that we were contacted.
21 Q  And the proposed land use change, by that you mean
22    that the Kunelius property was under either a farm
23    designation or forestry designation under Chapter 61
24    and, if it were sold to Mosaic Commons, it would be

- 27 -

1     changed to some other designation. Is that right?
2  A  By that I mean that there was development planned.
3     That's all I mean.
4  Q  Let me go back. Do you recall attending meetings in
5     December of 2002 where Mosaic Commons made
6     presentations to the Town of Stow, the Board of
7     Selectmen?
8  A  I don't remember seeing presentations.
9  Q  Do you recall whether anyone at TPL attended meetings
10    where Mosaic Commons made a presentation to the Board
11    of Selectmen or any other board of the Town of Stow?
12 A  The introduction to your question, do I remember if
13    anybody from TPL?
14 Q  Yes.
15 A  No.
16 Q  Would you have been the point person, in other words,
17    the person with the general authority, to go to such
18    meetings and make comments at such meetings on behalf
19    of TPL?
20       MS. FETOUH: Objection.
21 A  I don't know about the authority question. So, I'm
22    not sure how to answer that.
23 Q  Well, would TPL send an intern to have discussions
24    with the town's Board of Selectmen concerning the

- 28 -

1     possibility of having TPL assist the town in some way?
2        MR. CONROY: Objection.
3        MS. FETOUH: Objection.
4  A  Well, TPL scopes projects in a lot of different ways
5     and gathers lots of information about projects ahead
6     of time. Sometimes that involves project managers.
7     Sometimes that involves interns.
8  Q  Tell me about the scoping of a project. Does that
9     mean that, prior to a potential sale of property that
10    might change a land use designation, you might know
11    about that even before the sale occurs?
12       MR. CONROY: Objection.
13       MS. FETOUH: Objection.
14 A  I don't understand your question.
15 Q  Well, tell me what you mean when you say scopes a
16    project.
17 A  Analyzes a potential project. That's what scope
18    means.
19 Q  And what do you do to analyze a project?
20 A  You have discussions with local representatives. You
21    take a look at sort of the whole constellation of
22    factors that enable conservation projects to occur,
23    including the availability of conservation financing,
24    various transactional pieces, and you make an

- 29 -

1   assessment about the political interest of, in this
2   case, a town to undertake a conservation project.
3 Q   And did such a scoping occur with regard to the
4   Kunelius property?
5 A   Yes.
6 Q   And do you recall when that scoping began?
7 A   No.
8 Q   Is it likely that it began when you were first
9   contacted by Mr. Christianson?
10 A   Yes.
11 Q   Other than Mr. Christianson, who else attended the
12   meeting with you at your office that you mentioned
13   earlier?
14 A   The meeting that I mentioned, if you recall, I
15   couldn't put a date on it, and, actually, as I think
16   about it now, I can't remember who else was there. I
17   do remember meeting Mr. Christianson in my office.
18 Q   Do you recall whether other people were there?
19 A   I don't recall.
20 Q   Do you recall whether other TPL personnel were there?
21 A   I don't recall.
22 Q   Is it likely that Valerie Talmadge would have been
23   there?
24      MS. FETOUH: Objection.

- 30 -

1 A   I don't know how to answer it. I mean, I can tell you
2   what I remember. What I remember is that I did meet
3   with Mr. Christianson, but I don't remember who else
4   was there.
5 Q   And if I've asked this question, I apologize. Do you
6   recall, in that meeting, Mr. Christianson looking for
7   ways to prevent a 40B development occurring on the
8   Kunelius property?
9 A   The focus of the conversation, if I remember it in
10   that first meeting, was the creation of a conservation
11   project, and how one would do that, more than the
12   prevention of an alternative.
13 Q   Do you recall that Mr. Christianson was concerned
14   about low-income housing being adjacent to his
15   property?
16 A   No.
17 Q   At some point, after meeting with Mr. Christianson,
18   did you initiate any contact with the Town of Stow on
19   behalf of TPL?
20 A   I don't recall whether I initiated any contact.
21 Q   Who would have initiated contact with the Town of
22   Stow, if you did not, from TPL?
23      MR. CONROY: Objection.
24      MS. FETOUH: Objection.

- 31 -

1 A   Normally, the person who would be handling the
2   potential scoping would make that contact.
3 Q   And who was that in this case?
4 A   That would be me.
5 Q   So, is it likely that you were the person that
6   contacted the Town of Stow?
7 A   Well, I'd like to tell you that I remember contacting
8   the Town of Stow, but at this point in time, I just
9   don't remember that. I've had conversations with
10   Stow, subsequently, but whether or not I was the one
11   who initiated that contact, I just don't recall.
12 Q   But since you were the person running the scoping of
13   the project, it is likely that you were the person
14   that would contact the town? Is that correct?
15      MR. CONROY: Objection.
16      MS. FETOUH: Objection.
17      MR. CONROY: I think it's been asked
18   and answered.
19 A   I've tried to tell you what I remember about it. I
20   don't recall whether, in this situation, it was me or
21   not.
22 Q   How old are you?
23 A   Fifty.
24 Q   Have you testified before in a deposition?

- 32 -

1 A   No.
2 Q   Have you testified in any litigation?
3 A   No.
4 Q   Are you still a member of the bar?
5 A   Yes.
6 Q   At some point, did you contact the Town of Stow
7   concerning the possibility of TPL acquiring the
8   property, the Kunelius property? .
9 A   Yes.
10 Q   And do you recall when that was?
11 A   No.
12 Q   You have no idea at all as to when you may have
13   initiated a discussion with them concerning TPL
14   acquiring the property. Is that your testimony?
15      MR. CONROY: Objection.
16      MS. FETOUH: Objection.
17 A   My testimony is, for the third time, I don't remember
18   when it happened.
19 Q   Do you remember, generally, when it happened?
20 A   After talking with Peter.
21 Q   But I'm talking about something different. So, maybe
22   I'm being unclear. I didn't ask you when you
23   initiated discussions concerning a conservation
24   commission, I mean, a conservation restriction. I'm

- 33 -

1   asking you: when did you initiate discussions with
2   the Town of Stow concerning TPL acquiring the Kunelius
3   property?
4      MR. CONROY: Objection.
5      MS. FETOUH: Objection.
6      MS. ECKER: Objection.
7 A   I'm not sure what you mean by acquiring the property.
8   I mean, I don't distinguish -- I mean, my memory is
9   that I had discussions with the town in the period of
10   time after Peter Christianson brought this potential
11   project to our attention. That's my memory.
12 Q   But you don't understand the term acquiring the
13   property as I'm using it?
14 A   Well, the discussions weren't so much about acquiring
15   as they were about how to do a potential conservation
16   project out there.
17 Q   Did, using your term, doing a potential conservation
18   project out there, involve acquiring some or all of
19   the Kunelius property by TPL?
20 A   It may have or it may not have. At the beginning of a
21   project, you don't pre-ordain what the outcome of the
22   project is.
23 Q   But my question to you, sir, is: when did you discuss
24   it where it did involve the acquiring of the property

- 34 -

1   by TPL?
2 A   Sometime after meeting with Peter.
3 Q   And would that be in 1999?
4 A   No. I don't recall.
5 Q   So, you do have some sense of, generally, when it was.
6   Can you give me, plus or minus, a year? When did you
7   do this?
8 A   Well, my memory is that this project occurred during
9   the 2003 and 2004 period, generally. So, that
10   suggests that these conversations took place during
11   that time.
12      (WHEREUPON, Exhibit No. 4, Stow annual
13   report, 2003, marked for identification.)
14 Q   I've put before you a document which has been marked
15   as Exhibit 4 and ask you if you've seen this before.
16 A   I believe I have.
17 Q   And on the first page -- by the way, this has a Bate
18   stamp on it from KUN205 through 216. These are
19   documents that were provided by the Town of Stow.
20   That is their designation on the Bate stamp number.
21   The first page of this document, which is
22   Exhibit 4, has a picture of a horse on it and it
23   says Town of Stow Annual Report, 2003, Red Acre
24   Farm. Do you see that?

- 35 -



1 A  I do.
2 Q  The second page indicates that this is a special town
3     meeting. It has a heading: Special Town Meeting,
4     2003, January 13, 2003. Do you see that?
5 A  Yes.
6 Q  Now, just looking at that, does that in any way assist
7     you as to whether or not you may have contacted the
8     Town of Stow in 2002 concerning the possibility of
9     acquiring the Kunelius property?
10 A  Looking at Page 2?
11 Q  Yes.
12 A  Page 2 does not remind me.
13 Q  Well, you see where it says there's a special town
14    meeting of January 13th?
15 A  Yes.
16 Q  Is it likely that a special town meeting dealing with
17    the Kunelius property, that you would have attended
18    such a meeting, if in fact you did, without first
19    making contact with the town prior to January 13,
20    2003?
21        MR. CONROY: Objection.
22        MS. FETOUH: Objection.
23 A  Could I take a minute and just read this?
24 Q  Well, actually, let me just direct you to a couple of
- 36 -

1     sections which may be helpful to you.
2 A  Okay.
3 Q  I'd like you to take a look on Page 95, also, marked
4     as KUN211. In the third full paragraph down, it says:
5     Craig MacDonald of the Trust for Public Land would
6     work with the Stow Conservation Trust and Friends of
7     Red Acre together with the selectmen with regard to
8     the Chapter 61A assignment. TPL would be the project
9     manager. Do you see that?
10        MR. CONROY: It's MacDonnell, by the
11    way.
12        MR. McLAUGHLIN: What did I say?
13        MR. CONROY: MacDonald.
14        MR. McLAUGHLIN: I'm sorry. I
15    apologize.
16 A  I see that.
17 Q  Does this suggest to you that you had contacted the
18    Town of Stow prior to January 13, 2003, in order to at
19    least discuss a Chapter 61 matter, a 61A assignment?
20 A  Yes.
21 Q  And can you tell me what a 61A assignment would be?
22 A  My understanding is that, under Mass. General Law,
23    Chapter 61A, there's a provision that authorizes
24    municipalities to assign rights of first refusal to
- 37 -

1     conservation organizations.
2 Q  And do I understand it correctly that this reference
3     is referring to the possible assignment of the right
4     of first refusal to TPL?
5 A  This paragraph?
6 Q  Uh-huh.
7 A  Yes, I believe that would be the case.
8 Q  So, this is referring to -- it's also referring to TPL
9     would be the project manager. What does that mean?
10        MR. CONROY: To whom?
11        MR. McLAUGHLIN: I don't know. That's
12    what it says. What does it mean to him?
13 A  What does that mean to me?
14 Q  Yeah.
15 A  It means that we would manage the conservation
16    project.
17 Q  And would you manage the assignment?
18        MS. FETOUH: Objection.
19 A  We would help the town accomplish the assignment.
20 Q  And when the assignment occurs, who has the right to
21    purchase the property under the terms of an
22    assignment?
23        MR. CONROY: Objection.
24        MS. FETOUH: Objection.
- 38 -

1 A  The assignee.
2 Q  And do you have an understanding of what this
3     paragraph is referring to or who the assignee would be
4     under this paragraph?
5 A  TPL.
6 Q  So, when TPL then becomes the assignee, sir, was it
7     your expectation that TPL would then purchase the
8     land?
9        MS. FETOUH: Objection.
10 A  It was my expectation that we would live by the terms
11    of the contract.
12 Q  No, was it your expectation that under the terms of
13    the assignment the only entity that could purchase the
14    land would be TPL?
15 A  Correct.
16 Q  Now, do you recall, having read this, when you would
17    have first discussed the possibility of TPL acquiring
18    the land by assignment? Strike that.
19        Do you recall when you discussed this with
20    the town officials, concerning TPL acquiring the
21    land by assignment, given the fact that this
22    representation appears to be sometime on January
23    13th of 2003?
24        MR. CONROY: Objection.
- 39 -

1 A  Well, this paragraph would suggest to me that
2     conversations occurred prior to the town meeting.
3 Q  Is it likely that TPL met with the town in December of
4     2002 concerning this issue of a possible of assignment
5     of the right of first refusal?
6        MR. CONROY: Objection.
7        MS. FETOUH: Objection.
8 A  Well, what I can say is that TPL did meet with town
9     officials prior to January 13th.
10 Q  Was it you that met with the town officials prior to
11    January 13th?
12 A  I believe so.
13 Q  And who did you meet with?
14 A  There were many meetings between myself and municipal
15    officials regarding this project over many months, and
16    so I guess there were maybe seventy-five or a hundred
17    meetings over the period of this project. So, for me
18    to remember how who was at any one meeting is
19    difficult, but I do remember there were a series of
20    meetings.
21 Q  You don't remember who was at the first meeting, the
22    introductory meeting. Is that your testimony?
23 A  Correct.
24 Q  You don't remember where the introductory meeting was.
- 40 -

1     Is that right?
2 A  I don't.
3 Q  You don't recall whether it was the Board of
4     Selectmen. Is that correct?
5 A  I do not.
6 Q  You don't remember whether the meeting was in your
7     office or in the Town of Stow.
8 A  I don't remember the first meeting.
9 Q  Do you remember the second meeting?
10 A  No.
11 Q  In your role as director, who would you normally
12    contact from a town when initiating discussions
13    concerning a Chapter 61A assignment?
14        MS. FETOUH: Objection.
15 A  I would be interested in talking to the Board of
16    Selectmen.
17 Q  But you don't know in this case whether you contacted
18    the Board of Selectmen?
19 A  I do not recall.
20 Q  Who else in the Town of Stow would you have contacted
21    in order to initiate discussions on a Chapter 61A
22    assignment?
23        MS. FETOUH: Objection.
24        MR. CONROY: Might he have contacted?
- 41 -



1      MR. McLAUGHLIN: Yeah.
2 A    Well, what I can say is, normally, in a 61A project, I
3      like to talk to people on the Conservation Commission.
4      I like to talk to people on the CPC and on the
5      Planning Board and other municipal committees. The
6      objective is to get a feel for the possibility of any
7      project by talking to as many people as possible, and
8      because TPL has many projects going in every year,
9      there are hundreds of these meetings that occur, have
10     occurred, since 2002.
11 Q   You described having seventy-five or a hundred
12     meetings with the town officials from the initiation
13     of the possibility of an assignment of the Chapter 61A
14     exercise of right of first refusal to --
15 A   I'd like to clarify that. I'd say discussions,
16     probably not meetings but discussions.
17 Q   Okay. The span of time from the initiation, perhaps
18     sometime before January 13, 2003, to the end of the
19     hundredth meeting was approximately what date?
20     MS. FETOUH: Objection.
21 A   Well, I'm not saying there were a hundred meetings. I
22     said I've had between seventy-five and a hundred
23     discussions.
24 Q   Okay.

                           - 42 -

1 A    And that's a ball-park. So, your question is?
2 Q    Well, over what span of time did you have these
3      discussions and/or meetings, beginning with --
4 A    The course of the whole project.
5 Q    At some point, is it fair to say you actively began
6      lobbying for the possibility of accepting an
7      assignment of the 61A right of first refusal?
8      MR. CONROY: Objection.
9      MS. FETOUH: Objection.
10 A   Lobbying to whom?
11 Q   To the town.
12 A   It is fair that at some point it made sense to TPL
13     that, for the project to go forward, the way that
14     would occur is via an assignment of the right of first
15     refusal.
16 Q   And at some point did you begin any process of
17     convincing the town that that was the way the project
18     should go?
19 A   Well, I had a number of discussions, the place and
20     time of which I can't recall right now, with various
21     town officials about how to go forward, how to do
22     this, and we certainly talked about Chapter 61A among,
23     you know, a whole host of other issues.
24 Q   And when you would have these discussions, do you ever

                           - 43 -

1      recall discussions with a political body, such as the
2      entire Board of Selectmen?
3 A    Yes.
4 Q    And how often did you meet with the entire Board of
5      Selectmen?
6 A    I don't recall the frequency. I think it was a number
7      of times that I met with the whole board.
8 Q    Did you meet with them during official Board of
9      Selectmen hearings or privately?
10 A   I met with them during regularly scheduled meetings,
11     and I believe I had conversations with individual
12     members outside of those meetings.
13 Q   Do you know approximately when you met with the Board
14     of Selectmen in official meetings?
15 A   No.
16 Q   Can you tell me approximately when you did that?
17 A   Not with reference to a date. I mean, I believe that,
18     in order to accomplish the assignment, there were
19     meetings with the Board of Selectmen in advance of the
20     actual assignment. So, you know, in relation to other
21     events, I can remember it, but I don't have dates in
22     mind.
23 Q   Do you recall when the assignment took place?
24 A   I believe it was in 2003.

                           - 44 -

1      (WHEREUPON, Exhibit No. 5, Stow letter
2      with attachments to Kunelius, dated February 12,
3      2003, marked for identification.)
4 Q    I've put before you what has been marked as Exhibit 5
5      and ask you if you've seen that before.
6 A    Yes, I believe I have.
7 Q    Now, for the record, this is a compilation of
8      documents as received from the Town of Stow. So, they
9      were stapled together in this matter when we received
10     them and I've left them that way. The first page is
11     KUN474. It is a February 12th letter to Marilyn
12     Kunelius from the Board of Selectmen. The second one
13     is an assignment and acceptance, and that's 476,
14     signed by three members of the Board of Selectmen.
15     And the third page is an acceptance of assignment,
16     which is 478, and that is signed by Dorothy Nelson
17     Stuckey, regional counsel, Trust for Public Land.
18     Now, does this exhibit, number five, assist
19     you in getting a sense of when the assignment
20     took place?
21 A   It does.
22 Q   And the first page of Exhibit 5 is a notice from the
23     Town of Stow to Marilyn Kunelius that they are
24     assigning the right of first refusal to the Trust for

                           - 45 -

1      Public Land. Do you see that?
2 A    I do.
3 Q    And you've seen this before. Is that correct?
4 A    Yes.
5 Q    And this is copied to Dorothy Nelson Stuckey, Trust
6      for Public Land, on the cc: line. Is that correct?
7 A    Yes.
8 Q    And does she remain counsel for the Trust for Public
9      Land?
10 A   Yes.
11 Q   And that was on February 12th of 2003. Is that
12     correct?
13 A   Exhibit 5 is dated February 12th.
14 Q   And the last page of Exhibit 5 is an acceptance of the
15     assignment signed on February 12, 2003. Do you recall
16     that?
17 A   Do I recall the acceptance?
18 Q   I'm sorry. Am I correct there?
19 A   Well, I see the last page of Exhibit 5.
20 Q   Okay. Now, were you at any meeting of the Board of
21     Selectmen when they voted to assign the rights to TPL?
22 A   I believe I was.
23 Q   And do you recall what that meeting was?
24 A   No.

                           - 46 -

1 Q    Was Dorothy Stuckey with you at that meeting with the
2      Board of Selectmen when they voted to assign the right
3      of first refusal to you, to TPL?
4 A    Don't believe so.
5 Q    Well, I note that both are dated the same date,
6      February 12th. Do you see that?
7 A    Page 3 being -- or --
8 Q    Well, if we look at the date of the letter, first page
9      of Exhibit 5, February 12, 2003, and if you look at
10     the acceptance, it's dated the same day. Would that
11     suggest that she was with you at a meeting concerning
12     the acceptance?
13 A   Not necessarily.
14 Q   So, you don't remember whether she was even with you
15     at the meeting of the Board of Selectmen when the
16     assignment was made?
17     MS. FETOUH: Objection, asked and
18     answered.
19 A   My recollection is that she was not.
20 Q   And did you have the authority, at the time of the
21     vote to assign it to TPL, to accept on behalf of TPL
22     that assignment?
23 A   Are you asking whether, as Massachusetts state
24     director, I had the authority to do that?

                           - 47 -

1 Q   Yeah.
2 A   I don't know whether I had the authority to do it.
3     Let me clarify that. I believe the Trust for Public
4     Land had considered this and had voted to accept the
5     assignment and, by that vote, essentially authorize
6     Dorothy Stuckey to sign that acceptance.
7 Q   And was that a vote of the Board of Directors of TPL?
8 A   It was a vote of the Project Review Committee of the
9     Board of Directors.
10 Q   And is that of the national Board of Directors or is
11     there --
12 A   There is only one Board of Directors.
13 Q   So, the Project Review Committee voted to accept the
14     assignment?
15 A   Correct.
16 Q   And it's that vote that authorized Dorothy Stuckey to
17     accept on behalf of TPL?
18 A   Correct.
19 Q   And it is likely, therefore, that the vote occurred
20     prior to her accepting the assignment? Is that
21     correct?
22 A   It is likely.
23 Q   I'm going to put before you another document. Do you
24     have a sense, prior to doing that, when they voted?

- 48 -

1     Would they have voted a week before, a day before?
2 A   I do not know.
3         (WHEREUPON, Exhibit No. 6, MacDonnell
4     letter to Perry, dated February 11, 2003, marked
5     for identification.)
6 Q   I've put before you a document that we received from
7     the Town of Stow. This has been marked as Exhibit 6.
8     It's a February 11, 2003, letter to Ross Perry from
9     Craig MacDonnell, Massachusetts state director. Do
10     you recognize this?
11 A   I do.
12 Q   Is that your signature?
13 A   Yes.
14 Q   Now, this is dated the day before the vote to assign
15     to TPL, is that correct?
16         MS. FETOUH: Objection.
17 A   It's dated February 11th.
18 Q   And this is the day before Dorothy Stuckey accepted
19     the assignment, correct?
20         MR. CONROY: Objection.
21 A   The day before the 12th, which is the date next to
22     Dorothy's signature on Exhibit 5.
23 Q   So, it's the day before she accepted the assignment.
24     Is that fair to say?

- 49 -

1         MR. CONROY: Objection.
2         MS. FETOUH: Objection.
3 A   Well, since I don't have a recollection independent of
4     these documents, what happened in what sequence, all I
5     can do is sort of agree with you that those two dates
6     are one after another.
7 Q   Looking at the first paragraph of Exhibit 6, well,
8     strike that.
9         Do you have a recollection of why you sent
10     this letter to Ross Perry?
11 A   I need to take a minute and read this. Okay. Your
12     question?
13 Q   Is it fair to say this was a letter from you
14     establishing what the terms were that would have to be
15     met by the town in order for TPL to accept the
16     assignment of the right of first refusal?
17 A   It was a proposal to that effect, yes.
18 Q   And did the town meet your proposal?
19 A   I believe they did.
20 Q   And that resulted in the assignment the next day. Is
21     that correct?
22         MS. FETOUH: Objection.
23 A   I believe it resulted in the assignment. I don't have
24     independent recollection of the date that it actually

- 50 -

1     occurred.
2         (WHEREUPON, Exhibit No. 7, Conditions
3     for right of first refusal, marked for
4     identification.)
5 Q   I am going to put before you the next document,
6     Exhibit 7. Do you recognize this document?
7 A   I don't.
8 Q   Do you recall this document -- well, let me suggest to
9     you that there are numerous copies of this document in
10     the Town's production which indicate that this is
11     something that was sent to you seeking answers to the
12     questions outlined, or the statements outlined, in two
13     pages.
14         MS. FETOUH: Objection.
15 Q   Does that in any way refresh your memory?
16 A   That by itself doesn't, no.
17 Q   This document appears -- it's an unsigned document
18     that has a signature line for Ross Perry. Do you see
19     that on the second page?
20 A   Yes.
21 Q   Do you recall Ross Perry discussing with you topic
22     number two on the front page of Exhibit 7? And for
23     the record, the second item on the first page is:
24     Town is held harmless if TPL backs out of deal before

- 51 -

1     closing. In other words, TPL will defend the town
2     against any suit resulting from the failure of the
3     property purchase to be completed. Alternatively, TPL
4     posts a bond that guarantees their performance.
5 A   I remember discussing this issue with the board as a
6     whole. I don't remember having an individual
7     discussion with Ross Perry about it.
8 Q   What do you remember about that discussion?
9 A   I remember the issue of indemnification coming up in
10     the Board of Selectmen's meeting.
11 Q   And what do you recall about the indemnification issue
12     at the Board of Selectmen meeting?
13         MR. CONROY: Hold on one minute. Go
14     ahead.
15 A   I remember it was discussed in the open meeting.
16         MR. CONROY: That having been asked and
17     answered, can I just have a minute with counsel?
18         MR. McLAUGHLIN: Sure.
19         (Brief recess held)
20         MR. McLAUGHLIN: Can you repeat the
21     question? I don't even remember what it was.
22         (Question and answer read back)
23 Q   Can you tell me what you remember about the
24     indemnification issue during the meeting at the Board

- 52 -

1     of Selectmen?
2 A   Yes.
3 Q   Go ahead.
4 A   I remember the issue was discussed. William Wrigley
5     raised the issue, asked if TPL would indemnify. I
6     told the board we would not.
7 Q   Is that your recollection?
8 A   Yes.
9 Q   Do you recall why they were asking for
10     indemnification?
11         MR. CONROY: Objection.
12         MS. FETOUH: Objection.
13         MR. McLAUGHLIN: Strike that.
14 Q   Do you recall whether they told you why they were
15     asking for the indemnification?
16 A   I don't.
17 Q   Do you recall whether they asked you whether TPL had
18     the money to make the purchase under the terms of the
19     right of first refusal?
20 A   I don't.
21 Q   Do you recall telling TPL, I'm sorry, do you recall
22     telling the Board of Selectmen that TPL did have the
23     money necessary to make the purchase?
24 A   No.

- 53 -

1  Q  You do not recall telling them that. Do you know
2     whether TPL did have the money to make the purchase at
3     the time that you met with the Board of Selectmen on,
4     I presume, February 11th or 12th?
5  A  I'm not sure I know what you mean by have the money.
6  Q  Did you have the funds necessary to complete the
7     purchase?
8  A  No, not in hand.
9  Q  What was the source of the money that would allow TPL
10    to make the purchase under the terms of the right of
11    first refusal?
12 A  I believe it was a combination of sources, including
13    the Town of Stow, a hoped for private sale of a part
14    of Mrs. Kunelius' property and private fund-raising.
15 Q  Any state money?
16 A  There was the hope for a grant.
17 Q  Okay. Let's go back to Exhibit No. 6 for a moment.
18    On the first page of No. 6, there's a reference to
19    $100,000 for affordable housing and 300,000 for open
20    space. Is that correct?
21 A  I see that.
22 Q  And is that the amount that you were looking for when
23    you referred to the source of money from the Town of
24    Stow?

- 54 -

1  A  Yes.
2  Q  So, there's $400,000 there.
3  A  Correct.
4  Q  Did TPL ever receive any of that money?
5  A  No.
6  Q  The second reference you made was the hoped for
7     private sale. And I would ask you to look at the same
8     Exhibit 6, and it refers to deeds from private
9     parcels. Is that correct?
10 A  I see those words.
11 Q  And is that what you were referring to when you said
12    that a source of the money would be hoped for private
13    sales?
14 A  Well, the intention was to subdivide Mrs. Kunelius'
15    land into three portions, one for the town and two
16    lots that would be sold privately, the two lots we
17    referred to as 142 and 144. So, the hope was to sell
18    those two lots, 142 and 144, on the private market and
19    raise funds for Mrs. Kunelius.
20 Q  And raise funds. Where on Exhibit 6 does it discuss,
21    as a requirement of accepting the assignment, that
22    funds would have to be raised?
23       MS. FETOUH: Objection.
24       MR. CONROY: Objection.

- 55 -

1  A  Well, the four hundred thousand are funds that would
2     need to be raised.
3  Q  So, the $400,000 of funds we've already discussed in
4     the funds to be raised by the Town of Stow, I thought.
5     Am I incorrect there?
6  A  No. No, you're correct.
7  Q  And so then there's $400,000. And then you hoped for
8     funds from the private sale of one or two of the lots.
9     Am I correct there?
10 A  Both lots, sale of both lots.
11 Q  And does it say anywhere in Exhibit 6 how much money
12    that would be, would be derived from the sale of the
13    two lots?
14 A  I don't believe so.
15 Q  So, you didn't make, as a requirement of the
16    acceptance of the right of first refusal, a specific
17    dollar amount that would have to be derived from the
18    hoped for private sale, is that correct?
19 A  In this letter, no.
20 Q  And between the date of this letter, January 11th, and
21    the acceptance --
22       MS. FETOUH: February 11th?
23 Q  I'm sorry, February 11, 2003, and the acceptance on
24    February 12, 2003, in which Dorothy Stuckey on behalf

- 56 -

1     of TPL accepted the assignment, are you aware of any
2     other document that would have outlined additional
3     requirements of TPL necessary for TPL to accept the
4     assignment?
5  A  As I sit here this morning, no.
6  Q  Now, the private funding, let's get back to the
7     private funding that you referred to, private funding,
8     private fund-raising. Where does your letter of
9     February 11th, Exhibit 6, refer to that private fund-
10    raising?
11       MR. CONROY: Objection.
12       MS. FETOUH: Objection.
13 A  I don't believe it does.
14 Q  And are you aware of any other document between
15    February 11th and February 12th of 2003 that
16    established, as a condition for the acceptance of the
17    assignment, that private fund-raising would be a
18    necessary component of the acceptance?
19 A  As I sit here this morning, no.
20 Q  Looking at the last page of Exhibit 6, there's a
21    paragraph that states: Under these circumstances, TPL
22    will entertain acceptance of the ROFR. All in
23    caps. Right of first refusal is what that means.
24    Is that correct?

- 57 -

1  A  Yes.
2  Q  Upon acceptance, TPL, quote, steps into the shoes,
3     unquote, of the buyer and is bound by the applicable
4     terms of the contract. Have I read that correctly?
5  A  You have.
6  Q  What did you mean by applicable terms?
7  A  I meant the terms that the common law would require
8     TPL to meet.
9  Q  And what do you mean by common law? What terms would
10    the common law require?
11       MR. CONROY: Objection.
12 A  I mean decisions of the Massachusetts courts under
13    Chapter 61A.
14 Q  And in fact, at that point, did you not have an
15    understanding that there were no decisions concerning
16    what terms would necessarily be applicable and what
17    terms would not?
18       MS. FETOUH: Objection.
19       MR. CONROY: Objection.
20 A  My understanding was that courts would apply some
21    terms and not other terms.
22 Q  And did you have an understanding of what terms
23    were that would be applicable and what terms would not
24    be applicable?

- 58 -

1  A  My understanding was that the terms that would
2     naturally make sense for an assignee to abide by would
3     apply.
4  Q  So, in your mind, when you wrote Exhibit 6, you had an
5     understanding that some of the terms of the contract
6     were applicable to the assignment and some were not.
7     Is that correct?
8  A  Basically.
9  Q  Do you recall being asked by the Town of Stow to
10    identify what terms you thought were applicable and
11    what terms you did not think were applicable?
12 A  No.
13       MR. CONROY: Somewhere in here, Mike,
14    I'd like to take a five-minute break if we could.
15       MR. McLAUGHLIN: Sure. That would be
16    good. It's now 11:30. We'll take a break; 531
17    for the ladies room, is the code, and then why
18    don't we go, say, to 12:30. There's a cafeteria
19    downstairs that's not bad. Oh, you know that.
20       MR. CONROY: So I hear.
21       MR. McLAUGHLIN: Cafeteria downstairs
22    is not bad, and we can take like a half hour if
23    that's all right.
24       (Recess, 11:30 A.M.)

- 59 -

1  (After recess, 11:44 A.M.)
2  THE WITNESS: Are we still on Exhibit 6
3  here?
4  MR. McLAUGHLIN: We're still on
5  Exhibit 6, yeah.
6  THE WITNESS: All right.
7 Q  Just so I understand, when you refer to the language
8  on Exhibit 6, on the last page, where it says, "Upon
9  acceptance, TPL steps into the shoes of the buyer and
10  is bound by the applicable terms of the contract,"
11  have I understood you correctly that you believed that
12  there were terms that you did not have to abide with
13  in the contract, or comply with in the contract, when
14  you wrote this letter?
15 A  By that sentence, I meant to convey my general
16  understanding about an assignee's obligation under
17  Chapter 61. As a general matter, I don't have in my
18  mind at that time a particular term, if that's what
19  you're asking, that would not apply.
20 Q  Okay.
21 A  But while we're on that sentence, I'd like to clarify
22  something I said earlier about this letter not
23  referencing any other financing that was required.
24  The next sentence in that paragraph, where I

- 60 -

1  wrote, "TPL is ready to work hard to assemble the
2  finances required to make the seller whole," by
3  that sentence, I meant that there was a lot of
4  work to do to bring the finances to the table,
5  including town money, private sale money and
6  private fund-raising.
7 Q  So, the reader of the sentence that you just read, TPL
8  is ready to work hard to assemble the finances
9  required to make the seller whole, the reader of that
10  would have to know that it involved some private fund-
11  raising as well. Is that your testimony?
12  MS. FETOUH: Objection.
13  MR. CONROY: Objection.
14 A  Not really. I'm just trying to tell you what I meant
15  by that so I could answer your earlier question more
16  completely. It's that sentence that is sort of the
17  textual reference to some of the things that we talked
18  about between TPL and the town in the meetings that
19  we've referred to.
20 Q  So, on February 11th, the day before the acceptance of
21  the right of first refusal by TPL, is it your
22  testimony that you did not have specific terms of the
23  contract which you believed would allow you to not
24  perform under the contract?

- 61 -

1  MS. FETOUH: Objection.
2  MR. CONROY: Objection.
3 A  No, what I said was a little different than that.
4  What I meant to say was that, by using that sentence,
5  I was saying that, under Chapter 61, there are terms
6  of a contract that apply to an assignee and that,
7  depending on the circumstances, there are others that
8  don't apply.
9 Q  So, based on the fact that you're an attorney and you
10  profess to know Chapter 61, can you tell me what terms
11  you think apply?
12  MS. FETOUH: Objection.
13  MR. CONROY: Objection. Let me say,
14  Mike, if I may, for the record, I have some
15  concern about Mr. MacDonnell being asked to
16  testify, effectively, as an expert, as a legal
17  expert. I think it's fair game to ask him what
18  was in his mind when he did what he did and how
19  that may have influenced him, but for him to be
20  asked to testify in general as to the meaning of
21  the law, I think is inappropriate. So, I object
22  on that basis.
23  MR. McLAUGHLIN: Okay. But I'm not
24  going to change the question.

- 62 -

1 Q  As an attorney, you have some understanding of
2  Chapter 61.
3  MR. CONROY: Excuse me. I will just
4  not repeat that.
5  MR. McLAUGHLIN: No, I understand.
6  MR. CONROY: But throughout the
7  deposition, I have that standing objection, okay?
8  MR. McLAUGHLIN: Yes.
9  MR. CONROY: Is that acceptable?
10  MR. McLAUGHLIN: That's acceptable.
11 Q  Can you tell me, based upon your understanding of the
12  fact that, under Chapter 61, there are terms of a
13  contract that apply and terms of a contract that don't
14  apply, please tell me what terms apply.
15  MS. FETOUH: Objection.
16 A  Because I don't have this contract in my mind as we're
17  talking about it, I can only tell you that sort of as
18  an example of a kind of a term that I don't think
19  would apply, a Chapter 61A contract that imagines a
20  full-scale development process whereby the purchaser
21  gets permits. Those kinds of provisions would sort of
22  be inapposite for an assignee to comply with under
23  Chapter 61.
24 Q  And so, for example, under the terms of the contract

- 63 -

1  in question, which anticipated a 40B development, you
2  did not feel compelled to put up a 40B development as
3  the assignee of the right of first refusal. Is that
4  fair to say?
5 A  For example.
6 Q  Yeah, okay. Do you recall ever meeting with the Town
7  of Stow Community Preservation Committee?
8 A  Yes.
9 Q  I'm going to put before you what will be marked as
10  Exhibit 8.
11  (WHEREUPON, Exhibit No. 8, minutes of
12  Stow CPC meeting, February 10, 2003, marked for
13  identification.)
14 Q  And these are provided to us from the Town of Stow. I
15  note that they are doubled. They're printed on both
16  sides. I'm going to just have you look at one small
17  part of this document, and it's on the second page,
18  which is marked as 039, and it's a -- by the way, this
19  document is called Minutes of Meeting of February 10,
20  2003, and it says a committee member asked what
21  happens if CPC votes in favor and gets voted down at
22  the town meeting. TPL responded that they would be
23  under contract at that point and would have to make it
24  work. Do you recall whether the person that said that

- 64 -

1  for TPL was you?
2  MR. CONROY: Objection.
3  MS. FETOUH: Objection.
4 A  I recall discussing this issue at a meeting of CPC. I
5  don't know whether it was on February 10th.
6 Q  February 10th would have been two days before the
7  assignment. Does that in any way refresh your
8  recollection?
9 A  It would make sense.
10 Q  And it would make sense that you were the person at
11  that point that would have been attending the
12  Community Preservation Committee meeting.
13 A  Yes.
14 Q  Given that, what did you mean when you said that TPL
15  would be under contract at that point and would have
16  to make it work?
17 A  I don't know if I've testified that I actually said
18  that. I remember discussing it.
19 Q  Do you have reason to believe that the minutes of the
20  meeting of February 10th of the Preservation Committee
21  are inaccurate with regard to this paragraph that I've
22  just read?
23 A  I have no reason to think they are accurate or
24  inaccurate.

- 65 -



1 Q Well, you have no reason to believe that it's accurate
2     or inaccurate?
3 A I don't know anything about this document. I've seen
4     it here this morning for the first time. So, I don't
5     know anything about it.
6 Q Well, let's go back. The document, Exhibit 8,
7     purports to be minutes of a meeting of February 10th.
8     Do you see that?
9 A I do.
10 Q And it's your testimony that you likely attended that
11     meeting since it was two days before the assignment.
12 A Yes.
13 Q And so is your testimony that you have no comment as
14     to the accuracy of the statement that TPL responded
15     that they would be under contract at that point and
16     would have to make it work? You have no comment as to
17     whether that is inaccurate or accurate?
18 A I just don't have a recollection of saying that,
19     that's all.
20 Q Do you remember being asked the question?
21 A I don't remember being asked the question.
22 Q Do you remember questions concerning what happens if
23     the town meeting votes down this project?
24 A I don't.

1 Q Did in fact the town vote down the project?
2 A No.
3 Q Did the town have a vote to buy the project?
4 A Yes.
5 Q And it passed?
6 A Correct.
7 Q Is it fair to say, sir, that you were involved
8     extensively in the drafting of a warrant for the town
9     for a town meeting?
10 A I remember participating in the drafting of a warrant
11     article in Stow.
12 Q And is it fair to say that that warrant involved the
13     town purchasing the Kunelius property?
14 A Yes.
15 Q And is it fair to say that the town voted and they
16     voted down the purchase?
17 A My memory is they voted to approve that.
18 Q Let's go back to Exhibit 6 for a second. Looking at
19     Exhibit 6, which is right here, did you ever tell
20     anyone that if you didn't get the town financial
21     commitment of $400,000 that it didn't matter? You
22     were going to buy the property anyhow under the
23     assignment of right of first refusal.
24 A I don't remember that.

1 Q Is it likely that you would have said that?
2     MR. CONROY: Objection.
3 A I don't know how to answer the is-it-likely question.
4 Q Was the $400,000 that is referred to in Exhibit 6 a
5     requirement of TPL's acceptance of the assignment?
6     MS. FETOUH: Objection.
7 A No.
8 Q So, if you didn't get the $400,000, you were still
9     going to accept the assignment. Is that correct?
10 A Well, I believe the vote to authorize the expenditure
11     post-dated the assignment. So, the decision whether
12     to accept the assignment would occur before that would
13     happen.
14 Q Is it also true that if you didn't get the, quote,
15     hoped for sale of the two parcels that that was not
16     critical in whether or not you would accept the
17     assignment?
18     MS. FETOUH: Objection.
19     MR. CONROY: Objection.
20 A Well, likewise, the proposed sale of 142 and 144 Red
21     Acre Road were going to post-date the assignment, so
22     we would not have known then whether in fact those
23     parcels would have sold. It would be later in time.
24 Q Did you tell the Community Preservation Commission

1     that it didn't matter whether you got the four hundred
2     thousand from the town or whether you sold off
3     portions of the property; you would still purchase the
4     property?
5 A I don't recall.
6 Q Do you recall telling that to anyone?
7 A It not mattering --
8 Q Yeah.
9 A -- is your question? I don't recall using that --
10 Q Did it matter? In other words, if the money wasn't
11     given to TPL from the town, $400,000, and if you
12     couldn't sell the two lots, did you tell anyone that
13     it didn't matter because TPL would purchase the
14     property and pay the full asking price?
15 A That's what I don't recall. I don't recall using that
16     language.
17 Q My question to you is: is that a fact that it didn't
18     matter to TPL, that they were going to purchase it
19     anyhow?
20 A It was our complete and absolute intention to do this
21     project and conserve this property and buy this
22     property from Marilyn Kunelius. It's our business to
23     do this. The reason I changed careers was to be
24     involved in the environmental field. This is why I

1     work at TPL. This is why we do this stuff. We fully
2     intended -- from the very second we looked at this
3     project, we would never have accepted the assignment
4     unless we fully intended to do this.
5 Q So, the answer --
6 A Yes, the answer is we fully intended to buy this
7     property.
8 Q And what was your source of funds in the absence of
9     the $400,000 and the absence of the sale of parcels
10     and in the absence of fund-raising? What would be the
11     source of the funds that you would purchase the
12     property with?
13     MR. CONROY: Objection.
14     MS. FETOUH: Objection.
15 A We did not contemplate being able to do this project
16     without finding adequate financial sources external to
17     TPL to complete it.
18 Q You never considered that?
19 A What we considered was, as we consider in all our
20     projects, is advocating as hard as we can for public
21     money, if necessary for private sale money, and if
22     necessary for private fund-raising money, and working
23     as hard as we can to put that money together as we
24     have in every one of our 61 projects in Massachusetts,

1     and so we fully intended that the sources we had
2     identified would come together and that we would be
3     able to purchase this property.
4 Q And did you consider what your obligations would be to
5     Marilyn Kunelius if those sources did not pan out?
6     MS. FETOUH: Objection.
7 A Yes.
8 Q And how did you consider dealing with that
9     possibility?
10 A We looked at the contract.
11 Q You didn't consider any other assets or sources of
12     funds, other than the three that we've already
13     discussed, the money from the Town of Stow, sale of
14     the private lots and fund-raising?
15 A The obligation that TPL had was measured by the
16     contract. So, it's natural for us to look at the
17     contract to figure out what the scope of the
18     obligation was, which is what we did.
19 Q So, you looked at the contract. And is it fair to say
20     you determined that, if we don't get the money from
21     the Town of Stow and if we don't get the private sale
22     from the two lots and we don't get fund-raising, then
23     we'll claim that we don't have to purchase the
24     property because of the liquidated damage clause? Is

1   that correct?
2      MS. FETOUH: Objection.
3 A   We read the liquidated damages clause and believed it
4   would apply in this case and -- well, I'll leave it at
5   that.
6 Q   And you made that determination prior to the
7   acceptance of the assignment. Is that correct?
8 A   Correct.
9 Q   And that was because just the normal prudence would
10   suggest that you would have to have some contingency
11   for the possibility that you wouldn't have the town
12   financing, you wouldn't have the sale of the lots, and
13   you wouldn't have money from fund-raising. Your
14   normal procedure, due diligence and prudence, would
15   suggest that you would have to have some way to deal
16   with that, correct?
17      MR. CONROY: Objection.
18      MS. FETOUH: Objection.
19 A   It's true that, when we scope a project, we look at
20   our legal obligations and make decisions in accordance
21   with them, absolutely.
22 Q   And did you ever tell the Town of Stow prior to the
23   acceptance of the assignment, the right of first
24   refusal, that if you failed to accomplish obtaining

- 72 -

1   money from the Town of Stow or from obtaining the
2   deeds or from fund-raising or selling property from
3   the deeds, that you would rely on the liquidated
4   damage clause and not purchase the property?
5 A   Did I tell the Town of Stow?
6 Q   Yes.
7 A   About our analysis of the --
8 Q   Yes.
9 A   At some point, yes.
10 Q   Prior to the time that you accepted the assignment,
11   did you tell them?
12 A   I don't remember when I had that discussion.
13 Q   Is there anything in Exhibit 6 that outlines,
14   specifically, that you intended to rely on the
15   liquidated damage clause if necessary?
16      MR. CONROY: Objection.
17 A   Well, not explicitly. The sentence where I say that
18   we are bound by the applicable terms of the contract
19   is a summary, really, of normal Chapter 61 legal
20   analysis, which includes all of those terms.
21 Q   Do you recall telling any public officials from the
22   Town of Stow that TPL had never failed at any time to
23   honor an assignment of a right of first refusal?
24 A   Yes, I believe I did say that.

- 73 -

1 Q   And, in fact, do you remember telling public officials
2   of the Town of Stow that they had nothing to worry
3   about regarding indemnification because TPL, having
4   never failed, would find a way to purchase the
5   property to make Mrs. Kunelius whole?
6 A   I remember discussing this issue with the town. I
7   don't recall the language I used.
8 Q   But you do recall that you told the town that TPL had
9   never failed in the past to honor an assignment of a
10   right of first refusal.
11 A   I do remember that, and I believe we honored it here.
12 Q   So, I don't want to belabor a point, but I'm a little
13   confused. On one hand I thought you said that you had
14   every intention of going forward and purchasing the
15   property even if the three items outlined in your
16   letter of February 11th, Exhibit 6, were not achieved.
17      MR. CONROY: Objection.
18 Q   And on the other hand you say that if you did not
19   achieve the three items on Exhibit 6, i.e., the money
20   from the town, the sale of private lots, the two
21   private lots, and fund-raising, that you would look to
22   the liquidated damage clause. So, which is it?
23      MR. CONROY: Objection.
24      MS. FETOUH: Objection.

- 74 -

1      MS. ECKER: Objection.
2 Q   Was the intention to go forward even if you didn't
3   have the three requirements that are outlined on
4   Exhibit 6, or was it your intention to rely on the
5   liquidated damage clause?
6      MR. CONROY: Objection.
7      MS. FETOUH: Objection.
8 A   It was our intention at the beginning and throughout
9   most of this project to close no matter what because
10   that's the way TPL does its business, believing fully
11   that it would be possible to do so. It became
12   apparent at some point, despite all of our good
13   efforts, that the public and private money was not
14   going to make it to the table, and it was only after
15   realizing that there was, what TPL concluded was, an
16   unbridgeable cap between the money that was available
17   and the money that was needed that it became
18   impossible to go forward.
19      (WHEREUPON, Exhibit No. 9, printout of
20   TPL Web site, marked for identification.)
21 Q   I'm going to put before you a document, Exhibit 9, and
22   ask you to take a look at it. This is a printout of
23   the TPL Web site. It was printed out on 3-23, 2005.
24   I'm going to ask you to look at the second page under

- 75 -

1   Buying Time, which is about two-thirds of the way
2   down. It says: Timing is critical in today's real
3   estate markets, but public agencies may not have the
4   capacity or budget to move quickly to acquire land
5   when it becomes unavailable. Using our private
6   capital, TPL can bridge the gap to secure and hold
7   vital lands under the public acquisition process until
8   the public acquisition can gear up. Now, have I read
9   that correctly?
10 A   The word available, I think you said unavailable, but
11   otherwise --
12 Q   I'm sorry, becomes available. I apologize. But other
13   than that, have I read it correctly?
14 A   I believe so.
15 Q   Now, in your last answer, you talked about the fact
16   that you could not bridge the gap in the Kunelius
17   property, and my question is, for you: what are you
18   referring to when you say our private capital?
19      MR. CONROY: Objection.
20 Q   Using our private capital, TPL can bridge the gap.
21   What is the private capital?
22      MS. FETOUH: Objection.
23 A   Well, it's not what I mean, because it's really not my
24   creation.

- 76 -

1 Q   I understand.
2 A   So, you're asking me what I believe TPL means?
3 Q   Yes.
4 A   Private capital is a generic term to describe lines of
5   credit and borrowed funds. Really, it's borrowed
6   funds to bridge gaps in conservation projects where
7   timing is a problem.
8 Q   And so the term private capital from your point of
9   view is money that is borrowed by TPL?
10 A   Yes.
11 Q   That's private capital?
12 A   Yes.
13 Q   Is that definition of private capital your definition,
14   or do you think it has some greater understanding in
15   the public, that the term private capital means
16   borrowed funds?
17      MS. FETOUH: Objection.
18      MR. CONROY: Objection.
19 A   I can only say what I believe it means here.
20 Q   Do you know Rob Glassman?
21 A   No.
22 Q   You've heard of Rob Glassman?
23 A   I may have, but I don't recall.
24 Q   Robert Glassman?

- 77 -



1  A  I don't believe I know Robert Glassman.
2  Q  What was the point where TPL determined that it could
3       not bridge the gap?
4  A  It wasn't so much a point in time if you're using the
5       phrase bridge the gap to mean is it possible to do the
6       deal, or are you using it to mean borrow money? I'm
7       not quite sure.
8  Q  I'm using it however you meant to use it when you said
9       the answer to one of the questions was that TPL made a
10      determination. These are not the exact terms, but you
11      said made a determination that they could not bridge
12      the gap to acquire the property, something to that
13      effect. So, using it however you meant to use it, my
14      question is: at what point did you determine that you
15      could not bridge the gap?
16  A  Well, what I can tell you is that there was a gradual
17      dawning that this project had lots of problems
18      associated with it. So, there was no exact point in
19      time when we can say that's when we knew. It was a
20      very gradual awareness that dawned on TPL that this
21      project was troubled.
22  Q  Now, in considering the term bridging the gap, if we
23      consider the gap on one side is the purchase price and
24      on the other side is the buyer, and if TPL is the

                              - 78 -

1       buyer, can you identify for me specific TPL funds, not
2       borrowed funds, not state funds, not town funds, but
3       TPL funds, which were identified and earmarked for the
4       purchase of the Kunelius property?
5  A  Can I identify those funds?
6  Q  Yes.
7  A  No.
8  Q  Were there any TPL funds ever specifically earmarked
9       for the purchase of the property?
10  A  I don't believe so.
11          (WHEREUPON, Exhibit No. 10, Stow
12      Finance Committee minutes, January 7, 2003,
13      marked for identification.)
14  Q  So, from your point of view, TPL itself never had one
15      dollar of the purchase price at risk with regard to
16      this project. Is that correct?
17          MS. FETOUH: Objection.
18          MR. CONROY: Objection.
19  A  I don't think that's my testimony. No, I wouldn't say
20      that.
21  Q  What were the funds that TPL, of the purchase price,
22      now, what funds which were to make up the purchase
23      price were actually TPL's own monies?
24          MR. CONROY: Objection.

                              - 79 -

1  A  There were deposits made against the contract, the
2       amount of which I'm not quite certain of, but those
3       were TPL dollars.
4  Q  Well, in fact, weren't those dollars that were donated
5       to TPL from the Friends of Red Acre?
6  A  Some of them, I believe, were.
7  Q  Weren't all of them, sir?
8  A  I don't recall.
9  Q  Is it likely that they were? Do you have any
10      recollection?
11          MR. CONROY: Objection.
12          MS. FETOUH: Objection.
13  A  My recollection is that we did ask for a donation from
14      the Friends of Red Acre for some money up front. What
15      I can't remember is how much.
16  Q  So, you don't remember how much of the earnest money
17      that was paid to Mrs. Kunelius was actually TPL funds
18      and how much had been raised by TPL through the
19      Friends of Red Acre. That's your testimony, correct?
20          MS. FETOUH: Objection.
21  A  What I don't remember is how much, how many of the
22      dollars that were deposited with Mrs. Kunelius were
23      TPL dollars and how many were Friends of Red Acre
24      dollars.

                              - 80 -

1  Q  And as you sit here today, you cannot say with any
2       certainty that any of those monies that were -- you
3       used the word deposited. I used the word earnest
4       money. You cannot say with any certainty that any of
5       those dollars were TPL dollars. Isn't that fair to
6       say?
7  A  I do not know where they came from.
8  Q  Now, if we look at the document --
9  A  Well, let me -- I'd like to clarify that. That's all
10      right. I'll leave it at that.
11  Q  Let's look at Exhibit 10, which is before you, and
12      this is also from the Town of Stow. It's Finance
13      Committee meeting minutes, January 7, 2003, town
14      building draft. It appears to be: Fincom joins the
15      Board of Selectmen in a joint meeting at 7:15. It
16      begins -- I'm going to read just a couple of
17      sentences.
18          Craig MacDonnell from TPL and David Cobb
19      from the Friends of Red Acre are present. The
20      Trust for Public Land is a national non-profit
21      organization that helps communities achieve
22      effective use in conservation land planning.
23      TPL, responding to the Stow Conservation Trust
24      and Friends of Red Acre, proposes that Stow

                              - 81 -

1       exercise the right of first refusal at the
2       Kunelius land. TPL would like to bear 50 percent
3       of the 1.2 million dollar cost of the land. Do
4       you see that?
5  A  I do.
6  Q  Now, were you present at that meeting?
7  A  As with respect to the other minutes --
8  Q  Well, this is a joint meeting, so it's Fincom and the
9       Board of Selectmen. And so the question --
10  A  My name is listed as being there. I have to say to
11      you, just in being honest, I don't, as I sit here this
12      morning, have an independent recollection of being at
13      this meeting.
14  Q  Do you recall telling them that TPL would bear 50
15      percent of the cost of 1.2 million dollars?
16  A  No.
17  Q  Do you have any reason to believe that these minutes
18      are inaccurate with regard to that statement?
19          MR. CONROY: Objection.
20          MS. FETOUH: Objection.
21  A  Yes, I do.
22  Q  And in what regard are they inaccurate?
23  A  I would not have said, I do not believe, that we would
24      bear 50 percent of the cost. That was not the project

                              - 82 -

1       structure that we were considering. So, I have to
2       assume that these minutes are inaccurate and just
3       not -- it doesn't jive with what was going on.
4  Q  And that's because you never told anyone you'd pay 50
5       percent of the costs for the acquisition. Is that
6       fair to say?
7  A  It is fair to say.
8  Q  So, going further down, there is a sentence about one-
9       third down that says: TPL would buy the property and
10      would actually own it. And on the left-hand side,
11      there's a word, household, would be in the amount of
12      17.50 for ten years, and it picks up right there, just
13      about halfway down. TPL would buy the land and
14      actually own it.
15  A  I see that.
16  Q  So, what was TPL intending to use as a source of
17      income based on -- well, strike that.
18          Do you have reason to believe that this
19      statement is inaccurate as well, that is, TPL
20      would buy the property and actually own it?
21  A  It would be consistent with the project design for TPL
22      to buy the property in September, I think it was, of
23      that year, subdivide it and then convey out the
24      pieces.

                              - 83 -

**EXHIBIT D**



1 Q   Now, at the time, in January of 2003, you had not
2     identified a specific amount of money necessary from
3     the town in order to accept an assignment. Is that
4     correct?
5 A   Well, I think there was a discussion about four
6     hundred thousand.
7 Q   And that discussion, you expect, was prior to
8     January 7, 2003?
9 A   I would say that it is, in part, having my
10    recollection refreshed by the reference to four
11    hundred thousand in this paragraph.
12 Q   The purchase was approximately 1.2. That's fair to
13    say, right?
14 A   It was a little under that.
15 Q   A little under. Four hundred thousand dollars
16    subtracted from the 1.2 would leave $800,000,
17    approximately, correct?
18 A   Approximately.
19 Q   And you expected to make some money from the sale of
20    the two lots. Did you have any expectation of what
21    that would be on or about January 7th of 2003?
22 A   Is your question how much TPL thought we would sell
23    142 and 144 for?
24 Q   Yes.

- 84 -

1 A   And if we knew that at this moment in time?
2 Q   Yes.
3 A   I have a recollection of what, ultimately, we expected
4     to sell those for, but I can't say whether at this
5     moment in time I knew or I had that number in my mind.
6 Q   What is your recollection of what it ultimately would
7     sell for?
8 A   Well, there's two pieces. I think the hope was that
9     142 would sell for between two and three hundred and
10    that 144 would sell for more. How much, I can't
11    remember right now.
12 Q   So, if we have 300,000 and 700,000, I'm sorry, 300,000
13    and 400,000, meaning 300,000 from one sale, 400,000
14    from the town, and another 300,000 from the second
15    lot, approximately, how did you anticipate making up
16    the difference at that point?
17        MS. FETOUH: Objection.
18 A   Well, I think there were other project costs as well.
19    I mean, some of these properties needed to have
20    renovation before they could be sold. So, I don't
21    know what sum we were trying to achieve, but there was
22    an intention to raise money privately.
23 Q   Have you ever read the complaint?
24        MS. FETOUH: Objection. In this

- 85 -

1     matter?
2        MR. McLAUGHLIN: No, the complaint in
3     the matter has nothing to do with this.
4        MR. CONROY: That's not necessary.
5        MR. McLAUGHLIN: All right. Well, I
6     mean, neither is the question. If you are asking
7     that question, Madam, tell me what other
8     complaint you could possibly be considering.
9        MR. CONROY: Let's move on.
10       MS. FETOUH: My objection has been
11    noted.
12 Q   All right. Have you ever read the complaint in this
13    matter?
14 A   I have skimmed through it.
15 Q   And did you read your answer in this matter prior to
16    it being filed with the court?
17 A   Yes.
18 Q   Did you check it to make sure it was truthful and
19    accurate?
20 A   I believe I did.
21 Q   Do you recall having a telephone discussion with
22    Marilyn Kunelius after TPL accepted the assignment?
23 A   I remember trying to reach Mrs. Kunelius, and I also
24    remember trying to reach her attorney then, Peter

- 86 -

1     Kachajian. I remember having difficulty reaching both
2     of them, but I believe I recall talking to one or both
3     of them at some point during that time.
4 Q   Do you recall talking to Mrs. Kunelius before the
5     assignment?
6 A   I don't remember when I first talked to Mrs. Kunelius.
7 Q   I'm going to just quickly read something from the
8     complaint. This is Paragraph 20 of the complaint.
9        Shortly after TPL notified Kunelius of the
10    assumption of Stow's exercise of right of first
11    refusal, Kunelius and her counsel met with
12    MacDonnell. During that meeting, Kunelius
13    informed MacDonnell that the property was the
14    sole asset of Kunelius, that she was a single
15    woman supporting herself and the sole care-giver
16    to her 91-year-old mother -- should have been
17    father -- and that the sale of the property under
18    the terms of the P&S were critical to her
19    financial well-being and financial stability.
20    Kunelius informed MacDonnell that she was relying
21    on his representations that TPL would acquire the
22    property under the terms of the P&S. MacDonnell
23    acknowledged to Kunelius and her attorney that
24    the acquisition of the property by TPL was a

- 87 -

1     certainty.
2        Do you recall that discussion with
3     Mrs. Kunelius?
4        MR. CONROY: Objection.
5 A   As I said a minute ago, I recall an early discussion,
6     but as I sit here this morning, I can't remember all
7     of the details of it.
8 Q   Your answer to this was: MacDonnell admits that he
9     met with Kunelius and her attorney on several
10    occasions and was informed that Kunelius was a single
11    woman caring for her elderly father and that Kunelius
12    wanted to sell the property. Except as expressly
13    admitted, MacDonnell denies the allegations in
14    Paragraph 20 of the complaint.
15       As you sit here today, is it your testimony
16    that you have no recollection of telling
17    Mrs. Kunelius that the sale was a certainty?
18 A   That is my testimony.
19 Q   And is it your testimony you would never have told
20    Mrs. Kunelius that the sale was a certainty?
21       MR. CONROY: Objection.
22 A   No, my testimony is that I don't recall using that
23    word.
24 Q   Are you testifying that you did not use the word or

- 88 -

1     that you do not recall using the word?
2 A   I have no recollection of that word being used in that
3     conversation.
4 Q   So, is your testimony concerning the word certainty as
5     opposed to the concept that the sale would most
6     certainly occur?
7 A   It is both. I do not believe that I used the word
8     certainty, as I sit here this morning, but I do not
9     recall using it or not using it.
10 Q   So, as you sit here today, you cannot deny with any
11    certainty at all that you had a discussion with her in
12    which you told her that she did not have to worry
13    about this sale because it would occur.
14       MR. CONROY: Objection.
15       MS. FETOUH: Objection.
16       MS. ECKER: Objection.
17 A   I believed it would occur. Whenever TPL goes into
18    these projects, it is our one hundred percent belief
19    and we are very confident that the deals go through,
20    and in every one of the other Chapter 61 cases that
21    TPL has worked on, it has gone through. So, I would
22    have had confidence that this one would go through.
23 Q   In fact, you told her that every other TPL sale went
24    through. Do you recall telling her that?

- 89 -

1    MS. FETOUH: Objection.
2 A   I do not recall telling Mrs. Kunelius that. I
3    remember saying that to others through the course of
4    this project.
5 Q   Is it likely, therefore, that you may have also said
6    it to her?
7    MR. CONROY: Objection.
8    MS. FETOUH: Objection.
9 A   I can't use the word likely because I don't --
10 Q   Is it possible?
11 A   It is possible because I believed it would occur.
12 Q   Now, do you recall saying to Mrs. Kunelius during that
13    meeting that TPL already had all of the money
14    assembled necessary to make the purchase?
15 A   No, I don't remember that.
16 Q   Did TPL have the money already assembled to make the
17    purchase?
18 A   We had identified the money from the town, what we
19    thought we would get from the sale of the two lots and
20    the hoped for fund-raising. So, those were funds we
21    expected to bring to the table.
22 Q   Was it your intention to pay Mrs. Kunelius with the
23    funds from the sale of the two lots after you acquired
24    it, or were you going to pay her the full purchase

- 90 -

1    price when you acquired the property?
2    MR. CONROY: Objection.
3 A   I don't believe that had been determined.
4 Q   So, as you sit here today, you do not even know
5    whether TPL intended to provide Mrs. Kunelius with the
6    full purchase price on the date of the closing or
7    whether the full purchase price was dependent upon the
8    subsequent sale by TPL of the two lots. Is that fair
9    to say?
10 A   No, that's not what I'm saying. I'm saying something
11    different. I can clarify it if you'd like.
12 Q   I would.
13 A   I believe the contract had a mortgage provision. So,
14    when you ask the question whether or not TPL was going
15    to deliver the full amount, I don't believe it had
16    been decided whether or not it was appropriate to
17    utilize the mortgage provision or not.
18 Q   In other words, take back a mortgage from
19    Mrs. Kunelius.
20 A   To do whatever the contract said with respect to that.
21    MR. McLAUGHLIN: Okay. It's now a
22    little after 12:30, so we'll stop and pick it up
23    in a half hour or so.
24    MR. CONROY: Okay.

- 91 -

1    (Luncheon recess, 12:34 P.M.)
2    (After recess, 1:16 P.M.)
3    (All parties present)
4    MR. McLAUGHLIN: Just as a housekeeping
5    matter, in the room is Peter Kachajian who has
6    been co-counsel with me on this matter and
7    Mrs. Kunelius' attorney for many years and also
8    David Norris who is Mrs. Kunelius' husband, and
9    so counsel for Mr. MacDonnell has requested that
10    since they are both likely to be witnesses, that
11    when there is any discussion in which there's
12    testimony relating to something that they are
13    also going to testify to, that they leave the
14    room, and so is that acceptable to everybody?
15    MS. ECKER: Yes.
16    MS. FETOUH: Yes.
17    MR. McLAUGHLIN: So, I think I know
18    where you're going to testify, but if you think
19    so, then just get up and leave. Otherwise, I'll
20    ask you to leave when I think it is -- but don't
21    let me mistake that it is.
22    MR. KACHAJIAN: So, if I storm out, no
23    one will take it personally.
24    MR. McLAUGHLIN: That's correct.

- 92 -

1    MR. CONROY: Unless you let us know
2    that we're supposed to take that personally.
3    MR. KACHAJIAN: Oh, you'd know.
4    MR. CONROY: Okay.
5    By MR. McLAUGHLIN:
6 Q   Okay. Just going back to, I think, the last thing
7    that we were talking about, and you had mentioned,
8    sir, that there was the possibility of taking back a
9    mortgage, which was referred to in the purchase and
10    sale agreement. Do you remember that?
11 A   I do.
12 Q   So, as I understand it, that mortgage was
13    approximately $400,000 that Mrs. Kunelius was willing
14    to grant to Mosaic Commons in their purchase and sale
15    agreement. Is that right?
16 A   I don't remember the amount.
17 Q   Do you remember approximately what it was?
18 A   We could take a quick look at the contract. I don't
19    remember the amount.
20 Q   I'm going to represent to you that it was $400,000 or
21    thereabouts.
22 A   Okay.
23 Q   Assuming that to be a fact, and we will look at the
24    purchase and sale agreement shortly, that would mean

- 93 -

1    that out of the 1.116 million of the purchase price,
2    that approximately $800,000 was accounted for by way
3    of the mortgage that she was willing to give back and
4    the $400,000 that you were receiving from the Town of
5    Stow. Is that correct?
6 A   I'm not sure I understand your question. You're
7    saying that if you add up those --
8 Q   Yeah, at the time that you have to close under the
9    terms of the purchase and sale agreement, if you
10    assumed all of the obligations and rights of Mosaic
11    Commons, the purchase price would have been assembled
12    by way of $400,000 from the town and taking back a
13    mortgage note of $400,000 from Mrs. Kunelius, leaving
14    approximately $400,000 of additional cash that had to
15    be put in at the time of the closing to effectuate the
16    sale. Is that fair to say?
17 A   There's one wrinkle to that. There may be more than
18    one wrinkle. The town's vote was split in two parts,
19    a three hundred thousand dollar component for open
20    space and a one hundred thousand dollar component that
21    I believe was split into two fifty thousand dollar
22    pieces attached to the sales of the two structures as
23    affordability restrictions, and it was my memory that
24    the town was uninterested in contributing the one

- 94 -

1    hundred thousand affordability dollars until those
2    properties had been renovated and were sort of up to
3    snuff, if you will. So, that one hundred might come in
4    sometime later.
5 Q   So, is it fair to say that between 700- and $800,000,
6    perhaps 700,000 if your understanding is correct,
7    would have been funds already accounted for in order
8    to effectuate the purchase of the Kunelius property,
9    leaving either 4- or $500,000, approximately, that
10    needed to be found in order to complete the purchase?
11 A   So, you would start with the three hundred open space
12    money?
13 Q   Yes.
14 A   And to that, what would you add?
15 Q   The four hundred thousand dollar mortgage that
16    Mrs. Kunelius agreed to provide to Mosaic
17    Commons, which you had said earlier you had
18    considered.
19 A   Considered.
20 Q   Yeah.
21 A   We had considered.
22 Q   Right.
23 A   Right.
24 Q   Okay. So, given that, that would be a total of

- 95 -



1    $700,000 that would have been available at the time of
2    the closing, given the fact that 400,000 was a note,
3    and that TPL would have to come up with between 4- and
4    $500,000 of additional funds at the closing in order
5    to effectuate the sale.
6 A   If there was a way to take advantage of the mortgage,
7    but ultimately we concluded that there wasn't.
8 Q   And you concluded that there wasn't because, isn't it
9    fair to say, that TPL voted not to borrow the money
10   from Mrs. Kunelius?
11 A   The reason that the mortgage didn't seem to be helpful
12    for TPL is that it would have required that the
13    property be subject to a mortgage and that --
14 Q   Right. And -- go ahead.
15 A   I was going to say that it was the town's insistence
16    that, if they're going to spend their money, they're
17    going to get a property interest for it. The town
18    would be uninterested in getting the property interest
19    that they were tieing up, which is the 45 acres,
20    subject to a mortgage.
21 Q   So, it's fair to say that there was an independent
22    decision by TPL not to avail itself of the four
23    hundred thousand dollar mortgage that was part of the
24    purchase and sale agreement. Isn't that fair to say?

- 96 -

1    MS. FETOUH: Objection.
2 A   It didn't seem that it would work.
3 Q   So, you had testified earlier that, according to your
4    understanding of Chapter 61, there were certain
5    provisions that were applicable on an assignment under
6    Chapter 61 and certain provisions that were not. My
7    question now is relative to the purchase price itself,
8    which includes components such as mortgage provisions.
9    Is it your testimony today that, prior to
10   accepting the assignment, you had concluded that
11   you would not comply with the requirements of that
12   mortgage provision because TPL didn't like the effect of that
13   mortgage provision?
14    MS. FETOUH: Objection.
15 A   I can't recall when, in the sequence of this long
16    project, the mortgage problem came up, so I just don't
17    have that recollection, but somewhere along the way
18    that issue was considered and it resulted in sort of
19    an awareness. It's not so much a decision, an
20    awareness that it just wasn't going to be helpful.
21 Q   But the term of the mortgage was clearly stated in the
22    purchase and sale agreement that was provided to you
23    and to the town at the time that the town considered
24    the exercise of the right of first refusal or the

- 97 -

1    assignment thereof. Is that fair to say?
2 A   Was the mortgage provision in the contract?
3 Q   Yeah.
4 A   Yes.
5 Q   So, it didn't come as a surprise to you or to the town
6    that, as a result of complying with the terms of the
7    contract, there would be a mortgage on the property
8    for some period of time until the final $400,000 was
9    paid off. Is that correct?
10   MS. FETOUH: Objection.
11 A   Not necessarily. I mean, I think part of TPL's
12    analysis was not so much to conclude ahead of time,
13    early in the game, whether or not the mortgage was
14    helpful or not helpful or something that we'd take
15    advantage of or not. It was just there.
16 Q   So, from your point of view, that term, that mortgage,
17    was an option available to you but not something that
18    you were required to do. Is that fair to say?
19    MS. FETOUH: Objection.
20 A   You know, I don't know whether using the term option
21    is the right way to describe it. I remember reading
22    the provision and sometime later figuring out that it
23    was problematic to use it and that we needed to
24    wrestle with that issue.

- 98 -

1 Q   Do you recall being told by Mrs. Kunelius --
2    MR. McLAUGHLIN: Could you step out?
3    MR. KACHAJIAN: Yes.
4    (Messrs. Kachajian and Norris exit the room.)
5 Q   Do you recall being told by Mrs. Kunelius or her
6    counsel that the mortgage provision remained available
7    to TPL after TPL accepted the assignment?
8 A   I don't remember that. I remember having a discussion
9    with somebody within Mrs. Kunelius' team about the
10   mortgage, but I don't recall exactly what we said.
11 Q   Do you recall, generally, that perhaps Mr. Kachajian
12    had a discussion with you concerning the fact that
13    Mrs. Kunelius remained open to the application of that
14    provision of the contract to TPL?
15 A   As I think I said, I don't remember that.
16 Q   So, you don't even remember Mr. Kachajian saying that?
17 A   I don't remember anybody expressing the availability
18    of a mortgage provision. I remember having a
19    discussion about the mortgage provision.
20 Q   At some point, the issue came up concerning looking
21    for additional funds from the state. Do you recall
22    that?
23 A   Yes.
24 Q   What were the funds that were being sought from the

- 99 -

1    state and what were the purposes of those funds?
2 A   The funds sought were a grant from DHCD, which I
3    believe stands for the Department of Housing and
4    Community Development.
5 Q   And what were they for?
6 A   My memory is that they were a grant which would help
7    facilitate the conversion of the units to affordable
8    structures, affordable housing.
9 Q   Do you remember what the amount was that you sought
10   from the Commonwealth?
11 A   I believe it's three hundred and fifty thousand.
12 Q   And do you recall that it was initially 125,000 and
13    then it was increased to 350 or 325?
14 A   No.
15 Q   So, you don't recall any circumstances in which there
16    was a need to increase the amount of the application.
17    You don't recall anything related to that?
18 A   I don't.
19 Q   Going back to the conversation and/or meeting with
20    Mrs. Kunelius and her attorney, I believe your answer
21    indicated that you remembered that this was her
22    retirement. I think that's what you said, that you
23    realized it was her retirement, but I probably -- let
24    me just read his answer to make sure I'm saying that

- 100 -

1    correctly.
2    MR. CONROY: You mean the answer to the
3    complaint?
4    MR. McLAUGHLIN: Answer to the
5    complaint.
6    MR. CONROY: Are you going to put it in
7    front of him?
8    MR. McLAUGHLIN: Yeah.
9 Q   All right. So, here's what it says. If you can just
10   read your response. It's 20. That's to the telephone
11   conversation.
12 A   You want me to read this?
13 Q   Yes.
14 A   Number 20?
15 Q   Yes.
16 A   MacDonnell admits, or, quote: MacDonnell admits that
17    he met with Kunelius and her attorney on several
18    occasions and was informed that Kunelius was a single
19    woman caring for her elderly father and that Kunelius
20    wanted to sell her property. Except as expressly
21    admitted, MacDonnell denies the allegations in
22    Paragraph 20 of the complaint.
23 Q   Would it refresh your memory if I told you that,
24    during that discussion, Mrs. Kunelius will testify

- 101 -



1 that you told her that you had several million dollars
2 available for the purchase in-hand at the time that
3 you had the telephone discussion, in-hand?
4 A It would not.
5 Q Do you recall telling anyone that TPL, and when I say
6 you, I mean TPL under that circumstance, so if I
7 replace the word you having the money with TPL, would
8 your answer still be the same? I wasn't implying that
9 you had the money but that TPL had the money.
10     MR. CONROY: Will you state it again?
11 A Could you just ask the question?
12 Q Would it refresh your memory if you were to learn that
13 Mrs. Kunelius would testify that you told her that you
14 had several million dollars, that TPL had several
15 million dollars of funds in-hand, available to it
16 immediately, for the purchase of the property?
17 A It would not.
18 Q Are you testifying that you didn't say that or that
19 you don't recall saying that?
20 A I don't have a recollection of that conversation, so
21 that's sort of the sum total of what I can say about
22 it.
23 Q So, you're not saying for certain that you didn't say
24 it. You're only saying that you don't have a
- 102 -

1 recollection of saying it.
2 A There is nothing in my memory that suggests to me that
3 I said that.
4 Q Is there anything in your memory that suggests that
5 TPL, at that time, had several million dollars of
6 funds available to it on a fairly immediate basis that
7 would allow for the purchase of the property without
8 any other source other than the TPL funds themselves?
9 A I'm sorry to make you do this, but I think I need to
10 have you say that again.
11 Q Is there anything that you can recall that would
12 suggest that TPL had several million dollars available
13 to it to buy the property at the time that you had a
14 discussion with Mrs. Kunelius, this discussion
15 referred to in Paragraph 20?
16 A No.
17 Q Did you ever tell Mrs. Kunelius that you had the
18 equivalent of a Plan A or a Plan B and a Plan C,
19 something like that, so that no matter what happened
20 the sale would go forward?
21 A I don't.
22 Q You don't recall telling her that, correct?
23 A Right.
24 Q Did you have a Plan A or a Plan B or a Plan C to
- 103 -

1 ensure that the sale would go forward even if Plan A
2 failed or Plan B failed?
3 A Well, the way TPL crunches these projects, generally,
4 is with a Plan A, the set of circumstances that we
5 hope will work, and I'd say in, you know, nine out of
6 ten projects, what feels like Plan A actually is
7 utilized but that there are, in most projects, a
8 number of variables that result in some things
9 changing. So, at the beginning of a project, it's
10 very common that Plan A becomes Plan B. I don't
11 recall this discussion using those terms.
12 Q Do you have specific expertise in your role as the
13 state director, Massachusetts state director, in
14 applying for loans from DH, whatever, Department of
15 Housing and Community Development?
16 A No.
17 Q You are aware, are you not, that TPL made an
18 application for funds to the Department of Housing and
19 Community Development?
20 A Yes.
21 Q And you are aware that TPL itself filled out the
22 application for those funds, which were the 325- or
23 $350,000 that you referred to earlier, correct?
24 A We hired a consultant who knows more about this
- 104 -

1 process than we do to help us do that, but together
2 with him, we prepared it.
3 Q And do you know who prepared it from TPL?
4 A Together with the consultant?
5 Q Yes.
6 A Yes, I do.
7 Q Who is that?
8 A Chris LaPointe.
9 Q And what's Chris LaPointe's position?
10 A Project manager.
11 Q And does he report to you?
12 A He does.
13 Q And do you recall working with Ross Perry in reviewing
14 the application to DHCD?
15 A Yes.
16 Q I'm going to put before you what is now going to be
17 marked as 11.
18     (WHEREUPON, Exhibit No. 11, DHCD grant
19 application, marked for identification.)
20 Q I'm putting before you Exhibit 11, and just for the
21 record, this is a compilation of various documents
22 received from the town, beginning with Bate stamp
23 number KUN336 and continuing to 411, the first page of
24 which is a document that appears to be sent by Ross
- 105 -

1 Perry, project management of BNC/LID/Interconnect, to
2 someone by the name of Bill, and the first sentence
3 says: I left at your door the DHCD grant application
4 that TPL has filled out.
5     Do you recall receiving a copy of this?
6 A Of the cover memo?
7 Q The whole thing.
8 A I have a recollection of seeing the application before
9 it was submitted, whether this is the application that
10 you have in front of me or it has, you know, more
11 things here, I just don't know.
12 Q This appears to us, having gone through the documents
13 received from the town, that this is the application
14 minus the signature of TPL. The second page appears
15 to be the signature of Ross Perry on 3-30-03. Do you
16 see that?
17 A 3-3 --
18 Q 3-30-03, second page.
19 A 33?
20 Q No, down at the bottom, his signature.
21 A Oh, I'm sorry. I was reading the Bate's number. Yes,
22 I see that.
23 Q I direct you to the first page again, which says: Let
24 Craig MacDonnell and me know if there are any
- 106 -

1 questions.
2     Do you know from looking at this who Bill
3 is?
4 A I would guess that it's Bill Wrigley.
5 Q And Bill Wrigley is the town administrator?
6 A Either administrator or manager. I can't remember his
7 title.
8 Q And at the bottom, it says: Craig can be reached at
9 617-367-6200. Is that the TPL number?
10 A Yes.
11 Q Now, I have a couple of questions here which, I must
12 admit, confuse me. So, if I can direct your attention
13 to Page 342, under the Financing Mechanism, and it's a
14 paragraph with a one, Financing Mechanism.
15 A Uh-huh.
16 Q And the second paragraph says: TPL is prepared to
17 purchase the property. TPL has a primary plan and a
18 fallback plan. The primary plan envisions a
19 multilateral funding approach to this project. Some
20 of the funding is contingent, as explained below, but
21 all of it is subject to a fallback plan, fallback line
22 of credit from Wainwright Bank. Do you see that?
23 A I do.
24 Q So, earlier I had asked you if you knew a man by the
- 107 -



1   name of Rob or Robert Glassman. Do you recall me
2   asking you that?
3 A  I do.
4 Q  Do you know who Robert Glassman is now?
5 A  No.
6 Q  I will represent to you that he was on the board of
7   your advisors at the time that this application was
8   made, a Robert Glassman. Does that ring a bell?
9 A  No.
10 Q  If I told you he was the president and founder of
11   Wainwright Bank, would that ring a bell to you?
12 A  No.
13 Q  Were you aware that there was a line of credit at
14   Wainwright Bank that was available as a fallback to
15   the financing of this purchase from Mrs. Kunelius?
16 A  I am familiar that TPL has a line of credit with
17   Wainwright Bank.
18 Q  Are you familiar that it was described as a fallback
19   for the funding, as a contingency for the funding, of
20   the purchase of Mrs. Kunelius' property?
21 A  Well, I see it written here, and it does remind me
22   that there was some discussion about using Wainwright.
23 Q  And did you participate in the application for a line
24   of credit to Wainwright Bank?

            - 108 -

1 A  No.
2 Q  Who would have made application on behalf of TPL to
3   Wainwright Bank?
4        MR. CONROY: Objection.
5 A  It's a standing line of credit. There's no
6   application involved.
7 Q  Does TPL have a standing line of credit right now with
8   Wainwright Bank?
9 A  Yes.
10 Q  What is the amount of that line of credit?
11 A  I don't know.
12 Q  Let me turn you to the next page, and before I do,
13   let's stay on the same page and look at TPL's primary
14   plan to generate funds, and it has a chart, and then
15   it says: A. Town funds. B. Red Acre. C. The DHCD
16   funds -- which are the subject of this application --
17   and D. Private financing. Do you see that?
18 A  I do.
19 Q  Right after that, it says, quote:
20        MR. CONROY: Excuse me. Private fund-
21   raising.
22        MR. McLAUGHLIN: I'm sorry. Private
23   fund-raising.
24 Q  After that, it says: As a fallback position, if any

            - 109 -

1   or all of the above-referenced sources of funds are
2   unavailable, TPL intends to utilize capital from the
3   private market. In this regard, TPL has available for
4   its use a line of credit from Wainwright Bank in the
5   amount of $6,000,000 -- and it's written as 6,000,000
6   with a dollar sign -- as evidenced by the letter
7   attached as Exhibit -- blank. The use of this capital
8   is subject to TPL's internal approval process,
9   including customary due diligence and approval of the
10   Board of Directors.
11        Now, at the time -- did I read that
12   correctly? Let's make sure I read that
13   correctly.
14 A  I didn't follow you close enough to do that.
15 Q  Okay. All right. Well, your counsel hasn't corrected
16   me, so I probably did.
17        MR. CONROY: Minor.
18        MR. McLAUGHLIN: Okay.
19        MR. CONROY: Minor failings but
20   otherwise substantively accurate.
21        MR. McLAUGHLIN: That's the best thing
22   anybody's said in a long time.
23        THE WITNESS: He's very kind.
24 Q  Is today the first time that you have become aware

            - 110 -

1   that there was a six million dollar line of credit
2   available to TPL for the purchase of the property if,
3   quote, any or all of the above-referenced sources
4   listed on Page 343 and 342 were unavailable?
5 A  I was familiar with the Wainwright line of credit
6   before today.
7 Q  And so you were aware that, should the funds that you
8   sought from the town fail, TPL intended to use the
9   line of credit. Is that fair to say?
10        MR. CONROY: Objection.
11        MS. FETOUH: Objection.
12 A  No, it's fair to say that TPL could use that line of
13   credit if necessary and subject to due diligence and
14   approval.
15 Q  But it doesn't say that. It says: TPL intends to
16   utilize the capital from the private market. In this
17   regard, it has available for its use a line of credit.
18   Do you see that?
19 A  I do.
20 Q  Doesn't say could, might. It says intends to. Is
21   that correct?
22 A  Well, the word in the document is intends.
23        MR. CONROY: I'll point out for the
24   sake of completeness that there is other language

            - 111 -

1   that follows on that same page, Counsel.
2        MR. McLAUGHLIN: I'm going to get to
3   that.
4        MR. CONROY: Okay.
5 Q  You're aware, are you not, in this litigation that TPL
6   has made representations to the federal court that TPL
7   did not have the money to purchase the property? Are
8   you aware of that?
9        MR. CONROY: Objection.
10 A  As I sit here today?
11 Q  Yeah.
12 A  I am not sure I am aware of that.
13 Q  Did you review the documents filed on behalf of TPL in
14   the current litigation?
15 A  On behalf of TPL or myself?
16 Q  Yes, on behalf of TPL.
17 A  I believe I saw them before they were filed, yes.
18 Q  And did you review the documents that were filed on
19   your behalf?
20 A  I did.
21 Q  And do you recall seeing statements to the federal
22   court indicating that TPL did not have the money to
23   purchase the property and that that's the reason that
24   the property purchase did not go forward?

            - 112 -

1 A  Well, in fact, TPL did not have the money.
2 Q  I thought you just said that TPL has a line of credit.
3 A  The line of credit is not our money. It's somebody
4   else's money.
5 Q  Is it your testimony today that TPL did not intend to
6   use the line of credit as a way of paying for the
7   property if all other sources failed?
8 A  Our intention with respect to the use of any borrowed
9   money has to be decided in the context of what's
10   possible. So, here, utilizing the six million dollar
11   line of credit, being subject as it is to due
12   diligence and approval of the Board of Directors, TPL
13   could only borrow that money if the project manager,
14   in this case me, went to the Board of Directors and
15   said, "Can I use this money?" And there's a process,
16   an internal process, for getting that approval.
17 Q  I want to direct your attention to the Motion to
18   Dismiss of the Defendants, Trust for Public Land and
19   Craig A. MacDonnell and the Town of Stow, and in this
20   motion, beginning on Page 1, is the following
21   statement: However, after paying thousands of dollars
22   in deposits required under the agreement, TPL found
23   itself unable to raise the money necessary to fund the
24   project and was unable to complete its purchase of the

            - 113 -


1   property. Do you see that?
2 A   Yes.
3 Q   Now, you were not unable to raise the money because
4   you had a six million dollar line of credit, but you
5   just decided not to use it. Isn't that reasonable to
6   say?
7         MR. CONROY: Objection.
8         MS. FETOUH: Objection.
9         MS. ECKER: Objection.
10 A   The decision was made not to use the line of credit.
11 Q   But that's not what you told the judge. What you told
12   the judge was you were unable to raise it. Is there
13   some sort of stop-payment or stop-borrowing order on
14   your line of credit at Wainwright Bank? In other
15   words, can you go in there right now, TPL, and borrow
16   money on the line of credit, or is it in some way in
17   default?
18 A   I don't know.
19 Q   You don't know if your own line of credit is in
20   default, sir?
21 A   Correct.
22 Q   Do you have reason to believe that your line of credit
23   is in default?
24 A   I have no reason to believe.
           - 114 -

1 Q   So, as the director of the State of Massachusetts TPL,
2   is it your testimony today under oath that you do not
3   know whether your line of credit is in default or not.
4         MR. CONROY: Objection.
5         MS. FETOUH: Objection.
6 A   I think I answered that question.
7 Q   And the answer is you do not know whether it's in
8   default or not.
9 A   Correct.
10 Q   Do you know if it's overdrawn or not?
11 A   I don't.
12 Q   Do you know if any money is withdrawn on that account?
13 A   I don't.
14 Q   Who would?
15         MR. CONROY: Objection.
16 A   Our finance manager.
17 Q   And is the line of credit that's in Wainwright Bank,
18   is that money that is earmarked for the Massachusetts
19   branch of TPL?
20 A   I think it's available for the region.
21 Q   And so the region would be the New England region?
22 A   Right.
23 Q   Do you know who applied for that six million dollar
24   line of credit?
           - 115 -

1 A   No.
2 Q   How would Christopher LaPointe know of this line of
3   credit as a project manager?
4         MS. FETOUH: Objection.
5         MR. CONROY: Objection.
6 A   He would ask our business manager, finance manager.
7 Q   He would not ask you, sir?
8 A   I'm not sure what he did in this case. I don't know
9   what he would do. He could ask me. He could also ask
10   our finance manager.
11 Q   Is it your testimony today that this is the first time
12   you are aware that TPL informed the Commonwealth of
13   Massachusetts, under oath, that it had a six million
14   dollar line of credit?
15         MR. CONROY: Wait a minute. 1 object.
16         MS. FETOUH: Objection.
17 Q   Do you know of any laws that prohibit the filing of
18   inaccurate documents with the state, the Commonwealth
19   of Massachusetts, with regard to attempting to obtain
20   grants where the applications contain false
21   information?
22 A   No.
23 Q   Are you aware of whether the money that you sought to
           - 116 -

1   obtain from the Commonwealth of Massachusetts came
2   entirely from the Commonwealth of Massachusetts or
3   from some federal agency?
4 A   I don't know.
5 Q   Are you familiar with making applications for funds
6   from federal agencies?
7 A   Yes.
8 Q   Are you familiar with any statutes providing for
9   criminal and civil penalties for the filing of
10   inaccurate or untrue statements where federal funds
11   are being requested?
12 A   No.
13 Q   Let's go forward on this paragraph, under two,
14   contingency plan for cost overruns. It says: As part
15   of the larger Kunelius project, the Trust for Public
16   Land has organized a significant private fund-raising
17   campaign. This campaign, in conjunction with the Stow
18   CPA funds, the sale of the unit and the HDSP funds,
19   has sufficient capacity to, if necessary, cover cost
20   overruns. Do you see that?
21 A   I do.
22 Q   So, at the time of the application, you were not
23   relying on multiple sale of units. You were relying
24   on one sale. Isn't that correct?
           - 117 -

1 A   We made reference to just 144. Now, whether in fact,
2   by that reference, we intended to capture a sale of
3   just 140 -- at that time, it had not been subdivided.
4   Whether we were referring to just the single lot or
5   the hoped for double lot, I don't know.
6 Q   Going on, it says: In addition, the Trust for Public
7   Land has received confirmation that its six million
8   dollar line of credit has been renewed by Wainwright
9   Bank and that these funds would be available to cover
10   cost overruns subject to TPL's normal due diligence
11   and internal review. Do you see that?
12 A   I do.
13 Q   Is this the first time you knew that the money could
14   be also used, the line of credit could also be used,
15   for cost overruns?
16 A   No, I was aware of the line of credit.
17 Q   But you were not aware of a fallback position that
18   involved the use of borrowing under the line of
19   credit?
20 A   What I remember is that the line of credit was out
21   there and that, if the circumstances were right, it
22   might make sense to use it.
23 Q   So, at the time that you told the federal court that
24   you could not raise the funds sufficient to purchase
           - 118 -

1   the property -- I'm going to withdraw that question.
2   I'm going to read from a document that was filed on
3   your behalf called, "Memorandum of Law in Support of
4   the Motion to Dismiss of the Defendants, the Trust for
5   Public Land, Craig A. MacDonnell and the Town of Stow.
6       Down at the bottom of the first page on the
7   right-hand side, three lines up, it says: When
8   TPL accepted that assignment and exercised the
9   right of first refusal, TPL stepped into the
10   place of the buyer in that agreement and became
11   subject to its terms and conditions. When TPL
12   ultimately was unable to raise the money to fund
13   the purchase, it was unable to acquire the
14   property and forfeited thousands of dollars to
15   Kunelius pursuant to the liquidated damage
16   clause. Do you see that?
17 A   I do.
18 Q   Now, did you read this before it was submitted to the
19   court on your behalf?
20 A   I believe I did.
21 Q   And you've already testified that you were aware that
22   there was a line of credit. Am I correct there?
23 A   Yes.
24 Q   But you weren't aware of how much money was in the
           - 119 -

1    line of credit. Am I correct as well?
2 A  Correct.
3 Q  And you weren't aware of whether the line of credit
4    was in default, is that correct?
5 A  I don't have a recollection of the status of the line,
6    as I sit here today, regarding my awareness then.
7 Q  Are you aware of TPL being in default on lines of
8    credit or other banking obligations?
9 A  I am not.
10 Q  In your tenure as director of the Massachusetts state
11    office of TPL, are you aware of any circumstance in
12    which TPL was in default on a line of credit or any
13    other financial obligation to a bank?
14 A  I am not.
15 Q  You are aware, are you not, that the president of
16    Wainwright Bank was a Board of Advisor member to TPL?
17 A  I was not aware of that.
18 Q  Are you aware of any banking obligations in which
19    insiders to bank operations have to disclose certain
20    applications for loans?
21 A  Could you state that again?
22 Q  Well, if you don't understand it, I'll withdraw the
23    question.
24 A  I don't understand it.

- 120 -

1 Q  I want to read from Page 6 of your Memorandum of Law
2    in Support of a Motion to Dismiss the Defendants, the
3    Trust for Public Land, Craig A. MacDonnell and the
4    Town of Stow. Page 6 says: Ultimately -- this is the
5    second paragraph, four lines down. Ultimately,
6    however, TPL was unable to raise the funds necessary
7    to purchase the property by the closing date of
8    September 26, 2003. Do you see that?
9 A  Yes.
10 Q  Now, I would like you to look back at Exhibit 11 and
11    tell me: what is the date of Exhibit 11 on the first
12    page?
13 A  3-30.
14 Q  So, that would be March 30, 2003. So, we have April,
15    May, June, July, August, September. Six months later,
16    you certainly had the -- strike that.
17    Is it your testimony today that you elected
18    not to borrow the money for the purchase of the
19    property from Mrs. Kunelius?
20    MR. CONROY: Clarify when you say you.
21    MR. McLAUGHLIN: TPL.
22 A  The decision of how to go forward on this project was
23    a function of a lot of different variables, including
24    whether or not it was likely that TPL could raise the

- 121 -

1    money privately via traditional fund-raising and the
2    sale of 142 and 144 and the town's contribution.
3 Q  If that's the case, sir, why does TPL write: As a
4    fallback position, if any or all of the above-
5    referenced sources of funds are unavailable, TPL
6    intends to use capital from the private market?
7    The statement in the application to the
8    Commonwealth of Massachusetts seems to be
9    inconsistent with your last answer because this
10    statement says it doesn't matter whether you get
11    any of the funds; you're going to borrow in order
12    to meet the obligation. Did you read this
13    application before it was signed?
14 A  Exhibit 11?
15 Q  Yeah.
16 A  I'm sure I did. Put it this way. I'd like to clarify
17    that. I don't have a recollection today of reading
18    it. I remember working on it.
19 Q  I'm going to have you look at Page 351 of Exhibit 11.
20 A  Yup.
21 Q  Under Item 63, you're listed as the contact person for
22    TPL. Is that correct?
23 A  Yes.
24 Q  And also mortgagor. Do you see that?

- 122 -

1 A  Sixty-four.
2    MS. FETOUH: Objection.
3 Q  Sixty-four. And, I'm sorry, on Item 64, it refers to
    Do you see that?

    tending to borrow in order to be a
    pon this application?
    ETOUH: Objection.
    CONROY: Objection.
    of this, number 64, the significance
    ad the opportunity under the
    land and become an owner of the

    the money from the state, from the
    id TPL have to grant you mortgage? Did
    at money in any way?
    ere to take advantage of
    rtgage.
    at the next page, Item 71, Denise
    he, if you know?
21 A  She is an attorney who worked, at the time, for TPL.
22 Q  Does she work for TPL anymore?
23 A  No.
24 Q  Was she an intern of Goodwin, Procter & Hoar?

- 123 -

1 A  I don't know.
2 Q  You're aware that there are virtually dozens of people
3    from Goodwin, Procter & Hoar that have worked as
4    interns at TPL, is that correct?
5    MS. FETOUH: Objection.
6 A  There have been several. I wouldn't say dozens.
7 Q  You wouldn't?
8 A  No. No, I wouldn't.
9    (WHEREUPON, Exhibit No. 12, TPL Web
10    site excerpt, marked for identification.)
11 Q  I'm going to put this -- Exhibit 12. Exhibit 12 is an
12    excerpt from your Web site. I think it refers to 40
13    associates, 17 partners, something like that. Do you
14    see that? And that they've done over 4,000 hours of
15    work for TPL since 2001. Do you see that?
16 A  Yes.
17 Q  So, there have been dozens of Goodwin, Procter & Hoar
18    partners and associates who have worked pro bono
19    some as interns. Isn't that correct?
20 A  That is correct. They were not all interns.
21 Q  I understand.
22 A  You asked me whether or not dozens had been interns
23    and so.
24 Q  I want to point out with as much kindness as possible

- 124 -

1    that that Michael McLaughlin in that picture most
2    certainly is not me. Do you see that?
3 A  Doesn't look like you.
4    MR. CONROY: Nor are you Mike
5    McLaughlin.
6    MR. McLAUGHLIN: Yes, I know.
7 Q  So, can I have that back?
8 A  Yeah.
9 Q  On Paragraph 71, are you aware of whether Denise
10    Pelletier reviewed this document?
11 A  I am not aware.
12 Q  Looking at the next line, Dorothy Stuckey, Esquire,
13    we've already referenced Dorothy Stuckey. She is
14    counsel, correct, to TPL?
15 A  Stuckey, yes.
16 Q  Stuckey. Are you aware of whether she had reviewed
17    this document?
18 A  I am not aware.
19 Q  Would Dorothy Stuckey be aware of whether there was a
20    line of credit in the amount of $6,000,000 that TPL
21    had?
22    MR. CONROY: Objection.
23    MS. FETOUH: Objection.
24 A  I don't know.

- 125 -

1 Q Is it likely that counsel would know that?
2      MR. CONROY: Objection.
3      MS. FETOUH: Objection.
4 A I don't know what she knows.
5 Q Are you aware of any circumstance in which the line of
6    credit was ever used?
7 A No, I am not aware of those circumstances.
8 Q Are you aware of any time which you were involved, and
9    I'm going to, with all due respect, remind you're
10    under oath, that you were involved in the acquisition
11    of any property by TPL in which the line of credit was
12    used?
13 A I am not aware of utilizing the Wainwright line of
14    credit on one of my projects.
15 Q Are you aware of utilizing any line of credit on one
16    of your projects?
17 A It is hard to answer your question, because when
18    project managers seek approval to borrow money to do
19    projects, it's not always made clear to them which --
20    where the money comes from. In other words, the
21    finance office at TPL generally addresses accessing
22    those funds.
23 Q Is that finance office in Boston or in California?
24 A Here.

- 126 -

1 Q What other banks does TPL have lines of credit with?
2      MR. CONROY: Objection.
3 A I only know of one other, and I believe it's Sun
4    Trust.
5 Q As I understand it at the time you told the court, the
6    time the memorandums were filed on behalf of TPL and
7    yourself, that TPL was unable to borrow the money. As
8    it understand it, the amount of money that would have
9    had to have been borrowed -- strike that.
10    At the time that TPL filed its memorandum
11    with the court indicating that it was unable to
12    raise the money, it had available to it a four
13    hundred thousand dollar possibility with
14    Mrs. Kunelius and a six million dollar
15    possibility of borrowing with Wainwright Bank,
16    correct?
17      MS. FETOUH: Objection.
18      MR. CONROY: Objection.
19 A Well, as we've talked about with respect to the
20    Kunelius potential, that did not seem to be available.
21 Q Availing or available?
22 A As I think I mentioned earlier, my understanding of
23    the mortgage, the potential mortgage, was that were
24    TPL to close utilizing it, Mrs.

- 127 -

1 Q I understand that. I understand that. What I'm
2    trying to say --
3      MR. McLAUGHLIN: I don't need an
4    explanation for why he didn't use it. My
5    question was: does he understand that that was
6    available and the six million dollar line of
7    credit was available for the possibility of
8    borrowing on? That's all I'm asking.
9      MR. CONROY: And I think he's entitled
10    to answer the question as he sees fit.
11 A I'm addressing the availability issue. If you'll let
12    me finish, I can complete the thought.
13 Q Well, before I do, before I do, the issue -- I don't
14    want to mince words. When I say available, I mean
15    that your organization had the ability, should it so
16    desire, to borrow that money. I am not talking -- I
17    don't want to mince words and have you say, well,
18    available to us means does it work. The question was:
19    did the contract, either the line of credit or the
20    purchase and sale agreement, allow you to borrow
21    money?
22      MR. CONROY: Objection.
23      MS. FETOUH: Objection.
24 Q That's the question.

- 128 -

1      MS. ECKER: Objection.
2 A The four hundred thousand dollar mortgage required an
3    actual mortgage to be imposed on the property which
4    would have prevented us from conveying it to the town.
5 Q Didn't that also require that of Mosaic Commons as
6    well?
7 A I don't know.
8 Q You don't know that?
9 A Well, what I'd like to do is finish my sentence.
10      MR. CONROY: Yeah, and I'm going to
11    insist that he finish uninterrupted.
12      MR. McLAUGHLIN: I thought he had
13    finished, but I'm sorry.
14      MR. CONROY: Go ahead, Craig.
15 A The Kunelius mortgage potential would have required an
16    actual mortgage to be imposed on the property itself.
17    The existence of that mortgage would have been
18    unacceptable to the Town of Stow because they wanted
19    to take their 45 acres free of any mortgage. If
20    they're going to invest, they don't want to burden the
21    property. That led us to conclude that, in your
22    words, that mortgage was unavailable.
23      (Messrs. Kachajian and Norris enter.)
24 Q You make the assumption in your answer, I believe,

- 129 -

1    that the mortgage was to be entirely on that portion
2    of the property that was going to the town. In fact,
3    TPL was to retain certain property after the purchase.
4    Isn't it in fact true that the mortgage that was to be
5    given to Mrs. Kunelius was to be on that portion of
6    the property not going to the town?
7      MR. CONROY: Objection.
8 A I don't know that.
9 Q But you have just testified that you did, because
10    you've said that the town objected concerning that
11    mortgage. I will represent to you that there is not
12    one document from the town indicating that objection,
13    unless I've missed it. So, if there is such an
14    objection, then I would request town counsel to
15    provide that to me, where the town says they will not
16    allow the deal to be done because of a mortgage on the
17    property to be given to the town. Having said that,
18    are you --
19      MS. ECKER: Can I object to that
20    request first?
21      MR. McLAUGHLIN: Yes.
22      MS. ECKER: I object to the request.
23    The town has turned over all documents pursuant
24    to the documents requested. Whether that

- 130 -

1    specific document exists, I am not sure.
2      MR. McLAUGHLIN: Okay.
3      MS. ECKER: But, in general, we've
4    turned over all documents to you, whether it's
5    contained in a conversation or otherwise. So, I
6    want --
7      MR. McLAUGHLIN: I'm not impugning you,
8    madam.
9      MS. ECKER: I understand, but, no, I'm
10    not going to go through the town documents at
11    this time and provide you any further documents.
12      MR. McLAUGHLIN: Well, at this point,
13    I'm going to ask the witness again if the witness
14    believes that the town objected to the borrowing
15    by the witness' organization because it resulted
16    in a mortgage on the portion of the land going to
17    the town. Then I will ask you again to see if
18    there is such a document, because nothing has
19    been produced. I'm just saying --
20      MS. ECKER: Well, let me just start
21    here. I don't know if nothing has been produced.
22    We produced hundreds of documents to you. It
23    might your interpretation of the document. I
24    have not had the opportunity, nor do I suggest

- 131 -



1  the witness had the opportunity, to review the
2  hundreds of documents, including meeting minutes,
3  that have been produced. So, I'm not going to
4  agree to produce anything at this time.
5          MR. McLAUGHLIN: Okay.
6          MS. ECKER: Or agree that I haven't
7  produced it.
8          MR. McLAUGHLIN: Okay. Let the record
9  reflect that counsel has spoken to the witness.
10 Q I'm going to again ask you: are you certain that the
11    town objected to TPL complying with the terms of the
12    purchase and sale agreement and borrowing $400,000
13    from Mrs. Kunelius?
14         MS. FETOUH: Objection.
15 A I don't believe that was my testimony.
16 Q What was your testimony, sir?
17 A My testimony, I thought, and --
18         MR. CONROY: With all due respect, the
19    question is: what is his testimony? That's the
20    right question.
21         MR. McLAUGHLIN: What did I just say?
22         MR. CONROY: What was your testimony?
23    And the record will say what his testimony was.
24    I'd suggest that he be asked a question now and
                      - 132 -

1  he answer it.
2          MR. McLAUGHLIN: No, that's not -- but
3  I thank you for the instruction. What I am
4  saying is I want to know what he said, not what
5  he's saying now but what he said, and then I'll
6  work from there.
7          MR. CONROY: What he said back in time?
8          MR. McLAUGHLIN: I want to know what,
9  no, what he just said about the town objecting,
10 because he's now saying that wasn't his
11 testimony. I want to know what he just
12 said about the town objecting.
13         MR. CONROY: Well, I object.
14         THE WITNESS: Well, I'm happy to
15 clarify it.
16 Q Okay. Go ahead.
17 A Okay. The issue of the mortgage, requiring an actual
18    mortgage to be placed on the property, led TPL to
19    believe, correctly or incorrectly, that that would
20    have been a problem for the town. It's not my
21    testimony that I had a conversation with anyone from
22    the town about that. It was my -- it is my
23    recollection that that presented an obstacle to
24    utilizing that portion of the financing.
                      - 133 -

1  Q Why would the mortgage have been on the property that
2    went to the town rather than the property that went to
3    TPL?
4  A I'm testifying to my recollection of that issue, and
5    I've shared with you what my recollection is of that
6    issue.
7  Q But I believe you just said that TPL surmised that the
8    town wouldn't want -- my question to you is: the land
9    that was going to the town was a donation as part of
10   the deal with Mosaic Commons. The mortgage with
11   Mosaic Commons stayed on the remaining portion of
12   property that was to be owned by Mosaic Commons. What
13   made TPL believe that it would not remain on the
14   portion to be maintained by TPL and be somehow
15   transferred to that land being given to the town?
16         MR. CONROY: Objection. Among other
17   things, this is not a 30(b)(6) deposition.
18         MR. McLAUGHLIN: I understand. I'm
19   going to do a 30(b)(6), and he may be the person
20   to come back.
21         MR. CONROY: I understand you are.
22         MR. McLAUGHLIN: But if he can answer
23   the question --
24 A I think I've exhausted my ability to speak to that
                      - 134 -

1  issue.
2  Q So, if I can sum up, the town never told you they
3    would not accept a mortgage on the property that was
4    going back to the town, is that correct?
5          MS. ECKER: Objection.
6  A We never had a discussion about it.
7  Q So, it was your, TPL's, assumption that they might
8    object and, therefore, it would not work?
9  A Correct.
10 Q And that TPL never anticipated that the mortgage for
11   the $400,000 would be on the portion of the property
12   that TPL was to acquire.
13         MS. FETOUH: Objection.
14 A That's where I don't have a recollection.
15 Q But you realize, do you not, that TPL was the borrower
16   and that the remaining portion of the land was going,
17   as part of the sale, to the town? So, how is it
18   possible that TPL could ever have anticipated that
19   they acquire the money, they borrow the money -- they
20   acquire the property, they borrow the money from
21   Mrs. Kunelius, and somehow transfer the liability
22   for that money to the town?
23         MR. CONROY: Craig, don't answer.
24 Q And somehow transfer the liability for that money to
                      - 135 -

1  the town rather than TPL, because TPL's the borrower.
2          MR. CONROY: Objection.
3          MS. FETOUH: Objection.
4          (Mr. Kachajian exits the room.)
5  A With all due respect, I don't think I understand the
6    question.
7  Q Okay. Who was going to borrow the money, the
8    $400,000, under the purchase and sale agreement?
9  A Do you mean under the Kunelius mortgage option?
10 Q Yes, under the terms of the purchase and sale
11   agreement, who was to borrow $400,000 from
12   Mrs. Kunelius?
13 A The ultimate purchaser.
14 Q Well, it says -- it doesn't say the ultimate
15   purchaser, does it? It says Mosaic Commons. Isn't
16   that what it says?
17         MS. FETOUH: Objection.
18 A Why don't we get out the contract.
19         MR. CONROY: We have the document, so.
20         THE WITNESS: I'm going to take a
21   break.
22         (Recess, 2:20 P.M.)
23         (After recess, 2:31 P.M.)
24   (Messrs. Kachajian and Norris not present)
                      - 136 -

1          (WHEREUPON, Exhibit No. 13, MacDonnell
2    letter to Kachajian, dated September 9, 2003,
3    marked for identification.)
4  By MR. McLAUGHLIN:
5  Q Before you is Exhibit 13, which is a September 9,
6    2003, letter from you to Peter Kachajian. Do you
7    recognize this?
8  A Yes.
9  Q And that's your signature at the end?
10 A Yes.
11 Q Looking at the first page, there is a paragraph
12   beginning with First, which reads: First, there is a.
13   significant fund-raising gap. What was the
14   significant fund-raising gap that you were referring
15   to?
16 A The gap between the number of dollars that we believed
17   was going to come in from the Town of Stow investment
18   and the purchase price.
19 Q And what investment are you talking about by the Town
20   of Stow?
21 A The three hundred thousand dollar open space
22   investment and the one hundred thousand dollar
23   affordable housing.
24 Q And so did you become aware on or about September 9th
                      - 137 -



1 of 2003 that the Town of Stow was not going to provide
2 the three hundred thousand and the one hundred
3 thousand?
4 A No. No.
5 Q So, the fund-raising gap that you're referring to does
6 not include the Stow funds, correct?
7 A Correct.
8 Q And so what you were referring to -- well, let's go
9 on. Not only has the economy been hostile to
10 philanthropy, in general, we have experienced a
11 catastrophic failure in the rejection of the 350,000
12 Department of Housing and Community Development grant.
13 Do you see that?
14 A Yes.
15 Q Now, why was that catastrophic?
16 A Because we needed it.
17 Q But if you look at Exhibit 11, Exhibit 11 says: As a
18 fallback plan, if any or all of the above-referenced
19 sources are unavailable, TPL intends to utilize
20 capital from the private market.
21 Now, Exhibit 11 suggests that nothing would
22 be catastrophic because you had the fallback plan
23 which involved a line of credit. What made the
24 loss of the 350 catastrophic?

- 138 -

1 MR. CONROY: Objection.
2 MS. FETOUH: Objection.
3 A When TPL analyzes these projects, it identifies
4 sources of takeout money, dollars that will be spent
5 to acquire the property interests that are necessary
6 to make the conservation project complete. Because
7 TPL is not a landholding organization -- in other
8 words, we don't buy land to hold for conservation. We
9 occasionally will buy it and sell it, if necessary, to
10 complete a conservation project -- we always look for
11 the ultimate takeout, that is, the source of funds
12 that will purchase the property interest that I just
13 mentioned.
14 So, in determining whether or not a project
15 can be completed, TPL engages in an analysis of
16 whether the ultimate takeout funds will be
17 available. In this project, those funds appeared
18 not to be available, ultimately. The fund-
19 raising we had imagined did not materialize, the
20 DHCD grant did not come through, and it did not
21 seem as if it was possible to raise those dollars
22 for the ultimate conclusion of the project, not
23 that TPL could not borrow the money to make -- to
24 replicate those dollars but that any borrowing

- 139 -

1 that TPL engages in is designed only as a
2 stopgap, an interim stopgap, subject to our own
3 due diligence that would satisfy us that
4 ultimately that loan could be repaid from capital
5 takeout.
6 Q At the time that you accepted the assignment, I
7 believe your testimony was that you had every
8 expectation that everything would work out.
9 A We did.
10 Q Is it reasonable -- is it your position that
11 Mrs. Kunelius, in signing the purchase and sale
12 agreement with Mosaic Commons, should have
13 anticipated, one, that TPL was coming onboard
14 and, two, that eventually, notwithstanding their
15 alleged best intentions, they would fail?
16 MS. FETOUH: Objection.
17 Q Is that something that you think Mrs. Kunelius should
18 have anticipated?
19 MR. CONROY: Objection.
20 MS. FETOUH: Objection.
21 A Well, I don't know if Mrs. Kunelius should have
22 anticipated that, but an attorney reading the contract
23 and knowing Chapter 61 would know that the assignee
24 steps into the shoes of a contract negotiated by him

- 140 -

1 or her and that that contract imagined Mrs. Kunelius
2 walking away with liquidated damages but not the
3 purchase of her property.
4 Q It's your testimony that you did not anticipate,
5 ultimately, that this matter would fail, and, in fact,
6 your testimony is that you had every expectation that
7 it would go forward. Am I right on that?
8 A As with every TPL project we work on. We don't get
9 into these projects just for the heck of them. We do
10 them to achieve conservation. So, absolutely, yes,
11 completely our intention.
12 Q And, therefore, you were not expecting that
13 Mrs. Kunelius should have anticipated that TPL
14 would not have been able to raise money for the
15 purchase. Is that reasonable to say? I don't
16 care about lawyers.
17 A No.
18 Q The question is: if you didn't anticipate it, is it
19 reasonable for you to expect that Mrs. Kunelius should
20 have anticipated that you would have failed?
21 MR. CONROY: Objection.
22 MS. FETOUH: Objection.
23 MS. ECKER: Objection.
24 Q TPL would have failed.

- 141 -

1 A I don't know what it is reasonable for Mrs. Kunelius
2 to have expected on her own, but anyone reading the
3 contract would know that there are two ways forward
4 under that contract. One is with the purchase.
5 Another is via an in-completed transaction.
6 Q But you told the Commonwealth of Massachusetts there
7 was a fallback plan. I still don't understand what
8 was intended by TPL in telling the Commonwealth that,
9 even if any or all of the other sources were
10 unavailable; that TPL intends to utilize capital. If
11 that's the fallback plan, what was the purpose of
12 telling the Commonwealth that?
13 MR. CONROY: Objection.
14 MS. FETOUH: Objection.
15 A What that means is that TPL could have borrowed to
16 conclude this transaction if it made sense, otherwise,
17 from a due diligence point of view. What I'm trying
18 to tell you about is this due diligence piece that
19 imagines in every TPL project that if borrowing is
20 necessary, the borrowing is replaced by conservation
21 takeout dollars that materialize somewhere. In the
22 absence of dollars on the horizon, fund-raised, sale
23 of 142 or 144, it would not be prudent for TPL to
24 borrow the money to complete the transaction.

- 142 -

1 Q How much money you had to borrow?
2 MS. FETOUH: Objection.
3 A It depends how much money would have been on the table
4 to begin with.
5 Q Well, at the time, the application says none of the
6 sources are critical because you can borrow. That's
7 essentially what it says. My question is, at a
8 minimum, one source was available. That's the four
9 hundred thousand from the city, from the town, is that
10 correct?
11 MS. FETOUH: Objection.
12 MR. CONROY: Objection.
13 A Well, three hundred is available at the closing if the
14 town gets their land. The one hundred wouldn't be
15 available until the ultimate renovation and resale of
16 the two units, of 142 and 144. It became apparent in
17 the middle of this project that that subdivision
18 process was fraught with problems, that we can talk
19 about, but towards the end of the project, the ability
20 of TPL to subdivide that property was highly
21 problematic, and it did not appear as if that
22 subdivision was possible.
23 Q In fact, you were told prior to the time that you
24 acquired the property that the subdivision was

- 143 -



1  unlikely. Isn't that true?
2 A  No, in fact, we were told it was very likely.
3 Q  Isn't in fact true that, before you accepted the
4   assignment, you had already been told that a
5   subdivision was not likely at all?
6 A  That's not my recollection at all.
7 Q  My question remains: how much money did you think you
8   had to borrow at the time that you decided not to go
9   forward in making the purchase?
10        MR. CONROY: Objection.
11 A  Well, as I testified earlier, there is no point in
12   time. It's a gradual awareness that this project is
13   getting highly complicated and highly problematic from
14   a whole lot of different perspectives.
15 Q  Did the Mosaic Commons deal require a subdivision?
16        MS. FETOUH: Objection.
17        MR. McLAUGHLIN: I'll strike that.
18 Q  Did the purchase and sale agreement with Mosaic
19   Commons include a subdivision?
20        MR. CONROY: Objection. It speaks for
21   itself.
22 A  I don't remember.
23 Q  Isn't it in fact true that the subdivision issue was
24   not part of the Mosaic Commons contract, but it was a

- 144 -

1   part of your requirement after you accepted the
2   assignment, that you wanted a subdivision of the
3   property in a particular way?
4        MR. CONROY: Objection.
5 A  Well, I don't know what the Mosaic provision
6   contained. I just don't have that contract in front
7   of me, so I can't speak to it. My understanding is
8   that's it a 40B and that that short of greases the
9   skids.
10 Q  Your counsel has the contract in front of him. Why
11   don't you take a look at it, and I'll look at the one
12   I have.
13 A  I have it in front of me.
14 Q  Okay. I'm going to move off that subject. I'm going
15   to ask you to look at Paragraph 30.
16 A  Yes.
17 Q  Second paragraph of Paragraph 30: Security for the
18   four hundred thousand promissory note afore-described
19   shall be in the form of a mortgage on the 8.57 acre
20   parcel. Do you see that?
21 A  I do.
22 Q  Is it fair to say that you were wrong in making the
23   assumption that the mortgage for the $400,000 was
24   going to be on that portion of the property that was

- 145 -

1   being given to the town?
2 A  What I don't know is whether the configuration of the
3   8.57 acre parcel is the same configuration that the
4   two, 142 and 144, parcels were located on.
5 Q  Sir, did you just make up, today, the argument that
6   the Town of Stow would object to the inclusion of a
7   mortgage on the parcel of land that was to be donated
8   to the town?
9        MS. FETOUH: Objection.
10        MR. CONROY: Objection.
11        MS. ECKER: Objection.
12 Q  Did you make that up today?
13        MS. FETOUH: Objection.
14        MS. ECKER: Objection.
15        MR. CONROY: Objection. And this is
16   inappropriate sort of questioning,
17   Mr. McLaughlin.
18        MR. McLAUGHLIN: I don't think so.
19   Your objection is noted.
20 Q  Let me ask you again, sir.
21 A  I will happily say I did not make that up today.
22 Q  And can you tell me who raised that issue with you?
23 A  What issue?
24 Q  From TPL, as to whether or not the four hundred

- 146 -

1   thousand dollar mortgage was going to be put on the
2   land that was being given to the town?
3        MS. FETOUH: Objection.
4 A  That was my own notion.
5 Q  Now, you have, do you not, substantial tax expertise?
6        MS. FETOUH: Objection.
7        MR. CONROY: Objection.
8 A  No.
9 Q  Do you recall writing an extensive letter concerning
10   the tax benefits that Mrs. Kunelius would gain if she
11   accepted a four hundred thousand dollar reduction in
12   the purchase price?
13 A  I can't remember whether the reduction was four
14   hundred, but I do remember writing a letter with
15   respect to the value of a bargain sale.
16 Q  Do you recall that a significant component of your
17   letter dealt with the donation of land by
18   Mrs. Kunelius and the tax benefits to be derived
19   from that donation of land to the Town of Stow?
20        MS. FETOUH: Objection.
21 A  I don't think it related to a donation. I think it
22   was with respect to a theoretical below-market sale.
23 Q  Do you recall that a component of the sale involved a
24   donation of a substantial portion of the property to

- 147 -

1   the Town of Hull for a tax consideration on her part?
2        MR. CONROY: Objection.
3        MS. FETOUH: Objection.
4        MS. ECKER: Objection.
5 A  That's not my recollection.
6 Q  So, how was the remaining land going to be given to
7   the Town of Stow? The portion that was being donated
8   to the Town of Stow, how was that going to work under
9   the terms of the Mosaic Commons deal?
10        MS. FETOUH: Objection.
11        MR. CONROY: Objection.
12 A  You're asking me to essentially read this contract and
13   tell you how the land pieces were to be -- I'm sorry.
14 Q  Well, earlier you testified that you were familiar
15   under the provision of Chapter 61 with what provisions
16   of a purchase and sale agreement would be applicable
17   and what wouldn't. So, I have perhaps mistakenly
18   assumed -- I have assumed that you have read the
19   purchase and sale agreement, because you've drawn
20   conclusions as to what portions of the purchase and
21   sale agreement are applicable to TPL and which are
22   not.
23        So, let me start with a basic question.
24   Have you ever read in its entirety the purchase

- 148 -

1   and sale agreement?
2        MS. FETOUH: Objection.
3 A  Yes.
4 Q  Are you the person at TPL that came to the conclusion
5   that you could rely on the liquidated damage clause
6   provision?
7        MR. CONROY: Objection.
8        MS. FETOUH: Objection.
9 A  There were a number of people at TPL who reached that
10   conclusion.
11 Q  And who besides you reached that conclusion?
12        MR. CONROY: Before you answer the
13   question, I want to consider whether it calls for
14   an attorney-client privilege, raises an attorney-
15   client privilege issue.
16 Q  Other than attorneys, was there anybody else?
17        MR. McLAUGHLIN: Does that do it for
18   you?
19        MR. CONROY: Well, why don't you
20   rephrase it, please.
21 Q  Other than TPL's counsel, who reached the conclusion
22   that the liquidated damage clause would apply and that
23   should you not move forward in the purchase, Mrs.
24   Kunelius would be left with the earnest money?

- 149 -

1     MR. CONROY: Objection.
2     MS. FETOUH: Objection.
3 A I can testify that I reached that conclusion, but I
4 can't say who else in their own minds reached that
5 conclusion.
6 Q Okay. Let's go back to Paragraph 30, and I want to,
7 again, ask you since I didn't understand your past
8 answer.
9     Look at Paragraph 30, the third paragraph of
10 Paragraph 30: Notwithstanding the foregoing,
11 buyer shall only encumber the 8.57 acre parcel
12 expected to be developed -- parentheses --
13 consisting of .93 acre parcel and 7.64 acre horse
14 farm parcel. Do you see that?
15 A Yes.
16 Q Again, I'm going to ask you what made you consider
17 that the security for the four hundred thousand dollar
18 loan from Mrs. Kunelius to TPL would be anything but
19 the parcel described for security in Paragraph 30?
20 A And as I sit here today, I don't know what caused me
21 to reach that conclusion.
22 Q In fact, isn't it fair to say that it's entirely
23 possible that your conclusion was wrong?
24     MS. FETOUH: Objection.
- 150 -

1 A I don't know if that is a fair thing to say. What I
2 started to talk about was the configuration of the
3 8.57 acre parcel. One of the things TPL was doing was
4 considering revising the boundary between the town
5 parcel and the developed parcels, and the reason that
6 we imagined doing that was to facilitate the
7 redevelopment, or the reconfiguration, of 142 and 144
8 so that they could be sold. There were a number of
9 provisions in the subdivision law that required us --
10 I think there were shape variances and various things
11 that required us to redraw the boundary of the line
12 between the town parcels and the developed parcels. I
13 don't know, as I sit here today, whether or not that
14 followed the same line.
15 Q But where in the purchase and sale agreement or in the
16 assignment does it allow TPL to alter such a basic
17 term of the purchase and sale agreement involving the
18 very essence of the amount that is to be paid and how
19 it's to be paid? In other words, does TPL, simply as
20 an assignee, have the right to say, "I don't like this
21 term as defined in Paragraph 30, and, therefore, we're
22 going to do something else"? Is that what TPL
23 believes is their right under the assignment?
24     MR. CONROY: Objection.
- 151 -

1     MS. FETOUH: Objection.
2 A I don't know what you're asking.
3 Q You do not know what I'm asking? Is it your testimony
4 that TPL could unilaterally change the terms and
5 provisions of Paragraph 30 and not have to comply with
6 Paragraph 30?
7 A That's not my testimony.
8 Q Is it your testimony that you agreed to comply with
9 Paragraph 30?
10     MS. FETOUH: Objection.
11     MR. CONROY: Objection.
12 A We stepped into the shoes of the contract.
13 Q But the contract does not say that there will be a
14 redefining of the 8.57 parcel. It doesn't say that
15 anywhere, does it?
16 A This discussion is in the context of trying to decide
17 whether or not the four hundred thousand dollar
18 mortgage was available or usable, correct?
19 Q Well, certainly, I think you're aware that it was
20 available. Mrs. Kunelius was willing to lend it. The
21 question becomes whether TPL believed it could
22 unilaterally say, "We're not going to do it unless we
23 get a subdivision in a manner that we deem
24 appropriate. Otherwise, there is no availability."
- 152 -

1 Essentially, that's what you're saying, and I'm
2 saying, where in the contract does that allow --
3 A I think you've misunderstood me.
4     MS. FETOUH: Objection.
5     MS. ECKER: Objection.
6     MR. CONROY: Objection.
7 A With respect to the subdivision, the subdivision issue
8 relates to the question of how TPL would create value
9 and bring dollars to the table. What became apparent
10 is that that subdivision wasn't possible.
11 Q But your argument, I think, sir, is that you stepped
12 into the shoes of the buyer. The shoes of the buyer
13 allowed for what was contained in Paragraph 30, but
14 you didn't like what was contained in Paragraph 30, so
15 TPL changed those terms by seeking to get variances,
16 did you not?
17     MS. FETOUH: Objection.
18     MR. CONROY: Objection.
19     MS. ECKER: Objection.
20 A With all due respect, it's a complete non sequitur.
21 What I'm talking about is how TPL brings money to the
22 table, not whether or not this contract imagines or
23 doesn't imagine us doing that.
24 Q Well, do you agree that you stepped into the shoes of
- 153 -

1 the buyer?
2     MS. FETOUH: Objection.
3 A Yes.
4 Q And do you agree that some terms do not apply to TPL?
5 A As a matter of Chapter 61 law, or lore, the assignee
6 is naturally required to comply with some but not all
7 terms.
8 Q Does the assignee have to comply with the purchase
9 price?
10     MR. CONROY: Objection.
11     MS. FETOUH: Objection.
12 A If the assignee goes forward and purchases the
13 property, I would say yes.
14 Q I'm going to put before you another document.
15     (WHEREUPON, Exhibit No. 14, Conditions
16 for right of first refusal, marked for
17 identification.)
18 Q The document that I am putting before you appears to
19 be an iteration of what you've already seen as
20 Exhibit 7. It was received from the Town of
21 Stow. It has DRAFT on the top. It discusses the
22 conditions for transfer of the town's right of
23 first refusal on the Kunelius property. The bold
24 language appears to be TPL's answers to
- 154 -

1 questions.
2     I had asked you earlier if you remembered
3 Exhibit 7, and you said you were not sure or, no,
4 you didn't. I'm asking you now. Do you remember
5 what is now Exhibit 14?
6     MR. CONROY: Objection.
7 A It looks somewhat familiar.
8 Q And isn't it in fact true that all of the TPL
9 responses are after each question raised by the town,
10 and those responses are in bold print?
11 A It appears that way.
12 Q And are you the author of the bold print responses?
13 A I believe so.
14 Q And you would agree with me that this correspondence,
15 or this document, had to be drafted prior to the
16 assignment?
17 A That would make sense.
18 Q So, let's look at Item No. 2, which is referring to
19 the town's request that the town be held harmless if
20 TPL backs out of the deal before closing, in other
21 words, and I'm quoting, in order words, that TPL will
22 defend the town against any suit resulting from the
23 failure of the property purchase to be completed.
24 Alternatively, TPL posts a bond that guarantees their
- 155 -



1  performance. Then there's a response.
2      TPL: The appropriate way for risks
3  presented by this project to be managed are for
4  the common law of contract to apply. This law
5  will require TPL, not the town, to be obligated
6  to perform if the right of first refusal is
7  assigned. The town's legal responsibility ends
8  with the assignment. If we are offered the
9  opportunity to accept the assignment and we
10  decide to go forward, the law will require us to
11  meet the essential requirements of the contract
12  or suffer the consequences of default.
13      Now, at this point, you were referring, were
14  you not, to the fact that if you defaulted, then
15  the only money that was at risk to you was the
16  20,000 or $22,000 that had been paid as earnest
17  money to Mrs. Kunelius, is that correct?
18      MR. CONROY: Objection.
19      MS. FETOUH: Objection.
20 A  We believed that the liquidated damages provision
21  would apply.
22 Q  Now, I want you to go to the last page, Item No. 7.
23  The town raises the following issue: Because of the
24  difference in type of buyer, any parts of the P&S that
                           - 156 -

1  TPL believes don't apply should be addressed. A,
2  Paragraph 8, Time Performance, references a 12-month
3  extension if 40B approval process is proceeding
4  forward. B, Paragraph 30, Purchase Price Financing,
5  references a construction loan of 80 percent of the
6  construction costs. C, Paragraph 30, Purchase Price
7  Financing, references all purchase agreements of the
8  Co-housing project should be assigned to the seller as
9  further security. D, Paragraph 30, buyer shall only
10  encumber the 8.57 parcel. E, Paragraph 32, buyer and
11  seller agree to cooperate on a 40B submission. F,
12  Paragraph 35, upon receipt of all permits for the
13  development of the 8.57 acre parcel, seller will
14  transfer the right of the 42.1 acre parcel to the
15  town.
16      Now, those appear, is it fair to say that
17  those appear, to be the issues that the town was
18  identifying that needed to be considered in
19  reference to the difference in the buyer, in the
20  type of buyer? Is that how you understood that
21  question?
22 A  I understood the question to be just a straight-up
23  question to TPL, whether or not A through F apply.
24 Q  Look at your response. TPL: Because the decided
                           - 157 -

1  cases under Chapter 61 do not explicitly resolve all
2  of the potential issues that arise when a municipality
3  assigns its right of first refusal to a non-profit
4  conservation organization, including which of the
5  terms of the underlying contract should obligate the
6  assignee, it would be prudent for TPL and Marilyn
7  Kunelius' attorney to enter into good-faith dialogue
8  to determine which terms are relevant and which are
9  truly inapplicable. Do you see that?
10 A  Yes.
11 Q  So, you knew prior to accepting that that, in fact,
12  Chapter 61 did not identify with any certainty at all,
13  nor did the cases applying to Chapter 61 explicitly
14  resolve, what terms were applicable to whom.
15      MS. FETOUH: Objection.
16      MR. CONROY: Objection.
17      MS. ECKER: Objection.
18 A  That's not true.
19 Q  Well, I believe earlier you testified that -- I think
20  you said the cases -- I don't remember. You said that
21  you believed that, given the case law under Chapter
22  61, you could rely on the liquidated damage clause
23  provision. Yet, in this correspondence, you say,
24  because the decided cases under Chapter 61 do not
                           - 158 -

1  explicitly resolve all the potential issues that
2  arise, the parties essentially have to get together to
3  decide what truly does apply and what doesn't.
4      So, in your mind, is it fair to say that you
5  understood that the parties, i.e., yourself and
6  the town and Mrs. Kunelius, did not have an
7  understanding as to what terms specifically
8  applied and what did not and that's why you
9  suggested getting together with them?
10      MR. CONROY: Objection.
11      MS. FETOUH: Objection.
12      MS. ECKER: Objection.
13 A  Okay. Well, there's a lot of pieces to that question.
14  I guess what I'd start by saying is that what TPL said
15  there was that the cases don't resolve all of the
16  issues but that, together with the advice of counsel,
17  it was clear to us that some provisions would apply.
18 Q  What provisions? What provisions would apply?
19      MS. FETOUH: Objection.
20 Q  The P&S, you have the P&S right in front of you.
21  Let's go through them and decide, have you tell me
22  right now, what provisions would apply and what
23  provisions would not.
24      MS. FETOUH: Objection. And I'll just
                           - 159 -

1  note the concern that this will infringe on
2  communications with counsel, as the witness has
3  identified, and just instruct the witness to
4  limit his answer to anything that does not
5  involve communications with counsel.
6 A  Much of what I would say would refer to communications
7  with counsel.
8      MR. McLAUGHLIN: You want to go this
9  way?
10      MS. FETOUH: Well, I think I need some
11  time to talk to the witness about what those
12  communications are and the extent to which they
13  were shared with others.
14      MR. McLAUGHLIN: Okay. If you want to
15  go this way, we can go over to the court right
16  now. If your argument is, if I understand this,
17  that he's not going to testify as to what
18  provisions apply and don't apply because he only
19  heard it from his counsel, if that's what you're
20  actually saying, then I am prepared to go over to
21  see the judge right now if in fact that's what
22  you're saying. Maybe you're not.
23      MS. FETOUH: I think what I said is I
24  need to speak to the witness about this.
                           - 160 -

1      MR. McLAUGHLIN: Well, wait a minute.
2  The position taken by TPL, the position taken by
3  TPL is that some provisions apply and some do
4  not. It is a quintessential component of the
5  case as to what provisions do and do not apply.
6  This man is the director of Massachusetts and has
7  been the decision-maker with regard to a large
8  percentage of what's before the court right now.
9  I have every right for him -- since he has
10  testified he is aware that, under the provisions
11  of Chapter 61, certain provisions do and do not
12  apply, I certainly have the right to say, fine,
13  here's the P&S. Tell me what applies and what
14  doesn't. And if he says, no, I'm sorry, I
15  learned that from my counsel, I'm not asking what
16  counsel told him. I'm asking what is his
17  understanding. That's simple, what his
18  understanding is. I'm not asking what his
19  counsel told him.
20      MS. FETOUH: And it may be that he can
21  answer those questions, but I need an opportunity
22  to speak with my witness first. If I can have
23  that for a few minutes, we'll be right back.
24      MR. McLAUGHLIN: Okay.
                           - 161 -

1    MR. CONROY: And I would add to that,
2  Mr. McLaughlin, that you do have a 30(b)(6)
3  deposition coming, and this is not the
4  appropriate role for this deposition. Let me
5  finish, please. You're here, as I understand it,
6  to question Craig MacDonnell about Craig
7  MacDonnell's memories, things he saw, touched,
8  smelled, heard, whatever. You'll have another
9  opportunity to depose the Trust for Public Land
10  as to what their position is.
11    MR. McLAUGHLIN: That is true.
12    MR. CONROY: And let me suggest that
13  that be deferred to that deposition.
14    MR. McLAUGHLIN: I think I should have
15  the right, since he's already testified what he
16  knows under Chapter 61, to ask him the questions
17  of which one applies. You can talk to him.
18  You're talking to him in his role as an employee
19  of TPL.
20    MS. FETOUH: That's correct.
21    MR. McLAUGHLIN: Okay. Just for the
22  record, I want to note that the responses in this
23  case have been indistinguishable as to who is
24  saying what since they've been jointly filed.

- 162 -

1  So, each response is from Craig MacDonnell, and
2  statements regarding these types of questions
3  have also been defended by Craig MacDonnell.
4  That's why we have a joint motion to dismiss
5  statements by Craig MacDonnell that say there are
6  certain provisions that apply and there are
7  certain provisions that do. It's in your
8  responses.
9    So, if it was only in TPL's, I would say
10  maybe you're right. That's not what you guys
11  elected to do, but if you want to talk to him,
12  that's fine. We can take a break.
13    (Recess, 3:10 P.M.)
14    (After recess, 3:17 P.M.)
15    (All parties present)
16    MS. FETOUH: I've had an opportunity to
17  speak with Mr. MacDonnell. We'll allow him to
18  answer your question to the extent of his
19  understanding of the answer to your questions in
20  his individual capacity, not speaking for TPL as
21  an institution.
22    MR. McLAUGHLIN: Okay. Thank you.
23    MR. KACHAJIAN: Is this regarding the
24  purchase and sale?

- 163 -

1    MR. McLAUGHLIN: Yes. You probably
2  ought to go.
3    (Mr. Kachajian exits the room.)
4    MR. CONROY: And let me make my little
5  piece, too, if I may. I have objected
6  previously, and now again, to the mixing of what
7  I think is appropriate 30(b)(6) versus individual
8  deposition and also to the notion of querying
9  Mr. MacDonnell as a legal expert. With those
10  objections stated and reserved, I have no grounds
11  to instruct him not to answer, other than to be
12  careful that he doesn't reveal any attorney-
13  client confidences.
14  By MR. McLAUGHLIN:
15 Q  Okay. Before we go into the purchase and sale
16  agreement, I want to go back to some of your prior
17  testimony. Do you remember we talked about the fact
18  that you didn't know that variances were not going to
19  be granted until well after the acquisition of the
20  assignment?
21 A  My memory was that I had reason to believe that the
22  variance would be granted.
23    (WHEREUPON, Exhibit No. 15, Sommerlad
24  email to Kennedy, marked for identification.)

- 164 -

1 Q  I have put before you what has been marked as Exhibit
2  15 and ask you if you recognize this document.
3 A  I can describe it. I don't recall seeing it before.
4 Q  Well, who is Ruth Kennedy, do you know?
5 A  She's a Stow resident. I believe she's on the
6  Planning Board.
7 Q  Who is Karen Sommerlad?
8 A  She lives on Red Acre Road.
9 Q  And Exhibit 15 is a letter from Karen Sommerlad to R.
10  Kennedy, Landvest. Subject, Planning Board. Question
11  re Kunelius property. Importance, high. Ruth, I
12  apologize for bothering you at work. I'm writing on
13  behalf of Friends of Red Acre and Craig MacDonnell.
14    Was Karen Sommerlad writing on your behalf
15  with regard to questions relating to variances
16  and special permits and so forth?
17 A  Well, I don't know. I remember having some
18  conversations with a number of the Red Acre Road
19  people about subdivision.
20 Q  Does this remind you or refresh your memory concerning
21  the fact that you were subsequently told that
22  subdivision and special permits were not going to be
23  granted in February of 2003?
24    MS. FETOUH: Objection.

- 165 -

1 A  No.
2 Q  Looking at the second paragraph, it reads: The
3  question is, if we need a zoning variance for lot
4  frontage and possibly other dimensional variances, can
5  we submit an approval-not-required, ANR, for the
6  submission and is the appropriate sequencing of events
7  to get variances and then submit the ANR? Is it
8  possible to submit an ANR and have it approved subject
9  to receiving the variances? Is an ANR in this
10  situation even possible?
11    Do you recall what the answer to those
12  questions were?
13 A  I remember having questions about how to go forward on
14  the subdivision, and I believe we set up a meeting
15  with a representative of the planning office to cut
16  through the ambiguity in which we met with Karen
17  Kelleher who is an employee of the Town.
18 Q  Let's go to this one.
19    (WHEREUPON, Exhibit No. 16, Jacobs
20  email to Sommerlad and Kennedy, dated February 6,
21  2003, marked for identification.)
22 Q  Before you is what has been marked as Exhibit 16, and
23  we're looking at the first page of that exhibit.
24 A  Uh-huh.

- 166 -

1 Q  This appears to be from Donna Jacobs to Karen
2  Sommerlad and Ruth Kennedy, copied to you. Do you see
3  that?
4 A  Yes.
5 Q  The second paragraph says: I do not clearly
6  understand your objective. However, I can add some
7  additional statements for your consideration. The
8  caretaker's cottage is a pre-existing, non-conforming
9  structure and use. As such, any extension, change in
10  use or alteration addition is subject to a special
11  permit from the ZBA. I am uncertain of the specifics
12  of the Kunelius property as I do not have a map I can
13  view at this time, but it is likely to be a pre-
14  existing, non-conforming lot because almost 90 percent
15  of the lots in Stow fall into that category. The
16  Planning Board cannot endorse an ANR plan that will
17  increase the degree of non-conformity of a pre-
18  existing non-conforming lot. Because the purpose of
19  the subdivision approval is to create lots with
20  adequate accesses, frontage and lot area in compliance
21  with the zoning bylaw, the board can't grant the
22  waivers you are seeking.
23    Now, this is dated February 6, 2003, is that
24  correct?

- 167 -



1 A  The email from Jacobs to Sommerlad?
2 Q  Yes.
3 A  Yes.
4 Q  So, you had reason to believe in early February, long
5     before the acceptance of the assignment, that there
6     were going to be problems with zoning for the two lots
7     in question, didn't you?
8         MR. CONROY: Objection.
9 A  We knew it would be a challenging subdivision that
10    would require relief from the relevant boards.
11 Q  But I thought you testified, sir, that you didn't have
12    any inkling that there was going to be a problem until
13    well after the acceptance of the assignment and it was
14    well into the process. In fact, you did have
15    knowledge very early on, even before you accepted the
16    assignment, that you weren't going to get approvals
17    from the Planning Board. Isn't that fair to say?
18        MS. ECKER: Objection.
19        MS. FETOUH: Objection.
20        MR. CONROY: Objection.
21 A  I think you're confusing two issues.
22 Q  What are the two issues I'm confusing?
23 A  One is whether there was an analysis to be had on the
24    front end about which waivers, which variances, which
                    - 168 -

1     permits, were required and which path through that
2     process was appropriate. My recollection is that that
3     issue was wrestled with and that Karen Kelleher, in a
4     meeting with TPL, led us to believe that those issues
5     could be resolved. So, later on, however, in the
6     process, another more complicating factor emerged, so
7     that when I was referring to the problem earlier -- do
8     you follow me?
9 Q  Yes.
10 A  That I was referring to the problem that developed
11    later rather than the analysis, sort of the just
12    working through the kinks on the front end.
13 Q  Let's go to the purchase and sale agreement, if you
14    would. Where in the purchase and sale agreement
15    between Mrs. Kunelius and Co-housing does it discuss
16    zoning changes, special permits or variances?
17 A  I don't believe there's any reference to those issues
18    in the contract.
19 Q  So, the insertion of a zoning variance, special
20    permit, subdivision issues, those three issues, was
21    made by TPL since it's not discussed in the purchase
22    and sale agreement itself.
23 A  We're not inserting anything. I'm not suggesting that
24    the subdivision issue is a contract contingency. It's
                    - 169 -

1     a fund-raising obstacle.
2 Q  So, let me move back. This is the first time I've
3     heard that.
4         So, your refusal to move forward and
5     purchase the property did not result from the
6     failure to get a subdivision plan approved, or
7     any variances or permits that would be needed,
8     for the project that you envisioned to be built
9     on the site rather than what Mosaic Commons
10    envisioned. Is that correct?
11        MR. CONROY: Objection.
12        MS. FETOUH: Objection.
13 A  What I'm saying is that the difficulty TPL encountered
14    in achieving the subdivision was not related to the
15    contract per se at all. It was a project issue that
16    prevented TPL from subdividing 142 and 144 and thus
17    realizing on the sale of the separate lots.
18 Q  You realize, sir, that Mrs. Kunelius lost the
19    opportunity to sell the property to Mosaic Commons as
20    a result, direct result, of the actions of TPL in
21    accepting the assignment and then failing to go
22    forward in the purchase.
23        MS. FETOUH: Objection.
24        MR. CONROY: Objection.
                    - 170 -

1 Q  Do you realize that?
2 A  Is that a question?
3 Q  Yeah.
4 A  I believe that the contract played out as it was
5     intended, to either enable Mosaic or the assignee to
6     go forward under the contract.
7 Q  But, in fact, neither did. Isn't that correct?
8 A  In fact, the contract imagined either a sale or a
9     default, and the default resulted in liquidated
10    damages. That was the end of the contract.
11 Q  Is it your testimony that you believe Mrs. Kunelius
12    anticipated that TPL -- strike that.
13        Prior to TPL scoping out Mrs. Kunelius'
14    property, did you ever meet with her?
15 A  Prior to scoping it out?
16 Q  Yeah.
17 A  No, I believe we spoke on the phone and met through
18    the course of the project.
19 Q  But is it your testimony that you believe
20    Mrs. Kunelius anticipated that TPL would come in
21    and then default and that she would lose, as a
22    result of that default, the opportunity to sell
23    the property to Mosaic Commons?
24        MR. CONROY: Objection.
                    - 171 -

1         MS. FETOUH: Objection.
2         MS. ECKER: Objection.
3 A  I have no idea what Mrs. Kunelius --
4 Q  Do you have an understanding that Mrs. Kunelius had
5     considered such an outcome when she was negotiating
6     her deal with Mosaic Commons?
7         MR. CONROY: Objection.
8         MS. FETOUH: Objection.
9 A  Given that I wasn't in the room when she was talking
10    about this contract with her attorney, I have no idea
11    what she anticipated.
12 Q  Looking at Paragraph 1, 2, 3, 4, of the purchase and
13    sale agreement, since I don't think anyone disagrees,
14    at least for the purposes of today, that those apply,
15    or perhaps they don't. Do you agree that all of those
16    provisions, 1, 2, 3 and 4, of the purchase and sale
17    agreement apply to TPL?
18 A  Well, I'll go through them one by one. Should I do
19    that?
20 Q  Sure.
21 A  Paragraph 1 speaks in terms of the seller and the
22    buyer, and the buyer is listed as Co-housing
23    Resources, not TPL.
24 Q  Right.
                    - 172 -

1 A  Of course, the operation of 61 would alter that.
2     Paragraph 2 talks about the property. Paragraph 3
3     talks about the buildings. Paragraph 4 talks about
4     title.
5 Q  Well, let me stop at Paragraph 3 for a minute. It
6     says in as-is condition, does it not?
7 A  Those are the last three words of Paragraph 3.
8 Q  Do you have an understanding as to what as-is
9     condition means?
10 A  I do.
11 Q  And what is your understanding?
12 A  That the property is sold as is.
13 Q  Not with additional subdivisions, doesn't mention
14    that. Doesn't mention additional permits. It says as
15    is, isn't that correct?
16        MS. FETOUH: Objection.
17        MR. CONROY: Objection. It says what
18    it says.
19 Q  Well, you don't see anything in there that talks about
20    additional provisions such as subdivisions or permits
21    or anything.
22 A  As I mentioned a minute ago, the question of
23    subdivision is not a contract -- just allow me to
24    finish -- is not a contract issue that TPL is raising.
                    - 173 -

1   It's a fund-raising issue.
2 Q   Have you ever made such a statement to the court, that
3   the subdivision issue was a function of the fund-
4   raising and that's why it didn't have the money?
5       MS. FETOUH: Objection.
6       MS. ECKER: Objection.
7       MR. CONROY: Objection. This
8   deposition is out of control. I will say that on
9   the record. And there comes a time when it gets
10   out of control.
11       MR. McLAUGHLIN: I have to say I am
12   just totally appalled, sir. I am appalled by
13   this --
14       MR. CONROY: Well, I'm sorry to hear
15   you're appalled. Now, why don't you ask a
16   factual question and go forward.
17       MR. McLAUGHLIN: I am just appalled at
18   the behavior of this man who is a member of the
19   bar. I am appalled.
20       MS. FETOUH: Objection.
21       MR. CONROY: I am going to walk out of
22   this room the next time that gets said or
23   anything of that sort gets said.
24       MR. McLAUGHLIN: You go ahead.
     - 174 -

1       MR. CONROY: And you can talk to Judge
2   O'Toole and tell him, and I hope the stenographer
3   is getting this. You can tell him and defend to
4   him why you are abusing this witness. If you
5   want to ask a question, ask it, and he will
6   answer it.
7       MR. McLAUGHLIN: Do not, do not, point
8   your finger at me.
9       MR. CONROY: I'll point anything I want
10   at you. Go ahead and ask your question.
11       MR. McLAUGHLIN: If you'd like to walk
12   out of this, you do anything you want. The rules
13   are the rules. If you want to disregard the
14   rules, that's fine.
15       MR. CONROY: Yeah, the rules include,
16   the ethical rules include, not abusing a witness.
17   So, let's continue.
18       MR. McLAUGHLIN: I understand your
19   frustration based upon what's happened already in
20   this deposition, because -- I understand all of
21   your frustrations, because I can't believe that
22   there is a six million dollar line of credit and
23   all of you told the judge that there was no money
24   available.
     - 175 -

1       MR. CONROY: Okay. Go ahead.
2       MR. McLAUGHLIN: Good luck. Not all
3   but maybe all.
4 Q   All right. Let's look to number four. Did the title
5   provision apply to TPL?
6 A   Based on sort of my own perception of this?
7 Q   That's right. All of these are based upon your
8   perception as the director of the Massachusetts branch
9   of TPL.
10 A   By your question, I assume you're asking whether or
11   not TPL, as the assignee, has the right to require
12   Mrs. Kunelius to provide good title.
13 Q   I presume that's what I mean.
14 A   Well, if that's what you mean, I'll answer. I don't
15   want to guess about what you mean.
16 Q   Does Paragraph 4, is that obligation applicable to
17   TPL?
18 A   I believe it's applicable to Mrs. Kunelius. It
19   requires her to deliver good title.
20 Q   Five, Paragraph 5?
21 A   It requires Mrs. Kunelius to deliver the plan
22   referenced there.
23 Q   Six?
24 A   I would say that would require Mrs. Kunelius to comply
     - 176 -

1   with the requirements related to registered land.
2 Q   Paragraph 7, Purchase Price, I'm going to direct your
3   attention to the amount of the deposit listed under
4   Paragraph 7. How much of a deposit was made under
5   this provision?
6 A   The first line says zero.
7 Q   And noting the bottom of the compilation of numbers
8   there, four hundred thousand promissory note secured
9   by a mortgage, do you see that?
10 A   Yes.
11 Q   It has an asterisk that refers to Paragraph 30 for
12   further terms and provisions.
13 A   Yes.
14 Q   And turn to Paragraph 30. Now, this is the paragraph
15   that you had already looked at. My question to you
16   now is: does Paragraph 30, is this an obligation of
17   Mrs. Kunelius under the terms of the purchase and sale
18   agreement?
19       MS. FETOUH: Objection.
20       MR. CONROY: Objection.
21 A   Based on my own perception of this contract, not from
22   TPL's perception, it would require Mrs. Kunelius to
23   make that mortgage a part of the assigned
24   relationship.
     - 177 -

1 Q   And you would agree that the mortgage is secured by
2   the 8.57 parcel as we've already discussed?
3 A   We have already discussed that.
4 Q   And looking at the time for performance, number eight,
5   is that time for performance applicable to TPL?
6 A   I would say the first sentence is. The reference to
7   Chapter 40B would not apply.
8 Q   So, the time for performance by TPL was September 26,
9   2003, correct?
10 A   That's what the contract says.
11 Q   Did you perform at that time?
12 A   Did we bring the purchase price to the table on that
13   date?
14 Q   Yes.
15 A   No.
16 Q   Now, is it your understanding that the bold language
17   of Paragraph 8 did not apply to TPL or was optional
18   for TPL?
19 A   Well, based on my own understanding of the provision
20   and my own understanding of the law, the Chapter 40B
21   related extension would be inapposite to TPL.
22 Q   And by inapposite, meaning that it just would be
23   inapplicable, it would be inappropriate based upon the
24   goals and directions of TPL as a conservation
     - 178 -

1   foundation.
2 A   No. No.
3 Q   What do you mean by inapposite, then?
4 A   It means, I mean, that TPL would not be in the
5   business of applying for a Chapter 40B approval.
6 Q   But there was nothing that prevented TPL from moving
7   forward and obtaining a 40B approval, except that TPL
8   did not want to. Is that correct? Is there anything
9   in this contract, I'm taking about, that prevents TPL
10   from doing that?
11 A   No.
12 Q   In fact, this contract anticipates that the buyer
13   would do that. Isn't that fair to say?
14 A   Anticipates that Mosaic Commons would.
15 Q   And you testified before that TPL steps into the shoes
16   of Mosaic Commons, correct?
17 A   I have.
18 Q   And would it be your testimony that Mrs. Kunelius
19   should have understood that maybe TPL may also want to
20   do a 40B?
21       MS. FETOUH: Objection.
22 A   I have no idea what she would have expected.
23 Q   Number nine, does this apply to TPL?
24 A   I believe it would require Mrs. Kunelius to comply
     - 179 -

1     with that paragraph.
2 Q  Number ten?
3 A  I believe the printed paragraph before the asterisk
4     would enable Mrs. Kunelius to perfect title and go
5     forward.
6 Q  Number eleven and twelve are related. So, I'm going
7     to ask you, at any time, did you determine that
8     Mrs. Kunelius had failed to provide the property
9     in accordance with what she was required to do by
10    way of title defect? Did you identify any title
11    defects?
12 A  I don't recall any title defects.
13 Q  So, twelve really doesn't apply because no defects
14    were identified. What about thirteen?
15 A  I haven't read Paragraph 12 yet, but I'll move on to
16    thirteen. Or eleven. Okay. I believe Mrs. Kunelius
17    could, based on my own understanding, could ask that
18    TPL live by the terms of Paragraph 13.
19 Q  Fourteen?
20 A  That would enable Mrs. Kunelius to clear title with
21    purchase.
22 Q  Fifteen?
23 A  Fifteen, based on my own understanding, would require
24    Mrs. Kunelius to maintain insurance on the property.

- 180 -

1 Q  Sixteen, seventeen, together, since they deal with
2     adjustments, would you agree that at the time of
3     closing, TPL would have the right to make adjustments
4     on fees paid for water, sewer and so forth, and
5     Mrs. Kunelius would have the right to recover on
6     amounts that had already been paid but not fully
7     accrued?
8 A  I'm just going to read these quickly.
9 Q  Okay.
10 A  It appears as if 16 and 17 could be utilized by both
11    Mrs. Kunelius and the assignee.
12 Q  Who was going to pay the brokerage fee under eighteen?
13 A  The language of Paragraph 18 suggests that a brokerage
14    fee would be paid by the seller.
15 Q  Nineteen is probably inapplicable to this situation.
16    The deposit described in 20, were deposits made?
17 A  Yes.
18 Q  Were these the earnest money deposits that are
19    described in Paragraph 31?
20 A  I believe TPL made what are described in Paragraph 31,
21    or made deposits, however they're described, to
22    Mrs. Kunelius.
23 Q  Do you differentiate between a deposit and earnest
24    money?

- 181 -

1 A  It's been my understanding that a deposit is a deposit
2     is a deposit.
3 Q  And is earnest money earnest money earnest money?
4 A  My understanding all along is that whatever had been
5     paid ahead of time before the purchase price, before
6     the closing, excuse me, was a deposit.
7 Q  And is that because of your understanding of normal
8     real estate procedure in which money was put down to
9     hold the property?
10 A  It's my recollection of this transaction.
11 Q  Did you have any understanding that the earnest monies
12    described in Paragraph 31 were to be used as living
13    expenses by Mrs. Kunelius during the pendency of the
14    40B approval process?
15 A  No.
16 Q  So, is it fair to say there's nothing in this contract
17    that says that, but did you have any separate
18    understanding that the money that was being given to
19    Mrs. Kunelius, that fifteen hundred dollars a month,
20    was because she didn't have any money to live on and,
21    therefore, Co-housing agreed that they would pay her
22    living expenses while they went forward?
23 A  No.
24 Q  Today is the first time you've heard that?

- 182 -

1 A  Yes.
2 Q  On Paragraph 21, that's the provision that you believe
3     applies, is that correct, on liquidated damages?
4 A  I do believe, on my own personal understanding of the
5     contract, that Paragraph 21 applies.
6 Q  Twenty-two, 23, 24, don't seem to apply. Twenty-five?
7 A  Based on my own understanding of the contract, I
8     believe Paragraph 25 would apply.
9 Q  So, representations made by you on behalf of TPL would
10    apply to this purchase. Is that fair to say? Is that
11    how you read that?
12         MS. FETOUH: Objection.
13         MS. ECKER: Objection.
14         MR. CONROY: Objection.
15 A  The way I read that is as follows: the buyer
16    acknowledges that the buyer has not been influenced to
17    enter into this transaction nor has he -- I guess, in
18    this case, she -- relied upon any warranties or
19    representations not set forth or incorporated in this
20    agreement. And it goes on.
21 Q  And TPL is the buyer?
22 A  TPL is the assigned buyer.
23 Q  Mortgage contingency clause refers to 80 percent of a
24    project construction price. Under your understanding

- 183 -

1     of this contract, could you have borrowed money, TPL
2     have borrowed money, construction loan, and have it
3     secured by the property?
4         MR. CONROY: Objection.
5 A  Based on my own understanding of the contract, this is
6     exactly the kind of provision that would not apply to
7     TPL.
8 Q  That's by election of TPL. In other words, if TPL
9     were to elect to have a project construction price, I
10    mean, a conventional financing, they could do that.
11    TPL could have availed themselves of this provision,
12    correct?
13         MS. FETOUH: Objection.
14         MS. ECKER: Objection.
15         MR. CONROY: Objection.
16 A  Well, speaking on my own understanding of the
17    contract, it appears that Paragraph 26 was designed to
18    enable -- we've been saying Mosaic Commons, but it's
19    actually Co-housing Resources -- to borrow money to
20    build the project that they imagined, and since that
21    notion really is inapposite to what TPL was intending
22    to do, it seems to me that Paragraph 26 would not be
23    available for TPL to rely on.
24 Q  That's because TPL wouldn't do the 40B. Is that

- 184 -

1     correct?
2 A  It's because that provision imagines a large-scale
3     construction on the property.
4 Q  So, it is important for you to consider what the
5     provision must have imagined at the time that it was
6     entered into in order for it to have some validity in
7     the contract. Is that your testimony?
8         MS. FETOUH: Objection.
9 A  My testimony is, on my own personal understanding of
10    the law, is that a court would require some provisions
11    to apply and others not to apply and that there would
12    be an analysis conducted by a judge, if this were ever
13    put to a judge, that would figure out which provisions
14    are applicable to an assignee and the assignee's
15    purpose under the statute.
16 Q  Where does it say that, under the statute? Have you
17    ever found any particular portion of the statute that
18    deals with what the intention of the assignee or his
19    purpose might be, his or its purpose?
20 A  What I'm referring to is the lore and the common law
21    under Chapter 61A that's understood by Chapter 61A
22    practitioners.
23 Q  So, you've had some experience identifying what
24    Chapter 61A practitioners do as a matter of course.

- 185 -



1   How did you establish what that was?
2 A It's through working with them.
3 Q Any other provision of the purchase and sale agreement
4   that you believe -- well, which one are we on here?
5   We're on the mortgage contingency, the construction of
6   the agreement, lead paint law, smoke detectors. The
7   purchase price financing, we have already discussed.
8   The earnest money, we have discussed. The 40B
9   application and transfer of the land, I think you've
10   discussed. Are there any other provisions? For
11   example, let's go to thirty-five.
12 A I don't think I have an opinion on that one.
13 Q Well, you would agree with me, wouldn't you, that the
14   seller was not going to convey the entire parcel to
15   Co-housing but, rather, was going to convey 8.57 acres
16   only, and that the purchase price was for the 8.57
17   acres only and that the remaining parcel would be
18   transferred as a charitable contribution to the town?
19   Isn't that correct?
20 A Paragraph 35 contemplates that.
21 Q But that's not what TPL contemplated, is it? In other
22   words, TPL did not contemplate spending 1.116 million
23   dollars for the 8.57 acres, did it?
24      MS. FETOUH: Objection.

- 186 -

1 A I think it imagines, speaking of my own understanding
2   of the contract, that it would have the ability to
3   control the whole parcel and achieve the conservation
4   project that we've talked about.
5 Q Your answer, therefore, is that TPL did not want to
6   comply with a strict reading of Paragraph 35 because
7   TPL wanted to control the whole parcel. Is that fair
8   to say?
9      MS. ECKER: Objection.
10      MS. FETOUH: Objection.
11      MR. CONROY: Objection.
12 A No, I'm saying that our intention was to have that
13   parcel, a conservation parcel that in our minds was
14   that parcel, go to the town and that there be a
15   development on a portion adjacent to Red Acre Road
16   that would bring enough dollars to be able to pay
17   Mrs. Kunelius.
18 Q Or pay back TPL had they borrowed on their line of
19   credit.
20 A Our intention was to pay Mrs. Kunelius.
21 Q But that money from the parcel development was
22   intended, at least initially, according to the
23   statements that you made to the Commonwealth of
24   Massachusetts, that that development would pay back

- 187 -

1   TPL for the money it borrowed under its line of credit
2   with Wainwright Bank.
3      MS. FETOUH: Objection.
4 A If TPL decided to borrow the money.
5 Q So, the crux of the issue, from your point of view, is
6   that it was simply an issue of whether TPL decided it
7   wanted to borrow or not. If it didn't, then it
8   wouldn't. If it did, Mrs. Kunelius would be paid. Is
9   that fair?
10      MS. FETOUH: Objection.
11 A No.
12 Q What's unfair about that?
13 A What I've tried to help you understand is that TPL's
14   mission was to complete this project. The way we
15   would go about that would be to raise money in these
16   various ways. If it appeared likely that either
17   private fund-raising or private sales were going to
18   come together successfully, then TPL would have
19   considered borrowing ahead of time, but where, in this
20   case, where it seemed so unlikely that those various
21   sources of money would come back to TPL, that it would
22   not have been prudent for TPL to borrow.
23 Q So, it was the fact that TPL faced a risk of loss that
24   was the reason that they didn't go forward. When you

- 188 -

1   were doing that analysis, is it fair to say that you
2   became aware that Mosaic Commons had been dissuaded
3   from re-applying to purchase the property and get a
4   40B because of the activities of TPL and the Town of
5   Stow?
6      MS. FETOUH: Objection.
7      MR. CONROY: Objection.
8 A No.
9 Q Did you ever have discussions with anyone from Mosaic
10   Commons or Co-housing?
11 A Yes.
12 Q Are you aware that Mosaic Commons believes that TPL
13   and the Town of Stow were intentionally trying to
14   dissuade it from coming back and purchasing the
15   property under the 40B requirement?
16      MR. CONROY: Objection.
17 A I am not aware of that.
18 Q Are you aware of any conversations between yourself
19   and anyone from the town dealing with the fact that
20   the town members were pleased with your efforts
21   because it resulted in the 40B being defeated, in
22   effect, because Mosaic Commons would not come back?
23      MS. ECKER: Objection.
24      MR. CONROY: Objection.

- 189 -

1 A No.
2 Q It is your testimony that no one ever said to you that
3   the outcome prevented low-income housing from being
4   adjacent to the properties and the Red Acre Road and
5   that that was a result that a lot of people hoped to
6   achieve?
7 A I don't recall anyone saying that to me in so many
8   words, no.
9 Q Do you recall them saying it to you in some other
10   fashion?
11 A Well, I have an understanding, and, actually, as I sit
12   here now, I don't know where that understanding came
13   from, but I believe that the Friends of Red Acre were
14   disappointed this overall project did not go forward
15   but were not unhappy about Mosaic Commons not being
16   there.
17 Q And that's because Mosaic Commons was low-income
18   housing. Isn't that correct?
19 A Well, I can't say that.
20 Q Was there any other reason that you had heard as to
21   why the abutter would be happy that Mosaic Commons was
22   not going to be coming, other than the fact that the
23   housing they were going to be putting in was low-
24   income?

- 190 -

1      MS. FETOUH: Objection.
2 A Part of the justification of this conservation project
3   was that this was a delicate aquifer area. So, many
4   folks saw this conservation project as a way of
5   protecting Stow's water supply and that the absence of
6   any development on Mrs. Kunelius' land was good for
7   the water supply in the Town of Stow, and I think the
8   absence of a development on that property does result
9   in the protection of that water supply. So, that
10   would be another reason why people would be not
11   unhappy that Mosaic Commons is not around anymore.
12      MR. CONROY: When you're ready, five
13   minutes, ten minutes?
14      MR. McLAUGHLIN: Sure. I'll ask one
15   question and we'll take a break.
16 Q On February 11th, there was a town Board of
17   Selectmen's meeting concerning TPL, and I think you've
18   already testified that you attended that meeting. I'm
19   going to put before you the following document.
20      (WHEREUPON, Exhibit No. 17, Stow Board
21   of Selectmen meeting, February 11, 2003, marked
22   for identification.)
23 Q I'd ask you to look at the second page. These appear
24   to be minutes, although I can't tell exactly what they

- 191 -

1 are. It's a February 11th document. At the top is
2 Stow Board of Selectmen Meeting. It talks about
3 handouts. Some of it's written in the first person.
4 I don't know whether these are minutes or not.
5     Pointing to the second page, the last two
6 paragraphs say: If TPL can complete this deal
7 without additional cost to the taxpayers, I urge
8 you, then, to vote the way that the townspeople
9 have demonstrated at the polls, conservation, and
10 assign the right of first refusal under Chapter
11 61B to Trust for Public Land. Otherwise, the
12 proposed 40B development will have a negative
13 irreversible effect on the Red Acre community and
14 the Town of Stow.
15     When you were at that meeting, were you
16 aware that there were people who were against the
17 40B simply because it would have a negative
18 effect on the community?
19 A  Well, I don't recall this fellow, Drew Simmons, being
20 there, but apparently he's one.
21 Q  So, you don't recall that discussion?
22 A  I don't recall his presentation. I don't know if he
23 made a presentation. I've never seen this before, so
24 I don't know what it is.

- 192 -

1 Q  Okay. I'm going to put before you another document,
2 which is a compilation of documents from the Stow
3 Conservation Commission.
4     (WHEREUPON, Exhibit No. 18, Stow
5 Conservation Commission documents, marked for
6 identification.)
7 Q  I'd ask you to look to Bate stamp No. 154, and on that
8 Bate stamp number are Stow conservation minutes, April
9 15, 2004. Going down to about three-quarters of the
10 page down, Trust for Public Land/Kunelius parcel, it
11 states: Craig MacDonnell, of the Trust for Public
12 Land, TPL, and Carol Sommerlad, of the Friends of Red
13 Acre, requested a meeting with the Commission to give
14 them an update on their progress with the Kunelius
15 property on Red Acre Road. The Board of Selectmen
16 assigned the right of first refusal to TPL for the 50-
17 acre Kunelius Farm located on Red Acre, preventing a
18 40B Co-housing development.
19     So, you were aware, certainly, that your
20 efforts with TPL had the effect of preventing a
21 40B development. Is that fair to say?
22 A  Were we successful in conserving the property, the
23 property would have been conserved and not developed.
24 Q  Under 40B.

- 193 -

1 A  Correct.
2 Q  And you are aware, also, that under 40B there were no
3 permits or variances required by Co-housing in moving
4 forward. Isn't that correct?
5     MS. ECKER: Objection.
6     MS. FETOUH: Objection.
7 A  I don't know. I mean, I don't have a thorough
8 understanding Chapter 40B.
9 Q  Well, under the provisions of the purchase and sale
10 agreement, there were no contingencies for the
11 obtaining of variances or permits by Co-housing.
12 Isn't that fair to say?
13 A  Yes.
14 Q  And the only contingency under the purchase and sale
15 agreement was for some sort of feasibility study by
16 Co-housing. Is that fair to say?
17 A  I could go back and double-check the contract if you'd
18 like.
19 Q  You don't recall offhand. Is that your testimony?
20 A  Well.
21 Q  That's all right.
22 A  It's late in the day and I've been looking at a lot of
23 documents. I'd be happy to go back and take a look at
24 it.

- 194 -

1 Q  No, that's all right. Do you recall, when you had a
2 discussion with Mrs. Kunelius, that she told you that
3 the reason that she agreed to the Co-housing purchase
4 price of $1,116,900 was because, in effect, while it
5 was less than she wanted, there was a certainty of
6 collection because it was a 40B and did not require
7 any variances or permits? Do you remember her telling
8 you that?
9 A  No.
10 Q  As you sit here today, are you testifying that she did
11 not tell you that or that you do not remember that?
12 A  I have no recollection of her saying that.
13 Q  If she were to testify that she did say that, would
14 you testify that she did not?
15     MR. CONROY: Objection.
16     MS. FETOUH: Objection.
17     MS. ECKER: Objection.
18 Q  Or that you did not remember it?
19 A  I would be surprised to hear that testimony.
20 Q  Do you recall anything in a discussion with her
21 concerning the fact that the certainty of payment with
22 Co-housing under the 40B ensured that her retirement
23 would be available to her? Do you recall anything
24 like that?

- 195 -

1 A  I remember a reference to retirement. I don't recall
2 the reference being in the context of Chapter 40B.
3 Q  Do you recall her telling you that she had no money?
4 A  No.
5 Q  Did you ever go out on the site?
6 A  Uh-huh.
7     MR. CONROY: Yes or no.
8 A  Yes, I did go on the site.
9 Q  What was the condition of the house?
10 A  I never went in the house. I only saw it from the
11 outside.
12 Q  What was the condition of the barn?
13 A  It needed repair.
14 Q  Was it dilapidated?
15 A  You know, the structure was still pretty good. It
16 needed some work, but the basic timbers were fairly
17 strong.
18     MR. McLAUGHLIN: I'm going to read
19 something from the complaint and I'd like you to
20 leave.
21     (Mr. Norris exits the room.)
22 Q  I'd like you to turn to Paragraph 46 of the complaint.
23 It reads as follows: In the spring of 2004,
24 MacDonnell met with Kunelius, Kunelius' counsel and

- 196 -

1 Jim Boothroyd, and a local real estate broker, David
2 Norris, in connection with TPL's demands for a lower
3 purchase price. During that meeting, TPL threatened
4 and intimidated Kunelius and her counsel by stating,
5 generally, that TPL had serious and influential
6 connections by way of its Board of Advisors who would
7 defend TPL against any legal action brought by
8 Kunelius as a result of TPL's default.
9     I'm going to stop there and continue from
10 that point, but without commenting on Item No. 1
11 which I've just read, do you recall attending a
12 meeting with Kunelius, Kunelius' counsel,
13 Mr. Kachajian, Jim Boothroyd and David Norris and
14 others?
15 A  Is this Mr. Norris here?
16 Q  Yes.
17 A  Yes, I do remember a meeting in Boothroyd's office
18 with them.
19     MR. CONROY: Before you ask the next
20 question, we've been going a long time. I'd like
21 to take a little break before we go further.
22     MR. McLAUGHLIN: Sure.
23     (Recess, 4:14 P.M.)
24     (After recess, 4:24 P.M.)

- 197 -



1     (Messrs. Kachajian and Norris not present)
2     By MR. McLAUGHLIN:
3 Q   We were talking about the meeting, I think you said,
4     at Boothroyd's office. Do you remember if anyone
5     accompanied you from TPL to that meeting?
6 A   I don't believe so.
7 Q   Do you recall whether anyone from the town accompanied
8     you to that meeting?
9         MS. FETOUH: Objection.
10 A   You know, I don't remember. There were so many of
11     these with various players.
12 Q   Do you recall being assisted out of the room by one of
13     the individuals at that meeting because you had become
14     extremely angry, angry and agitated?
15 A   No, that did not happen.
16 Q   Do you know a Bob Wilbur?
17 A   I do know Bob.
18 Q   Do you recall, was Bob Wilbur at that meeting?
19 A   Bob Wilbur was at several of these meetings. This
20     doesn't have a date on it.
21 Q   You're looking at the complaint?
22 A   Yes.
23 Q   No, it doesn't not have a date. How well do you know
24     Jim Boothroyd?

- 198 -

1     I met Jim through this project.
2 Q   Do you recall the discussion between yourself and
3     Mrs. Kunelius and her representatives as being heated?
4 A   I remember this period of time continuing, actually,
5     into the fall, later -- what is the date, spring of
6     '04? Is that right?
7 Q   Yes.
8 A   I remember there were discussions in the spring and in
9     the summer and into the fall where TPL was trying very
10     hard to keep this project alive, and there were a
11     number of meetings to do that.
12 Q   When you say they were trying to keep the project
13     alive, do you recall proposing a new purchase price
14     for the property?
15 A   I recall trying to put together an alternative deal.
16 Q   And did that include a new purchase price?
17 A   Yes.
18 Q   And do you recall doing that on at least two
19     occasions?
20 A   Yes.
21 Q   Do you recall asking that the price be reduced to
22     $900,000?
23 A   I remember, I believe, eight hundred and nine hundred.
24 Q   Okay. Saved me the question. Under the terms of the

- 199 -

1     purchase and sale agreement, did you believe you had
2     the right to change the purchase price?
3 A   The contract was over at that point. We weren't
4     talking about the contract anymore.
5 Q   So, you viewed the contract as dead at that point?
6 A   Yes.
7 Q   Back to the meeting. Do you recall getting into an
8     argument with Mr. Kachajian and then threatening him
9     in any way?
10 A   I remember having a discussion where TPL was trying
11     very hard to come up with an alternative plan that
12     would get a significant amount of money into
13     Mrs. Kunelius' pocket, and what I remember is
14     that we weren't making any progress on that front
15     and that Mr. Kachajian and I went back and forth
16     on whether or not this was possible or not, and I
17     believe Mr. Kachajian was not encouraging this
18     outcome, and I was trying my best to encourage
19     him that it's a good opportunity for
20     Mrs. Kunelius.
21 Q   And the good opportunity you're talking about is
22     accepting a lower purchase price. Is that fair to
23     say?
24 A   Lower than the contract price.

- 200 -

1 Q   And in the alternative, if she did not, that you would
2     not pay her anything at all and walk away.
3 A   We had already walked away.
4 Q   Now, back to Paragraph 46. Do you recall saying
5     something to the effect that TPL had serious and
6     influential connections by way of its Board of
7     Advisors who would defend TPL against any legal action
8     brought by Kunelius as a result of TPL's default? Do
9     you remember saying anything like that?
10 A   I remember saying that we thought that, if necessary,
11     we would litigate this issue, because we thought we
12     were right, and that if we couldn't put a project
13     together now or then, after the contract was dead,
14     that we would look to our pro bono counsel to litigate
15     the issue, and because we thought we had a good case,
16     we thought we'd win.
17 Q   And, in fact, the pro bono counsel was on your Board
18     of Advisors, and that was Goodwin, Procter & Hoar.
19         MS. FETOUH: Objection.
20 A   Goodwin does represent us in this matter, and, you
21     know, whether I referred to them by name, I can't
22     remember.
23 Q   You also had other counsel, pro bono counsel, on your
24     Board of Advisors, including Hill & Barlow?

- 201 -

1 A   If it was still Hill & Barlow then. I can't remember.
2 Q   I think it was. But you recall them being on your
3     Board of Advisors?
4 A   I do. Well, not the firm. There was --
5 Q   Someone from Hill & Barlow?
6 A   -- a lawyer from what I think was Hill & Barlow.
7 Q   Do you recall referring to Choate, Hall & Stewart as
8     your counsel in that discussion with Mr. Kachajian?
9 A   I don't.
10 Q   Do you recall saying to Mr. Kachajian that your pro
11     bono counsel could bury him because it doesn't cost
12     you anything and Mrs. Kunelius couldn't afford to have
13     counsel represent her in the long run?
14 A   I remember saying that I thought we had a really good
15     case and that, if necessary, we would litigate it and
16     that we would win because of the strength of our
17     position.
18 Q   But you do not remember saying -- are you denying that
19     you said to anyone at that meeting that your counsel,
20     your pro bono counsel, would bury Mrs. Kunelius and
21     anyone who tried to represent her?
22 A   I don't know if I used the word bury, but I was
23     vehement in my statements that we had a very strong
24     case.

- 202 -

1 Q   Do you recall saying that the Board of Advisors
2     included prominent law firms that would tie up
3     Kunelius for as long as it took?
4 A   Not in those words, I don't recall, but I do remember
5     saying that we would litigate this to the end and that
6     we would win.
7 Q   Do you recall saying that it would tie up whatever
8     assets she had and that she couldn't possibly win,
9     something to that effect?
10 A   I don't recall discussing assets. I recall discussing
11     the merits of the case and saying that, because of the
12     correctness of our position and the capacity of our
13     counsel, I believed we would prevail.
14 Q   Do you recall saying to Mrs. Kunelius and the people
15     that were with her there that you knew she was of
16     limited means and that her attorney would not be able
17     to spend sufficient funds to win any matter against
18     TPL because of TPL's pro bono counsel that didn't
19     charge anything?
20 A   What I can tell you is what I remember of that
21     meeting, in which I believe Mr. Kachajian and I
22     debated at length whether or not it was possible for
23     this project to be reconstructed, and we debated
24     lawyer to lawyer who would win the litigation if it

- 203 -

1    came.
2 Q How well do you know Bob Wilbur?
3 A I know him in a professional capacity.
4 Q And do you know him to be an honest person?
5 A I have not experienced any dishonesty from Bob.
6 Q Is it your testimony today, after discussing this
7    meeting which you attended, that you still have no
8    recollection of Mr. Wilbur literally forcing you out
9    of the room to calm you down?
10 A I have a very explicit understanding of what happened
11   that day with respect to Mr. Wilbur and it had nothing
12   to do with him forcing me out of the room.
13 Q So, you have a pretty good and explicit memory as to
14   some things related to this case and some meetings,
15   and on this particular matter, you remember the actual
16   specifics of whether or not Mr. Wilbur took you out of
17   the room. If Mr. Wilbur testified that he did, would
18   that surprise you?
19       MS. FETOUH: Objection.
20       MS. ECKER: Objection.
21 A What I will say about that is that Bob asked me to go
22   out to the street to talk about how to refine our
23   position. We went outside. Mr. Boothroyd's office is
24   a storefront. We were meeting in the open space. We

- 204 -

1    went outside, Bob and I, to discuss is it possible to
2    get another chunk of money on the table for
3    Mrs. Kunelius. We didn't discuss the hijinks or
4    whatever it was that went on inside. We talked
5    about the proposal we were trying to fashion for
6    Mrs. Kunelius. I discussed with Bob the
7    possibility of bringing additional Stow
8    Conservation Trust money to the table on the
9    sidewalk in Maynard. That was the reason we went
10   outside.
11 Q Were you yelling at Mr. Wilbur at that point, outside
12   on the sidewalk, do you recall?
13 A We were on the same team, if you will. We were trying
14   to keep this project together.
15 Q Do you recall swinging your fists and your arms in the
16   air when you were out on the sidewalk or during the
17   meeting when Mr. Wilbur left with you?
18 A I recall doing no such thing inside. Outside, I don't
19   have a recollection of whether I waved my arms in an
20   animated sort of way of helping me articulate what I
21   was saying, sort of like the way I am now, but there
22   was nothing intimidating about it.
23       MR. CONROY: Off the record?
24       (Brief discussion off the record)

- 205 -

By MR. McLAUGHLIN:
2 Q When you left the meeting, after you had your meeting
3    out on the sidewalk with Mr. Wilbur, did you come back
4    into the meeting?
5 A I think we did.
6 Q I have referred to Bob Glassman in the past. I just
7    want to, to give you a sense -- I don't even need to
8    use this as an exhibit, but just so you have an
9    understanding, Bob Glassman is listed on your Web site
10   as the founder of Wainwright Bank and is on your Board
11   of Advisors. I want to again turn to
12   Mr. Glassman and what knowledge Wainwright Bank
13   had of references to that line of credit.
14      Are you aware of any correspondence between
15   TPL and Wainwright Bank regarding the disclosure
16   of the line of credit to the state as a backup
17   plan?
18 A I am not.
19 Q Are you aware of any restrictions on the line of
20   credit as to how much money can be taken out at a
21   particular time?
22 A I am not.
23 Q You were aware, were you not, that Mrs. Kunelius was,
24   during the summer of 2003, extremely worried about the

- 206 -

1    status of the sale to TPL?
2 A I was aware from talking to her counsel that she was
3    concerned.
4 Q Did you ever call Mr. Kachajian prior to the
5    acceptance of the right of first refusal and say to
6    Mr. Kachajian or to Mrs. Kunelius, or any
7    representative of Mrs. Kunelius, including Boothroyd,
8    that it was your intention to rely on the liquidated
9    damage clause provision and that she should be aware
10   of that in case she wanted to take any steps to let
11   the town know of that prior to the town assigning the
12   right of first refusal to TPL?
13       MS. ECKER: Objection.
14 A No, I have no recollection.
15 Q Do you think, as an attorney, that you had any
16   obligation, dealing with an elderly woman, to inform
17   her of the likelihood or the chance that if the town
18   assigned the right of first refusal to TPL that TPL,
19   as a charitable institution, might in effect prevent
20   the sale to Mosaic Commons and leave Mrs. Kunelius
21   with no buyer?
22       MR. CONROY: Objection.
23       MS. FETOUH: Objection.
24 A Do I think as an attorney that I have an obligation or

- 207 -

1    that TPL -- I'm just trying to --
2 Q Well, let's start with you. You, as an attorney, do
3    you think you had any obligation to be up front about
4    the possibility that Mrs. Kunelius would be left with
5    $22,000 months after the fact with no one to purchase
6    her property?
7       MR. CONROY: Objection.
8       MS. FETOUH: Objection.
9 A An attorney who happens to be working for the Trust
10   for Public Land doing this project or?
11 Q Well, why don't we do this. TPL is a charitable
12   institution, is it not?
13 A It's a non-profit.
14 Q Well, I asked you earlier if it was a charitable
15   institution, and I thought you said yes. It is not?
16   What's the difference between a charitable institution
17   and a non-profit?
18       MR. CONROY: Objection.
19 A You know, I should be accurate here. My understanding
20   is that it is a California not-for-profit corporation
21   that's registered as a 501c3.
22 Q And as a result, TPL has a tax-exempt status, right?
23 A Yes, that's my understanding.
24 Q And as a result of that, TPL, with its tax-exempt

- 208 -

1    status, is able to obtain pro bono counsel and pro
2    bono advice and doesn't have to count it as income.
3    Is that correct?
4       MS. FETOUH: Objection.
5       MR. CONROY: Objection.
6 A I don't really know how TPL accounts for the provision
7    of pro bono services.
8 Q Do you recall trying to convince the Town of Stow to
9    re-describe the involvement of TPL in the Kunelius
10   property after the fact so that TPL could get a tax
11   deduction where otherwise it could not?
12       MR. CONROY: Objection.
13       MS. FETOUH: Objection.
14       MS. ECKER: Objection.
15 A TPL -- well, I have no such recollection of any
16   conversation like that.
17 Q Do you recall writing to Ross Perry and telling him
18   that you would like him to re-designate TPL's
19   activities on the Kunelius property from activities of
20   lobbying to activities of advice so that you could
21   claim deductions and have a tax benefit for that?
22 A No, that's not my memory.
23       (WHEREUPON, Exhibit No. 19, MacDonnell
24   email to Perry, dated April 17, 2003, marked for

- 209 -



1    identification.)
2 Q   Exhibit 19 is before you. This appears to be a
3    letter, or an email, from Craig MacDonnell, with your
4    email address, to Ross and Bill. I believe it's Ross
5    Perry and perhaps Bill Wrigley, but I can't be sure,
6    but it goes to the town administrator, so it's
7    probably Bill Wrigley, the town administrator, in
8    which you, apparently, are revising letters for the
9    Board of Selectmen to you, in which you ask them to
10    write a letter on April 15, 2003, describing your
11    involvement as technical rather than lobbying. Do you
12    see that?
13 A   I see the language under the heading Ross and Bill.
14 Q   Now, up until April 15th, isn't it in fact true that
15    it was TPL's absolute intention from early January of
16    2003, at the latest, through the time of the
17    assignment, that TPL sought to acquire and control the
18    property known as the Kunelius Farm? Isn't that fair
19    to say that's what you were doing?
20        MR. CONROY: Objection.
21 A   Pardon me. I just had a moment of lack of
22    concentration and I missed your question. Would you
23    mind restating it? I'm sorry.
24    Well, I'm interested here in your letter to Mr. Perry

- 210 -

1    in which you write for him, it appears, in which you
2    are asking Mr. Perry, and, in fact, sir, I will inform
3    you that he does write such a letter on April 15th or
4    thereafter in which the letter seems to be asking for
5    technical advice, and the purpose of this letter seems
6    to be that the reason TPL needs it is because it
7    enables TPL to count more of the support work as
8    technical assistance rather than lobbying for IRS
9    purposes.
10       MS. FETOUH: Objection.
11 Q   Now, in fact, TPL was lobbying for that property.
12    Isn't that fair to say?
13       MR. CONROY: Objection.
14       MS. FETOUH: Objection.
15 A   TPL typically asks boards of selectmen for these kinds
16    of letters because the IRS recognizes the work that
17    TPL does in response to requests from boards of
18    selectmen as technical assistance rather than lobbying
19    if the record so reflects that. So, it's a normal,
20    every-project request that we ask boards of selectmen
21    to do this letter.
22       (Mr. Kachajian enters the room.)
23 Q   Well, you may recall that I asked you at the beginning
24    of this deposition how you got involved with the

- 211 -

1    Kunelius property, and your testimony was through
2    Mr. Christianson concerning the possibility of
3    establishing a conservation restriction on the
4    property. Is it your testimony that the
5    application for $350,000 from the state was
6    advice work on behalf of the Town of Stow, or was
7    it lobbying?
8       MR. CONROY: Objection.
9       MS. FETOUH: Objection.
10 A   I don't think I have a position on that. I mean, I
11    have never thought of that in one way or another, so
12    forgive me here, late in the day, for not having a
13    facile answer to that question.
14       (WHEREUPON, Exhibit No. 20, Friends of
15    Red Acre letter to Board of Selectmen, dated June
16    6, 2003, marked for identification.)
17 Q   These two documents, which are Exhibit 20, were
18    together when we received them, so we kept them
19    together. The first one is from Friends of Red Acre
20    to the Town of Stow, and it is a letter to the Board
21    of Selectmen of the Town Stow signed by three people,
22    apparently, from the Friends of Red Acre. It's dated
23    June 6th. I'm going to ask you to just take a look at
24    that letter, because it would seem that this letter

- 212 -

1    indicates that the Friends of Red Acre believed that
2    the deal was done as of June 6, 2003, and I would ask
3    you to read the letter and then tell me whether you
4    have any understanding concerning this letter.
5 A   I read it.
6 Q   Had you seen this before?
7 A   I don't remember seeing it before.
8 Q   Is it fair to say that the Friends of Red Acre had
9    been approached by you for fund-raising purposes?
10 A   Yes.
11 Q   Is it also fair to say that at some point in the fund-
12    raising process you approached them and told them not
13    to fund-raise because, for other reasons, you had
14    decided not to go forward with the development?
15 A   I have no memory of telling Friends of Red Acre not to
16    fund-raise during the period of time that was sort of
17    relevant to the possibility of the project going
18    forward.
19 Q   Is it your testimony that you did not tell them, or is
20    it your testimony that you have no recollection of not
21    telling them to fund-raise, of telling them not to
22    fund-raise, because you didn't want to go forward with
23    the project?
24 A   I did not tell them not to fund-raise because TPL did

- 213 -

1    not want to go forward with the project.
2 Q   So, if any of these people were to testify, any of
3    these people listed here were to testify, that in fact
4    you did discourage them from fund-raising because TPL
5    did not want to go forward with the project, would
6    they be lying?
7       MS. FETOUH: Objection.
8       MS. ECKER: Objection.
9       MR. CONROY: Objection.
10 A   I would be surprised.
11 Q   Do you know Michael Labosky?
12 A   I have met Michael, yes.
13 Q   Did you ever have any discussions with him in which
14    you discouraged him from fund-raising?
15 A   The reason I'm pausing is that over the course of, you
16    know, more than one year we talked about this project
17    a lot, this group of people and TPL. Towards the end
18    of that period of time, when the project was falling
19    apart, TPL discussed with Friends of Red Acre the fact
20    that it was falling apart, and during those
21    conversations, when the horizon was very dark, it made
22    sense for all of us to fold our tent.
23 Q   Well, do you recall them questioning you as to why TPL
24    was not using the money that TPL said it had in its

- 214 -

1    own funds or by way of line of credit in order to
2    effectuate the sale?
3 A   Generally, I remember having discussions with this
4    group about how to keep the project together,
5    including where was the money going to come from, is
6    it borrowed, is it privately fund-raised. There were
7    many, many conversations along those lines.
8 Q   But do you remember them questioning you as to why you
9    would not use the line of credit or any other funds
10    that you had referred to as capital?
11 A   Yes.
12       (Mr. Norris enters the room.)
13 Q   And do you recall them being angry at you or
14    dissatisfied with you because they felt that you had
15    misled them concerning the availability of funds that
16    TPL itself had or could obtain in order to effectuate
17    the purchase?
18 A   I remember some difficult conversations about the
19    future of the project.
20 Q   But not so much --
21 A   I'm trying to answer your question.
22 Q   I know, but you have a distinct method of answering
23    surrounding issues. I'm talking about just the issue
24    of were they angry at you for not using the line of

- 215 -

1  credit or such other capital funds as you had
2  described to them previously, just that issue, line of
3  credit or capital funds.
4 Q  Do I remember anger related to line of credit?
5 A  Not being used.
6 A  Not specifically.
7 Q  Generally, do you remember it?
8        MR. CONROY:  Remember anger?
9 Q  Anger by the members of the Friends of Red Acre
10  because they were upset that you were not using either
11  the line of credit or such other capital funds as you
12  had referred to in the past with them.
13 A  My memory regarding their frustration regarding the
14  pace of the project was, really, the frustration we
15  were all having with the private fund-raising.  There
16  was a sense going into this project that there was a
17  very significant amount of private fund-raising easily
18  had in the Town of Stow in a small collection of
19  foundations and that when it became apparent later on
20  in the project that those identified sources of funds
21  and the dollars assigned to those funds were
22  overstated, there was a disconnect between TPL and the
23  Friends of Red Acre and there was upset over that
24  question.

                    - 216 -

1 Q  Was there also upset over the disconnect between your
2  description of private market funds and the line of
3  credit which you were now refusing to use?
4        MS. FETOUH:  Objection.
5 A  Okay.  I've tried to testify that my memory regarding
6  this upset is not specific as to the line of credit.
7  It's regarding sort of the overall progress of the
8  project.
9 Q  Do you recall reviewing an except from your Web site
10  which referred to the ability of TPL to bridge the gap
11  when the town couldn't raise funds?
12 A  The one you showed me earlier today?
13 Q  Yes.
14 A  Yes, I do remember that.
15 Q  Do you recall Friends of Red Acre being angry at you
16  concerning your refusal to bridge the gap because you
17  had told them of TPL's ability to do so and it was
18  because you had that they had spent time trying to
19  fund-raise?
20 A  My memory of this disconnect is related to the debate
21  between finances and financing, which was a question
22  of is it possible to raise the money necessary for the
23  project versus how do you finance it.
24 Q  Well, do you not recall that the $22,000 that was paid

                    - 217 -

1  to Mrs. Kunelius by TPL was raised by the Friends of
2  Red Acre and that they were concerned and upset with
3  you once you decided that you were not going to borrow
4  the money from the line of credit and/or from your
5  private capital markets that you had referred to, and
6  there was an issue as to whether or not -- why you
7  were doing that when you had caused them to raise the
8  $22,000, which was the entire amount of money that was
9  paid to Mrs. Kunelius?
10        MS. FETOUH:  Objection.
11        MR. CONROY:  Objection.
12 A  I'd like to answer your question, but I really -- it's
13  so long that I'm afraid I don't understand it.
14 Q  You would agree with me that $19,000 has been paid to
15  Mrs. Kunelius under the terms of the purchase and sale
16  agreement.
17 A  As I sit here today, I'm not certain how much has been
18  paid.  I know that a significant amount has been paid.
19 Q  Would you agree with me that the Friends of Red Acre
20  had raised $22,000 and given it to TPL in order to
21  fund the -- what's the money called?
22        MR. KACHAJIAN:  Earnest money?
23 Q  Earnest money.  That $22,000 came from the Friends of
24  Red Acre.

                    - 218 -

1 A  I know the Friends of Red Acre raised some money for
2  the purposes of making deposits.  I don't know how
3  much it was as I sit here today.
4 Q  Did you give back any money to the Friends of Red Acre
5  that they raised that was not used for earnest money
6  payments to Mrs. Kunelius?
7 A  I don't believe so.
8 Q  Is it fair to say that the Friends of Red Acre were
9  very upset with you concerning this issue of TPL not
10  obtaining funds sufficient from their own resources,
11  TPL's own resources, and that, essentially, the
12  Friends of Red Acre believed that you had misled them?
13  Do you recall any discussions concerning that?
14 A  My memory is that I had discussions with folks in
15  Friends of Red Acre about the same issues that we've
16  talked about today, the question being whether or not,
17  ultimately, any dollars would materialize that could
18  pay off any potential amount.
19 Q  I'm going to have you look at Exhibit 14 again, if you
20  would.
21 A  Yup.
22 Q  I want you to look at Bate stamp No. 443.
23 A  Yes.
24 Q  Item No. 6.  We have answers to 6A through D.  Under

                    - 219 -

1  Item No. C, letter C, is a note from the town relative
2  to the four hundred thousand dollar promissory note,
3  with seven percent interest, paid in full within 24
4  months, with monthly interest payments of $2,333, TPL
5  states, to be paid from privately raised funds or from
6  the sale of the houses on the property.  Do you see
7  that?
8 A  Yes.
9 Q  So, as to the issue of the $400,000, is it fair to say
10  that, in fact, TPL absolutely intended to avail
11  themselves of the four hundred thousand dollar loan
12  from Mrs. Kunelius and that your method of repaying it
13  within 24 months was either the sale of the houses or
14  privately raised funds?
15        MS. FETOUH:  Objection.
16        MS. ECKER:  Objection.
17        MR. CONROY:  Objection.
18 A  With reference to Exhibit 14, Paragraph 6C, and the
19  bold sentence after the letters TPL, that sentence was
20  intended to communicate that the total of the four
21  hundred, as a whole, could be raised.  We intended it
22  to be raised from those sources when I put this
23  together.  That was our intention at that time.
24 Q  What four hundred was it?

                    - 220 -

1 A  Did you ask me about 6C?
2 Q  Yes.
3 A  Okay.  That's the one.
4 Q  The four hundred thousand promissory note.  You're
5  talking about raising money to pay off the four
6  hundred thousand dollar promissory note to
7  Mrs. Kunelius.
8 A  Correct.  Well, actually, I'd like to clarify that,
9  because the further along we got in this process,
10  whether our decision-making was correct or not about
11  the availability of the mortgage itself -- we've
12  talked about that a lot today -- it was our sense that
13  that mortgage was not available to us and that,
14  instead, TPL contemplated adding on to the four
15  hundred thousand the interest that Mrs. Kunelius would
16  have earned over the term, and I think that was
17  $56,000.
18        So, I think our planning, for planning
19  purposes, four hundred was not four hundred.  The
20  four hundred was 456,000, which we would need to
21  deliver at the time of closing.
22 Q  But that was the term of the purchase and sale
23  agreement.  Is it your testimony -- I'm not trying to
24  put words in your mouth.  Your testimony is, as I now

                    - 221 -



1  understand it, that you simply changed your mind about
2  the terms of the purchase and sale agreement and did
3  not want to borrow the money, the $400,000. Am I
4  right?
5        MS. FETOUH: Objection.
6  A  No.
7  Q  Let's look at Exhibit 12, I'm sorry, Exhibit 13. On
8  Exhibit 13, which is the September 9th letter from you
9  to Peter Kachajian --
10       (Mr. Kachajian exits the room.)
11  Q  Strike that. Let's look at the third paragraph, which
12  says, five lines down: TPL's Board of Directors will
13  not approve any borrowing to bridge a fund-raising gap
14  because the prospects of raising funds necessary to
15  repay the loan required are not encouraging. Further,
16  any bridge loan would be for an amount greater than
17  the land would be worth even if the subdivision were
18  approved.
19       Now, isn't it in fact true, sir, that what
20  you have said today has not been accurate, in
21  that one of the primary reasons that you did not
22  go forward was that you did not like the purchase
23  price of the property?
24       MS. FETOUH: Objection.
- 222 -

1  A  Is completely untrue.
2  Q  So, when you state that the amount of the loan -- any
3  bridge loan would be for an amount greater than the
4  land would be worth even if the subdivision were
5  approved, let me ask you something. How much money
6  were you talking about when you said a bridge loan?
7  Were you talking about the $400,000?
8  A  As I sit here today, I don't know how much money I was
9  talking about.
10  Q  And you would agree, wouldn't you, that the 8.57 acres
11  had a price on it of $1,116,000 and change for 8.57
12  acres? Is that correct?
13  A  TPL always viewed this as a 50-acre project.
14  Q  But nothing in the P&S agreement gave a 50-acre
15  project to Mosaic Commons or Co-housing. Isn't that
16  correct?
17       MS. FETOUH: Objection.
18       MS. ECKER: Objection.
19       MR. CONROY: Objection.
20  A  Well, I think there's a legal question out there,
21  whether or not the allocation, 8.57 versus 50,
22  survives the assignment in the exact same form it
23  existed prior to.
24  Q  So, you're disagreeing with the allocation of the
- 223 -

1  purchase price that is outlined in the terms of the
2  purchase and sale agreement, which specifically states
3  that Co-housing was to get 8.57 acres and the town, by
4  way of gift, would get the remaining portion, and your
5  testimony now is that you did not agree with that
6  allocation. Is that your testimony?
7       MS. FETOUH: Objection.
8       MS. ECKER: Objection.
9       MR. CONROY: Objection.
10  A  No.
11  Q  Is it your testimony that you always viewed it as, TPL
12  always viewed it as, a 50-acre project and, therefore,
13  you do not agree with the allocation as to the
14  $1,116,900 that was applicable to the 8.57 acres?
15       MS. FETOUH: Objection.
16       MS. ECKER: Objection.
17       MR. CONROY: Objection.
18  A  I'm saying something less than what you would like me
19  to say.
20  Q  Do you recall telling people that Mosaic Commons
21  overpaid for the property?
22  A  Yes.
23  Q  And that's because you believed that it wasn't a good
24  deal for Mosaic Commons but it was a good deal for
- 224 -

1  Mrs. Kunelius. Isn't that correct?
2  A  I have no idea whether it was a good deal for Mosaic
3  Commons.
4  Q  Well, if Mosaic Commons overpays for the property,
5  it's probably not a good thing for Mosaic Commons, is
6  it?
7       MS. FETOUH: Objection.
8  A  I would say that Mosaic Commons paid more than fair
9  market value, but it may be a good deal for them
10  because they have the power of 40B.
11  Q  And it was certainly a good deal for Mrs. Kunelius if
12  you believe she got better than market value. Is that
13  correct?
14       MS. FETOUH: Objection.
15  A  I would agree with that.
16  Q  So, a component of your refusal, TPL's refusal, as
17  reflected by your letter of September 9th, was that
18  you did not believe you could borrow an amount of
19  money that would not exceed the value of the 8.57 acre
20  parcel. Am I correct on that?
21  A  If you're asking me to explain what the third
22  paragraph of Exhibit 13 is, it's my testimony that I
23  don't recall the number of dollars that I was
24  referring to, as I sit here today, in that letter that
- 225 -

1  I wrote four years ago.
2  Q  Well, maybe you can explain this to me, sir. You say,
3  I mean, there has to be some amount of money that
4  would be applicable to the loan that you're talking
5  about bridging, and by any stretch of the imagination,
6  it's hard for me to consider it being more than
7  $800,000, meaning, subtract the 400,000, 300- and
8  100,000 from the purchase price that you knew you were
9  going to get, eventually, from the town. You're left
10  with approximately $800,000. Now, if that's the case,
11  doesn't this say that any bridge loan would be for an
12  amount greater than the land would be worth even if a
13  subdivision were approved, which means you did not
14  like the value of the deal and you wouldn't borrow
15  even $800,000 because you did not think that the land
16  would be worth even $800,000?
17       MR. CONROY: Objection.
18       MS. ECKER: Objection.
19       MS. FETOUH: Objection.
20  A  That's not really what I'm saying. I cannot
21  characterize any further what I believe, as I sit here
22  today, this sentence means.
23  Q  Well, what did you expect Peter Kachajian to think
24  when he read this if you don't understand?
- 226 -

1  A  Well, if it was September 9, 2003, I could tell you
2  what I meant, but it's four years later.
3  Q  Let's go forward to the next sentence, which says:
4  Essentially, this would be asking TPL for an unsecured
5  loan based on weak fund-raising prospects with no
6  backup plan to repay the loan.
7       Tell me, if you would, who was asking TPL
8  for an unsecured loan? Was anybody asking TPL
9  for an unsecured loan?
10  A  What that sentence referred to was the notion that
11  borrowing against an uncertain fund-raising future
12  was, on the basis of a line of credit, was unwise if
13  TPL did not believe that the fund-raising prospects
14  would materialize.
15  Q  So, you were concerned -- well, this says this would
16  be asking TPL for an unsecured loan. Who was asking
17  TPL? I just don't understand.
18  A  It's a hypothetical notion that I was inferring
19  for TPL to invest money in this project without a
20  reasonable expectation of capital takeout, whether
21  that be the sale of assets or private fund-raising.
22  Q  I'm going to put before you a document that is
23  attached to the complaint as Exhibit 9. We'll re-mark
24  it as Exhibit 21 to the complaint.
- 227 -



1 (WHEREUPON, Exhibit No. 21, Pelletier
2 letter to Stow Board of Appeals, dated September
3 25, 2003, marked for identification.)
4 MR. McLAUGHLIN: I don't know what you
5 want to do. I've still got a substantial amount
6 here, so we'll keep plugging along here as long
7 as we can.
8 Q Exhibit 21 appears to be a letter from regional
9 counsel, Denise Pelletier, to the chairman of the Stow
10 Board of Appeals on September 25th, in which you're
11 asking for variances to be dropped, I should say, to
12 drop your application for variances, and, this, some
13 almost three weeks after your letter to Mr. Kachajian.
14 During the time that you were applying for
15 these variances, particularly, in September, I
16 thought you already said that if it was
17 September, the deal was done. It was over. You
18 were looking at some new deal. Am I correct in
19 my characterization of your testimony?
20 A As I've testified earlier, TPL's confidence level in
21 this project waned gradually over a period of time.
22 There was no decision point, so that over the summer
23 of 2003, it became increasingly untenable that this
24 project could go forward. There was a moment in time
— 228 —

1 when it became particularly problematic, and I think
2 that moment probably was when we determined that the
3 subdivision was hugely problematic, and you recall
4 earlier today we talked about sort of the early
5 analysis of when we were trying to just, as lawyers,
6 figure out the best route to subdivide the property,
7 and then I said later on another problem arose that
8 was even more problematic.
9 What happened in the summer -- let me just
10 finish the thought. In the summer, we learned
11 something that we hadn't known before, which was
12 that the two parcels, 142 and 144, were not owned
13 by separate entities. It was our understanding
14 before that time that they were owned by separate
15 entities and that the common law doctrine of
16 merger would not apply, and so that so long as we
17 could get the variances that we were seeking, the
18 future existence of 142 and 144 could be created
19 for purposes of land use. Somewhere along the path,
20 it became apparent to us that, in fact, 142 and
21 144 were owned by the same entity, the doctrine
22 of merger applied, and there was no way to
23 subdivide it.
24 Q There was no way to subdivide based upon your plan for
— 229 —

1 the property rather than the plan for Co-housing and
2 Mosaic Commons, correct?
3 A The proposal for what we intended to do, the variances
4 we sought, would be rejected. So, it was important
5 for us not to have that rejection made. In effect, we
6 were thinking of Mrs. Kunelius' property rights at
7 this point in time and didn't want an adverse variance
8 decision on the record, not only for Mrs. Kunelius'
9 sake but also for the possibility of the future in
10 which the town, TPL, everybody else, could reconfigure
11 this project and make it go forward.
12 Q Are you familiar with how much cash on hand TPL
13 Massachusetts has at any particular point in time?
14 A No.
15 Q Do you have even a general sense of how much cash on
16 hand TPL has right now?
17 A TPL, nationally?
18 Q No, Massachusetts.
19 A I do not know.
20 Q Could you tell me within a half a million dollars?
21 A No.
22 Q As the director of the Massachusetts division of TPL,
23 you do not know how much money is in your checking
24 account, approximately?
— 230 —

1 A In any given moment, no, because a lot of money goes
2 in and out to do projects all the time.
3 Q I understand. But within general terms, do you carry
4 a balance in your checking account of a half a million
5 dollars?
6 A I just told you that I don't know what the balance is,
7 and I don't know what it normally is. It fluctuates
8 hugely.
9 Q So, do you have any idea of what amounts TPL has in
10 other assets, liquid assets, nationally?
11 A I do not.
12 Q Have you ever looked at TPL's financial statements to
13 determine how much money they have in their accounts?
14 A Not closely.
15 Q But you've looked?
16 A I mean, I've seen the balance sheet.
17 Q Have you ever considered or did you consider using any
18 of TPL's assets beyond the line of credit in order to
19 fund the purchase from Mrs. Kunelius?
20 A No.
21 Q Did you ask anybody if there were funds available that
22 could be used? I'm talking about liquid assets, such
23 as cash or certificates of deposit or any other types
24 of assets, which could be liquidated within some
— 231 —

1 reasonable period of time in order to effectuate the
2 purchase.
3 A I don't recall.
4 Q Is it your testimony today that you do not know
5 whether TPL, nationally, has $800,000 in cash or
6 liquid assets available to it, or had $800,000 in cash
7 or liquid assets available to it, that it could have
8 used at the time that TPL was required to purchase the
9 property from Mrs. Kunelius?
10 A That's not my testimony.
11 Q So, is it possible that TPL did have cash or liquid
12 assets sufficient to make the purchase from
13 Mrs. Kunelius?
14 A I just don't know what the state of TPL's liquid
15 assets were in that period of time.
16 Q Do you have to submit a budget in your role as a
17 director of Massachusetts?
18 A Yes.
19 Q And with that budget, do you consider sources and uses
20 of funds on a daily, weekly, monthly, yearly basis?
21 A Quarterly.
22 Q Quarterly. And when was the last time you did that?
23 Would it be December 31?
24 A TPL's fiscal year ends at the end of March. So, we
— 232 —

1 are coming up on the end of our fiscal year.
2 Q So, you're actually considering a budget right now for
3 next year, are you not?
4 A Yes.
5 Q Is it your testimony today that in establishing that
6 budget, as you are apparently doing currently, you
7 have no idea of how much money is in the cash
8 reserves, the bank accounts, the checking accounts,
9 the savings accounts, of TPL for Massachusetts?
10 A TPL begins every year at zero and ends, hopefully,
11 every year at zero. We don't have an endowment. This
12 is not an organization that has cash sitting around
13 ready to throw at projects. This is a very squeaky
14 organization when it comes to spending money. We're a
15 conservation organization. We just don't have that
16 much. So, in the budgeting process, we think very
17 carefully about anticipated revenue, anticipated
18 expenses, going forward.
19 Q When your line of credit was obtained for six million
20 dollars, what did TPL give as collateral for that, if
21 you know?
22 A I don't know.
23 Q Is it an unsecured line of credit?
24 A It very well may be.
— 233 —



1 Q   Would that suggest to you that Wainwright Bank has
2     some confidence in the ability to be repaid on a six
3     million dollar line of credit?
4           MS. FETOUH: Objection.
5 A   I don't know what Wainwright is thinking.
6           (WHEREUPON, Exhibit No. 22, MacDonnell
7     letter to Kachajian, dated July 6, 2004, marked
8     for identification.)
9 Q   I want to have you look at the next exhibit.
10          THE WITNESS: Before you ask that
11    question, could I take a two-minute break?
12          MR. McLAUGHLIN: Sure.
13          (Recess, 5:24 P.M.)
14          (After recess, 5:29 P.M.)
15          (All parties present)
16    By MR. McLAUGHLIN:
17 Q   Exhibit 22, this is also attached to the complaint as
18    Exhibit 11 to the complaint, and it is a July 6, 2004,
19    letter from you, sir.
20          MR. KACHAJIAN: Is that to me?
21          MR. McLAUGHLIN: To Peter Kachajian,
22    yes, see you later.
23          (Mr. Kachajian exits the room.)
24 Q   With attachments. And the attachments have an A and a

- 234 -

1     to bring in the neighborhood of eight or nine
2     hundred thousand dollars to her.
3 Q   Where was the $500,000 coming from that resulted from
4     the $800,000 minus the payback of three hundred to
5     TPL? That meant that TPL had to come up five hundred.
6     Where were you proposing that $500,000 come from?
7 A   We would hope to sell the two lots, 142 and 144.
8 Q   And that was it, no money from TPL in this deal
9     whatsoever. It was the sale of the lots from
10    Mrs. Kunelius' property and the money from the
11    town of $300,000 and nothing from TPL. Is that
12    correct?
13 A   In this proposal, in the first paragraph, on Page 2, I
14    believe the two lots plus three hundred would come up
15    to eight hundred.
16 Q   So, in other words, TPL was going to put nothing in it
17    themselves?
18          MS. FETOUH: Objection.
19 Q   For the purchase price.
20 A   It was never contemplated for TPL to put its own money
21    in the deal.
22 Q   Well, it's either its money or capital market money or
23    the line of credit. I'm counting that as TPL's money
24    for the purposes of my question, but let me just move

- 237 -

1     B on them, and I'm wondering first, sir, whether you
2     recall this letter.
3 A   I do.
4 Q   And you authored this letter?
5 A   I did.
6 Q   And did you assemble Exhibit A and Exhibit B to this?
7 A   Did I attach them?
8 Q   No, did you assemble the information in Exhibit A and
9     Exhibit B? Is that your work product or is that
10    someone else's work?
11 A   It's like a little software program that generates
12    these tax benefit analyses. It's not entirely my work
13    product. It's relying on the built-in analysis.
14 Q   Now, is it fair to say that -- well, let's look at the
15    second page of your letter, beginning with the first
16    paragraph, third line. It says: The first such
17    proposal contemplated a partnership with the town and
18    Mrs. Kunelius whereby TPL would pay her eight hundred
19    thousand for the property. The town would invest
20    three hundred thousand.
21          So, does that mean that Mrs. Kunelius gets a
22    million-one, or does that mean that Mrs. Kunelius
23    gets eight hundred thousand and the town then
24    pays back TPL three hundred thousand so that TPL

- 235 -

1     on. Let me just move on. You don't have to answer
2     that.
3           MR. CONROY: I'll make it clear that
4     he's not answering the question.
5           MR. McLAUGHLIN: All right.
6           (WHEREUPON, Exhibit No. 23, MacDonnell
7     letter to Perry, dated January 5, 2003, marked
8     for identification.)
9 Q   Is it fair to say that in the eight hundred thousand
10    dollar offer, none of the $800,000 came from TPL's own
11    funds, that is, their own assets, cash or the sale of
12    stock or anything else?
13 A   Well, this was a proposal, and because it was still in
14    the proposal stage, it's not clear to me whether the
15    five hundred that would come from the sale of the two
16    lots would be fronted by TPL and then recovered from
17    the sale or whether the sale of the two lots would
18    have to precede it.
19 Q   And where would the money come from if it was fronted
20    by TPL? That's my question.
21 A   That was not proposed.
22 Q   Well, you could borrow it. Isn't that fair to say?
23 A   TPL could borrow that money. Correct, we could borrow
24    that money.

- 238 -

1     is paying five hundred thousand?
2 A   It imagined paying $800,000 for the property.
3 Q   And the town's investment was a repay to TPL of three
4     hundred thousand, is that correct?
5 A   Well, in exchange for the three hundred thousand which
6     had previously been approved, the CPC money, the town
7     would receive the conservation parcel.
8 Q   So, this first paragraph is an offer of eight hundred
9     thousand to Mrs. Kunelius. Down at the bottom of the
10    page, in the middle of the page, third paragraph, it
11    says: It's my understanding that the purchase price
12    could be improved to nine hundred thousand. Do you
13    see that?
14 A   Yes, I do.
15 Q   So, in order for you to move forward, meaning TPL,
16    your letter indicates that Mrs. Kunelius was going to
17    have to accept one of these two offers in order for
18    TPL to move forward with it. Is that a fair
19    description of the purpose of the letter?
20 A   The purpose of the letter was to advise Mr. Kachajian
21    that TPL continued to have an interest in this
22    conservation project, that it wanted to continue to
23    work hard to bring as much money as possible to
24    Mrs. Kunelius, and that the hope was to be able

- 236 -

1 Q   Fine.
2 A   If there was a reasonable likelihood of return to pay
3     back the loan, the same issue we've talked about all
4     day.
5 Q   So, that offer wasn't an offer, because you didn't
6     know if you could sell the units, the two units. So,
7     it was contingent upon whether there was a likelihood
8     of selling the two units, correct?
9           MS. FETOUH: Objection.
10          MR. CONROY: Objection.
11 A   No, that's not what I just said.
12 Q   So, let me make sure I understand. You could borrow
13    money providing there was an assurance that you could
14    pay it back. Is that fair to say?
15 A   Like any business.
16 Q   And the only source of being assured of paying back
17    the money was the sale of the two units. Is that
18    correct?
19 A   No.
20 Q   So, then there was another source, and that was what?
21 A   Private fund-raising, if the private fund-raising was
22    substantiated. Is it likely to come forward?
23 Q   So, this wasn't an offer. It was a proposal for which
24    you were not certain that you could perform under that

- 239 -



1 proposal because you didn't know the likelihood of
2 fund-raising. Is that fair to say?
3      MS. FETOUH: Objection.
4 A No. No, not at all. This letter talks about a
5 proposal that was previously on the table. This
6 letter, the purpose of this letter, is to talk about
7 the next proposal, a better proposal.
8 Q And that's the nine hundred thousand dollar proposal?
9 A Right.
10 Q All right. Let me simply ask you a few questions
11 concerning the complaint and your understanding of
12 your relationship with the town.
13      I presume as an attorney that, when you went
14 to law school, you studied partnership law. Is
15 that fair to say?
16 A Well, I'm trying to remember whether I took that
17 course.
18 Q Well, Cornell most certainly teaches that course.
19      MS. FETOUH: Objection.
20 Q Well, she doesn't think Cornell does, but --
21      MS. FETOUH: No, I went to a comparable
22 school. We didn't learn that.
23      MR. McLAUGHLIN: There's nothing
24 comparable to Cornell.

     - 240 -

1 Q You don't have to answer that question. You're aware,
2 are you not, that Mrs. Kunelius has alleged that there
3 was a joint venture, or a partnership, between TPL and
4 the town. Is that fair to say?
5 A I've seen the word -- that there's the allegation?
6 Q Yes.
7 A I've seen the word partnership in the complaint.
8 Q And you are aware, are you not, that TPL has denied
9 that there is a partnership?
10 A I am aware of that.
11 Q And you are aware, also, that you denied there was a
12 partnership.
13 A I am aware of that.
14 Q Okay. Let's look at the January 5th letter from you
15 to the town, to Ross Perry of the Board of Selectmen,
16 and I would ask you to look at the fifth line up from
17 the bottom. On the right-hand side, it says: All our
18 projects are done at the request of and in partnership
19 with entities that become permanent owners of the
20 property. The two most important roles we play in
21 this process are, one, we make sure that our
22 obligations to our partners are met and, two, to raise
23 funds necessary for the transaction from a combination
24 of private and public sources.

     - 241 -

1      Now, when you used the word partnership on
2 the first page of your January 5th letter, which
3 is Exhibit 25, were you referring to a
4 partnership with the town?
5 A I was using the term in its colloquial sense and not
6 in its formal legal sense.
7 Q There is a colloquial sense to partnership? And that
8 would be what?
9 A Working together on something less than a legal
10 partnership.
11 Q Well, is it fair to say that, in a partnership, would
12 you expect the individuals or parties to a partnership
13 to have a financial stake in a partnership?
14      MS. FETOUH: Objection.
15      MR. CONROY: Objection.
16 Q An investment, something that --
17 A A legal partnership, you're talking about?
18 Q Yes.
19 A Not always.
20 Q Doesn't have to have one?
21 A Correct.
22 Q Would you expect that there would be some contractual
23 stake in a partnership where the parties enter into a
24 written agreement by which they declare their partner

     - 242 -

1 status to each other?
2 A Sometimes but not always.
3 Q Well, let me just ask you to look at your letter of
4 January 5th to the town, and the second full paragraph
5 says: For TPL to consider a financial and contractual
6 stake in this project, we would need to secure our
7 involvement in a way that will enhance the likelihood
8 of sufficient public and private funds being available
9 and ensures a strong conservation and community
10 outcome.
11      Now, this says, as I understand it, that TPL
12 intended to have a financial stake in the
13 project. Am I wrong in my reading of that, sir?
14 A No.
15 Q So, what was the financial stake of TPL in the project
16 when the project was for the acquisition of a
17 1,116,900 dollar piece of property? What was your
18 financial stake, TPL's?
19 A Well, it would be the out-of-pocket dollars that we
20 spent in pursuit of the deal, together with the value
21 of the services that we provided through our staff
22 that would otherwise be working on some other project.
23 Q Well, now, from a matter of your standing as a non-
24 profit tax-exempt entity, do you bill services of your

     - 243 -

1 staff on an hourly rate in order to establish a
2 financial investment in a particular project?
3 A We analyze the time commitments of our staff on the
4 basis of dollars every year, every project, all the
5 time.
6 Q What was the contractual stake that you were entering
7 into as a partner with the town that you're referring
8 to here?
9 A It makes reference to a contractual stake in the
10 project that I think we were contemplating. This is
11 before the assignment?
12 Q Yeah.
13 A We're talking about stepping into the shoes of Co-
14 housing Resources.
15 Q So, it was a financial stake with the town and a
16 contractual stake with who, Mrs. Kunelius?
17      MS. FETOUH: Objection.
18      MS. ECKER: Objection.
19 A Well, there is a contract that we've spent a lot of
20 time talking about that TPL became the assignee of.
21 So, in effect, yes, that contract is the contract
22 we're talking about.
23 Q Looking at the very last sentence of this exhibit, it
24 states: If so, we ask that you authorize your

     - 244 -

1 chairman to sign below as an indication of your
2 partnership with TPL. Do you see that?
3 A I do.
4 Q Now, you have alleged, or you have denied, the
5 existence of any partnership between yourself and the
6 Town of Stow, is that correct?
7 A Yes.
8 Q Not yourself but TPL. Is that correct?
9 A It's my understanding that TPL has denied the
10 existence of a partnership and that, individually, I
11 have denied that TPL and the town had a partnership.
12 Q And you continue to deny that notwithstanding the fact
13 that there is a written document that evidences their
14 indication of joining the partnership and that there's
15 a written document indicating what the cost of joining
16 the partnership would be.
17      MR. CONROY: Objection.
18      MS. FETOUH: Objection.
19      MS. ECKER: Objection.
20 Q That means the Town of Stow.
21      MS. FETOUH: Objection
22      MS. ECKER: Objection.
23 Q Is that fair to say? Well, go head.
24 A Do you want to keep asking something?

     - 245 -

1 Q No, go head. Is that fair to say?
2 A It is fair to say that the partnership we're referring
3    to in Exhibit 23 is not a legal partnership but just a
4    colloquial level of cooperation that doesn't rise to
5    the level of a legal partnership.
6 Q Now, do you think a legal partnership has to be in
7    writing, sir?
8          MS. FETOUH: Objection.
9          MR. CONROY: Objection.
10 A I don't have thoughts about that.
11 Q Well, you're aware that two people can have a joint
12    venture which is called a general partnership in which
13    they both work for some single purpose, such as two
14    lawyers joining together for a law firm. There's no
15    requirement of a written document in that instance, is
16    there?
17          MS. FETOUH: Objection.
18          MR. CONROY: Objection.
19 A I don't know that to be true. My understanding is
20    that the relationship that TPL had with the Town of
21    Stow is not that kind of partnership.
22 Q How many kinds of partnerships are there that you're
23    aware of?
24          MS. FETOUH: Objection.
         - 246 -

1          MR. CONROY: Objection.
2 A Well, there is this kind, this informal collaboration,
3    lower case P, non-legal, and then there are legal
4    partnerships, sort of the formal partnership that the
5    law firms that I was a part of and you may have been a
6    part of, and that these folks are part of, that
7    constitute a partnership.
8 Q Have you ever heard of the concept of partnership
9    estoppel?
10 A No.
11          MR. McLAUGHLIN: Almost done. I think
12    we're there.
13 Q I want you to just look at Exhibit 8 for a moment.
14    Exhibit 8 is the Stow Community Preservation Committee
15    minutes of February 10th. On the third page, which is
16    040, now, this is on February 10th, third paragraph
17    down: A committee member asked Bob Wilbur about his
18    conversation with Marilyn Kunelius. Bob said that she
19    is afraid the contract may unravel with the town
20    intervention and she will lose everything. Bob said
21    TPL will not back down from a commitment.
22       Now, you were present at that meeting, so
23    isn't it fair to say that you were aware that
24    Mrs. Kunelius was afraid that she would lose
         - 247 -

1    everything as a result of the intervention of the
2    town and subsequent transfer of the right to TPL?
3          MR. CONROY: Objection.
4 A My memory of Mrs. Kunelius' situation is that this was
5    an important asset for her. I don't have a
6    recollection of this item being discussed at this
7    meeting.
8 Q It goes on to say: Tom Marr spoke from the audience
9    and said, "This is not the babe we want to fool around
10    with and 1.2 is not the figure." Do you know what
11    that's about, and do you know who he's talking about?
12    Is Mrs. Kunelius the babe they were talking about?
13 A I can honestly say I have no idea what that refers to.
14 Q You can honestly say you have no idea. Was there some
15    other individual that was a babe that had a connection
16    with the 1.2 million dollar number?
17          MS. FETOUH: Objection.
18          MR. CONROY: Objection.
19 A I don't know what this is about.
20          MR. McLAUGHLIN: Okay. I think that's
21    it. Thank you.
22       (WHEREUPON, the deposition concluded at
23    5:52 P.M.)
24
         - 248 -

C E R T I F I C A T E
COMMONWEALTH OF MASSACHUSETTS
COUNTY OF ESSEX, ss.
     I, Roberta J. Daniels, a Court Reporter and
Notary Public within and for the Commonwealth of
Massachusetts, do hereby certify that the foregoing
deposition of CRAIG MacDONNELL was taken before me on
February 8, 2007, that the said witness was
satisfactorily identified and duly sworn before the
commencement of his testimony and that the testimony
was taken audiographically by myself and then
transcribed by myself. To the best of my knowledge,
skill and ability, the within transcript is a complete,
true and accurate record of said deposition.
     Further, I am not connected either by blood
or by marriage with any of the said parties nor am I
interested either directly or indirectly in the matter
in controversy.
     IN WITNESS WHEREOF, I have hereunto set my
hand and affixed my notarial seal this 20th day of
February, 2007.

       Roberta J. Daniels, Notary Public
       Commission expires: 11-15-13
       - 249 -

C E R T I F I C A T E
     I, CRAIG MacDONNELL, do hereby certify that I
have read the foregoing transcript of my testimony and
further certify that said transcript is a true,
accurate and complete record of said testimony.
     Dated at _____ , this
     day of _____ , 2007,
under the pains and penalties of perjury.

       - 250 -

E R R A T A   S H E E T
Deposition of CRAIG MacDONNELL

Page   Line
No.    No.     Transcript reads     Change made
       - 251 -

| Word ...... Page | Word ..... Page | Word ...... Page | Word ...... Page | Word ..... Page |
|---|---|---|---|---|
| .93 ... 150 | 18 ... 181, 193 | 192-196, 225 | abusing ... 175 | advantage ... 96, 98, 123 |
| $1,116,000 ... 223 | 19 ... 209, 210, 218 | 411 ... 105 | abutter ... 190 | adverse ... 230 |
| $1,116,900 ... 195, 224 | 1983 ... 10 | 42.1 ... 157 | accept ... 47, 48, 50, 57, 68, | advice ... 159, 209, 211, 212 |
| $100,000 ... 54 | 1999 ... 35 | 443 ... 219 | 84, 135, 156, 236 | advise ... 236 |
| $19,000 ... 218 | 2 ... 17, 36, 82, 84, 136, | 45 ... 96, 129 | acceptable ... 63, 92 | Advisor ... 120 |
| $2,333 ... 220 | 155, 172, 173, 220, | 456,000 ... 221 | acceptance ... 45-48, 56-58, | Advisors ... 108, 197, |
| $22,000 ... 156, 208, 217, | 237, 248 | 46 ... 196, 201 | 60, 61, 68, 72, 168, | 201-203, 206 |
| 218 | 2:20 ... 136 | 476 ... 45 | 207 | advocating ... 70 |
| $300,000 ... 237 | 2:31 ... 136 | 478 ... 45 | accepted ... 49, 57, 70, 73, | affect ... 9 |
| $350,000 ... 104, 212 | 20 ... 87, 88, 101, 103, 136, | 5 ... 45-47, 49, 176, 234, | 86, 99, 119, 140, 144, | afford ... 202 |
| $400,000 ... 55, 56, 67-70, | 156, 181, 212 | 238, 248 | 145, 147, 168 | affordability ... 94, 95 |
| 93, 94, 98, 132, 135, | 20,000 ... 156 | 5:24 ... 234 | accepting ... 43, 48, 55, 97, | affordable ... 54, 100, 137 |
| 136, 145, 220, 222, | 2000 ... 19 | 5:29 ... 234 | 158, 170, 200 | afore ... 145 |
| 223 | 2001 ... 124 | 5:52 ... 248 | accesses ... 167 | afraid ... 218, 247 |
| $500,000 ... 95, 96, 237 | 2002 ... 7, 26, 28, 36, 40, | 50 ... 82, 83, 193, 223, 224 | accessing ... 126 | against ... 52, 80, 155, 192, |
| $56,000 ... 221 | 42 | 501c3 ... 7, 14, 21, 208 | accompanied ... 198 | 197, 201, 203, 227 |
| $6,000,000 ... 110, 125 | 2003 ... 8, 14, 24, 35-37, | 531 ... 59 | accomplish ... 38, 44, 72 | agencies ... 76, 117 |
| $700,000 ... 96 | 39, 42, 44-47, 49, 56, | 5th ... 241-243 | accordance ... 72, 180 | agency ... 117 |
| $800,000 ... 84, 94, 95, 226, | 57, 64, 79, 81, 84, | 6 ... 49, 50, 54-57, 59, 60, | according ... 97, 187 | agitated ... 198 |
| 232, 236-238 | 121, 137, 138, | 67, 68, 73-75, 110, | account ... 115, 230, 231 | agree ... 50, 132, 153-155, |
| $900,000 ... 199 | 165-167, 178, 191, ... | 121, 125, 134, 162, | accounted ... 94, 95 | 157, 172, 178, 181, |
| 03 ... 106 | 206, 209, 210, 212, | 164, 166, 167, 212, | accounts ... 209, 231, 233 | 186, 218, 223-225 |
| 039 ... 61 | 213, 219, 227, 228, 238 | 213, 219, 234, ... | accrued ... 181 | agreed ... 95, 152, 182, 195 |
| 040 ... 247 | 2004 ... 35, 193, 196, 234 | 6,000,000 ... 110, 125 | accuracy ... 66 | agreement ... 93, 94, 96, 97, |
| 1 ... 16, 82, 84, 92, 94, 113, | 2005 ... 75 | 61 ... 27, 37, 60, 62, 63, 70, | accurate ... 65, 66, 86, 110, | 113, 119, 128, 132, |
| 157, 172, 186, 195, | 2007 ... 6 | 73, 89, 97, 140, 148, | 208, 222 | 136, 140, 144, 148, |
| 197, 223, 224, 243, | 21 ... 183, 227, 228 | 154, 158, 161, 162, | achieve ... 74, 81, 85, 141, | 149, 151, 164, 169, |
| 248 | 216 ... 35 | 173 | 187, 190 | 172, 177, ... 183, 186, |
| 1.116 ... 94, 186 | 22 ... 156, 208, 217, 218, | 617 ... 107 | achieved ... 74 | 194, 200, 218, |
| 1.2 ... 82, 84, 248 | 234 | 61A ... 37, 41-43, 58, 63, | achieving ... 170 | 221-224, 242 |
| 1.2. ... 84 | 23 ... 75, 183, 238, 246 | 185 | acknowledged ... 87 | agreements ... 157 |
| 1,116,900 ... 195, 224, 243 | 24 ... 183, 197, 220, 234 | 61B ... 192 | acknowledges ... 183 | ahead ... 29, 52, 53, 96, 98, |
| 1:16 ... 92 | 25 ... 24, 183, 228, 242 | 6200 ... 107 | acquainted ... 21 | 129, 133, 174-176, |
| 10 ... 6, 64, 79, 81, 163 | 25th ... 228 | 63 ... 122 | acquire ... 76, 78, 87, 119, | 182, 188 |
| 10:01 ... 6 | 26 ... 121, 178, 184 | 64 ... 123, 150 | 135, 139, 210 | air ... 205 |
| 100,000 ... 54, 226 | 3 ... 18, 19, 47, 75, 106, | 6A ... 219 | acquired ... 90, 91, 143 | alive ... 199 |
| 10th ... 65, 66, 247 | 121, 163, 172, 173 | 6C ... 220, 221 | acquiring ... 33, 34, 36, 39 | allegation ... 241 |
| 11 ... 49, 56, 59, 60, 105, | 3:10 ... 163 | 6th ... 212 | acquisition ... 19, 76, 83, 87, | allegations ... 88, 101 |
| 121, 122, 138, 191, | 3:17 ... 163 | 7 ... 51, 79, 81, 84, 150, | 126, 164, 243 | alleged ... 140, 241, 245 |
| 234 | 30 ... 24, 59, 91, 106, 121, | 154-156, 177 | acquisitions ... 8 | allocation ... 223, 224 |
| 11:30 ... 59 | 134, 145, 150-153, | 7.64 ... 150 | acre ... 6, 22, 23, 35, 37, 68, | allow ... 54, 61, 103, 128, |
| 11:44 ... 60 | 157, 162, 164, 177 | 7:15 ... 81 | 80, 81, 109, 145, 146, | 130, 151, 153, 163, |
| 11th ... 49, 54, 56, 57, 61, | 300 ... 54, 85, 226, 237 | 700 ... 85, 95, 96 | 150, 151, 157, 165, | 173 |
| 74, 191, 192 | 300,000 ... 54, 85, 237 | 700,000 ... 85, 95, 96 | 187, 190, 192, 193, | allowed ... 153 |
| 12 ... 45-47, 56, 59, 91, 92, | 31 ... 136, 181, 182, 232 | 71 ... 123, 125 | 212-214, ... 216-219, | alter ... 151, 173 |
| 124, 157, 180, 222 | 32 ... 157 | 7th ... 84 | 223-225 | alteration ... 167 |
| 12:30 ... 59, 91 | 325 ... 100, 104 | 8 ... 6, 64, 66, 145, 146, | acres ... 96, 129, 186, 223, | alternative ... 31, 199-201 |
| 12:34 ... 92 | 33 ... 18 | 150-152, 157, 178, | 224 | Alternatively ... 52, 155 |
| 125,000 ... 100 | 337 ... 106 | 186, 223-225, 247 | Action ... 17-19, 197, 201 | ambiguity ... 166 |
| 12th ... 45-47, 49, 54, 57 | 342 ... 107, 111 | 8.57 ... 145, 146, 150-152, | actions ... 170 | among ... 43, 134 |
| 13 ... 36, 37, 42, 137, 180, | 343 ... 111 | 157, 178, 186, 223-225 | actively ... 43 | amount ... 8, 54, 56, 80, 83, |
| 222, 225 | 35 ... 157, 186, 187 | 80 ... 157, 183 | activities ... 189, 209 | 84, 91, 93, 100, 109, |
| 13th ... 36, 39, 40 | 350 ... 100, 104, 138, 212 | 800 ... 6, 84, 94, 95, 226, | actual ... 44, 129, 133, 204 | 110, 125, 127, 151, |
| 14 ... 154, 155, 197, 219, | 350,000 ... 104, 138, 212 | 232, 236-238 | add ... 94, 95, 162, 167 | 177, 200, 216, 218, |
| 220 | 351 ... 122 | 9 ... 75, 137, 227 | adding ... 221 | 219, 222, ... 223, 225, |
| 140 ... 118 | 367 ... 107 | 90 ... 167 | addition ... 118, 167 | 226, 228 |
| 142 ... 22, 23, 55, 68, 84, 85, | 4 ... 35, 95, 96, 124, 172, | 91 ... 87 | address ... 6, 18, 210 | amounts ... 181, 231 |
| 122, 142, 143, 146, | 173, 176, 197 | 95 ... 37 | addressed ... 157 | analyses ... 235 |
| 151, 170, 229, 237 | 4,000 ... 124 | 9th ... 137, 222, 225 | addresses ... 126 | analysis ... 73, 98, 139, 168, |
| 144 ... 55, 68, 84, 85, 118, | 4:14 ... 197 | **A** | addressing ... 128 | 169, 185, 189, 229, |
| 122, 142, 143, 146, | 4:24 ... 197 | A.M. ... 6, 59, 60 | adequate ... 70, 167 | 235 |
| 151, 170, 229, 237 | 40 ... 124 | abide ... 59, 60 | adjacent ... 25, 31, 187, 190 | analyze ... 29, 244 |
| 15 ... 81, 164, 165, 193, 210 | 400,000 ... 55, 56, 67-70, | ability ... 128, 134, 143, 187, | adjustments ... 181 | analyzes ... 29, 139 |
| 154 ... 193 | 85, 93, 94, 96, 98, | 217, 234 | administrator ... 107, 210 | Anger ... 216 |
| 15th ... 210, 211 | 132, 135, 136, 145, | able ... 70, 71, 141, 187, | admit ... 107 | angry ... 198, 215, 217 |
| 16 ... 92, 166, 181 | 220, 222, 223, 226 | 203, 209, 236 | admits ... 88, 101 | animated ... 205 |
| 17 ... 83, 124, 163, 181, 191, | 40B ... 25, 31, 64, 145, | above ... 110, 111, 122, 138 | admitted ... 88, 101 | annual ... 35 |
| 209 | 157, 178, 179, 182, | absence ... 70, 142, 191 | advance ... 44 | ANR ... 166, 167 |
| 17.50 ... 83 | 184, 186, 189, | absolute ... 69, 210 | advanced ... 13 | anticipate ... 85, 141 |

| Word ...... Page | Word ...... Page | Word ...... Page | Word ...... Page | Word ...... Page |
|---|---|---|---|---|
| anticipated ... 64, 135, 140, 141, 171, 172, 233 | assignee ... 39, 59, 62-64, 140, 151, 154, 158, 171, 176, 181, 185, 244 | babe ... 248 | bob ... 52, 155 | 134, 135, 139, 143, 146, 150, 160-163, 165-167, ... 175, 192, 203, 206, 226, 228, 246, 248 |
| anticipates ... 179 | | back ... 20, 24, 28, 52, 54, 57, 66, 67, 91, 93-95, 100, 121, 125, | bono ... 124, 201-203, 209 | |
| anyhow ... 67, 69 | assigning ... 45, 207 | | bonuses ... 15 | cap ... 75 |
| anymore ... 123, 191, 200 | assignment ... 37-50, 55, 57, 59, 65-68, 70, 72-74, 84, 86, 87, 97-99, 119, 140, 144, 145, 151, 155, ... 156, 164, 168, 170, 210, 223, 244 | 133-135, 150, 161, 164, 170, 187-189, ... 194, 200, 201, 206, 219, 235, 239, 247 | Boothroyd ... 197, 198, 207 | capacity ... 76, 117, 163, 203, 204 |
| anywhere ... 56, 152 | | | borrow ... 78, 96, 113, 114, 121-123, 126-128, 135, 136, 139, 142-144, 184, 188, 218, 222, 225, 226, ... 238, 239 | capital ... 76, 77, 110, 111, 122, 138, 140, 142, 215, 216, 218, 227, 237 |
| apologize ... 31, 37, 76, 165 | | | | |
| appalled ... 174 | | background ... 10 | | |
| apparent ... 75, 143, 153, 216, 229 | | backs ... 51, 155 | | caps ... 57 |
| apparently ... 192, 210, 212, 233 | | backup ... 206, 227 | borrowed ... 77, 79, 113, 127, 142, 184, 187, 188, 215 | capture ... 118 |
| | assigns ... 158 | balance ... 231 | | care ... 87, 141 |
| Appeals ... 228 | assist ... 29, 36, 45 | ball ... 43 | borrower ... 135, 136 | career ... 10 |
| appear ... 143, 157, 191 | assistance ... 211 | Bank ... 107-110, 114, 115, 118, 120, 127, 188, 206, 233, 234 | borrowing ... 114, 118, 127, 128, 131, 132, 139, 142, 188, 222, 227 | careers ... 69 |
| appeared ... 139, 188 | assisted ... 198 | | | careful ... 164 |
| appears ... 15, 39, 51, 81, 105, 106, 154, 155, 167, 181, 184, 210, 211, 228 | associate ... 11 | banking ... 120 | Boston ... 7, 10, 18, 24, 126 | carefully ... 233 |
| | associated ... 78 | banks ... 127 | Both ... 47, 56, 64, 87, 89, 92, 181, 246 | caring ... 88, 101 |
| | associates ... 124 | bar ... 33, 174 | | Carol ... 193 |
| | assumption ... 87, 129, 135, 145 | bargain ... 147 | bothering ... 165 | carry ... 231 |
| applicable ... 58-60, 73, 97, 148, 158, 176, 178, 185, 224, 226 | | Barlow ... 201, 202 | bottom ... 106, 107, 119, 177, 236, 241 | case ... 30, 32, 38, 41, 72, 113, 116, 122, 158, 161, 162, 183, 188, 201-204, 206, 224, 247 |
| | assurance ... 239 | barn ... 196 | | |
| application ... 99, 100, 104-106, 108, 109, 117, 122, 123, 143, 186, 212, 228 | assured ... 239 | based ... 62, 63, 83, 123, 175-178, 180, 183, 184, 227, 229 | bound ... 58, 60, 73 | |
| | asterisk ... 177, 180 | | boundary ... 151 | |
| | attach ... 235 | | branch ... 115, 176 | cases ... 89, 158, 159 |
| | attached ... 94, 110, 227, 234 | basic ... 148, 151, 196 | break ... 59, 136, 163, 191, 197, 234 | cash ... 94, 230-233, 238 |
| applications ... 116, 117, 120 | | basis ... 62, 103, 227, 232, 244 | | catastrophic ... 13 |
| applied ... 115, 159, 229 | attachments ... 45, 234 | | bridge ... 76-78, 217, 222, 223, 226 | category ... 167 |
| applies ... 161, 162, 183 | attempting ... 16 | Bate ... 35, 105, 193, 219 | | cause ... 9 |
| apply ... 58-60, 62, 63, 72, 149, 154, 156, 157, 159-161, 163, 172, 176, 178-180, 183-185, 229 | attended ... 28, 30, 36, 66, 191, 204 | bear ... 82 | bridging ... 78, 226 | caused ... 150, 218 |
| | attending ... 27, 28, 65, 197 | became ... 21, 75, 119, 143, 153, 189, 216, 228, 229, 244 | Brief ... 52, 205 | cc ... 46 |
| | attention ... 34, 107, 113, 177 | | brings ... 153 | certain ... 80, 97, 102, 120, 130, 132, 161, 163, 218, 239 |
| | attorney ... 10, 16, 20, 62, 63, 86-88, 92, 100, 101, 123, 140, 149, 158, 164, 172, 203, 207, 208, 240... | become ... 19, 110, 123, 137, 198, 241 | broker ... 197 | |
| applying ... 104, 158, 179, 189, 228 | | becomes ... 39, 76, 104, 152 | brokerage ... 181 | certainly ... 43, 89, 121, 125, 152, 161, 193, 225, 240 |
| approach ... 107 | | began ... 30, 43 | brought ... 34, 197, 201 | |
| approached ... 213 | | begins ... 81, 233 | budget ... 76, 232, 233 | |
| appropriate ... 91, 152, 156, 162, 164, 166, 169 | attorneys ... 149 | behavior ... 174 | budgeting ... 233 | certainty ... 81, 88, 89, 158, 195 |
| | audience ... 248 | belabor ... 74 | build ... 184 | |
| | August ... 121 | belief ... 89 | building ... 18, 81 | certificates ... 231 |
| approval ... 110, 111, 113, 126, 157, 166, 167, 179, 182 | author ... 155 | believed ... 60, 61, 72, 89, 90, 137, 152, 156, 158, 203, 213, 219, 224 | buildings ... 173 | chairman ... 228, 245 |
| | authored ... 235 | | built ... 25, 170, 235 | challenging ... 168 |
| | authorities ... 8 | | burden ... 129 | chance ... 207 |
| approvals ... 168 | authority ... 8, 9, 28, 47, 48 | believes ... 131, 151, 157, 189 | bury ... 202 | change ... 10, 27, 29, 62, 152, 167, 200, 223 |
| approve ... 67, 222 | authorize ... 48, 68, 244 | believing ... 75 | business ... 69, 75, 116, 179, 239 | |
| approved ... 166, 170, 222, 223, 226, 236 | authorized ... 48 | bell ... 108 | buy ... 67, 69, 70, 83, 103, 123, 139 | changed ... 28, 69, 153, 222 |
| | authorizes ... 37 | below ... 107, 147, 245 | | changes ... 169 |
| approximately ... 11, 25, 26, 42, 44, 84, 85, 93-95, 226, 230 | avail ... 96, 220 | benefit ... 209, 235 | buyer ... 58, 60, 78, 79, 119, 150, 153, 154, 156, 157, 172, 179, 183, 207 | changing ... 104 |
| | availability ... 29, 99, 128, 152, 215, 221 | benefits ... 147 | | Chapter ... 27, 37, 41-43, 58, 60, 62, 63, 73, 89, 97, 140, 148, 154, 158, 161, 162, 178, 179, 185, 192, ... 194, 196 |
| | available ... 75, 76, 96, 98, 99, 102, 103, 108, 110, 111, 115, 118, 127, 128, 139, 143, 152, 175, 184, ... 195, 221, 231, 232, 243 | beside ... 15 | | |
| April ... 121, 193, 209-211 | | Bickford ... 12 | Buying ... 76 | |
| aquifer ... 191 | | big ... 9 | bylaw ... 167 | |
| area ... 14, 167, 191 | | Bill ... 106, 107, 210, 243 | | characterization ... 228 |
| argument ... 146, 153, 160, 200 | | bind ... 8 | **C** | characterize ... 226 |
| | availed ... 184 | blank ... 110 | | charge ... 7, 203 |
| arise ... 158, 159 | Availing ... 127 | BNC ... 106 | Cafeteria ... 59 | charitable ... 14, 186, 207, 208 |
| arms ... 205 | aware ... 14, 19, 57, 104, 108, 110-112, 116, 118-120, 124-126, 137, 152, 161, 189, 192-194, 206, ... 207, 241, 246, 247 | Board ... 28, 41, 42, 44-48, 52-54, 81, 82, 108, 110, 113, 120, 165, 167, 168, 191-193, 197, 201-203, ... 206, 210, 212, 222, 228, 241 | California ... 126, 208 | |
| arose ... 229 | | | call ... 13, 20, 24, 207 | chart ... 109 |
| article ... 67 | | | called ... 22, 64, 119, 218, 246 | check ... 86, 194 |
| articulate ... 205 | | | calling ... 24 | checked ... 14 |
| assemble ... 61, 235 | | | calls ... 149 | checking ... 230, 231, 233 |
| assembled ... 90, 94 | | | calm ... 204 | Choate ... 202 |
| assessment ... 30 | | | campaign ... 117 | chose ... 14 |
| asset ... 87, 248 | | boards ... 168, 211 | Can ... 6, 10, 15, 16, 18, 20, 21, 23, 31, 33, 35, 37, 40, 42, 44, 50, 52, 59, 62, 63, 70, 76-79, 91, 101-103, ... 107, 113, 114, 125, 128, 130, | Chris ... 105 |
| assets ... 71, 203, 227, 231, 232, 238 | | Bob ... 198, 204-206, 247 | | Christianson ... 21-23, 25, 26, 30, 31, 34, 212 |
| assign ... 37, 46, 47, 49, 192 | | body ... 44 | | |
| assigned ... 156, 157, 177, 183, 193, 207, 216 | **B** | bold ... 154, 155, 178, 220 | | |

Word ...... Page

Christopher ... 116
chunk ... 205
circumstance ... 102, 120, 126
circumstances ... 22, 23, 57, 62, 100, 104, 118, 126
city ... 143
civil ... 117
claim ... 71, 209
clarify ... 16, 42, 48, 60, 81, 91, 121, 122, 133, 221
clause ... 71-75, 119, 149, 158, 183, 207
close ... 75, 94, 110, 127
closely ... 231
closing ... 52, 91, 94, 96, 121, 143, 155, 181, 182, 221
Co ... 92, 157, 169, 172, 182, 184, 186, 189, 193-195, 223, 224, 230, 244
Cobb ... 81
code ... 59
collaboration ... 247
collateral ... 233
collection ... 195, 216
colloquial ... 242, 246
combination ... 54, 241
come ... 25, 26, 71, 95, 96, 98, 134, 137, 139, 171, 188, 189, 200, 206, 215, 237-239
comes ... 126, 174, 233
coming ... 52, 140, 162, 189, 190, 233, 237
comment ... 66
commenting ... 197
comments ... 28
Commission ... 33, 42, 68, 193
commissioner ... 12
commitment ... 67, 247
commitments ... 244
Committee ... 48, 64, 65, 79, 81, 247
committees ... 42
common ... 58, 104, 156, 185, 229
Commons ... 27, 28, 93-95, 129, 134, 136, 140, 144, 148, 170-172, 179, 184, 189-191, 207, 223-225, ... 230
Commonwealth ... 12, 15, 100, 116, 117, 122, 123, 142, 187
communicate ... 220
communications ... 160
communities ... 19, 81
Community ... 64, 65, 68, 100, 104, 138, 192, 243, 247
company ... 27
comparable ... 240
compelled ... 64
compilation ... 45, 105, 177, 193
complaint ... 85-88, 101,

196, 198, 227, 234, 240, 241
complete ... 54, 69, 70, 95, 113, 128, 139, 142, 153, 188, 192
completed ... 52, 139, 142, 155
completely ... 61, 141, 223
completeness ... 111
compliance ... 167
complicated ... 144
complicating ... 169
comply ... 60, 63, 97, 152, 154, 176, 179, 187
complying ... 98, 132
component ... 57, 94, 147, 161, 225
components ... 97
concentration ... 210
concept ... 89, 247
concern ... 62, 160
concerned ... 31, 207, 218, 227
concerning ... 21, 24-28, 33, 34, 36, 39-41, 47, 58, 66, 89, 99, 130, 147, 165, 191, 195, 212, 213, 215, ... 217, 219, 240
conclude ... 98, 129, 142
concluded ... 75, 96, 97, 248
conclusion ... 139, 149, 150
conclusions ... 148
Concord ... 6
condition ... 57, 173, 196
Conditions ... 51, 119, 154
conducted ... 185
confidence ... 89, 228, 234
confidences ... 164
confident ... 89
configuration ... 146, 151
confirmation ... 118
conforming ... 167
conformity ... 167
confuse ... 107
confused ... 74
confusing ... 168
conjunction ... 117
connection ... 15, 197, 248
connections ... 197, 201
CONROY ... 6, 8, 14, 16, 17, 19-21, 29, 31-34, 36-41, 43, 49, 50, 52, 53, 55, 57-59, 61-63, 65, 68, ... 70, 72-77, 79, 80, 82, 86, 88-91, 93, 101, 102, 109-112, 114-116, 121, 123, 125-130, ... 132-136, 139-156, 158, 159, 162, 164, 168, 170-177, 183, 184, 187, 189, 191, ... 195-197, 205, 207-212, 214, 216, 218, 220, 223, 224, 226, 238, 239, 242, 245-248

consequences ... 156
conservation ... 7, 18, 19, 22-26, 29-31, 33, 34, 37, 38, 42, 77, 81, 139, 141, 142, 158, 178, 187, 191-193, ... 205, 212, 233, 236, 243
conserve ... 25, 69
conserved ... 193
conserving ... 193
consider ... 25, 70, 71, 78, 149, 150, 185, 226, 231, 232, 243
consideration ... 148, 167
considered ... 48, 70, 95, 97, 157, 172, 188, 231
considering ... 78, 83, 86, 151, 233
consistent ... 83
consisting ... 150
constellation ... 29
constitute ... 247
construction ... 157, 183-186
consultant ... 104, 105
contact ... 21, 23, 24, 26, 31-33, 36, 41, 122
contacted ... 21-25, 27, 30, 32, 36, 37, 41
contacting ... 26, 32
contain ... 116
contained ... 131, 145, 153
contemplate ... 70, 186
contemplated ... 186, 221, 235, 237
contemplates ... 186
contemplating ... 244
context ... 113, 152, 196
contingencies ... 194
contingency ... 72, 108, 117, 169, 183, 186, 194
contingent ... 107, 239
continue ... 175, 197, 236, 245
continued ... 236
continuing ... 105, 199
contract ... 9, 39, 58-66, 71, 73, 80, 91, 93, 98, 99, 123, 128, 136, 140-142, 144, 145, 148, 152, 153, ... 156, 158, 169-173, 177-179, 182-185, 187, 194, 200, 201, 244, 247
contracts ... 8
contractual ... 242-244
contributing ... 94
contribution ... 122, 186
control ... 174, 187, 210
conventional ... 184
conversation ... 31, 89, 100-102, 131, 133, 209, 247
conversations ... 32, 35, 40, 44, 165, 189, 214, 215
conversion ... 100
convey ... 60, 83, 186
conveying ... 129
convince ... 209
convincing ... 43

Cook ... 18
cooperate ... 157
cooperation ... 246
copied ... 46, 167
copies ... 51
copy ... 106
Cornell ... 12, 13, 240
Corner ... 6
corporate ... 13, 16, 18
corporation ... 14, 15, 208
corrected ... 110
correctly ... 38, 58, 60, 76, 101, 110, 133
correctness ... 203
correspondence ... 155, 158, 206
cost ... 82, 117, 118, 192, 202, 245
costs ... 83, 85, 157
cottage ... 167
couldn't ... 167
counsel ... 45, 46, 52, 87, 92, 99, 110, 112, 125, 126, 130, 132, 145, 149, 159-161, 196, 197, 201-203, ... 207, 209, 228
count ... 24, 209, 211
counting ... 237
couple ... 36, 81, 107
course ... 43, 90, 171, 173, 185, 214, 240
courses ... 13
court ... 86, 112, 118, 119, 127, 160, 161, 174, 185
courts ... 12, 13, 58
cover ... 106, 117, 118
CPA ... 117
CPC ... 42, 64, 65, 236
Craig ... 6, 37, 49, 81, 106, 107, 113, 119, 121, 129, 135, 162, 163, 165, 193, 210
create ... 153, 167
created ... 229
creation ... 31, 76
credit ... 77, 107-111, 113-116, 118-120, 125-128, 138, 175, 187, 188, 206, 215-218, 227, 231, 233, ... 234, 237
criminal ... 117
critical ... 68, 76, 87, 143
crunches ... 104
crux ... 188
current ... 112
currently ... 21, 233
customary ... 110
cut ... 166

**D**

daily ... 232
damage ... 71, 73-75, 119, 149, 158, 207
damages ... 72, 141, 156, 171, 183
dark ... 214
date ... 30, 42, 44, 47, 49, 50, 56, 68, 91, 121,

178, 198, 199
dated ... 45-47, 49, 68, 137, 166, 167, 209, 212, 228, 234, 238
dates ... 44, 50
David ... 81, 92, 197
dawned ... 78
dawning ... 78
day ... 47, 49, 50, 61, 194, 204, 212, 239
days ... 65, 66
dead ... 200, 201
deal ... 51, 72, 78, 130, 134, 144, 148, 155, 172, 181, 192, 199, 213, 224-226, 228, 237, 243
dealing ... 36, 71, 189, 207
deals ... 18, 89, 185
dealt ... 147
debate ... 217
debated ... 203
December ... 28, 40, 232
decide ... 152, 156, 159
decided ... 91, 113, 114, 144, 157, 158, 188, 213, 218
decision ... 68, 96, 97, 114, 121, 161, 221, 228, 230
decisions ... 58, 72
declare ... 242
deduction ... 209
deductions ... 209
deeds ... 55, 73
deem ... 152
default ... 114, 115, 120, 156, 171, 197, 201
defaulted ... 156
defeated ... 189
defect ... 180
defects ... 180
defend ... 52, 155, 175, 197, 201
Defendants ... 113, 119, 121
defended ... 163
deferred ... 162
define ... 8
defined ... 151
definition ... 77
degree ... 13, 167
degrees ... 13
delicate ... 191
deliver ... 91, 176, 221
demands ... 197
demonstrated ... 192
denied ... 241, 245
denies ... 88, 101
Denise ... 123, 125, 228
deny ... 89, 245
denying ... 202
Department ... 11, 12, 100, 104, 138
dependent ... 91
depose ... 162
deposes ... 5
deposit ... 177, 181, 182, 231
deposited ... 80, 81
deposition ... 6, 16, 17, 32, 63, 134, 162, 164, 174,

| Word ...... Page | Word ...... Page | Word ...... Page | Word ...... Page | Word .... Page |
|---|---|---|---|---|
| 175, 211, 248 | dissatisfied ... 215 | 158, 159, 168, 172, 174, 183, 184, ... 187, 189, 194, 195, 204, 207, 209, 214, 220, 223, 224, 226, 244, 245 | 148, 153, 159, 219, 227 | faced ... 188 |
| deposits ... 80, 113, 181, 219 | dissuade ... 189 | | establish ... 186, 244 | facile ... 212 |
| derived ... 15, 56, 147 | dissuaded ... 189 | | established ... 23, 57 | facilitate ... 100, 151 |
| describe ... 14, 77, 98, 165, 209 | distinct ... 215 | | establishing ... 50, 212, 233 | factors ... 29 |
| described ... 42, 108, 145, 150, 181, 182, 216 | distinguish ... 34 | economy ... 138 | establishment ... 24 | fail ... 111, 140, 141 |
| describing ... 210 | division ... 18, 19, 230 | education ... 13 | estate ... 76, 182, 197 | failed ... 72-74, 104, 113, 141, 180 |
| description ... 217, 236 | doctrine ... 229 | educational ... 10 | estimation ... 9 | failing ... 170 |
| design ... 83 | document ... 15-18, 35, 48, 49, 51, 57, 64, 66, 75, 81, 105, 111, 119, 125, 130, 131, 136, 154, 155, ... 165, 191-193, 227, 245, 246 | effect ... 50, 78, 97, 189, 192, 193, 195, 201, 203, 207, 230, 244 | estoppel ... 247 | failings ... 110 |
| designate ... 209 | | effective ... 81 | ethical ... 175 | failure ... 52, 138, 155, 170 |
| designation ... 14, 15, 20, 27-29, 35 | | effectively ... 62 | events ... 44, 166 | fair ... 26, 27, 43, 49, 50, 62, 64, 67, 71, 81, 83, 84, 91, 94-96, 98, 111, 145, 150, 151, 157, 159, 168, ... 179, 182, 183, 187-189, 193, 194, 200, 210, 211, 213, 219, 220, 225, 235, 236, 238-242, ... 245-247 |
| designed ... 140, 184 | | effectuate ... 94-96, 215, 232 | eventually ... 140, 226 | |
| despite ... 75 | documents ... 20, 21, 35, 45, 50, 105, 106, 112, 116, 130-132, 193, 194, 212 | efforts ... 75, 189, 193 | everybody ... 92, 230 | |
| detectors ... 186 | | eight ... 178, 199, 235-238 | everything ... 140, 247, 248 | |
| determination ... 72, 78 | | eighteen ... 181 | evidenced ... 110 | |
| determine ... 78, 158, 180, 231 | | eighty ... 16 | evidences ... 245 | |
| determined ... 71, 78, 91, 229 | dollar ... 8, 16, 56, 79, 82, 94-96, 110, 111, 113-116, 118, 127-129, 137, 147, 150, 152, 175, 220, 221, ... 234, 238, 240, 243, 248 | elderly ... 88, 101, 207 | EXAMINATION ... 6 | fairly ... 26, 103, 196 |
| determining ... 139 | | elect ... 184 | Examining ... 15 | faith ... 158 |
| developed ... 150, 151, 169, 193 | | elected ... 21, 121, 163 | example ... 8, 13, 63, 64, 186 | fall ... 167, 199 |
| development ... 25, 27, 28, 31, 63, 64, 100, 104, 138, 157, 187, 191-193, 213 | | election ... 184 | exceed ... 225 | fallback ... 107-109, 118, 122, 138, 142 |
| | | eleven ... 180 | except ... 6, 88, 101, 179, 217 | falling ... 214 |
| DH ... 104 | dollars ... 8, 9, 80-82, 84, 95, 102, 103, 113, 119, 137, 139, 142, 153, 182, 186, 187, 216, 219, 225, ... 230, 231, 233, 237, 243, 244 | email ... 164, 166, 168, 209, 210 | excerpt ... 124 | false ... 116 |
| DHCD ... 100, 105, 106, 109, 139 | | emerged ... 169 | exchange ... 236 | far ... 8, 19 |
| dialogue ... 158 | | employed ... 18 | exempt ... 208, 243 | Farm ... 27, 35, 150, 193, 210 |
| difference ... 85, 156, 157, 208 | | employee ... 19, 24, 162, 166 | exercise ... 42, 82, 87, 97 | fashion ... 190, 205 |
| different ... 29, 33, 62, 91, 121, 144 | donated ... 80, 146, 148 | employees ... 24 | exercised ... 119 | father ... 87, 88, 101 |
| differentiate ... 181 | donation ... 80, 134, 147 | enable ... 29, 171, 180, 184 | exhausted ... 134 | favor ... 64 |
| difficult ... 40, 215 | Donna ... 167 | enables ... 211 | Exhibit ... 16-19, 35, 45-47, 49-51, 54-57, 59, 60, 64, 66-68, 73-75, 79, 81, 105, 110, 121, 122, 124, ... 137, 138, 154, 155, 164-166, 191, 193, 206, 209, 210, 212, 219, 220, 222, 225, 227, ... 228, 234, 235, 238, 242, 244, 247, 248 | feasibility ... 194 |
| difficulty ... 87, 170 | door ... 106 | encountered ... 170 | | February ... 6, 45-47, 49, 54, 56, 57, 61, 64-66, 74, 165-168, 191, 192, 247 |
| dilapidated ... 196 | Dorothy ... 45-49, 56, 125 | encourage ... 200 | | |
| diligence ... 72, 110, 111, 113, 118, 140, 142 | double ... 118, 194 | encouraging ... 200, 222 | | |
| dimensional ... 166 | doubled ... 64 | encumber ... 150, 157 | | |
| directions ... 178 | downstairs ... 59 | endorse ... 167 | | federal ... 12, 13, 112, 117, 118 |
| directly ... 21 | dozens ... 124 | endowment ... 233 | | fee ... 181 |
| director ... 7, 8, 14, 20, 24, 41, 47, 49, 104, 115, 120, 161, 176, 230, 232 | draft ... 81, 154 | ends ... 156, 232, 233 | existed ... 19, 223 | feel ... 42, 64 |
| | drafted ... 155 | Enforcement ... 11 | existence ... 129, 229, 245 | feels ... 104 |
| | drafting ... 67 | engages ... 139, 140 | exists ... 131 | fees ... 181 |
| Directors ... 48, 110, 113, 222 | drawn ... 148 | England ... 24, 115 | exit ... 99 | fellow ... 21, 192 |
| disagreeing ... 223 | Drew ... 192 | enhance ... 243 | exits ... 136, 164, 196, 222, 234 | felt ... 215 |
| disagrees ... 172 | drop ... 228 | ensure ... 104 | expect ... 84, 141, 226, 242 | FETOUH ... 13, 17, 19, 20, 22, 27-34, 36, 38-43, 47, 49-51, 53, 55-58, 61-63, 65, 68, 70-72, 74-77, ... 79, 80, 82, 85, 86, 89, 90, 92, 97, 98, 111, 114-116, 123-128, 132, 135, 136, 139-144, ... 146-150, 152-154, 156, 158-163, 165, 168, 170, 172-174, 177, 179, 183-189, 191, ... 194, 195, 198, 201, 204, 207-209, 211, 212, 214, 217, 218, 220, 222-226, 234, 237, ... 239, 240, 242, 244-246, 248 |
| disappointed ... 190 | dropped ... 228 | ensured ... 195 | expectation ... 39, 84, 140, 141, 227 | |
| disclose ... 120 | due ... 72, 110, 111, 113, 118, 126, 132, 136, 140, 142, 153 | ensures ... 243 | expected ... 84, 85, 90, 142, 150, 179 | |
| disclosure ... 206 | duly ... 6 | enter ... 16, 129, 158, 183, 242 | expecting ... 141 | |
| disconnect ... 216, 217 | | entered ... 185 | expenditure ... 68 | |
| discourage ... 214 | **E** | entering ... 244 | expenses ... 182, 233 | |
| discouraged ... 214 | each ... 7, 155, 163, 243 | enters ... 211, 215 | experience ... 185 | |
| discusses ... 154 | earlier ... 30, 60, 61, 95, 97, 104, 107, 127, 144, 148, 155, 158, 169, 208, 217, 228, 229 | entertain ... 57 | experienced ... 138, 204 | |
| discussing ... 25, 51, 52, 65, 74, 203, 204 | | entire ... 44, 186, 218 | expert ... 62, 164 | |
| | | entirely ... 117, 130, 150, 235 | expertise ... 104, 147 | |
| discussions ... 23-26, 28, 29, 33, 34, 41-44, 189, 199, 214, 215, 219 | early ... 10, 26, 88, 98, 168, 210, 229 | entirety ... 148 | explain ... 225, 226 | |
| | earmarked ... 79, 115 | entities ... 17, 229, 241 | explained ... 107 | |
| dishonesty ... 204 | earned ... 221 | entitled ... 128 | explanation ... 128 | field ... 69 |
| Dismiss ... 113, 119, 121, 163 | earnest ... 80, 81, 149, 156, 181, 182, 186, 218, 219 | entity ... 18-20, 27, 39, 229, 243 | explicit ... 204 | Fifteen ... 180, 182 |
| | | environmental ... 11, 13, 69 | explicitly ... 73, 158, 159 | fifth ... 241 |
| disregard ... 175 | easily ... 216 | envisioned ... 170 | expressing ... 99 | fifty ... 9, 32, 94, 100 |
| | ECKER ... 34, 75, 89, 92, 114, 129-132, 135, 141, 146, 148, 153, | envisions ... 107 | expressly ... 88, 101 | figure ... 71, 185, 229, 248 |
| | | equivalent ... 103 | extension ... 157, 167, 178 | |
| | | Ernest ... 18 | extensive ... 147 | |
| | | Esquire ... 125 | extensively ... 67 | |
| | | essence ... 151 | external ... 70 | |
| | | essential ... 156 | | |
| | | essentially ... 17, 48, 143, | **F** | |

| Word ...... Page | Word ...... Page | Word ...... Page | Word ...... Page | Word .... Page |
|---|---|---|---|---|
| figuring ... 98 | 121, 123, 127, 129, | gift ... 224 | hard ... 61, 70, 126, 199, | 105, 124, 137, 154, |
| filed ... 86, 112, 119, 127, | 143, 145-147, 150, | give ... 35, 94, 95, 193, 206, | 200, 226, 236 | 164, 166, 191, 193, |
| 162 | 152, 176, 177, 220, | 219, 233 | harmless ... 51, 155 | 210, 212, ... 228, 234, |
| filing ... 20, 116, 117 | 221, 226, 227... | given ... 39, 65, 69, 95, 96, | Hatch ... 7, 8 | 238 |
| filled ... 104, 106 | Fourteen ... 180 | 130, 134, 146-148, | HDSP ... 117 | identified ... 6, 71, 79, 84, |
| final ... 98 | fraught ... 143 | 158, 172, 182, 218, | head ... 245, 246 | 90, 160, 180, 216 |
| finance ... 18, 19, 79, 81, | free ... 129 | 231 | heading ... 36, 210 | identifies ... 139 |
| 115, 116, 126, 217 | frequency ... 44 | giver ... 87 | headquarters ... 7 | identifying ... 157, 185 |
| finances ... 61, 217 | Friends ... 37, 80, 81, 165, | Glassman ... 77, 78, 108, | hear ... 59, 174, 195 | imagination ... 226 |
| financial ... 18, 67, 70, 87, | 190, 193, 212-214, | 206 | heard ... 17, 77, 160, 162, | imagine ... 153 |
| 120, 231, 242-244 | 216-219 | go ... 11, 12, 20, 28, 43, | 170, 182, 190, 247 | imagined ... 139, 141, 151, |
| Financing ... 29, 60, 72, | front ... 9, 15, 18, 51, 80, | 52-54, 59, 66, 67, 75, | hearings ... 27, 44 | 171, 184, 185, 236 |
| 107-109, 133, 157, | 81, 101, 106, 145, 159, | 89, 96, 103, 104, 112, | heated ... 199 | imagines ... 63, 142, 153, |
| 184, 186, 217 | 168, 169, 200, 208 | 114, 117, 121, 129, | heck ... 141 | 185, 187 |
| Fincom ... 81, 82 | frontage ... 166, 167 | 131, 133, ... 138, 141, | held ... 51, 52, 155 | immediate ... 103 |
| find ... 74 | fronted ... 238 | 144, 150, 156, 159, | help ... 14, 38, 100, 105, 188 | immediately ... 102 |
| finding ... 70 | frustration ... 175, 216 | 160, 164, 166, | helpful ... 37, 96-98 | implying ... 102 |
| fine ... 161, 163, 175, 239 | frustrations ... 175 | 169-172, 174-176, 180, | helping ... 205 | Importance ... 165 |
| finger ... 175 | full ... 37, 63, 69, 90, 91, | 186-188, 190, ... 194, | helps ... 19, 81 | important ... 185, 230, 241, |
| firm ... 202, 246 | 220, 243 | 196, 197, 204, 213, | hesitated ... 17 | 248 |
| firms ... 10, 203, 247 | fully ... 70, 71, 75, 181 | 214, 222, 227, 228, | high ... 165 | imposed ... 129 |
| first ... 6, 19, 30, 31, 35-43, | function ... 121, 174 | 230, 245, 246 | highly ... 143, 144 | impossible ... 75 |
| 45, 47, 50, 51, 53, 54, | fund ... 17-19, 54, 57, 61, | goals ... 178 | hijinks ... 205 | improved ... 236 |
| 56, 57, 61, 64, 66, 67, | 70-74, 90, 109, 113, | going ... 15, 17, 24, 42, 48, | Hill ... 201, 202 | imprudent ... 227 |
| 72-74, 82, 87, 97, 105, | 117, 119, 122, | 51, 62, 64, 67-69, 74, | hired ... 104 | impugning ... 131 |
| 106, ... 110, 116, 118, | 137-139, 142, 170, | 75, 81, 83, 87, 90-93, | Hoar ... 123, 124, 201 | inaccurate ... 65, 66, 82, 83, |
| 119, 121, 130, 137, | 174, 188, 213-218, ... | 96, 97, 100, 101, 105, | hold ... 17, 52, 76, 139, 182 | 116, 117 |
| 154, 156, 158, 161, | 222, 227, 231, 239, | 112, ... 118, 119, 122, | honest ... 82, 204 | inapplicable ... 158, 178, 181 |
| 166, 170, 177, 178, | 240 | 124, 126, 129-132, | honestly ... 248 | inapposite ... 63, 178, 179, |
| 182, 192, ... 193, 207, | funding ... 57, 107, 108 | 134-138, 145, 147, | honor ... 73, 74 | 184 |
| 212, 235-237, 242 | funds ... 54-56, 70, 71, 77, | 148, 150-152, 154, | honored ... 74 | inappropriate ... 62, 146, 178 |
| fiscal ... 232, 233 | 79, 80, 90, 95, 96, 99, | 160, 164, ... 165, 168, | hope ... 54, 55, 85, 104, 175, | inclusion ... 146 |
| Fish ... 10 | 100, 102-104, | 174, 177, 180, 181, | 236, 237 | income ... 31, 83, 190, 209 |
| Fisheries ... 11, 12 | 109-111, 117, 118, | 186, 188, 190, 191, | hoped ... 54-56, 68, 90, 118, | inconsistent ... 122 |
| fists ... 205 | 121, 122, 126, ... 138, | 193, 196, 197, 212, | 190 | incorporated ... 183 |
| five ... 24, 40, 42, 45, 59, | 139, 203, 215-217, | 213, 215, 216, ... 218, | hopefully ... 233 | incorrect ... 56 |
| 176, 183, 186, 191, | 219, 220, 222, 231, | 219, 226, 227, 233, | horizon ... 142, 214 | incorrectly ... 133 |
| 222, 236-238 | 232, 238, 241, 243 | 236, 237 | horse ... 35, 150 | increase ... 100, 167 |
| fluctuates ... 231 | further ... 83, 131, 157, | gone ... 89, 106 | host ... 43 | increased ... 100 |
| focus ... 31 | 177, 197, 221, 222, | good ... 59, 75, 158, 176, | hostile ... 138 | increasingly ... 228 |
| fold ... 214 | 226 | 191, 196, 200-202, | hour ... 59, 91 | indemnification ... 52, 53, 74 |
| folks ... 191, 219, 247 | future ... 215, 227, 229, 230 | 204, 224, 225 | hourly ... 244 | indemnify ... 53 |
| follow ... 110, 169 | **G** | Goodwin ... 123, 124, 201 | hours ... 124 | indicated ... 100 |
| followed ... 151 | gain ... 147 | gradual ... 78, 144 | house ... 22, 196 | indicating ... 112, 127, 130, |
| following ... 113, 156, 191 | game ... 62, 98 | gradually ... 228 | household ... 83 | 245 |
| follows ... 6, 112, 183, 196 | gap ... 76, 78, 137, 138, | graduate ... 12 | housekeeping ... 92 | indication ... 245 |
| fool ... 248 | 217, 222 | grant ... 54, 93, 100, 105, | houses ... 220 | indistinguishable ... 162 |
| forcing ... 204 | gaps ... 77 | 106, 123, 138, 139, | housing ... 31, 54, 100, 104, | individually ... 245 |
| foregoing ... 150 | gathers ... 29 | 167 | 137, 138, 157, 169, | influenced ... 62, 183 |
| forestry ... 27 | gave ... 223 | granted ... 164, 165 | 172, 182, 184, 186, | influential ... 197, 201 |
| forfeited ... 119 | gear ... 76 | grants ... 116 | 189, 190, 193-195, | informal ... 247 |
| forgive ... 212 | general ... 9, 25, 28, 37, 60, | greases ... 145 | 223, 224, 230, ... 244 | informed ... 87, 88, 101, 116 |
| form ... 6, 16, 18, 145, 223 | 62, 131, 138, 230, | greater ... 77, 222, 223, 226 | hugely ... 229, 231 | infringe ... 160 |
| formal ... 242, 247 | 231, 246 | grounds ... 164 | Hull ... 148 | initial ... 26 |
| forth ... 165, 181, 183, 200 | Generally ... 17, 33, 35, 99, | group ... 214, 215 | hundred ... 9, 16, 40, 42, 56, | initially ... 100, 187 |
| forward ... 43, 74, 75, 103, | 104, 126, 197, 215, | guarantees ... 52, 155 | 69, 84, 85, 89, 94-96, | initiate ... 31, 34, 41 |
| 104, 112, 117, 121, | 216 | guess ... 40, 107, 159, 176, | 100, 127, 129, 137, | initiated ... 31-33 |
| 141, 142, 144, 149, | generate ... 109 | 183 | 138, 143, 145-147, | initiating ... 41 |
| 154, 156, 157, 166, | generates ... 235 | guys ... 163 | 150, 152, ... 177, 182, | initiation ... 42 |
| 170, 171, 174, ... 179, | generic ... 77 | **H** | 199, 220, 221, | inkling ... 168 |
| 180, 182, 188, 190, | gentleman ... 18 | half ... 9, 59, 91, 230, 231 | 235-238, 240 | inserting ... 169 |
| 194, 213, 214, 222, | get ... 42, 57, 67, 68, 71, | halfway ... 19, 83 | hundreds ... 42, 131, 132 | insertion ... 169 |
| 227, 228, 230, 233, | 90, 92, 96, 112, 122, | Hall ... 202 | hundredth ... 42 | inside ... 205 |
| 236, 239 | 123, 136, 141, 152, | hand ... 54, 74, 83, 102, 119, | husband ... 92 | insiders ... 120 |
| found ... 95, 113, 185 | 153, 159, 166, 168, | 230, 241 | hypothetical ... 227 | insist ... 129 |
| foundation ... 179 | 170, 189, 200, ... 205, | handling ... 32 | **I** | insistence ... 96 |
| foundations ... 216 | 209, 224, 226, 229 | handouts ... 192 | i.e. ... 25, 74, 159 | institution ... 14, 163, 207, |
| founder ... 108, 206 | gets ... 63, 64, 143, 174, | happily ... 146 | identification ... 16-18, 35, | 208 |
| four ... 56, 69, 84, 95, 96, | 235 | happy ... 133, 190, 194 | 45, 49, 51, 64, 75, 79, | instruct ... 160, 164 |

| Word ...... Page | Word ..... Page | Word ...... Page | Word ...... Page | Word .... Page |
|---|---|---|---|---|
| instruction ... 133 | justification ... 191 | lawyer ... 10, 11, 14, 202, 203 | 150, 155, ... 157, 176, 191, 193, 194, 201, 212, 219, 222, 234, 235, 241, 243, 247 | market ... 55, 110, 111, 122, 138, 147, 217, 225, 237 |
| insurance ... 180 | **K** | lawyers ... 11, 141, 229, 246 | | markets ... 76, 218 |
| intend ... 113 | Kachajian ... 87, 92, 93, 99, 129, 136, 137, 163, 164, 197, 198, 200, 202, 203, 207, 211, 218, 222, ... 226, 228, 234, 236 | lead ... 186 | looked ... 70, 71, 177, 231 | Marr ... 248 |
| intended ... 27, 70, 71, 73, 91, 111, 118, 142, 171, 187, 220, 230, 243 | | learn ... 102, 240 | Looking ... 20, 31, 36, 50, 54, 57, 67, 99, 107, 125, 137, 166, 172, 178, 194, 198, 228, 244 | Mass ... 6, 37 |
| intending ... 83, 123, 184 | | learned ... 161, 229 | | Massachusetts ... 6-8, 12, 14, 20, 47, 49, 58, 70, 104, 115-117, 120, 122, 142, 161, 176, 187, 230, 232, ... 233 |
| intends ... 110, 111, 122, 138, 142 | | leave ... 10, 14, 72, 81, 84, 92, 196, 207 | | |
| intention ... 55, 69, 74, 75, 85, 90, 113, 141, 185, 187, 207, 210, 220 | Karen ... 165-167, 169 | leaving ... 94, 95 | lore ... 154, 185 | materialize ... 139, 142, 219, 227 |
| intentionally ... 189 | Keegan ... 10, 11, 13 | led ... 129, 133, 169 | lose ... 171, 247 | mattering ... 69 |
| intentions ... 140 | Kelleher ... 166, 169 | left ... 13, 20, 45, 83, 106, 149, 205, 206, 208, 226 | loss ... 138, 188 | matters ... 18 |
| Interconnect ... 106 | Kennedy ... 164-167 | | lost ... 170 | Maynard ... 205 |
| interest ... 30, 96, 139, 220, 221, 236 | kindness ... 124 | legal ... 11, 14, 62, 72, 73, 156, 164, 197, 201, 223, 242, 246, 247 | lot ... 29, 61, 85, 118, 121, 144, 159, 166, 167, 190, 194, 214, 221, 231, 244 | McClennen ... 10 |
| interests ... 139 | kinds ... 63, 211, 246 | | | McLAUGHLIN ... 6, 16-18, 37, 38, 42, 52, 53, 59, 60, 62, 63, 86, 91-93, 99, 101, 109, 110, 112, 121, ... 125, 128-134, 137, 144, 146, 149, 160-164, 174-176, 191, 196-198, 206, 228, 234, ... 238, 240, 247, 248 |
| interim ... 140 | kinks ... 169 | lend ... 152 | | |
| interm ... 28, 123 | knowing ... 140 | length ... 203 | lots ... 29, 55, 56, 69, 71, 72, 74, 78, 84, 90, 91, 167, 168, 170, 237, 238 | |
| internal ... 110, 113, 118 | knowledge ... 19, 21, 25, 168, 206 | letter ... 45, 47, 49, 50, 56, 57, 60, 74, 110, 137, 147, 165, 210-213, 220, 222, 225, 228, 234-236, 238, ... 240-243 | low ... 31, 190 | |
| interns ... 29, 124 | known ... 26, 27, 68, 210, 229 | | Lower ... 197, 200, 247 | |
| interpretation ... 131 | knows ... 104, 126, 162 | | luck ... 176 | |
| intervention ... 247, 248 | KUN211 ... 37 | letters ... 210, 211, 220 | Luncheon ... 92 | MCLE ... 13 |
| intimidated ... 197 | KUN205 ... 35 | level ... 228, 246 | lying ... 214 | means ... 29, 38, 57, 77, 128, 142, 173, 179, 203, 226, 245 |
| intimidating ... 205 | KUN336 ... 105 | liability ... 135 | **M** | |
| introduction ... 28 | KUN474 ... 45 | license ... 6 | MacDonald ... 37 | meant ... 58, 60-62, 78, 227, 237 |
| introductory ... 40 | Kunelius ... 21-25, 27, 30, 31, 33, 34, 36, 45, 55, 67, 69, 71, 74, 76, 79, 80, 82, 86-88, 90, 91, 93-96, ... 99-103, 108, 117, 119, 121, 127, 129, 130, 132, 135, 136, 140-142, 147, 149, 150, ... 152, 154, 156, 159, 165, 167, 169-172, 176, 177, 179-182, 187, 188, ... 193, 195-197, ... 199-203, 205-210, 212, 218-221, 225, 231, 232, 235, 236, 241, 244, 247, 248 | LID ... 106 | MacDonnell ... 6, 37, 49, 62, 81, 87, 88, 92, 101, 106, 113, 119, 121, 137, 162-165, 193, 196, 209, ... 210, 234, 238 | measured ... 71 |
| invest ... 129, 227, 235 | | likelihood ... 207, 239, 240, 243 | | Mechanism ... 107 |
| investment ... 137, 236, 242, 244 | | likewise ... 68 | | medication ... 9 |
| involve ... 34, 160 | | limit ... 160 | | meet ... 26, 31, 40, 44, 50, 58, 122, 156, 171 |
| involvement ... 24, 26, 27, 209, 210, 243 | | limitation ... 8, 9 | Madam ... 86, 131 | meeting ... 26, 30, 31, 35, 36, 40-42, 46, 47, 52, 64-67, 81, 82, 87, 90, 100, 132, 166, 169, 191-193, ... 197, 198, 200, 202-206, 247, 248 |
| involves ... 29 | | limited ... 203 | Maine ... 12 | |
| irreversible ... 192 | | line ... 46, 51, 107-111, 113-116, 118-120, 125, 126, 128, 138, 151, 175, 177, 187, 188, 206, 215-218, ... 227, 231, 233-235, 237, 241 | maintain ... 180 | |
| IRS ... 211 | | | maintained ... 134 | |
| issue ... 40, 52, 53, 65, 74, 97-99, 128, 133-135, 144, 146, 149, 153, 156, 169, 170, 173, 174, 188, ... 201, 215, 216, 218-220, 239 | | | make ... 28, 29, 32, 53, 54, 56, 59, 61, 64-66, 72, 74, 75, 79, 84, 86, 90, 100, 103, 110, 118, 129, ... 139, ... 146, 155, 164, 177, 181, 230, 232, 238, 239, 241 | meetings ... 28, 40, 42-44, 61, 198, 199, 204 |
| issued ... 15 | | | maker ... 161 | member ... 33, 64, 120, 174, 247 |
| issues ... 13, 14, 43, 157-159, 168, 169, 215, 219 | | lines ... 77, 119-121, 127, 215, 222 | making ... 36, 85, 117, 144, 145, 200, 219, 221 | members ... 44, 45, 189, 216 |
| Item ... 51, 122, 123, 155, 156, 197, 219, 220, 248 | **L** | liquid ... 231, 232 | man ... 7, 107, 161, 174 | memo ... 106 |
| items ... 74 | Labosky ... 214 | liquidated ... 71-75, 119, 141, 149, 156, 158, 171, 183, 207, 231 | manage ... 38 | memorandum ... 119, 121, 127 |
| iteration ... 154 | lack ... 210 | | managed ... 156 | memorandums ... 127 |
| **J** | ladies ... 59 | listed ... 14, 15, 82, 111, 122, 172, 177, 206, 214 | management ... 156 | memories ... 162 |
| Jacobs ... 166-168 | land ... 6, 7, 14, 17-19, 21, 27, 29, 37, 39, 45, 46, 48, 55, 76, 81-83, 113, 117-119, 121, 123, 131, 134, ... 135, 139, 143, 146-148, 162, 177, 186, 191-193, 208, 222, 223, 226 | literally ... 204 | manager ... 37, 38, 105, 107, 113, 115, 116 | memory ... 9, 17, 25, 34, 35, 51, 67, 94, 100-103, 123, 164, 165, 204, 209, 213, 216, 217, 219, 248... |
| January ... 36, 37, 39, 40, 42, 56, 79, 81, 84, 210, 238, 241-243 | | litigate ... 201-203 | managers ... 29, 126 | merger ... 229 |
| Jim ... 197-199 | | litigation ... 13, 33, 112, 203 | many ... 11, 13, 24, 40, 42, 80, 92, 190, 191, 198, 215, 246 | merits ... 203 |
| jive ... 83 | | litigator ... 10, 12 | | Messrs ... 99, 129, 136, 198 |
| job ... 7 | | lives ... 165 | map ... 167 | met ... 40, 44, 50, 54, 87, 88, 101, 166, 171, 196, 199, 214, 241 |
| John ... 12 | landholding ... 139 | loan ... 140, 150, 157, 184, 220, 222, 223, 226, 227, 239 | March ... 121, 232 | |
| join ... 14 | lands ... 76 | | Marilyn ... 45, 69, 71, 86, 158, 247 | |
| joining ... 245, 246 | Landvest ... 165 | loans ... 104, 120 | mark ... 18, 227 | method ... 215, 220 |
| joins ... 81 | language ... 60, 69, 74, 111, 154, 178, 181, 210 | lobbying ... 43, 209-212 | marked ... 15-18, 35, 37, 45, 49, 51, 64, 75, 79, 105, 124, 137, 154, 164-166, 191, 193, 209, 212, 228, ... 234, 238 | Michael ... 125, 214 |
| joint ... 81, 82, 163, 241, 246 | LaPointe ... 105, 116 | local ... 29, 197 | | Mike ... 59, 62, 125 |
| jointly ... 162 | large ... 161, 185 | located ... 146, 193 | | million ... 8, 9, 82, 94, 102, |
| Judge ... 114, 160, 175, 185 | larger ... 117 | long ... 11, 26, 97, 110, 168, 197, 202, 203, 218, 228, 229 | | |
| July ... 121, 234 | late ... 10, 11, 194, 212 | look ... 15, 17, 29, 37, 47, 55, 64, 71, 72, 74, 75, 81, 93, 109, 121-123, 125, 138, 139, 145, | | |
| June ... 121, 212, 213 | later ... 12, 68, 95, 98, 121, 169, 199, 216, 227, 229, 234 | | | |
| | latest ... 210 | | | |

Word ...... Page

103, 111, 113-116, 118, 127, 128, 175, 186, 230, 231, 233-235, 248
mince ... 128
minds ... 150, 187
minimum ... 143
Minor ... 110
minus ... 35, 106, 237
misled ... 215, 219
missed ... 130, 210
mission ... 188
misspelled ... 18
mistake ... 92
mistakenly ... 148
misunderstood ... 153
mixing ... 164
money ... 19, 53-56, 61, 69-75, 77, 78, 80, 81, 84, 85, 90, 95, 96, 102, 112-116, 118, 119, 121-123, ... 126-128, 135, 136, 139, 141-144, 149, 153, 156, 174, 175, 181, 182, 184, 186-188, ... 196, 200, 205, 206, 214, 215, 217-219, 221-223, 225-227, 230, 231, 233, 236-239...
monies ... 15, 79, 81, 182
month ... 157, 182
monthly ... 220, 232
months ... 40, 121, 208, 220
morning ... 57, 66, 82, 88, 89
mortgage ... 91, 93-99, 123, 127, 129-131, 133-136, 145-147, 152, 177, 178, 183, 186, 221
mortgagor ... 122, 123
Mosaic ... 27, 28, 93-95, 129, 134, 136, 140, 144, 145, 148, 170-172, 179, 184, 189-191, 207, 223-225, ... 230
mother ... 87
Motion ... 113, 119, 121, 163
motivated ... 25
mouth ... 221
move ... 76, 86, 145, 149, 170, 180, 236-238
moving ... 179, 194
much ... 34, 56, 78, 80, 84, 85, 97, 98, 119, 124, 143, 144, 160, 177, 206, 215, 218, 219, 223, 230, ... 231, 233, 236
multilateral ... 107
multiple ... 117
municipal ... 40, 42
municipalities ... 37
municipality ... 158

**N**

named ... 21
names ... 10
Nasson ... 12

national ... 7, 48, 81
nationally ... 230-232
natural ... 71
naturally ... 59, 154
near ... 22
necessary ... 53, 54, 57, 70, 73, 84, 86, 90, 111, 113, 117, 121, 139, 142, 201, 202, 217, 222, 241
needed ... 75, 85, 95, 98, 138, 157, 170, 196
negotiated ... 140
negotiating ... 172
neighborhood ... 24, 237
neither ... 86, 171
Nelson ... 45, 46
New ... 24, 115, 199, 228
nine ... 6, 104, 179, 199, 236, 237, 240
Nineteen ... 181
ninety ... 16
non ... 7, 14, 81, 153, 158, 167, 208, 243, 247
nor ... 125, 131, 158, 183
normal ... 72, 73, 118, 182, 211
Normally ... 32, 41, 42, 231
Norris ... 6, 16, 92, 99, 129, 136, 196-198, 215
northeast ... 7
notary ... 7
note ... 18, 19, 47, 64, 94, 96, 145, 160, 162, 177, 220, 221
noted ... 86, 146
notice ... 16, 17, 45
notified ... 87
noting ... 177
notion ... 147, 164, 184, 227
notwithstanding ... 140, 150, 245
numbers ... 177
Nutter ... 10

**O**

object ... 62, 116, 130, 133, 135, 146
objected ... 130-132, 164
objecting ... 133
Objection ... 8, 13, 14, 17, 19-22, 27-34, 36, 38-43, 47, 49-51, 53, 55, 57, 58, 61-63, 65, 68, 70-77, ... 79, 80, 82, 85, 86, 88-91, 97, 98, 109, 111, 112, 114-116, 123-130, 132, 134-136, ... 139-156, 158, 159, 165, 168, 170-174, 177, 179, 183-189, 191, 194, 195, 198, ... 201, 204, 207-212, 214, 217, 218, 220, 222-226, 234, 237, 239, 240, 242, 244-248
objections ... 6, 164

objective ... 42, 167
obligate ... 158
obligated ... 156
obligation ... 60, 71, 120, 122, 176, 177, 207, 208
obligations ... 71, 72, 94, 120, 241
obstacle ... 133, 170
obtain ... 116, 117, 209, 215
obtained ... 233
obtaining ... 72, 73, 179, 194, 219
occasionally ... 139
occasions ... 88, 101, 199
occupation ... 6
occur ... 29, 30, 42, 43, 68, 89, 90
occurred ... 35, 40, 42, 48, 51
occurring ... 31
occurs ... 29, 38
offer ... 236, 238, 239
offered ... 156
offers ... 236
office ... 7, 18-20, 23, 24, 26, 30, 41, 120, 126, 166, 197, 198, 204
offices ... 24
official ... 21, 44
officials ... 26, 39, 40, 42, 43, 73, 74
often ... 44
Old ... 6, 32, 87
onboard ... 140
one ... 19, 27, 31, 32, 40, 45, 48, 50, 52, 55, 56, 64, 70, 74, 78, 79, 83, 85, 87, 89, 92, 94, 95, 107, 117, ... 126, 127, 130, 137, 138, 140, 142, 143, 145, 151, 162, 166, 168, 172, 186, 190-192, ... 198, 208, 212, 214, 217, 221, 222, 235, 236, 241, 242
open ... 52, 54, 94, 95, 99, 137, 204
operation ... 15, 173
operations ... 120
opinion ... 186
opposed ... 89
option ... 98, 136
optional ... 178
ordain ... 34
order ... 37, 41, 44, 50, 84, 95, 96, 114, 122, 123, 155, 185, 215, 218, 231, 232, 236, 244
organization ... 7, 81, 128, 131, 139, 158, 233
organizations ... 38
organized ... 12, 19, 117
otherwise ... 76, 92, 110, 131, 142, 152, 192, 209, 243
outcome ... 34, 172, 190, 200, 243

outlined ... 51, 57, 74, 75, 224
outlines ... 73
overdrawn ... 115
overpaid ... 224
overpays ... 225
overruns ... 117, 118
overstated ... 216
own ... 79, 83, 114, 140, 142, 147, 150, 176-178, 180, 183-185, 187, 215, 219, 237, 238
owned ... 134, 229
owner ... 23, 24, 123
owners ... 241

**P**

P.M. ... 92, 136, 163, 197, 234, 248
Pabian ... 10
pace ... 216
paid ... 80, 98, 151, 156, 181, 182, 188, 217, 218, 220, 225
paint ... 186
pan ... 71
parcel ... 145, 146, 150-152, 157, 178, 186, 187, 193, 225, 236
parcels ... 55, 68, 70, 146, 151, 229
parentheses ... 150
park ... 43
participate ... 108
participating ... 67
particularly ... 228, 229
parties ... 92, 159, 163, 234, 242
partner ... 10, 11, 242, 244
partners ... 124, 241
partnership ... 235, 240-242, 245-247
partnerships ... 246, 247
parts ... 94, 156
passed ... 67
past ... 74, 150, 206, 216
path ... 169, 229
pausing ... 214
pay ... 69, 83, 90, 181, 182, 187, 201, 219, 221, 235, 239
payback ... 237
paying ... 113, 236, 239
payment ... 114, 195
payments ... 219, 220
pays ... 235
Pelletier ... 123, 125, 228
penalties ... 117
pendency ... 182
people ... 23, 24, 30, 42, 124, 149, 165, 190-192, 203, 212, 214, 224, 246
percent ... 82, 83, 89, 157, 167, 183, 220
percentage ... 161
perception ... 176, 177
perfect ... 180
perform ... 61, 156, 178, 239

Performance ... 52, 156, 157, 178
perhaps ... 11, 42, 95, 99, 148, 172, 210
period ... 34, 35, 40, 98, 199, 213, 214, 228, 232
permanent ... 241
permit ... 167, 169
permits ... 63, 157, 165, 169, 170, 173, 194, 195
Perry ... 49-52, 105, 106, 209-211, 238, 241
person ... 28, 32, 64, 65, 122, 134, 149, 192, 204
personal ... 183, 185
personally ... 92, 93
personnel ... 30
perspectives ... 144
Peter ... 21, 23, 25, 33-35, 86, 92, 137, 222, 226, 234
philanthropy ... 138
Phillips ... 12
phone ... 171
phrase ... 78
pick ... 91
picks ... 83
picture ... 35, 125
piece ... 22, 142, 164, 243
pieces ... 29, 83, 85, 94, 148, 159
place ... 7, 35, 43-45, 119
placed ... 133
Plaintiff ... 6, 16
plan ... 103, 104, 107, 109, 117, 138, 142, 167, 170, 176, 200, 206, 227, 229, 230
planned ... 28
planning ... 42, 81, 165-168, 221
play ... 241
played ... 171
players ... 198
pleased ... 189
plugging ... 228
pocket ... 200, 243
Pointing ... 15, 192
political ... 30, 44
polls ... 192
portion ... 130, 131, 133-135, 145, 147, 148, 185, 187, 224
portions ... 55, 69, 148
position ... 8, 11, 21, 105, 109, 118, 122, 140, 161, 162, 202-204, 212
positions ... 17
possibility ... 26, 29, 33, 36, 39, 42, 43, 71, 92, 93, 127, 128, 205, 208, 212, 213, 230
post ... 68
posts ... 52, 155
potential ... 22, 23, 29, 32, 34, 127, 129, 158, 159, 219
power ... 225

| Word ...... Page | Word ..... Page | Word ...... Page | Word ...... Page | Word .... Page |
|---|---|---|---|---|
| practice ... 10, 12, 13 | 113, 116, 117, 121, | 139-142, 144, 147-149, | receiving ... 94, 106, 166 | replicate ... 139 |
| practiced ... 13 | 126, 139, 141-144, | 151, 154, 155, ... 157, | recognize ... 49, 51, 137, 165 | report ... 7, 8, 35, 105 |
| practicing ... 13 | 156, 157, 170, 171, | 163, 164, 169, 170, | recognizes ... 211 | representation ... 39 |
| practitioners ... 185 | 183, 184, 187, ... 188, | 172, 177, 178, 180, | reconfiguration ... 151 | representations ... 87, 112, |
| pre ... 34, 167 | 190, 191, 199, 201, | 182, 183, 186, 189, | reconfigure ... 230 | 183 |
| precede ... 238 | 203, 205, 208, 211, | 194, 195, 197, 199, ... | reconstructed ... 203 | representative ... 166, 207 |
| prepared ... 105, 107, 160 | 213-217, 223, 224, | 200, 208, 215, 218, | recover ... 181 | representatives ... 29, 199 |
| present ... 6, 81, 82, 92, 136, | 227, 228, 230, 236, ... | 221, 222, 224, 226, | recovered ... 238 | request ... 130, 155, 211, 241 |
| 163, 198, 234, 247 | 243, 244 | 231, 232, 236, 237 | Red ... 22, 23, 35, 37, 68, 80, | requested ... 92, 117, 130, |
| presentation ... 28, 192 | projects ... 24, 29, 42, 70, | purchaser ... 63, 136 | 81, 109, 165, 187, 190, | 193 |
| presentations ... 28 | 77, 89, 104, 126, 139, | purchases ... 154 | 192, 193, 212-214, | requests ... 211 |
| presented ... 133, 156 | 141, 231, 233, 241 | purchasing ... 67, 74, 189 | 216-219 | require ... 58, 129, 144, 156, |
| Preservation ... 64, 65, 68, | prominent ... 203 | pursuant ... 119, 130 | redefining ... 152 | 168, 176, 177, 179, |
| 247 | promissory ... 145, 177, | pursuit ... 243 | redevelopment ... 151 | 180, 185, 195 |
| president ... 19, 108, 120 | 220, 221 | putting ... 105, 154, 190 | redraw ... 151 | required ... 60, 61, 96, 98, |
| prevail ... 203 | properties ... 85, 95, 190 | | reduced ... 199 | 113, 129, 151, 154, |
| prevent ... 31, 207 | property ... 8, 21-27, 29-31, | **Q** | reduction ... 147 | 166, 169, 180, 194, |
| prevented ... 129, 170, 179, | 33, 34, 36, 38, 52, 54, | Quarterly ... 232 | referenced ... 110, 111, 122, | 222, 232 |
| 190 | 67, 69-71, 73, 74, 76, | quarters ... 193 | 125, 138, 176 | requirement ... 55, 56, 68, |
| preventing ... 193 | 78, 79, 83, 87, 88, 91, | querying ... 164 | references ... 157, 206 | 145, 189, 246 |
| prevention ... 31 | 95, ... 96, 98, | questioning ... 146, 214, 215 | referencing ... 60 | requirements ... 57, 75, 156, |
| prevents ... 179 | 101-103, 107, 108, | quick ... 93 | referred ... 54, 55, 57, 61, 68, | 177 |
| previously ... 164, 216, 236, | 111-114, 119, 121, | quickly ... 76, 87, 181 | 93, 103, 104, 201, 206, | requires ... 176 |
| 240 | 126, 129, 130, | quintessential ... 161 | 215-218, 227 | requiring ... 133 |
| price ... 69, 78, 79, 91, 94, | 133-135, 139, 141, | quote ... 58, 68, 101, 109, | refers ... 55, 123, 124, 177, | resale ... 143 |
| 97, 137, 147, 154, 157, | 143, ... 145, 147, 154, | 111 | 183, 248 | reserve ... 6 |
| 177, 178, 182-184, | 155, 165, 167, 170, | quoting ... 155 | refine ... 204 | reserves ... 233 |
| 186, 195, 197, 199, | 171, 173, 180, 182, | | reflect ... 132 | resident ... 21, 165 |
| 200, 222-224, ... 226, | 184, 185, 189, 191, | **R** | reflected ... 225 | resolve ... 158, 159 |
| 236, 237 | 193, 199, ... 208-212, | raise ... 19, 55, 85, 113, 114, | reflects ... 211 | resolved ... 169 |
| print ... 155 | 220, 222, 224, 225, | 118, 119, 121, 127, | refreshed ... 84 | resources ... 172, 184, 219, |
| printed ... 64, 75, 180 | 229, 230, 232, | 139, 141, 188, 213, | refusal ... 37, 38, 40, 42, 43, | 244 |
| printout ... 75 | 235-237, 241, 243 | 217, 218, 241 | 45, 47, 50, 51, 53, 54, | respect ... 8, 22, 82, 91, 113, |
| Prior ... 26, 27, 29, 36, 37, | proposal ... 50, 205, 230, | raised ... 53, 55, 56, 80, 142, | 56, 57, 61, 64, 67, | 126, 127, 132, 136, |
| 40, 48, 72, 73, 84, 86, | 235, 237-240 | 146, 155, 215, 218-220 | 72-74, 82, 87, 97, 119, | 147, 153, 204 |
| 97, 143, 155, 158, 164, | proposed ... 25, 27, 68, 192, | raises ... 149, 156 | 154, ... 156, 158, 170, | responded ... 64, 66 |
| 171, 207, 223 | 238 | raising ... 54, 57, 61, 70-74, | 192, 193, 207, 217, | responding ... 81 |
| private ... 54-57, 61, 70, 71, | proposes ... 81 | 90, 109, 117, 122, | 225 | response ... 14, 101, 156, |
| 74-77, 109-111, 117, | proposing ... 199, 237 | 137-139, 170, 173, | refusing ... 217 | 157, 163, 211 |
| 122, 138, 188, | prospects ... 222, 227 | 174, 188, 213, 214, | region ... 7, 20, 24, 115 | responses ... 155, 162, 163 |
| 216-218, 227, 239, | protecting ... 191 | 216, 221, 222, ... 227, | Regional ... 7, 8, 45, 228 | responsibility ... 156 |
| 241, 243 | protection ... 191 | 239, 240 | registered ... 177, 208 | restating ... 210 |
| privately ... 44, 55, 85, 122, | provide ... 91, 130, 131, | range ... 16 | registration ... 16, 18 | restriction ... 26, 33, 212 |
| 215, 220 | 138, 176, 180 | rate ... 244 | regularly ... 24, 44 | restrictions ... 94, 206 |
| privilege ... 149 | provided ... 35, 64, 97, 243 | rather ... 25, 134, 136, 169, | rejected ... 230 | result ... 98, 104, 170, 171, |
| pro ... 124, 201-203, 209 | providing ... 117, 239 | 170, 186, 210, 211, | rejection ... 138, 230 | 190, 191, 197, 201, |
| problem ... 77, 97, 133, 168, | provision ... 37, 91, 97-99, | 230 | relation ... 44 | 208, 248 |
| 169, 229 | 145, 148, 149, 156, | re ... 165, 189, 209, 227 | relationship ... 177, 240, 246 | resulted ... 50, 97, 131, 171, |
| problematic ... 98, 143, 144, | 158, 176-178, | reach ... 86, 150 | relative ... 97, 220 | 189, 237 |
| 229 | 183-186, 207, 209 | reached ... 107, 149, 150 | relied ... 183 | resulting ... 23, 52, 155 |
| problems ... 78, 143, 168 | provisions ... 63, 97, 148, | reaching ... 87 | relief ... 168 | retain ... 130 |
| procedure ... 72, 182 | 151, 152, 159-161, | reaction ... 19 | rely ... 73, 75, 149, 158, 184, | retirement ... 100, 195, 196 |
| Procter ... 123, 124, 201 | 163, 172, 173, 177, | reader ... 61 | 207 | return ... 239 |
| produce ... 132 | 185, 186, 194 | reads ... 137, 166, 196 | relying ... 87, 117, 235 | reveal ... 164 |
| produced ... 131, 132 | prudence ... 72 | ready ... 61, 191, 233 | remain ... 46, 134 | revenue ... 233 |
| product ... 235 | prudent ... 142, 158, 188 | realize ... 135, 170, 171 | remained ... 99 | reviewed ... 125 |
| production ... 6, 51 | Public ... 6, 7, 14, 18, 21, | realized ... 100 | remaining ... 134, 135, 148, | reviewing ... 105, 217 |
| profess ... 62 | 27, 37, 45, 46, 48, 70, | realizing ... 75, 170 | 186, 224 | revising ... 151, 210 |
| professional ... 13, 204 | 73-77, 81, 113, | reason ... 13, 17, 22, 27, 65, | remains ... 144 | rights ... 37, 46, 94, 230 |
| profit ... 7, 14, 15, 20, 81, | 117-119, 121, 162, | 66, 69, 82, 83, 96, 112, | remind ... 36, 108, 126, 165 | ring ... 108 |
| 158, 208, 243 | 192, 193, 208, ... 241, | 114, 151, 164, 168, | renewed ... 118 | rise ... 246 |
| program ... 235 | 243 | 188, 190, 191, 195, | renovated ... 95 | risk ... 79, 156, 188 |
| progress ... 193, 200, 217 | purchase ... 27, 38, 39, | 205, 211, ... 214 | renovation ... 85, 143 | risks ... 156 |
| prohibit ... 116 | 52-54, 67, 69-71, 73, | reasonable ... 114, 140-142, | repaid ... 140, 234 | Road ... 6, 22, 23, 68, 165, |
| project ... 22-24, 29-32, 34, | 74, 78, 79, 84, 90, 91, | 227, 232, 239 | repair ... 196 | 187, 190, 193 |
| 35, 37, 38, 40, 42, 43, | 93-97, 102, 103, 107, | reasons ... 22, 27, 213, 222 | repay ... 222, 227, 236 | Rob ... 77, 108 |
| 48, 66, 67, 69, 70, 72, | 108, 111-113, ... 118, | receipt ... 157 | repaying ... 220 | Robert ... 77, 78, 108 |
| 75, 78, 79, 82, 83, 85, | 119, 121, 128, 130, | receive ... 55, 236 | replace ... 102 | ROFR ... 57 |
| 90, ... 97, 104-107, | 132, 136, 137, | received ... 16, 45, 49, 105, | replaced ... 142 | role ... 8, 14, 20, 41, 104, |
| | | 106, 118, 154, 212 | | |

| Word . . . . . . Page | Word . . . . . Page | Word . . . . . . Page | Word . . . . . . Page | Word . . . . Page |
|---|---|---|---|---|
| 162, 232 | 101, 139, 170, 171, | smelled ... 162 | stop ... 91, 114, 173, 197 | **T** |
| roles ... 241 | 237, 239 | smoke ... 186 | stopgap ... 140 | table ... 61, 75, 90, 143, 153, |
| room ... 59, 92, 99, 136, 164, | seller ... 61, 157, 172, 181, | snuff ... 95 | storefront ... 204 | 178, 205, 240 |
| 172, 174, 196, 198, | 186 | software ... 235 | storm ... 92 | takeout ... 139, 140, 142, |
| 204, 211, 215, 222, | selling ... 73, 239 | sold ... 27, 55, 68, 69, 85, | Stow ... 21, 25-28, 31-37, | 227 |
| 234 | sent ... 50, 51, 105 | 151, 173 | 41, 45, 49, 54, 56, 59, | taking ... 24, 93, 94, 179 |
| Ross ... 49-52, 105, 106, | sentences ... 81 | sole ... 87 | 64, 67, 71-74, 79, 81, | Talmadge ... 24, 25, 30 |
| 209, 210, 241 | separate ... 1, 18, 170, | somewhat ... 155 | 94, 113, 117, 119, 121, | tax ... 13, 147, 148, 208, |
| route ... 229 | 182, 229 | Sommerlad ... 164-168, 193 | 129, ... 137, 138, | 209, 235, 243 |
| rules ... 175 | September ... 83, 121, 137, | sought ... 99, 100, 111, 116, | 146-148, 154, 165, | taxpayers ... 192 |
| run ... 202 | 178, 222, 225, 227, | 210, 230 | 167, 189, 191-193, | teaches ... 240 |
| running ... 32 | 228 | source ... 54, 55, 70, 83, 103, | 205, 209, 212, 216, | team ... 99, 205 |
| Ruth ... 165, 167 | sequence ... 26, 50, 97 | 139, 143, 239 | 228, 245-247 | technical ... 210, 211 |
| | sequencing ... 166 | sources ... 54, 70, 71, 110, | straight ... 157 | teeing ... 96 |
| **S** | sequentially ... 10 | 111, 113, 122, 138, | Street ... 18, 204 | telephone ... 86, 101, 102 |
| sake ... 111, 230 | sequitur ... 153 | 139, 142, 143, 188, | strength ... 202 | telling ... 53, 54, 69, 73, 74, |
| salary ... 15, 16 | series ... 40 | 216, 220, 232, 241 | stretch ... 226 | 82, 88-90, 102, 103, |
| sale ... 29, 54-56, 61, 68, | serious ... 197, 201 | space ... 54, 94, 95, 137, 204 | strict ... 187 | 142, 195, 196, 209, |
| 70-72, 74, 84, 85, | services ... 209, 243 | span ... 11, 42, 43 | strike ... 9, 39, 50, 53, 83, | 213, 224 |
| 87-91, 93, 94, 96, 97, | set ... 104, 166, 183 | speaks ... 144, 172 | 121, 127, 144, 171, | ten ... 83, 104, 180, 191 |
| 103, 104, 117, 118, | seven ... 11, 19, 220 | special ... 36, 165, 167, 169 | 222 | tent ... 214 |
| 122, 128, 132, ... 135, | seventeen ... 181 | specific ... 56, 61, 79, 84, | strong ... 196, 202, 243 | tenure ... 20, 120 |
| 136, 140, 142, 144, | seventy ... 40, 42 | 104, 131, 217 | structure ... 83, 167, 196 | term ... 27, 34, 60, 63, 77, |
| 147-149, 151, 163, | several ... 88, 101-103, 124, | specifics ... 167, 204 | structures ... 94, 100 | 78, 97, 98, 151, 221, |
| 164, 169-172, 177, | 198 | spell ... 6, 12 | Stuckey ... 45-49, 56, 125 | 242 |
| 186, 194, 200, 207, ... | sewer ... 181 | spend ... 96, 203 | studied ... 240 | terms ... 38, 39, 50, 53, 54, |
| 215, 218, 220-222, | Shall ... 20, 145, 150, 157 | spending ... 186, 233 | study ... 194 | 58-63, 73, 78, 87, 94, |
| 224, 227, 229, 237-239 | shape ... 151 | spent ... 139, 217, 243, 244 | subdivide ... 55, 83, 143, 229 | 98, 104, 119, 132, 136, |
| sales ... 55, 94, 188 | share ... 15 | split ... 94 | subdivided ... 118 | 148, 152-154, 158, |
| satisfactorily ... 6 | shared ... 134, 160 | spoken ... 132 | subdividing ... 170 | 159, 172, ... 177, 180, |
| satisfy ... 140 | sheet ... 231 | spring ... 196, 199 | subdivision ... 143-145, | 199, 218, 222, 224, |
| Saved ... 199 | shoes ... 58, 60, 140, 152, | Springvale ... 12 | 151-153, 165-170, 173, | 231 |
| savings ... 233 | 153, 179, 244 | squeaky ... 233 | 174, 222, 223, 226, | testimony ... 22, 33, 40, 61, |
| saw ... 112, 162, 191, 196 | shortly ... 87, 93 | stability ... 87 | 229 | 66, 79, 80, 88, 89, 92, |
| scale ... 63, 185 | showed ... 217 | staff ... 243, 244 | subdivisions ... 173 | 97, 113, 115, 116, 121, |
| scheduled ... 44 | side ... 78, 83, 119, 241 | stage ... 238 | submission ... 157, 166 | 132, 133, 140, 141, |
| school ... 12, 240 | sides ... 64 | stake ... 242-244 | submitted ... 106, 119 | 152, ... 164, 171, 179, |
| scope ... 29, 71, 72 | sidewalk ... 205, 206 | stamp ... 35, 105, 193, 219 | subsequent ... 91, 248 | 185, 190, 194, 195, |
| scopes ... 29 | sign ... 9, 48, 110, 245 | standing ... 63, 109, 243 | subsequently ... 32, 165 | 204, 212, 213, 221, |
| scoping ... 29, 30, 32, 171 | signature ... 6, 49, 51, 106, | stands ... 100 | substantial ... 147, 228 | 224, 225, 228, 232, |
| second ... 15, 19, 20, 36, 41, | 137 | stapled ... 45 | substantiated ... 239 | 233 |
| 45, 51, 55, 64, 67, 70, | signed ... 45, 46, 122, 212 | start ... 6, 95, 131, 148, 159, | substantively ... 110 | textual ... 61 |
| 75, 85, 106, 107, 121, | significance ... 123 | 208 | subtract ... 226 | theoretical ... 147 |
| 145, 166, 167, 191, | significant ... 17, 137, | started ... 151 | subtracted ... 84 | thereabouts ... 19, 93 |
| 192, ... 235, 243 | 147, 200, 216, 218 | state ... 6-8, 12, 14, 17, 20, | successful ... 193 | therefore ... 48, 90, 135, 141, |
| Secretary ... 14, 17, 20, 21 | signing ... 140 | 21, 47, 49, 54, 79, 99, | successfully ... 188 | 151, 182, 187, 224 |
| sections ... 37 | Simmons ... 192 | 100, 102, 104, 115, | suffer ... 156 | thereof ... 98 |
| secure ... 76, 123, 243 | simple ... 161 | 116, 120, 123, 206, | sufficient ... 117, 118, 203, | these ... 10, 35, 42, 43, 50, |
| secured ... 177, 178, 184 | simply ... 151, 188, 192, | 212, 223, ... 232 | 219, 232, 243 | 57, 64, 78, 82, 83, 85, |
| security ... 145, 150, 157 | 222, 240 | statement ... 66, 82, 83, 113, | suggested ... 159 | 89, 104, 118, 139, 141, |
| see ... 14, 15, 18, 20, 35-37, | single ... 87, 88, 101, 118, | 122, 174 | suggests ... 35, 103, 138, 181 | 163, 176, 181, 188, |
| 46, 47, 51, 54, 55, 66, | 246 | statements ... 51, 112, 117, | suit ... 52, 155 | 191, ... 192, 198, 211, |
| 82, 83, 106-109, 111, | sit ... 57, 81, 82, 88, 89, 91, | 163, 167, 187, 202, | sum ... 85, 102, 135 | 212, 214, 228, 235, |
| 114, 117-119, 121-125, | 112, 120, 150, 151, | 231 | summary ... 73 | 236, 247 |
| 131, ... 138, 145, 150, | 190, 195, 218, 219, | stating ... 197 | summer ... 199, 206, 228, | third ... 33, 37, 45, 83, 150, |
| 158, 160, 167, 173, | 223, 225, 226 | status ... 120, 207-209, 243 | 229 | 222, 225, 235, 236, |
| 177, 210, 220, 234, | site ... 75, 124, 170, 196, | statute ... 185 | Sun ... 127 | 247 |
| 236, 245 | 206, 217 | statutes ... 117 | supervisor ... 12 | thirds ... 76 |
| seeing ... 28, 106, 112, 165, | sitting ... 233 | stay ... 109 | supply ... 191 | thirteen ... 180 |
| 213 | situation ... 32, 166, 181, | stayed ... 134 | Support ... 119, 121, 211 | thirty ... 24, 186 |
| seek ... 126 | 248 | stenographer ... 175 | supporting ... 87 | thorough ... 194 |
| seeking ... 51, 153, 167, 229 | six ... 11, 111, 113-116, | step ... 99 | supposed ... 93 | thousand ... 9, 16, 56, 69, 84, |
| seen ... 15, 16, 21, 35, 45, | 118, 121, 127, 128, | stepped ... 119, 152, 153 | surmised ... 134 | 94-96, 100, 127, 129, |
| 46, 66, 154, 192, 213, | 175, 176, 233, 234 | stepping ... 244 | surprise ... 98, 204 | 137, 138, 143, 145, |
| 231, 241 | Sixteen ... 181 | steps ... 58, 60, 140, 179, | surprised ... 19, 20, 195, 214 | 147, 150, 152, 177, |
| sees ... 128 | Sixty ... 123 | 207 | surrounding ... 23, 215 | 220, 221, ... 235-238, |
| Selectmen ... 28, 37, 41, | skids ... 145 | Stewart ... 202 | survives ... 223 | 240 |
| 44-47, 52-54, 81, 82, | skimmed ... 86 | stipulations ... 6 | swinging ... 205 | thousands ... 113, 119 |
| 191-193, 210-212, 241 | small ... 8, 9, 64, 216 | stock ... 238 | sworn ... 6 | threatened ... 197 |
| sell ... 55, 69, 84, 85, 88, | | | | |

| Word ...... Page | Word ..... Page | Word ...... Page | Word ...... Page | Word .... Page |
|---|---|---|---|---|
| threatening ... 200 | 213-221, ... 223, 224, | update ... 193 | whole ... 29, 43, 44, 52, 61, | |
| three ... 11, 18, 45, 55, 71, | 227, 230-233, | upset ... 216-219 | 74, 106, 144, 187, 220 | |
| 74, 75, 85, 94, 95, 100, | 235-238, 241, | urge ... 192 | Wilbur ... 198, 204-206, 247 | |
| 119, 137, 138, 143, | 243-248 | usable ... 152 | Wildlife ... 11 | |
| 169, 173, 193, 212, | traditional ... 122 | uses ... 232 | will ... 52, 57, 63, 64, 92, 93, | |
| 228, 235-237... | trained ... 10 | using ... 34, 62, 69, 76, 78, | 95, 101, 102, 104, 108, | |
| throw ... 233 | transaction ... 142, 182, | 88, 89, 98, 104, 108, | 130-132, 139, 146, | |
| Thursday ... 6 | 183, 241 | 214-216, 231, 242 | 152, 155-157, 160, | |
| thus ... 170 | transactional ... 29 | utilize ... 91, 110, 111, 138, | 167, 174, ... 175, 192, | |
| tie ... 203 | transfer ... 135, 154, 157, | 142 | 204, 205, 211, 222, | |
| timbers ... 196 | 186, 248 | utilized ... 104, 181 | 243, 247 | |
| time ... 6, 19, 23-25, 29, | transferred ... 134, 186 | utilizing ... 113, 126, 127, | William ... 53 | |
| 32-35, 42, 43, 47, 54, | trial ... 6 | 133 | willing ... 93, 94, 152 | |
| 60, 66, 68, 73, 76, 78, | troubled ... 78 | | win ... 201-203 | |
| 84, 85, 87, 94, 96-98, | truly ... 158, 159 | **V** | winter ... 26 | |
| 102, 103, ... 108, 110, | Trust ... 6, 7, 14, 18, 21, 37, | Valerie ... 24, 25, 30 | wish ... 25 | |
| 116-118, 123, 126, | 45, 46, 48, 81, 113, | validity ... 185 | withdraw ... 119, 120 | |
| 127, 131-133, 140, | 117-119, 121, 127, | value ... 147, 153, 225, 226, | withdrawn ... 115 | |
| 143, 144, 157, 160, | 162, 192, 193, 205, | 243 | witness ... 60, 110, 131-133, | |
| 167, 170, 174, ... 178, | 208 | variables ... 104, 121 | 136, 160, 161, 175, | |
| 180-182, 185, 188, | truthful ... 86 | variance ... 164, 166, 169, | 234 | |
| 197, 199, 206, 210, | turn ... 109, 177, 196, 206 | 230 | witnesses ... 92 | |
| 213, 214, 217, 220, | turned ... 130, 131 | variances ... 151, 153, | woman ... 87, 88, 101, 207 | |
| 221, 228-232, 244... | twelve ... 180 | 164-166, 168-170, 194, | word ... 18, 76, 81, 83, | |
| times ... 44 | Twenty ... 24, 183 | 195, 228-230 | 88-90, 102, 111, 202, | |
| Timing ... 76, 77 | two ... 9, 10, 50, 51, 55, 56, | vehement ... 202 | 241, 242 | |
| title ... 7, 107, 173, 176, 180 | 65, 66, 68, 69, 71, 74, | venture ... 241, 246 | words ... 22, 23, 28, 52, 55, | |
| today ... 16, 19, 81, 88, 89, | 76, 84, 85, 90, 91, 94, | verify ... 21 | 69, 91, 114, 126, 128, | |
| 91, 97, 110-113, 115, | 117, 140, 142, 143, | versus ... 164, 217, 223 | 129, 139, 151, 155, | |
| 116, 120-123, 146, | 146, 168, ... 183, 192, | via ... 43, 122, 142 | 173, 184, 186, 190, | |
| 150, 151, 172, 182, | 199, 212, 229, 234, | view ... 77, 79, 98, 142, 167, | 203, 221, ... 237 | |
| 195, 204, ... 217-219, | 236-239, 241, 246 | 188 | work ... 6, 14, 18, 37, 61, | |
| 221-223, 225, 226, | types ... 163, 231 | viewed ... 200, 223, 224 | 64-66, 70, 97, 104, | |
| 229, 232, 233 | typically ... 211 | vital ... 76 | 123, 124, 128, 133, | |
| Tom ... 248 | | vote ... 47-49, 67, 68, 94, | 135, 140, 141, 148, | |
| took ... 13, 35, 44, 45, 203, | **U** | 192 | 165, 196, 211, ... 212, | |
| 204, 240 | ultimate ... 136, 139, 143 | voted ... 46-49, 64, 67, 96 | 235, 236, 246 | |
| top ... 154, 192 | unable ... 113, 114, 119, | votes ... 64, 66 | worked ... 10, 11, 13, 89, | |
| topic ... 51 | 121, 127 | | 123, 124 | |
| total ... 95, 102, 220 | unacceptable ... 129 | **W** | working ... 25, 70, 105, 122, | |
| touched ... 162 | unavailable ... 76, 110, 111, | Wainwright ... 107-111, 114, | 169, 186, 208, 242, | |
| towards ... 143, 214 | 122, 129, 138, 142 | 115, 118, 120, 126, | 243 | |
| Town ... 21, 25-43, 45, | unbridgeable ... 75 | 127, 188, 206, 234 | works ... 7, 18 | |
| 49-52, 54-56, 59, 61, | uncertain ... 167, 227 | Wait ... 116, 161 | worried ... 206 | |
| 64, 66, 67, 69, 71-74, | unclear ... 33 | waivers ... 167, 168 | worry ... 74, 89 | |
| 79, 81, 84, 85, 90, 94, | undergrad ... 12 | walk ... 174, 175, 201 | worth ... 222, 223, 226 | |
| 96-98, 105-107, ... 109, | underlying ... 158 | walked ... 201 | wrestle ... 98 | |
| 111, 113, 119, 121, | understood ... 60, 157, 159, | walking ... 141 | wrestled ... 169 | |
| 129-138, 143, 146-148, | 179, 185 | Walter ... 12 | Wrigley ... 53, 107, 210 | |
| 151, 154-157, 159, | undertake ... 14, 30 | waned ... 228 | wrinkle ... 94 | |
| 166, 186, ... 187, 189, | unfair ... 188 | warrant ... 67 | write ... 122, 210, 211 | |
| 191, 192, 198, 207, | unfamiliar ... 17 | warranties ... 183 | writing ... 147, 165, 209, 246 | |
| 209, 210, 212, 216, | unhappy ... 190, 191 | water ... 181, 191 | written ... 108, 110, 192, | |
| 217, 220, 224, 226, | unilaterally ... 152 | waved ... 205 | 242, 245, 246 | |
| 230, 235-237, ... | uninterested ... 94, 96 | ways ... 29, 31, 142, 188 | wrote ... 59-61, 226 | |
| 240-248 | uninterrupted ... 129 | weak ... 227 | | |
| townspeople ... 192 | Union ... 18 | Web ... 75, 124, 206, 217 | **Y** | |
| TPL ... 7, 8, 14-26, 28-31, | unit ... 117 | week ... 49 | year ... 19, 35, 42, 83, 87, | |
| 33-35, 37-40, 42, 43, | units ... 100, 117, 143, 239 | weekly ... 232 | 214, 232, 233, 244 | |
| 46-55, 57, 58, 60, 61, | unless ... 70, 93, 123, 130, | weeks ... 228 | yearly ... 232 | |
| 64-66, 69-71, 73-84, | 152 | Werlin ... 10 | years ... 11, 19, 83, 92, 226, | |
| 86, 87, ... 89-91, 96, | unlikely ... 144, 188 | whatsoever ... 237 | 227 | |
| 97, 99, 102-116, | unquote ... 58 | whereby ... 63, 235 | yelling ... 205 | |
| 119-127, 130, 132-136, | unravel ... 247 | WHEREUPON ... 16-18, 35, | Yup ... 122, 219 | |
| 138-143, 146, 148-159, | unsecured ... 227, 233 | 45, 49, 51, 64, 75, 79, | | |
| 161-163, ... 169-173, | unsigned ... 51 | 105, 124, 137, 154, | **Z** | |
| 176, 178-181, 183, | untenable ... 228 | 164, 166, 191, 193, | ZBA ... 167 | |
| 184, 186-189, 191-193, | untrue ... 117, 223 | 209, 212, ... 228, 234, | zero ... 177, 233 | |
| 197-201, 203, 206-211, | unusual ... 24 | 238, 248 | zoning ... 166-169 | |
| | unwise ... 227 | Whitney ... 7, 8 | | |

July 27, 2003

Craig MacDonnell, State Director
The Trust for Public Land
33 Union Street, 4th Floor
Boston, MA 02108

Dear Craig:

We are writing to you at this critical juncture in the Kunelius Farm project to reaffirm the partnership that we have enjoyed with TPL. As we come closer to the September closing we have been faced with a few unexpected hurdles. We have already been able to overcome several hurdles in this project and we look forward to taking on the current challenges – locked arm in arm with TPL. The partnership we enjoy requires that we work together and explore all of our options.

The two main hurdles that remain to complete this complicated project are the variance to sub-divide the 144 property and fundraising the balance of the budget.

Let's Start with the Variance:
You have requested an extension of the variance process which we understand has been strongly supported by the Town's counsel – Jake Diemert. We anticipate that this extension will be granted. At our meeting with you last Monday there was a good discussion of the merits of various agreements and challenges that we could make about the variance. With the additional time, it seems as though a methodical step by step case can be made to educate the ZBA as to why the variance requested is grantable and to bolster and strengthen our current case for the variance we have requested. This includes dissecting the options suggested by Jake and others in Town that we feel are not reasonable.

While not specifically called out as one of the identified statuatory hardships, it is important that the Board consider the maintenance of the agricultural use when granting the variance. The fact that this IS the only available option for maintaining the agricultural use while providing conservation land to the town seems to be an argument that has not been sufficiently focused on. We should emphasize that the variance, if granted will not be the same as 1) allowing a change of use or change of lot dimensions that is offensive to abutters nor 2) does this request represent a change of use. The key to our success is that our effort is to 1) maintain existing agricultural use, 2) apply restrictions to prevent future change of use and 3) preserve an existing farm. It is our no change-of-use goal that differentiates previous situations and decisions that have come before the board.

Mr. Diemert also needs to realize that this project is being done in partnership with the town. In his role as counsel to the Board of Selectmen he needs to be working with TPL and the Board to come up with zoning solutions for this project. FORA is also trying to

find out if there is someone that would be helpful in bringing our views on the variance to Jake. Someone he knows that has worked with him successfully.

The bottom line is that we have no reason to give up on the variance!!

## Fund Raising:

The other big hurdle is fund raising. The timetable for fundraising has always been in dispute and it is clear that several other project hurdles did not help our fundraising efforts. The project and its configuration always required that we fundraise outside of the Stow area. While the timetable for completing overall fundraising by September may be desirable, neither FORA nor the TPL fund raising staff have ever agreed that this timetable is at all feasible, and it is not.

The fact that FORA has fund raising experience within the group should be seen as an asset and not be blamed for the lack of attention and the poor timing of various aspects of this project. We do not feel that the lack of fundraising attempts make it any more likely that our key funders can afford any additional support. We should try to raise funds from foundations and individuals. The chances of having 100% of the fundraising completed by September '03 were never good and they became worse when the decision was made to delay fundraising efforts until various project pieces were in place.

The current strategy of not soliciting donors except for current funders (RAF and SCT) is not exercising all of our options. There has always been a need to wait for certain things to occur before fundraising could commence and a conflicting urgent need to show results from fundraising and these dates have been collapsing in on each other. So what can we do? Let's revisit the project budget one more time (see attached).

We have the following options that should all be explored:

• Participate in the critique of the grant to find out why it was rejected and re-submit.
• Send out project proposals for funding open space, affordable housing and equine sources.
• Pursue short term financing sources that have been developed or others.
• Consider market based alternatives for the 142 property.

FORA does not agree with the TPL conclusion that "the money isn't there". We suggest that TPL explain to their Board that other hurdles have prevented their fundraising from beginning and that a combination of financing and fundraising will keep the project moving forward to a successful conclusion in 2004. We have commitments for 2/3rds of the budget from all sources. This is a success not a failure in these economic times.

## Kunclius

FORA does not believe that it is necessary to renegotiate a lower price with the seller. TPL should live up to its promises to the town and to the seller. The variance issue does

EXHIBIT E

point to the seller needing to agree to move back the closing date. This should be pursued.

## The Consequences of Termination

What if we quit now? There are several large downsides to the termination of the contract and TPL ending their commitment to the project. The messages sent to the citizens of Stow and other Towns in Massachusetts will be felt for many years to come. There has been significant press coverage of the project and many will be struck by the news that it is not going forward. The skeptics will be proven right and they will relish that all of the statements made about never backing out were made in vain. Eye of the Storm may not find a suitable location within Stow and the long tradition of animal humanitarianism on Red Acre Road will not continue. If spurious lawsuits are made against the town, TPL should realize that this will be combined with the news this week that the town manager has told the Board of Selectmen that the town will be $1.5 million in the red. This project will be blamed for the lawsuits that will appear as new financial hardships for a financially beleaguered town. Not to mention that it reinforces a practice of making it easier to develop agricultural property than to conserve open space. On principal, TPL should fight this battle for that very reason alone.

## Conclusion:

The Kunelius Farm Project is very close to success, and we need to work together to make the final push. We need to first fight the variance in a methodical manner and on both legal and political fronts. We need to maintain our relationship with the seller and be ready to explore both challenging the decision and coming up with new plot configurations if the variance is denied. Finally, we need to send out solicitations for funding and explore all fundraising options.

                    TPL's Kuneilus Farm Project Partners
                    The Friends of Red Acre (FORA),

Subj:     RE: thought on fund raising
Date:     Wednesday, July 23, 2003 9:17:46 AM
From:     Peter.Christianson@lahey.org
To:       Karen_Sommerlad@harvard.edu, SFandPC@aol.com,
          cobb@fas.harvard.edu, michael_labosky@harvard.edu,
          enilsson@caregroup.harvard.edu, Hemmacher@aol.com

bcc:

They already used several of the contacts that I provided for other projects while at the same time telling their staff to hold off on fund raising for this project.  I feel raped.

The false paradigm here is that they are implying that they are limited to the prospect pool I generated.  The fact is that there are plenty of more prospects, and they need to identify and solicit them.

In my July 3 conversation with Craig, he explicitly told me that TPL intended to do zero fund raising, and that FORA was responsible for 100% of it and/or financing no later than the closing in September or TPL would have to pull out.  This is tantamount to challenging me to a duel.  Since I do not participate in duels, I will simply ignore this ridiculous, outrageous, insulting set of demands.  My position is non-negotiable, because it is the only path to success.  His demand is either a poison pill or simply juvenile.

I have held off on fund raising for the EOS prospects for several reasons:
1. Craig told me to wait
2. I did not want to risk my relationships while he was threatening to pull out
3. The timing was not right
4. I received no feedback from TPL on the proposal template
5. TPL was not doing anything whatsoever on fund raising, and I did not want to set a precedent
6. Sheila asked me to participate in a committee to raise funds from individuals, and I agreed.  Committee has not yet been convened, apparently because Craig told her to hold off.

Added to that list is now the idea that, if I do fund raising beginning now, and

FURMAN0087

TPL uses lack of funds as an excuse to pull out, it will characterize my efforts as having failed. I was just a leutenant all along, and I am not the one who should fall on his sword. Even as recently as the RAF board meeting, Craig specifically, publicly said that we had not raised more money because I had not followed up as promised. This is an evil strategy, and my response is now as follows:

Until TPL sends out proposals FORA will not.
If there is one more ultimatum from TPL, then I am completely finished helping with fund raising.

Whereas the timeframe for raising money had previously been stipulated as needing to last through the end of 2004, I now estimate that it will be through the end of June 2004, because nothing has happened during the first six months of 2003.
TPL is 100% responsible for financing.
RAF and SCT are off limits for future solicitation.

When Craig said we had done nothing, he omitted the following:
RAF $125,000 (more than 4x larger than any previous RAF gift)
SCT $100,000 (largest investment to-date)
Black Creek $20,000 (first two grant made in the history of the foundation)
Individual contributions $11,500
Total raised by FORA (incl. EOS input) $256,500

Total raised by TPL zero
Total number of proposals generated by TPL zero

Recap of budget
$200K sale of house
$400K CPC (primary liaison with Bob Wilber = PRC)
$256K fund raising

total raised to date $856K

-----Original Message-----
From: Karen Sommerlad [mailto:Karen_Sommerlad@harvard.edu]
Sent: Tuesday, July 22, 2003 11:38 AM
To: SFandPC@aol.com; David Cobb; michael_labosky@harvard.edu;

Christianson, Peter; enilsson@caregroup.harvard.edu; Hemmacher@aol.com
Subject: thought on fund raising


I'm a little slow when it comes to this stuff (you all probably thought of this a long time ago) but I think that the whole push back on the fund raising thing presented last night is because TPL doesn't want to use their contacts, or the contacts that Peter gave them, for our piddly ass project.  They want to hoard them for their larger sexier projects.



Karen Sommerlad
Harvard Planning + Allston Initiative
1350 Massachusetts Avenue, 912 Holyoke Center
Cambridge, MA   02138
voice:617-495-0995   fax:617-495-0559




See our web page at http://www.lahey.org for a full directory of Lahey sites, staff, services and career opportunities.

THIS MESSAGE IS INTENDED FOR THE USE OF THE PERSON TO WHOM IT IS ADDRESSED. IT MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If you are not the intended recipient, your use of this message for any purpose is strictly prohibited. If you have received this communication in error, please delete the message and notify the sender so that we may correct our records.

FURMAN0089

EXHIBIT G

Volume: I
Pages: 1-176
Exhibits:  7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11697-GAO

MARILYN KUNELIUS,

          Plaintiff,

v.

TOWN OF STOW, separately,
A PARTNERSHIP OF UNKNOWN NAME
BETWEEN TOWN OF STOW and THE
TRUST FOR PUBLIC LAND, separately,
and CRAIG A. MacDONNELL, in his
individual capacity,
          Defendants.

          DEPOSITION of SERENA FURMAN, a witness

called by and on behalf of the Plaintiff, taken

pursuant to the Fed.R.Civ.P. 30, before Roberta

J. Daniels, a Court Reporter and Notary Public

within and for the Commonwealth of Massachusetts,

at the Law Offices of Michael C. McLaughlin, One

Beacon Street, Boston, Massachusetts  02108, on

Tuesday, April 3, 2007, scheduled to commence at

10:00 A.M.

*MELVIN LIPMAN COURT REPORTING*
*101 Tremont Street, Suite 700*
*Boston, Massachusetts  02108*
*617-227-3985*

EXHIBIT G

2

A P P E A R A N C E S


Michael C. McLaughlin, Esquire
Law Offices of Michael C. McLaughlin
One Beacon Street, Suite 3333
Boston, Massachusetts  02108
          Counsel for the Plaintiff


Deborah I. Ecker, Esquire
Brody Hardoon Perkins & Kesten, LLP
One Exeter Plaza
Boston, Massachusetts  02116
          Counsel for Defendant Town of Stow


Patricia M. Murphy, Esquire
Goodwin Procter, LLP
Exchange Place
Boston, Massachusetts  02109
          Counsel for Defendant The Trust for Public Land


James B. Conroy, Esquire
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd floor
Boston, Massachusetts  02108
          Counsel for Defendant Craig A. MacDonnell


Also present:

Lucie DeBellis, Paralegal
Law Offices of Michael C. McLaughlin

EXHIBIT G

3

I N D E X

| Witness | D | C | RD | RC |
|---------|---|---|----|----|
| SERENA FURMAN | 5 | | | |

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

4

E X H I B I T S

| No. | Description | Page |
|-----|-------------|------|
| 1 | Subpoena | 6 |
| 2 | Kelleher e-mail to Kennedy, 1-29-03 | 21 |
| 3 | Jacobs e-mail to Sommerlad, 2-6-03 | 24 |
| 4 | FORA letter to Town of Stow, 6-6-03 | 39 |
| 5 | TPL letter to Kachajian, 9-9-03 | 53 |
| 6 | DHCD notice of intent, 9-23-03 | 145 |
| 7 | TPL letter to Perry, 2-11-03 | 161 |

1                    P R O C E E D I N G S

2                                        Tuesday, April 3, 2007

3                                               10:11 A.M.

4                MR. McLAUGHLIN:  We will stipulate to

5         the same stipulations, reserve all objections

6         till the time of trial, except as to form.  Is

7         that agreeable to all counsel?

8                    MS. MURPHY:  Yes.

9                    MS. ECKER:  That's fine.

10                   MR. CONROY:  Yes.

11              SERENA FURMAN, first having been

12        satisfactorily identified by the production of a

13        Massachusetts driver's license and then duly

14        sworn, on oath, deposes and says as follows:

15                        DIRECT EXAMINATION

16        By MR. McLAUGHLIN:

17   Q    Good morning.

18   A    Good morning.

19   Q    My name is Michael McLaughlin.  I represent

20        Mrs. Kunelius in this matter.  Could you please

21        state your name for the record?

22   A    Serena Furman.

23   Q    And could you spell that, please?

24   A    S-E-R-E-N-A  F-U-R-M-A-N.

1    Q    And it's Ms. Furman?  Should I refer to you --

2    A    Serena is fine.

3    Q    Serena, okay.

4                    (WHEREUPON, Exhibit No. 1, subpoena,

5         marked for identification.)

6    Q    Serena, are you here today as a result of receiving a

7         subpoena from my office?

8    A    Yes.

9    Q    And is this the subpoena that you received or a copy

10        of it?

11   A    Yes.

12   Q    So, we've marked that as Exhibit 1.  I've already done

13        that.  Could you just briefly give me your educational

14        background?

15   A    I am a graduate of Middlebury College.  I only carry

16        an undergraduate degree.  I've done some advanced

17        degree work related to my profession, but I don't have

18        an advanced degree beyond that.

19   Q    What is your profession?

20   A    I'm a project manager for museum design.

21   Q    And what's the name of the company?

22   A    Christopher Chadbourne & Associates.

23   Q    Is that an architect?

24   A    It's a museum design firm.

7

| | | |
|---|---|---|
| 1 | Q | And what's the scope of the project manager's work? |
| 2 | A | Well, it's similar to construction.  I think that's |
| 3 | | the best way to put it.  I'm overseeing projects that |
| 4 | | range between three and seventeen million dollars all |
| 5 | | over the country, and I'm part of a team that has, you |
| 6 | | know, graphic designers, exhibit designers, draftsmen, |
| 7 | | and I am the one who is running the numbers and |
| 8 | | keeping the client happy and everything else that |
| 9 | | construction managers do and having interesting |
| 10 | | conversations with people in the field. |
| 11 | Q | Where do you live? |
| 12 | A | Stow, Massachusetts. |
| 13 | Q | And are you an abutter of Mrs. Kunelius? |
| 14 | A | Yes, I am. |
| 15 | Q | And are you married? |
| 16 | A | Yes. |
| 17 | Q | What is your husband's name? |
| 18 | A | Peter Christianson. |
| 19 | Q | And what does Mr. Christianson do for a living? |
| 20 | A | He's currently a freelance consultant, but what he |
| 21 | | does is non-profit fund-raising, corporate and |
| 22 | | foundation relations. |
| 23 | Q | I could tell from looking at these documents that |
| 24 | | someone knew what they were doing.  How long have you |

1          lived in Stow?

2     A    I think we've been in that house somewhere between

3          nine and twelve years.  He's always better at

4          remembering.  We didn't live far from there before.

5          We lived in Maynard before that for eight years.  So,

6          we've been in the community for a while.

7     Q    Prior to being in the project management business for

8          museum construction, what else have you done?

9     A    I was an exhibit designer for the previous twenty-four

10         years.

11    Q    And that means an exhibit at museums?

12    A    Yes.  I had my own company for seven years,

13         freelanced.  Prior to that, I was at the National

14         Heritage Museum in Lexington, Mass., for eight years,

15         and I was at the New England Aquarium prior to that

16         for eight years.

17    Q    At some point, did you become aware that Mrs. Kunelius

18         was thinking about selling her property?

19    A    I don't know if I knew prior to a for sale sign going

20         up on the street.  I don't recall.

21    Q    But you do recall a for sale sign up?

22    A    Yeah.

23    Q    And at some point, did you come to understand that

24         Mrs. Kunelius had signed a purchase and sale agreement

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

9

1    with Co-housing Resources, Inc., which is also called

2    Mosaic Commons?

3    A    Yes, but, again, I don't quite recall how I found that

4    out.

5    Q    Are you familiar with a group called Friends of Red

6    Acre?

7    A    Yeah, really, what it was is, when the idea was formed

8    that there might be an alternative to this purchase

9    because the town had a right of first refusal, two or

10    three of the neighbors got together and we went and

11    talked to everybody on the street to see how they felt

12    about it.

13    Q    And when you say everybody on the street, you're

14    referring to Red Acre Road?

15    A    I think we did Red Acre Road and South Acton Road and

16    a few people on Tuttle.

17    Q    And did you have a concern about the plan for

18    development of the Kunelius property as evidenced by a

19    purchase and sale agreement?

20    A    No, I didn't understand what that development looked

21    like.  I think that happened later, but because there

22    was an opportunity for right of first refusal, I think

23    I saw an opportunity for not losing a farm on the

24    street and providing an opportunity for Eye of the

1           Storm to have a permanent place -- they're on a rent

2           basis -- in Stow.

3   Q   And what is Eye of the Storm?

4   A   It's an equine rescue organization.

5   Q   And did you have some affiliation with Eye of the

6           Storm?

7   A   Not beyond reading at the post office that they were

8           looking for donations for a sale at the Bolton Fair,

9           and I gave them some riding equipment to sell at the

10          Bolton Fair, but that's how I became aware of them

11          because they have a very low profile in the town.

12          Because they are dealing with rescued animals, they

13          don't want people walking in off the street, and so

14          they have a very low profile in the town.

15  Q   Are you an equestrian yourself?

16  A   I have never owned a horse.  I've been an O.P. rider,

17          which is an other people's rider, stopped in college,

18          but I used to train polo ponies and hunters in

19          Maryland most of my life.  I started riding at about

20          five.

21  Q   Are you originally from Maryland?

22  A   Uh-huh.

23  Q   Now, did your neighbors on Red Acre Road and

24          surrounding roads form a group called Friends of Red

1   Acre?

2 A Well, what we did is we had a meeting and invited

3   people to it and we had quite a good turnout.  I don't

4   have a list of people, but it seemed like in excess of

5   twenty-five people, and we just stated what our goals

6   and objectives were and did we have support to go out

7   and try to find a non-profit organization that would

8   be willing to take on this project that we had in

9   mind.

10 Q And the project you had in mind pre-dated your

11   understanding of what Co-housing Resources, Inc., had

12   planned to put --

13 A Yeah, they had an open meeting, and I didn't attend

14   it, but the Co-housing had -- was it in December or

15   January?  They had some sort of an open house where

16   they invited people of Stow to come and tour the

17   property and talk about, you know, what they were

18   planning, and one of the other abutters, I think

19   Michael Labosky, went on that tour, and that's when we

20   started to understand how they were going to put

21   buildings on it and, you know, where they were going

22   to situate it, et cetera.

23 Q And if you know, when did the group Friends of Red

24   Acre start acting as a group per se?

1    A    It was never really a group.  It was really three

2         people that were trying to stay within what the

3         neighborhood wanted and not -- we didn't enlist other

4         people to do a lot of work.  Occasionally, for

5         elections, et cetera, to do phone calls we would ask

6         for volunteers, but it really wasn't a very large

7         number of people.

8    Q    Who were the three people?

9    A    Well, three houses, households, let's put it that way,

10        myself and my husband, Karen Sommerlad and her

11        husband, David Cobb, Michael Labosky and, to a much

12        lesser extent, his wife, Erica Nilsson.  She is what

13        they call a physician's assistant and had insane

14        hours, so she was not available much to help.

15   Q    And those three families were the sort of active

16        members of the group?

17   A    It's not an organization.

18   Q    Yeah, of the group?

19   A    Yeah.

20   Q    It never actually formed?

21   A    No.  I think the only thing we had to do is sign up

22        when we wanted to distribute -- and I imagine Marilyn

23        had to do the same thing when she sent around a

24        postcard influencing an election.  You know, you have

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

13

1        to go to the town and fill out some paperwork so that

2        you have the ability to do a town-wide mailing on a

3        topic.  Do you understand what --

4    Q    I do, yeah.

5    A    Okay.  Yeah, that was the only time we ever had to

6        kind of sign up, and then we immediately dropped it

7        after that.

8    Q    I have seen some documents that have Friends of Red

9        Acre as a letterhead.

10    A    Uh-huh.

11    Q    Do you know how that came about?

12    A    I designed it.  Does that mean anything?

13    Q    No, I'm just trying to --

14    A    Yeah, they photographed it as Marilyn Kunelius' house.

15        That represents the affordable housing, and then we

16        used the Eye of the Storm logo as the horse symbol,

17        and we used the Stow Conservation Trust logo as the

18        open space symbol.  So, it never was, you know,

19        printed.  It just came off the computer.

20    Q    At the time that you had decided to advance the cause

21        of Eye of the Storm, had you already heard of The

22        Trust for Public Land?

23    A    Well, the idea came first, and I don't believe The

24        Trust for Public Land was the first non-profit that we

1    approached.

2    Q    And so I take that --

3    A    So, we went through a process of trying -- I mean, we

4         thought of Eye of the Storm first, and she was very --

5         she didn't want to be -- she loved the idea, but she

6         really didn't want to be involved, from the beginning.

7         So, she sort of gave us the blessing to look into it,

8         but she was not -- she did not want to be a pro-active

9         piece.

10   Q    When you say *she* --

11   A    Oh, Nina Arbella is the director.

12   Q    Does that still exist, the Eye of the Storm?

13   A    Yes, it does.  It's a 501c3.

14   Q    Now, at some point, someone from Red Acre -- I'm going

15        to refer to the Friends of Red Acre as this loosely

16        associated group of families.

17   A    Yeah, simplify things.

18   Q    At some point, did Friends of Red Acre contact

19        conservation groups to seek their assistance?

20   A    Yes.

21   Q    Prior to contacting TPL, do you recall who you

22        contacted?

23   A    I think we spoke first to Mass. Audubon.  We have two

24        people within the town that work there, and then we

15

| | | |
|---|---|---|
| 1 | | spoke to Sudbury Valley Trustees.  They gave it a good |
| 2 | | long look. |
| 3 | Q | And when Mass. Audubon and Sudbury Valley Trustees |
| 4 | | were contacted, were you the contact person between |
| 5 | | the Friends of Red Acre and these organizations? |
| 6 | A | I'm trying to think.  Well, we knew -- let's see, who |
| 7 | | knew Kathy Sferra first?  I don't know.  She was sort |
| 8 | | of the first person that we contacted, and I believe |
| 9 | | she's the one that eventually suggested Trust for |
| 10 | | Public Land, but I'm not certain. |
| 11 | Q | Were you the person that contacted Trust for Public |
| 12 | | Land? |
| 13 | A | I was not the person that contacted -- |
| 14 | Q | Who was? |
| 15 | A | And I believe it was Val Talmadge.  It might have |
| 16 | | either been my husband, or it could have been Karen |
| 17 | | Sommerlad or David Cobb.  I'm not sure. |
| 18 | Q | And you used the word *Val Talmadge*.  Who is Val |
| 19 | | Talmadge? |
| 20 | A | I think she is regional -- |
| 21 | | THE WITNESS:  Is she still their |
| 22 | | regional deputy director? |
| 23 | | MS. MURPHY:  I'm not sure what her |
| 24 | | title is, but, yeah, she was at TPL. |

1    A    Yeah, and Craig was state director, I believe.

2    Q    And you think that contact was perhaps through your

3         husband or Sommerlad or her husband?

4    A    Yeah, right.

5    Q    Do you recall when you first participated in contact

6         with TPL?

7    A    Wow.  I don't know.  My first memory is that the first

8         thing they wanted to do was see the land, so it might

9         have been then, and I believe Craig had already, you

10        know, told Kunelius that we went on the property

11        without permission.  It was a day with his daughter.

12        It was rainy, must have been in November or December.

13        I'm not sure.

14   Q    And was that a group of people that went onto the

15        Kunelius property?

16   A    I don't recall everybody.  I reluctantly went, my

17        husband went, and after that, I don't recall.  There

18        may have been somebody else.

19   Q    I note that you today brought a package of documents

20        with you which you assembled of your own volition.  In

21        other words, I did not ask you to.

22   A    Right.

23   Q    And you brought two copies, one for me and one for the

24        counsel for --

1   A   Trust for Public Land.

2   Q   -- Trust for Public Land?

3   A   Yeah.

4   Q   Can you tell me, do you know Patty Murphy?

5   A   Only from having gone and visited with her within

6       about ten days ago.

7   Q   And what was the purpose of visiting with her?

8   A   Just as you contacted me, within a few days, she

9       contacted me.

10             THE WITNESS:  And I don't mean to refer

11      to you in the third person.

12  A   But asked me to stop by and to talk to me about

13      what -- you know, asked me to sort of give a run

14      through as best of my memory.  This was before I

15      had even bothered to pull this stuff together, so

16      I'm sure my memory was pretty lame at that point.

17  Q   How long did you meet with her?

18  A   About a half hour.

19  Q   And where did you meet with her?

20  A   In their law offices over on Congress Street, or is

21      that State Street?  I don't know quite which address

22      it is.

23  Q   Other than Patty Murphy, did you meet with anybody

24      else?

1    A    Recently?

2    Q    When you went over to the --

3    A    No.  No, nobody else.

4    Q    Other than Patty Murphy and my call to you, have you

5         been contacted by any other --

6    A    And Marilyn's call.

7    Q    -- anybody from the town itself?

8    A    No.

9    Q    Now, at some point, did you become aware that TPL was

10        interested in acquiring the property as a result of an

11        assignment of the right of first refusal?

12   A    I don't remember what the process was that led them up

13        to make the decision to go forward.

14   Q    Did you become aware that -- go ahead.

15   A    Well, I'm vaguely recalling that there were meetings

16        with the selectmen of the town, public meetings that I

17        attended, and I don't even recall whether or not there

18        had to be a vote at town meeting before --

19   Q    And when you said there were meetings with the town,

20        you're talking about a meeting with the town

21        between --

22   A    Selectmen.

23   Q    -- the Board of Selectmen and TPL?

24   A    I think they were just on the agenda for a regular

19

1          meeting of the selectmen.

2     Q    And do you recall anyone from TPL speaking at those

3          meetings?

4     A    Pretty uniformly speaking, all the time it was Craig

5          MacDonnell.

6     Q    And it was your understanding he was the Massachusetts

7          director of TPL?

8     A    That's correct.

9     Q    And it appears from some of the documents I see here

10         that you began working with TPL fairly closely on

11         matters relating to fund-raising and other efforts in

12         order to see if something could be done with the

13         Kunelius property.  Is that fair to say?

14    A    Yes.

15    Q    Prior to dealing with TPL, did you undertake any due

16         diligence concerning TPL to see whether or not it had

17         the capabilities that you might have thought were

18         necessary for their involvement with you?

19    A    I think I just went based upon the recommendation of

20         people at Mass. Audubon.  I don't know whether Bob

21         Wilbur at that point was in the mix, but definitely

22         Kathy Sferra was giving a very high recommendation.

23    Q    And so when you say Bob Wilbur was in the mix, is he a

24         Sudbury Valley Trustee?

1  A    No, he's at Mass. Audubon.

2  Q    Oh, he is.

3  A    He is land acquisitions officer or something like

4       that.

5  Q    Does he also have a job with the town?

6  A    He sits on the CPC.  So, he was giving us, you know,

7       some positive feedback that that was a good direction

8       to go for part of the funding for --

9  Q    At some point, did you come to understand that, prior

10      to the assignment of the right of first refusal to

11      TPL, it was involved in efforts to determine whether

12      or not it could get variances or permits or

13      subdivisions on the property?

14 A    No, the only thing -- I'm sure they wanted to look at

15      that to some degree, but they didn't, you know, go

16      to -- they didn't start to go to meetings with

17      the town regarding that, I don't believe, early

18      on, but I recall something to the effect that

19      their geniuses about zoning, et cetera, at some

20      level had said that they thought there would be

21      no problem going forward.

22 Q    And you're talking about the geniuses at TPL?

23 A    Yeah.

24 Q    And is that because you believe them to be geniuses or

1        is that a reference to --

2   A   Well, his experts, let's put it that way, people that

3        he turns to.

4   Q   And it was your understanding they thought there would

5        be no problem?

6   A   That's what they were foreseeing.

7   Q   Did you have an understanding that Karen Sommerlad was

8        working with TPL and making inquiries of the Planning

9        Board or the Zoning Board with regard to those issues

10       prior to the assignment of the right of first refusal?

11  A   You know, that's where the sequencing, you know, gets

12       a little loose for me.  I don't know what happened

13       before or what happened after, but I'm sure that there

14       were meetings that I attended with the Planning Board

15       where they floated the idea in front of them and liked

16       what they heard, in other words, what the town was

17       saying was positive or, at least not immediately,

18       forget it.  You'll never -- you know.

19  Q   I'm going to put a document in front of you which we

20       will mark as Exhibit 2.

21            (WHEREUPON, Exhibit No. 2, Kelleher

22       e-mail to Kennedy, dated January 29, 2003, marked

23       for identification.)

24  A   I remember Karen Kelleher.  Since you have a pivot

1   date in your question, can you tell me what the date

2   is?

3 Q I think February 12th, 11th.

4 A Is the assignment?

5 Q Was the assignment.

6      MS. DeBELLIS:  Twelfth.

7 Q Twelfth.

8 A Okay.  If you told me January 1st, I would have

9   believed you.  So, I can't remember that.

10 Q So, looking at Exhibit 2, I direct your attention to

11   the lower half of Exhibit 2, which appears to be from

12   Karen Kelleher to Ruth, and it is referring to Items 1

13   through 4, which are identified areas where a variance

14   might be required and a special permit may be

15   required.

16 A Uh-huh.

17 Q Is it your understanding that the town had told TPL

18   that this was likely, that they would be able to get

19   these variances or special permits?

20 A You know, the best I can characterize it is they were

21   not discouraging, but not to the point like, oh, yeah,

22   this will be -- you can do this or -- nothing

23   positive.

24 Q So, that tends to, at least a little bit, contradict

1          what I thought I heard you say.  So, I just want to
2          make it clear.
3      A   Regarding time frame of my involvement or?
4      Q   No, regarding the feedback they were getting from the
5          town.  I thought I had heard you say that the feedback
6          was positive, initially.
7      A   Right.
8      Q   But is it more likely that they were not getting
9          positive feedback?
10             MS. ECKER:  Objection.
11     A   You know, there was never anybody from the town that
12         said, "You should be able to do this."
13     Q   Looking on the back page of Exhibit 2, which is KUN252
14         as marked down at the bottom right-hand side, I note
15         that this is a letter from Karen Sommerlad to Ruth
16         Kennedy.
17     A   Ruth Kennedy.
18     Q   Did you know Ruth Kennedy?
19     A   Ruth Kennedy is Stow Conservation Trust.  At the time,
20         she was on the board.  That's how we came to know her.
21         I didn't know her prior to that.
22     Q   It says:  I'm writing on behalf of Friends of Red --
23     A   And she was also on the Planning Board for the town at
24         the time.

24

1    Q    I believe she was.  Karen Sommerlad writes that she's

2         writing on behalf of the Friends of Red Acre and Craig

3         MacDonnell.  Is it fair to say that you knew and the

4         other Friends of Red Acre knew that Karen Sommerlad

5         was contacting the Planning Board with regard to the

6         issues of possible zoning variances and permits?

7    A    Yes, I would assume we were doing, individually,

8         whatever it was that would be helpful.

9    Q    Did you ever see any documentation from the Planning

10        Board or the Zoning Board, or the Zoning Board of

11        Appeals, in which Karen Sommerlad or Craig MacDonnell

12        were told that it was unlikely they were going to get

13        any special permits or variances?

14   A    Not that I recall.

15   Q    Would it surprise you if there were such documents?

16   A    It would depend on the date.

17   Q    Prior to the assignment of the right of first refusal?

18   A    That would surprise me.

19              (WHEREUPON, Exhibit No. 3, Jacobs

20        e-mail to Sommerlad, dated February 6, 2003,

21        marked for identification.)

22   Q    I've put before you a document that's been marked as

23        Furman 3 and it is a two-page document.  Furman 3 is

24        two pages, both printed on both sides, beginning with

25

1    KUN256 through KUN259.  I'm going to direct your

2    attention to the second page.  Up on the top right-

3    hand side, it says *Page 2 of 4*.  Down at the bottom

4    right-hand corner it says *KUN257*.

5  A  Uh-huh.

6  Q  And that page begins with, the language I want to

7    direct your attention to begins with *Unless you create*

8    *sufficient frontage* and ends with *sorry.*  I'd like you

9    to read that section.

10  A  Uh-huh.  Not very encouraging.  This is one particular

11    way of approaching the issues at hand of the project,

12    though, which is to create a subdivision, right, and

13    that isn't necessarily the only way that TPL was

14    looking at the situation.

15  Q  Looking at the second page, which is 257, it actually

16    is not talking on that page about a subdivision, is

17    it?  Isn't it talking about special permits or zoning

18    variances?

19        MS. ECKER:  Objection.

20        MR. CONROY:  Objection.

21  A  Well, you're talking about *I've seen the subdivision*

22    *process*, on the top of Page 2, *a cursory look*, yeah.

23  Q  Where it says, "You need a variance from the ZBA," do

24    you know what those variances were?

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

1    A    I would assume -- this is not my area of expertise,

2         much more so relying upon Karen Sommerlad.  This is

3         more closely aligned with her background -- that it

4         relates to the previous document they gave me, with

5         these issues that needed to be addressed.

6    Q    Looking at the one-sentence paragraph that states,

7         "Massachusetts case law indicates that the variance

8         standards are so hard to meet that only five percent

9         of the decisions granting a variance are held in court

10        when challenged.  Sorry, Donna Jacobs, Senior

11        Planner," do you see that?

12   A    Uh-huh.

13   Q    Is today the first time that you were aware that as of

14        February 6, 2003, TPL and Karen Sommerlad had received

15        discouraging news with regard to any proposal that TPL

16        was considering to replace the development plan that

17        was contained in the purchase and sale agreement

18        between Mrs. Kunelius and Co-housing Resources?

19                  MS. MURPHY:  Objection.

20                  MS. ECKER:  Objection.

21                  MR. CONROY:  Objection.

22   A    I'm not surprised.  At any rate, I'll just restate

23        what I said before, that there were many approaches

24        that were being looked at for making this work and

1        this was just one.

2    Q    Can you tell me what the many were?

3    A    Well, now, here you go.  I think if you had asked this

4        line of questions with Karen you'd probably get a much

5        better answer because --

6    Q    Tell me what your best recollection is.

7    A    Well, for example, across the street from Karen

8        Sommerlad is a house that does not have sufficient

9        frontage, and they got a second lot behind their

10       house, recently, and it was something that Karen was

11       pointing to as one of the other avenues.  I don't know

12       whether it was fully followed, but it was the idea

13       where you put a paper driveway.  You have a driveway

14       on paper that actually is not used, and then you share

15       a driveway, create a common driveway with the house

16       that does not allow for sufficient frontage, and

17       that's what that person did.

18          So, I understood that Marilyn had frontage,

19       for example, on Tuttle Road that has a fire road,

20       fire access road, or maybe it was just a logging

21       road, that ran all along behind all the other

22       properties.  So, another approach, rather than

23       trying to create a subdivision, would be to

24       create a paper driveway, calling the frontage on

1          Tuttle Road to be the driveway of record, whereas

2          in reality they would end up sharing the lesser

3          frontage.  They could have also possibly

4          approached a neighbor to see if they could

5          acquire land off of the neighbor to create

6          sufficient frontage.  I don't remember how far

7          off it was at the time, how many feet were

8          required.

9    Q    At the time that these, we'll call them options,

10         development options, were available, do you know

11         whether TPL proposed these options to the town?

12   A    I don't know what all of the different phases were.  I

13         mean, you'd have to go through the documents that you

14         have and tell me, because the conversations with the

15         town and the options that were pursued, I believe

16         there was more than one that was put before the town

17         and then withdrawn before, what do they call it, a

18         finding against the idea was --

19   Q    Is it your understanding that there were multiple

20         proposals put forward that were withdrawn or that

21         there was one proposal?

22   A    I think there were two at least, but I don't remember

23         what they were.

24   Q    You don't.

1    A    But I know that this went on.  I mean, I think that

2          the subdivision may have gone away and then another

3          one followed, but I don't have anything because,

4          again, this was more Karen's baby than mine.  I just

5          know that we were continuing with options well into

6          the summer. she

7    Q    When you say *we*, you're talking about Friends of Red

8          Acre and TPL?

9    A    Yeah.  In support of TPL, yeah.

10    Q    But do you have any understanding of what the last

11          proposal was by TPL after they accepted the

12          assignment?

13    A    I don't recall.

14    Q    Do you recall whether there was a connection between

15          the proposal of how the property was going to be

16          completed by TPL and fund-raising efforts that were

17          undertaken by Friends of Red Acre?

18    A    You're going to have to rephrase that question.  It

19          was just a little too long.

20    Q    Do you recall there was a connection between the fund-

21          raising efforts of Friends of Red Acre and the actual

22          proposal that was being sought or made by TPL?

23    A    Well, fund-raising was on hold until -- TPL asked for

24          their fund-raising efforts to go on hold until they

1 had achieved the zoning.  You know, think about the

2 logic behind it.  You wouldn't want to go and acquire

3 funds for a project and it would not end up to be able

4 to go forward because the zoning was not in place, all

5 the variances had not been solved.  So, there is a

6 link between the two actions.

7 Q At some point, did Friends of Red Acre initiate their

8 own fund-raising efforts?

9 A What we were able to do with the three, two -- let's

10 see, how to put this.  On behalf of Eye of the Storm,

11 helping them to write their funding materials, we

12 approached one funder that they already had in place,

13 which is the Red Acre Foundation, that has a

14 long-term --

15 Q I'm going to stop you and have you start again because

16 you're using the word *they, they, they,* when you

17 say --

18 A Okay.

19 Q So, when you say *we approached because they had*, I'm

20 not sure what you're talking about.  Eye of the Storm?

21 A Oh, okay.  So, Eye of the Storm has been receiving

22 operating funds from Red Acre Foundation for --

23 Q Which is different from your organization.

24 A Red Acre Foundation is, I believe, headquartered in

1        Arizona, but they are family descendants of a woman

2        who did equine rescue on Red Acre Road, who is famous

3        in the town, and so we approached them for a

4        significantly larger donation than they typically give

5        her in order to provide funding to allow her to

6        participate in this and then, hopefully, to move her

7        into the farm parcel of the plan that we had.

8    Q   And did the Red Acre Foundation provide a donation?

9    A   They made a promise.  Do I have a written letter?  I

10       do not.

11   Q   And what was the amount that they promised?

12   A   I have to look.  Was it a hundred or a hundred and

13       twenty-five?  And then, serendipitously, I was at a

14       cocktail party in New Hampshire on Christmas and this

15       guy who runs a foundation in Boston said, "I am

16       looking to support equine rescue," and I said, "You've

17       got to be kidding me."

18            I'm serious.  That's how it fell.  And now

19       we've created -- there's a new relationship with,

20       I believe it's called, the Black Brook Foundation

21       in Boston and they made a much smaller -- having

22       no relationship with Nina, they eventually made a

23       much smaller promise, but it was in the tens of

24       thousands.  Again, it should be in here

32

1          somewhere.  We approached Stow Conservation Trust

2          and they had just finished a very aggressive

3          fund-raising campaign in the town, so they were

4          very interested in supporting us, but on the

5          other hand, they had just tapped out all the

6          local donors.

7               So, I think if they had not just done this

8          for Red Acre Woods, which is another parcel on

9          our street, they may have been more generous, but

10         I think they also made a promise, and I believe

11         one or both of these were over a series of years.

12         It was not, you know, we'll give you a hundred

13         thousand dollars in September, but we can give

14         you this over two or three years.

15    Q    And what was the total amount of the Stow Conservation

16         donation?

17    A    Hundred thousand.

18    Q    So, between those three donors, you had identified

19         approximately 225 plus?

20    A    Was it twenty-five for Black Brook?  That's what I

21         don't recall.  It sounds high.

22    Q    I have you down for 125 from Red Acre Foundation.

23    A    Oh, it might have been a hundred.  I said I'd have to

24         look.  You want me to check while we're talking?

1    Q    Yeah, since you have the documents.  Those are the

2         same documents that you've given to us?

3    A    Yes, exactly the same.  Ten thousand from Black Creek,

4         hundred thousand from Red Acre Foundation.

5    Q    So, ten thousand from Black Brook, a hundred thousand

6         from Red Acre Foundation.

7    A    Black Creek?  I'll find it.  It says Black Creek here

8         on this.  You know, this is a document, I think, that

9         was encouraging to Trust for Public Land because this

10        is 19 of January, that it was encouraging that they

11        had some given.  So, Black Creek gave ten thousand, or

12        promised ten thousand at that point, never -- I think

13        they actually gave the money to Nina, to Eye of the

14        Storm, forgive me, and a promise from Red Acre

15        Foundation.

16   Q    Can you tell me -- these are not paginated.

17   A    Right.

18   Q    Can you tell me which document you're looking at?

19   A    I'm looking at a January -- they are in more or less

20        chronological order.  So, look for January 19, 2003.

21   Q    I got that, yeah.

22   A    Okay.  So, this is information that was not publicly

23        distributed.  As it says here, this was just prepared

24        to show both Trust for Public Land and Eye of the

34

1          Storm a program that we were presenting where we were

2          showing that we believed that there was a very good,

3          strong stream for fund-raising, which includes

4          research done by my husband, Peter Christianson,

5          reviewing -- what is it called -- identifying

6          prospects, through his research capabilities as a

7          fund-raiser, that represented both very likely targets

8          for fund-raising and the kinds of -- the funding

9          levels that they typically give.

10              So, he knows enough to say this group can

11         give, you know, five thousand versus twenty-five

12         thousand.  You can tell from information on the

13         foundation.

14    Q    Can I just ask you, looking at the foundations by

15         type, 19 Jan. '03, there are several columns, one

16         being *Name*, second one, *Affinity*.  What is the E?

17    A    Equine conservation.

18    Q    Okay.  H?

19    A    Housing, affordable housing.

20    Q    *Size being*, what does that indicate?

21    A    Oh, gee, I think that might be their gross pool of

22         giving per year, but you'd have to -- I'd have to find

23         out from my husband, if you'd like me to.

24    Q    *Detailed AGM*?

1    A    Probably the way that he located them.  Associated

2          Grant-makers, which is AGM, is a funding Web site that

3          you have restricted access for fund-raisers.

4    Q    Patenaude?

5    A    Leonard Patenaude is the guy I ran into at the party

6          who is the funding officer for the small firm, the

7          small foundation.

8    Q    L-O-E in caps?

9    A    I don't know.

10    Q    L-C?

11    A    I don't know.

12    Q    Small Brook?

13    A    It's probably another funding resource.  It definitely

14          is what the source is.  Like Foundation Finder, I

15          believe, is a Web search browser engine.  So, my

16          husband is making a mental note, making a note as to

17          where he located these in his research.

18    Q    As of January 19, 2003, the documents you provided to

19          us, which I'm looking at two pages after the one we've

20          just looked at which is -- the one we just looked at

21          is called *Foundations by Type*, and then we have a

22          document which seems to be on Friends of Red Acre

23          letterhead.  It says:  Friends of Red Acre, January

24          19, 2002, Confidential, Kunelius farm project budget.

1    A    Uh-huh.

2    Q    This indicates that there was a goal of $1,300,000.

3         Is that goal the fund-raising goal?

4    A    As we understood it.

5    Q    So, it was your understanding that the fund-raising

6         goal would actually exceed the purchase price of the

7         property?

8    A    Yeah, and I've wondered when were we made aware of --

9         I don't know.  Here.  Here's what I don't know.  I

10        don't know -- I know at some point the purchase price

11        no longer became the goal, and at some point we

12        understood that TPL needed to recoup their time and

13        money and effort as part of their bottom line, and I

14        don't know when that was.  I understand that, at some

15        point, Marilyn Kunelius had some sort of --

16   Q    Earnest money?

17   A    No, isn't it more to do with if you do some of the

18        financing for the selling that --

19   Q    Oh, that Marilyn Kunelius was willing, yeah.

20   A    And I don't know when that happened, but at some

21        point, she said, "Oh, no, it's not just the purchase

22        price.  It's the purchase price plus this money that I

23        was going to make as financing the deal," and I don't

24        know when that was related to this.

1    Q    Now, on January 19, 2002 --

2    A    2003?

3    Q    This one says 2002.

4    A    Is that a typo?

5    Q    I'm wondering.

6    A    Because the cover is 2003, same date.  Typo, I would

7         say.

8    Q    Yeah, because the prior correspondence appears to be

9         2003.

10   A    Yeah, 2002, I don't think we were --

11   Q    Yeah, okay.

12   A    No, sorry, typo.

13   Q    So, other than that typo, did the Friends of Red Acre,

14        through yourself and your husband, have -- what were

15        your expectations as to the likelihood of raising 1.3

16        million dollars?

17   A    Positive.

18   Q    Your husband is in the business of fund-raising, you

19        said?

20   A    Correct.

21   Q    Does he have his own business?

22   A    Yes, recently he was working at Peabody-Essex Museum,

23        but now he's consulting on his own.

24   Q    And how long has he been in the fund-raising business?

1    A    Wow.  Well, he got his master's -- no, he got his MBA

2           at Boston College in non-profit management in, I want

3           to say, the late '80s, and since then, he has been

4           both a business manager for non-profits and a fund-

5           raiser at everything from public radio -- primarily,

6           the arenas are museums, public radios and hospitals

7           and universities, but he's been on staff.

8    Q    At some point, did you become aware that TPL did not

9           want fund-raising by Friends of Red Acre to continue?

10           MS. MURPHY:  Objection.

11    A    Well, the point was that the fund-raising has to be

12           done through a non-profit.  Friends of Red Acre cannot

13           fund-raise.  I can write grants, for example, help Eye

14           of the Storm write grants for Eye of the Storm to

15           issue, and for affordable housing and for the

16           conservation oriented fund-raising that was going to

17           happen, it had to happen through Trust for Public

18           Land.  We could write templets for them, but the fund-

19           raising would have to happen out through their office.

20           That's the difference between the strategy of doing

21           fund-raising through corporations and foundations

22           versus often what I think Trust for Public Land is

23           more used to, which is fund-raising through the

24           generosity of individuals in the town, and then it's

1        much easier for me to go to a wealthy person in Stow,

2        for example, and say, "It's a great project.  Could

3        you give Trust for Public Land some money for this

4        project?"  But you can't even approach -- the names

5        that you see on this list, you can't even write these

6        people a letter or call them up unless you are a non-

7        profit yourself.

8    Q   Is that because it's prohibited?

9    A   They would never consider a third-party letter.

10   Q   Is that because there's some statutory requirement

11       that they only deal with other non-profits?

12   A   I don't believe it's a legal requirement, but it's the

13       best -- it's what my husband understands is their best

14       practice, that it's just not possible.

15            MR. McLAUGHLIN:  We're going to mark

16       this as Furman No. 4.

17            (WHEREUPON, Exhibit No. 4, FORA letter

18       to Town of Stow, dated June 6, 2003, marked for

19       identification.)

20   Q   I'm particularly looking at the first page of Furman

21       No. 4, and I'd ask you to read that if you would.

22   A   I can see where you're looking.  It's in the last

23       paragraph.  If you were grammatically -- you'd say we,

24       as the subject of the sentence, is the citizens group,

1           but in fact the understanding in writing is the we is

2           every single entity mentioned in that.  I'm guessing,

3           but I suddenly -- my mother is grammatical.  I saw

4           that sentence and went, ah-huh, yeah.

5      Q    So, looking at Exhibit No. 4, Furman 4, the last

6           paragraph says -- this appears to be sent to -- it's a

7           June 6, 2003, letter to the Board of Selectmen.  Now,

8           this was --

9      A    A thank you note, basically.

10     Q    This is three months, four months, after the

11          assignment to TPL, is that correct?

12     A    Uh-huh.

13     Q    And the last sentence says:  With your help, this

14          citizens group has been able to partner with the town

15          to form an unprecedented coalition of organizations,

16          including TPL, Stow Conservation Trust, Eye of the

17          Storm and others, and we are well on our way to

18          raising the necessary funds.  Thank you for working

19          with us and allowing the voters to speak on this

20          conservation alternative.

21     A    Right.  Well, basically, the function was a thank you

22          note.

23     Q    Now, can you tell me whether the funds, the

24          approximately $210,000 that you had identified from

EXHIBIT G

41

1          three major contributors, were those funds actually

2          raised?  In other words, did the money come in to

3          someone?

4    A     I don't believe that -- the money would have come

5          in -- if it was coming in from Red Acre

6          Foundation, it would have gone to Eye of the

7          Storm, but we did not request that money to come

8          in-hand until the project was moving forward,

9          until, you know, we had purchased, you know, we

10         were further than we were.  The Black Creek money

11         was, I believe, received by Eye of the Storm.

12   Q     And was that then --

13   A     Went into a savings account.

14   Q     It was put into a savings account?

15   A     Yeah, and then, again, Trust for Public Land would

16         have been the direct recipient of Stow Conservation

17         Trust.

18   Q     And did that -- was that --

19   A     I don't believe that that came in.  It was a promise.

20         It was a promise out there.

21   Q     So, at that point, other than the $10,000, the

22         remaining $200,000 had not been received either by TPL

23         or by any other entity.

24   A     Not that I was told by TPL.

42

1    Q    Did you consider the efforts, your fund-raising

2         efforts, as a failure?

3    A    Well, it hadn't really started, because we met with

4         TPL and formed a -- there was a committee formed at

5         TPL to do the fund-raising, and then you'll find in

6         this package a series of letters where TPL was saying

7         we want to hold off on beginning the fund-raising

8         until we have solved the zoning issues.

9    Q    Could you find that letter for me, please?

10   A    Well, easier to find letters from us to them than

11        responses, but let's see what we can find.

12   Q    This would be a TPL letterhead?

13   A    Oh, no, let me look for -- where would I be going?

14        Well, first thing, here's something, just to go back

15        about who contacted TPL.  Can you find December 17th?

16        I'm sorry to go off topic.

17   Q    December 17th of?

18   A    Of 2002.

19   Q    I've got it, 2002.

20   A    Must be a wrong typo, yeah, in the middle of --

21   Q    I've got it here, Val Talmadge and I spoke?

22   A    Was 2002 the beginning of the project?

23   Q    Yes.

24   A    Okay.  So, it is December 17th.

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

43

1              MR. CONROY:  Excuse me.  Can you help

2       me here.  No, I'm trying to find it in my --

3              MR. McLAUGHLIN:  I think these are all

4       chronological.

5              THE WITNESS:  Oh, they should be

6       chronological.

7              MR. CONROY:  Chronological, okay.

8              THE WITNESS:  So, it's about this far

9       in.

10             MR. CONROY:  December what?

11             THE WITNESS:  December 17th.

12             MR. CONROY:  Of '02?

13             THE WITNESS:  Yeah.

14    A    So, this is just to answer your question about

15         contacting.  Jerry Bird is here.  Jerry Bird, there's

16         an interesting cross-over between Red Acre Foundation

17         and Trust for Public Land, because that Jerry Bird,

18         his family founded Red Acre Foundation and he, I

19         believe, was advisor to the board for Trust for Public

20         Land.

21    Q    Okay.

22    A    So, anyway, I just want to point that out.  Then the

23         next page, Terry Vienot, I don't believe she's a

24         senior fund-raiser on the project.  That was a woman

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

44

1        by the name of Sheila Dennis.  But this is a response

2        back, and this looks like it was a phone call talking

3        about the strategies for fund-raising, how we might

4        coordinate efforts.  She said, "I'm happy to help with

5        grant writing research, follow up with foundations,"

6        et cetera.

7    Q   That's the January 9, 2003, e-mail from --

8    A   Right.

9    Q   -- Terry Vienot, V-I-E-N-O-T?

10   A   O-T, yeah.

11   Q   To your husband, Peter Christianson, and copied to

12       Craig MacDonnell?

13   A   Yeah, this is the beginning of working -- trying to

14       work with them.  I think we even went in and had some

15       meetings with them.  And let's just go forward.

16       January 30, 2003, Page 2, Item No. 10:  I just want to

17       point out the fund-raising plan that FORA provided

18       should be vetted amongst you and Terry Vienot.  This

19       is written to Craig.

20   Q   January 30th?

21   A   Yeah, January 30th.  It starts:  January 30.  To Craig

22       from Peter.  Subject:  budget.  It does not look like

23       that.  It looks like this.  It seems to be out of

24       sequence.  This is January 29th.  That's just a

1                    project sheet.  This is the end.

2          Q      Oh, here it is, okay.

3          A      Got that?

4          Q      Yeah.

5          A      So, Page 2, fund-raising plan should be vetted amongst

6                    you and Terry Vienot.  Qualified prospects may be new

7                    long-term sources of major grants for TPL.

8                         So, my husband was pointing out that some of

9                    the people that he had identified would be maybe

10                   people that may be useful for further projects as

11                   well.  In fact, going back, I know what you're

12                   looking for, but I'm just trying to stop on the

13                   fund-raising pieces as we go forward.

14                        So, next one, I think, related -- 2-25-03,

15                   which has a handwritten note along the top if

16                   people are having a hard time finding it.  It

17                   starts to talk about -- one of the ongoing

18                   problems we had with this project is that the --

19                   when you are giving to foundations, they review

20                   grants at specific times of year.  So, to have

21                   done a push in -- in this paragraph that's kind

22                   of highlighted with a little kind of a C-mark:

23                   To raise the entire amount by closing, I'm not

24                   optimistic.  Most foundations to which we would

1          apply at any time between now and December would

2          likely disburse their grants in December or

3          January.  And I believe the closing we imagined

4          would be more before that date.  Stow

5          Conservation Trust and Red Acre Foundation are

6          doing us a favor by accelerating this, we think:

7          Fund-raising plans should be considered a

8          component of the budget, and the other component

9          should be bridge funding.

10             And the conversations, as you review the

11         documents going forward, is a constant struggle

12         between us, knowing that to get foundation grants

13         out and have them follow in the cycle of

14         foundation grants and meet a hundred percent

15         funding in-hand by closing was always a problem

16         with whether TPL was willing to take on bridge

17         funding or not.  I don't think it's typically

18         what they like to do.

19    Q    Let me just identify this document a little bit

20         clearer.  This appears to be, if I am correct here, a

21         four-page e-mail?

22    A    Uh-huh.

23    Q    It has handwritten comments at the top right-hand

24         corner.  It might say:  Craig re --

1    A    Regarding closing funds.

2    Q    Re closing funds.  It has a handwritten 2-25-03 on it.

3         It is to Peter from Craig.  Below that is a *Hi, Craig,*

4         *and everyone*.  And I'm interested in the very first

5         paragraph at the top, from Craig to Peter.  It says:

6         Thanks for refining the numbers for us.  Yes, let's

7         talk in greater detail.  All we need for closing is

8         725, 400 from town, 325 from SCT.  What is that?

9    A    Stow Conservation Trust.  Red Acre Foundation is

10        RAF.

11   Q    Did you have an understanding that only $725,000 --

12        well, is it your understanding that only 725 was

13        actually $725 or 725,000?

14   A    Yeah, that was all thousands.

15   Q    So, this would suggest that Craig MacDonnell knew

16        that, at the time of the closing, only 400 from the

17        town and 325 from Stow Conservation Trust was

18        necessary:  All we need for closing is 725.  Is

19        that --

20             MR. CONROY:  Objection.

21   A    But, also, I don't know where he got 325 from Stow

22        Conservation Trust.  It doesn't represent anything

23        that I know that they've ever --

24   Q    I'm going to just ask you to look at something very

48

1       briefly here, and this has been pre-marked.  This has

2       already been marked as Perry No. 17, and these appear

3       to be Zoning Board of Appeals minutes, and there is a

4       document which has been marked -- this is a

5       compilation of documents.  This is how we received it

6       from the town.  And I'm going to have you look at the

7       minutes for June 30, 2003, and particularly KUN562,

8       which I will open up to you, and this just goes back a

9       little bit to a question I had asked you earlier.

10          Looking at the first full paragraph:  The

11      board was in receipt of a package of several

12      documents from concerned citizen Linda Hathaway

13      to substantiate the argument that The Trust for

14      Public Land and the neighborhood organization

15      Friends of Red Acre were aware of the

16      difficulties and requirements of subdividing the

17      property prior to accepting the right of first

18      refusal.

19   A   You know she's town clerk, right?

20   Q   I do, yes.

21   A   Okay.

22   Q   Is that a fair statement as to what Friends of Red

23      Acre was aware of prior to TPL accepting the right of

24      first refusal?

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

1          MS. ECKER:  Objection.

2     A    Well, why wouldn't this just refer to that same

3          document you showed me before from Donna Jacobs?

4     Q    I'm not sure.  My question is:  is it a fair

5          representation of what Friends of Red Acre was aware

6          of prior to TPL accepting the right of first refusal?

7          MS. ECKER:  Objection.

8     A    No, I believe -- I don't believe that -- I mean, let's

9          see.  Ask me the question one more time.

10    Q    Well, was Friends of Red Acre, prior to the acceptance

11         of the right of first refusal by TPL, was Friends of

12         Red Acre aware of the difficulties and requirements of

13         subdividing the property?

14    A    In order for us to make a judgment on our own that it

15         could or could -- that they were surmountable or not

16         surmountable?

17    Q    No, just what were you aware of prior to TPL accepting

18         the right of first refusal?

19         MS. ECKER:  Objection.

20    A    What was the pivot date, again, for the --

21    Q    February 12th.

22    A    So, for example, this document that you showed, which

23         is the Donna Jacobs -- is this the one where she --

24         yeah, Donna Jacobs, this is before.

50

1    Q    So, you're talking about Exhibit 3?

2    A    Yeah.

3    Q    Which is the Donna Jacobs --

4    A    What would be your concern?  Don't these just line up,

5         the fact that we saw this?  The question is, in my

6         mind, does it matter whether we knew there were issues

7         or whether we understood that Trust for Public Land

8         thought that these issues were surmountable or not.

9    Q    No, my question is whether Friends of Red -- is it

10        fair to say you're confirming, by looking at Exhibit

11        3, Furman 3, that Friends of Red Acre was aware of the

12        difficulties and requirements of subdividing the

13        property?

14                 MS. ECKER:  Objection.

15   A    I think your question is too vague.  I think you'd

16        have to define what the difficulties are that you're

17        referring to.

18   Q    Okay.  I'm asking you to determine, based upon what

19        was written by the secretary of the board in this

20        exhibit, which is Perry 17, whether that's an accurate

21        statement that the Friends of Red Acre were aware of

22        the difficulties and requirements prior to the

23        acceptance of the right of first refusal.  That's all

24        I'm asking.

```
 1                    MS. ECKER:  Objection.
 2    A    Well, there's also the words in here of subdivision,
 3         and that, again, is only one of many possible
 4         approaches.  So, my point in not answering your
 5         question is I think it's not specific enough.
 6    Q    Well, all I'm asking for is whether you think this
 7         statement is accurate, and I'm talking about the
 8         exhibit, Perry 17, which is part of the Zoning Board
 9         of Appeals minutes.
10                    MS. ECKER:  Objection.
11    A    Well, I object to the use of the word difficulties.
12         Issues.
13    Q    I appreciate your objection, but it's not -- you can
14         delineate -- you can tell me why it's not accurate or
15         why it is accurate.
16                    MS. ECKER:  Objection.
17                    MR. CONROY:  I can object to it,
18         though.
19    A    Okay.
20                    MR. CONROY:  Go ahead.
21    Q    Go ahead.
22    A    Difficulty, I believe, is the word that I don't
23         believe -- that's why I cannot answer your question,
24         because I don't -- if Trust for Public Land was
```

52

1      confident to move forward, I was going with them.  So,

2      my opinion of whether something is difficult or not is

3      irrelevant.

4    Q   Did it turn out that your confidence in Trust for

5      Public Land's analysis of whether it could get permits

6      or licenses, or variances, rather, or special permits

7      or subdivision approval, was that confidence well-

8      founded?

9           MS. MURPHY:  Objection.

10          MS. ECKER:  Objection.

11          MR. CONROY:  Objection.

12   A   Well-founded?  I don't know.  Other than trusting the

13     Trust, I didn't do extensive individual research.  I

14     assume that they are a well thought of and well run

15     organization that has a lot of experts at hand and

16     knows what they're taking on and what's worth taking

17     on and what's not.

18   Q   Are you aware The Trust for Public Land said that the

19     local fund-raising was a failure?

20          MR. CONROY:  Objection.

21          MS. ECKER:  Objection.

22   A   Yeah.

23   Q   And when did you become aware that Trust for Public

24     Land said that the local fund-raising was a failure?

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

1    A    Let's see.  Fairly late.  Now, are you saying that

2         they said that to us or they said it to other parties?

3    Q    Let me read something to you from the complaint.  I'm

4         reading from Exhibit 12 to the complaint, which is a

5         September 9, 2003 --

6    A    I was going to say, it's going to be fairly late.  I

7         was looking in August.

8                    (WHEREUPON, Exhibit No. 5, TPL letter

9         to Kachajian, dated September 9, 2003, marked for

10        identification.)

11   Q    This is Exhibit No. 5.

12                   MR. CONROY:  Perry 17 wasn't marked in

13        this?

14                   MR. McLAUGHLIN:  No.

15   Q    I direct your attention to the third paragraph, which

16        says:  First, there is a significant fund-raising gap.

17        Not only has the economy been hostile to philanthropy

18        in general, but we have experienced a catastrophic

19        failure in the rejection of the 350,000 Department of

20        Housing and Community Development grant.  Local fund-

21        raising efforts have not been as successful as we had

22        hoped and are necessary to make the project work.  Do

23        you see that?

24   A    Yes.

54

1    Q    Do you understand what he meant by that?

2                    MR. CONROY:  Objection.

3    A    Well, this agreement, from the very beginning, is

4         whether or not Trust for Public Land was telling us

5         not to help them fund-raise or not.

6    Q    And can you explain to me what you mean by that?

7    A    Well, we can only help by helping to write templets,

8         et cetera.  The funding letters have to go out through

9         Trust for Public Land's office, and they were holding

10        off to solve the zoning problems.

11   Q    And it was your understanding that they were telling

12        you that they could not fund-raise because they hadn't

13        resolved the zoning problems?

14                   MS. MURPHY:  Objection.

15   A    Well, that's why I was looking for some correspondence

16        before, which I think might be helpful.

17   Q    Yeah.

18   A    March 20th might be my first thing I would point to,

19        is a letter from my husband to Craig MacDonnell, and

20        it points to --

21   Q    Let me see if I can find it first.

22   A    Sure.

23                   MR. CONROY:  What year is that?

24                   THE WITNESS:  March 20, 2003.

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

1    Q    Okay.  I've got that.

2    A    So, look at Paragraph 3:  On the issue of fund-raising

3         and time line for payments, we have areas of agreement

4         and distinctions.  This is the ongoing issue.  We've

5         been saying from day one of this project that it is

6         the financing and not the finances.  Another way of

7         saying this is that the payment dates, as specified in

8         the purchase and sale, are not related to the time

9         line for bringing in donations from foundations or

10        government sources.  The cycle of giving by

11        foundations is set by individual foundation boards,

12        their members, and their financial backing.  We have

13        attempted to program the financing for this project

14        based on realistic time lines for philanthropy.

15        Wishing or insisting that these time lines will be

16        aligned will not change the fact that they're not in

17        sync.  We have been forthright with you, the town, SCT

18        and Red Acre Foundation on this point.

19             It goes on to show how we had found a

20        generous source of low financing from Bob Durand.

21    Q    The next paragraph begins with:  We have gone so far

22        as to begin to negotiate lines of credit that TPL may

23        wish to utilize, and we would again urge you to follow

24        up with Bob Durand on his generous offer.

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

1    A    Right.

2    Q    Were you aware at the time that you were attempting to

3         negotiate lines of credit for TPL that TPL had

4         seventy-six million dollars worth of lines of credit

5         available to it?

6              MS. MURPHY:  Objection.

7    A    No, I think you mentioned that in a phone call to me

8         and that it appeared -- did it appear in the DHCD

9         grant?  Because I never saw a completed copy of that

10        grant.  I participated in writing, I don't know, the

11        history of Stow, you know, sections based upon what I

12        thought was the master plan for the town.  I guess it

13        was on file at the library, but it never was fully

14        incorporated.  There was a previous master plan that

15        was written that the library has.  So, I was pulling

16        language from that.

17   Q    Okay.  I'm going to put before you something that's

18        already been marked as MacDonnell 11, and this is an

19        application provided to us by the town.

20   A    Oh, the entire thing?

21   Q    It's not the entire -- but this was provided to us by

22        the town, and I would direct your attention to KUN342.

23   A    Right.

24   Q    Now, looking at KUN342 under *Financing Mechanism*, it

1    says -- by the way, this appears to be a document --

2    looking at the first page, the letter from Ross to

3    Bill indicates that this was something that Craig

4    MacDonnell had sent to him, had been completed by TPL,

5    and it's dated the 30th of March.

6  A    Okay.

7  Q    It says:  TPL -- looking back on 342 -- is prepared to

8    purchase the property.  TPL has a primary and fallback

9    plan.  The primary plan envisions a multilateral

10   funding approach to this project.  Some of the funding

11   is contingent, as explained below, but all is subject

12   to a fallback line of credit from Wainwright Bank.

13       The next page, after a discussion of A

14   through D on the private fund-raising, it says:

15   As a fallback plan, if any or all of the above-

16   referenced sources of funds are unavailable, TPL

17   intends to use capital from the private market.

18   In this regard, TPL has available for its use a

19   line of credit from Wainwright Bank in the amount

20   of six million dollars as evidenced by a letter

21   attached as Exhibit -- blank.

22       I will represent to you that exhibit blank

23   was not attached to this document.  Use of this

24   capital is subject to TPL's internal approval

1          process, including customary due diligence and

2          approval by the Board of Directors.

3               Now, is today the first time you've actually

4          seen reference to a six million dollar line of

5          credit that TPL had in place in order to purchase

6          the property?

7                    MS. MURPHY:  Objection.

8                    MR. CONROY:  Objection.

9     A    Well, here's the thing.  I mean, I feel as if I could

10         be -- my memory is that I never saw the completed

11         document of the DHCD grant as it was submitted.  I

12         gave some pieces in, it was put together, and I didn't

13         see the completed document.  Let me tell you that, if

14         I had seen this, it wouldn't have shocked me that this

15         information was in here.

16    Q    Okay.  Let me ask you this.

17    A    So, if I had seen this, if, for example, Craig had

18         shown me some of the -- I know I've seen some of this

19         document, never the whole thing.  If I had seen this

20         in a paragraph, I wouldn't have been -- it wouldn't

21         have bothered me one way or the other, or it wouldn't

22         have been of note to me.

23    Q    Did you have an understanding that TPL would have

24         purchased the property even if the Town of Stow's

1          contribution was not made, even if the sale of 144 Red

2          Acre Road did not occur, even if they didn't get the

3          funding from DHCD, and even if they didn't get private

4          fund-raising of $200,000?

5                    MS. MURPHY:  Objection.

6                    MS. ECKER:  Objection.

7     Q    Because looking at the paragraph --

8     A    Well, that's not what he's talking about here.  What

9          he's doing is he's securing -- what he's doing is

10         providing the DHCD with a grant where all the bases

11         are covered.

12    Q    Well, if you look at the fallback position on Page

13         343, it says:  As a fallback position, if any or all

14         of the above-referenced sources of funds are

15         unavailable, TPL intends to use capital from the

16         private market.

17             Were you aware that TPL had informed the

18         town and the state that it didn't matter whether

19         the local fund-raising worked or not worked; it

20         didn't matter whether the Town of Stow had given

21         the money or not?  Were you aware that none of

22         those things, according to TPL's statement to the

23         state, were material enough to prevent it from

24         using its line of credit?

1           MS. MURPHY:  Objection.

2           MS. ECKER:  Objection.

3           MR. CONROY:  Objection.

4     A     Well, I mean, I understand this is a fund-raising

5           document.  What TPL is doing here is they are

6           providing a full plan.  The DHCD would never approve a

7           grant if it relied upon fund-raising or something that

8           had yet to happen.  So, what TPL did is they wrote a

9           very good grant, and what they are talking about is

10          financing the project here.  That's what they're

11          talking about, and I believe, what I see this as, that

12          they really viewed -- they were making a decision with

13          this document.  They viewed the DHCD grant as a

14          critical fund-raising component, and if this money had

15          come in, they would have made it work.  That's the way

16          I view it, because --

17    Q     What about the language --

18    A     But, also, also, the other thing is, they can receive,

19          they can successfully receive, a grant from DHCD,

20          right, and then not take it, give it back.  Now,

21          that's a horrible repercussion, just like all the

22          other funding sources, and when I'm explaining

23          corporate and foundation funding, if you do that to

24          these people, if you made DHCD award you a grant and

1          then you say, you know, we can't really make this

2          work, we're going to back out, you'll never be able to

3          go back to that pool again.

4              So, on the one hand, what they were doing

5          was really not, I don't think, setting their

6          course in stone with this document, but they knew

7          if they wanted to back off from the DHCD money

8          after it had been awarded, there would have been

9          problems down the road if they ever wanted to go

10          back there again.  They may not.  This is an

11          unusual funding source for TPL.  Their funding

12          sources are conservation.  The affordable housing

13          thing was very unusual.

14              So, I'm just trying to read a little bit

15          into their thoughts, but they always -- I believe

16          they're a big enough organization that they could

17          extend financing if they wanted to, but I don't

18          believe it's what they typically do.

19      Q   Your last extended answer, is it based upon any

20          specific knowledge that you had at the time that TPL

21          made these statements, or is this --

22      A   I didn't know they did this.  That's my memory.  I

23          would have been very happy to see them do that,

24          because that would have been very encouraging to me to

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

1          have seen that they had made that jump.

2    Q    At the time that you were trying to arrange, or your

3          husband was trying to arrange, a line of credit for

4          TPL, does it now strike you that TPL was withholding

5          from you information concerning the fact that it had a

6          line of credit already?

7                MS. ECKER:  Objection.

8    A    You know, all we were trying to do is help TPL, and --

9    Q    That's not my question.

10    A    I'm sorry.

11    Q    The question is:  does it strike you that they were

12          withholding information from you?  Because, in truth,

13          I can't understand why you would be trying to raise or

14          arrange a line of credit for TPL if you already knew

15          that they had a six million dollar line of credit

16          available for this.

17                MS. ECKER:  Objection.

18                MS. MURPHY:  Objection.

19    A    No, I think there's some logic to what you're saying.

20          We had never asked them if they had one in place or

21          not.  So, we just went out and thought, well, maybe we

22          could find something.  It was very -- maybe, hey, you

23          don't know.  Maybe Bob Durand's line of credit turned

24          out to be a better interest rate than the bank, too.

63

1          You don't know.

2     Q    Who attempted to arrange for the Bob Durand line of

3          credit?

4     A    I'd have to back up.  It wasn't me.  Bob Durand has a

5          very strong local presence in our area, and I don't

6          recall who approached him.  I don't even know where we

7          got the idea to contact him.  I know who he was,

8          because he used to be very involved in some other

9          things, like condo associations and stuff, that I was

10         involved with years ago.

11    Q    Let's go back to the March 20, 2003, letter from your

12         husband to MacDonnell.

13    A    Uh-huh.

14    Q    Was there a bone of contention between Friends of Red

15         Acre and TPL as to TPL's requirement that the fund-

16         raising not occur until such time as a resolution of

17         the zoning was achieved?

18    A    That was our understanding.

19    Q    I'm going to have you look at Exhibit 5 again.

20    A    And this is dated still September?  I'm sorry.  I was

21         still creeping forward within my letters to see what I

22         could find from Craig.  We'll look at 5 again?

23    Q    Yes, five.

24    A    Okay, sorry.

64

1    Q    Now, I'm again interested in having you look at the

2         third paragraph, which says:  Local fund-raising

3         efforts have not been as successful as we had hoped

4         and are necessary to make the project work.

5              This is a letter of September 9th to Peter

6         Kachajian, the attorney for Mrs. Kunelius.  I

7         would like your understanding of how local fund-

8         raising efforts could have been successful in

9         light of TPL instructing Friends of Red Acre not

10        to do fund-raising until a zoning resolution had

11        been achieved.

12             MS. MURPHY:  Objection.

13   A    Now, what we have to do before we can say that that

14        was a direct instruction is find a document from Craig

15        that says that, and he may not have ever done that,

16        but the point is --

17   Q    Well, I will represent to you that Karen Sommerlad has

18        testified that he did.

19   A    Okay.  I mean, I wonder.  I know that Craig is a

20        professional, and maybe he was careful about what he

21        said and did not say in letters, but.  DHCD denied the

22        grant on July 2nd.  Well, this is probably one of my

23        most dramatic pieces of correspondence on July 23rd.

24        This is an internal e-mail.

1          MR. CONROY:  Excuse me.  What year?

2          THE WITNESS:  Sorry, 2003.

3    A    This page which is directly in front of it is probably

4          pretty easy to spot, which is a bunch of handwritten

5          notes, but this is my husband just communicating with

6          myself and with Karen.  Have you found it yet?

7    Q    It's July, what date?

8    A    Twenty-third.

9    Q    Okay.

10   A    So, I showed this to my husband, and he was like,

11         well, fine, you know.  So, the first thing that he

12         refers to here is, in the early document, where he had

13         identified all those different foundations, that many

14         of them were responded by Trust for Public Land as

15         we've never heard of these people before, great.  This

16         is fantastic.  And then he followed up with this e-

17         mail saying that Trust for Public Land has now told

18         him that they have now used those prospects for other

19         projects, so they're not available.  So, that was very

20         disconcerting to him.

21   Q    Let me make sure I understand.

22   A    You can't go to foundations for more than one thing

23         per year.

24   Q    Let me make sure I understand what you just said.

| | | |
|---|---|---|
| 1 | A | Yeah. |
| 2 | Q | Peter Christianson, your husband, produces for Craig |
| 3 | | MacDonnell and TPL a list of prospective donors. |
| 4 | A | Right. |
| 5 | Q | That your husband, as a professional fund-raiser, |
| 6 | | believed would be good sources of fund-raising in |
| 7 | | order to facilitate the purchase. |
| 8 | A | Right.  And he vetted them. |
| 9 | Q | Is what you've just said?  I want to make sure I |
| 10 | | understand it correctly.  After Craig MacDonnell and |
| 11 | | TPL received that list, they proceeded to use that |
| 12 | | list for other fund-raising efforts un-associated with |
| 13 | | the Friends of Red Acres' efforts to acquire the |
| 14 | | property from Mrs. Kunelius? |
| 15 | A | Right.  I don't know what kind of specific |
| 16 | | documentation exists, because all we have in our |
| 17 | | documents is this note, internal note, and it probably |
| 18 | | followed a phone conversation, where he was going over |
| 19 | | that pool of applicants and they indicated to him that |
| 20 | | they were no longer available because they had been |
| 21 | | used for other projects. |
| 22 | Q | By TPL. |
| 23 | A | Right.  So, here, but what I want to point out -- |
| 24 | Q | Well, before -- |

1    A    Sure.

2    Q    Did TPL pay your husband any fund-raising funds for

3         this?

4    A    No.

5    Q    Did TPL notify your husband that it was going to use

6         these resources, these references --

7    A    No.

8    Q    -- prior to them using it?

9    A    I doubt it.  Otherwise, he wouldn't have been so --

10        used such words in that note.

11   Q    So, do I understand you correctly, that TPL then --

12        that your husband found out -- strike that.

13            How did your husband specifically find out

14        that TPL had used those?

15   A    Well, unfortunately -- let me see.  Hang on a second.

16        Let's see if we can read back through this series of

17        e-mails, because what I don't see in here is what the

18        communication was.  How did my husband -- who did my

19        husband talk to?  I couldn't figure that out from

20        looking at this document.

21            So, but at any rate, again, this is just

22        another one that speaks to the fact that -- so it

23        looks like a conversation on July 3rd.  He told

24        Peter that TPL intended to do zero the fund-

68

1          raising and FORA were responsible for a hundred

2          percent, and this was direct opposite of what

3          they had been talking about back in January, when

4          we met with their fund-raising team.

5      Q   Can you explain to me, technically, what you just

6          said?  You said that TPL intended to do zero fund-

7          raising?

8      A   That's in the third paragraph.

9      Q   Meaning that they were going to do no fund-raising.

10     A   Right.

11     Q   And that FORA was responsible for a hundred percent of

12         it.

13     A   And/or financing, no later than the closing.

14     Q   A hundred percent of what?

15     A   Whatever the fund-raising goal was beyond what had

16         already been achieved through the town, the CPC money

17         and --

18     Q   Okay.  Let's go back.

19     A   But I just want to point out one thing here.  Number

20         one, Craig told me to wait.

21     Q   Yeah.

22     A   So, I just wanted to confirm.  That's the closest

23         thing I can get to that Craig was actually telling us

24         not to do fund-raising.

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

69

1    Q    Okay.  Let's go back to the document that's already

2         been marked as MacDonnell 11, and I would ask you to

3         again go to 342.  On Page 342 is a grid showing TPL's

4         primary plan.

5    A    Okay.

6    Q    There, it references private fund-raising of $200,000.

7         Was that the private fund-raising that MacDonnell was

8         now asserting was entirely the responsibility --

9    A    No, why wouldn't that be 100,000 from Red Acre

10        Foundation and 100,000 from Stow Conservation Trust?

11        That's in-hand.

12   Q    So, that money was already in-hand, meaning that while

13        it hadn't been received, it had been pledged.

14   A    Uh-huh, as promised.  Yeah, pledged, good word.

15   Q    So, do you have any understanding as to what

16        MacDonnell was referring to when he told your husband

17        that FORA was responsible for a hundred percent of it,

18        a hundred percent being the 200,000?

19             MS. ECKER:  Objection.

20   A    Well, is this not after?  Is this not after?  This is

21        after the date when the DHCD fell through.

22   Q    So, are you implying there that the amount sought from

23        DHCD would have been added to the fund-raising

24        requirement?

1    A    I would assume.  What other source would there be?

2    Q    Other than the line of credit or that kind of thing.

3    A    Well, again, you know, we were committed to the

4         project.  Any line of credit would just be used as a

5         bridge for fund-raising that would occur over a couple

6         of years.

7    Q    Did your husband feel that the list that he had put

8         together for TPL had any proprietary components to it?

9                   MS. ECKER:  Objection.

10   A    No.

11   Q    Are you aware of whether there is any document in what

12        you have supplied to us in which that list of

13        potential donors was passed on to TPL and your husband

14        said, by the way, this is for Friends of Red Acre?

15   A    I bet he wasn't that careful.

16   Q    Are you aware of any standard among not-for-profits,

17        charitable institutions, where someone in the position

18        of your husband providing this information to TPL,

19        that that standard would have suggested that it would

20        have been just available for the Friends of Red Acre

21        fund-raising effort?

22                  MS. MURPHY:  Objection.

23   A    No, and I'm also fairly certain that the list of the

24        prospect pool, I think that we both believe it's

71

1          highly likely that many of those had been identified

2          and used before by TPL.  We tried to look for funding

3          sources they hadn't used before, knowing that, you

4          know, that's where we could create the best benefit to

5          the project, but I think he had a response that there

6          were ones amongst that list that they had never heard

7          of before.  I'm wondering at this point whether he'd

8          be able to say this one and this one and not that one.

9     Q    Let's go on, on the July 23, 2003, e-mail from Peter

10         Christianson to Karen Sommerlad, Michael Labosky.

11         There is a list beginning with:  One, Craig told to

12         wait.  Two, I did not want to risk my relationships

13         while he was threatening to pull out.  Do you know

14         what that is referring to?

15    A    Well, I think TPL all along has, you know, from time

16         to time, said that things were going very badly and

17         that they, you know, may not be able to continue.

18    Q    And if the fund-raising was not being undertaken

19         because of TPL's instruction and if you had an

20         understanding that TPL believed it could get the

21         permits and variances that it was seeking, was it

22         going badly?

23              MS. MURPHY:  Objection.

24    A    Well, for one thing, there was a town vote that went

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

1    against us.  That was one -- was very discouraging.

2    So, it wasn't just all this financing, but then what

3    was increasingly becoming a problem was the

4    stipulation that the cash be on-hand for closing, or

5    not, whether TPL was going to entertain the idea of

6    any kind of bridge funding.

7              MR. CONROY:  Mike, excuse me.  Off the

8    record for a minute?

9              MR. McLAUGHLIN:  Yeah.

10             (Brief discussion off the record)

11             (Luncheon recess, 11:47 A.M.)

12              (After recess, 12:41 P.M.)

13    By MR. McLAUGHLIN:

14  Q  Looking at your husband's e-mail to Karen Sommerlad of

15    July 23rd, what does a templet mean, when it says --

16    Item No. 4, on the first page.

17  A  I'll show you one.  What you do when you do a fund-

18    raising campaign, for certain, you know, when you're

19    going after a certain type of funder, in our case, we

20    probably would have ended up with three templets.  The

21    funders that are categorized by people interested in

22    conservation are different people than equine rescue

23    and affordable housing.  So, a templet has components

24    in it such as -- this goes back to almost the very

1      beginning of the document set, and it is -- I think we

2      took these down to a meeting, but, at any rate, what

3      you do is you write basically -- it's like a

4      boilerplate.  Let's say you have a proposal or

5      something.  You have a standard boilerplate, talks

6      about the goals, the description of the project.  It's

7      usually, you know, in this case, it's one, two, three,

8      four, five, six pages long.

9    Q    Beginning with *Conservation Project in Stow*?

10   A    Project in Stow, correct.  Correct.  So, this is a

11        boilerplate written with a conservation bias.  There

12        would be another one for equine rescue and then

13        another one.  It just simplified the work that you

14        have to do, because then you take this, as you would

15        with any contract boilerplate, or any other kind of

16        boilerplate, proposal boilerplate, and then you tweak

17        it.

18   Q    Looking at the third paragraph, it says:  In my July

19        3rd conversation with Craig, he explicitly told me

20        that TPL intended to do zero fund-raising.

21            Now, with that in mind, TPL has informed the

22        Court that it was unable to raise funds and,

23        therefore, unable to purchase the property from

24        Mrs. Kunelius.  The two unables being unable to

74

1        fund-raise successfully and unable to purchase

2        the property.  Are you aware, on the fund-raising

3        component, whether TPL did fund-raise at all?

4                        MS. MURPHY:  Objection.

5                        MR. CONROY:  Objection.

6    A    Well, I know that we did a joint presentation with

7        them to try to increase the fund-raising for -- might

8        have been Stow Conservation Trust or Red Acre

9        Foundation.  I'm not quite sure, but I think it was

10       Red Acre Foundation.  We went down to Leonard

11       Johnson's house, and he's one of the board members.

12       He lives down on the Cape.  What their strategy was at

13       this point was for us to go back to the people who had

14       already donated money and get more money from them.

15            So, yes, they did that, but I don't know if

16       they did any.  My understanding, Peter's

17       understanding, was that, if you go to Item 6,

18       that Sheila Dennis asked me to participate in a

19       committee to raise funds from individuals, and I

20       agreed.  The committee has not been convened

21       because, apparently, Craig told her to hold off,

22       but she subsequently left.

23   Q    TPL?

24   A    TPL, yeah.

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

1   Q   And her last name was Dennis?

2   A   Dennis.  Yeah, she must have still been there for this

3       conversation, but I believe, by the end of the end of

4       the end, she had left.

5   Q   Now, do you recall what your husband's reaction was to

6       being told that TPL intended to do zero fund-raising?

7   A   Well, I think the interesting thing here is he's

8       pretty -- got his shirt on -- heart on his sleeve

9       here.  He said, in the middle of the third paragraph,

10      "This is tantamount to challenging me to a duel."

11  Q   Do you have an understanding of what he meant by that?

12  A   Meaning that that was a very -- that was probably the

13      first time that Craig had ever said that to him.

14      That's why he's fairly worked up in this document and

15      that, basically, he was going to put that he was being

16      told by Craig to take on a hundred percent of the

17      responsibility at, you know, this late date, in my

18      mind.

19  Q   And this was in July of 2003?

20  A   Well, the conversation is dated as July 3rd, yeah.

21      So, basically, they were pulling all, you know, the

22      work that they were going to do for fund-raising.

23  Q   So, is it your understanding that as of July 3, 2003,

24      MacDonnell tells your husband that he's responsible

1    for doing all fund-raising and that this was the first

2    time that your husband had understood that TPL was

3    looking to have Friends of Red Acre do a hundred

4    percent of the fund-raising?

5       MS. MURPHY:  Objection.

6  A  Was that the first time, a hundred percent?  Probably.

7  Q  Now, you had said, and this document says, that Craig

8    MacDonnell told your husband to wait, as did Sheila

9    Dennis.  Do you have an understanding of how your

10    husband dealt with, on one hand, being told don't

11    fund-raise, and then as of July 3rd, shortly before

12    closing, being told that he's responsible for a

13    hundred percent of the fund-raising?  What was his

14    reaction with regard to that?

15  A  I know that he wrote Craig a letter.  There's a letter

16    following it, July 27th.  Isn't that after this?

17  Q  Yes.

18  A  Yeah.  So, you know, we're still doing everything we

19    can to keep Trust for Public Land going.  We go

20    through our concerns about the zoning, and then you're

21    specifically asking about the fund-raising, so.

22  Q  Well, let me ask the question differently.  It appears

23    that, on one hand, FORA, Friends of Red Acre, is being

24    told, "Don't fund-raise."

1    A    Right.

2    Q    And then, on the other hand, they are being used as

3         the explanation for why TPL can't go forward, because

4         of the failure of local fund-raising.  So, my question

5         is:  did Friends of Red Acre feel that they were

6         somehow being made into a scapegoat for the failure to

7         move forward in the purchase of the property?

8              MS. MURPHY:  Objection.

9              MS. ECKER:  Objection.

10             MR. CONROY:  Objection.

11   A    Sometimes I wonder what the meanings are behind your

12        question, so.  I wanted to just see if I could find

13        something that answers a question of what my husband

14        did.  If you keep going a few more pages from the e-

15        mail that we have been referring to earlier, the one

16        that has August 6th handwritten at the top, I just

17        remember when I was reading through this -- yeah,

18        after that.  There you go.

19   Q    All right.

20   A    Go to Page 2.  This is what my husband did.  In future

21        statements from TPL to our stakeholders or to the

22        public, there can be no implication that the absence

23        of private funds raised is in any way contributable to

24        FORA for fund-raising, as cited by TPL, and TPL must

1          also explicitly say that it was TPL's choice and TPL's

2          failure.

3                So, that's what my husband did.  He was

4          pretty upset about that because it reflects upon

5          him personally and his ability as a professional.

6          So, one of the important things I want to point

7          out at this document is that we have never broken

8          ranks publicly with TPL, and the last sentence is

9          that, if TPL does make these assertions about us,

10         then we are going to break ranks with them, and

11         so, really, this has never happened before in any

12         public venue.  This is the public venue where we

13         were first breaking ranks with TPL, in making,

14         you know, this story, and we were very, very

15         careful about trying to be one hundred percent

16         behind them and not doing anything where we

17         disparaged them in public, so.

18    Q    In the motion to dismiss filed by TPL, Craig

19         MacDonnell, and the town, they write the following:

20         However, after paying thousands of dollars in deposits

21         required under the agreement, TPL found itself unable

22         to raise the money necessary to fund the project and

23         was unable to complete its purchase of the property.

24               Now, is it your understanding that TPL was

79

1          unable to raise the money or was unwilling to go

2          out and do fund-raising?

3     A    I think that I would read the sentence as was unable

4          to raise the money by closing, which is their standard

5          procedure, and I don't think they ever agreed to the

6          problem that we pointed out from the very beginning,

7          that this project would require financing and some

8          kind of a bridge loan to carry it over a few years in

9          order to make the funding goal.  I think their

10          decision was that they would stick with their standard

11          procedure and just raise funds by the closing date.

12     Q    And not use any of their own funds at any time.

13     A    I don't know.  It's their decision, their decision,

14          but that was sort of my understanding of why it went

15          down the way it went down.  That's the way I saw it.

16     Q    So, when, on July 3rd, your husband learns that TPL

17          intends to do zero fund-raising, given that fact, is

18          it fair to say that a decision, or being unable to

19          move forward when TPL had made a decision to do zero

20          fund-raising, means that, in essence, TPL had decided

21          at that point not to purchase the property?

22               MS. MURPHY:  Objection.

23               MS. ECKER:  Objection.

24               MR. CONROY:  Objection.

EXHIBIT G

80

1    A    I don't know.  I mean, I don't think that would be

2         correct, because if we had somehow magically reached

3         into daddy's bank account and pulled the cash out,

4         they would have gone forward, but they just said,

5         "We're not fund-raising."  The door was still open if

6         we could somehow magically come up with the money.

7    Q    So, from the time at least as of July 3rd through to

8         the present, you're unaware of TPL actually trying to

9         fund-raise, is that fair to say, for this project?

10   A    Other than, as I said, we made some presentations to

11        funders that had already been identified to see if

12        they would give more.  And the DHCD grant.  That's the

13        major fund-raising effort.  That was a lot of work by

14        TPL.  That was a lot of work.

15   Q    But that grant was not part of the original proposal

16        that you were involved in with TPL, isn't that

17        correct?

18   A    Well, the thing is, our original proposal, the thing

19        we knew the least about was funding sources for

20        affordable housing.  So, it doesn't surprise me that

21        that came up later, because that was the thing that we

22        had been -- when you go out and look in the standard

23        donor, donation, donor pools of information, there

24        really aren't a lot of non-profit organizations that

81

1           are funding affordable housing.  It's pretty much a

2           new thing, so.  I'm not surprised it wasn't in the

3           early plans, but it became a very significant portion

4           of TPL's efforts.

5    Q    I would like you to move forward to a document.  It's

6           got a handwritten number of 9-11-03 on top of it.

7    A    How many pages forward is it, quite a few?

8    Q    Yes.

9    A    Oh, yeah, got it.  This is a response to his letter of

10          September 10th.

11    Q    That's correct.  Looking down at that, under TPL's

12          project assessment, under B, it says:  TPL has assumed

13          a position that, quote, local fund-raising efforts

14          have not been successful and a catastrophic failure of

15          the DHCD grant -- unquote.

16    A    Yeah, that sounds very similar to this thing that he

17          wrote to Kachajian, right?

18    Q    That's correct.

19    A    Right.

20    Q    Now, it goes on to say -- I think this is your

21          husband's response to him, or maybe yours.

22    A    Good question.

23    Q    Serena Furman.  It's from you.

24    A    That's mine.

82

1    Q   By the way, this is marked *DRAFT*.  Do you know if some

2          version of this was sent?

3    A   I assume so.

4    Q   It goes on to say:  Though the DHCD grant was not part

5          of the original budget, TPL's financial plan became

6          dependent on this one grant submission.  The resulting

7          financial picture does not conform to TPL's project

8          guidelines and would require advocacy on the part of

9          TPL's project leaders that may expose them to

10         criticism.

11   A   What the hell did I mean by that?  Okay.

12   Q   What did you mean by that?

13   A   Well, this is what I'm saying.  The resulting

14         financial picture, which means we did not receive the

15         grant and that TPL's typical project guidelines --

16         and, believe me, I'm reading -- I haven't read their

17         manifesto or something that tells me exactly what they

18         do and don't do -- but that their typical project

19         guidelines bring the project to a close at the time of

20         closing, funding in-hand, all done, go on to the next

21         thing.

22         So, the fact that we were in this

23         position -- this is a sympathetic paragraph to

24         TPL -- that it would take a great exertion on

1          their part to convince their board to do

2          something unusual and go forward with financing

3          and something, et cetera, at this point.

4     Q    Now, this document, if you continue, it says, next

5          paragraph:  TPL is choosing to change history by

6          neglecting to mention that fund-raising, local or

7          otherwise, was organized as a joint effort with TPL

8          who repeatedly delayed the start-up of fund-raising

9          committees.  There is an understandable reluctance on

10         the part of TPL to fund-raise before certain key

11         decisions were made regarding town support and Zoning

12         Board approvals.

13              Now, you have mentioned that TPL has told

14         you that they weren't going to do fund-raising

15         prior to having those approvals.  I want to just

16         ask you a few questions concerning the logic of

17         that.

18    A    Okay.  I think I've gone over a little bit of that

19         before, but we can go over it again.

20    Q    There was nothing stopping TPL from simply acquiring

21         that property and dedicating the entire property to

22         conservation, was there?

23                   MR. CONROY:  Objection.

24                   MS. MURPHY:  Objection.

84

1    A    I don't know how they would do that.

2    Q    Well, if they acquired the property using their own

3         resources, for example, and they elected to dedicate

4         the entire property to a conservation restriction,

5         they could have done that, isn't that fair to say,

6         regardless of whether they wanted to spend the money?

7         I'm just saying is there anything that stopped them

8         from acquiring the property and dedicating the entire

9         parcel to a conservation restriction?

10   A    Other than that I don't know what the -- I don't know

11        how you run the numbers on that.

12   Q    Well, I'm taking the issue of whether TPL wanted to

13        spend the money out of the equation.  I'm just trying

14        to understand that there was nothing to stop them from

15        doing that if they used their own funds.

16   A    I don't know to respond to that, because that just

17        seems like it would be considered bad practice on

18        their part.  They wouldn't be in business if they went

19        around doing that.

20   Q    Do you have any idea how much money TPL has as far as

21        assets?

22   A    No.

23   Q    Do you know whether they've got fifty million dollars

24        or five hundred million dollars in assets?

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

1  A    No.

2  Q    Now, what did you mean when you said they are changing

3       history?

4  A    Well, that was their first public pronouncement that

5       there was a failure in fund-raising.  Wait, wait,

6       that's not quite right.  Let me read that sentence

7       again, because I think I'm talking about something

8       else here.

9            Well, I don't know if changes or make a

10       declaration, a historic declaration.  What

11       they're basically doing is, what we were talking

12       about here is, they were characterizing it as not

13       being their fault.  They were characterizing

14       fund-raising as not being their fault and thus

15       trying to make a statement of fact that would,

16       you know, go down in public understanding that it

17       was not their fault.

18  Q    And within the scope of the original documents that we

19       reviewed that demonstrated that your husband and

20       Friends of Red Acre had identified as much as 1.3

21       million of possible donations, and given the fact that

22       Friends of Red Acre had given that list to TPL, can

23       you explain to me why TPL refused to access that list

24       specifically for the Kunelius property, if you know?

1              MR. CONROY:  Objection.

2              MS. MURPHY:  Objection.

3              MS. ECKER:  Objection.

4      A   Well, again, I think the point that I made before,

5          which is even relative to the DHCD grant, is that you

6          don't make a request for fund-raising from foundations

7          and corporations unless you know that the deal is

8          going to go through.  From our perspective, you know,

9          once they signed over the right of first refusal, we

10         thought that was the starting point, and then you

11         could start sending in grants in January, grant

12         submissions, but, in fact, I guess TPL wanted to

13         practice some kind of, you know, due caution to make

14         sure that all of the zoning issues were behind them

15         first, because what you risk with any one of these

16         foundations, whether they're ones you've gone to

17         before or ones you're interested in going to in the

18         future, and I'm certain that a lot of the ones with

19         the environmental letter next to them are ones they

20         might be interested in using for other projects, is,

21         if you get a foundation grant from them and then you

22         don't use it, you're toast with that organization,

23         forever.  So, that's why you have to be very careful,

24         and I think that's why they didn't go forward.

87

1    Q    So, is it your understanding that it was a failure of

2         fund-raising, or was it a failure of getting the

3         permits and variances that was the basis for not

4         purchasing the property, or are they somehow

5         connected?

6    A    They're probably somewhat connected.  Was it a

7         failure?  I know we tried a few different avenues and

8         they were withdrawn, but I don't know if they tried

9         all of the zoning options.  I don't know.

10   Q    The assignment of the right of first refusal occurred

11        on February 12, 2003.  The application to the

12        Commonwealth for the money from DHCD appears to have

13        been signed on or about April 1st.  Do you know why

14        there was that kind of delay in even seeking the grant

15        from the state?

16   A    I bet, for this, it was -- see, there's always a grant

17        deadline.  I'm sure it made the grant deadline.

18        That's all you have to do.  You don't get better

19        status by turning it in earlier.  This was an

20        incredible amount of work to put together.  So, they

21        just worked towards the grant deadline.

22   Q    When you had conversations with Patty Murphy, when you

23        met with Patty Murphy at Goodwin Procter, did you

24        provide her with any of these documents?

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

1    A    No, I didn't.  This is the first sharing of documents.

2    Q    When do you think that meeting occurred?

3    A    What meeting?

4    Q    The meeting with Patty Murphy.

5    A    Do I have my calender with me?  I believe it was a

6         Wednesday, a week ago, week and a few days ago.

7    Q    And did you discuss the issues relating to TPL's

8         instructions to Friends of Red Acre not to fund-raise?

9    A    Well, I did characterize that we had this disagreement

10        from very early on that the financing and finances

11        were two different issues and that we knew from the

12        beginning there was going to be a problem with our

13        fund-raising strategy of having all the money in-hand

14        at closing and that it would require some financing,

15        possibly up to three years but hopefully much less

16        than that.

17   Q    Are you aware of TPL's Web site which says that, in

18        such circumstances, they provide bridge financing for

19        expressly that purpose?

20              MR. CONROY:  Objection.

21              MS. MURPHY:  Objection.

22   A    If we had seen it, I don't think we ever said, you

23        know, said to TPL anything about that, but I don't

24        know.

1    Q    Are you aware of TPL and Craig MacDonnell asserting

2         that the property wasn't worth the purchase price and

3         therefore they wanted a reduction in the purchase

4         price?

5    A    Yeah.

6    Q    And how did you come to know that?

7    A    Isn't that in the e-mail?  Isn't that in a letter?

8    Q    Yeah, I believe it is.  If you look at September 9th.

9    A    Do you have it there?

10   Q    Yes, that's September 9th.

11   A    Oh, back up.  Don't they also value the property in

12        this document?  Didn't they have the property valuated

13        in the DHCD grant?

14   Q    I believe they did, yes.

15   A    Yeah, so that might be where he got it from.  This is

16        the 12th.  Sorry, a little out of order here.  Oh,

17        here we go.

18   Q    Now, let me ask you.  In the last two sentences of the

19        first page, beginning with *Further*, I wondered if you

20        had any understanding of what this meant:  Further,

21        any bridge loan would be for an amount greater than

22        the land would be worth even if the subdivision were

23        approved.  Essentially, this would be asking TPL for

24        an unsecured loan based on weak fund-raising prospects

1           with no backup plan to repay the loan.

2                   Did you have an understanding as to who was

3           asking TPL for a loan?

4     A     Uh-uh.

5     Q     You're not aware that FORA, Friends of Red Acre, was

6           asking for a loan, are you?

7     A     No.

8     Q     And you're not aware of Mrs. Kunelius asking for a

9           loan.

10    A     No, I think I would question the sentence structure

11          rather than --

12    Q     But you don't have any knowledge of such a loan.  What

13          follows, it says:  Essentially, this would be asking

14          TPL for an unsecured loan based on weak fund-raising

15          prospects.

16                  So, looking at that sentence and the prior

17          sentence, we have a bridge loan that's being

18          looked at and an unsecured loan.

19    A     But they're the same subject.

20    Q     And so unsecured, meaning -- do you have an

21          understanding of what unsecured loan means?

22    A     Well, if somebody, some third party, wanted to co-sign

23          would be one way of securing a loan, wouldn't it?  I

24          don't know.

91

1    Q    Yeah, I suppose it could be.

2    A    I don't know.

3    Q    And then it says:  based upon weak fund-raising

4         prospects and with no backup plan to repay the loan.

5              As of September 9, 2003, did Friends of Red

6         Acre continue to believe that there were strong

7         fund-raising prospects?

8    A    Well, I don't know the details in terms of that

9         original list that we provided and then Peter's

10        comment about some of those were no longer available.

11        I don't know what the implications are with that.

12   Q    But as far as it relates to the 1.3 million dollars

13        that had been identified as possible, is it fair to

14        say that as of September 9th you were unaware, Friends

15        of Red Acre was unaware, of how much of that 1.3

16        million dollar possible funds had either been accessed

17        already by TPL, for any reason, and therefore you were

18        uncertain as to --

19   A    Well, you know, if they hadn't done anything to that

20        funding pool, I would consider the same -- except for

21        the fact that DHCD did not come through, I would

22        consider that it was the same prospects for fund-

23        raising going all the way back to January 1.

24   Q    I'm trying to understand if TPL was trying to shift

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

1      the burden to Friends of Red Acre.  Is there a

2      document that says, from Craig MacDonnell or TPL, is

3      there a document that says, "You are not tasked with

4      raising X amount of dollars in order for this matter

5      to go forward"?  Otherwise, we --

6    A  I think it's a conversation.  It's not a letter.  I

7      mean, maybe you'll prove me wrong if you read through

8      this carefully, but there's quite a few letters from

9      Craig in here.  But I don't know.  You'd have to go

10     back and take a look.

11   Q  At some point, there was a meeting at Craig

12     MacDonnell's home with regard to the Kunelius

13     property.  Do you recall that?

14   A  Yeah.  I think, was Trudy there from -- she's the

15     attorney for the zoning.  Sheila might have been there

16     as well.

17   Q  And who is Sheila?

18   A  Dennis.

19   Q  Sheila Dennis.

20   A  She may have been there.  I'm not sure.  What date was

21     that?

22   Q  I don't know.  It was at his house.  It may have been

23     a dinner meeting.  Do you recall that?

24   A  I remember the house, yeah.

1 Q And this was in Concord, is that right?

2 A Uh-huh.

3 Q What do you remember about the house?

4 A He has a parrot flying around inside of it and an

5   adorable daughter, and I remember that, you know, this

6   was getting in the phase where there was a lot more

7   sort of -- you know, we were no longer working on a

8   team as we were, you know, still trying to convince

9   him to go forward, and being frustrated and --

10 Q Was it adversarial at that point?

11 A How do you characterize that?  I mean, there were no

12   threats or anything.  It was just, as any time where

13   we sensed that he might not be going forward, we would

14   be ramping up our --

15      THE WITNESS:  I think I called it

16   whining when I was visiting you.

17 A But, I mean, it's, you know, educated whining.

18 Q Well, would you describe it as a heated meeting?

19 A I think so.  I think so.

20 Q And why was it heated?

21 A Probably because we didn't agree with whatever he

22   was -- his sort of take on where things were

23   going.

24 Q Was anybody from the town present at that meeting?

94

1    A    Oh, good question.  I don't think so.  I don't know.

2         There was a lot of people in that room, though.  Could

3         have been.  There could have been somebody.

4    Q    Give me your best recollection of who you think was at

5         that meeting, who you recall.

6    A    Well, as I said, I definitely think that Trudy was

7         there and Craig and maybe Sheila Dennis.  I was there.

8         My husband, Peter Christianson, was there.  Karen

9         Sommerlad was there.  I'm not sure about David or

10        Labosky.  After that, I'm not sure.

11   Q    And do you recall if you sat around a table and

12        discussed the matter, or was it in the living room?

13   A    I remember the living room, being too big a group for

14        a table.

15   Q    And do you remember voices being raised?

16   A    Raised?  Probably.

17   Q    Do you remember Karen Sommerlad telling --

18   A    She was coming to mind in particular, because she was

19        very frustrated about giving up on the options for

20        zoning the parcel.

21   Q    And do you recall her telling Craig, quote, this is

22        bullshit, when he said they weren't going forward with

23        the project?

24   A    That sounds like something she might say.  I don't

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

1    remember for sure.

2    Q   Tell me your best recollection of when everybody sat

3        down to discuss this matter, how the meeting went.

4    A   I don't even remember the agenda of the meeting.  So,

5        I mean.

6    Q   Was there a written agenda?

7    A   I don't believe so.

8    Q   Do you know who called the meeting?

9    A   I would assume it was Craig, because it was his house.

10   Q   Do you recall if you had dinner first and then there

11       was a meeting?

12   A   There was definitely food involved.  I can see a

13       buffet thing.

14   Q   At some point, you went into the living room and sat

15       down to discuss it.  Do you recall who ran the

16       meeting?

17   A   No.

18   Q   Do you recall Craig MacDonnell telling people either

19       at that meeting or otherwise that he was the

20       professional and you all were a bunch of amateurs and

21       that he knew what he was talking about and you didn't?

22   A   I don't remember him saying that.  If he had, I don't

23       think it would particularly bother me.

24   Q   Was your answer that Craig MacDonnell ran the meeting?

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

1    A    I don't remember.

2    Q    What do you recall about the meeting once you sat

3         down?

4    A    See, I don't remember the subject of it.  Was the

5         subject right after the latest meeting with one of the

6         planning boards or the zoning variance boards?  Was it

7         a meeting, you know, did it follow this exchange of

8         e-mails that we had?  Was it a meeting that they

9         were calling because they were basically hitting

10        a wall and they wanted to just stop it?  I don't

11        even recall what -- all of those could have

12        possibly been the point of the meeting.  I don't

13        remember.

14   Q    If you'd look at the document that is August 6, 2003,

15        in the documents that you provided to us.

16   A    Uh-huh.

17   Q    This appears to be an August 6th letter from Craig to

18        Friends of --

19   A    There we go.  We met at my house.  Here we go.

20   Q    Now, that one, that document which you have provided

21        to us, is a two-page document, with no signature, from

22        Craig to Friends of Red Acre and SCT, and it reads,

23        second line:  As we discussed when we met at my house,

24        the disappointment in funding, both the failure to

97

1    obtain the state grant and the absence of significant

2    progress in fund-raising, along with uncertainties

3    with regard to gaining approval of the zoning

4    variance, have changed TPL's estimation of the

5    likelihood of success of the conservation project.

6  A  Yeah, I remember this meeting being quite a bummer.

7  Q  So, does that help you sort of contextualize when the

8    meeting occurred and what was discussed at it?

9  A  No.

10  Q  Well, we do know that the meeting occurred sometime

11    around in August, would that be fair to say, late July

12    or early August?

13  A  Yeah, I would try to piece it, you know, between

14    documents to see if there was something that made

15    sense, but it certainly wouldn't be much before that.

16    You said early August?

17  Q  Well, it says August 6th.

18  A  Yeah, so could have been late July.

19  Q  Late July or early August.

20  A  Uh-huh.

21  Q  Let me, again, go to the issue of the third line,

22    where it says:  Disappointments in fund-raising, both

23    the failure to obtain the state grant and the absence

24    of significant progress in private fund-raising.

98

1              That statement to you, or to the Friends of

2        Red Acre, must have been, again, inconsistent

3        with your understanding as to what fund-raising

4        efforts had actually taken place.  Am I correct?

5              MS. MURPHY:  Objection.

6    A   Well, the only thing, and, again, I don't know quite

7        the sequence here, is there was an attempt to go back

8        to Red Acre Foundation and Stow Conservation Trust and

9        dramatically ask for an increase in funding.  So, that

10       may have been the last thing that wasn't successful,

11       you know, the thing that they were referring to.

12   Q   Other than those two, and those two entities had

13       contributed by pledge some $200,000 at that point, is

14       that fair to say?

15   A   Uh-huh.

16   Q   Other than those two, are you aware of any other

17       specific fund-raising efforts that were failures as it

18       relates to local fund-raising?

19             MS. MURPHY:  Objection.

20   A   I don't know.

21   Q   You're not aware of any failure of local fund-raising?

22   A   I don't recall anything.  Where we had gone to yet

23       another party and been denied, I don't recall anything

24       like that.

1    Q   So, when he refers in writing to the absence of

2         significant progress in fund-raising, did you or your

3         husband have any specific reaction to that when you

4         received this letter?

5    A   I don't know if my husband would have responded.

6         Well, that's August 6th.  This is the same day that he

7         wrote back.  So, that's the response.

8    Q   So, you're referring to a document that says *Dear*

9         *Craig* on the top?

10   A   Yeah, exactly.

11   Q   With a handwritten note of 8/6?

12   A   Uh-huh.

13   Q   And it's your testimony that this is the response by

14        your husband?

15   A   Uh-huh.

16   Q   I note that it's a two-page document.  It does not

17        appear to have a signature line.

18   A   No, it's an e-mail.

19   Q   It does not have any e-mail address or numbers

20        attached to it.

21   A   Uh-huh.  It's probably copied and pasted, because AOL

22        is lame at providing an opportunity to save e-mails

23        with all the formatting, used to be anyways back in

24        the days.

1    Q    Looking at the bottom of this document, which has the

2         handwritten 8/6 on it, the last paragraph on the first

3         page, it says:  Your July 3rd phone conversation and

4         the July 21st meeting --

5    A    There you go.  There's the meeting.

6    Q    -- were presented as leadership but were actually only

7         attempts to intimidate us into doing your work and

8         then blame us for not doing it.

9              Did you have an understanding of what your

10        husband meant by that statement?

11   A    Well, I think the way I would rewrite that would be

12        they were attempts to force us to do the load of work.

13   Q    I'm sorry.  I'm not asking you how you would rewrite

14        it.

15   A    Right.

16             MR. CONROY:  I think she has a right to

17        answer the question as she sees fit.

18             MR. McLAUGHLIN:  Well, no, I think that

19        she doesn't have a right to rephrase the question

20        and then answer the rephrased question.

21   Q    What I'd like to ask you is, simply, did you have an

22        understanding of what your husband meant, not what you

23        think it should have been rewritten as?

24             MR. CONROY:  And I'll just say I'm not

1          counsel to this witness, but I will just state

2          for the record that she's entitled to answer the

3          questions as she sees fit.

4                MR. McLAUGHLIN:  No, she is not.  She

5          cannot rewrite my questions, Counsel.

6   Q   All right.  Now, what's your best understanding of

7          what was meant by your husband when he refers to the

8          fact that Mr. MacDonnell was attempting to intimidate

9          the group, for example?

10   A   Well, the July 3rd phone conversation, we've gone over

11          before, which covers the fact that said that he's

12          going to do zero and it will be up to us to do a

13          hundred percent, which was unrealistic at the time, is

14          being pointed out to as, first, putting the

15          responsibility on us so that then we could be blamed

16          for it when it was unable to be achieved, if that's

17          clear.

18   Q   And do you recall at the meeting on July 21st,

19          presuming the meeting on July 21st was at

20          Mr. MacDonnell's home, do you recall the

21          discussion being heated with regard to this issue

22          of shifting the responsibility to Friends of Red

23          Acre and then blaming Red Acre for not

24          performing?

1    A    I'm sorry.  Could you repeat the question?

2    Q    I'm going to withdraw the question.  How was it your

3         responsibility to do the fund-raising if Friends of

4         Red Acre was not a non-profit?  Because you've

5         testified earlier that --

6    A    Right.

7    Q    -- you didn't have the ability to do it.

8    A    That's correct.

9    Q    So, when Mr. MacDonnell attempts to shift the burden

10        to Friends of Red Acre, how did he explain how that

11        would be implemented?

12            MR. CONROY:  Objection.

13   A    That would have to be through individual donations.

14        That's how you can, how you, me, I, we can all go to

15        our cocktail parties and talk our friends into giving

16        money to TPL.  That's how you do it.

17   Q    So, it's your understanding that Mr. MacDonnell was

18        saying you can't use any of the identified

19        organizations, charitable organizations, on the

20        list --

21   A    No.

22   Q    Let me finish.  But, rather, you can only use

23        individuals, and I want you, Friends of Red Acre, to

24        raise those funds on your own, but you can't use any

1          of the organizations on the list.  Am I wrong there?

2                    MS. ECKER:  Objection.

3                    MR. CONROY:  Objection.

4    A    No, I don't think that's correct, because the other

5          two ways, first of all, if there was a tremendous

6          number, well, first of all, the unrealistic part is

7          the time frame.  You have to understand that.  If TPL

8          had extended the time frame for two to three years and

9          said, "We don't want to fund-raise at all," we

10         probably could have, through a willing third-party

11         non-profit like Stow Conservation Trust, like Eye of

12         the Storm, we could have sent out solicitations on

13         their behalf, and then Stow Conservation Trust would

14         have made a donation to Trust for Public Land.  That

15         is an option, that we could have gone forward, but,

16         still, it's all about that sort of financing piece,

17         that time -- the unrealistic thing was time, from

18         July.

19   Q    I'm still a little confused.

20   A    Sure.

21   Q    Fund-raising is not something that I have done.

22   A    Yeah, and it's not my field of expertise, but I've

23         just lived with it for, you know, many, many years.

24   Q    So, initially, I want to characterize your testimony,

1        and I want you to make sure that I'm saying it

2        correctly.  I thought you had testified that

3        individuals could not go to charitable institutions

4        for the purposes of raising money because they just

5        wouldn't deal with the individuals.

6    A   Foundations and, yes, organizations, absolutely.

7    Q   So that if you were to call a foundation or charitable

8        organization that might be a likely candidate to get a

9        grant from or a donation from, you would have to be

10       doing it in the capacity of another fund-raise --

11   A   On behalf of, yes.

12   Q   Yes, such as TPL or whatever.

13   A   Right.  That's correct.

14   Q   So, my first question then becomes, if Mr. MacDonnell

15       and TPL are saying, hey, a hundred percent of the

16       fund-raising now is on you, meaning Friends of Red

17       Acre, then how does Friends of Red Acre, which is not

18       a qualified organization to be raising money, attempt

19       to do that?

20              MS. ECKER:  Objection.

21   A   Well, as I stated, individually.

22   Q   And let me stop you there.  Does individually mean

23       that you could go to your sister or to your

24       neighbor --

1    A    That's right.

2    Q    -- and say, "We'd like a hundred thousand dollars.

3         Can you give it to us"?

4    A    Well, wouldn't give it to me, would give it to Trust

5         for Public Land.  That's, I think, more how they often

6         get their projects completed.

7    Q    Do you need any license to do that?

8    A    No.  You can do that.

9    Q    So, as you understand it, what you were left with were

10        those individuals that had been identified on your

11        husband's list or such other individuals as you --

12   A    There are no individuals on my husband's list.

13   Q    So, then what would be the source of the individuals?

14        In other words, how would you compile the list in

15        order to then begin fund-raising so that you were not

16        contacting the foundations?  What was the plan there?

17   A    We didn't have a plan.  There is no plan.  And going

18        back to my earlier comment that Stow Conservation

19        Trust had warned us that they had just done an

20        extensive individual solicitation the previous year to

21        secure another parcel.  So, they were saying that you

22        better know, heads up, that the local individual

23        giving people are tapped out.

24   Q    Did they also warn TPL of that?

1    A    Beats me.  I don't know.

2    Q    So, at the time that you were told that Friends of Red

3         Acre had to be responsible for a hundred percent of

4         the fund-raising, is it fair to say that TPL knew that

5         would have to come simply from individuals that the

6         Friends of Red Acre may have had contact with?

7                   MR. CONROY:  Objection.

8                   MS. ECKER:  Objection.

9                   MS. MURPHY:  Objection.

10   Q    You can answer the question.

11   A    I always feel like I'm doing it at my own peril when I

12        get a good chorus over here.  And now I'm going to

13        make you repeat the question.  I'm sorry.

14   Q    Well, my concern here is that there was an identified

15        list of potential donors for up to 1.3 million

16        dollars.

17   A    Uh-huh.

18   Q    That that list was given to TPL.

19   A    Uh-huh.

20   Q    That TPL said they were doing no fund-raising.

21   A    Uh-huh.

22   Q    And that TPL said the burden was on you at some point,

23        perhaps around July 3rd, that TPL was going to do no

24        fund-raising whatsoever with regard to the Kunelius

1          property.

2     A    Right.

3     Q    And that the burden was on Friends of Red Acre to do a

4          hundred percent of the fund-raising.  Am I correct on

5          those facts so far?

6     A    Uh-huh.

7                    MS. MURPHY:  Objection.

8     Q    And my question then becomes:  from whom,

9          specifically, would Friends of Red Acre have had to

10         have raised those funds and how much would they have

11         to raise?

12                   MS. ECKER:  Objection.

13    A    I don't remember the bottom line at that point, and I

14         also don't think TPL said, you know, you should go out

15         and get it from X, Y and Z people.  I don't think they

16         knew.

17    Q    But they knew it couldn't be from the list that you

18         had already given them.

19    A    Because the time frame was too long.

20    Q    So, were they asking you to do the impossible?

21    A    Yes, that's basically what my husband is responding

22         to.

23    Q    That's why I didn't understand.  Okay.

24    A    And you know what?  I have to -- and maybe another way

1      they could check is through TPL records.  I really, of

2      all the documents, I really would like to show this to

3      my husband tonight and say, "Did you really send

4      this?"  Because I'll tell you, this is the kind of

5      letter, when he wrote them, I would go, "No, you're

6      not sending that."

7              So, I'd like to find out.  He will remember

8      if he sent it or not.  Craig did not respond,

9      which is unusual, but just for the record, this

10     one that's dated 8/6, I would like to find out

11     for sure if he sent that, that one, because then

12     after this, I wrote a much longer piece, which is

13     much more encouraging of TPL to keep going

14     forward, as always.

15  Q  Looking at the second page of the 8/6 letter from your

16     husband to Mr. MacDonnell, which --

17  A  May or may not have been sent.

18  Q  -- may or may not have been sent, there's nothing on

19     it --

20  A  This is what he wanted to send.

21  Q  There's nothing on it that indicates it's a draft, is

22     there?

23  A  No.

24  Q  First or second page?

1    A    No.

2    Q    And looking at the second page, there's a paragraph

3          that begins *In future*.

4    A    Yeah, the one I've read into the -- yes.

5    Q    Right.

6    A    He was sensing that we were going to be the scapegoat.

7    Q    That's followed by a letter dated August 19th, and

8          that appears to be from you.

9    A    From me, uh-huh.

10    Q    Sent to Whitney Hatch, copied also to Whitney Hatch.

11    A    Yeah.

12    Q    Who is Whitney Hatch?

13    A    He is on the -- is he a director of -- I don't know.

14    Q    Does he work for TPL?

15    A    I think Craig works for him, put it that way.

16    Q    Looking under your title *Publicity*.

17    A    Okay.

18    Q    The first paragraph says:  TPL must act as both a

19          financially responsible project manager and also as a

20          non-profit.  What did you mean by that?

21    A    I'm probably coming from an area of expertise that I

22          feel pretty strongly, and my husband does, because

23          that's all we've worked for, and so there's a lot

24          of -- the unfortunate thing is I don't understand

1          how environmental organizations are judged and

2          reviewed by their peers, whether they have

3          accreditation standards or not, but if, for

4          example -- just, it weighed very -- it seemed

5          very wrong to me that they made the promise they

6          did to the town and they went back on it, and

7          it's not -- that's behaving as a businessman

8          might under his legal rights, but it is not

9          behaving as a non-profit does.

10  Q    And do you think that's because there is a

11       difference --

12  A    And this is a characterization on my part.

13  Q    I understand.  Is it your understanding that a non-

14       profit or a charitable institution has to behave

15       according to standards that differ from standards of

16       normal business practices?

17  A    Sometimes.

18  Q    Can you give me examples of that?

19  A    Well, these days, there's a museum accreditation

20       program, which I'm very familiar with, and it used to

21       be, in the day, that a guy would become a museum

22       director and back his truck up and make off with half

23       the collection and take it down to Sotheby's and sell

24       it, or they'd run into some short-term problems and

1          sell collections to fix their roof.  This behavior now

2          will cause you to lose your accreditation with the

3          American Association of Museums.

4    Q    You're not suggesting Sotheby's would be part of that?

5    A    No, well, they're just selling.

6    Q    I'm only saying that because --

7    A    I know.  I know.  I would have said Christies if you

8          hadn't put that name in my head.

9    Q    Okay.

10    A    At any rate, there's a standard of conduct and

11          behavior that goes with things that you can and cannot

12          do in non-profits, that are held -- you know, it's

13          like being a realtor.  Isn't that real estate that

14          created the realtor, because then you join this group

15          and they somehow conform to a higher standard?  You

16          know, it's a governing body.

17    Q    Did you perceive that the behavior of Craig MacDonnell

18          and TPL was violating that higher standard?

19    A    I think, if they are, personally, if their business is

20          in partnering with towns, which was very clear to me

21          that Trust for Public Land does not do projects

22          without public partnership, that this kind of promise

23          that they made to the town and the right of first

24          refusal was beyond the bounds.  Totally within the

EXHIBIT G

112

1           rights of a businessman.  Beyond the bounds.

2    Q    Beyond the bounds for a non-profit?

3    A    Conduct, yes.

4    Q    It goes on to say in the same paragraph, by the way,

5         this is an August 19, 2003, letter that we're reading

6         from, from yourself to Craig MacDonnell, and it is a

7         two-page letter copied to Whitney Hatch, Eye of the

8         Storm Equine Rescue, Stow Conservation Trust and Red

9         Acre Foundation.

10    A    Right.

11    Q    It goes on, in the paragraph headed by the word

12         *publicity*:  As a non-profit, you must weigh the other

13         concerns and goals of TPL that exist beyond financial

14         considerations.  TPL should consider these publicity

15         issues.

16            The first one is listed as No. 1 and it

17         says:  In January, you stated to the Board of

18         Selectmen that, once TPL takes the right of first

19         refusal, it never withdraws from the deal.

20    A    That's correct.  He said that.

21    Q    Were you there when he said that?

22    A    Yes.

23    Q    Have you heard directly or indirectly that he said the

24         same thing to Mrs. Kunelius?

1     A    I am not aware one way or the other.

2     Q    When Mr. MacDonnell said this, was it at a public

3           hearing?

4     A    Yup.  Well, it's a public -- it was part of the

5           selectmen's meeting.

6     Q    It goes on to state:  Selectmen are probably used to

7           meaningless verbal assurances from developers.

8     A    Because my dad's a developer.  So, I just want to say

9           that.

10    Q    Okay.

11    A    I'm making fun of myself there, sort of.

12    Q    But it goes on to read:  But your word as a non-profit

13         means an entirely different thing.

14    A    Correct.

15    Q    And is that based upon your earlier statement that the

16         word of a non-profit has to comply with a higher

17         standard?

18    A    Correct.

19    Q    It goes on to say:  TPL does not want to be known as

20         an organization that does not keep its word.  Have I

21         read that correctly?

22    A    Uh-huh.

23    Q    Is it your understanding now that TPL is an

24         organization that does not keep its word?

1          MR. CONROY:  Objection.

2    A    Apparently this was the first time that they have not

3         done this.

4    Q    So, the answer to that is *yes*?

5          MR. CONROY:  Objection.

6          MS. MURPHY:  Objection.

7    A    The story's not over.

8    Q    As of now, they have not kept their word, is that fair

9         to say?

10   A    I'm saying the story's not over.  I'd wait to see how

11        this whole thing plays out.

12   Q    And by that, you mean that -- are you aware of some --

13   A    No, but it's not over, is it, the whole situation with

14        TPL and Kunelius?  It's not over, is it?

15   Q    You're talking about the current litigation?

16   A    Uh-huh.

17   Q    But as to your understanding of whether TPL has, at

18        least as it relates to you, would you say that TPL is

19        an organization that has not kept its word to Friends

20        of Red Acre?

21   A    I would prefer to characterize it in terms of its word

22        to the town.  I think that's really been damaging to

23        the Town of Stow.  Me, personally, so far, so good.

24   Q    What does that mean?

1   A   I mean, I don't feel like I've been overly damaged.

2   Q   Damaged.

3   A   Yeah.

4   Q   Well, did you have money at risk in this case?

5   A   I donated some money to Stow Conservation Trust and

6       received a deduction in taxes.

7   Q   How much money did you donate?

8   A   Well, all the receipts are in here.  I can't remember.

9       Were we ten thousand, five thousand?  I can't

10      remember, but the receipts are in here.

11  Q   But it's in there.  All right.

12  A   Yeah.

13  Q   And are you aware of whether or not TPL used the

14      monies that were donated by you and others to Stow

15      Conservation?  Is it Stow Conservation?

16  A   I think that was the down-payment to Marilyn, so it's

17      out of their hands.

18  Q   Do you know if TPL ever used any of its own funds, not

19      the funds that were raised by Friend of Red Acre, in

20      making any payments to Mrs. Kunelius?

21  A   I don't.  I don't know.  I know that at some point

22      there had been a notice that they had defaulted on a

23      certain payment, but I don't know how many, if other

24      payments had been made before that.  I just don't

1          know.

2     Q    Does the number 22,000 ring a bell as the amount that

3          you and others gave to Stow Conservation?

4     A    Yeah.

5     Q    And do you know how much money was paid to

6          Mrs. Kunelius?

7     A    No, we weren't party to that.

8     Q    I believe the number is nineteen thousand.

9     A    Okay.

10    Q    That's my best recollection.  And I could be wrong on

11         that.  But assuming for the purposes of this question

12         that it is correct, that 19,000 was paid to

13         Mrs. Kunelius, are you aware of TPL making any

14         payments to Mrs. Kunelius that exceeded the

15         $22,000 that was raised by Friends of Red Acre?

16    A    We were not copied on any sort of arrangements between

17         those parties.

18    Q    TPL has stated to the Court that, after it paid

19         thousands of dollars under the terms of the contract,

20         it could not raise funds.  My question is:  do you

21         have an understanding that the money paid by TPL to

22         Mrs. Kunelius was the funds that were raised by

23         TPL?

24              MS. MURPHY:  Objection.

1   Q   I mean, by Friends of Red Acre?

2   A   Well, you'd have to -- I think Stow Conservation Trust

3       would be a better person to answer that.  I believe

4       our receipts indicate that it is a specifically

5       targeted donation for a specific purpose.  So, that's

6       where -- okay.  So, here's the deposit.  Here's the

7       cashier's check, Community National Bank, Marilyn

8       Kunelius, delivered by hand to Peter Kachajian.

9           So, just, if I could back up before that, I

10      should be able to find -- is that right?  Seems

11      this is too early in the correspondence.

12      February 13th, is that about when she received

13      that money?

14  Q   I don't know.  That sounds perhaps correct.

15  A   If we can go back a little bit, I might find the

16      receipt.

17  Q   Looking at your letter of August 19, 2003.

18  A   Yeah.

19  Q   This is under Item 2.  It says:  Exposing towns to

20      lawsuits, regardless of their merit, is not in the

21      best interest of TPL as a practice.  The fact that

22      this town is one million five hundred thousand in the

23      red will surely fan the flames as well.

24          When you were referring to exposing towns to

1    lawsuits, what were you referring to, this

2    lawsuit or the likelihood of a lawsuit being

3    filed?

4  A  We didn't know.  We didn't have any counsel, but it

5    seemed that something might occur.

6  Q  Had you heard from Mr. Kachajian and Mrs. --

7  A  Oh, yes.  Well, had he contacted us before then?  I

8    think so.  You're testing my memory.  Had he written

9    that letter?

10  Q  There is a letter in your documents from --

11  A  No, it was after.  I think it was well after this,

12    wasn't it, when legal proceedings began?  That began

13    with you, right?

14  Q  Yes.

15  A  Okay.  Yeah, so it's after.  So, it was just a

16    conjecture on our part.  I mean, still, ultimately,

17    the goal here was to encourage them to go forward,

18    ever the optimist.  I mean, I thought that they had

19    much more to lose by defaulting.

20  Q  You go on to say, three:  Your partners at the Stow

21    town building will feel this personally.  Selectmen,

22    members of the Community Preservation Committee as

23    well as other supporters are going to personally

24    suffer if TPL withdraws.

EXHIBIT G

119

1    A    I think it's in terms of their relationship with the

2         town.  For example, right now the town is incurring,

3         you know, legal fees in this lawsuit, and I have not

4         seen anything in the papers.  As I say, all this

5         publicity stuff, again, nobody in our court instigated

6         any publicity, oh, look what TPL is doing, whatever,

7         but, you know, if it came out that, you know, sitting

8         selectmen might fare very badly, as would other groups

9         that had been supportive of this project, for leaving

10        them out to hang to dry so to speak.

11   Q    I want to have you look at the second page of your

12        letter to Mr. MacDonnell, and I'm going to refer you

13        to some of the testimony you gave at the very

14        beginning of today, the paragraph beginning:  In

15        January or February, I asked you if we should be begin

16        the ZBA process.  You stated that your experts saw no

17        problems in getting the variance and that a denial

18        would be easily challenged and won on appeal.  Now, at

19        this late date, there seems to be a lack of will and

20        time to pursue alternatives.

21            Am I correct that this sentence means that

22        you had suggested that the ZBA process start as

23        early as January of 2003 and that he,

24        Mr. MacDonnell, and TPL told you it wasn't

1     necessary?

2             MS. MURPHY:  Objection.

3   A   Appears to be.  You know, I wouldn't recall that at

4     this time.

5   Q   Are you aware that TPL has informed the Court that it

6     didn't have time to evaluate the project at the time

7     that it had accepted the right of first refusal?

8             MR. CONROY:  Objection.

9             MS. MURPHY:  Objection.

10           MS. ECKER:  Objection.

11  A   No, I'm not aware of anything that happened in Court.

12          MR. CONROY:  For the record, I would

13     like to record for the record that statements

14     about what defendants have told the Court that

15     are not being read from documents submitted to

16     the Court should be taken for what they're worth,

17     which is not much.

18  Q   Okay.  Since my brother has implied that I've made

19     some statement that was worth not much, I'm going to

20     put before you a document --

21  A   You guys really brothers?

22  Q   No.

23  A   Okay.  Just checking.

24  Q   That's a term used by lawyers, to refer to my brother

1          lawyer.

2     A    Oh, the guild.

3     Q    Yes.

4     A    Okay.

5     Q    We do share somewhat in hair color, but that's it.

6          Looking at Paragraph 11 of the document that

7          has been put in front of you entitled,

8          "Defendants' Motion to Certify Questions of State

9          Law to the Supreme Judicial Court," Paragraph 11,

10         on Page 6, says, second line:  In practice, much

11         of the 120-day option period is consumed by town

12         deliberations, leaving non-profits with very

13         little time to assess the preservation value of

14         the property, determine the risks and benefits,

15         assess fund-raising possibilities and coordinate

16         with local interest groups before they are forced

17         to decide whether or not to accept the right of

18         first refusal.

19         Now, stopping right there, is it your

20         understanding that TPL had very little time prior

21         to its accepting the right of first refusal to

22         evaluate the project?

23    A    Well, a 120-day option commences from the day that the

24         purchase and sale is signed, correct?

1    Q    That's correct.

2    A    You have to look at how long it took, first of all, to

3         even get Trust for Public Land in the picture in that

4         120-day time frame.  So, I mean, in fact, the Town of

5         Stow has recently been looking at a couple of other

6         situations where they've been exercising right of

7         first refusal, or not, and the time span has always

8         been pointed to as being egregiously too short in

9         order to do exactly what you need to do in that time

10        period.

11   Q    Well, in your letter, you refer specifically to the --

12   A    In January-February?

13   Q    In January or February, of inquiring as to whether or

14        not, quote, we should begin the ZBA process.

15   A    Uh-huh.

16   Q    Do you know whether that ZBA process was begun in

17        January or February?

18   A    I don't remember.  I think, particularly, what I was

19        pointing to was a conversation where this is what he

20        had said, and I think the point of the paragraph is

21        the lack of will, and my point is, and Karen would

22        only be able to speak better than me, that even at

23        this date all zoning options for the property had not

24        been exhausted in Karen's mind.  So, there's a lack of

1     will to go forward.  They're just kind of worn out.

2    Q   And so they gave up, is that fair to say?

3             MS. MURPHY:  Objection.

4             MR. CONROY:  Objection.

5    A   I don't know, because I don't understand whether there

6     really were other options or not out there.  Karen

7     seemed to think so.

8    Q   You state here, quote:  You stated that your legal

9     experts saw no problems in getting the variance and

10     that the denial would be easily challenged and won on

11     appeal.

12    A   Uh-huh.

13    Q   Do you know, did Mr. MacDonnell indicate to you

14     whether the legal experts were Goodwin, Procter &

15     Hoar?

16    A   No, not at that time.  They said they had their own

17     attorneys that specialized in this.  It seemed to me

18     there might have been some other person's name before

19     Trudy Procter came up.  I mean, she's the actual

20     attorney, but I thought they had in their office a

21     sort of a real estate branch of experts that weren't

22     necessarily attorneys but were experts that helped

23     advise on this.

24    Q   When you say, "Now, at this late date, there seems to

1  be a lack of will," the date of your letter is August

2  19th, is that correct?

3  A  Uh-huh.

4  Q  Did you come to understand that TPL actually pulled

5  the variance request, in other words, retracted it so

6  that it would not be acted on?

7    MS. MURPHY:  Objection.

8  A  What I understood, and it may have happened more than

9  once, or not, was that that was the wiser move.  If

10  you sensed that your current strategy for achieving a

11  variance was not being favorably accepted, the smarter

12  move was to pull it, because therefore you would be

13  able to then go back with another idea.  Once there's

14  a judgment against you, it's much harder, or maybe you

15  have to wait there's a time period you have to wait,

16  before you come forward with something else.  So,

17  that's what I recall, and I don't remember whether it

18  was more than once that something was put forward and

19  then pulled back before --

20    MR. McLAUGHLIN:  It's now two o'clock.

21  Let's take a little break.

22     (Recess, 1:53 P.M.)

23     (After recess, 2:10 P.M.)

24  By MR. McLAUGHLIN:

1    Q    Again, with your August --

2    A    Plea, my August 19th plea?

3    Q    -- August 19, 2003, letter to MacDonnell.  Looking at

4         the second page, in the paragraph that begins *Your*

5         *recent letters,* four lines up from the bottom of that

6         paragraph, there's a sentence that begins:  Another

7         view of the suggested configurations is that TPL is

8         defining the project in a manner that cannot be

9         accomplished.  We reiterate that fund-raising for this

10        project is dependent upon inclusion of equine rescue.

11            Are those two sentences linked, in your

12        mind, as to a concept?

13   A    Okay.  Let me just go back to the top and review the

14        alternate scenarios.  Need for fund-raising, but then

15        may eliminate Eye of the Storm from the project.  Sell

16        the properties on the market leaves out two of the key

17        project tenants, equine rescue and affordable housing,

18        but, also, elimination of equine rescue severely

19        limits potential fund-raising sources, and, obviously,

20        Red Acre Foundation would be completely pulled out at

21        that point because that's where they come from.

22        They're supporting the equine rescue component.  So,

23        that's $100,000 down for that.  Though the suggested

24        alternate project configuration may be viewed as an

1       attempt to solve the problem, we feel the solution is

2       as bad as the problem.

3    Q  Okay.  Is it your testimony that Craig MacDonnell and

4       TPL were suggesting a scenario to the Friends of Red

5       Acre in which the Eye of the Storm was dropped as a

6       component of the development of the property?  Am I

7       correct?

8    A  Boy, you know, I'd say your recent letters, you'd hope

9       that I have it.  So, is it this August 6th?  Thanks,

10      Craig.  Let's see.  As we've discussed -- see the

11      August 6th?  Yeah, that's the last page of that.

12      There you go.  So, at the bottom, fund-raising.

13   Q  Uh-huh.

14   A  Purchase price of the property is driven by 40B,

15      greater density, bah, bah, bah, blah.  I'm seeing

16      somewhere if there's something in here about the

17      alternate scenario.  Ah, it's back at the top of Page

18      2, about five lines down:  After TPL's acquisition, we

19      would sell the town its parcel and sell the two houses

20      privately, but we are left with a 370,000 gap.

21          So, that's the example of where he had

22      suggested that the scenario should not include

23      Eye of the Storm.  I think, my problem going

24      forward, and what I was trying to be very clear

1          about is, I can only operate, you know, on behalf

2          of even the people in my neighborhood under the

3          one scenario that we had projected to them.  I

4          would not be able to necessarily adopt some other

5          strategy that didn't have affordable housing or

6          equine rescue in it because it changes the

7          character.  I can't kind of shift with the latest

8          development plan.  More of a heads up than a

9          decision on my part.  It's just that it seemed

10         like they were reducing the potential for

11         funders, and I was still trying to hang onto the

12         original vision, so.

13   Q    So, let me see if I understand this correctly.  If

14        MacDonnell and TPL are saying an alternative plan is

15        to jettison Eye of the Storm, then implied in that

16        proposal would be that the Red Acre Foundation, which

17        is equine oriented --

18   A    Rescue, animal rescue, yup, equine and animal.

19   Q    -- all right, would necessarily withdraw their

20        commitment.

21   A    Absolutely.

22   Q    Because there was no equine rescue component to this

23        at all.

24   A    That's correct.

1    Q    So, the proposal, therefore, would not only eliminate

2         Eye of the Storm, but it would result in at least an

3         increase of an additional $100,000 of fund-raising

4         that would be necessary because of the loss of that

5         amount.

6                   MS. MURPHY:  Objection.

7    A    And technically Black Creek, which had given her

8         10,000, had promised another 10,000 in a subsequent

9         year.  They're a very small organization.  I mean,

10        technically, Eye of the Storm had to go back to them,

11        because that was a bigger donation than they normally

12        give, and say, "Look, take this back."  So, it's a

13        little bit more than a hundred thousand, hundred and

14        twenty thousand.

15   Q    And then the second donation from Stow Conservation

16        Trust of $100,000 --

17   A    That would be fine.

18   Q    -- would that be in jeopardy as well?

19   A    No, because that's the open land piece.

20   Q    So, your comment that another view of the project

21        configurations is that TPL is defining a project in a

22        manner that cannot be accomplished, are you referring

23        to the fact that, without Eye of the Storm, this was

24        going to go nowhere?

129

1                   MS. MURPHY:  Objection.

2     A     Well, we didn't know how the bottom line would work

3           out.  They probably had some plan, but, I mean, it

4           wasn't a plan that I could endorse, necessarily.

5     Q     And at that point, how close were you to the time for

6           performance under the purchase and sale agreement, if

7           you know?

8     A     I don't know.  We do have an e-mail saying that TPL

9           had reneged on their August payment to Marilyn

10          Kunelius, which shortly follows that.  Does that have

11          anything to do with that?

12    Q     Yeah.

13    A     Because I don't know what you mean by performance of

14          purchase and sale.

15    Q     Okay.  I'm just going to skip that.  Moving three

16          documents farther down in your package, there is an

17          outline saying:  1.  Should we meet?  Looks like this.

18    A     Uh-huh.

19    Q     And it appears to be a three-page document.

20    A     Right.

21    Q     What is this?

22    A     Probably an internal document for talking with maybe

23          Karen and David.

24    Q     Looking at Item No. 6, it says:  We are reluctant to

1       meet with TPL because we believe TPL has hidden agenda

2       items geared towards making us look bad when the

3       project inevitably fails.

4           Before I ask you a question about that, is

5       this your document?

6    A  I couldn't tell you.  I don't typically use the open

7       circle bullet, so it may have been something my

8       husband typed up.

9    Q  The hidden agenda items, is that explained by the

10      subsequent language in that sentence, i.e, the hidden

11      agenda is let's make Friends of Red Acre look bad when

12      this fails so that TPL doesn't?  Is that what you're

13      talking about?

14   A  Uh-huh.

15   Q  Yes?

16   A  Yes.

17   Q  Okay.  It says *hidden agenda items*.

18   A  Uh-huh.

19   Q  What other items, if any, were you aware of?

20   A  Well, we don't know.  It's conjecture since we don't

21      know what they're thinking.

22   Q  Looking at the next page of this document, the next

23      page begins with roman II, Scenario 1, followed by

24      eight paragraphs, eight numbered paragraphs.  It says:

1      1.  Friends of Red Acre no longer exists.  What is

2      that?

3  A   What this means is -- let me just take a look at this.

4      House sales, CPC, SCT, Red Acre Foundation.  The

5      problem here, as I mentioned before, is everything

6      that we had done on the street, having a meeting with

7      people, occasionally, we would ask people to come to

8      certain selectmen meetings and voice their support for

9      our project or we'd ask them to come out.  We'd

10     explain to them in terms of this project being in a

11     certain configuration.  The configuration had

12     affordable housing, equine rescue and open space.  The

13     scenarios that were being considered here would

14     possibly reduce that package by a component, meaning

15     this Scenario No. 1, having the house sell on the

16     market for $200,000, you've now eliminated affordable

17     housing.  Maybe that still had the affordable housing,

18     but there was something about this that no longer had

19     all the components.  So, we can't represent or even

20     pretend to represent our neighborhood because it does

21     not conform to what our neighborhood had heard was the

22     project.

23  Q  Whose scenario was this?  Is this the scenario from

24     TPL that you were referring to in your prior letter

EXHIBIT G

132

1          dated August 19th, when you said, "Is defining a

2          project in a manner that cannot be accomplished"?

3      A   As opposed to other documans, where everything is in

4          terms of correspondence, this probably is a bit

5          internal.

6      Q   Well, let me just direct you again to your August 19th

7          letter, which is a few documents prior.

8      A   Right.

9      Q   And in that letter, on the second page, you refer to

10         the scenario which eliminates Eye of the Storm.

11     A   Right.  So, the thing is do you have those scenarios.

12         That's the question.

13     Q   Well, my question was is Scenario 1 the scenario that

14         eliminates Eye of the Storm?

15     A   Well, the problem is there are still equine rescue

16         people here.  I'm thinking it's the affordable housing

17         component that's missing.

18     Q   And so looking at the document that we're currently

19         examining, which is roman II, Scenario No. 1, is this

20         a response to Scenario No. 1 or --

21     A   It's a strategy.

22     Q   -- is it a component?  Is it a list of the components?

23         Because what I don't understand is why Friends of Red

24         Acre no longer exists, whether that was a component of

1          Scenario No. 1 or whether it was Friends of Red Acre's

2          response to a scenario that had been proposed by TPL.

3    A    I think this is the scenario that we were still

4          encouraging TPL to go forward with that they had

5          rejected and that they were pursuing another funding

6          strategy.

7    Q    Looking at the bottom there, No. 8, it says:  Friends

8          of Red Acre never agreed to any financial

9          responsibility for this project.  Local volunteers

10         agreed to assist with fund-raising for equine rescue.

11         Local volunteers contributed 11,500 in cash.  TPL

12         subsequently directed the staff to suspend fund-

13         raising.  TPL informed Friends of Red Acre that a

14         hundred percent of the fund-raising effort would be

15         equine rescue.  A volunteer immediately told TPL that

16         volunteer fund-raising consequently suspended.  TPL

17         has not sent one proposal or suggested one prospect.

18   A    Right, uh-huh, definitely sounds like my husband.

19   Q    What does *suggested one prospect* mean to you?

20   A    A prospect is where you vet a pool of potential

21         funders and determine that they are a prospect.

22   Q    A prospect for fund-raising?

23   A    Exactly.

24   Q    Looking at No. 7, it says:  TPL has not to date

134

1        communicated with Friends of Red Acre about default or

2        DHCD review.  What does that mean?

3    A   Well, we received that e-mail from Ross Perry that

4        said that they had defaulted on the payment, but TPL

5        had never called us and told us they did that, nor did

6        they -- I guess there were review comments from DHCD

7        that hadn't been shared with us yet.

8    Q   Would you have expected, well, did you consider

9        yourself, not yourself, did Friends of Red Acre

10       consider that there was a partnership between the town

11       and TPL with regard to the Kunelius property?

12   A   I always viewed the town as having signed off the

13       right of first refusal and having agreed to it, that

14       they would support it, but they weren't integral

15       partners.  But I really don't know.

16   Q   Well, when they assigned the right of first refusal,

17       did you ever look at that document?

18   A   Uh-uh.

19   Q   Were you aware that, after the assignment of the right

20       of first refusal, the town had an obligation to fund

21       $400,000 to TPL?

22              MS. MURPHY:  Objection.

23   A   No.

24   Q   Did you know that the town had an obligation to fund

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

1      any money to TPL to assist in the purchase of the

2      property?

3   A  Might have been something tied to the monies that had

4      been voted in in town meeting, but I'm not sure of the

5      sequencing.  Didn't they have to get some of the --

6      didn't town meeting occur before assignment of the

7      right?

8   Q  So, as far as you're concerned, you don't recall one

9      way or the other whether there was a specific

10     financial obligation.

11  A  We weren't party to that.  That's why, I mean, the

12     fact that they didn't let us know about the payment

13     to -- or lack of payment, I mean, it's up to them

14     as to what they included us in or not.

15  Q  When you looked at the application to the state --

16  A  Like I said, I don't think I ever saw the whole thing

17     before.

18  Q  Well, let's just take a look quickly at that

19     application and you will see --

20  A  This one?

21  Q  Yes.  I'll use mine and direct your attention to 342.

22  A  Okay.

23  Q  Looking at the bottom of 342, there's a grid there,

24     primary plan, Town of Stow contribution $300,000.

1    A    Uh-huh.

2    Q    Having seen that, was it your understanding that, at

3         the time of the purchase, some --

4    A    CPC money?

5    Q    -- some money would be coming from the town?

6    A    The CPC money that had been approved, yes.

7    Q    Now, in referring to the application, I just want to

8         point out that that document that you've looking at is

9         MacDonnell 11 just so that I have the record straight.

10   A    Okay.

11   Q    Looking back to the document in question that we have,

12        which is a portion of the documents you provided to me

13        today, there's a page entitled roman III, Scenario

14        No. 2.

15   A    Uh-huh.

16   Q    And it begins again with:  Friends of Red Acre is not

17        a party to Scenario No. 2.  What was Scenario No. 2,

18        if you know?

19   A    Well, I'm trying to -- I believe Scenario No. 2, I

20        mean, I would, again, want to hunt back in here, but

21        that last document that we came across, it has to do

22        with selling both of the houses on the market.

23   Q    Maybe I'm getting confused.  Can you direct me to

24        whatever the document is that shows these scenarios,

1          because I think I've missed it?

2    A    Yeah, I'm not sure it's in here.  I know that there

3          was a reference to what TPL had proposed at the

4          meeting.

5    Q    And is that the meeting at Craig MacDonnell's house?

6    A    Yeah.  Yeah, it's on Page 2 of the letter from Craig

7          that's dated August 6th, sell the town its parcel and

8          sell the two houses privately.  I don't know if that's

9          Scenario 2.  That's my problem.  I don't have

10         whatever --

11   Q    So, the scenarios are, you think, contained in the

12         August 6th letter from Craig MacDonnell?

13   A    Yeah.  Wait, here is -- did you see the page

14         following, that spreadsheet?  That.  Take a look at

15         that because that -- there's a correlation with his

16         letter that says they'll be left with a 370,000 dollar

17         gap.  So, there is the 370,000 dollar gap and how it's

18         broken down.

19   Q    And this document --

20   A    Was this attached to this letter or was it distributed

21         at the meeting?  I have no idea.  It's not a typeface

22         that we would normally use.

23   Q    This revised market alternative variance granted

24         document, which appears, you think, to be attached to

1     or was attached to Craig --

2  A  I don't know.  I don't know.  It may have been filed

3     here because it might have been distributed at the

4     meeting.  I don't know.  I'm sure that they know.

5  Q  This would suggest that the purchase was a million --

6     the document is entitled, "A Revised Market

7     Alternative - Variance Granted," and it is a

8     compilation of several amounts of money that are added

9     and subtracted to give a bottom line of $370,400.  The

10    first line is a contract price of $1,116,900.  That is

11    the purchase price under the purchase and sale

12    agreement, correct?

13  A  Uh-huh.

14  Q  Then it says *plus $56,000*.  Do you know what this is?

15  A  I don't know what that interest represents, no.

16  Q  Then it says *initial deposit 17,500*.

17  A  That matches up between the 12,500 and the 5,000 that

18    you mentioned.  I think -- I don't know.  I mean, I'd

19    have to take a look.

20  Q  I think I made some representation as to how much

21    money had been paid.

22  A  Had been paid.

23  Q  And I don't remember how much that was.

24         MS. DeBELLIS:  Nineteen.

1          MR. McLAUGHLIN:  Nineteen?

2    Q    I think this is the amount, 17,500.

3    A    Here are the receipts.  I mean, if you want to know

4         where that --

5    Q    That's okay.

6    A    I'd have to add them up.

7    Q    I mean, it is what it is.

8    A    Yeah, yeah.  Okay.  So, it's not integral of what

9         we're talking about.

10   Q    It then says *70,000 TPL costs*.  Do you know what those

11        are?

12   A    I only vaguely recall that part of the bottom line on

13        a TPL project, they try to recoup their --  I don't

14        know whether these are expenses that they had to pay

15        out, you know, for various people that they had to

16        hire, estimators, appraisers.

17   Q    The next line down is $300,000 town investment.

18   A    CPC.

19   Q    I don't know.

20   A    Yeah.

21   Q    So, the town, that's referring to the Town of Stow,

22        CPC?

23   A    Uh-huh.

24   Q    Which is Community Preservation Committee?

1    A    Yeah.  And that was voted on and approved by the town

2         to go to this project.

3    Q    So, when the term *investment* -- did you have an

4         understanding that the town was investing in the

5         project?

6    A    I think you're looking for meaning in a line item

7         description.

8    Q    So, from your understanding, you don't know that it

9         was an investment.  Do you know if the town was going

10        to receive anything --

11   A    They were going to get land.

12   Q    In exchange for what?

13   A    You mean open space?

14   Q    No, they were getting land in exchange for what?

15        Presumably, somehow the town was going to get some 45

16        acres, approximately, from TPL, correct?

17   A    Part of the parcel, right.

18   Q    Yeah, TPL was not just giving that to the town.  They

19        were giving it in return for the town's investment of

20        200,000, 300,000.

21   A    I don't know how they characterized their relationship

22        with each other, whether it was a gift from TPL or if

23        the town was viewed as, you know, contributing to the

24        bottom line.  I don't know.

1    Q    Well, the $300,000, as far as you knew, was a

2         component of the bottom line.

3    A    Yeah.

4    Q    That was not 300,000 that your organization was ever

5         tasked to --

6    A    No, we had that in place.  As far as we were

7         concerned, that was a funding hurdle already

8         accomplished, and then it looked like they imagined

9         that they could then sell the two parcels subject

10        to -- a C.R. is a conservation restriction.

11   Q    And those two parcels --

12   A    That's the appraised value.

13   Q    Now, at some point, did you become aware that TPL was

14        trying to change the purchase price?

15   A    Well, maybe this is where this started to happen,

16        where they found a shortfall in their plan.  Does that

17        kind of represent the amount that they came and

18        offered?

19   Q    I am not sure.

20   A    I don't know.

21   Q    Let me ask you a different question.  Have you ever

22        spoken with Mrs. Kunelius?

23   A    Sure.

24   Q    How often have you spoken to her?

142

1    A    I have not spoken to her at all since, well, since the

2         end of some different efforts at the very end of this

3         year to come up with solutions to make it work out for

4         her, but nothing after that.

5    Q    Karen Sommerlad believes that you had made an offer to

6         Mrs. Kunelius to purchase the property, or at least

7         that's my recollection of her testimony.

8    A    Uh-huh.

9    Q    Did you ever make an offer to purchase the property,

10        you personally?

11   A    I don't think that that would be -- it seems to me

12        there were a few different offers towards the end.  I

13        can't believe that my husband and I would do something

14        unilaterally, but I don't recall.  Again, it would

15        have been not for the original price but whatever we

16        had come up with.

17   Q    Looking at the very last page of the documents you

18        produced, is this very last page the options, the

19        various options?

20   A    Let's see.  There's no date on this.  It may be at the

21        end because we couldn't date it.  So, I don't know

22        where in the project this fell.  This seems to be

23        still when the DHCD grant is in play.  If you look

24        down at the bottom, three out of four have a DHCD

1     grant.  So, this seems to be fairly early in the

2     process, series of looking at how different things

3     might play out.

4     Q    And were there certain assumptions that were made with

5     regard to the first three, that is, from the left

6     moving to the right?  What were the assumptions that

7     existed?  For example, did these three scenarios

8     anticipate that the subdivision or the variances or

9     the special permits were granted?

10    A    Uh-huh.

11    Q    Is that a *yes*?

12    A    Yeah, they all -- well, look at the one that says, the

13    third column over, 142 at market, one affordable

14    house.  So, could that possibly be construed as

15    selling the house, the only existing house lot that

16    is -- you know, you could turn around and sell

17    142.  You could section off one -- well, no, you

18    can't that easily, but -- I don't know.  I'd have

19    to -- there's not that much I know about this

20    sheet, but --

21    Q    Whose document is this?

22    A    I'm not sure.  I mean, it's from somebody in our --

23    you know, Karen or David or Peter or myself.

24    Q    Just so we have some sort of --

1   A   But I'll find out.  Do you want me to find out for

2       you?

3   Q   Yes, please.

4   A   Yeah, sure.

5   Q   This last document is the last document of the pages

6       that were produced by the deponent.

7   A   And it may be the last one because there's no date on

8       it.  So, it may have been thrown in.

9   Q   It is a document that's printed rather than -- the

10      width of the document is 11 and the height is 8, or

11      whatever this thing is.  In other words, it's printed

12      sideways.

13  A   Landscape.

14  Q   And it has four scenarios in it.  The first one is,

15      original, two affordable houses; second one is,

16      original, two affordable houses; third one is 142 at

17      market, one affordable house; and the fourth one is

18      all market, zero affordable houses.

19  A   Uh-huh.

20  Q   Did you become aware at some point that the Town of

21      Stow made a second application for money to DHCD after

22      the rejection of the application for the $325,000?

23  A   I don't recall that.  I don't recall that.

24  Q   Did you ever have any discussions with the town, with

1   Cathy Farrell, the then chairman of the Board of

2   Selectmen, with regard to possible ways of --

3 A She wasn't chairman.

4 Q She was not?

5 A No, I think Ross Perry was chairman, was he not?

6 Q He was chairman until 2003.

7 A Oh, and then it changed and she was chair, okay,

8   sorry.

9 Q Did you have any discussions with the town with regard

10   to their involvement either increasing or decreasing

11   the amount that the CPC would donate or contribute or

12   invest in the project?

13 A Well, what this is reminding me of is, early on, the

14   CPC technically has two different things that they

15   give money to that are unrelated.  So, perhaps we were

16   uncertain at this point.  This is all conjecture, but

17   we were uncertain at this point as to how much we

18   could ask the CPC for for supporting open space and

19   supporting affordable housing at the same time.

20     MR. McLAUGHLIN:  I'm going to have this

21   marked as No. 6, Exhibit 6.

22     (WHEREUPON, Exhibit No. 6. DHCD notice

23   of intent, dated September 23, 2003, marked for

24   identification.)

1    Q    I'd ask you to take a look at that and see if you've

2         seen -- if this rings a bell with you at all.

3    A    Uh-huh.

4    Q    Have you had a chance to look at that?

5    A    HDSP funds.  Is that for -- and it says here it is

6         used for renovating exterior and interior parcels.

7         Okay.  No, I don't know -- this doesn't look familiar.

8         It says a way of funding the line item for renovating

9         the houses.

10   Q    It appears that the Town of Stow was involved in

11        September 2003 with some effort to raise money, by one

12        method or another, in this case, after notice of

13        intent to apply for $352,000, for property acquisition

14        and renovation of two houses.  Did TPL or Craig

15        MacDonnell, having informed you that Friends of Red

16        Acre was responsible for a hundred percent of the

17        financing, did he ever share with you that TPL and/or

18        the town had filed a notice of intent to apply for

19        $352,000 for property acquisition and/or renovation?

20   A    No, but I think we made it pretty clear to him that

21        asking us to do that fund-raising in such a short time

22        was a no-starter, so we weren't out there trying to

23        raise the same pot of money.

24   Q    And so as of September 23, 2006 --

1    A    Wow.

2    Q    Well, you just said, "Wow."  Can you tell me --

3    A    Well, I mean, isn't that late?

4    Q    Yeah.

5    A    Isn't that fairly late?  I'm trying to go back.  I

6         mean, well, no, actually, Eye of the Storm was --

7         bowed out September 27th.  I just thought that was,

8         you know, much later than things were progressing.

9    Q    But prior to today, you were unaware that this notice

10        of an intent to apply from the Department of Housing

11        and Community Development was made, is that correct?

12   A    Right.  And they don't mention it -- yeah.  We gave a

13        summary on September 30th to Ross Perry in an e-mail,

14        and there's nothing in there about that.

15   Q    Earlier you had testified to the fact that today is

16        the first day with the production of these documents

17        that TPL and Friends of Red Acre had officially broken

18        ranks.

19   A    Publicly.

20   Q    Publicly, yes.  Did TPL or the Friends of Red Acre

21        ever inform the town that TPL had refused to fund-

22        raise until such time as the final permits that it

23        sought to obtain were obtained?

24            MS. MURPHY:  Objection.

1   A   I have no way of knowing what they told or did not

2       tell the town.

3   Q   Did you feel any obligation to withhold from the town

4       the fact that TPL had informed the Friends of Red Acre

5       that TPL would do no fund-raising?

6   A   Interesting question.  You know, I don't know -- let's

7       see.  Well, let's look at -- why don't we look at

8       September 30th to Ross Perry.

9   Q   I'm sorry.  Could you tell me which one it is?

10  A   It's only about ten pages from the back, September

11      30th.  We were writing to let Ross know that we had

12      found out, responding about finding out about them not

13      funding, you know, not paying that payment.  So, in

14      here, the different things we talk about with him is

15      that we didn't know -- TPL had not told us that they

16      had withdrawn the ZBA zoning variance.  He did not

17      mention it to us at the meeting on the 24th.  I'm

18      trying to answer your question, which was did we let

19      the town know about fund-raising, and I'm thinking

20      there might be something in here.

21  Q   All right.  Well, let me start with -- because this

22      letter raises a number of significant issues.  So,

23      let's start at the very beginning.  It says:  It was

24      regrettable that Whitney Hatch was unable to join us.

1       What role was Whitney Hatch playing?

2   A   See, I would assume the reason why we wanted him to

3       come was to have an opportunity to possibly -- you

4       know, the old thing.  If you can't convince one

5       person, you may try to convince that person's boss

6       that, you know, the position that you're trying to get

7       forward is correct.  So, we were trying, basically, to

8       bring in another level of TPL to hear our story.

9               MR. McLAUGHLIN:  I'm going to be right

10      back.  I'm going to see if I can get a document.

11                  (Brief recess held)

12              THE WITNESS:  The same memo.  I just

13      want to point out that we talked about fund-

14      raising with Ross Perry down in the second to

15      last paragraph.  So, I was just trying to answer

16      your question.  I don't know if I've got anything

17      before that that says anything.

18      By MR. McLAUGHLIN:

19  Q   So, this would suggest, therefore, that the Friends of

20      Red Acre did share with the town that no fund-raising

21      had been undertaken from January through June.

22  A   Uh-huh.

23              MS. ECKER:  Objection.

24              MS. MURPHY:  Objection.

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

1    Q    Is that correct?

2    A    Well, obviously, other than the stuff that we

3         initially got from Red Acre Foundation and Stow

4         Conservation Trust.

5    Q    I want to read something to you from the deposition of

6         Craig MacDonnell.  It begins with a question, and this

7         is on Page 213.  Question:  Is it your testimony that

8         you did not tell them -- and I'm referring to the

9         Friends of Red Acre -- or is it your testimony that

10        you have no recollection of not telling them to fund-

11        raise, or telling them not to fund-raise, because you

12        didn't want to go forward with the project?  Answer:

13        I did not tell them not to fund-raise because TPL did

14        not want to go forward with the project.

15   A    Well, that's right.  I mean, it's not because TPL

16        didn't want to go forward.  It's because there wasn't

17        time to start, because they need to get these other

18        things taken care of first.

19   Q    When you wrote to Ross Perry and told Ross Perry that

20        no fund-raising had occurred, did Ross Perry ever get

21        back to you concerning the fact that it wasn't a

22        problem because TPL had a line of credit that would be

23        sufficient to purchase the property?

24             MS. ECKER:  Objection.

| | | |
|---|---|---|
| 1 | | MS. MURPHY:  Objection. |
| 2 | | MR. CONROY:  Objection. |
| 3 | A | All I can say is, if Ross Perry had written us back |
| 4 | | anything of substance, we'd have it.  I don't see it. |
| 5 | Q | This letter that we're referring to is September 30, |
| 6 | | 2003.  Is it an e-mail? |
| 7 | A | Uh-huh. |
| 8 | Q | And that's a *yes*? |
| 9 | A | Yes. |
| 10 | Q | To Ross Perry, Board of Selectmen, from Peter |
| 11 | | Christianson. |
| 12 | A | Yes. |
| 13 | Q | Serena Furman, Erica Nilsson. |
| 14 | A | Nilsson is Mike Labosky's wife. |
| 15 | Q | And Michael Labosky. |
| 16 | A | Right. |
| 17 | Q | Karen Sommerlad and David Cobb. |
| 18 | A | Uh-huh. |
| 19 | Q | And those are the group of six which are the primary |
| 20 | | people who handled the laboring oar, if that's the |
| 21 | | term, for the Friends of Red Acre.  Did you inform the |
| 22 | | town that TPL had instructed the Friends of Red Acre |
| 23 | | not to do fund-raising? |
| 24 | | MR. CONROY:  Objection. |

1                    MS. MURPHY:  Objection.

2     A    Why wouldn't you assume that in the second to last

3          paragraph, since it was TPL that decided not to fund-

4          raise during the critical period from January through

5          June, directing their staff and our citizens group to

6          suspend fund-raising?

7     Q    I apologize.

8     A    Right there.

9     Q    Okay, good.  The following sentence, following

10         paragraph, says:  The funds guaranteed to TPL to date

11         are precisely $1,006,500.  Do you see that?

12    A    Yeah.

13    Q    What did you mean by guaranteed?

14    A    Oh, boy.  Well, let's see.  I don't know where that

15         number comes from.

16    Q    I'm going to come back to that in a minute.  Let's go

17         back up to the first paragraph, beginning with the

18         sentence five lines down:  This communique was sent

19         unilaterally by TPL without our knowledge --

20    A    Right.

21    Q    -- and we find it disheartening that Craig did not

22         mention it to any of us at the meeting on the 24th.

23         As Craig stated in the meeting, he has been trying to

24         either push the project along or kill it for some

| | | |
|---|---|---|
| 1 | | time.  Unquote.  So, it's, quote, either push the |
| 2 | | project along or kill it for quite some time, unquote. |
| 3 | A | Uh-huh. |
| 4 | Q | When he said at the meeting that he's been either |
| 5 | | trying to push the project along or kill it for quite |
| 6 | | some time, what was your reaction to that statement? |
| 7 | A | At the time? |
| 8 | Q | Yeah. |
| 9 | A | I don't know.  I mean, I think the language got a |
| 10 | | little more pointed towards, you know, the end of our |
| 11 | | relationship than before so.  I mean, I don't think -- |
| 12 | | surprised would not be the right expression. |
| 13 | Q | What would be the right expression? |
| 14 | A | In terms of how I would react to it? |
| 15 | Q | Yes. |
| 16 | A | It sounds like something that he would say, but it's a |
| 17 | | little bit more, I don't know, abrupt or disagreeable |
| 18 | | than he usually expresses himself. |
| 19 | Q | It goes on to say:  The ZBA letter appears to be TPL's |
| 20 | | killing of the original plan, which included |
| 21 | | affordable housing, equine rescue and open space. |
| 22 | | The ZBA letter is the withdrawal of the |
| 23 | | proposal made by TPL, is that correct? |
| 24 | A | That's what it looks like.  It says up here, at the |

154

1          top:  Subsequent September 25th letter from TPL to the

2          ZBA withdrawing zoning variance.

3     Q    Now, you're aware that TPL had determined that it

4          would not undertake the 40B project that was proposed

5          in the purchase and sale agreement between

6          Mrs. Kunelius and Co-housing Resources, Inc.,

7          correct?

8     A    From the very beginning, absolutely.

9     Q    Now, it appears from this letter, dated September

10         30th, to Ross Perry from yourself and the other five,

11         that TPL had unilaterally decided to abandon its own

12         proposal, and I direct your attention to the paragraph

13         that says, third paragraph, it says:  TPL unilaterally

14         decided that our three goals were no longer applicable

15         to the project, that the budget is unrealistic and

16         that the timetable does not fit their schedule.

17              Is my characterization of TPL changing its

18         goals correct when referring to that language

19         that I've just read?

20              MS. MURPHY:  Objection.

21    A    Okay.  Ask me the question again.

22    Q    Well, you refer to *our three goals*.  Are your three

23         goals the goals that are shared, at least initially,

24         by TPL when it sought to get variances and permits?

1    A    Affordable housing, equine rescue and open space.

2    Q    Yes.

3    A    Seems so.

4    Q    In the next paragraph, beginning with, "There may be

5         solutions other than what we have proposed," the last

6         sentence of that paragraph says:  We are tied to the

7         original project, which is the only plan that has been

8         presented to the neighborhood and the town for their

9         approval.

10   A    Right.  Anything that any one of us did going forward

11        would be on their own.

12   Q    Now, what approval are you referring to when you refer

13        to the town approval for your proposed plan?

14   A    Well, I think a lot of the town presentations talked

15        about all three parts of the project, and you don't

16        know, in that town, whether people supported you for

17        any one of the pieces.  Maybe somebody supported us

18        for affordable housing and could care about the other

19        two.  So, the only way we know that what we were doing

20        had town support was when all three pieces were in

21        place.  Once you parse it out, then you're in trouble.

22   Q    Was there a link between the CPC $300,000 and your

23        three-part proposal?

24             MS. MURPHY:  Objection.

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

1    A    Well, here's the part I don't know about the CPC

2         money, and you'd have to find it out.  I don't recall

3         whether the 300,000 was only for open space or it was

4         200,000 for open space and 100,000 for affordable

5         housing.  I just don't remember how that came out.

6    Q    Could it be 300,000 for open space and 100,000 for --

7    A    Did it end up being four hundred thousand?  I don't

8         think so, because we would have been showing 400,000

9         as a line item from the town, and we were showing

10        300,000, so.  We may have thought we could go to

11        400,000 and -- don't remember.

12   Q    Moving on, in your letter to Ross Perry, you state:

13        In our September 24th meeting, Craig stated that key

14        stakeholders had over-promised and under-performed.

15             Did you have an understanding of who the

16        stakeholders were?

17   A    I would assume it was that perhaps, for example, Red

18        Acre Foundation offering up 100,000 but then saying

19        that it's going to be over three years, so it's not

20        performing to what TPL had hoped for.  I don't know.

21        I know, also, that they went back to Stow Conservation

22        Trust, or Red Acre Foundation went back, and tried to

23        get more money, and so I don't agree with that

24        characterization of the stakeholders, but it is

1          something he said, apparently.

2     Q    You go on to say:  We have to wonder if he is

3          including TPL in that group since it was TPL that

4          decided not to fund-raise during the critical period

5          from January through June, directing their staff and

6          our citizens group to suspend fund-raising.

7               Did you ever get any response, verbal or

8          otherwise, to this statement from Ross Perry?

9     A    I don't remember Ross writing or saying anything to

10         this.  I think we were -- I mean, it's referring to

11         the meeting, and I remember it was at our house, and

12         Craig MacDonnell was there, and we had hoped that

13         Whitney Hatch would be there, and Ross Perry showed

14         up, so.

15    Q    Let's go back now to the very bottom on the precise

16         number of 1,006,500.

17    A    Yeah, that number.  Does that include sale of the

18         houses or something?  I'm just trying to figure out

19         where that number comes from, because if you have --

20    Q    Well, this is as of September 30, 2003, so this is

21         after.

22    A    Yeah.  Yeah, funds guaranteed to TPL to date are

23         precisely -- that seems -- I don't know how to track

24         that number.

1    Q    Well, let's see if we can back into it a little bit.

2         This is after the Commonwealth had rejected the grant,

3         correct?

4    A    Yeah.

5    Q    That was rejected on July 3rd, I believe, or beginning

6         of July of 2003.

7    A    Was it that early?

8    Q    Yes, think so.  I think so.  It's in July or August

9         for certain.  Based on the fact that this is dated

10        September 30th, would you have included in the funds

11        guaranteed to TPL to date the 325,000 that was

12        rejected by the Commonwealth?

13   A    No.  I don't think so.

14   Q    Would you have included in this amount the 300,000

15        from the CPC?

16   A    Yes.

17   Q    What other amounts did you believe were guaranteed to

18        TPL at this point?

19   A    Well, let's do a piece of paper here.  We have, as you

20        said, 300,000 CPC, right?  We have 100,000 Red Acre

21        Foundation, 100,000 Stow Conservation Trust.  You

22        cited another number, right, besides those two?

23             MR. CONROY:  I would suggest there's a

24        schedule attached to this that may be helpful.

1    A    That's the question.  Is this attached or not?  That's

2         the last piece of the document and it's actually -- it

3         shows up -- I'm going to worry myself if I get these

4         things out of order.  But it shows up earlier in the

5         project.  It's not an attachment.

6    Q    And this is also the same document as the last page as

7         well, is it not?

8    A    The one that's --

9    Q    I think this is also the last page that we were

10        looking at.

11             MR. CONROY:  The top of the second page

12        talks about an attached analysis.

13   Q    It may be.  If you look at the attached document here,

14        this analysis which my brother has just referenced --

15   A    Yes.

16   Q    -- you will see that at the bottom of the first line,

17        the first column, there's $69,601, and on the second

18        page of your September 30, 2003, letter, there's a

19        reference in the first full paragraph to a surplus of

20        just under $70,000.

21   A    Right.

22   Q    If the DHCD grant was obtained --

23   A    Had obtained, had been obtained, right.

24   Q    Is obtained.  So, the question is:  did you know --

1        you may not have known at that time that it was not

2        obtained.

3   A   Well, also, if you take the total cost and you

4        subtract -- which is 1,375,000 -- and you subtract out

5        the DHCD grant, which is 325, does that not equal the

6        number, the million six?

7   Q   Yeah, pretty close.

8   A   Close?

9   Q   Close, yeah.

10  A   So, I'm wondering if that -- I mean, all we did refer

11       to in the letter is that he hadn't told us about the

12       DHCD review.

13  Q   You were aware, were you not, that in the purchase and

14       sale agreement between Mrs. Kunelius and Co-housing

15       there was a component of that purchase that allowed

16  for Co-housing to borrow $400,000 from Mrs. Kunelius on a

17  one-year note?  Are you familiar with that?

18  A   I know that she asserted that the amount of money she

19       was out was more than what appeared on the purchase

20       and sale.

21  Q   And that's because there was an interest amount of

22       $56,000 that would have been earned on the $400,000.

23  A   Does that not show up there as interest to buy out

24       Marilyn Kunelius' mortgage?

1    Q    That's correct.

2    A    Okay.

3    Q    So, in the amount of money that was necessary at the

4         time of the closing, that would be necessary, this

5         would suggest that you, or someone producing the four

6         scenarios which appeared perhaps to be attached to the

7         September 30th letter, anticipated the use of the

8         400,000 dollar mortgage.  Am I correct on that?

9    A    I think it was not maybe using it but acknowledging

10        that there was a potential disagreement with her, so

11        that this was some additional money to the purchase

12        price that we needed to include as part of our funding

13        goal, because you have other funding goals in there.

14        You have that hard costs for TPL and the renovation of

15        the house.

16   Q    I'm going to put before you another document and have

17        you take a look at this.

18              (WHEREUPON, Exhibit No. 7, TPL letter

19        to Perry, dated February 11, 2003, marked for

20        identification.)

21   Q    This has been marked as Furman No. 7, and I'd just

22        like you to, on the issue of 300,000 and 100,000,

23        could you look at the first page under town financial

24        and project commitment and review that and tell me if

```
 1              that in any way assists you in --

 2      A       Thank you.  So, it was four hundred thousand?  So,

 3              that's what was voted on by the town?  Wait a minute.

 4              A record vote by the committee and the Board of

 5              Selectmen to support an article at town meeting.  But

 6              I don't know if that's what we went to town meeting

 7              and asked for.  Maybe at town meeting we decided to

 8              just ask for three hundred thousand.  Maybe they went

 9              up with separate votes and one was vote up, one was

10              voted down.  I just don't recall.

11      Q       I think Mr. MacDonnell testified that it was 300,000,

12              with some subsequent obligation for $100,000 if

13              certain things happened.  Does that sound familiar to

14              you?

15                      MS. ECKER:  Objection.

16                      MR. CONROY:  Objection.

17      A       I don't remember anything about that.

18      Q       That's my best recollection.

19      A       I've always had 300,000 in my head.

20      Q       Now, looking at the next page, there's a sentence at

21              the very top:  If Craig were to gain a concession on

22              the price from Mrs. Kunelius, then the amount being

23              risked by TPL would be affordable.

24      A       I'm sorry.  This is the Ross Perry?
```

163

1   Q    Yes, this is the September 30th letter.

2   A    Yeah, uh-huh.

3   Q    What did you mean by the amount being risked by TPL?

4   A    Might have filled that 300,000 dollar gap they alluded

5        to with us earlier.  Wasn't that about how much less

6        the offer was?

7   Q    Okay.  Now, looking at the second page of your

8        September 30th letter, there's a paragraph that says:

9        Both options favored by TPL would risk CPC funding and

10       require a new town meeting vote.  Why did you think

11       that?

12  A    Well, it does seem to imply that we did get CPC

13       funding for affordable housing.  This is where I'm

14       getting confused about what actually was passed,

15       because it says:  Would sell one house at the market

16       rate while still expecting CPC funding for the other

17       house.  CPC funding, if we talked about it at town

18       meeting, we always talked about it being two houses.

19  Q    So, you go on to say:  It is our understanding that

20       the expectation of CPC funding in this scheme is not

21       valid.

22  A    That you'd have to go back to town vote again because

23       you've changed the scenario.

24  Q    On the same second page of your letter of September

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

164

1        30th, it says:  The second option put forth by TPL is

2        a complete market rate scheme that leaves a deficit of

3        over 225,000, with no indication of how that deficit

4        could be made up because there is not any tangible

5        program to fund-raise.  What does that mean?

6   A   Well, there's no current fund-raising program in place

7        would be one way that --

8   Q   In other words, if you do not -- I'm sorry.  Were you

9        finished?

10   A   That's one.  And the other one is that when you

11        eliminate the equine rescue, then you've basically

12        dried up a whole pool of funders.

13   Q   So, does this sentence mean that, in the absence of

14        equine rescue, there's no program that funds can be

15        raised for, or does it mean that the $225,000 cannot

16        be made up because no one's out there trying to raise

17        money?  Does it mean one or the other?

18            MS. ECKER:  Objection.

19   A   It could mean both.

20   Q   It could mean both?

21   A   Yeah.

22   Q   And it was your understanding that there was no

23        program out there by TPL or Friends of Red Acre at

24        this point that actually was attempting to raise

1       funds.

2    A  That's right.

3    Q  I must say that I was very surprised by the next

4       paragraph, all right, because it says:  In addition to

5       the more than 225,000 we have raised privately thus

6       far, our group continues to offer to guarantee 175,000

7       of fund-raising and would assist with fund-raising the

8       rest if we pursued either version of the original

9       plan.

10   A  But as you see, so the spreadsheet seems to match up

11      with that, because it had a neighborhood fund-raising

12      commitment.  Maybe we were willing to take on our own

13      loan for that amount and fund-raise it.

14   Q  This is the first time that I've seen any document

15      that refers specifically to the Friends of Red Acre

16      guaranteeing or being willing to guarantee $175,000 of

17      their own funds to make this work.  Did you ever

18      propose that to Craig MacDonnell?

19   A  I'm going to have to go back and find a document to

20      prove it one way or the other.  It seems likely that

21      if we talked about it, if we were talking about it

22      with Ross, we've already talked about it with him.

23   Q  Well, instead of looking, we can go back in a minute,

24      but I just want to continue here.  It says:  TPL

1    should be willing to assume the risk commensurate with

2    that of our neighborhood, especially based upon their

3    public promises to the town.  What did you mean by

4    that?

5  A  If their gap in funding was 175,000, then we're just

6    saying they should step up and assume the same amount

7    of risk as we would.

8  Q  So, do I understand your testimony correctly that the

9    175 was half of a gap that was projected and that you

10    were proposing that the -- strike that.  Let's go

11    back.

12     As to the guarantee, who was guaranteeing or

13    was willing to guarantee the 175?  Was it the six

14    people, the three couples?

15  A  I don't recall how the financing was going to occur,

16    but it seemed like a reasonable risk to take on,

17    individually.  I don't think there was another party.

18  Q  So, when you say another party, are you referring

19    to --

20  A  Like saying that Stow Conservation Trust was going to

21    do it or somebody else that was already --

22  Q  So, when I say, "Who was willing to do this?" my

23    question is referring to Labosky, Nilsson, Sommerlad,

24    Christianson, Furman and David Cobb.

1   A   It might be or.

2   Q   Or?

3   A   Yeah, might not be -- it might just have been some of

4       those parties, not all.

5   Q   Could it have been just --

6   A   My husband and myself?

7   Q   -- Christianson and Furman?

8   A   Might have been.

9   Q   Was that your intention, that in fact you were willing

10      to issue a guarantee of 175,000 if TPL stepped up to

11      the plate and did the other 175?

12  A   I'm trying to remember where we offered that up.  Here

13      we go.  Here's the first reference of that I have

14      here.  No, that's still the September 30 one.  I

15      didn't find anything before that.  I'll have to find

16      out when, if ever, we discussed that with TPL.  I

17      know, also, one time we had talked about -- I think we

18      approached Marilyn's real estate agent and talked

19      about how we would be willing to buy part of a parcel

20      behind her, behind our property, to offset costs,

21      piece of wetland.

22  Q   If you look at -- well, that's September 30th.

23  A   Same one.

24  Q   Yeah.

1   A   I know.  I can't find anything before that either.

2       Perhaps you'll find something in the TPL documents

3       that we sent them.

4   Q   Do I understand that your September 30th letter to

5       Ross Perry anticipated that the only amount that TPL

6       would have to come up with by way of guaranteeing any

7       funds was an amount equal to $175,000, which was half

8       of the shortfall that was projected?

9               MS. MURPHY:  Objection.

10  A   I would have to, you know, I'd have to look things

11      over, and it seems -- it's looking to me like that is

12      what I'm seeing.  Here you go.  Go back to March 20,

13      2003.

14  Q   Okay.

15  A   The $175,000 or, in this case, 180,000 -- it's on Page

16      2 of the letter in the second paragraph -- right now

17      stands at 180,000 left to go for equine foundation

18      sources.  So, what we were doing was we were saying

19      that, as we were formulating the budget, they should

20      be viewing the farm in back as being purchased by Eye

21      of the Storm for the $400,000.

22          So, here's my guess, as I moved forward, is

23      that what we were doing by offering to carry the

24      175 was, knowing that we could raise with taking

1          on some sort of a loan, we could take on the

2          interest and go out and fund-raise that 175 for

3          Eye of the Storm to make up that difference, but

4          it would only work if Eye of the Storm was still

5          in the mix, which I think is what we implied in

6          the letter to Ross Perry.  We couldn't fund that

7          without Eye of the Storm in the mix.  So, that

8          400,000 represents purchase of the farm.

9     Q    Do you recall having discussions with Craig MacDonnell

10         regarding your willingness --

11    A    Yeah, that's what we still have not found.  I don't

12         know.  I don't know what we showed him at the meeting.

13    Q    Let me be frank here for a minute.  Please accept my

14         frankness.  I detect some modesty about your

15         disclosure of what you might or might not be willing

16         personally to guarantee.  If I'm wrong on that, I

17         apologize.

18    A    For what?

19    Q    But isn't it in fact true that you and your husband

20         literally said to him, "We -- Serena Furman and Peter

21         Christianson -- we personally will guarantee 175,000

22         even if others will not"?

23    A    Well, if you're trying to confirm something that

24         somebody else said, it sounds like something I would

1        be likely to say.

2    Q    Do you have a recollection of saying that?

3    A    No, but I would be interested in doing it today.

4    Q    But you don't know whether, when you said the

5        guarantee, and you referred to the guarantee in

6        your -- was it September 30th letter?

7    A    Uh-huh.

8    Q    You must have had in mind that someone had agreed to

9        guarantee it.  Otherwise, you would not have said

10        that.

11    A    It might have been us, though.  We might have just

12        assumed we would be able to go out and get a personal

13        loan to cover it.

14    Q    Well, it says:  Our group continues to offer to

15        guarantee 175 of fund-raising.

16    A    Right.  Over time.

17    Q    So, I presume that -- but someone had to commit to

18        you, either you and your husband to each other and to

19        yourselves, or that someone else had committed to you,

20        because otherwise you wouldn't --

21    A    You're talking fund-raising commitment, a commitment

22        to fund-raise, or commitment to --

23    Q    To guarantee 175 would be fund-raised, would be

24        raised.  In other words, if it wasn't, would that mean

1     that you were responsible for the delta between what

2     was raised and the 175, or the difference between?

3   A   I'm treading on sketchy memory here.

4   Q   I'm trying to determine what was meant by guarantee,

5     whether you meant it in a formal sense, that a minimum

6     175 could be -- was a certainty and that if it wasn't

7     raised you would come up with it between yourself and

8     your husband or such other people who had made that

9     commitment to you.

10  A   I'd have to find that in writing rather than say that

11    I said that, because that sounds -- it's a pretty big

12    statement to make.

13  Q   But as to the writing that we have in front of you

14    relating to your statements to Ross Perry, is it your

15    testimony today that you don't recall what you meant

16    by that, or is it that you're uncertain as to what you

17    meant by that?

18  A   Right.

19  Q   You're uncertain as to what you meant.

20  A   Right.  But if you can, you know, show some

21    documentation -- maybe you'll it find in letters to

22    Craig MacDonnell that we didn't carry copies of -- I

23    guess I wouldn't be surprised that we had done that.

24  Q   I don't mean to pry.  Did you have the financial

1          capability, you and your husband, to make an

2          independent guarantee of $175,000?

3     A    On a loan?  We'd probably have to go get a loan and a

4          co-signer, so.  No, not in the bank, no, no.

5               MR. McLAUGHLIN:  It is now 3:30.

6          You've been here a long time.  I'm trying to

7          operate here on the fly because these documents

8          were not expected.  So, I haven't even got to the

9          documents and other things that I was originally

10         planning to look at.  Why don't we take a short

11         break and let me see if I can sort of put those

12         together and see if I can sort of give you some

13         sense of how much more time I'm going to need.

14              MR. CONROY:  Okay.  Let me state, too,

15         off the record.

16              (Brief discussion off the record)

17              MR. McLAUGHLIN:  I think what we're

18         going to do now is counsel have conferred and the

19         deponent is willing to come back at another time

20         so that I can digest these documents and counsel

21         can also look at the documents.  We will continue

22         her deposition, and I'll ask her my remaining

23         questions at that point, and then counsel will

24         have an opportunity to cross-examine her at a

1    mutually agreeable time.

2                    (WHEREUPON, the deposition was

3    suspended at 3:30 P.M.)

4

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF ESSEX, ss.

      I, Roberta J. Daniels, a Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, do hereby certify that the foregoing deposition of SERENA FURMAN was taken before me on April 3, 2007, that the said witness was satisfactorily identified and duly sworn before the commencement of her testimony and that the testimony was taken audiographically by myself and then transcribed by myself. To the best of my knowledge, skill and ability, the within transcript is a complete, true and accurate record of said deposition.

      Further, I am not connected either by blood or by marriage with any of the said parties nor am I interested either directly or indirectly in the matter in controversy.

      IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 9th day of April, 2007.

_____
Roberta J. Daniels, Notary Public
Commission expires:  11-15-13

C E R T I F I C A T E

I, SERENA FURMAN, do hereby certify

that I have read the foregoing transcript of my

testimony and further certify that said

transcript is a true, accurate and complete

record of said testimony.

Dated at _____, this

_____ day of _____, 2007,

under the pains and penalties of perjury.

_____

EXHIBIT G

176

E R R A T A   S H E E T

Deposition of SERENA FURMAN

| Page No. | Line No. | <u>Transcript reads</u> | <u>Change made</u> |
|----------|----------|-------------------------|--------------------|

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

EXHIBIT H

September 30, 2003

To: Ross Perry, Board of Selectmen
From: Peter Christianson, Serena Furman, Erica Nilsson, Michael Labosky, Karen Sommerlad and David Cobb

Dear Ross:

Thank you again for taking the time to meet with us the other night. It was regrettable that Whitney Hatch was not able to join us. Unfortunately, the subsequent September 25th letter from TPL to the ZBA withdrawing the zoning variance is yet another example of the negotiating style we've encountered over the past several months. This communiqué was sent unilaterally by TPL without our knowledge, and we find it disheartening that Craig did not mention it to any of us at the meeting on the 24th. As Craig stated in the meeting, he has been trying to "either push the project along or kill it for quite some time." This ZBA letter appears to be TPL's killing of the original plan, which included affordable housing, equine rescue and open space.

As you know, our group has had a clear perspective since day 1 of this project: we were concerned about a development proposed on land that is zoned conservation/recreation. We had goals (affordable housing, equine rescue and open space) that have not changed. We proposed a budget and timetable that led to a remarkable coalition. The budget, timetable and coalition are still as they were: clear and purposeful.

TPL unilaterally decided that our three goals were no longer applicable to the project, that the budget is unrealistic, and that the timetable does not fit their schedule.

There may be solutions other than what we have proposed, however it is not clear how we can be party to those scenarios. As we have stated in the past we are neither a real estate company nor a bank; therefore, we bring the same skills and resources to the table as with the original plan. We are tied to the original project, which is the only plan that has been presented to the neighborhood and the Town for their approval.

In our September 24th meeting, Craig stated that key stakeholders had "overpromised and underperformed." We have to wonder if he is including TPL in that group, since it was TPL that decided not to fund raise during the critical period from January through June, directing their staff and our citizens' group to suspend fund raising.

The funds guaranteed to TPL to-date are precisely $1,006,500. We continue to believe that the obstacles to a successful project completion that were previously represented by TPL as being insurmountable, namely the DHCD

and ZBA, are likely resolved. If Craig were to gain a concession on the price from Ms. Kunelius, then the amount being risked by TPL would be affordable.

For the sake of comparison, we have attached an analysis that illustrates that the original scheme, subject to the DHCD grant, remains the most feasible option on the table. This option offers a surplus of just under $70,000 if the DHCD grant is obtained. If we look closely at the original scenario numbers, the remaining budget at risk to TPL is modest and certainly is not the $805,000 that Craig reports.

We also created a second viable option that safeguards $300,000 of CPC open space funding by sticking with our promise to create 2 affordable units. As shown in the spreadsheeet, neither of these options would require a new Town Meeting vote.

Both options favored by TPL would risk CPC funding and require a new Town Meeting vote. One scenario sells one house at the market rate while still expecting CPC funding for the other house. It is our understanding that the expectation of CPC funding in this scheme is not valid. The second option put forth by TPL is a complete market rate scheme that leaves a deficit of over $225,000 with no indication of how that deficit could be made up, because there is not any tangible program to fundraise.

In addition to the more than $225K we have raised privately thus far, our group continues to offer to guarantee $175K of fund raising, and would assist with fund raising the rest if we pursue either version of the original plan. TPL should be willing to assume risk commensurate with that of our neighborhood, especially based on their public promises to the Town.

By abandoning this project, TPL also abandons its mission. This decision could have a statewide domino effect on the CPC. As we have no mandate to pursue project alternatives, we wish the Town and TPL well in their efforts to bring this project to a successful conclusion.

CC: Tom Shepherd, SCT
Nina Arbella, EOS
Jerry Bird, RAF
Craig MacDonnell, TPL
Whitney Hatch, TPL
Bob Wilber, CPC

FURMAN0122