UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MARILYN KUNELIUS,

Plaintiff,

v.

TOWN OF STOW, et al.

Defendants.

Civil Action No. 05-11697-GAO

**MOTION OF THE TRUST FOR PUBLIC LAND AND CRAIG A. MACDONNELL FOR LEAVE TO FILE A RESPONSE**

Pursuant to Local Rule 7.1(B)(3), Defendants The Trust for Public Land ("TPL") and Craig A. MacDonnell hereby request leave to file the accompanying Response to Plaintiff's Supplemental Memorandum in Opposition to the Trust for Public Land's Motion to Quash and In Support of Plaintiff's Motion For Sanctions.

Although plaintiff already filed a memorandum in support of her Motion for Sanctions and in opposition to TPL's Motion to Quash, plaintiff recently filed, without seeking leave of court, a Supplemental Memorandum in Opposition to the Trust for Public Land's Motion to Quash and in Support of Plaintiff's Motion for Sanctions ("Supplemental Memorandum"). The Supplemental Memorandum made numerous false and misleading accusations of misconduct by TPL and Mr. MacDonnell which are unsupported in the record. To the extent the Court intends to consider any of the statements included in plaintiff's Supplemental Memorandum filed without leave of court, TPL and Mr. MacDonnell request leave of court to file the attached limited response in order to correct plaintiff's inaccuracies and misrepresentations and to bring the most egregious misstatements to the Court's attention.

WHEREFORE, TPL and Mr. MacDonnell respectfully request that this Court grant them leave to file the accompanying Response to Plaintiff's Supplemental Memorandum in Opposition to the Trust for Public Land's Motion to Quash and In Support of Plaintiff's Motion For Sanctions.

Respectfully submitted,

CRAIG A. MACDONNELL

By his attorneys,

/s/ James B. Conroy
Peter E. Gelhaar (BBO # 188310)
James B. Conroy (BBO # 096315)
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd Floor
Boston, MA 02108
(617) 720-2880

Dated: May 1, 2007

THE TRUST FOR PUBLIC LAND

By its attorneys,

/s/ Dahlia S. Fetouh
Richard A. Oetheimer (BBO # 377665)
Dahlia S. Fetouh (BBO # 651196)
Patricia M. Murphy (BBO # 665056)
Goodwin Procter LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

**LOCAL RULE 7.1(A)(2) CERTIFICATION AND CERTIFICATE OF SERVICE**

I, Dahlia S. Fetouh, hereby certify that on May 1, 2007, I attempted to confer in good faith with Michael C. McLaughlin, counsel for Marilyn Kunelius, but was unable to reach him.

I further certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 1, 2007.

/s/ Dahlia S. Fetouh
Dahlia S. Fetouh

LIBA/1785913.1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MARILYN KUNELIUS,

Plaintiff,

v.

TOWN OF STOW, et al.

Defendants.

Civil Action No. 05-11697-GAO

**DEFENDANTS THE TRUST FOR PUBLIC LAND AND CRAIG A. MACDONNELL'S RESPONSE TO PLAINTIFF'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO THE TRUST FOR PUBLIC LAND'S MOTION TO QUASH AND IN SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS**

Defendants The Trust for Public Land ("TPL") and Craig A. MacDonnell file this response to plaintiff Marilyn Kunelius' Supplemental Memorandum in Opposition to the Trust for Public Land's Motion to Quash and in Support of Plaintiff's Motion for Sanctions ("Supplemental Memorandum"). Although plaintiff has already filed a lengthy memorandum in support of her Motion for Sanctions and in opposition to TPL's Motion to Quash, plaintiff has now filed this Supplemental Memorandum claiming that information uncovered at the deposition of non-party Serena Furman reveals "additional and serious misrepresentations" by TPL and Mr. MacDonnell to the Court and to plaintiff.[1] Although plaintiff's latest allegations are wholly irrelevant to the ultimate issue in this case, namely, whether the liquidated damages clause represents plaintiff's sole remedy for the breach of the Purchase and Sale Agreement by TPL, the accusations are so caustic and their falsity so plain, that TPL and Mr. MacDonnell respond to the

[1] Plaintiff filed the Supplemental Memorandum without the required leave of Court. *See* Local Rule 7.1(b)(3). TPL and Mr. MacDonnell offer this response only to the extent the Court intends to consider any of the statements offered in plaintiff's Supplemental Memorandum.

Supplemental Memorandum solely to correct plaintiff's inaccuracies and misrepresentations and to bring the most egregious misstatements to the Court's attention. The following are examples of some of the ways in which plaintiff misstates the record.

## I. PLAINTIFF'S ALLEGATIONS THAT TPL PREVENTED ALL FUNDRAISING FOR THE PROJECT ARE BLATANTLY FALSE.

Plaintiff's new allegations are based solely on the testimony of, and documents produced by, non-party Serena Furman, a member of a local organization, the Friends of Red Acre ("FORA"), that worked with TPL toward the acquisition of plaintiff's property. In her Supplemental Memorandum, plaintiff claims that Ms. Furman's testimony, and documents Ms. Furman voluntarily produced, revealed that "TPL had <u>ordered</u> that no fundraising take place at all." (Supplemental Mem. at 4) (emphasis in original). Setting aside the point that TPL had no power to order FORA to do anything at all, Ms. Furman testified to just the opposite—that TPL never ordered FORA to stop fundraising. "To go out and further try to identify individuals that would be willing to make a promise of a donation, no, I don't believe he [Craig MacDonnell of TPL] ever asked us to stop." (Furman Tr. Vol II, p. 60:15-22) (attached hereto as Exhibit A). Plaintiff failed to cite this testimony in her Supplemental Memorandum.

Plaintiff attempts to bolster her assertion by quoting one sentence in a document produced by Ms. Furman stating that TPL "repeatedly delayed the start up of the fundraising committees." (Supplemental Mem. at 5, citing Letter from Furman to MacDonnell, bates labeled Furman0108-0110, attached to plaintiff's Supplemental Memorandum as Exhibit A). What plaintiff neglects to mention, however, is that the very next sentence of this document describes the reason for such delay.

> There was an understandable reluctance on the part of TPL to fundraise before certain key decisions were made regarding town

> support and Zoning Board approvals. Decisions that put off the funding campaign were based on real concerns and considerations. It is in hindsight after the DHCD grant decision [denial of a key state grant for the project] that TPL might realize that fund raising should have begun in early '03.

Exhibit A to Supplemental Memorandum at Furman0108. Furthermore, when asked about this very document at deposition, Ms. Furman testified that TPL's decision to delay some of the fundraising was a prudent, strategic decision. "Well, and I think I've made mention to this before, you don't want to request funds from foundations and then write them back and say, gee, I'm sorry, this project can't go forward. We can't use your funds. It would basically prevent TPL from ever going to that foundation again for the rest of their, you know, existence." (Furman Tr. Vol. II, p. 92:5-11). Somehow, plaintiff's Supplemental Memorandum overlooks that testimony. It also ignores the fact that, over the two days of her deposition, Ms. Furman repeatedly described TPL's decision to delay some of the fundraising until after the zoning issues were resolved as careful and logical (*see, e.g.*, Furman Tr. Vol. I, pp. 29:23-30:6; 54:7-10; 86:4-24, attached to plaintiff's Supplemental Memorandum as Exhibit G), not as unethical or sinister, as plaintiff argues.

Plaintiff further asserts that TPL engaged in "no fundraising effort at all." (Supplemental Mem. at 9). This flatly contradicts and ignores Ms. Furman's testimony that TPL did, in fact, undertake significant fundraising efforts. For instance, Ms. Furman testified that "we made some presentations to funders that had already been identified to see if they would give more. And the DHCD grant. That's the major fund-raising effort. That was a lot of work by TPL. That was a lot of work." (Furman Tr. Vol. 1, p. 80:7-14, attached to plaintiff's Supplemental Memorandum as Exhibit G).

## II.     PLAINTIFF'S BALD ALLEGATIONS THAT THE DEFENDANTS MADE MISREPRESENTATIONS TO THE COURT AND TO PLAINTIFF ARE WHOLLY UNSUPPORTED.

Plaintiff cites numerous documents provided by Ms. Furman at her deposition (attached to plaintiff's Supplemental Memorandum as Exhibits C, D and F) as evidence that TPL and Mr. MacDonnell withheld information and attempted to mislead the Court and the plaintiff. This is nonsense.

The first document, a draft email from Peter Christianson of FORA to Craig MacDonnell (attached to plaintiff's Supplemental Memorandum as Exhibit C), was never established as having been sent to Mr. MacDonnell or anyone at TPL. In fact, Ms. Furman testified at deposition, "we don't believe this was sent." (Furman Tr. Vol. II, p. 44:13-14; *see also* Furman Tr. Vol. I, p. 108:1-14). TPL and Mr. MacDonnell cannot have withheld a document that they never possessed.

Plaintiff next argues that TPL and Mr. MacDonnell withheld from the Court and the plaintiff information contained in a July 23, 2003 email from Mr. Christianson (attached to plaintiff's Supplemental Memorandum as Exhibit F). (Supplemental Mem. at 7). However, this document was an internal email from Mr. Christianson to other FORA members, and was never sent to or seen by anyone at TPL. Again, TPL and Mr. MacDonnell cannot have withheld from the Court or the plaintiff a document that they never saw.

Plaintiff also cites to a portion of the deposition transcript of Mr. MacDonnell, in which he said that he never told FORA not to fundraise because TPL did not want to go forward with the project, as evidence that TPL and Mr. MacDonnell deliberately attempted to mislead the Court and the plaintiff concerning TPL's fundraising efforts. (Supplemental Mem. at 5-6). However, when plaintiff's counsel asked Ms. Furman about this very passage from Mr.

MacDonnell's transcript, apparently looking for Ms. Furman to state that Mr. MacDonnell had lied, Ms. Furman confirmed the accuracy and veracity of Mr. MacDonnell's testimony. "Well, that's right. I mean, it's not because TPL didn't want to go forward. It's because there wasn't time to start, because they need to get these other things taken care of first." (Furman Tr. Vol. I, p. 150:15-18).

## III. PLAINTIFF'S ALLEGATIONS OF UNETHICAL MISCONDUCT BY TPL AND MR. MACDONNELL ARE BOGUS AND UNSUPPORTED.

Throughout the Supplemental Memorandum plaintiff also claims that documents provided by Ms. Furman demonstrate that TPL and Mr. MacDonnell engaged in unethical misconduct in various ways. These allegations are so bereft of factual support in the record that plaintiff resorts to mischaracterizing deposition testimony and citing the record in such a selective and incomplete manner that it is hard to see how the Supplemental Memorandum is anything but deliberately misleading.

For instance, plaintiff asserts that the documents provided by Ms. Furman "clearly show that FORA and Furman had identified that TPL had undertaken steps to ensure that TPL would not purchase the Property." (Supplemental Mem. at 4). However, plaintiff fails to mention that plaintiff's counsel directly asked Ms. Furman if she believed that "TPL was proposing plans that could not succeed" and her response was clear: "I don't think they were intentionally putting out a plan that wouldn't work." (Furman Tr. Vol. II, p.42:9-11).

Plaintiff also asserts that TPL and Mr. MacDonnell engaged in unethical behavior by using for other TPL projects a potential donor list provided by FORA. In addition to being wholly irrelevant to the claims and defenses in this lawsuit, plaintiff inexplicably fails to mention that when plaintiff's counsel asked Ms. Furman in deposition about this very issue, Ms. Furman stated that TPL and Mr. MacDonnell were not asked nor required to use those prospects only for

FORA's project, and that TPL had likely already used many of those contacts before FORA ever gave them the list.

> Q: Are you aware of any standard among not for profits, charitable institutions, where someone in the position of your husband providing this information to TPL, that that standard would have suggested that it would have been just available for the Friends of Red Acre fund-raising efforts?
>
> A: No, and I'm also fairly certain that the list of the prospect pool, I think that we both believe it's highly likely that many of those had been identified and used before by TPL.

Furman Tr. Vol. I., p. 70:16-71:2.

## CONCLUSION

Respectfully, TPL and Mr. MacDonnell submit that plaintiff's latest attempt not only to distract the Court from issues that are actually relevant to the claims and defenses in this lawsuit but also to make further accusations of misconduct against the defendants that are not only false and misleading but deliberately so, should not be tolerated.

Respectfully submitted,

CRAIG A. MACDONNELL

By his attorneys,

/s/ James B. Conroy
Peter E. Gelhaar (BBO # 188310)
James B. Conroy (BBO # 096315)
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd Floor
Boston, MA 02108
(617) 720-2880

Dated: May 1, 2007

THE TRUST FOR PUBLIC LAND

By its attorneys,

/s/ Dahlia S. Fetouh
Richard A. Oetheimer (BBO # 377665)
Dahlia S. Fetouh (BBO # 651196)
Patricia M. Murphy (BBO # 665056)
Goodwin Procter LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

**CERTIFICATE OF SERVICE**

I, Dahlia S. Fetouh, do hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 1, 2007.

/s/ Dahlia S. Fetouh
Dahlia S. Fetouh

LIBA/1785027.2

# EXHIBIT A

Volume: II
Pages: 1-105
Exhibits: 31

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11697-GAO

MARILYN KUNELIUS,
Plaintiff,

v.

TOWN OF STOW, separately,
A PARTNERSHIP OF UNKNOWN NAME
BETWEEN TOWN OF STOW and THE
TRUST FOR PUBLIC LAND, separately,
and CRAIG A. MacDONNELL, in his
individual capacity,
Defendants.

CONTINUED DEPOSITION of SERENA FURMAN, a witness called by and on behalf of the Plaintiff, taken pursuant to Fed.R.Civ.P. 30, before Roberta J. Daniels, a Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Law Offices of Michael C. McLaughlin, One Beacon Street, Suite 3333, Boston, Massachusetts 02108, on Tuesday, April 17, 2007, scheduled to commence at 5:00 P.M.

APPEARANCES

Michael C. McLaughlin, Esquire
Law Offices of Michael C. McLaughlin
One Beacon Street, Suite 3333
Boston, Massachusetts 02108
Counsel for the Plaintiff

Deborah I. Ecker, Esquire
Brody Hardoon Perkins & Kesten, LLP
One Exeter Plaza
Boston, Massachusetts 02116
Counsel for Defendant Town of Stow

Patricia M. Murphy, Esquire
Goodwin Procter, LLP
Exchange Place
Boston, Massachusetts 02109
Counsel for Defendant The Trust for Public Land

James B. Conroy, Esquire
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd floor
Boston, Massachusetts 02108
Counsel for Defendant Craig A. MacDonnell

Also present:

Lucie DeBellis, Paralegal
Law Offices of Michael C. McLaughlin

INDEX

| Witness | D | C | RD | RC |
|---|---|---|---|---|
| SERENA FURMAN | | | | |
| By Mr. McLaughlin | 7 | | 96 | |
| By Mr. Conroy | | 49 | | |

EXHIBITS

| No. | Description | Page |
|---|---|---|
| 7A | Furman Documents for Marking as Exhibits | 7 |
| 8 | Foundations spreadsheet, 1-19-03 | 102 |
| 9 | FORA budget, 1-19-02 | 102 |
| 10 | Christianson email to FORA, 12-17-02 | 80 |
| 11 | Christianson email to MacDonnell, 1-30-03 | 7 |
| 12 | MacDonnell email to Christianson, 2-25-03 | 18 |
| 13 | FORA email to MacDonnell, 3-20-03 | 32 |
| 14 | Christianson email to FORA, 7-23-03 | 88 |
| 15 | FORA letter to MacDonnell, 7-27-03 | 12 |
| 16 | Christianson letter to MacDonnell, 8/6 | 44 |
| 17 | Christianson letter to MacDonnell, 9-11-03 | 46 |
| 18 | MacDonnell letter to FORA, 9-10-03 | 102 |
| 19 | MacDonnell letter to FORA, 8-6-03 | 102 |
| 20 | FORA letter to MacDonnell, 8-19-07 | 102 |
| 21 | Outline: Should we meet? | 102 |
| 22 | Revised market alternative - variance granted | 102 |
| 23 | FORA email to Perry, 9-30-03 | 92 |
| 24 | DRAFT Conditions for Transfer of Right of First Refusal | 15 |
| 25 | TPL memo to Stow project partners, 3-18-03 | 24 |
| 26 | FORA letter to Perry, 9-30-03 | 47 |

| | | |
|---|---|---|
| 27 | FORA fund-raising prospects, dated 1-19-03 | 64 |
| 28 | FORA conservation project plate | 67 |
| 29 | Christian handwritten calculations | 71 |
| 30 | Kunelius letter to editor, 2-27-03 | 72 |
| 31 | Christianson letter to Kunelius, 2-19-04 | 73 |
| 32 | Christianson letter to Boothroyd, 8-2-05 | 75 |
| 33 | Christianson letter to Kunelius, 5-26-04 | 77 |
| 34 | TPL and FORA budgets, 2-11-03 | 82 |
| 35 | Christianson letter to Scofield, 3-3-03 | 86 |
| 36 | Christianson handwritten calculations | 87 |
| 37 | Lapointe email to FORA, 1-16-03 | 94 |

PROCEEDINGS
Tuesday, April 17, 2007
5:03 P.M.

MR. McLAUGHLIN: Counsel have just discussed my efforts to go back over the Furman testimony and to refer to the specific descriptions of documents that she provided at the time of her deposition, and we have now Bate stamped her documents and pre-marked them as exhibits beginning with Exhibit 8, and we have a document that is entitled, "Furman Documents for Marking as Exhibits," which is a description of what we were talking about during the deposition, the Bate stamp number that has now been applied to those, and the exhibit number that we have now pre-marked.

So, I'm going to put this in as perhaps Exhibit 7A, something like that. Why don't we do that, as Exhibit 7A, so that we have some track of what we're referring to, and then from here forward we will use the exhibit designation. I've also said to counsel that, if for some reason we are incorrect on something, they can object at some future time should they find that

we have made a miscalculation as to what the document is.

