UNITED STATES DISTRICT COURT
(DISTRICT OF MASSACHUSETTS)

CIVIL ACTION NO. 05-11697-GAO

MARILYN KUNELIUS,
                          PLAINTIFF,

V.

TOWN OF STOW separately, A
PARTNERSHIP OF UNKNOWN NAME
BETWEEN TOWN OF STOW and THE
TRUST FOR PUBLIC LAND, THE
TRUST FOR PUBLIC LAND separately
and CRAIG A. MACDONNELL, in his
individual capacity,
                          DEFENDANTS.

**PLAINTIFF'S SUMMARY
JUDGMENT MOTION
AGAINST THE TOWN OF STOW**

NOW COMES the Plaintiff, Marilyn Kunelius, under Fed. R. Civ. P. 56(c) with this

Summary Judgment Motion against the Town of Stow.  In support of this Motion the

Plaintiff relies on her Memorandum in Support of this Motion and states as follows:

## STATEMENT OF UNDISPUTED FACTS

1.      The Plaintiff Marilyn Kunelius ("Kunelius") is a former resident of the

town of Stow, Massachusetts and currently has a principle place of residence at 635 Stow

Road, Stow, Maine.  (See ¶ 1 of the Complaint).

2.      The Defendant, the Town of Stow, Massachusetts ("Stow") is a

Massachusetts Municipal Corporation having a mailing address of Town Building, 380

Great Road, Stow, Massachusetts 01775-2127.  (See ¶ 2 of the Complaint).

3.      The Defendant, the Trust for Public Land ("TPL") is a foreign corporation

organized under the laws of the State of California with a principle office in

Massachusetts at 33 Union Street, Boston, Massachusetts.  (See ¶ 4 of the Complaint).

TPL, as non-profit organization, under the Internal Revenue Code Section 501(c)(3) cannot lobby public officials except as specifically provided. (See Exhibit A, TPL 30(b)(6) deposition (Stookey); pg. 17, ln. 3- ln. 6).

4.      The Town of Stow ("Stow") and TPL entered into an agreement for the purpose of acquiring property owned by Kunelius. (See ¶ 3 of the Complaint; see also Exh. B, KUN482-484).

5.      The Defendant, Craig A. MacDonnell ("MacDonnell") is an individual who is also TPL's Massachusetts state Director. (See ¶ 5 of the Complaint; see also Exh. C, MacDonnell deposition, pg. 7, ln. 5).

6.      The Friends of Red Acre ("FORA") was an unincorporated group of Stow's citizens who were abutters and neighbors in the general vicinity to the Property who partnered with TPL to assist to TPL's lobbying efforts to acquire the Right of First Refusal ("ROFR"). FORA's goal was to have TPL purchase the Property and use it for a hoarse rescue facility. (See Exh. D, Furman deposition, Vol. I, pg. 11, ln. 23 – pg. 12, ln. 20).

7.      On or about October 11, 2002, Kunelius entered into a Purchase and Sale Agreement ("P&S") with Cohousing Resources, LLC ("Cohousing") (a business which develops real estate) for the sale of land and buildings known as and located at 142 and 144 Red Acres Road, Stow, Massachusetts ("the Property"). (See ¶ 6 of the Complaint; see also Exh. E, Affidavit of Kunelius, pg. 1, ¶2).

8.      TPL and MacDonnell knew that the property represented all of the Plaintiffs' assets. (See Exh. F, TPL-KUN01167; see also Exh. C, MacDonnell deposition, pg. 195, ln. 20 – p. 196, ln. 2).

9.      The purchase price for the Property in the P&S was $1,116,900.00 plus other valuable considerations. (See ¶ 7 of the Complaint; see also Exh. 1 to the Complaint, the P&S).

10.      The Property consists of uplands, wooden wetlands, a scenic pond, a vernal pool, two houses, a barn, a paddock and a pasture, and 42 acres that are designated as agricultural/horticultural and under M.G.L. c. 61 and therefore was taxed at a lower rate than land which was not so designated.  (See ¶ 8 of the Complaint; see also Exh. 1 to the Complaint, the P&S; see also Exh. E, Affidavit of Kunelius, pg. 1,¶1; see also Exh. G, Kunelius deposition, Vol. I, pg. 6, ln. 14 – pg. 7, ln. 6; pg. 10, ln. 4 – ln. 7 and pg. 10, ln. 12 – ln. 14; see also Exh. H, Affidavit of Kachajian, pg. 1,¶1; see also Exh. I, Kachajian deposition, pg. 49, ln. 21 – ln. 24).

11.      Under the terms of the P&S, Cohousing notified Stow that Cohousing intended to build a 30 house subdivision using the Anti-Snob Zoning law M.G.L. c. 40B, which enables developers to avoid local zoning by building 25% of a development as "affordable housing" if the community's affordable housing stock is below 10% of the town's housing.  (See Exh. 1 to the Complaint, the P&S; see also ¶ 9 of the Complaint).

12.      The Property was recorded under Chapter 61.  Chapter 61 grants a statutory FORF whereby Stow if it elected to do so could preserve the agricultural/ horticultural zoning designation and the preservation of the property as open space by purchasing the Property at the purchase price of the P&S.  This ROFR strips the buyer of the P&S but ensures that Kunelius receives the full purchase price. (See ¶ 9 of the Complaint; see also M.G.L. c. 61).

13.     TPL knew that c. 40B would eliminate or limit the need for any variances or special permits for the development of the Property.   (See Exh. A, TPL 30(b)(6) deposition (Stookey), pg. 61, ln. 13- ln. 14).

