UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No.: 05-11697GAO

MARILYN KUNELIUS

    Plaintiff,

    v.

TOWN OF STOW, separately, A
PARTNERSHIP OF UNKNOWN NAME
BETWEEN TOWN OF STOW and the TRUST
FOR PUBLIC LAND, THE TRUST FOR
PUBLIC LAND separately and CRAIG A.
MACDONNELL, in his individual capacity

    Defendants

## <u>AFFIDAVIT OF DEBORAH I. ECKER</u>

I, Deborah I. Ecker, hereby depose and state as follows:

1.    I am the attorney of record for the defendant Town of Stow in the captioned action.

2.    Attachment 1 is a copy of the Complaint in this action.

3.    Attachment 2 is a true and accurate copy of a letter dated October 16, 2002.

4.    Attachment 3 hereto is a true and accurate copy of page excerpts from the Deposition of Craig McDonnell in this action.

5.    Attachment 4 hereto is a true and accurate copy of page excerpts from the Deposition of Edward Perry in this action.

6.    Attachment 5 hereto is a true and accurate copy of page excerpts from the Deposition of Gregory Jones in this action.

7.    Attachment 6 hereto is a true and accurate copy of a question and answer form produced in this action.

8.    Attachment 7 hereto is a true and accurate copy of page excerpts from the Deposition of Peter Kachajian in this action.

9.    Attachment 8 hereto is a true an accurate copy of page excerpts from the Deposition of James Boothroyd in this action.

SIGNED under the pains and penalties of perjury, this 17th day of October, 2007.

/s/ Deborah I. Ecker
Deborah I. Ecker

# Attachment 1



RECEIVED
AUG 2 5 2005
TOWN CLERK
STOW, MA

UNITED STATES DISTRICT COURT
(DISTRICT OF MASSACHUSETTS)

CIVIL ACTION NO.

MARILYN KUNELIUS,                          )
        PLAINTIFF                     )
                                )
V.                                         )
                                )
TOWN OF STOW separately, A                 )
PARTNERSHIP OF UNKNOWN NAME                )
BETWEEN TOWN OF STOW and THE               )
TRUST FOR PUBLIC LAND, THE                 )
TRUST FOR PUBLIC LAND separately           )
and CRAIG A. MACDONNELL, in his            )
individual capacity,                       )
        DEFENDANTS.                    )

## **COMPLAINT**

### **JURISDICTION AND VENUE**

1.    This Court has subject matter jurisdiction over this action under 28 U.S.C.

       §1331, because the matter in controversy arises under the Constitution and

       laws of the United States.

2.    This Court has subject matter jurisdiction over this action under 28 U.S.C.

       §1332 (2) because the Plaintiff is a citizen of the State of Main and the

       Defendants are citizens of the Commonwealth of Massachusetts or a foreign

       state.

2005 AU 26 AM 8: 50
RECEIVED
US1/BOS

1

3. Venue is proper in this District because all of the Defendants are located in this District. In addition, all of the events and conduct give rise to the violations of the law complained of herein occurred and continue to occur in this District.

4. This Court has jurisdiction as provided for in §5 of the Fourteenth Amendment. §5 specifically provides that Congress shall have the power to enforce, by appropriate legislation, the provisions of the Fourteenth Amendment. This Court also has jurisdiction under 42 U.S.C. §§1981, 1983, 1985, 1986, and 1988.

5. This Court has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

## **FACTS**

6. The plaintiff Marilyn Kunelius ("Kunelius") is a former resident of the town of Stow, Massachusetts and currently has a principle place of residence at 635 Stow Road, Stow, Maine.

7. The defendant, the town of Stow, Massachusetts ("Stow") is a Massachusetts Municipal Corporation having a mailing address of Town Building, 380 Great Road, Stow, Massachusetts 01775-2127.

8. Upon information and belief, the defendant, the partnership of the town of Stow and the Trust for Public Land ("the Partnership") is a Massachusetts partnership formed by Stow and the Trust for Public Land for the alleged purpose of acquiring property owned by Kunelius and developing the property for business purposes.

RECEIVED
USI/BOS
2007 AU 26 AM 8 50

9.  The defendant, the Trust for Public Land ("TPL") is a foreign corporation organized under the laws of the State of California with a principle office in Massachusetts at 33 Union Street, Boston, Massachusetts.

10. The defendant, Craig A. MacDonnell ("MacDonnell") is an individual who is also a "director" of the Massachusetts Division of TPL and upon information and belief resides in Concord, Massachusetts.

11. On or about October 11, 2002, Kunelius entered into a Purchase and Sale Agreement ("P&S") with Cohousing Resources, LLC ("Cohousing") (a business which develops land) for the sale of land and buildings known as and located at 142 and 144 Red Acres Road, Stow, Massachusetts ("the Property"). See Exhibit 1. The Property represents essentially all of Kunelius' assets.

12. The purchase price for the Property was $1,116,900.00.

13. The Property consists of uplands, wooden wetlands, a scenic pond, a vernal pool, two houses, a barn, a paddock and a pasture, and 42 acres that are designated as agricultural/horticultural and under M.G.L. c. 61 and therefore was taxed at a lower rate than land which was not so designated.

14. Under the terms of the P&S, Cohousing notified Stow that Cohousing intended to build a 30 house subdivision using the Anti-Snob Zoning law M.G.L. c. 40B, which enables developers to avoid local zoning by building 25% of a development as "affordable housing" if the community's affordable housing stock is below 10% of the town's housing. The P&S anticipated that the zoning designation of agricultural/horticultural would be abandoned. This abandoning of the zoning designation results in a statutory right of the first

refusal under M.G.L. c. 61 whereby Stow if it elected to do so could preserve the agricultural/horticultural zoning designation and the preservation of the property as open space by purchasing the Property at the purchase price of the P&S. This right of first refusal strips the buyer of the P&S but ensures that Kunelius receives the full purchase price.

15. ~~Stow was not statutorily mandated to exercise the right of refusal.~~ The right of first refusal is an elective right. Stow immediately sought to avoid the 40B subdivision by Cohousing and exercised the right of first refusal by relying on M.G.L. c. 61 section 8. The purpose of the right of first refusal is to allow Stow to step into the position of the buyer Cohousing. In so doing, Stow must meet Cohousing's bona fide offer for the land. The right of first refusal requires Stow to purchase the land substantially on the same business terms and conditions as Cohousing. ~~See M.G.L. c. 61.~~ _Tru?_

16. Stow exercised its right of first refusal by letter dated February 12, 2003. See Exhibit 2.

17. Under the provisions M.G.L. c. 61 section 14, Stow, assigned its first refusal option to a nonprofit conservation, organization known as TPL.

18. Attached as Exhibit 3 is the February 12, 2003 Assignment and Acceptance between Stow and TPL in which TPL through its counsel accepted the assignment. In addition, Exhibit 4 is also a second exercise of the right of first refusal by TPL itself, whereby TPL Regional Counsel Dorothy Nelson Stookey not only acknowledged TPL's acceptance of the assignment but also "elects to exercise the right of first refusal under M.G.L. c. 61 section 8 that

4

was assigned to TPL by the town of Stow and assume the position of buyer under the above-referenced agreement." See Exhibit 4. This exercise of the right of first refusal by TPL was absolute, unconditional and obligated TPL to fund the purchase of the Property. By TPL exercising the right of first refusal put TPL in business and contractual position of Cohousing.

19.    TPL, on February 13, 2003 notified Kunelius of TPL's assumption of Stow's exercise of right of first refusal. See Exhibit 4.

20.    Shortly after TPL notified Kunelius of the assumption of Stow's exercise of the right of first refusal, Kunelius and her counsel met with MacDonnell. During that meeting, Kunelius informed MacDonnell that the Property was the sole asset of Kunelius, she was a single woman supporting herself and the sole care giver of her 91 year old mother and the sale of the Property under the terms of the P&S was critical to her financial wellbeing and financial stability. Kunelius informed MacDonnell that she was relying on his representations that TPL would acquire the Property under the terms of the P&S. MacDonnell acknowledged to Kunelius and her attorney that the acquisition of the Property by TPL was a certainty.

21.    Stow and TPL formed a partnership for the purpose of trade and business whereby the Partnership could develop the Property and derive profit so that Stow could benefit from the property. As part of the partnership Stow agreed to contribute $400,000 of the purchase price in the P&S.

22.    Upon information and belief, Stow and TPL undertook a course of action which was intended to and resulted in Stow and TPL deliberately interfering

RECEIVED
USI/BOS
2003 AU 26    AM 9:51

5

with a contractual relationship between Kunelius and Cohousing whereby Stow and TPL knew that Stow and TPL never intended to purchase the property in compliance with the terms of the P&S but nevertheless exercised the right of first refusal.

23. Stow was aware following its exercise of its right of first refusal and the assignment of said right to TPL, that TPL even though TPL had also exercised the right of first refusal, had no intention of honoring the business terms and purchase price in the P&S but rather intend to develop the Property itself.

24. Stow was aware that TPL, after exercising its right of first refusal, immediately attempted, in violation of M.G.L. c. 61, and the P&S to renegotiate the terms of the P&S and the purchase price with Kunelius in order to obtain a more favorable business deal for itself.

25. Stow had knowledge of and participated in TPL's attempt to dishonor the P&S by attempting to change the terms and negotiate the P&S purchase price in order to achieve a profit.

26. A letter dated September 24, 2003, from Stow's Board of Selectmen evidences that Stow "after due diligence and pursuant to M.G.L. c. 61, section 8, the town of Stow Board of Selectmen transferred completely to the Trust for Public Land the town's right of first refusal to acquire said property." See Exhibit 5.

27. Exhibit 5 unequivocally demonstrates that Stow was aware of TPL's intent to change the P&S and in fact the nature of the development of the Property itself. TPL made repeated attempts to change the terms of the P&S. Exhibit 5

6

states "the Board of Selectmen still believes the Project as originally outlined by TPL is in the best interest of the Town and we hope that your client [Kunelius] and the TPL, with the support from the Friends of Red Acre (FORA) will work together to make the project successful for all parties." The above quote demonstrates that:

    A.    Stow knew that TPL was "altering" the P&S because TPL decided after its exercise of right of first refusal to not move forward unless it received certain concessions from Kunelius which would allow Stow and TPL to profit from the Property.

    B.    Stow was not interested in compliance with the P&S but was acting in a manner to improve its own interests.

    C.    Stow was acknowledging that its interest and TPL were the same.

    D.    Stow had approved TPL's actions because TPL reneging on the terms of the P&S.

28. Exhibit 5 also shows that the Board of Selectmen was aware of and approved of TPL's dishonoring the P&S and TPL's submitting a new proposal to Kunelius. This, in spite of the fact that Stow and TPL were bound by the terms of the P&S under the provision of M.G.L. c. 61 once the voluntary election to exercise the right of first refusal was made.

29. After Stow and TPL dishonored the P&S, certain members of the Board of Selectmen became concerned about Stow's involvement in the partnership. A Memorandum entitled "Kunelius Property Workout" ("Board of Selectmen Memorandum") which was written by Greg Jones, a member of the Board of

2005 AUG 26 AM 8: 51

RECEIVED
US1/BOS

Selectmen was submitted to the Board of Selectmen for consideration at a

regularly scheduled meeting of the Board of Selectmen on November 25, 2003.

See Exhibit 6.

30.    The following quote is the opening paragraph of the Board of Selectmen

Memorandum:

> The lawyer for Marilyn Kunelius [plaintiff] has threatened a suit to
> enforce the contract that called for a $750,000 closing September 26th.
> The town does not want to find out if it has any legal liability. Yes, we
> ceded our right of first refusal to TPL and TPL certainly has the assets to
> make good on the transaction. But they have reneged, and the contract has
> been breached. The seller has certainly been harmed by our actions and
> TPL's inaction. Should a suit against TPL be initiated, it is likely the town
> would become involved. At a minimum the town had committed to
> contribute $400,000 to the deal, and the actions of many could be
> interpreted as implying the town was a partner in the deal. (emphasis
> supplied)

31.    The Board of Selectmen Memorandum (Exhibit 6) demonstrates that (i) Stow

was aware of its involvement in the dishonoring of the P&S, (ii) TPL reneged

on its obligations, (iii) the P&S had been breached by Stow and TPL (iv) Stow

was allowing itself to appear as a partner with TPL because it had committed

to contribute $400,000 of the purchase price, (v) the Board of Selectmen

Memorandum demonstrates that the actions of Stow and TPL would lead many

to believe that Stow and TPL were acting as a partnership and (vi) Kunelius

"has certainly been harmed by our actions and TPL's inaction."

32.    Notwithstanding the clear recognition that Stow was responsible for harming

Kunelius, Stow and TPL continued to move forward in their efforts to obtain

the benefits of avoiding the M.G.L. c. 40(B) benefit while stripping Kunelius

of her rights under the P&S both as it related to Cohousing purchasing the

Property and as it related to Stow's exercise of the right of first refusal and assignment thereof to TPL and TPL's subsequent exercise of the right of first refusal.

33. Stow took no steps to cause its partner TPL to honor the P&S.

34. Despite the Board of Selectmen's assertion that the Board had exercised "due diligence" Stow took no steps to ensure that TPL had sufficient funds to honor the P&S. See Exhibit 5.

35. Stow, as part of its partnership obligations, did appropriate $400,000 as Stow's share of the purchase price.

36. Stow deliberately misled Kunelius by claiming that Stow had exercised due diligence prior to assigning the P&S to TPL, (See Exhibit 5) because Stow had failed to appropriate the full purchase price under the terms of the P&S.

37. Subsequent to the assignment to TPL and TPL's exercise of its right of first refusal, numerous newspaper articles described TPL's default under the terms of the P&S. Included in the newspaper articles is an article written by Brian Eastwood for the Beacon Villager indicating that indeed TPL had missed the deadline to make the payment on the purchase of the Kunelius property because TPL had failed to raise the money necessary. See Exhibit 7.

38. A newspaper article written by Maureen Costello in which TPL is quoted through its "director" MacDonnell as admitting that it did not raise the funds and further that it attempted to get Kunelius to accept less than the purchase price contained in the P&S. See Exhibit 8.

39.  On September 25, 2003, TPL through its counsel attempted to renege on the assignment and its exercise of the right of first refusal by sending a letter to the chairman of the Stow Zoning Board of Appeals. See Exhibit 9. Exhibit 9 demonstrates that despite TPL's obligations under the P&S, it attempted to disregard such obligations. TPL did not honor the P&S and pay the purchase price. Rather, TPL decided to "develop" the Property by way of private sales in or to benefit financially and thus submitted its own plan to accomplish the private sale to the Stow Zoning Board of Appeals as to how the Property would be used by TPL and Stow as market participants in sale of individual lots. TPL's submission of its own plan to the Stow Zoning Board of Appeals was in blatant disregard of its obligation to pay Kunelius to pay the full purchase price.

40.  Upon information and belief, TPL has filed financial reports with the Secretary of State for the Commonwealth of Massachusetts. TPL has disclosed on its website that it has total assets of Three Hundred and Forty-Nine Million ($349,000,000) with total liabilities of One Hundred and Twenty Million ($120,000,000). Further, TPL also reveals total revenues of in excess of Seventy-Eight Million, Nine Hundred and Sixty Thousand ($78,960,000) for the year 2004. See Exhibit 10.

41.  On July 6, 2004, MacDonnell contacted Kunelius' counsel by letter and for the second time in violation of the P&S and M.G.L. c. 61 unfairly and deceptively attempted to renegotiate the purchase price notwithstanding the enforceability of the P&S which had been assumed by TPL. See Exhibit 11. As can be seen

on page 2 of Exhibit 11, TPL and MacDonnell proposed reducing the purchase

price by $400,000 thus giving a benefit to its business partner Stow because

Stow's investment in the partnership would be reduced rather than the

$400,000 which Stow had already committed.

42.  Kunelius refused to release TPL or Stow from their obligations under the P&S.

43.  On September 9, 2003, MacDonnell sent another letter to Kunelius' counsel

again trying to cause Kunelius to accept less than the purchase price.  See

Exhibit 12.  TPL aware of the illegality of its action used such illegally as

leverage in its attempt to cause Kunelius to accept less money or to face both

Stow and TPL refusing to honor the P&S which Stow and TPL were statutorily

require to do.  Exhibit 12 states:

> We are aware that these project uncertainties are of concern to you and
> your client and that Mrs. Kunelius would like to know as soon as possible
> whether TPL will be able to go forward.  To that end, we need to discuss
> this revised proposal with you as soon as possible and in now case later
> than the end of this week.

44.  The above quote demonstrates that TPL was using its refusal to honor the P&S

as leverage to unfairly and deceptively obtain a lower purchase price or in the

alternative to reneg on its obligations if it could not obtain a lower purchase

price.

45.  Stow, the Partnership of Stow and TPL, TPL and MacDonnell knew that

"these project uncertainties" were of concern to Kunelius because the property

was her sole source of income and her only asset.

46.  In the Spring of 2004, MacDonnell met with Kunelius, Kunelius' counsel and

Jim Boothroyd, a local real estate broker, David Norris, in connection with

RECEIVED USI/BOS AUG 26 AM 8:51

TPL's demands for a lower purchase price. During that meeting MacDonnell threatened and intimidated Kunelius and her counsel by stating generally that (i) TPL had "serious and influential connections by way of its Board of Advisors" who would defend TPL against any legal action brought by Kunelius as a result of TPL's default, (ii) TPL's Board of Advisors included prominent law firms that would tie up Kunelius and any attempt by her to enforce the P&S, (iii) TPL would notify the Court of its "influential connections beyond reproach" and that the Court would never find in favor of Kunelius notwithstanding that TPL was demanding a reduction in purchase price of $400,000, (iv) TPL was aware that Kunelius was of very limited means and that she and her attorney would not be able to spend sufficient funds to win any matter against TPL and (v) TPL had unlimited resources available to it to overwhelm anyone who would make the mistake of opposing TPL.

47.    The Board of Selectmen Memorandum (Exhibit 6) was written approximately two and a half months after TPL's letter of September 9, 2003. The Board of Selectmen understood the seriousness of the actions of TPL even though the Board of Selectmen knew they would benefit from such unfair and deceptive practices of TPL, either by a reduced purchase price, assuming TPL had the remainder of the purchase price or in the alternative that the dishonoring of the P&S would result in Kunelius losing the sale to Cohousing and thus avoiding the M.G.L. c, 40B Anti Snob zoning project.

48.   The July 6, 2004 letter from TPL to Kunelius' counsel (Exhibit 11) indicates TPL's unfair and deceptive business practices by stating that TPL will dishonor the P&S leaving Kunelius with the "liquidated damages" anticipated under the terms of the P&S with Cohousing.  Exhibit 11 specifically threatens to use the liquidated damage provision under the P&S if Kunelius refuses to lower the purchase price or in the alternative accept another proposal by MacDonnell and TPL.

49.   The use of the liquidated damage provision is prohibited as a means of avoidance of the P&S where Stow and TPL both had exercised the right of first refusal based upon the specific purchase price of $1,116,900.

