UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MARILYN KUNELIUS,

      Plaintiff,

    v.

TOWN OF STOW, et al.

      Defendants.

Civil Action No. 05-11697-GAO

Leave to file 30 pp. memorandum granted
August 8, 2007

## MEMORANDUM OF LAW IN SUPPORT
## OF THE MOTIONS FOR SUMMARY JUDGMENT OF DEFENDANTS THE TRUST
## FOR PUBLIC LAND AND CRAIG A. MACDONNELL

Defendants The Trust for Public Land ("TPL") and Craig A. MacDonnell (collectively,

"TPL Defendants") submit this Memorandum of Law in Support of their Motions for Summary

Judgment pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, seeking summary

judgment on all remaining counts of the Complaint filed by Plaintiff Marilyn Kunelius.

### INTRODUCTION

After extensive discovery, Plaintiff has failed to establish facts sufficient to support her

claims against TPL or its employee and Massachusetts State Director, Craig MacDonnell. There

is no dispute that TPL failed to perform under the Purchase and Sale Agreement (the

"Agreement") for purchase of Plaintiff's property in Stow, Massachusetts (the "Property"). The

only dispute is Plaintiff's remedy for TPL's failure to perform. That is a legal question. The

undisputed facts and the law demonstrate that Plaintiff has already received the only remedy to

which she is entitled—the liquidated damages she agreed would be her sole remedy when she

entered into the Agreement. Similarly, Plaintiff has no factual or legal support for the other

claims she has brought arising out of the same transaction. Finally, Mr. MacDonnell was only

doing his job at TPL and there is no legal or factual basis for suing him individually.

## BACKGROUND

For twenty years, Plaintiff benefited from classification of her land under Massachusetts General Laws Chapter 61 ("Chapter 61") by enjoying significantly reduced property taxes. She has known all along that, having reaped these benefits, she could not sell her land to any willing buyer to develop unchecked, without being required either to pay back those taxes or to provide the Town of Stow (the "Town") a right of first refusal to purchase the Property. Chapter 61 exists precisely to prevent the unchecked development of forest land.

Accordingly, when Plaintiff agreed to sell her Property to developer Cohousing Resources, LLC ("Cohousing"), she had to give notice to the Town and allow the Town 120 days to decide whether to exercise its right of first refusal. The Agreement included a common real estate conveyancing provision stating that any default by the Buyer would be remedied solely through Plaintiff's retention of the deposits paid. Plaintiff, represented by experienced real estate counsel, agreed to that provision, knowing that Cohousing might not be the ultimate purchaser.

After receiving notice of the Agreement, the Town invoked the provision of Chapter 61 permitting it to assign its right of first refusal to a non-profit conservation organization. After considering the conservation value of the Property, the support of local conservation groups, and the terms of the Agreement, TPL agreed to accept that assignment and exercised the right of first refusal. In so doing, TPL placed itself in the position of Cohousing in the Agreement and was both subject to and entitled to rely on the liquidated damages clause in the event of any default.

TPL worked hard to close on the purchase but ultimately was unable to raise the funds or obtain the zoning relief it sought. Having failed to perform, TPL forfeited the $19,000 in deposit sums that it had paid to Plaintiff—which Plaintiff has retained to this day—in addition to the time and effort it expended to pursue the project. Accordingly, TPL has already paid damages to Plaintiff for its failure to perform. Plaintiff's attempt now to claim that those liquidated

2

damages—which she expressly contracted for—are insufficient and that she is entitled to specific performance and monetary damages fails under the law and the undisputed material facts. Along with the forfeited deposits, she still has her Property and the ability to do with it as she pleases.

## SUMMARY OF UNDISPUTED FACTS

For a complete statement of the material, undisputed facts, please see the Statement of Undisputed Facts in Support of the Motions for Summary Judgment of Defendants the Trust for Public Land and Craig A. MacDonnell ("SUF"), filed with this Memorandum of Law.[1]  Briefly stated, the undisputed facts material to this matter are that TPL accepted an assignment from the Town of its statutory right of first refusal to become the Buyer under a Purchase and Sale Agreement which provided that the Seller's sole remedy in the event of Buyer's default was retention of all deposits paid under the Agreement as liquidated damages.

## THE SUMMARY JUDGMENT STANDARD

Defendants are entitled to summary judgment if they show "that there is an absence of evidence to support" Plaintiff's allegations. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once Defendants meet that burden, Plaintiff must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Plaintiff cannot rest upon her pleadings (*see Pagano v. Frank*, 983 F.2d 343, 347 (1st Cir. 1993)), but must adduce specific, provable facts demonstrating a triable issue. *Mack v. Great Atl. and Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989). The evidence establishing the factual controversy cannot be conjectural or problematic; it must have substance. *Id.* Because Plaintiff bears the ultimate burden of persuasion with respect to all her claims, she may avert summary judgment only by identifying issues genuinely in

---

[1] In submitting this Memorandum of Law and the accompanying Statement of Undisputed Facts, Defendants The Trust For Public Land and Craig MacDonnell do not concede these facts for any purpose other than their summary judgment motions.

dispute and advancing convincing theories as to their materiality. *Pagano*, 983 F.2d at 347. If

Plaintiff fails to meet this burden, summary judgment in Defendants' favor must be granted.

## ARGUMENT

I.    **PLAINTIFF'S CLAIM FOR BREACH OF CONTRACT AND SPECIFIC PERFORMANCE AGAINST TPL (COUNT I) FAILS.**

There is no dispute that TPL failed to pay the purchase price on the closing date and

thereby defaulted on the Purchase and Sale Agreement. SUF ¶ 76. The only issue in dispute is

what remedy Plaintiff is entitled to for the breach. Plaintiff asserts that she is entitled to specific

performance and the full purchase price under the contract; however, she has not shown, because

she cannot, that she is entitled to any remedy beyond what she has already received as liquidated

damages under the contract. TPL is therefore entitled to summary judgment on Count I.

A.    **Plaintiff Is Not Entitled to Specific Performance.**

Plaintiff is not entitled to specific performance because her sole remedy for Buyer's

default is governed by the liquidated damages provision of the Agreement. The Agreement

explicitly and unambiguously limits Plaintiff's remedy to retention of the deposits paid under the

contract: "[i]f the BUYER shall fail to fulfill the BUYER'S agreements herein, all deposits made

hereunder by the BUYER shall be retained by the SELLER as liquidated damages and *this shall*

*constitute SELLER'S sole remedy in equity and law*." SUF ¶ 30 (emphasis added).

Unambiguous contracts must be enforced according to their terms, *Freelander v. G. & K. Realty*

*Corp.*, 357 Mass. 512, 516 (1970), and contract interpretation is a matter of law appropriate for

disposition on summary judgment. *Allstate Ins. Co. v. Bearce*, 412 Mass. 442, 446–47 (1992).

Supreme Judicial Court Justice Botsford, sitting on the Massachusetts Superior Court, held that a

virtually identical liquidated damages clause providing that deposits would be retained by seller

as its "sole remedy at law and equity" was "unambiguous and susceptible to only one meaning."

