UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARILYN KUNELIUS,<br><br>        Plaintiff,<br><br>v.<br><br>TOWN OF STOW, et al.<br><br>        Defendants. | Civil Action No. 05-11697-GAO |

## STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THE MOTIONS FOR SUMMARY JUDGMENT OF DEFENDANTS THE TRUST FOR PUBLIC LAND AND CRAIG A. MACDONNELL

Pursuant to Local Rule 56.1, Defendants the Trust for Public Land ("TPL") and Craig A. MacDonnell (collectively, "TPL Defendants") hereby submit this Statement of Undisputed Facts in Support of the Motions for Summary Judgment of Defendants the Trust For Public Land and Craig A. MacDonnell.[1] The deposition exhibits, documents, deposition transcript excerpts, and interrogatory responses referenced herein may be found in the Appendix to the Statement of Undisputed Facts in Support of the Motions For Summary Judgment of Defendants The Trust For Public Land and Craig MacDonnell.

### I.  The Parties

1.  TPL is a non-profit national conservation organization with a New England Regional Office located in Boston. MacDonnell Dep. Ex. 9 (TPL website describing services TPL provides) (Appendix Tab 12); www.tpl.org.

---

[1] In submitting this Statement of Undisputed Facts, Defendants The Trust For Public Land and Craig MacDonnell do not concede these facts for any purpose other than their summary judgment motions.

2. TPL's mission is "Conserving Land For People," to improve the quality of life in communities and protect natural and historic resources. MacDonnell Dep. Ex. 9 (TPL website describing services TPL provides) (App. Tab 12); www.tpl.org.

3. Craig A. MacDonnell is the Massachusetts State Director of TPL. MacDonnell Dep. Tr. at 6:23-8:5 (App. Tab 3).

4. Mr. MacDonnell was the Project Manager for the Kunelius Project. TPL-KUN 01124-01138 at 01124 (TPL "Project Fact Sheet" describing the project) (App. Tab 13).

## II. The Kunelius Property

5. Plaintiff Marilyn Kunelius owns property located at 142 and 144 Red Acre Road in Stow, Massachusetts (the "Property"). The Property consists of 50.67 acres containing uplands, wooded wetlands, a scenic pond, a vernal pool, two houses, a barn, a paddock and a pasture, including 42 acres that are designated as forest land under M.G.L. c. 61. Complaint ¶ 13; Complaint Ex. 1 ¶ 3 (App. Tab 14); Kunelius Dep. Ex. 1 (certificate of M.G.L. c. 61 classification) (App. Tab. 15).

6. The Property sits above the Town of Stow's (the "Town") largest aquifer and is a natural linkage between two existing conservation tracts. KUN038-041 at 038 (MacDonnell Dep. Ex. 8) (Stow Community Preservation Committee meeting minutes from 2/10/03) (App. Tab 16); TPL-KUN 01124-1138 at 01125 (App. Tab 13).

7. The Property contained a working horse farm from 1983 through 1995, and horses are still kept on the Property. Kunelius Dep. Tr. Vol. I at 7:7-19 (App. Tab 1).

8. Plaintiff moved to the Property with her former husband in 1966 and lived on the Property until 2003. Kunelius Dep. Tr. Vol. I at 5:8-6:10.

9. Plaintiff currently rents the dwelling on her Property for $500/month. Kunelius Dep. Tr. Vol II at 126:11-23 (App. Tab 2).

10. In August 1984, Plaintiff applied to classify her land under M.G.L. c. 61 and her application was granted. Kunelius Dep. Ex. 1 (certificate of M.G.L. c. 61 classification) (App. Tab 15); Kunelius Dep. Tr. Vol. I. at 9:23-11:24.

11. In classifying her land under Chapter 61, Plaintiff received tax benefits in exchange for the obligation to offer the Town a right of first refusal upon receiving any bona fide offer to purchase the Property. Kunelius Dep. Tr. Vol. I. at 10:12-14; Complaint ¶ 13; M.G.L. c. 61.

