UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MARILYN KUNELIUS,

Plaintiff,

v.

TOWN OF STOW, et al.

Defendants.

Civil Action No. 05-11697-GAO

**APPENDIX TO THE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THE MOTIONS FOR SUMMARY JUDGMENT OF DEFENDANTS THE TRUST FOR PUBLIC LAND AND CRAIG A. MACDONNELL**

Richard A. Oetheimer (BBO # 377665)
Dahlia S. Fetouh (BBO # 651196)
Patricia M. Murphy (BBO # 665056)
Goodwin Procter LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

Attorneys for THE TRUST FOR PUBLIC LAND and CRAIG A. MACDONNELL

October 17, 2007

**Description of Document**

| | |
|---|---|
| Tab 1. | Excerpts from the deposition transcript of Marilyn Kunelius, dated March 29, 2007. |
| Tab 2. | Excerpts from the deposition transcript of Marilyn Kunelius, dated April 4, 2007. |
| Tab 3. | Excerpts from the deposition transcript of Craig A. MacDonnell, dated February 8, 2007. |
| Tab 4. | Excerpts from the deposition transcript of Dorothy Stookey, dated March 22, 2007. |
| Tab 5. | Excerpts from the deposition transcript of Serena Furman, dated April 3, 2007. |
| Tab 6. | Excepts from the deposition transcript of Serena Furman, dated April 17, 2007. |
| Tab 7. | Excerpts from the deposition transcript of Karen Sommerlad, dated April 2, 2007. |
| Tab 8. | Excerpts from the deposition transcript of Peter Kachajian, dated April 25, 2007. |
| Tab 9. | Excerpts from the deposition transcript of James Boothroyd, dated May 24, 2007. |
| Tab 10. | Excerpts from the deposition transcript of Edward R. Perry, dated February 26, 2007. |
| Tab 11. | Excerpts from the deposition transcript of Gregory D. Jones, dated March 5, 2007. |
| Tab 12. | Portion of the website www.tpl.org (MacDonnell Deposition Exhibit 9). |
| Tab 13. | The Trust For Public Land “Project Fact Sheet” (Bates Nos. TPL-KUN 01124-01138). |
| Tab 14. | Purchase and Sale Agreement between Marilyn Kunelius and Cohousing Resources, LLC (Complaint Exhibit 1). |
| Tab 15. | Certificate of M.G.L. c. 61 classification (Kunelius Deposition Exhibit 1). |

**Description of Document**

Tab 16. Stow Community Preservation Committee meeting minutes dated February 10, 2003 (MacDonnell Deposition Exhibit 8, Bates Nos. KUN038-041).

Tab 17. Renewed certificate for Chapter 61 classification, dated June 22, 2004 (Kunelius Deposition Exhibit 14, Bates No. KUN291).

Tab 18. Listing Agreement for 144 Red Acre Road, dated June 26, 2001 (Boothroyd Deposition Exhibit 1).

Tab 19. Listing Agreement for 142 and 144 Red Acre Road, dated April 4, 2002 (Boothroyd Deposition Exhibit 3).

Tab 20. Listing Agreement for 142 and 144 Red Acre Road, dated September 28, 2001 (Boothroyd Deposition Exhibit 2).

Tab 21. Fax from Chris ScottHanson to Jim Boothroyd dated September 24, 2002 containing a draft purchase and sale agreement (Kachajian Deposition Exhibit 2, Bates Nos. KUNELIUS0029-0034).

Tab 22. Fax from Chris ScottHanson to James Boothroyd and Peter Kachajian attaching a draft purchase and sale agreement dated September 25, 2002 (Kachajian Deposition Exhibit 3, Bates Nos. KUNELIUS0019-0028).

Tab 23. Letter dated October 16, 2002 from Peter Kachajian to the Town of Stow (Kachajian Deposition Exhibit 6, Bates Nos. KUN224-234).

Tab 24. Letter dated January 5, 2003 from TPL to Ross Perry (Perry Deposition Exhibit 9, Bates Nos. KUN501-504).

**Description of Document**

Tab 25. Letter dated June 6, 2003 from the Friends of Red Acre to Stow Board of Selectmen (Furman Deposition Exhibit 4, Bates No. KUN419).

Tab 26. Assignment of the right of first refusal by the Town of Stow to the Trust For Public Land dated February 11, 2003 and acceptance of the assignment by TPL dated February 12, 2003 (Complaint Exhibit 3).

Tab 27. Letter dated February 12, 2003 from Stow Board of Selectmen to Marilyn Kunelius (Complaint Exhibit 2).

Tab 28. Letter dated February 13, 2003 from the Trust For Public Land to Marilyn Kunelius (Complaint Exhibit 4).

Tab 29. Email dated February 4, 2003 from Peter Kachajian to Ross Perry (Kachajian Deposition Exhibit 10, Bates Nos. KUN313-314).

Tab 30. Letter dated September 24, 2003 from Ross Perry to Peter Kachajian (Perry Deposition Exhibit 8).

Tab 31. Letter dated June 24, 2003 from Jacob Diemert to Peter Kachajian attaching minutes of the Stow Town Meeting on May 19, 2003 (Bates Nos. KUN412-418).

Tab 32. Grant application dated April 1, 2003 submitted by Stow to the Department of Housing and Community Development (MacDonnell Deposition Exhibit 11, Bates Nos. KUN337-411).

Tab 33. Email dated March 21, 2003 from Rodger Brown to Chris LaPointe re: Assistance with DHCD application (Bates Nos. TPL-KUN 03091-03092).

Tab 34. Email dated January 9, 2003 from Teri Vienot to Peter Christianson re: fundraising in Stow (Bates No. TPL-KUN 02475).

**Description of Document**

Tab 35. Email dated February 26, 2003 from Advent Home Inspections to Chris LaPointe re: RFP/Confirmations (Bates Nos. TPL-KUN 02808-02810).

Tab 36. Email dated March 5, 2003 from Advent Home Inspections to Chris LaPointe re: report for 144, attaching invoice and Cost to Repair Summary (Bates Nos. TPL-KUN 02826-02838).

Tab 37. Building renovation Proposal from Integrity Building & Design, Inc. to Chris LaPointe dated March 26, 2003 (Bates Nos. TPL-KUN 00103-00105).

Tab 38. Application for Hearing before the Stow Zoning Board of Appeals (Kunelius Deposition Exhibit 16, Bates Nos. KUNELIUS 0140-0142).

Tab 39. Email dated July 1, 2003 to Denise Pelletier from Trudy Ernst re: Stow (Bates No. TPL-KUN 01588).

Tab 40. Letter dated July 10, 2003 from Jacob Diemert to Craig MacDonnell re: TPL – Kunelius Property, Pending Board of Appeals Application (Bates No. TPL-KUN 01819).

Tab 41. Letter to the Editor dated February 27, 2003 from Marilyn Kunelius, published in the Beacon Villager (Kunelius Deposition Exhibit 12, Bates No. KUNELIUS0191).

Tab 42. Email dated March 3, 2003 from Karen Sommerlad to Craig MacDonnell re: Marilyn (Sommerlad Deposition Exhibit 6, Bates No. TPL-KUN 02620).

Tab 43. Letter dated July 2, 2003 from Jane Wallis Grumble of the Department of Housing and Community Development to Ross Perry (Perry Deposition Exhibit 6, Bates No. KUN334).

**Description of Document**

Tab 44. Letter dated September 9, 2003 from Craig MacDonnell to Peter Kachajian re: Kunelius Property (Complaint Exhibit 12).

Tab 45. Email dated August 19, 2003 from Trudy Ernst to Chris LaPointe re: 144 Red Acre Road, Stow, MA (Bates No. TPL-KUN 01712).

Tab 46. Letter dated May 26, 2004 from Peter Christianson to Marilyn Kunelius (Kunelius Deposition Exhibit 8).

Tab 47. Plaintiff's Response to Defendants' Interrogatories, dated April 2, 2007.

Tab 48. Plaintiff's Expert Report of Michael F. Hill, CPA, dated May 14, 2007.

Tab 49. Letter Report of Geosphere Environmental Management, Inc., dated December 4, 2006, attached as Exhibit B to Plaintiff's Expert Report of Michael F. Hill dated May 14, 2007 (Bates Nos. KUNELIUS 0226-0230).

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 17, 2007.

/s/ Patricia M. Murphy
Patricia M. Murphy

LIBA/1837559.1

# TAB 1

VOLUME: I
PAGES: 1 through 68
EXHIBITS: Per index

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - x

MARILYN KUNELIUS,
Plaintiff,

VS. Civil Action No. 05-11697-GAO

TOWN OF STOW, et al.,
Defendants.

- - - - - - - - - - - - - - - - - - x

DEPOSITION OF MARILYN E. KUNELIUS
Thursday, March 29, 2007, 9:10 a.m.
Goodwin Procter, LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109

----------Reporter: MaryJo O'Connor, CSR, RPR-------
BOSTON REPORTING ASSOCIATES
REGISTERED PROFESSIONAL REPORTERS
67 Bright Road
Belmont, Massachusetts 02478
(617) 877-6640

Boston Reporting Associates

(617) 877 - 6640

APPEARANCES:

LAW OFFICES OF MICHAEL C. McLAUGHLIN
(By: Michael C. McLaughlin, Esq.)
One Beacon Street, 33rd Floor
Boston, Massachusetts 02108
Counsel for Craig MacDonnell.

DONNELLY, CONROY & GELHAAR, LLP
(By: James B. Conroy, Esq.)
One Beacon Street, 33rd Floor
Boston, Massachusetts 02108
jbc@dcglaw.com
Counsel for Craig MacDonnell.

GOODWIN PROCTER, LLP
(By: Dahlia S. Fetouh, Esq., and
Patricia M. Murphy, Esq.)
Exchange Place
53 State Street
Boston, Massachusetts 02109
dfetouh@goodwinprocter.com
pmurphy@goodwinprocter.com
Counsel for the Trust for Public Land.

BRODY, HARDOON, PERKINS & KESTON
(By: Deborah I. Ecker, Esq.)
One Exeter Plaza
Boston, Massachusetts 02116
decker@bhpklaw.com
Counsel for the Town of Stow.

ALSO PRESENT: Craig MacDonnell
David L. Norris

Lucie DeBellis, Paralegal
Law Offices of Michael C. Mclaughlin

INDEX

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Marilyn E. Kunelius | | | | |
| (By Ms. Fetouh) | 4 | --- | --- | --- |
| (By Mr. McLaughlin) | --- | --- | --- | --- |
| (By Ms. Ecker) | --- | --- | --- | --- |
| (By Mr. Conroy) | --- | --- | --- | --- |

EXHIBITS

| Exhibit No. | | Page |
|---|---|---|
| 1 | Chapter 61 application dated June 28, 1984 | 11 |
| 2 | Offer from Cohousing dated dated 7/25/02 crossed out to 9/24/02 | 51 |

*** EXHIBITS MARKED DURING THIS DEPOSITION WERE RETAINED BY ATTORNEY FETOUH ***

PROCEEDINGS

MARILYN E. KUNELIUS

having been satisfactorily identified by a Maine drivers license and duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. FETOUH:

**Q. Could you state your full name?**

A. Marilyn Kunelius.

**Q. Ms. Kunelius, have you ever been deposed before?**

MS. FETOUH: Actually, before we get into that, do we agree that the same stipulations will apply to this deposition as we used in the prior deposition.

MR. McLAUGHLIN: Yes.

**Q. Have you ever been deposed before?**

A. No.

**Q. I know you sat in on a few, so you know the way things run. If you could just answer verbally to any questions with words rather than a shake of the head or a ah-huh that would be great.**

**In addition, if you don't understand one of my questions, please let me know and I'll do my best**

**to clarify that question for you. I just need you to let me know if that's the case. Do you understand?**

A. Yes.

**Q. Miss Kunelius, how long did you live at 142-144 Red-Acre Road?**

A. 40 plus years.

**Q. And which years were those?**

A. 1966 through about 2003.

**Q. Approximately when in 2003 did you stop living there?**

A. I had a split week. I'd often go to Maine with a truckload of furniture and then come back, so.

**Q. Did that continue through the year 2003 until the end of 2003?**

A. Most of it, yeah.

**Q. Before you moved to this address on Red-Acre Road in 1966, where did you live?**

A. On Great Road in Stow.

**Q. And how long had you lived at that address?**

A. Since the time I was born.

**Q. So you were born in Stow, Massachusetts?**

A. Concord.

78914469-4ffa-4553-8d46-dfc1341af307

**Q. How old were you when you moved to 142-144 Red-Acre Road?**
A. 21 or 22.
**Q. Did you own the property when you moved there?**
A. Yes.
**Q. And did you move there with anyone?**
A. My former husband.
**Q. Did you own it jointly when you moved in?**
A. Well, that goes way back. Yes, I think so.
**Q. And have you owned it continuously since then?**
A. Yes.
**Q. Can you describe the property? What's located at 142 and 144 Red-Acre Road?**
A. 142, it's a .9 acre house lot with one house on it and a shed. And 144 is the caretaker's cottage with a farm, and there is a horse barn, various sheds, a sauna.
**Q. Is there anything else on the property at 144 Red-Acre Road?**
A. There is an indoor riding ring which is quite small.
**Q. Is that everything?**

A. You mean like a pond or?
**Q. Sure. If you could describe the land as well.**
A. There is a pond which was dug in maybe about 1979 or '80, and there is woods, wild flowers, deer, turkeys.
**Q. Okay. You mentioned a horse barn and a riding ring. Was the property used as a horse farm at any point?**
A. Yes, for awhile.
**Q. When was it used as a horse farm?**
A. Let me see. About 1983 or four through -- it kind of tapered off as I began to take care of my parents. So maybe '95.
**Q. Did you continue to keep horses on the property after 1995?**
A. Yes. Our horses are still in.
**Q. They're still there to the present?**
A. Yes.
**Q. How many horses?**
A. We have three.
**Q. While you were living on the property, did anyone help you take care of the horses?**
A. My father did.

**Q. Did you hire any outside employees to come in and help with the maintenance of the horses or the barn?**
A. There were people, you know, specifically for snowplowing and things like that, sure.
**Q. Did you ever have a sort of barn manager?**
A. That would be me.
**Q. Okay. Had you ever hired anyone else to be a barn manager?**
A. Not with any success.
**Q. Okay. When it was operating as a horse farm, did you have employees?**
A. No.
**Q. Other than people to do the snowplowing, did you ever have any employees on the property?**
A. Specifically related to the care of the horses or digging the pond or?
**Q. First related to the care of the horses.**
A. There were volunteers because people took care of their own horses most of the time.
**Q. People who kept their horses on your property?**
A. Yes.
**Q. How many people kept horses on the**

**property?**
A. At any given time?
**Q. Approximately, yes.**
A. It varied from zero to ten on average.
**Q. But after 1995 no one else kept their horse on the property; is that right?**
A. There was still people there, but I was mostly involved with caring for my parents.
**Q. Did your parents live on the property with you?**
A. They lived in the caretaker's cottage.
**Q. And what years did they live in the caretaker's cottage?**
A. I think around 19 -- early '80s to when my mother died which would be about '97.
**Q. Was your father still living at that time?**
A. Yes. And he moved in with me.
**Q. And how long did he continue to live with you on Red-Acre Road?**
A. Six years and one month. And at that point I couldn't take care of him anymore and he had to go to the hospital, in the nursing home.
**Q. When did you first classify your land or portions of your land under Chapter 61?**

Page 10

A. It would be about 24 years ago. So -- I can't do the math. I'm having a brain cramp. Well, 2007 minus 24. '83, '85, somewhere around there.
**Q. Okay. Why did you decide to classify your land under Chapter 61?**
A. At the time the program seemed to be worthwhile.
**Q. What made it seem worthwhile?**
A. The New England Forestry Foundation helped to mark timber for sale and, you know, gave ideas as to how to manage the wood lot.
**Q. Were there any other benefits of classifying your land under Chapter 61?**
A. The taxes were reduced.
**Q. How did you hear about Chapter 61?**
A. Good question. I'm going to guess that --
MR. McLAUGHLIN: Don't guess. If you know the question, answer it but don't guess.
A. Maybe talking to other people in the program maybe.
**Q. Do you remember who those other people are?**
A. No.
**Q. What did you have to do to classify your land under Chapter 61?**

Page 11

A. A surveyor marked the boundary, and a forester took an inventory of the timber that was there.
**Q. And then did you have to apply for this classification?**
A. To the selectmen.
**Q. And was your request granted?**
A. Yes.
MS. FETOUH: Can you mark this as Exhibit 1.
(Document marked for identification as Kunelius Exhibit 1.)
**Q. Miss Kunelius, I'm going to show you what's been marked as Exhibit 1 to your deposition. Do you recognize that document?**
A. The Chapter 61 -- this probably goes along with my deed. It was book and page.
**Q. Have you seen this before?**
A. Yes. I signed it.
**Q. So that's your signature in the middle of the page?**
A. Yes.
**Q. And it's dated -- your signature is dated June 28, 1984.**

Page 12

A. Yes.
**Q. Is that when you first applied for Chapter 61 classification? Does that help refresh your recollection at all about when it happened?**
A. Yes.
**Q. Before you classified your land under Chapter 61, did you review the statute?**
A. It was explained briefly by the forester and New England Forestry Association.
**Q. Did you read the statute?**
A. The entire thing?
**Q. Yes.**
A. No.
**Q. Did anyone assist you with your application under Chapter 61?**
A. No.
**Q. Did you have any representation by counsel when you classified your land as Chapter 61?**
A. No.
**Q. How often did you need to renew that classification?**
A. Every ten years.
**Q. And have you renewed it every ten years since this time?**

Page 13

A. Yes. This is the third decade.
**Q. Okay. Can I direct your attention to the very middle of the page right above your signature there is text that says, "I have read the various provisions of Chapter 61 as well as the rules and regulations under which said chapter is administered and agree to comply with the same." Do you see that?**
A. Yes.
**Q. Did I read that correctly?**
A. Yes.
**Q. Did you in fact read the various provisions of Chapter 61?**
A. I understand the whole statute is quite thick.
**Q. So you haven't read it?**
A. No, and it's changed over the years.
**Q. When you signed this, have you read the rules and regulations under which the chapter is administered?**
A. I probably had a handout to explain what the basic rules and regulations were. If I cut timber, I had to pay a stumpage tax of 8 percent and my plan had to be written by a forester, you know, a

professional forester.

**Q. But did you read the rules and regulations under which said chapter is administered?**

A. The copy that I read probably was condensed or, you know, not every single period and comma.

**Q. Do you still have that handout?**

A. No.

**Q. You mentioned that you were able to pay lower taxes as a result of classifying your land under Chapter 61. How much lower were your taxes?**

A. That changed I think over the period of the 23, 24 years, and the valuation of so-called back land or forest land was very, very low just in general and now it's very high.

**Q. And that's just over the course of the years the valuation has increased; is that right?**

A. Yes. Well, the amount that they -- the assessed value of any land in Stow has skyrocketed.

**Q. But your taxes have --**

A. Skyrocketed.

**Q. As well?**

A. You bet.

**Q. But they're lower than they would have been had your land not been classified as Chapter 61?**

A. Yes.

**Q. Have you calculated what the difference was and what you paid and what you would have paid in any year?**

A. My tax bill comes through based on the reduced value -- it shows the assessed value of the land and then it shows right next to it the reduced value. So I pay on the reduced value.

**Q. Do you keep copies of your tax bills?**

A. Not that far back.

**Q. How far back do you keep them?**

A. Well, they would be packed in a box in the trailer, and I don't know how far back they go.

**Q. Okay. But you maintain some of them?**

A. Some of them. I can get the records at the town hall if I need to.

**Q. Did you understand when you classified your land under Chapter 61 that you would -- that if you received a bona fide offer to purchase your land that you would have to offer a right of first refusal to the Town?**

A. Yes.

**Q. And how did you come to have that understanding?**

A. I believe it was part of the explanation of the chapter.

**Q. Was that the explanation that was given to you by the forester or in the handout that you received.**

A. Probably both.

**Q. And what did that explanation contain with respect to the right of first refusal?**

A. I felt it reassuring that if I had a bona fide offer, that the Town would match it.

**Q. Why was that reassuring?**

A. Whoever took title to it would pay me the same amount of money.

**Q. Is that what the explanation said that you received from the handout and the forester?**

A. I believe it did.

**Q. Do you remember anything else in that handout or your discussions with the forester about the right of first refusal?**

A. That they had 120 days to decide whether they wanted it or not.

**Q. Anything else?**

A. No. It's a long time ago.

**Q. So that's all you remember from that time?**

A. Yes.

**Q. Did you know at that point that the Town had the right to assign that right of first refusal to a nonprofit group?**

A. I did not.

**Q. When did you learn that?**

A. Probably three weeks after my contract was signed.

**Q. You mentioned earlier that when you classified your land under Chapter 61 you said at that time the program seemed worthwhile. Do you still think the program was worthwhile?**

MR. McLAUGHLIN: Objection.

A. Not anymore.

**Q. When did you decide that it was no longer worthwhile?**

A. I guess in January of '03.

**Q. What happened in January of '03?**

A. The Town decided to step in.

**Q. Why did that make you think the program was no longer worthwhile?**

A. Personally I felt that it had become foolish for anybody in the future to even enter the program.

MR. McLAUGHLIN: I am. I don't think you do have a right to know what the subject matter is of the discussions with her attorney.
MS. FETOUH: Well, we can address that later.
**Q. Was anyone else present when you had this discussion with Mr. Kachaijan?**
MR. McLAUGHLIN: You can answer that question.
A. I don't remember.
**Q. Do you remember where it took place?**
A. I was probably on my telephone at home.
MR. McLAUGHLIN: Okay. I'm going to make it clear, because apparently you asked the same question and I didn't object again. I'm going to ask you to stop, to refrain from asking questions with Attorney Kachaijan where you specifically reference the subject matter of the discussion; okay? I am now going to apply that to every objection and every question that you raise so that I don't have to keep saying it because apparently you asked it again after I objected and I didn't notice that. So, okay, are we on the same sheet of music here?

MS. FETOUH: Well I understand that your --
MR. McLAUGHLIN: I don't expect you to agree with me. I'm just telling you I'm going to tell her not to answer those questions; all right?
MS. FETOUH: I understand your position, and I would just note for the record is I don't believe the general subject matter of any discussion with an attorney is automatically privileged, and I have a right to ask some foundational questions in order to establish whether or not there is a valid claim for a privilege there.
MR. McLAUGHLIN: Well, you can bring it up with the Judge and he can decide, but I'm going to stay cautious on this matter.
**Q. Other than your conversation with Mr. Beals and whatever conversation you might have had with Mr. Kachaijan, did you speak with anyone else about your obligations under Chapter 61 prior to entering into the purchase and sale agreement with Cohousing Resources?**
A. No.
**Q. Did you review any written materials about your obligations under Chapter 61?**
A. No.

**Q. When did you decide to sell the property at 142 and 144 Red-Acre Road?**
A. It ran parallel from being exhausted to taking care of my father. The sicker he got, the more I wanted to move to Maine.
**Q. Had you had a plan for awhile to move to Maine?**
A. I had known David and we enjoyed going to Maine.
**Q. And about what time was this that this happened?**
A. Oh, for a period of ten years.
**Q. Which ten years are those?**
A. Probably about '93 to 2003.
**Q. Were you trying to sell the property during that ten-year period?**
A. I was really committed to finish taking care of my father. And as his prognosis deteriorated, the two kind of, you know, fell in line.
**Q. So approximately when did you start actively trying to sell the property?**
A. 2002.
**Q. At that point had your father moved into**

**the hospital or nursing home that you mentioned earlier?**
A. His last day in the house was in March of '03, and it was the same day that TPL did their home inspections, whatever day that was.
**Q. When you decided to begin trying to sell the property in 2002, what did you do to go about selling the property?**
A. I talked to Jim Boothroyd.
**Q. Who is Jim Boothroyd?**
A. The real estate agent who listed it.
**Q. Did you know Mr. Boothroyd before you approached him about your property?**
A. Yes, I did.
**Q. How did you know him?**
A. He had a horse in my barn.
**Q. How long had he had a horse in your barn?**
A. Many years.
**Q. Approximately how many?**
A. Maybe ten years.
**Q. Up to and including that time in 2002 when you approached him?**
A. Yes.
**Q. Were you and Mr. Boothroyd friendly?**

78914469-4ffa-4553-8d46-dfc1341af307

A. He had his horse there.
**Q. Did you socialize at all outside of him just keeping a horse on your property?**
A. No.
**Q. Before you spoke with Mr. Boothroyd, had you made any efforts to sell the property yourself?**
A. The ideal would have been to start with the property in the back, and as my -- the care of my parents changed, I would have either stayed in the house in the front or moved out of Stow.
**Q. Did you start out, then, trying to sell the back property?**
A. Years before, yes.
**Q. When had you done that?**
A. In about 1988 when the Town of Acton was interested in the water.
**Q. How did you learn that the Town of Acton was interested in the water?**
A. I believe I was approached by the Acton Water District.
**Q. How did they approach you? Was it in person or by a...**
A. I think I may have had the 42 acres listed specifically for water I think through a realtor in

Acton.
**Q. When did you first list the 42 acres with a realtor?**
A. Maybe around 1988.
**Q. Was that the first time you had tried to sell any portion of the land?**
A. Actively, yes.
**Q. Had there been inactive attempts to sell the land before then?**
A. Many people know about the water, and Maynard had done water studies in that area years before in the 1950s, '60s maybe.
**Q. Had anyone else expressed interest in the water besides Maynard and Acton?**
A. Up until that point, no.
**Q. Well, let's start with the older, with Maynard. When did Maynard express interest in the water on the property?**
A. As soon as they knew what my well yield was.
**Q. And how did they know what your well yield was?**
A. It was public knowledge. I told them.
**Q. Who did you tell?**

A. Walter Sokolowski, Public Works in Maynard. I knew him.
**Q. And how did you know what your well yield was?**
A. I had a draw down study done by D.L.Maher Company.
**Q. What kind of study did they do?**
A. It's called a draw down study, and they pump a well that's right next to an observation well all day long and they see how much yield there is per gallons per minute.
**Q. And was that something that you had contracted with them to do?**
A. Yes, I did.
**Q. Why did you ask them to do that?**
A. I had been on the conservation commission when the town did a townwide water resources study with a company that was then called IEP. I think it was Interdisciplinary Environmental something, and their name has now changed to -- or their letters have changed to ENSR, E-N-S-R.
**Q. And how did the Town doing this townwide study give you the idea to hire D.L. Maher to do a study on your property?**

A. The geology showed what's called a buried valley. That's a layer of saturated sands and gravels. It's about 60 to 80 feet deep.
**Q. And that was the geology from the IEP study done by the Town?**
A. Yes. Right.
**Q. Was that study done on your property itself?**
A. The seismic study for that aquifer was done on the little street that borders my property called Tuttle Street.
**Q. And how did the results of this study make you decide to do a study on your own property?**
A. It showed very high potential for water.
**Q. Did you know before this point that there was a high potential for water on your property?**
A. Just from my own knowledge of New England geology.
**Q. Had there been any studies of the water on your property prior to this point?**
A. By me?
**Q. By anyone.**
A. I don't know how extensive the Maynard exploratory studies were. They wouldn't probably

have been directly on my piece.
**Q. Were the Maynard studies before the D.L. Maher Company study?**
A. 30 years, sure.
**Q. And what year was the D.L. Maher Company study?**
A. It would have been in the middle to a little bit more 1980, '85. Something like that.
**Q. And what were the results of the D.L. Maher study?**
A. A large volume of water.
**Q. And when you learned there was a large volume of water, you mentioned you contacted Walter Sokolowski? Is that the name?**
A. Very good. Yes, I did.
**Q. And why did you call Mr. Sokolowski, or contact Mr. Sokolowski?**
A. 100 years ago different towns had agreements to share water sources, and Maynard and Stow had such an agreement. You were obligated if your neighbor needed water to let them come and get it.
**Q. So were you actually obligated to contact him to let him know about the presence of water?**

A. No, I wasn't personally. It was my understanding is it was an agreement between various towns that went back 100 years.
**Q. You said you knew Mr. Sokolowski before?**
A. Yes.
**Q. And how did you know him?**
A. He was about my age, and Maynard was a small town. Stow was a small town.
**Q. And you said he worked for the Public Works in Maynard; is that right?**
A. Yes.
**Q. Do you know what his position was with the Public Works?**
A. No.
**Q. And what did you tell him about the water on your property?**
A. That there was a high yielding potentially.
**Q. And you were telling him because you knew that Maynard had had an interest in water before?**
A. Maynard's population is much denser than Stow's, and they seem to always need water.
**Q. What did Mr. Sokolowski do when you told him about the presence of this water on your land?**
A. He probably said thank you very much.

**Q. He was not interested?**
A. He put it in the memory bank.
**Q. Did you have any further conversations with him about the water on your land?**
A. No.
**Q. Did you have any conversations with anyone else from Maynard about potentially selling the property or the water rights on your land?**
A. At that time, no.
**Q. Did you have a conversation with anyone from Maynard about selling the water rights at any other time?**
A. Yes.
**Q. When was that?**
A. It had to have been in the '90s, and I really don't remember what year.
**Q. Do you remember if it was the early '90s, mid '90s, late '90s?**
A. No, I don't remember.
**Q. And how did you come to know in the 1990s that Maynard might be interested in the property?**
A. Because Mr. Barilone came and asked about the water.
**Q. Who was Mr. Barilone?**

A. The term that comes to mind is townie.
**Q. Did he have a position with the Town?**
A. He became a selectman, and I'm going to guess that before that at some point he might have been a selectman also.
**Q. And you said he came and asked about the water. What did he ask?**
A. He asked if he could walk down towards the 42 acres and just look.
**Q. Did he do that?**
A. Yes, he did.
**Q. And what happened after he did that?**
A. He ran for selectman for the clean water that he could get for the Town.
**Q. Was he referring to your -- the water under your property?**
A. I think so, yes.
**Q. Did he ever make an offer on the property?**
A. No.
**Q. Did he ever come back and look at the property again?**
A. No.
**Q. Did you have any conversations with him again after he looked at your property?**

Page 42

A. No.

**Q. Did you ever contact him again to see if he might be interested in the property?**

A. No.

**Q. Was that the only other time that Maynard has expressed interest in the property?**

A. That would be probably the last time that they did.

**Q. Before we started talking about Maynard, you mentioned interest by Acton in the water?**

A. Yes.

**Q. And you said they approached you; is that right?**

A. They also needed water. Their population is much more dense and they had just lost a well to pollution and they needed to put another well on line.

**Q. You mentioned you may have had the 42 acres listed with a realtor at that time. Do you know who the realtor was?**

A. Probably Boyd, B-o-y-d, in Acton.

**Q. When had you first -- I'm sorry if I asked you this -- when did you first list the property with is it Mr. Boyd in Acton?**

Page 43

A. It might be Fred Boyd. It might be something else now.

**Q. Okay.**

A. It would have tied in with the conversations with Acton about the water.

**Q. With Acton or Maynard?**

A. Acton.

**Q. So at that point I think you said it was in 1988. Were you actively trying to sell the back property?**

A. At the time the Town of Stow, first of all, has no public water except for the library and the town hall. And it's been a continuing problem in the little business district called the Lower Village, and they needed water. And Acton would have been willing to give clean water to the Lower Village in exchange to taking some of it north into Acton. So it would have solved a couple of water problems.

**Q. What conversations did you have with Acton about the potential sale of your property?**

A. I met with the members of the Acton Water District, and then they came to I think one meeting with the Stow selectmen in about 1988.

Page 44

**Q. Did you attend that meeting?**

A. Yes, I did.

**Q. What was discussed at that meeting?**

A. I think four engineering companies were invited to submit proposals for putting in, you know, a pumping station and piping. Things like that.

**Q. Were those companies presenting to this group?**

A. Yes, they were.

**Q. At this point, had you received any offer on your property?**

A. For the water, the discussion was in the half a million dollar range, $500,000.

**Q. Was that in writing?**

A. I think it was.

**Q. Do you have a copy of that document?**

A. No, not anymore.

**Q. You said that was $500,000 for the water. Was that -- does that include the property itself?**

A. Well, in order to have a public drinking water supply source, you have to have a 400-foot radius around the well head and you have to have a mile in distance between any gas station and any dry

Page 45

cleaner. And I had the setbacks and the distances at that time.

**Q. So your property would have qualified under those terms?**

A. Yes, it would.

**Q. But the $500,000 wasn't for the full back property, the 42 acres?**

A. I believe that it would have, because it would have given them a good buffer around the well head.

**Q. Did you enter into a purchase and sale agreement with Acton for that property?**

A. There was a -- and it's a technical term. I'm not sure if it was a potential offer or if it was a legitimate offer or what.

**Q. How do you differentiate, just so I understand your terms, between a potential offer and a legitimate offer?**

A. Well, because the discussions were kind of preliminary. I'm not sure that it had been formalized as to boundary markers or that kind of specific detail.

**Q. What ultimately happened to Acton's interest in the property?**

A. They remain interested and Stow did nothing.
**Q. What was Stow supposed to do?**
A. Respond to the four engineering proposals. I think Acton wanted to cooperate with Stow in developing a plan.
**Q. Other than the interest of Acton and Maynard, did anyone else express interest in your property in 2002 when you tried to sell the property?**
A. Belmont Springs.
**Q. When did Belmont Springs express interest?**
A. I would say early to middle '90s.
**Q. Did they contact you?**
A. Word was out by that time that I had water and everybody suddenly became interested.
**Q. Did they ever make an offer on your land?**
A. No.
**Q. How many communications did you have with Belmont Springs?**
A. None directly.
**Q. Who did they communicate with?**
A. An elderly gentleman who claimed to know them.

**Q. Do you know who that person was?**
A. I don't remember his name.
**Q. How did you learn that they were interested in the property?**
A. I don't remember.
**Q. Is there anyone else who expressed interest in the property until the time in 2002 when you tried to sell the property?**
A. People always said that they thought it was a wonderful piece of property and they never put it in writing.
**Q. So you never received any offers on the property in that time period other than the Acton offer?**
A. You're talking about for the water supply?
**Q. For the water supply or the property itself.**
A. A lady who had a horse in the barn wanted to buy just the horse farm.
**Q. Were you interested in selling just the horse farm?**
A. It would have been difficult to split it out at that time.
**Q. Why would it have been difficult?**

A. Because of the right-of-way that goes to the barn.
**Q. What was her name?**
A. Athene von Hirschberg.
**Q. Did she ever make an offer on the property, on the horse farm?**
A. The horse farm by itself, yes.
**Q. And what was that?**
A. $750,000.
**Q. When was that offer made?**
MR. McLAUGHLIN: Excuse me, are we saying horse barn or horse farm?
**Q. I thought you said farm.**
A. Yes, I include that to mean the area around the barn.
MR. McLAUGHLIN: All right. I just want to make sure I was hearing you right.
A. The question?
**Q. When did she make that offer?**
A. A couple of years before she became the Connecticut Equestrian Center.
**Q. And approximately when was that?**
A. Let me see. Maybe middle '90s.
**Q. When you put the property up for sale in**

**2002, what did Mr. Boothroyd do to market the property?**
A. There was a description written, and it's probably, you know, maps of the town or the, you know, the area, and it would have gone on to the MLS listing.
**Q. When did you first hear about Cohousing Resources?**
A. When they appeared as a buyer.
**Q. When was that?**
A. Seriously in October. I think they had looked at only the farm yard area earlier, but they were interested in everything out to the street, and I was still taking care of my father at that point and I didn't want to move him if I didn't have to.
**Q. When did they express interest in just that area?**
A. It would have been '02, but perhaps, I don't know, three to six months earlier maybe.
**Q. So in the summer of 2002?**
A. Yes. Maybe.
**Q. What is Cohousing Resources?**
A. My understanding is that they're a group of people who kind of find each other and want to have

78914469-4ffa-4553-8d46-dfc1341af307

like a village and share meals, community gardens, child care. They're interested in knowing, you know, who their neighbors are and helping each other out.

**Q. And who from Cohousing Resources made contact with you?**

A. With Jim Boothroyd. Chris ScottHanson.

**Q. Did you have any communications directly with Cohousing?**

A. No, not in the beginning.

**Q. And what's Mosaic Commons as opposed to Cohousing Resources?**

A. Mosaic would be a group of individuals who have somehow or other heard about Cohousing -- the concept of Cohousing and then come together as a group.

**Q. What was the relationship between Mosaic Commons and Cohousing Resources?**

A. My understanding is that Cohousing Resources looks for locations for these groups of people who want to be together.

**Q. When --**

A. And they have since built in Berlin, Massachusetts.

**Q. Did Cohousing make an offer on the property?**

A. Yes.

**Q. When did they make that offer?**

A. October of '02, I think.

**Q. What was their offer?**

A. $1,116,900.

**Q. Had there been negotiations with Cohousing prior to October 2002?**

A. No.

**Q. Had you had any communications with Cohousing prior to October of 2003?**

A. Three?

**Q. Oh, I'm sorry, October 2002.**

A. No.

MS. FETOUH: Can you mark this as the next exhibit.

(Document marked for identification as Kunelius Exhibit 2.)

**Q. Ms. Kunelius, I'm going to show you what's been marked as Exhibit 2 to your deposition. Have you seen that document before?**

A. Yes.

**Q. When did you first see it?**

A. It seems that this was their preliminary feeler in showing interest in the property.

**Q. I notice on the first page of the document there are two dates, 7/25/02, which is crossed out and then next to it 9/24/02. Do you know why there are two dates on that cover page?**

A. As I said earlier, I know that they had inquired about the -- some of the back, the farm area, and this may have been when they asked me to sell the whole, you know.

**Q. I notice in the --**

A. It --

**Q. No, go ahead.**

A. No, I'm just looking.

**Q. Okay.**

A. Oh, this says previous offer it looks like July.

**Q. It looks like on the top of the second page in handwriting, "Previous offer 25 July '02." Do you see that?**

A. Yes.

**Q. Do you know whose handwriting that is?**

A. It's not mine.

**Q. Okay. And you don't know who else's**

**handwriting it is?**

A. No, I don't.

**Q. Okay. Did Mr. Boothroyd share this document with you on or about July 25, 2002?**

A. I think so.

**Q. Did you discuss this document with him at that time?**

A. I probably did.

**Q. What did you discuss with Mr. Boothroyd?**

A. That there was an interest by these people.

**Q. Did you discuss the terms of this offer?**

A. The terms of the offer changed over, let's see, well, it says the offer expired on July 29th. So, evidently, it was a feeler or something.

**Q. So this --**

A. And so this doesn't look like my ultimate contract.

**Q. But did you discuss the terms of this feeler, as you've called it, with Mr. Boothroyd?**

A. Probably.

**Q. Did you discuss it before -- well, first, did this offer in fact expire on July 29th?**

A. It's very different from my final contract, so my guess is it expired -- well, my signature

# TAB 2

VOLUME: II
PAGES: 1 through 211
EXHIBITS: Per index

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - x

MARILYN KUNELIUS,
Plaintiff,

VS. Civil Action No. 05-11697-GAO

TOWN OF STOW, et al.,
Defendants.

- - - - - - - - - - - - - - - - - - x

CONTINUED DEPOSITION OF MARILYN KUNELIUS
Wednesday, April 4, 2007, 10:15 a.m.
Goodwin Procter, LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109

----------Reporter: MaryJo O'Connor, CSR, RPR-------
BOSTON REPORTING ASSOCIATES
REGISTERED PROFESSIONAL REPORTERS
67 Bright Road
Belmont, Massachusetts 02478
(617) 877-6640

Boston Reporting Associates

(617) 877 - 6640

think you can find in the document; all right? The question was what do you remember about what you had hoped for.

A. I would have liked to have given the water to the Town.

**Q. Was there anything else?**

A. That was the big one.

**Q. Did you communicate directly with Cohousing during this time period?**

A. No.

**Q. Who did communicate with Cohousing during this time period?**

A. Jim Boothroyd.

**Q. Did anyone else communicate with Cohousing on your behalf?**

A. My attorney may have.

**Q. Turning to what is Bates numbered Page 20 of this document, which is titled "Purchase and Sale Agreement," if you can look at Paragraph 2 of that page you'll see that it now references payment of $700,000 in cash including earnest money, deposits paid, and a $400,000 promissory note secured by a mortgage against the land.**

**Can you tell me why that change was made**

**between this document and the prior document?**

MR. McLAUGHLIN: Objection. Are you asking her why she thinks Cohousing made that change, because this is not something that she has signed. So if the question is does she have an understanding as to why Cohousing changed it.

MS. FETOUH: Yes, that's the question. Do you know why this change is in here?

A. They asked me if I'd take out a -- give them a mortgage on it.

**Q. Did you agree to that change?**

A. Yes, I did.

**Q. There is some handwriting on this document. Is that your handwriting?**

A. No, it's not.

**Q. Do you know whose handwriting it is?**

A. No, I don't.

**Q. Paragraph 3 titled "Earnest Money," now calls for an initial earnest money deposit in the sum of $10,000 in the form of a promissory note, and then additional earnest money payments of $1,500 per month. Do you know why this change was made from the prior version which just had a single $50,000 deposit?**

MR. McLAUGHLIN: Objection. You can answer.

A. Cohousing was willing to give me cash so that I could pack up my house and move to Maine.

**Q. So is this change done at your request?**

A. I think they understood the circumstances, my circumstances.

**Q. And is that because you told them your circumstances, you or Mr. Boothroyd acting on your behalf?**

MR. McLAUGHLIN: Objection.

A. Yes, I may have told them.

**Q. And that was that you wanted, money available to you while this process was going on?**

A. Yes.

**Q. And, as a result, you were willing to lower the deposit, initial deposit, from $50,000 to $10,000; is that right?**

MR. McLAUGHLIN: Objection.

A. Yes.

**Q. If you turn the page to Paragraph 6, it references a 40B application?**

A. Yes.

**Q. Who added this provision to this document?**

MR. McLAUGHLIN: Objection.

A. I believe Cohousing did.

**Q. And what's your understanding of Chapter 40B?**

MR. McLAUGHLIN: Objection.

A. The state mandates that 10 percent of the Town's housing stock has to be affordable.

**Q. Were you familiar with the process to submit a 40B application?**

A. Personally, no.

**Q. If you turn to the top of Page 3 of 6 of this document, the continuation of Paragraph 6, it references 42 acres that may be encumbered by or deeded to the Town of Stow. Do you see that language?**

A. Yes.

**Q. Who added that language?**

MR. McLAUGHLIN: Objection.

A. My recollection is that it would be mutually agreeable to Cohousing, Boothroyd, and myself. And I had known for years that the Town needed water down at what's called the Lower Village on 117, and I had the water.

**Q. And was it your idea to donate or encumber**

Page 30

question. Is it possible to get the question read back, please?

*(Question read.)

MR. MONTGOMERY: Thank you.

**Q. With your attorney's instruction in mind, with whom did you discuss Paragraph 21?**

A. I will not answer.

**Q. Did you understand what your rights were under Paragraph 21 under Buyer's Default?**

MR. McLAUGHLIN: Objection.

**Q. You can answer. He didn't instruct you not to answer.**

MR. McLAUGHLIN: I didn't instruct you not to answer. The question was did you understand what your rights were with regard to that paragraph.

A. Yes.

**Q. What was that understanding?**

A. My understanding is as it reads, "If the buyer shall fail to fulfill," my change would be all deposits, you know, all earnest money.

**Q. All earnest money would be retained by you as liquidated damages; is that right?**

A. Yes.

**Q. And that would be your only remedy in equity and law?**

Page 31

MR. McLAUGHLIN: Objection. To the extent you understand the term in equity and law.

A. I'm not a lawyer. That's the way I read it.

MR. CONROY: I'm going to object to the coaching that's been going on here in response to a number of these questions.

MR. McLAUGHLIN: Well, then, she should --

MR. CONROY: If I may. We're all familiar with the rules and you're allowed to object as you've often said, Mr. McLaughlin, in your own depositions and that's all.

MR. McLAUGHLIN: And I will object if counsel uses terms like in equity and law presuming that this woman understands what that means.

MR. MONTGOMERY: Well, why don't we all agree that the witness is not to answer any question that she doesn't understand.

MS. FETOUH: She was already given that instruction at the beginning of the deposition, if she didn't understand anything to just let me know.

**Q. This provision is different than the language for the buyer's default in the prior**

Page 32

**Exhibit 3 of the prior offer. Are you aware that this is a different provision than what was in Exhibits 2 and 3?**

A. I see that it's different.

**Q. Do you know why it was changed from the language on Exhibit 3 to the language in Exhibit 4?**

A. No, I don't.

**Q. Did you have any conversations with anyone about that change in the language?**

A. No.

**Q. Did you have any discussions with anyone about what would happen if Cohousing failed to fulfill its obligations in this agreement?**

A. I felt that the likelihood was certain because it was a 40B.

**Q. The likelihood of what?**

A. Cohousing going forward.

**Q. What gave you the impression that the likelihood of Cohousing going forward was certain?**

A. Because it was a 40B.

**Q. And what about it being a 40B made you think that the likelihood of Cohousing going forward was certain?**

A. At the time Stow only had a little over 5 percent affordable housing and they needed 10 percent by state law.

Page 33

**Q. By this point, did you know anything more about the 40B process?**

MR. McLAUGHLIN: Objection. You can answer.

A. Not much more.

**Q. Did you have any discussions with anyone about what you perceived to be the likelihood of Cohousing going forward?**

A. I accepted the offer because the people seemed genuine. They would have given first -- the first shot at the affordable units to teachers, policemen and town employees, and I liked that part of it.

**Q. What about that do you think that it was more likely that Cohousing would go forward or certain, I think that was your word, that Cohousing would go forward?**

A. Because the Town is encouraged or expected by the State to work towards that goal of 10 percent affordable homes.

**Q. At this point in October of 2002, did Cohousing already have families to fill the 30 units**

Page 34

**that it was contemplating developing?**
A. They had I believe around 20 and they were actively seeking more people, and the affordable units would have been done by the lottery.
**Q. So at this point they did not have the 30 units committed; is that right?**
A. Not all 30, no.
**Q. When they entered into this agreement, Cohousing also still had to do a feasibility study; is that right?**
A. Yes, and they did soil tests and surveys.
**Q. When did they do those soil tests and surveys?**
A. After the purchase and sale was signed.
**Q. Did they complete that study?**
A. The soil tests were finished when the heavy equipment left my yard.
**Q. Do you know what the results were of their study?**
A. I know my soils to be very good.
**Q. Do you understand that if they found any conditions that were not acceptable to them in that study, that Cohousing could terminate the agreement?**
A. They did not.

Page 35

**Q. Did you understand that they could do that?**
A. I thought you asked me if they found any.
**Q. That I think was my prior question. This question was did you understand that if they had found any unacceptable conditions, they could have terminated the agreement?**
A. I had no reason to think that they would find anything unacceptable.
**Q. But did you understand that if they had found anything unacceptable, that could have terminated the agreement?**
MR. McLAUGHLIN: Objection.
A. You mean if the soils were unacceptable they could have terminated the agreement?
**Q. Yes.**
A. I knew enough about the condition of the soils that I knew they would pass because I had already put in two septic systems myself.
**Q. Did you know that the testing of the soil was the only thing they would be doing in their feasibility study?**
A. They mapped the wetlands.
**Q. Did you know what else they were going to do as part of their feasibility study and**

Page 36

**inspections?**
A. That's what I was aware of on site.
**Q. So there may have been other things, you're just not sure; is that right?**
A. There may have been.
**Q. Did they ever tell you what conditions would be unacceptable to them?**
A. No.
**Q. Can you look at Page 5 of the agreement, please, Paragraph 34?**
A. (Whereupon the witness complies.)
**Q. Have you seen that paragraph before?**
A. Yes.
**Q. And the first two sentences of that paragraph read, "The obligations of buyer under this agreement are expressly subject to buyer conducting engineering inspections and testing of the property during feasibility if any such inspections reveal conditions unacceptable to buyer during the feasibility period, buyer may terminate this agreement and any deposit will be refunded to buyer." Did I read that correctly?**
A. Yes.
**Q. So do you understand from this paragraph**

Page 37

**that Cohousing could terminate the agreement and you would have to refund any deposits to them if the inspections revealed conditions that were unacceptable to them?**
MR. McLAUGHLIN: Objection.
A. I couldn't imagine that they would find anything wrong with my soils or, you know, with their engineering.
**Q. But, again, you're not sure exactly what engineering inspections and testing they were doing with their feasibility study; is that right?**
MR. McLAUGHLIN: Objection.
A. I saw heavy equipment in my yard digging up big holes.
**Q. You understood the time that you entered into this agreement that the Town would have a right of first refusal over your property, correct?**
A. Yes.
**Q. I believe you testified last week that you were not aware at that time that the Town could assign that right to a nonprofit; is that right?**
A. That's correct.
**Q. When did you come to have that understanding?**

Page 46

**Q. So he directed you to TPL's website?**

A. Either he did or I asked my children to just please look it up for me.

**Q. Was anything else said in this conversation with Mr. MacDonnell?**

A. I called him because I was frankly worried. I hadn't heard of the organization. I needed reassurance, and he did his best to give it to me.

**Q. Did you understand at that point that you could somehow stand in the way of the assignment?**

MR. McLAUGHLIN: Objection.

A. I had no idea that that was possible because I was already feeling that I was being steamrollered. It was, you know, an attitude with the neighbors and with the Town and everything that, good-bye, we're going to take over.

**Q. But did you understand that you had any ability to stop the Town from exercising the right of first refusal under Chapter 61?**

A. No, I didn't.

MR. McLAUGHLIN: Can we take just a quick bathroom break?

MS. FETOUH: Sure. That's fine.

(Brief recess.)

Page 47

(Document marked for identification as Kunelius Exhibit 6.)

**Q. Miss Kunelius, at this time did you understand you had any power to prevent the Town from assigning the right of first refusal to a nonprofit conservation organization under Chapter 61?**

MR. McLAUGHLIN: Objection.

A. I didn't believe I had.

**Q. This conversation that you referenced with Mr. MacDonnell on the telephone, approximately how long did that last?**

A. For a short period of time. I needed reassurance from him that he could do the project and that he had the money.

**Q. Was that approximately ten minutes? Twenty minutes? More or less?**

A. Ten or fifteen minutes.

**Q. Did you have any other conversations with anyone from the Trust for Public Land prior to the assignment for the right of first refusal?**

A. No.

**Q. Miss Kunelius, I'm going to hand you what's been marked as Exhibit 6 and ask you if you have**

Page 48

**seen that document before?**

A. Yes.

**Q. What is it?**

A. It was a mailing that I did to the voters in Stow.

**Q. Is that your signature on the bottom?**

A. Yes, it is.

**Q. And to whom did you mail it exactly?**

A. To every household.

**Q. And when did you send this letter?**

A. This would have been before the January town meeting.

**Q. Did you write this letter?**

A. I helped her write it with Jim Boothroyd.

**Q. Did anyone else besides you and Mr. Boothroyd contribute to writing this letter?**

A. No.

**Q. Who primarily drafted this letter?**

A. We did it together.

**Q. Were you together when you were drafting it?**

A. Probably not.

**Q. Did someone do a first draft?**

A. This was really in response to the rumor

Page 49

that was going around town about TPL taking over the assignment. At that point they had really trashed my contract and treated me like dirt.

**Q. Who is the they you are referring to?**

A. Craig MacDonnell.

**Q. And how had Mr. MacDonnell trashed your contract and was it treated you like dirt? Is that what you said?**

A. Yes, I did.

**Q. Okay.**

A. They were trying to get everybody to believe that they were giving the forest land and the water supply to the land. That's one thing.

**Q. Is there anything else?**

A. I had a bad feeling about, you know, about them being serious and, you know, he said he had the money. I didn't necessarily believe him.

**Q. You said TPL was trying to get everyone to believe they were giving this land and water to the Town. How was TPL trying to get people to believe this?**

A. There was a presentation they made at the town meeting.

**Q. Were you present for that?**

Page 66

**Q. Did you attend the meeting of the Board of Selectmen at which they have voted to assign the right of first refusal?**

A. I did not.

MS. FETOUH: Can you mark this as the next exhibit.

(Document marked for identification as Kunelius Exhibit 7.)

**Q. Have you seen the document that's been marked as Exhibit 7 before?**

A. Yes, I have.

**Q. What is it?**

A. Exercise of right of first refusal.

**Q. And this is a letter from the Trust For Public Land addressed to you; is that right?**

A. Yes.

**Q. Did you receive this letter?**

A. Yes, I did.

**Q. And did you understand that the Trust For Public Land was electing to exercise the right of first refusal?**

A. Yes, I was.

**Q. The letter references a check in the amount of $11,500 being delivered to Mr. Kachaijan. Do you**

Page 67

**know if that check was in fact delivered?**

A. I ultimately got it. I don't know whose hands it passed through before I got it.

**Q. And you have since kept those funds; is that right?**

A. I sent the initial -- the $10,000 back to Mozaic Commons.

**Q. And that was returning the $10,000 that Mozaic Commons had paid you under the purchase and sale agreement?**

A. Yes.

**Q. And at least through July of 2003, did you receive monthly $1,500 payments from the Trust For Public Land?**

MR. McLAUGHLIN: Objection.

A. As payments toward the purchase price.

**Q. And have you kept those payments?**

A. I used the money to live on and to move my stuff up to Maine.

**Q. After February 13th of 2003 when was the next time you had any contact with anyone from the Trust For Public Land?**

A. In July of '03, Mr. MacDonnell had a three-way conversation with myself -- maybe it was

Page 68

four-way, Mr. Boothroyd and Mr. Kachaijan and myself where he demanded a lower purchase price.

**Q. I'm sorry, was that a telephone conversation?**

A. Yes.

**Q. Approximately how long did that conversation last?**

A. Maybe 20 minutes.

**Q. Were you together with Mr. Boothroyd or Mr. Kachaijan for that call?**

A. We were expected to be at the table in Mr. Kachaijan's office to get the -- to be in on the phone call with Mr. MacDonnell.

**Q. Were you in fact at Mr. Kachaijan's office for the call?**

A. Yes.

**Q. Who set up this call?**

A. Mr. MacDonnell I believe.

**Q. And who first spoke during that conversation?**

A. I believe he did.

**Q. What did --**

A. Mr. MacDonnell.

**Q. What did Mr. MacDonnell say?**

Page 69

A. That they were only going to pay me $800,000.

**Q. Did he explain why he was asking if he could pay $800,000?**

A. He may have, but I was so mad I couldn't hear.

**Q. Did he explain anything about their fund-raising efforts in that call?**

A. I didn't care. He said he had the money.

**Q. Did he say anything about the fund-raising efforts in that call?**

A. I told you I didn't care. He said he had had the money.

**Q. Do you remember sitting here today whether or not he said anything in that call about the fund-raising efforts?**

A. That was not my problem. I was developing a different problem at that point.

**Q. Do you remember if he said anything in that conversation about the fund-raising efforts?**

A. I don't recall.

**Q. Was the issue of zoning brought up in that call?**

A. It may have been.

**Q. Do you remember what, if anything, was said about zoning?**

A. I told you before it didn't matter to me in the lease. I expected to be paid on September 23rd or 26th, '03, the full amount.

**Q. Whether or not it mattered to you, I'm asking you what you remember about that conversation. If you can, tell me everything you can remember Mr. MacDonnell saying during that conversation.**

A. If I didn't take the $800,000, he wouldn't pay me anything.

**Q. Do you remember those words specifically?**

A. Generally.

**Q. What else do you remember Mr. MacDonnell saying in that conversation?**

A. I was seeing red. I don't know. I don't remember.

**Q. Did you speak in that conversation?**

A. I believe I said that I would not accept $800,000.

**Q. Did you say anything else?**

A. I may or may not have.

**Q. Do you have any memory of anything else you**

**said or you may have said in that conversation?**

A. Have you ever been so mad that you can hardly think? That's how mad I was. I was beside myself.

**Q. Are you saying you can't remember anything else?**

A. I can't remember specifically. I remember the $800,000 amount and I was furious.

**Q. Did Mr. Boothroyd speak in that conversation?**

A. I don't believe so.

**Q. Did Mr. Kachaijan speak in that conversation?**

A. He probably would have said we will not accept less than the full purchase price.

**Q. Do you remember anything else that was said in that conversation?**

A. If I didn't take a third less off my purchase price, that they would basically bail.

**Q. And you're saying Mr. MacDonnell said that?**

A. Yes.

**Q. And then when you said that you would not accept $800,000, what was TPL's response?**

A. I don't have a specific recollection,

because I was extremely angry.

**Q. Can you remember anything else that was said in that conversation?**

A. No.

**Q. After Mr. MacDonnell got off the phone, did you stay and speak with Mr. Boothroyd and Mr. Kachaijan?**

A. I must have, because I was incredulous.

**Q. And what did you and Mr. Boothroyd and Mr. Kachaijan speak about following the conclusion of this telephone conversation?**

A. Generally, that we would not accept less than the full amount.

**Q. How long did you speak with Mr. Kachaijan and Mr. Boothroyd following this conversation?**

A. Not long. Fifteen, twenty minutes.

(Whereupon Attorney Oetheimer leaves the room.)

**Q. Can you remember anything else that was said in that conversation with Mr. Boothroyd and Mr. Kachaijan?**

A. No.

**Q. When was the next time you spoke with anyone from TPL?**

A. The date of the closing came and went. I called I think the chairman of the Board of Selectmen then became Kathy Farrell, and I called her and asked where is the money. And she played dumb and said, What do you mean, didn't they pay you? And I said, You know God damn well they didn't pay me.

And so then she set up meetings between TPL. Whitney Hatch was at the first meeting, MacDonnell, Attorney Kachaijan, Mr. Boothroyd, myself, Serena Furman, Michael Labosky from Friends of Red-Acre. And I think Ms. Farrell kind of orchestrated the meeting.

**Q. When did that meeting take place?**

A. It was in the early spring of '04 and it was at the town hall in Stow, Massachusetts.

**Q. Do you remember with any more precision what month it was in other than the early spring?**

A. It might have taken her a couple of weeks to set up the meeting, and so I may have called in January and she might have been able to have the conference room there sometime in February. I'm not sure.

**Q. How long did that meeting take place or**

Page 74

last?
A. Probably more than two hours.
**Q. Was somebody leading the meeting?**
A. Kathy Farrell was the chairman of the selectmen and she probably tried to maintain some sort of order and, you know, ask people to speak.
**Q. Who spoke first?**
A. She probably did.
**Q. And what did she say?**
A. She probably told the group why I had asked for the meeting and was there any possibility of a resolution.
**Q. And was there any response to that?**
A. People talked back and forth. Mr. MacDonnell held to his $800,000 number.
**Q. Did he explain why he was holding to a $800,000 number?**
A. I felt he had a bunch of feeble excuses.
**Q. What were the in your mind feeble excuses that he was offering?**
A. He couldn't get the zoning. He couldn't get the fund-raising.
**Q. Did you speak at this meeting?**
A. I did.

Page 75

**Q. And what did you say?**
A. I explained that I expected that I was going to get paid the full amount of my contract. The Town had voted to -- by that time it was the May Town meeting, May of '03, And they had voted to contribute $400,000 from community preservation money, and I was trying to find ways to bring the number up to the full dollar amount.
**Q. And what ways --**
A. But nobody else was.
**Q. And what ways were you suggesting to bring the amount up to the full purchase price?**
A. Just write me a check.
There was the fund-raising issue, and Serena Furman said that Mr. MacDonnell told them to not raise any funds. And that was the first time I had heard that.
**Q. Can you tell me as much as you can recall about what Serena Furman said in that meeting?**
A. That was the thing that brought me to a full stop because I hadn't heard that before.
**Q. And what exactly did she say?**
A. I think it was in Mr. -- in response to Mr. MacDonnell saying that they had problems with

Page 76

fund-raising, and she was sitting diagonally across from me and she said you told us not to raise any money.
**Q. Did she say when he told her not to raise money?**
A. She did not.
**Q. Did Mr. MacDonnell say anything in response?**
A. I doubt it.
**Q. Do you recall Mr. MacDonnell saying anything in response?**
A. No, I do not.
**Q. Who else spoke during this meeting?**
A. Everybody had their own small -- or view of what had transpired over the previous year, and I felt like I had been kept out of the loop. Once the Town and TPL took over the project, nobody really ever contacted me. I, frankly, expected more from the Town because I had lived there for more than 60 years, and they had money set aside. They could have at least showed up at the table in September with their money and at least embarrassed the Trust For Public Land for not being there.
**Q. If they had shown up at the table in**

Page 77

**September of '03 with their money, what would you have done?**
A. I would have been thankful that they had the dignity to do that.
**Q. But you wouldn't have turned over the property to them for that money, would you?**
A. I felt that they should have stood up for their agreement, their partnership with TPL and said, you know, Folks, where are you. We're going to be at the closing. Are you going to be there?
**Q. But you would not have sold the property to them in September of 2003 for $400,000, correct?**
A. No.
MS. FETOUH: Let's take a short lunch break. Let's go off the record.
(Whereupon a luncheon recess was taken at 12:35 p.m.)

Page 78

AFTERNOON SESSION

(Whereupon the deposition was resumed at 1:06 p.m.)

**Q. Ms. Kunelius, did Mr. Hatch say anything at this meeting that you've been describing?**

A. Very little.

**Q. Do you remember anything that he did say?**

A. Mostly Mr. MacDonnell kept saying that he couldn't ask the board of directors for more money and that's all that they would pay. Something like that.

**Q. But did Mr. Hatch say anything?**

A. Nothing of significance.

**Q. When Mr. MacDonnell said that he couldn't ask his board of directors for more money, do you remember anything else that he said about that issue?**

A. No.

**Q. How did the meeting conclude?**

A. Poorly. People just kind of stopped talking. There was no resolution, so we agreed to meet again.

**Q. When was the next meeting?**

A. A week or two later down at the real estate

Page 79

office in Maynard.

**Q. Is that Mr. Boothroyd's office?**

A. Yes.

**Q. And you said that was a week or two later; is that right?**

A. Around that, yes.

**Q. So still in the February/March time frame?**

A. Yes.

**Q. Who was present for that meeting?**

A. Whitney Hatch was not there. The woman from Eye of the Storm, Nina Arbella, Serena Furman, Kathy Farrell, Bob Wilbur -- Bob Wilbur and Nina Arbella were probably at the first meeting. Mr. MacDonnell, Jim Boothroyd, myself, Kachaijan.

**Q. And how long did that meeting take place or last?**

A. About two hours again.

**Q. And how did that meeting begin?**

A. It began with the same kind of, you know, why are we here. Why isn't anything happening. Why are we still stuck.

**Q. And what was the response?**

A. Exactly the same as it was before.

**Q. Did Mr. MacDonnell speak at this meeting?**

Page 80

A. Yes, he did.

**Q. And what did Mr. MacDonnell say in this meeting?**

A. The same thing. He would only go to $800,000; take it or leave it.

**Q. Did he explain how he came to the $800,000 figure?**

A. He might have, but I didn't care.

**Q. Do you remember anything he may have said about that?**

A. It was probably exactly what he said at the previous meeting, which was a lot of nothing.

**Q. To the best of your recollection, can you tell me what he said?**

A. Same old stuff; no fund-raising, zoning, you know, poor times for philanthropy or whatever it was.

**Q. Now, at this point it's several months after the closing was scheduled to have occurred; is that right?**

A. Yes, it is. So from July of '03 until spring of '04, he would not move from $800,000.

Also at the July of '04 telephone conference I'm remembering that he had asked me to

Page 81

release him from the contract, and I said no.

**Q. Specifically what did he say with respect to the contract, releasing him from the contract?**

A. He just wanted me to let him go from it.

**Q. Do you remember his exact words?**

A. When I wouldn't take $800,000, he said, well, then release me from the contract and I said no.

**Q. Did you say anything else?**

A. Not much.

**Q. Is there anything else about the July '04 meeting that you have since remembered, or conversation?**

A. No. It is so maddening that the same thing went on more months.

**Q. Did you understand that when the closing date had come and gone and the purchase price had not been paid that the contract was no longer in effect?**

A. I didn't believe that and my contract is -- I mean my thing on the website for Century 21 says I'm still under contract.

**Q. Does the website currently say that?**

A. Yes, it does. It's like in the archives or

Page 82

whatever. And I'm still on your website, too, and I prefer not to be.

**Q. When you say you are on my website you mean --**

A. On the TPL's website it says the Kunelius farm property. I'd like that taken off.

**Q. Aside from what the website and Century 21 says, do you believe that you are still under contract?**

A. Yes, I do.

**Q. What gives you that belief?**

MR. McLAUGHLIN: Objection.

A. I had a signed purchase and sale agreement for a specified price, a specified date for closing, and it was taken away from me.

**Q. That specified date for closing has past, correct?**

A. Yes, it has.

**Q. And the specified price has not been paid; is that right?**

A. That's true.

**Q. In that second meeting in Mr. Boothroyd's office, did you speak?**

A. I must have.

Page 83

**Q. Do you remember what you said?**

A. That I'd like to get this resolved and I'd like to be paid. That's the most likely thing that I said.

**Q. What else did you say to your recollection?**

A. Again, I was extremely angry, and I don't think I embarrassed myself, but I was insistent on being paid.

**Q. Did you raise your voice in that meeting?**

A. I don't usually raise my voice. Only under duress.

**Q. Do you remember if you raised your voice at that meeting?**

A. My guess is I did not.

**Q. But you don't remember?**

A. No.

**Q. Who else spoke in that meeting?**

A. Mr. Kachaijan kept insisting that we be paid the full amount.

**Q. Did he say anything else?**

A. I don't recall. Something took two hours.

**Q. Who else spoke in the meeting?**

A. Probably Eye of the Storm, that would be Nina Arbella, probably Serena Furman, probably

Page 84

MacDonnell and probably Bob Wilbur and then Kathy Farrell, who is trying to chair the meeting.

**Q. What do you remember Eye of the Storm saying?**

A. It seems to be that they were disappointed because they were hoping that somehow or other they would move onto my farm.

**Q. Did they express that disappointment in this meeting?**

A. Probably. Sure.

**Q. Do you remember anything they said?**

A. Not specifically.

**Q. What did Serena Furman say in this meeting?**

A. I felt that she was legitimately disappointed and that I think they had put a lot of effort into the project, trying to get Eye of the Storm onto the farm.

**Q. Do you remember anything she said at that meeting?**

A. Not specifically.

**Q. What do you remember Bob Wilbur saying at this meeting?**

A. The community preservation funds, the $400,000 was probably still available.

Page 85

**Q. Did he say anything else?**

A. No. Each person kind of spoke to their little, you know, part of the puzzle.

**Q. And did Mr. MacDonnell say anything else other than what you've already testified?**

A. That he wouldn't go above the $800,000.

**Q. Did you entertain the $800,000 offer?**

A. Not for a minute.

**Q. Why not?**

A. I expected to be paid $1,116,900.

**Q. How did that meeting conclude?**

A. Poorly.

**Q. Were any next steps made?**

A. To meet a third time.

**Q. When was that meeting?**

A. In a week or two.

**Q. Where was that meeting?**

A. In the same location.

**Q. Mr. Boothroyd's office?**

A. Yes.

**Q. Who was present at that meeting?**

A. Probably the same. I'm not sure if Nina Arbella from Eye of the Storm was there. It might have been Serena Furman and her husband Peter

Page 90

steamrollered, whatever you want to call it. That everybody else entered an opinion about what was going to happen to me.

**Q. Did you tell anyone other than the newspaper reporter that you planned to go to court if you were not paid?**

A. I thought that pretty well did it. I put my two cents out there.

**Q. Do you remember telling anyone that you hoped TPL would fail so you could sue them for triple damages?**

MR. McLAUGHLIN: Objection.

A. They reassured me that they would not fail; that I would be paid, that they had the money. My girly gut instinct said he sounds like a used car salesman to me.

**Q. So did you tell anyone that you hoped TPL would fail so you could sue for triple damages?**

A. Evidently I did.

**Q. Do you remember telling somebody that?**

A. I had many conversations with many people, and that specific quote I don't recall but I was furious.

**Q. And so it's possible you said that but you**

Page 91

**don't remember?**

A. Sure.

**Q. Okay. In either of the prior two meetings that had taken place, had anyone said anything about going to court?**

A. No.

**Q. What happened after Mr. Kachaijan said something to the effect, We will see you in court?**

A. Mr. MacDonnell had a tantrum. He got very angry. He seemed kind of beside himself that we would dare.

**Q. What did he say after Mr. Kachaijan made this comment?**

A. Well, it would be along the same lines, you know, we're a nationwide, blah blah. We're well respected. We have friends in high places, and he also said we will bury you.

**Q. Do you remember anything else he said?**

A. I think that's plenty.

**Q. And where was Mr. MacDonnell seated at the table with respect to you?**

A. I was here and I think my husband was next, probably Mr. Boothroyd, Kachaijan, Furman, her husband, and Bob Wilbur and Mr. MacDonnell.

Page 92

**Q. Was it a round table?**

A. No. This shape.

**Q. A rectangular shape?**

MR. McLAUGHLIN: Just let the record reflect that she was pointing to various parts of this room to indicate where those people were, because it's not going to show up.

A. If I'm at 12 o'clock, my husband was at one, Boothroyd was at two, Kachaijan was at three, MacDonnell might have been five, Bob Wilbur seven, Serena Furman's husband nine, Serena Furman maybe ten, and somewhere between six and ten was Kathy Farrell.

**Q. So was Mr. MacDonnell on the other side of the table from you?**

A. Yes, he was.

**Q. What happened after Mr. MacDonnell made the comments that you've just described?**

A. The four of us, my husband, Peter and Jim Boothroyd and myself felt that the discussion was over and we kind of stood up to just go home.

**Q. Did you go home?**

A. No, we did not.

**Q. Why not?**

Page 93

A. Because Bob Wilbur intervened and Mr. MacDonnell and he had a kind of a tense exchange about more money, and Mr. MacDonnell was getting angrier and angrier. He seemed incredulous that I would be expecting my full purchase price and he wasn't going to pay it.

**Q. Before you stood up and after Mr. Kachaijan made his comment, how long did it take Mr. MacDonnell to make the comments that you've just described?**

A. A short period of time, a few minutes.

**Q. Was he still at the table while he was making those comments?**

A. By that time, he was standing up and red-faced.

**Q. Was he standing in front of the seat he had been sitting in?**

A. Yes.

**Q. And then you said he and Mr. Wilbur had a tense exchange. What was the tense exchange?**

A. Mr. MacDonnell was very tense and Bob Wilbur tried to, you know, get him to chill out a little bit.

**Q. How did he do that?**

Page 94

A. Kind of man to man, you know, come on. Relax. Didn't seem to work very well.
**Q. Why do you say that?**
A. Mr. MacDonnell was just, he was scowling and red-faced and just very angry.
**Q. Was he still standing near his seat while this exchange with Mr. Wilbur was taking place?**
A. Yes.
**Q. What happened after Mr. Wilbur tried to calm Mr. MacDonnell?**
A. He asked him to come outside so that they could, you know, talk quietly somewhere else. And then the four of us sat down, and I think the others who were sitting at the table just sat there with their mouths open.
**Q. Did Mr. MacDonnell go outside with Mr. Wilbur?**
A. Yes, he did.
**Q. And how long were they outside?**
A. Not very long. Five or ten minutes at the most.
**Q. Those of you who were still in the room, what did you say while he was outside?**
A. It revolved around wow.

Page 95

**Q. Was anything else said?**
A. No, not much. We waited for them to come back in.
**Q. And did they come back in?**
A. Yes, they did.
**Q. What happened when they came back in?**
A. I don't remember if it was Mr. MacDonnell or Bob Wilbur who said the $900,000 figure, but they were speaking, I believe, without authorization from the Stow Conservation Trust, and that's whose money they were volunteering.
**Q. Is Mr. Wilbur a member of the Stow Conservation Trust?**
A. He's a member of the Community Preservation Committee. I don't know if he's Stow Conservation Trust or not. So it struck me that they were playing with other people's money.
**Q. Would it surprise you to learn that he would be a member of the Stow Conservation Trust?**
A. No. Many people in the town wear many hats.
**Q. When they came back inside, did they sit down?**
A. We all sat down.

Page 96

**Q. And how long did the conversation continue after they came back inside?**
A. Not very long.
**Q. And what did you discuss when they came back inside?**
A. They still weren't coming up to the full dollar figure.
**Q. But now they were talking about a $900 figure; is that right?**
A. Yes. But it was somebody else's money and they weren't represented at the table.
**Q. Did Mr. MacDonnell participate in the discussion after he came back inside?**
A. Maybe a little.
**Q. How would you describe his demeanor when he came back inside?**
A. Beside himself.
**Q. What do you mean by that?**
A. He was upset and angry.
**Q. Was he raising his voice when he came back inside?**
A. I think he was talking between his teeth.
**Q. So he wasn't raising his voice?**
A. No.

Page 97

**Q. And how did this meeting conclude?**
A. Again, poorly. We all left without a resolution.
**Q. Were any next steps discussed?**
A. No. We seemed to be at an impasse, but a few weeks later Serena Furman and her husband asked for a fourth meeting. And they had some other grand scheme that I would be able to sell my front house, 142, for $300,000 and I could do that myself, and that they would contribute money and that they would try to pull the farm project back together.
**Q. Was this an actual meeting with Serena Furman?**
A. It was. It was in Jim Boothroyd's conference room.
**Q. Who was present for that meeting?**
A. A smaller number of people. I was here -- Serena Furman and perhaps her husband and Jim Boothroyd. I'm not sure if Peter Kachaijan was there or not.
**Q. Was anyone from TPL present at that meeting?**
A. No.
**Q. What was discussed at that meeting?**

A. Some way of trying to make something work.
**Q. You said this was a few weeks after the last meeting?**
A. Yes. It might have been into March or April. It was still spring of '04.
**Q. How long did this meeting last?**
A. It was shorter than the others.
**Q. Approximately.**
A. An hour.
**Q. An hour?**
A. Yes.
MS. FETOUH: Can you mark this as the next exhibit.
(Document marked for identification as Kunelius Exhibit 8.)
**Q. You said that they presented a plan that involved the sale of your house and raising some funds; is that right?**
MR. McLAUGHLIN: Objection.
A. They presented a plan of their own conceiving, I guess, which did nothing. It was just another, you know, waste of an evening. I appreciated the effort, but it was right up there with all the others. It just didn't go anywhere.

**Q. Why do you say it did nothing?**
A. It had now been six to nine months after my anticipated closing at the full purchase price, and I was getting further and further away from any kind of realization of that money.
**Q. Did you understand at this point that you were free to sell your property to anyone other than TPL if you wanted to?**
MR. McLAUGHLIN: Objection.
A. I hadn't released them from the contract.
**Q. I understand. But did you believe that you could still sell the property to someone other than TPL?**
A. I was still listed on the MLS website under contract.
**Q. But did you believe that --**
A. No, I did not.
**Q. And what was the basis for your belief that you could not sell the property to anyone else?**
A. Because Mr. Paul Boothroyd of Century 21 claimed that I still had a valid contract, and I'm sure he was expecting his commission.
**Q. Was it just Mr. Boothroyd's claim that formed the basis of your belief that you could not**

**sell the property?**
A. According to his interpretation, I could not list it with anybody else because it was on his website as under contract and it remained there until this day.
**Q. Have you discussed his claim with anyone?**
A. That's a matter for another time.
**Q. Have you discussed his claim with anyone?**
MR. McLAUGHLIN: That's a yes or no answer.
A. Yes.
**Q. With whom have you discussed his claim?**
A. Jim Boothroyd.
**Q. And what was the content of your discussion with Mr. Boothroyd -- Mr. James Boothroyd about Mr. Paul Boothroyd's claim?**
A. He related that, again, this is hearsay, that Paul Boothroyd had contacted the real estate board and that was their opinion.
**Q. That was whose opinion?**
A. The Massachusetts Real Estate Board, I guess.
**Q. And what was the Massachusetts Real Estate Board's opinion?**
MR. McLAUGHLIN: Objection.

A. That there was still a valid contract.
**Q. Ms. Kunelius, I'm going to show you what's been marked as Exhibit 8. Have you seen that document before?**
A. Well, this may have been presented to me at the meeting. I notice it's signed Peter Christiansen -- I'm sorry -- it's by Peter Christiansen.
**Q. In the first sentence of the letter it references -- it says, "It was very nice to finally have a real conversation with you after all these years." Do you know what conversation he's referring to?**
A. The meeting probably that we had in Maynard where he and his wife were present. And it just brings up the memory that no one ever spoke to me.
**Q. The what --**
A. The Friends of Red-Acre, TPL, the Town of Stow, and it's actually a nice surprise that they did.
**Q. Does this letter summarize the plan that Peter Christiansen and Serena Furman had presented to you in that meeting in Mr. Boothroyd's office?**
A. Yes.

Page 102

**Q. After they presented you with this plan, did you get back to them?**

A. I believe that I did or Jim Boothroyd did, and I was kind of thankful that they had taken the time to try and pull something together. It was kind of the same old story.

**Q. Did you consider accepting the offer?**

A. No, I did not.

**Q. Why not?**

A. A couple of other times they had also wanted to buy the land from me that looks kind of out from their deck. You know, so they were interested in doing anything they could about their view, about their -- it wasn't their backyard. It was my backyard, but they wanted to, you know, lock it in or preserve it or something.

**Q. So why didn't you consider their offer to purchase your land? This offer in May of 2004.**

A. I had rejected the $900,000 from TPL, and this was the same dollar amount.

**Q. * Did you tell Mr. Christiansen or Ms. Furman that you were rejecting their $900,000 offer?**

MR. McLAUGHLIN: Objection.

Just for the record, I have to go on record

Page 103

and say this is not a $900,000 offer. The document says --

MS. FETOUH: I think you've made your objection. I don't need you to coach the witness through your answer.

MR. McLAUGHLIN: I'm not. But I don't want your questions to imply there is a $900,000 offer. This is not a $900,000 offer.

MS. FETOUH: You've made your objection. If you think that I'm mischaracterizing the document --

MR. McLAUGHLIN: You are.

MS. FETOUH: -- then your objection has been noted for the record and will be reserved for the future. I'm asking Ms. Kunelius to answer the question, however.

Read the question.

*(Question read.)

MR. McLAUGHLIN: Oxygen.

A. Before you showed me this document, I believe I told you that they were trying to make me responsible for selling my own property, not to them, for $300,000. But just, you know, put it on the open market.

Page 104

**Q. And that's for the house?**

A. Yes, number 142. And that kind of sounded like when TPL said if you lower the price $400,000, we'll put your name on the woodland, and I specifically said I can't eat that. And another point TPL said they couldn't understand why I wasn't ponying up $125,000 that the Stow Conservation Trust would pony up $125,000 and Friends of Red-Acre and make the deal work. They called me a project partner. I almost laughed myself silly.

So it was beginning to be repetitive.

**Q. Although these conversations with Mr. Christiansen and Miss Furman did not involve TPL?**

A. At this point, no. And I didn't think they had any authority to tell me what to do.

**Q. In the middle of this letter it says, "Moving forward with us would not preclude you from pursuing a legal action against TPL."**

**Did you discuss any legal action against TPL with Mr. Christiansen or Ms. Furman?**

A. They were at the meeting where Peter Kachaijan said we'll see you in court.

**Q. In the subsequent meeting with just Mr. Christiansen, Ms. Furman, Mr. Kachaijan and Mr.**

Page 105

**Boothroyd, did you discuss pursuing a legal action against TPL?**

A. Could you repeat the question?

**Q. In the final meeting, the meeting you referenced at which TPL was not present --**

A. Just the Furmans and their offer?

**Q. Yes, at that meeting. Was there any reference in that meeting about pursuing a legal action against TPL?**

A. Not with them, no. They just made their proposal to me.

**Q. After that meeting with Serena Furman and Peter Christiansen, did you have any other communications with TPL?**

A. By that time I was in Maine most of the time and my father had died, so I wasn't there.

**Q. So you had no further communications with TPL; is that right?**

A. No.

MS. FETOUH: Can you mark this as the next exhibit.

(Document marked for identification as Kunelius Exhibit 9.)

**Q. Did Mr. Boothroyd have any communications**

**Q. The question was this letter states that TPL's board of directors would not have approved any borrowing; is that right?**
MR. McLAUGHLIN: Objection. You're asking her if the letter says that?
MS. FETOUH: Yes. This letter that she saw in September of 2003.
A. "TPL's board of directors will not approve any borrowing to bridge a fund-raising gap because the prospects of raising the funds necessary to repay the loan required are not encouraging." That's what it says.
**Q. On the second page of this letter, the second paragraph, it states, "In view of these circumstances, it's not feasible for TPL to go forward under the existing contract." Do you see that?**
A. Yes.
**Q. Is that the first time you understood that TPL did not think it was feasible to go forward under the existing contract?**
A. Before the whole thing started in January or February of '03 they had changed the contract anyway. They wanted a different plan. They wanted

a different configuration on the lot. They weren't going to allow me to donate the water.
**Q. Was this the first time you heard from TPL that it believed it was not feasible to go forward under the existing contract?**
A. In July of '03 they had basically drawn a line in the sand and they said if I didn't take $800,000, they wouldn't pay me anything.
**Q. And if they didn't pay you the purchase price, did you understand that they were defaulting under the contract?**
A. My personal understanding of them would have been something else.
**Q. What was the something else?**
A. That they had lied to me.
**Q. But did you understand whether or not they had defaulted under the contract that you had?**
MR. McLAUGHLIN: Objection.
A. This really meant nothing to me.
**Q. Okay. In the paragraph numbered 1 in this document they ask you to accept $125,000 less than the contract price; is that right?**
A. That's the $125,000 I told you about a few minutes ago.

**Q. So it's correct that they are through this letter asking you to accept $125,000 less than the purchase price; is that right?**
A. Yes. And they're asking two other groups for and Stow Conservation Trust to take, you know, I don't know if that would be to contribute. Believe me I was not going to pay them to buy my property.
**Q. They weren't asking you -- they were asking you for a reduction in price of $125,000, correct?**
MR. McLAUGHLIN: Objection.
A. They had already asked me of a reduction in price of $400,000.
**Q. In this letter they're asking you for a reduction of $125,000; is that right?**
A. I was not responsible for their so-called fund-raising gap.
**Q. I'm not asking you that question. I'm asking you the question that this letter is asking you to accept $125,000 less than the contract price?**
A. Look at all the other contingencies in here.
**Q. That's not my question. If you could just answer my question.**
MR. McLAUGHLIN: No, you can answer that

question. She said look at the other contingency --
MS. FETOUH: Are you objecting?
MR. McLAUGHLIN: Yes, I am. You can let her finish that answer because you're mischaracterizing this document. There are contingencies, and she just said look at the other contingencies that are tied to the 125. So let her answer. I think it's only fair.
A. "Town agreeing to a revised project structure, not affordability restrictions." This --
**Q. Go ahead. If these contingencies were met, the only difference to you would have been a price that was $125,000 less than the contract price, correct?**
A. I doubt it. It was starting to be smoke and mirrors about this time.
**Q. Did you discuss this proposal with anyone?**
A. It wasn't worth discussing.
**Q. Is the answer then, no, you did not discuss it with anyone?**
A. I probably discussed it with everybody. I did have a few sympathizers in town, people who felt badly that this had gone so foul.
**Q. Did you discuss whether you would be**

Page 114

**willing to accept that reduction in the price if those contingencies were met?**
A. I was adamant that I would not.
MS. FETOUH: Mark this, please.
(Document marked for identification as Kunelius Exhibit 10.)
**Q. Mrs. Kunelius, I'm going to show you what's been marked as Exhibit 10. Have you seen this document before?**
A. Yes.
**Q. When did you first see it?**
A. Somewhere in July of '04.
**Q. And this is a letter from Craig McDonnell of TPL to Mr. Kachaijan; is that right?**
A. Yes.
**Q. The first sentence of this letter references two months having passed since our last meeting in Maynard. Is the meeting referenced there the meeting you described where Mr. MacDonnell stepped out of the room with Mr. Wilbur?**
A. Yes, the meeting where he had a tantrum.
**Q. Mr. MacDonnell then describes in this letter a proposal for the purchase of your property, does it not?**

Page 115

A. It does.
**Q. Did you discuss this proposal with anyone?**
A. I didn't need to.
**Q. Why not?**
A. Same old shit. Different day.
**Q. In the first paragraph Mr. MacDonnell says they asked for a response at the last meeting but had heard nothing from Mr. Kachaijan since then. Do you know if Mr. Kachaijan tried to get back to Mr. MacDonnell between that last meeting in Maynard and this July 6, 2004 letter?**
A. I don't believe he did.
**Q. Why don't you think Mr. Kachaijan got back to Mr. MacDonnell?**
A. There seemed to be nothing to discuss.
**Q. In the third paragraph on that page the sentence begins, "You will remember that our discussion began with the recognition that the original contract assigned by the Town of Stow to TPL was no longer operative." Do you see that?**
A. That was only his opinion, yes.
**Q. Was that discussed at that last meeting?**
A. No. Oh, I'm sorry. At the meeting in Maynard?

Page 116

**Q. Yes.**
A. We felt that the contract was still in effect.
**Q. Did Mr. MacDonnell say anything at that meeting about the original contract no longer being operative?**
A. I don't remember.
**Q. It refers in the next paragraph to -- or the next sentence, I'm sorry, to deposits retained by you. Did you in fact retain the monthly deposits that were paid to you?**
A. The earnest money?
**Q. Yes.**
A. Yes.
**Q. And have you in fact kept or spent that money?**
MR. McLAUGHLIN: Objection.
A. Yes.
**Q. The second page of the letter references the tax savings of a bargain sale. Do you remember talking about the tax savings of a bargain sale under TPL's proposal?**
A. I believe Bob Wilbur -- I think Bob Wilbur works for Mass. Audubon doing fund-raising or

Page 117

something, so it was bargain sale or fire sale. Something like that.
**Q. And what was your understanding of what that meant, bargain sale?**
A. That they were undercutting my price.
**Q. And what did you understand that would mean with respect to your tax savings?**
A. How would they know what my tax savings would be?
**Q. Did you discuss your tax savings with Mr. Wilbur or Mr. MacDonnell?**
A. I had no reason to.
**Q. Was the topic of your tax savings raised at that meeting in Maynard in the spring of 2004?**
A. It was bargain sale, and I thought it was presumptuous of them to give me tax advice.
**Q. Did you consider the potential tax savings of a bargain sale?**
A. Absolutely not.
**Q. Why not?**
A. Because I was donating the water to the Town which had a far greater value.
**Q. Did you review the attachments to this letter?**

e4c6f340-c241-4635-bf49-0020c0aeb126

Page 118

A. I did. And I made note of Paragraph 8 on Page 84 which says, "These calculations are provided for illustrative purposes only and the Trust For Public Land cannot warrant the actions" -- "the actual results will be the same. Review by independent professional tax and/or legal counsel is therefore recommended."

**Q. Did you review these exhibits with independent tax or legal counsel?**

A. I read Paragraph 8 which says independent counsel, and I did not have the value of the water established at that point.

**Q. Did you review Exhibits A or B to this letter with anyone?**

A. I glanced at them briefly.

**Q. Did you discuss the merits of Exhibits A or B?**

A. They had no merits.

**Q. And why do you think they had no merit?**

A. As it says in Paragraph 8, I should rely on a tax expert and TPL claims to be a conservation organization. I don't believe that they're tax experts.

**Q. So did you consult a tax expert?**

Page 119

A. No, I did not.

**Q. Do you remember TPL discussing the fact that the proposals made in this letter could result in a net after-tax result to you that would be as good as or better than the purchase price?**

A. They had no business trying to give me tax advice in order to obtain a lower price.

**Q. Did you recognize that they were trying to present you with an alternative that might be as advantageous to you as the full purchase price?**

MR. McLAUGHLIN: Objection.

A. The full purchase price plus the interest from the Mozaic Commons mortgage plus the value of the donation of the water supply far outstripped any proposal that was here.

**Q. Did you discuss the content of this letter with Mr. Boothroyd?**

A. Probably.

**Q. What did you and Mr. Boothroyd discuss about this letter?**

A. Not much.

**Q. Did he advise you on whether or not you should accept this proposal?**

A. I made up my own mind. I did not want to

Page 120

accept that proposal.

**Q. Did he give you any advice on whether you should accept that proposal?**

A. If he did, I didn't listen.

**Q. Other than the proposal put together by Mr. Christiansen and Miss Furman, have you received any other offers on your -- have you received any other offers on your property since July of 2004?**

A. No offers in writing.

**Q. Have you received any oral offers?**

A. No. I've received inquiries.

**Q. From whom have you received inquiries?**

A. Frank Patterson from Patterson Auto Body on Great Road in Stow called and asked about the property because he hunts there, and Greg Jones had asked about the property but there were no dollar figures mentioned.

**Q. When did Mr. Patterson contact you?**

A. Perhaps a year ago or so.

**Q. And what did he say?**

A. He would be interested at some point, but we were already in litigation. He didn't know that.

**Q. Did you ask him to propose a price?**

A. I did not.

Page 121

**Q. Why not?**

MR. McLAUGHLIN: Objection.

A. I didn't feel it was appropriate.

**Q. Because --**

A. And I don't think he had a dollar figure in mind. He was looking to the future.

**Q. Why was it not appropriate?**

A. I had a signed contract and that's why I didn't get into any serious discussions with him. I'm also fighting for everybody else who has any land in Chapter 61.

**Q. What do you know about Mr. Jones's interest in your property?**

A. I didn't talk to him directly. He had called Mr. Boothroyd.

**Q. Do you know what he said to Mr. Boothroyd?**

A. No, I do not. Not specifically.

**Q. Did Mr. Boothroyd contact you after Mr. Jones expressed an inquiry into your property?**

A. Yes. And I referred the call to Mr. McLaughlin.

**Q. Have you had any contact with Mr. Jones since that time?**

A. I have not -- I was sitting at the table

Page 122

when he had his deposition.
**Q. Has Mr. Boothroyd been in contact at all with Mr. Jones since that time?**
A. Only to say that it wouldn't go anywhere at this point and there was no dollar amount, there was no offer on it anyway.
MS. FETOUH: Can you mark this for me, please.
(Document marked for identification as Kunelius Exhibit 11.)
**Q. Mrs. Kunelius, I'm going to show you what's been marked as Exhibit 11 to your deposition. Do you recognize that document?**
A. Yes.
**Q. Have you seen it before?**
A. Yes.
**Q. When did you see it?**
A. Probably about at the same time that Paul Boothroyd kept listing me as under contract February of '04.
**Q. And this is a letter from Mr. Kachaijan to Mr. Boothroyd, Mr. Paul Boothroyd; is that right?**
A. Yes.
**Q. The first paragraph references a letter of**

Page 123

**January 27, 2004 with Marilyn. Do you see that reference in the first sentence?**
A. Yes.
**Q. What did that letter refer to?**
A. I don't have the letter in front of me. Evidently, Paul Boothroyd was saying that he had an enforceable contract.
**Q. Do you still have a copy of the letter dated January 27, 2004?**
A. Specifically I don't remember.
**Q. If you turn to the top of the second page of this letter it says, "There is no listing agreement with any real estate broker." Do you see that?**
A. Yes.
**Q. Is that still the case?**
A. Yes, it is.
**Q. It also says, "Nor would I counsel Marilyn to sign an agreement with any broker until we determine what the course of action is vis a vis the Town of Stow and company." Do you see that language?**
A. Yes.
**Q. Did Mr. Kachaijan counsel you not to sign**

Page 124

**an agreement with any broker?**
MR. McLAUGHLIN: Objection. Don't answer the question.
MS. FETOUH: It's right in here in a letter to a third party. What exactly is the basis for your instruction not to answer?
MR. McLAUGHLIN: This one says, I think it says, "Nor would I counsel her to sign an agreement." It doesn't say I did or didn't. It says I wouldn't counsel her to. You're asking her now what he specifically counseled her to do or not to do, and so the answer is it's covered by attorney-client privilege.
MS. FETOUH: Well, I would argue, and I'll just state for the record, that I believe the privilege has been waived with respect to that advice, but I understand --
MR. McLAUGHLIN: You know, you just sent the document to me yesterday.
MS. FETOUH: This is from Miss Kunelius's production. That's the basis for my note --
MR. McLAUGHLIN: It doesn't say what his advice is.
MR. MONTGOMERY: Let's move on, please.

Page 125

You guys are not going to agree, so move on.
MR. McLAUGHLIN: I'm not taking instruction from you, sir. So don't tell me what to do and I will not tell you what to do.
MR. MONTGOMERY: I doubt that.
MR. McLAUGHLIN: So the answer is she's not going to answer the question.
MS. FETOUH: That's fine.
MR. McLAUGHLIN: Don't instruct me what to do. I haven't instructed you.
MR. MONTGOMERY: There is irony in your statement.
**Q. Does Mr. Boothroyd still represent you as a broker in connection with the sale of your property, Mr. Jim Boothroyd?**
A. He found Cohousing as a buyer and that's what we're still working from.
**Q. Is Jim Boothroyd currently doing anything to market your property?**
A. My property has gotten so much press, it's been called a poisonous property.
**Q. Is Mr. Jim Boothroyd doing anything currently to market your property?**
A. No.

Page 126

**Q. Have you given him any instructions on whether or not he should try and do anything to market your property?**
A. No.
**Q. Are you currently trying to sell your property?**
A. No. If somebody came along and said I'll give you $5 million dollars, it's gone.
**Q. You would sell it?**
A. For a price.
**Q. Is anyone currently using your property?**
A. There are two students in the caretaker's cottage.
**Q. Are these tenants?**
A. They're friends. I know the family.
**Q. Are they paying rent?**
A. $500 a month.
**Q. Is that total or per person?**
A. That's total for the two of them.
**Q. How long have they been living in the caretaker's cottage?**
A. The older brother came in about 2001, and then the younger brother came about a year later.
**Q. And I think you testified last week that**

Page 127

**you are still keeping your horses on the property; is that right?**
A. Yes. We have three.
**Q. Is anyone else using the barn part of your property?**
A. You mean as far as boarders?
**Q. Yes. That's what I mean.**
A. No, Mr. Boothroyd's horse is there until he finds a home for it.
**Q. What's your current address?**
A. 635 Stow Road, Stow, Maine.
**Q. Where did you attend high school?**
A. Stow, Massachusetts, Hale High School.
**Q. Did you go to any college after high school?**
A. I went to Massachusetts College of Art for three years.
**Q. And did you get any degree from the Massachusetts college of arts?**
A. I did not.
**Q. Have you had any other college education, college or beyond college education?**
A. No.
**Q. Are you currently employed?**

Page 128

A. I'm a homemaker and grandmother.
**Q. When was the last time, if ever, that you were employed outside of the home?**
A. About 1977 to '83.
**Q. And what was your position then?**
A. I worked for a small company that developed equipment for hearing.
**Q. What was the name of the company?**
A. American Electromedics.
**Q. And what was your position with that company?**
A. I did human engineering, and that means, for example, chairs are 18 inches tall because people bend at the knees at that height. So I did conceptual work and some advertising.
**Q. Did you have any training in this area before taking this job?**
A. At Mass. College of Art.
**Q. What did you study at Mass. College of Art?**
A. The first two years were a little bit of everything; drawing, painting, sculpture, art history, and then the third year was more of a specialty of design.
**Q. What was the last year that you attended**

Page 129

**Mass. College of Art?**
A. 1964.
**Q. Can you walk me through your employment between 1964 when you attended college and 1977 when you accepted the job at American Electromedics?**
A. I stayed at home with my children, and I did some displays for Drumlin Farm, Mass. Audubon in Lincoln.
**Q. What years did you do those displays?**
A. It was around 1964 to -- it was only about six months or so.
**Q. You also testified I think last week that you ran a horse farm for some period of time; is that right?**
A. Yes, and I took care of my parents. I'm an only child.
**Q. What years did you run the horse farm?**
A. About '83 to the early '90s.
**Q. What were your responsibilities with respect to the horse farm?**
A. Shoveling, feeding.
**Q. Was there anything else?**
A. I taught people to ride bare back. Not much a demand for that.

Page 130

**Q. Was there anything else besides what you've described so far?**
A. In the barn?
**Q. Yes, in your role in running this horse farm.**
A. It was twenty-four/seven. And as my parents got more feeble, my mother had myasthenia gravis and my father had a stroke and then she died in '97 or so.
My father moved in with me, and he had a large laundry list of problems, congestive heart failure, bowel resection, and he was often suicidal.
**Q. Ms. Kunelius, I'd want to move back to the time period of February 2003. You mentioned earlier that the Town -- or we had discussed earlier the CPC funds, the funds from the Community Preservation Committee.**
A. Right.
**Q. Do you know what needed to happen in order for those funds to be allocated to this project?**
A. Taxpayers had to vote to allocate the funds.
**Q. Did you advocate against the taxpayers voting to assign those funds?**

Page 131

A. I had very strong opinions.
**Q. Did you in fact try and discourage people from voting in favor of the allocation of those funds?**
A. Yes.
**Q. And how did you do so?**
A. Again, I felt that my gift of 83 percent of my land was totally disregarded. It was changed around. There was a lot of misconception in the town. TPL put out its own publicity about how everything was going to be wonderful, and I voiced my opinion.
**Q. At this point the right of first refusal had already been assigned to TPL; is that right?**
A. It had been assigned and without any funding in place.
**Q. Did you understand that CPC funds would be going toward the purchase price of your agreement?**
A. Only if the Town voted for it.
**Q. So why advocate against the Town voting for the allocation of funds that would go towards your purchase price?**
MR. McLAUGHLIN: Objection.
A. The project as presented by the Trust For

Page 132

Public Land absolutely did not take my contract into consideration. The thing that infuriated me the most was that they were going to take public funds, they were going to supposedly put two affordable housing units in there. And then rumor had it around town that they were going to be quietly given to two people from town, and my understanding was that when you use public funds it's by lottery.
So I had a lot of opinions about the way the project was being presented. I didn't feel that TPL was being straightforward with the voters.
MS. FETOUH: Can you mark this as an exhibit.
(Document marked for identification as Kunelius Exhibit 12.)
MR. McLAUGHLIN: Can we take a break? I have now it's 2:30.
MS. FETOUH: Sure. I won't be too much longer, even though I know counsel for the other defendants has questions.
MR. McLAUGHLIN: That's why I want to take a break. This is a long day for her.
MS. FETOUH: Sure. We can take a short break. If we can try and just keep it to less than

Page 133

five minutes, that would be great.
MR. McLAUGHLIN: I'll use the Conroy standard.
MR. CONROY: I can't argue with that.
(Brief recess.)
**Q. Ms. Kunelius, I'm showing you what's been marked as Exhibit 12 to your deposition. Do you recognize that document?**
A. My literary masterpiece, yes, I do.
**Q. Did you in fact write this letter?**
A. I was the author.
**Q. Did it appear in the newspaper the way that you submitted it?**
A. Yes, I did.
**Q. As far as you can tell, did they edit it at all or make any changes to it?**
A. That's I would guess pretty close.
**Q. And this was submitted prior to the vote regarding the CPC funds; is that right?**
A. It would have been probably four months prior to. This was right after the assignment.
**Q. And this was describing what you had just described to me about your views on the CPC funds; is that right?**

e4c6f340-c241-4635-bf49-0020c0aeb126

Page 138

A. Yes.
**Q. It's about seven minutes to three by my watch. I think we can have you out of here by 4:30, if we move this along.**
**I have a few questions. First you mentioned that your children checked out TPL's website for you?**
A. Yes.
**Q. Can you give me some -- well, can you tell me how old they are?**
A. My daughter is 42.
**Q. Okay.**
A. And my son will be 40.
**Q. All right. And how much education do they have?**
A. My daughter and son both have about one year after high school.
**Q. And have they advised you at all in connection with the matter concerning your land?**
A. No.
**Q. Have you kept in touch with them with respect to it at all?**
A. I always keep in touch with my children.
**Q. Okay. And have they supported you in the process?**

Page 139

MR. McLAUGHLIN: Objection.
A. Yes. Supported me as their mother?
**Q. Yes. As a child would a mother.**
A. Yes.
**Q. Did you -- I frankly don't know the technical term, but at some point in time did you reapply for status as a Chapter 61 beneficiary? Do you know what I mean?**
A. Yes. I had finished the 20 years that comes in ten-year cycles. So I'm in my third decade.
**Q. Okay. And when did you last renew that status?**
A. I believe it would be the summer of '03.
**Q. All right. And --**
A. Or, actually, it might have been '02. I had to make a guess it's '04 -- I'm sorry -- '03.
**Q. But you're guessing?**
A. I'm trying to, you know, tie in other events in my life to put a time frame on it.
**Q. Okay. Let me help you because I've just been handed something I didn't know would be here.**
MR. CONROY: Let's mark this as the next exhibit, number 14, please.

Page 140

(Document marked for identification as Kunelius Exhibit 14.)
**Q. Take a look, please, at Exhibit Number 14 and then tell me if you know what that is.**
A. That's the Chapter 61 -- what do you call it?
**Q. Renewal?**
A. Renewal, yes.
**Q. And I don't know if that's a technical term, but that's what you understood it to be, correct?**
A. Yes.
**Q. And do you see there it says June of '04?**
A. Yes.
**Q. Okay. And that was after the closing failed to take place in this matter in September of '03, correct?**
A. Yes.
**Q. Okay. Why did you choose to renew your Chapter 61 status at that point in time?**
A. I talked to John Clement, and I believe he might be the state forester, and there was the issue of the rollback tax that I would have to pay. If the land had closed, and I had donated the forest land to the Town, the assessors said that there would be no rollback tax, because they were receiving the forest land as a gift.

Page 141

**Q. Okay.**
A. And when this didn't happen, I went for another ten years.
**Q. Okay. Have you ever bought or sold any land other than the property we're speaking about in this lawsuit?**
A. No.
**Q. Have you had any dealings with lawyers apart from this matter? I should put it a little differently. Have you ever engaged a lawyer other than this one?**
A. No. I was asked 40 years ago to be a witness in a child custody case, the little boy that I was baby-sitting for, his parents were both claiming custody.
**Q. Okay.**
A. But I wasn't deposed.
**Q. Other than that?**
A. No.
**Q. And this is the first time you've been**

Page 142

**deposed?**
A. Yes.
**Q. Have you ever testified as a witness at a trial?**
A. The child custody.
**Q. Any other matter?**
A. No.
**Q. Have you ever served on a jury?**
A. No. I've come in a couple of times to, you know, but they didn't pick me.
**Q. Okay. Have you told us, Ma'am, about every conversation that you've had with Craig MacDonnell that you recall?**
A. The first conversation when I called TPL I didn't know even his name and I asked who would be working on the project out in Stow, and that's how I got his name. I can't say that we had conversations. You know, there might be like at the meeting, for instance, those meetings in Stow and Maynard, we were not having a conversation.
**Q. Okay. Let me put it a little differently. You've described earlier a couple of phone conversations that you had with Craig MacDonnell?**
A. Right.

Page 143

**Q. And you've described some meetings that you attended that Mr. MacDonnell also attended?**
A. Yes.
**Q. I'm asking you have there been any other encounters, if you will, between you and Mr. MacDonnell other than what you've already told us about?**
A. They weren't memorable, if there were.
**Q. Okay. Are you familiar with any other activities that Mr. MacDonnell has been involved in that have nothing to do with your case?**
A. I believe that he was involved in other land deals, and I'm not sure if one was in sterling, but that might be recent. I don't know.
**Q. Okay.**
A. I haven't linked his name specifically with specific projects.
**Q. All right. Are you aware of any conduct at all on the part of Mr. MacDonnell that is in any way blameworthy or improper independent of your case?**
MR. McLAUGHLIN: Objection.
A. I can only speak to what he -- at what happened between him and I.
**Q. Okay. Apart from your matter now, just to**

Page 144

**make myself clear or anything having to do with your matter, you don't have any other knowledge on the behavior on the part of Mr. MacDonnell?**
A. No.
**Q. Did Mr. MacDonnell ever say anything to you that caused you to do something that you otherwise would not have done?**
A. I'm not sure I understand the question.
**Q. Well, you've said that you were angry at some of the things Mr. MacDonnell said and did, correct?**
A. Yes.
**Q. And you've said that you don't believe that he was straightforward with you, correct?**
A. I hope to God he was.
**Q. How so?**
A. Well, when he told me he had the money, I was hoping that it was true.
**Q. You mean you hoped in the past tense that he was? I thought you said you hope.**
A. I'm sorry?
**Q. I just didn't understand what you said. Did you say you hoped in the past tense that he was being straight with you?**

Page 145

A. I expected that he would be. I mean he was, you know, representing a nationwide nonprofit organization.
**Q. Right. My point is that I understand what you've said about those things. What I'm asking you is did you change your position in any way, did you do anything or not do anything based on what Mr. MacDonnell said to you?**
A. By the time he was involved in the project at my farm, I felt that it was out of my hands.
**Q. Okay. So the answer, then, is that you did not do anything or fail to do anything as a result of anything Mr. MacDonnell said to you?**
MR. McLAUGHLIN: Objection.
A. I signed the application for the zoning change.
**Q. When did you --**
A. I --
**Q. Sorry?**
A. When?
**Q. When did you do that?**
A. I don't know.
**Q. And what was it that Mr. MacDonnell said or did that had anything to do with that?**

A. It was either the selectmen or the Zoning Board that brought it to everyone's attention that I had to sign as the current landowner.
**Q. And when was that?**
A. It would have been after the assignment.
**Q. Okay. And did you do that?**
A. Yes.
**Q. Okay. Did you do anything else as a result of anything Mr. MacDonnell said to you?**
A. I did not do anything that I'm aware of to, you know, change my own opinion of the thing.
**Q. Or to take any action?**
MR. McLAUGHLIN: Objection.
A. Like I say, the steamroller was pushing forward and my opinions really didn't matter a whole lot.
**Q. Is there anything that you would have done differently, Ma'am, but for something that Craig MacDonnell said to you?**
A. In signing the original purchase and sale, I would have divided off the 42.1 acres from the 8.57, so that it would have been a separate parcel. And then there wouldn't be this contention about the whole thing.

**Q. Okay, but that's not -- you didn't take any action with regard to the original purchase and sale agreement because of anything Craig MacDonnell said to you at that time, correct?**
A. I believed it stood on its own. It had been signed and it was what I considered a legal contract.
**Q. Right. I just wanted to --**
A. I didn't change it at that point.
**Q. No, I just want to make it clear that when you signed the purchase and sale agreement, you had not talked to Craig McDonnell about doing that?**
A. He didn't appear on the Stow horizon until December, and I had signed the P and S in October.
**Q. Okay. Of '02?**
A. '02.
**Q. You mentioned something about a transaction in Sterling I think you said; is that correct?**
A. I'm not sure where it is, and I don't remember if I have that, correct.
**Q. Okay. What was it that you're referring to, whether it's in Sterling or someplace else?**
A. That it was some other land deal.
**Q. That Mr. MacDonnell was involved in?**

A. Yes.
**Q. And what do you know about that?**
A. Not much.
**Q. Well, what have you heard about that?**
A. I don't know if it was the Chapter 61, and I think it was an airport that was going to be developed.
**Q. All right. What do you know about it, just quickly?**
A. I think that the Town did not go through with it or didn't assign it, or it just never went anywhere.
**Q. All right. Did Mr. MacDonnell ever tell you that there would be any intervention if you tried to sell this land again?**
MR. McLAUGHLIN: Any intervention?
MS. CONROY: On the part of anybody, on TPL or anybody.
A. The Town told me that they would exercise 61 again.
**Q. I'm talking about Mr. MacDonnell, did he ever say anything like that to you?**
A. I don't think so.
**Q. Did he ever say anything to discourage you**

**from trying to sell this property to anybody else?**
A. Well, by his actions. It was just all over the paper all the time, and someone had referred to it as a poisonous property.
**Q. Okay. And I'll get to that.**
A. I'm sorry.
**Q. Go ahead.**
MR. McLAUGHLIN: You can finish. Go ahead. Are you finished?
A. I guess.
**Q. Okay, I understand that, and I'll ask you about that in a moment. But I'm asking you did Craig MacDonnell ever say anything to you or at a meeting that you were ever present at that indicated that this some way you should not sell this property?**
MR. McLAUGHLIN: After the fact we're talking about?
MS. FETOUH: At any time.
MR. McLAUGHLIN: Like to Cohousing before they exercised the right of first refusal? I just want to contextualize it.
**Q. Let me just ask it this way, Ma'am.**
**Did Craig, leave aside everybody else, did**

e4c6f340-c241-4635-bf49-0020c0aeb126

Page 150

**Craig MacDonnell ever say anything to you that indicated that he didn't want you to sell this property to somebody else?**
A. They seemed to have their finger in the pie until '04, you know, those meetings and they were still, you know, making these offers and, you know, tax fire sales or bargain sales and all of that.
**Q. Right. Trying to make proposals to you to buy the land, correct? Even though you weren't interested, they were trying to do that, correct?**
A. I was interested in the $1.1 million dollars.
**Q. I understand that. All I'm trying to ask you, Ma'am, is did Craig ever say anything to you that indicated that he didn't want you to sell the land to some other party?**
A. No.
**Q. Now, I'm going to ask you some questions about this meeting in Mr. Boothroyd's office where there were some heated words said. Do you understand where I'm going?**
A. Yes.
**Q. Okay. When Mr. MacDonnell as you've described it became angry and said what you've**

Page 151

**described him as saying, who was he speaking to when he said that?**
A. Well, because he was standing at the table and there were, you know, the table is probably about half this size, he was up here and he was just kind of gesturing. I don't think he was speaking to, for instance, Serena Furman. I don't think he was speaking to my husband. It was just a general statement about don't bother going there. We'll bury you.
**Q. Now, I don't want to belabor this because we don't have all day to do it, when you say this -- as big was this table or he's here, that doesn't show up well on the record. Do you follow me? So how big of a table was it?**
A. Half this size. My guess is it would be about eight feet long to maybe ten feet.
**Q. Okay. And Craig stood up in his place? Is that what you said?**
A. Yes, I did.
**Q. And he was reacting to Mr. Kachaijan having said, We'll see you in court, or words to that effect?**
A. Yes.

Page 152

**Q. So was it Mr. Kachaijan that he was looking at when he said these things?**
A. They were probably closest together with Bob Wilbur was slightly behind.
**Q. Okay. But he was responding to Mr. Kachaijan, correct?**
A. They were having a discussion, yes.
**Q. Okay.**
A. Which was getting progressively more and more heated.
**Q. And the exchange was between the two of them --**
MR. McLAUGHLIN: Objection.
**Q. -- is that fair to say?**
A. I felt that the thing was also directed at me.
**Q. Okay, but apart from your feelings, Ma'am. I'm just asking you what actually happened. He was looking at Mr. Kachaijan and they were speaking to each other; is that fair to say?**
MR. McLAUGHLIN: Objection.
A. Yes, but in my position, I could see Mr. Kachaijan's back and shoulders and then I could see Mr. MacDonnell's, you know, chest and front and it

Page 153

was their discussion that was going on.
**Q. And what did Mr. Kachaijan say?**
A. That we would not accept the $800,000 offer.
**Q. No, I mean when they had this heated exchange as you've described it, what did Mr. Kachaijan say?**
A. He seemed surprised that it would heat up to that point I think. Again, that's my feeling. And Mr. MacDonnell was just adamant that that's our final offer, you know, that's it.
**Q. I'm just trying to focus you on some specific things, Ma'am. I'm speaking like a lawyer, and I know that's not something you're used to. But I'm just trying to get specific answers to specific questions; okay?**
A. Okay.
**Q. Did Mr. Kachaijan express any anger back at Mr. MacDonnell when this exchange was taking place?**
A. It was cool, and he was very as a matter of fact that, I guess, this, you know, means that we'll see you in court.
**Q. Okay. So as you perceived it, Mr. Kachaijan didn't display any anger back to Mr.**

Page 154

**MacDonnell?**
A. No, as a matter of fact, he seemed kind of surprised or taken aback.
**Q. Did he seemed frightened? Did he manifest any fear?**
A. It was to me, being behind him, it sounded more like surprise or, you know, wow.
**Q. And after Mr. MacDonnell left the room with Mr. Wilbur, did Mr. Kachaijan express any fear at that time to you?**
A. No. It was surprise and it kind of took the rest of the people who were in the room kind of aback.
**Q. Okay. But not fear? He didn't express any fear?**
A. I didn't feel that he -- should I say feel?
MR. McLAUGHLIN: Answer the question.
**Q. Just what you perceived.**
A. I didn't, you know, hide under the table or anything. It was heated and very uncomfortable for the people who were there.
**Q. Okay.**
MR. CONROY: Would you mark this, please, as 15.

Page 155

(Document marked for identification as Kunelius Exhibit 15.)
**Q. Please take a look at 15, Ma'am, and tell me when you've read through that and I can ask you a few questions about it.**
A. Okay.
(Pause.)
**Q. You all set?**
A. Yes.
**Q. Do you recognize that document?**
A. Yes. I remember my father being very sick.
**Q. Do you want to take a moment?**
A. No.
**Q. This is dated February 19, 2004, correct?**
A. Yes.
**Q. This letter indicates in the -- if you'll agree with me in substance, that Serena Furman and Peter Christiansen are interested in buying one acre of your land?**
A. Yes.
**Q. Did anything come of that overture?**
A. No.
**Q. Why not?**
A. It was probably the second time that they

Page 156

had asked me to, you know, break off a small portion that was beyond their deck.
**Q. And were you interested in that possibility?**
A. I wanted to sell the entire property and go to Maine.
**Q. Okay. Then is it fair to say you were not interested in just selling that one acre?**
A. Correct.
**Q. Was any specific price ever discussed?**
A. No. Not that I remember.
**Q. And did you tell them that you were not interested in pursuing that possibility?**
A. Probably.
**Q. Did you get any advice from anybody on that matter?**
A. No.
**Q. Is there any reason why you could not have sold that one acre of undevelopable land and continued to try to sell the rest to somebody else?**
A. Well, they weren't the only abutters who wanted me to break off little bits and pieces here and there, so I didn't feel like I wanted to sell it in increments.

Page 157

**Q. Okay. Why not?**
A. I didn't want to.
**Q. All right. But what was the reason why you didn't want to?**
A. I guess that was my prerogative not to.
**Q. I understand that, Ma'am. But did you have a reason? Did you have a reason why you chose not to do that?**
A. I did not want to sell it in little bits and pieces. I wanted the whole thing to go all at once and not have to spend more time down in Massachusetts selling other little tiny bits and pieces of it.
**Q. Okay. Did you have offers, actual written offers to purchase any pieces of your land?**
A. No.
**Q. You just had inquiries by some people?**
A. Yes.
**Q. Before or after the September '03 closing date on the original deal?**
A. Frank Patterson was after. My understanding was that he needed to reinvest some money in some future period of time and it was just -- it tied in with asking if he could hunt on

Page 174

**Q. But did you think in February of '03 that you might get that deal back?**
A. I had no hope at that point.
**Q. Okay, what were you trying to achieve by this letter, then, Ma'am?**
A. I wanted the taxpayers to know that what was being put before them was not true.
**Q. Okay. I understand that part. I'm asking really take aside the politics and, you know, your feelings about it. From a purely financial point of view, you still wanted to sell your land; is that fair to say?**
A. Under the original contract, yes.
**Q. Well, let me just ask it one point at a time. You wanted to sell the land and get the price that you had gotten in that original purchase and sale agreement, correct?**
A. Right.
**Q. Did it matter to you whether that money came from one place or another place as long as you got the money?**
A. No. One of my neighbors asked me that in the supermarket. She said, Where do you care where the money comes from. I said, I don't care. As

Page 175

long as it's there.
**Q. My question is did you not try to derail some funding here that could have gotten you to that price?**
A. I was standing ground on my own donation. I wanted the people of Stow -- I had lived there for 60 years. They needed the water. I knew for 30 years that they needed the water and I was planning to give it. I wasn't planning to donate it to TPL, I wasn't -- I'm through.
**Q. Okay. On the question of Mr. Boothroyd, has he -- let me get the names right. Is Paul Boothroyd the man that you had the original arrangement with?**
A. No. Paul Boothroyd and Jim Boothroyd are cousins. Paul Boothroyd owns Century 21 where Jim Boothroyd was an agent at the time of the ...
**Q. So Paul was the owner and Jim was an agent?**
A. Yes.
**Q. And, as we speak, do you understand it that the website for this realty agency says that the property is under agreement?**
A. In the portion that I think its realtors can look in to see what properties are, you know,

Page 176

kind of floating back to the market or are off the market, I believe it's still shown and with a description and it says under contract.
**Q. Okay. And there is some code that you have to use to get into that that the public can't get into?**
A. I have no idea. I'm not on the web.
**Q. Okay, but you seem to have some understanding that you have to be a realtor to get into that part of the web?**
A. I believe that's the case.
**Q. Okay.**
A. And I have no idea how one would do that not being a realtor.
**Q. If I or somebody else were to go to Mr. Boothroyd's office and say I'd be interested in buying Mrs. Kunelius's land, do you know what the response would be?**
A. I haven't talked to Paul Boothroyd in years, and you would have to ask him.
**Q. Okay. I think you said that he's not doing anything to try to sell the property; is that correct?**
A. Are you talking about Jim or Paul?

Page 177

**Q. Either one.**
A. Paul Boothroyd says it's under contract. That's his belief. I don't have to agree with him, but that's his stance.
**Q. Do you know if either Paul or Jim are doing anything to try to sell the property?**
A. Because it's on Century 21 website, it can't be listed through MLS. That's probably why he's, you know, holding onto it.
**Q. Okay. But do you know if he's doing anything to try to sell it, either Paul or Jim?**
A. I haven't heard anything, no.
**Q. Okay. Have you made any effort to pull the property from them and list it with another broker?**
A. No.
**Q. Why not?**
A. I'd like to get my original contract fulfilled.
**Q. Well, I understand that. But what's that got to do with your not trying to pull the property and have somebody else try to sell it?**
A. I'm dealing with one issue at a time. Right now the Town of Stow has told me that if I offer it for sale again, they will exercise 61

Page 182

**being charged?**
MR. McLAUGHLIN: You can answer.
A. It just went up. $435.
**Q. Okay. And have you actually paid any of Mr. McLaughlin's legal fees?**
A. Yes, we have.
**Q. You have, okay.**
**How much have you actually paid?**
MR. McLAUGHLIN: I'm not going to go forward on this. I'm going to instruct her not to answer that. I think that those questions are intended to delve into how long a particular litigant can participate. I'm not going to answer. It's attorney-client privilege at this point.
MR. CONROY: That's not my intention, number one.
MR. McLAUGHLIN: It may not be your intention. I'm not assuming that it is. But the reality is that there are other people around the table, and it will suffice to say she has an hourly rate.
MR. CONROY: Okay. And I'll just say for the record, as we said off the record, that the relevance to this is there is a claim in the case

Page 183

for attorney's fees, and I think we're entitled to know how much exposure there is to our clients on that matter, and that's where I'm going with this.
MR. McLAUGHLIN: I think prior to the time -- I think at some point we have to disclose as part of our pretrial documents what our damages are, if we haven't already. I'll have to look and see what we've done. But at some point, clearly, we have to do that, and it will be the standard bills that you would receive and I'm sure that your firm produces.
MR. CONROY: Okay.
MR. McLAUGHLIN: So I just don't think that we're in a position right now to.
MR. CONROY: Okay. I'll just reserve my rights and we'll go on.
**Q. When did you first engage Mr. McLaughlin?**
A. About two years ago.
**Q. Okay. And at what -- now, can you time that for me in the chronology of these major events? Was it after the assignment to start with?**
A. The assignment was in '03 in the spring.
**Q. It was after that?**
A. Yes.

Page 184

**Q. And was it after the closing date of September of '03?**
A. Yes.
**Q. And do you remember when this lawsuit was brought?**
A. The date that it was all assembled?
**Q. That it was filed in court.**
A. I don't.
**Q. It's being suggested to me it as August of 2005. Does that sound about right?**
A. It sounds somewhat logical, yes.
**Q. Can you approximate for me how much earlier than that it was that you engaged Mr. McLaughlin?**
A. Perhaps six months.
**Q. Okay. And did you know him before that?**
A. I did not.
**Q. Did somebody refer you?**
A. Mr. Kachaijan.
**Q. We're getting there. Ten more minutes I think.**
**Back to Exhibit 8, please, that's already been marked.**
A. (Whereupon the witness complies.)
**Q. Do you have that?**

Page 185

A. Yes.
**Q. Okay. This, again, is the letter to you from Mr. Christiansen, correct?**
A. Yes.
**Q. If you turn to the middle of the first page roughly, do you see the sentence that starts, "Our $900,000 plan is a bird in the hand"?**
A. Yes.
**Q. He goes on to say, quote, "Moving forward with us would not preclude you from pursuing a legal action against TPL," close quote. Do you see that?**
A. Yes.
**Q. Why did you not go ahead and pursue this opportunity and, you know, reserve your right to go file this lawsuit for the difference?**
A. They were putting a burden on me to sell my front house myself. In 2004 I'm not sure that the Community Preservation Committee money was still available. It may have been, and I think that Eye of the Storm had either already backed out or, you know, I didn't have any, you know, paperwork from them saying that they had this money in escrow.
The Community Preservation Committee money stayed available for the Town to use for quite

awhile, but I had no communication with Community Preservation.

**Q. Okay. So there were some uncertainties, correct?**

A. Many.

**Q. And complications, correct?**

A. Yes.

**Q. But notwithstanding that, you chose not to give this a try and let it run itself out; is that fair to say.**

A. I felt at the time that they were trying to put a Band-Aid on a very large wound.

**Q. Okay. But yet you chose not to pursue it?**

A. Yes, that's correct.

**Q. Let me turn you to Exhibit 9, please. It's already been marked.**

A. Yes.

**Q. And this is the letter to Mr. Kachaijan from Craig MacDonnell September 9, 2003, correct?**

A. Yes.

**Q. If you turn to the last paragraph of the first page roughly in the middle of that paragraph I'll read a sentence that says, quote, "TPL's board of directors will not approve any borrowing to**

**bridge a fund-raising gap because the prospects for raising the funds necessary to repay the loan required are not encouraging," close quote. Do you see that?**

A. Yes.

**Q. Had Mr. MacDonnell said that to you prior to September 9, 2003?**

A. It was all over the newspapers.

**Q. Okay. But that's another fact. But I'm asking you did Mr. MacDonnell say this to you before this letter of September 9, 2003?**

A. The conversation that sticks in my mind is when he demanded that I take only $800,000, and that was in July of '03, otherwise they would walk away.

**Q. Okay. And did he tell you at that time that the board of TPL would not approve any borrowing to bridge a funding gap?**

A. Up until that time they had paid me the $1,500 a month. I had frantically moved my worldly goods to Maine in my own truck, and then out of the blue in July was the phone conversation that that's all we're going to pay.

**Q. No, I understand, Ma'am, but I'm asking you a specific question.**

**In July of '03 when Mr. MacDonnell told you that $800,000 was the offer, did he also tell you at that time that TPL's board of directors would not approve any borrowing?**

A. I don't think he said that, that I remember, that I recall, until the meeting with Whitney Hatch in the spring of '04, and that's when he started, you know, talking about the board of directors' vote.

**Q. Okay, so this letter predates that by --**

A. Yes, it does, right.

**Q. Was this letter the first time you had heard that?**

A. I don't remember if he said that when he was trying to cut the price by $400,000.

**Q. Okay. Did you see this letter at the time? Did Mr. Kachaijan share this with you or did you get it stored away?**

MR. McLAUGHLIN: Objection.

**Q. Let me ask it differently.**

**Did you see this letter at or about the date that appears on it, September 9, 2003?**

A. I probably did, and this was when the closing was right on the horizon. It would have

been two weeks before the closing.

**Q. Okay.**

A. The expected closing.

**Q. Okay. Now, just a couple of follow-ups on another conversation you mentioned with Craig MacDonnell. I believe you said that it was on the Friday after the ballot vote that he told you we're out of the project; is that correct?**

A. Yes.

**Q. And that he called you back the next Monday --**

A. Yes.

**Q. -- and said the project is back on in effect?**

A. Yes. And I made an assumption that he had met with the Friends of Red-Acre over that weekend.

**Q. Okay. And I believe you said that you were very angry in that conversation; is that correct?**

A. Because the Town had voted no money and TPL said that they would not join the project without funding from the Town.

**Q. Okay. But why did that make you angry? What was it that made you angry?**

A. The facts. There was no funding from the

(Brief recess.)
**Q. Ms. Kunelius, in any of the meetings or conversations that you had after the assignment to TPL, did you ever offer to come down from the original price of a million -- what is the figure?**
A. $1,116,900.
**Q. Right.**
A. I did not.
**Q. Did you ever consider coming down from that price at all?**
A. No, I did not.
**Q. Would you have insisted on literally every dollar of that amount?**
A. Yes.
**Q. Did you ever consider any ways and means to get you equivalent in value to just getting a check for that amount?**
MR. McLAUGHLIN: Objection.
A. None of these so-called proposals had any substance to them. They put the responsibility on me. They weren't playing with their own money. They were using other people's money that wasn't guaranteed, so I don't even consider them offers.
**Q. Did you propose any alternatives, then, to**

**just get a check for the full amount of the P and S price?**
A. No. Why would I?
**Q. I'm just asking the question. You did not?**
A. No.
**Q. There was some testimony in your first session a couple of days back about Belmont -- was it Belmont water company or something?**
A. Belmont Springs.
**Q. Belmont Springs. And they at some point expressed interest in your land?**
A. The elderly gentleman who brought that subject up was evidently too elderly to do this, and at the last minute he brought over the husband and wife who believed that they could probably put in 40 or 50 houses, and it was really a pipedream.
**Q. Okay. What about the Belmont water company, though?**
A. I never had any discussions directly with them.
**Q. Did you have any discussions with any water company?**
A. The Acton Water District.
**Q. When was that?**

A. 1988.
**Q. And did anything come of that?**
A. Stow would not respond.
**Q. You mean the Town?**
A. Yes.
**Q. Has there ever been any other discussion of a sale involving these water rights or water as an asset?**
A. There is discussions all the time a mile from my well site that they don't have enough water. The water is not clean. They've talked about -- and, again, they will not talk to me directly probably because, you know, they could have had it for nothing and, you know, now they're in the soup about it.
**Q. They meaning the Town?**
A. The Town of Stow.
**Q. Okay. Apart from the Town, though, any outside commercial interest in this water that you haven't already discussed?**
A. No.
**Q. Briefly on this Greg Jones overture. You were sitting in Mr. Jones's deposition, correct?**
A. Yes.

**Q. And you heard him say something about approaching Mr. Boothroyd?**
A. Yes.
**Q. What do you know about that?**
A. Greg Jones, I believe, was interested in a number of units and I'm not sure I describe it properly. When you're becoming elderly, you might go to assisted living; and then when you're really infirmed you're in a nursing home. But I just learned that there is an in between stage, and I don't know if that means that you're ambulatory or that you're whatever. And he is, you know, interested in something like that.
**Q. Okay. Other than hearing what he said at the deposition, do you have any other knowledge about this at all?**
A. No, because I didn't have discussions directly with him. As soon as he raised the issue with Mr. Boothroyd, it was referred to Mr. McLaughlin and, you know, there were letters back and forth to, you know, is it -- or could we even talk about it with him; that that issue I think was resolved, but, no, we didn't talk about it with him.
**Q. All right. What did you understand the**

Page 198

**issue to be?**
A. Because he was going to be deposed, we could not talk to him.
**Q. Has there been any discussion of getting back to him now?**
A. No.
**Q. Why not?**
A. I don't know.
**Q. Okay. Your dad passed away when? What date roughly?**
A. December of '03.
**Q. Okay. And when did he leave your home?**
A. In March of '03, and that was about six years and one month after I started taking care of him.
**Q. And then the last subject here, your interrogatory, and I'd be happy to show them to you, but interrogatory answer Number 15, 1, says, quote, "MacDonnell informed the plaintiff" -- that's you -- "that TPL had the money to purchase the property should TPL obtain the right of first refusal," close quote. What are you referring to there?**
A. He told me, he told the selectmen, he told the Town meeting that they had the money.

Page 199

**Q. Okay. And when you say had the money, what do you mean exactly? Do you mean that TPL itself had its own money or that it had other sources of money?**
A. I didn't feel responsible in, you know, determining whether it was in a bank, in a mattress or in a pillowcase.
**Q. No, I understand. But I'm asking you what you understood at the time. Did you understand that Mr. MacDonnell was saying that we, TPL, have our own money that we're going to use here, or we have other people's money, other sources of money that we're going to use here?**
A. My understanding was that it was available immediately because that's the way they're -- they project themselves; that, you know, we're able to bridge the gap. We're able to, you know, help out because if there is a, you know, lag time between when a property comes up for sale and the Town doesn't have the time to call a town meeting, that they're able to just swoop in and do it.
**Q. Okay. And that's what you heard him say to the Town meeting of some kind or the selectmen 's meeting, whatever it was?**

Page 200

A. At the January town meeting I had heard secondhand from the selectmen's meeting about their presentation, and it was the same to everybody. We're nationwide. We do this all the time. We have the money.
**Q. Last question I think. On interrogatory 15, 5, it says, quote, "After acceptance of the assignment, MacDonnell informed the plaintiff that" -- I'm sorry, wrong one. Strike that.**
**15, 4. Quote, "MacDonnell subsequently informed the plaintiff that TPL could not obtain the money necessary to purchase the property," close quote.**
**Does that refer to the July 2003 phone call where he mentioned --**
A. Yes. Up until that time the $1,500 a month had come through the mail.
**Q. Okay.**
A. And then, boom, he said we're not going. We're taking $400,000 off the price.
**Q. And that was the first time he told you that they couldn't obtain the money?**
A. He told me that they would only give me $800,000.

Page 201

**Q. I understand, Ma'am. I'm just reading this interrogatory answer that says, "MacDonnell subsequently informed the plaintiff that TPL could not obtain the money necessary to purchase the property."**
**And I'm asking you what event that refers to? What was it that, you know, what occasion was it that he said that to you, if he said it at all?**
MR. McLAUGHLIN: Objection.
A. That he couldn't raise the money.
**Q. Right.**
A. I didn't think that had anything to do with anything because he said he had the money.
**Q. No, Ma'am, let me do it one more time. I'm confusing you and it's late; all right? I have this one last question and that's all I'm trying to get straight.**
**Your interrogatory answer says, quote "MacDonnell subsequently informed the plaintiff that TPL could not obtain the money necessary to purchase the property," close quote. And I'm asking you on what occasion did he tell you that, if he told you that at all?**
MR. McLAUGHLIN: Objection.

# TAB 3



Volume: I
Pages: 1-251
Exhibits: 23

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11697-GAO

MARILYN KUNELIUS,
Plaintiff,

v.

TOWN OF STOW, separately, A PARTNERSHIP OF UNKNOWN NAME BETWEEN TOWN OF STOW and THE TRUST FOR PUBLIC LAND, THE TRUST FOR PUBLIC LAND, separately, and CRAIG A. MacDONNELL, in his individual capacity,
Defendants.

DEPOSITION of CRAIG MacDONNELL, a witness called by and on behalf of the plaintiff, taken pursuant to the Massachusetts Rules of Civil Procedure, before Roberta J. Daniels, a Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Law Offices of Michael C. McLaughlin, One Beacon Street, Boston, Massachusetts 02108, on Thursday, February 8, 2007, scheduled to commence at 10:00 A.M.

A P P E A R A N C E S

Michael C. McLaughlin, Esquire
Law Offices of Michael C. McLaughlin
One Beacon Street
Boston, Massachusetts 02108
Counsel for the Plaintiff

Peter A. Kachajian, Jr., Esquire
292 Main Street
Northborough, Massachusetts 01532
Co-counsel for the Plaintiff

Deborah I. Ecker, Esquire
Brody Hardoon Perkins & Kesten, LLP
One Exeter Plaza
Boston, Massachusetts 02116
Counsel for Defendant Town of Stow

Dahlia S. Fetouh, Esquire
Goodwin Procter, LLP
Exchange Place
Boston, Massachusetts 02109
Counsel for Defendant Trust for Public Land

James B. Conroy, Esquire
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd floor
Boston, Massachusetts 02108
Counsel for Defendant Craig MacDonnell

Also present:
Lucie DeBellis, Paralegal
The Law Offices of Michael C. McLaughlin
Marilyn Kunelius, Plaintiff
David Norris, Husband of the plaintiff

I N D E X

| Witness | D | C | RD | RC |
|---|---|---|---|---|
| CRAIG MacDONNELL | 6 | | | |

E X H I B I T S

| No. | Description | Page |
|---|---|---|
| 1 | TPL corporate registration form | 16 |
| 2 | Notice of deposition | 17 |
| 3 | TPL Land Action Fund corporate registration form | 18 |
| 4 | Stow annual report, 2003 | 35 |
| 5 | Stow letter with attachments to Kunelius, 2-12-03 | 45 |
| 6 | MacDonnell letter to Perry, 2-11-03 | 49 |
| 7 | Conditions for right of first refusal | 51 |
| 8 | Minutes of Stow CPC meeting, 2-10-03 | 64 |
| 9 | Printout of TPL Web site | 75 |
| 10 | Stow Finance Committee minutes, 1-7-03 | 79 |
| 11 | DHCD grant application | 105 |
| 12 | TPL Web site excerpt | 124 |
| 13 | MacDonnell letter to Kachajian, 9-9-03 | 137 |
| 14 | Conditions for right of first refusal | 154 |
| 15 | Sommerlad email to Kennedy | 164 |
| 16 | Jacobs email to Sommerlad and Kennedy | 166 |
| 17 | Stow Board of Selectmen meeting, 2-11-03 | 191 |
| 18 | Stow Conservation Commission documents | 193 |
| 19 | MacDonnell email to Perry, 4-17-03 | 209 |
| 20 | Friends of Red Acre letter to Stow Board of Selectmen, 6-6-03 | 212 |

PROCEEDINGS
Thursday, February 8, 2007
10:01 A.M.
(Plaintiff and Mr. Norris not present)

CRAIG MacDONNELL, first having been satisfactorily identified by the production of a Massachusetts driver's license and then duly sworn, on oath, deposes and says as follows:

MR. McLAUGHLIN: Before we start, we'll use the usual stipulations? We'll reserve all objections till the time of trial, except as to form, waive the signature of the deposition?

MR. CONROY: Waive the notary.

MR. McLAUGHLIN: Yes, right.

MR. CONROY: Right.

DIRECT EXAMINATION

By MR. McLAUGHLIN:

Q Could you please state your name and spell it, please?
A It's Craig MacDonnell, C-R-A-I-G. Last name is M-A-C-D-O-N-N-E-L-L.
Q And can you tell me what your address is?
A 800 Old Road to Nine Acre Corner, Concord, Mass.
Q Can you tell me what your occupation is?
A I work for the Trust for Public Land.

Q And what is the Trust for Public Land?
A The Trust for Public Land is a 501c3, a national non-profit land conservation organization.
Q And what do you do for them?
A I'm the Massachusetts state director.
Q In 2002, what was your job at TPL?
A I was the Massachusetts state director.
Q Does each state have a director?
A Most states where TPL works have a director.
Q Is there a regional headquarters for TPL for the northeast region?
A Yes.
Q Where is that?
A Boston.
Q And is that the same place as your office?
A Yeah.
Q And is there someone in charge of the region that you report to?
A Yes.
Q And who is that?
A Whitney Hatch.
Q Is Whitney Hatch a man?
A He is.
Q Whitney, okay. And what is his title?

A Regional director.
Q And do you still report to Whitney Hatch?
A I do.
Q In 2003, were you also the Massachusetts director?
A In 2003, I was the Massachusetts state director.
Q In your role as Massachusetts state director, could you define what your authorities were as far as acquisitions of property?
A What do you mean by define my authority?
Q Well, were you in a position to bind TPL into contracts, for example?

MR. CONROY: Objection.

A Some contracts.
Q When I say in a position, did you have the authority to?
A Well, in my position, there were some contracts that I could bind TPL with respect to.
Q And what kind of contracts were those?
A Very small.
Q Was there a dollar amount limitation?
A There was.
Q What was that?
A I don't know.
Q Was it less than a million dollars?

A Well less than a million.
Q Less than a half a million dollars?
A Yes.
Q Less then two hundred and fifty thousand?
A Yes.
Q Do you have a general idea what the limitation was?
A I believe -- well, it was very small, but I don't know a number.
Q Do you have a general estimation of what -- well, let me strike that.
A I've already said I don't remember.
Q If a contract was put in front of you, was there a point where you would say to yourself, gee, I can't sign this; this is too big?
A Are we talking about now or then?
Q Then.
A Yes.
Q And what would that number be that would cause you to think you didn't have the authority?
A Well, I don't recall as to what it was then, so I can't testify to that.
Q Are you on any medication that would affect your memory?
A No.

Q Can you tell me what your background is, your educational background, please?
A I'm trained as a lawyer.
Q And what kind of lawyer were you trained to be?
A A litigator.
Q Did you practice as an attorney?
A I did.
Q And where did you practice?
A Two law firms.
Q What are the names of the two firms?
A Nutter, McClennen & Fish and Keegan, Werlin & Pabian.
Q Where is Keegan, Werlin, Pabian?
A Boston.
Q And can you tell me when you worked for these two firms, sequentially?
A I worked for Nutter, McClennen & Fish from 1983 through '87 or '88. I worked for Keegan, Werlin from the early '90s through the late '90s.
Q Why did you leave Nutter?
A To change my career.
Q And you were a litigator at Nutter?
A Yes.
Q Were you a partner?
A No.

Q Were you an associate?
A Yes.
Q And at Keegan, were you a partner?
A Yes.
Q Did you go in as a partner?
A No.
Q Did you go in as an associate?
A I did.
Q How long were you an associate there?
A About three years.
Q So, in the span of between approximately '90 and the late '90s, you were three years an associate and up to perhaps as many as six or seven as a partner?
A Approximately.
Q And what did you do between '88 and '90?
A I worked for the Department of Fisheries, Wildlife & Environmental Law Enforcement.
Q And what was your position there?
A I was a lawyer.
Q In their legal department?
A Yes.
Q Is there a separate legal department for that, for the Department of Fisheries?
A Well, no, not really. I mean, there were lawyers, but

Q What's the address of TPL where you work? Where do you work? What's the address?
A 33 Union Street in Boston.
Q And I note here that the document in front of you is also 33 Union Street. Do you see that?
A Yes, it's misspelled here.
Q What's misspelled, Union?
A The word Union, yes.
MR. McLAUGHLIN: Can we mark that as Exhibit -- whatever it is, three?
(WHEREUPON, Exhibit No. 3, TPL Land Action Fund corporate registration form, marked for identification.)
Q Who is Ernest Cook?
A He's a gentleman who works for the Trust for Public Land.
Q And does he work with you?
A He works in the same building I do. He is employed by the conservation finance office of the Trust for Public Land.
Q Is that a separate entity?
A No.
Q So, when you say conservation finance, is that the division of TPL that deals with financial matters for

the entity?
A No.
Q Okay. What is conservation finance division?
A I don't think it's a division. It's an office that helps communities raise money for land acquisition.
Q So, he, like you, is an employee of TPL as far as you understand?
A Yes.
Q And is today the first time you've become aware that he is the president of the TPL Land Acquisition Fund?
MS. FETOUH: Objection.
A The Land Action Fund?
Q The Land Action Fund, I'm sorry, Action Fund.
MR. CONROY: Objection.
A Yes, it is.
Q I note that under Exhibit 3, on Exhibit 3, it says that the TPL Land Action Fund was organized in the year 2000, on the first page about halfway down. Are you at all surprised that this entity has existed for the last seven years or thereabouts without your knowledge?
MR, CONROY: Objection.
A I don't have a reaction one way or another.
Q On the second page, it also indicates that it is for-

profit. Do you see that?
A Are you looking at the X in the middle of the second page?
Q Yes.
A I see the X.
Q And the X is to the left of the designation for-profit. Do you see that?
A I do.
Q Are you surprised that there is a for-profit designation for any entity related to TPL?
A Yes.
Q And as an attorney, were you at all involved in filing any documents with the Secretary of State for TPL during your tenure as a director of the Massachusetts section or region?
MR. CONROY: Objection.
MS. FETOUH: Objection.
A Well, which question would you like me to answer?
Q Well, let's go back. Shall we call it the Massachusetts region? Is that what you're the director of, or is it State of Massachusetts or?
A You can call it the Massachusetts state office.
Q Okay. So, in your role as the director, were you ever involved in filing any documents on behalf of TPL with

the Secretary of State?
A No.
Q And what makes you believe that TPL is a 501c3?
MR. CONROY: Objection.
A That is what I had been told.
Q So, you haven't specifically seen documents that would verify whether it is or is not.
A I may have, but I don't currently recall.
Q Can you tell me how TPL became acquainted with the Town of Stow concerning the Kunelius property?
A Yes.
Q Would you do that, please?
A I believe the Trust for Public Land was contacted by a fellow named Peter Christianson.
Q And who is Peter Christianson?
A A resident of Stow.
Q Did he have some official position with the Town of Stow? Was he an elected official or anything like that?
A Not to my knowledge.
Q And did he contact you directly?
A No.
Q Who did he contact?
A I don't remember.

Q Do you recall the circumstances as to why he called you?
A Yes.
Q What were those?
A It was with respect to a piece of property near his house.
Q And was that the Kunelius property?
A The property at 142 Red Acre Road.
Q And do you have reason to believe that's not the Kunelius property?
A No.
Q You don't recall who he contacted at TPL. Is that your testimony?
A I do not.
Q Do you recall the reasons that he contacted TPL?
MS. FETOUH: Objection.
A Yes.
Q What were those?
A It was with respect to a potential conservation project.
Q Did Mr. Christianson tell you there was a potential project there at the Kunelius property?
A I don't believe he used those words.
Q Well, you didn't actually talk to him about it, so how

do you know what his words were?
A I don't know what his words were.
Q Do you know who established that there was a potential conservation project at the Kunelius property?
A I'm not sure I understand what you mean by established.
Q Well, you said that he contacted you about a potential conservation project at the Kunelius property at 142 Red Acre Road, and my question is --
A He contacted TPL.
Q And my question is: who said there was a potential project there? If you don't know what he said, how did you know there was a potential project there?
A The words potential project are my words.
Q Do you recall any of the circumstances surrounding the contact of TPL by Peter Christianson resulting from any discussions you had with any other people at TPL?
A Yes.
Q Can you tell me what you know about that?
A I believe he talked to other people in my office about the potential for a conservation project on the Kunelius property.
Q Now, he was not the owner at that time of the Kunelius property. Is that correct?

A Correct.
Q Was it unusual for someone who is not an owner of a property to contact you concerning the establishment of a conservation project on someone else's property?
A No.
Q Does that happen regularly?
A Yes.
Q Do you recall who the people were in your office?
A I believe he contacted Valerie Talmadge.
Q And who is Valerie Talmadge?
A Valerie Talmadge is the director of projects for the New England region.
Q Is she still an employee of TPL?
A Yes.
Q How many employees are there at TPL in Boston?
A Well, without actually taking the time to count the offices, I'd say in the neighborhood of twenty-five or thirty.
Q And were there 25 or 30 back in 2003?
A Maybe a few less.
Q Did you have discussions with Valerie Talmadge concerning TPL's involvement with the property which -- instead of calling it the Kunelius property, I'm just going to call it the property

- 24 -

from now on. Did you have discussions with her concerning the property?
A I did.
Q And what do you recall from those discussions?
A I have a general recollection of them, that Peter Christianson proposed that TPL consider working with the Town of Stow to conserve the Kunelius property.
Q Do you recall discussing with Valerie Talmadge what motivated Mr. Christianson to come to TPL?
A No.
Q Do you recall that there was a 40B development on the Kunelius property approximately at the time that TPL was contacted?
A Yes.
Q Does that refresh your memory at all as to why Mr. Christianson had contacted TPL, i.e., that they wanted a conservation development rather than a 40B development?
A Does that itself refresh my recollection?
Q Yes.
A No.
Q Do you have any knowledge concerning Mr. Christianson's wish that a 40B not be built on property adjacent to his property?

- 25 -

A Yes.
Q And is it fair to say that Mr. Christianson made that known to TPL fairly early on in his discussions with TPL involving the possibility of TPL getting a conservation restriction on the property?
A I don't recall.
Q Do you recall ever meeting Mr. Christianson yourself?
A Yes.
Q And how long after his initial contact with TPL did you meet him, approximately?
A I'm not sure.
Q Do you recall approximately when the initial contact was made from Mr. Christianson to TPL?
A I believe it was in the winter.
Q The winter of 2002?
A I'm not sure.
Q Did Mr. Christianson come to your office at some point prior to you contacting the Town of Stow officials concerning the possibility of TPL's involvement?
A I don't know when, in the sequence of things, he came to TPL's office.
Q Do you recall meeting with him in your office?
A I do.
Q And when was that?

- 26 -

A That's what I don't remember.
Q Was it prior to your involvement in attending any public hearings in the Town of Stow concerning Mosaic Commons?
MS. FETOUH: Objection.
A That's what I don't remember, is when.
Q You're familiar with the term Mosaic Commons?
A I'm familiar with the entity known as Mosaic Commons.
Q And what is it?
A I understand it's a development company.
Q And did you have an understanding at some point that Mosaic Commons had intended to purchase the Kunelius property?
A Yes.
Q And is it fair to say that the intended purchase of the Kunelius property by Mosaic Commons was one of the reasons that you were contacted concerning TPL's involvement?
A The proposed land use change, it's my understanding, was the reason that we were contacted.
Q And the proposed land use change, by that you mean that the Kunelius property was under either a farm designation or forestry designation under Chapter 61 and, if it were sold to Mosaic Commons, it would be

- 27 -

changed to some other designation. Is that right?
A By that I mean that there was development planned. That's all I mean.
Q Let me go back. Do you recall attending meetings in December of 2002 where Mosaic Commons made presentations to the Town of Stow, the Board of Selectmen?
A I don't remember seeing presentations.
Q Do you recall whether anyone at TPL attended meetings where Mosaic Commons made a presentation to the Board of Selectmen or any other board of the Town of Stow?
A The introduction to your question, do I remember if anybody from TPL?
Q Yes.
A No.
Q Would you have been the point person, in other words, the person with the general authority, to go to such meetings and make comments at such meetings on behalf of TPL?
MS. FETOUH: Objection.
A I don't know about the authority question. So, I'm not sure how to answer that.
Q Well, would TPL send an intern to have discussions with the town's Board of Selectmen concerning the

- 28 -

possibility of having TPL assist the town in some way?
MR. CONROY: Objection.
MS. FETOUH: Objection.
A Well, TPL scopes projects in a lot of different ways and gathers lots of information about projects ahead of time. Sometimes that involves project managers. Sometimes that involves interns.
Q Tell me about the scoping of a project. Does that mean that, prior to a potential sale of property that might change a land use designation, you might know about that even before the sale occurs?
MR. CONROY: Objection.
MS. FETOUH: Objection.
A I don't understand your question.
Q Well, tell me what you mean when you say scopes a project.
A Analyzes a potential project. That's what scope means.
Q And what do you do to analyze a project?
A You have discussions with local representatives. You take a look at sort of the whole constellation of factors that enable conservation projects to occur, including the availability of conservation financing, various transactional pieces, and you make an

- 29 -

Q You do not recall telling them that. Do you know whether TPL did have the money to make the purchase at the time that you met with the Board of Selectmen on, I presume, February 11th or 12th?
A I'm not sure I know what you mean by have the money.
Q Did you have the funds necessary to complete the purchase?
A No, not in hand.
Q What was the source of the money that would allow TPL to make the purchase under the terms of the right of first refusal?
A I believe it was a combination of sources, including the Town of Stow, a hoped for private sale of a part of Mrs. Kunelius' property and private fund-raising.
Q Any state money?
A There was the hope for a grant.
Q Okay. Let's go back to Exhibit No. 6 for a moment. On the first page of No. 6, there's a reference to $100,000 for affordable housing and 300,000 for open space. Is that correct?
A I see that.
Q And is that the amount that you were looking for when you referred to the source of money from the Town of Stow?

A Yes.
Q So, there's $400,000 there.
A Correct.
Q Did TPL ever receive any of that money?
A No.
Q The second reference you made was the hoped for private sale. And I would ask you to look at the same Exhibit 6, and it refers to deeds from private parcels. Is that correct?
A I see those words.
Q And is that what you were referring to when you said that a source of the money would be hoped for private sales?
A Well, the intention was to subdivide Mrs. Kunelius' land into three portions, one for the town and two lots that would be sold privately, the two lots we referred to as 142 and 144. So, the hope was to sell those two lots, 142 and 144, on the private market and raise funds for Mrs. Kunelius.
Q And raise funds. Where on Exhibit 6 does it discuss, as a requirement of accepting the assignment, that funds would have to be raised?
MS. FETOUH: Objection.
MR. CONROY: Objection.

A Well, the four hundred thousand are funds that would need to be raised.
Q So, the $400,000 of funds we've already discussed in the funds to be raised by the Town of Stow, I thought. Am I incorrect there?
A No. No, you're correct.
Q And so then there's $400,000. And then you hoped for funds from the private sale of one or two of the lots. Am I correct there?
A Both lots, sale of both lots.
Q And does it say anywhere in Exhibit 6 how much money that would be, would be derived from the sale of the two lots?
A I don't believe so.
Q So, you didn't make, as a requirement of the acceptance of the right of first refusal, a specific dollar amount that would have to be derived from the hoped for private sale, is that correct?
A In this letter, no.
Q And between the date of this letter, January 11th, and the acceptance --
MS. FETOUH: February 11th?
Q I'm sorry, February 11, 2003, and the acceptance on February 12, 2003, in which Dorothy Stuckey on behalf

of TPL accepted the assignment, are you aware of any other document that would have outlined additional requirements of TPL necessary for TPL to accept the assignment?
A As I sit here this morning, no.
Q Now, the private funding, let's get back to the private funding that you referred to, private funding, private fund-raising. Where does your letter of February 11th, Exhibit 6, refer to that private fund-raising?
MR. CONROY: Objection.
MS. FETOUH: Objection.
A I don't believe it does.
Q And are you aware of any other document between February 11th and February 12th of 2003 that established, as a condition for the acceptance of the assignment, that private fund-raising would be a necessary component of the acceptance?
A As I sit here this morning, no.
Q Looking at the last page of Exhibit 6, there's a paragraph that states: Under these circumstances, TPL will entertain acceptance of the ROFR. All in caps. Right of first refusal is what that means. Is that correct?

A Yes.
Q Upon acceptance, TPL, quote, steps into the shoes, unquote, of the buyer and is bound by the applicable terms of the contract. Have I read that correctly?
A You have.
Q What did you mean by applicable terms?
A I meant the terms that the common law would require TPL to meet.
Q And what do you mean by common law? What terms would the common law require?
MR. CONROY: Objection.
A I mean decisions of the Massachusetts courts under Chapter 61A.
Q And in fact, at that point, did you not have an understanding that there were no decisions concerning what terms would necessarily be applicable and what terms would not?
MS. FETOUH: Objection.
MR. CONROY: Objection.
A My understanding was that courts would apply some terms and not other terms.
Q And did you have an understanding of what those terms were that would be applicable and what terms would not be applicable?

A My understanding was that the terms that would naturally make sense for an assignee to abide by would apply.
Q So, in your mind, when you wrote Exhibit 6, you had an understanding that some of the terms of the contract were applicable to the assignment and some were not. Is that correct?
A Basically.
Q Do you recall being asked by the Town of Stow to identify what terms you thought were applicable and what terms you did not think were applicable?
A No.
MR. CONROY: Somewhere in here, Mike, I'd like to take a five-minute break if we could.
MR. McLAUGHLIN: Sure. That would be good. It's now 11:30. We'll take a break; 531 for the ladies room, is the code, and then why don't we go, say, to 12:30. There's a cafeteria downstairs that's not bad. Oh, you know that.
MR. CONROY: So I hear.
MR. McLAUGHLIN: Cafeteria downstairs is not bad, and we can take like a half hour if that's all right.
(Recess, 11:30 A.M.)

Q Well, you have no reason to believe that it's accurate or inaccurate?
A I don't know anything about this document. I've seen it here this morning for the first time. So, I don't know anything about it.
Q Well, let's go back. The document, Exhibit 8, purports to be minutes of a meeting of February 10th. Do you see that?
A I do.
Q And it's your testimony that you likely attended that meeting since it was two days before the assignment.
A Yes.
Q And so is your testimony that you have no comment as to the accuracy of the statement that TPL responded that they would be under contract at that point and would have to make it work? You have no comment as to whether that is inaccurate or accurate?
A I just don't have a recollection of saying that, that's all.
Q Do you remember being asked the question?
A I don't remember being asked the question.
Q Do you remember questions concerning what happens if the town meeting votes down this project?
A I don't.

Q Did in fact the town vote down the project?
A No.
Q Did the town have a vote to buy the project?
A Yes.
Q And it passed?
A Correct.
Q Is it fair to say, sir, that you were involved extensively in the drafting of a warrant for the town for a town meeting?
A I remember participating in the drafting of a warrant article in Stow.
Q And is it fair to say that that warrant involved the town purchasing the Kunelius property?
A Yes.
Q And is it fair to say that the town voted and they voted down the purchase?
A My memory is they voted to approve that.
Q Let's go back to Exhibit 6 for a second. Looking at Exhibit 6, which is right here, did you ever tell anyone that if you didn't get the town financial commitment of $400,000 that it didn't matter? You were going to buy the property anyhow under the assignment of right of first refusal.
A I don't remember that.

Q Is it likely that you would have said that?
MR. CONROY: Objection.
A I don't know how to answer the is-it-likely question.
Q Was the $400,000 that is referred to in Exhibit 6 a requirement of TPL's acceptance of the assignment?
MS. FETOUH: Objection.
A No.
Q So, if you didn't get the $400,000, you were still going to accept the assignment. Is that correct?
A Well, I believe the vote to authorize the expenditure post-dated the assignment. So, the decision whether to accept the assignment would occur before that would happen.
Q Is it also true that if you didn't get the, quote, hoped for sale of the two parcels that that was not critical in whether or not you would accept the assignment?
MS. FETOUH: Objection.
MR. CONROY: Objection.
A Well, likewise, the proposed sale of 142 and 144 Red Acre Road were going to post-date the assignment, so we would not have known then whether in fact those parcels would have sold. It would be later in time.
Q Did you tell the Community Preservation Commission

that it didn't matter whether you got the four hundred thousand from the town or whether you sold off portions of the property; you would still purchase the property?
A I don't recall that.
Q Do you recall telling that to anyone?
A It not mattering --
Q Yeah.
A -- is your question? I don't recall using that --
Q Did it matter? In other words, if the money wasn't given to TPL from the town, $400,000, and if you couldn't sell the two lots, did you tell anyone that it didn't matter because TPL would purchase the property and pay the full asking price?
A That's what I don't recall. I don't recall using that language.
Q My question to you is: is that a fact that it didn't matter to TPL, that they were going to purchase it anyhow?
A It was our complete and absolute intention to do this project and conserve this property and buy this property from Marilyn Kunelius. It's our business to do this. The reason I changed careers was to be involved in the environmental field. This is why I

work at TPL. This is why we do this stuff. We fully intended -- from the very second we looked at this project, we would never have accepted the assignment unless we fully intended to do this.
Q So, the answer --
A Yes, the answer is we fully intended to buy this property.
Q And what was your source of funds in the absence of the $400,000 and the absence of the sale of parcels and in the absence of fund-raising? What would be the source of the funds that you would purchase the property with?
MR. CONROY: Objection.
MS. FETOUH: Objection.
A We did not contemplate being able to do this project without finding adequate financial sources external to TPL to complete it.
Q You never considered that?
A What we considered was, as we consider in all our projects, is advocating as hard as we can for public money, if necessary for private sale money, and if necessary for private fund-raising money, and working as hard as we can to put that money together as we have in every one of our 61 projects in Massachusetts,

and so we fully intended that the sources we had identified would come together and that we would be able to purchase this property.
Q And did you consider what your obligations would be to Marilyn Kunelius if those sources did not pan out?
MS. FETOUH: Objection.
A Yes.
Q And how did you consider dealing with that possibility?
A We looked at the contract.
Q You didn't consider any other assets or sources of funds, other than the three that we've already discussed, the money from the Town of Stow, sale of the private lots and fund-raising?
A The obligation that TPL had was measured by the contract. So, it's natural for us to look at the contract to figure out what the scope of the obligation was, which is what we did.
Q So, you looked at the contract. And is it fair to say you determined that, if we don't get the money from the Town of Stow and if we don't get the private sale from the two lots and we don't get fund-raising, then we'll claim that we don't have to purchase the property because of the liquidated damage clause? Is

that correct?
MS. FETOUH: Objection.
A We read the liquidated damages clause and believed it would apply in this case and -- well, I'll leave it at that.
Q And you made that determination prior to the acceptance of the assignment. Is that correct?
A Correct.
Q And that was because just the normal prudence would suggest that you would have to have some contingency for the possibility that you wouldn't have the town financing, you wouldn't have the sale of the lots, and you wouldn't have money from fund-raising. Your normal procedure, due diligence and prudence, would suggest that you would have to have some way to deal with that, correct?
MR. CONROY: Objection.
MS. FETOUH: Objection.
A It's true that, when we scope a project, we look at our legal obligations and make decisions in accordance with them, absolutely.
Q And did you ever tell the Town of Stow prior to the acceptance of the assignment, the right of first refusal, that if you failed to accomplish obtaining

money from the Town of Stow or from obtaining the deeds or from fund-raising or selling property from the deeds, that you would rely on the liquidated damage clause and not purchase the property?
A Did I tell the Town of Stow?
Q Yes.
A About our analysis of the --
Q Yes.
A At some point, yes.
Q Prior to the time that you accepted the assignment, did you tell them?
A I don't remember when I had that discussion.
Q Is there anything in Exhibit 6 that outlines, specifically, that you intended to rely on the liquidated damage clause if necessary?
MR. CONROY: Objection.
A Well, not explicitly. The sentence where I say that we are bound by the applicable terms of the contract is a summary, really, of normal Chapter 61 legal analysis, which includes all of those terms.
Q Do you recall telling any public officials from the Town of Stow that TPL had never failed at any time to honor an assignment of a right of first refusal?
A Yes, I believe I did say that.

Q And, in fact, do you remember telling public officials of the Town of Stow that they had nothing to worry about regarding indemnification because TPL, having never failed, would find a way to purchase the property to make Mrs. Kunelius whole?
A I remember discussing this issue with the town. I don't recall the language I used.
Q But you do recall that you told the town that TPL had never failed in the past to honor an assignment of a right of first refusal.
A I do remember that, and I believe we honored it here.
Q So, I don't want to belabor a point, but I'm a little confused. On one hand I thought you said that you had every intention of going forward and purchasing the property even if the three items outlined in your letter of February 11th, Exhibit 6, were not achieved.
MR. CONROY: Objection.
Q And on the other hand you say that if you did not achieve the three items on Exhibit 6, i.e., the money from the town, the sale of private lots, the two private lots, and fund-raising, that you would look to the liquidated damage clause. So, which is it?
MR. CONROY: Objection.
MS. FETOUH: Objection.

MS. ECKER: Objection.
Q Was the intention to go forward even if you didn't have the three requirements that are outlined on Exhibit 6, or was it your intention to rely on the liquidated damage clause?
MR. CONROY: Objection.
MS. FETOUH: Objection.
A It was our intention at the beginning and throughout most of this project to close no matter what because that's the way TPL does its business, believing fully that it would be possible to do so. It became apparent at some point, despite all of our good efforts, that the public and private money was not going to make it to the table, and it was only after realizing that there was, what TPL concluded was, an unbridgeable cap between the money that was available and the money that was needed that it became impossible to go forward.
(WHEREUPON, Exhibit No. 9, printout of TPL Web site, marked for identification.)
Q I'm going to put before you a document, Exhibit 9, and ask you to take a look at it. This is a printout of the TPL Web site. It was printed out on 3-23, 2005. I'm going to ask you to look at the second page under

Buying Time, which is about two-thirds of the way down. It says: Timing is critical in today's real estate markets, but public agencies may not have the capacity or budget to move quickly to acquire land when it becomes unavailable. Using our private capital, TPL can bridge the gap to secure and hold vital lands under the public acquisition process until the public acquisition can gear up. Now, have I read that correctly?
A The word available, I think you said unavailable, but otherwise --
Q I'm sorry, becomes available. I apologize. But other than that, have I read it correctly?
A I believe so.
Q Now, in your last answer, you talked about the fact that you could not bridge the gap in the Kunelius property, and my question is, for you: what are you referring to when you say our private capital?
MR. CONROY: Objection.
Q Using our private capital, TPL can bridge the gap. What is the private capital?
MS. FETOUH: Objection.
A Well, it's not what I mean, because it's really not my creation.

Q I understand.
A So, you're asking me what I believe TPL means?
Q Yes.
A Private capital is a generic term to describe lines of credit and borrowed funds. Really, it's borrowed funds to bridge gaps in conservation projects where timing is a problem.
Q And so the term private capital from your point of view is money that is borrowed by TPL?
A Yes.
Q That's private capital?
A Yes.
Q Is that definition of private capital your definition, or do you think it has some greater understanding in the public, that the term private capital means borrowed funds?
MS. FETOUH: Objection.
MR. CONROY: Objection.
A I can only say what I believe it means here.
Q Do you know Rob Glassman?
A No.
Q You've heard of Rob Glassman?
A I may have, but I don't recall.
Q Robert Glassman?

Q Now, at the time, in January of 2003, you had not identified a specific amount of money necessary from the town in order to accept an assignment. Is that correct?
A Well, I think there was a discussion about four hundred thousand.
Q And that discussion, you expect, was prior to January 7, 2003?
A I would say that it is, in part, having my recollection refreshed by the reference to four hundred thousand in this paragraph.
Q The purchase was approximately 1.2. That's fair to say, right?
A It was a little under that.
Q A little under. Four hundred thousand dollars subtracted from the 1.2 would leave $800,000, approximately, correct?
A Approximately.
Q And you expected to make some money from the sale of the two lots. Did you have any expectation of what that would be on or about January 7th of 2003?
A Is your question how much TPL thought we would sell 142 and 144 for?
Q Yes.

A And if we knew that at this moment in time?
Q Yes.
A I have a recollection of what, ultimately, we expected to sell those for, but I can't say whether at this moment in time I knew or I had that number in my mind.
Q What is your recollection of what it ultimately would sell for?
A Well, there's two pieces. I think the hope was that 142 would sell for between two and three hundred and that 144 would sell for more. How much, I can't remember right now.
Q So, if we have 300,000 and 700,000, I'm sorry, 300,000 and 400,000, meaning 300,000 from one sale, 400,000 from the town, and another 300,000 from the second lot, approximately, how did you anticipate making up the difference at that point?
MS. FETOUH: Objection.
A Well, I think there were other project costs as well. I mean, some of these properties needed to have renovation before they could be sold. So, I don't know what sum we were trying to achieve, but there was an intention to raise money privately.
Q Have you ever read the complaint?
MS. FETOUH: Objection. In this

matter?
MR. McLAUGHLIN: No, the complaint in the matter has nothing to do with this.
MR. CONROY: That's not necessary.
MR. McLAUGHLIN: All right. Well, I mean, neither is the question. If you are asking that question, Madam, tell me what other complaint you could possibly be considering.
MR. CONROY: Let's move on.
MS. FETOUH: My objection has been noted.
Q All right. Have you ever read the complaint in this matter?
A I have skimmed through it.
Q And did you read your answer in this matter prior to it being filed with the court?
A Yes.
Q Did you check it to make sure it was truthful and accurate?
A I believe I did.
Q Do you recall having a telephone discussion with Marilyn Kunelius after TPL accepted the assignment?
A I remember trying to reach Mrs. Kunelius, and I also remember trying to reach her attorney then, Peter

Kachajian. I remember having difficulty reaching both of them, but I believe I recall talking to one or both of them at some point during that time.
Q Do you recall talking to Mrs. Kunelius before the assignment?
A I don't remember when I first talked to Mrs. Kunelius.
Q I'm going to just quickly read something from the complaint. This is Paragraph 20 of the complaint.
Shortly after TPL notified Kunelius of the assumption of Stow's exercise of right of first refusal, Kunelius and her counsel met with MacDonnell. During that meeting, Kunelius informed MacDonnell that the property was the sole asset of Kunelius, that she was a single woman supporting herself and the sole care-giver to her 91-year-old mother -- should have been father -- and that the sale of the property under the terms of the P&S were critical to her financial well-being and financial stability. Kunelius informed MacDonnell that she was relying on his representations that TPL would acquire the property under the terms of the P&S. MacDonnell acknowledged to Kunelius and her attorney that the acquisition of the property by TPL was a

certainty.
Do you recall that discussion with Mrs. Kunelius?
MR. CONROY: Objection.
A As I said a minute ago, I recall an early discussion, but as I sit here this morning, I can't remember all of the details of it.
Q Your answer to this was: MacDonnell admits that he met with Kunelius and her attorney on several occasions and was informed that Kunelius was a single woman caring for her elderly father and that Kunelius wanted to sell the property. Except as expressly admitted, MacDonnell denies the allegations in Paragraph 20 of the complaint.
As you sit here today, is it your testimony that you have no recollection of telling Mrs. Kunelius that the sale was a certainty?
A That is my testimony.
Q And is it your testimony you would never have told Mrs. Kunelius that the sale was a certainty?
MR. CONROY: Objection.
A No, my testimony is that I don't recall using that word.
Q Are you testifying that you did not use the word or

that you do not recall using the word?
A I have no recollection of that word being used in that conversation.
Q So, is your testimony concerning the word certainty as opposed to the concept that the sale would most certainly occur?
A It is both. I do not believe that I used the word certainty, as I sit here this morning, but I do not recall using it or not using it.
Q So, as you sit here today, you cannot deny with any certainty at all that you had a discussion with her in which you told her that she did not have to worry about this sale because it would occur.
MR. CONROY: Objection.
MS. FETOUH: Objection.
MS. ECKER: Objection.
A I believed it would occur. Whenever TPL goes into these projects, it is our one hundred percent belief and we are very confident that the deals go through, and in every one of the other Chapter 61 cases that TPL has worked on, it has gone through. So, I would have had confidence that this one would go through.
Q In fact, you told her that every other TPL sale went through. Do you recall telling her that?

$700,000 that would have been available at the time of the closing, given the fact that 400,000 was a note, and that TPL would have to come up with between 4- and $500,000 of additional funds at the closing in order to effectuate the sale.
A If there was a way to take advantage of the mortgage, but ultimately we concluded that there wasn't.
Q And you concluded that there wasn't because, isn't it fair to say, that TPL voted not to borrow the money from Mrs. Kunelius?
A The reason that the mortgage didn't seem to be helpful for TPL is that it would have required that the property be subject to a mortgage and that --
Q Right. And -- go ahead.
A I was going to say that it was the town's insistence that, if they're going to spend their money, they're going to get a property interest for it. The town would be uninterested in getting the property interest that they were teeing up, which is the 45 acres, subject to a mortgage.
Q So, it's fair to say that there was an independent decision by TPL not to avail itself of the four hundred thousand dollar mortgage that was part of the purchase and sale agreement. Isn't that fair to say?

MS. FETOUH: Objection.
A It didn't seem that it would work.
Q So, you had testified earlier that, according to your understanding of Chapter 61, there were certain provisions that were applicable on an assignment under Chapter 61 and certain provisions that were not. My question now is relative to the purchase price itself, which includes components such as mortgage provisions.
Is it your testimony today that, prior to accepting the assignment, you had concluded that you would not comply with the mortgage provision because TPL didn't like the effect of that mortgage provision?
MS. FETOUH: Objection.
A I can't recall when, in the sequence of this long project, the mortgage problem came up, so I just don't have that recollection, but somewhere along the way that issue was considered and it resulted in sort of an awareness. It's not so much a decision, an awareness that it just wasn't going to be helpful.
Q But the term of the mortgage was clearly stated in the purchase and sale agreement that was provided to you and to the town at the time that the town considered the exercise of the right of first refusal or the

assignment thereof. Is that fair to say?
A Was the mortgage provision in the contract?
Q Yeah.
A Yes.
Q So, it didn't come as a surprise to you or to the town that, as a result of complying with the terms of the contract, there would be a mortgage on the property for some period of time until the final $400,000 was paid off. Is that correct?
MS. FETOUH: Objection.
A Not necessarily. I mean, I think part of TPL's analysis was not so much to conclude ahead of time, early in the game, whether or not the mortgage was helpful or not helpful or something that we'd take advantage of or not. It was just there.
Q So, from your point of view, that term, that mortgage, was an option available to you but not something that you were required to do. Is that fair to say?
MS. FETOUH: Objection.
A You know, I don't know whether using the term option is the right way to describe it. I remember reading the provision and sometime later figuring out that it was problematic to use it and that we needed to wrestle with that issue.

Q Do you recall being told by Mrs. Kunelius --
MR. McLAUGHLIN: Could you step out?
MR. KACHAJIAN: Yes.
(Messrs. Kachajian and Norris exit the room.)
Q Do you recall being told by Mrs. Kunelius or her counsel that the mortgage provision remained available to TPL after TPL accepted the assignment?
A I don't remember that. I remember having a discussion with somebody within Mrs. Kunelius' team about the mortgage, but I don't recall exactly what we said.
Q Do you recall, generally, that perhaps Mr. Kachajian had a discussion with you concerning the fact that Mrs. Kunelius remained open to the application of that provision of the contract to TPL?
A As I think I said, I don't remember that.
Q So, you don't even remember Mr. Kachajian saying that?
A I don't remember anybody expressing the availability of a mortgage provision. I remember having a discussion about the mortgage provision.
Q At some point, the issue came up concerning looking for additional funds from the state. Do you recall that?
A Yes.
Q What were the funds that were being sought from the

state and what were the purposes of those funds?
A The funds sought were a grant from DHCD, which I believe stands for the Department of Housing and Community Development.
Q And what were they for?
A My memory is that they were a grant which would help facilitate the conversion of the units to affordable structures, affordable housing.
Q Do you remember what the amount was that you sought from the Commonwealth?
A I believe it's three hundred and fifty thousand.
Q And do you recall that it was initially 125,000 and then it was increased to 350 or 325?
A No.
Q So, you don't recall any circumstances in which there was a need to increase the amount of the application. You don't recall anything related to that?
A I don't.
Q Going back to the conversation and/or meeting with Mrs. Kunelius and her attorney, I believe your answer indicated that you remembered that this was her retirement. I think that's what you said, that you realized it was her retirement, but I probably -- let me just read his answer to make sure I'm saying that

correctly.
MR. CONROY: You mean the answer to the complaint?
MR. McLAUGHLIN: Answer to the complaint.
MR. CONROY: Are you going to put it in front of him?
MR. McLAUGHLIN: Yeah.
Q All right. So, here's what it says. If you can just read your response. It's 20. That's to the telephone conversation.
A You want me to read this?
Q Yes.
A Number 20?
Q Yes.
A MacDonnell admits, or, quote: MacDonnell admits that he met with Kunelius and her attorney on several occasions and was informed that Kunelius was a single woman caring for her elderly father and that Kunelius wanted to sell her property. Except as expressly admitted, MacDonnell denies the allegations in Paragraph 20 of the complaint.
Q Would it refresh your memory if I told you that, during that discussion, Mrs. Kunelius will testify

that you told her that you had several million dollars available for the purchase in-hand at the time that you had the telephone discussion, in-hand?
A It would not.
Q Do you recall telling anyone that TPL, and when I say you, I mean TPL under that circumstance, so if I replace the word you having the money with TPL, would your answer still be the same? I wasn't implying that you had the money but that TPL had the money.
MR. CONROY: Will you state it again?
A Could you just ask the question?
Q Would it refresh your memory if you were to learn that Mrs. Kunelius would testify that you told her that you had several million dollars, that TPL had several million dollars of funds in-hand, available to it immediately, for the purchase of the property?
A It would not.
Q Are you testifying that you didn't say that or that you don't recall saying that?
A I don't have a recollection of that conversation, so that's sort of the sum total of what I can say about it.
Q So, you're not saying for certain that you didn't say it. You're only saying that you don't have a

recollection of saying it.
A There is nothing in my memory that suggests to me that I said that.
Q Is there anything in your memory that suggests that TPL, at that time, had several million dollars of funds available to it on a fairly immediate basis that would allow for the purchase of the property without any other source other than the TPL funds themselves?
A I'm sorry to make you do this, but I think I need to have you say that again.
Q Is there anything that you can recall that would suggest that TPL had several million dollars available to it to buy the property at the time that you had a discussion with Mrs. Kunelius, this discussion referred to in Paragraph 20?
A No.
Q Did you ever tell Mrs. Kunelius that you had the equivalent of a Plan A or Plan B and a Plan C, something like that, so that no matter what happened the sale would go forward?
A I don't.
Q You don't recall telling her that, correct?
A Right.
Q Did you have a Plan A or a Plan B or a Plan C to

ensure that the sale would go forward even if Plan A failed or Plan B failed?
A Well, the way TPL crunches these projects, generally, is with a Plan A, the set of circumstances that we hope will work, and I'd say in, you know, nine out of ten projects, what feels like Plan A actually is utilized but that there are, in most projects, a number of variables that result in some things changing. So, at the beginning of a project, it's very common that Plan A becomes Plan B. I don't recall this discussion using those terms.
Q Do you have specific expertise in your role as the state director, Massachusetts state director, in applying for loans from DH, whatever, Department of Housing and Community Development?
A No.
Q You are aware, are you not, that TPL made an application for funds to the Department of Housing and Community Development?
A Yes.
Q And you are aware that TPL itself filled out the application for those funds, which were the 325- or $350,000 that you referred to earlier, correct?
A We hired a consultant who knows more about this

process than we do to help us do that, but together with him, we prepared it.
Q And do you know who prepared it from TPL?
A Together with the consultant?
Q Yes.
A Yes, I do.
Q Who is that?
A Chris LaPointe.
Q And what's Chris LaPointe's position?
A Project manager.
Q And does he report to you?
A He does.
Q And do you recall working with Ross Perry in reviewing the application to DHCD?
A Yes.
Q I'm going to put before you what is now going to be marked as 11.
(WHEREUPON, Exhibit No. 11, DHCD grant application, marked for identification.)
Q I'm putting before you Exhibit 11, and just for the record, this is a compilation of various documents received from the town, beginning with Bate stamp number KUN336 and continuing to 411, the first page of which is a document that appears to be sent by Ross

Perry, project management of BNC/LID/Interconnect, to someone by the name of Bill, and the first sentence says: I left at your door the DHCD grant application that TPL has filled out.
Do you recall receiving a copy of this?
A Of the cover memo?
Q The whole thing.
A I have a recollection of seeing the application before it was submitted, whether this is the application that you have in front of me or it has, you know, more things here, I just don't know.
Q This appears to us, having gone through the documents received from the town, that this is the application minus the signature of TPL. The second page appears to be the signature of Ross Perry on 3-30-03. Do you see that?
A 3-3 --
Q 3-30-03, second page.
A 337?
Q No, down at the bottom, his signature.
A Oh, I'm sorry. I was reading the Bate's number. Yes, I see that.
Q I direct you to the first page again, which says: Let Craig MacDonnell and me know if there are any

questions.
Do you know from looking at this who Bill is?
A I would guess that it's Bill Wrigley.
Q And Bill Wrigley is the town administrator?
A Either administrator or manager. I can't remember his title.
Q And at the bottom, it says: Craig can be reached at 617-367-6200. Is that the TPL number?
A Yes.
Q Now, I have a couple of questions here which, I must admit, confuse me. So, if I can direct your attention to Page 342, under the Financing Mechanism, and it's a paragraph with a one, Financing Mechanism.
A Uh-huh.
Q And the second paragraph says: TPL is prepared to purchase the property. TPL has a primary plan and a fallback plan. The primary plan envisions a multilateral funding approach to this project. Some of the funding is contingent, as explained below, but all of it is subject to a fallback plan, fallback line of credit from Wainwright Bank. Do you see that?
A I do.
Q So, earlier I had asked you if you knew a man by the

of 2003 that the Town of Stow was not going to provide the three hundred thousand and the one hundred thousand?
A No. No.
Q So, the fund-raising gap that you're referring to does not include the Stow funds, correct?
A Correct.
Q And so what you were referring to -- well, let's go on. Not only has the economy been hostile to philanthropy, in general, we have experienced a catastrophic failure in the rejection of the 350,000 Department of Housing and Community Development grant. Do you see that?
A Yes.
Q Now, why was that catastrophic?
A Because we needed it.
Q But if you look at Exhibit 11, Exhibit 11 says: As a fallback plan, if any or all of the above-referenced sources are unavailable, TPL intends to utilize capital from the private market.
Now, Exhibit 11 suggests that nothing would be catastrophic because you had the fallback plan which involved a line of credit. What made the loss of the 350 catastrophic?

MR. CONROY: Objection.
MS. FETOUH: Objection.
A When TPL analyzes these projects, it identifies sources of takeout money, dollars that will be spent to acquire the property interests that are necessary to make the conservation project complete. Because TPL is not a landholding organization -- in other words, we don't buy land to hold for conservation. We occasionally will buy it and sell it, if necessary, to complete a conservation project -- we always look for the ultimate takeout, that is, the source of funds that will purchase the property interest that I just mentioned.
So, in determining whether or not a project can be completed, TPL engages in an analysis of whether the ultimate takeout funds will be available. In this project, those funds appeared not to be available, ultimately. The fund-raising we had imagined did not materialize, the DHCD grant did not come through, and it did not seem as if it was possible to raise those dollars for the ultimate conclusion of the project, not that TPL could not borrow the money to make -- to replicate those dollars but that any borrowing

that TPL engages in is designed only as a stopgap, an interim stopgap, subject to our own due diligence that would satisfy us that ultimately that loan could be repaid from capital takeout.
Q At the time that you accepted the assignment, I believe your testimony was that you had every expectation that everything would work out.
A We did.
Q Is it reasonable -- is it your position that Mrs. Kunelius, in signing the purchase and sale agreement with Mosaic Commons, should have anticipated, one, that TPL was coming onboard and, two, that eventually, notwithstanding their alleged best intentions, they would fail?
MS. FETOUH: Objection.
Q Is that something that you think Mrs. Kunelius should have anticipated?
MR. CONROY: Objection.
MS. FETOUH: Objection.
A Well, I don't know if Mrs. Kunelius should have anticipated that, but an attorney reading the contract and knowing Chapter 61 would know that the assignee steps into the shoes of a contract negotiated by him

or her and that that contract imagined Mrs. Kunelius walking away with liquidated damages but not the purchase of her property.
Q It's your testimony that you did not anticipate, ultimately, that this matter would fail, and, in fact, your testimony is that you had every expectation that it would go forward. Am I right on that?
A As with every TPL project we work on. We don't get into these projects just for the heck of them. We do them to achieve conservation. So, absolutely, yes, completely our intention.
Q And, therefore, you were not expecting that Mrs. Kunelius should have anticipated that TPL would not have been able to raise money for the purchase. Is that reasonable to say? I don't care about lawyers.
A No.
Q The question is: if you didn't anticipate it, is it reasonable for you to expect that Mrs. Kunelius should have anticipated that you would have failed?
MR. CONROY: Objection.
MS. FETOUH: Objection.
MS. ECKER: Objection.
Q TPL would have failed.

A I don't know what it is reasonable for Mrs. Kunelius to have expected on her own, but anyone reading the contract would know that there are two ways forward under that contract. One is with the purchase. Another is via an in-completed transaction.
Q But you told the Commonwealth of Massachusetts there was a fallback plan. I still don't understand what was intended by TPL in telling the Commonwealth that, even if any or all of the other sources were unavailable, that TPL intends to utilize capital. If that's the fallback plan, what was the purpose of telling the Commonwealth that?
MR. CONROY: Objection.
MS. FETOUH: Objection.
A What that means is that TPL could have borrowed to conclude this transaction if it made sense, otherwise, from a due diligence point of view. What I'm trying to tell you about is this due diligence piece that imagines in every TPL project that if borrowing is necessary, the borrowing is replaced by conservation takeout dollars that materialize somewhere. In the absence of dollars on the horizon, fund-raised, sale of 142 or 144, it would not be prudent for TPL to borrow the money to complete the transaction.

Q How much money you had to borrow?
MS. FETOUH: Objection.
A It depends how much money would have been on the table to begin with.
Q Well, at the time, the application says none of the sources are critical because you can borrow. That's essentially what it says. My question is, at a minimum, one source was available. That's the four hundred thousand from the city, from the town, is that correct?
MS. FETOUH: Objection.
MR. CONROY: Objection.
A Well, three hundred is available at the closing if the town gets their land. The one hundred wouldn't be available until the ultimate renovation and resale of the two units, of 142 and 144. It became apparent in the middle of this project that that subdivision process was fraught with problems, that we can talk about, but towards the end of the project, the ability of TPL to subdivide that property was highly problematic, and it did not appear as if that subdivision was possible.
Q In fact, you were told prior to the time that you acquired the property that the subdivision was

MR. CONROY: Objection.
MS. FETOUH: Objection.
A I can testify that I reached that conclusion, but I can't say who else in their own minds reached that conclusion.
Q Okay. Let's go back to Paragraph 30, and I want to, again, ask you since I didn't understand your past answer.
Look at Paragraph 30, the third paragraph of Paragraph 30: Notwithstanding the foregoing, buyer shall only encumber the 8.57 acre parcel expected to be developed -- parentheses -- consisting of .93 acre parcel and 7.64 acre horse farm parcel. Do you see that?
A Yes.
Q Again, I'm going to ask you what made you consider that the security for the four hundred thousand dollar loan from Mrs. Kunelius to TPL would be anything but the parcel described for security in Paragraph 30?
A And as I sit here today, I don't know what caused me to reach that conclusion.
Q In fact, isn't it fair to say that it's entirely possible that your conclusion was wrong?
MS. FETOUH: Objection.

A I don't know if that is a fair thing to say. What I started to talk about was the configuration of the 8.57 acre parcel. One of the things TPL was doing was considering revising the boundary between the town parcel and the developed parcels, and the reason that we imagined doing that was to facilitate the redevelopment, or the reconfiguration, of 142 and 144 so that they could be sold. There were a number of provisions in the subdivision law that required us -- I think there were shape variances and various things that required us to redraw the boundary of the line between the town parcels and the developed parcels. I don't know, as I sit here today, whether or not that followed the same line.
Q But where in the purchase and sale agreement or in the assignment does it allow TPL to alter such a basic term of the purchase and sale agreement involving the very essence of the amount that is to be paid and how it's to be paid? In other words, does TPL, simply as an assignee, have the right to say, "I don't like this term as defined in Paragraph 30, and, therefore, we're going to do something else"? Is that what TPL believes is their right under the assignment?
MR. CONROY: Objection.

MS. FETOUH: Objection.
A I don't know what you're asking.
Q You do not know what I'm asking? Is it your testimony that TPL could unilaterally change the terms and provisions of Paragraph 30 and not have to comply with Paragraph 30?
A That's not my testimony.
Q Is it your testimony that you agreed to comply with Paragraph 30?
MS. FETOUH: Objection.
MR. CONROY: Objection.
A We stepped into the shoes of the contract.
Q But the contract does not say that there will be a redefining of the 8.57 parcel. It doesn't say that anywhere, does it?
A This discussion is in the context of trying to decide whether or not the four hundred thousand dollar mortgage was available or usable, correct?
Q Well, certainly, I think you're aware that it was available. Mrs. Kunelius was willing to lend it. The question becomes whether TPL believed it could unilaterally say, "We're not going to do it unless we get a subdivision in a manner that we deem appropriate. Otherwise, there is no availability."

Essentially, that's what you're saying, and I'm saying, where in the contract does that allow --
A I think you've misunderstood me.
MS. FETOUH: Objection.
MS. ECKER: Objection.
MR. CONROY: Objection.
A With respect to the subdivision, the subdivision issue relates to the question of how TPL would create value and bring dollars to the table. What became apparent is that that subdivision wasn't possible.
Q But your argument, I think, sir, is that you stepped into the shoes of the buyer. The shoes of the buyer allowed for what was contained in Paragraph 30, but you didn't like what was contained in Paragraph 30, so TPL changed those terms by seeking to get variances, did you not?
MS. FETOUH: Objection.
MR. CONROY: Objection.
MS. ECKER: Objection.
A With all due respect, it's a complete non sequitur. What I'm talking about is how TPL brings money to the table, not whether or not this contract imagines or doesn't imagine us doing that.
Q Well, do you agree that you stepped into the shoes of

the buyer?
MS. FETOUH: Objection.
A Yes.
Q And do you agree that some terms do not apply to TPL?
A As a matter of Chapter 61 law, or lore, the assignee is naturally required to comply with some but not all terms.
Q Does the assignee have to comply with the purchase price?
MR. CONROY: Objection.
MS. FETOUH: Objection.
A If the assignee goes forward and purchases the property, I would say yes.
Q I'm going to put before you another document.
(WHEREUPON, Exhibit No. 14, Conditions for right of first refusal, marked for identification.)
Q The document that I am putting before you appears to be an iteration of what you've already seen as Exhibit 7. It was received from the Town of Stow. It has DRAFT on the top. It discusses the conditions for transfer of the town's right of first refusal on the Kunelius property. The bold language appears to be TPL's answers to

questions.
I had asked you earlier if you remembered Exhibit 7, and you said you were not sure or, no, you didn't. I'm asking you now. Do you remember what is now Exhibit 14?
MR. CONROY: Objection.
A It looks somewhat familiar.
Q And isn't it in fact true that all of the TPL responses are after each question raised by the town, and those responses are in bold print?
A It appears that way.
Q And are you the author of the bold print responses?
A I believe so.
Q And you would agree with me that this correspondence, or this document, had to be drafted prior to the assignment?
A That would make sense.
Q So, let's look at Item No. 2, which is referring to the town's request that the town be held harmless if TPL backs out of the deal before closing, in other words, and I'm quoting, in order words, that TPL will defend the town against any suit resulting from the failure of the property purchase to be completed. Alternatively, TPL posts a bond that guarantees their

A The email from Jacobs to Sommerlad?
Q Yes.
A Yes.
Q So, you had reason to believe in early February, long before the acceptance of the assignment, that there were going to be problems with zoning for the two lots in question, didn't you?
MR. CONROY: Objection.
A We knew it would be a challenging subdivision that would require relief from the relevant boards.
Q But I thought you testified, sir, that you didn't have any inkling that there was going to be a problem until well after the acceptance of the assignment and it was well into the process. In fact, you did have knowledge very early on, even before you accepted the assignment, that you weren't going to get approvals from the Planning Board. Isn't that fair to say?
MS. ECKER: Objection.
MS. FETOUH: Objection.
MR. CONROY: Objection.
A I think you're confusing two issues.
Q What are the two issues I'm confusing?
A One is whether there was an analysis to be had on the front end about which waivers, which variances, which

permits, were required and which path through that process was appropriate. My recollection is that that issue was wrestled with and that Karen Kelleher, in a meeting with TPL, led us to believe that those issues could be resolved. So, later on, however, in the process, another more complicating factor emerged, so that when I was referring to the problem earlier -- do you follow me?
Q Yes.
A That I was referring to the problem that developed later rather than the analysis, sort of the just working through the kinks on the front end.
Q Let's go to the purchase and sale agreement, if you would. Where in the purchase and sale agreement between Mrs. Kunelius and Co-housing does it discuss zoning changes, special permits or variances?
A I don't believe there's any reference to those issues in the contract.
Q So, the insertion of a zoning variance, special permit, subdivision issues, those three issues, was made by TPL since it's not discussed in the purchase and sale agreement itself.
A We're not inserting anything. I'm not suggesting that the subdivision issue is a contract contingency. It's

a fund-raising obstacle.
Q So, let me move back. This is the first time I've heard that.
So, your refusal to move forward and purchase the property did not result from the failure to get a subdivision plan approved, or any variances or permits that would be needed, for the project that you envisioned to be built on the site rather than what Mosaic Commons envisioned. Is that correct?
MR. CONROY: Objection.
MS. FETOUH: Objection.
A What I'm saying is that the difficulty TPL encountered in achieving the subdivision was not related to the contract per se at all. It was a project issue that prevented TPL from subdividing 142 and 144 and thus realizing on the sale of the separate lots.
Q You realize, sir, that Mrs. Kunelius lost the opportunity to sell the property to Mosaic Commons as a result, direct result, of the actions of TPL in accepting the assignment and then failing to go forward in the purchase.
MS. FETOUH: Objection.
MR. CONROY: Objection.

Q Do you realize that?
A Is that a question?
Q Yeah.
A I believe that the contract played out as it was intended, to either enable Mosaic or the assignee to go forward under the contract.
Q But, in fact, neither did. Isn't that correct?
A In fact, the contract imagined either a sale or a default, and the default resulted in liquidated damages. That was the end of the contract.
Q Is it your testimony that you believe Mrs. Kunelius anticipated that TPL -- strike that.
Prior to TPL scoping out Mrs. Kunelius' property, did you ever meet with her?
A Prior to scoping it out?
Q Yeah.
A No, I believe we spoke on the phone and met through the course of the project.
Q But is it your testimony that you believe Mrs. Kunelius anticipated that TPL would come in and then default and that she would lose, as a result of that default, the opportunity to sell the property to Mosaic Commons?
MR. CONROY: Objection.

MS. FETOUH: Objection.
MS. ECKER: Objection.
A I have no idea what Mrs. Kunelius --
Q Do you have an understanding that Mrs. Kunelius had considered such an outcome when she was negotiating her deal with Mosaic Commons?
MR. CONROY: Objection.
MS. FETOUH: Objection.
A Given that I wasn't in the room when she was talking about this contract with her attorney, I have no idea what she anticipated.
Q Looking at Paragraph 1, 2, 3, 4, of the purchase and sale agreement, since I don't think anyone disagrees, at least for the purposes of today, that those apply, or perhaps they don't. Do you agree that all of those provisions, 1, 2, 3 and 4, of the purchase and sale agreement apply to TPL?
A Well, I'll go through them one by one. Should I do that?
Q Sure.
A Paragraph 1 speaks in terms of the seller and the buyer, and the buyer is listed as Co-housing Resources, not TPL.
Q Right.

A Of course, the operation of 61 would alter that. Paragraph 2 talks about the property. Paragraph 3 talks about the buildings. Paragraph 4 talks about title.
Q Well, let me stop at Paragraph 3 for a minute. It says in as-is condition, does it not?
A Those are the last three words of Paragraph 3.
Q Do you have an understanding as to what as-is condition means?
A I do.
Q And what is your understanding?
A That the property is sold as is.
Q Not with additional subdivisions, doesn't mention that. Doesn't mention additional permits. It says as is, isn't that correct?
MS. FETOUH: Objection.
MR. CONROY: Objection. It says what it says.
Q Well, you don't see anything in there that talks about additional provisions such as subdivisions or permits or anything.
A As I mentioned a minute ago, the question of subdivision is not a contract -- just allow me to finish -- is not a contract issue that TPL is raising.

(Messrs. Kachajian and Norris not present)
By MR. McLAUGHLIN:
Q We were talking about the meeting, I think you said, at Boothroyd's office. Do you remember if anyone accompanied you from TPL to that meeting?
A I don't believe so.
Q Do you recall whether anyone from the town accompanied you to that meeting?
MS. FETOUH: Objection.
A You know, I don't remember. There were so many of these with various players.
Q Do you recall being assisted out of the room by one of the individuals at that meeting because you had become extremely angry, angry and agitated?
A No, that did not happen.
Q Do you know a Bob Wilbur?
A I do know Bob.
Q Do you recall, was Bob Wilbur at that meeting?
A Bob Wilbur was at several of these meetings. This doesn't have a date on it.
Q You're looking at the complaint?
A Yes.
Q No, it doesn't not have a date. How well do you know Jim Boothroyd?

A I met Jim through this project.
Q Do you recall the discussion between yourself and Mrs. Kunelius and her representatives as being heated?
A I remember this period of time continuing, actually, into the fall, later -- what is the date, spring of '04? Is that right?
Q Yes.
A I remember there were discussions in the spring and in the summer and into the fall where TPL was trying very hard to keep this project alive, and there were a number of meetings to do that.
Q When you say they were trying to keep the project alive, do you recall proposing a new purchase price for the property?
A I recall trying to put together an alternative deal.
Q And did that include a new purchase price?
A Yes.
Q And do you recall doing that on at least two occasions?
A Yes.
Q Do you recall asking that the price be reduced to $900,000?
A I remember, I believe, eight hundred and nine hundred.
Q Okay. Saved me the question. Under the terms of the

purchase and sale agreement, did you believe you had the right to change the purchase price?
A The contract was over at that point. We weren't talking about the contract anymore.
Q So, you viewed the contract as dead at that point?
A Yes.
Q Back to the meeting. Do you recall getting into an argument with Mr. Kachajian and then threatening him in any way?
A I remember having a discussion where TPL was trying very hard to come up with an alternative plan that would get a significant amount of money into Mrs. Kunelius' pocket, and what I remember is that we weren't making any progress on that front and that Mr. Kachajian and I went back and forth on whether or not this was possible or not, and I believe Mr. Kachajian was not encouraging this outcome, and I was trying my best to encourage him that it's a good opportunity for Mrs. Kunelius.
Q And the good opportunity you're talking about is accepting a lower purchase price. Is that fair to say?
A Lower than the contract price.

Q And in the alternative, if she did not, that you would not pay her anything at all and walk away.
A We had already walked away.
Q Now, back to Paragraph 46. Do you recall saying something to the effect that TPL had serious and influential connections by way of its Board of Advisors who would defend TPL against any legal action brought by Kunelius as a result of TPL's default? Do you remember saying anything like that?
A I remember saying that we thought that, if necessary, we would litigate this issue, because we thought we were right, and that if we couldn't put a project together now or then, after the contract was dead, that we would look to our pro bono counsel to litigate the issue, and because we thought we had a good case, we thought we'd win.
Q And, in fact, the pro bono counsel was on your Board of Advisors, and that was Goodwin, Procter & Hoar.
MS. FETOUH: Objection.
A Goodwin does represent us in this matter, and, you know, whether I referred to them by name, I can't remember.
Q You also had other counsel, pro bono counsel, on your Board of Advisors, including Hill & Barlow?

A If it was still Hill & Barlow then. I can't remember.
Q I think it was. But you recall them being on your Board of Advisors?
A I do. Well, not the firm. There was --
Q Someone from Hill & Barlow?
A -- a lawyer from what I think was Hill & Barlow.
Q Do you recall referring to Choate, Hall & Stewart as your counsel in that discussion with Mr. Kachajian?
A I don't.
Q Do you recall saying to Mr. Kachajian that your pro bono counsel could bury him because it doesn't cost you anything and Mrs. Kunelius couldn't afford to have counsel represent her in the long run?
A I remember saying that I thought we had a really good case and that, if necessary, we would litigate it and that we would win because of the strength of our position.
Q But you do not remember saying -- are you denying that you said to anyone at that meeting that your counsel, your pro bono counsel, would bury Mrs. Kunelius and anyone who tried to represent her?
A I don't know if I used the word bury, but I was vehement in my statements that we had a very strong case.

Q Do you recall saying that the Board of Advisors included prominent law firms that would tie up Kunelius for as long as it took?
A Not in those words, I don't recall, but I do remember saying that we would litigate this to the end and that we would win.
Q Do you recall saying that it would tie up whatever assets she had and she couldn't possibly win, something to that effect?
A I don't recall discussing assets. I recall discussing the merits of the case and saying that, because of the correctness of our position and the capacity of our counsel, I believed we would prevail.
Q Do you recall saying to Mrs. Kunelius and the people that were with her there that you knew she was of limited means and that her attorney would not be able to spend sufficient funds to win any matter against TPL because of TPL's pro bono counsel which didn't charge anything?
A What I can tell you is what I remember of that meeting, in which I believe Mr. Kachajian and I debated at length whether or not it was possible for this project to be reconstructed, and we debated lawyer to lawyer who would win the litigation if it

(WHEREUPON, Exhibit No. 21, Pelletier letter to Stow Board of Appeals, dated September 25, 2003, marked for identification.)

MR. McLAUGHLIN: I don't know what you want to do. I've still got a substantial amount here, so we'll keep plugging along here as long as we can.

Q Exhibit 21 appears to be a letter from regional counsel, Denise Pelletier, to the chairman of the Stow Board of Appeals on September 25th, in which you're asking for variances to be dropped, I should say, to drop your application for variances, and, this, some almost three weeks after your letter to Mr. Kachajian.

During the time that you were applying for these variances, particularly, in September, I thought you already said that if it was September, the deal was done. It was over. You were looking at some new deal. Am I correct in my characterization of your testimony?

A As I've testified earlier, TPL's confidence level in this project waned gradually over a period of time. There was no decision point, so that over the summer of 2003, it became increasingly untenable that this project could go forward. There was a moment in time

when it became particularly problematic, and I think that moment probably was when we determined that the subdivision was hugely problematic, and you recall earlier today we talked about sort of the early analysis of when we were trying to just, as lawyers, figure out the best route to subdivide the property, and then I said later on another problem arose that was even more problematic.

What happened in the summer -- let me just finish the thought. In the summer, we learned something that we hadn't known before, which was that the two parcels, 142 and 144, were not owned by separate entities. It was our understanding before that time that they were owned by separate entities and that the common law doctrine of merger would not apply, and so that so long as we could get the variances that we were seeking, the future existence of 142 and 144 could be created for purposes of sale. Somewhere along the path, it became apparent to us that, in fact, 142 and 144 were owned by the same entity, the doctrine of merger applied, and there was no way to subdivide it.

Q There was no way to subdivide based upon your plan for

the property rather than the plan for Co-housing and Mosaic Commons, correct?

A The proposal for what we intended to do, the variances we sought, would be rejected. So, it was important for us not to have that rejection made. In effect, we were thinking of Mrs. Kunelius' property rights at this point in time and didn't want an adverse variance decision on the record, not only for Mrs. Kunelius' sake but also for the possibility of the future in which the town, TPL, everybody else, could reconfigure this project and make it go forward.

Q Are you familiar with how much cash on hand TPL Massachusetts has at any particular point in time?

A No.

Q Do you have even a general sense of how much cash on hand TPL has right now?

A TPL, nationally?

Q No, Massachusetts.

A I do not know.

Q Could you tell me within a half a million dollars?

A No.

Q As the director of the Massachusetts division of TPL, you do not know how much money is in your checking account, approximately?

A In any given moment, no, because a lot of money goes in and out to do projects all the time.

Q I understand. But within general terms, do you carry a balance in your checking account of a half a million dollars?

A I just told you that I don't know what the balance is, and I don't know what it normally is. It fluctuates hugely.

Q So, do you have any idea of what amounts TPL has in other assets, liquid assets, nationally?

A I do not.

Q Have you ever looked at TPL's financial statements to determine how much money they have in their accounts?

A Not closely.

Q But you've looked?

A I mean, I've seen the balance sheet.

Q Have you ever considered or did you consider using any of TPL's assets beyond the line of credit in order to fund the purchase from Mrs. Kunelius?

A No.

Q Did you ask anybody if there were funds available that could be used? I'm talking about liquid assets, such as cash or certificates of deposit or any other types of assets, which could be liquidated within some

reasonable period of time in order to effectuate the purchase.

A I don't recall.

Q Is it your testimony today that you do not know whether TPL, nationally, has $800,000 in cash or liquid assets available to it, or had $800,000 in cash or liquid assets available to it, that it could have used at the time that TPL was required to purchase the property from Mrs. Kunelius?

A That's not my testimony.

Q So, is it possible that TPL did have cash or liquid assets sufficient to make the purchase from Mrs. Kunelius?

A I just don't know what the state of TPL's liquid assets were in that period of time.

Q Do you have to submit a budget in your role as a director of Massachusetts?

A Yes.

Q And with that budget, do you consider sources and uses of funds on a daily, weekly, monthly, yearly basis?

A Quarterly.

Q Quarterly. And when was the last time you did that? Would it be December 31?

A TPL's fiscal year ends at the end of March. So, we

are coming up on the end of our fiscal year.

Q So, you're actually considering a budget right now for next year, are you not?

A Yes.

Q Is it your testimony today that in establishing that budget, as you are apparently doing currently, you have no idea of how much money is in the cash reserves, the bank accounts, the checking accounts, the savings accounts, of TPL for Massachusetts?

A TPL begins every year at zero and ends, hopefully, every year at zero. We don't have an endowment. This is not an organization that has cash sitting around ready to throw at projects. This is a very squeaky organization when it comes to spending money. We're a conservation organization. We just don't have that much. So, in the budgeting process, we think very carefully about anticipated revenue, anticipated expenses, going forward.

Q When your line of credit was obtained for six million dollars, what did TPL give as collateral for that, if you know?

A I don't know.

Q Is it an unsecured line of credit?

A It very well may be.

proposal because you didn't know the likelihood of fund-raising. Is that fair to say?
MS. FETOUH: Objection.
A No. No, not at all. This letter talks about a proposal that was previously on the table. This letter, the purpose of this letter, is to talk about the next proposal, a better proposal.
Q And that's the nine hundred thousand dollar proposal?
A Right.
Q All right. Let me simply ask you a few questions concerning the complaint and your understanding of your relationship with the town.
I presume as an attorney that, when you went to law school, you studied partnership law. Is that fair to say?
A Well, I'm trying to remember whether I took that course.
Q Well, Cornell most certainly teaches that course.
MS. FETOUH: Objection.
Q Well, she doesn't think Cornell does, but --
MS. FETOUH: No, I went to a comparable school. We didn't learn that.
MR. McLAUGHLIN: There's nothing comparable to Cornell.

Q You don't have to answer that question. You're aware, are you not, that Mrs. Kunelius has alleged that there was a joint venture, or a partnership, between TPL and the town. Is that fair to say?
A I've seen the word -- that there's the allegation?
Q Yes.
A I've seen the word partnership in the complaint.
Q And you are aware, are you not, that TPL has denied that there is a partnership?
A I am aware of that.
Q And you are aware, also, that you denied there was a partnership.
A I am aware of that.
Q Okay. Let's look at the January 5th letter from you to the town, to Ross Perry of the Board of Selectmen, and I would ask you to look at the fifth line up from the bottom. On the right-hand side, it says: All our projects are done at the request of and in partnership with entities that become permanent owners of the property. The two most important roles we play in this process are, one, we make sure that our obligations to our partners are met and, two, to raise funds necessary for the transaction from a combination of private and public sources.

Now, when you used the word partnership on the first page of your January 5th letter, which is Exhibit 25, were you referring to a partnership with the town?
A I was using the term in its colloquial sense and not in its formal legal sense.
Q There is a colloquial sense to partnership? And that would be what?
A Working together on something less than a legal partnership.
Q Well, is it fair to say that, in a partnership, would you expect the individuals or parties to a partnership to have a financial stake in a partnership?
MS. FETOUH: Objection.
MR. CONROY: Objection.
Q An investment, something that --
A A legal partnership, you're talking about?
Q Yes.
A Not always.
Q Doesn't have to have one?
A Correct.
Q Would you expect that there would be some contractual stake in a partnership where the parties enter into a written agreement by which they declare their partner

status to each other?
A Sometimes but not always.
Q Well, let me just ask you to look at your letter of January 5th to the town, and the second full paragraph says: For TPL to consider a financial and contractual stake in this project, we would need to secure our involvement in a way that will enhance the likelihood of sufficient public and private funds being available and ensures a strong conservation and community outcome.
Now, this says, as I understand it, that TPL intended to have a financial stake in the project. Am I wrong in my reading of that, sir?
A No.
Q So, what was the financial stake of TPL in the project when the project was for the acquisition of a 1,116,900 dollar piece of property? What was your financial stake, TPL's?
A Well, it would be the out-of-pocket dollars that we spent in pursuit of the deal, together with the value of the services that we provided through our staff that would otherwise be working on some other project.
Q Well, now, from a matter of your standing as a non-profit tax-exempt entity, do you bill services of your

staff on an hourly rate in order to establish a financial investment in a particular project?
A We analyze the time commitments of our staff on the basis of dollars every year, every project, all the time.
Q What was the contractual stake that you were entering into as a partner with the town that you're referring to here?
A It makes reference to a contractual stake in the project that I think we were contemplating. This is before the assignment?
Q Yeah.
A We're talking about stepping into the shoes of Co-housing Resources.
Q So, it was a financial stake with the town and a contractual stake with who, Mrs. Kunelius?
MS. FETOUH: Objection.
MS. ECKER: Objection.
A Well, there is a contract that we've spent a lot of time talking about that TPL became the assignee of. So, in effect, yes, that contract is the contract we're talking about.
Q Looking at the very last sentence of this exhibit, it states: If so, we ask that you authorize your

chairman to sign below as an indication of your partnership with TPL. Do you see that?
A I do.
Q Now, you have alleged, or you have denied, the existence of any partnership between yourself and the Town of Stow, is that correct?
A Yes.
Q Not yourself but TPL. Is that correct?
A It's my understanding that TPL has denied the existence of a partnership and that, individually, I have denied that TPL and the town had a partnership.
Q And you continue to deny that notwithstanding the fact that there is a written document that evidences their indication of joining the partnership and that there's a written document indicating what the cost of joining the partnership would be.
MR. CONROY: Objection.
MS. FETOUH: Objection.
MS. ECKER: Objection.
Q That means the Town of Stow.
MS. FETOUH: Objection
MS. ECKER: Objection.
Q Is that fair to say? Well, go head.
A Do you want to keep asking something?

Q No, go head. Is that fair to say?
A It is fair to say that the partnership we're referring to in Exhibit 23 is not a legal partnership but just a colloquial level of cooperation that doesn't rise to the level of a legal partnership.
Q Now, do you think a legal partnership has to be in writing, sir?
MS. FETOUH: Objection.
MR. CONROY: Objection.
A I don't have thoughts about that.
Q Well, you're aware that two people can have a joint venture which is called a general partnership in which they both work for some single purpose, such as two lawyers joining together for a law firm. There's no requirement of a written document in that instance, is there?
MS. FETOUH: Objection.
MR. CONROY: Objection.
A I don't know that to be true. My understanding is that the relationship that TPL had with the Town of Stow is not that kind of partnership.
Q How many kinds of partnerships are there that you're aware of?
MS. FETOUH: Objection.

MR. CONROY: Objection.
A Well, there is this kind, this informal collaboration, lower case P, non-legal, and then there are legal partnerships, sort of the formal partnership that the law firms that I was a part of and you may have been a part of, and that these folks are part of, that constitute a partnership.
Q Have you ever heard of the concept of partnership estoppel?
A No.
MR. McLAUGHLIN: Almost done. I think we're there.
Q I want you to just look at Exhibit 8 for a moment. Exhibit 8 is the Stow Community Preservation Committee minutes of February 10th. On the third page, which is 040, now, this is on February 10th, third paragraph down: A committee member asked Bob Wilbur about his conversation with Marilyn Kunelius. Bob said that she is afraid the contract may unravel with the town intervention and she will lose everything. Bob said TPL will not back down from a commitment.
Now, you were present at that meeting, so isn't it fair to say that you were aware that Mrs. Kunelius was afraid that she would lose

everything as a result of the intervention of the town and subsequent transfer of the right to TPL?
MR. CONROY: Objection.
A My memory of Mrs. Kunelius' situation is that this was an important asset for her. I don't have a recollection of this item being discussed at this meeting.
Q It goes on to say: Tom Marr spoke from the audience and said, "This is not the babe we want to fool around with and 1.2 is not the figure." Do you know what that's about, and do you know who he's talking about? Is Mrs. Kunelius the babe they were talking about?
A I can honestly say I have no idea what that refers to.
Q You can honestly say you have no idea. Was there some other individual that was a babe that had a connection with the 1.2 million dollar number?
MS. FETOUH: Objection.
MR. CONROY: Objection.
A I don't know what this is about.
MR. McLAUGHLIN: Okay. I think that's it. Thank you.
(WHEREUPON, the deposition concluded at 5:52 P.M.)

CERTIFICATE

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF ESSEX, ss.

I, Roberta J. Daniels, a Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, do hereby certify that the foregoing deposition of CRAIG MacDONNELL was taken before me on February 8, 2007, that the said witness was satisfactorily identified and duly sworn before the commencement of his testimony and that the testimony was taken audiographically by myself and then transcribed by myself. To the best of my knowledge, skill and ability, the within transcript is a complete, true and accurate record of said deposition.

Further, I am not connected either by blood or by marriage with any of the said parties nor am I interested either directly or indirectly in the matter in controversy.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 20th day of February, 2007.

Roberta J. Daniels, Notary Public
Commission expires: 11-15-13

CERTIFICATE

I, CRAIG MacDONNELL, do hereby certify that I have read the foregoing transcript of my testimony and further certify that said transcript is a true, accurate and complete record of said testimony.

Dated at , this day of , 2007, under the pains and penalties of perjury.

ERRATA SHEET

Deposition of CRAIG MacDONNELL

| Page No. | Line No. | Transcript reads | Change made |
|---|---|---|---|

# TAB 4

Volume: I
Pages: 1-94
Exhibits: 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11697-GAO

MARILYN KUNELIUS,
Plaintiff,

v.

TOWN OF STOW, separately,
A PARTNERSHIP OF UNKNOWN NAME BETWEEN TOWN OF STOW and THE TRUST FOR PUBLIC LAND, separately, and CRAIG A. MacDONNELL, in his individual capacity,
Defendants.

DEPOSITION of DOROTHY NELSON STOOKEY, a witness called by and on behalf of the Plaintiff, taken pursuant to Fed.R.Civ.P. 30(b)(6), before Roberta J. Daniels, a Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Law Offices of Michael C. McLaughlin, One Beacon Street, Boston, Massachusetts 02108, on Thursday, March 22, 2007, scheduled to commence at 10:00 A.M.

INDEX

| Witness | D | C | RD | RC |
|---|---|---|---|---|
| DOROTHY NELSON STOOKEY | 13 | | | |

- 3 -

APPEARANCES

Michael D. McLaughlin, Esquire
Law Offices of Michael C. McLaughlin
One Beacon Street
Boston, Massachusetts 02108
Counsel for the Plaintiff

Deborah I. Ecker, Esquire
Brody Hardoon Perkins & Kesten, LLP
One Exeter Plaza
Boston, Massachusetts 02116
Counsel for Defendant Town of Stow

Dahlia S. Fetouh, Esquire
Richard A. Oetheimer, Esquire
Goodwin Procter, LLP
Exchange Place
Boston, Massachusetts 02109
Counsel for Defendant The Trust for Public Land

James B. Conroy, Esquire
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd floor
Boston, Massachusetts 02108
Counsel for Defendant Craig A. MacDonnell

Also present:

Lucie DeBellis, Paralegal
Law Offices of Michael C. McLaughlin

EXHIBITS

| No. | Description | Page |
|---|---|---|
| 1 | Notice of deposition | 14 |

- 4 -

there was sufficient time, and then I'll move on to the issue of 40B.

MS. FETOUH: Okay. And I'll just reiterate that I don't see how the line of questioning falls into No. 7, which reads: Any policy or decision, whether official or unofficial, in which TPL has concluded that development by it under the provisions of Mass. General Laws Chapter 40B is unacceptable to TPL.

As I stated, I'll allow the witness to answer the question in her individual capacity, not as a representative of TPL, because I don't believe that this question falls into that category, but I will allow her to answer that question and allow you to move on to the next.

MR. McLAUGHLIN: Well, I do not accept that she's here answering in her individual capacity. If you want to submit her as an individual witness at this point, then I'll start asking her questions as an individual witness.

So, she's either here as a 30(b)(6) or she is not. If you want to have her go back and forth, in and out, then I will change the whole direction of this.

MS. FETOUH: Well, then, she's only here as a 30(b)(6). To the extent you don't want to hear her answer as an individual, then I would instruct her not to answer that question, because I don't believe it's captured within topic No. 7.

MR. McLAUGHLIN: Do you have a protective order with regard to this issue, madam?

MS. FETOUH: We do not yet have a protective order with regard to this issue that you've just --

MR. McLAUGHLIN: There is absolutely a nexus between the question relating to the position taken by TPL before the Court, regarding the inability of time, to questions relating to how one would go about looking at a 40B and what positions they would take, and I am simply investigating here by reasonable questions what that connection is. It is you, madam, that told the Court that there was insufficient time to evaluate a project. Time evaluating a project and issues relating to the acceptability of a 40B are absolutely related, and, therefore, I am asking her again to answer the question. If this

is not covered by any protected -- you know, there's no privilege here, and this is well within the scope of what she should be able to answer.

MR. OETHEIMER: Can we stop with the colloquy? I don't think -- maybe you misunderstood our proposal.

MR. McLAUGHLIN: Wait a minute. Don't instruct me what to do, sir. You said she was going to deal with this.

MR. OETHEIMER: Yeah.

MR. McLAUGHLIN: I am not going to deal with two attorneys for this witness, one or the other. That's what the Court will say. You know it and I know it. So, I would ask you to either get into that chair or let her handle this, but I am not going to first argue an issue with this attorney and then you.

MR. OETHEIMER: Okay.

MR. McLAUGHLIN: So, it's one or the other. I am going to take a five-minute break. When I come back, one of you decide who is going to handle it. All right?

MR. OETHEIMER: Well, I'm glad you're

talking a break because we should have a discussion off the record, because I probably will leave, because I'm not going to sit through this.

MR. McLAUGHLIN: Well, then don't. Then don't, sir, but one or the other. I'm not going to take objections from one attorney, then the other, from one law firm. You've got one, got one shot at it.

MR. OETHEIMER: Okay. But before you leave, can we have a discussion off the record?

MR. McLAUGHLIN: Sure.

(Discussion off the record)

(Recess, 11:11 A.M.)

(After recess, 11:19 A.M.)

(Question read back)

THE WITNESS: Could I just ask for a clarification as to whether or not, when you say did we have time to evaluate the property, you meant the acceptance of the right of first refusal or the physical characteristics of the property?

MR. McLAUGHLIN: Acceptance of the right of first refusal.

MS. FETOUH: Objection, scope. Go ahead.

A If we didn't have sufficient time to evaluate the risks associated with the acceptance of the right of first refusal or the likelihood that we would be successful, we would not have accepted the assignment.
Q To the best of your knowledge, can you give me an approximate number of acceptances of rights of first refusal since you've been general counsel?
A I'm regional counsel.
Q Regional counsel.
A I believe we have accepted, I'd say, approximately, eight.
Q And that's over how many years?
A Eight.
Q So, one a year, approximately?
A Approximately.
Q And within that, how many of those have been the acceptance of right of first refusal for purchase and sale agreements that involved developments under Chapter 40B?
A I believe this matter is the only one we are currently evaluating accepting an assignment in a 40B situation. I believe this is the only one.

Q During Mr. MacDonnell's testimony, he stated that the 40B provisions of the purchase and sale agreement were not applicable to the assignee, and I am wondering whether you're aware of TPL having any policy by which TPL cannot go forward with a 40B development.
A Regarding the first part of your question, I would agree that we would have taken the position that we were not subject to the 40B development obligations contained in the purchase and sale agreement. We do not believe that the development provisions in a purchase and sale agreement that we take over as a result of an acceptance of an assignment would apply to us, perhaps except in narrow situations, whether it would establish a purchase price. As to a policy regarding the 40B not -- restate the question as to whether 40B is acceptable.
Q Well, let me just stick with your answer. Why are the development requirements, for example, with a 40B not applicable to TPL?
A When we began to consider accepting chapter land rights of first refusal, we consulted with our outside advisor, Greg Bialecki, who was then at Hill & Barlow, who then went to Piper, Rudnick. He has been an unofficial advisor to us on all chapter land rights of

first refusal acceptances, and Greg has advised us, and we believe, based on my reading of the case law and the statutes, that certain provisions of a purchase and sale agreement into which we step apply to us and certain don't, because they're illogical, and while the statute is less than clear, we certainly believe that a purchase price applies to us, the deposit structure and remedy applies to us, the closing date, except to the extent the closing date has passed, in which case, it is our position that we have a reasonable period of time to close.

So, those material provisions regarding things like purchase price would apply to us, but if, for example, a purchase and sale agreement said the purchaser has a right to go through a permitting process to determine whether 35 condominium units could be built, or had an obligation to go through the permitting process, or should go through the permitting process within 120 days of closing, of assigning the purchase and sale agreement, we would take the position that those don't apply to us because we're not intending to put condominium units or any other development on the land. We're

attempting to conserve it. So, they're illogical and don't apply to us.

Q You mentioned something concerning the correlation of the 40B to the purchase price. I think you mentioned something about the establishment of the purchase price based upon the development.

MS. FETOUH: Objection.

A If the purchase price was contingent upon the number of units that could be developed, we would -- obviously, that would be a matter of consideration as to whether we would accept that assignment, whether we would go through the expense and difficulty of seeking permitting that would then establish a purchase price, but that is the only instance, which I can think of, that a development provision would apply.

Q So, in the situation where a 40B is part of the purchase and sale agreement, it's TPL's position that the 40B is inapplicable because it's not something that TPL would do. Is that fair to say?

A Could you clarify in what way the 40B is part of the purchase and sale agreement?

Q Well, let's use the existing purchase and sale agreement, which you have some familiarity with, I think.

A Some.

Q The purchase and sale agreement required that the buyer would go forward with a 40B development. This is Mosaic Commons. And that a certain number of units -- I can't remember how many, but we'll say 60, however many it was -- would be built on a certain portion of the property. TPL's position is that such a development, TPL cannot be required to build that development in order to go forward in the purchase of the property. Is that fair to say?

MS. FETOUH: Objection.

A It would be my understanding, based on my understanding of the statutes, the legislative history of the statutes and the rights of first refusal, that forcing a municipality or a land trust to go forward with a development is inconsistent with the reason for the right of first refusal, and the seller could not force a municipality or a land trust assignee to go forward with a development.

Q Are you aware of any provision in the statute that allows for TPL, in deciding that a 40B is not acceptable, to substitute another development in its place?

MS. FETOUH: Objection.

A The statute requires that an assignee of a land trust, I'm sorry, an assignee land trust, protect the majority of the property.

Q So, are you aware that the seller of the property, Mrs. Kunelius, was actually insisting that a 40B be completed by TPL once it accepted the right of first refusal and exercised that right?

MS. FETOUH: Objection.

A I was not aware of that, but I don't believe she would have the right under the statute to insist upon that.

Q Are you aware of anyone attempting to force TPL to do a 40B on the property?

A No.

Q Given the fact that TPL believes that the 40B was inapplicable to TPL, what prevented TPL from simply buying the property and not doing a 40B and preserving the property in its then condition?

MS. FETOUH: Objection.

A When we accept a right of first refusal, we attempt to garner funding for the successful acquisition, and that would come from a variety of sources, and it's my understanding that in this particular case we felt that some limited development was a necessary

component of the finances of protecting the majority of the property, so we were not attempting to preserve the entirety but were willing to engage in a limited development of a portion in order to raise sufficient funds for the acquisition.

Q I'm sorry if I already asked this. Of the eight assignments that have been accepted by TPL during your tenure, did TPL fail to move forward in any of those assignments?

A Since I've been at TPL, we have never failed to go forward with a successful acquisition of chapter land rights of first refusal, except this case.

Q Are you familiar with any case law that would allow TPL to decide what provisions of a purchase and sale agreement it could accept and not accept? For example, on the 40B, is there any case law that says TPL can disregard a 40B provision in a purchase and sale agreement?

MS. FETOUH: Objection, both form and scope.

A As I indicated, I'm not aware, but we've relied on our outside counsel, Greg Bialecki, to advise us as to which provisions apply and which don't.

Q Of the eight that TPL has exercised the right of first

refusal on, accepted the assignment and exercised the right of first refusal, how many were 40B developments?

A None other than this one.

Q So, this is the very first one?

A Uh-huh.

Q This was the very first one in your experience, correct?

A Uh-huh.

MS. FETOUH: If you could actually give a verbal answer instead of an uh-huh.

A Yes.

Q Was it also the very first one for TPL as far as you know?.

A Yes.

Q During Mr. MacDonnell's deposition, he referred to certain case law on Chapter 61 that would allow for TPL to rely on contract terms in order to determine how a dispute may be resolved. Are you aware of any case law that would allow TPL, specifically, to rely on some contract terms and disregard other contract terms such as the 40B or any other particular provision of a contract?

MS. FETOUH: Objection, and objection

housing, to the extent that it supports the finances of the project, is certainly something that TPL would consider. Whether it needed to go through a 40B process, as I, again, understand allows a developer to void zoning bylaws in order to develop the maximum number of units on a property, which I understand is eight per acre regardless of the zoning acreage, that would be inconsistent -- that intensive development would be entirely inconsistent with TPL's mission.
Q I just looked at the purchase and sale agreement. It appears that it was 30 units.
Was there anything that prevented TPL from doing a five-unit 40B project?
MS. FETOUH: Objection, and objection to scope.
A No.
Q So, there wasn't a policy per se that was the reason that you did not believe that the 40B provision in the purchase and sale agreement didn't apply to TPL. Is it fair to say that it was the density of that 40B that TPL objected to and decided, therefore, it was not applicable to them?
MS. FETOUH: Objection. Objection to scope.

A When evaluating the contract, we would not have viewed any development requirement as applying to TPL.
Q So, if TPL wanted to avoid the zoning requirements, it could use 40B to do so just like any other developer could. Isn't that fair to say?
MS. FETOUH: Objection. Objection to scope.
A I understand that there are very specific requirements under 40B that make it quite expensive and cumbersome. I don't know the details as to whether or not TPL would have qualified as a 40B developer. We would be bound by any statutory requirements as any other developer would.
Q So, I'm trying to understand whether the inapplicability of 40B to TPL is related to the fact simply that it's a 40B or whether it's related to a specific density issue that TPL might find unacceptable in their role as the future conservator of the property, if that's appropriate.
MS. FETOUH: Objection.
Q Do you understand that question?
MS. FETOUH: Objection to scope.
A I think your question relates to whether the fact that it's 40B somehow differentiates the development from a

non-40B development, and my answer would be, no, we would not view any development provisions as binding us to develop the property similarly.
Q You're aware that TPL sought to get some zoning and special permits for the proposal that TPL was looking to undertake on the property.
MS. FETOUH: Objection to scope.
A I understand that, yes.
Q You are also aware that a 40B project would in large part eliminate the need for variances and special permits.
MS. FETOUH: Objection to scope.
A I understand that, under 40B, zoning requirements are often eliminated or limited.
Q Since this is the only project that TPL has ever done relating to 40B, up until that time, why did TPL not consider a less dense 40B development and simply move forward with the project under those terms, whatever they may have been?
MS. FETOUH: Object, scope.
A I am not familiar with the specifics of this project, because I was not the project counsel, but it is my understanding that, when we accepted the assignment, we were unaware of any zoning issues and we believed,

until fairly far into the project, that we would be given the variances that we sought and that we would be able to undertake a limited development.
Q Is it your testimony that you had no idea that Craig MacDonnell had been informed in January of 2003 that it was unlikely that there were going to be special permits, subdivisions, variances, granted to him fully two months before the acceptance of the assignment of right of first refusal?
MS. FETOUH: Objection. Objection to scope.
MR. CONROY: Objection.
A It's my understanding that discussions were held with the town planner and TPL received reasonable assurances that we would be able to undertake the kind of development that we were going to. Again, when we consider whether we will accept a right of first refusal, we make sure that we are relying on hard data and not just our own assumptions as to the likelihood of success. So, I believe that Craig, or someone, had conversations with the town planner, and the message that came back was that there was a very strong likelihood that we would be able to go forward as we wanted to go forward.

Q So, as you sit here today, you're unaware of any meeting before the Board of Appeals in which it was discussed that TPL had been told prior to the time of the assignment that it was unlikely that TPL was going to get any particular subdivision approval-not-required or variance or special permit. You're unaware of that.
MS. FETOUH: Objection, beyond the scope, and I'll just note for the record that because these topics are not included within the topics that we had agreed to produce a witness on, the witness would not be prepared to answer these questions and, you know, can only answer to the extent of her limited personal knowledge.
A My response is I'm not aware of any information like that. It would have been inconsistent with our willingness to take on a project like this. I would also add that ANR is very different from a variance. So, the fact that we might not be able to get an ANR, that's perfectly possible, but if we received assurances that a variance was very likely, we would likely have proceeded.
Q So, it's fair to say that once TPL had concluded that the 40B was not applicable to TPL, that TPL was in the

process of seeking some other special permit or variance in order to enable TPL to develop the property in a manner that TPL felt was appropriate as a conservation entity and where that would also result in income for TPL in order to offset the purchase price. Is that fair to say?
MS. FETOUH: Objection, scope.
A (No response.)
Q This is a document that was already marked as Jones No. 14, and I'm going to put it in front of you and just ask you to consider a certain paragraph in connection with the decision that the 40B not apply. This document is minutes of the Zoning Board of Appeals. It's minutes of several meetings. If you would look at KUN562, there's a paragraph that reads as follows: The board was in receipt of a package of several documents from concerned citizen Linda Hathaway to substantiate the argument that The Trust for Public Land and the neighborhood organization Friends of Red Acre were aware of the difficulties and requirements of subdividing the property prior to accepting the right of first refusal. Have I read that correctly?
A I believe so.

Q When the decision was made --
A To accept the assignment?
Q Yes.
A That was February 2003?
Q I believe it was. When the decision was made to accept the assignment, is it fair to say that TPL had already concluded that it would not undertake a 40B on the site?
MS. FETOUH: Objection, scope.
A I would say that's not fair.
Q I will tell you that Mr. MacDonnell has testified that he believed that the provision of 40B was not applicable to him.
A As a requirement, it would not have been applicable to TPL, and I would say that, at the time we accepted the assignment, we would have believed that we could undertake the limited development that was proposed to support the acquisition of this project or we would not have accepted the assignment.
Q And the limited development that was opposed in lieu of the --
A Proposed.
Q -- proposed in lieu of the 40B involved a subdivision of the property, did it not?

MS. FETOUH: Objection, scope.
A Could you repeat that question?
Q The limited development that TPL was proposing in lieu of the 40B development that was contained in the purchase and sale agreement involved a subdivision of the Kunelius property.
MS. FETOUH: Objection, scope.
A I believe that it did involve a small subdivision of the property.
Q Is today the first time that you have become aware, reading Exhibit Jones 14, that TPL was aware prior to the acceptance of the right of first refusal that there were significant issues relating to subdividing the property?
MS. FETOUH: Objection, and objection to scope.
A I would disagree that that's what this says. It says that one person, one concerned citizen, indicated that she might have some documents that she thought indicated something. TPL was not aware of any circumstance that would have impaired its ability to complete this project in the manner it had laid it out.
Q I'm going to put a document in front of you that has

been marked as MacDonnell 16. And before you answer any questions, are you familiar with Karen Sommerlad?
A No.
Q I would ask you to look at the first two paragraphs of this document, and looking at the second paragraph, it says: I do not clearly understand your objective. However, I can add some additional statements for your consideration. The caretaker's cottage is a pre-existing non-conforming structure and use. As such, any extension, change in use, alteration or addition is subject to a special permit from the ZBA.
So, is it fair to say that -- do you know who Donna Jacobs is?
A No.
Q Do you know who Ruth Kennedy is?
A No.
Q Do you know that Karen Sommerlad was working with TPL in trying to obtain permits or anything like that?
A No, I have no knowledge.
MS. FETOUH: Objection, scope, and you could also clarify for me which subject matter on your schedule these questions relate to.
MR. McLAUGHLIN: It has to do with the policy of 40B, because if there is -- she said

there is no policy regarding whether 40B is acceptable or not. However, there's only been one 40B that they've ever looked at, which, she's already testified, did not apply to TPL. By extension, therefore, something -- she said that TPL needed to subdivide or to use the property, develop the property, in some way in order to sell some portions of it to reimburse itself.
MS. FETOUH: And if you can just direct me to the numbered subject matter that you're referring to, that's all I'm asking.
MR. McLAUGHLIN: We're talking on No. 7, because, by extension, if there is no policy, and at the same time, if there is a provision of the contract that does not apply, i.e., the 40B provision, but it doesn't arise out of any policy, it just doesn't apply, then I have every right, based upon the vagueness of that, to inquire what does apply, because if she's saying, 40B, there's no policy that says they can't do it, but they decided it didn't apply to them, then, obviously, something had to apply to them and it was their -- apparently, they decided to put something else into the contract by way of

how they were going to develop the property, and so I need to know what it was and what TPL understood when it decides that it's not going to do a 40B. They had to have something else that made that decision applicable. Otherwise, if they say, well, it doesn't apply to us, the reason it doesn't apply is they had something else to propose. So, it's directly related to -- otherwise, they could have just bought the property and done nothing.
MS. FETOUH: Well, first, I would just respond and say they didn't put anything into the contract. Second, I think this line of questioning about the subdivision, what TPL knew about the likelihood of that subdivision or the zoning they were seeking in advance of the assignment, or after the assignment, is unrelated to any policy or decision, official or unofficial, in which TPL has concluded that development by it -- and so as to the --
MR. McLAUGHLIN: I will accept, as a stipulation, that TPL did not -- if you would like to -- that TPL did not put anything into the contract by way of requiring some other

development. If you would like to stipulate that they didn't attempt to do some other requirement, then I'll stop this line of questioning right now, but, in fact, you know and I know that they did, and it was Mr. MacDonnell's testimony --
MR. OETHEIMER: Okay. We're going to take a break, okay, right now.
MR. McLAUGHLIN: Okay.
(Recess, 12:01 P.M.)
(After recess, 12:13 P.M.)
(Mr. Oetheimer not present)
By MR. McLAUGHLIN:
Q At the time that the 40B was considered non-applicable to TPL, was TPL aware that there were pre-existing non-conforming structures and pre-existing non-conforming uses of the buildings on the property?
MS. FETOUH: Objection, scope.
A I have no knowledge of that, but I would like to correct. There was no rejection of 40B. There was a decision that we didn't have to undertake the development called for by the purchase and sale agreement.
Q But you could have done an infinite number of variables on what was essentially proposed, i.e., you

could have done a 40B of 25 or 20 or 15 or 5 units. Isn't that fair to say?
MS. FETOUH: Objection, scope.
A We could have done any form of limited development we chose to do.
Q Even under 40B.
A I have no knowledge.
MS. FETOUH: Objection, scope.
A Specific knowledge.
Q You're not aware of any policies that would prevent TPL in its role as a 501c3 from doing a 40B even if it were only six or seven units.
MS. FETOUH: Objection. Objection, scope.
A There's no specific policy within TPL, though as I indicated, I believe there are requirements under the statute as to the type of developer. It has to be a certain kind of non-profit-odd entities, and I don't know what the -- whether we were qualified or not.
Q When TPL acquires a property by right of first refusal, is it fair to say that TPL quite often subdivides the property and sells off portions of the property in order to reimburse itself for some of its costs in purchasing the property?

MS. FETOUH: Objection, scope.
A I don't believe that, in any of the other chapter land assignments of rights of first refusal, we had to participate in any legal limited development in order to fund the project.
Q Did any of the others, of the eight you're talking about, the eight assignments, are those in Massachusetts or --
A Yes.
Q Yes.
A Chapter 61, 61A and B are only in Massachusetts.
Q That's right, okay. Is it fair to say, however, that in New England there have been a number of developments in which there have been subdivisions of the property by TPL after they acquire it in which they sell off lots and existing buildings?
MS. FETOUH: Objection, scope.
A That would be true within Massachusetts. That would be true throughout New England, but we will sometimes do a very limited development in order to fund-raise for the project.
Q And that's after the purchase price has been paid.
MS. FETOUH: Objection, scope.
A Yes. Excuse me. Could I correct that statement?

Q Sure.
A It might be simultaneous with. It might not necessarily always follow the acquisition. We might try to do parallel transactions so the funds were available for the purchase.
Q At some point, did you become aware of the liquidated damage clause provision in the purchase and sale agreement between Mrs. Kunelius and Mosaic Commons?
A Yes, I would have been aware of that from the immediate analysis of the purchase and sale agreement.
Q Were you the person at TPL that asserted that the liquidated damage clause provision would apply should TPL elect not to go forward after the exercise of the right of first refusal?
MS. FETOUH: Objection.
A I would certainly have asserted that position, yes.
Q Did you?
A Very likely.
Q But you don't recall.
A I believe that I -- I believe there was an exchange as we were going through the approval process and I asserted that position.
Q When you were going through the approval process, when did the approval process start?

A Well, in order for us to accept an assignment of a right of first refusal, we must obtain approval from our national office. So, it would have been in advance of accepting the assignment of the right of first refusal, but I can't tell you exactly when. I just don't know.
Q So, when you say the approval process, you're talking about the internal TPL approval process?
A The process that we would have engaged in would have been as follows. As soon as an inquiry was made as to whether we would have been -- we were interested in accepting an assignment, I would have sent the purchase and sale agreement to Greg Bialecki at Hill & Barlow or Piper, Rudnick, or wherever he was at the time. We would then hold a series of team meetings internally to discuss whether we should accept the right of first refusal and the risks involved in doing so, and if we made a decision that there was a likelihood of success, that the risks were not significant and that there was a viable path to a good conservation outcome, and that it was important for TPL to be involved, we would have decided to go forward, and then we would have sought our national office approval.

Q And so there was some assessment of risk in your process?
A Yes, always.
Q And how early on did TPL assess its risk as being limited to the $15,000 that was required under the earnest money payments?
MS. FETOUH: Objection.
A It would have been very early in the process.
Q So, it's fair to say that, from the very beginning, TPL saw its risk as being limited only to the earnest money payments. Is that fair to say?
A It's fair to say that if we were ultimately unable to achieve a successful conservation outcome, said in the context of the fact that we had always in the past achieved successful outcomes, we would have understood that our risk was limited to liquidated damages, and if it were anything but liquidated damages, we would not have gone forward.
Q And is it your testimony that, in all prior assignments of rights of first refusal, there were no liquidated damage provisions?
MS. FETOUH: Objection.
Q In all seven other assignments?
A No, I believe that there would always have been

liquidated damage provisions or we would not have gone forward with accepting the assignment.
Q Did you undertake any legal analysis to determine whether or not or what the foreseeability of liquidated damages was, what Mrs. Kunelius' foreseeability of liquidated damages was, as it related to a substitution of a development from the 40B to whatever TPL was proposing as a development?
MS. FETOUH: Objection.
A I don't understand your question. Could you repeat that?
Q Well, isn't it fair to say that Mrs. Kunelius had a purchase and sale agreement that anticipated a 40B? Is that correct?
A I understand, yes, that's --
Q And it's fair to say that TPL did not anticipate that the 40B would apply to it should it accept the right of first refusal?
A We understood that we did not have to -- that we would not have been expected to develop the property to the extent or as laid out in the purchase and sale agreement.
Q And are you familiar, as an attorney, with Massachusetts case law concerning liquidated damages

# TAB 5

Volume: I
Pages: 1-176
Exhibits: 7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11697-GAO

MARILYN KUNELIUS,
Plaintiff,

v.

TOWN OF STOW, separately,
A PARTNERSHIP OF UNKNOWN NAME BETWEEN TOWN OF STOW and THE TRUST FOR PUBLIC LAND, separately, and CRAIG A. MacDONNELL, in his individual capacity,
Defendants.

DEPOSITION of SERENA FURMAN, a witness called by and on behalf of the Plaintiff, taken pursuant to the Fed.R.Civ.P. 30, before Roberta J. Daniels, a Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Law Offices of Michael C. McLaughlin, One Beacon Street, Boston, Massachusetts 02108, on Tuesday, April 3, 2007, scheduled to commence at 10:00 A.M.

APPEARANCES

Michael C. McLaughlin, Esquire
Law Offices of Michael C. McLaughlin
One Beacon Street, Suite 3333
Boston, Massachusetts 02108
Counsel for the Plaintiff

Deborah I. Ecker, Esquire
Brody Hardoon Perkins & Kesten, LLP
One Exeter Plaza
Boston, Massachusetts 02116
Counsel for Defendant Town of Stow

Patricia M. Murphy, Esquire
Goodwin Procter, LLP
Exchange Place
Boston, Massachusetts 02109
Counsel for Defendant The Trust for Public Land

James B. Conroy, Esquire
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd floor
Boston, Massachusetts 02108
Counsel for Defendant Craig A. MacDonnell

Also present:

Lucie DeBellis, Paralegal
Law Offices of Michael C. McLaughlin

INDEX

| Witness | D | C | RD | RC |
|---|---|---|---|---|
| SERENA FURMAN | 5 | | | |

EXHIBITS

| No. | Description | Page |
|---|---|---|
| 1 | Subpoena | 6 |
| 2 | Kelleher e-mail to Kennedy, 1-29-03 | 21 |
| 3 | Jacobs e-mail to Sommerlad, 2-6-03 | 24 |
| 4 | FORA letter to Town of Stow, 6-6-03 | 39 |
| 5 | TPL letter to Kachajian, 9-9-03 | 53 |
| 6 | DHCD notice of intent, 9-23-03 | 145 |
| 7 | TPL letter to Perry, 2-11-03 | 161 |

PROCEEDINGS
Tuesday, April 3, 2007
10:11 A.M.

MR. McLAUGHLIN: We will stipulate to the same stipulations, reserve all objections till the time of trial, except as to form. Is that agreeable to all counsel?
MS. MURPHY: Yes.
MS. ECKER: That's fine.
MR. CONROY: Yes.
SERENA FURMAN, first having been satisfactorily identified by the production of a Massachusetts driver's license and then duly sworn, on oath, deposes and says as follows:

DIRECT EXAMINATION

By MR. McLAUGHLIN:
Q Good morning.
A Good morning.
Q My name is Michael McLaughlin. I represent Mrs. Kunelius in this matter. Could you please state your name for the record?
A Serena Furman.
Q And could you spell that, please?
A S-E-R-E-N-A F-U-R-M-A-N.

Q And it's Ms. Furman? Should I refer to you --
A Serena is fine.
Q Serena, okay.
(WHEREUPON, Exhibit No. 1, subpoena, marked for identification.)
Q Serena, are you here today as a result of receiving a subpoena from my office?
A Yes.
Q And is this the subpoena that you received or a copy of it?
A Yes.
Q So, we've marked that as Exhibit 1. I've already done that. Could you just briefly give me your educational background?
A I am a graduate of Middlebury College. I only carry an undergraduate degree. I've done some advanced degree work related to my profession, but I don't have an advanced degree beyond that.
Q What is your profession?
A I'm a project manager for museum design.
Q And what's the name of the company?
A Christopher Chadbourne & Associates.
Q Is that an architect?
A It's a museum design firm.

Q And what's the scope of the project manager's work?
A Well, it's similar to construction. I think that's the best way to put it. I'm overseeing projects that range between three and seventeen million dollars all over the country, and I'm part of a team that has, you know, graphic designers, exhibit designers, draftsmen, and I am the one who is running the numbers and keeping the client happy and everything else that construction managers do and having interesting conversations with people in the field.
Q Where do you live?
A Stow, Massachusetts.
Q And are you an abutter of Mrs. Kunelius?
A Yes, I am.
Q And are you married?
A Yes.
Q What is your husband's name?
A Peter Christianson.
Q And what does Mr. Christianson do for a living?
A He's currently a freelance consultant, but what he does is non-profit fund-raising, corporate and foundation relations.
Q I could tell from looking at these documents that someone knew what they were doing. How long have you

lived in Stow?
A I think we've been in that house somewhere between nine and twelve years. He's always better at remembering. We didn't live far from there before. We lived in Maynard before that for eight years. So, we've been in the community for a while.
Q Prior to being in the project management business for museum construction, what else have you done?
A I was an exhibit designer for the previous twenty-four years.
Q And that means an exhibit at museums?
A Yes. I had my own company for seven years, freelanced. Prior to that, I was at the National Heritage Museum in Lexington, Mass., for eight years, and I was at the New England Aquarium prior to that for eight years.
Q At some point, did you become aware that Mrs. Kunelius was thinking about selling her property?
A I don't know if I knew prior to a for sale sign going up on the street. I don't recall.
Q But you do recall a for sale sign up?
A Yeah.
Q And at some point, did you come to understand that Mrs. Kunelius had signed a purchase and sale agreement

with Co-housing Resources, Inc., which is also called Mosaic Commons?
A Yes, but, again, I don't quite recall how I found that out.
Q Are you familiar with a group called Friends of Red Acre?
A Yeah, really, what it was is, when the idea was formed that there might be an alternative to this purchase because the town had a right of first refusal, two or three of the neighbors got together and we went and talked to everybody on the street to see how they felt about it.
Q And when you say everybody on the street, you're referring to Red Acre Road?
A I think we did Red Acre Road and South Acton Road and a few people on Tuttle.
Q And did you have a concern about the plan for development of the Kunelius property as evidenced by a purchase and sale agreement?
A No, I didn't understand what that development looked like. I think that happened later, but because there was an opportunity for right of first refusal, I think I saw an opportunity for not losing a farm on the street and providing an opportunity for Eye of the

Storm to have a permanent place -- they're on a rent basis -- in Stow.
Q And what is Eye of the Storm?
A It's an equine rescue organization.
Q And did you have some affiliation with Eye of the Storm?
A Not beyond reading at the post office that they were looking for donations for a sale at the Bolton Fair, and I gave them some riding equipment to sell at the Bolton Fair, but that's how I became aware of them because they have a very low profile in the town. Because they are dealing with rescued animals, they don't want people walking in off the street, and so they have a very low profile in the town.
Q Are you an equestrian yourself?
A I have never owned a horse. I've been an O.P. rider, which is an other people's rider, stopped in college, but I used to train polo ponies and hunters in Maryland most of my life. I started riding at about five.
Q Are you originally from Maryland?
A Uh-huh.
Q Now, did your neighbors on Red Acre Road and surrounding roads form a group called Friends of Red

Acre?
A Well, what we did is we had a meeting and invited people to it and we had quite a good turnout. I don't have a list of people, but it seemed like in excess of twenty-five people, and we just stated what our goals and objectives were and did we have support to go out and try to find a non-profit organization that would be willing to take on this project that we had in mind.
Q And the project you had in mind pre-dated your understanding of what Co-housing Resources, Inc., had planned to put --
A Yeah, they had an open meeting, and I didn't attend it, but the Co-housing had -- was it in December or January? They had some sort of an open house where they invited people of Stow to come and tour the property and talk about, you know, what they were planning, and one of the other abutters, I think Michael Labosky, went on that tour, and that's when we started to understand how they were going to put buildings on it and, you know, where they were going to situate it, et cetera.
Q And if you know, when did the group Friends of Red Acre start acting as a group per se?

A It was never really a group. It was really three people that were trying to stay within what the neighborhood wanted and not -- we didn't enlist other people to do a lot of work. Occasionally, for elections, et cetera, to do phone calls we would ask for volunteers, but it really wasn't a very large number of people.
Q Who were the three people?
A Well, three houses, households, let's put it that way, myself and my husband, Karen Sommerlad and her husband, David Cobb, Michael Labosky and, to a much lesser extent, his wife, Erica Nilsson. She is what they call a physician's assistant and had insane hours, so she was not available much to help.
Q And those three families were the sort of active members of the group?
A It's not an organization.
Q Yeah, of the group?
A Yeah.
Q It never actually formed?
A No. I think the only thing we had to do is sign up when we wanted to distribute -- and I imagine Marilyn had to do the same thing when she sent around a postcard influencing an election. You know, you have

to go to the town and fill out some paperwork so that you have the ability to do a town-wide mailing on a topic. Do you understand what --
Q I do, yeah.
A Okay. Yeah, that was the only time we ever had to kind of sign up, and then we immediately dropped it after that.
Q I have seen some documents that have Friends of Red Acre as a letterhead.
A Uh-huh.
Q Do you know how that came about?
A I designed it. Does that mean anything?
Q No, I'm just trying to --
A Yeah, they photographed it as Marilyn Kunelius' house. That represents the affordable housing, and then we used the Eye of the Storm logo as the horse symbol, and we used the Stow Conservation Trust logo as the open space symbol. So, it never was, you know, printed. It just came off the computer.
Q At the time that you had decided to advance the cause of Eye of the Storm, had you already heard of The Trust for Public Land?
A Well, the idea came first, and I don't believe The Trust for Public Land was the first non-profit that we

approached.
Q And so I take that --
A So, we went through a process of trying -- I mean, we thought of Eye of the Storm first, and she was very -- she didn't want to be -- she loved the idea, but she really didn't want to be involved, from the beginning. So, she sort of gave us the blessing to look into it, but she was not -- she did not want to be a pro-active piece.
Q When you say she --
A Oh, Nina Arbella is the director.
Q Does that still exist, the Eye of the Storm?
A Yes, it does. It's a 501c3.
Q Now, at some point, someone from Red Acre -- I'm going to refer to the Friends of Red Acre as this loosely associated group of families.
A Yeah, simplify things.
Q At some point, did Friends of Red Acre contact conservation groups to seek their assistance?
A Yes.
Q Prior to contacting TPL, do you recall who you contacted?
A I think we spoke first to Mass. Audubon. We have two people within the town that work there, and then we

spoke to Sudbury Valley Trustees. They gave it a good long look.
Q And when Mass. Audubon and Sudbury Valley Trustees were contacted, were you the contact person between the Friends of Red Acre and these organizations?
A I'm trying to think. Well, we knew -- let's see, who knew Kathy Sferra first? I don't know. She was sort of the first person that we contacted, and I believe she's the one that eventually suggested Trust for Public Land, but I'm not certain.
Q Were you the person that contacted Trust for Public Land?
A I was not the person that contacted --
Q Who was?
A And I believe it was Val Talmadge. It might have either been my husband, or it could have been Karen Sommerlad or David Cobb. I'm not sure.
Q And you used the word Val Talmadge. Who is Val Talmadge?
A I think she is regional --
THE WITNESS: Is she still their regional deputy director?
MS. MURPHY: I'm not sure what her title is, but, yeah, she was at TPL.

A Yeah, and Craig was state director, I believe.
Q And you think that contact was perhaps through your husband or Sommerlad or her husband?
A Yeah, right.
Q Do you recall when you first participated in contact with TPL?
A Wow. I don't know. My first memory is that the first thing they wanted to do was see the land, so it might have been then, and I believe Craig had already, you know, told Kunelius that we went on the property without permission. It was a day with his daughter. It was rainy, must have been in November or December. I'm not sure.
Q And was that a group of people that went onto the Kunelius property?
A I don't recall everybody. I reluctantly went, my husband went, and after that, I don't recall. There may have been somebody else.
Q I note that you today brought a package of documents with you which you assembled of your own volition. In other words, I did not ask you to.
A Right.
Q And you brought two copies, one for me and one for the counsel for --

A But I know that this went on. I mean, I think that the subdivision may have gone away and then another one followed, but I don't have anything because, again, this was more Karen's baby than mine. I just know that we were continuing with options well into the summer. she
Q When you say we, you're talking about Friends of Red Acre and TPL?
A Yeah. In support of TPL, yeah.
Q But do you have any understanding of what the last proposal was by TPL after they accepted the assignment?
A I don't recall.
Q Do you recall whether there was a connection between the proposal of how the property was going to be completed by TPL and fund-raising efforts that were undertaken by Friends of Red Acre?
A You're going to have to rephrase that question. It was just a little too long.
Q Do you recall there was a connection between the fund-raising efforts of Friends of Red Acre and the actual proposal that was being sought or made by TPL?
A Well, fund-raising was on hold until -- TPL asked for their fund-raising efforts to go on hold until they

had achieved the zoning. You know, think about the logic behind it. You wouldn't want to go and acquire funds for a project and it would not end up to be able to go forward because the zoning was not in place, all the variances had not been solved. So, there is a link between the two actions.
Q At some point, did Friends of Red Acre initiate their own fund-raising efforts?
A What we were able to do with the three, two -- let's see, how to put this. On behalf of Eye of the Storm, helping them to write their funding materials, we approached one funder that they already had in place, which is the Red Acre Foundation, that has a long-term --
Q I'm going to stop you and have you start again because you're using the word they, they, they, when you say --
A Okay.
Q So, when you say we approached because they had, I'm not sure what you're talking about. Eye of the Storm?
A Oh, okay. So, Eye of the Storm has been receiving operating funds from Red Acre Foundation for --
Q Which is different from your organization.
A Red Acre Foundation is, I believe, headquartered in

Arizona, but they are family descendants of a woman who did equine rescue on Red Acre Road, who is famous in the town, and so we approached them for a significantly larger donation than they typically give her in order to provide funding to allow her to participate in this and then, hopefully, to move her into the farm parcel of the plan that we had.
Q And did the Red Acre Foundation provide a donation?
A They made a promise. Do I have a written letter? I do not.
Q And what was the amount that they promised?
A I have to look. Was it a hundred or a hundred and twenty-five? And then, serendipitously, I was at a cocktail party in New Hampshire on Christmas and this guy who runs a foundation in Boston said, "I am looking to support equine rescue," and I said, "You've got to be kidding me."
I'm serious. That's how it fell. And now we've created -- there's a new relationship with, I believe it's called, the Black Brook Foundation in Boston and they made a much smaller -- having no relationship with Nina, they eventually made a much smaller promise, but it was in the tens of thousands. Again, it should be in here

somewhere. We approached Stow Conservation Trust and they had just finished a very aggressive fund-raising campaign in the town, so they were very interested in supporting us, but on the other hand, they had just tapped out all the local donors.
So, I think if they had not just done this for Red Acre Woods, which is another parcel on our street, they may have been more generous, but I think they also made a promise, and I believe one or both of these were over a series of years. It was not, you know, we'll give you a hundred thousand dollars in September, but we can give you this over two or three years.
Q And what was the total amount of the Stow Conservation donation?
A Hundred thousand.
Q So, between those three donors, you had identified approximately 225 plus?
A Was it twenty-five for Black Brook? That's what I don't recall. It sounds high.
Q I have you down for 125 from Red Acre Foundation.
A Oh, it might have been a hundred. I said I'd have to look. You want me to check while we're talking?

Q Yeah, since you have the documents. Those are the same documents that you've given to us?
A Yes, exactly the same. Ten thousand from Black Creek, hundred thousand from Red Acre Foundation.
Q So, ten thousand from Black Brook, a hundred thousand from Red Acre Foundation.
A Black Creek? I'll find it. It says Black Creek here on this. You know, this is a document, I think, that was encouraging to Trust for Public Land because this is 19 of January, that it was encouraging that they had some given. So, Black Creek gave ten thousand, or promised ten thousand at that point, never -- I think they actually gave the money to Nina, to Eye of the Storm, forgive me, and a promise from Red Acre Foundation.
Q Can you tell me -- these are not paginated.
A Right.
Q Can you tell me which document you're looking at?
A I'm looking at a January -- they are in more or less chronological order. So, look for January 19, 2003.
Q I got that, yeah.
A Okay. So, this is information that was not publicly distributed. As it says here, this was just prepared to show both Trust for Public Land and Eye of the

Storm a program that we were presenting where we were showing that we believed that there was a very good, strong stream for fund-raising, which includes research done by my husband, Peter Christianson, reviewing -- what is it called -- identifying prospects, through his research capabilities as a fund-raiser, that represented both very likely targets for fund-raising and the kinds of -- the funding levels that they typically give.
So, he knows enough to say this group can give, you know, five thousand versus twenty-five thousand. You can tell from information on the foundation.
Q Can I just ask you, looking at the foundations by type, 19 Jan. '03, there are several columns, one being Name, second one, Affinity. What is the E?
A Equine conservation.
Q Okay. H?
A Housing, affordable housing.
Q Size being, what does that indicate?
A Oh, gee, I think that might be their gross pool of giving per year, but you'd have to -- I'd have to find out from my husband, if you'd like me to.
Q Detailed AGM?

A Right.
Q And then, on the other hand, they are being used as the explanation for why TPL can't go forward, because of the failure of local fund-raising. So, my question is: did Friends of Red Acre feel that they were somehow being made into a scapegoat for the failure to move forward in the purchase of the property?
MS. MURPHY: Objection.
MS. ECKER: Objection.
MR. CONROY: Objection.
A Sometimes I wonder what the meanings are behind your question, so. I wanted to just see if I could find something that answers a question of what my husband did. If you keep going a few more pages from the e-mail that we have been referring to earlier, the one that has August 6th handwritten at the top, I just remember when I was reading through this -- yeah, after that. There you go.
Q All right.
A Go to Page 2. This is what my husband did. In future statements from TPL to our stakeholders or to the public, there can be no implication that the absence of private funds raised is in any way contributable to FORA for fund-raising, as cited by TPL, and TPL must

also explicitly say that it was TPL's choice and TPL's failure.
So, that's what my husband did. He was pretty upset about that because it reflects upon him personally and his ability as a professional. So, one of the important things I want to point out at this document is that we have never broken ranks publicly with TPL, and the last sentence is that, if TPL does make these assertions about us, then we are going to break ranks with them, and so, really, this has never happened before in any public venue. This is the public venue where we were first breaking ranks with TPL, in making, you know, this story, and we were very, very careful about trying to be one hundred percent behind them and not doing anything where we disparaged them in public, so.
Q In the motion to dismiss filed by TPL, Craig MacDonnell, and the town, they write the following: However, after paying thousands of dollars in deposits required under the agreement, TPL found itself unable to raise the money necessary to fund the project and was unable to complete its purchase of the property.
Now, is it your understanding that TPL was

unable to raise the money or was unwilling to go out and do fund-raising?
A I think that I would read the sentence as was unable to raise the money by closing, which is their standard procedure, and I don't think they ever agreed to the problem that we pointed out from the very beginning, that this project would require financing and some kind of a bridge loan to carry it over a few years in order to make the funding goal. I think their decision was that they would stick with their standard procedure and just raise funds by the closing date.
Q And not use any of their own funds at any time.
A I don't know. It's their decision, their decision, but that was sort of my understanding of why it went down the way it went down. That's the way I saw it.
Q So, when, on July 3rd, your husband learns that TPL intends to do zero fund-raising, given that fact, is it fair to say that a decision, or being unable to move forward when TPL had made a decision to do zero fund-raising, means that, in essence, TPL had decided at that point not to purchase the property?
MS. MURPHY: Objection.
MS. ECKER: Objection.
MR. CONROY: Objection.

A I don't know. I mean, I don't think that would be correct, because if we had somehow magically reached into daddy's bank account and pulled the cash out, they would have gone forward, but they just said, "We're not fund-raising." The door was still open if we could somehow magically come up with the money.
Q So, from the time at least as of July 3rd through to the present, you're unaware of TPL actually trying to fund-raise, is that fair to say, for this project?
A Other than, as I said, we made some presentations to funders that had already been identified to see if they would give more. And the DHCD grant. That's the major fund-raising effort. That was a lot of work by TPL. That was a lot of work.
Q But that grant was not part of the original proposal that you were involved in with TPL, isn't that correct?
A Well, the thing is, our original proposal, the thing we knew the least about was funding sources for affordable housing. So, it doesn't surprise me that that came up later, because that was the thing that we had been -- when you go out and look in the standard donor, donation, donor pools of information, there really aren't a lot of non-profit organizations that

are funding affordable housing. It's pretty much a new thing, so. I'm not surprised it wasn't in the early plans, but it became a very significant portion of TPL's efforts.
Q I would like you to move forward to a document. It's got a handwritten number of 9-11-03 on top of it.
A How many pages forward is it, quite a few?
Q Yes.
A Oh, yeah, got it. This is a response to his letter of September 10th.
Q That's correct. Looking down at that, under TPL's project assessment, under B, it says: TPL has assumed a position that, quote, local fund-raising efforts have not been successful and a catastrophic failure of the DHCD grant -- unquote.
A Yeah, that sounds very similar to this thing that he wrote to Kachajian, right?
Q That's correct.
A Right.
Q Now, it goes on to say -- I think this is your husband's response to him, or maybe yours.
A Good question.
Q Serena Furman. It's from you.
A That's mine.

Q By the way, this is marked DRAFT. Do you know if some version of this was sent?
A I assume so.
Q It goes on to say: Though the DHCD grant was not part of the original budget, TPL's financial plan became dependent on this one grant submission. The resulting financial picture does not conform to TPL's project guidelines and would require advocacy on the part of TPL's project leaders that may expose them to criticism.
A What the hell did I mean by that? Okay.
Q What did you mean by that?
A Well, this is what I'm saying. The resulting financial picture, which means we did not receive the grant and that TPL's typical project guidelines -- and, believe me, I'm reading -- I haven't read their manifesto or something that tells me exactly what they do and don't do -- but that their typical project guidelines bring the project to a close at the time of closing, funding in-hand, all done, go on to the next thing.
So, the fact that we were in this position -- this is a sympathetic paragraph to TPL -- that it would take a great exertion on



their part to convince their board to do something unusual and go forward with financing and something, et cetera, at this point.
Q Now, this document, if you continue, it says, next paragraph: TPL is choosing to change history by neglecting to mention that fund-raising, local or otherwise, was organized as a joint effort with TPL who repeatedly delayed the start-up of fund-raising committees. There is an understandable reluctance on the part of TPL to fund-raise before certain key decisions were made regarding town support and Zoning Board approvals.
Now, you have mentioned that TPL has told you that they weren't going to do fund-raising prior to having those approvals. I want to just ask you a few questions concerning the logic of that.
A Okay. I think I've gone over a little bit of that before, but we can go over it again.
Q There was nothing stopping TPL from simply acquiring that property and dedicating the entire property to conservation, was there?
MR. CONROY: Objection.
MS. MURPHY: Objection.

A I don't know how they would do that.
Q Well, if they acquired the property using their own resources, for example, and they elected to dedicate the entire property to a conservation restriction, they could have done that, isn't that fair to say, regardless of whether they wanted to spend the money? I'm just saying is there anything that stopped them from acquiring the property and dedicating the entire parcel to a conservation restriction?
A Other than that I don't know what the -- I don't know how you run the numbers on that.
Q Well, I'm taking the issue of whether TPL wanted to spend the money out of the equation. I'm just trying to understand that there was nothing to stop them from doing that if they used their own funds.
A I don't know to respond to that, because that just seems like it would be considered bad practice on their part. They wouldn't be in business if they went around doing that.
Q Do you have any idea how much money TPL has as far as assets?
A No.
Q Do you know whether they've got fifty million dollars or five hundred million dollars in assets?

A No.
Q Now, what did you mean when you said they are changing history?
A Well, that was their first public pronouncement that there was a failure in fund-raising. Wait, wait, that's not quite right. Let me read that sentence again, because I think I'm talking about something else here.
Well, I don't know if changes or make a declaration, a historic declaration. What they're basically doing is, what we were talking about here is, they were characterizing it as not being their fault. They were characterizing fund-raising as not being their fault and thus trying to make a statement of fact that would, you know, go down in public understanding that it was not their fault.
Q And within the scope of the original documents that we reviewed that demonstrated that your husband and Friends of Red Acre had identified as much as 1.3 million of possible donations, and given the fact that Friends of Red Acre had given that list to TPL, can you explain to me why TPL refused to access that list specifically for the Kunelius property, if you know?

MR. CONROY: Objection.
MS. MURPHY: Objection.
MS. ECKER: Objection.
A Well, again, I think the point that I made before, which is even relative to the DHCD grant, is that you don't make a request for fund-raising from foundations and corporations unless you know that the deal is going to go through. From our perspective, you know, once they signed over the right of first refusal, we thought that was the starting point, and then you could start sending in grants in January, grant submissions, but, in fact, I guess TPL wanted to practice some kind of, you know, due caution to make sure that all of the zoning issues were behind them first, because what you risk with any one of these foundations, whether they're ones you've gone to before or ones you're interested in going to in the future, and I'm certain that a lot of the ones with the environmental letter next to them are ones they might be interested in using for other projects, is, if you get a foundation grant from them and then you don't use it, you're toast with that organization, forever. So, that's why you have to be very careful, and I think that's why they didn't go forward.

Q So, is it your understanding that it was a failure of fund-raising, or was it a failure of getting the permits and variances that was the basis for not purchasing the property, or are they somehow connected?
A They're probably somewhat connected. Was it a failure? I know we tried a few different avenues and they were withdrawn, but I don't know if they tried all of the zoning options. I don't know.
Q The assignment of the right of first refusal occurred on February 12, 2003. The application to the Commonwealth for the money from DHCD appears to have been signed on or about April 1st. Do you know why there was that kind of delay in even seeking the grant from the state?
A I bet, for this, it was -- see, there's always a grant deadline. I'm sure it made the grant deadline. That's all you have to do. You don't get better status by turning it in earlier. This was an incredible amount of work to put together. So, they just worked towards the grant deadline.
Q When you had conversations with Patty Murphy, when you met with Patty Murphy at Goodwin Procter, did you provide her with any of these documents?

A No, I didn't. This is the first sharing of documents.
Q When do you think that meeting occurred?
A What meeting?
Q The meeting with Patty Murphy.
A Do I have my calender with me? I believe it was a Wednesday, a week ago, week and a few days ago.
Q And did you discuss the issues relating to TPL's instructions to Friends of Red Acre not to fund-raise?
A Well, I did characterize that we had this disagreement from very early on that the financing and finances were two different issues and that we knew from the beginning there was going to be a problem with our fund-raising strategy of having all the money in-hand at closing and that it would require some financing, possibly up to three years but hopefully much less than that.
Q Are you aware of TPL's Web site which says that, in such circumstances, they provide bridge financing for expressly that purpose?
MR. CONROY: Objection.
MS. MURPHY: Objection.
A If we had seen it, I don't think we ever said, you know, said to TPL anything about that, but I don't know.

1. Friends of Red Acre no longer exists. What is that?
A What this means is -- let me just take a look at this. House sales, CPC, SCT, Red Acre Foundation. The problem here, as I mentioned before, is everything that we had done on the street, having a meeting with people, occasionally, we would ask people to come to certain selectmen meetings and voice their support for our project or we'd ask them to come out. We'd explain to them in terms of this project being in a certain configuration. The configuration had affordable housing, equine rescue and open space. The scenarios that were being considered here would possibly reduce that package by a component, meaning this Scenario No. 1, having the house sell on the market for $200,000, you've now eliminated affordable housing. Maybe that still had the affordable housing, but there was something about this that no longer had all the components. So, we can't represent or even pretend to represent our neighborhood because it does not conform to what our neighborhood had heard was the project.
Q Whose scenario was this? Is this the scenario from TPL that you were referring to in your prior letter

dated August 19th, when you said, "Is defining a project in a manner that cannot be accomplished"?
A As opposed to other documents, where everything is in terms of correspondence, this probably is a bit internal.
Q Well, let me just direct you again to your August 19th letter, which is a few documents prior.
A Right.
Q And in that letter, on the second page, you refer to the scenario which eliminates Eye of the Storm.
A Right. So, the thing is do you have those scenarios. That's the question.
Q Well, my question was is Scenario 1 the scenario that eliminates Eye of the Storm?
A Well, the problem is there are still equine rescue people here. I'm thinking it's the affordable housing component that's missing.
Q And so looking at the document that we're currently examining, which is roman II, Scenario No. 1, is this a response to Scenario No. 1 or --
A It's a strategy.
Q -- is it a component? Is it a list of the components? Because what I don't understand is why Friends of Red Acre no longer exists, whether that was a component of

Scenario No. 1 or whether it was Friends of Red Acre's response to a scenario that had been proposed by TPL.
A I think this is the scenario that we were still encouraging TPL to go forward with that they had rejected and that they were pursuing another funding strategy.
Q Looking at the bottom there, No. 8, it says: Friends of Red Acre never agreed to any financial responsibility for this project. Local volunteers agreed to assist with fund-raising for equine rescue. Local volunteers contributed 11,500 in cash. TPL subsequently directed the staff to suspend fund-raising. TPL informed Friends of Red Acre that a hundred percent of the fund-raising effort would be equine rescue. A volunteer immediately told TPL that volunteer fund-raising consequently suspended. TPL has not sent one proposal or suggested one prospect.
A Right, uh-huh, definitely sounds like my husband.
Q What does suggested one prospect mean to you?
A A prospect is where you vet a pool of potential funders and determine that they are a prospect.
Q A prospect for fund-raising?
A Exactly.
Q Looking at No. 7, it says: TPL has not to date

communicated with Friends of Red Acre about default or DHCD review. What does that mean?
A Well, we received that e-mail from Ross Perry that said that they had defaulted on the payment, but TPL had never called us and told us they did that, nor did they -- I guess there were review comments from DHCD that hadn't been shared with us yet.
Q Would you have expected, well, did you consider yourself, not yourself, did Friends of Red Acre consider that there was a partnership between the town and TPL with regard to the Kunelius property?
A I always viewed the town as having signed off the right of first refusal and having agreed to it, that they would support it, but they weren't integral partners. But I really don't know.
Q Well, when they assigned the right of first refusal, did you ever look at that document?
A Uh-uh.
Q Were you aware that, after the assignment of the right of first refusal, the town had an obligation to fund $400,000 to TPL?
MS. MURPHY: Objection.
A No.
Q Did you know that the town had an obligation to fund

any money to TPL to assist in the purchase of the property?
A Might have been something tied to the monies that had been voted in in town meeting, but I'm not sure of the sequencing. Didn't they have to get some of the -- didn't town meeting occur before assignment of the right?
Q So, as far as you're concerned, you don't recall one way or the other whether there was a specific financial obligation.
A We weren't party to that. That's why, I mean, the fact that they didn't let us know about the payment to -- or lack of payment, I mean, it's up to them as to what they included us in or not.
Q When you looked at the application to the state --
A Like I said, I don't think I ever saw the whole thing before.
Q Well, let's just take a look quickly at that application and you will see --
A This one?
Q Yes. I'll use mine and direct your attention to 342.
A Okay.
Q Looking at the bottom of 342, there's a grid there, primary plan, Town of Stow contribution $300,000.

A Uh-huh.
Q Having seen that, was it your understanding that, at the time of the purchase, some --
A CPC money?
Q -- some money would be coming from the town?
A The CPC money that had been approved, yes.
Q Now, in referring to the application, I just want to point out that that document that you've looking at is MacDonnell 11 just so that I have the record straight.
A Okay.
Q Looking back to the document in question that we have, which is a portion of the documents you provided to me today, there's a page entitled roman III, Scenario No. 2.
A Uh-huh.
Q And it begins again with: Friends of Red Acre is not a party to Scenario No. 2. What was Scenario No. 2, if you know?
A Well, I'm trying to -- I believe Scenario No. 2, I mean, I would, again, want to hunt back in here, but that last document that we came across, it has to do with selling both of the houses on the market.
Q Maybe I'm getting confused. Can you direct me to whatever the document is that shows these scenarios,

# ERRATA SHEET

July 7, 2007

Deposition of SERENA FURMAN

| Page No. | Line No. | Transcript reads | Change made |
|---|---|---|---|
| 12 | 3 | "-- we didn't..." | "... -- we did..." |
| 23 | 19 | Ruth Kennedy is Stow Conservation Trust... | Ruth Kennedy is on the Board of Sudbury Valley Trustees. |
| 36 | 12-13 | ... recoup their time and money and effort... | ... recoup their hard costs... |
| 65 | 13-15 | "... different foundations, that many of them were responded by Trust for Public Land as we've never heard of these people before, great. This is fantastic." | "... different foundations. Trust for Public Land told Peter that they had never heard of many of the funding sources. They were excited." |
| 72 | 15 | templet (repeated elsewhere) | template |
| 73 | 13 | "... another one." | "...another one for affordable housing." |
| 74 | 16 | "they did any." | "they did any other fundraising." |
| 75 | 8-9 | "... pretty -- got his short on -- heart on his sleeve here." | "... pretty candid about his feelings here." |
| 75 | 21 | "... they were pulling all," | "... they were pulling out of all," |
| 98 | 9 | "... dramatically ask for an increase..." | "... ask for a dramatic increase..." |
| 109 | 22 | "... feel pretty strongly..." | "... feel pretty strong in,..." |
| 110 | 20-21 | "... familiar with, and it used to be, in the day, that..." | "... familiar with. It used to be that a guy..." |
| 111 | 13-14 | "... being a realtor. Isn't that real estate created the realtor, ..." | "... being a Realtor. Isn't it real estate that created the Realtor, ..." |
| 118 | 6-7 | "... and Mrs. --" "Oh, yes. Well..." | "... and Mrs. --" "Well..." |
| 134 | 1 | "... about default or DHCD..." | "... about defaulting or the DHCD..." |

C E R T I F I C A T E

I, SERENA FURMAN, do hereby certify that I have read the foregoing transcript of my testimony and further certify that said transcript is a true, accurate and complete record of said testimony. as amended by attached errata sheet dated July 7, 2007

Dated at Stow, MA, this 7 day of July, 2007, under the pains and penalties of perjury.

Serena Furman

# TAB 6

Volume: II
Pages: 1-105
Exhibits: 31

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11697-GAO

MARILYN KUNELIUS,
Plaintiff,

v.

TOWN OF STOW, separately,
A PARTNERSHIP OF UNKNOWN NAME
BETWEEN TOWN OF STOW and THE
TRUST FOR PUBLIC LAND, separately,
and CRAIG A. MacDONNELL, in his
individual capacity,
Defendants.

CONTINUED DEPOSITION of SERENA FURMAN, a witness called by and on behalf of the Plaintiff, taken pursuant to Fed.R.Civ.P. 30, before Roberta J. Daniels, a Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Law Offices of Michael C. McLaughlin, One Beacon Street, Suite 3333, Boston, Massachusetts 02108, on Tuesday, April 17, 2007, scheduled to commence at 5:00 P.M.

APPEARANCES

Michael C. McLaughlin, Esquire
Law Offices of Michael C. McLaughlin
One Beacon Street, Suite 3333
Boston, Massachusetts 02108
Counsel for the Plaintiff

Deborah I. Ecker, Esquire
Brody Hardoon Perkins & Kesten, LLP
One Exeter Plaza
Boston, Massachusetts 02116
Counsel for Defendant Town of Stow

Patricia M. Murphy, Esquire
Goodwin Procter, LLP
Exchange Place
Boston, Massachusetts 02109
Counsel for Defendant The Trust for Public Land

James B. Conroy, Esquire
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd floor
Boston, Massachusetts 02108
Counsel for Defendant Craig A. MacDonnell

Also present:

Lucie DeBellis, Paralegal
Law Offices of Michael C. McLaughlin

INDEX

| Witness | D | C | RD | RC |
|---|---|---|---|---|
| SERENA FURMAN | | | | |
| By Mr. McLaughlin | 7 | | 96 | |
| By Mr. Conroy | | 49 | | |

EXHIBITS

| No. | Description | Page |
|---|---|---|
| 7A | Furman Documents for Marking as Exhibits | 7 |
| 8 | Foundations spreadsheet, 1-19-03 | 102 |
| 9 | FORA budget, 1-19-02 | 102 |
| 10 | Christianson email to FORA, 12-17-02 | 80 |
| 11 | Christianson email to MacDonnell, 1-30-03 | 7 |
| 12 | MacDonnell email to Christianson, 2-25-03 | 18 |
| 13 | FORA email to MacDonnell, 3-20-03 | 32 |
| 14 | Christianson email to FORA, 7-23-03 | 88 |
| 15 | FORA letter to MacDonnell, 7-27-03 | 12 |
| 16 | Christianson letter to MacDonnell, 8/6 | 44 |
| 17 | Christianson letter to MacDonnell, 9-11-03 | 46 |
| 18 | MacDonnell letter to FORA, 9-10-03 | 102 |
| 19 | MacDonnell letter to FORA, 8-6-03 | 102 |
| 20 | FORA letter to MacDonnell, 8-19-07 | 102 |
| 21 | Outline: Should we meet? | 102 |
| 22 | Revised market alternative - variance granted | 102 |
| 23 | FORA email to Perry, 9-30-03 | 92 |
| 24 | DRAFT Conditions for Transfer of Right of First Refusal | 15 |
| 25 | TPL memo to Stow project partners, 3-18-03 | 24 |
| 26 | FORA letter to Perry, 9-30-03 | 47 |



trying to kill the project for some time?
MR. CONROY: Objection.
A No. I don't even recall who came up with that quote among the authors of this.
Q Okay. Last question, as far as I'm concerned anyhow, is, when you met with Patty Murphy, did you receive any advice or suggestions concerning how you should prepare for this deposition?
A No.
Q Did you receive any instruction or direction as to what testimony you should give?
A No.
Q At any time, did Ms. Murphy describe to you the position that TPL was taking in this litigation?
A No.
Q So, your recollection of her discussion with you, specifically, was what?
A It was why don't you tell me how you recall the project going forward. So, I basically talked.
MR. McLAUGHLIN: I have no further questions. Thank you.
MR. CONROY: I'm going to have some. This may be a good time to take a 10-minute break.

MR. McLAUGHLIN: Sure.
(Recess, 6:20 P.M.)
(After recess, 6:28 P.M.)
CROSS-EXAMINATION
By MR. CONROY:
Q Ms. Furman, my name is Jim Conroy. We met before at your last deposition, and I represent Craig MacDonnell. I'm going to have a few questions as well.
First of all, let me ask you, do you have any fund-raising experience of your own as opposed to your husband's experience?
A I have written components of grants for Museum of Our National Heritage and for the New England Aquarium. I have produced -- usually, the parts that I produce are closely related to my profession, which is exhibit design.
So, I would be working with the funders, but I would be doing the sections that describe the exhibits or renovations, et cetera, for larger funding, and then, also, we did some federal funding for operations, which is a big, big project, at the National Heritage Museum, and I wrote quite a few pieces of that, but I was not

the organizer of the funding efforts. But I contributed.
Q In addition to that, have you acquired some knowledge of fund-raising from your husband as well?
A Osmosis, yeah. Osmosis, definitely.
Q Were you ever hired to raise funds for any institution or person?
A No.
Q Have you had any conversations with Marilyn Kunelius, first of all, about anything at any time?
A Let's see. Yes, I had one about asking her if I could walk on her property. I had one about a dog nearly getting hit that came running off her property in front of a truck.
Q Okay. Let me just slow you down a little bit.
A Sort of neighborhood things. I've called her up and said, "I'm your neighbor. I know a lot about horses. If you have an emergency, please call me. I can come handle horses if there's a problem."
Q All right. Let me just slow you down a little bit.
A Sure.
Q And we don't need a lot of depth, but let's start from the back.
A Yeah.

Q The last one you mentioned about the horses, what was her response to that?
A No, thank you. I don't need any help.
Q And was that the extent of it?
A Uh-huh.
Q What about the dog? What was the answer to that?
A She said she'd let the -- I think it was a renter's dog and she said she'd let him know, thank you. It was kind of a young puppy and it just needed to be under better guard.
Q And then what was the first one? I forgot.
A The first one was we had some sort of confusing information in our neighborhood as to whether or not Marilyn minded if you were on her property or not, and so when we -- somebody had told us quite clearly that we could go just up her driveway and down a trail and she wouldn't mind, and she came out, and she did mind, and I was very apologetic, and I wrote her a letter, sorry. Sorry, I'm not going to walk on your property.
Q And did she, as you understood it, object just to your being on the property as opposed to --
A Perhaps not calling in advance. So, I completely understood her at that time.
Q Did you ever make any changes in the topography of

Ms. Kunelius' property, cut any bushes or --
A No.
Q -- open a path or anything of that kind?
A No.
Q Cut down any tree limbs, anything like that?
A No.
Q Any other conversations with her that you can recall?
A Well, she was at the hearing for -- Mosaic Commons ran an open session to talk about the project, which she was at. I don't remember talking to her, specifically, but we might have said something there. I know she was having a few conversations with the woman who is Eye of the Storm, Nina Arbella, and sometimes I got that secondhand, and then she called me recently to, you know, give me Michael's name, and I'm trying to remember if there was anything else.
Well, then we went and we talked about a possible -- two different times we went to talk to her about -- after Craig had left. One was trying to make good on a reduced price that we felt we could manage at that time, and then, again, I think my husband contacted Jim Boothroyd about even just purchasing a small portion of her property that was in wetland.

Q I'll come to that separately.
A Is there something else that I'm forgetting?
Q I have no idea. I'm asking you.
A Oh, okay. I don't know if she had mentioned something to you. But she's sort of a silent neighbor rather than a neighbor I've been actively engaged in.
Q Is that the extent of your memory about conversations with her?
A Yes, I think so.
Q Did you ever hear anything to the effect that Ms. Kunelius was hoping that the deal for the purchase of her land would fall through so that she could bring a lawsuit and get triple damages for it?
A I may have heard something like that secondhand.
Q I'll say, in fairness to you, that a document was marked in Ms. Sommerlad's deposition referring to such a comment.
A Through her barn manager?
Q Right.
A Right.
Q What did you hear about that?
A Just what Karen had said, that she had heard from -- was Trish Polin her name -- that she was hoping that

the deal would fall through because she wanted to sue.
Q But you have no other knowledge of that?
A Just through that contact. I don't know if I heard it again through Nina Arbella. I don't know if I heard it again through -- I don't know who else would have had a connection with Marilyn. There was a woman across the street who had a horse. They talked, but she never talked to me directly.
Q What has that got to do with that?
A Well, that Marilyn may have talked to her, and then she may have talked to Nina, and so this sort of second- and third-party. So, I don't know if I heard it more than once.
Q Now, you say that she called you and gave you Mr. McLaughlin's name?
A Correct, because she wanted -- she said that he wanted to get in touch with me.
Q And other than that, did she say anything further?
A She said that she was loving living up in Stow with a population of four hundred people.
Q Anything else?
A She said she was going to come to these, that she wanted to come down to these meetings and she was trying to get all of the Friends of Red Acre people,

Karen and whoever else that wanted to be talked to, to come together, because she obviously didn't want to make a lot of trips.
Q By meetings, you mean the depositions?
A I don't know, because at that time I didn't know the process, and, obviously, I met with Patty and that wasn't a formal deposition.
Q Do you recall anything else that you said in that conversation?
A No.
Q Now, I understand you spoke to Mr. McLaughlin. You said you did.
A Yeah, we talked on the cell phone first.
THE WITNESS: Though I think you did most of the talking or kind of running through the project.
Q Okay. Let me just keep the record clean, because it doesn't reflect you, okay.
A Oh, got it.
Q Tell me, how many times did you speak with Mr. McLaughlin on the telephone?
A Once.
Q Just once. And how long did you speak with him?
A It was about 20 minutes.

Q When was that?
A I don't have my calender, darn it.
Q Roughly.
A It was roughly, I would say, four days before I met with Patty.
Q And tell me as best you can the substance of that conversation.
A I think he was running through, basically, in reverse. As I was doing a chronology of the project, he was doing a chronology of the project to me on the phone, not really asking me questions or anything.
Q So, you mean to say that he was recounting to you his understanding of these events?
A Based on the limited information he had at that time, that this happened and this happened and this happened.
Q More as a narrative than as question and answers?
A Right, right, not a question and answer thing.
Q Was he asking you whether these things were correct or incorrect?
A I think I do recall one question where he was asking who were the major funding sources, and I said I couldn't quite recall at the time.
Q As you listened to him give this narrative to you, did

you understand him to be recounting it accurately as you recalled it?
A Boy, it seemed to me there were one or two points, but I think, more or less, it was accurate.
Q Do you recall what the one or two points were?
A I'm not quite sure they were wrong, but then I had to clarify, you know, did this happen before or after the assigning of the right, or was this right before town meeting, or was there a need to, say, encourage TPL after the -- I don't really recall, something about there was a moment, and it made sense when I put it in context of time, such as, oh, well, that was right after the town meeting vote, voted against -- not the town meeting but the vote at the polls went against the project.
Q So, you were correcting chronology?
A Oh, I think he had the chronology straight, but in my own mind, as he was making -- do you know that this happened, and I had to kind of go, well, wait, that was after the vote in the polls. So, I don't recall anything that was inaccurate.
Q Do you recall anything notable about anything he said in that conversation, anything that surprised you?
A I think he brought up the fact that TPL had this

gigunda line of credit. I'm sorry, but I don't remember the number, that had been written into the DHCD grant, which I never read the entire document.
So, I mean, I think he -- he did ask a question: Did you think that TPL could cover these kinds of expenses? And I said, well, enough of us are non-profits that we know how to look at Web sites for non-profits, and we can see that they have a good, strong bottom line, so I'm not surprised. I didn't know that they had this specific line of credit with some bank, but by looking at their Web site and understanding the organizational structure, I'm not surprised.
Q Do you know whether your husband spoke to Mr. McLaughlin?
A He has not, I don't believe.
Q You have said, as I recall it in your last session, that you and your husband were willing to come up with six figures by way of a loan, if need be, to try to make this deal work. Do you remember that?
A Uh-huh.
Q Yes or no, you have to say.
A Yes, I do remember that, and I went home, and he does have the breakdown of that offer, but he didn't think

it related directly to this lawsuit, so he didn't give that to me, but we do have that if you're interested.
Q Okay. Let me come to that. But my question is: what are your motives in this situation? Why would you be willing to do that?
MR. McLAUGHLIN: Objection.
A Well, I feel that it was -- we were still trying to do the right thing by Ms. Kunelius and by the town.
Q Put a different way, I suppose, are you still hopeful that the land will be conserved, that something can be done to preserve it?
A The land is what it is, which is it's very wet. So, I don't imagine the large part of it ever being developed. My main goal was to augment the project by allowing it to remain as a horse farm and fulfill the needs of Eye of the Storm.
Q With respect to this question that has come up so far in this deposition of Craig asking you or telling you not to raise anymore money, do you understand the issue that I'm referring to?
A Well, that TPL was not going to begin raising money with foundations, right.
Q But this is a little different question. Do you recall Craig ever saying to you that he didn't want to

wrote it.
A Right. It seems to be -- in my documents, it's mixed in quite closely with the assignment of the right of first refusal. Did the town require anything such as a funding document as part of their review process? Because it's lying right between the question and answer and our unsigned copy of the assignment and acceptance.
Q And having read it, nothing in it triggers any thought that this is something that you produced or your husband produced?
A I don't recall.
Q There's a reference on the second page under the heading Revenue to Foundation Grants In-Hand, $220,000.
A That's Red Acre Foundation, Stow Conservation Trust, and Black Creek.
Q The three of those combined?
A Yeah. That number, I understand.
Q And were those pledges or actual contributions in-hand?
A They're pledges. Actually, sorry, Black Creek did make a contribution to Eye of the Storm, and they put it in a bank account.

Q How much?
A Twenty thousand.
Q And then there's a reference to secured financing, 300,000. Do you know what that refers to?
A I would imagine that it's the amount of money that we need to bridge the difference. I've seen that 300,000 dollar number come up before as the gap between pledges to date and what money needs to be raised.
Q But you don't know anymore than that about that item?
A I would love to find out if this document went to the town as part of their, you know, review.
Q But you don't know?
A I don't know.
Q And then it says: Sale of assets and CPC, 600,000. Do you know what that refers to?
A Well, the CPC grant was 300,000 for open space, and I don't know how the other part -- I'm just guessing, because I really don't know. I would say it's a combination of selling property to Eye of the Storm. I don't know. It's been too long.
MR. McLAUGHLIN: Can I interrupt you for a second?
MR. CONROY: Yeah.
MR. McLAUGHLIN: Off the record.

(Brief discussion off the record)
THE WITNESS: I don't understand this.
MR. CONROY: Okay. Fair enough. What about this, Lucie? Is that marked?
MS. DeBELLIS: No.
MR. CONROY: This is a five-page document with the letterhead Peter R. Christianson on it, and we'll mark that as No. 35.
(WHEREUPON, Exhibit No. 35, Christianson letter to Scofield, dated March 3, 2003, marked for identification.)
Q Are you familiar with that?
A Yup.
Q This is a cover letter to Dean Scofield that reports that collection of a total of $11,500 in donations from you and others, right?
A Uh-huh, to Stow Conservation Trust.
Q Right. To your knowledge, was that the totality of the donations that FORA members made in this matter?
A Yes.
Q My notes reflect, and the record will speak for itself, and I can't vouch for the accuracy of it, but my notes reflect that there was some reference made by

you, or perhaps by Mr. McLaughlin, in the first session of your deposition to 22,000 being donated by FORA members. I believe that the 11,500 is the accurate figure, and I just wanted to check your memory of that.
A Yeah, this is the accurate figure. The only other thing I'd consider is that Black Creek may have done 10,000, but, no, I don't think so. I think that stated Eye of the Storm, and that coincides with the check, this delivery of the deposit of 11,500.
MR. CONROY: Next one, please. We'll make this 36.
(WHEREUPON, Exhibit No. 36, Christianson handwritten calculations, marked for identification.)
Q Do you recognize Exhibit 36?
A My husband's handwriting.
Q There's a reference there to 75,000 RAF. Do you know what that refers to?
A Possible additional pledge from Red Acre Foundation for $75,000 above the 100,000 that they already pledged.
Q Are you speculating about that?
A I'm speculating, but I do believe that they did

consider a higher amount at some point.
Q There's a figure of 100,000 below that, too. Do you see that?
A Uh-huh.
Q Do you know what that refers to?
A My guess is that's their previous pledge, but I don't know. That's Tom Shepard's email address at the bottom. He's on the board of Stow Conservation Trust.
Q I see, okay.
A It was something that he probably faxed to Tom for a conversation. I'm sorry. I don't remember that.
MR. CONROY: This will be 37, please.
MR. McLAUGHLIN: It's actually 14. It's already 14.
MR. CONROY: So, we'll refer to that as No. 14.
(WHEREUPON, Exhibit No. 14, Christianson email to FORA, dated July 23, 2003, marked for identification.)
Q Back to 14, then, Ms. Furman, specifically, on Page 2, this, of course, is the email, I guess, from your husband to the FORA members, correct?
A Uh-huh.
Q Dated July 23, '03. Now, turning to Page 2, roughly

the middle of the page: When Craig said we had done nothing, he omitted the following: RAF, $125,000. Does that refer to a pledge by RAF?
A Uh-huh.
Q Yes or no?
A Yes.
Q And SCT, 100,000, is that also a pledge?
A Yes.
Q And then Black Creek, 20,000, is that the contribution that you mentioned a minute ago?
A Yes.
Q And do you know when those pledges and that contribution were made?
A How interesting. I believe I might have a document in here for Black Creek. I would have thought the documentation for Red Acre Foundation and Stow Conservation Trust would have gone to TPL.
Q So, you don't know offhand when they were made?
A I think -- well, first of all, the Red Acre Foundation went up, because it was referred to as 100,000 earlier on. Let me see. This will take me some time to find something.
Q Okay. Well, let's pass it, then.
A But, at any rate, it was fairly early on in the

project. I think they were actually rather instrumental in, you know, kibitzing TPL to, you know, the early signage support from local organizations.
MR. CONROY: Did we mark this one?
MS. DeBELLIS: Exhibit 17.
Q I'll put Exhibit 17 in front of you. Do you see that?
A Uh-huh.
Q And this is a letter from you to Craig headed DRAFT No. 2, with a handwritten 9/11/03. Do you see that?
A Uh-huh.
Q Forgive me, because this obviously was asked earlier, but I don't recall. Was this actually sent, or was this a draft that was not sent?
A I believe it was sent.
Q You think it was sent?
A Yes.
Q And did you write it? It's signed by you, or it's got your signature block.
A Yes.
Q Do you want to take a moment to orient yourself?
A No, we've looked at this a couple times before, so.
Q The fourth paragraph or so down, As we continue to restate, do you see that?
A Okay.

Q Our diverging visions for this project. The last line of that paragraph says: We think that TPL's project management is completely defendable. Can you explain what that refers to?
A Seems like bad grammar. If we pursue the original plan, we think that TPL's project management is completely defendable. That sentence makes absolutely no sense.
Q You don't understand it?
A It's not an if then. If we pursue a plan, then TPL's project management is defendable. The sentence does not make sense to me.
Q I guess that's two of us, then.
A Seems complimentary a little bit.
Q But you don't know what it means?
A I do not know what it means.
Q At the bottom of the letter, or toward the bottom of the letter, I'm sorry, the first page, well, the last full paragraph.
A Okay.
Q It begins: TPL is choosing.
A Okay.
Q Second sentence: There was an understandable reluctance on the part of TPL to fund-raise before

certain key decisions were made regarding town support and zoning board approvals. Decisions that put off the funding campaign were based on real concerns and considerations. Can you explain what that refers to?
A Well, and I think I've made mention to this before, you don't want to request funds from foundations and then write them back and say, gee, I'm sorry, this project can't go forward. We can't use your funds. It would basically prevent TPL from ever going to that foundation again for the rest of their, you know, existence. It really puts foundations in a very bad strait when people don't take their money.
Q And that's another reference to that concept?
A Yeah.
MR. CONROY: I know we've marked this one. Lucie, which number is that?
MS. DeBELLIS: It's Exhibit 23. We didn't mark it. We have it on the list, but we didn't mark it.
MR. CONROY: Let's mark that as 23.
(WHEREUPON, Exhibit No. 23, FORA email to Perry, dated September 30, 2003, marked for identification.)
Q You're oriented to that?

A I've looked at this one before, yeah.
Q And this is a letter from FORA members to Mr. Perry, correct?
A Yes.
Q Of September 30, '03. First full paragraph afer Dear Ross, again, a few minutes ago we spoke of this passage where Craig said he had been trying to either push the project along or kill it for quite some time. Do you see that?
A Uh-huh.
Q I'm not sure that we've completely clarified what that means. Can you shed any further light on what is referred to with respect to killing it, the possibility of killing it?
A Well, again, all I've said is I'm surprised that Craig would use this kind of language, and, I mean, I don't know. You want me to conjecture what it means based upon --
Q For what it's worth.
MR. McLAUGHLIN: Objection.
Q Tell you what. Mr. McLaughlin is right. You shouldn't be conjecturing.
A Yeah.
Q You have no actual memory?

A No, I don't. I don't know.
Q Fine. Last item on the bottom of that first page: The funds guaranteed to TPL to date are precisely $1,600,500. What does that mean, guaranteed?
A I don't know. It must include the sale of properties.
MR. CONROY: And the last exhibit I have, this was not produced by you but, rather, by TPL. I'll mark that as 37.
(WHEREUPON, Exhibit No. 37, Lapointe email to FORA, dated January 16, 2003, marked for identification.)
Q This one might be new to you, so just take a moment, please, and review that.
A Chris Lapointe. He was Craig's assistant.
Q Do you have it?
A Okay. Thank you.
Q Having reviewed it, do you remember it?
A Yes, this is my first foray into the town offices to talk to the Planning Board and the building commissioner.
Q And this is a report on that discussion?
A Uh-huh, yeah. They were very, very friendly.
Q What do you remember about that event?
A Being the last time they were being very friendly to

me.
Q Can you describe what happened?
A No, let's see. I went through all of the 142 files that they had there and made some photocopies, and, basically, as I reported here, they were just very upbeat and encouraging.
Q This was good news as you saw it?
A Yeah, it was.
Q And what was your purpose in reporting this to Craig?
A To give him a notion of how the town was going to respond to going after variances.
Q And what was his reaction?
A I don't recall.
Q The top email, it's a little hard for me to figure out where -- let me ask the question. Is this a single email or is this two emails?
A Chris Lapointe is writing to me saying that -- wait a minute. Chris has asked for any previously mailed assent, if you have any assent. Why would Chris refer to himself?
Q This is what's confusing me.
A Maybe -- I don't know. At any rate, then I responded, and that was my one email that I had, because that's January 16th and that was January 9th, was my one

July 7, 2007 II-105

# ERRATA SHEET

Deposition of SERENA FURMAN

| Page No. | Line No. | Transcript reads | Change made |
|---|---|---|---|
| 33 | 13 | "... that has to go." | "... that has to go on." |
| 58 | 7 | "... of us are non-profits"... | "... of us work for non-profits..." |
| 66 | 1 | "UH-HUH" | CLARIFICATION: TPL, NOT MY HUSBAND WOULD DO THE ASKING. THESE ARE MY HUSBANDS RECOMMENDATIONS TO TPL." |
| ~~60~~ | ~~6~~ | | |
| 60 | 6 | "... write the -- they..." | "... write the grant applications. They..." |
| 78 | 13 | "... I don't think we were interested." | "... I don't think they were interested." |
| 90 | 2-3 | ", you know, kibitzing TPL to, you know, the early signage support..." | " you know, soliciting TPL to take the project on ... the early signs of support..." |
| 95 | 3 | "... the 142 files..." | "... the 142 Red Acre Rd. files..." |
| 99 | 11 | "... I wrote that..." | "... I co-wrote that..." |
| 95 | 18-19 | "... previously mail assent, if you have any assent." | "... previous emails sent to TPL... IF YOU HAVE SENT TPL A PAST EMAIL..." |

C E R T I F I C A T E

I, SERENA FURMAN, do hereby certify that I have read the foregoing transcript of my testimony and further certify that said transcript is a true, accurate and complete record of said testimony as amended by attached errata sheet dated July 7, 2007

Dated at Stow, MA, this 7 day of July, 2007, under the pains and penalties of perjury.

Serena Furman

# TAB 7

Volume: I
Pages: 1-105
Exhibits: 6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11697-GAO

MARILYN KUNELIUS,
Plaintiff,

v.

TOWN OF STOW, separately,
A PARTNERSHIP OF UNKNOWN NAME BETWEEN TOWN OF STOW and THE TRUST FOR PUBLIC LAND, separately, and CRAIG A. MacDONNELL, in his individual capacity,
Defendants.

DEPOSITION of KAREN SOMMERLAD, a witness called by and on behalf of the Plaintiff, taken pursuant to Fed.R.Civ.P. 30, before Roberta J. Daniels, a Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Law Offices of Michael C. McLaughlin, One Beacon Street, Boston, Massachusetts 02108, on Monday, April 2, 2007, scheduled to commence at 10:00 A.M.

APPEARANCES

Michael C. McLaughlin, Esquire
Law Offices of Michael C. McLaughlin
One Beacon Street, Suite 3333
Boston, Massachusetts 02108
Counsel for the Plaintiff

Peter E. Montgomery, Esquire
Brody Hardoon Perkins & Kesten, LLP
One Exeter Plaza
Boston, Massachusetts 02116
Counsel for Defendant Town of Stow

Patricia M. Murphy, Esquire
Goodwin Procter, LLP
Exchange Place
Boston, Massachusetts 02109
Counsel for Defendant The Trust for Public Land

James B. Conroy, Esquire
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd floor
Boston, Massachusetts 02108
Counsel for Defendant Craig A. MacDonnell

Also present:

Lucie DeBellis, Paralegal
Law Offices of Michael C. McLaughlin

INDEX

| Witness | D | C | RD | RC |
|---|---|---|---|---|
| KAREN SOMMERLAD | | | | |
| by Mr. McLaughlin | 5 | | 97 | |
| by Mr. Conroy | | 62 | | 100 |
| by Mr. Montgomery | | 101 | | |

EXHIBITS

| No. | Description | Page |
|---|---|---|
| 1 | Subpoena | 6 |
| 2 | Sommerlad e-mail to Kennedy, 1-29-03 | 20 |
| 3 | Jacobs e-mail to Sommerlad, 2-6-03 | 41 |
| 4 | Wainwright letter to Lee, 2-19-03 | 51 |
| 5 | MacDonnell letter to Lawson, 4-1-03 | 51 |
| 6 | Sommerlad e-mail to MacDonnell, 3-3-03 | 94 |

A To be honest, I can't remember whether it was he or I, but I think it was that I did.
Q And had you heard of TPL prior to your contacting Mr. MacDonnell or TPL?
A No, I did not.
Q So, do you recall how you came to contact TPL?
A I can't remember whether it was somebody recommended them or whether I just found them through searching organizations that might be interested in the property.
Q At the time that you contacted TPL, do you recall whether you were knowledgeable about Massachusetts General Law Chapter 61 and the right of first refusal for a city or a town to purchase land that was under the provisions of Chapter 61?
A I knew that was a possibility.
Q Had you had any experience prior to the Kunelius property?
A No.
Q Do you recall the first time you actually met with Mr. MacDonnell?
A No.
Q Are you familiar with a loosely formed group called Friends of Red Acre Road?

A Yes.
Q Are you a member of that group?
A It's not really a group.
Q Yeah, it's just an association, and I'm using that with a small A.
A Yes.
Q An association of people that live along Red Acre Road, is that fair to say?
A It's a group of interested neighbors in the Kunelius property.
Q To the best of your knowledge, it's not an entity that was formed such as a corporation or partnership or anything like that?
A No.
Q And at the time that you contacted Mr. MacDonnell or TPL, can you recall whether the Friends of Red Acre had actually existed -- and I'm using that term in a very unofficial way -- prior to the contact with TPL?
A Yes.
Q And do you recall how the Friends of Red Acre came to exist, and, again, I'm not trying to imply that they are a separate entity, but how the various individuals got together to discuss their joint concerns?
A Neighbors along the road got together to talk about

what options there might be for the property, and the name FORA, Friends of Red Acre, just sort of emerged out of that.
Q And did they have any elected spokesperson?
A No.
Q Did they have sort of a defacto leader or chairman?
A No.
Q Did any one person tend to take on the responsibilities of the group by attending hearings or meetings in connection with the possibility of TPL acquiring Mrs. Kunelius' property?
A No one individual.
Q No one individual. Is it fair to say that everyone in the group had generally the same involvement –
MR. MONTGOMERY: Objection.
Q -- in trying to advance the goals of Friends of Red Acre?
MR. MONTGOMERY: Objection.
A I would say -- could you repeat that, please?
Q Is it fair to say that the various members shared in a fairly equal way the obligations of attending hearings and meetings concerning how the Kunelius property would be dealt with?
MR. MONTGOMERY: Objection.

A I wouldn't say members.
Q I use that term in an unofficial way, and I'm not trying to suggest, again, that it's an official group by way of some corporate identity or anything like that.
Was there a smaller group within the Friends of Red Acre that was more active than the larger, the total membership?
A This is hard to answer, because we didn't have a membership per se. There were neighbors that were more involved than other neighbors.
Q Who were the top five people that had the most involvement if you can recall?
A I would say me, my husband, Serena Furman, Peter Christianson and, to some extent, Michael Labosky and Erica Nilsson.
Q Do you recall meeting with Mr. MacDonnell in the Town of Stow with yourself and others from the Friends of Red Acre?
A Do I remember the specific meeting?
Q Do you recall any meeting? Not specifics, just do you recall any meeting?
A Yes.
Q Do you recall when the first meeting was in the Town

of Stow with Mr. MacDonnell and other members of the Friends of Red Acre?
A No, not specifically.
Q Do you recall, generally, the first meeting, not as to date but generally the first time that you met with Mr. MacDonnell in the Town of Stow?
A I don't remember that first meeting.
Q Do you recall how many times you met with Mr. MacDonnell?
A No.
Q Would it be fifty times?
A Oh, no.
Q Would it be ten times?
A I don't think so.
Q Do you recall at some point being asked by Mr. MacDonnell to represent his interests or the interests of TPL whereby you would use your expertise to inquire as to certain developmental plans that were being considered by TPL for the property?
A I think so.
Q And what do you recall about that?
A I don't remember the specifics. I think I had probably, of the immediate abutters, the most

knowledge with zoning and had agreed to look at the zoning of the property.
Q Do you recall whether you were asked by Mr. MacDonnell to look at the zoning of the property to determine what TPL might be able to do on the property?
A I don't remember if he asked or if I said I would. I don't remember.
Q Do you recall whether Mr. MacDonnell authorized you to inquire on behalf of Mr. MacDonnell with various zoning board of appeals or any other town authorities to determine what, if anything, TPL could do with the property?
MR. CONROY: Objection. Do you mean, Mr. McLaughlin, on behalf of TPL?
MR. McLAUGHLIN: Yes.
A I don't know what you mean by authorized.
Q Well, did Mr. MacDonnell or someone from TPL tell you that you could contact the Zoning Board of Appeals or the Planning Board in order to inquire as to what TPL might be able to do with the property?
A I don't remember the specifics.
Q Do you remember, generally?
A Generally, I think it was a conversation or an e-mail or something. I don't think it was on the phone. I

a deal, that they were still trying to work out a deal but did not know that it -- did not think that it would go through, didn't know.
Q This was several years ago?
A This was in -- no. No, this was within the last -- right before -- between the time I was -- they attempted to serve the subpoena and when I actually received it.
Q And what caused you to talk to Mr. Wilbur at that time?
A He was working in his yard and -- no, actually, he was shoveling snow. It was the weekend we got snow, and I was on my run, and I've always, you know, hi, Bob, you know, how are you kind of thing, and we'd stop and talk, and so I stopped and I said, "Bob, I think I'm going to be deposed," and so we stood in his driveway and chatted for a few minutes.
Q And what did he tell you?
A Well, you know, we agreed. We both agreed that it was just a terrible thing that it's come to this, that the town was trying to make it work, and that's pretty much it.
Q That the town was trying to put some other deal together?

A They were trying to settle the lawsuit.
Q Have you talked to anybody else about the lawsuit?
A No.
Q Do you remember getting a telephone call from a lawyer representing TPL?
A Oh, yes, I did, Patty. She called and she wanted to talk to me off the record, and I said I would think about it, and then apparently she also talked to my husband, and he agreed and said that he would talk to her, and so --
Q He agreed what?
A To talk to Patty.
Q And do you know, did he talk to Patty?
A Yes.
Q And did you ever talk to Patty, substantively?
A No.
Q Why did you choose to talk to Mr. MacDonnell but not to Patty, I mean, to Mr. McLaughlin but not to Patty?
A I think, because Mr. McLaughlin, you know, mentioned that there were some things that we may not know about, so I was interested to find out what those were. So, he used the bait to get me to call, but, also, I do feel some sympathy towards Marilyn for how the deal turned out. I do have a general bias in how

I feel about The Trust for Public Land at the moment and wasn't sure I wanted to -- I would have anything that would be worthwhile to them.
Q What is your general bias?
A I think that Craig walked away from the deal after he said he would, and it's natural animosity, I think I feel.
Q To him, personally, or to TPL, or both?
A I'd say both.
Q And describe for me what this animosity consists of.
A He walked away from a deal. You know, we had worked hard to put together a deal that would work for Marilyn, for us, for the town, and he walked away. He went back on a promise he made to the town.
Q Were you aware before this lawsuit was brought that Ms. Kunelius was thinking about bringing a lawsuit?
A No. I mean, I don't know what she was thinking.
Q Obviously, you don't know what was in her head, but let me ask it a little different way, and I understand time has passed. Let's see if I can refresh your memory.
Is there a woman who lives near you who boarded a horse with Ms. Kunelius?
MR. McLAUGHLIN: Objection.

A I believe my neighbor, Trish, had a horse there for a while, but I don't know when she -- I don't think she has a horse there anymore.
Q What's her last name, Trish?
A Polin.
Q Poland, like the country?
A Polin, P-O-L-I-N, or something like that, E-N.
Q How well do you know her?
A Not very well.
Q Do you know whether she performed any service for Ms. Kunelius at some point?
A I think she was her barn person, whatever a barn person does.
Q Managed the barn in some way?
A I think so. I think she did that in return.
Q For the boarding?
A For the boarding, I think, but I don't know for sure.
Q And you speak with her from time to time?
A Hardly ever.
Q Do you remember Ms. Polin saying something to you about the prospect of a lawsuit?
A No, I don't remember her saying that.
Q I'm just trying to see if I can refresh your memory.
Do you remember Ms. Polin saying anything

about the possibility of Ms. Kunelius getting triple damages in a lawsuit?
A I remember the first time I heard the triple damages discussion, and that was in the selectmen's meeting when they were discussing whether to sign the right of first refusal, and Greg Jones was the first to mention that if it didn't go through, then Marilyn could sue the town for triple damages or something.
Q That was Mr. Jones who said that?
A Yes.
Q Apart from that, do you remember hearing anything about Ms. Kunelius' thoughts along the lines of suing for triple damages?
A No, I don't remember any of that.
Q Or Ms. Polin saying anything about that?
A She may have, but I just don't know. That is not really ringing any bells.
Q Do you remember Ms. Polin saying anything about Ms. Kunelius wanted to see the fund-raising fail so that she could sue for triple damages?
A I don't remember that.
Q Do you remember hearing anything from any other source about Ms. Kunelius wanted to get triple damages or hoping that the fund-raising would not come together?

A You know, it's like the kind of thing that's in my head that I want to say, yes, I kind of heard it, but I can't be -- I don't know. I don't know. I don't know if it's just because you're saying that, and I'm thinking it, or that I actually heard it.
MR. CONROY: Would you mark this, please? Is this number six?
(WHEREUPON, Exhibit No. 6, Sommerlad e-mail to MacDonnell, dated March 3, 2003, marked for identification.)
Q Take a moment, please, and read that.
A Oh, I guess I did hear it. I guess I did.
Q I understand it's been a long time, three, four years. Having read this now, do you remember this e-mail?
A No, I don't remember writing it, to tell you the truth, but, you know, reading it, it's familiar.
Q Having read it, is your memory refreshed?
A Yes.
Q What do you now recall?
A That I may have had a conversation with Trish at the -- this may have been -- I can't tell you about the conversation, whether it was a phone call or an in-her-driveway kind of conversation.
Q But what do you remember about the conversation, what

you were told?
A This is pretty much what I remember.
Q And it was Trish Polin had told you this?
A Apparently, yes.
Q And did you understand that Ms. Kunelius had told Trish Polin these things?
MR. McLAUGHLIN: Objection.
A That's what I understood.
Q Now, again, I know I'm showing you this after four years, four years and a month. Having now seen it and talked about it a bit, do you have any memory of sending it to Craig, sending this e-mail to Craig?
A You know, I see it on paper, but, no, I can't remember the circumstances.
Q Now, the last sentence there, would you read that to yourself, please?
A Now I'm embarrassed.
Q I understand. We all say things in e-mails.
A Yes.
Q What was the basis for that statement?
A I think the basis of that statement was that we wanted to be able to work with Marilyn and come up with a win-win-win deal that was a win for Marilyn, win for us, win for the town, and that we did have an interest

in making it work for her but that she seemed, at the time, not interested in being cooperative. She seemed very angry that we were trying to work out a deal different than her Mosaic Commons deal.
Q And at this time, as of March 3, '03, you felt that you and Craig were on the same team, basically?
A Yes.
Q And when you say we wanted to work out a win-win-win deal, you include Craig in that?
A Yes.
Q And he gave you to understand that that was his goal?
A Yes.
Q And what was it that led you to think that Ms. Kunelius was not interested in being cooperative?
A Before we went to town meeting to present to the town, she sent a letter. She did like a town-wide mailing to the town encouraging the town not to support a position that was going to be presented, our position, at town meeting.
Q What else?
A That was the main thing.
Q What was it that led you to think that, well, let me say, what did you mean by saying that it will be

difficult to convince her to play nice?
A That she might not -- that we didn't think that she would be willing to -- that if she was really out for just the three million dollars, it was going to make it difficult for her to -- it was going to make it more difficult to come up with a deal that was a win-win.
Q And forgive me for the embarrassment, but it is what it is. What was it that led you to say that she was wacky?
A That she was never -- she just seemed like an angry woman, just her interactions with my husband, I think, and that was mostly it.
Q The jogging business and the bonfire business?
A Yeah, yeah, stay out of my -- yeah. Not the bonfire business, because that was our fault.
Q That was over the top, okay.
A That was our fault. She had the right to be upset with that.
MR. CONROY: Okay. Thank you.
MR. McLAUGHLIN: I just have a couple of questions on this.
REDIRECT EXAMINATION
By MR. McLAUGHLIN:

Q In discussing your conversation with me, do you recall me asking you whether you were aware of whether Craig MacDonnell, whether this was Craig MacDonnell's first deal?
A To go forward?
Q Yes.
A First deal ever or first deal to not go through?
Q No, first deal with TPL to accept an assignment of right of first refusal, his, personally, first deal.
A I don't remember you asking me about that.
Q You had testified that you had only spoken to her once, Mrs. Kunelius, and, again, I understand e-mails are what they are, but is it your understanding that Mrs. Kunelius, when you're referring to play nice, you're referring to the fact that she was not willing to do something other than what the specific Co-housing Resources purchase and sale agreement provided for. Is that fair to say?
A Yeah, I think that she really wanted that and nothing else.
Q And nothing else, okay. And it was that refusal to accept something else is what you're referring to when you're saying she would not play nice. Is that fair?
A Yeah, I think so.

Q And are you aware of any obligation on the part of Mrs. Kunelius to accept something other than what was in the purchase and sale agreement?
A No.
Q And with regard to the fact that -- using the word wacky, is it fair to say that your husband's interactions with her involved the fact that he was trespassing on the land?
A Yes.
Q And that she was not willing to tolerate that, is that fair to say?
A That's true. My husband was being obstinate as well. So, it was two-sided.
Q As far as you knew, as of the date on Exhibit 6, March 3rd, you were aware, as of that date, that TPL had already had some feedback from Mrs. Kunelius that she was unwilling to accept anything other than the deal as it was structured in the Co-housing Resources, correct, purchase and sale agreement?
A Can you say that again?
Q You were aware that Craig MacDonnell already understood that Mrs. Kunelius was unwilling to accept anything other than the terms that were contained in the Co-housing Resources purchase and sale agreement.

A I don't think I can answer that. I don't know.
Q You had indicated that what you understood was she wanted that deal that she had with Co-housing, correct?
A Yes.
Q Is it fair to say that you understood that Mrs. Kunelius' letter to the town, the town-wide mailing, made it clear that she did not want to lose the Co-housing Resources purchase and sale agreement, and, therefore, she asked the town to vote down the TPL proposal? Is that fair to say?
A The best of my memory, that was what it was.
MR. McLAUGHLIN: I have no further questions.
MR. CONROY: Just one quick follow-up if I may.
RECROSS-EXAMINATION
By MR. CONROY:
Q When you say that you understood that she wanted the deal that she had and nothing else, what's the basis for that?
A I think that the -- based on the letter that she wrote to the town, and she just seemed very bitter.
Q Anything else, other than the letter?

# TAB 8

VOLUME: I
PAGES: 1-261
EXHIBITS: 1-43

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - x

MARILYN KUNELIUS,

Plaintiff,

v. Civil Action

TOWN OF STOW, et al. No. 05-11697-GAO

Defendants.

- - - - - - - - - - - - - - - - - - x

DEPOSITION of PETER A. KACHAJIAN, JR.

April 25, 2007, 10:08 a.m.

Goodwin Procter, LLP

53 State Street

Boston, Massachusetts

Reporter: Michael D. O'Connor, RPR

------------ BOSTON REPORTING ASSOCIATES -----------

REGISTERED PROFESSIONAL REPORTERS

67 Bright Road

Belmont, Massachusetts 02478

(617)877-6640

EXHIBITS (Cont'd)

| No. | | Page |
|---|---|---|
| 18 | Letter to Peter A. Kachajian, Jr. from Craig A. MacDonnell, dated 7/6/04, with attachment | 164 |
| 19 | Document entitled "Financial" | 170 |
| 20 | Letter to Paul Boothroyd, Sr. from Peter A. Kachajian, Jr., dated 2/20/04 | 175 |
| 21 | Fax to Kim Shute from Peter Kachajian, dated 9/18/02 | 175 |
| 22 | Document entitled "Friends of Red Acre (FORA) and Supporters" | 175 |
| 23 | Memo to Peter Kachajian from Jonathan Klein, dated 1/10/03 | 241 |

(Ms. Fetouh has retained the original exhibits)

PROCEEDINGS

PETER A. KACHAJIAN, JR.

having been satisfactorily identified by the production of his driver's license, and duly sworn by the Notary Public, was examined and testified as follows:

MS. FETOUH: Before we begin, Mr. McLaughlin, do you want to agree to use the same stipulations we have been using in the depositions so far?

MR. McLAUGHLIN: Yes.

DIRECT EXAMINATION

BY MS. FETOUH:

Q. Could you please state your full name.
A. Peter A. Kachajian, Jr.
Q. Are you represented by counsel today, Mr. Kachajian?
A. No, I am not.
Q. Are you appearing here today pursuant to a subpoena?
A. Yes.

(Document marked as Exhibit 1 for identification)

Q. Mr. Kachajian, showing you what's been marked as Exhibit 1, is that the subpoena you received?
A. I believe so.
Q. This subpoena called for your appearance today in a deposition and for the production of documents. Have you now produced all documents in your possession that are responsive to this request?
A. Yes, I have.
Q. Where do you live?
A. Southborough, Massachusetts.
Q. Have you ever lived in Stow, Massachusetts?
A. No, I have not.
Q. Where are you currently employed?
A. I'm self-employed. Northborough, Massachusetts.
Q. What's the name of your employment?
A. Law Offices of Peter A. Kachajian, Jr.
Q. How long have you been self-employed?
A. I think 18 or 19 years. Probably about 18, 19 years.
Q. Do any other attorneys practice with you?

A. No, not at this time.
Q. Did any other attorneys practice with you from 2002 until the present?
A. Actually, no. I hadn't passed the bar yet, so, no.
Q. What's the focus of your practice?
A. Probably real estate and probate.
Q. When you say "real estate," is that mostly residential real estate transactions or is there anything else?
A. Anything related to real estate; residential, commercial.
Q. Mr. Kachajian, what percentage of your practice would you say is made up of real estate?
A. 75 percent.
Q. Prior to starting your own law offices, were you employed?
A. Yes.
Q. Where were you employed?
A. I was in a partnership in a title company in Framingham and part of a firm in Framingham. At the time it was Black, Buono, DelPrete & Flynn. The title company was Longview Title.
Q. How long were you with Longview Title?

512cb0a1-fe00-11db-a265-444553540000

Page 14

property; is that right?
A. He was looking for land acquisitions to develop. He was a developer. He did most of the legwork himself.
Q. Did he make any offer on her property?
A. No.
Q. Do you know why he didn't make an offer on the property?
A. I think Marilyn really didn't take him seriously. Knowing Jay, that's probably accurate.
Q. Why is that?
A. Jay was always a great one for trying to use other people's money to get things done or do other things. That was kind of a flash in the pan, but that was my first encounter with Marilyn. It was short, sweet and brief; all of that good stuff.
Q. Did you actually meet her in person at that time?
A. You know, I'm not sure. I'm trying to think if I did. I may have. I know we went out and looked at the land, but I may have. I honestly can't recall, because it's been so long.
Q. And you said the next time you encountered Ms. Kunelius was in connection with Mr. Boothroyd?

Page 15

A. Yes. The whole Mosaic Commons, TPL.
Q. How did you come to be engaged by Ms. Kunelius?
A. Well, Jim was her broker, her friend, I believe he was her accountant. Jim and I were good friends and had done things together. He was a good referral source, and we hit it off. The rest is history, I guess.
Q. So Mr. Boothroyd referred you to Ms. Kunelius?
A. Correct.
Q. When did that take place?
A. Gee, Dahlia. It was a warm spring. Before the purchase and sale -- if I need to pick a date -- if you showed me the purchase and sale, I'd say sometime before that. Other than that, I can't remember.
Q. At that point, had Mosaic Commons already expressed interest in the property?
A. I don't know. I honestly don't recall. I don't recall if she wanted to sell or if Mosaic came in.
Q. Is your representation of Ms. Kunelius ongoing?

Page 16

A. I'd like to think so.
Q. Do you consider yourself currently representing her?
A. In some capacity, yes.
Q. In what capacity do you currently represent her?
A. With regard to this matter -- obviously Mr. McLaughlin is lead counsel and sort of the tiller man -- to the extent that I can provide any help or insight or whatever.
Q. Are you being compensated by Ms. Kunelius for your help?
A. Currently?
Q. Yes.
A. No.
Q. When is the last time you would have been compensated by her?
A. I don't know at this point. Probably a couple years ago.
Q. Do you intend to, at least currently, charge her for any of your time in connection with this litigation?
A. Good question. I don't know. I don't know.

Page 17

Q. But so far you have not?
A. No.
Q. Do you represent her pursuant to any engagement letter?
A. No, not that I can recall.
Q. Is there any other written document that describes your representation of her or her engagement of you?
A. Not that I can recall.
(Document marked as Exhibit 2 for identification)
Q. You mentioned earlier you weren't sure when you became involved in the representation of Ms. Kunelius. I'm showing you a document that's been marked as Exhibit 2 to your deposition. Have you seen this document before?
MR. McLAUGHLIN: Objection. You can answer.
A. I believe I have. I provided it.
Q. Approximately when did you first see this document?
A. Probably at the time it was presented.
Q. I notice there are a couple of dates on the document. On the first page there's a date in July,

Page 18

July 25, '02 and a date next to it, 9/24/02.
A. Where are we?
Q. This is on the first page of the fax cover sheet.
A. Okay.
Q. Then the document that's attached to the fax has a July 25th date on it. Do you know if you saw this document back in July versus September?
A. Honestly, I don't know. I may have. I don't know what the crossout means. I really don't.
Q. I notice this is a fax from an organization called Cohousing Resources. What is Cohousing Resources?
A. I think Cohousing Resources was a company that was headed by Chris ScottHanson out of -- I think Chris is out of Washington state.
Q. Had you heard of Cohousing Resources before your involvement with this transaction?
A. No.
Q. What's the relationship between Cohousing Resources and Mosaic Commons?
A. My understanding was Chris was a developer of sorts that Cohousing -- I will just give you the history that I understand. Cohousing is sort of a

Page 19

European concept -- Scandinavian, I guess, if you will -- going back to the sense of community.
What they would do is take people like us, college professors, people from all different walks of life, and they would, more or less, contribute their own money. They were trying to develop a community more, I guess, for -- some of us in this room probably remember, anyway, as children, you know, Mrs. Smith, I'll tell your mother.
It was a community that was designed for, you know, they would have sort of a common meeting place, probably have some common meals together. They were committed to open space. Anything they developed, a portion of any land they developed, would be, again, kept green space or open space. I think they utilized some of their own resources as much as possible to get the construction going and things.
So it was more of a sense of community, I guess, more than just like tract housing. I think they tended to do more cluster housing. I think you can see examples of it in Jamaica Plain, and as we speak, Cohousing is building -- or I should say Mosaic Commons is now building what they should have

Page 20

built in Stow in Berlin, Mass. They have done it throughout the country.
My understanding is it's got sort of a Scandinavian, European flavor to it. It's sort of a different spin on community.
Q. Was the Mosaic Commons Group supposed to be the group representing the community, and the developer was the developer helping them create that community?
A. Yes. Chris, as I understood Chris, nice man, Chris was a builder, very sharp, savvy guy, understood building and development, and that sort of thing, and had successfully done this in other parts of the country. So apparently, from talking to a couple of the Mosaic Commons people, he was highly regarded and a real stand-up guy.
I won't say that was his entire business, but it seemed like that's what he was doing, was developing these communities for people. So it was sort of a progressive type of community, something that would have probably fit well in Stow and other places because of their commitment to open space and community, and that sort of thing.
Q. When you came to represent Ms. Kunelius,

Page 21

were there any other offers on the property at the time?
A. Not that I remember, no.
Q. Did you communicate with Cohousing about their offer on the property?
A. Yes.
Q. Who was your primary contact there?
A. Well, we dealt with Chris ScottHanson.
Q. Did you deal with anyone else at Cohousing?
A. No. Just Chris, because Chris, to me, seemed like he was the guy.
Q. You mentioned that you believe you have seen Exhibit 2 before. Had you had communications with Cohousing before you saw this document?
A. I don't believe I did, no. That's not to say that I may not have spoken with Chris. I would say probably not.
Q. Did you have any communications with anyone about the content of this document?
A. I would say yes. Probably my client and Mr. Boothroyd.
Q. Were those conversations together or separate?
A. Probably separate, because we communicated,

Page 22

you know, quite a bit by telephone.
Q. How often did you communicate by telephone with your client?
A. A lot.
Q. Were there daily communications? I'm just trying to get a sense of what you mean by a lot, however you can best express it?
A. Dahlia, depending on what was happening in a particular day or crisis, and, of course, as we dealt more with Craig, it was probably more than just once a day. But in the beginning, maybe once, maybe twice. I don't know.
Q. I want to focus for now on the time period leading up to the execution of the final purchase and sale agreement with Cohousing Resources.
The handwriting on the top of the second page of the document, the first page of the agreement, do you recognize that handwriting?
A. No. It's not mine if that's your question. It's not mine.
Q. That was going to be my next question. Who prepared this document?
A. I'm not sure. I don't know if it was Chris, because it doesn't look like the standard one

Page 23

we do. It may have been Chris.
Q. I notice the last paragraph of the document indicates the offer expires on July 29th at 3:00 p.m.
A. Where are you?
Q. This is Page Kunelius 0033.
A. On Page 4?
Q. Yes. Do you see that language?
A. I do.
Q. Do you know if this offer did, in fact, expire?
A. I don't.
Q. I just want to walk through a few of the provisions in this agreement with you, beginning with Paragraph 2 on Page 1. I notice this agreement calls for a purchase price of $1.1 million payable on closing, all in cash. Do you see that?
A. I do.
Q. Was that ultimately what the purchase price was in this case?
MR. McLAUGHLIN: Objection.
A. I'm going to say no, because I think it was somewhat different.
Q. Do you know why the purchase price changed?

Page 24

A. As an attorney, I'd say probably more fine tuning, more negotiation.
Q. But you have no specific recollection of the reasons it changed?
A. Specifically, no. I'd say probably more fine tuning, just like every contract every attorney does.
Q. That same paragraph also refers to a deposit in the sum of $50,000 to be held in escrow pending the closing. Do you see that language?
A. I do.
Q. Do you know if that language changed between this draft and the final purchase and sale agreement?
A. I think ultimately it was structured differently.
Q. Do you know why that is?
A. I guess I'll rely on my previous answer. More fine tuning of the contract.
Q. Did you discuss the deposit language with Cohousing?
A. I would assume so.
Q. Do you remember what you discussed with Cohousing about the deposit?

Page 25

A. Not specifics, no.
Q. If I can turn your attention to Page 3 of 4, Paragraph 12.
A. Got it.
Q. That's the paragraph titled "Buyer's Default," correct?
A. Correct.
Q. This paragraph states, "Upon default by buyer, seller, at its option may, (i), retain the deposit as liquidated damages as its sole remedy, or (ii), repay the deposit to the buyer and subsequently enforce this agreement and pursue any and all remedies available at law or equity, including an action for specific performance in damages." Did I read that right?
A. I think so.
Q. Did you discuss this paragraph with anyone?
A. We're talking 13, right?
Q. 12?
A. Not that I recall.
Q. After you received what's been marked as Exhibit 2, what did you do next?
A. Could you repeat the question? I'm sorry. I'm looking at this and half listening to you.

Page 26

Q. After you received this document, what was the next step in the negotiations with Cohousing?
A. Discuss it with my client.
Q. Do you have any recollection of discussing this document with your client?
A. Specific recollection, no, but I'm sure I did.
Q. Did you discuss this document with Mr. Boothroyd at all?
A. Probably.
(Document marked as Exhibit 3 for identification)
Q. Mr. Kachajian, I'm going to show you what's been marked as Exhibit 3. Do you recognize that document?
A. I do.
Q. What is it?
A. What is it that I recognize?
Q. What do you recognize it to be?
A. It's entitled "Purchase and Sale Agreement."
Q. When did you first see this document?
A. Hazard a guess, based on the dates in here, I'd say probably sometime around September 25th, as

Page 27

a guess.
Q. And the first page, the cover fax transmission page, says "Please find a signed P&S and promissory note enclosed." Had you reached an agreement on the terms of this document at this point?
MR. McLAUGHLIN: Objection.
A. I don't believe so.
Q. What communications took place between you and Cohousing between what we were just looking at as Exhibit 2 and this document, Exhibit 3?
A. Probably discussions regarding some of the terms in here that obviously have my handwriting on it that I took issue with.
Q. So the handwriting throughout this document is your handwriting?
A. Yes.
Q. Did you discuss this document with anyone other than Cohousing Resources?
A. Probably Jim Boothroyd and probably Marilyn.
Q. Were there any draft agreements in between what we've looked at as Exhibit 2 and the document we are looking at right now, Exhibit 3?

Page 28

A. Not that I can specifically recall, unless I sent you something that there is between the two. Because otherwise, I don't specifically recall any other drafts.
Q. If we can walk through some of the terms in this agreement, starting on Page 1 of 6, and again, Paragraph 2, the purchase price. I note the total purchase price payable at closing is still $1.1 million, but now it indicates $700,000 in cash and a $400,000 promissory note, which is different from the prior draft. Do you know why that was changed?
A. I'm trying to recall. I don't know if it was a combination of what they needed and what Marilyn needed. I forget why the restructuring. I want to say it may be a combination of meeting their needs and meeting Marilyn's needs, you know, at a guess, looking at the differential between the two.
Q. When you say their needs, what do you believe their needs were?
A. For construction or what have you. I can only hazard a guess here, because I don't specifically recall. It may have been to try to give Marilyn an income stream. Then again, if you notice my note why the change -- I guess I'm at a

Page 29

loss, too, because I can't recall exactly why it did change.
Q. Was anyone else communicating on behalf of Ms. Kunelius to Cohousing at this point, other than yourself?
A. Jim Boothroyd.
Q. Were you generally apprised of communications between Mr. Boothroyd and Cohousing?
A. Always.
Q. The next paragraph refers to a deposit in the sum of $10,000, and then subsequent payments of $1,500 a month. Do you see those?
A. I do.
Q. As you recall, in the last document there was just one $50,000 deposit payable at closing; is that right?
A. What paragraph in the other document?
Q. Paragraph 2.
A. There was a sum of $50,000 earnest money you're saying versus?
Q. A $10,000 initial deposit instead of the $50,000 initial deposit.
A. Okay.
Q. Do you know why that change was made?

A. Again, as a guess, I would say probably to provide Ms. Kunelius with some sort of income stream.

Q. Is that a change that you or Mr. Boothroyd requested, then?

A. I'd probably have to say Jim and I conferred on it, because, you know, bear in mind, this was her only source of income was the stable. So she needed some way to live. This was her retirement. This was her be all and end all. She needed some way if she was going to -- as I recall, she boarded horses, she taught riding, anything with horses. So it's very difficult when they were going to develop the land, if they were going to knock down the structures, obviously to provide horses and provide an income stream to her.

Now that you mention it, I was thinking about it when looking at these two, I think a component of what we said was, Gee, Chris, if we allow you to come in and do what you need to do, Marilyn is not going to be able to make a living, because this is the only way she can make a living. We really need some way of providing her with money to eat and whatever.

So I think that may have centered around the change, was basically to provide her with, as I said, to beat a dead horse -- excuse me, Marilyn -- but to provide her with a source of revenue income because all of the boarders were going away. So, you know, there was really no way for her to make any money, other than to find some, I guess, creative way, and Chris, being the kind of guy that he was, kind of felt her pain and understood what was going on.

Again, Jim is a very creative guy. Jim, I guess, came up with a way for her to have some money to live on while this whole process went on, because again, sort of evicting the boarders, and not taking in any boarders or teaching the riding, sort of devolving the business, if you will, so that's got to be the only way she was going to be able to have any money at all.

That's what I recollect as to why we got creative here.

Q. So she was willing, I guess, to take a lower initial deposit in order to get the $1,500 payments?

MR. McLAUGHLIN: Objection.

A. You know, we had done a lot of homework in finding Cohousing and finding Chris, and he was just a really stand-up guy, and when we explained to him her situation that this was her retirement, this is all she had, Chris was pretty receptive to that. Again, he is just a nice man.

So I think we all came up with a way so that Marilyn could have some money and we could make this deal go forward. So obviously in any kind of transaction you try to meet the needs of both sides of the transaction. So I would say this was probably a creative way for Marilyn to get cash in her pocket while this thing was ongoing.

Q. And at the same time for Cohousing not to have to put up as much money initially?

A. Well, again, yes. There was certain money at risk for them. Obviously there was the non-refundable portion of this. So Chris was again -- and the people with Mosaic Commons, nice people, they understood. They understood what this meant to her.

It meant a lot to them, because they liked the spot, the proximity to the Stow station -- now that we start talking about this I start thinking

about all of this -- the Acton train station.

Again, they weren't your typical hard-nosed developer types. He was a nice guy to deal with, nice people.

Q. At the beginning of your answer you said something about how you had done a lot of homework in finding Chris ScottHanson. What did you mean by that?

A. Well, we went on the websites and we researched Chris and saw what his track record was. So it was a measured analysis of the potential buyer. We knew he was the real deal and not just some fly-by-night guy.

Again, as I told you, he, meaning Cohousing, he had been successful in doing these developments before. So they were a strong player, good people to work with, you know, you felt, unlike some of the people we deal with in our practices, what you see is what you get, and he proved to be that way. He was a nice guy. I think you'd like him if you met him. He was a cross between, I guess, Burl Ives and Santa Claus. He is a big kind of bear of a man, nice man.

Q. Had you gone out and solicited Cohousing or

Page 38

they would have needed to get the 40B passed in Stow?
A. I don't specifically, no, not off the top of my head. Maybe I did at the time, but it's been such a long time, and I haven't had to do 40B issues in quite a while. So I don't recall.
Q. If I can direct your attention to Page 3 of 6, Paragraph 7, there's a reference to a closing no later than September 26, 2004. Do you see that?
A. I do.
Q. And there's some handwriting next to it on one side that says "No" and on the other side it says "2003, 12 months extend 40B," and I'm not sure what the rest of it says; "proceed okay." Is that what that says?
A. I think it's cut off. I think it says "proceed," but I'm not sure.
Q. Was there disagreement over the closing date with Cohousing?
MR. McLAUGHLIN: Objection.
A. Honestly, Dahlia, I don't recall. I'll tell you my MO is. I like to see clients close as quickly as possible, get their money, and we're out the door. I was thinking gee, I don't want to

Page 39

extend this any longer than I have to. Let's make it sooner rather than later. But that's the attorney in me. Gee, I'd like the money tomorrow, not next week.
At a guess, that's what I'd say probably. I do that in every purchase and sale. Let's close tomorrow and give me the money. Let's close and get out of here.
Q. If you can turn one more page to Paragraph 14, the paragraph titled "Buyer's Default." Do you see that?
A. Yes.
Q. And this appears to contain the same language that was in Exhibit 2.
A. Are you saying it does or it appears to?
Q. It appears to me to. I think it's the exact same language.
A. We are comparing 14 to what was the other one, 12?
Q. It was Paragraph 12 in the prior agreement.
A. Yes, it appears to be the same.
Q. Had there been any discussions between those two drafts of the language in Paragraph 14 of Exhibit 3 and what's in Paragraph 12 of Exhibit 2?

Page 40

A. May have been, but I don't recall specifically. Honestly, I don't.
Q. Under this draft agreement, Exhibit 3, what did you understand the seller could retain as liquidated damages?
A. Say that again.
Q. Under this paragraph, Paragraph 14, which says that "Upon default by a buyer, the seller at its option may retain the deposit as liquidated damages," what did you understand to be the amount the seller could retain as liquidated damages?
MR. McLAUGHLIN: Objection.
A. I understand how it reads. If you're asking me what did I understand, I understand what it reads. It doesn't necessarily mean that I agreed with it or disagreed with it or anything. I understand it, yes.
Q. Is it referring to the deposits referred to in Paragraph 3 of this document, to your knowledge? I know you said you don't believe you drafted this.
A. I would say more than likely it refers back to that or that's what they're getting at here, yes; I would say that.
Q. After you received this document and made

Page 41

your handwritten notations, what happened next?
A. I would assume probably had further conversation based on my trepidations with the document, if you will, or my analysis of the document. Again, it would probably be an organic ongoing process just like every purchase and sale is.
Q. Before the final purchase and sale agreement was entered into, about how many conversations would you say you had with Cohousing about the sale of the property?
A. If you're asking for a number, honestly I couldn't tell you. I'd say probably several, but again, I don't know. I can't say three, I can't say 12. I don't know.
Q. About how many conversations did you have with your client prior to entering into the final purchase and sale agreement?
A. A lot. I spoke to Marilyn quite a bit.
Q. Was that generally over the phone or in person?
A. Over the phone. She was busy, I was busy. You're a lawyer. You know how that goes.

(Document marked as Exhibit 4
for identification)
Q. I'm showing you now what's been marked as Exhibit 4. Do you recognize that document?
A. I do.
Q. What do you recognize it to be?
A. Standard form purchase and sale agreement.
Q. Is this the final purchase and sale agreement between Ms. Kunelius and Cohousing Resources?
A. It's signed by both parties. I will go out on a limb and say probably.
Q. I notice in the top right-hand corner of the first page it has a notation "From the Office of Attorney Peter A. Kachajian." Do you see that?
A. I do.
Q. Is this sort of a standard form agreement that you use generally in your practice?
A. I licensed this software, unlike many attorneys, from the Greater Boston Real Estate Board. I try to avoid the plagiarism. So I've licensed this software for many years, because we use it quite a bit.
Q. Who created this document?

A. I did.
Q. As opposed to the earlier documents we have been looking at?
A. I don't believe those are templates I would use, but this is certainly a template I do employ.
Q. I notice the day is not filled in in the first paragraph of the document, the first line, "This" blank "day of October, 2002." Do you know on what day this was signed?
A. Probably somewhere around there. It's aggravating, because it happens quite a bit. We get purchase and sales all the time for whatever reason, whether it's the broker, whether it's the seller or the buyer, they don't fill in the date. It's a common occurrence. I'd have to say probably on or about -- I'd say on or before the 17th of October, because it has the Town of Stow's planning board stamp on it. So I'd say on or before that date obviously.
Q. Were you present when this document was signed by either party?
A. I think I was with Chris. I think Chris signed it in my office. I think Jim probably took it to Marilyn, if I have to hazard a guess.

Generally, you know, in the business the broker usually shuttles stuff back and forth. Again, clients don't want to pay for attorneys to be high-priced messengers. I guess you can appreciate that.
Q. You believe Mr. ScottHanson was present with you when this was signed?
A. Probably, because Chris, as I had said earlier, lived in Washington state. So Chris would come in, go to the Red Sox, do whatever he had to do, meet with his people. So I would say probably in one of Chris' forays from Washington state to here, Chris would have come in and probably signed it in my office, and then gone back. I'd say that's probably accurate. Jim would probably remember. He might remember.
Q. Did you have any meeting with Ms. Kunelius prior to her signing this agreement?
A. Specific meeting on this, no, I don't recall that, but we may have.
Q. Did you have discussions with her about this form of agreement?
A. I guess I don't understand that question.
Q. Well, as opposed to the earlier drafts, did

you discuss this draft with her?
A. Probably.
Q. Would that be your normal practice?
A. To discuss contracts with clients? Absolutely.
Q. Do you have any reason to think you would have strayed from that practice in this case?
A. No.
Q. If I can direct your attention to the second page, Paragraph 7, the purchase price. I notice here the purchase price is $1,116,900. Do you see that?
A. I do.
Q. Which is a little bit more than the $1.1 million that was reflected in the prior version; is that right?
A. Is $1,116,900 greater than $1.1 million? Yes, it is.
Q. Do you know why that change was made?
A. Why it's greater?
Q. Yes.
A. I think, and again, I'm trying to recall, but I think it may have had something to do with engineering reimbursement or something, as I recall.

Page 50

Q. Is that the first time you met her when you first inquired about the property?
A. I knew you would ask me that. But at least the first time I met her and she told me that --
MR. McLAUGHLIN: Objection. Just be careful on attorney-client privilege issues.
A. That it was, in fact, under the auspices of Chapter 61. She made me aware of it, just as Jim had. It's clearly something you need to deal with.
Q. Have you been involved in any other purchases or sales of property classified under Chapter 61 or its analogs, 61A or 61B?
A. I had experience with it before in my practice, yes.
Q. What experience had you had with Chapter 61 before?
A. I think we had looked at land with a client, and I forget who the client was, but looked at purchasing developable land that was subject to Chapter 61. Because I had the title company, you know, you deal with many aspects from bankruptcy to litigation probate, and clearly Chapter 61 or 61A came up in terms of title opinions I would have given, which would have, you know, caused me to go

Page 51

and read the statute and look at it and understand what it meant.
So, yes, I've got to honestly say I've had exposure to it over the years because it's something that's out there, you know. You run across it quite frequently in title work and things, again, particularly now where land is so precious.
Q. By this point, back in October of 2002, about how many experiences with Chapter 61 had you had?
MR. McLAUGHLIN: Objection.
A. I don't know. I guess I told you, I've encountered it over the years, and to give you a specific number, I couldn't hazard a guess.
Q. Have you ever been involved in the actual purchase or sale of property that was classified under Chapter 61 or represented a client purchasing or selling property that's classified under Chapter 61?
A. You know, I may have been, but I can't remember. It's a good question, because again, I have been exposed to it so many times in the past, and I'm just trying to think. It may have come up and we may have had conversations about it or

Page 52

possibly putting land in a 61 or 61A. So in different contexts I may have been exposed to it and worked with it in the past, but I can't give you specifically John and Jane Smith we did a deal, you know.
MR. McLAUGHLIN: Can we take a two-minute break?
MS. FETOUH: Yes. It can even be five minutes.
(Recess)
(Mr. Oetheimer has joined the deposition)
BY MS. FETOUH:
Q. Before we took a break, you were discussing your experience with Chapter 61. In any of those experiences, did the town or municipality exercise their right of first refusal?
A. You know, I don't recall. Again, as I said, sometimes I would be on the periphery in terms of title work or it may have been after the fact. They may have exercised, not exercised. I can't recall any specific deal where the town -- maybe, as I think about it, I might be able to come up with something. I have been at this a while, so luckily or unluckily, I guess, you've got to think back,

Page 53

pull it out and dredge it up.
Q. At the moment, you can't recall any other example of the town exercising its right of first refusal?
A. No.
Q. You said in connection with the experience you had with Chapter 61 you've read the statute before?
A. Correct.
Q. Was that before you were involved in the transaction involving Marilyn Kunelius' property?
A. I would say so.
Q. When you undertook to represent Ms. Kunelius, did you understand the town would have the right of first refusal over her property that's classified under Chapter 61?
MR. McLAUGHLIN: Objection.
A. I knew it was subject to Chapter 61, which would lead me to believe the town could avail themselves of the right of first refusal. So I'd have to say yes.
Q. Did you understand that under the statute the town could assign that right of first refusal to a nonprofit conservation organization?

Page 54

A. The statute states they could do that, yes.
Q. And did you understand, based on your reading of the statute, whether or not the seller of the property has any say in stopping the town from exercising its right or assigning that right?
MR. McLAUGHLIN: Objection.
A. Say that again.
Q. Does the seller have any power to stop the town from exercising its right of first refusal under the Chapter 61?
A. I will give you a lawyer answer. There may be ways to do it. Maybe, yes; maybe, no.
Q. Well, what sort of ways?
A. You could pay the rollback tax and not fall under the auspices of 61 or 61A. Again, if we're talking timing, you tell me. Are we talking about as it's happening, before? I don't know. Can you get out from under 61 or 61A; absolutely.
Q. That's by either paying the rollback taxes in order to take your land out of 61?
A. Right. Or same use. The statute is pretty clear.
Q. Were either of those options discussed in connection with Marilyn Kunelius' property?

Page 55

A. Not that I'm aware of.
Q. If I can return to the document that's been marked as Exhibit 4, the purchase and sale agreement, and the page numbered KUN 227, Paragraph 20 refers to a deposit, and the first line says, "All deposits made hereunder shall be held by the Law Offices of Peter A. Kachajian, Jr." Do you see that?
A. I do.
Q. Did you, in fact, hold deposits made under this agreement?
A. I'm going to say yes, but it is conceivable that Jim's office at the time may have held them, too, which is a common practice; the broker holds it or I hold it. If I put my name in there, it means generally I'm going to hold it.
Q. Do you have a recollection of holding the deposits in this case?
A. Specifically, I can't recall. Again, if I put my name in there, more than likely I held any monies like that. Specifically, if you ask me, you know, no, I can't -- I'd say probably I did.
Q. The next paragraph, Paragraph 21, refers to the buyer's default and damages. Do you see that?

Page 56

A. I do.
Q. Here it states, "If the buyer shall fail to fulfill the buyer's agreements herein, all deposits made hereunder by the buyer shall be retained by the seller as liquidated damages and this shall constitute seller's sole remedy in equity and law." Do you see that?
A. I do.
Q. I would note this language is different than the language we had been looking at in the prior Exhibit 3 for the buyer's default. Do you know why the language changed from that exhibit to this document?
A. Tell me where you are in the other document?
Q. I believe it's Paragraph 14 in Exhibit 3.
A. I don't know why we would have changed it or not changed it, as the case may be.
Q. In Exhibit 3, there was a choice between retaining the deposit as liquidated damages or repaying those deposits and seeking to enforce the agreement at law and equity; is that right?
A. Which one?
Q. Exhibit 3.

Page 57

A. No. 14?
Q. Yes.
A. I see it, yes.
Q. And Exhibit 4, the final purchase and sale agreement, doesn't have the second option; is that correct, the option of returning the deposits and proceeding to enforce the agreement?
A. Yes, it appears to not have that language.
Q. Did you have any discussions with anyone about the change in that language?
A. I don't recall. I may or may not have. It's been quite a while, so I don't know if we discussed it or didn't discuss it.
Q. You have no recollection today of any particular discussion about that language?
A. No.
Q. Is the language in Paragraph 21 part of the standard template that you generally use for your purchase and sale agreements?
A. Is it part of it? I'd say yes.
Q. Do you understand that the deposits referred to in Paragraph 21 refer to the deposits we discussed earlier in Paragraph 31 of the same agreement?

Page 58

A. Do you mean the earnest money?
Q. Right. Which you said reflected the deposits referenced in the purchase price paragraph, Paragraph 7.
A. So tell me again what you're asking me.
Q. The deposits that are referenced in Paragraph 21, where it says "All deposits made hereunder by the buyer shall be retained by the seller," do you see that language?
A. I do.
Q. Are those the same deposits you referred to earlier in your testimony referenced in Paragraphs 7 and 31?
A. Earnest money is different from deposit money, by definition. I guess what I don't understand is where you're going with this?
Q. I'm asking you a question. You had said earlier that the monies reflected in Paragraph 31 reflected the deposits referenced in Paragraph 7. I'm asking you if those are the same deposits that are referenced in another provision of the same document, Paragraph 21?
A. Probably not the same. If you look at No. 7, you see no deposits, zero deposits. So earnest

Page 59

money is earnest money.
Q. Referring again to Paragraph 7, the line that reads "$716,900 (less deposits paid)." Do you see that language?
A. I do. Do you see above where it says "zero deposits" and if you go to 31 it says "earnest money"?
Q. It refers to an earnest money deposit in the sum of $10,000; do you see that in Paragraph 31?
A. I do.
Q. And the money due at closing, that $716,900, less deposits paid, and it uses language deposits, you said referred to the money that would be paid under Paragraph 31; is that right?
A. The earnest money, yes.
Q. If you go to paragraph 34 of this document, titled "Inspections and Testing." Do you see that?
A. I do.
Q. The first line of this document indicates, "The obligations of buyer" -- here, Cohousing -- "under this agreement are expressly subject to the buyer conducting engineering inspections and testing of the property during feasibility." Do you see that?

Page 60

A. I do.
Q. What was your understanding of the testing and inspections that Cohousing intended to perform?
A. I think normal testing and inspections that any prudent developer does when they are going to develop land. Specifics, I don't recall, but I would imagine -- I don't think there's town water there. So maybe, you know -- then there's septic.
So I would probably say compliance with Title V, potability, flow of water, those sorts of things. Obviously if it didn't perk, those sorts of things, it could be an issue. At a guess, knowing what prudent builders do, that's what they do.
Q. Did you discuss with Cohousing what testing and inspections it intended to do?
A. Specifics, no. I just left it up to Chris.
Q. Did you understand that if those inspections revealed any conditions they found unacceptable, that they could terminate the agreement?
A. I understand what the language says.
Q. That's, in fact, the language of this agreement?
A. It is.

Page 61

Q. Did you have any discussions with Cohousing about what sorts of conditions might be unacceptable to them such that they would terminate the agreement?
A. Specifics, I don't recall, no.
Q. If I can direct your attention to Paragraph 35 of the purchase and sale agreement, it references the transfer of all right, title and interest in the 42.1 acre parcel under Chapter 61 to the Town of Stow, upon the Town of Stow's approval of the development of the remainder of the parcel; is that right?
A. Is what right?
Q. Have I summarized that correctly?
A. Say it again, please.
Q. This paragraph contemplates the transfer of all right, title and interest in the land that is under Chapter 61 to the Town of Stow by Ms. Kunelius upon the Town of Stow's approval of the development of the 8.57 acre parcel; is that right?
A. Correct.
(Phone)
MS. FETOUH: I guess we'll take a short break.

Page 62

(Short Recess)
Q. Do you remember the question?
A. I think I answered it. I said correct.
Q. So in this contract, Ms. Kunelius was only going to donate her land if the Town of Stow approved the development of the remainder of the parcel?
A. That was her intent, I believe, yes.
Q. On Page KUN 231, there is a signed promissory note. Do you know if this note was converted to cash?
A. I don't. I don't recall.
Q. It states that "Cohousing promises to pay Ms. Kunelius the sum of $10,000 on or before September 10, 2002." Do you know if Cohousing did, in fact, pay $10,000?
A. Honestly, Dahlia, I don't remember. They may have, they may not have. I'm not sure.
(Document marked as Exhibit 5 for identification)
Q. Mr. Kachajian, I'm showing you what's been marked as Exhibit 5 to your deposition. Do you recognize that document?
A. I don't, but I saw so many things.

Page 63

Specifically, I don't remember this, but I see it.
Q. I will note it comes from the documents produced to us by Ms. Kunelius. Do you have any reason to think that you did not receive this e-mail?
A. I have no reason to think I did not receive it.
Q. Do you know if you responded to this e-mail?
A. I don't recall. I'm trying to think. I don't know if I did respond to him or not. I honestly can't remember.
Q. In the body of the e-mail, Mr. ScottHanson is writing to you and referencing what would happen if the town decided to exercise the right of first refusal. Do you see that language in the first sentence of the e-mail?
A. I do.
Q. Had you at this point discussed with Mr. ScottHanson the fact that the town had a right of first refusal?
A. Chris was aware of he. He knew it was under 61. We all were.
Q. Did you know at this point, and this

Page 64

document is dated September 27, 2002, whether the town was interested in exercising its right of first refusal?
A. My understanding was they always wanted the land, and they desperately needed the water under it. This parcel, the one that Marilyn was going to donate, abutted town forest. So it would have been a real plum for them, the water aspect, and also adding to the town forest land. So it would have been, I guess, a coup for them to have this property. I think they always wanted it. That was my understanding anyway.
Q. How did you have that understanding?
A. I may have heard it from Marilyn. I may have heard it from Jim, and talking to other folks in Stow. I don't know. It was a desirable piece of property for so many reasons.
Q. Had you had any discussions with anyone from the town at the point?
A. No. Oh, let me think a second here. I'm wondering if I had spoken to Greg Jones. I don't think I spoke to anybody at that point. It was probably everything afterwards. God knows I had conversations with everybody there. Before that,

Page 65

no.
Q. When you say after, do you mean after you had given the town notice of the purchase and sale agreement?
A. Yes.
Q. Prior to giving the town notice of the purchase and sale agreement, did you have any understanding of any interest on the part of any of the neighbors or landowners in Stow of Ms. Kunelius' property?
A. No, I didn't.
(Document marked as Exhibit 6 for identification)
Q. Showing you what's been marked as Exhibit 6, do you recognize that document?
A. Yes, I do.
Q. What do you recognize it to be?
A. Notice of intent for sale pursuant to Chapter 61, notifying the town of obviously the offer to purchase.
Q. Is that your signature on that document?
A. It is.
Q. How soon after the purchase and sale agreement was signed was this document sent?

Page 94

Denise Pelletier, probably with him and Jim, I think I had one with Jake and Craig and me.

Q. I'm just thinking right now about the ones with Ms. Kunelius on the line and you and Mr. MacDonnell?

A. Maybe a couple. Again, we had so many conversations, but I do recall we had a few. It was easier, because Craig was here, I was in Northborough and she was in Stow. Logistically that's how it worked.

Q. And what was purpose of the first two or three conversations between you and Ms. Kunelius and Mr. MacDonnell?

A. I took it as him trying to allay his fears and get her on board with what he was trying to do. It was, again, telling her not to worry, that they had the money and it was going to come through, and she kept saying, you know, Gee, Craig, you have to understand, this is all I have. This is my retirement.

Q. Why do you say Mr. MacDonnell was trying to allay his fears? What fears?

A. That they weren't going to do the deal. She thought Mosaic Commons represented her best

Page 95

chance to get things done. Bear in mind, Craig was looking to do zoning changes and permitting, and that sort of thing.

Whereas, with Mosaic Commons, all we had was 40B to deal with, and really, as you're aware, 40B forgives a lot of things, and clearly zoning is not an issue. So 40B was, again, a real, I think, intelligent way to approach this property, and it was a conversation that Jake, Craig and I had as well when Craig was seeking zoning changes that, you know, Jake said to me, Pete, don't ask me what I can't give you. He said, They have other ways to do this, and he knows that.

Q. If we can back up, you said, all they had in the Mosaic proposal was 40B and that zoning was not an issue. Is it your belief that zoning is not an issue at all in a 40B project?

A. Well, generally in 40B, zoning -- there's a lot of forgiveness with regard to zoning issues in terms of frontage requirements and that sort of thing.

Recall, this land was nonconforming. It was grandfathered in, albeit, but it was nonconforming. So any concept of subdividing it was

Page 96

really, I think, ill-conceived. 40B would have allowed Mosaic to do what they needed to to best develop the property.

Yeah, there's minimal oversight by the town with regard to obviously health issues, that sort of thing, but by and large 40B is -- I won't call it the key to the candy store, but it's what builders obviously hit towns over the head with all the time when they won't give them what they want. Oh, put a 40B in. Okay, let's talk.

Q. Is it your understanding that there are still approval processes that the developer needs to go through in a 40B process?

A. Yes, but by comparison, it's not the same. The way the law is structured, again, it allows somebody who wants to potentially develop the property to end run, if you will, many of the requirements you would need if you were just a vanilla developer. So 40B is just an effective tool.

Q. There are still negotiations between a developer and the town on 40B projects, correct?

MR. McLAUGHLIN: Objection.

A. I'm sure they have to address certain

Page 97

things, as I had said earlier.

Q. Do you know how successful any 40B projects have been in Stow?

A. I don't.

Q. Do you know anything about the process that any developer has gone through in Stow to try and seek to do a 40B development?

A. I don't.

Q. Do you know what the Trust For Public Land intended to do with respect to zoning on the property or hope to do with respect to zoning?

A. I believe they wanted to subdivide 142 and 144.

Q. How did you come to have that understanding?

A. Mr. MacDonnell.

Q. Have you had any professional experience with zoning?

A. Some.

Q. What kind of experience?

A. I've represented people before the ZBA, I've represented people before planning boards. It's the natural adjunct to doing real estate. You've got to understand that what Craig was

that obviously lay people really wouldn't -- because they haven't had legal training. I was trying to point out to him things that didn't make common sense.

Q. Did you point out to him everything that you didn't think made common sense?

A. I wouldn't say everything. But again, I don't know.

Q. Were you trying to convey to him everything that you think did not apply to the town or an assignee?

MR. McLAUGHLIN: Objection.

A. Again, as I said, I think I was trying to point out to him certain things that just didn't make sense.

Q. The first one you point out is Paragraph 32, as you say, "It's not germane. It presupposes a 40B application." Why did you include that one?

A. I'd have to look at the purchase and sale. I think probably, talking more about the timetable in terms of pursuing a 40B, it's like they didn't have to go that route. They just pay the money.

Again, as I said, whatever they did after the fact, whatever they did, they can do. I hate to

be redundant, but again, my view of this whole thing has always been very simplistic. Pay the price on that date, here we go. So it's all about consideration and it's all about the property. Maybe it's frustrating for you, but it's frustrating for me, because I have a particular view of it.

Q. You've mentioned a few times that the closing date was a term that would apply. Can I direct your attention to the final paragraph, final bold paragraph of this document, in which you refer to the closing date and the relevance of the date to close, and how that may come into play. At the very end of that paragraph, you say, "An accommodation for the buyer, not the seller, possibly moot under the circumstances."

So was, in fact, the closing date something you were suggesting did not necessarily apply?

A. Again, the town wouldn't have to pursue the same things or, in my mind, didn't have to go through any of the further machinations that were necessary for Mosaic Commons. It wouldn't be relevant to them.

Again, it's this idea of relevance to which was the ultimate purchaser, the assignee, TPL, or

the town, because they partnered up, you know, this whole idea of particular to the September 26th date, because you guys are going to cut the check.

Again, this was all based too -- again, being redundant here -- but Craig made the representations that they had the money. So if they had the money, just pay the money. Whatever you guys do after the fact or however you're going to recoup that money, I could care less. If they want to put a missile base there, Dahlia, we could care less. It was just like pay the price.

So again, they weren't going to be doing the same things. There wasn't this whole idea of pursuing engineering or checking septic, because it was going to remain in its pristine condition.

Q. So there wasn't an expectation that TPL would do the same thing that Mosaic Commons would do?

MR. McLAUGHLIN: Objection.

A. I don't know what TPL was going to do. You're asking me what are they going to do. I don't know.

Q. I'm asking what your expectation was. You said you didn't expect what TPL would do?

A. Once again, hate me. My expectation was they would pay the money.

Q. But not necessarily put a 40B development with 30 units on the property?

A. Again, I don't know and I don't care.

Q. About halfway down the page you've referred to the income stream of $56,000 off of the mortgage on the property?

A. Yes.

Q. You say, "This provision subjects the purchaser to personal liability." What did you mean that?

A. I think if they were going to avail themselves of the $56,000, I wanted some kind of security, personally. I don't know that necessarily the town could mortgage it, but remember, a component of this, as I said earlier, was that she was going to realize income, and I think with the Friends of Red Acre jumping in and TPL, I would want to note -- and I think I had a conversation with Craig, now that I think about it, about who is going to sign the note. Obviously the Friends of Red Acre weren't going to do it, and I sure didn't see how Craig would do it personally, but would TPL do it or

512cb0a1-fe00-11db-a265-444553540000

Page 114

somebody, who would sign the promissory note, which would be pursuant to any mortgage. That's what I think I was alluding to there about any sort of personal indebtedness.

Remember, the Friends of Red Acre Road were not a registered entity of any sort. They were just folk from Red Acre Road. So if they were all going to join in concert, I guess as a prudent lawyer, I'd want to tie somebody up somehow.

Q. The next paragraph refers to the charitable donation of the land and the tax implications for Ms. Kunelius, and you've put in an estimate, a minimum estimated value to her of $150,000 to $200,000. How did you determine that number?

A. I think it's what Jim probably had estimated at the time. Bear in mind, we didn't know the value of the water at that time. It was something we had intended to research further, you know, once the money was on the table. I think it was a number that was thrown out by Jim, and I can't swear, because it didn't come from me, because I'm not a tax person.

It was probably a guesstimate, a very, very conservative guesstimate of what would be offsetting

Page 115

to her. But as we've come to find out, the value of the property is much greater now because of the value of the water underneath. So it would potentially not be worth a lot more.

Q. Do you know what Ms. Kunelius' income was at the time?

A. I never asked. Minimal.

Q. The final sentence of that paragraph states, "The actual value of land and the water resource potential could weigh very heavily in the event the deal did not come to fruition." What did you mean by that?

A. Well, again, bear in mind, it's what I had said earlier. We had sat down and factored in what was going to maximize those monies for her, and one of those things obviously was making this donation to the town. So that was a big component of the consideration, was what she was going to be able to offset for any sort of capital gains.

Again, that was weighing very heavily, and again, not to be redundant, we've come to find out it would have been a real boon.

Q. In this list of the sections of the purchase and sale agreement that, in your opinion,

Page 116

were not applicable to the prospective assignee or the town, you did not include the liquidated damages clause, correct?

MR. McLAUGHLIN: Objection.

A. As I said, I didn't think it was the be all or the end all, and I wasn't going to debate the legality with Ross. Again, it didn't seem to me germane.

Q. But it's not on this list, is it?

A. Apparently not.

Q. A few moments ago you mentioned having discussions with Mr. MacDonnell about the liquidated damages provision?

A. Yes.

Q. When was the first time you discussed that provision with him?

A. Honestly, we had a lot of discussions about it. It seemed to come up in every conversation, particularly when Craig was attempting to squeeze us down on the price.

It became really relevant, and he was trying to throw that out there as his sort of life preserver, and I kept saying, Craig, we can go around and around on this, but we are going to have

Page 117

to agree to disagree, because my view of it is fundamentally different than your view of it.

I've said this all on the record before, but I just don't see a Court going that way. I don't think 61A, if you look at the legislative history, was designed for the idea that a town or an assignee, you know, charitable organization like TPL, could just find a way to bail. The chilling effect that would have on 61 would be amazing. No one would do 61 or 61A again if you follow that scenario. That's dumb.

Q. The first time you talked about the liquidated damages clause, was that before or after the scheduled closing date?

A. I think it came up probably both times, you know, before and after, if we're using that as a time line.

Q. What did Mr. MacDonnell say to you about the use of the liquidated damages clause?

A. Asked and answered, but again, I respectfully agreed to disagree with him. He had his particular view of it and I had my view of it. I said, not relevant.

Q. And he told you his view was that it

Page 122

what he was telling me. I can only assume that.
(Document marked as Exhibit 11 for identification)
Q. I'm showing you what's been marked as Exhibit 11, which appears to be a fax from Ms. Pelletier to you, dated March 29, 2003. Have you seen this document before?
A. I think I have. It seems like something I've seen, maybe something that I provided to you. I don't know. It does look familiar. But then you're asking me about title insurance commitments, you know.
Q. In the cover page, the fax transmission sheet, indicates that you and Ms. Pelletier had spoken that morning. Do you recall speaking with Ms. Pelletier about these issues?
A. No. In looking at this, because I can tell you, when I get something like this normally, it's apparent that there was probably a title examination done. Just give me a second to decipher this.
It's kind of a strange question from Denise, because this title commitment would exhibit any variances or special permits, because those would be encumbrances that would affect title to the

Page 123

property. So if there was anything else, obviously -- I know Marsh Moriarty, they are well respected. So they would have done a pretty thorough job on the title examination.
I guess in looking at it now, it's kind of a weird question, because clearly any sorts of variances or special permits would necessarily have to be in here, because -- again, don't take this the wrong way. Do you know what a title commitment is, insurance commitment?
Q. To some degree.
A. Basically it's the lender's version of a title report. It's like what are we going to expect if we loan you money on this property.
So, in essence, it will list anything that affects the property; easements, variances, special permits, mortgages to be paid off, rights on a well. A myriad of things we all learn in law school, but those sorts of things. Again, it's kind of a weird question when I look at it. I don't understand it
Q. Do you remember responding to Ms. Pelletier?
A. I don't, because my response would be now if you asked me, I would say, gee, I don't know of

Page 124

anything else. Again, it should have come up, Dahlia, in a title exam.
(Document marked as Exhibit 12 for identification)
Q. I'm showing you a document dated a few days later, April 4, 2003, that appears to be a fax from you to Mr. Boothroyd. Have you seen this document before?
A. I'm going to say yes, because that's my printing. What I sent him, I don't know.
Q. There didn't appear to be 11 pages following this sheet in the production that seemed to be the attachment to it.
A. I will hazard a guess for you. It's probably pursuant to something Craig was contemplating filing with regard to getting a variance of a special permit. I would say I probably called Jim and said, Hey, this is what they are contemplating. That's a guess.
Q. How often did you speak with anyone from TPL about the zoning issues?
A. As I said, I had spoken with -- I had myriad conversations with Craig and with Denise, on occasion. So, you know, we had quite a few

Page 125

conversations; some good, some not so good. My recollection of Denise is she was very bright and very nice.
Q. Did you understand that TPL was seeking the zoning relief in order to sell those two lots, 142 and 144 Red Acre Road?
A. We were made aware that they were pursuing this, yes.
Q. Do you know what affect it would have had on TPL's plan had the zoning relief they sought not been granted?
A. What affect it would have had?
Q. Yes.
A. I'm sure it would have disappointed Craig, as they put a lot of work into it.
Q. Do you know if they would have been able to go forward with the purchase of the property if they were unable to sell those two lots?
A. Again, you know, it's somewhat of a red herring here, because it didn't really matter, what he did or what he didn't do. I made that abundantly clear to him. So if he thought he was going to get it and could do it, God bless him. I was just looking for the payday.

Page 138

sure it was before this. Again, we had so many conversations together, some nice, some not so nice.
Q. He references in this letter two major obstacles that stand in the way of success right in the middle of the first page there. Do you see that?
A. I'm sorry?
Q. The second paragraph on the first page.
A. Oh, the first page.
Q. "As you and I have discussed many times, there are two major obstacles that stand in the way of success, each of which must be addressed." Do you see that language?
A. I do.
Q. The first is the fundraising gap, and he goes on to explain failures in fundraising, including the rejection of the housing and community development grant and local fundraising efforts; do you see that in the third paragraph on the first page?
A. I do.
Q. Were you aware that TPL had applied for a grant from the Department of Housing and Community Development?

Page 139

A. I think I did, and I believe I subsequently saw that application where he told them he had the $6 million line of credit with Wainwright Bank, so it kind of was moot. If you don't give us the money, we still have the credit line. So a no-brainer.
Again, I honestly have to tell you, I took that letter with a grain of salt, because, again, he made representations they had the money, and if you looked at that application and what he represented to the Commonwealth, it was like, if you don't give us the money, give us the money, it doesn't matter, we've got the money.
Q. Would they have applied for a grant if it didn't matter at all to them whether they got the money?
A. I wasn't privy to the fundraising.
Q. In that same paragraph it also says, "TPL's Board of Directors will not approve any borrowing to bridge a fundraising gap." Do you see that?
A. I do see that.
Q. Had you discussed with Mr. MacDonnell the possibility of TPL borrowing money?
A. I think we offered up the mortgage to them

Page 140

at one point. Aside from any other borrowing they would do, I don't think we had a discussion about it. Again, probably it wouldn't have come up in terms of, you know, what his capabilities were for borrowing, other than, you know, I think at one point when we had a discussion, we did offer up the mortgage to him as a potential tool and getting the deal done.
So to that extent, that's probably about the only conversation regarding the "borrowing" that we had, you know, again, in furtherance of trying to help.
Q. On the top of the second page it references the second major obstacle as the zoning issues. Do you see that? Those are the same issues we have been discussing recently; is that right?
A. Yes, I assume so.
Q. In the second paragraph, the first line, it states, "In view of these circumstances, it is not feasible for TPL to go forward under the existing contract." Do you see that language?
A. I do.
Q. Did you understand when you received this language that TPL was saying it was essentially

Page 141

defaulting under the contract?
A. I think I would view that as a default, which was a segue to it ain't worth it, and you've got to lower the price.
Q. In this letter, Mr. MacDonnell proposes an alternative to the contract; is that right?
A. Where are we; number one?
Q. In the middle of the second page, "Please consider the following alternative," and then there are a couple of paragraphs about financing and subdivision.
A. I see what he says, which we've subsequently found out not to be true.
Q. What is not true?
A. I think I've had occasion to read this in Serena Furman's deposition, and I think this speaks to Friends of Red Acre raising money, and my understanding was, which kind of closed the gap, in my mind, and answered a lot of questions was why did Craig stop them from fundraising and why did he utilize the list for other projects.
So I guess in looking at this, you know, I see what he says, but I can't agree with it. I can intellectually see it, but I don't agree with it.

Page 142

Q. At the time, in September of 2003, when you received this letter, did you consider entering into an alternative arrangement with TPL on behalf of Ms. Kunelius?

A. Sure, if it would garner the same monies, and I think we've borne that out. I think we're here today as a result of that. But I think if you look at it, we would have entertained anything that would have gotten her the contract price, and I told Craig that. I said, We'll work with you to a point.

But, again, we were team players. It wasn't, you know, where we jumped up and down and said, no. We offered up the mortgage. We tried to be as creative as we could. I was very clear about the purchase price. I said, We're not cutting the price. He knew that, which led ultimately to his meltdown in Jim's office.

Again, we weren't there to thwart the deal, but if he was asking me to take less, that was unacceptable, and if you want to go that way, we can go that way.

Q. So you would not have accepted any alternative that did not result in a purchase price of $1.116 million being paid?

Page 143

A. If she would have realized the same dollars, I would have talked to anybody. But when he came in and looked to say now that Marilyn had to become a partner with him and reduce the price, and she's not being realistic and you're not being realistic, which led me to say you're not being realistic, because that's not what we're going to do, we're not taking less money.

So, I guess, to answer the question, we would have helped, but again, we weren't going to take it on the neck, and that's what he was asking. He was asking us to take a hit, and I wasn't clear why. And again, based on what I know today, a lot of questions have been answered for me.

Q. I just want to try and keep this moving quickly so we don't keep you here forever. You would not have accepted any alternative that would have resulted in a lower purchase price; is that right?

A. It was our intent to get the contract that we had with Mosaic Commons.

Q. The purchase price in that contract?

MR. McLAUGHLIN: Objection.

A. To get the benefit of the contract, however

Page 144

that worked out. I don't know what that would be in the end, given, you know, the structure of the consideration, but to get the benefit of the Mosaic contract.

Again, I told you, it seemed almost from day one, when we notified the town that the town and TPL attempted to change the playing field here, and make it something that it wasn't. We wanted the benefit of the Mosaic contract, and they viewed it as something different.

Craig was very clear about trying to lump in the donation aspect of it, and we kept saying, no, no, it's got to be segregated out. It's almost like we were on two different planets.

Q. The final paragraph of this letter on the third page, at the end says, "We need to discuss this revised proposal with you as soon as possible and in no case later than the end of this week."

Did you, in fact, have discussion with Mr. MacDonnell shortly after receipt of this letter?

A. I don't recall. I imagine this would have proffered some sort of a response from me to him, telephonically probably. But to say that I had a specific conversation on a specific date, say,

Page 145

September 10th or 11th, I don't recall.

(Document marked as Exhibit 17 for identification)

Q. I'm showing you what's been marked as Exhibit 17, which appears to be a letter from you to the Board of Selectmen, dated September 12, 2003. Have you seen this before?

A. I wrote it.

Q. Is that your signature on the second page?

A. Yes, it is.

Q. It states that, "At this point, TPL has not made its August and September payments to Ms. Kunelius." Do you see that reference in the first paragraph?

A. Hmm-hmm.

Q. Do you know how much in total you had received from the Trust For Public Land at this point?

MR. McLAUGHLIN: Objection.

A. I honestly don't, because they made direct payments of earnest money to Marilyn. So it didn't come through me. It's funny, I'm trying to recall that $10,000 promissory note. I don't think I held any money, because in thinking about it, I think

Page 146

everything went directly to Craig. I think the first check may have come to me, and then I gave it to Marilyn, and then I said to Craig, Don't give it to me. It's just crazy. Why should I act as an intermediary. Just keep giving it to Marilyn. So they paid monies directly to Marilyn.

So honestly, I didn't keep track of what they were -- you know, I may have in the file photocopies or Craig may have given me a breakdown, but I don't know. I kind of took myself out of it, because it just didn't seem to make sense.

Q. Did you believe at this point on September 12, 2003 that TPL had breached the purchase and sale agreement?

A. Well, again, you know, in looking at the letter from Craig, and, of course, the conversations, it was abundantly clear at that point that he wasn't -- that they weren't going to consummate, that they were looking to exit. So if you want to say that's tantamount to a breach, yeah, I'd say that.

Q. In the third paragraph of the letter, you state, "Moreover, TPL has made it abundantly clear that its approach to the development of the Kunelius

Page 147

property was ill-conceived and jeopardizes my client's future development of the property." Do you see that language?

A. I do.

Q. How was TPL's approach to the development of the property jeopardizing your client's future development of the property?

A. I think I may have alluded to the fact that they had filed applications for zoning variances and things that may have invoked -- I think there was a letter in there from Denise -- I think it was Denise -- that whole merger doctrine that came up about merging, you know, to achieve -- well, let me say this.

In zoning, and I think it's case law, but it may be statutory, it's kind of like water seeking its own level as an analogy, but it's basically if you own contiguous multiple parcels, and they are all nonconforming, what the law says is that they want you to achieve, to the extent possible, compliance with then zoning, the current zoning.

There also comes up issues with grandfathering, and do you jeopardize your standing with regard to any grandfathering of lots if you put

Page 148

these applications in, because it changes the necessary tenor of the property.

It's kind of a -- it's somewhat of a strange concept, but I've seen it come up, you know, subsequent to this, where you set a course in motion that you can't back away from, I guess is the best way to put it. So you kind of prejudice yourself by putting these applications in, they act on them, and so if they shoot you down or they allow it, you're sort of set in stone, or the other way is you maintain the status quo.

So if you had any argument with regard to grandfathering, because there's a particular body of cases with that, and I think there's some recent holdings, that grandfathering is very important for nonconforming lots.

So that's what I alluded to here, that whole concept of grandfathering and possibly merging the frontage, and, in a sense, casting this in stone, and that's what my concern was.

Q. Did you understand that TPL withdrew its application for the zoning relief?

A. That's what he told me he was going to do, yes. I had some concerns, because again, sometimes

Page 149

the mere application, and, you know, the attempt to withdraw can be prejudicial, and it may go in a record where the Court would say, well, you did this and you did this. So again, it can be prejudicial.

Q. Do you have any reason to think that the application was not withdrawn?

A. He told me he did. I took him at his word.

Q. Okay.

A. I don't think, you know, if Marilyn had gotten any subsequent notices of things, because obviously as the owner, she would have had to participate, and she probably would have sought counsel on it. If I had to hazard a guess, I'd say it probably didn't go much further than that.

Q. In the final paragraph of this letter, you ask for the town's clarification on its intentions in honoring the agreement. What were you seeking in sending this letter?

MR. McLAUGHLIN: Objection. Could you repeat that question for me.

(Reporter read back pending question)

MR. McLAUGHLIN: Objection.

A. Simply, pay the price. Kathy Farrell was one of the proponents for acquiring this land for

Page 174

people know generally what's going on. There's been enough press in the paper, and the Stow jungle drums to say that most people don't want to look at it.

It's fairly common knowledge, and what Ross said to me is they would do it all over again. So they would invoke the Chapter 61A again. So that's kind of out there, too.

When you hear that kind of thing, you know, clearly look at the money that's been spent here and the headache and the time and the grief. Nobody wants that on them.

Q. Do you know whether or not the Board of Selectmen has actually voted not to exercise its right of first refusal again?

A. I can only go on what Ross told me, that he said, We would do it all over again, Pete.

Q. When did Mr. Perry say that?

A. I can't give you a date, but it was some time ago that he had said that. I don't think Stow has changed much. I know they just lost a case, I think, on the Cushing property, because I know the attorney, who is a friend of mine, who litigated it. They kind of stumbled a little bit along the way.

Q. Would it surprise you to learn the Board of

Page 175

Selectmen actually voted in favor of not exercising its right of first refusal if a similar plan as the Mosaic plan was presented for Ms. Kunelius' property?

A. Would it surprise me? You know, you've got different people now, some of the same people. Who's to say. Talk is cheap. They can say that, and when it happens, I'll believe it. Again, they screwed up with Cushing, so I have no reason to believe they are not on that same track.

Q. Did anyone from TPL ever say that they would do it again?

MR. McLAUGHLIN: Objection.

A. Not to me.

(Documents marked as Exhibits 20 through 22 for identification)

(Recess)

BY MS. FETOUH:

Q. Mr. Kachajian, I'm showing you what's been marked as Exhibit 20, which appears to be a letter from you to Mr. Boothroyd. Is this, in fact, a letter that you authored?

A. Yes.

Q. Is that your signature on the second page?

Page 176

A. It is.

Q. The first paragraph references a letter of January 27, 2004 from Mr. Paul Boothroyd to Ms. Kunelius. Do you have a copy of that letter?

A. I thought I did. I think I know what it's about. He went to the real estate board and got an opinion or he sent a letter -- I know what precipitated the letter, because -- well, let me give you some background.

I've known Paul for years. I actually represented Paul and his wife and did a lot of business with them. That's how I got to meet Jim. Jim is Paul's cousin.

Jim ended up at Prudential Real Estate in Maynard, and there was sort of a family spat, I guess, for lack of a better word, and I think the listing agreement was up, if I remember correctly -- I think Marilyn probably remembers, and I think she called me --

MR. McLAUGHLIN: Be careful on what you disclose, the attorney-client privilege.

A. Paul was here for me to sign a new agreement, and I know Jim was the broker, and Jim had left. So, you know, Jim was Marilyn's guy, not

Page 177

Paul, and since he was leaving, I think that's what precipitated the letter.

So again, not telling tales out of school here, but -- and obviously this was in light of what was going on at the time to basically say, look, I don't know what the deal is on the commission.

If you see the cc to Nancy Quinn, Nancy owns the Prudential office. I think actually they did come to some understanding as to how they would split the commission, because Paul was in on it from the beginning.

Tristram's Landing is basically the seminal case for broker compensation. So read the case. It's pretty straightforward, and you always see it quoted whenever there's a dispute about paying a broker's commission, but that's what this is about.

Since I had known Paul, I just said -- it was kind of a nice way of saying, come on, back off. Wait until the dust settles to find out how you're going to do this. My understanding was Nancy and Paul had worked out some kind of fee agreement. Above and beyond that, I don't know what to tell you.

Q. I think you said the property is still

Page 198

money back.
Q. Which money?
A. Any money they paid to date to Marilyn.
Q. What did you understand "without further recourse" to mean?
A. We couldn't sue them, Mosaic Commons, in equity or law. So either, as you know, specific performance or damages. Again, I don't see how that applies to TPL or Stow.
Q. Did you actually receive any deposits?
A. No. I had answered that.
Q. The answer is, no?
A. No. Except that initial payment from Craig, everything went directly to Marilyn at my request, because, again, I didn't want to be a high-priced messenger.
Q. But Ms. Kunelius received them?
A. Correct.
Q. Paragraph 34 of the P&S deals, again, with "Inspections and Testing." Do you see that?
A. I do.
Q. Is that part of the template that you typically use?
A. No.

Page 199

Q. Do you typically have in a P&S agreement some provision for a buyer's inspection of the property prior to closing?
A. There is an inspection period. If we're going to talk residential versus commercial, it's a somewhat different paradigm. In this case, it was, for all intents and purposes, residential. There just happened to be a whole heck of a lot of real estate there.
Again, Mosaic's approach to this was going to be radically different than how TPL was going to approach it.
Q. Let me ask you a different question.
A. Maybe I don't understand, because in terms of what each needed to do would be an apples and oranges type of thing. It's hard to discern what you mean.
Q. First of all, what was it that made this residential in character?
A. There was a residence on there, and there were stables and a riding ring, and you had all of that open real estate.
Q. My question, sir, is --
A. It was unique.

Page 200

Q. I understand. Every piece of real estate is unique, right?
A. Well, this is nice.
Q. My question is, how common is it for purchase and sale agreements to have some provision that entitles the buyer to inspect and be satisfied with the property before closing?
A. Well, again, it's difficult to say, because in a normal context, you might do an offer to purchase with an inspection test, radon contingency. In a commercial setting, you can go straight to purchase and sale or a letter of intent or memorandum of understanding.
Q. I'm trying to get you out of here quicker.
A. I'm saying, it's difficult to say. If the parties are honest and on the same page, you clearly can go to something like this and put it into a purchase and sale, and give them a period of time to do their due diligence, if you will, for lack of a better word, within the context of a purchase and sale or you can do it under an offer to purchase, and then if everybody is satisfied, go to a purchase and sale.
It's difficult to answer. The normal

Page 201

course of events in Massachusetts is generally an offer, with inspections, and then go to a purchase and sale. But a purchase and sale is like gilding the lily.
Q. Well, let me ask you this, and then we'll move on. In this particular purchase and sale agreement, at Paragraph 34, there is a provision for inspection and testing prior to closing; is that correct?
A. When you say "prior to closing" --
Q. Prior to changing money?
A. Yes. They clearly could avail themselves of whatever inspections or whatever they want to do.
Q. In your experience, sir, as a real estate lawyer, how common is it for buyers to perform an inspection and then try to negotiate a better price based on what the inspection revealed?
MR. McLAUGHLIN: Objection.
A. I've had deals where inspections were waived. I've had situations where they have done inspections, came back and the seller said, no, I'm not going to do it.
Every deal is different. In this case, you're talking about razing buildings. So were they

Page 222

simplest way to put it.

Q. What I'm trying to understand, sir, is this. As I understood you to say throughout the deposition at various times that this is a highly desirable piece of property, that it's near the train station, it's a beautiful spot --

A. I said relative to Mosaic. That's how they viewed it.

Q. Don't you view it that way as well?

A. Jim, I'm the wrong one to ask now. How would I view this in this current context? I would say to you it's poison.

Q. Let me break that down, and I think it will end my line of questioning. The purchase and sale agreement that we have as Exhibit 4 was the contract that the Town of Stow stepped into, correct?

A. Correct.

Q. And that right was then assigned to TPL, correct?

A. Correct.

Q. And then TPL failed to close as scheduled in September of 2003, correct?

A. That's a nice characterization, yes.

Q. And another characterization might be that

Page 223

TPL breached at that point; is that correct?

A. Breached the contract? I would say that's probably a good characterization as well.

Q. Okay. That contract having been breached, do you perceive that it has any effect, as we speak today, on the marketability of that property, the contract itself?

A. "Marketability" is probably the wrong word.

Q. Again, it's not my field. Do you understand where I'm going with this? That contract having been breached, does that contract impair the ability of Ms. Kunelius to sell this land in any way?

A. I don't know. It's probably a topic for research at this point because we're deep into this. I don't know how to answer it.

Q. Are you aware, as we sit here today, of any impact that the existence of that breached contract has on her ability to sell this property?

A. Again, I think, you know, to go back to what I said, I think if we look at all of the adverse publicity, particularly, again, recent experience with Stow under the Cushing matter, and those sorts of things, to revisit this with Stow

Page 224

would probably be somebody perceiving another nightmare.

Q. Different topic, though. I'm trying to break this into pieces.

A. I understand.

Q. The fact that that purchase and sale agreement, Exhibit 4, was breached does not in itself impair Ms. Kunelius' ability to sell that property; isn't that fair to say?

MR. McLAUGHLIN: Objection.

A. I don't know whether TPL or the town would assert any rights under the contract. Who knows.

Q. Are you aware, Mr. Kachajian, that the Furman/Christianson household made some kind of offer to purchase this property?

A. They didn't make an offer. What they did was they came up with what I would consider to be some sort of --

Q. Shall we call it an overture?

A. Let's call it an overture. I was going to be a little less kind. They made an overture. But if you really distilled it down and looked at it, they put a number, I think it was tantamount to a $900,000 deal, but they couldn't tell you where the

Page 225

money came from. They were pledging money, I think, for eye of the storm. I don't know how you do that. It's like me saying, gee, I'm going to sell Jim's house. I don't know how I could do that.

Another component was they were going to ask Marilyn to sell her own house, and then there was something about her going to get zoning. Honestly, to be kind, I know they are very bright people, but it made no sense. It was nonsensical, Jim, to characterize it.

MR. CONROY: Strike that.

Q. Are you aware that Ms. Furman and her husband approached Ms. Kunelius about the possibility of buying part of the land themselves, just outright buying it?

A. Yeah, I think I heard something to that effect. I think I did.

Q. Were you involved in that at all, other than hearing something about it?

A. I don't want to speak for Marilyn, but I think, again, the whole idea was -- remember, you've got to preserve a certain amount of integrity around what could be a potential wellhead. Her idea was I want to donate to the town in its entirety.

Page 234

itself, prior to the execution of the purchase and sale agreement?

MR. McLAUGHLIN: Objection.

A. I don't think we talked about failure. I think we talked about performance.

Q. Prior to the execution of the purchase and sale agreement with Mosaic Commons -- you understand when I say Mosaic Commons, I also mean Cohousing Resources?

A. Yes, I do.

Q. Did you have any conversation with Chris ScottHanson about neighborhood reaction to the development of a 40B project in Stow, Massachusetts?

A. No, I don't think we talked specifically about that. I don't think it really came up. Do you remember I had said that -- Dahlia asked me about the Friends of Red Acre, when they first came on the scene, because they were the most vocal. They were sort of the front group. They didn't really rear their heads until contemporaneously bringing TPL in, as I understood it. I don't know which one of them approached TPL.

I would say there was no human cry about a 40B at that time. Understand, Stow needed 40B

Page 235

housing. So it seemed a reasonable approach. I think to date Stow hasn't met their 40B criteria -- well, there's a lot of cities and towns, I suppose. My understanding is they still haven't achieved it, and there have been -- while everything was going on, there was subsequent 40B projects. I think Bruce Wheeler was one, and then Jack -- a guy who owned property out by the airport.

There were some people who lived in town who had been there for a while that had a good amount of land that were thinking about doing 40B. So there was other talk about 40B in Stow. So it's not like they knew they didn't need it. They did need it. I don't think they were technically averse to it, because they were proposing it for other places in town.

So I'd have to say honestly, I don't think it was something like you said Stow and 40B in the same sentence, you know, Oh my God. I would say, no, because they needed it and they knew they needed it.

Q. Have you ever been an attorney for a developer who wanted to develop a 40B project in any town?

Page 236

A. I think I answered that with Dahlia. The answer is, no.

Q. Have you ever been the attorney for any seller of property where the purchaser wanted to develop a 40B project?

A. I think so, but I can't -- it's been a long time. I may have. I may have.

Q. Do you know how long a period of time, on average, it takes to get a comprehensive permit under the 40B statute?

A. Off the top of my head, I can't recall. I know that there's certain processes and certain machinations you have to go through. It's not a short time, but it's not an inherently long, long time either.

Q. Did you have any conversations with Chris ScottHanson or anyone from Mosaic Commons, prior to the execution of the purchase and sale agreement, as to how many units they needed to have built to make the project feasible for them to develop?

A. I think, if you look at Mosaic's stuff, I think the ideal situation was 24 units, maybe 30. But bear in mind that their MO was to maximize open space. So I think it was what was going to fit, you

Page 237

know, obviously from an engineering standpoint in terms of, you know, water and septic.

We discussed a number of units, and that's probably the place where the town, you know, when we talk about 40B or anything, it's about density, whether the town would have been happy with 24 versus 30. I think there was a little bit of discussion about that, you know, what would be acceptable to the town without much human cry, but as we found out, nothing was.

Q. Do you know if Mosaic Commons would have gone forward if the town would only approve five units on the parcel?

A. I don't know. Sure. I don't know.

Q. Was there any conversation to that effect of how many units they needed in order to go forward?

A. Yeah, I think, you know -- well, bear in mind, as I said, the whole concept of Cohousing is, you know, let's take this room. There were a certain amount of people that wanted in in that area and wanted to be there. So I don't know how many players there were for this Stow Cohousing project, how many families. That was somewhat the mitigating

Page 250

legal partnership between the Town of Stow and TPL?
MR. McLAUGHLIN: Objection.
A. If I had to give you a legal opinion, yeah, I'd say there was a partnership.
Q. What's that partnership? Have you seen any documentation of it?
A. I didn't. Craig's characterization, I think, that the town was going to put up money. If it looks like a duck and walks like a duck, it must be a duck. We all went to law school. It's easy to craft a joint venture or partnership when you look at the conduct of the parties, you look at how they work together in concert to make certain things happen, and clearly there's a financial component here.
I guess where I went to school, if you're going to put up a certain amount of money for a thing to happen, it makes you at least my partner.
Q. Do you believe FORA was a partner to the deal, then, because they put up some money?
A. I don't know. A group of people? They were a participant clearly. I guess they could be part of a partnership, I guess, if you wanted to say that. They were going to raise money to provide for

Page 251

purchasing it. So could you say it's triumphant. Yes, I guess you could probably construct that as an attorney; yes, you could.
Q. Do you believe anyone who donated money to purchase the property would have been a partner in the deal?
A. I think that's a stretch. A donation is a stretch. If you look at a structured entity, like FORA, TPL, the Town of Stow, and you looked how they worked in concert to attempt to consummate this transaction, I think you have to see a certain amount of meshing and working together toward a common goal, and clearly, as Craig had characterized it, there's a partnership of private and public money that had to come to fore. CPC was putting up like $400,000. So that would clearly be, I'd say, one-third of the purchase price.
So if you look at that in terms of what they were providing, it makes them a partner in my book. But again, we can agree to disagree.
Q. Do you know if there was any town vote on whether or not to accept Ms. Kunelius' donation of the 42-acre parcel?
A. I don't recall whether they were going to

Page 252

-- you know, I would assume they would take it. They would be crazy if they didn't.
Q. Do you know if there was any vote, though?
A. I don't know.
Q. And you understand that it would have been a town vote to accept a donation for a parcel of land?
MR. McLAUGHLIN: Objection.
A. Again, I don't know.
Q. Do you know who Bill Wrigley is?
A. Isn't he the town manager, I think.
Q. Did you ever speak with Mr. Wrigley about the Kunelius property?
A. I may have had a brief conversation with Bill. I think everything was generally Ross and Kathy and Greg. I may have had a conversation with Bill, but -- I think there was a letter -- I maybe had a phone conversation once with Wrigley, and again, we are going over old territory here, but I think it was with regard to the partnership aspect, and he said, we don't have a partnership, yes, you do, no, you don't. So it was like, okay, see you later.
Q. Did Mr. Diemert ever tell you that the Town

Page 253

of Stow had a partnership with TPL?
A. Did he ever tell me straight out? No.
Q. I'm going to have you briefly look at Exhibit 10. It's an e-mail between you and Ross.
A. Okay.
Q. Did you ever have a conversation with Mr. Diemert concerning the terms of the purchase and sale agreement that you believed to be applicable or inapplicable to a prospective assignee of the town?
A. I may have had a general conversation with him, but to say it specifically point by point, no, I don't recall any conversation.
Q. Then why did you have that conversation with Mr. Diemert instead of Mr. Perry, since Mr. Perry wasn't an attorney?
A. That's a good question. I don't know. Probably because Ross was always the one that was in my face or in everybody's face. So probably, you know, trying to point things out to him may have gotten me a little more distance than pointing things out to Jake, I guess.
Q. If you look at -- keep that in front of you. If you look at there's a paragraph that starts "Finally," and in there it says, "The actual value

Page 254

of land and the water resource potential could weigh very heavily in the event the deal did not come to fruition." What did you mean by that sentence?

A. I think if you go back in the record, I answered that. Again, you know, we are going over old territory, but if you want, I can revisit it for you.

A large component under consideration obviously was how we structured this. It wasn't just a straight money deal, if you will. There were many aspects to it, and obviously a big aspect was donating the land to the town.

So giving the town the land obviously would give her a tax deduction, which would be offset against the purchase price. Big, heavy, weigh heavily on anything we did.

Again, I think Dahlia asked me about the $150,000 or $200,000 portion of it, and said, who knows. It could be more.

Q. I'm focusing on the part if the contract was breached, why would the very high value of the water resource and the land have an effect on a breach of any contract if the deal wouldn't go through?

Page 255

A. I think I answered it, but I guess I don't understand.

Q. I'm just trying to understand your statement here, "The actual value of the land and water resource potential could weigh very heavily in the event the deal did not come to fruition." When you say "did not come to fruition," are you talking about if the deal was breached by TPL?

A. That sounds good, yeah.

Q. I honestly don't understand. Why would the value of the land and the water resource potential weigh heavily if the contract was breached? Couldn't you then just turn around and sell this high-valued land and water?

A. I don't know. I guess you could. You could turn around and sell it if it was breached. But again, I think Attorney Conroy asked that question. You know, what would happen in the future had we attempted? I don't know.

Q. Are there any other conversations you haven't testified to today that you recall having with Mr. Diemert concerning this property?

A. No. We may have spoken a couple of times, but I just remember certain things that pop out

Page 256

obviously in my head that I thought were important.

Q. Did you have any conversations with him about the ramifications of TPL not going through with the purchase of the property once the town assigned its right to purchase?

A. I don't recall specifically if we talked about that.

Q. Do you know if you had any conversation with Mr. Diemert concerning that issue when you were discussing the indemnification provision?

A. No, probably not. Again, I don't recall. Just a couple of things, important things, popped into my...

Q. You testified you represented planning boards; did I hear that right?

MR. McLAUGHLIN: Objection.

Q. You've never represented a planning board?

A. Never.

Q. You've represented clients in front of planning boards?

A. Correct.

Q. Have you ever represented any municipal entity?

A. No.

Page 257

Q. Have you had any conversations since the meeting that you were discussing in Mr. Boothroyd's office with any member of the town concerning Ms. Kunelius' property?

A. I may have talked to Kathy or Bob or even Greg after that. I don't even remember. It's possible, but I don't know. If they said I did, maybe I did. I don't know. I don't recall any off the top of my head; nothing that would have been of any consequence. I'd say probably not.

Q. Other than what you've testified here today, do you recall any conversations you've had with Mr. Jones concerning Ms. Kunelius' property?

A. When?

Q. At any time during this project.

A. We had spoken to Greg a lot, because Greg, again, was the one that kept saying, you know, Why are we paying for it if we can get it for free. Greg saw the folly in all of this.

Q. What did Mr. Jones tell you about that?

A. He just -- as somebody who lives in town, he couldn't understand they needed the water, they had the open space, and he didn't see why the 40B would be a problem. He thought they were nice

# TAB 9

VOLUME: I
PAGES: 1 through 193
EXHIBITS: Per index

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - x

MARILYN KUNELIUS,
Plaintiff,

vs. Civil Action No. 05-11697-GAO

TOWN OF STOW, et al.,
Defendants.

- - - - - - - - - - - - - - - - - x

DEPOSITION OF JAMES ARTHUR BOOTHROYD
Thursday, May 24, 2007, 10:09 a.m.
Goodwin Procter, LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109

----------Reporter: MaryJo O'Connor, CSR, RPR-------
BOSTON REPORTING ASSOCIATES
REGISTERED PROFESSIONAL REPORTERS
67 Bright Road
Belmont, Massachusetts 02478
(617) 877-6640

PROCEEDINGS

MS. FETOUH: Mr. McLaughlin, before we begin, do you agree we'll use the same stipulations we've been using in previous depositions waiving the signature before a notary and reserving all objections except as to those as to form?

MR. McLAUGHLIN: I do.

MS. FETOUH: Great.

JAMES ARTHUR BOOTHROYD,

having been satisfactorily identified by a Massachusetts drivers license and duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. FETOUH:

**Q. Could you state your full name?**

A. James Arthur Boothroyd.

**Q. Mr. Boothroyd, are you represented by counsel here today?**

A. No, I'm not.

**Q. Have you ever been deposed before?**

A. Yes, I have.

**Q. How many times have you been deposed?**

A. Twice.

**Q. Can you tell me a little bit about each of those depositions or what the cases involved?**

A. The cases involved work at my previous employer Digital Equipment Corporation, both times I was a security supervisor. One case involved theft of property by an employee, and the other case involved a much larger theft. And I was a part of the case and it involved also corporate security.

**Q. Okay. You've been deposed before, so I think you know a little bit about how this process works.**

A. It's been a long time.

**Q. Just to remind you, everything we're saying is going to be recorded, so I ask that you give a verbal answer to all of your questions?**

A. Yes.

**Q. So if your answer is yes, please say the word yes. Don't just nod your head or say ah-huh?**

A. I understand.

**Q. And, in addition, if you ever do not understand one of my questions or you need me to clarify one of my questions, please let me know and I'm happy to try and do so.**

A. Okay.

**Q. We'll take breaks every once and a while, but if at some point you feel you need a break just let me know and I'll try to accommodate you as soon as I can.**

A. Okay.

**Q. Great.**

**Mr. Boothroyd, what's your current home address?**

A. 7 Lincoln Street, Maynard, Mass.

**Q. Have you ever lived in Stow, Massachusetts?**

A. No, I have not.

**Q. Can you describe your education following high school, any education you may have had?**

A. I spent one semester at U. Mass. Amherst. I spent four semesters at Middlesex Community College.

The one semester at U. Mass. was for fisheries and wildlife biology which I decided was better spent as a hobby than a career. And then I went to Middlesex Community College, took accounting, and then transferred to Bentley College in Waltham to finish out my four years. I have a bachelor's of science in accounting.

**Q. Have you had any formal education following that bachelor of science degree?**

A. I'm not sure what you mean by formal education.

**Q. Any graduate education.**

A. No.

**Q. Have you taken any continuing education courses?**

A. Yes.

**Q. Can you describe what sorts of courses you've taken?**

A. Are you talking about all of my employment history, because I took several different courses in my work within security for Digital. And then since leaving Digital and becoming a licensed real estate agent, we're required not only to take the initial training to, you know, as required for our license, but we also have to take continuing education every two years.

**Q. When did you become a licensed real estate agent?**

A. 1993.

**Q. Have you maintained that license ever since?**

A. Yes, I have.

**Q. And how long did you keep your horses on her property?**

A. My horse is still there.

**Q. Okay.**

A. My now ex-wife gave her horse away I believe in 1994. It was either '93 or '94.

**Q. Did you pay Ms. Kunelius a fee to keep your horses there?**

A. Yes. Monthly board.

**Q. And what was the monthly board fee? I realize it may have changed over the years.**

A. It's changed, but it varied anywhere from $200 to $250 a month on average.

**Q. Is that per horse?**

A. Yes.

**Q. How often would you go to the property to see your horse?**

A. It varied. Sometimes several times a week. Sometimes once or twice.

**Q. And would you see Ms. Kunelius when you'd go to the property?**

A. Sometimes. Not always.

**Q. How would you describe your relationship with Ms. Kunelius?**

A. We became friends.

**Q. Do you socialize together outside of the, you know, visiting the horse?**

A. No.

**Q. At some point did you develop any kind of professional relationship with Ms. Kunelius?**

A. Yes.

**Q. When was that?**

A. In the early '90s I did some tax work for her, very limited tax work, and in 2001 she asked me to list her horse farm for sale.

**Q. Do you remember approximately when in 2001?**

A. April.

**Q. Prior to that point, had you ever discussed the sale of her property?**

A. We had at various points, but nothing serious. Just general conversations about it, and she had actually listed it with somebody else prior to listing it with me.

**Q. Do you know when that was?**

A. I don't. I don't know the dates.

**Q. Did she tell you why she wanted to sell her horse farm in April of 2003?**

A. Because she had held it for a long time and

she wanted to retire from the horse business, enjoy her life a little bit more.

**Q. Had she told you anything about any past inquiries or interest in the property?**

A. She has over different points in time. She has talked to the Town on several occasions. She told me that she had had conversations with the Town of Acton about the possibility of the Town buying the water.

She had also talked to two or three different people in town who had made her what she thought were very unacceptable offers on the property.

**Q. Were any of those inquiries still pending or any of that interest pending when you talked to her in April of 2001?**

A. No.

**Q. Once she asked you to list her farm for sale, what was the first thing you did?**

A. We sat down and talked about it, wrote up a listing contract including a price. When we talk about the initial listing, I just want to clarify that the initial listing did not include her residential house.

**Q. Why is that?**

A. Because her father had a life estate on the house.

**Q. And it's been awhile since I've dealt with those terms, but how would that stop her? She couldn't sell the house while he was living; is that right?**

A. Right.

MS. FETOUH: Can you mark that, please.

(Documents marked for identification as Boothroyd Exhibits 1 through 2.)

**Q. Showing you what's been marked as Exhibit 1, have you seen that document before?**

A. Yes, I have.

**Q. What is that?**

A. That is a listing contract.

**Q. And is that the first contract that you entered into with Ms. Kunelius?**

A. No.

**Q. There was one before this one?**

A. There was one before that.

**Q. When was the first one entered into?**

A. April.

**Q. And I'll just let you know looking at your**

09d6607b-d22e-462c-812e-4166879ba189

Page 22

**production, I didn't see one from April of 2001. Do you still have a copy of that?**

A. I don't. It should have been with the Century 21 Classic Properties file, which I don't have access to.

**Q. Were there any differences in the terms between the April contract and this June 26th contract?**

A. No.

**Q. I notice this contract lists a price of $1.1 million?**

A. That's correct.

**Q. Is that what the initial asking price was?**

A. Yes.

**Q. And how did you, or you and Ms. Kunelius, decide on that price?**

A. Through analyzing other properties and doing market evaluation on the property.

**Q. What kind of market evaluation did you do?**

A. That would -- the market evaluation involved looking at other horse farms that had sold. Also considering the structures on the property and the water rights, the water that was available on the property.

Page 23

**Q. Did you do any sort of study of the water that's available on the property?**

A. Not at that time, no.

**Q. Did you hire anyone to help you appraise the property?**

A. No.

**Q. I notice the fee, the broker fee listed on the agreement is 5 percent. Is that sort of your normal rate?**

A. That's what my office was asking at the time, yes.

**Q. Looking at what's been marked as Exhibit 2, those -- or actually I think three separate documents I've combined into one exhibit. Can you tell me if you've seen those before?**

A. Yes, I have.

**Q. And can you tell me what those are?**

A. Those are extension forms to extend the existing listing. They're meant to just extend the time period of the listing.

**Q. How long can you extend a listing for at any time?**

A. As long as you want. As long as the owner is willing to extend it.

Page 24

**Q. I notice on the second page there appears to be a second listing number there. The first page there was just one listing number and by the second and third pages there are two listing numbers. Can you tell me why that change was made?**

A. Initially we put the listing in as or under a residential category, and when we extended those -- when we signed the two extensions that you're referring to, we also put the same listing in under the land category in MLS, Multiple Listing Service.

**Q. So it's for the same property, just --**

A. Right.

**Q. -- two different listings?**

A. Yes.

**Q. And what's the purpose of doing that?**

A. To expose the property not only as a horse farm but also as potential land.

MS. FETOUH: Can you mark this, please.

(Document marked for identification as Boothroyd Exhibit 3.)

**Q. And just returning to your last answer, by exposing the property as land, were you hoping to attract buyers that might not otherwise be**

Page 25

**interested in the property; is that right?**

A. Possibly, yes.

**Q. I'm showing you what's been marked as Exhibit 3. It looks like another agreement now dated in April of 2002.**

A. Yes.

**Q. Have you seen this before?**

A. Yes, I have.

**Q. And what is this?**

A. This is a new contract dated April 4, 2002 which now includes the residential property that Marilyn, Ms. Kunelius's father previously had a life estate on but agreed to remove the life estate. In our discussions towards the end of the last extension on the million one -- $1,100,000 listing of the horse farm, I suggested to her that the entire property might be more attractive to somebody if the entire package including her residential lot and the house would be included.

So we let the previous listing expire. We added the residential house, increased the price to $1,239,900, and included the residential property along with the horse farm.

**Q. What needed to happen to remove the life**

A. Well, the developer who did put in an offer on the property was a developer I introduced to the property. I specifically contacted him.

**Q. And are you referring to Cohousing Resources?**

A. Yes, I am.

**Q. And how did you come to contact Cohousing?**

A. I had met Chris ScottHanson, a representative of Cohousing Resources approximately a year earlier. I had a listing of land in Maynard at the time plus our office, Century 21 Classic Properties, had another listing of land in Maynard and Mr. ScottHanson called and wanted to see the properties. So I took him to see both of them. And in the course of walking the properties and riding back and forth from the office to the properties, we discussed generally what his company did, the Cohousing concept, and we entered into other conversations about horses, and I told him about the horse farm listing. At that time we had just the horse farm listed, not the residential piece that I spoke of. And he asked me to show it to him just quickly. So I did take him over there, and he liked the property but didn't feel at that time that it

was a property that his group would be interested in.

**Q. Do you remember approximately when this was?**

A. Approximately August of 2001.

**Q. Did he say why he didn't think his group would be interested in the property at that time?**

A. Because he felt that they needed, and we talked about the residential house, and he felt that that piece was something that he could, you know, that they really needed to develop.

He also questioned whether because of the zoning at the time that they would be able to do what they needed to do on the property.

**Q. What did they want to do on the property?**

A. They wanted to -- what he was looking, his company was looking for was a property that they could build a Cohousing development on. They're looking for approximately 20 to 30 units.

**Q. And how much land was he looking for for those 20 to 30 units?**

A. He said at that time in August at least an acre of land.

**Q. There is another organization Mosaic**

**Commons that's been referred to. What was the relationship between Mosaic and Cohousing?**

A. Cohousing Resources is a project management development group that goes out, works with groups like Mosaic Commons. The requirements of Cohousing Resources are that groups have to form and there has to be, depending on the size of the development that the group is looking for, they have to have a certain number of committed members by contract with deposits down before Cohousing Resources and Chris ScottHanson will go out and actively search for land for them and look for a development.

And what Cohousing Resources then does is once they identify a property and negotiate a purchase and sale agreement with the owner, they then manage the entire project including developing, you know, the -- how should I say it, they do a feasibility study on the property, they coordinate all the engineering, the development plans, and they actually manage the project right to the end.

Mosaic Commons was a group they were working for and actively looking for a property for at the time that I first met Mr. ScottHanson.

**Q. After you took Mr. ScottHanson to see Ms.**

**Kunelius's property in August of 2001, when was the next time you communicated with Mr. ScottHanson?**

A. In August of 2002.

**Q. And why did you wait, like I say, a year to contact him again?**

A. While at the time that we talked, he felt the property as it was listed did not meet their requirements. And in or around the June or July 2002 time frame after we had listed the residential piece, I had done some investigating into 40B projects. I had heard about them, had looked into them a little bit and thought that that might be something that would, with a larger piece of property that could potentially be developed, I thought that that might be something that his group would possibly consider.

**Q. Prior to this time in the summer of 2002, did you have experience with 40B projects?**

A. No.

**Q. What made you think that 40B might be something worth investigating for them?**

A. My thought at the time was that with some of the restrictive zoning on the horse farm, the 40B project allowed any developer, actually, to develop

09d6607b-d22e-462c-812e-4166879ba189

A. From Cohousing Resources, yes.
**Q. And this is for Ms. Kunelius's property?**
A. Ms. Kunelius's property, yes.
**Q. Was this the first offer you had received from Cohousing?**
A. Give me a minute to look at it, please.
**Q. Sure. Take your time.**
**(Pause.)**
A. No, this isn't the original offer.
**Q. When was the original offer made?**
A. I don't recall specifically, but it was before this date. And the original purchase price listed was for $1 million dollars.
**Q. Was it a written offer?**
A. I believe so, yes.
**Q. And do you remember any of the other terms of that offer besides the $1 million purchase price?**
A. Very similar to this. Probably very much the same.
**Q. And when you said it was before this date, are you referring to the July 25, 2002 date?**
A. It was in or around July, end of July, yes, I believe so.
**Q. The original offer was in the end of July?**

A. Yes.
**Q. Do you know how long before what you're looking at as Exhibit 4 the initial offer was made?**
A. It would have been within a matter of days.
**Q. And if you had a copy of that document, I presume it would have been included in what you have sent to us?**
A. Yes.
**Q. So if it was not in your documents, it's not something you have --**
A. I don't have, no.
**Q. Prior to receiving that initial offer from Cohousing, had you discussed Cohousing's interest with Ms. Kunelius?**
A. Yes.
**Q. And what had you and Ms. Kunelius discussed about Cohousing's interest?**
A. I explained to her a little about my past experience with Cohousing, my showings of the two properties back in August of 2001 with Mr. ScottHanson. I explained to her how I originally met Mr. ScottHanson, told her my understanding of what they did, their concept, and told her I thought it might be a good match for her property if he was

interested in doing a 40B, Chapter 40B project.
**Q. Was Ms. Kunelius familiar with Chapter 40B at that point?**
A. A little bit.
**Q. Did you explain to her anything about what that would involve?**
A. All little, but I also, we involved Attorney Kachajian in some of the discussions so she had some discussion with him about that, too.
**Q. What discussions did you have with Ms. Kunelius about Chapter 40B?**
A. I explained to her how, in general terms, Chapter 40B worked; the purpose of a 40B as I understood it to be able to develop properties that weren't necessarily zoned, you know, completely residential at the time.
**Q. Were you present when Mr. Kachajian discussed Chapter 40B at all with Ms. Kunelius?**
A. No, I wasn't present. No.
**Q. And did Ms. Kunelius have any questions for you about Chapter 40B?**
A. I don't recall any specific questions, no.
**Q. Did she respond at all about -- or discuss with you her thoughts on Chapter 40B?**

A. As I recall just that if that would work. I mean she was just very excited about the possibility of having an offer on the property.
**Q. At that point you hadn't had any offers on the property; is that right?**
A. That's correct.
**Q. After you received the initial offer from Cohousing, what did you do with it?**
A. I presented it to Ms. Kunelius. I also faxed it to her attorney.
**Q. Did you discuss the offer with Ms. Kunelius?**
A. Yes, I did.
**Q. And what did you discuss?**
A. We discussed the terms. We discussed specifically the price.
**Q. And did you have any concerns about any of the terms in that initial offer?**
A. Some. And also with the price.
**Q. What were your concerns about the price?**
A. We were looking for a little bit higher price.
**Q. And you said you also discussed some of the other terms or had concerns about some of the other**

Page 42

**terms. Do you remember which terms those were?**
A. Well, we discussed the promissory note, the financing. We discussed some of the feasibility contingency in here, how the whole process would work.
**Q. When you say "In here," you're referring to Exhibit 4?**
A. In this, yes. In this offer you have given to me.
**Q. What happened between the receipt of the initial offer and the receipt of what's been marked as Exhibit 4?**
A. There were conversations back and forth between Ms. Kunelius, Attorney Kachajian, conversations also that I -- some of the conversations I was involved with with her attorney and with her.
**Q. What concerns did you have about the financing, or did you discuss about the financing?**
A. We discussed how this whole process would work. We discussed the purchase price. We also worked -- we did have some conversations about the promissory note and how -- what guarantee or what security that Cohousing could offer for the

Page 43

promissory note.
**Q. What specifically did you discuss about the security Cohousing could offer for the promissory note?**
A. Well, Ms. Kunelius's concern was, you know, how could all of this be -- what guarantee could she have that they would pay; that, you know, this transaction would go through to completion.
**Q. What was your response?**
A. Well, this is something that evolved over lots of conversations to get from the document that you see here to the actual signed purchase and sale. There were lots of conversations back and forth between Ms. Kunelius, with me, with her attorney, with Chris ScottHanson from Cohousing Resources.
**Q. And I guess I'm just asking a little bit more about the content of those conversations and what you were able to tell her about whether or not she had any guarantee that Cohousing would go through with the transaction as you put it.**
A. Well, a lot of those conversations took place with her attorney. I did not give her any specific information regarding the security of the note. Those were a lot of conversations she had

Page 44

with Attorney Kachajian, and I'm assuming. I don't know. I do know he talked to Chris ScottHanson.
**Q. Were you present for any of those conversations with Mr. Kachajian?**
A. I was with some, yes.
**Q. And can you tell me everything you can remember about --**
A. We did, yes. I'm sorry.
**Q. That's okay.**
**Can you tell me everything you remember about those conversations?**
A. We did have some conference calls. I also when we did finally put the version, the signed version of the purchase and sale together, we had about a two- or three-hour meeting with Mr. ScottHanson in Attorney Kachajian's office where they hammered out a lot of the details to come up with a final purchase and sale.
**Q. Do you remember anything that Mr. Kachajian told Ms. Kunelius about what guarantees she would have that Cohousing would go through with the transaction?**
A. I don't specifically know.
**Q. Let's look at Exhibit 4. Maybe that will**

Page 45

**help orient us a little bit about some of these terms. If you turn to the -- well, actually, looking at the first page. I see that there is a date that says 7/25/02 which is crossed out and then next to it is written 9/24/02. Do you know why that is?**
A. I don't.
**Q. Who drafted this document?**
A. I believe it was Cohousing Resources.
**Q. And looking at the first page of the agreement, the second paragraph, the purchase price paragraph I notice the purchase price here is $1.1 million. Does that reflect your discussions with Cohousing following the $1 million offer?**
A. Yes.
**Q. Is this what you asked for, the $1.1 million?**
A. Yes.
**Q. Had there been any back and forth on that purchase price in between the last offer and this one?**
A. We had told them that the original $1 million purchase price was too low, and we did counter their offer. And this is what they agreed

Page 46

to pay.
**Q. What was your counteroffer or counter request I guess?**
A. $1.1 million.
**Q. Okay. I notice that paragraph also references paying an earnest money deposit in the sum of $50,000. Was that provision in the earlier agreement, or the earlier offer?**
A. I don't remember.
**Q. Is that a term that you had discussed with Cohousing?**
A. I don't remember specifically.
**Q. Was the deposit term a term you had discussed with Ms. Kunelius prior to this agreement?**
A. In general terms, yes.
**Q. And what generally had you discussed about a deposit?**
A. We had discussed what would be a standard deposit, and normally you do talk roughly 5 percent down. And initially Cohousing Resources, you know, appeared to be willing to do that.
**Q. If you look on the next page there is a Paragraph Number 10 entitled "Feasibility Contingency." Did you understand what Cohousing**

Page 47

**needed to do for its feasibility evaluation?**
MR. McLAUGHLIN: Objection. You can answer.
A. Yes, I did.
**Q. And what was that?**
A. Cohousing Resources needed to do some engineering studies, some soil samples, also needed to do some work regarding possible deep hole tests for possible future septic.
**Q. Do you recall anything else?**
A. Not specifically, no.
**Q. Do you know if the feasibility evaluation involved any evaluation of the sort of 40B process they would have to go through or were thinking of going through?**
A. Not that I remember, no.
**Q. And pursuant to this agreement, was it your understanding that if any of that -- if they concluded that the feasibility evaluation was unsatisfactory for their purposes, that they could terminate the agreement?**
A. Yes.
**Q. Did you discuss that with Ms. Kunelius?**
A. Yes.

Page 48

**Q. On the next page Paragraph 12 contains a paragraph on the buyer's default and what would happen upon a default by the buyer. Did you discuss this paragraph with Cohousing Resources?**
A. I didn't, no.
**Q. Did you discuss this paragraph with Ms. Kunelius?**
A. I don't recall any specific conversations with her about that, no.
**Q. When you say you didn't discuss it with Cohousing, do you know if anyone else discussed this paragraph with Cohousing?**
A. Attorney Kachajian may have, but I don't know for sure.
**Q. Did this paragraph change at all between the last draft -- the first draft you received and this version?**
A. I don't know.
(Whereupon Attorney Oetheimer enters the conference room.)
**Q. I notice on the final paragraph of this document says the offer expires on July 29th at 3 o'clock. Do you know if in fact it expired?**
A. I guess you could say it did, but there

Page 49

were continuing discussions.
**Q. What did you do after you had received what's been marked as Exhibit 4?**
A. I'm not sure I understand the question.
**Q. Did you discuss the terms of Exhibit 4 with anyone?**
A. I did with Ms. Kunelius.
**Q. And how soon after you received the offer did you discuss it with Ms. Kunelius?**
A. I don't remember specifically, but it was very soon after. It would have been that day. And I would have also forwarded it on to Attorney Kachajian.
**Q. What did you and Ms. Kunelius discuss about this offer?**
A. It's a very general question. I'm not sure what your specific question is.
**Q. Well, once you had sent it to her, what did you and she discuss about it?**
A. Well, we discussed the purchase price which was acceptable to her; however, there were still terms in here that needed to be worked on.
**Q. Which terms are those?**
A. That wasn't really up to me to particularly

Page 50

-- you know, I mean Attorney Kachajian was more involved in that than I was.
**Q. Do you remember anything about which terms were still an issue?**
A. Not specifically, no.
**Q. Did you communicate with Cohousing Resources after communicating with Ms. Kunelius and Mr. Kachajian about this offer?**
A. I would have, yes. But most of those discussions would have taken place between Mr. Kachajian and Mr. ScottHanson.
**Q. What role did you play at all in any discussions, then?**
A. Not a whole lot.
**Q. Were you present for the discussions between Mr. Kachajian and Mr. ScottHanson?**
A. There is one specific one I can recall, but not in general, no.
**Q. What can you tell me about the one you can recall?**
A. It was the meeting we had at Mr. Kachajian's office where the final details of the purchase and sale that was signed were worked out.
MS. FETOUH: Can you mark this.

Page 51

(Document marked for identification as Boothroyd Exhibit 5.)
**Q. Mr. Boothroyd, showing you what's been marked as Exhibit 5, do you recognize that document?**
A. Yes, I do.
**Q. And what is it?**
A. This is a fax sent to me and to Attorney Kachajian by Mr. ScottHanson. It's a version of an updated version of a purchase and sale.
**Q. And that is -- while I don't see a date on the fax cover sheet, on the final page of the purchase and sale agreement right before the note it says it was executed on the 25th day of September 2002.**
A. Yes.
**Q. Is that approximately when you received this offer?**
A. I can't read the date either, but that would be the approximate date, yes. It would appear from Page 7 that it looks like the 25th of September that this was faxed, yes.
**Q. So approximately two months after the July offer that we've just been looking at; is that right?**

Page 52

A. That's correct.
**Q. How many communications had you or Mr. Kachajian had with Cohousing in those intervening two months?**
A. I can't speak for Attorney Kachajian, but I had had conversations off and on with Cohousing, yes.
**Q. Can you tell me approximately how many conversations? I know it's hard to --**
A. I don't know specifically, no.
**Q. Was it more than once a week?**
A. I couldn't say.
**Q. When you received this document, what did you do with it?**
A. I would have talked to Ms. Kunelius about it, would have given her a copy of it, would also have had a conversation with Mr. Kachajian to see if he had received it.
**Q. You say you would have talked to Ms. Kunelius --**
A. I did.
**Q. You did talk to her?**
A. I did, yes. I'm sorry, poor choice of words.

Page 53

**Q. That's fine. And can you tell me what you can recall about your conversation with Ms. Kunelius about this agreement?**
A. That we were making progress in putting the purchase and sale together. I can't recall anything else specifically.
**Q. Do you recall if she had any questions for you about this agreement?**
A. I don't specifically know.
**Q. You said you also spoke with Mr. Kachajian about the agreement?**
A. Yes.
**Q. Can you tell me what you and Mr. Kachajian discussed about this agreement?**
A. I don't recall any specific items in the purchase and sale that we would have discussed.
**Q. Do you recall anything generally?**
A. Generally that we were making progress towards putting an agreement together.
**Q. Looking at some of the specific terms of the agreement, if you turn to the first page, Paragraph 2, on the purchase price, I notice the purchase price is still $1.1 million but now it's $700,000 payable in cash and then a $400,000**

Page 54

**promissory note. Do you know why that change was made from the last agreement?**

A. Cohousing Resources as I understood it had asked for that provision in order to conserve some of their cash and was willing to offer the promissory note at the 7 percent interest rate to Ms. Kunelius during the construction, you know, phase of the project.

**Q. Did you discuss that provision with Ms. Kunelius?**

A. I would have in general terms, yes.

**Q. And was that a change that Ms. Kunelius was agreeable to?**

A. Yes, she was.

**Q. Do you remember anything specifically about that discussion with Ms. Kunelius?**

A. I remember we talked about how that promissory note would work and that she would be receiving the $2,333 per month in interest which she found to her liking because that gave her some cash flow.

**Q. I notice in the third paragraph there is now a separate paragraph titled "Earnest Money," and it references an initial deposit of $10,000 and an**

Page 55

**additional earnest money payments of $1,500 per month which appears to be a different term than the prior agreement which had a single $50,000 deposit; is that right?**

A. That's correct.

**Q. Do you know why this change was made?**

A. The reason that that was changed and offered by Cohousing is there is also a provision that was worked out that the earnest money would be given directly to Ms. Kunelius's cash flow rather than held in escrow. That was to benefit her in terms of an actual cash flow at that time.

One of our concerns that we had expressed to Cohousing is that once we did put this together that in all likelihood a lot of her boarding tenants at the barn would begin to leave and that that was a concern of hers in terms of monthly cash flow.

**Q. And so in exchange she was willing to accept a lower initial deposit; is that right?**

A. That's correct.

**Q. Was this change initiated by Ms. Kunelius then?**

A. Not specifically, no.

**Q. Whose idea was it for this change?**

Page 56

A. I don't recall specifically how that came about, whose suggestion that was. It seems to me that it was initially offered by Cohousing Resources, but I'm not positive of that.

**Q. And at that point you had shared with Cohousing Ms. Kunelius's concern about maintaining some sort of cash flow; is that right?**

A. That's correct.

**Q. On the next page, Paragraph 6, there is now a paragraph regarding the 40B application?**

A. Yes.

**Q. Who added that provision which I don't believe was in the previous version of this document?**

A. I don't know specifically who added that paragraph, but it would have been something that was worked out between Attorney Kachajian and Cohousing Resources.

**Q. Why was it added?**

A. I mean I did not specifically add that, so I couldn't really comment on why it was added other than it would make sense that this is protection for both parties in terms of, you know, the 40B application.

Page 57

**Q. What do you mean by protection for both parties?**

A. Protection in terms of the -- or language I should say that would go in there in terms of a 40B application just like a developer would want protection in terms of permits, this is just another permitting type process that would be put into a purchase and sale agreement.

**Q. When you said earlier you hadn't had any personal experience with any 40B project; is that right?**

A. Not prior to this, no.

**Q. Referring you to Paragraph 14 on Page 4 of 6 of the agreement, the paragraph on the buyer's default, which I notice appears to be the same as the paragraph that was in the prior version of this document; is that right? I mean as far as you can tell.**

A. It appears to be.

**Q. Do you know if there had been any negotiations over the terms of Paragraph 14?**

A. Not specifically, no.

**Q. Did you discuss with Ms. Kunelius what her rights were under Paragraph 14?**

Page 58

A. Maybe in general terms, but that would have been more conversations she would have had with Attorney Kachajian.

**Q. Do you have any recollection of discussing this paragraph with Ms. Kunelius?**

A. I do know we talked about it and I explained to her that this is standard language in most purchase and sales I've seen, yes.

**Q. And under this paragraph if Cohousing defaulted, she would have the choice of either retaining the deposit as liquidated damages or returning the deposit and seeking to enforce the agreement at law; is that right?**

A. Yes.

**Q. And under this agreement, what deposits would she have retained as liquidated damages?**

A. She would have retained the $10,000 plus the $1,500 per month for as long as that period lasted.

MS. FETOUH: Can we take a five-minute break?

MR. McLAUGHLIN: Sure.

(Brief recess.)

Page 59

(Document marked for identification as Boothroyd Exhibit 6.)

**Q. After you received what we were just looking at, Exhibit 5, what negotiations or conversations did you have with Cohousing Resources?**

A. I don't remember any specific negotiations.

**Q. You referenced earlier a meeting between you and Mr. Kachajian and Mr. ScottHanson.**

A. Yes.

**Q. When did that meeting take place?**

A. That meeting took place it would have been October 11th or 12th of 2002 in Mr. Kachajian's office.

**Q. Was Mr. ScottHanson present for that meeting?**

A. Yes, he was.

**Q. How long did that meeting last?**

A. I don't recall specifically, but it was two or three hours. It was a lengthy meeting.

**Q. Was Ms. Kunelius present for any part of that meeting?**

A. No.

**Q. And you had described earlier where that was a meeting where you hammered out the final terms**

Page 60

**of the P and S I think was your term; is that right?**

A. Yes.

**Q. I'm showing you what's been marked as Exhibit 6. Can you tell me what that document is?**

A. That is the purchase and sale agreement.

**Q. And that's the final purchase and sale?**

A. That's correct.

**Q. Were you working from a draft of this document during that meeting with Mr. ScottHanson, or were you working with sort of the previous version, Exhibit 5 at that meeting?**

A. I don't know that we were working with any specific draft. I mean this was an ongoing process, Ms. Fetouh, to get to the final version.

**Q. How would you describe the tenor or the tone of the meeting?**

A. Very positive.

**Q. Looking at Exhibit 6, and specifically Paragraph 7, the purchase price paragraph.**

A. Yes.

**Q. I notice the price is now $1,116,900 which is a little bit higher than the last document we had looked at. Why was that change made?**

A. That change was made at the request of

Page 61

Cohousing Resources to include the $16,900 in the purchase price that would be refunded to them for engineering costs, et cetera, in the event that the Town exercised the right of first refusal and Cohousing was not allowed to complete the project.

**Q. So the $16,900 represents money that Cohousing had already paid; is that right?**

A. No.

**Q. What does that number represent?**

A. That would be a portion of the money that they expected to spend during their feasibility period.

The reason that that was included and that this was worked out was because we, meaning myself, Mr. Kachajian, and Ms. Kunelius wanted them to proceed with their feasibility and their engineering rather than wait until after the Town's 120-day right of first refusal period was up. In other words, we wanted to get the engineering, the deep hole testing, the soil testing, all of that work done before the snow flew.

**Q. So was it Cohousing that was going to pay that $16,900 for that testing?**

A. That was -- that amount was put in to the

Page 66

**without putting any money down; is that right?**
A. I don't recall specifically. As the purchase and sale is worded, that appears to be correct, yes.
**Q. Turning to Paragraph 8 in this document, it references a time for performance of September 26, 2003, and then in bold says that "Provided the Chapter 40B approval process is proceeding forward, the buyer may have up to 12 months extension." Did I read that right?**
A. Yes.
**Q. So under this paragraph the closing may not have occurred on September 26, 2003; is that right?**
A. That was the potential, yes, that's correct.
**Q. And it could have in fact been a full 12 months later September of 2004?**
A. That's correct.
**Q. And that depended on where the Chapter 40B application was and its progress I guess; is that right?**
A. That's correct.
**Q. If you look at Paragraph 21 which is the paragraph on the buyer's default, I notice it**

Page 67

**states, "If the buyer shall fail to fulfill buyer's agreements herein, all deposits made hereunder by the buyer shall be retained by the seller as liquidated damages and this shall constitute buyer's sole equity and remedy in law." Do you see that language?**
A. Can I just have a moment?
**Q. Sure.**
**(Pause.)**
A. Yes, I see that paragraph.
**Q. I notice this is different than the prior versions of the agreement we had looked at which gave two options, either retaining the deposits as liquidated damages or returning the deposits and seeking to enforce whatever remedy at equity or law; is that right?**
A. Yes.
**Q. Do you know why that change was made?**
A. No.
**Q. Did you discuss that paragraph at that meeting with Mr. Kachajian and Mr. ScottHanson?**
A. I don't remember specifically discussing that with them, no.
**Q. Do you recall either of them referencing**

Page 68

**having discussed this with one another?**
A. Not specifically, no.
**Q. Did you discuss this change with Ms. Kunelius?**
A. I didn't specifically, no.
**Q. Do you have any knowledge of anyone else discussing this change with Ms. Kunelius?**
A. Not specifically, no.
**Q. Under this agreement, what would Ms. Kunelius have retained in the event of Cohousing's default?**
A. That would depend on when the default occurred.
**Q. If the default occurred before the conclusion of the feasibility period, what would she have retained?**
A. Nothing.
**Q. If the default had occurred after the end of the feasibility period and Cohousing was still proceeding with the project, what would she have retained?**
A. It depends on when after the feasibility period that they defaulted.
**Q. And is that because it depends on whether**

Page 69

**she had received the -- how much she had received in the $1,500 payments?**
A. That's correct.
**Q. But she would have received -- so it's your understanding of the $10,000 and whatever $1,500 deposits had been made, at least beginning 60 days after the feasibility period?**
A. Yes.
**Q. If you turn to the next page, Paragraph 26 contains a mortgage contingency clause. Can you tell me what that clause provides?**
A. That provides for the buyer applying for a construction loan of up to 80 percent of the construction price.
**Q. And if the buyer was unsuccessful in obtaining that loan, what would happen?**
A. Then the buyer would have the right to terminate the agreement, I guess.
**Q. If you look at Paragraph 35 of the agreement --**
A. Yes.
**Q. -- there is a reference to the seller, Ms. Kunelius, transferring all right, title, and interest in the 42.1 acre parcel as a charitable**

**contribution to the Town of Stow. Do you see that language?**
A. Yes.
**Q. Who added this provision?**
A. The attorney and Cohousing.
**Q. Do you know why it was added?**
A. The agreement between the parties was that Cohousing only needed the upland 8.57 acre parcel for their development. They didn't have a need for the other 42.1 acres. Ms. Kunelius had a desire to leave something to the Town and had expressed during the process that she would like to be able to do that. We had discussed in general terms that there might be a tax benefit to that. Cohousing was very willing to go along with that, and so that's what was agreed upon.
**Q. And as I read this paragraph, the opening clause says, "Upon the Town of Stow's approval of the development of the 8.57 acre parcel, she would make this donation"; is that right?**
A. No.
**Q. Okay.**
A. At least not my understanding to what it says. That's only part of the requirement.

**Q. Okay. Can you tell me what I'm missing?**
A. It says that, "Upon the Town of Stow's approval of the development of said 5.7 acre parcel by the buyer and issuance of all requisite board of approvals, building permits and seller receiving purchase monies as set forth herein, buyer and seller agree that the seller shall upon acceptance of the Town of Stow transfer all right, title, and interest to said 42.1 acre parcel currently under Mass. General Law Chapter 61 as a charitable contribution."
**Q. So the donation would only be made if the Town of Stow approved Cohousing's Chapter 40B application?**
A. That would be part of the approval process, yes.
**Q. And what would have happened if the Town of Stow had not approved or had scaled back the Chapter 40B application?**
A. Well, I'm not sure what you mean by scaled back, however if Cohousing Resources was not able to complete the project, was not able to get the approvals they needed, then Cohousing would have the right to terminate the agreement.

**Q. You mentioned a moment ago a possible -- in discussing a charitable contribution a tax benefit to Ms. Kunelius that you had discussed with her. Can you tell me what tax benefit you're referring to?**
A. The possibility that she may be able to get a charitable donation or a charitable deduction for the donation.
**Q. And that's a deduction against her income?**
A. In future years, that's correct.
**Q. Had you done anything to measure the value of that charitable donation?**
A. No, for particular reasons.
**Q. What are those?**
A. In order to even determine the value of the property, the water which was included would have to be appraised. And given Ms. Kunelius's financial situation at the time, I didn't feel, and I discussed it with her and she agreed, that that was the appropriate time to be spending the money until we knew that, you know, the agreement would be completed.
So I discussed with her the possibility of a charitable donation in the future, but that would

have to be determined. I also told her that at some point in the future if all of this did go through that the process would be, you know, applying to the IRS for approval of this donation.
**Q. Have you had experience with similar applications to the IRS?**
A. In much smaller terms, yes. Not anything of this size, no.
**Q. Did you have any sense of the likelihood of that application being --**
A. No.
**Q. -- granted?**
A. No. Nor would I, you know, if I felt that at some point in the future that that would require somebody with more experience from me, I'd advise her that way.
MR. McLAUGHLIN: Quick question for you. Just by way of a lunch break, if you are going to be done and other people aren't going to ask questions and you are going to be done in X amount of time, we can just go right through. If otherwise, maybe we could take a break soon. For my own purposes, that would be good.
Does it look like we're all going to

09d6607b-d22e-462c-812e-4166879ba189

Page 74

have -- are you guys going to have questions, too, or do you know?

MR. CONROY: I would guess I'll have a few but not a lot.

MS. ECKER: The same.

MR. McLAUGHLIN: What do you think?

MS. FETOUH: I think I probably have enough that you'd want to take a lunch break.

MR. McLAUGHLIN: All right. Maybe we can -- I would prefer to do it now myself.

MS. FETOUH: That's fine with me.

MR. McLAUGHLIN: If that's possible.

MS. FETOUH: Okay.

(Whereupon Mr. Oetheimer exits the conference room.)

(Whereupon the luncheon recess was taken at 12:12 p.m.)

Page 75

AFTERNOON SESSION

(Whereupon the deposition resumed at 1:08 p.m.)

**Q. Mr. Boothroyd, when did you first learn that Ms. Kunelius's property was classified under Chapter 61?**

A. I actually knew it when I had my horse boarded over there. Something she told me a long time ago.

**Q. Do you remember how it came up in conversation?**

A. No. It was way back in the '90s.

**Q. Were you familiar with Chapter 61?**

A. Somewhat.

**Q. And how did you have familiarity with it?**

A. Through real estate.

**Q. Have you ever had any transactions involving land that's classified under Chapter 61?**

A. No.

**Q. Have you ever been involved with any property owner's decision to classify his or her land under Chapter 61?**

A. No.

**Q. Have you had any professional experience I guess with Chapter 61?**

Page 76

A. No.

**Q. When you first spoke with Ms. Kunelius about trying to help her sell the property, did you discuss with her the obligations she had under Chapter 61?**

A. Yes.

**Q. What did you discuss?**

A. We discussed the rollback tax, some of the requirements for right of first refusal and notification.

**Q. About when did you have that conversation with her?**

A. I don't know.

**Q. Was it --**

A. It would have been around the time that we first listed the property. I also suggested that she go to the Town and find out what the rollback tax would have been at that time. They have an approximate amount that she might be dealing with.

**Q. Do you know if she did that?**

A. Yes, she did.

**Q. And what did she learn?**

A. I believe it was somewhere around $16,000 or $17,000.

Page 77

**Q. And that's the amount she would have had to pay in rollback taxes; is that right? $16,000 to $17,000?**

A. Yes.

**Q. Did you discuss taking her property out of Chapter 61 before selling it?**

A. We had conversations about that, but she didn't seem to be interested in doing that.

**Q. What gave you that impression?**

A. Well, she said she didn't really want to do that, because if you pull the property out of Chapter 61 there is a waiting period before you sell it if you want to clear the rollback tax plus you may have to pay the rollback tax at that time. And that's something that she couldn't afford at the time.

Plus if the property doesn't sell for a while, then it's taxed at a higher rate also. So it has a double-edged affect.

**Q. Did you discuss the fact that the Town had a right of first refusal for a bona fide offer?**

A. Yes.

**Q. And what do you remember discussing about**

**that?**

A. We discussed the notification process; the Town having a 120-day period to decide, so any potential buyer that she might have. First of all, the Chapter 61 required that she actually have a signed purchase and sale and not just a signed offer. So that was a requirement also that her attorney would have to notify the Town in writing by certified mail. So she was aware of that.

**Q. Did you also discuss whether or not that right of first refusal could be assigned to a nonprofit conservation organization?**

A. I don't remember specifically discussing that with her, no.

**Q. Were you aware of that at the time?**

A. Yes, I was.

**Q. After the purchase and sale agreement was executed with Cohousing, when did you first learn that the Town might be interested in exercising that right of first refusal? If that happened before the purchase and sale agreement was signed.**

A. No, it didn't before the purchase and sale agreement. I believe the first time would have been sometime possibly late November, early December.

There were Board of Selectmen -- there was a Board of Selectmen's meeting and then subsequent meetings where the Friends of Red Acre group had requested that the Town consider exercising their right of first refusal. That's when I first became aware of it.

**Q. You mentioned a group called the Friends of Red Acre. What is that group?**

A. That's a neighborhood group that formed in opposition of the development, the proposed development, and a group that put forth an alternate plan that included the Trust For Public Land.

**Q. Did you know any of the members of the Friends of Red Acre?**

A. I knew of them.

**Q. Did you know any of them personally before?**

A. Yes.

**Q. Which ones did you know?**

A. I knew Peter Christiansen and Serena Furman. They had at one time listed a property in Maynard through Century 21.

**Q. Did you handle that listing?**

A. No, I did not.

**Q. Do you know if they eventually sold that**

**property in Maynard?**

A. Yes, they did.

**Q. Do you know what kind of property it was?**

A. It was a two-level townhouse.

**Q. Did you know any of the other members of the Friends of Red Acre?**

A. No.

**Q. Did you know anything about the relationship between any of the members of the Friends of Red Acre and Ms. Kunelius?**

A. I'm not sure.

**Q. Do you know if they were on friendly terms?**

A. Some were friendly. Some were -- I don't know how I would best describe it -- tolerant, I guess.

**Q. How did you come to have that understanding?**

A. I had spoken to Ms. Kunelius at different times about certain neighbors who felt that they could just walk her property and that it was just an extension of their own, and she wasn't happy about that. But she had decided not to press the issue with them or post the property or anything, but she was aware that they did trespass on her property.

**Q. When you learned that the Town might be interested in the property in late November early December, did you speak with anyone in the Town about that?**

A. I had actually spoken to the selectmen previous to that before we even involved Cohousing Resources. The Board of Selectmen had been in touch with Ms. Kunelius and arranged a walk-through where three of the sitting selectmen came out and walked the property with us.

At a later date, probably a month or a little bit more later, one of that group came back along with one of the other selectmen. So they were aware that the property was for sale, and four out of the five had actually walked the property -- part of the property.

**Q. When did that initial meeting with the selectmen take place?**

A. The walk-through?

**Q. Yes.**

A. I believe it was July of 2002.

**Q. Was that initiated by you or the selectmen themselves?**

A. It was a request by the selectmen.

09d6607b-d22e-462c-812e-4166879ba189

**Q. And what were they interested in?**
A. Just wanted to see the property. They were also interested in walking out to one of the well heads, which we did. And one of the selectmen got stuck in the mud and we had to pull him out.
**Q. Which selectmen accompanied you on that walk-through?**
A. Ross Perry, I believe it was Kathy Farrell and Shirley Birchfield I believe is her name.
**Q. And who were the two selectmen who returned with you for the subsequent walk-through?**
A. Ross Perry and Greg Jones.
**Q. Did they indicate any interest in purchasing the property for the Town?**
A. They didn't indicate an interest in purchasing the property, but they were interested to know about the property. They never made an offer. There was some interest and discussion about the water.
**Q. After the walk-throughs, did you have any communications with them, with any of them?**
A. Yes, pretty much on a regular basis throughout the process. I believe it was August of that year the Town had an informational meeting

where Selectman Greg Jones did a presentation on water, things like that, water resources in the Town. Ms. Kunelius's property was mentioned. I was invited to sit in the audience, which I did.
We were also -- Ms. Kunelius's attorney, Peter Kachajian, and I were invited to a selectmen's meeting after that first walk-through to talk about the property at a Selectmen's board meeting.
**Q. And that was sometime after the July walk-through?**
A. Yes.
**Q. Was it before this August presentation?**
A. I don't remember specifically.
**Q. Between August and when the agreement was signed in October with Cohousing, did you have any other communications with the Town?**
A. On an ongoing basis, yes.
**Q. During those conversations, was there any discussion of the Town's right of first refusal?**
A. I don't recall specifically. I mean everybody was pretty much aware that the Town had a right of first refusal. So we were aware of it; the Town was aware of it.
**Q. After the purchase and sale agreement was**

**signed, you said you learned in November/December that the Board of Selectmen was thinking about exercising the right of first refusal; is that right?**
A. Well, I knew the Friends of Red Acre were attending a Board of Selectmen meeting to ask the Town to exercise the right of first refusal.
**Q. Did you attend that meeting?**
A. Yes, I did.
**Q. Who spoke at that meeting about Ms. Kunelius's property?**
A. I'm not sure. What do you mean by who?
**Q. Was there a presentation by the Friends of Red Acre?**
A. David Cobb, who was one of the members of the Friends of Red Acre and an abutting neighbor spoke, did the presentation.
**Q. And what did he -- what was his proposal or suggestion to the Board?**
A. At that time the Friends of Red Acre were interested in preserving the horse farm. They were interested in potentially moving the Eye of the Storm, which is a horse rescue group in Stow, to that location.

**Q. Did you speak at that meeting?**
A. I did not.
**Q. Did Ms. Kunelius attend that meeting?**
A. No.
**Q. Did Mr. Kachajian?**
A. No.
**Q. And what was the response of the Board of Selectmen at that meeting?**
A. They seemed open to the possibility, which was well within the Town's right.
**Q. When was the next time you talked to anyone from the Town or heard from anyone from the Town about the right of first refusal or the possibility of exercising the right of first refusal?**
A. There were ongoing discussions. I don't remember any specific. There were Board of Selectmen's meetings in December and into January. At one point Trust For Public Land was introduced and spoke. I don't remember any specific conversations I had with the Board.
As a matter of fact, at that point because of the ongoing proposal with the Friends of Red Acre, I didn't really speak to the Town a whole lot. We took a wait-and-see approach.

(Document marked for identification as Boothroyd Exhibit 8.)

**Q. Mr. Boothroyd, when TPL accepted the assignment of the right of first refusal, did you have any concerns about their ability to follow through on the transaction?**

A. Yes.

**Q. What concerns did you have?**

A. My concerns were their proposal for converting the properties to -- the two dwellings to low income housing. Also whether they would be able to raise the money that they needed to through fund-raising, yes.

**Q. Showing you what's been marked as Exhibit 8, I know you're not copied on this letter. Have you seen it before?**

A. Yes, I have.

**Q. When did you see this letter?**

A. May I just take a moment to look it over?

**Q. Sure.**

**(Pause.)**

A. I would have seen that in February, about the time it was sent out.

**Q. I'll note it's a letter from Mr. Kachajian**

**to Mr. ScottHanson notifying Mr. ScottHanson of the exercise of the right of first refusal and returning -- and enclosing a check for $10,000. The final sentence says, "Jim and I are not convinced that TPL and the Friends of Red Acre will be able to meet their commitment; however, as we know, stranger things have happened."**

**I took it when I read this that the Jim was referring to you. Do you know if that's in fact the case?**

A. I would presume that that's me, yes.

**Q. And is that in fact a true statement that you were not convinced that TPL and the Friends of Red Acre would be able to meet their commitment?**

A. We had our reservations, Dahlia.

Let me just backtrack a little bit and just put something on the record here. I really felt for a long time that in some senses this was my baby. I introduced Cohousing Resources to this project. I did some research into Cohousing. I think it's a very, from a real estate perspective, it's a pretty reasonably secure development process. I believe it that way because you have to have a committed group to start with. The group has some committed

funding. They aren't a traditional undependable developer who builds speck houses in hopes that they sell.

However, with that said, we all understood going into this that the right of first refusal existed. We felt, and I felt, that the Town had every right to exercise it. My feeling was that in the Selectmen meetings that I attended, that the fund-raising explanation was vague, however, we had no say over that. And we did everything from that point on to attempt to support Trust For Public Land in their request, in their access to the property. And we assumed walking out of the Board of Selectmen's meeting in February when the right of first refusal was exercised and that the Trust For Public Land did accept it; that this was a done deal. Despite, you know, these comments to the contrary, we did nothing to attempt to make it more difficult for them. We were supportive in that we wanted to see Ms. Kunelius be paid, and that the Town had every right to do what they were doing.

**Q. In your understanding of Chapter 61 having elected not to take her property out of Chapter 61, there was nothing Ms. Kunelius could do really to**

**stop the Town from exercising the right of first refusal; is that correct?**

A. That's correct. Nor did she want to stop the Town. She understood that the Town had the right to do that.

**Q. Similarly there was nothing she could do to stop the Town from signing that right of first refusal; is that right?**

A. That's correct, to my understanding.

**Q. You mentioned earlier that you felt that the Cohousing development was reasonably secure.**

A. Yes.

**Q. You still understood, however, that they needed to go through the 40B process, correct?**

A. Yes.

**Q. And that they had to meet certain qualifications in order to qualify for a 40B project?**

A. Yes.

**Q. And that they needed to pass through certain hurdles in order to be successful in getting that 40B application approved?**

A. Yes.

**Q. I think you said earlier you at least**

09d6607b-d22e-462c-812e-4166879ba189

**personally aren't -- haven't had any experience with that process itself?**
A. That's correct.
**Q. And, similarly, is it fair to say you didn't have a conclusion or -- about the likelihood that Cohousing would have been successful in getting its 40B application approved in the manner in which it was submitted?**
A. That's not correct.
**Q. Why is that not correct?**
A. I in my experience with working with buyers and sellers in my several years in real estate have come to have a certain feeling and confidence about certain buyers and sellers when you talk to them, when you deal with them.
As a matter of fact, when you were questioning me earlier about the purchase and sale, some of the reason that some of those terms may not be as strict as others is because we had a high level of confidence that Cohousing would perform. And I believe, and I can't speak for her personally, but I believe Ms. Kunelius also did. She had met Chris ScottHanson.
I'd also point out that since Cohousing

Resources was unable to complete the purchase of Red Acre Road due to the right of first refusal, that group, the Mosaic Commons group, and another group have through Cohousing Resources gone on to purchase a piece of property on Sawyer Hill Road in Berlin. They currently have just received in the not too distant past approval for their project. They're doing two joint side by side 40Bs. So it would appear that our confidence in them is born out.
**Q. That's in a different town, correct?**
A. That's correct.
**Q. Do you know anything about the process that they had to go through in order to get their 40B application approved in Berlin?**
A. I don't because I was not directly involved in that; however, I think that the results speak for themselves.
**Q. The fact that they were able to develop -- strike that. That's fine.**
**You had mentioned earlier that if they hadn't got approval of the 40B application for the I think it was 30 units that they were seeking to build on Ms. Kunelius's property, they would have been able to terminate the purchase and sale**

**agreement; is that right?**
A. That's correct.
**Q. And were you involved at all in the process between Cohousing and the Town of Berlin in order to approve the 40B application there?**
A. No.
**Q. You mentioned a few moments ago that you did everything you could to support the Trust For Public Land once it had accepted the assignment; is that right?**
A. I felt we did.
**Q. Were there ever times when the Trust For Public Land was trying to reach you and you did not return their phone calls?**
A. Not that I'm aware of.
**Q. When did you first learn that the Trust For Public Land might not be able to close on this project?**
A. I believe the time frame was sometime in August. There had been indications before that in July the Trust For Public Land or, specifically, Mr. MacDonnell, notified Mr. Kachajian that he was having difficulty with zoning issues. We became aware of that in a, I believe, a letter that Mr.

Kachajian received from Stow town counsel Jake Diemert regarding some possible alternatives to the zoning issues that they were running into.
Mr. Kachajian had subsequent conversations with Mr. MacDonnell over some of those options which Mr. MacDonnell said TPL was not willing to explore.
**Q. I'm sorry. Who said Mr. MacDonnell said TPL was unwilling to explore? Did you say that somebody said Mr. MacDonnell said he was unwilling to explore or something?**
A. Mr. Diemert had suggested in his letter some alternative zoning methods to resolve some of the issues with, you know, the zoning of the property. And Mr. MacDonnell informed Mr. Kachajian that TPL was not willing to pursue those.
**Q. Do you know why he told Mr. Kachajian that?**
A. I don't know specifically, but I believe that some of the issue was time and cost.
**Q. Were you a part of any of those conversations?**
A. I was aware of them. I was part of the conversation in August in Mr. Kachajian's office and Ms. Kunelius was there when Mr. MacDonnell informed us that TPL wouldn't -- he didn't think they would

Page 110

**Q. I think you mentioned earlier that TPL said it would not be able to complete this transaction and had offered the lower purchase price as an alternative; is that right?**

A. That's correct.

**Q. After this conversation with Mr. MacDonnell, where were things left? Was someone supposed to follow through with someone?**

A. I don't specifically remember who was supposed to do what, but we were also aware at that point that the $1,500 monthly payment that the Trust For Public Land had begun paying in February I believe with the exchange of the initial deposit money, the Trust For Public Land paid that as part of the initial assignment exchange of money in March, April, May, June and July, but then did not make a payment in August. I don't recall whether that was before or at the time of the meeting.

And, as I recall, the Trust For Public Land, or specifically Mr. MacDonnell, wanted us to consider that alternative purchase price and was going to wait for an answer.

**Q. When the Trust For Public Land failed to make the $1,500 payment in August, did you consider**

Page 111

**them to have failed to perform under the agreement?**

A. Yes. And I believe Mr. Kachajian sent a letter to the Town at some point, it may have been later than that date, but expressing his concern over their lack of performance.

**Q. At that point did you consider the purchase and sale agreement to have been defaulted by TPL?**

A. I don't know that anybody had any specific conversation about that. I think all of us took a wait-and-see attitude to see what happened in September and up to the proposed or the scheduled closing date of September 26th of 2003.

**Q. And when that date did arrive, did TPL close on the property?**

A. No.

**Q. And at that point did you consider TPL to have defaulted?**

A. It wasn't my specific responsibility to decide whether they had defaulted or not, but, yes, I considered they defaulted, yes.

**Q. But in any case where you have a client who has entered into a purchase and sale agreement and one party fails to live up to its obligation, one of its obligations under that contract, do you consider**

Page 112

**that contract then terminated?**

A. I consider the seller to be -- the buyer to be in default, yes.

**Q. After that August conversation, when is the next time you spoke with anyone from the Trust For Public Land?**

A. I don't recall specifically anything with the Trust For Public Land after that.

**Q. Did you have any conversations with anyone from TPL between that August conversation and the scheduled closing date?**

A. No, I did not. To my recollection, anyway.

MS. FETOUH: Mark that as the next exhibit, please.

(Document marked for identification as Boothroyd Exhibit 9.)

**Q. Mr. Boothroyd, I'm showing you what I've marked as Exhibit 9, a letter from Mr. MacDonnell of the Trust For Public Land to Mr. Kachajian dated September 9, 2003. Have you seen this document before?**

A. Just give me a moment to look it over, please.

**Q. Sure.**

Page 113

**(Pause.)**

A. Yes, I've seen the letter before.

**Q. And do you remember when you saw it?**

A. I don't specifically remember. It would have been not long after it was received by Mr. Kachajian.

**Q. Did you discuss the letter with Mr. Kachajian?**

A. Yes, I did.

**Q. What did you and Mr. Kachajian discuss about this letter?**

A. Just give me another moment, please.

**Q. Sure.**

**(Pause.)**

A. Yes, we did discuss that.

**Q. And what did you and Mr. Kachajian discuss about this letter?**

A. We discussed this along with, you know, the meeting in August in terms of this, you know, the proposal and, you know, the Trust For Public Land not living up to their, you know, their commitment to the assignment and the contract.

**Q. Did you also discuss this letter with Ms. Kunelius?**

**there any discussion about that proposal?**
A. There was some, but Ms. Kunelius and Mr. Kachajian didn't feel that that was sufficient. The feeling still was that the Trust For Public Land should live up to the original purchase price.
**Q. Did you share that feeling?**
A. Yes, I did.
(Brief recess.)
(Document marked for identification as Boothroyd Exhibit 10.)
**Q. Showing you what's been marked as Exhibit 10, have you seen that document before?**
A. Yes, I have.
**Q. And did you see it on or about July 6, 2004?**
A. On or about that time.
**Q. The first paragraph of this letter from TPL to Mr. Kachajian says, "Almost two months have passed since our last meeting in Maynard." Is that referring to the meeting that we were just discussing?**
A. Yes.
**Q. It also mentions having heard nothing from Mr. Kachajian since that time. Do you know if**

**anyone on behalf of Ms. Kunelius got back to the Trust For Public Land after that Maynard meeting?**
A. I don't know for sure, but I don't believe so.
**Q. Did you personally get in touch with anyone from the Trust For Public Land after that Maynard meeting?**
A. No, I did not.
**Q. In the third paragraph Mr. MacDonnell says, "You will remember that our discussion began with the recognition that the original contract assigned by the Town of Stow to TPL was no longer operative." Was there a discussion about whether or not that original contract was operative?**
A. Well, that's his opinion, not necessarily shared by everybody else. I'm not sure what you mean by operative.
**Q. Was there a discussion at that last meeting about whether or not that original contract was in effect any longer?**
A. Yes, there was. Our position was still that the Trust For Public Land should live up to their original commitment.
**Q. But did you believe that contract, that**

**purchase and sale agreement, was still in effect?**
A. I didn't, no. But the purchase price and the terms should still apply if there is going to be anything worked out here.
**Q. And if nothing was to be worked out, then the contract was at that point terminated. Or even if something was to be worked out, that contract was to be terminated?**
MR. McLAUGHLIN: Objection. You can answer.
A. Well, the original contract expired with the expiration of the closing date.
**Q. The deposits that you referenced earlier that had been made to Ms. Kunelius, the $10,000 deposit and then the $1,500 monthly deposits, were those ever returned to the Trust For Public Land?**
A. No.
**Q. Those have been --**
A. Not to my knowledge.
**Q. To your knowledge those have been retained by Ms. Kunelius?**
A. To the best of my knowledge, yes.
**Q. On the second page of this document, there is a discussion about alternate proposals. One that**

**included the $900,000 purchase price that Mr. Wilbur had proposed at the last meeting; is that right?**
A. Which specific line are you referring to?
**Q. In the third paragraph it said -- he says "It's my understanding the purchase price could be improved to $900,000."**
A. Yes.
**Q. And he goes on to say, "Mr. Wilbur and I said we would discuss this with the trustees of the Stow Conservation Trust if the proposal met with your approval." Did you ever invite TPL or Mr. Wilbur to discuss this purchase with the Stow Conservation Trust?**
A. I did not, no.
**Q. There is a discussion in this letter about potential tax savings of a bargain sale. Do you remember having any discussion with TPL about those tax savings?**
A. I didn't with TPL, no. That subject came up at the end of the third meeting when Mr. Wilbur proposed the $900,000 price and he did talk about the potential fire sale benefits.
**Q. Did you discuss those potential benefits with Ms. Kunelius?**

Page 134

water. Maynard had been going through a water issue in the late '90s, early 2000s. Before all of this transaction happened, I had had a conversation with the town DPW supervisor, Walter Sokolowski. At that time the Town of Maynard was pursuing another alternative to solve the water problem.

After this whole time period, I did have a follow-up conversation with Mr. Sokolowski, but he said that the Town of Maynard was not interested.

Mr. Kachajian and I did a follow-up conversation after the September default by TPL with Chris ScottHanson from Cohousing Resources about possibly, you know, about their possible interest in the property, and I believe in the documents there is a copy of a letter from or an e-mail from him stating that they just felt that too much time had elapsed and that the -- at that point trying to do a 40B for them was too risky, so they were no longer interested in the property.

I also had conversations with a gentleman named Ken Kells who was a consultant brought in. I believe he was associated with a company called Assabet Water.

**Q. What water I'm sorry?**

Page 135

A. I believe it was Assabet Water, but I'm not positive. He was consulting with what was called a Lower Village Committee in the Town of Stow looking to resolve their water issues and he had actually called to find out what the status of Ms. Kunelius's property was and whether there might be some interest depending on how things worked out with the committee as to whether, you know, that water might be available. But, subsequently, the committee broke off their working relationship with him and I haven't spoken to him since. He's no longer associated with that.

And there is another contact that I had, which I'm sure you're well aware of because it stirred things up, that was Mr. Jones who called me acting in a different capacity. He's no longer a selectman in town, but he does -- he's active in rental properties and things like that and different committees in town, and he was inquiring about the possibility that that property might be available, but he said in my last conversation with him that it will be quite some time before they're ready to do anything.

I also did make it known to all the real

Page 136

estate agents in my office that if they had clients that Ms. Kunelius would be willing to consider talking or negotiating to sell the property.

**Q. Is there anyone else you can think of?**

A. No.

**Q. Let's go back through each of these. First the Town of Maynard, you said they had expressed interest earlier. This is back in the late '90s, early 2000. Is that what you said?**

A. Yes.

**Q. Were you involved with those communications?**

A. I had conversations with the gentleman I mentioned, Walter Sokolowski. However, he said that at that point the Town was moving in another direction and that's the direction that they chose to -- they put wells deep -- bedrock wells in the town as opposed to going outside the town.

**Q. After the October closing came and went, you said you contacted -- did you contact the Town of Maynard?**

A. I did, yes.

**Q. Do you know about when you did that?**

A. I don't recall specifically, but it would

Page 137

have been between then and the end of the year.

**Q. This is when you're still at Century 21?**

A. Yes.

**Q. And you contacted Mr. Sokolowski?**

A. That's correct.

**Q. And what did you tell Mr. Sokolowski?**

A. I just told him that the property had not closed; that we didn't know whether there was any opportunity to reactivate the agreement but that as of that point the property was still available, and I asked him if the Town of Maynard was interested in any further water resources, but he said no, not at this point. The way we left it was he would contact me if that changed.

**Q. Have you heard from him?**

A. No.

**Q. You also mentioned speaking with Cohousing.**

A. That's correct.

**Q. How soon did you contact Cohousing Resources after the closing date?**

A. I believe it was October.

**Q. Okay. And who contacted whom? Did you contact Chris ScottHanson yourself?**

A. Yes. I picked him out of a crowd.

**13, have you seen that document before?**
A. Yes, I have.
**Q. And is this -- that's your e-mail address, correct, creativejim0717@aol.com?**
A. That's correct.
**Q. Mr. ScottHanson in this e-mail says he's sorry he hadn't been able to get back to you sooner. Is this the first time you heard from him following that Red Sox game?**
A. I don't believe so, no. And I don't know whether -- how many times I might have talked to him. Most of his communication was more than likely with Mr. Kachajian.
**Q. In the second paragraph he says, "As we understand the situation and I think we have tracked it in the background pretty carefully, Mosaic Commons is not interested in the Red Acre property because of the risks and costs and delays associated with the necessary 40B process."**
**Do you know what risks and costs and delays he was referring to?**
A. I can't speak for him, but what would make sense to me is when Cohousing Resources first got involved in this, they would have been at the front

of the line, so to speak, in terms of being able to apply for a 40B. And there were other projects that were generally known around town to be in the works that, obviously, now with the time slipping had gained time on them. Plus, you know, just increased costs in terms of construction, et cetera, because of a delay.
**Q. And, finally, looking at Exhibit 14 which is an e-mail from Mr. ScottHanson to you in January of 2004 which appears to be responding to an e-mail from you on January 11, 2004; is that right?**
A. I don't recall what this is about.
**Q. There is a reference in the paragraph on this page. What proceeds it is creativejim0717@aol.com wrote and then it says, "Hi, Chris. Hope you're keeping warm. Pete and I understand the Stow selectmen were successful in contacting you and you have a meeting set up with them on this Tuesday morning."**
**Do you know why the Stow selectmen were trying to contact Chris ScottHanson?**
A. Absolutely not. I don't. This doesn't make sense to me. I don't recall any meeting that they would have had at this point especially after

the previous exhibit you showed me, and I don't recall any meeting that he would have had with them.
**Q. Do you know if the Stow selectmen actually voted that if a proposal like Mosaic Commons came back to them, that they would not exercise their right of first refusal?**
A. I know that there was discussion, but I don't believe that they actually decided to vote not to exercise a right of first refusal. I know there was discussion about that in a meeting.
**Q. You also mentioned speaking with a man named Ken Kells who was a consultant to the Lower Village Committee?**
A. Yes.
**Q. When did that conversation take place initially?**
A. I believe sometime in spring of 2004, but I don't know. I don't remember for sure.
**Q. And you said Mr. Kells contacted you; is that right?**
A. Yes.
**Q. How many conversations did you have with Mr. Kells?**
A. Probably two or three all together.

**Q. And did Mr. Kells indicate an interest in purchasing the property on behalf of the Lower Village Committee?**
A. No.
**Q. What was his interest?**
A. His interest was in -- he wanted to know whether the property was available and specifically the water. He was working with the Lower Village Committee to try and figure solutions to the water problem. He didn't know whether Ms. Kunelius's water was an option, but he wanted to know if it was available. It never really got beyond that point in terms of a discussion.
**Q. What did you tell him about whether the property was available?**
A. I told him it would be available.
**Q. Do you know if the Lower Village Committee still exists?**
A. I don't know for sure. I believe so. I see articles in the local paper from time to time, but I don't know what they're doing or I don't know when they meet. I don't know that much about it.
**Q. Have you tried to reach out to them now that Mr. Kells is no longer consultant for them?**

**property is worth in today's market? Ballpark.**
MR. McLAUGHLIN: Objection.
A. My opinion is that it's worth the purchase price in the purchase and sale agreement or more.
**Q. Well, which is it, is it that price or is it more?**
A. I can't give you a specific number without going back and doing a market evaluation.
**Q. In general, has property in the Town of Stow appreciated --**
A. Yes, it has.
**Q. -- since the P and S was signed in this matter?**
A. Yes.
**Q. Do you have any sense of by what percentage or across the board?**
A. Not particularly.
**Q. Can you give me a ballpark?**
A. 15 or 20 percent maybe.
**Q. Okay. Do you know whether anyone is marketing this property right now?**
A. I'm not sure what you mean by marketing.
**Q. Well, advertising it, promoting it, making phone calls, doing whatever realtors do to try and**

**sell a piece of property?**
A. Nobody is advertising it. I have had the contact with the people that I have mentioned. I've put the word out through realtors in my office.
**Q. And has there been any interest?**
A. No.
**Q. Do you have an assessment as to why that is the case?**
A. My professional opinion is that the property has become very well-known; that, obviously, from information in the papers that people know that it's under litigation. I also mentioned earlier that my conversation, my last conversation with Chris ScottHanson from Cohousing Resources, he described it particularly as a poison property.
**Q. Okay. And to what do you attribute that?**
A. The notoriety in the papers, the knowledge that people have that the neighborhood group was against any kind of development there, which would then make it difficult to market to another developer. The, you know, the knowledge that you are going to have to go up against a very active neighborhood group.

**Q. Anything else?**
A. Quite possibly also a question over whether anybody wanting to develop this property would, again, have to go through the right of first refusal process with the Town.
**Q. Okay. Anything else?**
A. No.
**Q. Okay. Are you aware of anything that TPL did that has had a negative impact on the value of this property?**
A. No.
**Q. Now, I'm going to ask you to help me a little bit with some real estate concepts as I close here. The fact that this land is listed as under agreement by your cousin, the other Mr. Boothroyd, is what I'd like to ask you a few questions about.**
A. Yes, sir.
**Q. In your understanding as a real estate professional, when a purchase and sale agreement is breached and the buyer does not perform, would you consider that property to be, quote, under agreement, close quote?**
A. No, I would not.
**Q. Have you seen situations in which buyers**

**have failed to close on properties that there is a P and S for?**
A. I'm aware of situations. I've never had one myself, but I know it does happen, yes.
**Q. Okay. Are you aware of any such situations when the property continued to be listed as under agreement?**
A. Not that I'm aware of. But, then again, I'd have to preface that by saying I don't track other properties like that.
**Q. Okay. If you look at the MLS and you see a property that's listed as under agreement, what does that mean to you?**
A. That tells me that there is an accepted offer. Depending on how it's noted in MLS, there could or could not be a purchase and sale signed on it yet, but it would tell me that there is a binding agreement on the property.
**Q. Okay.**
A. And someone is in the first position for the property.
**Q. And what affect, if any, would that knowledge have on your interest in pursuing that property?**

Page 186

A. I would be obligated to explain that to any buyer that I might have in order for them to decide whether they wanted to even see the property or not.
**Q. And what affect would you expect that to have on a potential buyer?**
A. I would expect that they would not want to see it.
**Q. Do you know if any effort is being undertaken by anyone to try to get that under agreement designation removed?**
A. I don't know, but not to my knowledge.
**Q. Do you have any knowledge as to why that's the case?**
A. No.
**Q. * Are you aware of any reason why the existence of this breached purchase and sale agreement would in any way impair the ability of Ms. Kunelius to sell this land?**
A. I'm not sure I understand the question.
MR. CONROY: Well, could you read it back and we'll see if you can get it on the second reading.
*(Question read.)
A. No.

Page 187

**Q. Are you aware that there has been a representation made that the water rights in this property have been appraised in the multiple millions of dollars range?**
A. I am.
**Q. Do you know whether there has been any interest on the part of any person or entity to acquire those rights?**
A. Not present, no.
**Q. Can you give us some sense based on your knowledge and experience of what sort of entity might be interested in such a property?**
A. Specifically towns might be. I suppose there is a potential that a private water company might, although there might be some issues as to access to that water by a private company for the very same reasons we're talking about, neighborhood resistance and, you know, truck traffic and things like that. I mean primary interest would likely be municipalities.
**Q. Okay. Back to this issue or this notion of neighborhood resistance and the rest. Before the town exercised its right of first refusal in this matter, did you discuss with Mrs. Kunelius the**

Page 188

**prospect that Mosaic Commons would not be able to get the approvals and the permits and the rest that they needed to make this deal work?**
A. We had discussions about that in terms of, you know, this overall process leading up to putting together a final purchase and sale agreement, and Ms. Kunelius -- I mean her attorney, Mr. Kachajian, had more conversations with her than I did. But my understanding as I sit here today is she understood that that was a possibility, however, there was a fairly high level of confidence that Cohousing would put every effort together and that they were a reputable development company and management company.
**Q. In your presence was there any discussion of the resistance that you now see retroactively occurred?**
MR. McLAUGHLIN: Objection.
MR. CONROY: That's a badly spaced question.
**Q. You know now that there was in fact neighborhood resistance to the project?**
A. Yes.
**Q. And that the Town in fact did not vote the**

Page 189

**funds subsequently to acquire the land, and you know those things, correct?**
A. I'm not sure that I'm clear on part of that question, because the Town was not looking to vote the funds to purchase the property. The funds that are in question that the Town was looking to initially raise through taxation were for just their part of the requested amount of money that they need to, as it was put several times, partner up with the Trust For Public Land.
**Q. Okay, fair enough. I'll put it a different way.**
**You're aware that there was in fact substantial resistance in the town to Mosaic Commons coming in there and putting that project together, correct?**
A. We found that out, yes.
**Q. And you anticipated that at the time of the purchase and sale agreement also, didn't you?**
A. We did. We anticipated that that was a possibility.
**Q. Okay. And there was certainly no guarantee that the project would in fact come together, correct?**

A. That's correct.
**Q. Okay. You mentioned just before I sat here that Mr. Kachajian had a, I don't know if you want to call it, a parting of the ways or some sort of a whatever, dispute with Mrs. Kunelius --**
MR. McLAUGHLIN: Objection.
**Q. -- is that fair to say?**
A. I wouldn't term it a dispute.
**Q. Disagreement of some kind?**
A. Actually I wouldn't call it a disagreement on his part. I just would term it more that she was frustrated at not getting the service that she was looking for at the time and the response from him at the time.
**Q. Okay. And my question is what was it that she was looking from him that wasn't forthcoming?**
A. She was looking for return of phone calls. She was interested in proceeding, I believe, with the lawsuit and wanted him to get in touch with Mr. McLaughlin.
**Q. So that what I'm trying to get to was the subject matter of Mrs. Kunelius's displeasure with Mr. Kachajian. As opposed to not returning calls, what substantively did she want him to be doing?**

A. She wanted him to be returning her calls to talk to her and let her know where things stood, and she also was anxious to proceed with the lawsuit.
**Q. Okay. And at what stage was this? I'm sure you've said that but I'd like to clarify it. At what stage of the scenario did that occur?**
A. You're talking time frame?
**Q. Yes.**
A. This was December 2004 into January and February of 2005.
**Q. Okay. And do you know whether Ms. Kunelius dismissed Mr. Kachajian?**
A. Not to my knowledge.
MR. CONROY: Okay. I have nothing else.
MS. ECKER: I have no questions.
MR. McLAUGHLIN: No questions. Thank you.
(Whereupon the deposition was concluded at 4:27 p.m.)

C E R T I F I C A T E

I, JAMES ARTHUR BOOTHROYD, do hereby certify that I have read the foregoing transcript of my testimony, and further certify that it is a true and accurate record of my testimony (with the exception of the corrections listed below):

Page Line Correction

Signed under the pains and penalties of perjury this day of , 2007.

JAMES ARTHUR BOOTHROYD

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK, SS.

I, MaryJo O'Connor, a Notary Public in and for the Commonwealth of Massachusetts, do hereby certify:

That JAMES ARTHUR BOOTHROYD, the witness whose testimony is hereinbefore set forth, was duly sworn by me and that such testimony is a true and accurate record of my stenotype notes taken in the foregoing matter to the best of my knowledge, skill and ability.

IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal this 12th day of June 2007.

MARYJO O'CONNOR
RPR/CSR
Notary Public

My Commission expires:
September 1, 2011

09d6607b-d22e-462c-812e-4166879ba189

# TAB 10

Volume: I
Pages: 1-279
Exhibits: 20

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11697-GAO

MARILYN KUNELIUS,
Plaintiff,

v.

TOWN OF STOW, separately, A PARTNERSHIP OF UNKNOWN NAME BETWEEN TOWN OF STOW and THE TRUST FOR PUBLIC LAND, THE TRUST FOR PUBLIC LAND, separately, and CRAIG A. MacDONNELL, in his individual capacity,
Defendants.

DEPOSITION of EDWARD R. PERRY, JR., a witness called by and on behalf of the Plaintiff, taken pursuant to Fed.R.Civ.P. 30, before Roberta J. Daniels, a Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Law Offices of Michael C. McLaughlin, One Beacon Street, Boston, Massachusetts 02108, on Monday, February 26, 2007, scheduled to commence at 10:00 A.M.

APPEARANCES

Michael C. McLaughlin, Esquire
Law offices of Michael C. McLaughlin
One Beacon Street
Boston, Massachusetts 02108
Counsel for the Plaintiff

Deborah I. Ecker, Esquire
Brody Hardoon Perkins & Kesten, LLP
One Exeter Plaza
Boston, Massachusetts 02116
Counsel for Defendant Town of Stow

Dahlia S. Fetouh, Esquire
Goodwin Procter, LLP
Exchange Place
Boston, Massachusetts 02109
Counsel for Defendant Trust for Public Land

James B. Conroy, Esquire
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd floor
Boston, Massachusetts 02108
Counsel for Craig MacDonnell

Also present:
Lucie DeBellis, Paralegal
Law Offices of Michael C. McLaughlin

Marilyn Kunelius, Plaintiff
David Norris, Husband of the plaintiff

Craig A. MacDonnell, Defendant

INDEX

| Witness | D | C | RD | RC |
|---|---|---|---|---|
| EDWARD R. PERRY, JR. | | | | |
| By Mr. McLaughlin | 5 | | 266 | |
| By Mr. Conroy | | 264 | | |

EXHIBITS

| No. | Description | Page |
|---|---|---|
| 1 | Notice of deposition | 41 |
| 2 | Beacon Villager article | 41 |
| 3 | DHCD grant application | 51 |
| 4 | Stow letter to Kunelius, 2-12-03 | 80 |
| 5 | P&S agreement | 94 |
| 6 | DHCD letter to Perry, 7-2-03 | 104 |
| 7 | Kachajian letter to Perry, 9-12-03 | 108 |
| 8 | Perry letter to Kachajian, 9-24-03 | 112 |
| 9 | MacDonnell letter to Perry, 1-5-03 | 118 |
| 10 | Diemert letter to Wrigley, 2-10-03 | 135 |
| 11 | Kachajian letter to Stow, 1-28-03 | 147 |
| 12 | Simmons letter to Stow, 2-11-03 | 156 |
| 13 | Conditions of right of first refusal | 158 |
| 14 | Stow proposed terms of agreement, 5-20-03 | 161 |
| 15 | Kachajian undated email to Perry | 179 |
| 16 | DHCD letter to Farrell, 9-23-03 | 189 |
| 17 | ZBA minutes | 213 |
| 18 | Jacobs letter to Sommerlad, 2-6-03 | 222 |
| 19 | MacDonnell memo to Stow with letter | 243 |
| 20 | Friends of Red Acre letter, 6-6-03 | 244 |

project as we had done with TPL, which we thought was still a valid --
Q For the full purchase price?
A Yes.
Q So, this didn't refer to any other proposal by TPL to reduce the purchase price by two or three or four hundred thousand dollars?
A (Indicating.)
Q You're sure? You're shaking your head no, so you have to answer.
A I don't believe that this letter is referring to a reduced purchase price.
Q And the reason you didn't is because you must have believed that TPL could still come up with the money. Is that fair to say?
MS. FETOUH: Objection.
A We still felt the deal should try to go forward with TPL exercising the right and making it go forward. I don't think that letter was meant to refer to specific dollars being available.
Q But the specific dollars as to the purchase price, it was referring to, is that fair to say, because that was the original deal?
A The original purchase price, yes.

Q Now, you asked about the letter, so I'm going to put before you --
MR. McLAUGHLIN: I have five minutes more. In five more minutes, we'll take a break.
MS. ECKER: Okay.
Q Have you had a chance to read this?
A Yes.
Q Is this the letter that you were referring to?
A I believe it is.
(WHEREUPON, Exhibit No. 7, Kachajian letter to Perry, dated September 12, 2003, marked for identification.)
Q And this is the letter that, when you responded on September 24th with what is Exhibit 5 to the complaint, you were responding to, the September 12th letter of Peter Kachajian, which is now Exhibit 7.
A I think that's correct, yes.
Q Now, you had testified earlier that you needed to look at this letter, which is now Exhibit 7, to help clarify what you perhaps meant with regard to the project as originally outlined by TPL, as referred to in Exhibit 5 of the complaint.
A Uh-huh.
Q Does this in any way help you do that?

A Sure.
Q Can you tell me how?
A First of all, I was responding to Mr. Kachajian's comments that we were a partner with TPL and that we felt that we had transferred our right of first refusal and, therefore, were not part of the deal any longer and, therefore, not a partner with them, other than fulfilling the CPC funds.
Q So, the first part of your letter, which is the September 24, 2003, letter, Exhibit 5 to the complaint, deals with the partnership allegation by Mr. Kachajian. My question to you is what part of Exhibit 7 clarifies what you meant when you referred to the Board of Selectmen still believes the project, as outlined by TPL, is in the best interest of the town and we hope that your client and TPL with the support of Friends of Red Acre will work together to make this project successful for all parties?
A It was meant that TPL acquiring the property and with their plans on how they were going to develop or dispose of segments of that.
Q Was TPL telling you they had the ability to use the line of credit at that point?
A I don't recall any of those conversations.

Q Had TPL told you they didn't have the money to make the purchase at this point of September 24, 2003?
A I believe so, yes.
Q So, if they didn't have the money and you were aware that they were telling you that they didn't have the money, why were you suggesting that TPL should continue forward with the original purchase price?
A As the town, I've never felt, as frustrating as it is, that we have the right to negotiate the purchase price. So, we weren't saying they should take a reduction. I was aware that those conversations were going on, and if that was something that Mrs. Kunelius and TPL, who now had the purchase and sale agreement, if that's what they agreed to, that was between them.
Q What makes you think that the town did not have the right to negotiate the purchase price?
A Because every time a Chapter 61 comes up, we're told we have to live by what's in the P&S.
Q Did you assign whatever rights you had to TPL, meaning the town?
MR. CONROY: Objection.
A We believed that we assigned the rights of the first refusal to TPL.
Q So, it's your testimony that TPL had no greater rights

than the Town of Stow had with regard to the purchase and sale agreement?
MR. CONROY: Objection.
MS. FETOUH: Objection.
A I'm not stating that. I'm just saying that they, the town, was out and TPL was in.
Q Well, if you would like, we can go back to the assignment, but I can assure you there's nothing in the assignment that gives any greater rights to TPL to do something that the town could otherwise not do. Does that sound reasonable to you?
MR. CONROY: Objection.
MS. FETOUH: Objection.
A I'm not going to answer that, because I'm not the legal expert on this.
Q Is it your testimony that TPL obtained, as a result of the assignment, greater rights than the rights that the Town of Stow had under Chapter 61?
MR. CONROY: Objection.
MS. FETOUH: Objection.
A It's my understanding, on a transfer like that, that TPL, in this case, had the same conditions as the purchase and sale for any other developer.
Q So, if the town could not renegotiate the purchase

price, what made you think, if you did, that TPL could?
A Nothing made me think that they could or they couldn't. The town was no longer involved in that. It was between them, the proposed new buyer and the seller.
MR. McLAUGHLIN: Okay. Why don't we take a break and have lunch. How much time would be good?
MS. ECKER: 1:30, is that all right?
MS. FETOUH: Yes, okay.
MR. McLAUGHLIN: Okay, terrific.
(Luncheon recess, 12:53 P.M.)
(After recess, 1:40 P.M.)
(All parties present)
(WHEREUPON, Exhibit No. 8, Perry letter to Kachajian, dated September 24, 2003, marked for identification.)
MR. McLAUGHLIN: Just for the record, what we did is we marked the September 24th letter, which we'll refer to as Exhibit 8.
Q So, just for the record, the references in my questions to you, sir, concerning Exhibit 5 to the complaint, we've now marked that document as Exhibit 8

most important roles we play in this process are, one, to make sure that our obligations to our partners are met and, two, raise funds necessary for the transaction from a combination of private and public sources. Do you see that?
A I do.
Q Now, when you saw the word partnership as it's written in Exhibit 9, the language that I've just read, did you not think that the requirement of putting $400,000 into a deal in order to get something back resulted in a partnership between you and TPL?
MS. ECKER: Objection.
MS. FETOUH: Objection.
MR. CONROY: Objection.
A I didn't see that as a partnership, as I interpreted Mr. Kachajian's letter back in September, in the same context.
Q And do you have an understanding of what a partnership is?
A You're probably going to prove me wrong, but I thought I did.
Q And what is it?
A A partnership, in the first sense, could be sharing of the funding, and in the sense that I thought

Mr. Kachajian was talking to was that we were co-purchasing the property with TPL, which we weren't. We had completely transferred our right or I believed we had transferred our right of first refusal and were no longer involved in the purchase and sale at the time of the transfer.
Q Well, on January 9, 2003, the date of Exhibit 9, you certainly hadn't transferred the property then, had you?
A No, and the deal ended up being structured differently by the time we did in September or whenever the transfer occurred.
Q So, is it your understanding that a partnership that Mr. Kachajian referred to was some sort of formal arrangement or agreement?
A I interpreted that as he was referring to us as having purchased the property with TPL, which we had not. When the town transferred its right, we believed that we were completely removed from the purchase of that property, other than some of the funding sources.
Q How was the $300,000 going to be provided to TPL, if you recall? Were you just going to give it to TPL by check?
A Well, the 400,000 never ended up happening because

that vote didn't carry. When we got the 300,000 vote for the slightly different deal, it would have been upon completion and sale or completion and availability of the affordable housing units. So, they would not have gotten any of the money until those units had become, I guess, saleable under the affordable housing plan.
Q And your understanding of that is what? How did you come to that understanding?
A We had agreed that we weren't going to pay for the affordable units until they were available.
Q And so if you look at the assignment, which is Exhibit 4, is there anything in the assignment that talks about when the 3- or $400,000 was to be given and what conditions under which it was going to be given?
A This was correspondence between the town and Mrs. Kunelius. So, that was not part of this discussion.
Q If you look at the third page of Exhibit 4, and these have been stapled together by the town, there is --
MS. ECKER: Or whatever copy company the town decided to --
MR. McLAUGHLIN: Pardon?
MS. ECKER: I said whatever copy

company the town decided to use.
MR. McLAUGHLIN: Well, no, some were and some weren't.
MS. ECKER: Yeah, right.
MR. McLAUGHLIN: So, I presume that they did it based upon the way they received it.
MS. ECKER: I don't know. I don't mean to make anything of it, but you keep saying that.
MR. McLAUGHLIN: Well, I'm saying it because I don't want any suggestion that somehow they were stapled together by my office.
MS. ECKER: Oh, okay.
MR. McLAUGHLIN: So, they came in this form. That's all.
MS. ECKER: Okay.
MR. McLAUGHLIN: I'm not making any accusations. It's just here they are.
Q Now, within the assignment and acceptance, there's no reference at all to when the $300,000 is going to be paid and under what circumstances, such as the affordable housing in place or anything like that, is there?
MS. ECKER: Objection.
A I believe this is just an assignment of right.

Q So, there's nothing in the assignment that even refers to any obligation to pay TPL anything.
A Correct.
Q Now, looking at, again, Exhibit 9, on the second page, the second full paragraph on the second page on Exhibit 9, on the second page of Exhibit 9, it reads: For TPL to consider a financial and contractual stake in this project, we would need to structure our involvement in a way that, A, will enhance the likelihood of significant public and private funds being available and, B, ensures a strong conservation and community outcome.
Now, my question for you is you knew that a financial and contractual stake was being considered by TPL when they wrote you this letter and said that they were considering a financial and contractual stake. What was the contractual stake that they were considering when they wrote this letter to you, if you know?
A I believe it was in the context of CPC funds being made available to help fund the project.
Q And so were they looking for a contract in regard to that commitment?
A I don't believe they were looking for a contract.

Q So, let me re-ask the question. Were they looking for a written contract with regard to the commitment of the CPC funds?
A I think they were looking for a commitment from the town.
Q And so that's the contractual stake that you think they were referring to?
A I think so, yes.
Q And that contractual stake is developed further down with the two chevrons, sideway chevrons there on the same page, listing the one hundred and three hundred thousand dollar amounts. Do you see that?
A I do.
Q And that's the money that you're referring to, what they're considering the contractual stake?
A Yes. Now, you need to remember that this is not the deal that ended up closing following town meeting.
Q I understand.
A Okay.
Q Now, looking at the next page, there's a designation, one, acceptance of the ROFR, right of first refusal. Is that what that means?
A I believe so.
Q And that Paragraph 1 says in the second sentence: TPL

MR. McLAUGHLIN: No, it says the board was in receipt of documents from a concerned citizen Linda Hathaway to substantiate the argument. It doesn't say whose argument it is.
A The board it's referring to is the Zoning Board of Appeals not the select board.
Q No, I agree.
A Okay.
Q But you were aware, you testified earlier that you were aware, that they were looking for -- TPL was intending to do variances and special permits that were not being considered by Mosaic Commons in the purchase and sale agreement, correct?
A Yes.
Q Now, my question to you is you knew that prior to undertaking the assignment TPL had already inquired of the Board of Appeals and already had strong indications that they could not do what they wanted to do.
MS. FETOUH: Objection.
MS. ECKER: Objection, asked and answered.
A You're asking it in the time frame of prior to the assignment of the right of first refusal, and I'm

telling you I have no recollection of them having a zoning board problem at that time, prior to the transfer.
Q Is today the first time that you became aware that, prior to the acceptance of the right of first refusal, TPL and the Friends of Red Acre were aware of difficulties and requirements that made it predictable that they would not get what they wanted from the town?
MS. ECKER: Objection.
MS. FETOUH: Objection.
A Yes, this is the first time I've been aware that they knew prior to the assignment that there were obstacles that would make it so it wouldn't happen.
Q Who is Donna Jacobs?
A She's a member of the Planning Board or was a member of the Planning Board probably back then.
Q And who is Ruth Kennedy?
A Also a member of the planning board.
Q And who is Karen Kelleher?
A Their administrative assistant.
Q In the documents supplied to us by the town are a series of emails from Karen Sommerlad to Donna Jacobs on or around February of 2003 concerning the

difficulty in getting any subdivision approval through the Board of Appeals. Have you ever reviewed any of those documents?
A Not to my memory, no.
Q Prior to this office receiving the documents from the Town of Stow, were you questioned concerning what documents you had relative to the Kunelius matter by any representative of the town?
A Prior to when?
Q Prior to the documents being produced in this case.
A No, because I didn't know when these were being produced.
Q Do you have documents that you keep, as personal copies, of matters that are Board of Selectmen matters?
A I have some documents, yes.
Q And how extensive is that?
A Not very, because I relied on our administrative assistant to keep all the documents and keep the minutes.
Q And did she on occasion make copies of documents for you?
A As part of the mail that was received, we would get copies, yes.

Q And do you know whether you have documents relating to TPL's problems with the Zoning Board of Appeals?
A I don't remember having any documents referring to problems with the ZBA until the summer time frame of '03.
Q So, no one from the town told you that -- in February of 2003, nobody told you as the chairman of the Board of Selectmen that TPL was seeking variances and permits and subdivision approvals for the property that they had not even acquired yet.
MS. ECKER: Objection.
MS. FETOUH: Objection.
A That's a different question than you asked before. You asked me if I knew that they had problems getting the variances or permits prior to the transfer. I did not know of any, or recall knowing of any, problems. Whether they had applied at that time or not, I don't remember.
Q But you could have known?
A We're back to the same discussion. I don't recall them having a problem. Whether they had applied, I mean, it was understood that they would have to get some permits in order to do what they wanted to do. If anybody does any project, even a 40B, they would

have to get permits.
Q Just different permits, are they not?
A Yes, significantly different, but, yes, different permits.
Q You testified earlier that you did due diligence with regard to TPL, is that correct?
A Yes.
Q Did you request that TPL copy you on documents that they were submitting to any other board of permit granting authority with the town during the pendency of your consideration of the assignment of the right of first refusal?
A We did not require them to copy us on compensations.
Q Would you expect them to have copied you if they were seeking special permits or variances that differed from the purchase and sale agreement permits or variances that were anticipated in the P&S?
MS. FETOUH: Objection.
A Not the way you worded it. We anticipated them doing a project that was different from the P&S and that, therefore, they would go through whatever process required to do that. The only time we would have expected them to copy us is if they wanted to change the contents of what we thought they were going to be

doing.
Q I'm going to ask you again to look at the exact language in Exhibit 17 as written by Katherine Desmond, the secretary of the board, and on the language that I have read, the board was in receipt of a package of several documents from concerned citizen Linda Hathaway to substantiate the argument that the Trust for Public Land and the neighborhood organization of Friends of Red Acre were aware of difficulties in requirements of subdividing the property prior to accepting the right of first refusal, does that in any way surprise you now, looking back, that TPL didn't tell you that they had, one, applied for a subdivision of the property and, two, that there were substantial difficulties and requirements and that they had found that out prior to them accepting the assignment of the right of first refusal?
A It surprises me now to find out that they said they had problems with it prior to the acceptance of the right of first refusal.
Q And why does it surprise you?
A We were under the assumption that they could make this project go forward. This might indicate they would

# TAB 11

MINIDEP by Kenson

Volume: I
Pages: 1-195
Exhibits: 16

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11697-GAO

MARILYN KUNELIUS,
Plaintiff,

v.

TOWN OF STOW, separately, A PARTNERSHIP OF UNKNOWN NAME BETWEEN TOWN OF STOW and THE TRUST FOR PUBLIC LAND, THE TRUST FOR PUBLIC LAND, separately, and CRAIG A. MacDONNELL, in his individual capacity,
Defendants.

DEPOSITION of GREGORY D. JONES, a witness called by and on behalf of the Plaintiff, taken pursuant to Fed.R.Civ.P. 30, before Roberta J. Daniels, a Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Law Offices of Michael C. McLaughlin, One Beacon Street, Boston, Massachusetts 02108, on Monday, March 5, 2007, scheduled to commence at 12:00 P.M.

INDEX

| Witness | D | C | RD | RC |
|---|---|---|---|---|
| GREGORY D. JONES | | | | |
| By Mr. McLaughlin | 6 | | | |
| By Mr. Conroy | | 187 | | |

APPEARANCES

Michael C. McLaughlin, Esquire
Law Offices of Michael C. McLaughlin
One Beacon Street
Boston, Massachusetts 02108
Counsel for the Plaintiff

Deborah I. Ecker, Esquire
Brody Hardoon Perkins & Kesten, LLP
One Exeter Plaza
Boston, Massachusetts 02116
Counsel for Defendant Town of Stow

Dahlia S. Fetouh, Esquire
Richard A. Oetheimer, Esquire
Goodwin Procter, LLP
Exchange Place
Boston, Massachusetts 02109
Counsel for Defendant The Trust for Public Land

James B. Conroy, Esquire
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd floor
Boston, Massachusetts 02108
Counsel for Defendant Craig A. MacDonnell
Also present:
Lucie DeBellis, Paralegal
Law Offices of Michael C. McLaughlin

Marilyn Kunelius, Plaintiff
David Norris, Husband of the plaintiff

Craig A. MacDonnell, Defendant

EXHIBITS

| No. | Description | Page |
|---|---|---|
| 1 | Notice of deposition | 5 |
| 2 | TPL letter to Perry, 2-11-03 | 22 |
| 3 | Stow letter to Kunelius, 2-12-03 with assignment and acceptance | 27 |
| 4 | Application for DHCD funding | 30 |
| 5 | Kunelius Property Workout | 36 |
| 6 | Diemert letter to Wrigley, 2-10-03 | 48 |
| 7 | Jones email to Wrigley | 62 |
| 8 | DRAFT conditions for transfer of right of first refusal | 103 |
| 9 | Kachajian email to Perry, 2-4-03 | 115 |
| 10 | Kachajian letter to Farrell, 9-12-03 | 131 |
| 11 | Perry letter to Kachajian, 9-24-03 | 136 |
| 12 | Stow notice of intent to DHCD, 9-23-03 | 157 |
| 13 | Kachajian undated letter to Stow | 169 |
| 14 | ZBA minutes | 171 |
| 15 | MacDonnell email to Perry/Wrigley, 4-17 | 176 |
| 16 | Friends of Red Acre letter to Stow, 6-6-03, with attachment | 178 |

A Actually, sixty-two.
Q Sixty-two. You're not aware of any other disability that would result in you not remembering these sort of things?
A No.
Q Would you say that within the scope of your involvement with the Board of Selectmen this is a fairly high priority matter that received a lot of publicity during the 2002 and 2003 period?
MR. CONROY: Objection.
A Yes.
Q And so you would expect, based upon its high profile, that these documents that I've shown you today should have been made available to you, i.e., the ones that you've said you had not seen today, given the high profile nature of the matter and, in particular, since you opposed the assignment in the first place?
MS. FETOUH: Objection.
MR. CONROY: Objection.
MS. ECKER: Objection.
A Well, the ones that were simply between an individual board member and Peter Kachajian, I would not assume that I'd be copied on those. Ones where, you know, the town is testifying that TPL is doing this as a

partner as opposed to on their own hook, I'm surprised that I wasn't, that I don't recall that.
Q Well, if Ross Perry writes saying the Board of Selectmen doesn't do this or does do this and the town is not a partner, as we have shown you in his September 24th letter --
A Yeah, I'd include that one.
Q -- do you not believe that those kind of statements relative to what the Board of Selectmen did or did not do is necessarily to be copied to you so that you can be aware of what statements are being made on behalf of the Board of Selectmen?
MS. ECKER: Objection.
MS. FETOUH: Objection.
MR. CONROY: Objection.
A Okay. When saying that I was referring to the ones that, in effect, were working papers between Peter and Ross where Ross is replying with Board of Selectmen letterhead, then, yes, that should be copied to everybody.
MR. McLAUGHLIN: Okay. I have no further questions.
MR. CONROY: Mr. Jones, my name is Jim Conroy. I represent Craig MacDonnell, and I just

have, I think, five minutes' worth of questions for you, give or take.
THE WITNESS: Okay.

CROSS-EXAMINATION

By MR. CONROY:
Q I'd like to orient you to the brief testimony you gave about a conversation, or perhaps more than one, with Mr. Boothroyd involving the possibility of buying this land. Do you remember that testimony?
A Yes.
Q First of all, sir, can you tell us whether you had more than one conversation with Mr. Boothroyd in that regard?
A I think it was one conversation. It may have been call, leave a message, get a message back, voice mail, and then actually made contact, but it was one conversation.
Q When did that occur?
A I think what spurred me to make the inquiry was being notified that I needed to be deposed. So, when was that? You know, it's within the last two or three months.
Q And what was it about receiving that notice that prompted you to make that contact with Mr. Boothroyd?

A Well, the Stow Community Housing Corporation, members of the board, had been talking about coming up with a new project. I had walked the property at 144 and -42 Red Acre Road a number of times. It occurred to me that that would be a good size piece of property for the kind of project we were talking about, and so I took a flyer.
Q What I'm trying to understand, though, is the connection between receiving the notice of deposition and having that thought. Can you explain that for me?
A I hadn't thought of the Kunelius property in probably two years.
Q Now, did you speak with Mr. Boothroyd by phone?
A Yes.
Q Was anyone else on the line as far as you know?
A No.
Q Do you have a rough estimate of how long that call took?
A Two to five minutes.
Q Now, can you describe for us as best you can the substance of that conversation?
A We greeted each other. I said, with a completely different hat, the Stow Community Housing Corporation might be interested in the property. Was it still on

the market? He said that he thought that it was. I said, "Well, do you know what the current price is?" And he said he would contact Marilyn and get back to me.
Q Anything else you recall about that conversation?
A That's about it.
Q And did you then have a subsequent conversation with him?
A No, I think I had a conversation with Deborah saying that I may have transgressed some legal courtesies or something.
Q Did you hear anything at all from Mr. McLaughlin or from anyone in his office with respect to that matter?
A I was told I was going to get a call from Mr. McLaughlin, but I never did.
Q Did you get any written communications from him or anyone associated with him?
A I think the only written communications I had were email from Deborah.
Q Did you have a price range in mind when you made that telephone call to Mr. Boothroyd?
A No, because I don't know the ability of the project that we were talking about to support anything. This was more, simply, give me a data point.

Q Now, just to make sure I understand the relation, professionally, you are not represented by Ms. Ecker, is that correct?
A Well, not that I know about. I mean, maybe town counsel represents former selectmen, maybe not. I don't know.
Q I don't want to intrude on that conversation. It's privileged.
MS. ECKER: Well, town counsel does represent former selectmen. It's obviously their select election to take the representation or not, but we do offer it, and I actually was under the assumption that we did, but he has testified otherwise.
MR. CONROY: Before I ask any questions about that, should I, in view of a potential privilege?
MS. ECKER: Yes. No, don't ask a question.
MR. CONROY: I should not, okay.
MS. ECKER: Yes.
MR. CONROY: I'll respect that.
THE WITNESS: Consider the testifier ignorant.

# TAB 12



Working With TPL: The Trust for Public Land Page 1 of 3

THE TRUST for PUBLIC LAND
ABOUT TPL

HOME > About TPL > Working With TPL

- Select State -

GO

Home
View by Region
About TPL
Mission Statement
Working With TPL
Financial Information
Frequent Questions
TPL Office Addresses
Friend and Partner Links
Boards and Advisors
Support TPL
Conservation Finance
City Parks
Land & Water
Federal Programs
Local Programs
National Programs
Newsroom
Publications
Activities
Jobs
TPL Store

Search

SUBMIT

FREE
E-Newsletters

click here

# Working With TPL

success story

Jaqueline Denise Davis Garden, NY

### Why do communities seek TPL's help?

There are many reasons to set aside open space from development: to create parks and provide recreation opportunities, guide growth, preserve local character, safeguard water supplies, protect wildlife, and conserve other important natural resources. But real estate transactions are rarely simple. TPL bridges the needs of landowners seeking to protect a special property and those of government agencies that acquire land for public benefit. Our depth of experience in land transactions, and the tools and techniques we develop and share, make TPL a powerful partner in any effort to conserve land for people.

### What kinds of land does TPL acquire?

TPL projects range from small city lots for a playground, community park, or garden to hundreds or even thousands of acres for addition to a national park or forest.

Because TPL does not own or manage land over the long term, there must be a government agency or organization willing and able to assume ownership of the land.

In some instances, TPL may help land- owners place conservation easements on their property. In such cases, the landowners continue to hold title to their property but forgo development rights.

### What services does TPL provide?

"Greenprinting" is TPL's proactive approach to conservation. Through greenprinting, TPL can:

- Help identify lands the community wants to
- protect.
- Develop an acquisition strategy for targeted lands.
- Identify sources of public and private funding for conservation.
- Independently acquire land from private owners for later purchase by public agencies.
- Mobilize public support for land protection.

http://www.tpl.org/tier2_sa.cfm?folder_id=1825 3/23/2005

**How do landowners benefit by working with TPL?**

TPL works only with willing sellers, including individuals, families, corporations, and developers. For owners of conservation lands, TPL can make commitments timed to landowners' needs, negotiate in confidence, and often provide substantial tax benefits. TPL is able to act swiftly when government agencies often cannot. TPL's government affairs and fundraising staff often can help assemble funding to make a conservation transaction work.

**How does TPL help public agencies?**

TPL's goal is to enable public agencies to acquire important lands at a fair value. TPL works closely with the agencies' standards and processes for establishing an independent fair market value for targeted properties.

TPL acquires land in its own name, assuming all the risks of ownership as well as the costs associated with buying, holding, and selling land. We do not operate as a broker or an agent of governmental agencies, but rather as a principal and risk-taker, supporting the agencies' independent decision-making process.

**What are the advantages of working with TPL?**

As an independent nonprofit, TPL can work in the marketplace in ways that public agencies often cannot. TPL specializes in problem- solving, and can lend real estate expertise to complex land transactions.

- **Buying time** – Timing is critical in today's real estate markets, but public agencies may not have the capacity or budget to move quickly to acquire land when it becomes available. Using our private capital, TPL can bridge the gap to secure and hold vital lands until the public acquisition process can gear up.
- **Solving acquisition challenges**– TPL brings specialized skills to complex real estate transactions. Our financial and legal experts are experienced in resolving issues over title, assembling properties from multiple owners for a single transaction to the agency, and handling special needs such as in cases of environmental contamination.
- **Seizing opportunities**– TPL has the flexibility to respond to special conservation opportunities such as the sale of distressed properties. We often work with bankruptcy trustees, foreclosing lenders, and state and federal regulators.
- **Making the pieces fit**– TPL can tailor acquisitions for public agencies and simplify complex transactions, such as when desired land is part of a larger parcel or must be acquired in phases. Timing transactions to

meet landowner needs and agency budgets is a specialty.

- **Training and tools–** TPL develops and shares proven land protection techniques. We offer training and consultation to help governments integrate parks and open space protection with other civic goals, such as environmental protection, transportation, and business and community development.
- **Leveraging funds–** In addition to identifying and assembling private and public funding sources for land protection, TPL's financial experts and partners work to craft local bond measures, conduct polling, and run successful campaigns to fund open space and parks.

**How does TPL support itself?**

TPL is a 501(c)(3) tax-exempt organization. Much of TPL's financial support comes from charitable contributions from individuals, corporations, and foundations. A major source of support comes from landowners with whom we work. TPL may seek a fee from public agencies to help defray transaction costs. TPL uses the support it receives from landowners and through general fundraising to acquire more land, meet operating expenses, and fund our education and outreach programs.

The *Chronicle of Philanthropy, Forbes, Money*, and *The Wall Street Journal's SmartMoney* magazine have given TPL high ratings for a charitable institution for keeping fundraising and operation costs low.

© 2005 The Trust for Public Land. All Rights Reserved.
Privacy Policy

# TAB 13

THE TRUST FOR PUBLIC LAND
PROJECT FACT SHEET
(version 2000-1)

**PART I: PROJECT OVERVIEW**

1. PROJECT NAME: Stow - Kunelius Farm

2. DATE: January 30, 2003

3. CITY, COUNTY, STATE: Stow, Middlesex County, Massachusetts

4. TPL REGION: NERO

5. PROJECT MANAGER: Craig MacDonnell

6. PROJECT NUMBER:

7. ACREAGE, LOCATION AND ADJACENT PROPERTIES: 50.67 +/- acres, adjacent to Red Acre Woods conservation area (196 acres) owned by the Stow Conservation Trust, and the Captain Sargeant conservation area (153 acres) owned by he Town of Stow Conservation Commission.

8. PROGRAM DESCRIPTION: This the latest in NERO's Community Partnership Program

9. ACTION REQUESTED AND PRIOR APPROVAL HISTORY: We are seeking authority to:

(1) accept an assignment of the Town of Stow's right of first refusal to purchase the property;
(2) sign a $400,000 note payable to the seller;
(3) acquire the property for $1,116,900 with $400,000 in seller financing; and
(4) convey 45+/- acres to the Town and two other parcels in private sales.

10. SUMMARY OF TRANSACTION:

This project presents the opportunity to protect 50 acres of wetlands and uplands situated above Stow's largest aquifer and to preserve an existing horse farm in lieu of a 30-unit co-housing facility. NERO will divide the property into 3 parcels: the 45+/- acres that will be sold to the Town and two lots with existing

TPL-KUN 01124

houses that will be sold privately. The houses will be sold with affordability restrictions.

**Project Facts**

- Size: 50 +/- acres
- Acquisition Price: $1,116,900
- Deposits of $22,000 secure the property until 9/26/03
- $694,900 due at closing 9/26/03, plus $400,000 note and mortgage
- Fundraising: $400,000 identified; $200,000 pledged;
- NERO must accept ROFR on or before 2/13/03 and exercise by that date
- Gross Support: Approximately $183,100 excess of asset sales and fundraising over acquisition cost
- Net Support: $93,881
- Town Vote: Stow will conduct its regular spring Town Meeting and will vote whether to invest (1) $300,000 from its pre-existing Community Preservation Fund to purchase a portion (45+/- acres) of the property; and (2) $100,000 from the same fund to purchase affordability restrictions over the two parcels to be sold privately.
- Remainder of funding as described above is dependent upon (1) private sales of the two houses; and (2) private philanthropy
- Due diligence will include (1)determining the environmental condition of the property, (2) inspecting the houses; and (3) researching the ease of subdividing the property as required.
- TPL's mission is served by virtue of the transaction assisting the Town in (1) connecting two large conservation areas on either side of the Kunelius Farm; (2) protecting Stow's largest aquifer, which lies beneath the surface of the area to be conserved; (3) creating two affordable houses in an otherwise very expensive rural suburb of Boston; and (4) assisting in the continued good work of a non-profit organization dedicated to horse rehabilitation, Eye of the Storm Equine Rescue.

Below is a table summarizing the Sources of Funds for the project:

| Sources of Funds | Amount | Status | Availability | Interest |
|---|---|---|---|---|
| CPA Affordable Housing | $100,000 | Vote at Spring Town Meeting | Before 9/03 closing | Restrictions on two residences |
| CPA Open Space | $300,000 | Vote at Spring Town Meeting | Before 9/03 closing | Town fee open space |
| Private Sale of Residence | $200,000 | Market asap | Affordable units sell fast | Modest residence |
| Eye of the Storm | $300,000 | Under negotiation | As soon as non-profit can secure funds | Fee to barn and residence |
| Stow Conservation Trust | $200,000 | $100,000 pledged; balance under consideration | Spring 2003 | Trail hook-up with adjacent land owned by Trust |
| Other fundraising | $200,000 | $100,000 pledged | Spring campaign | None |
| **TOTAL** | $1,300,000 | | | |

11. GROSS SUPPORT/OTHER SUPPORT: $183,000

12. NET SUPPORT: $93,881

13. CAPITAL REQUIREMENTS: N/A

If more than $100,000 in capital is required or if capital will be outstanding for more than one year utilizing TPL national funds or outside commercial sources, the CAPITAL ALLOCATION CHECKLIST (Addendum 1 to this Fact Sheet) must be completed and attached. Additionally, if capital will be outstanding for more than one year, a discounted cash flow analysis is required.

14. HOLDING PERIOD: None, back to back

15. PROGRAMMATIC VALUE ASSESSMENT:
In the view of the Regional Manager, this projects ranks as follows:

__ Level 1: Protects a significant land resource and contributes to TPL's mission.
__ Level 2: Level 1 plus high priority for local constituency
X_ Level 3: Level 2 plus furthers TPL's regional strategic objectives
__ Level 4: Level 1 plus high priority for broad regional or

national constituency
__ Level 5: Level 4 plus furthers TPL's national strategic objective

16. SUCCESS AND RISK ANALYSIS

All things considered, the Regional Manager ranks this a
__ High __ Medium _X_ Low risk project.

Discuss the chances for success, the risk factors and back-up strategies:

1. Town Meeting Risk: The Town must vote at its regular spring Town Meeting to acquire the 45+/- acres for $300,000 and to purchase the affordability restrictions for $100,000 (all to be accomplished using existing Community Preservation Funds rather than new taxes). This risk is made somewhat greater than it otherwise might be as a result of the recent failure of the Town to vote to borrow the funds for this project. In January, at its Special Town Meeting, Stow residents voted to spend these funds, but the measure was defeated by an unsuccessful ballot vote that followed. Mitigating this risk, however, are the following factors:
   a. Use of existing funds: The new proposal is to expend existing Community Preservation Funds, which would not require any new taxes.
   b. Town support: This risk is further mitigated by our reasonable confidence that the Community Preservation Committee, the Board of Selectmen and the Finance Committee will support the use of such dedicated funds.
   c. No referendum required: Spending these funds is authorized by Town Meeting, which has previously approved this project; no referendum is required.
   d. Fallback: Our fallback strategy will be to backfill with greater fundraising efforts and more private money. For example, if the Town does not invest in the affordability restrictions, the houses could be sold without such restrictions, thus increasing their value and potential return to NERO.

2. Accepting the ROFR Before the Town Vote. The second risk presented by this project is that NERO must agree to accept the Town of Stow's right of first refusal before it is possible for us to fully assess the likelihood that the Town will vote at it's spring 2003 Town Meeting

to spend significant sums on this project. Mitigating this risk are the following factors:

a. Town support is expected for the reasons described directly above (1.a-c.)
b. Liquidated damages fallback: The contract with the seller limits the damages upon default to the deposits under the contract, which would be no more than $22,000. TPL will receive a donation for this amount.

3. Fundraising Risk: The third risk is the large private fundraising requirement. Assuming the investment of $400,00 of Town funds and sale of one of the houses for $200,000, the fundraising objective is $700,000 (which includes assisting the Eye of the Storm raise $300,00 it needs to buy the other house and barn. Mitigating this risk are the following factors:
   a. Progress: Coordinating with NERO's development staff, the local advocacy group (the Friends of Red Acre) has begun the fundraising process, and has made substantial progress, including actual pledges from the Stow Conservation Trust and the Red Acre Foundation for $100,000 each, as well as additional individual pledges totaling $21,000. The expectation is that each of these organizations will deliver closer to $200,000 based on discussions with trustees and other supporters.
   b. Liquidated damages fallback, as above.

4. Subdivision Risk: The fourth risk presented by this project is the subdivision of the property required for NERO to sell separate parcels to the Town and the Eye of the Storm (the sale of the other house is not problematic because it is situated on a separate lot). As currently divided, the property consists of two parcels, 142 and 144 Red Acre Road, the former being the location of the so-called main house; the latter being the location of the so-called caretaker's house, barn paddock and 42+/- acres of adjacent wetlands and uplands. NERO contemplates dividing 144 Red Acre Road into two parcels: one for sale to the Town; and one for private sale. We have been advised by that this subdivision will require a dimensional variance to account for the hammerhead configuration of the proposed lot and a frontage variance to account for there being less than the required 150' frontage on Red Acre Road. Mitigating this risk are the following factors:

a. Local support: We have sought the advice of the Town Planner and a member of the Zoning Board, both of whom have assured us that the variances will be granted.
b. Town Vote Impact: If the Town votes to spend the money on the project, including $100,000 for the creation of affordable housing, that Town will be respected by the Zoning Board of Appeal, which should be moved to grant the variances.
c. Sale/Lease Fallback: In the event the variances are not granted we would seek to have the two houses sold together as an existing nonconforming lot separate from the conservation land. Such a buyer could lease the caretaker's house and barn to Eye of the Storm. Town might be interested in purchasing an affordability restriction on the rental unit.
d. Liquidated damages fallback, as above.

5. Litigation Risk: The landowner is upset by the possibility that the Town may assign the ROFR to TPL. She sees this deal as essential for her retirement. On the phone, she recently said that she would "sue the Town and others if anybody defaults and I lose my buyer." She has told us not to call her and to speak only to her attorney, who has not returned our calls. Her attorney may have discussed this subject with the Town Manager recently, as he recently has asked whether TPL would be willing to sign an indemnification agreement. This risk is mitigated by the following factors:
   a. Liquidated damages: The seller's contract is clear that the only damages recoverable upon default are the deposits, which at most would be $22,000.
   b. Buyer won't go anywhere: Even if NERO defaults, it is likely that the buyer, a national development company, would reappear.
   c. Lawsuit would be easily defended: In our view, a Massachusetts court would consider this dispute on a motion for summary judgment after very limited discovery. Likelihood of prevailing is very high because the contract is so clear.

6. Private Sale: The transaction structure anticipates the sale of one existing residence as an "affordable" unit to an as yet unidentified private buyer. While private sales when buyers are not identified usually raise some questions for concern, in this case because of the scarcity of affordable houses in Stow and the attractive nature of property, NERO is confident that

many potential buyers will materialize.

**PART II: TRANSACTION DETAILS**

17. ACQUISITION FACTS:

A. Name and address of seller: Marilyn Kunelius, 142-144 Red Acre Road, Stow, Middlesex County, Massachusetts

B. Acquisition price and terms of payment: $1,116,900 purchase price; $10,000 down; earnest money payments of $12,000 between now and August 2003; $694,900 due at closing on 9/26/03, at which time buyer must sign a note and a mortgage for $400,000 (7% APR, $2,333 per month principal payments over following 24 months).

C. Type and current status of acquisition contract: P&S between landowner and developer dated October 2002.

D. Deadline for exercise or commitment: NERO must accept Town's ROFR on or before 2/14/03 and exercise by that date.

E. Estimated acquisition closing date: 9/26/03

18. DISPOSITION FACTS:

A. Name and Address of Buyer: Town of Stow, Massachusetts (45+/- acres) (Town Parcel); Eye of the Storm Equine Rescue, Stow, Massachusetts (5 acres, house and barn) (House and Barn Parcel); buyer of the other residence (House Parcel) has not been identified.

B. Disposition price and terms: Town will purchase 45+/- acre Town Parcel for $300,000 if the May Town Meeting authorizes the purchase. NERO anticipates selling House Parcel 142 Red Acre Road, a separate lot and single-family house, for approximately $200,000, a price we are informed would be considered affordable by the Stow Housing Authority. If authorized by Town Meeting, NERO would also receive a payment of $50,000 from the Town in exchange for the imposition of an affordability restriction on this parcel. NERO also intends to sell the House and Barn Parcel to Eye of the Storm for approximately $300,000. No contract for this parcel has been negotiated yet. NERO would receive a second $50,000 payment from the Town when an affordability restriction is imposed on this second house.

C. Type and current status of disposition contracts: To be

TPL-KUN 01130

negotiated.

D. FMV; status of appraisal and agency approval: (1) Town Parcel: As for the Town's 45+/- acre parcel, the Town has not yet voted, but will not require an appraisal for the $300,000 acquisition. (2) House and Barn Parcel: This five-acre parcel will be sold to Eye of the Storm for approximately $300,000 and will be subject to an affordability restriction to be purchased by the Town for $50,000. Based on a market review performed by a local real estate broker, the value of this parcel and buildings is approximately $450,000. (3) Single House Parcel: This one-acre parcel containing the main house will be sold to a buyer qualified by the Town as deserving of the opportunity to purchase a property subject to an affordability restriction. The anticipated sales price will be approximately $200,000. Based on a market review performed by a local broker, the value of this property is $300,000.

E. Estimated disposition closing date: The sale of the Town Parcel would be simultaneous with or shortly after the 9/26/03 closing. We anticipate that the other parcels will be marketed during the spring and summer and will be ready for conveyance in September 2003

F. Source of Agency funds: In May, the Town will vote whether (1) to spend $300,000 of funds set aside in the Community Preservation Fund; (2) to bond the $300,000 using funds set aside in the said fund as a source of bond repayments; and (3) to spend $100,000 of said funds to purchase affordability restrictions on the House Parcel and the House and Barn Parcel.

G. Public agency's intended use of property: Conservation and passive recreation (connection to adjacent conserved lands) and to protect the largest aquifer in the area, which sits beneath the property.

H. Status of agency approval of title, survey and environmental condition: This review has not occurred. The due diligence period contemplated under the contract expired before NERO was asked to become involved. We are attempting to work with the landowner and her attorney to gain access to the property for building and environmental inspections and will undertake a title examination. If we are dissatisfied with these examinations, our only option is not to complete the purchase, in which case our deposits will be forfeited as

Seller's sole remedy.

19. DESCRIBE ANY SIGNIFICANT TITLE, SUBDIVISION, SURVEY OR ACCESS PROBLEMS: As discussed in Section 16 above, NERO must subdivide the property, which will require two variances.

20. STATUS OF DUE DILIGENCE UNDER TPL'S POLICY ON ENVIRONMENTAL HAZARDS:

A. Has a professional assessment been performed and are we satisfied with the results? We have not been on the property yet. NERO will attempt to conduct title research, house inspections, and an environmental review. See Section 18.H, above.

B. If an assessment will not be performed, has the project manager completed an environmental checklist and the regional manager granted a waiver of an outside assessment under exceptions for back-to-back closings, "exceptionally clean" properties or conservation easements? N/A.

C. If neither A nor B has occurred, please explain plan of action prior to acquisition:

21. DESCRIBE ANY MANAGEMENT OR INSURANCE ISSUES DUE TO IMPROVEMENTS OR TENANTS:
**Insurance:** Seller is required under the P&S to insure the Property until the time of closing. NERO will need to purchase insurance thereafter.

22. DATE AND RESULT OF SITE INSPECTION: None yet.

## PART III: RESOURCE, DEVELOPMENT, MARKETING AND ARCHIVAL INFORMATION

23. DESCRIBE THE NATURAL AND OTHER RESOURCES UNIQUE TO THIS PROPERTY:

The Kunelius Farm sits atop Stow's largest aquifer and constitutes a natural linkage between the Stow Conservation Trust's Red Acre Woods conservation area (196 acres) and the Town's Captain Sargeant Conservation Area (153 acres). It is a forested area of wetlands (including several vernal pools, one of which has been certified by the conservation commission) and uplands. There is abundant wildlife on the property, including deer, coyotes and wild turkeys.

24. KEY WORDS:

SELECT THE WORDS WHICH APPLY TO THIS PROJECT

| | |
|---|---|
| ____ URBAN | X HISTORIC |
| X SUBURBAN | X CULTURAL SIGNIFICANCE |
| ____ RURAL | X BUILDING |
| ____ WILDERNESS | X FOREST |
| ____ PARK | ____ MINE/QUARRY SITE |
| ____ GARDEN | ____ MOUNTAINOUS |
| X TRAIL | X RECREATIONAL |
| ____ RAIL-TRAIL | X SCENIC |
| ____ OCEAN | ____ ARCHEOLOGICAL SITE |
| ____ LAKE | X THREATENED OR ENDANGERED SPECIES |
| ____ RIVER | X WILDLIFE CORRIDOR |
| ____ WATERFRONT | ____ TRANSPORTATION CORRIDOR |
| X WETLAND | ____ OTHER: |

25. GEOGRAPHIC STATUS OF PROJECT:

Categorize the project in one of the following categories:

__. U1: Urban, Underserved
__. U2: Urban, Central
__. U3: Urban, Peripheral
X. U4: Urban, Peripheral/Other
__. R1: Rural, Modified
__. R2: Rural, Remote
__. G: General

26. SOUND BITE: The conservation of the Kunelius Farm brings together three strong community objectives: protection of a key open space and water supply parcel between two existing conservation tracts; creation of affordable housing for the residents of Stow, and the support of a local horse rehabilitation non-profit organization, none of which could have or would have happened without the intervention of the Trust for Public Land.

27. ROLE OF COOPERATING ORGANIZATIONS, PARTNERS AND VOLUNTEERS (including Board and advisory committee members): NERO is partnering with Stow Conservation Trust, the Town of Stow, Red Acre Foundation (NEAC member Jerry Bird is a trustee) and the Friends of Red Acre, a local advocacy group.

28. FUNDRAISING COMPONENT/STRATEGY:

X Yes Does this project require fundraising?

X Yes Does this project offer opportunities to fundraise from individuals, corporations or foundations?

[if yes, complete A. and B. below]

A. If the project offers fundraising opportunities, and we intend to fundraise, please describe our plan and how it relates to regional fundraising strategy: Fundraising is a central strategy for this project. Thankfully, the project has n excellent head start, owing in large part to the participation of one member of the local advocacy group, the Fiends of Red Acre, Peter Christianson. Peter is a professional fundraiser for Lahey Clinic in Boston, and has been hard at work on this project for several months. He has identified a number of foundations having open space, affordable housing and equine affinities, and has already received pledges for over $200,000. Peter will work closely with the Project Manager and NERO's development staff in pursuing the required funds for this project.

B. If the project offers fundraising opportunities, and we **don't** intend to fundraise, please describe the reasoning, in the context of regional fundraising strategy:

29. SOURCE OF PROJECT:

A. Name and address of person/s who were responsible for bringing the project to TPL? NEAC member Jerry Bird and Stow Conservation Trust member Bob Wilber (who works for MA Audubon doing land protection).

B. Date of contact with TPL: January 2003

C. How did they hear about TPL?

__ Word of mouth. If so, who referred them?

__ Publication. If so, give the name and date of the publication:

__ Advertising. If so, give the name and date of the advertising source:

__ Direct Mail.

__ Events/conferences. If so, give name and date of event/conference:

X_ Other. Please specify: NEAC connection: Jerry Bird is also on the board of the Red Acre Foundation, which played a central role in conserving an adjacent parcel.

30. PUBLIC RELATIONS AND MARKETING:

A. What are our plans for publicizing this project prior to closing? NERO will run an extensive local campaign in advance of Town Meeting in May. This campaign will include direct mail efforts and paid and free press. We anticipate that the project will enjoy editorial support and received the endorsement of all relevant local boards and commissions.

B. Describe the plans for post-closing publicity:

X Yes Press release
X Yes Post-closing event
X Yes Signage recognizing TPL
Yes Other:

Please explain negative responses above:

C. How can we use this project to build towards other projects and enhance our relationships with landowners and public agencies?

This project (1) enhances NERO's ability to do future project with the Town of Stow, which recently has passed the Community Preservation Act; and (2) improves our working relationships with our partners (Stow Conservation Trust, the Red Acre Foundation, and MA Audubon).

31. OTHER CONSIDERATIONS (OPTIONAL):

32. INNOVATIVE ASPECTS OF THIS PROJECT APPLICABLE TO OTHER PROJECTS:

**PART IV: FINANCIAL DETAIL**

| | | |
|---|---|---|
| <u>Fair Market Value</u> | | 1,116,900 |
| Less: | Land value gift to agency | 0 |
| | Proposed Sale Price | 900,000 |
| Less: | Price Paid by TPL | 1,116,900 |
| Plus: | Private fundraising | 400,000 |
| | Estimated Gross Support | **183,000** |
| Less: | Anticipated Project Costs | |
| | TPL/outside interest cost | |
| | Interest rate premium (if any) | |
| | Interest on $400,000 note | 40,000 |
| | Property Taxes | 1,600 |
| | Outside Services *(Environmental, Appraisal, Legal, etc.)* | 25,000 |
| | Brokerage | |
| | Travel | 500 |
| | Staff Time (Minimum of $1,000) *(Project, legal and support staff)* | 10,000 |
| | Other (Operation and Maintenance) | 5,000 |
| | **Subtotal** | **82,100** |
| | Nat. Cost Alloc. (50% staff time) | 5,000 |
| | Total Costs | **87,100** |
| **<u>Anticipated Net Support</u>** | | **96,000** |

TPL-KUN 01136

33. AMOUNT INVESTED TO DATE (including staff time): 0.

34. BUDGETED AND FORECAST GROSS SUPPORT:

REVENUE FROM THIS PROJECT [ ] IS [X] IS NOT IN THE BUDGET FOR THE CURRENT YEAR

Budget: $183,100 prob. 60% Timing 85% = $ 93,881 in Q 3

Forecast from latest Rev Track:

$______ prob. __% Timing __% = $ ________ in Q__

**PART V: TEXT OF REQUESTED CORPORATE RESOLUTION**

"RESOLVED, that the Project Review Committee of the Board of Directors of The Trust for Public Land hereby authorizes (i) acceptance of an assignment of the Town of Stow's right of first refusal to purchase 50+/- acres of real property located at 142-144 Red Acre Road in Stow, Massachusetts; (ii) acquisition of 50± acres of real property located at 142-144 Red Acre Road in Stow, Massachusetts from Marilyn Kunelius; (iii) conveyance of a portion of the property located at 144 Red Acre Road to the Town of Stow, Massachusetts; (iv) conveyance of a portion of the property located at 142 Red Acre Road containing a single family residence to a private buyer; and (v) conveyance of a portion of the property located at 144 Red Acre Road containing a single family residence and a barn to a private buyer."

ATTACHMENTS

Attach: 1. Area map

2. Photographs

PROJECT MANAGER [signature] Signature Craig MacDonnell

THE REGIONAL MANAGER APPROVES AND RECOMMENDS APPROVAL OF THIS

PROJECT. IF AN OUTSIDE ENVIRONMENTAL ASSESSMENT IS NOT BEING CONDUCTED, REGIONAL MANAGER CONFIRMS THAT HE/SHE HAS DECIDED TO WAIVE THE ASSESSMENT UNDER TPL'S ENVIRONMENTAL LIABILITY PROCEDURES.

Regional Mgr. ______________________________
Signature Whitney Hatch

THE STAFF ATTORNEY ASSIGNED TO THIS PROJECT HAS READ THIS FACT SHEET AND CONFIRMS THAT IT IDENTIFIES ALL KNOWN MATERIAL LEGAL RISKS.

Staff Atty. Dorothy Nelson Stookey
Signature Dorothy Nelson Stookey

J:_\NATL\FACTSHT2000-1.doc

Valerie Talmage
Valerie Talmage
Director of Projects

# TAB 14

STANDARD FORM
PURCHASE AND SALE AGREEMENT

From the Office of:
Atty. Peter A. Kachajian, Jr.
292 Main Street
Northborough, MA 01532
(508) 393-6278

1. PARTIES
*(fill in)*

This ________ day of October, 2002
**Marilyn Kunelius of 142 and 144 Red Acres Road, Stow, MA**
hereinafter called the **SELLER**, agrees to SELL and

**Cohousing Resources, LLC, with an address of 9813 NE Murden Cove Road, Brainbridge Islande, WA 98110**
hereinafter called the **BUYER** or PURCHASER, agrees to BUY, upon the terms hereinafter set forth, the following described premises: **142 and 144 Red Acres Road, Stow, MA**

2. DESCRIPTION
*(fill in and include title reference)*

The land with the buildings and improvements thereon known and located at **142 and 144 Red Acres Road, Stow, MA**. Being more particularly described in the Middlesex Registry of Deeds Book 15412; Page 316; Book 26230; Page 255 (see exhibits).

3. BUILDINGS, STRUCTURES, IMPROVEMENTS, FIXTURES
*(fill in or delete)*

Included in the sale as a part of said premises are 50.67 acres of land with a home, caretakers residence, barn and the buildings, structures, and improvements now thereon, and the fixtures belonging to the SELLER and used in connection therewith including, if any, all wall-to-wall carpeting, drapery rods, automatic garage door openers, venetian blinds, window shades, screens, screen doors, storm windows and doors, awnings, shutters, furnaces, heaters, heating plumbing and bathroom fixtures, garbage disposers, electric and other lighting fixtures, mantels, outside television antennas, fences, gates, trees, shrubs, plants, ONLY IF BUILT IN, refrigerators, dishwashers, washing machines and dryers; and all buildings and improvements thereon are sold in **"as is" condition.**

4. TITLE DEED
*(fill in)*
**Include here by specific reference any restrictions, easements, rights and obligations in party walls not included in (b), leases, municipal and other liens, other encumbrances, and make provision to protect SELLER against BUYER'S breach of SELLER'S covenants in leases, where necessary.*

Said premises are to be conveyed by a good and sufficient quitclaim deed running to the BUYER, or to the nominee designated by the BUYER by written notice to the SELLER at least seven (7) days before the deed is to be delivered as herein provided, and said deed shall convey a good and clear record and marketable title thereto, free from encumbrances, except

*(a)* Provisions of existing building and zoning laws;
*(b)* Such taxes for the then current taxable year are not due and payable on the date of the delivery of such deed;
*(c)* Any liens for municipal betterments assessed after the date of this agreement;
*(d)* Easements, restrictions and reservations of record, if any, so long as the same do not prohibit or materially interfere with the current use of said premises
*(e)*

5. PLANS

If said deed refers to a plan necessary to be recorded therewith, the SELLER shall deliver such plan with the deed in form adequate for recording or registration.

6. REGISTERED TITLE

In addition to the forgoing, if the title to said premises is registered, said deed shall be in form sufficient to entitle the BUYER to a Certificate of Title of said premises, and the SELLER shall deliver with said deed all instruments, if any, necessary to enable the BUYER to obtain such Certificate of Title.

COPYRIGHT © 1979, 1984, 1986, 1987, 1988, 1991
GREATER BOSTON REAL ESTATE BOARD
Rev. 1999 Form No RA151

All rights reserved. This form may not be copied or reproduced in whole or in part in any manner whatsoever without the prior express written consent of the Greater Boston Real Estate Board. CWV 5.0

7. PURCHASE PRICE *(fill in): space is allowed to write out the amounts if desired*

The agreed purchase price for said premises is $1,116,900.00 ONE MILLION ONE HUNDRED SIXTEEN THOUSAND NINE HUNDRED and 00/100s.......dollars, of which

| | |
|---|---|
| $ 0.00 | have been paid as a deposit this day and |
| $ 0.00 | have been paid at the time of the offer to purchase |
| $ 716,900.00 | (less deposits paid) are to be paid at the time of delivery of the deed in cash, or by certified cashier's, treasurer's or bank check, or conveyancing attorney's check.** |
| $ 400,000.00 | promissory note secured by a mortgage* |
| $ $1,116,900.00 | TOTAL |

** **See Paragraph #31 for further terms and provisions**
* **See paragraph #30 for further terms and provisions**

8. TIME FOR PERFORMANCE; DELIVERY OF DEED *(fill in)*

Such deed is to be delivered at **1:00 o'clock P.M.** on or before the **26th** day of **September, 2003**, at the Office of the Conveyancing Attorney unless otherwise agreed upon in writing provided notice of same is given to Buyer's and Seller's counsel. **However, provided the Chap. 40B approval process is proceeding forward, BUYER may have. up to 12 months extension** It is agreed that time is of the essence of this agreement.

9. POSSESSION and CONDITIONS of PREMISES. *(attach a list of exceptions, if any)*

Full possession of said premises free of all tenants and occupants, except as herein provided, is to be delivered at the time of the delivery of the deed, said premises to be then (a) in the same condition as they now are, reasonable use and wear thereof excepted and (b) not in violation of said building and zoning laws, and (c) in compliance with provisions of any instrument referred to in clause 4 hereof. The BUYER shall be entitled to an inspection of said premises prior to the delivery of the deed in order to determine whether the condition thereof complies with the terms of this clause.

10. EXTENSION TO PERFECT TITLE OR MAKE PREMISES CONFORM *(Change period of time if desired.)*

If the SELLER shall be unable to give title or to make conveyance, or to deliver possession of the premises, all as herein stipulated, or if at the time of delivery of the deed the premises do not conform with the provisions hereof, the SELLER shall use reasonable efforts to remove any defects in title, or to deliver possession as provided herein, or to make the said premises conform to the provisions hereof, as the case may be, in which event the time for performance hereof shall be extended for a period of **thirty (30) days.***
* **Contemplated herein is the Town of Stow exercising its right of first refusal pursuant to M.G.L c. 61.**

11. FAILURE TO PERFECT TITLE OR MAKE PREMISES CONFORM, etc.

If at the expiration of the extended time the SELLER shall have failed so to remove any defects in title, deliver possession, or make the premises conform, as the case may be, all as herein agreed, or if at any time during the period of this agreement or any extension thereof, the holder of a mortgage on said premises shall refuse to permit the insurance proceeds, if any, to be used for such purposes, then any payments made under this agreement shall be forthwith refunded and all other obligations of the parties hereto shall cease and this agreement shall be void without recourse to the parties hereto.

12. BUYER'S ELECTION TO ACCEPT TITLE

The BUYER shall have the election, at either the original or any extended time for performance, to accept such title as the SELLER can deliver to the said premises in their then condition and to pay therefor the purchase price without deduction, in which case the SELLER shall convey such title, except that in the event of such conveyance in accord with the provisions of this clause, if the said premises shall have been damaged by fire or casualty insured against, then the SELLER shall, unless the SELLER has previously restored the premises to their former condition, either

(a) pay over or assign to the BUYER, on delivery of the deed, all amounts recovered or recoverable on account of such insurance, less any amounts reasonably expended by the SELLER for any partial restoration, or

(b) if a holder of a mortgage on said premises shall not permit the insurance proceeds or a part thereof to be used to restore the said premises to their former condition or to be so paid over or assigned, give to the BUYER a credit against the purchase price, on delivery of the deed, equal to said amounts so recovered or recoverable and retained by the holder of the said mortgage less any amounts reasonably expended by the SELLER for any partial restoration.

13. ACCEPTANCE OF DEED

The acceptance of a deed by the BUYER or his nominee as the case may be, shall be deemed to be a full performance and discharge of every agreement and obligation herein contained or expressed, except such as are, by the terms hereof, to be performed after the delivery of said deed.

14. USE OF MONEY TO CLEAR TITLE

To enable the SELLER to make conveyance as herein provided, the SELLER may, at the time of delivery of the deed, use the purchase money or any portion thereof to clear the title of any or all encumbrances or interests, provided that all instruments so procured are recorded in a manner consistent with customary conveyancing practices.

15. INSURANCE
*Insert amount (list additional types of insurance and amounts as agreed)*

Until the delivery of the deed, the SELLER shall maintain insurance on said premises as follows:

| *Type of Insurance* | *Amount of Coverage* |
|---|---|
| (a) Fire | **Risk to remain with SELLER** |
| (b) Extended Coverage | **As is presently insured** |
| (c) | |

16. ADJUSTMENTS
*(list operating expenses, if any, or attach schedule)*

Water and sewer use charges and taxes for the then current year shall be apportioned and fuel value shall be adjusted as of the day of performance of this agreement and the net amount thereof shall be added to or deducted from, as the case may be, the purchase price payable by the BUYER at the time of delivery of the deed.

17. ADJUSTMENT OF UNASSESSED AND ABATED TAXES

If the amount of said taxes is not known at the time of the delivery of the deed, they shall be apportioned on the basis of the taxes assessed for the preceding year, with a reapportionment as soon as the new tax rate and valuation can be ascertained; and, if the taxes which are to be apportioned shall thereafter be reduced by abatement, the amount of the abatement, less the reasonable cost of obtaining the same, shall apportioned between the parties, provided that neither party shall be obligated to institute or prosecute proceedings for an abatement unless herein otherwise agreed.

18. BROKER'S FEE
*(fill in fee with dollar amount or percentage; also name of Broker(s))*

A broker's fee for professional service per listing agreement is due from the SELLER to **Century 21 Classic Properties**, the broker herein, but only if, as when the SELLER receives the full purchase price pursuant to this Agreement and the BUYER accepts and records the SELLER'S deed and not otherwise.

19. BROKER(S) WARRANTY
*(fill in name)*

The Broker(s) named herein **Century 21 Classic Properties** warrant(s) that the Broker(s) is(are) duly licensed as such by the Commonwealth of Massachusetts.

20. DEPOSIT
*(fill in, or delete reference to broker(s) if SELLER holds deposit)*

All deposits made hereunder shall be held by **Law Offices of Peter A. Kachajian, Jr.** subject to the terms of this agreement and shall be duly accounted for at the time for performance of this agreement, provided however that in the event of any disagreement the escrow agent may retain said deposits pending instructions mutually given by the SELLER and BUYER or a court of competent jurisdiction, **except as herein provided in Paragraph #31.**

21. BUYER'S DEFAULT; DAMAGES

If the BUYER shall fail to fulfill the BUYER'S agreements herein, all deposits made hereunder by the BUYER shall be retained by the SELLER as liquidated damages and this shall constitute SELLER'S sole remedy in equity and law.

22. RELEASE BY HUSBAND OR WIFE

The SELLER's spouse hereby agrees to join in said deed and to release and convey all statutory and other rights and interests in said premises.

23. BROKER AS PARTY

The Broker(s) named herein join(s) in this agreement and becomes a party hereto, insofar as any provisions of this agreement expressly apply to the Broker(s), and to any amendments or modifications of such provisions to which the Broker(s) agree(s) in writing.

24. LIABILITY OF TRUSTEE, SHAREHOLDER, BENEFICIARY, etc.

If the SELLER or BUYER executes this agreement in a representative or fiduciary capacity, only the principal or the estate represented shall be bound, and neither the SELLER or BUYER so executing, nor any shareholder or beneficiary of any trust, shall be personally liable for any obligation, express or implied, hereunder.

25. WARRANTIES AND REPRESENTATIONS *(fill in); if none, state "none"; if any listed, indicate by whom each warranty or representation was made*

The BUYER acknowledges that the BUYER has not been influenced to enter into this transaction nor has he relied upon any warranties or representations not set forth or incorporated in this agreement or previously made in writing, except for the following additional warranties and representations, if any, made by either the SELLER or the Broker(s):

26. MORTGAGE CONTINGENCY CLAUSE

In order to help finance the acquisition of said premises, the parties agree that the BUYER shall apply for a conventional bank or other institutional construction loan of **80% of the project construction price**, at prevailing rates, terms and conditions.

27. CONSTRUCTION OF AGREEMENT

This instrument, executed in quadruplicate counterparts, is to be construed as a Massachusetts contract, is to take effect as a sealed instrument, sets forth the entire contract between the parties, is binding upon and enures to the benefit of the parties hereto and their respective heirs, devisees, executors, administrators, successors and assigns, and may be cancelled, modified or amended only by a written instrument executed by both the SELLER and the BUYER. If two or more persons are named herein as BUYER, their obligations hereunder shall be joint and several. The captions and marginal notes are used only as a matter of convenience and are not to be considered a part of this agreement or to be used in determining the intent of the parties to it.

28. LEAD PAINT LAW

The parties acknowledge that, under Massachusetts law, whenever a child or children under six years of age resides in any residential premises in which any paint, plaster or other accessible material contains dangerous levels of lead, the owner of said premises must remove or cover said paint, plaster or other material so as to make it inaccessible to children under six years of age.

29. SMOKE DETECTORS

The SELLER shall, at the time of the delivery of the deed, deliver a certificate from the fire department of the city or town in which said premises are located stating that said premises have been equipped with approved smoke detectors in conformity with applicable law.
The initialed riders, if any, attached hereto, are incorporated herein by reference.

30. PURCHASE PRICE FINANCING

**The $400,000.00 promissory note secured by a mortgage against the land, subordinated only to a comprehensive construction loan in the amount of 80% of project construction costs. Promissory note shall bear interest at 7% APR and shall become due and payable 24 months after closing, or within 30 days after substantial completion of the project construction. BUYER shall make interest payments to SELLER of $2,333.00 per month until principal is paid in full. All payments to be made in cash or certified funds.**

**Security for the $400,000.00 promissory note, aforescribed, shall be in the form of a mortgage on the 8.57 acre parcel. Upon BUYER obtaining construction financing, SELLER shall subordinate said mortgage to the construction lender. All purchase and sale agreements (pre-sale or otherwise) executed by potential purchasers of the BUYER'S contemplated co-housing project shall be assigned to the SELLER as further security concomitant with each purchase and sale agreement subjecting the purchaser, unequivocally, to personal liability as to the $400,000.00 promissory note.**

**Nothwithstanding the foregoing, BUYER shall only encumber the 8.57 acre parcel expected to be developed (consisting of .93 acre house parcel and 7.64 acre horse farm parcel).**

31. EARNEST MONEY

**Seller acknowledges receipt from Buyer of an initial earnest money deposit in the sum of $10,000 * in the form of a Promissory Note to be held by Seller pending the completion of Feasibility. Buyer shall convert the Promissory Note to non-refundable cash at completion of the feasibility period when the Buyer has removed this contingency. Buyer will make additional non-refundable earnest money payments of $1500 per month beginning 60 days after removal of the Feasibility Contingency and until closing. It is agreed that earnest money payments shall be immediately available for use by the Seller and no payments shall be held in escrow. All earnest money payments will be applied to the purchase price at the closing.**

* See exhibit A attached hereto and made a part hereof

32 40B APPLICATION & TRANSFER OF LAND

The Buyer and Seller agree to cooperate in the timely submission of a 40B application for the development of a 30 unit owner occupied, tightly clustered, environmentally sensitive residential housing project, with 25% of the units qualifying as affordable under the guidelines for such an application. Said application shall be made within 135 days of the date of this Agreement. It is agreed that the 40B application process will be as cooperative and friendly as possible to the Town of Stow, with all mutually beneficial environmental agendas addressed as openly and clearly as possible.

33. RISK OF LOSS OR ENVIRONMENTAL DAMAGE

Seller, at its sole cost and responsibility, shall keep the Premises safe and secure from environmental damage until the closing. Seller shall bear the risk of all damage to the Premises from all causes until the closing. Should there be any intentional or unintentional environmental damage that is not restored by Seller to its former condition by the closing, Buyer, at its option, may (i) terminate this Agreement and any deposit shall be refunded to Buyer, plus all costs incurred by buyer for feasibility, engineering and design, or (ii) purchase the Premises and be entitled to a reduction in the purchase price which is sufficient to cover the cost of the repairing any such damage.

34. INSPECTIONS AND TESTING

The obligations of Buyer under this Agreement are expressly subject to Buyer conducting engineering inspections and testing of the property during feasibility. If any such inspections reveal conditions unacceptable to Buyer during the feasibility period, Buyer may terminate this Agreement and any deposit will be refunded to Buyer. After completion of the feasibility period, Buyer shall have the right to reasonable tours, inspections and testing for the purposes of planning, design and marketing of the project, with 24 hour notice to Seller. Buyer agrees to conduct such a feasibility evaluation with all due diligence. If Buyer is unable to determine that the site is feasible for their purposes within 60 days of the date of this agreement, Buyer shall inform Seller in writing by such date and this Agreement will terminate and the earnest money deposit will be refunded to Buyer.

35. ADDITIONAL PROVISIONS

Upon the Town of Stow's approval of the development of the said 8.57 acre parcel, by the BUYER, and issuance of all requisite Board Approvals, building permits and SELLER receiving purchase monies as set forth herein,, BUYER and SELLER agree that SELLER shall, upon acceptance of the Town of Stow, transfer all right, title and interest in the said 42.1 acre parcel currently under M.G.L. c. 61, as a charitable contribution.

In the event that the Town of Stow exercises its right of first refusal pursuant to M.G.L. c. 61, all monies deposited hereunder shall be forthwith returned to BUYER without further recourse by either party in equity or law.

NOTICE: This is a legal document that creates binding obligations. If not understood, consult an attorney.

Marilyn Kunelius

SELLER Marilyn Kunelius

C S Hanson

BUYER Chris ScottHanson
Representative for Cohousing Resources, LLC

**EXTENSION**

Date ____________________

The time for the performance of the foregoing agreement is extended until____________ o'clock_____M. on the ________ day of ______________, 19___, time still being of the essence of this agreement as extended. In all other respects, this agreement is hereby ratified and confirmed.

This extension, executed in multiple counterparts, is intended to take effect as a sealed instrument.

______________________________________
SELLER

______________________________________
BUYER

______________________________________
BROKER(S)

# Promissory Note

In connection with the Agreement to Purchase
50.67 Acre Horse Property owned by Marilyn Kunelius

October 11, 2002

$10,000.00

For value received and as a deposit made in conjunction with the offer to purchase real estate of today's date, I promise to pay Marilyn Kunelius, the sum of Ten Thousand and no/100ths Dollars ($10,000) on or before December 10, 2002.

This note shall become void if the purchaser chooses to terminate the purchase and sale agreement during the feasibility period terminating 60 days after the signing of the Purchase and Sale agreement. If feasibility is approved by the purchaser, this note shall be converted to cash at the end of the feasibility period, as stipulated in the purchase and sale agreement attached hereto.

If this note becomes in default, borrower agrees to pay all reasonable collection costs and attorney's fees.

Agreed this 11th day of October, 2002

Chris ScottHanson, Owner
for Cohousing Resources LLC
9813 NE Murden Cove Rd.
Bainbridge Island, WA 98110

(206)842-9160

01/15/54 0 1:2 0 TR 194 RE 2500

JOHN A. BUBNOWICZ of Maynard, Middlesex County, Massachusetts, and MARILYN E. KUNELIUS, formerly Marilyn E. Bubnowicz, of Stow, Middlesex County, Massachusetts, Husband and Wife as tenants by the entirety,

in consideration of ONE ($1.00) DOLLAR and other valuable consideration

grant to MARILYN E. KUNELIUS

of 142 Red Acre Road, Stow, Massachusetts

with quitclaim covenants

A certain parcel of land with the buildings thereon on the Northwesterly side of Red Acre Road in Stow, Middlesex County, Massachusetts and being shown as Lot 1 on a plan entitled, "Plan of Land Stow, Mass. owned by Charles H. Lord et al dated January 30, 1976, survey by Clyde R. Wheeler, Inc., Bolton, Mass.", recorded at Book 12959 End, and bounded and described as follows:

| | |
|---|---|
| SOUTHEASTERLY | by land of Bubnowicz and land of Frederickson, as shown on said plan, three hundred and twenty-five (325.00) feet; |
| SOUTHEASTERLY | by land of Magurn, as shown on said plan, one hundred sixty-two (162.00) feet; |
| SOUTHWESTERLY | by land of Brown, as shown on said plan, two hundred twelve and 56/100 (212.56) feet; |
| NORTHWESTERLY | by land of Red Acre Farm Inc., as shown on said plan, two hundred eighty and 92/100 (280.92) feet; |
| NORTHWESTERLY | by land of Red Acre Farm Inc., as shown on said plan, four hundred and sixteen (416.00) feet; |
| SOUTHWESTERLY | by land of Red Acre Farm Inc., as shown on said plan, six hundred and fifteen (615.00) feet; |
| SOUTHWESTERLY | by land of Red Acre Farm Inc., as shown on said plan, four hundred and eighty-five (485.00) feet; |
| NORTHWESTERLY | by land of Red Acre Farm Inc., as shown on said plan, seven hundred fifty-one and 15/100 (751.15) feet; |
| NORTHWESTERLY | by land of Freeman, McClellan and Quinn, as shown on said plan, three hundred thirty-seven and 12/100 (337.12) feet; |
| NORTHWESTERLY | by land of Quinn, Herrick and Duncanson, as shown on said plan, one hundred ninety-two and 77/100 (192.77) feet; |
| NORTHWESTERLY | by land of Duncanson and May, as shown on said plan, one hundred ninety-three and 01/100 (193.01) feet; |
| NORTHWESTERLY | by land of May, as shown on said plan, fifty-one and 12/100 (51.12) feet; |
| NORTHWESTERLY | by land of May and Henry, as shown on said plan, one hundred forty-seven and 86/100 (147.86) feet; |
| NORTHWESTERLY | by land of Henry, as shown on said plan, fifty-one and 25/100 (51.25) feet; |
| NORTHEASTERLY | by land of Babrikki, as shown on said plan, eight hundred forty-nine and 29/100 (849.29) feet; |
| NORTHWESTERLY | by land of Babrikki, as shown on said plan, one hundred three and 09/100 (103.09) feet; |
| NORTHEASTERLY | by land of Babrikki, as shown on said plan, one hundred twenty-six and 19/100 (126.19) feet; |
| NORTHEASTERLY | by land of Babrikki, as shown on said plan, two hundred ninety-three and 47/100 (293.47) feet; |

Property Address: Lot 1 and Lot 2, Red Acre Road Stow, Massachusetts

| | |
|---|---|
| NORTHWESTERLY | by land of Babrikki, as shown on said plan, three hundred two and 41/100 (302.41) feet; |
| NORTHWESTERLY | by land of Babrikki, as shown on said plan, two hundred thirty-eight and 78/100 (238.78) feet; |
| NORTHEASTERLY | by Tuttle Lane, as shown on said plan, eighty-six and 75/100 (86.75) feet; |
| NORTHEASTERLY | by Tuttle Lane, as shown on said plan, three hundred and ten (310.00) feet; |
| NORTHEASTERLY | by Tuttle Lane, as shown on said plan, seventy-six and 47/100 (76.47) feet; |
| NORTHEASTERLY | by Tuttle Lane, as shown on said plan, one hundred twenty-one and 65/100 (121.65) feet; |
| SOUTHEASTERLY | by land of Weinman, as shown on said plan, two hundred thirty-six and 85/100 (236.85) feet; |
| SOUTHEASTERLY | by land of Ostrowski, as shown on said plan, two hundred twenty-five and 25/100 (225.25) feet; |
| SOUTHEASTERLY | by land of John J. & Kathy B. Palmaccio, Ianatta, McLean, Taylor, Wendell, and Barry A. & Sharyn L. Palmaccio, as shown on said plan, eight hundred ninety-six and 10/100 (896.10) feet; |
| NORTHEASTERLY | by land of Barry A. & Sharyn L. Palmaccio, as shown on said plan, two hundred and seventy (270.00) feet; |
| SOUTHEASTERLY | by Red Acre Road, as shown on said plan, thirty-eight and 90/100 (38.90) feet; and |
| SOUTHWESTERLY | by land of Bubnowicz, as shown on said plan, two hundred and seventy (270.00) feet to the point of beginning. |

Containing 49.75 acres more or less as shown on said plan, and hereby conveying Lot 1 as shown on said plan, however otherwise bounded, measured or described.

Also a certain parcel of land, with the buildings thereon, on the Easterly side of Tuttle Lane and being shown as Lot 2 on said plan entitled, "Plan of Land, Stow, Mass. owned by Charles H. Lord et al, Scale 1" = 100', January 30, 1976, Survey by Clyde R. Wheeler Inc., Bolton, Mass. recorded at Book 12959 End, and bounded and described as follows:

| | |
|---|---|
| NORTHEASTERLY | by land of Morey, as shown on said plan, one hundred and twenty-seven (127.00) feet; |
| NORTHEASTERLY | by land of Weinman, as shown on said plan, one hundred nineteen and 69/100 (119.69) feet; |
| SOUTHEASTERLY | by land of Andrews, as shown on said plan, one hundred thirty and 89/100 (130.89) feet; and |
| SOUTHWESTERLY | by Tuttle Lane, as shown on said plan, one hundred seventy-five and 06/100 (175.06) feet to the point of beginning. |

Containing 18,134 square feet more or less and hereby conveying Lot 2 as shown on said plan however otherwise bounded, measured or described.

Being the same premises conveyed to us by deed of Charles H. Lord, Donald L. Priest, Executor of the Estate of Evelyn L. Priest, Eleanor N. Derby and Mary Elizabeth davis dated April 8, 1976 and recorded with the Middlesex South District Registry of Deeds in Book 12959, Page 626.

Executed as a sealed instrument this 8th day of ~~October~~ November 1983

John A. Bubnowicz
JOHN A. BUBNOWICZ

Marilyn Kunelius
MARILYN E. KUNELIUS formerly
Marilyn E. Bubnowicz

The Commonwealth of Massachusetts

Middlesex ss. ~~October~~ November 8, 1983

Then personally appeared the above named John A. Bubnowicz

and acknowledged the foregoing instrument to be his free act and deed,

Before me, [signature]
Notary Public — ~~Justice of the Peace~~

My commission expires Nov 16, 1984

COMMONWEALTH OF MASSACHUSETTS

Middlesex, ss. ~~October~~ November 8, 1983

Then personally appeared the above named Marilyn E. Kunelius and acknowledged the foregoing instrument to be her free act and deed,

Before me, [signature]
Notary Public

My commission expires: 9/28/90

# TAB 15

Kunelius EXHIBIT 1 3/29/07 MJO

CERTIFICATE NUMBER 850391

CASE NUMBER M0368

NAME: Marilyn Kunelius

ADDRESS: 142 Red Acre Road, Stow, Massachusetts 01775

Pursuant to Chapter 61 of the General Laws, I/We request 42.1 acres of Forestland of the 50.16 acres of land covered by a deed recorded in the Middlesex County Registry of Deeds in Book ~~*12059~~, Page ~~*626~~, for property located in the Town/City of Stow that the State Forester issue a Certificate of Management to cover those forested acres. The tract can further be described as Tract 57, Map R 31, on the Town/City Assessors Maps. Excluded from certification are 8.06 acres, which are described as follows:

Begin at the south west corner of the access from Red Acre Road. Then: N28° 10'W 270' along access; then around the area: S61° 49'W 325', S72° 26'W 162', N35° 18'W 212', N35° 15'E 598' (on lines surveyed by Wheeler); then S52E 92', N84E 462', S27E 90', S55W 370' and S26E 120' to the property line; then S61° 49'W 100' to an iron pipe; the S28° 10'E 270' to the road; then 40' westerly to the start, being 7.65 acres.

Also, 0.41 acres on the north side of Tuttle Lane

* Book 15412 Page 316

I/We have read the various provisions of Chapter 61/~~Chapter 61A~~ as well as the Rules and Regulations under which said chapter is administered and agree to comply with same.

Submitted the 28th day of June, 19 84.
Signed Marilyn E Kunelius

---

DEPARTMENT USE ONLY

The Department of Environmental Management, 100 Cambridge Street, Boston, Massachusetts, acting by and through its State Forester pursuant to the authority of Chapter 61/Chapter 61A of the General Laws hereby certifies that the described land is being managed under a planned program to improve the quantity and quality of a continuous forest crop. This certifies that 42.1 acres of forestland, owned by the above is being managed under an approved Forest Management Plan M0368.

Certification is in effect from January 1, 19 85 to Dec. 31, 19 94. Don Stoddard State Forester Aug 9, 1984.

---

ASSESSOR'S USE

The Board of Assessor's have recorded the above acres as Classified Forest Land, and will cause this document to be duly recorded in the Registry of Deeds.

Edwin B. Merrick Chairman August 20, 19 84.

# TAB 16

Approved

STOW COMMUNITY PRESERVATION COMMITTEE
Minutes of the Meeting of February 10, 2003

In attendance: Members Wilber, Gray, Carrig, Walrath, Green, Way, Fletcher, and Asssociate Member Maxfield, plus a large audience. Minutes taken by Fletcher.

Minutes of January 6 approved.

Discussion ensued about the new DHCD rules and the qualifications of renters of accessory apartments.

Friends of Red Acre met with the Committee as well as The Trust for Public Lands (TPL). They presented a project proposal submission sheet and a package including the project description and a locus plan.

Committee Member Fletcher made a public disclosure that his brother has had a relationship with the President of the Eye of the Storm, and that he has volunteered for Eye of the Storm in the past but has no personal financial interest in the outcome of this matter.

A lengthy presentation ensued and some of the points that were brought up were as follows:

This plan completes the Red Acre conservation corridor;
It protects water resources;
It provides fire protection for the neighborhood;
There is a strong possibility of reimbursement of CP funds;
It negates 30 housing units and related traffic;
It cements the relationship of the Town with the history of horse rescue and conservation;
The plan creates permanent affordable housing and permanent open space;
TPL always works with towns on their projects;
It was stated that this is a wonderful example of partnerships;
TPL could probably not participate without Town participation;
This project serves so many different objectives;

TPL was asked what level of town assistance would be needed. The response was that it would be the same as what was mentioned at the Town Meeting - 100K for affordable housing and 300K for open space. It was pointed out that the Town is being asked to contribute about one third of the funds needed.

When asked about upgrades to the houses, it was stated that Friends of Red Acre is committed to upgrades either with outside help or through "sweat equity". There were comments about the roof, Title V issues, etc. The statement was made that this is exactly what Mass Community Housing grants are for, and that there are a variety of other sources.

Mark Carrig spoke on behalf of the Housing Authority and said that the funds would be contigent upon the upgrades needed. He asked about the potential for multi-family rentals. The answer was that, in order to generate the capital needed, they need to sell not rent.

A committee member asked about a previous discussion relative to whether or not there would be State reimbursement for open space if a well was established on the site. The response from TPL was that at least 14.3 acres would not be elligible for self-help funds if it was set aside for municipal purposes such as a well. If that parcel was "surveyed out" to be separate, there may be self-help funds available for the remainder. A committee member asked about water rights. TPL responded that nothing in the original contract requires the future owner to have access over the frontage to the well, but under the TPL plan the town would.

KUN038

A committee member asked if this plan would go forward with CP funds, and if so, how much is necessary. TPL responded that approval would probably not be forthcoming if the town didn't commit to the entire 400K.

Bob Wilber expressed how much TPL is a highly honorable and reputable outfit.

A committee member asked what happens if CPC votes in favor and it gets voted down at the Town Meeting. TPL responded that they would be under contract at that point and would have to make it work.

It was asked how we get more open land under their plan as opposed to the original plan, and FoRA responded that the land around the barn and pond would be deed restricted so if Eye of the Storm moved out, the land would be protected.

It was stated that the deed to the Town from TPL would provide access to the pond for fire protection.

A committee member asked about public access to trails and it was pointed out that there are at least 3 accesses off Tuttle Lane, and that negotiations might need to take place for access through the horse farm.

Speaking from the audience, Tom Maher pointed out that about 600 people voted this down with full knowledge of what this involved and we are under seige for affordable housing and we would not be getting many units and this horse farm was not the Bird's and is not historical and the public is being deceived. He said we are entering into a suicide pact because 1.2 million is not an accurate figure because of the other funds that would be coming back to Mrs. Kunelius, and that the Town would be liable for possibly up to 1.8 million. He said the taxpayers of Stow do not want this. He said that if the Board is to be true to its charter, keep in mind we are a political body.

Chairman Wilber pointed out that Town Meeting overwhelmingly supported this, and many discussions have mentioned that people believe that this is exactly what CP funds are for. He also pointed out that 40Bs are not permanent restrictions, but our funds would create permanent restrictions.

Mr. Maher went on to say that if we have a slush fund of 400,000 then that's obscene.

TPL pointed out that we could bond this purchase rather than spend it all in one fell swoop. As a matter of economics it makes more sense to bond and thereby still be able to fund other projects in the short term. They handed out a financial chart to show costs over time if this was bonded.

Bob Wilber pointed out that the possibility of a self-help grant is very real. He has a concern about funding all of the purchase in the year of sale. He preferred that the open space portion be appropriated in the next fiscal year. It was asked what percentage reimbursement might be realized. Bob mentioned the cap of 250K with a 50% local match. All reimbursement would go back into the CP fund in accordance with the Act. Bob said he spoke to Joel Lerner who expects the Self-Help program to be back up and running shortly. TPL mentioned that Lerner knows about this project.

Bob Wilber said that this property was ranked 12th out of 16 rankings. Ranking was done prior to purchase of Red Acre Woods.

Bob Wilber brought up the question that people have asked about why would we pay anything if the town would get the land anyway. He said that the CPC should look at this from a community preservation perspective. Traffic was mentioned as problem with the orginal proposal which would generate 600

additional trips per day. Another committee member suggested that that's a town-wide problem. It was also pointed out that there will be a reduction in the total number of housing units - population increase being the biggest threat to preserving our character.

Bob recognized the Stow Conservation Trust. Dick Perkins spoke on their behalf and said that they would be supportive of the TPL project and hoped that we would allow the town to vote on it at Town Meeting.

A committee member asked Bob Wilber about his conversation with Marilyn Kunelius. Bob said that she is afraid that the contract may unravel with town intervention and she'll lose everything. Bob said TPL will not back down from a committment.

Tom Maher spoke from the audience and said that this is not the babe we want to fool around with, and 1.2 is not the figure.

TPL said that they have honored every assignment ever given them under Chapter 61 and there is less risk with TPL than any other option.

Bob suggested that 100K be committed for open space in this fiscal year and the remainder to come from subsequent fiscal years, because the first 100K could be considered for the wellhead parcel, and there will then be time to bring the houses up to code, and time for state fiscal crisis to wane. TPL said that the Selectmen meet tomorrow and they need to accomplish the assignment before the end of the week. At Bob's request, they agreed to change their request to 100K for 2003 and 300K in FY'04.

There was a question about bonding. It was suggested that bonding will allow us to still have cash for things such as for buying deed restrictions from seniors.

Another committee member expressed concern that we can't vote on this without hearing from the other side. Bob said that this is a decision that comes soley out of the Town's right of first refusal.

The motion was made that we allocate the funds in the fashion proposed and further that it be by bonding, as follows: 100,000 in FY'03 for Open Space, 100,000 in FY'04 for affordable housing, and 200,000 in FY'04 for Open Space, and that it be contingent upon satisfactory upgrades to the houses, and that we recommend the expenditures to Town Meeting. The vote was 3 in favor, one opposed, two abstentions, and one recusal (Fletcher). It was decided to re-vote. The re-vote resulted in 4 in favor, none opposed, 2 abstentions (Gray and Green), and one recusal.

The motion carried, but it was suggested for the future that we clarify how abstentions get counted. It was asked if they get counted as members voting.

Discussion ensued about the viability of self-help funds.

A member stated that they were uncomfortable that this was voted down at the poles previously, but stated that it's hard to "read" the voters. The consensus of opinion was that voting for this just allows the Town Meeting voters to make the call as to how we spend CP funds.

There were concerns expressed about access, water rights, the chance that Mosaic Commons may not have been able to afford the deal if they couldn't get the density, and the possibility that that deal could have fallen through, and that the town could have lost it altogether.

Bob said he asked about the rumor that Romney is going to raid the Trust Fund, and the answer from the

KUN040

State was that the Legislature might skim some off the top because there is so much more in the fund than anyone anticipated.

Bruce brought up the meeting that he and Mark had attended with people from Community Housing Corp,., Community Builders, and the Housing Task Force. There were several issues expressed and there didn't seem to be a consensus.

Mark said that we need to create an inventory of people and/or houses that could be targeted for our funds.

Bob said that Marshfield has already executed a program of issuing a grant to the Housing Authority to purchase interests in property.

Next meeting was scheduled for Flag Day, February 24.

Meeting adjourned 22:15.

KUN041

# TAB 17


Kunelius EXHIBIT 14 4/4/07 MJO

Commonwealth of Massachusetts
Executive Office of Environmental Affairs
Department of Environmental Management

Certificate for Chapter 61/Chapter 61A Forest Lands

CASE NUMBER 286-365
CERTIFICATE NUMBER ______

Owner(s) Marilyn Kunelius

Mailing Address 142 Red Acre Road, Stow, MA 01775

Pursuant to Chapter 61 of the General Laws, I/We request 42.1 acres of forestland of the 49.74 acres of land covered by a deed recorded in the Middlesex County Registry of Deeds in Book 15412 Page 319, for property located in the Town/City of Stow that the State Forester issue a Certificate of Management to cover those forested acres. The tract can further be described as Map # R31, Lot # 57, on the Town/City Assessors Maps. Excluded from certification are 7.64 acres, which are described as follows (continue on back of page if additional space is needed):

As shown on the Forest Type Map and previously described in the 1984 Chapter 61 Forest Management Plan.

I/We have read the various provisions of Chapter 61/Chapter 61A as well as the Rules and Regulations under which said Chapter is administered and agree to comply with the same.

Submitted the June 6th day of ______, year of 04.

Signed by Owner(s) Marilyn Kunelius

DEPARTMENT USE ONLY

The Department of Environmental Management, 100 Cambridge Street, Boston, Massachusetts, acting by and through its State Forester pursuant to the authority of Chapter 61/Chapter 61A of the General Laws hereby certifies that the described land is being managed under a planned program to improve the quantity and quality of a continuous forest crop. This certifies that the above listed acres of forestland, owned by the above, is being managed under an approved Forest Management Plan.

Certification is in effect from January 1, 2005 to December 31, 2014

gned by State Forester [signature] Date 6/22/04

KUN291

ASSESSOR'S USE

The Board of Assessors have recorded the above acres of Classified Forest Land, and will cause evidence of a lien to be duly recorded in the Registry of Deeds. No recording is necessary for a recertification.

# TAB 18

# GREATER BOSTON REAL ESTATE BOARD

## AGREEMENT FOR EXCLUSIVE RIGHT TO SELL WITH MLS ADDENDUM

DATE: June 26, 2001

THIS AGREEMENT concerns the following property: 49± ACRE HORSE FARM INCLUDING BARNS, INDOOR RING, CARETAKER COTTAGE, LAND AND WATER RIGHTS LOCATED AT 144 RED ACRE RD, STOW, MA PRICE: $ 1,100,000

In consideration of the mutual covenants and agreements herein contained, the undersigned Seller hereby gives to the undersigned Broker the sole and exclusive right to sell the said property for the price and on the terms and conditions herein set forth.

I. The Broker agrees:
   a. To use reasonable efforts to procure a ready, willing, and able Buyer of the property in accordance with the price, terms, and conditions of this Agreement.

Boothroyd EXHIBIT 1 5/24/07 MJO

II. The Broker is granted the sole authority to: *(Check if applicable)*
- [x] a. Advertise the property;
- [ ] b. Post "For Sale" signs on the property;
- [x] c. Cooperate with subagents; and/or
- [x] d. Offer compensation to buyer agents.

(NOTE: Regardless of how compensated, buyer agents represent the interests of buyers, not sellers.)

III. The Seller agrees:
   a. To refer all inquiries and offers for the purchase of said property to the Broker;
   b. To cooperate with the Broker in every reasonable way;
   c. To pay the Broker a fee for professional services of FIVE (5%) PERCENT if:
      (1) A Buyer is procured ready, willing, and able to buy said property, or any part thereof, in accordance with the price, terms and conditions of this Agreement, or such other price, terms and conditions as shall be acceptable to the Seller.
      (2) The said property, or any part thereof, is sold through the efforts of anyone including the Seller; or
      (3) The said property, or any part thereof, is sold within 90 days after the term of this Agreement to anyone who was introduced to the said property through the efforts of the Broker or his agents prior to the expiration of said term. However, no fee will be payable under this clause if the said property is sold after said term with the participation of a licensed broker to whom the Seller is obligated to pay a fee under the terms of a subsequent written exclusive listing agreement.

**Once an offer has been accepted in writing and a transaction is pending, the Broker shall have no obligation to present further offers to the Seller.**

IV. The Seller understands and agrees that the property will be marketed in compliance with all applicable fair housing laws.

V. The period of this Agreement shall be from June 26, 2001, to and including SEPTEMBER 30, 2001. Time is of the essence hereof.

VI. Additional terms and conditions: SUB-AGENTS AND BUYER AGENTS TO BE COMPENSATED AT 2.5%.

COPYRIGHT © 1985, 1987, 1993, 1998
GREATER BOSTON REAL ESTATE BOARD
Form No. RA251

EQUAL HOUSING OPPORTUNITY

All rights reserved. This form may not be copied or reproduced in whole or in part in any manner whatsoever without the prior express written consent of the Greater Boston Real Estate Board. CWV 3.0

MLS ADDENDUM

_____ Check if Applicable

In order to introduce other Brokers to the property and solicit their assistance in procuring a buyer, the Broker may arrange to have this listing distributed through any multiple listing service ("MLS") to which the Broker has access. Any data regarding the property submitted by the Broker to an MLS shall be verified by the Seller. Such data, together with any other information provided to or obtained by the Broker with respect to the property, may be disclosed to prospective buyers and other brokers and may be included in all listings, comparable books and other materials distributed by the MLS either before or after the term of this listing or the sale of the property. If the following space is checked _____ , the Broker is further authorized to place a lock box on the property in order to facilitate entry by cooperating brokers and other authorized to examine the property.

IN WITNESS WHEREOF, the Seller and the Broker have hereunto set their hands and seals as of the 26th day of June, 2001.

James L. Boothroyd
BROKER

Marilyn E Kunelius
SELLER

BY Century 21 Classic Properties, Inc.

SELLER

ITS SALESPERSON
title (duly-authorized)

Under the Code of Ethics and Standards of Practice of the National Association of Realtors®, any Realtor® entering into a listing contract must advise the SELLER of:

1. The Realtor's® general company policies regarding cooperation with subagents, the payment of compensation to Buyer Agents, or both;
2. The fact that Buyer Agents, even if compensated by the Listing Broker or by the SELLER, will represent the interests of BUYERS; and
3. Any potential for the Listing Broker to act as a disclosed Dual Agent on behalf of the SELLER as well as the BUYER.

Copyright © 1985, 1987, 1993, 1998 Greater Boston Real Estate Board. Rev. 1981, 1994. All rights reserved.

# TAB 19

# GREATER BOSTON REAL ESTATE BOARD

## AGREEMENT FOR EXCLUSIVE RIGHT TO SELL WITH MLS ADDENDUM

DATE: APRIL 4, 2002

THIS AGREEMENT concerns the following property: 142 RED ACRE ROAD, STOW AND 144 RED ACRE ROAD, STOW

PRICE: $ 1,239,900

In consideration of the mutual covenants and agreements herein contained, the undersigned Seller hereby gives to the undersigned Broker the sole and exclusive right to sell the said property for the price and on the terms and conditions herein set forth.

I. The Broker agrees:
  a. To use reasonable efforts to procure a ready, willing, and able Buyer of the property in accordance with the price, terms, and conditions of this Agreement.

Boothroyd EXHIBIT 3 5/24/07 MJO

II. The Broker is granted the sole authority to: *(Check if applicable)*
  - [x] a. Advertise the property;
  - [x] b. Post "For Sale" signs on the property;
  - [x] c. Cooperate with subagents; and/or
  - [x] d. Offer compensation to buyer agents.

  (NOTE: Regardless of how compensated, buyer agents represent the interests of buyers, not sellers.)

III. The Seller agrees:
  a. To refer all inquiries and offers for the purchase of said property to the Broker;
  b. To cooperate with the Broker in every reasonable way;
  c. To pay the Broker a fee for professional services of FIVE (5%) PERCENT if:
    (1) A Buyer is procured ready, willing, and able to buy said property, or any part thereof, in accordance with the price, terms and conditions of this Agreement, or such other price, terms and conditions as shall be acceptable to the Seller
    (2) The said property, or any part thereof, is sold through the efforts of anyone including the Seller; or
    (3) The said property, or any part thereof, is sold within 90 days after the term of this Agreement to anyone who was introduced to the said property through the efforts of the Broker or his agents prior to the expiration of said term. However, no fee will be payable under this clause if the said property is sold after said term with the participation of a licensed broker to whom the Seller is obligated to pay a fee under the terms of a subsequent written exclusive listing agreement.

**Once an offer has been accepted in writing and a transaction is pending, the Broker shall have no obligation to present further offers to the Seller.**

IV. The Seller understands and agrees that the property will be marketed in compliance with all applicable fair housing laws.

V. The period of this Agreement shall be from APRIL 8, 2002, to and including OCTOBER 31, 2002. Time is of the essence hereof.

VI. Additional terms and conditions: ______________________

COPYRIGHT © 1985, 1987, 1993, 1998
GREATER BOSTON REAL ESTATE BOARD
Form No. RA251

All rights reserved. This form may not be copied or reproduced in whole or in part in any manner whatsoever without the prior express written consent of the Greater Boston Real Estate Board. CWV 3.0

MLS ADDENDUM

✓ Check if Applicable

In order to introduce other Brokers to the property and solicit their assistance in procuring a buyer, the Broker may arrange to have this listing distributed through any multiple listing service ("MLS") to which the Broker has access. Any data regarding the property submitted by the Broker to an MLS shall be verified by the Seller. Such data, together with any other information provided to or obtained by the Broker with respect to the property, may be disclosed to prospective buyers and other brokers and may be included in all listings, comparable books and other materials distributed by the MLS either before or after the term of this listing or the sale of the property. If the following space is checked ✓ , the Broker is further authorized to place a lock box on the property in order to facilitate entry by cooperating brokers and other authorized to examine the property.

IN WITNESS WHEREOF, the Seller and the Broker have hereunto set their hands and seals as of the 4th day of APRIL , 2002.

CENTURY 21 CLASSIC PROPERTIES, INC.
BROKER

Marilyn Kunelius
SELLER

BY Jamesh Boothroyd

SELLER

ITS SALESPERSON
title (duly-authorized)

Under the Code of Ethics and Standards of Practice of the National Association of Realtors®, any Realtor® entering into a listing contract must advise the SELLER of:

1. The Realtor's® general company policies regarding cooperation with subagents, the payment of compensation to Buyer Agents, or both;
2. The fact that Buyer Agents, even if compensated by the Listing Broker or by the SELLER, will represent the interests of BUYERS; and
3. Any potential for the Listing Broker to act as a disclosed Dual Agent on behalf of the SELLER as well as the BUYER.

Copyright © 1985, 1987, 1993, 1998 Greater Boston Real Estate Board. Rev. 1981, 1994. All rights reserved.

# TAB 20

# MLS PROPERTY INFORMATION NETWORK, INC.

STATUS CHANGE FORM

06/14/00

The Information Requested In This Section Is Required

PROPERTY ADDRESS 144 Red Acre Road, Stow, MA

OFFICE NAME C-21 Classic Properties # BB4960 (Office ID) LISTING # 30538026

OFFICE ADDRESS 42 Summer Street, Maynard, MA

AGENT NAME Jim Boothroyd # BB990254 (Agent ID) DATE LISTED

Boothroyd EXHIBIT 2 5/24/07 MJO

Circle the Proper Mode. Fill in the Corresponding Boxes. Use the Function CHGL

★ Denotes Required Information

**PCG** -- Price Change

*LP |_|_|_|_|_|_|_|_|_| New List Price

**EXT** -- Extend Expiration Date
**XTUA** - If UAG (Contract Renewal)

*XD 12/31/01 New Expiration Date (MM/DD/YY)

**RACT** - If Listing has Expired
**BOM** -- Back on Market

* OMD |_|_|/|_|_|/|_|_| Back On Market Date (MM/DD/YY)

**WDN** -- Withdrawn TEMPORARILY Off Market

*OMD |_|_|/|_|_|/|_|_| Withdrawn (Off Market) Date (MM/DD/YY)

**CAN** -- Contract Cancelled

*OMD |_|_|/|_|_|/|_|_| Cancelled (Off Market) Date (MM/DD/YY)

Use Function CHGL

**OTHER CHANGES:**

FIELD NAME: |_|_|_|_|_|_|_|

NEW VALUE:

**BUP** Under Agreement with Back Up Offers

*OMD |_|_|/|_|_|/|_|_| Contingent (Off-Market) Date (MM/DD/YY)

Listing Remains in Active Section.
(Will expire on Expire Date)

**UAG** -- Under Agreement (Pending)

*OMD |_|_|/|_|_|/|_|_| Pending (Off-Market) Date (MM/DD/YY)

* |_|_|/|_|_|/|_|_| Anticipated Sold Date (MM/DD/YY)

SO |_|_|_|_|_|_|_| Selling Office Number

SAG |_|_|_|_|_|_|_|_|_| Selling Agent Number

Listing Removed from Active Section.

Use Function CHGL

**Compensation Changes:**

SAC |_|_|_|_|_| Sub-Agent Compensation

BAC |_|_|_|_|_| Buyers Agent Compensation

OAC |_|_|_|_|_|_|_|_|_|_|_| Other Agent Compensation

**SLD** -- Sold **RNT** -- Rented

*CLD |_|_|/|_|_|/|_|_| Closing/Rental Date (MM/DD/YY)

*SP |_|_|_|_|_|_|_|_|_| Sale/Rent Price

*SO |_|_|_|_|_|_|_| Selling/Renting Office Number

* SAG |_|_|_|_|_|_|_|_|_| Selling/Renting Agent Number

PB |_|_|_|_|_| Discount Points - Buyer

PS |_|_|_|_|_| Discount Points - Seller

CC |_|_|_|_|_| Buyer's Closing Costs Paid by Seller

*FIN |_|_| Financing

FINANCE CODES:

1 - FHA
2 - VA
3 - FHVA
4 - Assumption
5 - Conv. Fixed
6 - Cash
7 - Withheld
8 - Conv. ARM
9 - Assume Conv.
10 - FHA ARM
11 - Private
12 - Bond
13 - Exchange or Trade
14 - Other

If you are utilizing the MLS Property Information Network data entry service, please mail the above requested status change(s) to MLS Property Information Network, Inc., 22 Elm Street, Suite 410, Worcester, MA 01608 or fax to us at (508) 797-0368. MLS Property Information Network, Inc. will complete the above requested change(s) within two (2) business days of our receipt of this form. It is your responsibility to review the listing and advise us immediately of any inaccuracy of information entered by the MLS Property Information Network, Inc. staff. MLS Property Information Network, Inc. disclaims any responsibility for input errors that are not brought to our attention.

Owner's Signature: Marilyn Kunelius Date: 9/28/01

# MLS PROPERTY INFORMATION NETWORK, INC.

STATUS CHANGE FORM

06/14/00

The Information Requested In This Section Is Required

PROPERTY ADDRESS 144 Red Acre Road, Stow, MA (SFR)

OFFICE NAME C-21 Classic Properties # BB4960 (Office ID) LISTING # 30538026 + 30518843 (LAND)

OFFICE ADDRESS 42 Summer Street, Maynard, MA

AGENT NAME Jim Boothroyd # BB980654 (Agent ID) DATE LISTED

Circle the Proper Mode. Fill in the Corresponding Boxes. Use the Function CHGL

★ Denotes Required Information

**PCG** -- Price Change

*LP New List Price

**EXT** - Extend Expiration Date
**XTUA** - If UAG (Contract Renewal)

*XD 03/31/02 New Expiration Date (MM/DD/YY)

**RACT** - If Listing has Expired
**BOM** -- Back on Market

* OMD Back On Market Date (MM/DD/YY)

**WDN** -- Withdrawn TEMPORARILY Off Market

*OMD Withdrawn (Off Market) Date (MM/DD/YY)

**CAN** -- Contract Cancelled

*OMD Cancelled (Off Market) Date (MM/DD/YY)

**BUP** Under Agreement with Back Up Offers

*OMD Contingent (Off-Market) Date (MM/DD/YY)

Listing Remains in Active Section. (Will expire on Expire Date)

**UAG** -- Under Agreement (Pending)

*OMD Pending (Off-Market) Date (MM/DD/YY)

★ Anticipated Sold Date (MM/DD/YY)

SO Selling Office Number

SAG Selling Agent Number

Listing Removed from Active Section.

**SLD** - Sold **RNT** - Rented

*CLD Closing/Rental Date (MM/DD/YY)

*SP Sale/Rent Price

*SO Selling/Renting Office Number

*SAG Selling/Renting Agent Number

PB Discount Points - Buyer

PS Discount Points - Seller

CC Buyer's Closing Costs Paid by Seller

*FIN Financing

FINANCE CODES:

1 - FHA
2 - VA
3 - FHVA
4 - Assumption
5 - Conv. Fixed
6 - Cash
7 - Withheld
8 - Conv. ARM
9 - Assume Conv.
10 - FHA ARM
11 - Private
12 - Bond
13 - Exchange or Trade
14 - Other

Use Function CHGL

**Compensation Changes:**

SAC Sub-Agent Compensation

BAC Buyers Agent Compensation

OAC Other Agent Compensation

Use Function CHGL

**OTHER CHANGES:**

FIELD NAME:

NEW VALUE:

If you are utilizing the MLS Property Information Network data entry service, please mail the above requested status change(s) to MLS Property Information Network, Inc., 22 Elm Street, Suite 410, Worcester, MA 01608 or fax to us at (508) 797-0368. MLS Property Information Network, Inc. will complete the above requested change(s) within two (2) business days of our receipt of this form. It is your responsibility to review the listing and advise us immediately of any inaccuracy of information entered by the MLS Property Information Network, Inc. staff. MLS Property Information Network, Inc. disclaims any responsibility for input errors that are not brought to our attention.

Owner's Signature: Marilyn Kinnelius Date: 12/30/01

# MLS PROPERTY INFORMATION NETWORK, INC.

STATUS CHANGE FORM

The Information Requested in This Section is Required

06/14/00

PROPERTY ADDRESS 144 Red Acre Road Stow

OFFICE NAME C-21 Classic Properties • BB4860 (Office ID)

LISTING # 30538026 (SFR) + 30518843 (LAND)

OFFICE ADDRESS 42 Summer Street Maynard, MA

AGENT NAME Jim Boothroyd • BB990654 (Agent ID)

DATE LISTED

Circle the Proper Mode. Fill in the Corresponding Boxes. Use the Function CHGL

★ Denotes Required Information

**PCG** -- Price Change

*LP [ ] New List Price

**EXT** - Extend Expiration Date

**XTUA** - If UAG (Contract Renewal)

*XD 04/07/02 New Expiration Date (MM/DD/YY)

**RACT** - If Listing has Expired

**BOM** -- Back on Market

*OMD [ / / ] Back On Market Date (MM/DD/YY)

**WDN** -- Withdrawn TEMPORARILY Off Market

*OMD [ / / ] Withdrawn (Off Market) Date (MM/DD/YY)

**CAN** -- Contract Cancelled

*OMD [ / / ] Cancelled (Off Market) Date (MM/DD/YY)

**BUP** Under Agreement with Back Up Offers

*OMD [ / / ] Contingent (Off-Market) Date (MM/DD/YY)

Listing Remains in Active Section. (Will expire on Expire Date)

**UAG** -- Under Agreement (Pending)

*OMD [ / / ] Pending (Off-Market) Date (MM/DD/YY)

★ [ / / ] Anticipated Sold Date (MM/DD/YY)

SO [ ] Selling Office Number

SAG [ ] Selling Agent Number

Listing Removed from Active Section.

**SLD** - Sold **RNT** - Rented

*CLD [ / / ] Closing/Rental Date (MM/DD/YY)

*SP [ ] Sale/Rent Price

*SO [ ] Selling/Renting Office Number

*SAG [ ] Selling/Renting Agent Number

PB [ ] Discount Points - Buyer

PS [ ] Discount Points - Seller

CC [ ] Buyer's Closing Costs Paid by Seller

*FIN [ ] Financing

FINANCE CODES:

1 - FHA
2 - VA
3 - FHVA
4 - Assumption
5 - Conv. Fixed
6 - Cash
7 - Withheld
8 - Conv. ARM
9 - Assume Conv.
10 - FHA ARM
11 - Private
12 - Bond
13 - Exchange or Trade
14 - Other

Use Function CHGL

## Compensation Changes:

SAC [ ] Sub-Agent Compensation

BAC [ ] Buyers Agent Compensation

OAC [ ] Other Agent Compensation

Use Function CHGL

## OTHER CHANGES:

FIELD NAME: [ ]

NEW VALUE: [ ]

If you are utilizing the MLS Property Information Network data entry service, please mail the above requested status change(s) to MLS Property Information Network, Inc., 22 Elm Street, Suite 410, Worcester, MA 01608 or fax to us at (508) 797-0368. MLS Property Information Network, Inc. will complete the above requested change(s) within two (2) business days of our receipt of this form. It is your responsibility to review the listing and advise us immediately of any inaccuracy of information entered by the MLS Property Information Network, Inc. staff. MLS Property Information Network, Inc. disclaims any responsibility for input errors that are not brought to our attention.

Owner's Signature: Marilyn Kiemlius Date: 4/1/02

# TAB 21

Cohousing Resources
Cohousing, Eco-Village & Sustainable Communities Development & Consulting

Kachajian
EXHIBIT NO. 2
4/26/07
M.D. O'CONNOR

MEMORANDUM
FAX Transmission

Page 1 of 6

DATE: ~~7-25-02~~ 9/24/02

TO: Jim Boothroyd ~~& PEER~~ K.

FROM: ~~Kelly~~ Chris Scotthanson

RE: Stow offer.

Chris & Kelly ScottHanson
9813 NE Murden Cove Dr.
Bainbridge Is. WA 98110
Web: http://www.CohousingResources.com
Email: Chris@CohousingResources.com

(206) 842-9160
FAX (206) 842-9203
Cell (206) 369-7755

PREVIOUS OFFER
25 July 02

# Real Estate Sales Agreement

50 Acre Horse Property

This Agreement is entered into by and between Marilyn Kunelius, with an address of 142 and 144 Red Acre Road("Seller"), and Cohousing Resources LLC, with an address of 9813 NE Murden Cove Rd, Bainbridge Island, WA 98110 ("Buyer").

In consideration of the mutual covenants contained herein and other valuable consideration received, and with the intent to be legally bound, Seller and Buyer agree as follows:

1. SALE OF PREMISES. Seller agrees to sell and convey to Buyer, and Buyer agrees to purchase from Seller, the following Premises: 50.67 Acres with a home and several outbuildings at 142 and 144 Red Acre Road. (Legal Description attached) The sale shall include all improvements and fixtures attached to the Premises and used in connection therewith, if any.

2. PURCHASE PRICE. The purchase price for the Premises is $1,100,000 payable on the closing as follows: all cash, including earnest money deposit. All payments must be with cash or certified funds. Seller acknowledges receipt from Buyer of an earnest money deposit in the sum of $50,000 to be held in escrow pending the closing. The deposit will be applied to the purchase price at the closing.

3. DEED. On the closing, Seller will convey the Premises by a good and sufficient warranty deed conveying a good and marketable title, free of all liens and encumbrances, except (i) all easements, rights of way, covenants and restrictions of record, (ii) current and future real estate taxes and assessments, (iii) zoning and other governmental laws and regulations, provided none of the foregoing interfere with the continued use of the Premises for its present use. Seller, at its sole cost, shall furnish Buyer with a preliminary report or abstract of title from a lawyer or reputable title company as soon as possible after the execution of this Agreement. Buyer shall give written notice to Seller of any objections to title within 10 days.

4. CLOSING. The deed will be delivered and the balance of the purchase price paid sixty days from the end of a 60 day feasibility period, unless extended in writing by the parties. The closing will be held at the offices of the seller's attorney, or other mutually agreed location. The sale will be closed according to the usual and customary closing procedures in effect in the county where the Premises are located. At the closing, Seller and Buyer agree to execute and deliver to the other all instruments required by law or which may reasonably be requested by the other party or the closing agent.

25 July 02

5. **MECHANIC'S LIENS.** At the closing, Seller will furnish to Buyer an affidavit attesting that no work has been performed on the Premises for which a mechanic's or materialman's lien could attach. If any work was performed on the Premises for which a lien has or may attach, Seller will obtain and deliver to Buyer appropriate lien waivers and releases executed by all contractors, subcontractors and suppliers, in addition to the seller's affidavit.

6. **DEFECTIVE TITLE.** If Seller shall be unable to deliver title or make conveyance as provided herein, Buyer, at its option, may (i) terminate this Agreement whereupon the deposit shall be refunded to Buyer and all obligations of the parties shall cease, or (ii) waive the defects and accept whatever title Seller is able to convey, without any reduction in the purchase price and as a full performance by Seller.

7. **POSSESSION.** On the closing, the Premises and all improvements, fixtures and items of personal property, if any, will be delivered to Buyer in their present condition, reasonable wear and tear excepted. The Premises shall be free of all occupants, tenants and personal possessions, except as may otherwise be provided herein. Buyer shall be allowed to inspect the Premises prior to the closing to determine whether the Premises complies with this section. After the feasibility period, and before the closing the seller shall have the right to install a double sided sign not greater than 4 feet by 8 feet on each side, subject to local regulations, for the purposes of advertising the intended development.

8. **ADJUSTMENTS.** Current property taxes, regular and special assessments, water and sewer charges, fuel, rents, interest, insurance, operating expenses and other customary matters, if any, shall be prorated between the parties on the closing.

9. **RISK OF LOSS OR ENVIRONMENTAL DAMAGE.** Seller, at its sole cost, shall keep the Premises safe and secure from environmental damage until the closing. Seller shall bear the risk of all damage to the Premises from all causes until the closing. Should there be any intentional or unintentional environmental damage that is not restored by Seller to its former condition by the closing, Buyer, at its option, may (i) terminate this Agreement and any deposit shall be refunded to Buyer, plus all costs incurred by buyer for feasibility, engineering and design, or (ii) purchase the Premises and be entitled to a reduction in the purchase price which is sufficient to cover the cost of the repairing any such damage.

10. **FEASIBILITY CONTINGENCY.** The obligations of Buyer under this Agreement are expressly subject to Buyer completing satisfactory feasibility evaluation of the ability to develop the site for the Buyer's intended purposes. Buyer agrees to conduct such a feasibility evaluation with all due diligence. If Buyer is unable to determine that the site is feasible for their purposes by September 27th, 2002, Buyer shall inform Seller in writing by such date and this Agreement will terminate and the deposit will be refunded to Buyer. If Buyer is able to determine that the

25 Juy 02

site is feasible for their purposes by September 27th, 2002 the Buyer shall convert the Promissory Note to non-refundable cash, which shall be credited to the purchase price. If Buyer fails to notify Seller in writing by such date, Buyer shall be required to perform its obligations under this Agreement and this contingency shall lapse, and the note shall become due and payable.

11. **INSPECTION(S).** The obligations of Buyer under this Agreement are expressly subject to Buyer conducting engineering inspections of the property during feasibility. If any such inspections reveal conditions unacceptable to Buyer during the feasibility period, Buyer may terminate this Agreement and any deposit will be refunded to Buyer.

12. **BUYER'S DEFAULT.** Upon default by Buyer, Seller, at its option, may (i) retain the deposit as liquidated damages as its sole remedy, or (ii) repay the deposit to the Buyer and subsequently enforce this Agreement and pursue any and all remedies available at law or equity, including an action for specific performance and damages.

13. **SELLER'S DEFAULT.** Upon default by Seller, Buyer, at its option, may (i) treat this Agreement as terminated and be entitled to the return of the deposit, or (ii) enforce this Agreement and pursue any and all remedies available at law or equity, including an action for specific performance and damages.

14. **BROKER'S COMMISSION.** Seller shall pay brokers commission.

15. **ATTORNEY'S FEES.** In the event of any litigation or other proceeding between the parties relating to this Agreement, the prevailing party shall be entitled to recover all costs and expenses incurred, including reasonable attorney's fees.

16. **ENTIRE AGREEMENT.** This Agreement contains the entire agreement and understanding between the parties and is subject to no understandings, conditions or representations that are not set forth herein. This Agreement may only be amended in writing and signed by both parties. Time is of the essence in the performance of this Agreement.

17. **JOINT AND SEVERAL LIABILITY.** Each person signing this Agreement as Seller and Buyer shall be jointly and severally liable for the performance of every term and condition of this Agreement.

18. **INVALID PROVISION.** If any provision of this Agreement shall be invalid or unenforceable, the remaining provisions shall remain in full force and effect.

19. **PARTIES BOUND.** This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, legal representatives, successors and assigns.

20. **GOVERNING LAW.** This Agreement shall be governed by and enforced in accordance with the laws of the Commonwealth of Massachusetts.

25 July 02

21. **CAPTIONS.** The captions in this Agreement are inserted only for convenience and in no way construe or interpret the provisions hereof or affect their scope or intent.
22.. **RELEASE BY SPOUSE.** The spouse or spouses of each seller, for consideration received, hereby agrees to join in the deed and waive and release all rights of dower, courtesy, homestead, community property and all other right, title and interest, if any, in and to the Premises.
23. **RIDERS.** The riders and exhibits, if any, attached hereto and initialed by the parties are made a part of this Agreement.
23. **OFFER EXPIRES.** This offer expires on , July 29th at 3:00 pm EDT.

This Agreement is executed on the 25th day of July, 2002.

BUYER, Chris ScottHanson, owner, for Cohousing Resources LLC

______________________ date : __________
SELLER

KUNELIUS0033

# Promissory Note

EXAMPLE

July 25th, 2002

$50,000.00

For value received and as a deposit made in conjunction with the offer to purchase real estate of today's date, I promise to pay Marilyn Kunelius, the sum of Fifty Thousand and no/100ths Dollars ($50,000) on or before September 27th , 2002.

This note shall become void if the seller does not sign the Purchase and sale agreement, or if purchaser chooses to terminate the purchase and sale agreement during the feasibility period. If feasibility is approved by the purchaser, this note shall be converted to cash at the end of the feasibility period, as stipulated in the purchase and sale agreement attached hereto.

If this note becomes in default, borrower agrees to pay all reasonable collection costs and attorney's fees.

Agreed this 25th day of July 2002,

Chris ScottHanson, Owner
for Cohousing Resources LLC
9813 NE Murden Cove Rd.
Bainbridge Island, WA 98110

(206)842-9160
(206)842-9203 FAX

# TAB 22



Cohousing
Resources LLC

Kachajian
EXHIBIT NO. 3
4/26/07
M.D. O'CONNOR

Cohousing, EcoVillage & Sustainable Communities Development & Consulting

# FAX Transmission

Page 1 of 8

To: James Boothroyd
Peter A. Kachajian, Jr.

From: Chris ScottHanson

Re: P&S and Promissory Note on Kunelius Property

Please find a signed P&S and Prommissory note enclosed. When the Seller signs this agreement and returns it by FAX I will mail 2 signed copies of the original documents for countersignatures and for your records.

Cohousing Resources LLC
9813 NE Murden Cove Dr.
Bainbridge Is. WA 98110

(206) 842-9160
FAX (206) 842-9203
Cell (206) 369-7755

Web: http://www.CohousingResources.com
Email: Chris@CohousingResources.com

# Purchase & Sales Agreement

50.67 Acre Horse Property
Stow, MA

This Agreement is entered into by and between Marilyn Kunelius, with an address of 142 and 144 Red Acres Road, Stow, MA ("Seller"), and Cohousing Resources LLC, with an address of 9813 NE Murden Cove Rd, Bainbridge Island, WA 98110 ("Buyer").

In consideration of the mutual covenants contained herein and other valuable consideration received, and with the intent to be legally bound, Seller and Buyer agree as follows:

1. **SALE OF PREMISES.** Seller agrees to sell and convey to Buyer, and Buyer agrees to purchase from Seller, the following Premises: 50.67 Acres of land with a home, caretakers residence, barn and outbuildings, located at 142 and 144 Red Acres Road in Stow, MA. (Legal Description attached.) The sale shall include all improvements and fixtures attached to the Premises and used in connection therewith, subject to ownership or deed restrictions as mutually agreed in paragraph 6 below.

2. **PURCHASE PRICE.** The purchase price for the Premises is $1,100,000 payable on the closing as follows: $700,000 in cash, including earnest money deposits paid; $400,000 promissory note secured by a mortgage against the land, subordinated only to a comprehensive construction loan in the amount of 80% of project construction cost. Promissory note shall bear interest at 7% APR and shall become due and payable 24 months after closing, or within 30 days after substantial completion of the construction of the project. Buyer shall make interest payments to Seller of $2,333 per month until principal is paid in full. All payments must be with cash or certified funds.

3. **EARNEST MONEY.** Seller acknowledges receipt from Buyer of an initial earnest money deposit in the sum of $10,000 in the form of a Promissory Note to be held by Seller pending the completion of Feasibility. Buyer shall convert the Promissory Note to non-refundable cash at completion of the feasibility period when the Buyer has removed this contingency. Buyer will make additional non-refundable earnest money payments of $1500 per month beginning 60 days after removal of the Feasibility Contingency and until closing. It is agreed that earnest money payments shall be immediately available for use by the Seller and no

payments shall be held in escrow. All earnest money payments will be applied to the purchase price at the closing.

4. **DEED.** On the closing, Seller will convey the Premises by a good and sufficient warranty deed conveying a good and marketable title, free of all liens and encumbrances, except (i) all easements, rights of way, covenants and restrictions of record, (ii) current and future real estate taxes and assessments, (iii) zoning and other governmental laws and regulations, provided none of the foregoing interfere with the continued use of the Premises for its present use. Seller, at its sole cost, shall furnish Buyer with a preliminary report or abstract of title from a lawyer or reputable title company as soon as possible after the execution of this Agreement, and not later than 30 days after execution of this Agreement. Buyer shall give written notice to Seller of any objections to title within 10 days of receipt of such abstract.

5. **FEASIBILITY CONTINGENCY.** The obligations of Buyer under this Agreement are expressly subject to Buyer completing satisfactory feasibility evaluation of the ability to develop the site for the Buyer's intended purposes. Buyer agrees to conduct such a feasibility evaluation with all due diligence. If Buyer is unable to determine that the site is feasible for their purposes within 60 days of the date of this agreement, Buyer shall inform Seller in writing by such date and this Agreement will terminate and the earnest money deposit will be refunded to Buyer. If Buyer is able to determine that the site is feasible for their purposes Buyer shall convert the Promissory Note to non-refundable cash, which shall be credited to the purchase price. If Buyer fails to notify Seller in writing by such date, Buyer shall be required to perform its obligations under this Agreement, this contingency shall lapse, and the note shall become due and payable. All engineering and surveys undertaken by the Buyer during feasibility shall become the property of the Seller upon termination of this agreement.

6. **40B APPLICATION & TRANSFER OF LAND.** The Buyer and Seller agree to cooperate in the timely submission of a 40B application for the development of a 30 unit owner occupied, tightly clustered, environmentally sensitive residential housing project, with 25% of the units qualifying as affordable under the guidelines for such an application. Said application shall be made within 135 days of the date of this Agreement. ~~Seller shall inform the Town of Stow within 5 days of the date of this agreement.~~ It is agreed that the 40B application process will be as cooperative and friendly as possible to the Town of Stow, with all mutually beneficial environmental agendas addressed as openly and

clearly as possible. As a part of this approval process, it is understood by both parties that a significant portion of the undeveloped land, and not to exceed 42 acres, may be encumbered by or deeded to the Town of Stow for the mutually beneficial protection of water supplies and environmental resources. It is understood and agreed that the granting of rights or property to the Town of Stow will occur after approval of the 40B application, and before the closing on this purchase.

7. **CLOSING.** The deed will be delivered and the balance of the purchase price paid within 60 days of completed approval of a 40B permit to develop 30 clustered housing units, but no later than September 26, 2004, unless extended in writing by the parties. The closing will be held at the offices of the seller's attorney, or other mutually agreed location. The sale will be closed according to the usual and customary closing procedures in effect in the county where the Premises is located. At the closing, Seller and Buyer agree to execute and deliver to the other all instruments required by law or which may reasonably be requested by the other party or the closing agent.

8. **MECHANIC'S LIENS.** At the closing, Seller will furnish to Buyer an affidavit attesting that no work has been performed on the Premises for which a mechanic's or materialman's lien could attach. If any work was performed on the Premises for which a lien has or may attach, Seller will obtain and deliver to Buyer appropriate lien waivers and releases executed by all contractors, subcontractors and suppliers, in addition to the seller's affidavit.

9. **DEFECTIVE TITLE.** If Seller shall be unable to deliver title or make conveyance as provided herein, Buyer, at its option, may (i) terminate this Agreement whereupon the deposit shall be refunded to Buyer and all obligations of the parties shall cease, or (ii) waive the defects and accept whatever title Seller is able to convey, without any reduction in the purchase price and as a full performance by Seller.

10. **POSSESSION.** On the closing, the Premises and all improvements, fixtures and items of personal property, if any, will be delivered to Buyer in their present condition, reasonable wear and tear excepted. The Premises shall be free of all occupants, tenants and personal possessions, except as may otherwise be provided herein. Buyer shall be allowed to inspect the Premises prior to the closing to determine whether the Premises complies with this section. After the feasibility period, and before the closing the seller shall have the right to install a double sided

sign not greater than 4 feet by 8 feet on each side, subject to local regulations, for the purposes of advertising the intended development.

11. **ADJUSTMENTS.** Current property taxes, regular and special assessments, water and sewer charges, fuel, rents, interest, insurance, operating expenses and other customary matters, if any, shall be prorated between the parties on the closing.

12. **RISK OF LOSS OR ENVIRONMENTAL DAMAGE.** Seller, at its sole cost and responsibility, shall keep the Premises safe and secure from environmental damage until the closing. Seller shall bear the risk of all damage to the Premises from all causes until the closing. Should there be any intentional or unintentional environmental damage that is not restored by Seller to its former condition by the closing, Buyer, at its option, may (i) terminate this Agreement and any deposit shall be refunded to Buyer, plus all costs incurred by buyer for feasibility, engineering and design, or (ii) purchase the Premises and be entitled to a reduction in the purchase price which is sufficient to cover the cost of the repairing any such damage.

13. **INSPECTIONS AND TESTING.** The obligations of Buyer under this Agreement are expressly subject to Buyer conducting engineering inspections and testing of the property during feasibility. If any such inspections reveal conditions unacceptable to Buyer during the feasibility period, Buyer may terminate this Agreement and any deposit will be refunded to Buyer. After completion of the feasibility period, Buyer shall have the right to reasonable tours, inspections and testing for the purposes of planning, design and marketing of the project, with 24 hour notice to Seller.

14. **BUYER'S DEFAULT.** Upon default by Buyer, Seller, at its option, may (i) retain the deposit as liquidated damages as its sole remedy, or (ii) repay all earnest money deposits received by the Buyer and subsequently enforce this Agreement and pursue any and all remedies available at law or equity, including an action for specific performance and damages.

15. **SELLER'S DEFAULT.** Upon default by Seller, Buyer, at its option, may (i) treat this Agreement as terminated and be entitled to the return of the all earnest money deposit payments, or (ii) enforce this Agreement and pursue any and all remedies available at law or equity, including an action for specific performance and damages.

16. **BROKER'S COMMISSION.** Seller shall pay all commissions payable to listing agents or brokers from proceeds of this sale.

17. **ATTORNEY'S FEES.** In the event of any litigation or other proceeding between the parties relating to this Agreement, the prevailing party shall be entitled to recover all costs and expenses incurred, including reasonable attorney's fees.

18. **ENTIRE AGREEMENT.** This Agreement contains the entire agreement and understanding between the parties and is subject to no understandings, conditions or representations that are not set forth herein. This Agreement may only be amended in writing and signed by both parties. Time is of the essence in the performance of this Agreement.

19. **JOINT AND SEVERAL LIABILITY.** Each person signing this Agreement as Seller and Buyer shall be jointly and severally liable for the performance of every term and condition of this Agreement.

20. **INVALID PROVISION.** If any provision of this Agreement shall be invalid or unenforceable, the remaining provisions shall remain in full force and effect.

21. **PARTIES BOUND.** This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, legal representatives, successors and assigns.

22. **GOVERNING LAW.** This Agreement shall be governed by and enforced in accordance with the laws of the Commonwealth of Massachusetts.

23. **CAPTIONS.** The captions in this Agreement are inserted only for convenience and in no way construe or interpret the provisions hereof or affect their scope or intent.

24. **RELEASE BY SPOUSE.** The spouse or spouses of each seller, for consideration received, hereby agrees to join in the deed and waive and release all rights of dower, courtesy, homestead, community property and all other right, title and interest, if any, in and to the Premises.

25. **RIDERS AND EXHIBITS.** The riders and exhibits, if any, attached hereto and initialed by the parties are made a part of this Agreement.

26. **EXPIRATION OF THIS OFFER.** This offer expires on Thursday, September 26, 2002 at 5:00 pm EDT.

This Agreement is executed on the 25th day of September, 2002.

BUYER, Chris ScottHanson, owner, for Cohousing Resources LLC

________________________ date : __________
SELLER, Marilyn Kunelius

# Promissory Note

In connection with the Agreement to Purchase
50.67 Acre Horse Property owned by Marilyn Kunelius

September 25, 2002

$10,000.00

For value received and as a deposit made in conjunction with the offer to purchase real estate of today's date, I promise to pay Marilyn Kunelius, the sum of Ten Thousand and no/100ths Dollars ($10,000) on or before November 24th, 2002.

This note shall become void if the purchaser chooses to terminate the purchase and sale agreement during the feasibility period terminating 60 days after the signing of the Purchase and Sale agreement. If feasibility is approved by the purchaser, this note shall be converted to cash at the end of the feasibility period, as stipulated in the purchase and sale agreement attached hereto.

If this note becomes in default, borrower agrees to pay all reasonable collection costs and attorney's fees.

Agreed this 25th day of September, 2002

Chris ScottHanson, Owner
for Cohousing Resources LLC
9813 NE Murden Cove Rd.
Bainbridge Island, WA 98110

(206)842-9160
(206)842-9203 FAX

# TAB 23

10/22/02 meeting reschedule for 11/12 meeting

Law Offices of
Peter A. Kachajian, Jr., Esq.

292 Main Street
Northborough, MA 01532

tel: 508 393-6278
fax: 508 393-5228
email: pakjr@earthlink.net

October 16, 2002

Town of Stow
Board of Selectmen
c/o Town Clerk Linda Hathaway
380 Great Road
Stow, MA 01775-2127

**Re: NOTICE OF INTENT FOR SALE OF PROPERTY LOCATED AT 142 – 144 RED ACRE ROAD, STOW, MASSACHUSETTS**

Dear Board of Selectmen:

Enclosed please find, pursuant to Massachusetts General Laws, Chapter 61, the Purchase and Sale Agreement regarding the intended sale of the above referenced property. As is proscribed in said statute we are initiating the 120-day notice requirement.

If you have any questions or if I could be of further assistance, please do not hesitate to call.

Very truly yours,

Peter A. Kachajian, Jr., Esq.
Attorney for Marilyn Kunelius

Cc: Board of Assessors
Planning Board
Conservation Commission

RECEIVED
OCT 17 2002
TOWN OF STOW
PLANNING BOARD

**STANDARD FORM**
**PURCHASE AND SALE AGREEMENT**

**From the Office of:**
Atty. Peter A. Kachajian, Jr.
292 Main Street
Northborough, MA 01532
(508) 393-6278

1. PARTIES *(fill in)*

This ________ day of October, 2002
**Marilyn Kunelius of 142 and 144 Red Acres Road, Stow, MA**
hereinafter called the SELLER, agrees to SELL and

**Cohousing Resources, LLC, with an address of 9813 NE Murden Cove Road, Brainbridge Islande, WA 98110**
hereinafter called the BUYER or PURCHASER, agrees to BUY, upon the terms hereinafter set forth, the following described premises: **142 and 144 Red Acres Road, Stow, MA**

2. DESCRIPTION *(fill in and include title reference)*

The land with the buildings and improvements thereon known and located at **142 and 144 Red Acres Road, Stow, MA.** Being more particularly described in the Middlesex Registry of Deeds Book 15412; Page 316; Book 26230; Page 255 (see exhibits).

3. BUILDINGS, STRUCTURES, IMPROVEMENTS, FIXTURES *(fill in or delete)*

Included in the sale as a part of said premises are 50.67 acres of land with a home, caretakers residence, barn and the buildings, structures, and improvements now thereon, and the fixtures belonging to the SELLER and used in connection therewith including, if any, all wall-to-wall carpeting, drapery rods, automatic garage door openers, venetian blinds, window shades, screens, screen doors, storm windows and doors, awnings, shutters, furnaces, heaters, heating plumbing and bathroom fixtures, garbage disposers, electric and other lighting fixtures, mantels, outside television antennas, fences, gates, trees, shrubs, plants, ONLY IF BUILT IN, refrigerators, dishwashers, washing machines and dryers; and all buildings and improvements thereon are sold in **"as is" condition.**

4. TITLE DEED *(fill in)*
**Include here by specific reference any restrictions, easements, rights and obligations in party walls not included in (b), leases, municipal and other liens, other encumbrances, and make provision to protect SELLER against BUYER'S breach of SELLER'S covenants in leases, where necessary.*

Said premises are to be conveyed by a good and sufficient quitclaim deed running to the BUYER, or to the nominee designated by the BUYER by written notice to the SELLER at least seven (7) days before the deed is to be delivered as herein provided, and said deed shall convey a good and clear record and marketable title thereto, free from encumbrances, except

*(a)* Provisions of existing building and zoning laws;
*(b)* Such taxes for the then current taxable year are not due and payable on the date of the delivery of such deed;
*(c)* Any liens for municipal betterments assessed after the date of this agreement;
*(d)* Easements, restrictions and reservations of record, if any, so long as the same do not prohibit or materially interfere with the current use of said premises
*(e)*

5. PLANS

If said deed refers to a plan necessary to be recorded therewith, the SELLER shall deliver such plan with the deed in form adequate for recording or registration.

6. REGISTERED TITLE

In addition to the forgoing, if the title to said premises is registered, said deed shall be in form sufficient to entitle the BUYER to a Certificate of Title of said premises, and the SELLER shall deliver with said deed all instruments, if any, necessary to enable the BUYER to obtain such Certificate of Title.

KUN225

COPYRIGHT © 1979, 1984, 1986, 1987, 1988, 1991
GREATER BOSTON REAL ESTATE BOARD
Rev. 1999 Form No RA151

All rights reserved. This form may not be copied or reproduced in whole or in part in any manner whatsoever without the prior express written consent of the Greater Boston Real Estate Board. CWV 5.0

7. PURCHASE PRICE *(fill in): space is allowed to write out the amounts if desired*

The agreed purchase price for said premises is $1,116,900.00 ONE MILLION ONE HUNDRED SIXTEEN THOUSAND NINE HUNDRED and 00/100s.......dollars, of which

| | | |
|---|---|---|
| $ | 0.00 | have been paid as a deposit this day and |
| $ | 0.00 | have been paid at the time of the offer to purchase |
| $ | 716,900.00 | **(less deposits paid)** are to be paid at the time of delivery of the deed in cash, or by certified cashier's, treasurer's or bank check, or conveyancing attorney's check.** |
| $ | 400,000.00 | **promissory note secured by a mortgage*** |
| $ | $1,116,900.00 | TOTAL |

**** See Paragraph #31 for further terms and provisions**

*** See paragraph #30 for further terms and provisions**

8. TIME FOR PERFORMANCE; DELIVERY OF DEED *(fill in)*

Such deed is to be delivered at **1:00 o'clock P.M.** on or before the **26th day of September, 2003**, at the Office of the Conveyancing Attorney unless otherwise agreed upon in writing provided notice of same is given to Buyer's and Seller's counsel. **However, provided the Chap. 40B approval process is proceeding forward, BUYER may have. up to 12 months extension** It is agreed that time is of the essence of this agreement.

9. POSSESSION and CONDITIONS of PREMISES. *(attach a list of exceptions, if any)*

Full possession of said premises free of all tenants and occupants, except as herein provided, is to be delivered at the time of the delivery of the deed, said premises to be then (a) in the same condition as they now are, reasonable use and wear thereof excepted and (b) not in violation of said building and zoning laws, and (c) in compliance with provisions of any instrument referred to in clause 4 hereof. The BUYER shall be entitled to an inspection of said premises prior to the delivery of the deed in order to determine whether the condition thereof complies with the terms of this clause.

10. EXTENSION TO PERFECT TITLE OR MAKE PREMISES CONFORM *(Change period of time if desired.)*

If the SELLER shall be unable to give title or to make conveyance, or to deliver possession of the premises, all as herein stipulated, or if at the time of delivery of the deed the premises do not conform with the provisions hereof, the SELLER shall use reasonable efforts to remove any defects in title, or to deliver possession as provided herein, or to make the said premises conform to the provisions hereof, as the case may be, in which event the time for performance hereof shall be extended for a period of **thirty (30)** days.*

*** Contemplated herein is the Town of Stow exercising its right of first refusal pursuant to M.G.L c. 61.**

11. FAILURE TO PERFECT TITLE OR MAKE PREMISES CONFORM, etc.

If at the expiration of the extended time the SELLER shall have failed so to remove any defects in title, deliver possession, or make the premises conform, as the case may be, all as herein agreed, or if at any time during the period of this agreement or any extension thereof, the holder of a mortgage on said premises shall refuse to permit the insurance proceeds, if any, to be used for such purposes, then any payments made under this agreement shall be forthwith refunded and all other obligations of the parties hereto shall cease and this agreement shall be void without recourse to the parties hereto.

12. BUYER'S ELECTION TO ACCEPT TITLE

The BUYER shall have the election, at either the original or any extended time for performance, to accept such title as the SELLER can deliver to the said premises in their then condition and to pay therefor the purchase price without deduction, in which case the SELLER shall convey such title, except that in the event of such conveyance in accord with the provisions of this clause, if the said premises shall have been damaged by fire or casualty insured against, then the SELLER shall, unless the SELLER has previously restored the premises to their former condition, either

(a) pay over or assign to the BUYER, on delivery of the deed, all amounts recovered or recoverable on account of such insurance, less any amounts reasonably expended by the SELLER for any partial restoration, or

(b) if a holder of a mortgage on said premises shall not permit the insurance proceeds or a part thereof to be used to restore the said premises to their former condition or to be so paid over or assigned, give to the BUYER a credit against the purchase price, on delivery of the deed, equal to said amounts so recovered or recoverable and retained by the holder of the said mortgage less any amounts reasonably expended by the SELLER for any partial restoration.

| | | |
|---|---|---|
| 13. | ACCEPTANCE OF DEED | The acceptance of a deed by the BUYER or his nominee as the case may be, shall be deemed to be a full performance and discharge of every agreement and obligation herein contained or expressed, except such as are, by the terms hereof, to be performed after the delivery of said deed. |
| 14. | USE OF MONEY TO CLEAR TITLE | To enable the SELLER to make conveyance as herein provided, the SELLER may, at the time of delivery of the deed, use the purchase money or any portion thereof to clear the title of any or all encumbrances or interests, provided that all instruments so procured are recorded in a manner consistent with customary conveyancing practices. |
| 15. | INSURANCE *Insert amount (list additional types of insurance and amounts as agreed)* | Until the delivery of the deed, the SELLER shall maintain insurance on said premises as follows:<br>*Type of Insurance* — *Amount of Coverage*<br>(a) Fire — **Risk to remain with SELLER**<br>(b) Extended Coverage — **As is presently insured**<br>(c) |
| 16. | ADJUSTMENTS *(list operating expenses, if any, or attach schedule)* | Water and sewer use charges and taxes for the then current year shall be apportioned and fuel value shall be adjusted as of the day of performance of this agreement and the net amount thereof shall be added to or deducted from, as the case may be, the purchase price payable by the BUYER at the time of delivery of the deed. |
| 17. | ADJUSTMENT OF UNASSESSED AND ABATED TAXES | If the amount of said taxes is not known at the time of the delivery of the deed, they shall be apportioned on the basis of the taxes assessed for the preceding year, with a reapportionment as soon as the new tax rate and valuation can be ascertained; and, if the taxes which are to be apportioned shall thereafter be reduced by abatement, the amount of the abatement, less the reasonable cost of obtaining the same, shall apportioned between the parties, provided that neither party shall be obligated to institute or prosecute proceedings for an abatement unless herein otherwise agreed. |
| 18. | BROKER'S FEE *(fill in fee with dollar amount or percentage; also name of Broker(s))* | A broker's fee for professional service per listing agreement is due from the SELLER to **Century 21 Classic Properties**, the broker herein, but only if, as when the SELLER receives the full purchase price pursuant to this Agreement and the BUYER accepts and records the SELLER'S deed and not otherwise. |
| 19. | BROKER(S) WARRANTY *(fill in name)* | The Broker(s) named herein **Century 21 Classic Properties** warrant(s) that the Broker(s) is(are) duly licensed as such by the Commonwealth of Massachusetts. |
| 20. | DEPOSIT *(fill in, or delete reference to broker(s) if SELLER holds deposit)* | All deposits made hereunder shall be held by **Law Offices of Peter A. Kachajian, Jr.** subject to the terms of this agreement and shall be duly accounted for at the time for performance of this agreement, provided however that in the event of any disagreement the escrow agent may retain said deposits pending instructions mutually given by the SELLER and BUYER or a court of competent jurisdiction, **except as herein provided in Paragraph #31.** |
| 21. | BUYER'S DEFAULT; DAMAGES | If the BUYER shall fail to fulfill the BUYER'S agreements herein, all deposits made hereunder by the BUYER shall be retained by the SELLER as liquidated damages and this shall constitute SELLER'S sole remedy in equity and law. |
| 22. | RELEASE BY HUSBAND OR WIFE | The SELLER's spouse hereby agrees to join in said deed and to release and convey all statutory and other rights and interests in said premises. |
| 23. | BROKER AS PARTY | The Broker(s) named herein join(s) in this agreement and becomes a party hereto, insofar as any provisions of this agreement expressly apply to the Broker(s), and to any amendments or modifications of such provisions to which the Broker(s) agree(s) in writing. |
| 24. | LIABILITY OF TRUSTEE, SHAREHOLDER, BENEFICIARY, etc. | If the SELLER or BUYER executes this agreement in a representative or fiduciary capacity, only the principal or the estate represented shall be bound, and neither the SELLER or BUYER so executing, nor any shareholder or beneficiary of any trust, shall be personally liable for any obligation, express or implied, hereunder. |

25. WARRANTIES AND REPRESENTATIONS *(fill in): if none, state "none"; if any listed, indicate by whom each warranty or representation was made*

The BUYER acknowledges that the BUYER has not been influenced to enter into this transaction nor has he relied upon any warranties or representations not set forth or incorporated in this agreement or previously made in writing, except for the following additional warranties and representations, if any, made by either the SELLER or the Broker(s):

26. MORTGAGE CONTINGENCY CLAUSE

In order to help finance the acquisition of said premises, the parties agree that the BUYER shall apply for a conventional bank or other institutional construction loan of 80% of the project construction price, at prevailing rates, terms and conditions.

27. CONSTRUCTION OF AGREEMENT

This instrument, executed in quadruplicate counterparts, is to be construed as a Massachusetts contract, is to take effect as a sealed instrument, sets forth the entire contract between the parties, is binding upon and enures to the benefit of the parties hereto and their respective heirs, devisees, executors, administrators, successors and assigns, and may be cancelled, modified or amended only by a written instrument executed by both the SELLER and the BUYER. If two or more persons are named herein as BUYER, their obligations hereunder shall be joint and several. The captions and marginal notes are used only as a matter of convenience and are not to be considered a part of this agreement or to be used in determining the intent of the parties to it.

28. LEAD PAINT LAW

The parties acknowledge that, under Massachusetts law, whenever a child or children under six years of age resides in any residential premises in which any paint, plaster or other accessible material contains dangerous levels of lead, the owner of said premises must remove or cover said paint, plaster or other material so as to make it inaccessible to children under six years of age.

29. SMOKE DETECTORS

The SELLER shall, at the time of the delivery of the deed, deliver a certificate from the fire department of the city or town in which said premises are located stating that said premises have been equipped with approved smoke detectors in conformity with applicable law. The initialed riders, if any, attached hereto, are incorporated herein by reference.

30. PURCHASE PRICE FINANCING

**The $400,000.00 promissory note secured by a mortgage against the land, subordinated only to a comprehensive construction loan in the amount of 80% of project construction costs. Promissory note shall bear interest at 7% APR and shall become due and payable 24 months after closing, or within 30 days after substantial completion of the project construction. BUYER shall make interest payments to SELLER of $2,333.00 per month until principal is paid in full. All payments to be made in cash or certified funds.**

**Security for the $400,000.00 promissory note, aforescribed, shall be in the form of a mortgage on the 8.57 acre parcel. Upon BUYER obtaining construction financing, SELLER shall subordinate said mortgage to the construction lender. All purchase and sale agreements (pre-sale or otherwise) executed by potential purchasers of the BUYER'S contemplated co-housing project shall be assigned to the SELLER as further security concomitant with each purchase and sale agreement subjecting the purchaser, unequivocally, to personal liability as to the $400,000.00 promissory note.**

**Nothwithstanding the foregoing, BUYER shall only encumber the 8.57 acre parcel expected to be developed (consisting of .93 acre house parcel and 7.64 acre horse farm parcel).**

31. EARNEST MONEY

**Seller acknowledges receipt from Buyer of an initial earnest money deposit in the sum of $10,000 * in the form of a Promissory Note to be held by Seller pending the completion of Feasibility. Buyer shall convert the Promissory Note to non-refundable cash at completion of the feasibility period when the Buyer has removed this contingency. Buyer will make additional non-refundable earnest money payments of $1500 per month beginning 60 days after removal of the Feasibility Contingency and until closing. It is agreed that earnest money payments shall be immediately available for use by the Seller and no payments shall be held in escrow. All earnest money payments will be applied to the purchase price at the closing.**

* See exhibit A attached hereto and made a part hereof

32 40B APPLICATION & TRANSFER OF LAND

The Buyer and Seller agree to cooperate in the timely submission of a 40B application for the development of a 30 unit owner occupied, tightly clustered, environmentally sensitive residential housing project, with 25% of the units qualifying as affordable under the guidelines for such an application. Said application shall be made within 135 days of the date of this Agreement. It is agreed that the 40B application process will be as cooperative and friendly as possible to the Town of Stow, with all mutually beneficial environmental agendas addressed as openly and clearly as possible.

33. RISK OF LOSS OR ENVIRONMENTAL DAMAGE

Seller, at its sole cost and responsibility, shall keep the Premises safe and secure from environmental damage until the closing. Seller shall bear the risk of all damage to the Premises from all causes until the closing. Should there be any intentional or unintentional environmental damage that is not restored by Seller to its former condition by the closing, Buyer, at its option, may (i) terminate this Agreement and any deposit shall be refunded to Buyer, plus all costs incurred by buyer for feasibility, engineering and design, or (ii) purchase the Premises and be entitled to a reduction in the purchase price which is sufficient to cover the cost of the repairing any such damage.

34. INSPECTIONS AND TESTING

The obligations of Buyer under this Agreement are expressly subject to Buyer conducting engineering inspections and testing of the property during feasibility. If any such inspections reveal conditions unacceptable to Buyer during the feasibility period, Buyer may terminate this Agreement and any deposit will be refunded to Buyer. After completion of the feasibility period, Buyer shall have the right to reasonable tours, inspections and testing for the purposes of planning, design and marketing of the project, with 24 hour notice to Seller. Buyer agrees to conduct such a feasibility evaluation with all due diligence. If Buyer is unable to determine that the site is feasible for their purposes within 60 days of the date of this agreement, Buyer shall inform Seller in writing by such date and this Agreement will terminate and the earnest money deposit will be refunded to Buyer.

35. ADDITIONAL PROVISIONS

Upon the Town of Stow's approval of the development of the said 8.57 acre parcel, by the BUYER, and issuance of all requisite Board Approvals, building permits and SELLER receiving purchase monies as set forth herein,, BUYER and SELLER agree that SELLER shall, upon acceptance of the Town of Stow, transfer all right, title and interest in the said 42.1 acre parcel currently under M.G.L. c. 61, as a charitable contribution.

In the event that the Town of Stow exercises its right of first refusal pursuant to M.G.L. c. 61, all monies deposited hereunder shall be forthwith returned to BUYER without further recourse by either party in equity or law.

NOTICE: This is a legal document that creates binding obligations. If not understood, consult an attorney.

Marilyn Kunelius

SELLER Marilyn Kunelius

BUYER Chris ScottHanson
Representative for Cohousing Resources, LLC

**EXTENSION**

Date ____________________

The time for the performance of the foregoing agreement is extended until____________ o'clock______M. on the ________ day of _______________ 19___, time still being of the essence of this agreement as extended. In all other respects, this agreement is hereby ratified and confirmed.

This extension, executed in multiple counterparts, is intended to take effect as a sealed instrument.

______________________________________
SELLER

______________________________________
BUYER

______________________________________
BROKER(S)

# Promissory Note

In connection with the Agreement to Purchase
50.67 Acre Horse Property owned by Marilyn Kunelius

October 11, 2002

$10,000.00

For value received and as a deposit made in conjunction with the offer to purchase real estate of today's date, I promise to pay Marilyn Kunelius, the sum of Ten Thousand and no/100ths Dollars ($10,000) on or before December 10, 2002.

This note shall become void if the purchaser chooses to terminate the purchase and sale agreement during the feasibility period terminating 60 days after the signing of the Purchase and Sale agreement. If feasibility is approved by the purchaser, this note shall be converted to cash at the end of the feasibility period, as stipulated in the purchase and sale agreement attached hereto.

If this note becomes in default, borrower agrees to pay all reasonable collection costs and attorney's fees.

Agreed this 11th day of October, 2002

Chris ScottHanson, Owner
for Cohousing Resources LLC
9813 NE Murden Cove Rd.
Bainbridge Island, WA 98110

(206)842-9160

BK 15412 PG 316

JOHN A. BUBNOWICZ of Maynard, Middlesex County, Massachusetts, and MARILYN E. KUNELIUS, formerly Marilyn E. Bubnowicz, of Stow, Middlesex County, Massachusetts, Husband and Wife as tenants by the entirety,

being unmarried, for consideration paid, and in full consideration of ONE ($1.00) DOLLAR and other valuable consideration

grant to MARILYN E. KUNELIUS

of 142 Red Acre Road, Stow, Massachusetts

with quitclaim covenants

the land in

A certain parcel of land with the buildings thereon on the Northwesterly side of Red Acre Road in Stow, Middlesex County, Massachusetts and being shown as Lot 1 on a plan entitled, "Plan of Land Stow, Mass. owned by Charles H. Lord et al dated January 30, 1976, survey by Clyde R. Wheeler, Inc., Bolton, Mass.", recorded at Book 12959 End, and bounded and described as follows:

| | |
|---|---|
| SOUTHEASTERLY | by land of Bubnowicz and land of Frederickson, as shown on said plan, three hundred and twenty-five (325.00) feet; |
| SOUTHEASTERLY | by land of Magurn, as shown on said plan, one hundred sixty-two (162.00) feet; |
| SOUTHWESTERLY | by land of Brown, as shown on said plan, two hundred twelve and 56/100 (212.56) feet; |
| NORTHWESTERLY | by land of Red Acre Farm Inc., as shown on said plan, two hundred eighty and 92/100 (280.92) feet; |
| NORTHWESTERLY | by land of Red Acre Farm Inc., as shown on said plan, four hundred and sixteen (416.00) feet; |
| SOUTHWESTERLY | by land of Red Acre Farm Inc., as shown on said plan, six hundred and fifteen (615.00) feet; |
| SOUTHWESTERLY | by land of Red Acre Farm Inc., as shown on said plan, four hundred and eighty-five (485.00) feet; |
| NORTHWESTERLY | by land of Red Acre Farm Inc., as shown on said plan, seven hundred fifty-one and 15/100 (751.15) feet; |
| NORTHWESTERLY | by land of Freeman, McClellan and Quinn, as shown on said plan, three hundred thirty-seven and 12/100 (337.12) feet; |
| NORTHWESTERLY | by land of Quinn, Herrick and Duncanson, as shown on said plan, one hundred ninety-two and 77/100 (192.77) feet; |
| NORTHWESTERLY | by land of Duncanson and May, as shown on said plan, one hundred ninety-three and 01/100 (193.01) feet; |
| NORTHWESTERLY | by land of May, as shown on said plan, fifty-one and 12/100 (51.12) feet; |
| NORTHWESTERLY | by land of May and Henry, as shown on said plan, one hundred forty-seven and 86/100 (147.86) feet; |
| NORTHWESTERLY | by land of Henry, as shown on said plan, fifty-one and 25/100 (51.25) feet; |
| NORTHEASTERLY | by land of Babrikki, as shown on said plan, eight hundred forty-nine and 29/100 (849.29) feet; |
| NORTHWESTERLY | by land of Babrikki, as shown on said plan, one hundred three and 09/100 (103.09) feet; |
| NORTHEASTERLY | by land of Babrikki, as shown on said plan, one hundred twenty-six and 19/100 (126.19) feet; |
| NORTHEASTERLY | by land of Babrikki, as shown on said plan, two hundred ninety-three and 47/100 (293.47) feet; |

Property Address: Lot 1 and Lot 2, Red Acre Road Stow, Massachusetts

01/19/84 01:20 TR 194 RE 2500

NORTHWESTERLY by land of Babrikki, as shown on said plan, three hundred two and 41/100 (302.41) feet;

NORTHWESTERLY by land of Babrikki, as shown on said plan, two hundred thirty-eight and 78/100 (238.78) feet;

NORTHEASTERLY by Tuttle Lane, as shown on said plan, eighty-six and 75/100 (86.75) feet;

NORTHEASTERLY by Tuttle Lane, as shown on said plan, three hundred and ten (310.00) feet;

NORTHEASTERLY by Tuttle Lane, as shown on said plan, seventy-six and 47/100 (76.47) feet;

NORTHEASTERLY by Tuttle Lane, as shown on said plan, one hundred twenty-one and 65/100 (121.65) feet;

SOUTHEASTERLY by land of Weinman, as shown on said plan, two hundred thirty-six and 85/100 (236.85) feet;

SOUTHEASTERLY by land of Ostrowski, as shown on said plan, two hundred twenty-five and 25/100 (225.25) feet;

SOUTHEASTERLY by land of John J. & Kathy B. Palmaccio, Ianatta, McLean, Taylor, Wendell, and Barry A. & Sharyn L. Palmaccio, as shown on said plan, eight hundred ninety-six and 10/100 (896.10) feet;

NORTHEASTERLY by land of Barry A. & Sharyn L. Palmaccio, as shown on said plan, two hundred and seventy (270.00) feet;

SOUTHEASTERLY by Red Acre Road, as shown on said plan, thirty-eight and 90/100 (38.90) feet; and

SOUTHWESTERLY by land of Bubnowicz, as shown on said plan, two hundred and seventy (270.00) feet to the point of beginning.

Containing 49.75 acres more or less as shown on said plan, and hereby conveying Lot 1 as shown on said plan, however otherwise bounded, measured or described.

Also a certain parcel of land, with the buildings thereon, on the Easterly side of Tuttle Lane and being shown as Lot 2 on said plan entitled, "Plan of Land, Stow, Mass. owned by Charles H. Lord et al, Scale 1" = 100', January 30, 1976, Survey by Clyde R. Wheeler Inc., Bolton, Mass. recorded at Book 12959 End, and bounded and described as follows:

NORTHEASTERLY by land of Morey, as shown on said plan, one hundred and twenty-seven (127.00) feet;

NORTHEASTERLY by land of Weinman, as shown on said plan, one hundred nineteen and 69/100 (119.69) feet;

SOUTHEASTERLY by land of Andrews, as shown on said plan, one hundred thirty and 89/100 (130.89) feet; and

SOUTHWESTERLY by Tuttle Lane, as shown on said plan, one hundred seventy-five and 06/100 (175.06) feet to the point of beginning.

Containing 18,134 square feet more or less and hereby conveying Lot 2 as shown on said plan however otherwise bounded, measured or described.

Being the same premises conveyed to us by deed of Charles H. Lord, Donald L. Priest, Executor of the Estate of Evelyn L. Priest, Eleanor N. Derby and Mary Elizabeth davis dated April 8, 1976 and recorded with the Middlesex South District Registry of Deeds in Book 12959, Page 626.

Executed as a sealed instrument this 8th day of ~~October~~ November 1983

JOHN A. BUBNOWICZ

MARILYN E. KUNELIUS formerly Marilyn E. Bubnowicz

The Commonwealth of Massachusetts

Middlesex ss. ~~October~~ November 8, 19 83

Then personally appeared the above named John A. Bubnowicz

and acknowledged the foregoing instrument to be his free act and deed,

Before me,

Notary Public — ~~Justice of the Peace~~

My commission expires Nov 16, 1984

COMMONWEALTH OF MASSACHUSETTS

Middlesex , ss. ~~October~~ November 8, 1983

Then personally appeared the above named Marilyn E. Kunelius and acknowledged the foregoing instrument to be her free act ~~and~~ deed,

Before me,

Notary Public

My commission expires: 9/28/90

# TAB 24



Conserving Land for People

January 5, 2003

BY HAND

Ross Perry, Chairman
Board of Selectmen
Stephen Dungan, Chairman
Finance Committee
Town of Stow
Stow, MA 01775

RE: Kunelius Property on Red Acre Road

Dear Chairmen, Board Members and Committee Members:

Thank you for the opportunity to meet with you on Tuesday, January 7, 2003 to discuss the above-referenced property and the possibility of the Trust for Public Land (TPL) accepting an assignment of the Town of Stow's right of first refusal (ROFR) under Chapter 61A. In advance of our meeting it seemed appropriate for me to provide you with some information and materials about TPL and to outline the circumstances under which it would be possible for TPL to become involved in this conservation project. I hope this letter and its attachments are a helpful step toward a proper introduction and, more importantly, mark the beginning of a productive and cooperative relationship between us.

TPL is a national non-profit land conservation organization. Founded thirty years ago, we have seven regional offices and 40 state or area offices around the country. The New England Regional Office is located in Boston. Our role in the conservation community is to facilitate the passage of land that is important for its recreational, cultural or ecological resources from private hands to permanent protected ownership by a municipality, public agency or other non-profit. All of our projects are done at the request of and in partnership with the entities that will become the permanent owners of the land. The two most important roles we play in this process are (1) to make sure that our obligations to our partners are met; and (2) to raise the funds necessary for the transaction from a

The Trust for Public Land
New England Regional Office
33 Union Street, Fourth Floor
Boston, MA 02108
(617) 367-6200
Fax (617) 367-1616

Connecticut Field Office
383 Orange Street
New Haven, CT 06511
(203) 777-7367
Fax (203) 777-7488

Maine Field Office
377 Fore Street 3rd Floor
Portland, ME 04101
(207) 772-7424
Fax: (207) 772-7420

Vermont Field Office
3 Shipman Place
Montpelier, VT 05602
(802) 223-1373
Fax (802) 223-0451

Connecticut Lakes Project Office
54 Portsmouth Street
Concord, NH 03301
(603) 224-0103
Fax (603) 228-0423

combination of private and public sources. Enclosed with this letter are some materials about TPL, including one page summaries of our Massachusetts program, a copy of our quarterly newsletter, and a copy of our magazine, Land and People, for your review.

The Kunelius property represents a wonderful opportunity for the Town to achieve an excellent and complementary set of land-use objectives. If packaged correctly, the rights held by the Town by virtue of Chapter 61A give it the leverage to achieve a strong conservation outcome for the majority of the property, to ensure the addition of two units of affordable housing to the Town's modest stock of property falling in this category, and to facilitate the relocation of an appropriate low-intensity equine rescue facility that is compatible with the rural and historical character of the Red Acre Road area.

For TPL to consider a financial and contractual stake in this project we would need to structure our involvement in a way that (a) will enhance the likelihood of sufficient public and private funds being available; and (b) ensures a strong conservation and community outcome.

Conservation projects are most successful when public funds constitute the majority of, or take a leadership position in, the conservation investment. We understand that the Selectmen have included a warrant for partial funding for a conservation project on the agenda of the upcoming Special Town Meeting. TPL proposes that the Town vote at the January 13, 2003 Special Town Meeting to fund the project as follows:

- $100,000 from Community Preservation Act funds for purposes of supporting the creation of two units of affordable housing; and
- $300,000 from general town funds for the purpose of achieving the conservation of between 42 and 46 acres of land (the Conservation Parcel) and to provide for potential future municipal water supplies for the Town.

If the Town fully approves this $400,000 commitment, TPL believes that a path to funding the entire project can be navigated by working closely with the Town and the private advocates, including the Stow Conservation Trust (SCT), the Friends of Red Acre (FORA), and Eye of the Storm Equine Rescue.

The proposed structure for funding a conservation strategy for the Kunelius property thus requires a strong town/private partnership. The total project costs, including purchase price, will be met from three sources: (1) the Town's $400,000; (2) fundraised dollars from private individuals and foundations; and (3) the private sales of restricted properties (the barn and one house (the Equine Parcel) to Eye of the Storm and the main house on the private market). Both residences would be sold as affordable units,

subject to appropriate affordability restrictions. With the Town's cooperation, additional funding will be sought from state grant sources such as Self Help or the DEP water quality program.

TPL understands that the Town would need assurances from TPL that this project meets certain Town objectives as well.

1. Acceptance of the ROFR. Under MGL Chapter 61A, the Town may assign its right of first refusal to a qualified non-profit. TPL is willing to accept the right of first refusal in the following circumstances:

- Town Meeting approves a total of $400,000 for the protection of the property, including $100,000 towards creating two existing units as affordable housing;
- SCT, FORA or another non-profit organization or individual makes a donation to TPL of $22,000 for the deposits required under the contract;
- TPL is satisfied that funding the balance of the project is feasible; and
- TPL's governing board approves the assignment.

Between now and February 6, 2003 when the Town's 120 days expire, TPL will work with local partners to continue to assess the likelihood and feasibility of funding the project. If TPL agrees to accept the assignment, we will be confident that the project will be successful. Once the Town assigns its right of first refusal, TPL will meet the deposit requirements and conduct the due diligence allowed by the contract (title review, building inspections and environmental analysis).

2. Municipal Water Supply Potential and Conservation Restriction. We know that the Town is interested in utilizing the property for potential municipal well purposes. In this regard, TPL will explore with the Division of Conservation Services within the Executive Office of Environmental Affairs (EOEA) whether and to what extent such uses are permissible if the state were to provide Self-Help reimbursement to the Town. Normally, EOEA secures a Conservation Restriction (CR) over property acquired by a town seeking reimbursement. We believe that such a CR could accommodate municipal water development in the future. Accordingly, the deed that TPL would deliver to the Town will require that the Conservation Parcel be subject to a CR, but one that would allow for such water development by the Town. The CR would also have to provide for public access in order to meet EOEA requirements.

3. Affordable Housing. If the Special Town Meeting authorizes the expenditure of $100,000 to ensure that the two houses on the property be affordable, TPL will ask the Community Preservation Committee and local affordable housing advocates to assist us in placing appropriate affordability restrictions on those structures in perpetuity. TPL would be responsible for the sale of the structures in the private residential market.

4. <u>Appropriate Usage of the Equine Parcel</u>. We understand that the Town is interested in achieving an appropriate usage of this parcel. If TPL agrees to accept the right of first refusal, we will work with the Town and Eye of the Storm to address these usage concerns, such as the location of manure storage and a limitation on development. However, it seems clear that if this project goes forward the Equine Parcel will be designated as an area for animal husbandry.

There no doubt will be many other issues for us to discuss on Tuesday evening. Please know that TPL is committed to being completely open and forthright in our relationship with you. We look forward to answering any questions you may have about this multi-faceted project. Based on the information contained in this letter and the discussion we have at our meeting, we hope that both the Board of Selectmen and the Finance Committee will vote to endorse this undertaking according to the terms outlined herein. If so, we ask that you authorize your chairman to sign below as an indication of your partnership with TPL.

Thank you

Sincerely,

Craig A. MacDonnell
MA State Director

Board of Selectmen

By ____________________

Its Chairman

Finance Committee

By ____________________

Its Chairman

# TAB 25

Friends of Red Acre

EQUINE RESCUE

RECEIVED
JUN 11 2003
BOARD OF SELECTMEN

June 6, 2003

Stow Board of Selectmen
Town Building
Stow, MA 01775

Dear Selectmen:

Recently, the Stow Board of Selectmen and then Town Meeting voted to support use of Community Preservation Committee (CPC) funds to contribute to the acquisition of the Kunelius Farm. This effort was a reflection of the wishes of the citizens of Stow and especially the residents of the Red Acre Road area.

A committed group of people banded together for this project and became known as the Friends of Red Acre (FORA). On behalf of FORA and the people of Stow, we want to thank the Selectmen for your support.

OPEN SPACE

Because of your open process and thoughtful consideration, a farm will be saved from development, a major aquifer protected, affordable housing created and existing conservation lands linked into a major wildlife corridor. Your willingness to assign your right of first refusal to our partner, the Trust for Public Land (TPL), and your subsequent endorsement of use of $400,000 of CPC funds have been crucial catalysts for this project. The recently approved CPC funds will comprise a small but vital portion of our budget and will in no way impact the general operating budget of the Town.

With your help, this citizens' group has been able to partner with the Town to form an unprecedented coalition of organizations including TPL, Stow Conservation Trust, Eye of the Storm and others, and we are well on our way to raising the necessary remaining funds. Thank you for working with us and allowing the voters to speak on this conservation alternative.

AFFORDABLE HOUSING

Sincerely,

Michael Labosky Erica Nilsson Karen Sommerlad

Peter Christianson Serena Furman David Cobb

KUN419

# TAB 26



Town of Stow
BOARD OF SELECTMEN
380 Great Road
Stow, Massachusetts 01775-1122
(978) 897-4515
FAX (978) 897-4534

ASSIGNMENT AND ACCEPTANCE

THIS ASSIGNMENT is made as of February 11th, 2003 by the Town of Stow, a Massachusetts municipal corporation having a mailing address of Town Building, 380 Great Rd., Stow, MA. 01775-2127 ("Town") and The Trust for Public Land, a California nonprofit conservation organization, having a mailing address of 33 Union Street, Boston, MA. 02108 ("Trust") under the following circumstances:

A. Pursuant to Massachusetts General Laws, Chapter 61, Section 8, the Town has Rights of First Refusal to acquire certain property valued, assessed and taxed as forest land during a period of one hundred twenty (120) days subsequent to its receipt of a Notice of Intent;

B. Pursuant to said statute, the Town has a right to assign its Rights of First Refusal to a nonprofit conservation organization and the Town voted by majority vote on February 11, 2003 to assign to The Trust for Public Land the Town's rights under M.G.L. Chapter 61, Section 8 to purchase land owned by Marilyn Kunelius of 142 and 144 Red Acres Road, Stow, MA ("Seller") described in two Deeds recorded with the Middlesex County Registry of Deeds Books 15412, Page 316 and Book 26230, Book 255 (the "Property") pursuant to the terms of a Purchase and Sale Agreement between Seller and Cohousing Resources, LLC dated October, 2002; and

C. The Trust desires to assume the Town's Rights of First Refusal pursuant to Chapter 61, Section 8.

NOW THEREFORE, FOR VALUE RECEIVED, Town hereby assigns and transfers all of its Rights of First Refusal to exercise an option to purchase the Property as set forth above.

This instrument shall be governed by and enforced in accordance with, the laws of the Commonwealth of Massachusetts without regard to the principles of conflicts of laws thereof.

IN WITNESS WHEREOF, the undersigned has executed this agreement as of the date first set forth above.

TOWN OF STOW
By its Board of Selectman

[signature]
[signature]
[signature]

________________________

________________________

THIS ACCEPTANCE OF ASSIGNMENT is made by The Trust for Public Land of the assignment of the Town of Stow's right of first refusal pertaining to 142 and 144 Red Acres Road, Stow, MA.

The Trust for Public Land

By: Dorothy Nelson Stookey
Dorothy Nelson Stookey
Regional Counsel,
duly authorized

Dated: February 12, 2003

# TAB 27



Town of Stow
**BOARD OF SELECTMEN**
380 Great Road
Stow, Massachusetts 01775-1122
(978) 897-4515
FAX (978) 897-4534

February 12, 2003

BY CERTIFIED MAIL
Marilyn Kunelius
142 and 144 Red Acres Road
Stow, MA 01775

Re: Land of Marilyn Kunelius located at 142 and 144 Red Acres Road, Stow, Middlesex County, MA.

Dear Ms. Kunelius:

In response to your letter dated October 16, 2002 regarding your intention to sell the above-referenced property, which is classified as forest land under Massachusetts General Laws Chapter 61, this will serve as formal notice that, by vote taken on February 11, 2003, the Board of Selectmen of the Town of Stow has voted to assign the Town's rights under Chapter 61, Section 8 to purchase the above-referenced land under the terms set forth in the Purchase and Sale Agreement between you and Cohousing Resources, LLC dated October, 2002. The Town has assigned its rights under Chapter 61, Section 8 to The Trust for Public Land, a national non-profit corporation, having its New England Regional Office at 33 Union Street, Boston, MA. 02108.

Copy of Assignment is attached hereto.

Pursuant to Massachusetts General Laws Chapter 61, this letter will be recorded with the Registry of Deeds within the statutory 120 day option period.

Very truly yours,

THE TOWN OF STOW
By its Board of Selectman

(by first class mail)
cc. Dorothy Nelson Stookey, Esq., The Trust for Public Land
Peter A. Kachajian, Jr., Esq., Attorney for Marilyn Kunelius

Attachment

# TAB 28



THE TRUST FOR PUBLIC LAND

February 13, 2003

Conserving Land for People

BY CERTIFIED MAIL
Marilyn Kunelius
142 and 144 Red Acres Road
Stow, MA 01775

Re: Exercise of Right of First Refusal, Land in Stow, Middlesex County, MA

Dear Ms. Kunelius:

On February 12, 2003, the Board of Selectmen of the Town of Stow assigned its rights under M.G.L. c. 61, Section 8 to purchase the land located at 142 and 144 Red Acres Road, Stow, MA described in two Deeds recorded with the Middlesex County Registry of Deeds Books 15412, Page 316 and Book 26230, Book 255 pursuant to the terms of a certain Purchase and Sale Agreement between you and Cohousing Resources, LLC dated October, 2002 (the "Agreement") and The Trust for Public Land accepted that assignment.

The undersigned, Dorothy Nelson Stookey, Regional Counsel and Assistant Secretary of the Trust for Public Land ("TPL"), duly authorized, elects to exercise the Right of First Refusal under M.G. L. c. 61, Section 8 that was assigned to TPL by the Town of Stow and assume the position of buyer under the above-referenced Agreement. A check in the amount of $ 11,500, being the initial $10,000 deposit and the first monthly $1500 deposit due under Paragraph 31 of the Agreement, made payable to you is being delivered to your attorney, Peter Kachajian, Esq.

We look forward to working with you to complete the preservation of this property. Thank you for your anticipated assistance and cooperation.

Very truly yours,

The Trust for Public Land

By: Dorothy Nelson Stookey
Dorothy Nelson Stookey
Regional Counsel

cc. Peter Kachajian, Esquire

he Trust for Public Land
New England Regional Office
33 Union Street, Fourth Floor
Boston, MA 02108
(617) 367-6200
Fax: (617) 367-1616

Connecticut Field Office
383 Orange Street
New Haven, CT 06511
(203) 777-7367
Fax: (203) 777-7488

Maine Field Office
377 Fore Street 3rd Floor
Portland, ME 04101
(207) 772-7424
Fax: (207) 772-7420

Vermont Field Office
3 Shipman Place
Montpelier, VT 05602
(802) 223-1373
Fax: (802) 223-0451

Connecticut Lakes Project Office
54 Portsmouth Street
Concord, NH 03301
(603) 224-0103
Fax: (603) 228-0423

# TAB 29

**From:** Ross_Perry@3com.com
**Sent:** Tuesday, February 04, 2003 4:38 PM
**To:** TownAdministrator@ci.stow.ma.us
**Cc:** Selectmen@ci.stow.ma.us
**Subject:** Kunelius property Red Acre Road Stow, MA

C.htm

Bill:

This if from Kunelius's attorney. Please review with Jake as appropriate.

Let me know if you believe we should meet with Kunelius before next week.

Thanks,

Ross
---------------------- Forwarded by Ross Perry/US/3Com on 02/04/2003 04:13 PM ---------------------------

"Peter Kachajian" <pakjr@earthlink.net> on 02/04/2003 04:06:46 PM

Please respond to pakjr@earthlink.net

Sent by: "Peter Kachajian" <pakjr@earthlink.net>

To: Ross Perry/US/3Com
cc:
Subject: Kunelius property Red Acre Road Stow, MA

(See attached file: C.htm)

KUN313

--- Peter Kachajian
--- pakjr@earthlink.net
Ross:

Pursuant to our phone conversation the following are sections of the Purchase and sale Agreement that in my opinion are inapplicable to a prospective assignee or the Town :

paragraph 32 : Not germane it presupposes a 40B application

paragraph 34 : the "feasibility" period applies to to design, engineering, and related tasks specific to construction of Mosaic Commons project.

paragraph 35 : transfer to the town is predicated upon Buyer receiving all monies due hereunder. Obviously permitting and approvals are irrelevant ,perhaps suggesting an accelerated timetable if all monies are paid timely and in full.

The $10,000 promissory note would have to be converted to a cash deposit immediately and deemed non-refundable.

All monies paid to Marilyn by Mosaic Commons would be refunded to them by the assignee immediately, again non-refundable.

The $400,000 second mortgage equates to an income stream of $56,000.00 which assumed a construction mortgage in first position. **This provision subjects the purchaser to personal liability. This is food for thought for the Friends of Red Acre Road and TPL. What was contemplated here is a level of commitment far exceeding normal indebtedness and a measure of security not expected in a second mortgage scenario.**

**Finally, of paramount concern is the charitable donation of the Ch. 61 land and the tax implications for Marilyn. It's minimum estimated value to her is $150,000 to $200,000. As I indicated the actual value will be determined by an appraisal at the appropriate time. The actual value of land and the water resource potential could weigh very heavily in the event the deal did not come to fruition.**

**Contingencies would seem not to be relevant to the Town or an assignee.**

**I would also point out that the closing date was decided upon as result of fundamental fairness to Mosaic Commons in the event the Town exercised its right of first refusal. An earlier closing date would have necessitated Mosaic Commons to seek permitting, etc. thus requiring expenditures that may never be recouped. The relevance of the date to close may come into play; an accommodation for the Buyer not the Seller possibly moot under the circumstances.**

Please contact me relative to a meeting to discuss these issues.

KUN314

# TAB 30



**Town of Stow**
**BOARD OF SELECTMEN**
**380 Great Road**
**Stow, Massachusetts 01775**
(978) 897-4515
FAX (978) 897-4534

September 24, 2003

Mr. Peter A. Kachajian, Jr., Esq.
292 Main Street
Northborough, MA 01532

Re: Kunelius property 142 & 144 Red Acre Road

Dear Attorney Kachajian:

In response to your letter of September 12th, the Town of Stow is not a "partner" with The Trust for Public Land (TPL) for the project on Red Acre Road.

After due diligence and pursuant to Massachusetts General laws, Chapter 61, Section 8, the Stow Board of Selectmen transferred completely to the Trust for Public Land the Town's Right of First Refusal to acquire said property.

The Board of Selectmen still believes the project as originally outlined by TPL is in the best interest of the Town and we hope that your client and the TPL, with support from the Friends For Red Acre (FORA) will work together to make this project successful for all parties.

Sincerely,

Ross Perry, pb

Ross Perry

Stow Board of Selectmen

# TAB 31

**WILSON & ORCUTT, P.C.**
COUNSELORS AT LAW
201 GREAT ROAD
ACTON, MASSACHUSETTS 01720

..LIP A. WILSON (1938-1967)
CHARLES E. ORCUTT, JR. (1962-1996)
RICHARD M. COTTER - OF COUNSEL
DANIEL B. GREENBERG
JACOB C. DIEMERT
JOHN R. McNAMARA
KRISTIN A. BULLWINKEL
CATHLEEN H. SUMMERS

TELEPHONE: (978) 264-4770
FACSIMILE: (978) 263-7142
EMAIL: JAKE@WILSONORCUTT.COM

Via Facsimile

June 24, 2003

Peter A. Kachajian, Jr., Esq.
Rockman & Kachajian
292 Main Street
Northboro, Massachusetts 01532

Re: Kunelius Property - Town of Stow

Dear Peter:

Attached are copies of the warrant articles, motions and votes (set forth in the attached minutes) for Articles 35 and 36, all of which have been provided by the Town Clerk. Your concerns should be addressed to Mr. William J. Wrigley, the Town Administrator, or to the Board of Selectmen, as to the intended action or schedule involving the Town's acquisition of an interest in your client's property by gift or purchase.

Very truly yours,

Jacob C. Diemert, Esq.
Town Counsel

cc: Stow Board of Selectmen (w/enc.)
Mr. William J. Wrigley (w/enc.)

RECEIVED
JUN 25 2003
BOARD OF SELECTMEN

KUN412

WARRANT ARTICLE RE: Kunelius Property
STOW ANNUAL TOWN MEETING CONVENED MAY 19, 2003

**Allow Discussion on 35/36 at the same time. Separate votes**

**ARTICLE 35. COMMUNITY PRESERVATION COMMITTEE**

To see if the Town will vote to appropriate and transfer the sum of Three Hundred Thousand Dollars ($300,000.00), or any other sum, from the Community Preservation Fund, to be added to any balance remaining in the Community Preservation Fund, to be expended under the direction of the Community Preservation Committee for the purposes of acquiring by purchase, eminent domain or otherwise, and to accept by charitable donation, for conservation, and passive and active open space, or any other municipal purposes as the Town shall hereafter determine, and set forth in the action proposed on this article, a fee simple interest, or any other interest in, a certain parcel of land containing approximately 45 +/- acres located on Red Acre Road, Stow, Middlesex County, Massachusetts; and that the Town accept the recommendation of the Community Preservation Committee with regard to such purchase; or, alternately, to see if the Town will vote to authorize the Treasurer to borrow the sum of Three Hundred Thousand Dollars ($300,000.00) under the provisions of M.G.L. Chapter 44B Section 11, which borrowing shall be for a period of three years, it being the intent of the Town that the principal of and interest on such portion of the borrowing shall be repaid from Community Preservation Fund revenues; and further that any gifts or grants received by the Town for the purposes of this Article may be applied by the Town to pay the interest on and the principal of any borrowing authorized by this vote; and that the Board of Selectmen be authorized to discuss, apply for, accept and expend any and all federal and state grants, aid or loans which may be available for the acquisition of such land and to convey any easements or conservation restrictions as may be required to obtain such grants, aid or loans; to negotiate for and to acquire such land or interest in land by gift, purchase, charitable donation, eminent domain or otherwise; and to take all other actions necessary or appropriate to accomplish the acquisition of such land or interest in land, including, without limitation, engaging counsel, obtaining or preparing plans, surveys, studies, assessments, title reports, or other instruments or documents, obtaining appraisals, and conducting tests and studies, including environmental and feasibility studies; and further, that the Board of Selectmen be authorized to negotiate such purchase upon such terms, provisions and conditions as to the Board of Selectmen and the Community Preservation Committee deem, in their discretion, to be appropriate; and to take all other action deemed necessary or appropriate to accomplish the purpose of this article; that all land acquired for conservation or passive or active open space shall be managed and controlled by and be under the jurisdiction of the Stow Conservation Commission; which together with the Board of Selectmen, shall be authorized to file on behalf of the Town any and all applications deemed necessary or appropriate to obtain grants and/or reimbursements from the Commonwealth of Massachusetts under the Self-Help Act (M.G.L. c. 132A, sec. 11) and /or any other statute or regulation in any way connected with the purpose or intent of this article; or take any other action relative thereto.

(Community Preservation Committee)

*The Finance Committee recommends approval of this article. It provides a number of benefits to the town. Unlike an article at a prior town meeting concerning this property, the Finance Committee believes that this article is funded from an appropriate source for this sort of purchase, making the open space a fair investment for the town. All funds required for this article will be paid from the Stow Community Preservation Fund, which will not require any increase in town property taxes. The article as printed may spend $300,000 by borrowing money for three years against Community Preservation income to fund this project; the interest costs from borrowing could substantially increase the total costs. The Finance Committee has concern over this potential interest expense and would prefer to see the final implementation of this article structured to minimize any borrowing costs.*

At 8:03 p.m. there was a call for the question which carried, and the meeting proceeded to vote on Mr. Jones' amendment. The motion to amend DID NOT CARRY.

Discussion continued on the main motion. Ms. Hathaway noted the Zoning Board of Appeals will conduct a public hearing on June 2nd for frontage variance concerning 144 Red Acre Road. She inquired into plans if the variance were not granted. Mr. MacDonnell felt it likely the variance would be granted. If not, there would be a re-examination of the project.

Leonard Golder asked how the project would be financed. Mr. MacDonnell responded that normally The Trust for Public Land asks the municipality involved to contribute 50% of the purchase, but here the Town is being asked for only $300,000, plus $100,000 for the affordable component. Mr. Wilber indicated that self-help funds would be sought from the State. The Selectmen were said to support the project.

At 8:24 p.m. there was a call for the question that carried. The vote on the main motion was in excess of a majority.

**Article 36. Affordable Housing Restriction**

On motion of Robert Wilber of the Conservation Preservation Committee, it was voted by majority to appropriate and transfer from the Community Preservation Fund the sum of $100,000.00 to be used and expended under the direction of the Community Preservation Committee for the purpose of purchasing a property interest commonly known as "affordability restriction" for two properties located at 142 and 144 Red Acre Road; that the Board of Selectmen be authorized to negotiate such purchase upon such terms, provisions and conditions as the Board of Selectmen and Community Preservation Committee deem, in their discretion, to be appropriate; and that the Board of Selectmen and the Community Preservation Committee be authorized to take all other actions necessary or appropriate to accomplish the foregoing consistent with the Community Preservation Act.

**Article 37. Adjustments to Eligibility Requirements under Chapter 59, Section 5(41C)**

On motion of Selectman Shirley Burchfield, it was voted unanimously, pursuant to Chapter 184, Section 51 of the Acts of 2002, to allow for the adjustment in eligibility requirements and in the amount of the exemption granted to those qualifying under Mass. General Laws Chapter 59, Section 5(41C), as such eligibility requirements and amounts are printed in the warrant.

1. Decrease the age requirement from 70 to 65.
2. Increase the income limits from $13,000 single/$15,000 married to $20,000 single/ $30,000 married.
3. Increase the asset limits from $28,000 single/$30,000 married to $40,000 single/ $55,000 married.
4. Increase the exemption amount granted by 100%.

**Article 38. Amendment of the Nashoba Regional School District Agreement**

On motion of Selectman Jones, it was voted unanimously to authorize the Nashoba Regional School District Committee to vote to amend the existing Nashoba Regional School District Agreement, as printed in the warrant, and to authorize the Committee or the Town of Stow to petition the Great and General Court to enact any special legislation as may be necessary for such purpose.

Section 1. (A) The powers and duties of the regional school district shall be vested in and exercised by a regional school district committee, sometimes referred to as the committee. The committee shall consist of eight members: three from the town of Lancaster, three from the town of Stow and two from the town of Bolton. Such committee had members elected at the 2001 annual election of each town as follows: Bolton: two members, one for a term of three years and one for a term of two years; Lancaster: three members, one for a term of one year, one for a term of

Stow Annual Town Meeting
Convened May 19

Minutes from 3rd Session May 21st

question seeks approval of a $414,511 override for the purpose of funding the FY2004 Nashoba School District operating budget. The District budget vote was not contingent upon an override, therefore, if question 2 were approved, it would provide additional levy limit. Current estimates are than one million dollars will be required to balance the Fiscal 2004 budget. Question 3 seeks to exempt debt for the Pompositticut and Center School capital projects (Article 26). Question 4 seeks to exempt debt to finance acquisition of the former Hewlett-Packard/Compaq/Digital property at the corner of Hudson Road.

**Article 35 and 36.**

On motion of Selectman Perry, it was voted unanimously that Article 35 and Article 36 be combined for purposes of discussion, but each article be acted on by separate motion.

**Article 35. Community Preservation - Kunelius Property**

On motion of Robert Wilber of the Community Preservation Committee it was voted by majority to appropriate and transfer from the Community Preservation Fund the sum of $300,000.00 to be expended under the direction of the Community Preservation Committee for the purposes of acquiring by purchase or gift a certain parcel of land containing approximately 44.57 acres of land located on Red Acre Road, Stow, Middlesex County, Massachusetts for conservation, active and open space, for any other municipal purposes as the Town shall hereafter determine, so long as areas designated for separate purposes shall be clearly identified and delineated;

that the Board of Selectmen be authorized to negotiate such purchases upon such terms, provisions and conditions as the Board of Selectmen and the Community Preservation Committee deem, in their discretion, to be appropriate, including terms addressing easements over the adjacent parcels of land located at 142 and 144 Red Acre Road providing appropriate conservation restrictions and access to the 44.57 acre parcel;

that such acquisition shall occur only after the Community Preservation Committee and the Board of Selectmen have received an appraisal from a qualified real estate appraiser that confirms to their satisfaction the value of the interest being conveyed to the Town hereunder;

and that the Board of Selectmen and the Community Preservation Committee be authorized to take all other actions necessary or appropriate to accomplish the foregoing consistent with the Community Preservation Act.

Craig MacDonnell, Director of The Trust for Public Lands, described the property, its location and the history of the project. The existing dwelling at 142 Red Acre Road would be renovated and sold as affordable. The dwelling at 144 would be acquired by "Eye of the Storm", an equine rescue entity. There would be a permanent conservation restriction. The appropriation would afford the Town a deeded access across the property to the fire pond and to the potential water supply resource. The affordable housing restriction under Article 36 would provide two affordable dwelling units and count toward the Town's 10% goal. Both units would be renovated to code prior to being turned over to the Town. Mr. Wilber advised the property would serve as a connector to existing conservation lands, Red Acre Woodland and Captain Sargent Land.

Selectman Gregory Jones moved to amend as follows: "...$300,000.00 to be expended under the direction of the Conservation Preservation Committee for the purpose of acquiring by purchase a certain parcel of land containing approximately 2.47 acres of land located off Red Acre Road, Stow, Middlesex County,..."

Linda Hathaway, speaking as a taxpayer, reminded that a ballot question at the January special town election concerning debt exemption for acquisition of the Kunelius property had failed. James Dunlap questioned the effect on the aquifer of the presence of horses and their waste products.

Stow Annual Town Meeting
Convened May 19, 2003

Kay's notes

Start Time:________ FinCom By:________

Motion By:________ Fin Com: In Favor________ Opposed:________

Pres/Ques(s) By:________ Cap. Plan:________

Vote Required: Majority ______ 2/3s______ 4/5s______ 9/10s______ No Action______

MOTION

ARTICLE 36

Mr. Moderator:

I move that the Town vote to appropriate and transfer from the Community Preservation Fund, the sum of $100,000.00 to be used and expended under the direction of the Community Preservation Committee for the purpose of purchasing a property interest commonly know as "affordability restrictions" for two properties located at 142 and 144 Red Acre Road; that the Board of Selectmen be authorized to negotiate such purchase upon such terms, provisions and conditions as the Board of Selectmen and Community Preservation Committee deem, in their discretion to be appropriate; and that the Board of Selectmen and the Community Preservation Committee be authorized to take all other actions necessary or appropriate to accomplish the foregoing consistent with the Community Preservation Act.

Hand Vote: Pass:________ Uanaimous:________ Fail:________

KUN416

Teller/Ballot Vote: Pass:____ Fail:____ Votes: Total____ Req____ In Favor____ Opposed____

Time Declared:________

Warrant Article RE Kunelius Property

Stow Annual Town Meeting Convened May 19, 2003

## ARTICLE 36. AFFORDABLE HOUSING RESTRICTION

To see if the Town will vote to appropriate and transfer the sum of One Hundred Thousand Dollars ($100,000.00), or any other sum, from the Community Preservation Fund, to be added to any balance remaining in the Community Preservation Fund, to be expended under the direction of the Community Preservation Committee for the purposes of acquiring by purchase, eminent domain or otherwise, a property interest commonly known as an "affordability" restriction with respect to each of the dwellings located at 142 and 144 Red Acre Road, which property interest or restriction would be recorded at the Middlesex County Registry of Deeds and would limit in perpetuity the sale of said dwelling to persons meeting the qualifications to purchase such properties as adopted and accepted by the Massachusetts Department of Housing and Community Development; that the Town accept the recommendation of the Community Preservation Committee with regard to such purchase; or, alternately, to see if the Town will vote to authorize the Treasurer to borrow the sum of One Hundred Thousand Dollars ($100,000.00) under the provisions of M.L. c. 44B sec. 11, which borrowing shall be for a period of three years, it being the intent of the Town that the principal of and interest on such portion of the borrowing shall be repaid from Community Preservation Fund revenues; and further that any gifts or grants received by the Town for the purposes of this Article may be applied by the Town to pay the interest on and the principal of any borrowing authorized by this vote; and that the Board of Selectmen be authorized to discuss, apply for, accept and expend any and all federal and state grants, aid or loans which may be available for the acquisition of such land and to convey any easements or conservation restrictions as may be required to obtain such grants, aid or loans; to negotiate for and to acquire such land or interest in land by gift, purchase, charitable donation, eminent domain or otherwise; and to take all other actions necessary or appropriate to accomplish the acquisition of such land or interest in land, including, without limitation, engaging counsel, obtaining or preparing plans, surveys, studies, assessments, title reports, or other instruments or documents, obtaining appraisals, and conducting tests and studies, including environmental and feasibility studies; and further, that the Board of Selectmen be authorized to negotiate such purchase upon such terms, provisions and conditions as to the Board of Selectmen and Community Preservation Committee deem, in their discretion, to be appropriate; and to take all other action deemed necessary or appropriate to accomplish the purpose of this article; or take any other action relative thereto.

(Community Preservation Committee)

*The Finance Committee recommends approval of this article. This article both provides for two affordable houses and the purchase of open space along Red Acre Road. The affordable housing component will add to Stow's 10% affordable housing goal without adding new houses to the town, with safeguards to make sure that the houses are in good condition before the town actually transfers any of its affordable housing funds.*

KUN417

Stow Annual Town Meeting
Convened May 19, 2003

Kay's NOTES

Start Time: 7:19

FinCom By: Dave Walcott

Motion By: Bob Wilber

Fin Com: In Favor X Opposed: FinCom

Pres/Ques(s) By: Craig MacDonnell

Cap. Plan: Karen Meyer supports

guarantee gift if
- 45 acres
- 3 acres purchase
- Right of way

Vote Required: Majority FRL 2/3s ____ 4/5s ____ 9/10s ____ No Action ____

MOTION

ARTICLE 35

Mr. Moderator:

I move that the Town vote to appropriate and transfer from the Community Preservation Fund the sum of $300,000.00 to be expended under the direction of the Community Preservation Committee for the purposes of acquiring by purchase or gift a certain parcel of land containing approximately 44.57 acres of land located on Red Acre Road, Stow, Middlesex County, Massachusetts for conservation, active and open space, for any other municipal purposes as the Town shall hereafter determine, so long as areas designated for separate purposes shall be clearly identified and delineated; that the Board of Selectmen be authorized to negotiate such purchases upon such terms, provisions and conditions as the Board of Selectmen and the Community Preservation Committee deem, in their discretion, to be appropriate, including terms addressing easements over the adjacent parcels of land located at 142 and 144 Red Acre Road providing appropriate conservation restrictions and access to the 44.57 acre parcel; that such acquisition shall occur only after the Community Preservation Committee and the Board of Selectmen have received ~~said~~ an appraisal from a qualified real estate appraiser that confirms to their satisfaction the value of the interest being conveyed to the Town hereunder; and that the Board of Selectmen and the Community Preservation Committee be authorized to take all other actions necessary or appropriate to accomplish the foregoing consistent with the Community Preservation Act.

Hand Vote: Pass: ________ Unanimous: ________ Fail: ____________

KUN418

Teller/Ballot Vote: Pass: ____ Fail: ____ Votes: Total ____ Req ____ In Favor ____ Opposed ____

Time Declared: ____________________

# TAB 32

# HOUSING DEVELOPMENT SUPPORT PROGRAM

# MASSACHUSETTS COMMUNITY DEVELOPMENT BLOCK GRANT

## APPLICATION COVER SHEET
(Form 1-1)

***APPLICANT***

Community: Town of Stow

Address: 380 Great Road

Stow, MA 01775-2127

Contact Person: (Name) Edward R. Perry

(Title) Chairman, Stow Board of Selectmen

Address: 380 Great Road, Stow, MA 01775-2127

Phone: 978-897-4514

Fax: 978-897-4534 E-Mail: Ross_Perry@3com.com

***PROPOSED PROJECT***

Project Name: Kunelius Farm

Use of Funds (indicate amount for each category applied for)

| | |
|---|---|
| Acquisition | $320,000 |
| Demolition | $ |
| Relocation | $ |
| Housing Rehabilitation | $ |
| New Construction | $ |
| Infrastructure Improvements | $ |
| Other: | $ |
| Administrative Costs | $32,000 |
| Total HDSP Grant Request: | $352,000 |

**Executive Order 418 Certification:**
Included with application
- Date Certified ☐
- Awaiting Certification ☒
- Request attached ☐

***AUTHORIZATION***

[signature]
Signature Chief Elected Official (CEO)

3/30/03
Date

Edward R. Perry
Name of Chief Elected Official

Chairman, Board of Selectmen
Title

978-897-4514
Phone Number of CEO

To the best of my knowledge, information in this application is true and correct.

# HOUSING DEVELOPMENT SUPPORT PROGRAM

# MASSACHUSETTS COMMUNITY DEVELOPMENT BLOCK GRANT

## APPLICATION COVER SHEET
(Form 1-1)

***APPLICANT***

Community: Town of Stow

Address: 380 Great Road

Stow, MA 01775-2127

Contact Person: (Name) Edward R. Perry

(Title) Chairman, Stow Board of Selectmen

Address: 380 Great Road, Stow, MA 01775-2127

Phone: 978-897-4514

Fax: 978-897-4534 E-Mail: Ross_Perry@3com.com

***PROPOSED PROJECT***

Project Name: Kunelius Farm

Use of Funds (indicate amount for each category applied for)

| | |
|---|---|
| Acquisition | $320,000 |
| Demolition | $ |
| Relocation | $ |
| Housing Rehabilitation | $ |
| New Construction | $ |
| Infrastructure Improvements | $ |
| Other: | $ |
| Administrative Costs | $32,000 |
| Total HDSP Grant Request: | $352,000 |

**Executive Order 418 Certification:**
Included with application
Date Certified ☐
Awaiting Certification ☒
Request attached ☐

***AUTHORIZATION***

Edward R. Perry
Name of Chief Elected Official

Signature Chief Elected Official (CEO)

Chairman, Board of Selectmen
Title

Date

978-897-4514
Phone Number of CEO

To the best of my knowledge, information in this application is true and correct.

## Item 1-2: Community Development Strategy

In 1996, The Town of Stow published *Stow 2000, A Master Plan*. This 359-page document was adopted by the Planning Board and presents a comprehensive report on the characteristics of the town; the needs and challenges that face the community; and a strategy of implementation to address these issues. Its contents were developed in a community planning process by the Stow 2000 Committee, whose planning analyses included a survey sent to all town households that had a 33% response rate. It was further refined with public input at many meetings including public forums in 1994 and 1995. A final draft was released for public comment before the document was published. This CDS summary relies on the content of the *Stow 2000: A Master Plan* to describe the town's community development strategy and how this project is consistent with the needs and goals of the Town of Stow.

**Background:**

Stow, a 17.62 square mile community of 5,902 residents (Census 2000) has a land use that is 63% residential. There are two developments constructed under comprehensive permits for senior citizens (50 units) and diverse income rental units (12 of 60 are restricted for renters of low and moderate income). "The balance of Stow's housing is primarily frontage lots along existing roadways and a few smaller subdivisions."

Stow recognizes that housing prices within the town are "...beyond the reach of first time home buyers." At the time of the report, the median price of a single-family home was in excess of $250,000. According to the report, "less than 10% of the houses in Stow are sold for under $150,000. New construction houses are now selling for an average price of $300,000." Median single-family home sales for the month of September 2002 (the most recent month available) were in excess of $450,000. The continuing strong real estate market has reinforced the need for affordable single-family units in Stow.

Stow has become a community that is affordable only to buyers with higher incomes. Residents that are adversely affected by this limited opportunity for purchasing homes include "...first time home buyers, service employees, and the elderly who earn low and moderate incomes." Providing housing opportunities for these residents is listed as Goal number 4.10.1 in the report: Provide housing opportunities for those at the entry level of homeownership, "empty-nesters, elder residents, and those requiring housing assistance and rental housing units."

The comprehensive permit developments mentioned above, along with a housing development that contains deed restricted affordable housing, have added to an affordable housing stock within the town that has exceeded 7%. "The sales or rental price is based on the Boston Primary Statistical Area median income and is defined by the Commonwealth. These dwelling units are deed restricted to require resale or rental only to qualified buyers under the State program."

142 Red Acre Road

The CDS outlines strategic goals that include higher density development in the village areas of the town; residential condominiums; elderly housing; and the conversion of existing "...affordable housing stock into non-profit or residential ownership models that protect affordability on a permanent basis (Priority: high)".

The purchase and sale of 142 Red Acre Road as deed restricted as affordable in perpetuity will capture an existing house in Stow and provide an opportunity for someone with an income between 65% and 80% of

the Boston Primary Statistical Area median income with a 2-3 bedroom home on .93 acres in an attractive, wooded neighborhood of single family homes.

Regardless of what the Town does to expand its housing stock, it is important to preserve the variety of housing that it already has.

This goal is reiterated in the passing of the Planned Conservation Development amendment to the Zoning Bylaw at the 1995 Annual Town Meeting. One of the intents of this amendment was to encourage "...a greater mixture of housing types..."

Under the "Objectives and Action Items" section of Stow 2000: A Master Plan are two action items that this project addresses:

2. Protect existing subsidized rental units... and where possible, move the affordable housing stock into nonprofit or resident ownership models that protect affordability on a permanent basis. (Priority: high)

3. Revitalize the Stow Housing Partnership in order to provide housing for the empty nesters, young families, and low and moderate-income residents in our community. (Priority: high).

The unique characteristic of this project is that it fits neither of the usual models for affordable housing development. It is neither a Town-initiated project, nor is it a Town partnership with a traditional for-profit developer. The project is a unique partnership between the Town and a national non-profit organization, which will provide the following benefits:

1. A model for encouraging the capture of suitable housing throughout the Stow community that can be offered for sale as deed restricted affordable in perpetuity. Many of the underserved residents of Stow would benefit from having the opportunity to live in and own a single-family detached residence in an economically diverse neighborhood.

2. A model for bringing federal dollars to bear in Stow's continuing effort to increase affordable housing stocks. Experience gained from the preparation of this application provides the town a foundation for future affordable housing funding efforts.

In summary, this project allows for the capture, conversion and sale of existing housing stock to deed restricted affordable in perpetuity. The project meets many of the goals and objectives defined by the town in its master planning process, and has the added benefit of public-private partnership to reduce the burden on Town staff. In this partnership, The Trust for Public Land is fulfilling its mission, which is to work with communities on land projects that fulfill town goals and objectives. The Trust for Public Land is pleased and excited to have the opportunity to work with the Town of Stow and with the Massachusetts DHCD to convert an existing home into affordable housing stock to further benefit the community.

Reference: Stow 2000, A Master Plan, (May 1996), pps 21, 22, 78-82, 175-186.

Item 1-3: Project Description and One-Stop

| Project Summary | |
|---|---|
| Project Scope | Acquisition and rehabilitation |
| Number/Type of Unit | 1 two-bedroom, single family ownership unit |
| Developer Identity | The Trust for Public Land |
| Housing Type and Proposed Clientele | Single family residential, affordable to persons earning 65% - 80% of Median Income |
| Affordability Terms | Unit will be sold for $199,000, and will be affordable to families earning XXXX |

The Kunelius Farm is located at 142/144 Red Acre Road and Tuttle Lane between Red Acre Woods Conservation Land and Captain Sargent Conservation Land. The property consists of 50 acres that includes approximately 8 acres of uplands, wooded wetlands, a scenic pond, a vernal pool, two houses, a barn, a paddock, a riding ring, and pasture. One house, the residence at 142 Red Acre Road, is the subject of this application.

The project calls for approximately 45 acres to be acquired by the Town of Stow for the purpose of conservation and for a potential future water supply. The two houses will be owned privately, but will be deeded "affordable" to moderate-income families in perpetuity. The project developer expects that the Eye of the Storm, a local equine rescue facility, will occupy the existing horse facilities and the house at 144 Red Acre Road, and continue to shelter and care for injured and frail horses. Upon sale of the house, affordability restrictions will be attached and conveyance will be subject to the town-directed lottery system.

The entire 50-acre parcel is now under contract for a price of $1,116,900, plus interest on a retained motgage. Because the property is subject to Chapter 61A, the Town had a right of first refusal to purchase the land instead of the developer. After a public hearing, the Town assigned this right to the Trust for Public Land.

The Town of Stow will be voting at Town Meeting to spend $300,000 for the purchase of the 45-acre conservation and aquifer protection parcel and $100,000 to purchase the affordability restrictions on the two houses.

The cost of these acquisitions will be borne by the Community Preservation Fund, which will pay the principal and interest on the bonds that will be sold to generate the funds for this town investment.

Acquisition of the Kunelius Farm by the Town will provide a critical link between the Red Acre woodland and the Captain Sargent conservation area that extends across Tuttle Lane and South Acton Road. Limiting development on this parcel to the existing residential and horse-related uses also will preserve the integrity of the Town's investment in surrounding open space. In addition, public ownership will result in increased opportunities for trail connections, preserve the existing wildlife corridor, and provide greater public access to previously protected open space.

Protecting the Kunelius Farm will also preserve an important water resource. Portions of the Kunelius Farm sit above one the most valuable and productive aquifers in town. It would be an important safeguard for Stow to have ownership rights in this valuable resource. The proposed conservation project would ensure that this resource will be protected and not be utilized primarily by the multi-unit development being proposed for the property.

Perhaps the most important aspect of this project is that it will add two units to Stow's very limited inventory of affordable housing. Based on discussions with the Community Preservation Committee (CPC), it appears likely that CPC will spend $100,000 to purchase affordability restrictions on the two houses on the property. Adding these two units of affordable housing would help maintain Stow as a diverse and affordable community, one of the major objectives of CPA.

The unique opportunity presented by this project to rehabilitate at-risk affordable single-family housing is one that is consistent with Stow's Community Development Strategy (see Item 1-2). Along with 45 acres of conservation land, the project will ultimately deliver two units of high-quality housing that is affordable to moderate-income families. These units are located in a highly desirable neighborhood within a short distance to shopping, schools, public services, and recreational opportunities.

Project Schedule

May 19: Town meeting vote to determine use of CPA funds

June - September: Federal grants and private development funds sought for acquisition and renovation of the structures.

September 26: Formal acquisition of the property by the Trust for Public Land. 45 acres conservation parcel deeded to Town. Conservation and affordability restrictions imposed on private parcels.

1. Financing Mechanism:

The total acquisition costs, including the conservation land, the horse property, and the residence at 142 Red Acre Road are nearly $1.2 million, including interest due the owner under the purchase and sale agreement. HDSP funds will be specifically used for acquisition of the property at 142.

TPL is prepared to purchase the Property. TPL has a primary plan and a fallback plan. The primary plan envisions a multilateral funding approach to this project. Some of the funding is contingent, as explained below, but all of it is subject to a fallback Line of Credit from Wainwright Bank.

TPL's primary plan is to generate the funds necessary for the closing as follows.

| **Primary Plan** | |
|---|---|
| Town of Stow contribution | $300,000 |
| Sale of 144 Red Acre Road | $400,000 |
| DHCD funding | $250,000 |
| Private fundraising | $200,000 |
| TOTAL | $1,150,000 |

a. Town Funds: The Town's contribution will be allocated from the pre-existing Community Preservation Fund (CPF) in Stow. CPF monies are derived from a property tax surcharge imposed on real estate. The fund currently has approximately [$550,000] available for allocation to projects like this one. Any allocation requires a simple

majority vote at Town Meeting on May 19, 2003. The Board of Selectmen and the Community Preservation Committee have voted to support this measure. This contribution will entitle the Town to the ownership of 45 acres of adjacent woodlands and wetlands for conservation and municipal water supply purposes.

b. 144 Red Acre Road: TPL will sell 144 Red Acre Road, an adjacent five-acre property containing a two-bedroom house, two barns and a small outbuilding to the Eye of the Storm Equine Rescue, Inc. (EOS), a non-profit corporation dedicated to the rehabilitation of sick and injured horses. EOS intends to utilize this property as its primary rehabilitation facility.

c. DHCD Funds: TPL intends to use the acquisition funds requested in this application at the closing of the purchase of the property from the current owner on September 26, 2003.

d. Private Fundraising: TPL has and will continue to pursue private-sector fundraising for this project. Currently, there are pledges in excess of $200,000 available for this project (two $100,000 pledges from other non-profit organizations, and the remainder in individual donations).

As a fallback plan, if any or all of the above-referenced sources of funds are unavailable, TPL intends to utilize capital from the private market. In this regard, TPL has available for its use a Line of Credit from Wainwright Bank in the amount of $6,000,000, as evidenced by the letter attached as Exhibit __. The use of this capital is subject to TPL's internal approval process, including customary due diligence and approval by the board of directors.

2. Contingency Plan for Cost Overruns

As part of the larger Kunelius Farm project, the Trust for Public Land has organized a significant private fundraising campaign. This campaign, in conjunction with Stow CPA funds, the sale of the unit, and HDSP funds, has sufficient capacity to, if necessary, cover cost overruns.

In addition, the Trust for Public Land has received confirmation that its $6,000,000 line of credit has been renewed by Wainwright Bank, and these funds would be available to cover cost overruns, subject to TPL's normal due diligence and internal review.

3. Construction Estimates and Procurement Process

Based upon an appraisal performed by Prospectus, Inc. (see Exhibit 6), the acquisition cost of the land, a .93-acre parcel, and the 1,066 square foot residence will be $320,000. Given the scarcity of frontage land in Stow, and the current housing market, this price is appropriate.

Estimates for housing rehabilitation were provided by Integrity Builders and Remodelers, Inc., from Acton, MA. Renovation estimates provided by Dana McKiel of Integrity to bring the structure up to appropriate conditions and current building code total approximately $126,000. The work is estimated to take between four and six months to complete given the extensive work required on the roof. In addition to the roof, windows, exterior doors, side and rear decks, and kitchen cabinets need replacing.

Infrastructure improvements to the property include the septic repairs necessary to achieve full Title V Certification. ABC Cesspool Co. Inc. completed a Title V inspection on March 20, 2003, and granted a conditional certification. Cost for the repairs are estimated at $1,200.

The Town of Stow will circulate, according to procedures described in *Municipal, County, District, and Local Authority Procurement of Supplies, Services, and Real Property*, a request for bids for the management, administration, and oversight of this grant. A grant management consultant will be chosen by the Town (with advice and guidance for suitability from DHCD prior to the commencement of the contract between the town and the consultant).

# Section 1
# PROJECT DESCRIPTION

## Name and Address of Project

1 . Project Name: Kunelius Farm
1a . Application Completed By: Christopher LaPointe, TPL, Rodger Brown, R. Broen and Associates
1b . Original Application Date: April 1, 2003 Application Revision Date:

2 . Project Address: 142 Red Acre Road
3 . Neighborhood
4 . City/ Town: Stow MA (state) 01775 (zip code)

5 . County MIDDLESEX

6 . ☐ Scattered sites

7 . Is this a qualified census tract? No Enter a census tract

8 . Difficult to develop area QCT information last updated on: 3/20/03

## Development Plan

9 . Development Type (Please check all that apply.)

| | |
|---|---|
| No | New construction |
| Yes | Acquisition, substantial rehab of existing housing |
| No | Acquisition, moderate rehab of existing housing |
| No | Acquisition, minimal or no rehab of existing housing |
| No | Adaptive re-use of non-residential structure |

10 . Proposed Housing Type: Home Ownership

11 . **Project Description:** Number of buildings: 1

Acquisition and renovation of a .93-acre parcel in the Town of Stow, with a 3 bedroom, one bath split level residence built in 1967. The Town of Stow will purchase an affordability restriction using CPA funds. Property is part of a larger 50-acre project which includes 45 acres of conservation land to be conveyed to the Town of Stow, and an approximately 5-acre horse property to be purchased by the Eye of the Storm equine rescue group, a 2 bedroom residence that will be subject to an affordability restiction upon future

12 . **Development Schedule:**

| | *Original* | *Revised* | *Optional user comments* |
|---|---|---|---|
| Application Date | April 1, 2003 | | |
| Construction Loan Closing | N/A | | |
| Initial Loan Closing (MHFA only) | N/A | | |
| Construction Start | 9/27/03 | | |
| 50% Construction Completion | TBD | | |
| Construction Completion | TBD | | |
| First Certificate of Occupancy | TBD | | |
| Final Certificate of Occupancy | TBD | | |
| Sustained Occupancy | TBD | | |
| Permanent Loan Closing | | | |

KUN345

© Massachusetts Housing Investment Corporation, 1993, 1994, 1995, 1999 in its own name and on behalf of MHFA, DHCD, and the MHP Fund. All rights reserved.

13 . **Unit Mix:**

| | Low-Income Rental Assisted | Low-Income below 50% | Low-Income below 60% | Other Income 80% | Market Rate | Total Units |
|---|---|---|---|---|---|---|
| 2 bedrooms | | | | 1 | | 1 |
| 0 bedroom | | | | | | 0 |
| 1 bedroom | | | | | | 0 |
| 2 bedrooms | | | | | | 0 |
| 3 bedrooms | | | | | | 0 |
| 4 bedrooms | | | | | | 0 |
| Total Units | 0 | 0 | 0 | 1 | 0 | 1 |
| Home Units* | | | 0 | | | 0 |

*HOME units included in the above totals. Other Income=Below 80% of median income

14 . Unit Size in square feet:

| | Low-Income Rental Assisted | Low-Income below 50% | Low-Income below 60% | Other Income 80% | Market Rate | Average All Incomes |
|---|---|---|---|---|---|---|
| 2 bedrooms | | | | 1066.0 | | 1,066 |
| 0 bedroom | | | | | | N/A |
| 1 bedroom | | | | | | N/A |
| 2 bedrooms | | | | | | N/A |
| 3 bedrooms | | | | | | N/A |
| 4 bedrooms | | | | | | N/A |

15 . Number of bathrooms in each unit:

| | Low-Income Rental Assisted | Low-Income below 50% | Low-Income below 60% | Other Income 80% | Market Rate | Average All Incomes |
|---|---|---|---|---|---|---|
| 2 bedrooms | | | | 1.0 | | 1.0 |
| 0 bedroom | | | | | | N/A |
| 1 bedroom | | | | | | N/A |
| 2 bedrooms | | | | | | N/A |
| 3 bedrooms | | | | | | N/A |
| 4 bedrooms | | | | | | N/A |

16 . **Funding Applied For:**

Please check all the funding that is being applied for at this time, with this application:

DHCD Tax Credit Allocation .......... No
Category .......... Not Applicable
Category .......... Not Applicable

HOME Funding through DHCD .......... No

Massachusetts Housing Finance Agency (select all that apply):
Official Action Status .......... No
Construction Financing/Bridge Financing .......... No
Permanent Financing .......... No

Massachusetts Housing Partnership (MHP) Fund:
Permanent Rental Financing Program .......... No

Massachusetts Housing Investment Corporation (select all that apply):
Debt Financing .......... No
Tax Credit Equity Investment .......... No

Boston Department of Neighborhood Development (DND): No

Other Yes
Other.......... HDSP
Other..........
Other..........
Financing from MassDevelopment No

KUN346

17 . Number of buildings planned

| | Total | New Construction | Rehabilitation |
|---|---|---|---|
| a. Single-Family | 1 | | 1 |
| b. 2-4 Family | 0 | | |
| c. Townhouse | 0 | | |
| d. Low/Mid rise | 0 | | |
| e. High-rise | 0 | | |
| f. Other | 0 | | |
| TOTAL | 1 | 0 | 1 |

18 . Number of units:

| | Total | New Construction | Rehabilitation |
|---|---|---|---|
| Number of units | 1 | | 1 |

19 . Gross Square Footage

| | Total | New Construction | Rehabilitation |
|---|---|---|---|
| a. Residential | 1,066 | | 1,066 |
| b. Commercial | - | | |

20 . Net Rentable Square Footage:

| | Total | | Percent of Gross |
|---|---|---|---|
| a. Residential | 1,066 | s.f. | 100% |
| b. Commercial | | s.f. | N/A |

21 . Number of handicapped accessible units: 0 Percent of total: 0%

22 . Fire Code Type: Wood frame

23 . Will building(s) include elevators? No

24 . Are the following provided with the housing units:

| | |
|---|---|
| a. Range? | Yes |
| b. Refrigerator? | Yes |
| c. Microwave? | No |
| d. Dishwasher? | Yes |
| e. Disposal? | No |
| f. Washer/Dryer Hookup? | Yes |
| g. Washer & Dryer? | No |
| h. Wall-to-wall Carpet? | No |
| i. Window Air Conditioner? | No |
| j. Central Air Conditioning? | No |

Gas or electric? electric

*Optional user comments*

25 . Are the following included in the rent:

| | |
|---|---|
| a. Heat? | No |
| b. Domestic Electricity? | No |
| c. Cooking Fuel? | No |
| d. Hot Water? | No |
| e. Central A/C, if any? | No |

26 . Type of heating fuel: Oil

27 . Total no. of parking spaces: 2 Outdoor: 2 Enclosed:

28 . Number of parking spaces exclusively for the use of tenants:

| | Total: | Outdoor: | Enclosed: |
|---|---|---|---|
| a. Residential | 2 | 2 | |
| b. Commercial | 0 | | |

29 . Will rehabilitation require the relocation of existing tenants? No

30 . Scope of rehabilitation: Please describe the following (or type N/A).

a. Major systems to be replaced:

Minor septic work, conditional Title V certification.

b. Substandard conditions and structural deficiencies to be repaired:

Roof, including sheathing and shingles, windows, exterior doors, interior wall repair and painting, complete bathroom renovation, partial kitchen renovation, exterior siding repair and repainting, more (see attached House Inspection)

c. Special features/adaptations for special needs clients to be housed:

31 . Are energy conservation materials in excess of the Building Code?

| | |
|---|---|
| a. Insulation | No |
| b. Windows | No |
| c. Heating system | No |

## Information On Site And Existing Buildings

| | Square Feet | Acres |
|---|---|---|
| 32 . Size of Site: | 40,510 | 0.93 |
| 33 . Wetlands area: | 0 | |
| 34 . Buildable area: | | |

**Existing Conditions:**

35 . What is the present use of the property? Residential

36 . Number of existing structures: 1

37 . Gross s.f. of existing structures: 1,066

38 . If rehabilitation:

| | number of units | num. of bedrooms |
|---|---|---|
| a. Number of existing residential units/bedrooms: | 1 | 3 |
| b. Number of units/bedrooms currently occupied: | 1 | 2 |

39 . If site includes commercial space:

a. Square footage of existing commercial space: square feet

b. Square footage currently occupied: square feet

40 . What are the surrounding land uses?

Residential. Abutting property is currently used as a horse farm. Property is adjacent to town-owned conservation land and is located on a quiet, scenic country road.

**Utilities:**

41 . Are the following utilities available on the site:

| | | | |
|---|---|---|---|
| a. Sanitary sewer? | No | Distance from site (ft.) | |
| b. Storm sewer? | No | Distance from site (ft.) | |
| c. Public water? | No | Distance from site (ft.) | |
| d. Electricity? | Yes | | 0 |
| e. Gas? | No | Distance from site (ft.) | |

If any of the above are not available, is plan attached explaining how such service will be extended to the site? Yes

***Please attach as part of Exhibit 2***

## Zoning:

***Please include information on the property zoning in Exhibit 3. This should include a zoning map, highlighting any special use or dimensional restrictions on the property. If the present zoning does not allow for the proposed use, please explain current status and how approvals will be obtained.***

42 . Does the present zoning allow the proposed development? ◉ Yes ○ No

43 . Have you applied for a zoning variance, change,special permit or subdivision? N/A

44 . Do you anticipate applying for a comprehensive permit under Chapter 774 N/A

## Site Control:

45 . What form of site control do you have? Purchase and Sale Agreement(s)

***Include copies of the appropriate site control documents as part of Exhibit 4.***

46 . Please provide details about your site control agreement.

| | |
|---|---|
| a. Name of Seller: | Marilyn Kunelius |
| b. Principals of seller corporation: | |
| c. Type of Agreement: | Purchase and Sale Agreement |
| d. Agreement Date: | 11/11/02 |
| e. Expiration Date: | 09/26/03 |
| f. Purchase price if under agreemen | $1,116,900 |
| g. Is there any identity of interest between buyer and seller? | |

47 . In the past three years, have there been any defaults on any mortgage on the property or any other forms of financial distress? No

48 . Are there any outstanding liens on the property? No

## Amenities and Services:

49 . Please indicate distance from site and locate on city/town map (Exhibit 1).

| | *Distance* | |
|---|---|---|
| a. Shopping facilities | 0.78 | miles |
| b. Schools | 1.90 | miles |
| c. Hospitals | 5.58 | miles |
| d. Parks and recreational facilities | <0.1 | miles |
| e. Police station | 3.00 | miles |
| f. Fire station | 1.94 | miles |
| g. Public transportation | N/A | miles |
| h. Houses of worship | 1.53 | miles |
| i. City/Town Hall | 1.90 | miles |

Environmental Information

| | |
|---|---|
| 50 . Is there any evidence of underground storage tanks or releases of oil or hazardous materials, including hazardous wastes, on the site or within close proximity to the site? | Yes |
| 51 . Has a Chapter 21E assessment been performed? *Please include a copy as Exhibit 2* | Yes |
| 52 . Does the project consist of either: (a) new construction of more than 100 units; or (b) substantial rehabilitation of more than 200 units, or where more than 10% new floor space is added? | No |
| 53 . Does the building require lead paint abatement? ***Lead inspection and a plan for abatement are required and should be included in Exhibit 2. Include information on how the budget will cover expense of deleading all units, except SRO's.*** | Yes |
| 54 . Does the building require asbestos abatement? | No |
| 55 . Do radon tests show radon levels exceeding four picocuries/liter? | No |
| 56 . Is there any evidence that the premises are insulated with urea formaldehyde foam (UFFI)? | No |
| 57 . Is the site located in an historic district, or contain buildings listed or eligible for listing in the State Register of Historic Places? | No |
| 58 . Are there any above ground storage containers with flammable or explosive petroleum products or chemicals within 1/2 mile of the site? | Yes |
| 59 . Is the site located in a floodplain or wetlands area? | No |
| 60 . Does the site contain endangered animal or plant species? | No |
| 61 . Is the site subject to noise impact from jet airports within five miles, major highways within 1,000 feet, or rail traffic within 3,000 feet? | No |

Section 2

# DEVELOPMENT TEAM SUMMARY

**62 . Developer/Sponsor Type** — Non-profit corporation (Chapter 180)

**63 . Developer/Sponsor:**

| | | |
|---|---|---|
| Form of Legal Entity | Non-profit corporation | |
| Legal Name | The Trust for Public Land | |
| Address | 33 Union Street | |
| | Boston, MA 02108 | |
| Contact Person | Craig MacDonnell | |
| | (617) 367-6200 | (617) 367-9885 |
| E-mail | Craig.MacDonnell@tpl.org | |

**64 . Owner/Mortgagor:**

| | | | |
|---|---|---|---|
| Legal Name | The Trust for Public Land | | |
| Address | 116 New Montgomery Street | | |
| | San Francisco, CA 94105-3607 | | |
| Has this entity already been formed? | Yes | Soc. Sec. or Tax ID # | 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 |
| Principals | Francis W. Hatch | | |
| Principals | | | |
| Contact Person | Craig MacDonnell | | |
| Telephone No. / Fax. No. | (617) 367-6200 | 6173679885 | |
| E-mail | craig.macdonnell@tpl.org | | |

**65 . General Partner:**

| | | |
|---|---|---|
| Legal Name | N/A | |
| Address | | |
| | | |
| Has this entity already been formed? | No | |
| Principal (if corporate) | | |
| Contact Person | | |
| % of Ownership | | |
| Telephone No. / Fax. No. | | |
| E-mail | | |

**66 . General Partner:**

| | | |
|---|---|---|
| Legal Name | N/A | |
| Address | | |
| | | |
| Has this entity already been formed? | No | |
| Principal (if corporate) | | |
| Contact Person | | |
| % of Ownership | | |
| Telephone No. / Fax. No. | | |
| E-mail | | |

KUN351

**67 . Development Consultant:**

| | | |
|---|---|---|
| Legal Name | N/A | |
| Address | | |
| | | |
| Contact Person | | |
| Telephone No. / Fax. No. | | |
| E-mail | | |

**68 . Contractor:**

| | | |
|---|---|---|
| Name | Integrity Building and Design, Inc. | |
| Address | 498 Great Road | |
| | Acton, MA 01720 | |
| Fed Tax ID # | | |
| Contact Person | Dana McKiel | |
| Telephone No. / Fax. No. | (978) 264-0657 | 9782669463 |
| E-mail | | |

**69 . Architect:**

| | | |
|---|---|---|
| Name | Gary Wolf Architects | |
| Address | 7 Marshall Street | |
| | Boston, MA 02108-2404 | |
| Contact Person | Gary Wolf | |
| Telephone No. / Fax. No. | (617) 742-7557 | |
| E-mail | | |

**70 . Management Agent:**

| | | |
|---|---|---|
| Name | N/A | |
| Address | | |
| | | |
| Contact Person | | |
| Telephone No. / Fax. No. | | |
| E-mail | | |

**71 . Attorney (Real Estate):**

| | | |
|---|---|---|
| Name | Denise Pelletier, Esq. | |
| Address | 33 Union Street | |
| | Boston, MA 02108 | |
| Contact Person | | |
| Telephone No. / Fax. No. | (617) 367-6200 | 6173671616 |
| E-mail | Denise.Pelletier@tpl.org | |

**72 . Attorney (Tax):**

| | | |
|---|---|---|
| Name | Dorothy Stookey, Esq. | |
| Address | 33 Union Street | |
| | Boston, MA 02108 | |
| Contact Person | | |
| Telephone No. / Fax. No. | (617) 367-6200 | 6173671616 |
| E-mail | dorothy.stookey@tpl.org | |

**73 . Syndicator:**

| | | |
|---|---|---|
| Name | N/A | |
| Address | | |
| | | |
| Contact Person | | |
| Telephone No. / Fax. No. | | |
| E-mail | | |

KUN352

74 . **Guarantor:**

| | |
|---|---|
| Name | N/A |
| Address | |
| | |
| Contact Person | |
| Telephone No. / Fax. No. | |
| E-mail | |

75 . **Service Provider or Coordinator:**

| | |
|---|---|
| Name | Metropolitan Boston Housing Partnership or TBD by Town of |
| Address | |
| | |
| Contact Person | |
| Telephone No. / Fax. No. | |
| E-mail | |

76 . **Marketing Agent:**

| | | |
|---|---|---|
| Name | Century 21 Classic Properties | |
| Address | 42 Summer Street | |
| | Maynard, MA 01754 | |
| Contact Person | James Boothroyd | |
| Telephone No. / Fax. No. | (978) 897-5311 | 9788974874 |
| E-mail | creativejim0717@aol.com | |

77 . *Other role*

| | |
|---|---|
| Name | N/A |
| Address | |
| | |
| Contact Person | |
| Telephone No. / Fax. No. | |
| E-mail | |

78 . *Other role*

| | |
|---|---|
| Name | N/A |
| Address | |
| | |
| Contact Person | |
| Telephone No. / Fax. No. | |
| E-mail | |

79 . Is there any identity of interest between any members of the development team?

No

80 . Please describe the relationship of the development entity to sponsoring organizations. Is the entity newly-formed or to-be-formed? Is it a single-purpose corporation? How will the parent corporation provide support to this entity? Include an organizational chart showing other affiliates of the parent corporation, as appropriate, and principals of each.

KUN353

Section 3

# SOURCES AND USES OF FUNDS

## Sources of Funds

**Private Equity:**

| | | | |
|---|---|---|---|
| 81 . | Developer's Cash Equity | | $0 |
| 82 . | Tax Credit Equity (net amount) | *(See line 360, Section 5, page 18.)* | $ |
| 83 . | Developer's Fee/Overhead, Contributed or Loaned | | $0 |
| 84 . | Other Source: | | |

*Optional user calculations*

**Public Equity:**

| | | | |
|---|---|---|---|
| 85 . | HOME Funds, as Grant | | $ |
| 86 . | Grant: | HDSP | $320,000 |
| 87 . | Grant: | | $ |
| 88 . | **Total Public Equity** | | $320,000 |

| | **Subordinate Debt (see definition):** | *Amount* | *Rate* | *Amortiz.* | *Term* |
|---|---|---|---|---|---|
| 89 . | Home Funds-DHCD, as Subordinate Debt | $0 | % | yrs. | yrs. |
| | Source: | | | | |
| 90 . | Home Funds-Local, as Subordinate Debt | $0 | % | yrs. | yrs. |
| | Source: | | | | |
| 91 . | Subordinate Debt | $0 | % | yrs. | yrs. |
| | Source: | | | | |
| 92 . | Subordinate Debt | $0 | % | yrs. | yrs. |
| | Source: | | | | |
| 93 . | Subordinate Debt | $0 | % | yrs. | yrs. |
| | Source: | | | | |
| 94 . | Total Subordinate Debt | $0 | | | |

| | **Permanent Debt (Senior):** | | *Amount* | *Rate* | *Override* | *Amortiz.* | *Term* | *MIP* |
|---|---|---|---|---|---|---|---|---|
| 95 . | **MHFA** | MHFA Program 1 | $ | % | % | yrs. | yrs. | % |
| 96 . | **MHFA** | MHFA Program 2 | $ | % | % | yrs. | yrs. | % |
| 97 . | **MHP Fund Permanent Loan** | | $ | % | | yrs. | yrs. | % |
| 98 . | **Other Permanent Senior Mortgage** | | $0 | % | | yrs. | yrs. | % |
| | Source: | Sales Proceeds | | | | | | |
| 99 . | **Other Permanent Senior Mortgage** | | $ | % | | yrs. | yrs. | % |
| | Source: | | | | | | | |

| | | |
|---|---|---|
| 100 . | **Total Permanent Senior Debt** | $0 |
| 101 . | **Total Permanent Sources** | $320,000 |

| | **Construction Period Financing:** | | *Amount* | *Rate* | *Term* |
|---|---|---|---|---|---|
| 102 . | Construction Loan | | $187,060 | 4.00% | 8.0 |
| | Source: | TPL | | | |
| | Repaid at: | Sale of house | *(event)* | | |
| 103 . | Other Interim Loan | | $0 | % | mos. |
| | Source: | | | | |
| | Repaid at: | | *(event)* | | |
| 104 . | Syndication Bridge Loan | | $0 | % | mos. |
| | Source: | | | | |
| | Repaid at: | | *(event)* | | |

KUN354

## Uses of Funds

**Direct Construction:**

*The Contractor certifies that, to the best of their knowledge, the construction estimates, and trade-item breakdown on this page are complete and accurate.*

105 . Who prepared the estimates? Dana McKiel, Integrity Building an

*Name* *Signature*

106 . Basis for estimates? Based upon a review of a house inspection and a site visit on 3/18/03.

| | DV | Trade Item | Amount | Description |
|---|---|---|---|---|
| 107 . | 3 | Concrete | $750 | |
| 108 . | 4 | Masonry | $0 | |
| 109 . | 5 | Metals | $0 | |
| 110 . | 6 | Rough Carpentry | $26,440 | |
| 111 . | 6 | Finish Carpentry | $10,361 | |
| 112 . | 7 | Waterproofing | $0 | |
| 113 . | 7 | Insulation | $2,440 | |
| 114 . | 7 | Roofing | $3,300 | |
| 115 . | 7 | Sheet Metal and Flashing | $0 | |
| 116 . | 7 | Exterior Siding | $9,000 | |
| 117 . | 8 | Doors | $1,250 | |
| 118 . | 8 | Windows | $3,200 | |
| 119 . | 8 | Glass | $0 | |
| 120 . | 9 | Lath & Plaster | $7,160 | |
| 121 . | 9 | Drywall | $0 | |
| 122 . | 9 | Tile Work | $0 | |
| 123 . | 9 | Acoustical | $0 | |
| 124 . | 9 | Wood Flooring | $2,592 | |
| 125 . | 9 | Resilient Flooring | $0 | |
| 126 | 9 | Carpet | $0 | |
| 127 . | 9 | Paint & Decorating | $8,000 | |
| 128 . | 10 | Specialties | $0 | |
| 129 . | 11 | Special Equipment | $0 | |
| 130 . | 11 | Cabinets | $6,000 | |
| 131 . | 11 | Appliances | $0 | |
| 132 . | 12 | Blinds & Shades | $0 | |
| 133 . | 13 | Modular/Manufactured | $0 | |
| 134 . | 13 | Special Construction | $0 | |
| 135 . | 14 | Elevators or Conveying Syst. | $0 | |
| 136 . | 15 | Plumbing & Hot Water | $4,000 | |
| 137 . | 15 | Heat & Ventilation | $1,750 | |
| 138 . | 15 | Air Conditioning | $0 | |
| 139 | 15 | Fire Protection | $0 | |
| 140 . | 16 | Electrical | $2,150 | |
| 141 . | | Accessory Buildings | | |
| 142 . | | Other/misc | $0 | |
| 143 . | | **Subtotal Structural** | $88,393 | |
| 144 . | 2 | Earth Work | | |
| 145 . | 2 | Site Utilities | | |
| 146 . | 2 | Roads & Walks | | |
| 147 . | 2 | Site Improvement | | |
| 148 . | 2 | Lawns & Planting | $2,000 | |
| 149 | 2 | Geotechnical Conditions | | |
| 150 | 2 | Environmental Remediation | | |
| 151 | 2 | Demolition | $9,920 | |
| 152 . | 2 | Unusual Site Cond | $0 | |
| 153 . | | **Subtotal Site Work** | $11,920 | |
| 154 . | | **Total Improvements** | $100,313 | |
| 155 . | 1 | General Conditions | $7,500 | |
| 156 . | | **Subtotal** | $107,813 | |
| 157 . | 1 | Builders Overhead | $11,416 | |
| 158 . | 1 | Builders Profit | $7,610 | |
| 159 . | | **TOTAL** | $126,839 | |

160 Total Cost/square foot: $122.91 Residential Cost/s.f.: $122.91

KUN355

## Development Budget:

| | | Total | Residential | Commercial | Comments |
|---|---|---|---|---|---|
| 161 | Acquisition: Land | $320,000 | $320,000 | | |
| 162 | Acquisition: Building | $0 | $0 | | |
| 163 | **Acquisition Subtotal** | $320,000 | $320,000 | $0 | |
| 164 | Direct Construction Budg | $126,839 | $126,839 | | (from line 159) |
| 165 | Construction Contingency | $7,308 | $7,308 | | 5.8% of construction |
| 166 | **Subtotal: Construction** | $134,147 | $134,147 | $0 | |
| | **General Development Costs:** | | | | |
| 167 | Architecture & Engineering | $1,000 | $1,000 | | |
| 168 | Survey and Permits | $6,800 | $6,800 | | |
| 169 | Clerk of the Works | $0 | $0 | | |
| 170 | Environmental Engineer | $2,250 | $2,250 | | |
| 171 | Bond Premium | $0 | | | |
| 172 | Legal | $1,750 | $1,750 | | |
| 173 | Title and Recording | $1,500 | $1,500 | | |
| 174 | Accounting & Cost Cert. | $500 | $500 | | |
| 175 | Marketing and Rent Up | $5,000 | $5,000 | | |
| 176 | Real Estate Taxes | $625 | $625 | | |
| 177 | Insurance | $1,000 | $1,000 | | |
| 178 | Relocation | $0 | | | |
| 179 | Appraisal | $1,500 | $1,500 | | |
| 180 | Security | $0 | | | |
| 181 | Construction Loan Interest | $4,988 | $4,988 | | |
| 182 | Inspecting Engineer | $0 | | | |
| 183 | Fees to: | $0 | | | |
| 184 | Fees to: | $0 | | | |
| 185 | MIP | $0 | | | |
| 186 | Credit Enhancement Fees | $0 | | | |
| 187 | Letter of Credit Fees | $0 | | | |
| 188 | Other Financing Fees | $0 | | | |
| 189 | Development Consultant | $0 | $0 | | |
| 190 | Other: | $0 | | | |
| 191 | Other: | $0 | | | |
| 192 | Soft Cost Contingency | $1,000 | $1,000 | | 3.7% of soft costs |
| 193 | **Subtotal: Gen. Dev.** | $27,913 | $27,913 | $0 | |
| 194 | **Subtotal: Acquis., Const and Gen. Dev.** | $482,060 | $482,060 | $0 | |
| 195 | Capitalized Reserves | $0 | | | |
| 196 | Developer Overhead | $0 | | | |
| 197 | Developer Fee | $25,000 | $25,000 | | |
| 198 | **Total Development Cost** | $507,060 | $507,060 | $0 | **TDC per unit** $507,060 |
| 199 | **TDC, Net** | $507,060 | $507,060 | $0 | **TDC, Net per unit** $507,060 |

KUN356

Case 1:05-cv-11697-GAO Document 78-9 Filed 10/17/2007 Page 22 of 33

## Additional Detail on Development Pro-Forma:

| Line | Item | Amount |
|---|---|---|
| 200 | Gross Syndication Investment | |
| | **Off-Budget Costs:** | |
| | **Syndication Costs:** | |
| 201 | Syndication Legal | |
| 202 | Syndication Fees | |
| 203 | Syndication Consultants | |
| 204 | Bridge Financing Costs | |
| 205 | Investor Servicing (capitalized) | |
| 206 | Other Syndication Expenses | |
| 207 | Total Syndication Expense | $0 |
| 208 | Current Reserve Balance | |
| | **Reserves (capitalized):** | |
| 209 | Development Reserves | |
| 210 | Initial Rent-Up Reserves | |
| 211 | Operating Reserves | |
| 212 | Net Worth Account | |
| 213 | Other Capitalized Reserves | |
| 214 | Subtotal: Capitalized Reserves | $0 |
| 215 | Letter of Credit Requirements | |
| 216 | Total of the Above | $0 |

**Check: Line 214 is the same as line 195.**

| Please Answer The Following | Dev. Reserves | Initial Rent-Up | Op. Reserves | Net Worth | Other | Letter of Credit |
|---|---|---|---|---|---|---|
| Who requires the reserves? | | | | | | |
| Who administers the reserves? | | | | | | |
| When and how are they used? | | | | | | |
| Under what circumstances can they be released? | | | | | | |

**Unit Sales (For Sale Projects Only):**

| Line | Item | Amount |
|---|---|---|
| 217 | Gross Sales From Units | $199,000 |
| 218 | Cost of Sales (Commissions, etc.) | $11,940 |
| 219 | Net Receipt from Sales | $187,060 |

**Debt Service Requirements:**

| Line | Item | Value |
|---|---|---|
| 220 | Minimum Debt Service Coverage | |
| 221 | Is this Project subject to HUD Subsidy Layering Review? | No |

*Optional user comments*

KUN357

# Construction Period Sources and Uses

*Please fill out the following table with information on each month for which the project will be under construction. "Sources" and "Uses" should equal each other every month. Indicate loan repayment during the construction period.*

| Sources of Cash: | Total | Closing | Month 1 | Month 2 | Month 3 | Month 4 |
|---|---|---|---|---|---|---|
| Construction Loan | $187,060 | $13,925 | $23,171 | $23,171 | $23,171 | $23,171 |
| Proceeds from Sale (Net)* | $187,060 | | $ | $ | $ | $ |
| Equity: Cash | $320,000 | $320,000 | $ | $ | $ | $ |
| Equity: Tax Credit (Net) | $0 | $ | $ | $ | $ | $ |
| Subordinate Debt | $0 | $ | $ | $ | $ | $ |
| Permanent Debt | $0 | $ | $ | $ | $ | $ |
| Syndication Bridge Loan | $0 | $ | $ | $ | $ | $ |
| Other Interim Loan | $0 | $ | $ | $ | $ | $ |
| SUBTOTAL | $694,120 | $333,925 | $23,171 | $23,171 | $23,171 | $23,171 |
| Repayment: Construction Loan | $187,060 | $ | $ | $ | $ | $ |
| Repayment: Syndication Loan | $ | $ | $ | $ | $ | $ |
| Repayment: Interim Loan | $ | $ | $ | $ | $ | $ |
| **TOTAL SOURCES, NET** | $507,060 | $333,925 | $23,171 | $23,171 | $23,171 | $23,171 |
| **Cumulative Sources** | | $333,925 | $357,096 | $380,267 | $403,438 | $426,609 |

* Only relevant in the case of for-sale projects.

| Uses of Cash (Expenses): | Total | Closing | Month 1 | Month 2 | Month 3 | Month 4 |
|---|---|---|---|---|---|---|
| **Acquisition** | $320,000 | $320,000 | $ | $ | $ | $ |
| **Hard Costs:** | | | | | | |
| Direct Construction | $126,839 | | $21,140 | $21,140 | $21,140 | $21,140 |
| Contingency | $7,308 | | $0 | $0 | $0 | $0 |
| Total Hard Costs | $134,147 | | $21,140 | $21,140 | $21,140 | $21,140 |
| **Soft Costs:** | | | | | | |
| Construction Loan Interest | $4,988 | $ | $ | $ | $ | $ |
| Architecture & Engineering | $1,000 | $ | $250 | $250 | $250 | $250 |
| Survey and Permits | $6,800 | $6,800 | $ | $ | $ | $ |
| Clerk of the Works | $0 | $ | $0 | $0 | $0 | $0 |
| Environmental Engineer | $2,250 | $2,250 | $ | $ | $ | $ |
| Bond Premium | $0 | $ | $ | $ | $ | $ |
| Legal | $1,750 | $875 | $ | $ | $ | $ |
| Title and Recording | $1,500 | $1,500 | $ | $ | $ | $ |
| Accounting & Cost Certificat. | $500 | $ | $125 | $125 | $125 | $125 |
| Marketing and Rent Up | $5,000 | $ | $1,250 | $1,250 | $1,250 | $1,250 |
| Real Estate Taxes | $625 | $ | $156 | $156 | $156 | $156 |
| Insurance | $1,000 | $1,000 | $ | $ | $ | $ |
| Relocation | $0 | $ | $ | $ | $ | $ |
| Appraisal | $1,500 | $1,500 | $ | $ | $ | $ |
| Security | $0 | $ | $ | $ | $ | $ |
| Inspecting Engineer | $0 | $ | $ | $ | $ | $ |
| Financing Fees | $0 | $ | $ | $ | $ | $ |
| Development Consultant | $0 | $0 | $ | $ | $ | $ |
| Other | $0 | $ | $ | $ | $ | $ |
| Other | $0 | $ | $ | $ | $ | $ |
| Developer's Overhead | $0 | $ | $ | $ | $ | $ |
| Developer's Fee (Net) | $25,000 | $ | $ | $ | $ | $ |
| Soft Cost Contingency | $1,000 | $ | $250 | $250 | $250 | $250 |
| Contribution to Reserves | $0 | $ | $ | $ | $ | $ |
| Subtotal Soft Costs, Fees | $52,913 | $13,925 | $2,031 | $2,031 | $2,031 | $2,031 |
| **TOTAL USES** | $507,060 | $333,925 | $23,171 | $23,171 | $23,171 | $23,171 |
| **Cumulative Uses** | | $333,925 | $357,096 | $380,267 | $403,438 | $426,609 |
| **Budget: Percentage of Funds Expended** | | 65.9% | 4.6% | 4.6% | 4.6% | 4.6% |
| Construction Loan Balance | $0 | $13,925 | $37,096 | $60,267 | $83,438 | $106,609 |
| Syndication Loan Balance | $0 | $0 | $0 | $0 | $0 | $0 |
| Interim Loan Balance | $0 | $0 | $0 | $0 | $0 | $0 |

Exhibit 11

## Construction Period Sources and Uses

Page 2

*Please fill out the following table with information on each month for which the project will be under construction. "Sources" and "Uses" should equal each other every month. Indicate loan repayment during the construction period.*

| Sources of Cash: | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 |
|---|---|---|---|---|---|---|
| Construction Loan | $21,140 | $54,323 | $4,988 | $ | $ | $ |
| Proceeds from Sale (Net)* | $ | $ | $ | $ | $ | $ |
| Equity: Cash | $ | $ | $ | $ | $ | $ |
| Equity: Tax Credit | $ | $ | $ | $ | $ | $ |
| Subordinate Debt | $ | $ | $ | $ | $ | $ |
| Permanent Debt | $ | $ | $ | $ | $ | $ |
| Syndication Bridge Loan | $ | $ | $ | $ | $ | $ |
| Other Interim Loan | $ | $ | $ | $ | $ | $ |
| **SUBTOTAL** | $21,140 | $54,323 | $4,988 | $0 | $0 | $0 |
| Repayment: Construction Loan | $ | $ | $187,060 | $ | $ | $ |
| Repayment: Syndication Loan | $ | $ | $ | $ | $ | $ |
| Repayment: Interim Loan | $ | $ | $ | $ | $ | $ |
| **TOTAL SOURCES, NET** | $21,140 | $54,323 | ($182,072) | $0 | $0 | $0 |
| **Cumulative Sources** | $447,749 | $502,072 | $320,000 | $320,000 | $320,000 | $320,000 |

* Only relevant in the case of for-sale projects.

| Uses of Cash (Expenses): | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 |
|---|---|---|---|---|---|---|
| **Acquisition** | $ | $ | $ | $ | $ | $ |
| **Hard Costs:** | | | | | | |
| Direct Construction | $21,140 | $21,140 | $ | $ | $ | $ |
| Contingency | $0 | $7,308 | $ | $ | $ | $ |
| Total Hard Costs | $21,140 | $28,448 | $0 | $0 | $0 | $0 |
| **Soft Costs:** | | | | | | |
| Construction Loan Interest | $ | $ | $4,988 | $0 | $ | $ |
| Architecture & Engineering | $ | $ | $ | $ | $ | $ |
| Survey and Permits | $ | $ | $ | $ | $ | $ |
| Clerk of the Works | $ | $ | $ | $ | $ | $ |
| Environmental Engineer | $ | $ | $ | $ | $ | $ |
| Bond Premium | $ | $ | $ | $ | $ | $ |
| Legal | $ | $875 | $ | $ | $ | $ |
| Title and Recording | $ | $ | $ | $ | $ | $ |
| Accounting & Cost Certificat. | $ | $ | $ | $ | $ | $ |
| Marketing and Rent Up | $ | $ | $ | $ | $ | $ |
| Real Estate Taxes | $ | $ | $ | $ | $ | $ |
| Insurance | $ | $ | $ | $ | $ | $ |
| Relocation | $ | $ | $ | $ | $ | $ |
| Appraisal | $ | $ | $ | $ | $ | $ |
| Security | $ | $ | $ | $ | $ | $ |
| Inspecting Engineer | $ | $ | $ | $ | $ | $ |
| Financing Fees | $ | $ | $ | $ | $ | $ |
| Development Consultant | $ | $ | $ | $ | $ | $ |
| Other | $ | $ | $ | $ | $ | $ |
| Other | $ | $ | $ | $ | $ | $ |
| Developer's Overhead | $ | $ | $ | $ | $ | $ |
| Developer's Fee (Net) | $ | $25,000 | $ | $ | $ | $ |
| Soft Cost Contingency | $ | $ | $ | $ | $ | $ |
| Contribution to Reserves | $ | $ | $ | $ | $ | $ |
| Sub-Total Soft Costs | $0 | $25,875 | $4,988 | $0 | $0 | $0 |
| **TOTAL** | $21,140 | $54,323 | $4,988 | $0 | $0 | $0 |
| **Cumulative Uses** | $447,749 | $502,072 | $507,060 | $507,060 | $507,060 | $507,060 |
| | | | | | | |
| **Percentage of Funds Expended** | 4.2% | 10.7% | 1.0% | 0.0% | 0.0% | 0.0% |
| | | | | | | |
| Construction Loan Balance | $127,749 | $182,072 | $0 | $0 | $0 | $0 |
| Syndication Loan Balance | $0 | $0 | $0 | $0 | $0 | $0 |
| Interim Loan Balance | $0 | $0 | $0 | $0 | $0 | $0 |

## Construction Period Sources and Uses

*Please fill out the following table with information on each month for which the project will be under construction. "Sources" and "Uses" should equal each other every month. Indicate loan repayment during the construction period.*

| Sources of Cash: | Month 11 | Month 12 | Month 13 | Month 14 | Month 15 | Month 16 |
|---|---|---|---|---|---|---|
| Construction Loan | $ | $ | $ | $ | $ | $ |
| Proceeds from Sale (Net)* | $ | $ | $ | $ | $ | $ |
| Equity: Cash | $ | $ | $ | $ | $ | $ |
| Equity: Tax Credit | $ | $ | $ | $ | $ | $ |
| Subordinate Debt | $ | $ | $ | $ | $ | $ |
| Permanent Debt | $ | $ | $ | $ | $ | $ |
| Syndication Bridge Loan | $ | $ | $ | $ | $ | $ |
| Other Interim Loan | $ | $ | $ | $ | $ | $ |
| **SUBTOTAL** | $0 | $0 | $0 | $0 | $0 | $0 |
| Repayment: Construction Loan | $ | $ | $ | $ | $ | $ |
| Repayment: Syndication Loan | $ | $ | $ | $ | $ | $ |
| Repayment: Interim Loan | $ | $ | $ | $ | $ | $ |
| **TOTAL SOURCES, NET** | $0 | $0 | $0 | $0 | $0 | $0 |
| **Cumulative Sources** | $320,000 | $320,000 | $320,000 | $320,000 | $320,000 | $320,000 |

* Only relevant in the case of for-sale projects.

| Uses of Cash (Expenses): | Month 11 | Month 12 | Month 13 | Month 14 | Month 15 | Month 16 |
|---|---|---|---|---|---|---|
| **Acquisition** | $ | $ | $ | $ | $ | $ |
| **Hard Costs:** | | | | | | |
| Direct Construction | $ | $ | $ | $ | $ | $ |
| Contingency | $ | $ | $ | $ | $ | $ |
| Total Hard Costs | $0 | $0 | $0 | $0 | $0 | $0 |
| **Soft Costs:** | | | | | | |
| Construction Loan Interest | $ | $ | $ | $ | $ | $ |
| Architecture & Engineering | $ | $ | $ | $ | $ | $ |
| Survey and Permits | $ | $ | $ | $ | $ | $ |
| Clerk of the Works | $ | $ | $ | $ | $ | $ |
| Environmental Engineer | $ | $ | $ | $ | $ | $ |
| Bond Premium | $ | $ | $ | $ | $ | $ |
| Legal | $ | $ | $ | $ | $ | $ |
| Title and Recording | $ | $ | $ | $ | $ | $ |
| Accounting & Cost Certificat. | $ | $ | $ | $ | $ | $ |
| Marketing and Rent Up | $ | $ | $ | $ | $ | $ |
| Real Estate Taxes | $ | $ | $ | $ | $ | $ |
| Insurance | $ | $ | $ | $ | $ | $ |
| Relocation | $ | $ | $ | $ | $ | $ |
| Appraisal | $ | $ | $ | $ | $ | $ |
| Security | $ | $ | $ | $ | $ | $ |
| Inspecting Engineer | $ | $ | $ | $ | $ | $ |
| Financing Fees | $ | $ | $ | $ | $ | $ |
| Development Consultant | $ | $ | $ | $ | $ | $ |
| Other | $ | $ | $ | $ | $ | $ |
| Other | $ | $ | $ | $ | $ | $ |
| Developer's Overhead | $ | $ | $ | $ | $ | $ |
| Developer's Fee (Net) | $ | $ | $ | $ | $ | $ |
| Soft Cost Contingency | $ | $ | $ | $ | $ | $ |
| Contribution to Reserves | $ | $ | $ | $ | $ | $ |
| Sub-Total Soft Costs | $0 | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | $0 | $0 | $0 | $0 | $0 | $0 |
| **Cumulative Uses** | $507,060 | $507,060 | $507,060 | $507,060 | $507,060 | $507,060 |

| | Month 11 | Month 12 | Month 13 | Month 14 | Month 15 | Month 16 |
|---|---|---|---|---|---|---|
| **Percentage of Funds Expended** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Construction Loan Balance | $0 | $0 | $0 | $0 | $0 | $0 |
| Syndication Loan Balance | $0 | $0 | $0 | $0 | $0 | $0 |
| Interim Loan Balance | $0 | $0 | $0 | $0 | $0 | $0 |

# Construction Period Sources and Uses

*Please fill out the following table with information on each month for which the project will be under construction. "Sources" and "Uses" should equal each other every month. Indicate loan repayment during the construction period.*

| Sources of Cash: | Month 17 | Month 18 | Month 19 | Month 20 | Month 21 | Month 22 |
|---|---|---|---|---|---|---|
| Construction Loan | $ | $ | $ | $ | $ | $ |
| Proceeds from Sale (Net)* | $ | $ | $ | $ | $ | $ |
| Equity: Cash | $ | $ | $ | $ | $ | $ |
| Equity: Tax Credit | $ | $ | $ | $ | $ | $ |
| Subordinate Debt | $ | $ | $ | $ | $ | $ |
| Permanent Debt | $ | $ | $ | $ | $ | $ |
| Syndication Bridge Loan | $ | $ | $ | $ | $ | $ |
| Other Interim Loan | $ | $ | $ | $ | $ | $ |
| SUBTOTAL | $0 | $0 | $0 | $0 | $0 | $0 |
| Repayment: Construction Loan | $ | $ | $ | $ | $ | $ |
| Repayment: Syndication Loan | $ | $ | $ | $ | $ | $ |
| Repayment: Interim Loan | $ | $ | $ | $ | $ | $ |
| TOTAL SOURCES, NET | $0 | $0 | $0 | $0 | $0 | $0 |
| Cumulative Sources | $320,000 | $320,000 | $320,000 | $320,000 | $320,000 | $320,000 |

* Only relevant in the case of for-sale projects.

| Uses of Cash (Expenses) | Month 17 | Month 18 | Month 19 | Month 20 | Month 21 | Month 22 |
|---|---|---|---|---|---|---|
| **Acquisition** | $ | $ | $ | $ | $ | $ |
| **Hard Costs:** | | | | | | |
| Direct Construction | $ | $ | $ | $ | $ | $ |
| Contingency | $ | $ | $ | $ | $ | $ |
| Total Hard Costs | $0 | $0 | $0 | $0 | $0 | $0 |
| **Soft Costs:** | | | | | | |
| Construction Loan Interest | $ | $ | $ | $ | $ | $ |
| Architecture & Engineering | $ | $ | $ | $ | $ | $ |
| Survey and Permits | $ | $ | $ | $ | $ | $ |
| Clerk of the Works | $ | $ | $ | $ | $ | $ |
| Environmental Engineer | $ | $ | $ | $ | $ | $ |
| Bond Premium | $ | $ | $ | $ | $ | $ |
| Legal | $ | $ | $ | $ | $ | $ |
| Title and Recording | $ | $ | $ | $ | $ | $ |
| Accounting & Cost Certificat. | $ | $ | $ | $ | $ | $ |
| Marketing and Rent Up | $ | $ | $ | $ | $ | $ |
| Real Estate Taxes | $ | $ | $ | $ | $ | $ |
| Insurance | $ | $ | $ | $ | $ | $ |
| Relocation | $ | $ | $ | $ | $ | $ |
| Appraisal | $ | $ | $ | $ | $ | $ |
| Security | $ | $ | $ | $ | $ | $ |
| Inspecting Engineer | $ | $ | $ | $ | $ | $ |
| Financing Fees | $ | $ | $ | $ | $ | $ |
| Development Consultant | $ | $ | $ | $ | $ | $ |
| Other | $ | $ | $ | $ | $ | $ |
| Other | $ | $ | $ | $ | $ | $ |
| Developer's Overhead | $ | $ | $ | $ | $ | $ |
| Developer's Fee (Net) | $ | $ | $ | $ | $ | $ |
| Soft Cost Contingency | $ | $ | $ | $ | $ | $ |
| Contribution to Reserves | $ | $ | $ | $ | $ | $ |
| Sub-Total Soft Costs | $0 | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $0 | $0 | $0 | $0 | $0 | $0 |
| Cumulative Uses | $507,060 | $507,060 | $507,060 | $507,060 | $507,060 | $507,060 |
| **Percentage of Funds Expended** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Construction Loan Balance | $0 | $0 | $0 | $0 | $0 | $0 |
| Syndication Loan Balance | $0 | $0 | $0 | $0 | $0 | $0 |
| Interim Loan Balance | $0 | $0 | $0 | $0 | $0 | $0 |

## Construction Period Sources and Uses

*Please fill out the following table with information on each month for which the project will be under construction. "Sources" and "Uses" should equal each other every month. Indicate loan repayment during the construction period.*

| Sources of Cash: | Month 23 | Month 24 | Month 25 | Month 26 | Month 27 | Month 28 |
|---|---|---|---|---|---|---|
| Construction Loan | | | | | | |
| Proceeds from Sale (Net)* | | | | | | |
| Equity: Cash | | | | | | |
| Equity: Tax Credit | | | | | | |
| Subordinate Debt | | | | | | |
| Permanent Debt | | | | | | |
| Syndication Bridge Loan | | | | | | |
| Other Interim Loan | | | | | | |
| SUBTOTAL | $0 | $0 | $0 | $0 | $0 | $0 |
| Repayment: Construction Loan | | | | | | |
| Repayment: Syndication Loan | | | | | | |
| Repayment: Interim Loan | | | | | | |
| TOTAL SOURCES, NET | $0 | $0 | $0 | $0 | $0 | $0 |
| Cumulative Sources | $320,000 | $320,000 | $320,000 | $320,000 | $320,000 | $320,000 |

* Only relevant in the case of for-sale projects.

| Uses of Cash (Expenses): | Month 23 | Month 24 | Month 25 | Month 26 | Month 27 | Month 28 |
|---|---|---|---|---|---|---|
| **Acquisition** | | | | | | |
| **Hard Costs:** | | | | | | |
| Direct Construction | | | | | | |
| Contingency | | | | | | |
| Total Hard Costs | $0 | $0 | $0 | $0 | $0 | $0 |
| **Soft Costs:** | | | | | | |
| Construction Loan Interest | | | | | | |
| Architecture & Engineering | | | | | | |
| Survey and Permits | | | | | | |
| Clerk of the Works | | | | | | |
| Environmental Engineer | | | | | | |
| Bond Premium | | | | | | |
| Legal | | | | | | |
| Title and Recording | | | | | | |
| Accounting & Cost Certificat. | | | | | | |
| Marketing and Rent Up | | | | | | |
| Real Estate Taxes | | | | | | |
| Insurance | | | | | | |
| Relocation | | | | | | |
| Appraisal | | | | | | |
| Security | | | | | | |
| Inspecting Engineer | | | | | | |
| Financing Fees | | | | | | |
| Development Consultant | | | | | | |
| Other | | | | | | |
| Other | | | | | | |
| Developer's Overhead | | | | | | |
| Developer's Fee (Net) | | | | | | |
| Soft Cost Contingency | | | | | | |
| Contribution to Reserves | | | | | | |
| Sub-Total Soft Costs | $0 | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $0 | $0 | $0 | $0 | $0 | $0 |
| Cumulative Uses | $507,060 | $507,060 | $507,060 | $507,060 | $507,060 | $507,060 |
| **Percentage of Funds Expended** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Construction Loan Balance | $0 | $0 | $0 | $0 | $0 | $0 |
| Syndication Loan Balance | $0 | $0 | $0 | $0 | $0 | $0 |
| Interim Loan Balance | $0 | $0 | $0 | $0 | $0 | $0 |

# Construction Period Sources and Uses

*Please fill out the following table with information on each month for which the project will be under construction. "Sources" and "Uses" should equal each other every month. Indicate loan repayment during the construction period.*

| Sources of Cash: | Month 29 | Month 30 | Month 31 | Month 32 | Month 33 | Net Balance |
|---|---|---|---|---|---|---|
| Construction Loan | | | | | | $0 |
| Proceeds from Sale (Net)* | | | | | | $187,060 |
| Equity: Cash | | | | | | $0 |
| Equity: Tax Credit | | | | | | $0 |
| Subordinate Debt | | | | | | $0 |
| Permanent Debt | | | | | | $0 |
| Syndication Bridge Loan | | | | | | $0 |
| Other Interim Loan | | | | | | $0 |
| **SUBTOTAL** | $0 | $0 | $0 | $0 | $0 | $187,060 |
| Repayment: Construction Loan | | | | | | $187,060 |
| Repayment: Syndication Loan | | | | | | $0 |
| Repayment: Interim Loan | | | | | | $0 |
| **TOTAL SOURCES, NET** | $0 | $0 | $0 | $0 | $0 | $0 |
| **Cumulative Sources** | $320,000 | $320,000 | $320,000 | $320,000 | $320,000 | |

* Only relevant in the case of for-sale projects.

| Uses of Cash (Expenses) | Month 29 | Month 30 | Month 31 | Month 32 | Month 33 | Net Balance |
|---|---|---|---|---|---|---|
| **Acquisition** | | | | | | $0 |
| **Hard Costs:** | | | | | | |
| Direct Construction | | | | | | $0 |
| Contingency | | | | | | $0 |
| Total Hard Costs | $0 | $0 | $0 | $0 | $0 | $0 |
| **Soft Costs:** | | | | | | |
| Construction Loan Interest | | | | | | $0 |
| Architecture & Engineering | | | | | | $0 |
| Survey and Permits | | | | | | $0 |
| Clerk of the Works | | | | | | $0 |
| Environmental Engineer | | | | | | $0 |
| Bond Premium | | | | | | $0 |
| Legal | | | | | | $0 |
| Title and Recording | | | | | | $0 |
| Accounting & Cost Certificat. | | | | | | $0 |
| Marketing and Rent Up | | | | | | $0 |
| Real Estate Taxes | | | | | | $0 |
| Insurance | | | | | | $0 |
| Relocation | | | | | | $0 |
| Appraisal | | | | | | $0 |
| Security | | | | | | $0 |
| Inspecting Engineer | | | | | | $0 |
| Financing Fees | | | | | | $0 |
| Development Consultant | | | | | | $0 |
| Other | | | | | | $0 |
| Other | | | | | | $0 |
| Developer's Overhead | | | | | | $0 |
| Developer's Fee (Net) | | | | | | $0 |
| Soft Cost Contingency | | | | | | $0 |
| Contribution to Reserves | | | | | | $0 |
| Sub-Total Soft Costs | $0 | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | $0 | $0 | $0 | $0 | $0 | $0 |
| **Cumulative Uses** | $507,060 | $507,060 | $507,060 | $507,060 | $507,060 | |

| | Month 29 | Month 30 | Month 31 | Month 32 | Month 33 |
|---|---|---|---|---|---|
| **Percentage of Funds Expended** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Construction Loan Balance | $0 | $0 | $0 | $0 | $0 |
| Syndication Loan Balance | $0 | $0 | $0 | $0 | $0 |
| Interim Loan Balance | $0 | $0 | $0 | $0 | $0 |

# APPENDIX A

## "One-Stop" Affordable Housing Finance Application
## Required Exhibits and Attachments

**Note: These <u>must</u> be submitted as part of the HDSP application**

| | DHCD HDSP |
|---|---|
| *General Exhibits*: | |
| 1 Site Information | Y |
| 2 Environmental | Y |
| 3 Evidence of Zoning | Y |
| 4 Evidence of Site Control | Y |
| 5 Evidence of Local Support | N |
| 6 Market Information and Acquisition Value | Y |
| 7 Marketing Plan* | N |
| 8 Affirmative Fair Marketing Plan | N |
| 9 Equal Opportunity Questionnaire | N |
| 10 Sales Prices and Affordability* | Y* |
| 11 Construction Period Sources and Uses | N |
| 12 Tax-Exempt Project Information* | N* |
| 13 Relocation Plan* | N |
| 14 Special Needs Service Plan* | Y* |
| 15 Required Tax Credit Certifications* | N |
| *Design Exhibits*: | |
| 16 Preliminary Plans and Specifications | Y |
| 17 Commitment Drawings and Specifications | N |
| 18 Soil and/or Structural Report* | N |
| 19 Energy Budget | N |
| *Funding Interest/Commitments*: | |
| 20 Construction Financing | Y |
| 21 Permanent Financing | Y |
| 22 Equity Commitment* | Y* |
| 23 Other Funding Commitments* | Y* |
| 24 Rental Subsidies* | Y* |
| *Developer Team Information*: | |
| 25 Developer Profile | Y |
| 26 Mortgagor's Other Real Estate | Y |
| 27 Architect's Resume | N |
| 28 Management Agent Profile | N |
| 29 General Contractor's Profile | L |
| 30 Financial Statement and Credit Release | N |
| 31 Mortgagor Personal Financial Statement | N |
| 32 Individual Financial Profile | N |
| 33 General Contractor's Financial Capacity | N |

*Only if applicable (see instructions in "One Stop.")

*Legend*:

Y = Yes, required; application will be deemed incomplete if not submitted.
N = Not required.
L = Not required with application, but may be required prior to commitment or closing; should be submitted with application if available.

# Exhibit 10: Sales Prices and Affordability

If the proposed project is *for-sale* housing, then complete the following sales and affordability information.

*10:1* **Unit Descriptions**: Describe each unit type or style which will have different sales prices and assign them each letters (A, B, C, etc.).

| *Type* | *Number of Units* | *Bed-rooms* | *Square Footage* | *Bath-rooms* | *Appliances* | *Other* |
|---|---|---|---|---|---|---|
| A | 1 | 2 | 1066 | 1 | | |
| B | | | | | | |
| C | | | | | | |
| D | | | | | | |
| E | | | | | | |
| F | | | | | | |
| G | | | | | | |
| H | | | | | | |

*10:2* **Sales Prices:**

| *Type* | *Sales Price* | *Income to Afford* | *Percent of Median* | *Number of Units, By Phase* | | | |
|---|---|---|---|---|---|---|---|
| | | | | *I* | *II* | *III* | *IV* |
| A | $199,000 | $47,855 ** | 59% | 1 | | | |
| B | | | | | | | |
| C | | | | | | | |
| D | | | | | | | |
| E | | | | | | | |
| F | | | | | | | |
| G | | | | | | | |
| H | | | | | | | |

** Assumes 5.5%, 30 year fixed rate mortgage currently available from several local lenders

*10:3* **Subsidy:**

Source of subsidy (if any) to support reduced prices or below-market financing: HDSP

Amount of subsidy: $320,000

*10:4* **Source of Financing:**

Indicate source of permanent financing: Trust for Public Land, Homeowner End Loans.

KUN365

Item 1-4: Grant Management Plan

In compliance with 24 Code of Federal Regulations Part 85, and M.G.L. Ch. 30B, the Town of Stow will hire a grant management consultant with suitable CDBG experience to administer the HDSP grant for the Town.

Upon notice of grant award, the Town of Stow will circulate, according to procedures described in *Municipal, County, District, and Local Authority Procurement of Supplies, Services, and Real Property*, a request for bids for the management, administration, and oversight of this grant. The consultant will be reviewed by DHCD for suitability prior to the commencement of the contract between the town and the consultant.

Because the Town of Stow largely relies on volunteer time, it is inappropriate to expect that existing personnel within the Town of Stow would be able to administer this grant. Because of this, and because of the level of understanding of the CDBG process required, the Town of Stow recognizes that an outside administrator is required.

To that end, the Town of Stow requests $32,000.00 in administrative assistance to cover salary and soft costs.

As directed by DHCD, the Town of Stow will contract with a grant management administrator who will develop a grant management plan, including systems of checks and balances for oversight of all project activities.

[Subcontractors used for this project will be contracting directly with the Trust for Public Land. Other than any required public bidding processes, there will be no relationship between subcontractors and the Town of Stow.]

(Form 1-5)
**HOUSING DEVELOPMENT SUPPORT PROGRAM**

**MASSACHUSETTS CDBG PROGRAM**

***PART A*** **Program Delivery/General Administrative Cost Breakdown - Personnel, Fringe Benefits**

| | (1) | (2) | | (3) | | (4) | | (5) | | (6) | | (7) | (8) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | COST CATEGORY | HOUSING REHAB. (4a) | | ECONOMIC DEVEL. (5a) | | INFRA/PUB FACILITIES (6a) | | SOCIAL SERV. (8a) | | GENERAL ADMIN. (9) | | TOTAL CDBG FUNDS | OTHER TOWN/AGENCY FUNDS |
| A1 | Personnel (list each position) | | % | | % | | % | | % | | % | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| A2 | Fringe Benefits (list for each position) | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| A3 | Sub-Total Personnel Costs (A1 & A2) | $0 | | | | $0 | | | | $0 | | $0 | $0 |

KUN367

MASSACHUSETTS CDBG PROGRAM
Budget Summary Sheet
Form 1-6

| PROGRAM/PROJECT/ACTIVITY | | HDSP FUNDS ($) | OTHER FUNDS |
|---|---|---|---|
| 1 | PROPERTY ACQUISITION | $320,000 | |
| 2 | CLEARANCE/DEMOLITION | | |
| 3 | RELOCATION | | |
| 4 | HOUSING REHABILITATION | XXXXXXXXXX | XXXXXXXXX |
| A | Program Delivery | $32,000 | $160,663 |
| B | Unit Development/Creation | | |
| C | Rehabilitation Loan/Grant | | |
| D | Other | | |
| 5 | COMMUNITY ECONOMIC DEVELOPMENT | XXXXXXXXXX | XXXXXXXXX |
| | Program Delivery | XXXXXXXXXX | |
| | Acquisition | XXXXXXXXXX | |
| | Commercial Improvements (Signs/Facades) | XXXXXXXXXX | |
| | Assist. to For-profits (formally Sm. Business Assist.) | XXXXXXXXXX | |
| | Infrastructure or Streetscape Improvements | XXXXXXXXXX | |
| | Planning/Technical Assistance Activities | XXXXXXXXXX | |
| | Downtown Partnerships/Technical Assistance | XXXXXXXXXX | |
| | Other/Microenterprise Assistance | XXXXXXXXXX | |
| 6 | PUBLIC FACILITIES/INFRASTRUCTURE | XXXXXXXXXX | XXXXXXXXX |
| A | Program Delivery | | |
| B | Streets and Sidewalks | | |
| C | Parks and Recreation | | |
| D | Neighborhood Facilities | | |
| E | Parking | | |
| F | Water, Sewer, Drainage | | |
| G | Architectural Barriers | | |
| H | Other | | |
| 7 | OTHER/PLANNING | | |
| 8 | PUBLIC SOCIAL SERVICES | XXXXXXXXXX | XXXXXXXXXX |
| A | Program Delivery | XXXXXXXXXX | XXXXXXXXXX |
| B | Program Costs | XXXXXXXXXX | XXXXXXXXXX |
| 9 | GENERAL ADMINISTRATION | | |
| | TOTAL PROGRAM COSTS | $352,000 | $160,663 |

KUN368

Item 1-7: Affordability and Recapture Plan

This project will be subject to the Affordability and Recapture provisions outlined in the attached Regulatory Agreement and Attachments 1-7.1-3. The Town believes that these provisions will ensure affordability, discourage real estate speculation, and adequately provide information about the availability of affordable units to all relevant population groups.

The components of this plan include a Regulatory Agreement, suggested Affordable Housing Covenant (Attachment 1-7.1) which includes language describing the maximum resale value of the unit, the number of years that the restriction will be in effect (in perpetuity), methods for the community's monitoring of property owner compliance, methods for the community to take corrective action in instances of non-compliance with the plan, and provisions for preventing windfall on sale. In addition, the plan includes a Monitoring Service Agreement (Attachment 1-7.2) and a Marketing, Monitoring, Education and Enforcement Plan (Attachment 1-7.3) to be used by the Town of Stow with respect to the property at 142 Red Acre Road.

REGULATORY AGREEMENT

In consideration of the mutual promises contained herein, The Trust for Public Land, a California nonprofit corporation having a regular place of business at 33 Union Street, Boston, Massachusetts 02108 ("TPL"), and the Town of Stow, Massachusetts, a municipal corporation with a mailing address of 380 Great Road, Stow, Massachusetts 01775 ("Town"), hereby agree that with respect to the intention of TPL to purchase property located at 142 Red Acre Road, Stow, Massachusetts (the "Property") for the purposes of renovating the single-family residence located thereon; and with respect to the Town's intention to make application to the Department of Housing and Community Development ("DHCD") for Housing Development Support Program funds to be utilized to assist TPL regarding the acquisition, renovation and resale of the Property (the "Project"), the following terms shall apply:

1. TPL and the Town agree to abide by the terms of any DHCD grant made with respect to the Project:
2. TPL and the Town agree that the terms of the [Affordable Housing Covenant] attached hereto as Attachment 1-7.1 shall govern the Project;
3. TPL and the Town agree that the Monitoring Services Agreement attached hereto as Attachment 1-7.2 shall govern the Project;
4. TPL and the Town agree that the Marketing, Monitoring, Education and Enforcement Plan attached hereto as Attachment 1-7.3 shall govern the Project.

TRUST FOR PUBLIC LAND

By ________________

TOWN OF STOW

By [signature]

**[Proposed Form of Agreement]**

KUN370

Attachment 1-7.1

# AFFORDABLE HOUSING COVENANT

**for 142 Red Acre Road, Stow MA**

OWNER - ______________________________

OWNER'S ADDRESS - 142 Red Acre Road, Stow, Massachusetts 01775.

COVENANT HOLDER - Town of Stow, Massachusetts.

COVENANT HOLDER 'S ADDRESS - 380 Great Road, Stow, MA 01775-2127.

PREMISES - The land, building and other improvements, presently a 1 family house, now or hereafter thereon located at 142 Red Acre Road, Stow, Massachusetts, as more completely described in Exhibit A hereto, together with all rights and easements now or hereafter appurtenant thereto and all fixtures now or hereafter thereon insofar as the same are a part of the realty.

RESIDENCE - The residential unit at the Premises occupied by the Owner's Household.

**Summary of the Affordable Housing Covenant**

**I am buying this home to live in it as my principal residence. I acknowledge that I am qualified to buy and live in this home because my income is _________. This home has been made affordable by government activities so that it can be home to persons of low or moderate income in perpetuity and I recognize that I must (i) live in the Residence as my principal residence and (ii) sell the home to persons having income no greater than permitted under this Covenant. Just as I could not afford to buy this home unless its price were reduced to affordable levels, they will also need the price at which I sell to be at affordable levels. I agree to this restriction recognizing I probably will not make as much profit from sale of this home as another homeowner in the neighborhood who purchased and may sell at full market value. To enforce these provisions intended to assure long term affordability for this home, I recognize I will need to give notice to the Covenant Holder (or its designated representative) when I sell the home, the Covenant Holder will have a right to purchase the Premises if it wishes, and any buyer will be subject to this Affordable Housing Covenant. I recognize that this paragraph is a brief summary of the complete terms and conditions of this Covenant, which are set out below, which have been explained to me to my satisfaction, and to which I agree.**

**Owner initials** ____________ ______________

**The Full Covenant**

The Covenant Holder, to further the public purpose of assuring affordable housing in Stow, Massachusetts, has provided assistance in the creation of the Premises for long term use as Affordable Housing to be owned by members of a Household of Qualified Income for use as their principal residence. The assistance and support of the Covenant Holder has reduced significantly the Owner's cost of buying the Premises. The Owner acknowledges the receipt and sufficiency of such assistance and support as consideration for this Covenant.

For valuable consideration, the receipt and sufficiency of which is acknowledged, the Owners, for themselves and their heirs, successors and assigns (including all persons who subsequently own the Premises or any interest therein while this Covenant is in effect), hereby covenant and agree that the Premises shall be subject to the following covenants and restrictions for the benefit of the Covenant Holder, its successors, assigns, agents and designees, with the intent that these restrictions created by this Covenant shall be perpetual duration.

**1. Definitions**

The following words and phrases when capitalized have the following meaning:

1.1. "Affordable Housing" means housing occupied as its principal residence by a Household who at the time of the purchase of the Premises by one or more of its members was of Qualified Income as the same may be defined from time to time by the Covenant Holder of Stow.

1.2. "Covenant" means this Affordable Housing Covenant.

1.3. "Covenant Holder" means any legal person or entity who possesses the rights under this and similar Covenants or to whom the rights under this and similar Covenants have been transferred either outright or for purposes of administration. A general delegation of authority by the current Covenant Holder to another person as a new Covenant Holder shall transfer those rights, powers and obligations assigned to the new Covenant Holder in this Covenant. Transfer of any rights, powers and obligations assigned to the Covenant Holder in this Covenant shall be effective only to the extent such rights, powers and obligations are specifically enumerated in the delegation of authority.

1.4. "Fair Market Value" means fair market value as of the day of the event in question (for example, purchase, foreclosure or termination of this Covenant) taking into account the restrictions on ownership and occupancy imposed by this Covenant as if such restriction were perpetual. (When not capitalized, fair market value has the ordinary meaning established by law or custom without regard to the terms of this Covenant.)

1.5. "Household" means all persons who reside together and with the Owner at the Residence.

1.6. "Low income" means total household income less than or equal to sixty percent (60%) of the Median Income.

KUN372

1.7. "Maximum Resale Price" means, with respect to the Premises, as of a given date, the sum of:

(a) the consideration paid for the Premises as specified in the Deed to the Owner increased five percent (5%( per annum), compounded annually;

(b) plus the actual cost of bedrooms added to the units located on the Premises;

(c) plus the actual cost of bathrooms added to the units located on the Premises if such unit(s) contain(s) three (3) or more bedrooms;

(d) plus the actual cost of other capital improvements made to the Premises by the Owner from time to time subject to the limitation that credit for such capital improvements shall not exceed one percent (1%) per year of the consideration paid for the Premises by the Owner;

(e) plus the amount incurred by the Owner for the services of a real estate agent, up to an amount not greater than six percent (6%) of the sum of (a) through (d) and provided that such expense is documented (the "Broker's Commission").

Consideration shall include the aggregate value of all money, property and services of every kind given or paid by the buyer to or for the benefit of the Owner in connection with the transfer of the Premises, including any consideration paid for any other real property or personal property conveyed by the Owner to the buyer.

The cost of capital improvements shall be included in the Maximum Resale Price only if, (i) the improvement is considered to be a "capital" improvement within the definition of the United States Internal Revenue Code; (ii) the improvements complied with all pertinent statutes, ordinances and regulations at the time such improvements were made, and (iii) the cost of such improvements have been documented to the satisfaction of the Covenant Holder at the time of resale.

Upon written application and upon submission of such evidence as the Covenant Holder may require, the Covenant Holder shall furnish to any Owner, mortgagee or person having a security interest in the Premises, a certificate in recordable form stating the Maximum Resale Price for the Premises pursuant to Section 3.1.5 below.

1.8. "Median Income" means the median household income for the Boston Metropolitan Statistical Area ("BMSA") set forth in or calculated pursuant to regulations promulgated by HUD, pursuant to Section 8. If HUD discontinues publication of median income statistics, then the Covenant Holder shall designate another measure of household income.

1.9."Moderate income" means total household income less than or equal to eighty percent (80%) of Median Income.

1.10. "Owner" means each legal and equitable owner of all or any portion of the Premises during the term of this Covenant, including the Owner identified above, and any subsequent owner by sale, conveyance or other transfer of any legal or beneficial interest in the

Premises. Unless the context otherwise requires, "Owner" shall mean the Owner at the time in question. "Owner" and" owners" are used interchangeably.

1.11. "Qualified Income" means the Household income level of a purchaser of the Premises which shall not exceed an amount calculated as follows:

(a) Calculate the "Imputed Loan Amount" by multiplying the Maximum Resale Price at the time of the sale by ninety percent (90%);

(b) Calculate the "Imputed Monthly Debt Service Amount" by calculating the level monthly payment needed to amortize the Imputed Loan Amount, using the average interest rate offered during the 30 days prior to the date of said calculation [by financial institution approved by the Covenant Holder ] for a thirty-year, fixed rate residential mortgage, or as specified in such standard index of home mortgage loans as the [Covenant Holder ] may designate from time to time;

(c) Calculate the "Annual Imputed Housing Cost" by adding twelve times the Imputed Monthly Debt Service Amount plus three times the Imputed Monthly Debt Service Amount (to make a standard allowance for real estate taxes and insurance) plus twelve times the imputed monthly condominium fee applicable to the Residence, if any, as the case may be; and

(d) Calculate Qualified Income by multiplying the Annual Imputed Housing Cost by 3.928.

1.12. "Section 8" means Section 8 of the Housing Act of 1937, as amended by the Housing and Community Development Act of 1974 (24 CFR Part 812), or any successor thereto.

1.13. "Term" shall mean that period during which the restrictions imposed by this Covenant are legally enforceable against the Premises. It is the parties' intention that the Term shall be of perpetual duration.

**2. Affordable Housing Covenants**

2.1. Covenant as to Residence

2.1.1 Affordable Housing; Principal Residence. Each Owner covenants and agrees that the Residence shall be Affordable Housing throughout the term of this Covenant.

2.1.2 Principal Residence. Each Owner agrees that, except as otherwise expressly permitted in this Covenant, the Residence shall be used only as the principal residence for members of the Household of which the Owner is a member. Each Owner agrees not to permit use or occupancy of the Residence by any other person or for any other purpose (including without limitation short-term tenancy) without the prior written consent of the Covenant Holder, which consent need not be given if in the Covenant Holder's judgment the occupancy or use would not further the purposes of this Covenant to promote Affordable Housing in Stow.

**2.1.3** Changes in Household's Circumstances. It is not a violation of this Covenant if the Household of which the Owner is a member ceases during the Owner's ownership of the Premises to be of Qualified Income, provided the Owner's Household continues to occupy the Residence as its principal residence.

2.1.4 Accessory Legal Uses. It is not a violation of this Covenant if members of the Owner's Household, while occupying the Residence as their principal residence, make accessory use of the Residence (for instance, as their place of business) so long as such additional use is in compliance with zoning and all other requirements of law.

2.1.5 Sale Only to Households of Qualified Income as Principal Residence. Under this Covenant, the Premises can be sold or otherwise transferred (i) only for an amount not exceeding the Maximum Resale Price and (ii) only to members of Households who at the time of acquisition of their interest in the Premises are a Household of Qualified Income acquiring the Residence for occupancy as their principal residence.

**3. Rights and Obligations on Sale of Premises**

3.1.. The Owner's Right to Sell the Premises.

3.1.1 Notice of Intent to Sell. Any time the Owner intends to sell or otherwise voluntarily transfer the Premises or any interest in the Premises, the Owner shall give written notice to the Covenant Holder in the manner required in Section 7 which shall state the Owner's intention to sell or otherwise voluntarily transfer the Premises or any interest in the Premises (the "Notice of Intent to Sell").

3.1.2 Second Notice of Intent to Sell. The Owner, having given a Notice of Intent to Sell as stated above in Notice of Intent to Sell as to which the Purchase Rights were not exercised, shall give written notice to the Covenant Holder in the manner required in Section 7 prior to making a legally binding obligation to sell or otherwise transfer the Premises or any interest therein (the "Second Notice of Intent to Sell").

The Owner's Second Notice of Intent to Sell shall specify at least

(i) the full consideration for the proposed sale (which in no event shall exceed the Maximum Resale Price), and in the case of other voluntary transfer, a description of the proposed transaction,

(ii) sufficient evidence to determine whether each person to whom any interest in the Premises is proposed to be sold or otherwise transferred is / are members of a Household of Qualified Income as defined in this Covenant and

(iii) the statement of each person to whom any interest in the Premises is proposed to be sold or otherwise transferred that (a) their Household intends to use the Residence as its principal residence and (b) they have read and understand this Covenant.

3.1.3 Sale Free of Repurchase Rights Following Second Notice To Sell. Only after the Purchase Rights have expired unexercised as stated in this Covenant, the Owner may proceed to sell the Premises to the proposed purchaser(s) identified in the Second Notice of Intent to Sell or otherwise transfer the Premises to the person(s) identified in the Second Notice of Intent to Sell, free of the Purchase Rights for a price not exceeding the price stated in the Second Notice of Intent to Sell. In all events the Premises shall remain as Affordable Housing as stated in this Covenant until the termination of this Covenant.

3.1.4 Revival of Purchase Rights. Any sale of the Premises, or any other transfer the Premises, occurring more than six (6) months after the last day the Covenant Holder could have exercised the Purchase Rights under the Notice of Intent to Sell required under Section 3.1.2, Second Notice of Intent to Sell, shall be subject once again to all the Covenant Holder's Purchase Rights, a new Notice of Intent to Sell (and Second Notice of Intent to Sell, as the case may be) shall be required and the Covenant Holder shall have all the Purchase Rights as to such sale or other transfer as stated above.

3.1.5 Certificate of Price and Purchaser's Qualification. The Owner may request, and the Covenant Holder after due verification shall issue (when such is the case), a certificate in recordable form stating that the price for the proposed purchase does not exceed the Maximum Resale Price and that the proposed purchaser(s) and the purchaser(s) Household are qualified to own the Premises under the terms of this Covenant. Such certificate shall be valid for the period stated in the certificate, which shall not be less than ninety (90) days.

3.1.6 Deed to Reference This Covenant. The Owner shall include a reference to this Covenant in any and all deeds or other instruments conveying any interest in the Premises or any part thereof or interest therein, although neither the validity nor enforceability of this Covenant shall be affected in any manner by failure to do so.

3.2. The Covenant Holder's Right to Purchase the Premises

3.2.1 Grant of Purchase Rights. To maintain the Residence as Affordable Housing throughout the Term of this Covenant, the Covenant Holder shall have, and each Owner hereby grants the Covenant Holder the right (but without obligation) to purchase the Premises in any of the following circumstances (the "Purchase Rights"):

(a) The Owner has given the Covenant Holder a Notice of Intent to Sell or a Second Notice of Intent to Sell as stated in Section 3.1; or

(b) The Residence is no longer the principal residence of the Owner whose occupancy fulfills the requirements of Section 2 (or that deceased Owner's spouse as permitted in Changes in Household's Circumstances above), or the Premises is being used in any other manner which does not comply with this Covenant, the Owner (or that deceased Owner's spouse) has been given written notice identifying the violations and has failed to cure them; or

(c) Any legal or beneficial interest in the Premises is conveyed without both Notice of Intent to Sell and Second Notice of Intent to Sell as required in Section 3

having been given, unless the Covenant Holder has waived the Purchase Rights in writing; or

(d) The Covenant Holder has notice of a pending mortgage or other lien foreclosure or similar proceeding (for instance, a sheriff's sale) against the Premises; or

(e) The Covenant Holder has notice that the Premises are being taken for unpaid taxes; or

(f) The Owner made material misrepresentations in applying to buy the Premises which cause the Owner's ownership of the Premises to be not in compliance with this Covenant; or

(g) The Owner has failed to observe and perform the Owner's obligations under this Covenant (other than as stated in (h) below), has been given written notice identifying the violations and has failed to cure them; or

(h) The Owner has failed to observe and perform the Owner's obligations under this Covenant in a manner which constitutes criminal conduct or in the Covenant Holder's judgment constitutes other willful, egregious and continuing violation of such obligations.

The Covenant Holder shall be obligated to give the Owner notice and an opportunity to cure only for events under subsections (b) or (g); and for those events, the Owner shall have a reasonable time to cure which shall not exceed six months. In all cases other than sale or other transfer of the Premises under subsection (a), the Covenant Holder's right to buy the Premises shall continue only while the event giving rise to exercise of the Purchase Rights continues unremedied.

3.2.2 Duration of Purchase Rights. The Purchase Rights may be exercised throughout the term of this Covenant.

3.2.3 Purchase Price. The purchase price of the Premises under the Purchase Rights shall be one of the following:

(i) if the Owner proposes to sell or otherwise voluntarily transfer the Premises,
(a) the amount for which the Owner proposes to sell or transfer the Premises, or
(b) the Maximum Resale Price if less; and
(ii) in all other cases, the Maximum Resale Price .

3.2.4 Exercise of Purchase Rights. To exercise the Purchase Rights, the Covenant Holder shall give written notice to the Owner in the manner described in Section 7 as follows.

3.2.5 If the Covenant Holder is exercising the Purchase Rights pursuant to a Notice of Intent to Sell or a Second Notice of Intent to Sell, the Covenant Holder shall give its notice of exercise, if at all, within (sixty calendar (60) days) (in response to a Notice of Intent to

Sell) or ten (10) business days (in response to a Second Notice of Intent to Sell) of receipt of the Owner's Notice of Intent to Sell (or Second Notice of Intent to Sell, as the case may be).

The Covenant Holder may give notice exercising the Purchase Rights in all other circumstances until the event giving rise to the Purchase Rights has ceased to exist.

3.2.6 Closing Procedure. The closing shall be held on the date specified at 2:00 P.M. at the ____________ of Deeds (unless the Covenant Holder's notice specifies another place for closing in Stow) on a date not greater than ninety (90) days before the notice of exercise under Section 3.2.5. The Premises are to be conveyed by a good and sufficient quitclaim deed to the Covenant Holder or its designee, conveying good and clear record and marketable title free from encumbrances except (i) such taxes for the then current year as are not due and payable on the date of the delivery of the deed, (ii) such matters of record (other than mortgages) to which this Covenant was intended to be subordinate at the time of its recording, and (iii) such other matters of record (other than mortgages) to which the Covenant Holder gave its express written consent. The Premises shall be delivered in the same condition as at the time of the Covenant Holder's exercise of the Purchase Rights (but always in at least the condition required under this Covenant) and shall be free of all tenants and occupants as to the Residence. The Covenant Holder may inspect the Premises prior to closing to determine whether its condition complies with this paragraph. Common expenses, fuel, and water and sewer use charges, if applicable, and current real estate taxes shall be adjusted as of the closing date.

3.2.7 Purchaser's Right to Cure Defaults at Closing. If the Owner shall be unable on the closing date to give title or to make conveyance or to deliver possession of the Premises, all in accordance with the terms of this Covenant, or if on the closing date the Premises in any other way does not conform with the requirements of this Covenant, then the Covenant Holder may apply as much of the Purchase Price as necessary to curing such failures and nonconformities; but this remedy shall not be deemed to waive, impair or otherwise diminish the priority of the Purchase Rights over other's rights, whether or not appearing of record.

3.2.8 No Closing if Defaults Cured. Except as to Purchase Rights arising under a Notice of Intent to Sell or a Second Notice of Intent to Sell, if at closing the event(s) giving rise to exercise of the Purchase Rights have been remedied and no longer exist, then the Purchase Rights may not be exercised with respect to those events.

3.2.9 Purchase Rights Arising in Sales Revocable Only by Covenant Holder. Purchase Rights which have been exercised pursuant to a Notice of Intent to Sell or a Second Notice of Intent to Sell shall not be revocable except by the Covenant Holder.

3.2.10 Purchase Rights Exercisable as to All Ownership Interests. The Purchase Rights shall always be exercisable as to the entire ownership interest in the Premises, notwithstanding that the event giving rise to the Purchase Rights might involve less than the entire ownership interest, and shall be exercisable against all the Owners (or any subsequent Owner) notwithstanding that the acts of fewer than all the Owners (or a prior Owner) gave rise to the Purchase Rights.

3.3. Certificate of Nonexercise of Purchase Rights. If the Covenant Holder does not exercise the Purchase Rights, the Owner may request, and the Covenant Holder shall issue, a certificate in recordable form stating that the Covenant Holder did not exercise the Purchase Rights as to specified events. Such certificate, if recorded with the Middlesex Registry of Deeds, shall constitute the Covenant Holder's waiver of the Purchase Rights as to the events stated therein.

3.4. Maintenance of Premises. The Owner covenants to maintain the Premises in good order, repair and condition at all times, including without limitation all fixtures, utility services, driveway and parking areas, and landscaping in existence from time to time. Without limiting the foregoing, the Owner shall maintain the Premises in full compliance with all laws, regulations, ordinances, codes, orders or other law, now existing or hereafter enacted, regarding the habitability of the Premises as housing.

4. **Compliance**

4.1. Certificate of Compliance. Each sale, conveyance or other transfer of full or partial ownership of the Premises shall be subject to all the terms of this Covenant (including without limitation the Purchase Rights) unless a certificate, signed, and acknowledged by the Covenant Holder which acknowledges non-exercise of the Purchase Rights, or waives the same, or acknowledges the purchaser(s) qualifications, as the case may be, is recorded with the Middlesex Registry of Deeds. The Covenant Holder agrees to issue such a certificate, when required, within a reasonable time of receipt of written request. If the Covenant Holder determines that a proposed conveyance, sale or other transfer does not comply with the requirements of this Covenant, or in the event of other noncompliance rendering issuance of such a certificate inappropriate, the Covenant Holder shall within such time issue a statement in writing (which need not be in recordable form) stating in reasonable detail the reasons for the finding of noncompliance.

4.2. Reliance on Evidence of Compliance with this Agreement._Any mortgagee or other bona fide purchaser for value of the Premises may conclusively rely upon a certificate issued by the Covenant Holder pursuant to this Section as to compliance with or waiver of rights under this Covenant, as the case may be.

4.3. Compliance Information. The Owner shall furnish such information about the Premises as the Covenant Holder may reasonably request from time to time, for example, on the identity of each Owner and of each member of the Household living in the Residence, the identity of any mortgagee or other person having an interest in the Premises, the full consideration paid for the Premises or any interest therein identified by category (e.g., equity, institutional loan and so forth), the condition of the Premises, and any other information which the Covenant Holder in good faith deems relevant, all for the purpose of assuring compliance with this Covenant.

5. **Enforcement**

5.1. Remedies. Without limiting other remedies of the Covenant Holder, in the event a court of competent jurisdiction finds that any Owner sold, conveyed or otherwise transferred,

or leased the Residence, or any Owner or any member of the Household living in the Residence used the Residence in violation of the provisions of this Covenant, or that in any other material way any Owner or any member of such Household was in violation of this Covenant, then after expiration of all applicable appeal rights the Covenant Holder shall be entitled to the following remedies (which shall be cumulative and not mutually exclusive) against each Owner and any other person whose conduct has contributed to the violation :

(a) specific performance of the provisions of this Covenant (including, if such be the case, the Covenant Holder's assertion of the Purchase Rights as to such violation);

(b) voiding of any rental arrangement that violates this Covenant;

(c) (i) in the case of any rental which violated this Covenant, damages equivalent to the rent charged during the existence of the violation, or (ii) in the case of a conveyance or other transfer of the Premises which violates this Covenant, damages for the cost of creating or obtaining other comparable dwelling units to replace the Premises in the event it can no longer be Affordable Housing for Households of Qualified Income;

(d) voiding of any contract for sale, or any sale or other transfer or conveyance, of the Premises in violation of the provisions of this Covenant including without limitation any sale, transfer or conveyance made in the absence of a certificate from the Covenant Holder approving such sale, transfer or conveyance as provided in Section 5, Certificate of Compliance of this Covenant; or

(e) Damages in the amount of the Affordable Housing Subsidy, together with interest thereon, as set forth in the Mortgage Securing this Affordable Housing Covenant.

5.2. Attorney's Fees. If any action is brought to enforce this Covenant, the prevailing party shall be entitled to reasonable attorneys' fees and other costs of bringing such action, in addition to any other relief or remedy to which such party may be entitled.

5.3. Covenant Holder Right to Enter. Each Owner hereby grants to the Covenant Holder the right to enter upon the Premises upon reasonable notice for the purpose of enforcing the restrictions contained in this Covenant.

5.4. Survival of Enforcement Rights. Notwithstanding the definition of Owner hereinbefore contained, the rights of enforcement for violations of this Covenant shall survive any subsequent sale or transfer of the Premises.

5.5. Remedies under Separate Instruments Not Limited. Nothing in this Covenant shall limit exercise of rights or remedies (for instance, foreclosure under the Mortgage Securing Obligations Under A Certain Affordable Housing Covenant recorded herewith) arising under an instrument other than this Covenant.

**6. Mortgagees' Rights**

Other provisions of this Covenant notwithstanding, a financial institution (the "Lender") holding a mortgage or security interest in the Premises which secures repayment of funds loaned to purchase the Premises (or to refinance any such mortgage) or for other purposes which comply with this Covenant, shall acquire title by deed in lieu of foreclosure, and such Lender (or any other successful bidder(s) at a foreclosure sale) shall acquire title by foreclosure superior to this Affordable Housing Covenant and the Mortgage which secures it, and all Affordable Housing restrictions, including all Purchase Rights contained in this Covenant, shall terminate and have no further effect. All notices shall be sent to the Covenant Holder as set forth in Section 7 of this Covenant. The holders of all other mortgage(s) (or any other successful bidder(s) at a foreclosure sale of such other mortgage(s)) who shall acquire title, whether by foreclosure or deed in lieu thereof, are and shall remain subject to this Covenant.

Within a reasonable time of receipt of written request, the Covenant Holder will issue a certificate in recordable form stating whether a mortgage secures repayment of funds loaned to purchase the Premises (or to refinance any such mortgage) or for other purposes which comply with this Covenant, and any such certificate, when recorded with the Middlesex District Registry of Deeds, shall be binding and conclusive on the Covenant Holder and all other persons relying thereon.

Notwithstanding the foregoing, if any person who was an Owner of the Premises immediately prior to foreclosure acquires an interest in the Premises through or subsequent to foreclosure, or by deed in lieu of foreclosure, then all covenants and the Purchase Rights contained herein shall apply thereafter to the Premises with their original full force and effect as if never terminated.

**7. Notice**

Any demand, notice or request by either party to the other shall be sufficiently given if in writing delivered to the party intended to receive the same, or if mailed by certified mail, return receipt requested, or delivered to a recognized national courier, or if given in a manner sufficient for legal process. Each notice to the Owner named above shall be addressed to such party at the Owner's Address set forth above, or to such other address as may be stated in a notice given as herein provided. Each notice to subsequent Owners shall be sufficiently given if addressed to or given at the Residence. Notices to the Covenant Holder, to be valid, must be correctly and sufficiently addressed to Board of Selectmen, Town of Stow, 380 Great Road, Stow, MA 01775-2127.

**8. Term; Termination**

8.1. Term. This Covenant shall be binding upon each Owner, and all heirs, successors and assigns, for the benefit of, and enforceable by the Covenant Holder and its successors and assigns for the maximum duration permitted by law with the approval of the Commonwealth of Massachusetts, pursuant to General Laws, Chapter 184, Sections 31-33, and absent such approval, for a period of thirty (30) years from the date of this Covenant and for such further

time thereafter (up to 99 years) as this Covenant may be lawfully extended (including without limitation extensions permitted under General Laws, Chapter 184, Section 27-30).

8.2. Certificate of Termination. Within a reasonable time of receipt of written request, the Covenant Holder will issue a certificate in recordable form stating (if such be the case) that this Covenant has been terminated, and any such certificate, when recorded with the Middlesex Registry of Deeds, shall be binding and conclusive on the Covenant Holder and all persons relying thereon.

8.3. Payment on Termination. When this Covenant terminates for whatever reason (such as mortgage foreclosure or by operation of law) other than expiration of the agreed period of restriction, the Owner shall owe the Covenant Holder the amount equal to the difference between (i) the fair market value of the Premises free of the restrictions imposed by this Covenant, and (ii) the Fair Market Value of the Premises subject to the restrictions imposed by this Covenant (assuming the same to be perpetual for such purpose), but not less than all sums, with interest at annual rate of _____% compounded annually, paid by the Covenant Holder for the purpose of making the Premises Affordable Housing (the "Affordable Housing Subsidy"). The parties agree that as of this date the Affordable Housing Subsidy is $______________________________. Fair market value (both subject to and free of the restrictions imposed by this Covenant) shall be determined by the Covenant Holder through its Assessing Department or other qualified municipal staff; provided however, that after notice to the Covenant Holder, given before or after determination by the Covenant Holder, the Owner may obtain an appraisal at the Owner's expense from a qualified appraiser approved by the Covenant Holder to determine fair market values for these purposes, whose decision shall be binding on the parties. Payment shall be made out of the proceeds from or on account of the Premises (such as sales proceeds, foreclosure proceeds or insurance proceeds) received at the time of, or next following, such termination after discharge of mortgages and other liens senior to this Covenant and shall be paid after payment (net of such mortgage and other lien payments) of the Fair Market Value of the Premises as restricted to the Owner and as if perpetual. In no event shall the Owner be personally liable to pay the Covenant Holder more than the amount, determined as stated above, actually received from or on account of the Premises as stated above.

**9. Appointment of Agent; Appointment of Covenant Holder**

The Covenant Holder may from time to time appoint and revoke the appointment of one or more persons (who may but need not be municipal employees and who may be natural or legal persons) who shall have the authority to issue certificates as provided herein and to exercise the appointor's other rights under this Covenant to the extent stated in such Certificate. Such appointments shall be made (or revoked) only by instrument duly executed by the appointor and recorded in the Middlesex District Registry of Deeds, and each such action shall be effective only upon recording. No such instrument of appointment or revocation of appointment shall be effective unless it expressly refers to this Covenant. Only the Covenant Holder may appoint a Covenant Holder, and no appointee shall be a Covenant Holder unless the same is stated in the recorded certificate. As of the date of execution of this Covenant, the Covenant Holder is ___________ and such certificates shall be signed by _____________.

**10. Miscellaneous**

10.1. Covenants Run with the Land. All covenants, rights and restrictions set forth in this Covenant shall run with the real property constituting or including the Premises for the purpose of maintaining the Residence as Affordable Housing throughout the Term of this Covenant.

10.2. Public Purpose. The Covenant Holder declares, and the Owner and each other person, including mortgagees, hereafter holding any interest in the Premises acknowledges, that the reservation and grant of the covenants, and restrictions contained in this Covenant are for public purposes.

10.3. Releases. Except as expressly authorized in this Covenant (for instance, as to Certificates of Compliance or waivers), no release of or other change in the rights of the Covenant Holder contained in this Covenant shall be effective unless it is in writing and duly executed by the Covenant Holder or an authorized agent (including without limitation the Covenant Holder) as stated above.

10.4. Severability. If any provision of this Covenant or the application thereof to any person or circumstances is held to be invalid or unenforceable by any decision of any court of competent jurisdiction, such decision shall not impair or otherwise affect any other provision of this Covenant, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable.

10.5. Interpretation. This Covenant shall be enforceable according to its terms, is subject to the general principles of equity, fairness and reasonableness irrespective of whether such enforcement or interpretation is considered in a proceeding at equity or in law and shall be construed according to its purpose of fostering and preserving Affordable Housing.

10.6. Successors Bound. This Covenant shall be legally binding on, as the obligations of, the parties and their respective successors and assigns, including without limitation successors in title or interest to the Premises, who by their acceptance of any ownership interest in the Premises shall be deemed to have agreed to perform and observe all the Owner's obligations under, and to be bound by all the terms and condition of, this Covenant.

This Covenant shall take effect as a sealed instrument as of this _______ day of _______________, 200__.

*owner signature*

COVENANT HOLDER

By:____________________________ ____________________________

KUN383

Approved as to Form: ______________________________

KUN384

COMMONWEALTH OF MASSACHUSETTS

Middlesex, ss. *date*

Then personally appeared the above-named *owner*, and acknowledged the foregoing instrument to be his / her free act and deed, before me

____________________________
Notary Public
My Commission Expires_______

COMMONWEALTH OF MASSACHUSETTS

Middlesex, ss. *date*

Then personally appeared the above-named ___________________________, and acknowledged the foregoing instrument to be his / her free act and deed and the free act and deed of said Covenant Holder of Stow, before me

____________________________
Notary Public
My Commission Expires_______

**EXHIBIT A**

LEGAL DESCRIPTION

KUN386

-16-

**MORTGAGE**
**SECURING OBLIGATIONS UNDER A CERTAIN**
**AFFORDABLE HOUSING COVENANT**
**for ____________, Stow, MA**
(CHAPA Model Form - 3/00)

OWNER - ______________________

OWNER'S ADDRESS - _________________, Stow, Massachusetts _____.

COVENANT HOLDER - ______________________

COVENANT HOLDER 'S ADDRESS - _______________________________.

THE OBLIGATIONS - All the Owner's obligations set forth in that certain Affordable Housing Covenant dated _________________ recorded herewith in the Middlesex Registry of Deeds as instrument _________ of ___________________, Book ________, Page _______ (the "Affordable Housing Covenant")

THE MORTGAGED PREMISES - The land, building and other improvements now or hereafter thereon located at ___________________, Stow, Middlesex County, Massachusetts, as more completely described in Exhibit A hereto, together with all rights and easements now or hereafter appurtenant thereto and all fixtures now or hereafter on the Mortgaged Premises insofar as the same are a part of the realty.

Capitalized words or phrases not defined in this Mortgage have the meaning ascribed to them in the Affordable Housing Covenant.

In consideration of the benefits of the Affordable Housing Covenant, and for other valuable consideration paid, the receipt and sufficiency of which is acknowledged, the Owner hereby grants the Mortgaged Premises to the Covenant Holder WITH MORTGAGE COVENANTS to secure the Obligations.

This Mortgage shall in all events be subordinate to any other mortgage now or hereafter on all or any portion of the Mortgaged Premises which secures the repayment of funds loaned to purchase the Mortgaged Premises (or to refinance any such mortgage) or for other purposes which comply with the Affordable Housing Covenant. On written request, the Covenant Holder shall confirm such subordination in a recordable instrument.

The Owner covenants and agrees that the CONDITION of this Mortgage is that the Owner, and all other persons now or hereafter owning all or any part of the Mortgaged Premises faithfully performs and observes the Obligations.

For any breach of such condition continuing uncured for such period as is specifically stated in the Affordable Housing Covenant with respect thereto (and for ninety (90) days after notice if none is stated), the Covenant Holder shall have the STATUTORY POWER OF SALE.

In event foreclosure of any prior mortgage extinguishes the Affordable Housing Covenant, or the Affordable Housing Covenant terminates for whatever reason other than expiration of the agreed period of restriction, this Mortgage shall also secure repayment to the Covenant Holder of the amount equal to the difference between (i) the fair market value of the Mortgaged Premises, free of the restrictions on ownership and occupancy imposed by this Covenant, and (ii) the Fair Market Value of the Mortgaged Premises, subject to the restrictions imposed by this Covenant as if perpetual, but not less than all sums, with interest at annual rate of ______% compounded annually, paid by the Covenant Holder for the purpose of making the Mortgaged Premises Affordable Housing (the "Affordable Housing Subsidy"). The parties agree that as of this date the Affordable Housing Subsidy is $________________.

**In no event shall any Owner of the Mortgaged Premises, or any other person, be personally responsible to repay all or any portion of the Affordable Housing Subsidy, or any interest thereon, or any costs or expenses under this Mortgage (such as but not limited to costs and expenses of foreclosure), and the Covenant Holder agrees to look solely to the Mortgaged Premises for payment thereof, except for recovery of funds wrongfully derived by the Owner from the Mortgaged Premises in violation of the Affordable Housing Covenant.**

EXECUTED as a sealed instrument under Massachusetts law this *date*.

*owner signature*

COMMONWEALTH OF MASSACHUSETTS

*date*

Then personally appeared the above-named *owner*, and acknowledged the foregoing instrument to be his / her free act and deed, before me

_______________________________
Notary Public
My Commission Expires________

KUN 389

**EXHIBIT A**

LEGAL DESCRIPTION

-20-

KUN390

Attachment 1-7.2

MONITORING SERVICES AGREEMENT

THIS AGREEMENT is made as of the _______ day of, _________ 2003, by and between The Trust for Public Land, a California non-profit corporation having a usual place of business at 33 Union Street, Boston, MA 02108 ("TPL") and the Town of Stow with an address at 380 Great Road, Stow, MA 01775 ("Monitoring Agent").

Background

Developer, a California non-profit corporation, will develop one (1) single-family ownership unit (the "Unit") on property located at 142 Red Acre Road, Stow, MA. 142 Red Acre Road is currently owned by the Trust for Public Land (the "Property" as more fully described in Exhibit A attached hereto and incorporated herein).

Pursuant to a deed rider recorded with the deed to the Property, dated _______, and recorded with the Middlesex County Registry of Deeds in Book _____, Page ____ (the "Property Deed Rider"), this unit is required to be sold to a family whose income is below 80% of the median household income for the Boston Metropolitan Statistical Area set forth in or calculated pursuant to regulations promulgated by DHCD (the "Affordable Unit"). In addition, the Affordable Unit will be subject to a deed rider governing resale (the "Affordable Housing Covenant") in perpetuity.

Pursuant to requirements of the Property Deed Rider, the Monitoring Agent has agreed to perform monitoring and enforcement services regarding the initial sale of the Affordable Unit and compliance of the Project with the Affordable Housing Covenant.

Agreement

The parties, intending to be legally bound, agree as follows:

1. Monitoring Services. Monitoring Agent shall monitor the initial sale of the Affordable Unit and compliance of the Project with the Affordability Requirement, including:

(i) Review of the substantive compliance of the Project with the Affordable Housing Covenant.

(iii) Review of Unit Deed and deed rider with respect to initial sale of Affordable Unit.

(iv) Monitoring of re-sales of Affordable Unit for compliance with the terms of the applicable deed riders and issuance of certifications, as appropriate, approving re-sales and the payment of recapture amounts.

The Monitoring Agent may provide reasonable supplemental monitoring on its own initiative in order to ensure to the extent practicable the compliance of the Affordable Unit owners and the Developer with the Affordable Housing Covenant. The services under this Agreement shall not include any construction period monitoring. The services under this Agreement shall include follow-up discussions with the Developer or Affordable Unit owner(s), if appropriate, after an event of noncompliance.

**[Proposed Form of Agreement]**

2. Enforcement Services.

Prior to the initial conveyance of an Affordable Unit:

(a) the Monitoring Agent shall have the right, at its discretion, to take appropriate enforcement action against the Developer, including, without limitation, notice to DHCD to compel the Developer to comply with the requirements of the Affordable Housing Covenant.

(b) Developer shall pay the fees and expenses (including legal fees) of the Monitoring Agent with respect to such Affordable Unit(s) in the event such enforcement action is taken against the Developer, and

(c) the Monitoring Agent shall be entitled to seek recovery of its fees and expenses incurred in enforcing the Affordability Requirement against the Developer and to seek an attachment of the interest of the Developer in the Project in connection with any action to recover its fees and expenses, and to assert a lien on any interest of the Developer in the Project.

After the initial conveyance of an Affordable Unit:

(x) in the event of a violation of the provisions of a Unit Deed rider, the Monitoring Agent shall have the right, at its discretion, to take appropriate enforcement action against the Affordable Unit owner or such owner's successors in title, including, without limitation, notice to DHCD or legal action to compel the such unit owner to comply with the requirements of the Affordable Housing Covenant and

(y) the Monitoring Agent shall be entitled to seek recovery of its fees and expenses incurred in enforcing an Affordable Housing Covenant against the Affordable Unit owner or such owner's successors in title and in any action against the Affordable Unit owner or such owner's successors in title and to seek an attachment of the relevant Affordable Unit to secure payment of such fees and expenses and to assert a lien against the Affordable Unit as provided in the deed rider.

The form of Affordable Housing Covenant will provide for payment by the unit owner of fees and expenses (including legal fees) of the Monitoring Agent in the event enforcement action is taken against the unit owner thereunder or under this Agreement.

The Monitoring Agent shall not be entitled to seek any compensation or reimbursement from DHCD or Developer (except as provided herein) in connection with the enforcement services under this Section 3, it being understood that the Monitoring Agent shall look solely to the reimbursement rights described above for payment of the Monitoring Agent's costs and expenses.

4. Term. The monitoring services are to be provided until such time that the Monitoring Agent, in collaboration with DHCD creates a new monitoring entity, which shall occur upon the initial sale of the Affordable Unit conveyed by the Developer.

5. Responsibility of Monitoring Agent. The Monitoring Agent shall not be held liable for any action taken or omitted under this Agreement so long as it shall have acted in good faith and without gross negligence.

6. Applicable Law. This Agreement, and the application or interpretation of this Agreement, shall be governed by the laws of The Commonwealth of Massachusetts.

**[Proposed Form of Agreement]**

7. Binding Agreement. This Agreement shall be binding on the parties to this Agreement, their heirs, executors, personal representatives, successors and assigns. In the event that the Monitoring Agent shall cease to exist, then a successor Monitoring Agent may be appointed by DHCD.

8. Headings. All paragraph headings in this Agreement are for convenience of reference only and are not intended to qualify the meaning of the paragraph.

IN WITNESS WHEREOF, the parties to this Agreement have caused this Agreement to be duly executed as of the date first written above.

The Trust for Public Land

By:______________________________
Craig A. MacDonnell, Massachusetts
State Director

The Town of Stow, Massachusetts

By: Edward R. Perry
Edward R. Perry
Its Chief Elected Official

[Proposed Form of Agreement]

Attachment 1-7.3

## Marketing, Monitoring, Education and Enforcement Plan

### Marketing and Buyer Selection

The two basic elements of the Marketing and Buyer Selection plan are local preference and the buyer selection process. Each aspect of the marketing plan is described below.

### Local Preference

The marketing plan includes local preference for the moderate-income unit. A separate pool of applicants will be maintained to address the desire for local preference expressed by the community. This local preference pool will comply with all DHCD and fair housing regulations, and will have not discriminatory or unlawful effects. The mechanics of the "local preference" pool and the "other" pool are further described in the buyer selection section.

### Buyer Selection (Lottery Process)

The demand for this moderate-income housing unit in and around Stow exceeds the supply. Because of the disparity between demand and supply, prospective buyers will be selected using a lottery to be administered by the Town of Stow, modeled upon the recommendations of the Citizen's Housing and Planning Association (CHAPA). The lottery process will be managed by the Town of Stow subject to approval by DHCD.

The Town of Stow reserves the right to expand the Local Preference category beyond current residents, to potentially include parents and/or children of Stow residents, current employees in the Town of Stow who may not live in the town, etc. Additional outreach will be employed to attract these additional qualified applicants, including such strategies as flyers accompanying paychecks, separate mailings to municipal employees or informational sessions targeted to these employees.

*Step 1: Determining Basic Qualifications*

Below are minimum thresholds for lottery qualifications:
• Total household gross income cannot exceed 80% of the area median income as defined by the U.S. Department of Housing and Urban Development. There are different income limits, depending on household size. Annual income should include all members of the household over the age of 18 (unless full-time students) during the most recent calendar year.

• The buyer must have funds or demonstrate the ability to obtain funds for a down payment and closing costs, as determined by lending industry standards. This can be verified after the lottery result. There will likely be many more applicants than available units and it makes more sense to process down payment and mortgage qualification items for the successful lottery applicant. However, every applicant should have a lottery position (assigned a number) so that if any earlier applicants are not fully eligible, they will move up into that position.

• Household size should be appropriate for the number of bedrooms in the home. It is appropriate to set a minimum and maximum household size for the units. In this case, it may be appropriate for two bedroom homes to set a minimum household size of two persons.

• It is recommended that buyer income should be able to support at least 50% of the price of the home. No more than 50% of the purchase price should be cash.

• The Town, with guidance from DHCD, can choose to impose an asset limit. It is recommended that, at a minimum, household assets over $5,000 be calculated as imputed income using the current HUD approved passbook rate (currently at 2%).

• Non-household members should not be permitted as co-signers of the mortgage.

• The lottery process will give preference to families of two or more over single individuals in all cases. Units with two or more bedrooms shall be prioritized for larger families requiring additional bedrooms, as follows:

First preference shall be given to families requiring the total number of bedrooms in the unit to house members of the household, based on the following criteria:

    (i) No two persons (with the exception of husband and wife, or those in a similar living arrangement) shall be required to share a bedroom;

    (ii) A person described in (i) shall not be required to share a bedroom if a consequence of sharing would be a severe adverse impact on his or mental or physical health and the lottery director receives reliable medical documentation as to such impact of sharing.

Second preference shall be given to families requiring the number of bedrooms in the unit minus one, based on the above criteria; third preference shall be given to families requiring the number of bedrooms in the unit minus two; and so on.

A "family" shall mean two or more persons who will live regularly in the unit as their primary residence and who are related by blood, marriage, law or who have otherwise evidenced a stable inter-dependent relationship.

Lottery drawings shall result in each applicant being given a ranking among other applicants and larger families being prioritized for units with appropriate numbers of bedrooms based on the above criteria.

*Step 2: Developing Application Materials*

The developer, in collaboration with the Town of Stow, will prepare complete application materials, including an application form, application certification form, authorization for consent to release information, the Affordable Housing Covenant, a description of the threshold eligibility requirements, a clear description of the preference categories being used, and how the lottery winners will be chosen.

*Step 3: Advertising and Outreach*

Notices will be sent to area churches, local and regional housing agencies, local housing authorities, civic groups, lending institutions, social service agencies, and other non-profit organizations.

The Town of Stow will offer one or more information meetings for the public to educate them about the lottery process and the development. These meetings may include local officials, lottery administrators, developers, and local bank or finance officials. The date, time, and location of these meetings will be published in ads or flyers that publicize the availability of lottery applications. Meetings will be held in the evening and at least one weekend day in accessible public facilities in order to reach as many potential

applicants as possible. Attendance at a meeting will not have any effect on the approval of a lottery application.

The purpose of the meeting is to answer questions that are commonly asked by lottery applicants. A town official will be available to describe the town's role in the affordable housing project, and the lottery administrator will explain the information requested on the application and answer questions about the lottery drawing process. The developer will be present at the initial lottery to describe the development and to answer specific questions about the affordable unit. The Town also expects that a local banker or financial representative will be present to answer questions about qualifications for the financing of affordable units. The number of meetings will be determined by the interest in the development throughout the community.

At the meetings and through general outreach, the lottery administrator will provide application materials to lottery applicants, which outline income qualifications for the lottery, the sales prices of the affordable units, the Affordable Housing Covenant, and the process one must follow to be eligible for the lottery.

Sales prices will be "locked-in" at the time of the initial marketing of the affordable units. The prices of the homes will not be increased once the lottery process begins, even if interest rates and HUD income guidelines change during this period.

*Step 4: Developing and Distributing Applications*

The application period will be at least 60 days. The lottery applicants should submit all of the required materials by a deadline to be specified by the Town of Stow. The level of documentation required from the applicant will depend on whether DHCD suggests that the Town of Stow allow the applicants to "self-qualify" based on information obtained from the meeting and materials or require that applicants obtain a "pre-qualification" letter from a lender and submit income tax returns to be eligible for the lottery.

In either case, only applicants that are income eligible and who submit all required information will be entered into the lottery.

*Step 5: Lottery Selection*

Once all required information has been received, each qualified applicant will be assigned a number. The Town of Stow will have two drawing pools: one for at large applicants and one for local preference applicants (up to 70% of the total units).

*Step 6: Loan Application*

Once the lottery has been completed and all persons have been assigned a lottery number, applicants will be given a time period in which they must apply for a loan (usually three weeks). Lottery winners should be free to choose the lender of their choice. A formal loan application is made to the lender within the time limit prescribed at the meeting. The lender should determine eligibility based on the qualifications outlined in step 1 above as well as credit worthiness of the applicant.

The lender should also review the deed rider, which contains the long-term affordability restrictions.

The lender will send a preliminary approval, at which time the applicant contacts the property owner and enters into a Purchase and Sale Agreement. The executed Purchase and Sale Agreement is submitted to the lender who then will issue a firm financing commitment.

*Step 7: Final Qualification*

Prior to a Purchase and Sale Agreement being executed, the developer or lender should submit each applicant's income documentation of the applicant to the monitoring agent. Income verification should include tax returns from the past year and five most recent pay stubs. The monitoring agent will then verify that the household's income does not exceed 80% of the area median income according to household size. The developer should also submit the signed deed rider to the monitoring agent. The deed rider restricts the resale price of the home so that it will remain affordable in the future.

*Step 8: Execute a Purchase and Sale Agreement*

Once the monitoring agent has approved the applications, the property owner and the homebuyer execute a purchase and sale agreement for each affordable home.

Item 1-8: Anti-Displacement and Relocation Assistance Plan/ Form 1-9 MA CDBG Program Anti-Displacement & Relocation Assistance Certification

When purchased by the developer (The Trust for Public Land), the unit will be vacant. The project involves a single homeownership unit that will not involve displacement at any time. No displacement or relocation is required as part of this project, and therefore an Anti-Displacement and Relocation Assistance Plan is not required.

1-10 Citizen Participation Plan

Development of the Kunelius Farm Project began in November of 2002. It is a testament to the soundness of the plan and its community based support that the initial concept has not been modified since its inception. The conversion and sale of an existing .93 acre parcel with 2 bedroom house as deed restricted affordable in perpetuity has been presented at numerous town committee meetings, a Special Town Meeting, and at an Open Hearing. This section will describe the wide range of local audiences that has provided feedback during the project's development and will project a plan for further community input upon grant funding.

**Community Participation: A Summary**

Neighborhood citizens learned in late October 2002 that the Town of Stow had a right of first refusal to purchase the properties of 142 and 144 Red Acre Road that had recently been put under a single contract for a housing development. On November 12, 2002, 15 citizens attended a Board of Selectmen meeting and convinced the Board to defer their decision to waive that right to give the group more time to develop an alternative proposal.

On November 16, 2002, a neighborhood group of sixteen Stow residents met to begin developing this plan. The minutes of this meeting clearly identified affordable housing in perpetuity as something that the town needs.

Subsequently, four community members then canvassed Red Acre Road and invited neighbors to a second meeting to "brainstorm" on the best possible project and how it should be implemented. Over 35 people attended that second meeting on November 23, 2002. The local citizens group called itself Friends of Red Acre (FORA). Throughout the meetings and the canvassing of the neighborhood neighbors and citizens fully supported the conversion of two houses to deed restricted affordable in perpetuity. Those residents that directly abut the subject houses continue to actively support this project (See Exhibit 5, Evidence of Local Support).

Members of FORA attended meetings of the Stow Housing Task Force and spoke with members of the Stow Housing Authority and with staff members of the Massachusetts Department of Housing and Community Development. The purpose of this outreach was to verify that this plan for affordable housing met the needs of the Town of Stow and to learn about the procedures and requirements for renovating, writing the deed restrictions, and selling the house at 142 Red Acre Road.

**Presentations to the Town**

FORA made a presentation to the Planning Board on November 19th to provide project information to inform the board's recommendation to the Board of Selectmen on whether or not to waive their right of first refusal. These minutes contain the first public record that FORA recognized the town's need for affordable housing and planned to purchase the two houses and put affordable deed restrictions on them. After deliberation, the Planning Board voted unanimously to "...recommend that the Selectmen refrain from waiving the Town's option, pending further review, and development of a potential plan for purchase" (Stow Planning Board Minutes, November 19, 2002).

As noted in the minutes, dozens of citizens filled the meeting room and hallway to support FORA's presentation to the Board of Selectmen at their November 26th meeting. The Selectmen voted unanimously to let the full 120 days pass before making a decision on their right of first refusal. They also agreed to put two placeholders for articles for warrant for the Special Town Meeting to see if the town would vote to appropriate funding for this project. Also notable were comments made by a member of the

Community Preservation Committee stating that the CPC would be interested in hearing a presentation from the group once their project was better defined.

In early December, The Trust for Public Land (TPL) agreed to become involved in this project and was assigned the right of first refusal on the property by the town in mid-February. TPL has continued to work with FORA, but now assumes directorship of the project.

In preparation for the Special Town Meeting in January, the town committees met individually to review and make recommendations on the various warrant articles. TPL and FORA attended the Conservation Commission, Planning Board, Finance Committee, and Capital Planning Committee to seek their public endorsement of this project at the Special Town Meeting. Though other concerns were raised about the project, there were no concerns voiced about the conversion of the houses to deed restricted affordable. Prior to the Special Town Meeting, The Trust for Public Land made an introductory presentation to the Board of Selectmen on January 7th. There was a majority vote of the Selectmen in favor of supporting the efforts of the Trust for Public Land.

At the Special Town Meeting on January 13, 2003 the Red Acre Project's Article for Warrant asked that the town vote to go to the polls and vote in favor of a Prop. 2 1/2 override to fund $305,000 of the Kunelius Farm Project. The project's plan to have affordable deed restrictions placed on the two houses was part of the presentation. The article passed, requiring a two-thirds majority of the voters.

**Open Hearing, January 28, 2003**

The Board of Selectmen met to decide whether or not to assign the right of first refusal to The Trust for Public Land. In order to obtain sufficient input from the town, the Board of Selectmen held a public hearing on January 28th. The announcement of the meeting was published in the local newspaper on January 16th.

The discussion at this meeting regarding the affordable housing component was not about the merits of the affordable housing proposal, but how The Trust for Public Land would ensure the Town of Stow that the properties would be deeded affordable. According to the minutes, "Selectman Clayton moved to transfer the Town's Right of First Refusal to the Trust for Public Land contingent upon all deliverables being received in time for Town Council to approve prior to the Board's meeting on February 11, 2003, and the offer to be rescinded if all is not received. Seconded by Selectman Burchfield and voted unanimously."

The Public Hearing was continued on February 11, 2003. At that meeting, Craig MacDonnell of The Trust for Public Land explained "...that 142 Red Acre Road would be conveyed subject to a perpetual affordability restriction if the Town votes to spend CPA funds to purchase one and a conservation restriction reasonably limiting the further development of the property. Any sale of the property would be coordinated with a local preference lottery and would be subject to all appropriate law and regulation."

The Selectmen voted to approve the following:

- that the Town transfer its Right of First Refusal under Chapter 61 to the Trust for Public Land and ratifying the vote taken at the January 28, 2003 meeting.
- that the Board support an article at ATM (Annual Town Meeting) in which funds from the CPA will be used for affordable housing and open space at 142-144 Red Acre Road.

- to inform the Zoning Board of Appeals of this Board's approval of the Red Acre Road planned project.

**Preparing for Annual Town Meeting**

On February 10th, The Trust for Public Land made a formal presentation to the Community Preservation Committee. At that meeting, the CPC voted to recommend that $400,000 of CPA funds be expended on that project by borrowing against the existing funds over two years. $100,000 of that amount would be from CPC funding set aside for affordable housing.

**Management of Affordable Housing Project Component**

Upon the sale of 142 Red Acre Road to The Trust for Public Land, the property will be vacated by the owner and no existing tenant will be displaced during the renovation and sale of the house.

The Trust for Public Land will seek to keep the public apprised of the project's progress and seek input on how the project should proceed. Stow is a small town of 2,082 households (Census 2000). The Stow Housing Authority, under direction of the Board of Selectmen, will be closely involved with this project and help to determine the public input process through scheduled meetings and Open Hearings. TPL and the Town of Stow will rely on the Housing Authority's ability to involve the community members that represent the needs of those of low and moderate income.

The Town of Stow will arrange for technical assistance through the Housing authority to help coordinate the provision of technical assistance to groups who represent low and moderate income persons throughout the grant term;

The grant management consultant, in conjunction with TPL, will hold at least one public hearing to review program performance during the grant year.

Procedures for the resolution of complaints and grievances will be consistent with those already in place in the Town of Stow, and in use by the Stow Housing Authority.

Throughout the process, handicapped residents will be provided for by holding all public meetings in accessible locations. Both the Stow Town Offices and Stow Housing Authority are handicap accessible. Non-English speaking residents will be accommodated as much as possible given the capacity of the Town of Stow. Whenever necessary, assistance will be sought to accommodate non-English speaking persons during the citizen participation process.

Federal FY 2002 Massachusetts CDBG Program

**PUBLIC HEARING DOCUMENTATION**
(Form 1-11)

PUBLIC HEARING INFORMATION:

Date/Time Held: January 28, 2003, 8:00 pm; February 11, 2003, 9:00 pm

Number of Attendees: Approximately 35

Location: Stow Town Building, 380 Great Road

Hearing Officer: Chairman, Board of Selectmen, Edward R. Perry
Hearing Outreach: Beacon-Villager , Circulation of 3,500 Weekly
(List all sources)

Posted in Town Building

Dates Published: 1/16/03

How Published? Newspaper, Public Posting in Town Building

**HEARING NOTICE AND MINUTES DOCUMENTATION:**

Attach a copy of the public hearing notice as it appeared in the newspaper(s) listed above, or a copy of the notice as was posted in the appropriate public buildings. In addition, you must attach a copy of the minutes from the public hearing.

**Attachment 1-11.1 Public Hearing Notice**
**Attachment 1-11.2 Public Hearing Minutes**
**Attachment 1-11.3 List of Attendees at Public Hearing**

# LEGAL NOTICES

MAURA ESTATES

LEGAL NOTICE

NOTICE OF PUBLIC HEARING

The Stow Planning Board will hold a public hearing on February 11, 2003 at 7:50 PM, in the Stow Town Building, 380 Great Road, Stow MA, to discuss a proposed Amendment to the Certificate of Action for Road A of the Maura Estates Definitive Subdivision, as petitioned by Foresite Engineering Associates, Inc. Road A, owned by Trustees of Boston College and Nancy Nyhan, is located off Taylor Road as shown on Property Map Sheet R-2. Plans may be viewed at the Office of the Planning Board or the Office of the Town Clerk during normal business hours.

Donald G. McPherson, Chairman

AD#135783
Beacon Villager 1/16, 1/23/03

---

SHOEMAKER

LEGAL NOTICE

NOTICE OF MORTGAGEE'S SALE OF REAL ESTATE

By virtue and in execution of the Power of Sale contained in a certain mortgage given by Philip P. Shoemaker Jr. and Michele L. Shoemaker to Source One Mortgage Corporation, dated July 6, 1999 and recorded with the Middlesex County (Southern District) Registry of Deeds at Book 30406, Page 409, of which mortgage Bank One, National Association, as Trustee is the present holder by assignment, for breach of the conditions of said mortgage and for the purpose of foreclosing, the same will be sold at Public Auction at 11:00 a.m. on February 3, 2003, on the mortgaged premises located at 5 Red Acre Road, Stow Middlesex County, Massachusetts, all and singular the premises described in said mortgage,

TO WIT:

That certain parcel of land with the buildings thereon, situated on the Easterly side of Red Acre and the Northerly side of Summer Street, in Stow, Middlesex County, Massachusetts, and being shown on a plan entitled, "Land in Stow owned by the Estate of John Wanhalalo", surveyed by Horace F. Tuttle, C.E., dated January 11, 1955, recorded as Plan No. 85 of 1955 in Middlesex South District Registry of Deeds, Book 8398, Page 244, bounded and described as follows

WESTERLY by Red Acre Road, one hundred eighty-five and 8/10 (185.8) feet;

SOUTHWESTERLY by said Road and the Old County Road to Lancaster, twentyseven and 2/10 (27.2) feet;

SOUTHERLY by said Old County Road by three courses, one hundred twenty-five and 4/10 (125.4) feet, seventy and 65/100 (70.65) feet, and thirty-three and 82/100 (33.82) feet,

SOUTHEASTERLY by said Old County Road, thirty-six and 2/10 (36.2) feet.

SOUTHEASTERLY by Summer Street, one hundred fifty-five and 46/100 (155.46) feet

EASTERLY by land of the Estate of John Wanhalalo, two hundred and fifty-six (256) feet.

NORTHERLY by land formerly of Mrs. Bass, one hundred forty-six and 7/10 (146.7) feet;

WESTERLY by land of Ralph G. Moody, one hundred and twenty-four (124) feet;

NORTHERLY by said Moody land, one hundred and sixty-five (165) feet,

EASTERLY by said Moody land fifty-one (51) feet, and

NORTHERLY by said Moody land, ninetynine (99) feet.

Containing according to said Plan two (2) acres, more or less.

Said premises are conveyed subject to rights of way of record

For mortgagors' title see deed recorded with Middlesex County (Southern District) Registry of Deeds in Book 27783, Page 9

These premises will be sold and conveyed subject to and with the benefit of all rights, rights of way, restrictions, easements, covenants, liens or claims in the nature of liens, improvements, public assessments, any and all unpaid taxes, tax titles, tax liens, water and sewer liens and any other municipal assessments or liens or existing encumbrances of record which are in force and are applicable, having priority over said mortgage, whether or not reference to such restrictions, easements, improvements, liens or encumbrances is made in the deed.

TERMS OF SALE

A deposit of Five Thousand ($5,000.00) Dollars by certified or bank check will be required to be paid by the purchaser at the time and place of sale. The balance is to be paid by certified or bank check at Harmon Law Offices, P.C., 150 California Street, Newton, Massachusetts 02458, or by mail to P.O. Box 610389, Newton Highlands, Massachusetts 02461-0389, within thirty (30) days from the date of sale. Deed will be provided to purchaser for recording upon receipt in full of the purchase price. The description of the premises contained in said mortgage shall control in the event of an error in this publication

Other terms, if any, to be announced at the sale

BANK ONE, NATIONAL ASSOCIATION, AS TRUSTEE
Present holder of said mortgage

By its Attorneys,
HARMON LAW OFFICES, P.C.
Kristin A. Hedvig, Esquire
150 California Street
Newton, MA 02458
(617) 558-0500

AD#135400, 135401
Beacon Villager 1/09, 1/16, 1/23/03

---

142 & 144 RED ACRE ROAD

LEGAL NOTICE

TOWN OF STOW

NOTICE OF PUBLIC HEARING

The Board of Selectmen will hold a public hearing on **Tuesday, January 28, 2003, at** 7:30 pm, in the Stow Town Building, Stow, Massachusetts, for public input regarding assigning the Right of First Refusal to Trust For Public Land, a nonprofit conservation organization, pursuant to Massachusetts General Laws, Chapter 61, Section 8, as it relates to the Kunelius property located at 142 and 144 Red Acre Road, Stow, MA.

AD#138197
Beacon Villager 1/16/03

KUN403



Town of Stow
BOARD OF SELECTMEN
380 Great Road
Stow, Massachusetts 01775-1122
(978) 897-4515
FAX (978) 897-4534

January 28, 2003

**Public Hearing – Transfer of Right of First Refusal**
At 8:00pm, Selectman Perry opened the public hearing by reading the public hearing notice.

Mr. David Cobb, representing the Friends of Red Acre, and Mr. Craig MacDonnell, representing The Trust for Public Land (TPL), were in to inform the Board that they are still gathering
information in their assistance to help the Friends of Red Acre to accept the transfer of Right of
First Refusal if offered by the Town.

Although The Trust for Public Land does qualify under statute as a non-profit organization to accept this right, they are not sure, at this point, if they can meet all the financial demands to accept the offer of Right of First Refusal.

Selectman Perry has requested of TPL to submit legal documentation of how they intend to deed the property, that the two houses on the property will be deeded affordable and a promissory of deliverables before the Board considers transferring their rights. The Board is also looking for language that clearly establishes the Town's right to the 42 acres of backland together with our right to access this land for the purposes of building and maintaining a drinking water well and an indemnification clause in the agreement that requires that TPL defend and hold harmless the Town against any third party claims.

Mr. MacDonnell stated that he has not been in the two homes and is unaware of what it will take financially to make them livable and will need to research that. He also stated that there would be slightly more than 42 acres deeded to the Town but didn't feel the Trust for Public Land would agree to defend and hold harmless the Town against future claims.

Selectman Clayton moved to transfer the Town's Right of First Refusal to The Trust for Public Land contingent upon all deliverables being received in time for Town Council to approve prior to the Board's meeting on February 11, 2003, and the offer to be rescinded if all is not received.
Seconded by Selectman Burchfield and voted unanimously.

The Public Hearing will continue on February 11, 2003.



Town of Stow
BOARD OF SELECTMEN
380 Great Road
Stow, Massachusetts 01775-1122
(978) 897-4515
FAX (978) 897-4534

**Right of First Refusal – Kunelius property**

At 9:00pm Selectman Perry re-opened the public hearing on transferring the Town's Right of
First Refusal on the Kunelius property.

Craig MacDonnell of the Trust For Public Land (TPL) was present to offer the Board a summary of conditions under which TPL would consider accepting the proposed assignment. Mr. MacDonnell explained that although TPL has not had the opportunity to access the property, he is requesting a recorded vote by the Community Preservation Committee and the Board of Selectmen to support an

article on the Annual Town Meeting (ATM) warrant to spend Community Preservation Act (CPA) funds for affordable housing and open space. They are also requesting a recorded vote of the Board of Selectmen to support the variance required for the subdivision of the property.

Mr. MacDonnell stated that an agreement in principle that the deeds to the private parcels would include certain provisions and the sales of the properties would be restricted in certain respects. He went on to explain that 142 Red Acre Road would be conveyed subject to a perpetual affordability restriction if the Town votes to spend CPA funds to purchase one and a conservation restriction reasonably limiting the further development of the property. Any sale of the property would be coordinated with a local preference lottery and would be subject to all appropriate law and regulation.

He went on to explain that 144 Red Acre Road would be conveyed subject to a conservation restriction reasonably limiting (a) further development of the property allowed under existing zoning and (b) agricultural and animal husbandry activities that pose direct threats to the aquifer.

Regarding the possibility of a municipal well, TPL will need to negotiate terms of access for purposes of construction, operation and maintenance of future water supply facilities and for the potential development of a water line from the farm pond to a hydrant for purposes of fire suppression that may be developed on the adjacent parcel.

Mr. MacDonnell stated that as a condition of Eye of the Storm buying the parcel at 144 Red Acre Road, a perpetual affordability restriction will be imposed if the Town votes to purchase one.

Selectman Jones moved that the Town not transfer their rights under Chapter 61 to the Trust for Public Land. There was not a second to this motion. No action on the motion.

Selectman Farrell moved that the Town transfer its Right of First Refusal under Chapter 61 to the Trust for Public Land and ratifying the vote taken at the January 28, 2003 meeting. Seconded by Selectman Burchfield. Discussion ensued with Selectman Farrell stating that she feels she represents the interests of the entire community by offering this parcel to TPL. Selectman Burchfield stated that she feels the questions given to TPL by Selectman Perry have been answered to her satisfaction. Selectman Perry stated that he feels that his concerns have been answered and the transfer is the wish of the Town voters. Selectman Jones stated that he feels that transferring the Town's rights unconditionally is not reasonable and is against the idea because of the risks involved. Selectman Perry ended the discussion by saying that TPL is a national entity and feels that this is a risk worth taking. The motion carried by a 3-1 vote with Selectman Jones voting in opposition.

Selectman Burchfield moved that the Board support an article at ATM in which funds from the CPA will be used for affordable housing and open space at 142-144 Red Acre Road. Seconded by Selectman Farrell. The motion carried by majority with Selectman Jones abstaining from the vote.

Selectman Farrell moved to recommend supporting the frontage variance needed to support TPL's
plan for division of the property. Seconded by Selectman Burchfield. Discussion ensued and Mr.

Wrigley suggested that the Board may not want to make a decision to weigh on the deliberation of another Board and that this Board should not ask the Zoning Board of Appeals to recommend or influence their decision on a variance as there is no negotiation on a variance. The motion did not
carry with a 1-3 vote with Selectmen Perry, Jones and Burchfield voting in opposition.

Selectman Farrell moved to inform the Zoning Board of Appeals of this Board's approval of the Red Acre Road planned project. Seconded by Selectman Burchfield and carried by a majority vote. Selectman Jones abstained from voting.

Selectman Perry closed the Public Hearing.

Attachment 1-11.3

List of Attendees at Public Hearing:

Ross Perry, Chair of Board of Selectmen
Greg Jones, Board of Selectmen
Shirley Burchfield, Board of Selectmen
Kathleen Farrell, Board of Selectmen
Bill Wrigley, Town Administrator
Paula Bruno, Board of Selectmen Admin Assistant
Linda Hathaway, Town Clerk
Stephanie Doss, Mosaic Commons
Peter Kachagian, seller's attorney
Jim Boothroyd, seller's realtor
Chris LaPointe, Trust for Public Land
Craig MacDonnell, Trust for Public Land
Matt Gunderson, Beacon Villager Reporter
Bob Wilber, Chair of the Stow Community Preservation Committee
John Beusch, Stow Resident, Director of Stow Conservation Trust
Rob Bowers, Stow Resident, Board Member of Stow Conservation Trust
Tom Maher, Stow Resident
Peter Mills, Stow Resident
Karen Gray, Stow Resident
Nina Arbella, Stow Resident
Janet Burge
Tim Reed
David Cobb
Karen Sommerlad
Sharlet Ramsland
Drew Simmons
Erica Nilsson
Michael Labosky
Allan Fierce
Serena Furman
Peter Christianson
John Browne
Victor Castelline
Peter McManus
Kate McManus

**Chief Elected Official Certifications (Form 1-14)**

MASSACHUSETTS CDBG PROGRAM

**CHIEF ELECTED OFFICIAL (CEO) CERTIFICATION FORM**

On behalf of the applicant, of which I am a duly authorized local official empowered to sign such documents, I certify that the following actions have or will be taken:

1. The applicant possesses the legal authority to make a grant submission.

2. The applicant will minimize displacement resulting from CDBG-funded projects whenever possible, and comply with relocation requirements governing the CDBG program.

3. The project will be conducted in accordance with Title VI and Title VIII of the Civil Rights Act and, further, the applicant will affirmatively further fair housing.

4. The applicant has provided opportunities for citizen participation, and has conducted a public hearing, and has provided information to citizens regarding the project that is to be submitted for CDBG funding consistent with Section 104(a) (2) of Title I of the Housing and Community Development Act of 1974 as amended through 1987.

5. The applicant will not attempt to recover any capital costs of public improvements assisted in whole or in part with CDBG funds by assessing properties owned and occupied by low and moderate persons unless: (A) CDBG funds are used to pay the portion of such assessment that relates to non-CDBG funding or; (B) the applicant certifies to the State that, for the purposes of assessing properties owned and occupied by low and moderate income persons who are not very low income, the applicant does not have sufficient CDBG funds to comply with the provisions of "A" above.

6. In applying for this grant from the Massachusetts Small Cities Program, the applicant understands that its Chief Elected Official is ultimately responsible for compliance with all requirements of the Program, including providing sufficient management oversight to carry out the activities requested hereunder.

**Certification Regarding the Use of Force**

The Community further certifies that:

1. The applicant will adopt/has adopted and will enforce a policy to prohibit the use of excessive force by law enforcement agencies within their jurisdiction against any individuals engaged in nonviolent civil rights demonstrations.

2. The policy to be adopted or has been adopted is contained in:
   a. a local legislative act (such as an ordinance); or
   b. a local administrative act (such as a written statement of policy by the local chief executive); or
   c. an executive order; or
   d. a regulation within the police department.

3. The community understands that a new policy need not be adopted if they have and are enforcing a written policy that meets the requirements of Section 519 of the Housing and Community Development act of 1974, as amended.

KUN408

**Certification Regarding Assistance to Primarily Religious Organizations:**

The Community further certifies that:

1. Community Development Block Grant {CDBG} funds shall not be provided to primarily religious organizations, such as churches, for any activities including secular activities, or to rehabilitate or construct housing owned by primarily religious organizations or assist primarily religious organizations in acquiring housing. CDBG funds may be provided to a wholly secular entity established by a religious organization, provided that the program or housing receiving assistance is wholly secular in purpose and is available to all persons regardless of religion.

**Certification Regardi ng Lobbying**

The Community further certifies that:

1. No federal appropriated funds have been paid or will be paid by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, and officer or employee of Congress, in connection with the awarding of any federal contract, the making of any federal grant, the making of any federal loan, the entering into of any cooperative agreement, and the extension, continuation, or enewal, amendment or modification of any federal contract, grant, loan or cooperative agreement.

2. If any funds other than federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an employee or officer of congress, or an employee of a member of congress in connection with this shall complete and submit standard form - III, "Disclosure Form to Report Lobbying," in accordance with its instructions.

3. The undersigned shall require that the language of this certification be included in the award documents for all sub-awards at all tiers, (including subcontracts, sub-grants, and contracts under grants, loans and cooperative agreements) and that all sub-recipients shall certify and disclose accordingly.

**Certification Regarding**
**Disclosure Requirements for Activities**
**Receiving $200,000 or More**

1. The undersigned shall comply with the requirements of full disclosure for any project or activity proposed for and receiving funding equal to $200,000 or more. Disclosure will include providing information regarding:

- assistance from other government sources in connection with the project;
- financial interests of persons involved in the project (from planning to development to implementation of the project or activity), such financial interests exceeding $50,000 or 10% of the project assistance requested, whichever is lower; and
- sources and uses of other funds involved in the project.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by section 1352, Title 31, US Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $ 10,000 and not more than $ 100,000 for each such failure.

By:__________________________

KUN409

Signature, Chief Elected Official
(Lead Applicant Only)

Typed Name

Title

Date

KUN410

MASSACHUSETTS CDBG PROGRAM

**CHIEF FINANCIAL OFFICER CERTIFICATION**
**1-15**

***Budget Summary/Administrative Cost Breakdown:***

This is to certify that the Budget Summary and Administrative Cost Breakdown forms included in the City/Town of ______________________________'s application to the Massachusetts CDBG Program have been reviewed and determined to be a fair and accurate accounting of allowable and reasonable costs.

The costs identified compare consistently with those described for each requested program activity identified in this application.

By:

Chief Financial Officer

City/Town of ______________________________

William Wrigley
Signature

______________________________
Typed Name

______________________________
Title

______________________________
Date

KUN411

# TAB 33

**From:** "rodger brown" <rodgerbrown@attbi.com>
**To:** "'Chris LaPointe'" <Chris.LaPointe@tpl.org>
**Date:** Fri, Mar 21, 2003 3:33 PM
**Subject:** RE: Assistance with DHCD application

Chris-

I would love to offer you some assistance with the application. When are you available to talk of meet about this? My contact information is below. Thanks very much.

Rodger

R. Brown & Associates, Inc.
99 Prospect Street
Sherborn, Massachusetts 01770

Tel: (617) 966-4372
Fax: (508) 650-4218

-----Original Message-----
From: Chris LaPointe [mailto:Chris.LaPointe@tpl.org]
Sent: Friday, March 21, 2003 1:15 PM
To: rodgerbrown@attbi.com
Subject: Assistance with DHCD application

Roger - Laurie Gould suggested that I get in touch with you. My name is Chris LaPointe and I am with the Trust for Public Land in Boston. We are helping the Town of Stow with a DHCD Housing Development Support Program grant application for the April 1st deadline.

We have completed a great deal of the application but have come to a point where we need the advice of someone who has handled these applications before. Specifically, we need help with the financial sections of the OneStop.

The project in Stow represents a unique opportunity to combine affordable single family housing with land conservation. We are requesting DHCD funds for acquisition and renovation of a single family residence.

What we would need from you is a small block of time, early next week to advise us on our application. What we can offer you is a fee to be negotiated, and a working knowledge of the project that will undoubtedly give you an advantage in the ultimate bidding process for the grant administration contract.

I would greatly appreciate your response, either by email, or by phone at the number below. Thank you for your time.

Chris

Christopher B. LaPointe
Project Associate
The Trust for Public Land
(617) 367-8310 Ext. 358

Conserving Land for People - an average of 350 acres of parks and open space each and every day.
On the Web at http://www.tpl.org

# TAB 34

**From:** Teri Vienot
**To:** Peter.Christianson@lahey.org
**Date:** Thu, Jan 9, 2003 12:23 PM
**Subject:** fundraising in Stow

Hi Peter,
It was nice talking with you and it sounds like you've got a great handle already on fund-raising for the project! It'd be good to talk again next week or so re: the status/strategy for foundations and how we might coordinate efforts. I'm happy to help with grantwriting, research, follow up with foundations, etc... so let me know what works best for you.
Regards,
Teri

Teri Vienot
Foundation Relations Manager
Trust for Public Land
teri.vienot@tpl.org
617-367-6200 ext. 337

A great investment! SmartMoney magazine's most efficient conservation charity--in 2000, 2001, and again in 2002. On the Web at http://www.tpl.org

**CC:** Craig MacDonnell

# TAB 35

Case 1:05-cv-11697-GAO Document 78-11 Filed 10/17/2007 Page 7 of 83

**From:** "Dan" <dan@adventhome.com>
**To:** "Chris LaPointe" <Chris.LaPointe@tpl.org>
**Date:** Wed, Feb 26, 2003 11:58 PM
**Subject:** RFP/Confirmations

Daniel L. DeStefano

dba

ADVENT HOME INSPECTIONS

108 Waite Road, Boxborough, MA 01719

Office: 978-263-0758 dan@adventhome.com www.adventhome.com

2-26-03

Chris,

As we discussed in our phone conversation, I will perform an ASHI inspection of the house and outbuildings located at 142 Red Acre Road, Stow, MA on Wednesday, March 5, at 8:30 AM. The inspection will take about 4.0 hours. I will need reasonable access to all areas of the property, including the electrical panel(s), heating & cooling equipment, shut-off valves, pipe clean-out plugs, attic, utilities, and the basement.

The report will be approximately 40 pages and will also include a summary of estimates for correcting deficiencies. There will also be some digital photos of visible defects. I will email the report to you on the day following the inspection.

Fees:

Basic ASHI inspection: $550

Additional services, if needed:

Wood destroying insect inspection: $75

*Radon test: $75

Total fees are payable at the site at the completion of the inspection.

Optional tests: Lead paint determination: $200

**Lead in water analysis: $175

Additional tests or services are done at the time of the home inspection and priced accordingly. If any of these are required at a later date, additional charges may apply.

*The house should be kept closed for at least 12 hours prior to installing the test vials. Normal entry and exit of the house by the occupants is acceptable. The test will be installed by me and will remain exposed in the test location for 48 hours. I will not be responsible for retrieving the test, nor will I be responsible for any mishandling of the test after it is installed. Either you or your designate should retrieve the test. The lab fees and postage for mailing are pre-paid and a mailing kit is provided.

**The kitchen sink should remain idle 6 hours prior to my sampling of the lead in water, however if it is not possible to get the full 6 hours, the flush sample (2nd) will be the key indicator of lead in water.

I am required by law to ask the following questions of the seller or seller's agent. If time allows, you may want to forward these questions to either individual. I'll be asking these questions at the inspection.

1. Does the house have a history of water penetration or moisture in the basement, attic, and/or crawl space(s)? ( ) Yes ( ) No

If yes, please explain:____________________________________________________________________

2. Does the house have a public or private sewerage system? ( ) Public ( ) Private

3. Has the house ever been tested for radon gas? ( ) Yes ( ) No

4. Has the house ever had an underground fuel storage tank? ( ) Yes ( ) No

5. Has the house ever been inspected for insect infestation? ( ) Yes ( ) No

6. Has the house been previously inspected by a home inspector? ( ) Yes ( ) No

If yes, why did the previous buyer withdraw from the purchase?

______________________________________________________________________________

______________________________________________________________________________

7. Has the house ever been tested for lead paint? ( ) Yes ( ) No

If yes, what were the findings?________________________________________________________________

(Attach the report/certification submitted by licensed lead paint testing technician)

**Please confirm that you have received and understand this message.**

Looking forward to working with you,

Dan DeStefano, ASHI#1388; MA#288; CT#270

dba

Advent Home Inspections

# TAB 36

**From:** "Dan" <dan@adventhome.com>
**To:** "Chris LaPointe" <Chris.LaPointe@tpl.org>
**Date:** Wed, Mar 5, 2003 10:53 PM
**Subject:** report for 144

INVOICE

DANIEL L. DESTEFANO
DBA
ADVENT HOME INSPECTIONS
108 Waite Road
Boxborough, MA 01719
(978)263-07 58

TO:
Attn: Chris Lapoint The Trust For Public Land
33 Union Street
Boston, MA 02108

SITE
144 Red Acre Road
Stow
Control #: 23026

| TERMS | WORK DATE | INVOICE DATE |
|---|---|---|
| Due at inspection | 3-5-03 | 3-5-03 |

| | |
|---|---|
| Building inspection | $475.00 |
| Radon test | $75.00 |
| Total | $550.00 |
| Paid with check # | |
| Balance/Credit due | $550.00 |

PLEASE MAKE CHECK PAYABLE TO: Daniel L. DeStefano

Thank You

Daniel L. DeStefano, dba
ADVENT HOME INSPECTIONS 108 WAITE ROAD BOXBOROUGH, MA 01719
978-263-0758 FAX 978-635-9197 dan@adventhome.com www.adventhome.com
23026

COST TO REPAIR SUMMARY

for 144 Red Acre Road, Stow, MA

The following is a summary of major and minor deficiencies and estimates for repairs. Some of the items in the report listed other than "poor" may be mentioned here, but are not necessarily considered to be defects requiring urgent remediation. These estimates are "ball park" and can not be guaranteed for accuracy and should only be used as guidelines for help in understanding the approximate magnitude of the deficiencies. It is recommended that written estimates for each of these items should be obtained from at least 3 qualified contractors or trades persons. This list is provided to assist in the understanding of the priorities and value of deficiencies.

GROUNDS

DETACHED BUILDINGS:

RECOMMENDATIONS:

1. Sauna : Anticipate replacement of the roofing, facia boards, and eaves trim. Estimated cost: $1.200

The trees and vegetation should be trimmed away from the structure. Estimated cost: $150

Ask the seller to disclose the details of the pit.

Front Barn: The roofing should be replaced. It is possible to apply metal roofing over the existing shingles, but removal of the shingles would be preferable. However, the damaged eaves and sheathing at the eaves area must be replaced. Estimated cost: $18,00-$21,000;
Stripping shingles: add $2,500-$3,500

The electrical panel should be replaced; distribution wiring should be repaired; GFCI protection should be installed; and incandescent lights in the stalls should be upgraded to armored fixtures: Estimated cost: $2,000-$4,000

The pump pit should access should be rebuilt with pressure treated wood and should be weather tight to prevent freezing in the pit. It would be advisable to install a small thermostatically controlled baseboard electric heater in the pit. Estimated cost: $500-$750

Rear Barn: The re-covering of the southeast slope should be completed and the opposite slope should be re-covered. Extensively damaged plywood should be replaced, where accessible and without removal of the existing metal coverings. Damage eaves should be repaired and the roofing should have drip edging or enough outlook to prevent damage dot the facia boards and rake boards. Repair damaged rafters as needed by sistering or scabbing. The ridge vent should be rebuilt to accommodate proper ventilation and with proper pest screening. Estimated cost: $10,000-$13,000

The wiring in the barn should be properly repaired and brough to current safety standards. Estimated cost: $800-$1,200

Horse shed: Removal of the structure may be more cost effective and should be anticipated. Estimated cost: $1,800-$2,400

EXT I

ROOF COVERINGS:

RECOMMENDATIONS:

2. Anticipate replacement of the roofing within the next 3 years. Estimated cost: $3.600

Copyright© Daniel L. DeStefano dba Advent Home Inspections

Daniel L. DeStefano, dba
ADVENT HOME INSPECTIONS 108 WAITE ROAD BOXBOROUGH, MA 01719
978-263-0758 FAX 978-635-9197 dan@adventhome.com www.adventhome.com
23026

ROOF DRAINAGE SYSTEMS:
RECOMMENDATIONS:
3. Installing gutters is advisable. Estimated cost: $450-$600.

EXT 2
DECKS/PORCHES/ENCLOSURES: #1
RECOMMENDATIONS:
4. Railing openings should be reduced to a dimension that does not exceed 9". Estimated cost: $175.

EXTERIOR STAIRS/STOOPS: #1
RECOMMENDATIONS:
5. Installing a hand railing for safety is advisable. Estimated cost: $75-$375.

EXTERIOR COVERINGS:
RECOMMENDATION:
6. Siding and trim should be painted or sealed. Sealer should be tinted to protect against UV damage. Estimated cost: $7,500-$10,000.

EXT 3
EXTERIOR LIGHTING & OUTLETS:
RECOMMENDATION:
7. GFCI protection should be installed in the exterior wiring. Estimated cost: $75 each device.

UTILITIES AT EXTERIOR; GARAGE
OIL FILLER/VENT:
RECOMMENDATION:
8.

BASEMENT/SLAB AREA 1
BASEMENT STAIRS:
RECOMMENDATIONS:
9. Install a round hand grip for safer usage of the stairs. Estimated cost: $100-$175.

BASEMENT/SLAB AREA 2
WDI OBSERVATIONS: (Wood Destroying Insects)
RECOMMENDATIONS:
10. An application of carpenter ant control is advisable. Consult with a licensed pest control operator about use of environmentally friendly treatment systems. Estimated cost: $450-$650 A yearly inspection for wood destroying insect activity is advisable. Estimated cost: $175.

ELECTRICAL SYSTEM
MAIN PANEL WIRING:
RECOMMENDATIONS:
11. Installing the ground and neutral wires in separate terminal posts is advisable. Additional dedicated circuit breakers should be installed to prevent double tapping. Estimated cost: $175 The bath plumbing above the panel should be monitored for leaks and corrected as needed.

HEATING - AIR CONDITIONING - 1
ENERGY SOURCE:
RECOMMENDATIONS:
12. A nonmetallic sleeve should be installed to protect the oil line from corrosion and the soil environment from spillage or leakage. Estimated cost: $175.

Installing an enclosure around and over the tank is advisable.

BURNER:
RECOMMENDATIONS:
13. The oil leaks should be repaired. Estimated cost: $175.

Copyright© Daniel L DeStefano dba Advent Home Inspections

Daniel L. DeStefano, dba
ADVENT HOME INSPECTIONS 108 WAITE ROAD BOXBOROUGH, MA 01719
978-263-0758 FAX 978-635-9197 dan@adventhome.com www.adventhome.com
23026

HEATING - AIR CONDITIONING - 2

LIVING AREA HEATING/COOLING SOURCES:

RECOMMENDATIONS:

14. Replacement of end caps is advisable. Estimated cost: $275.

KITCHEN - ELECTRICAL - LAUNDRY

LIGHTING:

RECOMMENDATIONS:

15. The defective lighting and related wiring should be repaired. Estimated cost: $75.

LAUNDRY CONNECTIONS:

LAUNDRY CONNECTIONS RECOMMENDATIONS:

16. Installing a metal vent system would be advisable. Estimated cost: $75.

BATH

PLUMBING, BATH #1

FIXT. RECOMMENDATIONS:

17. The toilet should be properly fastened to the floor. This should be executed by a licensed plumber. Replacement of the seal may be needed. Applying a bead of caulking between the bottom of the toilet rim and floor will help keep the toilet from sliding on the tile. Estimated cos: $75-$150.

PLUMBING, BATH #2

FIXT. RECOMMENDATIONS:

18. A convenience electrical outlet with GFCI protection should be installed. Estimated cost: $175

A wash basin should be installed. Estimated cost: $300-$475.

INTERIOR 1

CEILINGS:

RECOMMENDATIONS:

19. Apply screen tape and spackle.

Re-attached loosened acoustic blocks. Estimated cost: $50.

RAILINGS:

RECOMMENDATIONS:

20. Installing a round hand grip is advisable. Estimated cost: $125-$225.

Copyright© Daniel L. DeStefano dba Advent Home Inspections

Daniel L. DeStefano, dba
ADVENT HOME INSPECTIONS 108 WAITE ROAD BOXBOROUGH, MA 01719
978-263-0758 FAX 978-635-9197 dan@adventhome.com www.adventhome.com
23026

# INSPECTION CONDITIONS

## CLIENT & SITE INFORMATION:

| | |
|---|---|
| FILE #: | 23026. |
| DATE OF INSPECTION: | 3-5-03. |
| TIME OF INSPECTION: | 8:30 AM. |
| CLIENT NAME: | The Trust For Public Land<br>Attn: Chris LaPointe. |
| MAILING ADDRESS: | 33 Union Street. |
| CITY/STATE/ZIP CODE: | Boston, MA 02108. |
| PHONE #: | 617-367-6200 x358. |
| EMAIL: | chris.lapointe@tpl.org. |
| INSPECTION LOCATION: | 144 Red Acre Road. |
| CITY/STATE/ZIP: | Stow, MA. |
| PURPOSE OF INSPECTION: | Prepurchase inspection of a single family dwelling and detached buildings. |

## CLIMATIC CONDITIONS:

| | |
|---|---|
| WEATHER: | Overcast, Rain. |
| SOIL CONDITIONS: | Wet, Frozen, Snow covered. |
| APPROXIMATE OUTSIDE TEMPERATURE (F): | 35. |

## BUILDING CHARACTERISTICS:

| | |
|---|---|
| MAIN ENTRY FACES: | Southeast. |

| | |
|---|---|
| ESTIMATED AGE OF HOUSE/BUILDING: | 17. |
| BUILDING TYPE: | 1 family, Contemporary. |

Copyright© Daniel L DeStefano dba Advent Home Inspections

Daniel L. DeStefano, dba
ADVENT HOME INSPECTIONS 108 WAITE ROAD BOXBOROUGH, MA 01719
978-263-0758 FAX 978-635-9197 dan@adventhome.com www.adventhome.com
23026

| | |
|---|---|
| STORIES: | 2 |
| SPACE BELOW GRADE: | Basem ent. |

## UTILITY SERVICES:

| | |
|---|---|
| WATER SOURCE: | Private. |
| SEWAGE DISPOSAL: | Private . |
| UTILITIES STATUS: | All utilities on. |

## OTHER INFORMATION:

| | |
|---|---|
| AREA: | Rural. |
| HOUSE/BUILDING/UNIT OCCUPIED? | Yes. |
| PEOPLE PRESENT: | Listing agent, Client. |

## PAYMENT INFORMATION:

| | |
|---|---|
| TOTAL FEE: | $550. |

REPORT LIMITATIONS

This report is intended only as a general guide to help the client make his or her own evaluation of the overall condition of the building or dwelling, and is not intended to reflect the value of the premises, nor make any representatio n as to the advisability of purchase. The report expresses the professional opinions of the inspector, based upon his visual impressions of the conditions that existed at the time of the inspection only. The inspection and report are not intended to be technically exhaustive, or to imply that every component was inspected, or that every possible defect was discovered. No disassembly of equipment, opening of walls, moving of furniture, appliances or stored items, or excavation was performed. All components and conditions which by the nature of their location are concealed, camouflaged or difficult to inspect are excluded from the report.

Unless otherwise indicated and reported separately, systems and conditions that are not within the scope of the inspection include, but are not limited to: formaldehyde, lead paint, asbestos, toxic or flammable materials, and other environmental hazards; pest infestation, playground equipment, efficiency measurement of insulation or heating and cooling equipment, internal or underground drainage or plumbing, any systems which are shut down or otherwise secured; water wells (water quality and quantity) zoning ordinances; intercoms; security systems; heat sensors; cosmetics or building code conformity. Any general comments about these systems and conditions are informational only and do not constitute an inspection. See applicable separate reports that may pertain to those items.

The inspection report should not be construed as a compliance inspection of any governmental or non government al codes or regulations. The report is not intended to be a warranty or guarantee of the present or future adequacy or performance of the structure, its systems, or their component parts. This report does not constitute any express or implied warranty of merchantabili ty or fitness for use regarding the condition of the property and it should not be relied upon as such. Any opinions expressed regarding adequacy, capacity, or expected life of components are general estimates based on information about similar components and occasional wide variations are to be expected between such estimates and actual experience.

I certify that I have no interest, present or contemplated, in this property or its improvement and no involvement with tradespeople or benefits derived from any sales or improvements. To the best of my knowledge and belief,

Copyright© Daniel L. DeStefano dba Advent Home Inspections

Daniel L. DeStefano, dba
ADVENT HOME INSPECTIONS 108 WAITE ROAD BOXBOROUGH, MA 01719
978-263-0758 FAX 978-635-9197 dan@adventhome.com www.adventhome.com
23026

all statements and information in this report are true and correct:

Should any disagreement, dispute, or claim arise as a result of this inspection or report, the Client will allow me to inspect the claim prior to any repairs, or waive the right to make the claim. The client agrees not to disturb, or repair, or have repaired, anything which may constitute evidence relating to the complaint, except in the case of an emergency.

CONDITION DEFINITIONS: **CONFIDENTIAL - FOR CLIENT USE ONLY**

**GOOD** - *No visible defects*
**FAIR** - *Declining usefulness; normal wear and tear*
**POOR** - *Unsatisfactory; in need of immediate repair or replacement*
**SATISFACTORY** - *Usable system or component that does not require immediate repair or upgrade*
**SERVICEABLE** - *Usefulness can be enhanced by maintenance or minor repairs*



Copyright© Daniel L. DeStefano dba Advent Home Inspections

Daniel L. DeStefano, dba
ADVENT HOME INSPECTIONS 108 WAITE ROAD BOXBOROUGH, MA 01719
978-263-0758 FAX 978-635-9197 dan@adventhome.com www.adventhome.com
23026

# GROUN DS

This inspection is not intended to address or include any geological conditions or site stability information. For information concerning these conditions, a geologist or soils engineer should be consulted. Any reference to grade is limited to only areas around the exterior of the exposed areas of foundation or exterior walls. This inspection is visual in nature and does not attempt to determine drainage performance of the site or the condition of any underground piping, including municipal water and sewer service piping or septic systems. Decks and porches are often built close to the ground, where no viewing or access is possible. These areas as well as others too low to enter, or in some other manner not accessible, are excluded from the inspection and are not addressed in the report. I recommend asking the seller to disclose details of any prior foundation or structural repairs. All references to locations in this report are made as one would be looking at the structure towards the front entry.

## GENERAL GRADING:

CONDITION: Satisfactory.

COMMENTS: Snow on grounds prevented full observation of conditions.

## FOUNDATION GRADING:

CONDITION: Satisfactory.

COMMENTS: Observation of true grading was obstructed by snow coverings.

## DRIVEW AY:

TYPE: Gravel.

COMMENTS: Snow/ice coverings on the driveway and grounds prevented full observation.

## SIDEWALKS

TYPE: Gravel.

COMMENTS: Snow covered- Unable to fully view.

## TREES & VEGETATION

CONDITION: Fair.

COMMENTS: Vegetation is too close to the house, which is a condition that can trap moisture and attract decay and wood destroying insects. Thick vegetation can conceal decay and insect damage. Mulch, grass, vegetation, and organic debris near the foundation can provide an attractive habitat for wood destroying insects.

RECOMMENDATIONS: Vegetation should be trimmed away from the house and kept outside of the roof line. Installing a 6" thick strip of pea stone or crushed rock at the perimeter of the house extending approximately 24" out from the perimeter of the foundation is advisable.

Copyright© Daniel L. DeStefano dba Advent Home Inspections

Daniel L. DeStefano, dba
ADVENT HOME INSPECTIONS 108 WAITE ROAD BOXBOROUGH, MA 01719
978-263-0758 FAX 978-635-9197 dan@adventhome .com www.adventhome. com
23026

## LAWN

**COMMENTS:** Snow on the grounds prevented observation of the lawn.

## DETACHED BUILDINGS:

**TYPE:** Sauna; 2 barns; horse shed.

**MATERIAL OF STRUCTURE:** Wood .

**CONDITION:** Sauna : Fair

Barns: Fair

Horse shed: Poor

**COMMENTS:**

**Sauna**: The roofing on the sauna is approaching the end of life. The facia boards and rake trim is damaged. There appears to be a pit in the floor, which was inaccessible due to stored goods. The sauna fire box has been removed and the front wall has been filled with loosened masonry blocks. Trees and vegetation are too close to the structure

**Front Barn**: The superstructure of the barn appears to be in good condition. The asphalt shingle roofing is in poor condition and leaks were observed. Damage from leaks was observed at the eaves and there is evidence that the roof boards are beginning to rot. Normal wear and tear of the siding and trim was observed.

The electrical wiring is not up to standards. Some improperly installed and improperly terminated wiring was observed. The wiring is not GFCI protected. A GFCI (ground fault circuit interrupter) device is commonly used in a circuit for protection against shock hazards generally associated with electricity in a damp or wet area. GFCI devices are installed either in the panel as a circuit breaker or in a specific outlet. These outlets are can be identified by observing for test and reset buttons. Kitchens, baths, outdoor outlets, pools, garages, and basements are areas where GFCI's are recommended. In new construction there are specific requirements for GFCI's. The main panel contains Type-T fuses, which can be tampered. Several of the fuses are too large in ampacity for the wiring, which is a serious electrical safety hazard. Incandescent light fixtures observed in the horse stalls are a fire safety hazard.

The well and pump pit are poorly protected against freezing. The pump and water was not tested.

**Rear barn**: The superstructure appears to be in good condition. Most of the support posts appear to be pressure treated. The roof structure is

Copyright© Daniel L DeStefano dba Advent Home Inspections

Daniel L. DeStefano, dba
ADVENT HOME INSPECTIONS 108 WAITE ROAD BOXBOROUGH, MA 01719
978-263-0758 FAX 978-635-9197 dan@adventhome.com www.adventhome.com
23026

compo sed of wood trusses, but the plywood sheathing is severely damag ed by rot. It appears that this roof endured a prolonged period of failure. Consequently, water penetrations damaged the plywood sheathing and may had damaged some of the rafters in the roof trusses. The southeast slope has bee partially re-covered with metal roofing. Approxim ately 20%-30% of this slope has not been re-covered. The opposite slope has not been repaired. Damage was also observed in the lofts over the southeast extension. The roof eaves are extensively damag ed. The main ridge vent is damaged. Normal wear and tear of the siding and trim was observed.

Some minor electrical work needs to be done, mostly in the changing of damaged or worn switches and outlets. No GFCI protection was observed.

**Horse shed:** This structure is not set on proper footings and it appears that the supporting posts are defective. Extensive settlement was observed in the structure.

RECOMMENDATIONS:

**Sauna** : Anticipate replacement of the roofing, facia boards, and eaves trim. Estimated cost: $1.200

The trees and vegetation should be trimmed away from the structure. Estima ted cost: $150

Ask the seller to disclose the details of the pit.

**Front Barn:** The roofing should be replaced. It is possible to apply metal roofing over the existing shingles, but removal of the shingles would be preferable. However, the damaged eaves and sheathing at the eaves area must be replaced. Estimated cost: $18,00-$21,000; Stripping shingles: add $2,500-$3,500

The electrical panel should be replaced; distribution wiring should be repaired; GFCI protection should be installed; and incandescent lights in the stalls should be upgraded to armored fixtures: Estimated cost: $2,000-$4,000

The pump pit should access should be rebuilt with pressure treated wood and should be weather tight to prevent freezing in the pit. It would be advisable to install a small thermostatically controlled baseboard electric heater in the pit. Estimated cost: $500-$750

**Rear Barn:** The re-covering of the southeast slope should be completed and the opposite slope should be re-covered. Extensively damaged plywood should be replaced, where accessible and without removal of the existing metal coverings. Damage eaves should be repaired and the roofing should have drip edging or enough outlook to prevent damage dot the facia boards and rake boards. Repair damaged rafters as needed by

Copyright© Daniel L DeStefano dba Advent Home Inspections

Daniel L. DeStefano, dba
ADVENT HOME INSPECTIONS 108 WAITE ROAD BOXBOROUGH, MA 01719
978-263-0758 FAX 978-635-9197 dan@adventhome.com www.adventhome.com
23026

sistering or scabbing. The ridge vent should be rebuilt to accommodate proper ventilation and with proper pest screening. Estimated cost: $10,000-$13,000

The wiring in the barn should be properly repaired and brough to current safety standards. Estimated cost: $800-$1,200

Horse shed: Removal of the structure may be more cost effective and should be anticipated. Estimated cost: $1,800-$2,400

**ADDITIONAL REMARKS:** Addition al photos of defects in the detached buildings.

Copyright© Daniel L. DeStefano dba Advent Home Inspections

TPL-KUN 02837

Case 1:05-cv-11697-GAO Document 78-11 Filed 10/17/2007 Page 23 of 83

ADVENT HOME INSPECTIONS • 108 Waite Road • Boxboro, MA 01719 • (978)263-0758 • Fax(978)263-5178
www.adventhome.com • advent@ma.ultranet.com

INSPECTOR: Daniel L. DeStefano, ASHI #1388, dba ADVENT HOME INSPECTIONS

I/We, The Trust for Public Land hereby

authorize the above inspector to make a building inspection at the stated address. I understand that the inspection is visual and the purpose of the inspection is to assist me in identifying the conditions of the structure and its major systems that exist at the time of inspection. The inspector will use his best efforts to provide me with his good faith opinions concerning the condition of the premises. I understand that on the basis of such an inspection, neither the inspector nor Advent Home Inspections, can guarantee its findings, nor does the inspection report represent, in any way any warranty. I further understand that this inspection report is of a general nature. I also understand that this report, or any portion thereof can not be reproduced, copied, or released to any other persons or interested parties without the written consent of the Inspector or Advent Home Inspections. EXCLUDED: Testing or inspection of hazardous materials or substances in the house or on the grounds, unless otherwise specified below.

*(*Please also see Exclusions and Limitations in the report.)*

*(Services performed are listed with fee amounts or $0.00)*

| Agreed price of Standard Inspection | | $475.00 |
|---|---|---|
| Additional Services | Pest Inspection* | |
| | Radon Test | $75.00 |
| | Lead Paint Test | |
| | Water Quality Analysis | |
| | Water Quantity Analysis | |
| | Title 5 Certification | |
| | Additional fee Video | |
| Total Fees *(payable at time of inspection)* | | $550.00 |

Purpose of Inspection: Preinspection of a Single-family dwelling

(Inspector) (Client)

If purchaser is not present at time of inspection, or for any other reason is unable to sign this authorization at the time of the inspection, this authorization will become part of the report, and acceptance of the report shall constitute acceptance of the terms of the above authorization.

Date: 3-5-03

Receipt is hereby acknowledged of payment in full for property inspections, additional services, and written report made at 144 Red Acre Road, Stow for The Trust for Public Land

Check #: Amount: Inspector:

**PLEASE READ THIS REPORT VERY CAREFULLY**

# TAB 37

**INTEGRITY** BUILDING & DESIGN, INC.

498 GREAT ROAD
ACTON, MA 01720
(978) 264-0857

The Trust For Public Land
33 Union Street
Boston Ma 02108
(617) 367-6200

March 26, 2003

Attention: Christopher B LaPointe

Job: 142 Red Acre Road
Stow Ma 01775

**PROPOSAL**

Remove Existing Roof And Replace — $ 37,203.00

The reason for doing the roof this way is that the existing roof is in such repair This would be the most cost effective way of fixing it. ( Thus giving you proper insulation, Ventilation, roofing and repairing all rotted wood. )

- Remove existing shingles, rafters, insulation, pine board ceiling, eave and rake trim.
- Construct new roof with 2" x 10" rafters and ½" CDX plywood.
- New 25 year architectual shingles with ridge vent.
- New eave, rake trim and soffit ventilation.
- R-30 insulation, blueboard and plaster new ceiling.

Replace Existing Windows & Doors — $ 14,539.00

The main reason would be to get rid of the lead paint. In addition the windows Leak and are rotting Also you will get windows in the bedroom that meet egress.

- Replace awning type windows with vinyl Superseal brand double hung style approximately 2'-6" x 5'-0" +/- mulled together at each location.
- Apply new window interior trim.
- Replace existing front & side doors with Thermatru brand fiberglass doors.
- Board and plaster around new openings.

Vinyl Siding For Entire House — $ 15,840.00

Do to new windows going in and rotting of existing siding this would be the Most cost effective way of fixing the exterior. ( Similar to fixing the roof. )

- Remove existing 1" x 4" t&g cedar siding and dispose of.
- Install "Certainteed" brand mainstreet series vinyl siding.
- Color to be selected.

Install New Aluminum Gutters — $ 660.00

Back Bedroom Replace Existing Board & Plaster — $ 3,504.00

Due to water damage from roof all walls have heavy water stains and cracking. The ideal way to cure this is to remove and replace. Price also includes trimwork for Baseboard and door casings.

**INTEGRITY** BUILDING & DESIGN, INC.

498 GREAT ROAD
ACTON, MA 01720
(978) 264-0657

| | |
|---|---|
| Replace Existing Kitchen | $ 19,452.00 |
| Due to owner taking existing cabinets & tops. | |
| - Purchase & Install new kitchen cabinets and countertops. | |
| - $ 6000.00 material allowance in price for cabinets and tops. | |
| - Appliances not in price. | |
| Sand & Refinish Existing Hardwood Floors | $ 3,111.00 |
| Paint Entire Inside Of House | $ 9,600.00 |
| Replace Copper Drains In Kitchen Area | $ 1,800.00 |
| Replace Living Room Heat | $ 1,200.00 |
| Cabinet being removed by previous owner. | |
| Add Sub Panel For Electric System | $ 750.00 |
| Clean Bathroom | $ 500.00 |
| Clean Heating System | $ 750.00 |
| Replace Existing Front Step | $ 750.00 |
| Landscaping | $ 2,000.00 |
| Clean up yard and shrubs. | |
| Replace Side & Rear Deck | $ 5,500.00 |
| Replace Existing Water Pump | $ 750.00 |
| Replace Sink Faucet In Bathroom | $ 250.00 |
| New Exhaust Fan In Bathroom | $ 400.00 |
| Building Permit | $ 1,800.00 |
| Supervision | $ 6,480.00 |
| Job Cost | $126,839.00 |

*In-teg-ri-ty:* "the quality or state of being of sound moral principle; uprightness, honesty and sincerity"

INTEGRITY BUILDING & DESIGN, INC.

498 GREAT ROAD
ACTON, MA 01720
(978) 264-0657

## NOTES

- Price includes all materials and labor to do above mentioned work.
- Price also assumes house will be vacant and no furniture in house during entire project.
- Project to take between 4 to 6 months to complete.
- There is no pricing figured for existing shed or other structures on property.

## GAURANTEE

Integrity Building and Design, Inc. will only be held liable for the work that which they have done And not for any previous work. Integrity Building and Design, Inc. will gaurantee their work for 1 year After completion of their work.

C:\My Documents\INTEGRITY BUILDING\Preliminary\public.doc

*In·teg·ri·ty*: "the quality or state of being of sound moral principle; uprightness, honesty and sincerity"

TPL-KUN 00105

# TAB 38

ZONING BOARD OF APPEALS
STOW, MASSACHUSETTS 01775

APPLICATION FOR HEARING

Please follow the instructions carefully. Failure to complete the form properly or to supply the required plan, properly engineered, will result in denial of the request. Submission of the form to the Board for review prior to filing is strongly recommended.

1. Nature of relief sought. Circle only one. If multiple relief is sought, complete a form for each item.

a. PETITION FOR VARIANCE: (circled) Applicable Bylaw Section 4.4 and, if applicable, 4.3.2.4

b. APPLICATION FOR SPECIAL PERMIT: Applicable Bylaw Section _____

c. APPEAL FROM UNFAVORABLE ACTION: Specify action _____

Board or Official _____ Date of Action _____

d. OTHER (Specify) _____

2. Name of Applicant The Trust for Public Land

Address 33 Union Street, 4th Floor, Boston,

State MA Zip Code 02108

3. Location of Property 144 Red Acre Road

Assessors' Map # R31 Parcel # 57 Area in sq. ft. 2,166,969*

Applicant ~~is Owner~~ _____ ~~Tenant~~ _____ Agent/Attorney _____ Purchaser _____

Property Owner Name Marilyn E. Kunelius

Address 142 Red Acre Road Telephone (978) 897-9350

4. Definitive plan(s) or site plans in accordance with the accompanying instruction sheet shall be included with the application.

*Variance is requested only for 225,354 square feet of the property, as shown on the plan.

5. Description of problem for which relief is sought. If a request for lot line variance(s), state the variance(s) sought in actual feet.

We request reduction of the frontage required under Section 4.4 to 39.87 feet on Red Acre Road for a lot substantially in the Recreation/Conservation District, and, if necessary, reduction of the width requirement under Section 4.2.3.4 to 39.87 feet.

6. Justification for request: See supplemental statement attached. The location of existing structures on the approximately 50-acre parcel prevents creation of a separate lot without a variance. The inability to create a separate lot jeopardizes the existing improvements.

7. List of names and addresses of abutters and abutters of abutters within 300 feet of the property line of the petitioner, together with a copy of the Assessors' map showing the corresponding locations of those names listed.

I hereby certify that I have read and complied with the instructions accompanying this application and request a hearing before the Board of Appeals.

Signature of applicant or representative THE TRUST FOR PUBLIC LAND By: Dorothy Nelson Starkey

Address 33 Union Street, 4th Floor, Boston, MA 02108 Telephone (617) 367-6200

Owner's permission (if other than applicant) ____________________ Marilyn E. Kunelius

*********************************************

*WARNING*

*Failure to provide all of the information and documentation as required by the Stow Board of Appeals rules, regulations and instructions for filing an application for special permit or a petition for variance may very well result in an automatic denial by the Board after opening the public hearing.*

Read and understood: The Trust for Public Land By: Dorothy Nelson Starkey
Signature of Applicant/Petitioner

KUNELIUS0141

SUMMARY OF BOARD OF APPEALS ACTION

Received by ZBA ______________ Hearing Date ______________

Publishing Dates ______________ Abutter Mailing ______________

Decision required by ______________ Decision notices sent ______________
(Within 100 days of filing for variance)
(Within 90 days of hearing for special permit)

Granted __________ Denied __________

Withdrawn on __________ By ______________
Signature

04/03

# TAB 39

**From:** "Ernst, Trudy A" <ternst@goodwinprocter.com>
**To:** "Denise A. Pelletier Esq. (E-mail)" <denise.pelletier@tpl.org>
**Date:** 7/1/03 6:21PM
**Subject:** Stow

Denise,

I will try to be available for a 9:30 call tomorrow, but I cannot be sure. If I am not available, here are the points to make:

1. M.G.L. c.40A, s. 10 authorizes ZBAs to grant variances. It limits their right to grant use variances, but does not otherwise do so. It contravenes s. 10 to otherwise limit the ZBA's variance powers. Section 14 of c. 40A further says that a ZBA shall have the power to "hear and decide petitions for variances as set forth in section ten." This bolsters the argument that the ZBA has the power to grant all kinds of variances except as expressly limited by section 10,

2. The last sentence of Section 4.1.3 of the By-Law makes no reference to prohibiting variances and should not be read expansively to do so. It should be read as applying only to situations where the minimum frontage requirement is not changed by variance. At the worst, we should be allowed to amend our application to apply for a variance from this section.

Trudy A. Ernst, Esq.
Goodwin Procter LLP
Exchange Place
Boston, MA 02109
(617) 570-1426 (tel)
(617) 227-8591 (fax)
ternst@goodwinprocter.com

******************************************************************************
This message is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.
******************************************************************************

**CC:** "MacDonnell Craig (E-mail)" <craig.macdonnell@tpl.org>

# TAB 40

**WILSON & ORCUTT, P.C.**
COUNSELORS AT LAW
201 GREAT ROAD
ACTON, MASSACHUSETTS 01720

PHILIP A. WILSON (1938-1967)
CHARLES E. ORCUTT, JR. (1962-1996)
RICHARD M. COTTER - OF COUNSEL
DANIEL B. GREENBERG
JACOB C. DIEMERT
JOHN R. McNAMARA
KRISTIN A. BULLWINKEL

TELEPHONE: (978) 264-4770
FACSIMILE: (978) 263-7142
EMAIL: JAKE@WILSONORCUTT.COM

VIA FACSIMILE
July 10, 2003

Mr. Craig MacDonnell
Massachusetts State Director
The Trust for Public Lane
33 Union Street
Boston, Massachusetts 02108

Re: TPL - Kunelius Property
Pending Board of Appeals Application

Dear Craig:

I an aware of TPL's several efforts to contact me, and although I am in the midst of a family medical crisis, I wanted to respond quickly and concisely, without further delay, in particular after my conversation with counsel of Mrs. Kunelius this morning. As I told him, the Board of Appeals is a quasi-judicial body, and if a variance is requested by anyone (Portia wears a blindfold), can only base its decision on the law and the legal requirements for a variance. If you have reserved the right to file a brief to assist the Board in doing so, both as to fact and law, I suggest you do so. If not, you can file to reopen the hearing in order to further your arguments on the pending application.

Other than these two possibilities, there are other possible legal rights that could be pursued, as I discussed with Peter Kachajian, including a condo or a Chapter 40B application, the first which need not involve the Board of Appeals at all, and the second which does not present the legal hurdles of meeting the criteria for a variance.

I suggest you discuss the above possibilities and then proceed accordingly.

Very truly yours,

Jacob C. Diemert, Esq.
Town Counsel

cc: Board of Appeals (via facsimile)
Mr. William J. Wrigley (via facsimile)
Board of Selectmen (via facsimile)
Peter Kachajian, Esq. (via facsimile)

# TAB 41

Kunelius EXHIBIT 12 4/4/07 MJO

"Beacon Villager" 02/27/03

LETTERS TO THE EDITOR

## Is Stow now in the Twilight Zone?

To the editor:

I think the signs coming into Stow should read "Welcome to the Twilight Zone," where "no" means "yes." Voters said "no" to a request for $305,000 from a tax override and now the Friends of Red Acre are asking for $400,000 from the Community Preservation Fund instead (80 percent of the funds total). "No" means "yes" when the town counsel and the town manager recommend against the Kunelius project but three selectmen vote "yes." "No" means "yes" when I've repeatedly asked my abutters to not trespass on my land and they do anyway.

Welcome to the twilight zone where truth is stranger than fiction. It is true that I'm donating 83 percent of my land (with aquifer) to the town but the Friends and TPL let you assume it was them making the donation.

Welcome to the twilight zone where the math is very fuzzy. After my donation of 42 plus acres and promised 2.6 acre donation by TPL, the total land area drops to about 5-6 acres, but the price is still the same ($1,116,900) and climbing. Now add in about $100,000 for new septics, furnace, roof and $50,000 each for deed restrictions on two promised low income units. With a cap of $150,000 for a low income unit we're left with a balance due from somewhere of about $1,000,000, for the express benefit of one woman with horses and a carpenter with a couple of kids. Pretty fancy. Also in Massachusetts, low income is by lottery and not by who you know.

So, you the taxpayer are getting a very big bill for a very small amount of acreage that you won't be allowed to use and enjoy.

And here in the twilight zone if you can't laugh, you'll scream. Wouldn't it be funny if TPL and the Friends were forced to put in 30 condo units to pay the bill.

*Marilyn Kunelius*
*Stow*

# TAB 42

**From:** Karen Sommerlad <Karen_Sommerlad@harvard.edu>
**To:** <Craig.MacDonnell@tpl.org>
**Date:** Mon, Mar 3, 2003 11:57 AM
**Subject:** Marilyn

Craig,
We had an interesting conversation on Saturday evening with the woman that lives between us and Marilyn. She has been Marilyn's barn manager and keeps her horse there. Marilyn is apparently chomping at the bit to see us fail so that she can sue for triple damages and get $3M out of the deal! More proof of just how wacky she is and how difficult it will be to convince her to play nice.

Karen

Karen Sommerlad
Harvard Planning + Allston Initiative
1350 Massachusetts Avenue, Cambridge, MA 02138
voice:617-495-0995 fax:617-495-0559

**CC:** David Cobb <cobb@fas.harvard.edu>

# TAB 43



Commonwealth of Massachusetts

# DEPARTMENT OF HOUSING & COMMUNITY DEVELOPMENT

Mitt Romney, Governor ◆ Kerry Healey, Lt. Governor ◆ Jane Wallis Gumble, Director

July 2, 2003

RECEIVED
JUL - 8 2003
BOARD OF SELECTMEN

Mr. Edward R. Perry, Chairman
Stow Board of Selectmen
380 Great Road
Stow, MA 01775-2127

Dear Mr. Perry,

We regret to inform you that your application to the Housing Development Support Program (HDSP) is not among the grants awarded from the Massachusetts Community Development Block Grant Program's FY 2003 funding round.

The Housing Development Support Program application process is competitive, and we are not always able to provide funding for every proposal received.

I encourage you to call the HDSP staff with any questions you may have about your application, the review process, and our funding decisions. David Lawson and John Curran can be reached at 617-727-7001 extensions 431 and 432.

Sincerely,

Jane Wallis Gumble
Director

Red Acre Rd

cc: Senator Edward M. Kennedy
Senator John F. Kerry
Congressman Martin T. Meehan
Senator Pamela P. Resor
Representative Patricia A. Walrath

s:\wp\hdsp\stow-no03 doc

KUN334

One Congress Street
Boston, Massachusetts 02114-2010

www.mass.gov/dhcd
617.727.7765

# TAB 44



*Conserving Land for People*

September 9, 2003

**BY FAX and OVERNIGHT COURIER**

Peter A. Kachajian, Jr., Esquire
292 Main Street
Northborough, MA 01532

RE: Kunelius Property

Dear Peter:

Enough time had passed since our last conversation that I wanted to remind you of TPL's strong interest in keeping this transaction together. Towards that end, we have spent a considerable amount of time in the last week or so trying to find a way to reconfigure this project to meet adequately the various needs of your client, the Town of Stow, the Friends of Red Acre (FORA) and the Stow Conservation Trust (SCT).

As you and I have discussed many times, there are two major obstacles that stand in the way of success, each of which must be addressed.

First, there is a significant fundraising gap. Not only has the economy been hostile to philanthropy in general, we have experienced a catastrophic failure in the rejection of the $350,000 Department of Housing and Community Development grant. Local fundraising efforts have not been as successful as we had hoped and are necessary to make the project work. TPL's Board of Directors will not approve any borrowing to bridge a fundraising gap because the prospects for raising the funds necessary to repay the loan required are not encouraging. Further, any bridge loan would be for an amount greater than the land would be worth, even if the subdivision were approved. Essentially, this would be asking TPL for an unsecured loan based on weak fundraising prospects with no back-up plan to repay the loan.

Trust for Public Land
New England Regional Office
33 Union Street, Fourth Floor
Boston, MA 02108
(617) 367-6200
Fax: (617) 367-1616

Connecticut Field Office
383 Orange Street
New Haven, CT 06511
(203) 777-7367
Fax: (203) 777-7488

Maine Field Office
377 Fore Street 3rd Floor
Portland, ME 04101
(207) 772-7424
Fax: (207) 772-7420

Vermont Field Office
3 Shipman Place
Montpelier, VT 05602
(802) 223-1373
Fax: (802) 223-0451

Connecticut Lakes Project Office
54 Portsmouth Street
Concord, NH 03301
(603) 224-0103
Fax: (603) 228-0423

Second, it is unclear whether your client's property can be subdivided to meet our project design. The Zoning Board of Appeals has been sending very mixed signals, and we have recently become aware of an additional problem presented by the doctrine of merger.

In view of these circumstances it is not feasible for TPL to go forward under the existing contract. If, however, the parties were jointly able to create a new financial structure for this transaction, TPL would be willing to continue to stay involved, subject to the other contingencies noted below.

Please consider the following alternative:

1. **Finances.** Try as TPL might to persuade just one of our project partners to bridge the roughly $375,000 gap identified during our last conversation, neither your client nor FORA have agreed to do so on their own. As an alternative, TPL is proposing to each of the primary project partners (FORA, SCT, and Marilyn Kunelius) that they jointly shoulder the financial gap, contingent of course on (a) the appropriate variances being requested and granted; and (b) the Town agreeing to a revised project structure in which the two private parcels are sold on the private market subject to conservation, but not affordability, restrictions. Reduced to equal shares, each partner's obligation would be $125,000. For your client, this would mean accepting $125,000 less than the contract price. For FORA and SCT, this would mean raising $125,000 each. We are presenting this project structure to each of the three project partners simultaneously. We believe that TPL's Board will approve such a reconfigured project going forward.

2. **Subdivision.** We have recently been advised by Goodwin Procter that the doctrine of merger forces 142 and 144 Red Acre Road into a single lot. For us to go forward now, with variance requests regarding 144 only, would mean that 142 would be rendered a non-conforming, illegal lot. If we resolve the funding issues, we will have to proceed in a manner that remedies the merger problem as to both 142 and 144, which probably will require a further extension by the ZBA. Most likely this will necessitate the involvement of town counsel, whom we should approach together.

We are aware that these project uncertainties are of concern to you and your client, and that Mrs. Kunelius would like to know as soon as possible whether TPL will be able to go forward. To that end, we need to discuss this revised proposal with you as soon as possible, and in no case later than the end of this week.

Sincerely,

Craig A MacDonnell

Craig A. MacDonnell
MA State Director

# TAB 45

**From:** "Ernst, Trudy A" <ternst@goodwinprocter.com>
**To:** "'chris.lapointe@tpl.org'" <chris.lapointe@tpl.org>
**Date:** 8/19/03 9:13AM
**Subject:** 144 Red Acre Road, Stow, MA

Hi, Chris. Denise recommended that I communicate the results of yesterday's Stow ZBA meeting to you. The Board agreed to an extension, but the dates proposed in Denise's letter did not work for them. The Chair proposed shortening up the time periods, and I asked if instead we could move them out a little more. The dates we agreed to are as follows:

| | |
|---|---|
| Additional briefing due | September 26 |
| ZBA discussion meeting | October 6 |
| ZBA decision deadline | November 3 |

The Board requested a letter confirming these dates, which I am sending out today. If you have any questions, please give me a call.

Trudy A. Ernst, Esq.
Goodwin Procter LLP
Exchange Place
Boston, MA 02109
(617) 570-1426 (tel)
(617) 227-8591 (fax)
ternst@goodwinprocter.com

******************************************************************************
This message is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.
******************************************************************************

**CC:** "Denise A. Pelletier Esq. (E-mail)" <denise.pelletier@tpl.org>, "Craig MacDonnell (E-mail)" <craig.macdonnell@tpl.org>

# TAB 46

Kunelius
EXHIBIT
8
4/4/07
MJO

May 26, 2004

Marilyn Kunelius
142 Red Acre Road
Stow, MA 01775

Dear Marilyn:

It was very nice to finally have a real conversation with you after all these years. Serena and I feel so badly for the way things have gone, and we wished that we could have spoken with you sooner. However, we did not and do not want to interfere with any potential negotiation you may have with Trust for Public Land (TPL).

Having said that, we want to reiterate our offer to work with you to achieve a sale of your farm. We feel that involvement of Eye of the Storm (EOS) and the Community preservation Committee (CPC) are key elements that will maximize the value of any offer. Eye of the Storm's purchase of the horse farm part of your property would represent an existing use, and therefore would lessen regulatory hurdles. It is also a tribute to your commitment to years of running a horse farm on that property that we and others wish to preserve.

Let me reiterate what we offered:

$900K Revenue
- $300K CPC
- $300K sale of 142 on the market
- $300 EOS philanthropy

Our $900K plan is "a bird in the hand". Moving forward with us would not preclude you from pursuing a legal action against TPL.

- This "bird in the hand" offer is all local.
- When the CPC money goes away, the likelihood of a package deal disappears.
- CPC funds voted for this project may expire soon.
- Currently, CPC requires no further parliamentary procedure.
- If 142 Red Acre sold for more than $300K, you would keep the difference.
- The $300K of philanthropy would require financing, because the pledges and solicitation process stretches over 3 or 4 years.
- We have $225K in pledges, subject to confirmation of Stow Conservation Trust and Red Acre Foundation each at the $100K level, plus one other $25K pledge.
- We have proposals, strategies and qualified prospects to achieve the remaining $75K fund raising goal within 4 years.
- Serena and I would guarantee the remainder of the fund raising ($100K) with a note or contract.
- Zoning issues would be your responsibility, although we would assist in any way possible. We have reason to believe that you would be treated favorably.

Thank you for consideration of this offer, and please call us anytime with your thoughts or concerns.

Very truly yours,


Peter Christianson

# TAB 47

UNITED STATES DISTRICT COURT
(DISTRICT OF MASSACHUSETTS)

MARILYN KUNELIUS,
PLAINTIFF

V.

TOWN OF STOW separately, A PARTNERSHIP OF UNKNOWN NAME BETWEEN TOWN OF STOW and THE TRUST FOR PUBLIC LAND, THE TRUST FOR PUBLIC LAND separately and CRAIG A. MACDONNELL, in his individual capacity,
DEFENDANTS.

CIVIL ACTION NO. 05-11697-GAO

**PLAINTIFF'S RESPONSE TO DEFENDANTS INTERROGATORIES**

The following are the Plaintiff's responses to the Defendants Interrogatories.

**General Objections of Specific Applicability**

The Plaintiff objects to the Interrogatories pursuant to Rule 33, to the extent that they are not relevant, are not likely to lead to discovery of admissible evidence, are overly broad, and unduly burdensome.

The Plaintiff further objects to the Interrogatories, to the extent they seek to require Plaintiff to provide information or to identify documents prepared or obtained in preparation for litigation or for trial.

The Plaintiff objects to the Interrogatories to the extent that they seek disclosure of confidential and/or privileged attorney-client communications, or communications otherwise protected from discovery on the grounds of another privilege, or that they otherwise constitute mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of the Plaintiff.

The Plaintiff objects to the Interrogatories, to the extent they seek to impose a burden on the Plaintiff that set forth in the Federal Rules of Civil Procedure. Further, in responding to the interrogatories, the Plaintiff will assign to each word its everyday meaning, and has construed the language of each interrogatory in light of the scope of discovery permitted by the Federal Rules of Civil Procedure.

The Plaintiff objects to the Interrogatories, to the extent they seek the burden on the Plaintiff to separately produced documents. All records from which the answers to the interrogatories are derived, or are ascertained, are in the possession of the Defendants or their counsel. Therefore, the Defendants simply need to review, examine, and inspect their own records in order to identify the documents they seek from the Plaintiff.

The Plaintiff hereby incorporates by reference, as if fully set forth herein, each of the foregoing objections of its answers to each of the individual Interrogatories as set forth below.

## INTERROGATORIES

**Interrogatory No. 1**: Identify, stating the name, address, and last known place of employment, each and every individual who prepared the responses to these interrogatories and/or assisted in the preparation of responses to these interrogatories and state specific interrogatories with respect to which each such person provided advice.

**Answer to No. 1:**

Subject to and without waiving the foregoing objections, the Plaintiff states the following:

Marylin Kunelius
635 Stow Road
Stow, ME 04037

Michael C. McLaughlin
Law Offices of Michael C. McLaughlin
One Beacon Street, 33rd Floor
Boston, MA 02108

**Interrogatory No. 2**: Identify each witness You intend to call at the trial of this matter, and for each person identified, please state the expected subject matter areas of the testimony of each.

**Answer to No. 2**:

Subject to and without waiving the foregoing objections, the Plaintiff states that the complete list of witnesses the Plaintiff intends to call at the time of trial is, at the present time, unknown due to pending discovery. The Plaintiff further states that the following is an incomplete list:

1. Marilyn Kunelius;
2. David Norris;
3. Peter A. Kachajian;
4. Craig A. MacDonnell;
5. Dorothy Stookey;
6. James Boothroyd;
7. Raymond W. Talkington, Ph.D., P.G., LSP;
8. Edwin Ross Perry;
9. Greg Jones;
10. Karen Sommerlad;

11. Serena Furman; and

12. The Keeper of the Records for the Department of Housing and Community Development.

The Plaintiff reserves the right to supplement, augment, or change this list at any time as permitted by the Federal Rules of Civil Procedure.

**Interrogatory No. 3**: Please identify, pursuant to Fed. R. Civ. P. 26(b)(4), each person You expect to call as an expert witness at trial, and as to each such expert, set forth (i) the qualifications and experience of the expert; (ii) the subject matter on which the expert is expected to testify; (iii) the substance of the facts and opinions on which the expert is expected to testify; and (iv) summaries of the grounds for each opinion, including all treatises, learned texts, or other documents and things upon which each expert relies.

**Answer to No. 3:**

Subject to and without waiving the foregoing objections, the Plaintiff states that the obligation to disclose expert witnesses and the date of such obligation is stated in the Scheduling Conference Order.

**Interrogatory No. 4**: Identify all documents and things that You intend to introduce as an exhibit at the trial of this matter

**Answer to No. 4:**

Subject to and without waiving the foregoing objections, the Plaintiff states that the documents to be introduced by the Plaintiff as exhibits at the time of trial are yet to be identified due to pending discovery.

**Interrogatory No. 5**: Identify by name and address all persons that You or anyone on your behalf has interviewed regarding any matters or issues raised in the Complaint, and as to each such person state whether the interview was recorded or preserved in any way, by written or electronic means.

**Answer to No. 5:**

Subject to and without waiving the foregoing objections, the Plaintiff states that all interviews undertaken by the Plaintiff's counsel are protected by Attorney Work Product. The Plaintiff further states that she has spoken to Karen Sommerlad, Serena Furman; and Linda Hathaway.

The Plaintiff reserves the right to supplement, augment, revise, or change this response.

**Interrogatory No. 6**: Identify whether You intend to challenge TPL's non-profit status and if so, identify the specific factual bases on which you intend to challenge TPL's non-profit status, including all documents and communications.

**Answer to No.6:**

Subject to and without waiving the foregoing objections, the Plaintiff states that this issue is yet to be decided by the Plaintiff upon completion of discovery.

The Plaintiff further states that the Plaintiff has asserted that the Defendant, MacDonnell, an employee of TPL, lied in informing the Plaintiff that TPL did not have the money to purchase the Property from the Plaintiff. The Plaintiff has further asserted that MacDonnell threatened to "bury" the Plaintiff by employing "pro bono" attorneys which resulted from TPL's alleged charitable institution/non-profit status.

The Plaintiff further has alleged that MacDonnell was aware, prior to the acceptance of the Right of First Refusal, that he and TPL intended to rely on a Liquidated Damages Clause provision in the P&S Agreement that was not applicable to TPL, and that such reliance was undertaken even though TPL knew it was not going to purchase the Property.

The Plaintiff further states that MacDonnell and TPL attempted to materially change the purchase price under the terms of the P&S Agreement, and stripped the Plaintiff of the tax benefits of the P&S Agreement, and materially attempted to change the development contemplated by the P&S Agreement.

The above list of accusations also incorporates all other components of the Complaint.

To the extent that MacDonnell was acting with the full authority, knowledge, and permission of TPL;

(1) TPL has abused its non-profit status;

(2) TPL has used that status to attempt to extract financial gain at the expense of the Plaintiff;

(3) TPL has used that status to threaten the Plaintiff, where such threats resulted entirely from the "pro bono" legal representation derived solely from the non-taxable status of TPL;

(4) TPL did this as a method of doing business that was never anticipated by the Internal Revenue Code when it was granted the designation of 501C3;

(5) TPL deliberately lobbied in violation of its 501C3 designation and attempted through conspiracy to hide that lobbying by causing the Town of Stow to execute an "after the fact" letter for IRS.

To the extent that TPL asserts or could assert in the future that MacDonnell was acting on "a frolic on his own," the Plaintiff further states that MacDonnell's actions were so blatantly apparent, including MacDonnell's threats and explosive confrontation outbursts, that TPL sought to benefit from MacDonnell's "frolic on his own" and has been aware, from the date of the filing of the Complaint, of the assertions made in the Complaint, including but not limited to paragraph 46 of the Complaint, that such TPL's behavior with regard to this matter is in violation of its 501C3 status.

The Plaintiff reserves the right to supplement, augment, revise, or change this response.

**Interrogatory No. 7**: State specific factual basis for your contention in paragraph 22 of the Complaint that "Stow and TPL knew that Stow and TPL never intended to purchase the property in compliance with the terms of the P&S but nevertheless exercised the right of first refusal."

**Answer to No. 7**:

Subject to and without waiving the foregoing objections, the Plaintiff states that all factual bases for statement in paragraph 22 are sufficiently stated in the Complaint.

The Plaintiff further states that TPL, in violation of its 501C3 status, lobbied extensively to obtain the Right of First Refusal through an Assignment. TPL's lobbying commenced in 2002 and continued up and until it obtained the Assignment on February

12, 2002. Although unknown to the Plaintiff, Stow and TPL through "back channels" had engaged personnel to inquire as to certain development plans, which Stow and TPL had considered as substitution for the development plan anticipated under the terms of the P&S Agreement. These inquiries were made to the Zoning Board of Appeals concerning the likelihood of obtaining subdivision approvals, as well as approvals for expanding prior non-conforming uses, where such inquiries were met with the Board's negative responses. These inquiries commenced in January of 2003. TPL has argued that its inability to "develop" the Property and sell off lots in order to repay itself for the purchase price was the/a reason why TPL was unable to purchase the Property. TPL and Stow were aware that the Plaintiff and her counsel were relying on the fact that, the failure to obtain any variances or permits would not be a justification for TPL not moving forward. TPL also identified the Liquidated Damages Clause provision as its "out" whereby the reliance on the Liquidated Damages Clause would allegedly result in TPL incurring no losses, should TPL default, and that such a default would likely result in the failure of the original P&S Agreement. The failure of the original P&S Agreement, i.e. the refusal of the original buyer to purchase the Property after the exercise of the Right of First Refusal resulted in no development of the Property, i.e. one of the stated goals of TPL.

**Interrogatory No. 8**: State the specific factual basis for your contention in paragraph 24 of the Complaint that "Stow was aware that TPL, after exercising its right of first refusal, immediately attempted ... to negotiate the terms of the P&S and the purchase price with Kunelius in order to obtain a more favorable business deal for itself."

**Answer to No. 8:**

Subject to and without waiving the foregoing objections, the Plaintiff states that all factual bases for statement in paragraph 24 are sufficiently stated in the Complaint.

The Plaintiff further states that TPL attempted to lower the purchase price to $800,000.00 and then to $900,000.00, so that TPL did not have to pay any amount or a lesser amount to the Plaintiff. TPL did this through the actions of MacDonnell, having already assured the Plaintiff, prior, or approximately at the time of the Assignment, that TPL had the funds necessary for the purchase of the Property and that there was no need for concern because the purchase by TPL was certainty. (*See* Exhibit 11 to the Complaint; *see also* Exhibit 12 to the Complaint). The Plaintiff further states that MacDonnell repeatedly attempted to cause the Plaintiff to lower the purchase price from that contained in the P&S Agreement, and that he did so in discussions with Peter Kachajian, counsel for the Plaintiff, and further that MacDonnell threatened the Plaintiff when she refused to lower the agreed to purchase price.

**Interrogatory No. 9**: State the specific factual basis for your contention in paragraph 55 of the Complaint that the "liquidated damages clause provision was applicable only to Cohousing Resource, LLC, ("Cohousing") since it sought certain permits and approvals in connection with its 40(B) Anti-Snob Zoning Development.

**Answer to No. 9:**

Subject to and without waiving the foregoing objections, the Plaintiff states that all factual bases for statement in paragraph 55 are sufficiently stated in the Complaint.

The Plaintiff further states that the Liquidated Damage Clause provision was established with connection with the purchase price which anticipated a development of a

40(B) project on the Property and in connection with the tax benefits to be derived by the Plaintiff as a result of the donation of approximately 45 acres to the Town of Stow. The Liquidated Damage Clause anticipated that no "deposit" was paid by Cohousing, the original buyer. Cohousing was required to make "earnest money" payments to help support the Plaintiff during the period of time anticipated under the P&S Agreement for the final 40(B) project. The Plaintiff accepted the purchase price offered by Cohousing because of the relative certainty of payment since no special permits, or variances would be required from the Zoning Board of Appeals as a result of the provisions of Chapter 40(B). The Plaintiff asserts that the liquidated Damage Clause does not apply because:

(1) while the clause is contained in the P&S Agreement, it is surplusage, since the P&S Agreement describes the deposit as zero.

(2) The earnest money payments were never intended to be a deposit as normally anticipated in real estate purchase and sale agreement, since Cohousing and the Plaintiff anticipated that the earnest money payment would not be given to the broker to be held in escrow, but rather would be given directly to the Plaintiff to be spent by her to off set her living expenses.

(3) Even if the earnest money payments were to be held by the court to be a "deposit" as anticipated by the Liquidated Damage Clause, an assertion which the Plaintiff denies, the Plaintiff could not and did not anticipate that the Town of Stow would assign the Right of First Refusal to TPL where from the inception of TPL's lobbying for the Assignment, TPL has anticipated variances, permits, subdivision approvals, and expansion of prior non-

conforming uses that were not part of or contemplated by Cohousing or the Plaintiff.

The Plaintiff further states that MacDonnell and TPL assured the Plaintiff and others that TPL had the funds necessary to purchase the property; that the purchase was a certainty; that TPL had never failed to purchase a property once it had received an assignment; that the Plaintiff should not worry about TPL's acquiring the Property. Such statements were materially false, misleading, and were intended to specifically derail the original P&S Agreement and to permanently discourage Cohousing from purchasing the Property. As such TPL is estopped from asserting that its actions any rights under the Liquidated Damage Clause provision.

The provisions of M.G.L. Chapter 61 do not anticipate that an assignee, having exercised the Right of First Refusal, can "cherry pick" such provisions of the purchase and sale agreement as the assignee deems acceptable to itself and to disregard such other provision as the assignee deems inappropriate.

The Plaintiff further states that discovery has not been completed and that the Plaintiff may supplement this answer within the Rules of Civil Procedure.

**Interrogatory No. 10**: State the specific factual basis for your contention in paragraph 95 of the Complaint that "The actions of ...TPL separately, and MacDonnell individually were taken under the color of state law as evidenced by Stow involvement."

**Answer to No. 10**:

See Answers No. 7, 8, and 9 above. Having incorporated Answers No. 7, 8, and 9 to the answer to No. 10, the Plaintiff further states that Ross Perry ("Perry") of the Board

of Selectmen informed the Plaintiff's counsel that the actions taken by Stow and TPL with regard to the P&S Agreement was not an isolated incident. The Plaintiff further states that Perry informed the Plaintiff's counsel, Peter Kachajian, that should the Plaintiff enter into another purchase and sale agreement with another developer, that Stow and TPL would take whatever steps necessary to defeat such an purchase and sale agreement, including the use of Chapter 61 and the assignment process. The Plaintiff further states that Stow and TPL were aware of TPL's and MacDonnell's assertion to the Commonwealth of Massachusetts that TPL had a $6 million line of credit as back up position, should any and all other revenue sources necessary for the purchase fail. The Plaintiff asserts that the joint statements with regard to the $6 million line of credit and the accompanying letter of MacDonnell asserting $70 million dollars in lines of credits were submitted to the Commonwealth even though TPL, MacDonnell, and Stow had reason to believe that TPL and MacDonnell had no intention of using either the $6 million line of credit or the $70 million dollars in various lines of credits. TPL, MacDonnell, and Stow sought to disregard the terms of the P&S Agreement demand changes to material terms of the P&S Agreement and threaten the Plaintiff with the considerable resources of TPL if the Plaintiff would not agree to their demands and the threats, specifically included the constructive taking of the Plaintiff property through the repeated used of Chapter 61 and the Assignment. The Plaintiff asserts that all of these actions of TPL and MacDonnell were taken under the authority, cooperation, and involvement of Stow.

**Interrogatory No. 11**: State the specific factual basis for your contention in paragraph 97 of the Complaint that the "The actions of Stow, the Partnership of Stow and TPL, TPL

separately, and MacDonnell individually resulted in ... the loss of the ability [to sell the property at the agreed upon purchase price] in the future."

**Answer to No. 11:**

Subject to and without waiving the foregoing objections, the Plaintiff states that all factual bases for statement in paragraph 97 are sufficiently stated in the Complaint.

The Plaintiff further states that Cohousing, having experienced the actions of TPL and the Town of Stow, could not be induced to return after the default of TPL; that since the default of TPL and Stow, the Property has been available subject to the P&S Agreement which is enforceable, and that there has been no offer for the Property; that any subsequent sale of the Property at the agreed upon purchase price would again be subject to the Town's Right of First Refusal and such price would be linked to the number of units that could be built on the Property. The Town of Stow, in conspiracy with TPL, had informed TPL that a two lot subdivision would not be acceptable. This fact, would require that any development necessary to achieve the purchase price of Cohousing would necessary involve a 40(B) development. Since the date of the Cohousing's P&S Agreement, the Plaintiff's Property has been affected by the general down turns in the real estate values in the area with no relief in sight with regard to the recovery to those values.

**Interrogatory No. 12**: State the specific factual basis for your contention in paragraph 21 of the Complaint that "Stow and TPL formed a partnership ... whereby the Partnership could develop the Property and derive profit so that Stow could benefit from the property."

**Answer to No. 12:**

Subject to and without waiving the foregoing objections, the Plaintiff states that all factual bases for statement in paragraph 21 are sufficiently stated in the Complaint. The Plaintiff further states that the correspondence between TPL and Stow unequivocally establish that, both TPL and Stow considered their relationship that of partnership. The express intent of the partnership, need not be understood entirely by the Plaintiff, the effect of the partnership was to materially change the terms and conditions of the P&S Agreement including the purchase price, the development of the property, the scope of the development, and to make variances and permits a necessary and unachievable component of the development of the project. The partnership intended to defeat the P&S Agreement and to use the provisions of Chapter 61, i.e. the assignment and exercise of the Right of First Refusal, to effectuate their goal. By so doing, Stow and TPL continues to have the "benefit" of the avoidance of the development of the Property. In the alternative, both Stow and TPL attempted to change the price of the purchase price radically with the hope that such change in terms would result in a serious reduction in the obligation of the Town of Stow under its partnership with TPL. This reduction would result in a 25% reduction in the amount that Stow would have to pay TPL as part of Stow's partnership payment, when TPL elect to use its assets to purchase the Property. The attempts to lower the purchase price clearly were to benefit Stow and TPL. The subsequent refusal of TPL to honor the purchase price inured to the benefit of Stow, since the $400,000 partnership payment was no longer required.

**Interrogatory No. 13**: State the amount of damages You allege You suffered or will suffer as a result of the alleged actions identified in the Complaint broken down by

individual damage, and identify all documents relied upon in arriving at said amount and all person(s) who assisted you in arriving at said amount."

**Answer to No. 13:**

Subject to and without waiving the foregoing objections, the Plaintiff states that the break down of damages was include in the Plaintiff's Automatic Disclosure with the right to supplement such disclosure. The Plaintiff further states that the break down of the damages in the Plaintiff's Automatic Disclosure does not specifically deal with the scope of the tax benefits to be derived by the Plaintiff under the terms of the P&S Agreement. The Plaintiff believes that the property to be given to Stow under terms of P&S Agreement exceed in $17 million in value. The Plaintiff will designate an expert with regard to the damages resulted from the loss of that tax benefit in addition to the other damages described in the Automatic Disclosure plus attorney's fees and damages under the provisions of M.G.L. C. 93A.

**Interrogatory No.14**: Identify all efforts to mitigate damages, including all efforts to sell the Property and all offers on the Property.

**Answer to No. 14:**

Subject to and without waiving the foregoing objections, the Plaintiff states that the Plaintiff has a valid contract with TPL, which stepped into the shoes of Cohousing, as a result its exercise of the Right of First Refusal. The Plaintiff further states that the Property remains on the market and that no offer has been made with regard to the Property.

**Interrogatory No. 15**: Identify each alleged "misrepresentation" that forms the basis of the fraud and misrepresentation claim at Count VII of the Complaint.

**Answer to No. 15:**

Subject to and without waiving the foregoing objections, the Plaintiff states that basis for claims alleged at Count VII of the Complaint are sufficiently pled in the Complaint. The Plaintiff further states;

(1) MacDonnell informed the Plaintiff that TPL had the money to purchase the Property, should TPL obtain the Right of First Refusal.

(2) That the Plaintiff should not be concerned in any way about receiving the payment.

(3) MacDonnell understood that the purchase price was based upon the M.G.L. C. 40(B) development and that purchase price would be honored by TPL.

(4) MacDonnell subsequently informed the Plaintiff that TPL could not obtain the money necessary to purchase the Property.

(5) After acceptance of the Assignment, MacDonnell informed the Plaintiff that the purchase price was too high.

(6) After acceptance of the Assignment, MacDonnell informed the Plaintiff that the 40(B) development was too speculative to support the purchase price.

(7) After acceptance of the Assignment, MacDonnell informed the Plaintiff that as a result of not being able to get a grant from the Commonwealth of Massachusetts that TPL "was unable to purchase the Property."

(8) After acceptance of the Assignment, MacDonnell told the Plaintiff that the Plaintiff would have to accept less money or that TPL would walk away from the purchase.

(9) That TPL knew that it should have contact the Plaintiff prior to the exercise of the Right of First Refusal because TPL understood that there would be confusion and disagreement as to what provision of the P&S Agreement would apply to TPL as the assignee. Having identified that it should contact the Plaintiff, prior to the exercise of the Right of First Refusal, TPL refused to do so.

(10) That TPL and Stow were aware that failure to obtain any variances or special permits could not be the justification for TPL not purchasing the Property, and both Stow and TPL concocted the Liquidated Damage Clause argument as a "out" in order to defeat the P&S Agreement.

**Interrogatory No. 16**: Identify each alleged "unfair and deceptive trade practice" by TPL or the alleged partnership of Stow and TPL that forms the basis of the M.G.L. c. 93A claims in Count II and Count III of the Complaint.

**Answer to No. 16**:

Subject to and without waiving the foregoing objections, the Plaintiff states that basis for claims alleged at Court II and Count III of the Complaint are sufficiently pled in the Complaint. See Answers 1 – 15 above which are by reference incorporated herein.

The Plaintiff further states that Stow and TPL, in early January of 20004, knew that TPL's "development plans" for the property were not going to be approved by Stow.

Stow aware of this fact, nevertheless, assigned the Right of First Refusal to TPL aware that TPL has informed the Plaintiff that TPL had funds necessary to purchase the Property. TPL and Stow subsequently informed the Commonwealth of Massachusetts that TPL had over $70 million dollars in lines of credit; that Stow had been informed by its own counsel that the Assignment and a subsequent default by TPL would most certainly result in litigation and that Stow would need to be indemnified for that eventuality. Notwithstanding that warning, Stow and TPL formed a partnership by which Stow promised to pay $400,000.00 to TPL to assist TPL in purchasing the Property from the Plaintiff providing TPL could strip the Plaintiff of the tax benefit she was to derive under the terms of P&S Agreement so that tax benefit would inure to the benefit of TPL. TPL and Stow subsequently, after the Assignment of the Right of First Refusal, demand a lower purchase price and attempted to redefine the development of the property, even though TPL had been warned months before the acceptance of the Right of First Refusal that its proposed development would not be acceptable to the Zoning Board of Appeals. TPL and Stow, aware that TPL was refusing to use the $70 million dollars in lines of credit, attempted to convince the Plaintiff that TPL was "unable to purchase the Property." Stow, having been warned by its counsel of the likelihood of litigation, took no steps to require TPL to use the $70 million dollars in various lines of credits to purchase the Property, since TPL's failure to do so would result in Stow not having to pay $400,000 partnership price. Stow and TPL were aware that the Plaintiff did not know about the $70 million dollars in lines of credits when Stow and TPL asserted that TPL was "unable to purchase the Property."

**Interrogatory No. 17**: If You contend that any of the Defendants had a wrongful motives or used wrongful means in connection with the intentional interference with a contractual relationship alleged in Court V of the Complaint, identify each such motive and means and all specific facts, circumstances, and documents that support your contention.

**Answer to No. 17:**

Subject to and without waiving the foregoing objections, the Plaintiff states that the Plaintiff alleged and sufficiently described such acts of Defendants sufficiently in the Complaint and further in subsequent filings of the Plaintiff with the United States District Court for District of Massachusetts.

The Plaintiff incorporates herein by reference Answers No. 1-16 above and also incorporates by reference Plaintiff's Opposition to TPL's Motion to Quash which provides a detail list of TPL's misrepresentation to the Court. The Plaintiff further states that the decision of TPL not to develop the Property in accordance with the terms of the P&S Agreement was unilaterally made by TPL; that TPL could have develop the Property under the provision 40(B) to achieve whatever internal goal it had while at the same time not defeating the terms of P&S Agreement. TPL knew at the time it was lobbying for the Assignment of the Right of First Refusal, it had not intention for the developing of the Property and that the exercise of the Right of First Refusal would defeat permanently the rights of Cohousing under the terms of P&S Agreement. TPL knew that despite its statements to the Plaintiff and to the Commonwealth of Massachusetts, and others to the contrary, TPL knew it would not purchase the Property, if such purchase required TPL to rely on its own funds or access to lines of credits. TPL

knew that the only way it would purchase the property if it could renegotiate the purchase price, develop the Property in a way not anticipated by the P&S Agreement and not to use any of its funds. TPL knew all of this at the time that it lobbied for and received the Assignment of the Right of First Refusal and exercised that right, resulting in the loss of P&S Agreement

**Interrogatory No. 18**: If You contend that any of the Defendants' statements or acts were pretextual, identify each such pretextual statement or act and all specific facts, circumstances, and documents that support your contention.

**Answer to No. 18:**

Subject to and without waiving the foregoing objections, the Plaintiff states the Defendants pretextual statements and acts are described and sufficiently pled in the Complaint. The Plaintiff further states that Stow and TPL violated the Constitutional Rights of the Plaintiff and did so employing deliberate pretextual statements including;

1. TPL had the money to purchase the Property as told to the Plaintiff by MacDonnell;

2. That Plaintiff had nothing to worry about told to Plaintiff by MacDonnell.

3. That TPL was "unable to purchase the Property" because of inability to raise the funds.

4. TPL's and Stow's bogus reliance on Liquated Damage Clause which TPL and Stow knew was not applicable to TPL, since TPL had elected to change the purchase price, the scope of the development and the development itself, and that these changes were never anticipated by the Plaintiff.

**Interrogatory No. 19**: Identify by name the address all persons at Cohousing that You communicated with regard the sale of the Property.

**Answer to No. 19:**

Subject to and without waiving the foregoing objections, the Plaintiff states that to the best of her recollection with Chris ScottHanson.

**Interrogatory No. 20**: State the dates during which the Purchase and Sale Agreement for the Property was negotiated with Cohousing.

**Answer to No. 20:**

Subject to and without waiving the foregoing objections, the Plaintiff states that to the best of her recollection the P&S Agreement was negotiated during some period of time before signing the P&S Agreement.

**Interrogatory No. 21**: Identify the location and date of the signing of the Purchase and Sale Agreement, and identify by name and address all persons who were present at the signing.

**Answer to No. 21:**

Subject to and without waiving the foregoing objections, the Plaintiff states;

James Broothroyd
Prudential
Prime Properties
58 Main Street
Maynard, MA 01754

**Interrogatory No. 22**: Identify the allegedly "devastating" evidence referred to by Mr. McLaughlin in his conversation with Ms. Fetouh on February 8, 2007 following the close of Craig MacDonnell's deposition.

**Answer to No. 22:**

Subject to and without waiving the foregoing objections, the Plaintiff states that she was not present the conversation between Attorney McLaughlin and Ms. Fetouh. The Plaintiff further states that any discussion between herself and her counsel are covered by Attorney-Client Privilege.

[THE REMAIDER OF THIS PAGE WAS INTENTIONALLY LEFT BLANK]

Dated: March 29, 2007

Marilyn Kunelius

Signature as to Objections:

Dated: March 29, 2007

Michael C. McLaughlin BBO# 337350
Law Offices of Michael C. McLaughlin
One Beacon Street, 33rd Floor
Boston, MA 02108
(617) 227-2275

**CERTIFICATE OF SERVICE**

I, Michael C. McLaughlin, do hereby certify that on April 2, 2007, I served a copy of the accompanying document, by hand, to:

Dahlia Fetouh, Esq.
Goodwin Procter, LLP
Exchange Place
Boston, MA 02109

Deborah I. Ecker, Esq.
Brody, Hardoon, Perkins & Kesten, LLP
One Exeter Plaza
Boston, MA 02116

James B. Conroy, Esq.
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street
Boston, MA 02108

Michael C. McLaughlin

# TAB 48

Case 1:05-cv-11697-GAO Document 52 Filed 05/14/2007 Page 1 of 2

**Michael F. Hill, CPA**
**25 Orchard Lane**
**Wayland, MA 01778-1907**
**(508) 361-6738**
**michaelfhillcpa@comcast.net**

May 14, 2007

Expert Report

I have reviewed the P&S Agreement between Mrs. Marilyn Kunelius and Cohousing Resources, LLC, dated October, 2002, for the sale of the land of approximately 8.57 acres for the amount $ 1,116,900. The P&S Agreement is attached hereto as Exhibit A. A component of the P&S Agreement that I review provided that if the sale took place with Cohousing Resources, LLC, and Mrs. Kunelius, Mrs. Kunelius would convey to the Town of Stow approximately 42.1 acres.

It is my understanding that the gift component of the transaction anticipated that the property in giving to the Town of Stow had significant value based upon its unspoiled nature and the fact that currently it contains a substantial aquifer.

I am informed that Mrs. Kunelius has long sought, upon the sale of her property, donate said 42.1 acres to the Town of Stow as a lasting legacy of her many decades as the residence of the Town of Stow.

I am informed that Mrs. Kunelius had little or no income at the time she signed the P&S Agreement. I am informed that she has had no or little income from the date of the P&S Agreement to date.

I have reviewed an appraisal of her property consisting of 50.67 acres where said appraisal was undertaken by Geosphere Environmental Management, Inc., 51 Portsmouth Avenue, Exeter, New Hampshire 03833, which I have attached hereto as Exhibit B. Exhibit B indicates that the property has approximately value of $17 million with a Net Present Value of $4.3M.

Mrs. Kunelius' property, should it be sold (8.57 acres), normally would have capital gain of $221,000. This is based upon the fact that she acquired the property 24 years ago.

It is my opinion that Mrs. Kunelius would pay capital gains of $138,955.00 on her sale of her property to Cohousing Resources, LLC, because a portion of the capital gain would be off set by the charitable deduction she would receive from the gift of 42.1 acres to the Town of Stow, as provided for in Section 170(c ) of the Internal Revenue Code.

The charitable deduction would also include a carry forward component which can be used by Mrs. Kunelius for the next 5 year or until the carry forward is exhausted. I

Case 1:05-cv-11697-GAO Document 52 Filed 05/14/2007 Page 2 of 2

cannot calculate the exact amount of taxes that she would be able to off set because I ( not have enough information to project her future income.

Michael F. Hill, CPA

# TAB 49



December 4, 2006

Ms. Marilyn Kunelius
635 Stow Road
Stow, Maine 04037

Attorney Michael C. McLaughlin
One Beacon Street, 33rd floor
Boston, Massachusetts 02108

Re: Letter Report
Ground Water Resource Evaluation
Red Acre Road
Stow, Massachusetts

Dear Ms. Kunelius:

Geosphere Environmental Management, Inc. (GEOSPHERE) is pleased to submit this letter report on our findings regarding the ground water resources on your property at 142 Red Acre Road, Stow, Massachusetts. This letter report has been prepared in accordance with our scope of work and cost estimate dated August 2, 2006.

**BACKGROUND AND PROJECT UNDERSTANDING**

Based on our conversations with you and Attorney Michael McLaughlin, it is GEOSPHERE's understanding that the court requires an evaluation of the ground water resources of your property located at 142 Red Acre Road. This evaluation includes the development of a dollar value for the ground water if it is assumed a potable public ground water supply well, permitted by the Massachusetts Department of Environmental Protection (MA DEP) in accordance with 310 CMR 22.00, is installed on your property.

D.L. Maher, Inc. (Maher), a well drilling contractor, performed a ground water test well exploration program between 1985 and 2000 that included the installation of three 2 ½-inch diameter ground water exploration test wells (identified as Test Well 1-85, Test Well 2-86, and 2-foot observation well), a four-hour aquifer-pumping test on Test Well 1-85 to determine a potential ground water yield, and the collection of a ground water sample from Test Well 1-85 at the end of the four-hour aquifer-pumping test to determine ground water quality. The continuous pumping rate for the aquifer-pumping test was 60 gallons per minute (gpm).

At the end of the four-hour aquifer-pumping test the drawdown in the aquifer was 4.41 feet according to Maher in their letter dated March 25, 1986. This drawdown indicates a specific capacity (i.e. gallons per minute divided by the drawdown) of 13.6 gpm/foot of drawdown (60 gpm/4.41 feet of drawdown) for this well. Maher indicated that "Test Well 1-85 was driven to a depth of 59.5 feet" below ground surface and that "brown fine to coarse sand with gravel was encountered from 15-59.5 feet." A well screen was

installed between 50 to 56 feet. The well screen allows the ground water to flow into the well.

Based on the results of the four-hour aquifer-pumping test, Maher proposed that a 24-inch by 18-inch gravel pack water supply well be installed to a depth of 59 feet with a 10-foot well screen. Using this proposed well design and aquifer characteristics, Maher indicated the proposed well should yield 300 to 350 gpm. Ground water quality results for Test Well 1-85, collected September 13, 2000 indicated good water quality that appears to meet U.S. EPA and Massachusetts ground water quality standards.

These reports are attached as Appendix A.

**DOCUMENTS REVIEWED**

The following documents were reviewed for this letter report. Most of these documents were found in the Town of Stow Planning Office files unless otherwise noted.

1. Summary Water Resources Study, Town of Stow, MA., dated October 28, 1977 by IEP, Inc.
2. Water Resources Study, Town of Stow, MA, dated October 28, 1977 by IEP, Inc.*
3. Flood Plain Information, Assabet River (Westborough to West Concord, MA), Department of the Army, NE Corps of Engineers, Waltham, MA, June 1966.
4. Letter to IEP, Inc. dated July 24, 1990 from John Clayton, Jr., Chairman, Board of Appeals, Town of Stow, MA.
5. Letter to IEP, Inc. dated August 4, 1977 regarding IEP Water Resources Study Draft Report dated July 28, 1977 from Stephen J. Daly, Board of Selectmen, Town of Stow, MA.
6. Letter to Stephen J. Daly, Administrative Assistant, Town of Stow, MA dated July 27, 1977 regarding IEP Water Resources Study of the Town of Stow, MA dated July 28, 1977 from Attorney Jacob C. Diemer, Town Counsel, Sherbourne, Powers & Needham.
7. The 1965 SUASCO River Study – Background data on water quality by Water Resources Commission, Division of Water Pollution Control dated February 1973, Publication # 6628, 37 pages.
8. Report on Proposed Water Supply and Distribution Facilities for the Town of Stow, MA by Morgenroth & Associates, Inc. dated October 5, 1966.*
9. Letter to Marilyn Kunelius dated March 25, 1986 from D.L. Maher, Inc. regarding test well exploration program for 142 Red Acre Road, Stow, MA from D.L. Maher, Inc.*
10. D.L. Maher, Inc. Record of test for four-hour aquifer pumping test on Test Well 1-85 dated September 13, 2000.*
11. Ground water quality results for ground water sample collected by D.L. Maher, Inc. from Test Well 1-85 on September 13, 2000.*
12. 2004 Massachusetts Water Rate Survey compiled by Tighe & Bond, Westfield, MA.*
13. MA DEP GIS database.
14. Town of Stow, Assessors Office files.

* - denotes documents, either in total or excerpts, included as attachments in Appendix A.

**DESCRIPTION OF 142 RED ACRE ROAD PROPERTY AND TEST WELL SITES**

The 142 Red Acre Road property is located in the northeast portion of the Town of Stow, MA (See Figure 1). It consists of approximately 50 acres of largely undeveloped land. The property is bounded to the northwest by South Acton Road, to the northeast by Tuttle Road, and to the southeast by Red Acre Road. The land to the southwest is undeveloped. A pond is located in the southeast portion of the property. Test Wells 1-85 and the 2-foot observation well are located approximately 150 – 200 feet northeast of the

Case 1:05-cv-11697-GAO Document 78-11 Filed 10/17/2007 Page 82 of 83

ground water that can be withdrawn from an aquifer without causing an adverse impact to the ecosystem (i.e. wetland system, surface water bodies, etc.). In addition, the well cannot adversely impact adjacent wells such that their yields drop off to an unacceptable rate or that it dries up because of over-pumping and/or interference from another well.

Think of the behavior of an aquifer in terms of a bank account. The goal is to only use the interest derived from the principal. If we exceed the interest, we must now use the principal. This may be acceptable for emergency purposes, but not a desired practice. For an aquifer, the water in storage is the principal. Recharge to the aquifer from precipitation and snowmelt is the "interest". Safe yield is the interest the aquifer receives each year. As with a bank account, the interest varies from year to year. Some years it is higher than others. For an aquifer, recharge is dependent upon the amount of precipitation. Some years it is higher than others.

In order to determine the safe yield for the aquifer at 142 Red Acre Road, additional aquifer testing and water budget analysis must be performed. To date, this additional data has not been collected or calculations performed. However, in the absence of this information and based on the 1962, 1966, and site specific aquifer testing, a safe yield of 250 gpm can be assumed.

Ground water wells are typically pumped from 16 to 18 hour per day. This can vary significantly depending upon the season and community needs. However, at 250 gpm pumping rate for 16 hours, the daily withdrawal will be 250 gpm x 60 minutes per hour x 16 hours = 240,000 gallons per day. Wells operate 7 days per week for 365 days per year. Therefore, 240,000 gpd x 365 days = 87,600,000 gallons per year (gpy). There are many wells in production that are 30 – 50 years old. If we use a conservative well life of 40 years, the amount of water pumped by this well would be 87,600,000 gpy x 40 years or **3,504,000,000 gallons.**

Given the available data, the forgoing fundamental approach was used to determine the volume of ground water a permitted water supply well could potentially pump at 142 Red Acre Road.

A water rate must be assigned to calculate a dollar value for this volume of ground water. We will use the 2004 water rate for an adjacent community (Acton Water Supply District) (see Document 12). Their water bill includes a $ 10.00 charge for the first 500 cubic feet (or 3,740 gallons). Additional charges on a per cubic foot (or 7.48 gallons) basis are used in excess of the 500 cubic feet. The 2004 water rate study assumes a "typical" water usage of 12,000 cubic feet or 90,000 gallons per household per year and one billing cycle per year. There are approximately 2,100 households in Stow according to 2000 statistics. This calculates to 90,000 gallons of ground water per household per year and there are 2,100 households or 189,000,000 gpy. The well at 142 Red Acre Road produces only 87,600,000 gpy or approximately 46 percent of the projected town's demand (or 966 households).

The breakdown in the water rate would be, using the 90,000 gpy typical usage per household would be:

1. $ 10.00 for the first 3,740 gallons (500 cubic feet); and
2. $ 0.0385 per cubic foot for the remaining 11,532 cubic feet (86,260 gallons) using the average Summer/Winter water rate.

Assuming this well was to supply water to 966 homes, the calculations are as follows:

1. $ 10.00 + ($ 0.0385 per cubic foot x 11,532 cubic feet) x 966 households = $ 438,544.68 per year.
2. The conservative life span of the well is 40 years, therefore, 40 years x $ 438,544.68 per year = **$ 17,541,787.20** (present day value).

These calculations are fundamental and are based on assumptions, including the safe yield of the well. This a reasonable assessment of the ground water resource potential for this property at this stage of the technical investigation. We have not taken into consideration capital costs to develop the well, permitting costs, infrastructure costs (i.e. distribution system, hydrants, personnel, compliance testing and reporting to the State, etc.), and yearly operation and maintenance.

If you have any questions or require further information, please do not hesitate to contact our office.

Sincerely,

**GEOSPHERE ENVIRONMENTAL MANAGEMENT, INC.**

Raymond W. Talkington, Ph.D., P.G., LSP
Principal Hydrogeologist

Attachments