UNITED STATES DISTRICT COURT
(DISTRICT OF MASSACHUSETTS)

CIVIL ACTION NO. 05-11697-GAO

MARILYN KUNELIUS,
                    PLAINTIFF,

V.

TOWN OF STOW separately, A
PARTNERSHIP OF UNKNOWN NAME
BETWEEN TOWN OF STOW and THE
TRUST FOR PUBLIC LAND, THE
TRUST FOR PUBLIC LAND separately
and CRAIG A. MACDONNELL, in his
individual capacity,
                    DEFENDANTS.

**MEMORANDUM IN SUPPORT OF
THE PLAINTIFF'S SUMMARY
JUDGMENT MOTIONS AGAINST
THE TOWN OF STOW, THE TRUST
FOR PUBLIC LAND, CRAIG A.
MACDONNELL, AND THE
PARTNERSHIP OF UNKNOWN
NAME BETWEEN THE TOWN OF
STOW AND THE TRUST FOR
PUBLIC LAND**

Leave to file 57 pp. memorandum granted
on October 24, 2007

## INTRODUCTION

Under the provisions of M.G.L. c. 61, § 8, a citizen who has received the benefits

of c. 61, i.e. lower tax status, must, after he/she enters into a purchase and sale agreement

for the sale of his/her land with a bona fide purchaser, where the sale of land will change

the use of the land from forest land, give the town or municipality the opportunity of "a

first refusal option to meet a bona fide offer to purchase the land." (See M.G.L. c. 61, §

8). As a result, provisions of c. 61 anticipate that the town, should it so elect within a

specified period of time, will put the seller on notice that it will meet the *bona fide*

purchase price of a purchase & sale agreement.

Any common sense analysis of c. 61 leaves one with the inescapable conclusion

that when the town exercises the right, it must meet the purchase price anticipated in the

*bona fide* purchase and sale agreement.

> "The common meaning of a right of first refusal involving real
> estate is well established," and its use in a statutory context

> imparts no new meaning to the phrase. *Greenfield Country Estates Tenants Ass'n v. Deep,* 423 Mass. 81, 89 n. 14 (1996). "On notice of a bona fide offer from a third party, a right of first refusal ripens into an option to purchase according to [the] terms" of the offer. *Id.* at 89. See *Roy v. George W. Greene, Inc.,* 404 Mass. 67, 71 (1989), *S. C.,* 408 Mass. 721 (1990) … There is no indication, however, that the Legislature intended that a municipality's "first refusal option" to purchase would encompass the right to purchase such land on different terms and conditions than set forth in the "bona fide offer." See *Sudbury v. Scott, supra* at 299 n. 14 (§ 14 must be read in "commonsense fashion to effectuate the purpose of the statute"). We discern no compelling reason to read such an intention in the statute. Accordingly, to meet the purchasers' bona fide offer, the town was required to purchase the land on substantially the same terms and conditions as presented in the agreement. (fn8) See *Stone v. W.E. Auchbuchon Co.,* 29 Mass.App.Ct. 523, 527 (1990) ("It is basic, of course, that an option may be exercised only in strict compliance with its terms")… **The municipality then has an option to acquire the land, by meeting "a bona fide offer to purchase" the land or, in the case of conversion not involving sale, by purchasing the land at "full and fair market value."**

(emphasis added)(See <u>Town of Franklin v. Wyllie</u>, 443 Mass. 187 (2005)).

It is worth noting that the Legislature has concluded that the only component of the purchase and sale agreement that has any applicability when the Right of First Refusal ("ROFR") is exercised is the purchase price. This can be seen by the fact that when the land is intended to be converted by the owner, rather than through a sale, the municipality has the right to acquire the property at the "full and fair market value." Thus, the municipality should only be concerned with the purchase price when the *bona fide* offer exists and with the fair market value when there is no *bona fide* offer. In Ms. Kunelius' case, it is undisputed there was a *bona fide* offer of $1,116,000.

Notwithstanding the SJC's requirement of common sense applying to the application of c. 61, the Defendants assert that The Town of Stow ("Stow") and The Trust for Public Land ("TPL") can elect to enforce certain provisions of the Purchase and Sale Agreement ("P&S"), as if they were the actual developer under the original P&S. This argument strains credulity. The Defendants assert that they can reject the

development plan anticipated by the P&S and unilaterally replace it with another plan. While the statute anticipates that Ms. Kunelius' property ("Property") can be developed differently by the municipality from the original P&S, the statute does not anticipate that the decision of the municipality to reject its own development plan after the exercise of the ROFR would enable the municipality to then hide behind the Liquidated Damage Clause that never anticipated the municipality's development plan. The Defendants also assert that TPL, as the Assignee of the ROFR, would not have to comply with the P&S unless the Assignee "purchases the Property." (See Exh. A, Craig A. MacDonnell ("MacDonnell") deposition, pg. 154, ln. 8 – ln. 13). In other words, TPL does not differentiate between accepting the ROFR and exercising the ROFR. TPL, having exercised the ROFR, now asserts that the exercise did not obligate it to purchase the Property. This position would render c. 61 nothing more than a mechanism to defeat development of a property by exercising the right and then refusing to purchase the Property. This, in fact, would have a chilling effect on the landowners and would render the statute unconstitutional as a *per se* taking, because the landowner would not be able ever to sell his/her property because the town could repeatedly exercise the right of first refusal and then default. TPL's behavior with regard to its selective enforcement of some of the provisions of the P&S was a concerted effort based upon the fact that it had identified its selective enforcement paragraphs with full knowledge that Ms. Kunelius had no idea that TPL intended to do so. In correspondence between Stow and TPL, six (6) days before the Assignment by Stow, TPL discussed with Stow the fact that TPL intended to have some provisions of the P&S apply while disregarding others.

> "TPL: Because the decided cases under Chapter 61 do not
> explicitly resolve all of the potential issues that arise when a
> municipality assigns its right of first refusal to a nonprofit

> conservation organization, including which of the terms of the underlying contract should obligate the assignee, it would be prudent for TPL and Marilyn Kunelius's attorney to enter into a good faith dialogue to determine which terms are relevant and which are truly inapplicable."

(See Exh. B, KUN306).  The above demonstrates that TPL knew it would be prudent to contact Ms. Kunelius and to disclose that it intended to rely on the Liquidated Damage Clause and that it believed it was not obligated to purchase the Property even though the ROFR would be exercised.  Having identified these facts, it never disclosed its intentions to Ms. Kunelius prior to its effort to drive Cohousing Resources, LLC ("Cohousing") from the project permanently.  Certainly, if the original buyer, Cohousing was aware that TPL intended to or could have walked away from the project, then Cohousing may well have waited to determine what TPL intended to do.  TPL wanted Cohousing to believe that the sale was certain and therefore, permanently discourage Cohousing.  More importantly, TPL and Stow were aware that Ms. Kunelius was operating under the belief that the only provision of the P&S applicable to TPL was the purchase price.  On February 4, 2003, one week before the Assignment, Ms. Kunelius' attorney wrote to the Chairman of the Board of Selectmen and asserted that, in essence, the only component of the P&S Agreement that was applicable to the potential Assignee would be the purchase price.  (See Exh. C, KUN00313-14).  Despite this knowledge by Stow and TPL, they elected to go forward with the full knowledge that they would be destroying Ms. Kunelius' sale and that they were doing so with the full expectation that they would have no liability because of their outrageous reliance on the Liquidated Damage Clause.

**I.**     **The Plaintiff is entitled to Summary Judgment against The Town of Stow and the Trust for Public Land under Count I – Contract/Specific Performance**

The cornerstone of the Defendants' Summary Judgment Motion is the Liquidated Damage Clause defense. That defense asserts that the Purchase and Sale Agreement between Cohousing and Ms. Kunelius that was assigned to TPL by Stow limits the Plaintiff's recovery to approximately $19,000 that was paid to the Plaintiff as part of "earnest money payments," as outlined in ¶31 of the P&S. (See Exh. 1 to the Complaint, the P&S, ¶31). The Defendants further assert that the Liquidated Damage Clause is a threshold issue that, if decided in their favor, requires the Dismissal of the entire lawsuit. The Defendants are wrong on both assertions.

The Liquidated Damage Clause is found in ¶21 of the P&S. (See Exh. 1 to the Complaint, the P&S, ¶21). At the time that the P&S was entered into, the buyer and Ms. Kunelius anticipated that the buyer would pay $1,116,900 for 8.57 acres of land and develop a M.G.L. c. 40B low income housing development of the Property. The 40B development was critical to Ms. Kunelius because the developer, under the provisions of c. 40B, is largely relieved from the requirements of zoning approvals from Stow. (See Exh. D, Kachajian deposition, pg. 36, ln. 19 – ln. 24 and pg. 95, ln. 18 – ln. 21; see also Exh. E, Kunelius deposition, pg. 204, ln. 7 – pg. 205, ln. 18; see also Exh. F, Boothroyd deposition pg. 40, ln. 12 – ln. 16; see also Exh. G, Affidavit of Kunelius, pg. 2 – 3, ¶2. ; see also Exh. H, Affidavit of Kachajian, pg. 2, ¶2 and pg. 2 ¶ 3).

After the exercise of the ROFR On February 13, 2003, with the knowledge and consent of Stow, TPL decided that it did not like the terms of the P&S and therefore

unilaterally decided that it would change the fundamental terms of the P&S without Ms. Kunelius' approval or agreement.  These changes included:

1.       That TPL required the Plaintiff to sell 50.67 acres to TPL, rather than the 8.57 acres as anticipated in the P&S.  (See Exh. G, Affidavit of Kunelius, pg. 3, ¶4; see also Exh. H, Affidavit of Kachajian, pg. 3, ¶7; see also Exh. I Affidavit of Boothoyd, pg. 2, ¶2; see also Exh. A, MacDonnell deposition, pg. pg. 186, ln. 21 – pg. 187, ln. 4 and pg. 223, ln. 10 – pg. 23; see also Exh. E, Kunelius deposition, pg. 51, ln. 6 – ln. 9 and pg. 111, ln. 1- ln. 2).  This, in spite of the fact, that the clear language of the P&S is that Cohousing was purchasing only 8.57 acres for the $1,116,900. TPL was fully aware that the P&S only called for Cohousing to purchase only 8.57 acres of the Property, and TPL told its appraiser of that fact.

> "We have been informed by you that the $1,116,900 represents the 142 Red Acre Road property and approximately 8 acres of 144 Red Acre Road – the area currently occupied by the farm and a pond. The remaining 42+acres of 144 Red Acre Road were not included in the agreement, which provides that the owner shall donate this acreage to the town."

(See Exh. J, TPL-KUN01317-1318, Letter of TPL's appraiser to TPL; see also Exh. A, MacDonnell deposition, subsequently designated as TPL 30(b)(6), pg. 186, ln. 13 - pg. 187, ln. 4).

2.       The purchase price:  TPL decided that the Property was not worth what the original buyer agreed to pay and, therefore, TPL demanded that Ms. Kunelius reduce the purchase price by $400,000.  (See Exh. G, Affidavit of Kunelius, pg. 3, ¶ 4; see also Exh. H, Affidavit of Kachajian, pg. 3, ¶7; see also Exh. I, Affidavit of Boothroyd, pg. 2, ¶3; see also Exh. 1 to the Complaint, the P&S, ¶7).

3.       That TPL would not allow the Plaintiff to donate the remaining portion of the land, approximately 42.1 acres to Stow, for a charitable deduction, as anticipated by

the P&S.  (<u>See</u> Exh. G Affidavit of Kunelius, pg. 3, ¶4; <u>see also</u> Exh. I, Affidavit of Boothoyd, pg. 2, ¶3; <u>see also</u> Exh. H Affidavit of Kachajian, pg. 3, ¶7; <u>see also</u> Exh. A, MacDonnell deposition, pg. 186, ln. 13 – pg. 187, ln. 4 and pg. 223, ln. 10 – pg. 23; <u>see also</u> Exh. E Kunelius deposition, pg. 51, ln. 6 – ln. 9 and pg. 111, ln. 1- ln. 2).

4.    That TPL unilaterally decided it would not develop the Property under the provisions of c. 40B, as required by the P&S.  Rather, it would instead change the development plan, which would require special permits and variances from the Zoning Board of Appeals that TPL had reason to know it could not obtain.  (<u>See</u> Exh. G, Affidavit of Kunelius, pg. 3, ¶4; <u>see also</u> Exh. G, Affidavit of Kachajian, pg. 3, ¶7; <u>see also</u> Exh. I, Affidavit of Boothroyd, pg.2, ¶3; <u>see also</u> Exh. A, MacDonnell deposition, pg. 179, ln. 4 – ln. 22 and pg. 151, ln. 3 – ln. 12 and pg. 168, ln. 5 – pg. 169, ln. 10; <u>see also</u> Exh. E, Kunelius deposition, pg. 110, ln. 22 – pg. 111, ln. 2).  The validity of these types of unilateral changes has already been considered by Supreme Judicial Court in <u>Town of Franklin</u>, *supra*:

> "There is no indication, however, that the Legislature intended that a municipality's "first refusal option" to purchase would encompass the right to purchase such land on different terms and conditions than set forth in the "bona offer." See *Sudbury v. Scott, supra* at 299 n. 14 (§14 must be read in "Commonsense fashion to effectuate purpose of the statute")."  Id.

