UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MARILYN KUNELIUS,

        Plaintiff,

    v.

TOWN OF STOW, et al.

        Defendants.

Civil Action No. 05-11697-GAO

Leave to file 30 pp. memorandum granted
November 15, 2007

## MEMORANDUM OF THE TRUST FOR PUBLIC LAND AND CRAIG A. MACDONNELL IN OPPOSITION TO PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT AND IN FURTHER SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT

## INTRODUCTION

Defendants the Trust for Public Land and Craig A. MacDonnell ("MacDonnell") (collectively, "TPL") submit this Memorandum in Opposition to Plaintiff's Motions for Summary Judgment,[1] and in further support of their own Motions for Summary Judgment.[2]

Plaintiff's Motions, incredibly, ask this Court to determine, *as a matter of law*, that on the summary judgment record Plaintiff has already met her burden of proof, without a trial, to establish such subjective elements of her claims as Defendants' bad faith, intentional interference, improper motive, and knowingly false statements. Plaintiff's Motions are frivolous. Plaintiff has already received her sole contract remedy for TPL's breach of the Purchase and Sale

---

[1] Plaintiff filed four motions for summary judgment, one against each of the four named defendants: the Town of Stow, TPL, Craig MacDonnell and "a partnership of unknown name between the Town of Stow and TPL." TPL and MacDonnell hereby respond in opposition to Plaintiff's motions for summary judgment against TPL, Craig MacDonnell and the "partnership of unknown name."

[2] TPL incorporates by reference the Motions for Summary Judgment of Craig A. MacDonnell and TPL, the Memorandum of Law in support of those motions, and the Statement of Undisputed Facts of Craig A. MacDonnell and TPL, all filed on October 17, 2007.

Agreement ("Agreement" or "P&S"), and lacks evidence to establish any of her other collateral claims.

## ARGUMENT

### I.    PLAINTIFF'S SUMMARY JUDGMENT MOTIONS AGAINST TPL AND MACDONNELL LACK ANY LEGAL OR FACTUAL BASIS.

As set out in TPL and MacDonnell's initial Memorandum in Support of their Motions for Summary Judgment ("TPL's Memorandum" or "TPL Mem."), this case is fundamentally a contract dispute, and all of Plaintiff's claims are simply an attempt to avoid the limitation of remedy she freely agreed upon. There is no dispute that TPL defaulted on the Agreement. The sole question is Plaintiff's remedy. The Agreement provides that Plaintiff's "sole remedy in equity and law" is retention of all deposits as liquidated damages. Complaint Ex. 1 ¶ 21: "Buyer's Default; Damages." Plaintiff admittedly has retained TPL's $19,000 in deposit funds.

Plaintiff asserts in her Summary Judgment Memorandum ("Plaintiff's Memorandum" or "Pl. Mem.") that the Court should not enforce the Agreement because she did not know that the Town of Stow ("Stow") would assign its statutory right of first refusal ("ROFR") under M.G.L. c. 61 to TPL, and because TPL purportedly acted in "bad faith." The first proposition is legally immaterial, and the second lacks both legal and factual support. Plaintiff also brings peripheral claims under c. 93A and Section 1983, and for alleged intentional interference with contract and alleged fraud and misrepresentation. After extensive discovery, however, there is no evidentiary support for any of Plaintiff's claims. Without evidence, Plaintiff's Motions improperly resort to distortions of the factual record and conjecture and other inadmissible evidence.

By the terms of Rule 56(e), parties on summary judgment may only offer evidence based on personal knowledge. *See Maiorana v. MacDonald*, 596 F.2d 1072, 1079-80 (1st Cir. 1979). "Of course, the requisite personal knowledge must concern facts as opposed to conclusions,

assumptions, or surmise." *Perez v. Volvo Car Corp.*, 247 F.3d 303, 315-16 (1st Cir. 2001).

Additionally, speculation or conjecture is not competent to oppose, let alone to support, a motion

for summary judgment. *See Over the Road Drivers, Inc. v. Transport Ins. Co.*, 637 F.2d 816,

819 (1st Cir. 1980). "It is black-letter law that hearsay evidence cannot be considered on

summary judgment." *Bennett v. Saint-Gobain Corp.*, --- F.3d ---, 2007 WL 3227393 (1st Cir.)

(Nov 2, 2007), quoting *Davila v. Corporación de Puerto Rico para la Difusión Pública*, 498

F.3d 9, 17 (1st Cir. 2007). Furthermore, documents submitted at the summary judgment phase

must be properly authenticated. *Carmona v. Toledo*, 215 F.3d 124, 131 (1st Cir. 2000). Finally,

affidavits that contradict or materially vary clear deposition testimony should be disregarded on

summary judgment. *See Gillen v. Fallon Ambulance Service, Inc.*, 283 F.2d 11 (1st Cir. 2002).

Plaintiff's summary judgment motion breaks every rule in the book. Plaintiff's motion is

a hodgepodge of erroneous and unsupported legal propositions; clear factual errors or gross

distortions of the factual record; speculation, conjuncture and innuendo; inadmissible hearsay

and other incompetent evidence; and legally immaterial and factually baseless allegations.[3] TPL

will limit itself to giving the Court a flavor of the seriousness of the problem through some of the

more egregious examples. Plaintiff's utter disregard for not only the rules of evidence, but even

the most basic faithfulness to the factual record developed in discovery, is so pervasive as to

discredit Plaintiff's entire summary judgment submission, and justify denial of her Motions.

A.    **Erroneous or Unsupported Legal Propositions**

- Plaintiff argues that "any common sense analysis" of c. 61 leads to the conclusion that that when a municipality exercises a ROFR, "it must meet the purchase price," Pl. Mem. at 1, which Plaintiff then interprets, without support, to mean it must close on the sale. Massachusetts caselaw in fact recognizes that when Selectmen vote to exercise the Town's ROFR, they may do so knowing that Town

---

[3]    *See* Defendants' Omnibus Motion to Strike Portions of Plaintiff's Evidence and Defendants' Memorandum in Support.

Meeting or Town voters may not appropriate the funds to complete the purchase. *See Meachen v. Hayden*, 6 Land Ct. Rptr. 235 (1998).

- Plaintiff states, with no support, that "the Legislature has concluded that the only component of [the P&S] that has any applicability when the [ROFR] is exercised is the purchase price." Pl. Mem. at 2. Inexplicably, this statement immediately follows a lengthy quotation from *Town of Franklin* v. *Wyllie*, 443 Mass 187, 195-96 (2005), holding that a town in exercising a so-called "Chapter Lands" ROFR is "required to purchase the land on substantially the same *terms and conditions* as presented in the agreement" (emphasis added).

- Plaintiff asserts that "[t]here is no 'colloquial' meaning of the word 'partnership,'" Pl. Mem. at 50, ignoring directly contrary First Circuit authority. *See, e.g., Dinco v. Dylex, Ltd.*, 111 F.3d 964, 969 (1st Cir. 1997) (distinguishing "colloquial" usage of term 'partner' from "legal relationship").

## B.    Factual Errors and Distortions of the Record

- Plaintiff asserts that MacDonnell told Stow's citizens in January, 2003 that "Cohousing is gone," relying on MacDonnell's "Town Meeting Remarks," Pl. Mem. Ex. T, TPL-KUN 01095-01102.[4] *See* Pl. Mem. at 16. However, the document Plaintiff cites is MacDonnell's Remarks for the Annual Town Meeting ("ATM") in May, 2003. Declaration of Craig MacDonnell ("MacDonnell Decl."), ¶ 21. That the remarks are not for the January Town Meeting is apparent on the face of the document, which in reviewing the "Project History," begins "You will recall the January Special Town Meeting . . ." TPL-KUN 01095.

