UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MARILYN KUNELIUS,

        Plaintiff,

v.

TOWN OF STOW, et al.

        Defendants.

Civil Action No. 05-11697-GAO

## DECLARATION OF CRAIG A. MACDONNELL

I, Craig A. MacDonnell, declare as follows:

1.     I am Massachusetts State Director of The Trust for Public Land ("TPL"). TPL is a national non-profit land conservation organization. TPL's New England Regional Office ("NERO") is located in Boston. TPL's role in the conservation community is to facilitate the transfer of land that is important for its recreational, cultural or ecological resources from private hands to permanent protected ownership by a municipality, public agency or other non-profit. TPL seeks to raise the funds necessary for the land conservation transactions it seeks to facilitate from a combination of private and public sources.

2.     I was the Project Manager for TPL for the proposed transaction involving the land of Plaintiff Marilyn Kunelius at 142-144 Red Acre Road in Stow, Massachusetts ("the Property"). I have personal knowledge of TPL's Stow project, and make this Declaration on personal knowledge. The purpose of this Declaration is to provide a chronology of TPL's

involvement in the Stow project, and to correct a number of material factual inaccuracies in plaintiff's summary judgment motion submissions.

3.    TPL was first approached about the Kunelius Property in December, 2002 after a notice of a bona fide offer for the Property had been given to the Town of Stow by counsel for Mrs. Kunelius, triggering the Town's right of first refusal ("ROFR") under Chapter 61. A local community group, the Friends of Red Acre ("FORA"), approached TPL about accepting an assignment of the Town's ROFR as part of an effort to conserve the Kunelius Property as an alternative to the 30 unit multifamily housing development proposed for a portion of the land by Cohousing Resources, LLC ("Cohousing").

4.    TPL evaluated the proposal and determined that there existed significant conservation value in facilitating an alternative to allowing a large residential development to be wedged adjacent to the Town's largest aquifer and between two sizable already protected conservation areas. TPL worked to encourage a result that would have maintained the prior equine usage of the Property, imposed affordability restrictions on the two existing residences, provided municipal access to a pond on the Property for fire suppression, provided the Town access to the aquifer for water development, and deeded the Town significant acreage (approximately 45 of a total 50 acres) for conservation and water supply. The public would have received access to the conservation areas, and the watershed area would have been protected by the deed from TPL to the Town, which would have permanently restricted use of the land to conservation and water supply.

5.    TPL requested that the Town of Stow commit to fund a portion of the purchase price for the Property. Specifically, in order to accept assignment of the town's ROFR, TPL

asked the Town to approve a total of $400,000 for the Kunelius Property, including $100,000 towards creating affordability restrictions on the two existing residences. I appeared before the Stow Board of Selectmen on January 7, 2003, as reflected in the Minutes attached hereto as Exhibit A. The Selectmen voted 3 to 1 to support TPL's efforts.

6.      At a Stow Special Town Meeting on January 13, 2003, it was voted by a two-thirds voice vote for the Town to borrow $305,000, including loan closing costs, for the purpose of acquiring a portion of the Kunelius Property for the purpose of developing and establishing a future water resource and supply for the Town, and a separate portion for purposes of conservation under the jurisdiction and control of the Stow Conservation Commission. See Special Town Meeting Minutes, attached as Exhibit B (KUN 205-216 at KUN 210-211).

7.      The January, 2003 Special Town Meeting vote to borrow funds for acquisition of a portion of the Kunelius Property was conditioned on Stow voters approving a ballot question to exempt the amount voted for borrowing from the provisions of Proposition 2 1/2. Ex. B (KUN 211). The question was placed on the ballot for the January 23, 2003 special Town election and failed to pass.

8.      After Stow voters failed to approve borrowing for the project, a majority of the Selectmen expressed their continuing support for the project. At the Board of Selectmen meeting on January 28, 2003, the Selectmen voted conditionally to assign the Town's ROFR to TPL, but as of this time, TPL was still engaged in its own diligence efforts and had not yet agreed to accept assignment of the ROFR from the Town. The Board of Selectmen continued the Public Hearing to February 11, 2003.

9.      A revised proposal was developed involving funding the Town's acquisition from its Community Preservation Act ("CPA") funds. The CPA is a state law which allows towns to impose a property tax surcharge for the purpose of funding open space, affordable housing, and historic preservation. Approval of use of CPA funds requires a majority Town Meeting vote.

10.      With respect to land classified under Chapter 61, the Town and any non-profit assignee have a 120-day period to exercise the statutory ROFR. In the case of the Kunelius Property, to meet the statute, TPL had to accept assignment from the Town and exercise the ROFR by February 13, 2003. The results of the municipal election on January 23, 2003 left the Town and TPL with only three weeks to formulate a new financing structure.

11.      Any real estate purchase by TPL requires approval of TPL's National Board of Directors or the Project Review Committee ("PRC") of the Board. The approval process requires submission of a write-up, known as the Project Fact Sheet. I was the principal draftsman of TPL's Project Fact Sheet for the Stow-Kunelius Farm proposal, dated January 30, 2003. Ex. C (TPL-KUN 01124-01138).

12.      At the time of preparation and submission of the Project Fact Sheet, the proposal contemplated that at its regular Spring Town Meeting, Stow would vote whether to invest (1) $300,000 from its Community Preservation Fund to purchase a portion (45+/- acres) of the Property; and (2) $100,000 from the Community Preservation Fund to purchase affordability restrictions over the two residential parcels to be sold privately. Ex. C at TPL-KUN 01125. The Project Fact Sheet describes the remainder of funding as dependent upon (1) private sales of the two houses, and (2) private philanthropy. The Project Fact Sheet identifies several project risks, including Town Meeting Risk (Town Meeting might not vote to authorize use of CPA funds),

Fundraising Risk (private fundraising from foundations and individuals might not achieve target goals), and Subdivision Risk (TPL might not receive the variance needed for private sale of two residential house lots). The Project Fact Sheet further states that TPL's "due diligence" will include (1) determining the environmental condition of the Property, (2) inspecting the houses, and (3) researching the ease of subdividing the Property as required.

13.    TPL's limited development plan contemplated sale of 142 Red Acre Road, the site of the so-called main house, and subdivision of 144 Red Acre Road, the location of the so-called caretaker's house, barn paddock and 42 +/- acres of adjacent wetlands and uplands. Ex. C at TPL-KUN 01128. The Project Fact Sheet recites that TPL had consulted the Stow Town Planner (Karen Kelleher) and a member of the Zoning Board of Appeals ("ZBA") and had received encouragement about obtaining a variance to subdivide the 144 Red Acre Road property to create a nonconforming house lot. Id. On or about February 3, 2003, I personally appeared before the Stow ZBA in an effort to gauge the feasibility of TPL's subdivision plan before TPL agreed to accept assignment of the Town's ROFR. As my notes reflect, Ex. D (TPL-KUN 01963), I was told that while the ZBA could not give "legal advice," TPL's plan "looks 'do-able.'"

14.    At a regularly scheduled PRC meeting on February 5, 2003, TPL's National Board authorized TPL to accept assignment of the Town's ROFR, a decision that had to be made at that time due to the looming expiration of the statutory 120 day ROFR exercise period under Chapter 61. Because of the uncertainties and risks presented by the required Town Meeting vote to approve expenditure of CPA funds, the subdivision risk associated with the need to obtain a variance, and the fundraising risk generally, the PRC required that TPL return to the PRC with a

request to approve closing on the purchase at a later date nearer to Closing after details of TPL's take-out financing had become clearer. Ex. E (TPL-KUN 01144-01146).

15.     In connection with the intent to create affordability restrictions on the two house lots, TPL and FORA were able to identify a state grant program as a potential source of funding for rehabilitation of the two existing structures. Because the deadline for the Notice of Intent for the Housing Development Support Program was February 11, 2003, TPL and FORA urged the Town to file a Notice of Intent to preserve the Town's ability to apply for a grant if the Board of Selectmen approved assignment of the ROFR to TPL. Attached as Exhibit F is a February 9, 2003 e-mail message to me from David Cobb and Karen Sommerlad of FORA forwarding a copy of their e-mail of the same date to Stow Selectman Ross Perry transmitting a draft Notice of Intent to the Commonwealth's Department of Housing and Community Development ("DHCD"). (TPL-KUN 02553-02555)

16.     On or about February 10, 2003, I appeared before the Stow Community Preservation Committee ("CPC") to discuss the Kunelius farm project and TPL's request that the CPC vote to dedicate a total of $400,000 in CPA funds to the Kunelius Farm proposal -- $100,000 for affordable housing and $300,000 for open space. As noted in the Minutes of the CPC meeting, attached hereto as Exhibit G (KUN038-KUN041), the CPC voted in favor of the proposal and to recommend the expenditures to Town Meeting. (KUN040).

17.     In addition to (1) the $400,000 in Town CPA funds, (2) what were viewed by TPL at the time as promising prospects for a state affordable housing grant to rehabilitate the two dilapidated houses on the Property, and (3) the projected proceeds from private sale of the two house lots, TPL's project plans included an expectation of a private fundraising campaign to

generate a portion of the purchase price. In a February 8, 2003 communication addressed to Stow Selectman Ross Perry, FORA reported that to date it had received pledges from foundations totaling $220,000 and pledges from individuals totaling an additional $11,000, and that FORA was confident of its prospects for raising substantial additional sums. *See* FORA Answers to Ross Perry, attached as Exhibit H (KUN671). In accepting assignment of the Town's ROFR, TPL in part relied on FORA's fundraising projections.

18.    On or about February 11, 2003, I attended the Stow Board of Selectmen meeting, and requested that the Selectmen vote to support an article on the Annual Town Meeting ("ATM") Warrant to spend CPA funds for affordable housing and open space as a condition necessary for TPL to accept assignment of the Town's ROFR. As reflected in the Minutes of the Selectmen's Meeting, attached hereto as Exhibit I, the Board voted to support an article at ATM to authorize use of $400,000 in CPA funds for affordable housing and open space at 142-144 Red Acre Road. The Board also voted by a 3-1 vote, with Selectman Greg Jones casting the only vote in opposition, to assign the Town's ROFR under Chapter 61 to TPL. (Id.)

19.    On February 12, 2003, the Town of Stow formally assigned its ROFR to purchase the Kunelius Property to TPL and TPL accepted the assignment. On February 13, 2003, TPL notified Marilyn Kunelius of the assignment and TPL's exercise of the Chapter 61 ROFR, informing Mrs. Kunelius that TPL was stepping into the shoes of the Buyer, Cohousing, under the Purchase and Sale Agreement dated October 11, 2002 ("Agreement"). TPL tendered to Mrs. Kunelius the initial $10,000 deposit under the Agreement, and the first monthly $1,500 earnest money deposit due each month until Closing. Attached as Exhibit J and K, respectively, are the Town's Assignment to TPL and TPL's exercise of the ROFR (Complaint Exs. 3, 4).

20.     After accepting the assignment from the Town and exercising the ROFR, TPL proceeded in earnest to attempt to consummate the transaction. TPL engaged a consultant to assist in preparation of the DHCD grant application for the Town of Stow. The grant application was a lengthy submission and TPL devoted significant time and resources to its preparation. The grant application was submitted to DHCD on or about April 1, 2003. TPL also prepared a zoning variance application and filed it with the Stow ZBA on or about May 6, 2003.

21.     On May 21, 2003, I spoke in support of the use of CPA funds for the Kunelius Property at the Stow ATM. A copy of my prepared remarks for the May, 2003 ATM is attached hereto as Exhibit L (TPL-KUN 01095-01103). Plaintiff's summary judgment motion misidentifies these remarks as delivered at the January, 2003 Stow Special Town Meeting. My written remarks state on the first page, in recounting the "Project History," "You will recall the January Special Town Meeting when two-thirds of you voted to borrow funds to protect the property." TPL-KUN 01095. In May, 2003, ATM voted again in favor of the project, by approving two separate warrant articles, one authorizing expenditure of $300,000 in CPA funds for open space, and the other authorizing expenditure of $100,000 in CPA funds for affordability restrictions on the two residences.

22.     At the ATM on May 21, 2003, there was discussion of TPL's request for a frontage variance concerning 144 Red Acre Road. I was asked a question concerning TPL's plans if the variance was not granted, and I replied that I felt it likely the variance would be granted and, if not, there would be a re-examination of the project. ATM Minutes, May 21, 2003, Discussion of Articles 35 and 36, attached hereto as Ex. M.

23.    On or about July 2, 2003, DHCD issued notification of denial of the Town's grant application. Denial of the DHCD grant application came as a surprise and disappointment to TPL, and dealt TPL's plans for rehabilitating the two houses and raising funds to defray or recoup some of the purchase price of the Property through their private sales a serious blow.

24.    Obtaining zoning relief also proved more problematic than originally envisioned. TPL's initial zoning analysis had assumed that 142 Red Acre Road would remain intact, and that a variance would be sought to create a nonconforming house lot to include the location of the caretaker's house and barn paddock out of the larger 144 Red Acre Road property. Much later, TPL became aware of a serious complication resulting from application of the so-called Merger Doctrine. Because the adjoining 142 and 144 Red Acre Road parcels were in common ownership, title had merged by operation of law, and TPL's subdivision plan thus would require variances to create two new nonconforming (due to lack of required street frontage) residential house lots. This serious obstacle to TPL's subdivision proposal had not been identified by either TPL or Stow zoning officials in any of the multiple informal discussions that preceded assignment and exercise of the Town's ROFR. In the face of this information, TPL's prospects for obtaining the variances necessary for its planned subdivision dimmed. Ultimately, after TPL had sought to withdraw its application to avoid an adverse decision, the ZBA on October 6, 2003 voted to deny the variance without prejudice.

25.    After much careful consideration, TPL reluctantly made the decision, well in advance of the projected September 26, 2003 Closing Date under the Agreement, that it would not be able to purchase the Property at the original contract price. Beginning in July, 2003, I reached out to Mrs. Kunelius' attorney Peter Kachajian to tell him that things were not looking good, that the fundraising gap seemed large, that subdivision for development and sale looked

hard, and that without a purchase price concession, it appeared likely that TPL would not be in a position to proceed to Closing on September 26, 2003. On September 9, 2003, I sent a letter to Attorney Kachajian describing the obstacles that the project faced and letting Mr. Kachajian and Mrs. Kunelius know that it was not feasible for TPL to go forward under the existing contract. My letter further stated that TPL's Board will not approve borrowing by TPL to bridge a fundraising gap where the prospects for raising the funds necessary to repay the loan are not encouraging. A copy of my September 9, 2003 letter is attached as Exhibit N (Complaint Ex. 12).

26.     Even after defaulting on the Agreement, TPL considered various avenues in an effort to salvage the project, but Mrs. Kunelius was unwilling to entertain any purchase offer that entailed accepting a reduction from the original contract price. At no time did I or TPL suggest that Mrs. Kunelius had any legal obligation to accept a reduced purchase price. TPL acknowledged its default under the Agreement, and Mrs. Kunelius retained TPL's total deposit payments of $19,000 pursuant to the liquidated damages provision of the Agreement.

27.     Even after the Closing Date had passed, TPL continued to explore possibilities for conserving the Kunelius Property. In discussions in 2004 with Mrs. Kunelius, her counsel Mr. Kachajian and her real estate broker James Boothroyd, TPL shared its analysis suggesting that Mrs. Kunelius could possibly achieve the same or comparable net economic return through a lower sale price coupled with the benefit of a potential bargain sale charitable tax deduction. At a meeting in Mr. Boothroyd's office in Maynard, Massachusetts, at which Mr. Kachajian was continuously present, there was legal posturing by both sides, animated conversation and some hard feelings expressed, also by both sides, and some frustration on my part with the complete lack of flexibility coming from Mrs. Kunelius' side of the table. In response to Attorney

Kachajian's express threat of suit against TPL, I said that TPL believed the liquidated damages provision would be enforced and that TPL would accordingly prevail if litigation was brought.

28.    TPL has continued to try to explore creative alternatives for acquiring and conserving the Property. My handwritten notes, attached hereto as Ex. O (TPL-KUN 01167), represent one such effort. They reflect a new proposal to create a new house lot fronting on Tuttle Lane and to seek $200,000 to $300,000 from a state grant. Although the grant program is not identified in my note, it is not the previously denied DHCD housing grant because my note lists as one of a series of "Next Steps" the need to confirm that the Town Meeting $300,000 vote (of CPA open space funds) was separate from the $100,000 vote (of CPA funds for affordable housing). The need for such confirmation is the result of no longer including the affordable housing component in the proposed development scenario. I believe the state grant program referenced in these notes is the drinking water protection grant program administered by the Commonwealth's Executive Office of Energy and Environmental Affairs ("EOEEA"), which TPL has considered in connection with the Kunelius property subsequent to its default under the Agreement. Plaintiff's summary judgment motion cites the entry in this note denoted as "#1 Major Idea:  Don't even bother trying to create 2 lots out of the existing compound. Two many variances; two much uncertainty.  One large lot," as evidencing that TPL allegedly knew prior to accepting assignment of the ROFR that it likely could not obtain zoning relief to proceed with its planned subdivision of 144 Red Acre Road. This note (TPL-KUN 01167), while not dated, long post-dates assignment and exercise of the ROFR. In fact, it post-dates TPL's default on the Agreement, and even post-dates the discussion and meetings in 2004 regarding TPL's proposal that Mrs. Kunelius consider the tax advantages of a potential  "bargain sale."

29.    TPL devoted substantial time, energy and resources to attempting to conserve the Kunelius Property.  So that TPL can accurately track its project-related costs, both internal and external, TPL staff are directed to record their time to projects and out-of-pocket expenditures by TPL are charged to the projects they support.  Through September 26, 2003 TPL personnel devoted time to the Stow project worth approximately $30,000.00 (calculated based on allocation of the attributable salary expense of TPL project staff), and TPL incurred out-of-pocket costs totaling $18,572.05 in addition to the $19,000 in deposit payments made to Mrs. Kunelius.  In the course of pursuing the Stow project for TPL, I personally attended numerous meetings and municipal sessions and had many dozens if not hundreds of conversations, written correspondence and electronic communications with various interested parties between December, 2002 and TPL's default on the Agreement in September, 2003.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on November 15, 2007.

Craig A. MacDonnell

LIBA/1845570.1

12

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 16, 2007.

/s/ *Richard Oetheimer*
Richard Oetheimer

# EXHIBIT A

MINUTES
BOARD OF SELECTMEN
JANUARY 7, 2003

Present at the meeting that began at 7:00pm in the Town Building were Selectmen Edward R.
Perry, Jr., John Clayton, Jr. Kathleen K. Farrell and Gregory D. Jones. Also present were Town
Administrator William Wrigley and Administrative Assistant Paula Bruno. Selectman Shirley
A. Burchfield was not present.

**Minutes**
The minutes for the meeting held on December 3, 2002 were accepted as submitted.

Selectman Clayton moved to accept the executive session minutes for the meeting held on
January 8, 2002. Seconded by Selectman Jones and voted unanimously.

Selectman Farrell moved to release the executive session minutes for meetings held on February
22, 2001, June 26, 2001, October 4, 2001, November 13, 2001, January 8, 2002 and October 22,
2002. Seconded by Selectman Jones and voted unanimously. The substance of those meetings
has been resolved.

**Administrator's Activities Report**

**Nashoba Regional School District**
Mr. Wrigley informed the Board that the Nashoba Regional School District (NRSD) has issued a
one year Bond Anticipation Note (BAN), at 3% interest, in anticipation of issuing the $3.8
million deficit bond. He also informed the Board that the NRSD expects to issue five one-year
BANs and will then bond for 5 years. They are taking this approach hoping to save interest costs
and equalized payments will be made over the ten years, thus making annual principal and
interest payments.

Mr. Wrigley has estimated that in FY04, Stow's share off this debt payment will be
approximately $168,720 and will attempt to debt exclude this amount at the annual election in
May.

As Mr. Wrigley did not get this information directly from the NRSD, he is attempting to confirm
these numbers with them.

**Police Dispatcher**
On December 27, 2002, dispatcher Scott Annunziata submitted his resignation to Chief Rebello
effective today. He has accepted a similar position with the State Police. Mr. Wrigley,
Selectman Clayton, Chief Rebello and Chief Soar will be interviewing experienced and qualified
dispatchers for his replacement. Hiring will be as soon as possible.

Page 2
January 7, 2003

**FY04 Budget**
Mr. Wrigley is beginning to develop a budget baseline for FY04 and explained that certain uncontrollable budget expenditure impacts are known. Those being the NRSD deficit bond payment of $168,720, which will cause a 2% increase in next year's assessment. The Middlesex Country Retirement assessment will increase approximately 21% and the group health care premium will increase 15%.

A decrease in the state aide is expected at yet a determined percentage, which will impact both the Town and the NRSD. The loss in Chapter 70 money to the NRSD is generally compensated for by a corresponding increase in the Town's NRSD assessment.

**Middlesex County Retirement**
Selectman Clayton moved to support the proposed legislation to make a statutory change to Massachusetts General Law 30B Section 19A with regard to the Middlesex Country Retirement. Seconded by Selectman Jones and voted unanimously.

**Kunelius property**
Craig MacDonnell, Project Manager for the Trust for Public Land (TPL), was present to inform the Board and the public in attendance how his firm could help the Town acquire the Kunelius property that is located on Red Acre Road.

Mr. MacDonnell explained that the two houses on the property would be deeded as affordable housing units in perpetuity, the horse farm and stables would be used to house a non-profit horse rescue organization and 46 acres would remain with the Town for municipal purposes.

Mr. MacDonnell explained that TPL usually requests 50% of the selling price as the Town's contribution to facilitate the risk for their undertaking of such a project but went on to explain that revenues from the selling of the homes and other private donations would lower the Town's contribution to $400,000. Some of which could possibly come from the Community Preservation Act under an affordable housing project. He also explained that the Town could request self-help money from the state to help fund the Town's expense.

If the Board of Selectmen transferred the right of first refusal to the Trust For Public Land, the TPL would end up owning the property. The Town and TPL would work together to draw up a deed to include the Town's requirements for their contribution of $400,000.

Stephen Johnson of Mosaic Commons spoke against this proposition by stating that if the original buyers were to acquire the property, the Town would get those same 46 acres for no money.

Response to this comment was that the character and cost of services, if a 30-unit development were to be built, would cost the Town much more in the long run than the monies requested at this time.

Page 3
January 7, 2003

Selectman Clayton moved to support the efforts of The Trust For Public Land. Seconded by Selectman Farrell. After a brief discussion on the affordable price of roughly $7,000 per acre, by majority vote, this motion passed with Selectmen Clayton, Farrell and Perry voting in favor and Selectman Jones voting against.

## Stow Municipal Electric Department (SMED)

Selectman Clayton moved to support the motion put forth by SMED for the upcoming Special Town Meeting. Seconded by Selectman Jones and voted unanimously.

It is noted that an argument from an audience member feels that this agreement is less than optimal.

## School Building Committee

Nancy Fleming, School Building Committee Chair, informed the Board that her committee was not going to request funding for a new school building at Special Town Meeting. Rather they will be requesting additional monies to continue the site evaluation process and do a traffic, water and wastewater study.

Selectman Jones moved to support this motion. Seconded by Selectman Clayton and voted unanimously.

## Adjournment

It was unanimously voted to adjourn at 9:05pm.

Respectfully submitted,


Paula Bruno
Administrative Assistant

# EXHIBIT B

# Town of Stow



# Annual Report
# 2003

### *Red Acre Farm*
#### The First Hundred Years
##### 1903 - 2003

KUN205

## 2003 VITAL RECORDS

| | |
|---|---|
| MARRIAGES | 14 |
| BIRTHS | 72 |
| DEATHS | 28 |

Individual listings are omitted as a security precaution to deter identity theft.

## TOWN CLERK 2003 FINANCIAL TRANSACTIONS

### Fees Collected

| | |
|---|---|
| Vital record copies, bylaws, maps, etc | $2,480.03 |
| Fines, bylaw violations, late fees | 2,200.00 |
| Uniform Commercial Code filings | 518.44 |
| Business Certificate filings | 1,100.00 |
| Fuel storage tank registrations | 20.00 |
| Raffle permit | 10.00 |
| Dog Licenses | 9,091.00 |
| Kennel Licenses | 610.00 |
| | |
| Total Fees Collected | $16,029.47 |

## SPECIAL TOWN MEETING
## JANUARY 13, 2003

Pursuant to the Selectmen's warrant of December 17, 2002, posted by the Constable on December 27, 2002, the Special Town Meeting was called to order by Moderator Edward Newman at 7:00 pm in Hugh Mill Auditorium at Hale School.

Mr. Newman gave an invocation and then led the meeting in the Pledge of Allegiance to the Flag. He introduced Deputy Moderator Gary Horowitz and Assistant Moderator Ellen Sturgis. Also introduced were the Town Clerk, Assistant Town Clerk, the Selectmen, Town Counsel, Town Administrator, Selectmen's Administrative Assistant, members of the Finance Committee and Planning Board.

Moderator Newman advised that several non-voters were in attendance to answer questions or offer information. The voters had no objection to Keith Hoffses and David Finney of The Design Partnership with regard to Article 4 concerning school design, nor to those who may speak to Article 5 concerning the Kunelius property.

Steve Dungan, chairman of the Finance Committee, advised that the motion for Article 4 would differ from the printed warrant in that an appropriation from the Stabilization Fund would be requested, rather the borrowing of a sum of money. Thus, there would be no impact on the tax rate. On the other hand, there would be an impact should Article 5 to purchase the Kunelius property be approved. A graphic was displayed to depict the additional taxes for the typically

KUN206

assessed property value as related to the appropriation of $100,000 to $600,000 as being from $23 to $70 annually.

On motion of Selectman Edward Perry, Jr., it was voted unanimously that the reading of the warrant and return of the constable thereon be waived but made a part of the record of this meeting, and that the Moderator be permitted to refer to each article by subject matter instead of reading each article in its entirety.

