UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MARILYN KUNELIUS,

        Plaintiff,

    v.

TOWN OF STOW, et al.

        Defendants.

Civil Action No. 05-11697-GAO

**SUPPLEMENTAL APPENDIX IN SUPPORT OF THE MOTIONS FOR SUMMARY
JUDGMENT OF DEFENDANTS THE TRUST FOR PUBLIC LAND
AND CRAIG A. MACDONNELL**

Richard A. Oetheimer (BBO # 377665)
Patricia M. Murphy (BBO # 665056)
Goodwin Procter LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

Attorneys for THE TRUST FOR PUBLIC
LAND and CRAIG A. MACDONNELL

November 16, 2007

## Description of Document

Tab 1.      Handwritten notes of Craig MacDonnell, dated February 3, 2003 (TPL-KUN 01963)

Tab 2.      Minutes of Stow Special Town Meeting, January 13, 2003 (KUN205-216)

Tab 3.      Minutes of Stow Annual Town Meeting, May 19-21, 2003

Tab 4.      Excerpt from the deposition transcript of Gregory Jones, March 5, 2007

Tab 5.      Minutes of Stow Board of Selectmen Meeting, November 25, 2003

Tab 6.      Email dated February 4, 2003 from Craig MacDonnell to Ann Cole re: PRC – Stow – Kunelius Farm Q&A (TPL-KUN 01144-01146)

Tab 7.      Email dated February 9, 2003 from Karen Sommerlad to Craig MacDonnell re: Notice of Intent Application (TPL-KUN 02553-02555)

Tab 8.      Document titled Answers to Ross Perry, dated February 8, 2003 (KUN671)

Tab 9.      Minutes of Board of Selectmen Meeting, February 11, 2003

Tab 10.     Minutes of Board of Selectmen Meeting, January 7, 2003

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 16, 2007.

/s/ Richard A. Oetheimer
Richard A. Oetheimer

# EXHIBIT 1

CW ZBA Stow 2/3/03

Looks "do-able".

Can't give legal advice.

Apply the variance criteria (3 or 4?)

Next steps

☐ Get G+P lawyer
☐ Get plan/survey prepared.

TPL-KUN 01963

# EXHIBIT 2

# Town of Stow



# Annual Report
# 2003

### Red Acre Farm
The First Hundred Years
1903 - 2003

KUN205

## 2003 VITAL RECORDS

| | |
|---|---|
| MARRIAGES | 14 |
| BIRTHS | 72 |
| DEATHS | 28 |

Individual listings are omitted as a security precaution to deter identity theft.

## TOWN CLERK 2003 FINANCIAL TRANSACTIONS

### Fees Collected

| | |
|---|---|
| Vital record copies, bylaws, maps, etc | $2,480.03 |
| Fines, bylaw violations, late fees | 2,200.00 |
| Uniform Commercial Code filings | 518.44 |
| Business Certificate filings | 1,100.00 |
| Fuel storage tank registrations | 20.00 |
| Raffle permit | 10.00 |
| Dog Licenses | 9,091.00 |
| Kennel Licenses | 610.00 |
| | |
| Total Fees Collected | $16,029.47 |

## SPECIAL TOWN MEETING
## JANUARY 13, 2003

Pursuant to the Selectmen's warrant of December 17, 2002, posted by the Constable on December 27, 2002, the Special Town Meeting was called to order by Moderator Edward Newman at 7:00 pm in Hugh Mill Auditorium at Hale School.

Mr. Newman gave an invocation and then led the meeting in the Pledge of Allegiance to the Flag. He introduced Deputy Moderator Gary Horowitz and Assistant Moderator Ellen Sturgis. Also introduced were the Town Clerk, Assistant Town Clerk, the Selectmen, Town Counsel, Town Administrator, Selectmen's Administrative Assistant, members of the Finance Committee and Planning Board.

Moderator Newman advised that several non-voters were in attendance to answer questions or offer information. The voters had no objection to Keith Hoffses and David Finney of The Design Partnership with regard to Article 4 concerning school design, nor to those who may speak to Article 5 concerning the Kunelius property.

Steve Dungan, chairman of the Finance Committee, advised that the motion for Article 4 would differ from the printed warrant in that an appropriation from the Stabilization Fund would be requested, rather the borrowing of a sum of money. Thus, there would be no impact on the tax rate. On the other hand, there would be an impact should Article 5 to purchase the Kunelius property be approved. A graphic was displayed to depict the additional taxes for the typically

KUN206

assessed property value as related to the appropriation of $100,000 to $600,000 as being from $23 to $70 annually.

On motion of Selectman Edward Perry, Jr., it was voted unanimously that the reading of the warrant and return of the constable thereon be waived but made a part of the record of this meeting, and that the Moderator be permitted to refer to each article by subject matter instead of reading each article in its entirety.

## ARTICLE 1. Zoning Bylaw Amendment - Active Adult Neighborhood (AAN)

On motion of Selectman Shirley Burchfield, it was voted unanimously to amend the Zoning Bylaw Section 8.8.1, introductory paragraph of Active Adult Neighborhood (AAN), by deleting the words "from time to time" and by adding the words "in accordance with applicable law" and "Planning Board under its Rules and Regulations" in the third sentence thereof, and leaving the balance of Section 8.8.1 as it currently exists, so that the introductory paragraph shall read as follows:

8.8.1 Purpose - Stow cherishes the wisdom and experience of our citizens, and encourages continuity and participation in the Town by its residents. This bylaw is intended to provide housing designed for adult residents age 55 and older who no longer want to maintain a single-family home. Preference shall be given to Stow residents and shall be achieved by local preference requirements as established, in accordance with all applicable law, by the Town of Stow Planning Board under its Rules and Regulations. An AAN shall be designed to:

Planning Board member Bruce Fletcher read the report of the Planning Board as the result of the public hearing on the amendment proposed to address concerns of the Attorney General's office. Adoption was recommended. The Finance Committee was in favor of adoption.

*Report of Planning Board re Article 1 - January 13, 2003 Special Town Meeting*
The Planning Board held a duly noticed Public Hearing on January 7, 2003 at 7:15 pm in the Stow Town Building to consider a proposed amendment to the Stow Zoning Bylaw to: Amend Section 8.8.1, paragraph 1, to clarify the reference to the term "local preference requirements."

Section 8.8.1 of the Bylaw references "local preference requirements established by the Town of Stow." The Attorney General noted (1) it is not clear what these requirements are and where they may be found; and (2) whether the "Town of Stow" means Town Meeting or the Planning Board, who is authorized under Section 8.8.4.2 to establish rules and regulations necessary for implementation of the Bylaw.

The proposed amendment addresses these concerns by indicating local preference requirements are established <u>in accordance with applicable law, by the Town of Stow Planning Board under its Rules and Regulations</u>.

At its meeting of January 7, 2003, by a unanimous vote of four members present, the Planning Board voted to recommend adoption of Article 1 to Town Meeting.

KUN207

## ARTICLE 2.  Road Construction Funds

On motion of Selectman John Clayton, Jr., it was voted unanimously to appropriate and transfer from available funds the following sums of money for highway purposes:

1. For construction, reconstruction and/or improvements to Town Public Ways, the sum of $67,186.38, to be reimbursed by the Commonwealth of Massachusetts pursuant to Chapter 53 of the Acts of 1999.

2. For construction, reconstruction and/or improvements to Town Public Ways, the sum of $134,372.77, to be reimbursed by the Commonwealth of Massachusetts pursuant to Chapter 246 of the Acts of 2002.

The Finance Committee was in favor of this article.

## ARTICLE 3.  Stow Municipal Electric Department

On motion of Selectman Perry, it was voted 216 in favor and 185 opposed to:

A. Reject, in accordance with Massachusetts General Laws Chapter 164, Section 43, the tender of a deed of conveyance of the property owned in Stow by the Hudson Light and Power Department at the price and upon the terms determined by the Department of Telecommunications and Energy (DTE) as set forth in the DTE's decision in D.P.U. 94-176 dated February 16, 1996, that was affirmed by the Supreme Judicial Court, and the DTE's decision in D.T.E. 94-176-C dated January 30, 2001;

B. Accept the terms of the settlement agreement as presented at the Stow Special Town Meeting of January 13, 2003 (the terms having been negotiated between the Stow Municipal Electric Department and the Hudson Light and Power Department);

C. Authorize SMED's attorney to dismiss the appeal SMED has filed challenging the DTE's decision in D.T.E. 94-176-C & E dated January 30, 2001 and May 14, 2001, respectively;

D. Rescind the votes of the Town Meeting taken in 1993 and 1994 to establish Stow's own municipal lighting plant;

E. Dissolve and abolish the SMED Board, duly established pursuant to Massachusetts General Laws Chapter 164, Section 55, as a municipal light board by vote of the Town Meeting on June 2, 1994, and transfer all functions heretofore exercised by said board to the Board of Selectmen; and

F. Transfer to the Town's general fund the unexpended SMED funds, including but not limited to those funds that have been raised, transferred, borrowed and/or appropriated for legal and engineering work involved in establishing a municipal light plant.

KUN208

The Finance Committee did not recommend approval of this article, but pointed out that about $85,000.00 would be returned to the general fund; there would be a payment to the Town of $32,000.00 from Hudson Light and Power in lieu of taxes; a reduction in the street light rate. If not approved, there will be additional litigation expenses, with no idea of that cost.

Richard Mortenson, chairman of the SMED Board, advised that the separation process has been long (12 years) and costly to both the Town and Hudson Light and Power. Hudson Light's rates are competitive and the service exceptional. It is time to end the separation effort. The SMED Board is unanimous in urging voters to support the article. Mr. Mortensen related the history of the separation effort and said it is highly unlikely that SMED's Supreme Judicial Court appeal would prevail and would probably be remanded to the Dept. of Telecommunications and Energy. He reviewed the terms of the settlement agreement, one of which allows the appointment of a non-voting Stow representative to the Light Board. Mr. Mortenson described the settlement agreement as the best that can be negotiated.

Allen Fierce, former member of the SMED Board, spoke in opposition to the article. He did not believe this was the way to settle the matter and felt the agreement would commit Stow to the role of "captive customers." If the Supreme Judicial Court appeal is dropped it will undermine Stow's right to leave Hudson Light in the future. The issue is will there be an option to separate in the future. He felt the appeal should proceed and that the Town could be successful in that regard.

Selectman Perry said there were valid points to both sides of the argument. He believed this to be the best settlement to the matter. It comes down to the cost benefit and the legal costs. He felt the situation was different than it was 12 years ago. The Selectmen had voted unanimously to support this article on a cost benefit basis.

Many voters spoke to the issue, in favor or not, including those connected to the power industry. A call for the question was approved. The Moderator called for a hand count when he determined the vote was too close to call. The result, with 401 votes, was Yes 216, No 185. The motion carried.

## ARTICLE 4. School Design

On motion of Selectman Kathleen Farrell, it was voted unanimously to appropriate and transfer from the Stabilization Fund the sum of $60,000.00 for the purpose of preparing engineering plans and reports, conducting site analyses and studies, obtaining project cost estimates, developing design plans and specifications, and incurring any other costs incidental and relative thereto for and including, but not limited to, the current Center School and Pompositticut School sites, provided that the School Building Committee shall further evaluate the feasibility of renovating and/or adding to Center and/or Pompositticut Schools, for the purpose of considering school building and construction needs in order to determine the school building requirements to house all eligible students grade pre-K through grade 5; to transfer any and all unexpended funds remaining from Article 28, voted at the Annual Town Meeting in May 2002, to be added to the amount of money voted in this article for such purposes; such funds to be expended under the direction, supervision and control of the five-member School Building Committee established

KUN209

and appointed jointly by the Stow Board of Selectmen and Nashoba Regional School Committee pursuant to Article 28 of the May 2002 Annual Town Meeting.

The Finance Committee was in favor of this article. Karen Meyer of the Capital Planning Committee gave a lengthy report and urged looking into all options, such as renovation of Center and Pomposittituc Schools. She noted the uncertainty of State reimbursement for construction costs. This article, as moved, expands the scope of the committee's charge and is in the best interests of the Town.

Deborah Woods of the School Building Committee reported on the feasibility study completed in November 2002. Both Center and Pomposittituc must be brought up to code, i.e., electrical, plumbing, HVAC, roofs, etc. Renovation of both will be required to house the 10-year projection of students. The original proposal had been to construct a new building to the rear of Center School that would then be demolished ($21.5 million). The Pomposittituc would be available for other purposes. Following the recent public forum, it was decided to take more time to study the situation. Three new sites (to be determined) will be reviewed. The enrollment projections will be validated. A new proposal will be brought forth at the May Annual Town Meeting.

Nancy Fleming of the Regional School Committee offered information. David Finney and Keith Hoffses of The Design Partnership answered questions. Many voters asked questions or offered opinions.

When put to a vote, the motion carried unanimously.

At this point, Moderator Newman called for a two-minute intermission for leg-stretching.

## ARTICLE 5. Kunelius Property

On motion of Selectman Farrell, it was voted, by declaration of the Moderator of a hand vote in excess of the two-thirds required, to borrow $305,000.00, including all loan closing and other related costs incidental thereto, for the purpose of acquiring a fee simple, or other rights or interests, in all or a portion of the so-called Kunelius property located at 142 and 144 Red Acre Road, described in the Middlesex South District Registry of Deeds in Book 15412, Page 316 and Book 26320, Page 255; such parcels totaling 50.67 acres, a portion of which shall be acquired for the purpose of developing and establishing a future water resource and supply for the Town, or for any other municipal purpose as may be determined by the Board of Selectmen, and a separate portion of which shall be acquired for the purposes of conservation under the jurisdiction and control of the Conservation Commission, and a portion of which may be sold or developed for the purpose of providing for all or a portion of the costs of the acquisitions of the Kunelius property, with the boundaries of each such portion to be determined by the Board of Selectmen in consultation with the Conservation Commission; and

to authorize the Town, through its Board of Selectmen and other agents, to enter into any and all agreements and to execute any and all instruments for this purpose, including an assignment of the Town's right pursuant to M.G.L. Chapter 61, Section 8 to a qualified non-profit conservation group to acquire all or a portion of said parcel or parcels, subject to such terms and conditions as the Board of Selectmen may impose;

**KUN210**

provided, however, that an affirmative vote on this article shall be null and void, and of no further force and effect, unless the Town approves by affirmative vote a ballot question to exempt the amount voted by borrowing from the provisions of Proposition 2 1/2.

The Finance Committee was not in favor of the article. The Capital Planning Committee was in favor.

David Cobb, a resident of Red Acre Road, described the property as one containing 50 acres with two residences and a large aquifer. The plan is to acquire the property in conjunction with The Trust for Public Land. The existing dwellings would be deeded in perpetuity. There would be no impact on Town resources. He said that a proposal for a 30-unit co-housing development was wrong for this parcel.

Craig MacDonnell of The Trust of Public Land would work with the Stow Conservation Trust and the Friends of Red Acre together with the Selectmen with regard to the Chapter 61A assignment. TPL would be the project manager.

Attorney Peter Kachajian, representing Ms. Kunelius, said that the alternate co-housing proposal would add eight units of affordable housing to the Town's inventory, to be developed on eight acres. The remaining 42 acres would be transferred to the Town as a charitable contribution. Steve Johnson, representing Mosaic Commons, verified that. The co-housing would be state-of-the art with energy efficient features and tertiary septage treatment. Chris ScottHanson of Cohousing Resources also spoke.

Selectman Perry advised the Selectmen would transfer the right of first refusal to The Trust for Public Land if the Town votes to appropriate the $305,000.00.

Questions were asked and answered. Comments were made in support of conservation and possible use of the property as a horse sanctuary. Others pointed out the Town would realize a gift of 42 acres whether purchased or not.

There was a call for the question which was voted unanimously. When put to a vote on the main motion, the Moderator declared the hand vote to be in excess of the two-thirds required for the borrowing.

NOTE: The question on the ballot for the January 23, 2003 special election failed to pass: Yes 355, No 515, Blank 1. Therefore, the affirmative vote on Article 5 shall be null and void and of no further force and effect.

## ARTICLE 6. Community Preservation Fund

On motion of Selectman Burchfield, it was voted unanimously to reserve and add to existing reserved monies for later appropriation from the Stow Community Preservation Fund, or annual revenues therefrom, for the undertaking of Community Preservation projects in Stow, in accordance with the provisions of Massachusetts General Laws Chapter 44B, the following sums for the stated purposes:

KUN211

| | |
|---|---|
| Preservation of Historic Resources | $14,600.00 |
| Conservation of Open Space | $14,600.00 |
| Provision of Affordable Housing | $14,600.00 |

The Finance Committee was in favor of the article, described as one of bookkeeping.

## ARTICLE 7. Community Preservation Fund – Affordable Housing
On motion of Robert Wilber of the Community Preservation Committee, it was voted unanimously to Take No Action on this article. He explained that more information was needed on the use of the funds.

## ARTICLE 8. Citizens' Petition re Wetlands
On motion of Ingeborg Hegemann Clark, it was voted unanimously to refer the matter to the Conservation Commission for further deliberation and consideration at the May Town Meeting.

## ARTICLE 9. Special Town Election
On motion of Selectman Gregory Jones, it was voted unanimously at 10:38 pm to adjourn the meeting until the Special Election on Thursday, January 23, 2003, commencing at 7:00 am at the Center School Gymnasium in Stow, then and there to act on Article 9 for ballot question 1 and ballot question 2 as listed in the warrant; and thereafter, at the close of the polls, to dissolve this meeting.

Checkers at the Door: Janet Derby, Utahna Hallet, Elizabeth MacGilvra, Eila Makey, Loretta Sagar, Judith Scraggs.

Tellers for the Special Town Meeting: Heinz Bachmann, Wendy Bachmann, Pennie Cushing, Margaret Irwin, Jean Lynch, Edwin Merrick, Jayne Merrick, Constance Mohr, Joanne Newman, John O'Connell, Edward Perry, Sr., Donald Rising, Marcia Rising, Kathleen Sferra, Dwight Sipler, Laura Spear.

Timekeeper: Catherine Desmond

Number of Voters Checked: 430

Number of Registered Voters: 4,162

A true copy. Attest: Linda E. Hathaway, Town Clerk of Stow

NOTE: The amendment to the Zoning Bylaws adopted under Article 1 was approved by the Attorney General on March 3, 2003. Posted as a Town Bulletin on March 12, 2003.

KUN212

## SPECIAL TOWN ELECTION
## JANUARY 23, 2003

Pursuant to the Selectmen's warrant of December 17, 2002, the special town election was held in Center School Gymnasium/Auditorium, 403 Great Road, and was called to order at 7:00 am to act on two ballot questions.

After examining the ballot box and finding it empty and in good order, the counter was set to zero. The ballot box was then locked and the keys delivered to the Warden who declared the polls open.

During polling hours fourteen absentee ballots were opened, recorded and cast into the ballot box. There were four spoiled ballots. The polls were declared closed at 8:00 pm, with 871 ballots cast. There were 4158 registered voters. At 8:30 pm September 9, 2003 the results were announced as follows:

QUESTION 1.
Shall the Town of Stow be allowed to exempt from the provisions of Proposition 2 1/2, so-called, the amounts required to pay for the bond issued in order to acquire a fee simple, or other rights and interests in all or a portion of the so-called Kunelius property for the purpose of developing and establishing a future water resource and supply for the Town, or for any other municipal purpose?

Question did not carry.        Yes – 355    No- 515        Blanks – 1

QUESTION 2.
Shall the Town of Stow be allowed to exempt from the provisions of Proposition 2 1/2, so-called, the amounts required to pay for the bond issued for the purpose of considering school building and construction needs, and preparing design plans and specifications, engineering plans, studies and reports, project cost estimates; and other costs incidental and relative thereto?

Question did not carry        Yes- 351    No - 442        Blanks – 78
Note: Town Meeting voted not to borrow money for this question and to instead use $60,000.00 from the Stabilization Fund.

### ELECTION WORKERS

Warden
Carolyn R. Johnson

Clerk
Rebecca Faford

Checkers
Janet Derby
Elizabeth D. MacGilvra
Eila J. Makey
Judith A. Scraggs – Deputy Clerk

Ballot Box Officers
Viola E. Bond
Ellen S. Veazey

KUN213

## Article 34. Community Preservation Expenses

On motion of Mr. Wilber, it was voted unanimously to take no action on this article. The appropriation and transfer from the Community Preservation Fund was accomplished under Article 5.

At 10:18 pm the meeting was adjourned to reconvene on Wednesday, May 21, 2003 at 7:00 pm in Hale School Auditorium.

## MAY 21, 2003
### (Third and Final Session)

Moderator Newman declared the third and final session in order at 7:00 p.m. Several Hale School students again led the meeting in the Pledge of Allegiance to the Flag. Deputy Moderator Ellen Sturgis reviewed actions taken the previous evening.

Town Administrator Wrigley responded to voter questions concerning the four ballot questions to be voted upon at the annual election on May 27th, three for debt exemption and one a proposition 2 1/2 override. The first is for a bond to finance the Town's assessment for the School District deficit bond payment and will be in effect for the ten-year life of the bond (Article 5.1). The second question seeks approval of a $414,51.00 override for the purpose of funding the FY2004 Nashoba School District operating budget. The District budget vote was not contingent upon an override, therefore, if question 2 were approved, it would provide additional levy limit. Current estimates are that one million dollars will be required to balance the Fiscal 2004 budget. Question 3 seeks to exempt debt for the Pompositticut and Center School capital projects (Article 26). Question 4 seeks to exempt debt to finance acquisition of the former Hewlett-Packard/Compaq/Digital property at the corner of Hudson Road.

## Articles 35 and 36.

On motion of Selectman Perry, it was voted unanimously that Article 35 and Article 36 be combined for purposes of discussion, but each article be acted on by separate motion.

