UNITED STATES DISTRICT COURT
(DISTRICT OF MASSACHUSETTS)

CIVIL ACTION NO. 05-11697-GAO

| | |
|---|---|
| MARILYN KUNELIUS,<br>         PLAINTIFF<br><br>V.<br><br>TOWN OF STOW separately, A PARTNERSHIP OF UNKNOWN NAME BETWEEN TOWN OF STOW and THE TRUST FOR PUBLIC LAND, THE TRUST FOR PUBLIC LAND separately and CRAIG A. MACDONNELL, in his individual capacity,<br>         DEFENDANTS. | **PLAINTIFF'S OPPOSITION TO THE TRUST FOR PUBLIC LAND'S AND CRAIG A. MACDONNELL'S MOTION TO STRIKE** |

NOW COMES the Plaintiff, Marilyn Kunelius, with this Opposition to The Trust for Public Land's ("TPL") and Craig A. MacDonnell's ("MacDonnell") Motion to Strike, stating as follows:

The Plaintiff respectfully suggests that the Motion to Strike demonstrates a level of desperation by the Defendants. Indeed most, if not all, of the objections are to documents produced by TPL, or to documents where TPL has waived any objections.

1.     TPL and MacDonnell moved the Court to strike page 110, line 4 through line 9 of Serena Furman's deposition testimony concerning TPL's conduct. TPL alleges that Ms. Furman's deposition is irrelevant, conclusory statement, impermissible lay opinion and that Ms. Furman is not qualified as expert. (See Furman deposition, Exh. D to Plaintiff's Summary Judgment Motions ("Plaintiff's SJM"), Exh. JJ to Plaintiff's Memorandum in Support of Plaintiff's SJM ("Plaintiff's Memorandum")).

The testimony of Ms. Furman deals specifically with her rationally based perceptions of the inappropriate behavior of TPL and MacDonnell. The objected to language of Ms. Furman testimony is:

> "[I]t seemed to me very wrong that they made the promised they did to the town and they went back on it, and it is not – as business person might under his legal right but not it behaving as non-profit does."

(See Furman deposition, pg. 110, ln. 4 – ln. 9, Exh. JJ to Plaintiff's Memorandum). Indeed, Ms. Furman's perception, as reflected by her testimony, is not "expert opinion" at all. She is referring to her perception of what is right and wrong and her understanding that TPL made promises and then reneged on those promises. Rule 701 states:

> "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

(See Fed. R. Ev. Rule 701). Rule 701 abandons the common law's normally rigid approach to lay testimony, opting for a more pragmatic rule. It is designed to insure that the jury is presented with testimony in the form most likely to help it resolve contested issues. While jurors will often benefit from hearing the witness relate concrete details, sometimes they will be aided by hearing a lay witness relate his conclusions. Therefore, Rule 701 allows a lay witness to testify in the form of an opinion or inference when the opinion or inference (1) is rationally based on the witness's perception and (2) would help the factfinder to understand clearly the testimony or determine a fact in issue. … Numerous cases exist in which federal courts have permitted lay witness to offer their opinions. Among the range of opinions admitted are:

- An opinion that a truck driver was "in total control" when his truck was struck. <u>Robinson v. Bump</u>, 894 F.2d 758, 762-63 (5th Cir. 1990), cert. denied, 498 U.S. 111 S.Ct. 73, 112 L.Ed.2d 46 (1990).

- An opinion that a developer never intended to carry out promises made to purchasers. <u>Winant v. Bostic</u>, 5 F.3d 767, 772-73 (4th Cir. 1993). …

- An opinion concerning another person's knowledge. <u>United States v. Anderskow</u>, 88 F.3d 245, 250-51 (3d Cir. 1996), cert. denied, 519 U.S. 1042, 117 S.Ct. 613, 136 L.Ed.2d 537 (1996). …

- An opinion that a person is sane or insane. <u>United States v. Anthony</u>, 944 F.2d 780, 782-83 (10th Cir. 1991). Note that lay witness testimony is not subject to Rule 704(b)'s ban on ultimate issue opinions relating to a criminal defendant's mental state or condition.

(<u>See</u> Courtroom Handbook on Federal Evidence 2007, Authors' Comments, pg. 408, 409 and 410). This statement of Ms. Furman is rationally based on the perception by Ms. Furman of the objectionable behavior of a non-profit entity. The Plaintiff asks this Court to overrule this objection.

