UNITED STATES DISTRICT COURT
(DISTRICT OF MASSACHUSETTS)

CIVIL ACTION NO. 05-11697-GAO

MARILYN KUNELIUS,

PLAINTIFF,

V.

TOWN OF STOW separately, A
PARTNERSHIP OF UNKNOWN NAME
BETWEEN TOWN OF STOW and THE
TRUST FOR PUBLIC LAND, THE
TRUST FOR PUBLIC LAND separately
and CRAIG A. MACDONNELL, in his
individual capacity,

DEFENDANTS.

**PLAINTIFF'S OPPOSITION TO THE
TRUST OF PUBLIC LAND'S, CRAIG
A. MACDONNELL'S, AND THE
TOWN OF STOW'S SUMMARY
JUDGMENT MOTIONS**

Leave to file 42 pp. memorandum granted
on February 12, 2008 Nunc Pro Tunc

NOW COMES the Plaintiff, Marilyn Kunelius, under Fed. R. Civ. P. 56(c) with this

combined Opposition to The Trust of Public Land's ("TPL") and Craig A. MacDonnell's

("MacDonnell"), and the Town of Stow's ("Stow") Summary Judgment Motions.  The

Plaintiff relies on and incorporates by reference herewith her Memorandum in Support of

her Motions for Summary Judgment and further states the following:

### MOTIONS FOR SUMMARY JUDGMENT SHOULD BE DENIED

Throughout the TPL's and MacDonnell's[1] Memorandum (collectively referred to

as "TPL's Memorandum"), TPL and MacDonnell assert no less than thirteen (13) times

that there is "no evidence" to support the Plaintiff's various Counts.  In light of the

extraordinary evidence by way TPL's own documents and admissions, it is worth listing

---

[1] TPL and MacDonnell in their Memorandum referred to themselves collectively as the "TPL Defendants".
The Plaintiff asserts that TPL and MacDonnell are different Defendants and therefore the Plaintiff will
continue to distinguish between TPL and MacDonnell.

for the Court the assertions by TPL and MacDonnell that no evidence exists.  Those assertions are as follows.

1. "Plaintiff has **no factual or legal support** for the other claims she has brought arising out of the same transaction".  (emphasis added)(<u>See</u> TPL's Memorandum, pg. 1).

2. "…[S]he [the Plaintiff] has not shown…that she is entitled to any remedy beyond what she has already received …" (<u>See</u> TPL's Memorandum, pg. 4).

3. "…[S]he [the Plaintiff] has failed to prove the necessary elements of a claim under either section and therefore summary judgment should be granted in favor of TPL on Count II".  (<u>See</u> TPL's Memorandum, pg. 15).

4. "However, **there is no evidence** of that, or that TPL intended to deceived Plaintiff or any one else about its ability to close". (emphasis added)(<u>See</u> TPL's Memorandum, pg. 17).

5. "[S]he [the Plaintiff] **has no evidence** of any unfair and deceptive act". (<u>see also</u> TPL's Memorandum, pg. 18).

6. "But Count III also fails because Plaintiff **has failed to show the existence of any partnership** between Stow and TPL". (emphasis added)(<u>See</u> TPL's Memorandum, pg. 18).

7. "…[**T**]**here is no evidence to establish any partnership in fact**.  **There is no evidence** that there was an express written or oral agreement between the Town and TPL…". (emphasis added)(<u>See</u> TPL's Memorandum, pg. 19).

8. "…[**T**]**here is no evidence** to establish any element of partnership by estoppel…".  (emphasis added)(<u>See</u> TPL's Memorandum, pg. 20).

2

9.  "…[**T**]**here is no evidence** TPL acted in any way other than to exercise a legal right".  (emphasis added)(See TPL's Memorandum, pg. 21).

10.  "Plaintiff has **adduced no facts to demonstrate** that TPL and MacDonnell' "primary" purpose in accepting assignment of the right of first refusal was to cause her injury". (emphasis added)(See TPL's Memorandum, pg. 23).

11.  "Plaintiff's misrepresentation claim fails because she has not shown that she relied on any alleged false statement or that TPL and MacDonnell made any such false statement".  (See TPL's Memorandum, pg. 24).

12.  "…[**T**]**here is no evidence that** TPL and MacDonnell made any knowingly false representation.  Plaintiff **has no evidence that** TPL and MacDonnell knew TPL would be unable to meet the purchase price or that TPL and MacDonnell acted to deceive her regarding TPL's ability and intention to acquire the Property". (emphasis supplied)(See TPL's Memorandum, pg. 25).

13.  "Plaintiff **cannot prove an essential element** of all of her claims – that she has suffered damages…". (emphasis supplied)(See TPL's Memorandum, pg. 28).

The above assertions must be assessed in light of the volumes of evidence contained in the Plaintiff's Memorandum in Support of her various Motions for Summary Judgment ("Memorandum") [2] that are directly supportive of her various claims. TPL and MacDonnell pretend that their actions and TPL's failure to purchase the Property occurred in vacuum, in which none of the indisputable facts existed.  In other words, TPL

---

[2] The Plaintiff refers the Court to the Plaintiff's Memorandum and Exhibits referred to therein.  The overwhelming percentage of references to Exhibits in the Plaintiff's Memorandum results from TPL documents, TPL deposition admissions by the 30(b)(6) deponents and other evidence that results.

pretends that there was an assignment of the ROFR and exercise of that right and the default. It pretends that there were no promises, no ulterior motives, no goals of preventing the c. 40B on the Plaintiff's Property, no collusion with Town of Stow, no Partnership, no misrepresentations to the Plaintiff, to the State, and to citizens in Town Meeting. TPL's and MacDonnell's indefensible position, at a minimum, must result in the denial of their Motion for Summary Judgment because TPL, in its opposition, must either dispute the dozens of material facts proposed by the Plaintiff or admit to them. If disputed, by definition, there would be material issues of facts to be decided at the time of trial. Thus, their Motion for Summary Judgment would have to be denied. If TPL and MacDonnell admit to the dozens of documents provided by the Plaintiff, then their Motion would be also denied and Plaintiff's Motions granted. The fact that TPL Defendants have elected to state, on 13 separate occasions, that there is "no evidence" despite the overwhelming fact that there is such evidence, should estop TPL and MacDonnell from reversing their position and trying to assert that there are disputed facts.

## I.    PLAINTIFF'S CLAIM FOR BREACH OF CONTRACT AND SPECIFIC PERFORMANCE

TPL Defendants assert that the Plaintiff has not shown that she is entitled to Specific Performance beyond liquidated damages under the P&S. However, TPL and MacDonnell are incorrect.

### A.    <u>Plaintiff Is Entitled to Specific Performance as a Matter of Law</u>

The Plaintiff was entitled to the full purchase price once TPL exercised the Right of First Refusal ("ROFR"). The legal meaning of a true right of first refusal involving real estate was described in <u>Roy v. George W. Greene, Inc.</u>, 404 Mass. 67, 69-71 (1989),

S.C., 408 Mass. 721 (1990).  Such right becomes operation when the "owner has decided to accept a third person's outstanding and enforceable offer and the holder of the right has been informed of the details of that offer and has had a reasonable time to meet it." Id. at 71.  (See Franklin v. Wyllie, 443 Mass. 187, 195 (2005); see also Greenfield Country Estates Tenants Ass'n v. Deep, 423 Mass. 81, 89 (1996)("On notice of receipt of a bona fide offer from a third party, a right of first refusal ripens into an option to purchase according to [the] terms" of the offer)).  A property owner's obligation under a right of first refusal is not to sell at such a time that the holder of the right may demand (as in option to purchase), or to sell to the holder at a fixed price at such a time as the owner should wish to sell (as in a fixed price right of first refusal), but merely "to provide the holder of the right reasonable disclosure of the terms of any bona fide third-party offer" that is acceptable to the owner.  (See Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 382 (2004)).  The prerogative belongs both to the owner of the property, who may decide whether to sell, as well as the holder of the right, who may decide whether to purchase at the price offered by the third party.  At the time of a third-party offer if the owner has decided to accept, the right of first refusal ripens into an option to purchase according to the terms of the third party offer.  (See Knott v. Racicot, 442 Mass. 314, 315 n. 4 (20904); see also Sudbury v. Scott, 439 Mass. 288, 297 (2003); Greenfiled Country Estate Tenants Ass'n v. Deep, supra at 89 n. 14; see also Roy v. George W. Green, Inc., supra at 70 ("a right of first refusal … cannot be exercised before the owner has received a bona fide and enforceable [written] offer from a third party")).

> "… Because the holder of a right of first refusal may only <u>choose to purchase property</u> on the same terms as a bona fide offer, if and when the owner decides to sell, <u>there is not power to compel an owner to sell the property at an unfavorable price</u>, or to encumber an owner's ability to sell the property for a lengthy period of time."

5

(emphasis added)(See Bortolotti v. Hayden, 449 Mass. 193 (Supreme Judicial Court of Massachusetts 2007)).  In Cellucci v. Sun Oil Co., 2 Mass. App. Ct. 722 (1974), S.C., 368 Mass. 811 (1975), the court ordered specific performance (the buyer was required to purchase the property) of an agreement to sell real estate where the agent of the defendant-purchaser made misrepresentations of fact and law designed to induce the plaintiff to refrain from negotiation with the defendant's competitor for sale of the property.    Among the misstatements was the statement that the purchase and sale agreement between the parties meant that the defendant had purchased the site.    The Court focused on the impact of the misrepresentations of the buyer to the detriment of the seller.

> "… [A]n estoppel could lie as a result of misrepresentations of both fact and law by the defendant's agent, an employee who represented the company in real estate transactions in the area."

(See Cellucci v. Sun Oil Co. of Pennsylvania, *supra*, at 811)

> "Where an oil company's agent incorrectly represented to a landowner over a period of time that the company intended to buy his land and that the landowner was legally bound by a purchase and sale agreement signed by him but not by the company, and where the landowner relied on these misrepresentations to his detriment, the company was properly estopped from asserting that it had not signed the purchase and sale agreement."

(See Cellucci v. Sun Oil Co. of Pennsylvania, *supra*, at 723, 732).

> "However, while the defendant might him not have clothed the agent with authority to execute the contract, it placed him in a position of sufficient ostensible authority to negotiate it to the point where all that was necessary was its formal execution. See *McQuade v. Springfield Safe Deposit & Trust Co.* 333 Mass. 229, 233 (1995); *Costonis v. Medford Housing Authy.* 343 Mass. 108, 115 (1961).  Consequently, the defendant must be held responsible for the manner in which the agent conducted himself during those negotiations.  *Haskell v. Starbird*, 152 Mass. 117, 120 (1890)."

(See Cellucci v. Sun Oil Co. of Pennsylvania, 368 Mass. 811).  The Plaintiff respectfully suggests that the holding in Cellucci is particularly applicable based upon the dozens of

examples of the misrepresentations by TPL and MacDonnell intended to cause Ms. Kunelius to rely and intended to discourage Cohousing from remaining interested in the Project.