All right. So, I'll leave it at that.

(WHEREUPON, Exhibit No. 7A, Furman Documents for Marking as Exhibits, marked for identification.)

MR. McLAUGHLIN: Hello.

THE WITNESS: Hi.

MR. McLAUGHLIN: Nice to see you again. I have, hopefully, just a few questions before other counsel talk to you.

DIRECT EXAMINATION

By MR. McLAUGHLIN:

Q We've gone through the documents that you provided to us. Are you familiar with any discussions between Friends of Red Acre and Craig MacDonnell about lowering the purchase price to be paid to Mrs. Kunelius prior to the town accepting the right of first refusal?

A No.

Q I'm going to put before you a document that has been marked as -- maybe it hasn't. Let's see.

(WHEREUPON, Exhibit No. 11, Christianson email to MacDonnell, dated January

30, 2003, marked for identification.)

Q I'm going to put before you what has been marked as Exhibit 11 and ask you if you recognize this document.

A Recognize it.

Q Just for your benefit, this is one of the documents that you provided to us. We've just marked it with the designation, at the bottom, of Furman0035.

A Right. Just, technically, I'm not very good at remembering documents. So, if it came out of my package, it's something that I brought to the table.

Q If you could look, this appears to be, Exhibit 11 appears to be, to Craig from Peter on behalf of FORA. Do you call it FORA? Is that how you say it?

A FORA.

Q FORA, okay. And I'd ask you to look at 2(b), which reads: What is the likelihood of reducing the sale price after assignment?

I'd ask you if you remember the circumstances concerning the issue of the possibility of reducing the sale price after assignment, if you know.

A I would love to read the document that this was referring to, you know, to read the document that Craig sent.

Q Well, does this in any way refresh your memory that there was a discussion concerning the possibility of lowering the purchase price in January of 2003? That's several weeks prior to the assignment.

A Well, I don't know if a discussion actually ever happened. What I'm trying to do is understand the intent of this letter. The 1.16 million was the purchase price for the property, is that correct?

Q Roughly, yes.

A And then the 1.3 million was the estimate to cover the closing costs. I don't remember the context of this. I mean, it seems to me that what happened is that the fund-raising goal was elevated by TPL from 1.16 to 1.3 to cover closing costs, and what we're trying to do is understand what those differences are.

Q And when you refer to covering closing costs, are you referring to the specific costs of effectuating the transfer from Mrs. Kunelius to TPL?

A Well, we didn't, at this time, understand what it represented, but since then, there's some documents that say that TPL wants to recover their hard costs in doing discovery of the property, et cetera.

Q Do you recall any discussions in January of 2003 between FORA and MacDonnell concerning the possibility

that the purchase price may not be able to be met if TPL's other hard costs had to be met as well?

A I don't recall.

Q Do you recall any discussion as to what a closing cost compromise was as reflected in 2 )?

A Comprise.

Q I'm sorry. I apologize. I misread that, so I'll withdraw the question.

Do you recall what the expenses associated with due diligence were?

A I don't think TPL ever shared with us an itemized list of those items as part of their management of the project.

Q So, the sentence in Paragraph 2 that begins with As you know, it reads: As you know, the 1.3 million was simply an estimate to cover closing costs.

Is it your testimony that that estimate was TPL's estimate, or was it FORA's estimate?

A It wasn't FORA's estimate, no. I wouldn't see how any of us would be in a position to make that kind of an estimate.

Q In Paragraph 2(I), there's a reference to how much it would cost to get G. Jones to leave the country.

A Greg Jones, yes. Well, he was very actively opposing

us. So, that was a joke.

Q I suspected. Even I could discern that. However, my question was related to what significance Greg Jones' opposition had since -- well, strike that.

Did you believe at that time that Greg Jones' opposition was sufficient to potentially prevent the deal from going forward?

A Only insofar as he was trying to affect voting at town meeting.

Q There are other documents which I have referred to already during your earlier deposition with regard to TPL in which you explained that TPL should not attempt to lower the purchase price with the seller. Do you recall those documents, that document?

A I believe that we suggested that they not attempt it.

Q They not, okay.

A Do I recall the documents, or do I recall that being our counsel?

Q Do you recall that being your counsel? I mean, I can get the document. I had kind of hoped to move quicker, but if you want it, I can get it for you.

A Other than having a strong feeling that the seller was not going to entertain that, I don't recall other reasons why we would suggest that. And this was what

time, too? What date were you talking about for lowering the price?
Q Let me just find the document. Okay. It's 90, which is Exhibit 15.
A July.
Q Yeah.
A So, that's later, and that to make up the difference for what --
Q Let me just put it in front of you. This is going to be 15.
A The date means a lot, you know, puts it in context.

(WHEREUPON, Exhibit No. 15, FORA letter to MacDonnell, dated July 27, 2003, marked for identification.)

Q If you'd look at Exhibit 15, the second page, which is Bate stamped Furman91, at the very bottom, it says: FORA does not believe that it's necessary to renegotiate a lower price with the seller.

Now, I think this is a document from you, is that correct?
A Uh-huh.
Q It says Friends of Red Acre, but I think you had testified you were the author of this, is that correct?

A Yes.
Q So, my question is, in comparing these two documents, that is the document that's been marked as 15 and the document that's been marked as 11, both of them refer to the lowering of the purchase price. My question is whether these two documents in any way help you to recall when the issue of lowering the purchase price became a topic of discussion with FORA and TPL.
A Well, I definitely believe that it's mid to late summer, was when it began to be clear that that funding difference was something that TPL was having a very hard time with. Going back to this earlier one about reducing the sale price after assignment, I mean, during any purchase and sale, when you go through discovery of a property, you do have an opportunity to go back to the seller based upon what you find in your discovery and, you know, negotiate.

So, that's what I would assume. That's the only level of that, you know, query was about, you know, if you find that there's toxic waste or something on the property.
Q Well, you're aware that no toxic waste or --
A No, no, absolutely.
Q And you're aware that TPL undertook analysis of the

site?
A Yeah.
Q And that included environmental analysis?
A Yeah, but I don't think that was completed by January 30th.
Q No, I'm not saying that. I'm just saying you're aware that they undertook those types of analyses, is that correct?
A I'm just aware that there wasn't any discovery that they raised with us where they had an issue with the property, other than the obvious zoning ones.
Q Do you recall if you had a specific response from Craig MacDonnell concerning your statement on Exhibit 15 that there is no need to renegotiate the purchase price with the seller?
A He usually is pretty good about writing back. I have a letter from August 6th that he wrote.
Q And does he specifically, in that letter, deal with the necessity to lower the purchase price?
A He said he was unsuccessful in getting purchase price concessions. This is probably after he offered the price. Let's see if there's something earlier. No, the next, most previous, document I have is this one. So, that was the next thing that I have.

Q I'd like you to look at another document, if you would, which is -- let me put this in front of you.

(WHEREUPON, Exhibit No. 24, DRAFT Conditions for Transfer of Right of First Refusal, marked for identification.)

Q I'm putting before you a document entitled -- and this is now Exhibit 24 -- entitled, "DRAFT Conditions for Transfer of the Town's Right of First Refusal on the Kunelius Property." I will tell you that this document has been already identified by Ross Perry as the non-bolded language being authored by Ross Perry and the bold language being the response by Craig MacDonnell. So, if you look, and it's a three-page document, the last page of which appears to be intended to be signed by Ross Perry. Simple question here. How is it that FORA has this document, which appears to be correspondence prior to the assignment from the town?
A Good question. Well, there's only two sources. It could have been Ross Perry or it could have been Craig MacDonnell. It's unusual that we see third-party, you know, pieces where TPL is working with other people. They didn't copy us, generally, on things like that, but that was fairly early, wasn't it, in January or

so?
Q The final version of this, which appears, in all respects, to be identical to this, except it doesn't have DRAFT on it, at least in my best recollection, is the day before the assignment.
A Oh, okay.
Q From the town to TPL. Does your answer with regard --
A Well, look at the very top. The Board would appreciate advance notice if any of these items will be an issue by TPL or Friends of Red Acre. That indicates to me that it came from the Board of Selectmen for our review, which is a bit bizarre.
Q Could you tell me if there's anything on this document that would suggest that Friends of Red Acre responded to any of these issues?
A To the town?
Q Yes.
A No.
Q In other words, the first paragraph says: The Board will appreciate advance notice if any of these items will be an issue to Friends of Red Acre. And so my question is did you respond in any way to Items 1 through 7(f)?
A I don't recall. It doesn't seem like something we

would do. We would just go through TPL.
Q So, do you recall discussing TPL's answers with them prior to them being given to the town?
A I don't recall.
Q Do you recall making any recommendations to TPL concerning any of the issues raised in Items 1 through 7(f)?
A In Item 4, there were some concerns because of the possible use of water on the property and horse farms being a concern to some citizens, that I was researching things that related to how, currently, horse farms do all of these great things to prevent barn runoff from affecting ground water. So, this kind of language in here may have been something that I might have helped them with, but it might have been in a previous document that I gave to TPL that they drew from, from a presentation to town meeting.
Q Looking at the last page of this exhibit, could you tell me if you recall reading the last response, which is in bold above the word regards, beginning with TPL: Because the decided cases under Chapter 61 do not explicitly resolve all of the potential issues that arise when a municipality assigns its right of first refusal to a non-profit conservation organization,

including which of the terms of the underlying contract should obligate the assignee, it would be prudent for TPL and Marilyn Kunelius' attorney to enter a good-faith dialogue to determine which terms are relevant and which terms are truly inapplicable.
A What's the question?
Q Did you read that prior to the assignment by the Town of Stow?
A I can't tell you whether I saw this before or after the assignment.
Q Was FORA aware, or you, that there was an issue as to whether some terms of the underlying contract were applicable to TPL and some were not?
A The underlying contract being the purchase and sale?
Q The purchase and sale agreement.
A I'm not really knowledgeable on that. I would have assumed that once you paid the price, the asking price, you were in full compliance with it. That's how far my knowledge goes with these things.
(WHEREUPON, Exhibit No. 12, MacDonnell email to Christianson, dated February 25, 2003, marked for identification.)
Q I'm going to put before you a document which has been designed as Exhibit 12 and has the designation of

Furman56, 57, 58 and 59 on it, and I want to ask you. This appears to be a document from your husband, a series of emails, is that correct?
A Yes.
Q This is a document you provided to us, and it has the handwritten date of 2-25-03, and I want to direct your attention to the second page, and I am not a computer person, so I cannot decipher all of the tracking or the addressing, or whatever the term is that is done in an email, but there is, about one-third of the way down, a sentence that begins: Thanks for refining the numbers for us and NBSP. What's NBSP?
A Thanks for refining the numbers. Let's talk in greater detail?
Q Yes.
A That's exactly the same as the cover note up here.
Q What is N --
A I think that's just -- it's computer code.
Q It then goes on to say: All we need for closing is 725.
A As it says on the top as well.
Q Four hundred from the town, 325 from SCT.
A RAF and a few others.
Q Right. And, again, you're right. This is all on the

first page of Exhibit 12.
A Right.
Q I think I asked you back when you first testified whether you understood what that 725 was for. I'm going to ask you again. Do you understand what that meant?
A What's the critical number? Why is $725,000 a critical number?
Q Yes. This appears to be an email from Craig MacDonnell to your husband.
A Right.
Q And I'm just wondering whether you, as a member of FORA, understood what the closing -- all we need for closing is 725,000. I think you testified that meant 725,000, and I'm just wondering if you --
A Would that relate to what the payment requirements were for the purchase and sale?
Q All right. You're just guessing at this point?
A Yeah.
Q Yeah, okay. All right. Do you know if your husband had a habit of copyrighting his correspondence?
A In a humorous way, yes.
Q It was not intended to be a copyright?
A Where?

Q Not on this document, but, in general, do you know him to have a habit of copyrighting his correspondence?
A No, there's a long-running joke. He has a copyright symbol underneath the dining room table of my friend's house so that he copyrights everything they say, and then they turned around and copyrighted him, so. It's a long-standing joke.
Q Oh, I see. So, that's sort of an in-joke?
A It's an in-joke. That's all.
Q Had me flummoxed on it.
A I didn't see the copyright symbol, so I didn't know what you were referring to.
Q It's not on that document.
A Oh, it's on a different one?
Q I was going to get it out if it had any significance.
A No, it does not.
Q Okay. Still on that same document, you had testified earlier that there was an issue as to whether or not the fund-raising from foundations could ever have been accomplished prior to the time of the scheduled closing under the purchase and sale agreement because of the foundation --
A The time frame.
Q -- because of the time frame of foundations.

A Yeah, that's correct.
Q In that they had to process applications within a specified period and then act on them within that --
A That's right. So, he talks about bridge funding even on Page 3 of this last document that you showed me.
Q If we look at Page 57, there is a reference on 57 to bridge funding, other components should be bridge funding. It says, at the top: Therefore, the fund-raising plan should be considered a component of the budget, and the other component should be bridge funding.
Now, that would suggest that on February 25th FORA was telling TPL that bridge funding was going to have to be a component if this was going to work.
A Yeah.
Q Am I correct?
A Yes.
MR. CONROY: Objection.
MS. MURPHY: Objection.
A Well, you have to just read down at the bottom of the second page. I'm sorry there's all this gobbledegook in it, but as for raising the entire amount by closing, I'm not so optimistic about that. Most

foundations to which we would apply anytime between now and December would likely disburse their grants in December. So, we're talking bridge funding for possibly those few months if we could have started that fund-raising.
Q Are you aware of TPL telling FORA at that point that they would not agree to any bridge funding, and that's in February, on or about February 25th of 2003?
A I probably would answer that question in saying that they're saying things like they don't want to do that, they don't like to do that, but will not, I don't recall them ever saying will not.
Q Do you recall reviewing any documents from TPL in which TPL identified, prior to the assignment, that they intended to rely on the liquidated damage clause and that they would have no exposure for loss because the payments to Mrs. Kunelius would come from FORA?
A I don't think they conveyed that to us. That might have been their plan.
Q Would it surprise you if that was in fact the case?
A Not now.
Q And why is that?
A Because the cash outlay did come from -- did not come from TPL. I wouldn't say it came from FORA, but it

did not come from TPL. So, they laid out a certain amount of cash, too, right? I mean, they had a lot of hard costs, not to Ms. Kunelius directly, but they had a lot of hard costs to pay.
Q Within TPL itself?
A Yeah.
Q For their due diligence?
A Paying inspectors and, yeah, all that.
(WHEREUPON, Exhibit No. 25, TPL memo to Stow project partners, dated March 18, 2003, marked for identification.)
Q I'm going to put before you a document which we've marked as 25. This document is a confidential memo to the Stow project partners from TPL. Is it fair to say that since this was in your possession, FORA was a project partner that was copied with this?
A I think I'm going to say I don't want to define the term partner, and I never referred to myself as a partner.
Q Yourself, personally?
A I don't think any one of us would view ourselves as a partner because we didn't have any say in the process.
Q This appears to be TPL's financial analysis. It says: As we continue to assemble the various moving parts

necessary to keep this complex project moving forward, it seems prudent for us to analyze the financial components of this project in greater detail.
Have I read that correctly? I'm sorry. And to plan how to manage all of them appropriately, period. Is it fair to say that this two-page document was the first financial analysis that TPL shared with FORA? And I note it's dated March 18th.
A I can't say that this was the first one.
Q Does it strike you that it was prudent to do such an analysis virtually a month after the acceptance of the right of first refusal, or would you have expected this analysis to have occurred first?
MS. MURPHY: Objection.
A I seriously doubt that this was the first one that they ever did, and, also, you have to look at the fact that there's some things in here like the DHCD grant which probably was not even in the play, in play, when they took on the assignment. So, they had to reconfigure, you know, their program.
Q And you're referring to the DHCD grant referenced on the first page of this Exhibit 25 in the box?
A Right.

Q And it refers to a DHCD grant of zero to 200.
A Right.
Q Do you see that?
A Uh-huh.
Q So, it's not clear from this document that the DHCD grant was actually a necessary component as of March 18, 2003, since they have assigned a value to it of zero to 200,000. Is that fair to say?
MS. MURPHY: Objection.
A It's just a variable, I mean.
Q Looking at the subtotal, it has 950,000. I presume that means thousand even though it says 950 to 1.15. Do you see that?
A Uh-huh. That's not good math.
Q Yeah, I was going to say. Can you explain to me where they get the 950,000 from the lesser amounts that are contained in Lines 3 and 4?
A One to three.
Q So, that's 950 there. Now, at some point, there is a reference to development of 250,000 to 550,000. Do you know what that number represents?
A I'm going to guess. No, I don't know. I would assume that you would read that as a developer's cost to take those properties to sale.