14.     Stow immediately sought to avoid the 40B subdivision by Cohousing and exercised the ROFR by relying on M.G.L. c. 61, section 8.  The purpose of the RFOR is to allow Stow to step into the position of the buyer Cohousing.  In so doing, Stow must meet Cohousing's *bona fide* offer for the land.  The ROFR requires Stow to purchase the land substantially on the same business terms and conditions as Cohousing.  (See ¶ 10 of the Complaint; see also Chapter 61).

15.     Prior to the Assignment of the ROFR, Stow was concerned that it would be sued by the Plaintiff and as result the Board sought indemnification from TPL for such lawsuit.  (See Exh. J, TPL-KUN02586; see also Exh. K, Perry deposition, pg. 113, ln.8 – ln. 14)

16.     Stow assigned its ROFR by letter dated February 12, 2003.  (See ¶11 of the Complaint; see also Exh. 2 to the Complaint).

17.     Under the provisions M.G.L. c. 61 section 14, Stow, assigned its first refusal option to a nonprofit conservation, organization known as TPL.  (See ¶ 12 of the Complaint; see also Exh. 3 to the Complaint).

18.     Exhibit 4 to the Complaint is the exercise of the ROFR by TPL, whereby TPL Regional Counsel Dorothy Nelson Stookey not only acknowledged TPL's acceptance of the assignment but also "elects to exercise the ROFR under M.G.L. c. 61 section 8 that was assigned to TPL by the town of Stow and assume the position of buyer

4

under the above-referenced agreement." (See ¶13 of the Complaint; see also Exh. 4 to the Complaint).

19.     On February 10, 2003, Stow was advised by its Town Counsel that the language of Chapter 61 did not absolve Stow from any liability to the seller for the failure of TPL to purchase the land and for other claims that had been raised by the Plaintiff. In addition, town counsel informed Stow that because of that exposure Stow needed indemnification from TPL. Specifically because of TPL's intention to deprive the seller of the tax benefits of the P&S. Town counsel also advised Stow of the possibility of damages being assessed against it for its involvement in the assignment and that lawsuit was very likely because of his understanding of TPL's objectives. (See Exh. L, KUN428-429, Stow's Town Counsel's February 10, 2003 letter).

20.     TPL, on February 13, 2003, notified Kunelius of TPL's assumption of Stow's exercise of the ROFR. (See ¶ 22 of the Complaint; see also Exh. 4 to the Complaint).

21.     Prior to TPL's assumption of the ROFR, Kunelius had a telephone conversation with MacDonnell. During that conversation, Kunelius informed MacDonnell that the Property was her sole asset, she was a single woman supporting herself and the sole care giver of her 91 year old father, and the sale of the Property under the terms of the P&S was critical to her financial wellbeing and financial stability. Kunelius informed MacDonnell that she was relying on his representations that TPL would acquire the Property under the terms of the P&S. MacDonnell acknowledged to Kunelius and her attorney that the acquisition of the Property by TPL was a certainty. (See ¶ 15 of the Complaint; see also Exh. M, Kunelius deposition, Vol. II, pg. 90, ln. 13 –

ln. 14; pg. 54, ln. 21 – pg. 55, ln.  1 and pg. 44, ln. 21 – pg. 45, ln. 21; <u>see</u> <u>also</u> Exh. E,

Affidavit of Kunelius, pg. 3, ¶4; <u>see</u> <u>also</u> Exh. H, Affidavit of Kachajian, pg. 3, ¶4).

22.    MacDonnell does not deny that he told Mrs. Kunelius that the sale to TPL

was a certainly, rather, he asserts that he does not recall using the word "certainty."  (<u>See</u>

Exh. C, MacDonnell deposition, pg. 88, ln. 19 – ln. 23).

23.    MacDonnell is trained as a lawyer and is a current member of the

Massachusetts bar.  (<u>See</u> Exh. C, MacDonnell deposition, pg. 10, ln. 1- ln. 24).

24.    TPL, in correspondence with Stow, referred to a partnership with Stow.

(<u>See</u> Exh. C, MacDonnell deposition, designed as TPL 30(b)(6) deposition, pg. 241, ln.

14 – pg. 242, ln. 18).

25.    Stow agreed to contribute $400,000 of the purchase price in the P&S. (<u>See</u>

¶ 16 of the Complaint; <u>see</u> <u>also</u> Exh. K, Perry deposition, pg. 85, ln. 2 – ln. 9).

26.    TPL asserted it was successful in achieving its goal of preventing the 40B

development.  (<u>See</u> ¶ Exh. C, MacDonnell deposition, pg. 183, ln. 18 – pg. 184, ln. 1).

27.    Stow was aware before the Assignment of its ROFR, that TPL intended to

change the terms of the P&S, including the developing the Property differently than

anticipated in the P&S.  (<u>See</u> ¶ 18 of the Complaint; <u>see</u> <u>also</u> Exh. H, Affidavit of

Kachajian, pg. 3, ¶7; <u>see</u> <u>also</u> Exh. K, Perry deposition, pg. 116, ln. 13 – pg. 117, ln. 24;

<u>see</u> <u>also</u> Exh. A, TPL 30(b)(6) deposition (Stookey), pg. 46, ln. 6- ln. 14).