50.   Upon receiving Exhibit 11, Kunelius' counsel referred TPL and Stow the Supreme Judicial Court's decision of Town of Franklin v. Wyllie and provided a copy of the decision to TPL.  In Town of Franklin, the S.J.C. makes clear that the reliance by a town on uncertainties contained in a P&S relative to permits is misplaced as a vehicle to avoid compliance with M.G.L. c. 61. Notwithstanding the receipt of same, TPL, MacDonnell and Stow completely and utterly reneged their obligations on the P&S.

51.   Upon information and belief, Cohousing, having witnessed the unfair and deceptive trade practices and collusive and conspiratorial behavior of Stow and TPL and MacDonnell refused to enter into a new P&S with Kunelius for fear of the certain repetition of such behavior of Stow and TPL.

52.   Stow, TPL and MacDonnell's actions eliminated Cohousing's 40(B) Anti-Snob Zoning Development.

53. Stow informed Kunelius' counsel that any subsequent attempt by Kunelius to sell the property to a developer who intended to use M.G.L. c. 40B would be met with a similar exercise of the right of first refusal.

54. The unfair, deceptive, collusive and conspiratorial acts of Stow, the partnership of Stow and TPL and MacDonnell resulted in Kunelius being unable to collect the $1,116,900 from Cohousing, Stow or TPL.

55. The obligations of Stow and TPL under M.G.L. c. 61 could not be avoided by relying on the liquidated damage clause provision in the P&S since such liquidated damage clause provision was applicable only to Cohousing since it sought certain permits and approvals in connection with its 40(B) Anti-Snob Zoning Development. The exercise of the right of first refusal and assignment by Stow and the subsequent exercise of first refusal by TPL precluded any consideration by Stow of how or why it or TPL could rely on a submission of a wholly separate development plan submitted to Stow by its partner TPL as a means of avoiding the obligation contained in the P&S. Nor could Stow or TPL avoid the obligations under the P&S by relying on its own zoning bylaws as justification for the denial of TPL's substitute development plan.

56. The partnership of Stow and TPL's reliance on the liquidated damage provision of the P&S was a pretext for the unconditional violation of Kunelius' rights and the unfair, deceptive and conspiratorial dishonoring of the P&S.

## Count I

## Contract and Specific Performance (Stow and TPL)

57. Plaintiff restates and realleged Paragraphs 1 through 45 and incorporates them.

14

58. The P&S is a valid and enforceable contract for the sale of land between Kunelius and Stow and TPL.

59. Kunelius had complied with all terms of the P&S including being prepared, ready, willing and able to perform under the terms of the P&S.

60. Stow and TPL reneged on and breached their obligation under the terms of the P&S.

61. WHEREFORE, Kunelius asks that this Court order Stow and TPL to specifically perform under the terms of the P&S and to immediately pay the purchase price plus statutory interest which as accrued since the scheduled closing date of September 26, 2003.

## Count II

## M.G.L. c. 93A, Unfair and Deceptive Trade Practice by TPL

62. The plaintiff repeats and reasserts the allegations contained in the above paragraphs and incorporate them by reference as if fully and completely set forth herein.

63. Stow, the Partnership of Stow and TPL, and TPL separately, acted unfairly and deceptively to avoid a direct contractual obligation where such behavior is distinctly separate from and outside of any activity that could be authorized under the terms of TPL's corporate charter as a nonprofit, to the extent that TPL is a nonprofit entity under the laws of the Commonwealth of Massachusetts, a fact the plaintiff does not concede.

64. The claims against Stow, the Partnership of Stow and TPL, and TPL separately, in connection with c. 93A arise out of contractual obligations which

15

Stow, the Partnership of Stow and TPL, and TPL separately, sought to avoid fulfilling through pretext, threats and intimidation in order to achieve a better purchase price and in order to ensure that Kunelius be deprived of the business bargained for purchase price, the responsibility of which TPL freely assumed under the provisions of Massachusetts General Laws.

65.  To the extent that TPL had funds available to meet its obligations under the assignment of the P&S and under TPL's exercise of the right of first refusal and nevertheless sought to achieve a better purchase price then the claims by TPL of its financial inability to meet its obligations were fraudulent, unfair and deceptive and not covered by any charitable immunity.

66.  To the extent that TPL did not have the funds available to meet its obligations under the assignment then TPL through the actions of its regional counsel Dorothy Nelson Stookey and MacDonnel was not acting in accordance with its nonprofit charter when it obligated itself to pay $1,116,900 to Kunelius under the terms of the assignment. As such TPL's actions are not protected by any charitable immunity which might be afforded under Massachusetts law, if TPL is a nonprofit entity under the law, a fact not conceded by the plaintiff.

67.  WHEREFORE, the plaintiff respectfully requests that this Court award $1,116,900 and treble that amount ($3,507,000) plus statutory interest accruing from September 26, 2003 due to the outrageous nature of TPL's behavior and further that this Court award attorney's fees under the provision of M.G.L. c. 93A.

RECEIVED
USI/BOS
2006 AU 26 AM 9:15

## Count III

## M.G.L. c. 93A, Unfair and Deceptive Trade Practices (The Partnership of Stow and TPL)

68. The plaintiff repeats and reasserts the allegations contained in the above paragraphs and incorporate them by reference as if fully and completely set forth herein.

69. Stow and TPL entered into a partnership whereby Stow would contribute $400,000 to the purchase price under the terms of the P&S and TPL would supply the additional $716,900 needed to meet the obligations of Stow and TPL under the P&S.

70. In furtherance of the partnership, Stow appropriated the $400,000 contribution to the partnership.

71. In furtherance of the partnership, Stow repeatedly participated in and approved TPL's reneging on the terms of payment under the P&S whereby TPL refused to pay the purchase price in the P&S and attempted to renegotiate a new purchase price.

72. Stow Board of Selectmen acknowledged the appearance of a partnership relationship with TPL. See Exhibit 6.

73. Stow, despite its acknowledgement of the appearance in a partnership continued its support of TPL's breach of the P&S in order to obtain the benefit of a reduction in the purchase price.

74. Plaintiff has been damaged thereby.

75. WHEREFORE, the plaintiff respectfully requests that this Court find that Stow and TPL entered into a partnership and that the partnership acted in an unfair

and deceptive manner under the terms and provisions of M.G.L. c. 93A.

Further that this Court treble the plaintiff's damages and statutorily interest from September 26, 2003 and award attorney's fees as provided for under M.G.L. c. 93A.

## Count IV

### Intentional Infliction of Emotional Distress
### (TPL, the Partnership of Stow and TPL and MacDonnell)

76.  The plaintiff repeats and reasserts the allegations contained in the above paragraphs and incorporate them by reference as if fully and completely set forth herein.

77.  TPL and MacDonnell were aware that Kunelius was selling all or essentially all of her assets in the form of the Property. Further, the partnership of Stow and TPL and MacDonnell were aware that Kunelius was looking to the sale of the Property to Cohousing as a way to provide herself financial stability.

78.  Exhibit 12, a September 9, 2003 letter from MacDonnell makes clear that MacDonnell and TPL were aware of the "uncertainties and concerns" being suffered by Kunelius and her need to close the matter and her need to sell the property.

79.  Notwithstanding MacDonnell and TPL's awareness of the importance of their compliance with the terms of the P&S to Kunelius, MacDonnell and TPL and the partnership of Stow and TPL undertook a course of action which was intended to and had the effect of intentionally inflicting emotional distress on Kunelius, whereby Kunelius faced the loss of the purchase price which would have provided her with financial security. In addition, Kunelius faced the

unfair and deceptive leveraging of the P&S by MacDonnell and TPL and the

Partnership of Stow and TPL whereby Kunelius faced the loss of the sale price

unless she agreed to the unfair and deceptive demands of MacDonnell and TPL

and changed the terms, conditions and intent of the P&S.

80. Kunelius, as a result of the actions of MacDonnell and TPL and the Partnership

of Stow and TPL with the support and approval of Stow, suffered and

continues to suffer emotional distress, anxiety, sleeplessness and depression.

81. WHEREFORE, the plaintiff requests that the Court find that MacDonnell the

Partnership and TPL intentionally inflicted emotional distress on the plaintiff

and award damages commensurate with such infliction.

### Count V

### Intentional Interference with an Contracual Relationship (Partnership of Stow and TPL, TPL, separately and MacDonnell, individually)

82. The plaintiff repeats and reasserts the allegations contained in the above

paragraphs and incorporate them by reference as if fully and completely set

forth herein.

83. The partnership of Stow and TPL, TPL separately and MacDonnell,

individually were all aware that the P&S would provide the plaintiff with

$1,116,900 and that Cohousing would be building a 40B subdivision which

was opposed by Stow.

84. Stow at the time that it exercised its right of first refusal was aware that it had

not appropriated sufficient funds to honor its obligations under the P&S.

85. Stow in assigning the P&S to TPL under the provisions of M.G.L. c. 61 knew

that TPL either did not have sufficient funds to honor the terms of the P&S, or

RECEIVED
US1/BOS
JU 26 AM 8: 51

in the alternative that TPL while capable of honoring the terms of the P&S

would attempt, with the support of Stow, to alter the terms and conditions of

the P&S in order to obtain a lower price.

86.    The partnership of Stow and TPL, TPL separately and MacDonnell

individually were aware that exercising the right of first refusal under M.G.L.

c. 61 would effectively eliminate Cohousing as a potential buyer.

87.    The partnership of Stow and TPL, TPL separately and MacDonnell

individually were aware that additional low income housing was scheduled to

go on the market from other developers in the town of Stow where such

additional low income housing would be sufficient to eliminate Stow's

"exposure" to M.G.L. c. 40B Anti-Snob Housing efforts by Cohousing or any

other Buyer of Kunelius' property seeking the automatic approvals authorized

under 40B.

88.    The partnership of Stow and TPL, TPL separately and MacDonnell

individually undertook a course of action to delay, defer and disregard the

obligations under the P&S whereby with the passage of time, Cohousing

would be unable to reassume the P&S because it would have been no longer

capable of obtaining the 40B approvals.

89.    The partnership of Stow and TPL, TPL separately and MacDonnell

individually were aware that the purchase price in the P&S was established

based upon the availability of the 40B development.

90.    The partnership of Stow and TPL, TPL separately and MacDonnell

individually undertook a course of action which resulted in: the dishonoring

the P&S, the permanent elimination of Cohousing as a potential buyer and the loss of the purchase price to the plaintiff. In addition, Stow continues to enjoy the fact that the Property remains undeveloped and under the agricultural/horticultural designation.

91.    The partnership of Stow and TPL, TPL separately and MacDonnell individually have obtained the benefit of their goal, i.e. no development on the Property and yet avoided meeting the statutory obligation to purchase the Property.

92.    The plaintiff has been damaged thereby.

93.    WHEREFORE, the plaintiff respectfully requests that this Court determine that the actions of the partnership of Stow and TPL, TPL separately and MacDonnell individually resulted in the intentional interference in an advantageous or contractual relationship and award damages in accordance therewith.

## Count VI

### 42 U.S.C. §1983, §1988 Civil Rights Violations Resulting from Violations of the United States Constitution Fifth and Fourteenth Amendments (Stow, the Partnership of Stow and TPL, TPL, separately, and MacDonnell, individually)

94.    The plaintiff repeats and reasserts the allegations contained in the above paragraphs and incorporate them by reference as if fully and completely set forth herein.

95.    The actions of Stow, the Partnership of Stow and TPL, TPL separately, and MacDonnell individually were taken under the color of state law as evidenced by Stow involvement, for the purposes of abridging the privileges and

immunities of the plaintiff and depriving the plaintiff of property without due process violating the Fourteenth Amendment of the United State Constitution.

96. The actions of Stow, the Partnership of Stow and TPL, TPL, separately, and MacDonnell individually resulted in a constructive taking of the value of the property without just compensation violating the provisions of the Fifth Amendment of the United States Constitution.

97. The actions of Stow, the Partnership of Stow and TPL, TPL separately, and MacDonnell individually resulted in the inability of the plaintiff to sell the property at the agreed upon purchase price and the loss of that ability in the future where such loss of ability resulted from the deliberate reneging on the purchase price by Stow, the Partnership of Stow and TPL, TPL, separately, and MacDonnell.

98. The plaintiff has been damaged thereby.

99. WHEREFORE, the plaintiff respectfully requests that this Court find that Stow, the Partnership of Stow and TPL, TPL separately, and MacDonnell individually violated the provisions of 42 U.S.C. §1983 and further that this Court award attorney's fees in connection with same under the provisions of 42 U.S.C. §1988.

## Count VII

### Fraud and Misrepresentation (the Partnership of Stow and TPL, TPL, separately and MacDonnell, individually)

100. The plaintiff repeats and reasserts the allegations contained in the above paragraphs and incorporate them by reference as if fully and completely set forth herein.

22

101. The Partnership of Stow and TPL, TPL separately and MacDonnell individually knew at the time that Stow exercised the right of first refusal and at the time that TPL exercised its right of first refusal, that the Partnership of Stow and TPL, TPL separately and MacDonnell individually were fraudulently and materially misrepresenting Stow's and TPL's ability and/or intention to meet the obligations arising under the P&S and assignment.

102. The Partnership of Stow and TPL, TPL separately and MacDonnell individually fraudulently caused the plaintiff to rely on the terms of the P&S as assumed and assigned by Stow and TPL even though the Board of Selectmen for the Town of Stow, TPL and MacDonnell fully realized and appreciated that there were no funds available to honor the P&S.

103. As a result of the fraud of the Partnership of Stow and TPL, TPL separately and MacDonnell individually, the plaintiff lost: the purchase price, Cohousing as a buyer, the ability to sell the Property for another 40B development, financial security and suffered and continues to suffer emotional distress.

104. WHEREFORE, the plaintiff respectfully requests that this Court find that as a result of the fraud and misrepresentations of the Partnership of Stow and TPL, TPL, separately and MacDonnell, individually, that this Court award damages commensurate with such fraud and misrepresentations.

### PRAYERS FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court:

With respect to all of the Defendants:

1.     After a trial on Counts I through VII order judgment in the Plaintiff's

       favor in such amount as will fully compensate her for her losses to the

       greatest extent allowed by law;

2.     Order the payment of damages, interest, costs, and attorney's fees

       pursuant to 42 U.S.C. §§ 1983, 1988, M.G.L. c. 93A, and under any

       statute or common law theory applicable to these facts;

3.     Order the specific performance of the P&S whereby Stow and TPL

       immediately pay the full purchase price plus interest that has accrued from

       the date of the exercise of the right of first refusal at the statutory rate of

       12%; and

4.     Order such further relief as this Court deems fair and just.

<u>JURY DEMAND</u>

PLAINTIFF RESPECTFULLY REQUESTS A TRIAL BY JURY ON ALL

ISSUES SO TRIABLE.

Respectfully submitted,

Marilyn Kunelius,

By Her Attorney

Michael C. McLaughlin, Esquire BBO# 337350
Law Offices of Michael C. McLaughlin
One Beacon Street 33rd Floor
Boston, MA  02108
(617) 227-2275

Dated: August 16, 2005

1

**STANDARD FORM**
**PURCHASE AND SALE AGREEMENT**

From the Office of:
Atty. Peter A. Kachajian, Jr.
292 Main Street
Northborough, MA 01532
(508) 393-6278

1. **PARTIES**
   *(fill in)*

This _____ day of __October,__ 2002
Marilyn Kunelius of 142 and 144 Red Acres Road, Stow, MA
hereinafter called the SELLER, agrees to SELL and

Cohousing Resources, LLC, with an address of 9813 NE Murden Cove Road, Brainbridge
Islande, WA 98110
hereinafter called the BUYER or PURCHASER, agrees to BUY, upon the terms hereinafter set
forth, the following described premises: 142 and 144 Red Acres Road, Stow, MA

2. **DESCRIPTION**
   *(fill in and include title reference)*

The land with the buildings and improvements thereon known and located at 142 and 144 Red
Acres Road, Stow, MA. Being more particularly described in the Middlesex Registry of Deeds
Book 15412; Page 316; Book 26230; Page 255 (see exhibits).

3. **BUILDINGS, STRUCTURES, IMPROVEMENTS, FIXTURES**

   *(fill in or delete)*

Included in the sale as a part of said premises are 50.67 acres of land with a home, caretakers
residence, barn and the buildings, structures, and improvements now thereon, and the fixtures
belonging to the SELLER and used in connection therewith including, if any, all wall-to-wall
carpeting, drapery rods, automatic garage door openers, venetian blinds, window shades,
screens, screen doors, storm windows and doors, awnings, shutters, furnaces, heaters, heating
plumbing and bathroom fixtures, garbage disposers, electric and other lighting fixtures, mantels,
outside television antennas, fences, gates, trees, shrubs, plants, ONLY IF BUILT IN,
refrigerators, dishwashers, washing machines and dryers; and all buildings and improvements
thereon are sold in "as is" condition.

4. **TITLE DEED**
   *(fill in)*
   *Include here by specific reference any restrictions, easements, rights and obligations in party walls not included in (b), leases, municipal and other liens, other encumbrances, and make provision to protect SELLER against BUYER'S breach of SELLER'S covenants in leases, where necessary.*

Said premises are to be conveyed by a good and sufficient quitclaim deed running to the
BUYER, or to the nominee designated by the BUYER by written notice to the SELLER at least
seven (7) days before the deed is to be delivered as herein provided, and said deed shall convey
a good and clear record and marketable title thereto, free from encumbrances, except
   (a)  Provisions of existing building and zoning laws;
   (b)  Such taxes for the then current taxable year as are not due and payable on the date of the
        delivery of such deed;
   (c)  Any liens for municipal betterments assessed after the date of this agreement;
   (d)  Easements, restrictions and reservations of record, if any, so long as the same do not
        prohibit or materially interfere with the current use of said premises
   (e)

5. **PLANS**

If said deed refers to a plan necessary to be recorded therewith, the SELLER shall deliver such
plan with the deed in form adequate for recording or registration.

6. **REGISTERED TITLE**

In addition to the forgoing, if the title to said premises is registered, said deed shall be in form
sufficient to entitle the BUYER to a Certificate of Title of said premises, and the SELLER shall
deliver with said deed all instruments, if any, necessary to enable the BUYER to obtain such
Certificate of Title.