4

*Carroll v. Barberry Homes, Inc.*, 10 Mass. L. Rptr. 668, 1999 WL 1204020, at *3 (Mass. Super. 1999). The unambiguous meaning was that receipt of liquidated damages was the "sole remedy available" to seller. *Id.* In this case, having likewise signed an Agreement limiting her remedy in law and equity to retention of deposits, and having received and retained those deposits, SUF ¶¶ 30, 77, Plaintiff is not now entitled to seek specific performance.

Even if the plain terms of the Agreement did not preclude additional remedies, Plaintiff cannot obtain specific performance because she has already received the liquidated damages. Recently, the Supreme Judicial Court held that a seller is not entitled to seek both specific performance and liquidated damages for breach of contract because "the retention of a deposit as liquidated damages is an alternative to specific performance, not an additional remedy." *Perroncello v. Donahue*, 448 Mass. 199, 204 (2007). The rule disallowing a seller to seek both remedies is based on the principle that "the law of contracts is intended to give an injured party the benefit of the bargain, not the benefit of the bargain and a windfall." *Id.* at 206 (citing *Situation Mgt. Sys. v. Malouf, Inc.*, 430 Mass. 875, 880 (2000)). Here, Plaintiff has retained all deposits paid to her under the Agreement, SUF ¶ 77; she has thus received all damages she is entitled to under the contract. TPL advised Plaintiff that it was providing her deposits pursuant to the terms of the Agreement, SUF ¶ 53, and Plaintiff did not object to those deposits or suggest that the deposit terms of the Agreement were inapplicable to TPL. Since Plaintiff has already received liquidated damages, she is not now entitled to seek specific performance. *Perroncello*, 448 Mass. at 206 ("To award liquidated damages against the buyer for his failure to close and also specific performance to the seller requiring the buyer to acquire the property by a date certain at the contracted price, would violate the fundamental principles of contract law.").

Not only do the Agreement and Massachusetts law limit Plaintiff's remedy to the deposits paid, but equitable principles also weigh against an award of specific performance.

Massachusetts courts recognize that "he who seeks equity must do equity" and that equitable relief will be denied when the party seeking relief has not acted equitably. *New England Merchants Natl. Bank of Boston v. Kann*, 363 Mass. 425, 428 (1973); *see also Galipault v. Wash Rock Investments*, 65 Mass. App. Ct. 73, 85 (2005) ("it is axiomatic that one must have behaved equitably in order to obtain equitable remedies"). Plaintiff here does not deserve discretionary equitable relief because she has acted inequitably herself, endeavoring to obstruct TPL's purchase of the Property and to position herself to extract as much as she can from TPL in litigation. Shortly after TPL accepted assignment of the right of first refusal, Plaintiff tried to convince the Town residents to vote against the appropriation of funds for TPL's purchase of the Property. SUF ¶ 68. Plaintiff told others that she hoped that TPL's efforts to purchase the Property would fail so she could sue TPL for triple damages. SUF ¶ 69. Since the closing date, Plaintiff has made no effort to mitigate damages, and admits that she has not tried to sell her Property. SUF ¶¶ 79, 80. Worse yet, several interested individuals have approached Plaintiff about purchasing her Property, and she has promptly rejected each and every inquiry. SUF ¶ 81.

### B.    The Liquidated Damages Clause Applies With Equal Force to TPL as Buyer.

The liquidated damages clause limits Plaintiff's recovery against TPL just as it would against Cohousing. When Stow voted to assign its right of first refusal to TPL, and TPL accepted the assignment and exercised that right, TPL stepped into the shoes of Cohousing in the Agreement. *Roy v. George W. Greene, Inc.*, 404 Mass. 67, 72 (1989) (a right of first refusal in real estate places the party exercising the right into the position of the party it is replacing); *Town of Franklin v. Wyllie*, 443 Mass. 187, 195 (2005) (meaning is the same in statutory context).[2]

---

[2] The Town's notice of Assignment to TPL and the Assignment itself both state explicitly that TPL was accepting an assignment to purchase the land "pursuant to the terms of a Purchase and Sale Agreement between [Kunelius] and Cohousing Resources, LLC." SUF ¶¶ 51, 52. Further, TPL's notice to Plaintiff of its exercise stated that the exercise was pursuant to the terms of the Agreement and that TPL "assume[d] the position of buyer" in the

A right of first refusal is the right to purchase property "upon the *same terms* as contained in any bona fide offer from a third person." *Roy*, 404 Mass. at 70 (emphasis added). For that reason, the party deciding whether to exercise the right of first refusal can only do so once "informed of the details of the offer" in order to assess whether or not it is willing to take on the obligations of that offer. *Id.* at 71. This status is not altered in the context of a statutory right of first refusal pursuant to Chapter 61. In a recent case addressing a right of first refusal pursuant to Chapter 61A, the Supreme Judicial Court observed: "'The common meaning of a right of first refusal involving real estate is well established,' and its use in a statutory context imparts no new meaning to the phrase." *Wyllie*, 443 Mass. at 195 (quoting *Greenfield Country Estates Tenants Ass'n v. Deep*, 423 Mass. 81, 89 n. 14 (1996)). Accordingly, any exercise of the right of first refusal by the Town in that case would have required the Town to purchase the land only on "*substantially the same* terms and conditions as presented in the agreement." *Id.* at 195–96 (emphasis added). Likewise, TPL accepted the assignment from the Town and exercised the right of first refusal on the same terms and conditions of the Agreement, including the liquidated damages clause.

Plaintiff has articulated no ground to depart from these settled SJC decisions to hold that the liquidated damages clause did not survive the exercise of the right of first refusal. There is no dispute that it would have applied to any default by Cohousing. Plaintiff herself, her real estate broker and her attorney—the professionals who negotiated the Agreement on her behalf—have all testified that Plaintiff's sole remedy were Cohousing to default would be retention of the deposits paid under the liquidated damages clause. SUF ¶ 33. Since TPL stepped into the shoes

---

Agreement. SUF ¶ 53. Thus Plaintiff was on notice from the outset that TPL was stepping into Cohousing's position in the Agreement.

of Cohousing and became a purchaser of the Property on substantially the same terms as

Cohousing, Plaintiff's sole remedy for TPL's default is retention of the deposits.

### C.    The Liquidated Damages Clause Should Be Enforced.

The SJC has held that liquidated damages provisions will be enforced "where actual

damages are difficult to ascertain and where the sum agreed upon by the parties at the time of the

execution of the contract represents a reasonable estimate of the actual damages." *Kelly v. Marx*,

428 Mass. 877, 880 (1999) (enforcing liquidated damages provision in purchase and sale

agreement for sale of real estate). Clauses that provide for the seller to retain the buyer's deposit

upon a failure to close are not only recognized and enforced but are a "common real estate

practice." *Id.* at 879. Indeed, *Kelly* rejected the so-called "second-look" doctrine that allowed

courts to take a retrospective look at the reasonableness of the liquidated damages and instead

held that parties should be held to such provisions. *Id.* at 881. This holding is based on the long-

standing principle that the "proper course is to enforce contracts according to their plain meaning

and not to undertake to be wiser than the parties, and therefore that in general when parties say

that a sum is payable as liquidated damages they will be taken to mean what they say and will be

held to their word." *Id.* (quoting *Guerin v. Stacy*, 175 Mass. 595, 597 (1900)). *Kelly's* rejection

of the "second-look" doctrine was further predicated on an effort to eliminate uncertainty and

prevent costly future litigation. *Id.* To allow a seller to seek specific performance despite the

existence of a liquidated damages clause that explicitly declares itself the *sole* remedy for

buyer's breach would effectively undercut *Kelly's* rejection of the "second-look" doctrine.