12. Since 1984, Plaintiff has renewed the classification of her land under Chapter 61 twice, the last time in June 2004. KUN291 (Kunelius Dep. Ex. 14) (renewed certificate for Chapter 61 classification, dated June 22, 2004) (App. Tab 17); Kunelius Dep. Tr. Vol. I. at 12:20-13:1; Kunelius Dep. Tr. Vol. II at 139:6-140:19. As a result, the Property has continuously been classified under Chapter 61 from 1984 to the present.

13. Plaintiff has been aware for decades that classification of her Property under Chapter 61 obligated her to provide the Town a right of first refusal. Kunelius Dep. Tr. Vol. I at 15:17-22; Kunelius Dep. Tr. Vol. II at 37:15-18.

14. Plaintiff signed a declaration on each application and renewal application to classify her land under Chapter 61 attesting that she had "read the various provisions of Chapter 61 as well as the Rules and Regulations under which said chapter is administered and agree to comply with same." Kunelius Dep. Ex. 1 (App. Tab 15); KUN291 (Kunelius Dep. Ex. 14) (App. Tab 17).

3

### III. Sale of the Property

15. In 2001, Plaintiff began listing her Property for sale. Boothroyd Dep. Ex. 1 (Listing Agreement for 144 Red Acre Road, dated June 26, 2001) (App. Tab 18); Boothroyd Dep. Ex. 3 (Listing Agreement for 142 and 144 Red Acre Road, dated April 4, 2002) (App. Tab 19); Kunelius Dep. Tr. Vol. I at 32:21-23.

16. Plaintiff wanted to sell her Property for personal reasons—so she could move to Maine—not for any business purpose. Kunelius Dep. Tr. Vol I at 32:1-9; Boothroyd Dep. Tr. at 19:22-20:2 (App. Tab 9); Kachajian Dep. Tr. at 199:6-9 (sale of Plaintiff's Property was "residential" in nature, not commercial) (App. Tab 8).

17. Plaintiff engaged a real estate broker, Jim Boothroyd, to assist her in selling the Property. Boothroyd Dep. Ex. 1 (Listing Agreement for 144 Red Acre Road) (App. Tab 18); Boothroyd Dep. Ex. 2 (Listing Agreement for 142 and 144 Red Acre Road, dated September 28, 2001) (App. Tab 20); Boothroyd Dep. Tr. at 19:5-13, 25:3-23.

18. Mr. Boothroyd has been a licensed real estate broker since 1993. Boothroyd Dep. Tr. at 9:19-24.

19. Plaintiff was also represented by counsel, Peter Kachajian, in her efforts to sell the Property. Kachajian Dep. Tr. at 15:2-16:4.

20. Mr. Kachajian has run his own law practice focusing on real estate and probate law for 18 or 19 years. Kachajian Dep. Tr. at 8:16-9:7. Approximately 75% of his law practice is comprised of real estate law. Kachajian Dep. Tr. at 9:13-15.

21. In 2002, a representative of Cohousing Resources, LLC ("Cohousing") expressed interest in purchasing the Property and contacted Plaintiff through her broker. Kunelius Dep. Tr. Vol. I at 49:7-50:10.

4

22. Cohousing is a project management development organization that works with local groups interested in creating a community-based residential development. Boothroyd Dep. Tr. at 32:3-20; Kachajian Dep. Tr. at 18:22-20:5.

23. Cohousing worked with Mosaic Commons, a local group of individuals who wanted to form a housing community on the Property based on the model used by Cohousing Resources. Kunelius Dep. Tr. Vol. I at 50:11-21; Boothroyd Dep. Tr. at 32:3-23; Kachajian Dep. Tr. at 18:22-20:23.

24. Cohousing sought to build a 30-unit subdivision on the Property under M.G.L. c. 40B, which offers developers relief from certain local zoning requirements by building 25% of the development as affordable housing. Complaint ¶ 14.

25. From July 2002 through October 2002, Plaintiff, through her broker and attorney, negotiated with Cohousing for the sale of her Property. Boothroyd Dep. Tr. at 38:10-59:16; Kachajian Dep. Tr. at 21:4-32:21, 40:24-43:19. Negotiations yielded several draft purchase and sale agreements. KUNELIUS0029-0034 (Kachajian Dep. Ex. 2) (9/24/02 fax containing a draft purchase and sale agreement) (App. Tab 21); KUNELIUS0019-0028 (Kachajian Dep. Ex. 3) (Fax containing a draft purchase and sale agreement dated 9/25/02) (App. Tab 22).