It is important to consider the "common sense fashion" in which c. 61 is to be read in order to effectuate the purpose of the statute as required by the SJC.  The Defendants' position lacks all common sense in that the Defendants assert that (a) they can change the terms; and (b) they can then "pick and choose" which terms of the P&S they will enforce against the seller.

### A. Ms. Kunelius could never have anticipated TPL's behavior when she agreed to Liquidated Damage Clause

The four (4) unilateral changes to the P&S made by TPL were certainly not anticipated by Ms. Kunelius and the original buyer when they signed the P&S.  The Plaintiff testified that she had never heard of TPL prior to the Assignment.  (See Exh. E, Kunelius deposition, Vol. I, pg. 19, ln. 9).  Further, the 30(b)(6) deponent of TPL testified that TPL had no idea why Ms. Kunelius would have anticipated that TPL would have made such revisions to the development plan for the Property.  In the 30(b)(6) deposition, Attorney Dorothy Nelson Stookey ("Stookey") testified:

> "There's no reason that Ms. Kunelius would have known of our plans to preserve the property."

(See Exh. K, TPL 30(b)(6) deposition (Stookey), Vol. I, pg. 85, lns. 3 – 4; see also Exh. H, Affidavit of Kunelius, pg. 3, ¶4).

The Plaintiff could never have understood what TPL might have in store for her land before TPL actually planned it.  Nor could she predict what provisions of the P&S TPL would "elect" to honor and which provisions it would elect to dishonor.  Nevertheless, TPL asserts that the Plaintiff should have anticipated that Stow would (a) assign the ROFR; (b) that the assignment would be  to TPL; (c) that TPL would default; (d) that default would occur even though MacDonnell, TPL's Massachusetts state Director, told Stow's public officials that TPL had never failed at any time to honor an Assignment of the ROFR.  (See Exh. K TPL 30(b)(6) deposition (Stookey), Vol. I, pg. 73, ln.  21 – ln. 24). MacDonnell also told Ms. Kunelius not to be concerned about the loss of the original buyer because TPL had the money in place to purchase the Property.  Equally important is the fact that MacDonnell also assured many other people that TPL would purchase the 8.57 acres.  Thus, TPL is asserting that Ms. Kunelius should have

anticipated that MacDonnell was lying.  (See Exh. G, Affidavit of Kunelius, pg. 4, ¶6). The issue of anticipation or expectations of the Parties at the time of signing a contract with liquidated damages is fundamental to Ms. Kunelius' contract claim.  In the case of Kelly v. Marx, 428 Mass. 877 (1999), the SJC stated that:

> "[I]n determining the enforceability of liquidated damage clause, [a judge] should examine only the circumstances in contract formation.  Our position is that "[w]here actual damages are difficult to ascertain and **where the sum agreed upon by the parties at the time of execution of the contract represents a reasonable estimate of the actual damages, such contract will be enforceable**. … This approach most accurately matches the expectations of the parties, who negotiated the liquidated damage amount that was fair to each side based on their unique concerns and circumstances surrounding the agreement and their individual estimate of damages in event of a breach." Id. at 880. [emphasis added].

The undisputed testimony of the Plaintiff, her attorney, Kachajian, and the broker, Boothroyd, is that the Plaintiff accepted the Cohousing offer because it had a Chapter 40B component, which made the likelihood of a sale extremely high, since the buyer could not be stopped by Stow's zoning issues.  (See Exh. E, Kunelius deposition, pg. 203, ln. 22 – pg. 204, ln. 15; see also Exh. F, Boothroyd deposition, pg. 33, ln. 20 – 34, ln. 2; see also Exh. D, Kachajian deposition, pg. 95, ln. 14 – pg. 96, ln. 10).  The certainty of sale was critical to Ms. Kunelius' retirement, since she had no other assets.  (See Exh. L, Kunelius deposition, Vol. II, pg. 45, ln. 2 – ln. 3). These components were part of her "unique concerns and circumstances," since the sale of the property represented 100% of her retirement.  (See Exh. G, Affidavit of Kunelius, pg. 2, ¶2(c); see also Exh. H, Affidavit of Kachajian, pg. 2, ¶3; see also Exh. E Kunelius deposition, pg. 44, ln. 24 – pg. 45, ln. 4; see also Exh. A, MacDonnell deposition, pg. 100, ln. 22 – pg. 101, ln. 22). In fact, even before the Assignment to TPL, MacDonnell was aware of the "unique concerns and circumstances" of the Plaintiff surrounding the execution of the P&S by the buyer

and Ms. Kunelius. TPL's own "Fact Sheet" dated January 30, 2003, (the Assignment was on February 12, 2003), specifically notes that TPL knew the Property represented 100% of Ms. Kunelius' retirement and that she feared that TPL's involvement would result in the loss of the buyer:

> "The landowner [Kunelius] is upset by the possibility that the Town may assign the RFOR to TPL. She [Kunelius] sees the deal as essential of the retirement. **On the phone, she recently said that she would sue the Town and others if anybody defaults and I lose my buyer** [Cohousing].' ..."

(emphasis added)(See Exh. M, TPL-KUN01129).  MacDonnell's handwritten notes of that telephone conversation reflect that he had the exact same understanding, prior to the Assignment to TPL.

> "Concern [Ms. Kunelius' concern] a retirement - needs the money – financial life on the line - <u>FEAR:</u> loss of buyer - she will sue the town."

(See Exh. N, TPL-KUN1260).  The above quotes demonstrate the warnings that were given by Ms. Kunelius to MacDonnell and TPL and demonstrate their knowledge of her "unique concerns and circumstances."  Despite the above quotes, MacDonnell, during his deposition, tried to deny his knowledge of those unique concerns and circumstances by denying having had a conversation with Ms. Kunelius regarding the fact that she had no money and that her financial life was on the line.  (The deposition was prior to MacDonnell turning over his notes).

> Q. Do you recall in a discussion with her concerning the fact that the certainty of payment with Co-housing under the 40B ensured her retirement would be available to her? Do you recall anything like that?
> A. I remember a reference to retirement.  I don't recall the reference being in the context of Chapter 40B.
> Q. Do you recall her telling you that she had no money?
> A. No.

10

(See Exh. N, TPL-KUN01260, MacDonnell's handwritten notes; see also Exh. A,

MacDonnell deposition, pg. 195, ln. 20 – pg. 196, ln. 4).

**B.**    **Stow remains liable since it assigned the RFOR and Stow was aware of
Ms. Kunelius' unique concerns and circumstances prior to Assigning the
ROFR**

Not only did TPL understand Ms. Kunelius' fears, so also did Stow have a

complete understanding of the significance of interfering with Ms. Kunelius' P&S.  On

February 10, 2003, three days before the exercise of the ROFR, Stow's Community

Preservation Committee meeting minutes indicate that a Committee member, Bob

Wilbur, had a discussion with Ms. Kunelius.  The minutes state as follows:

> "[S]he [was] afraid that the contract [with Cohousing] may
> unravel with town intervention and **she'll lose everything.** Bob
> said TPL will not back down from commitment. **Tom Maher spoke from
> the audience and said that this is not the babe** [Ms. Kunelius] **we
> want to fool around with**, and 1.2 is not the figure.  **TPL said
> that they have honored every assignment given to them under
> Chapter 61 and there is less risk with TPL than with other
> options."**

(emphasis added)(See Exh. O, KUN040).   As will be seen below, Stow had an

extraordinary relationship with TPL.  However, the simple fact that Stow was aware of

why Ms. Kunelius signed the P&S with Cohousing renders Stow's reliance on the

Liquidated Damage Clause as frivolous as TPL's.

**C.**    **TPL's Assertion that the Liquidated Damage Clause Is Dispositive
Is totally without Merit.**

The Summary Judgment Record is replete with extraordinary examples of TPL, a

so-called charitable institution, lying, deceiving, distorting, and misrepresenting its

intentions to the Plaintiff, to Stow's citizens during Town meetings, to the

Commonwealth of Massachusetts, to its Partners attempting to raise funds for TPL, and

indeed, to the Federal Government ("IRS") as part of an overall plan to achieve a goal

that Ms. Kunelius could have never anticipated. That goal was to prevent the low income

housing project without purchasing the Property.  Even if this Court were to hold that the

Liquidated Damage Clause would be applicable to a subsequent Assignee under c. 61, the

fact remains that the original parties to the contract could never have anticipated the bad

faith of TPL and Stow.  That bad faith is detailed below within the Plaintiff's argument

concerning M.G.L. c. 93A.   The Liquidated Damage Clause, in and of itself, is not

dispositive of the Contract Count in favor of the Defendants, since the extent of the bad

faith renders that Liquidated Damage Clause null and void.  See Hawthorne's, Inc. v.

Warrenton Realty, Inc.; 414 Mass. 200 (1993); see also Anthony's Pier Four, Inc. v. HBC

Assocs., 411 Mass. 451, 471--473 (1991) (every contract in Massachusetts is subject to

an implied covenant of good faith and fair dealing); see also Warner Ins. Co. v.

Commissioner of Ins., 406 Mass. 354, 362 n.9 (1990); see also Kerrigan v. Boston, 361

Mass. 24, 33 (1972); see also Cadle Co. v. Vargas, 55 Mass. App. Ct. 361, 366 (2002) (A

breach occurs when one party violates the reasonable expectations of the other); see also

Restatement (Second) of Contracts § 205 (1979).

    **D.**    **Promissory Estoppel**

      Each of the Defendants is estopped from asserting any defense of any kind with

regard to their failure to meet their obligations under the terms of  the P&S, as a result of

their promises to Ms. Kunelius and related promises to the DHCD and the citizens of

Stow.   Ms. Kunelius, in paragraph 20 of her Complaint, asserted that MacDonnell

promised and assured her that TPL had the money and that TPL would purchase the

Property. (See Exh. L, Kunelius deposition, Vol. II, pg. 90, ln. 13 – ln. 16; pg. 54, ln. 21 –

pg. 55, ln.  1 and pg. 44, ln. 21 – pg. 45, ln. 21). **This assertion by Kunelius is not even**

disputed.  **MacDonnell, when questioned about his promises, only testified that he
did not remember stating that the sale to TPL was a "certainty."**  (See Exh. A,
MacDonnell deposition, pg. 88, ln. 19 – ln. 23).  In other words, he did not deny he said
it.  The testimony and Affidavits of Kachajian, Kunelius, Furman, Sommerlad, as well as
the newspaper articles, Town meeting minutes and Board of Selectmen minutes,
unequivocally demonstrate that MacDonnell and TPL, with the knowledge of Stow,
promised virtually everyone that TPL would purchase the Property.  All of these
promises must be considered along with the promises made by TPL and Stow to the
DHCD, which assured DHCD that TPL would purchase the Property.  These promises
result in "promissory estoppel."  All of the Defendants were aware of these promises.  As
a result Promissory Estoppel applies to each of the Defendants and each of the defenses
raised to the Contract/Specific Enforcement Count.

> "Promissory estoppel does not create promise where none existed
> before; rather, it prevents defendant from denying enforcement of
> obligations which would otherwise be barred at law."

(See Computer Systems of America, Inc. v. International Business Machines Corp., 578
F.Supp. 558).

> "Theory of "promissory estoppel" permits recovery if (1) a
> promisor makes a promise which he should reasonably expect to
> induce action or forbearance of a definite and substantial
> character on part of the promisee, (2) the promise does induce
> such action or forbearance, and (3) injustice can be avoided only
> enforcement of the promise."

(See Loranger Const. Corp. v. E.F. Hauserman Co., 384 N.E.2d 176, 376 Mass. 757).

The promises by TPL and MacDonnell induced forbearance.  That forbearance amounted
to Ms. Kunelius having to accept the representations that the money was available to fund
the exercise of the ROFR and as a result lose her buyer.

II.    **Plaintiff is entitled to Summary Judgment against Stow, TPL, the Partnership under M.G.L. c. 93A (Counts II and III) – Unfair and Deceptive Trade Practices**

    The Statement of Undisputed Facts and the various admissions of the Defendants leave no genuine issue of fact to be determined with regard to the Defendants' violations of M.G.L. c. 93A.  Examples of the undisputed violations of c. 93A and extreme bad faith are as follows:

    1.    **The Defendants knew of the <u>Kelly v. Marx</u> decision, *supra*, by the SJC, prior to the exercise of the ROFR.**[1]    The <u>Kelly</u> decision demonstrated, to a reasonable certainty to TPL and its partner Stow, that their reliance on the Liquidated Damage Clause defense would not prevail and that Defendants' liability was virtually certain.  Nevertheless, they went forward, which, in and of itself, is a violation of c. 93A.  Even in the absence of the Liquidated Damage Clause argument, it is clear that the litany of bad faith behavior by the Defendants is so outrageous, unfair, and deceptive that such behavior would abrogate the enforceability of the Liquidated Damage Clause because of TPL's violations of the implied covenant of good faith and fair dealing.