- Plaintiff's argument that MacDonnell's deposition testimony reveals TPL's alleged "hidden agenda," Pl. Mem. at 18, to defeat the c. 40B development proposed by Cohousing is premised entirely on a transposition of his testimony. In place of "*Were we*" Plaintiff substitutes "*We were*." *Compare* Pl. Mem. at 18 *with* Deposition Transcript of Craig MacDonnell ("MacDonnell Dep. Tr.") at 193:22-23. Here is the testimony that MacDonnell actually gave:

Q:    So, you were aware, certainly, that your efforts with TPL had the effect of preventing a 40B development. Is that fair to say?

A:    *Were we* successful in conserving the property, the property would have been conserved and not developed (emphasis added).[5]

---

[4]  Because Plaintiff unaccountably filed two Appendices on summary judgment—one in support of her motions for summary judgment, and one in support of her memorandum of law—there is no unique identifier for each of Plaintiff's exhibits. Throughout TPL's submission in opposition, exhibits from Plaintiff's Motion Appendix are designated "Mot. Ex." and those from her Memorandum Appendix are designated "Mem. Ex."

[5]  There is no dispute that if TPL had acquired the Kunelius land, TPL would have prevented its development for multifamily housing under c. 40B. That is the purpose of c. 61, a land conservation statute.

4

- In asserting that TPL knew prior to accepting assignment of Stow's ROFR that it would not be able to obtain the zoning relief needed for subdivision of the property, Plaintiff relies on unauthenticated, undated handwritten notes of MacDonnell, Pl. Mem. Ex. R, TPL-KUN 01167. *See* Pl. Mem. at 15.[6] The notes in question not only post-date the assignment and exercise of the ROFR; they also long post-date TPL's default on the Agreement. MacDonnell Decl. ¶ 28. MacDonnell's contemporaneous notes reflect that the informal feedback TPL received from Stow zoning officials prior to exercise of the ROFR was that its plan "looked 'do-able,'" MacDonnell Decl. ¶ 13 and TPL Supp. App. Ex. 1, TPL-KUN 01963.

C. **Speculation, Conjecture and Attributions of Motive**

- Plaintiff alleges repeatedly in her Motion that TPL had a goal of preventing the 40B project without purchasing Plaintiff's property. Pl. Mem. at 12, 18-19. Plaintiff mischaracterizes the evidence, as described above. Further, Plaintiff cannot explain why if TPL, before exercise of the ROFR, "knew that it did not intend to purchase the Property," Pl. Mem. at 17, TPL devoted so much time and effort *after* exercise of the ROFR to preparation of the DHCD grant application, filing its variance application with the ZBA for subdivision, and obtaining CPC and Town Meeting approval of use of $400,000 in CPA funds.

- Plaintiff baldly states (and asserts as *undisputed facts*) that MacDonnell's conduct was "unequivocally *intended* to interfere with the financial well-being of Mrs. Kunelius," Pl. Mem. at 44 (emphasis added), and "certainly was *intended* to violate Mrs. Kunelius' Civil Rights," *id.* at 46 (emphasis added), with no evidence of such intent.

- Without testimony in the record from any representative of Cohousing, Plaintiff states that after TPL defaulted, Cohousing decided not to return "because of the certainty that the entire outrageous process [c.61 ROFR] would be used again and again in order to prevent the 40B development." Pl. Mem. at 44.

D. **Inadmissible Hearsay and Other Incompetent Evidence**

- The Affidavit of Plaintiff's real estate attorney, Peter Kachajian states, "I had several conversations with Stow's Town Counsel, Jacob Diemert [since deceased], regarding to the fact that Stow knew that TPL wanted to strip my client of the charitable deduction." Kachajian Aff. ¶ 8. This is compound hearsay, not within any hearsay exception.

- As evidence that TPL was "not acting to advance its core [charitable] mission," Pl. Mem. at 40, Plaintiff offers the opinion of Serena Furman of FORA that non-

---

[6]  MacDonnell was not examined about these notes at his deposition because Plaintiff did not serve any request for production of documents to TPL until well after noticing and conducting MacDonnell's deposition.

profits should be held to a higher standard. Pl. Mem. at 34-35.[7] Nothing qualifies Ms. Furman as an expert in standards governing the behavior of non-profit charitable institutions, and her testimony is incompetent.

- Plaintiff offers the rankest of hearsay, an article in a local newspaper, the Beacon Villager, Pl. Mem. Ex. DD, TPL-KUN 01488, as evidence of the truth of its contents: a reported discussion at a Board of Selectmen hearing. Pl. Mem. at 21.

## E.    Legally Immaterial and Irrelevant Matters

- Plaintiff accuses TPL of "illegally" lobbying the Town of Stow, Pl. Mem. at 26, and TPL and Stow of engaging in a "conspiracy" to defraud the IRS. *Id.* Plaintiff devotes ten pages of her Memorandum to this effort to impugn TPL's reputation, while at the same time seeming to recognize its irrelevance. *See* Pl. Mem. at 30 ("The Plaintiff is not asking the Court to consider the Defendants' IRS fraud as determinative of the Plaintiff's claims against TPL and Stow.").

- Plaintiff alleges that the statement in the DHCD grant application that TPL had a $6 million credit line with Wainwright Bank was "inaccurate," Pl. Mem. at 21, because at the time that credit line was almost completely drawn down, in the process ignoring that it was a *revolving* credit line and that the same letter also notes that TPL also had substantial national credit lines available for its use. *See* Pl. Mot. Ex. II. The issue is a complete red herring since DHCD did not award the grant, Kunelius knew nothing of the letter and did not rely on it, and TPL ultimately chose not to borrow to purchase the Property where no reasonable prospects for repayment of the loan existed.

- A major focus of the Kunelius, Norris, Kachajian and Boothroyd Affidavits concerns discussion at a meeting at Boothroyd's office "in the Spring of 2004," i.e., one-half year after TPL's default on the Agreement. Kunelius Aff. ¶ 10; Norris Aff. ¶ 2; Kachajian Aff. ¶ 9; Boothroyd Aff. ¶ 4. This meeting has no bearing on Plaintiff's rights or claims, and Plaintiff's only use of this evidence is to argue that TPL should be subject to the reach of c.93A because MacDonnell, in Plaintiff's view, did not behave "charitably" toward Plaintiff. Pl. Mem. at 38.

As demonstrated below, Plaintiff lacks evidence to establish any of her claims, and TPL and MacDonnell are entitled to summary judgment dismissing the Complaint.

---

[7]    The irony of claiming that non-profits should be subject to a higher standard than "businesses" for the precise purpose of trying to subject TPL's land conservation efforts to a statute governing business activity, c. 93A, apparently escapes Plaintiff.

## II.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE COMPLAINT.

### A.   TPL Is Entitled To Summary Judgment On Plaintiff's Contract Claims.

#### 1.   Plaintiff's Failure to Anticipate Every Detail of the Assignment Does Not Invalidate the Liquidated Damages Clause.

Plaintiff argues that her inability to 'anticipate' with specificity the precise facts that occurred in the assignment of the ROFR somehow invalidates the liquidated damages clause ("LDC"). For example, Plaintiff points out that, before assignment of the ROFR, she had never heard of TPL. Pl. Mem. at 8. This is completely irrelevant. By their own admission, Plaintiff's real estate broker and real estate attorney understood that because Plaintiff's property (the "Property") was classified under Chapter 61, Plaintiff was required to offer the Property to Stow and that Stow could assign its ROFR to a nonprofit conservation organization. *See* TPL SUF ¶ 26, citing Kachajian Dep. Tr. at 53:13-54:1; Boothroyd Dep. Tr. at 77:21-78:16, 83:18-23.