## ARTICLE 1. Zoning Bylaw Amendment - Active Adult Neighborhood (AAN)

On motion of Selectman Shirley Burchfield, it was voted unanimously to amend the Zoning Bylaw Section 8.8.1, introductory paragraph of Active Adult Neighborhood (AAN), by deleting the words "from time to time" and by adding the words "in accordance with applicable law" and "Planning Board under its Rules and Regulations" in the third sentence thereof, and leaving the balance of Section 8.8.1 as it currently exists, so that the introductory paragraph shall read as follows:

8.8.1  Purpose - Stow cherishes the wisdom and experience of our citizens, and encourages continuity and participation in the Town by its residents. This bylaw is intended to provide housing designed for adult residents age 55 and older who no longer want to maintain a single-family home. Preference shall be given to Stow residents and shall be achieved by local preference requirements as established, in accordance with all applicable law, by the Town of Stow Planning Board under its Rules and Regulations. An AAN shall be designed to:

Planning Board member Bruce Fletcher read the report of the Planning Board as the result of the public hearing on the amendment proposed to address concerns of the Attorney General's office. Adoption was recommended. The Finance Committee was in favor of adoption.

*Report of Planning Board re Article 1 - January 13, 2003 Special Town Meeting*
The Planning Board held a duly noticed Public Hearing on January 7, 2003 at 7:15 pm in the Stow Town Building to consider a proposed amendment to the Stow Zoning Bylaw to: Amend Section 8.8.1, paragraph 1, to clarify the reference to the term "local preference requirements."

Section 8.8.1 of the Bylaw references "local preference requirements established by the Town of Stow." The Attorney General noted (1) it is not clear what these requirements are and where they may be found; and (2) whether the "Town of Stow" means Town Meeting or the Planning Board, who is authorized under Section 8.8.4.2 to establish rules and regulations necessary for implementation of the Bylaw.

The proposed amendment addresses these concerns by indicating local preference requirements are established <u>in accordance with applicable law, by the Town of Stow Planning Board under its Rules and Regulations</u>.

At its meeting of January 7, 2003, by a unanimous vote of four members present, the Planning Board voted to recommend adoption of Article 1 to Town Meeting.

KUN207

## ARTICLE 2. Road Construction Funds

On motion of Selectman John Clayton, Jr., it was voted unanimously to appropriate and transfer from available funds the following sums of money for highway purposes:

1. For construction, reconstruction and/or improvements to Town Public Ways, the sum of $67,186.38, to be reimbursed by the Commonwealth of Massachusetts pursuant to Chapter 53 of the Acts of 1999.

2. For construction, reconstruction and/or improvements to Town Public Ways, the sum of $134,372.77, to be reimbursed by the Commonwealth of Massachusetts pursuant to Chapter 246 of the Acts of 2002.

The Finance Committee was in favor of this article.

## ARTICLE 3. Stow Municipal Electric Department

On motion of Selectman Perry, it was voted 216 in favor and 185 opposed to:

A. Reject, in accordance with Massachusetts General Laws Chapter 164, Section 43, the tender of a deed of conveyance of the property owned in Stow by the Hudson Light and Power Department at the price and upon the terms determined by the Department of Telecommunications and Energy (DTE) as set forth in the DTE's decision in D.P.U. 94-176 dated February 16, 1996, that was affirmed by the Supreme Judicial Court, and the DTE's decision in D.T.E. 94-176-C dated January 30, 2001;

B. Accept the terms of the settlement agreement as presented at the Stow Special Town Meeting of January 13, 2003 (the terms having been negotiated between the Stow Municipal Electric Department and the Hudson Light and Power Department);

C. Authorize SMED's attorney to dismiss the appeal SMED has filed challenging the DTE's decision in D.T.E. 94-176-C & E dated January 30, 2001 and May 14, 2001, respectively;

D. Rescind the votes of the Town Meeting taken in 1993 and 1994 to establish Stow's own municipal lighting plant;

E. Dissolve and abolish the SMED Board, duly established pursuant to Massachusetts General Laws Chapter 164, Section 55, as a municipal light board by vote of the Town Meeting on June 2, 1994, and transfer all functions heretofore exercised by said board to the Board of Selectmen; and

F. Transfer to the Town's general fund the unexpended SMED funds, including but not limited to those funds that have been raised, transferred, borrowed and/or appropriated for legal and engineering work involved in establishing a municipal light plant.

KUN208

The Finance Committee did not recommend approval of this article, but pointed out that about $85,000.00 would be returned to the general fund; there would be a payment to the Town of $32,000.00 from Hudson Light and Power in lieu of taxes; a reduction in the street light rate. If not approved, there will be additional litigation expenses, with no idea of that cost.

Richard Mortenson, chairman of the SMED Board, advised that the separation process has been long (12 years) and costly to both the Town and Hudson Light and Power. Hudson Light's rates are competitive and the service exceptional. It is time to end the separation effort. The SMED Board is unanimous in urging voters to support the article. Mr. Mortensen related the history of the separation effort and said it is highly unlikely that SMED's Supreme Judicial Court appeal would prevail and would probably be remanded to the Dept. of Telecommunications and Energy. He reviewed the terms of the settlement agreement, one of which allows the appointment of a non-voting Stow representative to the Light Board. Mr. Mortenson described the settlement agreement as the best that can be negotiated.

Allen Fierce, former member of the SMED Board, spoke in opposition to the article. He did not believe this was the way to settle the matter and felt the agreement would commit Stow to the role of "captive customers." If the Supreme Judicial Court appeal is dropped it will undermine Stow's right to leave Hudson Light in the future. The issue is will there be an option to separate in the future. He felt the appeal should proceed and that the Town could be successful in that regard.

Selectman Perry said there were valid points to both sides of the argument. He believed this to be the best settlement to the matter. It comes down to the cost benefit and the legal costs. He felt the situation was different than it was 12 years ago. The Selectmen had voted unanimously to support this article on a cost benefit basis.

Many voters spoke to the issue, in favor or not, including those connected to the power industry. A call for the question was approved. The Moderator called for a hand count when he determined the vote was too close to call. The result, with 401 votes, was Yes 216, No 185. The motion carried.

## ARTICLE 4. School Design

On motion of Selectman Kathleen Farrell, it was voted unanimously to appropriate and transfer from the Stabilization Fund the sum of $60,000.00 for the purpose of preparing engineering plans and reports, conducting site analyses and studies, obtaining project cost estimates, developing design plans and specifications, and incurring any other costs incidental and relative thereto for and including, but not limited to, the current Center School and Pompositticut School sites, provided that the School Building Committee shall further evaluate the feasibility of renovating and/or adding to Center and/or Pompositticut Schools, for the purpose of considering school building and construction needs in order to determine the school building requirements to house all eligible students grade pre-K through grade 5; to transfer any and all unexpended funds remaining from Article 28, voted at the Annual Town Meeting in May 2002, to be added to the amount of money voted in this article for such purposes; such funds to be expended under the direction, supervision and control of the five-member School Building Committee established

KUN209

and appointed jointly by the Stow Board of Selectmen and Nashoba Regional School Committee pursuant to Article 28 of the May 2002 Annual Town Meeting.

The Finance Committee was in favor of this article. Karen Meyer of the Capital Planning Committee gave a lengthy report and urged looking into all options, such as renovation of Center and Pompositticut Schools. She noted the uncertainty of State reimbursement for construction costs. This article, as moved, expands the scope of the committee's charge and is in the best interests of the Town.

Deborah Woods of the School Building Committee reported on the feasibility study completed in November 2002. Both Center and Pompositticut must be brought up to code, i.e., electrical, plumbing, HVAC, roofs, etc. Renovation of both will be required to house the 10-year projection of students. The original proposal had been to construct a new building to the rear of Center School that would then be demolished ($21.5 million). The Pompositticut would be available for other purposes. Following the recent public forum, it was decided to take more time to study the situation. Three new sites (to be determined) will be reviewed. The enrollment projections will be validated. A new proposal will be brought forth at the May Annual Town Meeting.

Nancy Fleming of the Regional School Committee offered information. David Finney and Keith Hoffses of The Design Partnership answered questions. Many voters asked questions or offered opinions.

When put to a vote, the motion carried unanimously.

At this point, Moderator Newman called for a two-minute intermission for leg-stretching.

### ARTICLE 5. Kunelius Property

On motion of Selectman Farrell, it was voted, by declaration of the Moderator of a hand vote in excess of the two-thirds required, to borrow $305,000.00, including all loan closing and other related costs incidental thereto, for the purpose of acquiring a fee simple, or other rights or interests, in all or a portion of the so-called Kunelius property located at 142 and 144 Red Acre Road, described in the Middlesex South District Registry of Deeds in Book 15412, Page 316 and Book 26320, Page 255; such parcels totaling 50.67 acres, a portion of which shall be acquired for the purpose of developing and establishing a future water resource and supply for the Town, or for any other municipal purpose as may be determined by the Board of Selectmen, and a separate portion of which shall be acquired for the purposes of conservation under the jurisdiction and control of the Conservation Commission, and a portion of which may be sold or developed for the purpose of providing for all or a portion of the costs of the acquisitions of the Kunelius property, with the boundaries of each such portion to be determined by the Board of Selectmen in consultation with the Conservation Commission; and

to authorize the Town, through its Board of Selectmen and other agents, to enter into any and all agreements and to execute any and all instruments for this purpose, including an assignment of the Town's right pursuant to M.G.L. Chapter 61, Section 8 to a qualified non-profit conservation group to acquire all or a portion of said parcel or parcels, subject to such terms and conditions as the Board of Selectmen may impose;

**KUN210**

provided, however, that an affirmative vote on this article shall be null and void, and of no further force and effect, unless the Town approves by affirmative vote a ballot question to exempt the amount voted by borrowing from the provisions of Proposition 2 1/2.

The Finance Committee was not in favor of the article. The Capital Planning Committee was in favor.

David Cobb, a resident of Red Acre Road, described the property as one containing 50 acres with two residences and a large aquifer. The plan is to acquire the property in conjunction with The Trust for Public Land. The existing dwellings would be deeded in perpetuity. There would be no impact on Town resources. He said that a proposal for a 30-unit co-housing development was wrong for this parcel.

Craig MacDonnell of The Trust of Public Land would work with the Stow Conservation Trust and the Friends of Red Acre together with the Selectmen with regard to the Chapter 61A assignment. TPL would be the project manager.

Attorney Peter Kachajian, representing Ms. Kunelius, said that the alternate co-housing proposal would add eight units of affordable housing to the Town's inventory, to be developed on eight acres. The remaining 42 acres would be transferred to the Town as a charitable contribution. Steve Johnson, representing Mosaic Commons, verified that. The co-housing would be state-of-the art with energy efficient features and tertiary septage treatment. Chris ScottHanson of Cohousing Resources also spoke.

Selectman Perry advised the Selectmen would transfer the right of first refusal to The Trust for Public Land if the Town votes to appropriate the $305,000.00.

Questions were asked and answered. Comments were made in support of conservation and possible use of the property as a horse sanctuary. Others pointed out the Town would realize a gift of 42 acres whether purchased or not.

There was a call for the question which was voted unanimously. When put to a vote on the main motion, the Moderator declared the hand vote to be in excess of the two-thirds required for the borrowing.

*NOTE: The question on the ballot for the January 23, 2003 special election failed to pass: Yes 355, No 515, Blank 1. Therefore, the affirmative vote on Article 5 shall be null and void and of no further force and effect.*

## ARTICLE 6. Community Preservation Fund
On motion of Selectman Burchfield, it was voted unanimously to reserve and add to existing reserved monies for later appropriation from the Stow Community Preservation Fund, or annual revenues therefrom, for the undertaking of Community Preservation projects in Stow, in accordance with the provisions of Massachusetts General Laws Chapter 44B, the following sums for the stated purposes:

KUN211

| Preservation of Historic Resources | $14,600.00 |
| Conservation of Open Space | $14,600.00 |
| Provision of Affordable Housing | $14,600.00 |

The Finance Committee was in favor of the article, described as one of bookkeeping.

### ARTICLE 7.  Community Preservation Fund - Affordable Housing
On motion of Robert Wilber of the Community Preservation Committee, it was voted unanimously to Take No Action on this article. He explained that more information was needed on the use of the funds.

### ARTICLE 8.  Citizens' Petition re Wetlands
On motion of Ingeborg Hegemann Clark, it was voted unanimously to refer the matter to the Conservation Commission for further deliberation and consideration at the May Town Meeting.

### ARTICLE 9.  Special Town Election
On motion of Selectman Gregory Jones, it was voted unanimously at 10:38 pm to adjourn the meeting until the Special Election on Thursday, January 23, 2003, commencing at 7:00 am at the Center School Gymnasium in Stow, then and there to act on Article 9 for ballot question 1 and ballot question 2 as listed in the warrant; and thereafter, at the close of the polls, to dissolve this meeting.

Checkers at the Door:  Janet Derby, Utahna Hallet, Elizabeth MacGilvra, Eila Makey, Loretta Sagar, Judith Scraggs.

Tellers for the Special Town Meeting:  Heinz Bachmann, Wendy Bachmann, Pennie Cushing, Margaret Irwin, Jean Lynch, Edwin Merrick, Jayne Merrick, Constance Mohr, Joanne Newman, John O'Connell, Edward Perry, Sr., Donald Rising, Marcia Rising, Kathleen Sferra, Dwight Sipler, Laura Spear.

Timekeeper:  Catherine Desmond

Number of Voters Checked:  430

Number of Registered Voters:  4,162

A true copy.  Attest:  Linda E. Hathaway, Town Clerk of Stow

*NOTE:  The amendment to the Zoning Bylaws adopted under Article 1 was approved by the Attorney General on March 3, 2003.  Posted as a Town Bulletin on March 12, 2003.*

**KUN212**

## SPECIAL TOWN ELECTION
## JANUARY 23, 2003

Pursuant to the Selectmen's warrant of December 17, 2002, the special town election was held in Center School Gymnasium/Auditorium, 403 Great Road, and was called to order at 7:00 am to act on two ballot questions.

After examining the ballot box and finding it empty and in good order, the counter was set to zero. The ballot box was then locked and the keys delivered to the Warden who declared the polls open.

During polling hours fourteen absentee ballots were opened, recorded and cast into the ballot box. There were four spoiled ballots. The polls were declared closed at 8:00 pm, with 871 ballots cast. There were 4158 registered voters. At 8: 30 pm September 9, 2003 the results were announced as follows:

QUESTION 1.
Shall the Town of Stow be allowed to exempt from the provisions of Proposition 2 1/2, so-called, the amounts required to pay for the bond issued in order to acquire a fee simple, or other rights and interests in all or a portion of the so-called Kunelius property for the purpose of developing and establishing a future water resource and supply for the Town, or for any other municipal purpose?

Question did not carry.        Yes – 355      No- 515        Blanks – 1

QUESTION 2.
Shall the Town of Stow be allowed to exempt from the provisions of Proposition 2 1/2, so-called, the amounts required to pay for the bond issued for the purpose of considering school building and construction needs, and preparing design plans and specifications, engineering plans, studies and reports, project cost estimates; and other costs incidental and relative thereto?

Question did not carry        Yes- 351      No - 442        Blanks – 78
Note: Town Meeting voted not to borrow money for this question and to instead use $60,000.00 from the Stabilization Fund.

### ELECTION WORKERS

Warden
Carolyn R. Johnson

Clerk
Rebecca Faford

Checkers
Janet Derby
Elizabeth D. MacGilvra
Eila J. Makey
Judith A. Scraggs – Deputy Clerk

Ballot Box Officers
Viola E. Bond
Ellen S. Veazey

KUN213

## Article 34. Community Preservation Expenses

On motion of Mr. Wilber, it was voted unanimously to take no action on this article. The appropriation and transfer from the Community Preservation Fund was accomplished under Article 5.

At 10:18 pm the meeting was adjourned to reconvene on Wednesday, May 21, 2003 at 7:00 pm in Hale School Auditorium.

## MAY 21, 2003
### (Third and Final Session)

Moderator Newman declared the third and final session in order at 7:00 p.m. Several Hale School students again led the meeting in the Pledge of Allegiance to the Flag. Deputy Moderator Ellen Sturgis reviewed actions taken the previous evening.

Town Administrator Wrigley responded to voter questions concerning the four ballot questions to be voted upon at the annual election on May 27th, three for debt exemption and one a proposition 2 1/2 override. The first is for a bond to finance the Town's assessment for the School District deficit bond payment and will be in effect for the ten-year life of the bond (Article 5.1). The second question seeks approval of a $414,51.00 override for the purpose of funding the FY2004 Nashoba School District operating budget. The District budget vote was not contingent upon an override, therefore, if question 2 were approved, it would provide additional levy limit. Current estimates are that one million dollars will be required to balance the Fiscal 2004 budget. Question 3 seeks to exempt debt for the Pompositticut and Center School capital projects (Article 26). Question 4 seeks to exempt debt to finance acquisition of the former Hewlett-Packard/Compaq/Digital property at the corner of Hudson Road.

## Articles 35 and 36.

On motion of Selectman Perry, it was voted unanimously that Article 35 and Article 36 be combined for purposes of discussion, but each article be acted on by separate motion.

## Article 35. Community Preservation - Kunelius Property

On motion of Robert Wilber of the Community Preservation Committee it was voted by majority to appropriate and transfer from the Community Preservation Fund the sum of $300,000.00 to be expended under the direction of the Community Preservation Committee for the purposes of acquiring by purchase or gift a certain parcel of land containing approximately 44.57 acres of land located on Red Acre Road, Stow, Middlesex County, Massachusetts for conservation, active and open space, for any other municipal purposes as the Town shall hereafter determine, so long as areas designated for separate purposes shall be clearly identified and delineated;

that the Board of Selectmen be authorized to negotiate such purchases upon such terms, provisions and conditions as the Board of Selectmen and the Community Preservation Committee deem, in their discretion, to be appropriate, including terms addressing easements over the adjacent parcels of land located at 142 and 144 Red Acre Road providing appropriate conservation restrictions and access to the 44.57 acre parcel;

KUN214

that such acquisition shall occur only after the Community Preservation Committee and the Board of Selectmen have received an appraisal from a qualified real estate appraiser that confirms to their satisfaction the value of the interest being conveyed to the Town hereunder;

and that the Board of Selectmen and the Community Preservation Committee be authorized to take all other actions necessary or appropriate to accomplish the foregoing consistent with the Community Preservation Act.

Craig MacDonnell, Director of The Trust for Public Lands, described the property, its location and the history of the project. The existing dwelling at 142 Red Acre Road would be renovated and sold as affordable. The dwelling at 144 would be acquired by "Eye of the Storm," an equine rescue entity. There would be a permanent conservation restriction. The appropriation would afford the Town a deeded access across the property to the fire pond and to the potential water supply resource. The affordable housing restriction under Article 36 would provide two affordable dwelling units and count toward the Town's 10 percent goal. Both units would be renovated to code prior to being turned over to the Town. Mr. Wilber advised the property would serve as a connector to existing conservation lands, Red Acre Woodland and Captain Sargent Land.

Selectman Gregory Jones moved to amend as follows: "...$300,000.00 to be expended under the direction of the Conservation Preservation Committee for the purpose of acquiring by purchase a certain parcel of land containing approximately 2.47 acres of land located off Red Acre Road, Stow, Middlesex County,..."

Linda Hathaway, speaking as a taxpayer, reminded that a ballot question at the January special town election concerning debt exemption for acquisition of the Kunelius property had failed. James Dunlap questioned the effect on the aquifer of the presence of horses and their waste products.

At 8:03 pm there was a call for the question which carried, and the meeting proceeded to vote on Mr. Jones' amendment. The motion to amend DID NOT CARRY.

Discussion continued on the main motion. Ms. Hathaway noted the Zoning Board of Appeals will conduct a public hearing on June 2nd for frontage variance concerning 144 Red Acre Road. She inquired into plans if the variance were not granted. Mr. MacDonnell felt it likely the variance would be granted. If not, there would be a re-examination of the project.

Leonard Golder asked how the project would be financed. Mr. MacDonnell responded that normally The Trust for Public Land asks the municipality involved to contribute 50 percent of the purchase, but here the Town is being asked for only $300,000.00, plus $100,000.00 for the affordable component. Mr. Wilber indicated that self-help funds would be sought from the State. The Selectmen were said to support the project.

At 8:24 pm there was a call for the question that carried. The vote on the main motion was in excess of a majority.

KUN215

**Article 36.  Affordable Housing Restriction**

On motion of Robert Wilber of the Conservation Preservation Committee, it was voted by majority to, appropriate and transfer from the Community Preservation Fund the sum of $100,000.00 to be used and expended under the direction of the Community Preservation Committee for the purpose of purchasing a property interest commonly known as "affordability restriction" for two properties located at 142 and 144 Red Acre Road; that the Board of Selectmen be authorized to negotiate such purchase upon such terms, provisions and conditions as the Board of Selectmen and Community Preservation Committee deem, in their discretion, to be appropriate; and that the Board of Selectmen and the Community Preservation Committee be authorized to take all other actions necessary or appropriate to accomplish the foregoing consistent with the Community Preservation Act.

**Article 37.  Adjustments to Eligibility Requirements under Chapter 59, Section 5(41C)**

On motion of Selectman Shirley Burchfield, it was voted unanimously, pursuant to Chapter 184, Section 51 of the Acts of 2002, to allow for the adjustment in eligibility requirements and in the amount of the exemption granted to those qualifying under Mass. General Laws Chapter 59, Section 5(41C), as such eligibility requirements and amounts are printed in the warrant.

1.  Decrease the age requirement from 70 to 65.
2.  Increase the income limits from $13,000 single/$15,000 married to $20,000 single/ $30,000 married.
3.  Increase the asset limits from $28,000 single/$30,000 married to $40,000 single/ $55,000 married.
4.  Increase the exemption amount granted by 100 percent.

**Article 38.  Amendment of the Nashoba Regional School District Agreement**

On motion of Selectman Jones, it was voted unanimously to authorize the Nashoba Regional School District Committee to vote to amend the existing Nashoba Regional School District Agreement, as printed in the warrant, and to authorize the Committee or the Town of Stow to petition the Great and General Court to enact any special legislation as may be necessary for such purpose.

Section 1. (A) The powers and duties of the regional school district shall be vested in and exercised by a regional school district committee, sometimes referred to as the committee. The committee shall consist of eight members: three from the Town of Lancaster, three from the Town of Stow and two from the Town of Bolton. Such committee had members elected at the 2001 annual election of each Town as follows: Bolton: two members, one for a term of three years and one for a term of two years; Lancaster: three members, one for a term of one year, one for a term of two years, and one for a term of three years; Stow: three members, one for a term of one year, one for a term of two years, and one for a term of three years. At the expiration of each term set forth above, each Town will elect a member for a term of three years.

If a vacancy occurs among the members of the committee, the Selectmen and the remaining members of the committee from the Town involved, acting jointly, shall appoint a new member by ballot within one (1) month after the vacancy occurs to serve until the next Town election, at which time a new member will be elected to serve the remainder of the vacated term.

KUN216

# EXHIBIT C

THE TRUST FOR PUBLIC LAND
PROJECT FACT SHEET
(version 2000-1)

## PART I: PROJECT OVERVIEW

1.    PROJECT NAME: Stow – Kunelius Farm

2.    DATE: January 30, 2003

3.    CITY, COUNTY, STATE:  Stow, Middlesex County, Massachusetts

4.    TPL REGION: NERO

5.    PROJECT MANAGER:  Craig MacDonnell

6.    PROJECT NUMBER:

7.    ACREAGE, LOCATION AND ADJACENT PROPERTIES: 50.67 +/- acres, adjacent to Red Acre Woods conservation area (196 acres) owned by the Stow Conservation Trust, and the Captain Sargeant conservation area (153 acres) owned by he Town of Stow Conservation Commission.

8.    PROGRAM DESCRIPTION: This the latest in NERO's Community Partnership Program

9.    ACTION REQUESTED AND PRIOR APPROVAL HISTORY:  We are seeking authority to:

    (1)    accept an assignment of the Town of Stow's right of first refusal to purchase the property;
    (2)    sign a $400,000 note payable to the seller;
    (3)    acquire the property for $1,116,900 with $400,000 in seller financing; and
    (4)    convey 45+/- acres to the Town and two other parcels in private sales.

10.    SUMMARY OF TRANSACTION:

    This project presents the opportunity to protect 50 acres of wetlands and uplands situated above Stow's largest aquifer and to preserve an existing horse farm in lieu of a 30-unit co-housing facility. NERO will divide the property into 3 parcels: the 45+/- acres that will be sold to the Town and two lots with existing

1

TPL-KUN 01124

houses that will be sold privately.  The houses will be sold with affordability restrictions.

## Project Facts

- Size: 50 +/- acres
- Acquisition Price: $1,116,900
- Deposits of $22,000 secure the property until 9/26/03
- $694,900 due at closing 9/26/03, plus $400,000 note and mortgage
- Fundraising: $400,000 identified; $200,000 pledged;
- NERO must accept ROFR on or before 2/13/03 and exercise by that date
- Gross Support: Approximately $183,100 excess of asset sales and fundraising over acquisition cost
- Net Support: $93,881
- Town Vote: Stow will conduct its regular spring Town Meeting and will vote whether to invest (1) $300,000 from its pre-existing Community Preservation Fund to purchase a portion (45+/- acres) of the property; and (2) $100,000 from the same fund to purchase affordability restrictions over the two parcels to be sold privately.
- Remainder of funding as described above is dependent upon (1) private sales of the two houses; and (2) private philanthropy
- Due diligence will include (1)determining the environmental condition of the property, (2) inspecting the houses; and (3) researching the ease of subdividing the property as required.
- TPL's mission is served by virtue of the transaction assisting the Town in (1) connecting two large conservation areas on either side of the Kunelius Farm; (2) protecting Stow's largest aquifer, which lies beneath the surface of the area to be conserved; (3) creating two affordable houses in an otherwise very expensive rural suburb of Boston; and (4) assisting in the continued good work of a non-profit organization dedicated to horse rehabilitation, Eye of the Storm Equine Rescue.