## Article 35. Community Preservation - Kunelius Property

On motion of Robert Wilber of the Community Preservation Committee it was voted by majority to appropriate and transfer from the Community Preservation Fund the sum of $300,000.00 to be expended under the direction of the Community Preservation Committee for the purposes of acquiring by purchase or gift a certain parcel of land containing approximately 44.57 acres of land located on Red Acre Road, Stow, Middlesex County, Massachusetts for conservation, active and open space, for any other municipal purposes as the Town shall hereafter determine, so long as areas designated for separate purposes shall be clearly identified and delineated;

that the Board of Selectmen be authorized to negotiate such purchases upon such terms, provisions and conditions as the Board of Selectmen and the Community Preservation Committee deem, in their discretion, to be appropriate, including terms addressing easements over the adjacent parcels of land located at 142 and 144 Red Acre Road providing appropriate conservation restrictions and access to the 44.57 acre parcel;

KUN214

that such acquisition shall occur only after the Community Preservation Committee and the Board of Selectmen have received an appraisal from a qualified real estate appraiser that confirms to their satisfaction the value of the interest being conveyed to the Town hereunder; and that the Board of Selectmen and the Community Preservation Committee be authorized to take all other actions necessary or appropriate to accomplish the foregoing consistent with the Community Preservation Act.

Craig MacDonnell, Director of The Trust for Public Lands, described the property, its location and the history of the project. The existing dwelling at 142 Red Acre Road would be renovated and sold as affordable. The dwelling at 144 would be acquired by "Eye of the Storm," an equine rescue entity. There would be a permanent conservation restriction. The appropriation would afford the Town a deeded access across the property to the fire pond and to the potential water supply resource. The affordable housing restriction under Article 36 would provide two affordable dwelling units and count toward the Town's 10 percent goal. Both units would be renovated to code prior to being turned over to the Town. Mr. Wilber advised the property would serve as a connector to existing conservation lands, Red Acre Woodland and Captain Sargent Land.

Selectman Gregory Jones moved to amend as follows: "...$300,000.00 to be expended under the direction of the Conservation Preservation Committee for the purpose of acquiring by purchase a certain parcel of land containing approximately 2.47 acres of land located off Red Acre Road, Stow, Middlesex County,..."

Linda Hathaway, speaking as a taxpayer, reminded that a ballot question at the January special town election concerning debt exemption for acquisition of the Kunelius property had failed. James Dunlap questioned the effect on the aquifer of the presence of horses and their waste products.

At 8:03 pm there was a call for the question which carried, and the meeting proceeded to vote on Mr. Jones' amendment. The motion to amend DID NOT CARRY.

Discussion continued on the main motion. Ms. Hathaway noted the Zoning Board of Appeals will conduct a public hearing on June 2nd for frontage variance concerning 144 Red Acre Road. She inquired into plans if the variance were not granted. Mr. MacDonnell felt it likely the variance would be granted. If not, there would be a re-examination of the project.

Leonard Golder asked how the project would be financed. Mr. MacDonnell responded that normally The Trust for Public Land asks the municipality involved to contribute 50 percent of the purchase, but here the Town is being asked for only $300,000.00, plus $100,000.00 for the affordable component. Mr. Wilber indicated that self-help funds would be sought from the State. The Selectmen were said to support the project.

At 8:24 pm there was a call for the question that carried. The vote on the main motion was in excess of a majority.

KUN215

**Article 36. Affordable Housing Restriction**

On motion of Robert Wilber of the Conservation Preservation Committee, it was voted by majority to, appropriate and transfer from the Community Preservation Fund the sum of $100,000.00 to be used and expended under the direction of the Community Preservation Committee for the purpose of purchasing a property interest commonly known as "affordability restriction" for two properties located at 142 and 144 Red Acre Road; that the Board of Selectmen be authorized to negotiate such purchase upon such terms, provisions and conditions as the Board of Selectmen and Community Preservation Committee deem, in their discretion, to be appropriate; and that the Board of Selectmen and the Community Preservation Committee be authorized to take all other actions necessary or appropriate to accomplish the foregoing consistent with the Community Preservation Act.

**Article 37. Adjustments to Eligibility Requirements under Chapter 59, Section 5(41C)**

On motion of Selectman Shirley Burchfield, it was voted unanimously, pursuant to Chapter 184, Section 51 of the Acts of 2002, to allow for the adjustment in eligibility requirements and in the amount of the exemption granted to those qualifying under Mass. General Laws Chapter 59, Section 5(41C), as such eligibility requirements and amounts are printed in the warrant.

1. Decrease the age requirement from 70 to 65.
2. Increase the income limits from $13,000 single/$15,000 married to $20,000 single/ $30,000 married.
3. Increase the asset limits from $28,000 single/$30,000 married to $40,000 single/ $55,000 married.
4. Increase the exemption amount granted by 100 percent.

**Article 38. Amendment of the Nashoba Regional School District Agreement**

On motion of Selectman Jones, it was voted unanimously to authorize the Nashoba Regional School District Committee to vote to amend the existing Nashoba Regional School District Agreement, as printed in the warrant, and to authorize the Committee or the Town of Stow to petition the Great and General Court to enact any special legislation as may be necessary for such purpose.

Section 1. (A) The powers and duties of the regional school district shall be vested in and exercised by a regional school district committee, sometimes referred to as the committee. The committee shall consist of eight members: three from the Town of Lancaster, three from the Town of Stow and two from the Town of Bolton. Such committee had members elected at the 2001 annual election of each Town as follows: Bolton: two members, one for a term of three years and one for a term of two years; Lancaster: three members, one for a term of one year, one for a term of two years, and one for a term of three years; Stow: three members, one for a term of one year, one for a term of two years, and one for a term of three years. At the expiration of each term set forth above, each Town will elect a member for a term of three years.

If a vacancy occurs among the members of the committee, the Selectmen and the remaining members of the committee from the Town involved, acting jointly, shall appoint a new member by ballot within one (1) month after the vacancy occurs to serve until the next Town election, at which time a new member will be elected to serve the remainder of the vacated term.

KUN216

# EXHIBIT 3

**ANNUAL TOWN MEETING**
**MAY 19, 20 AND 21, 2003**
**(First Session)**

Pursuant to the Selectmen's warrant of April 23, 2003, posted by the Constable on May 9, 2003, the annual town meeting was called to order by Moderator Edward Newman at 7:00 p.m. in Hugh Mill Auditorium at Hale School.

The Pledge of Allegiance to the Flag was recited, led by several Hale School students. An invocation was given by Rev. Tom Rosiello of The First Parish Church of Acton and Stow. Moderator Newman introduced Ellen Sturgis as Deputy Moderator, whose appointment was unanimously approved by the meeting. Also introduced was Temporary Moderator Gary Horowitz who was presiding in the gymnasium where were seated voters that the auditorium could not accommodate.

Mr. Newman introduced the Selectmen, Town Administrator, Selectmen's Administrative Assistant, Town Counsel, Finance Committee members, Town Clerk, Assistant Town Clerk and other town officials present. The names of non-voters were enumerated: non-resident town personnel, Nashoba Regional School District personnel, Minuteman Regional High School personnel and others who were to address certain articles. There was no objection from the meeting.

On motion of Selectmen Chair Edward Perry, it was voted unanimously that the reading of the warrant and return of the constable thereon be waived but made a part of the record of this meeting, and that the Moderator be permitted to refer to each article by subject matter instead of reading each article in its entirety. It was further voted that no new article, or any section thereof, be considered after ten-thirty p.m., and that as soon as practicable after ten-thirty the meeting be adjourned to 7:00 p.m. May 20, 2003 in this place.

**Article 1. Town Officers Not Elected by Ballot**
On motion of Selectman Shirley Burchfield, it was voted unanimously that the members of the Board of Selectmen be elected to serve as Field Drivers for the ensuing year.

**Article 2. Reports of Selectmen and Other Officers and Committees**
On motion of Selectman John Clayton, it was voted unanimously that the reports of the Selectmen and other Town Officers, Boards, Committees and Commissions be accepted as printed in the Town Report for 2002, with a correction of the Town Clerk's report for the Annual Town Election held on May 21, 2002 for the Stow Municipal Electric Department three-year term election where it states Richard Mortenson received 78 votes: it should be corrected to read 781 votes.

**Article 3. Reports of Special Committees**
On motion of Selectman Kathleen Farrell, it was voted unanimously that the reports of the Ancient Documents Committee, Public Education & Government (PEG) Advisory Committee, School Building Committee, Town Hall Improvement Committee, Cable TV Advisory Committee, Stow Municipal Electric Department, Metropolitan Area Planning Council, Stow Master Plan Committee and Community Preservation Committee be accepted as printed in the Town Report for 2002. Also voted that the report of the Center Common Improvement Committee be accepted as a final report.

At this point, Selectmen Chair Edward Perry recognized Jacob C. Diemert, who has served as Stow's Town Counsel for thirty years since appointment by the Selectmen in 1973. He quoted from the Selectmen's report for 1978: "This board would like to single out and compliment our town counsel, Mr.

Jacob Diemert, for a job well done. Mr. Diemert's guidance, his tenacity, his impeccable detailing, and his integrity (to the point of pain) accomplished this complex task perfectly. We are very proud of Mr. Diemert and, for ourselves and the people of the Town of Stow, wish to thank him for his expert guidance through the complicated web of governmental law. For his continuing actions on behalf of Stow, we consider him among our greatest assets." (Report of John Clayton, Jr., Wayne E. Erkkinen and Harry D. McMullen)  Mr. Diemert was given thanks and a standing ovation for his dedicated service to Stow and its citizens.

Steve Dungan, chairman of the Finance Committee, presented a review of the Town's financial position, which information had been printed in the town meeting warrant booklet. The Fiscal 2004 budget, as proposed by the Selectmen with a 3% increase in the Nashoba School District appropriation, is balanced without need for a Proposition 2-1/2 override. A graph was displayed showing the decline in "free cash" and the Stabilization Fund which means less money to pay for future capital needs or emergencies. A graph of town debt showed a steady decline until Fiscal 2009, assuming no new borrowing. Payments for the Police Station will end in 2005 and for the Town Building in 2008. Mr. Dungan noted that the largest source of revenue is the property tax which, with the proposed Fiscal 2004 budget, will provide 78% of the total income. State aid is on the decline, and a figure for Fiscal 2004 has yet to be learned.

## CONSENT CALENDAR

On motion of Selectman Gregory Jones, it was voted unanimously by declaration that the annual meeting take the following articles out of the order in the warrant and take action on Articles 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 23 and 24 as said motions are printed in the Consent Calendar, a copy of which has been provided to the voters at this meeting, without debate on any such articles, including the following changes:  the number to be moved in Article 12 is $1,060.00, and the number to be moved in Article 13 is $5,151.00; and provided that upon the request of any voter at this meeting made before the vote is taken on this motion, an article shall be dropped from the Consent Calendar and shall be acted upon in the ordinary course and order of business at this town meeting.

**Article 6. Reserve Fund**
Voted to raise and appropriate the sum of $80,000.00 for a Reserve Fund for the fiscal year beginning July 1, 2003.

**Article 7. Tax Title Proceedings**
Voted to raise and appropriate the sum of $7,000.00 to be added to any balance remaining and previously appropriated for Land Court proceedings for tax title foreclosure, including court costs and legal expenses related thereto, to be expended by the Treasurer-Collector.

**Article 8. Audit of Financial Records**
Voted to raise and appropriate the sum of $10,000.00 to be expended for an audit of the Town's financial records.

**Article 9. Revolving Fund for Inspection Fees**
Voted to authorize, upon the recommendation of the Selectmen, a revolving fund for certain inspection fees, pursuant to Mass. General Laws Chapter 44, Section 53E-1/2 for Fiscal Year 2004, to which shall be credited all permitting fees received for wire, gas, plumbing and fire alarm permits and for weights and measures sealing, to a limit of $40,000.00 for Fiscal 2004, to be expended by the Selectmen without further appropriation for the purpose of payment of fees to the inspectors administering such permits and reimbursement of expenses incurred on behalf of the Town.

**Article 10.  Revolving Fund for Conservation Commission**
     Voted to authorize, upon the recommendation of the Selectmen, a revolving fund pursuant to Mass. General Laws Chapter 44, Section 53E-1/2 for Fiscal Year 2004, to which shall be credited revenue derived from the sale of Open Space and Trail Map books, or other products offered by the Conservation Commission, to a limit of $5,000.00 for Fiscal 2004, to be expended by the Conservation Commission without further appropriation for enhancement and/or maintenance of land under the jurisdiction of the Commission including, but not limited to, costs associated with mapping efforts.

**Article 11.  Revolving Fund for Advanced Life Support Services**
     Voted to authorize, upon the recommendation of the Selectmen, the establishment of a revolving fund pursuant to Mass. General Laws Chapter 44, Section 53E-1/2 for Fiscal Year 2004, to which shall be credited all fees received for advanced life support services provided by the Town of Stow to a limit of $40,000.00 for Fiscal Year 2004, to be expended by the Fire Department without further appropriation for the purpose of payment of all costs associated with providing advanced life support services.

**Article 12.  Transfer to Conservation Fund**
     Voted to appropriate and transfer from the Conservation Land Maintenance Account to the Conservation Fund the sum of $1,060.00.

**Article 13.  Transfer from Wetlands Protection Fund**
     Voted to appropriate and transfer from the Wetlands Protection Fund the sum of $5,151.00 as an additional appropriation to the Conservation Commission, to be expended by the Conservation Commission in performing its duties under the Wetlands Protection Act.

**Article 14.  Update of Property Valuations**
     Voted to raise and appropriate the sum of $5,000.00 to be added to the balance remaining from the amount previously appropriated for the purpose of updating property valuations in the town to full and fair cash value, to be expended by the Assessors.

**Article 15.  Town Records Binding and Repair**
     Voted to raise and appropriate the sum of $200.00 to be added to any balance previously appropriated for the purpose of binding and repairing town records in accordance with Mass. General Laws Chapter 66, Section 9, to be expended by the Town Clerk.

**Article 16.  Highway Department**
     Voted to raise and appropriate the following sums of money for highway purposes:
     1.  For the Road Machinery Account:  $30,291.00
     2.  For repairs on private ways:  $10,000.00

**Article 17.  Federal Safe Drinking Water Act**
     Voted to raise and appropriate the sum of $4,400.00 to be added to any balance remaining from previous appropriation for the purpose of satisfying the compliance requirements of the Federal Safe Drinking Water Act, as amended, in accordance with State regulations, to be expended under the direction of the Board of Health.

**Article 18.  Household Hazardous Waste Collection**
     Voted to raise and appropriate the sum of $5,000.00 to be added to any balance remaining from previous appropriation for the purpose of providing for household hazardous waste collection, to be expended under the direction of the Board of Health.

**Article 19. Board of Health**

    1.  Voted to raise and appropriate the sum of $2,000.00 to be added to any balance remaining from previous appropriation, to be expended under the direction of the Board of Health for services provided by Emerson Hospital Home Care, or any other provider.

    2.  Voted to raise and appropriate the sum of $2,000.00 to be added to any balance remaining from previous appropriation, to be expended under the direction of the Board of Health for services provided by Concord Family & Youth Services, or any other provider.

**Article 20. Stow Cultural Council**

    Voted to appropriate and transfer the sum of $2,800.00 from the Recreation Department Transformer Installation Account, #A02-60-30-78241, to the Stow Cultural Council, to be added to any balance remaining and previously appropriated, to be expended under the control of the Town Administrator for the purpose of funding community cultural activities including activities associated with Springfest.

**Article 21. Water Source Maintenance**

    Voted to raise and appropriate the sum of $10,000.00 to be added to any balance remaining and previously appropriated for construction and maintenance of water holes and dry hydrants.

**Article 23. Legal Services**

    Voted to raise and appropriate the sum of $40,000.00 to be added to any balance remaining and previously appropriated for the purpose of engaging legal counsel.

**Article 24. Policemen and Fireman Medical Payments**

    Voted to raise and appropriate the sum of $400.00, to be added to any balance remaining and previously appropriated in anticipation of possible claims presented to the Town under the provisions of Chapter 40, Section 5, Clause 32 and Chapter 41, Section 100, for the payment of any reasonable hospital, medical, surgical, nursing, pharmaceutical, prosthetic and related expenses incurred by policemen or firemen injured in the performance of and within the scope of duty.

**\*\*\*\*\*\*\*\*\*\*End of Consent Calendar\*\*\*\*\*\*\*\*\*\***

**Article 4. Wage and Salary Schedules for FY2004**

    On motion of Selectman Edward Perry, it was voted unanimously to amend Article 11 of the General Bylaws of the Town, Personnel Administration, by deleting from Section 20.h. the existing salary Schedules A, B, C, D, E and F and inserting in place thereof new Schedules A, B, C, D, E and F, as printed in the warrant.

**TOWN OF STOW**
**WAGE & SALARY SCHEDULES**
**Effective July 1, 2003 (3%)**

**SCHEDULE A**
**ANNUAL RATE POSITIONS**

| Position Title | Minimum | Step 1 | Step 2 | Step 3 | Maximum |
|---|---|---|---|---|---|
| Police Chief | $57,236 | $59,317 | $62,440 | $67,643 | $76,514 |
| Fire Chief | 51,500 | 53,560 | 57,058 | 61,800 | 66,950 |
| Supt. of Streets | 50,717 | 53,885 | 57,058 | 60,226 | 63,398 |
| Town Accountant | 45,100 | 47,919 | 50,738 | 53,558 | 56,375 |

| | | | | |
|---|---|---|---|---|
| Police Lieutenant | 54,590 | 58,710 | 61,800 | 64,890 | 66,950 |
| Treasurer-Collector | 42,594 | 45,258 | 47,919 | 50,580 | 53,243 |
| Building Inspector | 41,697 | 44,301 | 46,908 | 49,515 | 52,120 |
| Planning, Zoning & Environmental Coord. | 39,678 | 42,158 | 44,638 | 47,121 | 49,598 |
| Library Director | 39,678 | 42,158 | 44,638 | 47,121 | 49,598 |
| Selectmen's Admin. Asst. | 31,327 | 33,188 | 35,142 | 37,091 | 39,045 |
| Town Clerk | 31,327 | 33,188 | 35,142 | 37,091 | 39,045 |

## SCHEDULE B
## HOURLY RATE POSITIONS

### GROUP A

| Position Title | Minimum | Step 1 | Step 2 | Step 3 | Maximum |
|---|---|---|---|---|---|
| Parks & Commons Worker | $9.06 | $9.84 | $10.67 | $11.46 | $12.23 |
| Cemetery Worker | 9.06 | 9.84 | 10.67 | 11.46 | 12.23 |
| Custodian | 9.06 | 9.84 | 10.67 | 11.46 | 12.23 |

### GROUP B

| Position Title | Minimum | Step 1 | Step 2 | Step 3 | Maximum |
|---|---|---|---|---|---|
| Assistant Town Clerk | $10.28 | $11.07 | $11.89 | $12.88 | $13.84 |
| Capital Prog. Comm. Secry. | 10.28 | 11.07 | 11.89 | 12.88 | 13.84 |

### GROUP C

| Position Title | Minimum | Step 1 | Step 2 | Step 3 | Maximum |
|---|---|---|---|---|---|
| Bd. of Appeals Secretary | $11.07 | $12.06 | $13.01 | $14.00 | $14.97 |
| Town Secretary | 11.07 | 12.06 | 13.01 | 14.00 | 14.97 |
| Highway/Tree/Grounds Worker | 11.07 | 12.06 | 13.01 | 14.00 | 14.97 |

### GROUP D

| Position Title | Minimum | Step 1 | Step 2 | Step 3 | Maximum |
|---|---|---|---|---|---|
| Highway/Tree/Grounds Driver-Laborer | $13.70 | $14.57 | $15.42 | $16.26 | $17.11 |

### GROUP E

| Position Title | Minimum | Step 1 | Step 2 | Step 3 | Maximum |
|---|---|---|---|---|---|
| Highway Dept. Equipment Operator | $14.96 | $15.89 | $16.82 | $17.77 | $18.68 |
| Tree Worker | 14.96 | 15.89 | 16.82 | 17.77 | 18.68 |
| Maintenance Person | 14.96 | 15.89 | 16.82 | 17.77 | 18.68 |

## GROUP F

| Position Title | Minimum | Step 1 | Step 2 | Step 3 | Maximum |
|---|---|---|---|---|---|
| Highway Dept. Mechanic | $15.86 | $16.79 | $17.85 | $18.84 | $19.82 |
| Highway Crew Chief | 15.86 | 16.79 | 17.85 | 18.84 | 19.82 |

## GROUP G

| Position Title | Minimum | Step 1 | Step 2 | Step 3 | Maximum |
|---|---|---|---|---|---|
| Highway Dept. Foreman | $16.78 | $17.83 | $18.86 | $19.90 | $20.94 |

## SCHEDULE C
### SINGLE RATE POSITIONS PAID ANNUALLY

| | |
|---|---|
| Registrar of Voters | $ 107 |
| Assistant Registrar of Voters | 213 |
| Animal Control Officer | 13,555 |
| Animal Inspector | 2,587 |
| Director of Summerthing | 2,139 |
| Beach Director | 4,608 |
| Cemetery Superintendent | 9,695 |
| Veterans' Agent | 1,168 |
| Council on Aging Secretary | 743 |

## SCHEDULE D
### SINGLE RATE POSITIONS PAID HOURLY

| | |
|---|---|
| Election Warden | $ 8.15 |
| Election Clerk | 8.15 |
| Election Teller | 7.21 |
| Election Clerical Assistance | 7.21 |
| Lifeguard | 8.95 |
| Lifeguard (W.S.I.) | 10.56 |
| Beach Checker | 7.21 |
| Street Lister | 7.78 |
| Street Listing Clerk | 7.21 |
| Street Numberer | 7.21 |
| Per Diem Firefighter (call) | 10.66 |
| Apprentice Firefighter (call) | 10.96 |
| Firefighter (call) | 12.52 |
| Emergency Medical Technician (call) | 12.52 |
| Firefighter/EMT (call) | 13.10 |
| EMT - w/Defib & Epi Pen (call) | 13.67 |
| Firefighter/EMT - w/Defib & Epi Pen (call) | 14.24 |
| Officers - Fire or Medical (call) | 15.39 |
| Police Officer, part-time | 17.51 |
| Police Matron | 15.45 |

| | |
|---|---|
| Auxiliary Police Officer | 11.44 |
| Dispatcher, part-time | 11.44 |
| Summerthing Assistant | 7.21 |

## SCHEDULE E
## FIRE DEPARTMENT ANNUAL SINGLE RATES

| | |
|---|---|
| Deputy Fire Chief (call) | $773 |
| Fire Engineer | 670 |
| Fire Captain (call) | 515 |
| Fire Lieutenant (call) | 412 |
| Fire Medical Officer | 309 |
| EMS Quartermaster | 206 |
| EMS Schedule Coordinator | 155 |
| EMS Assistant Coordinator | 258 |
| EMS Records Coordinator | 309 |

An employee who qualifies to receive benefits from the Town's Educational Incentive Program will earn a 5%, 10% or 15% annual bonus above his or her base Step Schedule wage or salary.