    2.    TPL and MacDonnell moved the Court to strike the letter of Jacob Diemert (the "Diemert Letter"), counsel for the Town of Stow (the "Town") as hearsay. (<u>See</u> Exh. I to Plaintiff's SJM and Exh. ZZZ to Plaintiff's Memorandum). The Diemert Letter was sent to Ross Perry, the Chairman of the Board of Selectmen, and to the Town Administrator in which Attorney Diemert informs the Town of the likelihood of legal problems arising out of the Town's Assignment of the Right of First Refusal (the "ROFR") to TPL. The Diemert Letter predates the date of the Assignment and

specifically warns the Town that the Town would likely be liable for the default of TPL. Certainly, the former Chairman of the Board of Selectmen acknowledged receiving this letter. (See Perry deposition, Exh. K to Plaintiff's SJM, pg. 136, ln. 20 – ln. 220). To suggest that the letter is hearsay denies that, in fact, it is a statement of Town Counsel as a representative of the Town. As such, the Court may determine that the letter is a Party Admission by an authorized agent or employee of the Town concerning the fact that the Town was aware that it would likely need indemnification because of a likely default by TPL. Rule 801(d)(2).

> "An attorney's statement in the course of representing a client
> may be admissible against the client as an agent admission under
> Rule 801(d)(D).  United States v. GAF Corp., 928 F.2d 1253, 1259
> (2d Cir. 1991)."

(See Courtroom Handbook on Federal Evidence 2007, Authors' Comments, pg. 451). There is little doubt as to why TPL attempts to exclude the Diemert Letter. There is also no doubt that the Defendants have waived any objection with regard to this issue. The Diemert letter was used by the Plaintiff and relied on in her Memorandum In Opposition to TPL's Motion to Quash an In Support of Plaintiff's Motion for Sanctions. (See Exhibit G to Plaintiff's Memorandum in Opposition to TPL's Motion to Quash an In Support of Plaintiff's Motion for Sanctions (Doc. #39)). In addition, it was used in depositions of Ross Perry without objection as to any authenticity or hearsay.

Equally important is the fact that a subsequent document provided by TPL in discovery specifically referred to the admission made in the Diemert Letter. Exhibit WWW to Plaintiff's Memorandum is an email from Ross Perry, Chairman of the Board of Selectmen, to MacDonnell of TPL. In that email Perry specifically asks MacDonnell to help to formulate an answer that Perry can give the citizens of the Town as to why the

4

Board of Selectmen disregarded Attorney Diemert's statements and failed to obtain the indemnification urged by Attorney Diemert. That email and its specific reference to the statement of Attorney Diemert is more than sufficient to justify the document itself as a business record and a public record regularly made and kept by the Board of Selectmen.

    3.    TPL and MacDonnell move this Court to strike Exhibit DD of Plaintiff's Memorandum (*The Beacon Villager* article) alleging that it is hearsay. Rule 902 entitled "Self-Authentication" states that extrinsic evidence of authenticity as condition precedent to admissibility is not required with respect to "(6) Newspapers". Certainly, MacDonnell's interview with the newspaper is the present sense impression describing what he had told the Town immediately after he said it. In addition, MacDonnell's testimony is a party admission as it relates to MacDonnell, individually, and his employer TPL. (See Fed. R. Ev. Rule 801(d)(2)).

> "'By reprinting the newspaper articles and distributing them to persons with whom defendants were doing business, defendants unequivocally manifested their adoption of the inflated statements made in the newspaper article.' Wagstaff v. Protective Apparel Corp., 760 F.2d 1074, 1078 (10th Cir. 1985). … University president's acceptance of grievance committee's report and his implementation of its recommendations without disclaimer served as a adoption of the report. Pilgrim v. Trustees of Tufts College, 118 F.3d 864, 870 (1st Cir. 1997)."

(See Courtroom Handbook on Federal Evidence 2007, Authors' Comments, pg. 449). It must be noted that TPL provided Exhibit DDD in its discovery. Thus, there can be no doubt that TPL was actively involved in re-printing the article. The Plaintiff notes that it T has TPL's bates stamp designation TPL-KUN01488. The Plaintiff asks the Court to overrule this objection.

    4.    TPL and MacDonnell move this Court to strike Exhibit 6 to the Complaint, which is a Memorandum by Mr. Gregory Jones, a member of the Board of

Selectmen (the "Jones Memorandum"), stating that Exhibit 6 to the Complaint is irrelevant and not properly authenticated. The Defendants are well aware that the "Jones Memorandum" was authenticated by its author Mr. Jones. (See Jones deposition, pg. 36, ln. 10 – ln. 23, attached hereto as Exhibit A). Certainly, the Defendants' counsel was at Mr. Jones' deposition and was aware that the document was authenticated by Mr. Jones.