**B.**     **The Plaintiff Has Demonstrated that She Relied on Defendants' Misrepresentations and further She Has Demonstrated that TPL, MacDonnell, and Stow Were Fully Aware of Her Reliance**

Incredibly, TPL and MacDonnell assert that Ms. Kunelius did not rely on any misrepresentations by TPL or MacDonnell.  However, Ms. Kunelius has provided to this Court with TPL's own documents and her Affidavit which absolutely and dispositively demonstrate her reliance.  That evidence is as follows:

1.   Ms. Kunelius repeatedly warned TPL and MacDonnell that if they failed to purchase she would loose her buyer and loose her retirement.  (See Exh. G to Memorandum, Affidavit of Kunelius, pg. 3, ¶5).

2.   TPL was absolutely aware of Ms. Kunelius' warning and that she was relying on their assurances because TPL specifically referred to her warnings in TPL's Fact Sheet dated January of 2003, drafted weeks before it exercised the ROFR.

> "The landowner [Kunelius] is upset by the possibility that the Town may assign the RFOR to TPL. She [Kunelius] sees the deal as essential of the retirement. **On the phone, she recently said that she would sue the Town and others if anybody defaults and I lose my buyer** [Cohousing].' ..."

(emphasis added)(See Exh. M to Memorandum, TPL-KUN01129).

3.   MacDonnell's hand written notes of his conversation with Ms. Kunelius indicate that he was also aware of her extraordinary concern and her reliance on his promises that he and TPL would not default and that she had nothing to worry about.

> ```
> "Concern [Ms. Kunelius' concern] a retirement – needs the
> money – financial life on the line – FEAR: loss of buyer –
> she will sue the town."
> ```

(See Exh. N to Memorandum, TPL-KUN1260).

4.  Despite their promises, TPL and MacDonnell were aware that Cohousing, the Original Buyer, would give up on the sale if TPL exercised the ROFR. This can be found in MacDonnell's notes on a telephone discussion with Attorney Jonathan Klein, who represented the Original Buyer.

> ```
> "If assigned, they [Cohousing] will move on."
> ```

(See Exh. U to Memorandum, TPL-KUN01255).

5.  TPL fully understood that it was unlikely that TPL would ever receive authority from its Board to purchase the Property because of TPL's inability to get the zoning relief their plan of development which differed from the plan in the P&S. In fact, TPL was aware that there was less than 5% chance that it could get the zoning variances. (See Exh. Y to Plaintiff's Summary Judgment Motions ("SJM"), TPL-KUN02536, last paragraph).

6.  TPL and MacDonnell represented to Ms. Kunelius that TPL had the money to purchase the Property and nevertheless, after the exercise of the ROFR, they repeatedly asserted that they were "unable" to purchase the Property. (See Exh. A to Memorandum, MacDonnell deposition, page 74, ln. 1 - ln. 11). **The Plaintiff points out that Stow's Proposed Statement of Undisputed Facts #9 states: Craig MacDonnell, of TPL, met with representatives of the Town of Stow and assured the Town and the Plaintiff and her representatives that TPL in the past always honored its assignment of the right of first refusal**. Paragraph 9 of Stow Proposed Statement of Undisputed Facts ("Stow's SUF")

is a verification of the scope of the misrepresentations by MacDonnell and TPL. To suggest there is no evidence of misrepresentation is ludicrous.

7.   TPL and MacDonnell asked Ms. Kunelius to rely on their assurance and stated TPL had never failed to purchase any property when they exercised the ROFR and therefore, she had nothing to be concerned about. (See Exh. G to Memorandum, Affidavit of Kunelius, pg. 4, ¶6).

8.   TPL and MacDonnell repeatedly assured Ms. Kunelius that TPL would purchase the Property even though TPL and MacDonnell knew that, at the time of such assurances, TPL did not have the authority to purchase the Property. (See Exh. V to Memorandum, TPL-KUN01144-45)

9.   TPL and MacDonnell knew, prior to accepting the ROFR that, it had no intention of adhering of the terms of the P&S and that it had already decided to change the terms of the P&S without telling the Plaintiff.  These changes included:

   a.   Not paying the purchase price (See Plaintiff's Statement of Undisputed Facts ("Plaintiff's SUF") #49; see also Exh. GG to SJM, TPL KUN2646);

   b.   Requiring Ms. Kunelius to sell to TPL all 50.67 acres rather then the 8.57 acres as anticipated in the P&S (See Plaintiff's SUF #45, see also Exh. BB to SJM, TPL-KUN01124);

   c.   Denying Ms. Kunelius the right to make the charitable donation of 42.1 acres as anticipated in the P&S (See Plaintiff's SUF #45 and 47, see also Exh. BB to SJM, TPL-KUN01124); and

d.  Attempting to make the purchase contingent upon a completely new development plant not anticipated by the P&S, where TPL knew that the development plan had virtually no chance of being approved.  (See *e.g.* Exh. V to SJM, TPL-KUN02494; see also Exh. W to SJM, TPL-KUN02499, see also Exh. Y to SJM, TPL-KUN02536).

10.  TPL and MacDonnell knew that it had spent $5,995,000 of the Wainwright $6 million line of credit but, nevertheless, informed Commonwealth that the line of credit was available for the purchase and that it would be used even if all sources of money failed.

> "As a fall back plan, **if any or all of the above-referenced sources of funds are unavailable**, TPL intends to utilize capital from the private market.  In this regard, TPL has available for its use a Line of Credit from Wainwright Bank in the amount of $6,000,000, as evidenced by the letter attached as Exhibit___.  The use of this capital is subject to TPL's internal approval process, including customary due diligence and approval by the board of directors."

(emphasis added)(See Exh. Y to Memorandum, KUN-TPL00343).

11.  TPL never intended to conduct fund raising to purchase the Property and misrepresented this fact to the Commonwealth, Ms. Kunelius, FORA, and others.  (See Exh. EE to Memorandum, Furman0087; see also Exh. FF to Memorandum, TPL-KUN1621)

12.  TPL and MacDonnell attempted to spread the blame for the failure to purchase the Property, when they knew the failure was as a result of its actions.  (See Exh. TT to Memorandum, TPL-KUN02765; see also Exh. UU to Memorandum, TPL-KUN01710))

The above examples demonstrate that Ms. Kunelius was clearly relying on MacDonnell's and TPL's repeated assurances that she had nothing to worry about and

that the sale would go through and that her retirement would be safe. If this is not reliance then one would be hard pressed to demonstrate what reliance would be.

**C.    The Liquidated Damages Clause Does Not Apply Because the Behavior of TPL Could Have Never Been Contemplated by the Parties When the Parties  Negotiated the Liquidated Damage Clause**

TPL and MacDonnell argue disingenuously that Liquidated Damage Clause applies. They argue, that the Plaintiff should have anticipated all of the extraordinary and deceptive actions of TPL and Stow and that the Liquidated Damage Clause was somehow negotiated based upon this suggested anticipation. However, TPL and MacDonnell cannot avoid the admission by TPL in its 30(b)(6) deposition, that Ms. Kunelius could have never have anticipated what TPL had intended to do or what had intended to plan with the Property. Dorothy Nelson Stookey, the General Counsel of TPL, in the 30(b)(6) deposition of TPL stated:

> "There's no reason that Ms. Kunelius would have known of our plans to preserve the property."

(See Exh. K to Memorandum, TPL 30(b)(6) deposition (Stookey), Vol. I, pg. 85, lns. 3 – 4; see also Exh. G to Memorandum, Affidavit of Kunelius, pg. 3, ¶4). Stookey's testimony is an admission that Ms. Kunelius would have not known:

i.    That TPL would acquire the ROFR.

ii.    That TPL would change the development plan;

iii.    That TPL would have known that there was virtually no chance that the development would be approved;

iv.    That TPL did not have the money to purchase the Property;

v.    That TPL did not have the authority to purchase the Property; and

vi.    That TPL wanted to change the purchase price.

11

vii.    That TPL would attempt to take Ms. Kunelius' tax benefits by stopping her charitable donation.

viii.   That TPL would demand 50 acres rather than 8.57 acres as anticipated by the P&S.

TPL's admission that Ms. Kunelius would have not know of TPL's plans is in direct contrast to their position in their Motion that she should have anticipated all of i.-vi. above.  Such a position is made in bad faith.

If this Court were to hold that the Liquidated Damage Clause would be applicable to a subsequent Assignee under c. 61, the fact remains that the original parties to the contract could never have anticipated the bad faith of TPL and Stow.  That bad faith is detailed extensively in the Plaintiff's Memorandum. The Liquidated Damage Clause, in and of itself, is not dispositive of the Contract Count in favor of the Defendants, since the extent of the bad faith renders that Liquidated Damage Clause null and void.  (See Hawthorne's, Inc. v. Warrenton Realty, Inc.; 414 Mass. 200 (1993); see also Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471--473 (1991) (every contract in Massachusetts is subject to an implied covenant of good faith and fair dealing); see also Warner Ins. Co. v. Commissioner of Ins., 406 Mass. 354, 362 n.9 (1990); see also Kerrigan v. Boston, 361 Mass. 24, 33 (1972); see also Cadle Co. v. Vargas, 55 Mass. App. Ct. 361, 366 (2002) (A breach occurs when one party violates the reasonable expectations of the other); see also Restatement (Second) of Contracts § 205 (1979)).

### D.    Exercise of a Right of First Refusal Under Chapter 61 Creates a Duty to Perform

TPL and MacDonnell assert that the mere fact that Stow assigned the RORF and that TPL exercised that ROFR creates no duty on the part of TPL to purchase the

Property.  Again, TPL pretends that there is no reliance on their assurances, TPL pretends

that it was not aware that the Original Buyer would leave if TPL exercised the ROFR.

TPL pretends that it did not matter that TPL did not have the authority to purchase the

Property when it exercised the RORF.  TPL's and MacDonnell's position is disingenuous

at best.  Further, it would render c. 61 nothing more than a tool to materially deprive any

owner of any *bona fide* purchase price by allowing a city or a town or an organization

such as TPL to materially interfere with contracts in order to achieve TPL's illegal goals.

Chapter 61 states:

> "[T]he city or town shall have, in the case of intended sale, **a first refusal option to meet a bona fide offer to purchase the land.**"

(emphasis added)(See M.G.L. c. 61, §8).  TPL and MacDonnell's position is a perversion

of the Legislature's intention when the statue was enacted.

### E.    Chapter 61 Presumes Performance

The Plaintiff specifically asks the Court to review TPL's and MacDonnell's

argument found on page 11 through 13 of their Memorandum with regard to what TPL

and MacDonnell assert is the law regarding the alleged Presumption of Non-Performance

under c. 61.   There is no such Presumption and the Plaintiff asks the Court to consider

whether TPL's and MacDonnell's argument has been proffered to the Court in good faith.

The Plaintiff believes that there is virtually no justification for the assertions made on

pages 11 through 13.   The Plaintiff further asserts that the case law relied on by

MacDonnell and TPL is absolutely inappropriate and misleading, for the following

reasons:

1.    MacDonnell and TPL rely on Town of Franklin v. Wyllie, 443 Mass. 187

(2005) for the concept that the Court should liberally construe and effectuate

Stow's and TPL's goals.  (See TPL's Memorandum, page 11).  In fact, the Town of Franklin stands for the proposition that the town could not purchase the Property because it had failed to comply with c. 61 and that it had inappropriately attempted to render a *bona fide* offer as "conditional" and unenforceable.  The Plaintiff believes that the Defendants' reliance on Town of Franklin is deliberately misleading and that their assertions mislead the Court as to the holding of Town of Franklin.