Q So, the budget and the analysis that they're referring to here is not specifically the budget as to how to acquire the property. It is how they will develop and sell the property that they're referring to here, is that correct?
MR. CONROY: Objection.
MS. MURPHY: Objection.
A I think it's costs, potential costs. I don't think it's necessarily a plan.
Q And do you recall reviewing it at the time on March 18, 2003, or thereabouts and drawing any conclusions from your review of this?
A I'm going to be diving into my papers to see what we wrote, if anything. There's that number on Page 2 that you said, the 750 for closing. I see 694. So, that probably kind of confirms your question about the 750 having a meaningful number, of having enough money at closing, but that's not your question.
Q All right. Why don't I move on to the question.
A Okay.
Q On the second page, under 2. Timing and Use, under Paragraph 2, Item 2, in the first paragraph, it says: Execute a note and mortgage consistent with these terms. Both of these alternatives are problematic,

the first because it requires an amendment to the original purchase and sale agreement which, as a result of the effect of Chapter 61, is difficult unless we can persuade Mosaic Commons to waive their rights under that agreement. Do you see that?
A This would be the fact that they don't want to take on the property with a mortgage, correct? That's my interpretation.
Q I don't know. I'm asking you if you have an understanding of that sentence, or that section that I read, as it relates -- specifically, let's start with an amendment to the purchase and sale agreement. Were you aware in March of 2003 that TPL was considering an amendment to the purchase and sale agreement?
A It sounds vaguely familiar. I think the issue was that Mrs. Kunelius was going to achieve some interest over the course of this mortgage, and I believe, as far as we knew, what she was insisting upon was still earning that interest regardless of the course of the mortgage, and that was an issue. I don't remember how that got negotiated.
Q And why would TPL and FORA believe that they could in any way go back and negotiate a term with the original buyer that could in any way affect the rights of

Mrs. Kunelius?
A I have no idea.
MR. CONROY: Objection.
A I have no idea what TPL thought they could and couldn't do with real estate deals. It's not my area of expertise.
Q Are you aware of anyone at FORA that questioned this component of the project structure and financial needs which dealt with the possibility of getting Mosaic Commons to waive their rights under an agreement that had been assigned to TPL?
A I don't recall.
Q Looking at the next sentence after the semicolon, it says: The second, because TPL cannot burden the property with a mortgage, we must sell the real estate free of such encumbrances prior to the expiration of the mortgage. Have I read that correctly?
A (Indicating.)
Q And that's a yes? You're shaking your head.
A Oh, sorry. What I recall is that TPL wanted to execute the entire project over a limited period of time, and conforming to this mortgage would have extended the project longer. They wanted to be able to go sell those houses.

Q Did anybody raise, at FORA, any concerns about TPL's statement on March 18th that they could not burden the property with a mortgage, since you have earlier testified that FORA had stated on several occasions that bridge financing would be necessary?
A Bridge financing does not affect the sale of property.
Q Does bridge financing burden the property with a mortgage?
A No, because what we would imagine is that TPL's bridge financing would not be tied to the property.
Q And did you have any understanding that TPL was going to access lines of credit?
A They had never pointed to any line of credit that they were looking at. We talked about it before, about how we had found something for them to consider.
Q What was your understanding as to what the source of money was if TPL was to provide bridge financing?
A They hadn't identified it.
Q Looking at the second paragraph, the next paragraph, it says: Although not an easy path, the only manageable solution is for TPL to reach an agreement with Marilyn to accept a present value figure and to negotiate a release from Mosaic Commons. Do you have an understanding today as to what was meant by that

sentence?
A I'm only guessing that it revolves around the fact that she was expecting this interest and that they wanted to negotiate something with her so they wouldn't be held to the original mortgage period.
Q And is that the original mortgage period that was in the purchase and sale agreement? Is that what you're referring to?
A Oh, did I ever see the purchase and sale? I'm not sure. I'm just assuming that it's what they are saying in the first paragraph about the mortgage of 400,000 plus interest at seven percent over 24 months.
Q Well, looking at the next sentence, it says: Regarding the latter, I have discussed this issue with their attorney and I believe we can come to terms. Do you know what attorney they were referring to?
A No.
Q It goes on: Likewise, so long as we accurately present value the 400,000 -- that's actually a typo there, but I think it means 400,000 -- dollar mortgage, I do not believe that Marilyn will object to liquidating this contract right earlier than originally contemplated. Do you have an understanding of what was meant there?

A I don't know what present value means, maybe -- I don't know what that means.
Q The last sentence of the next paragraph reads: The real question thus becomes where do these funds come from. Do you recall reading that on or about March 18, 2003?
A I must have.
Q Did you at any time on or about March 18, 2003, begin to wonder why these questions were being asked, given the fact that you believed TPL had the ability to bridge finance any financing shortfall?
MS. MURPHY: Objection.
A Well, I still say there's a difference between ability and whether or not that fits in the way that they run their projects.
(WHEREUPON, Exhibit No. 13, FORA email to MacDonnell, dated March 20, 2003, marked for identification.)
Q I'm going to put before you Exhibit 13, which has been marked as Furman77 and 78, and this is a March 20th letter from someone since it's what you provided to us. It appears to be a two-page document, and I'm wondering whether you know if it was from you or your husband.

A Well, he's definitely got a hand in it, but I'd probably just say co-authored.
Q I direct your attention to the third paragraph, the second paragraph. I'm sorry. It says: The need of TPL to negotiate the present value with Marilyn and to achieve a waiver from Mosaic are weighty and important issues. I'm wondering what you meant by that.
A Here's how. I would have felt the day that this was written the way I feel today, that there are nuances of this project that we were unaware of and were hoping that TPL would do a good job at resolving, because it's pretty much beyond us to know, to understand this sort of negotiation that has to go.
So, what we're saying, basically, if you read the next, was we're here to assist you in any way we can, but, clearly, that's something that they have to take on, because we don't really even understand it, how you can negotiate that.
Q I truly do not know. When I ask this question, I'm just going to qualify it by telling you that I don't know what is being referred to here as a weighty or important issue as it relates to Mosaic Commons, a waiver from Mosaic Commons. What waiver are you

actually talking about?
A Here, if we can persuade Mosaic Commons to waive their rights under the assignment.
Q What rights under the assignment?
A This is where we would say we don't know what Craig is dealing with, but it looks pretty difficult, whatever it is that he's wrestling with here, because us going in, we would just assume, if you pay the money due to the seller, you've met -- you've stepped in the shoes.
Q That was your understanding of this?
A That's our limited understanding of assigning the right, that it's really just a matter of, you know, satisfying the owner's purchase price.
Q With regard to attempting to get Mosaic Commons to give up a right under a purchase and sale agreement that it had no rights under, since it had already been assigned, in other words, Mosaic Commons had no say once the exercise of the right of first refusal occurred. I'm making that statement to you, and I'm asking you to accept it for the time being.
A Okay.
Q Did you have an understanding as to why TPL was telling FORA and others that they needed to get something from Mosaic Commons?

A I would say it must have come out of the counsel of their own team at the office, of how they had to deal with this issue.
Q I'm going to ask you to look at the next paragraph, the middle of it: The cycle of giving by foundations is set by individual foundation boards, their members and their financial backing. We have attempted to program the financing for this project based upon realistic time lines of philanthropy. Wishing or insisting that these time lines would become aligned will not change the fact that they are not in sync. FORA has been forthright with you, the town, SCT and Red Acre Foundation on this point.
When you were talking about wishing or insisting that these time lines would become aligned, what are you referring to? Who's wishing and who's insisting?
A Well, I want to review this document, because I think this document is a response to this memorandum.
Q So, when you say this document, you're talking about Exhibit 13?
A Yeah.
Q Is a response to the memorandum which is Exhibit 15?
A I'm just taking a look, because it's not as if other

things had occurred in between these two points.
Q Well, I will note that Exhibit -- is it 15 that's in your hand -- is dated March 18th. Is that helpful to you?
A And this is March 20th.
Q Yes, and Exhibit 13 says: Thank you for your thoughtful memo of March 18th.
A Right.
Q So, I'm just pointing that out to you. Does that confirm your understanding that Exhibit 13 is a response to Exhibit 15?
A Yeah. I'm just seeing if he -- I don't even see anything in here, on first glance, where he is talking about fund-raising.
Q And you're looking at Exhibit 15?
A Right.
MS. MURPHY: I think you're talking about Exhibit 25.
A Sorry, Exhibit 25. I'm looking at Exhibit 25.
Q I apologize. So, every time I've referred to 15 there on this section, I meant 25. Thank you.
A And now, sorry. Now I'm understanding. You asked me what development meant?
Q Yes.

A I think that's fund-raising. So, there's that 250 to 500,000 dollar fund-raising window, but I don't see him referring to timing and use of capital.
Q Well, my question is: what was the basis for your stating that wishing and insisting on these time lines to become aligned will not change the fact? Was it because there was something discussed?
A I think it's this question: Where do these funds come from? It's the second to last paragraph.
Q Are you guessing here or is that your --
A I don't see anything else in this document that would be the response, but the problem is that he's saying that TPL has to come up with 1.154 million at closing, and the response is saying that you're going to have to do financing to bridge.
Q So, at that point, is it fair to say you're not at cross-purposes, that he's identified some amount of money that he has to come up with at the time of closing? That's MacDonnell.
A Uh-huh.
Q And you're saying you're not going to get it through the foundations because we're not in sync with the --
A I think even some of the money -- I would have to go back and look, but I think some of the money from Red

Acre Foundation and Stow Conservation Trust also would be -- was released, would be released, after the closing as well. So, the bridge funding would be for that money as well.
Q If you look at the next paragraph, fourth line down, beginning with, "We have asserted that the potential for fund-raising is sufficient to allow TPL to borrow short-term funds without worry," does that help you recollect that it was your expectation that they were going to borrow short-term funds, because you had said earlier you discussed that with them?
A I'll tell you I've never -- I do not remember them ever saying, "We will do it; we will borrow."
Q It goes on to say -- this is Exhibit 13: We have also asserted that the organizations we plan to solicit cannot be expected to make donations prior to the closing in September and, more likely, would not give until late 2003 at the earliest.
A And that's the difference between fund-raising in March and fund-raising in January, because if you're fund-raising in March, you're looking at June and July reviews, and they would be disbursing the cash early the following year.
Q It goes on to say: This is true of any proposal that

would be submitted during 2003. The correct time line for the project is through the end of 2004 and neither TPL or FORA can control that fact. As we have said from the beginning, bridge funding is required.
Did you get a sense after writing this with your husband that -- that's on March 20, 2003 -- that if there was a requirement that TPL had to have a hundred percent of the funds and not borrow it, that TPL was not going to go forward, because there was no way that they could get the funds from foundations until the end of 2003 at the earliest?
MS. MURPHY: Objection.
Q You can answer the question.
A Well, my personal logic is that they would never have accepted the assigning of the right if they hadn't already a plan in place.
Q And did you determine that they did have a plan in place?
A Not that they showed us, but I would assume that would be the way they would operate.
Q So, your assumption is they had a plan in place to obtain those funds. That's your testimony.
A I would assume that's how they would operate as a non-

profit, is that they would run the numbers, so to speak, before they dove in.
Q But it is also your testimony that they never actually showed you what that plan was in place at the time that they accepted the right of first refusal?
A No, they did not share with us all the inner workings of the organization. Time to time they did, but it wasn't -- we didn't expect them to.
Q Looking at the last line of the first page of Exhibit 13, it says: This is an unworkable plan. Referring to -- why don't I start that paragraph: You expressed the desire of TPL to sell the horse farm to EOS and implied exclusion of EOS from the horse farm if they did not buy the property from TPL prior to September of 2003. Can you tell me how EOS -- that's Eye of the Storm?
A Uh-huh.
Q -- could buy the property from TPL prior to TPL acquiring the property from Mrs. Kunelius?
A Sounds pretty illogical. Maybe the implication there is that they would put together all of the finances on paper for them to show their ability, which they didn't have the ability to do that.
Q Are you guessing at that?

A No, I know that.
Q Are you guessing that that's what they were meaning when they wrote this?
A I think so. I think they wanted to go to closing with that chunk of the cash in their hand.
Q So, I note that the word buy is in quotes. Does that help? Does that help you clarify that position? Do you see that?
A Yeah. I'm sorry. What's the question?
Q Does that help clarify your position that they weren't actually talking about buying it but that they had to have the documents and the funding in place?
A That's right, but the problem is that TPL had to participate in the fund-raising to raise the money. So, that would be the next few sentences.
Q Well, it goes on to say: This is an unworkable plan and the position of FORA on this has also been consistent from day one. The onus rests on TPL, working cooperatively with FORA, in order to raise the funds on the EOS purchase.
A That's right.
Q EOS has no assets to borrow against and has stated unequivocally and repeatedly that they will not take on a mortgage.

Now, you used the words unworkable plan on the first page of Exhibit 13. Did you have a sense at that point that TPL was proposing plans that could not succeed?
A I think that I don't really like that question, so.
Q And as much as I appreciate the fact that you don't like --
A Yeah, because, I mean, I think that, as you work through many plans, you find faults in the plans. I don't think they were intentionally putting out a plan that wouldn't work. Is that what you were saying in your question?
Q Well, if you continue to read that paragraph, tell me whether you think that you were saying that TPL was in fact proposing something that would prevent the entire --
A What TPL was trying to do was divorce themselves from the fund-raising responsibilities for the equine rescue component, which is not -- doesn't work.
Q Let's look at what it goes on to say. It says: Like it or not, TPL and FORA are helping EOS become a full-fledged non-profit in the course of this project. We cannot force them to be something they are not and the political and financial implications of excluding them

at this point would be catastrophic. Are you referring to it being catastrophic to the project, to the acquisition of this property from Mrs. Kunelius?
A Well, you have to look down at Red Acre Foundation. That's $100,000 of that, and that is for Eye of the Storm. It's not for anything else. That money is earmarked for their piece of the puzzle. So, that's a big chunk of cash pulled out of the project right there.
Q So, answering the question that I asked, if TPL were to force Eye of the Storm out, isn't it fair to say that the loss of Eye of the Storm would be the simultaneous loss of Red Acre Foundation funds in the amount of $200,000?
A It was a hundred thousand at this point. They were thinking of going up, but at this point, as you can see, it's only a hundred thousand, and Black Creek as well. That's another one that's identified for them.
Q And how much is Black Creek?
A That's just twenty.
Q So, is that what you're referring to when you said that the financial implications of excluding EOS would be catastrophic?
A Well, it's a dramatic word to use, but it had a lot to

do with the first major breaking up of the plan.
(WHEREUPON, Exhibit No. 16, Christianson letter to MacDonnell, dated 8/6, marked for identification.)
Q I'm putting before you a document which has been marked Exhibit 16, and I'd have you take a look at this. This is a document you supplied to us. It's got Furman96 and 97 on the bottom.
A We looked at this the last time, I think.
Q Yes. I just have a quick question on this, well, a couple of quick questions. Is this from you or your husband?
A This is the letter that I spoke to before. We don't believe this was sent, and this is definitely my husband.
Q And you don't believe this has been sent?
A I showed it to him and he looked at it, and he said, "You're probably right," because if you go down to a week later, there's a very, very nice letter to Craig. So, this is the one like you've got to be crazy. I don't care how mad you are. We're not sending this letter. I mean, TPL's correspondence may prove me wrong, but that's the only thing that makes sense to me.

Q I want to just look at the second to the last sentence, beginning, or the third to the last sentence: We pledge neither our support for nor our opposition to your exit strategy. Do you understand what that means?
A Well, the problem is this goes back to the -- this is the different -- hang on one second. This is when they move away from equine rescue and doing development of the two properties and maybe even the reduced asking price to Marilyn, and everything we've done as a neighborhood organization has to be all of these components. Once you get rid of one -- we can't be representing anybody anymore. So, that's what we're saying.
Q You had testified earlier that FORA had not broken ranks with --
A Publicly.
Q Publicly. Was this decision not to break ranks until this litigation reflected in the statement that we neither pledge our support for nor opposition to your exit strategy?
MR. CONROY: Objection.
MS. ECKER: Objection.
THE WITNESS: Well, I want to know why.

MR. McLAUGHLIN: No, that's all right. You can answer the question.
MR. CONROY: You don't get to know.
THE WITNESS: Darn.
A I guess taking a neutral position was our goal.
Q At some point, did FORA believe it needed counsel in this matter as it related to TPL?
A I don't recall.
Q Do you recall that there was an agenda for the final meeting with TPL that was put together?
A We talked about that before. Did that surface in anybody else's documents?
Q No.
A Because we couldn't come up with a paper for that.
Q But you don't recall the specific need of FORA hiring counsel?
A Not that I recall.
(WHEREUPON, Exhibit No. 17, Christianson letter to MacDonnell, dated September 11, 2003, marked for identification.)
Q This is a document that's been marked 108, -9 and -10. It's a letter from you, Draft No. 2, and it has a date of 9-11-03, and I want to ask you -- never mind. I'm not going to use that.

(WHEREUPON, Exhibit No. 26, FORA letter to Perry, dated September 30, 2003, marked for identification.)
Q Quick question on this, because I think we discussed this earlier, but this has now been marked as Exhibit 26. I direct your attention to the first full paragraph. About the middle of the paragraph on the right-hand side, it says: This communique was sent unilaterally by TPL.
I'm going to stop again and just identify this. It appears to be from you and your husband and others to Ross Perry, and it says: This communique was sent unilaterally by TPL without our knowledge. We find it disheartening that Craig did not mention it to any of us at the meeting on the 24th. As Craig stated in the meeting, he has been trying to -- quote -- either push the project along or kill it for quite some time. End quote.
A I remember you asking about this before.
Q Now, I want to ask you again about the quote, specifically.
A Yeah.
Q Do you recall how Craig MacDonnell said he had been

trying to kill the project for some time?
MR. CONROY: Objection.
A No. I don't even recall who came up with that quote among the authors of this.
Q Okay. Last question, as far as I'm concerned anyhow, is, when you met with Patty Murphy, did you receive any advice or suggestions concerning how you should prepare for this deposition?
A No.
Q Did you receive any instruction or direction as to what testimony you should give?
A No.
Q At any time, did Ms. Murphy describe to you the position that TPL was taking in this litigation?
A No.
Q So, your recollection of her discussion with you, specifically, was what?
A It was why don't you tell me how you recall the project going forward. So, I basically talked.
MR. McLAUGHLIN: I have no further questions. Thank you.
MR. CONROY: I'm going to have some. This may be a good time to take a 10-minute break.