28.    On January 30, 2003, TPL and MacDonnell authored a Trust for Public

Land Fact Sheet which included a heading entitled "Risk Assessment for Litigation,"

should TPL exercised the ROFR.  That Risk Assessment states:

> "The landowner is upset that the town has assigned the RFOR to
> TPL. She sees the deal as essential of the retirement and wary
> of TPL's ability to complete the project.   On the phone in

```
        January, she said that she would 'sue the town and others if
        anyone defaults and I loose my buyer [Cohousing].' ..."
```

(See Exh. N, TPL-KUN00377)

29.    On March 19, 2003, approximately on month of the exercise of the ROFR, MacDonnell and TPL realized that their assumptions for the acquisition for the Property from the Plaintiff were "unworkable." (See Exh. O, TPL-KUN03075).

30.    TPL, prior the Assignment, informed numerous people, including the assembled citizens at the Town meeting that, TPL had never failed to go forward with the acquisition of the property after the exercise of ROFR.    (See Exh. A, TPL 30(b)(6) deposition (Stookey), pg. 55, ln 10 – ln. 12; see also Exh. C, MacDonnell deposition, pg. 73, ln. 21 – ln. 24; see also Exh. P, Sommerlad deposition, pg. 27, ln. 7 – ln. 20, and pg. 53, ln. 10 – ln. 23).

31.    TPL had no policy, official or unofficial, which would have prevented TPL from developing in accordance with terms of P&S, including the 40B development. (See Exh. A, TPL (30(b)(6) deposition (Stookey), pg 58, ln. 9 –  ln.14).

32.    Stow was aware that TPL, after exercising its ROFR, attempted to renegotiate the terms of the P&S and the purchase price with Kunelius.  (See ¶ 19 of the Complaint; see also Exh. M, Kunelius deposition, Vol. II, pg. 67, ln. 20 – pg. 68, ln. 2; see also Exh. K, Perry deposition, pg. 202, ln. 4 – ln. 9 and pg. 102, ln. 18 – ln. 20; see also Exh. I, Kachajian deposition, pg. 104, ln. 10 – ln. 21; see also Exh. D, Furman deposition, Vol. I, pg. 143, ln. 4 – ln. 20; Exh. Q, Furman deposition, Vol. II, pg. 14, ln. 12 – ln. 21; see also Exh. P, Sommerlad deposition, pg. 95, ln. 20 – pg. 96, ln. 10 and pg. 98, ln. 14 – pg. 99, ln. 5; see also Exh. E, Affidavit of Kunelius, pg. 3, ¶5; see also Exh. H, Affidavit of Kachajian, pg. 4, ¶8).

33.     TPL attempted to change the terms of the P&S and re-negotiate the purchase price.  (See ¶ 20 of the Complaint; see also Exh. E, Affidavit of Kunelius, pg. 3, ¶4; see also Exh. C, MacDonnell deposition, pg. 55, ln. 14 – 19, pg. 199, ln. 12-20 and pg. 200, ln. 21 – 24; see also Exh. I, Kachajian deposition, pg. 152, ln. 23 – pg. 153, ln. 6 and pg. 156, ln. 5 – ln. 15; see also Exh. G, Kunelius deposition, Vol. II, pg. 110, ln. 19 – pg. 111, ln. 2 and pg. 67, ln. 20 – pg. 68, ln. 2; see also Exh. 5 to the Complaint).

34.     The original purchaser, Cohousing, intended to purchase the 8.57 acres. TPL, after the Assignment, demanded that Mrs. Kunelius sell the entire parcel of 50 acres to TPL.  (See Exh. A, MacDonnell deposition, subsequently designated as TPL 30(b)(6) deposition, pg. 186, ln. 13- pg. 187, ln. 4).

35.     TPL was aware that it would need (1) variance for frontage, (2) a special permit for changing the Property line; and (3) special permit for the care taker's house. (See Exh. R, TPL-KUN01231).

36.     MacDonnell's notes indicate that on January 21, 2003, the Plaintiff contacted him and explained to him that:

> "her primary concern was to make sure that she would not loose the buyer [Cohousing].  I [MacDonnell] tried to assure that TPL will follow the contract to the greater extent legally required.  But she fears that we back off that Mossaic would have left town."

(See Exh. S, TPL-KUN02771).

37.     On January 29, 2003, TPL undertook a detailed zoning analysis and identified the possible need for special permits, variances for non-conforming structures and uses, variances required for frontage.  (See Exh. T, TPL-KUN01943).

38.     On January 29, 2003, TPL was aware that its proposed use for the Property involved special permits and variances (1) insufficient frontage, (2) insufficient

8

area in the residential frontage, and (3) non conforming use of take care cottage, alteration of pre-existing non-conforming use.  (See Exh. U, TPL-KUN2036-37).

39.     On January 29, 2003, two weeks before TPL exercised the ROFR, it had reason to believe that it could not obtain the variances and permits that it wanted.  (See Exh. V, TPL-KUN02494).

40.     On February 4, 2003, MacDonnell was aware of the extensive difficulties in obtaining variances and permits.  (See Exh. W, TPL-KUN02499).

41.     On February 4, 2003, MacDonnell had reason to believe that TPL could not obtain variance because TPL could identify no "hardship" that would allow TPL to qualify for variance from the zoning requirements, since the hardship of which TPL would have to rely, was self-imposed by TPL.  (See Exh. X, TPL-KUN02510).

42.     On February 6, 2003, MacDonnell received confirmation that obtaining variances and permits was unlikely and that the variance standard was very demanding and further that only 5% of the decision granting variances are upheld in court when challenged.  (See Exh. Y, TPL-KUN02536).