COPYRIGHT © 1979, 1984, 1986, 1987, 1988, 1991
GREATER BOSTON REAL ESTATE BOARD
Rev. 1999          Form No RA151

All rights reserved. This form may not be copied or reproduced in whole or
in part in any manner whatsoever without the prior express written consent of
the Greater Boston Real Estate Board.
                                        CWV 5.0

RECEIVED USI/BOS
AU 26 AM 8: 5

7.  PURCHASE PRICE
    *(fill in): space is
    allowed to write out
    the amounts if desired*

The agreed purchase price for said premises is $1,116,900.00
ONE MILLION ONE HUNDRED SIXTEEN THOUSAND NINE HUNDRED and
00/100s.......dollars, of which

| | | |
|---|---|---|
| $ | 0.00 | have been paid as a deposit this day and |
| $ | 0.00 | have been paid at the time of the offer to purchase |
| $ | 716,900.00 | (less deposits paid) are to be paid at the time of delivery of the deed in cash, or by certified cashier's, treasurer's or bank check, or conveyancing attorney's check.** |
| $ | 400,000.00 | promissory note secured by a mortgage* |
| $ | $1,116,900.00 | TOTAL |

** See Paragraph #31 for further terms and provisions
* See paragraph #30 for further terms and provisions

8.  TIME FOR
    PERFORMANCE;
    DELIVERY OF DEED
    *(fill in)*

Such deed is to be delivered at **1:00 o'clock P.M.** on or before the **26th day of September, 2003**, at the Office of the Conveyancing Attorney unless otherwise agreed upon in writing provided notice of same is given to Buyer's and Seller's counsel. However, provided the **Chap. 40B approval process is proceeding forward, BUYER may have. up to 12 months extension** It is agreed that time is of the essence of this agreement.

9.  POSSESSION and
    CONDITIONS of
    PREMISES.
    *(attach a list of
    exceptions, if any)*

Full possession of said premises free of all tenants and occupants, except as herein provided, is to be delivered at the time of the delivery of the deed, said premises to be then (a) in the same condition as they now are, reasonable use and wear thereof excepted and (b) not in violation of said building and zoning laws, and (c) in compliance with provisions of any instrument referred to in clause 4 hereof. The BUYER shall be entitled to an inspection of said premises prior to the delivery of the deed in order to determine whether the condition thereof complies with the terms of this clause.

10. EXTENSION TO
    PERFECT TITLE OR
    MAKE PREMISES
    CONFORM
    *(Change period of time
    if desired.)*

If the SELLER shall be unable to give title or to make conveyance, or to deliver possession of the premises, all as herein stipulated, or if at the time of delivery of the deed the premises do not conform with the provisions hereof, the SELLER shall use reasonable efforts to remove any defects in title, or to deliver possession as provided herein, or to make the said premises conform to the provisions hereof, as the case may be, in which event the time for performance hereof shall be extended for a period of thirty (30) days.*
* Contemplated herein is the Town of Stow exercising its right of first refusal pursuant to M.G.L c. 61.

11. FAILURE TO
    PERFECT TITLE OR
    MAKE PREMISES
    CONFORM, etc.

If at the expiration of the extended time the SELLER shall have failed so to remove any defects in title, deliver possession, or make the premises conform, as the case may be, all as herein agreed, or if at any time during the period of this agreement or any extension thereof, the holder of a mortgage on said premises shall refuse to permit the insurance proceeds, if any, to be used for such purposes, then any payments made under this agreement shall be forthwith refunded and all other obligations of the parties hereto shall cease and this agreement shall be void without recourse to the parties hereto.

12. BUYER'S ELECTION
    TO ACCEPT TITLE

The BUYER shall have the election, at either the original or any extended time for performance, to accept such title as the SELLER can deliver to the said premises in their then condition and to pay therefor the purchase price without deduction, in which case the SELLER shall convey such title, except that in the event of such conveyance in accord with the provisions of this clause, if the said premises shall have been damaged by fire or casualty insured against, then the SELLER shall, unless the SELLER has previously restored the premises to their former condition, either

(a) pay over or assign to the BUYER, on delivery of the deed, all amounts recovered or recoverable on account of such insurance, less any amounts reasonably expended by the SELLER for any partial restoration, or

(b) if a holder of a mortgage on said premises shall not permit the insurance proceeds or a part thereof to be used to restore the said premises to their former condition or to be so paid over or assigned, give to the BUYER a credit against the purchase price, on delivery of the deed, equal to said amounts so recovered or recoverable and retained by the holder of the said mortgage less any amounts reasonably expended by the SELLER for any partial restoration.

13. **ACCEPTANCE OF DEED**

The acceptance of a deed by the BUYER or his nom. as the case may be, shall be deemed to be a full performance and discharge of every agreement and obligation herein contained or expressed, except such as are, by the terms hereof, to be performed after the delivery of said deed.

14. **USE OF MONEY TO CLEAR TITLE**

To enable the SELLER to make conveyance as herein provided, the SELLER may, at the time of delivery of the deed, use the purchase money or any portion thereof to clear the title of any or all encumbrances or interests, provided that all instruments so procured are recorded in a manner consistent with customary conveyancing practices.

15. **INSURANCE**
*Insert amount (list additional types of insurance and amounts as agreed)*

Until the delivery of the deed, the SELLER shall maintain insurance on said premises as follows:

| Type of Insurance | Amount of Coverage |
|---|---|
| (a) Fire | Risk to remain with SELLER |
| (b) Extended Coverage | As is presently insured |
| (c) | |

16. **ADJUSTMENTS**
*(list operating expenses, if any, or attach schedule)*

Water and sewer use charges and taxes for the then current year shall be apportioned and fuel value shall be adjusted as of the day of performance of this agreement and the net amount thereof shall be added to or deducted from, as the case may be, the purchase price payable by the BUYER at the time of delivery of the deed.

17. **ADJUSTMENT OF UNASSESSED AND ABATED TAXES**

If the amount of said taxes is not known at the time of the delivery of the deed, they shall be apportioned on the basis of the taxes assessed for the preceding year, with a reapportionment as soon as the new tax rate and valuation can be ascertained; and, if the taxes which are to be apportioned shall thereafter be reduced by abatement, the amount of the abatement, less the reasonable cost of obtaining the same, shall apportioned between the parties, provided that neither party shall be obligated to institute or prosecute proceedings for an abatement unless herein otherwise agreed.

18. **BROKER'S FEE**
*(fill in fee with dollar amount or percentage; also name of Broker(s))*

A broker's fee for professional service per listing agreement is due from the SELLER to **Century 21 Classic Properties**, the broker herein, but only if, as when the SELLER receives the full purchase price pursuant to this Agreement and the BUYER accepts and records the SELLER'S deed and not otherwise.

19. **BROKER(S) WARRANTY**
*(fill in name)*

The Broker(s) named herein **Century 21 Classic Properties** warrant(s) that the Broker(s) is(are) duly licensed as such by the Commonwealth of Massachusetts:

20. **DEPOSIT**
*(fill in, or delete reference to broker(s) if SELLER holds deposit)*

All deposits made hereunder shall be held by **Law Offices of Peter A. Kachajian, Jr.** subject to the terms of this agreement and shall be duly accounted for at the time for performance of this agreement, provided however that in the event of any disagreement the escrow agent may retain said deposits pending instructions mutually given by the SELLER and BUYER or a court of competent jurisdiction, **except as herein provided in Paragraph #31.**

21. **BUYER'S DEFAULT; DAMAGES**

If the BUYER shall fail to fulfill the BUYER'S agreements herein, all deposits made hereunder by the BUYER shall be retained by the SELLER as liquidated damages and this shall constitute SELLER'S sole remedy in equity and law.

22. **RELEASE BY HUSBAND OR WIFE**

The SELLER's spouse hereby agrees to join in said deed and to release and convey all statutory and other rights and interests in said premises.

23. **BROKER AS PARTY**

The Broker(s) named herein join(s) in this agreement and becomes a party hereto, insofar as any provisions of this agreement expressly apply to the Broker(s), and to any amendments or modifications of such provisions to which the Broker(s) agree(s) in writing.

24. **LIABILITY OF TRUSTEE, SHAREHOLDER, BENEFICIARY, etc.**

If the SELLER or BUYER executes this agreement in a representative or fiduciary capacity, only the principal or the estate represented shall be bound, and neither the SELLER or BUYER so executing, nor any shareholder or beneficiary of any trust, shall be personally liable for any obligation, express or implied, hereunder.

RECEIVED USI/BOS AU 26 AM 9:51

25. **WARRANTIES AND REPRESENTATIONS** *(fill in); if none, state "none", if any listed, indicate by whom each warranty or representation was made*

.he BUYER acknowledges that the BUYER has not been influenced to enter into this transaction nor has he relied upon any warranties or representations not set forth or incorporated in this agreement or previously made in writing, except for the following additional warranties and representations, if any, made by either the SELLER or the Broker(s):

26. **MORTGAGE CONTINGENCY CLAUSE**

In order to help finance the acquisition of said premises, the parties agree that the BUYER shall apply for a conventional bank or other institutional construction loan of 80% of the project construction price, at prevailing rates, terms and conditions.

27. **CONSTRUCTION OF AGREEMENT**

This instrument, executed in quadruplicate counterparts, is to be construed as a Massachusetts contract, is to take effect as a sealed instrument, sets forth the entire contract between the parties, is binding upon and enures to the benefit of the parties hereto and their respective heirs, devisees, executors, administrators, successors and assigns, and may be cancelled, modified or amended only by a written instrument executed by both the SELLER and the BUYER. If two or more persons are named herein as BUYER, their obligations hereunder shall be joint and several. The captions and marginal notes are used only as a matter of convenience and are not to be considered a part of this agreement or to be used in determining the intent of the parties to it.

28. **LEAD PAINT LAW**

The parties acknowledge that, under Massachusetts law, whenever a child or children under six years of age resides in any residential premises in which any paint, plaster or other accessible material contains dangerous levels of lead, the owner of said premises must remove or cover said paint, plaster or other material so as to make it inaccessible to children under six years of age.

29. **SMOKE DETECTORS**

The SELLER shall, at the time of the delivery of the deed, deliver a certificate from the fire department of the city or town in which said premises are located stating that said premises have been equipped with approved smoke detectors in conformity with applicable law. The initialed riders, if any, attached hereto, are incorporated herein by reference.

30. **PURCHASE PRICE FINANCING**

The $400,000.00 promissory note secured by a mortgage against the land, subordinated only to a comprehensive construction loan in the amount of 80% of project construction costs. Promissory note shall bear interest at 7% APR and shall become due and payable 24 months after closing, or within 30 days after substantial completion of the project construction. BUYER shall make interest payments to SELLER of $2,333.00 per month until principal is paid in full. All payments to be made in cash or certified funds.

Security for the $400,000.00 promissory note, aforescribed, shall be in the form of a mortgage on the 8.57 acre parcel. Upon BUYER obtaining construction financing, SELLER shall subordinate said mortgage to the construction lender. All purchase and sale agreements (pre-sale or otherwise) executed by potential purchasers of the BUYER'S contemplated co-housing project shall be assigned to the SELLER as further security concomitant with each purchase and sale agreement subjecting the purchaser, unequivocally, to personal liability as to the $400,000.00 promissory note.

Notwithstanding the foregoing, BUYER shall only encumber the 8.57 acre parcel expected to be developed (consisting of .93 acre house parcel and 7.64 acre horse farm parcel).

31. **EARNEST MONEY**

Seller acknowledges receipt from Buyer of an initial earnest money deposit in the sum of $10,000 * in the form of a Promissory Note to be held by Seller pending the completion of Feasibility. Buyer shall convert the Promissory Note to non-refundable cash at completion of the feasibility period when the Buyer has removed this contingency. Buyer will make additional non-refundable earnest money payments of $1500 per month beginning 60 days after removal of the Feasibility Contingency and until closing. It is agreed that earnest money payments shall be immediately available for use by the Seller and no payments shall be held in escrow. All earnest money payments will be applied to the purchase price at the closing.

* See exhibit A attached hereto and made a part hereof

| 32 | 40B APPLICATION & TRANSFER OF LAND | The Buyer and Seller agree to cooperate in the timely submission of a 40B application for the development of a 30 unit owner occupied, tightly clustered, environmentally sensitive residential housing project, with 25% of the units qualifying as affordable under the guidelines for such an application. Said application shall be made within 135 days of the date of this Agreement. It is agreed that the 40B application process will be as cooperative and friendly as possible to the Town of Stow, with all mutually beneficial environmental agendas addressed as openly and clearly as possible. |
|---|---|---|
| 33. | RISK OF LOSS OR ENVIRONMENTAL DAMAGE | Seller, at its sole cost and responsibility, shall keep the Premises safe and secure from environmental damage until the closing. Seller shall bear the risk of all damage to the Premises from all causes until the closing. Should there be any intentional or unintentional environmental damage that is not restored by Seller to its former condition by the closing, Buyer, at its option, may (i) terminate this Agreement and any deposit shall be refunded to Buyer, plus all costs incurred by buyer for feasibility, engineering and design, or (ii) purchase the Premises and be entitled to a reduction in the purchase price which is sufficient to cover the cost of the repairing any such damage. |
| 34. | INSPECTIONS AND TESTING | The obligations of Buyer under this Agreement are expressly subject to Buyer conducting engineering inspections and testing of the property during feasibility. If any such inspections reveal conditions unacceptable to Buyer during the feasibility period, Buyer may terminate this Agreement and any deposit will be refunded to Buyer. After completion of the feasibility period, Buyer shall have the right to reasonable tours, inspections and testing for the purposes of planning, design and marketing of the project, with 24 hour notice to Seller. Buyer agrees to conduct such a feasibility evaluation with all due diligence. If Buyer is unable to determine that the site is feasible for their purposes within 60 days of the date of this agreement, Buyer shall inform Seller in writing by such date and this Agreement will terminate and the earnest money deposit will be refunded to Buyer. |
| 35. | ADDITIONAL PRO- VISIONS | Upon the Town of Stow's approval of the development of the said 8.57 acre parcel, by the BUYER, and issuance of all requisite Board Approvals, building permits and SELLER receiving purchase monies as set forth herein,, BUYER and SELLER agree that SELLER shall, upon acceptance of the Town of Stow, transfer all right, title and interest in the said 42.1 acre parcel currently under M.G.L. c. 61, as a charitable contribution.

In the event that the Town of Stow exercises its right of first refusal pursuant to M.G.L. c. 61, all monies deposited hereunder shall be forthwith returned to BUYER without further recourse by either party in equity or law. |

NOTICE: This is a legal document that creates binding obligations. If not understood, consult an attorney.

_Marilyn Kunelius_
SELLER    Marilyn Kunelius

_Chris ScottHanson_
BUYER    Chris ScottHanson
Representative for Cohousing Resources, LLC

## EXTENSION

The time for the performance of the foregoing agreement is extended until_____ Date _____
_____ day of _____ 19___, time still being of the essence of this agreement as extended. In all other respects, this agreement is hereby ratified and confirmed. _____ o'clock_____M. on the

This extension, executed in multiple counterparts, is intended to take effect as a sealed instrument.

_____
SELLER

_____
BUYER

_____
BROKER(S)

# Promissory Note

In connection with the Agreement to Purchase
50.67 Acre Horse Property owned by Marilyn Kunelius

October 11, 2002

## $10,000.00

For value received and as a deposit made in conjunction with the offer to purchase real estate of today's date, I promise to pay Marilyn Kunelius, the sum of Ten Thousand and no/100ths Dollars ($10,000) on or before December 10, 2002.

This note shall become void if the purchaser chooses to terminate the purchase and sale agreement during the feasibility period terminating 60 days after the signing of the Purchase and Sale agreement. If feasibility is approved by the purchaser, this note shall be converted to cash at the end of the feasibility period, as stipulated in the purchase and sale agreement attached hereto.

If this note becomes in default, borrower agrees to pay all reasonable collection costs and attorney's fees.

Agreed this 11th day of October, 2002

Chris ScottHanson, Owner
for Cohousing Resources LLC
9813 NE Murden Cove Rd.
Bainbridge Island, WA 98110

(206)842-9160

JOHN A. BUBNOWICZ of Maynard, Middlesex County, Massachusetts, and MARILYN E. KUNELIUS, formerly Marilyn D. Bubnowicz, of Stow, Middlesex County, Massachusetts, Husband and Wife as tenants by the entirety,

bk

in consideration of   ONE ($1.00) DOLLAR and other valuable consideration

grant   to   MARILYN E. KUNELIUS

of 142 Red Acre Road, Stow, Massachusetts

with quitclaim covenants

the land in

A certain parcel of land with the buildings thereon on the Northwesterly side of Red Acre Road in Stow, Middlesex County, Massachusetts and being shown as Lot 1 on a plan entitled, "Plan of Land Stow, Mass. owned by Charles H. Lord et al dated January 30, 1976, survey by Clyde R. Wheeler, Inc., Bolton, Mass.", recorded at Book 12959 End, and bounded and described as follows:

| | |
|---|---|
| SOUTHEASTERLY | by land of Bubnowicz and land of Frederickson, as shown on said plan, three hundred and twenty-five (325.00) feet; |
| SOUTHEASTERLY | by land of Magurn, as shown on said plan, one hundred sixty-two (162.00) feet; |
| SOUTHWESTERLY | by land of Brown, as shown on said plan, two hundred twelve and 56/100 (212.56) feet; |
| NORTHWESTERLY | by land of Red Acre Farm Inc., as shown on said plan, two hundred eighty and 92/100 (280.92) feet; |
| NORTHWESTERLY | by land of Red Acre Farm Inc., as shown on said plan, four hundred and sixteen (416.00) feet; |
| SOUTHWESTERLY | by land of Red Acre Farm Inc., as shown on said plan, six hundred and fifteen (615.00) feet; |
| SOUTHWESTERLY | by land of Red Acre Farm Inc., as shown on said plan, four hundred and eighty-five (485.00) feet; |
| NORTHWESTERLY | by land of Red Acre Farm Inc., as shown on said plan, seven hundred fifty-one and 15/100 (751.15) feet; |
| NORTHWESTERLY | by land of Freeman, McClellan and Quinn, as shown on said plan, three hundred thirty-seven and 12/100 (337.12) feet; |
| NORTHWESTERLY | by land of Quinn, Herrick and Duncanson, as shown on said plan, one hundred ninety-two and 77/100 (192.77) feet; |
| NORTHWESTERLY | by land of Duncanson and May, as shown on said plan, one hundred ninety-three and 01/100 (193.01) feet; |
| NORTHWESTERLY | by land of May, as shown on said plan, fifty-one and 12/100 (51.12) feet; |
| NORTHWESTERLY | by land of May and Henry, as shown on said plan, one hundred forty-seven and 86/100 (147.86) feet; |
| NORTHWESTERLY | by land of Henry, as shown on said plan, fifty-one and 25/100 (51.25) feet; |
| NORTHEASTERLY | by land of Babrikki, as shown on said plan, eight hundred forty-nine and 29/100 (849.29) feet; |
| NORTHWESTERLY | by land of Babrikki, as shown on said plan, one hundred three and 09/100 (103.09) feet; |
| NORTHEASTERLY | by land of Babrikki, as shown on said plan, one hundred twenty-six and 19/100 (126.19) feet; |
| NORTHEASTERLY | by land of Babrikki, as shown on said plan, two hundred ninety-three and 47/100 (293.47) feet; |

Property Address:  Lot 1 and Lot 2, Red Acre Road Stow, Massachusetts

| | |
|---|---|
| NORTHWESTERLY | by land of Babrikki, as shown on said plan, three hundred two and 41/100 (302.41) feet; |
| NORTHWESTERLY | by land of Babrikki, as shown on said plan, two hundred thirty-eight and 78/100 (238.78) feet; |
| NORTHEASTERLY | by Tuttle Lane, as shown on said plan, eighty-six and 75/100 (86.75) feet; |
| NORTHEASTERLY | by Tuttle Lane, as shown on said plan, three hundred and ten (310.00) feet; |
| NORTHEASTERLY | by Tuttle Lane, as shown on said plan, seventy-six and 47/100 (76.47) feet; |
| NORTHEASTERLY | by Tuttle Lane, as shown on said plan, one hundred twenty-one and 65/100 (121.65) feet; |
| SOUTHEASTERLY | by land of Weinman, as shown on said plan, two hundred thirty-six and 85/100 (236.85) feet; |
| SOUTHEASTERLY | by land of Ostrowski, as shown on said plan, two hundred twenty-five and 25/100 (225.25) feet; |
| SOUTHEASTERLY | by land of John J. & Kathy B. Palmaccio, Ianatta, McLean, Taylor, Wendell, and Barry A. & Sharyn L. Palmaccio, as shown on said plan, eight hundred ninety-six and 10/100 (896.10) feet; |
| NORTHEASTERLY | by land of Barry A. & Sharyn L. Palmaccio, as shown on said plan, two hundred and seventy (270.00) feet; |
| SOUTHEASTERLY | by Red Acre Road, as shown on said plan, thirty-eight and 90/100 (38.90) feet; and |
| SOUTHWESTERLY | by land of Bubnowicz, as shown on said plan, two hundred and seventy (270.00) feet to the point of beginning. |

Containing 49.75 acres more or less as shown on said plan, and hereby conveying Lot 1 as shown on said plan, however otherwise bounded, measured or described.