Indeed, it would accomplish that which *Kelly* sought to avoid—the undermining of "the peace of

mind and certainty of result the parties sought when they contracted for liquidated damages." *Id.*

There is no reason here to depart from the settled rule adopted by the SJC in *Kelly*.

Plaintiff's retention of all deposits paid prior to the default was a "reasonable estimate" of actual

damages at the time the Agreement was executed and, as such, should be respected. In order to find the clause unenforceable, this Court would be required to find the sum "grossly disproportionate" to a reasonable estimate of actual damages made at the time of contract formation. *Kelly*, 428 Mass. at 880. In *Kelly*, the Court found liquidated damages in the amount of five percent of the purchase price was a reasonable forecast of the losses from a breach. *Id.* at 882; *see also Howard v. Wee*, 61 Mass. App. Ct. 912, 913 (2004) (finding a $1000 deposit a reasonable sum for liquidated damages for the buyer's breach of an offer to purchase real estate). Here, the deposits TPL paid to Plaintiff -- a total of $19,000 -- is not a "grossly disproportionate" sum for her to retain for TPL's inability to perform over less than a six-month period.[3]

The undisputed facts demonstrate that Plaintiff's real estate professionals actively negotiated the deposit terms of her Agreement. In fact, Plaintiff might have sought to contract for higher liquidated damages but chose not to do so. Early drafts of the Agreement provided for a larger initial deposit, but Plaintiff accepted a lower initial deposit and monthly earnest money payments leading up to the closing date in order to have immediate access to that money. SUF ¶¶ 31, 32. Plaintiff decided it was in her best interest to choose more money in her pocket and less in escrow. Plaintiff was paid the prescribed sums by TPL. Plaintiff should not now be allowed to have her cake and eat it too. She should be held to the terms of the contract she negotiated.

Additionally, the assignment of the Town's right of first refusal was foreseeable and foreseen, and should not provide a reason for Plaintiff to avoid application of the liquidated damages clause. Plaintiff has alleged that the assignment and exercise of the right of first refusal was not foreseeable. Interrogatory Response No. 9. To the contrary, she has been aware for

---

[3] Plaintiff agreed to monthly $1500 deposit payments knowing her Property could be tied up for almost two years, since Cohousing had the right under the Agreement to extend the closing date for twelve months. SUF ¶ 38.

decades that she had to provide the Town a right of first refusal. SUF ¶ 13.    Plaintiff's real estate broker and attorney also understood at the time her Property was for sale that she was required to offer the land to the Town and that the Town could assign that right to a nonprofit conservation organization. SUF ¶ 26. Indeed, provisions for that possibility were written into the Agreement. SUF ¶ 28. Cohousing's default was also foreseeable, as Paragraph 21 of the Agreement expressly provides for Seller's remedy. SUF ¶ 30.[4] Thus, since assignment and exercise of the right of first refusal were foreseeable, and Cohousing's default was foreseeable, so then was TPL's assumption of the right of first refusal and subsequent default.

Plaintiff further argues that TPL changed the contract in ways she could not have foreseen, specifically by not undertaking a 30-unit, M.G.L. c. 40B affordable housing development on the Property.  Complaint ¶ 55; Interrogatory Response No. 9.  This argument has no merit. First, Plaintiff's own real estate attorney—who negotiated the terms of the Agreement—did not think an assignee of the right of first refusal would be required to do a 40B development. SUF ¶ 56. He specifically pointed to the 40B provision in the Agreement as one which would not apply to an assignee because it was not "germane." *Id.*  Second, it was foreseeable as a matter of law that the right of first refusal might be assigned to a nonprofit that would seek to conserve, not develop the land.  Indeed, that is one of the main purposes of a right of first refusal under Chapter 61—that the municipality or nonprofit conservation organization exercising the right would do so precisely to avoid or limit planned development of the land.[5]

---

[4] Plaintiff has testified that she did not believe Cohousing would default, but Cohousing's purchase was contingent upon a successful c. 40B application that she did not control and that could not be assured. SUF ¶ 36. Cohousing's purchase was also contingent upon Cohousing obtaining construction financing. SUF ¶ 35. Moreover, her belief about Cohousing's intent or ability to complete the purchase is immaterial where she knew that the Town or a nonprofit could take the place of Cohousing in the Agreement.

[5] Plaintiff claims that she could not foresee that TPL would change the contract by allegedly demanding a lower purchase price. However, upon TPL's default, Plaintiff was entitled to her liquidated damages and had the option of entertaining TPL's subsequent offers to try to salvage the transaction or instead pursuing other offers. The subsequent offers by TPL have no effect on the enforceability of the liquidated damages clause.

**D.    Exercise of a Right of First Refusal Under Chapter 61 Does Not Create Any Extra-Contractual Duty of Performance.**

Plaintiff alleges that TPL's exercise of the right of first refusal "obligated TPL to fund the purchase of the Property." Complaint ¶ 18. For the reasons described above, Plaintiff is simply wrong. Not only is this assertion devoid of any support in fact or law, it runs contrary to the history and purpose of Chapter 61.

The Supreme Judicial Court recently held that Chapters 61, 61A, and 61B "must be interpreted in a manner that will not frustrate or impair a town's right of first refusal." *Town of Franklin*, 443 Mass. at 196 (the statutes should be "liberally construed to effectuate their goals"). Plaintiff's interpretation would not only frustrate a town's right of first refusal; it would effectively defeat it. These statutes embody the Commonwealth's intent to encourage the preservation of forest, agricultural, and recreational land by conferring favorable assessment and taxation on land subject to the statutory schemes. This incentive was borne of a concern that open space in the Commonwealth was rapidly decreasing in the face of increasing taxes and pressure from urban and suburban development. *See Town of Sudbury v. Scott*, 439 Mass. 288, 299–301 (2003) (providing a detailed description of the legislative history).

In order to ensure that landowners did not take advantage of the tax benefits provided by these statutes and then convert the land for development, the Legislature built into the statutes a requirement that landowners afford the city or town in which the land is located a first refusal option to meet an offer to purchase it. This manifests a legislative intent to help preserve the forest, agricultural, and recreational use of these lands before they can be sold for some other use. *Scott*, 439 Mass. at 300. The statute gives municipalities 120 days to assess the offer to purchase and decide whether to exercise the right of first refusal. M.G.L. c. 61, § 8.