26. Plaintiff's real estate broker and real estate attorney understood at the time the Property was for sale that because the Property was classified under Chapter 61, Plaintiff was required to offer the Property to the Town and that the Town could assign its right of first refusal to a nonprofit conservation organization. Kachajian Dep. Tr. at 53:13-54:1; Boothroyd Dep. Tr. at 77:21-78:16, 83:18-23.

## IV. Purchase and Sale Agreement

27. On October 11, 2002, Plaintiff entered into a Purchase and Sale Agreement ("Agreement") with Cohousing to sell the Property for $1,116,900.00. Complaint ¶¶ 11-12; Complaint Ex. 1 (App. Tab 14).

28. Recognizing that most of the Property was taxed as forest land under Chapter 61, the Agreement included provisions governing the possibility that the Town would exercise its right of first refusal. Agreement ¶ 35 (providing for the return of Cohousing's deposits should the Town exercise its right); Agreement ¶ 10 (contemplating the Town exercising the right of first refusal).

29. The Agreement included provisions governing the payment of an initial deposit and monthly earnest money deposit payments until closing. Agreement ¶¶ 7, 20, 21, 31, 35.

30. The Agreement also defined the remedy available to Plaintiff in the event of the Buyer's failure to perform: "If the BUYER shall fail to fulfill the BUYER'S agreements herein, all deposits made hereunder by the BUYER shall be retained by the SELLER as liquidated damages and this shall constitute SELLER'S sole remedy in equity and law." Agreement ¶ 21. Payment of the purchase price was among the "BUYER'S agreements." *Id.*, ¶ 7.

31. An early draft of the Agreement provided for a larger initial deposit to be held in escrow. Compare KUNELIUS0029-0034 at ¶ 2 (Kachajian Dep. Ex. 2) (App. Tab 21), providing for a $50,000 initial deposit, with KUNELIUS0019-0028 at ¶3 (Kachajian Dep. Ex. 3) (App. Tab 22) and Agreement ¶ 31, providing for only a $10,000 initial deposit.

32. Plaintiff accepted a lower deposit in return for monthly payments leading up to the closing date that were available immediately. Kachajian Dep. Tr. at 29:10-32:16 (Plaintiff negotiated a lower initial deposit by Cohousing in exchange for immediately available monthly

6

payments); Boothroyd Dep. Tr. at 54:22-55:20 (Plaintiff was willing to accept a lower initial deposit in exchange for monthly payments); Kunelius Dep. Tr. Vol. II at 11:18-12:20.

33. Plaintiff, her real estate broker and her attorney all agreed that under the liquidated damages clause of the Agreement, if Cohousing were to default on the purchase, Plaintiff was entitled to retain the deposits already paid to her under the Agreement and nothing more. Agreement ¶ 21; Kunelius Dep. Tr. Vol. II at 30:8-31:5; Boothroyd Dep. Tr. at 68:14-69:8; Kachajian Dep. Tr. at 56:9-57:8.

34. Plaintiff's real estate broker understood that there was no guarantee that Cohousing would complete the purchase of the Property. Boothroyd Dep. Tr. at 189:22-190:1.

35. Cohousing included in the Agreement a contingency based on Cohousing obtaining construction financing, Agreement ¶ 26, as well as a contingency based on the satisfactory completion of a feasibility evaluation (including engineering studies and soil samples). If Cohousing concluded the feasibility evaluation was unsatisfactory it was entitled to terminate the agreement. Agreement ¶ 34; Boothroyd Dep. Tr. at 47:6-24. Plaintiff discussed these contingencies with her real estate broker. Boothroyd Dep. Tr. at 47:6-24.

36. The closing was also contingent upon Cohousing receiving approvals to proceed with its planned 40B development. Agreement ¶ 35; Boothroyd Dep. Tr. at 71:17-24. If Cohousing had been unable to secure the approvals necessary to do the 40B project as planned, Cohousing was entitled to terminate the Agreement with no payment obligations to Ms. Kunelius. Boothroyd Dep. Tr. at 71:17-24, 103:20-104:2; Kachajian Dep. Tr. at 61:6-62:8.