    2.    **The document discovery indicated that there is no genuine issue of fact concerning TPL's realization that it would not be granted variances and special permits for its unilaterally changed development plans, <u>three (3) months before it accepted the Assignment</u>.**    This by itself is more than sufficient to demonstrate the Defendants' bad faith, and unfair and deceptive trade practices, when the Defendants many months later pretended to be surprised that TPL could not obtain said special

---

[1] The Plaintiff points out that TPL in its document production produced a Westlaw copy of the <u>Kelly v. Marx</u>, *supra*, decision which it had in its file at TPL.  (<u>See</u> Exh. P, TPL-KUN 01609).  This means that TPL knew of the SJC's standard with regard to the expectations of the parties at the time of contract formation.  Nevertheless, TPL has continued to act in bad faith by claiming the Liquidated Damage Clause defense.

permits and variances. Discovery has demonstrated that TPL, in December of 2002, while it was "illegally" lobbying for the Assignment of the ROFR, analyzed the considerable zoning issues it faced if it accepted the Assignment and unilaterally attempted to change the development. In January of 2003, the Defendants had reason to believe that they could not meet variances and special permits requirements. On January 9, 2003, TPL was informed that it would have to go before Stow's Zoning Board of Appeals because of frontage deficiencies. (See Exh. Q, TPL-KUN00181). The handwritten notes of MacDonnell indicate that TPL would need too many variances.

> "[D]on't even bother trying to create 2 lots out the cristing [sic] compound. Too many variances; too much uncertainty. One large lot."

(See Exh. R, TPL-KUN01167). TPL was aware that it would need (1) a variance for frontage, (2) a special permit for changing the Property line; and (3) a special permit for the caretaker's house. (See Exh. S, TPL-KUN01231).

3. **TPL knew it was destroying any chance of the original buyer acquiring the Property**. While TPL understood the difficulties of obtaining the variances and permits for its unilateral changes to the P&S, it also participated in a presentation at Stow's Town meeting. During that presentation, TPL boasted to Stow's citizens that, in effect, TPL's actions had permanently discouraged Cohousing, the original buyer, from remaining interested in the Property and never disclosed during the Town meeting that TPL had understood that it was unlikely that it would obtain the variances and permits. In other words, TPL was fully aware that its actions were forever stripping Ms. Kunelius of the original buyer, while they understood that they could never build what they were considering. In discovery, TPL provided its notes of TPL's

presentation by MacDonnell at the Town meeting.  (See Exh.T, TPL-KUN01095-1101).

At TPL-KUN1100, MacDonnell states at the Town meeting:

> "Compare this [support of TPL] to what a vote against [TPL] would <u>mean</u>: zero acres are deeded to the town; no 42 or 45; zero (**Cohousing is gone**);…"

(emphasis added)(See Exh. T,TPL-KUN01100).   The above statement by MacDonnell

was made many weeks before the actual exercise of the ROFR.  It was a statement made

to Stow's citizens.  He did so for the express purpose of convincing Stow's citizens that

Ms. Kunelius' charitable donation to Stow of the 42.1 acres could never occur because

TPL had been successful in arranging for the Assignment of the ROFR and thus,

permanently discouraging Cohousing.  Indeed, MacDonnell's own handwritten notes

indicate that he had a telephone conference with Attorney Jonathan Klein, the Attorney

for Cohousing:

> "If assigned, they [Cohousing] will move on."

(See Exh. U, TPL-KUN01255).   Having told Stow's citizens that Cohousing would

"move on," TPL, in its January 30, 2003 Project Fact Sheet, stated under the heading of

"Litigation Risk," the following:

> "<u>Buyer [Cohousing] won't go anywhere</u>: Even if NERO [TPL] defaults, it is likely that the buyer, a national developing company, would reappear."

(See Exh. V, TPL-KUN01129).  TPL knew that its own assessment, in its Fact Sheet,

done on January 30, 2003, that Cohousing might do the project if TPL defaulted, was

false, since TPL told Stow's citizens on January 23, 2003 that Cohousing "was gone".

Thus, in January or very early February of 2003, MacDonnell and other Defendants knew

that his efforts would result in the permanent loss of Cohousing as a buyer for Ms.

Kunelius.  With the loss of Cohousing, MacDonnell also knew that there would be the

loss of the Property as the 40B development.  40B, by definition, maximized the value of the land.  The Defendants also knew that this was Ms. Kunelius' biggest fear.  The Plaintiff respectfully suggests that the Defendants are <u>estopped</u> from arguing that they did not know that their actions would result in the loss of the original buyer and, therefore, the loss of Ms. Kunelius' contract.

     4.      **It is undisputed that TPL knew, even when it exercised the ROFR, that it had no authority to purchase the Property**.  Despite its assurances at the Town meeting and to Ms. Kunelius that TPL would purchase the Property, TPL knew it was unlikely that TPL could purchase the Property.  Nevertheless, it accepted the Assignment and exercised the ROFR inevitably causing Ms. Kunelius' buyer to back out.  In fact, on February 3, 2003, 10 days before it exercised the ROFR, TPL knew that it did not intend to purchase the Property and that it would have no idea whether such purchase would even be possible until late summer of 2003.  In an internal TPL document to MacDonnell, TPL states:

> "There are questions, may of which are solved by a motion on the table offered by Bowen (seconded by Eric Love) that the PRC [TPL] vote to approve accepting the Right of First Refusal and to exercise the option, **but not to approve closing on the project at this point**.  You [MacDonnell] would be requested to come back to the PRC later on with a request to approve details of the take-out prior to closing…. Essentially, I am OK with our exercising since we have the ability to walk away under the liquidated damages provision ($22K), but I think it's premature for PRC to approve closing since so many aspects of the take-out remains uncertain, and our ultimate risk is unclear now, **but should be much clearer by later this summer**. … We have a significant financial risk, in that the fallback is more fundraising.  And, it seems to me, we have a programmatic risk, if the ulimate [sic] project design is the sale of private parcels.  What is missing for me is a more detailed analysis of the public conservation accomplishments under the best case and worst case scenarios.  For example, what are the rights of the public on the parcels?  What are the nature of the restrictions on the private parcels.  How is the watershed being protected?  This has a more practical dimension, as well.  If the project has too little public benefit embedded in it, the revenues from the private lot sales may be unrelated business income."

(See Exh. W, TPL-KUN01144-45) (emphasis added).

It is undisputed that on March 27, 2003, approximately 6 weeks after TPL exercised the ROFR, MacDonnell informed TPL's partner, FORA, of the history of TPL's decision to exercise the ROFR and disclosed to FORA that TPL believed that it was unlikely that TPL would purchase the Property despite the exercise of the ROFR. MacDonnell wrote the following:

> "TPL's national board has only given a tentative approval to this excellent adventure we are undertaking together. We have not received the go-ahead to actually purchase the property. Our board is awaiting progress on both the **political** and fundraising fronts. Unless we secure approval at the May town meeting and make substantial progress on the remaining finances, I do not believe that we will get national approval for this project."

(emphasis added)(See Exh. X, TPL-KUN02078); see also Exh. Y, TPL-KUN03075). The above quote demonstrates the level of bad faith that existed, particularly in light of the fact that TPL certainly understood that they were playing with Ms. Kunelius' financial life. This must be considered in light of numerous undisputed examples of TPL and MacDonnell informing Stow's citizens and the Plaintiff of their absolute intention to purchase the Property.

5.    **There is no real genuine issue of fact that TPL had a hidden agenda to defeat the 40B proposed by Cohousing**.   This can be seen by the unequivocal deposition testimony of MacDonnell, designated as a portion of 30(b)(6) testimony of TPL.  In that testimony, MacDonnell makes clear that TPL had a goal of preventing the 40B project on Ms. Kunelius' Property, even if TPL did not purchase the Property.

> Q. So, you were aware, certainly, that your efforts with TPL had the effect of preventing a 40B development.  Is that fair to say?
> A. **We were successful in conserving the property, the property would have been conserved and not developed.**
> Q. Under 40B.

```
    A. Correct.
```

(emphasis added)(<u>See</u> Exh. A, MacDonnell deposition, pg. 193, ln. 19 – pg. 194, ln. 1). The above testimony makes clear that TPL was "successful" in meeting its goal of preventing the buyer from developing the Property under c. 40B.  This would explain why TPL never received an internal approval to purchase the Property.  There can be no other explanation as to why TPL, having defaulted in the P&S and having reneged on an Assignment, for the first time <u>ever</u>, could somehow describe its failed efforts as "successful."  Thus, the damages resulting from TPL's interference would most certainly not be limited by the "Liquidated Damage Clause."  MacDonnell's admission is also dispositive of the Contract (Count I), M.G.L. c. 93A (Count II and Count III), the Intentional Interference with Contractual Relationship (Count V) and Civil Rights violation (Count VI) claims.

6.     **The Defendants had a strategy of misdirection in virtually every aspect of their involvement**.  The Defendants made material misrepresentations not only to Ms. Kunelius, but also to the Department of Housing and Community Development of the Commonwealth of Massachusetts ("DHCD"), Stow's citizens at the Town meeting and others as part of its plan to achieve its goal.  Those misrepresentations furthered TPL's overall plan and therefore can be considered by this Court, even if a particular misrepresentation was not directed to Ms. Kunelius. TPL, in its grant application, informed the DHCD that TPL had a Wainwright Bank $6 million line of credit available to it to purchase the Property, even if all other sources of funding failed.  That application stated as follows:

```
    "TPL is prepared to purchase the Property.   TPL has a primary
    plan  and  a  fall  back  plan.    The  primary  plan  envisions  a
    multilateral  funding  approach  to  this  project.  Some  of  the
```

> funding is contingent, as explained below, but all of it is subject to a fallback Line of Credit from Wainwright Bank."

(See Exh. X, KUN342).

> "As a fall back plan, **if any or all of the above-referenced sources of funds are unavailable**, TPL intends to utilize capital from the private market. In this regard, TPL has available for its use a Line of Credit from Wainwright Bank in the amount of $6,000,000, as evidenced by the letter attached as Exhibit__. The use of this capital is subject to TPL's internal approval process, including customary due diligence and approval by the board of directors."

(emphasis added)(See Exh. Y, KUN-TPL00343).  These quotes confirm what Ms. Kunelius has asserted from the inception of this litigation; i.e., that MacDonnell assured her that TPL had the money to purchase the Property.  The sources referred to in the quote were fundraising, the DHCD grant, Stow's contribution ($300,000 - $400,000) and TPL's eventual sale of a portion of Ms. Kunelius' Property after TPL theoretically acquired it.  TPL informed the DHCD that none of those sources were necessary and TPL would buy the Property even if those funds were unavailable.

> MacDonnell himself wrote to the DHCD the following:

> "A local lending institution, Wainwright Bank, has issued us a line of credit in the amount of six million dollars, which funds we could utilize if necessary to complete the Stow transaction, subject to normal due diligence and internal TPL review."

(See Exh. Z, MacDonnell's letter to the DHCD).

It is now clear that the Defendants deliberately misled the DHCD, <u>since the $6 million line of credit, at the time of the Application to the DHCD and many months thereafter, had been depleted leaving only $5,000 in the line of credit</u>.  (See Exh. AA WB00338[2], <u>see also</u> Exh. BB, TPL 30(b)(6) deposition (Stookey), Vol. II, pg. 19, ln. 5 – ln. 20).  Stookey, TPL's General Counsel, testified in the Rule 30(b)(6) deposition that

---

[2] Confidentiality of this document was waived by counsel.  (See Exh. BB, TPL 30(b)(6) deposition (Stookey), Vol. II. pg. 60, ln. 2 – pg. 62, ln. 15).

the Defendants' statement to the DHCD was "inaccurate." (See Exh. BB, TPL 30(b)(6)

deposition (Stokey), Vol. II, pg. 24, ln. 20 – pg. 25, ln. 19 ).  The deposition of Karen

Sommerlad, a member of FORA, indicates that MacDonnell at the Town meeting

informed Stow's citizens that TPL had the funds necessary.  (See Exh. CC, Sommerlad

deposition, pg. 53, ln. 10 – 23).  In addition, MacDonnell informed members of the

Friends of Red Acre ("FORA") of the same fact. (See Exh. CC, Sommerlad deposition,

pg. 53, ln. 10 – 23).

On January 30, 2003, the local newspaper, *The Beacon Villager*, published an

article entitled, "Friends of Red Acre still have ace in the hole."  The article discusses the

fact that the voters of Stow defeated a ballot question as to whether or not Stow would

fund a portion of the purchase price of Ms. Kunelius' Property.  However, after losing

that vote, TPL nevertheless insisted that it would exercise the ROFR and that it would

pay for the Property itself.

> "Marilyn Kunelius, current owner of the property, spoke through
> her realtor at the meeting, expressing that the trust [TPL] might
> be unable to pay the entire $1.2 million.  Kunelius urged
> selectmen to deny the request [of TPL] to assign of their rights
> of first refusal and let her and Mosaic Commons, the developer,
> close the original deal on the property. **MacDonnell, however,
> replied that trust would not adopt the rights of first refusal,
> if the organization was not absolutely certain it could pay the
> asking price.** "Developers aren't always able to make their
> promises … If we accept the terms of this project, this Landowner
> will be made whole," he said."

(emphasis added)(See Exh. DD, TPL-KUN01488, *The Beacon Villager* article).  The

above statement by MacDonnell was made in a public Board of Selectmen hearing.