The fact that Plaintiff did not anticipate *this particular assignee* or its specific plans for the property is immaterial. Requiring the landowner to have detailed knowledge of the assignee in every c. 61 assignment would invalidate the contract terms of every such transfer; plainly this is not required by the statute. The fact that TPL did not intend to complete a high-density c. 40B multifamily housing development as Plaintiff's original P&S contemplated is clearly within the bounds of c.61, which is on its face a pro-conservation, anti-development statute. Plaintiff through her representatives was aware of the possibility of assignment of the ROFR and the possibility of default under the P&S; it is not necessary that she have anticipated TPL's role.

#### 2.   Plaintiff's Alleged "Unique Concerns and Circumstances" Do Not Impose an Extra-Contractual Duty of Performance on TPL.

Plaintiff repeatedly argues that because TPL was informed of the importance of the transaction to her financial well-being that TPL somehow had a super-contractual duty to

perform. *E.g.,* Pl. Mem. at 9-10. Yet the fact that Plaintiff allegedly told TPL and MacDonnell that the Property was her sole asset or important to her retirement plans is irrelevant to the question of Plaintiff's remedy. The responsibilities of the parties were spelled out in the P&S. Plaintiff's additional representations to TPL or MacDonnell did not create a duty to close on the sale beyond that identified in the contract itself, and they certainly do not enlarge the remedy that Plaintiff should be entitled to after default.

Plaintiff appears to base her argument on a misinterpretation of the legal standard of *Kelly v. Marx. See* Pl. Mem. at 9, citing 428 Mass. 877 (1999). In *Kelly,* the SJC enforced a liquidated damages clause on the basis that the agreed-upon sum "most accurately matches the expectations of the parties, who negotiated the liquidated damages amount that was fair to each side *based on their unique concerns and circumstances...*" *Kelly,* 428 Mass. at 880 (emphasis added). Plaintiff argues that TPL's knowledge of her unique concerns and circumstances somehow suffices to undo the LDC after Plaintiff herself agreed to it; but the *Kelly* decision suggests just the opposite. The *Kelly* rule is that parties will be held to the liquidated damages amount they agreed upon where the parties accurately appraised *their own* "unique concerns" at the time of negotiating. Here, Plaintiff was responsible for assessing her own unique concerns at the time of negotiation, in light of the possibility of assignment (which her representatives were aware of), and default, and agreeing to an appropriate sum of liquidated damages. The argument that *Defendants'* awareness of *Plaintiff's* "unique concerns" somehow invalidates the contract clause that Plaintiff herself agreed to is thus not supported by the *Kelly* framework.

Plaintiff further asserts that because she could not anticipate TPL's specific plans for the Property, she should be released from the clause she agreed to. *See* Pl. Mem. at 8. But as noted above, her failure to anticipate TPL's plans is irrelevant to the operation of the LDC. At the time

of negotiation of the P&S, Plaintiff was aware of the possibility of assignment and the possibility

of default, and she freely agreed to the LDC. Its terms control her remedy. Finally, Plaintiff in

any event is not entitled to the specific performance she seeks because, under Massachusetts law,

"the retention of a deposit as liquidated damages is an alternative to specific performance, not an

additional remedy." *Perroncello v. Donahue*, 448 Mass. 199, 204 (2007); *see* TPL Mem. at 5.

**3.    Plaintiff's Allegations of Bad Faith Are a Groundless Attempt to
Discredit TPL, and Have No Bearing on the Validity of the LDC.**

Plaintiff also asserts that the alleged bad faith of the TPL somehow invalidates the LDC.

Pl. Mem. at 12. As explained below in response to Plaintiff's c. 93A claim, there is no factual

support for Plaintiff's allegations of bad faith. Even if Plaintiff could prove bad faith, however,

Plaintiff has no authority to establish it would operate to overturn a plain limitation on damages

such as the LDC. Plaintiff's authorities establish merely that breach of the implied covenant of

good faith and fair dealing amounts to a breach of contract. *See Anthony's Pier Four, Inc. v.

HBC Assocs.*, 411 Mass. 451, 471-73 (1991) (every contract implies a covenant of good faith and

fair dealing), citing *Warner Ins. Co. v. Comm'r of Ins.*, 406 Mass. 354, 362 n.9 (1990), quoting

*Kerrigan v. Boston*, 361 Mass. 24, 33 (1972)); *see also* Restatement (Second) Contracts § 205

(1981) (every contract imposes duty of good faith and fair dealing). Plaintiff's citation to *Cadle

Company v. Vargas* further establishes that violation of a party's reasonable expectations

constitutes breach. *See* 55 Mass. App. Ct. 361, 366 (2002). But here, where breach is

undisputed, authorities establishing breach resolve nothing. Plaintiff must show not just that the

contract was breached but that she is entitled to an additional remedy beyond the "sole remedy in

equity and law" specifically identified in the contract.

Plaintiff's sole argument on this front is that "the extent of the bad faith renders the

Liquidated Damage Clause null and void." Pl. Mem. at 12. Yet the only case Plaintiff cites that

even addresses bad faith and remedies is *Hawthorne's Inc. v. Warrenton Realty, Inc.*, which does not advance Plaintiff's argument. *See* 414 Mass. 200 (1993). The Court in *Hawthorne's* upheld a denial of the equitable remedy of specific performance where one party had behaved inequitably, *id.* at 208-10, and denied contract damages to a party who had acted in bad faith, *id.* at 211. In neither case did it *expand* a remedy beyond those provided for in the contract; it merely *prevented* the party acting inequitably from recovering contract damages or the equitable remedy of specific performance. Even if Defendants had engaged in the most egregious bad faith conduct, which they vigorously deny and Plaintiff's allegations do not begin to prove, *Hawthorne's* would only prevent Defendants from recovering damages under the contract. Nothing in *Hawthorne's* would suggest extra liability in the face of a plain limitation of remedies. In short, by her own authorities, Plaintiff's sweeping generalization that Defendants' supposed "bad faith renders the [LDC] null and void" has no support in the law.

### 4. Plaintiff Misapplies the Theory and Fails to Meet Her Own Test for Promissory Estoppel.

Plaintiff asserts that the TPL is "estopped from asserting any defense of any kind" with regard to the breach of the P&S. Pl. Mem. at 12. This greatly overstates the theory of promissory estoppel, which is essentially a substitute for the consideration otherwise necessary to create an enforceable contract. *See generally* Restatement (Second) Contracts § 90(1); *see also Rhode Island Hosp. Trust Nat. Bank v. Varadian*, 419 Mass. 841, 850 (1995) ("the party bringing [an action based on reliance] must prove all the necessary elements of a contract other than consideration"). The typical case relies on promissory estoppel to establish a contract where there otherwise would be no legally enforceable agreement – i.e., where one party defends by denying the existence of a contract. Thus, promissory estoppel bars defendants from raising

10

the specific defense of no consideration or other contract formation defense; promissory estoppel does *not* prevent defendants from asserting "any defense of any kind."

Here, no party denies the existence of a valid contract or TPL's default; the only question is the remedy to which Plaintiff is entitled. While a contract established by a valid promissory estoppel claim is "enforceable pursuant to 'traditional contract theory,'" *see Loranger Const. Corp. v. E.F. Hauserman Co.*, 376 Mass. 757, 761 (1978), Plaintiff cites no authority for the proposition that promissory estoppel should override a clear limitation on remedies like the LDC. On this point, promissory estoppel simply is not relevant.

Even if Plaintiff were properly applying the theory, however, she fails to meet the test laid out in her own Memorandum. *See* Pl. Mem. at 13. *Loranger Construction Corp.* sets out the three-part test for a promissory estoppel claim; the claimant must prove

> (1) [that] a promisor makes a promise which he should reasonably
> expect to induce action or forbearance of a definite and substantial
> character on the part of the promisee, (2) the promise does induce
> such action or forbearance, and (3) injustice can be avoided only
> by enforcement of the promise.

*Loranger Const. Corp. v. E.F. Hauserman Co.*, 6 Mass. App. Ct. 152, 154 *aff'd*, 376 Mass. 757 (1978).