2

Below is a table summarizing the Sources of Funds for the project:

| Sources of Funds | Amount | Status | Availability | Interest |
|---|---|---|---|---|
| CPA Affordable Housing | $100,000 | Vote at Spring Town Meeting | Before 9/03 closing | Restrictions on two residences |
| CPA Open Space | $300,000 | Vote at Spring Town Meeting | Before 9/03 closing | Town fee open space |
| Private Sale of Residence | $200,000 | Market asap | Affordable units sell fast | Modest residence |
| Eye of the Storm | $300,000 | Under negotiation | As soon as non-profit can secure funds | Fee to barn and residence |
| Stow Conservation Trust | $200,000 | $100,000 pledged; balance under consideration | Spring 2003 | Trail hook-up with adjacent land owned by Trust |
| Other fundraising | $200,000 | $100,000 pledged | Spring campaign | None |
| TOTAL | $1,300,000 | | | |

11.    GROSS SUPPORT/OTHER SUPPORT: $183,000

12.    NET SUPPORT: $93,881

13.    CAPITAL REQUIREMENTS: N/A

If more than $100,000 in capital is required or if capital will be outstanding for more than one year utilizing TPL national funds or outside commercial sources, the CAPITAL ALLOCATION CHECKLIST (Addendum 1 to this Fact Sheet) must be completed and attached. Additionally, if capital will be outstanding for more than one year, a discounted cash flow analysis is required.

14.    HOLDING PERIOD: None, back to back

15.    PROGRAMMATIC VALUE ASSESSMENT:
In the view of the Regional Manager, this projects ranks as follows:

___    Level 1:    Protects a significant land resource and contributes to TPL's mission.
___    Level 2:    Level 1 plus high priority for local constituency
X_     Level 3:    Level 2 plus furthers TPL's regional strategic objectives
___    Level 4:    Level 1 plus high priority for broad regional or

3

TPL-KUN 01126

national constituency
_:_ Level 5:    Level 4 plus furthers TPL's national strategic
objective

16.  SUCCESS AND RISK ANALYSIS

All things considered, the Regional Manager ranks this a
__ High  __ Medium  _X_ Low risk project.

Discuss the chances for success, the risk factors and back-up
strategies:

1. Town Meeting Risk:  The Town must vote at its regular
   spring Town Meeting to acquire the 45+/- acres for
   $300,000 and to purchase the affordability restrictions
   for $100,000 (all to be accomplished using existing
   Community Preservation Funds rather than new taxes).
   This risk is made somewhat greater than it otherwise
   might be as a result of the recent failure of the Town
   to vote to borrow the funds for this project.  In
   January, at its Special Town Meeting, Stow residents
   voted to spend these funds, but the measure was defeated
   by an unsuccessful ballot vote that followed. Mitigating
   this risk, however, are the following factors:
   a. Use of existing funds: The new proposal is to expend
      existing Community Preservation Funds, which would
      not require any new taxes.
   b. Town support:  This risk is further mitigated by our
      reasonable confidence that the Community
      Preservation Committee, the Board of Selectmen and
      the Finance Committee will support the use of such
      dedicated funds.
   c. No referendum required: Spending these funds is
      authorized by Town Meeting, which has previously
      approved this project; no referendum is required.
   d. Fallback: Our fallback strategy will be to backfill
      with greater fundraising efforts and more private
      money.  For example, if the Town does not invest in
      the affordability restrictions, the houses could be
      sold without such restrictions, thus increasing
      their value and potential return to NERO.

2. Accepting the ROFR Before the Town Vote. The second risk
   presented by this project is that NERO must agree to
   accept the Town of Stow's right of first refusal before
   it is possible for us to fully assess the likelihood
   that the Town will vote at it's spring 2003 Town Meeting

4

TPL-KUN 01127

to spend significant sums on this project. Mitigating
this risk are the following factors:
   a. Town support is expected for the reasons described
      directly above (1.a-c.)
   b. Liquidated damages fallback: The contract with the
      seller limits the damages upon default to the
      deposits under the contract, which would be no more
      than $22,000. TPL will receive a donation for this
      amount.

3. Fundraising Risk:  The third risk is the large private
   fundraising requirement. Assuming the investment of
   $400,00 of Town funds and sale of one of the houses for
   $200,000, the fundraising objective is $700,000 (which
   includes assisting the Eye of the Storm raise $300,00 it
   needs to buy the other house and barn. Mitigating this
   risk are the following factors:
      a. Progress: Coordinating with NERO's development
         staff, the local advocacy group (the Friends of Red
         Acre) has begun the fundraising process, and has
         made substantial progress, including actual pledges
         from the Stow Conservation Trust and the Red Acre
         Foundation for $100,000 each, as well as additional
         individual pledges totaling $21,000. The expectation
         is that each of these organizations will deliver
         closer to $200,000 based on discussions with
         trustees and other supporters.
      b. Liquidated damages fallback, as above.

4. Subdivision Risk: The fourth risk presented by this
   project is the subdivision of the property required for
   NERO to sell separate parcels to the Town and the Eye of
   the Storm (the sale of the other house is not
   problematic because it is situated on a separate lot).
   As currently divided, the property consists of two
   parcels, 142 and 144 Red Acre Road, the former being the
   location of the so-called main house; the latter being
   the location of the so-called caretaker's house, barn
   paddock and 42+/- acres of adjacent wetlands and
   uplands.  NERO contemplates dividing 144 Red Acre Road
   into two parcels: one for sale to the Town; and one for
   private sale.  We have been advised by that this
   subdivision will require a dimensional variance to
   account for the hammerhead configuration of the proposed
   lot and a frontage variance to account for there being
   less than the required 150' frontage on Red Acre Road.
   Mitigating this risk are the following factors:

5

a. Local support: We have sought the advice of the Town Planner and a member of the Zoning Board, both of whom have assured us that the variances will be granted.

b. Town Vote Impact:  If the Town votes to spend the money on the project, including $100,000 for the creation of affordable housing, that Town will be respected by the Zoning Board of Appeal, which should be moved to grant the variances.

c. Sale/Lease Fallback:  In the event the variances are not granted we would seek to have the two houses sold together as an existing nonconforming lot separate from the conservation land.  Such a buyer could lease the caretaker's house and barn to Eye of the Storm.  Town might be interested in purchasing an affordability restriction on the rental unit.

d. Liquidated damages fallback, as above.

5.  Litigation Risk:  The landowner is upset by the possibility that the Town may assign the ROFR to TPL. She sees this deal as essential for her retirement.  On the phone, she recently said that she would "sue the Town and others if anybody defaults and I lose my buyer."  She has told us not to call her and to speak only to her attorney, who has not returned our calls. Her attorney may have discussed this subject with the Town Manager recently, as he recently has asked whether TPL would be willing to sign an indemnification agreement.  This risk is mitigated by the following factors:

a. Liquidated damages: The seller's contract is clear that the only damages recoverable upon default are the deposits, which at most would be $22,000.

b. Buyer won't go anywhere:  Even if NERO defaults, it is likely that the buyer, a national development company, would reappear.

c. Lawsuit would be easily defended:  In our view, a Massachusetts court would consider this dispute on a motion for summary judgment after very limited discovery.  Likelihood of prevailing is very high because the contract is so clear.

6.  Private Sale:  The transaction structure anticipates the sale of one existing residence as an "affordable" unit to an as yet unidentified private buyer.  While private sales when buyers are not identified usually raise some questions for concern, in this case because of the scarcity of affordable houses in Stow and the attractive nature of property, NERO is confident that

6

TPL-KUN 01129

many potential buyers will materialize.

## PART II: TRANSACTION DETAILS

17. ACQUISITION FACTS:

    A.  Name and address of seller: Marilyn Kunelius, 142-144 Red
        Acre Road, Stow, Middlesex County, Massachusetts

    B.  Acquisition price and terms of payment: $1,116,900 purchase
        price; $10,000 down; earnest money payments of $12,000
        between now and August 2003; $694,900 due at closing on
        9/26/03, at which time buyer must sign a note and a mortgage
        for $400,000 (7% APR, $2,333 per month principal payments
        over following 24 months).

    C.  Type and current status of acquisition contract: P&S between
        landowner and developer dated October 2002.

    D.  Deadline for exercise or commitment: NERO must accept Town's
        ROFR on or before 2/14/03 and exercise by that date.

    E.  Estimated acquisition closing date: 9/26/03

18. DISPOSITION FACTS:

    A.  Name and Address of Buyer: Town of Stow, Massachusetts
        (45+/- acres) (Town Parcel); Eye of the Storm Equine Rescue,
        Stow, Massachusetts (5 acres, house and barn)(House and Barn
        Parcel); buyer of the other residence (House Parcel)has not
        been identified.

    B.  Disposition price and terms: Town will purchase 45+/- acre
        Town Parcel  for $300,000 if the May Town Meeting authorizes
        the purchase. NERO anticipates selling House Parcel 142 Red
        Acre Road, a separate lot and single-family house, for
        approximately $200,000, a price we are informed would be
        considered affordable by the Stow Housing Authority.  If
        authorized by Town Meeting, NERO would also receive a
        payment of $50,000 from the Town in exchange for the
        imposition of an affordability restriction on this parcel.
        NERO also intends to sell the House and Barn Parcel to Eye
        of the Storm for approximately $300,000.  No contract for
        this parcel has been negotiated yet.  NERO would receive a
        second $50,000 payment from the Town when an affordability
        restriction is imposed on this second house.

    C.  Type and current status of disposition contracts: To be

7

TPL-KUN 01130

negotiated.

D'. FMV; status of appraisal and agency approval: (1) Town Parcel: As for the Town's 45+/- acre parcel, the Town has not yet voted, but will not require an appraisal for the $300,000 acquisition. (2) House and Barn Parcel: This five-acre parcel will be sold to Eye of the Storm for approximately $300,000 and will be subject to an affordability restriction to be purchased by the Town for $50,000. Based on a market review performed by a local real estate broker, the value of this parcel and buildings is approximately $450,000. (3) Single House Parcel: This one-acre parcel containing the main house will be sold to a buyer qualified by the Town as deserving of the opportunity to purchase a property subject to an affordability restriction. The anticipated sales price will be approximately $200,000. Based on a market review performed by a local broker, the value of this property is $300,000.

E. Estimated disposition closing date: The sale of the Town Parcel would be simultaneous with or shortly after the 9/26/03 closing. We anticipate that the other parcels will be marketed during the spring and summer and will be ready for conveyance in September 2003

F. Source of Agency funds: In May, the Town will vote whether (1) to spend $300,000 of funds set aside in the Community Preservation Fund; (2) to bond the $300,000 using funds set aside in the said fund as a source of bond repayments; and (3) to spend $100,000 of said funds to purchase affordability restrictions on the House Parcel and the House and Barn Parcel.

G. Public agency's intended use of property: Conservation and passive recreation (connection to adjacent conserved lands) and to protect the largest aquifer in the area, which sits beneath the property.

H. Status of agency approval of title, survey and environmental condition: This review has not occurred. The due diligence period contemplated under the contract expired before NERO was asked to become involved. We are attempting to work with the landowner and her attorney to gain access to the property for building and environmental inspections and will undertake a title examination. If we are dissatisfied with these examinations, our only option is not to complete the purchase, in which case our deposits will be forfeited as

8

Seller's sole remedy.

19. DESCRIBE ANY SIGNIFICANT TITLE, SUBDIVISION, SURVEY OR ACCESS
PROBLEMS: As discussed in Section 16 above, NERO must subdivide
the property, which will require two variances.

20. STATUS OF DUE DILIGENCE UNDER TPL'S POLICY ON ENVIRONMENTAL
HAZARDS:

A. Has a professional assessment been performed and are we
satisfied with the results? We have not been on the property
yet. NERO will attempt to conduct title research, house
inspections, and an environmental review. See Section 18.H,
above.

B. If an assessment will not be performed, has the project
manager completed an environmental checklist and the
regional manager granted a waiver of an outside assessment
under exceptions for back-to-back closings, "exceptionally
clean" properties or conservation easements? N/A.

C. If neither A nor B has occurred, please explain plan of
action prior to acquisition:

21. DESCRIBE ANY MANAGEMENT OR INSURANCE ISSUES DUE TO
IMPROVEMENTS OR TENANTS:
**Insurance:** Seller is required under the P&S to insure the
Property until the time of closing. NERO will need to purchase
insurance thereafter.

22.
DATE AND RESULT OF SITE INSPECTION: None yet.

## PART III: RESOURCE, DEVELOPMENT, MARKETING AND ARCHIVAL INFORMATION

23. DESCRIBE THE NATURAL AND OTHER RESOURCES UNIQUE TO THIS PROPERTY:

The Kunelius Farm sits atop Stow's largest aquifer and
constitutes a natural linkage between the Stow Conservation Trust's
Red Acre Woods conservation area (196 acres) and the Town's Captain
Sargeant Conservation Area (153 acres). It is a forested area of
wetlands (including several vernal pools, one of which has been
certified by the conservation commission) and uplands. There is
abundant wildlife on the property, including deer, coyotes and wild
turkeys.

9

TPL-KUN 01132

24.  KEY WORDS:

SELECT THE WORDS WHICH APPLY TO THIS PROJECT

| | |
|---|---|
| ____URBAN | _X_ HISTORIC |
| _X_ SUBURBAN | _X_ CULTURAL SIGNIFICANCE |
| ____RURAL | _X_ BUILDING |
| ____WILDERNESS | _X_ FOREST |
| ____PARK | ____MINE/QUARRY SITE |
| ____GARDEN | ____MOUNTAINOUS |
| _X_ TRAIL | _X_ RECREATIONAL |
| ____RAIL-TRAIL | _X_ SCENIC |
| ____OCEAN | ____ARCHEOLOGICAL SITE |
| ____LAKE | _X_ THREATENED OR ENDANGERED SPECIES |
| ____RIVER | _X_ WILDLIFE CORRIDOR |
| ____WATERFRONT | ____TRANSPORTATION CORRIDOR |
| _X_ WETLAND | ____OTHER: |

25.  GEOGRAPHIC STATUS OF PROJECT:

Categorize the project in one of the following categories:

```
___.  U1:  Urban, Underserved
___.  U2:  Urban, Central.
___.  U3:  Urban, Peripheral
_X_.  U4:  Urban, Peripheral/Other
___.  R1:  Rural, Modified
___.  R2:  Rural, Remote
___.  G:   General
```

26.  SOUND BITE: The conservation of the Kunelius Farm brings together three strong community objectives: protection of a key open space and water supply parcel between two existing conservation tracts; creation of affordable housing for the residents of Stow, and the support of a local horse rehabilitation non-profit organization, none of which could have or would have happened without the intervention of the Trust for Public Land.

27.  ROLE OF COOPERATING ORGANIZATIONS, PARTNERS AND VOLUNTEERS (including Board and advisory committee members):  NERO is partnering with Stow Conservation Trust, the Town of Stow, Red Acre Foundation (NEAC member Jerry Bird is a trustee) and the Friends of Red Acre, a local advocacy group.

28.  FUNDRAISING COMPONENT/STRATEGY:

10

TPL-KUN 01133

X Yes     Does this project require fundraising?

X Yes     Does this project offer opportunities to fundraise from individuals, corporations or foundations?

[if yes, complete A. and B. below]

A.    If the project offers fundraising opportunities, and we intend to fundraise, please describe our plan and how it relates to regional fundraising strategy:  Fundraising is a central strategy for this project.  Thankfully, the project has n excellent head start, owing in large part to the participation of one member of the local advocacy group, the Fiends of Red Acre, Peter Christianson.  Peter is a professional fundraiser for Lahey Clinic in Boston, and has been hard at work on this project for several months.  He has identified a number of foundations having open space, affordable housing and equine affinities, and has already received pledges for over $200,000.  Peter will work closely with the Project Manager and NERO's development staff in pursuing the required funds for this project.

B.    If the project offers fundraising opportunities, and we **don't** intend to fundraise, please describe the reasoning, in the context of regional fundraising strategy:

29.  SOURCE OF PROJECT:

A.    Name and address of person/s who were responsible for bringing the project to TPL? NEAC member Jerry Bird and Stow Conservation Trust member Bob Wilber (who works for MA Audubon doing land protection).

B.    Date of contact with TPL: January 2003

C.    How did they hear about TPL?

    ___ Word of mouth.  If so, who referred them?

    ___ Publication.  If so, give the name and date of the publication:

    ___ Advertising.  If so, give the name and date of the advertising source:

    ___ Direct Mail.

11

TPL-KUN 01134

___ Events/conferences.  If so, give name and date of
       event/conference:

X_ Other.  Please specify: NEAC connection: Jerry Bird is
also on the board of the Red Acre Foundation, which played a
central role in conserving an adjacent parcel.

30.  PUBLIC RELATIONS AND MARKETING:

A.  What are our plans for publicizing this project prior to
closing?  NERO will run an extensive local campaign in
advance of Town Meeting in May.  This campaign will include
direct mail efforts and paid and free press.  We anticipate
that the project will enjoy editorial support and received
the endorsement of all relevant local boards and
commissions.

B.  Describe the plans for post-closing publicity:

   X Yes     Press release
   X Yes     Post-closing event
   X Yes     Signage recognizing TPL
     Yes     Other:

Please explain negative responses above:


C.  How can we use this project to build towards other projects
and enhance our relationships with landowners and public
agencies?

    This project (1) enhances NERO's ability to do future project
with the Town of Stow, which recently has passed the Community
Preservation Act; and (2) improves our working relationships with our
partners (Stow Conservation Trust, the Red Acre Foundation, and MA
Audubon).

31.  OTHER CONSIDERATIONS (OPTIONAL):

32.  INNOVATIVE ASPECTS OF THIS PROJECT APPLICABLE TO OTHER PROJECTS:


**PART IV:  FINANCIAL DETAIL**

12

TPL-KUN 01135

| | | |
|---|---|---:|
| Fair Market Value | | 1,116,900 |
| Less: | Land value gift to agency | 0 |
| | Proposed Sale Price | 900,000 |
| Less: | Price Paid by TPL | 1,116,900 |
| Plus: | Private fundraising | 400,000 |
| | | |
| | Estimated Gross Support | **183,000** |
| | | |
| Less: | Anticipated Project Costs | |
| | TPL/outside interest cost | |
| | Interest rate premium (if any) | |
| | Interest on $400,000 note | 40,000 |
| | Property Taxes | 1,600 |
| | Outside Services | 25,000 |
| | *(Environmental, Appraisal, Legal, etc.)* | |
| | Brokerage | |
| | Travel | 500 |
| | Staff Time (Minimum of $1,000) | 10,000 |
| | *(Project, legal and support staff)* | |
| | Other (Operation and Maintenance) | 5,000 |
| | **Subtotal** | **82,100** |
| | Nat. Cost Alloc. (50% staff time) | 5,000 |
| | Total Costs | **87,100** |

**Anticipated Net Support**                    **96,000**

13

TPL-KUN 01136

Stow – Kunelius Farm

33.  AMOUNT INVESTED TO DATE (including staff time):  0.

34.  BUDGETED AND FORECAST GROSS SUPPORT:

REVENUE FROM THIS PROJECT  [ ] IS  [X] IS NOT IN THE BUDGET FOR THE CURRENT YEAR

Budget:  $183,100 prob. 60% Timing 85% = $ 93,881 in Q 3

Forecast from latest Rev Track:

$_____ prob. __% Timing __% = $ _____ in Q__

## PART V: TEXT OF REQUESTED CORPORATE RESOLUTION

"RESOLVED, that the Project Review Committee of the Board of Directors of The Trust for Public Land hereby authorizes (i) acceptance of an assignment of the Town of Stow's right of first refusal to purchase 50+/- acres of real property located at 142-144 Red Acre Road in Stow, Massachusetts; (ii) acquisition of 50± acres of real property located at 142-144 Red Acre Road in Stow, Massachusetts from Marilyn Kunelius; (iii) conveyance of a portion of the property located at 144 Red Acre Road to the Town of Stow, Massachusetts; (iv) conveyance of a portion of the property located at 142 Red Acre Road containing a single family residence to a private buyer; and (v) conveyance of a portion of the property located at 144 Red Acre Road containing a single family residence and a barn to a private buyer."

## ATTACHMENTS

Attach:  1.  Area map

2.  Photographs

PROJECT MANAGER  _Craig A MacDonnell_____
                 Signature      Craig MacDonnell

THE REGIONAL MANAGER APPROVES AND RECOMMENDS APPROVAL OF THIS

14

TPL-KUN 01137

PROJECT.  IF AN OUTSIDE ENVIRONMENTAL ASSESSMENT IS NOT BEING
CONDUCTED, REGIONAL MANAGER CONFIRMS THAT HE/SHE HAS DECIDED TO
WAIVE THE ASSESSMENT UNDER TPL'S ENVIRONMENTAL LIABILITY
PROCEDURES.

Regional Mgr.                    _____

                                Signature       Whitney Hatch


THE STAFF ATTORNEY ASSIGNED TO THIS PROJECT HAS READ THIS FACT
SHEET AND CONFIRMS THAT IT IDENTIFIES ALL KNOWN MATERIAL LEGAL
RISKS.


Staff Atty.                     _____

                                Signature  Dorothy Nelson Stockey

J:~\NATL\FACTSHT2000-1.doc

                                Valerie Talmage
                                Director of Projects


                                15


TPL-KUN 01138

# EXHIBIT D

CW ZBA Stow 2/3/03

Looks "do-able"
Can't give legal advice.
Apply the variance criteria (3 or 4?)

Next steps

☐ Get GtP lawyer
☐ Get plan/survey prepared.

TPL-KUN 01963

# EXHIBIT E

Craig MacDonnell - Re: PRC - Stow - Kunelius Farm Q & A

| | |
|---|---|
| From: | Craig MacDonnell |
| To: | Ann Cole |
| Subject: | Re: PRC - Stow - Kunelius Farm Q & A |
| CC: | Bowen Blair; Eric Love; Nelson Lee |

Ann,

Just picked up your e-mail late last night - was on the road with Whitney. I'm happy to give you and the PRC as much information as I can now.

**Bowen's Questions:**

(1) The original warrant article at the Special Town Meeting in January was approved. But because it contemplated a borrowing that exceeded the town's levy limit a refendum was required. The referndum failed (we believe because it required new taxes). The funding proposal now being considered taps into existing funds created by the town's passage of the Community Preservation Act (CPA), which allows towns like Stow to impose a property tax surcharge for the purposes of funding open space, affordable housing, and historic preservation. These funds can be used directly or bonded against. Approval would only require a majority vote at the regular Town Meeting.

(2) Sorry for the imprecise language. The CPA money can be spent directly or used as an income stream for bond payments. We would recommend that Stow raise the $300,000 via the latter approach.

**Nelson's Questions:**

(1) Yes, significant additional fundraising will be required if the Town does not authorize the expenditure of CPA funds, however, we feel confident that the Town will go forward. We will know more next Monday evening when the CPA committee meets to discuss this project.

From a programmatic standpoint, this project is really about local choice: whether to allow a large multifamily development to be wedged adjacent to the Town's largest aquifer and in between two sizable conservation areas or to encourage a result that maintains the current usage (horse boarding, two modest residences), imposes affordabilty restrictions on the two houses, provides access to a pond on the property for fire suppression, provides the Town access to the aquifer for water devlopment, and deeds the Town significant acreage for conservation and water supply. The public will have access to the conservation areas (the Town may restrict the area directly adjacent to a future wellhead). The watershed area would be protected by the deed from TPL to the Town, which would restrict the uses of the property to conservation and water supply. Under the development option the Town would receive most but not all (42 of 45 acres) of the watershed area via a donation from the

TPL-KUN 01144

landowner, but would not receive access to the pond for fire suppression (important to the fire dep't as there is no town water in the area), and there would be no guarantee of public access or that the donated land would be restricted to conservation and water supply. The private parcels will be restricted in three ways: (1) affordabilty restrictions will mean that the owners of the houses will not be able to sell them except at "affordable" prices determined in consultation with the Stow Housing Authority; (2) a conservation restriction will limit the further development of the parcels; and (3) the barn/paddock area will be subject to an agreement (to be negotiated with Town) about agricultural activities in order to protect the adjacent aquifer.

(2) Town acquired the ROFR by virtue of the property being subject to a tax classification statute (M.G.L. c. 61) giving landowners preferential tax treatment in exchange for limiting usage to forestry activities. The statute gives the Town the right to assign the ROFR to a nonprofit conservation organization like TPL.

(3) Table attached. Katie Fisher, the most prominent broker (more sales than any other) in Stow performed the analysis. She is familiar with all of the properties on the market in Stow (population approximately 5,000). The figures provided in the fact sheet are conservative according to her.

>>> Ann Cole 02/03/03 03:23PM >>>
Hi Craig, thanks for your "heads-up" on the late breaking project and your fact sheet. I was out of the office last week testing the project tracking system off-site, so I wasn't able to return your message; but we did get the fact sheet, were able to circulate it, and the PRC has had a chance to look at it.

There are questions, many of which are solved by a motion on the table offered by Bowen (seconded by Eric Love) that the PRC vote to approve accepting the Right Of First Refusal and to exercise the option, but not to approve closing on the project at this point. You would be requested to come back to the PRC later on with a request to approve details of the take-out prior to closing.

Given that motion, some of the questions Nelson Lee asks, below, would be easier for your to answer later on, but if you can provide information now it would be helpful.

**Here are Bowen's comments and questions:**
Essentially, Im OK with our exercising since we have the ability to walk away under the liquidated damages provision ($ 22K), but I think its premature for PRC to approve closing since so many aspects of the take-out remain uncertain, and our ultimate risk is unclear now,

but should be much clearer by later this summer.

For instance, we'll need to reassess our environmental risk if we aren't given permission to get on the property for testing. There were also some relatively minor aspects of the fact sheet that I didn't understand, and it would be nice to get clarification:

1) The Town process is unclear to me: per par. 16, there was a Special Town Meeting, then there needed to be a subsequent Town vote (on the earlier, borrowing measure), but now there doesnt need to be a subsequent Town referendum. More explanation would be helpful. roubling for me is scenario that arises if the town fails to approve funding for purchasing the 50 acres and the affordability restrictions. We have a significant financial risk, in that the fallback is more fundraising. And, it seems to me, we have a programmatic risk, if the ulimate project design is the sale of private parcels. What is missing for me is a more detailed analysis of the public conservation accomplishments under the best case and worst case scenarios. For example, what are the rights of the public on the parcels? What are the nature of the restricitons on the private parcels. How is the watershed being protected? This has a more practical dimension, as well. If the project has too little public benefit embedded in it, the revenues from the private lot sales may be unrelated business income.