## SCHEDULE
## FEE RATE POSITIONS

| | |
|---|---|
| Wire Inspector | 90% of fees collected |
| Deputy Wire Inspector | 90% of fees collected |
| Gas Inspector | 90% of fees collected |
| Assistant Gas Inspector | 90% of fees collected |
| Animal Disposal Officer | $10 per animal |
| Sealer of Weights & Measures | Total fees collected |

### Article 5.0. General Budget for Fiscal 2004

Selectman Shirley Burchfield moved that the Town vote to raise and appropriate the sum of $5,907,706.00 as recommended by the Town Administrator and Selectmen for Items 1 through 77 inclusive, as printed in the warrant under the column entitled *"FY2004 Budget Town Admin/Selectmen Recommend"*, each item to be considered a separate appropriation for the purposes designated and the same to be expended only for such purposes.

Moderator Newman explained there is a change in the customary budget line item arrangement. The line item for the Nashoba School District assessment is a separate article which will be considered following conclusion of action on Article 5.0.

Mr. Newman read off each group of line items, and the following were held for questions or clarification: 20, 24, 25, 31, 41, 42 and 68. Those items not held were put to a vote, and the sums of printed in the warrant carried.

Item 20 - Town Clerk's Other Wages: A voter questioned the reason the requested FY04 budget had been reduced. Town Clerk Linda Hathaway explained she had requested funds for part-time

assistance in the office, but it was not recommended. The sum of $8,711.00, as printed in the warrant, was moved and unanimously voted.

Item 24 - Planning Board Clerical Wages: A voter questioned the figure for this item. It was explained there are two positions involved, i.e., Planning Coordinator and Office Assistant. The sum of $73,664.00, as printed in the warrant, was moved and unanimously voted.

Item 25 - Planning Board Expenses: A voter questioned the reason for reduction of the requested amount. Town Administrator Wrigley explained the item had included funds for office furniture and fixtures, however, another funding source was located. The sum of $3,550.00, as printed in the warrant, was moved and unanimously voted.

Item 31 - Community Preservation Committee: A voter questioned the reason for this item. The explanation was that funds are required to meet certain anticipated expenses, i.e., office supplies, clerical assistance, property surveys, appraisals, legal and professional fees, etc. This duplicates Article 34 later in this warrant. The motion was amended to appropriate and transfer $20,000.00 from the Community Preservation Fund for this purpose. The motion was carried by majority. Article 34 will be moved "no action".

Item 41 - Supt. of Streets Salary: A voter noted that the recommended salary calculates to exceed the 3% general increase. The explanation was that the figure includes a step increase. The sum of $57,058.00, as printed in the warrant, carried by majority.

Item 42 - Highways & Grounds Wages: The sum of $362,107.00, as printed in the warrant, was moved and unanimously voted.

Item 68 - Educational Incentive: Malcolm FitzPatrick inquired into review of this item. Town Administrator Wrigley explained this line item is not related to the so-called Quinn Bill, a Police Officer educational incentive. This item is to benefit other town personnel who have earned post-secondary degrees. The sum of $48,000.00, as printed in the warrant, carried by more than a majority.

The total General Budget for Fiscal 2004, less the Nashoba School District assessment, totaled $5,907,706.00, of which $5,887,706 was to be raised and appropriated and $20,000.00 to be appropriated and transferred from the Conservation Preservation Fund.

**Article 5. General Budget for Fiscal Year beginning July 1, 2003**

### General Government

| | | | |
|---|---|---|---|
| 1 | Moderator Salary | $ | 32.00 |
| 2 | Moderator Expenses | | 41.00 |
| 3 | Selectmen Administrative Asst. Salary | | 38,064.00 |
| 4 | Selectmen Expenses | | 13,100.00 |
| 5 | Town Administrator Salary | | 79,953.00 |
| 6 | Town Administrator Expenses | | 500.00 |
| 7 | Town Building Clerical Wages | | 25,370.00 |
| 8 | Finance Committee Wages | | 2,714.00 |
| 9 | Finance Committee Expenses | | 495.00 |
| 10 | Accountant Salary | | 25,750.00 |
| 11 | Accountant Clerk Salary | | 3,643.00 |
| 12 | Accountant Expenses | | 309.00 |

| | | |
|---|---|---:|
| 13 | Assessors' Assistant Salary | 42,158.00 |
| 14 | Assessors' Clerical Wages | 34,112.00 |
| 15 | Assessors' Expenses | 6,100.00 |
| 16 | Treasurer-Collector Salary | 53,743.00 |
| 17 | Treasurer-Collector Clerical Wages | 41,547.00 |
| 18 | Treasurer-Collector Expenses | 35,600.00 |
| 19 | Town Clerk Salary | 37,091.00 |
| 20 | Town Clerk Other Wages | 8,711.00 |
| 21 | Town Clerk Expenses | 7,955.00 |
| 22 | Conservation Commission Wages | 39,596.00 |
| 23 | Conservation Commission Expenses | 3,513.00 |
| 24 | Planning Board Wages | 73,664.00 |
| 25 | Planning Board Expenses | 3,550.00 |
| 26 | Board of Appeals Wages | 4,991.00 |
| 27 | Board of Appeals Expenses | 2,775.00 |
| 28 | Municipal Building & Property Wages | 15,899.00 |
| 29 | Municipal Building & Property Expenses | 45,052.00 |
| 30 | Town Reports Expenses | 9,300.00 |
| 31 | Community Preservation Committee (A&T) | 20,000.00 |
| | General Government Total | $ 675,328.00 |

### Public Safety

| | | |
|---|---|---:|
| 32 | Police Chief Salary | $ 76,514.00 |
| 33 | Police & Dispatch Wages | 842,254.00 |
| 34 | Police & Dispatch Expenses | 70,000.00 |
| 35 | Fire Chief Salary | 61,800.00 |
| 36 | Fire & EMS Wages | 365,898.00 |
| 37 | Fire & EMS Expenses | 71,050.00 |
| 38 | Building Inspector Salary | 52,120.00 |
| 39 | Building Dept. Clerical Wages | 10,795.00 |
| 40 | Building Inspector Expenses | 3,000.00 |
| | Public Safety Total | $1,553,431.00 |

### Public Works and Facilities

| | | |
|---|---|---:|
| 41 | Supt. of Streets Salary | $ 57,058.00 |
| 42 | Highways & Grounds Wages | 362,107.00 |
| 43 | Highways & Grounds Expenses | 98,525.00 |
| 44 | Snow & Ice Removal Expense | 80,000.00 |
| 45 | Municipal Lighting | 13,400.00 |
| 46 | Gasoline & Diesel Fuel Expense | 40,000.00 |
| 47 | Cemetery Salary & Wages | 21,393.00 |
| 48 | Cemetery Expenses | 321.00 |
| | Public Works and Facilities Total | $ 672,804.00 |

### Human Services

| | | |
|---|---|---:|
| 49 | Health Dept. Administrative Asst. Salary | $   39,045.00 |
| 50 | Sanitary Agent Wages | 16,962.00 |
| 51 | Health Department Wages | 15,973.00 |
| 52 | Health Department Expenses | 8,095.00 |
| 53 | Council on Aging Director Salary | 35,141.00 |
| 54 | Council on Aging Wages | 42,276.00 |
| 55 | Council on Aging Expenses | 4,635.00 |
| 56 | Veterans' Agent Salary | 1,158.00 |
| 57 | Veterans' Agent Expenses | 200.00 |
| | **Human Services Total** | **$  163,485.00** |

### Culture and Recreation

| | | |
|---|---|---:|
| 58 | Library Director Salary | $   50,148.00 |
| 59 | Library Wages | 52,428.00 |
| 60 | Library Expenses | 47,960.00 |
| 61 | Recreation Wages | 35,140.00 |
| 62 | Recreation Expenses | 24,250.00 |
| 63 | Lake Boon Commission Wages | 2,220.00 |
| 64 | Lake Boon Commission Expenses | 1,235.00 |
| 65 | Historical Commission Expenses | 450.00 |
| 66 | Memorial Day Expenses | 950.00 |
| 67 | Lighting of Clock Expenses | 100.00 |
| | **Culture and Recreation Total** | **$  214,881.00** |

### Town-Wide Expenses

| | | |
|---|---|---:|
| 68 | Educational Incentive | $   48,000.00 |
| 69 | Group Insurance | 388,500.00 |
| 70 | Insurance & Bonds | 80,000.00 |
| 71 | Telephone | 21,000.00 |
| | **Town-Wide Expenses Total** | **$  537,500.00** |

### Education

| | | |
|---|---|---:|
| 72 | Minuteman Voc-Tech Assessment | $  881,246.00 |

### Debt Service

| | | |
|---|---|---:|
| 73 | Principal, Long-Term Debt | $  575,000.00 |
| 74 | Principal, Long-Term Debt - Non-Exempt | 24,460.00 |
| 75 | Interest, Long-Term Debt - Bonds | 607,954.00 |
| 76 | Interest, Long-Term Debt - Non-Exempt | 617.00 |
| 77 | Interest, Temporary Loans - Revenue | 1,000.00 |
| | **Debt Service Total** | **$1,209,031.00** |

| | |
|---|---|
| **General Budget - Raise and Appropriate** | **$5,887,706.00** |
| **Appropriate & Transfer from Conservation Pres. Fund** | **20,000.00** |
| **TOTAL GENERAL BUDGET** | **$5,907,706.00** |

## Article 5.1. Nashoba Regional School District Deficit

On motion of Selectman Clayton, it was voted, by declaration of the Moderator of a hand vote in excess of the two-thirds required, to borrow the sum of $168,720.00 for the purpose of funding the Town's apportionment of the Nashoba Regional School District's annual deficit bond payment and continue to borrow annually for the full term of the 3.8 million dollar deficit bond, provided, however, that an affirmative vote shall be null and void unless the Town approves a ballot question to exempt the amounts required to pay for said indebtedness from the provisions of proposition two and one-half.

*Note: The vote on the ballot question taken at the Annual Town Election of May 27, 2003 was in the affirmative.*

## Articles 5.2 and 5.3. Nashoba Regional School District Assessment

On motion of Selectman Farrell, it was voted unanimously that Article 5.2 and Article 5.3 be combined for the purposes of discussion, but each article acted on by separate motion.

## Article 5.2.

On motion of Selectman Farrell, it was voted by majority to raise and appropriate the sum of $10,434,736.00 for the purpose of funding the fiscal year 2004 Nashoba Regional School District so-called "alternative" operating budget, which shall be null and void in the event of affirmative votes on Article 5.3 and ballot question number 2 to exempt the amount appropriated under Article 5.3 from the limits of proposition two and one-half.

Selectman Jones recommended passage of Articles 5.1 and 5.2, which will not require approval of an override. This alternative budget represents a 3% increase over Fiscal 2003. Lancaster has voted to approve this budget. School Committee member Carole Makary advised this figure is not recommended by the Nashoba Regional District, but rather the figure to be moved under Article 5.3.

John Antonucci, Assistant Superintendent of Business & Finance, spoke of the current conditions within the District and the on-going changes, such as the hiring of a paid treasurer and the upgrade of the bookkeeper position to accountant. He advised that 61% of the operating budget is for wages.

Finance Committee member Thomas Ryan noted that the motion to be presented by the School Committee under Article 5.3 does not include dependence on an override question. He asked for a few minutes to discuss this development with his fellow committee members to learn if their recommendation might change.

The Moderator called a five-minute recess at 9:31 p.m.

When the meeting resumed, Mr. Ryan said there has been progress made within the District. Passage of Article 5.2 does not require an override, however Article 5.3 does as it represents a 5.69% increase over Fiscal 2003. The School Committee advised that a 3% increase is not its intention. The Finance Committee favors only a 3% increase and feels it is all the Town can afford without an override. Jason Robart of the Finance Committee indicated the figure under Article 5.2 would maintain current

programs and class size. There will be cuts in certain areas, but it is felt to be a reasonable budget. The Finance Committee recommended Article 5.3, but only contingent on approval of an override vote. Passage of Article 5.2 was felt to be a "stop gap".

Several members of the School District spoke and enumerated the areas where cuts would have to be made with Article 5.2 funding.

At 10:20 p.m. there was a call for the question. The Moderator declared a two-thirds vote to cease discussion on Article 5.2. The vote on the main motion carried in the majority: Yes 395, No 256.

**Article 5.3.**

On motion of Nancy Fleming of the Nashoba Regional School District Committee, it was voted by majority to raise and appropriate the sum of $10,716,856.00 for the purpose of funding the fiscal year 2004 Nashoba Regional School District adjusted level services operating budget.

On the question of why the motion did not include dependence on an override question, Ms. Fleming responded that decision rests only with the School Committee. An override should not be tied to just this article.

Selectman Perry moved to amend by inserting, "provided, however, that an affirmative vote shall be null and void unless the Town approves by affirmative vote a ballot question to exempt the amount appropriated from the provision of proposition two and one-half."

Discussion ensued until a call for the question at 11:09 p.m. The vote to cease discussion carried unanimously. The vote on Mr. Perry's amendment DID NOT CARRY.

The vote on Ms. Fleming's motion carried by majority.

At 11:15 p.m. the meeting was adjourned to reconvene on Tuesday, May 20, 2003 at 7:00 p.m. in Hale School Auditorium.

**MAY 20, 2003**
**(Second Session)**

Moderator Edward Newman declared the second session in order at 7:00 p.m. Several Hale School students led the meeting in the Pledge of Allegiance to the Flag. The members of the Center School "Destination Imagination" team were introduced. Selectman Kathleen Farrell addressed the team and offered congratulations on its accomplishments.

Deputy Moderator Ellen Sturgis reviewed actions taken last evening. There appeared confusion on the part of voters concerning Question 2 of the Town Election ballot concerning a proposition two and one-half override of $414,511.00 for the purpose of funding the Nashoba Regional School District budget for Fiscal 2004. Article 5.3, as proposed by the School Committee and approved by the voters, was not contingent on passage of Question 2. Town Administrator Wrigley advised that the Town's Fiscal 2004 budget is not in balance. If the vote on Question 2 was in the affirmative, it would provide a method of tax levy capability.

**Article 6. Reserve Fund:** See Consent Calendar

**Article 7. Tax Title Proceedings:** See Consent Calendar

**Article 8. Audit of Financial Records:** See Consent Calendar

**Article 9. Revolving Fund for Inspection Fees:** See Consent Calendar

**Article 10. Revolving Fund for Conservation Commission:** See Consent Calendar

**Article 11. Revolving Fund for Advanced Life Support Services:** See Consent Calendar

**Article 12. Transfer to Conservation Fund:** See Consent Calendar

**Article 13. Transfer from Wetlands Protection Fund:** See Consent Calendar

**Article 14. Update of Property Valuations:** See Consent Calendar

**Article 15. Town Records Binding and Repair:** See Consent Calendar

**Article 16. Highway Department:** See Consent Calendar

**Article 17. Federal Safe Drinking Water Act:** See Consent Calendar

**Article 18. Household Hazardous Waste Collection:** See Consent Calendar

**Article 19. Board of Health:** See Consent Calendar

**Article 20. Stow Cultural Council:** See Consent Calendar

**Article 21. Water Source Maintenance:** See Consent Calendar

**Article 22. Purchase of Information Technology Equipment**
On motion of Selectman Edward Perry, it was voted unanimously to raise and appropriate the sum of $17,885.00 to be added to any balance remaining and previously appropriated, to be expended under the direction of the Town Administrator for the purchase of information technology equipment and software for various town departments; and to authorize the Town Administrator to sell, trade or otherwise dispose of existing equipment in connection therewith.

**Article 23. Legal Services:** See Consent Calendar

**Article 24. Policemen and Firemen Medical Payments:** See Consent Calendar

**Article 25. Capital Program**
On motion of Selectman Kathleen Farrell, it was voted unanimously to discuss the items of this article individually and vote upon each separately as to the amount to be appropriated for each item, as set forth in separate motions proposed.

Karen Mayer, chair of the Capital Planning Committee, explained the function of the committee. She presented graphics showing the Town's debt payment obligations through Fiscal 2015 and projected capital requests from Highway, Fire and Police for the next five years

**Article 25-1. Purchase of Cab and Chassis**

On motion of Selectman Farrell, it was voted unanimously to appropriate and borrow the sum of $30,000.00 to be used for the replacement of a six-wheel cab and chassis for use by the Highway Department provided, however, that an affirmative vote shall be null and void unless the Town approves by affirmative vote a ballot question to exempt the amount appropriated from the provisions of proposition two and one-half.

*Note: The vote under Question 3 of the ballot for the Special Town Election of September 9, 2003 to exempt this borrowing from the provisions of proposition 2-1/2 failed, thus the vote under Article 25-1 is null and void.*

**Article 25-2. Purchase of Used Bucket Truck**

On motion of Selectman Farrell, it was voted unanimously to appropriate and borrow the sum of $15,000.00 to be used for the purchase of a used bucket truck for use by the Highway Department provided, however, that an affirmative vote shall be null and void unless the Town approves by affirmative vote a ballot question to exempt the amount appropriated from the provisions of proposition two and one-half.

*Note: The vote under Question 4 of the ballot for the Special Town Election of September 9, 2003 to exempt this borrowing from the provisions of proposition 2-1/2 failed, thus the vote under Article 25-2 is null and void.*

**Article 25-3. Purchase of Fire Pumper Truck**

On motion of Selectman Farrell, it was voted unanimously to appropriate and borrow the sum of $180,000.00 to be used to replace a pumper truck to be used by the Fire Department provided, however, that an affirmative vote shall be null and void unless the Town approves by affirmative vote a ballot question to exempt the amount appropriated from the provisions of proposition two and one-half.

*Note: The vote under Question 2 of the ballot for the Special Town Election of September 9, 2003 to exempt this borrowing from the provisions of proposition 2-1/2 failed, thus the vote under Article 25-3 is null and void.*

**Article 25-4. Fire Dispatch Computer Component**

On motion of Selectman Farrell, it was voted unanimously to appropriate and borrow the sum of $20,000.00 to be used for the purchase of a dispatch computer component to be used by the Fire Department provided, however, that an affirmative vote shall be null and void unless the Town approves by affirmative vote a ballot question to exempt the amount appropriated from the provisions of proposition two and one-half.

*Note: The vote under Question 5 of the ballot for the Special Town Election of September 9, 2003 to exempt this borrowing from the provisions of proposition 2-1/2 failed, thus the vote under Article 25-4 is null and void.*

**Article 25-5. Purchase of Police Cruiser**

On motion of Selectman Farrell, it was voted unanimously to appropriate and borrow the sum of $28,000.00 for the purpose of purchasing a replacement police cruiser for the Police Department provided, however, that an affirmative vote shall be null and void unless the Town approves by affirmative vote a ballot question to exempt the amount appropriated from the provisions of proposition two and one-half.

*Note: The vote under Question 6 of the ballot for the Special Town Election of September 9, 2003 to exempt this borrowing from the provisions of proposition 2-1/2 failed, thus the vote under Article 25-5 is null and void.*

### Article 26. Pomposticut and Center Schools Capital Projects

On motion of Selectman Farrell, it was voted, as amended, in excess of the required two-thirds vote, to borrow the sum of $595,000.00 for the purpose of improving, rehabilitating, renovating or reconstructing the Pomposticut and Center Schools, to include appurtenances, engineering, architectural and project management costs associated with and incidental thereto, under the direction and with the approval of the Selectmen, or their designee, as lessor of school buildings, and subject to an affirmative vote on a ballot question to exempt such amount from the provisions of proposition two and one-half.

The Finance Committee was not in favor of the motion as its purposes were felt to be the responsibility of the School District in that some of the items were repairs and maintenance and not renovations.

Nancy Fleming of the School Building Committee explained this article is proposed as a necessary step until there is a school building proposal to present to the voters. The regional agreement does not specifically define operational and capital expenditures. It is proposed to expend $156,000 at Pomposticut (30 years old) and $429,000 at Center (original section 50 years old) and provide $10,000 for borrowing costs. The project would commence in June 2004 with completion by September 2004. A project manager would be hired to manage the work on a daily basis.

A motion by Edwin Merrick to amend the amount to $491,386.00, as voted by the Capital Planning Committee, DID NOT CARRY: Yes 200, No 223.

Steve Dungan of the Finance Committee inquired into control of the project, District or Town. Town Administrator Wrigley was of the opinion the district agreement implies responsibility of the District.

Karen Meyer of the Capital Planning Board moved to amend by including the following: ...."under the direction and with the approval of the Selectmen, or their designee, as lessor of school buildings, and ...."

It was determined the School Committee would be in charge through the document stage. Once the project begins, it would be under the direction of the project manager who may report to the Town Administrator. Town Counsel Jacob Diemert advised that the Town as lessor has the right to approve additions and improvements. Under the district agreement and statute, the District controls those buildings. Any other arrangement would have to be through agreement between the parties.

When put to a vote, Ms. Meyer's motion to amend carried unanimously. The main motion, as amended, carried in excess of the required two-thirds vote.

*Note: The vote on the ballot question taken at the Annual Town Election of May 27, 2003 was in the affirmative.*

At this point, Moderator Newman handed over the gavel to Deputy Moderator Ellen Sturgis to preside over the next few articles.

**Article 27. Supplemental Educational Funding**
Selectman Edward Perry moved the Town vote to accept the provisions of Massachusetts General Laws Chapter 60, Section 3C to establish an educational fund and/or scholarship fund for the purpose of providing supplemental educational funding to assist in meeting local educational needs.

Selectman Gregory Jones explained this was an opportunity for citizens to donate to an educational fund to improve facilities or to provide scholarships. Donations would be received through a check-off box on the real estate bill. The Board of Selectmen would set requirements and appoint a committee to administer the fund.

When put to a vote, the motion DID NOT CARRY.

**Article 28. Snow and Ice Expense Deficit**
On motion of Selectman Shirley Burchfield, it was voted unanimously to appropriate and transfer the sum of $43,039.00 from the Overlay Surplus Account (#01-00-00-32200) to the Snow and Ice Account (#A01-40-23-67800) for the purpose of funding the Fiscal Year 2003 Snow and Ice deficit.