TPL and MacDonnell assert that the "Jones Memorandum" is not relevant. The Jones Memorandum states, among other things, that:

(1) The Town does not want to find out that it has legal liability;

(2) "TPL has the assets to make good on the transaction";

This demonstrates and confirms that TPL told the Town that it had the funds.

(3) TPL "reneged" on its promises to Ms. Kunelius;

(4) The contract was breached by TPL;

(5) Ms. Kunelius was harmed by the Board of Selectmen's action;

(6) Ms. Kunelius was harmed by TPL's action;

(7) The Town had committed to contribute $400,000 to the deal; and

(8) The actions of many could be interpreted as implying that the Town was a partner in the deal.

(See Exh. 6 to the Complaint, the Jones Memorandum, first paragraph). To suggest that Exhibit 6 to the Complaint is not relevant is absurd. It demonstrates that, at least one member of the Board of Selectmen, believed that 1-8 above are true and as such, the Jones' Memorandum may be deemed to be a party admission and a public record. Certainly, it is a "Party Admission" concerning the Town's actions and the harm caused by the Town and TPL to Ms. Kunelius. It also demonstrates that the author was aware of

6

the potential implications of TPL doing business with the Town. Those admissions are relevant to each Count in the Plaintiff's Complaint. A review of Rule 401 which defines relevant evidence indicates that:

> "Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence."

(See Fed. R. Ev. Rule 403). Certainly, it cannot be said that the admissions and statements in the document and the probative value thereof could be outweighed by the danger of unfair prejudice, confusion of the issue, or misleading the jury. (See Fed. R. Ev. Rule 403). Since Rule 403 calls for weighing or balancing judgment, its application necessarily involves the exercise of the trial court's discretion.

> "In weighing the probative value of evidence against the dangers and considerations enumerate in Rule 403, the general rule is that the balance should be struck in favor of admission." United States v. Dennis, 625 F.2d 782, 797 (8th Cir. 1980). … Courts have characterized Rule 403 as an extraordinary remedy to be used sparingly because it permits the trial court to exclude otherwise relevant evidence." United States v. Meester, 762 F.2d 867, 875 (11th Cir. 1985) (citing many other cases), cert. denied, 474 U.S. 1024, 106 S.Ct. 579, 88 L.Ed.2d 562 (1985)."

(See Courtroom Handbook on Federal Evidence 2007, Authors' Comments, pg. 253). The Plaintiff asks the Court overrule this objection.

5.   TPL and MacDonnell moved this Court to strike an Appraisal Letter (Exhibit DD to Plaintiff's SJM, Exh. J to Plaintiff's Memorandum). The letter in question is part of an Appraisal undertaken by the author of the letter who was engaged by MacDonnell and/or TPL. As the Court is aware, MacDonnell and TPL have asserted to this Court that the Plaintiff has failed to demonstrate damages. As a component of the Defendants' argument, the Defendants assert that the Plaintiff should have sold the Property for specific amounts. The Defendants further assert that the Property was not

7

worth the $1,116,900 required in the P&S. Further, and perhaps most importantly, MacDonnell and TPL assert in their Proposed Statement of Undisputed Facts, that the purchase price was for the entire 50 acre parcel rather than only for 8.57 acres.

The Appraiser letter was produced by TPL and bears its bates stamp number and needs no authentication. More importantly, it clearly is an admission by an agent of TPL as to the exact statements made to that agent by TPL and that the statements were made to the agent by TPL and the admissions were made to the agent by TPL in the course of his employment. (See Fed. R. Ev. Rule 801(d)(2)). In order for the appraiser to give the appraisal, as a matter of his engagement and scope of employment, the appraiser outlined for TPL the scope of TPL's instructions upon which the appraiser undertook the appraisal. As a result, the letter is part of business record regularly made and kept by the appraiser and by TPL. (See Fed. R. Ev. Rule 803). The above document has significant probative value with regard to TPL's understanding that the P&S terms were intended to sell only the 8.57 acres. It has probative value with regard to the unfair and deceptive business practices of TPL in attempting to force Ms. Kunelius to abandon the terms of the P&S as it relates to price and acreage. In fact, the Defendants wish to have the document excluded because it dispositively demonstrates that their attempts to avoid the P&S terms were outrageous and they simply do not want a jury to understand their deliberate disregard of the contract terms. The Defendants fear that the admission of the document would sway a jury concerning the Defendants' bad faith. However, Rule 403 does not provide a shield for a defendant who acts outrageously. (See United States v. Gatmon, 146 F.3d 1015, 1021 (D.C. Cir. 1998)). The Plaintiff asks this Court to overrule this objection.