2.  MacDonnell and TPL assert that the c. 61 120-day-period is intended to give a town time to assess a *bona fide* offer prior to the town's exercise of the ROFR, they assert that this period translates somehow as the Legislature's attempt to absolve the town of its performance once the ROFR is exercised by the town. In effect, MacDonnell and TPL argued that 120 days demonstrate that once a RORF is exercised, the town can simply default and the Legislature intended this to be appropriate.  Again, the argument is disingenuous, since TPL began assessing the Property in December 2002 and exercised the ROFR on February 12, 2003.  The argument by MacDonnell and TPL is deliberately misleading because the 120-day-option period is the period intended to give a municipality time to consider the *bona fide* offer prior to the exercise of the ROFR.  Further, the facts of the case demonstrate, beyond any reasonable doubt, that TPL itself had approximately three (3) months to consider the Property.  More importantly, it was TPL that approached Stow and that actively, aggressively and illegally lobbied for over three months to obtain the ROFR and to exercise that right.  In addition, TPL and MacDonnell lobbied for the assignment of the ROFR even

14

after the January 13, 2003 Town Meeting voted down the purchase. TPL went to extraordinary lengths to obtain the right and to interfere with Ms. Kunelius' P&S. TPL was never put in a position where it needed time. The ROFR was not thrust upon TPL. TPL did everything in its power to obtain the ROFR. The evidence of their lobbying is indisputable. Therefore, TPL and MacDonnell's reliance on <u>Warren Land Trust v. A.D. Makepeace Co.,</u> No. 295259, 2004 WL 1117172 at *3 (Mass. Land Ct. May 19, 2004) is in bad faith and, at a minimum, misleading. In addition, TPL and MacDonnell admitted in their Proposed Statement of Undisputed Fact ("TPL's SUF") #44, that "**once TPL became aware of the Project, it [TPL] began its approval process**". (<u>See</u> TPL's SUF #44).

3.  TPL and MacDonnell assert that TPL could not be expected to raise the full purchase price in the 120-day-period for the exercise the ROFR and cites to <u>Meachen v. Hayden</u>, Misc. Case No. 240129, 6 Land. Ct. Rptr. 235, 238 (Mass. Land Ct. Aug. 6, 1998). Again, the Plaintiff would ask the Court to consider whether this component of their argument was proffered in good faith. This is because TPL has asserted to the Commonwealth, Ms. Kunelius, her counsel, and to the Town Meeting that it already had the funds necessary to purchase the Property. In addition, it has asserted to this Court that it had and continues to have the funds necessary to purchase the Property. The Plaintiff respectfully asks the Court, after considering the arguments and case law relied on by TPL and MacDonnell, to determine that TPL and MacDonnell have not proffered their argument in good faith.

## II.    PLAINTIFF'S c. 93A CLAIM AGAINST TPL (COUNT II)

### A.    Plaintiff Was Engaged in Business and Thus She Met the Threshold Requirements of a M.G.L. c. 93A Claim Arising Under Section 11

TPL and MacDonnell attempt to avoid the application of c. 93A by asserting that the Property was "residential". It is undisputed that the Plaintiff ran a horse farm on the Property. She has and continues to rent horse stalls to horse owners. The rentals of such stalls included the regular maintenance of the stalls, the feeding of the horses, the purchase of the food for the horse, etc. In addition, the Plaintiff engaged professionals to snowplow the Property in order to maintain access for her customers. (See Exh. 1, Affidavit of Kunelius, pg. 1, ¶¶2 and 3). The Plaintiff also harvested timber and firewood on her Property. (See Exh. 1, Affidavit of Kunelius, pg. 2, ¶4). The Plaintiff testified that she had hired personnel for snowplowing and that she was the barn manager. (See Exh. G to SJM, Kunelius deposition, pg. 8, ln. 1 – ln. 20). Therefore, the Plaintiff was engaged in a trade or commerce and thus pursuant to the provisions of M.G.L. 93A, she was not required to send a c. 93A demand letter to TPL, under Section 9, as TPL Defendants attempt to suggest.

### B.    Plaintiff Has Submitted Undisputed Proof of an Unfair and Deceptive Acts by TPL

As mentioned above, TPL and MacDonnell argued that there is no evidence as to TPL's unfair and deceptive acts. TPL and MacDonnell argue that there is "**no evidence**" that TPL intentionally deceived the Plaintiff or anyone else about its ability to close. TPL and MacDonnell argue that there is "**no evidence**" that TPL had no intention of closing or its knowledge that it could not close. The opposite is true. The Plaintiff has

provided overwhelming evidence for both of these assertions.  This evidence of unfair and deceptive acts is from TPL's own documents.  That evidence is as follows.

    1.    <u>**Evidence of TPL's Intentional Deception**</u>

TPL, on numerous occasions, assured Stow's officials, Stow's citizens at Town Meeting, the Plaintiff, FORA and others that TPL never failed to purchase a property. (<u>See</u> Plaintiff's SUF #21 and #53; <u>see</u> <u>also</u> Exh. A to Memorandum, MacDonnell deposition, pg. 73, ln.  21 – ln. 24; <u>see</u> <u>also</u> Ex. E to SJM, Affidavit of Kunelius, pg. 3, ¶4; <u>see</u> <u>also</u> Exh. H to Memorandum, Affidavit of Kachajian, pg. 3, ¶4).  This is admitted by Stow.  (<u>See</u> Stow's SUF, ¶9, pg. 30).

The deposition of Ms. Kunelius and her Affidavit indicate that TPL and MacDonnell repeatedly assured her that TPL had the funds and that she should not worry of loosing her retirement. (<u>See</u> Exh. L to Memorandum, Kunelius deposition, Vol. II, pg. 90, ln. 13 – ln. 16; pg. 54, ln. 21 – pg. 55, ln.  1 and pg. 44, ln. 21 – pg. 45, ln. 21; <u>see</u> <u>also</u> Exh. G to Memorandum, Affidavit of Kunelius, pg. 4, ¶6).

The deposition of Karen Sommerlad, a member of FORA, indicates that MacDonnell at Town Meeting informed Stow's citizens that TPL had the funds necessary.  (<u>See</u> Exh. CC to SJM, Sommerlad deposition, pg. 53, ln. 10 – 23).  In addition, MacDonnell informed members of the Friends of Red Acre ("FORA") of the same fact.  (<u>See</u> Exh. CC to SJM, Sommerlad deposition, pg. 53, ln. 10 – 23).

Stow's Community Preservation Committee meeting minutes indicate that a Committee member, Bob Wilbur, had a discussion with Ms. Kunelius.  The minutes state as follows:

> "[S]he [was] afraid that the contract [with Cohousing] may unravel with town intervention and **she'll lose everything.** Bob said TPL will not back down from commitment. **Tom Maher spoke from**

> **the audience and said that this is not the babe** [Ms. Kunelius] **we want to fool around with**, and 1.2 is not the figure. **TPL said that they have honored every assignment given to them under Chapter 61 and there is less risk with TPL than with other options."**

(emphasis added)(See Exh. O to Memorandum, KUN040). The above quote is unequivocal evidence of TPL's misrepresentation concerning its ability to close on the Property. In addition, TPL Defendants made statements as to TPL's financial viability to a reporter of local news paper.

> "MacDonnell, however, replied that trsut [sic] would not adopt the rights of first refusal, if the organization was not **absolutely certain it could pay the asking price."**

(See Exh. DD to Memorandum, *The Beacon Villager* article entitled "Friends of Red Acre still have ace in the hole", January 30, 2003).

MacDonnell, in his notes on TPL's presentation at the Town Meeting, states:

> "Compare this [support of TPL] to what a vote against [TPL] would mean: zero acres are deeded to the town; no 42 or 45; zero (**Cohousing is gone**);…"

(emphasis added)(See Exh. T to Memorandum, TPL-KUN01100).

As a result, TPL and MacDonnell cannot state that the Plaintiff has provided "no evidence" of their intentional deceit of the Plaintiff and others about TPL's ability to close.

2. **TPL Knew that It Would Not Close on the Property**

It is not disputed that on February 2, 2003, TPL and MacDonnell <u>knew that they had no authority to close</u> on the Property. <u>They knew that, at the time they exercised the ROFR, TPL would not know until many months later whether if it would even be possible to purchase the Property.</u> (See Exh. CC to SJM). MacDonnell and TPL knew, at the time they exercised the ROFR, that TPL had not obtained an internal approval to

purchase and close on the Property.  This was all known when they made the assurances

to Ms. Kunelius and others.   On February 3, 2003, TPL stated:

> "Essentially, Im OK with our [TPL] exercising since **we have the**
> **ability to walk away under the liquidated damages provision**
> **($22K), but I think its** <u>premature for PRC to approve closing</u>
> since so many aspects of the take-out remain uncertain, and our
> ultimate risk is unclear now, but should be much clearer by later
> this summer."

(<u>See</u> Exh. CC to SJM, TPL-KUN01149).   The above quote demonstrates that there is

overwhelming evidence as to TPL and MacDonnell's knowledge that it was likely that

TPL would not <u>close on the Property, at the time it negotiated the Assignment of ROFR</u>

<u>and exercised the ROFR</u>.   Even with this knowledge, TPL and MacDonnell assured the

Plaintiff that TPL never failed and she had no reason to worry about the sale or the loss of

her retirement funds.  (<u>See</u> Affidavit of Kunelius, pg. , ).  This in spite the fact that, TPL

was acutely aware that the Plaintiff feared that TPL had no intention of purchasing the

Property. Not only was Ms. Kunelius misled, but also was the Commonwealth of

Massachusetts.  The Annual Audit of TPL indicates that, at the time of TPL's promises of

a $6 million line of credit to purchase the Property, it, in fact, had depleted that line of

credit completely.  The audit states:

> "The **Trust has a $6,000,000** revolving bank line of credit for
> land acquisition in New England.   The line of credit bears
> interest at prime rate less than one-quarter of one percent (4.0%
> at March 31, 2003).  **At March 31, 2003, $5,995,000 of the line of**
> **credit** was being utilized.   The Line of credit expires at
> February 14, 2004."

(<u>See</u> Exh. DDD to SJM, WB00340) (emphasis added).  As can be seen above, TPL had

used $5,995,000 of $6,000,000 available to it by Wainwright Bank.  Nevertheless, TPL

Defendants represented to the DHCD[3] that they renewed its $6 million line of credit with

---

[3]Department of Housing and Community Development, which is referred to by the Plaintiff as the
"DHCD".

Wainwright Bank for the acquisition of the Plaintiff's Property, when in fact, as of March 31, 2007 (the date of the Application) only $5,000 was left to pay off $1,116,900 for the Plaintiff's Property.  (See Exh. II to SJM, KUN343).

### C.    Improper Means

MacDonnell and TPL assert on page 22 of their Memorandum that there is no liability under c. 93A because "[a]s a matter of law, TPL was permitted to "interfere" with the [P&S]".  (See TPL's Memorandum, pg. 22).  The Plaintiff respectfully asserts that TPL and MacDonnell, from the inception of this case, have had acted with an arrogance and sense of entitlement ostensibly based on their belief that the mere fact that c. 61 authorize them to take all and every steps, regardless how misleading, false and simply because they were acting under the alleged authority of the statute and in conjunction and partnership with Stow.