MR. McLAUGHLIN: Sure.
(Recess, 6:20 P.M.)
(After recess, 6:28 P.M.)
CROSS-EXAMINATION
By MR. CONROY:
Q Ms. Furman, my name is Jim Conroy. We met before at your last deposition, and I represent Craig MacDonnell. I'm going to have a few questions as well.
First of all, let me ask you, do you have any fund-raising experience of your own as opposed to your husband's experience?
A I have written components of grants for Museum of Our National Heritage and for the New England Aquarium. I have produced -- usually, the parts that I produce are closely related to my profession, which is exhibit design.
So, I would be working with the funders, but I would be doing the sections that describe the exhibits or renovations, et cetera, for larger funding, and then, also, we did some federal funding for operations, which is a big, big project, at the National Heritage Museum, and I wrote quite a few pieces of that, but I was not

the organizer of the funding efforts. But I contributed.
Q In addition to that, have you acquired some knowledge of fund-raising from your husband as well?
A Osmosis, yeah. Osmosis, definitely.
Q Were you ever hired to raise funds for any institution or person?
A No.
Q Have you had any conversations with Marilyn Kunelius, first of all, about anything at any time?
A Let's see. Yes, I had one about asking her if I could walk on her property. I had one about a dog nearly getting hit that came running off her property in front of a truck.
Q Okay. Let me just slow you down a little bit.
A Sort of neighborhood things. I've called her up and said, "I'm your neighbor. I know a lot about horses. If you have an emergency, please call me. I can come handle horses if there's a problem."
Q All right. Let me just slow you down a little bit.
A Sure.
Q And we don't need a lot of depth, but let's start from the back.
A Yeah.

Q The last one you mentioned about the horses, what was her response to that?
A No, thank you. I don't need any help.
Q And was that the extent of it?
A Uh-huh.
Q What about the dog? What was the answer to that?
A She said she'd let the -- I think it was a renter's dog and she said she'd let him know, thank you. It was kind of a young puppy and it just needed to be under better guard.
Q And then what was the first one? I forgot.
A The first one was we had some sort of confusing information in our neighborhood as to whether or not Marilyn minded if you were on her property or not, and so when we -- somebody had told us quite clearly that we could go just up her driveway and down a trail and she wouldn't mind, and she came out, and she did mind, and I was very apologetic, and I wrote her a letter, sorry. Sorry, I'm not going to walk on your property.
Q And did she, as you understood it, object just to your being on the property as opposed to --
A Perhaps not calling in advance. So, I completely understood her at that time.
Q Did you ever make any changes in the topography of

Ms. Kunelius' property, cut any bushes or --
A No.
Q -- open a path or anything of that kind?
A No.
Q Cut down any tree limbs, anything like that?
A No.
Q Any other conversations with her that you can recall?
A Well, she was at the hearing for -- Mosaic Commons ran an open session to talk about the project, which she was at. I don't remember talking to her, specifically, but we might have said something there. I know she was having a few conversations with the woman who is Eye of the Storm, Nina Arbella, and sometimes I got that secondhand, and then she called me recently to, you know, give me Michael's name, and I'm trying to remember if there was anything else.
Well, then we went and we talked about a possible -- two different times we went to talk to her about -- after Craig had left. One was trying to make good on a reduced price that we felt we could manage at that time, and then, again, I think my husband contacted Jim Boothroyd about even just purchasing a small portion of her property that was in wetland.

Q I'll come to that separately.
A Is there something else that I'm forgetting?
Q I have no idea. I'm asking you.
A Oh, okay. I don't know if she had mentioned something to you. But she's sort of a silent neighbor rather than a neighbor I've been actively engaged in.
Q Is that the extent of your memory about conversations with her?
A Yes, I think so.
Q Did you ever hear anything to the effect that Ms. Kunelius was hoping that the deal for the purchase of her land would fall through so that she could bring a lawsuit and get triple damages for it?
A I may have heard something like that secondhand.
Q I'll say, in fairness to you, that a document was marked in Ms. Sommerlad's deposition referring to such a comment.
A Through her barn manager?
Q Right.
A Right.
Q What did you hear about that?
A Just what Karen had said, that she had heard from -- was Trish Polin her name -- that she was hoping that

the deal would fall through because she wanted to sue.
Q But you have no other knowledge of that?
A Just through that contact. I don't know if I heard it again through Nina Arbella. I don't know if I heard it again through -- I don't know who else would have had a connection with Marilyn. There was a woman across the street who had a horse. They talked, but she never talked to me directly.
Q What has that got to do with that?
A Well, that Marilyn may have talked to her, and then she may have talked to Nina, and so this sort of second- and third-party. So, I don't know if I heard it more than once.
Q Now, you say that she called you and gave you Mr. McLaughlin's name?
A Correct, because she wanted -- she said that he wanted to get in touch with me.
Q And other than that, did she say anything further?
A She said that she was loving living up in Stow with a population of four hundred people.
Q Anything else?
A She said she was going to come to these, that she wanted to come down to these meetings and she was trying to get all of the Friends of Red Acre people,

- 54 -

Karen and whoever else that wanted to be talked to, to come together, because she obviously didn't want to make a lot of trips.
Q By meetings, you mean the depositions?
A I don't know, because at that time I didn't know the process, and, obviously, I met with Patty and that wasn't a formal deposition.
Q Do you recall anything else that you said in that conversation?
A No.
Q Now, I understand you spoke to Mr. McLaughlin. You said you did.
A Yeah, we talked on the cell phone first.
THE WITNESS: Though I think you did most of the talking or kind of running through the project.
Q Okay. Let me just keep the record clean, because it doesn't reflect you, okay.
A Oh, got it.
Q Tell me, how many times did you speak with Mr. McLaughlin on the telephone?
A Once.
Q Just once. And how long did you speak with him?
A It was about 20 minutes.

- 55 -

Q When was that?
A I don't have my calender, darn it.
Q Roughly.
A It was roughly, I would say, four days before I met with Patty.
Q And tell me as best you can the substance of that conversation.
A I think he was running through, basically, in reverse. As I was doing a chronology of the project, he was doing a chronology of the project to me on the phone, not really asking me questions or anything.
Q So, you mean to say that he was recounting to you his understanding of these events?
A Based on the limited information he had at that time, that this happened and this happened and this happened.
Q More as a narrative than as question and answers?
A Right, right, not a question and answer thing.
Q Was he asking you whether these things were correct or incorrect?
A I think I do recall one question where he was asking who were the major funding sources, and I said I couldn't quite recall at the time.
Q As you listened to him give this narrative to you, did

- 56 -

you understand him to be recounting it accurately as you recalled it?
A Boy, it seemed to me there were one or two points, but I think, more or less, it was accurate.
Q Do you recall what the one or two points were?
A I'm not quite sure they were wrong, but then I had to clarify, you know, did this happen before or after the assigning of the right, or was this right before town meeting, or was there a need to, say, encourage TPL after the -- I don't really recall, something about there was a moment, and it made sense when I put it in context of time, such as, oh, well, that was right after the town meeting vote, voted against -- not the town meeting but the vote at the polls went against the project.
Q So, you were correcting chronology?
A Oh, I think he had the chronology straight, but in my own mind, as he was making -- do you know that this happened, and I had to kind of go, well, wait, that was after the vote in the polls. So, I don't recall anything that was inaccurate.
Q Do you recall anything notable about anything he said in that conversation, anything that surprised you?
A I think he brought up the fact that TPL had this

- 57 -

gigunda line of credit. I'm sorry, but I don't remember the number, that had been written into the DHCD grant, which I never read the entire document.
So, I mean, I think he -- he did ask a question: Did you think that TPL could cover these kinds of expenses? And I said, well, enough of us are non-profits that we know how to look at Web sites for non-profits, and we can see that they have a good, strong bottom line, so I'm not surprised. I didn't know that they had this specific line of credit with some bank, but by looking at their Web site and understanding the organizational structure, I'm not surprised.
Q Do you know whether your husband spoke to Mr. McLaughlin?
A He has not, I don't believe.
Q You have said, as I recall it in your last session, that you and your husband were willing to come up with six figures by way of a loan, if need be, to try to make this deal work. Do you remember that?
A Uh-huh.
Q Yes or no, you have to say.
A Yes, I do remember that, and I went home, and he does have the breakdown of that offer, but he didn't think

- 58 -

it related directly to this lawsuit, so he didn't give that to me, but we do have that if you're interested.
Q Okay. Let me come to that. But my question is: what are your motives in this situation? Why would you be willing to do that?
MR. McLAUGHLIN: Objection.
A Well, I feel that it was -- we were still trying to do the right thing by Ms. Kunelius and by the town.
Q Put a different way, I suppose, are you still hopeful that the land will be conserved, that something can be done to preserve it?
A The land is what it is, which is it's very wet. So, I don't imagine the large part of it ever being developed. My main goal was to augment the project by allowing it to remain as a horse farm and fulfill the needs of Eye of the Storm.
Q With respect to this question that has come up so far in this deposition of Craig asking you or telling you not to raise anymore money, do you understand the issue that I'm referring to?
A Well, that TPL was not going to begin raising money with foundations, right.
Q But this is a little different question. Do you recall Craig ever saying to you that he didn't want to

- 59 -

see anymore money raised for this project?
A That wouldn't be the correct way to put it, because if we had a bunch of millionaire friends that we could go and get money from, there would be no stopping us, but the funding strategy that we had was through TPL's office. They had to write the -- they had to send them out.
Q But did Craig MacDonnell ever tell you, "Don't raise anymore money for this project"?
A How to put this. The problem with your question is that until TPL knew that the deal was something that could go forward, they didn't want to exact promises from foundations that they would have to then say, oh, I'm sorry. The project's not going to go forward.
To go out and further try to identify individuals that would be willing to make a promise of a donation, no, I don't believe he ever asked us to stop, but that wasn't really what we were there to do. We were there to write the grant. So, it was a problem with the project being unresolved for so long that was really a major problem for TPL.
Q I wrote down, and I'm not guaranteeing that I got this right, but I took a note the last time you were

deposed, ten days ago or so, that said: Craig does not usually express himself abruptly.
A Oh, that was the cut it or kill it or save it or --
Q Yeah. Can you expand on that a little bit based on your interactions with Craig?
A He's very professional. He's not -- he doesn't do things that are -- you know, it's like the real professional who knows -- and a lot of people, frankly, in my office don't know this -- that they have to conduct themselves the same whether they're on the job or off the job, and he's very uniform in his behavior.
Q Which was what?
A Even, calm, not personal, not vindictive, but, you know, he could be forceful, because he's trained as a lawyer, so he could be forceful, but it's not really a tool that you use in the field that he's in right now.
Q Did you ever see him lose his temper and behave inappropriately in any way?
A Well, we talked about the meeting at his house, and everyone gets a little testy, but I don't think -- he never did anything that was insulting.
Q Were you at a meeting at Mr. Boothroyd's office?
A Several. The one with Kachajian?

Q Right.
A Was he there as well?
Q Well, let me ask you. Do you remember a meeting that you attended that Mr. Kachajian attended and Mr. Boothroyd?
A I think that was the one where Craig was offering the lower price, and at that point, you know, I believe Eye of the Storm was off the table at that point, and my husband and I were there because we still wanted to see something happen in a positive way, but the whole Friends of Red Acre was not an element anymore.
Q As an institution or as a group.
A Exactly.
Q But you as individuals were interested.
A We were interested in seeing something go forward.
Q And did you perceive at that meeting that an effort was being made by both sides to try to make something happen, or not?
A Well, I don't think that -- I think the offer was accepted, I mean, not accepted like, yes, we want it, but they did not respond to the offer at the table as I recall. They just took it and said, "We'll get back to you."
Q Do you remember anything happening at that meeting

that was indicative of misbehavior on anybody's part?
Well, again, nothing too memorable. I remember thinking that Mr. Kachajian was a little bit somewhat of a rough and ready kind of guy. I don't know if maybe he expressed himself in some way. I don't know.
Q Anything else?
A No.
Q Now, I've got a few questions on documents here, and this is where I'm going to ask Lucie --
MR. CONROY: I'm sorry. I don't know your last name, Lucie, or I'd use it, but --
MS. DeBELLIS: Yeah, that's okay. Go ahead.
MR. CONROY: Okay, ask you to help me with some of this, and I'm going to try to do them in the order in which they showed up in the document production. This first one is this, January 19, 2003.
MS. DeBELLIS: That hasn't been marked.
MR. CONROY: That's not been marked, okay.
MS. DeBELLIS: Would you like to use ours?
MR. CONROY: Thank you, but I have my

own. Would you mark that, please, as the next document?
(WHEREUPON, Exhibit No. 27, FORA fund-raising prospects, dated January 19, 2003, marked for identification.)
Q Do you have 27, Ms. Furman?
A Yes.
Q Take a moment, please, and look that over. Everything I'm going to be showing you, by the way, is among what you've already given us, so.
A Okay, but I have not committed this stuff to memory.
Q I understand.
A Have not been doing my homework.
Q Just want you to know there's no left hooks coming here.
A Okay.
Q Really, the only thing I'm interested in is the attachment with the foundations on it.
A The prospects?
Q Yeah. Are you oriented to it?
A Uh-huh.
Q Do you know who prepared this?
A My husband.
Q And the word guestimate is used as a column on the far

right end. Do you see that?
A Uh-huh.
Q Do you know what these guestimates were based upon?
A Sure. Each foundation has a certain amount of information provided on these sites, such as Small Book and Associated Grant Manager, and what you do is you can see their range of -- you can either see the range of giving that they do per year. They may say we give between 10,000 and 200,000, or they might simply say we give out this much money every year.
So, you take that number. Say it's $200,000. And you have to look at the type of things that they support and make an estimate of the correct ask for that organization.
Q So, this is the amount that was expected to be requested of them?
A Yes.
Q As opposed to any projection that they would give these amounts.
A These were reasonable requests. That's possible. You don't know until you make the ask, I'm afraid.
Q So, to sum up, these were the amounts that your husband was planning on asking for from these institutions, correct?

A Uh-huh. And I think I was just reading in back that, ideally, you shoot for 10,000 and up to make your bullets effective. If you read back a couple of pages, the minimum grant request should be ten thousand.
Q But there are several fives in here.
A So, you can resort to those if you have to, but you focus in on the 10,000 and up first.
Q I'm just curious as to, what is it, about the eighth one down, EDEY, E-D-E-Y?
A Uh-huh.
Q There appears to be a zero there. Do you know why EDEY would be there at all if the guestimate was a zero?
A Good question.
Q You don't know?
A I don't know why it would be zero.
Q Is this the list, by the way, of potential donors that your husband was upset about, thinking that --
A Well, is this the list that he took down to TPL or is this the final list? I'm not sure.
Q So, you don't know?
A I don't know if this is the list.
Q Okay. You can put that one away. This next one --

MR. CONROY: Do you have that one?
MS. DeBELLIS: I just pointed out that the document designated as Furman27 is partially also Exhibit 8 and 9.
MR. CONROY: I see, okay.
MS. DeBELLIS: Because we did not staple them together.
MR. CONROY: I see, fair enough. Do you have this one?
MS. DeBELLIS: No.
MR. CONROY: Mark that, please, as 28.
(WHEREUPON, Exhibit No. 28, FORA conservation project plate, marked for identification.)
Q I'm going to put 28 before you, and, first of all, can you tell us what this is?
A This is a project plate. For this project, there would have been three plates written. There would have been one directed toward foundations that fund conservation, there would be another one written for foundations that support equine rescue, and there would be a third one that would be for affordable housing. A lot of the information would be the same, but, some, there would be some shift in focus.

Q And what's a plate?
A Same as a boilerplate, which is a base document that you create, and then you take this and you take each foundation's demands and you tweak it.
Q Got it. Who wrote it?
A Probably my husband.
Q On the second paragraph of the first page under the heading The Need, do you see that?
A Yeah.
Q This describes the property, correct?
A Uh-huh.
Q This is the kind of thing that would be boilerplated in all of these proposals?
A Well.
Q Or potentially, I guess, it might be different based on --
A It might be slightly different. In fact, you know, the horse farm piece might be beefed up for one and --
Q Got it. Take you back to the first paragraph, the introduction, and before I ask the question, do you know when this was written?
A Well, I have it in sequence, and it follows a January 19th project budget, and this is January 5th. So, I would say this is an early to mid-January document of

2003. Wait a minute. That's 2002. That must be a typo.
Q Well, you're trying to date this simply by the order in which you --
A Well, my husband told me that this was in chronological order.
Q Okay. Let me just get the record clean, because you'll find that if the record isn't precise, it's confusing.
A Yes, yes.
Q What you're trying to do, as I understand it, is look at the sequence in which this document appears in the collection you brought and trying to determine from that --
A Roughly, right.
Q -- where its chronology falls.
A Yeah, and where it would have lined up with is providing things to the fund-raising team at TPL.
Q Now, to the introduction, that first paragraph, the last two sentences, quote: The total cost of the project is 1.5 million. To date, we have raised over one million.
First of all, do you know how it came to be 1.5 million as opposed to 1.3, which is --

A No, I don't.
Q -- what we spoke about earlier? You don't. And then: To date, we have raised over one million. Do you know what that refers to?
A Well, again, I'll just have to refresh my memory by looking at documents of a similar time frame.
Q Well, let me ask you. Was there ever a time when you raised one million dollars?
A In-hand?
Q Right.
A No.
Q So, I'm trying to understand what that refers to. Can you help us with that?
A It could be something as generic as that you put numbers in here and then you change them when it goes out based upon what the status of the project is. The numbers are just, you know, lump numbers that would be changed out when you actually issued it. So, those numbers would be a moving target over time as you sent these proposals out.
Q So, this might just be a template number that's just plugged in?
A Might be. We seem to have something from January 19th that says we have total commitments of 866,000, but I

don't see an itemization if it.
MR. CONROY: This will be No. 29. I'd ask the stenographer to mark that, please.
(WHEREUPON, Exhibit No. 29, Christianson handwritten calculations, marked for identification.)
Q Do you have that?
A Yes.
Q Do you know what that is, No. 29, Exhibit 29?
A Peter running some numbers.
Q But that's your husband's writing, you think?
A Yes, it is.
Q And the copyright thing is another joke or a habit --
A It is a joke.
Q -- that started as a joke?
A It's a joke.
Q Do you know what the references to 400K land and 100K well refer to?
A Uh-uh, I mean, unless there was some further conversation with the town about, you know, an interest in the well, developing a well as a separate line. I thought there was something in the CPC grant that prevented that use, but I don't know.
MR. CONROY: Mark this as No. 30,

please.