43.     On February 6, 2003, MacDonnell was informed that the Planning Board could not endorse TPL's plans if it increased the degree of non-conformity of pre-existing non-conforming lot.  (See Exh. Z, TPL-KUN02543)

44.     MacDonnell's notes concerning a telephone call with the Plaintiff indicate that the Plaintiff's concerns were her retirement, that she needed the money because her financial life was on the line, and that she feared that she would loose the buyer.  (See Exh. AA, TPL-KUN01260).

45.     TPL knew as of January 30, 2003 that it would not accept the 8.5 acres but rather it would require the full 50 acres.  (See Exh. BB, TPL-KUN01124).

46.     On January 30, 2003, TPL knew that it was likely that it may have to rely on the Liquidated Damage Clause to get out of the P&S.  (See Exh. BB, TPL-KUN01128; see also  Exh. CC, TPL-KUN01149).

47.     TPL was fully aware that the $1,116,900 was for approximately 8.57 acres only and the remaining $42^+$ were not included in the P&S.  (See Exh. DD, TPL-KUN01317, Letter of TPL's Appraiser to TPL; see also Exh. EE, TPL-KUN02476).

48.     On March 10, 2003, TPL had not yet applied for variance that it knew it needed.  (See Exh. FF, TPL-KUN02895).

49.     On March 20, 2003, shortly after the acceptance of the Assignment, TPL had need to negotiate the present value with the seller, in effect, changing the purchase price.  (See Exh. GG, TPL KUN2646).

50.     On March 27, 2003, MacDonnell was personally involved in establishing financing parameters which were transmitted to Commonwealth of Massachusetts whereby MacDonnell drafted a statement to the Commonwealth of Massachusetts in an effort to obtain DHCD funds.  That statement described four fundraising sources which TPL intended to pursue.  Those sources were Stow's funds, the sale of a portion of the Plaintiff's Property (after it was acquired by TPL), DHCD's fund and private fundraising. (See Exh. HH, TPL-KUN03201).  MacDonnell and TPL further stated that as a fall back plan TPL intended to use utilized capital from the private market including a "Line of Credit from Wainwright Bank in the amount of $6 million as evidence by the attached letter."  (See Exh. HH, TPL-KUN03203).

51.     On March 31, 2003, the same language, described in paragraph 50 above, was used for the application for DHCD's funds.  (See Exh. II, KUN0343, Application to DHCD).

52.     Exhibit II was forwarded to the Commonwealth as evidence of $6 million dollars of available funds to purchase the Plaintiff's Property if one or all of the other sources of funds failed.

53.     TPL repeatedly stated that it never withdraws from the deal.  (See Exh. D, Furman deposition, Vol. I, pg. 112, ln.17 – ln. 22).

54.     TPL and Stow executed a letter dated April 15, 2003 which purported to be a request to TPL to become involved in consulting and assisting Stow and its efforts to acquire the Kunelius' Property, even though Stow had already assigned ROFR had already assigned it to TPL and TPL had already exercised the ROFR.  (See Exh. JJ, TPL-KUN03428).

55.     MacDonnell and TPL were aware that the Wainwright Bank $6 million line of credit had been fully disbursed except for $5,000 and was not available for the purchase of the Plaintiff's Property at the time TPL made the representation to DCHD. (See Exh. KK, TPL 30(b)(6) deposition (Stookey), Vol. II, pg. 19, ln. 5 – ln. 20).

56.     TPL repeatedly sought releases from the Plaintiff.  (See Exh. LL, TPL-KUN01803).

57.     TPL was aware that it did know whether it would be able to meet the requirements of the P&S when it decided to seek variances and permits that were not anticipated by the P&S. (See Exh. W, TPL-KUN02499).

58.    TPL, including its legal department, intended to subdivide the Property in a way that were not anticipated by the P&S and discussed such changes internally.  (See Exh. MM, TPL-KUN03486).

59.    TPL was aware that it might not be able to obtain the variance and approvals that it was seeking.  (See Exh. NN, TPL-KUN03524).

60.    TPL and MacDonnell contacted FORA and informed them that even if TPL could get the variance and Stow continues to want to invest [$400,000] in the project, TPL had concluded that TPL cannot go forward with the P&S unless the Plaintiff lowers the purchase price.  (See Exh. OO, TPL-KUN03668).

61.    On June 17, 2003, MacDonnell and TPL had been advised that the Zoning Board of Appeals would reject TPL's plan and that TPL would no have any approvals by the closing date with Mrs. Kunelius. (See Exh. PP, TPL-KUN03633).

62.    On July 10, 2003, Jacob C. Diemert, Esq., Stow's Town Counsel, wrote to MacDonnell and TPL to inform him that any variance sought by TPL would require that it be based on the law and further informed MacDonnell and TPL that the Property could involve a construction of a condo or a chapter 40B application "the first of which need not involve the Board of Appeals at all, and the second of which does not present the legal hurdles of meeting the criteria for variance." (See Exh. QQ, TPL-KUN01825).

63.    TPL continued on July 22, 2003 to require the Plaintiff to lower her purchase price.  (See Exh. RR, TPL-KUN03684).

64.    On August 2, 2003, TPL contact the Plaintiff's counsel and broker and stated that TPL would not purchase the Property unless the Plaintiff lowered her purchase price by $300,000.  (See Exh. SS, TPL-KUN03689).