Also a certain parcel of land, with the buildings thereon, on the Easterly side of Tuttle Lane and being shown as Lot 2 on said plan entitled, "Plan of Land, Stow, Mass. owned by Charles H. Lord et al, Scale 1" = 100', January 30, 1976, Survey by Clyde R. Wheeler Inc., Bolton, Mass. recorded at Book 12959 End, and bounded and described as follows:

| | |
|---|---|
| NORTHEASTERLY | by land of Morey, as shown on said plan, one hundred and twenty-seven (127.00) feet; |
| NORTHEASTERLY | by land of Weinman, as shown on said plan, one hundred nineteen and 69/100 (119.69) feet; |
| SOUTHEASTERLY | by land of Andrews, as shown on said plan, one hundred thirty and 89/100 (130.89) feet; and |
| SOUTHWESTERLY | by Tuttle Lane, as shown on said plan, one hundred seventy-five and 06/100 (175.06) feet to the point of beginning. |

Containing 18,134 square feet more or less and hereby conveying Lot 2 as shown on said plan however otherwise bounded, measured or described.

Being the same premises conveyed to us by deed of Charles H. Lord, Donald L. Priest, Executor of the Estate of Evelyn L. Priest, Eleanor N. Derby and Mary Elizabeth davis dated April 8, 1976 and recorded with the Middlesex South District Registry of Deeds in Book 12959, Page 626.

Executed as a sealed instrument this    8th   day of November 19 83

_____

_____    John A. Bubnowicz
        JOHN A. BUBNOWICZ

_____    Marilyn Kunelius
        MARILYN E. KUNELIUS formerly
        Marilyn E. Bubnowicz

_____    _____

### The Commonwealth of Massachusetts

Middlesex    ss.        October November 8, 19 83

Then personally appeared the above named   John A. Bubnowicz

and acknowledged the foregoing instrument to be   his    free act and deed,

       Before me,   _____
                           Notary Public — Justice of the Peace
           My commission expires    Nov 16, 1984

COMMONWEALTH OF MASSACHUSETTS

Middlesex   , ss.         November 8, 1983

Then personally appeared the above named Marilyn E. Kunelius and acknowledged the foregoing instrument to be her free act and deed,

       Before me,   _____
                                Notary Public

   My commission expires:   9/28/90

# Attachment 1
# (continued)

**2**



### Town of Stow
# BOARD OF SELECTMEN
### 380 Great Road
### Stow, Massachusetts 01775-1122
(978) 897-4515
FAX (978) 897-4534

February 12, 2003

<u>BY CERTIFIED MAIL</u>
Marilyn Kunelius
142 and 144 Red Acres Road
Stow, MA 01775

Re: Land of Marilyn Kunelius located at 142 and 144 Red Acres Road, Stow, Middlesex County, MA.

Dear Ms. Kunelius:

In response to your letter dated October 16, 2002 regarding your intention to sell the above-referenced property, which is classified as forest land under Massachusetts General Laws Chapter 61, this will serve as formal notice that, by vote taken on February 11, 2003, the Board of Selectmen of the Town of Stow has voted to assign the Town's rights under Chapter 61, Section 8 to purchase the above-referenced land under the terms set forth in the Purchase and Sale Agreement between you and Cohousing Resources, LLC dated October, 2002. The Town has assigned its rights under Chapter 61, Section 8 to The Trust for Public Land, a national non-profit corporation, having its New England Regional Office at 33 Union Street, Boston, MA. 02108.

Copy of Assignment is attached hereto.

Marilyn Kunelius
Page 2
February 2, 2003

Pursuant to Massachusetts General Laws Chapter 61, this letter will be recorded with the Registry of Deeds within the statutory 120 day option period.

Very truly yours,

THE TOWN OF STOW
By its Board of Selectman

_____

_____

(by first class mail)
cc. Dorothy Nelson Stookey, Esq., The Trust for Public Land
    Peter A. Kachajian, Jr., Esq., Attorney for Marilyn Kunelius

Attachment

3





### Town of Stow
# BOARD OF SELECTMEN
380 Great Road
Stow, Massachusetts 01775-1122
(978) 897-4515
FAX (978) 897-4534

## ASSIGNMENT AND ACCEPTANCE

THIS ASSIGNMENT is made as of February 11th, 2003 by the Town of Stow, a Massachusetts municipal corporation having a mailing address of Town Building, 380 Great Rd., Stow, MA. 01775-2127 ("Town") and The Trust for Public Land, a California nonprofit conservation organization, having a mailing address of 33 Union Street, Boston, MA. 02108 ("Trust") under the following circumstances:

A. Pursuant to Massachusetts General Laws, Chapter 61, Section 8, the Town has Rights of First Refusal to acquire certain property valued, assessed and taxed as forest land during a period of one hundred twenty (120) days subsequent to its receipt of a Notice of Intent;

B. Pursuant to said statute, the Town has a right to assign its Rights of First Refusal to a nonprofit conservation organization and the Town voted by majority vote on February 11, 2003 to assign to The Trust for Public Land the Town's rights under M.G.L. Chapter 61, Section 8 to purchase land owned by Marilyn Kunelius of 142 and 144 Red Acres Road, Stow, MA ("Seller") described in two Deeds recorded with the Middlesex County Registry of Deeds Books 15412, Page 316 and Book 26230, Book 255 (the "Property") pursuant to the terms of a Purchase and Sale Agreement between Seller and Cohousing Resources, LLC dated October, 2002; and

C. The Trust desires to assume the Town's Rights of First Refusal pursuant to Chapter 61, Section 8.

NOW THEREFORE, FOR VALUE RECEIVED, Town hereby assigns and transfers all of its Rights of First Refusal to exercise an option to purchase the Property as set forth above.

This instrument shall be governed by and enforced in accordance with the laws of the Commonwealth of Massachusetts without regard to the principles of conflicts of laws thereof.

1

IN WITNESS WHEREOF, the undersigned has executed this agreement as of the date first set forth above.

TOWN OF STOW
By its Board of Selectman

_____

_____

THIS ACCEPTANCE OF ASSIGNMENT is made by The Trust for Public Land of the assignment of the Town of Stow's right of first refusal pertaining to 142 and 144 Red Acres Road, Stow, MA.

The Trust for Public Land

By: Dorothy Nelson Stookey

Dated: February 12, 2003

Dorothy Nelson Stookey
Regional Counsel,
duly authorized

RECEIVED
USI/BOS

2003 AU 26  AM 9: 51

3

**4**



**T H E**
**TRUST**
**F O R**
**PUBLIC**
**LAND**



February 13, 2003

*Conserving Land*
*for People*

BY CERTIFIED MAIL
Marilyn Kunelius
142 and 144 Red Acres Road
Stow, MA 01775

Re:    Exercise of Right of First Refusal, Land in Stow, Middlesex County, MA

Dear Ms. Kunelius:

On February 12, 2003, the Board of Selectmen of the Town of Stow assigned its rights under M.G.L. c. 61, Section 8 to purchase the land located at 142 and 144 Red Acres Road, Stow, MA described in two Deeds recorded with the Middlesex County Registry of Deeds Books 15412, Page 316 and Book 26230, Book 255 pursuant to the terms of a certain Purchase and Sale Agreement between you and Cohousing Resources, LLC dated October, 2002 (the "Agreement") and The Trust for Public Land accepted that assignment.

The undersigned, Dorothy Nelson Stookey, Regional Counsel and Assistant Secretary of the Trust for Public Land ("TPL"), duly authorized, elects to exercise the Right of First Refusal under M.G. L. c. 61, Section 8 that was assigned to TPL by the Town of Stow and assume the position of buyer under the above-referenced Agreement. A check in the amount of $ 11,500, being the initial $10,000 deposit and the first monthly $1500 deposit due under Paragraph 31 of the Agreement, made payable to you is being delivered to your attorney, Peter Kachajian, Esq.

We look forward to working with you to complete the preservation of this property. Thank you for your anticipated assistance and cooperation.

Very truly yours,

The Trust for Public Land

By: *Dorothy Nelson Stookey*
Dorothy Nelson Stookey
Regional Counsel

cc. Peter Kachajian, Esquire

The Trust for Public Land
New England Regional Office
33 Union Street, Fourth Floor
Boston, MA 02108

(617) 367-6200

Connecticut Field Office
383 Orange Street
New Haven, CT 06511

(203) 777-7367
Fax: (203) 772-7488

Maine Field Office
377 Fore Street 3rd Floor
Portland, ME 04101

(207) 772-7424
Fax: (207) 772-7420

Vermont Field Office
3 Shipman Place
Montpelier, VT 05602

(802) 223-1373
Fax: (802) 223-0451

Connecticut Lakes
Project Office
54 Portsmouth Street
Concord, NH 03301

(603) 224-0103
Fax: (603) 228-0423



THE
TRUST
F o R
PUBLIC
LAND

The Trust for Public Land
New England Regional Office
33 Union Street, Fourth Floor
Boston, Massachusetts 02108

RECEIVED
US1/BOS

2005 AU 26 AM 8: 51

Peter A. Kachajian, Jr., Esq.
292 Main Street
Northboro MA 01532



5

RECEIVED
USI/BOS

2005 AU 26  AM 8: 51



**Town of Stow**
**BOARD OF SELECTMEN**
**380 Great Road**
**Stow, Massachusetts 01775**
(978) 897-4515
FAX (978) 897-4534

September 24, 2003

Mr. Peter A. Kachajian, Jr., Esq.
292 Main Street
Northborough, MA 01532

Re: Kunelius property 142 & 144 Red Acre Road

Dear Attorney Kachajian:

In response to your letter of September 12th, the Town of Stow is not a "partner" with The Trust for Public Land (TPL) for the project on Red Acre Road.

After due diligence and pursuant to Massachusetts General laws, Chapter 61, Section 8, the Stow Board of Selectmen transferred completely to the Trust for Public Land the Town's Right of First Refusal to acquire said property.

The Board of Selectmen still believes the project as originally outlined by TPL is in the best interest of the Town and we hope that your client and the TPL, with support from the Friends For Red Acre (FORA) will work together to make this project successful for all parties.

Sincerely,

Ross Perry, sb

Ross Perry

Stow Board of Selectmen

**6**

## Kunelius Property Workout

The lawyer for Marilyn Kunelius has threatened a suit to enforce the contract that called for a $750,000 closing September 26th. The town does not want to find out if it has any legal liability. Yes, we ceded our right of first refusal to TPL and TPL certainly has the assets to make good on the transaction. But they have reneged, and the contract has been breached. The seller has certainly been harmed by our actions and TPL's inaction. Should a suit against TPL be initiated, it is likely the town would become involved. At a minimum the town had committed to contribute $400,000 to the deal, and the actions of many could be interpreted as implying the town was a partner in the deal.

A way to avoid ever finding out about our liability is to help to reinstate the original Mosaic Commons deal. The agent for the seller is very eager to reopen negotiations with Mosaic Commons. But he is reluctant to do so without some indication from the town that the development would be supported. The last vote the Selectmen took on this issue was the Chapter 61 vote, which was clearly against Mosaic Commons. Why should Mosaic Commons spend any time or money on this property if the Selectmen are against their efforts? A resolution in support of Mosaic Commons on the Kunelius property would offer them encouragement.

As the 40B law stands now, the ZBA cannot deny a Comprehensive Permit, as the town would need to approve 1.5% (32 units) to get the ability to say NO for a year. The Villages at Stow only yields 24 units, and then only if building permits get issued within a year of 10/20/2003. Since the plan is to construct the project over 3 years, it is unlikely the ZBA will ever be able to deny another permit under the current law.

But 40B is likely to change within the next 6 months, reducing the threshold to 1% or .5% if the town has a Planned Production Strategy. Stow has submitted a Planned Production Strategy, but we have not heard if it has been approved. Even if the PPS is not approved, TVAS will give the ZBA the temporary ability to say NO. But come 10/20/2004, only the number of building permits actually granted for affordable units will count, and that is unlikely to be either number.

8 affordable units from Mosaic Commons could dramatically change the equation. Added to TVAS's 24, it could give the ZBA the ability to say NO to the airport 40B under the current law. Under the new law (depending upon the timing of actual construction) the ability to say NO could be extended for 3 years. This could be VERY popular along Boxborough Road.

Mosaic Commons is a small-scale development of the kind we endorsed in our Comprehensive Permit Policy Statement. In spite of the vehemence of the neighborhood opposition, the group proposes an environment-friendly development. Yes, the site is constricted, but 30 units on 8 acres is not particularly dense. It would be no more dense than TVAS, depending on how much of the TVAS site you consider as eligible for building.

2005 AU 26 AM 8: 52    RECEIVED USI/BOS

The town will get a valuable water source from the deal, as well as 42 acres of swamp connecting 2 other conservation properties. The water is needed for Lower Village, and we could encourage Mosaic Commons by offering to co-develop the water resource, thus eliminating their need to devote part of their 8 acres to a wellhead protection area.

Therefore, I move the following:

The Selectmen would welcome Mosaic Commons to apply for a friendly 40B on the Kunelius Property. The Selectmen do not have the authority to grant a Comprehensive Permit or even to influence its consideration, but as leaders in the town the Selectmen see benefits from the development proposed by Mosaic Commons. Should the town gain control of the 42 acres proposed to be donated to the town, the Selectmen will work with Mosaic Commons to arrange for permits that will enable a well on the town-controlled property to supply water to the development in exchange for an easement across Mosaic Commons property to deliver water to Lower Village.

7

*ve made Maynard Fest an annual tradition.'*

DEANNA LYONS, MAYNARD RESIDENT



STAFF PHOTOS BY HOLLY SCHMIDT

her horn as she and her brother, Tony, 4, waited for the Happy Wagon to begin at a soggy

# comes the sun

EASTWOOD
WRITER

day makes.

pt some vendors and Saturday's Maynard Fest, ight the crowds back for ished back one day due to

t 9:30 a.m. Saturday, half nual Maynard Fest began, roughout the day.
ìink we did pretty well," it of the Assabet Valley hich organized the event.
bout 2,000 people attend- th 4,000 under sunny ' the 80 scheduled ven- out 40 stayed until the ressy said. Two years ago, to pack up around noon.
active as the festival end- fern Massage Therapy in t massages and passing ts.



Marisa Bonish, 5, was disappointed along with her parents, Jeff and Rachel, of Stow, to discover she missed the last ride of the day at the Happy Wagon.

Shortly after 3 p.m., she prepared to give a five-minute massage to a woman who had just driven from Nebraska.
"I've been having a blast," she said. "I just love talking to people and giving stickers out to little

■ SEE **FESTIVAL**, PAGE 12

---

P. 2

# Trust is late on payment

## Fund-raising lag hinders purchase

BY BRIAN EASTWOOD
STAFF WRITER

STOW — Citing problems with fund-raising efforts, the Trust for Public Land has missed a Sept. 26 deadline to make a payment on the purchase the Kunelius Farm. The group hopes to keep the project on track, however.

The deadline was established in February when the Board of Selectmen voted 3-1 to assign the trust the right of first refusal for the property, which was put up for sale by farm owner Marilyn Kunelius.

The farm's purchase agreement was for $1.2 million. Under the agreement with the town, and after a Town Meeting vote in May, $300,000 of that would come from the town's Community Preservation Fund. Another $100,000 from the fund would purchase permanent affordability restrictions on two existing residences. The rest of the money was to come from the trust.

Craig MacDonnell, the Massachusetts state director for the trust, said the effort to raise the remaining funds had been hindered for many reasons. MacDonnell referred to the declining economy, a tough market for philanthropy and the denial of a grant from the state Department of Housing and Community Development, which he said the trust lost "for reasons we have yet to understand."

"It's a really challenging time," he said.

Now that the deadline has passed, MacDonnell said the trust will discuss with the town — represented by Selectman Ross Perry — Kunelius and the neighborhood group Friends of Red Acre, a plan for an alternative project design. The goal is preserving the 50-acre farm from future housing development.

"The Trust for Public Land has been trying hard to keep that dialogue going," MacDonnell said.

Last fall, a group of developers proposed a 30-unit attached apartment development called Mosaic Commons on a small portion of the farm. Developers would have deeded the rest of the parcel, roughly 42 acres, to the town, and the development would have boosted the

■ SEE **TRUST**, PAGE 14

www.beaconvillage

# to reduce hours

years. United Parcel Service.

Cannon said the decision to reduce hours at some post offices came after a study of post offices and when people use them. The reduced hours reflect the times when foot traffic was either light or non-existent.

"Fewer people are coming into the post office during those times," Cannon said.

Stow Postmaster Frank Jenkins said this week that he recognizes there are still some people who will be affected.

"I'm sure it will inconve-nience some," Jenkins said. "I got a couple of minor calls, nothing heavy. It's some-thing the Postal Service has to do to lessen the deficit with-out an increase."

People come into the post office early tend to be "people who want to grab their stuff first thing in the morning," Maynard Postmaster Michael Welch said.

The Maynard post office will keep its current hours of 8 a.m. to 5 p.m., Monday through Friday and 9 a.m. to noon on Saturday.

# Trust for Public Land late on payment

**TRUST**, FROM PAGE 1

town's affordable housing stock under Chapter 40B.

However, the Board of Selectmen, the Planning Board and the Friends of Red Acre did not support Mosaic Commons on the grounds that it was too dense for Stow.

"On land that's zone conservation, that's just not appropriate," Serena Fur-man of the Friends said.

Under the Trust for Pub-lic Land's proposal, the

farm would be preserve One house, which is on own one-acre lot, would auctioned off, and the ot er would be sold to the E of the Storm Equirie Resc Program. Both residenc would be deed restricted.