Recognizing that many municipalities have limited financial resources, the statute was later amended to authorize cities and towns to assign such first refusal rights to a nonprofit conservation organization. *Id.*; *see also Raffi v. Johnson*, Misc. Case No. 231739, 5 Land Ct. Rptr. 139, 143 (Mass. Land Ct. Aug. 18, 1997) (noting that M.G.L. c. 61, § 8 assures municipalities that property can still be preserved via assignment to a nonprofit when the price is too high for the town). In practice, much of the 120-day option period is often consumed by the town's deliberations, leaving the nonprofit even less time in which to assess the preservation value of the project, determine the risks and benefits, assess fundraising possibilities, and coordinate with local interest groups, among other tasks. Critical to this assessment is the need to be able to evaluate the contract terms into which the municipality or nonprofit is entering. Indeed, the statute requires that a landowner's notice to a town of an offer to purchase include a "full description of all of the terms and conditions of the offer," without which, a town, and by extension a nonprofit conservation organization, would have "no knowledge, or materially incomplete knowledge, of the offer it had to meet." *Wareham Land Trust v. A.D. Makepeace Co.*, No. 295259, 2004 WL 1117172 at *3 (Mass. Land Ct. May 19, 2004).

Nonprofit organizations such as TPL must be able to rely upon the terms and conditions of the contracts into which they are entering when they decide whether to accept an assignment. If denied that certainty, nonprofits would never be able to accept assignments because they would be unable to determine the financial liability to which they would be exposed. In this case, TPL had to weigh its likelihood of raising the funds sought to complete the purchase and obtaining the necessary zoning approvals against the potential exposure if it failed. That is precisely what TPL did in this case—it consulted a lawyer knowledgeable about so-called "chapter lands" and conducted an analysis of potential liabilities should the project not succeed. SUF ¶¶ 44, 45. During that approval process, TPL understood that if the project was not

successful the risk to TPL was limited to liquidated damages. SUF ¶ 46. In fact, it was standard procedure for TPL to move forward with a project only if the P&S contained a liquidated damages clause. SUF ¶ 47.[6] In analyzing the benefits and risks of the project, TPL was entitled to rely upon the terms and conditions of the Agreement as negotiated by the Plaintiff, including the limitation of damages to retention of deposits under the liquidated damages clause.

Plaintiff's contention that a town or non-profit must complete the purchase following the exercise of a Chapter 61 right of first refusal has been squarely rejected by the Land Court. The court held that towns and, in turn, nonprofit assignees, cannot be expected to raise the full purchase price in the 120 days prior to the exercise of the right of first refusal. *See Meachen v. Hayden*, Misc. Case No. 240129, 6 Land Ct. Rptr. 235, 238 (Mass. Land Ct. Aug. 6, 1998) (holding that Chapter 61A does not require the appropriation of funds necessary for purchase before the 120-day period concludes). *Meachen* rejected the seller's contention that a municipality exercising a right of first refusal needed to appropriate funds for the purchase prior to exercising the right. *Id.* Accordingly, there is always a possibility that a town's Board of Selectmen will exercise a right of first refusal, but that the Town Meeting will vote down the purchase following the exercise, preventing the municipality from closing. Similarly, a conservation nonprofit stepping into the shoes of a municipality cannot be expected to raise all of the funds necessary for a purchase before deciding to accept an assignment under Chapter 61, and likewise faces the possibility that it will not ultimately be able to purchase the property.

---

[6] Simply because TPL assessed its potential exposure if it failed to close does not mean TPL never had any intention to close as Plaintiff has suggested. Review of TPL's thorough internal Project Fact Sheet, used to request approval from TPL's National Board of Directors, puts that claim to rest. SUF ¶ 44. TPL would never have accepted the assignment and devoted its resources to the preservation of the Property if it did not intend for the project to succeed. SUF ¶ 49. Rather, like any prudent party entering into a contract, it reviewed all terms of the contract, including the terms concerning its potential liability upon default. SUF ¶¶ 44, 45.

### E.   Risk of Nonperformance Is Inherent in All Conditional Real Estate Sales.

Risk of nonperformance is inherent in all conditional real estate sales, and Plaintiff

cannot use the fact that the Agreement was assigned under Chapter 61 to place greater

obligations upon TPL than Cohousing. Sellers of real property subject to Chapter 61, as in other

real estate transactions, always risk nonperformance, whether by the original buyer,

municipality, or nonprofit assignee. Nonperformance can arise not only from a failure of

financing, but failure to obtain necessary permits, rejected zoning applications, negative

environmental testing, and other failures. It is because of this range of risks that parties enter

into contracts that limit the consequences of default. Just as Plaintiff had no guarantee of

performance by Cohousing as the buyer, she had no guarantee of performance by the Town or

TPL. It is because of these risks that the Agreement included a liquidated damages clause to

prescribe the Plaintiff's relief in the event of a default. *See Kelly*, 428 Mass. at 881–82 (purchase

and sale agreements are amenable to liquidated damages clauses because parties cannot know

"what delays might ensue, what might occur in the real estate market, or how a failed sale might

affect [the seller's] plans") (citation omitted).

Here, the Agreement with Cohousing included several contingencies, and Plaintiff had no

guarantee that Cohousing would satisfy them. SUF ¶¶ 35, 36. Cohousing included in the

Agreement a contingency based on a satisfactory feasibility evaluation (including engineering

studies, soil samples, etc.) and if Cohousing found the evaluation unsatisfactory it could

terminate the Agreement. SUF ¶ 35. Plaintiff discussed these contingencies with her broker.

SUF ¶ 35. The closing was also contingent upon Cohousing receiving approvals to proceed with

its planned high density, 30-unit 40B development. SUF ¶ 36. If Cohousing had been unable to

secure the 40B zoning and permitting approvals, Cohousing was entitled to terminate the

Agreement with no obligations to Plaintiff but the deposits. SUF ¶ 36. Although 40B

14

developments generally enjoy a streamlined zoning and permitting process, they must still meet certain zoning, density, and other requirements and are by no means guaranteed to be approved as originally proposed. SUF ¶ 37. Indeed, at the time Plaintiff signed the Agreement, Cohousing only had commitments to fill 20 of the 30 units it needed to proceed with its planned 40B development. SUF ¶ 39. Plaintiff is not entitled to impose upon TPL a greater duty of performance under the Agreement than was placed upon the original buyer Cohousing.

## II.    PLAINTIFF'S c. 93A CLAIM AGAINST TPL (COUNT II) FAILS.

Plaintiff failed to plead in her Complaint whether she brings Count II under Section 9 or Section 11 of M.G.L. c. 93A. She has failed to prove the necessary elements of a claim under either section and therefore summary judgment should be granted in favor of TPL on Count II.

### A.    Plaintiff Has Failed to Meet the Threshold Requirements of a M.G.L. c. 93A Claim Arising Under Either Section 9 or Section 11.

If Plaintiff purports to bring her c. 93A claim under § 9, the claim fails because she did not send a demand letter to TPL. Failure to allege and prove that she sent a demand letter is fatal to a claim under § 9. *Spilios v. Cohen*, 38 Mass. App. Ct. 338, 342–43 (1995) (affirming summary judgment on c. 93A claim because plaintiff failed to allege and prove demand letter); *Waters v. Earthlink*, 21 Mass. L. Rptr. 219, 2006 WL 1843583, at *4 (Mass. Super. Jun. 19, 2006) (same). Nowhere has Plaintiff asserted that she sent a demand letter to TPL or raised any argument as to why she should be entitled to bring a claim under § 9 without one. Any claim under § 9 must therefore fail.