37. Although a 40B development is generally subject to a streamlined zoning and permitting process, 40B projects must still meet certain zoning, density, and other requirements and are by no means guaranteed to be approved as originally proposed. Boothroyd Dep. Tr. at

101:13-23; Kachajian Dep. Tr. at 96:11-97:1, 236:8-15; Perry Dep. Tr. at 218:21-219:1 (App. Tab 10).

38. The Agreement also provided Cohousing the right to extend the closing date by twelve months. Agreement ¶ 8.

39. At the time Cohousing signed the Agreement, it did not have commitments to fill all 30 units it needed to proceed with the planned 40B development—it only had commitments to fill 20 of the units. Kunelius Dep. Tr. Vol II at 33:23-34:7.

### V. Notice to the Town Under Chapter 61

40. On October 16, 2002, Plaintiff, through her counsel, gave the Town notice of her intent to sell the Property to Cohousing pursuant to the Purchase and Sale Agreement, as required under Chapter 61. KUN224-234 (Kachajian Dep. Ex. 6) (App. Tab 23).

### VI. Initial Involvement of TPL

41. During the Winter of 2002, Peter Christianson, a Town resident, contacted TPL to discuss the potential for doing a conservation project on the Property as an alternative to Cohousing's 40B development. MacDonnell Dep. Tr. at 21:9-26:14.

42. Christianson was a member of a neighborhood organization called the Friends of Red Acre ("FORA"), which had come together to consider alternatives to the proposed 40B development on the Property. Other members of FORA included Serena Furman and Karen Sommerlad. Sommerlad Dep. Tr. at 11:23-14:16 (App. Tab 7); Furman Dep. Tr. Vol. I at 9:5-12:12 (App. Tab 5).

43. During the eight years prior to TPL's involvement with the Kunelius Property, TPL had accepted assignment of a right of first refusal under Chapter 61 eight times. Stookey

8

Dep. Tr. at 45:7-15 (App. Tab 4). All of the acquisitions under those eight municipal right of first refusal assignments were completed successfully. *Id.* at 51:6-12.

44.     Once TPL became aware of the potential conservation project on the Property, TPL began its project approval process, which included assessing the project's likelihood of success and risks involved, and obtaining approval from TPL's National Board of Directors. MacDonnell Dep. Tr. at 72:19-21 ("when we scope a project, we look at our legal obligations and make decisions in accordance with them"); Stookey Dep. Tr. at 74:1-3 ("in order for us to accept an assignment of a right of first refusal, we must obtain approval from our national office."); Stookey Dep. Tr. at 74:9-24 (TPL's internal approval process for the project included an internal assessment of the risks involved and the potential likelihood of success); TPL-KUN 01124-01138 (TPL Project Fact Sheet outlining the project risks) (App. Tab 13).

45.     As part of its approval process, TPL also consulted with a legal advisor on Chapter 61, who told TPL that the liquidated damages clause would apply if the Agreement was assigned to TPL. Stookey Dep. Tr. at 46:20-48:2 (TPL consulted attorney Greg Bialecki of Hill and Barlow and DLA Piper Rudnick as an unofficial advisor to TPL on chapter land rights of first refusal, and Mr. Bialecki advised TPL that certain provisions of the Agreement, including price and the remedy for breach, would apply to TPL and other provisions would not); Stookey Dep. Tr. at 74:9-24 (TPL's internal approval process for the project involved consulting with Greg Bialecki about potential risks of the project).

46.     During the approval process, TPL understood that if the project was not successful the risk to TPL was limited to liquidated damages. Stookey Dep. Tr. at 75:12-18.

9

47.     It was standard procedure for TPL to move forward with a project only if the Purchase and Sale Agreement for the project contained a liquidated damages clause. Stookey Dep. Tr. at 75:12-76:2.

48.     TPL formulated a plan to purchase the Property, including a plan to raise the funds to pay the purchase price by seeking funds from public and private sources, and to seek zoning relief needed to engage in limited development to help defray some of the cost of the acquisition. KUN501-504 (Perry Dep. Ex. 9) (Letter from TPL to Ross Perry 1/5/03 outlining TPL's plans for the project) (App. Tab 24); TPL-KUN 01124-1138 (App. Tab 13); MacDonnell Dep. Tr. at 54:9-14 (TPL intended to seek funds from the Town, from private sale of part of the Property and from private fundraising).