7.    **The Defendants lied about fundraising efforts**.  As the Court is aware,

the Defendants attempted to blame the default on the "inability to raise funds" for the

purchase of the Property.  Discovery has proven beyond doubt that the Defendants have

repeatedly misrepresented the truth concerning fundraising as the reason for not purchasing the Property.  After TPL exercised the ROFR, TPL asked its Partner, FORA and its members, for a list of potential contributors to "assist" TPL in raising funds for the purchase.   In reality, TPL never intended to use that list to raise funds for the purchase of Ms. Kunelius' Property.  After FORA members provided the list to TPL and MacDonnell, it was used by TPL to fundraise on different projects, i.e., <u>not</u> Ms. Kunelius' project.  On July 23, 2003, Peter Christianson, a professional fundraiser and a member of FORA, wrote to other FORA members, and stated:

> "They [TPL] already used several of the contacts that I [Peter Christianson of FORA] provided for other [TPL's] projects while at the same time telling their [TPL's] staff to hold off on fund raising for this project [for the purchase of the Plaintiff's property].  I feel raped. The false paradigm here is that they are implying that they are limited to the prospect pool I generated.  The fact is that there are plenty of more prospects, and they need to identify and solicit them."

(<u>See</u> Exh. EE, July 23, 2003 email of Peter Christianson to FORA, bates # Furman0087, first and fourth paragraphs).   The Defendants, having told the DHCD and FORA members that TPL was "fundraising," in fact, deliberately instructed TPL's staff not to fundraise for the project. (<u>See</u> Exh. EE, Furman0087; <u>see</u> <u>also</u> Exh. FF, TPL-KUN1621). Out of frustration, FORA alerted the Board of Selectmen of this fact:

> "[I]t was TPL that decided not to fund raise during the critical period from January through June, directing their staff and our citizen group to suspend our fundraising."

(<u>See</u> Exh. FF, TPL-KUN1621, letter from FORA to Perry, the Chairman of Board of Selectmen).   The following is a portion of an e-mail from FORA fundraiser Peter Christianson to FORA members describing outright lies being made by TPL with regard to the failure of fundraising:

> "In my July 3 conversation with Craig, he [MacDonnell] explicitly told me that **TPL intended to do zero fund raising**, and that FORA

```
was responsible for 100% of it and/or financing no later than the
closing in September or TPL would have to pull out.  This is
tantamount to challenging me to a duel.  Since I do not
participate in duels, I will simply ignore this ridiculous,
outrageous, insulting set of demands.  My position is non-
negotiable, because it is the only path to success.  His demand
is either a poison pill or simply juvenile.
I [Peter Christianson of FORA] held off on fund raising for the
EOS prospects for several reasons:
1. Craig [MacDonnell] told me to wait
2. I did not want to risk my relationships [with his potential
   donors] while he [MacDonnell] was threatening to pull out
3. The timing was not right
4. I received no feedback from TPL on the proposal template
5. TPL was not doing anything whatsoever on fund raising, and I
   did not want to set a precedent
6. Sheila [of TPL] asked me to participate in a committee to
   raise funds from individuals, and I agreed.  Committee has not
   yet been convened, apparently because Craig [MacDonnell] told
   her to hold off.”
```

(emphasis added)(See Exh. EE Furman00087)  The decision not to fundraise was seen at least by FORA members as insuring TPL's ultimate failure, as can be seen by the "poison pill" reference (above).

It was not just MacDonnell who was instructing TPL's staff not to fundraise.  On January 30, 2003, Erin Rowland, the New England Public Relations Director of TPL, sent an email to three (3) individuals who were working internally on the project.  In that e-mail Roland states the following:

```
“In terms of costs, I would say given our very precarious budget
situation, we should be spending as little as possible to raise
money.”
```

(See Exh. GG, TPL-KUN03677).  Rowland's instruction clearly demonstrates that TPL had been misleading not only Ms. Kunelius and Stow's citizens, but also its partner FORA.

On August 19, 2003, just weeks before TPL was to purchase the Property, it still had not began fundraising in earnest.  Its partner, FORA, was exasperated with TPL's behavior.  A representative of FORA, Serena Furman, wrote to MacDonnell and stated:

> "FORA does not agree with your assertions that "funding does not
> exist." I would like to explain to you why TPL's best option is
> to take on financing; finally **begin fundraising; and see this
> project through to a successful completion.**"

(emphasis added)(See Exh. HH, TPL-KUN01681-82).  FORA also wrote to Ross Perry

and the Board of Selectmen for Stow and informed them of TPL's fundraising lies:

> "[I]t was TPL that decided not to fund raise during the critical
> period from January through June, directing their staff and our
> citizen group to suspend our fundraising."

(See Exh. FF, TPL-KUN1621).  The above quotes demonstrate that not only was TPL

misrepresenting the status of fundraising, but also that Stow knew that the proffered

"reason" for defaulting, i.e., the failure of fundraising, was knowingly false.

Nevertheless, Stow, realizing that it had successfully prevented the 40B development, sat

back and allowed TPL to default without ever demanding that TPL perform.  Stow made

this decision, even though it had been informed by its own counsel that Stow would be

liable if TPL defaulted (as discussed below).  The misrepresentations by the Defendants

continued on September 9, 2003, when MacDonnell and TPL wrote to Peter A.

Kachajian, Ms. Kunelius' attorney, and stated that TPL would default because:

(a)    Local fundraising has not been successful;

(b)    Weak fundraising prospects with no backup plan; and

(c)    Mixed signals from the Zoning Board of Appeals.

(See Exh. II, TPL-KUN01671).  These statements were knowingly false, since TPL had

ordered that no fundraising could commence.  (See Exh. II, TPL-KUN1621; see also

Exh. JJ, Furman deposition, Vol. I, pg. 59, ln. 17 – ln. 21). Nevertheless, MacDonnell and

TPL, by using these knowingly false statements, attempted to coerce Ms. Kunelius into

lowering the purchase price by $125,000.

24

**The Deposition of Serena Furman is tantamount to Whistle Blowing**

Apparently, TPL was confident that Ms. Kunelius would never learn of TPL's outrageous behavior and of the dispute that had arisen between TPL and FORA. Indeed, Ms. Kunelius would not have, but for the fact that FORA would "break ranks" with TPL and inform Ms. Kunelius and this Court of the extent of TPL's and Stow's bad acts.

During her deposition, Serena Furman of FORA testified that her testimony <u>was the first time that she or her organization, FORA, "broke ranks" with TPL and told the truth about the extent of TPL's deception</u>:

> "[W]e have never broken ranks publicly with TPL … and this has never happened before in any public venue.  This is the public venue [i.e. the deposition] where we were first breaking ranks with TPL…"

(<u>See</u> Exhibit JJ, Furman deposition, Vol. I, pg. 78, ln. 7 – ln. 13).  FORA's breaking ranks exposed TPL to the magnitude of TPL's and Stow's repeated deception.

**8.     The Defendants, in furtherance of their fraud, unfair and deceptive trade practices and intentional interference, also made material misrepresentations to the federal government.**  The Defendants willfully defeated the 40B development on the Property under the guise of TPL being a "charitable institution."  In so doing, the Defendants violated the Internal Revenue Code provisions concerning its tax exempt status of TPL.  Again, the Plaintiff asserts that the Defendants' tax exempt status and the Defendants' tax fraud efforts are relevant to Ms. Kunelius' claims.  TPL knew that it had to accurately and truthfully describe its activities to the IRS, because TPL, a 501(c)(3) entity, enjoys tax exempt status.  Therefore, TPL decided to enter into a conspiracy whereby it would lobby the Town officials of Stow in order to defeat the c. 40B low income housing development, but then "after the fact" re-characterize TPL's lobbying as

"consulting," in order to maintain its tax exempt status.    Further evidencing this conspiracy is an April 15, 2003, letter which MacDonnell drafted to be signed by the Board of Selectmen.  (See Exh. KK, TPL-KUN3366).  In this regard, the Court need only review TPL's efforts to cause Stow to sign a document dated April 15, 2003, some five (5) months after TPL and Stow had been working together, where the document purports to be asking TPL, dated April 15, 2003, to become involved with the Project as consultant so that Stow could acquire the Property from Ms. Kunelius.  TPL's and Stow's effort to re-characterize TPL's lobbying occurred after TPL had already exercised the ROFR and Stow had assigned the right to TPL.  The purpose of the document was to provide a false statement to the IRS, where TPL and Stow attempted to mischaracterize the months of TPL's lobbying efforts as having never occurred.  TPL realized that it had "illegally" lobbied, in violation of the Internal Revenue Code, and that only re-characterizing TPL's efforts could preserve its non-taxable status.  That letter was signed and eventually sent to the IRS.  Stow and TPL knew that every aspect of that letter was knowingly false and was intended to mislead the IRS.  (See Exh. KK, TPL-KUN03366).  The letter was written as if Stow was, for the first time, on April 15, 2003, contacting TPL and asking for its assistance in Stow's acquisition of the Property.[3]  It is written expressly to convince the IRS that Stow intended to acquire the Property from Ms. Kunelius and TPL was "engaged" to effectuate that acquisition by Stow.  Again, it must be emphasized that TPL began lobbying Stow in December of 2002 and further, that the Town meeting vote on January 23, 2003, voted down the possibility of Stow itself purchasing the Property from Ms. Kunelius.  Thus, the letter was false regarding the

---

[3] Stow's participation in misleading the IRS estops it from asserting that it had no obligation to purchase the Property after the default of TPL, since weeks after it assigned the ROFR, Stow attempted to convince the IRS that Stow intended to purchase the Property.

characterization of the services allegedly asked of TPL and Stow's alleged intention with regard to the Property. There is no circumstance that could explain how Stow, some nine (9) weeks after it assigned the ROFR and some twelve (12) weeks after the vote which turned down the purchase, could be asking for TPL's assistance on Stow's acquiring of the Property.

According to the Internal Revenue Code ("IRC") Sec. 501(c)(3), TPL maintains its tax exempt status as long as TPL's activities do not substantially involve carrying on propaganda, or otherwise attempting to influence legislation, and if TPL does not participate in, or intervene in, any political campaign on behalf of any candidate for public office. (See IRC Sec. 501(c)(3)). In addition, TPL maintains its tax exempt status if it does not exceed 150% of a lobbying nontaxable amount (lobbying ceiling amount) or 150% of grass roots nontaxable amount (grass root ceiling) for a given taxable year. (See IRC Sec. 501(h)(1), (2), and (3)). Any amount above the nontaxable amount (lobbying or grass roots) is levied by 25% tax. (See IRC, Sec. 4911(a)(1)). The lobbying nontaxable amount is $1,000,000 or an amount determined by IRC table, whichever is less. (See below).

| Not over $500,000 | 20 percent of the exempt purpose expenditures. |
|---|---|
| Over $500,000 but not over $1,000,000 | $100,000, plus 15 percent of the excess of the exempt purpose $500,000 |
| Over $1,000,000 but not over $1,500,000 | $175,000 plus 10 percent of the excess of the exempt purpose 1,000,000 |
| Over $1,500,000 | $225,000 plus 5 percent of the excess of the exempt purpose expenditures over $1,500,000. |

The grass roots nontaxable amount is 25% of the lobbying nontaxable amount, i.e. $250,000 or less. IRC Sec. 4911(d), recognizes two terms: "lobbying expenditures" and

"grass roots expenditures" as it relates to lobbying. These two terms mean any expenditure for the purposes of "influencing legislation." (See IRC Sec. 4911(d)). In other words, <u>lobbying expenditure</u> is:

> **(1) any attempt to influence any legislation through an attempt to affect the opinions of the general public or any segment thereof**; and

> (2) any attempt to influence any legislation through communication with any member or employee of a legislative body, or with any government official or employee who may participate in the formulation of the legislation.

(emphasis added)(<u>See</u> IRC Sec. 4911(d)). <u>Grass roots expenditures</u> means any attempt to influence any legislation through an attempt to affect the opinions of the general public or any segment thereof. Further, IRC Sec. 1949(e)(2) defines the term "**legislature**" as:

> "an action with respect to Acts, bills, resolutions, or similar items by Congress, any State legislature, **any local council, or similar governing body, or by the public in a referendum, initiative, constitutional amendment, or similar procedure.**"

(<u>See</u> IRC Sec. 1949(e)(2)) (emphasis added).

There are <u>some exceptions</u> from the meaning of the term "influencing legislation," as defined in Sec. 4911(d)(2), which allow a nonprofit to perform certain activities without imposing any tax on the nonprofit's expenses. These activities include:

> "… **providing of technical advice or assistance (where such advice would otherwise constitute the influencing of legislation) to a governmental body or to a committee or other subdivision thereof in response to a written request by such body or subdivision, as the case may be;** … "

(emphasis added)(<u>See</u> IRC Sec. 4911(d)(2)).   As can be seen above, TPL's lobbying activities would be fatal to its tax return and tax exempt status. TPL and MacDonnell requested on or about April 17, 2003, 62 days after the Assignment of the ROFR, that TPL and Stow rewrite history by way of Stow's "written request" for TPL's "technical support."