Here, Plaintiff asserts that MacDonnell effectively promised her that TPL would perform on the contract. Pl. Mem. at 12-13. Although Plaintiff in her Affidavit asserts that MacDonnell told her that sale of her property to TPL was a "certainty," *see* Pl. SUF at ¶ 21, this is certainly not an undisputed fact.[8] *See* TPL Response to SUF ¶¶ 21, 22. Given the dispute, Plaintiff cannot

---

[8] Plaintiff's summary judgment affidavit states that MacDonnell told her that purchase of her land was "a certainty." *See* Kunelius Aff. ¶ 6 ("After I told MacDonnell about my concerns . . . he assured me that: (a) TPL's purchase of the Property was a certainty."). When questioned extensively on this point at deposition, Plaintiff's testimony did not use the term "certainty." *See* Pl. Mem. Ex. L, Kunelius Dep. Vol. II at 90: 13-14 ("They reassured me that they would not fail; that I would be paid, that they had the money"). MacDonnell testified both that he did not recall using that term *and* that he did not believe he did so. Pl. Mem. Ex. A, MacDonnell Dep. at 88-89. How Plaintiff makes the leap that because MacDonnell did not recall making the

LIBA/1846325.1

even establish the "promise" element of promissory estoppel sufficient for summary judgment purposes.

Plaintiff's promissory estoppel theory also fails for lack of reliance. Plaintiff asserts that MacDonnell's alleged promise induced forbearance on her part, which "amounted to Ms. Kunelius having to accept the representations that the money was available to fund the exercise of the ROFR and as a result lose her buyer." Pl. Mem. at 13. Plaintiff's position appears to be that "having to accept representations" amounts to "forbearance of a definite and substantial character" in reliance on TPL's statements. On its face, this is an implausible theory.

In fact, it was impossible for Plaintiff to change her position in reliance on any supposed promise, because Plaintiff had no role to play in the invocation or assignment of the ROFR. Plaintiff has acknowledged repeatedly that, as a matter of fact and law, she was unable to affect the assignment process once it had begun. TPL SUF ¶ 54, citing Kunelius Dep. Tr. Vol. II at 46:17-20, 47:3-9, 145:5-10. The assignment process operated entirely outside her control, and consequently, no statement from any Defendant could possibly have induced her to take or not take any action in reliance thereon. Plaintiff's lack of reliance has been raised since the motion to dismiss phase, and this statement appears to be Plaintiff's best attempt to formulate a response. It is plainly inadequate to make out a claim of promissory estoppel. [9]

### 5.    TPL Did Not Try to "Change" the P&S As Plaintiff Alleges.

Finally, Plaintiff asserts that TPL tried to change the P&S in ways that she could not have anticipated. It is unclear what legal significance Plaintiff attributes to the supposed changes, as

---

statement, he therefore "did not deny he said it," Pl. Mem. at 13, and as a result the statement is "not even disputed," *id.* at 12-13, is a mystery.

[9]    Plaintiff's failure to adduce evidence of reliance is also fatal to her fraud and misrepresentation claim.

she offers no theory as to why this is relevant to her claims.[10]  Regardless, Plaintiff's allegation
that TPL tried to "change" the P&S blatantly misstates the facts.

First, Plaintiff alleges that the P&S initially contemplated sale of approximately 8 acres,
and that TPL affirmatively tried to change the P&S to include the entire parcel of roughly 50
acres.  Pl. Mem. at 6.  The P&S itself is dispositive of this point.  The P&S by its express terms
governs the entire 50.67 acre parcel ("Included in the sale as a part of said premises are 50.67
acres of land").  Complaint Ex. 1, ¶ 3.

Plaintiff also charges TPL with trying to manipulate the purchase price under the P&S.
Pl. Mem. at 6.  MacDonnell did approach Plaintiff's representatives in the Summer of 2003 to
explore the possibility of a purchase price concession to salvage the transaction once TPL's
substantial fundraising gap became apparent.  TPL was not changing the P&S, however, but
seeking to find an alternative proposal that Plaintiff might be prepared to accept, recognizing that
she had no obligation to do so and that TPL might simply have to default on the P&S if it was
not prepared to close at the original contract price.  *See* Pl. Mem. Ex. A, MacDonnell Dep. Tr. at
199:8-200:6.

Plaintiff next alleges that TPL attempted to interfere with her planned charitable donation
of 42 acres to the Town of Stow.  Pl. Mem. at 6-7.[11]  This charge is false on its face.  It was the
assignment of the ROFR, and not the unilateral action of TPL, that affected Plaintiff's ability to

---

[10]  Seeking to change the agreement might be relevant to prove breach, but as noted above, Defendants do not
dispute that TPL defaulted on the Agreement.

[11]  Besides citing conclusory statements from the three fresh affidavits from Plaintiff, her real estate counsel and
broker, Kunelius Aff. ¶ 4, Kachajian Aff. ¶ 7, Boothroyd Aff. ¶ 3, Plaintiff cites her own and MacDonnell's
depositions. *See* Pl. Mem. at 7, citing Pl. Mem. Ex. A, MacDonnell Dep. Tr. at 186:13-187:4; Pl. Mem. Ex. L,
Kunelius Dep. Tr. Vol. II at 51:6-9, 111:1-2.  Plaintiff cites MacDonnell's testimony on the P&S to show that
TPL wanted to "interfere" with the conveyance of 42 acres to the Town, *see* MacDonnell Dep. Tr. at 186:13-
187:4, but ignores MacDonnell's next response in the deposition testimony: "I'm saying that our intention was
to have that parcel, a conservation parcel that in our minds was that parcel, go to the town..." MacDonnell
Dep. Tr. at 187:12-14.

LIBA/1846325.1

dispose of the specified 42 acres of her property.  The P&S on its face governed disposition of all

50 acres of Plaintiff's property.  Complaint, Ex. 1 ¶ 3.  The P&S also contemplated exercise of

the ROFR.  Complaint, Ex. 1 ¶¶ 10 35.  Consequently, when TPL stepped into the shoes of the

buyer, it inherited a P&S that covered all 50 acres of the Plaintiff's Property.[12]

Finally, Plaintiff charges that TPL sought to "change" the P&S by not building the c. 40B

development on the Property.  Pl. Mem. at 7.  Yet Plaintiff's own real estate attorney did not

think that the c. 40B provision in the P&S would apply to an assignee of the ROFR.  *See* TPL

SUF ¶ 56, citing Kachajian Dep. Tr. at 110:16-22.  Addressing c. 61A, the SJC has noted that

"the statute must be read in a commonsense fashion to effectuate [its] purpose."  *Town of*

*Sudbury v. Scott*, 439 Mass. 288, 299 n.14 (2003).  Requiring a conservation organization

accepting an assignment under c. 61 to carry out the high-density development originally

planned would obviously defeat the conservationist purpose of the statute itself.  Thus, it was not

TPL who changed this contract provision, but Massachusetts law which provided a statutory

mechanism to preserve forest land from intensive development like that planned by Cohousing.

In sum, Plaintiff's attempt to paint TPL as unilaterally "picking and choosing" which

contract provisions to enforce and which to ignore misstates the record evidence.

**B.**     **TPL IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CHAPTER 93A CLAIMS.**

TPL is entitled to summary judgment on Plaintiff's c. 93A claims because, even after

submission of her own motions for summary judgment, Plaintiff has still failed to prove or even

allege the necessary elements of a claim under either Section 9 or Section 11 of M.G.L. c. 93A.