2. How did the town acquire a right of first refusal? How secure is that right?

3. As in Warren, it would be nice to see a clear display of the FMV's and sales prices of all parcels and rights being sold privately. How thorough were the "market reviews" performed by the local broker?

\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Thanks for your help,

PRC meets this Wednesday at 2:00 Pacific Time
(Let me know if the quetions are all bunched together - they shouldn't be, and I can try to resend!)

- Ann

TPL-KUN 01146

2/4/03

# EXHIBIT F

| From: | cobb and karen <cobbandkaren@comcast.net> |
| To: | Craig MacDonnell <Craig.MacDonnell@tpl.org> |
| Date: | Sun, Feb 9, 2003  8:55 PM |
| Subject: | Fw: Notice of Intent Application |

----- Original Message ----
From: cobb and karen
To: Ross_Perry@3com.com
Sent: Sunday, February 09, 2003 8:26 PM
Subject: Notice of Intent Application


Ross -

Attached, and noted below, the Notice of Intent for the Housing Development Support Program which is
due on Tuesday, February 11th! One more deadline at the very last moment. I would sincerely appreciate
your support of filing this "intent" which does not commit the Town to anything BUT it does allow us to
place our application "in the mix." In the next few months we will be able to gather considerably more
information to complete an actual application which is due in April and will allow us to at least be
considered during this round of applications. It is important that we be able to move our affordable housing
rehabilitation forward for the coming year.

We understand that you wish to attach a cover letter stating that this notice is contingent upon "approval"
at the February 11th Board of Selectmen's meeting. Obviously, this 'Notice of Intent' will need to be sent
"Overnight" to arrive at their offices by 5 pm on Tuesday. Please feel free to contact me should you have
any questions. The Friends of Red Acre will be happy to reimburse the Town for the "Overnight" charges.

David


Department of Housing and Community Development

Housing Development Support Program - Division of Municipal Development

One Congress Street, 10th Floor, Boston, MA 02114


http://www.state.ma.us/dhcd/Temp/03/CDBG/alert.pdf

TPL-KUN 02553

Department of Housing and Community Development
Housing Development Support Program (HDSP)
Notice of Intent to Apply

City/Town of _____Stow_____

Contact: (name/title/address/phone): Ross Perry, Chairman,
Board of Selectmen
380 Great Road
Stow, MA 01775
978-89704514

Name of Project: 142/144 Red Acre Road Affordable Housing Conversion Project

Signature of Chief Elected Official: _____

Date: _____

1. Briefly describe the proposed project. Include specific information concerning
   project, size, type, low/moderate income benefit and afford ability terms.

The Red Acre Road Affordable Housing Conversion Project will renovate two existing
single family houses for the purpose of converting existing housing stock to affordable
housing. The two houses, located at 142 and 144 Red Acre Road, will be owner
occupied by low or moderate income households and subject to permanent affordability
restrictions.

2. Is there a need and market for this project?

Yes. Only 5.5% of Stow's housing stock is classified as affordable housing.

3. What are the total estimated project costs? What is the source of the estimate?

The total estimated cost of the project is $125,000 for renovation of the two houses. The
estimate is based on superficial inspection and current owner's description of needed
repairs.

4. Identify all proposed sources and uses of project financing. What is the status of the
   proposed financing and the estimated timeline for securing financing?

Funding for the project will come from foundation and individual donations.

5. Identify the specific uses proposed for HDSP funds and the procurement/contracting
   process to be followed.

The project will substantially renovate the exterior and interior of two houses.–

Page 1 of 2

TPL-KUN 02554

Department of Housing and Community Development
Housing Development Support Program (HDSP)
Notice of Intent to Apply

6. Please discuss the status of the proposed projects(s). Describe steps necessary for project completion and timetable for completion of major steps. Please indicate any permits or approvals required for implementing the proposed project and anticipated timetable for approval. Also please identify any known obstacles to project completion, and indicate the steps to be taken and timing of the resolution of any obstacles to project implementation.

Pending the Town assigning their right of first refusal to The Trust for Public Land, this property will be eligible for further project development. Project completion is expected within 18 months after receipt of both funding and of developer receiving control of property.

7. Does the developer own/control the site? If not, when will the site control be achieved?

The developer of the proposed project is expected to take control of the site in September, 2003.

8. Identify all known project participants, including owner/developer, development consultants, HDSP grant manager, and their respective roles.

The Trust for Public Land: Future Temporary Owner/Project Manager

TPL-KUN 02555

# EXHIBIT G

## STOW COMMUNITY PRESERVATION COMMITTEE
Minutes of the Meeting of February 10, 2003

In attendance: Members Wilber, Gray, Carrig, Walrath, Green, Way, Fletcher, and Asssociate Member Maxfield, plus a large audience. Minutes taken by Fletcher.

Minutes of January 6 approved.

Discussion ensued about the new DHCD rules and the qualifications of renters of accessory apartments.

Friends of Red Acre met with the Committee as well as The Trust for Public Lands (TPL). They presented a project proposal submission sheet and a package including the project description and a locus plan.

Committee Member Fletcher made a public disclosure that his brother has had a relationship with the President of the Eye of the Storm, and that he has volunteered for Eye of the Storm in the past but has no personal financial interest in the outcome of this matter.

A lengthy presentation ensued and some of the points that were brought up were as follows:

    This plan completes the Red Acre conservation corridor;
    It protects water resources;
    It provides fire protection for the neighborhood;
    There is a strong possibility of reimbursement of CP funds;
    It negates 30 housing units and related traffic;
    It cements the relationship of the Town with the history of horse rescue and conservation;
    The plan creates permanent affordable housing and permanent open space;
    TPL always works with towns on their projects;
    It was stated that this is a wonderful example of partnerships;
    TPL could probably not participate without Town participation;
    This project serves so many different objectives;

TPL was asked what level of town assistance would be needed. The response was that it would be the same as what was mentioned at the Town Meeting - 100K for affordable housing and 300K for open space. It was pointed out that the Town is being asked to contribute about one third of the funds needed.

When asked about upgrades to the houses, it was stated that Friends of Red Acre is committed to upgrades either with outside help or through "sweat equity". There were comments about the roof, Title V issues, etc. The statement was made that this is exactly what Mass Community Housing grants are for, and that there are a variety of other sources.

Mark Carrig spoke on behalf of the Housing Authority and said that the funds would be contigent upon the upgrades needed. He asked about the potential for multi-family rentals. The answer was that, in order to generate the capital needed, they need to sell not rent.

A committee member asked about a previous discussion relative to whether or not there would be State reimbursement for open space if a well was established on the site. The response from TPL was that at least 14.3 acres would not be elligible for self-help funds if it was set aside for municipal purposes such as a well. If that parcel was "surveyed out" to be separate, there may be self-help funds available for the remainder. A committee member asked about water rights. TPL responded that nothing in the original contract requires the future owner to have access over the frontage to the well, but under the TPL plan the town would.

**KUN038**

1

A committee member asked if this plan would go forward with CP funds, and if so, how much is necessary. TPL responded that approval would probably not be forthcoming if the town didn't commit to the entire 400K.

Bob Wilber expressed how much TPL is a highly honorable and reputable outfit.

A committee member asked what happens if CPC votes in favor and it gets voted down at the Town Meeting. TPL responded that they would be under contract at that point and would have to make it work.

It was asked how we get more open land under their plan as opposed to the original plan, and FoRA responded that the land around the barn and pond would be deed restricted so if Eye of the Storm moved out, the land would be protected.

It was stated that the deed to the Town from TPL would provide access to the pond for fire protection.

A committee member asked about public access to trails and it was pointed out that there are at least 3 accesses off Tuttle Lane, and that negotiations might need to take place for access through the horse farm.

Speaking from the audience, Tom Maher pointed out that about 600 people voted this down with full knowledge of what this involved and we are under seige for affordable housing and we would not be getting many units and this horse farm was not the Bird's and is not historical and the public is being deceived. He said we are entering into a suicide pact because 1.2 million is not an accurate figure because of the other funds that would be coming back to Mrs. Kunelius, and that the Town would be liable for possibly up to 1.8 million. He said the taxpayers of Stow do not want this. He said that if the Board is to be true to its charter, keep in mind we are a political body.

Chairman Wilber pointed out that Town Meeting overwhelmingly supported this, and many discussions have mentioned that people believe that this is exactly what CP funds are for. He also pointed out that 40Bs are not permanent restrictions, but our funds would create permanent restrictions.

Mr. Maher went on to say that if we have a slush fund of 400,000 then that's obscene.

TPL pointed out that we could bond this purchase rather than spend it all in one fell swoop. As a matter of economics it makes more sense to bond and thereby still be able to fund other projects in the short term. They handed out a financial chart to show costs over time if this was bonded.

Bob Wilber pointed out that the possibility of a self-help grant is very real. He has a concern about funding all of the purchase in the year of sale. He preferred that the open space portion be appropriated in the next fiscal year. It was asked what percentage reimbursement might be realized. Bob mentioned the cap of 250K with a 50% local match. All reimbursement would go back into the CP fund in accordance with the Act. Bob said he spoke to Joel Lerner who expects the Self-Help program to be back up and running shortly. TPL mentioned that Lerner knows about this project.

Bob Wilber said that this property was ranked 12th out of 16 rankings. Ranking was done prior to purchase of Red Acre Woods.

Bob Wilber brought up the question that people have asked about why would we pay anything if the town would get the land anyway. He said that the CPC should look at this from a community preservation perspective. Traffic was mentioned as problem with the orginal proposal which would generate 600

KUN039

2

additional trips per day. Another committee member suggested that that's a town-wide problem. It was also pointed out that there will be a reduction in the total number of housing units - population increase being the biggest threat to preserving our character.

Bob recognized the Stow Conservation Trust. Dick Perkins spoke on their behalf and said that they would be supportive of the TPL project and hoped that we would allow the town to vote on it at Town Meeting.

A committee member asked Bob Wilber about his conversation with Marilyn Kunelius. Bob said that she is afraid that the contract may unravel with town intervention and she'll lose everything. Bob said TPL will not back down from a committment.

Tom Maher spoke from the audience and said that this is not the babe we want to fool around with, and 1.2 is not the figure.

TPL said that they have honored every assignment ever given them under Chapter 61 and there is less risk with TPL than any other option.

Bob suggested that 100K be committed for open space in this fiscal year and the remainder to come from subsequent fiscal years, because the first 100K could be considered for the wellhead parcel, and there will then be time to bring the houses up to code, and time for state fiscal crisis to wane. TPL said that the Selectmen meet tomorrow and they need to accomplish the assignment before the end of the week. At Bob's request, they agreed to change their request to 100K for 2003 and 300K in FY'04.

There was a question about bonding. It was suggested that bonding will allow us to still have cash for things such as for buying deed restrictions from seniors.

Another committee member expressed concern that we can't vote on this without hearing from the other side. Bob said that this is a decision that comes soley out of the Town's right of first refusal.

The motion was made that we allocate the funds in the fashion proposed and further that it be by bonding, as follows: 100,000 in FY'03 for Open Space, 100,000 in FY'04 for affordable housing, and 200,000 in FY'04 for Open Space, and that it be contingent upon satisfactory upgrades to the houses, and that we recommend the expenditures to Town Meeting. The vote was 3 in favor, one opposed, two abstentions, and one recusal (Fletcher). It was decided to re-vote. The re-vote resulted in 4 in favor, none opposed, 2 abstentions (Gray and Green), and one recusal.

The motion carried, but it was suggested for the future that we clarify how abstentions get counted. It was asked if they get counted as members voting.

Discussion ensued about the viability of self-help funds.

A member stated that they were uncomfortable that this was voted down at the poles previously, but stated that it's hard to "read" the voters. The consensus of opinion was that voting for this just allows the Town Meeting voters to make the call as to how we spend CP funds.

There were concerns expressed about access, water rights, the chance that Mosaic Commons may not have been able to afford the deal if they couldn't get the density, and the possibility that that deal could have fallen through, and that the town could have lost it altogether.

Bob said he asked about the rumor that Romney is going to raid the Trust Fund, and the answer from the

KUN040

3

State was that the Legislature might skim some off the top because there is so much more in the fund than anyone anticipated.

Bruce brought up the meeting that he and Mark had attended with people from Community Housing Corp,., Community Builders, and the Housing Task Force. There were several issues expressed and there didn't seem to be a consensus.

Mark said that we need to create an inventory of people and/or houses that could be targeted for our funds.

Bob said that Marshfield has already executed a program of issuing a grant to the Housing Authority to purchase interests in property.

Next meeting was scheduled for Flag Day, February 24.

Meeting adjourned 22:15.

KUN041

4

# EXHIBIT H

Friends of Red Acre



EQUINE RESCUE

**ANSWERS TO ROSS PERRY**
**FEBRUARY 8, 2003**

**Question**: identify money sources
- don't need name & SS # but need more than "private pledges"

**Answer**:

- To-date, we have received pledges from foundations totaling $220,000
- To-date, we have received pledges from individuals totaling $11,000
- We have identified 38 "qualified" foundation prospects, which are conservatively estimated as being capable of generating $715,000.
- Our remaining need from these sources is $480,000.
- Many of these funders are already familiar with TPL or Eye of the Storm, or we have personal contacts at the foundations.
- This list and its associated plan was compiled by a FORA member who is a professional fund raiser with 20 years experience specializing in foundation relations.
- This plan has been coordinated with the professional development staff of TPL.
- In order to ensure that this project has the necessary time to raise $480,000, we have arranged for $600,000 of low or no cost financing.
- Our remaining goal for this project for donations from individuals is $39,000.



OPEN SPACE

**Question**:
Self-help grant
- double counting? - should it go back to CPC if they contribute to open space?

**Answer**:
"No" to double counting. "Yes" to reimbursement of CPC.

There are three sources of government money associated wit this project:
1. CPC funds
2. A state grant to rehab the two houses
3. Self-help money



AFFORDABLE HOUSING

Self help money does not appear in our budget, since it would be used by the town to defray outlays from municipal funds, presumably CPC. We anticipate that self-help reimbursements for this project would be about $100,000.

KUN671

# EXHIBIT I

**MINUTES**
**BOARD OF SELECTMEN**
**FEBRUARY 11, 2003**

Present at the meeting held in the Town Building and beginning at 7:00pm were Selectmen Edward R. Perry, Jr., Kathleen K. Farrell, Shirley A. Burchfield and Gregory D. Jones. Also present were Town Administrator William Wrigley and Administrative Assistant Paula Bruno. Selectman John Clayton, Jr. was not present.

**Minutes**
The minutes for the meeting held on January 14, 2003 were unanimously accepted after amendment.

The minutes for the meeting held on January 28, 2003 were unanimously accepted as submitted.

**Bills**
The January invoice from Wilson & Orcutt was approved for payment.

**Town Administrator's report**
Mr. Wrigley informed the Board that he has been contacted by two Lancaster Selectwomen regarding their interest in the possibility of sharing information and viewpoints relative to the FY04 Nashoba Regional School District budget. They are hopeful that the Selectmen and Finance Committees of both towns can corroborate in developing a joint approach to Town Meeting presentations.

Selectman Perry stated that he would be meeting with Lancaster Selectwoman Alix Turner tomorrow in a working session towards that goal.

In speaking with Nancy Fleming, Chairman of the School Building Committee (SBC), regarding the probability of the SBC being prepared to submit a Warrant Article by closing date, he feels that irrespective of whether they have completed their ongoing evaluative work, he will be able to word and article sufficiently broad enough in scope so as to allow a subsequent rewrite prior to going to print. A motion will be available at Town Meeting that will meet the 4-corners test although they may not be ready to offer an actionable item at the Annual Town Meeting.

Mr. Wrigley stated that he received verification of a $41,236 cut in local aide for FY03, which represents just over a 9% reduction. Combined with that cut, Mr. Wrigley informed the Board that he is tacking behind on local receipts after six months in the amount of approximately $35,000. He feels that if this trend in local receipts continues, we will be facing a total year-end revenue short fall of at least $110,000. He recommended that the Town appropriate and transfer a sum of money at the Annual Town Meeting to cover all or a portion of the revenue shortfall.

**Superintendent Search Committee**
Four candidates were in to inform the Board of their interest in being appointed as Stow's representative to the Superintendent Search Committee.

Page 2
February 11, 2003

When asked why she would like to volunteer for this position, Jennifer d'Entremont answered that she has children in the school system would like to try to restore the faith, trust and good will of the teachers and administration that has been lacking recently. She explained that her background is in education and business and has been involved in the community by co-chairing the PTO and as a member of the Pompositticut/Center School council. She also explained that prior to becoming a full-time mom, she worked in contact negotiations at her job. She stated that her time is flexible enough to be available for the meetings involved in this search.

The next candidate, Ellen Sturgis, explained that she would like to see the District move forward after the recent happenings. She stated that her background is in finance management and that she has been involved in the interview and hiring process in the past. She outlined three objectives for hiring a new Superintendent. The first being a well defined job description needs to be in place, followed by communication that has been received by faculty and staff should be included in the hiring process an lastly, we should think about an interim replacement in the event a qualified candidate is not hired prior to the current Superintendent's contract's expiration.

Mrs. Sturgis' desire is to see a strong leader in this position with a background not only in education and business, but finance as well. She explained that she does work mother's hours but feels that she will be able to make all meetings that are scheduled.

Vickery Trinkus-Randall, the third candidate, informed the Board that she has knowledge in grant writing and feels that she can contribute in the search of a new Superintendent, as she was a member of the committee that conducted the Principal search for Center and Pompositticut schools a few years back. She stated she is looking for evidence of a strong academic background for the incoming Superintendent that is aware of the financial situation of the district and will be able to work within the allotted budget.

As the final candidate for the position of the Superintendent Search Committee, Mary Mintz informed the Board that she has been involved in two Superintendent searches in the past, that she is a former school committee member and has been involved in the school system for the past ten years. She stated that she would like to see this position filled by someone that can handle all financial, business and educational issues that are currently before the district.

Selectman Burchfield moved to appoint Vickery Trinkus-Randall as a member of the Superintendent Search Committee. The motion was not seconded.

Selectman Jones moved to appoint Mary Mintz as a member of the Superintendent Search Committee. Seconded by Selectman Farrell. In the discussion on the motion, Selectman Jones offered that Mary was organized and has a good concept of what we are looking for. Both Selectmen Perry and Burchfield stated, although Mary was a very good candidate, that they would like to see a fresh viewpoint. The vote was 2-2 with Selectmen Jones and Farrell voting in favor and Selectmen Perry and Burchfield voting against.

Selectman Jones moved to appoint Ellen Sturgis as a member of the Superintendent Search Committee. Seconded by Selectman Burchfield and voted unanimously without discussion.

Page 3
February 11, 2003

## Audit Advisory Committee
The Nashoba Regional School District is seeking one member from Stow to serve on the newly formed Audit Advisory Committee. There were two interested candidates for this position.

Pam Glauner, an Associate Member of the Finance Committee, informed the Board that she does have audit experience and is a part-time controller for a company in Clinton. She stated that she deals with auditors and has bid out audits for private companies in the past. Pam feels that this type of committee is a good way to convey some trust back in to the community.

The second candidate, Bill Ross, informed the Board that he has participated in two school audits in the past and has done auditing for Brockton Hospital. He feels that the Audit Committee should be prepared to give a scope of parameters to the auditors chosen to help to avoid any delay in audit process. Mr. Ross explained that he is self-employed and has the time flexibility to serve on this committee.

Selectman Jones moved to appoint Bill Ross to the Audit Advisory Committee. Seconded by Selectman Farrell. Discussion ensued and both Selectman Farrell and Burchfield felt that there was value in appointing a Finance Committee member to represent Stow as a bridge to both the District and the Town. They both felt that both candidates' backgrounds were strong and that either choice would be a good one. The motion carried unanimously.

## Hudson Light & Power Department
Tony Monteiro, representing Hudson Light & Power Department (HL&PD), was in to inform the Board of a reduction in Stow's municipal lighting rate to take effect on March 1, 2003. Mr. Monteiro informed the Board that Stow will have the same terms as Hudson for municipal lighting rates.

Mr. Monteiro also stated that regarding the P.I.L.O.T. (Payment in Lieu of Taxes), there has been no change in their budget for it and the first payment will be made in March of 2004.

## Wedgewood Pines Country Club
The application for sale of alcoholic beverages that The Wedgewood Pines Country Club submitted had been approved by the Alcoholic Beverage Control Commission for an all-alcoholic Club license in December. After a brief discussion on the annual fee for this type of license, Selectman Jones moved to charge the same annual fee as the other restaurant licenses in Town of $2,200. Seconded by Selectman Farrell and voted 3-1 in favor with Selectman Perry voting in opposition.

## Right of First Refusal – Kunelius property
At 9:00pm Selectman Perry re-opened the public hearing on transferring the Town's Right of First Refusal on the Kunelius property.

Craig MacDonnell of the Trust For Public Land (TPL) was present to offer the Board a summary of conditions under which TPL would consider accepting the proposed assignment. Mr. MacDonnell explained that although TPL has not had the opportunity to access the property, he is requesting a recorded vote by the Community Preservation Committee and the Board of Selectmen to support an

Page 4
February 11, 2003

article on the Annual Town Meeting (ATM) warrant to spend Community Preservation Act (CPA) funds for affordable housing and open space. They are also requesting a recorded vote of the Board of Selectmen to support the variance required for the subdivision of the property.

Mr. MacDonnell stated that an agreement in principle that the deeds to the private parcels would include certain provisions and the sales of the properties would be restricted in certain respects. He went on to explain that 142 Red Acre Road would be conveyed subject to a perpetual affordability restriction if the Town votes to spend CPA funds to purchase one and a conservation restriction reasonably limiting the further development of the property. Any sale of the property would be coordinated with a local preference lottery and would be subject to all appropriate law and regulation.

He went on to explain that 144 Red Acre Road would be conveyed subject to a conservation restriction reasonably limiting (a) further development of the property allowed under existing zoning and (b) agricultural and animal husbandry activities that pose direct threats to the aquifer.

Regarding the possibility of a municipal well, TPL will need to negotiate terms of access for purposes of construction, operation and maintenance of future water supply facilities and for the potential development of a water line from the farm pond to a hydrant for purposes of fire suppression that may be developed on the adjacent parcel.

Mr. MacDonnell stated that as a condition of Eye of the Storm buying the parcel at 144 Red Acre Road, a perpetual affordability restriction will be imposed if the Town votes to purchase one.

Selectman Jones moved that the Town not transfer their rights under Chapter 61 to the Trust for Public Land. There was not a second to this motion. No action on the motion.

Selectman Farrell moved that the Town transfer its Right of First Refusal under Chapter 61 to the Trust for Public Land and ratifying the vote taken at the January 28, 2003 meeting. Seconded by Selectman Burchfield. Discussion ensued with Selectman Farrell stating that she feels she represents the interests of the entire community by offering this parcel to TPL. Selectman Burchfield stated that she feels the questions given to TPL by Selectman Perry have been answered to her satisfaction. Selectman Perry stated that he feels that his concerns have been answered and the transfer is the wish of the Town voters. Selectman Jones stated that he feels that transferring the Town's rights unconditionally is not reasonable and is against the idea because of the risks involved. Selectman Perry ended the discussion by saying that TPL is a national entity and feels that this is a risk worth taking. The motion carried by a 3-1 vote with Selectman Jones voting in opposition.

Selectman Burchfield moved that the Board support an article at ATM in which funds from the CPA will be used for affordable housing and open space at 142-144 Red Acre Road. Seconded by Selectman Farrell. The motion carried by majority with Selectman Jones abstaining from the vote.

Selectman Farrell moved to recommend supporting the frontage variance needed to support TPL's plan for division of the property. Seconded by Selectman Burchfield. Discussion ensued and Mr.

Page 5
February 11, 2003

Wrigley suggested that the Board may not want to make a decision to weigh on the deliberation of another Board and that this Board should not ask the Zoning Board of Appeals to recommend or influence their decision on a variance as there is no negotiation on a variance. The motion did not carry with a 1-3 vote with Selectmen Perry, Jones and Burchfield voting in opposition.

Selectman Farrell moved to inform the Zoning Board of Appeals of this Board's approval of the Red Acre Road planned project. Seconded by Selectman Burchfield and carried by a majority vote. Selectman Jones abstained from voting.

Selectman Perry closed the Public Hearing.

**Adjournment**
It was voted unanimously at 10:20pm to adjourn this meeting.

Respectfully submitted,


Paula Bruno
Administrative assistant

EXHIBIT J



**Town of Stow**
# BOARD OF SELECTMEN
**380 Great Road**
**Stow, Massachusetts 01775-1122**
(978) 897-4515
FAX (978) 897-4534

### ASSIGNMENT AND ACCEPTANCE

THIS ASSIGNMENT is made as of February 11th, 2003 by the Town of Stow, a Massachusetts municipal corporation having a mailing address of Town Building, 380 Great Rd., Stow, MA. 01775-2127 ("Town") and The Trust for Public Land, a California nonprofit conservation organization, having a mailing address of 33 Union Street, Boston, MA. 02108 ("Trust") under the following circumstances:

A. Pursuant to Massachusetts General Laws, Chapter 61, Section 8, the Town has Rights of First Refusal to acquire certain property valued, assessed and taxed as forest land during a period of one hundred twenty (120) days subsequent to its receipt of a Notice of Intent;

B. Pursuant to said statute, the Town has a right to assign its Rights of First Refusal to a nonprofit conservation organization and the Town voted by majority vote on February 11, 2003 to assign to The Trust for Public Land the Town's rights under M.G.L. Chapter 61, Section 8 to purchase land owned by Marilyn Kunelius of 142 and 144 Red Acres Road, Stow, MA ("Seller") described in two Deeds recorded with the Middlesex County Registry of Deeds Books 15412, Page 316 and Book 26230, Book 255 (the "Property") pursuant to the terms of a Purchase and Sale Agreement between Seller and Cohousing Resources, LLC dated October, 2002; and

C. The Trust desires to assume the Town's Rights of First Refusal pursuant to Chapter 61, Section 8.

NOW THEREFORE, FOR VALUE RECEIVED, Town hereby assigns and transfers all of its Rights of First Refusal to exercise an option to purchase the Property as set forth above.