**Article 29. Fiscal Year 2003 Budget Deficit Reduction**
On motion of Selectman John Clayton, it was voted unanimously to appropriate and transfer the sum of $85,307.49 from the Stow Municipal Electric Department Account (#62-00-00-10400.000) for the purpose of being used as another financial source in the Fiscal Year 2003 General Fund.

**Article 30. Town Building Third Floor Improvement**
On motion of Selectman Farrell, it was voted unanimously to appropriate and transfer the sum of $3,920.70 from the Pompositticut School Door Repair Account (#A02-30-10-78501) and the sum of $3,927.11 from the Town Building Telephone Purchase Account (#A02-10-55-78500), for a total of $7,847.81, to the Town Building Third Floor Improvement Account (#A01-10-92-78260) for the purpose of completing renovations to the third floor of Town Building.

**Article 31. Fire Station Parking Lot**
Selectman Jones moved to raise and appropriate the sum of $5,000.00 to replace, repair and reconstruct the parking lot at the Fire Station.

When put to a vote, the motion DID NOT CARRY.

**Article 32. Addition to Conservation Fund**
Selectman Perry moved to raise and appropriate the sum of $30,000.00 to be added to any remaining balance and previously appropriated to the Conservation Fund, to be expended by the Conservation Committee.

Conservation Commission chair Daniel delSobral gave a presentation. When put to a hand counted vote, the motion DID NOT CARRY: Yes 162, No 178.

Deputy Moderator Ellen Sturgis relinquished the gavel to Moderator Edward Newman.

**Article 33. Community Preservation Deed Restrictions**
On motion of Robert Wilber of the Community Preservation Committee, it was voted unanimously to appropriate and transfer from the Community Preservation Fund the sum or $150,000.00 to be transferred under the direction of the Community Preservation Committee in the form of specific grants, consistent with the guidelines set forth in the Community Preservation Plan, to the Stow Housing

Authority, for the purpose of purchasing perpetual deed restrictions to ensure continued affordability to eligible low and/or moderate income households.

**Article 34. Community Preservation Expenses**
On motion of Mr. Wilber, it was voted unanimously to take no action on this article. The appropriation and transfer from the Community Preservation Fund was accomplished under Article 5.

At 10:18 p.m. the meeting was adjourned to reconvene on Wednesday, May 21, 2003 at 7:00 p.m. in Hale School Auditorium.

### MAY 21, 2003
### (Third and Final Session)

Moderator Newman declared the third and final session in order at 7:00 p.m. Several Hale School students again led the meeting in the Pledge of Allegiance to the Flag. Deputy Moderator Ellen Sturgis reviewed actions taken the previous evening.

Town Administrator Wrigley responded to voter questions concerning the four ballot questions to be voted upon at the annual election on May 27th, three for debt exemption and one a proposition two and one-half override. The first is for a bond to finance the Town's assessment for the School District deficit bond payment and will be in effect for the ten-year life of the bond (Article 5.1). The second question seeks approval of a $414,511 override for the purpose of funding the FY2004 Nashoba School District operating budget. The District budget vote was not contingent upon an override, therefore, if question 2 were approved, it would provide additional levy limit. Current estimates are than one million dollars will be required to balance the Fiscal 2004 budget. Question 3 seeks to exempt debt for the Pompositticut and Center School capital projects (Article 26). Question 4 seeks to exempt debt to finance acquisition of the former Hewlett-Packard/Compaq/Digital property at the corner of Hudson Road.

**Article 35 and 36.**
On motion of Selectman Perry, it was voted unanimously that Article 35 and Article 36 be combined for purposes of discussion, but each article be acted on by separate motion.

**Article 35. Community Preservation - Kunelius Property**
On motion of Robert Wilber of the Community Preservation Committee it was voted by majority to appropriate and transfer from the Community Preservation Fund the sum of $300,000.00 to be expended under the direction of the Community Preservation Committee for the purposes of acquiring by purchase or gift a certain parcel of land containing approximately 44.57 acres of land located on Red Acre Road, Stow, Middlesex County, Massachusetts for conservation, active and open space, for any other municipal purposes as the Town shall hereafter determine, so long as areas designated for separate purposes shall be clearly identified and delineated;
that the Board of Selectmen be authorized to negotiate such purchases upon such terms, provisions and conditions as the Board of Selectmen and the Community Preservation Committee deem, in their discretion, to be appropriate, including terms addressing easements over the adjacent parcels of land located at 142 and 144 Red Acre Road providing appropriate conservation restrictions and access to the 44.57 acre parcel;
that such acquisition shall occur only after the Community Preservation Committee and the Board of Selectmen have received an appraisal from a qualified real estate appraiser that confirms to their satisfaction the value of the interest being conveyed to the Town hereunder;

and that the Board of Selectmen and the Community Preservation Committee be authorized to take all other actions necessary or appropriate to accomplish the foregoing consistent with the Community Preservation Act.

Craig MacDonnell, Director of The Trust for Public Lands, described the property, its location and the history of the project. The existing dwelling at 142 Red Acre Road would be renovated and sold as affordable. The dwelling at 144 would be acquired by "Eye of the Storm", an equine rescue entity. There would be a permanent conservation restriction. The appropriation would afford the Town a deeded access across the property to the fire pond and to the potential water supply resource. The affordable housing restriction under Article 36 would provide two affordable dwelling units and count toward the Town's 10% goal. Both units would be renovated to code prior to being turned over to the Town. Mr. Wilber advised the property would serve as a connector to existing conservation lands, Red Acre Woodland and Captain Sargent Land.

Selectman Gregory Jones moved to amend as follows: "...$300,000.00 to be expended under the direction of the Conservation Preservation Committee for the purpose of acquiring by purchase a certain parcel of land containing approximately 2.47 acres of land located off Red Acre Road, Stow, Middlesex County,..."

Linda Hathaway, speaking as a taxpayer, reminded that a ballot question at the January special town election concerning debt exemption for acquisition of the Kunelius property had failed. James Dunlap questioned the effect on the aquifer of the presence of horses and their waste products.

At 8:03 p.m. there was a call for the question which carried, and the meeting proceeded to vote on Mr. Jones' amendment. The motion to amend DID NOT CARRY.

Discussion continued on the main motion. Ms. Hathaway noted the Zoning Board of Appeals will conduct a public hearing on June 2nd for frontage variance concerning 144 Red Acre Road. She inquired into plans if the variance were not granted. Mr. MacDonnell felt it likely the variance would be granted. If not, there would be a re-examination of the project.

Leonard Golder asked how the project would be financed. Mr. MacDonnell responded that normally The Trust for Public Land asks the municipality involved to contribute 50% of the purchase, but here the Town is being asked for only $300,000, plus $100,000 for the affordable component. Mr. Wilber indicated that self-help funds would be sought from the State. The Selectmen were said to support the project.

At 8:24 p.m. there was a call for the question that carried. The vote on the main motion was in excess of a majority.

## Article 36. Affordable Housing Restriction

On motion of Robert Wilber of the Conservation Preservation Committee, it was voted by majority to appropriate and transfer from the Community Preservation Fund the sum of $100,000.00 to be used and expended under the direction of the Community Preservation Committee for the purpose of purchasing a property interest commonly known as "affordability restriction" for two properties located at 142 and 144 Red Acre Road; that the Board of Selectmen be authorized to negotiate such purchase upon such terms, provisions and conditions as the Board of Selectmen and Community Preservation Committee deem, in their discretion, to be appropriate; and that the Board of Selectmen and the Community Preservation Committee be authorized to take all other actions necessary or appropriate to accomplish the foregoing consistent with the Community Preservation Act.

**Article 37. Adjustments to Eligibility Requirements under Chapter 59, Section 5(41C)**
On motion of Selectman Shirley Burchfield, it was voted unanimously, pursuant to Chapter 184, Section 51 of the Acts of 2002, to allow for the adjustment in eligibility requirements and in the amount of the exemption granted to those qualifying under Mass. General Laws Chapter 59, Section 5(41C), as such eligibility requirements and amounts are printed in the warrant.
1. Decrease the age requirement from 70 to 65.
2. Increase the income limits from $13,000 single/$15,000 married to $20,000 single/$30,000 married.
3. Increase the asset limits from $28,000 single/$30,000 married to $40,000 single/$55,000 married.
4. Increase the exemption amount granted by 100%.

**Article 38. Amendment of the Nashoba Regional School District Agreement**
On motion of Selectman Jones, it was voted unanimously to authorize the Nashoba Regional School District Committee to vote to amend the existing Nashoba Regional School District Agreement, as printed in the warrant, and to authorize the Committee or the Town of Stow to petition the Great and General Court to enact any special legislation as may be necessary for such purpose.

Section 1. (A) The powers and duties of the regional school district shall be vested in and exercised by a regional school district committee, sometimes referred to as the committee. The committee shall consist of eight members: three from the town of Lancaster, three from the town of Stow and two from the town of Bolton. Such committee had members elected at the 2001 annual election of each town as follows: Bolton: two members, one for a term of three years and one for a term of two years; Lancaster: three members, one for a term of one year, one for a term of two years, and one for a term of three years; Stow: three members, one for a term of one year, one for a term of two years, and one for a term of three years. At the expiration of each term set forth above, each town will elect a member for a term of three years.

If a vacancy occurs among the members of the committee, the selectmen and the remaining members of the committee from the town involved, acting jointly, shall appoint a new member by ballot within one (1) month after the vacancy occurs to serve until the next town election, at which time a new member will be elected to serve the remainder of the vacated term.

The population of the participating town shall be determined every five (5) years in accordance with the town's annual census as certified by the respective town clerks. The census will be reviewed by the Regional District School Committee to determine if the number of representatives elected from each town is within the standard 10-16% deviation in compliance with the one person – one vote ruling.

If the population in a participating town results in a change in the number of members to be elected to the Regional District School Committee, such change shall be effective at the annual town election following the certification of the census.

**LOCATION AND LEASE OF SCHOOLS**

Section 2. (A) The Regional District schools serving students from all district towns shall be located as near as feasible to the geographic and population centers of the District, except that any new school constructed for the purpose of accommodating pupils primarily from a particular member town shall be located in that town.

(B) The town of Bolton is hereby authorized to lease to the Regional School District all the premises and buildings presently known as the Emerson School (including the 1952 + 1972 sections, excluding the 1922 section) and the Florence Sawyer School. The town of Lancaster is hereby authorized to lease to the Regional School District all the premises and buildings presently known as the Mary Rowlandson Elementary School and the Luther Burbank Middle School. The town of Stow is hereby authorized to lease to the Regional School District all the premises and buildings presently known as the (1) Hale School, (2) Center School, (3) Pompositticut School, and (4) the

Stone Building. Each of the leases authorized above shall be for a term not in excess of twenty (20) years and the term shall commence on July 1, 1994. Each of the leases shall contain a provision for the extension of the term thereof for an additional term not in excess of twenty (20) years, renewable at any time during the term, at the option of the Regional District School Committee. Each of the leases shall contain provisions authorizing the Regional School District to insure, repair, improve, alter or remodel any of the leased buildings. Alterations or changes to any leased property can only be made with the concurrence of the leasing town. No rental shall be charged to the District by any of the participating towns except as hereinafter provided.

If the Regional District School Committee shall assign any pupils residing in any one (1) or more participating towns to attend any of the aforementioned leased schools of another town on which any funded indebtedness remains outstanding the town of residence of such pupils shall be charged a rental fee at the rate of net cost per pupil per school year for each pupil so assigned. The rental shall be paid to the Regional School District by the town of residence of such pupils within thirty (30) days after the date of billing by the said Committee and the said Committee shall transmit said payment to the town of ownership of the school to which such students have been assigned.

In the event of withdrawal of any of the participating towns from the District, the above-mentioned leases shall be terminated at the time of such withdrawal. Each lease involving a participating town shall be on such other terms as may be determined by the Selectmen thereof and the Regional District School Committee who shall execute the lease for the participating town and the Regional School District, respectively.

New school facilities built by member towns shall be subject to the leasing terms as outlined above. When facilities are no longer used for education purposes, the lease for that facility is terminated.

## TYPE OF DISTRICT

Section 3. The Regional School District shall include all grades from kindergarten through grade twelve (12).

## METHOD OF APPORTIONING COSTS OF THE REGIONAL SCHOOL

Section 4. (A)  Capital costs shall include all expenditures in the nature of capital outlay such as the cost of acquiring land, the costs of constructing, reconstructing, and adding to buildings, and the cost of remodeling or making extraordinary repairs to a school building or buildings, including without limitation the cost of the original equipment and furnishings for such buildings or additions, plans, architects' and consultants' fees, grading and other costs incidental to placing school buildings and additions and related premises in operating condition. Capital costs shall also include payment of principals of and interest on bonds or other obligations issued by the District to finance capital costs.

(B)  Operating costs shall include all costs not included in capital costs as defined in Section 4(A) but including interest on temporary notes issued by the District in anticipation of revenue.

(C) 1.  Capital costs, including debt service on bonds or notes issued by the District to finance capital costs, in connection with any particular District school shall be apportioned on the basis of each member town's pupil enrollment in such school. Each member town's share shall be determined by computing the ratio which its pupil enrollment in such school on October 1 of the year next preceding the year for which the apportionment is made bears to the total pupil enrollment from all the member towns in such school on that date. If there is not enrollment in such school on the aforesaid October 1, the apportionment of debt service with respect thereto shall be made on the basis of the estimated pupil enrollment from each member town in such school on the aforesaid date had there been any reenrollment, such estimate to be made by the Committee.

Incurring of indebtedness for the construction of new school facilities, including additions to existing school facilities, which are designed to serve students from one member town, shall be by vote of the voters of the member town so served, at an annual or special town meeting and said indebtedness shall be incurred by the member town so served and not the Regional School District.

Incurring of indebtedness for capital improvements or capital replacements for existing school facilities to serve students from one (1) member town shall be by vote of the voters of the member town so served, at an annual or special town meeting, and said indebtedness shall be incurred by the member town so served and not the Regional School District.

(D)  Operating costs the average of the previous five (5) years' enrollment as of October 1 of each of the preceding years for fiscal year 2000 and thereafter.

Assessments to each town shall be said apportionment less the average percentage of Regional Aid, Transportation Aid, and any other reductions to the gross budget voted by the Regional School District, less each town's allocation of Chapter 70 aid, but not less than each town's minimum contribution required by the State.

(E)  Payments of one-quarter of each town's proportional part of the its assessment from the regional school district, including indebtedness, shall be made on the first day of each February, May, August, and November and in the manner prescribed by Statute.

Within seven (7) days after the date on which the Regional District School Committee authorizes the incurring of debt, other than temporary debt in anticipation of revenue to be received from participating towns, the said Committee shall cause written notice of the date of said authorization, the sum authorized, and the general purpose or purposes for authorizing such debt, to be given to the Board of Selectmen of each participating town.


## TRANSPORTATION

Section 5.  (A)  School Transportation shall be provided by the Regional School District and the cost thereof shall be apportioned to the participating towns as an operating cost.

(B)  Students in pre-kindergarten through grade eight (8) shall attend schools in their town of residence except as hereinafter provided.

(C)  The Regional District School Committee may assign by a majority vote students in grades six (6) through eight (8) to a school in other than their town of residence only after a favorable majority vote at an annual or special town meeting on the part of both sending and receiving towns involved in such an assignment.

(D)  The Regional District School Committee may determine by a majority vote the need to assign elementary pupils to schools in other than their town of residence in case of an emergency which prevents use of a building whole or part, or with parent approval; the town whose students are so assigned will be responsible for all costs associated with temporarily housing its students.


## ADMISSION TO AND WITHDRAWAL FROM THE DISTRICT

Section 6.  (A)  Any town not included in the Regional School District may be admitted to the District by Majority vote of the Regional District School Committee and upon acceptance by the town of this Agreement with any amendments thereto and upon acceptance by the Town of the provision of Section sixteen through sixteen (I), inclusive, of Chapter 71, as amended, of the General Laws.  Upon admission of such a town, the costs of Section 4 plus subsequent acquisitions and improvements shall be reapportioned in accordance with Section 4 to all the towns now comprising the District as determined by the Regional District School Committee. The newly admitted town shall then assume liability for its entire share of the costs of Section 4 for the remaining terms of the funded indebtedness.  It shall pay to the Regional School District Treasurer an amount equal to the sum of its normal share of the costs of Section 4 plus its share of the funded indebtedness already retired divided by the number of years in the remaining life of the funded indebtedness.  Payments made by the newly admitted town for funded indebtedness already retired, shall be credited to the towns previously forming the District on the basis of over-payments made by them.  If no funded indebtedness exists the newly admitted town must pay to the Regional School District their percentage of student enrollment to the District total capital costs over a ten (10) year period.

Funds received for capital expenditures from any newly admitted town will be used to reduce assessments to the previous members of the Regional School District based on the average percent of each town's enrollment over the life of the District

(B) By a majority vote at a regular or special town meeting, any town in the Regional School District may withdraw from the District, provided that a majority of the remaining members of the Regional School District Committee so vote; and provided that the town desiring to withdraw has paid its portion of the remaining funded indebtedness and any other expenses for which it became liable as a member of the District.

The withdrawing town shall remain liable to the District for indebtedness of the District outstanding at the time of such withdrawal, and the interest thereon to the same extent and in the same manner as though such town had not withdrawn from the District; provided that such liability shall be reduced by any amount which such town has paid at the time of withdrawal and which has been applied to the payment of such indebtedness or interest.

The withdrawing town's annual share of any future installment of principal and interest on obligations outstanding on the effective date of its withdrawal shall be fixed at the percentage prevailing for such town at the last annual apportionment made next prior to the effective date of the withdrawal. The remainder of any such installment after subtracting the share of any towns which have withdraw shall be apportioned to the remaining participating towns in the manner provided in Section 4 (C) and any amendments which may be made thereto.

## AMENDMENTS

Section 7. This Agreement may be amended by recommendation of the Regional District School Committee or by initiative Petition of 10% of the registered voters in the towns comprising the Regional School District, provided that such amendment is approved by majority vote in each of the towns comprising the District. No such amendment shall be made which shall substantially impair the rights of the holders of any bonds or notes of the District then outstanding or the rights of the District to procure the means for payment thereof; provided, that this provision shall not prevent the admission of new towns to the District and the reapportionment accordingly of that part of the cost of construction represented by bonds or notes of the District then outstanding and of interest thereon.

## BUDGET

Section 8. The Regional District School Committee shall, in accordance with Section 16B of Chapter 71 of the General Laws of the Commonwealth of Massachusetts, prepare and adopt a budget and present this budget to each of the Towns comprising the District on or before March 15th for the next fiscal year, itemized as follows:

Administration
Instruction
Other School Services
Operation & Maintenance of School Plant
Fixed Charges
Community Service
Acquisition of Fixed Assets
Debt Retirement and Debt Services
Programs With Other Districts and Private Schools
Contingency

## ADMISSION OF STUDENTS

Section 9. Students residing outside of the Regional School District may attend any of the schools in the District provided sufficient space is available as determined by the Regional District School Committee. At any time the Regional District School Committee may vote not to accept students residing outside the District.

**ORGANIZATION OF THE REGIONAL DISTRICT**
**SCHOOL COMMITTEE**

Section 10. (A) Within ten (10) days after selection of membership, the Regional District School Committee shall organize and choose by majority vote such officers as provided for by law, and determine their term of office.

Provisions shall be made for meetings, including an annual meeting at which the officers of the Committee shall be elected. All meetings except those involving personal relations of pupils or employees of the Regional District School Committee shall be open to the public and the press.

(B) The Regional District School Committee, for and on behalf of the Regional School District, shall establish and maintain within the District a central office for the transaction of its business; the place to be determined by the Committee. The Committee shall have the power to equip the same and to purchase such supplies as may be required in the transaction of its business.

**AUDIT COMMITTEE**

Section 11. The school committee shall create an Audit Committee consisting of four (4) voting members: one (1) from each town appointed jointly by the Selectmen and Finance Committee of that town and one (1) voting member appointed by the school committee, where that member shall not be a member of the school district's administration. Each committee member must be independent of the financial reporting system of the district and should possess a reasonable level of financial literacy. The Audit Committee shall oversee the district's financial reporting process and annual audit(s), both financial and compliance.

It will be the responsibility of the Audit Committee to:

Establish an understanding of the district's financial reporting system through meetings and interviews with the district's management and individual interviews with all members of the district's financial reporting department. The Audit Committee will also have the authority to request financial reports from the business office of the district showing detailed financial transactions, actual expenditures against budgets, summaries of all "off budget" financial operations, all liabilities incurred or anticipated, and balances of all bank accounts.

Recommend to the school committee the hiring of the accounting firm that audits the financial affairs of the school district. The Audit Committee will define the scope of any audits performed, will meet with the auditors throughout the auditing process, and will receive any reports prepared by auditors.

Recommend to the school committee each year the amount of money required for auditing activities, and will recommend to the school committee expenditures from the auditing budget line item.

Report annually, after receiving the annual audit, or at other times it may deem appropriate, to the full school committee on the adequacy of the financial reporting system, outcomes of the annual audit and its recommendations for any changes in procedures. In addition, the Audit Committee will conduct, at least annually, a public session designed to inform the citizens of the member towns about the district's financial health.

Excerpt from Nashoba Regional School District Committee Meeting Minutes of March 27, 2003:
    "Carole Makary made a motion that the School Committee sponsor the Revised Regional Agreement on Town Meeting floor in May 2003. Seconded by Alice Roemer. Voted and passed unanimous."

**Article 39.  Bond Held by Planning Board**
    On motion of Selectman Clayton, it was voted unanimously to accept the provisions of Massachusetts General Laws Chapter 41, Section 81U of the Subdivision Control Law for the purpose of authorizing the expenditure of any monies up to $100,000, as provided in said statute, with the approval

of the Board of Selectmen, for the completion of any subdivision improvements from monies deposited with the Town or made available through any bond enforcement action or otherwise for such purposes in connection with any subdivision approved by the Planning Board;

and further voted to appropriate and to authorize the Town, acting by and through its Planning Board, under the direction of the Board of Selectmen to expend such funds over and above the limit of $100,000 as may be available under a certain bond given to the Town for the subdivision of land approved by the Planning Board known as "Whispering Woods" (Kettell Plain Road) up to and including any or all of said excess provided for in the Subdivision Performance Bond in the amount of $510,174.00.