6. TPL and MacDonnell moved this Court to strike page 151, line 21 through page 152, line 6 of Serena Furman deposition (Exh. D to Plaintiff's SJM, Exh. JJ to Plaintiff's Memorandum) stating that the Furman deposition testimony is not based on personal knowledge. Her testimony involved a specific document authored by herself and others. The document in question was authenticated by Furman as being sent by her, her husband Peter Christianson, Erica Nilsson, Michael Labosky, Karen Sommerlad, David Cobb (together referred to as the Friends of Red Acre ("FORA")). (See Exh. D to Plaintiff's SJM, pg. 151, ln. 10 – ln. 18). To suggest that, she has no personal knowledge, is completely without merit since she authenticated that it came from her and others. Therefore, the Plaintiff is at loss as to why there is any objection against this document based on lack of personal knowledge. The Plaintiff asks this Court to overrule this objection.

7. TPL and MacDonnell moved this Court to strike FORA Letter, TPL-KUN1621-1622 (Exh. EEE to Plaintiff's SJM, Exh. FF to Plaintiff's Memorandum) stating that the letter is hearsay. This document has been submitted by the Plaintiff to demonstrate that, a minimum the Town, through its Chairman of the Board of Selectmen, had been informed by FORA that TPL had instructed FORA not to fundraise. This letter establishes that the Town through its Chairman of its Board of Selectmen, Ross Perry, was aware that the stated "weakness in fundraising" used by TPL to justify its default was false, misleading and deceptive. It is clear that TPL and the Town were informing virtually everyone, including this Court that the FORA members were working in partnership with TPL allegedly to raise funds. The disclosure by FORA of the fact that TPL decided not to raise funds is probative of the Plaintiff's argument that TPL and the

Town were working together to defeat the Plaintiff's P&S without ever having to purchase the Plaintiff's Property. Clearly, the Town, having understood that TPL was not fundraising, would have been expected to attempt to force TPL to comply with its obligation and purchase the Property. However, the Town did nothing. The Hearsay exception for public records, of which this document is one, would most certainly apply. In addition, for the purposes of this document, it is undisputed that TPL and MacDonnell informed the world, including the Commonwealth of Massachusetts, that FORA was acting as TPL's agent in raising local funds. TPL has repeatedly, in this litigation referred to the "failure of local fundraising". As such an authorized statement by FORA as an agent of TPL, for the purpose of fundraising is not hearsay under Rule 801(d)(2). The Plaintiff asks this Court to overrule this objection.

8.    TPL and MacDonnell moved this Court to strike an email of Peter Christianson of FORA, Furman0087-89 (Exh. FFF to Plaintiff's SJM, Exh. EE to Plaintiff's Memorandum) stating that the email is hearsay. This document has been submitted by the Plaintiff to demonstrate that, a minimum, the Town through its Chairman of the Board of Selectmen had been informed by FORA that TPL had instructed FORA not to fundraise. This letter establishes that the Chairman of the Board of Selectmen, Ross Perry was aware that the stated "weakness in fundraising" used by TPL to justify the default was false, misleading and deceptive. In addition, Furman0087-89 is a correspondence between the members of FORA informing the membership of Peter Christianson's business dealing with TPL and MacDonnell. It informs the members that MacDonnell and TPL had already misused several of the contacts provided by Christianson in order for TPL to raise funds on other projects while at the same time

telling TPL's staff to hold off on fundraising on the Kunelius Project. It clearly indicates that Christianson felt "raped" by the outrageous behavior of TPL. It is also a document indicating FOR A's intention in going forward in fundraising and its understanding of the level of deceit by TPL. Equally important is that fact that it demonstrates that McDonnell may well be attempting to give the Project a "poison pill". Given the repeated statements by TPL that it was working in partnership with FORA, it is most certainly clear that the Christianson's email is an admission by someone authorized by TPL to act as its agent in fundraising. Indeed, the following are some references that FORA was acting as partner to TPL.