However, their belief that c. 61 insulates them from liability, no matter how outrageous, is misplaced. A defendant such as TPL can be held liable under c. 93A, even if the defendant's acts are "lawful".   In Schubach v. Household Finance Corp.,375 Mass. 133, 376 N.E.2d 140 (1978), the Court rejected the argument that an act or practice that is authorized by statute "can never be an unfair and deceptive act or practice." Schubach v. Houselhold Fin. Corp., 375 Mass. at 137, 376 N.E.2 at 142.  The *Schubach* Court held that a complaint alleging that the defendant finance company engaged in a practice of intentionally filing collection actions against consumers in inconvenient courts, with the purpose and effect of securing default judgments, stated a cause of action under G.L. c. 93A.    There can be no more egregious example of outrageous behavior by parties

purporting to be acting under statutory authority.  Certainly, the Defendant's actions in Schubach pale in comparison to the behavior of MacDonnell, TPL and Stow.

MacDonnell and TPL misrepresent their justification for their behavior. MacDonnell and TPL assert that "all of the evidence shows that the TPL Defendants' goals were simply to conserve the Property pursuant to c. 61 and purchase from the Plaintiff".  (See  TPL's Memorandum, pg. 23).  Again, it appears that MacDonnell and TPL believed that they can do anything no matter how unfair or deceptive it may be if it advances their "goal" or their "primary purpose".  However, MacDonnell testified that TPL's failure to purchase and the loss of the Original Buyer and the prevention of 40B development, in fact, was the goal of TPL.

> Q. So, you were aware, certainly, that your efforts with TPL had the effect of preventing a 40B development.  Is that fair to say?
> A. **We were successful in conserving the property, the property would have been conserved and not developed.**
> Q. Under 40B.
> A. Correct.

(emphasis added)(See Exh. A to Memorandum, MacDonnell deposition, pg. 193, ln. 19 – pg. 194, ln. 1).  The above testimony makes clear that TPL was "successful" in meeting its goal of preventing the buyer from developing the Property under c. 40B.  This would explain why TPL never received an internal approval to purchase the Property.  There can be no other explanation as to why TPL, having defaulted in the P&S and having reneged on an Assignment, for the first time ever, could somehow describe its failed efforts as "successful".

Perhaps even more telling is TPL's SUF #50 which states:

> "TPL's goal in accepting the right of first refusal from Stow was to conserve the majority of the Property classified as forest land under Chapter 61 for the Town and the residents of Stow."

(See TPL's SUF #50, pg. 10). The above statement demonstrates how the duplicitous nature of their statements continues unabated even in their Memorandum. This is because the stated goal in paragraph 50 could not have been TPL's goal in becoming involved in the Property, since one hundred percent of the Property classified under c. 61 was to be given to Stow by Ms. Kunelius as conservation land free of charge as stipulated in the P&S. It was for this reason that so many questions were raised by Stow citizens as to why Stow was paying $400,000.00 in their partnership with TPL to acquire exactly what they would have received under the terms of the P&S. Paragraph 50 of TPL's SUF, as proffered to this Court, therefore, verifies that TPL's goal had to be something different then simply "insuring that the forest land be preserved". The goal, as testified to by MacDonnell himself, was to prevent the 40B development. The goal had nothing to do with preserving the 42.1 acres because the 42.1 acres were never going to be developed.

## III.  PLAINTIFF'S CLAIM FOR VIOLATIONS OF c. 93A AGAINST THE "PARTNERSHIP OF STOW AND TPL" (COUNT III)

### A.  **TPL and Stow Created a Partnership**

TPL, MacDonnell and Stow assert that they used the word "partnership" between Stow and TPL in the "colloquial sense" and rely on an alleged holding of the First Circuit in Dinco v. Dylex Ltd., 111 F.3d 964, 969 (1st Cir. 1997). TPL asserts that Dinco establishes of what the "colloquial" and "legal" use "partnership" is. In fact, a review of Dinco indicates that MacDonnell's and TPL's representations of the First Circuit's holding are inaccurate, at best. In Dinco, the First Circuit considered the appellants' objection that the New Hampshire District Court's jury instructions concerning partnership and conspiracy were improper for lack of evidence of partnership and

conspiracy.  Under New Hampshire law (as in Massachusetts) a third party liability may

arise, among other things, based on a partnership.  The First Circuit vacated the District

Court's decision and remanded the case for a new trial based on its findings that there

was no evidence of a partnership and thus the District Court's partnership instructions

were unjustified and misleading.  The First Circuit's exact holding concerning the alleged

distinction between "colloquial" and "legal" use of the term of partnership is as follows:

> **"The difficulty is that there was no evidence of a partnership
> among the defendants.**  … We are talking here, it should be
> remembered, **not about a colloquial usage of the term "partner"
> but about a legal relationship that broadly imposes liability
> without fault upon otherwise innocent parties.**  H. Reuschlein &
> W. Gregory, The Law of Agency and Partnership §203, at 306-10 (2d
> ed. 1990)."  Id. at 969.  (emphasis added).

Unlike in <u>Dinco</u>, in the instant case, there is overwhelming evidence of a

partnership between Stow and TPL.  In the instant case, TPL and Stow had an agreement

in which they would acquire the 42.1 acres of land in exchange for funding of $400,000

of the purchase price to be paid by TPL.  (<u>See</u> Exh. B to SJM). That certainly is a "joint

venture/partnership".

As can be seen by Exhibits L to SJM and Exhibit 6 to the Complain, Stow's Town

Counsel warned Stow that it would be liable, as a result of a default by TPL.

> "Since the language of c. 61 does not absolve the Town of any
> further liability to the landowner for failure of the assignee to
> carry out the obligations to purchase the land under the
> assignment, or for any other claims as may be made by the
> landowner (such as exist in the present circumstances and are
> discussed below), appropriate terms and conditions for the
> assignment would include an indemnification agreement by the
> assignee (TPL) to the assignor (the Town)from any such claims as
> might be made by the landowner resulting from the assignment or
> its implementation and exercise by the assignee (TPL).  I highly
> recommend such an indemnity clause be required for acceptance of
> the assignment of TPL in the present circumstances.  These
> circumstances include two potential sources of litigation and
> possible damage claims by the Seller (Kunelius) who provided the
> c. 61 Notice to the Town in the present matter. … While we may
> disagree with the Seller's contentions, made through Seller's
> counsel (the only party actually to opine on the issue of the c.

```
61 Notice give to the Town being TPL as the Special Town
Meeting), the contentions contain the elements of causes of
action that could result in a legal action, involving not only
the possibility of damages being assessed, but the costs of
defending any such action, which can be substantial whether the
Town wins or loses.  Moreover, unless agreement can be reached
both with TPL and the Seller prior to making the assignment over
the Seller's claims, the assertion of one or more of these claims
by a lawsuit is, in my judgment, highly likely given the various
communications with counsel for the Seller. …"
```

(See Exh. ZZZ to Memorandum, KUN428-429).  The above quote makes clear that Stow

believed that it would be liable for the default of TPL and as a result specifically was

demanding that TPL indemnify Stow from "any such claims as might be made by the

landowner resulting from the assignment or its implementation and exercise by the

assignee (TPL)".  In addition, it shows that Stow expected that substantial damages could

be assessed against Stow.

So complete is the partnership between Stow and TPL that there is a confidential

e-mail from Ross Perry, the Chairman of the Board of Selectmen, dated February 25,

2003, approximately 13 days after Stow assigned the ROFR to TPL, which states as

follows:

```
"The concerns I've been hearing are:
Why spend money for wetlands [Kunelius Property] that we'd get
for free. Using CPC money is just low-ended way of going around
the town's vote at the January ballot. This is too much money
from CPC, and it will prevent other project. Money is tight and
the Selectmen shouldn't be spending money on projects like this.
Why did the Selectmen ignore Town Counsel an[d] not insist on the
indemnification? Why did the Selectmen put the town at risk to
pay the full $1.2M if TPL defaults? I can take the heat, and
still support our decision.  It will be up to TPL & FORA to be
sure I (and the town) don't regret this move."
```

(emphasis added)(See Exh. WWW to Memorandum, TPL-KUN02586).  There can be

little doubt that the Chairman of the Board of Selectmen regretted not having the

indemnification and that he understood that TPL's default was likely.  MacDonnell's

notes from a conversation with Ross Perry states:

```
"Ross has some issues:
• Fear of TPL bailing out
• Indemnification, again"
```

(See Exh. XXX to Memorandum, TPL-KUN01256). The above quotes make clear that even the Chairman of the Board of Selectmen was concerned as to why his own Board had disregarded the advice of its own counsel and thus was exposed to damages that would result from TPL's default.

In addition, one member of the Board of Selectmen absolutely believed "Stow was being perceived as TPL's partner". (See Exh. 6 to the Complaint). Mr. Jones warned the Board of Selectmen that Stow was perceived as being in partnership with TPL and that Stow and TPL harmed Kunelius' interests. Mr. Jones further stated that Stow is liable for TPL actions and will be sued by the Plaintiff. (See Exh. 6 to the Complaint; see also Plaintiff's SUF #68). FORA also understood that TPL and Stow were working in partnership. (See Exh. AAA to Memorandum).

The Plaintiff also relies on the numerous examples of the partnership already provided in the Memorandum. TPL, in furtherance of the partnership agreement with Stow, drafted news paper articles for Stow, drafted applications of Stow for DHCD grant and approved $400,000 to be paid from Community Preservation Committee's funds.

TPL and MacDonnell inappropriately rely on Southex Exhibitions v. Rhode Island Builders Assn., 279 F.3d 94, 101 (1st Cir. 2002). The First Circuit in Southex considered an interpretation of an agreement between plaintiff and defendant's predecessor and the issue whether that agreement established a partnership-by-estoppel under Rhode Island law. In Southex a "partnership agreement" was executed by the parties. The heading of the agreement stated that it was a "partnership agreement" however, nothing in the agreement even remotely suggested there was a partnership. In

effect, the agreement had been inappropriately named "partnership" when, in fact, it was not a partnership agreement. In <u>Southex</u>, the Plaintiff argued that partnership existed simply because of the word in the title. Notwithstanding TPL's and MacDonnell's assertions to contrary, the First Circuit's holding was:

> "[A] lone reference to 'partners' in the 1974 Agreement's prefatory clause is so inconclusive as to carry minimal interpretive weight, especially since it arguably conflicted with the other contract provision." Id. at 102.