(WHEREUPON, Exhibit No. 30, Kunelius letter to editor, dated February 27, 2003, marked for identification.)

Q Do you recognize that?
A Uh-huh. Yes, I do.
Q Did you read this letter to the editor by Ms. Kunelius at the time it was published?
A Yes.
Q What did you make of it at the time?
A I thought that she has irony in her personality. I'm not quite sure she's helping the voters to figure out whether to vote yes or no, a bit confusing, but she was trying to, you know, trying to dissuade the public from going along with the project.
Q And what did you make of that?
A Well, now that I see that owners quite routinely aren't happy with the assigning of a right of first refusal, because it's happened more than once, I was surprised. I would have thought owners would be interested in getting money and that they would be done with it. So, it was a disappointment to us that we had to battle the owner on this.
Q Do you recall being involved in any way in an effort

to campaign for the town to support this appropriation?
A We did a town-wide mailing, and in order to do so, we had to register for a short period of time, and I know that Marilyn did a town-wide mailing as well, but I don't know if she also had to go through the registration process. But she sent around a postcard. We did a phone -- we did phone marathons, where we called up people and asked their opinions.
Q And as a result of all of that, did you perceive that Ms. Kunelius was endeavoring to persuade the voters to oppose this appropriation?
A Yes.
Q Do you have any sense of how much, if any, influence she had in that regard?

MR. McLAUGHLIN: Objection.

A I don't know.

MR. CONROY: Would you mark this next one, please, as 31?

(WHEREUPON, Exhibit No. 31, Christianson letter to Kunelius, dated February 19, 2004, marked for identification.)

Q Take a look at that, please, and just let me know when you've oriented yourself to that.

A I forgot about that, because my husband ran into her at Emerson. She was visiting her father and he was having treatment.
Q Just review it, please, if you would, and then I'll ask you some questions.
A Uh-huh.
Q Now that you've read it, do you recall the letter?
A Yeah.
Q And what was the purpose of this letter?
A We wanted to make an offer to buy the swamp directly behind our house.
Q And was this letter the first overture that you made in that direction?
A I believe so.
Q Did you receive a response?
A I believe that -- that's hard to say. Either Jim Boothroyd called back and said that she wasn't interested or there was no response, but nothing went forward.
Q You don't recall any substantive response, other than perhaps silence?
A I don't recall.

MR. CONROY: This would be 32, please. You don't have that one marked, do you?

MS. DeBELLIS: No.

THE WITNESS: Oh, I see.

MR. CONROY: She has to mark it first.

(WHEREUPON, Exhibit No. 32, Christian letter to Boothroyd, dated August 2, 2005, marked for identification.)

Q Take a look, please, at No. 32, Exhibit 32, and let me know when you've reviewed that.
A Okay. Quite a bit of time lapse between the two.
Q Right. Have you read it?
A Uh-huh.
Q Do you remember seeing that at the time it went?
A No, but he probably told me about it.
Q As you see, the first letter is February 19, '04, and this one is August 2, '05. Does that refresh your memory as to any activity that might have been going on in that period of time regarding the possibility of your buying this property?
A No, I don't. I don't recall.
Q And do you recall or do you know whether any response was ever made to this letter?
A Again, I don't think there was any response to it or any number, not to the point where even they came back with a number that they were interested in.

Q So, as far as you know, this never went anywhere?
A Did not go anywhere. We're still interested, though. We have a reason for being interested, because our property, technically, if we did that, we could then say our property abutted conservation land, which it does not now. There's a little swath of floating water, nothing that she could ever use. In fact, the vernal pool that I certified is on both of our properties, but, technically, we could claim that we abutted conservation land if we got that property from her.
Q Do you recall whether any specific offer was made by you and your husband for this property?
A For the entire parcel?
Q For the acre that you were interested in.
A I want to make a guess, and, I'm sorry, it's been so long, but I thought it was something on the order of 65,000, but I really don't recall.
Q Do you know whether a written offer of any amount was ever presented to Ms. Kunelius?
A I can't recall what my husband did.
Q You don't recall either way?
A Uh-uh.
Q There was no counter or anything of that kind that you

recall?
A No.
Q And would you be prepared to offer Ms. Kunelius any sum today for that acre?
A We'd have to check our finances on that. We are interested. I don't know how quickly we could act at this very moment.

MR. CONROY: This is clipped rather than stapled, but it's a two-page document. I'd ask to have that marked as 33, please.

(WHEREUPON, Exhibit No. 33, Christianson letter to Kunelius, dated May 26, 2004, marked for identification.)

Q Take a look at Exhibit 33, please, and let me know when you've oriented yourself. Again, I'm not going to ask you a lot of details.
A Oh, great. Couldn't recall whether this included Eye of the Storm or not. I'm really pleased to see that it did. Uh-huh.
Q Do you recall that letter?
A Uh-huh.
Q Yes or no. You just have to say yes or no. You can't say --
A Okay. I'm going to say, no, I don't recall the

letter, but it looks like what my husband described to me.
Q You referred earlier this evening to such a document.
A Uh-huh.
Q Do you think this is that document?
A Probably he said that he has at home, yeah.
Q Do you know if this letter was sent?
A Yes.
Q It was?
A I think it was sent.
Q Was there a response?
A I think we went to Boothroyd's office and spoke about it, but I don't think we were interested.
Q Did you go to Mr. Boothroyd's office with your husband?
A Yeah, I believe so.
Q Was it just the three of you that met there?
A Yes, I believe so. Might have been Mr. Kachajian. I don't know.
Q And did that occur soon after this May 26, 2004, date?
A Well, this may have actually been prior to, because it says, "Let me reiterate what we offered." So, it may have been a follow-up letter.
Q To the meeting?

A To the meeting.
Q What do you remember about the meeting?
A Nothing in particular.
Q Nothing at all about any interest or lack of interest?
A I think she thought her property was worth more than that.
Q If you look about three-quarters of the way down or so, before the set of bullets at the end, it says, quote: Our nine thousand dollar plan is a bird in the hand. Moving forward with us would not preclude you from pursuing a legal action against TPL. Do you see that?
A Wow.
Q Do you recall anything about that?
A I don't know how -- I don't know what knowledge my husband would have had one way or the other regarding whether this offer would or would not affect the sale.
Q Do you know whether your husband either informally or formally consulted a lawyer about this issue?
A It would have had to have been somebody like a friend. We don't have a lawyer that we work with that, you know, we contacted, but he has a couple of friends that do real estate law in Colorado, and so that might have been the extent of it.

Q But you don't recall one way or the other?
A No, I do not. Seems rather a bold statement. In fact, on face value, I would think that they would be in conflict, but I don't know anything about --
Q Okay.
MR. CONROY: This one I don't believe has been marked.
MS. DeBELLIS: It's Exhibit 10.
MR. CONROY: Oh, it is, okay. Yeah, would you put that in front of her, please. Want me to mark it again?
MS. DeBELLIS: Sure.
MR. CONROY: Just mark that as 10, please.
(WHEREUPON, Exhibit No. 10, Christianson email to FORA, dated December 17, 2002, marked for identification.)
Q Would you take a look, please, at Exhibit 10 and let me know when you've reviewed it?
A Okay.
Q Do you recall that document, seeing it before?
A Yes.
Q And who is Val Talmadge?
A I believe that she is regional director of Trust for

Public Land.
Q I'm going to direct your attention to the last sentence of the document, quote: They will most likely take on this project unless there is something in the P&S that would be different than what they have done. Close quote. Do you understand what that refers to?
A No. To me, I would just have said that they had to scrutinize the purchase and sale before they could make a final decision.
Q Back to Exhibit 27. Will you pull that out? Should be in sequence.
A Got it.
Q Again, looking at the list of potential donors, TPL itself is not listed there, correct?
A Correct.
Q Was it your understanding throughout the course of this effort to raise these funds that TPL was not expected to contribute its own money to the purchase?
A No more than -- I didn't know one way or the other how their staff time is allocated. Is their staff time recouped as costs or is it the part that they donate, which is all the many hours that they spent on the project? But, no, no money.

Q And you mentioned earlier, as I understood it, that you had the understanding that, although TPL may have had the resources to provide a bridge loan, that's not the way they generally did business, or words to that effect.
MR. McLAUGHLIN: Objection.
Q Is that your understanding?
A Yes, but, you know, it's not something that they conveyed to me directly.
Q That was my next question. What was the basis for your understanding?
A It was probably talking with other people that work in conservation organizations that are more familiar with them and how they like to structure projects.
MR. CONROY: And I'm going to have to mark this one as 35, please.
MS. DeBELLIS: Thirty-four?
MR. CONROY: Oh, I thought 34 was the one -- oh, okay, right, right, exactly, 34. Mark that, please, as 34.
(WHEREUPON, Exhibit No. 34, TPL and FORA budgets, dated February 11, 2003, marked for identification.)
Q That's a two-page document that we'll staple later,

but it's clipped together now, and I'll ask you, first of all, if you know what that is.
MR. McLAUGHLIN: Can I just ask? Is this one of the documents she provided?
MR. CONROY: Yes. At least I'm pretty sure it is.
A It doesn't look that familiar to me. Oh, there it is. Yeah, I got it.
Q Take a moment and look it over and let me know when you're ready.
A Okay.
Q Do you know what this is?
A What the purpose of this is?
Q First of all, what is it?
A I don't know.
Q It's not familiar to you?
A Well, it's in my set of documents. I can't tell who created it. It doesn't follow sort of typical layout.
Q And you don't remember anything about it from reading it now?
A I wish they broke it out a little differently, because I wouldn't even be able to understand what some of these revenue line items, how they break out.
Q So, you, first of all, don't know what it is or who

wrote it.
A Right. It seems to be -- in my documents, it's mixed in quite closely with the assignment of the right of first refusal. Did the town require anything such as a funding document as part of their review process? Because it's lying right between the question and answer and our unsigned copy of the assignment and acceptance.
Q And having read it, nothing in it triggers any thought that this is something that you produced or your husband produced?
A I don't recall.
Q There's a reference on the second page under the heading Revenue to Foundation Grants In-Hand, $220,000.
A That's Red Acre Foundation, Stow Conservation Trust, and Black Creek.
Q The three of those combined?
A Yeah. That number, I understand.
Q And were those pledges or actual contributions in-hand?
A They're pledges. Actually, sorry, Black Creek did make a contribution to Eye of the Storm, and they put it in a bank account.

Q How much?
A Twenty thousand.
Q And then there's a reference to secured financing, 300,000. Do you know what that refers to?
A I would imagine that it's the amount of money that we need to bridge the difference. I've seen that 300,000 dollar number come up before as the gap between pledges to date and what money needs to be raised.
Q But you don't know anymore than that about that item?
A I would love to find out if this document went to the town as part of their, you know, review.
Q But you don't know?
A I don't know.
Q And then it says: Sale of assets and CPC, 600,000. Do you know what that refers to?
A Well, the CPC grant was 300,000 for open space, and I don't know how the other part -- I'm just guessing, because I really don't know. I would say it's a combination of selling property to Eye of the Storm. I don't know. It's been too long.
MR. McLAUGHLIN: Can I interrupt you for a second?
MR. CONROY: Yeah.
MR. McLAUGHLIN: Off the record.

(Brief discussion off the record)
THE WITNESS: I don't understand this.
MR. CONROY: Okay. Fair enough. What about this, Lucie? Is that marked?
MS. DeBELLIS: No.
MR. CONROY: This is a five-page document with the letterhead Peter R. Christianson on it, and we'll mark that as No. 35.
(WHEREUPON, Exhibit No. 35, Christianson letter to Scofield, dated March 3, 2003, marked for identification.)
Q Are you familiar with that?
A Yup.
Q This is a cover letter to Dean Scofield that reports that collection of a total of $11,500 in donations from you and others, right?
A Uh-huh, to Stow Conservation Trust.
Q Right. To your knowledge, was that the totality of the donations that FORA members made in this matter?
A Yes.
Q My notes reflect, and the record will speak for itself, and I can't vouch for the accuracy of it, but my notes reflect that there was some reference made by

you, or perhaps by Mr. McLaughlin, in the first session of your deposition to 22,000 being donated by FORA members. I believe that the 11,500 is the accurate figure, and I just wanted to check your memory of that.
A Yeah, this is the accurate figure. The only other thing I'd consider is that Black Creek may have done 10,000, but, no, I don't think so. I think that stated Eye of the Storm, and that coincides with the check, this delivery of the deposit of 11,500.
MR. CONROY: Next one, please. We'll make this 36.
(WHEREUPON, Exhibit No. 36, Christianson handwritten calculations, marked for identification.)
Q Do you recognize Exhibit 36?
A My husband's handwriting.
Q There's a reference there to 75,000 RAF. Do you know what that refers to?
A Possible additional pledge from Red Acre Foundation for $75,000 above the 100,000 that they already pledged.
Q Are you speculating about that?
A I'm speculating, but I do believe that they did

consider a higher amount at some point.
Q There's a figure of 100,000 below that, too. Do you see that?
A Uh-huh.
Q Do you know what that refers to?
A My guess is that's their previous pledge, but I don't know. That's Tom Shepard's email address at the bottom. He's on the board of Stow Conservation Trust.
Q I see, okay.
A It was something that he probably faxed to Tom for a conversation. I'm sorry. I don't remember that.
MR. CONROY: This will be 37, please.
MR. McLAUGHLIN: It's actually 14. It's already 14.
MR. CONROY: So, we'll refer to that as No. 14.
(WHEREUPON, Exhibit No. 14, Christianson email to FORA, dated July 23, 2003, marked for identification.)
Q Back to 14, then, Ms. Furman, specifically, on Page 2, this, of course, is the email, I guess, from your husband to the FORA members, correct?
A Uh-huh.
Q Dated July 23, '03. Now, turning to Page 2, roughly

the middle of the page: When Craig said we had done nothing, he omitted the following: RAF, $125,000. Does that refer to a pledge by RAF?
A Uh-huh.
Q Yes or no?
A Yes.
Q And SCT, 100,000, is that also a pledge?
A Yes.
Q And then Black Creek, 20,000, is that the contribution that you mentioned a minute ago?
A Yes.
Q And do you know when those pledges and that contribution were made?
A How interesting. I believe I might have a document in here for Black Creek. I would have thought the documentation for Red Acre Foundation and Stow Conservation Trust would have gone to TPL.
Q So, you don't know offhand when they were made?
A I think -- well, first of all, the Red Acre Foundation went up, because it was referred to as 100,000 earlier on. Let me see. This will take me some time to find something.
Q Okay. Well, let's pass it, then.
A But, at any rate, it was fairly early on in the

project. I think they were actually rather instrumental in, you know, kibitzing TPL to, you know, the early signage support from local organizations.
MR. CONROY: Did we mark this one?
MS. DeBELLIS: Exhibit 17.
Q I'll put Exhibit 17 in front of you. Do you see that?
A Uh-huh.
Q And this is a letter from you to Craig headed DRAFT No. 2, with a handwritten 9/11/03. Do you see that?
A Uh-huh.
Q Forgive me, because this obviously was asked earlier, but I don't recall. Was this actually sent, or was this a draft that was not sent?
A I believe it was sent.
Q You think it was sent?
A Yes.
Q And did you write it? It's signed by you, or it's got your signature block.
A Yes.
Q Do you want to take a moment to orient yourself?
A No, we've looked at this a couple times before, so.
Q The fourth paragraph or so down, As we continue to restate, do you see that?
A Okay.

Q Our diverging visions for this project. The last line of that paragraph says: We think that TPL's project management is completely defendable. Can you explain what that refers to?
A Seems like bad grammar. If we pursue the original plan, we think that TPL's project management is completely defendable. That sentence makes absolutely no sense.
Q You don't understand it?
A It's not an if then. If we pursue a plan, then TPL's project management is defendable. The sentence does not make sense to me.
Q I guess that's two of us, then.
A Seems complimentary a little bit.
Q But you don't know what it means?
A I do not know what it means.
Q At the bottom of the letter, or toward the bottom of the letter, I'm sorry, the first page, well, the last full paragraph.
A Okay.
Q It begins: TPL is choosing.
A Okay.
Q Second sentence: There was an understandable reluctance on the part of TPL to fund-raise before

certain key decisions were made regarding town support and zoning board approvals. Decisions that put off the funding campaign were based on real concerns and considerations. Can you explain what that refers to?
A Well, and I think I've made mention to this before, you don't want to request funds from foundations and then write them back and say, gee, I'm sorry, this project can't go forward. We can't use your funds. It would basically prevent TPL from ever going to that foundation again for the rest of their, you know, existence. It really puts foundations in a very bad strait when people don't take their money.
Q And that's another reference to that concept?
A Yeah.
MR. CONROY: I know we've marked this one. Lucie, which number is that?
MS. DeBELLIS: It's Exhibit 23. We didn't mark it. We have it on the list, but we didn't mark it.
MR. CONROY: Let's mark that as 23.
(WHEREUPON, Exhibit No. 23, FORA email to Perry, dated September 30, 2003, marked for identification.)
Q You're oriented to that?

A I've looked at this one before, yeah.
Q And this is a letter from FORA members to Mr. Perry, correct?
A Yes.
Q Of September 30, '03. First full paragraph afer Dear Ross, again, a few minutes ago we spoke of this passage where Craig said he had been trying to either push the project along or kill it for quite some time. Do you see that?
A Uh-huh.
Q I'm not sure that we've completely clarified what that means. Can you shed any further light on what is referred to with respect to killing it, the possibility of killing it?
A Well, again, all I've said is I'm surprised that Craig would use this kind of language, and, I mean, I don't know. You want me to conjecture what it means based upon --
Q For what it's worth.
MR. McLAUGHLIN: Objection.
Q Tell you what. Mr. McLaughlin is right. You shouldn't be conjecturing.
A Yeah.
Q You have no actual memory?