65.     On August 5, 2003, TPL and MacDonnell again attempted to cause the Plaintiff to lower the purchase price and believed that the Plaintiff might be cooperative, but only if TPL had a credible plan to fund the acquisition of the Property. (See Exh. TT, TPL-KUN03692).

66.     August 19, 2003, FORA complained to MacDonnell and TPL that:

> "FORA does not agree with your assertions that "funding does not exist." I would like to explain to you why TPL's best option is to take on financing; finally **begin fundraising; and see this project through to a successful completion.**"

(emphasis supplied)(See Exh. UU, TPL-KUN01681-82).

67.     Upon default of TPL, Stow made no effort to force TPL to comply with the P&S.  (See Exh. K, Perry deposition, pg. 141, ln. 8 – 142, ln. 7).

68.     After Stow and TPL failed to purchase the Property, a member of the Board of Selectmen became concerned about Stow's involvement in the Partnership.  A Memorandum entitled "Kunelius Property Workout" ("Board of Selectmen Memorandum") which was written by Greg Jones, a member of the Board of Selectmen, was submitted to the Board of Selectmen for consideration at a regularly scheduled meeting of the Board of Selectmen on November 25, 2003.

> "The lawyer for Marilyn Kunelius has threatened a suit to enforce the contract that called for a $750,000 closing September 26th.  The town does not want to find out if it has any legal liability. Yes, we ceded our right of first refusal to TPL and TPL certainly has the assets to make good on the transaction.  But they have reneged, and the contract has been breached.  The seller has certainly been harmed by our actions and TPL's inaction.  Should a suit against TPL be initiated, it is likely that town would become involved.  At a minimum the town had committed to contribute $400,000 to the deal, and the actions of many could be interpreted as implying the town was a partner in the deal."

(See Exh. 6 of the Complaint).

69.     Stow appropriated $400,000 through its Community Preservation Committee as Stow's share of the purchase price. (See ¶ 30 of the Complaint, see also Exh. K, Perry deposition, pg. 85, ln. 7 -9; see also Exh. 6 to the Complaint, Kunelius Property Workout).

70.     On July 6, 2004, MacDonnell contacted Kunelius' counsel by letter and for the second time attempted to renegotiate the purchase price by $400,000.   (See Exhibit 11 to the Complaint; see also ¶ 36 of the Complaint).

71.     Kunelius refused to lower the purchase price.  (See ¶ 37 of the Complaint; see also Exh. E, Affidavit of Kunelius, pg. 3, ¶4).

72.     On September 9, 2003, MacDonnell sent another letter to Kunelius' counsel again trying to cause Kunelius to accept less than the purchase price.  (See Exh. 12 to the Complaint; see also Exh. G, Kunelius deposition; see also Exh. C, MacDonnell deposition, pg. 137, ln. 5 – ln. 10, see also Exh. E, Affidavit Kunelius, pg. 5, ¶9; see also Exh. H, Affidavit of Kachajian, pg. 4, ¶10).

73.     MacDonnell was aware of Kunelius' concerns about project uncertainties. (See Exh. 12 to the Complaint) states:

> "We are aware that these project uncertainties are of concern to you and your client and that Mrs. Kunelius would like to know as soon as possible whether TPL will be able to go forward.  To that end, we need to discuss this revised proposal with you as soon as possible and in now case later than the end of this week."

(See ¶ 38 of the Complaint).

74.     In the Spring of 2004, MacDonnell met with Kunelius, Kunelius' counsel and Jim Boothroyd, a local real estate broker, and David Norris, Mrs. Kunelius' husband, and others in connection with TPL's demands for a lower purchase price.  During that meeting MacDonnell threatened and intimidated Kunelius and her counsel by stating

generally that TPL (1) **would bury the Plaintiff and her counsel** (See Exh. G, Kunelius deposition, Vol. II, pg. 91, ln. 14 – ln. 17; see also Exh. E, Affidavit of Kunelius, pg. 5, ¶9, see also Exh. I, Kachajian deposition, pg. 158, ln. 20 - pg. 159, ln. 24; see also Exh. H, Affidavit of Kachajian, pg. 4, ¶9; see also Exh. VV, Norris deposition, pg. 24, ln. 4 – ln. 10; see also Exh. WW, Affidavit of Norris, pg. 1, ¶2); (ii) would drag the litigation for a long time (See Exh. XX, Boothroyd deposition, pg. 122, ln. 18 to pg. 123, ln. 1; see also Exh. YY, Affidavit of Boothrody, pg. 2, ¶4); (iii) had a large law firm at its disposal (See Exh. Exh. VV, Norris deposition, pg. 24, ln. 4 – ln. 10; see also Exh. WW, Affidavit of Norris, pg. 1, ¶2); (iv) had friends in high places (See Exh. G, Kunelius deposition, Vol. II, pg. 91, ln. 14 – ln. 17; see also Exh. E, Affidavit of Kunelius, pg. 5, ¶9); (v) had influential friends (See Exh. I, Kachajian deposition pg. 158, ln. 20 - pg. 159, ln. 24; see also Exh. H, Affidavit of Kachajian, pg. 4, ¶9); (vi) TPL was aware that Kunelius was of very limited means (See Exh. XX, Boothroyd deposition, pg. 122, ln. 18 to pg. 123, ln. 1; see also Exh. YY, Affidavit of Boothrody, pg. 2, ¶4); (v) would overwhelm Mrs. Kunelius and her counsel (See Exh. I, Kachajian deposition pg. 158, ln. 20 to pg. 159, ln. 24; see also Exh. H, Affidavit of Kachajian, pg. 4, ¶9).