Furman said the Frien were happy that the tru hoped to proceed with i plan despite missing th deadline.

"We're still hoping fc the best for everybody," sh said.

**Connect**  www.beaconvillager.com

E-mail
the editor of
The Beacon-
Villager at   **beacon-villager@cnc.cor**





**BERLIN ORCHARDS**

Open Year Round    A Taste For All Seasons

**PICK YOUR OWN APPLES**
7 Days A Week 10:00AM to 6:00PM
On Weekends and Holidays take a Hay Wagon Ride to our Scenic Orchards

**COUNTRY SUNDAY, OCTOBER 12TH**
(Raindate, Monday, Oct. 13th)
NOON to 4PM • M-F Country DJ
Interactive Country Music • Free Line Dancing Lessons

Hot Apple Crisp • Fresh Pressed Cider • Pies • Caramel Apples
Cider Donuts • Homemade Baked Goods • Mums • Pumpkin Patch
Ice Cream • Country & Christmas Gift Shop
www.berlinorchards.com
200 Central St., Berlin, MA • Rte. 62, Exit 26 off Rte. 495
**978-838-0463**
Regular Store Hours: M-Sat 9-7, Sun 9-6

**PICK YOUR OWN APPLES & Pears** • Daily 10-5
VISIT OUR FARM STORE OPEN 7 DAYS, 9-6
• APPLES    • CARAMEL APPLES    • PIES
• PEARS    • CIDER DONUTS    • TOMATOES
• CIDER    • SQUASH

1,000S **PUMPKINS**   Come See The Little Pigs & Other Animals

**HONEYPOT HILL ORCHARDS**
Stow, MA

VOTED #1 Apple Orchard in New England. Come See Why!

**978-562-5666**
www.honeypothill.com

**CARLSON**
**GMAC**
Real Estate

"Entrusted With the Best Listings"

Glenn Berger    Mona Jameson

8

BOSTON SUN AY GLOBE                                                    OCTOBER 12, 2

# Abandoned house haunts officials

**▶ SOUTHBOROUGH**
*Continued from Page 1*

Technically, Cipriano said, all of the owner's descendants have legal rights to the house.

And for the past three months, Cipriano has been developing a family tree that traces back to Margaret A. Coyle, who purchased the property for $600 in 1877. He's also had to determine which of Coyle's relatives are still living and find each of their addresses.

"We've basically tried to piece together all known heirs of law," he said, characterizing the case as a "detective story."

"And now we have to prove to the court that we've made a significant effort to find all of them."

Cipriano said he has still not finished putting the list of descendants together, but that several of them live as close as Milford.

According to town records, Coyle (whose last name has an alternate spelling of "Coyl") died in 1890, at the age of 58, after suffering from gastritis, an inflammation of the stomach. And although her husband, Peter, and their five children continued to live in the house, it remained under Margaret Coyle's name.

Charles Scott, who owns Charles Group Real Estate, looked into the property several years ago because he wanted to purchase the land and tear down the house to build a new one.

He says the last person to occupy the house was Margaret A. Welch, who, according to town records, was Coyle's granddaughter. Welch, who never married, died in 1988 at the age of 89.

If the court rules in the town's favor, Cipriano would send formal notification to all of the known heirs saying that the town plans to foreclose on the house, which is assessed by the town at $135,400.

If the descendants choose to reclaim the property, they would first be hit with a hefty bill of $35,700 for property taxes that haven't been paid since 1991.

The town does not keep records of who paid property taxes, according to a secretary in the town's tax collection department, so it is impossible to determine who paid taxes on the house from

1988, when Welch died, u[...] 1991, the last year the prope[...] taxes were paid.

If the heirs decide to for[...] their rights to the property, [...] priano said, the town would t[...] over the 10,900-square-foot ho[...] and the quarter-acre it sits on.

Selectmen would then dec[...] whether to sell the property, dev[...] op it for a town use, or demolis[...] and use the land as open space.

Cipriano said he plans to f[...] the brief in Worcester Land Co[...] by the end of the month and he a[...] ticipates the case would be hea[...] "well within a year."

*Matt Viser can be reached [...]
viser@globe.com.*

---

*'We have been faced with a challenging set of circumstances. We had to request that the project be renegotiated.'*
CRAIG MacDONNELL, *Massachusetts director for the Trust for Public Land*

# Red Acre property deal falls through

## Owner cites Stow for nonpayment, breach of contract

**By Maureen Costello**
GLOBE CORRESPONDENT

The town, a national land conservation firm, and an ad hoc neighborhood group have been put on notice that their plan to purchase and preserve a 50-acre parcel off of Red Acre Road in Stow is in breach of contract.

Last week, Peter A. Kachajian, lawyer for the property owner Marilyn Kunelius, sent the notices to the Board of Selectmen, the Trust for Public Land, and the Friends of Red Acre Road.

The three entities have been working since last fall to raise $1.1 million to purchase the wooded land as open space. It is zoned as forestry, which allows the town the right to first refusal. Kunelius put the property up for sale in

signed a purchase and sale agreement for $1.1 million with Mosaic Common LLC, a cooperative housing group, in October 2002. Concerned that the project would be too dense for the land, neighbors persuaded the town to match the sale price. The town could not come up with the full amount, so signed its right of first refusal over to the trust, which was expected to kick in the $400,000 balance.

The land contains an aquifer that the town had hoped to profit from by selling water to neighboring communities. If the deal had been closed, a parcel of land was to be sold to a horse rescue farm.

However, no money arrived from anyone for the August and September payments, said Kachajian.

"They did not hold up their end of the bargain, so the contract cannot be enforced," he said.

Because the town signed over its right of first refusal to the Trust for Public Land in the spring, Stow

said Town Administrator William Wrigley, and the town is immune to legal action.

"I do not agree," said Kachijian. "The town is just as liable" as the trust.

Craig MacDonnell, the Massachusetts director for the Trust for Public Land, said a slow economy thwarted fund-raising efforts and a sizable grant fell through.

"We have been faced with a challenging set of circumstances," said MacDonnell. "We had to request that the project be renegotiated."

But Kachajian said that, so far, his client hasn't heard a viable proposal and has raised the asking price back to $1.2 million. "We have not heard of any alternative plan from anyone that sounds appealing," he said.

Kachajian said he wants to ensure that Stow gets about 45 acres of conservation land and the aquifer, that Kunelius gets her money, and that the deal stays out

have been accomplished unde[...] the terms with Mosaic Commons[...]

The group wanted to cluster 3[...] private dwellings on two acres [...] the property, and a few commun[...] ty buildings, such as a commo[...] building and recreation facility, o[...] about six. It would have donate[...] the remaining acreage, includin[...] the aquifer, to the town.

But promises of land and wate[...] were not enough for neighbor[...] many of whom formed Friends [...] Red Acre Road.

Chris ScottHanson, who repre[...] sents Mosaic Commons, a cohou[...] ing group, said the property's rea[...] tor and Stow officials hav[...] contacted him about reviving th[...] deal, which he said he would onl[...] do if a harmonious relationsh[...] with neighbors were guaranteed.

"We said, on the face of it, we'r[...] not interested," said ScottHanso[...] "We have angry, upset, activis[...] neighbors who do not want us i[...] their backyards. We are not a d[...] veloper. We must live there an[...]

9



T H E
TRUST
F O R
PUBLIC
L A N D

*Conserving Land*
*for People*

September 25, 2003

**<u>Via Federal Express</u>**

Mr. Donald Hyde
Chairman, Stow Zoning Board of Appeals
Town Hall
380 Great Road
Stow MA 01775

Re:  Pending Application for Variances for Property at 144 Red Acre Road

Dear Mr. Chairman and Members of the Board:

Due to a number of circumstances, we cannot proceed with the project for the above-referenced property as we had planned it.  Accordingly, we wish to withdraw our pending application for variances.  Alternatively, if procedural requirements prevent withdrawal, we request that you deny our application without prejudice at your next meeting, so that if we are able to plan a viable alternative project, we will not be foreclosed from reappearing before you if necessary.

We sincerely thank you for the time and effort you have spent on our application and for the consideration you have shown us in granting our requests for extensions.  We are deeply disappointed that we are unable to proceed with the project.  While we are continuing discussions to try to identify an alternative project, in light of the circumstances as they exist today, we cannot say that any further extensions of time on this application, should you decide to grant them, would be productive.

Thank you again for the consideration you have shown us in this process.

Very truly yours,

Denise A. Pelletier
Regional Counsel

cc:    Jacob C. Diemert, Esq.
        Peter A. Kachajian, Jr., Esq.

The Trust for Public Land
New England Regional Office
33 Union Street, Fourth Floor
Boston, MA 02108

(617) 367-6200

Connecticut Field Office
383 Orange Street
New Haven, CT 06511

(203) 777-7367

Maine Field Office
377 Fore Street 3rd Floor
Portland, ME 04101

(207) 772-7424

Vermont Field Office
3 Shipman Place
Montpelier, VT 05602

(802) 223-1373

Connecticut Lakes
Project Office
54 Portsmouth Street
Concord, NH 03301

(603) 224-0103



THE
TRUST
FOR
PUBLIC
LAND

*Conserving Land
for People*

September 25, 2003

**<u>Via Federal Express</u>**

Mr. Donald Hyde
Chairman, Stow Zoning Board of Appeals
Town Hall
380 Great Road
Stow MA 01775

Re:  Pending Application for Variances for Property at 144 Red Acre Road

Dear Mr. Chairman and Members of the Board:

Due to a number of circumstances, we cannot proceed with the project for the above-referenced property as we had planned it.  Accordingly, we wish to withdraw our pending application for variances.  Alternatively, if procedural requirements prevent withdrawal, we request that you deny our application without prejudice at your next meeting, so that if we are able to plan a viable alternative project, we will not be foreclosed from reappearing before you if necessary.

We sincerely thank you for the time and effort you have spent on our application and for the consideration you have shown us in granting our requests for extensions.  We are deeply disappointed that we are unable to proceed with the project.  While we are continuing discussions to try to identify an alternative project, in light of the circumstances as they exist today, we cannot say that any further extensions of time on this application, should you decide to grant them, would be productive.

Thank you again for the consideration you have shown us in this process.

Very truly yours,

Denise A. Pelletier
Regional Counsel

cc:    Jacob C. Diemert, Esq.
       Peter A. Kachajian, Jr., Esq.

The Trust for Public Land
New England Regional Office
33 Union Street, Fourth Floor
Boston, MA 02108

(617) 367-6200
Fax: (617) 367-1616

Connecticut Field Office
383 Orange Street
New Haven, CT 06511

(203) 777-7367

Maine Field Office
377 Fore Street 3rd Floor
Portland, ME 04101

(207) 772-7424

Vermont Field Office
3 Shipman Place
Montpelier, VT 05602

(802) 223-1373

Connecticut Lakes
Project Office
54 Portsmouth Street
Concord, NH 03301

(603) 224-0103

10

11



T H E
TRUST
F O R
PUBLIC
L A N D

*Conserving Land
for People*

July 6, 2004

**BY FACSIMILE AND REGULAR MAIL**

Peter A. Kachajian, Jr., Esquire
292 Main Street
Northborough, MA  01532

RE:  <u>Kunelius Property</u>

Dear Peter:

Almost two months have passed since our last meeting in Maynard.
At that time we discussed an alternative project structure that appeared to
hold real promise for securing significant funds for your client.  As you
recall, the Trust for Public Land ("TPL") modified its previous proposal at
our last meeting and asked for a response, hoping that we could refine the
proposal in order to reach agreement.  But we've heard nothing from you
since then.  I've tried to reach you by telephone several times, but have
received no response.

It was unclear to me, after our last meeting, whether your client fully
understood all of the potential financial benefits of the revised proposal we
put on then table for her to consider.  So before too much more time passed,
it seemed prudent to summarize those benefits for you and for her.

You will remember that our discussion began with the recognition
that the original contract (assigned by the Town of Stow ("Town") to TPL)
was no longer operative.  Insofar as the payments contemplated under that
contract were not made, the deposits retained by Marilyn Kunelius as
liquidated damages discharged the contracting parties from any further
obligations under the contract.  Our discussion also addressed TPL's view
that the original contract price was well above the traditional development
value – it being based on a speculative chapter 40B project – and that the
traditional development value of the property would be in the range of
eight or nine hundred thousand dollars.

The Trust for Public Land
New England Regional Office      Connecticut Field Office     Maine Field Office          Vermont Field Office      Connecticut Lakes
33 Union Street, Fourth Floor    383 Orange Street            377 Fore Street 3rd Floor    3 Shipman Place           Project Office
Boston, MA 02108                 New Haven, CT 06511          Portland, ME 04101           Montpelier, VT 05602      54 Portsmouth Street
                                                                                                                     Concord, NH 03301
(617) 367-6200                   (203) 777-7367               (207) 772-7424               (802) 223-1373
Fax: (617) 367-1616              Fax: (203) 777-7488          Fax: (207) 772-7420          Fax: (802) 223-0451        (603) 224-0103
                                                                                                                     Fax: (603) 228-0423

But knowing that the Town retained a strong interest in seeing the Kunelius property conserved, TPL agreed to fashion an alternative proposal. The first such proposal contemplated a partnership with the Town and Ms. Kunelius whereby: (1) TPL would pay her $800,000 for her property; (2) the Town would invest $300,000: (3) Ms Kunelius would apply (together with TPL) for the subdivision of the property into three lots (one for the Town; one including the existing house main house at 142 Red Acre Road; and one containing the rear house, barn and riding area); and (4) the Town would agree to support the subdivision. This proposal did not address the possibility of utilizing the tax savings of a so-called "bargain sale." This proposal was discussed but never accepted by Ms. Kunelius.

The second alternative proposal, made at our last meeting, contemplated several new aspects: (1) an improved bottom line; (2) rollback taxes being excused by the Town; and (3) taking advantage of the tax savings of characterizing this transaction as a "bargain sale."

It was my understanding that the purchase price could be improved to $900,000 with the assistance of the Stow Conservation Trust (Bob Wilber and I said we would discuss this with the trustees if the proposal met with your approval).

We also confirmed that Ms. Kunelius would not owe rollback taxes, which you may have assumed would be an obligation irrespective of the nature of the transaction. These taxes should not be triggered where, as here, more than fifty percent of the property is being conserved.

Finally, we discussed the impact of income taxes. I know that you are well acquainted with the tax benefits of selling land for conservation in cooperation with a non-profit like TPL, although your client may not be. Please carefully review with her the two enclosed tax benefit analyses, which compare the net, after-tax benefits of a conservation sale to TPL with a normal development sale, utilizing two different values for purposes of illustration.

She may be surprised that a sale to TPL at $900,000 is comparable to the original contract sale if evaluated from a net, after-tax perspective. The tax benefit analysis enclosed as Exhibit A reflects a "gift" in the amount of the bargain – the difference between a $900,000 conservation sale and the contract price. The tax consequences of this bargain sale together with the time value of money result in a modest net, after-tax difference (just over $20,0000) between the two approaches, with the contract sale bringing in the slightly larger amount.

A further refinement of this analysis is contained in Exhibit B. If one assumes that the value of the Kunelius property is greater than the contract price because of the value of the aquifer beneath it, then the tax benefits are

2

even more pronounced. In the tax benefit analysis attached as <u>Exhibit B</u> we have assumed for purposes of illustration that the value of the property has been appraised to be $1.5M. In that event, the amount of the bargain is larger and the net tax benefit to Ms. Kunelius is greater. The enclosed analysis shows that a sale to TPL at $900,000 would net Ms. Kunelius approximately <u>$100,000 more</u> than a private sale at the contract price. According to Jim Boothroyd, securing such an appraisal of the property from a water supply perspective would be achievable.

Utilizing this "bargain sale" approach, Ms. Kunelius stands to benefit handsomely from a sale to TPL and would avoid the uncertainty of putting her property back on the market during a period of increasing interest rates and falling land prices.

Please contact me directly if you would like to discuss the sale of your client's property in partnership with the Town and TPL.

Sincerely,

Craig A Mac Dull

Craig A. MacDonnell
MA State Director

cc  Kathy Farrell
    Bob Wilber

# Attachment 2

Law Offices of

# Peter A. Kachajian, Jr., Esq.

292 Main Street
Northborough, MA 01532

tel:    508 393-6278
fax:    508 393-5228
email: pakjr@earthlink.net

October 16, 2002

Town of Stow
Board of Selectmen
c/o Town Clerk Linda Hathaway
380 Great Road
Stow, MA 01775-2127

**Re:    NOTICE OF INTENT FOR SALE OF PROPERTY LOCATED AT 142 – 144 RED ACRE ROAD, STOW, MASSACHUSETTS**

Dear Board of Selectmen:

Enclosed please find, pursuant to Massachusetts General Laws, Chapter 61, the Purchase and Sale Agreement regarding the intended sale of the above referenced property. As is proscribed in said statute we are initiating the 120-day notice requirement.

If you have any questions or if I could be of further assistance, please do not hesitate to call.

Very truly yours,

Peter A. Kachajian, Jr., Esq.
Attorney for Marilyn Kunelius

Cc:    Board of Assessors
       Planning Board
       Conservation Commission

KUN521

OCT 17 REC'D

**STANDARD FORM**
**PURCHASE AND SALE AGREEMENT**

From the Office of:
Atty. Peter A. Kachajian, Jr.
292 Main Street
Northborough, MA 01532
(508) 393-6278

1. **PARTIES**
   *(fill in)*

   This _____ day of __October,____ 2002
   **Marilyn Kunelius of 142 and 144 Red Acres Road, Stow, MA**
   hereinafter called the **SELLER**, agrees to **SELL** and

   **Cohousing Resources, LLC, with an address of 9813 NE Murden Cove Road, Brainbridge Islande, WA 98110**
   hereinafter called the **BUYER** or **PURCHASER**, agrees to **BUY**, upon the terms hereinafter set forth, the following described premises: 142 and 144 Red Acres Road, Stow, MA

2. **DESCRIPTION**
   *(fill in and include title reference)*

   The land with the buildings and improvements thereon known and located at **142 and 144 Red Acres Road, Stow, MA**. Being more particularly described in the Middlesex Registry of Deeds Book 15412; Page 316; Book 26230; Page 255 (see exhibits).

3. **BUILDINGS, STRUCTURES, IMPROVEMENTS, FIXTURES**

   *(fill in or delete)*

   Included in the sale as a part of said premises are 50.67 acres of land with a home, caretakers residence, barn and the buildings, structures, and improvements now thereon, and the fixtures belonging to the SELLER and used in connection therewith including, if any, all wall-to-wall carpeting, drapery rods, automatic garage door openers, venetian blinds, window shades, screens, screen doors, storm windows and doors, awnings, shutters, furnaces, heaters, heating plumbing and bathroom fixtures, garbage disposers, electric and other lighting fixtures, mantels, outside television antennas, fences, gates, trees, shrubs, plants, ONLY IF BUILT IN, refrigerators, dishwashers, washing machines and dryers; and all buildings and improvements thereon are sold in "as is" condition.