If Plaintiff purports to bring her c. 93A claim under § 11, that claim too must fail. Section 11 applies only to interactions between parties who are both engaged in "trade or commerce." M.G.L. c. 93A § 11; *Linkage Corp. v. Trustees of Boston Univ.,* 425 Mass. 1, 22 (1997). Summary judgment is appropriate on a c. 93A, § 11 claim if the plaintiff fails to advance

specific facts establishing that the parties were engaged in "trade or commerce." *Ron Bouchard's Auto Store v. Godfrey Trust*, 2005 WL 2978744, at *2, (Mass. App. Div. Oct. 24, 2005) (affirming summary judgment on c. 93A claim because plaintiff failed to establish it was engaged in trade or commerce). Here, the evidence shows that Plaintiff was not engaged in trade or commerce. She sold her family home to move to Maine for personal reasons, not for any business purpose, and her broker acknowledged that the sale was residential, not commercial. SUF ¶ 16. Persons selling their private homes are generally considered not to be engaged in trade or commerce for purposes of § 11. *Begelfer v. Najarian*, 381 Mass. 177, 191 (1980) (in determining whether parties are engaged in trade or commerce, court may consider whether the transaction was motivated by business or personal reasons, noting sale of personal home as an example of a personal reason); *Lantner v. Carson*, 374 Mass. 606, 612 (1978) (c. 93A does not reach strictly private transactions such as the sale of a private home); *Nei v. Burley*, 388 Mass. 307, 317 (1983) (affirming judgment for defendants in c. 93A claim because sellers of real property to be subdivided by buyers were not engaged in trade or commerce). Since Plaintiff sent no demand letter to TPL and was not engaged in trade or commerce, her claim fails under § 9 and § 11 alike and TPL is entitled to summary judgment on Count II.

## B.   Plaintiff's c. 93A Claim Fails For Want of an Unfair or Deceptive Act.

Even if Plaintiff could show that she sent a demand letter or was engaged in trade or commerce, TPL is entitled to summary judgment on her c. 93A claim because she has failed to prove a necessary element of every such claim—an unfair or deceptive act. To maintain a cause of action under c. 93A, a plaintiff "must establish that the defendant's actions fell within at least the penumbra of some common-law, statutory, or other established concept of unfairness, or were immoral, unethical, oppressive or unscrupulous, and resulted in substantial injury . . . to

16

competitors or other businessmen." *Industrial Gen. Corp. v. Sequoia Pac. Sys. Corp.*, 44 F.3d 40, 43 (1st Cir. 1995) (citations omitted). Plaintiff cannot make that showing.

This question is appropriately answered on summary judgment. The First Circuit has made clear that it is judges, not juries, who decide whether conduct rises to the level of rascality required to let a jury hear a c. 93A claim. "Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, the boundaries of what may qualify for consideration as a chapter 93A violation is a question of law." *Industrial Gen. Corp.*, 44 F.3d at 43–44 (quoting *Shepard's Pharmacy v. Stop & Shop Cos.*, 37 Mass. App. Ct. 516, 520 (1994)). Here, the conduct simply does not fall within the purview of c. 93A and summary judgment should enter for TPL.

All of the conduct about which Plaintiff complains centers on TPL's assumption of a right of first refusal and its consequent default. However, a simple breach of contract does not constitute an unfair practice within the meaning of c. 93A. *Framingham Auto Sales v. Workers' Credit Union*, 41 Mass. App. Ct. 416, 418 (1996) ("a mere breach of a legal obligation under commercial law, without more, does not amount to an unfair or deceptive act under G.L. c. 93A."); *Whitinsville Plaza, Inc. v. Kotseas*, 378 Mass. 85, 100–01 (1979); *Bunge Oils v. M&F Mktg. Dev.*, No. Civ. A. 03-11559, 2005 WL 629489, at *3 (D. Mass. Mar. 15, 2005) (c. 93A claim fails where it "is merely piled on" to the breach of contract claim).

Plaintiff claims that TPL engaged in unfair or deceptive practices because it allegedly knew it would not close on the Property. However, there is no evidence of that, or that TPL intended to deceive Plaintiff or anyone else about its ability to close. To the contrary, all the evidence shows that at the time of assignment TPL intended to complete the purchase and believed it could. SUF ¶ 49. TPL had never before failed to complete a purchase after accepting assignment of a chapter lands right of first refusal and had no reason to think this project would

be different. SUF ¶ 43. TPL expended vast amounts of time and resources in its efforts to make the project work, including attending dozens of meetings, preparing a lengthy grant application, hiring a consultant to help with it, consulting counsel on how to obtain zoning relief, and appearing before Town zoning bodies. SUF ¶¶ 59, 60, 61, 62, 65, 66, 67. It would make no sense for TPL to expend such resources and put its reputation on the line for a project if it had no intention of closing or knew it could not close, and Plaintiff has no evidence to the contrary.

The mere fact that TPL had, at the time of assignment, considered its potential liability for liquidated damages under the Agreement if the project was not successful does not render its conduct unfair or deceptive. TPL conducted normal due diligence on the project, including assessment of its risk. SUF ¶¶ 44, 45. Indeed, it would be imprudent for TPL to accept an assignment without first considering its potential liability. Thus, even if Plaintiff had met the threshold requirements of a c. 93A claim, she has no evidence of any unfair or deceptive act.

**III.    PLAINTIFF'S CLAIM FOR VIOLATIONS OF c. 93A AGAINST THE "PARTNERSHIP OF STOW AND TPL" (COUNT III) FAILS BECAUSE THERE WAS NO SUCH PARTNERSHIP.**

Plaintiff also brings a M.G.L. c. 93A claim against "the partnership of Stow and TPL." As a preliminary matter, Count III fails for the same reasons Count II does. Plaintiff has failed to show that she sent a demand letter, that she was engaged in trade or commerce, or the existence of an unfair or deceptive act. But Count III also fails because Plaintiff has failed to show the existence of any partnership between Stow and TPL.

**A.    TPL and Stow Did Not Create a Partnership In Fact.**

A partnership is an association of two or more persons to carry on as co-owners a business for profit. M.G.L. c. 108A § 6; *Boyer v. Bowles,* 310 Mass. 134, 138 (1941); *Fenton v. Bryan,* 33 Mass. App. Ct. 688, 691 (1992). The question of whether there is a partnership is one of intent that must be proved by an express agreement, either written or oral, or be inferred from

the acts or conduct of the parties. *See Fenton,* 33 Mass. App. Ct. at 691; *Shain Investment Co. v.*

*Cohen,* 15 Mass. App. Ct. 4, 7 (1982); *John Alden Transp. Co. v. Bloom,* 11 Mass. App. Ct. 920,

921 (1981). Factors relevant to whether there is a partnership include the existence of an

agreement to act as partners, a sharing of losses and profits, and participation by the parties in the

control or management of the enterprise. *Boyer,* 310 Mass. at 138; *Fenton,* 33 Mass. App. Ct. at

691; *Shain Investment Co.,* 15 Mass. App. Ct. at 7–10.