49.     At the time TPL considered the project and accepted the assignment of the right of first refusal, TPL intended to, and believed it could, complete the purchase. Stookey Dep. Tr. at 66:20-23 ("TPL was not aware of any circumstance that would have impaired its ability to complete this project in the manner it had laid it out."); MacDonnell Dep. Tr. at 69:20-70:4 ("It was our complete and absolute intention to do this project...We fully intended—from the very second we looked at this project, we would never have accepted the assignment unless we fully intended to do this."); TPL-KUN 01124-01138 at 01127 (listing project as "low risk") (App. Tab 13).

50.     TPL's goal in accepting the right of first refusal from Stow was to conserve the majority of the Property classified as forest land under Chapter 61 for the Town and the residents of Stow. TPL-KUN 01124-01138 at 01124-01125 (App. Tab 13); KUN419 (Furman Dep. Ex. 4) (letter dated June 6, 2003 from the Friends of Red Acre to Stow Board of Selectmen outlining its efforts with TPL to conserve open space) (App. Tab 25).

## VII. Assignment of the Agreement to TPL

51. On February 11, 2003, the Town Board of Selectmen voted to assign the Town's rights under Chapter 61, Section 8 to TPL, to purchase the Property "pursuant to the terms of a Purchase and Sale Agreement between [Plaintiff] and Cohousing Resources, LLC." Complaint Ex. 3 (App. Tab 26).

52. On February 12, 2003, the Town Board of Selectmen gave Plaintiff formal notice that the Town had voted to assign its rights under Chapter 61 to TPL. Complaint Ex. 2 (App. Tab 27). Specifically, the Town notified Plaintiff that "by vote taken on February 11, 2003, the Board of Selectmen of the Town of Stow has voted to assign the Town's rights under Chapter 61, Section 8 to purchase the [Property] under the terms set forth in the Purchase and Sale Agreement between you and Cohousing Resources, LLC dated October, 2002." *Id.* Pursuant to Chapter 61, this letter was recorded with the Registry of Deeds within the statutory 120-day period. *Id.*

53. On February 13, 2003, TPL notified Kunelius that the Town had assigned its right of first refusal to TPL to purchase the Property "*pursuant to the terms of a certain Purchase and Sale Agreement between you and Cohousing*" and that TPL had accepted that assignment. Complaint Ex. 4 (emphasis added) (App. Tab 28). TPL further notified Kunelius that it "elects to exercise the Right of First Refusal under M.G.L. c. 61, Section 8 that was assigned to TPL by the Town of Stow and *assume the position of buyer under the above-referenced Agreement*." *Id.* (emphasis added). Transmitted with that letter was a check in the amount of $11,500 payable to Kunelius. *Id.* This sum represented the initial $10,000 deposit required by the Agreement and the first monthly $1500 deposit due each month until closing. Agreement ¶ 31.

11

54. Plaintiff acknowledges that the process by which the Town assigned the right of first refusal to TPL, and by which TPL exercised that right of first refusal, did not require or involve any action on Plaintiff's part whatsoever and that there was nothing she could do to interfere with the assignment. Kunelius Dep. Tr. Vol. II at 46:17-20 (Plaintiff did not believe she had the ability to stop the Town from exercising the right of first refusal); Kunelius Dep. Tr. Vol. II at 47:3-9 (Plaintiff did not believe she had any power to prevent the Town from assigning the right of first refusal to a nonprofit conservation organization); Kunelius Dep. Tr. Vol. II at 145:5-10 (project was "out of [her] hands" so nothing Mr. MacDonnell said affected what she did).

55. Plaintiff's real estate broker also understood there was nothing Plaintiff could do to stop the Town from exercising or assigning its right of first refusal. Boothroyd Dep. Tr. at 100:22-101:9.

56. Plaintiff's real estate attorney did not think an assignee of the right of first refusal would be required to undertake a 40B development on the Property. Kachajian Dep. Tr. at 110:16-22; KUN313-314 (Kachajian Dep. Ex. 10) (Email from Kachajian to Ross Perry 2/4/03 discussing the terms that would not apply to the Town or the Town's assignee, and pointing out the provision concerning 40B as one that would not apply to an assignee because it was not "germane") (App. Tab 29).