> "Ross [Ross Perry, the Chairman of the Board of Selectmen] and
> Bill, **Here is revised letter that is somewhat** more general (and,
> perhaps, somewhat less problematic). **The reason we need this is
> because it enables TPL to "count"** more of its **support work** as
> **"technical assistance"** rather than "lobbying" for IRS purposes…"

(emphasis added)(See Exh. NN, KUN421).  MacDonnell and TPL, in drafting Stow's

"written request," used the exact IRC Sec. 4911(d)(2)(B) language that would allow

TPL's lobbying efforts to remain exempt from those of "influencing legislation."  The

"written request" states as follows:

> "By this letter, the Board of Selectmen officially requests
> **technical advice and assistance** from your organization in
> connection with our efforts to evaluate the acquisition of
> property….  I understand you will advise the Town on the
> acquisition and funding of the property including **working with
> town committees, communication with residents of the town, and
> seeking approval at town meeting.**"

(emphasis added)(See Exh. NN, KUN422; see also Exh. OO, TPL-KUN02225).  The

"written request" was executed by Ross Perry on behalf of the Board of Selectmen on

April 22, 2003.  (See Exh. PP, KUN420).    Stow questioned TPL about the "written

request" after the fact:

> "Referring to the letter the Board signed this week: Is the
> letter used needed only for tax purposes? IRS/DOR? If for grants,
> does TPL they have specific grant in mind?  Will this be used for
> presentations to town boards or town meeting?  Will the letter be
> used in the town meeting educational literature that is handed
> out or mailed out.  What is the value of this letter to TPL?
> Confirm that there is no cost to the town through this letter."

(See Exhibit QQ, TPL-KUN02666, Ross Perry's April 25, 2003 email).  TPL's response

was:

> "Our lawyers have us do this to allow us to continue to provide
> these services while staying under our lobbying cap. … He also
> says that, as you know, under public record law, Ross [Chairman
> of the Board of Selectmen] may have to turn over some of his
> emails if these people [presumably Ms. Kunelius] want to be big
> enough pain in the ass, they could push this point."

(See Exh. RR, TPL-KUN003407).  In a separate e-mail from MacDonnell to Ross Perry

of the Board of Selectmen, the knowingly false letter concerning lobbying was described

as follows:

> "The letter is used by TPL internally to help us characterize
> the hours that we dedicate to our work. We are careful to
> allocate our time between lobbying and non-lobbying activity as
> required by the IRS.  The letter is normal procedure in all of
> our municipal projects and is required by TPL's attorneys."

(See Exh. SS, TPL-KUN03428).   The above mischaracterization of TPL's "illegal"

lobbying demonstrates an overall plan and practice by TPL and Stow based upon

misrepresentation, misdirection, and outright fabrication of facts and documents, all of

which were employed by the Defendants in order to achieve their goal.  The Plaintiff is

not asking the Court to consider the Defendants' IRS Fraud as determinative of the

Plaintiff's claims against TPL and Stow.  Rather, the Defendants' efforts to mislead the

IRS were simply a part of an overall plan to mislead Ms. Kunelius, Stow's citizens,

FORA, and the DHCD.

   MacDonnell, when asked about TPL's lobbying activities, testified that it was a

normal business practice of TPL to avoid its lobbying activities by way of letters from

municipalities to request TPL's services "after the fact."  In fact, it is not the municipality

who contacts TPL, as MacDonnell testified.  It is TPL who influences legislature and

then asks for a "written request" to avoid the tax implications of its actions. The

following is the testimony of MacDonnell:

> Q. **Now, in fact, TPL was lobbying for that property. Isn't that
> fair to say**?
>      MR. CONROY:  Objection.
>      MS. FETOUH:  Objection.
> A. **TPL typically asks boards of selectmen for these kinds of
> letters because the IRS recognizes** the work that TPL does in
> response to requests from boards of selectmen as if the record
> so reflects that.  So, it's a normal, **every-project request**
> that **we ask boards of selectmen to do this letter.**

(emphasis added)(See Exhibit A, MacDonnell deposition, pg. 211, ln. 11 – ln. 21).

Further, MacDonnell testified that TPL, in fact, was lobbying for the Assignment
of the ROFR:

```
Q. At some point, is it fair to say you actively began lobbying
   for the possibility of accepting an Assignment of the 61A
   right of first refusal?
        MR. CONROY:  Objection.
        MS. FETOUH:  Objection.
A. Lobbying to whom?
Q. To the town.
A. It is fair that at some point it made sense to TPL that, for
   the project to go forward, the way that would occur is via an
   Assignment of the right of first refusal.
```

(emphasis added)(See Exhibit A, MacDonnell deposition, pg. 43, ln. 5 – ln. 15).   In
addition, Perry, the Chairman of the Board of Selectmen, testified that TPL was lobbying
for the ROFR and that MacDonnell drafted and asked Stow to sign the "written request:"

```
Q. Their [TPL's] goal all along, according to your testimony
   today, was to purchase that property with funds that they
   intended to get from some source, and that's what you always
   had believed, i.e., that they always had the money and that
   they intended to go forward. Is that correct?
A. Yes.
Q. Now, Craig MacDonnell asks you to go back and describe their
   [TPL's] involvement as that of technical advice with regard to
   affordable housing and recreation and conservation purposes so
   that they could get a tax break.  Isn't that fair to say?
        MS. FETOUH:  Objection.
        MR. CONROY:  Objection.
A. That's what he says here.
Q. And Craig MacDonnell writes the letter for you to sign. Isn't
   that fair to say?
A. It appears that's true.
```

(emphasis added)(See Exhibit TT, Perry deposition, pg. 244, ln. 1 – ln. 18).

**III.  TPL's, MacDonnell's and Stow's Bad Acts with regard to the IRS are
relevant to Ms. Kunelius' claims as they relate to the Contract claim (Count
I), the M.G.L. c. 93A claim (Count II and Count III), the Intentional
Interference with Contractual Relationship claim (Count V) , Civil Rights
claim (Count VI), and Fraud and Misrepresentation claim (Count VII)**

The occurrence of an event such as the Defendants' attempt to mislead the IRS is

relevant to Ms. Kunelius' claim because the Defendants' bad acts occurred

simultaneously and in conjunction with their larger plan to defeat the 40B and Ms. Kunelius' P&S.

> "[W]here substantial identity in the circumstances appears, and the danger of unfairness, confusion or undue expenditure of time in the trial of collateral issues reasonably seems small to the trial judge, he has generally been left free to admit such evidence in his discretion."

(See Robitaille v. Netoco Community Theatre, 305 Mass 265, at 266, 25 N.E.2d at 7050 (1940)).

Evidence of similar occurrences may also be admissible for the limited purpose of proving TPL's and Stow's knowledge, notice and state of mind, all of which are critical to Counts II and III, V, VI and VII. See, e.g., Burnham v. Mark IV Homes, Inc., 387 Mass. 575, 584-585, 441 N.E.2d 1027, 1033 (1982)(testimony that dealer informed sales manager of leakage problems in roofs of other units admissible to prove notice of defect); Saldi v. Brighton Stoch Yard Co., 344 Mass. 89, 97-98, 181 N.E.2d 687, 692 (1962) (in action for personal injuries resulting when plaintiff was butted by defendant's cow, evidence of prior escapes of cows from defendant's yard admissible to show defendant's knowledge of the defective premises); Denton v. Park Hotel, Inc., 343 Mass. At 527-528, 180 N.E.2d at 72 (evidence of prior falls on defendant's dance floor admissible to show defendant's knowledge of the dangerous condition.).

In actions involving a count of fraud and misrepresentation [Count VII] or unfair and deceptive trade practices [Counts II and III], evidence may be available which points to similar fraud and misrepresentation perpetrated by the party charged upon third persons at or about the same time. Proof of other fraud and misrepresentation committed by the party charged with fraud and misrepresentation in the action may be made where there is evidence that they constitute parts of one scheme or plan, and all were done in

pursuance to a common purpose. (See Lynde v. McGregor, 95 Mass. 172 (1866); see also Horton v. Weiner, 124 Mass. 92 (1878), general scheme of fraud). (See also First Nat. Bank of Chelsea v. Goodsell, 107 Mass. 149 (1871), holding relevant prior dealings between plaintiff-indorsees and their allegedly fraudulent transferor). (See also Rioux v. Cronin, 222 Mass. 131, 109 N.E. 898 (1915), fraudulent conveyance, evidenced by other frauds part of common scheme or plan)). The fraudulent statements to the DHDC, to the citizens of Stow, to the IRS, to the newspapers, and of course, to Ms. Kunelius, all occurred simultaneously as a part of an overall plan.

Evidence of other misrepresentations and fraudulent conduct may also be admissible to prove that the party charged made the fraud and misrepresentations with knowledge of their falsity, and with intent to deceive. To support such an inference of knowledge or intent, the Court does not require that there had been any general purpose to defraud, or that the misrepresentations bear any direct resemblance as to subject matter or time when made. (See Foster v. Hall, 29 Mass. 89 (1831), proof of prior fraudulent conveyances to other grantees, admissible in action by grantees to prove fraudulent intent on part of the defendant-grantor; see also Lynde v. McGregor, 95 Mass. 172 (1866), to show fraudulent intent of married woman in conveying her property to defendant grantee, proper to show prior fraudulent conveyance from husband to same grantee. Accord, Lyon v. Wallace, 221 Mass. 351, 108 N.E. 1075 (1915)).

Similarly, if the fact of the making of the misrepresentation, or the doing of the act of fraudulent misconduct, or the identity of the perpetrator of the fraud is in issue, evidence of other fraudulent acts or misrepresentations will be deemed relevant to those propositions. In this situation, a fairly close connection will have to be established

between the evidentiary facts shown and the issuable fact-to-be-inferred, to avoid exclusion under the judicial policy against remoteness. (See <u>Fowle v. Child</u>, 164 Mass. 210, 41 N.E. 291, 49 Am.St.Rep. 451 (1895), to the issue of whether plaintiff removed money from vault fraudulently (which he denied doing), proper to prove other acts of fraud by plaintiff in course of his transactions with the defendant during same period of time). All of the above cases support the proposition that the various misrepresentations to Ms. Kunelius, FORA, the DHCD, the IRS, the newspapers, Stow's citizens at the Town meeting, and to Stow's citizens at the Board of Selectmen meeting, are a part of a plan by which TPL, MacDonnell and Stow successfully prevented the c. 40B and incurred as little expense as possible in so doing.

**IV.** **TPL Cannot Claim Protection as a Charitable Non-Profit Institution in order to Avoid its liabilities under the Contract (Count I), M.G.L. c. 93A claim (Count II and Count III), Intentional Interference with Contractual Relationship claim (Count V), Civil Rights claim (Count VI) and Fraud and Misrepresentation (Count VII)**

The behavior of TPL, although nominally a charitable institution, is that of a "cut-throat" business operation. Those in contact with TPL were certainly aware of its uncharitable behavior. In describing TPL's and MacDonnell's behavior, Furman of FORA testified:

```
A. …[I]t seems very wrong to me that they made the promise they
   did to the town and they went back on it – that's behaving as
   a business man under his legal rights, but it is not  behaving
   as a non-profit does…
Q. Did you perceive that the behavior of Craig MacDonnell and TPL
   was violating that higher standard [for non-profit behavior]?
A. I think, if they are, personally, if their business is in
   partnering with towns, which was very clear to me that Trust
   for  Public  Land  does  not  do  projects  without  public
   partnership, that this kind of promise that they made to the
   town and the right of first refusal was beyond the bounds.
   Totally within the rights of a businessman. Beyond the bounds.
Q. Beyond the bounds for a non-profit?
A. Conduct, yes.
```

(See Exh. LL, Furman deposition, Vol. I., pg. 110, ln  4 – ln. 9, and pg. 111, ln. 17 – pg.

112, ln. 3).   On August 19, 2003, Serena Furman, on behalf of FORA, wrote to

MacDonnell and conveyed FORA's dissatisfaction with the cut-throat behavior of

MacDonnell and TPL:

> "TPL must act as both a financially responsible project manager
> and also as a non-profit.  As a non-profit, you must weigh the
> other concerns and goals of TPL that exist beyond financial
> considerations.  TPL should consider these publicity issues: **1.
> In January, you stated to the Board of Selectmen that once TPL
> takes a right of first refusal, it never withdraws from the deal.**
> Selectmen are probably used to meaningless verbal assurances from
> developers, but your word as a non-profit means an entirely
> different thing. TPL does not want to be known as an organization
> that does not keep its word. … The two main issues facing this
> project appear to be funding and zoning relief.  At eight months
> into the project and less than 60 days from closing, this seems
> an oddly late time for TPL to begin fundraising and to finally do
> the in-depth legal analysis of the variance issues."

(emphasis added)(See Exh. JJ, TPL-KUN01681).  This behavior, taken with all of the

other extraordinary behavior of TPL, suggests that while TPL is nominally a non-profit,

TPL is actually a "wolf in sheep's clothing" and as such, it is most certainly susceptible

to the application of c. 93A.  This cut-throat behavior is further demonstrated by the

threats made by MacDonnell when Ms. Kunelius refused to reduce the purchase price.

The Plaintiff stated in her deposition:

> Q. What did he [MacDonnell] say after Mr. Kachajian made this
>    comment?
> A. Well, it would be along the same lines, you know, we're
>    nationwide, blah blah.  We're well respected.  We have friends
>    in high places, and he also said we will bury you.