As discussed in TPL's Memorandum at 15-16, Plaintiff has failed to plead under which section

---

[12]     Furthermore, any argument that Plaintiff might present concerning the donation of the 42 acres has long been waived.  Plaintiff's notice letter, apprising the Town of her intent to sell her property, referred to the sale and

14

she purports to bring her c. 93A claims, and in any event cannot meet the threshold requirements of either section. Plaintiff has not pled, and cannot prove with any evidence in the record, that she sent a demand letter to TPL or that she is engaged in trade or commerce. *Id.* Her c. 93A claims fail as a matter of law, and the Court should grant summary judgment in TPL's favor.

Nor is Plaintiff able to show that TPL was engaged in "trade or commerce" as required for a claim under c. 93A. The authorities cited by Plaintiff explain that generally a charitable institution is not engaged in trade or commerce when it undertakes activities in furtherance of its core mission. *Linkage Corp. v. Tr. of Boston Univ.*, 425 Mass. 1, 26-27 (1997); *Planned Parenthood Fedn. Of America, Inc. v. Problem Pregnancy of Worcester, Inc.*, 398 Mass. 480, 493 (1986). *See also Tr. of Boston Univ. v. ASM Commc'ns*, 33 F. Supp. 2d 66, 77 (D. Mass. 1998) ("A nonprofit or charitable corporation, however, is not engaged in trade or commerce 'if, in the transaction in question, the nonprofit is merely engaged in the customary business necessary to meet its charitable purpose"). Plaintiff attempts to sidestep this case law by arguing that TPL was engaged in trade or commerce and therefore liable under c. 93A because Plaintiff's neighbor Serena Furman described TPL's conduct as unbecoming of a nonprofit. *See* Pl. Mem. at 34, citing Pl. Mem. Ex. JJ, Furman Dep. Tr. Vol. I at 110:4-9. Ms. Furman's testimony constitutes inadmissible evidence and should be disregarded, *see* TPL Motion to Strike Mem. at 6, for the testimony is a conclusory assertion rather than a statement of fact, and cannot properly be qualified as lay opinion under F.R.E. 701 or expert opinion on the appropriate conduct for nonprofits under F.R.E. 702. Moreover, the cited portion of Ms. Furman's testimony actually undermines Plaintiff's c. 93A claim, as Ms. Furman stated that TPL's conduct was within the bounds of acceptable behavior for a business. Pl. Mem. Ex. JJ, Furman Dep. Tr. Vol. I at 110:4-

---

disposition of the entire parcel. TPL SUF ¶ 40, citing KUN224-234 (Kachajian Dep. Ex. 6) (attaching P&S).

9, 111:17-112:3. Plaintiff further argues that TPL's conduct at one meeting approximately six months after the closing date, in which both parties engaged in animated discussion and legal posturing, as well as TPL's consideration of the LDC as part of its legal due diligence prior to accepting the ROFR, somehow shows that TPL is a "cut-throat" organization. Pl. Mem. at 34. None of these arguments meet the standards Plaintiff sets out in her own Memorandum and she cannot prove TPL was acting outside its core conservation mission. Thus, Plaintiff cannot prove an essential element of her c. 93A claims and TPL is entitled to summary judgment.

Even if the Court were to look beyond these threshold legal deficiencies in Plaintiff's c. 93A claim, the record is devoid of any material facts that can save her claims. In order to support her c. 93A claims against TPL, Plaintiff attempts to recast this dispute over the remedy for TPL's default as some sort of nefarious conduct by TPL. Plaintiff's entire c. 93A argument relies on eight allegations of purported "bad faith" conduct by TPL. Yet none of Plaintiff's allegations of "bad faith" have any bearing on her claims against TPL, and even worse, they are built on mere conjecture and distortion of the evidentiary record.

Plaintiff's first argument in support of her c. 93A claims, that TPL should be liable under c. 93A because it had a copy of the *Kelly v. Marx* decision in its files, allegedly prior to exercise of the ROFR, is puzzling at best. Plaintiff cites no legal authority as to why or how TPL's bad faith could be inferred solely from its awareness of the case law that supports its good faith assessment of its legal rights and obligations. As discussed in TPL's Memorandum at 8, *Kelly* noted that liquidated damages clauses are a common real estate practice that are routinely upheld. *Kelly v. Marx*, 428 Mass. 877, 879 (1999). If anything, the presence of the *Kelly* case in TPL's files shows that TPL conducted legal due diligence to estimate the risk involved in accepting assignment of the ROFR and that TPL's understanding that its exposure was limited

16

by the LDC was grounded in Massachusetts law. In no event could this be any evidence of bad faith by TPL or any support for Plaintiff's c. 93A claims.

Plaintiff's second argument under c. 93A, that TPL knew it would not be granted zoning relief before accepting assignment of the ROFR, simply has no basis in the record. It is undisputed that TPL explored various options to approach zoning for the Property, including seeking special permits, variances and ANRs. The mere fact that TPL considered what zoning relief it might pursue provides no evidence of bad faith. If anything, the time and effort TPL spent considering zoning issues prior to assignment contradict any assertion by Plaintiff that TPL did not intend to complete the purchase; it would be nonsensical for TPL to undertake such due diligence if TPL never intended to close on the Property. Moreover, the documents Plaintiff cites do not support her conclusion that TPL knew it would not be able to obtain needed zoning relief. The first document cited by Plaintiff in fact shows that the Planning Board and Building Commissioner said they "would highly recommend to the ZBA that they grant [TPL] any variance or special permit that would be required" for the project. Pl. Mem. Ex. Q, TPL-KUN 00181-00182. It is inconceivable how Plaintiff draws from this document the conclusion that "Defendants had reason to believe that they could not meet variances and special permits requirements," Pl. Mem. at 15, for it shows that TPL was told it would likely obtain the zoning relief it needed. The other document Plaintiff cites, Pl. Mem. Ex. R, TPL-KUN 01167, is a handwritten note that Mr. MacDonnell wrote years after the assignment of the ROFR, and does not support any assertion regarding TPL's knowledge in January, 2003. *See* MacDonnell Decl., ¶ 28. While Plaintiff relies on a document written well after assignment, the documents created in January and February of 2003, when TPL was considering whether to accept assignment of and exercise the ROFR, in fact show that TPL believed any needed zoning relief would be

17

granted. *See* Pl. Mem. Ex. Q, TPL-KUN 00181; *see also* MacDonnell Decl. ¶ 13; TPL Supp. App. Ex. 1, TPL-KUN 01963.

In one of her most blatant misrepresentations of documents in the record, Plaintiff next argues that TPL should be liable under c. 93A because TPL knew it was permanently discouraging Cohousing from purchasing her Property. Putting aside that any exercise of a ROFR under the Chapter Lands statutes necessarily strips the original buyer of the contract and thus not only "discourages" but in fact precludes the buyer from purchasing the property, Plaintiff's allegations are based on a total misreading of the documents. As discussed at page 4, *supra*, Plaintiff claims that MacDonnell's Written Remarks in which he writes "Mosaic Commons is gone" were written in anticipation of, and spoken at, the Special Town Meeting on January 13, 2003. Pl. Mem. Ex. T, TPL-KUN01095-1101.[13] Plaintiff relies on these Remarks as evidence that TPL knew, prior to assignment, that it had permanently discouraged Cohousing. However, the Remarks on their face show that they were not written for the January Town Meeting but rather the Annual Town Meeting in May, 2003. The Remarks state that the January Town Meeting had already occurred, that assignment of the ROFR had already occurred, and the last page Plaintiff cites is the written request of May 6, 2003 to deliver the Remarks at Town Meeting. *See* MacDonnell Decl. ¶ 21. The subsequent two pages of argument are thus completely groundless.[14]

Plaintiff's fourth theory of bad faith is based on the fact that TPL did not have its national approval to close on the property at the time it accepted assignment of the ROFR. It is

---

[13] Plaintiff mistakenly states that the Special Town Meeting took place on January 23, 2003. Pl. Mem. at 16. However, minutes of the Special Town Meeting reveal that it took place on January 13, 2003. TPL Supp. App. Ex. 2, KUN205-216. The special Town election occurred on January 23, 2003.