This instrument shall be governed by and enforced in accordance with, the laws of the Commonwealth of Massachusetts without regard to the principles of conflicts of laws thereof.

1

IN WITNESS WHEREOF, the undersigned has executed this agreement as of the date first set forth above.

TOWN OF STOW
By its Board of Selectman

_____

_____

2

THIS ACCEPTANCE OF ASSIGNMENT is made by The Trust for Public Land of the assignment of the Town of Stow's right of first refusal pertaining to 142 and 144 Red Acres Road, Stow, MA.

The Trust for Public Land

By: _Dorothy Nelson Stookey_

Dorothy Nelson Stookey
Regional Counsel,
duly authorized

Dated: February _12_, 2003

3

# EXHIBIT K



**THE TRUST FOR PUBLIC LAND**

*Conserving Land for People*

February 13, 2003

BY CERTIFIED MAIL
Marilyn Kunelius
142 and 144 Red Acres Road
Stow, MA 01775

Re:    Exercise of Right of First Refusal, Land in Stow, Middlesex County, MA

Dear Ms. Kunelius:

On February 12, 2003, the Board of Selectmen of the Town of Stow assigned its rights under M.G.L. c. 61, Section 8 to purchase the land located at 142 and 144 Red Acres Road, Stow, MA described in two Deeds recorded with the Middlesex County Registry of Deeds Books 15412, Page 316 and Book 26230, Book 255 pursuant to the terms of a certain Purchase and Sale Agreement between you and Cohousing Resources, LLC dated October, 2002 (the "Agreement") and The Trust for Public Land accepted that assignment.

The undersigned, Dorothy Nelson Stookey, Regional Counsel and Assistant Secretary of the Trust for Public Land ("TPL"), duly authorized, elects to exercise the Right of First Refusal under M.G. L. c. 61, Section 8 that was assigned to TPL by the Town of Stow and assume the position of buyer under the above–referenced Agreement. A check in the amount of $ 11,500, being the initial $10,000 deposit and the first monthly $1500 deposit due under Paragraph 31 of the Agreement, made payable to you is being delivered to your attorney, Peter Kachajian, Esq.

We look forward to working with you to complete the preservation of this property. Thank you for your anticipated assistance and cooperation.

Very truly yours,

The Trust for Public Land

By: _Dorothy Nelson Stookey_
Dorothy Nelson Stookey
Regional Counsel

cc: Peter Kachajian, Esquire

The Trust for Public Land
New England Regional Office
33 Union Street, Fourth Floor
Boston, MA 02108

(617) 367-6200
Fax: (617) 367-1616

Connecticut Field Office
383 Orange Street
New Haven, CT 06511

(203) 777-7367
Fax: (203) 777-7488

Maine Field Office
377 Fore Street 3rd Floor
Portland, ME 04101

(207) 772-7424
Fax: (207) 772-7420

Vermont Field Office
3 Shipman Place
Montpelier, VT 05602

(802) 223-1373
Fax: (802) 223-0451

Connecticut Lakes
Project Office
54 Portsmouth Street
Concord, NH 03301

(603) 224-0103
Fax: (603) 228-0423

# EXHIBIT L

1

## TOWN MEETING REMARKS

Thank you, Mr. Moderator, for the opportunity to address Town Meeting.

Good evening everyone. [*Kunelius Farm*] I hope you have picked up on your way in the two handouts we have regarding Articles 35 and 36 – a fact sheet and a map.

My name is Craig MacDonnell and I am the State Director for the Trust for Public Land, or TPL, as I'll refer to it this evening. [*TPL*] TPL is a national nonprofit land conservation organization that was founded 30 years ago to preserve land for people. We work in partnership with other nonprofits, local governments, and state and federal agencies to help them acquire land for permanent protection.

First, let's orient ourselves. [*PLAN*] On the screen is a plan of the Kunelius Farm. You'll see that is it is a 50 acre parcel located directly between two large blocks of conservation land - Red Acre Woods and Captain Sargent Conservation Land. [*PHOTOS*]. As I am sure many of you know, this is an extraordinarily beautiful part of town. The Kunelius property contains a pond, walking trails and stone walls, and is located on one of Stow's most scenic country roads.

Next, let's review a bit of project history [*Project History*]. You will recall the January Special Town Meeting when two-thirds of you voted to borrow funds to protect the property. Yet this effort was later rejected, as town voters said no at the polls to the "Prop 2 ½" override then required by the

1

project. Based on comments at the January Town Meeting that CPA funds were the appropriate source of financing, and that borrowing was not the right solution, the BOS and the CPC voted to reconfigure the project using CPA funds, but no borrowing or new taxes. Accordingly, the BOS voted to assign the ROFR to TPL, which was followed by votes in support of the project by the Finance Committee and the Capital Planning Committee.

This would be a good time to review the budget [*BUDGET*]. The 1.4 million dollar overall project cost includes the purchase price and out-of-pocket costs for the due diligence and for renovation of the houses. This sum will be raised as follows: $300,000 from CPA for land and for the Conservation Restrictions; $100,000 for two affordability restrictions (50k each) on the two houses; $600,000 from the sale of the two residential properties; and $400,000 in private conservation funding. Note that the town's share of this $1.4m project cost is modest - less than 30%.

Now let's take a look at how the property will be re-configured as a result of the project [*PLAN*]. What is shown on the screen as "142" is a pre-existing lot, the house on which will be renovated and sold pursuant to a lottery open only to purchasers qualifying within low-to-moderate income guidelines. What is shown on the screen as "144" will be acquired by the Eye of the Storm Equine Rescue, a local non-profit horse rehabilitation organization and subject to a permanent Conservation Restriction. Eye of the Storm is managed by longtime Stow resident Nina Arbella, an accomplished horsewoman and caregiver,

TPL-KUN 01096

together with her staff of compassionate volunteers, who carry on the rich tradition of animal rescue in the Red Acre neighborhood dating back to the turn of the previous century. Town Lot A, only a portion of which is shown on the screen, is a 42-acre parcel that Marilyn Kunelius has agree to donate to the town if - and only if - this project succeeds. Town Lot B, which includes the fire suppression pond, is approximately three acres in size and is additional land that will be conveyed to the town by TPL.

Let's talk about the value of the Town's investment in this project [*WHAT DOES*]. Specifically, what does the $300,000 proposed under Article 35 buy the town? First, the transaction secures 45 acres of land. Some have suggested in the newspaper and elsewhere that 42 of the 45 acres are somehow "free" and that this projects is only about three acres of land. To be fair, however, this is a misleading way of looking at this opportunity, because without the transaction zero acres are conveyed to the town, not 42. The 42 and the 3 are wrapped together in this transaction to make 45 acres for conveyance to the Town. Second, beyond the 45 acres, valuable permanent Conservation Restrictions will be imposed on the two remaining lots. These Conservation Restrictions are legal documents that will permanently prevent further development –like the 40B development that recently was proposed – in the future. Third, there will be permanent agricultural restrictions placed on the horse lot limiting farm uses in order to protect the aquifer and the wetlands. Fourth, TPL will convey a deeded access easement over the horse lot to enable the town to build, access and

TPL-KUN 01097

maintain a wellhead and a waterline if the Town so desires. <u>Because</u> of the

unique configuration and location of the Town Lots A and B, the Town would

<u>not</u> be able to utilize this water supply without this deeded access right across

the horse lot. Finally, TPL will convey deeded access across the horse lot to the

pond, as requested by the Town, for fire suppression purposes.

Of course, [* another way**] there is another way of looking at this project,

which is that it is a question of preserving town character, and specifically, the

difference - between risking an intensive 40B development smack in the middle

of two conservation parcels, <u>on the one hand</u>, and a conservation option that also

secures affordable houses and preserves a local equine rescue tradition, <u>on the

other</u>.

Turning to Article 36, and the affordable housing component of this project,

what does $100,000 buy the town? [*WHAT DOES*] Most importantly, it buys –

for $50k each – two perpetual affordability restrictions – one on each of the two

houses. Now, you may hear tonight that only one of the two houses will be sold

pursuant to Stow's affordable housing lottery and that the second is going to the

Eye of the Storm and therefore doesn't count or isn't certain. Let me address

these concerns directly. In fact, according to the Mass DHCD, both will count

towards Stow's affordable housing goal – and that's because - under both CPA

and Chapter 40B - projects done with CPA money <u>count</u> toward a municipality's

affordable housing tally. So, even though the affordability restriction on the Eye

of the Storm property doesn't place that property into the lottery until after Eye

TPL-KUN 01098

5

of the Storm departs, the fact <u>remains</u> that the property <u>will count</u> toward Stow's

affordable housing numbers <u>right away</u> and that's good.  And having Eye of the

Storm there is a good thing, too, because it continues a local tradition of rural

character and animal welfare activities.

You should also know that, as required by the CPC, the buildings will be

renovated up to the building code prior to CPA funds being expended.

Remember also [*TAX IMPACT*], there will be <u>no new taxes</u> as a result of

this project.  The entire town investment will be borne out of the Community

Preservation Fund and no borrowing will be required.  I'll remind you again that

some who were opposed to this project at the January Town Meeting advised us

that instead of borrowing funds to do this project that CPA funds should be

used.  We listened carefully to those suggestions, have eliminated all borrowing,

and have proposed to use CPA funds for the project.

Shifting gears for a minute [*AREN'T*].  Aren't there other conservation

projects that will need Stow's attention in the future?  Of course there are.  But

none of them are ready now. And more importantly, even if another project were

imminent, there are sufficient CPA funds available to take care of it and, I'd

suggest, other land conservation projects when the time is right.

To illustrate this point [*GRAPH*], let's look at the graph on the screen.  On

the vertical axis are CPA dollars.  On the horizontal axis are the years covering

the current term of the CPA by-law in Stow.  The blue area represents the total of

CPA funds available <u>after</u> this project is complete.  The dip in the line you see

5

shows the impact of this project. You'll see that even after this project there are many hundreds of thousands of dollars remaining, which will increase if not spent up to over $1.8million in FY 06. Meaning there are sufficient CPA funds for other worthy projects, even after this one.

Let's review [*WHY CONSERVE*]. Why conserve the Kunelius Farm? First, to preserve and provide access to an important water resource. Second, to complete the public ownership of the Red Acre Woods Conservation Corridor. Third, to add to Stow's limited supply of affordable housing. Finally, to preserve the rural character of the town by limiting development and continuing farm usage. I'd submit that this project is an excellent example of very smart conservation.

In summary, let's compare what a vote in favor of Articles 35 and 36 means and what a vote against means. [*COMPARISON*] A vote in favor means: 45 acres are deeded to the town; the town's most productive aquifer is protected; there is no new development; two permanently affordable houses are created; the town gets valuable deeded access to the water supply; and deeded access to the fire pond, plus conservation and agricultural restrictions on the residential parcels, and, importantly, the gap between Red Acre Woods and the Captain Sargent Area is conserved. Compare this to what a vote against would mean: Zero acres are deeded to the town; not 42 or 45; zero (Mosaic Commons is gone); the aquifer is unprotected; there are zero affordable houses created; the landowner is free to develop the property, including contracting with another

TPL-KUN 01100

40B developer; no access for water supply or for fire suppression is provided; there are no conservation or agricultural restrictions imposed; and, sadly, the gap between Red Acre Woods and Captain Sargent is totally unprotected because without town funding this project will not go forward.

Finally, allow me to read you a letter from Marilyn Kunelius, the owner of the Kunelius Farm. [*READ LETTER*]

Personally, I am thrilled to have had the opportunity to work on this great project. Here, in one transaction, are contained so many positive, community-building outcomes. First and perhaps most obviously, Stow will acquire a large parcel of conservation land available for water supply and will "buy down" the development on the adjacent properties. Second, this project does much to preserve Stow's open space and community character by creating affordable housing and by preserving rural land uses – making your town an even better place to live and raise your families. The list of benefits goes on and on.

In closing, Mr. Moderator, I want to say what a <u>pleasure it has been</u> to work with the Town on this project. The Board of Selectmen, Town Administrator's office, the Finance Committee, the Community Preservation Committee, the Capital Planning Committee, Town Counsel, and many other individual Stow residents and organizations - including EOS, SCT, and FORA - have worked <u>hard</u> to bring this opportunity before the Town.

Thank you for allowing me to address your Town Meeting.

TPL-KUN 01101

8

TPL-KUN 01102

T-611   P.02/02   F-876

05-06-03   03:45pm   From-3COM Corporation

05/08/2003 TUE 14:07 FAX                                                 @002

# Non-Voter Request to Address Town Meeting

Article Number (s) ___35 and 36___

Reason to request approval to address the meeting:

I would like to present relevant information, such as project history, financial data, conservation benefits of the project, information about water supply issues, and ongoing developments that will enhance voter understandin

Stow Property Owner/Town Department Sponsor ___Ross Perry___

Address ___4 Circuit Dr___

City ___Stow___          State ___MA___   Zip ___01775___

Phone (day) ___508-323-6302___   Phone (eve) ___978-897-8447___

Signature ___Edward Perry___        Date ___5/6/03___

Non-Voter Name ___Craig MacDonnell___

Company/Town Department Name ___The Trust for Public Land___

Address ___33 Union Street___

City ___Boston___          State ___MA___   Zip ___02108___

Phone (day) ___(617) 367-6200___   Phone (eve) ___(978) 369-7629___

Signature ___Craig MacDonnell___        Date ___5/6/03___

NOTE: Please deliver to the Moderator prior to the start of the Town Meeting session

Moderator _____        Date _____ Time _____

                                              Non-voter Information

May 1, 2001

TPL-KUN 01103

EXHIBIT M

## ANNUAL TOWN MEETING
## MAY 19, 20 AND 21, 2003
### (First Session)

Pursuant to the Selectmen's warrant of April 23, 2003, posted by the Constable on May 9, 2003, the annual town meeting was called to order by Moderator Edward Newman at 7:00 p.m. in Hugh Mill Auditorium at Hale School.

The Pledge of Allegiance to the Flag was recited, led by several Hale School students. An invocation was given by Rev. Tom Rosiello of The First Parish Church of Acton and Stow. Moderator Newman introduced Ellen Sturgis as Deputy Moderator, whose appointment was unanimously approved by the meeting. Also introduced was Temporary Moderator Gary Horowitz who was presiding in the gymnasium where were seated voters that the auditorium could not accommodate.

Mr. Newman introduced the Selectmen, Town Administrator, Selectmen's Administrative Assistant, Town Counsel, Finance Committee members, Town Clerk, Assistant Town Clerk and other town officials present. The names of non-voters were enumerated: non-resident town personnel, Nashoba Regional School District personnel, Minuteman Regional High School personnel and others who were to address certain articles. There was no objection from the meeting.

On motion of Selectmen Chair Edward Perry, it was voted unanimously that the reading of the warrant and return of the constable thereon be waived but made a part of the record of this meeting, and that the Moderator be permitted to refer to each article by subject matter instead of reading each article in its entirety. It was further voted that no new article, or any section thereof, be considered after ten-thirty p.m., and that as soon as practicable after ten-thirty the meeting be adjourned to 7:00 p.m. May 20, 2003 in this place.

### Article 1. Town Officers Not Elected by Ballot
On motion of Selectman Shirley Burchfield, it was voted unanimously that the members of the Board of Selectmen be elected to serve as Field Drivers for the ensuing year.

### Article 2. Reports of Selectmen and Other Officers and Committees
On motion of Selectman John Clayton, it was voted unanimously that the reports of the Selectmen and other Town Officers, Boards, Committees and Commissions be accepted as printed in the Town Report for 2002, with a correction of the Town Clerk's report for the Annual Town Election held on May 21, 2002 for the Stow Municipal Electric Department three-year term election where it states Richard Mortenson received 78 votes: it should be corrected to read *781* votes.

### Article 3. Reports of Special Committees
On motion of Selectman Kathleen Farrell, it was voted unanimously that the reports of the Ancient Documents Committee, Public Education & Government (PEG) Advisory Committee, School Building Committee, Town Hall Improvement Committee, Cable TV Advisory Committee, Stow Municipal Electric Department, Metropolitan Area Planning Council, Stow Master Plan Committee and Community Preservation Committee be accepted as printed in the Town Report for 2002. Also voted that the report of the Center Common Improvement Committee be accepted as a final report.

At this point, Selectmen Chair Edward Perry recognized Jacob C. Diemert, who has served as Stow's Town Counsel for thirty years since appointment by the Selectmen in 1973. He quoted from the Selectmen's report for 1978: "This board would like to single out and compliment our town counsel, Mr.

Jacob Diemert, for a job well done. Mr. Diemert's guidance, his tenacity, his impeccable detailing, and his integrity (to the point of pain) accomplished this complex task perfectly. We are very proud of Mr. Diemert and, for ourselves and the people of the Town of Stow, wish to thank him for his expert guidance through the complicated web of governmental law. For his continuing actions on behalf of Stow, we consider him among our greatest assets." (Report of John Clayton, Jr., Wayne E. Erkkinen and Harry D. McMullen) Mr. Diemert was given thanks and a standing ovation for his dedicated service to Stow and its citizens.

Steve Dungan, chairman of the Finance Committee, presented a review of the Town's financial position, which information had been printed in the town meeting warrant booklet. The Fiscal 2004 budget, as proposed by the Selectmen with a 3% increase in the Nashoba School District appropriation, is balanced without need for a Proposition 2-1/2 override. A graph was displayed showing the decline in "free cash" and the Stabilization Fund which means less money to pay for future capital needs or emergencies. A graph of town debt showed a steady decline until Fiscal 2009, assuming no new borrowing. Payments for the Police Station will end in 2005 and for the Town Building in 2008. Mr. Dungan noted that the largest source of revenue is the property tax which, with the proposed Fiscal 2004 budget, will provide 78% of the total income. State aid is on the decline, and a figure for Fiscal 2004 has yet to be learned.

## CONSENT CALENDAR

On motion of Selectman Gregory Jones, it was voted unanimously by declaration that the annual meeting take the following articles out of the order in the warrant and take action on Articles 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 23 and 24 as said motions are printed in the Consent Calendar, a copy of which has been provided to the voters at this meeting, without debate on any such articles, including the following changes: the number to be moved in Article 12 is $1,060.00, and the number to be moved in Article 13 is $5,151.00; and provided that upon the request of any voter at this meeting made before the vote is taken on this motion, an article shall be dropped from the Consent Calendar and shall be acted upon in the ordinary course and order of business at this town meeting.

**Article 6. Reserve Fund**
Voted to raise and appropriate the sum of $80,000.00 for a Reserve Fund for the fiscal year beginning July 1, 2003.

**Article 7. Tax Title Proceedings**
Voted to raise and appropriate the sum of $7,000.00 to be added to any balance remaining and previously appropriated for Land Court proceedings for tax title foreclosure, including court costs and legal expenses related thereto, to be expended by the Treasurer-Collector.

**Article 8. Audit of Financial Records**
Voted to raise and appropriate the sum of $10,000.00 to be expended for an audit of the Town's financial records.

**Article 9. Revolving Fund for Inspection Fees**
Voted to authorize, upon the recommendation of the Selectmen, a revolving fund for certain inspection fees, pursuant to Mass. General Laws Chapter 44, Section 53E-1/2 for Fiscal Year 2004, to which shall be credited all permitting fees received for wire, gas, plumbing and fire alarm permits and for weights and measures sealing, to a limit of $40,000.00 for Fiscal 2004, to be expended by the Selectmen without further appropriation for the purpose of payment of fees to the inspectors administering such permits and reimbursement of expenses incurred on behalf of the Town.

**Article 10. Revolving Fund for Conservation Commission**

Voted to authorize, upon the recommendation of the Selectmen, a revolving fund pursuant to Mass. General Laws Chapter 44, Section 53E-1/2 for Fiscal Year 2004, to which shall be credited revenue derived from the sale of Open Space and Trail Map books, or other products offered by the Conservation Commission, to a limit of $5,000.00 for Fiscal 2004, to be expended by the Conservation Commission without further appropriation for enhancement and/or maintenance of land under the jurisdiction of the Commission including, but not limited to, costs associated with mapping efforts.

**Article 11. Revolving Fund for Advanced Life Support Services**

Voted to authorize, upon the recommendation of the Selectmen, the establishment of a revolving fund pursuant to Mass. General Laws Chapter 44, Section 53E-1/2 for Fiscal Year 2004, to which shall be credited all fees received for advanced life support services provided by the Town of Stow to a limit of $40,000.00 for Fiscal Year 2004, to be expended by the Fire Department without further appropriation for the purpose of payment of all costs associated with providing advanced life support services.

**Article 12. Transfer to Conservation Fund**

Voted to appropriate and transfer from the Conservation Land Maintenance Account to the Conservation Fund the sum of $1,060.00.

**Article 13. Transfer from Wetlands Protection Fund**

Voted to appropriate and transfer from the Wetlands Protection Fund the sum of $5,151.00 as an additional appropriation to the Conservation Commission, to be expended by the Conservation Commission in performing its duties under the Wetlands Protection Act.

**Article 14. Update of Property Valuations**

Voted to raise and appropriate the sum of $5,000.00 to be added to the balance remaining from the amount previously appropriated for the purpose of updating property valuations in the town to full and fair cash value, to be expended by the Assessors.

**Article 15. Town Records Binding and Repair**

Voted to raise and appropriate the sum of $200.00 to be added to any balance previously appropriated for the purpose of binding and repairing town records in accordance with Mass. General Laws Chapter 66, Section 9, to be expended by the Town Clerk.

**Article 16. Highway Department**

Voted to raise and appropriate the following sums of money for highway purposes:
1. For the Road Machinery Account: $30,291.00
2. For repairs on private ways: $10,000.00

**Article 17. Federal Safe Drinking Water Act**

Voted to raise and appropriate the sum of $4,400.00 to be added to any balance remaining from previous appropriation for the purpose of satisfying the compliance requirements of the Federal Safe Drinking Water Act, as amended, in accordance with State regulations, to be expended under the direction of the Board of Health.

**Article 18. Household Hazardous Waste Collection**

Voted to raise and appropriate the sum of $5,000.00 to be added to any balance remaining from previous appropriation for the purpose of providing for household hazardous waste collection, to be expended under the direction of the Board of Health.

**Article 19. Board of Health**

1. Voted to raise and appropriate the sum of $2,000.00 to be added to any balance remaining from previous appropriation, to be expended under the direction of the Board of Health for services provided by Emerson Hospital Home Care, or any other provider.

2. Voted to raise and appropriate the sum of $2,000.00 to be added to any balance remaining from previous appropriation, to be expended under the direction of the Board of Health for services provided by Concord Family & Youth Services, or any other provider.

**Article 20. Stow Cultural Council**

Voted to appropriate and transfer the sum of $2,800.00 from the Recreation Department Transformer Installation Account, #A02-60-30-78241, to the Stow Cultural Council, to be added to any balance remaining and previously appropriated, to be expended under the control of the Town Administrator for the purpose of funding community cultural activities including activities associated with Springfest.

**Article 21. Water Source Maintenance**

Voted to raise and appropriate the sum of $10,000.00 to be added to any balance remaining and previously appropriated for construction and maintenance of water holes and dry hydrants.

**Article 23. Legal Services**

Voted to raise and appropriate the sum of $40,000.00 to be added to any balance remaining and previously appropriated for the purpose of engaging legal counsel.

**Article 24. Policemen and Fireman Medical Payments**

Voted to raise and appropriate the sum of $400.00, to be added to any balance remaining and previously appropriated in anticipation of possible claims presented to the Town under the provisions of Chapter 40, Section 5, Clause 32 and Chapter 41, Section 100, for the payment of any reasonable hospital, medical, surgical, nursing, pharmaceutical, prosthetic and related expenses incurred by policemen or firemen injured in the performance of and within the scope of duty.

**\*\*\*\*\*\*\*\*\*\*End of Consent Calendar\*\*\*\*\*\*\*\*\*\***

**Article 4. Wage and Salary Schedules for FY2004**

On motion of Selectman Edward Perry, it was voted unanimously to amend Article 11 of the General Bylaws of the Town, Personnel Administration, by deleting from Section 20.h. the existing salary Schedules A, B, C, D, E and F and inserting in place thereof new Schedules A, B, C, D, E and F, as printed in the warrant.