Donald McPherson of the Planning Board explained that the subdivision developer has defaulted, so the Planning Board must now complete items remaining in the subdivision approval. The Finance Committee was in favor of this article.

**Article 40. Amendment to Zoning Bylaw - Section 5.2.1.1**
On motion of Selectman Farrell, it was voted unanimously to amend the Zoning Bylaws, "Water Resources Protection District", Section 5.2.1.1 subsection 7, by deleting the existing subsection 7 and inserting a new subsection 7, to read in its entirety as printed in the warrant.

"7. Involve MINING of the land, except as allowed in Section 5.2.5.3."

*Planning Board Report:* The Planning Board held a duly noticed public hearing on April 8, 2003 at 7:30 p.m. in the Stow Town Building to consider a proposed amendment to the Stow Zoning Bylaw Section 5.2.1.1.7. The purpose of this article is to correct an incorrect reference in Section 5.2.1.1. Section 5.2.1.1 lists uses permitted in the Water Resource Protection District. Subsection 7 incorrectly makes reference to Section 5.2.18.3 which does not exist. This section was intended to refer to Section 5.2.5.3 (Uses permitted only upon satisfaction of design requirements.) At its meeting of April 22, 2003, by a unanimous vote of four members present, the Planning Board voted to recommend adoption of Article 40 to Town Meeting.

**Article 41. Amendment to Zoning Bylaw - Inclusion of Affordable Housing**
On motion of Selectman Perry, it was voted unanimously by declaration of the Moderator, to amend the Zoning Bylaw Section 3.10, "Table of Principal Uses", by adding a new Footnote (11); amending Section 8.8.3, "AAN District", by deleting the existing Section 8.8.3 and inserting a new Section 8.8.3; and adding a new Section 8.9, "Inclusion of Affordable Housing", to read in their entirety as printed in the warrant, except that Section 8.9.6 shall read:

8.9.6  Fees-in-Lieu of Affordable Dwelling Unit Provision - As an alternative to the requirements of Section 8.9.2.1, and as allowed by law and with the approval of the Planning Board, an applicant may contribute an amount in cash equal to the costs of constructing such affordable dwelling units, and satisfactory to the Planning Board in consultation with other relevant Town Boards, to the Town of Stow Housing Authority or its designee for the development and preservation of affordable housing, in consultation with the Planning Board and other appropriate Town Boards, in lieu of constructing and offering affordable dwelling units within the locus of the proposed development or off-site, as set forth in Section 8.9.6.1 below.

---

*41 (A)    Amend Section 3.10, Table of Principal Uses, by adding a new Footnote (11) to read in its entirety as stated below:*

**Section 3.10**

**Table of Principal Uses**

| Principal Uses | Residential | Business | Compact Business | Industrial | Commercial | Recreation Conservation | Flood Plain Wetlands | Refuse Disposal | Site Plan Approval |
|---|---|---|---|---|---|---|---|---|---|
| Single Family DWELLING | Y(4) SPP(11) | N | Y SPP(11) | N | N | N | N | N | (3) |
| Single Family DWELLING with ACCESSORY APARTMENT | SPP(4) (7)(11) | N | SPP(7) (11) | N | N | N | N | N | (3) |
| Duplex DWELLINGS | SPP(4) (11) | N | N | N | N | N | N | N | (3) |
| ASSISTED LIVING RESIDENCE | N | SPP(9) (11) | N | N | N | N | N | N | (3) |
| Multi-Family DWELLING | SPP(4) (11) | N | N | N | N | N | N | N | (3) |

(11) Provisions of Section 8.9, Inclusion of Affordable Housing, may apply.

---

**41 (B)**    *Amend Section 8.8.3, AAN District, by deleting the existing section 8.8.3 and inserting a new section 8.8.3 to read in its entirety as stated below:*

**8.8.3 AAN District**
This district shall be an overlay district and shall include parcels of land depicted on a map dated May 13, 2002 and entitled "Active Adult Neighborhood District," or any amendments thereto. This map is hereby adopted coincident with the adoption of this Bylaw. Development in an AAN District is subject to all provisions of the remainder of the Zoning Bylaw, except to the extent provided in Sections 8.8, ACTIVE ADULT NEIGHBORHOOD (AAN). Section 8.9, Inclusion of Affordable Housing, does not apply to the AAN District.

---

**41 (C)**    *Amend the Zoning Bylaw by adding a new Section 8.9, to read in its entirety as stated below:*

**8.9    Inclusion of Affordable Housing**

**8.9.1    Purpose and Intent** - The purpose of this Bylaw is to increase the supply of housing in the Town of Stow that is available to and affordable by low income or moderate income households who might otherwise have difficulty in finding homes in Stow, and to ensure that such housing is affordable over the long-term and provided in accordance with the requirements of Massachusetts General Law Chapter 40B and its implementing regulations, Stow Comprehensive Permit Policy, the Stow Master Plan, and other ongoing programs within the Town of Stow. It is intended that the AFFORDABLE DWELLING UNITS authorized under the provisions of this Bylaw be considered as Local Initiative Program (LIP) dwelling units in compliance with the requirements for the same as specified by the Department of Community Affairs, Massachusetts Department of Housing and Community Development (DHCD), or successor, or additional programs adopted by the Commonwealth or its agencies, and that said units count toward Stow's requirements under Massachusetts General Law Chapter 40B, Sections 20-23, as amended. Through multi-family units, developers will be able to increase the number of DWELLING UNITS within a development versus conventional developments. The increased number of DWELLING UNITS is intended to offset the reduced revenue from the affordable homes. In those cases where the Inclusion of Affordable Housing may conflict or be inconsistent with Section 8.5, Planned Conservation Development (PCD) or other sections of the Town of Stow Zoning Bylaw, except as otherwise expressly provided herein, the provisions of Inclusion of Affordable Housing shall be controlling.

**8.9.2    Applicability**

8.9.2.1.    Beginning with the effective date of this Bylaw, any development or division of land subject to Massachusetts General Law Chapter 41, Sections 81-K through 81-GG, which will result in the creation

of six (6) or more DWELLING UNITS, shall require a Special Permit from the Planning Board, and shall include as a condition of said permit that:

    A. At least 10% of the units be priced for QUALIFIED AFFORDABLE HOUSING PURCHASERS;

    B. The mix of AFFORDABLE DWELLING UNITS and market rate housing built in any one year be equivalent to the overall mix for the entire development;

    C. Deed restrictions, acceptable to the Town, and established in accordance with the standards of DHCD or successor or additional programs adopted by the Commonwealth or its agencies, shall be placed on the appropriate property to ensure that AFFORDABLE DWELLING UNITS created under this section shall remain AFFORDABLE DWELLING UNITS in perpetuity or for as long a period as is allowed by law.

8.9.2.2. DWELLING UNITS shall be considered as part of a single development if located either on a single parcel or contiguous parcels of land, which have been in the same ownership at any time subsequent to the date of adoption of Inclusion of Affordable Housing.

**8.9.3    Inclusion of Affordable Housing Regulations** – The Planning Board shall adopt and maintain a set of regulations that contains the necessary policies, procedures, and requirements to implement the provisions of this Section.

**8.9.4    Provision of AFFORDABLE DWELLING UNITS** - AFFORDABLE DWELLING UNITS required under Section 8.9.2.1 may be provided in any one or combination of methods described below, subject to the approval of the Planning Board:

    A. Constructed on the locus subject to the Special Permit;

    B. Constructed on a locus different than the one subject to the Special Permit;

    C. An applicant may offer, and the Planning Board, in concert with the Board of Selectmen may accept, donations of land in fee simple, on or off-site, that the Planning Board determines are suitable for the construction of an equivalent number of AFFORDABLE DWELLING UNITS. The Planning Board may require, prior to acceptance of land by the Town, satisfaction of the requirements of this Bylaw, that the applicant submit appraisals of the land in question, as well as other data relevant to the determination of value;

    D. For fractional AFFORDABLE DWELLING UNITS, the applicant may round up to the next whole number of units or choose to pay equivalent fees-in-lieu of units (see Section 8.9.7) proportionate to the percentage of the unit required;

    E. Preservation of existing DWELLING UNITS as AFFORDABLE DWELLING UNITS through the purchase of deed restrictions.

**8.9.5  Provisions Applicable to AFFORDABLE DWELLING UNITS On- and Off-Site**

8.9.5.1. Allowed types of AFFORDABLE DWELLING UNITS:

    A. Single-family DWELLINGS;

    B. Single-family DWELLINGS with ACCESSORY APARTMENTS;

    C. MULTI-FAMILY DWELLINGS, which are designed to be consistent in character with the single-family DWELLINGS in the same development. Such MULTI-FAMILY DWELLINGS may be allowed provided:

        i.    in terms of exterior appearance, the BUILDING is compatible in design and, to the extent practicable, indistinguishable from the single-family DWELLINGS in the same development; and

        ii.    there shall be no more than four (4) DWELLING UNITS in any residential BUILDING; and

        iii.    the total number of MULTI-FAMILY DWELLINGS shall not exceed 10% of the lots in the development; and

        iv.    the overall length of any residential BUILDING shall not exceed 100 feet.

      D.     Accessory uses and structures incidental to principal uses indicated above and approved by the Planning Board.

8.9.5.2. Siting of AFFORDABLE DWELLING UNITS. All AFFORDABLE DWELLING UNITS that are constructed on-site under this Bylaw shall be situated within the development so as not to be in less desirable locations than market-rate units in the development and shall, on average, be no less accessible to public amenities, such as open space, as the market-rate units. The Site Plan shall identify those lots selected for AFFORDABLE DWELLING UNITS.

8.9.5.3. Minimum Design and Construction Standards for AFFORDABLE DWELLING UNITS. AFFORDABLE DWELLING UNITS within market-rate developments shall be integrated with the rest of the development and shall be compatible to the extent practicable in exterior design and appearance with other units, to the extent that such regulation is not inconsistent with Massachusetts General Laws Chapter 40B, Section 3.

8.9.5.4. With the approval of the Planning Board, as an alternative to the requirements of Section 8.9.4.A, an applicant subject to the Bylaw may develop, construct or otherwise provide AFFORDABLE DWELLING UNITS equivalent to those required by Section 8.9.2.1 off-site. To the maximum extent practicable, all requirements of this Bylaw that apply to on-site provision of AFFORDABLE DWELLING UNITS shall apply to provision of off-site AFFORDABLE DWELLING UNITS. In addition, the Planning Board shall approve the location of the off-site units to be provided as an integral element of the Special Permit review and approval process.

**8.9.6 Fees-in-Lieu of AFFORDABLE DWELLING UNIT Provision** - As an alternative to the requirements of Section 8.9.2.1, and as allowed by law and with the approval of the Planning Board, an applicant may contribute an amount in cash equal to the costs of constructing such AFFORDABLE DWELLING UNITS, and satisfactory to the Planning Board in consultation with other relevant Town boards, to the Town of Stow Housing Authority or its designee for the development and preservation of affordable housing, in consultation with the Planning Board and other appropriate Town boards, in lieu of constructing and offering AFFORDABLE DWELLING UNITS within the locus of the proposed development or off-site, as set forth in Section 8.9.6.1 below.

8.9.6.1. Calculation of fees-in-lieu of units. The applicant for development subject to this Bylaw may pay fees-in-lieu of the construction. For the purposes of this Bylaw, the fees-in-lieu of the construction or provision of each AFFORDABLE DWELLING UNIT is determined to be three (3) times 80% of the median income for a household of four (4), as reported by the most recent information from the United States Department of Housing and Urban Development (HUD) and/or the Massachusetts Department of Housing and Community Development (DHCD).

------------------------------------------------------------------------

*Planning Board Report:* The Planning Board held a duly noticed public hearing on April 8, 2003 at 7:30 p.m. in the Stow Town Building to consider a proposed amendment to the Stow Zoning Bylaw by amending Sections 3.10 and 8.8.3 and adding a new Section 8.9. This article is intended to help address 10% state requirement for affordable housing by increasing the supply of housing in the Town of Stow that is available to and affordable by low income or moderate income households who might otherwise have difficulty in finding homes in Stow.

It establishes
A requirement that all development or division of land into six or more units shall be subject to a Special Permit with a 10% affordability requirement. The Developer has the following options to meet the 10% requirement:
- Provide affordable deed restricted units on-site
- Provide affordable deed restricted units off-site
- Donation of land suitable for constructing an equivalent number of affordable units on-site or off-site
- Fees: 3 x 80% of median income for a household of four ($187,950) per affordable unit

This bylaw helps address the 10% state requirement by

- Providing for affordable housing with control growth
- Discourages concentrated development
- Provides mixed, not segregated, development
- Is self-administered
- Helps implement Master Plan

At its meeting of April 22, 2003, by a unanimous vote of the five members present, the Planning Board voted to recommend adoption of Article 41 to Town Meeting.

The Finance Committee was in favor of this article. Laura Spear, associate member of the Planning Board explained the highlights. The affordable units would remain as such in perpetuity through deed restriction.

## Article 42. Wetlands Protection Bylaw Amendment

On motion of Selectman Burchfield, it was voted by majority, as amended, to amend the Town of Stow General Bylaws Article 9, "Wetlands Protection", by amending Section 1, Section 2, Section 3, Section 3.1, Section 6, Section 7.2, Section 7.3, Section 7.4 and Section 9, so that the amended sections of the Wetlands Protection Bylaw shall read as printed in the warrant.

Amend Section 1 by deleting the present section and inserting in place thereof a new Section 1 to read in its entirety as follows:

## SECTION 1.  PURPOSE

The purpose of this Bylaw is to protect the wetlands, flood plains, water resources, and adjoining land areas of the Town of Stow by controlling activities deemed to have a significant effect upon the values of these resources, including but not limited to the following: public and private water supply, ground water, flood control, erosion and sedimentation control, storm damage prevention, water quality, soil and water pollution control, fisheries, shellfish, wildlife and wildlife habitat (wild plants and wild animals), rare species habitat including rare plant species, agriculture, aquaculture, and recreation (collectively, the "interests of this Bylaw"). This Bylaw is intended to utilize the Home Rule authority of this municipality to protect additional resource areas, for additional values, with additional standards and procedures to augment those of the Wetlands Protection Act, G.L. Ch. 131, §40 and Regulations thereunder, 310 CMR 10.00.

Amend Section 2 by deleting the first paragraph and inserting a new first paragraph and by amending the fourth and fifth paragraphs, so that the first, fourth and fifth paragraphs of Section 2 shall read in their entirety as follows:

## SECTION 2.  APPLICATION

No person shall remove, fill, dredge, alter, degrade, pollute, discharge into, or build upon or within one hundred feet of any bank, fresh water wetland, beach, dune, flat, marsh, meadow, bog or swamp; or lands bordering on or within one hundred feet of any Great Pond, estuary, creek, intermittent stream, or any land under said waters; or lands bordering on or within two hundred feet of any perennial stream, river, pond (with the exception of Great Ponds as defined at 310 CMR 10.58 and historic mill complexes as defined at 310 CMR 10.04), lake, reservoir, vernal pool, or any land under said waters; or lands bordering on or within one hundred feet of any land subject to flooding or inundation by ground water or surface water; or lands bordering on or within one hundred feet of the one-hundred year flood elevation, without filing written application for a permit so to remove, fill, dredge, build upon, degrade, pollute, discharge into, or alter, including such plans as may be necessary to describe such proposed activity and its effect on the environment, and receiving and complying with a permit issued pursuant to this Bylaw.

The written application, accompanied by a filing fee as described by regulation, payable to the Town of Stow, shall be sent in a manner that provides proof of delivery to the Stow Conservation Commission. This same application shall fulfill the requirements of the Massachusetts General Laws, Chapter 131, §40. Copies of this application shall be sent at the same time, in a manner that provides proof of delivery, to the Board of Selectmen, Planning Board and Board of Health. Such application shall be filed concurrently with applications for all other variances and approvals required by the Zoning Bylaw, the Subdivision Control Law or any other Bylaw or regulation, or after such variances and approvals have been obtained.

Upon written request of any person to the Commission, the Commission shall within twenty-one (21) days make a written determination as to whether this Bylaw is applicable to any land or work thereon. When the person requesting a determination is other than the owner, notice of the determination shall be sent to the owner as well as to the requesting person. Where appropriate, the Conservation Commission may conduct a public hearing on such a determination but is not required to do so. Notice of such a request for determination shall be sent to the abutters of record (as shown by the Assessors) where deemed necessary by the Commission.

---

Amend Section 3 to read in its entirety as follows:

---

## SECTION 3.  HEARING

The Commission shall hold a public hearing on the application within twenty-one (21) days of its receipt. Notice of the time and place of the hearing shall be given by the Commission, at the expense of the applicant, not less than five (5) days prior to the hearing, by publication in a newspaper of general circulation in Stow and by mailing copies of the notice to the applicant, Board of Health, Board of Selectmen, Planning Board, abutters as shown by the Assessors and to such other persons as the Commission may determine.

---

Amend Section 3.1 to read in its entirety as follows:

---

## SECTION 3.1.  PERMIT AND CONDITIONS

If after the public hearing the Commission determines that the area, which is the subject of the application, is significant to the interests protected by this Bylaw, the Commission shall within twenty-one (21) days of such hearing issue or deny a permit for the work requested. If it issues a permit after making such determination, the Commission shall impose such conditions as it determines are necessary or desirable for protection of those interests, and all work shall be done in accordance with those conditions. The conditions may include a condition that certain land or portions thereof not be built upon or altered, filled or dredged, that streams may not be diverted, dammed or otherwise disturbed. If the Commission determines that the area which is the subject of the application is not significant to the interests protected by this Bylaw, or that the proposed activity does not require the imposition of conditions, within twenty-one (21) days of the public hearing it shall issue a permit without conditions. Permits shall expire three (3) years from the date of issuance, unless renewal is sought by written application prior to the date of expiration.

---

Amend Section 6 to read in its entirety as follows:

---

## SECTION 6.  BURDEN OF PROOF

The applicant shall have the burden of proving by a preponderance of the credible evidence that the work proposed in the application will contribute to the interests protected by this Bylaw. Failure to provide adequate evidence to the Commission supporting a determination that the proposed work will contribute to the interests protected by this Bylaw shall be sufficient cause for the Commission to deny a permit or grant a permit with conditions, or, in the Commission's discretion, to continue the hearing to another date to enable the applicant or others to present additional evidence. Due consideration shall be given to any demonstrated hardship of the petitioner by reason of a denial, as brought forth at the public hearing.

> Amend Section 7.2 by adding new subsections e, k and l, so that Section 7.2, as amended, shall read in its entirety as follows:

## SECTION 7.2.  ALTER

The term "alter" shall include, without limitation, the following actions when undertaken in areas subject to this Bylaw:

a.    Removal, excavation or dredging of soil, sand, gravel, peat or aggregate materials of any kind;

b.    Changing drainage characteristics, flushing characteristics, salinity distribution, sedimentation patterns, flow patterns, and flood retention characteristics;

c.    Drainage or other disturbance of water level or water table;

d.    Dumping, discharging or filling with any material that may degrade water quality;

e.    Placement or removal of material, which would alter elevation;

f.    Driving of piles, erection of buildings or structures of any kind;

g.    Placing of obstructions whether or not they interfere with the flow of water;

h.    Destruction of plant life, including cutting of trees;

i.    Changing of water temperature, biochemical oxygen demand or other physical or chemical characteristics of the water;

j.    Any activities, changes or work that pollutes a stream or body of water, whether or not said stream or body of water is located within the Town of Stow;

k.    Application of pesticides or herbicides; *(Disapproved by Attorney General September 9, 2003)*

l.    Incremental activities, which have, or may have, a cumulative adverse impact on the resource areas protected by this Bylaw.

> Amend Section 7.3 by deleting the present section and inserting in place thereof a new Section 7.3 to read in its entirety as follows:

## SECTION 7.3.  BANKS

The term "bank" shall include the land area which normally abuts and confines a water boundary; the lower boundary being the mean annual low flow level, and the upper boundary being the first observable break in the slope or the mean annual flood level, whichever is higher.

> Amend Section 7.4.c. by adding a new subsection (4), so that Section 7.4.c., as amended, shall read in its entirety as follows:

**SECTION 7.4.  AGRICULTURAL PRACTICES**

    c.  The term "normal maintenance" of land in agricultural use shall mean only

        (1)  Tilling and/or harvesting practices customarily employed in the raising of crops.

        (2)  Pasturing of animals, including such fences and protective structures as may be required.

        (3)  Use of fertilizers, pesticides, herbicides and similar materials subject to all state and federal regulations covering their use.

        (4)  The term "normal maintenance" may include grade changes or drainage changes.  *(Disapproved by Attorney General September 9, 2003)*

---

Amend Section 9 by changing the amount of the maximum fee, so that Section 9, as amended, shall read in its entirety as follows:

---

**SECTION 9.  ENFORCEMENT**

Whoever violates any provision of this Bylaw shall be punished by a fine of not more than $500 *(Amount disapproved by Attorney General September 9, 2003)* or such other amount as may be provided by State statute. Each day or portion thereof during which a violation continues shall constitute a separate offense, and each permit condition violated shall constitute a separate offense

-------------------------------------------------------------

       Andrew Ladd of the Conservation Commission explained the intent of the proposed amendment was to update the Wetlands Protection Bylaw to become consistent with the Massachusetts Riverfront Protection Act and to add protection around vernal ponds and pools.  Since adoption of the current bylaw in 1983, Massachusetts has made many changes in the law.

       The Finance Committee was not in favor of this article as it was felt to be too strict.

       Richard Martin moved to amend Section 7.4.c.(4) which reads as printed, "The term 'normal maintenance' does not include grade changes or drainage changes', *to read*, "The term 'normal maintenance' may include grade changes or drainage changes".  As owner/operator of Honey Pot Hill Orchards, Mr. Martin explained that removal of trees within the orchard for one reason or another sometimes requires regarding.

       Mr. Martin's motion to amend carried unanimously.    A call for the question carried unanimously.  The main motion, as amended, carried by majority.

**Article 43.  Purchase of Land (Citizen Petition)**
       On motion of Malcolm FitzPatrick, it was voted Yes 172, No 84, with 171 affirmative votes necessary, to have the Selectmen initiate action to acquire, by whatever legal means necessary, the title to the parcel of land consisting of 36+/- acres, shown as Parcel No. 65-R-10 on the Assessors Maps of Stow (and placed under a Purchase and Sale Agreement, dated June 13, 2002, by Compaq Computer with Habitech Development for the reported sum of $1,910,000.00), for the Town's needs, including school buildings and playgrounds, recreational fields, etc.; to be financed by the sale of bonds, outside of

the debt limit, up to $3,000,000.00, which shall also be used to pay other costs associated with the acquisition, (such as legal, appraisal, etc., fees); to be administered under the jurisdiction of the Selectmen; and provided that the Town approves by affirmative vote ballot question No. 4.