> "It is our [FORA's] intention to have the Town assign its right of first refusal for this parcel to non-profit conservation organization, which would work in **partnership with our community organization** [FORA] and the Town *in order to purchase the land and preserve it*. If you will work with us [FORA] on this urgent effort, we [FORA] believe we can achieve these goals **while imposing little or no cost on the town**."

(emphasis added)(See Exh. BBBB to Plaintiff's Memorandum, TPL-KUN01309). The above quote from a December 17, 2002 letter of a FORA's member to Stow Conservation Committee indicates FORA's intention to participate in TPL's fundraising efforts. Ross Perry, the Chairman of the Board of Selectmen, understood that FORA was fundraising for TPL and wrote to TPL on February 25, 2003 the following:

> "Why did the Selectmen put the town at risk to pay the full $1.2M if TPL defaults? I can take the heat, and still support our decision. **It will be up to TPL & FORA** to be sure I (and the town) don't regret this move."

(emphasis added)(See Exh. WWW to Plaintiff's Memorandum, TPL-KUN02586, Ross Perry February 25, 2003 letter to TPL). The above indicates that the Town perceived FORA and TPL as partners in fundraising. If this is not a clear example that FORA was an agent of TPL.

11

> "**They** [TPL] **already used several of the contacts that I** [Peter Christianson of FORA] **provided** for other [TPL's] projects while at the same time telling their [TPL's] staff to hold off on fund raising for this project [for the purchase of the Plaintiff's property]. I feel raped. The false paradigm here is that they are implying that **they** [TPL] **are limited to the prospect pool I generated**. The fact is that there are plenty of more prospects, and they need to identify and solicit them."

(emphasis added)(See Exh. EE to Plaintiff's Memorandum, July 23, 2003 email of Peter Christianson to FORA, bates # Furman0087, first and fourth paragraphs). As can be seen by the above quote, it is difficult to understand why Peter Christianson of FORA would provide TPL with names and addresses of sources of fundraising unless he understood that he was the agent of TPL in TPL's fundraising efforts to purchase the Property. This is further demonstrated by TPL's use of those contacts on other projects and its alleged limitation of fundraising on Christianson's contact list. Thus, Peter Christianson's email (Exh. FFF to Plaintiff's SJM, Exh. EE to Plaintiff's Memorandum) is clearly a party admission that goes to the very heart of TPL's and MacDonnell's bad faith. The Plaintiff asks this Court to overrule this objection.

9. TPL and MacDonnell moved this Court to strike ¶¶2(d), 3, and 8 of the Plaintiff's Affidavit alleging that the Plaintiff's Affidavit is not based on personal knowledge and that it is impermissible lay opinion. (See Exh. E to Plaintiff's SJM, Exh. G to Plaintiff's Memorandum, Affidavit of Kunelius, pg. 2, ¶¶2(d) and 3 and pg. 4, ¶8).

The Affidavit of Kunelius deals specifically with her rationally based perceptions of the inappropriate behavior of TPL and MacDonnell. Indeed, Ms. Kunelius' perception, as reflected by her testimony, is not "expert opinion" at all. While it is not clear whether the Defendants are asserting the Affidavit of Kunelius is expert in nature, it is clear from the review of paragraphs in question that they reflect Ms. Kunelius' thought process when she elected to accept the terms of the P&S from the original buyer. It is

undisputed that c. 40B largely removes zoning permits, special permits and variances from the approval process. Ms. Kunelius' understandings with regard to same are intended only to establish why she accepted the offer. As to paragraph 3 of Ms. Kunelius' Affidavit, it is unclear why the Defendants have any valid objection. Paragraph 3 states that Ms. Kunelius never heard of TPL and had no idea what TPL's goals were. These statements run directly to the issue of whether the parties to the P&S could have reasonably anticipated the facts in the existing litigation concerning TPL's intention to change the purchase price, acreage and other components of the P&S where such changes were never anticipated by Ms. Kunelius. Paragraph 3, considering with the admission of TPL that, Ms. Kunelius could never have anticipated TPL's actions demonstrates that there is no genuine issue of fact as to this issue. As to paragraph 8, the Plaintiff again asserts that there is no reasonable basis for their objection. Paragraph 8 refers to the fact that Ms. Kunelius learned from her Attorney that TPL sought to change virtually every major component of the P&S after TPL exercised the ROFR. To suggest that this is not based on personal knowledge is ridiculous. In addition, Ms. Kunelius, who counted the Property as her only asset, has stated that she would never have accepted the offer of Cohousing if the offer was contingent on variances and permits from the Zoning Board of Appeals, since she did not believe that such variances and permits could be obtained. This belief was ultimately verified by TPL who attempted to escape the liability under the P&S by blaming their failure on the fact that they could not obtain such permits for its revised plan for the Property.