Unlike in <u>Southex</u>, TPL and Stow, in fact, had a partnership agreement, which anticipated Stow's financial pledge of $400,000.00 to assist TPL in the acquisition of the Plaintiff's Property. (Exh. B to SJM; <u>see also</u> Plaintiff's SUF #4 and #25). In exchange for this financial pledge, Stow was to receive 42.1 acres of the Property. There can be no dispute as to existence of Exh. B to SJM and its clear meaning, no dispute as to Stow's understanding that it would financially participate with TPL in the purchase, and no dispute as to Stow receiving approximately 42.1 acres of the Plaintiff's Property as a part of its partnership agreement with TPL. (<u>See</u> Exh. B to SJM). In fact, Stow appropriated $400,000 through its Community Preservation Committee. (<u>See</u> Plaintiff's SUF #69). There is no dispute that Stow also knew that it would receive 42.1 acres as a gift from the Plaintiff under the P&S. (<u>See</u> Exh. J to SJM, TPL-KUN2586 ("why spend money for wetlands that we'd [Stow] get for free"); <u>see also</u> Exh. 1 to the Complaint, the P&S, ¶35). As a result, the partnership agreement "imposes liability" not only on TPL but also on Stow and everyone from the Stow Conservation Trust, Board of Selectmen, Community Preservation Committee, to FORA. Thus, Stow and TPL are estopped from arguing that once Stow assigned the ROFR to TPL, it was no longer liable to the Plaintiff. (<u>See</u>

<u>Vaverly Productions, Inc. v. RKO General, Inc.</u>, 217 Cal.App. 2d 721, 32 Cal. Rprt. 73 (2d Dist. 1963).

Despite the Town Counsel's letter, Stow did not receive the indemnification from TPL and Stow, nevertheless, elected to go forward with the Assignment of the ROFR and signed the partnership agreement to provide a portion of the finances to TPL. With that decision, Stow decided that it would take the risk even though its Town Counsel had warned Stow that litigation was likely because TPL was attempting to take away Ms. Kunelius' tax deduction by way of her gift to Stow.

It is also very telling that TPL and MacDonnell literally argued against providing the indemnification agreement to Stow, by discussing "how to manage the risks" involved in their intended inappropriate changing of the contract with Ms. Kunelius. TPL wrote to the Board of Selectmen and stated:

> "TPL: The appropriate way for the risks presented by this project to be managed are for the common law of contract to apply. This law will require TPL, not the Town, to be obligated to perform if the right of first refusal is assigned. The Town's legal responsibility ends with the assignment. If we are offered the opportunity to accept such assignment, and we decide to go forward, the law will require us to meet the essential elements of the contract or to suffer the consequences of default. The landowner negotiated with the potential buyer what should occur in that event. These mechanisms sufficiently address the project risks, so TPL believes that a hold-harmless agreement is not appropriate."

(<u>See</u> Exh. B to Memorandum, KUN308). The Plaintiff also refers to her Memorandum as to the numerous references to TPL and Stow concerning their partnership.

**B.    <u>There Is No Material Issue of Fact Regarding Partnership by Estoppel Because It is Undisputed that Town Counsel, Members of the Board of Selectmen, and Others, Including FORA Believed TPL to Be in a Partnership With Stow</u>**

It is undisputed that critically important individuals, who were participating in this matter, perceived that Stow and TPL were working in partnership. (<u>See</u> Exh. HH to

Memorandum, TPL-KUN01681; see also Exh. AAAA to Memorandum, TPL-KUN00193; see also Exh. BBBB to Memorandum, TPL-KUN01309). The Partnership extended to TPL undertaking extraordinary services on behalf of the Board of Selectmen, including editing of a "letter to the editor" for the Board of Selectmen and supplying answers for the Board of Selectmen to use with their constituents as to why the Board disregarded Town Counsel's advice. (See Exh. MMM to Memorandum, TPL-KUN02687; see also Exh. NNN to Memorandum, TPL-KUN02794). TPL-KUN2776-77 is an internal document called "Project Time Sheet" in which TPL described Stow as its partner. (See Exh. YYY to Memorandum, TPL-KUN02776-77).

If the above were not enough, TPL's and Stow's joint efforts in defeating the 40B development on the Plaintiff's Property are further evidenced by a partnership agreement between Stow and TPL. (See Exh. B to SJM). This is because Stow was acutely aware that it was paying $400,000.00 to allegedly acquire property that the Plaintiff had anticipated donating to Stow for free. The inconsistency (and stupidity) of paying $400,000.00 for something you can get free-of-charge was fully understood by the Chairman of the Board of Selectmen, Ross Perry, when he stated:

> "The concerns I've been hearing are:
> **Why spend money for wetlands [Kunelius Property] that we'd get for free.** Using CPC money is just low-ended way of going around the town's vote at the January ballot. This is too much money from CPC, and it will prevent other project. Money is tight and the Selectmen shouldn't be spending money on projects like this. Why did the Selectmen ignore Town Counsel an[d] not insist on the indemnification? Why did the Selectmen put the town at risk to pay the full $1.2M if TPL defaults? I can take the heat, and still support our decision. It will be up to TPL & FORA to be sure I (and the town) don't regret this move."

(emphasis added)(See Exh. WWW to Memorandum, TPL-KUN02586). The reason that Stow elected to pay the $400,000.00 was that the actual goal was not to acquire the

Property, which it could otherwise get for free, the goal was to defeat the c. 40B development, even if it might cost Stow $400,000.00. These steps were unequivocally taken in concert between TPL and Stow. These steps are not a "genuine issue of material fact" to be decided by the Court as there are undisputed. Therefore, the Plaintiff met her burden of proving of partnership-by-estoppel. The elements of proving the partnership-by-estoppel are:

> "In order to establish a partnership by estoppel, the plaintiff bore the burden of proving "(1) that the would-be partner has held himself out as a partner; (2) that such holding out was done by the defendant directly or with his consent; (3) that the plaintiff had knowledge of such holding out; and (4) that the plaintiff relied on the ostensible partnership to his prejudice."

(See Brown v. Gerstein, 17 Mass. App. Ct. 558, 571 (1984); see also M.G.L. c. 108A, § 16; see also Atlas Tack Corp. v. Dimasi, 37 Mass. App. Ct. 66 (1994)).

FORA perceived that Stow and TPL were working in partnership. This can be seen by FORA's July 27, 2003, letter in which it states:

> "Mr. Diemert [Town Counsel] also needs to realize that this project is being done in **partnership** with the town. In his role as counsel to the Board of Selectmen he needs to be working with TPL and the Board to come up with zoning solutions for this project."

(emphasis added)(See Exh. AAAA to Memorandum, TPL-KUN00193).

> "Your **partners** at the Stow Town Building will feel this personally. Selectmen, members of the Community Preservation Committee as well as supporters are going to personally suffer if TPL withdraws."

(emphasis added)(See Exh. HH to Memorandum, TPL-KUN01681).

> "It is our [FORA's] intention to have the Town assign its right of first refusal for this parcel to non-profit conservation organization, which would work in **partnership** with our community organization [FORA] and the Town in order to *purchase the land and preserve it*. If you will work with us [FORA] on this urgent effort, we [FORA] believe we can achieve these goals while imposing little or no cost on the town."

(emphasis added)(See Exh. BBBB to Memorandum, TPL-KUN01309). Town Counsel advised the Board of Selectmen not to participate in the Partnership without indemnification because of the certainty of a lawsuit from Ms. Kunelius that Stow would face. That advice by Town Counsel was ignored by the Board of Selectmen because its Partner TPL urged them to rely on TPL's advice.

In addition, Ross Perry, the Chairman of the Board of Selectmen worked closely with TPL Defendants in disguising TPL's lobbying efforts for the Assignment of the ROFR to the Internal Revenue Service as "technical advice" after the fact. (See Exhs KK and NN to Memorandum). The concerted actions of TPL and Stow led the Plaintiff and others into believing that they were in partnership.

## IV. TPL AND MACDONNELL HAVE LIABILITY IN TORT (COUNTS V AND VII)

### A. The Intentional Interference and Misrepresentation Claims Survive

TPL and MacDonnell again argue that they did not use "improper motive or means" with regard to the interference with the Plaintiff's contractual relationship with the Original Buyer. Indeed, if none of the unfair and deceptive trade practices had occurred and TPL was merely an Assignee under the provisions of c. 61, then perhaps their argument would have some substance. But such an agreement denies the extraordinary facts of this case and therefore must be disregarded. More important, MacDonnell and TPL, on page 22 of their Memorandum, rely on United Truck Leasing Corp. v. Geltman, 406 Mass. 811 (1990). MacDonnell and TPL assert that there is "no evidence" that TPL's and MacDonnell's interference was improper in motive or means…". (See TPL's Memorandum, pg. 21). The Plaintiff relies on what has been already stated concerning the improper motive when TPL and MacDonnell fully

understood that they had no authority to purchase the Property, nevertheless, they exercised the ROFR with full knowledge that the Original Buyer would permanently back-out and with full knowledge that it was highly unlikely that TPL would ever purchase the Property.   In finding for the defendant in <u>United Truck Leasing</u>, the Court said that "[t]here is no evidence that he used threats, misrepresented any facts, … used any other improper means in relation to the … existing contract…"  Id. at 817.   In the instant case, MacDonnell and TPL are certainly aware that there is substantial evidence that MacDonnell and TPL used threats against Ms. Kunelius, misrepresented the facts to virtually everyone, including Cohousing, by making it clear that  TPL intended to purchase the Property, so that Cohousing would back away from the deal.  There is no material issue of fact with regard to the improper means used by TPL and MacDonnell when TPL, having been informed by its Board of Directors that it could not purchase the Property, nevertheless exercised the ROFR, resulting in Ms. Kunelius loosing the $1,116,900 in purchase price.   Had TPL told the truth to all the parties, including Cohousing, then Cohousing would not have sought another location to build its project, since Cohousing would have been informed that TPL had less than 5%  chance of purchasing the Property.

> **B.**    <u>**Plaintiff Has Shown Improper Means and Motive**</u>

The Plaintiff is not asserting that the mere fact that TPL seeks to conserve a property would be sufficient for TPL to incur liability.  The Plaintiff is asserting that the use of c. 61 process is, by definition, improper, if, when using that process, TPL had reason to believe that it would cause Ms. Kunelius to loose the sale and therefore her retirement and that TPL would not purchase the 8.57 acres.

V.    **PLAINTIF'S 42 U.S.C. §1983 CLAIM ANGAINST TPL, MACDONNELL AND THE "PARTNERHIP OF STOW AND TPL" (COUNT VI)**

While the Complaint lists the 42 U.S.C. §1983 claim and, in particular, a suggestion of an unconstitutional taking, the discovery in this matter has demonstrated that all of the Defendants worked in concert to violate Ms. Kunelius' contract rights and in particular used state action to violate the Contract Clause of United States Constitution.[4]    Therefore, the Defendants have deprived the Plaintiff of the $1,116,900.00 resulting from the sale of 8.57 acres of land and had further deprived the Plaintiff of the tax benefits that would have been derived from the donation of the 42.1 acres to Stow.    Virtually every argument made by the Defendants is tantamount to an admission that their collective goal was to prevent the c. 40B development anticipated under the P&S.    The Plaintiff relies on her argument in the Memorandum in Support of her Motion.

## TPL Defendants Acted Under Color of State Law

Stow, as a municipality, used its official power to interfere with and prevent the sale of the Plaintiff's property by the use of M.G.L. c. 61.    In furtherance of its goal, Stow executed a partnership agreement with TPL, assigned its ROFR to TPL, and appropriated funds to facilitate TPL's acquisition of the Property, even though Stow knew that its citizens voted down Stow's proposal for the acquisition of the Plaintiff's Property.    TPL, in turn, was lobbying for the Assignment of Stow's ROFR with the Board of Selectmen, Stow's citizens and FORA.    TPL and MacDonnell knew that TPL could not obtain the zoning it sought for the Property and that, if the ROFR would be assigned to it,

---

[4] The Plaintiff intends to file an amendment to the Complaint clarifying that the 42 U.S.C. §1983 claim is in connection with the 14th Amendment and United States Constitution.    However, every essential components of the Plaintiff's Contract Clause claim is supported by the overwhelming document discovery and Affidavits.