A No, I don't. I don't know.
Q Fine. Last item on the bottom of that first page: The funds guaranteed to TPL to date are precisely $1,600,500. What does that mean, guaranteed?
A I don't know. It must include the sale of properties.
MR. CONROY: And the last exhibit I have, this was not produced by you but, rather, by TPL. I'll mark that as 37.
(WHEREUPON, Exhibit No. 37, Lapointe email to FORA, dated January 16, 2003, marked for identification.)
Q This one might be new to you, so just take a moment, please, and review that.
A Chris Lapointe. He was Craig's assistant.
Q Do you have it?
A Okay. Thank you.
Q Having reviewed it, do you remember it?
A Yes, this is my first foray into the town offices to talk to the Planning Board and the building commissioner.
Q And this is a report on that discussion?
A Uh-huh, yeah. They were very, very friendly.
Q What do you remember about that event?
A Being the last time they were being very friendly to

me.
Q Can you describe what happened?
A No, let's see. I went through all of the 142 files that they had there and made some photocopies, and, basically, as I reported here, they were just very upbeat and encouraging.
Q This was good news as you saw it?
A Yeah, it was.
Q And what was your purpose in reporting this to Craig?
A To give him a notion of how the town was going to respond to going after variances.
Q And what was his reaction?
A I don't recall.
Q The top email, it's a little hard for me to figure out where -- let me ask the question. Is this a single email or is this two emails?
A Chris Lapointe is writing to me saying that -- wait a minute. Chris has asked for any previously mailed assent, if you have any assent. Why would Chris refer to himself?
Q This is what's confusing me.
A Maybe -- I don't know. At any rate, then I responded, and that was my one email that I had, because that's January 16th and that was January 9th, was my one

email to Craig.
Q All right. Let me just clarify it this way. A few inches down in the document there's a date, January 9, 2003.
A Uh-huh. So, I copied and pasted a previous email to Craig.
Q So, the part of the document that starts with January 9, 2003, is an email of that date to Craig?
A Yeah.
Q And then above that is, by some means or other, forwarding that?
A Yeah, and Chris Lapointe had come on as an assistant and wanted to accumulate all the documents.
Q Were you encouraged by that event that you're reporting here?
A The town meeting, absolutely.
Q Not at the town meeting.
A I'm sorry. At town hall, where I spent -- oh, yeah.
MR. CONROY: I have nothing else.
REDIRECT EXAMINATION
By MR. McLAUGHLIN:
Q I have a very quick question on Exhibit 33 if you would just take a look at it.
A Here it is.

Q Looking at Exhibit 33, halfway down, it says: Our plan is a bird in the hand. Who's our?
A I think it's just my husband and myself making an offer.
Q And when you were making the offer, were you using the combined resources of Furman and Christianson?
A Well, the amount that we were going to have to try to cover, which we probably could have even covered with a home equity loan, was $100,000.
Q So, the $900,000 was not your offer, personally?
A No. Well, it was with an understanding that the CPC money was available.
Q So, this was not an offer by Ms. Furman and Mr. Christianson for your purchase of the property in your name. Is that fair to say?
A Well, technically, I don't know how that would have shaken out.
Q Because my next question was: who was the buyer?
A Right.
Q And your response to who was the buyer is that you do not know. Is that fair to say?
A My guess, and it is a guess --
Q I don't want guesses. My question is: did you know at the time that you wrote the letter who the buyer

was going to be?
A I'll take a pass on that, because I can't --
Q So, the answer is, no, you don't know. Is that fair to say?
A Right.
Q And did you have a CPC grant of $300,000 dedicated to Serena Furman and Peter Christianson?
A No.
Q And the $300,000 which is referred to in the second bullet, that was not money that you were paying to Mrs. Kunelius as part of this, and I'm using the term offer in quotes here, the $300,000 which was part of, quote, our plan was not money that was being given to Mrs. Kunelius by either yourself or your husband, is that correct?
A The deal was that Marilyn was going to have to handle the zoning issues, and then bullet No. 5 says, if 142 Red Acre sold for more than 300,000, you'd keep the difference.
Q I'm looking at the second bullet under $900,000 of revenue.
A Uh-huh.
Q It says 300,000 from the sale of 142 on the market.
A 142 on the market by Marilyn.

Q By Marilyn.
A Right.
Q In other words, that was her money?
A Right.
Q And then on the $300,000 of EOS philanthropy --
A We would step in and basically buy the farm portion, and then the town and CPC would cover the open space going to the town.
Q Were you aware that EOS had informed TPL that it was not going forward?
A Yeah, I wrote that letter.
Q So, that letter went from EOS to TPL?
A That's right.
Q As to the $300,000 of philanthropy, looking at the sixth bullet down, that component of the so-called offer required financing, is that correct?
A Uh-huh.
Q So, the sixth bullet down says the 300,000 of philanthropy would require financing because the pledges and solicitation process would stretch over three to four years.
A Uh-huh.
Q See that?
A Uh-huh.

Q And so that component of the $300,000 was not a firm number that either you or your husband was saying was guaranteed but, rather, that you were hoping to raise that money over three or four years.
A No, we had $225,000 in pledges, but the pledges would not be paid out in time for closing. So, what we would have to do is finance the interest between the time that the pledges would come in and her, you know, wanting to sign a purchase and sale, plus we'd have to finance $75,000 of additional fund-raising we would have to do over four years.
Q And this was written not by the Friends of Red Acre.
A No.
Q It was written by Peter Christianson.
A Right.
Q And is there anything in this offer, this so-called offer, that demonstrates that Peter Christianson had the authority to state that those $225,000 in pledges which had been raised in conjunction with a joint effort with TPL were now available to Peter Christianson, personally?
A Well, the way it probably would have worked is that the pledges made to TPL would have been retracted and then transferred over.

Q So, at the time, Peter Christianson did not have those pledges to him, personally?
A I think he had a gentleman's call with these organizations.
Q It then says that Serena and I would guarantee the remainder of the fund-raising, $100,000, with a note or a contract.
A Yeah.
Q So, the shortfall was not going to be paid to Mrs. Kunelius in cash. It was some sort of note that was going to be given to her until such time as the fund-raising had been completed, and that $100,000 shortfall would be guaranteed by you over some period of time, is that correct?
A I don't know. I would have thought it would have been more like taking out a loan and paying her outright.
Q What zoning responsibilities would be Mrs. Kunelius' responsibility?
A Some of the same issues that The Trust for Public Land never resolved about being able to divide the houses into two parcels.
MR. McLAUGHLIN: No further questions. Thank you very much. I appreciate your coming in.

(WHEREUPON, the deposition concluded at 7:51 P.M.)

(WHEREUPON, Exhibit No. 8, Foundations spreadsheet, dated January 19, 2003, marked for identification.)

(WHEREUPON, Exhibit No. 9, FORA budget, dated January 19, 2002, marked for identification.)

(WHEREUPON, Exhibit No. 18, MacDonnell letter to FORA, dated September 10, 2003, marked for identification.)

(WHEREUPON, Exhibit No. 19, MacDonnell letter to FORA, dated August 6, 2003, marked for identification.)

(WHEREUPON, Exhibit No. 20, FORA letter to MacDonnell, dated August 19, 2007, marked for identification.)

(WHEREUPON, Exhibit No. 21, Outline: Should we meet?, marked for identification.)

(WHEREUPON, Exhibit No. 22, Revised market alternative - variance granted, marked for identification.)

* * * * *

- 102 -

CERTIFICATE

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF ESSEX, ss.

I, Roberta J. Daniels, a Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, do hereby certify that the foregoing continued deposition of SERENA FURMAN was taken before me on April 17, 2007, that the said witness was satisfactorily identified and duly sworn before the commencement of her testimony and that the testimony was taken audiographically by myself and then transcribed by myself. To the best of my knowledge, skill and ability, the within transcript is a complete, true and accurate record of said deposition.

Further, I am not connected either by blood or by marriage with any of the said parties nor am I interested either directly or indirectly in the matter in controversy.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 23rd day of April, 2007.

Roberta J. Daniels, Notary Public
Commission expires: 11-15-13

- 103 -

CERTIFICATE

I, SERENA FURMAN, do hereby certify that I have read the foregoing transcript of my testimony and further certify that said transcript is a true, accurate and complete record of said testimony.

Dated at , this day of , 2007, under the pains and penalties of perjury.

- 104 -

ERRATA SHEET

Deposition of SERENA FURMAN

| Page No. | Line No. | Transcript reads | Change made |
|---|---|---|---|

- 105 -

Word ...... Page

$1,600,500 ... 94
$100,000 ... 43, 97, 101
$11,500 ... 86
$125,000 ... 89
$200,000 ... 43, 65
$220,000 ... 84
$225,000 ... 100
$300,000 ... 98-100
$725,000 ... 20
$75,000 ... 87, 100
$900,000 ... 97, 98
03 ... 6, 19, 46, 90
1 ... 9, 10, 16, 17, 26, 37, 69, 94
1.15. ... 26
1.154 ... 37
1.16 ... 9
1.3 ... 9, 10, 69
1.5 ... 69
10 ... 46, 48, 65, 66, 80, 87, 102
10,000 ... 65, 66, 87
100,000 ... 43, 87-89, 97, 101
100K ... 71
108 ... 46
11 ... 7, 8, 13, 46, 82, 86, 87, 90
11,500 ... 86, 87
12 ... 18, 20
13 ... 32, 35, 36, 38, 40, 42
14 ... 88
142 ... 95, 98
15 ... 12-14, 26, 35, 36
16 ... 9, 44, 94
16th ... 95
17 ... 6, 46, 80, 90
18 ... 24, 26, 27, 32, 102
18th ... 25, 30, 36
19 ... 63, 64, 73, 75, 102
19th ... 68, 70
2 ... 8, 10, 19, 27, 46, 75, 88, 90
20 ... 32, 39, 49, 55, 89, 102
20,000 ... 89
200 ... 26, 43, 65
200,000 ... 26, 43, 65
2002 ... 69, 80, 102
2003 ... 8, 9, 12, 18, 23, 24, 26-28, 32, 38-40, 46, 47, 63, 64, 69, 72, 82, 86, 88, 92, 94, 96, 102
2004 ... 39, 73, 77, 78
2005 ... 75
2007 ... 6, 102
20th ... 32, 36
21 ... 102
22 ... 87, 102
22,000 ... 87
23 ... 88, 92
24 ... 15, 31
24th ... 47
25 ... 18, 19, 24, 25, 36
250 ... 26, 37
250,000 ... 26
25th ... 22, 23
26 ... 47, 77, 78
27 ... 12, 64, 72, 81
28 ... 49, 67
29 ... 71
3 ... 9, 10, 22, 26, 69, 86
30 ... 8, 47, 71, 72, 92, 93
300,000 ... 85, 98-100
30th ... 14
31 ... 73
32 ... 74, 75
325 ... 19
33 ... 77, 96, 97
34 ... 82
35 ... 82, 86
36 ... 87
37 ... 88, 94
4 ... 17, 26
400,000 ... 31
400K ... 71
5 ... 6, 69, 98
5:03 ... 6
500,000 ... 37
550,000 ... 26
57 ... 19, 22
58 ... 19
59 ... 19
5th ... 68
6 ... 44, 49, 102
6:20 ... 49
6:28 ... 49
600,000 ... 85
61 ... 17, 28
65,000 ... 76
694 ... 27
6th ... 14
7 ... 16, 17, 102
7:51 ... 102
725 ... 19, 20
725,000 ... 20
75,000 ... 87, 100
750 ... 27
78 ... 32
7A ... 6, 7
8 ... 6, 44, 67, 102
866,000 ... 70
9 ... 46, 67, 90, 96, 102
90 ... 12
950 ... 26
950,000 ... 26
97 ... 44
9th ... 95

**A**

ability ... 32, 40
able ... 10, 29, 83, 101
above ... 17, 87, 96
abruptly ... 61
abutted ... 76
accept ... 30, 34
acceptance ... 25, 84
accepted ... 39, 40, 62
accepting ... 7
access ... 30
accomplished ... 21
account ... 84
accumulate ... 96
accuracy ... 86
accurate ... 57, 87
accurately ... 31, 57
achieve ... 28, 33
acquire ... 27
acquired ... 50
acquiring ... 40
acquisition ... 43
Acre ... 7, 12, 16, 35, 38, 43, 54, 62, 76, 77, 84, 87, 89, 98, 100
across ... 54
act ... 22, 77
action ... 79
actively ... 10, 53
activity ... 75
actual ... 84, 93
addition ... 50
address ... 88
addressing ... 19
advance ... 16, 51
advice ... 48
afer ... 93
affect ... 11, 28, 30, 79
affecting ... 17
affordable ... 67
afraid ... 65
against ... 41, 57, 79
agenda ... 46
agree ... 23
agreement ... 18, 21, 28-31, 34
ahead ... 63
aligned ... 35, 37
allocated ... 81
allow ... 38
allowing ... 59
alternative ... 102
alternatives ... 27
amendment ... 28
among ... 48, 64
amount ... 22, 24, 37, 43, 65, 76, 85, 88, 97
amounts ... 26, 65
analyses ... 14
analysis ... 13, 14, 24, 25, 27
analyze ... 25
anyhow ... 48
anymore ... 45, 59, 60, 62, 85
anytime ... 23
anywhere ... 76
apologetic ... 51
apologize ... 10, 36
appears ... 8, 15, 16, 19, 20, 24, 32, 47, 66, 69
applicable ... 18
applications ... 22
applied ... 6
apply ... 23
appreciate ... 16, 42, 101
appropriately ... 25
appropriation ... 73
approvals ... 92
April ... 6
Aquarium ... 49
Arbella ... 52, 54
area ... 29
arise ... 17
assemble ... 24
assent ... 95
asserted ... 38
assets ... 41, 85
assigned ... 26, 29, 34
assignee ... 18
assigning ... 34, 39, 57, 72
assignment ... 8, 9, 13, 15, 16, 18, 23, 25, 34, 84
assigns ... 17
assist ... 33
assistant ... 94, 96
associated ... 10, 65
assumption ... 39
attachment ... 64
attempt ... 11
attempted ... 35
attempting ... 34
attended ... 62
attention ... 19, 33, 47, 81
attorney ... 18, 31
augment ... 59
August ... 14, 75, 102
author ... 12
authored ... 15, 33
authority ... 100
authors ... 48
available ... 97, 100
aware ... 13, 14, 18, 23, 28, 29, 99

**B**

back ... 6, 13, 14, 20, 28, 37, 45, 50, 62, 66, 68, 74, 75, 81, 88, 92
backing ... 35
bank ... 58, 84
barn ... 17, 53
base ... 68
based ... 13, 35, 56, 61, 65, 68, 70, 92, 93
basis ... 37, 82
Bate ... 6, 12
battle ... 72
became ... 13
become ... 35, 37, 42
becomes ... 32
beefed ... 68
began ... 13
begins ... 10, 19, 91
behave ... 61
behavior ... 61
behind ... 74
believed ... 32
below ... 88
benefit ... 8
big ... 43, 49
bird ... 79, 97
bit ... 16, 50, 61, 63, 72, 75, 91
bizarre ... 16
Black ... 43, 84, 87, 89
block ... 90
board ... 16, 88, 92, 94
boards ... 35
boilerplate ... 68
boilerplated ... 68
bold ... 15, 17, 80
bolded ... 15
Book ... 65
Boothroyd ... 52, 62, 74, 75
borrow ... 38, 39, 41
Both ... 13, 27, 62, 76
bottom ... 8, 12, 22, 44, 58, 88, 91, 94
box ... 25
Boy ... 57
break ... 45, 48, 83
breakdown ... 58
breaking ... 44
bridge ... 22, 23, 30, 32, 37-39, 82, 85
Brief ... 86
broke ... 83
broken ... 45
brought ... 8, 57, 69
budget ... 22, 27, 68, 102
budgets ... 82
building ... 94
bullet ... 98, 99
bullets ... 66, 79
bunch ... 60
burden ... 29, 30
bushes ... 52
business ... 82
buy ... 40, 41, 74, 99
buyer ... 28, 97
buying ... 41, 75

**C**

calculations ... 71, 87
calender ... 56
call ... 8, 50, 101
called ... 50, 52, 54, 73, 74, 99, 100
calling ... 51
calm ... 61
campaign ... 73, 92
Can ... 6, 11, 26, 28, 31, 33, 34, 39, 40, 43, 46, 50, 52, 56, 58, 59, 61, 65-67, 70, 83, 85, 91-93, 95...
capital ... 37
care ... 44
case ... 23
cases ... 17
cash ... 23, 24, 38, 41, 43, 101
catastrophic ... 43
cell ... 55
certain ... 24, 65, 92
certified ... 76
cetera ... 9, 49
change ... 35, 37, 70
changed ... 70
changes ... 51
Chapter ... 17, 28
check ... 77, 87
choosing ... 91
Chris ... 94-96
Christian ... 75
Christianson ... 7, 18, 44, 46, 71, 73, 77, 80, 86-88, 97, 98, 100, 101
chronological ... 69
chronology ... 56, 57, 69
chunk ... 41, 43
circumstances ... 8
citizens ... 17
claim ... 76
clarified ... 93
clarify ... 41, 57, 96
clause ... 23
clean ... 55, 69
clipped ... 77, 83
Close ... 81