75.     The July 6, 2004 letter from TPL to Kunelius' counsel indicates TPL's unfair and deceptive business practices by stating that TPL will dishonor the P&S leaving Kunelius with the "liquidated damages" anticipated under the terms of the P&S with Cohousing.  Exhibit 11 specifically threatens to use the liquidated damage provision under the P&S if Kunelius refuses to lower the purchase price or, in the alternative accept, another proposal by MacDonnell and TPL.  (See Exh. ZZ, July 6, 2004 letter from TPL, see also ¶43 of the Complaint).

76.     TPL was aware that the Plaintiff had not reason to have known what TPL's plans were for the Property at the time the Plaintiff signed the P&S.  (<u>See</u> Exh. A, TPL 30(b)(6) deposition (Stookey), pg. 84, ln. 20 – pg. 85, ln. 4).

77.     Stow, TPL and MacDonnell's actions successfully prevented Cohousing's 40(B) Anti-Snob Zoning Development.   (<u>See</u> ¶ 47 of the Complaint; <u>see</u> <u>also</u> Exh. C, MacDonnell deposition, pg. 193, ln. 19 – pg. 194, ln. 1).

78.     Stow informed Kunelius' counsel that any subsequent attempt by Kunelius to sell the property to a developer who intended to use M.G.L. c. 40B would be met with a similar exercise of the ROFR.  (<u>See</u> ¶ 48 of the Complaint; <u>see</u> <u>also</u> Exh. I, Kachajian deposition, pg. 229, ln. 21 – pg. 230, ln. 7; <u>see</u> <u>also</u> Exh. H, Affidavit of Kachajian, pg. 4, ¶11).

79.     The actions of Stow, TPL and MacDonnell resulted in Kunelius being unable to collect the $1,116,900 from Cohousing, Stow or TPL.  (<u>See</u> ¶ 49 of the Complaint; <u>see</u> <u>also</u> Exh. AAA, TPL-KUN01100; <u>see</u> <u>also</u> Exh. BBB, TPL-KUN01255; <u>see</u> <u>also</u> Exh. BB, TPL-KUN01133; <u>see</u> <u>also</u> Exh. E, Affidavit of Kunelius, pg. 5, ¶11).

80.     The Partnership of Stow and TPL's reliance on the Liquidated Damage provision of the P&S was anticipated prior to the Assignment of RFOR.  (<u>See</u> ¶ 51 of the Complaint; <u>see</u> <u>also</u> Exh. A, MacDonnell deposition, pg. 71, ln. 19 – pg. 72, ln. 8).

81.     TPL submitted an application to DHMC indicating:

> "As a fall back plan, **if any or all of the above-referenced sources of funds are unavailable**, TPL intends to utilize capital from the private market.  In this regard, TPL has available for its use a Line of Credit from Wainwright Bank in the amount of $6,000,000, as evidence by the letter attached as Exhibit__.  The use of this capital is subject to TPL's internal approval process, including customary due diligence and approval by the board of directors."

(emphasis added)(<u>See</u> Exh. II, KUN343, the Application to DHCD).

82.     Stow was aware of TPL's application to the DHMC.  (See Exh. II, KUN336, Application to DHCD).

83.     TPL submitted evidence to DHCD that $6 million line of credit was available for the purchase of the Property.  (See Exh. CCC, MacDonnell's April 1, 2003 letter to the DHCD).

84.     At the time that TPL informed the DHCD of the Wainwright $6 million line of credit, TPL was aware that, it in fact, did not have $6 million in line of credit, but rather $5,000 at all times relevant to the Complaint.  (See Exh. DDD, WB0338, TPL 2003 Annual Report; see also Exh. KK, TPL 30(b)(6) deposition (Stookey), Vol. II, pg. 19, ln. 5 – ln. 20).

85.     TPL informed the Plaintiff that TPL had been unsuccessful in fund raising even though TPL had ordered that no fundraising take place.  (See Exh. D, Furman deposition, Vol. I, pg. 152, ln. 3 – ln. 6; see also Exh. EEE, TPL-KUN1621, Furman's letter to Ross Perry; see also Exh. FFF, Furman0087, Peter Christianson's letter to FORA,).

86.     The Property remains listed and available for sale.  (See Exh. WW, Boothroyd deposition, pg. 152, ln. 24 – pg. 153, ln. 5 and pg. 154, ln. 15-17).

87.     Brokers associated with Boothroyd are aware that the Property is available.  (See Exh. WW, Boothroyd deposition, pg. 135, ln. 24 – pg. 136, ln. 3 and pg. 148, ln. 11 – ln. 14).

## COUNT I
## CONTRACT AND SPECIFIC PERFORMANCE

I.      <u>Stow breached the implied covenant of good faith and fair dealing</u>

The Statement of Undisputed Facts contains numerous statements of Stow and other Defendants that are nothing short of admissions that the Defendants unquestionably were in the partnership and further that the Defendants under took a deliberate course of action to mislead the Court and the Plaintiff as to the existence of the true reason why Stow and TPL failed to perform under the P&S between the Plaintiff and Cohousing. The "[P]arties have an obligation of good faith to each other." (See Town of Sudbury v. Scott, 439 Mass. 288, 298, 787 N.E.2d 536 (2003)).