4. **TITLE DEED**
   *(fill in)*
   *Include here by specific reference any restrictions, easements, rights and obligations in party walls not included in (b), leases, municipal and other liens, other encumbrances, and make provision to protect SELLER against BUYER'S breach of SELLER'S covenants in leases, where necessary.*

   Said premises are to be conveyed by a good and sufficient quitclaim deed running to the BUYER, or to the nominee designated by the BUYER by written notice to the SELLER at least seven (7) days before the deed is to be delivered as herein provided, and said deed shall convey a good and clear record and marketable title thereto, free from encumbrances, except
   (a) Provisions of existing building and zoning laws;
   (b) Such taxes for the then current taxable year are not due and payable on the date of the delivery of such deed;
   (c) Any liens for municipal betterments assessed after the date of this agreement;
   (d) Easements, restrictions and reservations of record, if any, so long as the same do not prohibit or materially interfere with the current use of said premises
   (e)

5. **PLANS**

   If said deed refers to a plan necessary to be recorded therewith, the SELLER shall deliver such plan with the deed in form adequate for recording or registration.

6. **REGISTERED TITLE**

   In addition to the forgoing, if the title to said premises is registered, said deed shall be in form sufficient to entitle the BUYER to a Certificate of Title of said premises, and the SELLER shall deliver with said deed all instruments, if any, necessary to enable the BUYER to obtain such Certificate of Title.

**KUN522**

COPYRIGHT © 1979, 1984, 1986, 1987, 1988, 1991
GREATER BOSTON REAL ESTATE BOARD
Rev. 1999                    Form No RA151

All rights reserved. This form may not be copied or reproduced in whole or in part in any manner whatsoever without the prior express written consent of the Greater Boston Real Estate Board.
                                                    CWV 5.0

OCT 17 REC'D

7. **PURCHASE PRICE**
*(fill in): space is allowed to write out the amounts if desired*

The agreed purchase price for said premises is $1,116,900.00
ONE MILLION ONE HUNDRED SIXTEEN THOUSAND NINE HUNDRED and 00/100s........dollars, of which

| $ | 0.00 | have been paid as a deposit this day and |
| $ | 0.00 | have been paid at the time of the offer to purchase |
| $ | 716,900.00 | **(less deposits paid)** are to be paid at the time of delivery of the deed in cash, or by certified cashier's, treasurer's or bank check, or conveyancing attorney's check.** |
| $ | 400,000.00 | promissory note secured by a mortgage* |
| $ | 1,116,900.00 | TOTAL |

** See Paragraph #31 for further terms and provisions
* See paragraph #30 for further terms and provisions

8. **TIME FOR PERFORMANCE; DELIVERY OF DEED** *(fill in)*

Such deed is to be delivered at **1:00** o'clock **P.M.** on or before the 26th day of September, 2003 , at the Office of the Conveyancing Attorney unless otherwise agreed upon in writing provided notice of same is given to Buyer's and Seller's counsel. However, provided the Chap. 40B approval process is proceeding forward, BUYER may have up to 12 months extension It is agreed that time is of the essence of this agreement.

9. **POSSESSION and CONDITIONS of PREMISES.** *(attach a list of exceptions, if any)*

Full possession of said premises free of all tenants and occupants, except as herein provided, is to be delivered at the time of the delivery of the deed, said premises to be then (a) in the same condition as they now are, reasonable use and wear thereof excepted and (b) not in violation of said building and zoning laws, and (c) in compliance with provisions of any instrument referred to in clause 4 hereof. The BUYER shall be entitled to an inspection of said premises prior to the delivery of the deed in order to determine whether the condition thereof complies with the terms of this clause.

10. **EXTENSION TO PERFECT TITLE OR MAKE PREMISES CONFORM** *(Change period of time if desired.)*

If the SELLER shall be unable to give title or to make conveyance, or to deliver possession of the premises, all as herein stipulated, or if at the time of delivery of the deed the premises do not conform with the provisions hereof, the SELLER shall use reasonable efforts to remove any defects in title, or to deliver possession as provided herein, or to make the said premises conform to the provisions hereof, as the case may be, in which event the time for performance hereof shall be extended for a period of thirty (30) days.*
* Contemplated herein is the Town of Stow exercising its right of first refusal pursuant to M.G.L c. 61.

11. **FAILURE TO PERFECT TITLE OR MAKE PREMISES CONFORM, etc.**

If at the expiration of the extended time the SELLER shall have failed so to remove any defects in title, deliver possession, or make the premises conform, as the case may be, all as herein agreed, or if at any time during the period of this agreement or any extension thereof, the holder of a mortgage on said premises shall refuse to permit the insurance proceeds, if any, to be used for such purposes, then any payments made under this agreement shall be forthwith refunded and all other obligations of the parties hereto shall cease and this agreement shall be void without recourse to the parties hereto.

12. **BUYER'S ELECTION TO ACCEPT TITLE**

The BUYER shall have the election, at either the original or any extended time for performance, to accept such title as the SELLER can deliver to the said premises in their then condition and to pay therefor the purchase price without deduction, in which case the SELLER shall convey such title, except that in the event of such conveyance in accord with the provisions of this clause, if the said premises shall have been damaged by fire or casualty insured against, then the SELLER shall, unless the SELLER has previously restored the premises to their former condition, either

(a) pay over or assign to the BUYER, on delivery of the deed, all amounts recovered or recoverable on account of such insurance, less any amounts reasonably expended by the SELLER for any partial restoration, or

(b) if a holder of a mortgage on said premises shall not permit the insurance proceeds or a part thereof to be used to restore the said premises to their former condition or to be so paid over or assigned, give to the BUYER a credit against the purchase price, on delivery of the deed, equal to said amounts so recovered or recoverable and retained by the holder of the said mortgage less any amounts reasonably expended by the SELLER for any partial restoration.

KUN523

**13. ACCEPTANCE OF DEED**

The acceptance of a deed by the BUYER or his nominee as the case may be, shall be deemed to be a full performance and discharge of every agreement and obligation herein contained or expressed, except such as are, by the terms hereof, to be performed after the delivery of said deed.

**14. USE OF MONEY TO CLEAR TITLE**

To enable the SELLER to make conveyance as herein provided, the SELLER may, at the time of delivery of the deed, use the purchase money or any portion thereof to clear the title of any or all encumbrances or interests, provided that all instruments so procured are recorded in a manner consistent with customary conveyancing practices.

**15. INSURANCE**
*\*Insert amount (list additional types of insurance and amounts as agreed)*

Until the delivery of the deed, the SELLER shall maintain insurance on said premises as follows:

| *Type of Insurance* | *Amount of Coverage* |
|---|---|
| (a) Fire | Risk to remain with SELLER |
| (b) Extended Coverage | As is presently insured |
| (c) | |

**16. ADJUSTMENTS**
*(list operating expenses, if any, or attach schedule)*

Water and sewer use charges and taxes for the then current year shall be apportioned and fuel value shall be adjusted as of the day of performance of this agreement and the net amount thereof shall be added to or deducted from, as the case may be, the purchase price payable by the BUYER at the time of delivery of the deed.

**17. ADJUSTMENT OF UNASSESSED AND ABATED TAXES**

If the amount of said taxes is not known at the time of the delivery of the deed, they shall be apportioned on the basis of the taxes assessed for the preceding year, with a reapportionment as soon as the new tax rate and valuation can be ascertained; and, if the taxes which are to be apportioned shall thereafter be reduced by abatement, the amount of the abatement, less the reasonable cost of obtaining the same, shall apportioned between the parties, provided that neither party shall be obligated to institute or prosecute proceedings for an abatement unless herein otherwise agreed.

**18. BROKER'S FEE**
*(fill in fee with dollar amount or percentage; also name of Broker(s)*

A broker's fee for professional service per listing agreement is due from the SELLER to **Century 21 Classic Properties**, the broker herein, but only if, as when the SELLER receives the full purchase price pursuant to this Agreement and the BUYER accepts and records the SELLER'S deed and not otherwise.

**19. BROKER(S) WARRANTY**
*(fill in name)*

The Broker(s) named herein **Century 21 Classic Properties** warrant(s) that the Broker(s) is(are) duly licensed as such by the Commonwealth of Massachusetts.

**20. DEPOSIT**
*(fill in, or delete reference to broker(s) if SELLER holds deposit)*

All deposits made hereunder shall be held by **Law Offices of Peter A. Kachajian, Jr.** subject to the terms of this agreement and shall be duly accounted for at the time for performance of this agreement, provided however that in the event of any disagreement the escrow agent may retain said deposits pending instructions mutually given by the SELLER and BUYER or a court of competent jurisdiction, **except as herein provided in Paragraph #31.**

**21. BUYER'S DEFAULT; DAMAGES**

If the BUYER shall fail to fulfill the BUYER'S agreements herein, all deposits made hereunder by the BUYER shall be retained by the SELLER as liquidated damages and this shall constitute SELLER'S sole remedy in equity and law.

**22. RELEASE BY HUSBAND OR WIFE**

The SELLER's spouse hereby agrees to join in said deed and to release and convey all statutory and other rights and interests in said premises.

**23. BROKER AS PARTY**

The Broker(s) named herein join(s) in this agreement and becomes a party hereto, insofar as any provisions of this agreement expressly apply to the Broker(s), and to any amendments or modifications of such provisions to which the Broker(s) agree(s) in writing.

**24. LIABILITY OF TRUSTEE, SHAREHOLDER, BENEFICIARY, etc.**

If the SELLER or BUYER executes this agreement in a representative or fiduciary capacity, only the principal or the estate represented shall be bound, and neither the SELLER or BUYER so executing, nor any shareholder or beneficiary of any trust, shall be personally liable for any obligation, express or implied, hereunder.

**KUN524**

25. **WARRANTIES AND REPRESENTATIONS** *(fill in): if none, state "none", if any listed, indicate by whom each warranty or representation was made*

The BUYER acknowledges that the BUYER has not been influenced to enter into this transaction nor has he relied upon any warranties or representations not set forth or incorporated in this agreement or previously made in writing, except for the following additional warranties and representations, if any, made by either the SELLER or the Broker(s):

26. **MORTGAGE CONTINGENCY CLAUSE**

In order to help finance the acquisition of said premises, the parties agree that the BUYER shall apply for a conventional bank or other institutional construction loan of 80% of the project construction price, at prevailing rates, terms and conditions.

27. **CONSTRUCTION OF AGREEMENT**

This instrument, executed in quadruplicate counterparts, is to be construed as a Massachusetts contract, is to take effect as a sealed instrument, sets forth the entire contract between the parties, is binding upon and enures to the benefit of the parties hereto and their respective heirs, devisees, executors, administrators, successors and assigns, and may be cancelled, modified or amended only by a written instrument executed by both the SELLER and the BUYER. If two or more persons are named herein as BUYER, their obligations hereunder shall be joint and several. The captions and marginal notes are used only as a matter of convenience and are not to be considered a part of this agreement or to be used in determining the intent of the parties to it.

28. **LEAD PAINT LAW**

The parties acknowledge that, under Massachusetts law, whenever a child or children under six years of age resides in any residential premises in which any paint, plaster or other accessible material contains dangerous levels of lead, the owner of said premises must remove or cover said paint, plaster or other material so as to make it inaccessible to children under six years of age.

29. **SMOKE DETECTORS**

The SELLER shall, at the time of the delivery of the deed, deliver a certificate from the fire department of the city or town in which said premises are located stating that said premises have been equipped with approved smoke detectors in conformity with applicable law.
The initialed riders, if any, attached hereto, are incorporated herein by reference.

30. **PURCHASE PRICE FINANCING**

The $400,000.00 promissory note secured by a mortgage against the land, subordinated only to a comprehensive construction loan in the amount of 80% of project construction costs. Promissory note shall bear interest at 7% APR and shall become due and payable 24 months after closing, or within 30 days after substantial completion of the project construction. BUYER shall make interest payments to SELLER of $2,333.00 per month until principal is paid in full. All payments to be made in cash or certified funds.

Security for the $400,000.00 promissory note, aforescribed, shall be in the form of a mortgage on the 8.57 acre parcel. Upon BUYER obtaining construction financing, SELLER shall subordinate said mortgage to the construction lender. All purchase and sale agreements (pre-sale or otherwise) executed by potential purchasers of the BUYER'S contemplated co-housing project shall be assigned to the SELLER as further security concomitant with each purchase and sale agreement subjecting the purchaser, unequivocally, to personal liability as to the $400,000.00 promissory note.

Nothwithstanding the foregoing, BUYER shall only encumber the 8.57 acre parcel expected to be developed (consisting of .93 acre house parcel and 7.64 acre horse farm parcel).

31. **EARNEST MONEY**

Seller acknowledges receipt from Buyer of an initial earnest money deposit in the sum of $10,000 * in the form of a Promissory Note to be held by Seller pending the completion of Feasibility. Buyer shall convert the Promissory Note to non-refundable cash at completion of the feasibility period when the Buyer has removed this contingency. Buyer will make additional non-refundable earnest money payments of $1500 per month beginning 60 days after removal of the Feasibility Contingency and until closing. It is agreed that earnest money payments shall be immediately available for use by the Seller and no payments shall be held in escrow. All earnest money payments will be applied to the purchase price at the closing.

* See exhibit A attached hereto and made a part hereof

KUN525

32  40B APPLICATION & TRANSFER OF LAND

The Buyer and Seller agree to cooperate in the timely submission of a 40B application for the development of a 30 unit owner occupied, tightly clustered, environmentally sensitive residential housing project, with 25% of the units qualifying as affordable under the guidelines for such an application. Said application shall be made within 135 days of the date of this Agreement. It is agreed that the 40B application process will be as cooperative and friendly as possible to the Town of Stow, with all mutually beneficial environmental agendas addressed as openly and clearly as possible.

33.  RISK OF LOSS OR ENVIRONMENTAL DAMAGE

Seller, at its sole cost and responsibility, shall keep the Premises safe and secure from environmental damage until the closing. Seller shall bear the risk of all damage to the Premises from all causes until the closing. Should there be any intentional or unintentional environmental damage that is not restored by Seller to its former condition by the closing, Buyer, at its option, may (i) terminate this Agreement and any deposit shall be refunded to Buyer, plus all costs incurred by buyer for feasibility, engineering and design, or (ii) purchase the Premises and be entitled to a reduction in the purchase price which is sufficient to cover the cost of the repairing any such damage.

34.  INSPECTIONS AND TESTING

The obligations of Buyer under this Agreement are expressly subject to Buyer conducting engineering inspections and testing of the property during feasibility. If any such inspections reveal conditions unacceptable to Buyer during the feasibility period, Buyer may terminate this Agreement and any deposit will be refunded to Buyer. After completion of the feasibility period, Buyer shall have the right to reasonable tours, inspections and testing for the purposes of planning, design and marketing of the project, with 24 hour notice to Seller. Buyer agrees to conduct such a feasibility evaluation with all due diligence. If Buyer is unable to determine that the site is feasible for their purposes within 60 days of the date of this agreement, Buyer shall inform Seller in writing by such date and this Agreement will terminate and the earnest money deposit will be refunded to Buyer.

35.  ADDITIONAL PRO-VISIONS

Upon the Town of Stow's approval of the development of the said 8.57 acre parcel, by the BUYER, and issuance of all requisite Board Approvals, building permits and SELLER receiving purchase monies as set forth herein,, BUYER and SELLER agree that SELLER shall, upon acceptance of the Town of Stow, transfer all right, title and interest in the said 42.1 acre parcel currently under M.G.L. c. 61, as a charitable contribution.

In the event that the Town of Stow exercises its right of first refusal pursuant to M.G.L. c. 61, all monies deposited hereunder shall be forthwith returned to BUYER without further recourse by either party in equity or law.

NOTICE: This is a legal document that creates binding obligations. If not understood, consult an attorney.

SELLER    Marilyn Kunelius

BUYER    Chris ScottHanson
Representative for Cohousing Resources, LLC

KUN526

## EXTENSION

Date _____

The time for the performance of the foregoing agreement is extended until_____ o'clock_____M. on the _____ day of_____ 19___, time still being of the essence of this agreement as extended.  In all other respects, this agreement is hereby ratified and confirmed.

This extension, executed in multiple counterparts, is intended to take effect as a sealed instrument.


SELLER _____

BUYER _____

_____
BROKER(S)


KUN527

# Promissory Note
### In connection with the Agreement to Purchase
### 50.67 Acre Horse Property owned by Marilyn Kunelius

### October 11, 2002

## $10,000.00

For value received and as a deposit made in conjunction with the offer to purchase real estate of today's date, I promise to pay Marilyn Kunelius, the sum of Ten Thousand and no/100ths Dollars ($10,000) on or before December 10, 2002.

This note shall become void if the purchaser chooses to terminate the purchase and sale agreement during the feasibility period terminating 60 days after the signing of the Purchase and Sale agreement.  If feasibility is approved by the purchaser, this note shall be converted to cash at the end of the feasibility period, as stipulated in the purchase and sale agreement attached hereto.

If this note becomes in default, borrower agrees to pay all reasonable collection costs and attorney's fees.