Here, there is no evidence to establish any partnership in fact. There is no evidence that

there was an express written or oral agreement between the Town and TPL, that they shared

losses and profits from the project, or that the Town participated in the control or management of

the project. Plaintiff may point to correspondence between TPL and the Town in which TPL

asked the Town to "partner" with it to see the project to conclusion. As Mr. MacDonnell has

testified, TPL used that term in its colloquial sense, not as a legal term. SUF ¶ 58. Courts

recognize the distinction. *See, e.g., Dinco v. Dylex Ltd.,* 111 F.3d 964, 969 (1st Cir. 1997)

(distinguishing "colloquial usage of the term 'partner'" from the "*legal relationship* that broadly

imposes liability without fault upon otherwise innocent parties") (emphasis in original); *Southex*

*Exhibitions v. Rhode Island Builders Assn.,* 279 F.3d 94, 101 (1st Cir. 2002) (no error in finding

party did not employ "the term 'partners' in its strict legal sense, but merely in its colloquial

sense, as a 'cooperative joint effort.'").

### B.    Plaintiff Has Not Shown Any Partnership By Estoppel.

Further, Plaintiff has not established facts sufficient to allow her to recover based on

partnership by estoppel. Under Massachusetts law, four elements must be proved in order to

establish liability under that doctrine: (1) that the would-be partner held himself out as such; (2)

that such holding out was done by the defendant directly or with his consent; (3) that the plaintiff

had knowledge of such holding out; and (4) that the plaintiff relied on the ostensible partnership

to her prejudice. G.L. c. 108A, § 16; *Brown v. Gerstein,* 17 Mass. App. Ct. 558, 571 (1984), citing *Standard Oil Co. v. Henderson,* 265 Mass. 322, 326 (1928). Failure to establish any of these requirements precludes recovery on an estoppel theory. *Brown,* 17 Mass. App. Ct. at 571.

Generally, the doctrine of partnership by estoppel applies in the context of a professional partnership where two or more individuals working closely are alleged to have been partners. *See, e.g., Burns v. Beatrice*, 63 Mass. App. Ct. 1119 (2005) (plaintiff alleged partnership by estoppel between attorneys practicing in same office); *McMillan v. Weinberg*, 1999 WL 706707 (Mass. Super. Aug. 17, 1999) (partnership by estoppel asserted against co-owners of a bookstore). The typical partnership by estoppel is a far cry from this case, in which TPL had no professional affiliation with the Town and was not providing services jointly with it.

There is no evidence to establish any element of partnership by estoppel; in fact, the evidence shows that TPL and the Town did *not* hold themselves out as partners, and the Plaintiff did not know of or rely upon any representation of partnership. SUF ¶ 57. Moreover, Plaintiff acknowledges that the process by which the Town assigned the right of first refusal to TPL, and by which TPL exercised it, did not require or involve any action on her part whatsoever. SUF ¶ 54. Accordingly, she could not have relied on any alleged partnership to her prejudice because she could not have changed her position in reliance on one.

Because Plaintiff has failed to establish a partnership between TPL and the Town, all claims brought against the alleged partnership fail as a matter of law. *Burns*, 63 Mass. App. Ct. at 1119 (summary judgment in c. 93A case because plaintiff failed to prove partnership in fact or partnership by estoppel); *McMillan*, 1999 WL 706707 (summary judgment because plaintiff failed to show existence of and reliance upon a partnership, when plaintiff tried to base claim on partnership by estoppel). Summary judgment is also appropriate on Counts V, VI and VII insofar as they are also brought against "the partnership of TPL and Stow."

IV.    **TPL AND MACDONNELL HAVE NO LIABILITY IN TORT (COUNTS V AND VII).[7]**

    A.    <u>The Intentional Interference and Misrepresentation Claims Fail Because They Stem From the Same Conduct as the Breach of Contract.</u>

Plaintiff brings two tort claims (intentional interference with contractual relations and misrepresentation) based on the same conduct that forms the basis for Count I. It is well established that a breach of contract with nothing more cannot form the basis for a tort claim. *Anderson v. Fox Hill Village Homeowners Corp.*, 424 Mass. 365, 368–69 (1997) (failure to remove ice under lease obligation not a tort); *Redgrave v. Boston Symphony Orchestra,* 557 F. Supp. 230, 238 (D. Mass. 1983) ("a breach of contract is not, standing alone, a tort as well"). Indeed, Massachusetts courts have repeatedly noted their frustration with peripheral tort claims based on a breach of contract. *See, e.g., Belmont L.V. Land Ltd. P'ship v. Lake Vista Villa Ltd. P'ship*, 14 Mass. L. Rptr. 138 (Suffolk Business Litigation Session, Mass. Super. 2001) (van Gestel, J.) (summary judgment for defendants on claims of fraud, violations of c. 93A, intentional interference with contractual relations, and breach of contract, court expressed irritation that plaintiff brought tort claims "remote" from principal breach of contract issues).

    B.    <u>Plaintiff's Claim for Intentional Interference with Contractual Relations Against TPL and MacDonnell (Count V) Fails.</u>

Plaintiff's claim of intentional interference with contractual relations fails on the undisputed facts. In order to succeed on such a claim, Plaintiff must prove, among other things, that Defendants' alleged interference arose "from improper motive or means." *United Truck Leasing Corp. v. Geltman,* 406 Mass. 811, 812, 816–17 (1990). Where, as here, there is no evidence that the TPL Defendants' alleged interference was improper in motive or means, the TPL Defendants are entitled to summary judgment. *Dulgarian v. Stone,* 420 Mass. 843, 851–52

---

[7] Count IV (Intentional Infliction of Emotional Distress) was previously dismissed by the Court. Memorandum and

(1995) (affirming summary judgment for defendants because "plaintiffs did not allege, and the evidence did not support, any improper motive or means").

### 1.    Plaintiff Has Not Shown Improper Means.

In the context of an intentional interference with contractual relations claim, "improper means" refers to egregious misconduct such as intimidation, deceit, bribery, unfounded litigation, defamation or disparaging falsehood. *Top Serv. Body Shop v. Allstate Ins. Co.*, 582 P.2d 1365, 1371 n.11 (Ore. 1978), adopted in *United Truck Leasing*, 406 Mass. at 816.

Here, there is no evidence of any such conduct. The only conduct Plaintiff complains of arises out of TPL's exercise of a legal mechanism created by Massachusetts law, which Plaintiff herself, her broker and counsel knew might be used. SUF ¶¶ 13, 26. As a matter of law, TPL was permitted to "interfere with" the Agreement. Chapter 61 specifically grants to the Town a right of first refusal and the option to assign it to a nonprofit organization. M.G.L. c. 61, § 8. Plaintiff was aware that in return for substantial tax benefits she faced the possibility that the Town and, by assignment, a nonprofit organization would "interfere" with any agreement she executed for the sale of the Property by displacing the buyer. That "interference" is authorized by statute and Plaintiff freely chose the Chapter 61 status. *See, e.g., Williams v. Watt*, No. 99-00696, 2002 WL 1009255, at *6 (Mass. Super. Apr. 5, 2002) (Plaintiff had not shown improper motive or means where conservation organization accepted assignment and exercised right of first refusal under c. 61A). In short, there is no evidence TPL acted in any way other than to exercise a legal right.

### 2.    Plaintiff Has Not Shown Improper Motive.

In the context of an intentional interference with contractual relations claim, an improper motive consists of a "primary purpose to injure the plaintiff." *Pathe Computer Control Sys.*

---

Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, dated May 17, 2006.