57. Stow and TPL did not hold themselves out as legal partners in the purchase of the Property. Kachajian Dep. Tr. at 252:24-253:2 (Jacob Diemert, Town Counsel, never told Kachajian that the Town had a partnership with TPL); Perry Dep. Ex. 8 (letter from Ross Perry to Kachajian 9/24/03 stating that "The Town of Stow is not a 'partner' with The Trust for Public Land") (App. Tab 30); Perry Dep. Tr. at 109:3-8, 119:7-17 (Perry did not see the Town's

relationship with TPL as one of legal partnership); Furman Dep. Tr. Vol. I at 134:8-15 (Serena Furman did not consider the Town and TPL to be partners).

58.     When TPL referred to Stow and FORA as its project "partners" it used the term "partner" in its colloquial sense, not the strict legal meaning of the term. MacDonnell Dep. Tr. at 240:14-241:10, 246:2-247:7.

## VIII. TPL'S Efforts to Complete the Purchase

59.     TPL made a formal proposal for funding to the Stow Community Preservation Committee ("CPC"). The CPC approved $300,000 for the purchase of open space and $100,000 for an affordable housing restriction. KUN038-041 (MacDonnell Dep. Ex. 8) (App. Tab 16). This plan then went before a Stow Town Meeting, which voted to appropriate both categories of the requested CPC funds. KUN412-418 (App. Tab 31).

60.     TPL pursued fundraising from the Department of Housing and Community Development ("DHCD") by putting together a lengthy grant application to the DHCD on the Town's behalf seeking $350,000. KUN337-411 (MacDonnell Dep. Ex. 11) (DHCD grant application) (App. Tab 32); MacDonnell Dep. Tr. at 100:2-11.

61.     Putting together the DHCD grant required a significant amount of work and effort by TPL. Furman Dep. Tr. Vol. 1 at 80:7-14 (describing the DHCD grant as "the major fund-raising effort. That was a lot of work by TPL. That was a lot of work.").

62.     TPL hired a consultant to help assemble the grant application and consulted with Town officials on the application. MacDonnell Dep. Tr. at 104:24-105:15; TPL-KUN 03091-03092 (email 3/21/03 Rodger Brown to Chris LaPointe of TPL regarding Mr. Brown assisting TPL with the application) (App. Tab 33).

13

63. TPL also planned to pursue fundraising from private donors, in conjunction with FORA. TPL-KUN 01124-01138 at 01125 (App. Tab 13); TPL-KUN 02475 (email 1/9/03 from Teri Vienot of TPL to Peter Christianson of FORA re: "fundraising in Stow") (App. Tab 34).

64. As part of its plan to transfer the conservation land to the Town, TPL intended to raise funds by subdividing the developed front portion of the Property, renovating the homes on the Property and selling them on the private market. MacDonnell Dep. Tr. at 84:19-85:11, 143:13-22.

65. As part of its effort to raise funds by selling the developed front portion of the Property, TPL commissioned inspections of the property and hired an engineering company to conduct renovations. Boothroyd Dep. Tr. 96:23-97:7; TPL-KUN 02808-02810 (Email from Advent Home Inspections to Chris LaPointe of TPL 2/26/03 discussing the fees TPL would pay for home inspection work) (App. Tab 35); TPL-KUN 02826-02838 (Summary from Advent Home Inspections of the cost to repair 144 Red Acre Road parcel) (App. Tab 36); TPL-KUN 00103-00105 (building renovation proposal from Integrity Building & Design, Inc.) (App. Tab 37).

66. TPL submitted a request for a variance to the Town's Zoning Board of Appeals ("ZBA"), and consulted with its lawyers and Town Counsel on how best to proceed. KUNELIUS 0140-0142 (Kunelius Dep. Ex. 16) (Application for Hearing before Zoning Board of Appeals) (App. Tab 38); TPL-KUN 01588 (email 7/1/03 to Denise Pelletier of TPL from Trudy Ernst of Goodwin Procter, counsel to TPL on zoning matters) (App. Tab 39); TPL-KUN 01819 (letter 7/10/03 from Jacob Diemert, Town Counsel, to MacDonnell discussing the zoning board of appeals application) (App. Tab 40).