(See Exh. E, Kunelius deposition, pg. 91, ln. 14 – ln. 17). Peter Kachajian, Ms. Kunelius'

attorney, described MacDonnell and TPL's threats against his client:

> Q. As far as you can recall, the words that you've just described
>    you saying, are those pretty much substantively what you said?
> A. Words to that effect, you know, basically guess I will have to
>    see you in court.  That's when he [MacDonnell] went into his
>    little tirade about how -- to me it was like when I was a kid
>    watching Khrushchev banging his shoe on the podium, "We will

> bury you." It was unprofessional. He started basically -- and
> again, give the devil his due -- we've got very influential
> people. You know who's on our board, we'll bury you type of
> thing. You litigate this, and we'll basically eat you alive.
> I'm not saying you guys [TPL's attorneys] are in his
> hippocket, but it was kind of an allusion to that, and in the
> past he kind of alluded to, you can't take on this fight, and
> if you try, we're basically going to overwhelm you, and that's
> where he went, you know --admittedly, every lawyer has an ego,
> but he really just seemed to me went a little over the top. At
> that point that's when he was really rocking and rolling and
> really getting heated, and that's when Bob Wilber ushered him
> out. I think he was quite torqued at that point. You could
> see them outside in the window, and he's flailing his arms,
> and it was kind of weird, quite frankly, but he was upset,
> really, really upset. He said what I would consider to be
> some very unprofessional and unkind things.

(See Exh. D, Kachajian deposition, pg. 158, ln. 20 to pg. 159, ln. 24). James Boothroyd,

Ms. Kunelius' broker, stated in his deposition:

> Q. Can you tell me as best as you can remember what Mr.
>    MacDonnell's words were in response to Mr. --
> A. I don't remember specific words. I remember more his reaction.
>    He did threaten that TPL was a large company that he knew Ms.
>    Kunelius didn't have a lot of funds and that they could drag
>    this out a long time.

(See Exh. F, Boothroyd deposition, pg. 122, ln. 18 to pg. 123, ln. 1).

David Norris, Ms. Kunelius' husband, testified about the same meeting with

MacDonnell:

> A. You asked me about MacDonnell.
> Q. Yes.
> A. MacDonnell's face got red. He said that it will be very
>    inadvisable for you to go that route. We have a large legal
>    organization. You can't afford to go up against us. We will
>    bury you. And that's basically what I remember about the
>    conversation.

(See Exh. UU, Norris deposition, pg. 24, ln. 4 – ln. 10). The Plaintiff directs the attention

of the Court to ¶46 of the Complaint which states as follows:

> "In the Spring of 2004, MacDonnell met with Kunelius, Kunelius'
> counsel and Jim Boothroyd, a local real estate broker, David
> Norris, in connection with TPL's demands for a lower purchase
> price. During that meeting MacDonnell threatened and intimidated
> Kunelius and her counsel by stating generally that (i) TPL had
> "serious and influential connections by way of its Board of

> Advisors" who would defend TPL against any legal action brought
> by Kunelius as a result of TPL's default, (ii) TPL's Board of
> Advisors included prominent law firms that would tie up Kunelius
> and any attempt by her to enforce the P&S, (iii) TPL would notify
> the Court of its "influential connections beyond reproach" and
> that the Court would never find in favor of Kunelius
> notwithstanding that TPL was demanding a reduction in purchase
> price of $400,000, (iv) TPL was aware that Kunelius was of very
> limited means and that she and her attorney would not be able to
> spend sufficient funds to win any matter against TPL and (v) TPL
> had unlimited resources available to it to overwhelm anyone who
> would make the mistake of opposing TPL."

(See ¶46 of the Complaint).  The above paragraph has been largely verified by Ms.

Kunelius in her deposition, as well as in those of Kachajian, Boothroyd and Norris.  The

alleged assertions by MacDonnell referenced in paragraph 46 in the Complaint no longer

seem surprising, given what discovery has disclosed.  MacDonnell's threats concerning

the power of TPL, the threat to crush Ms. Kunelius, and the statement that he was aware

she had no money (See Exh. N, TPL-KUN01260, MacDonnell's handwritten notes), etc.,

now have been indisputably verified by all of the above testimony and/or MacDonnell's

own notes.

In the case of Miller v. Risk Management Foundation of the Harvard Medical

Institutions, 36 Mass. App. Ct. 411 (1994), the Massachusetts Appeals Court analyzed

whether a charitable institution is susceptible to an M.G.L. c. 93A claim:

> "In reaching for the right characterization, [of whether an
> entity engages in trade] '[f]actors to be considered include the
> character of the party, the nature of the transaction, the
> activities engaged in by the party, and whether the transaction
> was motivated by business or personal reasons. *Barrett v.*
> *Massachusetts Insurers Insolvency Fund,* 412 Mass. 774, 775—776
> (1992).  See also *Begelfer v. Najarian*, 381 Mass. 177, 190—191
> (1980)." Id. at 416.

(See also  Linkage Corp. v. Trustee of Boston University, 425 Mass. 1, 679 N.E.2d 191

(1997)).  The above quote deserves particular scrutiny as it relates to TPL and

MacDonnell.  The "character" of TPL and MacDonnell must be viewed considering the

fact that they were so aggressive that they actually had a "Litigation Strategy" in place against Ms. Kunelius prior to exercising the ROFR.  This is because they knew that they were toying with her retirement and her future well-being. They also knew that, at the time they exercised the ROFR, it was unlikely that they would purchase the Property. Those bad acts plus the threats to crush Ms. Kunelius are hardly within the core mission of TPL.  Thus, the "activities engaged in" by TPL and MacDonnell go far beyond any reasonable behavior for a charitable institution, or any businessperson for that matter, and those activities were motivated by reasons that can be only described as cut-throat business goals.

TPL unquestionably entered into a course of action intended to interfere, nullify, and negate the P&S between the buyer and Ms. Kunelius for the express <u>and admitted</u> purpose of successfully avoiding the development of the Property under c. 40B.  The fact that TPL is "nominally a charitable institution does not allow it to escape from c. 93A where, as here, it has, in fact, performed in a business way."  <u>Miller</u>, *supra*, at 416. <u>Planned Parenthood Fedn. Of America, Inc. v. Problem Pregnancy of Worcester, Inc.,</u> 398 Mass. 480, 492 – 493 (1986).

> **A.    TPL Schemed to Spread the Blame to Ms. Kunelius and Others for TPL's Failure to Purchase the Property and such scheming is Dispositive of whether TPL was acting as a charitable institution**

In August of 2003, TPL, MacDonnell, and its General Counsel Stookey, were aware of TPL's "Exit Strategy" in which TPL would propose unacceptable resolutions to Ms. Kunelius and others (TPL proposed that Ms. Kunelius reduce the purchase price by various amounts, including $125,000, $200,000 and $400,000), and that such proposals would be made specifically so that TPL could blame its failure to purchase on Ms.

Kunelius and others for refusing to accept such outrageous proposals.  On August 27, 2003, Valerie Talmage of TPL wrote an e-mail to six (6) individuals from TPL, including MacDonnell, Stookey (TPL's General Counsel) and Whitney Hatch (TPL's Regional Director).  In that e-mail, Talmage states:

> "If we [TPL] reduce our number by $70K, that's $300 we need to find elsewhere – like $100 each, or the landowner [Ms. Kunelius] giving up $200 and the town and the private splitting $100. There may be some algebra that lets you rescue this from the ashes and **if it doesn't, at least presenting the opportunity lets others share in the project failure rather then laying in all on TPL's shoulders.**"

(emphasis added)(See Exh. VV, TPL-KUN02765). The handwritten notes of MacDonnell state unequivocally that he was part of the scheme to misrepresent the reasons to Ms. Kunelius and others as to why TPL was not purchasing the Property.  His handwritten notes state:

> "Next step: letter reply confirming that project is not viable, recognizing difficulty of this outcome; and then reaching out to the partners (Town, SCT [Stow Conservation Trust], CPC [Conservation Preservation Committee]). **Blame the failure of grant; delay; economy.**"

(emphasis added)(See Exh.WW, TPL-KUN01710). The above two quotes demonstrate the standing operating procedure for TPL.

On July 17, 2003, MacDonnell wrote an e-mail to five (5) individuals, including Stookey (TPL's General Counsel) and Whitney Hatch (TPL's Regional Director).  Said e-mail contained a forward of another e-mail in which TPL would employ an "Exit Strategy" designated to manipulate facts to divert attention from TPL's failure.

> "I think the most important thing about the "exit strategy" is not to be seen as TPL pulling the plug, but a consensus to emerge from all that the project has now got some fatal flaws and unless it can be reconfigured and funded differently, it will not succeed.  Please let me know if you need my help in talking this through with partners/funders/friends/**enemies.**"

(emphasis added)(See Exh. XX,TPL-KUN3682). The above quote demonstrates MacDonnell's, TPL's General Counsel's, and TPL's Regional Director's participation in trying to mischaracterize why TPL would not go forward. The above quote also demonstrates that this "charitable institution" had identified "enemies." The Plaintiff respectfully suggests that TPL had identified her as one of the "enemies." TPL certainly dealt with her in a financially deadly manner.

On July 31, 2003, MacDonnell sent an e-mail with attached letter to FORA in which MacDonnell attempted to assess the blame for the inability to purchase the Property on Ms. Kunelius' unwillingness to reduce the purchase price.

> "Even if we get the variance and the town continues to want to invest, we have concluded (after many rounds of internal debate) that TPL cannot go forward unless the seller lowers her price. As we discussed on the other night, a straight market approach (#3 on the handout) still leaves us with a substantial shortfall, which at this point can only be made up through a reduction in price."

(See Exh. YY,TPL-KUN03668). Again, this "Exit Strategy" was developed at a time when TPL now claims it had $70 million in available funds to purchase the Property. (See Exh. DD, TPL 30(b)(6) deposition (Stookey), Vol.II, pg. 42, ln. 11 – ln. 14).

> "TPL currently has lines of credit across the country in excess of 70 million dollars."

(See Exh. BB, letter of MacDonnell to DHCD re: $70 million in lines of credit). The fact that the Massachusetts Director MacDonnell, General Counsel Stookey, and the Regional Director Hatch were all aware of this effort unequivocally demonstrates that TPL was not acting to advance its core mission. In addition, there was no evidence whatsoever that suggested that the economy or the failure to obtain the grant was the reason why TPL could not go forward. In fact, TPL informed Ms. Kunelius and others that TPL had the funds to purchase the Property. TPL informed the DCHC that the Wainwright Bank line

of credit would be used if all other sources of funds failed.  This statement to the DHCD was only four months before TPL decided to "spread the blame," so that it was not on "TPL's shoulders."  If this behavior is not unfair, deceptive, outrageous, and unethical, particularly for a charitable institution, then one would be hard pressed to describe what would be.

## V.    Intentional Interference with Contractual Relationship (Count V)

TPL had a business plan that was extraordinarily sophisticated.  In January of 2003, TPL produced a Project Fact Sheet for internal use. (See Exh. ZZ,TPL-KUN01124-37).  That Fact Sheet included headings for "Project Facts," "Capital Requirements," "Success and Risk Analysis," "Fall Back Strategies," "Fundraising Risks," and "Subdivision Risks."   In addition, and more troubling, were the headings that demonstrated that TPL knew it was going to be facing litigation.  (See Exh. ZZ, TPL-KUN01129).  These heading included "Litigation Risk Analyses," "Liquidated Damages Analysis," and "Analysis whether the original buyer would give up."  The Fact Sheet also included a heading entitled "Sound Bite."  Under this heading TPL had crafted a media sound bite to boast that TPL had "intervened" in the P&S and to claim that its intervention was critical.

> "SOUND BITE: The conservation of the Kunelius Farm brings together three strong community objectives: protection of a key open space and water supply parcel between two existing conservation tracts; creation of affordable housing for the residents of Stow, and the support of a local horse rehabilitation non-profit organization, **none of which could have or would have happened without the intervention of the Trust for Public Land.**"

(emphasis added)(See Exh. ZZ,TPL-KUN01133).  The above quote estops TPL from claiming virtually all of its defenses related to Intentional Interference with Contractual Relationship, Fraud and Misrepresentation, and indeed, Unfair and Deceptive Trade

Practices.  First, it estops TPL from claiming that it was not lobbying under the IRS

requirements.  Second, it estops TPL from asserting that it did not have a primarily and

controlling role in intervening and defeating Ms. Kunelius' P&S.  Clearly, TPL's

intervention was the reason why TPL was "successful in conserving the property, the

property would have been conserved and not developed [under 40B]."  Third, the "Sound

Bite" was part of a "Public Relations Marketing" component of the Fact Sheet.  (See Exh.

ZZ,TPL-KUN01135).  In that component, TPL describes itself as NERO (New England

Regional Office).

> "PUBLIC RELATIONS AND MARKETING: A. What are our plans for
> publicizing this project prior to closing? NERO will run an
> extensive local campaign in advance of Town Meeting in May. This
> campaign will include direct mail efforts and paid and free
> press. We anticipate that the project will enjoy editorial
> support and received the endorsement of all relevant local boards
> and commissions."

(See Exh. ZZ,TPL-KUN1135).  The above quote demonstrates that TPL had an absolute

intention to intervene by lobbying through a sophisticated plan in order to defeat the 40B.