[14] Plaintiff similarly at least implies that MacDonnell had a conversation with Cohousing's attorney in January, 2003 before submitting TPL's Project Fact Sheet. *See* Plaintiff's Mem. at 16. Plaintiff relies on an undated note, Plaintiff's Mem. Ex. U, with no testimony to date the conversation or otherwise lay a foundation.

undisputed that in February, 2003 TPL received approval from its national Board to accept assignment of the ROFR, but that approval to close on the property in September, 2003 would not be awarded until later in the process. *See* MacDonnell Decl. ¶ 14. TPL told this to FORA, stated this numerous times at deposition, and this undisputed fact alone does not show anything even resembling bad faith. Indeed, this was a standard part of TPL's process in accepting assignment of a ROFR, as explained by TPL's Regional Staff Counsel:

> A: There is a strict internal approval process so that no land can be acquired on behalf of The Trust For Public Land without approval by either the project review committee of the board of directors or the executive committee of the board of directors. And in order to obtain that approval a project manager has to demonstrate to the satisfaction of the project review committee or the executive committee, that there is a repayment strategy that is likely to allow replenishment of a revolving line of credit.
>
> Q: When does that presentation to the committee occur?
>
> A: Typically, and certainly I encourage project staff to make that presentation only when the sources of repayment are buttoned up, are really solid. So it would be a month or two before the acquisition. That's not always the case, but that is certainly the preferred time.

Pl. Mem. Ex. BB, Stookey Dep. Tr. Vol. II at 44:1-21. Not only does Plaintiff ignore this testimony, she makes the indefensible leap of logic that because TPL did not have Board approval to purchase in February, 2003, it therefore "did not intend to purchase the Property." Pl. Mem. at 17. There is simply no support for this allegation anywhere in the record. It is undisputed that TPL expended large amounts of time and resources to complete the purchase, MacDonnell Decl. ¶ 29; *see also* TPL SUF ¶¶ 59, 60, 61, 62, 65, 66, 67, and it would make no sense for TPL to undertake such efforts if, as Plaintiff contends, TPL had no intention of closing.

In her fifth attempt to establish TPL's bad faith, this time regarding an alleged "hidden agenda" to defeat the 40B project, Plaintiff again blatantly misstates the record by misquoting MacDonnell's deposition transcript. As discussed at page 4, *supra*, Plaintiff misquotes

MacDonnell's deposition testimony at page 193, line 22 by replacing "Were we" with "We were." The transcript reads, "*Were we* successful in conserving the property, the property would have been conserved and not developed." This statement surely does not mean that TPL considered its failed effort "successful" or that TPL had a hidden plan to prevent the proposed 40B development. This altered deposition testimony is the sole support Plaintiff offers for TPL's "hidden agenda," and she piles layer after layer of supposition upon that false quotation. Again, her argument is built upon a false premise, and her allegation of bad faith fails.

Plaintiff's sixth allegation of bad faith, the vague statement that TPL "had a strategy of misdirection," again lacks any support in the record and bears no relevance to Plaintiff's claims. Plaintiff argues that TPL should be liable to Plaintiff under c. 93A because it had a "strategy of misdirection" by intentionally making alleged misrepresentations to the DHCD and to Stow citizens. This argument must fail as immaterial to any claim Plaintiff has brought and any issue raised on summary judgment. Plaintiff has not even attempted to argue that any of these alleged statements were made to her or that she even knew of or relied upon them.

Furthermore, Plaintiff's allegations regarding what TPL stated in the DHCD grant application two months after assignment and exercise of the ROFR are a red herring. TPL had substantial national credit lines and it is undisputed that notwithstanding the balance of the Wainwright Bank revolving credit line, TPL could have sought to borrow funds to purchase the property had it believed it had sufficient fundraising prospects to allow it to repay the loan. Pl. Mem. Ex. BB, Stookey Dep. Tr. Vol. II at 22:16-23:2. The fact that the Wainwright Bank credit line was drawn down in April 2003, five months before the closing date, does not indicate any bad faith or intentional misrepresentation on TPL's part. Plaintiff attempts to exploit Ms. Stookey's deposition testimony by citing, out of context and in an incomplete manner, her

testimony that the statement was "inaccurate." Plaintiff fails to cite the related testimony by Stookey that it is unlikely that MacDonnell would have confirmed the balance in the Wainwright Bank revolving line of credit before drafting the DHCD grant application given that TPL had other lines of credit available. Pl. Mem. Ex. BB, Stookey Dep. Tr. Vol. II at 26:20-27:5. Plaintiff attempts to twist "inaccurate" into "intentionally misleading" but Plaintiff has no evidence to support her claim that TPL knowingly made any inaccurate, much less misleading, statement. Nor does the newspaper article cited by Plaintiff, itself hearsay that should be stricken from the summary judgment record, *see* TPL Motion to Strike Mem. at 7, provide any evidence of bad faith. Even if the article constituted admissible evidence appropriate for consideration, it shows that if anything TPL was confident in the project's prospects, and is consistent with the testimony of MacDonnell and Stookey that TPL would not have pursued the project if TPL did not think it was feasible. TPL SUF ¶ 49, citing Stookey Dep. Tr. Vol. I at 66:20-23, MacDonnell Dep. Tr. at 69:20-70:4.

Plaintiff's seventh theory of TPL's bad faith—that TPL allegedly "lied" about its fundraising efforts—is simply false. But without even considering the lack of factual support for Plaintiff's claims, the Court may dispose of this allegation as immaterial, because how TPL conducted fundraising and in what order/at what time has no bearing on Plaintiff's c. 93A claims. Plaintiff cannot dispute that TPL spent substantial time and effort on the DHCD grant application, the variance application to the ZBA for its planned subdivision and private sale of the residences, and obtaining authorization for expenditure of the CPA funds, the three funding sources which comprised the majority of the funding for the project. Nor can Plaintiff dispute that TPL spent much time and effort on the project attending meetings, planning sessions, and

the like. Anything beyond that, including when TPL started private fundraising or how it used fundraising leads, is simply immaterial to the issues presented on summary judgment.

Even if it were somehow relevant to Plaintiff's c. 93A claims, Plaintiff's argument that TPL lied about fundraising fails for the additional reason that her citation to the record is so incomplete and misleading that when the documents are viewed in context and with the relevant, related deposition testimony, it is clear that TPL did not misrepresent its fundraising efforts. Plaintiff attempts to misuse documents written by FORA members to show that TPL prohibited all fundraising and misused the fundraising work FORA did. It is telling that Plaintiff cites documents authored by Serena Furman but does not cite to Ms. Furman's deposition transcript, for when asked at deposition about these very issues, Ms. Furman testified that TPL never ordered FORA to stop fundraising. Pl. Mot. Ex. Q, Furman Dep. Tr. Vol. II at 60:15-22 ("To go out and further try to identify individuals that would be willing to make a promise of a donation, no, I don't believe he [MacDonnell] ever asked us to stop."). Plaintiff also ignores Ms. Furman's testimony that TPL did, in fact, undertake significant fundraising efforts. Pl. Mem. Ex. JJ, Furman Dep. Tr. Vol. I at 80:7-14 ("we made some presentations to funders that had already been identified to see if they would give more. And the DHCD grant. That's the major fund-raising effort. That was a lot of work by TPL"). Moreover, Plaintiff neglects to cite Ms. Furman's testimony that FORA understood that any delay in certain aspects of private fundraising by TPL was a prudent business decision based on legitimate concerns and not evidence of anything even close to bad faith. Pl. Mot. Ex. Q, Furman Dep. Tr. Vol. II at 92:5-11; Pl. Mem. Ex. JJ, Furman Dep. Tr. Vol. I at 29:23-30:6, 86:4-24. Plaintiff's argument regarding TPL's alleged misuse of FORA's fundraising list is similarly flawed. Plaintiff neglects to cite Ms. Furman's deposition testimony in which, when asked about this issue, she testified that

FORA did not expect the list to have been available only for the Stow project and that she believed it was highly likely many of the prospects had already been identified and used by TPL before. Pl. Mem. Ex. JJ, Furman Dep. Tr. Vol. I at 70:16-71:2. Plaintiff's selective and misleading record citations do not support any allegation of bad faith or her claims under c. 93A.