### TOWN OF STOW
### WAGE & SALARY SCHEDULES
### Effective July 1, 2003 (3%)

### SCHEDULE A
### ANNUAL RATE POSITIONS

| Position Title | Minimum | Step 1 | Step 2 | Step 3 | Maximum |
|---|---|---|---|---|---|
| Police Chief | $57,236 | $59,317 | $62,440 | $67,643 | $76,514 |
| Fire Chief | 51,500 | 53,560 | 57,058 | 61,800 | 66,950 |
| Supt. of Streets | 50,717 | 53,885 | 57,058 | 60,226 | 63,398 |
| Town Accountant | 45,100 | 47,919 | 50,738 | 53,558 | 56,375 |

| | | | | | |
|---|---|---|---|---|---|
| Police Lieutenant | 54,590 | 58,710 | 61,800 | 64,890 | 66,950 |
| Treasurer-Collector | 42,594 | 45,258 | 47,919 | 50,580 | 53,243 |
| Building Inspector | 41,697 | 44,301 | 46,908 | 49,515 | 52,120 |
| Planning, Zoning & | | | | | |
|   Environmental Coord. | 39,678 | 42,158 | 44,638 | 47,121 | 49,598 |
| Library Director | 39,678 | 42,158 | 44,638 | 47,121 | 49,598 |
| Selectmen's Admin. Asst. | 31,327 | 33,188 | 35,142 | 37,091 | 39,045 |
| Town Clerk | 31,327 | 33,188 | 35,142 | 37,091 | 39,045 |

## SCHEDULE B
## HOURLY RATE POSITIONS

### GROUP A

| Position Title | Minimum | Step 1 | Step 2 | Step 3 | Maximum |
|---|---|---|---|---|---|
| Parks & Commons Worker | $9.06 | $9.84 | $10.67 | $11.46 | $12.23 |
| Cemetery Worker | 9.06 | 9.84 | 10.67 | 11.46 | 12.23 |
| Custodian | 9.06 | 9.84 | 10.67 | 11.46 | 12.23 |

### GROUP B

| Position Title | Minimum | Step 1 | Step 2 | Step 3 | Maximum |
|---|---|---|---|---|---|
| Assistant Town Clerk | $10.28 | $11.07 | $11.89 | $12.88 | $13.84 |
| Capital Prog. Comm. Secry. | 10.28 | 11.07 | 11.89 | 12.88 | 13.84 |

### GROUP C

| Position Title | Minimum | Step 1 | Step 2 | Step 3 | Maximum |
|---|---|---|---|---|---|
| Bd. of Appeals Secretary | $11.07 | $12.06 | $13.01 | $14.00 | $14.97 |
| Town Secretary | 11.07 | 12.06 | 13.01 | 14.00 | 14.97 |
| Highway/Tree/Grounds Worker | 11.07 | 12.06 | 13.01 | 14.00 | 14.97 |

### GROUP D

| Position Title | Minimum | Step 1 | Step 2 | Step 3 | Maximum |
|---|---|---|---|---|---|
| Highway/Tree/Grounds | | | | | |
|   Driver-Laborer | $13.70 | $14.57 | $15.42 | $16.26 | $17.11 |

### GROUP E

| Position Title | Minimum | Step 1 | Step 2 | Step 3 | Maximum |
|---|---|---|---|---|---|
| Highway Dept. Equipment | | | | | |
|   Operator | $14.96 | $15.89 | $16.82 | $17.77 | $18.68 |
| Tree Worker | 14.96 | 15.89 | 16.82 | 17.77 | 18.68 |
| Maintenance Person | 14.96 | 15.89 | 16.82 | 17.77 | 18.68 |

### GROUP F

| Position Title | Minimum | Step 1 | Step 2 | Step 3 | Maximum |
|---|---|---|---|---|---|
| Highway Dept. Mechanic | $15.86 | $16.79 | $17.85 | $18.84 | $19.82 |
| Highway Crew Chief | 15.86 | 16.79 | 17.85 | 18.84 | 19.82 |

### GROUP G

| Position Title | Minimum | Step 1 | Step 2 | Step 3 | Maximum |
|---|---|---|---|---|---|
| Highway Dept. Foreman | $16.78 | $17.83 | $18.86 | $19.90 | $20.94 |

## SCHEDULE C
### SINGLE RATE POSITIONS PAID ANNUALLY

| | |
|---|---|
| Registrar of Voters | $   107 |
| Assistant Registrar of Voters | 213 |
| Animal Control Officer | 13,555 |
| Animal Inspector | 2,587 |
| Director of Summerthing | 2,139 |
| Beach Director | 4,608 |
| Cemetery Superintendent | 9,695 |
| Veterans' Agent | 1,168 |
| Council on Aging Secretary | 743 |

## SCHEDULE D
### SINGLE RATE POSITIONS PAID HOURLY

| | |
|---|---|
| Election Warden | $ 8.15 |
| Election Clerk | 8.15 |
| Election Teller | 7.21 |
| Election Clerical Assistance | 7.21 |
| Lifeguard | 8.95 |
| Lifeguard (W.S.I.) | 10.56 |
| Beach Checker | 7.21 |
| Street Lister | 7.78 |
| Street Listing Clerk | 7.21 |
| Street Numberer | 7.21 |
| Per Diem Firefighter (call) | 10.66 |
| Apprentice Firefighter (call) | 10.96 |
| Firefighter (call) | 12.52 |
| Emergency Medical Technician (call) | 12.52 |
| Firefighter/EMT (call) | 13.10 |
| EMT - w/Defib & Epi Pen (call) | 13.67 |
| Firefighter/EMT - w/Defib & Epi Pen (call) | 14.24 |
| Officers - Fire or Medical (call) | 15.39 |
| Police Officer, part-time | 17.51 |
| Police Matron | 15.45 |

| | |
|---|---|
| Auxiliary Police Officer | 11.44 |
| Dispatcher, part-time | 11.44 |
| Summerthing Assistant | 7.21 |

## SCHEDULE E
### FIRE DEPARTMENT ANNUAL SINGLE RATES

| | |
|---|---|
| Deputy Fire Chief (call) | $773 |
| Fire Engineer | 670 |
| Fire Captain (call) | 515 |
| Fire Lieutenant (call) | 412 |
| Fire Medical Officer | 309 |
| EMS Quartermaster | 206 |
| EMS Schedule Coordinator | 155 |
| EMS Assistant Coordinator | 258 |
| EMS Records Coordinator | 309 |

An employee who qualifies to receive benefits from the Town's Educational Incentive Program will earn a 5%, 10% or 15% annual bonus above his or her base Step Schedule wage or salary.

## SCHEDULE
### FEE RATE POSITIONS

| | |
|---|---|
| Wire Inspector | 90% of fees collected |
| Deputy Wire Inspector | 90% of fees collected |
| Gas Inspector | 90% of fees collected |
| Assistant Gas Inspector | 90% of fees collected |
| Animal Disposal Officer | $10 per animal |
| Sealer of Weights & Measures | Total fees collected |

### Article 5.0. General Budget for Fiscal 2004

Selectman Shirley Burchfield moved that the Town vote to raise and appropriate the sum of $5,907,706.00 as recommended by the Town Administrator and Selectmen for Items 1 through 77 inclusive, as printed in the warrant under the column entitled *"FY2004 Budget Town Admin/Selectmen Recommend"*, each item to be considered a separate appropriation for the purposes designated and the same to be expended only for such purposes.

Moderator Newman explained there is a change in the customary budget line item arrangement. The line item for the Nashoba School District assessment is a separate article which will be considered following conclusion of action on Article 5.0.

Mr. Newman read off each group of line items, and the following were held for questions or clarification: 20, 24, 25, 31, 41, 42 and 68. Those items not held were put to a vote, and the sums of printed in the warrant carried.

Item 20 - Town Clerk's Other Wages: A voter questioned the reason the requested FY04 budget had been reduced. Town Clerk Linda Hathaway explained she had requested funds for part-time

assistance in the office, but it was not recommended. The sum of $8,711.00, as printed in the warrant, was moved and unanimously voted.

Item 24 - Planning Board Clerical Wages: A voter questioned the figure for this item. It was explained there are two positions involved, i.e., Planning Coordinator and Office Assistant. The sum of $73,664.00, as printed in the warrant, was moved and unanimously voted.

Item 25 - Planning Board Expenses: A voter questioned the reason for reduction of the requested amount. Town Administrator Wrigley explained the item had included funds for office furniture and fixtures, however, another funding source was located. The sum of $3,550.00, as printed in the warrant, was moved and unanimously voted.

Item 31 - Community Preservation Committee: A voter questioned the reason for this item. The explanation was that funds are required to meet certain anticipated expenses, i.e., office supplies, clerical assistance, property surveys, appraisals, legal and professional fees, etc. This duplicates Article 34 later in this warrant. The motion was amended to appropriate and transfer $20,000.00 from the Community Preservation Fund for this purpose. The motion was carried by majority. Article 34 will be moved "no action".

Item 41 - Supt. of Streets Salary: A voter noted that the recommended salary calculates to exceed the 3% general increase. The explanation was that the figure includes a step increase. The sum of $57,058.00, as printed in the warrant, carried by majority.

Item 42 - Highways & Grounds Wages: The sum of $362,107.00, as printed in the warrant, was moved and unanimously voted.

Item 68 -Educational Incentive: Malcolm FitzPatrick inquired into review of this item. Town Administrator Wrigley explained this line item is not related to the so-called Quinn Bill, a Police Officer educational incentive. This item is to benefit other town personnel who have earned post-secondary degrees. The sum of $48,000.00, as printed in the warrant, carried by more than a majority.

The total General Budget for Fiscal 2004, less the Nashoba School District assessment, totaled $5,907,706.00, of which $5,887,706 was to be raised and appropriated and $20,000.00 to be appropriated and transferred from the Conservation Preservation Fund.

**Article 5. General Budget for Fiscal Year beginning July 1, 2003**

**General Government**

| | | |
|---|---|---|
| 1 | Moderator Salary | $ 32.00 |
| 2 | Moderator Expenses | 41.00 |
| 3 | Selectmen Administrative Asst. Salary | 38,064.00 |
| 4 | Selectmen Expenses | 13,100.00 |
| 5 | Town Administrator Salary | 79,953.00 |
| 6 | Town Administrator Expenses | 500.00 |
| 7 | Town Building Clerical Wages | 25,370.00 |
| 8 | Finance Committee Wages | 2,714.00 |
| 9 | Finance Committee Expenses | 495.00 |
| 10 | Accountant Salary | 25,750.00 |
| 11 | Accountant Clerk Salary | 3,643.00 |
| 12 | Accountant Expenses | 309.00 |

| 13 | Assessors' Assistant Salary | 42,158.00 |
|----|------------------------------|-----------|
| 14 | Assessors' Clerical Wages | 34,112.00 |
| 15 | Assessors' Expenses | 6,100.00 |
| 16 | Treasurer-Collector Salary | 53,743.00 |
| 17 | Treasurer-Collector Clerical Wages | 41,547.00 |
| 18 | Treasurer-Collector Expenses | 35,600.00 |
| 19 | Town Clerk Salary | 37,091.00 |
| 20 | Town Clerk Other Wages | 8,711.00 |
| 21 | Town Clerk Expenses | 7,955.00 |
| 22 | Conservation Commission Wages | 39,596.00 |
| 23 | Conservation Commission Expenses | 3,513.00 |
| 24 | Planning Board Wages | 73,664.00 |
| 25 | Planning Board Expenses | 3,550.00 |
| 26 | Board of Appeals Wages | 4,991.00 |
| 27 | Board of Appeals Expenses | 2,775.00 |
| 28 | Municipal Building & Property Wages | 15,899.00 |
| 29 | Municipal Building & Property Expenses | 45,052.00 |
| 30 | Town Reports Expenses | 9,300.00 |
| 31 | Community Preservation Committee (A&T) | 20,000.00 |

General Government Total                        $   675,328.00

## Public Safety

| 32 | Police Chief Salary | $   76,514.00 |
|----|----------------------|---------------|
| 33 | Police & Dispatch Wages | 842,254.00 |
| 34 | Police & Dispatch Expenses | 70,000.00 |
| 35 | Fire Chief Salary | 61,800.00 |
| 36 | Fire & EMS Wages | 365,898.00 |
| 37 | Fire & EMS Expenses | 71,050.00 |
| 38 | Building Inspector Salary | 52,120.00 |
| 39 | Building Dept. Clerical Wages | 10,795.00 |
| 40 | Building Inspector Expenses | 3,000.00 |

Public Safety Total                            $1,553,431.00

## Public Works and Facilities

| 41 | Supt. of Streets Salary | $   57,058.00 |
|----|--------------------------|---------------|
| 42 | Highways & Grounds Wages | 362,107.00 |
| 43 | Highways & Grounds Expenses | 98,525.00 |
| 44 | Snow & Ice Removal Expense | 80,000.00 |
| 45 | Municipal Lighting | 13,400.00 |
| 46 | Gasoline & Diesel Fuel Expense | 40,000.00 |
| 47 | Cemetery  Salary & Wages | 21,393.00 |
| 48 | Cemetery Expenses | 321.00 |

Public Works and Facilities Total              $  672,804.00

### Human Services

| | | |
|---|---|---|
| 49 | Health Dept. Administrative Asst. Salary | $ 39,045.00 |
| 50 | Sanitary Agent Wages | 16,962.00 |
| 51 | Health Department Wages | 15,973.00 |
| 52 | Health Department Expenses | 8,095.00 |
| 53 | Council on Aging Director Salary | 35,141.00 |
| 54 | Council on Aging Wages | 42,276.00 |
| 55 | Council on Aging Expenses | 4,635.00 |
| 56 | Veterans' Agent Salary | 1,158.00 |
| 57 | Veterans' Agent Expenses | 200.00 |
| | Human Services Total | $ 163,485.00 |

### Culture and Recreation

| | | |
|---|---|---|
| 58 | Library Director Salary | $ 50,148.00 |
| 59 | Library Wages | 52,428.00 |
| 60 | Library Expenses | 47,960.00 |
| 61 | Recreation Wages | 35,140.00 |
| 62 | Recreation Expenses | 24,250.00 |
| 63 | Lake Boon Commission Wages | 2,220.00 |
| 64 | Lake Boon Commission Expenses | 1,235.00 |
| 65 | Historical Commission Expenses | 450.00 |
| 66 | Memorial Day Expenses | 950.00 |
| 67 | Lighting of Clock Expenses | 100.00 |
| | Culture and Recreation Total | $ 214,881.00 |

### Town-Wide Expenses

| | | |
|---|---|---|
| 68 | Educational Incentive | $ 48,000.00 |
| 69 | Group Insurance | 388,500.00 |
| 70 | Insurance & Bonds | 80,000.00 |
| 71 | Telephone | 21,000.00 |
| | Town-Wide Expenses Total | $ 537,500.00 |

### Education

| | | |
|---|---|---|
| 72 | Minuteman Voc-Tech Assessment | $ 881,246.00 |

### Debt Service

| | | |
|---|---|---|
| 73 | Principal, Long-Term Debt | $ 575,000.00 |
| 74 | Principal, Long-Term Debt - Non-Exempt | 24,460.00 |
| 75 | Interest, Long-Term Debt - Bonds | 607,954.00 |
| 76 | Interest, Long-Term Debt - Non-Exempt | 617.00 |
| 77 | Interest, Temporary Loans - Revenue | 1,000.00 |
| | Debt Service Total | $1,209,031.00 |

| **General Budget - Raise and Appropriate** | $5,887,706.00 |
| **Appropriate & Transfer from Conservation Pres. Fund** | 20,000.00 |
| | |
| **TOTAL GENERAL BUDGET** | $5,907,706.00 |

#### Article 5.1. Nashoba Regional School District Deficit

On motion of Selectman Clayton, it was voted, by declaration of the Moderator of a hand vote in excess of the two-thirds required, to borrow the sum of $168,720.00 for the purpose of funding the Town's apportionment of the Nashoba Regional School District's annual deficit bond payment and continue to borrow annually for the full term of the 3.8 million dollar deficit bond, provided, however, that an affirmative vote shall be null and void unless the Town approves a ballot question to exempt the amounts required to pay for said indebtedness from the provisions of proposition two and one-half.

*Note: The vote on the ballot question taken at the Annual Town Election of May 27, 2003 was in the affirmative.*

#### Articles 5.2 and 5.3. Nashoba Regional School District Assessment

On motion of Selectman Farrell, it was voted unanimously that Article 5.2 and Article 5.3 be combined for the purposes of discussion, but each article acted on by separate motion.

#### Article 5.2.

On motion of Selectman Farrell, it was voted by majority to raise and appropriate the sum of $10,434,736.00 for the purpose of funding the fiscal year 2004 Nashoba Regional School District so-called "alternative" operating budget, which shall be null and void in the event of affirmative votes on Article 5.3 and ballot question number 2 to exempt the amount appropriated under Article 5.3 from the limits of proposition two and one-half.

Selectman Jones recommended passage of Articles 5.1 and 5.2, which will not require approval of an override. This alternative budget represents a 3% increase over Fiscal 2003. Lancaster has voted to approve this budget.   School Committee member Carole Makary advised this figure is not recommended by the Nashoba Regional School District, but rather the figure to be moved under Article 5.3.

John Antonucci, Assistant Superintendent of Business & Finance, spoke of the current conditions within the District and the on-going changes, such as the hiring of a paid treasurer and the upgrade of the bookkeeper position to accountant. He advised that 61% of the operating budget is for wages.

Finance Committee member Thomas Ryan noted that the motion to be presented by the School Committee under Article 5.3 does not include dependence on an override question. He asked for a few minutes to discuss this development with his fellow committee members to learn if their recommendation might change.

The Moderator called a five-minute recess at 9:31 p.m.

When the meeting resumed, Mr. Ryan said there has been progress made within the District. Passage of Article 5.2 does not require an override, however Article 5.3 does as it represents a 5.69% increase over Fiscal 2003. The School Committee advised that a 3% increase is not its intention. The Finance Committee favors only a 3% increase and feels it is all the Town can afford without an override. Jason Robart of the Finance Committee indicated the figure under Article 5.2 would maintain current

programs and class size. There will be cuts in certain areas, but it is felt to be a reasonable budget. The Finance Committee recommended Article 5.3, but only contingent on approval of an override vote. Passage of Article 5.2 was felt to be a "stop gap".

Several members of the School District spoke and enumerated the areas where cuts would have to be made with Article 5.2 funding.

At 10:20 p.m. there was a call for the question. The Moderator declared a two-thirds vote to cease discussion on Article 5.2. The vote on the main motion carried in the majority: Yes 395, No 256.

**Article 5.3.**

On motion of Nancy Fleming of the Nashoba Regional School District Committee, it was voted by majority to raise and appropriate the sum of $10,716,856.00 for the purpose of funding the fiscal year 2004 Nashoba Regional School District adjusted level services operating budget.

On the question of why the motion did not include dependence on an override question, Ms. Fleming responded that decision rests only with the School Committee. An override should not be tied to just this article.

Selectman Perry moved to amend by inserting, "provided, however, that an affirmative vote shall be null and void unless the Town approves by affirmative vote a ballot question to exempt the amount appropriated from the provision of proposition two and one-half."

Discussion ensued until a call for the question at 11:09 p.m. The vote to cease discussion carried unanimously. The vote on Mr. Perry's amendment DID NOT CARRY.

The vote on Ms. Fleming's motion carried by majority.

At 11:15 p.m. the meeting was adjourned to reconvene on Tuesday, May 20, 2003 at 7:00 p.m. in Hale School Auditorium.

**MAY 20, 2003**
**(Second Session)**

Moderator Edward Newman declared the second session in order at 7:00 p.m. Several Hale School students led the meeting in the Pledge of Allegiance to the Flag. The members of the Center School "Destination Imagination" team were introduced. Selectman Kathleen Farrell addressed the team and offered congratulations on its accomplishments.

Deputy Moderator Ellen Sturgis reviewed actions taken last evening. There appeared confusion on the part of voters concerning Question 2 of the Town Election ballot concerning a proposition two and one-half override of $414,511.00 for the purpose of funding the Nashoba Regional School District budget for Fiscal 2004. Article 5.3, as proposed by the School Committee and approved by the voters, was not contingent on passage of Question 2. Town Administrator Wrigley advised that the Town's Fiscal 2004 budget is not in balance. If the vote on Question 2 was in the affirmative, it would provide a method of tax levy capability.

**Article 6. Reserve Fund:** See Consent Calendar

**Article 7. Tax Title Proceedings:** See Consent Calendar

**Article 8. Audit of Financial Records:** See Consent Calendar

**Article 9. Revolving Fund for Inspection Fees:** See Consent Calendar

**Article 10. Revolving Fund for Conservation Commission:** See Consent Calendar

**Article 11. Revolving Fund for Advanced Life Support Services:** See Consent Calendar

**Article 12. Transfer to Conservation Fund:** See Consent Calendar

**Article 13. Transfer from Wetlands Protection Fund:** See Consent Calendar

**Article 14. Update of Property Valuations:** See Consent Calendar

**Article 15. Town Records Binding and Repair:** See Consent Calendar

**Article 16. Highway Department:** See Consent Calendar

**Article 17. Federal Safe Drinking Water Act:** See Consent Calendar

**Article 18. Household Hazardous Waste Collection:** See Consent Calendar

**Article 19. Board of Health:** See Consent Calendar

**Article 20. Stow Cultural Council:** See Consent Calendar

**Article 21. Water Source Maintenance:** See Consent Calendar

**Article 22. Purchase of Information Technology Equipment**
On motion of Selectman Edward Perry, it was voted unanimously to raise and appropriate the sum of $17,885.00 to be added to any balance remaining and previously appropriated, to be expended under the direction of the Town Administrator for the purchase of information technology equipment and software for various town departments; and to authorize the Town Administrator to sell, trade or otherwise dispose of existing equipment in connection therewith.

**Article 23. Legal Services:** See Consent Calendar

**Article 24. Policemen and Firemen Medical Payments:** See Consent Calendar

**Article 25. Capital Program**
On motion of Selectman Kathleen Farrell, it was voted unanimously to discuss the items of this article individually and vote upon each separately as to the amount to be appropriated for each item, as set forth in separate motions proposed.

Karen Mayer, chair of the Capital Planning Committee, explained the function of the committee. She presented graphics showing the Town's debt payment obligations through Fiscal 2015 and projected capital requests from Highway, Fire and Police for the next five years

**Article 25-1. Purchase of Cab and Chassis**

On motion of Selectman Farrell, it was voted unanimously to appropriate and borrow the sum of $30,000.00 to be used for the replacement of a six-wheel cab and chassis for use by the Highway Department provided, however, that an affirmative vote shall be null and void unless the Town approves by affirmative vote a ballot question to exempt the amount appropriated from the provisions of proposition two and one-half.

*Note: The vote under Question 3 of the ballot for the Special Town Election of September 9, 2003 to exempt this borrowing from the provisions of proposition 2-1/2 failed, thus the vote under Article 25-1 is null and void.*

**Article 25-2. Purchase of Used Bucket Truck**

On motion of Selectman Farrell, it was voted unanimously to appropriate and borrow the sum of $15,000.00 to be used for the purchase of a used bucket truck for use by the Highway Department provided, however, that an affirmative vote shall be null and void unless the Town approves by affirmative vote a ballot question to exempt the amount appropriated from the provisions of proposition two and one-half.

*Note: The vote under Question 4 of the ballot for the Special Town Election of September 9, 2003 to exempt this borrowing from the provisions of proposition 2-1/2 failed, thus the vote under Article 25-2 is null and void.*

**Article 25-3. Purchase of Fire Pumper Truck**

On motion of Selectman Farrell, it was voted unanimously to appropriate and borrow the sum of $180,000.00 to be used to replace a pumper truck to be used by the Fire Department provided, however, that an affirmative vote shall be null and void unless the Town approves by affirmative vote a ballot question to exempt the amount appropriated from the provisions of proposition two and one-half.

*Note: The vote under Question 2 of the ballot for the Special Town Election of September 9, 2003 to exempt this borrowing from the provisions of proposition 2-1/2 failed, thus the vote under Article 25-3 is null and void.*

**Article 25-4. Fire Dispatch Computer Component**

On motion of Selectman Farrell, it was voted unanimously to appropriate and borrow the sum of $20,000.00 to be used for the purchase of a dispatch computer component to be used by the Fire Department provided, however, that an affirmative vote shall be null and void unless the Town approves by affirmative vote a ballot question to exempt the amount appropriated from the provisions of proposition two and one-half.

*Note: The vote under Question 5 of the ballot for the Special Town Election of September 9, 2003 to exempt this borrowing from the provisions of proposition 2-1/2 failed, thus the vote under Article 25-4 is null and void.*

**Article 25-5. Purchase of Police Cruiser**

On motion of Selectman Farrell, it was voted unanimously to appropriate and borrow the sum of $28,000.00 for the purpose of purchasing a replacement police cruiser for the Police Department provided, however, that an affirmative vote shall be null and void unless the Town approves by affirmative vote a ballot question to exempt the amount appropriated from the provisions of proposition two and one-half.

*Note:  The vote under Question 6 of the ballot for the Special Town Election of September 9, 2003 to exempt this borrowing from the provisions of proposition 2-1/2 failed, thus the vote under Article 25-5 is null and void.*

**Article 26.  Pompositticut and Center Schools Capital Projects**

On motion of Selectman Farrell, it was voted, as amended, in excess of the required two-thirds vote, to borrow the sum of $595,000.00 for the purpose of improving, rehabilitating, renovating or reconstructing the Pompositticut and Center Schools, to include appurtenances, engineering, architectural and project management costs associated with and incidental thereto, under the direction and with the approval of the Selectmen, or their designee, as lessor of school buildings, and subject to an affirmative vote on a ballot question to exempt such amount from the provisions of proposition two and one-half.

The Finance Committee was not in favor of the motion as its purposes were felt to be the responsibility of the School District in that some of the items were repairs and maintenance and not renovations.

Nancy Fleming of the School Building Committee explained this article is proposed as a necessary step until there is a school building proposal to present to the voters. The regional agreement does not specifically define operational and capital expenditures. It is proposed to expend $156,000 at Pompositticut (30 years old) and $429,000 at Center (original section 50 years old) and provide $10,000 for borrowing costs. The project would commence in June 2004 with completion by September 2004. A project manager would be hired to manage the work on a daily basis.

A motion by Edwin Merrick to amend the amount to $491,386.00, as voted by the Capital Planning Committee, DID NOT CARRY:  Yes 200, No 223.

Steve Dungan of the Finance Committee inquired into control of the project, District or Town. Town Administrator Wrigley was of the opinion the district agreement implies responsibility of the District.

Karen Meyer of the Capital Planning Board moved to amend by including the following: ...."under the direction and with the approval of the Selectmen, or their designee, as lessor of school buildings, and ...."

It was determined the School Committee would be in charge through the document stage. Once the project begins, it would be under the direction of the project manager who may report to the Town Administrator. Town Counsel Jacob Diemert advised that the Town as lessor has the right to approve additions and improvements. Under the district agreement and statute, the District controls those buildings. Any other arrangement would have to be through agreement between the parties.

When put to a vote, Ms. Meyer's motion to amend carried unanimously. The main motion, as amended, carried in excess of the required two-thirds vote.

*Note:  The vote on the ballot question taken at the Annual Town Election of May 27, 2003 was in the affirmative.*

At this point, Moderator Newman handed over the gavel to Deputy Moderator Ellen Sturgis to preside over the next few articles.

**Article 27. Supplemental Educational Funding**

Selectman Edward Perry moved the Town vote to accept the provisions of Massachusetts General Laws Chapter 60, Section 3C to establish an educational fund and/or scholarship fund for the purpose of providing supplemental educational funding to assist in meeting local educational needs.