Mr. FitzPatrick's motion to divide the motion did not carry. He explained the purpose of the article was to provide land for future town needs, financed through the sale of bonds.

The Finance Committee was opposed to this article and commented there should be a clearly defined use for the land before commitment. There should be a process among various town boards and consideration of public uses.

Selectman Clayton commented that an eminent domain taking procedure is not a good way to acquire property. This article appears to be an attempt to circumvent a Chapter 40B proposal currently before the Zoning Board of Appeals for this property. Selectman Perry said there is a need to study land availability, and not to purchase and then decide. Town Counsel Diemert advised that an eminent domain proceeding could go on for three or four years. An appraisal of the property could place the value at much more than that mentioned in the motion.

A call for the question carried. The vote on the main motion carried by the two-thirds vote required: Votes cast: 256 with 171 affirmative votes necessary for passage. Yes 172, No 84

*Note: The vote on the ballot question taken at the Annual Town Election of May 27, 2003 was in the affirmative.*

### Article 44. War in Iraq Resolution (Citizen Petition)

The motion of Susan Hosier to adopt the resolution regarding the War in Iraq, as printed in the warrant, except the change of the second word in item number 2 from "conduction" to "conducting", DID NOT CARRY.

The motion of Gregor Trinkaus-Randall to add, "comment sufficient forces to ensure the protection and recovery of cultural resources removed from libraries, archives and museums and archaeological sites subsequent to the fall of Baghdad", did not carry.

Several voters expressed outrage that this petition is before town meeting and that it has no place here.

### Article 45. Balancing the Fiscal Year 2004 Budget

Steve Dungan of the Finance Committee moved that the Town vote to authorize the Board of Assessors to use the sum of $207,256.00 from free cash and $207,255.00 from the Stabilization Fund (total of $414,511.00) in the hands of the Treasurer-Collector for the purpose of reducing the tax rate for fiscal year 2004.

Mr. Dungan advised that even with approval of this motion it may still be necessary to seek an override of Proposition 2-1/2 once the State aid figures become known.

The required two-thirds vote on the motion DID NOT CARRY.

**Article 46. Town Election**

On motion of Selectman Clayton, it was voted unanimously that the meeting be adjourned until the Annual Election on Tuesday, May 27, 2003, commencing at 7:00 a.m., then and there to act on Article 46 for such election of officers and ballot questions as listed in the warrant; and thereafter, at the close of the polls, to dissolve this meeting.

The meeting was adjourned at 11:13 p.m. to reconvene on May 27, 2003 at 7:00 a.m. for the Annual Election.

<u>Checkers at the Door</u>:  Cathy Derby, Janet Derby, Carol Dudley, Utahna Hallet, Diane Lowden, Elizabeth MacGilvra, Eila Makey, Loretta Sagar, Elizabeth Sauta, Judith Scraggs

<u>Tellers for the Town Meeting</u>:  Robert Aldape, Amanda Bennett, Fernando Colon-Osorio, Edward DeLuca, Philip Detsch, Serena Furman, Mark Hahn, Donald Hawkes, Jean Lynch, Peter Masters, Edwin Merrick, Jayne Merrick, Constance Mohr, Deanna Montgomery, Joanne Newman, John O'Connell, Edward Perry, Sr., Donald Rising, Marcia Rising, Dean Scofield, Dwight Sipler, John Toole, Gregor Trinkaus-Randall, Vickery Trinkaus-Randall, Robert Walrath, Pamela Weathers, John Wendler

<u>Timekeeper</u>:  Catherine Desmond

<u>Number of Voters Checked</u>:
| | |
|---|---|
| Monday, May 19th | 721 |
| Tuesday, May 20th | 476 |
| Wednesday, May 21st | 357 |

<u>Number of Registered Voters</u>:  4,136

A true copy: Attest:  Linda E. Hathaway, Town Clerk of Stow

NOTE:  *The amendments to the Zoning Bylaws adopted under Articles 40 and 41 were approved by the Attorney General on September 9, 2003.  Posted as a Town Bulletin on September 26, 2003.*

*The amendments to the General Bylaw adopted under Article 42 were approved by the Attorney General on September 9, 2003, **except as noted in Sections 7.2.k., 7.4.(4) and 9**.  Posted as a Town Bulletin on September 26, 2003.*

# EXHIBIT 4

Volume: I
Pages: 1-195
Exhibits: 16

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11697-GAO

MARILYN KUNELIUS,

Plaintiff,

v.

TOWN OF STOW, separately,
A PARTNERSHIP OF UNKNOWN NAME
BETWEEN TOWN OF STOW and THE
TRUST FOR PUBLIC LAND, THE
TRUST FOR PUBLIC LAND, separately,
and CRAIG A. MacDONNELL, in his
individual capacity,

Defendants.

DEPOSITION of GREGORY D. JONES, a witness called by and
on behalf of the Plaintiff, taken pursuant to Fed.R.Civ.P.
30, before Roberta J. Daniels, a Court Reporter and Notary
Public within and for the Commonwealth of Massachusetts, at
the Law Offices of Michael C. McLaughlin, One Beacon
Street, Boston, Massachusetts 02108, on Monday, March 5,
2007, scheduled to commence at 12:00 P.M.

## APPEARANCES

Michael C. McLaughlin, Esquire
Law Offices of Michael C. McLaughlin
One Beacon Street
Boston, Massachusetts 02108
       Counsel for the Plaintiff

Deborah I. Ecker, Esquire
Brody Hardoon Perkins & Kesten, LLP
One Exeter Plaza
Boston, Massachusetts 02116
       Counsel for Defendant Town of Stow

Dahlia S. Fetouh, Esquire
Richard A. Oetheimer, Esquire
Goodwin Procter, LLP
Exchange Place
Boston, Massachusetts 02109
       Counsel for Defendant The Trust for Public Land

James B. Conroy, Esquire
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd floor
Boston, Massachusetts 02108
       Counsel for Defendant Craig A. MacDonnell
Also present:
Lucie DeBellis, Paralegal
Law Offices of Michael C. McLaughlin

Marilyn Kunelius, Plaintiff
David Norris, Husband of the plaintiff

Craig A. MacDonnell, Defendant

## INDEX

| Witness | D | C | RD | RC |
|---|---|---|---|---|
| GREGORY D. JONES | | | | |
| By Mr. McLaughlin | 6 | | | |
| By Mr. Conroy | | 187 | | |

- 3 -

## EXHIBITS

| No. | Description | Page |
|---|---|---|
| 1 | Notice of deposition | 5 |
| 2 | TPL letter to Perry, 2-11-03 | 22 |
| 3 | Stow letter to Kunelius, 2-12-03 | 27 |
|   | with assignment and acceptance | |
| 4 | Application for DHCD funding | 30 |
| 5 | Kunelius Property Workout | 36 |
| 6 | Diemert letter to Wrigley, 2-10-03 | 48 |
| 7 | Jones email to Wrigley | 62 |
| 8 | DRAFT conditions for transfer of | |
|   | right of first refusal | 103 |
| 9 | Kachajian email to Perry, 2-4-03 | 115 |
| 10 | Kachajian letter to Farrell, 9-12-03 | 131 |
| 11 | Perry letter to Kachajian, 9-24-03 | 136 |
| 12 | Stow notice of intent to DHCD, 9-23-03 | 157 |
| 13 | Kachajian undated letter to Stow | 169 |
| 14 | ZBA minutes | 171 |
| 15 | MacDonnell email to Perry/Wrigley, 4-17 | 176 |
| 16 | Friends of Red Acre letter to Stow, | |
|   | 6-6-03, with attachment | 178 |

- 4 -

**Page 35**

1     Village.
2 Q And when you say fairly significant, it was a very
3     high water production, had a very high water
4     production value, didn't it?
5         MS. FETOUH: Objection.
6         MR. CONROY: Objection.
7 A That's what people told me. I know nothing about
8     water supply, so it could have been a zillion, and I
9     could be wrong. I have no idea, but certainly the
10    assertion was made that it would be perfectly
11    sufficient for the Lower Village, the issue being the
12    impurities would have to be removed.
13 Q And was that generally known, that Mrs. Kunelius'
14    property contained this kind of potential water
15    supply?
16        MS. FETOUH: Objection.
17 A It was known, yes.
18 Q And when I say generally known, I'm talking about the
19    Board of Selectmen and the general abutters, that sort
20    of thing.
21 A Certainly the Board of Selectmen knew. We walked the
22    property and physically went out to the well site,
23    and, you know, if they didn't know, then they were
24    denying it.
             - 35 -

**Page 36**

1 Q Did you have concerns about the fact that there was a
2    partnership developing between The Trust for Public
3    Land and the Town of Stow with regard to the effort to
4    acquire the property from Mrs. Kunelius, and you
5    objected to that partnership?
6        MS. ECKER: Objection.
7        MS. FETOUH: Objection.
8        MR. CONROY: Objection.
9 A I don't recall objecting to that partnership.
10 Q Did you have fears that a partnership was being
11    developed and you were concerned about whether the
12    Town of Stow would be sued concerning that
13    partnership?
14 A Well, at a certain point, I put a proposal to the
15    selectmen that, in the background for that, there was
16    the possibility of a lawsuit. So, yes, I had concerns
17    about that.
18        (WHEREUPON, Exhibit No. 5, Kunelius
19    Property Workout, marked for identification.)
20 Q I've put before you Exhibit 5, which is entitled,
21    "Kunelius Property Workout," and I would ask you if
22    this is the document you referred to?
23 A Yes.
24 Q I note that Exhibit 5 does not have a Bate stamp
             - 36 -

**Page 37**

1     number on it. Do you recall whether this document was
2    handed out by you to people at a hearing before the
3    Board of Selectmen when you made this presentation to
4    the board?
5 A I have no specific recollection. I do have a copy of
6    this on my word processing system at home, and I was
7    the author of it. I believe, generally, when I worked
8    up something like this, I distributed it to people so
9    that they'd have the background. I probably,
10    verbally, discussed all this before we considered it.
11 Q I will represent to you that this document is not
12    contained anywhere in the documents of the Board of
13    Selectmen that were provided to us by the Town of
14    Stow, and I'm wondering whether you would have any
15    idea of where this document would have been had it
16    been provided to the Board of Selectmen during the
17    time of your hearing. Where would they keep such a
18    document?
19        MR. CONROY: Objection.
20        MS. ECKER: Objection.
21        MS. FETOUH: Objection.
22 A Okay. If I had done this in time to be in part of the
23    packet that was sent out to the selectmen, it might
24    have -- I believe the packet information is considered
             - 37 -

**Page 38**

1     part of the information that's an official part of the
2    record of a meeting. It could well be that I hadn't
3    done it in time and I simply brought it to the meeting
4    itself. acreage
5 Q I'm going to just go back to Exhibit 4 for a few
6    minutes and just follow up on Exhibit 4. I would like
7    you to look at Page KUN342 under Financing Mechanism,
8    about in the middle of the page, and the second
9    paragraph after Item 1, Financing Mechanism, is a
10    paragraph that reads as follows: TPL is prepared to
11    purchase the property. TPL has a primary plan and a
12    fallback plan. The primary plan envisions a
13    multilateral funding approach to this project. Some
14    of the funding is contingent as explained below, but
15    all of it is subject to a fallback line of credit from
16    Wainwright Bank. Do you see that?
17 A I see it.
18 Q Had you ever heard of a fallback line of credit from
19    Wainwright Bank prior to today?
20 A No.
21 Q Continuing down, it says: TPL's primary plan is to
22    generate funds necessary for the closing.
23        And it lists four areas in which they were
24    going to raise money, one from the Town of Stow
             - 38 -

**Page 39**

1     contribution, 300,000, sale of Red Acre Road, 144
2    Red Acre Road, 400,000, DHCD funding, 250,000,
3    and private fund-raising, 200,000. Is today the
4    first time that you have seen that breakdown of
5    what TPL and the Town of Stow were telling the
6    Department of Housing and Community Development
7    as to the sources of funds that were going to be
8    used for the acquisition of the property from
9    Mrs. Kunelius?
10        MS. FETOUH: Objection.
11        MR. CONROY: Objection.
12 A Since I hadn't seen the application to the DHCD, I
13    didn't know that -- in the context that you're talking
14    about, the answer is, no, I have not seen those
15    before, but, in general, the financing was talked
16    about, around.
17 Q But you didn't even know there was an application
18    itself. Is that fair to say?
19 A I don't recall, but, you know, up till this point,
20    you've been asking me was I involved in the
21    preparation for it. I probably was aware that it was
22    going on, but, you know.
23 Q You don't recall right now?
24 A No.
             - 39 -

**Page 40**

1 Q Looking on the second page, the next page, rather,
2    343, the first full paragraph, it says: As a fallback
3    plan, if any or all of the above-referenced sources of
4    funds are unavailable, TPL intends to use capital from
5    the private market. In this regard, TPL has available
6    for its use a line of credit from Wainwright in the
7    amount of six million dollars as evidenced by the
8    letter attached as Exhibit -- blank. The use of this
9    capital is subject to TPL's internal approval process,
10    including customary due diligence and approval by the
11    Board of Directors.
12        Now, earlier, you had said that your
13    understanding was that they were having trouble
14    with fund-raising and that's why they didn't
15    purchase the property from Mrs. Kunelius. Do you
16    recall saying that was your understanding?
17 A Uh-huh.
18        MS. ECKER: Objection.
19        MS. FETOUH: Objection.
20 Q And your answer is yes on that?
21 A I recall saying that, yes.
22 Q Now, this paragraph that I just read to you on 343
23    states that if any or all of the above-referenced
24    sources of funds are unavailable, TPL intends to use
             - 40 -

DEPOSITION OF GREGORY D. JONES

MINIDEP by Kenson

| | |
|---|---|
| 1    capital from the private market. | 1 A   I just don't recall. |

1    capital from the private market.
2      So, did you have an understanding back when
3   you were told that TPL couldn't go forward
4   because they couldn't raise the money that, in
5   fact, they had already earmarked a six million
6   dollar line of credit to use if the fund-raising
7   failed?
8       MS. ECKER: Objection.
9       MS. FETOUH: Objection.
10      MR. CONROY: Objection.
11 A   I was not aware of that.
12 Q   Does it surprise you today to learn that TPL had a six
13   million dollar line of credit?
14 A   No.
15 Q   Now, I want to go back in the same document to the
16   very end of the document, which is KUN406, and at the
17   top, this appears to be minutes of a meeting. The
18   prior page is the right of first refusal, Kunelius
19   property. It appears to be the February 11th meeting
20   that you were referring to when you refused to sign
21   the assignment and vote for the assignment, is that
22   correct?
23       MS. ECKER: I'm sorry.
24       MR. McLAUGHLIN: The very end, it's

- 41 -

Right column:

1 A   I just don't recall.
2 Q   Did you have any discussions with the attorney for
3   Marilyn Kunelius?
4 A   Well, yes, I did. I can't remember what the context
5   was, and it's not -- it wasn't you.
6 Q   No. Does the name Peter Kachajian ring a bell?
7 A   Yes. I couldn't dredge it up, but you're right.
8 Q   Do you recall, generally, what that discussion
9   entailed?
10 A   Well, I recall talking to Peter during the time that
11   Mosaic Commons was trying to advance their development
12   of the parcel. I believe there was a public hearing.
13   Peter attended. I spoke with him at that point.
14 Q   Do you recall Mr. Kachajian discussing at the public
15   hearing Mrs. Kunelius' concern that if TPL didn't go
16   forward it would be disastrous to her, financially?
17 A   Certainly I was aware of that. Whether I got aware of
18   that through discussions with Peter, I have no idea.
19 Q   Were other members of the Board of Selectmen aware of
20   that?
21       MS. FETOUH: Objection.
22 A   I have no idea what they were aware of.
23 Q   The second sentence say: The town does not want to
24   find out if it has any legal liability. Yes, we ceded

- 44 -

1    406. Starting at 405, actually.
2 A   And, actually, on 404, it looks like there was a prior
3   hearing regarding this issue, so.
4 Q   Now, on 406, it says: Selectman Jones moved that the
5   town not transfer their rights under Chapter 61 to The
6   Trust for Public Land. There was no second to this
7   motion, no action on the motion.
8       At the time that you made that motion, did
9   anyone, now that you've seen this application,
10   anyone tell you that there was a certainty that
11   TPL would purchase the property and that your
12   concerns were unnecessary because of their
13   certainty of availability of funds?
14       MS. FETOUH: Objection.
15       MR. CONROY: Objection.
16 A   We were told that TPL was capable of this transaction.
17   We were told that it wasn't necessary to tie them down
18   with specific language, but, you know, whether what
19   they said was they would be able to consummate the
20   transaction or not, I have no idea.
21 Q   Did you ever have any discussions with Ross Perry
22   about his understanding that, if TPL decided not to go
23   forward, they wouldn't have to go forward because they
24   would simply rely on the liquidated damage clause in

- 42 -

Right column:

1   our right of first refusal to TPL, and TPL certainly
2   has the assets to make good on the transaction.
3       Your statement that TPL had the assets to
4   make good on the transaction is based upon the
5   statements that TPL made to the Board of
6   Selectmen concerning their ability to complete
7   the purchase?
8       MS. FETOUH: Objection.
9       MR. CONROY: Objection.
10 A   I believe that would be the basis for this, yes.
11 Q   So, if I ask you, specifically, what was the basis of
12   you saying that TPL has the assets to make good on the
13   transaction, what would your answer be?
14 A   I believe they had done other transactions of that
15   magnitude. They're a well-respected conservation
16   organization.
17 Q   The next sentence says: But they have reneged and the
18   contract has been breached.
19       What was your understanding of why they
20   reneged?
21       MS. FETOUH: Objection.
22       MR. CONROY: Objection.
23 A   I just know that they did.
24 Q   What was the basis for you believing that they

- 45 -

1   the purchase and sale agreement?
2       MR. CONROY: Objection.
3       MS. FETOUH: Objection.
4 A   I don't recall any such discussion before it happened.
5 Q   Now, looking back at Exhibit 5, which is the document
6   that you authored, it begins: A lawyer for Marilyn
7   Kunelius has threatened a suit to enforce the contract
8   that called for a seven hundred and fifty thousand
9   dollar closing on September 26th.
10       Can you assume from that statement that this
11   letter was written after September 26, 2003?
12 A   Yes. Actually, I believe this comes up in selectmen's
13   notes. I think it was a November or December meeting.
14       MR. McLAUGHLIN: We'll have to check
15   that. I do not recall seeing that in any notes.
16   I will go back.
17 Q   Do you recall having any discussions with Ross Perry
18   concerning advice given by Jake Diemert, the town
19   counsel, as to the possibility of a lawsuit being
20   brought by Mrs. Kunelius?
21 A   I don't recall such a discussion.
22 Q   Did he ever share with you a letter by Jake Diemert to
23   Mr. Wrigley suggesting that a lawsuit would be likely?
24       MS. ECKER: Objection.

- 43 -

Right column:

1   reneged?
2 A   Well, the closing was due in September, and that time
3   and -- I believe, in fact, in August, a notification
4   was delivered that they were not going to continue
5   with the project.
6 Q   And when you say, "The contract has been breached,"
7   what was the basis of you saying that?
8 A   Well, this may be overstating what was really
9   happening. This was sort of my perception of things,
10   but my understanding was that, like any real estate
11   deal, up until the actual closing, any parties can
12   walk away and surrender any assets that they've paid
13   up to that point.
14 Q   And that was your understanding on this deal?
15 A   Yes.
16 Q   Well, the next sentence says: The seller certainly
17   has been harmed by our actions and TPL's inaction.
18       What was the basis for you saying that
19   Mrs. Kunelius certainly had been harmed by the
20   Board of Selectmen's actions and TPL's actions?
21 A   Well, when the town ceded its right of first refusal,
22   she had a buyer. Nine months later, the buyer had
23   gone. So, if the town doesn't exercise its right of
24   first refusal, she has a deal. We do this, and, you

- 46 -

# EXHIBIT 5

Board of Selectmen Minutes to 11/25/03 Meeting
Page 1

**MINUTES**
**BOARD OF SELECTMEN**
**November 25, 2003**

Present at the meeting that was held at the Town Building beginning at 7:00 pm were Selectmen Kathleen Farrell, Gregory Jones and Edward R. Perry Jr. Also present were Town Administrator William Wrigley and Administrative Assistant Robin Riley.

Absent: Selectmen John Clayton Jr. and Shirley Burchfield.

Ms. Farrell called the meeting to order at 7 pm.

The minutes for the meeting held on 11/12/03 were unanimously accepted as submitted.

Two invoices from Conway Office Products for copier repair were approved for payment.

TOWN ADMINISTRATOR ACTIVITY REPORT

> Interim Town Counsel
> Mr. Wrigley said that, as an interim solution, he would like to replace the services of the late town counsel Jake Diemert with Daley and Philips, LLC for matters concerning the Planning Board and Zoning Board of Appeals, and that during this interim period he would like to use the law firm of Nichols and Philips LLC for general administrative and municipal matters. Mr. Wrigley said he chose Daley and Witten because they have been engaged in the town for many years, primarily in matters involving cell towers. Daley and Witten specialize in land use law and the Planning Board would like to have them. Mr. Wrigley said that he would like to use both firms on an interim basis, until the Board chooses a permanent replacement for Jake.

> Mr. Jones moved that the Selectmen vote to approve Mr. Wrigley's choice of interim town counsel. Mr. Perry asked if the rates for both firms were similar and Mr. Wrigley responded yes. Mr. Perry seconded the motion and asked if, since the town is splitting legal services between two firms, would the solution be as cost-effective. Mr. Wrigley said that he was optimistic that this solution would be just as cost-effective and that costs would be controlled because they would all be coming in through him.

> Mr. Wrigley said that Carol Vogel, Treasurer/Collector for the town, had engaged a firm that specializes in tax law. He said that the areas that Jake worked on were pretty compartmentalized and that he felt comfortable that these areas could be divided and handled efficiently by different firms.