Rule 701 abandons the normally rigid approach to lay testimony, opting for a more pragmatic rule. It is designed to insure that the jury is presented with testimony in

the form most likely to help it resolve contested issues. While jurors will often benefit from hearing the witness related concrete details, sometimes they will be aided by hearing a lay witness relate his conclusions. Therefore, Rule 701 allows a lay witness to testify in the form of an opinion or inference when the opinion or inference (1) is rationally based on the witness's perception and (2) would help the factfinder to understand clearly the testimony or determine a fact in issue. … Numerous cases exist in which federal courts have permitted lay witness to offer their opinions. Among the range of opinions admitted are:

- An opinion that a truck driver was "in total control" when his truck was struck. Robinson v. Bump, 894 F.2d 758, 762-63 (5th Cir. 1990), cert. denied, 498 U.S. 111 S.Ct. 73, 112 L.Ed.2d 46 (1990).

- An opinion that a developer never intended to carry out promises made to purchasers. Winant v. Bostic, 5 F.3d 767, 772-73 (4th Cir. 1993). …

- An opinion concerning another person's knowledge. United States v. Anderskow, 88F.3d 245, 250-51 (3d Cir. 1996), cert. denied, 519 U.S. 1042, 117 S.Ct. 613, 136 L.Ed.2d 537 (1996). …

- An opinion that a person is sane or insane. United States v. Anthony, 944 F.2d 780, 782-83 (10th Cir. 1991). Note that lay witness testimony is not subject to Rule 704(b)'s ban on ultimate issue opinions relating to a criminal defendant's mental state or condition.

(See Courtroom Handbook on Federal Evidence 2007, Authors' Comments, pg. 408, 409 and 410).

> "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on

>     the perception of the witness, (b) helpful to a clear
>     understanding of the witness' testimony or the determination of a
>     fact in issue, and (c) not based on scientific, technical, or
>     other specialized knowledge within the scope of Rule 702."

(See Fed. R. Ev. Rule 701). It is clear that the testimony reflected in the objected to paragraphs is simply the rationally based perception of the witness and are helpful to her understanding and of the facts in issue. The Plaintiff asks this Court to overrule this objection.

10. TPL and MacDonnell moved this Court to strike ¶¶8 and 11 of the Affidavit of Peter Kachajian alleging the statements in Mr. Kachajian's Affidavit are Hearsay. (See Exh. H to Plaintiff's SJM, Exh. H to Plaintiff's Memorandum, Affidavit of Kachajian, pg. 4, ¶¶8 and 11). Paragraph 8 indicates that he spoke with Town Counsel regarding the fact that TPL wanted to strip Ms. Kunelius of the charitable deduction anticipated in the P&S. Paragraph 8 also states that Attorney Diemert stated that he found TPL's position unacceptable. These statements are party admissions by an authorized agent, i.e. the attorney for the Town. (See Fed. R. Ev. Rule 801(d)(2)). The statement is a present sense impression describing his impressions of the nature of the demand by TPL when the demands were taking place. Paragraph 11 of Kachajian Affidavit refers to an admission of a party opponent. While paragraph 11 does not specifically states who was speaking for the Town, the statement is not hearsay because of that fact. The Town is a party to this litigation and Attorney Kachajian as attorney for the Plaintiff for all appropriate times in question can testify as to the statements of the opposing party with regard to admissions or intentions under Rule 801(d)(2). The Plaintiff asks this Court to overrule this objection.

                                                Respectfully submitted,

                                                Marilyn Kunelius,

                                                By her Attorney,

Dated: November 26, 2007   By:   */s/ Michael C. McLaughlin*
                                                          Michael C. McLaughlin BBO# 337350
                                                          Law Offices of Michael C. McLaughlin
                                                          One Beacon Street, 33rd Floor
                                                          Boston, MA 02108
                                                          617-227-2275
                                                          michaelcmclaughlin@speakeasy.net


## CERTIFICATE OF SERVICE

     I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on November 26, 2007.