Cohousing would move on. (See Exh. U to Memorandum, TPL-KUN01255). Nevertheless, TPL negotiated the terms of its partnership agreement with Stow, accepted the ROFR and exercised the ROFR  All of this, despite the fact that, TPL and MacDonnell knew that, TPL did not receive an internal approval to purchase the Property.  In other words, TPL was fully aware that its actions were forever stripping the Plaintiff of the Original Buyer, while they understood that they could never build what they were considering.  This by any standard meets the color of state law requirement.

## VI.    PLAINTIFF'S DAMAGES

### A.    The TPL Defendant's Argument concerning Ms. Kunelius' Failure to Mitigate Damages is Baseless

TPL and MacDonnell argue that Mrs. Kunelius failed to mitigate her damages and cannot prove her damages, and therefore, their Summary Judgment Motion should be granted.

Ms. Kunelius' P&S with Cohousing was a unique P&S.  Typically, if a purchaser defaults, the seller can simply market his or hers property again and sell it to another for a substantially similar price.  However, in this case, only 8.57 acres of 50.67 acres of the Plaintiff's Property were subject to the P&S with Cohousing.  Ms. Kunelius was offered $1,116,900 for that 8.57 acres of land, which was to be developed as a  c. 40B project. The remaining 42.1 acres of the Property were to be donated to Stow by Ms. Kunelius.

TPL and MacDonnell were aware that the purchase price reflected the 40B component and was for 8.57 acres only.  TPL's argument with regard to the Fair Market Value is disingenuous.  TPL, in furtherance of its bad faith, has waffled on what the Property was worth.  In TPL's own Fact Sheet dated January 30, 2003, drafted only 13 days before it accepted the Assignment, listed the Property at Fair Market Value of

$1,116,900.  (See Exh. M to Memorandum, TPL-KUN01136).  However, TPL engaged the services of a real estate broker, one week before TPL exercised the ROFR and determined that the Property was worth $800,000, i.e. less than the purchase price.  (See Exh. 2, TPL-KUN02497; see also Exh. 3, TPL-KUN02506).  Despite TPL's exercise of the ROFR, TPL nevertheless in violation of the SJC's holding in Town of Franklin v. Wyllie, 443 Mass. 187, __ N.E.2d __ (2005), asserted that the price for the Property was too far from Fair Market Value.  On July 6, 2003, MacDonnell wrote to Kunelius' Attorney and stated:

> "Our discussion also addressed TPL's view that the **original contract price was well above the traditional development value** – it being based on a speculative chapter 40B project – and that the traditional development value of the property would be in the range of **eight or nine hundred thousand dollars.**"

(See Exh. 11 to the Complaint).   The above statement demonstrates the obvious attempt to change the purchase price, in violation of the SJC's decision in Franklin.  In Franklin, the Court rejected the Town of Franklin's argument that a *bona fide* purchase price that was contingent on a special permit was somehow not valid because the price was contingent on obtaining certain permits.  The SJC stated that the town could not reject the purchase price because of the contingency.

The Defendants assert that Ms. Kunelius should have mitigated her damages of $1,116,900 by selling the Property for $800,000 or less.  However, without a c. 40B development the 8.57 acres **could not be developed**.  Cohousing's Offer was the only offer and only way to sell the Property for $1,116,900 in order to satisfy Ms. Kunelius' financial security.

TPL and MacDonnell further alledge that the Property is of greater value than the purchase price of $1,116,900.00, given the value of the water.  However, the Plaintiff has

not received any offer that would include the value of the water beneath the surface.  In addition, given the zoning restrictions, it is very unlikely that the water could be obtained without the cooperation of Stow, which is not remotely likely.

TPL and MacDonnell state that Ms. Kunelius failed to mitigate her damages because allegedly she received other Offers to Purchase her Property and that she refused them.  The opposite is true.  Ms. Kunelius has never received anything that could be even remotely considered as an offer to purchase her Property. Attached hereto as Exhibit 4 is a copy of the so-called offer to which MacDonnell, TPL and Stow refer.  Exhibit 4 needs to be reviewed carefully.  In this so-called offer, Peter Christianson and his wife Serena Furman allegedly offered $900,000 to Ms. Kunelius.  None of the $900,000 was their money.  $300,000 of the offer comes from Ms. Kunelius selling her own property, i.e. 142 Red Acre Road.  This is a bizarre offer indeed in which the alleged offeror includes in his offer, the seller's own funds.  The $300,000 for sale on market is a bizarre component of the offer under which Ms. Kunelius was to sell her property to unknown purchaser and add that amount to the offer.  It is also worth noting that the remaining $600,000 of this alleged offer is derived from funds which are not Peter Christianson's to offer.  Rather, there was $300,000 of Community Preservation Fund for which Mr. Christianson had no authority to act.  Finally, the last $300,000 of the alleged offer comes from EOS philanthropy.  EOS stands for Eye of Storm, a potential tenant of Ms. Kunelius' Property under this proposed offer.  Apparently, Mr. Christianson was hoping that donor will contribute to the Eye of the Storm and apparently Eye of the Storm would contribute that money to Ms. Kunelius.  Christianson had no authority for any representation concerning this offer.

If this was not enough, Exhibit 4 demonstrates that $300,000.00 of "philanthropy" would require financing over 3 or 4 years.   With $75,000.00 of that financing coming from alleged fundraising "goals" over 4 years. Even more incredible is that fact that in order to sell Ms. Kunelius' Property at 142 Red Acre Road, she would have to get zoning changes which TPL had already determined were impossible to achieve.  The Plaintiff directs the attention of this Court to the last two lines of Exhibit 4:

> "zoning issues would be your responsibility although we would
> assist in any way possible. We have reason to believe that you
> would be treated favorably."

(See Exh. 4, Furman0022-23).  So lacking is the offer that Serena Furman, the wife of Peter Christianson and co-offeror, testified that (1) she did not know who the offeror actually was; (2) that her husband did not have the authority to make the offer; (3) even her guarantee of $100,000 of the offer was only by a promise to pay with a note; (4) that no component of the offer had any actual validity whatsoever.  Although lengthy, the Plaintiff respectfully asks the Court to review the Furman deposition testimony with regard to this so-called offer.  (See Exh. 5, Excerpt of Furman Deposition, Vol. II, pg. 96, ln. 22 – pg. 101, ln. 21).  So absurd is TPL's assertion that there was legitimate offer that the Plaintiff respectfully suggest that the advancement of this argument as a component of the failure to mitigate damages, demonstrates the level of bad faith in this matter.  The Plaintiff respectfully suggests that the Defendants reveal their hypocrisy by attempting to suggest that Exhibit 4 is an offer.  It is not.  Any first year lawyer would know that it is not a valid offer and it is most certainly not deserving a response much less than acceptance.  Ms. Kunelius' broker testified that he did not considered Mr. Christianson's letter as an actual offer, but rather as a proposal.  (See Exh. F to the Memorandum, Boothroyd deposition, pg. 152, ln. 15 – ln. 20).

The fact remains that Ms. Kunelius' broker has received numerous inquiries concerning the availability of the Property and the asking price. However, once the interested party learned of the asking price of $1,116,900, he or she never contacted Ms. Kunelius' broker again.

Ms. Kunelius monetary damages are, the lost of the $1,116,900 minus the earnest money plus the loss of interest accrued from her loan to Cohousing, the payment of additional real estate taxes to Stow over the duration of the litigation, the payment for Forestry Plan for the Property, the legal fees incurred in negotiating the P&S with Cohousing (which went in vain due to TPL's involvement), the legal fees involved in this litigation and treble damages, and the loss of tax benefits anticipated by the P&S.

### B. TPL Did Not Spent $19,000 in the earnest money payments as They Attempt to Imply in their Memorandum

TPL and MacDonnell boasted in their Memorandum to the Court that they were "forced to forfeit … $19,000 in deposits to Plaintiff". (See TPL's Memorandum, pg. 29). However, TPL and MacDonnell neglected to mention to this Court that the so-called deposit of $11,500 allegedly made by TPL under the alleged terms of the P&S never came from TPL itself. Rather, one hundred percent of that $11,500 came from FORA's members who donated the $11,500 to the Stow Conservation Trust for the purchase of the Property, rather then from TPL's account. (See Exh. 6, Furman0068-72). This is yet another example of TPL's and MacDonnell' misrepresentations. In addition, Serena Furman, when asked about the financing of the $11,500 testified as follows.

```
Q:    TPL has stated to the Court that, after it paid thousands
      of dollars under the terms of the contract,
      it could not raise funds.  My question is:  do you
      have an understanding that the money paid by TPL to Mrs.
      Kunelius was the funds that were raised by TPL?
           MS. MURPHY:  Objection.
 Q:   I mean, by Friends of Red Acre?
```

```
A:    Well, you'd have to – I think Stow Conservation Trust would
      be a better person to answer that.  I believe our receipts
      indicate that it is a specifically targeted donation for a
      specific purpose.  So, that's where – okay.  So, here's the
      deposit.  Here's the cashier's check, Community National
      Bank, Marilyn Kunelius, delivered by hand to Peter
      Kachajian.  So, just, if I could back up before that, I
      should be able to find – is that right?  Seems this is too
      early in the correspondence. February 13th, is that about
      when she received that money?
Q:    I don't know.  That sounds perhaps correct.
A:    If we can go back a little bit, I might find the receipt.
```

(See Exh. Q to SJM, Furman deposition, Vol. II, pg. 116, ln. 18 -117, ln. 16).  The

Plaintiff is not asserting that origin of the funds somehow, in and of itself, negates the

Defendants' argument.  Rather, the Plaintiff asserts that virtually nothing that had been

said by TPL has any reliability whatsoever.  Each word is nuanced and parsed, in order to

spin the implications of its actions.

## VII.  STOW

The Plaintiff respectfully asserts that Stow has incorporated by reference the

Proposed Statement of Undisputed Facts by TPL and MacDonnell and therefore

Plaintiff's Motion to Strike Statement of Undisputed Facts by TPL and MacDonnell

applies also to Stow Proposed Statements.

### I.    Specific Performance

Stow makes the unsupported assertion that Stow is not liable to the Plaintiff by

"virtue of its assignment of the right of first refusal as permitted under c. 61."  The

Plaintiff asserts that Stow remains liable given the following undisputed facts.

1.    Stow was advised by its Town Counsel prior to the Assignment that the

      Assignment would not relieve Stow from liability, nevertheless Stow moved

      forward with the Assignment.  (See Exh. ZZZ to Memorandum, KUN428-429).

2.   While the terms of the Assignment appear to be unconditional and therefore, it appears to be a complete assignment, the undisputed facts are that TPL and Stow negotiated an agreement by which TPL would not accept the Assignment unconditionally because TPL required Stow to pay $400,000.00 to TPL after the Assignment and TPL would not purchase the Property after the Assignment without the $400,000.