Word ...... Page

closely ... 49, 84
closing ... 9, 10, 19-22, 27, 37, 38, 41, 100
co ... 33
code ... 19
coincides ... 87
collection ... 69, 86
Colorado ... 79
column ... 64
combination ... 85
combined ... 84, 97
come ... 23, 24, 31, 32, 35, 37, 46, 50, 53-55, 58, 59, 85, 96, 100
coming ... 64, 101
comment ... 53
commissioner ... 94
commitments ... 70
committed ... 64
Commons ... 28-30, 33, 34, 52
communique ... 47
comparing ... 13
completed ... 14, 101
completely ... 51, 91, 93
complex ... 25
compliance ... 18
complimentary ... 91
component ... 22, 26, 29, 42, 99, 100
components ... 22, 25, 45, 49
Comprise ... 10
compromise ... 10
computer ... 19
concept ... 92
concern ... 17
concerned ... 48
concerning ... 8, 9, 14, 17, 48
concerns ... 17, 30, 92
concessions ... 14
concluded ... 102
conclusions ... 27
Conditions ... 15
conduct ... 61
confidential ... 24
confirm ... 36
confirms ... 27
conflict ... 80
conforming ... 29
confusing ... 51, 69, 72, 95
conjecture ... 93
conjecturing ... 93
conjunction ... 100
connection ... 54
CONROY ... 22, 27, 29, 45, 46, 48, 49, 63, 67, 71, 73-75, 77, 80, 82, 83, 85-88, 90, 92, 94, 96
conservation ... 17, 38, 67, 76, 82, 84, 86, 88, 89
conserved ... 59
consider ... 30, 87, 88
considerations ... 92
considered ... 22
considering ... 28
consistent ... 27, 41
consulted ... 79
contact ... 54

Word ...... Page

contacted ... 52, 79
contained ... 26
contemplated ... 31
context ... 9, 12, 57
continue ... 24, 42, 90
contract ... 18, 31, 101
contribute ... 81
contributed ... 50
contribution ... 84, 89
contributions ... 84
control ... 39
conversation ... 55-57, 71, 88
conversations ... 50, 52, 53
conveyed ... 23, 82
cooperatively ... 41
copied ... 24, 96
copy ... 15, 84
copyright ... 20, 21, 71
copyrighted ... 21
copyrighting ... 20, 21
copyrights ... 21
correcting ... 57
correctly ... 25, 29
correspondence ... 15, 20, 21, 44
cost ... 10, 26, 69
costs ... 9, 10, 24, 27, 81
counsel ... 6, 7, 11, 35, 46
counter ... 76
country ... 10
couple ... 44, 66, 79, 90
course ... 28, 42, 81, 88
cover ... 9, 10, 19, 58, 86, 97, 99
covered ... 97
covering ... 9
CPC ... 71, 85, 97-99
Craig ... 7, 8, 14, 15, 20, 34, 44, 47, 49, 52, 59-62, 89, 90, 93, 95, 96
crazy ... 44
create ... 68
created ... 83
credit ... 30, 58
Creek ... 43, 84, 87, 89
critical ... 20
cross ... 37, 49
curious ... 66
currently ... 17
cut ... 52, 61
cycle ... 35

D

damage ... 23
damages ... 53
Darn ... 46, 56
date ... 12, 19, 46, 69, 70, 78, 85, 94, 96
dated ... 7, 12, 18, 24, 25, 32, 36, 44, 46, 47, 64, 72, 73, 75, 77, 80, 82, 86, 88, 92, 94, 102
day ... 16, 33, 41
days ... 56, 61
deal ... 11, 14, 35, 53, 54, 58, 60, 98
dealing ... 34
deals ... 29

Word ...... Page

dealt ... 29
Dean ... 86
Dear ... 93
DeBELLIS ... 63, 67, 75, 80, 82, 86, 90, 92
December ... 23, 80
decided ... 17
decipher ... 19
decision ... 45, 81
Decisions ... 92
dedicated ... 98
defendable ... 91
define ... 24
definitely ... 13, 33, 44, 50
delivery ... 87
demands ... 68
demonstrates ... 100
deposed ... 61
deposit ... 87
deposition ... 6, 11, 48, 49, 53, 55, 59, 87, 102
depositions ... 55
depth ... 50
describe ... 48, 49, 95
described ... 78
describes ... 68
description ... 6
descriptions ... 6
design ... 49
designated ... 67
designation ... 6, 8, 18
designed ... 18
determine ... 18, 39, 69
develop ... 27
developed ... 59
developing ... 71
development ... 26, 36, 45
DHCD ... 25, 26, 58
dialogue ... 18
difference ... 12, 13, 32, 38, 85, 98
differences ... 9
different ... 21, 45, 52, 59, 68, 81
differently ... 83
difficult ... 28, 34
diligence ... 10, 24
dining ... 21
directed ... 67
direction ... 48, 74
directly ... 24, 54, 59, 74, 82
director ... 80
disappointment ... 72
disburse ... 23
disbursing ... 38
discern ... 11
discovery ... 9, 13, 14
discussing ... 17
discussions ... 7, 9
disheartening ... 47
dissuade ... 72
diverging ... 91
divide ... 101
diving ... 27
divorce ... 42
document ... 6-8, 11-19, 21, 22, 24-26, 32, 35, 37, 44, 46, 53, 58, 63, 64, 67-69, 77, 78, 80-82,

Word ...... Page

84-86, ... 89, 96
documentation ... 89
documents ... 6-9, 11, 13, 23, 41, 46, 63, 70, 83, 84, 96
dog ... 50, 51
dollar ... 31, 37, 79, 85
dollars ... 70
donate ... 81
donated ... 87
donation ... 60
donations ... 38, 86
donors ... 66, 81
doubt ... 25
dove ... 40
DRAFT ... 15, 16, 46, 90
dramatic ... 43
drawing ... 27
drew ... 17
driveway ... 51
due ... 10, 24, 34

E

Each ... 65, 68
earlier ... 11, 13, 14, 21, 30, 31, 38, 45, 47, 70, 78, 82, 89, 90
earliest ... 38, 39
early ... 15, 38, 68, 89, 90
earmarked ... 43
earning ... 28
easy ... 30
ECKER ... 45
EDEY ... 66
editor ... 72
effect ... 28, 53, 82
effective ... 66
effectuating ... 9
effort ... 62, 72, 81, 100
efforts ... 6, 50
eighth ... 66
element ... 62
elevated ... 9
email ... 7, 18-20, 32, 80, 88, 92, 94-96
emails ... 19, 95
emergency ... 50
Emerson ... 74
encourage ... 57
encouraged ... 96
encouraging ... 95
encumbrances ... 29
endeavoring ... 73
engaged ... 53
England ... 49
enter ... 18
entertain ... 11
entire ... 22, 29, 42, 58, 76
entitled ... 6, 15
environmental ... 14
EOS ... 40-43, 99
equine ... 42, 45, 67
equity ... 97
estate ... 29, 79
estimate ... 9, 10, 65
et ... 9, 49
evening ... 78
events ... 56
everyone ... 61
everything ... 21, 45, 64

Word .... Page

EXAMINATION ... 7, 49, 96
except ... 16
excluding ... 42, 43
exclusion ... 40
execute ... 27, 29
exercise ... 34
Exhibit ... 6-8, 12, 14, 15, 17, 18, 20, 24, 25, 32, 35, 36, 38, 40, 42, 44, 46, 47, 49, 64, 67, 71-73, 75, ... 77, 80-82, 86-88, 90, 92, 94, 96, 97, 102
Exhibits ... 6, 7, 49
existence ... 92
exit ... 45
expand ... 61
expect ... 40
expectation ... 38
expected ... 25, 38, 65, 81
expecting ... 31
expenses ... 10, 58
experience ... 49
expertise ... 29
expiration ... 29
explain ... 26, 91, 92
explained ... 11
explicitly ... 17
exposure ... 23
express ... 61
expressed ... 40, 63
extended ... 29
Eye ... 40, 43, 52, 59, 62, 77, 84, 85, 87

F

face ... 80
Fair ... 24-26, 37, 43, 67, 86, 97, 98
fairly ... 15, 89
fairness ... 53
faith ... 18
fall ... 53, 54
falls ... 69
far ... 18, 28, 48, 59, 64, 76
farm ... 40, 59, 68, 99
farms ... 17
father ... 74
faults ... 42
faxed ... 88
February ... 18, 22, 23, 72, 73, 75, 82
federal ... 49
feel ... 33, 59
feeling ... 11
felt ... 33, 52
field ... 61
figure ... 30, 72, 87, 88, 95
figures ... 58
files ... 95
final ... 16, 46, 66, 81
finance ... 32, 100
finances ... 40, 77
financial ... 24, 25, 29, 35, 42, 43
financing ... 30, 32, 35, 37, 85, 99
find ... 6, 12, 13, 42, 47, 69, 85, 89

Word ...... Page

Fine ... 94
firm ... 100
first ... 7, 15-17, 20, 25, 27, 28, 31, 34, 36, 40, 42, 44, 47, 49-51, 55, 63, 66-69, 72, 74, 75, 83, 84, ... 87, 89, 91, 93, 94
five ... 86
fives ... 66
fledged ... 42
floating ... 76
flummoxed ... 21
focus ... 66, 67
follow ... 78, 83
following ... 38, 89
follows ... 68
FORA ... 8, 9, 12, 13, 15, 18, 20, 22-25, 28-30, 32, 34, 35, 39, 41, 42, 45-47, 64, 67, 80, 82, 86-88, ... 92-94, 102
foray ... 94
force ... 42, 43
forceful ... 61
forgetting ... 53
Forgive ... 90
forgot ... 51, 74
formal ... 55
formally ... 79
forthright ... 35
forward ... 6, 11, 25, 39, 48, 60, 62, 74, 79, 92, 99
forwarding ... 96
found ... 30
Foundation ... 21, 35, 38, 43, 65, 84, 87, 89, 92
foundations ... 21, 23, 35, 37, 39, 59, 60, 64, 67, 92, 102
four ... 19, 54, 56, 82, 99, 100
fourth ... 38, 90
frame ... 21, 70
frankly ... 61
free ... 29
friend ... 79
friendly ... 94
Friends ... 7, 12, 16, 54, 60, 62, 79, 100
front ... 12, 15, 50, 80, 90
fulfill ... 59
full ... 18, 42, 47, 91, 93
fund ... 9, 21-23, 36-38, 41, 42, 49, 50, 64, 67, 69, 91, 100, 101
funders ... 49
funding ... 13, 22, 23, 38, 39, 41, 49, 50, 56, 60, 84, 92
funds ... 32, 37-39, 41, 43, 50, 81, 92, 94
Furman ... 6, 7, 49, 64, 88, 97, 98
Furman0035 ... 8
Furman27 ... 67
Furman56 ... 19
Furman77 ... 32
Furman91 ... 12

Word ...... Page

Furman96 ... 44
further ... 48, 54, 60, 71, 93, 101
future ... 6

**G**

gap ... 85
gave ... 17, 54
general ... 21
generally ... 15, 82
generic ... 70
get ... 10, 11, 21, 26, 34, 37, 39, 45, 46, 53, 54, 60, 62, 69
gets ... 61
gigunda ... 58
give ... 34, 38, 48, 52, 56, 59, 65, 95
given ... 17, 32, 64, 98, 101
glance ... 36
go ... 6, 13, 17, 28, 29, 33, 37, 39, 41, 44, 51, 57, 60, 62, 63, 73, 76, 78, 92
goal ... 9, 46, 59
gobbledegook ... 22
going ... 6-8, 11-13, 18, 20-22, 24, 26-28, 30, 32-35, 37-39, 43, 46-49, 51, 54, 59, 60, 63, 64, 67, 72, ... 75, 77, 81, 82, 92, 95, 97-99, 101
gone ... 7, 89
good ... 8, 14, 15, 18, 26, 33, 48, 52, 58, 66, 95
grammar ... 91
grant ... 25, 26, 58, 60, 65, 66, 71, 85, 98
granted ... 102
Grants ... 23, 49, 84
greater ... 19, 25
Greg ... 10, 11
ground ... 17
group ... 62
guarantee ... 101
guaranteed ... 94, 100, 101
guaranteeing ... 60
guard ... 51
guess ... 26, 46, 68, 76, 88, 91, 97
guesses ... 97
guessing ... 20, 31, 37, 40, 41, 85
guestimate ... 64, 66
guestimates ... 65

**H**

habit ... 20, 21, 71
halfway ... 97
hall ... 96
hand ... 33, 36, 41, 47, 70, 79, 84, 97
handle ... 50, 98
handwriting ... 87
handwritten ... 19, 71, 87, 90
hang ... 45
happening ... 62
happy ... 72

Word ...... Page

hard ... 9, 10, 13, 24, 74, 95
head ... 29
headed ... 90
heading ... 68, 84
hear ... 53
heard ... 53, 54
hearing ... 52
held ... 31
Hello ... 7
help ... 13, 38, 41, 51, 63, 70
helped ... 17
helpful ... 36
helping ... 42, 72
Heritage ... 49
Hi ... 7
higher ... 88
hired ... 50
hiring ... 46
hit ... 50
home ... 58, 78, 97
homework ... 64
hooks ... 64
hoped ... 11
hopeful ... 59
hopefully ... 7
hoping ... 33, 53, 100
horse ... 17, 40, 54, 59, 68
horses ... 50, 51
hours ... 81
house ... 21, 61, 74
houses ... 29, 101
housing ... 67
humorous ... 20
hundred ... 19, 39, 43, 54
husband ... 19, 20, 32, 39, 44, 47, 50, 52, 58, 62, 64-66, 68, 69, 74, 76, 78, 79, 84, 88, 97, 98, 100

**I**

ideally ... 66
identical ... 16
identification ... 7, 8, 12, 15, 18, 24, 32, 44, 46, 47, 64, 67, 71-73, 75, 77, 80, 82, 86-88, 92, 94, 102...
identified ... 15, 23, 30, 37, 43
illogical ... 40
imagine ... 30, 59, 85
implication ... 40
implications ... 42, 43
implied ... 40
important ... 33
inaccurate ... 57
inapplicable ... 18
inappropriately ... 61
inches ... 96
incorrect ... 6, 56
Indicating ... 29
indicative ... 63
influence ... 73
informally ... 79
informed ... 99
inner ... 40
insisting ... 28, 35, 37
insofar ... 11
inspectors ... 24

Word ...... Page

institution ... 50, 62
institutions ... 65
instruction ... 48
instrumental ... 90
insulting ... 61
intended ... 15, 20, 23
intent ... 9
intentionally ... 42
interactions ... 61
interest ... 28, 31, 71, 79, 100
interesting ... 89
interpretation ... 28
interrupt ... 85
introduction ... 68, 69
irony ... 72
issue ... 8, 13, 14, 16, 18, 21, 28, 31, 33, 35, 59, 79
issued ... 70
issues ... 16, 17, 33, 98, 101
Item ... 17, 27, 85, 94
itemization ... 71
itemized ... 10
items ... 10, 16, 17, 83

**J**

January ... 7, 9, 14, 15, 38, 63, 64, 68, 70, 94-96, 102
Jim ... 49, 52, 74
job ... 33, 61
joint ... 100
joke ... 11, 21, 71
Jones ... 10
July ... 12, 38, 88
June ... 38

**K**

Kachajian ... 61-63, 78
Karen ... 53, 55
key ... 92
kibitzing ... 90
kill ... 47, 48, 61, 93
killing ... 93
kinds ... 58
knowledge ... 18, 47, 50, 54, 79, 86
knowledgeable ... 18
knows ... 61
Kunelius ... 7, 9, 15, 23, 24, 28, 29, 40, 43, 50, 53, 59, 72, 73, 76, 77, 98, 101

**L**

lack ... 79
laid ... 24
Land ... 53, 59, 71, 76, 81, 101
language ... 15, 17, 93
Lapointe ... 94-96
lapse ... 75
large ... 59
larger ... 49
late ... 13, 38
later ... 12, 44, 82
latter ... 31
lawsuit ... 53, 59
lawyer ... 61, 79
layout ... 83
leave ... 7, 10

Word ...... Page

left ... 52, 64
legal ... 79
lesser ... 26
letter ... 9, 12, 14, 32, 44, 46, 47, 51, 72-75, 77, 78, 86, 90, 91, 93, 97, 99, 102
letterhead ... 86
level ... 13
light ... 93
likelihood ... 8
Likewise ... 31
limbs ... 52
limited ... 29, 34, 56
line ... 30, 38-40, 58, 71, 83, 91
lined ... 69
lines ... 26, 30, 35, 37
liquidated ... 23
liquidating ... 31
list ... 10, 66, 81, 92
listed ... 81
listened ... 56
litigation ... 45, 48
loan ... 58, 82, 97, 101
local ... 90
logic ... 39
long ... 21, 31, 55, 60, 76, 85
longer ... 29
look ... 8, 12, 15, 16, 22, 25, 35, 37, 38, 42-45, 58, 64, 65, 69, 73, 75, 77, 79, 80, 83, 96
looked ... 44, 90, 93
Looking ... 17, 26, 29-31, 36, 38, 40, 58, 70, 81, 97-99
lose ... 61
loss ... 23, 43
lot ... 12, 24, 43, 50, 55, 61, 67, 77
love ... 8, 85
loving ... 54
lower ... 11, 12, 14, 62
lowering ... 7, 9, 12, 13
Lucie ... 63, 86, 92
lump ... 70
lying ... 84

**M**

MacDonnell ... 7, 9, 12, 14, 15, 18, 20, 32, 37, 44, 46, 47, 49, 60, 102
mad ... 44
mailed ... 95
mailing ... 73
main ... 59
major ... 44, 56, 60
make ... 10, 12, 38, 51, 52, 55, 58, 60, 62, 65, 66, 72, 74, 76, 81, 84, 87, 91
making ... 17, 34, 57, 97
manage ... 25, 52
manageable ... 30
management ... 10, 91
manager ... 53, 65
many ... 42, 55, 81
marathons ... 73
March ... 24-28, 30, 32, 36,