II.    Stow's denial of the Partnership between Stow and TPL is made in bad faith

The Memorandum in Support of this Motion provides indisputable evidence that Stow's denial of its Partnership with TPL is so blatant and concocted that this Court should conclude that they were made in bad faith. This is particularly true because Stow, as a municipality, is empowered with substantial state power. The Memorandum in Support of this Motion contains numerous references to Exhibits, admissions and deposition testimony of a Stow's representative which clearly depicts Partnership in which Stow participated allegedly as a result of the exercise of the ROFR.

III.    Stow is estopped from claiming that the Assignment of the Right of First Refusal relieved it from its liability to the Plaintiff for TPL's failure to purchase the Plaintiff's Property

Generally, a contracting party cannot, by assignment of the contract, relieve himself or herself of his or her obligations under the contract. Accordingly, unless permitted by the provisions of the contract, unless other contracting party has consented to release the assignor, or unless there is a novation of the contract, a delegation of duties or obligations does not relieve the assignor from liability under the contract without the

consent of obligee.[1]  Rather, after assignment the assignee becomes primarily liable for

the obligations under the contract, while the assignor remains secondarily liable[2] as a

guarantor[3], and the debtor may then sue the assignor, the assignee, or both."  Stow is

estopped from playing fast and loose with the facts in order to avoid the liability resulting

from their behavior.

Stow, as a result of its participation in the Partnership and its joint fraudulent

efforts with TPL, is liable to Ms. Kunelius and that liability cannot be avoided simply by

assigning the RFOR to TPL.  Stow, prior to the Assignment to TPL, had been specifically

warned by its Town Counsel that the Assignment would not relief Stow from its

obligation to Ms. Kunelius.

> "Since the language of c. 61 does not absolve the Town of any
> further liability to the landowner for failure of the assignee to
> carry out the obligations to purchase the land under the
> assignment, or for any other claims as may be made by the
> landowner (such as exist in the present circumstances and are
> discussed below), appropriate terms and conditions for the
> assignment would include an indemnification agreement by the
> assignee (TPL) to the assignor (the Town)from any such claims as
> might be made by the assignee (TPL).  I highly recommend such an
> indemnity clause be required for acceptance of the assignment of
> TPL in the present circumstances.  These circumstances include
> two potential sources of litigation and possible damage claims by
> the Seller (Kunelius) who provided the c. 61 Notice to the Town
> in the present matter. … While we may disagree with the Seller's
> contentions, made through Seller's counsel (the only party
> actually to opine on the issue of the c. 61 Notice give to the
> Town being TPL as the Special Town Meeting), the contentions
> contain the elements of causes of action that could result in a
> legal action, involving not only the possibility of damages being
> assessed, but the costs of defending any such action, which can
> be substantial whether the Town wins or loses.  Moreover, unless
> agreement can be reached both with TPL and the Seller prior to

---

[1] See Vetter v. Security Continental Ins. Co., 567 N.W.2d 516 (Minn. 1997).
[2] See K & K Recycling, Inc. v. Alaska Gold Co., 80 P.3d 702 (Alaska 2003); see also Valey Nat. Bank of Ariz. V. Byrne, 101 Ariz. 363, 419 P.2d 720 (1966)).
[3] See Waverly Productions, Inc. v. RKO General, Inc., 217 Cal.App. 2d 721, 32 Cal. Rprt. 73 (2d Dist. 1963); see also Roget v. Grand Pontiac, Inc., 5 P.3d 341 (Colo. Ct. App. 1999), opinion modified on denial of reh'g, (Jan. 6, 2000); see also Soreline Communications, Inc. v. Norwich Taxi, LLC, 70 Conn. App. 60, 797 A.2d 1165 (2002); see also  Homa v. Friendly Mobile Manor, Inc., 93 Md. App. 337, 612 A.2d 322 (1992); see also S O Designs USA, Inc. v. Rollerblade, Inc., 620 N.W.2d 48 (Minn. Ct. App. 2000); see also Fusco v. City of Union City, 261 N.J. Super. 332, 618 A.2d 914 (App. Div. 1993).

> making the assignment over the Seller's claims, the assertion of
> one or more of these claims by a lawsuit is, in my judgment,
> highly likely given the various communications with counsel for
> the Seller. …"

(See Exh. L, Town Counsel letter).  In addition, the fact that Stow participated in the

Partnership and that Stow had agreed with TPL to contribute $300,000 to $400,000 if the

Property was purchase, demonstrates that Stow remained active as a joint venturer in

order to acquire a portion of Ms. Kunelius' Property.  Stow also was fully aware that it

was entering into a highly dangerous course of action when it and its partner TPL were

damaging Ms. Kunelius.

> "The lawyer for Marilyn Kunelius has threatened a suit to enforce
> the contract that called for a $750,000 closing September 26th.
> The town does not want to find out if it has any legal liability.
> Yes, we ceded our right of first refusal to TPL and TPL certainly
> has the assets to make good on the transaction.  **But they have
> reneged, and the contract has been breached.  The seller has
> certainly been harmed by our actions and TPL's inaction.  Should
> a suit against TPL be initiated, it is likely that town would
> become involved.  At a minimum the town had committed to
> contribute $400,000 to the deal, and the actions of many could be
> interpreted as implying the town was a <u>partner</u> in the deal**. …"

(See Exh. 6. to the Complaint).  The above quote is from then member of the Board of

Selectmen.  Thus, there can be no genuine issue of fact as to whether or not Stow had an

active role in the potential acquisition of Ms. Kunelius' Property.  As such, Specific

Performance may be obtained from Stow directly.  Indeed, a buyer who participates in a

fraudulent activity may be required to purchase the property under the theory of Specific

Performance.  (See Cellucci v. Sun Oil Co., 2 Mass. App. Ct. 722, S.C. 368 Mass. 811).