Agreed this 11th day of October, 2002

Chris ScottHanson, Owner
for Cohousing Resources LLC
9813 NE Murden Cove Rd.
Bainbridge Island, WA 98110

(206)842-9160

KUN528

JOHN A. BUBNOWICZ of Maynard, Middlesex County, Massachusetts,
and MARILYN E. KUNELIUS, formerly Marilyn E. Bubnowicz, of
Stow, Middlesex County, Massachusetts, Husband and Wife as tenants
by the entirety.

in consideration of   ONE ($1.00) DOLLAR and other valuable consideration

grant   to   MARILYN E. KUNELIUS

of 142 Red Acre Road, Stow,
Massachusetts

with quitclaim covenants

the land in

A certain parcel of land with the buildings thereon on the
Northwesterly side of Red Acre Road in Stow, Middlesex County,
Massachusetts and being shown as Lot 1 on a plan entitled, "Plan
of Land Stow, Mass. owned by Charles H. Lord et al dated January 30,
1976, survey by Clyde R. Wheeler, Inc., Bolton, Mass.", recorded
at Book 12959 End, and bounded and described as follows:

| | |
|---|---|
| SOUTHEASTERLY | by land of Bubnowicz and land of Frederickson, as shown on said plan, three hundred and twenty-five (325.00) feet; |
| SOUTHEASTERLY | by land of Magurn, as shown on said plan, one hundred sixty-two (162.00) feet; |
| SOUTHWESTERLY | by land of Brown, as shown on said plan, two hundred twelve and 56/100 (212.56) feet; |
| NORTHWESTERLY | by land of Red Acre Farm Inc., as shown on said plan, two hundred eighty and 92/100 (280.92) feet; |
| NORTHWESTERLY | by land of Red Acre Farm Inc., as shown on said plan, four hundred and sixteen (416.00) feet; |
| SOUTHWESTERLY | by land of Red Acre Farm Inc., as shown on said plan, six hundred and fifteen (615.00) feet; |
| SOUTHWESTERLY | by land of Red Acre Farm Inc., as shown on said plan, four hundred and eighty-five (485.00) feet; |
| NORTHWESTERLY | by land of Red Acre Farm Inc., as shown on said plan, seven hundred fifty-one and 15/100 (751.15) feet; |
| NORTHWESTERLY | by land of Freeman, McClellan and Quinn, as shown on said plan, three hundred thirty-seven and 12/100 (337.12) feet; |
| NORTHWESTERLY | by land of Quinn, Herrick and Duncanson, as shown on said plan, one hundred ninety-two and 77/100 (192.77) feet; |
| NORTHWESTERLY | by land of Duncanson and May, as shown on said plan, one hundred ninety-three and 01/100 (193.01) feet; |
| NORTHWESTERLY | by land of May, as shown on said plan, fifty-one and 12/100 (51.12) feet; |
| NORTHWESTERLY | by land of May and Henry, as shown on said plan, one hundred forty-seven and 86/100 (147.86) feet; |
| NORTHWESTERLY | by land of Henry, as shown on said plan, fifty-one and 25/100 (51.25) feet; |
| NORTHEASTERLY | by land of Babrikki, as shown on said plan, eight hundred forty-nine and 29/100 (849.29) feet; |
| NORTHWESTERLY | by land of Babrikki, as shown on said plan, one hundred three and 09/100 (103.09) feet; |
| NORTHEASTERLY | by land of Babrikki, as shown on said plan, one hundred twenty-six and 19/100 (126.19) feet; |
| NORTHEASTERLY | by land of Babrikki, as shown on said plan, two hundred ninety-three and 47/100 (293.47) feet; |

*(left margin, vertical)* Property Address:   Lot 1 and Lot 2, Red Acre Road   Stow, Massachusetts

KUN529

| NORTHWESTERLY | by land of Babrikki, as shown on said plan, three hundred two and 41/100 (302.41) feet; |
| NORTHWESTERLY | by land of Babrikki, as shown on said plan, two hundred thirty-eight and 78/100 (238.78) feet; |
| NORTHEASTERLY | by Tuttle Lane, as shown on said plan, eighty-six and 75/100 (86.75) feet; |
| NORTHEASTERLY | by Tuttle Lane, as shown on said plan, three hundred and ten (310.00) feet; |
| NORTHEASTERLY | by Tuttle Lane, as shown on said plan, seventy-six and 47/100 (76.47) feet; |
| NORTHEASTERLY | by Tuttle Lane, as shown on said plan, one hundred twenty-one and 65/100 (121.65) feet; |
| SOUTHEASTERLY | by land of Weinman, as shown on said plan, two hundred thirty-six and 85/100 (236.85) feet; |
| SOUTHEASTERLY | by land of Ostrowski, as shown on said plan, two hundred twenty-five and 25/100 (225.25) feet; |
| SOUTHEASTERLY | by land of John J. & Kathy B. Palmaccio, Ianatta, McLean, Taylor, Wendell, and Barry A. & Sharyn L. Palmaccio, as shown on said plan, eight hundred ninety six and 10/100 (896.10) feet; |
| NORTHEASTERLY | by land of Barry A. & Sharyn L. Palmaccio, as shown on said plan, two hundred and seventy (270.00) feet; |
| SOUTHEASTERLY | by Red Acre Road, as shown on said plan, thirty-eight and 90/100 (38.90) feet; and |
| SOUTHWESTERLY | by land of Bubnowicz, as shown on said plan, two hundred and seventy (270.00) feet to the point of beginning. |

Containing 49.75 acres more or less as shown on said plan, and hereby conveying Lot 1 as shown on said plan, however otherwise bounded, measured or described.

Also a certain parcel of land, with the buildings thereon, on the Easterly side of Tuttle Lane and being shown as Lot 2 on said plan entitled, "Plan of Land, Stow, Mass. owned by Charles H. Lord et al, Scale 1" = 100', January 30, 1976, Survey by Clyde R. Wheeler Inc., Bolton, Mass. recorded at Book 12959 End, and bounded and described as follows:

| NORTHEASTERLY | by land of Morey, as shown on said plan, one hundred and twenty-seven (127.00) feet; |
| NORTHEASTERLY | by land of Weinman, as shown on said plan, one hundred nineteen and 69/100 (119.69) feet; |
| SOUTHEASTERLY | by land of Andrews, as shown on said plan, one hundred thirty and 89/100 (130.89) feet; and |
| SOUTHWESTERLY | by Tuttle Lane, as shown on said plan, one hundred seventy-five and 06/100 (175.06) feet to the point of beginning. |

Containing 18,134 square feet more or less and hereby conveying Lot 2 as shown on said plan however otherwise bounded, measured or described.

Being the same premises conveyed to us by deed of Charles H. Lord, Donald L. Priest, Executor of the Estate of Evelyn L. Priest, Eleanor N. Derby and Mary Elizabeth davis dated April 8, 1976 and recorded with the Middlesex South District Registry of Deeds in Book 12959, Page 626.

KUN530

Executed as a sealed instrument this _8th_ day of ~~October~~ November 19 83

_____    _John A. Bubnowicz_
_____    JOHN A. BUBNOWICZ
_____    _Marilyn Kunelius_
_____    MARILYN E. KUNELIUS formerly
_____    Marilyn E. Bubnowicz

### The Commonwealth of Massachusetts

_Middlesex_  ss.                    ~~October~~ November 8, 19 83

Then personally appeared the above named   John A. Bubnowicz

and acknowledged the foregoing instrument to be   his   free act and deed,

Before me, _Audrey M. Zahn_
                                         Notary Public — ~~Justice of the Peace~~
My commission expires      Nov 16, 1984

COMMONWEALTH OF MASSACHUSETTS

_Middlesex_  . ss.                    November 8
                                      ~~October~~        , 1983

Then personally appeared the above named Marilyn E. Kunelius
and acknowledged the foregoing instrument to be her free act and
deed,

Before me, _Joseph R. Hart_
                                              Notary Public

My commission expires: _9/28/90_

KUN531

# Attachment 3

☐ **COPY**

Volume: I
Pages: 1-251
Exhibits:  23

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11697-GAO

MARILYN KUNELIUS,
                Plaintiff,

v.

TOWN OF STOW, separately,
A PARTNERSHIP OF UNKNOWN NAME
BETWEEN TOWN OF STOW and THE
TRUST FOR PUBLIC LAND, THE
TRUST FOR PUBLIC LAND, separately,
and CRAIG A. MacDONNELL, in his
individual capacity,
                Defendants.

DEPOSITION of CRAIG MacDONNELL, a

witness called by and on behalf of the plaintiff,

taken pursuant to the Massachusetts Rules of

Civil Procedure, before Roberta J. Daniels, a

Court Reporter and Notary Public within and for

the Commonwealth of Massachusetts, at the Law

Offices of Michael C. McLaughlin, One Beacon

Street, Boston, Massachusetts  02108, on

Thursday, February 8, 2007, scheduled to commence

at 10:00 A.M.

*MELVIN LIPMAN COURT REPORTING*
*101 Tremont Street, Suite 700*
*Boston, Massachusetts  02108*
*617-227-3985*

74

1    Q   And, in fact, do you remember telling public officials

2        of the Town of Stow that they had nothing to worry

3        about regarding indemnification because TPL, having

4        never failed, would find a way to purchase the

5        property to make Mrs. Kunelius whole?

6    A   I remember discussing this issue with the town.  I

7        don't recall the language I used.

8    Q   But you do recall that you told the town that TPL had

9        never failed in the past to honor an assignment of a

10       right of first refusal.

11   A   I do remember that, and I believe we honored it here.

12   Q   So, I don't want to belabor a point, but I'm a little

13       confused.  On one hand I thought you said that you had

14       every intention of going forward and purchasing the

15       property even if the three items outlined in your

16       letter of February 11th, Exhibit 6, were not achieved.

17               MR. CONROY:   Objection.

18   Q   And on the other hand you say that if you did not

19       achieve the three items on Exhibit 6, i.e., the money

20       from the town, the sale of private lots, the two

21       private lots, and fund-raising, that you would look to

22       the liquidated damage clause.  So, which is it?

23               MR. CONROY:   Objection.

24               MS. FETOUH:   Objection.

# Attachment 4

**◀ COPY**

Volume: I
Pages: 1-279
Exhibits: 20

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11697-GAO

MARILYN KUNELIUS,
              Plaintiff,

v.

TOWN OF STOW, separately,
A PARTNERSHIP OF UNKNOWN NAME
BETWEEN TOWN OF STOW and THE
TRUST FOR PUBLIC LAND, THE TRUST
FOR PUBLIC LAND, separately,
and CRAIG A. MacDONNELL, in
his individual capacity,
              Defendants.

DEPOSITION of EDWARD R. PERRY, JR., a

witness called by and on behalf of the Plaintiff,

taken pursuant to Fed.R.Civ.P. 30, before Roberta

J. Daniels, a Court Reporter and Notary Public

within and for the Commonwealth of Massachusetts,

at the Law Offices of Michael C. McLaughlin, One

Beacon Street, Boston, Massachusetts  02108, on

Monday, February 26, 2007, scheduled to commence

at 10:00 A.M.

*MELVIN LIPMAN COURT REPORTING*
*101 Tremont Street, Suite 700*
*Boston, Massachusetts  02108*
*617-227-3985*

1    Q    What's the business?

2    A    Steppingstone School.

3    Q    And what is that?

4    A    It's a preschool kindergarten.

5    Q    And what's the address of that?

6    A    92 Main Street.

7    Q    And does she lease that property?

8    A    She does.

9    Q    How long have you lived in Stow?

10   A    Twenty-four years.

11   Q    Do you recall how you became acquainted with TPL, The

12        Trust for Public Land, which I'll refer to as TPL from

13        now on?

14   A    I've known of TPL for probably a number of years.  We

15        had considered them for other 61 parcels that were

16        coming to town.  In the case of the Kunelius property,

17        we were looking for ways to transact, you know, a 61A

18        process.  Their name came up as a recognized and

19        basically very, very strong firm that could help make

20        these things happen.

21   Q    And tell me what your first introduction to TPL was.

22   A    Relating to the Kunelius case?

23   Q    No, in general.

24   A    It was probably when we were looking at a piece of

12

| | | |
|---|---|---|
| 1 | A | I'm not aware of that. |
| 2 | Q | Is it possible that TPL contacted the board or members |
| 3 | | of the board? |
| 4 | A | You mean as far as initiating the process? |
| 5 | Q | Yes. |
| 6 | A | It's possible, but I can't tell you conclusively one |
| 7 | | way or the other.  That was a long time ago. |
| 8 | Q | Besides the Dawes property, do you recall any other |
| 9 | | interaction with TPL prior to the Kunelius property? |
| 10 | A | I do not. |
| 11 | Q | You had mentioned that it had -- I'm paraphrasing.  I |
| 12 | | don't know if you actually used this word, but it had |
| 13 | | a good reputation.  If I have paraphrased that |
| 14 | | correctly, how did you conclude that it had a good |
| 15 | | reputation? |
| 16 | A | When we were looking for a way to execute the 61 |
| 17 | | process, both in the Dawes and then eventually in the |
| 18 | | Kunelius property, any research we had done came up |
| 19 | | and said TPL is a firm that has a lot of experience in |
| 20 | | making these transactions happen, and people we talked |
| 21 | | to would say they're a good firm for doing that. |
| 22 | Q | Was the Dawes property acquired via Chapter 61? |
| 23 | A | It was not. |
| 24 | Q | Was there an assignment of a right of first refusal to |

13

1       anyone?

2   A   I don't believe there was.

3   Q   When you say research was done, who was responsible

4       for research on these types of issues for the Board of

5       Selectmen?

6   A   I don't believe it was any one person as much as it

7       was the board, collectively, and individuals that

8       might want to be involved in that process.

9   Q   So, did you undertake any research yourself with

10      regard to TPL?

11  A   Most of the time I spent with TPL was around the

12      Kunelius property versus the Dawes property, but I had

13      talked to Craig, and we talked to other people that

14      said they had a good reputation for making these type

15      of transactions happen.

16  Q   So, your -- and I'm using the word *research*, as you

17      used it.  Your research resulted from discussions with

18      Craig MacDonnell?

19  A   Craig MacDonnell, discussions with other entities such

20      as conservation trust groups, as to how we might be

21      able to make this happen.

22  Q   And do you remember which conservation trust groups

23      you spoke to?

24  A   I do not.

14

| | | |
|---|---|---|
| 1 | Q | Are there a lot of conservation trust groups that the |
| 2 | | Board of Selectmen has contact with on these types |
| 3 | | of -- |
| 4 | A | Sudbury Valley Trustees and the Stow Conservation, and |
| 5 | | there's a couple others that escape my memory right |
| 6 | | now. |
| 7 | Q | And is it likely that those are the conservation |
| 8 | | groups that you would have talked to regarding your |
| 9 | | research as to TPL? |
| 10 | A | Yeah.  Uh-huh. |
| 11 | Q | Do you recall why the town was interested in getting |
| 12 | | TPL involved on the Kunelius matter itself?  What were |
| 13 | | the specific reasons why you thought TPL would be |
| 14 | | involved, could be involved? |
| 15 | A | I think we felt that they had the ability to find |
| 16 | | financing, they had the ability to help with |
| 17 | | permitting, as far as grants, and they had the ability |
| 18 | | to sort of become the general manager of that project. |
| 19 | Q | Well, prior to that, is it fair to say that |
| 20 | | Mrs. Kunelius had entered into a purchase and |
| 21 | | sale agreement with a company called Co-housing |
| 22 | | for the purpose of allowing Co-housing to do a |
| 23 | | 40B development in -- |
| 24 | A | If that's the term.  We refer to them as Mosaic |

36

1    A    Peter Christianson.

2    Q    And Peter Christianson is an abutter to Mrs. Kunelius.

3         Do you recall that?

4    A    Abutter or close proximity.

5    Q    And you think it's possible that you may have had your

6         first introduction to Mr. MacDonnell at a meeting with

7         Mr. Christianson and other Red Acre members?

8    A    That's possible.

9    Q    And that would have been after the purchase and sale

10        agreement was disclosed to you, correct?

11   A    I believe so, yes.

12   Q    And do you recall the general tone of those meetings

13        as to what Mr. MacDonnell was doing there?  Do you

14        remember what he said?  Do you remember how he

15        explained why he was there, anything like that?

16             MS. ECKER:   Objection.

17             MS. FETOUH:  Objection.

18             MS. ECKER:   You can answer.

19   A    Part of the discussion would have been about who and

20        what TPL is and how they work and then what they could

21        possible do in the way of working with us on the

22        Kunelius property.

23   Q    Do you recall when you next met with Mr. MacDonnell?

24   A    I don't.

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

37

1    Q    Would you say that you were the contact person between

2         Mr. MacDonnell and the Board of Selectmen during the

3         time that the town and TPL were considering the

4         acquisition of the Kunelius property?

5    A    I think so, yes.

6    Q    And were you that contact person because you were the

7         chairman of the Board of Selectmen?

8    A    Not specifically.

9    Q    Had you been designated as the contact person by the

10        board?

11   A    I believe so.

12   Q    And did they do that through some vote?

13   A    Probably not.

14   Q    How do you recall being designated as the contact

15        person?

16   A    During all of the board process, when a project would

17        come up, somebody would be sort of a prime contact,

18        prime focus, and I said I would look into it.

19   Q    And did you consider yourself under any specific

20        obligations as the chairman of the Board of Selectmen

21        to look into the reputation of TPL?

22   A    Yes.

23   Q    And why did you think you had some obligation to do

24        that?

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

38

1   A    We were looking for someone that could help make the

2           process work.  We wanted to be sure that they had the

3           wherewithal to do that.  We wanted to know who we

4           would be working with.

5   Q    So, in considering whether they had the wherewithal,

6           are you referring to their financial capacity to

7           effectuate the transfer?

8   A    Yes.

9   Q    And did you undertake any due diligence in order to

10          ascertain whether or not TPL had the financial ability

11          to effectuate the transfer?

12   A    We did.

13   Q    And what steps did you take?

14   A    Besides talking to Craig MacDonnell and looking at

15          their literature, it was talking to the other

16          conservation groups, other people in other towns that

17          might have had experience with TPL.

18   Q    Did you look at their financial data?

19   A    Uh-huh.  Yes, we did.

20   Q    And how did you do that?

21   A    It was information provided us by Craig.  It was by

22          looking at their Web pages and, again, by talking to

23          other towns and other conservation groups.

24   Q    Do you know where the information concerning TPL's

39

1   financial data would be found at the town today?

2   A   If we have it, it's in the selectmen's office in a

3       folder probably under *Kunelius property*.

4   Q   And do you recall what you saw in that financial data?

5   A   Not specifically, other than that they had done

6       numbers of projects, had hundreds of thousands, if not

7       millions, of dollars in financing background and

8       experience and a reputation of having done a number of

9       projects.

10  Q   Did you look at their assets, balance sheets, anything

11      like that?

12  A   It would have been whatever was publicly available at

13      that time.

14  Q   I will tell you that we received no such file from the

15      town as to a financial analysis of TPL, and I believe

16      that to be the case.

17          MS. ECKER:  Objection.  Are you going

18      to ask him a question?

19          MR. McLAUGHLIN:  Yes.

20  Q   Could you give me any better direction as to where

21      that specific file might be within the town?

22          MS. ECKER:  Assuming that we have not

23      turned over the file he's referring to.

24          MR. McLAUGHLIN:  Yes, I'm assuming that

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

40

1    it has not been turned over since I do not

2    believe I have seen it.

3    　　　　MS. ECKER:  Which is not true.  But why

4    don't you tell him where you think files on the

5    Kunelius property might exist in the town.

6    Q    I'm talking about financial data and analysis of their

7    　　　ability to do the deal.  That's what I'm looking for.

8    A    I'm not aware of an independent accountant type

9    　　　analysis if that's what you're asking about.  What I'm

10   　　　aware of is reviewing their documentation on financing

11   　　　and experience.  So, it would be copies of their

12   　　　literature that we would have reviewed.

13   Q    I'm going to put a document in front of you and ask

14   　　　you if you recognize it.

15   　　　　MS. ECKER:  Did you mark the notice of

16   depo or you're not intending to?

17   　　　　MR. McLAUGHLIN:  Yeah, why don't we

18   mark it.  So, the notice of depo will be number

19   one, and then this will be number two.

20   　　　　THE WITNESS:  And you know that I

21   haven't seen this before today.

22   　　　　MR. McLAUGHLIN:  I do.

23   　　　　THE WITNESS:  Okay.  And you've got my

24   name wrong in there.

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

54

1    A    I did.

2    Q    So, it's fair to say that this is not the first time

3         today that you were aware that there was a line of

4         credit as a fallback position for the purchase of the

5         property?

6    A    That's true.

7    Q    And did you ever ask to see any backup data on the

8         line of credit?

9    A    I don't believe so.

10   Q    So, when you talk about due diligence, your due

11        diligence was simply a representation, your inquiry or

12        receiving a representation from TPL, that there was a

13        line of credit from Wainwright that was available as a

14        fallback plan.