22

*Corp. v. Abbey Holding*, No. Civ. A. 89-1374-Z, 1990 WL 122345, at *5 (D. Mass. Aug. 17,

1990); *see also United Truck Leasing*, 406 Mass. at 816. Plaintiff cannot meet this standard, and

summary judgment is appropriate when the record contains insufficient evidence of such a

motive. *Alba v. Sampson*, 44 Mass. App. Ct. 311, 314 (1998); *see also EEOC v. Amego, Inc.*,

956 F. Supp. 1039, 1043 (D. Mass. 1996) ("Even in cases where elusive concepts such as motive

or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely

upon conclusory allegations, improbable inferences, and unsupported speculation.").

Here, Plaintiff has adduced no facts to demonstrate that the TPL Defendants' "primary"

purpose in accepting assignment of the right of first refusal was to cause her injury. To the

contrary, all of the evidence shows that the TPL Defendants' goals were simply to conserve the

majority of the Property pursuant to Chapter 61 and to purchase it from Plaintiff. SUF ¶ 50.

Even if the TPL Defendants were going to derive some benefit from the exercise, that does not

support an intentional interference with contractual relations claim. To further one's own

commercial, personal, or financial goals is not an improper motive for purposes of intentional

interference claims. *United Truck Leasing*, 406 Mass. at 817; *Banta Corp. v. Total Graphics*,

No. 9301390, 1994 WL 878941, at *4 (Mass. Super. Ct. Dec. 1, 1994) (Where defendant was

"seeking to further its own commercial position," it had not acted with improper motive).

Further, to achieve a charitable purpose, such as a nonprofit's purchase of land to further its

conservation objectives, is not an improper motive. *Williams*, 14 Mass. L. Rptr. 511, 2002 WL

1009255, at *6 (summary judgment for defendant non-profit conservation organization against

claim for intentional interference where the only motive established for its actions in accepting

the right of first refusal under Chapter 61A was to conserve the land).

**C.    Plaintiff's Misrepresentation Claim Against TPL and MacDonnell (Count VII) Fails.**

Plaintiff's misrepresentation claim fails because she cannot prove the essential elements of the claim.  To maintain such a cause of action, Plaintiff must show "that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to [her] damage." *Danca v. Taunton Sav. Bank,* 385 Mass. 1, 8 (1982); *see also Twin Fires Inv. v. Morgan Stanley Dean Witter & Co.*, 445 Mass. 411, 423 (2005); *Zimmerman v. Kent*, 31 Mass. App. Ct. 72, 77 (1991).  Here, Plaintiff's misrepresentation claim fails because she has not shown that she relied on any alleged false statement or that the TPL Defendants made any such false statement.  Accordingly, the TPL Defendants are entitled to summary judgment. *David v. Dawson, Inc.*, 15 F. Supp. 2d 64, 141–42 (D. Mass. 1998) (summary judgment for defendants on fraud claim because plaintiff failed to show reliance).

    1.    Plaintiff Cannot Prove Reliance.

In order for Plaintiff to recover, she must show that she reasonably relied on a misrepresentation and acted upon it to her detriment. *Twin Fires Inv.,* 445 Mass. at 423.  Here, there is no evidence that Plaintiff relied on anything said or done by the TPL Defendants, true or false, because there was no role for her to play regarding the assignment process and nothing she could do to affect it.  Plaintiff acknowledges that the Town's assignment and TPL's exercise of the right of first refusal did not involve any action on her part whatsoever, nor did she have any say in it.  SUF ¶¶ 54, 55.  She voluntarily subjected herself to that process the day she registered her land under Chapter 61.  After that, she had no role in the assignment or exercise of the first refusal right. *Id.*  She did not and could not have changed her position based on any representation or misrepresentation by the TPL Defendants, and therefore cannot prove reliance.

2.    Plaintiff Has Not Shown that Defendants Made Any False Statement.

Absent any reliance, the question of whether the TPL Defendants made any false representation of material fact is never reached; but there is no evidence that the TPL Defendants made any knowingly false representation. Plaintiff has no evidence that the TPL Defendants knew TPL would be unable to meet the purchase price or that the TPL Defendants acted to deceive her regarding TPL's ability and intention to acquire the Property. To the contrary, the evidence shows that at the time of assignment the TPL Defendants intended and believed that TPL could and would complete the purchase. SUF ¶ 49. TPL conducted substantial due diligence regarding the prospects for the project, and TPL ultimately approved it as "low risk." SUF ¶¶ 44, 45, 49. TPL's project personnel had never before failed to complete a purchase after accepting an assignment of a chapter lands right of first refusal, and had no reason to think this project would be any different. SUF ¶ 43. The evidence also shows that TPL expended significant time and resources to try to complete the purchase. TPL and the Town prepared a lengthy grant application for state funding, which took much time and effort, SUF ¶ 60-62, as did TPL's work to seek zoning relief needed for TPL's planned limited development, including consulting counsel and appearing before the Zoning Board of Appeals. SUF ¶ 64-67.

Plaintiff's allegations that MacDonnell told her TPL would go through with the project and then ultimately TPL did not do not support a fraud claim. Statements of present intention as to future conduct may be the basis for a fraud action only if the statements misrepresent the actual intention of the speaker and were relied upon by the recipient to her damage. *McEvoy Travel Bureau v. Norton Co.*, 408 Mass. 704, 709 (1990). Intent cannot be inferred merely from nonperformance. *McCartin v. Westlake*, 36 Mass. App. Ct. 221, 230 n.11 (1994). Rather, the party alleging fraud must show that there was an intent not to carry out the promise existing when it was made. *Id.*; *Galotti v. U.S. Trust Co.*, 335 Mass. 496, 501–02 (1957); Restatement

25

(Second) of Torts § 530 (1977). There is no evidence here to suggest that the TPL Defendants intended anything other than to complete the project, and TPL's nonperformance, by itself, is legally insufficient to support a fraud claim.

Moreover, any statement made to Plaintiff regarding expected performance by TPL was legally immaterial. In the context of misrepresentation claims, "materiality" means "whether a reasonable [person] would attach importance to the fact not disclosed *in determining [her] choice of action.*" *Zimmerman v. Kent*, 31 Mass. App. Ct. 72, 78 (1991) (emphasis added). Here, Plaintiff had no choice of action for she played no role in the assignment process, and therefore no statement by the TPL Defendants could have been made to induce Plaintiff to act or not to act. SUF ¶ 54, 55. There was no consideration for any alleged "promise" and no change of position by Plaintiff in reliance on any alleged statement. Plaintiff's misrepresentation claim fails on the undisputed facts.

## V.    PLAINTIFF'S 42 U.S.C. § 1983 CLAIM AGAINST TPL, MACDONNELL AND THE "PARTNERSHIP OF STOW AND TPL" (COUNT VI) FAILS.

Plaintiff's Section 1983 claim fails because she cannot establish the essential elements of the claim. To state a claim for relief under Section 1983, Plaintiff must establish (1) that Defendants deprived her of a right secured by the Constitution, and (2) that Defendants acted "under color of state law." *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999). Here, Plaintiff claims that TPL, the Town, and MacDonnell deprived her of property without just compensation under the Fifth Amendment of the United States Constitution through a "constructive taking" of the value of her Property. Plaintiff's claim fails both because there was no "taking" and because the TPL Defendants did not act under color of state law.[8]

---

[8] As noted in Section III above, all of Plaintiff's claims against the "partnership of TPL and Stow," including Count VII, fail because Plaintiff has not shown the existence of a partnership.