14

67. Plaintiff's real estate lawyer testified that TPL put a substantial amount of time and energy into seeking zoning relief for the project. Kachajian Dep. Tr. at 125:9-15 (TPL "put a lot of work into" seeking zoning relief).

## IX. Plaintiff's Attempt to Hinder TPL's Purchase

68. After TPL exercised the right of first refusal on the Property, Plaintiff tried to convince Town residents to vote against the appropriation of Community Preservation Committee funds for TPL's purchase of the Property. KUNELIUS0191 (Kunelius Dep. Ex. 12) (Beacon Villager Letter to the Editor 2/27/03) (App. Tab 41); Kunelius Dep. Tr. Vol II at 130:23-131:5.

69. Shortly after the assignment, Plaintiff told Trish Polin, her neighbor and barn manager, that she hoped TPL's efforts to purchase the Property would fail so she could sue for triple damages. TPL-KUN 02620 (Sommerlad Dep. Ex. 6) (email from Sommerlad to MacDonnell 3/3/03) (App. Tab 42); Kunelius Dep. Tr. Vol II at 90:17-91:2; Furman Dep. Tr. Vol II at 53:10-54:1 (App. Tab 6); Sommerlad Dep. Tr. at 94:20-96:4.

## X. Defendants' Recognition that TPL Would Not Close on the Property

70. DHCD denied the grant application. KUN334 (Perry Dep. Ex. 6) (Letter 7/2/03 from DHCD to Ross Perry denying the grant application) (App. Tab 43); Complaint Ex. 12 (Letter to Kachajian 9/9/03) (App. Tab 44); MacDonnell Dep. Tr. at 139:18-22.

71. Obtaining the necessary zoning relief was problematic, which in turn hindered TPL's ability to raise funds by selling off the residential lots. MacDonnell Dep. Tr. at 228:20-229:23 ("In the summer, we learned something that we hadn't known before, which was that the two parcels, 142 and 144, were not owned by separate entities. It was our understanding before that time that they were owned by separate entities and that the common law doctrine of merger

would not apply, and so that so long as we could get the variances that we were seeking, the future existence of 142 and 144 could be created for purposes of sale. Somewhere along the path, it became apparent to us that, in fact, 142 and 144 were owned by the same entity, the doctrine of merger applied, and there was no way to subdivide it."); *see also* MacDonnell Dep. Tr. at 143:16-22, 153:7-10, 170:13-17.

72. In an effort to resolve the zoning issues, TPL requested an extension from the ZBA so it could revise the application. TPL-KUN 01712 (email 8/19/03 from Trudy Ernst to Chris LaPointe explaining that the ZBA granted an extension to allow for additional briefing on the application) (App. Tab 45). When it became apparent that TPL's zoning variance application would be denied, it withdrew its application to avoid an adverse ruling. MacDonnell Dep. Tr. at 230:3-11.

73. After the DHCD grant application was denied in July, 2003, TPL began to realize it was unlikely it would be able to raise the funds it sought to meet the purchase price at closing. MacDonnell Dep. Tr. at 139:17-22 ("The fund-raising we had imagined did not materialize, the DHCD grant did not come through, and it did not seem as if it was possible to raise those dollars for the ultimate conclusion of the project").

74. TPL apprised Plaintiff of its difficulties in fundraising, as well as obstacles it faced in the zoning process, when it sent Plaintiff's real estate counsel a letter on September 9, 2003. Complaint Ex. 12 (Letter from TPL to Kachajian 9/9/03) (App. Tab 44).

75. In the September 9, 2003 letter, TPL informed Plaintiff's counsel that it would not seek to borrow funds to finance the purchase since it was not assured it would be able to raise the funds necessary to pay off the loan. Complaint Ex. 12 (App. Tab 44). Specifically, TPL told Plaintiff that "TPL's Board of Directors will not approve any borrowing to bridge a fundraising

16

gap because the prospects for raising the funds necessary to repay the loan required are not encouraging." *Id.*

76. In the September 9, 2003 letter TPL also informed Plaintiff that because of the difficulties in both fundraising and obtaining zoning relief, TPL had made the decision that it would not go forward under the existing contract. Complaint Ex. 12 (App. Tab 44); Kachajian Dep. Tr. at 140:23-141:4 (Kachajian understood the September 9, 2003 letter from MacDonnell as notice of TPL's "default" on the Agreement); Boothroyd Dep. Tr. at 127:24-128:12 (after TPL defaulted on the Agreement, it was no longer in effect).