That sophisticated plan demonstrated the various intervention methods which were

simultaneously illegal lobbying efforts.  Those efforts included TPL's involvement (1) in

direct mail efforts (See Exh. XX, TPL-KUN03349); (2) paid and free press (See Exh. M,

TPL-KUN01129; (3) drafting Stow's Town Article seeking a vote for the purchase of the

Property (See Exh. YY, TPL-KUN02883-86; see also Exh. ZZ, KUN-TPL 2893-2894;

(4) providing personal advice to the Chairman of the Board (See Exh. PP, TPL-

KUN003407); (5) participating in telephone campaign designed to influence the Stow's

Town meeting vote (See Exh. AAA, TPL-KUN00424, Phone tree); (6) petitioning

abutters to the Property to sign a letter supporting Assignment of ROFR to TPL (See Exh.

BBB, TPL-KUN02727); (7) public outreach campaign (See Exh. CCC, TPL-

KUN02801); (8) support for the Town meeting  (See Exh. DDD, TPL-KUN02795-96); (9) influencing the outcome of the ballot question  (See Exh. EEE, TPL-KUN02483); (10) prepared for the Town meeting (See Exh. X, TPL-KUN03075); (11) established campaign "to do list" (See Exh. FFF, TPL-KUN03257-3259); (12) drafted letters on behalf of Stow to the DHCD (See Exh. GGG, TPL-KUN03260); (13) wrote press releases (See Exh. HHH, TPL-KUN03405); (14) was directly involved in lobbying the Chairman of the Board of Selectmen to be part of TPL's strategy (See Exh. III, TPL-KUN03031); (15) edit and discuss motions with Stow Community Preservation Committee ("CPC") and Jacob Diemert (See Exh. JJJ, TPL-KUN02417); (16) draft telephone script, letter to editor from Board of Selectmen ("BOS"), Stow Conservation Trust ("SCT"), Eye of the Storm ("EOS"), and FORA (See Exh. JJJ, TPL-KUN02417); (17) submitted newspaper ads (See Exh. JJJ, TPL-KUN02417); (18) prepare Town meeting remarks (See Exh. KKK, TPL-KUN02416); (19) contacted villagers about CPA article (See Exh. KKK, TPL-KUN02416); (20) mail reminder card (See Exh. KKK, TPL-KUN02416) and (21) numerous lobbying activities, including drafting articles for publications and local newspapers (See Exh LLL, TPL-KUN02665; see also Exh. MMM, TPL-KUN02687-88; see also Exh. NNN, TPL-KUN02794).  On April 2, 2003, TPL inquired about Community Preservation Committee of Stow's "ghost-writing" article:

> "Another question for you: if TPL were to ghost-write an article about CPA for the local paper, would David Walrath be an appropriate co-author (along with somebody from Community Preservation Coalition)?"

(See Exh. OOO, TPL-KUN01212; see also Exh. PPP, TPL-KUN03440-42; see also Exh. QQQ, TPL-KUN03459-61; see also Exh. RRR, TPL-KUN03462-64). All of this was

done while TPL knew it was violating Federal Law. Thus, TPL is estopped from arguing that they did not deliberately intervene in Ms. Kunelius' P&S.

**VI.    MacDonnell is liable to the Plaintiff despite his employment at TPL**

MacDonnell urges this Court to grant the Summary Judgment in his favor because he is an employee of TPL and as such he should not be personally responsible for his activities, since they were made with the full knowledge and approval of TPL. Normally, that argument would have some substance. However, it is abundantly clear that the behavior of MacDonnell, who is a current member of the Massachusetts bar, was so unequivocally intended to interfere with the financial well-being of Ms. Kunelius, he cannot attempt to hide behind the protection of the so-called "non-profit corporation." MacDonnell lied to Ms. Kunelius and others. His behavior shocked his partners into writing their objections, where they specifically pointed out that, as a representative of a non-profit, his behavior was unacceptable. He was aware from the beginning what Ms. Kunelius' concerns were. He knew that his statement concerning the availability of funds was a lie. He knew that his subsequent statements of the failure of fundraising was a lie. He told the DHCD that the Wainwright Bank line of credit was available, when he knew it was not. Virtually everything MacDonnell did had the intended effect of stripping the original buyer, Cohousing, from the deal. In his role, he helped put into a place a course of action which took from Ms. Kunelius the one opportunity that was available to her. His participation was structured so that not only did Cohousing decide not to return in order to build the 40B, it did so because of the certainty that the entire outrageous process would be used again and again in order to prevent the 40B development. These behaviors are so outside TPL's core mission, whether or not TPL approved them, so as to

strip MacDonnell of any personal protection that might be otherwise afforded to him by TPL.

Indeed, there are relatively few cases in which behavior of an officer of a non-profit requires a finding of personal liability.  However, in the case of Fotana v. TLD Builders, Inc., Civil Case No. 2--05--0045 (Illinois Appeals Court, 2nd District, December, 2005), the Illinois Court of Appeals had to consider the extraordinary behavior of a corporate officer and decide whether the corporate officer's behavior would result in liability.   In evaluating the potential liability of the corporate officer, the Court used the second prong of the test to pierce the corporate veil.  That prong deals with circumstances that must exist such that adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences.  (See People ex rel. Scott v. Pintozzi, 50 Ill. 2d 115, 128- 29 (1971)).  The second prong has been described as "some element of unfairness, something that can do fraud or deception, or the existence of the compelling public interest."  (See Berlinger's, Inc. v. Beef's Finest Inc., 57 Ill. App. 3d 319, at 324 (1978)).  Actual fraud is not necessarily predicate to piercing the corporate veil; limited liability may be discarded to prevent injustice.  (Central States, Southeast & Southwest Areas Pension Fund v. Gaylur Products, Inc., 66 Ill. App. 3d 709 (1970)).  This standard, which is applied by the Illinois Court, seems to have applicability in the instant case.[4]   Virtually every aspect of MacDonnell's involvement seems to be based on achieving a fraud and inequitable

---

[4] The Illinois Appeals Court considered the piercing of the corporate veil where corporate officer perpetuated a fraud.  In the instant case it is not clear whether MacDonnell, Massachusetts state Director of TPL, is a corporate officer.  However, the Plaintiff believes that the Illinois Court's analysis is equally applicable to an employee who participates in fraud.

outcome whereby he could defeat Ms. Kunelius' P&S without buying the Property when he knew of the implications for Ms. Kunelius if she were to lose the buyer.

MacDonnell's own personal assets should be available to Ms. Kunelius in order to recover the extraordinary damages she had to suffer. MacDonnell's behavior most certainly was intended to violate Ms. Kunelius' Civil Rights under 42 U.S.C. §1983, §1988.

**VII.    This Court Should Grant Summary Judgment against Stow and the alleged Partnership of Stow and TPL on All Counts**

It is undisputed that from the inception of the Chapter 61 process, Stow worked closely with TPL. TPL lobbied extensively in order to get the ROFR assigned to it. In that effort, there are eleven (11) documents indicating that TPL and Stow were acting in a partnership. As the Court is aware, no formal agreement is necessary to establish Joint Venture under the Common law. Having said that, the documentation is more than sufficient to outline the extent of partnership. Those documents include TPL-KUN01261, MacDonnell's notes of a telephone call with Ross Perry Chairman of the Board of Selectmen in which MacDonnell writes:

> ```
> "TPL mode of operation
> • Significant "p-ship" w/ town is essential."
> ```

(See Exh. N, TPL-KUN01261). TPL-KUN01262 states that: "SCT [Stow Conservation Trust] › potential for partnership." (See Exh. N, TPL-KUN01262).

> ```
> "We work in partnership with other nonprofits, local governments,
> and state and federal agencies to help them acquire land for
> permanent protection.  As is the case here in Stow, a partner
> will seek our help on the project when issues of timing,
> financing, subdivision, or any of the countless problems that can
> arise in a real estate acquisition present obstacles to achieving
> a community's open space objectives."
> ```

(See Exh. SSS, KUN-TPL01427).

TPL in KUN-TPL01576 states:

> "So we thought it made sense for us to gather with our project partners, to analyze the bad news..."

(See Exh. TTT, KUN-TPL01576).

KUN-TPL01578 indicates that Stow's investment in the partnership is $400,000.

(See Exh. TTT, KUN-TPL01578).

KUN-TPL01579 indicates that Stow's investment would be $300,000. (See Exh. TTT, KUN-TPL01579). KUN-TPL01683, an e-mail from MacDonnell to the Board of Selectmen, states the following:

> "We [TPL] are in the middle of fashioning a proposal to our project partners and hope to have a better sense next week where we stand."

(See Exh. UUU, KUN-TPL01683). KUN-TPL01916-1919 is a letter of TPL to Board of Selectmen:

> "All of our projects are done at the request of and in partnership with the entities that will become the permanent owners of the land. The two most important roles we play in this process are (1) to make sure that our obligations to our partners are met; … The proposed structure for funding a conservation strategy for the Kunelius property thus requires a strong town/private partnership. The total project costs, including the purchase price, will be met from three sources: (1) the Town's $400,000; … If so, we [TPL] ask that you authorize your chairman to sign below as an indication or your partnership with TPL."

(See Exh. VVV, TPL-KUN01916-17 and TPL-KUN01919).

So complete is the partnership between Stow and TPL that there is a confidential e-mail from Ross Perry, the Chairman of the Board of Selectmen, dated February 25, 2003, approximately 13 days after Stow assigned the ROFR to TPL, which states as follows:

> "The concerns I've been hearing are:
> Why spend money for wetlands [Kunelius Property] that we'd get for free. Using CPC money is just low-ended way of going around the town's vote at the January ballot. This is too much money

> from CPC, and it will prevent other project. Money is tight and
> the Selectmen shouldn't be spending money on projects like this.
> Why did the Selectmen ignore Town Counsel an[d] not insist on the
> indemnification? Why did the Selectmen put the town at risk to
> pay the full $1.2M if TPL defaults? I can take the heat, and
> still support our decision.  It will be up to TPL & FORA to be
> sure I (and the town) don't regret this move."

(See Exh. WWW, TPL-KUN02586).   MacDonnell's notes from a conversation with

Ross Perry states:

> "Ross has some issues:
> • Fear of TPL bailing out
> • Indemnification, again"

(See Exh. XXX, TPL-KUN01256).  Both of the above quotes demonstrate the "buyer's

regret," i.e., Stow now regretting the partnership because Stow did not want to pay the

$300,000-$400,000.  They also demonstrate that the Board of Selectmen knew that they

were attempting to disregard Stow's Town meeting vote which rejected Stow's

purchasing the Property.[5]  The above quotes also reflect the fact that the Board of

Selectmen did not want to spend the money and that they were very unsure of whether

TPL would honor its commitment.  The above quotes illustrate that Ross Perry, the

Chairman of the Board of Selectmen, was asking MacDonnell to supply him with suitable

answers that Perry could use in answering why the Selectmen ignored Town Counsel's

advice that TPL should have indemnified Stow.  It also demonstrates that the Selectmen

fully understood that Stow would be responsible for the full purchase price if TPL

defaulted, just as Town Counsel advised.   The bottom of TPL-KUN02687 also

demonstrates that TPL was editing "a letter to the editor" for the Board of Selectmen and

supplying answers for the Board of Selectmen as to why it disregarded Town Counsel's

advice. (See Exh MMM, TPL-KUN02687; see also Exh. NNN, TPL-KUN02794).  This

---

[5] After Town meeting vote, TPL and Board of Selectmen elected to go forward where Stow would
allegedly contribute its $300,000 to $400,000 from other sources from Stow.

document, perhaps more than any other, demonstrates a clear Joint Venture to disregard Town Counsel advice and to expose Stow to liability, and demonstrates the extent of MacDonnell's involvement in that effort.

TPL-KUN02589 represents MacDonnell's editing the letter to the editor on behalf of the Board of Selectmen. (See Exh. WWW, TPL-KUN02589).  TPL-KUN2776-77 is an internal document called "Project Time Sheet" in which TPL described Stow as its partner.  (See Exh. YYY, TPL-KUN02776-77).

The above list of references to the Partnership, when combined with the fact that TPL and Stow agreed that Stow would contribute between $300,000 to $400,000 in exchange for receiving 42.1 acres of land, demonstrates without a doubt that there is a Partnership.  There is no real genuine issue of fact as to whether or not there was a partnership.  It is axiomatic that Common law does not recognize or distinguish between an "unofficial partnership" and an "official partnership."  Parties are either in a partnership or they are not.  Nevertheless, MacDonnell, a member of the Massachusetts bar, attempted to avoid the Partnership designation during his 30(b)(6) deposition by suggesting that there are "official" and "unofficial" partnership arrangements.

```
Q.   … Now, when you used the word partnership of the first page
     of your January 5th letter, which is Exhibit 25, were you
     referring to partnership with the town?
A.   I was using the term in its colloquial sense and not in its
     legal sense.
Q.   There is a colloquial sense of partnership?  And that would
     be what?
A.   Working together on something less than a legal partnership.
Q.   Well, is it fair to say that, in a partnership, would you
     expect the individuals or parties to a partnership to have a
     financial stake in a partnership?
          MS. FETOUH: Objection.
          MR. CONROY: Objection.
Q.   An investment, something that –
A.   A legal partnership, you're talking about?
Q.   Yes.
A.   Not always.
Q.   Doesn't have to have one?
```

```
A.   Correct.
Q.   Would you expect that there would be some contractual stake
     in a partnership where the parties enter into a written
     agreement by which they declare their partner status to each
     other?
A.   Sometimes, but not always.
```

(See Exh. A, MacDonnell deposition, pg. 242, ln. 1 – pg. 243, ln. 2).  There is no "colloquial" meaning of the word "partnership."  Stow assigned the ROFR, TPL exercised the ROFR, and Stow committed to pay up to $400,000 to get 42.1 acres of land from TPL when they could have received it free of charge as a gift from Ms. Kunelius.  The stupidity of their decision is matched only by the absurdity of their argument that there was not partnership. It is no wonder that Stow and TPL attempt to avoid the general partnership designation as a result of their arrangements.  It is very clear that each of them shares in the liability for the bad acts of the other.  So complete was Stow's understanding of this Partnership arrangement and the potential liability of that arrangement that they were actually informed of such potential liability by Stow's Town Counsel.  On February 10, 2003, Stow was advised by its own Town Counsel that the language of Chapter 61 did not absolve Stow from any liability to Ms. Kunelius if TPL failed to purchase the Property and for other claims that had been raised by the Plaintiff's attorney.  In addition, Stow's Town Counsel, Jacob Diemert (now deceased), informed Stow that, because of that exposure, Stow needed indemnification from TPL, specifically because Stow knew of TPL's intention to deprive Ms. Kunelius of the tax benefits of the P&S  (Before Stow even assigned the ROFR to TPL).  Town counsel also advised Stow of the possibility of damages being assessed against Stow for its involvement in the assignment and that a lawsuit was very likely because of Town Counsel's understanding of TPL's objectives.