Plaintiff's eighth and final effort to concoct some theory of bad faith, asserting that TPL engaged in alleged illegal lobbying and IRS fraud, falls so far from the mark that it warrants almost no response. Plaintiff's allegations of illegal lobbying have absolutely nothing to do with her claims against TPL, which Plaintiff herself expressly acknowledges in her Memorandum: "The Plaintiff is not asking the Court to consider the Defendants' IRS Fraud as determinative of the Plaintiff's claims against TPL and Stow." Pl. Mem. at 30. Plaintiff offers no valid reason to consider such remote and ancillary issues and they should be disregarded. The only argument Plaintiff provides for even considering these issues is that TPL's supposed lobbying was part of an alleged overall scheme to defeat the 40B development. Pl. Mem. at 32, 34. As noted at page 4, *supra*, Plaintiff's sole evidence of any plan to defeat the proposed 40B development is her alteration of MacDonnell's deposition transcript which drastically changes its meaning. With no evidence of any overall "scheme or plan" and no relationship between TPL's acceptance of assignment of the ROFR and TPL's communications with the IRS, the case law Plaintiff cites is inapposite and her reference to any alleged representations to the IRS should be disregarded.

Even if TPL's interaction with the IRS were somehow relevant to Plaintiff's c. 93A claims, there is no evidence to support Plaintiff's allegation of wrongdoing. Plaintiff has not even attempted to show that TPL had reached its lobbying cap, and thus Plaintiff's argument on this point is a legal nonstarter. Plaintiff must again resort to misstating the record, by falsely stating that TPL and Stow admitted to illegal lobbying. The testimony she cites does not provide

any such "admission" and she outright ignores the related testimony by Selectman Ross Perry in which he unequivocally states that TPL was not engaged in illegal lobbying. Pl. Mem. Ex. Q, Perry Dep. Tr. at 248:16-18 ("they [TPL] weren't lobbying us to do the project. They were helping us find a way to make it happen."); *see also id.* at 246:11-14.

In sum, Plaintiff's allegations of "bad faith" are nothing more than her counsel's contrived conjecture and grandiose conspiracy theories, unsupported by the record and in many places built entirely on mischaracterization and misquotation of the record. Plaintiff cannot show that any of these allegations are true, that the alleged conduct rises to the level of "immoral, unethical, oppressive or unscrupulous conduct" required for liability under c. 93A, or that they are even material to the issues presented on summary judgment. As a result, Plaintiff's claims under c. 93A must be rejected and summary judgment should enter for TPL.

### C.    TPL AND MACDONNELL ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S INTENTIONAL INTERFERENCE CLAIM.

TPL and MacDonnell are entitled to summary judgment on Plaintiff's claim of intentional interference with contract. Plaintiff's claim finds no support in the law and the factual record. Plaintiff claims TPL and MacDonnell are liable because, when TPL accepted assignment of the ROFR, it intentionally interfered with her P&S with Cohousing. Plaintiff's argument is unavailing because such "interference" is specifically anticipated and explicitly authorized as a matter of law by Chapter 61. For that reason, Massachusetts courts have held that a nonprofit organization's acceptance of assignment of a ROFR does not form the basis for an intentional interference claim. *Williams v. Watt*, No. 99-00696, 2002 WL 1009255, at *6 (Mass. Super. Apr. 5, 2002).

Nor can Plaintiff prove the requisite improper motive or means by pointing to TPL's "sophisticated" plan for the Property or the substantial effort TPL undertook to the make the

project work.  Far from showing a sinister plot to improperly displace Plaintiff's buyer, TPL's public outreach campaign, fundraising efforts, and attendance at numerous municipal meetings demonstrate TPL's substantial effort and desire to make the project work.  Furthermore, Plaintiff's argument defies common sense, for if a landowner could sue for intentional interference merely because an assignee nonprofit engaged in fundraising and public outreach— activities vital to the success of such a project—no nonprofit would ever be able to accept assignment of a ROFR under the Chapter Lands statutes.  Their hands would be tied and every project would be doomed from the start.  Because Plaintiff's intentional interference claim fails on the law and the undisputed facts, TPL and MacDonnell are entitled to summary judgment.

Finally, whatever the merit or lack thereof concerning Plaintiff's tort claims against TPL, Plaintiff's Memorandum tacitly concedes that Plaintiff has no basis for pursuing MacDonnell individually.  *See* Pl. Mem. at 44 ("Normally, that argument [that an employee should not have personal liability for actions taken in the course of his employment] would have some substance."), and Pl. Mem. at 45 ("Indeed, there are relatively few cases in which behavior of an officer of a non-profit requires a finding of personal liability.").  Without any indication that MacDonnell is a corporate officer of TPL, *see* Pl. Mem. at 45 n.4, Plaintiff cites an apparently unreported case from an intermediate Illinois appellate court involving a corporate officer, Pl. Mem. at 45, that addresses the completely unrelated issue of piercing the corporate veil.  TPL can only surmise that Plaintiff has named MacDonnell individually in an effort to evade the Commonwealth's charitable immunity cap on damages[15] or to attempt to intimidate MacDonnell

---

[15] Even if the Court were to determine that Plaintiff has stated a viable claim against TPL for intentional interference with contractual relations requiring a trial, TPL, as a charitable institution, is entitled to the benefit of the statutory damages cap provided by M.G.L. c. 231 §85K.  Under Section 85K, the liability of TPL as a charitable organization is limited to $20,000 for all torts "committed in the course of any activity carried on to accomplish directly the charitable purposes of the corporation."  Section 85K applies to this case and limits

and bring undue pressure to bear on TPL. Plaintiff's allegation that MacDonnell, a current member of the Massachusetts bar, "lied to Ms. Kunelius and others" is unsupported and recklessly irresponsible, and Plaintiff has no basis to pursue MacDonnell personally.

### D.    TPL AND MACDONNELL ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S MISREPRESENTATION CLAIM.

Although Plaintiff purports to move for summary judgment on her misrepresentation claim against TPL and MacDonnell, she does not directly advance arguments in support of this claim in her Memorandum. In fact, Plaintiff's claim for misrepresentation must fail because there is no evidence that TPL or MacDonnell made any false statement to Plaintiff, or that Plaintiff relied on anything they did or said. Though Plaintiff blows smoke about other purported "fraudulent" acts by TPL toward the Commonwealth and the IRS, this is simply a distraction tactic, unrelated to Plaintiff and her claims and unsupported by the facts. Not only are TPL's actions toward the Commonwealth and the IRS not fraudulent, *see* discussion at pages 20-21, 23, *supra*, but Plaintiff does not even attempt to show that she was aware of or relied upon these alleged misrepresentations. Nor may Plaintiff's misrepresentation claim rest on the mere conclusory allegations that TPL knew it lied to her when MacDonnell allegedly told her TPL would purchase the Property. As discussed more fully in TPL's Memorandum at 25-26, there is no evidence to suggest that TPL intended anything other than to complete the project and conserve a majority of the Property, and the fact of TPL's nonperformance itself is legally insufficient to support a misrepresentation claim. *McEvoy Travel Bureau v. Norton Co.*, 408 Mass. 704, 709 (1990); *McCartin v. Westlaw*, 36 Mass. App. Ct. 221, 230 n.11 (1994).