Selectman Gregory Jones explained this was an opportunity for citizens to donate to an educational fund to improve facilities or to provide scholarships. Donations would be received through a check-off box on the real estate bill. The Board of Selectmen would set requirements and appoint a committee to administer the fund.

When put to a vote, the motion DID NOT CARRY.

**Article 28. Snow and Ice Expense Deficit**

On motion of Selectman Shirley Burchfield, it was voted unanimously to appropriate and transfer the sum of $43,039.00 from the Overlay Surplus Account (#01-00-00-32200) to the Snow and Ice Account (#A01-40-23-67800) for the purpose of funding the Fiscal Year 2003 Snow and Ice deficit.

**Article 29. Fiscal Year 2003 Budget Deficit Reduction**

On motion of Selectman John Clayton, it was voted unanimously to appropriate and transfer the sum of $85,307.49 from the Stow Municipal Electric Department Account (#62-00-00-10400.000) for the purpose of being used as another financial source in the Fiscal Year 2003 General Fund.

**Article 30. Town Building Third Floor Improvement**

On motion of Selectman Farrell, it was voted unanimously to appropriate and transfer the sum of $3,920.70 from the Pompositticut School Door Repair Account (#A02-30-10-78501) and the sum of $3,927.11 from the Town Building Telephone Purchase Account (#A02-10-55-78500), for a total of $7,847.81, to the Town Building Third Floor Improvement Account (#A01-10-92-78260) for the purpose of completing renovations to the third floor of Town Building.

**Article 31. Fire Station Parking Lot**

Selectman Jones moved to raise and appropriate the sum of $5,000.00 to replace, repair and reconstruct the parking lot at the Fire Station.

When put to a vote, the motion DID NOT CARRY.

**Article 32. Addition to Conservation Fund**

Selectman Perry moved to raise and appropriate the sum of $30,000.00 to be added to any remaining balance and previously appropriated to the Conservation Fund, to be expended by the Conservation Committee.

Conservation Commission chair Daniel delSobral gave a presentation. When put to a hand counted vote, the motion DID NOT CARRY: Yes 162, No 178.

Deputy Moderator Ellen Sturgis relinquished the gavel to Moderator Edward Newman.

**Article 33. Community Preservation Deed Restrictions**

On motion of Robert Wilber of the Community Preservation Committee, it was voted unanimously to appropriate and transfer from the Community Preservation Fund the sum or $150,000.00 to be transferred under the direction of the Community Preservation Committee in the form of specific grants, consistent with the guidelines set forth in the Community Preservation Plan, to the Stow Housing

Authority, for the purpose of purchasing perpetual deed restrictions to ensure continued affordability to eligible low and/or moderate income households.

**Article 34. Community Preservation Expenses**
On motion of Mr. Wilber, it was voted unanimously to take no action on this article. The appropriation and transfer from the Community Preservation Fund was accomplished under Article 5.

At 10:18 p.m. the meeting was adjourned to reconvene on Wednesday, May 21, 2003 at 7:00 p.m. in Hale School Auditorium.

## MAY 21, 2003
### (Third and Final Session)

Moderator Newman declared the third and final session in order at 7:00 p.m. Several Hale School students again led the meeting in the Pledge of Allegiance to the Flag. Deputy Moderator Ellen Sturgis reviewed actions taken the previous evening.

Town Administrator Wrigley responded to voter questions concerning the four ballot questions to be voted upon at the annual election on May 27th, three for debt exemption and one a proposition two and one-half override. The first is for a bond to finance the Town's assessment for the School District deficit bond payment and will be in effect for the ten-year life of the bond (Article 5.1). The second question seeks approval of a $414,511 override for the purpose of funding the FY2004 Nashoba School District operating budget. The District budget vote was not contingent upon an override, therefore, if question 2 were approved, it would provide additional levy limit. Current estimates are than one million dollars will be required to balance the Fiscal 2004 budget. Question 3 seeks to exempt debt for the Pompositticut and Center School capital projects (Article 26). Question 4 seeks to exempt debt to finance acquisition of the former Hewlett-Packard/Compaq/Digital property at the corner of Hudson Road.

**Article 35 and 36.**
On motion of Selectman Perry, it was voted unanimously that Article 35 and Article 36 be combined for purposes of discussion, but each article be acted on by separate motion.

**Article 35. Community Preservation - Kunelius Property**
On motion of Robert Wilber of the Community Preservation Committee it was voted by majority to appropriate and transfer from the Community Preservation Fund the sum of $300,000.00 to be expended under the direction of the Community Preservation Committee for the purposes of acquiring by purchase or gift a certain parcel of land containing approximately 44.57 acres of land located on Red Acre Road, Stow, Middlesex County, Massachusetts for conservation, active and open space, for any other municipal purposes as the Town shall hereafter determine, so long as areas designated for separate purposes shall be clearly identified and delineated;
that the Board of Selectmen be authorized to negotiate such purchases upon such terms, provisions and conditions as the Board of Selectmen and the Community Preservation Committee deem, in their discretion, to be appropriate, including terms addressing easements over the adjacent parcels of land located at 142 and 144 Red Acre Road providing appropriate conservation restrictions and access to the 44.57 acre parcel;
that such acquisition shall occur only after the Community Preservation Committee and the Board of Selectmen have received an appraisal from a qualified real estate appraiser that confirms to their satisfaction the value of the interest being conveyed to the Town hereunder;

and that the Board of Selectmen and the Community Preservation Committee be authorized to take all other actions necessary or appropriate to accomplish the foregoing consistent with the Community Preservation Act.

Craig MacDonnell, Director of The Trust for Public Lands, described the property, its location and the history of the project. The existing dwelling at 142 Red Acre Road would be renovated and sold as affordable. The dwelling at 144 would be acquired by "Eye of the Storm", an equine rescue entity. There would be a permanent conservation restriction. The appropriation would afford the Town a deeded access across the property to the fire pond and to the potential water supply resource. The affordable housing restriction under Article 36 would provide two affordable dwelling units and count toward the Town's 10% goal. Both units would be renovated to code prior to being turned over to the Town. Mr. Wilber advised the property would serve as a connector to existing conservation lands, Red Acre Woodland and Captain Sargent Land.

Selectman Gregory Jones moved to amend as follows: "...$300,000.00 to be expended under the direction of the Conservation Preservation Committee for the purpose of acquiring by purchase a certain parcel of land containing approximately **2.47** acres of land located off Red Acre Road, Stow, Middlesex County,..."

Linda Hathaway, speaking as a taxpayer, reminded that a ballot question at the January special town election concerning debt exemption for acquisition of the Kunelius property had failed. James Dunlap questioned the effect on the aquifer of the presence of horses and their waste products.

At 8:03 p.m. there was a call for the question which carried, and the meeting proceeded to vote on Mr. Jones' amendment. The motion to amend DID NOT CARRY.

Discussion continued on the main motion. Ms. Hathaway noted the Zoning Board of Appeals will conduct a public hearing on June 2nd for frontage variance concerning 144 Red Acre Road. She inquired into plans if the variance were not granted. Mr. MacDonnell felt it likely the variance would be granted. If not, there would be a re-examination of the project.

Leonard Golder asked how the project would be financed. Mr. MacDonnell responded that normally The Trust for Public Land asks the municipality involved to contribute 50% of the purchase, but here the Town is being asked for only $300,000, plus $100,000 for the affordable component. Mr. Wilber indicated that self-help funds would be sought from the State. The Selectmen were said to support the project.

At 8:24 p.m. there was a call for the question that carried. The vote on the main motion was in excess of a majority.

### Article 36. Affordable Housing Restriction

On motion of Robert Wilber of the Conservation Preservation Committee, it was voted by majority to appropriate and transfer from the Community Preservation Fund the sum of $100,000.00 to be used and expended under the direction of the Community Preservation Committee for the purpose of purchasing a property interest commonly known as "affordability restriction" for two properties located at 142 and 144 Red Acre Road; that the Board of Selectmen be authorized to negotiate such purchase upon such terms, provisions and conditions as the Board of Selectmen and Community Preservation Committee deem, in their discretion, to be appropriate; and that the Board of Selectmen and the Community Preservation Committee be authorized to take all other actions necessary or appropriate to accomplish the foregoing consistent with the Community Preservation Act.

**Article 37. Adjustments to Eligibility Requirements under Chapter 59, Section 5(41C)**

On motion of Selectman Shirley Burchfield, it was voted unanimously, pursuant to Chapter 184, Section 51 of the Acts of 2002, to allow for the adjustment in eligibility requirements and in the amount of the exemption granted to those qualifying under Mass. General Laws Chapter 59, Section 5(41C), as such eligibility requirements and amounts are printed in the warrant.

1. Decrease the age requirement from 70 to 65.
2. Increase the income limits from $13,000 single/$15,000 married to $20,000 single/ $30,000 married.
3. Increase the asset limits from $28,000 single/$30,000 married to $40,000 single/ $55,000 married.
4. Increase the exemption amount granted by 100%.

**Article 38. Amendment of the Nashoba Regional School District Agreement**

On motion of Selectman Jones, it was voted unanimously to authorize the Nashoba Regional School District Committee to vote to amend the existing Nashoba Regional School District Agreement, as printed in the warrant, and to authorize the Committee or the Town of Stow to petition the Great and General Court to enact any special legislation as may be necessary for such purpose.

Section 1. (A) The powers and duties of the regional school district shall be vested in and exercised by a regional school district committee, sometimes referred to as the committee. The committee shall consist of eight members: three from the town of Lancaster, three from the town of Stow and two from the town of Bolton. Such committee had members elected at the 2001 annual election of each town as follows: Bolton: two members, one for a term of three years and one for a term of two years; Lancaster: three members, one for a term of one year, one for a term of two years, and one for a term of three years; Stow: three members, one for a term of one year, one for a term of two years, and one for a term of three years. At the expiration of each term set forth above, each town will elect a member for a term of three years.

If a vacancy occurs among the members of the committee, the selectmen and the remaining members of the committee from the town involved, acting jointly, shall appoint a new member by ballot within one (1) month after the vacancy occurs to serve until the next town election, at which time a new member will be elected to serve the remainder of the vacated term.

The population of the participating town shall be determined every five (5) years in accordance with the town's annual census as certified by the respective town clerks. The census will be reviewed by the Regional District School Committee to determine if the number of representatives elected from each town is within the standard 10-16% deviation in compliance with the one person – one vote ruling.

If the population in a participating town results in a change in the number of members to be elected to the Regional District School Committee, such change shall be effective at the annual town election following the certification of the census.

**LOCATION AND LEASE OF SCHOOLS**

Section 2. (A) The Regional District schools serving students from all district towns shall be located as near as feasible to the geographic and population centers of the District, except that any new school constructed for the purpose of accommodating pupils primarily from a particular member town shall be located in that town.

(B) The town of Bolton is hereby authorized to lease to the Regional School District all the premises and buildings presently known as the Emerson School (including the 1952 + 1972 sections, excluding the 1922 section) and the Florence Sawyer School. The town of Lancaster is hereby authorized to lease to the Regional School District all the premises and buildings presently known as the Mary Rowlandson Elementary School and the Luther Burbank Middle School. The town of Stow is hereby authorized to lease to the Regional School District all the premises and buildings presently known as the (1) Hale School, (2) Center School, (3) Pompositticut School, and (4) the

Stone Building. Each of the leases authorized above shall be for a term not in excess of twenty (20) years and the term shall commence on July 1, 1994. Each of the leases shall contain a provision for the extension of the term thereof for an additional term not in excess of twenty (20) years, renewable at any time during the term, at the option of the Regional District School Committee. Each of the leases shall contain provisions authorizing the Regional School District to insure, repair, improve, alter or remodel any of the leased buildings. Alterations or changes to any leased property can only be made with the concurrence of the leasing town. No rental shall be charged to the District by any of the participating towns except as hereinafter provided.

If the Regional District School Committee shall assign any pupils residing in any one (1) or more participating towns to attend any of the aforementioned leased schools of another town on which any funded indebtedness remains outstanding the town of residence of such pupils shall be charged a rental fee at the rate of net cost per pupil per school year for each pupil so assigned. The rental shall be paid to the Regional School District by the town of residence of such pupils within thirty (30) days after the date of billing by the said Committee and the said Committee shall transmit said payment to the town of ownership of the school to which such students have been assigned.

In the event of withdrawal of any of the participating towns from the District, the above-mentioned leases shall be terminated at the time of such withdrawal. Each lease involving a participating town shall be on such other terms as may be determined by the Selectmen thereof and the Regional District School Committee who shall execute the lease for the participating town and the Regional School District, respectively.

New school facilities built by member towns shall be subject to the leasing terms as outlined above. When facilities are no longer used for education purposes, the lease for that facility is terminated.

## TYPE OF DISTRICT

Section 3. The Regional School District shall include all grades from kindergarten through grade twelve (12).

## METHOD OF APPORTIONING COSTS OF THE REGIONAL SCHOOL

Section 4. (A)  Capital costs shall include all expenditures in the nature of capital outlay such as the cost of acquiring land, the costs of constructing, reconstructing, and adding to buildings, and the cost of remodeling or making extraordinary repairs to a school building or buildings, including without limitation the cost of the original equipment and furnishings for such buildings or additions, plans, architects' and consultants' fees, grading and other costs incidental to placing school buildings and additions and related premises in operating condition. Capital costs shall also include payment of principals of and interest on bonds or other obligations issued by the District to finance capital costs.

(B)  Operating costs shall include all costs not included in capital costs as defined in Section 4(A) but including interest on temporary notes issued by the District in anticipation of revenue.

(C) 1.  Capital costs, including debt service on bonds or notes issued by the District to finance capital costs, in connection with any particular District school shall be apportioned on the basis of each member town's pupil enrollment in such school. Each member town's share shall be determined by computing the ratio which its pupil enrollment in such school on October 1 of the year next preceding the year for which the apportionment is made bears to the total pupil enrollment from all the member towns in such school on that date. If there is not enrollment in such school on the aforesaid October 1, the apportionment of debt service with respect thereto shall be made on the basis of the estimated pupil enrollment from each member town in such school on the aforesaid date had there been any reenrollment, such estimate to be made by the Committee.

Incurring of indebtedness for the construction of new school facilities, including additions to existing school facilities, which are designed to serve students from one member town, shall be by vote of the voters of the member town so served, at an annual or special town meeting and said indebtedness shall be incurred by the member town so served and not the Regional School District.

Incurring of indebtedness for capital improvements or capital replacements for existing school facilities to serve students from one (1) member town shall be by vote of the voters of the member town so served, at an annual or special town meeting, and said indebtedness shall be incurred by the member town so served and not the Regional School District.

(D) Operating costs the average of the previous five (5) years' enrollment as of October 1 of each of the preceding years for fiscal year 2000 and thereafter.

Assessments to each town shall be said apportionment less the average percentage of Regional Aid, Transportation Aid, and any other reductions to the gross budget voted by the Regional School District, less each town's allocation of Chapter 70 aid, but not less than each town's minimum contribution required by the State.

(E) Payments of one-quarter of each town's proportional part of the its assessment from the regional school district, including indebtedness, shall be made on the first day of each February, May, August, and November and in the manner prescribed by Statute.

Within seven (7) days after the date on which the Regional District School Committee authorizes the incurring of debt, other than temporary debt in anticipation of revenue to be received from participating towns, the said Committee shall cause written notice of the date of said authorization, the sum authorized, and the general purpose or purposes for authorizing such debt, to be given to the Board of Selectmen of each participating town.

## TRANSPORTATION

Section 5. (A)  School Transportation shall be provided by the Regional School District and the cost thereof shall be apportioned to the participating towns as an operating cost.

(B)  Students in pre-kindergarten through grade eight (8) shall attend schools in their town of residence except as hereinafter provided.

(C)  The Regional District School Committee may assign by a majority vote students in grades six (6) through eight (8) to a school in other than their town of residence only after a favorable majority vote at an annual or special town meeting on the part of both sending and receiving towns involved in such an assignment.

(D)  The Regional District School Committee may determine by a majority vote the need to assign elementary pupils to schools in other than their town of residence in case of an emergency which prevents use of a building whole or part, or with parent approval; the town whose students are so assigned will be responsible for all costs associated with temporarily housing its students.

## ADMISSION TO AND WITHDRAWAL FROM THE DISTRICT

Section 6. (A)  Any town not included in the Regional School District may be admitted to the District by Majority vote of the Regional District School Committee and upon acceptance by the town of this Agreement with any amendments thereto and upon acceptance by the Town of the provision of Section sixteen through sixteen (I), inclusive, of Chapter 71, as amended, of the General Laws.  Upon admission of such a town, the costs of Section 4 plus subsequent acquisitions and improvements shall be reapportioned in accordance with Section 4 to all the towns now comprising the District as determined by the Regional District School Committee. The newly admitted town shall then assume liability for its entire share of the costs of Section 4 for the remaining terms of the funded indebtedness.  It shall pay to the Regional School District Treasurer an amount equal to the sum of its normal share of the costs of Section 4 plus its share of the funded indebtedness already retired divided by the number of years in the remaining life of the funded indebtedness.  Payments made by the newly admitted town for funded indebtedness already retired, shall be credited to the towns previously forming the District on the basis of over-payments made by them.  If no funded indebtedness exists the newly admitted town must pay to the Regional School District their percentage of student enrollment to the District total capital costs over a ten (10) year period.

Funds received for capital expenditures from any newly admitted town will be used to reduce assessments to the previous members of the Regional School District based on the average percent of each town's enrollment over the life of the District

(B) By a majority vote at a regular or special town meeting, any town in the Regional School District may withdraw from the District, provided that a majority of the remaining members of the Regional District School Committee so vote; and provided that the town desiring to withdraw has paid its portion of the remaining funded indebtedness and any other expenses for which it became liable as a member of the District.

The withdrawing town shall remain liable to the District for indebtedness of the District outstanding at the time of such withdrawal, and the interest thereon to the same extent and in the same manner as though such town had not withdrawn from the District; provided that such liability shall be reduced by any amount which such town has paid at the time of withdrawal and which has been applied to the payment of such indebtedness or interest.

The withdrawing town's annual share of any future installment of principal and interest on obligations outstanding on the effective date of its withdrawal shall be fixed at the percentage prevailing for such town at the last annual apportionment made next prior to the effective date of the withdrawal. The remainder of any such installment after subtracting the share of any towns which have withdraw shall be apportioned to the remaining participating towns in the manner provided in Section 4 (C) and any amendments which may be made thereto.

## AMENDMENTS

Section 7.  This Agreement may be amended by recommendation of the Regional District School Committee or by initiative Petition of 10% of the registered voters in the towns comprising the Regional School District, provided that such amendment is approved by majority vote in each of the towns comprising the District.  No such amendment shall be made which shall substantially impair the rights of the holders of any bonds or notes of the District then outstanding or the rights of the District to procure the means for payment thereof; provided, that this provision shall not prevent the admission of new towns to the District and the reapportionment accordingly of that part of the cost of construction represented by bonds or notes of the District then outstanding and of interest thereon.

## BUDGET

Section 8.  The Regional District School Committee shall, in accordance with Section 16B of Chapter 71 of the General Laws of the Commonwealth of Massachusetts, prepare and adopt a budget and present this budget to each of the Towns comprising the District on or before March 15th for the next fiscal year, itemized as follows:

Administration
Instruction
Other School Services
Operation & Maintenance of School Plant
Fixed Charges
Community Service
Acquisition of Fixed Assets
Debt Retirement and Debt Services
Programs With Other Districts and Private Schools
Contingency

## ADMISSION OF STUDENTS

Section 9.  Students residing outside of the Regional School District may attend any of the schools in the District provided sufficient space is available as determined by the Regional District School Committee.  At any time the Regional District School Committee may vote not to accept students residing outside the District.

**ORGANIZATION OF THE REGIONAL DISTRICT**
**SCHOOL COMMITTEE**

Section 10. (A) Within ten (10) days after selection of membership, the Regional District School Committee shall organize and choose by majority vote such officers as provided for by law, and determine their term of office.

Provisions shall be made for meetings, including an annual meeting at which the officers of the Committee shall be elected. All meetings except those involving personal relations of pupils or employees of the Regional District School Committee shall be open to the public and the press.

(B) The Regional District School Committee, for and on behalf of the Regional School District, shall establish and maintain within the District a central office for the transaction of its business; the place to be determined by the Committee. The Committee shall have the power to equip the same and to purchase such supplies as may be required in the transaction of its business.

**AUDIT COMMITTEE**

Section 11. The school committee shall create an Audit Committee consisting of four (4) voting members: one (1) from each town appointed jointly by the Selectmen and Finance Committee of that town and one (1) voting member appointed by the school committee, where that member shall not be a member of the school district's administration. Each committee member must be independent of the financial reporting system of the district and should possess a reasonable level of financial literacy. The Audit Committee shall oversee the district's financial reporting process and annual audit(s), both financial and compliance.

It will be the responsibility of the Audit Committee to:

Establish an understanding of the district's financial reporting system through meetings and interviews with the district's management and individual interviews with all members of the district's financial reporting department. The Audit Committee will also have the authority to request financial reports from the business office of the district showing detailed financial transactions, actual expenditures against budgets, summaries of all "off budget" financial operations, all liabilities incurred or anticipated, and balances of all bank accounts.

Recommend to the school committee the hiring of the accounting firm that audits the financial affairs of the school district. The Audit Committee will define the scope of any audits performed, will meet with the auditors throughout the auditing process, and will receive any reports prepared by auditors.

Recommend to the school committee each year the amount of money required for auditing activities, and will recommend to the school committee expenditures from the auditing budget line item.

Report annually, after receiving the annual audit, or at other times it may deem appropriate, to the full school committee on the adequacy of the financial reporting system, outcomes of the annual audit and its recommendations for any changes in procedures. In addition, the Audit Committee will conduct, at least annually, a public session designed to inform the citizens of the member towns about the district's financial health.

Excerpt from Nashoba Regional School District Committee Meeting Minutes of March 27, 2003:

"Carole Makary made a motion that the School Committee sponsor the Revised Regional Agreement on Town Meeting floor in May 2003. Seconded by Alice Roemer. Voted and passed unanimous."

**Article 39. Bond Held by Planning Board**

On motion of Selectman Clayton, it was voted unanimously to accept the provisions of Massachusetts General Laws Chapter 41, Section 81U of the Subdivision Control Law for the purpose of authorizing the expenditure of any monies up to $100,000, as provided in said statute, with the approval

of the Board of Selectmen, for the completion of any subdivision improvements from monies deposited with the Town or made available through any bond enforcement action or otherwise for such purposes in connection with any subdivision approved by the Planning Board;

and further voted to appropriate and to authorize the Town, acting by and through its Planning Board, under the direction of the Board of Selectmen to expend such funds over and above the limit of $100,000 as may be available under a certain bond given to the Town for the subdivision of land approved by the Planning Board known as "Whispering Woods" (Kettell Plain Road) up to and including any or all of said excess provided for in the Subdivision Performance Bond in the amount of $510,174.00.

Donald McPherson of the Planning Board explained that the subdivision developer has defaulted, so the Planning Board must now complete items remaining in the subdivision approval. The Finance Committee was in favor of this article.

## Article 40. Amendment to Zoning Bylaw - Section 5.2.1.1

On motion of Selectman Farrell, it was voted unanimously to amend the Zoning Bylaws, "Water Resources Protection District", Section 5.2.1.1 subsection 7, by deleting the existing subsection 7 and inserting a new subsection 7, to read in its entirety as printed in the warrant.

"7. Involve MINING of the land, except as allowed in Section 5.2.5.3."

*Planning Board Report:* The Planning Board held a duly noticed public hearing on April 8, 2003 at 7:30 p.m. in the Stow Town Building to consider a proposed amendment to the Stow Zoning Bylaw Section 5.2.1.1.7. The purpose of this article is to correct an incorrect reference in Section 5.2.1.1. Section 5.2.1.1 lists uses permitted in the Water Resource Protection District. Subsection 7 incorrectly makes reference to Section 5.2.18.3 which does not exist. This section was intended to refer to Section 5.2.5.3 (Uses permitted only upon satisfaction of design requirements.) At its meeting of April 22, 2003, by a unanimous vote of four members present, the Planning Board voted to recommend adoption of Article 40 to Town Meeting.

## Article 41. Amendment to Zoning Bylaw - Inclusion of Affordable Housing

On motion of Selectman Perry, it was voted unanimously by declaration of the Moderator, to amend the Zoning Bylaw Section 3.10, "Table of Principal Uses", by adding a new Footnote (11); amending Section 8.8.3, "AAN District", by deleting the existing Section 8.8.3 and inserting a new Section 8.8.3; and adding a new Section 8.9, "Inclusion of Affordable Housing", to read in their entirety as printed in the warrant, except that Section 8.9.6 shall read:

8.9.6 Fees-in-Lieu of Affordable Dwelling Unit Provision - As an alternative to the requirements of Section 8.9.2.1, and as allowed by law and with the approval of the Planning Board, an applicant may contribute an amount in cash equal to the costs of constructing such affordable dwelling units, and satisfactory to the Planning Board in consultation with other relevant Town Boards, to the Town of Stow Housing Authority or its designee for the development and preservation of affordable housing, in consultation with the Planning Board and other appropriate Town Boards, in lieu of constructing and offering affordable dwelling units within the locus of the proposed development or off-site, as set forth in Section 8.9.6.1 below.

---

*41 (A)      Amend Section 3.10, Table of Principal Uses, by adding a new Footnote (11) to read in its entirety as stated below:*

**Section 3.10**

**Table of Principal Uses**

| Principal Uses | Residential | Business | Compact Business | Industrial | Commercial | Recreation Conservation | Flood Plain Wetlands | Refuse Disposal | Site Plan Approval |
|---|---|---|---|---|---|---|---|---|---|
| Single Family DWELLING | Y(4) SPP(11) | N | Y SPP(11) | N | N | N | N | N | (3) |
| Single Family DWELLING with ACCESSORY APARTMENT | SPP(4) (7)(11) | N | SPP(7) (11) | N | N | N | N | N | (3) |
| Duplex DWELLINGS | SPP(4) (11) | N | N | N | N | N | N | N | (3) |
| ASSISTED LIVING RESIDENCE | N | SPP(9) (11) | N | N | N | N | N | N | (3) |
| Multi-Family DWELLING | SPP(4) (11) | N | N | N | N | N | N | N | (3) |

(11) Provisions of Section 8.9, Inclusion of Affordable Housing, may apply.