> Mr. Jones said that the problem the town had with Wilson and Orcutt was that Jake was the only lawyer at the firm who knew municipal law.

> Ms. Farrell said that she thought the solution proposed by Mr. Wrigley was a good interim solution and that she liked the idea of using local companies who were familiar with the town. Mr. Wrigley said that the Board should give some thought to the process they want to use for selecting a new town counsel. The Board unanimously voted to retain the services of Daley and Witten and Nichols and Philips on an interim basis.

Board of Selectmen Minutes to 11/25/03 Meeting
Page 2

### Habitech Appraisal
Mr. Wrigley said that John Bolton, Chairman of the Board of Assessors, told him that he would have a formal written appraisal of the Habitech property the week of December 1. He said that he would provide the Selectmen with copies of the appraisal when he has received it from John.

### New Tax Rate
Mr. Wrigley told the Board that the new tax rate for 2004 had been set at $14.64 per $1,000.

### BOSE Site
Mr. Wrigley said the Planning Board has closed the hearing and has voted its final decisions and filed these with the Town Clerk.

### Miscellaneous
Mr. Jones asked Mr. Wrigley how much in total the town has spent in legal fees over cell tower matters. Mr. Wrigley said approximately $60,000. Mr. Wrigley said that most cell tower cases have been concluded and that only three cases remain pending.

## VISITORS

### Carol Vogel and Linda Hathaway
Carol Vogel, Treasurer/Collector and Linda Hathaway, Town Clerk, brought a Bond Anticipation Note purchased by Hare (Fleet) dated 12/5/03 at an interest rate of 1.34 percent to the Board for their signatures. Ms. Vogel said that the bond was for two NSRD projects and that the costs of both projects, totaling $720,000, would be covered by this bond. The bond is for $700,000 because the town is making a $20,000 paydown. Mr. Perry asked why the town was borrowing money now if the project was not going to begin until the spring. Ms. Vogel said that the town was borrowing now because it was bundling the cost of two school projects together. She said that it is less expensive for the town to borrow the money for both projects at the same time rather than to take out two separate loans. Mr. Jones asked how long this would be a permanent bond. Ms. Vogel said that the town would be making payments on the bond for the next six years and that on October 15, 2004 the town would make another paydown. Mr. Jones asked if the bond was definitely for six years. Ms. Vogel said that the length of the bond was not cast in stone and provided Mr. Jones with a copy of the schedule that had been set for repayment. Ms. Vogel said that the bond can be extended to 10 years but that the interest rate for the town would be higher.

Ms. Farrell asked what the town's total debt was. Mr. Wrigley said that the town's total debt was $1,228,000 and that the total would go up to approximately $1,300,000 in 2004.

Mr. Wrigley said that with regard to the town's annual debt schedule, the town cannot get full reimbursement on the Hale School (reimbursement comes from the state) until the state completes the program audit on the work that was done. Mr. Perry asked if someone was contacting the state about getting the audit completed. Mr. Wrigley and Ms. Vogel said that the state had been contacted several times. Mr. Wrigley said that the state is understaffed in the area of program auditors. He said that a program audit, not a financial audit, is what is needed. Mr. Perry said that the $200,000 or so that the audit would provide would make a difference to the town.

Mr. Jones moved that the Board approve the borrowing of the $ 700,000. Mr. Perry seconded the motion. The Board unanimously voted to approve the borrowing of the $700,000 bond.

Board of Selectmen Minutes to 11/25/03 Meeting
Page 3

**Fire Chief David Soar**
Fire Chief David Soar met with the Board of Selectmen to discuss raising the inspection fees that
the Fire Department charges for various services. Chief Soar said that currently the Fire
Department receives $10 for a permit fee and that cost includes all types of inspections. He said
that the Fire Dept. has to do a lot for that fee. He said that each inspection takes about one hour
and many times, especially with the new homes, they need to go out more than once. Ms. Farrell
asked which vehicle the department takes to do the inspection and Chief Soar said that they take
the ambulance. Chief Soar also said that they always send out two people to each inspection.
Chief Soar also said that when a contractor is doing blasting, there is a lot of liability that goes
along with that, and the Fire Department has a lot of paperwork to fill out if something goes
wrong with the blasting.

Chief Soar said that most towns charge a user fee to offset the cost of running lines into alarm
systems from the pole back to the station. He said that if the new homes are going to keep putting
in alarms, the Fire Department is going to have to upgrade its fire alarm equipment. Mr. Jones
asked how much the Chief anticipated the cost of such an upgrade to be. Chief Soar said he
would need a digitizer which would cost approximately $5,000. He said that they are working on
a fire alarm budget right now.

Chief Soar said that some towns also charge for false alarms and that some towns also charge for
re-inspections. Mr. Jones asked if false alarms were a problem and Chief Soar said they were not.
Mr. Perry said that he felt that in some cases fees could be an indirect way of raising taxes but
that these fee increases seemed appropriate. He said that they are essentially user fees. Mr. Perry
moved that the Board accept the fee increase. Mr. Jones seconded the motion. The Board
unanimously voted in favor of raising the inspection fees charged by the Fire Department.

Mr. Perry asked about the new fire truck and if people were being trained in its use. Chief Soar
said that yes, there had been some training over the week end. Mr. Perry asked what the number
was on the new fire truck and the Chief said that it was Number 14. Mr. Jones asked if the old
pump was gone and Chief Soar said that it is out for bids, and that Greenwood has said that it will
give them $1,000 for it if they cannot get more for it than that. Chief Soar said that the front end
parts for the old fire truck are no longer available so if it breaks it cannot be fixed. Mr. Perry
asked what year the old fire truck was and Chief Soar said 1980.

**Betsy Stepp**
Betsey Stepp visited the Board to express her interest in becoming a member of the Stow Cultural
Council. Ms. Farrell asked Ms. Stepp why she wanted to join the Cultural Council. Ms. Stepp
said that she works as a designer and that she believes that everyone should have exposure to the
arts. She said that she believes in contributing back to the town and that she has children and
believes in exposing children to art. She said that she felt that joining the Stow Cultural Council
was a good way for her to contribute to the town and to further support her interest in the arts.
Ms. Farrell asked how Ms. Stepp found out about the opening on the Cultural Council and Ms.
Stepp said that she knew people on the council. She said that she had created a logo for the
council. Mr. Jones asked what the logo looked like and Ms. Stepp explained the look of the logo
in detail.

**Catherine Hammill**
Catherine Hammill visited the Board to express her interest in becoming a member of the Stow
Cultural Council. Ms. Farrell asked Ms. Hammill why she was interested in joining the Board and
Ms. Hammill said that as a mother of three small children, she was interested in exposing children

Board of Selectmen Minutes to 11/25/03 Meeting
Page 4

to art, that her husband was an artist, that she and her children were involved in the arts and that she was a volunteer in the art room at the school her children attended. She said that for a small town she felt that Stow did a lot in the area of art and that she was encouraged by Stow's commitment to art. Ms. Farrell asked Ms. Hammill where she had heard about the opening on the Council and Ms. Hammill said that she had a friend on the Council who told her about it and recruited her. Ms. Hammill said that she had attended several Cultural Council events. Ms. Farrell asked Ms. Hammill what her vision for the Council was. Ms. Hammill said that she would love to see a little more funding for the Council because the Council has so many good ideas, particularly for childrens' programs. Ms. Hammill said she would like to see the Council sponsor activities around town such as art classes.

Ms. Farrell asked Ms. Riley for clarification on the number of openings currently available on the Cultural Council. Ms. Riley said that one opening was currently available and that she was waiting for a letter of resignation from a second former member of the Cultural Council, so she could post the second opening.

Mr. Jones moved to appoint Betsy Stepp to the Stow Cultural Council. Mr. Perry seconded the motion. The Board unanimously voted to appoint Betsy Stepp to the Stow Cultural Council and expressed their wish to be able to appoint both Betsy and Catherine to the Council.

**Trish Crawford**
Trish Crawford visited the Board to express her interest in becoming a member of the Stow Cable Advisory Committee. Ms. Farrell asked Ms. Crawford why she wanted to serve on the Cable Advisory Committee. Ms. Crawford said that she was very impressed with this team, specifically with how the team was able to communicate with Comcast. Ms. Crawford said that her exposure to the Cable Advisory Committee had helped her understand why certain initiatives had not been implemented; for example, if Stow were to film NRDC meetings there is a fiber that would need to go between towns, and that may incur a cost. Ms. Crawford said that she had been attending town and selectmen meetings for a while and that she was interested in any town-initiated communications that help inform people in the town about what is going on. Mr. Perry asked Ms. Crawford if she saw a difference between the PEG and Cable Committees. Ms. Crawford said that she saw PEG as being the committee that set policy and Cable as the committee that followed policy, but that the two teams work together. Mr. Jones said that there was a lot of overlap between the two committees. Mr. Perry asked Ms. Crawford if she thought that she could help with some of the enforcement issues that the Cable Committee had. Ms. Crawford said that she had had some discussions with Mr. Lew Halprin about this and that she believed that she could be of some help with this issue. Mr. Wrigley pointed out that the town is having some discussions with Comcast about breach of contract.

Mr. Jones moved to appoint Ms. Crawford to the Cable Advisory Committee. Mr. Perry seconded the motion. The Board unanimously voted to appoint Ms. Crawford to the Cable Advisory Committee.

**George Scraggs**
Mr. Scraggs visited the Board to express his interest in becoming a full member of the Cable Advisory Committee. Mr. Scraggs said he had been associated with the Cable Advisory Committee for three years and that he thought he had been a member all of that time. Mr. Scraggs said he had been involved in the negotiations and in the cable work that had been done in the Town Building and that he had supervised the wiring in the Town Building and Town Hall. He said that he had been to almost every Cable Advisory Committee meeting and that he was very interested in making sure that everyone in town was connected to cable. He said that a couple of

Board of Selectmen Minutes to 11/25/03 Meeting
Page 5

things have gotten in the way of this goal, such as the wetlands, but that the committee expects that the whole town will be able to be hooked up to cable.

Mr. Scraggs said that he also constructed the web room at the Town Building. Mr. Scraggs said that if he stays on the Committee he hopes to make sure that Comcast lives up to its responsibilities. Mr. Jones said that the Board had received correspondence from Comcast saying that they were increasing their rates. Mr. Scraggs said that there was nothing the Committee could do about this, that Comcast had no competition except from the satellite companies and that the increase was state-wide.

Ms. Farrell asked Ms. Riley for clarification on the number of posted vacancies for the Cable Advisory Committee. Ms. Riley said that the second posting for which Mr. Scraggs was applying would be closed on December 5. Mr. Perry asked Ms. Riley to notify Mr. Scraggs and other candidates quickly after the Board was able to make an appointment. Town Clerk Linda Hathaway said that official letters of acceptance would go out to each of the candidates appointed to a committee.

**Meadowbrook Streetlight**
The Board had been asked by the Planning Board to provide some direction on whether a streetlight should be mounted on the existing pole across the street from the intersection of Trefry Lane and Boxboro Road. Mr. Perry said that he thought this was a good idea provided the developer was going to pay for the light. Mr. Perry said that the developer could install the fixture and the town could hold off on connecting it until it knew that the light was needed. He said that neither Wheldon nor Hickory were lit at this point.

Ms. Farrell said that she thought this was a good approach since this was the recommendation that the Planning Board was making. Mr. Perry asked Ms. Riley to send a letter back to the Planning Board saying that the Board of Selectmen recommend that the light be installed according to plan but not turned on until it is established that there is a need for it. The Board unanimously voted to support the suggestion made by Mr. Perry.

**Light Pollution Sub Committee**
Russ Willis of the Light Pollution Committee had requested some input from the Board of Selectmen regarding three floodlights. Mr. Perry said that he had gone out and looked at the lights in question. Mr. Perry said that the floodlight that is lighting the cross walk on Great Road at the Town Hall could possibly use some shielding, but that the other two lights in question—the light on the north side of Great Road opposite the entrance to the Town Hall parking lot, and the light at the junction of Crescent Street and Great Road—were both needed. Mr. Jones asked how one shields a light. Mr. Perry said that the Building Inspector should be asked how to proceed with this. Mr. Wrigley said that Hudson Light & Power would need to be involved. Mr. Perry said that he would not turn off any of the three lights in question. The Board asked Ms. Riley to email the Light Pollution Committee with their recommendation. Ms. Riley will also look into the possibility of shielding the light that is located at the Town Hall cross walk on Great Road.

**One Day Special Liquor License**
The Air Field Café requested a one-day special liquor license for its Holiday Dinner on December 6. Mr. Perry moved to approve the Air Field Café's request and Mr. Jones seconded the motion. The Board unanimously voted to grant the Air Field Café a one-day special liquor license for December 6.

**Liquor License Renewal Fees**

Board of Selectmen Minutes to 11/25/03 Meeting
Page 6

Mr. Perry moved that the town maintain the current fee structure for liquor license renewal fees. Ms. Farrell seconded the motion and asked if there was any discussion. Mr. Jones said that Stow's liquor license renewal fees were below average for retailers and restaurants selling malt and wine. Ms. Farrell said that in this tough economy she did not want to raise the cost of the renewal fees. Mr. Perry said that he did not want to make it harder for these businesses than it already was. Mr. Jones said that he was not aware that the businesses were suffering and so he would recommend that the wine and malt renewal license fees be increased to be more in line with what the neighboring towns were charging. Mr. Perry said that he did not think the amount that the town would bring in as a result of the increase in these fees would be worth raising them. Mr. Perry and Ms. Farrell voted in favor of maintaining the current fee structure for liquor license renewals. Mr. Jones voted not in favor. Mr. Perry asked Ms. Riley to check with the police to see if any of the establishments requesting license renewals had any liquor-related complaints against them.

**Old Business**
Mr. Jones said that he had contacted Liz Painter of the Historical Committee regarding the Blacksmith Shop to find out what the Historical Committee wants to do with the shop. He said that he essentially handed the ball to the Historical Committee and asked Liz to let the Board of Selectmen know what the Historical Committee wants to do with the Blacksmith Shop. Mr. Wrigley said that the schools were not interested in the Blacksmith Shop.

Mr. Jones also brought up the Kunelius property under Old Business. He moved that if a similar proposal comes through for the Kunelius property, that the Board of Selectmen not exercise their MGL Chapter 61 rights as they previously had. Mr. Perry seconded this motion. Ms. Farrell opened the topic for discussion. Mr. Jones said that he thought that it would be good for the Board to assert some leadership and encourage Mosaic Commons to pursue an agreement. Mr. Perry said that the town exercised its right of first refusal the first time and it did not work. Mr. Perry said that what he thought Mr. Jones was asking and what he would support is that the town would not exercise its right of first refusal should Mosaic again express interest in buying the property.

Ms. Farrell said that the town did not have authority in this matter right now and that to tie the town's hands in this way was unnecessary and inappropriate. Ms. Farrell said that she had talked with other committees about having a chairs meeting on land use because there was overlap on issues that the different committees are working on. She said that the town has many housing and land use issues and that it would not be appropriate at this time for the Board to make a decision about a parcel that it has no authority over. She said that for the Board to interject an opinion about the Kunelius property at this point would be unnecessary.

Mr. Perry said that he thought it was within the Board's prerogative to discuss Chapter 61A issues – not recommending any specific future use of that site, but just saying that the Board is not interested in going through the Chapter 61 process. Ms. Farrell said then she would at least like to ask the committees investigating the Lower Village needs/water resources first. Mr. Perry said that the Board had already done that and Ms. Farrell disagreed. Ms. Farrell said that whoever buys the property does not have to guarantee water to the Lower Village. She said that there is a process going on right now with regard to the Kunelius property and that the Board of Selectmen were not a part of it.

Mr. Perry said that he was comfortable saying that the Board would not exercise its right of first refusal. He said that the town could potentially be involved again if there is a new Purchase & Sale Agreement. He said that he did not see why it was necessary to go through right of first

Board of Selectmen Minutes to 11/25/03 Meeting
Page 7

refusal again. He said that he did not want the Board to wait 120 days and go through right of first refusal. Mr. Jones said he would like the Board to put itself in a position where a new transaction could happen more quickly. Ms. Farrell asked if there were a way to ensure water rights. Mr. Perry said that there is a chance to control and regulate what happens there through the other Boards. Mr. Jones said he thought the town would have a better chance at water rights if it indicated that it was not intending to exercise its right of first refusal on this property.

Stow resident Trish Crawford asked the Board why there seemed to be a need to move quickly. Mr. Jones said the passage of time was important because the seller wants to move to Maine and the seller is out $700,000 and could sue. Mr. Perry said that the town was not responsible for the deal falling through. He said that it doesn't mean the seller won't try to sue, and if that were the case the town would go through a lot of angst and the town does not want to go that way.

Ms. Farrell said that she wanted to remind the Board that with respect to its responsibilities, they were to carry out the articles passed at the Town Meeting and to govern in the spirit of the Town Meeting. Mr. Perry said that if the seller feels they will find a buyer if these issues are put to rest then it is probably better to put them to rest than to let them get out of hand. Ms. Farrell asked Mr. Wrigley how binding a vote on this issue would be. Mr. Wrigley stated that it would not be a binding vote in that there was no actual request before the Board pursuant to MGL Chapter 61. However, the Board could, if they chose, publicly state what their expected vote would be if and when a Chapter 61 notice were to be received in the future. Ms. Farrell called for a vote. Mr. Jones and Mr. Perry voted in favor of the Board not exercising its right of first refusal if the purchase included plans similar to the previous Purchase & Sale or standard subdivision. Ms. Farrell voted against.

**New Business**
Ms. Farrell said that she was going to go ahead and coordinate a chairs meeting around the topic of municipal land use, to determine if any of the issues that the different Boards were handling overlapped.

Mr. Jones said that he had gotten in touch with Karen Kelleher regarding a Master Plan meeting.

Ms. Farrell said that the School Building Committee is going ahead with a site evaluation for a new building. She said that the soonest the SBA program would come back online with a similar amount of money would be 2007. She said that the town would probably need to cover the cost of borrowing out until 2012.

Mr. Perry voted to adjourn the meeting and the Board voted unanimously in favor of adjournment. Ms. Farrell adjourned the meeting at 8:45 pm.

Respectfully submitted,

Robin Riley
Administrative Assistant
Board of Selectmen

# EXHIBIT 6

Craig MacDonnell - Re: PRC - Stow - Kunelius Farm Q & A

**From:** Craig MacDonnell
**To:** Ann Cole
**Subject:** Re: PRC - Stow - Kunelius Farm Q & A
**CC:** Bowen Blair; Eric Love; Nelson Lee

Ann,

Just picked up your e-mail late last night - was on the road with Whitney. I'm happy to give you and the PRC as much information as I can now.

**Bowen's Questions:**

(1) The original warrant article at the Special Town Meeting in January was approved. But because it contemplated a borrowing that exceeded the town's levy limit a referendum was required. The referndum failed (we believe because it required new taxes). The funding proposal now being considered taps into existing funds created by the town's passage of the Community Preservation Act (CPA), which allows towns like Stow to impose a property tax surcharge for the purposes of funding open space, affordable housing, and historic preservation. These funds can be used directly or bonded against. Approval would only require a majority vote at the regular Town Meeting.

(2) Sorry for the imprecise language. The CPA money can be spent directly or used as an income stream for bond payments. We would recommend that Stow raise the $300,000 via the latter approach.

**Nelson's Questions:**

(1) Yes, significant additional fundraising will be required if the Town does not authorize the expenditure of CPA funds, however, we feel confident that the Town will go forward. We will know more next Monday evening when the CPA committee meets to discuss this project.

From a programmatic standpoint, this project is really about local choice: whether to allow a large multifamily development to be wedged adjacent to the Town's largest aquifer and in between two sizable conservation areas or to encourage a result that maintains the current usage (horse boarding, two modest residences), imposes affordabilty restrictions on the two houses, provides access to a pond on the property for fire suppression, provides the Town access to the aquifer for water devlopment, and deeds the Town significant acreage for conservation and water supply. The public will have access to the conservation areas (the Town may restrict the area directly adjacent to a future wellhead). The watershed area would be protected by the deed from TPL to the Town, which would restrict the uses of the property to conservation and water supply. Under the development option the Town would receive most but not all (42 of 45 acres) of the watershed area via a donation from the

**TPL-KUN 01144**

landowner, but would not receive access to the pond for fire suppression (important to the fire dep't as there is no town water in the area), and there would be no guarantee of public access or that the donated land would be restricted to conservation and water supply. The private parcels will be restricted in three ways: (1) affordabilty restrictions will mean that the owners of the houses will not be able to sell them except at "affordable" prices determined in consultation with the Stow Housing Authority; (2) a conservation restriction will limit the further development of the parcels; and (3) the barn/paddock area will be subject to an agreement (to be negotiated with Town) about agricultural activities in order to protect the adjacent aquifer.

(2) Town acquired the ROFR by virtue of the property being subject to a tax classification statute (M.G.L. c. 61) giving landowners preferential tax treatment in exchange for limiting usage to forestry activities. The statute gives the Town the right to assign the ROFR to a nonprofit conservation organization like TPL.

(3) Table attached. Katie Fisher, the most prominent broker (more sales than any other) in Stow performed the analysis. She is familiar with all of the properties on the market in Stow (population approximately 5,000). The figures provided in the fact sheet are conservative according to her.

>>> Ann Cole 02/03/03 03:23PM >>>
Hi Craig, thanks for your "heads-up" on the late breaking project and your fact sheet. I was out of the office last week testing the project tracking system off-site, so I wasn't able to return your message, but we did get the fact sheet, were able to circulate it, and the PRC has had a chance to look at it.

There are questions, many of which are solved by a motion on the table offered by Bowen (seconded by Eric Love) that the PRC vote to approve accepting the Right Of First Refusal and to exercise the option, but not to approve closing on the project at this point. You would be requested to come back to the PRC later on with a request to approve details of the take-out prior to closing.

Given that motion, some of the questions Nelson Lee asks, below, would be easier for your to answer later on, but if you can provide information now it would be helpful.

**Here are Bowen's comments and questions:**
Essentially, Im OK with our exercising since we have the ability to walk away under the liquidated damages provision ($ 22K), but I think its premature for PRC to approve closing since so many aspects of the take-out remain uncertain, and our ultimate risk is unclear now,

TPL-KUN 01145

but should be much clearer by later this summer.