                                                          */s/ Michael C. McLaughlin*
                                                          Michael C. McLaughlin


## CERTIFICATION UNDER LOCAL RULES 7.1

     I, Michael C. McLaughlin, certify that on November 26, 2007, I conferred with opposing counsel and have attempted in good faith to resolve and narrow the issue.

                                                          */s/ Michael C. McLaughlin*
                                                          Michael C. McLaughlin

# EXHIBIT A

**DEPOSITION OF GREGORY D. JONES**                                                                MINIDEP by Kenson

Volume: I
Pages: 1-195
Exhibits: 16

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11697-GAO

MARILYN KUNELIUS,
        Plaintiff,

v.

TOWN OF STOW, separately,
A PARTNERSHIP OF UNKNOWN NAME
BETWEEN TOWN OF STOW and THE
TRUST FOR PUBLIC LAND, THE
TRUST FOR PUBLIC LAND, separately,
and CRAIG A. MacDONNELL, in his
individual capacity,
        Defendants.

    DEPOSITION of GREGORY D. JONES, a witness called by and on behalf of the Plaintiff, taken pursuant to Fed.R.Civ.P. 30, before Roberta J. Daniels, a Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Law Offices of Michael C. McLaughlin, One Beacon Street, Boston, Massachusetts 02108, on Monday, March 5, 2007, scheduled to commence at 12:00 P.M.

INDEX

| Witness | D | C | RD | RC |
|---|---|---|---|---|
| GREGORY D. JONES | | | | |
| By Mr. McLaughlin | 6 | | | |
| By Mr. Conroy | | 187 | | |

- 3 -

APPEARANCES

Michael C. McLaughlin, Esquire
Law Offices of Michael C. McLaughlin
One Beacon Street
Boston, Massachusetts 02108
    Counsel for the Plaintiff

Deborah I. Ecker, Esquire
Brody Hardoon Perkins & Kesten, LLP
One Exeter Plaza
Boston, Massachusetts 02116
    Counsel for Defendant Town of Stow

Dahlia S. Fetouh, Esquire
Richard A. Oetheimer, Esquire
Goodwin Procter, LLP
Exchange Place
Boston, Massachusetts 02109
    Counsel for Defendant The Trust for Public Land

James B. Conroy, Esquire
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd floor
Boston, Massachusetts 02108
    Counsel for Defendant Craig A. MacDonnell

Also present:
Lucie DeBellis, Paralegal
Law Offices of Michael C. McLaughlin

Marilyn Kunelius, Plaintiff
David Norris, Husband of the plaintiff

Craig A. MacDonnell, Defendant

EXHIBITS

| No. | Description | Page |
|---|---|---|
| 1 | Notice of deposition | 5 |
| 2 | TPL letter to Perry, 2-11-03 | 22 |
| 3 | Stow letter to Kunelius, 2-12-03 with assignment and acceptance | 27 |
| 4 | Application for DHCD funding | 30 |
| 5 | Kunelius Property Workout | 36 |
| 6 | Diemert letter to Wrigley, 2-10-03 | 48 |
| 7 | Jones email to Wrigley | 62 |
| 8 | DRAFT conditions for transfer of right of first refusal | 103 |
| 9 | Kachajian email to Perry, 2-4-03 | 115 |
| 10 | Kachajian letter to Farrell, 9-12-03 | 131 |
| 11 | Perry letter to Kachajian, 9-24-03 | 136 |
| 12 | Stow notice of intent to DHCD, 9-23-03 | 157 |
| 13 | Kachajian undated letter to Stow | 169 |
| 14 | ZBA minutes | 171 |
| 15 | MacDonnell email to Perry/Wrigley, 4-17 | 176 |
| 16 | Friends of Red Acre letter to Stow, 6-6-03, with attachment | 178 |

- 4 -

---

Village.

Q And when you say fairly significant, it was a very high water production, had a very high water production value, didn't it?

MS. FETOUH: Objection.
MR. CONROY: Objection.

A That's what people told me. I know nothing about water supply, so it could have been a zillion, and I could be wrong. I have no idea, but certainly the assertion was made that it would be perfectly sufficient for the Lower Village, the issue being the impurities would have to be removed.

Q And was that generally known, that Mrs. Kunelius' property contained this kind of potential water supply?

MS. FETOUH: Objection.

A It was known, yes.

Q And when I say generally known, I'm talking about the Board of Selectmen and the general abutters, that sort of thing.

A Certainly the Board of Selectmen knew. We walked the property and physically went out to the well site, and, you know, if they didn't know, then they were denying it.