3.   Stow did not make unconditional assignment because as a component of the assignment it required TPL to give 42.1 acres to Stow in exchange for $400,000 from Stow, when and if TPL purchased the full 50 acres from Ms. Kunelius. Stow made this requirement even though the P&S was only for 8.57 acres.  As a result, Stow never intended to have TPL "unconditionally" purchase the Property.  Stow intended to receive benefits from the Assignment and took steps with TPL to achieve those benefits.  The assertion by Stow and TPL that the Assignment of the ROFR was a "standard" Assignment is disingenuous and misleading.  (See Exh. B to SJM).

4.   "That the Assignment divested the town of the option", Stow asserts on page 6. More importantly evidence of Stow's ongoing joint efforts in partnership demonstrated that it was not a complete assignment.  This can be found in Stow's letter intended for the IRS in which Stow on or about April 22, 2003, 5 weeks after the Assignment, asserted to the Internal Revenue Service (the "IRS"), that Stow was attempting to purchase the Property from the Plaintiff. Certainly, Stow is estopped from now claiming that it was attempting to mislead the IRS in conspiracy with TPL and that attempt somehow should exonerate

Stow from its obligations to the Plaintiff.    That letter must be considered in

light of Stow's Statement on page 6 which states as follows:

> "By virtue of that assignment, it was TPL that had control
> over the option and it was TPL who exercised the right – not
> the Town.  It was TPL not the Town, that had contract with the
> plaintiff. The Town was not a party to the same. It was TPL,
> not The town, that defaulted on the P&S …".

(See Stow's Memorandum, pg. 6, last paragraph).  Given the above, the letter to

the IRS claiming that it was Stow which was purchasing the Property is clear

evidence of the level of misrepresentation.

**II.     42 U.S.C. § 1983**

The Plaintiff relies on her argument in her Opposition regarding 42 U.S.C. 1983

and the violations of the 14th Amendment and the Contract Clause of the United States

Constitution.  In addition, the Plaintiff respectfully states that the documents obtained

through discovery have provided extraordinary evidence of a sophisticated attempt, under

the color of state law, to interfere with the Plaintiff's P&S.  To suggest that Stow' actions

when combined with TPL ostensibly using state law as justification somehow fails to

meet the constitutional standard is absurd.

Private entities and individuals whose involvement with state and local

government makes them state actors under the Fourteenth Amendment act under color of

state law and, therefore, are subject to §1983 liability.  In Lugar v. Edmondson Oil Co.,

457 U.S. 922 (1982), the Supreme Court discussed the relationship between the state

action requirement of the Fourteenth Amendment and the color of law requirement of

§1983.  Courts often proceed directly to the state action question without any independent

color of law analysis.  (See e.g., Ponce v. Basketball Fed'n, 760 F.2d 375, 377 (1st Cir.

1985.  But see Polk County v. Dodson 454 U.S. 312 (1981)(analyzing the issue as color

of law rather than state action)). In the instant case, the joint effort between the municipality and TPL including the requirement in the partnership agreement that TPL receive $400,000 from Stow is more than enough to demonstrate state action. If state action is found, that finding will automatically satisfy the color of law requirement. In the instant case, one hundred percent of TPL's authority arose under state law, namely M.G.L. c. 61. In fact, MacDonnell and TPL admit that c. 61 that "[a]s a matter of law, TPL was permitted to "interfere" with the Agreement". (See TPL's Memorandum, pg. 22).

The implementation of that authority resulted from the joint action of Stow in assigning the ROFR to TPL and TPL exercising that right in anticipation of receiving further benefits from Stow. The connection between Stow and TPL with regard to state action meets all of the standards establish by the Supreme Court. The Supreme Court in Burton v. Wilmington Parking Authority, 365 U.S. 715 (1961) stated that only by sifting facts and weighing circumstance can the non-obvious involvement of the State in private conduct be attributed its true significance. In the instant case, the involvement between the municipality and TPL is very obvious. Further, that involvement meets Symbiotic Relationship Test because the municipality has so far insinuated itself into a position of interdependence with TPL with regard to its on-going relationship with TPL that it must be recognized as a joint participant in the challenged activity. Id. at 725. Certainly, there is substantial showing that the municipality intended to profit from its interference with contract violation. Its goal was to defeat the P&S so that no c. 40B development would occur and that is the reason that it entered into the partnership obligation to pay $400,000 to TPL in order to get what it would have received for nothing under the P&S. As a

result, the Plaintiff has demonstrated that not only state action but color of law as sufficient for Summary Judgment to be grated in favor of the Plaintiff.

Respectfully submitted,

Marilyn Kunelius,

By her Attorney,

Dated: November 15, 2007    By:    */s/ Michael C. McLaughlin*
Michael C. McLaughlin BBO# 337350
Law Offices of Michael C. McLaughlin
One Beacon Street, 33rd Floor
Boston, MA 02108
617-227-2275
michaelcmclaughlin@speakeasy.net

## CERTIFICATION UNDER LOCAL RULES 7.1

I, Michael C. McLaughlin, certify that on November 15, 2007, I conferred with opposing counsel and have attempted in good faith to resolve and narrow the issue.

*/s/ Michael C. McLaughlin*
Michael C. McLaughlin

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on November 15, 2007.

*/s/ Michael C. McLaughlin*
Michael C. McLaughlin

# EXHIBIT 1

UNITED STATES DISTRICT COURT
(DISTRICT OF MASSACHUSETTS)

CIVIL ACTION NO. 05-11697-GAO

| | |
|---|---|
| MARILYN KUNELIUS, **PLAINTIFF** | ) ) ) |
| V. | ) ) |
| TOWN OF STOW separately, A PARTNERSHIP OF UNKNOWN NAME BETWEEN TOWN OF STOW and THE TRUST FOR PUBLIC LAND, THE TRUST FOR PUBLIC LAND separately and CRAIG A. MACDONNELL, in his individual capacity, **DEFENDANTS.** | ) ) ) ) ) ) ) ) ) ) |

## AFFIDAVIT OF MARILYN KUNELIUS

I, Marilyn Kunelius, under oath do state:

1. I am the owner of a property located at 142 and 144 Red Acre Road, Stow, Massachusetts that consists of uplands, wooden wetlands, a scenic pond, a vernal pool, two houses, a barn, a paddock and a pasture, of which 42 acres are designated as forest land under M.G.L. c. 61 (the "Property").

2. I ran a horse farm on a portion of the Property. I have and continue to rent horse stalls to horse owners. The rentals of my stalls include the regular maintenance of the stalls and two indoor and outdoor turnouts, the feeding of the horses, and the purchase of the food for the horses.

3. I have also engaged professionals to snowplow the Property in order to maintain access for my customers.

4-2001 04:28    2076972033                                                                        PAGE1
1/15/07  10:40 FAX                          JEFFERS GLASSMAN                                      003

4. In addition to my horse farm business, I also harvested timber and fire wood on my Property until 2004.

5. In 2006, as a result of this litigation, I engaged the services of Geosphere Environmental Management, Inc. in order to ascertain the value of the water beneath my Property. However, I have never received any valid offer for the Property that would be based upon the water value beneath the Property. I do not believe the water can be retrieved from my Property without the cooperation of the Town of Stow.

Signed under the pains and penalties of perjury this 15th day of November, 2007.

_Marilyn Kurfelius_
Marilyn Kurfelius

2

# EXHIBIT 2

| | |
|---|---|
| From: | <SFandPC@aol.com> |
| To: | <KateFisher@aol.com> |
| Date: | Tue, Feb 4, 2003 12:27 PM |
| Subject: | Kunelius |

Hi Kate:

We really appreciate your willingness to help us out in our tight timeframe. Thank you for agreeing to write up a short synopsis of your thoughts behind the estimated property values for 142 and 144 Red Acre Road. This synopsis is for the internal use only of The Trust For Public Land as part of their decision process in taking on the purchase and sale.

You and I reviewed the values as follows:
142: $270K - $300K (or $320K with some cleaning/new floors, etc.)
144: $500K for 5 acres with stable and caretakers house

The Trust for Public Land would, for timing purposes, prefer to recieve this information via email or fax at your earliest convenience.

The Information they seek is as follows:

Kate Fisher
Realtor (License or broker type)
Carlson Real Estate
(Street Address)
Concord, MA
978/369-3999
Stow Office: 978/897-3633

One paragraph on each property explaining your thoughts on how you arrived at the values.

The information should be sent via fax/email to:

Craig MacDonnell
State Director
The Trust for Public Land
33 Union St., 4th Floor
Boston, MA   02108

Craig.MacDonnell@tpl.org
617/367-6200
FAX617/367-1616

Kate, you have been a tremendous help to us. Thank you for coming to our aid and working within our tight schedule.

Best Regards,

Serena

Here is where the information is to be sent:

TPL-KUN 02497

Craig MacDonnell
State Director
The Trust for Public Land


**CC:**              <craig.macdonnell@tpl.org>

# EXHIBIT 3

| | |
|---|---|
| **From:** | <KateFisher@aol.com> |
| **To:** | <craig.macdonnell@tpl.org> |
| **Date:** | Tue, Feb 4, 2003 1:15 PM |
| **Subject:** | 142 & 144 Red Acre Road |

Dear Craig:

The attached is a letter as requested by Serene Furman.

Please contact me if you need follow up or more detailed information.

I am a Realtor with the Greater Boston Real Estate Board. Carlson GMAC
Concord is the Broker. I have been in real estate sales for 16 years.

You can take a look at my web site at on Realtor. com if you like.

<A HREF="http://www.realtor.com/mlspin/KatieFisher/">http://www.realtor.com/mlspin/KatieFisher</A>

Take care,

Katie Fisher

978 369-3999

CC:          <SFandPC@aol.com>

TPL-KUN 02505

Tuesday, February 04, 2003

Craig MacDonnell
State Director
The Trust for Public Land
33 Union St., 4th Floor
Boston, MA 02108


Re: 142 & 144 Red Acre Road, Stow, MA 01775

Dear Craig,

As per request, I have outlined estimated values on these two properties. This is a drive by evaluation based on information I have gathered from Serena Furman, town of Stow assessment information and a visit years ago to the barn located on the property. My numbers are based on square foot values of recent sales in town and history of properties with an access to conservation land and trails.

Assumptions:

1. 142 & 144 can be subdivided and sold as separate parcels.
2. 144 will maintain the upland developable land with the stable, indoor riding ring, outdoor paddocks and the caretaker's house. The property will have use and access to the riding trails.
3. The caretaker's house can be expanded in the future up to 40%.
4. I understand both residents need a fair amount of work and are in moderate condition, but livable condition.

142 Red Acre: $270K - $300K (or $320K with some cleaning/new floors, etc.)
144 Red Acre: $500K for 5 acres with stable and caretakers house

Please feel free to contact me for additional support data of sales of near by properties.

Sincerely,



Katie Fisher

Carlson GMAC Real Estate
113 Thoreau Street
Concord, MA 01742
978 369-3999
978 841-7679 Direct phone & fax
www.Katieshomenews.com

TPL-KUN 02506

cc: Serena Furman

# EXHIBIT 4

May 26, 2004

Marilyn Kunelius
142 Red Acre Road
Stow, MA 01775

Dear Marilyn:

It was very nice to finally have a real conversation with you after all these years. Serena and I feel so badly for the way things have gone, and we wished that we could have spoken with you sooner. However, we did not and do not want to interfere with any potential negotiation you may have with Trust for Public Land (TPL).