Word ...... Page

38, 39, 86
Marilyn ... 18, 30, 31, 33, 45, 50, 51, 54, 73, 98, 99
mark ... 64, 67, 71, 73, 75, 80, 82, 86, 90, 92, 94
marked ... 6-8, 12, 13, 15, 18, 24, 32, 44, 46, 47, 53, 63, 64, 67, 71-75, 77, 80, 82, 86-88, 92, 94, 102...
market ... 98, 102
Marking ... 6, 7
math ... 26
McLAUGHLIN ... 6, 7, 46, 48, 49, 55, 58, 59, 73, 82, 83, 85, 87, 88, 93, 96, 101
meaningful ... 27
means ... 12, 26, 31, 32, 45, 91, 93, 96
meant ... 20, 30, 31, 33, 36
meet ... 102
meeting ... 11, 17, 46, 47, 57, 61, 62, 78, 79, 96
meetings ... 54, 55
member ... 20
members ... 35, 86-88, 93
memo ... 24, 36
memorable ... 63
memorandum ... 35
memory ... 9, 53, 64, 70, 75, 87, 93
met ... 10, 34, 48, 49, 55, 56, 78
million ... 9, 10, 37, 69, 70
millionaire ... 60
minded ... 51
minimum ... 66
misbehavior ... 63
miscalculation ... 7
misread ... 10
mixed ... 84
money ... 27, 30, 34, 37, 38, 41, 43, 59, 60, 65, 72, 81, 85, 92, 97-100
month ... 25
months ... 23, 31
mortgage ... 27-31, 41
Mosaic ... 28-30, 33, 34, 52
motives ... 59
move ... 11, 27, 45
moving ... 24, 25, 70, 79
much ... 10, 33, 42, 43, 65, 73, 85, 101
municipality ... 17
MURPHY ... 22, 25-27, 32, 36, 39, 48
Museum ... 49

N

narrative ... 56
National ... 49
NBSP ... 19
necessary ... 12, 25, 26, 30
necessity ... 14
needed ... 34, 46, 51
negotiate ... 13, 28, 30, 31, 33
negotiated ... 28
negotiation ... 33
neighbor ... 50, 53
neighborhood ... 45, 50, 51
neither ... 39, 45
neutral ... 46
New ... 49, 94
news ... 95
nice ... 7, 44
Nina ... 52, 54
nine ... 79
non ... 15, 17, 39, 42, 58
nor ... 45
notable ... 57
note ... 19, 25, 27, 36, 41, 60, 101
notes ... 86
notice ... 16
notion ... 95
nuances ... 33
numbers ... 19, 40, 70, 71

O

object ... 6, 31, 51
Objection ... 22, 25-27, 29, 32, 39, 45, 48, 59, 73, 82, 93
obligate ... 18
obtain ... 39
occasions ... 30
occur ... 78
occurred ... 25, 34, 36
offer ... 58, 62, 74, 76, 77, 79, 97-100
offered ... 14, 78
offering ... 62
office ... 35, 60, 61, 78
offices ... 94
omitted ... 89
one ... 8, 13, 14, 19, 21, 24-26, 41, 43-45, 50-52, 56, 57, 61-63, 66-70, 73-75, 79-83, 87, 90, 92-95...
ones ... 14
onus ... 41
open ... 52, 85, 99
operate ... 39
operations ... 49
opinions ... 73
oppose ... 73
opposed ... 49, 51, 65, 69
opposing ... 10
opposition ... 11, 45
optimistic ... 22
order ... 41, 63, 69, 73, 76
organization ... 17, 40, 45, 65
organizational ... 58
organizations ... 38, 82, 90, 101
organizer ... 50
orient ... 90
oriented ... 64, 73, 77, 92
original ... 28, 31, 91
originally ... 31
Osmosis ... 50
ours ... 63
ourselves ... 24
outlay ... 23
Outline ... 102
outright ... 101
overture ... 74
own ... 35, 49, 57, 64, 81
owner ... 72
owners ... 72

P

P.M. ... 6, 49, 102
package ... 8
paid ... 7, 18, 100, 101
papers ... 27
parcel ... 76
parcels ... 101
partially ... 67
participate ... 41
partner ... 24
partners ... 24
parts ... 24, 49
party ... 15, 54
pass ... 89, 98
passage ... 93
pasted ... 96
path ... 30, 52
Patty ... 48, 55, 56
pay ... 24, 34
paying ... 24, 98, 101
payment ... 20
payments ... 23
people ... 15, 54, 61, 73, 82, 92
perceive ... 62, 73
percent ... 31, 39
perhaps ... 6, 51, 74, 87
period ... 22, 25, 29, 31, 73, 75, 101
Perry ... 15, 47, 92, 93
person ... 19, 50
personal ... 39, 61
personality ... 72
personally ... 24, 97, 100, 101
persuade ... 28, 34, 73
Peter ... 8, 71, 86, 98, 100, 101
philanthropy ... 35, 99
phone ... 55, 56, 73
photocopies ... 95
piece ... 43, 68
pieces ... 15, 49
place ... 39-41
plan ... 22, 23, 25, 27, 38-42, 44, 79, 91, 97, 98
Planning ... 65, 94
plans ... 42
plate ... 67, 68
plates ... 67
play ... 25
pleased ... 77
pledge ... 45, 87-89
pledged ... 87
pledges ... 84, 85, 89, 99-101
plugged ... 70
pointed ... 30, 67
pointing ... 36
points ... 36, 57
Polin ... 53
political ... 42
polls ... 57
pool ... 76
population ... 54
portion ... 52, 99
position ... 10, 41, 46, 48
positive ... 62
possession ... 24
possibility ... 8, 9, 29, 75, 93
postcard ... 73
potential ... 17, 27, 38, 66, 81
potentially ... 11, 68
pre ... 6
precise ... 69
precisely ... 94
preclude ... 79
prepare ... 48
prepared ... 64, 77
present ... 30-33
presentation ... 17
presented ... 76
preserve ... 59
prevent ... 11, 17, 42, 92
prevented ... 71
previous ... 14, 17, 88, 96
previously ... 95
price ... 7-14, 18, 34, 45, 52, 62
prior ... 7, 9, 15, 17, 18, 21, 23, 29, 38, 40, 78
problem ... 37, 41, 45, 50, 60
problematic ... 27
produce ... 49
produced ... 49, 84, 94
production ... 63
profession ... 49
professional ... 61
profit ... 17, 40, 42
profits ... 58
program ... 25, 35
project ... 10, 24, 25, 29, 33, 35, 39, 42, 43, 47-49, 52, 55-57, 59, 60, 67-70, 72, 81, 90-93
projection ... 65
projects ... 32, 82
promise ... 60
promises ... 60
properties ... 26, 45, 76, 94
Property ... 9, 13-15, 17, 27-30, 40, 43, 50-52, 68, 75, 76, 79, 85, 97
proposal ... 38
proposals ... 68, 70
proposing ... 42
prospects ... 64
provide ... 30, 82
provided ... 6-8, 19, 32, 65, 83
providing ... 69
prudent ... 18, 25
public ... 72, 81, 101
Publicly ... 45
published ... 72
pull ... 81
pulled ... 43
puppy ... 51
purchase ... 7, 9-11, 13, 14, 18, 20, 21, 28, 31, 34, 41, 53, 81, 97, 100
purchasing ... 52
pursue ... 91
pursuing ... 79
push ... 47, 93
puts ... 12, 92
putting ... 15, 42, 44
puzzle ... 43

Q

qualify ... 33
quarters ... 79
query ... 13
questioned ... 29
quick ... 44, 47, 96
quicker ... 11
quickly ... 77
quote ... 47, 48, 69, 79, 81, 98
quotes ... 41, 98

R

RAF ... 19, 87, 89
raise ... 30, 41, 50, 59, 60, 81, 91, 100
raised ... 14, 17, 60, 69, 70, 85, 100
raising ... 9, 21-23, 36-38, 41, 42, 49, 50, 59, 64, 69, 100, 101
ran ... 52, 74
range ... 65
ranks ... 45
rate ... 89, 95
rather ... 53, 77, 80, 90, 94, 100
reach ... 30
reaction ... 95
reads ... 8, 10, 32
ready ... 63, 83
realistic ... 35
reason ... 6, 76
reasonable ... 65
reasons ... 11
recalled ... 57
receive ... 48, 74
recently ... 52
recognize ... 8, 72, 87
recommendations ... 17
reconfigure ... 25
recounting ... 56, 57
recouped ... 81
recover ... 9
Red ... 7, 12, 16, 35, 37, 43, 54, 62, 84, 87, 89, 98, 100
REDIRECT ... 96
reduced ... 45, 52
reducing ... 8, 13
referenced ... 25
references ... 71
referred ... 11, 24, 33, 36, 78, 89, 93, 98
refers ... 26, 70, 81, 85, 87, 88, 91, 92
refining ... 19
reflect ... 55, 86
reflected ... 10, 45
refusal ... 7, 15, 17, 25, 34, 40, 72, 84
regards ... 17
regional ... 80
register ... 73

Word ...... Page

registration ... 73
reiterate ... 78
relate ... 20
release ... 30
released ... 38
reluctance ... 91
rely ... 23
remain ... 59
remainder ... 101
remembering ... 8
renegotiate ... 12, 14
renovations ... 49
repeatedly ... 41
report ... 94
reported ... 95
reporting ... 95, 96
reports ... 86
represented ... 9
request ... 66, 92
requested ... 65
requests ... 65
require ... 84, 99
required ... 39, 99
requirement ... 39
requirements ... 20
requires ... 28
rescue ... 42, 45, 67
researching ... 17
resolve ... 17
resolved ... 101
resolving ... 33
resort ... 66
resources ... 82, 97
respect ... 59, 93
respects ... 16
respond ... 16, 62, 95
responded ... 16, 95
response ... 14, 15, 17, 35-37, 51, 74, 75, 78, 97
responsibilities ... 42, 101
responsibility ... 101
rests ... 41
result ... 28, 73
retracted ... 100
Revenue ... 83, 84, 98
reverse ... 56
reviewed ... 75, 80, 94
reviewing ... 23, 27
reviews ... 38
Revised ... 102
revolves ... 31
rid ... 45
rights ... 28, 29, 34
room ... 21
Ross ... 15, 47, 93
rough ... 63
routinely ... 72
run ... 32, 40
running ... 21, 50, 55, 56, 71
runoff ... 17

S

sale ... 8, 13, 18, 20, 21, 26, 28, 30, 31, 34, 79, 81, 85, 94, 98, 100
satisfying ... 34
save ... 61
saw ... 18, 95
scheduled ... 21
Scofield ... 86
scrutinize ... 81
SCT ... 19, 35, 89
second ... 12, 19, 22, 27, 29, 30, 33, 37, 45, 54, 68, 84, 85, 91, 98
secondhand ... 52, 53
sections ... 49
secured ... 85
see ... 7, 10, 14, 15, 21, 26-28, 31, 36, 37, 41, 43, 50, 58, 60-62, 65, 67, 68, 71, 72, 75, 77, 79, 88-90, ... 93, 95, 99
seeing ... 36, 62, 75, 80
seen ... 85
Selectmen ... 16
sell ... 27, 29, 40
seller ... 11-14, 34
selling ... 85
semicolon ... 29
sending ... 44
sent ... 8, 44, 47, 70, 73, 78, 90
sentences ... 41, 69
separate ... 71
separately ... 53
September ... 38, 40, 46, 47, 92, 93, 102
sequence ... 68, 69, 81
Serena ... 98, 101
series ... 19
seriously ... 25
session ... 52, 58, 87
set ... 35, 79, 83
seven ... 31
several ... 9, 30, 61, 66
shaken ... 97
shaking ... 29
share ... 40
shared ... 10, 25
shed ... 93
shift ... 67
shoes ... 34
shoot ... 66
shortfall ... 32, 101
show ... 40
showed ... 22, 39, 40, 44, 63
showing ... 64
side ... 47
sides ... 62
sign ... 100
signage ... 90
signature ... 90
signed ... 15, 90
significance ... 11, 21
silence ... 74
silent ... 53
similar ... 70
Simple ... 15
simply ... 10, 65, 69
simultaneous ... 43
single ... 95
site ... 14, 58
sites ... 58, 65
situation ... 59
six ... 58
sixth ... 99
slightly ... 68
slow ... 50
Small ... 52, 65
sold ... 98
solicit ... 38
solicitation ... 99
solution ... 30
somewhat ... 63
sounds ... 28, 40
source ... 30
sources ... 15, 56
space ... 85, 99
specific ... 6, 9, 14, 46, 58, 76
specified ... 22
speculating ... 87
spent ... 81, 96
spreadsheet ... 102
staff ... 81
stamp ... 6
stamped ... 6, 12
standing ... 21
staple ... 67, 82
stapled ... 77
start ... 28, 40, 50
started ... 23, 71
starts ... 96
state ... 100
statement ... 14, 30, 34, 45, 80
stating ... 37
status ... 70
stenographer ... 71
step ... 99
stepped ... 34
stop ... 47, 60
stopping ... 60
Storm ... 40, 43, 52, 59, 62, 77, 84, 85, 87
Stow ... 18, 24, 38, 54, 84, 86, 88, 89
straight ... 57
strait ... 92
strategy ... 45, 60
street ... 54
stretch ... 99
strike ... 11, 25
strong ... 11, 58
structure ... 29, 58, 82
submitted ... 39
substance ... 56
substantive ... 74
subtotal ... 26
succeed ... 42
sue ... 54
sufficient ... 11, 38
suggested ... 11
suggestions ... 48
sum ... 65, 77
summer ... 13
supplied ... 44
support ... 45, 65, 67, 73, 90, 92
suppose ... 59
surface ... 46
surprise ... 23
surprised ... 57, 58, 72, 93
suspected ... 11
swamp ... 74
swath ... 76
symbol ... 21
sync ... 35, 37

T

table ... 8, 21, 62
taking ... 35, 46, 48, 101
Talmadge ... 80
target ... 70
team ... 35, 69
technically ... 8, 76, 97
telephone ... 55
telling ... 22, 23, 33, 34, 59
temper ... 61
template ... 70
ten ... 61, 66
term ... 19, 24, 28, 38, 98
terms ... 18, 27, 31
testimony ... 6, 10, 39, 40, 48
testy ... 61
Thanks ... 19
thereabouts ... 27
Therefore ... 22
these ... 13, 16-18, 27, 32, 35-37, 45, 54, 56, 58, 65, 68, 70, 81, 83, 101
third ... 15, 19, 33, 45, 54, 67
Thirty ... 82
thoughtful ... 36
thousand ... 26, 43, 66, 79, 85
three ... 15, 26, 67, 78, 79, 84, 99, 100
thus ... 32
tied ... 30
time ... 6, 9, 11-13, 21, 27, 29, 32, 34-37, 39, 40, 44, 47, 48, 50-52, 55-57, 60, 70, 72, 73, 75, 81, 89, ... 93, 94, 97, 100, 101
times ... 52, 55, 90
timing ... 27, 37
today ... 30, 33, 77
Tom ... 88
took ... 25, 60, 62, 66
tool ... 61
top ... 16, 19, 22, 95
topic ... 13
topography ... 51
total ... 69, 70, 86
totality ... 86
touch ... 54
toward ... 67, 91
town ... 7, 11, 15-19, 35, 57, 59, 71, 73, 84, 85, 92, 94-96, 99
toxic ... 13
TPL ... 9-11, 13, 15-18, 22-25, 28-30, 32-34, 37-43, 46-48, 57-60, 66, 69, 79, 81, 82, 89-92, 94, 99, ... 100
track ... 6
tracking ... 19
trail ... 51
trained ... 61
transfer ... 9, 15
transferred ... 100
treatment ... 74
tree ... 52
triggers ... 84
triple ... 53
trips ... 55
Trish ... 53
truck ... 50
truly ... 18, 33
Trust ... 38, 80, 84, 86, 88, 89, 101
Tuesday ... 6
turned ... 21
turning ... 88
tweak ... 68
twenty ... 43, 85
two ... 13, 15, 25, 32, 36, 45, 52, 57, 69, 75, 77, 82, 91, 95, 101
types ... 14
typical ... 83
typo ... 31, 69

U

unaware ... 33
underlying ... 18
underneath ... 21
understandable ... 91
understood ... 20, 51, 82
undertook ... 13, 14
unequivocally ... 41
uniform ... 61
unilaterally ... 47
unless ... 28, 71, 81
unresolved ... 60
unsigned ... 84
unsuccessful ... 14
unusual ... 15
unworkable ... 40-42
upbeat ... 95
upset ... 66
using ... 97, 98

V

vaguely ... 28
Val ... 80
value ... 26, 30-33, 80
variable ... 26
variance ... 102
variances ... 95
vernal ... 76
version ... 16
view ... 24
vindictive ... 61
visions ... 91
visiting ... 74
vote ... 57, 72
voted ... 57
voters ... 72, 73
voting ... 11
vouch ... 86

W

wait ... 57, 69, 95
waiver ... 33
walk ... 50, 51
wanting ... 100
wants ... 9
waste ... 13
water ... 17, 76

Word ...... Page

Web ... 58
week ... 44
weeks ... 9
weighty ... 33
wet ... 59
wetland ... 52
WHEREUPON ... 7, 12, 15, 18, 24, 32, 44, 46, 47, 64, 67, 71-73, 75, 77, 80, 82, 86-88, 92, 94, 102...
whole ... 62
wide ... 73
will ... 6, 15, 16, 23, 27, 31, 35-38, 41, 59, 71, 81, 86, 88, 89
willing ... 58-60
window ... 37
wish ... 83
wishing ... 35, 37
withdraw ... 10
WITNESS ... 7, 45, 46, 55, 75, 86
woman ... 52, 54
word ... 17, 41, 43, 64
words ... 16, 34, 42, 82, 99
work ... 22, 42, 58, 79, 82
worked ... 100
working ... 15, 41, 49
workings ... 40
worry ... 38
worth ... 79, 93
Wow ... 79
wrestling ... 34
write ... 60, 90, 92
writing ... 14, 39, 71, 95
written ... 33, 49, 58, 67, 68, 76, 100
wrote ... 14, 27, 41, 49, 51, 60, 68, 84, 97, 99

**Y**

year ... 38, 65
years ... 99, 100
young ... 51
Yup ... 86

**Z**

zero ... 26, 66
zoning ... 14, 92, 98, 101