**A. Stow cannot rely on the Liquidated Damage Clause**

**I.  Mrs. Kunelius could have never anticipated TPL's behavior when she
     agreed to Liquidated Damage Clause**

The Memorandum in Support of this Motion contains numerous references to the

deposition testimony of TPL, MacDonnell and Stow which clearly depicts TPL's

attempts to unilaterally change the P&S and Stow's knowledge of same. The unilateral changes to the P&S by TPL were certainly not anticipated by Mrs. Kunelius and the original buyer when they signed the P&S.

In the case of Kelly v. Marks, 428 Mass. 877 (1999), the SJC stated that:

> "[I]n determining the enforceability of liquidated damage clause, [a judge] should examine only the circumstances in contract formation. Our position is that "[w]here actual damages are difficult to ascertain and **where the sum agreed upon by the parties at the time of execution of the contract represents a reasonable estimate of the actual damages, such contract will be enforceable**. … This approach most accurately matches the expectations of the parties, who negotiated the liquidated damage amount that was fair to each side based on their unique concerns and circumstances surrounding the agreement and their individual estimate of damages in event of a breach." Id. at 880. [emphasis added].

**B.  Stow remains liable since it assigned the RFOR and Stow was aware of Ms. Kunelius' unique concerns and circumstances prior to Assigning the ROFR**

Not only did TPL understand Mrs. Kunelius' fears, so also did Stow have a complete understanding of the significance of interfering with Mrs. Kunelius' P&S. As it is discussed in detail in the Memorandum in Support of the Plaintiff's Motion for Summary Judgment, Stow had an extraordinary relationship with TPL. However, the simple fact that Stow was aware of why Mrs. Kunelius signed the P&S with Cohousing, renders Stow reliance on Liquidated Damage Clause as frivolous as TPL's. (See Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471--473 (1991) (every contract in Massachusetts is subject to an implied covenant of good faith and fair dealing)).

**C.    Promissory Estoppel**

Stow was aware of TPL's promises to Mrs. Kunelius and related promises to the DHCD and the citizens of Stow as well as of its own promises made to the DHCD, which

assured DHCD that TPL would purchase the Property.  As a result, Promissory Estoppel

applies to Stow and each of defenses raised to the Contract/Specific Enforcement Count.

> "Promissory estoppel does not create promise where none existed
> before; rather, it prevents defendant from denying enforcement of
> obligations which would otherwise be barred at law."

(See Computer Systems of America, Inc. v. International Business Machines Corp., 578

F.Supp. 558).

> "Theory of "promissory estoppel" permits recovery if (1) a
> promisor makes a promise which he should reasonably expect to
> induce action or forbearance of a definite and substantial
> character on part of the promisee, (2) the promise does induce
> such action or forbearance, and (3) injustice can be avoided only
> enforcement of the promise."

(See Loranger Const. Corp. v. E.F. Hauserman Co., 384 N.E.2d 176, 376 Mass. 757).

### COUNT VI
### 42 U.S.C. §1983, §1988

This case involves Stow's interference with and impairment of the Plaintiff's

contract rights, where the violations resulting from Stow's use of M.G.L. c. 61 give rise

to violations of the U.S. Constitution and 42 U.S.C. §§ 1983 and 1988.  42 U.S.C. §1983,

§1988, require that in order to recover, the violation alleged must involve "state action".

It is clear that Stow, a municipality, used its official power to interfere with and prevent

the sale of the Plaintiff's property.  (See Cohen v. Cowles Media Co., 111 S.Ct. 2513,

2517-18 (1991); see also Edmonson v. Lesville Concrete Company, 111 S.Ct. 2077

(1991)).

### PRAYERS FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court enter Judgment as follows:

1.     That this Court order Stow to specifically perform under the terms of the P&S

and to immediately pay $116,900 (the purchase price) plus interest accrued from

September 26, 2003 (the scheduled closing date);

2.      That this Court find that TPL violated 42 U.S.C. §1983, §1988 and award

under 42 U.S.C. the §1988Plaintiff her attorney's fees; and

3.      Award the Plaintiff with costs and expenses as this Court deem appropriate.

Respectfully submitted,

Marilyn Kunelius,

By her Attorney,


Dated: October 17, 2007      By:      */s/ Michael C. McLaughlin, Esq.*
                                     Michael C. McLaughlin BBO# 337350
                                     Law Offices of Michael C. McLaughlin
                                     One Beacon Street, 33rd Floor
                                     Boston, MA 02108
                                     (617) 227-2275
                                     michaelcmclaughlin@speakeasy.net


## CERTIFICATION UNDER LOCAL RULES 7.1

I, Michael C. McLaughlin, certify that I have conferred with opposing counsel and have attempted in good faith to resolve and narrow the issue.

Dated: October 17, 2007          */s/ Michael C. McLaughlin, Esq.*
                                Michael C. McLaughlin BBO# 337350
                                Law Offices of Michael C. McLaughlin
                                One Beacon Street, 33rd Floor
                                Boston, MA 02108
                                617-227-2275
                                michaelcmclaughlin@speakeasy.net

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on October 17, 2007.

*/s/ Michael C. McLaughlin, Esq.*
Michael C. McLaughlin BBO# 337350
Law Offices of Michael C. McLaughlin
One Beacon Street, 33rd Floor
Boston, MA 02108
617-227-2275
michaelcmclaughlin@speakeasy.net