15              MS. ECKER:  Objection.

16              MS. FETOUH:  Objection.

17              MS. ECKER:  You can answer.

18   A    Our due diligence included what you see here.  It also

19        included, as I said, conversations with other groups

20        that had worked with TPL, other towns that had worked

21        with TPL.

22   Q    And did you ever speak to anybody from Wainwright Bank

23        concerning the line of credit?

24   A    No.

66

1    Q    Does that refresh your memory?

2    A    Yes, it does.

3    Q    So, there apparently was some agreement between Eye of

4         the Storm and TPL concerning the sale of 144 Red Acre

5         Road.    Is that now your understanding?

6                       MS. FETOUH:    Objection.

7                       MS. ECKER:    Objection.

8    A    There was the plan for TPL to sell that land to Eye of

9         the Storm.

10   Q    And was it your understanding that that plan, if it

11        failed, would eliminate the need for TPL to go

12        forward?

13   A    Well, since you've refreshed my memory with the six

14        million dollar line of credit with Wainwright Bank,

15        the understanding was they had backup plans to cover

16        this.

17   Q    So that Item B, the sale of 144 Red Acre Road, as you

18        now understand it, was not a critical component of

19        TPL's ability to go forward and make the purchase.    Is

20        that fair to say?

21   A    What they showed us was that they had plans on how to

22        obtain funding and then, as you point out, with a

23        fallback plan.    They had a backup plan in case that

24        didn't happen.

81

1    A   I do.

2    Q   Now, is it your testimony that as of the date of the

3          assignment, which is now Exhibit 4, that you in fact

4          knew of the four components referred to in Exhibit 3

5          on Page 342 and 343, i.e., components A through D?

6                  MS. ECKER:  Objection.

7    A   You're asking me, on February 12th, if we knew of what

8          was in the application dated March 30th?

9    Q   No, on February 12th, did you know that there were

10         four components of funding in order to go forward with

11         the purchase of the Kunelius property, i.e., the four

12         components listed as Items A through D?

13               MS. ECKER:  Objection.

14    A   I believe that when we voted on February 12th, we felt

15         that TPL had the wherewithal to fund this project.  I

16         can't -- I don't recall whether we knew specifically

17         whether they had those four specific components at

18         that time.

19    Q   Well, as a matter of fact, you knew for a fact that

20         the $300,000 had not been voted for, which is Item A

21         on Exhibit 3, correct?

22    A   The town meeting was in May.  So, we would have known

23         that, yes.

24    Q   So, you would not have known whether it was going to

82

1      be voted for.

2    A    Yes.

3    Q    And in fact you also knew that Item B was not an

4         assured sale because you had never seen a purchase and

5         sale agreement for 144 Red Acre Road concerning the

6         sale of the five acres to Eye of the Storm Equine

7         Rescue.

8              MS. FETOUH:  Objection.

9    A    If you're going to go through all four points, I think

10        I've said this, is that we felt on February 12th that

11        TPL had the wherewithal to fund this and may not

12        have --

13   Q    But you didn't --

14             MS. ECKER:  Let him finish his

15        question.

16   A    And may not have seen or known the specifics of each

17        four of these and the exact dollar amounts proposed at

18        that time.

19   Q    So, as a result, there was a transfer or assignment,

20        which is part of Exhibit 4, and I would ask you to

21        look at Exhibit 4 and the assignment and acceptance

22        provision and tell me:  is there anything in the

23        assignment and acceptance provision that anticipated

24        that if any funding component of TPL's plan failed to

88

1    million dollar line of credit has been renewed by

2    Wainwright Bank and that these funds would be

3    available to cover cost overruns subject to TPL's

4    normal due diligence and internal review.  Do you see

5    that?

6  A    I do.

7  Q    Do you recall receiving anything from TPL concerning

8    renewal of a line of credit?

9  A    I do not.

10  Q    Do you recall asking for any proof of a renewal of a

11    line of credit?

12  A    I do not.

13  Q    Do you recall having any discussions with Craig

14    MacDonnell about whether the line of credit could be

15    used for cost overruns, acquisitions, that sort of

16    thing?

17  A    I recall having conversations with Craig that they had

18    sufficient funds to support this project and

19    contingency issues that arise.

20  Q    You're aware, are you not, that the Town of Stow and

21    Mr. MacDonnell, and TPL, have filed documents with the

22    federal court in which they have said they could not

23    raise the money to purchase the property, that TPL

24    could not raise the money to purchase the property?

89

1   A   I have not seen those documents, so I can't comment on

2       that.

3   Q   This is a document that was filed on behalf of the

4       Trust for Public Land, Craig MacDonnell, and the Town

5       of Stow, which has been filed with the Federal

6       District Court, and on the first page at the bottom,

7       last sentence, it says:  However, after paying

8       thousands of dollars in deposits required under the

9       agreement, TPL found itself unable to raise the money

10      necessary to fund the project and was unable to

11      complete its purchase of the property.  Do you see

12      that?

13  A   I don't.

14          MR. McLAUGHLIN:  Okay.  Did you give

15      him this one here?

16  A   Motion to dismiss?

17  Q   Yes, all right, starting at the very last line,

18      starting with *however* down at the bottom.

19  A   Okay.  I see it.

20  Q   Now, it was your understanding that TPL had the money.

21      I think that's what you testified to, correct?

22          MS. ECKER:  Objection.

23          MS. FETOUH:  Objection.

24  A   It was my understanding they could make this project

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

# Attachment 5

 **COPY**

Volume: I
Pages: 1-195
Exhibits: 16

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11697-GAO

MARILYN KUNELIUS,
　　　　　Plaintiff,

v.

TOWN OF STOW, separately,
A PARTNERSHIP OF UNKNOWN NAME
BETWEEN TOWN OF STOW and THE
TRUST FOR PUBLIC LAND, THE
TRUST FOR PUBLIC LAND, separately,
and CRAIG A. MacDONNELL, in his
individual capacity,
　　　　　Defendants.

DEPOSITION of GREGORY D. JONES, a

witness called by and on behalf of the Plaintiff,

taken pursuant to Fed.R.Civ.P. 30, before Roberta

J. Daniels, a Court Reporter and Notary Public

within and for the Commonwealth of Massachusetts,

at the Law Offices of Michael C. McLaughlin, One

Beacon Street, Boston, Massachusetts  02108, on

Monday, March 5, 2007, scheduled to commence at

12:00 P.M.

*MELVIN LIPMAN COURT REPORTING*
*101 Tremont Street, Suite 700*
*Boston, Massachusetts  02108*
*617-227-3985*

21

1          Selectmen as to the background and reputation of TPL?

2    A     Well, the town administrator had wanted us to get --

3          basically, work out a contract with TPL, and they were

4          affirming that they had never had problems in

5          following through on things like this.  So, at the end

6          of the day, that requirement wasn't followed through,

7          so basically the selectmen were believing the

8          assertions that they would follow through on things.

9    Q     Do you recall Craig MacDonnell indicating to the Board

10         of Selectmen that TPL had the money to make the

11         purchase if necessary?

12   A     I believe he said that.  But in other contexts, TPL

13         had been mentioned as a potential partner, and,

14         generally, when you read their literature, they, you

15         know, say they've got money.

16   Q     And did someone actually go and read the literature on

17         behalf of the Board of Selectmen, if you're aware?

18   A     Well, certainly the town administrator generally

19         worries about details like that, and he was advising

20         the selectmen that we put the understanding in

21         writing.  That was not done.

22   Q     At some point, did you recall getting requests for

23         entering into a contract with TPL by TPL itself?

24   A     I don't recall that.

*MELVIN LIPMAN COURT REPORTING*
*617-227-3985*

# Attachment 6

DRAFT

**Conditions for the transfer of the Town's right of first refusal on the Kunelius Property.**

The Board will appreciate advance notice if any of these items will be an issue by TPL or the Friends of Red Acre.

1.  Town gets at least the 42 acres in Chapter 61 free-and-clear to use for municipal purposes.

**TPL: The original warrant article contemplated some land going for water supply and some for conservation. This arrangement anticipated the benefit of applying for a Self-Help reimbursement. Deeding all of the land for municipal purposes would disqualify the reimbursement. Also, Chapter 61 requires that the "majority" of the classified land be maintained as forest land.**

2.  Town is held harmless if TPL backs out of the deal before closing. In other words, the TPL will defend the town against any suit resulting from the failure of the property purchase to be completed. Alternatively, TPL posts a bond that guarantees their performance.

**TPL: The appropriate way for the risks presented by this project to be managed are for the common law of contract to apply. This law will require TPL, not the Town, to be obligated to perform if the right of first refusal is assigned. The Town's legal responsibility ends with the assignment. If we are offered the opportunity to accept such assignment, and we decide to go forward, the law will require us to meet the essential requirements of the contract or to suffer the consequences of default. The landowner negotiated with the potential buyer what should occur in that event. These mechanisms sufficiently address the project risks, so TPL believes that a hold-harmless agreement is not appropriate.**

3.  If any affordable housing results from this effort:

    a.  The structures are brought up to a minimally habitable condition **TPL: OK**

    b.  Title V is complied with for all structures **TPL: If by this you mean that the sale of the dwellings would be treated like any other sale in terms of Title V, OK.**

    c.  Property is sub-divided so that occupant of caretaker cabin need not be the owner/operator of the barn. **TPL: We have been advised that dividing the property in order to separate the barn from the caretaker's house would result in a lot with no frontage and therefore not be acceptable. Moreover, our project structure contemplates that Eye of the Storm would assume ownership of the barn and the**

DRAFT

house and that a perpetual affordability restriction would be imposed.

d. Houses remain "affordable" in perpetuity **TPL: OK**

e. Standard local-preference lotteries are held to determine who can buy the properties. **TPL: A lottery would be appropriate for the house at 142 Red Acre Road and would be used to determine the next owner of the caretaker's house when it is sold by Eye of the Storm.**

4. If the Eye of the Storm occupies the horse barns:

   a. The scope of horse operations is clearly delineated

   b. Runoff from horse manure, urine, shavings, horse paddock activities be controlled so that the groundwater is protected

   c. Horse wastes be trucked away periodically to avoid pollution.

5. The above conditions are incorporated into the appropriate Deed restricts on each lot.

**TPL: The most appropriate mechanism for addressing these restrictions would be conservation restrictions held by the Town. Recognizing the primary objective of water supply protection, the precise language would be drafted by TPL in consultation with Town counsel.**

6. TPL shall show full compliance with the P&S and ability to meet the payment schedule and indicate source of these funds.

   a. $10,000 cash (earnest money) at time of acceptance of transfer rights **TPL: We have received private pledges for these funds.**

   b. $716,900 at time of tender of deed, September 26, 2003 **TPL: We anticipate asking Town voters to approve the use of $400,000 from the Community Preservation Fund (either direct expenditure or via bonding). In addition, TPL and the Friends of Red Acre will be engaged in a substantial fund-raising effort.**

   c. $400,000 Promissory note with 7% interest, paid in full within 24 months, with monthly interest payments of $2,333.00. **TPL: To be paid from privately-raised funds or from the sale of the houses on the property.**

   d. Additional earnest moneys. Buyer will make additional payments of $1500 beginning 60 days after the removal of Feasibility Contingency and

KUN309

DRAFT

until closing. (All earnest money is applied to the purchase price. **TPL: We have received private pledges for these funds.**

7. Because of the difference in type of Buyer, any part of the P&S that TPL believes don't apply should be addressed. (Such as)

   a. Paragraph 8, Time performance; references a 12 month extension if the 40B approval process is proceeding forward.

   b. Paragraph 30, Purchase price financing; references a construction loan of 80% of the construction cost.

   c. Paragraph 30, Purchase price financing: references all purchase agreements of the co-housing project shall be assigned to the Seller as further security.

   d. Paragraph 30: Buyer shall only encumber the 8.57 acre parcel

   e. Paragraph 32: Buyer &Seller agree to cooperate on a 40 B submission.

   f. Paragraph 35: Upon receipt of all permits for the development of the 8.57-acre parcel Seller will transfer all right of the 42.1-acre parcel to the town.

**TPL:  Because the decided cases under Chapter 61 do not explicitly resolve all of the potential issues that arise when a municipality assigns its right of first refusal to a nonprofit conservation organization, including which of the terms of the underlying contract should obligate the assignee, it would be prudent for TPL and Marilyn Kunelius's attorney to enter into a good faith dialogue to determine which terms are relevant and which are truly inapplicable.**

Regards,


Ross Perry


KUN310

# Attachment 7

1

1          VOLUME: I

2          PAGES: 1-261

3          EXHIBITS: 1-43

4          UNITED STATES DISTRICT COURT

5          DISTRICT OF MASSACHUSETTS

6   - - - - - - - - - - - - - - - - - x

7   MARILYN KUNELIUS,

8               Plaintiff,

9        v.                    Civil Action

10  TOWN OF STOW, et al.        No. 05-11697-GAO

11               Defendants.

12  - - - - - - - - - - - - - - - - - x

13          DEPOSITION of PETER A. KACHAJIAN, JR.

14          April 25, 2007, 10:08 a.m.

15          Goodwin Procter, LLP

16          53 State Street

17          Boston, Massachusetts

18

19          Reporter: Michael D. O'Connor, RPR

20  ------------ BOSTON REPORTING ASSOCIATES -----------

21          REGISTERED PROFESSIONAL REPORTERS

22          67 Bright Road

23          Belmont, Massachusetts 02478

24          (617)877-6640

1   at one point.  Aside from any other borrowing they

2   would do, I don't think we had a discussion about

3   it.  Again, probably it wouldn't have come up in

4   terms of, you know, what his capabilities were for

5   borrowing, other than, you know, I think at one

6   point when we had a discussion, we did offer up the

7   mortgage to him as a potential tool and getting the

8   deal done.

9           So to that extent, that's probably about

10  the only conversation regarding the "borrowing" that

11  we had, you know, again, in furtherance of trying to

12  help.

13      Q.   On the top of the second page it references

14  the second major obstacle as the zoning issues.  Do

15  you see that?  Those are the same issues we have

16  been discussing recently; is that right?

17      A.   Yes, I assume so.

18      Q.   In the second paragraph, the first line, it

19  states, "In view of these circumstances, it is not

20  feasible for TPL to go forward under the existing

21  contract."  Do you see that language?

22      A.   I do.

23      Q.   Did you understand when you received this

24  language that TPL was saying it was essentially

1  defaulting under the contract?

2      A.    I think I would view that as a default,

3  which was a segue to it ain't worth it, and you've

4  got to lower the price.

5      Q.    In this letter, Mr. MacDonnell proposes an

6  alternative to the contract; is that right?

7      A.    Where are we; number one?

8      Q.    In the middle of the second page, "Please

9  consider the following alternative," and then there

10 are a couple of paragraphs about financing and

11 subdivision.

12     A.    I see what he says, which we've

13 subsequently found out not to be true.

14     Q.    What is not true?

15     A.    I think I've had occasion to read this in

16 Serena Furman's deposition, and I think this speaks

17 to Friends of Red Acre raising money, and my

18 understanding was, which kind of closed the gap, in

19 my mind, and answered a lot of questions was why did

20 Craig stop them from fundraising and why did he

21 utilize the list for other projects.

22          So I guess in looking at this, you know, I

23 see what he says, but I can't agree with it.  I can

24 intellectually see it, but I don't agree with it.

1    everything went directly to Craig.  I think the

2    first check may have come to me, and then I gave it

3    to Marilyn, and then I said to Craig, Don't give it

4    to me.  It's just crazy.  Why should I act as an

5    intermediary.  Just keep giving it to Marilyn.  So

6    they paid monies directly to Marilyn.

7              So honestly, I didn't keep track of what

8    they were -- you know, I may have in the file

9    photocopies or Craig may have given me a breakdown,

10   but I don't know.  I kind of took myself out of it,

11   because it just didn't seem to make sense.

12        Q.   Did you believe at this point on September

13   12, 2003 that TPL had breached the purchase and sale

14   agreement?

15        A.   Well, again, you know, in looking at the

16   letter from Craig, and, of course, the

17   conversations, it was abundantly clear at that point

18   that he wasn't -- that they weren't going to

19   consummate, that they were looking to exit.  So if

20   you want to say that's tantamount to a breach, yeah,

21   I'd say that.

22        Q.   In the third paragraph of the letter, you

23   state, "Moreover, TPL has made it abundantly clear

24   that its approach to the development of the Kunelius

# Attachment 8

1

VOLUME: I
PAGES: 1 through 193
EXHIBITS: Per index

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - x

MARILYN KUNELIUS,
         Plaintiff,

VS.                                Civil Action No.
                                   05-11697-GAO
TOWN OF STOW, et al.,
         Defendants.

- - - - - - - - - - - - - - - - x

DEPOSITION OF JAMES ARTHUR BOOTHROYD
Thursday, May 24, 2007, 10:09 a.m.
Goodwin Procter, LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109

- - - - - - - - - -Reporter: MaryJo O'Connor, CSR, RPR- - - - - - -
BOSTON REPORTING ASSOCIATES
REGISTERED PROFESSIONAL REPORTERS
67 Bright Road
Belmont, Massachusetts 02478
(617) 877-6640

1  them to have failed to perform under the agreement?

2      A.    Yes.  And I believe Mr. Kachajian sent a

3  letter to the Town at some point, it may have been

4  later than that date, but expressing his concern

5  over their lack of performance.

6      Q.    At that point did you consider the purchase

7  and sale agreement to have been defaulted by TPL?

8      A.    I don't know that anybody had any specific

9  conversation about that.  I think all of us took a

10 wait-and-see attitude to see what happened in

11 September and up to the proposed or the scheduled

12 closing date of September 26th of 2003.

13     Q.    And when that date did arrive, did TPL

14 close on the property?

15     A.    No.

16     Q.    And at that point did you consider TPL to

17 have defaulted?

18     A.    It wasn't my specific responsibility to

19 decide whether they had defaulted or not, but, yes,

20 I considered they defaulted, yes.

21     Q.    But in any case where you have a client who

22 has entered into a purchase and sale agreement and

23 one party fails to live up to its obligation, one of

24 its obligations under that contract, do you consider

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No.: 05-11697GAO

MARILYN KUNELIUS

     Plaintiff,

     v.

TOWN OF STOW, separately, A
PARTNERSHIP OF UNKNOWN NAME
BETWEEN TOWN OF STOW and the TRUST
FOR PUBLIC LAND, THE TRUST FOR
PUBLIC LAND separately and CRAIG A.
MACDONNELL, in his individual capacity

     Defendants

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1(A)(2)

I hereby certify that counsel for the Defendant Town of Stow has conferred with Michael McLaughlin, attorney for the Plaintiff, by telephone in a good faith attempt to resolve or narrow the issues raised by the instant motion, and that we have been unable to do so.

Respectfully submitted,
The Defendant,
The Town of Stow,
By its attorneys,

/s/ Deborah I. Ecker
Deborah I. Ecker, BBO# 554623
Deidre Brennan Regan, BBO# 552432
BRODY, HARDOON, PERKINS & KESTEN, LLP
One Exeter Plaza
Boston, MA 02116
(617) 880-7100

Dated: October 17, 2007

1