A.    **Plaintiff Cannot Prove that the TPL Defendants Deprived Her of All or Most of Her Property.**

Governmental action short of an actual taking may be a "constructive taking" only where it deprives the owner of "all or most of [her] interest in the subject matter." *Trager v. Peabody Redevelopment Auth.*, 367 F. Supp. 1000, 1002 (D. Mass. 1973) (governmental determination that real estate is blighted for purposes of urban renewal is not a constructive taking even though it decreased the property's value). Here, Plaintiff alleges that the TPL Defendants have constructively taken the value of her Property, without offering any fact in support of her contention. The evidence shows that Defendants did nothing to diminish the Property's value and that Plaintiff claims she has learned since the closing date that the Property is worth more than the contract price due to the value of the water in the aquifer beneath it. SUF ¶ 82, 83.

TPL's breach of the Agreement has not deprived Plaintiff of "all beneficial use of her property" or even some use of it. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992). Plaintiff still owns her Property. She is free to sell, lease or farm it, or can seek to monetize the water rights through negotiation with public or private parties. Any of these uses would provide her with an economic return. She is currently renting the dwelling on the Property, which yields income to her. SUF ¶ 9. Further, nothing Defendants have done has prevented her from selling her Property. SUF ¶ 78. Her broker and attorney both testified that TPL's default does not impair her ability to sell the Property to another. SUF ¶ 78.

Plaintiff's claim that she has heard one description of her Property as "poisoned" due to the controversy associated with it does not mean she has lost value. Even if it did, a mere decline in property value does not constitute a taking. *Danforth v. United States*, 308 U.S. 271, 285 (1939); *Cayon v. City of Chicopee*, 360 Mass. 606, 609–10 (1971) (dismissing constructive

taking claim where property value decreased after the city announced it would take it and then failed to do so).  Plaintiff cannot establish a taking and Count VI fails on this ground alone.

###    B.    Plaintiff Cannot Prove the TPL Defendants Acted Under Color of State Law.

Count VI also fails because § 1983 liability attaches only to persons acting "under color of state law."  Private conduct generally lies outside the scope of the Constitution, and only in certain limited instances may "governmental authority … dominate an activity to such an extent that its participants must be deemed to act with the authority of the government and, as a result, be subject to constitutional constraints." *Edmondsen v. Leesville Concrete Co.*, 500 U.S. 614, 620 (1991).  To resolve the state action question, courts ask "whether the State provided a mantle of authority that enhanced the power of the harm-causing individual actor." *NCAA v. Tarkanian*, 488 U.S. 179, 192 (1988).

Here, when TPL accepted the right of first refusal, it stepped into the place of the original buyer, Cohousing.  Once the Town voted to assign its right to TPL under the statute, the Town's role ceased and responsibility for closing the transaction lay solely with TPL.  The fact that TPL sought funds from the Town does not make TPL a state actor, nor can it make MacDonnell, acting as TPL's representative, a state actor. *Rendell-Baker v. Kohn*, 457 U.S. 830, 832, 837 (1982) (private school's termination of employment agreement did not constitute state action where public funds accounted for 99 percent of the school's operating budget); *Blum v. Yaretsky*, 457 U.S. 991, 1011 (1982) (nursing home's decision to transfer patient was not state action where State paid 90 percent of the patient's medical costs).

## VI.    PLAINTIFF CANNOT PROVE DAMAGES.

Plaintiff cannot prove an essential element of all of her claims—that she has suffered damages—and Defendants are entitled to summary judgment on that ground alone. *McDonald v. Rockland Trust Co.*, 59 Mass. App. Ct. 836, 843 (2003) (summary judgment is appropriate for a

claim brought under c. 93A absent evidence of damages); *Chemawa Country Golf, Inc. v. Wnuk*, 9 Mass. App. Ct. 506, 510–11 (1980) (claim for intentional interference fails where there is no evidence plaintiff was harmed); *David v. Dawson, Inc.*, 15 F. Supp. 2d 64, 141–42 (D. Mass. 1998) (summary judgment on fraud claim because plaintiff failed to show damages); *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1122 (1st Cir. 1995) (in breach of contract action, plaintiff must "put forth competent evidence" of damages to survive summary judgment).

Plaintiff retains the Property, and is free to sell it to someone else. SUF ¶ 78. Plaintiff's broker testified that to his knowledge, TPL has not done anything that had a negative impact on the value of the Property. SUF ¶ 82. Plaintiff's real estate attorney testified that since the closing date, Plaintiff has realized that her Property is actually more valuable than she thought it was in 2003, given the value of the aquifer beneath it. SUF ¶ 83. Indeed, Plaintiff contends that the water rights have a present value of at least $4.3 million, far more than the $1,116,900 purchase price. SUF ¶ 83. Several parties have expressed interest in Plaintiff's Property for the water resources. SUF ¶ 84. Plaintiff has made no attempt to realize the Property's value subsequent to TPL's default. Plaintiff's failure to adduce proof of damages is an additional reason Defendants are entitled to summary judgment.

## CONCLUSION

TPL did nothing here but lend its expertise and diligent effort to local conservation groups to attempt to conserve a 40+ acre parcel of largely undeveloped land and valuable water resources. When those efforts failed and TPL was forced to forfeit not only $19,000 in deposits to Plaintiff, but also hundreds of hours and thousands of dollars worth of its own resources expended on the project, TPL was disappointed, but never expected it would be additionally burdened by baseless, vituperative charges and meritless litigation. Plaintiff – though retaining both her Property and the deposits paid by TPL – has refused to let the matter go, as she must

under the Agreement.  In addition to making reckless charges against TPL itself, she has dragged

an individual, Craig MacDonnell, through the burden and stigma of a lawsuit for having done no

more than faithfully carry out his job to further TPL's conservation mission.  Plaintiff has

already received her "sole remedy in equity and law" under the Agreement, retention of TPL's

deposits as liquidated damages.  Summary judgment for the TPL Defendants is mandated.

> Respectfully submitted,
>
> THE TRUST FOR PUBLIC LAND and
> CRAIG A. MACDONNELL
>
> By their attorneys,
>
> /s/ Richard A. Oetheimer
> Richard A. Oetheimer (BBO # 377665)
> Dahlia S. Fetouh (BBO # 651196)
> Patricia M. Murphy (BBO # 665056)
> Goodwin Procter LLP
> Exchange Place
> Boston, MA 02109
> (617) 570-1000

Dated:  October 17, 2007

## CERTIFICATION UNDER LOCAL RULE 7.1 AND CERTIFICATE OF SERVICE

I, Patricia Murphy, hereby certify that counsel for The Trust for Public Land and Craig
MacDonnell conferred with Michael McLaughlin, counsel for Plaintiff, in a good faith attempt to
narrow the issues in this motion prior to its filing.  The parties were unable to reach any
agreement on the issues raised in this motion and memorandum of law.

I further certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and paper copies will be sent to those indicated as non registered participants on October 17,
2007.

> /s/  Patricia M. Murphy
> Patricia M. Murphy