77. Plaintiff has retained all deposits paid to her by TPL under the Agreement (the $10,000 initial deposit plus all of the six monthly $1500 deposits paid in the months following the Assignment for a total of $19,000). Kunelius Dep. Tr. Vol II at 66:23-67:19, 116:10-18; Boothroyd Dep. Tr. at 128:13-22.

## XI. Status of the Property

78. TPL's default on the Agreement did not impair Plaintiff's ability to sell the Property to others. Kachajian Dep. Tr. at 143:1-2 (after TPL defaulted Kachajian would have negotiated the sale of the Property with anyone who offered the contract price); Kachajian Dep. Tr. at 255:10-16 (one could turn around and sell the Property after TPL breached the Agreement); Boothroyd Dep. Tr. at 137:6-14 (after the closing date passed, Boothroyd told potential purchasers that the property "was still available"); Boothroyd Dep. Tr. at 145:14-16 (In the Spring of 2004, Boothroyd told Ken Kells the Property "would be available" if he wanted it).

79. Plaintiff has not tried to sell the Property since TPL's default, and she admits she is not currently trying to sell the Property. Kunelius Dep. Tr. Vol. II, at 125:22-126:7.

17

80.     Neither Paul Boothroyd nor Jim Boothroyd—two brokers who listed the Property in 2002—are currently doing anything to market the Property, and Plaintiff has made no effort to pull the property from them and list it with another broker. Kunelius Dep. Tr. Vol II at 177:5-15.

81.     Several interested individuals have approached Plaintiff about buying all or some of her Property subsequent to TPL's default and she has rejected or failed to consider each and every expression of interest. *See* Kunelius Dep. Ex. 8 (letter dated May 26, 2004 from Serena Furman and Peter Christianson to Plaintiff) (App. Tab 46); Kunelius Dep. Tr. Vol. II at 101-102, 185:13-186:14, and 197:14-198:6; Jones Dep. Tr. at 187:6-189:15 (App. Tab 11).

82.     Plaintiff's real estate broker testified that to his knowledge, TPL has not done anything that had a negative impact on the property. Boothroyd Dep. Tr. at 184:8-11.

83.     Since the closing date, Plaintiff claims to have realized that the Property is actually worth more than the contract price, given the value of the water underneath the land. Interrogatory Response No. 13 (App. Tab 47); Kachajian Dep Tr. at 114:15-115:4; Plaintiff's Expert Report of Michael F. Hill, dated May 14, 2007 (App. Tab 48); KUNELIUS0226-0230 (Geosphere letter report 12/4/06) (App. Tab 49).

84.     Various municipal entities, including the towns of Acton and Maynard, have been interested in the Property for the water underneath the land since the 1950s and 1960s. Kunelius Dep. Tr. Vol. I at 35:8-15. Acton expressed interest in the Property again in 1988 when a water study showed "very high potential for water." Kunelius Dep. Tr. Vol. I at 34-39. Maynard expressed interest in the water again in the early 1990s. Kunelius Dep. Tr. Vol. I at 40-42. Stow has also expressed interest in the water. Boothroyd Dep. Tr. at 81:1-83:8.

Respectfully submitted,

...

Respectfully submitted,

THE TRUST FOR PUBLIC LAND and
CRAIG A. MACDONNELL

By their attorneys,

*/s/ Richard A. Oetheimer*
Richard A. Oetheimer (BBO # 377665)
Dahlia S. Fetouh (BBO # 651196)
Patricia M. Murphy (BBO # 665056)
Goodwin Procter LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

Dated: October 17, 2007

## CERTIFICATE OF SERVICE

I, Patricia M. Murphy, hereby certify that on October 17, 2007 this DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THE MOTIONS FOR SUMMARY JUDGMENT OF DEFENDANTS THE TRUST FOR PUBLIC LAND AND CRAIG A. MACDONNELL was filed through the ECF system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on this date.

*/s/ Patricia M. Murphy*
Patricia M. Murphy