> "Since the language of c. 61 does not absolve the Town of any further liability to the landowner for failure of the assignee to carry out the obligations to purchase the land under the assignment, or for any other claims as may be made by the landowner (such as exist in the present circumstances and are discussed below), appropriate terms and conditions for the assignment would include an indemnification agreement by the assignee (TPL) to the assignor (the Town)from any such claims as might be made by the assignee (TPL). I highly recommend such an indemnity clause be required for acceptance of the assignment of TPL in the present circumstances. These circumstances include two potential sources of litigation and possible damage claims by the Seller (Kunelius) who provided the c. 61 Notice to the Town in the present matter. … While we may disagree with the Seller's contentions, made through Seller's counsel (the only party actually to opine on the issue of the c. 61 Notice give to the Town being TPL as the Special Town Meeting), the contentions contain the elements of causes of action that could result in a legal action, involving not only the possibility of damages being assessed, but the costs of defending any such action, which can be substantial whether the Town wins or loses. Moreover, unless agreement can be reached both with TPL and the Seller prior to making the assignment over the Seller's claims, the assertion of one or more of these claims by a lawsuit is, in my judgment, highly likely given the various communications with counsel for the Seller. …"

(See Exh. ZZZ, KUN428-429). Attorney Diemert's letter demonstrates that Stow fully understood the gravity of what it was considering. The legal implication of the Partnership was such a concern to one member of the Board of Selectmen that he submitted a document to the assembled Board, evidencing the Board's concerns that they would be held liable as a Partner of TPL because TPL had damaged Ms. Kunelius. The Board of Selectmen member, Greg Jones, wrote the following:

> "The lawyer for Marilyn Kunelius has threatened a suit to enforce the contract that called for a $750,000 closing September 26th. The town does not want to find out if it has any legal liability. Yes, we ceded our right of first refusal to TPL and TPL certainly has the assets to make good on the transaction. **But they have reneged, and the contract has been breached. The seller has certainly been harmed by our actions and TPL's inaction. Should a suit against TPL be initiated, it is likely that town would become involved. At a minimum the town had committed to contribute $400,000 to the deal, and the actions of many could be interpreted as implying the town was a <u>partner</u> in the deal. …"**

(emphasis added)(See Exh. 6 to the Complaint).  All of the above further demonstrates the extraordinary bad faith arguments that have been raised by the Defendants in order to avoid liability in this matter.  MacDonnell, Stow, and TPL all actively participated in an unquestionably illegal effort to defeat Ms. Kunelius' P&S and to walk away unscathed. The fact remains, however, that the Board of Selectmen knew they were partners with TPL.  Even in the absence of a partnership agreement, the Defendants were aware that they were perceived by others as being Partners in their efforts concerning the Property. Under the theory of Partnership Estoppel, participants in an effort to cause others to believe a partnership exists, are estopped from denying that the Partnership.

>  "St. 1922, c. 486, § 16 (1) provides that "When a person, by words spoken or written or by conduct, represents himself, or consents to another representing him to any one, as a partner in an existing partnership or with one or more persons not actual partners, he is liable to any such person to whom such representation has been made, who has, on the faith of such representation, given credit to the actual partnership, and if he has made such representation, given credit to the a public manner he is liable to such person, whether the representation has or has not been made or communicated to such person so giving credit by or with the knowledge of the apparent partner making the representation or consenting to its being made."
>
> "The statutory rule is an expression of the common law as recognized in this Commonwealth."

(See Standard Oil Co. of N.Y. v. Henderson, 265 Mass. 322 (1928) quoting Phipps v. Little, 213 Mass. 414, 416.).

> "In order to establish a partnership by estoppel, the plaintiff bore the burden of proving "(1) that the would-be partner has held himself out as a partner; (2) that such holding out was done by the defendant directly or with his consent; (3) that the plaintiff had knowledge of such holding out; and (4) that the plaintiff relied on the ostensible partnership to his prejudice."

(See Brown v. Gerstein, 17 Mass. App. Ct. 558, 571 (1984); see also M.G.L. c. 108A, § 16; see also Atlas Tack Corp. v. Dimasi, 37 Mass. App. Ct. 66 (1994)).

FORA perceived that Stow and TPL were working in partnership. This can be seen by FORA's July 27, 2003, letter in which it states:

> "Mr. Diemert [Town Counsel] also needs to realize that this project is being done in **partnership** with the town. In his role as counsel to the Board of Selectmen he needs to be working with TPL and the Board to come up with zoning solutions for this project."

(emphasis added)(See Exh. AAAA, TPL-KUN00193).

> "Your **partners** at the Stow Town Building will feel this personally. Selectmen, members of the Community Preservation Committee as well as supporters are going to personally suffer if TPL withdraws."

(emphasis added)(See Exh. HH, TPL-KUN01681).

> "It is our [FORA's] intention to have the Town assign its right of first refusal for this parcel to non-profit conservation organization, which would work in **partnership** with our community organization [FORA] and the Town in order to *purchase the land and preserve it*. If you will work with us [FORA] on this urgent effort, we[FORA] believe we can achieve these goals while imposing little or no cost on the town."

(emphasis added)(See Exh. BBBB, TPL-KUN01309). Town Counsel advised the Board of Selectmen not to participate in the Partnership without indemnification because of the certainty of a lawsuit from Ms. Kunelius that Stow would face. That advice by Town Counsel was ignored by the Board of Selectmen because its Partner TPL urged them to rely on TPL's advice.

## VIII.  42 U.S.C. § 1983 (Count VII)

All of the above demonstrates a deliberate and concerted effort by governmental and non-governmental agencies acting under the authority of the government and the statute to defeat the contract of Ms. Kunelius. It is undisputed that the Defendants used c. 61, a Massachusetts state law. It is undisputed that the Board of Selectmen were intimately involved. It is undisputed that the Board of Selectmen assigned their rights as the Board of Selectmen to TPL. It is undisputed that TPL acted under c. 61, which

specifically referenced the assignment to a charitable conservation entity.  Thus, there is

more than sufficient "state action" involved in the instant case.  There is no genuine issue

of fact that needs to be determined with regard to any of the above, as it relates to the

Defendants', as state actors, impairment of Ms. Kunelius' contract.  Section 1983 states:

> "Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Colombia, subjects, or causes to be subjected any
> citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress.  For the purposes
> of this section, an Act of Congress applicable exclusively to the
> District of Columbia shall be considered to be a statute of the
> District of Columbia."

The Supreme Court's decision in Dennis v. Higgins, 498 U.S. 439 (1991),

supports the proposition right such as to be free of state impairment of contracts, are

enforceable under § 1983.  The dissenting opinion in Dennis read the Supreme Court's

decision in Carter v. Greenhow, 114 U.S. 317 (1885), as holding that contracts clause is

the right "to have a judicial determination declaring the nullity of the attempt to impair [a

state's contractual] obligation."  The majority in Dennis, however, pointed out that the

Court in Chapman v. Houston Welfare Rights Organization, 941 $.U. 600, 613 n. 29

(1979), gave Carter a narrow reading, stating that Carter held merely as a matter of

pleading that the plaintiff alleged only a common-law contracts claim and did not seek to

assert right under the contracts clause.  Dennis at 451 n. 9.  The implication of the Dennis

majority's discussion of Carter is that it would find contract clause claims enforceable

under § 1983.

The Complaint in Village of Willowbrook v. Olech, 120 S. Ct. 1073 (2000),

Olech alleged that Grace Olech and her husband, now deceased, used to get water from a

well on their property.  After the well broke down, they asked the Village to connect their

home to the municipal water supply.  The Village informed the Olechs that they would have to grant the Village not the customary 15-foot easement to enable servicing the water main, but a 33-foot easement to permit the Village to widen a road.  The Olechs refused to grant the larger easement and for three months went without water.  The Village finally relented and agreed to hook up the water with the smaller easement.  Ms. Olech's § 1983 complaint alleged that the Village's demand for the larger easement was "irrational and wholly arbitrary" and motivated by "ill will" generated by the Olechs having litigated an unrelated lawsuit against the Village in which they recovered damages for flood damage.  The district court dismissed the complaint under Fed. R. Civ. P. 12(b)(6) for failure to state an equal protection claim upon which relief may be granted.  Relying upon Esmail v. Macrane, 53 F.3d 176 (7th Cir. 1995), the circuit court held that the complaint stated a proper equal protection claim.  The Supreme Court agreed with the circuit court that Ms. Olech's § 1983 complaint stated a proper equal protection "class of one" claim because she alleged that she had been "intentionally treated differently from other[s] similarly situated and that there [was] no rational basis for the difference in treatment."  The Court's precedents supported the conclusion that the Equal Protection Clause protects *each individual* from arbitrary action by state enforcement authorities. Allegheny Pittsburgh Coal Co. v. Commission of Webster City, 448 U.S. 336 (1989); Sioux City Bridge Co. v. Dakota, 260 U.S. 441 (1923).  The Court thus held that the complaint allegations that the Village arbitrarily singled out the plaintiff for a 33-foot easement, while requiring only a 15-foot easement from other property owners, "quite apart from the Village's subjective motivation," were "sufficient to state a claim for relief

under traditional [rational basis] equal protection analysis." The Olech complaint thus survived the Village's motion to dismiss.

The facts of the Olech case are particularly pertinent to the instant case. In both cases, the town took steps to directly interfere with one citizen's right. Certainly, Stow and TPL unquestionably treated Ms. Kunelius differently from any other citizen with a purchase and sale agreement for the sale of their property. There is not genuine issue of fact as to what Stow did in order to interfere with the P&S. So intent was Stow in defeating the P&S that the Court only need to examine what Stow would obtain for free, had the original P&S gone forward. Under the P&S, Ms. Kunelius intended to give nearly 42 acres to Stow as <u>a gift</u>. Stow, however, was so focused on preventing the P&S from going forward that it was willing to potentially contribute up to $400,000 allegedly in order to secure the exact the same property it would receive for nothing. However, the $400,000 "investment in the Partnership" would have the "benefits" of preventing the Cohousing development. This effort by Stow and TPL established Ms. Kunelius as a "class of one" because Stow and TPL intentionally treated her differently from others similarly situated and there was no rational basis for this different treatment. The treatment was arbitrary and capricious.

Under the provisions of Section 1983, Ms. Kunelius is entitled to the recovery of all her attorney's fees as this Court may determine appropriate and after a hearing may determine to be multiplied by a factor of three under the provisions of the Supreme Court's Decision in <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 426 (1983) (interpreting Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988 which allows a

"prevailing party" to recover from his adversary "a reasonable attorney's fee as part of the costs" (internal quotation marks omitted)).

Respectfully submitted,

Marilyn Kunelius,

By her Attorney,

Dated: October 25, 2007          By:      */s/ Michael C. McLaughlin, Esq.*
                                          Michael C. McLaughlin BBO# 337350
                                          Law Offices of Michael C. McLaughlin
                                          One Beacon Street, 33rd Floor
                                          Boston, MA 02108
                                          (617) 227-2275
                                          michaelcmclaughlin@speakeasy.net

## CERTIFICATION UNDER LOCAL RULES 7.1

I, Michael C. McLaughlin, certify that on October 17, 2007, I conferred with opposing counsel and have attempted in good faith to resolve and narrow the issue.

Dated: October 25, 2007          */s/ Michael C. McLaughlin, Esq.*
                                 Michael C. McLaughlin BBO# 337350
                                 Law Offices of Michael C. McLaughlin
                                 One Beacon Street, 33rd Floor
                                 Boston, MA 02108
                                 617-227-2275
                                 michaelcmclaughlin@speakeasy.net

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on October 25, 2007.

*/s/ Michael C. McLaughlin, Esq.*
Michael C. McLaughlin BBO# 337350
Law Offices of Michael C. McLaughlin
One Beacon Street, 33rd Floor
Boston, MA 02108
617-227-2275
michaelcmclaughlin@speakeasy.net