---

TPL's liability to $20,000 for both Plaintiff's intentional interference claim and her misrepresentation claim. TPL's $19,000 in liquidated damages payments to Plaintiff should count toward that statutory cap.

Furthermore, Plaintiff acknowledges that she did not and could not have changed her position based on any representation by TPL. She admits that once she classified her land under Chapter 61 and provided Stow notice of a bona fide offer to purchase the Property, she played no role in the assignment and exercise of the ROFR. TPL SUF ¶¶ 54, 55; *see also* TPL Mem. at 24. Her only attempt to establish any reliance is her statement, in support of her promissory estoppel argument, that she "ha[d] to accept the representations that the money was available to fund the exercise of the ROFR and as a result lose the buyer." Pl. Mem. at 13. Her circular reasoning that she relied because she had to accept TPL's representations fails. Because Plaintiff could not have changed her position in reliance on anything TPL said, she cannot prove reliance and her misrepresentation claim fails.

### E.    TPL AND MACDONNELL ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S SECTION 1983 CLAIM.

Plaintiff also argues that Defendants should be held liable for violation of her civil rights under color of state law, per Section 1983.[16] As a threshold matter, the allegedly violated civil rights appearing in Plaintiff's summary judgment motion are not those she pled in her Complaint. Plaintiff's Complaint alleged that Defendants abridged her "privileges and immunities," deprived her of property without due process of law in violation of the Fourteenth Amendment, and accomplished a constructive taking of the value of her property without just compensation in violation of the Fifth Amendment. Complaint at ¶¶ 95–96.[17] On her summary judgment motion, Plaintiff appears to allege that Defendants impaired the value of her contract in

---

[16]    Although Plaintiff's brief refers to the § 1983 claim as Count VII, Pl. Mem. at 53, it is correctly referenced in Plaintiff's Motions for Summary Judgment as Count VI.

[17]    Plaintiff's additional allegation, that Defendants' "actions … resulted in the inability of the plaintiff to sell the property at the agreed upon purchase price and the loss of that ability in the future where such loss of ability resulted from the deliberate reneging on the purchase price by [Defendants]" appears to be a generalized

violation of the Contracts Clause, Pl. Mem. at 54, and that, as a "class of one," she has suffered an equal protection violation. Pl. Mem. at 56. Defendants had no notice that Plaintiff planned to abandon her initial claims and advocate new ones for summary judgment, and the Court should not entertain the effort to recast Plaintiff's "civil rights" cause of action at this late stage of litigation.

Whatever civil rights Plaintiff chooses to assert, Defendants have already argued that this Court need not consider the merits of Plaintiff's Section 1983 claim because TPL and MacDonnell's actions were not taken "under color of state law." TPL Mem. at 26. Plaintiff's argument on summary judgment is that the supposed partnership of TPL and the Town of Stow, together with the statutorily authorized assignment of the ROFR, constitute state action. Pl. Mem. at 53-54. However, as discussed *infra*, at page 29, and in TPL's Memorandum at 18-20, there was no legal partnership between Stow and TPL, and Plaintiff's argument to the contrary rests on a blithe disregard for the legal meaning of the term.

Moreover, the assignment itself—the only arguable "state action" that Plaintiff can point to—did not affect Plaintiff's legal rights in any way. The assignment was simply the conferral of an option to enter into the P&S as the buyer, and Stow's role ended at the moment of assignment. The true effect on Plaintiff's legal relations was wrought by the *exercise* of the ROFR by TPL, which was a private act undertaken by a private actor after Stow's role had ended. Thus, Plaintiff fails to identify any state action which allegedly harmed her civil rights.

Finally, in addition to their other fatal shortcomings, Plaintiff's new civil rights claims fail on their merits. Her own authorities do not establish that an alleged impairment of a contract in violation of the Contracts Clause is even actionable under Section 1983. *See Dennis v.*

---

statement of Plaintiff's grievance, but does not identify a civil rights violation cognizable in American Constitutional jurisprudence. *See* Complaint ¶ 97.

*Higgins*, 498 U.S. 439 (1991).[18]  Likewise, Plaintiff's "class of one" equal protection claim fails because she has failed to make any argument that would establish discrimination.  To show discrimination, Plaintiff needs to present evidence of a similarly situated group that was treated differently than her class—even if she is simply a "class of one." *See Village of Willowbrook v. Olech*, 528 U.S. 562, 565 (2000) (plaintiff alleged that village required 15 foot easement of other property owners and 33 foot easement of plaintiff).  Here, Plaintiff simply asserts that supposedly "similarly situated" property owners were treated differently, without adducing evidence or even suggesting what the difference might have been. *See* Pl. Mem. at 56 ("Stow and TPL intentionally treated [Plaintiff] differently from others similarly situated").  Plaintiff's bare declaration that her treatment was "arbitrary and capricious" is obviously insufficient.

Defendants are entitled to summary judgment on Plaintiff's Section 1983 claim.

## F.  PLAINTIFF'S CLAIMS AGAINST THE "PARTNERSHIP" OF TPL AND STOW FAIL BECAUSE PLAINTIFF CANNOT PROVE PARTNERSHIP.

Not only do Plaintiff's claims against the "partnership" of Stow and TPL fail for the reasons discussed above, they also fail for the separate reason that Plaintiff cannot prove the existence of a partnership. *See* TPL Mem. at 18-20.  Plaintiff has ignored the legal definition and requisite elements of partnership and instead has chosen to count the number of times the word "partner" was casually and colloquially used in communications between or by TPL and Stow.  Regardless of how many times TPL used the term "partner" to describe Stow, that in itself is legally insufficient to prove the existence of a legal partnership.  So, too, is the fact that Stow Town Counsel or one member of the Board of Selectmen had some concerns regarding Stow's

---

[18]   In *Dennis*, the majority noted that an earlier decision (*Carter v. Greenhow*) that would have *prevented* Plaintiff's claim had been subsequently narrowed (*Chapman v. Houston Welfare Rights Org.*).  498 U.S. at 451 n.9.  Plaintiff's tenuous reading of this convoluted proposition is that it *implies* that claims such as hers *would be enforceable* through § 1983.  This is an extraordinary leap of legal reasoning.

potential liability in the project. Additionally, Plaintiff's unsupported conclusion that "there is no colloquial meaning of the word 'partnership'" is contradicted by First Circuit case law. *Southex Exhibitions v. Rhode Island Builders Ass'n.*, 279 F.3d 94, 101 (1st Cir. 2002); *Dinco v. Dylex Ltd.*, 111 F.3d 964, 969 (1st Cir. 1997). Plaintiff's allegations of partnership, omitting any reference to legal authority and in fact ignoring the legal standards for the existence of partnership, must fail and therefore so too must her claims against the alleged partnership.

## CONCLUSION

Plaintiff and her counsel have attempted to make a cause célèbre out of a failed real estate purchase. TPL accepted assignment of and exercised Stow's ROFR under c. 61 in furtherance of its charitable mission of "Conserving Land for People." Unfortunately, TPL encountered the perfect storm of fundraising: denial of a state grant by DHCD, an unanticipated legal impediment to subdivision and sale of the Property's two residences, and overly optimistic projections of the private fundraising appeal. TPL reluctantly made the decision that it would default and forfeit the $19,000 in deposits. Retention of the deposits as liquidated damages is Plaintiff's "sole remedy in equity and law" under the P&S she freely signed. This case should never have been brought. Summary judgment should be granted dismissing Plaintiff's Complaint.

Dated: November 16, 2007

THE TRUST FOR PUBLIC LAND and
CRAIG A. MACDONNELL

By their attorneys,

*/s/ Richard A. Oetheimer*
Richard A. Oetheimer (BBO # 377665)
Patricia M. Murphy (BBO # 665056)
Goodwin Procter LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

30

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 16, 2007.

*/s/ Richard Oetheimer*
Richard Oetheimer