---

**41 (B)**    *Amend Section 8.8.3, AAN District, by deleting the existing section 8.8.3 and inserting a new section 8.8.3 to read in its entirety as stated below:*

**8.8.3 AAN District**

This district shall be an overlay district and shall include parcels of land depicted on a map dated May 13, 2002 and entitled "Active Adult Neighborhood District," or any amendments thereto. This map is hereby adopted coincident with the adoption of this Bylaw. Development in an AAN District is subject to all provisions of the remainder of the Zoning Bylaw, except to the extent provided in Sections 8.8, ACTIVE ADULT NEIGHBORHOOD (AAN). Section 8.9, Inclusion of Affordable Housing, does not apply to the AAN District.

---

**41 (C)**    *Amend the Zoning Bylaw by adding a new Section 8.9, to read in its entirety as stated below:*

**8.9    Inclusion of Affordable Housing**

**8.9.1    Purpose and Intent** - The purpose of this Bylaw is to increase the supply of housing in the Town of Stow that is available to and affordable by low income or moderate income households who might otherwise have difficulty in finding homes in Stow, and to ensure that such housing is affordable over the long-term and provided in accordance with the requirements of Massachusetts General Law Chapter 40B and its implementing regulations, Stow Comprehensive Permit Policy, the Stow Master Plan, and other ongoing programs within the Town of Stow. It is intended that the AFFORDABLE DWELLING UNITS authorized under the provisions of this Bylaw be considered as Local Initiative Program (LIP) dwelling units in compliance with the requirements for the same as specified by the Department of Community Affairs, Massachusetts Department of Housing and Community Development (DHCD), or successor, or additional programs adopted by the Commonwealth or its agencies, and that said units count toward Stow's requirements under Massachusetts General Law Chapter 40B, Sections 20-23, as amended. Through multi-family units, developers will be able to increase the number of DWELLING UNITS within a development versus conventional developments. The increased number of DWELLING UNITS is intended to offset the reduced revenue from the affordable homes. In those cases where the Inclusion of Affordable Housing may conflict or be inconsistent with Section 8.5, Planned Conservation Development (PCD) or other sections of the Town of Stow Zoning Bylaw, except as otherwise expressly provided herein, the provisions of Inclusion of Affordable Housing shall be controlling.

**8.9.2    Applicability**

8.9.2.1.    Beginning with the effective date of this Bylaw, any development or division of land subject to Massachusetts General Law Chapter 41, Sections 81-K through 81-GG, which will result in the creation

of six (6) or more DWELLING UNITS, shall require a Special Permit from the Planning Board, and shall include as a condition of said permit that:

    A. At least 10% of the units be priced for QUALIFIED AFFORDABLE HOUSING PURCHASERS;
    B. The mix of AFFORDABLE DWELLING UNITS and market rate housing built in any one year be equivalent to the overall mix for the entire development;
    C. Deed restrictions, acceptable to the Town, and established in accordance with the standards of DHCD or successor or additional programs adopted by the Commonwealth or its agencies, shall be placed on the appropriate property to ensure that AFFORDABLE DWELLING UNITS created under this section shall remain AFFORDABLE DWELLING UNITS in perpetuity or for as long a period as is allowed by law.

8.9.2.2. DWELLING UNITS shall be considered as part of a single development if located either on a single parcel or contiguous parcels of land, which have been in the same ownership at any time subsequent to the date of adoption of Inclusion of Affordable Housing.

**8.9.3**    **Inclusion of Affordable Housing Regulations** – The Planning Board shall adopt and maintain a set of regulations that contains the necessary policies, procedures, and requirements to implement the provisions of this Section.

**8.9.4**    **Provision of AFFORDABLE DWELLING UNITS** - AFFORDABLE DWELLING UNITS required under Section 8.9.2.1 may be provided in any one or combination of methods described below, subject to the approval of the Planning Board:

    A. Constructed on the locus subject to the Special Permit;
    B. Constructed on a locus different than the one subject to the Special Permit;
    C. An applicant may offer, and the Planning Board, in concert with the Board of Selectmen may accept, donations of land in fee simple, on or off-site, that the Planning Board determines are suitable for the construction of an equivalent number of AFFORDABLE DWELLING UNITS. The Planning Board may require, prior to acceptance of land by the Town, satisfaction of the requirements of this Bylaw, that the applicant submit appraisals of the land in question, as well as other data relevant to the determination of value;
    D. For fractional AFFORDABLE DWELLING UNITS, the applicant may round up to the next whole number of units or choose to pay equivalent fees-in-lieu of units (see Section 8.9.7) proportionate to the percentage of the unit required;
    E. Preservation of existing DWELLING UNITS as AFFORDABLE DWELLING UNITS through the purchase of deed restrictions.

#### 8.9.5  Provisions Applicable to AFFORDABLE DWELLING UNITS On- and Off-Site

8.9.5.1. Allowed types of AFFORDABLE DWELLING UNITS:
    A. Single-family DWELLINGS;
    B. Single-family DWELLINGS with ACCESSORY APARTMENTS;
    C. MULTI-FAMILY DWELLINGS, which are designed to be consistent in character with the single-family DWELLINGS in the same development. Such MULTI-FAMILY DWELLINGS may be allowed provided:
        i. in terms of exterior appearance, the BUILDING is compatible in design and, to the extent practicable, indistinguishable from the single-family DWELLINGS in the same development; and
        ii. there shall be no more than four (4) DWELLING UNITS in any residential BUILDING; and
        iii. the total number of MULTI-FAMILY DWELLINGS shall not exceed 10% of the lots in the development; and
        iv. the overall length of any residential BUILDING shall not exceed 100 feet.

D.      Accessory uses and structures incidental to principal uses indicated above and approved by the
         Planning Board.

8.9.5.2. Siting of AFFORDABLE DWELLING UNITS. All AFFORDABLE DWELLING UNITS that are
constructed on-site under this Bylaw shall be situated within the development so as not to be in less
desirable locations than market-rate units in the development and shall, on average, be no less accessible
to public amenities, such as open space, as the market-rate units. The Site Plan shall identify those lots
selected for AFFORDABLE DWELLING UNITS.

8.9.5.3. Minimum Design and Construction Standards for AFFORDABLE DWELLING UNITS. AFFORDABLE
DWELLING UNITS within market-rate developments shall be integrated with the rest of the
development and shall be compatible to the extent practicable in exterior design and appearance with
other units, to the extent that such regulation is not inconsistent with Massachusetts General Laws
Chapter 40B, Section 3.

8.9.5.4. With the approval of the Planning Board, as an alternative to the requirements of Section 8.9.4.A, an
applicant subject to the Bylaw may develop, construct or otherwise provide AFFORDABLE
DWELLING UNITS equivalent to those required by Section 8.9.2.1 off-site. To the maximum extent
practicable, all requirements of this Bylaw that apply to on-site provision of AFFORDABLE
DWELLING UNITS shall apply to provision of off-site AFFORDABLE DWELLING UNITS. In
addition, the Planning Board shall approve the location of the off-site units to be provided as an integral
element of the Special Permit review and approval process.

**8.9.6  Fees-in-Lieu of AFFORDABLE DWELLING UNIT Provision** - As an alternative to the requirements of
Section 8.9.2.1, and as allowed by law and with the approval of the Planning Board, an applicant may
contribute an amount in cash equal to the costs of constructing such AFFORDABLE DWELLING UNITS,
and satisfactory to the Planning Board in consultation with other relevant Town boards, to the Town of
Stow Housing Authority or its designee for the development and preservation of affordable housing, in
consultation with the Planning Board and other appropriate Town boards, in lieu of constructing and
offering AFFORDABLE DWELLING UNITS within the locus of the proposed development or off-site, as
set forth in Section 8.9.6.1 below.

8.9.6.1. Calculation of fees-in-lieu of units. The applicant for development subject to this Bylaw may pay fees-in-
lieu of the construction. For the purposes of this Bylaw, the fees-in-lieu of the construction or provision
of each AFFORDABLE DWELLING UNIT is determined to be three (3) times 80% of the median
income for a household of four (4), as reported by the most recent information from the United States
Department of Housing and Urban Development (HUD) and/or the Massachusetts Department of
Housing and Community Development (DHCD).

-----------------------------------------------------------------------

*Planning Board Report:* The Planning Board held a duly noticed public hearing on April 8, 2003 at 7:30 p.m. in
the Stow Town Building to consider a proposed amendment to the Stow Zoning Bylaw by amending Sections 3.10
and 8.8.3 and adding a new Section 8.9. This article is intended to help address 10% state requirement for
affordable housing by increasing the supply of housing in the Town of Stow that is available to and affordable by
low income or moderate income households who might otherwise have difficulty in finding homes in Stow.

It establishes
A requirement that all development or division of land into six or more units shall be subject to a Special Permit
with a 10% affordability requirement. The Developer has the following options to meet the 10% requirement:
   ▪ Provide affordable deed restricted units on-site
   ▪ Provide affordable deed restricted units off-site
   ▪ Donation of land suitable for constructing an equivalent number of affordable units on-site or off-site
   ▪ Fees: 3 x 80% of median income for a household of four ($187,950) per affordable unit

This bylaw helps address the 10% state requirement by

- Providing for affordable housing with control growth
- Discourages concentrated development
- Provides mixed, not segregated, development
- Is self-administered
- Helps implement Master Plan

At its meeting of April 22, 2003, by a unanimous vote of the five members present, the Planning Board voted to recommend adoption of Article 41 to Town Meeting.

The Finance Committee was in favor of this article. Laura Spear, associate member of the Planning Board explained the highlights. The affordable units would remain as such in perpetuity through deed restriction.

## Article 42. Wetlands Protection Bylaw Amendment

On motion of Selectman Burchfield, it was voted by majority, as amended, to amend the Town of Stow General Bylaws Article 9, "Wetlands Protection", by amending Section 1, Section 2, Section 3, Section 3.1, Section 6, Section 7.2, Section 7.3, Section 7.4 and Section 9, so that the amended sections of the Wetlands Protection Bylaw shall read as printed in the warrant.

> Amend Section 1 by deleting the present section and inserting in place thereof a new Section 1 to read in its entirety as follows:

## SECTION 1. PURPOSE

The purpose of this Bylaw is to protect the wetlands, flood plains, water resources, and adjoining land areas of the Town of Stow by controlling activities deemed to have a significant effect upon the values of these resources, including but not limited to the following: public and private water supply, ground water, flood control, erosion and sedimentation control, storm damage prevention, water quality, soil and water pollution control, fisheries, shellfish, wildlife and wildlife habitat (wild plants and wild animals), rare species habitat including rare plant species, agriculture, aquaculture, and recreation (collectively, the "interests of this Bylaw"). This Bylaw is intended to utilize the Home Rule authority of this municipality to protect additional resource areas, for additional values, with additional standards and procedures to augment those of the Wetlands Protection Act, G.L. Ch. 131, §40 and Regulations thereunder, 310 CMR 10.00.

> Amend Section 2 by deleting the first paragraph and inserting a new first paragraph and by amending the fourth and fifth paragraphs, so that the first, fourth and fifth paragraphs of Section 2 shall read in their entirety as follows:

## SECTION 2. APPLICATION

No person shall remove, fill, dredge, alter, degrade, pollute, discharge into, or build upon or within one hundred feet of any bank, fresh water wetland, beach, dune, flat, marsh, meadow, bog or swamp; or lands bordering on or within one hundred feet of any Great Pond, estuary, creek, intermittent stream, or any land under said waters; or lands bordering on or within two hundred feet of any perennial stream, river, pond (with the exception of Great Ponds as defined at 310 CMR 10.58 and historic mill complexes as defined at 310 CMR 10.04), lake, reservoir, vernal pool, or any land under said waters; or lands bordering on or within one hundred feet of any land subject to flooding or inundation by ground water or surface water; or lands bordering on or within one hundred feet of the one-hundred year flood elevation, without filing written application for a permit so to remove, fill, dredge, build upon, degrade, pollute, discharge into, or alter, including such plans as may be necessary to describe such proposed activity and its effect on the environment, and receiving and complying with a permit issued pursuant to this Bylaw.

The written application, accompanied by a filing fee as described by regulation, payable to the Town of Stow, shall be sent in a manner that provides proof of delivery to the Stow Conservation Commission. This same application shall fulfill the requirements of the Massachusetts General Laws, Chapter 131, §40. Copies of this application shall be sent at the same time, in a manner that provides proof of delivery, to the Board of Selectmen, Planning Board and Board of Health. Such application shall be filed concurrently with applications for all other variances and approvals required by the Zoning Bylaw, the Subdivision Control Law or any other Bylaw or regulation, or after such variances and approvals have been obtained.

Upon written request of any person to the Commission, the Commission shall within twenty-one (21) days make a written determination as to whether this Bylaw is applicable to any land or work thereon. When the person requesting a determination is other than the owner, notice of the determination shall be sent to the owner as well as to the requesting person. Where appropriate, the Conservation Commission may conduct a public hearing on such a determination but is not required to do so. Notice of such a request for determination shall be sent to the abutters of record (as shown by the Assessors) where deemed necessary by the Commission.

Amend Section 3 to read in its entirety as follows:

### SECTION 3.  HEARING

The Commission shall hold a public hearing on the application within twenty-one (21) days of its receipt. Notice of the time and place of the hearing shall be given by the Commission, at the expense of the applicant, not less than five (5) days prior to the hearing, by publication in a newspaper of general circulation in Stow and by mailing copies of the notice to the applicant, Board of Health, Board of Selectmen, Planning Board, abutters as shown by the Assessors and to such other persons as the Commission may determine.

Amend Section 3.1 to read in its entirety as follows:

### SECTION 3.1.  PERMIT AND CONDITIONS

If after the public hearing the Commission determines that the area, which is the subject of the application, is significant to the interests protected by this Bylaw, the Commission shall within twenty-one (21) days of such hearing issue or deny a permit for the work requested. If it issues a permit after making such determination, the Commission shall impose such conditions as it determines are necessary or desirable for protection of those interests, and all work shall be done in accordance with those conditions. The conditions may include a condition that certain land or portions thereof not be built upon or altered, filled or dredged, that streams may not be diverted, dammed or otherwise disturbed. If the Commission determines that the area which is the subject of the application is not significant to the interests protected by this Bylaw, or that the proposed activity does not require the imposition of conditions, within twenty-one (21) days of the public hearing it shall issue a permit without conditions. Permits shall expire three (3) years from the date of issuance, unless renewal is sought by written application prior to the date of expiration.

Amend Section 6 to read in its entirety as follows:

### SECTION 6.  BURDEN OF PROOF

The applicant shall have the burden of proving by a preponderance of the credible evidence that the work proposed in the application will contribute to the interests protected by this Bylaw. Failure to provide adequate evidence to the Commission supporting a determination that the proposed work will contribute to the interests protected by this Bylaw shall be sufficient cause for the Commission to deny a permit or grant a permit with conditions, or, in the Commission's discretion, to continue the hearing to another date to enable the applicant or others to present additional evidence. Due consideration shall be given to any demonstrated hardship of the petitioner by reason of a denial, as brought forth at the public hearing.

Amend Section 7.2 by adding new subsections e, k and l, so that Section 7.2, as amended, shall read in its entirety as follows:

### SECTION 7.2.  ALTER

The term "alter" shall include, without limitation, the following actions when undertaken in areas subject to this Bylaw:

a.    Removal, excavation or dredging of soil, sand, gravel, peat or aggregate materials of any kind;

b.    Changing drainage characteristics, flushing characteristics, salinity distribution, sedimentation patterns, flow patterns, and flood retention characteristics;

c.    Drainage or other disturbance of water level or water table;

d.    Dumping, discharging or filling with any material that may degrade water quality;

e.    Placement or removal of material, which would alter elevation;

f.    Driving of piles, erection of buildings or structures of any kind;

g.    Placing of obstructions whether or not they interfere with the flow of water;

h.    Destruction of plant life, including cutting of trees;

i.    Changing of water temperature, biochemical oxygen demand or other physical or chemical characteristics of the water;

j.    Any activities, changes or work that pollutes a stream or body of water, whether or not said stream or body of water is located within the Town of Stow;

k.    Application of pesticides or herbicides;  *(Disapproved by Attorney General September 9, 2003)*

l.    Incremental activities, which have, or may have, a cumulative adverse impact on the resource areas protected by this Bylaw.

Amend Section 7.3 by deleting the present section and inserting in place thereof a new Section 7.3 to read in its entirety as follows:

### SECTION 7.3.  BANKS

The term "bank" shall include the land area which normally abuts and confines a water boundary; the lower boundary being the mean annual low flow level, and the upper boundary being the first observable break in the slope or the mean annual flood level, whichever is higher.

Amend Section 7.4.c. by adding a new subsection (4), so that Section 7.4.c., as amended, shall read in its entirety as follows:

the debt limit, up to $3,000,000.00, which shall also be used to pay other costs associated with the acquisition, (such as legal, appraisal, etc., fees); to be administered under the jurisdiction of the Selectmen; and provided that the Town approves by affirmative vote ballot question No. 4.

Mr. FitzPatrick's motion to divide the motion did not carry. He explained the purpose of the article was to provide land for future town needs, financed through the sale of bonds.

The Finance Committee was opposed to this article and commented there should be a clearly defined use for the land before commitment. There should be a process among various town boards and consideration of public uses.

Selectman Clayton commented that an eminent domain taking procedure is not a good way to acquire property. This article appears to be an attempt to circumvent a Chapter 40B proposal currently before the Zoning Board of Appeals for this property. Selectman Perry said there is a need to study land availability, and not to purchase and then decide. Town Counsel Diemert advised that an eminent domain proceeding could go on for three or four years. An appraisal of the property could place the value at much more than that mentioned in the motion.

A call for the question carried. The vote on the main motion carried by the two-thirds vote required: Votes cast: 256 with 171 affirmative votes necessary for passage. Yes 172, No 84

*Note: The vote on the ballot question taken at the Annual Town Election of May 27, 2003 was in the affirmative.*

### Article 44. War in Iraq Resolution (Citizen Petition)

The motion of Susan Hosier to adopt the resolution regarding the War in Iraq, as printed in the warrant, except the change of the second word in item number 2 from "conduction" to "conducting", DID NOT CARRY.

The motion of Gregor Trinkaus-Randall to add, "comment sufficient forces to ensure the protection and recovery of cultural resources removed from libraries, archives and museums and archaeological sites subsequent to the fall of Baghdad", did not carry.

Several voters expressed outrage that this petition is before town meeting and that it has no place here.

### Article 45. Balancing the Fiscal Year 2004 Budget

Steve Dungan of the Finance Committee moved that the Town vote to authorize the Board of Assessors to use the sum of $207,256.00 from free cash and $207,255.00 from the Stabilization Fund (total of $414,511.00) in the hands of the Treasurer-Collector for the purpose of reducing the tax rate for fiscal year 2004.

Mr. Dungan advised that even with approval of this motion it may still be necessary to seek an override of Proposition 2-1/2 once the State aid figures become known.

The required two-thirds vote on the motion DID NOT CARRY.

**Article 46. Town Election**

On motion of Selectman Clayton, it was voted unanimously that the meeting be adjourned until the Annual Election on Tuesday, May 27, 2003, commencing at 7:00 a.m., then and there to act on Article 46 for such election of officers and ballot questions as listed in the warrant; and thereafter, at the close of the polls, to dissolve this meeting.

The meeting was adjourned at 11:13 p.m. to reconvene on May 27, 2003 at 7:00 a.m. for the Annual Election.

Checkers at the Door:    Cathy Derby, Janet Derby, Carol Dudley, Utahna Hallet, Diane Lowden, Elizabeth MacGilvra, Eila Makey, Loretta Sagar, Elizabeth Sauta, Judith Scraggs

Tellers for the Town Meeting:    Robert Aldape, Amanda Bennett, Fernando Colon-Osorio, Edward DeLuca, Philip Detsch, Serena Furman, Mark Hahn, Donald Hawkes, Jean Lynch, Peter Masters, Edwin Merrick, Jayne Merrick, Constance Mohr, Deanna Montgomery, Joanne Newman, John O'Connell, Edward Perry, Sr., Donald Rising, Marcia Rising, Dean Scofield, Dwight Sipler, John Toole, Gregor Trinkaus-Randall, Vickery Trinkaus-Randall, Robert Walrath, Pamela Weathers, John Wendler

Timekeeper:  Catherine Desmond

Number of Voters Checked:       Monday, May 19th       721
                                Tuesday, May 20th      476
                                Wednesday, May 21st    357

Number of Registered Voters:  4,136

A true copy: Attest: Linda E. Hathaway, Town Clerk of Stow

NOTE:  *The amendments to the Zoning Bylaws adopted under Articles 40 and 41 were approved by the Attorney General on September 9, 2003.  Posted as a Town Bulletin on September 26, 2003.*

*The amendments to the General Bylaw adopted under Article 42 were approved by the Attorney General on September 9, 2003, **except as noted in Sections 7.2.k., 7.4.(4) and 9**.  Posted as a Town Bulletin on September 26, 2003.*

EXHIBIT N



THE
**TRUST**
FOR
**PUBLIC**
**LAND**

*Conserving Land*
*for People*

September 9, 2003

**BY FAX and OVERNIGHT COURIER**

Peter A. Kachajian, Jr., Esquire
292 Main Street
Northborough, MA  01532

    RE: <u>Kunelius Property</u>

Dear Peter:

    Enough time had passed since our last conversation that I wanted to remind you of TPL's strong interest in keeping this transaction together. Towards that end, we have spent a considerable amount of time in the last week or so trying to find a way to reconfigure this project to meet adequately the various needs of your client, the Town of Stow, the Friends of Red Acre (FORA) and the Stow Conservation Trust (SCT).

    As you and I have discussed many times, there are two major obstacles that stand in the way of success, each of which must be addressed.

    First, there is a significant fundraising gap.  Not only has the economy been hostile to philanthropy in general, we have experienced a catastrophic failure in the rejection of the $350,000 Department of Housing and Community Development grant.  Local fundraising efforts have not been as successful as we had hoped and are necessary to make the project work.  TPL's Board of Directors will not approve any borrowing to bridge a fundraising gap because the prospects for raising the funds necessary to repay the loan required are not encouraging.  Further, any bridge loan would be for an amount greater than the land would be worth, even if the subdivision were approved.  Essentially, this would be asking TPL for an unsecured loan based on weak fundraising prospects with no back-up plan to repay the loan.

rust for Public Land
England Regional Office
55 Union Street, Fourth Floor
Boston, MA 02108

(617) 367-6200
Fax: (617) 367-1616

Connecticut Field Office
383 Orange Street
New Haven, CT 06511

(203) 777-7367
Fax: (203) 777-7488

Maine Field Office
377 Fore Street 3rd Floor
Portland, ME 04101

(207) 772-7424
Fax: (207) 772-7420

Vermont Field Office
3 Shipman Place
Montpelier, VT 05602

(802) 223-1373
Fax: (802) 223-0451

Connecticut Lakes
Project Office
54 Portsmouth Street
Concord, NH 03301

(603) 224-0103
Fax: (603) 228-0423

Second, it is unclear whether your client's property can be subdivided to meet our project design. The Zoning Board of Appeals has been sending very mixed signals, and we have recently become aware of an additional problem presented by the doctrine of merger.

In view of these circumstances it is not feasible for TPL to go forward under the existing contract. If, however, the parties were jointly able to create a new financial structure for this transaction, TPL would be willing to continue to stay involved, subject to the other contingencies noted below.

Please consider the following alternative:

1. **Finances.** Try as TPL might to persuade just one of our project partners to bridge the roughly $375,000 gap identified during our last conversation, neither your client nor FORA have agreed to do so on their own. As an alternative, TPL is proposing to each of the primary project partners (FORA, SCT, and Marilyn Kunelius) that they jointly shoulder the financial gap, contingent of course on (a) the appropriate variances being requested and granted; and (b) the Town agreeing to a revised project structure in which the two private parcels are sold on the private market subject to conservation, but not affordability, restrictions. Reduced to equal shares, each partner's obligation would be $125,000. For your client, this would mean accepting $125,000 less than the contract price. For FORA and SCT, this would mean raising $125,000 each. We are presenting this project structure to each of the three project partners simultaneously. We believe that TPL's Board will approve such a reconfigured project going forward.

2. **Subdivision.** We have recently been advised by Goodwin Procter that the doctrine of merger forces 142 and 144 Red Acre Road into a single lot. For us to go forward now, with variance requests regarding 144 only, would mean that 142 would be rendered a non-conforming, illegal lot. If we resolve the funding issues, we will have to proceed in a manner that remedies the merger problem as to both 142 and 144, which probably will require a further extension by the ZBA. Most likely this will necessitate the involvement of town counsel, whom we should approach together.

We are aware that these project uncertainties are of concern to you and your client, and that Mrs. Kunelius would like to know as soon as possible whether TPL will be able to go forward. To that end, we need to discuss this revised proposal with you as soon as possible, and in no case later than the end of this week.

Sincerely,

Craig A. MacDonnell
MA State Director

# EXHIBIT O

<u>Stow - Kunelius</u>

#1 <u>Major idea</u>: don't even bother trying to create 2 lots
out of the existing compound. Too many
variances; too much uncertainty. One large lot.

#2 <u>Major idea</u>: Create a lot on Tuttle Lane, which
probably could be done by special
Permit

GOAL should be $1 million

How?    300 from town (os component)
300 from existing compound    (maybe a little more)
300 from Tuttle Lane lot    ( " " " " )
200 - 300 from state grant
$ 1.1 - 1.2 million

<u>NEXT STEPS</u>

1. confirm that Stow has met 40B threshold
2.   "   " TM vote on 300 was separate from 100
3. Ask Trudi to opine on SP possibility
4. Visit the site again.

TPL-KUN 01167