For instance, we'll need to reassess our environmental risk if we aren't given permission to get on the property for testing. There were also some relatively minor aspects of the fact sheet that I didn't understand, and it would be nice to get clarification:

1) The Town process is unclear to me: per par. 16, there was a Special Town Meeting, then there needed to be a subsequent Town vote (on the earlier, borrowing measure), but now there doesnt need to be a subsequent Town referendum. More explanation would be helpful. roubling for me is scenario that arises if the town fails to approve funding for purchasing the 50 acres and the affordability restrictions. We have a significant financial risk, in that the fallback is more fundraising. And, it seems to me, we have a programmatic risk, if the ulimate project design is the sale of private parcels. What is missing for me is a more detailed analysis of the public conservation accomplishments under the best case and worst case scenarios. For example, what are the rights of the public on the parcels? What are the nature of the restricitons on the private parcels. How is the watershed being protected? This has a more practical dimension, as well. If the project has too little public benefit embedded in it, the revenues from the private lot sales may be unrelated business income.

2. How did the town acquire a right of first refusal? How secure is that right?

3. As in Warren, it would be nice to see a clear display of the FMV's and sales prices of all parcels and rights being sold privately. How thorough were the "market reviews" performed by the local broker?

**************

Thanks for your help,

PRC meets this Wednesday at 2:00 Pacific Time
(Let me know if the quetions are all bunched together - they shouldn't be, and I can try to resend!)

- Ann

TPL-KUN 01146

# EXHIBIT 7

| | |
|---|---|
| **From:** | cobb and karen <cobbandkaren@comcast.net> |
| **To:** | Craig MacDonnell <Craig.MacDonnell@tpl.org> |
| **Date:** | Sun, Feb 9, 2003  8:55 PM |
| **Subject:** | Fw: Notice of Intent Application |

------ Original Message ------
From: cobb and karen
To: Ross_Perry@3com.com
Sent: Sunday, February 09, 2003 8:26 PM
Subject: Notice of Intent Application


Ross -

Attached, and noted below, the Notice of Intent for the Housing Development Support Program which is
due on Tuesday, February 11th! One more deadline at the very last moment. I would sincerely appreciate
your support of filing this "intent" which does not commit the Town to anything BUT it does allow us to
place our application "in the mix." In the next few months we will be able to gather considerably more
information to complete an actual application which is due in April and will allow us to at least be
considered during this round of applications. It is important that we be able to move our affordable housing
rehabilitation forward for the coming year.

We understand that you wish to attach a cover letter stating that this notice is contingent upon "approval"
at the February 11th Board of Selectmen's meeting. Obviously, this 'Notice of Intent' will need to be sent
"Overnight" to arrive at their offices by 5 pm on Tuesday. Please feel free to contact me should you have
any questions. The Friends of Red Acre will be happy to reimburse the Town for the "Overnight" charges.

David


Department of Housing and Community Development

Housing Development Support Program - Division of Municipal Development

One Congress Street, 10th Floor, Boston, MA 02114


http://www.state.ma.us/dhcd/Temp/03/CDBG/alert.pdf

TPL-KUN 02553

Department of Housing and Community Development
Housing Development Support Program (HDSP)
Notice of Intent to Apply

City/Town of _____ Stow _____

Contact: (name/title/address/phone):  Ross Perry, Chairman,
Board of Selectmen
380 Great Road
Stow, MA  01775
978-89704514

Name of Project: <u>142/144 Red Acre Road Affordable Housing Conversion Project</u>

Signature of Chief Elected Official: _____

Date: _____

1. Briefly describe the proposed project.  Include specific information concerning
   project, size, type, low/moderate income benefit and afford ability terms.

The Red Acre Road Affordable Housing Conversion Project will renovate two existing
single family houses for the purpose of converting existing housing stock to affordable
housing.  The two houses, located at 142 and 144 Red Acre Road, will be owner
occupied by low or moderate income households and subject to permanent affordability
restrictions.

2. Is there a need and market for this project?

Yes.  Only  5.5% of Stow's housing stock is classified as affordable housing.

3. What are the total estimated project costs?  What is the source of the estimate?

The total estimated cost of the project is $125,000 for renovation of the two houses.  The
estimate is based on superficial inspection and current owner's description of needed
repairs.

4. Identify all proposed sources and uses of project financing.  What is the status of the
   proposed financing and the estimated timeline for securing financing?

Funding for the project will come from foundation and individual donations.

5. Identify the specific uses proposed for HDSP funds and the procurement/contracting
   process to be followed.

The project will substantially renovate the exterior and interior of two houses.–

TPL-KUN 02554

Department of Housing and Community Development
Housing Development Support Program (HDSP)
Notice of Intent to Apply

6. Please discuss the status of the proposed projects(s). Describe steps necessary for project completion and timetable for completion of major steps. Please indicate any permits or approvals required for implementing the proposed project and anticipated timetable for approval. Also please identify any known obstacles to project completion, and indicate the steps to be taken and timing of the resolution of any obstacles to project implementation.

Pending the Town assigning their right of first refusal to The Trust for Public Land, this property will be eligible for further project development. Project completion is expected within 18 months after receipt of both funding and of developer receiving control of property.

7. Does the developer own/control the site? If not, when will the site control be achieved?

The developer of the proposed project is expected to take control of the site in September, 2003.

8. Identify all known project participants, including owner/developer, development consultants, HDSP grant manager, and their respective roles.

The Trust for Public Land: Future Temporary Owner/Project Manager

TPL-KUN 02555

# EXHIBIT 8

Friends of Red Acre



EQUINE RESCUE

ANSWERS TO ROSS PERRY
FEBRUARY 8, 2003

**Question**: identify money sources
- don't need name & SS # but need more than "private pledges"

**Answer**:

- To-date, we have received pledges from foundations totaling $220,000
- To-date, we have received pledges from individuals totaling $11,000
- We have identified 38 "qualified" foundation prospects, which are conservatively estimated as being capable of generating $715,000.
- Our remaining need from these sources is $480,000.
- Many of these funders are already familiar with TPL or Eye of the Storm, or we have personal contacts at the foundations.
- This list and its associated plan was compiled by a FORA member who is a professional fund raiser with 20 years experience specializing in foundation relations.
- This plan has been coordinated with the professional development staff of TPL.
- In order to ensure that this project has the necessary time to raise $480,000, we have arranged for $600,000 of low or no cost financing.
- Our remaining goal for this project for donations from individuals is $39,000.



OPEN SPACE

**Question**:
Self-help grant
- double counting? - should it go back to CPC if they contribute to open space?

**Answer**:
"No" to double counting. "Yes" to reimbursement of CPC.

There are three sources of government money associated wit this project:
1. CPC funds
2. A state grant to rehab the two houses
3. Self-help money



AFFORDABLE HOUSING

Self help money does not appear in our budget, since it would be used by the town to defray outlays from municipal funds, presumably CPC. We anticipate that self-help reimbursements for this project would be about $100,000.

KUN671

# EXHIBIT 9

**MINUTES**
**BOARD OF SELECTMEN**
**FEBRUARY 11, 2003**

Present at the meeting held in the Town Building and beginning at 7:00pm were Selectmen Edward R. Perry, Jr., Kathleen K. Farrell, Shirley A. Burchfield and Gregory D. Jones. Also present were Town Administrator William Wrigley and Administrative Assistant Paula Bruno. Selectman John Clayton, Jr. was not present.

**Minutes**
The minutes for the meeting held on January 14, 2003 were unanimously accepted after amendment.

The minutes for the meeting held on January 28, 2003 were unanimously accepted as submitted.

**Bills**
The January invoice from Wilson & Orcutt was approved for payment.

**Town Administrator's report**
Mr. Wrigley informed the Board that he has been contacted by two Lancaster Selectwomen regarding their interest in the possibility of sharing information and viewpoints relative to the FY04 Nashoba Regional School District budget. They are hopeful that the Selectmen and Finance Committees of both towns can corroborate in developing a joint approach to Town Meeting presentations.

Selectman Perry stated that he would be meeting with Lancaster Selectwoman Alix Turner tomorrow in a working session towards that goal.

In speaking with Nancy Fleming, Chairman of the School Building Committee (SBC), regarding the probability of the SBC being prepared to submit a Warrant Article by closing date, he feels that irrespective of whether they have completed their ongoing evaluative work, he will be able to word and article sufficiently broad enough in scope so as to allow a subsequent rewrite prior to going to print. A motion will be available at Town Meeting that will meet the 4-corners test although they may not be ready to offer an actionable item at the Annual Town Meeting.

Mr. Wrigley stated that he received verification of a $41,236 cut in local aide for FY03, which represents just over a 9% reduction. Combined with that cut, Mr. Wrigley informed the Board that he is tacking behind on local receipts after six months in the amount of approximately $35,000. He feels that if this trend in local receipts continues, we will be facing a total year-end revenue short fall of at least $110,000. He recommended that the Town appropriate and transfer a sum of money at the Annual Town Meeting to cover all or a portion of the revenue shortfall.

**Superintendent Search Committee**
Four candidates were in to inform the Board of their interest in being appointed as Stow's representative to the Superintendent Search Committee.

Page 2
February 11, 2003

When asked why she would like to volunteer for this position, Jennifer d'Entremont answered that she has children in the school system would like to try to restore the faith, trust and good will of the teachers and administration that has been lacking recently. She explained that her background is in education and business and has been involved in the community by co-chairing the PTO and as a member of the Pompositticut/Center School council. She also explained that prior to becoming a full-time mom, she worked in contact negotiations at her job. She stated that her time is flexible enough to be available for the meetings involved in this search.

The next candidate, Ellen Sturgis, explained that she would like to see the District move forward after the recent happenings. She stated that her background is in finance management and that she has been involved in the interview and hiring process in the past. She outlined three objectives for hiring a new Superintendent. The first being a well defined job description needs to be in place, followed by communication that has been received by faculty and staff should be included in the hiring process an lastly, we should think about an interim replacement in the event a qualified candidate is not hired prior to the current Superintendent's contract's expiration.

Mrs. Sturgis' desire is to see a strong leader in this position with a background not only in education and business, but finance as well. She explained that she does work mother's hours but feels that she will be able to make all meetings that are scheduled.

Vickery Trinkus-Randall, the third candidate, informed the Board that she has knowledge in grant writing and feels that she can contribute in the search of a new Superintendent, as she was a member of the committee that conducted the Principal search for Center and Pompositticut schools a few years back. She stated she is looking for evidence of a strong academic background for the incoming Superintendent that is aware of the financial situation of the district and will be able to work within the allotted budget.

As the final candidate for the position of the Superintendent Search Committee, Mary Mintz informed the Board that she has been involved in two Superintendent searches in the past, that she is a former school committee member and has been involved in the school system for the past ten years. She stated that she would like to see this position filled by someone that can handle all financial, business and educational issues that are currently before the district.

Selectman Burchfield moved to appoint Vickery Trinkus-Randall as a member of the Superintendent Search Committee. The motion was not seconded.

Selectman Jones moved to appoint Mary Mintz as a member of the Superintendent Search Committee. Seconded by Selectman Farrell. In the discussion on the motion, Selectman Jones offered that Mary was organized and has a good concept of what we are looking for. Both Selectmen Perry and Burchfield stated, although Mary was a very good candidate, that they would like to see a fresh viewpoint. The vote was 2-2 with Selectmen Jones and Farrell voting in favor and Selectmen Perry and Burchfield voting against.

Selectman Jones moved to appoint Ellen Sturgis as a member of the Superintendent Search Committee. Seconded by Selectman Burchfield and voted unanimously without discussion.

Page 3
February 11, 2003

**Audit Advisory Committee**
The Nashoba Regional School District is seeking one member from Stow to serve on the newly formed Audit Advisory Committee. There were two interested candidates for this position.

Pam Glauner, an Associate Member of the Finance Committee, informed the Board that she does have audit experience and is a part-time controller for a company in Clinton. She stated that she deals with auditors and has bid out audits for private companies in the past. Pam feels that this type of committee is a good way to convey some trust back in to the community.

The second candidate, Bill Ross, informed the Board that he has participated in two school audits in the past and has done auditing for Brockton Hospital. He feels that the Audit Committee should be prepared to give a scope of parameters to the auditors chosen to help to avoid any delay in audit process. Mr. Ross explained that he is self-employed and has the time flexibility to serve on this committee.

Selectman Jones moved to appoint Bill Ross to the Audit Advisory Committee. Seconded by Selectman Farrell. Discussion ensued and both Selectman Farrell and Burchfield felt that there was value in appointing a Finance Committee member to represent Stow as a bridge to both the District and the Town. They both felt that both candidates' backgrounds were strong and that either choice would be a good one. The motion carried unanimously.

**Hudson Light & Power Department**
Tony Monteiro, representing Hudson Light & Power Department (HL&PD), was in to inform the Board of a reduction in Stow's municipal lighting rate to take effect on March 1, 2003. Mr. Monteiro informed the Board that Stow will have the same terms as Hudson for municipal lighting rates.

Mr. Monteiro also stated that regarding the P.I.L.O.T. (Payment in Lieu of Taxes), there has been no change in their budget for it and the first payment will be made in March of 2004.

**Wedgewood Pines Country Club**
The application for sale of alcoholic beverages that The Wedgewood Pines Country Club submitted had been approved by the Alcoholic Beverage Control Commission for an all-alcoholic Club license in December. After a brief discussion on the annual fee for this type of license, Selectman Jones moved to charge the same annual fee as the other restaurant licenses in Town of $2,200. Seconded by Selectman Farrell and voted 3-1 in favor with Selectman Perry voting in opposition.

**Right of First Refusal – Kunelius property**
At 9:00pm Selectman Perry re-opened the public hearing on transferring the Town's Right of First Refusal on the Kunelius property.

Craig MacDonnell of the Trust For Public Land (TPL) was present to offer the Board a summary of conditions under which TPL would consider accepting the proposed assignment. Mr. MacDonnell explained that although TPL has not had the opportunity to access the property, he is requesting a recorded vote by the Community Preservation Committee and the Board of Selectmen to support an

Page 4
February 11, 2003

article on the Annual Town Meeting (ATM) warrant to spend Community Preservation Act (CPA) funds for affordable housing and open space. They are also requesting a recorded vote of the Board of Selectmen to support the variance required for the subdivision of the property.

Mr. MacDonnell stated that an agreement in principle that the deeds to the private parcels would include certain provisions and the sales of the properties would be restricted in certain respects. He went on to explain that 142 Red Acre Road would be conveyed subject to a perpetual affordability restriction if the Town votes to spend CPA funds to purchase one and a conservation restriction reasonably limiting the further development of the property. Any sale of the property would be coordinated with a local preference lottery and would be subject to all appropriate law and regulation.

He went on to explain that 144 Red Acre Road would be conveyed subject to a conservation restriction reasonably limiting (a) further development of the property allowed under existing zoning and (b) agricultural and animal husbandry activities that pose direct threats to the aquifer.

Regarding the possibility of a municipal well, TPL will need to negotiate terms of access for purposes of construction, operation and maintenance of future water supply facilities and for the potential development of a water line from the farm pond to a hydrant for purposes of fire suppression that may be developed on the adjacent parcel.

Mr. MacDonnell stated that as a condition of Eye of the Storm buying the parcel at 144 Red Acre Road, a perpetual affordability restriction will be imposed if the Town votes to purchase one.

Selectman Jones moved that the Town not transfer their rights under Chapter 61 to the Trust for Public Land. There was not a second to this motion. No action on the motion.

Selectman Farrell moved that the Town transfer its Right of First Refusal under Chapter 61 to the Trust for Public Land and ratifying the vote taken at the January 28, 2003 meeting. Seconded by Selectman Burchfield. Discussion ensued with Selectman Farrell stating that she feels she represents the interests of the entire community by offering this parcel to TPL. Selectman Burchfield stated that she feels the questions given to TPL by Selectman Perry have been answered to her satisfaction. Selectman Perry stated that he feels that his concerns have been answered and the transfer is the wish of the Town voters. Selectman Jones stated that he feels that transferring the Town's rights unconditionally is not reasonable and is against the idea because of the risks involved. Selectman Perry ended the discussion by saying that TPL is a national entity and feels that this is a risk worth taking. The motion carried by a 3-1 vote with Selectman Jones voting in opposition.

Selectman Burchfield moved that the Board support an article at ATM in which funds from the CPA will be used for affordable housing and open space at 142-144 Red Acre Road. Seconded by Selectman Farrell. The motion carried by majority with Selectman Jones abstaining from the vote.

Selectman Farrell moved to recommend supporting the frontage variance needed to support TPL's plan for division of the property. Seconded by Selectman Burchfield. Discussion ensued and Mr.

Page 5
February 11, 2003

Wrigley suggested that the Board may not want to make a decision to weigh on the deliberation of another Board and that this Board should not ask the Zoning Board of Appeals to recommend or influence their decision on a variance as there is no negotiation on a variance. The motion did not carry with a 1-3 vote with Selectmen Perry, Jones and Burchfield voting in opposition.

Selectman Farrell moved to inform the Zoning Board of Appeals of this Board's approval of the Red Acre Road planned project. Seconded by Selectman Burchfield and carried by a majority vote. Selectman Jones abstained from voting.

Selectman Perry closed the Public Hearing.

**Adjournment**
It was voted unanimously at 10:20pm to adjourn this meeting.

Respectfully submitted,


Paula Bruno
Administrative assistant

EXHIBIT 10

MINUTES
BOARD OF SELECTMEN
JANUARY 7, 2003

Present at the meeting that began at 7:00pm in the Town Building were Selectmen Edward R. Perry, Jr., John Clayton, Jr. Kathleen K. Farrell and Gregory D. Jones. Also present were Town Administrator William Wrigley and Administrative Assistant Paula Bruno. Selectman Shirley A. Burchfield was not present.

**Minutes**
The minutes for the meeting held on December 3, 2002 were accepted as submitted.

Selectman Clayton moved to accept the executive session minutes for the meeting held on January 8, 2002. Seconded by Selectman Jones and voted unanimously.

Selectman Farrell moved to release the executive session minutes for meetings held on February 22, 2001, June 26, 2001, October 4, 2001, November 13, 2001, January 8, 2002 and October 22, 2002. Seconded by Selectman Jones and voted unanimously. The substance of those meetings has been resolved.

**Administrator's Activities Report**

**Nashoba Regional School District**
Mr. Wrigley informed the Board that the Nashoba Regional School District (NRSD) has issued a one year Bond Anticipation Note (BAN), at 3% interest, in anticipation of issuing the $3.8 million deficit bond. He also informed the Board that the NRSD expects to issue five one-year BANs and will then bond for 5 years. They are taking this approach hoping to save interest costs and equalized payments will be made over the ten years, thus making annual principal and interest payments.

Mr. Wrigley has estimated that in FY04, Stow's share off this debt payment will be approximately $168,720 and will attempt to debt exclude this amount at the annual election in May.

As Mr. Wrigley did not get this information directly from the NRSD, he is attempting to confirm these numbers with them.

**Police Dispatcher**
On December 27, 2002, dispatcher Scott Annunziata submitted his resignation to Chief Rebello effective today. He has accepted a similar position with the State Police. Mr. Wrigley, Selectman Clayton, Chief Rebello and Chief Soar will be interviewing experienced and qualified dispatchers for his replacement. Hiring will be as soon as possible.

Page 2
January 7, 2003

**FY04 Budget**
Mr. Wrigley is beginning to develop a budget baseline for FY04 and explained that certain
uncontrollable budget expenditure impacts are known. Those being the NRSD deficit bond
payment of $168,720, which will cause a 2% increase in next year's assessment. The Middlesex
Country Retirement assessment will increase approximately 21% and the group health care
premium will increase 15%.

A decrease in the state aide is expected at yet a determined percentage, which will impact both
the Town and the NRSD. The loss in Chapter 70 money to the NRSD is generally compensated
for by a corresponding increase in the Town's NRSD assessment.

**Middlesex County Retirement**
Selectman Clayton moved to support the proposed legislation to make a statutory change to
Massachusetts General Law 30B Section 19A with regard to the Middlesex Country Retirement.
Seconded by Selectman Jones and voted unanimously.

**Kunelius property**
Craig MacDonnell, Project Manager for the Trust for Public Land (TPL), was present to inform
the Board and the public in attendance how his firm could help the Town acquire the Kunelius
property that is located on Red Acre Road.

Mr. MacDonnell explained that the two houses on the property would be deeded as affordable
housing units in perpetuity, the horse farm and stables would be used to house a non-profit horse
rescue organization and 46 acres would remain with the Town for municipal purposes.

Mr. MacDonnell explained that TPL usually requests 50% of the selling price as the Town's
contribution to facilitate the risk for their undertaking of such a project but went on to explain
that revenues from the selling of the homes and other private donations would lower the Town's
contribution to $400,000. Some of which could possibly come from the Community
Preservation Act under an affordable housing project. He also explained that the Town could
request self-help money from the state to help fund the Town's expense.

If the Board of Selectmen transferred the right of first refusal to the Trust For Public Land, the
TPL would end up owning the property. The Town and TPL would work together to draw up a
deed to include the Town's requirements for their contribution of $400,000.

Stephen Johnson of Mosaic Commons spoke against this proposition by stating that if the
original buyers were to acquire the property, the Town would get those same 46 acres for no
money.

Response to this comment was that the character and cost of services, if a 30-unit development
were to be built, would cost the Town much more in the long run than the monies requested at
this time.

Page 3
January 7, 2003

Selectman Clayton moved to support the efforts of The Trust For Public Land. Seconded by Selectman Farrell. After a brief discussion on the affordable price of roughly $7,000 per acre, by majority vote, this motion passed with Selectmen Clayton, Farrell and Perry voting in favor and Selectman Jones voting against.

**Stow Municipal Electric Department (SMED)**
Selectman Clayton moved to support the motion put forth by SMED for the upcoming Special Town Meeting. Seconded by Selectman Jones and voted unanimously.

It is noted that an argument from an audience member feels that this agreement is less than optimal.

**School Building Committee**
Nancy Fleming, School Building Committee Chair, informed the Board that her committee was not going to request funding for a new school building at Special Town Meeting. Rather they will be requesting additional monies to continue the site evaluation process and do a traffic, water and wastewater study.

Selectman Jones moved to support this motion. Seconded by Selectman Clayton and voted unanimously.

**Adjournment**
It was unanimously voted to adjourn at 9:05pm.

Respectfully submitted,


Paula Bruno
Administrative Assistant