- 35 -

---

Q Did you have concerns about the fact that there was a partnership developing between The Trust for Public Land and the Town of Stow with regard to the effort to acquire the property from Mrs. Kunelius, and you objected to that partnership?

MS. ECKER: Objection.
MS. FETOUH: Objection.
MR. CONROY: Objection.

A I don't recall objecting to that partnership.

Q Did you have fears that a partnership was being developed and you were concerned about whether the Town of Stow would be sued concerning that partnership?

A Well, at a certain point, I put a proposal to the selectmen that, in the background for that, there was the possibility of a lawsuit. So, yes, I had concerns about that.

(WHEREUPON, Exhibit No. 5, Kunelius Property Workout, marked for identification.)

Q I've put before you Exhibit 5, which is entitled, "Kunelius Property Workout," and I would ask you if this is the document you referred to?

A Yes.

Q I note that Exhibit 5 does not have a Bate stamp

- 36 -

---

number on it. Do you recall whether this document was handed out by you to people at a hearing before the Board of Selectmen when you made this presentation to the board?

A I have no specific recollection. I do have a copy of this on my word processing system at home, and I was the author of it. I believe, generally, when I worked up something like this, I distributed it to people so that they'd have the background. I probably, verbally, discussed all this before we considered it.

Q I will represent to you that this document is not contained anywhere in the documents of the Board of Selectmen that were provided to us by the Town of Stow, and I'm wondering whether you would have any idea of where this document would have been had it been provided to the Board of Selectmen during the time of your hearing. Where would they keep such a document?

MR. CONROY: Objection.
MS. ECKER: Objection.
MS. FETOUH: Objection.

A Okay. If I had done this in time to be in part of the packet that was sent out to the selectmen, it might have -- I believe the packet information is considered

- 37 -

---

part of the information that's an official part of the record of a meeting. It could well be that I hadn't done it in time and I simply brought it to the meeting itself. acreage

Q I'm going to just go back to Exhibit 4 for a few minutes and just follow up on Exhibit 4. I would like you to look at Page KUN342 under Financing Mechanism, about in the middle of the page, and the second paragraph after Item 1, Financing Mechanism, is a paragraph that reads as follows: TPL is prepared to purchase the property. TPL has a primary plan and a fallback plan. The primary plan envisions a multilateral funding approach to this project. Some of the funding is contingent as explained below, but all of it is subject to a fallback line of credit from Wainwright Bank. Do you see that?

A I see it.

Q Had you ever heard of a fallback line of credit from Wainwright Bank prior to today?

A No.

Q Continuing down, it says: TPL's primary plan is to generate funds necessary for the closing.

And it lists four areas in which they were going to raise money, one from the Town of Stow

- 38 -

---

contribution, 300,000, sale of Red Acre Road, 144 Red Acre Road, 400,000, DHCD funding, 250,000, and private fund-raising, 200,000. Is today the first time that you have seen that breakdown of what TPL and the Town of Stow were telling the Department of Housing and Community Development as to the sources of funds that were going to be used for the acquisition of the property from Mrs. Kunelius?

MS. FETOUH: Objection.
MR. CONROY: Objection.

A Since I hadn't seen the application to the DHCD, I didn't know that -- in the context that you're talking about, the answer is, no, I have not seen those before, but, in general, the financing was talked about, around.

Q But you didn't even know there was an application itself. Is that fair to say?

A I don't recall, but, you know, up till this point, you've been asking me was I involved in the preparation for it. I probably was aware that it was going on, but, you know.

Q You don't recall right now?

A No.

- 39 -

---

Q Looking on the second page, the next page, rather, 343, the first full paragraph, it says: As a fallback plan, if any or all of the above-referenced sources of funds are unavailable, TPL intends to use capital from the private market. In this regard, TPL has available for its use a line of credit from Wainwright in the amount of six million dollars as evidenced by the letter attached as Exhibit -- blank. The use of this capital is subject to TPL's internal approval process, including customary due diligence and approval by the Board of Directors.

Now, earlier, you had said that your understanding was that they were having trouble with fund-raising and that's why they didn't purchase the property from Mrs. Kunelius. Do you recall saying that was your understanding?

A Uh-huh.

MS. ECKER: Objection.
MS. FETOUH: Objection.

Q And your answer is yes on that?

A I recall saying that, yes.

Q Now, this paragraph that I just read to you on 343 states that if any or all of the above-referenced sources of funds are unavailable, TPL intends to use

- 40 -