Having said that, we want to reiterate our offer to work with you to achieve a sale of your farm. We feel that involvement of Eye of the Storm (EOS) and the Community preservation Committee (CPC) are key elements that will maximize the value of any offer. Eye of the Storm's purchase of the horse farm part of your property would represent an existing use, and therefore would lessen regulatory hurdles. It is also a tribute to your commitment to years of running a horse farm on that property that we and others wish to preserve.

Let me reiterate what we offered:

$900K Revenue
- $300K CPC
- $300K sale of 142 on the market
- $300 EOS philanthropy

Our $900K plan is "a bird in the hand". Moving forward with us would not preclude you from pursuing a legal action against TPL.

- This "bird in the hand" offer is all local.
- When the CPC money goes away, the likelihood of a package deal disappears.
- CPC funds voted for this project may expire soon.
- Currently, CPC requires no further parliamentary procedure.
- If 142 Red Acre sold for more than $300K, you would keep the difference.
- The $300K of philanthropy would require financing, because the pledges and solicitation process stretches over 3 or 4 years.
- We have $225K in pledges, subject to confirmation of Stow Conservation Trust and Red Acre Foundation each at the $100K level, plus one other $25K pledge.
- We have proposals, strategies and qualified prospects to achieve the remaining $75K fund raising goal within 4 years.
- Serena and I would guarantee the remainder of the fund raising ($100K) with a note or contract.
- Zoning issues would be your responsibility, although we would assist in any way possible. We have reason to believe that you would be treated favorably.

FURMAN0022

Thank you for consideration of this offer, and please call us anytime with your thoughts or concerns.

Very truly yours,


Peter Christianson

FURMAN0023

# EXHIBIT 5

DEPOSITION OF SERENA FURMAN

**Page 96**

1    email to Craig.
2 Q  All right. Let me just clarify it this way. A few
3    inches down in the document there's a date, January 9,
4    2003.
5 A  Uh-huh. So, I copied and pasted a previous email to
6    Craig.
7 Q  So, the part of the document that starts with January
8    9, 2003, is an email of that date to Craig?
9 A  Yeah.
10 Q  And then above that is, by some means or other,
11    forwarding that?
12 A  Yeah, and Chris Lapointe had come on as an assistant
13    and wanted to accumulate all the documents.
14 Q  Were you encouraged by that event that you're
15    reporting here?
16 A  The town meeting, absolutely.
17 Q  Not at the town meeting.
18 A  I'm sorry. At town hall, where I spent -- oh, yeah.
19        MR. CONROY: I have nothing else.
20        REDIRECT EXAMINATION
21    By MR. McLAUGHLIN:
22 Q  I have a very quick question on Exhibit 33 if you
23    would just take a look at it.
24 A  Here it is.

- 96 -

**Page 97**

1 Q  Looking at Exhibit 33, halfway down, it says: Our
2    plan is a bird in the hand. Who's our?
3 A  I think it's just my husband and myself making an
4    offer.
5 Q  And when you were making the offer, were you using the
6    combined resources of Furman and Christianson?
7 A  Well, the amount that we were going to have to try to
8    cover, which we probably could have even covered with
9    a home equity loan, was $100,000.
10 Q  So, the $900,000 was not your offer, personally?
11 A  No. Well, it was with an understanding that the CPC
12    money was available.
13 Q  So, this was not an offer by Ms. Furman and
14    Mr. Christianson for your purchase of the
15    property in your name. Is that fair to say?
16 A  Well, technically, I don't know how that would have
17    shaken out.
18 Q  Because my next question was: who was the buyer?
19 A  Right.
20 Q  And your response to who was the buyer is that you do
21    not know. Is that fair to say?
22 A  My guess, and it is a guess --
23 Q  I don't want guesses. My question is: did you know
24    at the time that you wrote the letter who the buyer

- 97 -

**Page 98**

1    was going to be?
2 A  I'll take a pass on that, because I can't --
3 Q  So, the answer is, no, you don't know. Is that fair
4    to say?
5 A  Right.
6 Q  And did you have a CPC grant of $300,000 dedicated to
7    Serena Furman and Peter Christianson?
8 A  No.
9 Q  And the $300,000 which is referred to in the second
10    bullet, that was not money that you were paying to
11    Mrs. Kunelius and then bullet No. 5 says, if I am
12    offer in quotes here, the $300,000 which was part of,
13    quote, our plan was not money that was being given to
14    Mrs. Kunelius by either yourself or your husband, is
15    that correct?
16 A  The deal was that Marilyn was going to have to handle
17    the zoning issues, and then bullet No. 5, if 142
18    Red Acre sold for more than 300,000, you'd keep the
19    difference.
20 Q  I'm looking at the second bullet under $900,000 of
21    revenue.
22 A  Uh-huh.
23 Q  It says 300,000 from the sale of 142 on the market.
24 A  142 on the market by Marilyn.

- 98 -

**Page 99**

1 Q  By Marilyn.
2 A  Right.
3 Q  In other words, that was her money?
4 A  Right.
5 Q  And then on the $300,000 of EOS philanthropy --
6 A  We would step in and basically buy the farm portion,
7    and then the town and CPC would cover the open space
8    going to the town.
9 Q  Were you aware that EOS had informed TPL that it was
10    not going forward?
11 A  Yeah, I wrote that letter.
12 Q  So, that letter went from EOS to TPL?
13 A  That's right.
14 Q  As to the $300,000 of philanthropy, looking at the
15    sixth bullet down, that component of the so-called
16    offer required financing, is that correct?
17 A  Uh-huh.
18 Q  So, the sixth bullet down says the 300,000 of
19    philanthropy would require financing because the
20    pledges and solicitation process would stretch over
21    three to four years.
22 A  Uh-huh.
23 Q  See that?
24 A  Uh-huh.

- 99 -

**Page 100**

1 Q  And so that component of the $300,000 was not a firm
2    number that either you or your husband was saying was
3    guaranteed but, rather, that you were hoping to raise
4    that money over three or four years.
5 A  No, we had $225,000 in pledges, but the pledges would
6    not be paid out in time for closing. So, what we
7    would have to do is finance the interest between the
8    time that the pledges would come in and her, you know,
9    wanting to sign a purchase and sale, plus we'd have to
10    finance $75,000 of additional fund-raising we would
11    have to do over four years.
12 Q  And this was written not by the Friends of Red Acre.
13 A  No.
14 Q  It was written by Peter Christianson.
15 A  Right.
16 Q  And is there anything in this offer, this so-called
17    offer, that demonstrates that Peter Christianson had
18    the authority to state that those $225,000 in pledges
19    which had been raised in conjunction with a joint
20    effort with TPL were now available to Peter
21    Christianson, personally?
22 A  Well, the way it probably would have worked is that
23    the pledges made to TPL would have been retracted and
24    then transferred over.

- 100 -

**Page 101**

1 Q  So, at the time, Peter Christianson did not have those
2    pledges to him, personally?
3 A  I think he had a gentleman's call with these
4    organizations.
5 Q  It then says that Serena and I would guarantee the
6    remainder of the fund-raising, $100,000, with a note
7    or a contract.
8 A  Yeah.
9 Q  So, the shortfall was not going to be paid to
10    Mrs. Kunelius in cash. It was some sort of note
11    that was going to be given to her until such time
12    as the fund-raising had been completed, and that
13    $100,000 shortfall would be guaranteed by you
14    over some period of time, is that correct?
15 A  I don't know. I would have thought it would have been
16    more like taking out a loan and paying her outright.
17 Q  What zoning responsibilities would be Mrs. Kunelius'
18    responsibility?
19 A  Some of the same issues that The Trust for Public Land
20    never resolved about being able to divide the houses
21    into two parcels.
22        MR. McLAUGHLIN: No further questions.
23    Thank you very much. I appreciate your coming
24    in.

- 101 -

# EXHIBIT 6

# Peter R. Christianson

3/3/03

Dean Scofield
Stow Conservation Trust
137 Tuttle Lane
Stow, MA 01775

Dear Dean:

Enclosed please find receipts that we generated at the time of the payment of the first deposit to Marilyn Kunelius. As you can see, there were four donors who gave a total of $11,500. As you know, these funds were donated to SCT, which then generated a check that was paid to Marilyn. Rob Bowers was kind enough to sign the receipts, and we asked him to do this simply because they were not an SCT letterhead.

The wishes of the donors are also described on the receipts, and these wishes are in accordance with conversations between SCT and Friends of Red Acre. Please feel free to contact me if there are any questions, and thank you again for the multi-faceted support of SCT on this project.

Sincerely,


Peter R. Christianson

encl.

FURMAN0068

**130 Red Acre Road**
**Stow, MA 01775**

**(978) 897-5645**
**peterchri@aol.com**

February 12, 2003

Stow Conservation Trust
PO Box 397
Stow, MA 01775

Receipt For Donation
This donation was made without return of any goods or services.

| | |
|---|---|
| donor | David Cobb & Karen Sommerlad |
| amount | $500 |
| paid by | personal check |

THIS DONATION WILL BE USED TO DEFRAY THE COST TO PURCHASE THE KUNELIUS FARM.

These funds are not to defray but are in addition to the cost to pay the $100,000 pledge from SCT to TPL for this project.

On behalf of the Stow Conservation Trust, thank you for your donation.

Rob Bowers, SCT Trustee

FURMAN0069

February 12, 2003

Stow Conservation Trust
PO Box 397
Stow, MA 01775

Receipt For Donation
This donation was made without return of any goods or services.

donor      Serena Furman and Peter Christianson
amount    $5,000
paid by    personal check

THIS DONATION WILL BE USED TO DEFRAY THE COST TO PURCHASE
THE KUNELIUS FARM. THE EYE OF THE STORM PORTION OF THE
BUDGET WILL BE EARMARKED.

These funds are not to defray but are in addition to the cost to pay the
$100,000 pledge from SCT to TPL for this project.

On behalf of the Stow Conservation Trust, thank you for your
donation.

Rob Bowers, SCT Trustee

FURMAN0070

February 12, 2003

Stow Conservation Trust
PO Box 397
Stow, MA 01775

Receipt For Donation
This donation was made without return of any goods or services.

| donor(s) | Drew Simmons |
| amount | $1,000 |
| paid by | personal check |

THIS DONATION WILL BE USED TO DEFRAY THE COST TO PURCHASE THE KUNELIUS FARM.  THE EYE OF THE STORM PORTION OF THE BUDGET WILL BE EARMARKED.

These funds are not to defray but are in addition to the cost to pay the $100,000 pledge from SCT to TPL for this project.

On behalf of the Stow Conservation Trust, thank you for your donation.

Rob Bowers, SCT Trustee

FURMAN0071

February 12, 2003

Stow Conservation Trust
PO Box 397
Stow, MA 01775

Receipt For Donation
This donation was made without return of any goods or services.

donor     Michael Labosky and Erica Nilsson
amount    $5,000
paid by   personal check

THIS DONATION WILL BE USED TO DEFRAY THE COST TO PURCHASE
THE KUNELIUS FARM.

These funds are not to defray but are in addition to the cost to pay the
$100,000 pledge from SCT to TPL for this project.

On behalf of the Stow Conservation Trust, thank you for your
donation.

Rob Bowers, SCT Trustee